FILED BY _____ D.C.

SEP 2 4 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. **19-80181**-CR-RUIZ/REINHART

18 U.S.C. § 1349
18 U.S.C. § 1347
18 U.S.C. § 371
42 U.S.C. § 1320a-7b(b)(2)(A)
18 U.S.C. § 2
18 U.S.C. § 1956(h)
18 U.S.C. § 982(a)(1), (a)(7)

UNITED STATES OF AMERICA

vs.

MINAL PATEL,

     Defendant.

_____/

## INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

## MEDICARE PROGRAM

1.     The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

2.     Medicare was a "health care benefit program," as defined by Title 18, United States

Code, Section 24(b) and a "Federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3. Medicare programs covering different types of benefits were separated into different program "parts." "Part A" of the Medicare program covered health services provided by hospitals, skilled nursing facilities, hospices and home health agencies. "Part B" of the Medicare Program was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers. The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," is described in further detail below.

4. Physicians, clinics and other health care providers, including laboratories, that provided services to Medicare beneficiaries were able to apply for and obtain a "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

5. A Medicare claim was required to contain certain important information, including: (a) the Medicare beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form could be submitted in hard copy or electronically.

## PART B COVERAGE AND REGULATIONS

6.     CMS acted through fiscal agents called Medicare administrative contractors ("MACs"), which were statutory agents for CMS for Medicare Part B.  The MACs were private entities that reviewed claims and made payments to providers for services rendered to Medicare beneficiaries.  The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

7.     Novitas Solutions Inc. ("Novitas") was the MAC for the consolidated Medicare jurisdictions that covered Louisiana, Mississippi, Oklahoma, Texas, and Pennsylvania.  Palmetto GBA ("Palmetto") was the MAC for the consolidated Medicare jurisdictions that included Georgia, Alabama, Tennessee, South Carolina, North Carolina, Virginia, and West Virginia.

8.     To receive Medicare reimbursement, providers had to make appropriate application to the MAC and executed a written provider agreement.  The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider.  CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

9.     CMS Form 855B contained additional certifications that the provider "will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

10.     Payments under Medicare Part B were often made directly to the health care

3

provider rather than to the patient or beneficiary. For this to occur, the beneficiary would assign the right of payment to the health care provider. Once such an assignment took place, the health care provider would assume the responsibility for submitting claims to, and receiving payments from, Medicare.

## THE MEDICARE ADVANTAGE PROGRAM

11.    The Medicare Advantage Program, formerly known as "Part C" or "Medicare+Choice," provided Medicare beneficiaries with the option to receive their Medicare benefits through a wide variety of private managed care plans, including health maintenance organizations ("HMOs"), provider sponsored organizations ("PSOs"), preferred provider organizations ("PPOs"), and private fee-for-service plans ("PFFS"), rather than through the original Medicare program (Parts A and B).

12.    Private health insurance companies offering Medicare Advantage plans were required to provide Medicare beneficiaries with the same services and supplies offered under Parts A and B of Medicare. To be eligible to enroll in a Medicare Advantage plan, a person had to have been entitled to benefits under Part A and Part B of the Medicare Program.

13.    A number of companies, including UnitedHealth Group, Inc. ("UnitedHealth"), Humana Inc. ("Humana"), WellCare Health Plans, Inc. ("WellCare") and CVS Health Corporation ("CVS Health"), along with their related subsidiaries and affiliates, contracted with CMS to provide managed care to Medicare Advantage beneficiaries through various plans.

14.    UnitedHealth, Humana, WellCare and CVS Health were "health care benefit programs," as defined by Title 18, United States Code, Section 24(b).

15.    These companies, through their respective Medicare Advantage programs, often made payments directly to physicians, medical clinics, or other health care providers, rather than

to the Medicare Advantage beneficiary that received the health care benefits, items, and services. This occurred when the provider accepted assignment of the right to payment from the beneficiary.

16.     To obtain payment for services or treatment provided to a beneficiary enrolled in a Medicare Advantage plan, physicians, medical clinics, and other health care providers had to submit itemized claim forms to the beneficiary's Medicare Advantage plan. The claim forms were typically submitted electronically via the internet. The claim form required certain important information, including the information described above in paragraph 5 of this Indictment.

17.     When a provider submitted a claim form to a Medicare Advantage program, the provider party certified that the contents of the form were true, correct, complete, and that the form was prepared in compliance with the laws and regulations governing the Medicare program. The submitting party also certified that the services being billed were medically necessary and were in fact provided as billed.

18.     The private health insurance companies offering Medicare Advantage plans were paid a fixed rate per beneficiary per month by the Medicare program, regardless of the actual number or type of services the beneficiary received. These payments by Medicare to the insurance companies were known as "capitation" payments. Thus, every month, CMS paid the health insurance companies a pre-determined amount for each beneficiary who was enrolled in a Medicare Advantage plan, regardless of whether or not the beneficiary utilized the plan's services that month. CMS determined the per-patient capitation amount using actuarial tables, based on a variety of factors, including the beneficiary's age, sex, severity of illness, and county of residence. CMS adjusted the capitation rates annually, taking into account each patient's previous illness diagnoses and treatments. Beneficiaries with more illnesses or more serious conditions would

rate a higher capitation payment than healthier beneficiaries.

## CANCER GENOMIC TESTS

19.     Cancer genomic ("CGx") testing used DNA sequencing to detect mutations in genes that could indicate a higher risk of developing certain types of cancers in the future. CGx testing was not a method of diagnosing whether an individual presently had cancer.

20.     Medicare did not cover diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Title 42, United States Code, Section 1395y(a)(1)(A).  Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury."  Title 42, Code of Federal Regulations, Section 411.15(a)(1).  Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests."  *Id.*

21.     If diagnostic testing were necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing.  Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

22.     Because CGx testing did not diagnose cancer, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that cancer. Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer.

## TELEMEDICINE

23.     Telemedicine provided a means of connecting patients to doctors by using telecommunications technology, such as the internet or telephone, to interact with a patient.

24.     Telemedicine companies provided telemedicine services to individuals by hiring doctors and other health care providers.  Telemedicine companies typically paid doctors a fee to conduct consultations with patients.   In order to generate revenue, telemedicine companies typically either billed insurance or received payment from patients who utilized the services of the telemedicine company.

25.     Medicare Part B covered expenses for specified telehealth services if certain requirements were met. These requirements included that (a) the beneficiary was located in a rural or health professional shortage area; (b) services were delivered via an interactive audio and video telecommunications system; and (c) the beneficiary was a practitioner's office or a specified medical facility – not at a beneficiary's home – during the telehealth consultation with a remote practitioner.

## THE DEFENDANT AND RELATED ENTITIES

26.     LabSolutions, LLC ("LabSolutions"), a corporation organized under the laws of Georgia, was a laboratory that purportedly provided CGx testing to Medicare beneficiaries.

27.     Defendant **MINAL PATEL**, a resident of Georgia, was the owner of LabSolutions.

28.     Company A was a company incorporated under the laws of Florida, with its principal place of business in Palm Beach, Florida.

29.     Individual A, a resident of Bay County, Florida, was one of two managers and members of Company A.

30.     Company B was a company incorporated under the laws of Florida, with its principal place of business in Palm Beach County, Florida.

31.     Individual B, a resident of Bay County, Florida, was the sole manager and member of Company B.

32.     Company C was a company incorporated under the laws of Florida, with its principal place of business in Palm Beach County, Florida.

33.     Individual C, a resident of Palm Beach County, was one of two managers and members of Company C.

## COUNT 1
### Conspiracy to Commit Health Care Fraud and Wire Fraud
### (18 U.S.C. § 1349)

1.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.     From in or around July 2016, through in or around August 2019, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**MINAL PATEL,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with Individual A, Individual B, Individual C and others known and unknown to the Grand Jury, to commit offenses against the United States, that is:

8

a.      to knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare and Medicare Advantage plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347; and

b.      to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing the pretenses, representations, and promises were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

## <u>PURPOSE OF THE CONSPIRACY</u>

3.      It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks in exchange for the referral of Medicare beneficiaries, so that LabSolutions could bill Medicare for CGx tests, without regard to whether the beneficiaries needed the test; (b) paying kickbacks to telemedicine companies in exchange for ordering and arranging for the ordering of CGx tests for Medicare beneficiaries, without regard for medical necessity for the prescribed CGx tests; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare and Medicare Advantage plans through LabSolutions for CGx tests that were

not medically necessary and not eligible for reimbursement; (d) concealing the submission of false and fraudulent claims to Medicare and Medicare Advantage plans; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others and to further the fraud.

## MANNER AND MEANS

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

4. **MINAL PATEL** falsely certified to Medicare that he, as well as LabSolutions, would comply with all Medicare rules and regulations, and federal laws, including that they would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare and that they would comply with the Anti-Kickback Statute.

5. **MINAL PATEL** and co-conspirators, through LabSolutions, paid kickbacks and bribes to co-conspirators, including Individual A, Individual B, Individual C and others, in exchange for CGx test samples from Medicare beneficiaries and Medicare-required documents (collectively referred to as "doctors' orders") that were used to submit claims, via interstate wire communication, to Medicare and Medicare Advantage plans for those tests from LabSolutions.

6. **MINAL PATEL**, Individual A, Individual B, Individual C and other co-conspirators, created sham contracts and documentation that disguised the kickbacks and bribes as payments from LabSolutions for marketing services. In the contracts, **PATEL**, through LabSolutions, agreed to pay co-conspirators, including Individual A, Individual B, Individual C and others, a percentage – as much as 50% – of the gross revenues paid by Medicare in exchange for their recruitment and referral of Medicare beneficiaries, CGx tests and doctor's orders to LabSolutions, regardless of whether the CGx tests were medically necessary.

7.    **MINAL PATEL**, Individual A, Individual B, Individual C and other con-conspirators, obtained access to thousands of Medicare beneficiaries by targeting them with telemarketing campaigns and health fairs, and inducing them to accept CGx tests regardless of medical necessity.

8.    **MINAL PATEL**, Individual A, Individual B, Individual C and other co-conspirators, obtained doctor's orders for the CGx tests by paying telemedicine companies for doctor's orders written by doctors contracted with the telemedicine companies, even though those doctors were not treating the beneficiaries for cancer or symptoms of cancer, did not use the test results in the treatment of the beneficiaries, did not conduct a proper telemedicine visit and often never communicated with the beneficiaries at all.

9.    **MINAL PATEL**, Individual A, Individual B, Individual C and other co-conspirators, caused LabSolutions to submit false and fraudulent claims to Medicare and Medicare Advantage plans in at least the approximate amount of $494 million, via interstate wire communication.

13:    As the result of these false and fraudulent claims, Medicare and Medicare Advantage plans made payments to LabSolutions in at least the approximate amount of $154 million.

14.    **MINAL PATEL**, Individual A, Individual B, Individual C and other co-conspirators used the fraud proceeds received from LabSolutions to benefit themselves and others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS 2-6
### Health Care Fraud
### (18 U.S.C. § 1347)

1.      The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2.      From in or around July 2016 and continuing to in or around August 2019, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### MINAL PATEL,

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is Medicare and Medicare Advantage plans, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said healthcare benefit programs.

### PURPOSE OF THE SCHEME AND ARTIFICE

3.      It was a purpose of the scheme and artifice for the defendant and his accomplices to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks in exchange for the referral of Medicare beneficiaries, so that LabSolutions could bill Medicare for CGx tests, without regard to whether the beneficiaries needed the test; (b) paying kickbacks to telemedicine companies in exchange for ordering and arranging for the ordering of CGx tests for Medicare beneficiaries, without regard for medical necessity for the prescribed CGx tests; (c) submitting and causing the submission of false and fraudulent claims to Medicare and Medicare Advantage plans through LabSolutions for CGx tests that were not medically necessary and not eligible for reimbursement; (d) concealing the submission of false and fraudulent claims to

Medicare and Medicare Advantage plans; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others and to further the fraud.

### THE SCHEME AND ARTIFICE

4.     The Manner and Means section of Count 1 of this Indictment is re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

### ACTS IN EXECUTION OR ATTEMPTED EXECUTION OF THE SCHEME AND ARTIFICE

5.     On or about the dates specified below as to each count, in Palm Beach County, in the Southern District of Florida and elsewhere, the defendant,

### MINAL PATEL,

in connection with the delivery of and payment for health care benefits, items, and services, did knowingly and willfully execute, and attempt to execute, the above-described scheme and artifice to defraud a health care benefit program affecting commerce, as defined by Title 18, United States Code, Section 24(b), that is, Medicare and Medicare Advantage plans, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in that the defendant submitted and caused the submission of false and fraudulent claims, which sought the identified dollar amounts, representing that such services were medically necessary, eligible for Medicare reimbursement, and provided to Medicare beneficiaries as claimed:

| Count | Medicare Beneficiary | Approx. Date of Submission of Claim | Claim No. | First CGx Test Claimed; Total Approx. Amount Billed |
|-------|----------------------|--------------------------------------|-----------|-----------------------------------------------------|
| 2 | D.L. | 8/5/2018 | 161118285725880 | Gene analysis (breast cancer 1); $6,470 |

| Count | Medicare Beneficiary | Approx. Date of Submission of Claim | Claim No. | First CGx Test Claimed; Total Approx. Amount Billed |
|-------|---------|---------|----------|---------|
| 3 | G.C. | 9/14/2018 | 161118257426250 | Gene analysis (breast cancer 1); $6,470 |
| 4 | J.P. | 9/24/2018 | 161118267908850 | Gene analysis (cytochrome P45); $940 |
| 5 | R.D. | 10/12/2018 | 161118285723810 | Gene analysis (breast cancer 1); $6,470 |
| 6 | W.W. | 11/29/2018 | 161118333535410 | Gene analysis (breast cancer 1); $6,470 |

In violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT 7
### Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks
### (18 U.S.C. § 371)

1. The General Allegations section of this Indictment is re-alleged and incorporated by reference as though fully set forth herein.

2. From in or around July 2016, through in or around August 2019, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**MINAL PATEL,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with Individual A, Individual B, Individual C and others, known and unknown to the Grand Jury,

a. to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the HHS in its administration and oversight of the Medicare program; and

14

b.       to commit an offense against the United States, that is, to violate Title 42, United States Code, Section 1320a-7b(b)(2)(A), by knowingly and willfully offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire transfer, to a person to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, Medicare and Medicare Advantage plans.

## PURPOSE OF THE CONSPIRACY

3.       It was a purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by: (a) soliciting, receiving, offering and paying kickbacks and bribes in return for recruiting and referring Medicare beneficiaries to LabSolutions; (b) submitting and causing the submission of claims to Medicare and Medicare Advantage plans for CGx tests that LabSolutions purported to provide to those Medicare beneficiaries; (d) concealing the submission of false and fraudulent claims to Medicare and Medicare Advantage plans; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others and to further the fraud.

## MANNER AND MEANS

The manner and means by which the defendant and his co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things, the following:

4.       Co-conspirators, including Individual A, Individual B, Individual C and others, recruited and referred Medicare beneficiaries to LabSolutions, knowing that LabSolutions would bill Medicare for CGx tests purportedly provided to the recruited Medicare beneficiaries.

5.    **MINAL PATEL**, through LabSolutions, offered and paid kickbacks to co-conspirators, including Individual A, Individual B, Individual C and others, in exchange for the recruitment and referral of Medicare beneficiaries to LabSolutions.

6.    **MINAL PATEL**, Individual A, Individual B, Individual C and other co-conspirators, created sham contracts and documentation that disguised the kickbacks and bribes as payments from LabSolutions for marketing services.   In the contracts, **PATEL**, through LabSolutions, agreed to pay co-conspirators, including Individual A, Individual B, Individual C and others, a percentage – as much as 50% – of the gross revenues paid by Medicare in exchange for their recruitment and referral of Medicare beneficiaries, CGx tests and doctor's orders to LabSolutions, regardless of whether the CGx tests were medically necessary.

7.    Co-conspirators, including Individual A, Individual B, Individual C and others, offered and paid kickbacks to telemedicine companies and others in exchange for the ordering and arranging for ordering CGx tests for Medicare beneficiaries, who were paid, at least in part, to authorize the CGx tests.

8    **MINAL PATEL**, Individual A, Individual B, Individual C and other co-conspirators, caused LabSolutions to submit CGx claims to Medicare and Medicare Advantage plans in at least the approximate amount of $494 million.

9.    As the result of these claims, Medicare and Medicare Advantage plans made payments to LabSolutions in at least the approximate amount of $164 million.

10.    **MINAL PATEL** paid his co-conspirators, including Individual A, Individual B, Individual C and others, at least approximately $19 million, and used the fraud proceeds received from LabSolutions to benefit himself and others, and to further the fraud.

## OVERT ACTS

In furtherance of the conspiracy, and to accomplish its objects and purpose, at least one co-conspirator committed and caused to be committed, in the Southern District of Florida, at least one of the following overt acts, among others:

1.      On or about July 22, 2016, **MINAL PATEL** negotiated a contract between a company controlled by Individual C and LabSolutions, providing that LabSolutions would pay Company C 50% of the monthly revenue LabSolutions received from Medicare for CGx tests referred by Individual C or Company C, minus certain costs, and that Individual C would receive a 5% "over-ride" commission of any reimbursements LabSolutions received from Medicare for CGx tests referred by other marketers Individual C recruited to LabSolutions, also known as "downlines" of Individual C.

2.      On or about February 14, 2017, **MINAL PATEL** transferred approximately $35,738 from an account ending in 5593 in the name of LabSolutions at BB&T to an account ending in 6891 in the name of Individual C at Wells Fargo in exchange for Individual C's referral of Medicare beneficiaries to LabSolutions.

3.      On or about May 1, 2017, **MINAL PATEL** executed a contract with Company A pursuant to which LabSolutions agreed to pay Company A 45% of the monthly revenue LabSolutions received from Medicare for CGx tests referred by Company A, minus certain costs.

4.      On or about January 4, 2018, **MINAL PATEL** transferred approximately $402,848 from an account ending in 5593 in the name of LabSolutions at BB&T to an account in the name of Company B ending in 1659 at Wells Fargo in exchange for Individual B's referral of Medicare beneficiaries to LabSolutions.

5.      On or about January 14, 2019, **MINAL PATEL** transferred approximately $51,380

from an account ending in 5593 in the name of LabSolutions at BB&T to an account in the name of Company A ending in 3990 at Wells Fargo in exchange for Individual A's referral of Medicare beneficiaries to LabSolutions.

   6.  On or about August 9, 2019, **MINAL PATEL** called Individual C and suggested that Individual C hire a compliance person because "say they come in an interview you, they're going to ask who is your compliance officer.  It gives you a level of separation where you can say you're doing it compliantly."

  All in violation of Title 18, United States Code, Section 371.

**<u>COUNTS 8-12</u>**
**Payment of Kickbacks in Connection with a Federal Health Care Program**
**(42 U.S.C. § 1320a-7b(b)(2)(A))**

   1.  Paragraphs 1 through 33 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

   2.  On or about the dates enumerated below, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant, **MINAL PATEL**, did knowingly and willfully offer and pay any remuneration, that is, kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by wire transfer, as set forth below, to a person, to induce such person to refer an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part under a Federal health care program, that is, Medicare and Medicare Advantage plans:

| Count | Approx. Date of Kickback Payment | Approx. Amt. of Kickback Payment | Description of Payment |
|:---:|:---:|:---:|---|
| 8 | 2/14/2017 | $35,738 | Wire transfer from account at BB&T in the name of LabSolutions ending in 5953  to account in name of Individual C at Wells Fargo ending in 6891. |

| Count | Approx. Date of Kickback Payment | Approx. Amt. of Kickback Payment | Description of Payment |
|---|---|---|---|
| 9 | 1/4/2018 | $402,848 | Wire transfer from account at BB&T in the name of LabSolutions ending in 5953 to account in name of Company A at Wells Fargo ending in 1659. |
| 10 | 7/12/2018 | $656,068 | Wire transfer from account at BB&T in the name of LabSolutions ending in 5953 to account in control of Individual A at Wells Fargo ending in 4045. |
| 11 | 11/14/2018 | $150,251 | Wire transfer from account at BB&T in the name of LabSolutions ending in 5953 to account in name of Individual C at Wells Fargo ending in 7575. |
| 12 | 12/13/2018 | $728,972 | Wire transfer from account at BB&T in the name of LabSolutions ending in 5953 to account in name of Company B at Wells Fargo ending in 3990. |

In violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A) and Title 18, United States Code, Section 2.

<u>COUNT 13</u>
**Conspiracy to Commit Money Laundering**
**(18 U.S.C. § 1956(h))**

From in or around January 2017, through in or around August 2019, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**MINAL PATEL,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, and agree with others, known and unknown to the Grand Jury, to violate Title 18, United States Code, Section 1956, that is,

a.      to knowingly conduct a financial transaction affecting interstate and foreign commerce, which transaction involved the proceeds of specified unlawful activity, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, and knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

b.      to knowingly engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

It is further alleged that the specified unlawful activity is conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1349; health care fraud, in violation of Title 18, United States Code, Section 1347; and wire fraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 982(a)(1), (a)(7))

1.      The allegations of this Indictment are re-alleged and by this reference fully incorporated herein for the purpose of alleging forfeiture to the United States of certain property in which the defendant, **MINAL PATEL,** has an interest.

2.      Upon conviction of a violation of Title 18, United States Code, Section 1347 or 1349, or a violation of, or criminal conspiracy to commit a violation of, Title 42, United States Code, Section 1320a-7b, as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross

proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3.    Upon conviction of a violation of Title 18, United States Code, Section 1956, as alleged in this Indictment, the defendant shall forfeit to the United States any property, real or personal, involved in such offense, and any property traceable to such property, pursuant to Title 18, United States Code, Section 982(a)(1).

4.    The property subject to forfeiture as a result of the alleged offenses includes, but is not limited to, the following:

Forfeiture Money Judgment

(i)    The sum of at least $144,333,297.73 in U.S. currency, which amount is equal to the gross proceeds traceable to the commission of the violations alleged in this Indictment and which the United States may seek as a forfeiture money judgment;

BB&T Account x5945

(ii)    Up to and including $262,821.05 in U.S. currency on deposit in in account number 0005245165945 held in the name of LabSolutions LLC at BB&T Bank;

(iii)    Approximately $13,896,134.78 in U.S. currency formerly on deposit in account number 0005245165945 held in the name of LabSolutions LLC at BB&T Bank;

BB&T Account x6011

(iv)    Approximately $440,730.20 in U.S. currency previously on deposit in account number 0005245166011 held in the name of LabSolutions LLC at

BB&T Bank;

BB&T Account x5953

  (v) Approximately $534,093.52 in U.S. currency previously on deposit in account number 0005245165953 held in the name of LabSolutions LLC at BB&T Bank;

BB&T Account x0767

  (vi) Approximately $5,842,046.79 in U.S. currency previously on deposit in account number 1374000767 held in the name of LabSolutions LLC at BB&T Bank;

BB&T Account x8788

  (vii) Approximately $1,129,562.62 in U.S. currency previously on deposit in account number 0005244918788 held in the name of **MINALKUMAR PATEL** at BB&T Bank;

BB&T Account x0219

  (viii) Approximately $4,000,000.00 in U.S. currency previously on deposit in account number 0005248710219 held in the name of **MINALKUMAR PATEL** at BB&T Bank;

BB&T Account x0065

  (ix) Approximately $4,000,000.00 in U.S. currency previously on deposit in account number 0005248710065 held in the name of **MINALKUMAR PATEL** at BB&T Bank;

Range Rover

  (x) One 2019 black Land Rover Range Rover, Vehicle Identification Number

("VIN") SALGW5SE2KA545805;

Ferrari

(xi)   One 2018 red Ferrari 488 Spider, VIN ZFF80AMA6J0236067;

Real Property

(xii)  Real property located at 548 and 552 Ponce De Leon Avenue, NE, Atlanta, GA; and

(xiii) Real property located at 1118 Blackshear Drive, Decatur, GA.

5.     If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred or sold to, or deposited with, a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e.   has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property under the provisions of Title 21, United States Code, Section 853(p), and such property includes, but is not limited to, the real property located 2881 Peachtree Road, NE, #1903, Atlanta, GA.

All pursuant to Title 18, United States Code, Sections 982(a)(1) and (a)(7), and the procedures set forth in Title 21, United States Code, Section 853, as incorporated by Title 18, United States Code, Section 982(b)(1).

A TRUE BILL

_____
GRAND JURY FOREPERSON

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY


ALLAN MEDINA
ACTING DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE


TIMOTHY P. LOPER
TRIAL ATTORNEY
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA                           CASE NO._____

v.

### CERTIFICATE OF TRIAL ATTORNEY*

MINAL PATEL,
                                                   **Superseding Case Information:**
_____Defendant._____/

**Court Division:** (Select One)                   New defendant(s)          Yes _____   No _____
___ Miami          ___ Key West                    Number of new defendants  _____
___ FTL    ✓       ___ WPB    ___ FTP              Total number of counts    _____

1.  I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.  I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.  Interpreter:     (Yes or No)     No
    List language and/or dialect     _____

4.  This case will take __15__ days for the parties to try.

5.  Please check appropriate category and type of offense listed below:

| | (Check only one) | | | (Check only one) | |
|---|---|---|---|---|---|
| I | 0 to 5 days | _____ | Petty | | _____ |
| II | 6 to 10 days | _____ | Minor | | _____ |
| III | 11 to 20 days | ✓ | Misdem. | | _____ |
| IV | 21 to 60 days | _____ | Felony | | ✓ |
| V | 61 days and over | _____ | | | |

6.  Has this case previously been filed in this District Court?     (Yes or No)     No
    If yes: Judge _____     Case No. _____
    (Attach copy of dispositive order)
    Has a complaint been filed in this matter?     (Yes or No)     No
    If yes: Magistrate Case No. _____
    Related miscellaneous numbers: _____
    Defendant(s) in federal custody as of _____
    Defendant(s) in state custody as of _____
    Rule 20 from the District of _____

    Is this a potential death penalty case? (Yes or No)     No

7.  Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia O. Valle)?     Yes _____     No ✓

8.  Does this case originate from a matter pending in the Northern Region U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?     Yes _____     No ✓

_____
TIMOTHY P. LOPER
DOJ TRIAL ATTORNEY
COUTR ID NO. A5502016

*Penalty Sheet(s) attached                                         REV 8/13/2018

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:**           **MINAL PATEL**

**Case No:**

Count #:   1

  Conspiracy to Commit Health Care Fraud and Wire Fraud

  Title 18, United States Code, Section 1349

**\*Max Penalty:**   Twenty (20) years' imprisonment

Counts #:   2 – 6

  Health Care Fraud

  Title 18, United States Code, Section 1347

**\*Max Penalty:**   Ten (10) years' imprisonment as to each count

Count #:   7

  Conspiracy to Defraud The United States and to Pay and Receive Health Care Kickbacks

  Title 18, United States Code, Section 371

**\*Max Penalty:**   Five (5) years' imprisonment

Counts #:   8 – 12

  Payment of Kickbacks in Connection with a Federal Health Care Program

  Title 42, United States Code, Section 1320a-7b(b)(2)(A)

**\*Max Penalty:**   Ten (10) years' imprisonment as to each count

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## <u>PENALTY SHEET</u>

**Defendant's Name:**  <u>**MINAL PATEL**</u>

**Case No:** _____

Count #:   13

<u>Conspiracy to Commit Money Laundering</u>

<u>Title 18, United States Code, Section 1956(h)</u>

**<u>*Max Penalty:</u>**   <u>Twenty (20) years' imprisonment</u>

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**