UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CR-80181-RUIZ/REINHART

UNITED STATES OF AMERICA,

    vs.

MINAL PATEL,

Defendant.

_____/

**DEFENDANT PATEL'S MOTION TO DISMISS THE INDICTMENT, INCORPORATED
MEMORANDUM OF LAW AND REQUEST FOR ORAL ARGUMENT**

Defendant MINAL PATEL ("Patel") moves to dismiss the Indictment pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, as the allegations set forth in the Indictment [DE 1] fail as a matter of law. The Indictment alleges health care fraud predicated on "medically unnecessary" Cancer Genomic Testing ("CGx") for asymptomatic patients with a family history of cancer. The Government alleges CGx screening tests are "ineligible for reimbursement" by Medicare. The Indictment also alleges Patel's laboratory, LabSolutions, submitted claims for family-history CGx screening tests that were not properly covered Medicare benefits.

Further, the Indictment alleges Patel violated the Federal Anti-Kickback Statute by paying provider-funded community outreach programs fluctuating compensation to generate referrals for "medically unnecessary" CGx tests. The recitations of law contained within the Indictment are directly contradicted by the Affordable Care Act ("ACA[1]"), the HHS Secretary's exemption for provider-funded patient navigator programs for preventive services, and the HHS Office of the

---

[1] The Patient Protection and Affordable Care Act (Pub. L. No. 111-148, 124 STAT. 119) and Health Care and Education Reconciliation Act of 2010 (Pub. L. No. 111-152, 124 Stat. 1029) (collectively, the "ACA").

Inspector General's ("OIG") exemption of payments to promote preventive services from enforcement under the Federal Anti-Kickback Statute.

Additionally, the Indictment's statements of law are inconsistent with the Local Coverage Articles issued by Novitas and Palmetto Medicare Administrative Contractors, the relevant entities that administer Medicare claims adjudication. Both have exempted any requirement of medical necessity for Medicare to cover Cancer Genomic testing as a screening test.

Finally, the Indictment's recitations of law regarding a laboratory's legal obligation to determine medical necessity are legally incorrect.

All the charges contained in the Indictment fail as a matter of law. Therefore, dismissal of the Indictment is appropriate. In support thereof, Patel states as follows:

## I. Summary of Argument

1.  On September 25, 2019, the  grand jury returned  an Indictment  charging Patel with one count of Conspiracy to Commit Health Care Fraud and Wire Fraud pursuant to 18 U.S.C. § 1349, five counts of Health Care Fraud pursuant to 18 U.S.C. § 1349, one count of Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks pursuant to 18 U.S.C. § 371, five counts of Payment of Kickbacks in Connection with a Federal Health Care Benefit Program pursuant to 42 U.S.C. § 1320a-7b(b)(2)(A)), and one count of Conspiracy to Commit Money Laundering pursuant to 18 U.S.C. § 1956(h)).

2.  The Indictment's allegations of health care fraud are predicated on Patel's laboratory, LabSolutions, LLC, submitting health care claims for Cancer Genomic Tests ("CGx") that were allegedly "ineligible for reimbursement" by Medicare. Specifically, the Indictment alleges "Medicare did not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer." Indictment at page 7, ¶ 22.

3.   The Indictment further alleges that the CGx tests performed by LabSolutions were "screening tests" which were not eligible for reimbursement by Medicare pursuant to 42 C.F.R. § 410.32(a). The Government relies on a statute that only is applicable to "diagnostic laboratory tests." Indeed, the Government exclusively frames the Indictment's allegations as LabSolutions billed Medicare for CGx diagnostic laboratory tests "without regard for the medical necessity of the tests" because Medicare does not cover CGx screening tests. Indictment at page 9.

4.   The Indictment alleges that although some screening tests are covered by Medicare (see page 6, ¶ 20), family-history CGx screening tests are not covered. The Indictment then alleges that because LabSolutions family-history CGx tests do not comply with Medicare's diagnostic laboratory testing guidelines, more than 95% of LabSolutions CGx tests were fraudulently submitted to Medicare for payment. Both assertions are incorrect as a matter of law.

5.   The Government's theory of health care fraud as reflected in the Indictment is entirely predicated on family-history based CGx screening tests being improperly billed as covered by Medicare. This theory of fraud is contained in every count of the *Patel* Indictment including the kickback and conspiracy counts. The Indictment alleges:

> It was the purpose of the conspiracy for the defendant and his co-conspirators to unlawfully enrich themselves by, among other things: (a) paying and receiving kickbacks in exchange for the referral of Medicare beneficiaries, so that LabSolutions could bill Medicare for CGx tests, without regard to whether the beneficiaries needed the test; (b) paying kickbacks to telemedicine companies in exchange for the ordering and arranging for the ordering of CGx tests for Medicare beneficiaries, without regard for the medical necessity for the prescribed CGx tests; (c) submitting and causing the submission, via interstate wire communication, of false and fraudulent claims to Medicare and Medicare Advantage plans through LabSolutions for CGx tests that were not medically necessary and not eligible for reimbursement; (d) concealing the submission of false and fraudulent claims to Medicare and Medicare Advantage plans; and (e) diverting fraud proceeds for their personal use and benefit, the use and benefit of others and to further the fraud.

> Indictment at page 9, ¶ 3.

7.   The Government further alleges in the Indictment that Patel, through LabSolutions, agreed to pay co-conspirators "a percentage—as much as 50%-- of the gross revenues paid by Medicare in exchange for their recruitment and referral of Medicare beneficiaries, CGx tests and doctor's order to LabSolutions, regardless of whether the CGx tests were medically necessary." Indictment at page 16.

8.   The Indictment alleges that LabSolutions billed Medicare and Medicare Advantage plans for "medically unnecessary" family-history CGx testing, and therefore, LabSolutions received millions of dollars in fraudulent payments. Indictment at page 16.

9.   Finally, the Government alleges in the Indictment that LabSolutions failed to comply with 42 C.F.R. §410.32(a) and 42 C.F.R. § 411.15(a)(1), statutes which govern *diagnostic* laboratory testing of Medicare Patients. Indictment at page 6. The Indictment makes the conclusory assertion that a treating practitioner can only order a CGx test for a Medicare patient when the ordering provider has an on-going treatment relationship with the patient. 42 C.F.R. §410.32(a). This assertion is incorrect as a matter of law.

10. In reliance on the legally incorrect assertion that the tests at issue are "diagnostic laboratory tests" and are not a covered benefit of Medicare (as opposed to a Medicare-covered "screening tests"), the Indictment goes on to  allege that the use of telemedicine and fluctuating compensation to downline patient navigator programs are improper. These conclusory allegations also are incorrect as a matter of law.

11. The Indictment's failure to properly classify the type of testing at issue is a fatal pleading error. In fact, the Government's assertions in the Indictment patently contradict the ACA's mandate for Medicare beneficiaries to have access to personalized prevention plan services for cancer testing. ACA §4103-04; 42 U.S.C. § 1395x(ddd)(3)(c).

12. The Indictment's allegation that LabSolutions compensated marketing companies to promote family-history CGx screening tests underlies the allegations that Patel violated the Federal Anti-Kickback Statute. Family-history CGx tests qualify as "preventive services" under 42 C.F.R. § 1003.110, and any compensation remitted to promote these preventive services falls outside the definition of "remuneration" in the Federal Anti-Kickback Statute. 70 Fed. Reg. 4873 (Jan. 31, 2005); 65 Fed. Reg. 24408 (April 26, 2000).

13. Thus, the Government in the *Patel* Indictment fails to charge any viable criminal offenses based on relevant federal law and regulations. Such pleading defects in the Indictment mandate dismissal of the charges. *United States v. Blitch*, 2008 U.S. Dist. LEXIS 100998, *4-5 (M.D. Fla. 2018) ("An indictment fails to state an offense if the specific facts alleged in it 'fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation.'" *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007) (quoting *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002)); *Dowling v. United States*, 473 U.S. 207, 213 (1985) (noting that because federal crimes "are solely creatures of statute" that "when assessing the reach of a federal criminal statute," courts "must pay close heed to language, legislative history, and purpose in order strictly to determine the scope of the conduct the enactment forbids. Due respect for the prerogatives of Congress in defining federal crimes prompts restraint in this area, where we typically find a 'narrow interpretation' appropriate.").

## II. Legal Standards.

14. Rule 12(b), of the Federal Rules of Criminal Procedure provides: "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." FED. R. CRIM. P. 12(b).

15. In *United States v. Torkington*, 812 F.2d 1347 (11th Cir. 1987), the Eleventh Circuit articulated the standard of dismissal to be applied pursuant to Rule 12(b), stating that "an indictment may be dismissed where there is an infirmity of law in the prosecution; a court may not dismiss an indictment, however, on a determination of facts that should have been developed at trial." *Id*. at 1354 (citations omitted); *see United States v. Snipes*, 611 F.3d 855, 866 (11th Cir. 2010) ("Under Fed. R. Crim. P. 12(b) an indictment may be dismissed where there is an infirmity of law in the prosecution").

16. Further, the Eleventh Circuit stated in *Sharpe* – "In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes. *United States v. Critzer*, 951 F.2d 306, 307 (11th Cir. 1992). '[A] court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial.'" *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006) (citing *Torkington*, 812 F.2d at 1354).

17. Legal improprieties in an indictment support dismissal of the charges. *United States v. Crtizer*, *supra* (the Court properly dismissed an initial Indictment "assuming the facts to be true, defendant's actions did not constitute a violation of federal law."); *United States v. Frankel*, 721 F.2d 917 (3rd Cir. 1983) (Indictment charging a false statement was properly dismissed because the presentation of a false check did not constitute a false statement as a matter of law); *United States v. Levin*, 973 F.2d 463, 465 (6th Cir. 1992) (the undisputed evidence established that the government issued letters which were circulated to the defendant stating the government's approval of the activity charged in the indictment).

## III. Argument.

## PART ONE

### A.  The Indictment Is Predicated on an Incorrect Application of Federal Law.

18. The Indictment in this case is predicated on a basic misapplication of relevant federal law. Specifically, the Indictment alleges that Medicare does not cover family-history CGx screening tests for asymptomatic patients with a family-history or genetic susceptibility to develop hereditary cancer. This assertion is incorrect as a matter of federal law.

19. Medicare does cover family-history CGx screening tests for asymptomatic patients. In fact, Medicare is required to provide full coverage for any United States Preventive Services Task Force ("USPSTF") recommended screening test as a "personalized prevention plan service" under the Affordable Care Act (ACA). *See* 42 U.S.C. § 1395l(a)(1)(X)("…there shall be paid from the Federal Supplementary Medical Insurance Trust Fund…amounts equal to—with respect to *personalized prevention plan services* the amount paid shall be 100 percent of the lesser of the actual charge for the services…") (internal citations omitted).

20. Pursuant to 42 U.S.C. § 1395x(ddd)(3)(c) and defined under 42 U.S.C. § 1395x(hhh)(2)(E) of the Social Security Act), Medicare is federally mandated to cover one hundred percent (100%) of the costs of any USPSTF screening test that receives a grade of A or B, which is appropriate for the Medicare beneficiary. Any screening test that receives a grade of A or B is "recommended" by the USPSTF.

21. Since 2005, the USPSTF has graded CGx testing for asymptomatic patients who have a family-history, genetic susceptibility, or ancestry of BRCA-syndrome cancer as a B-grade[2]

---

[2] Pursuant to USPSTF guidelines, only screening tests that receive an A or B grade are "recommended" by the USPSTF. *See* https://www.uspreventiveservicestaskforce.org/uspstf/grade-definitions.

screening test. As a result, the Indictment's allegations misstate the applicable law with regard to Medicare coverage for CGx screening tests.

22. Further, the Government misstates the applicable law in the Indictment by misapplying "diagnostic laboratory tests" requirements onto USPSTF-recommended "screening tests." The diagnostic laboratory testing regulations set forth in the Indictment, including its reliance on 42 C.F.R. §410.32(a) and 42 C.F.R. §411.15, are inapplicable to USPSTF-recommended screening tests. Indictment at page 6.

23. Pursuant to applicable law, USPSTF screening test consultations may be provided to Medicare beneficiaries through "an interactive telephonic or web-based program," "during an encounter with a healthcare professional," or "through community-based prevention programs," statutorily defined as Patient Navigator Programs.[3] 42 U.S.C. §1395x(hhh)(4).

24. Moreover, no legal requirement exists that the treating provider have any established or on-going treatment relationship with the Medicare patient for whom a USPSTF screening test is being ordered. The statute permits any physician, physician assistant, nurse practitioner, clinical nurse specialist, certified registered nurse anesthetist, certified nurse-midwife, clinical social worker, clinical psychologist, or registered dietician or nutritional professional to order a USPSTF screening test regardless of any prior treatment relationship. 42 U.S.C. §1395x(hhh)(3)(as defined in 42 U.S.C. §1395u(18)(C)).

25. The Indictment's use of diagnostic laboratory testing regulations for USPSTF-recommended cancer screening tests results in a fatal legal deficiency in the Indictment. The Indictment's allegations regarding the use of telemedicine, community screening programs, and

---

[3] https://www.cdc.gov/screenoutcancer/patient-navigation.htm (accessed Nov. 23, 2020).

fluctuating compensation models for Patient Navigators[4] as being unlawful, are inapplicable to the facts the Government pleads in the same Indictment.

26. The Indictment also incorrectly applies the Federal Anti-Kickback Statute to patient navigator programs that promote USPSTF preventive services under the Affordable Care Act; such activities are not covered by the statute. On October 30, 2013, the then HHS Secretary provided written guidance to Senator Jim McDermott clarifying HHS's exemption of ACA patient navigator programs that promote USPSTF preventive services from enforcement under the Federal Anti-Kickback Statute. (Ex. A).

27. Such HHS guidance is consistent with Section 4004 of the ACA that established provider funded patient navigator programs. The statute states:

> [F]or the planning and implementation of a national public–private partnership for a prevention and health promotion outreach and education campaign to raise public awareness of health improvement across the life span. Such campaign shall include the dissemination of information that… promotes the use of preventive services *recommended* by the United States Preventive Services Task Force and the Community Preventive Services Task Force[.] ACA §400(a)(1)-(2); 42 U.S.C. §300u-12.

28. Section 6402(F) of the ACA further codifies an exclusion for community outreach and provider-funded patient navigator programs by creating an exemption to the definition of "remuneration" under the Federal Anti-Kickback Statute. The provision exempts "any other remuneration which promotes access to care and poses a low risk of harm to patients and Federal health care programs." *See* ACA at §6402(F). Congress enacted this exception for the purpose of

---

[4] *"Patient Navigators"* are defined by federal statute as individuals who have direct knowledge of the communities they serve to facilitate the care of individuals, including by  assisting in the coordination of health care services and  provider referrals, for individuals who are seeking prevention or early detection services for cancer or other chronic disease; facilitating the involvement of community organizations in assisting individuals who are at risk for cancer or other chronic diseases to receive better access to high-quality health care services; and conducting ongoing outreach to Medicare and Medicaid populations. 42 U.S.C. §256a(b)(1)-(2); ACA §4004.

promoting provider-funded patient navigator programs. 81 Fed. Reg. No. 235, 88368 (Dec. 7, 2016) (revising 42 U.S.C. § 1320-7); (Ex. A).

29. Moreover, the OIG has since 2005 defined the term "remuneration" under the Federal Anti-Kickback Statute to exclude any payments made to promote USPSTF-recommended preventive services. 70 Fed. Reg. 4873 (Jan. 31, 2005) (OIG adopts the definition of "remuneration" under 42 C.F.R. §1003.110 to bar enforcement under the Federal Anti-Kickback Statute); *see infra*, Part I, section III(F).

30. The BRCA-screening CGx multigene panel test meets the legal definition outlined above for exemption from the Federal Anti-Kickback statute. First, the test possesses a low risk of harm to patients and federal healthcare programs because Medicare only covers the screening test once in a lifetime for any Medicare patient with a qualifying family-history, or a genetic susceptibility to develop cancer. (Ex. B). Thus, if a qualifying Medicare patient was screened more than once, then Medicare will deny payment for the second screening test. *See* LCA (A58017) ("a beneficiary may only be covered for one test per lifetime… If non-duplicative testing is considered medically reasonable and necessary but utilizes the same billing codes as prior testing, please use a -77 modifier to trigger a medical review for coverage…Providers will be expected to provide a rationale for additional testing.").

31. The US Community Preventive Services Task Force is required to publish annual reports to Congress that provide guidance to healthcare providers as to how they should establish and implement effective USPSTF community outreach or patient navigator programs. All this is to encourage patients to access their USPSTF-recommended screening tests.

32. In its 2011 Task Force Report, the USPSTF-recommended use of "telephonic reminders," and "one-on-one patient education" to encourage BRCA-related cancer screening. *See* Community

Preventive Services Task Force 2012 Annual Report to Congress at pages 9-10. https://www.thecommunityguide.org/sites/default/files/assets/2012-congress-report-full_0.pdf; Community Preventive Services Task Force 2011 Annual Report to Congress at page 27. https://www.thecommunityguide.org/sites/default/files/assets/2011-congress-report-full_1.pdf.

33. The Indictment in this case attempts to criminalize the Task Force's recommended methods of provider-funded community outreach when it replaces the rules that apply to USPSTF-recommended preventive services, with the rules for medically necessary diagnostic testing.

34. Both the OIG and the then HHS Secretary exempted patient navigator programs from enforcement under the Federal Anti-Kickback Statute, *unless* the activity received a federal grant. 42 U.S.C. § 256a(c)(1) ("The Secretary shall require each recipient of a grant under this section to prohibit any patient navigator providing services under the grant from accepting any referral fee, kickback, or other thing of value in return for referring an individual to a particular health care provider.")

35. Aside from federal grant provision, the OIG narrowed the statutory definition of "remuneration" under the Federal Anti-Kickback Statute to exclude any payments made to promote USPSTF-recommended preventive services. 70 Fed. Reg. 4873 (Jan. 31, 2005).

36. The Indictment misapplies the prohibitions set forth in the patient navigator federal grant program to traditional provider-funded patient navigator programs which have long been sheltered from prosecution under the Federal Anti-Kickback Statute. 70 Fed. Reg. 4873 (Jan. 31, 2005) (adopting the definition of "remuneration" under 42 C.F.R. §1003.110 to prohibit enforcement of compensation arrangements to promote preventive services under the Federal Anti-Kickback Statute); *see infra* Part I, section III(F); *see also* Ex. A.

**B. Family-History CGx Screening Tests Are Recommended Preventive Services by the United States Preventive Services Task Force as of September 2005.**

37. The United States Preventive Screening Task Force ("USPSTF") is a government committee that was created in 1984 by Congress. "The U.S. Preventive Services Task Force is an independent, volunteer panel of national experts in prevention and evidence-based medicine. The Task Force works to improve the health of all Americans by making evidence-based recommendations about clinical preventive services such as screenings, counseling services, and preventive medications. All recommendations are published on the Task Force's Web site and/or in a peer-reviewed journal.[5]"

38. In 2005, the USPSTF-recommended Cancer Genomic Testing ("CGx") of the BRCA-related syndrome "multigene panel" received a B grade. All tests that received an A or B grade are "recommended" by the USPSTF. This recommendation has remained consistent since 2005 with the latest recertification of family-history based CGx testing as a B-graded USPSTF screening test on August 20, 2019.[6]

39. In other words, family-history CGx testing of the BRCA-syndrome multigene panel is a USPSTF-recommended screening test that is a federally mandated Medicare benefit under the Affordable Care Act (ACA).

**C. The Preventive Services Mandate Under the Affordable Care Act.**

40. In 2010, Congress passed, and President Obama signed into law, the Affordable Care Act (ACA) "to increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed'n of Indep. Bus. v. Sebelius,* 567 U.S. 519, 538 (2012)*.* The ACA "adopts

---

[5] About the USPSTF | United States Preventive Services Taskforce (uspreventiveservicestaskforce.org) (accessed January 2, 2021)

[6] https://www.uspreventiveservicestaskforce.org/uspstf/document/ClinicalSummaryFinal/brca-related-cancer-risk-assessment-genetic-counseling-and-genetic-testing (accessed June 12, 2020) (Ex. B).

a series of interlocking reforms designed to expand coverage in the individual insurance market."

*King v. Burwell,* 135 S. Ct. 2480, 2485 (2015).

41. Moreover, the ACA created ten (10) "Essential Health Benefits" which are federally mandated for coverage by non-grandfathered group plans, Medicaid, and Medicare to ensure a minimum level of coverage for healthcare services. *See* ACA §1302; 42 U.S.C. § 18022. One of the ten ACA mandated Essential Health Benefits is "preventive and wellness services." ACA §1302(b)(1)(I).

42. In enacting the ACA, Congress wanted to ensure that Americans would be provided expanded healthcare coverage. This expanded coverage ensured access for Medicare beneficiaries to USPSTF-recommended preventive services. ACA §4103-05.

43. In ensuring access to preventive services deemed "Essential Health Benefits" under the ACA, the costs of these services are covered by health insurance plans, including Medicaid and Medicare. Pursuant to Sections 4003-4105 of the Affordable Care Act, Medicare is federally mandated to cover one hundred (100%) percent of the costs of all USPSTF-recommended screening tests—that is, all USPSTF screening tests that receive a grade of A or B. *See* ACA §4103-05; 42 U.S.C. § 1395x(ddd)(3)(c); 42 U.S.C. § 1395x(hhh)(2)(E); 42 U.S.C. 1395l(a)(1)(X); MLN MM7012 (January 3, 2011)[7]; pgs. 5 & 8 of the MLN's Annual Wellness Visit Booklet (Ex. C); *see also* pgs. 12-3 of the Center for Disease Control's A Framework for Patient-Centered Health Risk Assessments: Providing Health Promotion and Disease Prevention Services to Medicare Beneficiaries (CS 228668-A) (2011) (Ex. D)

44. Pursuant to Medicare Learning Network (MLN) Matter No. SE1129 (rev. March 2, 2012), "Section 4104 of the Affordable Care Act waived deductible, copayments, or coinsurance effective

for Date of Service on or after January 1, 2011, for the following Medicare-covered preventive

services:

- The Initial Preventive Physician Exam (IPPR or "Welcome to Medicare Visit")

- The Annual Wellness Visit (AWV); and

- Those preventive services that:

    o Are identified with a grade of A or B by the United States Preventive Services
      Task Force (USPSTF) for any indication or population; and

    o Are appropriate for the beneficiary" [8]

45. Moreover, Section 80.1 of Chapter 16 of the Medicare Claims Processing Manual

governing "Laboratory Services" instructs providers to review Chapter 18 of the Medicare Benefit

Policy Manual to assess coverage of laboratory "screening services."

46. Chapter 18 of the Medicare Benefit Policy Manual states:

> 1.3 Waiver of Cost Sharing Requirements of Coinsurance, Copayment and
> Deductible for Furnished Preventive Services Available in Medicare …
>
> Section 4104(b)(4) of the ACA, amends section 1833(a)(1) of the Act, by requiring
> 100 percent payment for the IPPE, AWV *and* for those preventive services
> recommended by the United States Preventive Services Task Force (USPSTF) with
> a grade of A or B for any indication or population and that are appropriate for the
> individual. [9]

*See* p. 22 of Chapter 18 of the Medicare Benefit Policy Manual (2014) (Ex. F); *see also* Section

280.5, of Chapter 15 of the Medicare Benefit Policy Manual (2019) (Ex. G).

---

[8] https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network
MLN/MLNMattersArticles/downloads/SE1129.pdf. (accessed Jan. 3, 2021) (Ex. E).

[9] *See* p. 27 of Chapter 18 of the Medicare Benefit Policy Manual (2020), entitled "Preventive and Screening
Services" https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c18.pdf.

**D. Medicare Is Required to Cover the Costs of CGx Screening for Asymptomatic Patients with a Family-History, Personal-History, or Ancestry Linked to BRCA Gene Mutations.**

47. Given that the BRCA-syndrome related multigene CGx panel has received a B grade by the USPSTF, it is a USPSTF-recommended test for routine clinical use. The clinical guidelines published by the USPSTF reflect that the screening of asymptomatic patients is appropriate when the patient has a "family or personal history [that] is associated with an increased risk harmful mutations in the BRCA 1/2 genes, or who have an ancestry associated with BRCA 1/2 gene mutations, there is adequate evidence that the benefits of risk assessment, genetic counseling, genetic testing, and interventions are moderate." USPSTF Clinical Recommendation of BRCA-Screening CGx panel (Ex. B).

48. Predicated on the clinical findings of numerous screening studies and clinical research, the USPSTF reissued its "*Conclusions and Recommendation*" pertaining to BRCA-screening. The USPSTF recommends that "clinicians assess individuals with a personal or family history of breast, ovarian, tubal, or peritoneal cancer or who have an ancestry associated with BRCA1/2 gene mutations with an appropriate brief familial risk assessment tool" to received genetic testing and genetic counseling. *Id.* at 1 (Ex. B).

49. Thus, the *Patel* Indictment incorrectly alleges that Medicare does not cover CGx screening tests for asymptomatic patients with a family-history of cancer.

**E. No Prohibition Exists on the Use of Telemedicine & No Telemedicine Copayment Is Permitted with USPSTF-Recommended Screening Consultations for Medicare Patients.**

50. The Indictment unjustifiably alleges that the Medicare patients at issue were required to have an on-going treatment relationship with the ordering physicians. The Indictment alleges:

> Title 42, Code of Federal Regulations, Section 410.32(a) provided, "All diagnostic x-ray tests, *diagnostic* laboratory tests, and other *diagnostic* tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and 'who uses

the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

*Patel* Indictment at page 6, ¶ 21 (emphasis added).

51. Although the Indictment outlines the legal requirements for the ordering and coverage of "diagnostic laboratory tests" under Medicare, the tests at issue in this present Indictment are *not* diagnostic laboratory tests. The tests at issue in the *Patel* Indictment are USPSTF-recommended screening tests, for which the diagnostic guidelines do not apply. 42 U.S.C. § 1395x(hhh)(3)-(4).

52. Given that the tests in this case are USPSTF-recommended screening tests, numerous methods of securing the tests exist that do not involve in person consultations. Pursuant to 42 U.S.C. §1395x(hhh)(4)(a)(ii), patient consultations for USPSTF-recommended screening services: (ii) may be furnished— (I) through an interactive telephonic or web-based program; (II) during an encounter with a health care professional; (III) through community-based prevention programs; or (IV) through any other means the Secretary determines appropriate to maximize accessibility and ease of use by the beneficiaries, which ensures the privacy of such beneficiaries.

53. Federal law and published guidance from Medicare contradict Indictment's legal recitation that Medicare patients were required to pay a copayment to a telemedicine physician in connection with a consultation for a USPSTF-recommended screening test. A copayment policy for any USPSTF-recommended screening test consultation constitutes a violation of the Affordable Care Act. Specifically, the ACA in §4104 requires Medicare to cover one hundred percent (100%) of any patient cost-sharing requirement for consultations and testing for USPSTF-recommended screening tests and bars the application of co-payments.

54. Finally, the implementation of community outreach programs that provide Medicare beneficiaries access to preventive services are statutorily permissible modalities for ordering USPSTF screening tests. 42 U.S.C. § 1395x(hhh)(3)-(4); 42 U.S.C. § 1395l(a)(1)(X).

**F.   The OIG Has Excluded Payments to Promote Preventive Care Services from the Definition of "Remuneration" under the Federal Anti-Kickback Statute.**

55. The Office of the Inspector General (OIG) in 2005 published guidance formally adopting the Civil Monetary Penalty Law's definition of "remuneration" to exclude incentives given to individuals for the purpose of promoting the delivery of preventive care services under the Federal Anti-Kickback Statute. 70 Fed. Reg. 4873 (Jan. 31, 2005) ("The Medicare and Medicaid programs encourage patients to access preventive care services. The prohibition against inducements at section 1128A(a)(5) of the Act does not apply to incentives offered to promote the delivery of certain preventive care services.").

56. The OIG defined "preventive care" as any service that "is a specific clinical service described in the current U.S. Preventive Services Task Force's Guide to Clinical Preventive Services, and is reimbursable in whole or in part by Medicare or an applicable State health care program." 42 C.F.R. §1003.110.

57. Although the *Patel* Indictment recognizes that family-history CGx tests are "screening tests," it incorrectly alleges that the tests are *not* covered Medicare benefits. The Indictment simply overlooks the federal statutory coverage for USPSTF-recommended screening tests as personalized prevention plan services under the Affordable Care Act. 42 U.S.C. § 1395x(ddd)(3)(c).

58. Because the OIG has defined "remuneration" under the Federal Anti-Kickback Statute to intentionally exclude payments made to promote USPSTF-recommended preventive services, the payments made to LabSolutions' marketing downlines do not fall within the definition of

"remuneration" under the Federal Anti-Kickback Statute as a matter of law. 70 Fed. Reg. 4873 (Jan. 31, 2005).

59. Accordingly, the marketing payments at issue in the *Patel* Indictment are not subject to enforcement under the Federal Anti-Kickback Statute. *See* 70. Fed. Reg. 4873 (Jan. 31, 2005). Thus, the Indictment fails to properly allege any potentially viable violation of the Federal Anti-Kickback Statute given the facts also alleged in the same Indictment.

**G. The Implementation of a Provider-Funded Patient Navigator Program Under the ACA Is Exempt from Federal Anti-Kickback Enforcement.**

60. The Indictment attempts to criminalize legally permissible compensation models used to compensate community outreach programs that promote USPSTF-recommended preventive services, defined as "patient navigators," under Section 4004 of the ACA. As discussed above, these payments have been excluded from enforcement under the Federal Anti-Kickback Statute as of 2005. 70. Fed. Reg. 4873 (Jan. 31, 2005).

61. Pursuant to section 4004(e), of the ACA entitled "*Dissemination of Information Through Providers*," Congress encourages providers, such as LabSolutions, to develop and implement community outreach campaigns. Section 4004(e) states that the "[HHS] Secretary, acting through the Centers for Disease Control and Prevention,[10] shall develop and implement a plan for the dissemination of health promotion and disease prevention information consistent with national priorities, to health care providers who participate in Federal programs, including programs administered by the Indian Health Service, the Department of Veterans Affairs, the Department of Defense, and the Health Resources and Services Administration, and Medicare and Medicaid."

62. Pursuant to Section 4004(h) of the ACA, the federal government must also set aside $500 million per year in priority funding to provide federal grants to health care marketing entities and

to health care providers who engage in the same or similar community outreach services that were provided by LabSolutions' patient navigator programs.

63. Notably, Congress passed legislation to re-apply the Federal Anti-Kickback Statute to patient navigator programs, but only if the program receives federal grant funds. *See* 42 U.S.C. § 256a(c)(1). The then HHS Secretary issued written guidance on October 30, 2013, explaining that patient navigator programs are not considered "federal health care programs" under the Federal Anti-Kickback Statute:

> The Department of Health and Human Services does *not* consider QHPs, other programs related to the Federally-facilitated Marketplace, and other programs under Title I of the Affordable Care Act to be federal health care programs. This includes the State-based and Federally-facilitated Marketplaces; the cost-sharing reductions and advance payments of the premium tax credit; Navigators for the Federally-facilitated Marketplaces and other federally funded consumer assistance programs; consumer-oriented and operated health insurance plans; and the risk adjustment, reinsurance, and risk corridors programs. This conclusion was based upon a careful review of the definition of "Federal health care program" and an assessment of the various aspects of each program under Title I of the Affordable Care Act and consultation with the Department of Justice.

(Ex. A).

64. Indeed, many of the community outreach activities funded by the HHS are the same recommended activities that the Government now attempts to criminalize in the Indictment. (Ex. H).

65. Simply stated, because LabSolutions patient navigators did *not* accept any federal grant funds under 42 U.S.C. § 256a, the application of the prohibition set forth in 42 U.S.C. § 256a(c)(1) does not apply to LabSolutions Patient Navigator Programs.

## PART II

**A. The Indictment Misstates Medicare Administrative Contractors Authority to Enact Coverage Guidelines for Preventive Services Under Federal Law.**

66. The Indictment alleges that the "MACS were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service." *See* Indictment at page 3, ¶'s 6-7. The Indictment also alleges that Patel's laboratories located in Pennsylvania and Georgia were governed by the Novitas Solutions, Inc., and Palmetto GBA MACS, respectively. *Id.*

67. The Indictment further alleges "Medicare did not cover diagnostic testing that was 'not reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member.' 42 U.S.C. §1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover examinations performed for a 'purpose other treatment or diagnosis of a specific illness, symptoms, complaint or injury.' Title 42, Code of Federal Regulations, Section 411.15(a)(1)." Indictment at page 6, ¶ 20.

68. Pursuant to federal law, no Medicare Administrative Contractor has the authority to enact local coverage guidelines that could ever contain Medicare coverage of preventive screening services. This is primarily due to the fact that MACs have no authority to enact coverage guidelines relative to preventive services for Medicare beneficiaries. *See* Section 13.5.4 of Chapter 13, Medicare Program Integrity Manual at pgs. 12-3 (Ex. I)

69. In fact, only Congress through the enactment of federal legislation, or the HHS Secretary through her administrative authority enacted under MIPPA (P.L. 11-275 as codified in 42 U.S.C.

§1395x(ddd)(1)-(2)) have the authority to publish guidelines related to Medicare coverage of clinical preventive services. Any claims to the contrary are entirely unsupported by federal law.[11]

70. As explained in Section 13.5.4 of Chapter 13 of the Medicare Program Integrity Manual, Local Coverage Determinations ("LCDs") may only contain *diagnostic* coverage guidelines that are reasonable and medically necessary for the treatment of an illness or injury. An LCD may <u>not</u> contain coverage of preventive services because Medicare Administrative Contractors have no authority to enact coverage of preventive services as a matter of law:

> 13.5.4 – *Reasonable and Necessary Provisions in LCDs*
> *(Rev. 863; Issued: 02-12-19; Effective: 10-03-18; Implementation: 01-08-19)*
>
> An item or service may be covered by a contractor LCD if:
>
> • It is reasonable and necessary under 1862(a)(1)(A)[12] of The Act. Only reasonable and necessary provisions are considered part of the LCD.
>
> Reasonable and Necessary
>
> Contractors shall determine and describe in the LCD the circumstances under which the item or service is reasonable and necessary under 1862(a)(1)(A). Contractors shall determine if evidence exist to consider an item or service to be reasonable and necessary if the contractor determines that the service is:
>
> > o Furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member;
> >
> > o Furnished in a setting appropriate to the patient's medical needs and condition;

---

[11] *See* p.2 of CRS Report R40978, "*Medicare Coverage of Clinical Preventive Services*" (March 18, 2010).

[12] Section 1862(a)(1)(A) "Notwithstanding any other provision of this title, no payment may be made under part A or part B for any expenses incurred for items or services—which, except for items and services described in a succeeding subparagraph (which are not reasonable and necessary for the prevention of illness) are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]"

      o Ordered and furnished by qualified personnel;

      o One that meets, but does not exceed, the patient's medical need; and

      o At least as beneficial as an existing and available medically appropriate alternative.

*See* pgs. 12-3 of Chapter 13 of the Medicare Program Integrity Manual (Ex. I).

71. Thus, Medicare coverage of clinical preventive services can only be found in federal statutes, National Coverage Determinations (if the preventive service coverage was extended through the HHS Secretary's administrative authority granted under MIPPA as codified in 42 U.S.C. §1395x(ddd)(1)-(2)), or in USPSTF-recommended screening guidelines that have been linked by federal legislation to Medicare coverage through the passage of the Affordable Care Act.[13]

**B. The Novitas and Palmetto Local Coverage Articles (LCAs) Governing Cancer Genomic Testing Expressly Permit Providers to Submit CGx Screening Tests for Medicare Payment Without Requiring Any Signs or Symptoms of Disease.**

72. The Indictment's allegations regarding local Medicare coverage guidelines set forth in Novitas and Palmetto GBA are incorrect as a matter of law. Pursuant to Novitas Local Coverage Article A52986, all panel-based molecular genetic CPT codes require no particular diagnostic symptom codes to support payment.[14] *See* p. 9 of Novitas LCA A52986 ("Please note that because the following CPT codes represent multiple biomarkers these codes will not have procedure to diagnosis code limitations at this time."); pgs. 5-7 of Novitas LCD L35062 (removing all diagnosis-to-procedure code limitations for CPT Codes billing the CGx multigene BRCA

---

[13] *See* p. 9 of 2016 USPSTF Brief (Ex. J) ("In 2010, Congress created a link between the Task Force's recommendations and various coverage requirements for private and public insurers in the Affordable Care Act.")

[14] This includes 81246, 81350, 81400, 81401, 81402, 81403, 81404, 81405, 81406, 81407, 81408, 81435, 81436, 81450, and 81505.

screening panel); *see also* pgs. 3-6 of Palmetto LCA A56853 (disclosing there are no applicable ICD10 diagnosis codes necessary to support payment of any molecular genetic test panels, including CGx BRCA screening CPT codes).

73. In other words, both the Palmetto and Novitas MACS issued written guidance as of October 1, 2015, advising laboratory providers that all limitations in terms of requiring a Medicare patient have any signs or symptoms of disease were lifted when billing for the CPT Codes at issue in this case. Accordingly, the Indictment's allegation that "Medicare d[oes] not cover CGx testing for beneficiaries who did not have cancer or lacked symptoms of cancer (Indictment at page 7, ¶ 22) is legally incorrect.

74. If a Medicare beneficiary is not required to have any diagnosis code of any active signs or symptoms of illness to support payment of a CGx test, then the test is a Medicare-covered "screening test." According to the National Cancer Institute, a "screening test" is defined as "[c]hecking for disease when there are no symptoms. Since screening may find diseases at an early stage, there may be a better chance of curing the disease. Examples of cancer screening tests are the mammogram (for breast cancer), colonoscopy (for colon cancer), and the Pap test and HPV tests (for cervical cancer). Screening can also include doing a genetic test to check for a person's risk of developing an inherited disease.[15]"

75. The Indictment's recitation of the Medicare coverage guidelines stating that Medicare does not cover family-history screening for CGx tests is expressly contradicted by the Local Coverage Articles in both Palmetto LCA A56853 and Novitas LCA A52986 and Novitas LCD L35062 (May 2019).

---

[15] https://www.cancer.gov/publications/dictionaries/cancer-terms/def/screening (accessed January 3, 2021).

**C. The Indictment's Allegations Regarding Failing to Determine Medical Necessity for Cancer Genomic Tests Prior to Submitting the Claims to Medicare Are Legally False.**

76. The Indictment alleges that Patel's laboratory was responsible for determining medical necessity of the tests ordered by physicians prior to submitting claims to Medicare. However, the Government's assertions are contradicted by well-settled federal law. Laboratory owners have no duty to make any independent determination of medical necessity prior to submitting claims to Medicare.

77. In *United States v. Boston Heart Diagnostics Corp*., the District Court in the District of Columbia held that the Government's position that required a laboratory determine medical necessity of the tests performed was contrary to the published position of the HHS Office of Inspector General ("OIG"):

> [T]he Court is now convinced that a laboratory cannot and is not required to determine medical necessity, but rather is permitted to rely on the ordering physician's determination that the laboratory tests billed to Medicare are medically necessary. The OIG Guidance makes clear that "laboratories do not and cannot treat patients or make medical necessity determinations," but "should be able to produce or obtain from the treating physician . . . the documentation to support the medical necessity of the service the laboratory has provided." *Id.* at 45,079.

> Moreover, the OIG Guidance, in describing a laboratory's duties to ensure that it does not submit claims for medically unnecessary tests, does not include among those duties a laboratory's obligation to make an independent determination of the medical necessity of each test performed and billed. See *id. at 45,079-080* (e.g., stating that laboratories should communicate with physicians, maintain documentation to support medical necessity, construct requisition forms to promote conscious ordering of tests by physicians, and review coding).

> In the Court's view, the OIG Guidance would have explicitly included that obligation among its recommended compliance processes if it had intended to impose such an obligation on laboratories, and to suggest otherwise would entirely contradict that explicit language of the OIG Guidance.

*United States v. Boston Heart Diagnostic Corp*., 296 F. Supp. 3d 155, 159-160 (D.D.C. 2017).

78. Another U.S. district judge in the District of Columbia reached the same conclusion. *United States ex. Rel Riedel v. Boston Heart Diagnostic Corp*., 332 F. Supp. 3d 48, 56 (D.D.C. 2018) ("[E]ven though the Medicare statute requires the laboratory to certify the medical necessity of any test for which it makes a claim for payment, the laboratory is not required to make an independent determination of medical necessity, but rather may rely on the ordering physician's determination.").

79. Courts have dismissed healthcare fraud cases when the allegations are premised on laboratories submitting "medically unnecessary" testing. *United States v. Boston Heart Diagnostic Corp.*, *supra* (dismissing a civil False Claims Act case for medically unnecessary laboratory testing ordered by the patient's physician); *United States ex. Rel Riedel v. Boston Heart Diagnostic Corp*., *supra*.

80. The U.S. District Court in *United States ex. rel. Lutz v. Lab Corp. of Am. Holdings*, dismissed a civil False Claims Act case alleging healthcare fraud because it was predicated on allegations that Lab Corp submitted "medically unnecessary testing." 2019 U.S. Dist. LEXIS 7486 *6-7; 2019 WL 236799 (D.S.C. Jan. 16, 2019) ("In submitting a claim for reimbursement, 'a laboratory generally may rely on that doctor's order in submitting a claim for reimbursement as medically necessary.'") (*quoting United States v. Bertram,* 900 F.3d 743, 750 (6th Cir. 2018)).

81. Requiring laboratories to conduct an independent clinical review of medical necessity and placing an onus on laboratory providers to possibly override the independent clinical judgment of the treating physician is unlawful. Laboratories are not licensed healthcare practitioners. Laboratories do not possess the requisite licenses to practice medicine. Thus, laboratories are not permitted to treat, evaluate, or consult patients in order to determine the medical necessity of any test ordered for a Medicare patient.

82. Moreover, federal law is also clear that allegations that laboratory providers submitted a large volume of laboratory tests is legally insufficient to support allegations of healthcare fraud. "Merely citing the volume of sales, however, fell short of the… pleading burden because such reliance omits 'details about specific actions taken by the defendant to facilitate and further the alleged fraudulent scheme.' *United States v. Comstor Corp.*, 308 F. Supp. 3d 56, 89 (D.D.C. 2018) (citing *United States ex rel. Groat v. Boston Heart Diagnostics Corp.*, 296 F. Supp. 3d at 164-66; *DynCorp Int'l, LLC,* 253 F. Supp. 3d 89, 103 (D.D.C. 2017))." *United States ex. rel. Folliard v. Comstor Corp.*, 2018 U.S. Dist. LEXIS 187828 *23-4; 2018 WL 5777085 (D.D.C. Nov. 2, 2018).

**D. Medical Necessity Doesn't Apply to Preventive Screening Tests Under CMS Guidelines.**

83. The Indictment alleges Patel engaged in healthcare fraud as a result of LabSolutions submitting claims for family-history CGx tests because the tests lacked "medical necessity." Indictment at page 7, ¶ 22.

84. The Eleventh Circuit has previously upheld healthcare fraud convictions related to billing for healthcare products and services that were not medically necessary coupled with clear evidence of a defendant's intent to defraud. *United States v. Grow*, 977 F.3d 1310, 1321 (11th Cir. 2020) ("Recruits were prescribed, and Tricare was billed for, pain creams, scar creams, and vitamins that were not medically necessary); *United States v. Gonzalez*, 834 F.3d 1206, 1214 (11th Cir. 2016) ('A person makes a false claim if the treatments that were billed were 'not medically necessary or were not delivered to the patients.'").

85. In this case, however, medical necessity is not a relevant clinical or coverage criterion for preventive services and screening tests. BRCA screening CGx testing is a USPSTF-recommended

preventive service performed on asymptomatic patients.[16] The United States Preventive Services Task Force stated: "The recommendations of the USPSTF are made for asymptomatic populations.[17]"

**E. The Medicare Administrative Contractor's Voluntary Payment of Any Claim Constitutes Discretionary Coverage of That Claim Under CMS Guidelines.**

86. Aside from the federal statutory coverage discussed *supra*, Section 120.1 of Chapter 16 of the Medicare Claims Processing Manual explains that MAC's may elect to provide "discretionary coverage" to pay certain laboratory testing claims even without a formal coverage guideline or statute in place to support coverage of the test. CMS explains to its laboratory providers, that "A/B MACs (A) and (B) have discretionary authority to make reasonable and necessary scope of benefit determinations." *Id*.

87. Thus, even without any federal statutory coverage, or any local coverage determinations in place, the MAC may still elect to adjudicate claims for coverage within its powers to provide "discretionary coverage." *Id*. at §120.1. Thus, the absence of a specific coverage guideline alone is legally insufficient to justify the health care fraud charges pled in the Indictment when the claims were voluntarily adjudicated for reimbursement by Medicare.

**PART III**

**The Pleading Errors Require Dismissal of the Counts in Indictment**

88. The Indictment alleges conspiracy to commit healthcare fraud in violation of 18 U.S.C. §1349 (Count 1), five substantive counts of healthcare fraud in violation of (18 U.S.C. §1347)

---

[16] Grade Definitions | United States Preventive Services Taskforce (uspreventiveservicestaskforce.org) (accessed on December 8, 2020).

[17] https://web.archive.org/web/20100819014609/http://www.uspreventiveservicestaskforce.org/about.htm (accessed December 8, 2020).

(Counts 2-6), conspiracy in commit an offense relating to illegal renumeration in healthcare in violation of 18 U.S.C. §371 (Count 7), illegal remuneration in healthcare in violation of 42 U.S.C. §1320a-7b(b)(2)(A) (Counts 8-12), and conspiracy to commit money laundering in violation of (18 U.S.C. §1956(h) (count 13). The Government also seeks criminal forfeiture of significant assets.

89. Because each count's viability directly relies on the Government's erroneous application of federal law, the counts fail as a matter of law. Each count's specific legal deficiencies are outlined below.

**A. Count One – Alleged Conspiracy to Commit Healthcare Fraud Fails as a Matter of Law.**

90. The Government alleges in Count One that a violation of Section 1349 occurred because Patel conspired with others to (1) pay "kickbacks" in violation of the federal healthcare Anti-Kickback statute and (2) submit false claims by paying telemedicine company—who were not treating the Medicare beneficiary's cancer—to write prescriptions for CGx tests without regard to medical necessity and without using the tests for treatment. *See* Indictment at page 9, ¶ 3.

91. However, the Government's own allegations in the Indictment are that individuals associated with Patel's laboratory, LabSolutions, LLC, facilitated and/or secured the CGx screening tests by attending health fairs and otherwise contacting Medicare beneficiaries to inform them about the existence of CGx testing and to facilitate such testing. *See* Indictment at page 11, ¶ 7. Federal law and federal enforcement guidelines specifically exempt such activities (and the attendant compensation for them) from the Federal Anti-Kickback Statute.

92. If the referenced statute does not apply to the activities described in the Indictment, no underlying cause of action exists. The Indictment's legal allegations do not connect to the factual allegations pled. The Government has improperly misapplied inapposite law to Medicare-covered

preventive screening services in an attempt to create the conspiracy count, but the result is a fatal mismatch.

93.     Further, as outlined in the factual allegations, the CGx (specifically, the BRCA breast cancer tests in this case) are screening tests. These CGx screening tests are covered under ACA without the requirement of medical necessity and without the requirement of a prior or ongoing treating physician relationship with the Medicare beneficiary. As such, the medical necessity and the treating physician limitations/requirements described throughout the Indictment––are irrelevant to the specific tests submitted by the Laboratory for payment in this case.

**B. Counts Two Through Six – Alleged Healthcare Fraud Fails as a Matter of Law.**

94. Counts two through six of the Indictment contain allegations that fall within the overarching conspiracy count. Counts two though six involve cancer screening tests. *See* Indictment at pages 13-14, ¶ 5. The same Indictment alleges the CGx test claims were fraudulent because they were not medically necessary, were not eligible for Medicare coverage, and were not provided to beneficiaries as claimed. *See* Indictment at page 7, ¶ 22.

95. However, by separating the requirements and coverage for screening and diagnostic tests, the legal landscape becomes clear. The CGx screening tests were covered pursuant to federal law (ACA), did not require medical necessity for Medicare coverage as USPSTF-recommended preventive services, , and were provided to the beneficiaries through lawful modalities prescribed by federal law.

96. As outlined in the analytical sections of this motion, the CGx tests are covered under ACA without reference to medical necessity and without any requirement of being prescribed by a treating physician. The tests identified and described in counts two, three, four, five and six are not diagnostic in nature—nor were these tests submitted or paid as diagnostic tests. No

misrepresentation could occur as the stated requirements for the tests identified in counts two through six are inapplicable as a matter of law. In other words, it is irrelevant whether the Indictment's stated legal requirements were met or not as they are inapposite for USPSTF-recommended preventive services.

97. This conclusion makes sense—the CGx tests in this case are not for treatment because they are health screening tools. The preventive services at issue int he *Patel* Indictment do not require medical necessity because the tests' Medicare-coverage is predicated on family history, not current illness or injury.t The CGx screening tests do not need the prescribing physicians to have ongoing relationships with the beneficiaries because the test results have independent and ongoing clinical value regardless of the practitioner/beneficiary relationship.

98. For the reasons presented in this motion, counts two through six do not properly state federal statutory offenses and should be summarily dismissed.

**C. Count Seven – Alleged Conspiracy to Violate Federal Law Through Illegal Healthcare Renumeration Fails as a Matter of Law**.

99. Count Seven is a re-packaging of a subset of the allegations in Count One. Count Seven focuses on the compensation paid for identifying beneficiaries who might qualify for the CGx testing.  If the federal Anti-Kickback statute doesn't apply to the facts as alleged in the Indictment, then the resulting disconnect is fatal to Count Seven.

100.       Further, the HHS Secretary and the HHS OIG issued policy statements removing non-federal grant navigation activities such as those alleged in the Indictment from the enforcement shadow of the federal Anti-Kickback statute. Given this enforcement carve-out, the compensation paid to the individuals undertaking those activities cannot be characterized as improper, much less as illegal "kickback" payments. Pursuant to ACA, the CGx tests in this case were meant to be available to a wide pool of Medicare beneficiaries. The compensation for efforts

to identify qualified beneficiaries and facilitate the testing were removed on purpose from the scope of the Anti-Kickback provisions.

101.     One cannot illegally conspire to do something that is expressly permitted by federal regulations.

**D. Counts Eight Through Twelve – Alleged Illegal Remuneration in Healthcare Fails as a Matter of Law.**

102.     The individual counts alleging violations of the federal Anti-Kickback statute fail for the same reasons as the conspiracy count. Simply, the federal Anti-Kickback statute doesn't apply to the activities alleged in the Indictment.

**E. Count Thirteen – Alleged Conspiracy to Commit Money Laundering Fails as a Matter of Law**.

103.     The money laundering conspiracy count fails as a matter of law because no potential underlying specified unlawful activity exists given the pleading infirmities in the other counts of the Indictment. For example, if no fraud claims survive analytical scrutiny, then the money laundering claims tied to them also fail. In this case, the specified unlawful activity asserted in the Indictment is healthcare fraud (and wire fraud to effectuate the healthcare fraud). Because the underlying fraud allegations are fundamentally flawed, the allegations of conspiring to engage in illegal monetary transactions in furtherance of, or to conceal, the fraud also fail.

104.     In essence, all the counts of the Indictment involve an allegation of a specific type of fraud—of misrepresenting something was supposed to have been done prior to the filing of claims. In reality, however, each fraud count depends on nonexistent obligations or restrictions. One cannot commit fraud by filing a claim when the alleged deficiency is not a legal obligation in the first place. It cannot be a material misrepresentation if the alleged legal requirements are inapposite to the type of healthcare services provided to the Medicare beneficiaries.

## IV. Conclusion

105.     The Indictment is based on an erroneous legal foundation. The Government's failure to differentiate between diagnostic and USPSTF-recommended screening tests—each with differing coverage guidelines— coupled with the factual allegations in the Indictment, results in a fatally defective charging document.

106.     The Indictment attempts to criminalize the use of telemedicine and the activities of community-based screening programs that are permitted to assist Medicare beneficiaries obtain USPSTF-recommended preventive services including the services described in the Indictment. 42 U.S.C. § 1395x(hhh)(4).

107.   Further, the relevant Medicare MACS (Novitas and Palmetto's own Local Coverage Articles) contradict the Indictment's allegations. (Ex. L).

108.   The Indictment allegations facially contravene numerous sections of the ACA, federal statutes, the Palmetto and Novitas Local Coverage Articles (LCAs), and are inconsistent with the published guidance from the HHS.  (Ex. K).

109.    Patel should not be forced to stand trial based on a fatally defective charging document. He didn't choose to be before the Court; the Government drafted and secured the Indictment against him. The Government must identify correct statutes and frame the allegations in a manner that constitute a viable basis for proof of guilt. When the legal theories of culpability fail as a matter of law, the appropriate remedy is dismissal.

WHEREFORE, Defendant MINAL PATEL respectfully requests the Court grant this motion and dismiss the Indictment.

Respectfully submitted,

*/s/ Steven Sadow*
Steven H. Sadow
Georgia Bar No.: 622075
Admitted Pro Hac Vice
Lead Counsel for Minal Patel
260 Peachtree St., N.W., Ste. 2502
Atlanta, GA 30303
Tel.: 404-577-1400
Email: stevesadow@gmail.com


*/s/ Robyn Lynn Sztyndor*
Robyn Lynn Sztyndor
Florida Bar No.: 89253
*Local Counsel for Minal Patel*
RLS LAW, P.A.
401 E. Las Olas Blvd. Ste. 1400
Fort Lauderdale, FL 33301
Tel.: 786-395-1824
Email: rls409@nyu.edu

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 7, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Robyn Lynn Sztyndor*
Robyn Lynn Sztyndor