```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                    WEST PALM BEACH DIVISION
                     CASE NO. 19-CR-80181-RAR-1
 3
     UNITED STATES OF AMERICA,            Miami, Florida
 4
                                          November 29, 2022
 5          vs.
                                          10:51 a.m. - 5:30 p.m.
 6
     MINAL PATEL,                         Volume 2
 7
                     Defendant.           Pages 1 to 197
 8    _____

 9
                     TRANSCRIPT OF JURY TRIAL
10          BEFORE THE HONORABLE RODOLFO A. RUIZ, II
                     UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12

13   FOR THE GOVERNMENT:      JAMIE DE BOER
                              EMILY GURSKIS
14                            REGINALD CUYLER
                              KATHERINE ROOKARD
15                            UNITED STATES DEPARTMENT OF JUSTICE
                              CRIMINAL DIVISION, FRAUD SECTION
16                            1400 New York Avenue, 8th Floor
                              Washington, D.C. 20005
17
     FOR THE DEFENDANT:       STEVEN H. SADOW
18                            LAW OFFICE OF STEVEN H. SADOW, PC
                              260 Peachtree Street NW
19                            Suite 2052
                              Atlanta, Georgia 30303
20
     STENOGRAPHICALLY REPORTED BY:
21
                              ILONA LUPOWITZ, CRR, RPR, RMR
22                            Official Court Reporter to:
                              The Honorable Rodolfo A. Ruiz, II
23                            United States District Court
                              299 East Broward Boulevard
24                            Fort Lauderdale, Florida 3301
                              (954) 769-5568
25
```

```
 1   (Appearances continued)

 2
     FOR THE DEFENDANT:              DONALD F. SAMUEL
 3                                   GARLAND, SAMUEL & LOEB, PC
                                     3131 Maple Drive NE
 4                                   Atlanta Georgia 30305

 5                                   BRIAN T. RAFFERTY
                                     BAKER & HOSTETLER, LLP
 6                                   1170 Peactree Street, Suite 2400
                                     Atlanta, Georgia 30309
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I N D E X

2    WITNESS                                        PAGE

3    LAURIE MCMILLAN

4    DIRECT EXAMINATION BY MS. GURSKIS              70

5

6                       GOVERNMENT'S EXHIBITS

7

8
     Exhibit                                    Received
9
     209-A; 210-A; 212-A;                          69
10   213-A; 214-A; 216-A;
     217-A; 220; 221-A;
11   221-B; 221-C; 246;
     247; 213-D; 201-A;
12   201-B; 201-C; 222-A,
     B, and C; 223-A, B,
13   and C; 224-A and B;
     226-A and B; 228-A
14   through L; 230-A
     through M; 231-A
15   through E; 232-D
     through H; 233-A
16   and B; 235-G through
     J; 236-A through C;
17   237-D; 101; 107;
     108; 109; 110; 111;
18   260-A through D;
     201-A through D;
19   202-A and B; 203-A
     and B; 204-A and B;
20   205-A and B; 206-A
     and B; 207-A through
21   F; 208-A through D;
     243; 244; and 245
22   225-A, 225-B, 225-C             120

23

24

25
```

1              (Call to the Order of the Court.)

2         THE COURT:  This is case number 19-80181, United States

3    of America versus Minal Patel.  We had a juror that

4    unfortunately had some car trouble this morning, and that is

5    why we are starting later than anticipated.  But I am told that

6    the juror is here.  He's on his way up.  So I expect that we'll

7    be able to get started here in just a moment.

8         The plan is for me to do some preliminary instructions,

9    and then turn it over to openings.  I suspect that after we're

10   done with opening statements we might find ourselves with a

11   need for the break for lunch before the first government

12   witness is called soon thereafter.

13        So let me go ahead and check in with all sides to see

14   if there's any housekeeping concerns, any issues before we get

15   started today.

16        On the government's end, anything I need to be aware

17   of?

18        MS. DE BOER:  Thank you, Your Honor.  There will be

19   some exhibits that we'd like to preadmit before the first

20   witness, and I think there's a couple of disputes on exhibits

21   to resolve.

22        THE COURT:  Okay.

23        MS. DE BOER:  Before the first witness.  I don't know

24   if it makes sense to do it now or if we want to do it at lunch

25   because I think I agree that we're probably not gonna get to

1    the first witness until after lunch.

2         THE COURT:  Yeah, we can probably deal with that after.

3    Do you have any concerns -- I don't know if we have any issues

4    with the demonstratives during openings.  No problem there?

5         MS. DE BOER:  I believe the defense said yesterday they

6    don't object to what we intend to use during open.

7         THE COURT:  Is that all right, guys?

8         MR. SADOW:  Correct, Your Honor.

9         THE COURT:  Okay.  So why don't we go ahead and handle

10   that after openings.  We can get together before we bring the

11   jury back in as to any issues regarding your first witness.

12        Does that work?

13        MS. DE BOER:  Yes, Your Honor.  I would say I haven't

14   seen any demonstratives from the defense.  I don't know if they

15   intend to use any, but to the extent they do, this would be a

16   good time for us to take a look.

17        THE COURT:  Mr. Sadow, anything you guys plan on using,

18   just so that I can get ahead of it if there's any issues?

19        MR. SADOW:  No demonstratives for opening.

20        THE COURT:  All right, very good.  Okay.  So I think

21   with that we can go ahead and get through the preliminary

22   instructions and get through our opening statements this

23   morning.  Once we let the jury go, we can talk about any

24   rulings the Court needs to make as to the first witness this

25   afternoon.

1            Does that take care of it on the government's end?

2            MS. DE BOER:  Yes, Your Honor.

3            THE COURT:  Anything, Mr. Sadow, on the defense team

4     that I need to be aware of before we get into openings this

5     morning?

6            MR. SADOW:  No, Your Honor.

7            THE COURT:  All right.  Very good.  Thank you guys.  We

8     can see if we have them all here.  Hopefully he's up here

9     already.  Thanks, guys.

10           THE COURT SECURITY OFFICER:  He's here.

11           THE COURT:  All right.  Let's go ahead and bring in our

12    jury, please.

13           THE COURT SECURITY OFFICER:  All rise for the jury.

14        (Jury enters at 10:55 a.m.)

15           THE COURT:  Please be seated, everyone.  Good morning,

16    ladies and gentlemen of the jury.  It's good to see you all.

17    So we're going to get started here this morning.  I know we're

18    a little bit behind schedule.  One thing I'm sure you all are

19    now aware of is we don't start until we're all here together.

20           And I do want to thank the juror that I know had a

21    little bit of car trouble this morning, for letting me know.  I

22    would ask that you follow his example.  Certainly, if you have

23    any delays coming into court, you know, things happen.  Life

24    happens.  So whether it's traffic issues or family, car

25    trouble, whatever it may be, the proper thing to do is always

1    to call me.  I just want to make sure that you're on your way,

2    and I can go ahead and buy us time so that we're all here

3    together before we get started.

4         So let's keep -- continue that policy of keeping the

5    Court informed if you won't be here by 10:00 o'clock because I

6    do care about your whereabouts and want to make sure we try to

7    stay on schedule.

8         So here's the plan.  We're going to go ahead now and go

9    over what to expect.  I'm going to walk you through a

10   blueprint, if you will, about how the trial will be conducted.

11   As soon as I'm done with that, I'm going to turn it over to the

12   lawyers, and each one of them is going to present their opening

13   statements to all of you.

14        I expect that after that we will probably break for

15   lunch, and then the first witness will be called after lunch by

16   the government.  Everybody with me?  All right.

17        So I'm going to go ahead and go through some ground

18   rules here.  Now that you've been sworn, I need to explain to

19   all of you some basic principles about the criminal trial and

20   your duty as jurors, and these are known as preliminary

21   instructions.  I want you to know that at the end of the trial

22   I will give you much more detailed instructions that you must

23   follow.

24        Remember that it's your duty to decide what happens, so

25   you can determine whether the defendant, Mr. Patel, is guilty

1    or not guilty of the crimes charged in the indictment.  At the
2    end of the trial, I will explain the law that all of you must
3    follow to reach your verdict.  As you've all promised me, you
4    must follow the law even if you do not agree with it.  Now, you
5    must decide the case solely on the evidence that will be
6    presented here in this courtroom.  As a reminder, evidence can
7    come in many forms.  It can be testimony about what someone saw
8    or heard or smelled.  It could be an exhibit admitted into
9    evidence.  It can be someone's opinion.
10          Some evidence proves a fact indirectly, such as a
11   witness who saw wet grass outside and people walking into the
12   courthouse carrying wet umbrellas.  Indirect evidence,
13   sometimes called circumstantial evidence, is simply a chain of
14   circumstances that proves a fact.  As far as the law is
15   concerned, it makes no difference whether the evidence is
16   direct or indirect.
17          You may choose to believe or disbelieve either kind and
18   should give every piece of evidence whatever weight you all
19   think it deserves.
20          Now, certain things are not evidence and must not be
21   considered.  I want to list them for you now.  Statements and
22   arguments of the lawyers.  In their opening statements, which
23   you'll hear in just a moment, and closing arguments, the
24   lawyers will discuss the case.  But please remember that their
25   remarks are not evidence.

 1        Questions and objections of the lawyers should also be

 2    treated as speech that does not qualify as evidence.  The

 3    lawyers' questions are not evidence.  Only the witnesses'

 4    answers are evidence.  You should not think that something is

 5    true just because a lawyer's question suggests that it is.

 6        For instance, if a lawyer asks a witness, you saw the

 7    defendant hit his sister, didn't you?  That question is no

 8    evidence whatsoever of what the witness saw or what the witness

 9    did unless of course the witness agrees with it.

10        Do you all understand?

11        THE JURORS:  Yes.

12        THE COURT:  Very good.  Now, there are rules of

13    evidence that control what can be received into evidence.  When

14    a lawyer asks a question or offers an exhibit and a lawyer on

15    the other side thinks that is not permitted by the rules of

16    evidence, that lawyer may object.

17        If I overrule the objection, then the question may be

18    answered, or the exhibit may be moved into evidence.  If I

19    sustain the objection, then the question cannot be answered,

20    and you must ignore the question.  I want you to remember,

21    again, that when I sustain an objection to a question, ignore

22    it, and don't try to guess what the answer would have been.

23        Now, sometimes I may order that evidence be stricken or

24    that you disregard or ignore the evidence.  Other times, when

25    evidence is admitted, I may instruct you that it's being

1    admitted for a limited purpose and may give you an instruction

2    to guide you as to how you can consider that evidence.  But

3    what's important is if I strike evidence or ask you to

4    disregard it, that means that when you're deciding the case you

5    will not and shall not consider that evidence.

6         Now, I want to talk a little bit -- we discussed it

7    yesterday during our jury selection -- about the credibility of

8    witnesses.  We'll start hearing from witnesses this afternoon.

9    Remember that in reaching your verdict you may have to decide

10   what testimony to believe and what testimony not to believe.

11        You may believe everything a witness says or part of it

12   or none of it.  In considering the testimony of any witness,

13   remember the things you can take into account.  The opportunity

14   and ability of the witness to see or hear or know the things

15   testified to, the witness's memory, the witness's manner while

16   testifying, the witness's interest in the outcome of the case

17   and any bias or prejudice, whether other evidence contradicted

18   the witness's testimony, the reasonableness of the witness's

19   testimony in light of all the evidence, and any other factors

20   that bear on believability.

21        I will give you additional guidelines for determining

22   credibility of witnesses at the end of the case.

23        As you know, this is a criminal case, so I want to

24   remind you of the basic rules that you must keep in mind during

25   your service.  First, remember that the defendant, Mr. Patel,

1    is presumed innocent until proven guilty.  The indictment

2    against him brought by the government is only an accusation,

3    nothing more.  It is not proof of guilt or anything else.

4    Therefore, the defendant, Mr. Patel, starts out with a clean

5    slate.

6         Second:  The burden of proof is on the government until

7    the very end of the case.  The defendant has no burden

8    whatsoever to prove his innocence or to present any evidence or

9    to testify.  Since the defendant has a right to remain silent

10   and may choose whether to testify, you cannot legally put any

11   weight on a defendant's choice not to testify.  It is not

12   evidence.

13        Third:  The government must prove the defendant's guilt

14   beyond a reasonable doubt.  I will give you further

15   instructions on this point later, but bear in mind that the

16   level of proof required is high.

17        Now, our law requires you all as jurors to follow

18   certain instructions regarding your personal conduct.  And I

19   mentioned some of this yesterday before we broke.  In order to

20   help ensure a just and fair trial, there are certain

21   instructions I'm going to repeat again now.  You will hear me

22   repeat these instructions throughout your service.  It'll be a

23   bit of a broken record, but it's very important that all of you

24   recognize just how important this is to maintain a fair trial.

25        Do not talk either among yourselves or with anyone else

1    about anything related to the case.  You may tell the people

2    with whom you live and your employers that you are a juror in

3    this case and give them information about when you're going to

4    be required to be here in court, but you may not discuss with

5    them or anyone else anything related to the case.

6          Do not at any time during the trial request, accept,

7    agree to accept, or discuss with any person, any type of

8    payment or benefit in return for supplying any information

9    whatsoever about this trial.  You must properly tell me about

10   any incident you know of involving an attempt by any person to

11   improperly influence you or any member of the jury.

12         Do not visit or view the premises or places where the

13   charged crime was allegedly committed or any other premises or

14   place involved in this case.  Please do not use internet maps

15   or Google Earth or any other program or device to search for a

16   view of any location discussed in the testimony.

17         Do not read, watch, or listen to any accounts or

18   discussions related to the case which may be reported by

19   newspapers, television, radio, the internet, or any other news

20   media.  Do not attempt to research any fact, issue, or law,

21   related to this case whether by discussions with others, by

22   library, or internet research or by any other means or source.

23         In this age of instant electronic communication and

24   research, I want to emphasize that in addition to not talking

25   face to face with anyone about the case, you must not

1    communicate with anyone about the case by any other means,

2    including by telephone, text messages, email, internet chat,

3    chat rooms, blogs, or social networking sites and apps such as

4    Facebook, Instagram, YouTube or Twitter.

5           You may not use any similar technology of social media

6    even if I have not specifically mentioned it here.  You must

7    not provide any information about the case to anyone by any

8    means whatsoever, and that includes posting information about

9    the case or what you are doing in the case on any device or

10   internet site, including blogs, chat rooms, social websites, or

11   any other means.

12          You must not use Google or otherwise search for any

13   information about the case or the law that applies to the case

14   or the people involved in the case, including the defendant,

15   the witnesses, the lawyers, or me, the judge.  It is important

16   that you understand why these rules exist and why they are so

17   important.

18          Our law does not permit jurors to talk with anyone else

19   about the case or to permit anyone else to talk to them about

20   the case because only jurors are authorized to render a

21   verdict.  Only you have been found to be fair, and only you

22   have promised to be fair.  No one else is so qualified.

23          Our law does not permit jurors to talk among themselves

24   about the case until I tell you to begin deliberations because

25   premature discussions, as I stated yesterday, can lead to a

1    premature final decision.

2         Our law does not permit you to visit a place discussed

3    in the testimony, first, because you can't be sure the place is

4    in the same condition as it was on the day in question.  And

5    second, even if it were in the same condition, once you go to a

6    place discussed in the testimony to evaluate the evidence in

7    light of what you see, you now become a witness, not a juror.

8         As a witness, you may now have a mistaken view of the

9    scene that neither party may have a chance to correct, and that

10   of course is not fair.

11        Finally, our law requires that you not read or listen

12   to any news accounts of the case and that you not attempt to

13   research any fact, issue, or law, related to the case.  Your

14   decision must be based solely on the testimony and other

15   evidence presented in this courtroom.

16        Also, the law often uses words and phrases in special

17   ways.  We talked a little bit about this yesterday.  So it's

18   important that any definitions you hear come only from me and

19   not from any other source.  It wouldn't be fair to the parties

20   for you to base your decision on some reporter's view or

21   opinion or upon other information you acquire outside of the

22   courtroom.

23        Again, these rules are designated to help guarantee a

24   fair trial, and our law accordingly sets forth serious

25   consequences if these rules are not followed.  I trust that all

1   of you understand and appreciate the importance of following

2   these rules, and in accord with your oath and promise, I know

3   that all of you will do so.

4          Now, all of you, I believe, have been given notepads,

5   correct?

6          THE JURORS:  Yes.

7          THE COURT:  Okay.  Now, if you wish, you may take notes

8   to help you remember what a witness said.  If you do take

9   notes, please keep them to yourself until you and your fellow

10  jurors go to the jury room to decide the case.

11         Do not let note-taking distract you so that you don't

12  hear other answers by witnesses.  When you leave the courtroom,

13  I will instruct you to either leave your notes in the jury room

14  or to leave the notes in your chairs.

15         Whether or not you take notes, you should always rely

16  on your own memory of what was said.  Notes are to assist your

17  memory only.  They are not entitled to any greater weight than

18  your memory or impression about the testimony.

19         What I would do is on the first page of your notebook,

20  write your name, and then flip it and take notes after that.

21  That way if we get confused, we don't look at your notes, we

22  can open it up and quickly tell who it belongs to.

23         I want you also all to know that at the end of the

24  trial we shred and destroy all notes.  No one will read them.

25  You should feel very comfortable to write in there your

1    impressions and your notes regarding the testimony.

2         Do you all understand?

3         THE JURORS:  Yes.

4         THE COURT:  All right.  Now, the trial is going to

5    begin in just a moment.  First, the government is going to make

6    an opening statement which is simply an outline to help you

7    understand the evidence as it comes in.  Next, the defendant's

8    attorney may, but does not have to, make an opening statement.

9    Opening statements, remember again, are neither evidence nor

10   argument.

11        The government will then present its witnesses, and

12   counsel for the defendant may cross-examine them.  Following

13   the government's case, the defendant may, if he wishes, present

14   witnesses whom the government may cross-examine.  After all the

15   evidence is in, the attorneys will then present their closing

16   arguments to summarize and interpret the evidence for you, and

17   that will take place after I instruct all of you on the law.

18        After that, you will go to the jury room to decide your

19   verdict.

20        So that is kind of the blueprint of what to expect.

21   All right?

22        So with that being said, folks, it's time now to hear

23   from our lawyers.  I ask that you give them your undivided

24   attention.  They've each been given equal amount of time for

25   their opening statements.  So I'll turn it over to you.

1              Can you all see that screen that's in front of you?

2              THE JURORS:  Yes.

3              THE COURT:  During the trial there will be evidence put

4    on that screen.  There will be demonstrative exhibits put on

5    that screen.  Please be aware that to the extent any evidence

6    is introduced into evidence, it's admitted.  I will make sure

7    copies of documents are sent back to the jury room.

8              So don't worry if you don't capture everything right

9    when it comes up on the screen.  You're going to get copies to

10   review again later.  I just want to make sure you can all see

11   that.  Okay?  All right.

12             With that being said, we'll turn it over to the

13   government.

14             Ms. de Boer, the floor is yours.

15             MS. DE BOER:  Thank you, Your Honor.

16             Good morning, ladies and gentlemen.

17             THE JURORS:  Good morning.

18             MS. DE BOER:  This case is about a healthcare scam that

19   preyed on cancer survivors and people afraid of getting cancer,

20   to steal millions of dollars from Medicare.  It's about how con

21   men tricked senior citizens into accepting lab tests that they

22   did not need.  And it's about this defendant, Minal Patel, who

23   not only made this all possible, but made it all profitable.

24             The defendant, Minal Patel, was the architect of this

25   scheme.  He owned and operated a clinical laboratory called

1   LabSolutions, which billed Medicare for a sophisticated and

2   expensive DNA test, including a type of DNA test called a

3   cancer genetic test.

4          So folks, how much money are we talking about here?

5   You heard a bit about that yesterday.  We will show you that in

6   just three years, the defendant's laboratory billed Medicare

7   for over $463 million.

8          Members of the jury, the government will prove to you,

9   over the course of this trial, that the defendant, Minal Patel,

10  used his lab, LabSolutions, to defraud Medicare by billing

11  millions in excessive, expensive, and utterly wasteful lab

12  tests.

13         Ladies and gentlemen, the entire scheme revolved around

14  this (indicating).  This is a swab that was used to swab

15  people's mouths to collect samples of saliva.

16         The defendant devised a way to use what is effectively

17  a giant Q-tip, like a magic wand, to turn cancer into cash and

18  DNA into dollars.  The defendant oversaw, as owner, the lab,

19  LabSolutions, which was located in Atlanta, Georgia.

20         And like you heard yesterday and today, one of the

21  types of tests that the defendant's lab performed and billed to

22  Medicare is called a cancer genetic test, which is also known

23  as CGx testing.

24         A CGx test is just a type of DNA test that can help

25  determine if somebody has a higher risk of developing certain

1    types of cancers over the course of their lifetime, based on

2    mutations in their genes that they may have inherited from

3    their family.

4         The defendant's lab also billed to Medicare another

5    type of genetic test which is called a pharmacogenetic test or

6    PGx testing.  You will learn in this trial that a PGx test is a

7    way to test how someone will react to certain types of

8    treatments or medications based on their genetic makeup.

9         Now, these were not the only two tests that the

10   defendant's lab billed to Medicare, but these were the tests

11   that the defendant targeted because this is where the money

12   was.

13        CGx tests and PGx tests, you will learn, can be billed

14   to Medicare for hundreds or even thousands of dollars a pop.

15   The evidence will show that it was the defendant's decision to

16   target CGx and PGx testing and to target Medicare.  Medicare

17   paid a lot for these tests and it paid fast.  The defendant

18   knew that and he exploited it.

19        You will learn that these tests are only supposed to be

20   billed to Medicare in very limited circumstances.  Medicare

21   does not cover these tests as general screening tests for the

22   whole population.  This is not like a mammogram or a prostate

23   exam or a colonoscopy that everybody gets after a certain age.

24        These cancer genetic tests do not detect whether

25   someone has cancer right now.  They are not screening tests in

1    that regard.

2         The defendant may have used lots of complicated billing

3    codes to fool Medicare into paying for many of these tests that

4    his lab billed.  But at the end of the day, you will learn that

5    Medicare's coverage requirements for these tests are quite

6    simple:  The patient has to actually need the test.  A doctor

7    who is involved in treating the patient has to actually order

8    the test.  And the test results have to be used to help the

9    patient.

10        We will show you that none of these things happened.

11   These patients did not need these tests.  The doctors who

12   ordered the tests were not treating the patients.  And the test

13   results were not used to help these people.

14        But these were the lies that the defendant and his

15   partners in crime told to Medicare time and time again.  These

16   were the lies that the defendant and his partners in crime used

17   to attempt to steal nearly half a billion dollars from

18   Medicare.

19        What you will learn in this trial is that these genetic

20   tests can be good, but not the way the defendant used them.

21   These tests have the potential to be helpful and even

22   lifesaving, but not the way the defendant used them, because

23   rather than use these tests to help patients, the defendant

24   used these patients to help himself.

25        The evidence will show that these were wasted tests.

1    These so-called patients never got the benefit of the bargain.

2    They never got a benefit from these tests.  The only people who

3    benefited from these tests, in this case, were the defendant

4    and his partners in crime.

5          So how did the defendant pull this all off?  We will

6    show you that there were five essential steps that made this

7    scheme work.

8          Step number one:  Enroll with Medicare.  You will learn

9    that Medicare is a federal health program that provides

10   healthcare coverage to people age 65 and over and people with

11   disabilities.

12         You're going to learn that Medicare does not allow just

13   anybody to submit a claim for payment for medical service.

14   Providers have to make certain promises to Medicare before they

15   can be allowed to submit claims.

16         Medicare requires those promises, and it expects and

17   trusts that providers, like the defendant's lab, will keep

18   those promises.

19         Chief among those promises is that the provider will

20   not submit false claims and that the provider will not pay

21   what's known as kickbacks or bribes to obtain patients or to

22   obtain doctors' orders.

23         The defendant agreed to both of those promises, but he

24   broke them time and time again.

25         You will also learn that each and every claim that is

1    submitted to Medicare for payment comes with its own promise,

2    its own certification that the claim is, in fact, legitimate,

3    that it is not fraudulent.

4          At the defendant's direction and under his control, his

5    lab submitted tens of thousands of claims for tens of thousands

6    of patients.  That's tens of thousands of lies, day in and day

7    out, for years.

8          What this tells you, ladies and gentlemen, and what you

9    will know and learn throughout this trial, is that without the

10   defendant, without his seal of approval promising to abide by

11   Medicare's rules and regulations, without his lab's ability to

12   bill Medicare, and without his willingness to lie, this crime

13   could have never happened at all.

14         Step two was to lure in the patients.  You're going to

15   learn that the defendant paid kickbacks and bribes to patient

16   recruiters, patient brokers, in order to get referrals for

17   patients.  The defendant's army of patient brokers hired other

18   people to create internet ads.  Sometimes these ads were part

19   of a sweepstakes prize.  Sometimes they were part of coupons or

20   other free offers.

21         But these ads were a front for a telemarketing scam.

22   The defendant instructed his patient brokers to find people who

23   had Medicare as their insurance, and these people who were

24   primarily senior citizens, they would see these ads while

25   surfing the internet.  They would click, they would fill out a

1    survey, and all of a sudden their personal information is in

2    the hands of a telemarketer hired and paid for by the

3    defendant.

4         The telemarketers would call up the patients and

5    convince them to agree to take one of these tests.  These were

6    sales calls made by trained salespeople.  The point was to make

7    a sale.  The point was to get to yes.

8         Some of the telemarketers even offered gift cards and

9    other enticements.  Others implied or directly told the

10   patients that these tests were free, that they qualified for

11   these tests, that these tests were covered by Medicare.

12        We'll bring you in a medical expert who uses these

13   tests in his own practice.  He will tell you that these tests

14   are not meant to be given to the entire Medicare age

15   population.  In fact, you will learn that the number of people

16   who can benefit from these tests is actually quite small, and

17   those people that can benefit from these tests cannot and

18   should not be found through misleading internet advertising and

19   telemarketing.

20        The telemarketers also asked a series of questions when

21   they got on the phone with these patients, questions about the

22   patients' personal and family history of cancer.  These

23   questions were not designed to help the patients.  These

24   telemarketers were not doctors or medical professionals.  They

25   were not capable of diagnosing the patient with anything or

1   evaluating whether the patients needed one of these tests.

2          These questions were designed to streamline the fraud.

3   These questions were designed to find any hook, to make it look

4   like these patients wanted and needed the test.

5          The evidence will show that once these telemarketers

6   convinced the patients to agree, once they got to yes, the

7   patients were all but destined to receive one of these tests

8   and to have their Medicare insurance card used like an ATM card

9   by this defendant.

10          Folks, the defendant's lab, it was just a lab full of

11   worthless swabs of spit like that one, without one thing,

12   without an order signed by a doctor authorizing these tests.

13   Because you're going to learn that if a doctor does not order

14   these tests, they can't be done.  They cannot be billed to

15   Medicare, and Medicare will not pay.  So that's step three, by

16   a prescription.

17          If the patient said yes to these telemarketers, the

18   patient's information was sent to a telemedicine company.

19   Folks, just like these tests, telemedicine can be good, but not

20   the way the defendant used it.  The defendant turned

21   telemedicine on its head.  The telemedicine companies were paid

22   by middlemen hired by the defendant.

23          Think about that for a second.  The defendant's lab

24   paid middlemen to find patients through internet advertising

25   and telemarketing.  And then paid these middlemen to pay for

1    telemedicine visits.

2         You will learn that what the defendant was really

3    paying for was signed doctors' orders authorizing these tests.

4    These doctors were signatures for hire, rubber stamps.  Yet

5    again, the defendant was paying to get to yes, paying to get a

6    doctor's signature on a piece of paper.  And you will learn

7    that the vast majority of the time, the defendant got exactly

8    what he paid for.

9         What you will hear is that many of these patients never

10   even spoke with the doctor who ordered this test, didn't even

11   know who that person was.  Many of these patients never got the

12   results of their test.  And if they did get the results, the

13   results were meaningless without the assistance of a trained

14   doctor who knows the patient, who is treating the patient, and

15   can make use of those results in the patient's care.

16        Like I said, we will bring you a medical expert who

17   will explain to you that the results of these tests can be

18   extraordinarily complicated, and they can be scary.  They

19   require trained medical professionals to translate into a

20   course of treatment.  That is not what happened here.

21        The defendant and his partners in crime took the

22   patients' real doctors out of the equation because going

23   through a patient's real doctor is expensive and is not going

24   to yield the type of volume that the defendant wanted.

25        When you hear the evidence in this case, it will be

1   very obvious to you that this was not medicine.  This was not

2   healthcare of any sort.  This was the buying and selling of

3   patients and the buying and selling of doctors' orders.

4        Step four in this scheme was to maximize the revenue.

5   The defendant did not test patients for just one, just two

6   genes.  You will learn that the defendant's lab tested an

7   expansive panel of dozens of genes.  Why?  Not because the

8   patients needed that, but because the more genes that were

9   checked off, the more codes the defendant's lab could put on

10  the bill to Medicare, and the more likely it would be that one

11  of those codes would stick and get paid.  More genes, more

12  codes, more money.

13       You will hear about how the defendant and his

14  co-conspirators made it easy for the doctors to rubber-stamp

15  these orders and to do that on a massive scale.  They did that

16  by prechecking this expansive panel of genes and prefilling the

17  diagnosis codes before the order even got to the doctor.

18       You will hear that the defendant's lab billed CGx

19  tests, the cancer genetic tests, for over 27,000 patients.  The

20  number of people who can benefit from a test like this is quite

21  small, but, odds are, maybe somebody in that 27,000 could have

22  benefited from this test.

23       That makes this even worse, ladies and gentlemen.

24  Because the people who could have benefited didn't benefit,

25  because that's not what this scheme was about.

1           You will learn that these genetic tests are

2    once-in-a-lifetime coverage by Medicare.  So if Medicare covers

3    it for a person, Medicare covers it once.  So the people for

4    whom the defendant's lab billed, suppose they ever needed that

5    test, they can't get it covered again.

6           Another way the defendant maximized revenue was to

7    contract with a host of different patient recruiters - a host

8    of different patient brokers to supply him with a steady stream

9    of patients and a steady stream of doctors' orders.  And the

10   defendant learned early on in this scheme that traditional

11   marketing to doctors' offices was not going to generate the

12   kind of volume that he needed to pull off this scheme on this

13   grand of a scale.

14          So that's why he turned to the telemarketing and

15   telemedicine.

16          Step five of this scheme was to conceal the crime.

17          Folks, much of what the defendant did here, open and

18   obvious, right?  You can't hide telemarketing.  You can't hide

19   millions of dollars in payments to patient brokers.  You can't

20   hide tens of thousands of claims and tens of thousands of

21   patients.  You can't hide millions of dollars in bills to

22   Medicare.

23          But you can take steps to give this the appearance of

24   legitimacy, and that's what the defendant did.

25          You'll hear about how the defendant made his patient

1  brokers sign contracts, written agreements supposedly

2  describing what it was that the defendant was paying these

3  people to do.

4         We will show you those contracts, and we will bring in

5  some of the patient brokers to testify to you, to explain these

6  contracts themselves, so that you can see and hear about the

7  defendant's lies.

8         These contracts said that the patient brokers were

9  advertising to doctors' offices.  That's not what they were

10 doing.  The contract said nothing about using telemarketing,

11 internet ads, to directly solicit patients.

12        The defendant knew that these contracts were a lie, and

13 this was part of the coverup.  This was fake paperwork to paper

14 over this fraud.  Because you're going to learn over the course

15 of this trial that it's a problem to pay marketers and patient

16 brokers the way that the defendant did.

17        The defendant paid them based on a percentage of the

18 tests that referred -- based on a percentage of what Medicare

19 paid on those tests.  So an "eat what you kill" model.  That

20 might be okay in other industries, but you will learn that when

21 you're dealing with Medicare, that can be a problem, because of

22 as you will learn, that's a crime, when the marketers are

23 directly soliciting patients and are paying for doctors' orders

24 in the way that was done here.

25        You may hear about some legal advice that the defendant

1    received over the course of this scheme.

2         Ladies and gentlemen, the defendant lied to those

3    lawyers just like he lied to Medicare, to get what he wanted.

4    You will see and hear things about the defendant's scheme that

5    give it an appearance of legitimacy, but you will quickly learn

6    that it was not legitimate.

7         For example, there were actual patients, actual human

8    beings with Medicare cards, but they did not actually need

9    these tests.  There were licensed doctors, but those doctors

10   were paid rubber stamps.  There were tests performed, but those

11   tests were useless without a patient who needed them and a

12   doctor actually using those tests to help the patient.  The lab

13   had employees and it had lawyers, but they were kept in the

14   dark.

15        Ladies and gentlemen, it may have looked legitimate at

16   times, but the evidence will show that this was not patients in

17   search of legitimate medical care.  This was not doctors in

18   search of better treatments for their patients.  We all know

19   what medicine should be, but that's not what this was.  This

20   was tests in search of patients.

21        Members of the jury, for his role in this scheme, the

22   defendant is charged with conspiring to commit healthcare fraud

23   and wire fraud, conspiring to defraud the United States and pay

24   kickbacks, and money laundering.  He's also charged with some

25   examples of specific bills submitted to Medicare that were

1    fraudulent and specific payments of kickbacks.

2           The Judge is going to instruct you on the law of all

3    those charges at the end of this case, but healthcare fraud,

4    it's just lies for money.  Lies to Medicare in order to get

5    money.

6           The defendant also paid commissions to patient brokers

7    to get these patient referrals and to get doctors' signatures

8    on orders.  That's a kickback.  And then the money that the

9    defendant stole from Medicare, he spent it on personal

10   purchases, and he hid it.  That's money laundering.

11          Another thing that the Judge will instruct you on, and

12   already has instructed you on, is the government's burden of

13   proof in this case.  It is the government's burden to prove

14   these charges to you beyond a reasonable doubt.  That burden

15   stays with us throughout this entire case, and we embrace it.

16          So let me tell you about some of the evidence we're

17   going to bring to you throughout the course of this trial.

18   You're going to hear about the people pictured on this diagram.

19   You're going to hear about people like Brett Hirsch, Shawn

20   Griner, Senthil Ramamurthy, Christian McKeon, and Mark Sporn.

21   These were just some of the patient brokers and telemedicine

22   company owners that the defendant partnered with to plot this

23   scheme.

24          You're going to hear about others who were involved in

25   this as well.  You will hear about the companies that they

1  owned.  MyOnCallDoc, the telemedicine company; MedTech,

2  telemedicine company; XGEN, a marketing company; BBAR, another

3  marketing company; Alite Medical, Brett Hirsch's marketing

4  company; Q Health, and a company called IDGAF.  Yes, IDGAF, I

5  don't give a -- that is one of the company names involved in

6  the scheme that the defendant partnered with because that's

7  what this was, because no one involved in this gave a -- about

8  anything other than making money.

9       Some of the people here and some of the other names

10 that you've heard throughout this trial so far will come in and

11 testify.  You won't hear from all of them, but you will hear

12 from some of them.  And they will take you inside the scheme.

13 They had a front-row seat to the crimes that I've been

14 describing.

15      They will come in, and they will talk about the crimes

16 that they committed and what they did with the defendant.  They

17 will tell you how they got the patients.  They will tell you

18 how the telemarketing worked.  They will tell you how the

19 telemedicine worked.  And they will tell you what the defendant

20 instructed them to do.

21      They will admit their crimes to you, and they will tell

22 you that they entered into what is called a plea agreement.

23 They will tell you that they hope to get time off their

24 sentences in exchange for cooperating with the government.

25      The patient brokers will also tell you how they could

1    not have done what they did without the defendant and how the

2    defendant was in charge.

3           You will also learn that the defendant needed these

4    people to insulate himself from the worst parts of this crime.

5           Ladies and gentlemen, the government is not asking you

6    to like these people.  They took advantage of Medicare

7    beneficiaries to make a quick buck.  Some of them did things

8    that will make you uncomfortable.  Some of them got so greedy

9    that they even brought members of their own family into this.

10   But remember, the defendant wanted these patient brokers

11   because they were willing to do these bad things that made them

12   useful.

13          What the government is asking you to do is to listen to

14   their testimony.  We are not asking you to just take their word

15   for it, because the cooperating witnesses will be corroborated

16   by other evidence, other witnesses, documents, emails, billing

17   records, and financial records.

18          So, for example, you will hear from former employees of

19   the lab, people who were there.  They will tell you what they

20   saw at LabSolutions.  They will tell you that they saw and

21   observed things that made them uncomfortable.

22          You will hear from some of the Medicare beneficiaries

23   themselves.  They will tell you about how they were solicited

24   to take these tests.  They will tell you that they did not

25   speak with and did not know the doctors who ordered these

1    tests.  They will tell you that they either did not get the

2    results of these tests or, if they did, the results were

3    meaningless to them, and they were in no way, shape, or form,

4    used to help them.

5         These patients do not know the defendant, but they were

6    used by the defendant as pawns in this scheme.

7         We will bring you someone who is knowledgeable about

8    Medicare, someone to explain to you the limited circumstances

9    in which Medicare covers these tests.  This witness will

10   explain that the test has to be medically necessary, that this

11   test should not just be done for curiosity or for fun.  We will

12   bring in a medical expert, someone who uses these tests in his

13   own practice.  He will tell you how he determined that the

14   tests used in this case were not medically necessary based on

15   what he sees in the patients' files.

16        We will describe trends in the data and the billing.

17   We'll tell you what the bank records show.  We will show you

18   emails, text messages, contracts, internet ads, the documents

19   that show you the kinds of things that I've been talking about

20   today.  The documents that show you that the defendant knew

21   about it, that he authorized it, and that he orchestrated it.

22        We'll show you the patient files or, rather, what

23   passed for patient files in this scheme.  These files were

24   designed to be there just so that if Medicare checked, they

25   would look fine.  But they were not fine.  The documents in the

1    patient files were not meaningful.  This was just another way

2    to paper over the scheme, to make it look legitimate.

3            You will hear some of the recordings from these

4    telemarketing calls so you can see for yourself how these

5    patients were tricked.  We will show you the billing data

6    reflecting the tens of thousands of claims and tens of

7    thousands of patients that LabSolutions billed for.

8            Now, ladies and gentlemen, the defendant was not the

9    only person involved in this.  He was not the only person who

10   profited from this scheme.  You're going to hear about other

11   people, some of these people, some people that worked at the

12   defendant's lab and others who also made a lot of money from

13   this.

14           And there was plenty of money for the taking and plenty

15   of people who were, like the defendant, willing to take it.

16   But none of these other people that you will hear about were

17   lab owners.  They needed someone with a clinical lab and a

18   license to bill Medicare to make this all happen.  They needed

19   the defendant.  He needed them.

20           And at the end of the day, ladies and gentlemen, there

21   was only one lab owner, and it was the defendant.  There was

22   only one person at the top with control over the money coming

23   in from Medicare and the lab, and it was the defendant.

24           There was only one person who assembled all the cogs in

25   the fraud machine, and it was the defendant.  And without the

1    lab to bill these tests, none of this works.  The defendant was

2    therefore vital to the scheme and central to the fraud.

3          Ladies and gentlemen, this case, at the end of the day,

4    is simple:  Minal Patel sent tests in search of patients, and

5    in doing so he made a mockery of what should have been

6    legitimate medicine.  Minal Patel bribed middlemen to entice

7    senior citizens, people who have survived cancer, and others,

8    to take tests that they didn't need.

9          He took advantage of people to get what he wanted, and

10   he lied to Medicare for money.

11         Ladies and gentlemen, at the end of all of the evidence

12   in this case, you will know that the defendant is guilty of all

13   charges.  Thank you.

14         THE COURT:  Thank you, Ms. de Boer.

15         Mr. Sadow?

16         MR. SADOW:  Thank you, Your Honor.

17         THE COURT:  You're welcome.

18         MR. SADOW:  Good morning.

19         THE JURORS:  Good morning.

20         MR. SADOW:  You just heard a whole lot of stuff.  Now

21   let me give you the other side.

22         First, let me introduce the defense team and their

23   roles.  This is Brian Rafferty.  He will be handling the

24   healthcare aspects of the case.  This is John Samuel, and he

25   will be handling the legal advice and the lawyer part of the

1    case.  This is Mr. Patel, and he's the one that the

2    government's been talking about for the last 30 minutes.

3           So let's look at this in a little different light.

4    Let's try to figure out how we got here.  The money, the money.

5    Medicare, upon the submission of valid claims by LabSolutions,

6    paid, according to the government -- and we're not taking issue

7    with it -- $187 million to LabSolutions over a period of three

8    years, from the middle of 2016 to the end of August of 2019.

9           I don't have to tell you -- you already know -- that's

10   a lot of money.  But Medicare paid these claims because the

11   information submitted by LabSolutions was accurate, and

12   Medicare determined it was payable.

13          Now, how do we get to the Medicare part?  This is

14   ridiculously complex, and I'm not sure that I understand it,

15   which is why I'm not doing the healthcare part of this.  But

16   Medicare is an entity that we refer to as CMS.  Okay?  This

17   will all be made clear to you as we go through the case.  CMS

18   has under it -- it puts forth what are called National Coverage

19   Determinations.  Short term, NCDs.  And the NCDs are

20   nationwide.  They determine, on a national level, in essence,

21   what CMS or Medicare is going to cover.

22          But then, Medicare doesn't internally make these

23   decisions.  It contracts with what are called MACs, and a MAC

24   is a Medicare Administrative Contractor.  It's an independent

25   contractor that works with Medicare.

1          And the MACs are private healthcare insurers, and they

2    promulgate what are called Local Coverage Determinations, LCDs.

3    And you know who decided to pay the claims submitted by

4    LabSolutions?  The MACs.

5          And they put forth their own LCDs, Local Coverage

6    Determinations.  Now, you would think that the MACs -- and

7    there are many of them.  And here, we're going to be talking

8    about three.  Again, you're going to get all of this.  I know

9    it's a little bit much to begin with.

10         But we're going to be talking about a MAC called

11   Cahaba, a MAC called Palmetto, and a MAC called Novitas.

12   Remember what I said.  You have the national up here, then you

13   get the MACs, and the MACs give these LCDs.

14         Well, you would certainly think that these LCDs would

15   be the same, right?  I mean, you're coming down from the same

16   entity.  But they're not.  Each MAC promulgates its own LCDs.

17   What does that mean?

18         Some MACs say that personal history alone is covered

19   for CGx.  Some MACs say personal history and family history is

20   covered for CGx.  How can that be?  I mean, if the law is as

21   clear as the government's going to present it, how could it be

22   that these MACs have different rules that they follow?  Because

23   it's confusing and it's complex.

24         And LabSolutions is not a small entity.  It had tens of

25   employees in different roles.  Mr. Patel was the owner, but it

1   had a CEO, it had a CFO, it had all these people that helped

2   make determinations on billing.  It had all these people that

3   made determinations on genetics.  They had genetic counselors.

4   They had a whole company set up.

5           And you know what?  It was highly successful.

6   Mr. Patel, as an Indian businessman, was highly successful.

7           Now, at some point -- and we can't pinpoint exactly

8   when -- the Department of Justice, which is the prosecutors,

9   must have interacted with Medicare and said, how are you paying

10  out all this money on these claims?  And that's how we get to

11  this case.

12          Because three years go by, and all of these billings

13  and claims are being paid, and somebody steps in and says,

14  whoa, this is a whole lot of money.  We want to look at this

15  and determine whether LabSolutions, or Mr. Patel, must have

16  been doing something wrong.

17          That's when I say, it's all about the money.  Because

18  if this was a $2 million, we wouldn't be here.

19          MS. DE BOER:  Objection, Your Honor.

20          THE COURT:  Overruled.

21          MR. SADOW:  If it was a $5 million, we wouldn't be

22  here.  It's because LabSolutions made a lot of money, and it

23  spent a great deal of money on equipment and employees to be a

24  highly successful business.

25          Now, I'm going to digress.  What does a highly

1   successful business do to make sure or try to ensure, in good

2   faith, that it's doing it right?  It hires attorneys to provide

3   advice.  LabSolutions, in three years, spent $450,000 on

4   lawyers for advice on compliance, on what was allowed and what

5   wasn't allowed.

6           And this wasn't done after the fact, which is why we're

7   here for the government.  This was done from the get-go.  And

8   yes, you will hear from those lawyers, and no, there were no

9   lies to those lawyers.  Those lawyers will come in here, and

10  they will tell you the advice they gave.

11          Now, if that advice turned out to be incorrect, or

12  wrong, it is.  But Mr. Patel and LabSolutions is entitled to

13  rely on the advice as long as they are acting in good faith.

14          So really what this case is about is Mr. Patel's

15  actions, his conduct, to be judged on the basis of whether it

16  was done in good faith or not.

17          Can the government prove beyond a reasonable doubt that

18  Mr. Patel acted without good faith?

19          Now, let me give you an example.  The government is

20  making a big deal, and will continue, between the patient and

21  the doctor.  And somehow, LabSolutions is the entity that made

22  that mistake or did it wrong, and somehow they had

23  responsibility for the relationship between the telemedicine

24  doctor and a patient or beneficiary.

25          But the government knows, but they won't tell you,

1    that on February 23 of 2017, the lawyer, Mr. Tobin Watt,

2    W-a-t-t, told Mr. Patel, in writing, in an email -- now, we're

3    talking about early on, February of 2017 -- the relationship

4    with the patient is not LabSolutions' responsibility.  The

5    contracts need to be clear that the relationship is between the

6    doctor and the patient.

7            So when you get into the questions of medical

8    necessity, that is between the doctor and the patient.  The

9    government will present you not a single document, email, or

10   text, in which Mr. Patel tells anyone to have anything other

11   than the appropriate relationship.  You're going to hear that

12   telemedicine was approved by the lawyer.  You're going to hear

13   that telemarketing was approved by the lawyer.

14           And I digress another moment here.  Telemarketing can

15   be annoying.  We all know that because we get those phone

16   calls.  And typically, I don't know why it happens, we get them

17   in the middle of dinner.  But that doesn't make it illegal.

18   And telemarketing here, they're marketers.  Okay?  They're

19   marketers.

20           Can we put -- did you take the picture off?

21           The people that you saw when the government put up the

22   picture, those are marketers.  And, you know, Mr. Patel wanted

23   to know how he could pay those marketers to generate business.

24   And the lawyer said, you can pay them commissions.  You can pay

25   them commissions.  Never going to be an issue, except the

1     government wants to make it.

2          And they make it by saying this:  We don't think that

3     commissions is the right terminology.  We want to call it

4     kickbacks and bribes.  That's not what it was; it was

5     commissions.

6          But the MACs -- now we get back to the MACs.  There was

7     a period of time in early '18, 2018, in which there was the

8     MACs following a change in the law by Congress, something that

9     we call EKRA, E-K-R-A.  It stands for something, but EKRA is

10    enough.  And EKRA kind of clouded the picture about whether you

11    should pay commissions, whether it was still legal to do it.

12    Some people thought it was.  Some people thought it wasn't.

13    Some think it covered only certain types of telemarketing or

14    relationships.

15         In any event, what do you think LabSolutions and

16    Mr. Patel do?  They go to the lawyer and say, hey, the law's

17    changed.  What do we do?  And you know what the lawyer says?

18    You know, I'm not quite sure here you can stop the commissions.

19    You need to pay a set amount, a set amount.  Okay?  You can

20    make that determination based on what had been produced in the

21    past, but no more commissions.

22         You have to pay monthly, and you can only go back and

23    change it after a couple of months.  So what does Mr. Patel and

24    LabSolutions do?  It follows the lawyer's advice because that's

25    why they're paying the lawyers, for advice.

1         And at that point in time, around then -- maybe a

2    little earlier -- the MACs -- one MAC -- remember I told you

3    there was Cahaba and there's Palmetto.  Cahaba was the MAC that

4    dealt with the Georgia region.  Palmetto took over.  Palmetto

5    said Cahaba's rule about family history being covered, we're

6    not going to cover family history.

7         I mean, how does it change from family history and now

8    it's only personal history?  But Novitas, which is a MAC that

9    covered Pennsylvania, no, family history is fine.  So

10   LabSolutions, it's doing business.  It says, fine, we'll open

11   up a lab in Pennsylvania.  Why not?  They're business people.

12   As long as the MAC is telling them it's okay, they do it.

13        So then we have Pennsylvania LabSolutions.

14        Now back to the commissions.  We went from commissions

15   to essentially -- basically a monthly amount.  And in the

16   middle of 2019, what happens?  Mr. Watt, he says to

17   LabSolutions and Mr. Patel, you know, I think we can go back to

18   commissions.  And efforts are being made to change it in the

19   middle of July of 2018 back to commissions, but then the

20   government comes along and they search LabSolutions in the

21   middle of August of 2018.  They show up with an army of agents

22   and they seize essentially everything.  Which is why we're

23   talking about the end of August being the time period here.

24        So now I've given you that idea.  Now let's talk about

25   the -- what does the government call them?  Oh, they called

1    them partners in crime.  Nice.  They only became partners in

2    crime when the government went to them and said, we're going to

3    give you a choice.

4         Here's your choice.  You can go ahead and tell us that

5    you may have committed some crimes.  You may not have been

6    honest with Mr. Patel, or you can tell us that you did it with

7    Mr. Patel, and we'll go easy on you, or easier on you.

8         Let me see now.  How many people did the government

9    convince to do that?  Every single person, every single person.

10        Now, what is that?  The United States government is

11   like the master -- puppet master here.  They control the

12   strings.  Here's how this works.

13        There's a person by the name of Lohan in the spring

14   of 2019 who began to cooperate with the government.  And who

15   did he cooperate against?  One of the so-called partners in

16   crime, Mr. Hirsch, Brett Hirsch.  And when he cooperated with

17   Mr. -- against Mr. Hirsch, he wore a recording device, and he

18   began asking Mr. Hirsch about Mr. Hirsch's business and, of

19   course, about Mr. Patel.

20        Now, Mr. Hirsch, at that point he doesn't know that his

21   freedom is in jeopardy, so he's talking freely.  And what does

22   he say?  The one lab that's running it legal, the one that's

23   doing it the right way, the one that's paying the salaries to

24   the telemarketers is Mr. Patel.  Audiotapes, two of them, April

25   the 5th and April the 22nd of 2019.

1                But then the government goes to Mr. Hirsch and says,

2        well, you know, you're in a lot of trouble.  Don't you want to

3        cooperate?  Well, of course I want to cooperate because I don't

4        want to go to jail for the rest of my life.  I want to do what

5        I can to get myself in the best position possible.

6                So he starts talking to the government on June 13th of

7        2019, and as you can imagine, his tone begins to change.

8                So what do they say?  Why don't you record Mr. Patel?

9        Why don't you get those conversations on tape so that we can go

10       after Mr. Patel?  And Mr. Hirsch says, no problem, I'm going to

11       do it.

12               You know how many times he brings up the fact of

13       illegality with Mr. Patel?  Never.  You know how many times he

14       says we had a relationship that was illegal and paid kickbacks?

15       Never.  You know why?  Because if he had done that, Mr. Patel

16       would have said it didn't happen that way, what are you talking

17       about.

18               And what about lawyers?  What about lawyers?  Well,

19       that's really interesting because -- now, remember, I'm talking

20       about the puppet master.  At this stage, I'm talking about the

21       investigative agents.  And Mr. Hirsch knows that Mr. Patel had

22       lawyers, and he's taping him, and they're listening to these

23       recordings.

24               And Mr. Hirsch somewhere, somehow, brings up lawyers.

25       And what happens?  He gets a text from a special agent by the

1    name of Mahmood, M-a-h-m-o-o-d, that says no lawyers, don't

2    talk to lawyers.  Why?  Because it's if they talk to lawyers,

3    Mr. Patel would have said, I'm relying on my lawyers.

4         But the agents didn't want that.  See, they don't want

5    that on tape.  So they told him not to do it.  That's one

6    witness, Mr. Hirsch.

7         Then we move onto Mr. McKeon, another telemarketer.

8    Mr. McKeon at some point -- and I guess we'll figure out when

9    it was -- he decided that he was doing something illegal.  But

10   I'm suggesting to you that that wasn't until after the

11   government indicted him and said, guess what?  You also -- you

12   also get this option.  You can either cooperate or see your

13   freedom taken away for an extensive period.

14        Let me go back to Mr. Hirsch for a minute, and I want

15   to explain a little something.  When I tell you that the

16   government is a puppet master, let me explain how this works.

17   There are plea agreements -- oh, and they look great.  They

18   talk in terms of, you gotta tell the truth, and if you don't

19   tell the truth we're going to go against you.  And if you

20   violate the plea agreement, we're going to take it away from

21   you.

22        But what it really says is, if you want your

23   cooperation to be considered by us, if you want that, you have

24   to show us what comes, what you're able to achieve.  Now, how

25   do we know that?  It's not in the agreement.  Here's how it

1   works.

2           The government goes for Mr. Hirsch's sentencing, and he

3   gets 57 months.  But he's already cooperated.  He doesn't get a

4   reduction.  They say to him, you know what?  Your reduction

5   will come in a Rule 35.  It's a federal rule of criminal

6   procedure.  When you're all done with what we want you to do,

7   we will go back to the Judge, and if we want to, we will file a

8   motion to reduce your sentence.  You can't do it.  The defense

9   can't do it.  Only the government can do it.  They're the ones

10  that can go to the Judge and say, we're going to move to reduce

11  his sentence.

12          So Mr. Hirsch is out here still.  He still has to

13  perform because, if he doesn't -- if he doesn't, he'll never

14  get the Rule 35.

15          What's the other way they do it?  Cooperate and we'll

16  put your sentencing off until you finish your cooperation.  You

17  may have pled guilty, but we're not going to sentence you yet.

18  We're going to wait and see how things are when the trial is

19  over.  When the trial -- this trial right here, Mr. Patel --

20  and your ability to perform at the trial, then we'll decide how

21  much cooperation benefit we're going to give you.

22          So is Mr. Hirsch in jail?  Nope.  Is Mr. McKeon in

23  jail?  Nope.  The only person that's in jail is Ramamurthy.  He

24  was one of the people that was on here.

25          Now, here's how the government decides.  Ramamurthy

1    gets himself charged for illegal conduct, and he's going

2    towards trial, and he's under bond, and the bond says, of

3    course, you can't violate the law.  You've got to behave

4    yourself.  If you don't behave yourself, there's going to be

5    consequences.

6            And what does Ramamurthy do?  This is their witness,

7    the man who's going to come in here and they say, trust him,

8    find him credible.  What does Ramamurthy do?  He goes out and

9    does exactly the same thing that he was doing before he was

10   charged after he tells the Court, and the Judge, that he's

11   going to abide by the law.  Okay?  And you know who he does it

12   with?  Want to guess?  Brett Hirsch.

13           But the government catches it.  And what do they do?

14   They throw him in jail.  They talk about all the terrible

15   things that he's done.  Until what?  Until what?  Until he sits

16   down and says, oh, by the way, let me tell you about Mr. Patel.

17   Oh, now -- now you're a credible, trustworthy person.

18           Now we're going to call you as a witness and put you on

19   the witness stand because now you understand the game plan.

20   And Mr. Ramamurthy got ten years, but what is he looking for in

21   his Rule 35?  The government filed a motion to reduce it.

22   That's their witnesses.  That's the witnesses.

23           That's my role, folks.  When they get on the stand, I'm

24   going to show you exactly what I'm telling you, and I'm going

25   to do it even more so with -- I'm going to deal with all of

1    those individuals.

2         Now, let's talk a little bit about what the government

3    doesn't do with its witnesses.

4         Some of these people have been interviewed multiple

5    times.  Not once, but twice.  I will show you, through

6    cross-examination, how their testimony evolved over time.  What

7    they start at the beginning, it doesn't stay the same.  As time

8    goes on, it gets worse and worse for Mr. Patel.  I'll show you

9    that.  That holds true for all of the people, Mr. Hirsch,

10   Mr. McKeon.

11        Mr. McKeon, I hesitate to even go this far, but he went

12   out in April of 2019 -- now, remember, this is towards the end.

13   Supposedly he's going to tell you he's known it's illegal the

14   whole time.  What does he do in April of 2019?  He goes out and

15   hires a new lawyer to help him put his new program for exactly

16   the same thing into motion.

17        He didn't think he was doing anything wrong.  He only

18   thought he was doing something wrong when the government said,

19   guess what?  You're going to jail.

20        So you know what he spent?  He spent about 125- to

21   $150,000 on this new lawyer, and that lawyer met with

22   Mr. Patel's lawyer not once, not twice, but interaction

23   multiple times in working out this new arrangement

24   relationship, none of which was illegal, until Mr. McKeon

25   changed his mind.

1           But let's go forward with this.  Back to the

2     interviews.  You know the worst thing that can happen to

3     someone is to have their words on tape.  You know why?  Because

4     you can't explain away what you say on tape.

5           So with all these interviews, does the government --

6     does the government tape-record a single one?  No, not a one.

7     None of them are tape-recorded.  They are all written up by

8     who?  By government agents.  The agents write down what it is.

9     But then of course you would say, well, if they're going to do

10    that, of course they'll give it to the witness so the witness

11    can look at it, to see if it's right.  Nope, they don't give it

12    to the witness.  The witness doesn't see what's written down.

13          The reason for that, folks, is so I can't take what is

14    said on tape, or written by the agents, and tell the witness,

15    this is what you said when it is different than what they said

16    before.  That's the reason it is done.

17          I'll tell you, Mr. Sporn -- Mr. Sporn is the worst of

18    the lot.  His has evolved from Mr. Patel owned LabSolutions,

19    but a gentleman named Nick Saliba, S-a-l-i-b-a, made all the

20    decisions.  That's the first interview.

21          The last interview, they didn't even talk about

22    Mr. Saliba.  It's like he never existed.  It's now Mr. Patel,

23    Mr. Patel, Mr. Patel.  And Mr. Sporn is going to tell you that

24    he was a close friend of Mr. Patel.  And you know what?  He

25    didn't even tell Mr. Patel his true name.  He gave him a fake

1    name.  Mr. Patel would never have known him as Sporn.  He was

2    given a fake name.  This is the kind of people the government

3    is going to bring in here to prove their case.

4          Now, let's go back to good faith.  In a case like this,

5    what the government wants to do is overwhelm you with

6    documents, emails, text messages.  That's their right.  Every

7    time they put something up as evidence, you look at it and say,

8    did this actually involve Minal Patel?  If it did, look at it

9    closely and see what it says.  If it didn't, if he's not

10   involved in it, then it doesn't go to his knowledge or his good

11   faith; it goes to the actions of these other people.

12         Judge Mr. Patel on what he has done, what he has said,

13   not on what other people are doing or having been said.  That's

14   the key.  And not after-the-fact individuals who come in years

15   afterwards and say, you know, I felt uncomfortable.

16         That's not really evidence.  That's just the government

17   reaching out to support its position, because they think, when

18   it's all said and done, that the money is what's going to

19   convict Mr. Patel.  I suggest to you that we're not in that.

20         Fool Medicare?  How interesting.  Medicare wasn't

21   fooled.  Medicare got the exact billing and claims from

22   LabSolutions with the codes on there, the codes were

23   interpreted, LabSolutions had a billing company that did the

24   billing for them and Medicare paid.  Did it pay all the time?

25   No.

1           That's why you have this 450,000 -- 450 million or so

2    that was billed.  How much did they pay?  We already talked

3    about it.  The billing was done by a company called Comtron.

4    LabSolutions had billers.  They had people that worked.  And

5    they interact.  But they represented the right codes, at least

6    the codes they understood to apply.  And where are these codes

7    from?  Mr. Sporn is going to tell you they all came from

8    LabSolutions.  I'm going to show you, either this afternoon or

9    tomorrow, that's not so.

10          Fool Medicare?  No.  Medicare paid because what was

11   submitted to them was accurate.  If there were lies or there

12   was mistrust or there was dealings with the patients and the

13   doctors, that's not Mr. Patel.  There's not a single doctor

14   that's going to come in here and say he ever spoke to

15   Mr. Patel, not one.  And when you see what the telemarketers

16   did, that's the telemarketer.  And then you have the lawyer's

17   advice.

18          Let me end with this:  The government has made a big

19   deal out of the fact that the contracts were a sham.  They

20   weren't.  You're going to see compliance requirements, training

21   seminars, you're going to see contracts that covered these, all

22   of which are prepared by LabSolutions for the reason to try to

23   do it correctly and legally.

24          What the government has done is, they have interviewed

25   Mr. Watt, and they wanted to know whether Mr. Watt knew that

1    there was direct patient contact, that is, that telemarketers

2    reached out and initiated contact with patient beneficiaries.

3          According to what the government has written up,

4    Mr. Watt says I didn't know that there was direct contact, as

5    in telemarketer cold-calling someone and saying, do you want to

6    take a test.

7          But what the government told you in its opening, that's

8    not the way it happened.  These were opt-ins.  You know what

9    opt-in is?  If you're on the internet and you see an ad, and

10   the ad says if you're interested in doing this, click this,

11   it's clicked.  That information goes back to the telemarketing

12   company, and the telemarketing company then follows up on it.

13         And when it follows up on it, it records it, it asks

14   questions, extensive questions.  That's the information that is

15   supposed to go to the physician, the doctor, for the doctor to

16   then interact with the beneficiary.

17         That's not -- that's not what they wanted Mr. Watt to

18   know about.  They didn't ask him about that.  They asked him

19   about direct, not opt-in, and there will be evidence that he

20   knew it was opt in, and opt in is how telemarketing works.  And

21   yes, there was extensive opting in, but it's all legal.

22         It's only illegal because the government has come along

23   now and offered deals to people that you shouldn't trust, and

24   these people have now pointed the finger at Mr. Patel because

25   they have no other choice.

1        Freedom is the most important thing, and when given the

2    opportunity to choose between the truth and freedom, you choose

3    freedom, and that's what those witnesses are, and that's what

4    they've done.

5        The government has now gotten into bed with people that

6    they are calling liars and crooks, but they haven't changed

7    their skin.  They're still the same.  And the reason Mr. Patel

8    is here, and the only reason he is here, is because his

9    business was too damn successful, and the government, after the

10   fact, is going to punish him, if they can, for it.

11       We're going to show you otherwise.  They're not going

12   to meet their burden of proof, and you're going to find

13   Mr. Patel not guilty on every charge in the indictment.

14       And just to -- why do you think all those allegations

15   are in the indictment the way they are?  They're designed to

16   prejudice you before you ever get this case.  Fortunately, we

17   have great jurors who aren't going to let that happen.  And

18   that's why you all have been chosen, and that's why you're all

19   sitting there.

20       Give us an opportunity to show you that the

21   government's evidence here is not reliable and not guilty is

22   appropriate.  Thank you.

23       THE COURT:  Thank you, Mr. Sadow.

24       Okay, ladies and gentlemen of the jury, it's just about

25   12:15, so if I could have everybody back, let's say, 1:45,

1    which is about an hour and a half.  So what I'd like you all to

2    do is make sure you leave your notepads in the jury room before

3    you go to lunch.

4         Remember a couple of ground rules while you're out

5    grabbing lunch.  Should you run into any of the lawyers and

6    they steer clear of you, please take no offense from that.

7    They have to do that pursuant to ethical rules.

8         So remember that.  And, of course, no discussion

9    amongst yourselves about what you've heard so far with family

10   or friends.  Continue to stay off social media, and no

11   independent research.

12        So we'll see you all back in the jury room at

13   approximately 1:45.  Thank you very much.  You are excused.

14        THE COURT SECURITY OFFICER:  All rise.

15        (Jury exits at 12:18 p.m.)

16        THE COURT:  All right.  Please be seated, everyone.

17        So briefly, Ms. De Boer, I don't know if it would make

18   more sense to try to talk about this now or at least give me a

19   preview of what's to come.

20        Can you, once again, reiterate the concerns with the

21   first witness that you wanted the Court to address?

22        MS. DE BOER:  Yes, Your Honor.  The first witness will

23   be Laurie McMillan, who will talk about the Medicare coverage

24   requirements.  I'll actually let Ms. Gurskis address the

25   exhibits because that's going to be her witness.

1           There are some other exhibits that we understand are

2     disputed by the defense that will be for later this week.  I'm

3     not sure we have to take that up at this moment.

4           THE COURT:  Yeah, let's not -- I only want to take up

5     any time with anything that's relevant to this witness that

6     needs a ruling.

7           MR. RAFFERTY:  Your Honor, it might make sense for me

8     to just sort of address the objection.

9           THE COURT:  If that's easier, sure.  What is it?  Go

10    ahead and tell me.

11          MR. RAFFERTY:  The objection really has to do with a

12    series of exhibits beginning at Exhibit 222-A all the way

13    through 227-B.  Most of the other exhibits -- in fact I don't

14    think any of the other exhibits, I have an objection to.  The

15    exhibits between 222-A and 227-B are all sections of the law,

16    beginning with Title 42, Section 1395y, there are code of

17    federal regulation sections that are in there.

18          And my understanding from the exhibit list is the

19    government intends on offering pieces of law into evidence.

20    And I don't think that it's appropriate for the government to

21    be introducing into evidence the law because I believe the law

22    comes from Your Honor, not from the government, and not from

23    the witness.

24          What I'm suggesting, Your Honor, is -- I get that the

25    witness may testify about what's covered and what's not

1    covered, which is what most of these sections deal with, but I

2    do not believe it's appropriate to introduce these sections of

3    law into evidence and have them published to this jury and have

4    them go back to this jury during the course of its

5    deliberations.  That's my objection, Your Honor.

6           THE COURT:  That's a fair point, Mr. Rafferty.

7           THE WITNESS:  So tell me, Ms. Gurskis, do you want to

8    address why I would need these particular CFRs and sections of

9    law introduced into evidence?  Certainly there is no objection

10   for context.  You're going to need to present them to the

11   witness.  She needs to explain what they mean.

12          But I have to say, I am a little bit concerned that it

13   would be just a stack of statutory sections sent back to the

14   jury that may not necessarily fit in with the jury

15   instructions.

16          Do we really need that admitted?  Could we just use

17   them as demonstrative to give some context to her testimony?

18          MS. GURSKIS:  Your Honor, I think it would be more

19   helpful to the jury if they were admitted.  These are

20   regulations that define the coverage.  The coverage of these

21   tests is at specific issue in this case.

22          It's a question of fact in this case as to what

23   Medicare covers and whether these tests were covered.  So these

24   are the Social Security Act provisions that squarely deal with

25   coverage of tests and screening tests.

1              THE COURT:  So why would it not be something that I

2      would attempt to incorporate into the jury instructions?  Why

3      would I have freestanding floating statutory sections and not

4      simply try at charge conference to build them in, and that way

5      it's presented to them in some organized fashion?

6              I'm just a little worried about them reading things out

7      of context that are statutory and trying to make determinations

8      as to what is covered and what is not.

9              MS. GURSKIS:  Yes, Your Honor.  I think there is

10     context for each of these statutory provisions.  I know that

11     Mr. Rafferty expressed that he does not have an objection to

12     the LCDs.  These statutory provisions are actually referenced

13     in the first couple of pages of every single one of the LCDs

14     that we will be introducing into evidence.

15             So to provide that foundation for the jury, just to

16     give a quick overview at the beginning of Ms. McMillan's

17     testimony, as to the origin of what that is coming from, that

18     the Social Security Act provisions are reiterated every single

19     time each one of these LCDs is issued or superseded.  It's --

20     that would be the contextual relevance for it in her testimony.

21             THE COURT:  Sure.  I don't think anyone's disputing

22     that.  And I certainly have no problem, nor do I think

23     Mr. Rafferty has a problem, with you utilizing them in your

24     direct examination.

25             What he's taking concern with is admission of 222-A

1    through 227-B of standalone sections of law under Title 22 and

2    CFRs.

3         If you are also telling me there's no objection to the

4    LCDs coming in, once again, I wonder why we can't simply

5    present her with some of these Social Security provisions for

6    context, but we don't have to be moving in a bunch of exhibits

7    that really I think outside of her testimony could potentially

8    cause confusion.  That's what I'm trying to understand.

9         I don't really see right now the need for that.  No one

10   is going to be going off script on my jury instructions and

11   looking back at those codes and utilizing them to make

12   determinations, and if they are, then it should be built into

13   the instructions.

14        It just seems to me that if the LCDs are coming in and

15   you're just talking about having some background for them, I

16   don't think the defense is objecting to you showing provisions

17   of the Social Security Code to explain what it means, guiding

18   the jurors through Ms. McMillan's testimony, but not

19   necessarily admitting all of those sections.

20        Does that make sense?

21        MS. GURSKIS:  I think Ms. De Boer has --

22        MS. DE BOER:  Your Honor, may I add one thing on that?

23        THE COURT:  Yeah.

24        MS. DE BOER:  So this is -- just two things, actually.

25   One is, this is really no different than if this was a private

1    insurance case, a private insurance coverage manual which would

2    be admitted into evidence, and the jury would use that to

3    decide what did the insurance company cover and did the testing

4    at issue meet that coverage requirements.

5         And even more than that, I would analogize it, for

6    example, to the *Agresti* case which was a sober homes case, as

7    Your Honor knows, and I believe that portions of the Florida

8    statutes governing what is certain -- what counts as certain

9    types of levels of care in the sober home, substance abuse

10   world, were admitted in that case and perhaps it was without

11   objection.  But the premise is the same, that this is what

12   governs what this treatment looks like in any given type of

13   case.

14        It happens to be statutorily regulated because we're

15   dealing with Medicare, but it would be no different than if we

16   were in a sober homes case.  It would be regulated either by

17   private insurance guidelines and the state requirements, and

18   that's just the nature of how these types of medical services

19   are regulated.

20        So it's factual evidence in the same way as any other

21   type of coverage, guidelines would be factual evidence, and

22   it's up to the jury to decide what that factual evidence means.

23        THE COURT:  Well, let me ask you this, Mr. Rafferty.

24        What say you if I gave a curative to this regard, just

25   so that the people understand?  Because I do share a little bit

1    of your concern that bringing this in, without at least some

2    framework, could lead the jurors to confusion.  And certainly

3    even if Ms. McMillan is going to be speaking on it, it's her

4    testimony that gives these specific CFRs and sections at least

5    some framework for their applicability.

6         When they're in isolation after two weeks, someone is

7    going to look at them and it's possible they could be confused.

8    So I do share a little bit of concern.  But I think maybe one

9    way to do it would be to give some sort of limiting instruction

10   on what they are to be used for.  What would you say?

11        MR. RAFFERTY:  Your Honor, I think the Court had it

12   right initially, and that is, the Court can craft instructions

13   at the end of this case if the government wants it, to talk

14   about what these various provisions mean.

15        These are statutes and laws, and having them admitted

16   through the government suggests that somehow the government is

17   the one who decides what the law is, or the witness decides

18   what the law is, when the Court has already instructed this

19   jury that the law comes from Your Honor.

20        And I do have a concern, especially since this is

21   coming at the very beginning of this case, that when the jury

22   goes back into deliberations and they have confusions about

23   what the law is and what it's not and what's covered and what's

24   not, instead of going to Your Honor with those questions,

25   they're going to start flipping through the government's

1    exhibits and decide on their own what certain things mean, and

2    that's exactly what should not happen.

3          THE COURT:  Okay.

4          MR. RAFFERTY:  With respect to these other cases, I

5    understand -- and I think Ms. De Boer is correct.  In other

6    cases the government has attempted to admit these types of

7    statutory sections, some of the very transcripts that the

8    government has provided to us and Jencks Act material, all of

9    those involve instances where they were admitted without

10   objection.

11         We object.  We believe the law should only come from

12   the Court.  If the government wants to ask witnesses questions

13   about what's covered and what's not covered and referencing to

14   these statutory sections, we understand that.  We just do not

15   believe that any statute or law should be introduced into

16   evidence as the government has it on its exhibit list.

17         THE COURT:  Understood.  So this is what the Court will

18   do.  The Court will overrule the objection.  However, by

19   allowing it -- and I'm going to be giving essentially a

20   limiting instruction -- that these statutes are admitted for

21   the limited purpose of background to understand how the

22   Medicare scheme works or at least what the applicable

23   regulations are.

24         And I will emphasize again upon their admission that

25   the Court will be giving the jurors instructions, and those are

1     the instructions that should guide them when they're

2     deliberating.  This is simply being admitted so they have a

3     reference point for background regarding Ms. McMillan's

4     testimony, when, at the end of this trial, they want to go back

5     and get some context for the LCDs.

6              I mean, that will be my limiting instruction.  I'll

7     allow it in.  But it's going to be very clear because I tend to

8     agree with the defense that although I don't think keeping out

9     is the proper way to do it, certainly coming up with a way to

10    make sure that they don't feel that they should be reading

11    those statutory sections in determining whether or not the case

12    has been proven by the government.  That's problematic for me.

13             But I think the curative can do it and certainly not

14    only that limiting instruction, but I can revisit that when we

15    get to closing arguments.  When the exhibits go back, I'll make

16    sure again that I repeat to them that they should only be

17    guided by the jury instructions and that the remaining evidence

18    is coming in as supplemental material that will help them

19    digest and refresh and review the evidence that's been admitted

20    by the Court.  Something to that effect should do it.

21             Okay?  Is that the main objection for her exhibits?  I

22    think we are okay with everything else, Mr. Rafferty?

23             MR. RAFFERTY:  Yes, that's correct, Your Honor, and I

24    just talked to Mr. Samuel.  If we have the opportunity to put

25    together some suggestion language, can we do that?

```
 1          THE COURT:  Sure, absolutely.  I would welcome that.
 2   I'm obviously going off the top of my head, but certainly if
 3   you have something a little clearer, feel free to propose it to
 4   me when we come back from lunch, and I can read it to the
 5   jurors.  I don't have a problem with that at all.
 6          MR. RAFFERTY:  Thank you, Your Honor.
 7          THE COURT:  All right.  Okay, everyone, I think that's
 8   about it.  I don't know if we have anything else.  I want to
 9   give everyone a break.  When we come back, we'll take care of
10   Ms. McMillan.  We'll be back at 1:45.  We're in recess.
11          MS. DE BOER:  Thank you, Your Honor.
12          THE COURT:  You got it.
13      (Court recessed at 12:30 p.m.)
14      (Back on the record at 2:25 p.m.)
15          THE COURT:  Before we bring out our jury -- they're
16   presently accounted for.  Thanks to the Court they're being
17   caffeinated as well.
18          I would like to just touch base briefly.  I was looking
19   at it in chambers just now, the government's revised
20   instruction -- revised limiting instruction that I received
21   from the defense team.  I don't know if Mr. Samuel or Mr. Sadow
22   or Mr. Rafferty, you've taken a look at it.  There's been some
23   proposed additional language to the instruction.
24          Have you guys seen that?
25          MR. SADOW:  I have not.
```

1        THE COURT:  All right.  I'll read to you how it reads

2    now.

3        So the government would ask that when we get into the

4    subset of exhibits dealing with regulations, that's 22(a) -- or

5    222(a) to 227(b), that I state:  Members of the jury, I am

6    permitting the government to introduce certain federal laws

7    dealing with Medicare known as federal statutes and federal

8    regulations.

9        I want to provide you an instruction known as a

10   limiting instruction that explains the relevance of these

11   exhibits.  I want to remind you that this is a criminal case.

12   These exhibits are not criminal laws.  A violation of a

13   Medicare regulation or a federal statute dealing with Medicare

14   in and of itself is not a crime.  But that same evidence may or

15   may not be relevant in determining the defendant's state of

16   mind and whether the defendant acted with criminal intent.

17       The only crimes that you're here to decide are the

18   crimes in the indictment.  However, these laws may put into

19   context the testimony of this witness regarding Medicare

20   coverage.

21       And there's a qualifier, at least a citation to my

22   colleague, Judge Dimitrouleas as having added a little bit

23   about his state of mind.

24       Any concerns on the defense camp?  I think that it is

25   valid so they understand its limited purpose.

1          MR. SAMUEL:  I'm waiting for Mr. Sadow to add his two

2     cents.

3          MR. SADOW:  Probably a cent and a half, actually.

4          (Discussion was held off the record.)

5          THE COURT:  It's certainly not a misstatement of the

6     law.  I mean, that's really what you're allowed to consider it

7     for.  I like the fact that it may or may not be relevant.  The

8     weight they give to the regulations is up to them and them

9     alone in the context of the remaining instructions at the end

10    of the case.

11         So unless there's anything, you know, jumping off the

12    page, I think we can live with that.

13         MR. SAMUEL:  My observation is this:  First of all, I

14    think that correctly states what *Stephan* says and *Christo* says,

15    all the cases I cite.  What's peculiar about it is it assumes

16    the defendant knew what's in the regulations; otherwise, it

17    doesn't really inform his state of mind at all.

18         THE COURT:  I agree with you there because he may not

19    be aware of them.  I certainly think there will be an

20    opportunity for the defense, through cross-examination and

21    advice-of-counsel defense, to qualify the value of these

22    statutes and to maintain that there really is no weight that

23    should be given to them at all because they were interpreted by

24    counsel and advice given to Mr. Patel, or Mr. Patel was simply

25    not aware of some of these regulations and, therefore, they had

1    no probative value as to intent.

2         So certainly I don't disagree with you.  I just don't

3    know that at this stage of the game there's really anything

4    more that I can do to qualify it than this.  So understood, but

5    I'd like to go ahead and use this instruction as it's been

6    modified.  I think it's fair.

7         It at least cautions the jury as to your initial

8    concern, which I share, and that is that they look at these and

9    think, well, I'm going to match up the conduct to these

10   statutes in evidence and simply go by that as opposed to

11   following the Court's instructions at the end of the case.

12        MR. SAMUEL:  The only thing I'd add is, maybe we will

13   further wordsmith this just a little bit before the final

14   instructions.

15        THE COURT:  Oh, sure.  Sure.  Yeah.  When we talk about

16   some, you know, regulations have been admitted into evidence,

17   you are to use them, et cetera, we can do that at charge

18   conference.

19        I'm fine with that.  Thank you.

20        MR. SAMUEL:  All right.

21        THE COURT:  Okay.  Let's go ahead and round up our

22   jurors.  They should all be ready to go, guys.  Thank you.

23        MS. GURSKIS:  Your Honor, I neglected to invoke the

24   rule before.

25        THE COURT:  Yes.  We have a lot of folks here, but the

1     rule of sequestration is invoked.  There may be some experts

2     here, in which case it's okay, but any witnesses here that are

3     on our witness list that are present need to exit the courtroom

4     at this time.

5          If there are any friends or family or colleagues of the

6     defendant, no issue, but any witnesses need to be exiting at

7     this time.

8          All right, guys.  Let's go ahead and bring them in.

9          THE COURT SECURITY OFFICER:  All rise for the jury.

10         THE COURT:  Am I correct, as you move these exhibits

11    in -- now that we have this qualifier, it should be moved in

12    without objection, I believe.  I am going to make sure for

13    Ilona's sake that we're laying the record on that so I can move

14    them in expeditiously.

15         MS. GURSKIS:  Thank you, Your Honor.

16         Once the jury is fully in the room, if it's all right

17    with Your Honor, I will go through the list --

18         (Court reporter clarification.)

19         THE COURT:  She's going to go through the list of

20    exhibits first, and we're going to try to move them in in mass.

21    It might be easiest before you get started.  That's fine.

22         (Jury enters at 2:32 p.m.)

23         THE COURT:  Please be seated, everyone.

24         Ladies and gentlemen of the jury, welcome back.  Thank

25    you, again, for adhering to the Court's schedule and for your

 1    patience.

 2          As you recall, before we broke for lunch, we are now

 3    going to begin the government's case-in-chief.  So they're

 4    going to call their first witness.  Please remember to not get

 5    too caught up in the note-taking that you miss any of the

 6    testimony, but certainly that's what the notes are there for.

 7          So with that being said, I will turn it over to the

 8    government to call their first witness.

 9          MS. GURSKIS:  Thank you, Your Honor.  And one thing I

10    wanted to do briefly is just introduce our paralegal, Ava

11    Puntillo, who was not here yesterday during openings, so I'll

12    just introduce her to the jury.

13          THE COURT:  Thank you.

14          MS. GURSKIS:  And with that, the United States calls

15    Ms. Laurie McMillan.

16          THE COURT:  All right.  Come on up, Ms. McMillan.

17    We'll swear you in.

18          THE COURTROOM DEPUTY:  Please raise your right hand.

19          (Government witness, LAURIE MCMILLAN, duly sworn.)

20          THE COURTROOM DEPUTY:  Please be seated.  Speak into

21    the microphone.  Say and spell your name for the record.

22          THE WITNESS:  My name is Laurie McMillan.  It's

23    L-A-U-R-I-E.  Last name is M-C-M-I-L-L-A-N.

24          MS. GURSKIS:  Thank you, Your Honor.  At this time, the

25    government has a series of exhibits that we would like to move

1    into evidence.

2            THE COURT:  Sure.  You may proceed.

3            MS. GURSKIS:  Government's Exhibits 209-A; 210-A;

4    212-A; 213-A; 214-A; 216-A; 217-A; 220; 221-A; 221-B; 221-C;

5    246; 247; 213-D; 201-A; 201-B; 201-C; 222-A, B, and C;

6    223-A, B, and C; 224-A and B; 226-A and B; 228-A through L;

7    230-A through M; 231-A through E; 232-D through H; 233-A and B;

8    235-G through J; 236-A through C; 237-D; 101; 107; 108; 109;

9    110; 111; 260-A through D; 201-A through D; 202-A and B; 203-A

10   and B; 204-A and B; 205-A and B; 206-A and B; 207-A through F;

11   208-A through D; 243; 244; and 245.

12           THE COURT:  Thank you for that.

13           Turning to the defense, subject to the cautionary

14   instruction the Court will give to certain exhibits, any

15   objection to entering those into evidence?

16           MR. RAFFERTY:  Subject to the previously stated

17   objection, Your Honor.  No further objection.

18           THE COURT:  Very good.  So we'll admit all of those at

19   this time.

20            (Government Exhibits 209-A; 210-A; 212-A; 213-A; 214-A;

21           216-A; 217-A; 220; 221-A; 221-B; 221-C; 246; 247; 213-D;

22           201-A; 201-B; 201-C; 222-A, B, and C; 223-A, B, and C;

23           224-A and B; 226-A and B; 228-A through L; 230-A through

24           M; 231-A through E; 232-D through H; 233-A and B; 235-G

25           through J; 236-A through C; 237-D; 101; 107; 108; 109;

```
 1          110; 111; 260-A through D; 201-A through D; 202-A and B;

 2          203-A and B; 204-A and B; 205-A and B; 206-A and B; 207-A

 3          through F; 208-A through D; 243; 244; and 245 were

 4          received in evidence.)

 5              THE COURT:  You may proceed.

 6              MS. GURSKIS:  Thank you, Your Honor.

 7                          DIRECT EXAMINATION

 8     BY MS. GURSKIS:

 9     Q.   Good afternoon, Ms. McMillan.

10     A.   Good afternoon.

11     Q.   What is your educational background?

12     A.   So I am a registered nurse.  I graduated from of the

13     University of Nebraska back in 1985, and I passed my State

14     boards back then.  I am also a certified professional coder,

15     that is, for medical billing and coding.  I obtained that

16     certification in 2012, after passing a national exam.

17          I continue to take continuing education for that

18     certification.  I am also a certified fraud examiner.  I took

19     special training and took that national exam in 2018, and I

20     continue to take educational requirements to fulfill that

21     certification.

22     Q.   Where do you currently work, Ms. McMillan?

23     A.   I work for a company called Advize Health.  I am currently

24     the director of healthcare payment policy integrity.  I work

25     with them as a subject matter expert on various topics.
```

1    Advize Health uses their experts to assist both in

2    governmental insurance, healthcare claims, private insurance

3    healthcare claims, and we assist also when there are legal

4    issues both with private law firms and the government, and we

5    provide them our subject matter expertise.

6    Q.   How long have you worked at Advize Health?

7    A.   I started with Advize Health this year, so in February

8    of 2022.

9    Q.   What is your title?

10   A.   Director of healthcare payment policy integrity.

11   Q.   What does that mean?

12   A.   Basically that I'm available to act as a subject matter

13   expert on various issues having to do with payment of

14   healthcare claims, both from the government aspect and from

15   private industry aspect, looking at medical records and

16   utilizing my expertise in the regulations that they use for

17   payment of those healthcare claims and the billing and coding.

18   Q.   In your job at Advize Health, have you studied regulations

19   and guidelines relating to Medicare's payment and reimbursement

20   for laboratory services?

21   A.   Yes.  I also have extensive background -- I've worked in

22   the compliance industry since 2007.  I started my nursing

23   career in the clinical area, and I worked in the intensive care

24   units and clinical areas in the hospital, on various areas, for

25   about 15 years.

1      In 2007, I began reviewing medical records for a Medicare

2    Part C provider.  And then in 2010, I began working for what is

3    called a Medicare Administrative Contractor or a MAC.

4      I have been reviewing medical records and utilizing the

5    regulations that are connected with paying those since 2010

6    both for Medicare Part A and Medicare Part B, home health and

7    hospice, and I've continued to work in that area.

8    Q.  And when you were working at the MAC from -- I think you

9    said you were there starting in 2010.

10     How long were you working at that location?

11   A.  So I worked for a couple of different MACs.  I started

12   working in 2010 at TrailBlazer, and then I later on moved to a

13   different Medicare administrate by the name of Palmetto, and

14   later on worked with CDS.

15     There was some common ownership in those, so I was moved

16   from one contract to another, but I have experience working

17   with both Part A, Part B, home health, hospice, and in 2014, I

18   moved to a different contractor with the administration of

19   healthcare.  It's called a UPIC.  And I worked with the UPIC

20   from 2014 until 2021.

21   Q.  When you were at the MACs, what was your job role?

22   A.  So at the Medicare Administrative Contractor, they have a

23   medical review team.  It is a team of clinical people who are

24   licensed, and we review medical records, and we utilize the

25   regulations.  We make payment determinations on claims that are

1   submitted to Medicare.

2   Q.   And how much of this experience has been focusing on

3   laboratories in particular?

4   A.   So laboratories have different ways of billing.  They do

5   bill under Part A, and that was what I initially started

6   looking at.  And then when I moved to the UPIC in 2014, we

7   began looking at quite a bit of laboratory billing under

8   Part B.

9   Q.   So in the various roles that you've had, have you become

10  familiar with Medicare guidelines for payment and reimbursement

11  of laboratory services?

12  A.   Yes.

13  Q.   In the course of your career, have you trained other people

14  regarding coverage requirements for laboratory reimbursement?

15  A.   Yes.  So in my role at the UPIC, initially I was a claims

16  analyst, which is looking at medical records and making

17  determinations on payment.  That was from 2014 until 2017.

18       In 2017, I switched roles.  My role became a law

19  enforcement coordinator.  It was in that role that I began

20  teaching members of law enforcement.  When I say "law

21  enforcement" regarding healthcare, I'm specifically speaking

22  about FBI agents, OIG -- Office of Inspector General agents,

23  and also members of the Department of Justice, and teaching

24  them about not only the rules and regulations but how those

25  apply when you're looking at medical records.

1    Q.   So have you participated in fraud investigations involving

2    Medicare contracts?

3    A.   Yes, since 2014, I have.

4    Q.   Approximately how many fraud investigations do you think

5    you participated in?

6    A.   I've been a part of the team investigating those, I would

7    say, 50 to 100.  From 2014 to 2017, I specifically was writing

8    medical review reports.  We did do on-site investigations, and

9    I accompanied the investigators sometimes on those on-sites.

10   And since 2017, I have been more of in a liaison role and

11   specifically writing reports when it involved allegations of

12   fraud that were at the criminal level.

13   Q.   I think I heard you say 50 to 100 different cases.  Does

14   that mean 50 to 100 different providers?

15   A.   Yes.

16   Q.   Based on your work as a Medicare contractor, are you

17   familiar with Medicare generally?

18   A.   Yes.

19   Q.   Are you familiar with how Medicare works?

20   A.   Yes.

21   Q.   Are you familiar with how providers or suppliers become

22   enrolled in Medicare?

23   A.   Yes.

24   Q.   Are you familiar with how coverage for medical services is

25   regulated under Medicare?

1   A.   Yes.

2   Q.   Are you familiar with how Medicare pays claims?

3   A.   Yes.

4   Q.   Are you familiar with how Medicare audits claims?

5   A.   Yes.

6   Q.   Have you previously testified as an expert regarding

7   Medicare?

8   A.   Yes, I have.

9   Q.   How many times?

10  A.   So in the -- as an expert witness, I've testified in two

11  other previous trials.

12          MS. GURSKIS:  Your Honor, at this time, the government

13  would move for qualification of Ms. McMillan as an expert

14  pursuant to Rule 702 in Medicare coverage, reimbursement, claim

15  filing requirements, and audit processes.

16          THE COURT:  You may proceed.

17  BY MS. GURSKIS:

18  Q.   I'd like to begin, Ms. McMillan, with some general

19  questions about the Medicare program.

20          Can you explain what Medicare is?

21  A.   So Medicare is the United States government healthcare

22  program for people who are 65 years and older, and it also

23  covers people who are deemed disabled.

24  Q.   Is there a name for individuals who have Medicare

25  insurance?

 1    A.   Yes.  We refer to them as Medicare beneficiaries.

 2    Q.   Who or what administers the Medicare program?

 3    A.   So an organization within the government called the Centers

 4    for Medicare and Medicaid Services -- you'll hear it called

 5    CMS -- they administer the Medicare and Medicaid program.  They

 6    hire various contractors to assist with the administration of

 7    that program.

 8    Q.   Is CMS part of a larger agency?

 9    A.   Yes.  CMS is under the guidance of HHS, or Health and Human

10    Services.

11    Q.   What role do contractors play within the Medicare program?

12    A.   So there are many contractors associated with the

13    administration of the Medicare program.  You will hear quite a

14    bit about what's called a Medicare Administrative Contractor.

15    There's also a UPIC, and there are various other contractors

16    that you might hear about.

17        A Medicare Administrative Contractor is that contractor

18    that is mainly focused on processing claims.  They are mainly

19    focused on provider enrollment.  And they also partake in

20    provider education.

21    Q.   And you mentioned the UPIC.  What is that, and what does a

22    UPIC do?

23    A.   The UPIC is a contractor that works under the guidance of

24    CMS.  They -- it stands for Unified Program Integrity

25    Contractor.  Their focus is looking at fraud, waste, and abuse,

1   and helping to prevent that, and also taking steps to protect

2   the Medicare trust fund.

3   Q.   You mentioned that the MAC, or the Medicare Administrative

4   Contractor, plays a role in processing claims.

5   A.   Yes.

6   Q.   Can you explain to the jury how Medicare processes a claim?

7   A.   Right.  When I say a claim, I'm talking about the bill that

8   your physician presents to Medicare for payment.  Medicare

9   beneficiaries are entitled to payment for their healthcare

10  services under certain circumstances, and they go to the

11  physician or whatever healthcare provider they're going to

12  that's enrolled in Medicare.

13       And then that bill goes directly from that provider to

14  Medicare, and Medicare pays the provider directly.

15  Q.   After the provider receives payment on the claim, are they

16  given any kind of other information from Medicare about the

17  claim?

18  A.   Can you ask that again?

19  Q.   Sure.

20       In terms of after -- when Medicare processes a claim -- you

21  just mentioned that the provider submits the information to

22  Medicare.  Medicare reimburses the claim.

23       Is there any type of paperwork or document that is

24  generated after the submission of the claim and the payment of

25  the claim?

```
 1   A.   To the provider?

 2   Q.   Yes.

 3   A.   Yes.

 4   Q.   What is that?

 5   A.   There is -- they get information about how much the claim

 6   was paid and how much the beneficiary might owe, if they owe

 7   money on that claim.

 8   Q.   Will they also receive denial information if the claim was

 9   denied?

10   A.   Yes.

11   Q.   And in this particular case, where -- what MAC or Medicare

12   Administrative Contractors were involved?

13   A.   So one of the Medicare Administrative Contractors went by

14   the name of Palmetto, one was Novitas, and there was one also

15   called Cahaba.

16   Q.   And Palmetto is based in what state?

17   A.   Palmetto is headquartered out of South Carolina.

18   Q.   What about Novitas?

19   A.   Novitas is headquartered out of Pennsylvania.

20   Q.   And what about Cahaba?

21   A.   And Cahaba had an office out of Birmingham, Alabama.

22   Q.   How is Medicare funded?

23   A.   So we -- anyone who works has a Medicare tax that's taxed

24   on their income.  That money is sent to the government, and the

25   government sets that aside in what's called a Medicare trust
```

1   fund.  And that money is specifically set aside for the care of

2   our Medicare beneficiaries.

3   Q.  You just mentioned taxes.  Are those federal taxes?

4   A.  Yes.

5   Q.  And in terms of accessing the Medicare trust fund, how does

6   that work?

7   A.  So the fund is set aside for payment of Medicare

8   beneficiaries' healthcare needs.  And what happens is, that

9   money is then sent to the MACs, the Medicare Administrative

10  Contractors.  Those MACs are divided up geographically across

11  the United States.  So the money is sent to the MACs.

12      And when providers send claims into the claims system to

13  their Medicare Administrative Contractor, or MAC, payment is

14  put directly into that provider's account.

15      When I say "provider," I'm using the term, meaning that

16  person that is enrolled in Medicare that is providing and

17  billing the service for Medicare.  So it could be a physician,

18  or it could be a lab.  It's the provider that I'm talking

19  about.

20  Q.  So the money in the Medicare trust fund would reimburse a

21  provider for services that were potentially rendered to a

22  beneficiary; is that fair?

23  A.  Yes.

24  Q.  How does fraud affect the Medicare trust fund?

25  A.  So fraud would be utilizing money from those funds that we

1    pay as taxpayers.  It would be paying for services that were

2    not deemed payable by law.  It would be wasting the taxpayer's

3    money, and it would make it so the trust fund is not funding

4    what it was intending to fund.

5    Q.  Are you familiar with the different parts of Medicare?

6    A.  Yes.

7    Q.  Can you tell us what the different parts are and what they

8    cover?

9    A.  So very high level, Medicare Part A -- when we speak of

10   Medicare Part A, we're mainly talking about care that is

11   delivered in a facility, specifically a hospital, so the

12   payment goes directly to the hospital.  Part A also covers home

13   health and hospice.  That's a general description.

14        Part B is usually a -- I think of it as a person.  So when

15   you go to your doctor or have care, if you go to a physical

16   therapist, those types of things are billed under Part B.

17   Part B also pays for laboratory work.

18        Part C, you'll hear about, and you might hear that

19   described on TV as the Medicare Advantage program.  That is

20   considered Part C.  The traditional Medicare, or what we call

21   fee for service, is under Medicare Part A and B, and then those

22   two combined are under what is called Medicare Part C, and that

23   is the Medicare Advantage program.

24        You might also have heard of Medicare Part D, and that has

25   to do with your drug benefit or your pharmacy benefit.

1   Q.   You mentioned laboratory work when you were talking about

2   Part B.

3        Does that include genetic testing?

4   A.   Yes, it does.

5   Q.   Can you explain what a claim is?

6   A.   So a claim is a word that we use for the bill that goes

7   from the provider to Medicare, or the Medicare Administrative

8   Contractor is considered a claim.   It's filed electronically.

9   Everything is done electronically in the Medicare system, and

10  then money is electronically deposited into the provider's

11  account.

12  Q.   Are you familiar with the information that Medicare

13  considers important when determining whether to pay a claim?

14  A.   Yes.

15  Q.   What is some of that information?

16  A.   So on a claim is information about the beneficiary,

17  obviously, that they are a qualified beneficiary for Medicare

18  services.   There's information on the claim about who is

19  providing that service, where it's being provided, what type of

20  service is being provided, who ordered the service.

21       You might hear me use the word "referred," but "referred"

22  or "ordered" is kind of the same thing.

23       There's information on there about exactly what service was

24  provided, and we utilize codes on those claims, so you'll hear

25  about CPT codes.   And then there's also diagnoses on the claim.

1    Those are diagnoses codes that gives information.  There's

2    dates of service, who provided it, how much it cost, how much

3    it was paid.

4    Q.  And the claims processing, I think you mentioned is done by

5    the MAC or the Medicare Administrative Contractor?

6    A.  Yes.

7    Q.  What company processed Medicare claims for the State of

8    Georgia -- or companies for the State of Georgia from 2016 to

9    2019?

10   A.  So from '14 to '17, for the State of Georgia, it was

11   Cahaba, and then from '17 on, it was Palmetto, for Part B.

12   Q.  And what about for Part B Medicare claims for the State of

13   Pennsylvania from 2016 to 2019?

14   A.  The MAC is called Novitas.

15   Q.  Can you explain how a Medicare provider, like a laboratory,

16   gets paid by Medicare for a service?

17   A.  So a Medicare enrolled laboratory -- in this case, we're

18   talking about independent laboratories.  They would render the

19   service, obviously, and then they would submit a bill or a

20   claim electronically to their Medicare Administrative

21   Contractor.

22        And if the claim comes through the system, money is

23   deposited into that provider's account.  It is all done

24   electronically.

25   Q.  Who decides if a Medicare claim will be paid?

1    A.   So when the claim comes through the system, it is

2    electronic.  It is information that they put on the claim.

3    That claim, if it does not hit any edits, money is deposited.

4        Edits -- when I use that term "edit," I'm talking about

5    something that would be put into that system to stop the claim.

6    The reason you may stop the claim is maybe the claim was

7    incomplete, maybe it had wrong information on it, or maybe

8    it -- they could tell right off the bat that it couldn't -- it

9    shouldn't be paid.

10       There are very few edits put in the system because when a

11   claim is stopped, number one, the provider won't be paid.  And

12   two, we stop claims to do medical review on them.  Medical

13   review takes quite a bit of time and effort and money, both

14   from the providers and from the government.

15       And so just because a claim comes through the system and is

16   paid or processed, money is deposited in that provider's

17   account, but that does not mean that it meets compliance with

18   payment rules.  Medicare, at all times, has data analysis --

19   what we refer to as postpayment data analysis going on in the

20   background, and Medicare looks at that data analysis and makes

21   decisions on whether they think those meet -- are complying

22   with the rules and regulations.  And if they decide that it may

23   not be adhering to the rules and regulations, they can reopen

24   those claims and call that paperwork in so that we can do a

25   medical review.

1    Q.   You mentioned the edits.  I think I heard you say something

2    about the edits catching wrong information.

3         What would be an example of wrong information that would

4    get caught by the edits?

5    A.   So, say, you were going to amputate four legs.  That's not

6    possible on a human.  So the claim would see that, and it would

7    say no.  It would immediately return that claim to the

8    provider.  Some information, if it's at all possible, it's not

9    going to stop a claim.  So it would be very basic edits that

10   stop claims.

11   Q.   So the edit process that you're describing, is it sort of

12   like a computer-automated filter that is allowing some things

13   to go through and not everything?

14   A.   Yes.  So those edits have to be humanly put into the

15   system.

16   Q.   And who puts those edits -- who decides those edits?

17   A.   So they're decided on various things.  Some are put in by

18   CMS or mandated by CMS to put in those edits, but most of them

19   are put in by the Medicare Administrative Contractors

20   themselves.  This is because the Medicare Administrative

21   Contractors are very aware of the issues within their

22   geographical area, and also the stopping of a claim either,

23   with a denial or asking for medical record documentation to be

24   sent in, greatly affects the workload of that.

25        So when you stop a claim and ask for documentation, you're

1    going to have to allow that provider to gather the

2    documentation and send it in, a medical reviewer to review that

3    documentation, make a claims determination.  That takes quite a

4    bit of time.

5         And so Medicare, with the agreement of the providers,

6    they're working on a trust-based system.  Medicare asks the

7    providers to submit true, accurate, complete, and honest

8    claims, and the providers agree to do that.  And for that

9    promise, Medicare is sending money out before it looks at

10   documentation.

11        Documentation is only sent in when the postpayment data

12   analysis indicates that there may be mistakes in the payment.

13   Q.  What would be an example of a postpayment data analysis

14   that might catch something?

15   A.  So there are alerts that are set up in the claim system or

16   data analytic system; rendering services that seem to be not

17   medically necessary.  You might hear that term.  Rendering

18   services by providers who are not qualified to provide that

19   service.  Rendering services to beneficiaries who may not

20   qualify for that benefit to be provided.

21   Q.  So is Medicare or is a Medicare contractor reviewing every

22   claim before it's being paid?

23   A.   No.  The vast amount of Medicare claims are not reviewed in

24   terms of the documentation that would support them.  The claims

25   manual estimates that over one billion claims come into the

1   system every year, and that is by over a million different

2   providers.

3        It's physically impossible to review all of that

4   documentation.  If you had to wait on a medical review team to

5   review that documentation, our providers wouldn't get paid.

6   Nobody would want to work as Medicare providers because it

7   would be so cumbersome.

8   Q.  So if the Medicare contractor -- if Medicare isn't

9   reviewing every single claim, what information is being relied

10  on when Medicare is deciding whether to issue that payment?

11  A.  So a couple of things.  One, there's a heavy reliance on

12  the agreement that the providers make when they enroll in the

13  Medicare program.  Two, the rules and regulations, they promise

14  to adhere to those.

15       And did you ask me a second part of that question?

16  Q.  I think I asked what information was relied on before a

17  claim was submitted -- or paid, I'm sorry, not submitted.

18  A.  Right.  And that the information that they are submitting

19  in the claims system is true and correct.  At no time is a

20  provider allowed to submit a claim that they know should not be

21  paid.

22  Q.  With respect to laboratory tests that are billed to

23  Medicare, how long does Medicare, the Medicare Administrative

24  Contractor, have before -- to process a claim?

25  A.  So there is a term that you'll hear.  It's called a payment

1    floor.  That is the minimum time.  And generally, that's about

2    14 days, would be the minimum time that that claim would work

3    its way through the system, and money would be deposited into

4    the provider's account.

5         If the claim is stopped for some type of edit reason and

6    documentation is requested, it is longer.

7    Q.   And information that's being validated at that stage is the

8    beneficiary's name and what other information?

9    A.   So validated -- the beneficiary's information about who

10   they are and that they have a Medicare benefit, the services

11   that are being provided, that the provider is enrolled in the

12   Medicare system, and that the type of things that are on the

13   claim could possibly happen.

14   Q.   Is any information validated at that stage about whether

15   the services were actually provided?

16   A.   No.

17   Q.   Is any information evaluated at that stage about whether

18   the services are medically necessary?

19   A.   No.

20   Q.   So if a health provider is submitting a claim to Medicare,

21   what are the chances that that claim gets paid automatically?

22   A.   Very high.

23   Q.   So if it's not possible to review every single claim in

24   detail, like you were just describing, how does Medicare ensure

25   the integrity of its system?

1    A.   Well, a couple of things.  One, it's a trust-based system,

2    so there is an enrollment process that the providers go to

3    where they make certain promises, agreeing that they're going

4    to submit true, accurate, and complete claims, that they're

5    going to know the rules and regulations that are required to

6    bill Medicare and have access to that trust-based system.

7         And also, there is a constant data analytics that's going

8    through and -- post-payment of those claims, and audits will be

9    conducted based on those medical -- or the post-payment data

10   analysis.  There are multiple contractors who perform different

11   kinds of Medicare audits.

12   Q.   So when a claim is submitted for services provided by a

13   laboratory, who is responsible for the accuracy of that claim

14   that's submitted to Medicare?

15   A.   The provider is responsible for the accuracy.

16   Q.   And when you say the "provider," is that the provider

17   submitting the claim?

18   A.   Yes, billing the claim.

19   Q.   Billing the claim.

20   A.   The billing claim.

21   Q.   So if the laboratory is billing the claim, then the

22   laboratory is responsible?

23   A.   Yes.

24   Q.   What if a doctor's name is appearing on the claim that's

25   submitted?

1  A.  So in some services -- and I will say, lab in

2  particularly -- there is a cooperative effort that is

3  requested, but at no time is a provider who is submitting a

4  bill relieved of the responsibility that they have to submit --

5  that they promised to submit true and accurate claims.

6      They have agreed to know the rules and regulations for

7  Medicare, and any kind of reckless disregard or ignorance about

8  those rules and regulations is -- does not relieve them of the

9  responsibility that they agree to not submit false claims.

10 Q.  What is required for a provider to be able to bill

11 Medicare?

12 A.  So they must be an enrolled approved Medicare provider.

13 You go through an enrollment process.

14 Q.  Does an enrolled provider obtain any type of special

15 identification or identification number?

16 A.  Yes.  Once they are approved as a Medicare provider, they

17 are issued a billing number.  It's referred to as a PTAN.

18 Q.  What's the significance of that billing number, PTAN?

19 A.  So once they have access to that PTAN, they have access to

20 the electronic claims system.  And remember those claims are

21 submitted electronically.  Nobody is essentially looking at

22 them in the live aspect.  They submit claims, and money is put

23 directly into their accounts.

24 Q.  Are there opportunities for fraud and abuse since you can't

25 check every claim to make sure that the claims are truthful?

1    A.   Yes.

2    Q.   Does Medicare -- in addition to the edits that you were

3    describing, does Medicare take any other precautions when

4    doctors or laboratories or other providers are registering to

5    be able to bill with Medicare?

6    A.   There are several things that they do.  One, I spoke about

7    the enrollment process.  So they are looking at the people who

8    are involved in the provider enrollment.  They're looking at

9    the services that they provided.  And if at any time there are

10   indications of fraud, waste, and abuse, there are steps that

11   they take to protect that Medicare trust fund.

12   Q.   And is education material also made available to providers?

13   A.   Yes.  So the Medicare Administrative Contractors, one of

14   their main roles is to do provider education.  Once you submit

15   your enrollment application, you get a letter, and it provides

16   you various sources where you can obtain educational

17   information.

18        So both the Medicare Administrative Contractor, or MAC, has

19   its own website.  It does education through various emails.

20   They'll do YouTube videos.  They'll do emails.  They'll come to

21   various towns and cities and provide on-site education.  You

22   can call their 1(800) number, if you have questions.  There's

23   also publications that are published by what's called the

24   Medicare Learning Network, and it provides various topics and

25   teaching.

1       Anything that you want to know, you can request to be

2   educated on.

3   Q.   Was LabSolutions enrolled as a Medicare provider?

4   A.   Yes.

5   Q.   And you mentioned the PTAN and obtaining the number before.

6       Is there any other process that has to happen before a

7   company like LabSolutions can be enrolled with Medicare?

8   A.   So laboratories in specific, they have to also have what's

9   called a CLIA license to perform those tests.  That is one of

10  the things.  They go through a survey for that.

11  Q.   Do providers also have to make certain promises when

12  they're enrolling in the Medicare program?

13  A.   Yes.

14  Q.   Can you describe those?

15  A.   The promises that they make?

16  Q.   Yes.

17  A.   So, one, all the information that they're putting on that

18  enrollment form is true and accurate and complete.  They're

19  also promising that if there's any changes to that information,

20  that they will update that enrollment form.  They are promising

21  to submit true, accurate, and complete claims.

22      They're promising to know the rules and regulations that

23  are required to bill Medicare and to bill those services.  They

24  are agreeing to abide by the Anti-Kickback Statute.  And they

25  are agreeing to not submit false claims.

1          And there might be something I forgot on there.

2    Q.   Okay.

3          MS. GURSKIS:   I'm showing what's been previously

4    admitted as Government's Exhibit 209-A.

5    BY MS. GURSKIS:

6    Q.   Ms. McMillan, is this a document or type of document that

7    is familiar with you?

8    A.   Yes.   This is called an 855B.   An 855 is the title used for

9    an enrollment form, and the B is used for specific things,

10   which include labs.

11   Q.   What's the purpose of this document?

12   A.   The provider fills out various information that Medicare

13   uses to help understand who is providing those services to the

14   Medicare beneficiaries.

15         MR. SADOW:   Your Honor, could we hold up one moment?

16   The monitor is not working.

17         THE COURT:   Sure.

18      (Discussion was held off the record.)

19      (Back on the record at 3:11 p.m.)

20   BY MS. GURSKIS:

21   Q.   So looking at this second page of Government's

22   Exhibit 209-A, what are the types of suppliers that are

23   completing this particular enrollment form with Medicare?

24   A.   The 855B could include ambulance service supplier,

25   ambulatory surgical center, a clinic or group practice, an

1    independent clinical laboratory, an independent diagnostic

2    testing facility, an intensive cardiac rehab supplier,

3    mammography center, a mass immunization center, a Part B drug

4    vendor, a portable X-ray supplier, or a radiation therapy

5    center.

6    Q.  And looking at the fifth page of Government's

7    Exhibit 209-A, what is the reason for this particular

8    application?

9    A.  The reason for this application is marked as you are a new

10   enrollee in Medicare.

11   Q.  And what is the type of role that somebody has who might be

12   filling out this form to submit to Medicare?

13   A.  Excuse me.  Someone who has ownership interest and/or

14   managing control.

15   Q.  Okay.  Directing you to this page that is identifying

16   somebody's name and the ownership interest and management

17   control.

18           MR. RAFFERTY:  What page number is this?

19           MS. GURSKIS:  It's the -- the Bates stamp ends in 312.

20   BY MS. GURSKIS:

21   Q.  Could you see whose name appears on this form?

22   A.  Yes.  They were adding a Minal Patel, who is the owner.

23   Q.  And now turning your attention to this Section 14 of this

24   document, and the Bates stamp on this ends in 315, Government's

25   Exhibit 209-A.

1       What is the purpose of this section, Ms. McMillan?

2    A.   So Section 14 is referred to as the penalties for

3    falsifying information.  This section explains the penalties

4    for deliberately falsifying information in the application to

5    gain or maintain enrollment in the Medicare program.

6    Q.   And is this a continuation of that section?

7    A.   Yes.

8    Q.   What is the purpose of Section 15, Ms. McMillan?

9    A.   This Section 15 is referred to as a certification

10   statement.  There are several statements on here that the

11   provider is about to agree to.

12   Q.   So turning to the next page of that, which ends in

13   Bates 318, is this a continuation of that certification

14   section?

15   A.   Yes.

16   Q.   Can you tell us, generally, what is articulated in the

17   certification statement section?

18   A.   They're stating that they have read the enrollment form,

19   and then they are making these agreements.  It's basically that

20   they're not going to submit false claims; that everything in

21   the information is true and accurate that they've submitted.

22   Q.   Okay.  So I'd like to go through some of these sections

23   with you.

24       So first, is the section that I just highlighted, beginning

25   by his or her signature, is that an agreement that the provider

1    is making to abide by the promises contained in this section?

2    A.  Yes.  By signing it, they are agreeing to adhere to the

3    following requirements.

4        (Discussion was held off the record.)

5        MS. DE BOER:  What exhibit number, Ms. Gurskis?

6        MS. GURSKIS:  It's Exhibit 209-A.

7    BY MS. GURSKIS:

8    Q.  All right.  If we could turn your attention, Ms. McMillan,

9    to the third paragraph here.

10   A.  Do you want me to read it?

11   Q.  If you could, yes.  If you need me to zoom in, let me know.

12   A.  Okay.  I agree to abide by the Medicare laws, regulations

13   and program instructions that apply to this supplier.  The

14   Medicare laws, regulations, and program instructions are

15   available through Medicare contractor.  I understand that

16   payment of a claim by Medicare is conditioned upon the claim

17   and the underlying transaction complying with such laws,

18   regulations, and program instructions, including, but not

19   limited to, the Federal Anti-Kickback Statute and The Stark

20   Law, and on the supplier's compliance with all applicable

21   conditions of participation in Medicare.

22   Q.  Can a provider enroll in the Medicare program without

23   making that promise?

24   A.  No.

25   Q.  And where is the information about these Medicare rules and

1    regulations made available?

2    A.   So they're published on the internet.  They're both

3    provided through the Medicare Administrative Contractor and

4    through CMS.  And you can actually pull down all the -- Social

5    Security Act, and the Code of Federal Regulations is all

6    online.

7    Q.   And the paragraph here, paragraph 3, references the Federal

8    Anti-Kickback Statute.

9        What is that?

10   A.   So when they say a "kickback," a kickback is a bribe,

11   basically.  And anything to deal with the healthcare that is

12   reimbursed by the federal government, kickbacks or bribes are

13   not allowed.

14   Q.   And why does this statement specifically reference the

15   Federal Anti-Kickback Statute?

16   A.   Because any kind of kickbacks associated with the delivery

17   of healthcare that is funded by the federal government, those

18   claims are not payable.  Kickbacks are not allowed in the

19   federal healthcare system.

20   Q.   Who does the Federal Anti-Kickback Statute apply to in

21   terms of its scope?

22   A.   Everyone.  So whether you're related directly or

23   indirectly, covertly or overtly, if you have a role in the

24   ordering and delivering of healthcare that is paid for by the

25   federal government, you are subject to anti-kickback laws.

1    Q.   So if Medicare became aware that a claim was submitted as a

2    result of a kickback, would Medicare knowingly pay that claim?

3    A.   No, it would not.

4    Q.   Other than submitting the claim, who else does this apply

5    to -- the lab submitting the claim, who else does this apply

6    to?

7    A.   It applies to everyone who is involved in that service or

8    item that is paid for by the federal government.  So if you're

9    ordering it or you're providing it, you're part of the entire

10   spectrum of people who are involved in the delivery of that

11   benefit.  It also applies to the beneficiary.

12   Q.   Why is Medicare concerned about people getting paid for

13   arranging referrals?

14   A.   So kickbacks corrupt our healthcare system.  Kickbacks is a

15   bribe.  Where there are bribes involved in healthcare, it

16   undermines the system.  Kickbacks then, or bribes, become about

17   the exchange of money between two parties instead about the

18   healthcare of that individual.

19        Healthcare should be about the medical needs of that

20   beneficiary.  When kickbacks are involved in the delivery of

21   healthcare, it corrupts medical decision-making because it

22   becomes about the exchange of money.  You see an

23   overutilization of medical services because people are ordering

24   services and either not providing them, or they are ordering

25   them and providing them at a lower level than what they are

1    billing the federal government.

2         It also compromises decision-making.  The decision-making

3    becomes about the exchange of money instead of about that

4    beneficiary.  It provides an unlevel playing field for all of

5    the Medicare providers who are abiding by the Anti-Kickback

6    Statute, and it makes it unfair.  It also leads to what we call

7    patient steering.

8         Instead of the service being provided by a -- all the

9    providers that are available out there, patients get steered in

10   order to have that exchange of money instead of the patient

11   having needs met by other providers that may be more available

12   and more beneficial for their care.

13   Q.  So you mentioned that Medicare would not knowingly pay a

14   claim if it was submitted based on a kickback?

15   A.  That's correct.

16   Q.  Would that be true even if the underlying service was

17   actually provided?

18   A.  Yes, that is correct.

19   Q.  Would that be true even if the patient actually needed the

20   service?

21   A.  That is true.  Kickbacks are not allowed in our system --

22   in the healthcare system because they corrupt it.

23   Q.  So just the fact that the -- the fact of the kickback means

24   that Medicare will not pay the claim, period?

25   A.  That is correct.

1   Q.   And you were talking before about how Medicare operates on

2   a trust-based system.

3        Is a kickback arrangement an example of how a provider

4   might have used that trust-based system?

5   A.   Yes.  It puts the trust fund at risk.  And if kickbacks are

6   identified, steps need to be taken to protect that trust fund.

7   Q.   Does Medicare have any special rules that would allow a

8   laboratory to offer kickbacks in exchange for referrals?

9   A.   No.

10  Q.   For example, would Medicare pay a laboratory for performing

11  a genetic test if the same lab were paying a kickback for

12  somebody to refer samples to the lab?

13  A.   Medicare is paying for the service based out of the

14  Medicare fund, and they would not pay for the service if

15  kickbacks were involved.

16  Q.   About so to put that another way, does that mean marketers

17  should not be receiving kickbacks in exchange for referring

18  genetic tests to labs?

19  A.   So any kind of reimbursement cannot vary during the course

20  of the term, and it cannot be based on volume or value of the

21  service being provided.  Medicare pays a set amount to the

22  provider for, for instance, a laboratory service, and there is

23  no variation in the amount paid based on the volume or the

24  value of that service being paid.

25  Q.   Okay.  I want to turn your attention back to what's on the

1    screen here.  I'm going to zoom in on another section.

2        Can you read, Ms. McMillan, what is No. 6?

3    A.   No. 6 reads, I will not knowingly present or cause to be

4    presented a false or fraudulent claim for payment by Medicare,

5    and I will not submit claims with deliberate ignorance or

6    reckless disregard for their truth or falsity.

7    Q.   Can a provider enroll in Medicare without paying that

8    claim -- without making that promise?  I'm sorry.

9    A.   No.

10   Q.   Is this a continuation of the certification statement

11   section?

12   A.   This is a continuation of Section 15, the certification

13   statement.

14   Q.   Okay.  I'm going to zoom in on the top section here.

15       Can you read the first three sentences in that Section B,

16   under first authorized official signature?

17   A.   Yes.  It states:  I have read the contents of this

18   application.  My signature legally and financially binds the

19   supplier to the laws, regulations, and program instructions of

20   the Medicare program.  By my signature, I certify that the

21   information contained herein is true, correct, and complete,

22   and I will authorize the Medicare fee-for-service contractor to

23   verify this information.

24       Do you want me to continue?

25   Q.   That's all right.  Thank you, Ms. McMillan.

1      And whose name appears in the authorized official

2    statement -- sorry, authorized official information and

3    signature section?

4    A.   Minal Patel.

5    Q.   And is he identified as the owner?

6    A.   Yes, he is.

7    Q.   And does the section also contain his signature?

8    A.   Yes.

9    Q.   And what is the date on this particular form?

10    A.   It is December 11, 2013.

11    Q.   Is this signature a Medicare requirement?

12    A.   Yes.

13    Q.   From Medicare's perspective, does it mean that Minal Patel

14    signed this document and submitted it to Medicare on behalf of

15    LabSolutions?

16    A.   Yes.  The authorized official has the legal authority to

17    commit the organization to abide by the Medicare rules and

18    regulations.  They also have the authority to make changes on

19    that application if they need to, and they are responsible for

20    updating the information.

21    Q.   And by this signature is Mr. Patel agreeing to the

22    conditions that we just went over?

23    A.   Yes.

24    Q.   Why are these promises important to Medicare?

25    A.   Again, Medicare is a trust-based system.  The way the

1    system is able to function is that we have trustworthy

2    providers that enroll and agree to provide Medicare services to

3    the beneficiaries.  They have access to that trust fund, and

4    the money will be deposited in their account in a timely

5    fashion for the services that they are providing for the

6    beneficiaries.  It also allows for the providers to be paid in

7    a timely fashion.

8    Q.   So if Medicare knew a claim contained false information,

9    would Medicare knowingly pay the supplier or provider for that

10   claim?

11   A.   No.

12   Q.   You said that suppliers and providers are required to

13   submit claims and promise that they're medically necessary.

14        In terms of medical necessity, what does Medicare require?

15   A.   So one of the very basic rules about Medicare that you'll

16   probably hear over and over and over again is the term

17   "medically reasonable and necessary."

18        So Medicare authorizes payment for services that are

19   medically reasonable and necessary.  And you might say, so what

20   does that mean?  So Medicare defines, on certain terms, what

21   that means.  In general, you'll hear, again and again, about

22   descriptions that make a service or an item medically

23   reasonable and necessary.

24        That means that that service or item is safe.  It is

25   effective.  It is not experimental.  It is not investigational.

1    It is provided by someone who is qualified to provide that

2    service and order that service.  It is provided for a duration

3    and in a setting that is specific for that patient's medical

4    needs.

5        It is provided by qualified personnel.  It is a service or

6    item that does not exceed the beneficiary's medical need, but

7    it is also a service or item that meets their medical need and

8    is at least as effective as another medically appropriate

9    available item or service.

10   Q.  If Medicare knew a claim was for services that had not been

11   ordered by a patient's treating physician, would Medicare pay

12   that claim?

13   A.  So for diagnostic services, Medicare's rule is that it is

14   ordered by the treating physician.  That is one of the tenets

15   of that rule when ordering diagnostic services.

16   Q.  What does that mean, the treating physician?

17   A.  The treating physician is the physician who then takes the

18   information of that diagnostic test and utilizes the

19   information in making care decisions for that patient.

20       MS. GURSKIS:  I'm now showing the witness what's been

21   previously admitted as Government's Exhibit 210-A.

22   BY MS. GURSKIS:

23   Q.  Ms. McMillan, what is this document?

24   A.  This is another 855B Medicare enrollment application.

25   Q.  And drawing your attention to the box that's checked, what

1    is the purpose of this particular form?

2    A.   They are providing basic information here, and it has to do

3    with the practice location, the payment address, and the

4    medical record information.

5    Q.   And turning your attention to the Bates stamp ending in 364

6    of Government's Exhibit 210-A, what is the email addresses

7    that's listed under correspondence address for the laboratory?

8    A.   It's Minal, it looks like, 2875@gmail.com -- 2878 -- it is

9    a little blurry for me.   2878@gmail.com.

10   Q.   Now turning to Section 15, this is Bates stamp ending in

11   388 of Government's Exhibit 210-A.

12        Ms. McMillan, is this certification statement similar to

13   the one we just looked at?

14   A.   Yes.

15   Q.   And whose name appears in this section?

16   A.   Minal Patel, and he is listed as the owner.

17   Q.   And whose signature appears in that section?

18   A.   Minal Patel.

19   Q.   And what is the date?

20   A.   It is June 27, 2014.

21   Q.   And through this signature, is Mr. Patel, again, being

22   bound by the same promises we just went over --

23   A.   Yes.

24   Q.   -- in the other application?

25   A.   Yes.

1          MS. GURSKIS:  I'm now showing the witness what's been

2    previously admitted as Government's Exhibit 212-A.

3    BY MS. GURSKIS:

4    Q.   Ms. McMillan, what is this document?

5    A.   This is another Medicare enrollment application 855B.

6    Q.   And turning to Bates stamp ending in 423, Section 14,

7    penalties for falsifying information, does this section appear

8    in every 855B, Ms. McMillan?

9    A.   It does appear in every 855B.  Anytime there's a change on

10   a Medicare application, Medicare requires that they review that

11   section where it's, again, delineating the penalties and the

12   certification statements.  So every time there's a change, they

13   have to, again, sign that they've read that and they are

14   knowledgeable about that.

15   Q.   And, again, this Section 15 is the same?

16   A.   Yes.

17   Q.   And whose name appears under the authorized official's

18   information and signature here?

19   A.   It is Minal Patel, and he's listed as the owner.

20   Q.   And what is the date listed on this particular application

21   or form?

22   A.   This is October 22, 2014.

23   Q.   Okay.  The cover page on this one looks a little bit

24   different, but what is this?

25   A.   This is -- JJ stands for Jurisdiction J.  It's a provider

1    enrollment cover sheet.

2    Q.  What does Jurisdiction -- JJ mean?

3    A.  So when we talk about Medicare Administrative Contractors,

4    they're assigned a jurisdiction or a geographical region.

5    You'll hear that referred to as a jurisdiction.  This J

6    specifically delineates that jurisdiction.

7    Q.  So this is another of the same forms that we were just

8    looking at?

9    A.  Yes.

10   Q.  Okay.  And turning to Bates stamp 449, who is listed here

11   in the ownership intersection?

12   A.  So here, they're adding a Sonal Jariwala, and the title is

13   a CFO.

14   Q.  And this, again, is the same certification statement

15   appearing in this form?

16   A.  Yes, it is.

17   Q.  And whose name appears here in the certification section?

18   A.  Again, it is Sonal Jariwala, who is the CFO.

19   Q.  And by Ms. Jariwala signing these forms, is that somehow

20   replacing Mr. Patel as the authorized official for

21   LabSolutions?

22   A.  No.  The box was checked to add them.  In order to remove

23   somebody, it would delete them.

24   Q.  Okay.  I'm now showing you what's previously been admitted

25   as Government's Exhibit 216-A.  If you need me to zoom in,

1    Ms. McMillan, let me know.

2         But what is this document?

3    A.   So this is also a Medicare enrollment form.  They're

4    available online, through the website.  This is what you're

5    seeing here.  It includes the same content that we've been

6    looking at on the paper document.

7    Q.   And who is listed here under authorized signer?

8    A.   It is Ms. Jariwala.  It's Hemangini.

9    Q.   And here, I think you can see Section 5, it says ownership

10   interest and managing control.

11        Whose name is listed on this page towards the bottom?

12   A.   Minal Patel.

13   Q.   And what does it say is Mr. Patel's relationship to the

14   lab?

15   A.   He is the owner.

16        MS. GURSKIS:  I'm now showing the witness Government's

17   Exhibit -- what has previously been admitted as Government's

18   Exhibit 217-A.

19   BY MS. GURSKIS:

20   Q.   Ms. McMillan, what are we looking at?

21   A.   This is another application form.

22   Q.   And for what entity?

23   A.   It is LabSolutions.

24   Q.   What is the Medicare contractor identified on this?

25   A.   Novitas.

1    Q.   And who's identified as the authorized signer on this first

2    page?

3    A.   Hemangini Jariwala.

4    Q.   And on the second page, who is identified as the authorized

5    signer?

6    A.   Minal Patel.

7    Q.   What is the significance of the authorized signer?

8    A.   Again, the authorized signer is authorized official.  He

9    binds the organization to abide by Medicare rules and

10   regulations.

11   Q.   And turning to Bates stamp 643 of the same exhibit, whose

12   name appears again as the authorized official for LabSolutions,

13   or whose names?

14   A.   So there's two.  It's Hemangini Jariwala and also

15   Minal Patel.

16   Q.   In addition to the LabSolutions enrollment paperwork that

17   we've just looked at, were you aware of Mr. Patel submitting

18   Medicare enrollment paperwork for other entities?

19   A.   I observed that in some of the documents I reviewed prior

20   to this.

21        MS. GURSKIS:  I'm showing the witness what's previously

22   been admitted as Government's Exhibit 220.

23   BY MS. GURSKIS:

24   Q.   Is this another Medicare enrollment application,

25   Ms. McMillan?

1    A.   Yes, it is.  Yes.

2    Q.   And looking at Section 4, what is the practice name of this

3    particular medical practice?

4    A.   So this enrollment application is in relationship to an

5    organization called Georgia Pain and Wellness Center.

6    Q.   Does it indicate what kind of practice Georgia Pain and

7    Wellness Center is?

8    A.   It is a group practice office or clinic.

9    Q.   And looking at the certification statement here, whose name

10   appears in this section?

11   A.   So the authorized official is Minal Patel, who is the CEO.

12   Q.   And what is the significance of Mr. Patel's signature on

13   this document?

14   A.   So that means that he's the authorized official for this

15   organization, this pain clinic.

16        MS. GURSKIS:  I'm showing the witness what's previously

17   been admitted as Government's Exhibit 221-C.

18   BY MS. GURSKIS:

19   Q.   Ms. McMillan, is this another enrollment application?

20   A.   Yes, it is.

21   Q.   What is the name of the supplier identified?

22   A.   It is Hapeville Medical Center, LLC.

23   Q.   And what is the type of practice?

24   A.   It is notated as a multispecialty clinic of pain

25   management, general medicine clinic.

1   Q.   And turning to Section 15, to the certification statement,

2   whose name appears in the certification statement as its

3   authorized official?

4   A.   The authorized official is Minal Patel.

5   Q.   And whose signature appears in the certification statement?

6   A.   Minal Patel's.

7   Q.   And, again, what is the significance of this certification

8   and signature from Medicare's perspective?

9   A.   As the authorized official, he is agreeing to abide by

10  those rules and regulations as well as the organization that he

11  has been appointed as the authorized official.

12  Q.   So overall, what representations are made by providers in

13  all of these enrollment documents that we just looked at?

14  A.   The representation of the Medicare provider that they are

15  enrolling to provide services to the Medicare beneficiaries,

16  and who is those authorized officials that are agreeing to bind

17  that organization to follow the Medicare rules and regulations,

18  and anyone who has ownership interest would be listed on those

19  enrollment forms.

20  Q.   In your -- all your years of experience, have you seen

21  false claims?

22  A.   Yes.

23  Q.   What are some examples of a false claim that you've seen?

24  A.   So in my time working with the UPIC, we see various kinds

25  of things.  But claims for services that were never rendered,

1    claims for services that -- we call upcoding.  They're billed

2    at the highest level -- of a CPT level, and they're providing

3    lesser services.

4         Services that were provided by people who are not qualified

5    to provide those services.  Services that did not meet medical

6    necessity requirement of the benefit.  Services that didn't

7    meet all of the -- what we call conditions of payment for that

8    claim, but yet they were submitting claims to be paid as if

9    they did.

10        MS. GURSKIS:  Sorry.  One moment.  I apologize.

11        (Discussion was held off the record.)

12        MS. DE BOER:  What exhibit do you want?

13        MS. GURSKIS:  213-D.

14   BY MS. GURSKIS:

15   Q.  Do suppliers or providers have to submit an agreement for

16   an electronic funds transfer?

17   A.  Yes, they do.

18   Q.  And what's the significance of an EFT agreement?

19   A.  So they're providing their banking information so that

20   Medicare can electronically deposit money into their bank

21   account.

22   Q.  And what are we looking at here with what's previously been

23   admitted at Government's Exhibit 213-D?

24   A.  So this is the electronic funds transfer authorization

25   agreement, otherwise known as the EFT.

1   Q.   And is this for LabSolutions?

2   A.   Yes.

3   Q.   And this is an agreement between LabSolutions and Medicare?

4   A.   Yes.

5   Q.   Okay.  Let's transition a minute to talking about the

6   circumstances in which cancer genetic testing is and is not

7   covered by Medicare.

8        You've said, I think, a couple of times today that Medicare

9   is a trust fund?

10  A.   Yes.

11  Q.   And that's made up of taxpayer money?

12  A.   Yes.

13  Q.   So does Medicare pay for every single medical service

14  that's available out there?

15  A.   No.  So the Medicare benefit has -- it pays for services

16  that are medically reasonable and necessary.  Again, it's not

17  more than the beneficiary needs, but it's not less than the

18  beneficiary needs.

19  Q.   So are there some things then that Medicare doesn't cover?

20  A.   Yes.

21  Q.   For example, does Medicare cover cosmetic surgery?

22  A.   No.

23  Q.   What would happen if Medicare paid for every conceivable

24  medical service or treatment?

25  A.   We would run out of the Medicare trust fund.

1   Q.   So would there be --

2   A.   We'd have to pay a lot higher taxes.

3   Q.   And what's the name of the main federal law that discusses

4   what Medicare pays for and what it doesn't?

5   A.   It's noted under the Social Security Act.

6   Q.   Is there a provision in that law that explains what

7   Medicare does not cover?

8   A.   Yes.

9   Q.   At a high level, what does that law exclude from coverage?

10   A.   So it notes exclusions.  Mainly, Medicare doesn't pay

11   for -- there's several things, but Medicare pays for medically

12   reasonable and necessary items and services, and they have a

13   very limited screening benefit.

14       When I use the term "screening," screening means that

15   you're running a test when there's no sign or symptoms.  You're

16   just running the test based on no signs or symptoms or

17   complaints from the patient.

18       MS. DE BOER:  Ms. Puntillo, if you could please pull up

19   Government's Exhibit 222-C.

20       MR. RAFFERTY:  Your Honor, may we approach?

21       THE COURT:  Sure.

22     (The following proceedings were held sidebar:)

23       MR. RAFFERTY:  I think the government is about to go

24   into all of these laws, rules, and regulations.

25       THE COURT:  I'll give them the curative now.  You got

1    it.

2         (Proceedings returned to open court.)

3         THE COURT:  So ladies and gentlemen of the jury, we are

4    now going to begin going over a number of statutes and federal

5    regulations regarding Medicare.  Now, as these exhibits come

6    into evidence, you will get an opportunity to revisit them

7    later, but it is important -- if you recall, when I made my

8    opening remarks to you all, that there will be certain kinds of

9    evidence that are introduced and admitted with a limiting

10   instruction, meaning you should use them only for specific

11   purposes.

12        So I want to read you this cautionary instruction

13   before we consider this next run of documents.

14        Are you all with me?  All right.

15        Members of the jury, I'm permitting the government to

16   introduce certain federal laws dealing with Medicare known as

17   federal statutes or federal regulations.  I want to provide you

18   with this limited instruction that explains the relevance of

19   these exhibits.

20        I want to remind all of you that this is a criminal

21   case.  These exhibits, these federal statutes and federal

22   regulations, are not criminal laws.  A violation of a Medicare

23   regulation or a federal statute dealing with Medicare, in and

24   of itself, is not a crime.  But that same evidence may or may

25   not be relevant in determining the defendant's state of mind or

1    whether the defendant acted with criminal intent.

2            The only crimes that you're here to decide are the

3    crimes that are alleged in the indictment.  However, these laws

4    that I will be admitting may put into context the testimony of

5    the witness regarding Medicare coverage, and the weight you

6    give these exhibits and these regulations will be up to you.

7            Do you all understand?

8            THE JURORS:  Yes.

9            THE COURT:  Very good.

10           So with that being said, we can proceed with the

11   examination.

12           MS. GURSKIS:  Thank you, Your Honor.

13   BY MS. GURSKIS:

14   Q.  The title of this --

15           MS. GURSKIS:  If you could zoom in, Ms. Puntillo, on

16   the title.

17   BY MS. GURSKIS:

18   Q.  -- is Exclusions from Coverage; is that right?

19   A.  Yes.

20   Q.  And what does that mean, essentially?

21   A.  Items and services that would not be covered.

22           MS. GURSKIS:  If you could zoom out, Ms. Puntillo, and

23   then start with the Section A.

24           Sorry, I'm having trouble reading.

25   BY MS. GURSKIS:

1   Q.   Could you -- Ms. McMillan, could you read the section

2   beginning items or services specifically excluded.

3   A.   Items or services specifically excluded:  Not withstanding

4   any other provision of this subchapter.  No payment may be made

5   under Part A or Part B for any expenses incurred for items and

6   services which, except for the items and services described in

7   this succeeding subparagraph or additional preventive service

8   as described in Section 1395(x)(ddd)(1) of this title, are not

9   reasonable and necessary for the diagnosis or treatment of

10  illness or injury or to improve the functioning of a malformed

11  body member.

12  Q.   So basically does that say that Medicare will not pay for

13  services that are not reasonable and necessary?

14  A.   Yes.

15       MR. RAFFERTY:  Your Honor, I'm going to object to the

16  form of the question at this point.  I think it's leading.

17       THE COURT:  Overruled.

18       You may continue.

19       MS. GURSKIS:  If you move down a little bit, I think --

20  sorry.  If you could stay in that section, Ms. Puntillo.  I

21  apologize.

22  BY MS. GURSKIS:

23  Q.   So I think it actually is even more specific and says that

24  the services have to be reasonable and necessary; is that

25  right?

1    A.   Yes.  So payment will not be made if the items are not

2    reasonable and necessary.

3    Q.   And then the second part, for the diagnosis or treatment of

4    illness or injury?

5    A.   Yes.

6    Q.   So is that essentially saying that Medicare will not cover

7    services just for fun?

8    A.   Yes.

9    Q.   Is it saying that Medicare generally does not cover

10   screening services?

11   A.   It is not mentioning screening services here.  There's

12   another screening regulation.

13   Q.   Okay.  So if I go to my doctor because I had a bad fall,

14   and the doctor decides that I need an X-ray to determine if my

15   arm is broken and what kind of fracture I have, would that

16   X-ray be covered under Medicare guidelines?

17   A.   So presenting to your physician with a complaint of arm

18   pain or arm -- that you fell or something, that gives medical

19   reason to do an X-ray, and that is a medically reasonable and

20   necessary support of that service.

21   Q.   What if I go to my doctor because I want to see what the

22   inside of my bone -- I want to see what my bones look like

23   under the imaging.  Is that covered?

24   A.   So that would not be a medical reason to do that diagnostic

25   test.  You could have it done, but you could pay for it on your

1    own.  It would not be paid for by the Medicare benefit.

2    Q.  So is it fair to say that Medicare covers what you need but

3    not what you're curious about?

4    A.  Yes.

5    Q.  If I wanted to get this X-ray out of my own curiosity, I

6    guess I could, but would I have to pay for that out of my own

7    pocket?

8    A.  Yes.

9    Q.  But the taxpayers don't have to pay for something I'm

10   curious about.

11   A.  No.

12   Q.  And why is that?

13   A.  So the trust fund that is funded by us, as taxpayers, is

14   set aside, and that fund is to be used by things that are

15   payable under that Social Security Act and the Code of Federal

16   Regulations.  Items and services that do not meet the federal

17   regulations are not payable under those regulations.

18   Q.  So an X-ray is sort of an obvious example, but what about

19   something like a colonoscopy or a mammogram, that people might

20   be told to get after a certain age even if they don't have a

21   symptom of breast cancer or a symptom of colon cancer.

22       Would Medicare cover that?

23   A.  So under the Medicare benefit, there are certain services

24   that are described in the regulation under which Medicare will

25   pay for as a screening benefit, meaning, screening is when

1    there are no signs and symptoms, but you can get that service.

2         Under the Medicare benefit, a screening service is

3    specifically delineated in the regulation on when it can be

4    provided, where it can be provided, under what circumstances it

5    can be provided, and in the claims data we would note it as a

6    screening service because it is billed using a screening code.

7    Q.   So people can get those mammograms and have those covered

8    by Medicare without showing signs or symptoms of breast cancer?

9    A.   Those limited screening services, yes, they can, as long as

10   they're abiding by the screening benefit.

11   Q.   And we know that those are covered because Congress

12   expressly said they were covered; is that right?

13   A.   Yes.

14   Q.   Are those exceptions spelled out in the Social Security

15   Act?

16   A.   Yes, and the Code of Federal Regulation.

17   Q.   Okay.

18        MS. GURSKIS:  Ms. Puntillo, if you could please pull up

19   225-B.

20   BY MS. GURSKIS:

21   Q.   Ms. McMillan, what is being shown at 225-B?

22   A.   So this is 42 CFR, Code of Federal Regulation.  It's

23   411.15.  It talks about the screening benefit.

24   Q.   So not to necessarily go through all of the screening

25   benefits that are listed here, but are there screening benefits

1    aside from the mammogram that Medicare covers?

2    A.   Yes, they're listed here.  So the ones that are most

3    common -- and I can list them from Section 1 -- are screening

4    mammography, colorectal cancer screening test, screening pelvic

5    exams, prostate cancer screening tests, glaucoma screening

6    exams, ultrasound screening for an abdominal aortic aneurysm, a

7    cardiovascular disease screening test, diabetes screening test,

8    a screening electrocardiogram, and also the initial preventive

9    physical examination that would meet criteria that's specified

10   in this other regulation, K6 through K15 of this section.

11       There is additional preventative services that meet

12   criteria in 410.64 of this chapter or an annual wellness visit

13   that provides personalized prevention plan services.

14       MS. GURSKIS:  And I apologize, Your Honor.  I was just

15   informed by my colleague that I had not moved at the start to

16   bring in 225-A, 225-B, and 225-C.  I'd inadvertently left that

17   off of the list.  I don't think the defense objects.

18       MR. RAFFERTY:  Subject to the same objection, Your

19   Honor.

20       THE COURT:  Correct.  That'll be moved in at this time.

21       MS. GURSKIS:  Thank you, Your Honor.

22       (Government Exhibits 225-A, 225-B, 225-C were received in

23       evidence.)

24   BY MS. GURSKIS:

25   Q.   So to sum up, Ms. McMillan, is it fair to say that the

1   general rule is that screening tests are not covered by

2   Medicare?

3   A.   There are certain screening services that are covered.  It

4   does not include genetic studies as a screening tool.

5   Q.   Okay.  So here, your mammograms, pelvic exams, prostate

6   exams, are some exceptions to that rule?

7   A.   Yes.

8           MR. RAFFERTY:  Your Honor, I'm going to object at this

9   time.

10          THE COURT:  Overruled.

11  BY MS. GURSKIS:

12  Q.   And those are expressly spelled out in the law?

13  A.   Could you repeat the question?

14  Q.   Sure, I'll rephrase the question.

15          If there's a screening test that's not spelled out in this

16  regulation, does that mean the screening test is covered or not

17  covered?

18  A.   If it's not listed here, it is not covered.

19  Q.   Is there any exception for genetic testing for screening

20  for cancer?

21  A.   We're specifically talking about screening, and Medicare

22  only pays for those screening services that are listed here.

23  Q.   So if someone has no symptoms of cancer, but are curious if

24  they have a genetic marker or mutation that might affect their

25  risk of developing cancer, would that test be covered by

1   Medicare?

2   A.   No.

3   Q.   Why not?

4   A.   Because it would be considered screening, and the federal

5   law only allows for screening services based on this regulation

6   and the services that they have defined.

7        MS. GURSKIS:   Ms. Puntillo, if you could pull up

8   Government's Exhibit 224-B.

9   BY MS. GURSKIS:

10  Q.   Do you recognize what's on the screen, Ms. McMillan?

11  A.   Yes.  This is speaking about 410.32 or 42 CFR, 410.32.  We

12  refer to this as the diagnostic testing regulation.

13  Q.   Does this regulation apply to cancer genetic tests that are

14  performed by a lab?

15  A.   It applies to all diagnostic testing.  When I use the word

16  "diagnostic testing," I am specifically noting that it is

17  different than screening.  Diagnostic testing is done based on

18  the complaints of signs and symptoms for a patient in order to

19  diagnose those problems.

20       MS. GURSKIS:   And, Ms. Puntillo, if you could just zoom

21  in on the top section here (indicating).

22  BY MS. GURSKIS:

23  Q.   Can you read that subsection A for us, Ms. McMillan?

24  A.   Ordering diagnostic tests:  All diagnostic X-ray tests,

25  diagnostic laboratory tests, and other diagnostic tests, must

1  be ordered by the physician who is treating the beneficiary.

2  That is, the physician who furnishes a consultation or treats a

3  beneficiary for a specific medical problem and who uses that

4  result in the management of the beneficiary's specific medical

5  problem.

6      Tests not ordered by the physician who is treating the

7  beneficiary are not reasonable and necessary.

8  Q.   Okay.  That was a lot of words.  Can you translate that?

9  A.   When you go to the doctor with a complaint, and you need a

10  diagnostic test, it is the doctor who is going to be treating

11  you who should be ordering that test, because he will use those

12  results in making medical decisions regarding your care.

13  Q.   So if these conditions are not met, would Medicare cover

14  the test?

15  A.   No.

16  Q.   And then focusing on the last sentence here, the Section A.

17      MS. GURSKIS:  Could we zoom in on that, Ms. Puntillo,

18  starting with tests not ordered?  Right here (indicating).

19  BY MS. GURSKIS:

20  Q.   Can you read that last sentence for us, Ms. McMillan?

21  A.   Tests not ordered by a physician who is treating the

22  beneficiary are not reasonable and necessary.

23  Q.   So is that saying that one part of determining whether a

24  test is necessary for a particular patient is whether that's

25  ordered by a doctor who's actually treating the patient?

1    A.  Yes.  And --

2    Q.  I'm sorry?

3    A.  And the results are used in decision-making for that

4    patient.

5    Q.  Okay.  So let me see if I have this straight.  If the

6    patient has symptoms of cancer, but the test results are not

7    used in the treatment of that patient, would Medicare cover the

8    test?

9    A.  So I want to be real clear.  When you order a test based on

10   signs and symptoms of the patient, and the results of the test

11   come back normal, that may still be used in decision-making in

12   that patient.

13       If you go and complain of a stomachache and you do a

14   diagnostic test to diagnose that stomachache, and it comes back

15   normal, your physician is still making the decision on what to

16   do next, how to relieve that stomachache, how to treat that

17   stomachache.

18       So it doesn't mean that the test doesn't need to be

19   abnormal.  It means that he is using that information from the

20   diagnostic test to make treatment decisions regarding the

21   beneficiary's care.

22   Q.  What if the person's family members had cancer?  So the

23   patient wants the test to see if they have predisposition for

24   cancer.

25   A.  Could you please clarify?

1   Q.   Sure.

2   A.   Are you asking about a specific diagnostic test?

3   Q.   Yes.  So if a person's family members have had cancer and

4   that person wants a genetic test, but the results aren't used

5   to treat the patient, would Medicare cover that?

6   A.   So the patient themselves needs to have signs and symptoms

7   of cancer or a problem in order to qualify for genetic testing.

8   Q.   What if the patient has those signs and symptoms but the

9   test is ordered by a doctor who has never treated the patient

10   for anything, would Medicare cover that?

11   A.   A doctor who is not using the test results in the treatment

12   of that patient does not meet the medical necessity standard.

13   Q.   What's the significance of that doctor/patient relationship

14   from the Medicare perspective?

15   A.   So the patient relationship.  So when we do medical review,

16   we're looking at is there a reason that these tests were

17   ordered, whatever the test may be, and were the results of

18   those tests used in the treatment of the beneficiary.

19       I want to explain that there are times when a patient may

20   be referred out for a consultation to another physician who is

21   perhaps more knowledgeable about a certain situation, a

22   clinical situation, and that physician would be considered a

23   consultant that is defined in the CPT manual.

24       It has a very specific definition.  A consultant is when

25   one physician or healthcare practitioner reaches out to another

1    qualified healthcare practitioner or physician and asks them to

2    consult, see that patient, and make recommendations, and then

3    either take over the care of that patient, based on their

4    recommendations, or refer them back to the original physician

5    so that they can use that information to continue treating the

6    patient.

7         The medical necessity has to do with, are you doing

8    diagnostic tests that are utilized in the treatment of that

9    beneficiary?

10         MS. GURSKIS:  And, Ms. Puntillo, if you could zoom out

11    again, but staying within this section.  Thank you.

12    BY MS. GURSKIS:

13    Q.  So focusing on the section that talks about the physician

14    who is furnishing the test and using that result in the

15    management of a beneficiary's specific medical problem, do you

16    see that part of the rule, Ms. McMillan?

17    A.  Yes.

18    Q.  What's the purpose of the requirement that the doctor is

19    actually using the test to manage a specific medical problem?

20    A.  Because Medicare doesn't want to utilize a trust fund to

21    run tests for the fun of it.  It needs to be for the treatment

22    of that beneficiary's specific medical problem, unless it is a

23    stated screening benefit.

24    Q.  In your experience, how much is Medicare reimbursing for

25    cancer genetic tests in the circumstances where they are

1    covered?

2    A.   Genetic tests can run from hundreds to thousands of

3    dollars.

4    Q.   Did you say thousands?

5    A.   Yes.

6    Q.   And if Medicare pays for an expensive test that's not used

7    in the patient's treatment, does anyone -- is Medicare

8    benefiting from that, or is the patient benefiting from that?

9    A.   The patient wouldn't be benefiting from it.  It's a risk to

10   the Medicare trust fund, and it is not allowed under Medicare

11   statute.

12        MS. GURSKIS:   Thanks, Ms. Puntillo.

13   BY MS. GURSKIS:

14   Q.   Ms. McMillan, I'd like to talk to you briefly about

15   telemedicine.  What is telemedicine, according to Medicare

16   regulations?

17   A.   So in the Medicare regulations, we refer to it as

18   telehealth, and it was -- it changed during the pandemic.  So I

19   am referring to the rules regarding prepandemic.

20        Telehealth was meant to bridge the gap in what we refer to

21   as health professional shortage areas outside of a metropolitan

22   statistical area.  That's a lot of words to describe.  Make

23   sure that people had access to healthcare no matter where they

24   lived.

25        So for those people who were in a rural setting, in a rural

1    healthcare facility, in a doctor's office that maybe did not

2    have access to those types of things that would be available in

3    a bigger city, they can have access to that through what we

4    refer to as telehealth.

5        Medicare had a couple of requirements for that.  One, it

6    was geographical in nature.  Two, it had to utilize two-way

7    interactive realtime communication.  In other words, it had to

8    be audiovisual at the same time.

9    Q.  I think I heard you say audiovisual at the same time.  So

10   would that include telephone calls?

11   A.  No.

12   Q.  Would that include listening to a recording of a patient

13   talking about whether or not people in his family have had

14   cancer?

15   A.  No.  There was a special demonstration project that took

16   place in Alaska, but that is not pertinent in this situation.

17   Q.  Okay.

18       MS. GURSKIS:  Ms. Puntillo, could you please pull up

19   Government's Exhibit 226-B.

20   BY MS. GURSKIS:

21   Q.  What is this, Ms. McMillan?

22   A.  It didn't change for me.

23   Q.  Oh, I'm sorry.

24       MS. GURSKIS:  226-B, is that up?

25   BY MS. GURSKIS:

1   Q.   Is that up for you now on the screen, Ms. McMillan?

2   A.   Okay.

3   Q.   What is this?

4   A.   Can you make it bigger?  I'm sorry.  I can't see it.

5        MS. GURSKIS:  Just the title, I think, so she can

6   identify what it is.

7        THE WITNESS:  This is 410.78.  This is the telehealth

8   service regulation.

9        MS. GURSKIS:  Thank you.

10       And, Ms. Puntillo, if you could flip to the second page

11  and zoom in on the bottom beginning with number three.

12  BY MS. GURSKIS:

13  Q.   What does this say about where the beneficiary must be for

14  a telemedicine appointment?

15  A.   I think she highlighted the wrong person.

16  Q.   Oh, I'm sorry.

17  A.   Thank you.

18       So the services are furnished to a beneficiary at an

19  originating site, which is one of the following:  The office of

20  a physician or practitioner; a critical access hospital, which

21  is described in Section 1861(mm)(1) of the Act; a rural health

22  clinic as described in Section 1861(aa)(2) of the Act; a

23  federally qualified healthcare center as defined in 1861(aa)(4)

24  of the Act; or a hospital as defined in 1861(e) of the Act.

25  Q.   So what does this mean in terms of where a beneficiary

1   needs to be for purposes of a telemedicine appointment?

2   A.   So the beneficiary had to be located at an originating

3   site, which is defined here about what I just read.  And there

4   was also -- the other half of the equation was the distant site

5   practitioner.

6   Q.   Could a beneficiary be at her home?

7   A.   No.

8   Q.   Could a beneficiary be in her car?

9   A.   In a car?

10  Q.   Yes.

11  A.   No.

12  Q.   And was there some shift to this due to the COVID-19

13  pandemic?

14  A.   Yes.  When the public health emergency was declared, the

15  regulations on this were temporarily altered.  So if you heard

16  about telehealth services during the pandemic, this happened

17  before that.

18  Q.   Thank you.

19       There's one more kind of policy-related document that I

20  want to talk to you about.  I think we've heard a bit earlier

21  today about a Medicare Administrative Contractor, or a MAC?

22  A.   Yes.

23  Q.   Are you familiar with national coverage determinations and

24  local coverage determinations?

25  A.   Yes.

1    Q.   Can you explain to the jury what those are?

2    A.   So we might hear the term called a "local coverage

3    determination."  We call it an LCD.  Those are published by the

4    MAC, and they are local coverage determinations or LCDs.  It's

5    basically more information giving guidance on when things are

6    covered and not covered.

7         They are further defining federal law.  They do not

8    override, supersede higher-up legislation, meaning the Code of

9    Federal Regulations or the Social Security Act, they cannot

10   change that, override it, or supersede it.  So when a MAC

11   publishes a local coverage determination, or an LCD, it's just

12   helping the provider better understand when that item or

13   service is or is not covered and what kinds of things go into

14   the making of that decision.

15   Q.   So fair to say it's sort of like a different user manual,

16   but for the same ultimate piece of equipment or --

17   A.   It's for educational purposes.  And, again, it does not

18   override or supersede higher-up federal regulation.  The MACs

19   are jurisdictional or geographical in nature, and whether

20   you're a beneficiary in New York or Texas or California, your

21   Medicare benefit is the same.  It is not based on what the

22   Medicare Administrative Contractor publishes in those LCDs.

23        That is just to give the provider guidance and to help

24   further understand the higher-up regulation.

25   Q.   So do different MACs have different rules for

1    reimbursement?

2    A.   They are not different rules.  They are the same rules.

3    Q.   And what governs which of those kind of user manuals

4    applies?

5    A.   So we always start -- we call it a hierarchy of rules and

6    regulations.  Always the very most important one is the Social

7    Security Act, followed by the Code of Federal Regulations.

8    Those are federal rules and guidelines that are made by our

9    lawmakers that we vote into office.

10          Then, CMS publishes what you might hear referred to as the

11   internet of -- the IOM, or the manuals.  Manuals are published,

12   and they're available online.  You could go and look at them.

13   They kind of give the how-tos and how to administrate certain

14   things that are involved in the running of the benefit for

15   Medicare.

16          Then underneath -- and included in those are what are

17   called "national coverage determinations."  Again, those are

18   regulations that apply across the whole nation.  Underneath

19   that, the MACs can publish local coverage determinations.

20   Again, they are not overriding or superseding higher-up

21   legislation.  They're clearly helping to describe those medical

22   reasonable and necessary circumstances.

23          And remember, earlier I described how they would describe

24   those circumstances having to do with what makes an item or

25   service safe or effective, not experimental, not

1    investigational, deliberate in the setting that would be

2    appropriate for that item or service by qualified people.

3         It begins to delineate what those types of things might

4    mean, might look like.  And it also provides the references

5    where that MAC is referring to on why they are making this

6    determination.  Again, it does not override or supersede

7    higher-up legislation.

8    Q.   So the same Medicare reimbursement across the nation?

9    A.   Yes.  Wherever you live, your Medicare benefit is the same.

10        MS. GURSKIS:  Ms. Puntillo, if you could please pull up

11   Government's Exhibit 101.

12   BY MS. GURSKIS:

13   Q.   Ms. McMillan, what does this document show?

14   A.   So this is just giving you a geographical picture of the

15   MAC, Medicare Administrative Contractor for the State of

16   Pennsylvania, which is in green there.  The MAC there is called

17   Novitas.  And then the MAC for the State of Georgia was called

18   Palmetto during 2016, but it later changed to -- I mean, it was

19   called Cahaba during 2016, and then later it changed to

20   Palmetto during the time frame of 2017 and 2019.

21        Those were the MACs, or Medicare Administrative

22   Contractors, that process the claims and pay the providers for

23   the services that were rendered in those geographical areas.

24   Q.   Okay.  And I see that there are -- there's the LabSolutions

25   logo, and there are two states that are highlighted on the map.

1       Can you explain that?

2   A.   Those were states where a LabSolutions lab -- laboratory

3   was enrolled in the Medicare program and located in those two

4   states.

5   Q.   Okay.  And that's Pennsylvania and Georgia?

6   A.   Yes.

7        MS. GURSKIS:  Ms. Puntillo, if you could pull up

8   Government's Exhibit 230-J.

9   BY MS. GURSKIS:

10  Q.   Ms. McMillan, what is this document?

11  A.   So this is a copy of the LCD.  It is published by Palmetto,

12  which, again, is one of those Medicare Administrative

13  Contractors, and it is describing their local coverage

14  determination, or LCD, based on the BRCA1 and BRCA2 genetic

15  test.

16  Q.   And what is the BRCA1 and BRCA2?  What does that mean?

17  A.   You probably have heard about that.  It is related to

18  breast cancer or breast cancer-related syndromes.

19  Q.   So does this LCD, or local coverage determination, apply to

20  genetic testing?

21  A.   Yes.

22       MS. GURSKIS:  And if you could zoom in at the top,

23  Ms. Puntillo.

24  BY MS. GURSKIS:

25  Q.   I see that in red.  It says superseded.  What does that

1   mean?

2   A.   So LCDs are published, and they give information for a

3   certain time period.  Any time there's any kind of change to

4   that LCD in regards to the codes or maybe the information

5   becomes a little bit more clear, or maybe they even find a

6   typographical error -- any time there's a change made for that,

7   a new LCD is published.

8        And you can always go to the back of the LCD to see exactly

9   what changed and when it changed.  The back of that will give

10  you every single update that was ever made to that LCD.  Again,

11  the content is not changing in regard to the higher-up national

12  law.

13       It is only giving information that might be helpful to the

14  provider in understanding when this might be medically

15  reasonable and necessary.

16  Q.   Thank you.

17       MS. GURSKIS:  If you can zoom out, Ms. Puntillo, and

18  turn to the second page, and zoom in on the top where the date

19  is.

20       Could you move to the left.  Thank you.

21  BY MS. GURSKIS:

22  Q.   What is the relevant time period for this particular LCD?

23  A.   So it fell within the time frame.  It became effective on

24  August 9, 2018, and this particular revision ended on

25  August 22, 2018.

1   Q.   So there were versions of this that were effective in the

2   years after, through August of 2019?

3   A.   Yes.

4   Q.   And then the years prior, from 2016 through this time

5   period?

6   A.   Yes.

7   Q.   So before we go through the coverage requirements, did the

8   requirements change in any material way from version to version

9   in terms of what conditions or what symptoms are required for

10  Medicare coverage of the BRCA test?

11  A.   No.   The national coverage or the federal regulation did

12  not change.   The provider was still required to establish

13  medically necessary testing, and that did not include

14  screening.   It was not a covered screening test.

15       MS. GURSKIS:   Ms. Puntillo, if you could zoom out and

16  then zoom into the nationally covered indication section on the

17  bottom of page 2.

18  BY MS. GURSKIS:

19  Q.   Can you read that section for us, Ms. McMillan?   I believe

20  it bleeds to the second page, so we can start here and then

21  move to the next page.

22  A.   This section is called the Coverage Guidance.   It gives

23  coverage indications, limitations, and/or medical necessity.

24  The indications and limitations of coverage for nationally

25  covered indications:   This policy covers testing for the BRCA1

1    and BRCA2 genes for patients suspected of hereditary breast

2    and/or ovarian cancer syndromes.

3        To be eligible for Medicare coverage, the individual being

4    tested must have signs or symptoms of breast, invasive or

5    ductal carcinoma in situ (DCIS), ovarian cancer, including

6    fallopian tube and primary peritoneal cancer, pancreatic cancer

7    or prostate cancer, and meet one of the criteria below.

8    Q.   Okay.  And --

9    A.   And then testing, and then it must go on to the --

10        MS. GURSKIS:  If you could flip to the very top of the

11   next page.

12        Thank you, Ms. Puntillo.

13        THE WITNESS:  Genetic testing for a known mutation in a

14   family is a covered service for individuals with signs and/or

15   symptoms of breast cancer.  Testing of an unaffected

16   Medicare-eligible individual, or a family member, is not a

17   covered Medicare benefit.

18        BRCA1 and BRCA2 testing consists of a full sequence and

19   duplication/deletion analysis.  Genetic testing for a known

20   mutation in a family may be limited to the known familial

21   variant.

22        MS. GURSKIS:  If you can zoom out, Ms. Puntillo, and

23   show us the section that lists the criteria.

24   BY MS. GURSKIS:

25   Q.   Not to read through all of this, Ms. McMillan, but what is,

1  generally speaking, involved in this criteria section for

2  testing?

3  A.   It is giving the provider information on what criteria

4  might be considered when considering a patient for BRCA1 and

5  BRCA2 genetic testing.

6       MS. GURSKIS:  Thank you, Ms. Puntillo.  If you could

7  flip back to the first page?  The second page, I'm sorry.

8  BY MS. GURSKIS:

9  Q.   Does this section reference the same Social Security Act

10  provision that we were talking about earlier today?

11  A.   Yes.  The higher-up legislation is listed on here.  It

12  should also be noted that there are other rules that the

13  provider may need to be following.  But this provides a

14  baseline of where they could look at for those higher-up

15  legislation rules.

16  Q.   And, again, that's an act that generally excludes screening

17  tests from coverage.

18  A.   Yes.

19  Q.   Except the ones that it specifically outlines in the act.

20  A.   Yes.

21  Q.   Okay.

22       MS. GURSKIS:  Could we turn to the fourth page of this

23  exhibit, Ms. Puntillo?  And zooming in on the multigene panels

24  section.

25  BY MS. GURSKIS:

1   Q.   Ms. McMillan, can you read what is written about the

2   multigene panels?

3   A.   So BRCA1 and BRCA2 genetic testing for susceptibility to

4   breast or ovarian cancer with multigene next-generation

5   sequencing, called NGS panels, is covered as medically

6   necessary when all of the following criteria are met:  Pretest

7   genetic counseling by a cancer genetics professional has been

8   performed, and posttest genetic counseling by a cancer genetics

9   professional meeting the NCCN accreditation criteria is

10  planned.

11       No. 2 is:  All genes in the panel are relevant to the

12  personal and family history for the individual being tested.

13  Panels with genes that are not relevant to the individual or

14  personal and family history are not reasonable and necessary.

15       Criteria listed under, quote, personal history of female

16  breast cancer, quote, and/or, quote, personal history of other

17  cancer, quote, are met.

18       And the last:  This individual also meets criteria for at

19  least one hereditary cancer syndrome for which NCCN guidelines

20  provide clear testing criteria and management recommendations,

21  including but not limited to, HBOC, Li-Fraumeni syndrome,

22  Cowden syndrome, or Lynch syndrome.

23  Q.   Okay.  Let's take each of these one by one.

24       MS. GURSKIS:  Ms. Puntillo, if you could further zoom

25  in on the first bullet that starts with pretest genetic

1   counseling.

2   BY MS. GURSKIS:

3   Q.   Can someone with no medical background perform this

4   pretesting genetic counseling?

5   A.   So they want someone who's educated and knowledgeable about

6   cancer genetic testing to interview the patient and assess

7   whether they actually need this test or not.

8   Q.   Can a telemarketer perform the pretesting genetic

9   counseling?

10  A.   A telemarketer would not have this qualification.   That

11  would not be -- it would not qualify.

12  Q.   If the posttest plan that's referenced here were to have a

13  genetic counselor available in case the results showed a marker

14  for cancer, would that satisfy the requirement?

15  A.   Ask this again.

16  Q.   Sure.

17       So this bullet here references a posttest genetic

18  counseling by a cancer genetics professional as being part of a

19  plan.   If rather than having -- let me rephrase that.

20       If you were simply to have the knowledge that a genetic

21  counselor could be available to discuss the results, would that

22  satisfy this requirement?

23  A.   So, again, the Medicare requirement is that the test is

24  ordered by the physician who is treating the beneficiary.   The

25  involvement of a genetics counselor in order to help facilitate

1    the knowledge and assessment and options to do with the test

2    results would be helpful in establishing medical necessity.

3    Q.   Okay.

4         MS. GURSKIS:   If you could zoom out, Ms. Puntillo, and

5    take us to the second bullet.

6    BY MS. GURSKIS:

7    Q.   All genes in the panel are relevant to the personal and

8    family history to the individual being tested.

9         Can you explain what is articulated here in this bullet?

10   A.   When we talk about a panel, it's a group of tests that are

11   related either by specimen or disease status.  And they're --

12   it's one test that's done, but it gives several different

13   results.  And we call that a panel.

14        It's billed with one code.  And it might include several

15   different test results.  An easy example might be if you've

16   gone to the doctor and had a complete blood count and it gives

17   all these different results, that's a panel of results.

18   Q.   So when it says panels with genes that are not relevant are

19   not reasonable, can you explain?

20   A.   That's right.  Each and every item that is tested and

21   provided with a result must be used in the decision-making for

22   that patient.  So just because running a sample through a piece

23   of lab equipment, and it gives you, maybe, ten results, if

24   those results are not pertinent to the care and decision-making

25   of that payment -- of that patient, payment is not medically

1   reasonable and necessary, and it would not meet payment

2   guidelines.

3          MS. GURSKIS:  Thanks, Ms. Puntillo.  If you could zoom

4   back out and then zoom in on the third bullet.

5   BY MS. GURSKIS:

6   Q.  So in consideration of this criterion, if the only reason a

7   patient is getting a test is because a lot of people in that

8   person's family had cancer, would Medicare cover it?

9   A.  Again, for the diagnostic testing of genetic testing, the

10  patient would have to have signs and symptoms of some type of

11  cancer-related element.

12         They would either -- genetic testing could also be done

13  because they were looking to treat them with some type of

14  medication, and the doctor was going to be using the result in

15  the decision-making of that medication or treatment form.

16  Or -- I lost my train of thought.  What did you ask me?

17  Q.  I was asking about whether -- it's late in the day.  I was

18  asking about whether there were family -- if a person's family

19  members had cancer, according to this bullet, whether that

20  would be something Medicare would pay for, if that person had

21  wanted a genetic test?

22  A.  No.  And the other requirement for genetic testing in

23  regard to cancer would be that there had been a diagnosis

24  established.  So meaning that other more readily available

25  test, like an X-ray, blood work, a physical exam, perhaps a

1   biopsy had established a cancer diagnosis, and they were using

2   the molecular testing to further delineate or define that

3   cancer.

4   Q.   Thank you.

5        MS. GURSKIS:   Ms. Puntillo, if you could zoom in on the

6   fourth bullet.

7   BY MS. GURSKIS:

8   Q.   So just generally, without going into reading this, what

9   are the hereditary cancer syndromes that would be acceptable

10  according to the fourth provision here?

11  A.   So with BRCA testing, there's kind of a family of cancers

12  that can be related, and they're just listing those.

13       MS. GURSKIS:   Thanks, Ms. Puntillo.

14  BY MS. GURSKIS:

15  Q.   So in terms of the panel testing that we were talking about

16  a moment ago, if Medicare would cover BRCA testing in a certain

17  circumstance, for a certain patient, would Medicare then also

18  cover testing for 10 or 20 other genes?

19  A.   Again, the medical reasonable and necessary criteria would

20  have to be met.  So for each and every test that is ordered and

21  performed on that beneficiary, the result would have to pertain

22  to the management of that beneficiary's specific medical need.

23       MS. GURSKIS:   And, Ms. Puntillo, if you could turn to

24  the fifth page.  And then, Ms. Puntillo, if you could zoom in

25  under limitations and that first couple of sentences under

1   limitations.

2   BY MS. GURSKIS:

3   Q.  Can you read where it says BRCA testing, those two

4   sentences?

5   A.  BRCA testing is limited to once in a lifetime.  If a

6   patient has been previously tested for a BRCA1 and BRCA2,

7   repeat testing prior to Lynparza therapy is not reasonable and

8   necessary and will not be covered by Medicare.

9   Q.  What does once in a lifetime mean in this context?

10  A.  Your genes don't change.  So you're only -- only if you're

11  required -- need it -- how do I want to say it?  If you met the

12  conditions for payment of Medicare to have your genes tested,

13  they don't change, so you wouldn't need it ever again.

14  Q.  So if a patient got a BRCA test through Medicare benefits,

15  perhaps one that was ordered by a physician who never treated

16  her, and then years later her oncologist wanted to order a BRCA

17  test for her, what could happen?

18  A.  Well, the claims system, of course, is tracking all those

19  claims.  So if the claim system picked up that this patient

20  already had a BRCA test, it would automatically deny or edit

21  out that claim.

22       Now, when a claim is denied, a beneficiary has the right to

23  appeal that denial, but it would take a process that they would

24  need to go through.

25            MS. GURSKIS:  Ms. Puntillo, if you could zoom back out

1    and then zoom in on the section, Nationally Covered

2    Indications -- Noncovered Indications.  I'm sorry, here

3    (indicating).

4    BY MS. GURSKIS:

5    Q.   Can you read the first sentence here, Ms. McMillan?

6    A.   Nationally Noncovered Indications:  BRCA1 and BRCA2 genetic

7    testing is not reasonable and necessary, thus, it is noncovered

8    for the following indications:  Genetic screening in the

9    general population, such testing is considered screening and is

10   excluded by the Medicare statute.

11        An ABN, which stands for Advanced Beneficiary Notice, must

12   be obtained for BRCA1 and BRCA2 testing for individuals without

13   signs and symptoms of breast, ovarian, or other hereditary

14   cancer syndromes as indicated in this policy.

15   Q.   Thank you, Ms. McMillan.

16   A.   Okay.

17   Q.   Is this section specifically mentioning that screening

18   tests are not covered?

19   A.   That is correct.

20   Q.   So someone has to have a personal history of certain

21   cancers to be covered for these BRCA1 and BRCA2 testings under

22   Medicare?

23   A.   And they would have to meet the medical necessity

24   qualification for that.  So it's not just having a personal

25   history.  They would have to be having active signs and

1    symptoms of some kind of medical need that would indicate they

2    needed testing.

3    Q.   Okay.  And the personal history of cancer that's here in

4    the second bullet, are those specific types of cancer, or is it

5    more broadly any type of cancer history?

6    A.   Can you reask that?

7    Q.   Sure.

8         I'm looking at bullet 1, the second bullet, testing of

9    individuals with no personal history of breast, ovarian,

10   fallopian tube, primary peritoneal, pancreatic, or prostate

11   cancer.

12        There are specific cancers that are listed here.  What

13   about if somebody had a history for a cancer that wasn't one of

14   the cancers listed here?

15   A.   Okay.  So let's talk about that a little bit.

16        So a personal history, that is a very specific defined

17   element in the CPT book.  When we say the word "personal

18   history," according to CPT guidelines, remember that's the book

19   that tells us how to code and assign codes to certain

20   situations.

21        When we say you have a personal history of a certain

22   disease, that means that treatment is no longer aimed at that

23   issue, meaning, the disease condition is in the past.  So we'll

24   take, for instance, cancer.  That means your cancer has been

25   treated, it is gone.  There's no more surgery planned or no

1    more medications being taken, no more chemotherapy.  It's in

2    the past.  It is considered part of your personal history.

3          It is important to include a personal history on the claim

4    because it helps give more information about what has happened

5    to that beneficiary in the past.  But for Medicare regulations,

6    you are doing genetic testing under certain circumstances

7    because that patient is presenting with a sign or symptoms that

8    may be indicative of cancer.  And further treatment is needed.

9          In that instance, a provider would be submitting as a

10   principal diagnosis, that would be the diagnosis in that

11   primary position, that would indicate that there was some type

12   of cancer or tumor.  We would see a different code other than a

13   personal history.

14         Personal history helps gives information about what's

15   happened to you in the past, or the beneficiary.

16   Q.   So both of these bullets -- one of them you read that said

17   that such testing is considered screening and is excluded by

18   Medicare statute.

19         Is that a reference to the provision of the Social Security

20   Act that we were looking at earlier?

21   A.   Yes.  This LCD does not override or supersede the Social

22   Security Act.  It just helps further define the context of

23   which you can understand the Social Security Act.

24   Q.   Is there any ambiguity in your mind that a personal history

25   of one of these listed cancers is required in order for the

1    BRCA test to be covered?

2    A.   No.   This LCD is very good about explaining the context

3    under which a patient may be considered medically reasonable

4    and necessary to have a BRCA test done.

5    Q.   If somebody tried to tell you that Medicare covered BRCA

6    screening if somebody only had a family history of cancer, what

7    would your reaction to that be?

8    A.   It does not meet the screening regulation as defined by

9    Medicare.   Remember, screening means you have no sign or

10   symptom.   You're simply running the test.

11        MS. GURSKIS:   Ms. Puntillo, if you could zoom out and

12   then zoom into the section that says General Overview.

13   BY MS. GURSKIS:

14   Q.   Just generally speaking here, Ms. McMillan, what does this

15   section say about how common it is to have a cancer that stems

16   from a genetic mutation?

17   A.   It's rare.   This section kind of gives the provider a

18   little bit of information about where the Medicare

19   administrator is coming from in regards to the rules.   So it

20   says:   Cancer is the result of a genetic alteration that often

21   results in the deregulation of pathways that are important for

22   various cellular functions, including growth, maintenance of

23   DNA integrity, cell cycle progression, and apoptosis, which is

24   programmed cell death, among others.

25        Among women in the United States, breast cancer is the most

1   common cancer diagnosis excluding squamous and basal cell skin

2   cancers.  Breast cancer is the second leading cause of death

3   among women after lung cancer.  Epithelial ovarian cancer is

4   the leading cause of death from gynecological cancer in the

5   United States and the fifth most common cause of cancer

6   mortality in women.

7        Epithelial --

8   Q.  Sorry.  Just moving down here.

9   A.  Okay.

10  Q.  I'm looking here where it says:  Up to 10 percent are due

11  to specific mutations and single genes referring to breast

12  cancer.

13  A.  Passed down to families, yes.

14  Q.  Okay.  Is that similar for other types of female cancers?

15  A.  It says similar rates are reported for ovarian cancer.

16  Q.  So based on this, how common would coverage be, then, in

17  the general population for this test?

18  A.  So it would be not seen on -- one, you do not test BRCA

19  testing on the general population.  And for women who would be

20  suspected of carrying the BRCA gene, it's a small percentage of

21  the population.  And just carrying the gene does not mean that

22  you will develop breast cancer.

23       MS. GURSKIS:  Ms. Puntillo, if you could turn to the

24  sixth page under the bullet that starts recently.

25  BY MS. GURSKIS:

1    Q.   So directing your attention here to the discussion of

2    treatment considerations in patients with cancer.

3        Would it be fair to say that cancer genetic testing is more

4    appropriate for determining a plan of care for a patient as

5    opposed to as a diagnostic tool?

6    A.   Yes.  Genetic testing is utilized after initial testing has

7    been done that is more standardized.  Standardized testing

8    would include X-rays, blood work, physical exam, perhaps

9    surgical exploration and biopsy of that material.  That would

10   establish a cancer diagnosis.

11       And then molecular testing would go on to help further

12   define either the specific diagnoses and what that entails, how

13   they would treat that patient, or how that patient would

14   respond if they did not have therapy.

15       Those are the indications in which genetic testing might be

16   considered reasonable and necessary under the Medicare benefit.

17   BY MS. GURSKIS:

18   Q.   And if the requirements are not met, would Medicare still

19   cover the test?

20   A.   No.  Medicare requires that you provide information that

21   supports those conditions of payment in order for the Medicare

22   benefit to pay for that.

23   Q.   So if the requirements are not met should a supplier or

24   provider be submitting a claim to Medicare for the test?

25   A.   Again, the provider is responsible for submitting claims

1   that adhere to the rules and regulations.  They should not be

2   submitting claims for payment if they do not support those

3   rules.

4   Q.   Thank you.

5        MS. GURSKIS:  Ms. Puntillo, if you could pull up

6   Government's Exhibit 231-A.

7        THE COURT:  Let's go ahead -- folks, does anybody need

8   a break?  I would assume it would be a good time now to maybe

9   take a quick restroom break before we continue.

10       So what I'd like to do is, let's just take a

11  five-minute break.  Do me a favor, leave your notepads in your

12  chairs, please.  We're going to use this to stretch out and use

13  the restroom.  I don't want to go ahead and belabor it.

14       We've been going about almost two-and-a-half hours.

15  But let's go ahead and give you guys a break.  You're excused.

16       THE COURT SECURITY OFFICER:  All rise.

17  (Jury exits at 4:50 p.m.)

18       THE COURT:  Please be seated.

19       Ms. Gurskis, how much longer do you have in this

20  examination?

21       MS. GURSKIS:  I would guess maybe 20 or 30 minutes.

22       THE COURT:  Let's make that 20, not 30.  I just want to

23  point out -- and it's a good time for me to say it.  I know

24  that this requires a lot of baseline testimony to explain this

25  material, and I'm sure the government is concerned about not

1    losing every juror within the first few days.

2           But I'm going to be abundantly clear.  When I sit

3    through two-and-a-half hours of testimony like this, I better

4    not have repeats of this.  This is your witness for this

5    material.  No one needs to sit through this again.

6           So when you establish the baseline and knowledge and

7    you go back and you give me the list of people who are

8    testifying tomorrow, I just want us all to be crystal clear

9    that we need to avoid duplicative testimony.  The amount being

10   covered by this witness to me means that we can move forward

11   through this very extensive witness list and perhaps we don't

12   need some of these other individuals identified because

13   Ms. McMillan has covered so much material as a baseline for the

14   entire Medicare system.

15          I think we're probably all on the same page, but I just

16   want the government to understand that the way I try cases,

17   especially out of your unit, is to keep you guys moving or else

18   I will be here until 2023.  So I want to make sure we're all on

19   the same page.

20          Let's go ahead and take a five-minute break.  We will

21   finish in the next 20 minutes.

22          Mr. Sadow, I think we are going to have to do your

23   cross tomorrow.  There is just literally no way we are going to

24   begin this today.

25          What did you want to add, Mr. Rafferty?

 1          MR. RAFFERTY:  That was it, Your Honor.

 2          THE COURT:  I'm not making these jurors go any further

 3     than that.  I told them between 5:00 and 5:30.  I have no doubt

 4     that Ms. Gurskis will finish well in advance of 5:30, so we'll

 5     be fine.

 6          So let's take a five-minute break for the restroom.

 7          (Court recessed at 4:52 p.m.)

 8          (Back on the record at 5:04 p.m.)

 9          THE COURT:  Let's round up our jurors.

10          (Jury enters at 5:04 p.m.)

11          THE COURT:  Please be seated, everyone.

12          Ladies and gentlemen of the jury, before we conclude

13     the examination of this witness, I did want to let a few of our

14     jurors know, my courtroom deputy and I have been working this

15     afternoon preparing letters to some of your employers to -- one

16     of our jurors, I've already written to your professors as well,

17     so hopefully that will take care of anything.  I expect to get

18     a response.  I copied and wrote to all of the TAs and all of

19     the professors.

20          Those that need other letters, flight issues, we are

21     drafting them.  So we will get you guys everything that you

22     need for cover with employers or anyone else that you need help

23     with.  Okay?  So we've been working on that this afternoon.  I

24     just wanted to let everyone know we are helping you all out.

25          Okay.  So with that being said, we'll turn it back to

1    the government to complete the examination of Ms. McMillan.

2         Go ahead, Counselor.

3         MS. GURSKIS:  Thank you, Your Honor.

4    BY MS. GURSKIS:

5    Q.  Ms. McMillan, we just spent a while going through that BRCA

6    LCD for Palmetto.  There were some shifts that you mentioned

7    when you noted the superseding notation at the top of the

8    exhibit.

9         Do you recall that?

10   A.  Yes.

11   Q.  The entire time that this LCD was in effect, did anything

12   materially change about how a BRCA1 or BRCA2 test was covered

13   under Medicare guidelines?

14   A.  Not under federal regulation, no.

15   Q.  And you mentioned earlier that Palmetto, at some point,

16   took over the contract for Cahaba --

17   A.  Yes.

18   Q.  -- for the MAC?

19        Did any coverage for BRCA1 and BRCA2 testing change at all

20   during that time period?

21   A.  Coverage did not change, no.

22   Q.  And we've spoken today just more specifically about BRCA1

23   and BRCA2, but more broadly, in terms of genetic testing, what

24   are the general -- the general coverage requirements?

25        Do those differ from Cahaba, to Palmetto, to the other MACs

1   that you know?

2   A.   No.   The Medicare benefit is the same across the

3   United States.   It does not differ geographically.

4   Q.   So does every MAC have the same LCD?

5   A.   They publish their own LCDs.   Again, those LCDs cannot

6   override or supersede higher-up legislation.   The MAC is trying

7   to give the provider information on what would entail medical

8   necessities.   The MAC is responsible for processing claims.

9        Some MACs have the ability to edit out claims at a higher

10  level than other MACs, not that those claims would be covered

11  versus the other MACs not covering them.   It's not a difference

12  in coverage.   It's a difference in the ability for that MAC to

13  stop those claims electronically.

14       Again, at no time, when a claim comes through the system

15  and is processed or paid, as we say, does it denote that it

16  meets coverage guidelines or is in compliance with federal

17  laws.   That requires or would deem a medical review that would

18  be determined upon the post-payment data analytics that might

19  support that there was something wrong with those claims and

20  that they needed to be looked at further.

21  Q.   Okay.   So just speaking to the different versions, so to

22  speak, of these LCDs, is there -- are there any material

23  changes through all of the years -- the 2016 to 2019 time

24  period?

25  A.   No.   The elements of the coverage are the same.   The MACs

1   communicate a little bit differently, and they might edit out

2   claims a little more aggressive or less aggressive.  But again,

3   the coverage is the same wherever you live as a beneficiary.

4   Q.   Are you familiar with PGx or pharmacogenomics testing?

5   A.   Yes.  That's the kind of genetic testing done in

6   relationship to decisions made to give certain drugs.  They

7   call that pharmacogenetics.

8   Q.   What are the general -- generally speaking, what are the

9   Medicare coverage rules regarding pharmacogenetic tests?

10  A.   Again, it's very limited.  There are certain circumstances,

11  specifically with oncology patients, where pharmacogenetics

12  would be payable because they're trying to determine how that

13  beneficiary would respond to certain medications on a genetic

14  level, so how they would metabolize that medication, whether

15  they would respond to it, how that cancer might progress or not

16  progress.

17       There are other reasons to do pharmacogenetic testing, but

18  Medicare coverage is very limited.  So, for instance, you could

19  have pharmacogenetic testing of a gene that has to do with an

20  antidepressant drug.  The Medicare coverage rules are one drug

21  in specific, and whether you would be utilizing that

22  pharmacogenetics in order to make treatment decisions with that

23  one drug.

24       You all know that there are multiple drugs out on the

25  market that treat depression.  Just because you have a

1   diagnoses of depression does not mean that you are on that

2   specific drug, nor that your provider would be using the

3   information based on that pharmacogenetic result in order to

4   make treatment decisions regarding your use of that drug.

5   Q.  So is the Medicare coverage, then, tied to a particular

6   medication or treatment in terms of a PGx test being ordered?

7   A.  The Medicare coverage is tied to the federal regulations --

8   the rules and regulations.

9   Q.  And I'm sorry.  I should have asked that question

10  differently.

11      In terms of the coverage rule for pharmacogenetic testing,

12  does that need to be in conjunction with the administration or

13  anticipated administration of a certain type of medicine?

14  A.  It would be, yes, in alignment with the treatment decision

15  that your physician is making.

16  Q.  And in terms of Cahaba, Palmetto, Novitas, is it the same

17  across all of those three MACs?

18  A.  Those Medicare Administrative Contractors and their LCDs

19  cannot override or supersede higher-up legislation.  The

20  legislation is the same across the nation.

21  Q.  Earlier today -- earlier this afternoon, you were talking

22  about claims and claims submission.

23      What is -- what is the coding that is used on a claim

24  that's submitted to Medicare?

25  A.  So we refer to basically two different types of coding.

1   When we say CPT coding, we're talking about the five-digit code

2   that's used on the claim to denote the exact procedure or item

3   that is being rendered.

4       And then there's also what we call an ICD-10 code, and that

5   refers to the diagnosis that that claim is relating to.  This

6   diagnosis is the reason why we're doing this specific

7   procedure.

8   Q.  Why is the CPT code or procedure code significant from a

9   Medicare billing perspective?

10  A.  So the CPT codes are published by -- the AMA has a -- the

11  American Medical Association has a committee that they put

12  together this list of CPT codes.  That book is published on an

13  annual basis, and it's updated about four times a year.

14      Those people on that committee, they decide which codes

15  stay in that book and are moved on or updated, and it's based

16  on the medical care that's delivered across the United States.

17  Procedures that are no longer used or may be updated, or --

18  those codes change as the years go by, so you will see those

19  codes updated.

20      It's important to know that the instructions for utilizing

21  those CPT codes are very specific, and they're included in that

22  book.  Medicare directs its providers to use that CPT book in

23  accordance with the instructions provided inside that book,

24  except unless Medicare provides a different instruction.

25      So everybody looks at the CPT book and uses the guidelines

1   provided within it.  Same thing with the diagnosis book.

2   Q.  And in terms of the claims in this case, did you review the

3   claims data from LabSolutions?

4   A.  Yes.

5   Q.  And these exhibits which have already been admitted have

6   your signature on them?

7   A.  Yes.

8   Q.  And you reviewed those?  In the course of your review, did

9   you create a list of the -- some of the CPT codes that you saw?

10  A.  Yes.

11  Q.  And I believe that that's been admitted as Government's

12  Exhibit 245.  I just want to show you.

13      Do you have a background with CPT coding as it relates to

14  genetic testing then?

15  A.  Yes.  I began delving deep into it back when I started

16  working with the UPIC.

17  Q.  Are there different tiers or different types of coding as

18  it relates to genetic testing?

19  A.  Right.  So in the CPT book there's one section that

20  specifically has to do with laboratory testing.  Molecular

21  diagnostic testing is included in that section.  It gives

22  specific guidelines on how to use the codes and when to choose

23  those codes.  They're divided up into a couple of categories.

24      You'll hear about Tier 1 coding in the CPT manual.  Those

25  are codes that specifically describe the gene or biomarker that

1    they are testing for.  For instance, a BRCA gene, and they're

2    doing this test, it is very specific and it's very clear about

3    which gene or biomarker they are testing.  And even it gives,

4    in parentheses, what disease condition that might entail.

5        A second section in the CPT book is called the Tier 2

6    Codes.  Now, you're aware, probably, that genetic testing has

7    recently come online, and it is rapidly progressing in its

8    importance and its application to medical care as well as other

9    things.

10        The CPT book is trying to keep up with the care that is

11   coming online and the way they are doing that is they define

12   what Tier 1 codes are.  Those are very specific.  You can look

13   at the coding and know exactly which gene the provider is

14   testing and the indication that's listed in the code book.

15        Tier 2 codes do not describe specific genes.  They describe

16   a procedure in the guidelines listed for the Tier 2 section.

17   It specifically states that these are genetic testing

18   procedures that may be utilized for instances where the disease

19   processes are rare and much less seen.

20        You have to denote the procedure, and the higher the code

21   level, the more difficult and more involved in both the

22   procedure and that interpretive work that goes along with that.

23   Q.  Did you see Tier 2 and Tier 1 coding in this case?

24   A.  Yes, I did.

25   Q.  Did you make any observations about the Tier 2 coding that

1    you saw in this case?

2    A.   In looking at the data, there were several red flags that

3    came out when I looked at the data.  One of those was the codes

4    that they were billing.  For genetic testing, number one, a lot

5    of the diagnosis codes were limited to either a family history

6    or a personal history.

7         There was no indication on there of a current cancer

8    diagnosis.  That was a red flag regarding the genetic testing.

9         Number two, there was a high usage of these Tier 2 codes.

10   So from selecting Tier 2 codes, the CPT book states that those

11   would be procedures that would be for rare diseases and would

12   not be utilized very often.

13        Furthermore, the Medicare Administrative Contractor

14   publishes articles in addition to the local coverage

15   determinations, and in those articles they also state that they

16   do not expect to see Tier 2 codes used.  In fact, they say

17   rarely, if ever, utilized.

18        And so the fact that when you go through the data, the

19   number of times the Tier 2 codes were used --

20        MR. RAFFERTY:  Your Honor, I'm going to object at this

21   time.  If I can approach.

22        THE COURT:  Sure.  Sidebar.

23        (The following proceedings were held sidebar:)

24        MR. RAFFERTY:  At this point we're going way beyond

25   background information for the jury.  We're talking about a

1  witness now -- talking about claims data and analysis before a

2  single witness testifying is the equivalent of someone starting

3  the government's case.  This practice has been criticized in

4  the First Circuit, Eighth Circuit, and D.C. Circuit.

5          THE COURT:  One thing I would say she's in a narrative

6  format now and she needs a question.  Let's break this up.

7  It's well-taken, but let's see if we can clean it up.

8          (Proceedings returned to open court.)

9          MS. GURSKIS:  Ms. Puntillo, could you please pull up

10  Government's Exhibit 110?

11  BY MS. GURSKIS:

12  Q.  Ms. McMillan, is this what you would refer to as Tier 2

13  data?

14  A.  Yes.  This is what we refer to as Tier 2 codes.

15  Q.  Okay.  And what is significant about that to you?

16  A.  They describe procedure level and not specific genes that

17  they are testing.  They are denoted as the number or the level

18  increases, the number of interpretive effort and procedural

19  effort increases.  They are more expensive at the higher

20  levels.

21  Q.  You said the number of procedural effort or the degree of

22  procedural effort?

23  A.  The degree of procedural effort.

24  Q.  Okay.  Does that suggest a higher level of expertise?

25  A.  Yes, a higher level of expertise.  And the fact that all of

1   these Tier 2 codes would not be used very often because they

2   are for diseases that are very rare.

3   Q.   Okay.  But you saw these in the data.

4   A.   Yes.

5   Q.   And how many tier codes, whether it's Tier 1 or Tier 2, are

6   typically assigned to a slide of a sample?

7   A.   Well, again, the Tier 2 codes, that is a specific

8   procedure, not a specific test that they're utilizing.  And so

9   one would ask why are they doing so many different procedures

10   on one specimen.  It seems unlikely -- and it asks --

11        MR. RAFFERTY:  Objection, Your Honor.

12        THE COURT:  Overruled.

13        Go ahead and finish this point.

14        Go ahead, Ms. McMillan.

15        THE WITNESS:  The reviewer is looking at red flags in

16   the data and that is a red flag that we need to take a further

17   look at this data in order to confirm accountability with the

18   compliance.

19   BY MS. GURSKIS:

20   Q.   Okay.  So the codes that are on this screen where it says

21   molecular pathology procedure, these are Tier 2 codes?

22   A.   Yes.

23   Q.   Okay.  And was there anything else in the data that stood

24   out to you?

25        MR. RAFFERTY:  Your Honor, same objection.

1            THE COURT:  Overruled.

2            Go ahead.

3            THE WITNESS:  There were several things.  One, the

4    volume of lab work, and it was billed from all across the

5    United States.  When you went to look at where these specimens

6    were coming from, it was coming from all across the United

7    States.

8            Yet, these labs were located in Pennsylvania and in

9    Georgia.  Doctors can send labs to any lab that they want to

10   send a lab to, but it begs the question of why are these

11   physicians located all across the United States sending it to

12   only two states in the United States when they have available

13   labs within their own state?  Again, it raises a red flag for a

14   kickback situation.

15   BY MS. GURSKIS:

16   Q.  Why is that --

17           MR. RAFFERTY:  Your Honor, I'm going to object.

18           THE COURT:  Yeah.  Understood.

19           I'm going to overrule it, but we really need to narrow

20   down the rest of this examination now.  Now, please.

21           MS. GURSKIS:  Yes, Your Honor.  One moment, Your Honor.

22           THE COURT:  Sure.

23           (Discussion was held off the record.)

24   BY MS. GURSKIS:

25   Q.  So just a couple more questions, Ms. McMillan.

1      Did you see multiple Tier 2 codes used in combination in

2    the data?

3    A.   Yes, I did.

4    Q.   And why is that significant?

5    A.   Because these are procedures that you would not ordinarily

6    see, and they were doing more than one procedure on one

7    specimen coming in for one patient.  It clinically did not make

8    sense and it begged the question that we needed to take a

9    further look.

10         MS. GURSKIS:  No further questions.  Thank you.

11         THE COURT:  Thank you.

12         Thank you, Ms. McMillan.  You may step down from the

13    witness stand.  We'll recall you tomorrow.

14         Ladies and gentlemen of the jury, I do not want to keep

15    you any longer.  It is almost 5:30.  A brief few comments.

16         You may go ahead, Ms. McMillan, and rejoin the gallery.

17         A few final words before I let you all go for the

18    evening.  Tomorrow we will pick up with the cross-examination

19    of Ms. McMillan.  She will retake the stand.  As we stated when

20    we began, the defense will have a chance to ask her some

21    questions.

22         After that, the government will have their redirect

23    examination and then they will move on to their next witness.

24         When you go home this evening you may be asked what is

25    this trial about, what have you heard, what have you seen.

1    Continue to keep the rules that I have prescribed from the very

2    beginning.  Do not discuss this case with anyone, family,

3    friends, or one another.  Do not go on the internet and do any

4    research regarding, for example, some of the testimony you may

5    have heard regarding genetic testing and telemedicine from

6    Ms. McMillan.

7         I cannot have you looking at independent sources of

8    information.  Stay off any social media regarding your jury

9    service.

10        If you were to see the lawyers tomorrow and they avoid

11   you, take no offense.  They are simply following their ethical

12   requirements.

13        Let's try to see if everyone could get in tomorrow by

14   10:00.  As soon as everyone is present and accounted for, we

15   will begin.  And again, we will have Ms. McMillan take the

16   stand.

17        Make sure that you leave your notepads in the jury

18   room.  Okay?  We will seal up the jury room as we do every

19   night.  No one will go in there and read your notes.  We'll

20   pick up where we left off tomorrow.

21        So with that being said, hope everyone has a great

22   evening.  We'll see you all at 10:00 a.m. tomorrow morning.

23   You are excused.

24        (Jury exits at 5:25 p.m.)

25        THE COURT:  Please be seated, everyone.

1          Can I get a sense, tomorrow after we get through

2    Ms. McMillan, who does the government intend to call?

3          MS. DE BOER:  Yes, Your Honor.  We plan to call two

4    beneficiary witnesses, Ms. Candice New and Ms. Patricia Wulf,

5    which we expect to be relatively short witnesses.  We had some

6    travel rearrangements to make for them because we had hoped

7    they would get on the stand today, but I'm confident we will be

8    able to arrange that.

9          And then we intend to call Marc Sporn.  We need to take

10   a look at some other witness travel to make sure that nothing

11   else needs to gets bumped or switched around.  We were

12   intending to call a number of beneficiaries and employee

13   witnesses this week who are traveling from out of state, and

14   their schedules, we were hoping to accommodate as much as

15   possible.

16         And then after Mr. Sporn, I don't know that we will

17   complete his direct and cross tomorrow.  He's a pretty big

18   witness.  But we have already informed the defense of the two

19   likely next witnesses and likely exhibits for those witnesses.

20         To the extent anything changes in the anticipated

21   lineup for tomorrow, as we sort out witness travel and

22   schedules, we'll be sure to notify them.

23         THE COURT:  What were the names?  I have Sporn but I

24   missed the names -- I'm looking at my witness list -- for the

25   two beneficiaries again for tomorrow.

1          MS. DE BOER:  Candice New and Patricia Wulf.  Their

2     names are the abbreviated C.N. and P.W.

3          THE COURT:  There we are.  Okay.  And the other one was

4     Wulf, right, P.W.?

5          MS. DE BOER:  Correct.

6          THE COURT:  Okay.  All right.  Very good.  We'll see

7     hopefully if we have all our jurors arrive tomorrow by 10:00 --

8     today we had a late start because one had a couple of flat

9     tires -- we should be able to get Ms. McMillan back on the

10    stand and let the defense do their cross.

11         You guys would wrap up and then hopefully if that takes

12    the morning, so be it.  But then in the afternoon we have some

13    brief witnesses, C.M., P.W., and perhaps we start with

14    Mr. Sporn.

15         Does that sound right, Ms. de Boer?

16         MS. DE BOER:  Yes, Your Honor.

17         THE COURT:  All right.  Definitely keep me posted if we

18    have to juggle folks around.  As long as we're filling up the

19    time.  If we have to take people in a certain sequence, that's

20    fine with the Court.

21         I just want to point out -- I mean, the Court gives

22    some leeway there at the end, but as Mr. Rafferty pointed out,

23    I think that -- at least my understanding of Ms. McMillan's

24    testimony and her focus seemed to shift a little bit at the

25    end.  We are getting more into some of the diagnostics and less

1    about the background.

2           That's why I needed to hold the line there a little

3    bit.  So I don't necessarily disagree that the government could

4    ask a little bit, but it got to the point where I thought we

5    were going to enter, quite frankly, a whole new different line

6    of direct examination on evaluation of some of the claims as

7    opposed to maybe the baseline.

8           Certainly, when we get into redirect, if there needs to

9    be a slight clarification, we'll do that.  Let's see how we get

10   through the defense cross-examination tomorrow.

11          Any other scheduling concerns on behalf of the

12   government that I need to be aware of before we break this

13   evening?  Anything else you guys can think of?

14          MS. DE BOER:  No, Your Honor.

15          THE COURT:  Okay.  Anything else on behalf of the

16   defense, guys?

17          MR. SADOW:  Yes.  I think the witness should be

18   instructed not to communicate with anyone from the prosecution,

19   or for that matter, anyone between the time of today and cross

20   tomorrow.

21          THE COURT:  Fair request, Mr. Sadow.

22          Obviously, Ms. McMillan, you're still on the stand, and

23   you're still under oath -- oh, did she step out already?

24          MR. RAFFERTY:  She stepped out.

25          THE COURT:  Could someone go ahead and grab her for me,

1  please.  I just want to make sure she's aware of her

2  obligations.  Hopefully she's still out in the hallway.

3      So, Mr. Sadow, while I'm doing that, anything else that

4  you guys wanted to raise for me before I wrap up this evening?

5      MR. SADOW:  No.  We put the government on notice that

6  Magliocco -- I don't know if I'm pronouncing that correctly.

7  It's very possible he's going to try to cover the same subject

8  matter that we just heard, so we're putting the government on

9  notice that we are going to be making Rule 403 objections, if

10  they are appropriate at the time.

11      THE COURT:  I agree.  At the end of the day, I'm not

12  here to do duplicative testimony.  Unless Dr. Magliocco is

13  going to be specifically testifying about an arena that

14  Ms. McMillan did not cover, then I would find it to be

15  duplicative, and so I am in agreement.

16      We'll wait and see if he is called, what he's going to

17  offer because I don't want to pay for the same real estate

18  twice.  So if we are going to cover the same material, I will

19  be sustaining objections in that regard.

20      Did we find Ms. McMillan?  Maybe we did not.  I would

21  expect that the government can go ahead and inform her, so I

22  don't belabor this and we can all go home, that she, again,

23  needs to be reminded she's under oath, and I don't expect her

24  to be meeting or discussing her testimony with anyone before

25  she retakes the witness stand tomorrow.  Okay?

1           MS. DE BOER:  Understood, Your Honor.

2           THE COURT:  All right.  Very good.

3           Anything else, Mr. Rafferty?

4           MR. RAFFERTY:  No, Your Honor.  Thank you.

5           THE COURT:  Okay, everyone.  All right.

6           Did you guys get the room open today as you requested

7    at 8:30?

8           MR. RAFFERTY:  Yes.  Thank you very much.

9           THE COURT:  Okay.  So we'll continue to do the 8:30 and

10   the 9:30 courtroom opening for everyone as well.

11          All right.  We are in recess.  We'll see you all at

12   10:00 a.m. tomorrow.  Thank you, everyone.

13          MS. DE BOER:  Thank you, Your Honor.

14          THE COURT:  You got it.

15       (Court recessed at 5:30 p.m.)

16

17

18

19

20

21

22

23

24

25

## $

**$150,000** [1] - 48:21
**$187** [1] - 36:7
**$450,000** [1] - 39:3
**$463** [1] - 18:7

## '

**'14** [1] - 82:10
**'17** [2] - 82:10, 82:11
**'18** [1] - 41:7

## 1

**1** [7] - 1:7, 120:3, 146:8, 159:24, 160:12, 160:23, 163:5
**1(800** [1] - 90:22
**10** [2] - 143:18, 149:10
**100** [3] - 74:7, 74:13, 74:14
**101** [4] - 3:17, 69:8, 69:25, 133:11
**107** [3] - 3:17, 69:8, 69:25
**108** [3] - 3:17, 69:8, 69:25
**109** [3] - 3:17, 69:8, 69:25
**10:00** [5] - 7:5, 166:14, 166:22, 168:7, 171:12
**10:51** [1] - 1:5
**10:55** [1] - 6:14
**11** [1] - 101:10
**110** [4] - 3:17, 69:9, 70:1, 162:10
**111** [3] - 3:17, 69:9, 70:1
**1170** [1] - 2:6
**120** [1] - 3:22
**125** [1] - 48:20
**12:15** [1] - 53:25
**12:18** [1] - 54:15
**12:30** [1] - 63:13
**1395(x)(ddd)(1** [1] - 116:8
**1395y** [1] - 55:16
**13th** [1] - 44:6
**14** [4] - 87:2, 93:23, 94:2, 105:6
**1400** [1] - 1:16
**15** [7] - 71:25, 94:8, 94:9, 100:12, 104:10, 105:15, 110:1
**1861(aa)(2** [1] - 129:22
**1861(aa)(4** [1] - 129:23
**1861(e** [1] - 129:24
**1861(mm)(1** [1] - 129:21
**19-80181** [1] - 4:2
**19-CR-80181-RAR-1** [1] - 1:2
**1985** [1] - 70:13
**1:45** [3] - 53:25, 54:13, 63:10

## 2

**2** [20] - 1:6, 38:18, 136:17, 139:11, 160:5, 160:15, 160:16, 160:23, 160:25, 161:9, 161:10, 161:16, 161:19, 162:12, 162:14, 163:1, 163:5, 163:7, 163:21, 165:1
**20** [4] - 143:18, 151:21, 151:22, 152:21
**20005** [1] - 1:16
**2007** [2] - 71:22, 72:1
**201-A** [6] - 3:11, 3:18, 69:5, 69:9, 69:22, 70:1
**201-B** [3] - 3:12, 69:5, 69:22
**201-C** [3] - 3:12, 69:5, 69:22
**2010** [4] - 72:2, 72:5, 72:9, 72:12
**2012** [1] - 70:16
**2013** [1] - 101:10
**2014** [8] - 72:17, 72:20, 73:6, 73:17, 74:3, 74:7, 104:20, 105:22
**2016** [7] - 36:8, 82:8, 82:13, 133:18, 133:19, 136:4, 155:23
**2017** [7] - 40:1, 40:3, 73:17, 73:18, 74:7, 74:10, 133:20
**2018** [6] - 41:7, 42:19, 42:21, 70:19, 135:24, 135:25
**2019** [12] - 36:8, 42:16, 43:14, 43:25, 44:7, 48:12, 48:14, 82:9, 82:13, 133:20, 136:2, 155:23
**202-A** [3] - 3:19, 69:9, 70:1
**2021** [1] - 72:20
**2022** [2] - 1:4, 71:8
**2023** [1] - 152:18
**203-A** [3] - 3:19, 69:9, 70:2
**204-A** [3] - 3:19, 69:10, 70:2
**205-A** [3] - 3:20, 69:10, 70:2
**2052** [1] - 1:19
**206-A** [3] - 3:20, 69:10, 70:2
**207-A** [3] - 3:20, 69:10, 70:2
**208-A** [3] - 3:21, 69:11, 70:3
**209-A** [8] - 3:9, 69:3, 69:20, 92:4, 92:22, 93:7, 93:25, 95:6
**210-A** [6] - 3:9, 69:3, 69:20, 103:21, 104:6, 104:11
**212-A** [4] - 3:9, 69:4, 69:20, 105:2
**213-A** [3] - 3:10, 69:4, 69:20
**213-D** [5] - 3:11, 69:5, 69:21, 111:13, 111:23
**214-A** [3] - 3:10, 69:4, 69:20
**216-A** [4] - 3:10, 69:4, 69:21, 106:25
**217-A** [4] - 3:10, 69:4, 69:21, 107:18
**22** [3] - 58:1, 105:22, 135:25
**22(a** [1] - 64:4
**220** [4] - 3:10, 69:4, 69:21, 108:22
**221-A** [3] - 3:10, 69:4, 69:21
**221-B** [3] - 3:11, 69:4, 69:21
**221-C** [4] - 3:11, 69:4, 69:21, 109:17
**222(a** [1] - 64:5
**222-A** [6] - 3:12, 55:12, 55:15, 57:25, 69:5, 69:22
**222-C** [1] - 113:19
**223-A** [3] - 3:12, 69:6, 69:22
**224-A** [3] - 3:13, 69:6, 69:23
**224-B** [1] - 122:8
**225-A** [3] - 3:22, 120:16, 120:22
**225-B** [5] - 3:22, 119:19, 119:21, 120:16, 120:22
**225-C** [3] - 3:22, 120:16, 120:22
**226-A** [3] - 3:13, 69:6, 69:23
**226-B** [2] - 128:19, 128:24
**227(b** [1] - 64:5
**227-B** [3] - 55:13, 55:15, 58:1
**228-A** [3] - 3:13, 69:6, 69:23
**22nd** [1] - 43:25
**23** [1] - 40:1
**230-A** [3] - 3:14, 69:7, 69:23
**230-J** [1] - 134:8
**231-A** [4] - 3:14, 69:7, 69:24, 151:6
**232-D** [3] - 3:15, 69:7, 69:24
**233-A** [3] - 3:15, 69:7, 69:24
**235-G** [3] - 3:16, 69:8, 69:24
**236-A** [3] - 3:16, 69:8, 69:25
**237-D** [3] - 3:17, 69:8, 69:25
**2400** [1] - 2:6
**243** [3] - 3:21, 69:11, 70:3
**244** [3] - 3:21, 69:11, 70:3
**245** [4] - 3:21, 69:11, 70:3, 159:12
**246** [3] - 3:11, 69:5, 69:21
**247** [3] - 3:11, 69:5, 69:21
**260** [1] - 1:18
**260-A** [3] - 3:18, 69:9, 70:1
**27** [1] - 104:20
**27,000** [2] - 26:19, 26:21
**2875@gmail.com** [1] - 104:8
**2878** [1] - 104:8
**2878@gmail.com** [1] - 104:9
**29** [1] - 1:4
**299** [1] - 1:23

**2:25** [1] - 63:14
**2:32** [1] - 67:22

## 3

**3** [1] - 96:7
**30** [3] - 36:2, 151:21, 151:22
**30303** [1] - 1:19
**30305** [1] - 2:4
**30309** [1] - 2:6
**312** [1] - 93:19
**3131** [1] - 2:3
**315** [1] - 93:24
**318** [1] - 94:13
**3301** [1] - 1:24
**35** [3] - 46:5, 46:14, 47:21
**364** [1] - 104:5
**388** [1] - 104:11
**3:11** [1] - 92:19

## 4

**4** [1] - 109:2
**403** [1] - 170:9
**410.32** [2] - 122:11
**410.64** [1] - 120:12
**410.78** [1] - 129:7
**411.15** [1] - 119:23
**42** [3] - 55:16, 119:22, 122:11
**423** [1] - 105:6
**449** [1] - 106:10
**450** [1] - 51:1
**450,000** [1] - 51:1
**4:50** [1] - 151:17
**4:52** [1] - 153:7

## 5

**5** [2] - 38:21, 107:9
**50** [3] - 74:7, 74:13, 74:14
**57** [1] - 46:3
**5:00** [1] - 153:3
**5:04** [2] - 153:8, 153:10
**5:25** [1] - 166:24
**5:30** [5] - 1:5, 153:3, 153:4, 165:15, 171:15
**5th** [1] - 43:25

## 6

**6** [2] - 100:2, 100:3
**643** [1] - 108:11
**65** [2] - 21:10, 75:22
**69** [1] - 3:9

## 7

**70** [1] - 3:4

**702** [1] - 75:14
**769-5568** [1] - 1:24

---

**8**

**855** [1] - 92:8
**855B** [6] - 92:8, 92:24, 103:24, 105:5, 105:8, 105:9
**8:30** [2] - 171:7, 171:9
**8th** [1] - 1:16

---

**9**

**9** [1] - 135:24
**954** [1] - 1:24
**9:30** [1] - 171:10

---

**A**

**a.m** [4] - 1:5, 6:14, 166:22, 171:12
**abbreviated** [1] - 168:2
**abdominal** [1] - 120:6
**abide** [8] - 22:10, 47:11, 91:24, 95:1, 95:12, 101:17, 108:9, 110:9
**abiding** [2] - 98:5, 119:10
**ability** [5] - 10:14, 22:11, 46:20, 155:9, 155:12
**able** [7] - 4:7, 45:24, 89:10, 90:5, 102:1, 167:8, 168:9
**ABN** [1] - 145:11
**abnormal** [1] - 124:19
**absolutely** [1] - 63:1
**abundantly** [1] - 152:2
**abuse** [4] - 59:9, 76:25, 89:24, 90:10
**accept** [2] - 12:6, 12:7
**acceptable** [1] - 143:9
**accepting** [1] - 17:21
**access** [8] - 88:6, 89:19, 102:3, 127:23, 128:2, 128:3, 129:20
**accessing** [1] - 79:5
**accommodate** [1] - 167:14
**accompanied** [1] - 74:9
**accord** [1] - 15:2
**accordance** [1] - 158:23
**according** [6] - 36:6, 52:3, 127:15, 142:19, 143:10, 146:18
**accordingly** [1] - 14:24
**account** [8] - 10:13, 79:14, 81:11, 82:23, 83:17, 87:4, 102:4, 111:21
**accountability** [1] - 163:17
**accounted** [2] - 63:16, 166:14
**accounts** [3] - 12:17, 14:12, 89:23

**accreditation** [1] - 139:9
**accuracy** [2] - 88:13, 88:15
**accurate** [8] - 36:11, 51:11, 85:7, 88:4, 89:5, 91:18, 91:21, 94:21
**accusation** [1] - 11:2
**achieve** [1] - 45:24
**acquire** [1] - 14:21
**act** [3] - 71:12, 138:16, 138:19
**Act** [17] - 56:24, 57:18, 61:8, 96:5, 113:5, 118:15, 119:15, 129:21, 129:22, 129:24, 131:9, 132:7, 138:9, 147:20, 147:22, 147:23
**acted** [3] - 39:18, 64:16, 115:1
**acting** [1] - 39:13
**actions** [2] - 39:15, 50:11
**active** [1] - 145:25
**actual** [2] - 29:7
**ad** [2] - 52:9, 52:10
**add** [5] - 58:22, 65:1, 66:12, 106:22, 152:25
**added** [1] - 64:22
**adding** [2] - 93:22, 106:12
**addition** [4] - 12:24, 90:2, 108:16, 161:14
**additional** [4] - 10:21, 63:23, 116:7, 120:11
**address** [6] - 54:21, 54:24, 55:8, 56:8, 104:3, 104:7
**addresses** [1] - 104:6
**adhere** [3] - 86:14, 95:2, 151:1
**adhering** [2] - 67:25, 83:23
**administer** [1] - 76:5
**administers** [1] - 76:2
**administrate** [2] - 72:13, 132:13
**administration** [5] - 72:18, 76:6, 76:13, 157:12, 157:13
**Administrative** [27] - 36:24, 72:3, 72:22, 76:14, 76:17, 77:3, 78:12, 78:13, 79:9, 79:13, 81:7, 82:5, 82:20, 84:19, 84:20, 86:23, 90:13, 90:18, 96:3, 106:3, 130:21, 131:22, 133:15, 133:21, 134:12, 157:18, 161:13
**administrator** [1] - 148:19
**admission** [2] - 57:25, 61:24
**admit** [3] - 31:21, 61:6, 69:18
**admitted** [25] - 8:8, 9:25, 10:1, 17:6, 56:16, 56:19, 59:2, 59:10, 60:15, 61:9, 61:20, 62:2, 62:19, 66:16, 92:4, 103:21, 105:2, 106:24,

107:17, 108:22, 109:17, 111:23, 114:9, 159:5, 159:11
**admitting** [2] - 58:19, 115:4
**ads** [6] - 22:18, 22:21, 22:24, 28:11, 33:18
**advance** [1] - 153:4
**Advanced** [1] - 145:11
**Advantage** [2] - 80:19, 80:23
**advantage** [2] - 32:6, 35:9
**advertising** [3] - 23:18, 24:24, 28:9
**advice** [12] - 28:25, 35:25, 39:3, 39:4, 39:10, 39:11, 39:13, 41:24, 41:25, 51:17, 65:21, 65:24
**advice-of-counsel** [1] - 65:21
**Advize** [5] - 70:23, 71:1, 71:6, 71:7, 71:18
**affect** [2] - 79:24, 121:24
**affects** [1] - 84:24
**afraid** [1] - 17:19
**after-the-fact** [1] - 50:14
**afternoon** [9] - 5:25, 10:8, 51:8, 70:9, 70:10, 153:15, 153:23, 157:21, 168:12
**afterwards** [1] - 50:15
**age** [5] - 12:23, 19:23, 21:10, 23:14, 118:20
**agency** [1] - 76:8
**agent** [1] - 44:25
**agents** [8] - 42:21, 44:21, 45:4, 49:8, 49:14, 73:22
**aggressive** [2] - 156:2
**ago** [1] - 143:16
**agree** [13] - 4:25, 8:4, 12:7, 23:5, 24:6, 62:8, 65:18, 85:8, 89:9, 94:11, 95:12, 102:2, 170:11
**agreed** [2] - 21:23, 89:6
**agreeing** [7] - 88:3, 91:24, 91:25, 95:2, 101:21, 110:9, 110:16
**agreement** [11] - 31:22, 45:20, 45:25, 85:5, 86:12, 94:25, 111:15, 111:18, 111:25, 112:3, 170:15
**agreements** [3] - 28:1, 45:17, 94:19
**agrees** [1] - 9:9
**Agresti** [1] - 59:6
**ahead** [24] - 4:13, 5:9, 5:18, 5:21, 6:11, 7:2, 7:8, 7:17, 43:4, 55:10, 66:5, 66:21, 67:8, 151:7, 151:13, 151:15, 152:20, 154:2, 163:13, 163:14, 164:2, 165:16, 169:25, 170:21
**aimed** [1] - 146:22

**Alabama** [1] - 78:21
**Alaska** [1] - 128:16
**alerts** [1] - 85:15
**alignment** [1] - 157:14
**Alite** [1] - 31:3
**allegations** [2] - 53:14, 74:11
**alleged** [1] - 115:3
**allegedly** [1] - 12:13
**allow** [4] - 21:12, 62:7, 85:1, 99:7
**allowed** [9] - 21:15, 39:4, 39:5, 65:6, 86:20, 96:13, 96:18, 98:21, 127:10
**allowing** [2] - 61:19, 84:12
**allows** [2] - 102:6, 122:5
**almost** [2] - 151:14, 165:15
**alone** [2] - 37:18, 65:9
**alteration** [1] - 148:20
**altered** [1] - 130:15
**AMA** [1] - 158:10
**ambiguity** [1] - 147:24
**ambulance** [1] - 92:24
**ambulatory** [1] - 92:25
**America** [1] - 4:3
**AMERICA** [1] - 1:3
**American** [1] - 158:11
**amount** [8] - 16:24, 41:19, 42:15, 85:23, 99:21, 99:23, 152:9
**amputate** [1] - 84:5
**analogize** [1] - 59:5
**analysis** [6] - 83:18, 83:19, 83:20, 85:12, 85:13, 88:10, 137:19, 162:1
**analyst** [1] - 73:16
**analytic** [1] - 85:16
**analytics** [2] - 88:7, 155:18
**aneurysm** [1] - 120:6
**annoying** [1] - 40:15
**annual** [2] - 120:12, 158:13
**answer** [1] - 9:22
**answered** [2] - 9:18, 9:19
**answers** [2] - 9:4, 15:12
**anti** [1] - 96:25
**Anti** [6] - 91:24, 95:19, 96:8, 96:15, 96:20, 98:5
**anti-kickback** [1] - 96:25
**Anti-Kickback** [6] - 91:24, 95:19, 96:8, 96:15, 96:20, 98:5
**anticipated** [3] - 4:5, 157:13, 167:20
**antidepressant** [1] - 156:20
**anytime** [1] - 105:9
**aortic** [1] - 120:6
**apologize** [3] - 111:10, 116:21, 120:14
**apoptosis** [1] - 148:23

appeal [1] - 144:23
appear [2] - 105:7, 105:9
appearance [2] - 27:23, 29:5
Appearances [1] - 2:1
APPEARANCES [1] - 1:11
appearing [2] - 88:24, 106:15
applicability [1] - 60:5
applicable [2] - 61:22, 95:20
application [16] - 90:15, 93:8, 93:9, 94:4, 100:18, 101:19, 103:24, 104:24, 105:5, 105:10, 105:20, 107:21, 108:24, 109:4, 109:19, 160:8
applies [5] - 13:13, 97:7, 97:11, 122:15, 132:4
apply [9] - 51:6, 73:25, 95:13, 96:20, 97:4, 97:5, 122:13, 132:18, 134:19
appointed [1] - 110:11
appointment [2] - 129:14, 130:1
appreciate [1] - 15:1
approach [2] - 113:20, 161:21
appropriate [8] - 40:11, 53:22, 55:20, 56:2, 103:8, 133:2, 150:4, 170:10
approval [1] - 22:10
approved [4] - 40:12, 40:13, 89:12, 89:16
apps [1] - 13:3
April [4] - 43:24, 43:25, 48:12, 48:14
architect [1] - 17:24
area [4] - 71:23, 72:7, 84:22, 127:22
areas [4] - 71:24, 127:21, 133:23
arena [1] - 170:13
argument [1] - 16:10
arguments [4] - 8:22, 8:23, 16:16, 62:15
arm [3] - 117:15, 117:17, 117:18
army [2] - 22:17, 42:21
arrange [1] - 167:8
arrangement [2] - 48:23, 99:3
arranging [1] - 97:13
arrive [1] - 168:7
articles [2] - 161:14, 161:15
articulated [2] - 94:16, 141:9
aside [5] - 78:25, 79:1, 79:7, 118:14, 120:1
aspect [3] - 71:14, 71:15,

89:22
aspects [1] - 35:24
assembled [1] - 34:24
assess [1] - 140:6
assessment [1] - 141:1
assign [1] - 146:19
assigned [2] - 106:4, 163:6
assist [4] - 15:16, 71:1, 71:3, 76:6
assistance [1] - 25:13
associated [2] - 76:12, 96:16
Association [1] - 158:11
assume [1] - 151:8
assumes [1] - 65:15
Atlanta [4] - 1:19, 2:4, 2:6, 18:19
ATM [1] - 24:8
attempt [2] - 12:10, 12:20, 14:12, 20:17, 57:2
attempted [1] - 61:6
attention [7] - 16:24, 93:23, 95:8, 99:25, 103:25, 104:5, 150:1
attorney [1] - 16:8
attorneys [2] - 16:15, 39:2
audiotapes [1] - 43:24
audiovisual [2] - 128:8, 128:9
audit [1] - 75:15
audits [3] - 75:4, 88:8, 88:11
August [6] - 36:8, 42:21, 42:23, 135:24, 135:25, 136:2
authority [2] - 101:16, 101:18
authorization [1] - 111:24
authorize [1] - 100:22
authorized [22] - 13:20, 33:21, 100:16, 101:1, 101:2, 101:16, 105:17, 106:20, 107:7, 108:1, 108:4, 108:7, 108:8, 108:12, 109:11, 109:14, 110:3, 110:4, 110:9, 110:11, 110:16
authorizes [1] - 102:18
authorizing [2] - 24:12, 25:3
automated [1] - 84:12
automatically [2] - 87:21, 144:20
Ava [1] - 68:10
available [15] - 71:12, 90:12, 95:15, 96:1, 98:9, 98:11, 103:9, 107:4, 112:14, 128:2, 132:12, 140:13, 140:21, 142:24, 164:12
Avenue [1] - 1:16
avoid [2] - 152:9, 166:10
aware [12] - 4:16, 6:4, 6:19,

17:5, 65:19, 65:25, 84:21, 97:1, 108:17, 160:6, 169:12, 170:1

B

background [10] - 58:15, 61:21, 62:3, 70:11, 71:21, 83:20, 140:3, 159:13, 161:25, 169:1
bad [2] - 32:11, 117:13
BAKER [1] - 2:5
bank [2] - 33:17, 111:20
banking [1] - 111:19
bargain [1] - 21:1
basal [1] - 149:1
base [2] - 14:20, 63:18
based [30] - 14:14, 19:1, 19:8, 28:17, 28:18, 33:14, 41:20, 74:16, 78:16, 85:6, 88:1, 88:6, 88:9, 98:14, 99:2, 99:4, 99:13, 99:20, 99:23, 101:25, 113:16, 122:5, 122:17, 124:9, 126:3, 131:21, 134:14, 149:16, 157:3, 158:15
baseline [5] - 138:14, 151:24, 152:6, 152:13, 169:7
basic [7] - 7:19, 10:24, 84:9, 102:15, 104:2
basis [2] - 39:15, 158:13
bat [1] - 83:8
Bates [8] - 93:19, 93:24, 94:13, 104:5, 104:10, 105:6, 106:10, 108:11
BBAR [1] - 31:2
BEACH [1] - 1:2
bear [2] - 10:20, 11:15
became [4] - 43:1, 73:18, 97:1, 135:23
become [4] - 14:7, 73:9, 74:21, 97:16
becomes [3] - 97:22, 98:3, 135:5
bed [1] - 53:5
BEFORE [1] - 1:10
began [8] - 43:14, 43:18, 72:1, 72:2, 73:7, 73:19, 159:15, 165:20
begged [1] - 165:8
begin [8] - 13:24, 16:5, 37:9, 68:3, 75:18, 114:4, 152:24, 166:15
beginning [9] - 48:7, 55:12, 55:16, 57:16, 60:21, 94:24, 116:2, 129:11, 166:2
begins [2] - 44:7, 133:3
begs [1] - 164:10
behalf [3] - 101:14, 169:11, 169:15

behave [2] - 47:3, 47:4
behind [1] - 6:18
beings [1] - 29:8
belabor [2] - 151:13, 170:22
believability [1] - 10:20
belongs [1] - 15:22
below [1] - 137:7
beneficial [1] - 98:12
beneficiaries [13] - 32:7, 32:22, 52:2, 76:1, 77:9, 79:2, 85:19, 92:14, 102:3, 102:6, 110:15, 167:12, 167:25
beneficiaries' [1] - 79:8
beneficiary [32] - 39:24, 52:16, 78:6, 79:22, 81:16, 81:17, 97:11, 97:20, 98:4, 112:17, 112:18, 123:1, 123:3, 123:7, 123:22, 125:18, 126:9, 129:13, 129:18, 129:25, 130:2, 130:6, 130:8, 131:20, 140:24, 143:21, 144:22, 147:5, 147:15, 156:3, 156:13, 167:4
Beneficiary [1] - 145:11
beneficiary's [8] - 87:8, 87:9, 103:6, 123:4, 124:21, 126:15, 126:22, 143:22
benefit [30] - 12:8, 21:1, 21:2, 23:16, 23:17, 26:20, 26:24, 46:21, 80:25, 85:20, 87:10, 97:11, 111:6, 112:15, 113:13, 118:1, 118:23, 118:25, 119:2, 119:10, 119:23, 126:23, 131:21, 132:14, 133:9, 137:17, 150:16, 150:22, 155:2
benefited [2] - 21:3, 26:22, 26:24
benefiting [3] - 127:8, 127:9
benefits [3] - 119:25, 144:14
best [1] - 44:5
better [3] - 29:18, 131:12, 152:3
between [10] - 39:20, 39:23, 40:5, 40:8, 53:2, 55:15, 97:17, 112:3, 153:3, 169:19
beyond [4] - 11:14, 30:14, 39:17, 161:24
bias [1] - 10:17
big [3] - 39:20, 51:18, 167:17
bigger [2] - 128:3, 129:4
bill [15] - 22:12, 26:10, 34:18, 35:1, 73:5, 77:7, 77:13, 81:6, 82:19, 88:6,

89:4, 89:10, 90:5, 91:23
**billed** [19] - 18:1, 18:6, 18:21, 19:4, 19:10, 19:13, 19:20, 20:4, 24:14, 26:18, 27:4, 34:7, 51:2, 80:16, 86:22, 111:1, 119:6, 141:14, 164:4
**billers** [1] - 51:4
**billing** [24] - 18:10, 20:2, 32:16, 33:16, 34:5, 38:2, 50:21, 50:23, 50:24, 51:3, 70:15, 71:17, 73:4, 73:7, 79:17, 88:18, 88:19, 88:20, 88:21, 89:17, 89:18, 98:1, 158:9, 161:4
**billings** [1] - 38:12
**billion** [2] - 20:17, 85:25
**bills** [2] - 27:21, 29:25
**bind** [1] - 110:16
**binds** [2] - 100:18, 108:9
**biomarker** [2] - 159:25, 160:3
**biopsy** [2] - 143:1, 150:9
**Birmingham** [1] - 78:21
**bit** [27] - 6:18, 6:21, 10:6, 11:23, 14:17, 18:5, 37:9, 48:2, 56:12, 59:25, 60:8, 64:22, 66:13, 73:7, 76:14, 83:13, 85:4, 105:23, 116:19, 130:20, 135:5, 146:15, 148:18, 156:1, 168:24, 169:3, 169:4
**bleeds** [1] - 136:20
**blogs** [2] - 13:3, 13:10
**blood** [3] - 141:16, 142:25, 150:8
**blueprint** [2] - 7:10, 16:20
**blurry** [1] - 104:9
**boards** [1] - 70:14
**body** [1] - 116:11
**BOER** [23] - 1:13, 4:18, 4:23, 5:5, 5:13, 6:2, 17:15, 17:18, 38:19, 54:22, 58:22, 58:24, 63:11, 95:5, 111:12, 113:18, 167:3, 168:1, 168:5, 168:16, 169:14, 171:1, 171:13
**Boer** [6] - 17:14, 35:14, 54:17, 58:21, 61:5, 168:15
**bond** [2] - 47:2
**bone** [1] - 117:22
**bones** [1] - 117:22
**book** [14] - 146:17, 146:18, 158:12, 158:15, 158:22, 158:23, 158:25, 159:1, 159:19, 160:5, 160:10, 160:14, 161:10
**bottom** [3] - 107:11, 129:11, 136:17
**Boulevard** [1] - 1:23

**bound** [1] - 104:22
**box** [2] - 103:25, 106:22
**BRCA** [15] - 136:10, 143:11, 143:16, 144:3, 144:5, 144:14, 144:16, 144:20, 148:1, 148:4, 148:5, 149:18, 149:20, 154:5, 160:1
**BRCA1** [13] - 134:14, 134:16, 136:25, 137:18, 138:4, 139:3, 144:6, 145:6, 145:12, 145:21, 154:12, 154:19, 154:22
**BRCA2** [13] - 134:14, 134:16, 137:1, 137:18, 138:5, 139:3, 144:6, 145:6, 145:12, 145:21, 154:12, 154:19, 154:23
**break** [11] - 4:11, 7:14, 63:9, 151:8, 151:9, 151:11, 151:15, 152:20, 153:6, 162:6, 169:12
**breast** [15] - 118:21, 119:8, 134:18, 137:1, 137:4, 137:15, 139:4, 139:16, 145:13, 146:9, 148:25, 149:2, 149:11, 149:22
**Brett** [4] - 30:19, 31:3, 43:16, 47:12
**Brian** [1] - 35:23
**BRIAN** [1] - 2:5
**bribe** [2] - 96:10, 97:15
**bribed** [1] - 35:6
**bribes** [6] - 21:21, 22:15, 41:4, 96:12, 97:15, 97:16
**bridge** [1] - 127:20
**brief** [2] - 165:15, 168:13
**briefly** [4] - 54:17, 63:18, 68:10, 127:14
**bring** [5] - 5:10, 6:11, 23:12, 25:16, 28:4, 30:17, 33:7, 33:12, 50:3, 63:15, 67:8, 120:16
**bringing** [1] - 60:1
**brings** [2] - 44:12, 44:24
**broadly** [2] - 146:5, 154:23
**broke** [3] - 11:19, 21:24, 68:2
**broken** [2] - 11:23, 117:15
**brokers** [13] - 22:16, 22:17, 22:22, 27:8, 27:19, 28:1, 28:5, 28:8, 28:16, 30:6, 30:21, 31:25, 32:10
**brought** [2] - 11:2, 32:9
**Broward** [1] - 1:23
**buck** [1] - 32:7
**build** [1] - 57:4
**built** [1] - 58:12
**bullet** [11] - 139:25, 140:17, 141:5, 141:9, 142:4, 142:19, 143:6, 146:4, 146:8, 149:24

**bullets** [1] - 147:16
**bumped** [1] - 167:11
**bunch** [1] - 58:6
**burden** [6] - 11:6, 11:7, 30:12, 30:13, 30:14, 53:12
**business** [7] - 38:24, 39:1, 40:23, 42:10, 42:11, 43:18, 53:9
**businessman** [1] - 38:6
**buy** [1] - 7:2
**buying** [2] - 26:2, 26:3
**BY** [52] - 1:20, 3:4, 70:8, 75:17, 92:5, 92:20, 93:20, 95:7, 103:22, 105:3, 107:19, 108:23, 109:18, 111:14, 115:13, 115:17, 115:25, 116:22, 119:20, 120:24, 121:11, 122:9, 122:22, 123:19, 126:12, 127:13, 128:20, 128:25, 129:12, 133:12, 134:9, 134:24, 135:21, 136:18, 137:24, 138:8, 138:25, 140:2, 141:6, 142:5, 143:7, 143:14, 144:2, 145:4, 148:13, 149:25, 150:17, 154:4, 162:11, 163:19, 164:15, 164:24

## C

**C.M** [1] - 168:13
**C.N** [1] - 168:2
**caffeinated** [1] - 63:17
**Cahaba** [11] - 37:11, 42:3, 78:15, 78:20, 78:21, 82:11, 133:19, 154:16, 154:25, 157:16
**Cahaba's** [1] - 42:5
**California** [1] - 131:20
**camp** [1] - 64:24
**cancer** [79] - 17:19, 18:3, 18:17, 18:22, 19:24, 19:25, 23:22, 26:19, 35:7, 112:6, 118:21, 119:8, 120:4, 120:5, 121:20, 121:23, 121:25, 122:13, 124:6, 124:22, 124:24, 125:3, 125:7, 126:25, 128:14, 134:18, 137:2, 137:5, 137:6, 137:7, 137:15, 139:4, 139:7, 139:8, 139:16, 139:17, 139:19, 140:6, 140:14, 140:18, 142:8, 142:11, 142:19, 142:23, 143:1, 143:3, 143:9, 145:14, 146:3, 146:4, 146:5, 146:11, 146:13, 146:24, 147:8, 147:12, 148:6, 148:15, 148:20, 148:25, 149:1, 149:2, 149:3, 149:4, 149:5, 149:12, 149:15,

149:22, 150:2, 150:3, 150:10, 156:15, 161:7
**cancer-related** [2] - 134:18, 142:11
**cancers** [8] - 19:1, 143:11, 145:21, 146:12, 146:14, 147:25, 149:2, 149:14
**Candice** [2] - 167:4, 168:1
**cannot** [10] - 9:19, 11:10, 23:17, 24:14, 99:19, 99:20, 131:9, 155:5, 157:19, 166:7
**capable** [2] - 23:25
**capture** [1] - 17:8
**car** [5] - 4:4, 6:21, 6:24, 130:8, 130:9
**carcinoma** [1] - 137:5
**card** [2] - 24:8
**cardiac** [1] - 93:2
**cardiovascular** [1] - 120:7
**cards** [2] - 23:8, 29:8
**care** [21] - 6:1, 7:6, 25:15, 29:17, 59:9, 63:9, 71:23, 79:1, 80:10, 80:15, 98:12, 103:19, 123:12, 124:21, 126:3, 141:24, 150:4, 153:17, 158:16, 160:8, 160:10
**career** [2] - 71:23, 73:13
**Carolina** [1] - 78:17
**carrying** [3] - 8:12, 149:20, 149:21
**CASE** [1] - 1:2
**case** [71] - 4:2, 8:5, 8:24, 10:4, 10:16, 10:22, 10:23, 11:7, 12:1, 12:3, 12:5, 12:14, 12:18, 12:21, 12:25, 13:1, 13:7, 13:9, 13:13, 13:14, 13:19, 13:20, 13:24, 14:12, 14:13, 15:10, 16:13, 17:18, 21:3, 25:25, 30:3, 30:13, 30:15, 33:14, 35:3, 35:12, 35:24, 36:1, 36:17, 38:11, 39:14, 50:3, 50:4, 53:16, 56:21, 56:22, 59:1, 59:6, 59:10, 59:13, 59:16, 60:13, 60:21, 62:11, 64:11, 65:10, 66:11, 67:2, 68:3, 78:11, 82:17, 114:21, 140:13, 159:2, 160:23, 161:1, 162:3, 166:2
**case-in-chief** [1] - 68:3
**cases** [5] - 61:4, 61:6, 65:15, 74:13, 152:16
**cash** [1] - 18:17
**catch** [1] - 85:14
**catches** [1] - 47:13
**catching** [1] - 84:2
**categories** [1] - 159:23
**caught** [2] - 68:5, 84:4
**cautionary** [2] - 69:13,

**114**:12
**cautions** [1] - 66:7
**CDS** [1] - 72:14
**cell** [3] - 148:23, 148:24, 149:1
**cellular** [1] - 148:22
**cent** [1] - 65:3
**Center** [3] - 109:5, 109:7, 109:22
**center** [5] - 92:25, 93:3, 93:5, 129:23
**Centers** [1] - 76:3
**central** [1] - 35:2
**cents** [1] - 65:2
**CEO** [2] - 38:1, 109:11
**certain** [36] - 8:20, 11:18, 11:20, 18:25, 19:7, 19:23, 21:14, 41:13, 59:8, 61:1, 64:6, 69:14, 77:10, 88:3, 91:11, 102:20, 114:8, 114:16, 118:20, 118:23, 121:3, 125:21, 132:13, 135:3, 143:16, 143:17, 145:20, 146:19, 146:21, 147:6, 156:6, 156:10, 156:13, 157:13, 168:19
**certainly** [13] - 6:22, 37:14, 56:9, 57:22, 60:2, 62:9, 62:13, 63:2, 65:5, 65:19, 66:2, 68:6, 169:8
**certification** [18] - 22:2, 70:16, 70:18, 70:21, 94:9, 94:13, 94:17, 100:10, 100:12, 104:12, 105:12, 106:14, 106:17, 109:9, 110:1, 110:2, 110:5, 110:7
**certified** [2] - 70:14, 70:18
**certify** [1] - 100:20
**cetera** [1] - 66:17
**CFO** [3] - 38:1, 106:13, 106:18
**CFR** [2] - 119:22, 122:11
**CFRs** [3] - 56:8, 58:2, 60:4
**CGx** [7] - 18:23, 18:24, 19:13, 19:16, 26:18, 37:19, 37:20
**chain** [1] - 8:13
**chairs** [2] - 15:14, 151:12
**chambers** [1] - 63:19
**chance** [2] - 14:9, 165:20
**chances** [1] - 87:21
**change** [19] - 41:8, 41:23, 42:7, 42:18, 44:7, 105:9, 105:12, 128:22, 131:10, 135:3, 135:6, 136:8, 136:12, 144:10, 144:13, 154:12, 154:19, 154:21, 158:18
**changed** [8] - 41:17, 48:25, 53:6, 127:18, 133:18, 133:19, 135:9

**changes** [4] - 91:19, 101:18, 155:23, 167:20
**changing** [1] - 135:11
**chapter** [1] - 120:12
**charge** [4] - 32:2, 53:13, 57:4, 66:17
**charged** [6] - 8:1, 12:13, 29:22, 29:24, 47:1, 47:10
**charges** [3] - 30:3, 30:14, 35:13
**chat** [3] - 13:2, 13:3, 13:10
**check** [2] - 4:13, 89:25
**checked** [2] - 26:9, 33:24, 103:25, 106:22
**chemotherapy** [1] - 147:1
**chief** [2] - 21:19, 68:3
**choice** [4] - 11:11, 43:3, 43:4, 52:25
**choose** [5] - 8:17, 11:10, 53:2, 159:22
**chosen** [1] - 53:18
**Christian** [1] - 30:20
**Christo** [1] - 65:14
**Circuit** [3] - 162:4
**circumstance** [1] - 143:17
**circumstances** [11] - 8:14, 19:20, 33:8, 77:10, 112:6, 119:4, 126:25, 132:22, 132:24, 147:6, 156:10
**circumstantial** [1] - 8:13
**citation** [1] - 64:21
**cite** [1] - 65:15
**cities** [1] - 90:21
**citizens** [3] - 17:21, 22:24, 35:7
**city** [1] - 128:3
**claim** [84] - 21:13, 21:25, 22:2, 75:14, 77:6, 77:7, 77:15, 77:17, 77:20, 77:22, 77:24, 77:25, 78:5, 78:7, 78:8, 81:5, 81:6, 81:8, 81:13, 81:16, 81:18, 81:25, 82:20, 82:22, 82:25, 83:1, 83:2, 83:3, 83:5, 83:6, 83:11, 83:15, 84:6, 84:7, 84:9, 84:22, 84:25, 85:15, 85:22, 86:9, 86:17, 86:20, 86:24, 87:2, 87:5, 87:13, 87:20, 87:21, 87:23, 88:12, 88:13, 88:17, 88:18, 88:19, 88:20, 88:21, 88:24, 89:25, 95:16, 97:1, 97:2, 97:4, 97:5, 98:14, 98:24, 100:4, 100:8, 102:8, 102:10, 103:10, 103:12, 110:23, 111:8, 144:19, 144:21, 144:22, 147:3, 150:24, 155:14, 157:23, 158:2, 158:5
**claims** [72] - 21:15, 21:20, 22:5, 27:20, 34:6, 36:5,

36:10, 37:3, 38:10, 38:13, 50:21, 71:2, 71:3, 71:14, 71:17, 72:25, 73:15, 75:2, 75:4, 76:18, 77:4, 79:12, 81:24, 82:4, 82:7, 82:12, 83:12, 83:24, 84:10, 85:3, 85:8, 85:23, 85:24, 85:25, 86:19, 88:4, 88:8, 89:5, 89:9, 89:20, 89:22, 89:25, 91:21, 91:25, 94:20, 96:18, 100:5, 102:13, 110:21, 110:25, 111:1, 111:8, 119:5, 133:22, 144:18, 144:19, 150:25, 151:2, 155:8, 155:9, 155:10, 155:13, 155:19, 156:2, 157:22, 159:2, 159:3, 162:1, 169:6
**clarification** [2] - 67:18, 169:9
**clarify** [1] - 124:25
**clean** [2] - 11:4, 162:7
**clear** [11] - 36:17, 37:21, 40:5, 54:6, 62:7, 124:9, 135:5, 139:20, 152:2, 152:8, 160:2
**clearer** [1] - 63:3
**clearly** [1] - 132:21
**CLIA** [1] - 91:9
**click** [2] - 22:25, 52:10
**clicked** [1] - 52:11
**clinic** [6] - 92:25, 109:8, 109:15, 109:24, 109:25, 129:22
**clinical** [7] - 17:25, 34:17, 71:23, 71:24, 72:23, 93:1, 125:22
**clinically** [1] - 165:7
**close** [1] - 49:24
**closely** [1] - 50:9
**closing** [3] - 8:23, 16:15, 62:15
**clouded** [1] - 41:10
**CMS** [11] - 36:16, 36:17, 36:21, 76:5, 76:8, 76:9, 76:24, 84:18, 96:4, 132:10
**co** [1] - 26:14
**co-conspirators** [1] - 26:14
**Code** [7] - 58:17, 96:5, 118:15, 119:16, 119:22, 131:8, 132:7
**code** [11] - 55:16, 119:6, 141:14, 146:19, 147:12, 158:1, 158:4, 158:8, 160:14, 160:20
**coder** [1] - 70:14
**codes** [41] - 20:3, 26:9, 26:11, 26:12, 26:17, 50:22, 51:5, 51:6, 58:11, 81:24, 81:25, 82:1, 135:4, 146:19, 158:10, 158:12, 158:14,

158:18, 158:19, 158:21, 159:9, 159:22, 159:23, 159:25, 160:12, 160:15, 161:3, 161:5, 161:9, 161:10, 161:16, 161:19, 162:14, 163:1, 163:5, 163:7, 163:20, 163:21, 165:1
**Codes** [1] - 160:6
**coding** [11] - 70:15, 71:17, 157:23, 157:25, 158:1, 159:13, 159:17, 159:24, 160:13, 160:23, 160:25
**cogs** [1] - 34:24
**cold** [1] - 52:5
**cold-calling** [1] - 52:5
**colleague** [2] - 64:22, 120:15
**colleagues** [1] - 67:5
**collect** [1] - 18:15
**colon** [1] - 118:21
**colonoscopy** [2] - 19:23, 118:19
**colorectal** [1] - 120:4
**combination** [1] - 165:1
**combined** [1] - 80:22
**comfortable** [1] - 15:25
**coming** [14] - 6:23, 34:22, 37:15, 57:17, 58:4, 58:14, 60:21, 62:9, 62:18, 148:19, 160:11, 164:6, 165:7
**comments** [1] - 165:15
**commissions** [12] - 30:6, 40:24, 40:25, 41:3, 41:5, 41:11, 41:18, 41:21, 42:14, 42:18, 42:19
**commit** [2] - 29:22, 101:17
**committed** [3] - 12:13, 31:16, 43:5
**committee** [2] - 158:11, 158:14
**common** [6] - 72:15, 120:3, 148:15, 149:1, 149:5, 149:16
**communicate** [3] - 13:1, 156:1, 169:18
**communication** [2] - 12:23, 128:7
**companies** [3] - 24:21, 30:25, 82:8
**company** [18] - 24:18, 30:22, 31:1, 31:2, 31:3, 31:4, 31:5, 38:4, 50:23, 51:3, 52:12, 59:3, 70:23, 82:7, 91:7
**complain** [1] - 124:13
**complaint** [2] - 117:17, 123:9
**complaints** [2] - 113:17, 122:18
**complete** [8] - 85:7, 88:4, 91:18, 91:21, 100:21,

141:16, 154:1, 167:17

**completing** [1] - 92:23

**complex** [2] - 36:14, 37:23

**compliance** [7] - 39:4,
51:20, 71:22, 83:17, 95:20,
155:16, 163:18

**complicated** [2] - 20:2,
25:18

**complying** [2] - 83:21,
95:17

**compromises** [1] - 98:2

**computer** [1] - 84:12

**computer-automated** [1] -
84:12

**Comtron** [1] - 51:3

**con** [1] - 17:20

**conceal** [1] - 27:16

**conceivable** [1] - 112:23

**concern** [5] - 57:25, 60:1,
60:8, 60:20, 66:8

**concerned** [4] - 8:15,
56:12, 97:12, 151:25

**concerns** [5] - 4:14, 5:3,
54:20, 64:24, 169:11

**conclude** [1] - 153:12

**condition** [4] - 14:4, 14:5,
146:23, 160:4

**conditioned** [1] - 95:16

**conditions** [7] - 95:21,
101:22, 111:7, 123:13,
136:9, 144:12, 150:21

**conduct** [4] - 11:18, 39:15,
47:1, 66:9

**conducted** [2] - 7:10, 88:9

**conference** [2] - 57:4,
66:18

**confident** [1] - 167:7

**confirm** [1] - 163:17

**confused** [2] - 15:21, 60:7

**confusing** [1] - 37:23

**confusion** [2] - 58:8, 60:2

**confusions** [1] - 60:22

**Congress** [2] - 41:8, 119:11

**conjunction** [1] - 157:12

**connected** [1] - 72:5

**consequences** [2] - 14:25,
47:5

**consider** [4] - 10:2, 10:5,
65:6, 114:13

**consideration** [1] - 142:6

**considerations** [1] - 150:2

**considered** [12] - 8:21,
45:23, 80:20, 81:8, 122:4,
125:22, 138:4, 145:9, 147:2,
147:17, 148:3, 150:16

**considering** [2] - 10:12,
138:4

**considers** [1] - 81:13

**consists** [1] - 137:18

**conspirators** [1] - 26:14

**conspiring** [2] - 29:22,
29:23

**constant** [1] - 88:7

**consult** [1] - 126:2

**consultant** [2] - 125:23,
125:24

**consultation** [2] - 123:2,
125:20

**contact** [3] - 52:1, 52:2,
52:4

**contain** [1] - 101:7

**contained** [3] - 95:1,
100:21, 102:8

**content** [2] - 107:5, 135:11

**contents** [1] - 100:17

**context** [12] - 56:10, 56:17,
57:7, 57:10, 58:6, 62:5,
64:19, 65:9, 115:4, 144:9,
147:22, 148:2

**contextual** [1] - 57:20

**continuation** [4] - 94:6,
94:13, 100:10, 100:12

**continue** [11] - 7:4, 39:20,
54:10, 70:17, 70:20, 100:24,
116:18, 126:5, 151:9, 166:1,
171:9

**continued** [2] - 2:1, 72:7

**continuing** [1] - 70:17

**contract** [4] - 27:7, 28:10,
72:16, 154:16

**Contractor** [18] - 36:24,
72:3, 72:22, 76:14, 76:17,
76:25, 77:4, 79:13, 81:8,
82:5, 82:21, 86:24, 90:18,
96:3, 130:21, 131:22,
133:15, 161:13

**contractor** [10] - 36:25,
72:18, 74:16, 76:17, 76:23,
85:21, 86:8, 95:15, 100:22,
107:24

**contractors** [5] - 76:6,
76:11, 76:12, 76:15, 88:10

**Contractors** [10] - 78:12,
78:13, 79:10, 84:19, 84:21,
90:13, 106:3, 133:22,
134:13, 157:18

**contracts** [11] - 28:1, 28:4,
28:6, 28:8, 28:12, 33:18,
36:23, 40:5, 51:19, 51:21,
74:2

**contradicted** [1] - 10:17

**control** [7] - 9:13, 22:4,
34:22, 43:11, 93:14, 93:17,
107:10

**conversations** [1] - 44:9

**convict** [1] - 50:19

**convince** [2] - 23:5, 43:9

**convinced** [1] - 24:6

**cooperate** [6] - 43:14,
43:15, 44:3, 45:12, 46:15

**cooperated** [2] - 43:16,
46:3

**cooperating** [2] - 31:24,
32:15

**cooperation** [3] - 45:23,
46:16, 46:21

**cooperative** [1] - 89:2

**coordinator** [1] - 73:19

**copied** [1] - 153:18

**copies** [2] - 17:7, 17:9

**copy** [1] - 134:11

**correct** [14] - 5:8, 14:9,
15:5, 61:5, 62:23, 67:10,
86:19, 98:15, 98:18, 98:25,
100:21, 120:20, 145:19,
168:5

**correctly** [3] - 51:23, 65:14,
170:6

**correspondence** [1] -
104:7

**corroborated** [1] - 32:15

**corrupt** [2] - 97:14, 98:22

**corrupts** [1] - 97:21

**cosmetic** [1] - 112:21

**cost** [1] - 82:2

**counsel** [3] - 16:12, 65:21,
65:24

**counseling** [6] - 139:7,
139:8, 140:1, 140:4, 140:9,
140:18

**Counselor** [1] - 154:2

**counselor** [3] - 140:13,
140:21, 140:25

**counselors** [1] - 38:3

**count** [1] - 141:16

**counts** [1] - 59:8

**couple** [13] - 4:20, 41:23,
54:4, 57:13, 72:11, 86:11,
88:1, 112:8, 128:5, 143:25,
159:23, 164:25, 168:8

**coupons** [1] - 22:19

**course** [19] - 9:9, 14:10,
18:9, 19:1, 25:20, 28:14,
29:1, 30:17, 43:19, 44:3,
47:3, 49:9, 49:10, 54:8, 56:4,
73:13, 99:19, 144:18, 159:8

**court** [4] - 6:23, 12:4,
114:2, 162:8

**Court** [23] - 1:22, 1:23, 4:1,
5:24, 7:5, 47:10, 54:21,
60:11, 60:12, 60:18, 61:12,
61:17, 61:18, 61:25, 62:20,
63:13, 63:16, 67:18, 69:14,
153:7, 168:20, 168:21,
171:15

**COURT** [89] - 1:1, 4:2, 4:22,
5:2, 5:7, 5:9, 5:17, 5:20, 6:3,
6:7, 6:10, 6:11, 6:13, 6:15,
9:12, 15:7, 16:4, 17:3, 35:14,
35:17, 38:20, 53:23, 54:14,

54:16, 55:4, 55:9, 56:6, 57:1,
57:21, 58:23, 59:23, 61:3,
61:17, 63:1, 63:7, 63:12,
63:15, 64:1, 65:5, 65:18,
66:15, 66:21, 66:25, 67:9,
67:10, 67:19, 67:23, 68:13,
68:16, 69:2, 69:12, 69:18,
70:5, 75:16, 92:17, 113:21,
113:25, 114:3, 115:9,
116:17, 120:20, 121:10,
151:7, 151:16, 151:18,
151:22, 153:2, 153:9,
153:11, 161:22, 162:5,
163:12, 164:1, 164:18,
164:22, 165:11, 166:25,
167:23, 168:3, 168:6,
168:17, 169:15, 169:21,
169:25, 170:11, 171:2,
171:5, 171:9, 171:14

**Court's** [2] - 66:11, 67:25

**courthouse** [1] - 8:12

**COURTROOM** [2] - 68:18,
68:20

**courtroom** [7] - 8:6, 14:15,
14:22, 15:12, 67:3, 153:14,
171:10

**cover** [25] - 19:21, 36:21,
42:6, 59:3, 80:8, 105:23,
106:1, 112:19, 112:21,
113:7, 117:6, 117:9, 118:22,
123:13, 124:7, 125:5,
125:10, 142:8, 143:16,
143:18, 150:19, 153:22,
170:7, 170:14, 170:18

**Coverage** [5] - 36:18, 37:2,
37:5, 115:18, 136:22

**coverage** [47] - 20:5, 21:10,
27:2, 54:23, 56:20, 56:25,
59:1, 59:4, 59:21, 64:20,
73:14, 74:24, 75:14, 113:9,
115:5, 130:23, 130:24,
131:2, 131:4, 131:11,
132:17, 132:19, 134:13,
134:19, 136:7, 136:10,
136:11, 136:23, 136:24,
137:3, 138:17, 149:16,
154:19, 154:21, 154:24,
155:12, 155:16, 155:25,
156:3, 156:9, 156:18,
156:20, 157:5, 157:7,
157:11, 161:14

**Covered** [1] - 145:1

**covered** [47] - 23:11, 27:5,
37:18, 37:20, 41:13, 42:5,
42:9, 51:21, 55:25, 56:1,
56:23, 57:8, 60:23, 61:13,
112:7, 115:21, 117:16,
117:23, 119:7, 119:11,
119:12, 121:1, 121:3,
121:16, 121:17, 121:18,

121:25, 127:1, 131:6, 131:13, 136:14, 136:16, 136:25, 137:14, 137:17, 139:5, 144:8, 145:18, 145:21, 148:1, 148:5, 152:10, 152:13, 154:12, 155:10

**covering** [1] - 155:11
**covers** [9] - 27:2, 27:3, 33:9, 56:23, 75:23, 80:12, 118:2, 120:1, 136:25
**covertly** [1] - 96:23
**coverup** [1] - 28:13
**COVID-19** [1] - 130:12
**Cowden** [1] - 139:22
**CPT** [19] - 81:25, 111:2, 125:23, 146:17, 146:18, 158:1, 158:8, 158:10, 158:12, 158:21, 158:22, 158:25, 159:9, 159:13, 159:19, 159:24, 160:5, 160:10, 161:10
**craft** [1] - 60:12
**create** [2] - 22:18, 159:9
**credibility** [2] - 10:7, 10:22
**credible** [2] - 47:8, 47:17
**crime** [14] - 12:13, 20:15, 20:16, 21:4, 22:12, 25:21, 27:16, 28:22, 32:4, 43:1, 43:2, 43:16, 64:14, 114:24
**crimes** [9] - 8:1, 31:13, 31:15, 31:21, 43:5, 64:17, 64:18, 115:2, 115:3
**CRIMINAL** [1] - 1:15
**criminal** [10] - 7:19, 10:23, 46:5, 64:11, 64:12, 64:16, 74:12, 114:20, 114:22, 115:1
**criteria** [11] - 120:9, 120:12, 137:7, 137:23, 138:1, 138:3, 139:6, 139:9, 139:18, 139:20, 143:19
**Criteria** [1] - 139:15
**criterion** [1] - 142:6
**critical** [1] - 129:20
**criticized** [1] - 162:3
**crooks** [1] - 53:6
**cross** [10] - 16:12, 16:14, 48:6, 65:20, 152:23, 165:18, 167:17, 168:10, 169:10, 169:19
**cross-examination** [4] - 48:6, 65:20, 165:18, 169:10
**cross-examine** [2] - 16:12, 16:14
**CRR** [1] - 1:21
**crystal** [1] - 152:8
**cumbersome** [1] - 86:7
**curative** [3] - 59:24, 62:13, 113:25
**curiosity** [2] - 33:11, 118:5

**curious** [3] - 118:3, 118:10, 121:23
**current** [1] - 161:7
**CUYLER** [1] - 1:14
**cycle** [1] - 148:23

# D

**D.C** [2] - 1:16, 162:4
**damn** [1] - 53:9
**dark** [1] - 29:14
**data** [23] - 33:16, 34:5, 83:18, 83:19, 83:20, 85:11, 85:13, 85:16, 88:7, 88:9, 119:5, 155:18, 159:3, 161:2, 161:3, 161:18, 162:1, 162:13, 163:3, 163:16, 163:17, 163:23, 165:2
**date** [4] - 101:9, 104:19, 105:20, 135:18
**dates** [1] - 82:2
**days** [2] - 87:2, 152:1
**DCIS** [1] - 137:5
**de** [6] - 17:14, 35:14, 54:17, 58:21, 61:5, 168:15
**DE** [23] - 1:13, 4:18, 4:23, 5:5, 5:13, 6:2, 17:15, 17:18, 38:19, 54:22, 58:22, 58:24, 63:11, 95:5, 111:12, 113:18, 167:3, 168:1, 168:5, 168:16, 169:14, 171:1, 171:13
**deal** [8] - 5:2, 38:23, 39:20, 47:25, 51:19, 56:1, 56:24, 96:11
**dealing** [7] - 28:21, 59:15, 64:4, 64:7, 64:13, 114:16, 114:23
**dealings** [1] - 51:12
**deals** [1] - 52:23
**dealt** [1] - 42:4
**death** [3] - 148:24, 149:2, 149:4
**December** [1] - 101:10
**decide** [13] - 7:24, 8:5, 10:9, 15:10, 16:18, 46:20, 59:3, 59:22, 61:1, 64:17, 83:22, 115:2, 158:14
**decided** [3] - 37:3, 45:9, 84:17
**decides** [6] - 46:25, 60:17, 82:25, 84:16, 117:14
**deciding** [2] - 10:4, 86:10
**decision** [15] - 14:1, 14:14, 14:20, 19:15, 97:21, 98:2, 124:3, 124:11, 124:15, 131:14, 141:21, 141:24, 142:15, 157:14
**decision-making** [8] - 97:21, 98:2, 124:3, 124:11, 141:21, 141:24, 142:15

**decisions** [9] - 36:23, 49:20, 83:21, 103:19, 123:12, 124:20, 156:6, 156:22, 157:4
**declared** [1] - 130:14
**deem** [1] - 155:17
**deemed** [2] - 75:23, 80:2
**deep** [1] - 159:15
**Defendant** [1] - 1:7
**defendant** [77] - 7:25, 9:7, 10:25, 11:4, 11:7, 11:9, 13:14, 16:12, 16:13, 17:22, 17:24, 18:9, 18:16, 18:18, 19:11, 19:17, 20:2, 20:14, 20:16, 20:20, 20:22, 20:23, 21:3, 21:5, 21:23, 22:10, 22:15, 22:22, 23:3, 24:9, 24:20, 24:22, 25:2, 25:5, 25:7, 25:21, 25:24, 26:5, 26:13, 27:6, 27:10, 27:17, 27:24, 27:25, 28:2, 28:12, 28:16, 28:17, 28:25, 29:2, 29:22, 30:6, 30:9, 30:22, 31:6, 31:16, 31:19, 32:1, 32:2, 32:3, 32:10, 33:5, 33:6, 33:20, 34:8, 34:15, 34:19, 34:21, 34:23, 34:25, 35:1, 35:12, 64:16, 65:16, 67:6, 115:1
**DEFENDANT** [2] - 1:17, 2:2
**defendant's** [22] - 11:11, 11:13, 16:7, 18:6, 18:21, 19:4, 19:10, 19:15, 21:17, 22:4, 22:17, 24:10, 24:23, 26:6, 26:9, 26:18, 27:4, 28:7, 29:4, 34:12, 64:15, 114:25
**defense** [19] - 5:5, 5:14, 6:3, 35:22, 46:8, 55:2, 58:16, 62:8, 63:21, 64:24, 65:20, 65:21, 69:13, 120:17, 165:20, 167:18, 168:10, 169:10, 169:16
**define** [5] - 56:20, 143:2, 147:22, 150:12, 160:11
**defined** [7] - 122:6, 125:23, 129:23, 129:24, 130:3, 146:16, 148:8
**defines** [1] - 102:20
**defining** [1] - 131:7
**definitely** [1] - 168:17
**definition** [1] - 125:24
**definitions** [1] - 14:18
**defraud** [2] - 18:10, 29:23
**degree** [2] - 162:21, 162:23
**delays** [1] - 6:23
**delete** [1] - 106:23
**deliberate** [2] - 100:5, 133:1
**deliberately** [1] - 94:4
**deliberating** [1] - 62:2

**deliberations** [3] - 13:24, 56:5, 60:22
**delineate** [2] - 133:3, 143:2
**delineated** [1] - 119:3
**delineates** [1] - 106:6
**delineating** [1] - 105:11
**delivered** [2] - 80:11, 158:16
**delivering** [1] - 96:24
**delivery** [3] - 96:16, 97:10, 97:20
**delving** [1] - 159:15
**demonstration** [1] - 128:15
**demonstrative** [2] - 17:4, 56:17
**demonstratives** [3] - 5:4, 5:14, 5:19
**denial** [3] - 78:8, 84:23, 144:23
**denied** [2] - 78:9, 144:22
**denote** [3] - 155:15, 158:2, 160:20
**denoted** [1] - 162:17
**deny** [1] - 144:20
**DEPARTMENT** [1] - 1:15
**Department** [2] - 38:8, 73:23
**deposit** [1] - 111:20
**deposited** [6] - 81:10, 82:23, 83:3, 83:16, 87:3, 102:4
**depression** [2] - 156:25, 157:1
**deputy** [1] - 153:14
**DEPUTY** [2] - 68:18, 68:20
**deregulation** [1] - 148:21
**describe** [9] - 33:16, 91:14, 127:22, 132:21, 132:23, 159:25, 160:15, 162:16
**described** [7] - 80:19, 116:6, 116:8, 118:24, 129:21, 129:22, 132:23
**describing** [6] - 28:2, 31:14, 84:11, 87:24, 90:3, 134:13
**description** [1] - 80:13
**descriptions** [1] - 102:22
**deserves** [1] - 8:19
**designated** [1] - 14:23
**designed** [5] - 23:23, 24:2, 24:3, 33:24, 53:15
**destined** [1] - 24:7
**destroy** [1] - 15:24
**detail** [1] - 87:24
**detailed** [1] - 7:22
**detect** [1] - 19:24
**determination** [7] - 41:20, 85:3, 131:3, 131:11, 133:6, 134:14, 134:19
**Determinations** [3] - 36:19,

37:2, 37:6
**determinations** [12] - 38:2, 38:3, 57:7, 58:12, 72:25, 73:17, 130:23, 130:24, 131:4, 132:17, 132:19, 161:15
**determine** [6] - 7:25, 18:25, 36:20, 38:15, 117:14, 156:12
**determined** [3] - 33:13, 36:12, 155:18
**determining** [7] - 10:21, 62:11, 64:15, 81:13, 114:25, 123:23, 150:4
**develop** [1] - 149:22
**developing** [2] - 18:25, 121:25
**device** [3] - 12:15, 13:9, 43:17
**devised** [1] - 18:16
**diabetes** [1] - 120:7
**diagnose** [2] - 122:19, 124:14
**diagnoses** [4] - 81:25, 82:1, 150:12, 157:1
**diagnosing** [1] - 23:25
**diagnosis** [14] - 26:17, 116:9, 117:3, 142:23, 143:1, 147:10, 149:1, 150:10, 158:5, 158:6, 159:1, 161:5, 161:8
**diagnostic** [21] - 93:1, 103:13, 103:15, 103:18, 117:24, 122:12, 122:15, 122:16, 122:17, 122:24, 122:25, 123:10, 124:14, 124:20, 125:2, 126:8, 142:9, 150:5, 159:21
**diagnostics** [1] - 168:25
**diagram** [1] - 30:18
**differ** [2] - 154:25, 155:3
**difference** [3] - 8:15, 155:11, 155:12
**different** [35] - 27:7, 27:8, 36:3, 37:22, 37:25, 49:15, 58:25, 59:15, 72:11, 72:13, 72:18, 73:4, 74:13, 74:14, 80:5, 80:7, 86:1, 88:10, 105:24, 122:17, 131:15, 131:25, 132:2, 141:12, 141:15, 141:17, 147:12, 155:21, 157:25, 158:24, 159:17, 163:9, 169:5
**differently** [2] - 156:1, 157:10
**difficult** [1] - 160:21
**digest** [1] - 62:19
**digit** [1] - 158:1
**digress** [2] - 38:25, 40:14
**Dimitrouleas** [1] - 64:22
**dinner** [1] - 40:17

**direct** [7] - 8:16, 52:1, 52:4, 52:19, 57:24, 167:17, 169:6
**DIRECT** [2] - 3:4, 70:7
**directing** [2] - 93:15, 150:1
**direction** [1] - 22:4
**directly** [9] - 23:9, 28:11, 28:23, 77:13, 77:14, 79:14, 80:12, 89:23, 96:22
**director** [2] - 70:24, 71:10
**directs** [1] - 158:22
**disabilities** [1] - 21:11
**disabled** [1] - 75:23
**disagree** [2] - 66:2, 169:3
**disbelieve** [1] - 8:17
**discuss** [5] - 8:24, 12:4, 12:7, 140:21, 166:2
**discussed** [4] - 10:6, 12:16, 14:2, 14:6
**discusses** [1] - 113:3
**discussing** [1] - 170:24
**discussion** [2] - 54:8, 150:1
**Discussion** [5] - 65:4, 92:18, 95:4, 111:11, 164:23
**discussions** [3] - 12:18, 12:21, 13:25
**disease** [6] - 120:7, 141:11, 146:22, 146:23, 160:4, 160:18
**diseases** [2] - 161:11, 163:2
**disputed** [1] - 55:2
**disputes** [1] - 4:20
**disputing** [1] - 57:21
**disregard** [4] - 9:24, 10:4, 89:7, 100:6
**distant** [1] - 130:4
**distract** [1] - 15:11
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [1] - 1:23
**divided** [2] - 79:10, 159:23
**DIVISION** [2] - 1:2, 1:15
**DNA** [5] - 18:2, 18:18, 18:24, 148:23
**doctor** [27] - 20:6, 24:12, 24:13, 25:10, 25:14, 25:23, 26:17, 29:12, 39:21, 39:24, 40:6, 40:8, 51:13, 52:15, 80:15, 117:13, 117:14, 117:21, 123:9, 123:10, 123:25, 125:9, 125:11, 126:18, 141:16, 142:14
**doctor's** [3] - 25:6, 88:24, 128:1
**doctor/patient** [1] - 125:13
**doctors** [12] - 20:11, 23:24, 25:4, 25:22, 26:14, 29:9, 29:17, 32:25, 51:13, 90:4, 164:9
**doctors'** [8] - 21:22, 25:3,

26:3, 27:9, 27:11, 28:9, 28:23, 30:7
**document** [15] - 40:9, 77:23, 92:6, 92:11, 93:24, 101:14, 103:23, 105:4, 107:2, 107:6, 109:13, 130:19, 133:13, 134:10
**documentation** [10] - 84:23, 84:25, 85:2, 85:3, 85:10, 85:11, 85:24, 86:4, 86:5, 87:6
**documents** [9] - 17:7, 32:16, 33:18, 33:20, 33:25, 50:6, 108:19, 110:13, 114:13
**dollars** [7] - 17:20, 18:18, 19:14, 20:17, 27:19, 27:21, 127:3
**DONALD** [1] - 2:2
**done** [28] - 4:10, 7:11, 24:14, 28:24, 32:1, 33:11, 39:6, 39:7, 39:16, 44:15, 46:6, 47:15, 49:16, 50:12, 50:18, 51:3, 51:24, 53:4, 81:9, 82:4, 82:23, 117:25, 122:17, 141:12, 142:12, 148:4, 150:7, 156:5
**doubt** [4] - 11:14, 30:14, 39:17, 153:3
**down** [10] - 37:15, 47:16, 49:8, 49:12, 96:4, 116:19, 149:8, 149:13, 164:20, 165:12
**dozens** [1] - 26:7
**Dr** [1] - 170:12
**drafting** [1] - 153:21
**drawing** [1] - 103:25
**Drive** [1] - 2:3
**drug** [7] - 80:25, 93:3, 156:20, 156:23, 157:2, 157:4
**drugs** [2] - 156:6, 156:24
**ductal** [1] - 137:5
**due** [2] - 130:12, 149:10
**duly** [1] - 68:19
**duplication/deletion** [1] - 137:19
**duplicative** [3] - 152:9, 170:12, 170:15
**duration** [1] - 103:2
**during** [15] - 5:4, 5:6, 10:7, 10:24, 12:6, 17:3, 56:4, 68:11, 99:19, 127:18, 130:16, 133:18, 133:19, 133:20, 154:20
**duty** [2] - 7:20, 7:24

## E

**E-K-R-A** [1] - 41:9
**early** [3] - 27:10, 40:3, 41:7
**Earth** [1] - 12:15

**easier** [2] - 43:7, 55:9
**easiest** [1] - 67:21
**East** [1] - 1:23
**easy** [3] - 26:14, 43:7, 141:15
**eat** [1] - 28:19
**edit** [6] - 83:4, 84:11, 87:5, 144:20, 155:9, 156:1
**edits** [12] - 83:3, 83:4, 83:10, 84:1, 84:2, 84:4, 84:9, 84:14, 84:16, 84:18, 90:2
**educated** [2] - 91:2, 140:5
**education** [6] - 70:17, 76:20, 90:12, 90:14, 90:19, 90:21
**educational** [4] - 70:11, 70:20, 90:16, 131:17
**effect** [2] - 62:20, 154:11
**effective** [5] - 102:25, 103:8, 132:25, 135:23, 136:1
**effectively** [1] - 18:16
**effort** [7] - 83:13, 89:2, 162:18, 162:19, 162:21, 162:22, 162:23
**efforts** [1] - 42:18
**EFT** [2] - 111:18, 111:25
**Eighth** [1] - 162:4
**either** [14] - 8:17, 11:25, 15:13, 33:1, 45:12, 51:8, 59:16, 84:22, 97:24, 126:3, 141:11, 142:12, 150:12, 161:5
**EKRA** [3] - 41:9, 41:10
**electrocardiogram** [1] - 120:8
**electronic** [5] - 12:23, 83:2, 89:20, 111:16, 111:24
**electronically** [8] - 81:8, 81:9, 81:10, 82:20, 82:24, 89:21, 111:20, 155:13
**element** [2] - 142:11, 146:17
**elements** [1] - 155:25
**eligible** [2] - 137:3, 137:16
**email** [4] - 13:2, 40:2, 40:9, 104:6
**emails** [5] - 32:16, 33:18, 50:6, 90:19, 90:20
**embrace** [1] - 30:15
**emergency** [1] - 130:14
**EMILY** [1] - 1:13
**emphasize** [2] - 12:24, 61:24
**employee** [1] - 167:12
**employees** [4] - 29:13, 32:18, 37:25, 38:23
**employers** [3] - 12:2, 153:15, 153:22
**end** [23] - 4:16, 6:1, 7:21, 8:2, 10:22, 11:7, 15:23, 20:4,

30:3, 34:20, 35:3, 35:11, 36:8, 42:23, 48:12, 51:18, 60:13, 62:4, 65:9, 66:11, 168:22, 168:25, 170:11
**ended** [1] - 135:24
**ending** [3] - 104:5, 104:10, 105:6
**ends** [3] - 93:19, 93:24, 94:12
**enforcement** [3] - 73:19, 73:20, 73:21
**enroll** [5] - 21:8, 86:12, 95:22, 100:7, 102:2
**enrolled** [10] - 74:22, 77:12, 79:16, 82:17, 87:11, 89:12, 89:14, 91:3, 91:7, 134:3
**enrollee** [1] - 93:10
**enrolling** [2] - 91:12, 110:15
**enrollment** [23] - 76:19, 88:2, 89:13, 90:7, 90:8, 90:15, 91:18, 91:20, 92:9, 92:23, 94:5, 94:18, 103:24, 105:5, 106:1, 107:3, 108:16, 108:18, 108:24, 109:4, 109:19, 110:13, 110:19
**ensure** [3] - 11:20, 39:1, 87:24
**entail** [2] - 155:7, 160:4
**entails** [1] - 150:12
**enter** [1] - 169:5
**entered** [1] - 31:22
**entering** [1] - 69:15
**enters** [3] - 6:14, 67:22, 153:10
**entice** [1] - 35:6
**enticements** [1] - 23:9
**entire** [6] - 18:13, 23:14, 30:15, 97:9, 152:14, 154:11
**entities** [1] - 108:18
**entitled** [3] - 15:17, 39:12, 77:9
**entity** [5] - 36:16, 37:16, 37:24, 39:21, 107:22
**epithelial** [2] - 149:3, 149:7
**equal** [1] - 16:24
**equation** [2] - 25:22, 130:4
**equipment** [3] - 38:23, 131:16, 141:23
**equivalent** [1] - 162:2
**error** [1] - 135:6
**especially** [2] - 60:20, 152:17
**essence** [1] - 36:20
**essential** [1] - 21:6
**essentially** [6] - 42:15, 42:22, 61:19, 89:21, 115:20, 117:6
**establish** [3] - 136:12, 150:10, 152:6

**established** [2] - 142:24, 143:1
**establishing** [1] - 141:2
**estate** [1] - 170:17
**estimates** [1] - 85:25
**et** [1] - 66:17
**ethical** [2] - 54:7, 166:11
**evaluate** [1] - 14:6
**evaluated** [1] - 87:17
**evaluating** [1] - 24:1
**evaluation** [1] - 169:6
**evening** [5] - 165:18, 165:24, 166:22, 169:13, 170:4
**event** [1] - 41:15
**evidence** [71] - 8:5, 8:6, 8:9, 8:10, 8:12, 8:13, 8:15, 8:18, 8:20, 8:25, 9:2, 9:3, 9:4, 9:8, 9:13, 9:16, 9:18, 9:23, 9:24, 9:25, 10:2, 10:3, 10:5, 10:17, 10:19, 11:8, 11:12, 14:6, 14:15, 16:7, 16:9, 16:15, 16:16, 17:3, 17:5, 17:6, 19:15, 20:25, 24:5, 25:25, 29:16, 30:16, 32:16, 35:11, 50:7, 50:16, 52:19, 53:21, 55:19, 55:21, 56:3, 56:9, 57:14, 59:2, 59:20, 59:21, 59:22, 61:16, 62:17, 62:19, 64:14, 66:10, 66:16, 69:1, 69:15, 70:4, 114:6, 114:9, 114:24, 120:23
**evolved** [2] - 48:6, 49:18
**exact** [2] - 50:21, 158:2
**exactly** [9] - 25:7, 38:7, 47:9, 47:24, 48:15, 61:2, 81:23, 135:8, 160:13
**exam** [5] - 19:23, 70:16, 70:19, 142:25, 150:8
**EXAMINATION** [2] - 3:4, 70:7
**examination** [13] - 48:6, 57:24, 65:20, 115:11, 120:9, 151:20, 153:13, 154:1, 164:20, 165:18, 165:23, 169:6, 169:10
**examine** [3] - 16:12, 16:14
**examiner** [1] - 70:18
**example** [13] - 6:22, 29:7, 32:18, 39:19, 59:6, 84:3, 85:13, 99:3, 99:10, 112:21, 118:18, 141:15, 166:4
**examples** [2] - 29:25, 110:23
**exams** [4] - 120:5, 120:6, 121:5, 121:6
**exceed** [1] - 103:6
**except** [4] - 40:25, 116:6, 138:19, 158:24
**exception** [1] - 121:19

**exceptions** [2] - 119:14, 121:6
**excessive** [1] - 18:11
**exchange** [7] - 31:24, 97:17, 97:22, 98:3, 98:10, 99:8, 99:17
**exclude** [1] - 113:9
**excluded** [4] - 116:2, 116:3, 145:10, 147:17
**excludes** [1] - 138:16
**excluding** [1] - 149:1
**exclusions** [1] - 113:10
**Exclusions** [1] - 115:18
**excuse** [1] - 93:13
**excused** [3] - 54:13, 151:15, 166:23
**exhibit** [10] - 8:8, 9:14, 9:18, 55:18, 61:16, 95:5, 108:11, 111:12, 138:23, 154:8
**Exhibit** [25] - 3:8, 55:12, 92:4, 92:22, 93:7, 93:25, 95:6, 103:21, 104:6, 104:11, 105:2, 106:25, 107:17, 107:18, 108:22, 109:17, 111:23, 113:19, 128:19, 133:11, 134:8, 151:6, 159:12, 162:10
**exhibits** [26] - 4:19, 4:20, 17:4, 54:25, 55:1, 55:12, 55:13, 55:14, 55:15, 58:6, 61:1, 62:15, 62:21, 64:4, 64:11, 64:12, 67:10, 67:20, 68:25, 69:14, 114:5, 114:19, 114:21, 115:6, 159:5, 167:19
**Exhibits** [3] - 69:3, 69:20, 120:22
**EXHIBITS** [1] - 3:6
**exist** [1] - 13:16
**existed** [1] - 49:22
**exit** [1] - 67:3
**exiting** [1] - 67:6
**exits** [3] - 54:15, 151:17, 166:24
**expansive** [2] - 26:7, 26:16
**expect** [9] - 4:6, 7:9, 7:14, 16:20, 153:17, 161:16, 167:5, 170:21, 170:23
**expects** [1] - 21:16
**expeditiously** [1] - 67:14
**expenses** [1] - 116:5
**expensive** [5] - 18:2, 18:11, 25:23, 127:6, 162:19
**experience** [4] - 72:16, 73:2, 110:20, 126:24
**experimental** [2] - 102:25, 132:25
**expert** [8] - 23:12, 25:16, 33:12, 70:25, 71:13, 75:6, 75:10, 75:13

**expertise** [4] - 71:5, 71:16, 162:24, 162:25
**experts** [2] - 67:1, 71:1
**explain** [21] - 7:18, 8:2, 25:17, 28:5, 33:8, 33:10, 45:15, 45:16, 49:4, 56:11, 58:17, 75:20, 77:6, 81:5, 82:15, 125:19, 131:1, 134:1, 141:9, 141:19, 151:24
**explaining** [1] - 148:2
**explains** [4] - 64:10, 94:3, 113:6, 114:18
**exploited** [1] - 19:18
**exploration** [1] - 150:9
**expressed** [1] - 57:11
**expressly** [2] - 119:12, 121:12
**extensive** [5] - 45:13, 52:14, 52:21, 71:21, 152:11
**extent** [3] - 5:15, 17:5, 167:20
**extraordinarily** [1] - 25:18

## F

**face** [2] - 12:25
**Facebook** [1] - 13:4
**facilitate** [1] - 140:25
**facility** [3] - 80:11, 93:2, 128:1
**fact** [19] - 8:10, 8:14, 12:20, 14:13, 22:2, 23:15, 39:6, 44:12, 50:14, 51:19, 53:10, 55:13, 56:22, 65:7, 98:23, 161:16, 161:18, 162:25
**factors** [1] - 10:19
**factual** [3] - 59:20, 59:21, 59:22
**fair** [15] - 11:20, 11:24, 13:21, 13:22, 14:10, 14:19, 14:24, 56:6, 66:6, 79:22, 118:2, 120:25, 131:15, 150:3, 169:21
**faith** [6] - 39:2, 39:13, 39:16, 39:18, 50:4, 50:11
**fake** [3] - 28:13, 49:25, 50:2
**fall** [1] - 117:13
**fallopian** [2] - 137:6, 146:10
**false** [8] - 21:20, 89:9, 91:25, 94:20, 100:4, 102:8, 110:21, 110:23
**falsifying** [3] - 94:3, 94:4, 105:7
**falsity** [1] - 100:6
**familial** [1] - 137:20
**familiar** [12] - 73:10, 74:17, 74:19, 74:21, 74:24, 75:2, 75:4, 80:5, 81:12, 92:7, 130:23, 156:4
**families** [1] - 149:13

**family** [27] - 6:24, 19:3, 23:22, 32:9, 37:19, 42:5, 42:6, 42:7, 42:9, 54:9, 67:5, 124:22, 125:3, 128:13, 137:14, 137:16, 137:20, 139:12, 139:14, 141:8, 142:8, 142:18, 143:11, 148:6, 161:5, 166:2
**far** [4] - 8:14, 31:10, 48:11, 54:9
**fashion** [3] - 57:5, 102:5, 102:7
**fast** [1] - 19:17
**favor** [1] - 151:11
**FBI** [1] - 73:22
**February** [3] - 40:1, 40:3, 71:7
**federal** [31] - 21:9, 46:5, 55:17, 64:6, 64:7, 64:13, 79:3, 96:12, 96:17, 96:19, 96:25, 97:8, 98:1, 113:3, 114:4, 114:16, 114:17, 114:21, 114:23, 118:16, 122:4, 131:7, 131:18, 132:8, 136:11, 154:14, 155:16, 157:7
**Federal** [10] - 95:19, 96:5, 96:7, 96:15, 96:20, 118:15, 119:16, 119:22, 131:9, 132:7
**federally** [1] - 129:23
**fee** [2] - 80:21, 100:22
**fee-for-service** [1] - 100:22
**fell** [2] - 117:18, 135:23
**fellow** [1] - 15:9
**felt** [1] - 50:15
**female** [2] - 139:15, 149:14
**few** [5] - 83:10, 152:1, 153:13, 165:15, 165:17
**field** [1] - 98:4
**fifth** [3] - 93:6, 143:24, 149:5
**figure** [2] - 36:4, 45:8
**file** [1] - 46:7
**filed** [2] - 47:21, 81:8
**files** [5] - 33:15, 33:22, 33:23, 34:1
**filing** [1] - 75:15
**fill** [1] - 22:25
**filling** [2] - 93:12, 168:18
**fills** [1] - 92:12
**filter** [1] - 84:12
**final** [3] - 14:1, 66:13, 165:17
**finally** [1] - 14:11
**financial** [1] - 32:17
**financially** [1] - 100:18
**fine** [8] - 33:25, 42:9, 42:10, 66:19, 67:21, 153:5, 168:20
**finger** [1] - 52:24
**finish** [4] - 46:16, 152:21,

153:4, 163:13
**firms** [1] - 71:4
**first** [29] - 4:11, 4:19, 4:23, 5:1, 5:11, 5:24, 7:15, 10:25, 14:3, 15:19, 16:5, 35:22, 49:20, 54:21, 54:22, 57:13, 65:13, 67:20, 68:4, 68:8, 94:24, 100:15, 100:16, 108:1, 138:7, 139:25, 143:25, 145:5, 152:1
**First** [1] - 162:4
**fit** [1] - 56:14
**five** [6] - 21:6, 27:16, 151:11, 152:20, 153:6, 158:1
**five-digit** [1] - 158:1
**five-minute** [3] - 151:11, 152:20, 153:6
**flag** [3] - 161:8, 163:16, 164:13
**flags** [2] - 161:2, 163:15
**flat** [1] - 168:8
**flight** [1] - 153:20
**flip** [4] - 15:20, 129:10, 137:10, 138:7
**flipping** [1] - 60:25
**floating** [1] - 57:3
**Floor** [1] - 1:16
**floor** [2] - 17:14, 87:1
**FLORIDA** [1] - 1:1
**Florida** [3] - 1:3, 1:24, 59:7
**focus** [2] - 76:25, 168:24
**focused** [2] - 76:18, 76:19
**focusing** [2] - 73:2, 123:16, 126:13
**folks** [10] - 16:22, 18:4, 24:10, 24:19, 27:17, 47:23, 49:13, 66:25, 151:7, 168:18
**follow** [6] - 6:22, 7:23, 8:3, 8:4, 11:17, 37:22, 110:17
**followed** [2] - 14:25, 132:7
**following** [12] - 15:1, 16:12, 41:8, 66:11, 95:3, 113:22, 129:19, 138:13, 139:6, 145:8, 161:23, 166:11
**follows** [3] - 41:24, 52:12, 52:13
**fool** [3] - 20:3, 50:20, 51:10
**fooled** [1] - 50:21
**FOR** [3] - 1:13, 1:17, 2:2
**forgot** [1] - 92:1
**form** [16] - 33:3, 91:18, 91:20, 92:9, 92:23, 93:12, 93:21, 94:18, 101:9, 104:1, 105:21, 106:15, 107:3, 107:21, 116:16, 142:15
**format** [1] - 162:6
**former** [1] - 32:18
**forms** [4] - 8:7, 106:7, 106:19, 110:19
**Fort** [1] - 1:24

**forth** [3] - 14:24, 36:18, 37:5
**fortunately** [1] - 53:16
**forward** [2] - 49:1, 152:10
**foundation** [1] - 57:15
**four** [3] - 26:4, 84:5, 158:13
**fourth** [3] - 138:22, 143:6, 143:10
**fracture** [1] - 117:15
**frame** [2] - 133:20, 135:23
**framework** [2] - 60:2, 60:5
**frankly** [1] - 169:5
**FRAUD** [1] - 1:15
**fraud** [16] - 24:2, 28:14, 29:22, 29:23, 30:3, 34:25, 35:2, 70:18, 74:1, 74:4, 74:12, 76:25, 79:24, 79:25, 89:24, 90:10
**fraudulent** [2] - 22:3, 30:1, 100:4
**Fraumeni** [1] - 139:21
**free** [3] - 22:20, 23:10, 63:3
**freedom** [5] - 43:21, 45:13, 53:1, 53:2, 53:3
**freely** [1] - 43:21
**freestanding** [1] - 57:3
**friend** [1] - 49:24
**friends** [3] - 54:10, 67:5, 166:3
**front** [3] - 17:1, 22:21, 31:13
**front-row** [1] - 31:13
**fulfill** [1] - 70:20
**full** [2] - 24:10, 137:18
**fully** [1] - 67:16
**fun** [3] - 33:11, 117:7, 126:21
**function** [1] - 102:1
**functioning** [1] - 116:10
**functions** [1] - 148:22
**fund** [19] - 77:2, 79:1, 79:5, 79:7, 79:20, 79:24, 80:3, 80:4, 90:11, 99:5, 99:6, 99:14, 102:3, 112:9, 112:25, 118:13, 118:14, 126:20, 127:10
**funded** [3] - 78:22, 96:17, 118:13
**funding** [1] - 80:3
**funds** [3] - 79:25, 111:16, 111:24
**furnished** [1] - 129:18
**furnishes** [1] - 123:2
**furnishing** [1] - 126:14
**furthermore** [1] - 161:13

## G

**gain** [1] - 94:5
**gallery** [1] - 165:16

**game** [2] - 47:19, 66:3
**gap** [1] - 127:20
**GARLAND** [1] - 2:3
**gather** [1] - 85:1
**gene** [7] - 149:20, 149:21, 156:19, 159:25, 160:1, 160:3, 160:13
**General** [2] - 73:22, 148:12
**general** [12] - 19:21, 75:18, 80:13, 102:21, 109:25, 121:1, 145:9, 149:17, 149:19, 154:24, 156:8
**generally** [9] - 74:17, 87:1, 94:16, 117:9, 138:1, 138:16, 143:8, 148:14, 156:8
**generate** [2] - 27:11, 40:23
**generated** [1] - 77:24
**generation** [1] - 139:4
**genes** [17] - 19:2, 26:6, 26:7, 26:8, 26:11, 26:16, 137:1, 139:11, 139:13, 141:7, 141:18, 143:18, 144:10, 144:12, 149:11, 160:15, 162:16
**genetic** [57] - 18:3, 18:22, 19:5, 19:8, 19:24, 20:19, 26:19, 27:1, 38:3, 81:3, 99:11, 99:18, 112:6, 121:4, 121:19, 121:24, 122:13, 125:4, 125:7, 126:25, 127:2, 134:14, 134:20, 137:13, 137:19, 138:5, 139:3, 139:7, 139:8, 139:25, 140:4, 140:6, 140:8, 140:13, 140:17, 140:20, 142:9, 142:12, 142:21, 142:22, 145:6, 147:6, 148:16, 148:20, 150:3, 150:6, 150:15, 154:23, 156:5, 156:13, 159:14, 159:18, 160:6, 160:17, 161:4, 161:8, 166:5
**Genetic** [1] - 145:8
**genetics** [5] - 38:3, 139:7, 139:8, 140:18, 140:25
**gentleman** [1] - 49:19
**gentlemen** [17] - 6:16, 17:16, 18:3, 22:8, 26:23, 29:2, 29:15, 32:5, 34:8, 34:20, 35:3, 35:11, 53:24, 67:24, 114:3, 153:12, 165:14
**geographical** [6] - 84:22, 106:4, 128:6, 131:19, 133:14, 133:23
**geographically** [2] - 79:10, 155:3
**Georgia** [13] - 1:19, 2:4, 2:6, 18:19, 42:4, 82:8, 82:10, 109:5, 109:6, 133:17, 134:5, 164:9
**get-go** [1] - 39:7

**giant** [1] - 18:17
**gift** [1] - 23:8
**given** [10] - 15:4, 16:24, 23:14, 42:24, 50:2, 53:1, 59:12, 65:23, 65:24, 77:16
**glaucoma** [1] - 120:5
**gonna** [1] - 4:25
**Google** [2] - 12:15, 13:12
**gotta** [1] - 45:18
**governing** [1] - 59:8
**Government** [1] - 68:19
**GOVERNMENT** [1] - 1:13
**government** [93] - 4:11, 7:16, 11:2, 11:6, 11:13, 16:5, 16:11, 16:14, 17:13, 18:8, 31:24, 32:5, 32:13, 36:6, 39:7, 39:17, 39:19, 39:25, 40:9, 40:21, 41:1, 42:20, 42:25, 43:2, 43:8, 43:10, 43:14, 44:1, 44:6, 45:11, 45:16, 46:2, 46:9, 46:25, 47:13, 47:21, 48:2, 48:18, 49:5, 49:6, 49:8, 50:2, 50:5, 50:16, 51:18, 51:24, 52:3, 52:7, 52:22, 53:5, 53:9, 55:19, 55:20, 55:22, 60:13, 60:16, 61:6, 61:8, 61:12, 61:16, 62:12, 64:3, 64:6, 68:8, 68:25, 69:20, 71:4, 71:14, 75:12, 75:21, 76:3, 78:24, 78:25, 83:14, 96:12, 96:17, 96:25, 97:8, 98:1, 113:23, 114:15, 120:22, 151:25, 152:16, 154:1, 165:22, 167:2, 169:3, 169:12, 170:5, 170:8, 170:21
**GOVERNMENT'S** [1] - 3:6
**government's** [13] - 4:16, 6:1, 16:13, 30:12, 30:13, 36:2, 37:21, 53:21, 60:25, 63:19, 68:3, 69:3, 162:3
**Government's** [22] - 92:4, 92:21, 93:6, 93:24, 103:21, 104:6, 104:11, 105:2, 106:25, 107:16, 107:17, 108:22, 109:17, 111:23, 113:19, 122:8, 128:19, 133:11, 134:8, 151:6, 159:11, 162:10
**governmental** [1] - 71:2
**governs** [2] - 59:12, 132:3
**grab** [1] - 169:25
**grabbing** [1] - 54:5
**graduated** [1] - 70:12
**grand** [1] - 27:13
**grass** [1] - 8:11
**great** [4] - 38:23, 45:17, 53:17, 166:21
**greater** [1] - 15:17
**greatly** [1] - 84:24

**greedy** [1] - 32:8
**green** [1] - 133:16
**Griner** [1] - 30:20
**ground** [2] - 7:17, 54:4
**group** [3] - 92:25, 109:8, 141:10
**growth** [1] - 148:22
**guarantee** [1] - 14:23
**guess** [7] - 9:22, 45:8, 45:11, 47:12, 48:19, 118:6, 151:21
**Guidance** [1] - 136:22
**guidance** [4] - 76:9, 76:23, 131:5, 131:23
**guide** [2] - 10:2, 62:1
**guided** [1] - 62:17
**guidelines** [15] - 10:21, 59:17, 59:21, 71:19, 73:10, 117:16, 132:8, 139:19, 142:2, 146:18, 154:13, 155:16, 158:25, 159:22, 160:16
**guiding** [1] - 58:17
**guilt** [2] - 11:3, 11:13
**guilty** [7] - 7:25, 8:1, 11:1, 35:12, 46:17, 53:13, 53:21
**Gurskis** [5] - 54:24, 56:7, 95:5, 151:19, 153:4
**GURSKIS** [113] - 1:13, 3:4, 56:18, 57:9, 58:21, 66:23, 67:15, 68:9, 68:14, 68:24, 69:3, 70:6, 70:8, 75:12, 75:17, 92:3, 92:5, 92:20, 93:19, 93:20, 95:6, 95:7, 103:20, 103:22, 105:1, 105:3, 107:16, 107:19, 108:21, 108:23, 109:16, 109:18, 111:10, 111:13, 111:14, 115:12, 115:13, 115:15, 115:17, 115:22, 115:25, 116:19, 116:22, 119:18, 119:20, 120:14, 120:21, 120:24, 121:11, 122:7, 122:9, 122:20, 122:22, 123:17, 123:19, 126:10, 126:12, 127:12, 127:13, 128:18, 128:20, 128:24, 128:25, 129:5, 129:9, 129:12, 133:10, 133:12, 134:7, 134:9, 134:22, 134:24, 135:17, 135:21, 136:15, 136:18, 137:10, 137:22, 137:24, 138:6, 138:8, 138:22, 138:25, 139:24, 140:2, 141:4, 141:6, 142:3, 142:5, 143:5, 143:7, 143:13, 143:14, 143:23, 144:2, 144:25, 145:4, 148:11, 148:13, 149:23, 149:25,

150:17, 151:5, 151:21, 154:3, 154:4, 162:9, 162:11, 163:19, 164:15, 164:21, 164:24, 165:10
**guys** [15] - 5:7, 5:17, 6:7, 6:9, 63:24, 66:22, 67:8, 151:15, 152:17, 153:21, 168:11, 169:13, 169:16, 170:4, 171:6
**gynecological** [1] - 149:4

# H

**half** [6] - 20:17, 54:1, 65:3, 130:4, 151:14, 152:3
**hallway** [1] - 170:2
**hand** [1] - 68:18
**handle** [1] - 5:9
**handling** [2] - 35:23, 35:25
**hands** [1] - 23:2
**Hapeville** [1] - 109:22
**HBOC** [1] - 139:21
**head** [2] - 24:21, 63:2
**headquartered** [2] - 78:17, 78:19
**Health** [7] - 31:4, 70:23, 71:1, 71:6, 71:7, 71:18, 76:9
**health** [8] - 21:9, 72:6, 72:17, 80:13, 87:20, 127:21, 129:21, 130:14
**healthcare** [35] - 17:18, 21:10, 26:2, 29:22, 30:3, 35:24, 36:15, 37:1, 70:24, 71:2, 71:3, 71:10, 71:14, 71:17, 72:19, 73:21, 75:21, 77:9, 77:11, 79:8, 96:11, 96:17, 96:19, 96:24, 97:14, 97:15, 97:18, 97:19, 97:21, 98:22, 125:25, 126:1, 127:23, 128:1, 129:23
**hear** [43] - 8:23, 10:14, 11:21, 14:18, 15:12, 16:22, 25:9, 25:25, 26:13, 26:18, 27:25, 28:6, 28:25, 29:4, 30:18, 30:19, 30:24, 30:25, 31:11, 32:18, 32:22, 34:3, 34:10, 34:16, 39:8, 40:11, 40:12, 76:4, 76:13, 76:16, 80:18, 81:21, 81:24, 85:17, 86:25, 102:16, 102:21, 106:5, 131:2, 132:10, 159:24
**heard** [16] - 8:8, 18:5, 18:20, 31:10, 35:20, 54:9, 74:13, 80:24, 84:1, 128:9, 130:15, 130:20, 134:17, 165:25, 166:5, 170:8
**hearing** [1] - 10:8
**heavy** [1] - 86:11
**held** [7] - 65:4, 92:18, 95:4, 111:11, 113:22, 161:23,

164:23
**help** [19] - 11:20, 14:23, 15:8, 16:6, 18:24, 20:8, 20:13, 20:23, 20:24, 23:23, 29:12, 33:4, 48:15, 62:18, 92:13, 131:23, 140:25, 150:11, 153:22
**helped** [1] - 38:1
**helpful** [4] - 20:21, 56:19, 135:13, 141:2
**helping** [4] - 77:1, 131:12, 132:21, 153:24
**helps** [3] - 147:4, 147:14, 147:22
**Hemangini** [3] - 107:8, 108:3, 108:14
**hereditary** [4] - 137:1, 139:19, 143:9, 145:13
**herein** [1] - 100:21
**hesitate** [1] - 48:11
**HHS** [1] - 76:9
**hid** [1] - 30:10
**hide** [4] - 27:18, 27:20, 27:21
**hierarchy** [1] - 132:5
**high** [5] - 11:16, 80:9, 87:22, 113:9, 161:9
**higher** [17] - 18:25, 113:2, 131:8, 131:18, 131:24, 132:20, 133:7, 135:11, 138:11, 138:14, 155:6, 155:9, 157:19, 160:20, 162:19, 162:24, 162:25
**higher-up** [10] - 131:8, 131:18, 131:24, 132:20, 133:7, 135:11, 138:11, 138:14, 155:6, 157:19
**highest** [1] - 111:2
**highlighted** [3] - 94:24, 129:15, 133:25
**highly** [4] - 38:5, 38:6, 38:24, 38:25
**himself** [3] - 20:24, 32:4, 47:1
**hire** [2] - 25:4, 76:6
**hired** [3] - 22:17, 23:2, 24:22
**hires** [2] - 39:2, 48:15
**Hirsch** [16] - 30:19, 43:16, 43:17, 43:18, 43:20, 44:1, 44:10, 44:21, 44:24, 45:6, 45:14, 46:12, 46:22, 47:12, 48:9
**Hirsch's** [3] - 31:3, 43:18, 46:2
**history** [31] - 23:22, 37:18, 37:19, 42:5, 42:6, 42:7, 42:8, 42:9, 139:12, 139:14, 139:15, 139:16, 141:8, 145:20, 145:25, 146:3,

146:5, 146:9, 146:13, 146:16, 146:18, 146:21, 147:2, 147:3, 147:13, 147:14, 147:24, 148:6, 161:5, 161:6

**hit** [2] - 9:7, 83:3
**hold** [2] - 92:15, 169:2
**holds** [1] - 48:9
**home** [7] - 59:9, 72:6, 72:17, 80:12, 130:6, 165:24, 170:22
**homes** [2] - 59:6, 59:16
**honest** [2] - 43:6, 85:7
**Honor** [53] - 4:18, 5:8, 5:13, 6:2, 6:6, 17:15, 35:16, 38:19, 54:22, 55:7, 55:22, 55:24, 56:5, 56:18, 57:9, 58:22, 59:7, 60:11, 60:19, 60:24, 62:23, 63:6, 63:11, 66:23, 67:15, 67:17, 68:9, 68:24, 69:17, 70:6, 75:12, 92:15, 113:20, 115:12, 116:15, 120:14, 120:19, 120:21, 121:8, 153:1, 154:3, 161:20, 163:11, 163:25, 164:17, 164:21, 167:3, 168:16, 169:14, 171:1, 171:4, 171:13
**HONORABLE** [1] - 1:10
**Honorable** [1] - 1:22
**hook** [1] - 24:3
**hope** [2] - 31:23, 166:21
**hoped** [1] - 167:6
**hopefully** [5] - 6:8, 153:17, 168:7, 168:11, 170:2
**hoping** [1] - 167:14
**hospice** [3] - 72:7, 72:17, 80:13
**hospital** [5] - 71:24, 80:11, 80:12, 129:20, 129:24
**host** [2] - 27:7
**HOSTETLER** [1] - 2:5
**hour** [1] - 54:1
**hours** [2] - 151:14, 152:3
**housekeeping** [1] - 4:14
**how-tos** [1] - 132:13
**Human** [1] - 76:9
**human** [2] - 29:7, 84:6
**humanly** [1] - 84:14
**hundreds** [2] - 19:14, 127:2

---

**I**

**ICD-10** [1] - 158:4
**idea** [1] - 42:24
**identification** [2] - 89:15
**identified** [7] - 99:6, 101:5, 107:24, 108:1, 108:4, 109:21, 152:12
**identify** [1] - 129:6
**identifying** [1] - 93:15

**IDGAF** [2] - 31:4
**ignorance** [2] - 89:7, 100:5
**ignore** [3] - 9:20, 9:21, 9:24
**II** [2] - 1:10, 1:22
**illegal** [7] - 40:17, 44:14, 45:9, 47:1, 48:13, 48:24, 52:22
**illegality** [1] - 44:13
**illness** [2] - 116:10, 117:4
**ILONA** [1] - 1:21
**Ilona's** [1] - 67:13
**imagine** [1] - 44:7
**imaging** [1] - 117:23
**immediately** [1] - 84:7
**immunization** [1] - 93:3
**implied** [1] - 23:9
**importance** [2] - 15:1, 160:8
**important** [14] - 10:3, 11:23, 11:24, 13:15, 13:17, 14:18, 53:1, 81:13, 101:24, 114:7, 132:6, 147:3, 148:21, 158:20
**impossible** [1] - 86:3
**impression** [1] - 15:18
**impressions** [1] - 16:1
**improperly** [1] - 12:11
**improve** [1] - 116:10
**inadvertently** [1] - 120:16
**incident** [1] - 12:10
**include** [10] - 81:3, 92:10, 92:24, 121:4, 128:10, 128:12, 136:13, 141:14, 147:3, 150:8
**included** [3] - 132:16, 158:21, 159:21
**includes** [2] - 13:8, 107:5
**including** [8] - 13:2, 13:10, 13:14, 18:2, 95:18, 137:5, 139:21, 148:22
**income** [1] - 78:24
**incomplete** [1] - 83:7
**incorporate** [1] - 57:2
**incorrect** [1] - 39:11
**increases** [2] - 162:18, 162:19
**incurred** [1] - 116:5
**independent** [6] - 36:24, 54:11, 82:18, 93:1, 166:7
**Indian** [1] - 38:6
**indicate** [3] - 109:6, 146:1, 147:11
**indicated** [1] - 145:14
**indicates** [1] - 85:12
**indicating)** [4] - 18:14, 122:21, 123:18, 145:3
**indication** [3] - 136:16, 160:14, 161:7
**Indications** [3] - 145:2,

145:6
**indications** [6] - 90:10, 136:23, 136:24, 136:25, 145:8, 150:15
**indicative** [1] - 147:8
**indicted** [1] - 45:11
**indictment** [6] - 8:1, 11:1, 53:13, 53:15, 64:18, 115:3
**indirect** [2] - 8:12, 8:16
**indirectly** [2] - 8:10, 96:23
**individual** [7] - 97:18, 137:3, 137:16, 139:12, 139:13, 139:18, 141:8
**individuals** [7] - 48:1, 50:14, 55:24, 137:14, 145:12, 146:9, 152:12
**industries** [1] - 28:20
**industry** [2] - 71:15, 71:22
**influence** [1] - 12:11
**inform** [2] - 65:17, 170:21
**information** [69] - 12:3, 12:8, 13:7, 13:8, 13:13, 14:21, 23:1, 24:18, 36:11, 52:11, 52:14, 77:16, 77:21, 78:5, 78:8, 81:12, 81:15, 81:16, 81:18, 81:23, 82:1, 83:2, 83:7, 84:2, 84:3, 84:8, 86:9, 86:16, 86:18, 87:7, 87:8, 87:9, 87:14, 87:17, 90:17, 91:17, 91:19, 92:12, 94:3, 94:4, 94:21, 95:25, 100:21, 100:23, 101:2, 101:20, 102:8, 103:18, 103:19, 104:2, 104:4, 105:7, 105:18, 111:19, 124:19, 126:5, 131:5, 135:2, 135:4, 135:13, 138:3, 147:4, 147:14, 148:18, 150:20, 155:7, 157:3, 161:25, 166:8
**informed** [3] - 7:5, 120:15, 167:18
**inherited** [1] - 19:2
**initial** [3] - 66:7, 120:8, 150:6
**initiated** [1] - 52:2
**injury** [2] - 116:10, 117:4
**innocence** [1] - 11:8
**innocent** [1] - 11:1
**inside** [3] - 31:12, 117:22, 158:23
**Inspector** [1] - 73:22
**Instagram** [1] - 13:4
**instance** [6] - 9:6, 99:22, 146:24, 147:9, 156:18, 160:1
**instances** [2] - 61:9, 160:18
**instant** [1] - 12:23
**instead** [5] - 60:24, 97:17, 98:3, 98:8, 98:10
**instruct** [5] - 9:25, 15:13, 16:17, 30:2, 30:11

**instructed** [5] - 22:22, 30:12, 31:20, 60:18, 169:18
**instruction** [16] - 10:1, 60:9, 61:20, 62:6, 62:14, 63:20, 63:23, 64:9, 64:10, 66:5, 69:14, 114:10, 114:12, 114:18, 158:24
**instructions** [25] - 4:8, 5:22, 7:21, 7:22, 11:15, 11:18, 11:21, 11:22, 56:15, 57:2, 58:10, 58:13, 60:12, 61:25, 62:1, 62:17, 65:9, 66:11, 66:14, 95:13, 95:14, 95:18, 100:19, 158:20, 158:23
**insulate** [1] - 32:4
**insurance** [9] - 22:23, 24:8, 59:1, 59:3, 59:17, 71:2, 75:25
**insurers** [1] - 37:1
**integrity** [4] - 70:24, 71:10, 87:25, 148:23
**Integrity** [1] - 76:24
**intend** [4] - 5:6, 5:15, 167:2, 167:9
**intending** [2] - 80:4, 167:12
**intends** [1] - 55:19
**intensive** [2] - 71:23, 93:2
**intent** [3] - 64:16, 66:1, 115:1
**interact** [2] - 51:5, 52:16
**interacted** [1] - 38:9
**interaction** [1] - 48:22
**interactive** [1] - 128:7
**interest** [5] - 10:16, 93:13, 93:16, 107:10, 110:18
**interested** [1] - 52:10
**interesting** [2] - 44:19, 50:20
**internally** [1] - 36:22
**internet** [15] - 12:14, 12:19, 12:22, 13:2, 13:10, 22:18, 22:25, 23:18, 24:24, 28:11, 33:18, 52:9, 96:2, 132:11, 166:3
**interpret** [1] - 16:16
**interpreted** [2] - 50:23, 65:23
**interpretive** [2] - 160:22, 162:18
**intersection** [1] - 106:11
**interview** [3] - 49:20, 49:21, 140:6
**interviewed** [2] - 48:4, 51:24
**interviews** [2] - 49:2, 49:5
**introduce** [6] - 35:22, 56:2, 64:6, 68:10, 68:12, 114:16
**introduced** [4] - 17:6, 56:9, 61:15, 114:9

introducing [2] - 55:21, 57:14
invasive [1] - 137:4
investigating [1] - 74:6
investigational [2] - 102:25, 133:1
investigations [3] - 74:1, 74:4, 74:8
investigative [1] - 44:21
investigators [1] - 74:9
invoke [1] - 66:23
invoked [1] - 67:1
involve [2] - 50:8, 61:9
involved [19] - 12:14, 13:14, 20:7, 30:24, 31:5, 31:7, 34:9, 50:10, 74:11, 78:12, 90:8, 97:7, 97:10, 97:15, 97:20, 99:15, 132:14, 138:1, 160:21
involvement [1] - 140:25
involving [2] - 12:10, 74:1
IOM [1] - 132:11
isolation [1] - 60:6
issue [9] - 12:20, 14:13, 36:6, 40:25, 56:21, 59:4, 67:6, 86:10, 146:23
issued [2] - 57:19, 89:17
issues [9] - 4:14, 5:3, 5:11, 5:18, 6:24, 71:4, 71:13, 84:21, 153:20
it'll [1] - 11:22
item [11] - 97:8, 102:22, 102:24, 103:6, 103:7, 103:9, 131:12, 132:24, 133:2, 141:20, 158:2
items [8] - 113:12, 115:21, 116:2, 116:3, 116:5, 116:6, 117:1, 118:16
itself [2] - 64:14, 114:24

**J**

jail [6] - 44:4, 46:22, 46:23, 47:14, 48:19
JAMIE [1] - 1:13
Jariwala [6] - 106:12, 106:18, 106:19, 107:8, 108:3, 108:14
Jencks [1] - 61:8
jeopardy [1] - 43:21
JJ [2] - 105:25, 106:2
job [2] - 71:18, 72:21
John [1] - 35:24
Judge [6] - 30:2, 30:11, 46:7, 46:10, 47:10, 64:22
judge [2] - 13:15, 50:12
JUDGE [1] - 1:10
judged [1] - 39:15
juggle [1] - 168:18
July [1] - 42:19

jumping [1] - 65:11
June [2] - 44:6, 104:20
Jurisdiction [2] - 105:25, 106:2
jurisdiction [3] - 106:4, 106:5, 106:6
jurisdictional [1] - 131:19
juror [4] - 4:3, 4:6, 6:20, 12:2, 14:7, 152:1
JURORS [7] - 9:11, 15:6, 16:3, 17:2, 17:17, 35:19, 115:8
jurors [17] - 7:20, 11:17, 13:18, 13:20, 13:23, 15:10, 53:17, 58:18, 60:2, 61:25, 63:5, 66:22, 153:2, 153:9, 153:14, 153:16, 168:7
JURY [1] - 1:9
jury [46] - 5:11, 5:23, 6:12, 6:13, 6:16, 10:7, 12:11, 15:10, 15:13, 16:18, 17:7, 18:8, 29:21, 53:24, 54:2, 54:12, 56:3, 56:4, 56:14, 56:19, 57:2, 57:15, 58:10, 59:2, 59:22, 60:19, 60:21, 62:17, 63:15, 64:5, 66:7, 67:9, 67:16, 67:24, 68:12, 77:6, 114:3, 114:15, 131:1, 153:12, 161:25, 165:14, 166:8, 166:17, 166:18
Jury [6] - 6:14, 54:15, 67:22, 151:17, 153:10, 166:24
Justice [2] - 38:8, 73:23
JUSTICE [1] - 1:15

**K**

K15 [1] - 120:10
K6 [1] - 120:10
KATHERINE [1] - 1:14
keep [9] - 7:4, 10:24, 15:9, 21:17, 152:17, 160:10, 165:14, 166:1, 168:17
keeping [2] - 7:4, 62:8
kept [1] - 29:13
key [1] - 50:14
kickback [10] - 30:8, 96:10, 96:25, 97:2, 98:14, 98:23, 99:3, 99:11, 164:14
Kickback [6] - 91:24, 95:19, 96:8, 96:15, 96:20, 98:5
kickbacks [18] - 21:21, 22:15, 29:24, 30:1, 41:4, 44:14, 96:12, 96:16, 96:18, 97:14, 97:16, 97:20, 98:21, 99:5, 99:8, 99:15, 99:17
kill [1] - 28:19
kind [20] - 8:17, 16:20, 27:12, 41:10, 50:2, 77:16,

81:22, 89:7, 96:16, 99:19, 109:6, 117:15, 130:19, 132:3, 132:13, 135:3, 143:11, 146:1, 148:17, 156:5
kinds [5] - 33:19, 88:11, 110:24, 114:8, 131:13
knowingly [4] - 97:2, 98:13, 100:3, 102:9
knowledge [4] - 50:10, 140:20, 141:1, 152:6
knowledgeable [4] - 33:7, 105:14, 125:21, 140:5
known [12] - 7:20, 18:22, 21:21, 48:13, 50:1, 64:7, 64:9, 111:25, 114:16, 137:13, 137:19, 137:20
knows [4] - 25:14, 39:25, 44:21, 59:7

**L**

L-A-U-R-I-E [1] - 68:23
lab [39] - 17:21, 18:10, 18:11, 18:18, 18:21, 19:4, 19:10, 20:4, 21:17, 22:5, 24:10, 24:23, 26:6, 26:9, 26:18, 27:4, 29:12, 32:19, 34:12, 34:17, 34:21, 34:23, 35:1, 42:11, 43:22, 79:18, 89:1, 97:5, 99:11, 99:12, 107:14, 122:14, 134:2, 141:23, 164:4, 164:9, 164:10
lab's [1] - 22:11
laboratories [5] - 73:3, 73:4, 82:18, 90:4, 91:8
laboratory [22] - 17:25, 18:6, 71:20, 73:7, 73:11, 73:14, 80:17, 81:1, 82:15, 82:17, 86:22, 88:13, 88:21, 88:22, 93:1, 99:8, 99:10, 99:22, 104:7, 122:25, 134:2, 159:20
labs [5] - 92:10, 99:18, 164:8, 164:9, 164:13
LabSolutions [39] - 18:1, 18:10, 18:19, 32:20, 34:7, 36:5, 36:7, 36:11, 37:4, 37:24, 38:15, 38:22, 39:3, 39:12, 39:21, 41:15, 41:24, 42:10, 42:13, 42:17, 42:20, 49:18, 50:22, 50:23, 51:4, 51:8, 51:22, 91:3, 91:7, 101:15, 106:21, 107:23, 108:12, 108:16, 112:1, 112:3, 133:24, 134:2, 159:3
LabSolutions' [17] - 40:4
ladies [7] - 6:16, 17:16, 18:13, 22:8, 26:23, 29:2, 29:15, 32:5, 34:8, 34:20, 35:3, 35:11, 53:24, 67:24,

114:3, 153:12, 165:14
language [2] - 62:25, 63:23
larger [1] - 76:8
last [6] - 36:2, 49:21, 68:23, 123:16, 123:20, 139:18
late [2] - 142:17, 168:8
Lauderdale [1] - 1:24
laundering [2] - 29:24, 30:10
Laurie [3] - 54:23, 68:15, 68:22
LAURIE [2] - 3:3, 68:19
law [45] - 8:2, 8:4, 8:14, 11:17, 12:20, 13:13, 13:18, 13:23, 14:2, 14:11, 14:13, 14:16, 14:24, 16:17, 30:2, 37:20, 41:8, 47:3, 47:11, 55:15, 55:19, 55:21, 56:3, 56:9, 58:1, 60:17, 60:18, 60:19, 60:23, 61:11, 61:15, 65:6, 71:4, 73:18, 73:20, 80:2, 113:3, 113:6, 113:9, 121:12, 122:5, 131:7, 135:12
Law [1] - 95:20
LAW [1] - 1:18
law's [1] - 41:16
lawmakers [1] - 132:9
laws [14] - 60:15, 64:6, 64:12, 64:18, 95:12, 95:14, 95:17, 96:25, 100:19, 113:24, 114:16, 114:22, 115:3, 155:17
lawyer [19] - 9:6, 9:14, 9:16, 35:25, 40:1, 40:12, 40:13, 40:24, 41:16, 41:17, 48:15, 48:21, 48:22
lawyer's [3] - 9:5, 41:24, 51:16
lawyers [23] - 7:12, 8:22, 8:24, 9:1, 13:15, 16:23, 29:3, 29:13, 39:4, 39:8, 39:9, 41:25, 44:18, 44:22, 44:24, 45:1, 45:2, 45:3, 54:5, 166:10
lawyers' [1] - 9:3
laying [1] - 67:13
LCD [15] - 131:3, 131:11, 134:11, 134:14, 134:19, 135:4, 135:7, 135:8, 135:10, 135:22, 147:21, 148:2, 154:6, 154:11, 155:4
LCDs [18] - 37:2, 37:5, 37:13, 37:14, 37:16, 57:12, 57:13, 57:19, 58:4, 58:14, 62:5, 131:4, 131:22, 135:2, 155:5, 155:22, 157:18
lead [2] - 13:25, 60:2
leading [3] - 116:16, 149:2, 149:4
leads [1] - 98:6

**learn** [21] - 19:6, 19:13, 19:19, 20:4, 20:19, 21:8, 21:12, 21:25, 22:9, 22:15, 23:15, 24:13, 25:2, 25:6, 26:6, 27:1, 28:14, 28:20, 28:22, 29:5, 32:3
**learned** [1] - 27:10
**Learning** [1] - 90:24
**least** [10] - 51:5, 54:18, 60:1, 60:4, 61:22, 64:21, 66:7, 103:8, 139:19, 168:23
**leave** [6] - 15:12, 15:13, 15:14, 54:2, 151:11, 166:17
**leeway** [1] - 168:22
**left** [3] - 120:16, 135:20, 166:20
**legal** [7] - 28:25, 35:25, 41:11, 43:22, 52:21, 71:3, 101:16
**legally** [3] - 11:10, 51:23, 100:18
**legislation** [8] - 131:8, 132:21, 133:7, 138:11, 138:15, 155:6, 157:19, 157:20
**legitimacy** [2] - 27:24, 29:5
**legitimate** [6] - 22:2, 29:6, 29:15, 29:17, 34:2, 35:6
**legs** [1] - 84:5
**less** [4] - 112:17, 156:2, 160:19, 168:25
**lesser** [1] - 111:3
**letter** [1] - 90:15
**letters** [2] - 153:15, 153:20
**letting** [1] - 6:21
**level** [15] - 11:16, 36:20, 74:12, 80:9, 97:25, 111:2, 113:9, 155:10, 156:14, 160:21, 162:16, 162:17, 162:24, 162:25
**levels** [2] - 59:9, 162:20
**Li** [1] - 139:21
**Li-Fraumeni** [1] - 139:21
**liaison** [1] - 74:10
**liars** [1] - 53:6
**library** [1] - 12:22
**license** [2] - 34:18, 91:9
**licensed** [2] - 29:9, 72:24
**lie** [2] - 22:12, 28:12
**lied** [3] - 29:2, 29:3, 35:10
**lies** [8] - 20:14, 20:16, 22:6, 28:7, 30:4, 39:9, 51:11
**life** [2] - 6:23, 44:4
**lifesaving** [1] - 20:22
**lifetime** [4] - 19:1, 27:2, 144:5, 144:9
**light** [3] - 10:19, 14:7, 36:3
**likely** [3] - 26:10, 167:19
**limitations** [4] - 136:23, 136:24, 143:25, 144:1

**limited** [15] - 10:1, 19:20, 33:8, 61:21, 64:25, 95:19, 113:13, 114:18, 119:9, 137:20, 139:21, 144:5, 156:10, 156:18, 161:5
**limiting** [7] - 60:9, 61:20, 62:6, 62:14, 63:20, 64:10, 114:9
**line** [2] - 169:2, 169:5
**lineup** [1] - 167:21
**list** [13] - 8:21, 55:18, 61:16, 67:3, 67:17, 67:19, 120:3, 120:17, 152:7, 152:11, 158:12, 159:9, 167:24
**listed** [19] - 104:7, 104:16, 105:19, 105:20, 106:10, 107:7, 107:11, 110:18, 119:25, 120:2, 121:18, 121:22, 138:11, 139:15, 146:12, 146:14, 147:25, 160:14, 160:16
**listen** [3] - 12:17, 14:11, 32:13
**listening** [2] - 44:22, 128:12
**listing** [1] - 143:12
**lists** [1] - 137:23
**literally** [1] - 152:23
**live** [5] - 12:2, 65:12, 89:22, 133:9, 156:3
**lived** [1] - 127:24
**LLC** [1] - 109:22
**LLP** [1] - 2:5
**Local** [2] - 37:2, 37:5
**local** [8] - 130:24, 131:2, 131:4, 131:11, 132:19, 134:13, 134:19, 161:14
**located** [5] - 18:19, 130:2, 134:3, 164:8, 164:11
**location** [2] - 12:16, 72:10, 104:3
**LOEB** [1] - 2:3
**logo** [1] - 133:25
**Lohan** [1] - 43:13
**look** [23] - 5:16, 15:21, 24:3, 33:25, 34:2, 36:3, 38:14, 45:17, 49:11, 50:7, 50:8, 60:7, 63:22, 66:8, 117:22, 132:12, 133:4, 138:14, 160:12, 163:17, 164:5, 165:9, 167:10
**looked** [6] - 29:15, 104:13, 108:17, 110:13, 155:20, 161:3
**looking** [29] - 47:20, 58:11, 63:18, 71:15, 73:6, 73:7, 73:16, 73:25, 76:25, 89:21, 90:7, 90:8, 92:21, 93:6, 106:8, 107:6, 107:20, 109:2, 109:9, 111:22, 125:16, 142:13, 146:8, 147:20,

149:10, 161:2, 163:15, 166:7, 167:24
**looks** [5] - 59:12, 83:20, 85:9, 104:8, 105:23, 158:25
**losing** [1] - 152:1
**lost** [1] - 142:16
**lower** [1] - 97:25
**lunch** [9] - 4:11, 4:24, 5:1, 7:15, 54:3, 54:5, 63:4, 68:2
**lung** [1] - 149:3
**LUPOWITZ** [1] - 1:21
**lure** [1] - 22:14
**Lynch** [1] - 139:22
**Lynparza** [1] - 144:7

## M

**M-C-M-I-L-L-A-N** [1] - 68:23
**MAC** [29] - 36:23, 37:10, 37:11, 37:16, 42:2, 42:3, 42:8, 42:12, 72:3, 72:8, 77:3, 78:11, 79:13, 82:5, 82:14, 90:18, 130:21, 131:4, 131:10, 133:5, 133:15, 133:16, 133:17, 154:18, 154:4, 155:6, 155:8, 155:12
**machine** [1] - 34:25
**MACs** [28] - 36:23, 37:1, 37:4, 37:6, 37:13, 37:18, 37:19, 37:22, 41:6, 41:8, 42:2, 72:11, 72:21, 79:9, 79:10, 79:11, 131:18, 131:25, 132:19, 133:21, 154:25, 155:9, 155:10, 155:11, 155:25, 157:17
**magic** [1] - 18:17
**Magliocco** [2] - 170:6, 170:12
**Mahmood** [1] - 45:1
**MAHMOOD** [1] - 45:1
**main** [3] - 62:21, 90:14, 113:3
**maintain** [3] - 11:24, 65:22, 94:5
**maintenance** [1] - 148:22
**majority** [1] - 25:7
**makeup** [1] - 19:8
**malformed** [1] - 116:10
**mammogram** [3] - 19:22, 118:19, 120:1
**mammograms** [2] - 119:7, 121:5
**mammography** [2] - 93:3, 120:4
**man** [1] - 47:7
**manage** [1] - 126:19
**management** [6] - 93:16, 109:25, 123:4, 126:15, 139:20, 143:22
**managing** [2] - 93:14,

107:10
**mandated** [1] - 84:18
**manner** [1] - 10:15
**manual** [5] - 59:1, 85:25, 125:23, 131:15, 159:24
**manuals** [3] - 132:3, 132:11
**map** [1] - 133:25
**Maple** [1] - 2:3
**maps** [1] - 12:14
**Marc** [1] - 167:9
**Mark** [1] - 30:20
**marked** [1] - 93:9
**marker** [2] - 121:24, 140:13
**market** [1] - 156:25
**marketers** [7] - 28:15, 28:22, 40:18, 40:19, 40:22, 40:23, 99:16
**marketing** [4] - 27:11, 31:2, 31:3
**mass** [2] - 67:20, 93:3
**massive** [1] - 26:15
**master** [4] - 43:11, 44:20, 45:16
**match** [1] - 66:9
**material** [10] - 61:8, 62:18, 90:12, 136:8, 150:9, 151:25, 152:5, 152:13, 155:22, 170:18
**materially** [1] - 154:12
**matter** [6] - 70:25, 71:5, 71:12, 127:23, 169:19, 170:8
**maximize** [1] - 26:4
**maximized** [1] - 27:6
**McKeon** [7] - 30:20, 45:7, 45:8, 46:22, 48:10, 48:11, 48:24
**McMillan** [58] - 54:23, 60:3, 63:10, 68:15, 68:16, 68:22, 70:9, 70:22, 75:13, 75:18, 92:6, 94:1, 94:8, 95:8, 100:2, 100:25, 103:23, 104:12, 105:4, 105:8, 107:1, 107:20, 108:25, 109:19, 116:1, 119:21, 120:25, 122:10, 122:23, 123:20, 126:16, 127:14, 128:21, 129:1, 133:13, 134:10, 136:19, 137:25, 139:1, 145:5, 145:15, 148:14, 152:13, 154:1, 154:5, 162:12, 163:14, 164:25, 165:12, 165:16, 165:19, 166:6, 166:15, 167:2, 168:9, 169:22, 170:14, 170:20
**MCMILLAN** [2] - 3:3, 68:19
**McMillan's** [4] - 57:16, 58:18, 62:3, 168:23
**mean** [29] - 37:15, 37:17, 37:20, 42:7, 56:11, 60:14, 61:1, 62:6, 65:6, 71:11,

74:14, 83:17, 99:16, 101:13, 102:20, 103:16, 106:2, 115:20, 121:16, 124:18, 129:25, 133:4, 133:18, 134:16, 135:1, 144:9, 149:21, 157:1, 168:21

**meaning** [6] - 79:15, 114:10, 118:25, 131:8, 142:24, 146:23

**meaningful** [1] - 34:1

**meaningless** [2] - 25:13, 33:3

**means** [17] - 10:4, 12:22, 13:1, 13:8, 13:11, 58:17, 59:22, 98:23, 102:21, 102:24, 109:14, 113:14, 124:19, 146:22, 146:24, 148:9, 152:10

**meant** [2] - 23:14, 127:20

**media** [4] - 12:20, 13:5, 54:10, 166:8

**Medicaid** [2] - 76:4, 76:5

**Medical** [3] - 31:3, 109:22, 158:11

**medical** [61] - 21:13, 23:12, 23:24, 25:16, 25:19, 29:17, 33:12, 40:7, 59:18, 70:15, 71:15, 72:1, 72:4, 72:23, 72:24, 73:16, 73:25, 74:8, 74:24, 83:12, 83:25, 84:23, 85:2, 86:4, 88:9, 97:19, 97:21, 97:23, 102:14, 103:3, 103:6, 103:7, 104:4, 109:3, 111:5, 112:13, 112:24, 117:18, 117:24, 123:3, 123:4, 123:12, 125:12, 125:15, 126:7, 126:15, 126:19, 126:22, 132:21, 136:23, 140:3, 141:2, 143:19, 143:22, 145:23, 146:1, 155:7, 155:17, 158:16, 160:8

**medically** [17] - 33:10, 33:14, 85:17, 87:18, 102:13, 102:17, 102:19, 102:22, 103:8, 112:16, 113:11, 117:19, 135:14, 136:13, 139:5, 141:25, 148:3

**Medicare** [343] - 17:20, 18:1, 18:6, 18:10, 18:22, 19:4, 19:10, 19:14, 19:16, 19:20, 20:3, 20:15, 20:18, 21:8, 21:9, 21:12, 21:14, 21:16, 22:1, 22:12, 22:23, 23:11, 23:14, 24:8, 24:15, 26:10, 27:2, 27:3, 27:22, 28:18, 28:21, 29:3, 29:8, 29:25, 30:4, 30:9, 32:6, 32:22, 33:8, 33:9, 33:24, 34:18, 34:23, 35:10, 36:5,

36:10, 36:12, 36:13, 36:16, 36:21, 36:22, 36:24, 36:25, 38:9, 50:20, 50:21, 50:24, 51:10, 54:23, 56:23, 59:15, 61:22, 64:7, 64:13, 64:19, 72:1, 72:3, 72:6, 72:13, 72:22, 73:1, 73:10, 74:2, 74:16, 74:17, 74:19, 74:22, 74:25, 75:2, 75:4, 75:7, 75:14, 75:19, 75:20, 75:21, 75:24, 76:1, 76:2, 76:4, 76:5, 76:11, 76:13, 76:14, 76:17, 77:2, 77:3, 77:6, 77:8, 77:12, 77:14, 77:16, 77:20, 77:22, 78:11, 78:13, 78:22, 78:23, 78:25, 79:2, 79:5, 79:7, 79:9, 79:13, 79:16, 79:17, 79:20, 79:24, 80:5, 80:9, 80:10, 80:19, 80:20, 80:21, 80:22, 80:23, 80:24, 81:7, 81:9, 81:12, 81:17, 82:5, 82:7, 82:12, 82:15, 82:16, 82:17, 82:20, 82:25, 83:18, 83:20, 84:19, 84:20, 85:5, 85:6, 85:9, 85:21, 85:23, 86:6, 86:8, 86:10, 86:13, 86:23, 87:10, 87:12, 87:20, 87:24, 88:6, 88:11, 88:14, 89:7, 89:11, 89:12, 89:16, 90:2, 90:3, 90:5, 90:11, 90:13, 90:18, 90:24, 91:3, 91:7, 91:12, 91:23, 92:12, 92:14, 92:23, 93:10, 93:12, 94:5, 95:12, 95:14, 95:15, 95:16, 95:21, 95:22, 95:25, 96:3, 97:1, 97:2, 97:12, 98:5, 98:13, 98:24, 99:1, 99:7, 99:10, 99:13, 99:14, 99:21, 100:4, 100:7, 100:20, 100:22, 101:11, 101:14, 101:17, 101:24, 101:25, 102:2, 102:8, 102:9, 102:14, 102:15, 102:18, 102:20, 103:10, 103:11, 103:24, 105:5, 105:10, 106:3, 107:3, 107:24, 108:9, 108:18, 108:24, 110:14, 110:15, 110:17, 111:20, 112:3, 112:7, 112:8, 112:13, 112:15, 112:19, 112:21, 112:23, 112:25, 113:4, 113:7, 113:10, 113:11, 114:5, 114:16, 114:22, 114:23, 115:5, 116:12, 117:6, 117:9, 117:16, 118:1, 118:2, 118:22, 118:23, 118:24, 119:2, 119:8, 120:1, 121:2, 121:21, 122:1, 123:13, 124:7, 125:5, 125:10, 125:14, 126:20, 126:24, 127:6, 127:7,

127:10, 127:15, 127:17, 128:5, 130:21, 131:21, 131:22, 132:15, 133:8, 133:9, 133:15, 133:21, 134:3, 134:12, 136:10, 137:3, 137:16, 137:17, 140:23, 142:8, 142:20, 143:16, 143:17, 144:8, 144:12, 144:14, 145:10, 145:22, 147:5, 147:18, 148:5, 148:9, 148:18, 150:16, 150:18, 150:20, 150:21, 150:24, 152:14, 154:13, 155:2, 156:9, 156:18, 156:20, 157:5, 157:7, 157:18, 157:24, 158:9, 158:22, 158:24, 161:13

**Medicare's** [6] - 20:5, 22:11, 71:19, 101:13, 103:13, 110:8

**Medicare-eligible** [1] - 137:16

**medication** [4] - 142:14, 142:15, 156:14, 157:6

**medications** [3] - 19:8, 147:1, 156:13

**medicine** [5] - 26:1, 29:19, 35:6, 109:25, 157:13

**MedTech** [1] - 31:1

**meet** [13] - 53:12, 59:4, 83:21, 111:5, 111:7, 118:16, 120:9, 120:11, 125:12, 137:7, 142:1, 145:23, 148:8

**meeting** [2] - 139:9, 170:24

**meets** [4] - 83:17, 103:7, 139:18, 155:16

**member** [3] - 12:11, 116:11, 137:16

**members** [10] - 18:8, 29:21, 32:9, 64:5, 73:20, 73:23, 114:15, 124:22, 125:3, 142:19

**memory** [4] - 10:15, 15:16, 15:17, 15:18

**men** [1] - 17:21

**mentioned** [13] - 11:19, 13:6, 76:21, 77:3, 77:21, 79:3, 81:1, 82:4, 84:1, 91:5, 98:13, 154:6, 154:15

**mentioning** [2] - 117:11, 145:17

**messages** [3] - 13:2, 33:18, 50:6

**met** [9] - 48:21, 98:11, 123:13, 139:6, 139:17, 143:20, 144:11, 150:18, 150:23

**metabolize** [1] - 156:14

**metropolitan** [1] - 127:21

**Miami** [1] - 1:3

**microphone** [1] - 68:21

**middle** [5] - 36:8, 40:17, 42:16, 42:19, 42:21

**middlemen** [4] - 24:22, 24:24, 24:25, 35:6

**might** [31] - 4:10, 28:20, 55:7, 67:21, 76:16, 78:6, 80:18, 80:24, 81:21, 85:14, 85:17, 92:1, 93:11, 99:4, 102:19, 118:19, 121:24, 131:2, 132:10, 133:3, 133:4, 135:13, 135:14, 138:4, 141:14, 141:15, 150:15, 155:18, 156:1, 156:15, 160:4

**million** [6] - 18:7, 36:7, 38:18, 38:21, 51:1, 86:1

**millions** [4] - 17:20, 18:11, 27:19, 27:21

**Minal** [20] - 4:3, 17:22, 17:24, 18:9, 35:4, 35:6, 50:8, 93:22, 101:4, 101:13, 104:8, 104:16, 104:18, 105:19, 107:12, 108:6, 108:15, 109:11, 110:4, 110:6

**MINAL** [1] - 1:6

**mind** [8] - 10:24, 11:15, 48:25, 64:16, 64:23, 65:17, 114:25, 147:24

**minimum** [2] - 87:1, 87:2

**minute** [5] - 45:14, 112:5, 151:11, 152:20, 153:6

**minutes** [3] - 36:2, 151:21, 152:21

**misleading** [1] - 23:18

**miss** [1] - 68:5

**missed** [1] - 167:24

**misstatement** [1] - 65:5

**mistake** [1] - 39:22

**mistaken** [1] - 14:8

**mistakes** [1] - 85:12

**mistrust** [1] - 51:12

**mockery** [1] - 35:5

**model** [1] - 28:19

**modified** [1] - 66:6

**molecular** [4] - 143:2, 150:11, 159:20, 163:21

**moment** [9] - 4:7, 8:23, 16:5, 40:14, 55:3, 92:15, 111:10, 143:16, 164:21

**money** [45] - 18:4, 19:11, 26:12, 29:24, 30:4, 30:5, 30:8, 30:10, 31:8, 34:12, 34:14, 34:22, 35:10, 36:4, 36:10, 38:10, 38:14, 38:17, 38:22, 38:23, 50:18, 78:7, 78:24, 79:1, 79:9, 79:11, 79:20, 79:25, 80:3, 81:10, 82:22, 83:3, 83:13, 83:16, 85:9, 87:3, 89:22, 97:17,

97:22, 98:3, 98:10, 102:4, 111:20, 112:11

**monitor** [1] - 92:16
**monthly** [2] - 41:22, 42:15
**months** [2] - 41:23, 46:3
**morning** [12] - 4:4, 5:23, 6:5, 6:15, 6:17, 6:21, 17:16, 17:17, 35:18, 35:19, 166:22, 168:12
**mortality** [1] - 149:6
**most** [8] - 53:1, 55:13, 56:1, 84:18, 120:2, 132:6, 148:25, 149:5
**motion** [3] - 46:8, 47:21, 48:16
**mouths** [1] - 18:15
**move** [12] - 45:7, 46:10, 67:10, 67:13, 67:20, 68:25, 75:13, 116:19, 135:20, 136:21, 152:10, 165:23
**moved** [9] - 9:18, 67:11, 72:12, 72:15, 72:18, 73:6, 120:15, 120:20, 158:15
**moving** [3] - 58:6, 149:8, 152:17
**MR** [38] - 5:8, 5:19, 6:6, 35:16, 35:18, 35:20, 38:21, 55:7, 55:11, 60:11, 61:4, 62:23, 63:6, 63:25, 65:1, 65:3, 65:13, 66:12, 66:20, 69:16, 92:15, 93:18, 113:20, 113:23, 116:15, 120:18, 121:8, 153:1, 161:20, 161:24, 163:11, 163:25, 164:17, 169:17, 169:24, 170:5, 171:4, 171:8
**MS** [134] - 3:4, 4:18, 4:23, 5:5, 5:13, 6:2, 17:15, 17:18, 38:19, 54:22, 56:18, 57:9, 58:21, 58:22, 58:24, 63:11, 66:23, 67:15, 68:9, 68:14, 68:24, 69:3, 70:6, 70:8, 75:12, 75:17, 92:3, 92:5, 92:20, 93:19, 93:20, 95:5, 95:6, 95:7, 103:20, 103:22, 105:1, 105:3, 107:16, 107:19, 108:21, 108:23, 109:16, 109:18, 111:10, 111:12, 111:13, 111:14, 113:18, 115:12, 115:13, 115:15, 115:17, 115:22, 115:25, 116:19, 116:22, 119:18, 119:20, 120:14, 120:21, 120:24, 121:11, 122:7, 122:9, 122:20, 122:22, 123:17, 123:19, 126:10, 126:12, 127:12, 127:13, 128:18, 128:20, 128:24, 128:25, 129:5, 129:9, 129:12, 133:10,

133:12, 134:7, 134:9, 134:22, 134:24, 135:17, 135:21, 136:15, 136:18, 137:10, 137:22, 137:24, 138:6, 138:8, 138:22, 138:25, 139:24, 140:2, 141:4, 141:6, 142:3, 142:5, 143:5, 143:7, 143:13, 143:14, 143:23, 144:2, 144:25, 145:4, 148:11, 148:13, 149:23, 149:25, 150:17, 151:5, 151:21, 154:3, 154:4, 162:9, 162:11, 163:19, 164:15, 164:21, 164:24, 165:10, 167:3, 168:1, 168:5, 168:16, 169:14, 171:1, 171:13
**multigene** [3] - 138:23, 139:2, 139:4
**multiple** [5] - 48:4, 48:23, 88:10, 156:24, 165:1
**multispecialty** [1] - 109:24
**must** [22] - 7:22, 8:2, 8:4, 8:5, 8:20, 9:20, 10:24, 11:13, 12:9, 12:25, 13:6, 13:12, 14:14, 38:9, 38:15, 89:12, 122:25, 129:13, 137:4, 137:9, 141:21, 145:11
**mutation** [4] - 121:24, 137:13, 137:20, 148:16
**mutations** [2] - 19:2, 149:11
**MyOnCallDoc** [1] - 31:1

## N

**name** [27] - 15:20, 43:13, 45:1, 49:25, 50:1, 50:2, 68:21, 68:22, 68:23, 72:13, 75:24, 78:14, 87:8, 88:24, 93:16, 93:21, 101:1, 104:15, 105:17, 106:17, 107:11, 108:12, 109:2, 109:9, 109:21, 110:2, 113:3
**named** [1] - 49:19
**names** [6] - 31:5, 31:9, 108:13, 167:23, 167:24, 168:2
**narrative** [1] - 162:5
**narrow** [1] - 164:19
**nation** [3] - 132:18, 133:8, 157:20
**National** [1] - 36:18
**national** [8] - 36:20, 37:12, 70:16, 70:19, 130:23, 132:17, 135:11, 136:11
**Nationally** [2] - 145:1, 145:6
**nationally** [2] - 136:16, 136:24

**nationwide** [1] - 36:20
**nature** [3] - 59:18, 128:6, 131:19
**NCCN** [2] - 139:9, 139:19
**NCDs** [2] - 36:19
**NE** [1] - 2:3
**nearly** [1] - 20:17
**Nebraska** [1] - 70:13
**necessarily** [4] - 56:14, 58:19, 119:24, 169:3
**necessary** [29] - 33:10, 33:14, 85:17, 87:18, 102:13, 102:17, 102:19, 102:23, 112:16, 113:12, 116:9, 116:13, 116:24, 117:2, 117:20, 123:7, 123:22, 123:24, 132:22, 135:15, 136:13, 139:6, 139:14, 142:1, 143:19, 144:8, 145:7, 148:4, 150:16
**necessities** [1] - 155:8
**necessity** [8] - 40:8, 102:14, 111:6, 125:12, 126:7, 136:23, 141:2, 145:23
**need** [45] - 4:11, 4:16, 6:4, 7:18, 17:22, 20:6, 20:11, 29:8, 35:8, 40:5, 41:19, 56:8, 56:10, 56:16, 58:9, 67:3, 67:6, 95:11, 99:6, 101:19, 103:6, 103:7, 106:25, 117:14, 118:2, 123:9, 124:18, 138:13, 140:7, 143:22, 144:11, 144:13, 144:24, 146:1, 151:7, 152:9, 152:12, 153:20, 153:22, 157:12, 163:16, 164:19, 167:9, 169:12
**needed** [16] - 24:1, 24:4, 26:8, 27:4, 27:12, 29:11, 32:3, 34:17, 34:18, 34:19, 98:19, 146:2, 147:8, 155:20, 165:8, 169:2
**needs** [7] - 5:24, 55:6, 56:11, 79:8, 97:19, 98:11, 103:4, 112:17, 112:18, 125:6, 126:21, 130:1, 152:5, 162:6, 167:11, 169:8, 170:23
**neglected** [1] - 66:23
**Network** [1] - 90:24
**networking** [1] - 13:3
**never** [14] - 21:1, 21:2, 22:13, 25:9, 25:11, 40:25, 44:13, 44:15, 46:13, 49:22, 50:1, 110:25, 125:9, 144:15
**new** [7] - 48:15, 48:21, 48:23, 93:9, 135:7, 169:5
**New** [4] - 1:16, 131:20, 167:4, 168:1
**news** [2] - 12:19, 14:12
**newspapers** [1] - 12:19

**next** [10] - 16:7, 94:12, 114:13, 124:16, 136:21, 137:11, 139:4, 152:21, 165:23, 167:19
**next-generation** [1] - 139:4
**NGS** [1] - 139:5
**Nice** [1] - 43:1
**Nick** [1] - 49:19
**night** [1] - 166:19
**NO** [1] - 1:2
**nobody** [2] - 86:6, 89:21
**Noncovered** [2] - 145:2, 145:6
**noncovered** [1] - 145:7
**none** [6] - 10:12, 20:10, 34:16, 35:1, 48:24, 49:7
**normal** [2] - 124:11, 124:15
**notated** [1] - 109:24
**notation** [1] - 154:7
**note** [3] - 15:11, 68:5, 119:5
**note-taking** [2] - 15:11, 68:5
**notebook** [1] - 15:19
**noted** [3] - 113:5, 138:12, 154:7
**notepads** [4] - 15:4, 54:2, 151:11, 166:17
**notes** [13] - 15:7, 15:9, 15:13, 15:14, 15:15, 15:16, 15:20, 15:21, 15:24, 16:1, 68:6, 113:10, 166:19
**nothing** [3] - 11:3, 28:10, 167:10
**Notice** [1] - 145:11
**notice** [2] - 170:5, 170:9
**notify** [1] - 167:22
**noting** [1] - 122:16
**November** [1] - 1:4
**Novitas** [9] - 37:11, 42:8, 78:14, 78:18, 78:19, 82:14, 107:25, 133:17, 157:16
**number** [21] - 4:2, 21:8, 23:15, 26:20, 83:11, 89:15, 89:17, 89:18, 90:22, 91:5, 93:18, 95:5, 114:4, 129:11, 161:4, 161:9, 161:19, 162:17, 162:18, 162:21, 167:12
**nurse** [1] - 70:12
**nursing** [1] - 71:22
**NW** [1] - 1:18

## O

**o'clock** [1] - 7:5
**oath** [3] - 15:2, 169:23, 170:23
**object** [7] - 5:6, 9:16, 61:11, 116:15, 121:8, 161:20, 164:17

**objecting** [1] - 58:16
**objection** [22] - 9:17, 9:19, 9:21, 38:19, 55:8, 55:11, 55:14, 56:5, 56:9, 57:11, 58:3, 59:11, 61:10, 61:18, 62:21, 67:12, 69:15, 69:17, 120:18, 163:11, 163:25
**objections** [3] - 9:1, 170:9, 170:19
**objects** [1] - 120:17
**obligations** [1] - 170:2
**observation** [1] - 65:13
**observations** [1] - 160:25
**observed** [2] - 32:21, 108:19
**obtain** [4] - 21:21, 21:22, 89:14, 90:16
**obtained** [2] - 70:15, 145:12
**obtaining** [1] - 91:5
**obvious** [3] - 26:1, 27:18, 118:18
**obviously** [4] - 63:2, 81:17, 82:19, 169:22
**October** [1] - 105:22
**odds** [1] - 26:21
**OF** [5] - 1:1, 1:3, 1:9, 1:15, 1:18
**offense** [2] - 54:6, 166:11
**offer** [2] - 99:8, 170:17
**offered** [2] - 23:8, 52:23
**offering** [1] - 55:19
**offers** [2] - 9:14, 22:20
**office** [5] - 78:21, 109:8, 128:1, 129:19, 132:9
**Office** [1] - 73:22
**OFFICE** [1] - 1:18
**OFFICER** [5] - 6:10, 6:13, 54:14, 67:9, 151:16
**offices** [2] - 27:11, 28:9
**official** [13] - 100:16, 101:1, 101:2, 101:16, 106:20, 108:8, 108:12, 109:11, 109:14, 110:3, 110:4, 110:9, 110:11
**Official** [1] - 1:22
**official's** [1] - 105:17
**officials** [1] - 110:16
**often** [4] - 14:16, 148:20, 161:12, 163:1
**OIG** [1] - 73:22
**older** [1] - 75:22
**on-site** [2] - 74:8, 90:21
**on-sites** [1] - 74:9
**once** [16] - 5:23, 14:5, 24:5, 24:6, 27:2, 27:3, 48:5, 48:22, 54:20, 58:4, 67:16, 89:16, 89:19, 90:14, 144:5, 144:9
**once-in-a-lifetime** [1] - 27:2
**oncologist** [1] - 144:16

**oncology** [1] - 156:11
**one** [92] - 6:18, 7:12, 13:22, 15:24, 18:20, 21:8, 23:5, 24:1, 24:7, 24:11, 26:5, 26:10, 31:5, 31:7, 34:21, 34:22, 34:24, 36:1, 42:2, 43:15, 43:22, 43:23, 45:5, 46:24, 49:6, 51:15, 57:13, 57:19, 58:9, 58:22, 58:25, 60:8, 60:17, 68:9, 72:16, 78:13, 78:14, 83:11, 85:25, 86:11, 88:1, 90:6, 90:13, 91:9, 91:17, 92:15, 102:15, 103:14, 104:13, 105:23, 111:10, 123:23, 125:25, 128:5, 129:19, 130:19, 132:6, 134:12, 137:7, 139:19, 139:23, 141:12, 141:14, 144:15, 146:13, 147:16, 147:25, 149:18, 152:5, 153:15, 156:20, 156:23, 159:19, 161:3, 161:4, 162:5, 163:9, 163:10, 164:3, 164:21, 165:6, 165:7, 166:3, 166:19, 168:3, 168:8
**ones** [4] - 46:9, 120:2, 138:19
**online** [5] - 96:6, 107:4, 132:12, 160:7, 160:11
**open** [7] - 5:6, 15:22, 27:17, 42:10, 114:2, 162:8, 171:6
**opening** [12] - 4:10, 5:19, 5:22, 7:12, 8:22, 16:6, 16:8, 16:9, 16:25, 52:7, 114:8, 171:10
**openings** [5] - 4:9, 5:4, 5:10, 6:4, 68:11
**operated** [1] - 17:25
**operates** [1] - 99:1
**opinion** [2] - 8:9, 14:21
**opportunities** [1] - 89:24
**opportunity** [6] - 10:13, 53:2, 53:20, 62:24, 65:20, 114:6
**opposed** [3] - 66:10, 150:5, 169:7
**opt** [5] - 52:8, 52:9, 52:19, 52:20
**opt-in** [2] - 52:9, 52:19
**opt-ins** [1] - 52:8
**opting** [1] - 52:21
**option** [1] - 45:12
**options** [1] - 141:1
**orchestrated** [1] - 33:21
**Order** [1] - 4:1
**order** [21] - 9:23, 11:19, 20:7, 22:16, 24:12, 24:13, 26:17, 30:4, 98:10, 103:2, 106:22, 122:18, 124:9, 125:7, 140:25, 144:16,

147:25, 150:21, 156:22, 157:3, 163:17
**ordered** [18] - 20:12, 25:10, 32:25, 81:20, 81:22, 103:11, 103:14, 123:1, 123:6, 123:18, 123:21, 123:25, 125:9, 125:17, 140:24, 143:20, 144:15, 157:6
**ordering** [7] - 96:24, 97:9, 97:23, 97:24, 103:15, 122:24, 123:11
**orders** [7] - 21:22, 25:3, 26:3, 26:15, 27:9, 28:23, 30:8
**ordinarily** [1] - 165:5
**organization** [7] - 76:3, 101:17, 108:9, 109:5, 109:15, 110:10, 110:17
**organized** [1] - 57:5
**origin** [1] - 57:17
**original** [1] - 126:4
**originating** [2] - 129:19, 130:2
**otherwise** [4] - 13:12, 53:11, 65:16, 111:25
**ourselves** [1] - 4:10
**outcome** [1] - 10:16
**outline** [1] - 16:6
**outlines** [1] - 138:19
**outside** [4] - 8:11, 14:21, 58:7, 127:21
**ovarian** [7] - 137:2, 137:5, 139:4, 145:13, 146:9, 149:3, 149:15
**overall** [1] - 110:12
**override** [7] - 131:8, 131:10, 131:18, 133:6, 147:21, 155:6, 157:19
**overriding** [1] - 132:20
**overrule** [3] - 9:17, 61:18, 164:19
**overruled** [5] - 38:20, 116:17, 121:10, 163:12, 164:1
**oversaw** [1] - 18:18
**overtly** [1] - 96:23
**overutilization** [1] - 97:23
**Overview** [1] - 148:12
**overview** [1] - 57:16
**overwhelm** [1] - 50:5
**owe** [2] - 78:6
**own** [15] - 15:16, 22:1, 22:2, 23:13, 32:9, 33:13, 37:5, 37:16, 61:1, 90:19, 118:1, 118:5, 118:6, 155:5, 164:13
**owned** [3] - 17:25, 31:1, 49:18
**owner** [8] - 18:18, 34:21, 37:25, 93:22, 101:5, 104:16, 105:19, 107:15

**owners** [2] - 30:22, 34:17
**ownership** [6] - 72:15, 93:13, 93:16, 106:11, 107:9, 110:18

**P**

**p.m** [12] - 1:5, 54:15, 63:13, 63:14, 67:22, 92:19, 151:17, 153:7, 153:8, 153:10, 166:24, 171:15
**P.W** [3] - 168:2, 168:4, 168:13
**page** [24] - 15:19, 65:12, 92:21, 93:6, 93:15, 93:18, 94:12, 105:23, 107:11, 108:2, 108:4, 129:10, 135:18, 136:17, 136:20, 136:21, 137:11, 138:7, 138:22, 143:24, 149:24, 152:1, 152:19
**PAGE** [1] - 3:2
**pages** [1] - 57:13
**Pages** [1] - 1:7
**paid** [41] - 19:17, 22:15, 23:2, 24:21, 24:24, 24:25, 25:8, 26:11, 28:17, 28:19, 29:10, 30:6, 36:6, 36:10, 38:13, 44:14, 50:24, 51:10, 78:6, 82:3, 82:16, 82:25, 83:9, 83:11, 83:16, 85:22, 86:5, 86:17, 86:21, 87:21, 96:24, 97:8, 97:12, 99:23, 99:24, 102:6, 111:8, 112:23, 118:1, 155:15
**Pain** [2] - 109:5, 109:6
**pain** [3] - 109:15, 109:24, 117:18
**PALM** [1] - 1:2
**Palmetto** [16] - 37:11, 42:3, 42:4, 72:13, 78:14, 78:16, 78:17, 82:11, 133:18, 133:20, 134:11, 154:6, 154:15, 154:25, 157:16
**pancreatic** [2] - 137:6, 146:10
**pandemic** [3] - 127:18, 130:13, 130:16
**panel** [8] - 26:7, 26:16, 139:11, 141:7, 141:10, 141:13, 141:17, 143:15
**panels** [5] - 138:23, 139:2, 139:5, 139:13, 141:18
**paper** [4] - 25:6, 28:13, 34:2, 107:6
**paperwork** [5] - 28:13, 77:23, 83:24, 108:16, 108:18
**paragraph** [3] - 95:9, 96:7
**paralegal** [1] - 68:10
**parentheses** [1] - 160:4

**Part** [24] - 72:2, 72:6, 72:17, 73:5, 73:8, 80:9, 80:10, 80:12, 80:14, 80:16, 80:17, 80:18, 80:20, 80:21, 80:22, 80:24, 81:2, 82:11, 82:12, 93:3, 116:5

**part** [16] - 10:11, 22:18, 22:19, 28:13, 35:25, 36:13, 36:15, 74:6, 76:8, 86:15, 97:9, 117:3, 123:23, 126:16, 140:18, 147:2

**partake** [1] - 76:19

**participated** [2] - 74:1, 74:5

**participation** [1] - 95:21

**particular** [13] - 56:8, 73:3, 78:11, 92:23, 93:7, 101:9, 104:1, 105:20, 109:3, 123:24, 135:22, 135:24, 157:5

**particularly** [1] - 89:2

**parties** [2] - 14:19, 97:17

**partnered** [2] - 30:22, 31:6

**partners** [7] - 20:15, 20:16, 21:4, 25:21, 43:1, 43:15

**parts** [3] - 32:4, 80:5, 80:7

**party** [1] - 14:9

**passed** [3] - 33:23, 70:13, 149:13

**passing** [1] - 70:16

**past** [5] - 41:21, 146:23, 147:2, 147:5, 147:15

**Patel** [66] - 4:3, 7:25, 10:25, 11:4, 17:22, 17:24, 18:9, 35:4, 35:6, 36:1, 37:25, 38:6, 38:15, 39:12, 39:18, 40:2, 40:10, 40:22, 41:16, 41:23, 42:17, 43:6, 43:7, 43:19, 43:24, 44:8, 44:10, 44:13, 44:15, 44:21, 45:3, 46:19, 47:16, 48:8, 49:18, 49:22, 49:23, 49:24, 49:25, 50:1, 50:8, 50:12, 50:19, 51:13, 51:15, 52:24, 53:7, 53:13, 65:24, 93:22, 101:4, 101:13, 101:21, 104:16, 104:18, 104:21, 105:19, 106:20, 107:12, 108:6, 108:15, 108:17, 109:11, 110:4

**PATEL** [1] - 1:6

**Patel's** [5] - 39:14, 48:22, 107:13, 109:12, 110:6

**pathology** [1] - 163:21

**pathways** [1] - 148:21

**patience** [1] - 68:1

**patient** [78] - 20:6, 20:7, 20:9, 22:15, 22:16, 22:17, 22:22, 23:25, 24:17, 25:14, 27:7, 27:8, 27:19, 27:25, 28:5, 28:8, 28:15, 29:11, 29:12, 30:6, 30:7, 30:21, 31:25, 32:10, 33:22, 33:23, 34:1, 39:20, 39:24, 40:4, 40:6, 40:8, 52:1, 52:2, 98:7, 98:10, 98:19, 103:19, 113:17, 122:18, 123:24, 123:25, 124:4, 124:6, 124:7, 124:10, 124:12, 124:23, 125:5, 125:6, 125:8, 125:9, 125:12, 125:15, 125:19, 126:2, 126:3, 126:6, 127:8, 127:9, 128:12, 138:4, 140:6, 141:22, 141:25, 142:7, 142:10, 143:17, 144:6, 144:14, 144:19, 147:7, 148:3, 150:4, 150:13, 165:7

**patient's** [6] - 24:18, 25:15, 25:23, 103:3, 103:11, 127:7

**patients** [42] - 20:11, 20:12, 20:23, 20:24, 21:1, 21:21, 22:6, 22:14, 22:17, 23:4, 23:10, 23:21, 23:23, 24:1, 24:4, 24:6, 24:7, 24:24, 25:9, 25:11, 26:3, 26:5, 26:8, 26:19, 27:9, 27:21, 28:11, 28:23, 29:7, 29:16, 29:18, 29:20, 31:17, 33:5, 34:5, 34:7, 35:4, 51:12, 98:9, 137:1, 150:2, 156:11

**patients'** [3] - 23:22, 25:22, 33:15

**Patricia** [2] - 167:4, 168:1

**pawns** [1] - 33:6

**pay** [35] - 21:20, 24:15, 24:25, 28:15, 29:23, 37:3, 40:23, 40:24, 41:11, 41:19, 41:22, 50:24, 51:2, 80:1, 81:13, 97:2, 98:13, 98:24, 99:10, 99:14, 102:9, 103:11, 112:13, 113:2, 113:10, 116:12, 117:25, 118:6, 118:9, 118:25, 133:22, 142:20, 150:22, 170:17

**payable** [6] - 36:12, 80:2, 96:18, 118:15, 118:17, 156:12

**paying** [14] - 20:3, 25:3, 25:5, 28:2, 28:23, 38:9, 41:25, 43:23, 72:5, 80:1, 99:11, 99:13, 100:7

**payment** [38] - 12:8, 21:13, 22:1, 70:24, 71:10, 71:13, 71:17, 71:19, 72:25, 73:10, 73:17, 77:8, 77:9, 77:15, 77:24, 79:7, 79:13, 80:12, 83:18, 85:12, 86:10, 86:25, 88:8, 88:9, 95:16, 100:4, 102:18, 104:3, 111:7, 116:4, 117:1, 141:25, 142:1, 144:12, 150:21, 151:2, 155:18

**payments** [2] - 27:19, 30:1

**pays** [9] - 75:2, 77:14, 80:17, 99:21, 112:15, 113:4, 113:11, 121:22, 127:6

**PC** [2] - 1:18, 2:3

**Peachtree** [1] - 1:18

**Peactree** [1] - 2:6

**peculiar** [1] - 65:15

**pelvic** [2] - 120:4, 121:5

**penalties** [4] - 94:2, 94:3, 105:7, 105:11

**Pennsylvania** [8] - 42:9, 42:11, 42:13, 78:19, 82:13, 133:16, 134:5, 164:8

**people** [67] - 8:11, 12:1, 13:14, 17:19, 20:13, 21:2, 21:10, 22:18, 22:22, 22:23, 23:15, 23:17, 26:20, 26:24, 27:3, 28:3, 30:18, 30:19, 31:9, 32:4, 32:6, 32:19, 34:11, 34:15, 34:16, 35:7, 35:9, 38:1, 38:2, 40:21, 41:12, 42:11, 43:8, 46:24, 48:4, 48:9, 50:2, 50:11, 50:13, 51:4, 52:23, 52:24, 53:5, 59:25, 72:23, 73:13, 75:22, 75:23, 90:7, 97:10, 97:12, 97:23, 111:4, 118:19, 119:7, 127:23, 127:25, 128:13, 133:2, 142:7, 152:7, 158:14, 168:19

**people's** [1] - 18:15

**percent** [1] - 149:10

**percentage** [3] - 28:17, 28:18, 149:20

**perform** [6] - 46:13, 46:20, 88:10, 91:9, 140:3, 140:8

**performed** [5] - 18:21, 29:10, 122:14, 139:8, 143:21

**performing** [1] - 99:10

**perhaps** [7] - 59:10, 125:21, 142:25, 144:15, 150:8, 152:11, 168:13

**period** [10] - 36:7, 41:7, 42:23, 45:13, 98:24, 135:3, 135:22, 136:5, 154:20, 155:24

**peritoneal** [2] - 137:6, 146:10

**permit** [4] - 13:18, 13:19, 13:23, 14:2

**permitted** [1] - 9:15

**permitting** [2] - 64:6, 114:15

**person** [18] - 12:7, 12:10, 25:11, 27:3, 34:9, 34:22, 34:24, 43:9, 43:13, 46:23, 47:17, 79:16, 80:14, 125:4, 129:15, 142:20

**person's** [4] - 124:22,

125:3, 142:8, 142:18

**personal** [25] - 11:18, 23:1, 23:22, 30:9, 37:18, 37:19, 42:8, 139:12, 139:14, 139:15, 139:16, 141:7, 145:20, 145:24, 146:3, 146:9, 146:16, 146:17, 146:21, 147:2, 147:3, 147:13, 147:14, 147:24, 161:6

**personalized** [1] - 120:13

**personnel** [1] - 103:5

**perspective** [4] - 101:13, 110:8, 125:14, 158:9

**pertain** [1] - 143:21

**pertinent** [2] - 128:16, 141:24

**PGx** [6] - 19:6, 19:13, 19:16, 156:4, 157:6

**pharmacogenetic** [6] - 19:5, 156:9, 156:17, 156:19, 157:3, 157:11

**pharmacogenetics** [3] - 156:7, 156:11, 156:22

**pharmacogenomics** [1] - 156:4

**pharmacy** [1] - 80:25

**phone** [2] - 23:21, 40:15

**phrases** [1] - 14:16

**physical** [4] - 80:15, 120:9, 142:25, 150:8

**physically** [1] - 86:3

**physician** [25] - 52:15, 77:8, 77:11, 79:17, 103:11, 103:14, 103:16, 103:17, 117:17, 123:1, 123:2, 123:6, 123:21, 124:15, 125:20, 125:22, 125:25, 126:1, 126:4, 126:13, 129:20, 140:24, 144:15, 157:15

**physicians** [1] - 164:11

**pick** [2] - 165:18, 166:20

**picked** [1] - 144:19

**picture** [4] - 40:20, 40:22, 41:10, 133:14

**pictured** [1] - 30:18

**piece** [4] - 8:18, 25:6, 131:16, 141:22

**pieces** [1] - 55:19

**pinpoint** [1] - 38:7

**place** [6] - 12:14, 14:2, 14:3, 14:6, 16:17, 128:16

**places** [1] - 12:12

**plan** [9] - 4:8, 5:17, 7:8, 47:19, 120:13, 140:12, 140:19, 150:4, 167:3

**planned** [2] - 139:10, 146:25

**play** [1] - 76:11

**playing** [1] - 98:4

**plays** [1] - 77:4
**plea** [3] - 31:22, 45:17, 45:20
**pled** [1] - 46:17
**plenty** [2] - 34:14
**plot** [1] - 30:22
**pocket** [1] - 118:7
**point** [16] - 11:15, 23:6, 23:7, 38:7, 42:1, 43:20, 45:8, 56:6, 62:3, 116:16, 151:23, 154:15, 161:24, 163:13, 168:21, 169:4
**pointed** [2] - 52:24, 168:22
**policy** [6] - 7:4, 70:24, 71:10, 130:19, 136:25, 145:14
**policy-related** [1] - 130:19
**pop** [1] - 19:14
**population** [6] - 19:22, 23:15, 145:9, 149:17, 149:19, 149:21
**portable** [1] - 93:4
**portions** [1] - 59:7
**position** [3] - 44:5, 50:17, 147:11
**possible** [8] - 17:23, 44:5, 60:7, 84:6, 84:8, 87:23, 167:15, 170:7
**possibly** [1] - 87:13
**post** [3] - 88:8, 88:9, 155:18
**post-payment** [3] - 88:8, 88:9, 155:18
**posted** [1] - 168:17
**posting** [1] - 13:8
**postpayment** [3] - 83:19, 85:11, 85:13
**posttest** [3] - 139:8, 140:12, 140:17
**potential** [1] - 20:21
**potentially** [2] - 58:7, 79:21
**practice** [10] - 23:13, 33:13, 92:25, 104:3, 109:2, 109:3, 109:6, 109:8, 109:23, 162:3
**practitioner** [4] - 125:25, 126:1, 129:20, 130:5
**preadmit** [1] - 4:19
**precautions** [1] - 90:3
**prechecking** [1] - 26:16
**predisposition** [1] - 124:23
**prefilling** [1] - 26:16
**prejudice** [2] - 10:17, 53:16
**preliminary** [3] - 4:8, 5:21, 7:20
**premature** [2] - 13:25, 14:1
**premise** [1] - 59:11
**premises** [2] - 12:12, 12:13
**prepandemic** [1] - 127:19
**prepared** [1] - 51:22
**preparing** [1] - 153:15

**prescribed** [1] - 166:1
**prescription** [1] - 24:16
**present** [12] - 7:12, 11:8, 16:11, 16:13, 16:15, 37:21, 40:9, 56:10, 58:5, 67:3, 100:3, 166:14
**presented** [4] - 8:6, 14:15, 57:5, 100:4
**presenting** [2] - 117:17, 147:7
**presently** [1] - 63:16
**presents** [1] - 77:8
**presumed** [1] - 11:1
**pretest** [2] - 139:6, 139:25
**pretesting** [2] - 140:4, 140:8
**pretty** [1] - 167:17
**prevent** [1] - 77:1
**preventative** [1] - 120:11
**prevention** [1] - 120:13
**preventive** [2] - 116:7, 120:8
**preview** [1] - 54:19
**previous** [1] - 75:11
**previously** [11] - 69:16, 75:6, 92:3, 103:21, 105:2, 106:24, 107:17, 108:21, 109:16, 111:22, 144:6
**preyed** [1] - 17:19
**primarily** [1] - 22:24
**primary** [2] - 137:6, 146:10, 147:11
**principal** [1] - 147:10
**principles** [1] - 7:19
**private** [7] - 37:1, 58:25, 59:1, 59:17, 71:2, 71:4, 71:15
**prize** [1] - 22:19
**probative** [1] - 66:1
**problem** [13] - 5:4, 28:15, 28:21, 44:10, 57:22, 57:23, 63:5, 123:3, 123:5, 125:7, 126:15, 126:19, 126:22
**problematic** [1] - 62:12
**problems** [1] - 122:19
**procedural** [4] - 162:18, 162:21, 162:22, 162:23
**procedure** [11] - 46:6, 158:2, 158:7, 158:8, 160:16, 160:20, 160:22, 162:16, 163:8, 163:21, 165:6
**procedures** [5] - 158:17, 160:18, 161:11, 163:9, 165:5
**proceed** [4] - 69:2, 70:5, 75:16, 115:10
**proceedings** [2] - 113:22, 161:23
**Proceedings** [2] - 114:2, 162:8
**process** [8] - 84:11, 86:24,

88:2, 89:13, 90:7, 91:6, 133:22, 144:23
**processed** [3] - 82:7, 83:16, 155:15
**processes** [4] - 75:15, 77:6, 77:20, 160:19
**processing** [4] - 76:18, 77:4, 82:4, 155:8
**produced** [1] - 41:20
**professional** [5] - 70:14, 127:21, 139:7, 139:9, 140:18
**professionals** [2] - 23:24, 25:19
**professors** [2] - 153:16, 153:19
**profitable** [1] - 17:23
**profited** [1] - 34:10
**program** [22] - 12:15, 21:9, 48:15, 75:19, 75:22, 76:2, 76:5, 76:7, 76:11, 76:13, 80:19, 80:23, 86:13, 91:12, 94:5, 95:13, 95:14, 95:18, 95:22, 100:19, 100:20, 134:3
**Program** [1] - 76:24
**programmed** [1] - 148:24
**progress** [2] - 156:15, 156:16
**progressing** [1] - 160:7
**progression** [1] - 148:23
**project** [1] - 128:15
**promise** [7] - 15:2, 22:1, 85:9, 86:13, 95:23, 100:8, 102:13
**promised** [3] - 8:3, 13:22, 89:5
**promises** [11] - 21:14, 21:16, 21:18, 21:19, 21:23, 88:3, 91:11, 91:15, 95:1, 101:24, 104:22
**promising** [4] - 22:10, 91:19, 91:20, 91:22
**promulgate** [1] - 37:2
**promulgates** [1] - 37:16
**pronouncing** [1] - 170:6
**proof** [5] - 11:3, 11:6, 11:16, 30:13, 53:12
**proper** [2] - 6:25, 62:9
**properly** [1] - 12:9
**propose** [1] - 63:3
**proposed** [1] - 63:23
**prosecution** [1] - 169:18
**prosecutors** [1] - 38:8
**prostate** [5] - 19:22, 120:5, 121:5, 137:7, 146:10
**protect** [3] - 77:1, 90:11, 99:6
**prove** [6] - 11:8, 11:13, 18:8, 30:13, 39:17, 50:3
**proven** [2] - 11:1, 62:12
**proves** [2] - 8:10, 8:14

**provide** [14] - 13:7, 39:2, 57:15, 64:9, 71:5, 85:18, 90:21, 102:2, 103:1, 110:15, 111:5, 114:17, 139:20, 150:20
**provided** [24] - 61:8, 81:19, 81:20, 81:24, 82:2, 85:20, 87:11, 87:15, 88:12, 90:9, 96:3, 98:8, 98:17, 99:21, 103:1, 103:2, 103:5, 111:4, 119:4, 119:5, 141:21, 158:23, 159:1
**provider** [56] - 21:19, 21:20, 72:2, 76:19, 76:20, 77:11, 77:13, 77:14, 77:15, 77:21, 78:1, 79:15, 79:18, 79:21, 81:7, 82:15, 83:11, 84:8, 85:1, 86:20, 87:11, 87:20, 88:15, 88:16, 89:3, 89:10, 89:12, 89:14, 89:16, 90:8, 90:14, 91:3, 92:12, 94:11, 94:25, 95:22, 99:3, 99:22, 100:7, 102:9, 105:25, 110:14, 131:12, 131:23, 135:14, 136:12, 138:3, 138:13, 147:9, 148:17, 150:24, 150:25, 155:7, 157:2, 160:13
**provider's** [5] - 79:14, 81:10, 82:23, 83:16, 87:4
**providers** [28] - 21:14, 21:17, 74:14, 74:21, 79:12, 83:14, 85:5, 85:7, 85:8, 85:18, 86:2, 86:5, 86:6, 86:12, 88:2, 90:4, 90:12, 91:11, 98:5, 98:9, 98:11, 102:2, 102:6, 102:12, 110:12, 111:15, 133:22, 158:22
**provides** [8] - 21:9, 90:15, 90:24, 98:4, 120:13, 133:4, 138:13, 158:24
**providing** [10] - 79:16, 81:19, 92:13, 97:9, 97:24, 97:25, 102:5, 104:2, 111:2, 111:19
**provision** [5] - 113:6, 116:4, 138:10, 143:10, 147:19
**provisions** [7] - 56:24, 57:10, 57:12, 57:18, 58:5, 58:16, 60:14
**PTAN** [4] - 89:17, 89:18, 89:19, 91:5
**public** [1] - 130:14
**publications** [1] - 90:23
**publish** [2] - 132:19, 155:5
**published** [10] - 56:3, 90:23, 96:2, 131:3, 132:11, 134:11, 135:2, 135:7,

158:10, 158:12
**publishes** [4] - 131:11,
131:22, 132:10, 161:14
**pull** [11] - 21:5, 27:12, 96:4,
113:18, 119:18, 122:7,
128:18, 133:10, 134:7,
151:5, 162:9
**punish** [1] - 53:10
**Puntillo** [34] - 68:11,
113:18, 115:15, 115:22,
116:20, 119:18, 122:7,
122:20, 123:17, 126:10,
127:12, 128:18, 129:10,
133:10, 134:7, 134:23,
135:17, 136:15, 137:12,
137:22, 138:6, 138:23,
139:24, 141:4, 142:3, 143:5,
143:13, 143:23, 143:24,
144:25, 148:11, 149:23,
151:5, 162:9
**puppet** [3] - 43:11, 44:20,
45:16
**purchases** [1] - 30:10
**purpose** [8] - 10:1, 61:21,
64:25, 92:11, 94:1, 94:8,
104:1, 126:18
**purposes** [3] - 114:11,
130:1, 131:17
**pursuant** [2] - 54:7, 75:14
**put** [26] - 11:10, 17:3, 17:4,
26:9, 37:5, 40:20, 40:21,
46:16, 47:18, 48:15, 50:7,
62:24, 64:18, 79:14, 83:2,
83:5, 83:10, 84:14, 84:17,
84:18, 84:19, 89:22, 99:16,
115:4, 158:11, 170:5
**puts** [3] - 36:18, 84:16, 99:5
**putting** [2] - 91:17, 170:8

## Q

**Q-tip** [1] - 18:17
**qualification** [3] - 75:13,
140:10, 145:24
**qualified** [10] - 13:22,
23:10, 81:17, 85:18, 103:1,
103:5, 111:4, 126:1, 129:23,
133:2
**qualifier** [2] - 64:21, 67:11
**qualify** [6] - 9:2, 65:21,
66:4, 85:20, 125:7, 140:11
**questions** [17] - 9:1, 9:3,
23:20, 23:21, 23:23, 24:2,
24:3, 40:7, 52:14, 60:24,
61:12, 75:19, 90:22, 164:25,
165:10, 165:21
**quick** [3] - 32:7, 57:16,
151:9
**quickly** [2] - 15:22, 29:5
**quite** [9] - 20:5, 23:16,

26:20, 41:18, 73:7, 76:13,
83:13, 85:3, 169:5
**quote** [4] - 139:15, 139:16,
139:17

## R

**radiation** [1] - 93:4
**radio** [1] - 12:19
**Rafferty** [10] - 35:23, 56:6,
57:11, 57:23, 59:23, 62:22,
63:22, 152:25, 168:22, 171:3
**RAFFERTY** [23] - 2:5, 55:7,
55:11, 60:11, 61:4, 62:23,
63:6, 69:16, 93:18, 113:20,
113:23, 116:15, 120:18,
121:8, 153:1, 161:20,
161:24, 163:11, 163:25,
164:17, 169:24, 171:4, 171:8
**raise** [2] - 68:18, 170:4
**raises** [1] - 164:13
**Ramamurthy** [6] - 30:20,
46:23, 46:25, 47:6, 47:8,
47:20
**rapidly** [1] - 160:7
**rare** [4] - 148:17, 160:19,
161:11, 163:2
**rarely** [1] - 161:17
**rates** [1] - 149:15
**rather** [3] - 20:23, 33:22,
140:19
**ray** [8] - 93:4, 117:14,
117:16, 117:19, 118:5,
118:18, 122:24, 142:25
**rays** [1] - 150:8
**reach** [1] - 8:3
**reached** [1] - 52:2
**reaches** [1] - 125:25
**reaching** [2] - 10:9, 50:17
**react** [1] - 19:7
**reaction** [1] - 148:7
**read** [23] - 12:17, 14:11,
15:24, 63:4, 64:1, 94:18,
95:10, 100:2, 100:15,
100:17, 105:13, 114:12,
116:1, 122:23, 123:20,
130:3, 136:19, 137:25,
139:1, 144:3, 145:5, 147:16,
166:19
**readily** [1] - 142:24
**reading** [4] - 57:6, 62:10,
115:24, 143:8
**reads** [2] - 64:1, 100:3
**ready** [1] - 66:22
**real** [4] - 25:22, 25:23,
124:9, 170:17
**really** [15] - 25:2, 39:14,
44:19, 45:22, 50:16, 55:11,
56:16, 58:7, 58:9, 58:25,
65:6, 65:17, 65:22, 66:3,

164:19
**realtime** [1] - 128:7
**rearrangements** [1] - 167:6
**reask** [1] - 146:6
**reason** [14] - 49:13, 49:16,
51:22, 53:7, 53:8, 83:6, 87:5,
93:7, 93:9, 117:19, 117:24,
125:16, 142:6, 158:6
**reasonable** [25] - 11:14,
30:14, 39:17, 102:17,
102:19, 102:23, 112:16,
113:12, 116:9, 116:13,
116:24, 117:2, 117:19,
123:7, 123:22, 132:22,
135:15, 139:14, 141:19,
142:1, 143:19, 144:7, 145:7,
148:3, 150:16
**reasonableness** [1] - 10:18
**reasons** [1] - 156:17
**receive** [2] - 24:7, 78:8
**received** [5] - 9:3, 29:1,
63:20, 70:4, 120:22
**Received** [1] - 3:8
**receives** [1] - 77:15
**receiving** [1] - 99:17
**recently** [2] - 149:24, 160:7
**recess** [2] - 63:10, 171:11
**recessed** [3] - 63:13, 153:7,
171:15
**reckless** [2] - 89:7, 100:6
**recognize** [1] - 11:24,
122:10
**recommendations** [3] -
126:2, 126:4, 139:20
**record** [15] - 11:23, 44:8,
49:6, 63:14, 65:4, 67:13,
68:21, 84:23, 92:18, 92:19,
95:4, 104:4, 111:11, 153:8,
164:23
**recorded** [1] - 49:7
**recording** [2] - 43:17,
128:12
**recordings** [2] - 34:3, 44:23
**records** [10] - 32:17, 33:17,
52:13, 71:15, 72:1, 72:4,
72:24, 73:16, 73:25
**recruiters** [2] - 22:16, 27:7
**red** [6] - 134:25, 161:2,
161:8, 163:15, 163:16,
164:13
**redirect** [2] - 165:22, 169:8
**reduce** [3] - 46:8, 46:10,
47:21
**reduction** [2] - 46:4
**refer** [12] - 36:16, 76:1,
83:19, 99:12, 122:12, 126:4,
127:17, 127:20, 128:4,
157:25, 162:12, 162:14
**reference** [4] - 62:3, 96:14,
138:9, 147:19

**referenced** [2] - 57:12,
140:12
**references** [3] - 96:7,
133:4, 140:17
**referencing** [1] - 61:13
**referrals** [4] - 22:16, 30:7,
97:13, 99:8
**referred** [9] - 28:18, 81:21,
89:17, 94:2, 94:9, 106:5,
125:20, 132:10
**referring** [4] - 99:17,
127:19, 133:5, 149:11
**refers** [1] - 158:5
**reflecting** [1] - 34:6
**refresh** [1] - 62:19
**regard** [5] - 20:1, 59:24,
135:11, 142:23, 170:19
**regarding** [19] - 5:11,
11:18, 16:1, 62:3, 64:19,
73:14, 73:21, 75:6, 114:5,
115:5, 123:12, 124:20,
127:19, 156:9, 157:4, 161:8,
164:4, 166:5, 166:8
**regards** [2] - 135:4, 148:19
**REGINALD** [1] - 1:14
**region** [2] - 42:4, 106:4
**registered** [1] - 70:12
**registering** [1] - 90:4
**regulated** [4] - 59:14,
59:16, 59:19, 74:25
**Regulation** [2] - 119:16,
119:22
**regulation** [17] - 55:17,
64:13, 114:23, 117:12,
118:24, 119:3, 120:10,
121:16, 122:5, 122:12,
122:13, 129:8, 131:18,
131:24, 136:11, 148:8,
154:14
**Regulations** [4] - 96:5,
118:16, 131:9, 132:7
**regulations** [46] - 22:11,
56:20, 61:23, 64:4, 64:8,
65:8, 65:16, 65:25, 66:16,
71:16, 71:18, 72:5, 72:25,
73:24, 83:22, 83:23, 86:13,
88:5, 89:6, 89:8, 91:22,
95:12, 95:14, 95:18, 96:1,
100:19, 101:18, 108:10,
110:10, 110:17, 113:24,
114:5, 114:17, 114:22,
115:6, 118:17, 127:16,
127:17, 130:15, 132:6,
132:18, 147:5, 151:1, 157:7,
157:8
**rehab** [1] - 93:2
**reimburse** [1] - 79:20
**reimbursed** [1] - 96:12
**reimbursement** [7] - 71:19,
73:10, 73:14, 75:14, 99:19,

132:1, 133:8
**reimburses** [1] - 77:22
**reimbursing** [1] - 126:24
**reiterate** [1] - 54:20
**reiterated** [1] - 57:18
**rejoin** [1] - 165:16
**related** [12] - 12:1, 12:5, 12:18, 12:21, 14:13, 96:22, 130:19, 134:17, 134:18, 141:11, 142:11, 143:12
**relates** [2] - 159:13, 159:18
**relating** [2] - 71:19, 158:5
**relationship** [11] - 39:23, 40:3, 40:5, 40:11, 44:14, 48:24, 107:13, 109:4, 125:13, 125:15, 156:6
**relationships** [1] - 41:14
**relatively** [1] - 167:5
**relevance** [3] - 57:20, 64:10, 114:18
**relevant** [9] - 55:5, 64:15, 65:7, 114:25, 135:22, 139:11, 139:13, 141:7, 141:18
**reliable** [1] - 53:21
**reliance** [1] - 86:11
**relied** [2] - 86:9, 86:16
**relieve** [2] - 89:8, 124:16
**relieved** [1] - 89:4
**rely** [2] - 15:15, 39:13
**relying** [1] - 45:3
**remain** [1] - 11:9
**remaining** [2] - 62:17, 65:9
**remarks** [2] - 8:25, 114:8
**remember** [20] - 7:24, 8:24, 9:20, 10:9, 10:13, 10:25, 15:8, 16:9, 32:10, 37:12, 42:2, 44:19, 48:12, 54:4, 54:8, 68:4, 89:20, 132:23, 146:18, 148:9
**remind** [3] - 10:24, 61:11, 114:20
**reminded** [1] - 170:23
**reminder** [1] - 8:6
**remove** [1] - 106:22
**render** [2] - 13:20, 82:18
**rendered** [4] - 79:21, 110:25, 133:23, 158:3
**rendering** [3] - 85:16, 85:17, 85:19
**reopen** [1] - 83:23
**repeat** [5] - 11:21, 11:22, 62:16, 121:13, 144:7
**repeats** [1] - 152:4
**rephrase** [2] - 121:14, 140:19
**replacing** [1] - 106:20
**REPORTED** [1] - 1:20
**reported** [2] - 12:18, 149:15
**Reporter** [1] - 1:22

**reporter** [1] - 67:18
**reporter's** [1] - 14:20
**reports** [2] - 74:8, 74:11
**representation** [1] - 110:14
**representations** [1] - 110:12
**represented** [1] - 51:5
**request** [3] - 12:6, 91:1, 169:21
**requested** [3] - 87:6, 89:3, 171:6
**require** [2] - 25:19, 102:14
**required** [10] - 11:16, 12:4, 88:5, 89:10, 91:23, 102:12, 136:9, 136:12, 144:11, 147:25
**requirement** [7] - 101:11, 111:6, 126:18, 140:14, 140:22, 140:23, 142:22
**requirements** [16] - 20:5, 51:20, 54:24, 59:4, 59:17, 70:20, 73:14, 75:15, 95:3, 128:5, 136:7, 136:8, 150:18, 150:23, 154:24, 166:12
**requires** [7] - 11:17, 14:11, 21:16, 105:10, 150:20, 151:24, 155:17
**research** [6] - 12:20, 12:22, 12:24, 14:13, 54:11, 166:4
**resolve** [1] - 4:21
**respect** [2] - 61:4, 86:22
**respond** [2] - 150:14, 156:13, 156:15
**response** [1] - 153:18
**responsibility** [4] - 39:23, 40:4, 89:4, 89:9
**responsible** [6] - 88:13, 88:15, 88:22, 101:19, 150:25, 155:8
**rest** [2] - 44:4, 164:20
**restroom** [3] - 151:9, 151:13, 153:6
**result** [8] - 97:2, 123:4, 126:14, 141:21, 142:14, 143:21, 148:20, 157:3
**results** [26] - 20:8, 20:13, 25:12, 25:13, 25:15, 25:17, 33:2, 123:12, 124:3, 124:6, 124:10, 125:4, 125:11, 125:17, 140:13, 140:21, 141:2, 141:13, 141:15, 141:17, 141:23, 141:24, 148:21
**retake** [1] - 165:19
**retakes** [1] - 170:25
**return** [2] - 12:8, 84:7
**returned** [2] - 114:2, 162:8
**revenue** [2] - 26:4, 27:6
**review** [18] - 17:10, 62:19, 72:23, 72:24, 74:8, 83:12,

83:13, 83:25, 85:2, 86:3, 86:4, 86:5, 87:23, 105:10, 125:15, 155:17, 159:2, 159:8
**reviewed** [3] - 85:23, 108:19, 159:8
**reviewer** [2] - 85:2, 163:15
**reviewing** [4] - 72:1, 72:4, 85:21, 86:9
**revised** [2] - 63:19, 63:20
**revision** [1] - 135:24
**revisit** [2] - 62:14, 114:6
**revolved** [1] - 18:13
**ridiculously** [1] - 36:14
**rise** [4] - 6:13, 54:14, 67:9, 151:16
**risk** [4] - 18:25, 99:5, 121:25, 127:9
**RMR** [1] - 1:21
**RODOLFO** [1] - 1:10
**Rodolfo** [1] - 1:22
**role** [11] - 29:21, 47:23, 72:21, 73:15, 73:18, 73:19, 74:10, 76:11, 77:4, 93:11, 96:23
**roles** [5] - 35:23, 37:25, 73:9, 73:18, 90:14
**ROOKARD** [1] - 1:14
**room** [10] - 15:10, 15:13, 16:18, 17:7, 54:2, 54:12, 67:16, 166:18, 171:6
**rooms** [2] - 13:3, 13:10
**round** [2] - 66:21, 153:9
**row** [1] - 31:13
**RPR** [1] - 1:21
**rubber** [3] - 25:4, 26:14, 29:10
**rubber-stamp** [1] - 26:14
**Ruiz** [1] - 1:22
**RUIZ** [1] - 1:10
**Rule** [5] - 46:5, 46:14, 47:21, 75:14, 170:9
**rule** [10] - 42:5, 46:5, 66:24, 67:1, 103:13, 103:15, 121:1, 121:6, 126:16, 157:11
**rules** [44] - 7:18, 9:12, 9:15, 10:24, 13:16, 14:23, 14:25, 15:2, 22:11, 37:22, 54:4, 54:7, 73:24, 83:18, 83:22, 83:23, 86:13, 88:5, 89:6, 89:8, 91:22, 95:25, 99:7, 101:17, 102:15, 108:9, 110:10, 110:17, 113:24, 127:19, 131:25, 132:2, 132:5, 132:8, 138:12, 138:15, 148:19, 151:1, 151:3, 156:9, 156:20, 157:8, 166:1
**ruling** [1] - 55:6
**rulings** [1] - 5:24
**run** [5] - 54:5, 112:25,

114:13, 126:21, 127:2
**running** [6] - 43:22, 113:15, 113:16, 132:14, 141:22, 148:10
**rural** [3] - 127:25, 129:21

## S

**SADOW** [14] - 1:17, 1:18, 5:8, 5:19, 6:6, 35:16, 35:18, 35:20, 38:21, 63:25, 65:3, 92:15, 169:17, 170:5
**Sadow** [9] - 5:17, 6:3, 35:15, 53:23, 63:21, 65:1, 152:22, 169:21, 170:3
**safe** [2] - 102:24, 132:25
**sake** [1] - 67:13
**salaries** [1] - 43:23
**sale** [1] - 23:7
**sales** [1] - 23:6
**salespeople** [1] - 23:6
**Saliba** [2] - 49:19, 49:22
**SALIBA** [1] - 49:19
**saliva** [1] - 18:15
**sample** [2] - 141:22, 163:6
**samples** [2] - 18:15, 99:12
**Samuel** [3] - 35:24, 62:24, 63:21
**SAMUEL** [6] - 2:2, 2:3, 65:1, 65:13, 66:12, 66:20
**satisfy** [2] - 140:14, 140:22
**saw** [10] - 8:7, 8:11, 9:6, 9:8, 32:20, 40:21, 159:9, 161:1, 163:3
**scale** [2] - 26:15, 27:13
**scam** [2] - 17:18, 22:21
**scary** [1] - 25:18
**scene** [1] - 14:9
**schedule** [3] - 6:18, 7:7, 67:25
**schedules** [2] - 167:14, 167:22
**scheduling** [1] - 169:11
**scheme** [20] - 17:25, 18:13, 21:7, 26:4, 26:25, 27:10, 27:12, 27:16, 29:1, 29:4, 29:21, 30:23, 31:6, 31:12, 33:6, 33:23, 34:2, 34:10, 35:2, 61:22
**scope** [1] - 96:21
**screen** [8] - 17:1, 17:4, 17:5, 17:9, 100:1, 122:10, 129:1, 163:20
**screening** [50] - 19:21, 19:25, 56:25, 113:13, 113:14, 117:10, 117:11, 117:12, 118:25, 119:2, 119:6, 119:9, 119:10, 119:23, 119:24, 119:25, 120:3, 120:4, 120:5, 120:6,

120:7, 120:8, 121:1, 121:3,
121:4, 121:15, 121:16,
121:19, 121:21, 121:22,
122:4, 122:5, 122:17,
126:23, 136:14, 138:16,
145:8, 145:9, 145:17,
147:17, 148:6, 148:8, 148:9

**script** [1] - 58:10

**seal** [2] - 22:10, 166:18

**search** [7] - 12:15, 13:12,
29:17, 29:18, 29:20, 35:4,
42:20

**seat** [1] - 31:13

**seated** [7] - 6:15, 54:16,
67:23, 68:20, 151:18,
153:11, 166:25

**second** [16] - 11:6, 14:5,
24:23, 86:15, 92:21, 108:4,
117:3, 129:10, 135:18,
136:20, 138:7, 141:5, 146:4,
146:8, 149:2, 160:5

**section** [40] - 94:1, 94:3,
94:6, 94:14, 94:17, 94:24,
95:1, 100:1, 100:11, 100:14,
101:3, 101:7, 104:15,
104:17, 105:7, 105:11,
106:17, 109:10, 116:1,
116:20, 120:10, 122:21,
126:11, 126:13, 136:16,
136:19, 136:22, 137:23,
138:1, 138:9, 138:24, 145:1,
145:17, 148:12, 148:15,
148:17, 159:19, 159:21,
160:5, 160:16

**SECTION** [1] - 1:15

**Section** [19] - 55:16, 93:23,
94:2, 94:8, 94:9, 100:12,
100:15, 104:10, 105:6,
105:15, 107:9, 109:2, 110:1,
115:23, 116:8, 120:3,
123:16, 129:21, 129:22

**sections** [14] - 55:15,
55:17, 56:1, 56:2, 56:8,
56:13, 57:3, 58:1, 58:19,
60:4, 61:7, 61:14, 62:11,
94:22

**SECURITY** [5] - 6:10, 6:13,
54:14, 67:9, 151:16

**Security** [14] - 56:24, 57:18,
58:5, 58:17, 96:5, 113:5,
118:15, 119:14, 131:9,
132:7, 138:9, 147:19,
147:22, 147:23

**see** [53] - 4:13, 6:8, 6:16,
10:14, 14:7, 17:1, 17:10,
22:24, 28:6, 29:4, 34:4, 43:8,
45:4, 45:12, 46:18, 49:11,
49:12, 50:9, 51:15, 51:20,
51:21, 52:9, 54:12, 58:9,
84:6, 93:21, 97:22, 107:9,

110:24, 117:21, 117:22,
124:5, 124:23, 126:2,
126:16, 129:4, 133:24,
134:25, 135:8, 147:12,
158:18, 160:23, 161:16,
162:7, 165:1, 165:6, 166:10,
166:13, 166:22, 168:6,
169:9, 170:16, 171:11

**seeing** [1] - 107:5

**seem** [1] - 85:16

**sees** [1] - 33:15

**seize** [1] - 42:22

**selecting** [1] - 161:10

**selection** [1] - 10:7

**selling** [2] - 26:2, 26:3

**seminars** [1] - 51:21

**send** [4] - 79:12, 85:2,
164:9, 164:10

**sending** [2] - 85:9, 164:11

**senior** [3] - 17:21, 22:24,
35:7

**sense** [6] - 4:24, 54:18,
55:7, 58:20, 156:2, 168:8

**sent** [9] - 17:7, 24:18, 35:4,
56:13, 78:24, 79:9, 79:11,
84:24, 85:11

**sentence** [6] - 46:8, 46:11,
46:17, 123:16, 123:20, 145:5

**sentences** [4] - 31:24,
100:15, 143:25, 144:4

**sentencing** [2] - 46:2,
46:16

**Senthil** [1] - 30:20

**sequence** [2] - 137:18,
168:19

**sequencing** [1] - 139:5

**sequestration** [1] - 67:1

**series** [3] - 23:20, 55:12,
68:25

**serious** [1] - 14:24

**service** [44] - 10:25, 11:22,
21:13, 79:17, 80:21, 81:19,
81:20, 81:23, 82:2, 82:16,
82:19, 85:19, 92:24, 97:7,
98:8, 98:16, 98:20, 99:13,
99:14, 99:21, 99:22, 99:24,
100:22, 102:22, 102:24,
103:2, 103:5, 103:7, 103:9,
112:13, 112:24, 116:7,
117:20, 119:1, 119:2, 119:6,
129:8, 131:13, 132:25,
133:2, 137:14, 166:9

**services** [59] - 59:18, 71:20,
73:11, 74:24, 77:10, 79:21,
80:1, 81:18, 85:16, 85:18,
85:19, 87:10, 87:15, 87:18,
88:12, 89:1, 90:9, 91:23,
92:13, 97:23, 97:24, 102:2,
102:5, 102:18, 103:10,
103:13, 103:15, 110:15,

110:25, 111:1, 111:3, 111:4,
111:5, 111:6, 112:15,
113:12, 115:21, 116:2,
116:3, 116:6, 116:13,
116:24, 117:7, 117:10,
117:11, 118:16, 118:23,
119:9, 120:11, 120:13,
121:3, 121:22, 122:5, 122:6,
129:18, 130:16, 133:23

**Services** [2] - 76:4, 76:10

**set** [8] - 38:4, 41:19, 79:1,
79:7, 85:15, 99:21, 118:14

**sets** [2] - 14:24, 78:25

**setting** [3] - 103:3, 127:25,
133:1

**several** [7] - 90:6, 94:10,
113:11, 141:12, 141:14,
161:2, 164:3

**shall** [1] - 10:5

**sham** [1] - 51:19

**shape** [1] - 33:3

**share** [3] - 59:25, 60:8, 66:8

**Shawn** [1] - 30:19

**sheet** [1] - 106:1

**shift** [2] - 130:12, 168:24

**shifts** [1] - 154:6

**short** [2] - 36:19, 167:5

**shortage** [1] - 127:21

**show** [25] - 18:5, 19:15,
20:10, 20:25, 21:6, 24:5,
28:4, 29:16, 33:17, 33:19,
33:20, 33:22, 34:5, 42:21,
45:24, 47:24, 48:5, 48:8,
51:8, 53:11, 53:20, 133:13,
137:23, 159:12

**showed** [1] - 140:13

**showing** [9] - 58:16, 92:3,
103:20, 105:1, 106:24,
107:16, 108:21, 109:16,
119:8

**shown** [1] - 119:21

**shred** [1] - 15:24

**side** [2] - 9:15, 35:21

**sidebar** [3] - 113:22,
161:22, 161:23

**sides** [1] - 4:13

**sign** [5] - 28:1, 105:13,
113:15, 147:7, 148:9

**signature** [16] - 25:6, 94:25,
100:16, 100:18, 100:20,
101:3, 101:7, 101:11,
101:21, 104:17, 104:21,
105:18, 109:12, 110:5,
110:8, 159:6

**signatures** [2] - 25:4, 30:7

**signed** [3] - 24:12, 25:3,
101:14

**signer** [5] - 107:7, 108:1,
108:5, 108:7, 108:8

**significance** [6] - 89:18,

108:7, 109:12, 110:7,
111:18, 125:13

**significant** [3] - 158:8,
162:15, 165:4

**signing** [2] - 95:2, 106:19

**signs** [12] - 113:16, 119:1,
119:8, 122:18, 124:10,
125:6, 125:8, 137:4, 137:14,
142:10, 145:13, 145:25

**silent** [1] - 11:9

**similar** [4] - 13:5, 104:12,
149:14, 149:15

**simple** [2] - 20:6, 35:4

**simply** [10] - 8:13, 16:6,
57:4, 58:4, 62:2, 65:24,
66:10, 140:20, 148:10,
166:11

**single** [13] - 40:9, 43:9,
49:6, 51:13, 57:13, 57:18,
86:9, 87:23, 112:13, 135:10,
149:11, 162:2

**sister** [1] - 9:7

**sit** [2] - 152:2, 152:5

**site** [6] - 13:10, 74:8, 90:21,
129:19, 130:3, 130:4

**sites** [2] - 13:3, 74:9

**sits** [1] - 47:15

**sitting** [1] - 53:19

**situ** [1] - 137:5

**situation** [4] - 125:21,
125:22, 128:16, 164:14

**situations** [1] - 146:20

**sixth** [1] - 149:24

**skin** [2] - 53:7, 149:1

**slate** [1] - 11:5

**slide** [1] - 163:6

**slight** [1] - 169:9

**small** [4] - 23:16, 26:21,
37:24, 149:20

**smelled** [1] - 8:8

**so-called** [2] - 21:1, 43:15

**sober** [3] - 59:6, 59:9, 59:16

**social** [5] - 13:3, 13:5,
13:10, 54:10, 166:8

**Social** [14] - 56:24, 57:18,
58:5, 58:17, 96:4, 113:5,
118:15, 119:14, 131:9,
132:6, 138:9, 147:19,
147:21, 147:23

**solely** [2] - 8:5, 14:14

**solicit** [1] - 28:11

**solicited** [1] - 32:23

**soliciting** [1] - 28:23

**someone** [18] - 8:7, 19:7,
19:25, 33:7, 33:8, 33:12,
34:17, 49:3, 52:5, 60:6,
93:13, 103:1, 121:23, 140:3,
140:5, 145:20, 162:2, 169:25

**sometimes** [5] - 8:13, 9:23,
22:18, 22:19, 74:9

**somewhere** [1] - 44:24

**Sonal** [2] - 106:12, 106:18

**soon** [3] - 4:12, 7:11, 166:14

**sophisticated** [1] - 18:1

**sorry** [14] - 86:17, 100:8, 101:2, 111:10, 115:24, 116:20, 124:2, 128:23, 129:4, 129:16, 138:7, 145:2, 149:8, 157:9

**sort** [7] - 26:2, 55:8, 60:9, 84:11, 118:18, 131:15, 167:21

**sound** [1] - 168:15

**source** [2] - 12:22, 14:19

**sources** [2] - 90:16, 166:7

**South** [1] - 78:17

**SOUTHERN** [1] - 1:1

**speaking** [7] - 60:3, 73:21, 122:11, 138:1, 148:14, 155:21, 156:8

**special** [6] - 14:16, 44:25, 70:19, 89:14, 99:7, 128:15

**specific** [33] - 29:25, 30:1, 56:21, 60:4, 91:8, 92:9, 103:3, 114:10, 116:23, 123:3, 123:4, 125:2, 125:24, 126:15, 126:19, 126:22, 143:22, 146:4, 146:12, 146:16, 149:11, 150:12, 156:21, 157:2, 158:6, 158:21, 159:22, 160:2, 160:12, 160:15, 162:16, 163:7, 163:8

**specifically** [21] - 13:6, 73:21, 74:7, 74:11, 79:1, 80:11, 96:14, 106:6, 116:2, 116:3, 119:3, 121:21, 122:16, 138:19, 145:17, 154:22, 156:11, 159:20, 159:25, 160:17, 170:13

**specified** [1] - 120:9

**specimen** [3] - 141:11, 163:10, 165:7

**specimens** [1] - 164:5

**spectrum** [1] - 97:10

**speech** [1] - 9:2

**spell** [1] - 68:21

**spelled** [3] - 119:14, 121:12, 121:15

**spent** [6] - 30:9, 38:23, 39:3, 48:20, 154:5

**spit** [1] - 24:11

**spoken** [1] - 154:22

**Sporn** [10] - 30:20, 49:17, 49:23, 50:1, 51:7, 167:9, 167:16, 167:23, 168:14

**spring** [1] - 43:13

**squamous** [1] - 149:1

**squarely** [1] - 56:24

**stack** [1] - 56:13

**stage** [5] - 44:20, 66:3, 87:7, 87:14, 87:17

**stamp** [8] - 26:14, 93:19, 93:24, 104:5, 104:10, 105:6, 106:10, 108:11

**stamps** [2] - 25:4, 29:10

**stand** [9] - 47:19, 47:23, 165:13, 165:19, 166:16, 167:7, 168:10, 169:22, 170:25

**standalone** [1] - 58:1

**standard** [1] - 125:12

**standardized** [2] - 150:7

**stands** [4] - 41:9, 76:24, 105:25, 145:11

**Stark** [1] - 95:19

**start** [10] - 6:19, 10:8, 48:7, 60:25, 115:23, 120:15, 132:5, 136:20, 168:8, 168:13

**started** [10] - 4:7, 4:15, 6:17, 7:3, 67:21, 71:7, 71:22, 72:11, 73:5, 159:15

**starting** [4] - 4:5, 72:9, 123:18, 162:2

**starts** [4] - 11:4, 44:6, 139:25, 149:24

**state** [10] - 59:17, 64:5, 64:15, 64:23, 65:17, 78:16, 114:25, 161:15, 164:13, 167:13

**State** [7] - 70:13, 82:7, 82:8, 82:10, 82:12, 133:15, 133:17

**statement** [14] - 16:6, 16:8, 94:10, 94:17, 96:14, 100:10, 100:13, 101:2, 104:12, 106:14, 109:9, 110:1, 110:2, 110:5

**statements** [9] - 4:10, 5:22, 7:13, 8:21, 8:22, 16:9, 16:25, 94:10, 105:12

**states** [8] - 65:14, 100:17, 133:25, 134:2, 134:4, 160:17, 161:10, 164:12

**States** [15] - 1:23, 4:2, 29:23, 43:10, 68:14, 75:21, 79:11, 148:25, 149:5, 155:3, 158:16, 164:5, 164:7, 164:11, 164:12

**STATES** [4] - 1:1, 1:3, 1:10, 1:15

**stating** [1] - 94:18

**statistical** [1] - 127:22

**status** [1] - 141:11

**statute** [6] - 61:15, 64:13, 114:23, 127:11, 145:10, 147:18

**Statute** [6] - 91:24, 95:19, 96:8, 96:15, 96:20, 98:6

**statutes** [9] - 59:8, 60:15,

61:20, 64:7, 65:22, 66:10, 114:4, 114:17, 114:21

**statutorily** [1] - 59:14

**statutory** [8] - 56:13, 57:3, 57:7, 57:10, 57:12, 61:7, 61:14, 62:11

**stay** [6] - 7:7, 48:7, 54:10, 116:20, 158:15, 166:8

**staying** [1] - 126:11

**stays** [1] - 30:15

**steady** [2] - 27:8, 27:9

**steal** [2] - 17:20, 20:17

**steer** [1] - 54:6

**steered** [1] - 98:9

**steering** [1] - 98:7

**stems** [1] - 148:15

**STENOGRAPHICALLY** [1] - 1:20

**step** [7] - 21:8, 22:14, 24:15, 26:4, 27:16, 165:12, 169:23

**Stephan** [1] - 65:14

**stepped** [1] - 169:24

**steps** [6] - 21:6, 27:23, 38:13, 77:1, 90:10, 99:6

**STEVEN** [2] - 1:17, 1:18

**stick** [1] - 26:11

**still** [11] - 41:11, 46:12, 53:7, 124:11, 124:15, 136:12, 150:18, 169:22, 169:23, 170:2

**stole** [1] - 30:9

**stomachache** [4] - 124:13, 124:14, 124:16, 124:17

**stood** [1] - 163:23

**stop** [8] - 41:18, 83:5, 83:6, 83:12, 84:9, 84:10, 84:25, 155:13

**stopped** [2] - 83:11, 87:5

**stopping** [1] - 84:22

**straight** [1] - 124:5

**stream** [2] - 27:8, 27:9

**streamline** [1] - 24:2

**Street** [2] - 1:18, 2:6

**stretch** [1] - 151:12

**stricken** [1] - 9:23

**strike** [1] - 10:3

**strings** [1] - 43:12

**studied** [1] - 71:18

**studies** [1] - 121:4

**stuff** [1] - 35:20

**subchapter** [1] - 116:4

**subject** [8] - 69:13, 69:16, 70:25, 71:5, 71:12, 96:25, 120:18, 170:7

**submission** [3] - 36:5, 77:24, 157:22

**submit** [19] - 21:13, 21:15, 21:20, 82:19, 85:7, 86:20, 88:4, 89:4, 89:5, 89:9, 89:22,

90:14, 91:21, 91:25, 93:12, 94:20, 100:5, 102:13, 111:15

**submits** [1] - 77:21

**submitted** [18] - 22:1, 22:5, 29:25, 36:11, 37:3, 51:11, 73:1, 86:17, 88:12, 88:14, 88:25, 89:21, 94:21, 97:1, 98:14, 101:14, 157:24

**submitting** [12] - 86:18, 87:20, 88:17, 89:3, 97:4, 97:5, 108:17, 111:8, 147:9, 150:24, 150:25, 151:2

**subparagraph** [1] - 116:7

**subsection** [1] - 122:23

**subset** [1] - 64:4

**substance** [1] - 59:9

**succeeding** [1] - 116:7

**successful** [5] - 38:5, 38:6, 38:24, 39:1, 53:9

**sudden** [1] - 23:1

**suggest** [2] - 50:19, 162:24

**suggesting** [2] - 45:10, 55:24

**suggestion** [1] - 62:25

**suggests** [2] - 9:5, 60:16

**Suite** [2] - 1:19, 2:6

**sum** [1] - 120:25

**summarize** [1] - 16:16

**supersede** [7] - 131:8, 131:10, 131:18, 133:6, 147:21, 155:6, 157:19

**superseded** [2] - 57:19, 134:25

**superseding** [2] - 132:20, 154:7

**supplemental** [1] - 62:18

**supplier** [8] - 92:24, 93:2, 93:4, 95:13, 100:19, 102:9, 109:21, 150:23

**supplier's** [1] - 95:20

**suppliers** [4] - 74:21, 92:22, 102:12, 111:15

**supply** [1] - 27:8

**supplying** [1] - 12:8

**support** [5] - 50:17, 85:24, 117:20, 151:2, 155:19

**supports** [1] - 150:21

**suppose** [1] - 27:4

**supposed** [2] - 19:19, 52:15

**supposedly** [2] - 28:1, 48:13

**surfing** [1] - 22:25

**surgery** [2] - 112:21, 146:25

**surgical** [2] - 92:25, 150:9

**survey** [2] - 23:1, 91:10

**survived** [1] - 35:7

**survivors** [1] - 17:19

**susceptibility** [1] - 139:3

**suspect** [1] - 4:9
**suspected** [2] - 137:1, 149:20
**sustain** [2] - 9:19, 9:21
**sustaining** [1] - 170:19
**swab** [2] - 18:14
**swabs** [1] - 24:11
**swear** [1] - 68:17
**sweepstakes** [1] - 22:19
**switched** [2] - 73:18, 167:11
**sworn** [2] - 7:18, 68:19
**symptom** [3] - 118:21, 148:10
**symptoms** [17] - 113:15, 113:16, 119:1, 119:8, 121:23, 122:18, 124:6, 124:10, 125:6, 125:8, 136:9, 137:4, 137:15, 142:10, 145:13, 146:1, 147:7
**syndrome** [4] - 139:19, 139:21, 139:22
**syndromes** [4] - 134:18, 137:2, 143:9, 145:14
**system** [32] - 79:12, 81:9, 82:22, 83:1, 83:5, 83:10, 83:15, 84:15, 85:6, 85:15, 85:16, 86:1, 86:19, 87:3, 87:12, 87:25, 88:1, 88:6, 89:20, 96:19, 97:14, 97:16, 98:21, 98:22, 99:2, 99:4, 101:25, 102:1, 144:18, 144:19, 152:14, 155:14

## T

**talks** [2] - 119:23, 126:13
**tape** [7] - 44:9, 45:5, 49:3, 49:4, 49:6, 49:7, 49:14
**tape-record** [1] - 49:6
**tape-recorded** [1] - 49:7
**taping** [1] - 44:22
**target** [2] - 19:16
**targeted** [1] - 19:11
**TAs** [1] - 153:18
**tax** [1] - 78:23
**taxed** [1] - 78:23
**taxes** [3] - 79:3, 113:2
**taxpayer** [1] - 112:11
**taxpayer's** [1] - 80:2
**taxpayers** [3] - 80:1, 118:9, 118:13
**teaching** [3] - 73:20, 73:23, 90:25
**team** [7] - 6:3, 35:22, 63:21, 72:23, 74:6, 86:4
**technology** [1] - 13:5
**telehealth** [5] - 127:18, 127:20, 128:4, 129:7, 130:16
**telemarketer** [6] - 23:2,

**telemarketers** [9] - 23:4, 23:8, 23:20, 23:24, 24:5, 24:17, 43:24, 51:15, 52:1
**telemarketing** [15] - 22:21, 23:19, 24:25, 27:14, 27:18, 28:10, 31:18, 34:4, 40:13, 40:14, 40:18, 41:13, 52:11, 52:12, 52:20
**telemedicine** [17] - 24:18, 24:19, 24:21, 25:1, 27:15, 30:21, 31:1, 31:2, 31:19, 39:23, 40:12, 127:15, 129:14, 130:1, 166:5
**telephone** [2] - 13:2, 128:10
**television** [1] - 12:19
**temporarily** [1] - 130:15
**ten** [2] - 47:20, 141:23
**tend** [1] - 62:7
**tenets** [1] - 103:14
**tens** [8] - 22:5, 22:6, 27:20, 34:6, 37:24
**term** [9] - 36:19, 79:15, 83:4, 85:17, 86:25, 99:20, 102:16, 113:14, 131:2
**terminology** [1] - 41:3
**terms** [15] - 45:18, 77:20, 79:5, 85:24, 96:21, 102:14, 102:20, 129:25, 136:9, 143:15, 154:23, 157:6, 157:11, 157:16, 159:2
**terrible** [1] - 47:14
**test** [81] - 18:2, 18:3, 18:22, 18:24, 19:5, 19:6, 19:7, 20:6, 20:8, 20:12, 24:4, 25:10, 25:12, 26:5, 26:20, 26:22, 27:5, 33:10, 33:11, 52:6, 99:11, 103:18, 113:15, 113:16, 117:25, 120:4, 120:7, 121:15, 121:16, 121:25, 123:10, 123:11, 123:14, 123:24, 124:6, 124:8, 124:9, 124:10, 124:14, 124:18, 124:20, 124:23, 125:2, 125:4, 125:9, 125:11, 125:17, 126:14, 126:19, 127:6, 134:15, 136:10, 136:14, 140:7, 140:23, 141:1, 141:12, 141:15, 142:7, 142:21, 142:25, 143:20, 144:14, 144:17, 144:20, 148:1, 148:4, 148:10, 149:17, 149:18, 150:19, 150:24, 154:12, 157:6, 160:2, 163:8
**tested** [7] - 26:6, 137:4, 139:12, 141:8, 141:20, 144:6, 144:12

**testified** [3] - 10:15, 75:6, 75:10
**testify** [6] - 11:9, 11:10, 11:11, 28:5, 31:11, 55:25
**testifying** [4] - 10:16, 152:8, 162:2, 170:13
**testimony** [31] - 8:7, 10:10, 10:12, 10:18, 10:19, 12:16, 14:3, 14:6, 14:14, 15:18, 16:1, 32:14, 48:6, 56:17, 57:17, 57:20, 58:7, 58:18, 60:4, 62:4, 64:19, 68:6, 115:4, 151:24, 152:3, 152:9, 166:4, 168:24, 170:12, 170:24
**testing** [72] - 18:23, 19:6, 19:16, 59:3, 81:3, 93:2, 112:6, 121:19, 122:12, 122:15, 122:16, 122:17, 125:7, 134:20, 136:13, 136:25, 137:9, 137:13, 137:15, 137:18, 137:19, 138:2, 138:5, 139:3, 139:20, 140:6, 142:9, 142:12, 142:22, 143:2, 143:11, 143:15, 143:16, 143:18, 144:3, 144:5, 144:7, 145:7, 145:9, 145:12, 146:2, 146:8, 147:6, 147:17, 149:19, 150:3, 150:6, 150:7, 150:11, 150:15, 154:19, 154:23, 156:4, 156:5, 156:17, 156:19, 157:11, 159:14, 159:18, 159:20, 159:21, 160:1, 160:3, 160:6, 160:14, 160:17, 161:4, 161:8, 162:17, 166:5
**testings** [1] - 145:21
**tests** [84] - 17:21, 18:12, 18:21, 19:9, 19:10, 19:13, 19:17, 19:19, 19:21, 19:24, 19:25, 20:3, 20:5, 20:11, 20:12, 20:20, 20:21, 20:23, 20:25, 21:2, 21:3, 23:5, 23:10, 23:11, 23:13, 23:16, 23:17, 24:1, 24:7, 24:12, 24:14, 24:19, 25:3, 25:17, 26:19, 27:1, 28:18, 28:19, 29:9, 29:10, 29:11, 29:12, 29:20, 32:24, 33:1, 33:2, 33:9, 33:12, 33:14, 35:1, 35:4, 35:8, 56:21, 56:23, 56:25, 86:22, 91:9, 99:18, 120:5, 121:1, 122:13, 122:24, 122:25, 123:6, 123:18, 123:21, 125:16, 125:18, 126:8, 126:21, 126:25, 127:2, 138:17, 141:10, 145:18, 156:9
**Texas** [1] - 131:20

**text** [5] - 13:2, 33:18, 40:10, 44:25, 50:6
**that'll** [1] - 120:20
**THE** [107] - 1:10, 1:13, 1:17, 2:2, 4:2, 4:22, 5:2, 5:7, 5:9, 5:17, 5:20, 6:3, 6:7, 6:10, 6:11, 6:13, 6:15, 9:11, 9:12, 15:6, 15:7, 16:3, 16:4, 17:2, 17:3, 17:17, 35:14, 35:17, 35:19, 38:20, 53:23, 54:14, 54:16, 55:4, 55:9, 56:6, 56:7, 57:1, 57:21, 58:23, 59:23, 61:3, 61:17, 63:1, 63:7, 63:12, 63:15, 64:1, 65:5, 65:18, 66:15, 66:21, 66:25, 67:9, 67:10, 67:19, 67:23, 68:13, 68:16, 68:18, 68:20, 68:22, 69:2, 69:12, 69:18, 70:5, 75:16, 92:17, 113:21, 113:25, 114:3, 115:8, 115:9, 116:17, 120:20, 121:10, 129:7, 137:13, 151:7, 151:16, 151:18, 151:22, 153:2, 153:9, 153:11, 161:22, 162:5, 163:12, 163:15, 164:1, 164:3, 164:18, 164:22, 165:11, 166:25, 167:23, 168:3, 168:6, 168:17, 169:15, 169:21, 169:25, 170:11, 171:2, 171:5, 171:9, 171:14
**themselves** [5] - 13:23, 28:6, 32:23, 84:20, 125:6
**therapist** [1] - 80:16
**therapy** [3] - 93:4, 144:7, 150:14
**thereafter** [1] - 4:12
**therefore** [3] - 11:4, 35:2, 65:25
**they've** [4] - 16:24, 53:4, 94:21, 105:13
**thinks** [1] - 9:15
**third** [3] - 11:13, 95:9, 142:4
**thousands** [10] - 19:14, 22:5, 22:6, 27:20, 34:6, 34:7, 127:2, 127:4
**three** [9] - 18:6, 24:15, 36:7, 37:8, 38:12, 39:3, 100:15, 129:11, 157:17
**throughout** [5] - 11:22, 22:9, 30:15, 30:17, 31:10
**throw** [1] - 47:14
**tied** [2] - 157:5, 157:7
**Tier** [20] - 159:24, 160:5, 160:12, 160:15, 160:16, 160:23, 160:25, 161:9, 161:10, 161:16, 161:19, 162:12, 162:14, 163:1, 163:5, 163:7, 163:21, 165:1

**tier** [1] - 163:5
**tiers** [1] - 159:17
**timely** [2] - 102:4, 102:7
**tip** [1] - 18:17
**tires** [1] - 168:9
**title** [7] - 71:9, 92:8, 106:12, 115:14, 115:16, 116:8, 129:5
**Title** [2] - 55:16, 58:1
**Tobin** [1] - 40:1
**today** [13] - 4:15, 18:20, 33:20, 112:8, 130:21, 138:10, 152:24, 154:22, 157:21, 167:7, 168:8, 169:19, 171:6
**together** [5] - 5:10, 6:19, 7:3, 62:25, 158:12
**tomorrow** [18] - 51:9, 152:8, 152:23, 165:13, 165:18, 166:10, 166:13, 166:20, 166:22, 167:1, 167:17, 167:21, 167:25, 168:7, 169:10, 169:20, 170:25, 171:12
**tone** [1] - 44:7
**took** [8] - 25:21, 32:6, 35:9, 42:4, 70:18, 70:19, 128:15, 154:16
**tool** [2] - 121:4, 150:5
**top** [8] - 34:22, 63:2, 100:14, 122:21, 134:22, 135:18, 137:10, 154:7
**topics** [2] - 70:25, 90:24
**tos** [1] - 132:13
**touch** [1] - 63:18
**towards** [3] - 47:2, 48:12, 107:11
**towns** [1] - 90:21
**tracking** [1] - 144:18
**traditional** [2] - 27:10, 80:20
**traffic** [1] - 6:24
**TrailBlazer** [1] - 72:12
**train** [1] - 142:16
**trained** [4] - 23:6, 25:13, 25:19, 73:13
**training** [2] - 51:20, 70:19
**transaction** [1] - 95:17
**TRANSCRIPT** [1] - 1:9
**transcripts** [1] - 61:7
**transfer** [2] - 111:16, 111:24
**transition** [1] - 112:5
**translate** [2] - 25:19, 123:8
**travel** [3] - 167:6, 167:10, 167:21
**traveling** [1] - 167:13
**treat** [5] - 124:16, 125:5, 142:13, 150:13, 156:25
**treated** [4] - 9:2, 125:9, 144:15, 146:25

**treating** [14] - 20:7, 20:12, 25:14, 103:11, 103:14, 103:16, 103:17, 123:1, 123:6, 123:10, 123:21, 123:25, 126:5, 140:24
**treatment** [20] - 25:20, 59:12, 112:24, 116:9, 117:3, 124:7, 124:20, 125:11, 125:18, 126:8, 126:21, 127:7, 142:15, 146:22, 147:8, 150:2, 156:22, 157:4, 157:6, 157:14
**treatments** [2] - 19:8, 29:18
**treats** [1] - 123:2
**trends** [1] - 33:16
**TRIAL** [1] - 1:9
**trial** [26] - 7:10, 7:19, 7:21, 8:2, 11:20, 11:24, 12:6, 12:9, 14:24, 15:24, 16:4, 17:3, 18:9, 19:6, 20:19, 22:9, 28:15, 30:17, 31:10, 46:18, 46:19, 46:20, 47:2, 62:4, 165:25
**trials** [1] - 75:11
**tricked** [2] - 17:21, 34:5
**tried** [1] - 148:5
**trouble** [5] - 4:4, 6:21, 6:25, 44:2, 115:24
**true** [14] - 9:5, 48:9, 49:25, 85:7, 86:19, 88:4, 89:5, 89:18, 91:21, 94:21, 98:16, 98:19, 98:21, 100:21
**trust** [24] - 14:25, 47:7, 52:23, 77:2, 78:25, 79:5, 79:20, 79:24, 80:3, 85:6, 88:1, 88:6, 90:11, 99:2, 99:4, 99:5, 99:6, 101:25, 102:3, 112:9, 112:25, 118:13, 126:20, 127:10
**trust-based** [6] - 85:6, 88:1, 88:6, 99:2, 99:4, 101:25
**trusts** [1] - 21:17
**trustworthy** [2] - 47:17, 102:1
**truth** [4] - 45:18, 45:19, 53:2, 100:6
**truthful** [1] - 89:25
**try** [11] - 7:6, 9:22, 36:4, 39:1, 51:22, 54:18, 57:4, 67:20, 152:16, 166:13, 170:7
**trying** [5] - 57:7, 58:8, 155:6, 156:12, 160:10
**tube** [2] - 137:6, 146:10
**tumor** [1] - 147:12
**turn** [13] - 4:9, 7:11, 16:25, 17:12, 18:17, 68:7, 95:8, 99:25, 135:18, 138:22, 143:23, 149:23, 153:25
**turned** [3] - 24:20, 27:14, 39:11

**turning** [9] - 69:13, 93:23, 94:12, 104:5, 104:10, 105:6, 106:10, 108:11, 110:1
**TV** [1] - 80:19
**twice** [3] - 48:5, 48:22, 170:18
**Twitter** [1] - 13:4
**two** [26] - 19:9, 22:14, 26:5, 43:24, 58:24, 60:6, 65:1, 75:10, 80:22, 83:12, 86:13, 97:17, 108:14, 128:6, 133:25, 134:3, 144:3, 151:14, 152:3, 157:25, 161:9, 164:12, 167:3, 167:18, 167:25
**two-and-a-half** [2] - 151:14, 152:3
**two-way** [1] - 128:6
**type** [20] - 12:7, 18:2, 18:24, 19:5, 25:24, 59:12, 59:21, 77:23, 81:19, 87:5, 87:12, 89:14, 92:6, 93:11, 109:23, 142:10, 142:13, 146:5, 147:11, 157:13
**types** [15] - 18:21, 19:1, 19:7, 41:13, 59:9, 59:18, 61:6, 80:16, 92:22, 128:2, 133:3, 146:4, 149:14, 157:25, 159:17
**typically** [2] - 40:16, 163:6
**typographical** [1] - 135:6

# U

**ultimate** [1] - 131:16
**ultrasound** [1] - 120:6
**umbrellas** [1] - 8:12
**unaffected** [1] - 137:15
**uncomfortable** [3] - 32:8, 32:21, 50:15
**under** [40] - 22:4, 36:18, 47:2, 58:1, 73:5, 73:7, 74:25, 76:9, 76:23, 77:10, 80:16, 80:21, 80:22, 100:16, 104:7, 105:17, 107:7, 113:5, 116:5, 117:16, 117:23, 118:15, 118:17, 118:23, 118:24, 119:2, 119:4, 127:10, 139:15, 143:25, 145:21, 147:6, 148:3, 149:24, 150:16, 154:13, 154:14, 169:23, 170:23
**underlying** [2] - 95:17, 98:16
**undermines** [1] - 97:16
**underneath** [2] - 132:16, 132:18
**understood** [5] - 51:6, 61:17, 66:4, 164:18, 171:1
**undivided** [1] - 16:23

**unfair** [1] - 98:6
**unfortunately** [1] - 4:4
**Unified** [1] - 76:24
**unit** [1] - 152:17
**United** [15] - 1:23, 4:2, 29:23, 43:10, 68:14, 75:21, 79:11, 148:25, 149:5, 155:3, 158:16, 164:5, 164:6, 164:11, 164:12
**UNITED** [4] - 1:1, 1:3, 1:10, 1:15
**units** [1] - 71:24
**University** [1] - 70:13
**unless** [5] - 9:9, 65:11, 126:22, 158:24, 170:12
**unlevel** [1] - 98:4
**unlikely** [1] - 163:10
**up** [65] - 4:6, 6:8, 15:22, 17:9, 23:4, 37:12, 38:4, 40:21, 42:11, 42:21, 44:12, 44:24, 49:7, 50:7, 52:3, 52:12, 52:13, 55:3, 55:4, 59:22, 62:9, 65:8, 66:9, 66:21, 68:5, 68:16, 79:10, 85:15, 92:15, 112:11, 113:18, 115:6, 119:18, 120:25, 122:7, 128:18, 128:24, 129:1, 131:8, 131:18, 131:24, 132:20, 133:7, 133:10, 134:7, 135:11, 138:11, 138:14, 144:19, 149:10, 151:5, 153:9, 155:6, 157:19, 159:23, 160:10, 162:6, 162:7, 162:9, 165:18, 166:18, 166:20, 168:11, 168:18, 170:4
**upcoding** [1] - 111:1
**update** [2] - 91:20, 135:10
**updated** [4] - 158:13, 158:15, 158:17, 158:19
**updating** [1] - 101:20
**UPIC** [10] - 72:19, 73:6, 73:15, 76:15, 76:21, 76:22, 76:23, 110:24, 159:16
**usage** [1] - 161:9
**useful** [1] - 32:12
**useless** [1] - 29:11
**user** [2] - 131:15, 132:3
**uses** [7] - 14:16, 23:12, 33:12, 71:1, 92:13, 123:3, 158:25
**utilize** [4] - 72:24, 81:24, 126:20, 128:6
**utilized** [5] - 126:8, 150:6, 160:18, 161:12, 161:17
**utilizes** [1] - 103:18
**utilizing** [8] - 57:23, 58:11, 71:16, 72:4, 79:25, 156:21, 158:20, 163:8

utterly [1] - 18:11

## V

valid [2] - 36:5, 64:25
validated [3] - 87:7, 87:9, 87:14
value [4] - 65:21, 66:1, 99:20, 99:24
variant [1] - 137:21
variation [1] - 99:23
various [15] - 60:14, 70:25, 71:13, 71:24, 73:9, 76:6, 76:15, 84:17, 90:16, 90:19, 90:21, 90:24, 92:12, 110:24, 148:22
vary [1] - 99:19
vast [2] - 25:7, 85:23
vendor [1] - 93:4
verdict [4] - 8:3, 10:9, 13:21, 16:19
verify [1] - 100:23
version [2] - 136:8
versions [2] - 136:1, 155:21
versus [2] - 4:3, 155:11
videos [1] - 90:20
view [4] - 12:12, 12:16, 14:8, 14:20
violate [2] - 45:20, 47:3
violation [2] - 64:12, 114:22
visit [3] - 12:12, 14:2, 120:12
visits [1] - 25:1
vital [1] - 35:2
volume [5] - 25:24, 27:12, 99:20, 99:23, 164:4
Volume [1] - 1:6
vote [1] - 132:9
vs [1] - 1:5

## W

wait [3] - 46:18, 86:4, 170:16
waiting [1] - 65:1
walk [1] - 7:9
walking [1] - 8:11
wand [1] - 18:17
wants [6] - 41:1, 50:5, 60:13, 61:12, 124:23, 125:4
Washington [1] - 1:16
waste [2] - 76:25, 90:10
wasted [1] - 20:25
wasteful [1] - 18:11
wasting [1] - 80:2
watch [1] - 12:17
Watt [6] - 40:1, 42:16, 51:25, 52:4, 52:17
WATT [1] - 40:2
ways [2] - 14:17, 73:4

website [2] - 90:19, 107:4
websites [1] - 13:10
week [2] - 55:2, 167:13
weeks [1] - 60:6
weight [6] - 8:18, 11:11, 15:17, 65:8, 65:22, 115:5
welcome [3] - 35:17, 63:1, 67:24
well-taken [1] - 162:7
wellness [1] - 120:12
Wellness [2] - 109:5, 109:7
WEST [1] - 1:2
wet [2] - 8:11, 8:12
whatsoever [4] - 9:8, 11:8, 12:9, 13:8
whereabouts [1] - 7:6
whoa [1] - 38:14
whole [7] - 19:22, 35:20, 38:4, 38:14, 48:14, 132:18, 169:5
willing [2] - 32:11, 34:15
willingness [1] - 22:12
wire [1] - 29:23
wish [1] - 15:7
wishes [1] - 16:13
withstanding [1] - 116:3
WITNESS [7] - 3:2, 56:7, 68:22, 129:7, 137:13, 163:15, 164:3
witness [62] - 4:12, 4:20, 4:23, 5:1, 5:11, 5:24, 7:15, 8:11, 9:6, 9:8, 9:9, 10:11, 10:12, 10:14, 14:7, 14:8, 15:8, 33:9, 45:6, 47:6, 47:18, 47:19, 49:10, 49:12, 49:14, 54:21, 54:22, 54:25, 55:5, 55:23, 55:25, 56:11, 60:17, 64:19, 67:3, 68:4, 68:8, 68:19, 75:10, 103:20, 105:1, 107:16, 108:21, 109:16, 115:5, 152:4, 152:10, 152:11, 153:13, 162:1, 162:2, 165:13, 165:23, 167:10, 167:18, 167:21, 167:24, 169:17, 170:25
witness's [5] - 10:15, 10:16, 10:18
witnesses [22] - 10:8, 10:22, 13:15, 15:12, 16:11, 16:14, 32:15, 32:16, 47:22, 48:3, 53:3, 61:12, 67:2, 67:6, 167:4, 167:5, 167:13, 167:19, 168:13
witnesses' [1] - 9:3
women [4] - 148:25, 149:3, 149:6, 149:19
wonder [1] - 58:4
word [5] - 32:14, 81:6, 81:21, 122:15, 146:17
words [6] - 14:16, 49:3,

123:8, 127:22, 128:7, 165:17
wordsmith [1] - 66:13
wore [1] - 43:17
workload [1] - 84:24
works [10] - 35:1, 36:25, 43:12, 45:16, 46:1, 52:20, 61:22, 74:19, 76:23, 78:23
world [1] - 59:10
worried [1] - 57:6
worry [1] - 17:8
worse [3] - 26:23, 48:8
worst [3] - 32:4, 49:2, 49:17
worthless [1] - 24:11
wrap [2] - 168:11, 170:4
write [3] - 15:20, 15:25, 49:8
writing [3] - 40:2, 74:7, 74:11
written [7] - 28:1, 49:7, 49:12, 49:14, 52:3, 139:1, 153:16
wrote [1] - 153:18
Wulf [3] - 167:4, 168:1, 168:4

## X

X-ray [8] - 93:4, 117:14, 117:16, 117:19, 118:5, 118:18, 122:24, 142:25
X-rays [1] - 150:8
XGEN [1] - 31:2

## Y

year [3] - 71:7, 86:1, 158:13
years [15] - 18:6, 22:7, 36:8, 38:12, 39:3, 47:20, 50:14, 71:25, 75:22, 110:20, 136:2, 136:4, 144:16, 155:23, 158:18
yesterday [8] - 5:5, 10:7, 11:19, 13:25, 14:17, 18:5, 18:20, 68:11
yield [1] - 25:24
York [2] - 1:16, 131:20
yourself [4] - 15:9, 34:4, 47:4
yourselves [2] - 11:25, 54:9
YouTube [2] - 13:4, 90:20

## Z

zoom [26] - 95:11, 100:1, 100:14, 106:25, 115:15, 115:22, 122:20, 123:17, 126:10, 129:11, 134:22, 135:17, 135:18, 136:15, 136:16, 137:22, 139:24, 141:4, 142:3, 142:4, 143:5,

143:24, 144:25, 145:1, 148:11, 148:12
zooming [1] - 138:23