```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                     WEST PALM BEACH DIVISION
                       CASE NO. 19-CR-80181-RAR-1
 3
       UNITED STATES OF AMERICA,          Miami, Florida
 4
                                          November 30, 2022
 5            vs.
                                          10:19 a.m. - 5:55 p.m.
 6
       MINAL PATEL,                       Volume 3
 7
                      Defendant.          Pages 1 to 260
 8     _____

 9
                       TRANSCRIPT OF JURY TRIAL
10          BEFORE THE HONORABLE RODOLFO A. RUIZ, II
                   UNITED STATES DISTRICT JUDGE
11
       APPEARANCES:
12

13     FOR THE GOVERNMENT:        JAMIE DE BOER
                                  EMILY GURSKIS
14                                REGINALD CUYLER
                                  KATHERINE ROOKARD
15                                UNITED STATES DEPARTMENT OF JUSTICE
                                  CRIMINAL DIVISION, FRAUD SECTION
16                                1400 New York Avenue, 8th Floor
                                  Washington, D.C. 20005
17
       FOR THE DEFENDANT:         STEVEN H. SADOW
18                                LAW OFFICE OF STEVEN H. SADOW, PC
                                  260 Peachtree Street NW
19                                Suite 2052
                                  Atlanta, Georgia 30303
20
       STENOGRAPHICALLY REPORTED BY:
21
                                  ILONA LUPOWITZ, CRR, RPR, RMR
22                                Official Court Reporter to:
                                  The Honorable Rodolfo A. Ruiz, II
23                                United States District Court
                                  299 East Broward Boulevard
24                                Fort Lauderdale, Florida 3301
                                  (954) 769-5568
25
```

```
 1   (Appearances continued)

 2
     FOR THE DEFENDANT:          DONALD F. SAMUEL
 3                               GARLAND, SAMUEL & LOEB, PC
                                 3131 Maple Drive NE
 4                               Atlanta Georgia 30305

 5                               BRIAN T. RAFFERTY
                                 BAKER & HOSTETLER, LLP
 6                               1170 Peactree Street, Suite
                                 2400
 7                               Atlanta, Georgia 30309

 8

 9                    I N D E X

10

11   WITNESS                                          PAGE

12
     LAURIE MCMILLAN
13   CROSS-EXAMINATION BY MR. RAFFERTY                  16
     REDIRECT EXAMINATION BY MS. GURSKIS                97
14
     C.N.
15   DIRECT EXAMINATION BY MS. GURSKIS                 111

16   P.W.

17   DIRECT EXAMINATION BY MS. ROOKARD                 115

18   SENTHIL RAMAMURTHY
     DIRECT BY MS. GURSKIS                             125
19

20

21

22

23

24

25
```

```
 1                          GOVERNMENT'S EXHIBITS

     Exhibit                                          Received
 2
     209-B, 209-C, 209-D,                             16
 3   209-E, 209-G, 209-H,
     210-B, 212-B, 214-B,
 4   214-C, 214-D, 243,
     and 247
 5   408-C                                            115
     450                                              137
 6   665 and 665-A                                    138
     1123                                             147
 7   1351 and 1351-A                                  149
     1245-A, 1245-B, and                              157
 8   1245-C
     1318, 1318-A, 1319,                              160
 9   1324, 1324-A, 1325,
     1325-A, 1338, and
10   1338-A
     1866 and 1337                                    166
11   1364, 1364-A, and                                170
     1369
12   1214-A and 1214-B                                176
     667-A and 667-B                                  178
13   1875, 1334                                       180
     1004                                             180
14   1247 and 1234                                    182
     1414, 1414-A, 1415,                              189
15   and 1416
     1326, 1327, 1327-A,                              199
16   1328, 1328-A, 1329,
     1330, 1331, 1332,
17   1332-A, 1333,
     1334-A, 1336, 1336,
18   1338-A, 1343,
     1343-A, 1345, 1360,
19   1375, 1376, 1382,
     1385, 1385-A, 1399-A
20   and B and C and D
     and E and F and G,
21   1404, 1453, 1454,
     1455, 1455-A, 1456,
22   1457, 1460 and 1463


23                          DEFENDANT'S EXHIBITS
     Exhibit                        Marked           Received
24
     200                                             16
25   A-1, A-2, A-3, A-4,                             200
     and A-5
```

```
 1                    (Call to the Order of the Court.)
 2          THE COURT:  We are back online in case number 19-80181,
 3   our trial in the United States of America versus Minal Patel.
 4   All jurors are now present and accounted for and ready to go.
 5   Any concerns, issues, housekeeping, that I need to be aware of,
 6   starting with the government?
 7          MS. DE BOER:  Three brief issues, Your Honor.
 8          THE COURT:  Okay.
 9          MS. DE BOER:  Number one, we informed the defense
10   yesterday at 3:27 p.m. that we may call Senthil Ramamurthy
11   today, and then upon reflecting on our schedule we cut one
12   witness for tomorrow and we rearranged some travel for folks,
13   and we intend to call Mr. Ramamurthy today in lieu of
14   Mr. Sporn.
15          The marshals have brought him over.  There's one
16   potential -- we wanted to just make sure of any logistics
17   because he's incarcerated, so how you want him brought out in
18   front of the jury.  He has diabetes, and so we did speak with
19   the marshals.  We understand he has some food, but we advised
20   the witness that if at any point on the stand he feels a little
21   woozy or whatever, to just not try to push through and let us
22   know.  We have a Pepsi for him if he needs it, we have snacks
23   if he needs it, just in case.
24          So we just wanted to advise the Court of that potential
25   issue.
```

1              THE COURT:  So what we'll do with Mr. Ramamurthy is
2       we'll have him take the witness stand while the jury is on
3       break.  I'll have him already seated.  I will speak to him
4       outside the presence of the jury regarding any concerns with
5       his diabetes so he knows that he can alert me if he doesn't
6       feel well or he needs to take a quick bite or sip of something
7       while he's on the stand.
8              But my plan will be to go ahead and have him seated
9       before the jury comes back in.
10             MS. DE BOER:  Very good, Your Honor.  And we anticipate
11      that after Ms. McMillan we'll call two other witnesses before
12      Mr. Ramamurthy, so it may be that he's right after the lunch
13      break, which may be convenient for everybody.
14             A second issue with respect to the witness who we
15      expect to go third today.  So it'll be McMillan, then it will
16      be Ms. N., then it'll be Ms. Wulf.  So this is with respect to
17      Ms. Wulf.  She was a patient witness who was referred to the
18      lab by Chris White's operation.  She does not know Mr. White.
19             She is not going to be introducing any statements with
20      respect to Mr. White, therefore we don't believe that this
21      would implicate the recordings that we discussed last week with
22      Your Honor, but we wanted to advise the Court of the way in
23      which she was referred.  She's not going to be talking about
24      any of the -- you know, the financial arrangements between
25      marketers and the lab.  She doesn't know about that.

1          THE COURT:  So she won't be talking about any of the

2    financial arrangements.  We don't think she'll be referenced or

3    opening up any concerns regarding the recorded statements.

4          MS. DE BOER:  That's correct, Your Honor.

5          THE COURT:  All right.

6          MS. DE BOER:  And then the third issue pertains to a

7    witness who's coming tomorrow, but it may require some advanced

8    work on our part, depending on how this issue is resolved.  I

9    understand that the defense is objecting to the authenticity of

10   certain patient files for which we have a 902.11 certificate

11   with the Exhibit S2, Docket Entry 358.

12          These are patient files.  These are clearly business

13   records.  We have a certificate indicating that they are

14   business records.  We understand there's an objection to

15   authenticity.  We would ask to not have to bring in a custodian

16   witness on this in order to move this case along and keep on

17   track.

18          THE COURT:  So let's do this.  I'll handle that

19   authenticity issue later today so that I can make a ruling on

20   that in preparation for tomorrow.  This is not at issue until

21   tomorrow's witness, right?

22          MS. DE BOER:  That's correct, Your Honor.

23          THE COURT:  Obviously I understand if you have to bring

24   a custodian of record that logistically impacts you, but my

25   hope is I can get to this later today.  Okay, so those are the

1    three issues from the government's side, right?

2         MS. DE BOER:  Yes, Your Honor.  Thank you.

3         THE COURT:  Is Ms. McMillan available right now?

4         MS. DE BOER:  Yes, she's right outside.

5         THE COURT:  Why don't we go ahead and get her, and

6    let's get her already on the stand while I'm hearing from

7    Mr. Rafferty.

8         MR. RAFFERTY:  Your Honor, if we could just hold off --

9         THE COURT:  Oh, okay.  I'm sorry.  If it implicates her

10   testimony.  Go ahead.

11        MR. RAFFERTY:  It does.  So there's a number of

12   exhibits which I understand the government has no objection to

13   which I intend on introducing --

14        THE COURT:  Slow down a bit for my court reporter.  So

15   number of exhibits that you intend on introducing in the

16   cross-examination of presumably Ms. McMillan?

17        MR. RAFFERTY:  Yes, Your Honor.

18        THE COURT:  Okay.

19        MR. RAFFERTY:  Those exhibits are on the government's

20   exhibit list.  I've conferred with Ms. Gurskis on those

21   exhibits and there are no objections.  So when she's brought

22   in, I would just ask the Court to be able to read those

23   exhibits into the record similar to the manner in which

24   Ms. Gurskis did.

25             And then there's one additional exhibit which I've

1    disclosed to the government.  It is government exhibit -- or

2    Defense Exhibit 200.  It is an OIG-related document.  It was

3    prepared by the Office of the Inspector General, and it

4    concerns the local coverage determinations.  It's a document

5    that was produced in 2014.  It is a memo that addresses the

6    inconsistencies in the use of LCDs.

7         And I would -- I intend on seeking to have that

8    admitted as an exhibit during the course of my examination of

9    Ms. McMillan.  The document is entitled the Department of

10   Health and Human Services, Office of Inspector General, Local

11   Coverage Determinations Create Inconsistencies in Medicare

12   Coverage.

13        I think, clearly, based on her testimony yesterday,

14   there's significant relevance to this.  She testified

15   repeatedly about LCDs, her knowledge of LCDs, her expertise in

16   LCDs, and that the LCDs that exist are designed, and I quote,

17   to make sure that wherever you live, your Medicare benefit is

18   the same.

19        This document, Your Honor, makes clear that that's been

20   a concern of HHS, OIG, and CMS going back to 2014.  The

21   document further specifically talks about the difficulties in

22   LCDs in new technology, which is straight on point with what

23   we're dealing with here when it comes to genetic testing.

24        I'd last point out that the government spent a

25   considerable amount of time during the course of her testimony

1   not only laying the foundation for her expertise and her

2   background in various rules, regulations, statutes, opinions --

3   they have some of the very same kinds of opinions on their own

4   exhibit list -- but they spent quite a bit of time talking

5   about documents signed by Mr. Patel in 2014, beginning with

6   209-A, 210-A, 212-A, a number of documents signed in 2014, and

7   the witness testified that by signing those, he agreed to

8   comply with various coverage obligations, including LCDs.

9        So this particular memo from 2014 is squarely on point

10   with respect to that as well.  And so rather than bringing in

11   another witness, ask for a 902(11) certificate, Your Honor, I

12   would ask to introduce it into evidence and use it during the

13   cross-examination of Ms. McMillan.

14        THE COURT:  So let's take things in turn.  The Court

15   has no issue with at the beginning of your cross-examination

16   going ahead and reading into the record the list of exhibits

17   you plan on utilizing that are going to be admitted without

18   objection.

19        As to the Exhibit 200 of the defense, the government's

20   position on that?

21        MS. GURSKIS:  The government's position is that it's

22   irrelevant, Your Honor.  Mr. Rafferty correctly knows that this

23   was published in 2014, but I'm actually reading from the report

24   itself, which relates to a one-week period in which they were

25   looking at procedure codes from October of 2011, which actually

1    predates every single LCD at issue in this case by a minimum of

2    three years.

3         Mr. Patel himself did not start billing genetic testing

4    codes until 2017, but the LCDs on our exhibit list which were

5    introduced yesterday, the earliest of which went into effect in

6    mid to late 2014.

7         THE COURT:  Okay.

8         MS. GURSKIS:  So this would be entirely irrelevant, and

9    if not irrelevant, would certainly confuse the jury.

10        THE COURT:  Okay.  The Court's going to go ahead and

11   allow that to come in.  But my view on this is you can clarify

12   that on your redirect.  And truthfully, although I don't

13   disagree with you that the time periods may be off, I would

14   suspect that part of it's relevancy, and why I'm going to go

15   ahead and let it be shown to the witness, is really also to

16   illustrate the uncertain nature of this space, that it is a

17   space that historically may have been in flux and that there

18   are rules that are evolving when it comes to Medicare.

19        Certainly you can draw up the fact that these aren't

20   rules that at the time should have let Mr. Patel or misguided

21   Mr. Patel in his evaluation of LCDs, but certainly that is

22   something that I'd rather go ahead and address on the redirect

23   as opposed to keeping it out.

24        Because I do see a little bit of value in terms of just

25   the big picture of how Medicare works, which at the end of the

1    day I think we had a lot of testimony from Ms. McMillan that

2    spoke in broad terms about Medicare and coverage determination.

3            So I'm going to allow it in.  So let's go ahead and use

4    that, and that objection will be overruled.  So as part of your

5    presentation, I think, Mr. Rafferty, when you begin, go ahead

6    and include Exhibit 200 in that, and obviously the government

7    will renew the objection, but we'll be able to use it.

8            Okay?  All right.

9            MS. GURSKIS:  Do you have a copy of that?

10           MR. RAFFERTY:  I do.  I'm sorry.

11           THE COURT:  Anything else on the defense side before I

12   get my jury back in here, guys?  Was that it, Mr. Rafferty, on

13   your end?

14           MR. RAFFERTY:  That's it.

15           MR. SADOW:  I have --

16           THE COURT:  Yes, Mr. Sadow, what do you have?

17           MR. SADOW:  I would like to do a quick whine,

18   w-h-i-n-e, if I might.

19           THE COURT:  Okay.  Uh-huh.

20           MR. SADOW:  When I'm given a list of witnesses on

21   Sunday that includes Mr. Sporn, but not Mr. Ramamurthy, and

22   then I'm given the same list with additional exhibits and there

23   are multiple exhibits for Mr. Sporn on Monday, and no mention

24   of Mr. Ramamurthy, and I'm given late in the afternoon

25   yesterday a document that says that Ramamurthy and one other

1    witness may be called potentially today or tomorrow, and I'm

2    not told that Mr. Sporn isn't be going to be called, I spent my

3    time and effort preparing for Mr. Sporn, not for

4    Mr. Ramamurthy, only to be told last night, about 7:30, that

5    Mr. Ramamurthy will be testifying and Mr. Sporn will not.

6          That kind of defeats the whole purpose of notice, since

7    Mr. Sporn's file is this thick (indicating) with just documents

8    for use on cross, and Mr. Ramamurthy's is similar.

9          So if I'm going to get notice and I'm not going to have

10   a witness that I'm preparing for because I've already received

11   notice, maybe the government could say, you know what?  We're

12   not going to call Mr. Sporn.  Because I don't know if Your

13   Honor watched.  Yesterday, as the witness was testifying, I was

14   working on Mr. Sporn the entire time.  So it puts me at a

15   disadvantage.

16         What it required me to do is, starting at 8:00 o'clock

17   last night, to start getting on Ramamurthy and putting aside

18   Mr. Sporn.  So I'm going to be prepared.  I'm going to do my

19   cross, but this kind of playing -- my words -- doesn't really

20   work.

21         If you're not going to call a witness and you've made

22   that decision, let me know you're not going to call them so I

23   can put that one aside and go to the next one.  That's all I'm

24   asking.

25         THE COURT:  Understood.  And I think the government

1    understands also that these types of determinations -- although
2    I do recognize that things can change at the eleventh hour, I
3    really also am planning out my schedule and my timing based
4    upon who we think we're going to call.  That's why I asked
5    yesterday.  I didn't leave it up to the lawyers to sort out the
6    list for today.  So I would just echo.  And I'm certain
7    that we're going to make every effort to make sure that we
8    stick to whatever list we're lining up the evening or the
9    afternoon before so that we can try to really keep the
10   efficiency levels up, because what it does is, arguably it only
11   makes things more belabored because the preparation then is
12   shortcut because we didn't go ahead and let the other side know
13   not to worry about certain witnesses or to focus energies on
14   others.
15           So can the government just please make that promise to
16   the Court and opposing counsel, that absent extenuating
17   circumstances, I'm going to have you guys really stick to the
18   list that you let the Court know about the day before.  Okay?
19           MR. SADOW:  If I may add to that.  Mr. Ramamurthy, as
20   the Court now knows, is in custody.  And he's been here since
21   November 25th at the earliest.  So the notion that there is
22   some concern about Mr. Ramamurthy being in the U.S. Marshal's
23   custody -- now, if Mr. Sporn for some reason is unavailable,
24   which I find hard to believe since he was interviewed last
25   night.

1          So this is not a scheduling issue.  This is just a, we

2    decided to change it.  It has nothing to do with the

3    circumstances arising yesterday.  They've just made a decision

4    to call Ramamurthy before Sporn, which, again, they're

5    permitted to do, but I understand scheduling issues, like the

6    Court pointed out.  This isn't one of them.

7          THE COURT:  Understood.  So just on the government's

8    end, so that I don't also lose time with housekeeping on these

9    matters, I would just ask that we try to stick with our plan as

10   much as possible, absent extenuating circumstances, because

11   certainly we have a need to move swiftly through some of these

12   witnesses so that we can keep a good pace going.

13         So can I just get an assurance from the government

14   going forward that we won't have any major last-minute changes,

15   okay?

16         MS. DE BOER:  Understood, Your Honor.  Thank you.

17         THE COURT:  All right.  Mr. Rafferty, you're good on

18   your end?

19         MR. RAFFERTY:  Yes, Your Honor.  Thank you.

20         THE COURT:  All right.  Let's go ahead now.  If we can

21   have Ms. McMillan now.  I'm going to have her take the stand

22   already before I bring in the jury.

23         (Witness takes the witness stand.)

24         THE COURT:  Let's all rise for the jury.

25         (Jury enters at 10:35 a.m.)

1          THE COURT:  Please be seated, everyone.

2          Good morning, ladies and gentlemen of the jury.  Good

3   to see you all.  Hope you all had a nice evening.  As you

4   recall, when we broke yesterday we had just completed the

5   direct examination of Ms. McMillan.  You will see that

6   Ms. McMillan has already taken the stand.  We are now going to

7   turn it over to Mr. Rafferty on behalf of the defense.  He will

8   be conducting the cross-examination.  And then, after that, we

9   have the redirect from the government.  Okay?  And once that is

10  complete, we've completed the witness.

11         So does everyone have their notepads?  Seems like you

12  all do.  Very good.  So with that, I will turn it over to

13  defense counsel for the cross.

14         Mr. Rafferty, the floor is yours.

15         MR. RAFFERTY:  Thank you, Your Honor.

16         Good morning.  Your Honor, before I begin my cross, if

17  I could take care of some housekeeping with respect to some

18  exhibits?

19         THE COURT:  Please do.

20         MR. RAFFERTY:  Thank you.

21         At this time, the defense would move into evidence

22  Government Exhibits 209-B, 209-C, 209-D, 209-E, 209-G, 209-H,

23  210-B, 212-B, 214-B, 214-C, 214-D, 243, and 247.

24         THE COURT:  All right.

25         MR. RAFFERTY:  In addition, Your Honor, at this time

1    we'd also move into evidence Defendant's Exhibit 200.

2         THE COURT:  Very good.  Subject to prior objections,

3    any other concerns on behalf of the government before we admit

4    this list of exhibits?

5         MS. GURSKIS:  Nothing other than the previously

6    indicated objection.  Thank you, Your Honor.

7         THE COURT:  Thank you very much.  Those will be moved

8    into evidence at this time.

9         (Government Exhibits 209-B, 209-C, 209-D, 209-E, 209-G,

10        209-H, 210-B, 212-B, 214-B, 214-C, 214-D, 243, and 247

11        were received in evidence.)

12        (Defense Exhibit 200 was received in evidence.)

13                        CROSS-EXAMINATION

14   BY MR. RAFFERTY:

15   Q.  Good morning, Ms. McMillan.

16   A.  Good morning.

17   Q.  My name is Brian Rafferty, and I'm one of the attorneys

18   that represent Minal Patel.

19   A.  Good morning.

20   Q.  And I have some questions for you about your testimony

21   yesterday.

22   A.  Okay.

23   Q.  Some of it is background information that I want to make

24   sure I have straight.  Okay?

25   A.  Sure.

1   Q.   With respect to your testimony, I assume that you did some

2   preparations in advance of your testimony.

3   A.   Yes, I did.

4   Q.   And you reviewed materials; is that right?

5   A.   Yes, I did.

6   Q.   And I just want to make sure I know what those materials

7   are.

8   A.   Sure.

9   Q.   That would include, I assume, some publicly available

10  statutes?

11  A.   Yes.

12  Q.   Regulations?

13  A.   Yes.

14  Q.   Guidance documents?

15  A.   Yes.

16  Q.   Alerts?

17  A.   Yes.

18  Q.   OIG memos?

19  A.   I did not review any OIG memos.

20  Q.   How about Medicare-related information about genetic

21  testing?

22  A.   Yes.

23  Q.   Medicare enrollment forms?

24  A.   Yes.

25  Q.   Other Medicare documents related to LabSolutions?

1   A.   The enrollment forms.

2   Q.   Correspondence related to that, perhaps?

3   A.   No.

4   Q.   Okay.  How about some billing data?

5   A.   Yes.

6   Q.   For Part B?

7   A.   For Part B, yes.

8   Q.   And Part C?

9   A.   Yes.

10   Q.   And all of that information, was that provided to you by

11   the government?

12   A.   Yes.

13   Q.   Did you select the information, or did they give you the

14   information for you to review?

15   A.   They gave it to me.

16   Q.   So they selected the information?

17   A.   Regarding the data and the enrollment forms, I personally

18   went out and looked at regulations on my own.  They did provide

19   some of those, but they were similar to what I had already

20   produced.

21   Q.   Understood.  And that's the universe of what you reviewed

22   in advance of your testimony?

23   A.   Yes.

24   Q.   Okay.  And you testified you have extensive experience, I

25   think, with respect to Medicare --

1   A.   Yes.

2   Q.   -- right?

3        You've worked in this industry for 20-plus years?

4   A.   Since 2007, essentially reviewing medical records, and

5   2010, directly working for a Medicare contractor.

6   Q.   And through that experience you've come to know quite a bit

7   about the rules and regulations of Medicare; is that fair?

8   A.   Yes.

9   Q.   And there are literally thousands of rules, regulations,

10  LCDs, NCDs, all these things you've talked about related to

11  Medicare; is that right?

12  A.   There are a lot, yes.

13  Q.   And there are a whole bunch of advisory opinions out there

14  about different aspects of Medicare?

15  A.   There are advisory opinions out there, yes.

16  Q.   And there's a lot of them, aren't there?

17  A.   I'm not as familiar about -- with the advisory opinions.

18  Those are more legal in nature.

19  Q.   Well, you testified a little bit about legal, didn't you,

20  yesterday?

21  A.   Yes.

22  Q.   You talked about the Anti-Kickback Statute, which is a law?

23  A.   Yes.

24  Q.   You went through a bunch of Code of Federal Regulations

25  sections?

```
 1    A.   Yes.

 2    Q.   Various sections of the United States Code?

 3    A.   Yes.

 4    Q.   So you have some familiarity with the law?

 5    A.   I do.

 6    Q.   But you're not a lawyer?

 7    A.   I am not.

 8    Q.   Got it.

 9         I want to ask you about the basic process.  You were

10    talking about a lab, right?

11    A.   Yes.

12    Q.   I want to make sure I understand the process of a lab.

13         Let's assume for my example here that we're talking about

14    somebody who is a Medicare beneficiary.

15    A.   Yes.

16    Q.   And the process is, with respect to a lab, a doctor decides

17    it's medically necessary to order a test; is that fair?

18    A.   Yes.

19    Q.   Okay.  And from there, the lab performs the test that the

20    doctor ordered?

21    A.   Yes.

22    Q.   And from there, the lab would have the ability to bill

23    Medicare, right?

24    A.   Of course, they need to be submitting accurate and true

25    claims that adhere to the Medicare regulations, yes.
```

```
 1   Q.   But as a basic and general proposition, after the lab does
 2   the test, the lab can bill Medicare, correct?
 3   A.   Yes.
 4   Q.   And Medicare gets the bill?
 5   A.   Yes.
 6   Q.   And you said it's submitted electronically?
 7   A.   Yes.
 8   Q.   And it's a 1500 form?
 9   A.   For Part B, yes.
10   Q.   For Part B.  We'll get to that in a minute.
11        So they submit a bill electronically to Medicare, right?
12   A.   Yes.
13   Q.   Medicare -- one of these MACs you talked about, they make
14   the decision about whether or not to pay the claim, right?
15   A.   It's all done electronically.
16   Q.   And electronically they decide are we going to pay the
17   claim or not, right?
18   A.   It's an electronic decision, but there's no human
19   interaction in that.
20   Q.   Fair enough.  But my point is, whether it's electronic or
21   human action, somebody or something at Medicare decides are we
22   going to pay this claim or not?
23   A.   That's correct.
24   Q.   And if the Medicare does not pay the claim, the beneficiary
25   has a right to appeal that decision?
```

1   A.   Yes, if it's denied, they can appeal it.

2   Q.   And if Medicare decides not to pay the claim, the lab would

3   have the ability to appeal the decision, right?

4   A.   That is correct.

5   Q.   And if Medicare decided to pay the claim, you talked about

6   a post-payment analysis that can go on, right?

7   A.   Yes.

8   Q.   And in those circumstances, if Medicare decides we

9   shouldn't have paid this claim, Medicare can enact -- or go

10  through what's called recoup; is that right?

11  A.   They can do a postpayment review and perhaps recoup money,

12  yes.

13  Q.   And that means they can ask for their money back, right?

14  A.   Yes.

15  Q.   I just want to make sure I understood that process.

16       With respect to the initial determination --

17  A.   Yes.

18  Q.   -- to order the tests in the first place, it is the

19  doctor's job to determine if the test is medically necessary,

20  right?

21  A.   Yes.

22  Q.   Okay.  And with respect to the test results, it is the

23  doctor's job to use those test results, as you said, to treat

24  the patient, right?

25  A.   Yes.

1    Q.   It's not the lab's job to treat the patient?

2    A.   No.

3    Q.   Now, you talked a lot about coverage, LCDs, NCDs, what's

4    covered, what's not covered.  You went through a bunch of

5    sections of the law, right?

6    A.   Yes.

7    Q.   And you talked about what Medicare is, right?

8    A.   Yes.

9    Q.   In many ways, Medicare is like a giant insurance policy?

10   A.   It is an insurance policy.

11   Q.   It is an insurance policy.

12        And so what you were talking about a lot yesterday is,

13   like, what's covered by an insurance policy, right?

14   A.   That's correct.

15   Q.   Like a car insurance policy, mortgage insurance policy, my

16   own private insurance policy, right?

17   A.   Yes.

18   Q.   And there's often disagreements between beneficiaries and

19   those policies about what is and what isn't covered, right?

20   A.   Yes.

21   Q.   And there are different folks out there that at times will

22   advocate for certain things to be covered that the insurance

23   company says we don't think it should be covered, right?

24   A.   Yes.

25   Q.   And there are organizations that do that in the genetic

1    testing space, right?

2    A.  Yes.

3    Q.  There's, for example, the Affordable Care Act.  There were

4    provisions in the Affordable Care Act that suggested that there

5    should be more coverage on genetic testing, right?

6    A.  They suggested it.

7    Q.  And there's an organization called the USPTF [sic]?

8    A.  Yes.

9    Q.  And that organization also has advocated for additional

10   coverage of genetic testing as well, right?

11   A.  They have advocated for it, yes.

12   Q.  And I think you testified during your direct that genetic

13   testing is a rapidly developing technology.  Is that a fair

14   statement?

15   A.  Yes.

16   Q.  That means that we're learning new things every day about

17   the value of genetic testing.

18   A.  Yes.

19   Q.  It's a new technology, right?

20   A.  Yes.

21   Q.  It is.  And therefore, it presents challenges to Medicare

22   and to the MACs.

23   A.  That's correct.

24   Q.  Okay.  Now, I want to ask you a little bit about labs for a

25   second.  We're talking about LabSolutions, but as a general

```
 1   matter, you don't need to be a doctor to own a lab, correct?
 2   A.   That is correct.
 3   Q.   You don't need to be a scientist to own a lab; is that
 4   right?
 5   A.   To own it, no.
 6   Q.   You don't need to be a college graduate to own a lab?
 7   A.   No.
 8   Q.   Do you know if Mr. Patel is a doctor?
 9   A.   I actually don't know anything about him.
10   Q.   Did you know that he's not a doctor?
11   A.   I didn't know.
12   Q.   Did you know he's not a scientist?
13   A.   I don't know him.
14   Q.   Did you know that he's not a college graduate?
15   A.   No.
16   Q.   With respect to LabSolutions, did you know that there were
17   a lot of employees at LabSolutions?
18   A.   I don't know anything about them.
19   Q.   Did you know there are over 150 employees at LabSolutions?
20   A.   No, I did not.
21   Q.   Did you know that there was a CEO?
22   A.   I think the direct owner, did he mark himself as a CEO?
23   Q.   I can't answer questions, ma'am.
24   A.   I'm sorry.
25   Q.   Did you know there was a CEO that was not Mr. Patel?
```

1  A.   No.

2  Q.   Did you know that there was a CFO that was not Mr. Patel?

3  A.   Yes.

4  Q.   Did you know that there was a compliance officer that was

5  not Mr. Patel?

6  A.   No, I did not.

7  Q.   Did you know that there was an individual in charge of

8  sales and marketing who was also not Mr. Patel?

9  A.   No.

10 Q.   The government didn't give you any information about any

11 aspect of the operations of LabSolutions?

12 A.   No.

13 Q.   Okay.  So you don't know anything about the employees.  You

14 don't know anything about the CEO.  You don't know anything

15 about the CFO.  You don't know anything about anything related

16 to LabSolutions.

17 A.   That is correct.

18 Q.   Got it.  With respect to the process that we talked about

19 to get certified for a second, you talked about the 855, right?

20 A.   Yes.

21 Q.   There are other processes that LabSolutions had to go to --

22 go through in order to get certified, aren't there?

23 A.   To become a Medicare provider?

24 Q.   As a lab?

25 A.   Yes.

1  Q.  There's something called a CLIA certification; is that

2  right?

3  A.  That's correct.

4  Q.  What's a CLIA certification?

5  A.  CLIA stands -- it's a certification that Medicare requires,

6  and there's different levels of CLIA certification.  And it's

7  where they've been reviewed as a lab on the processes that they

8  do.  There's a whole regulation that they had to adhere to to

9  go through that process.  And a CLIA certification is in

10 regards to that.

11 Q.  What does CLIA stand for?

12 A.  I'm drawing a blank right now.

13 Q.  Clinical Laboratory --

14 A.  Improvement Act.

15 Q.  There you go.  So LabSolutions got CLIA certified, didn't

16 it?

17 A.  Yes.

18 Q.  And there's also a COLA certification, right?

19 A.  I'm not aware of that.  I don't know that.

20 Q.  You don't know a COLA certification?  What about a CAP

21 accreditation.  What is that?  Don't know that either?

22 A.  No.

23 Q.  Do you know if LabSolutions was CAP accredited?

24 A.  I don't know.

25 Q.  Do you know if it had a COLA certification?

1  A.   I don't know.

2  Q.   Okay.  I want to turn to the 855, if we could.

3  A.   Sure.

4  Q.   Okay.  And you went through a lot of documents during your

5  direct.  I'm afraid I'm going to have to go through some of

6  them with you.  I apologize for that.

7       And just to make things clearer and easier for you, I wrote

8  down some of the subjects I want to cover, and these are some

9  of the subjects.  We'll come back to this, but we're going to

10  talk about the 855, which do you see the word "credential"

11  here?

12  A.   Yes.

13  Q.   Is that essentially what the 855 serves, getting

14  credentialed?

15  A.   It's allowing them to give Medicare information and then

16  Medicare reviews that information and then either approves or

17  does not approve of them as being a Medicare provider.

18       MR. RAFFERTY:  I think I need to go to the -- so just

19  help me --

20       MS. DE BOER:  Mr. Rafferty, if you touch the screen, it

21  will come back on.

22       MR. RAFFERTY:  Thank you.  Can you bring up for me

23  Government Exhibit 247.

24  BY MR. RAFFERTY:

25  Q.   Okay.  So this is -- this is a blank copy of the 855.

1      Do you see that?

2   A.   Yes.

3   Q.   And can we go to the last page of that document?  Does that

4   say how many pages that document is?

5   A.   48.

6   Q.   So it's 48 pages in length, it's single -- single-spaced;

7   is that right?

8   A.   Yes.

9   Q.   And it asks for a host of different kinds of information

10  throughout.

11  A.   Yes.

12  Q.   There are references throughout this document, statutes,

13  codes, regulations, all kinds of stuff, right?

14  A.   Yes.

15  Q.   And in fact, it links to various websites that somebody

16  who's filling this thing out can go to and learn even more

17  about the process by which you get credentialed; is that right?

18  A.   That is correct.

19  Q.   The process itself is not exactly like getting a library

20  card, right?

21  A.   It is not complicated.  It is very lengthy.

22  Q.   It is very lengthy, but in fact there are companies out

23  there that get paid to fill these out with folks, aren't there?

24  A.   I actually don't know that.

25  Q.   You don't know that there are companies out there that do

1    credentialing?

2    A.   Well, there are companies out there that do credentialing,

3    yes.

4    Q.   And credentialing is part of this process, isn't it?

5    A.   This is the Medicare application that you have to have to

6    bill Medicare.

7         MR. RAFFERTY:  If we can go to page 29 of that

8    document.

9    BY MR. RAFFERTY:

10   Q.   Do you see the Section 13 at the top of page 29?

11   A.   Yes.

12   Q.   There is a contact person.  Do you see that?

13   A.   Yes.

14   Q.   And that contact person does not necessarily have to be the

15   lab owner or anybody associated with the lab, right?

16   A.   That is correct.

17   Q.   It can be a company that fills this thing out, right?

18   A.   It can be whoever they designate as the contact person.

19   Q.   Did you happen to notice throughout the different documents

20   that you saw yesterday if there was somebody else who was a

21   contact person?

22   A.   There were several documents in there, and I don't recall

23   right off the top of my head who the contact person was.

24         MR. RAFFERTY:  If I can go back to this for just a

25   second.

```
 1   BY MR. RAFFERTY:
 2   Q.  Ms. McMillan, I want to ask you a question.  Have you ever
 3   bought a house or an apartment or any sort of piece of property
 4   in your life?
 5   A.  Yes.
 6   Q.  And when you bought that house or piece of property, did
 7   you use a closing attorney?
 8   A.  I don't remember, quite frankly.  No, I don't remember one.
 9   Q.  Are you familiar with what closing attorneys do?
10   A.  No.
11   Q.  Have you ever prepared a document in your life where
12   somebody put something like this in front of you that said sign
13   here?  Did you ever see anything like that?
14   A.  Yes.
15   Q.  Yes.  So a lot of times we go to see a lawyer or somebody
16   else.  They put a big stack of documents in front of us, and
17   they're kind enough to tag the pages with things like this,
18   right?
19   A.  That is correct.
20   Q.  And you're free to read all 150, 200 pages if you're at a
21   closing if you want to, right?
22   A.  That is correct.
23   Q.  But your attorney is kind enough to mark the pages with
24   stuff like this so you know where to sign.
25   A.  That is correct.
```

1    Q.   And sometimes when you go to those pages, they may even put

2    an asterisk or a star next to your name so you know exactly

3    where to sign on the particular page.

4         Do you ever see that?

5    A.   Yes.

6    Q.   Okay.  If we can go to 209-A --

7         MR. RAFFERTY:  I'm sorry.  Back again.  If you can

8    bring up 209-A, second-to-last page.  I don't think that's the

9    second-to-last page.

10   BY MR. RAFFERTY:

11   Q.   Okay.  This is part of 209-A.  Do you see that?

12   A.   Yes.

13   Q.   And 209-A is one of the first enrollment documents that you

14   went over during your direct yesterday, right?

15   A.   Yes.

16   Q.   It's another one of these 50-page documents, right?

17   A.   Yes.

18   Q.   And do you see in the right-hand corner the return address

19   of where this document came from?

20   A.   Laboratory Billing Services in Maine.

21   Q.   Do you know if Laboratory Billing Services is a

22   credentialing company?

23   A.   I do not know that personally, no.

24   Q.   Okay.  The lab we're talking about here, LabSolutions,

25   that's not located in Saco, Maine, is it?

1  A.   No.

2  Q.   That's in Atlanta, Georgia.

3  A.   Yes.

4  Q.   Okay.

5       MR. RAFFERTY:  If we can go to, from there, page 29 of

6  this same exhibit.  And if we could highlight the top half.

7  BY MR. RAFFERTY:

8  Q.   And this is that contact person information we talked about

9  before, right?

10  A.   Yes.

11  Q.   And you see the person on there whose name is Suzanne

12  Holliday.

13       Do you see that?

14  A.   Yes, I do.

15  Q.   And she's from where?

16  A.   She is from -- her email address...

17  Q.   Well, not her email address.  What city is she in?

18  A.   In Saco, Maine.

19  Q.   Saco, Maine.  So the same address that's on the envelope,

20  right?

21  A.   Yes.

22  Q.   And her email address is there as the contact person as

23  well, right?

24  A.   That is correct.

25  Q.   And her phone number is there, presumably?

1    A.   That is correct.

2    Q.   And her fax number is there, correct?

3    A.   That is correct.

4    Q.   And so if information was needed about this process, that's

5    who you're supposed to call, correct?

6    A.   That is correct.

7    Q.   And did you notice how this is typewritten?

8    A.   Yes.

9    Q.   Okay.

10        MR. RAFFERTY:  If we can go to page 20 of this

11   document.  I think it was 20.  No.  It might be 26.  My

12   handwriting is terrible.

13        There we go.  Okay.  That's the page I'm looking at.

14   If we can highlight the handwriting on that document.

15        If I could approach the screen, Your Honor.

16        THE COURT:  You may.

17        MR. RAFFERTY:  Thank you.

18   BY MR. RAFFERTY:

19   Q.   Looking at this document, you see that the Medicare

20   identification number, slash N/A -- do you see that?

21   A.   Yes.

22   Q.   That's pretty neat, right, neat handwriting?

23   A.   Yes.

24   Q.   And so is the NPI.  That's pretty neat, right?

25   A.   Yes.

1   Q.   If you look right above that, place of birth.

2        Do you see that?

3   A.   Yes.

4   Q.   That's not quite as neat as the N/A, is it?

5   A.   That's correct.

6   Q.   It says something with a G, it looks to me, India, right?

7   A.   Yes.

8   Q.   So it looks like somebody put in their date of birth.

9        Do you know if that's Mr. Patel's date of birth?

10  A.   I don't know.

11  Q.   Do you know if that's his Social Security number?

12  A.   I don't know.

13  Q.   Do you know if that's where he was born?

14  A.   I don't know.

15  Q.   Do you know if that's the country he was born in?

16  A.   I don't know.

17  Q.   But you see right above it, his typewritten name,

18  Minal Patel, owner, right?

19  A.   Yes.

20  Q.   Would it be fair to conclude that that's probably where he

21  was born?

22  A.   Yes.

23  Q.   And that's probably his date of birth?

24  A.   Yes.

25  Q.   And that's probably his Social Security number?

1    A.   Yes.

2    Q.   And it also appears that whoever wrote that has different

3    handwriting than who wrote the N/A; is that correct?

4    A.   That is correct.

5         MR. RAFFERTY:  So if we can go to page 33.  If we can

6    highlight the whole signature there.

7    BY MR. RAFFERTY:

8    Q.   I think this is the signature that you've been talking

9    about, that certification from yesterday; is that right?

10   A.   Yes.

11   Q.   And do you see how the name above that, typewritten, is

12   Minal Patel?

13   A.   Yes.

14   Q.   The position is owner; that's typewritten?

15   A.   Yes.

16   Q.   The telephone number appears to be typewritten?

17   A.   Yes.

18   Q.   And once again, if we look at the date signed, the date

19   signed does not appear to be the same handwriting as the

20   handwriting that we saw for the city in India where Mr. Patel

21   was born, right?

22   A.   That is correct.

23   Q.   No expert, but that handwriting appears to be the same as

24   the N/A, doesn't it?

25   A.   Yes.

1   Q.   And the signature is, you said, that of Mr. Patel; is that

2   right?

3   A.   Yes.

4   Q.   And one thing that you weren't asked by the government

5   about, but I want to ask you about --

6           MR. RAFFERTY:   If I can approach again, Your Honor.

7           THE COURT:   You may.

8   BY MR. RAFFERTY:

9   Q.   -- the asterisk right here.  Do you see that?

10  A.   Yes.

11  Q.   That's sort of like what we talked about when you close on

12  a house, right?

13  A.   Yes.

14  Q.   Somebody tags the place where you're supposed to sign?

15  A.   Yes.

16          MR. RAFFERTY:   If we can go to 209-B.

17  BY MR. RAFFERTY:

18  Q.   And by the way, 209-A, the date of submission was around

19  January of 2014; is that right?

20  A.   I don't recall it right off the top of my head, but I will

21  --

22          MR. RAFFERTY:   Can we go back to that document?  I

23  think it was page 33.

24          There we go.

25  BY MR. RAFFERTY:

```
 1  Q.  Do you see the date?

 2  A.  December 11, 2013.

 3  Q.  December of '13.

 4      If we can go to 209-B.

 5      Do you see that?  And this is a letter from who?

 6  A.  This is from CMS, Cahaba.

 7  Q.  And it's to who?

 8  A.  It's to LabSolutions, attention Susan [sic] Holliday.

 9  Q.  And do you see where LabSolutions is located here?

10  A.  In Saco, Maine.

11  Q.  And you said before, LabSolutions is not in Saco, Maine,

12  right?

13  A.  That's correct.

14  Q.  And so CMS is sending the letter acknowledging receipt of

15  the application to Ms. Holliday; is that right?

16  A.  Who is the contact person.

17  Q.  And not to Mr. Patel?

18  A.  That is correct.

19          MR. RAFFERTY:  If we could go to 209-C.

20  BY MR. RAFFERTY:

21  Q.  Do you see the -- this is an email.  Do you see that?

22  A.  Yes.

23  Q.  And do you see -- it's from who?

24  A.  From D.D. Bice (phonetic).

25  Q.  Do you know D.D. Bice?
```

1    A.    No.

2    Q.    Do you know Cahaba?

3    A.    I've heard about Cahaba, yes.

4    Q.    That's one of the MACs you talked about yesterday, isn't

5    it?

6    A.    Yes, it is.

7    Q.    They're in Birmingham, Alabama, right?

8    A.    Yes.

9    Q.    So it appears that Ms. Buys is sending an email about that

10   same CMS 855, right?

11   A.    Yes.

12   Q.    And that email isn't also being -- it isn't being sent to

13   Mr. Patel, is it?

14   A.    No.

15   Q.    It is being sent to Ms. Holliday, right?

16   A.    Yes.

17   Q.    Okay.  If we can go to 209-D.  And you described this

18   application process.

19        It's an important part of the process to become a Medicare

20   provider, right?

21   A.    Yes.

22   Q.    And this is a letter about that same process, correct?

23   A.    Yes.

24   Q.    And this letter here is also addressed to who?

25   A.    Ms. Suzanne Holliday.

1   Q.   And it's about LabSolutions again, right?

2   A.   Yes.

3   Q.   This is in March of 2014, right?

4   A.   Yes.

5   Q.   And in this letter, the application is being rejected.

6   A.   Yes, it is.

7   Q.   And so this very important application, notice about it

8   being rejected, is not being sent to Mr. Patel, correct?

9   A.   It is being sent to the contact person.

10          MR. RAFFERTY:  If we can go to 209-E.  If we can go to

11  the very top.

12  BY MR. RAFFERTY:

13  Q.   And this is an email from Suzanne Holliday, correct?

14  A.   Yes.

15  Q.   To somebody named Clifford Hurley.

16          Do you know who that is?

17  A.   No, I don't.

18          MR. RAFFERTY:  Can we go down this email?  See if we

19  can figure out who that is.

20          All right.  If we could highlight the third email.  No,

21  further down.  I'm sorry, from Suzanne Holliday -- okay.

22          Can we scroll over to the right?  Oh, we can see it on

23  that screen.  Okay.

24  BY MR. RAFFERTY:

25  Q.   Do you see Ms. Holliday's title here?

1   A.   Yes, she is the --

2   Q.   LBS Credentialing.  Do you see that?

3   A.   Yes.

4   Q.   So she works in this area, right?

5   A.   Yes.

6   Q.   Okay.  And the email, this 209-E, if we can bring it back

7   for a second, this is also not sent to Mr. Patel; is that

8   right?

9   A.   That is correct.

10  Q.   It's also not from Mr. Patel, is it?

11  A.   No.

12  Q.   Okay.

13        MR. RAFFERTY:  If we could go to 209-G.

14  BY MR. RAFFERTY:

15  Q.   This is another letter from CMS to who?

16  A.   This is to Suzanne Holliday.

17  Q.   And in this letter, she's being informed by CMS that the

18  application has been approved, right?

19  A.   That is correct.

20  Q.   And this very important application -- approval of this

21  application was not sent to Mr. Patel?

22  A.   That is correct.

23        MR. RAFFERTY:  If we can go to -- if I can go back for

24  a second to 209-A at page 28.  We're going to get to this in a

25  moment, but can we bring out the section that says billing

1    agency information?

2            Do you see that?  Can we bring out the whole section?

3    I'm sorry.  There we go.

4    BY MR. RAFFERTY:

5    Q.  You said before, during your testimony, that Ms. Holliday

6    worked for LBS Credentialing, right?

7    A.  Yes.

8    Q.  You didn't know what LBS stood for when you saw that, did

9    you?

10   A.  No.

11   Q.  Now, looking at this document, you'll see the billing

12   agency is called Laboratory Billing Services.

13           Do you see that?

14   A.  Yes.

15   Q.  Doing business as what?

16   A.  LBS.

17   Q.  So there are agencies that do credentialing and then do

18   billing, right?

19   A.  Yes.

20   Q.  And the biller here for LabSolutions is LBS, right?

21   A.  Yes.

22   Q.  And they're in Saco, Maine?

23   A.  Yes.

24   Q.  Okay.

25           MR. RAFFERTY:  If we can go to 209-H, please.

1    BY MR. RAFFERTY:

2    Q.   And 209-H, real quickly, is another letter.  This is about

3    payment cycles.

4         Do you see that?

5    A.   Yes.

6    Q.   And that means where you're going to get paid.  Is that

7    what that means?

8    A.   The Medicare payment cycle, yes.

9    Q.   That's where Medicare is going to send the money, right?

10   A.   Yes.

11   Q.   This document is also not sent to Mr. Patel, is it?

12   A.   No, it is sent to the contact person, Suzanne Holliday.

13   Q.   Suzanne Holliday.

14        MR. RAFFERTY:  If we can split screen now 209-A, 210-A,

15   and I'd like to see 209-A, page 33, with 210-A, page 34.

16   BY MR. RAFFERTY:

17   Q.   So 210-A is another one of these applications that was

18   submitted that you talked about yesterday, correct?

19   A.   Yes.

20   Q.   I just want to see if I could find my exhibit list.

21        210-A is described as the amended LabSolutions Medicare

22   enrollment form; is that right?

23   A.   I don't have that in front of me, but --

24   Q.   Okay.  The one on the right there, on the screen in front

25   of you, do you see the date of 6 -- I think it says 6/27 of

1    '14?

2    A.   Yes.

3    Q.   Do you recall testifying yesterday about a certification

4    that was signed in 210-A?

5    A.   Yes.

6    Q.   Okay.  This certification is very similar to the last

7    certification that we talked about in 209-A, right?

8    A.   Yes.

9         MR. RAFFERTY:  If I could approach the screen again,

10   Your Honor.

11        THE COURT:  You may.

12        MR. RAFFERTY:  Thank you.

13   BY MR. RAFFERTY:

14   Q.   The one on the left here, we talked about the asterisk next

15   to Mr. Patel's name.

16        Do you remember that?

17   A.   Yes.

18   Q.   If you look at the one on the right, it's again Minal

19   Patel.

20        Do you see that?

21   A.   Yes.

22   Q.   And again there's an asterisk next to his name?

23   A.   Yes.

24   Q.   Do you think Mr. Patel put the asterisk there?

25   A.   No.

1    Q.   You think somebody pointed him to sign it right there?

2    A.   Yes.

3    Q.   Okay.

4         MR. RAFFERTY:  If we can go to 210-B, please.

5    BY MR. RAFFERTY:

6    Q.   Similar document we've seen before, again a letter dated

7    July 17th of 2014.

8         Once again, not sent to Mr. Patel, correct?

9    A.   Yes.

10   Q.   Sent to Ms. Holliday?

11   A.   Yes.

12        MR. RAFFERTY:  If we can go to 212-A.  And if you can

13   go to page 10.

14   BY MR. RAFFERTY:

15   Q.   Now, 212-A is yet another one of these certification forms

16   that you've testified about already, right?

17   A.   Yes.

18   Q.   And this one is described, just so I got it -- this is the

19   second amended LabSolutions Medicare enrollment form dated

20   10/22 of '14, right?

21   A.   I don't see the date on here, but...

22   Q.   All right.  Well, we can go to the --

23   A.   Oh, 10/28/14 is on top, I see it.

24   Q.   Do you see that?

25   A.   Okay, yes.

1   Q.   Yeah.  So this is a second amended application.

2        And if we look at the correspondence address, do you see

3   that?

4   A.   Yes.

5   Q.   This is an Atlanta, Georgia address, but do you see the

6   email address here?

7   A.   Is credentialing at -- I can't read the writing, but it's a

8   credentialing company.

9   Q.   That's the email address -- that doesn't say Minal Patel,

10  does it?

11  A.   No.

12  Q.   Okay.

13       MR. RAFFERTY:  If we could go to page 16 of this

14  document.

15       If we could pull out the section entitled Medical --

16  the billing agency information.

17  BY MR. RAFFERTY:

18  Q.   And you see, once again, there's a biller here.

19       Do you see that?

20  A.   That's correct.

21  Q.   This biller is located in Athens, Georgia, right?

22  A.   Yes.

23  Q.   So it appears this is the billing agency that's going to do

24  the billing for LabSolutions now.

25  A.   Yes.

1   Q.   And they're also the same company that's doing the

2   credentialing for LabSolutions, right?

3   A.   Yes.

4   Q.   You look at the email address, it says credentialing, and I

5   think we both were having trouble reading the latter part of

6   that?

7   A.   Mmm-hmm.

8   Q.   Is that right?

9   A.   Yes.

10  Q.   Okay.

11       MR. RAFFERTY:   If we can go to page 20 of this

12  document.

13  BY MR. RAFFERTY:

14  Q.   Now, this is a new company.   It's different than the last

15  one.

16       Suzanne Holliday did the last couple I've shown you, right?

17  A.   Yes.

18       MR. RAFFERTY:   If I could approach the screen again,

19  Your Honor.

20       THE COURT:   You may.

21  BY MR. RAFFERTY:

22  Q.   This is the same certification statement we've seen before,

23  right?

24  A.   Yes.

25  Q.   This particular company also appears to have typewritten

1   Mr. Patel's name; is that right?

2   A.  Yes.

3   Q.  They put his phone number there?

4   A.  Yes.

5   Q.  They put his title, right?

6   A.  Yes.

7   Q.  This time instead of using an asterisk, they used an X.

8   A.  That's correct.

9   Q.  Appears to be the same practice, just signed next to the X.

10  A.  Yes.

11  Q.  You don't think Mr. Patel put the X there, do you?

12  A.  No.

13  Q.  Okay.

14        MR. RAFFERTY:  If we go to 212-B, please.

15  BY MR. RAFFERTY:

16  Q.  This is another one of these letters, again, about the

17  application.  This one is actually being sent to that same

18  address in Saco, Maine, right?

19  A.  Yes.

20  Q.  And not to Mr. Patel.

21  A.  That's correct.

22        MR. RAFFERTY:  If we can go to 213-A, page 17, please.

23  BY MR. RAFFERTY:

24  Q.  And this is entitled the third -- the Third Amended

25  LabSolutions Medicare Enrollment form, dated 6/5 of 2015.

1      Do you see that?

2   A.   Yes.

3   Q.   And if you look at the top left-hand corner you can see

4   that date?

5   A.   Yes.

6   Q.   6/5 of 2015.

7      And if I once again approach the screen, this is that same

8   certification statement you saw before; is that right?

9   A.   Yes.

10  Q.   And there is a date here, 5/26/2015?

11  A.   Yes.

12  Q.   This apparently has something to do with a change, right?

13  A.   Yes.

14  Q.   And you see his name in this case is handwritten, right?

15  A.   Yes.

16  Q.   Very neat handwriting.  You can read that, right?

17  A.   Yes.

18  Q.   It sure is.  And his phone number is handwritten, right?

19  A.   Yes.

20  Q.   This time they call him the CEO, right?

21  A.   Yes.

22  Q.   And there's once again an X next to his signature, right?

23  A.   Yes.

24  Q.   Same question.  Do you think Mr. Patel put the X there?

25  A.   No.

1    Q.   You think the company told him to sign right here?

2    A.   Yes.

3    Q.   Okay.  And that's consistent with your experience we talked

4    about, doing closings on houses or filling out documents;

5    lawyers, others tell you, just sign right here?

6    A.   Yes, but they're signing that they -- clearly they can't --

7    Q.   That's not my question, ma'am.  My question is --

8         MS. DE BOER:  Your Honor, can the witness be allowed to

9    finish her answer?

10        THE COURT:  Go ahead and state the question again,

11   Mr. Rafferty.

12   BY MR. RAFFERTY:

13   Q.   The question is yes or no, this is consistent with the

14   experience you talked about where you go into a lawyer's office

15   or somebody else, they put an X next to a place, and they tell

16   you to sign it, right?

17   A.   Yes.

18   Q.   Okay.

19        MR. RAFFERTY:  If we can go to 213-D, page 2.

20   BY MR. RAFFERTY:

21   Q.   And I'm not going to approach the screen.  I'm just going

22   to ask you to look at his signatures there.

23        You're familiar with this kind of document, aren't you?

24   A.   Yes.

25   Q.   And at the signature line you see Mr. Patel's name is once

1   again handwritten?

2   A.   Yes.

3   Q.   And you see the date there, 10/22 of '15?

4   A.   Yes.

5   Q.   And once again you see the X next to where his name is

6   signed?

7   A.   Yes.

8        MR. RAFFERTY:  If we can go to 214-A, page 22.

9   BY MR. RAFFERTY:

10  Q.   And this is a different person on this document, right?  It

11  says Sonal?

12  A.   Yes.

13  Q.   Sonal Jariwala.

14  A.   Yes.

15  Q.   She's listed here as the CFO, right?

16  A.   Yes.

17  Q.   And same practice here.  There's an X next to her name.

18       Do you see that?

19  A.   Yes.

20  Q.   Do you agree with me, again, that somebody put the X there

21  and said sign right here?

22  A.   Yes.

23  Q.   Okay.

24       MR. RAFFERTY:  If we can go to 214-B.

25  BY MR. RAFFERTY:

1   Q.   This is another one of these letters, right?

2   A.   Yes.

3   Q.   And this one is sent to LabSolutions, this time in Athens,

4   Georgia.

5        Do you see that?

6   A.   Yes.

7   Q.   Different person, no longer that lady, Suzanne Holliday.

8        This one is to Kelly Minish, I think?

9   A.   I agree.

10   Q.   Yeah.  And that's not Minal Patel, right?

11   A.   That's correct.

12   Q.   Okay.

13        MR. RAFFERTY:   214-C, please.

14   BY MR. RAFFERTY:

15   Q.   It's another one of these letters that we talked about,

16   correct?

17   A.   Yes.

18   Q.   And this was a letter sent to, again, that Athens, Georgia,

19   address, Kelly Minish, correct?

20   A.   Yes.

21        MR. RAFFERTY:   If we can go to 214-D.

22   BY MR. RAFFERTY:

23   Q.   And this one here is another letter from CMS to a

24   LabSolutions address in Athens, Georgia, right?

25   A.   Yes.

```
 1   Q.   And we've already covered, I think, that LabSolutions is

 2   not in Athens, Georgia, is it?

 3   A.   No.

 4   Q.   It's sent to Kelly Minish, right?

 5   A.   Yes.

 6   Q.   And not to Mr. Patel.

 7   A.   That's correct.

 8   Q.   And this is the rejection of the Medicare enrollment form,

 9   correct?

10   A.   Yes.

11   Q.   Okay.

12        MR. RAFFERTY:   If we can go to page 215 -- I mean,

13   Exhibit 215, page 22.

14   BY MR. RAFFERTY:

15   Q.   This is another one of these certification statements,

16   right?

17   A.   Yes.

18   Q.   I'm not going to try and pronounce that first name there,

19   but the last name seems to be Jariwala.

20        Do you see that?

21   A.   I agree.

22   Q.   And this is the CFO.   Do you see that?

23   A.   Yes.

24   Q.   Same issue we've talked about many times, there's an X next

25   to the signature.
```

1         Do you see that?

2    A.   Yes.

3    Q.   And the X next to the date, do you see that?

4    A.   Yes.

5    Q.   Do you think that whoever -- Jariwala put the "Xs" on that

6    document?

7    A.   Someone put the "Xs" on the document.  I don't know who.

8    Q.   Do you think it was the person who signed it?

9    A.   No.

10   Q.   Okay.

11        MR. RAFFERTY:  If we can go to 213 -- did I put up

12   213-B, D.J.?  No?  No.  Can you put up 213-B?

13        And if we can go to the second page.

14        And actually, go back to the first page for a minute.

15   BY MR. RAFFERTY:

16   Q.   This is the electronic funds transfer authorization

17   agreement you talked about yesterday, right?

18   A.   Yes.

19   Q.   And if we can go to the second page, this is how you get

20   paid?

21   A.   Yes, where your money goes.

22   Q.   If you look to the authorization signature, there's an X

23   next to that signature too, right?

24   A.   Yes.

25   Q.   And it's, again, for Mr. Patel?

1    A.   Yes.

2    Q.   Okay.  So you'd agree with me there was a whole lot of

3    correspondence from CMS about these applications that all went

4    to people other than Mr. Patel?

5    A.   Yes.

6    Q.   Okay.  We have this list so we can kind of keep track.

7         So we covered credentialing, right?

8    A.   Yes.

9    Q.   And the fact that there were experts who helped with these

10   applications, right?

11   A.   Yes.

12   Q.   Okay.  I want to talk to you about genetics.  I mean,

13   obviously a lot of what you talked about yesterday has to do

14   with genetics; is that right?

15   A.   Yes.

16   Q.   Now, genetics is a new technology, right?

17   A.   Yes.

18   Q.   You talked about panels, right?

19   A.   Panels.

20   Q.   Panels are different ways in which genes get tested?

21   A.   Panels is a grouping of tests that are run together, and

22   they either have a similar sample or similar clinical situation

23   which you apply them to.

24   Q.   And the folks that develop these panels and do all this

25   testing, they're typically Ph.D.'s?

1   A.   I don't know.

2   Q.   They're scientists, for sure, right?

3   A.   I don't know.

4   Q.   But they'd have to be pretty sharp, you'd think, to be able

5   to develop the panels, right?

6   A.   They're developed by multiple people.  So there's a couple

7   of different types of panels.  The panels that are developed by

8   CPT are developed by those physicians that are involved in that

9   CPT editing panel.

10  Q.   Okay.

11  A.   And just because you bill a group of tests together, if a

12  lab calls it a panel, that would be different than a CPT panel.

13  Q.   Is a panel a bunch of different kind of genes?

14  A.   It can be several different tests.  It doesn't necessarily

15  need to be genes.

16  Q.   Do you know anything about the development of the panels

17  that were being done at LabSolutions?

18  A.   The requisitions I saw listed several different tests that

19  they were asking to be done.

20  Q.   Did the government tell you anything about Dr. Bernadette

21  Wildemore?

22  A.   I don't know that name.

23  Q.   Did you know her to be a Ph.D.?

24  A.   I don't know that name.

25  Q.   Did you know her to be the person in charge of the lab

1   there at LabSolutions, the LabSolutions person who helped

2   develop these tests?

3   A.   I don't know anything about that.

4   Q.   Did you know a person by the name of -- and forgive me if I

5   get this wrong -- Madhuri Hegde?

6   A.   I've never heard of that name.

7   Q.   Okay.  Do you know if Madhuri Hegde was employed by

8   LabSolutions?

9   A.   I don't know of him.  I've never heard of --

10  Q.   Do you know if she's a world-renowned --

11        MS. GURSKIS:  Objection, Your Honor.  She just said she

12  has not heard of this person.

13        THE COURT:  Yeah.  Let's move on.  That's going to be

14  sustained.

15        Go ahead.  Your next question.

16  BY MR. RAFFERTY:

17  Q.   Do you know of a company named PerkinElmer?

18  A.   No, I don't know that.

19  Q.   Never heard of that company either?

20  A.   No.

21  Q.   And you don't know if Madhuri had a contract --

22        MS. GURSKIS:  Objection, again, Your Honor.

23        THE COURT:  Let's move on.  She doesn't know that

24  entity.

25  BY MR. RAFFERTY:

1    Q.   Okay.  So you don't know anything about any experts that

2    might have been retained by LabSolutions to develop the genetic

3    panels that it did?

4    A.   No, I don't know anything about that.

5    Q.   But you don't disagree with me that experts are typically

6    involved in those panels?

7    A.   I don't know in regards to this case who was involved in

8    that.  I am a medical reviewer and look at documentation.

9    Q.   Forget about this case for a minute, though.

10        Would you agree with me that there are experts out there

11   that develop panels in genetics?

12   A.   There are people out there that build panels, yes.

13   Q.   The next subject I want to talk to you about is legal.

14        You talked about -- as I said before, you talked a lot

15   about the law, right?

16   A.   Yes.

17   Q.   And you went through a whole bunch of statutes and sections

18   and things of that nature that govern healthcare, correct?

19   A.   Yes.

20   Q.   And as you said, you are -- you're not a lawyer, right?

21   A.   No, I'm not.

22   Q.   There are lawyers, though, that specialize in healthcare,

23   correct?

24   A.   Yes.

25   Q.   Lawyers that are out there that specialize in compliance.

```
 1   A.   Yes.

 2   Q.   Lawyers that are out there that specialize in the

 3   Stark Act?

 4   A.   Yes.

 5   Q.   There are lawyers out there that, in particular, specialize

 6   in the Anti-Kickback Statute, correct?

 7   A.   Yes.

 8   Q.   Because these statutes are all very complicated, right?

 9   A.   I wouldn't say they're all very complicated.  No, I

10   wouldn't say that.

11   Q.   Well, would you agree with me that the Anti-Kickback

12   Statute is pretty complicated?

13   A.   No bribes.  No bribes.

14   Q.   I understand that's your position, but you agree with me

15   that there are lawyers that specialize in the Anti-Kickback

16   Statute?

17   A.   Yes, I would agree with that.

18   Q.   That read guidance about the Anti-Kickback Statute all day

19   long?

20   A.   Yes.

21   Q.   And that's all they do?

22   A.   That is correct.

23   Q.   And these folks have gone to law school, right?

24   A.   Yes.

25   Q.   And they're some Harvard-trained lawyers who do nothing but
```

 1   study the Anti-Kickback Statute.

 2        Do you agree with me on that?

 3   A.   I would surmise that, yes.

 4   Q.   Okay.  There are such things as safe harbors with respect

 5   to the Anti-Kickback Statute?

 6   A.   Yes.

 7            MS. GURSKIS:  Objection.

 8            THE COURT:  Overruled.

 9            Go ahead and finish your question.

10   BY MR. RAFFERTY:

11   Q.   And there are all sorts of aspects of the Anti-Kickback

12   Statute other than what you just said; is that fair?

13   A.   Yes.

14   Q.   With respect to LabSolutions, did the government tell you

15   about an individual by the name of Tobin Watt?

16   A.   No.

17   Q.   Did they tell you about a law firm called Fox Rothschild?

18   A.   No.

19   Q.   Did they tell you about a lawyer named Steve Petersen?

20   A.   No.

21   Q.   Did they tell you about a law firm named Baker Donelson?

22   A.   No.

23   Q.   Did they tell you about a lawyer named Craig Holden?

24   A.   No.

25   Q.   Did they tell you about any lawyers that provided advice to

1   Mr. Patel and LabSolutions about compliance?

2   A.  No.

3   Q.  About the Anti-Kickback Statute?

4   A.  No.

5   Q.  About the Stark Act?

6   A.  No.

7   Q.  About any aspect of the legality of the operations of

8   LabSolutions?

9   A.  No.

10   Q.  Did they tell you that LabSolutions and Minal Patel spent

11   $350,000 on lawyers during the time period at issue in this

12   case?

13        MS. GURSKIS:  Objection.

14        THE COURT:  Overruled.

15        You may answer.

16        THE WITNESS:  No.

17   BY MR. RAFFERTY:

18   Q.  They didn't tell you about any of that?

19   A.  No.

20   Q.  Did they tell you about the 30,000 emails between

21   Fox Rothschild and LabSolutions about compliance?

22   A.  No.

23   Q.  They didn't show you any of those?

24   A.  No.

25   Q.  Okay.  You talked a little bit about -- in addition to the

1    Anti-Kickback Statute, you talked about telemedicine or

2    telehealth?

3    A.   Telehealth, yes.

4    Q.   And you went through a bunch of different statutes and

5    talked about what applies and when you can use telemedicine,

6    correct?

7    A.   That's correct.

8    Q.   And you said that once the COVID -- COVID hit, some of

9    those rules and regulations were relaxed --

10   A.   Yes.

11   Q.   -- in order to allow folks to see their doctors and be

12   treated, right?

13   A.   Yes.

14   Q.   And some of those relaxed rules allowed for folks to just

15   talk on the phone and not have the video?

16   A.   Yes.

17   Q.   So there were different things that were done in order to

18   allow people to continue to receive their care?

19   A.   Yes --

20   Q.   And --

21   A.   -- during the public health --

22   Q.   And those rules continue to be relaxed, aren't they?

23   A.   Currently, right now.

24   Q.   Currently, they are, right?

25   A.   Yes.

1   Q.   You testified about the audiovisual component, among other

2   things, right?

3   A.   Yes.

4   Q.   There needs to be both an audio and a visual component of

5   this in order for it to be covered?

6   A.   At that time, yes.

7   Q.   If one part of that for some reason doesn't happen, then

8   the particular encounter between the doctor and patient is not

9   covered, correct?

10  A.   In addition to the other things that they would have had to

11  be doing, yes.

12  Q.   Let's assume all the other things are in place, but if

13  there's only a phone call during this time frame, your position

14  is that the interaction between the doctor and the patient is

15  not covered?

16  A.   It would not qualify for payment as telehealth.

17  Q.   Okay.  As telehealth, that's right.  Okay.

18       I want to ask you an example:  So suppose I'm really sick

19  during this time frame in this case.  I'm feeling really sick

20  and I'm at home, and I schedule a telehealth visit and I meet

21  all the other requirements for telehealth.

22       Can we assume that?

23  A.   And you're at home?

24  Q.   I'm at home or somewhere else, whatever the requirements

25  are.  I'm somewhere and I just feel lousy, and I schedule a

1    telehealth visit that qualifies for all other reasons under

2    Medicare.

3         Can you accept that?

4    A.  So I can only accept that the qualification -- you would

5    have to meet all of the qualifications for payment.  So --

6    Q.  Let's assume I do meet all those qualifications.

7    A.  And you're not at home?

8    Q.  And I'm not at home.

9    A.  Okay.

10   Q.  And I'm not feeling well and I schedule this visit, and I'm

11   just not up for the video part of this.  I'm just laying in

12   bed.  I just get on the phone, and I say, Doc, I feel really

13   lousy.  I feel really sick.  I got whatever the symptoms are.

14   Can you help me?

15        So the doctor talks to me for a while, hears all about what

16   my problems are, and at the end of the day says here's what I

17   want you to do.  I want you to go to this lab, and I want you

18   to get this test, blood test, urine test, whatever it is.

19        Do you get all that?

20   A.  Yes.

21   Q.  Okay.  So the lab runs whatever the test is and gets a

22   result.  Okay?

23        Under those facts, because I did not have the video

24   component with my doctor, the doctor can't bill for that

25   telemedicine visit, right?

 1   A.   He can't get paid.

 2   Q.   He can't get paid.  But the laboratory that runs the test

 3   that the doctor ordered, that laboratory can get paid for

 4   running the test.

 5   A.   If they are submitting claims according to the regulations

 6   and following the regulations, they could get paid.

 7   Q.   Correct.  So telemedicine applies to the interaction

 8   between the physician and the patient, correct?

 9   A.   Restate that question, please.

10   Q.   In terms of coverage, telemedicine and telehealth apply to

11   the interaction between the patient and the physician, right?

12   A.   The billing for that service is done from the telehealth

13   provider and that they would have to meet coverage payment

14   conditions.

15   Q.   But that doesn't necessarily apply to whatever tests might

16   result from the encounter, correct?

17   A.   Well, of course the medical necessity would have to be met,

18   and the lab is responsible for submitting claims that meet

19   those regulations.

20   Q.   Understood.  With respect to lab tests, though, typically

21   what happens is the doctor orders the test, right?

22   A.   Yes.

23   Q.   And the doctor says it's medically necessary, right?

24   A.   Hopefully he would only be ordering those medically

25   necessary tests.

1    Q.   Yes.  So in my example, the doctor said it was medically

2    necessary that I get whatever test is given, right?  I said

3    that, didn't I?

4    A.   Yes.

5    Q.   And so the lab that ran that test can get reimbursed if it

6    bills Medicare, whether or not the doctor can get reimbursed

7    for his encounter with me, right?

8    A.   So the lab is responsible for the claims that they are

9    submitting, and the physician is responsible for the claims

10   that he is submitting.

11   Q.   Exactly.

12        With respect to this particular issue, do you know whether

13   or not Mr. Patel sought advice from Tobin Watt about that

14   aspect of telehealth?

15   A.   I don't know anything about that.

16   Q.   Thank you.  We talked a little bit about this already,

17   but -- billing.

18        You talked a lot about billing during your examination,

19   right?

20   A.   Yes.

21   Q.   And as an initial matter, I think you said that bills to

22   Medicare are typically submitted -- or for Part B, on a 1500

23   form, right?

24   A.   Yes.

25             MR. RAFFERTY:  If we could bring up Government

 1   Exhibit 243, please?

 2   BY MR. RAFFERTY:

 3   Q.  This is a sample of a paper copy of a 1500 form, right?

 4   A.  Yes, this is the information that they would be putting in

 5   electronically.

 6        MR. RAFFERTY:  If I can approach the screen for a

 7   second.

 8        THE COURT:  You may.

 9        MR. RAFFERTY:  Thank you, Your Honor.

10   BY MR. RAFFERTY:

11   Q.  There's a whole bunch of information on here, beginning at

12   the top with the patient's name.

13        Do you see that?

14   A.  Yes.

15   Q.  And there's boxes all the way down to the bottom, right?

16   A.  Yes.

17   Q.  This is a paper form, right?

18   A.  Yes.

19   Q.  Folks don't submit these typically on paper anymore, right?

20   A.  That's correct.

21   Q.  Everything is submitted electronically?

22   A.  Yes.

23   Q.  Bunch of rows and columns that get sent to somebody, a MAC,

24   to process, right?

25   A.  Yes.

1   Q.   Bunch of numbers and information about the patient,

2   correct?

3   A.   Yes.

4   Q.   And on here are different codes.  I think you called them

5   CPT codes, right?

6   A.   Yes.

7   Q.   And I think that's -- I can't really see the box numbers

8   here.  Which box number would that -- there we go.  Thank you.

9        So you see Box 21 appears to be diagnosis.  Those are the

10  diagnosis codes?

11  A.   Yes.

12  Q.   And Box 24-D, those are the CPT codes, you said, right?

13  A.   Yes.

14  Q.   What it says right here.

15  A.   Yes.

16  Q.   Right, right there in the middle of the page?

17  A.   Yes.

18  Q.   And both the diagnosis code and the CPT code needs to be on

19  the document, right?

20  A.   Yes.

21  Q.   Okay.  Now, you talked a little bit about when it comes to

22  billing and coding and how to bill and what's covered.

23       LCDs and NCDs, right?

24  A.   Yes.

25  Q.   And you said that each MAC has the authority to implement

1    its own LCDs, right?

2    A.   They have the authority to publish.

3    Q.   To publish.  And there's a process they follow to help

4    provide guidance on coverage, right?

5    A.   Yes.

6    Q.   As part of -- you said you're a certified coder?

7    A.   Yes.

8    Q.   And there are a lot of certified coders out there?

9    A.   Yes.

10   Q.   It's not easy to get, is it?

11   A.   It's not.

12   Q.   You had to take a bunch of courses and classes?

13   A.   Yes.

14   Q.   And you had to take a test?

15   A.   Yes.

16   Q.   I'm sure that test was not easy?

17   A.   You would be correct.

18   Q.   How long did you study for that test?

19   A.   Probably a couple of months.

20   Q.   Couple of months.

21   A.   Mmm-hmm.

22   Q.   And you had to learn all about, you said, the CPT codes,

23   right?

24   A.   Yes.

25   Q.   And the ICD-10 codes?

```
 1   A.   Yes.

 2   Q.   Those are the diagnosis codes?

 3   A.   Yes.

 4   Q.   So you had to study both those things, right?

 5   A.   Yes.

 6   Q.   Did you also have to study LCDs and NCDs?

 7   A.   No.

 8   Q.   Okay.  But you had to study a bunch of different things in

 9   order to understand -- or make sure that you passed that test?

10   A.   Yes.

11   Q.   And you did pass it?

12   A.   Yes.

13   Q.   But even after you passed it, you have to keep getting

14   educated about what CPT codes to use and when, right?

15   A.   Yes.

16   Q.   And what diagnosis codes to use and when, right?

17   A.   Yes.

18   Q.   Okay.  With respect to LabSolutions, do you know if

19   LabSolutions had a revenue cycle management?

20   A.   I do not know.

21   Q.   Do you know what revenue cycle management is?

22   A.   Yes.

23   Q.   What is it?

24   A.   They're looking at the inflow and outflow of money and, you

25   know, how they're managing that.
```

1    Q.   Okay.  And do you know if LabSolutions had revenue cycle

2    managers on staff?

3    A.   I don't know.

4    Q.   Did you ever hear of a company called Comtron?

5    A.   No.

6    Q.   Did you know that LabSolutions used a company called

7    Comtron to do its billing?

8    A.   No.

9    Q.   Did you know that LabSolutions had weekly calls about

10   billing with Comtron and the revenue cycle managers?

11            MS. GURSKIS:  Objection.

12            THE COURT:  Overruled.

13            You may answer if you know.

14            THE WITNESS:  No, I did not know.

15   BY MR. RAFFERTY:

16   Q.   Did you know that Comtron provided interpretations of the

17   LCDs?

18   A.   No, I did not know.

19   Q.   Did you see any of the emails between Comtron and

20   LabSolutions about the LCDs and the NCDs?

21   A.   No.

22   Q.   The government chose not to show you those either.

23   A.   That is correct.

24   Q.   Okay.  You don't know an individual named David Lowsar

25   (phonetic)?

```
 1   A.   No.

 2   Q.   You don't know an individual named Harry Miles?

 3   A.   No.

 4   Q.   You don't know an individual named Kate Zakh (phonetic)?

 5   A.   No.

 6   Q.   You don't know that they all worked at Comtron?

 7   A.   No.

 8   Q.   Billing companies, they do a lot of advertising to

 9   advertise to healthcare providers to do their billing, right?

10   A.   I would guess so.  I don't know.

11   Q.   Right?  A lot of healthcare providers use outside billers

12   to do their billing?

13   A.   Yes.

14   Q.   Because it's a complicated process, right?

15   A.   Yes.

16   Q.   It's not easy.

17   A.   Yes.

18   Q.   Picking the right codes is not easy?

19   A.   Well, the codes should be coming from the physicians.

20   Q.   Okay.  But the billing process itself, as you said, is

21   pretty complicated.  You had to take a test that you studied

22   for months to become a certified coder.

23   A.   Yes.

24   Q.   Okay.  With respect to the billing at LabSolutions, did you

25   know that Minal Patel had almost nothing to do with it?
```

1   A.   I have no knowledge of his interactions with it.

2   Q.   Okay.  Did you know that these companies that are online,

3   that advertise their services, they talk about their experience

4   in the industry, don't they?

5   A.   I have no knowledge about that, but I would guess so, yes.

6   Q.   They talk about years and years of experience in billing,

7   right?

8   A.   I would be guessing, but I would imagine so.

9   Q.   And billing for labs can be especially complicated at

10  times, can't it?

11  A.   It can.

12  Q.   Is it more complicated than other forms of billing?

13  A.   I wouldn't say yes or no on that.

14  Q.   Well, with respect to the new technology with CGx testing,

15  has that created challenges with billing?

16  A.   It does.

17  Q.   It has?

18  A.   Yes.

19  Q.   Because new technology results in the issuance of new CPT

20  codes, right?

21  A.   Yes.

22  Q.   And new coverage requirements and determinations, right?

23  A.   The coverage requirements really haven't changed.

24  Q.   Okay.  But things change with respect to genetic testing?

25  A.   The CPT codes get updated.

1  Q.  And it creates challenges for everyone, doesn't it?

2  A.  Yes.

3  Q.  And there are coders and experts out there that work

4  regularly on trying to make sure they keep up to speed on the

5  right codes to bill for genetic testing.

6  A.  Yes.

7  Q.  Okay.  Now, I think that when you testified -- the early

8  part of this case involves a MAC called Cahaba, right?

9  A.  Yes.

10 Q.  And Cahaba was replaced by another MAC called Palmetto; is

11 that right?

12 A.  Yes.

13 Q.  And did Palmetto -- did Palmetto replace Cahaba because

14 Cahaba screwed something up?

15 A.  I don't know about that.

16 Q.  Okay.  Do you know if they were covering things that

17 shouldn't have been covered?

18 A.  I don't know about that.

19 Q.  Now, Cahaba was in the business of deciding if something

20 was covered or not at that time, though, right?

21 A.  They had the Medicare administrative contract for that --

22 Q.  But you don't know if they were covering things related to

23 genetic testing that they shouldn't have been covering.

24 A.  I have no knowledge of that.

25 Q.  Okay.  With respect to claims data --

1    A.   Yes.

2    Q.   -- you talked about the claims data.  I think the

3    government introduced into evidence what's been marked as

4    201-A.

5         MR. RAFFERTY:  Would you bring that up for me, please?

6    Just the first page.

7    BY MR. RAFFERTY:

8    Q.   Okay.  So this is a spreadsheet, I guess, of billing data;

9    is that right?

10   A.   Yes.

11        MR. RAFFERTY:  If I can approach the screen again,

12   Your Honor.

13        THE COURT:  You may.

14        MR. RAFFERTY:  I'll take this microphone.

15   BY MR. RAFFERTY:

16   Q.   And there's a whole lot of information starting from the

17   left here, right?

18   A.   Yes.

19   Q.   You've got a member -- it says beneficiary claim.

20   Something number -- HTC number?

21   A.   HIC number.

22   Q.   What's that?

23   A.   Health Information Control Number.

24        MR. RAFFERTY:  I'm not going to use any of the names in

25   here to protect their privacy.  So if we identify any patients,

1    I'll identify them by initials, Your Honor.

2         THE COURT:  Turn it on.  I think it may not be on.

3         MR. RAFFERTY:  I'm not going to use their names.  I'm

4    just going to use initials.

5    BY MR. RAFFERTY:

6    Q.  Looking at that first one, you see the initials KM?

7         Do you see that?

8    A.  Yes.

9    Q.  And there's a whole bunch of stuff that goes across that

10   includes their birth date, their address, where they live.  All

11   the way across to the right, there's a whole bunch of stuff?

12        MR. RAFFERTY:  If we can keep going to the right, D.J.,

13   if you can keep going.

14   BY MR. RAFFERTY:

15   Q.  There's all kinds of additional information here.

16        MR. RAFFERTY:  Hold on a second.  Stop for a second.

17   BY MR. RAFFERTY:

18   Q.  So you've got some procedural codes.

19        These are what are called CPT codes; is that right?

20   A.  Yes.

21   Q.  And this information that's on this form, this is

22   information that's collected based on what's been submitted as

23   part of the bill; is that right?

24   A.  That's correct.

25   Q.  So whatever -- in this case, whether it was LabSolutions or

1  another entity that billed for LabSolutions, this is the

2  information that was captured by Medicare or one of the MACs,

3  correct?

4  A.  That's correct.

5  Q.  Okay.  And I think you testified during the course of your

6  direct yesterday -- direct examination yesterday that with just

7  a few exceptions, screening tests are not covered; is that

8  right?

9  A.  That's correct.

10  Q.  Okay.  Are there specific codes for screening tests?

11  A.  Yes.

12  Q.  Are there actually diagnosis codes that would tell Medicare

13  that it's a screening test?

14  A.  There can be.

15  Q.  Okay.  I want to see if I can bring up an example for you.

16       MR. RAFFERTY:  Can we bring up -- I wrote this name

17  down, R. C-x-x-x -- can you bring up that name?  I think I gave

18  it to you before.

19  BY MR. RAFFERTY:

20  Q.  Okay.  Do you see --

21       MR. RAFFERTY:  If I can approach that screen again.

22       THE COURT:  Yeah.

23       MR. RAFFERTY:  Okay.

24  BY MR. RAFFERTY:

25  Q.  So this looks like R.C.  I think I misspelled it.

1          MR. RAFFERTY:  And I'm sorry, Your Honor.  I shouldn't

2     have used the name.

3     BY MR. RAFFERTY:

4     Q.  R.C. is the beneficiary, right?

5     A.  Yes.

6     Q.  And her date of birth is listed there, and she's from North

7     Carolina.

8          Do you see that?

9     A.  Yes.

10          MR. RAFFERTY:  And Column K -- D.J., what is Column K?

11     Is that a ZIP code?  It's a ZIP code.

12          Could you go back to Ms. C.?  If we can just keep going

13     to the right.  Actually, go to the top for a second.

14          Okay.  Can we scroll to the right?

15          Can you find the diagnosis codes?  There they are.

16     BY MR. RAFFERTY:

17     Q.  Those are the different codes that were submitted by

18     LabSolutions or somebody on its behalf; is that right?

19     A.  Yes.

20     Q.  Okay.

21          MR. RAFFERTY:  If we go down -- if you can try and find

22     Ms. C. on this document, and go to that -- that's AP.  Okay.

23     If we go to Column AP under Ms. C.

24          I keep saying the last name.  C.

25     BY MR. RAFFERTY:

 1   Q.   Okay.  So we have a bunch of diagnosis codes here.

 2        Do you see that?

 3   A.   Yes.

 4   Q.   And you see one that says Z-1379.  Do you see that?

 5   A.   Yes.

 6   Q.   And do you see next to it, the description of what that is?

 7   A.   Encounter for screening for genetic -- and I can't read the

 8   rest of it.

 9   Q.   Now, I believe you said that Medicare as a whole does not

10   cover generally screening tests, right?

11   A.   That is correct.

12   Q.   In this particular case, LabSolutions has billed a CGx test

13   and has told Medicare that it's a screening, right?

14   A.   Yes.

15        MR. RAFFERTY:  And if we can go all the way to the

16   right.

17   BY MR. RAFFERTY:

18   Q.   Is there a column here for payment?

19   A.   Yes.

20   Q.   Okay.  Was this one paid?

21   A.   You would have to scroll to the top so I could see the paid

22   amount.

23        MR. RAFFERTY:  I think you have to keep going to the

24   right, perhaps.  Oh, there it is.  I'm sorry.  It's BG.

25   BY MR. RAFFERTY:

```
 1   Q.  See BG?

 2   A.  Okay.

 3           MR. RAFFERTY:  If we can go down again now.  Okay.

 4   BY MR. RAFFERTY:

 5   Q.  So for this screening test -- and it just says family

 6   history.

 7           Do you see that?

 8   A.  Yes.

 9   Q.  It says family history.  We saw screening test.  And we see

10   that Medicare paid it?

11   A.  Yes.

12   Q.  Thousands of dollars, right?

13   A.  Yes.

14   Q.  And this is a screen, right?

15   A.  That's what it indicates.

16   Q.  And it's a screen that says it's just family history,

17   right?

18   A.  Yes.

19   Q.  Which I think you said yesterday, family history is not

20   covered, right?

21   A.  That is correct.

22   Q.  So this particular claim, LabSolutions told Medicare, we

23   did a screening test, right?

24   A.  Yes.

25   Q.  For family history, right?
```

1   A.   Yes.

2   Q.   And it was paid, right?

3   A.   So it was processed, and money was put in the provider's

4   account.  But going through the claims system does not in any

5   way indicate that it complies with payment conditions.

6   Q.   Let me ask my question again.

7        That document right there shows that it was paid, right?

8   A.   It was, yes.

9   Q.   It was paid?

10  A.   It was paid.

11  Q.   Okay.  And if I told you that if I did the same thing on

12  this document, in 201-B and 201-C, that there were 21,561 times

13  where LabSolutions told Medicare we did a screening, would that

14  surprise you?

15  A.   No.

16  Q.   It wouldn't.

17       21,000 times they told Medicare, we're doing a screening.

18  A.   Yes.

19  Q.   Didn't conceal anything.

20  A.   Yes.

21  Q.   Okay.  I covered that last one.  One more I want to cover.

22       We talked about billing experts.  We talked about legal

23  experts.  We talked about genetics experts.  We talked about

24  credentialing experts.

25       I want to ask you about these LCDs.  Okay?

1    A.   Yes.

2    Q.   And you went through a bunch of different LCDs during the

3    course of your testimony, right?

4    A.   Yes.

5    Q.   For different things and provided a lot of explanations of

6    what they all mean, right?

7    A.   Yes.

8    Q.   And LCD means local coverage determination, right?

9    A.   Yes.

10   Q.   And what that refers to, I guess, in insurance is whether

11   something is covered or not, right?

12   A.   It helps to explain the context.

13   Q.   And they're issued by the MACs, right?

14   A.   Yes.

15   Q.   And you said -- and I just want to quote you from your

16   direct yesterday.  You said that -- in response to a question,

17   that wherever you live, your Medicare benefit is the same; is

18   that right?

19   A.   Yes.

20   Q.   But you also said that some -- I think you said that

21   some -- the MACs communicate a little bit differently, and they

22   might edit out claims a little more aggressive or less

23   aggressive, right?

24   A.   Yes.

25   Q.   So some MACs are more aggressive than others?

1   A.   Yes.

2   Q.   Do you think that Palmetto was more aggressive than Cahaba?

3   A.   I know they were.

4   Q.   They were.  They asked and made labs get Z codes, right?

5   A.   Yes.

6   Q.   Through a MolDX process?

7   A.   Yes.

8   Q.   And, in fact, LabSolutions went through the MolDX process

9   too, didn't it?

10  A.   I don't know.

11  Q.   You don't know?

12  A.   I don't know.

13  Q.   So the government didn't tell you that LabSolutions went

14  through Palmetto's MolDX program?

15  A.   I don't know.

16  Q.   Did the government tell you that LabSolutions got Z codes?

17  A.   I don't know.  I don't know that.

18  Q.   Explain to the jury, in order to bill in Palmetto, you have

19  to apply for the Z codes, right?

20  A.   Yes.

21  Q.   Until you have get those Z codes, you can't bill, right?

22  A.   That's right.

23  Q.   And in this particular case, LabSolutions told Palmetto we

24  want the Z codes.  Here's our test, right?

25  A.   I don't know, but that would have to occur.  And Palmetto

1    uses Z codes to bill for their genetic testing.

2    Q.   If they got Z codes -- if LabSolutions got Z codes, they

3    told Palmetto what they were doing, right?

4    A.   They would have to get those Z codes from Palmetto.

5    Q.   Okay.  But you said during your testimony that regardless

6    of where you live, your Medicare benefits are the same, right?

7    A.   Yes.

8             MR. RAFFERTY:  I'm going to approach the witness, if I

9    could.

10            THE COURT:  You may.

11            MR. RAFFERTY:  This is a paper copy.  Maybe I can just

12   give it to the clerk, Your Honor.  This is a paper copy of

13   Defense Exhibit 200.

14            THE COURT:  You can approach and hand it to her.

15            MR. RAFFERTY:  Thank you.  If we can bring up 200 up on

16   the screen, I'll pull the LCD thing down.

17   BY MR. RAFFERTY:

18   Q.   This is a document that was issued by the Department of

19   Health and Human Services, right?

20   A.   Yes.

21   Q.   And CMS is under that particular agency; is that right?

22   A.   Yes.

23   Q.   Okay.  And the Office of Inspector General is an

24   investigative agency that works within HHS?

25   A.   Yes.

1   Q.   And the title of this document is Local Coverage

2   Determinations.

3        Do you see that?

4   A.   Yes.

5   Q.   That's LCDs, right?

6   A.   Yes.

7   Q.   Create inconsistencies in Medicare coverage.

8   A.   That's what it says.

9   Q.   Right?  And it's dated January of 2014; is that right?

10  A.   Yes.

11  Q.   Now, I don't want to go back through all these documents,

12  but Mr. Patel first signed one of those 855s that subjected him

13  to LCD coverage back in December of 2013.

14       Do you remember that?

15  A.   Yes.

16  Q.   There was another one he signed in January of 2014.

17       Do you remember that?

18  A.   Yes.

19  Q.   There was another one in July of 2014.  Remember that?

20  A.   Yes, there were several.

21  Q.   And then 212-A was October of 2014.  Do you remember that?

22  A.   Yes.

23  Q.   All of those were signed in around the same time that this

24  report was issued by the Office of the Inspector General.

25  A.   Yes.

1   Q.   Okay.

2        MR. RAFFERTY:  If we can go to the next page, please,

3   and if we could highlight the section that says, "What we

4   found."

5   BY MR. RAFFERTY:

6   Q.   Do you see that?

7   A.   Yes.

8   Q.   If you can read that into the record?

9   A.   Yes.  In October of 2011, over half of Part B procedure

10  codes were subject to an LCD in one or more states.  The

11  presence of these LCDs was unrelated to the cost and

12  utilization of items and services.

13  Q.   Can we stop there for a second?

14  A.   Sure.

15  Q.   One of the things I think you talked about yesterday was

16  that LCDs were designed to help cost and utilization.

17       Did you say that yesterday?

18  A.   Cost and -- no, guidance.

19  Q.   Okay.  Keep reading, then.

20  A.   Furthermore, LCDs limited coverage for these items and

21  services differently across states.  LCDs also defined similar

22  topics inconsistently.

23  Q.   Similar clinical topics inconsistently, right?

24  A.   Oh, did I say that?

25  Q.   No, you didn't say that.

1   A.   Let me reread it.   LCDs also defined similar clinical

2   topics inconsistently.   Finally, CMS has taken steps to

3   increase consistency among LCDs, but it lacks a plan to

4   evaluate new LCDs for national coverage as called for by the

5   MMA.

6   Q.   Okay.

7        MR. RAFFERTY:   And if we can go to page -- hang on a

8   second -- page 11.

9   BY MR. RAFFERTY:

10  Q.   And these are the findings of the OIG's report.   Now, this

11  is an analysis of codes going back to 2011, but it was issued

12  in 2014?

13  A.   Okay.

14  Q.   Right?

15  A.   The report was issued in 2014.   Yes.

16  Q.   Do you need me to go back to the first page?

17  A.   No.   I got it.

18  Q.   It was about stuff in 2011, but it was issued in 2014,

19  meaning this was a continued problem, right?

20  A.   Yes.

21  Q.   Okay.   So if we look at the findings, and it says, In

22  October of 2011, over half of Part B procedure codes were

23  subject to an LCD in one or more states, right?

24  A.   Yes.   Where are you reading from?   Can you just point --

25  Q.   The heading right under findings.   Do you see that?

1    A.   Okay.

2         MR. RAFFERTY:   If we can go to the next page, on the

3    top there.

4    BY MR. RAFFERTY:

5    Q.   And it says, The presence of LCDs was unrelated to the cost

6    or utilization of Part B item services.

7         Do you see that?

8    A.   I see it.

9    Q.   Okay.  And it says in the first sentence, Although MACs may

10   develop LCDs to prevent overutilization and the misuse of items

11   and services, we found no correlation between the number of

12   states with LCDs for items and services and the unit cost or

13   utilization rate of those items or services.

14        Do you see that?

15   A.   Yes.

16   Q.   Do you understand what that means?

17   A.   They're not correlating the LCDs to cost and utilization.

18   Q.   Okay.  If we can go to the next bullet point there, it

19   says, LCDs' limited coverage for these procedure codes

20   differently across states.

21        Do you see that?

22   A.   Okay.  Yes, I see that.

23   Q.   And it says in the second sentence, All but two of these

24   procedure codes were subject to one or more LCDs that limited

25   coverage in some, but not all states.

1       Do you see that?

2   A.  Where are you reading?

3   Q.  The second sentence under LCDs limited coverage for these

4   procedure codes differently across states?

5   A.  All but two of these procedure codes were subject to one or

6   more LCDs that limited coverage in some but not all states.

7   Q.  And if you can read the sentence after that?

8   A.  Thus, coverage for a given service may be restricted in one

9   state where the LCD is in place and completely unrestricted in

10  another state where the [sic] LCD is in place.

11  Q.  So you testified earlier that wherever you lived, your

12  Medicare benefit is the same; is that right?

13  A.  That is right.

14  Q.  This suggests that because of the problem with LCDs, at

15  least at this point in time, that was not the case, correct?

16  A.  All I can tell you is that the PIM states that the LCDs

17  cannot override or supersede higher-up legislation.

18  Q.  But this particular document -- and let me read it again.

19  It says, Coverage for a given service may be restricted in one

20  state where an LCD is in place and completely unrestricted in

21  another state where no LCD is in place, right?

22  A.  It looks like based on what the HHS was looking at, that is

23  their conclusion.

24  Q.  Which suggests that at least then, wherever you lived, your

25  Medicare benefit was not the same.

1    A.   According to this report, but I'm not quite sure exactly

2    what they were looking at.

3    Q.   Well, it was issued by HHS, right?

4    A.   Yes.

5    Q.   They're the ones that govern CMS, right?

6    A.   They have input as to what CMS is doing.

7    Q.   Okay.

8         MR. RAFFERTY:   If we can go to the last bullet.

9    BY MR. RAFFERTY:

10   Q.   You talked about new technology and that CGx presents

11   unique problems because it's a unique and growing technology

12   for medicine, right?

13   A.   Yes.

14   Q.   Okay.  And this is back in 2014, when this was issued, this

15   report, right?

16   A.   Yes.

17   Q.   And they're specifically talking about the very unique

18   problems created by LCDs when it comes to new technology.

19   A.   Yes.

20   Q.   Okay.  And it reads, LCDs prohibited coverage for some

21   procedure codes, often those for new technology, in some states

22   but not in others.

23        Right?

24   A.   They were editing them out.

25   Q.   And that's what it says in this heading here, right?

1    A.   Yes.

2    Q.   And in particular, if you can read the last sentence of

3    this page, beginning with the word "for," onto the next page.

4    A.   For example, during the period of our review, an LCD

5    prohibited coverage in three states for CPT Code 86141 for

6    high-sensitivity C-reactive protein.

7    Q.   And then into the next page at the top?

8    A.   Hs-CRP test.

9    Q.   And then the next sentence?

10   A.   At the same time, LCDs allowed coverage of hs-CRP tests in

11   20 other states, but only for beneficiaries with certain

12   clinical indications.  MACs did not issue any LCDs or hs-CRP

13   tests in the remaining states, leaving coverage for it open

14   without restriction.

15   Q.   So what this is saying is there was some sort of new test

16   which they describe here as C-reactive protein hs-CRP test at

17   this time, right?

18   A.   That is correct.

19   Q.   And what it says here is that in some states you can't have

20   those tests at all, right?

21   A.   That's what this report is saying.

22   Q.   And in other states it says you can, but only if you have

23   certain clinical indications, right?

24   A.   Yes, and it's talking about what the local coverage

25   determination is saying.

 1   Q.   And in other states, there's no restrictions at all, right?

 2   A.   That's what this is saying.

 3   Q.   And so you can have the same test, but whether you can get

 4   it covered by Medicare or not depended on where you lived.

 5   A.   I would disagree.

 6   Q.   Well, isn't that what it says?

 7   A.   That's what this report says.

 8   Q.   And who wrote it?

 9   A.   The HHS.

10   Q.   Got it.

11        So if we go down to the next bullet point, that's LCDs'

12   limited coverage for many Part B items and services in some

13   states and few items and services in others.

14        Do you see that?

15   A.   Yes.

16   Q.   That's once again saying that there were certain areas of

17   the country where LCDs were more prevalent and more used than

18   in others?

19   A.   There -- some MACs publish more LCDs than other MACs.

20   Q.   So, for example, it says here, 50 percent of items and

21   services in some states were affected by LCDs, while 5 percent

22   of items and services in other states were covered.

23        Do you see that?

24   A.   I do see that.

25   Q.   Okay.  If you go to the last sentence there, they talk

1    about the states where there aren't very many LCDs.

2        Do you see that sentence that says "conversely"?

3    A.   Yes.

4    Q.   Conversely, in three states, Alabama, Georgia, and

5    Tennessee, only 5 percent of procedure codes were subject to an

6    LCD?

7    A.   Yes.

8    Q.   Do you see that?

9    A.   Yes.

10   Q.   And what state did you say LabSolutions was in?

11   A.   It was in Georgia and Pennsylvania.

12   Q.   Okay.  But in 2014 it was just in Georgia, wasn't it?

13   A.   Yes.

14   Q.   Okay.

15       MR. RAFFERTY:  If we can go to the next page, please.

16   BY MR. RAFFERTY:

17   Q.   And do you see the heading there under the MAC?

18   A.   Yes.

19   Q.   It reads, LCDs defined similar clinical topics

20   inconsistently.

21       Do you see that?

22   A.   Yes.

23   Q.   And if you go to the second-to-last paragraph, can you read

24   the first sentence beginning with "a total of"?

25   A.   A total of 319 of the 540 clinical topics, or 59 percent,

1    were addressed by more than one LCD.  However, 134 were

2    addressed inconsistently among LCDs.

3         You want me to keep reading?

4    Q.  Please.

5    A.  This means that different LCDs used different procedure

6    and/or diagnostic codes to address the same clinical topic.

7         One example is blepharoplasty, a surgery to correct

8    drooping eyelids that impair vision.  At the time of our

9    review, LCDs addressed blepharoplasty in 32 of the --

10   Q.  You can stop reading.  I appreciate it.

11   A.  Okay.

12        MR. RAFFERTY:  If we can go to -- I actually didn't

13   flag this page.  Hang on a second.  If we can go to page 19.

14   BY MR. RAFFERTY:

15   Q.  And this is the agency comments.  Do you see that at the

16   top, Appendix A?

17   A.  Yes.

18   Q.  And it appears that they were given a copy -- if you look

19   at the subject, they were given a copy of this report about

20   local coverage determinations creating inconsistency in

21   Medicare coverage policy, right?

22   A.  Yes.

23   Q.  And this is actually written by CMS.  Do you see that?

24   A.  Yes.

25   Q.  And it goes through the various recommendations.

1      Do you see that in the middle -- or towards the bottom of

2   the page, OIG recommendations?

3      Do you see that?

4   A.  Yes.

5   Q.  And throughout this document, beginning with that CMS

6   response, it says CMS concurs.

7      Do you see that?

8   A.  Yes.

9   Q.  If you go to the next page, CMS responds that CMS concurs.

10     Do you see that?

11  A.  Yes.

12  Q.  And then the last paragraph there, CMS responds that CMS

13  concurs.

14     Do you see that?

15  A.  Yes.

16  Q.  And so at least --

17        MR. RAFFERTY:  If we can go to the first page of this

18  document again.  The first page of the whole document.  I'm

19  sorry, D.J.

20  BY MR. RAFFERTY:

21  Q.  At least in 2014, January, the same time Mr. Patel was

22  signing all these forms you've went through, the 855s, CMS

23  itself was concluding that local coverage determination created

24  inconsistency in Medicare coverage.

25     Do you see that?

1   A.   Yes.

2        MR. RAFFERTY:  If I could have a moment, Your Honor.

3        THE COURT:  You may.

4   BY MR. RAFFERTY:

5   Q.   The name at the bottom of this document, do you see that,

6   Daniel Levinson?

7   A.   Yes.

8   Q.   Do you know who Daniel Levinson is?

9   A.   The inspector general.

10  Q.   Do you know him personally?

11  A.   No.

12  Q.   Now, you said in advance of your testimony here today that

13  you read a bunch of different documents?

14  A.   Yes.

15  Q.   You read a bunch of different statutes?

16  A.   Yes.

17  Q.   You did a bunch of different research?

18  A.   Yes.

19  Q.   Did you read this document before you testified?

20  A.   No.

21  Q.   Have you seen this document before?

22  A.   No.

23       MR. RAFFERTY:  One more moment, Your Honor.

24       THE COURT:  Sure.

25       MR. RAFFERTY:  Thank you, Your Honor.  Thank you,

1    ma'am.

2            I pass the witness.

3            THE COURT:  Thank you.

4            Redirect, please.

5            MS. GURSKIS:  Your Honor, could we approach briefly?

6            THE COURT:  Sure.

7         (The following proceedings were held sidebar:)

8            MS. GURSKIS:  I think I've got about 30 minutes of

9    redirect, and I just didn't know if you wanted to break now.

10           THE COURT:  Let's do it so we can take it up to lunch,

11   and then we can get rid of the witness.

12           MS. GURSKIS:  Okay.

13        (Proceedings returned to open court.)

14           THE COURT:  Ladies and gentlemen of the jury, we're

15   going to go ahead and complete the redirect.  We expect to

16   complete the redirect of this witness and then go to lunch.

17           Thank you all for your patience.

18           You may proceed when you're ready.

19           MS. GURSKIS:  Thank you, Your Honor.

20                        REDIRECT EXAMINATION

21   BY MS. GURSKIS:

22   Q.  Good afternoon, Ms. McMillan.

23   A.  Good afternoon.

24   Q.  Mr. Rafferty concluded his questioning of you by asking you

25   about this report, Defense Exhibit No. 200.

1       Do you recall that?

2   A.   Yes.

3   Q.   Have you read that report prior to your testimony today?

4   A.   No.

5   Q.   And the date on the front of the report, I believe, is

6   January 2014.

7       But can you read under where it says how he did this study,

8   that first sentence?

9   A.   Yes.  We analyzed a -- does that say one?  I can't

10  really -- --

11  Q.   I could zoom in.

12  A.   We analyzed a one-week period within the Medicare coverage

13  database to determine that LCD caused variation in coverage of

14  Part B items and services.

15  Q.   And in the what we found section, do you see the time

16  period in which that one week-analysis occurred?

17  A.   Yes, October 2011.

18  Q.   Do you know approximately when Medicare coverage of genetic

19  testing began?

20  A.   So there was a massive change of the way the codes were

21  done by CPT in 2012.

22  Q.   And that was prior -- that was after this particular report

23  was issued; is that right?

24  A.   Yes.

25  Q.   And Mr. Rafferty also asked you about this code, 86141.

```
 1        That is not a genetic testing code, is it?
 2   A.   No.
 3   Q.   And Mr. Rafferty asked you a lot of questions about the 855
 4   manuals that we also spent some time going over yesterday.
 5        Do you recall that?
 6   A.   Yes.
 7   Q.   This is Government's Exhibit 209-A.
 8        Ms. McMillan, can you read the first sentence under first
 9   authorized signature?
10   A.   I have read the contents of this application.  My signature
11   legally and financially binds the supplier to laws,
12   regulations, and program instructions of the Medicare program.
13   Q.   This is Government's Exhibit 210-A.
14        Can you read that first sentence again?
15   A.   I have read the contents of this application.  My signature
16   legally and financially binds the supplier to the laws,
17   regulations, and program instructions of the Medicare program.
18        MR. RAFFERTY:  Your Honor, I'm going to object.  We
19   went through this same document with this same highlighting
20   yesterday.
21        THE COURT:  That'll be overruled.
22        Okay.  Go ahead.
23        MS. GURSKIS:  Thank you, Your Honor.
24   BY MS. GURSKIS:
25   Q.   This is Government's Exhibit 220.
```

1          I'm not going to make you read through all these, but we

2     went through a lot of 855s today and yesterday.

3          Does this promise about reading the contents of the

4     application and the signature legally binding the signer to

5     that application, does that appear on every single 855B?

6     A.   Yes.

7     Q.   Who is responsible for what a lab is submitting, a contact

8     person or the authorized signer?

9     A.   The authorized official signer.

10    Q.   Would Medicare enroll a provider if there was no authorized

11    signer on the 855?

12    A.   No.

13    Q.   Does Medicare need a contact person in order to enroll

14    someone with Medicare?

15    A.   It is available for the authorized signer to put on there,

16    but they do not have the same legal responsibilities.

17    Q.   So if these promises are not made and these 855s are not

18    signed in this section, can a lab submit a single bill?

19    A.   No.

20    Q.   Mr. Rafferty asked you some questions about buying a house.

21         Do you recall that?

22    A.   Yes.

23    Q.   And potentially having a lawyer to assist you with

24    paperwork.

25         Do you recall that?

1    A.   Yes.

2    Q.   And if you're signing a piece of paperwork, once your

3    signature is on the dotted line, who is responsible, the person

4    whose signature is on the dotted line or the lawyer?

5    A.   It would be my responsibility, if I was signing those

6    documents.

7    Q.   And when you bought your house, did you lie to the bank?

8    A.   Did I -- I'm sorry, what?

9    Q.   Did you lie to the bank?

10   A.   No.

11   Q.   Why not?

12   A.   Well, because it might end me up in jail.

13   Q.   Mr. Rafferty also asked you some questions about CPT codes.

14        Do you recall that?

15   A.   Yes.

16   Q.   How should CPT codes be selected?  Should it be selected to

17   target what will be reimbursed?

18   A.   So CPT directs you, the user, according to the guidelines,

19   to select the code to the highest specificity.

20   Q.   And would it be appropriate to have somebody in sales or

21   finance selecting the CPT codes and kind of back-dooring in

22   what Medicare would pay?

23        MR. RAFFERTY:  I'm going to object to the form of the

24   question, Your Honor.

25        THE COURT:  Overruled.

1              You may answer, ma'am.

2              THE WITNESS:  Can you repeat the question?

3    BY MS. GURSKIS:

4    Q.  Yes.

5         Would it be appropriate to have somebody in perhaps the

6    sales or finance field back-dooring in codes and selecting

7    codes according to what Medicare would pay?

8    A.  You want the most highly capable people selecting those

9    codes, and they should be selected by the documented medical

10   information that has occurred because you are submitting them

11   to the government for payment.

12   Q.  And you need a CPT code or CPT codes on a claim in order to

13   bill Medicare, right?

14   A.  Yes.

15   Q.  And Medicare does not automatically deny claims; is that

16   right?

17   A.  They can, but they do not do that as a routine.

18   Q.  Why not?

19   A.  Well, because -- well, a couple of reasons.  One, they're

20   trying to move the claims through the system so that healthcare

21   providers are providing the care.  But also, the claim system

22   is not thinking about the information in there.

23        It's clearly moving the claims through, and just because

24   the information is on that claim, it may not necessarily

25   recognize it and deny it.

1    Q.   And we spent some time yesterday talking about the

2    trust-based system that Medicare is founded on.

3         Do you recall that?

4    A.   Yes.

5    Q.   Is that automatic payment in connection to that trust-based

6    system that you talked about?

7    A.   Yes.

8    Q.   And are these signatures, the certification statements, are

9    those also in connection to that trust-based system?

10        THE COURT:   Yes.   Let me do -- if I could, just take a

11   quick break.   I think a couple of our jurors need to use the

12   restroom before we complete this examination.

13        Let me have you leave your notepads on your chairs.

14   We'll take a brief break, and we'll come back and finish and

15   then go to lunch.

16        You are excused.

17        THE COURT SECURITY OFFICER:   All rise.

18      (Jury exits at 12:11 p.m.)

19        THE COURT:   If anyone needs to use the restroom as

20   well.   Five-minute break here before we bring the jury back

21   out.

22        You may step down, Ms. McMillan.

23      (Court recessed at 12:11 p.m.)

24      (Back on the record at 12:19 p.m.)

25        THE COURT SECURITY OFFICER:   All rise.

1          (Jury enters at 12:19 p.m.)

2              THE COURT:  Please be seated, everyone.

3              All right, ladies and gentlemen, we're going to turn it

4    back to Ms. Gurskis who will continue on with her redirect of

5    Ms. McMillan.

6              Counsel, the floor is yours.

7              MS. GURSKIS:  Thank you, Your Honor.

8    BY MS. GURSKIS:

9    Q.   Ms. McMillan, I have up on the screen Government's

10   Exhibit 110.

11             You were asked by Mr. Rafferty about the selection of

12   panels that were used in this case.

13             Did you see certain procedure codes that were billed

14   together in this case?

15   A.   Yes.

16   Q.   What type of codes was that?

17   A.   So when I was looking at the data, there seemed to be

18   specific orders or requisitions for the test in groupings.

19   Q.   And were there certain tiers or types of codes that you

20   saw?

21   A.   Yes, a combination of Tier 1 and Tier 2, molecular

22   pathology codes.

23   Q.   What was the significance of that?

24   A.   Oh, it was a lot of genetic testing on one patient, on one

25   sample, on one day.

1  Q.   What about the tier specifically?

2  A.   And the tier -- so the Tier 1 is --

3       MR. RAFFERTY:  Your Honor, I'm going to object.  I

4  didn't ask at all about Tier 1 or Tier 2 or anything else.

5       THE COURT:  I'm going to allow it.  I know it's a

6  little bit on the edges of the scope of the cross-examination,

7  but let's go ahead and continue.  That's fine.

8       THE WITNESS:  Can you restate the question?

9  BY MS. GURSKIS:

10 Q.   Thinking about Tier 2 specifically, what was significant

11 about that to you?

12 A.   The fact that, you know, the beneficiaries were getting

13 several codes from the Tier 2 selection, which would indicate

14 multiple different procedures of very highly specialized

15 nature, and that were out of the section where CPT stated that

16 you would rarely see these because they were for disease

17 processes that were rare.

18      And furthermore, that the local coverage article described

19 Tier 2 codes as that you would rarely see those.

20 Q.   And Mr. Rafferty also asked you some questions about

21 Z Codes.

22      Do you recall that?

23 A.   Yes.

24 Q.   I think on Government's Exhibit 110 you see some mention of

25 Z Codes on there.

1          Do you see that as well?

2     A.   Yes.

3     Q.   Z Codes aren't a blank check, right?

4     A.   No.

5     Q.   And you were also asked some questions about the claims

6     that were submitted in this case.

7          Did those claims cross state lines?  Did they cross

8     interstate wires?

9     A.   Yes.

10    Q.   Mr. Rafferty also asked you some questions about the length

11    and the complexity of Medicare regulations.

12         Do you recall that?

13    A.   Yes.

14    Q.   Let me ask you something:  What's so complicated about the

15    concept that in order to bill a lab --

16         MR. RAFFERTY:  Your Honor, I'm going to object to the

17    question and the form.

18         THE COURT:  Overruled.  Overruled.

19         Go ahead.

20    BY MS. GURSKIS:

21    Q.   What's so complicated about the concept that in order to

22    bill a lab test to Medicare, the doctor who orders the test

23    needs to be actually involved in the patient's care?

24    A.   That's not complicated.

25    Q.   Is there anything complicated about the concept that the

1   test results need to actually be used in the patient's

2   treatment?

3   A.   That's not complicated.

4   Q.   Is there anything complicated about the fact that a doctor

5   shouldn't be paid a kickback to secure an order for a genetic

6   test?

7   A.   No, kickbacks are not allowed with the federal healthcare

8   system.

9   Q.   Are kickbacks complicated?

10  A.   No.

11  Q.   You heard a lot about regulations from Mr. Rafferty, but

12  what's the law that makes all of that clear?

13  A.   The law that makes the --

14  Q.   The law that governs these regulations.

15  A.   The Social Security Act.

16  Q.   And who is the person who promised time after time after

17  time that he would comply with the rules and with the law in

18  connection with the submissions to Medicare by LabSolutions?

19  A.   The authorized official, Minal Patel.

20        MS. GURSKIS:  No further questions.

21        THE COURT:  Thank you.

22        Thank you, Ms. McMillan.  You're excused.

23        THE WITNESS:  Thank you.

24        THE COURT:  All right.  Ladies and gentlemen of the

25  jury, we're going to take our lunch break at this time.  Thank

1   you for your undivided attention.

2          As we did yesterday, we will have you all be back in

3   the jury room, if you could, please, by 1:45.

4          I expect that at around 1:45 someone from my staff will

5   once again enter the jury room and bring you all coffee, for

6   those who want it, before we have you guys seated this

7   afternoon.

8          We plan on covering a few witnesses this afternoon, so

9   we have a busy rest of the day ahead of us.  So please make

10  sure, as you take your break and have your lunch, that we all

11  get back to the jury room at the allotted time.

12         One thing of course I will remind you all, we've heard

13  a lot of testimony from this initial government witness.

14  Please continue to follow the Court's instructions.  Do not

15  discuss anything you have heard or seen with each other, with

16  family or friends, or do any independent research regarding any

17  of the terms or concepts that have been discussed by

18  Ms. McMillan throughout her examination.

19         Certainly stay off social media.  And if the lawyers

20  run into you when you are out and about having lunch, take no

21  offense if they steer clear, as they must.

22         So with that being said, make sure you leave your

23  notepads in the jury room.  We're going to excuse you all, and

24  see you back in the jury room at 1:45.  Have a great lunch.

25         THE COURT SECURITY OFFICER:  All rise.

1          (Jury exits at 12:25 p.m.)

2          THE COURT:  All right, everyone.  Please be seated.

3     Briefly, before we excuse everyone else for lunch, I believe

4     that my lineup then this afternoon would be the shorter

5     witnesses first, C.N., and P.W.  I believe that's N. and Wulf;

6     am I correct in that?

7          MS. DE BOER:  That's correct, Your Honor.

8          THE COURT:  All right.  So we will tackle those two

9     witnesses, and then hopefully if that is relatively short, we

10    can begin with Mr. Ramamurthy later this afternoon.  All right?

11         MS. DE BOER:  Very good, Your Honor.

12         THE COURT:  Okay.  Anything else before I let everybody

13    go for lunch?

14         MR. RAFFERTY:  One housekeeping matter, Your Honor.  I

15    think I accidentally used a beneficiary's name from time to

16    time, and I just would ask, I assume the government will join

17    me in having their names redacted in some form in the

18    transcript.

19         THE COURT:  Correct.  And I'm assuming the government

20    is on board with that as well.

21         MS. DE BOER:  Yes, and we've spoken with the court

22    reporter about that.

23         THE COURT:  Yeah.  I figured Ilona would know.  No

24    worries.  It happens.  We'll make sure we excise that.

25         MR. RAFFERTY:  Thank you.

1          MS. DE BOER:  Your Honor, just to confirm, after the

2    second patient witness, we'll break.

3          THE COURT:  Yes.  So the goal would be to do the two

4    patient witnesses, break, restroom, get the next witness on the

5    stand, and then I will check with Mr. Ramamurthy at that time

6    regarding any concerns with diabetes, et cetera.  And then

7    we'll bring in the jury, and we'll start with him.

8          MS. DE BOER:  Okay.  Thank you.

9          THE COURT:  All right.  We'll see each other about a

10   quarter before 2:00 o'clock, 1:45.  You've got about an hour

11   and 15.  We're in recess.

12         (Court recessed at 12:27 p.m.)

13         (Back on the record at 2:17 p.m.)

14         THE COURT:  Let's go ahead and get our jurors.  Thank

15   you, guys.

16         THE COURT SECURITY OFFICER:  All rise.

17         (Jury enters at 2:18 p.m.)

18         THE COURT:  Please be seated, everyone.  Welcome back,

19   ladies and gentlemen of the jury.  I hope you had a nice lunch

20   break.  We're going to pick up where we left off, turn it back

21   to the government so they can call the next witness.  All

22   right?

23         Government's next witness, please.

24         MS. GURSKIS:  Thank you, Your Honor.  The United States

25   calls C.N.

```
 1              THE COURT:  Come on up, Ms. N.  Make your way up here
 2   and we'll swear you in.
 3              THE COURTROOM DEPUTY:  Please raise your right hand.
 4          (Government witness, C.N., duly sworn.)
 5              THE COURTROOM DEPUTY:  Please be seated.  Speak into
 6   the microphone.  Say and spell your name for the record.
 7              THE WITNESS:  C.N., C-x-x-x-x-x-x, N-x-x.
 8                           DIRECT EXAMINATION
 9   BY MS. GURSKIS:
10   Q.  Good afternoon, Ms. N.  What do you currently do for a
11   living?
12   A.  I am retired, but I do a little part-time job where I sit
13   and educate patients.
14   Q.  What did you do prior to your retirement?
15   A.  My career was in the cardiac cath lab.
16   Q.  Where do you reside?
17   A.  Palm City, Florida.
18   Q.  Were you married to D.N.?
19   A.  Yes.
20   Q.  Where does Mr. N. currently reside?
21   A.  At the Cabanas which is an assisted living in Jensen Beach,
22   Florida.
23   Q.  Is Mr. New a Medicare beneficiary?
24   A.  Yes.
25   Q.  Are you involved in Mr. N.'s healthcare?
```

1   A.   Yes.

2   Q.   Why is that?

3   A.   I'm just the one that has always taken care of him.   We --

4   we're married 38 years.

5   Q.   Does he have some health issues that he's dealing with

6   right now?

7   A.   Oh, yes.

8   Q.   Can you be a little more specific?

9   A.   Well, he has several health issues, like diabetes and stuff

10   like that, but he also has frontotemporal lobe dementia.

11   Q.   What is frontotemporal lobe dementia?

12   A.   It affects personality and judgment.

13   Q.   Before Mr. N. moved to the assisted care facility, was his

14   dementia effecting your day-to-day life with him?

15   A.   Oh, yes.

16   Q.   Can you explain that?

17   A.   Frontotemporal lobe dementia affects personality and

18   judgment, and basically it also presents almost like an

19   addiction.   The person seems normal, but they focus on

20   something that -- it can be overeating.   It can be gambling.

21   For him, it was money or making money or any way to get rich

22   fast.

23   Q.   Do you know if Mr. N. ever received calls from

24   telemarketers?

25   A.   Nonstop, constantly, enough where I had to unplug the house

1    phone.

2    Q.   You had to unplug the house phone; is that what you said?

3    A.   Oh, yes.  Oh, yes.

4    Q.   Do you recall any relating to healthcare items in

5    particular?

6    A.   Yes, many.

7    Q.   What do you remember about those calls?

8    A.   I know that he received several knee braces, back braces,

9    neck braces, and some kind of cancer something, screening, or

10   cancer test to tell him he did or did not have cancer or would

11   or would not get it.

12   Q.   Okay.  And that cancer test, do you recall when that was?

13   A.   It was, I would say late '17 or early '18, but

14   specifically, like, a date or -- no.

15   Q.   Okay.  And that test was -- came from a call from a

16   telemarketer?

17   A.   I can't absolutely say it was a phone call.  It could have

18   been a mailing or an email.  But I believe it was a phone call.

19   Q.   Did Mr. N. ever tell you what he thought the test did?

20   A.   Oh, yes.  It was gonna tell him if he had cancer or was

21   going to get cancer.

22   Q.   Do you know if Mr. N. ever received a phone call about his

23   test results?

24   A.   Well, he told me -- I don't know if it was a phone call,

25   but he received his results, and he would not ever be getting

1    cancer.

2    Q.   Did you see any paper document that said that?

3    A.   No, I did not.

4    Q.   Given your sense of involvement in Mr. N.'s healthcare, do

5    you know all the doctors who treat Mr. N.?

6    A.   Yes, I do.

7    Q.   Is that because you bring him to his appointments?

8    A.   Yes, I do.

9    Q.   Has Mr. N. ever been treated by a doctor named Juan Sigh?

10   A.   Not that I was involved with.

11   Q.   Has Mr. N. ever had cancer?

12   A.   No.

13            MS. GURSKIS:   No further questions.

14            Thank you, Your Honor.

15            THE COURT:   Thank you.   Cross-examination?

16            MR. RAFFERTY:   No questions, Your Honor.   Thank you,

17   ma'am.

18            THE WITNESS:   Thank you.

19            THE COURT:   Thank you, Ms. N.   That's it.   You're free

20   to go.

21            Government's next witness.

22            MR. RAFFERTY:   Your Honor, could I have a moment?

23            THE COURT:   Sure.

24            MS. ROOKARD:   Thank you, Your Honor.   The government

25   calls P.W.

```
 1                THE COURT:  All right.  Ms. W., make your way up, and

 2      we'll swear you in.

 3                (Government witness, P.W., duly sworn.)

 4                THE COURT:  The government may proceed when you're

 5      ready.

 6                MS. ROOKARD:  Thank you, Your Honor.

 7                At this time, the government moves Exhibit 408-C into

 8      evidence.

 9                THE COURT:  Any objection?

10                MR. RAFFERTY:  No objection.

11                THE COURT:  All right.  That will be admitted.  408-C

12      is in evidence.

13                Go ahead.

14                (Government Exhibit 408-C was received in evidence.)

15                              DIRECT EXAMINATION

16      BY MS. ROOKARD:

17      Q.  Good afternoon, Ms. W.

18      A.  Hello.

19      Q.  Ms. W., where do you live?

20      A.  Odessa, Florida.

21      Q.  And what do you do for work?

22      A.  I'm retired.

23      Q.  And what did you do for work before you retired?

24      A.  I was a security guard.

25      Q.  And about when did you retire?
```

1    A.   About 20 years ago.

2    Q.   And what kind of insurance do you have?

3    A.   I have Medicare and Blue Cross/Blue Shield.

4    Q.   And how long have you had that?  How long have you had

5    Medicare?

6    A.   Since I was 62, so that would be 12 years.

7    Q.   Okay.  And so you had Medicare in 2018?

8    A.   Yes.

9    Q.   And turning to cancer genetic testing, what knowledge, if

10   any, do you have about what cancer genetic testing is?

11   A.   None.

12   Q.   And was there a time when you came to learn about it at

13   all?

14   A.   Not really, no.

15   Q.   Turning your -- turning to 2018, was there a time that you

16   attended a senior exposition?

17   A.   Yes, I did.

18   Q.   And when was that?

19   A.   June of 2018.

20   Q.   And where did that take place?

21   A.   Jacksonville, Florida.

22   Q.   And what was the setup there?

23   A.   It was a senior expo.  So you would go in, get your blood

24   pressure taken, see what shoe soles you could have,

25   chiropractor information.

1   Q.   And did you speak to anyone at that exposition?

2   A.   Yes.

3   Q.   Who did you speak to?

4   A.   Well, when I took that saliva test.

5   Q.   And when you say "that saliva test," you -- did you speak

6   to someone at a booth at the fair?

7   A.   Oh, at the booth, yes.

8   Q.   And what did the person at the booth tell you?

9   A.   I was walking --

10          MR. RAFFERTY:  Your Honor, I'm going to object at this

11   time.  Hearsay.

12          THE COURT:  Sustained.

13          Go ahead.

14   BY MS. ROOKARD:

15   Q.   What did you speak to the person in the booth about?

16   A.   Well, I was walking past the booth and he stopped me and he

17   said, would you like to see -- find out if you have cancer.

18   All you have to do is spit in the tube.

19          MR. RAFFERTY:  Your Honor, same objection.

20          THE WITNESS:  Am I saying it wrong?

21          THE COURT:  No.  Ms. W., you're doing nothing wrong.

22   You're doing just fine.  Let's go ahead and move on from that.

23   That's going to be sustained.  But let's not talk about what

24   anybody told us outside of court.

25          That's all right.  Go ahead.

```
 1    BY MS. ROOKARD:

 2    Q.   Ms. W., did you take a test at that time?

 3    A.   Yes.

 4    Q.   What kind of test was that?

 5    A.   I had to spit in a tube.

 6    Q.   And you spit in a tube and handed it back to someone?

 7    A.   Yes.

 8    Q.   And what was your understanding of what that was going to

 9    do?

10    A.   To see if I had -- it was a test to see if I had cancer.

11    Q.   And did you speak to a medical professional there?

12    A.   No.

13    Q.   And did you have cancer at that time?

14    A.   No.

15    Q.   And did you make a payment at that time?  Did you pay for

16    the test?

17    A.   No.

18    Q.   What was your understanding of if it would cost you any

19    money?

20    A.   I don't really remember that part.

21    Q.   And do you recall receiving results of that test?

22    A.   Yes, I got a letter a few weeks later.

23    Q.   And what -- you received it how?

24    A.   In the mail.

25    Q.   Okay.
```

1          MS. ROOKARD:  At this time, could we publish 408-C?

2          THE COURT:  There's no objection to that.  It's in

3     evidence.  We can publish that.

4          MR. RAFFERTY:  No objection.

5     BY MS. ROOKARD:

6     Q.  Ms. W., do you recognize this?

7     A.  Yes.

8     Q.  And what is this?

9     A.  That's the letter I received.

10    Q.  That you were just describing?

11    A.  Yes.

12         MS. ROOKARD:  Ms. Puntillo, could you zoom in on the

13    top section?

14    BY MS. ROOKARD:

15    Q.  Do you know what this is, Lotus Health and Wellness?

16    A.  Never seen that before until I got the letter.

17         MS. ROOKARD:  Ms. Puntillo, could we go to the second

18    page?  Could we go -- I'm sorry.  And blow up the top section,

19    please.

20    BY MS. ROOKARD:

21    Q.  And where it says LabSolutions at the top, do you know what

22    that is?

23    A.  Never seen that before until the letter.

24    Q.  And where it says on the left side, physician, what does

25    that say?

1  A.    Farah Chaka.

2  Q.    Do you know who that is?

3  A.    Never -- no.

4  Q.    Is that your doctor?

5  A.    No.

6  Q.    Has that ever been your doctor?

7  A.    No.

8         MS. ROOKARD:  And could we go to the middle section?

9  BY MS. ROOKARD:

10  Q.    And can you -- what does the top line of this say?

11  A.    Variant of uncertain significance detected.

12  Q.    And did you understand what this meant?

13  A.    Not really.

14  Q.    Did anyone -- the doctor or someone set up an appointment

15  with you to explain what this meant?

16  A.    No.

17  Q.    A doctor?

18  A.    No.

19  Q.    A genetic counselor?

20  A.    No.

21         MS. ROOKARD:  Ms. Puntillo, could you go to the rest of

22  the page?

23  BY MS. ROOKARD:

24  Q.    Did you understand what any of this meant?

25  A.    No.

```
1            MS. ROOKARD:  Could we go to the next page quickly?

2    BY MS. ROOKARD:

3    Q.   What about any of -- any of this?

4    A.   No.

5    Q.   Ms. W., did you speak to anyone at all about your results?

6    A.   I brought this piece of paper to my diabetic doctor, and he

7    looked at it and said I have no idea what it is.

8            MR. RAFFERTY:  Your Honor, again, objection.

9            THE COURT:  Ladies and gentlemen, I'm going to sustain

10   it.  But just so we're clear, any out-of-court statements are

11   not being offered here presumably for the truth of the matter

12   asserted, correct?

13           MS. ROOKARD:  Correct.

14           THE COURT:  They're being offered to show the state of

15   mind of the witness as to why she would spit in a tube or take

16   any another action.

17           Do you all understand?

18           THE JURORS:  Yes.

19           THE COURT:  All right.  Let's proceed.

20   BY MS. ROOKARD:

21   Q.   Did your doctor use your results in your care at all?

22   A.   No.

23   Q.   Did any doctor use your results at all?

24   A.   No.

25   Q.   And have you had cancer?
```

1    A.   No.

2              MS. ROOKARD:  Thank you.  I have no further questions.

3              MR. RAFFERTY:  No questions, Your Honor.

4              THE COURT:  Thank you, Ms. W.  you're free to go.

5              Ladies and gentlemen of the jury, what I would like to

6    do at this time is I want you all to leave your notepads at

7    your chairs.  There is going to be a brief break, but the next

8    witness may be a little lengthier.  So I want you to all make

9    sure that if you need to use the restroom that you use it now,

10   so we don't break up any flow.  Okay?

11             We're going to come right back out.  Don't stray too

12   far.  We'll be on to our next witness in just a moment.

13             You are excused.

14             THE COURT SECURITY OFFICER:  All rise.

15        (Jury exits at 2:32 p.m.)

16             THE COURT:  All right.  Our next witness should be

17   Mr. Ramamurthy; is that correct?

18             MS. DE BOER:  Yes, Your Honor.

19             THE COURT:  Do we have Mr. Ramamurthy here?

20             THE COURT SECURITY OFFICER:  Yes, Your Honor.  He's

21   here.

22             THE COURT:  If we could escort Mr. Ramamurthy to the

23   witness stand, please.

24             THE COURT SECURITY OFFICER:  Not a problem.

25             THE COURT:  Thank you, guys.  I appreciate your help on

 1    this one.

 2           MR. RAFFERTY:  Your Honor, do we have a minute to step

 3    out?

 4           THE COURT:  Absolutely.  Go ahead while I get him set

 5    up, guys.

 6       (Court recessed at 2:33 p.m.)

 7       (Back on the record at 2:41 p.m.)

 8           THE COURT:  Let's see if our jurors are ready.

 9           THE COURT SECURITY OFFICER:  All rise.

10       (Jury enters at 2:41 p.m.)

11           THE COURT:  Please be seated, everyone.  All right.

12    Ladies and gentlemen, we're going to turn it back to the

13    government for our next --

14           THE COURT SECURITY OFFICER:  Your Honor, we're missing

15    one.

16           THE COURT:  Oh, that's right.  Thank you, guys.  You

17    guys are changing your seating arrangements during the day, so

18    it's getting harder to see when you're all here.

19           Now we have everybody.  Okay, folks.  So we'll turn it

20    back to the government for our next witness, who has already

21    taken the stand.

22           Next witness.

23           MS. GURSKIS:  Thank you, Your Honor.

24           The Government calls Senthil Ramamurthy.

25       (Government witness, SENTHIL RAMAMURTHY, duly sworn.)

```
 1                      DIRECT EXAMINATION
 2   BY MS. GURSKIS:
 3   Q.   Good afternoon, Mr. Ramamurthy.
 4   A.   Good afternoon.
 5   Q.   How are you?
 6   A.   Very good.
 7   Q.   Where did you go to school?
 8   A.   I'm from Texas.
 9   Q.   How far did you go in school?
10   A.   I dropped out of my fourth year of med school.
11   Q.   Did you complete any residencies or clinical rotations when
12   you were in medical school?
13   A.   Yes, I did.
14   Q.   And what was that?
15   A.   I did a few clinical rotations, psychiatry, family
16   medicine, surgery, a handful of rotations.
17   Q.   Did you see patients during those rotations?
18   A.   I saw patients during most of my rotations, except -- with
19   the exception of when I was working in my psychiatry rotation
20   for Compass Health Systems.
21   Q.   And what were you doing during that psychiatry rotation
22   that was not related to patient care?
23   A.   Well, for a week I saw patients, and then afterwards the --
24   my professor told me to work on the fourth floor, on the
25   administrative level, where they do business development.  And
```

1    basically I was just coming up with ideas for Compass Health to

2    make more money.

3    Q.   And did that involve marketing particular products?

4    A.   Yes.  I was working under John Schulte, who was an

5    administrator there on the fourth floor, and we started

6    throwing around ideas for marketing compounds and various types

7    of genetic tests.

8    Q.   And very briefly, Mr. Ramamurthy, what are compounds?

9    A.   Compounds are customized creams with medication in them.

10   It could be, like, a cyclobenzaprine for your back pain or it

11   could be for a wound cream or a scar cream.

12        They were supposed to be customized, but the ones that we

13   marketed weren't really that customized.  They were more mass

14   produced.

15   Q.   And what did you do for a living after not returning to

16   medical school?

17   A.   I marketed pharmaceutical products including compounding

18   and genetic testing.

19   Q.   For approximately how many years did you work in that

20   medical marketing field?

21   A.   About three years.

22   Q.   And that was roughly when?

23   A.   This was 2015 onwards.

24   Q.   Okay.  Where do you currently reside?

25   A.   FDC Miami Prison.

1    Q.   Is that because you pled guilty to a crime?

2    A.   This is correct.

3    Q.   What did you plead guilty to?

4    A.   Conspiracy to commit healthcare fraud.

5    Q.   Did you admit to specific conduct when you pled guilty?

6    A.   I did.

7    Q.   Can you tell us in a couple of sentences what you did to

8    violate the law?

9    A.   Well, we marketed these very overpriced compounds and

10   genetic tests to vulnerable populations, to poor people, to

11   people who really -- there wasn't much of a resistance to

12   market these products to, and we used telemedicine to get

13   doctors to kind of just get as many prescriptions done as

14   possible.  We billed a lot of money, so a lot of money, and

15   took advantage of a lot of people.

16   Q.   And the money that you're talking about, was there a

17   particular health insurance or health insurance programs that

18   were billed?

19   A.   Medicare, Medicaid, TriCare, some private insurance.  But

20   mostly government insurance.

21   Q.   What was the company or entity that you worked for that was

22   involved in that guilty plea?

23   A.   Many companies.  As in the compounding, in the testing,

24   in...

25   Q.   Did you have a company?

1   A.   Oh, yeah.  I had a company called -- excuse me --

2   SKR Services and Ventures, another one called Q Health

3   Services.

4   Q.   And what type of company were Q Health Services and

5   SKR Ventures?

6   A.   Pharmaceutical marketing.  We had contracts with many

7   different vendors, laboratories, pharmacies, et cetera.

8   Q.   Do you see anyone in the courtroom today who participated

9   in that scheme with you?

10  A.   Yes, I do.

11  Q.   Can you identify that person based on an article of

12  clothing he or she is wearing?

13  A.   It's like a light blue shirt, grey suit.

14          MS. GURSKIS:  May the record reflect that the witness

15  has identified the defendant.

16          THE COURT:  The record will reflect it.

17  BY MS. GURSKIS:

18  Q.   And I'm sorry.  What is the name of the person in the light

19  blue shirt and grey suit?

20  A.   His name is Minal Patel.

21  Q.   Can you give us a two-or-three-sentence description of what

22  Minal Patel did to further the scheme?

23  A.   The genetic testing was Minal's brain child.  This was what

24  he wanted.  This is what he figured out.  This is what he put

25  together.  And he found the people that he needed to execute

1    his plan.  He was the architect of this whole thing.

2    Q.   Are you testifying today pursuant to a plea agreement with

3    the government?

4    A.   I am.

5    Q.   Have you agreed to cooperate with the government for that

6    plea agreement?

7    A.   I have.

8    Q.   Have you promised to tell the truth if called to testify?

9    A.   Yes, I have.

10   Q.   Has the government or any government representative

11   promised you anything in exchange for your testimony today?

12   A.   No, they have not.

13   Q.   Have you been sentenced for your crime?

14   A.   I have.

15   Q.   Did your plea agreement say that the government may make

16   recommendations about a potential reduction in your sentence?

17   A.   Yes.

18   Q.   Is it fair to say you're hoping to receive a reduction in

19   your sentence in exchange for your testimony today?

20   A.   This is fair to say.

21   Q.   Who will ultimately decide if your sentence does get

22   reduced?

23   A.   Only my judge.

24   Q.   All right.  Let's move back to the genetic testing that you

25   were mentioning a moment ago, Mr. Ramamurthy.

1    Approximately when did you first learn about genetic

2  testing?

3  A.   In 2015, John Schulte kept on telling me about PGx testing

4  and pharmacogenomic testing.  He had a lab.  This is when I was

5  in my clinical rotations.  And then, I guess a few months

6  later, he discovered a lab in New Jersey, and we tried to send

7  samples there, but none of them went through.

8    And then in the summer of 2016, I had gotten a call from

9  another friend of mine in the industry named Brett, and he told

10  me that he had found a laboratory that was able to do the

11  genetic testing, and he --

12  Q.   Okay.  Let's just stop there for a moment.  You say Brett.

13  Does Brett have a last name?

14  A.   Brett Hirsch.

15  Q.   Okay.  And you said this was in mid 2016?

16  A.   Yes.

17  Q.   Okay.  And you were about to say that -- I think you were

18  talking about Mr. Hirsch calling you or reaching out to you?

19  A.   Yes.  He gave me a call, and he said it was very urgent.

20  He told me to fly to New York immediately.  So I hopped on a

21  plane, and I met him at the Waldorf Hotel.  I had a suite

22  there.  And Brett came to the meeting.  It was a very short

23  meeting.

24    He showed me what's called an EOB, an Explanation of

25  Benefits.  It is basically like a receipt for what Medicare has

1    paid for, for something, right?  And I was going through it

2    with Brett, and it had various gene markers on it, like BRCA,

3    K-RAS, PTEN.  These are all different like alleles on your gene

4    that you can test for, for some kind of mutation that could

5    lead to cancer.

6         And it was a list of all these different codes.  And next

7    to it was a dollar amount, next to every single one.  And all

8    the way at the bottom, I saw it said like $9,000, and I was,

9    like, shocked.  I was, like, flabbergasted.  And I asked Brett

10   about this.  And he was, like, yes, this is true.  It's a

11   saliva sample.  We're making nine G's on it.  You need to go

12   meet the guy who owns this laboratory.  The whole thing works.

13   His name is Minal.  Go fly to Atlanta.

14   Q.   Okay.  And how did you meet Mr. Hirsch initially?

15   A.   I met him through John Schulte, back when I was doing

16   compounding.  They kind of all ran in the same circle.

17   Q.   Did Mr. Hirsch have a business partner who he worked with?

18   A.   Yes, Keith Youngswick.

19   Q.   Did you also interact with Mr. Youngswick?

20   A.   I did, but to a more limited capacity.

21   Q.   Okay.  Did you ultimately travel to see this lab, like

22   Brett Hirsch had recommended?

23   A.   I did, just a couple of days later.

24   Q.   When did you first meet Minal Patel?

25   A.   When he picked me up from the airport.

1    Q.   Can you describe that first meeting with Minal Patel?

2    A.   Yeah.  He picked me up from the airport.  He had an Aston

3    Martin Carbon Fiber.  It was very nice.  And we were driving

4    around.  He was talking on like two cell phones at the same

5    time, like, driving all over the place.

6         And we got to his condo, and he confirmed to me, you know,

7    that, yes, he's got a lab, it all functions, everything is

8    billing, it all works.  So he said, I'll show you the lab

9    tomorrow.

10   Q.   When you say "everything is billing, it all works," what is

11   the "it" that you're referring to?

12   A.   Money, like it works.  You can get a sample from somebody,

13   you can bill Medicare, and you can make $9,000 on it.

14   Q.   What type of test on that sample?

15   A.   This is a cancer hereditary test.  It will test for your

16   propensity to get cancer based upon your family history of

17   cancer.

18   Q.   Did Mr. Patel say anything to you about how he got his

19   start in genetic testing?

20   A.   Yes.  He told me his origin story.  He had spinal surgery

21   at some point, and then when he got the bill for his lab work

22   during the surgery, it was, like, expensive.  It surprised him.

23   So he decided to sell one of his hotels or motels, and he made

24   a laboratory, and then eventually he bought the space that

25   became LabSolutions that I visited.

1    Q.   Was the ride in the Aston Martin the only contact that you

2    had with Minal Patel on that first trip to Atlanta?

3    A.   No.  I was staying at his house, at his condo, yeah.

4    Q.   And did you ever visit the lab?

5    A.   I visited the lab the very next day.

6    Q.   And did you meet anybody -- meet with anybody at the lab?

7    A.   I did.  I met with a guy named Nicholas Vartanian, and

8    later that evening I met someone named Omar, at his house.  I

9    don't remember if Omar was at the initial meeting of the

10   laboratory that day, but I interacted with Omar numerous times

11   at the laboratory thereafter.

12   Q.   Okay.  Who is Nicholas Vartanian?

13   A.   He worked at LabSolutions.  I believe he was in charge of

14   the billing.

15   Q.   Did you have any meetings or discussions with Minal Patel

16   and Nicholas Vartanian on that first lab visit?

17   A.   Yes, I did.

18   Q.   What did you talk about?

19   A.   We talked about basically how this thing works.  We talked

20   about billing, because that was kind of Nicholas' thing.  And

21   Minal introduced us.  And Nicholas kind of broke it down.

22   There was -- there was, like, a whiteboard in his office, and

23   it had a bunch of codes on it.  These are what are called

24   ICD-10 codes.  It's diagnosis codes, like, a patient has some

25   kind of thing.  They got a cold, they have a flu, they have

1    psoriasis.  Every disease out there has an ICD-10 code.  It's

2    how you bill things.  So they had figured out a way to make

3    sure everything always goes through for these tests.

4    Q.  And when you say "they," who are you referring to?

5    A.  Minal and Nicholas Vartanian.

6    Q.  And when you say that Minal Patel and Nicholas Vartanian

7    figured out a way to make things go through for a test, can you

8    be a little more specific about what you mean?

9    A.  Like, I guess the best way to describe it is ICD-10 code

10   hacking.  Like you will take the codes, like, some set of

11   codes, and try to bill Medicare for the test.

12        And then, depending on whether it works or not, they you

13   reverse out the charges.  And then you try a different set of

14   codes.  You keep doing this pilot testing until you come up

15   with a list of codes that will always go through.  And Medicare

16   is like a robot.  It just spits out money.

17   Q.  You mentioned Medicare.  Did you have any discussion with

18   Mr. Patel and Mr. Vartanian about any other health insurance

19   program?

20   A.  Medicaid and Blue Cross to, like, a lesser degree.  They

21   were really interested in the Medicare and Medicaid samples,

22   though.

23   Q.  Did you discuss anything with Mr. Patel and Mr. Vartanian

24   other than billing codes on that first visit?

25   A.  Yes.  We talked about marketing strategy.

1    Q.   What marketing strategies did you discuss?

2    A.   Well, there were a few things that I was directed to do as

3    far as my company.  Minal had asked us to do a couple of

4    things.

5         The first was, he wanted samples from my mom, because my

6    mom's a doctor, so he wanted all the samples from her office.

7         The second thing is that he wanted -- he wanted to collect

8    samples from, I guess, poor communities in Georgia or the

9    Atlanta metropolitan area.  There's, like, a thing where people

10   have prepaid cell phones.  Like, they get them free from the

11   government if you're low income, and there are people that hand

12   out those cell phones in those area, right?  So he wanted us to

13   hire those marketers, and as they were passing out the cell

14   phones, he wanted them to also collect saliva samples.

15   Q.   Did you --

16   A.   I'm sorry.  Did I say that clear?  I feel like I was

17   stumbling or something.  Was I clear on that or --

18   Q.   I think -- I believe that you stated that one of the

19   marketing strategies that was being employed -- or was

20   recommended to you by Mr. Patel and Mr. Vartanian was some sort

21   of low-income, free cell phone business model.

22        Is that what you were saying?

23   A.   Yes, except it was not recommended.  I was ordered to do

24   this.

25   Q.   Okay.

```
1    A.   He was, like, this is what I need.  I need your mom's

2    samples.  I need you to get a team out there, in Georgia, hit

3    the ground, get those samples from poor people, with the

4    prepaid cell phone hustle.

5    Q.   And other than the prepaid cell phone hustle, as you

6    described it, were there any other marketing strategies or

7    locations that you discussed with Mr. Patel and Mr. Vartanian

8    about where you could obtain samples?

9    A.   Yes, older people, because Medicare is typically older

10   people.  So he said, go to, like, bingo halls, nursing homes,

11   adult day cares, anyplace that old people kind of congregate.

12   Q.   And you mentioned your mother, Mr. Ramamurthy.  What does

13   your mother do for a living?

14   A.   She was a geriatrician; takes care of old people.

15   Q.   Did you share that information with Mr. Patel during that

16   initial meeting?

17   A.   Yes.

18   Q.   What type of patients did your mother primarily take care

19   of?

20   A.   Medicare patients.

21   Q.   Did you ultimately start working with LabSolutions?

22   A.   Yes, immediately.

23   Q.   Did you end up getting your mother involved?

24   A.   I did.

25   Q.   How exactly did that come about?
```

1    A.   Well, I pitched her this test, and she said that she would

2    do it for me.  So she did it for her patients.  And those are

3    among the first samples that were collected, yeah.

4         MS. GURSKIS:  Your Honor, may I approach the witness?

5         THE COURT:  You may.

6         MS. GURSKIS:  I just handed the defendant what's been

7    marked for identification as Government's Exhibit 450.

8    BY MS. GURSKIS:

9    Q.   Mr. Ramamurthy, do you recognize this document?

10   A.   I do.

11   Q.   What is it?

12   A.   This is a provider's preferred order form.  This basically

13   signs up a physician's office and registers it with the

14   laboratory so that now they are able to submit samples.

15   Q.   And it relates to who -- which provider?

16   A.   My mother and my father.

17        MS. GURSKIS:  The government now moves to admit

18   Government Exhibit 450.

19        THE COURT:  Any objection?

20        MR. SADOW:  Can we have the date on that, please?

21        MS. GURSKIS:  September 22nd.

22        THE COURT:  Yeah, September 22nd.

23        MR. SADOW:  No objection.

24        THE COURT:  All right.  That will be admitted at this

25   time.

1          MS. GURSKIS:  Thank you, Your Honor.  May I publish it

2     to the jury?

3          THE COURT:  You may.

4          (Government Exhibit 450 was received in evidence.)

5     BY MS. GURSKIS:

6     Q.  So, Mr. Ramamurthy, you were starting to describe this

7     document.  I believe you said it was a preferred provider form?

8     A.  Yes.

9     Q.  Did you use this document in your business with Mr. Patel?

10    A.  Yes.

11    Q.  What was the purpose of it?

12    A.  This will register you with the laboratory and will

13    initiate the lab to send out kits to the office to begin

14    collection.

15    Q.  Do you recall if you ever signed a contract with

16    LabSolutions, Mr. Ramamurthy?

17    A.  I did.

18         MS. GURSKIS:  Your Honor, may I approach the witness?

19         THE COURT:  You may.

20         MS. GURSKIS:  I'm showing the witness what has been

21    marked for identification as Government's Exhibit 665 and

22    665-A.

23    BY MS. GURSKIS:

24    Q.  Mr. Ramamurthy, do you recognize the documents that I just

25    handed you?

1    A.   Yes, I do.

2    Q.   What are they?

3    A.   It's the contract that was signed between my company and

4    Minal's company.

5    Q.   Okay.  And what is the first document that's in front of

6    it, 665?

7    A.   Let's see.  It says DocuSign.  Then it goes through, and it

8    says Laboratory Sales Representative Distribution Agreement.

9    Q.   Okay.  Is the first document the transmittal email for the

10   contract?

11   A.   Yes.

12   Q.   And what is the date on it?

13   A.   The date is 11/1/2016.

14        MS. GURSKIS:  Your Honor, the government moves to admit

15   Government's Exhibits 665 and 665-A.

16        THE COURT:  Any objection?

17        MR. SADOW:  No objection.

18        THE COURT:  Thank you.  That'll be admitted.

19     (Government Exhibits 665 and 665-A were received in

20     evidence.)

21        MS. GURSKIS:  May I publish it to the jury, Your Honor?

22        THE COURT:  You may.

23   BY MS. GURSKIS:

24   Q.   So, Mr. Ramamurthy, this is the agreement that you said

25   that you signed with LabSolutions; is that right?

```
1    A.   That is right.

2         Is this page 5?

3    Q.   It is, Mr. Ramamurthy --

4    A.   Okay.

5    Q.   -- No. 8.

6         What does Section 8 on page 5 state?

7    A.   Section 8, indemnification --

8    Q.   It should be up on the screen for you, Mr. Ramamurthy.

9    A.   Oh, I'm sorry.

10   Q.   I'm sorry.  Section G.  I apologize.

11   A.   Section G.  Sales rep represents that neither sales rep nor

12   any immediate family members are in a position to refer or

13   influence the referral of testing services to laboratory other

14   than through the provision of the duties, responsibilities, and

15   services in accordance with the terms of this agreement.

16   Q.   Is that true?  Did you follow that provision?

17   A.   No.  I got samples from my mom.

18   Q.   Did Mr. Patel know you were getting samples from your mom?

19   A.   Absolutely.

20   Q.   Did you ever discuss -- you mentioned that your mom had a

21   geriatric practice.  Did you ever discuss marketing to other

22   types of physicians with Mr. Patel?

23   A.   Yes.  Primary care physicians.  Really any physician -- any

24   physician who would be interested in marketing -- interested in

25   using this test.
```

1      So I hired some direct-to-physician marketers.  I guess you

2  would call them traditional pharma reps.

3  Q.  Did you ever discuss marketing to oncologists or oncology

4  practices?

5  A.  Yes.  Yeah.  I didn't manage to get any, though.  But that

6  wasn't -- really, he wanted the primary care physicians more,

7  yeah.

8  Q.  Did you discuss with Mr. Patel what types of tests in

9  particular would be offered or what genes in particular would

10  be tested?

11  A.  Yeah.  There was -- there were a lot of different genes

12  there, but when it came down to the genes, you know, it could

13  be considered, like, a menu of different options.  Really, he

14  wanted everything to be the whole menu.  And you call that,

15  like, a bundle.  It's a comprehensive panel.  This will cover

16  all the genes.  And that's what they wanted.

17      That's what he wanted at the lab.  That's what Nicholas

18  wanted.  They wanted as many comprehensive panels done as

19  possible.

20  Q.  Aside from that initial conversation about the paneling --

21  the bundling of the tests, did you have other conversations

22  with Mr. Patel about tests for particular genes?

23  A.  Yes.  The BRCA gene is the most expensive.  BRCA is the

24  gene that will detect a propensity for breast cancer and

25  ovarian cancer.  And I think that was, like -- that gene alone

1   is, like, $3,000.  So they really wanted that gene to be

2   included in any order.

3   Q.   When you say they really wanted that gene to be included

4   with each order, who are you talking about?

5   A.   Minal and the laboratory administrators.

6   Q.   Earlier you mentioned you also met somebody named Omar on

7   that first trip to LabSolutions.

8        What role did Omar have at LabSolutions?

9   A.   Omar used to work at another lab.  He had lab experience in

10  the field.  And he was the one that knew that this test

11  actually worked.  He used to work at another lab, where they

12  got the billing done right, and then Minal brought him over to

13  his lab.  So he knew the business.

14       Beyond that, I don't know what he did because I only met

15  him a couple of times.  After about a month, he was let go.  So

16  when I would go visit Atlanta, he wasn't there anymore.

17  Q.   And thinking back to that first trip, when Omar was still

18  working at LabSolutions, did you have any meetings with Omar

19  and Minal Patel during that trip?

20  A.   Yes, I did.

21  Q.   Did you discuss anything in particular at those meetings or

22  at that meeting --

23  A.   I --

24  Q.   -- if you can recall?

25  A.   Yeah.  I had a hotel at one time, and it was Omar and

1    Nicholas that were there.  And I asked them, well, how many

2    samples can I put in?  Like, how many do you want?  And they

3    said, don't worry about it.  Send in as many as you want.  And

4    I said, well, how is that possible?  Isn't that gonna raise any

5    red flags?

6         And they said, no, because -- they explained that they're

7    already billing at a certain level.  Like, if you're billing

8    millions of dollars every month and you throw in a few more

9    million, that's not going to raise any red flags with auditors.

10   It's not going to set off any alarm bells.

11        Like, if your lab was zero, started with nothing in

12   January, and February, all of a sudden you're billing

13   $1 million, that's a red flag.  But he said because we're

14   already billing millions of dollars, we're not going to meet

15   the threshold for a Medicare audit.

16        So the next day, I talked to Minal, and I broached this

17   subject.  I was, like, so this is what they told me.  Is this

18   actually true?  And he said, yes, because we're already billing

19   so much, we can bill more, and this can go under the radar.

20   Q.   And you said Mr. Patel said that they were already billing

21   so much, it could go under the radar?

22   A.   Yes.

23   Q.   And "under the radar" means what?

24   A.   That these activities would not be detected by Medicare or

25   law enforcement.

1    Q.   For about how long was your working relationship with

2    Minal Patel and LabSolutions?

3    A.   Around two years.  Maybe less.

4    Q.   And in that two-year period, how often were you

5    communicating with Minal Patel?

6    A.   Nearly daily.

7    Q.   Did you have -- who was your primary, or who were your

8    primary contacts at LabSolutions?

9    A.   Minal.

10   Q.   Can you describe Minal Patel's role at LabSolutions as a

11   company?

12   A.   He's the boss.  There may be people with their individual

13   areas of expertise and their own projects, but Minal is the

14   boss of the lab.  He owns the lab.

15   Q.   You mentioned -- you mentioned a couple of times today

16   genetic testing, kind of generally speaking.  Can you explain

17   for us how the genetic testing operation actually worked

18   between Q Health and LabSolutions?

19   A.   Okay.  So I'll explain the telemedicine, kind of, supply

20   chain first.

21        So we have collectors that will go out into the community

22   and collect these samples from people, and tell them that

23   they're going to get a call from a telemedicine physician to

24   schedule a consult.

25        So first we have the sample now.  We already have the

1    sample.  And just, like, some background information on the

2    person.  Really, these people that we sent out there, they're

3    not really medically trained.  They're not -- they don't have

4    that knowledge base that would -- you know, that would be

5    needed for something of this magnitude.  They wouldn't know the

6    ramifications of this test, really.  They were just kind of

7    grabbing the samples.

8         And then the telemedicine doctor will call.  And this is,

9    like, an exercise in box checking, because this is not a long

10   call.  This is a very short, you want the test, yes, okay,

11   done.  You got the test.

12        Then all that is put together, and it is -- the data is

13   pushed to the lab with the sample.  Then the lab will assess

14   the sample, and they will put it into something, what's called

15   ascension.  Ascension is when a sample goes from like just

16   sitting there to being, okay, we can put this through the

17   process.  We think this is a good sample and it's billable.  So

18   now it's an ascension.

19        So this takes like two or three weeks.  It gets run.  Then

20   they get the report back that has the interpretation of the

21   test.  And then they give that to the billing company, or they

22   bill it in-house, and they will send that to Medicare.  And

23   then Medicare will decide, okay, we're gonna pay for this,

24   we're not gonna pay for this.  Okay, we're paying for this.

25   Then Minal will get the money, and then he'll send me my

1    portion of the money.

2    Q.   Okay.  And you said that -- so this was the process for the

3    telemedicine side of business.  And I think I also heard you

4    say that the sales rep did not really have medical training.

5         Did they have any medical training?

6    A.   No.

7    Q.   And was there another side to the business in addition to

8    the telemedicine side that you worked on with Mr. Patel?

9    A.   There is the direct-to-physician side.

10        So the physician will go through all of his charts and will

11   kind of say, okay, all of these people meet the criteria.  So

12   on one day, he'll start calling his patients into the office

13   and collect all the samples.

14        And maybe there will be a member of the staff that's like a

15   collector, that's his or her job, is to collect the samples.

16   And they'll collect them, and then fill the paperwork out, and

17   then FedEx it to the lab.

18   Q.   And in addition to this, the method of using the

19   physicians' offices themselves, what other strategies did you

20   end up actually employing to find beneficiaries to collect

21   samples from?

22   A.   Health fairs, at bingo halls, or adult day cares,

23   television commercials.  Direct-to-patient marketing on the

24   ground, to I guess disadvantaged communities.  I guess we -- we

25   call this low-hanging fruit.  This is where -- there's not a

1   lot of resistance from people in these communities because you

2   kind of just throw some jargon at them, and they kind of go

3   with it.

4       And then once you get that initial sample, in a sales

5   funnel, that builds commitment, like you come back at them

6   three days later and you'll say, oh, the doctor's ready to have

7   a call with you.  This is what you wanted, right?  Because you

8   already have your sample.  So it kind of, like, well, I've

9   already given the sample.  It's building commitment.  So

10  through your own internal consistency, you kind of go along

11  with the process.

12  Q.   You said we employ this strategy of targeting the

13  low-hanging fruit.  Who is "we"?

14  A.   My company and Minal's company.

15  Q.   Did you ever discuss with Mr. Patel that -- the fact that

16  you were going to adult day cares and bingo halls and some of

17  these other places to try to collect samples?

18  A.   Yes, this is what he told me to do.

19  Q.   What type of training did the reps receive who were

20  collecting the samples?

21  A.   Not a lot of training, unfortunately.  We gave them the

22  LabSolutions brochure.  Maybe we had a brochure also.  That was

23  kind of it.

24  Q.   Did they ever have any kind of in-person meetings or

25  anything like that?

1    A.   We had a meeting -- because I hired a team of those Georgia

2    reps, and we had a meeting in the lobby of LabSolutions.   And I

3    was there.   It was a short meeting.   Minal was there.   It was

4    just kind of "welcome to the team" kind of meeting, and then we

5    let them go to work.

6         MS. GURSKIS:   May I approach the witness, Your Honor?

7         THE COURT:   You may.

8         MS. GURSKIS:   I've handed the witness what's previously

9    been marked for identification as Government's Exhibit 1123.

10   BY MS. GURSKIS:

11   Q.   Mr. Ramamurthy, do you recognize what I just handed you?

12   A.   I do.   This is the conference room where the meeting took

13   place on the first floor.

14   Q.   Where you were with Mr. Patel?

15   A.   That is correct.

16        MS. GURSKIS:   Your Honor, the government moves to admit

17   Government's Exhibit 1123.

18        THE COURT:   Any objection?

19        MR. SADOW:   No objection.   And to move things along, I

20   know the government's got lots of different exhibits.   I don't

21   object to any of them.   So you can just move them all in.

22        MS. GURSKIS:   Thank you.

23        THE COURT:   Very good.   Thank you, Mr. Sadow.   That,

24   1123, will be admitted at this time.

25        (Government Exhibit 1123 was received in evidence.)

1          MS. GURSKIS:  I'm sorry, Your Honor, may I publish

2     that exhibit?

3          THE COURT:  You may.

4     BY MS. GURSKIS:

5     Q.  Mr. Ramamurthy, is this the conference room in the lobby

6     that you were just describing?

7     A.  Yes.

8     Q.  And what do you recall about that meeting in the lobby

9     area?

10    A.  It was a brief meeting.  I had, maybe, seven of the reps

11    that we hired there.  It was just welcome to the team, this is

12    the lab, just to kind of show them, yeah, this is a real lab,

13    and it's functioning, and you guys are getting paid to do this.

14    This is a real job.

15         And we gave them, I think, some brochures, and then -- my

16    office would follow up with them, you know, maybe once a week,

17    and just kind of see how things were going.  And that's it.

18    Q.  A moment ago you were describing the steps of the process

19    in terms of getting the sample and getting the sample to

20    LabSolutions.

21         Did I hear you correctly that the sample is obtained in the

22    telemedicine space before a doctor is ever signing a form?

23    A.  Yes.

24    Q.  And before a doctor is ever treating or contacting a

25    patient?

1    A.   Yes.

2    Q.   Did you ever discuss that order of operations with Minal

3    Patel?

4    A.   Yes.  We came up with it together on what order, what

5    should be when and where, to streamline the process to increase

6    conversions, like, people who go through all the steps of the

7    process, to increase billing.

8    Q.   So that order of business of getting the sample and then

9    getting a doctor's order, you did that with Mr. Patel to

10   increase billing?

11   A.   Yes.

12   Q.   Were you aware of LabSolutions ever receiving any

13   complaints about the sales reps?

14   A.   Yes.

15        MS. GURSKIS:  Your Honor, may I approach the witness?

16        THE COURT:  You may.

17        MS. GURSKIS:  I'm showing the witness what's been

18   marked for identification as Government's Exhibits 1351 and

19   1351-A which we'll now move into evidence.

20        THE COURT:  Those will be admitted without objection.

21        MS. GURSKIS:  Thank you, Your Honor.  May I publish to

22   the jury?

23        THE COURT:  Yes, you may.

24     (Government Exhibits 1351 and 1351-A were received in

25      evidence.)

```
 1   BY MS. GURSKIS:

 2   Q.   What's the date on this email, Mr. Ramamurthy?

 3   A.   Monday, 16 of January, 2017.

 4   Q.   And who is this email from?

 5   A.   This is from me to Minal.

 6   Q.   And who is Letoria Cooke (phonetic)?

 7   A.   She's one of our community outreach specialists, one of our

 8   people on the ground in Atlanta doing the prepaid cell phone

 9   hustle.

10   Q.   Do you know why Ms. Cooke sent you this email?

11   A.   Yes.  There was some kind of a complaint or an incident,

12   and she's kind of defending or giving us the -- her version of

13   what happened.

14        Let's see.  A new rep I trained on Friday was telling

15   people to spit in this cup to draw people to listen to what I

16   was telling them.  Believe it or not, people came to listen.

17   Michael and I signed up over ten people in less than three

18   hours.  I did explain to my patients what the test was and gave

19   them my card, if they had any questions.  Hopefully the lab

20   only had one complaint for Friday.  I will make sure this

21   doesn't happen again.

22        So as I remember, she -- they were just kind of collecting

23   samples and there was a complaint because they weren't really

24   fluent or knowledgeable in their sales pitch or medical

25   knowledge, and I think that's where the complaint came from.
```

1    Q.   Okay.   There's an attachment to this email, so I'm just

2    going to pull that out, Government's Exhibit 1351-A.

3         So looking at this document, Mr. Ramamurthy, is this a

4    truthful advertisement piece?

5    A.   There are bits of truth in here, but some of these things,

6    like the fun fact here -- okay.   So Stage I colon cancer,

7    90-95 percent survival rate, Stage IV, 10 percent, early

8    detection will save lives and this test will help.   Okay.

9         Early detection saves lives and this test will help.   But

10   this test does not detect if you have cancer.   It detects your

11   likelihood that you may get cancer in the future based upon the

12   genes you inherited from your parents.

13        So that is misleading, deliberately.   And it kind of,

14   like -- it kind of puts a little bit of fear into a person,

15   when they read that.   It's -- it kind of makes them --

16   that brings a sense of urgency to, like, you need to get this

17   test, and don't ask too many questions kind of thing.

18   Q.   And why were you being deliberately misleading when

19   plugging these tests to beneficiaries?

20   A.   To reduce resistance, to get samples easier and faster.

21   Q.   You mentioned a moment ago that you spoke to Minal Patel

22   nearly every day for two years.

23        What did you typically discuss on those calls?

24   A.   Oh, we talked about plans for vacations, or hanging out.

25   But mainly, business.   We talked about business nearly every

1    day, just about how things are going at the lab.  Are there new

2    ICD-10 codes I need to know about?  Are there changes to

3    requirements, or is there marketing things you want me to do

4    differently?  That sort of thing.

5    Q.   So I think I heard you say marketing, changes to

6    regulations, and coding.

7         How often were you talking about care of the patients?

8    A.   You know, it may have came up a couple of times, but I

9    really can't recall so well.

10   Q.   Sorry.  Did you say it may have come up a couple of times?

11   A.   Yeah, it's possible, but it doesn't stick in my mind.

12   Q.   And when you were talking about the steps of the process on

13   the telemedicine side of business, did you have visibility into

14   what doctors said on the calls with the patients?

15   A.   No, I did not.

16   Q.   What was -- did you have visibility into the expectation

17   for the doctors who were involved in that piece of the

18   business?

19   A.   Yeah, I knew the expectations.  Because John Schulte, who

20   was still working with me at this time, he was my med school

21   administrator, he was handling day-to-day business and he was

22   in charge of talking to the telemedicine vendors, one of them

23   being Shawn Griner.  And the expectation was that a certain

24   number of scripts need to be approved based on what we're

25   paying the telemedicine people.  Otherwise, we're going to pay

1    a different telemedicine company.

2        So we need a high percentage of all these things that we

3    send at you to go through.

4    Q.   And in terms of the high percentage, how is that -- did you

5    ever communicate that with Mr. Patel?

6    A.   Yes.

7    Q.   Can you be more specific?

8    A.   Well, the telemedicine platform needed to be effective, and

9    we all wanted to work with a telemedicine platform that got the

10   prescriptions through, a high percentage.  And that was able to

11   actually cover the business.  But what we would later find out

12   that the telemedicine company we hired was not even able to

13   handle the volume, and it just became chaos.

14   Q.   What do you mean, it became chaos?

15   A.   There were a lot of complaints that people were not getting

16   their second call from the doctor.  The second call is the call

17   with the results and the interpretation of the -- what it

18   means.  And that's alarming, because you're going around

19   collecting all these samples, and then months go by and you

20   have no idea -- like you're sitting in the hot pan, so to

21   speak.  Like, you don't know what's going on.

22       Like, do I have this cancer thing, propensity, do I have

23   this gene?  And no one's telling me.  Because the telemedicine

24   platform dropped the ball.

25   Q.   Did you ever discuss the situation with patients not

1   receiving phone calls with Mr. Patel?

2   A.  I did.

3   Q.  What do you recall about that?

4   A.  He was very angry about it.  He was very, very angry about

5   it.  I remember that.

6   Q.  Anything in particular that you remember about that

7   conversation or conversations?

8   A.  Well, he called Shawn to yell at him and to fix it, but

9   beyond that, I don't know what else was done to rectify the

10  situation.

11  Q.  And were you there when Mr. Patel called Mr. Griner, or is

12  that something that he -- that Mr. Patel relayed to you?

13  A.  This was something he relayed to me.

14  Q.  Okay.  And earlier this afternoon, you mentioned that

15  Brett Hirsch pulled you in or got you involved with -- with

16  this business.

17      Was he -- did he stay involved in the business?

18  A.  Yes.  He made money off every sample that I sent in as a

19  broker.

20  Q.  Can you explain that?

21  A.  Because he introduced me and Minal, he made a 5 percent

22  override on all samples that I submitted.

23  Q.  A 5 percent cut; is that what you mean?

24  A.  Correct.

25  Q.  What about Keith Youngswick?

1   A.   Keith is kind of, like, the partner of Brett.  I don't know

2   too much about what he does, but they're just kind of buddies,

3   and they hang out, and they're kind of in the business

4   together.

5        I didn't talk to Keith so much, and he kind of felt bad

6   about that sometimes, and I'd kind of leave him out.  So I'd

7   always have to text him and say, hey, buddy, you're part of

8   this too.  I mean, the competent person to deal with was Brett.

9   I knew that Brett knew everything that was happening with this

10  lab and that lab, and any pharmacy, Brett knows what's

11  happening.

12  Q.   Earlier you were talking about one of your first meetings

13  at the lab when you met somebody named Omar who was involved in

14  the LabSolutions.

15       Do you remember that?

16  A.   Yes.

17  Q.   I think you said he was there for roughly a month, or

18  overlapped with you for a month?

19  A.   Yes.

20  Q.   Did anybody replace him after he left?

21  A.   Yes.  A guy named Nick Saliba.

22  Q.   Do you know where Mr. Saliba had worked prior to

23  LabSolutions?

24  A.   He had worked at a lab that was raided by the FBI called

25  Confirmatrix.

1   Q.   How did you learn he was worked at a lab that was raided by

2   the FBI?

3   A.   Because Minal showed me a video on his phone of a news

4   story -- like, a local news story, about that whole story,

5   like, 40 FBI agents raiding Confirmatrix.

6   Q.   Did you discuss that with Mr. Patel after watching that

7   video?

8   A.   I did.  I was, like, why are you hiring this guy, dude?

9   Wasn't he just in this lab where all that melee was happening

10  and all that?  Then he was, like, no, this is the opportunity

11  to get all these people from Confirmatrix so we can get all

12  their -- so I'm getting all the good people from that company

13  and bringing them to us.

14  Q.   And what was your reaction to that?

15  A.   Yeah, I kind of went along with it because Minal pays the

16  bills.

17  Q.   How often would you communicate with Mr. Saliba?

18  A.   Not so often.  Maybe once a week.  Really, John Schulte,

19  from my company, would interface with Nick Saliba.  They would

20  do day-to-day stuff.  Maybe, if there was an issue, I would

21  talk to Nick twice a month, maybe once a week.

22          MS. GURSKIS:  Your Honor, may I approach the witness?

23          THE COURT:  You may.

24          MS. GURSKIS:  I've just handed the witness subsets of

25  Government's Exhibit 1245, 1245-A, 1245-B, and 1245-C.

1    BY MS. GURSKIS:

2    Q.   Mr. Ramamurthy, do you recognize what I just handed you?

3    A.   Yes.

4    Q.   Are those text messages between you and Mr. Saliba?

5    A.   Yes.

6         MS. GURSKIS:  Your Honor, the government moves to admit

7    Exhibits 1245-A, 1245-B, and 1245-C.

8         THE COURT:  I believe those will be admitted without

9    objection, right, Mr. Sadow?

10        MR. SADOW:  Right.  As I've said before, whatever they

11   got, put it in.

12        THE COURT:  Thank you.  Those will be put in at this

13   time.  Permission to publish, if you desire.

14        MS. GURSKIS:  Thank you.

15        (Government Exhibits 1245-A, 1245-B, and 1245-C were

16        received in evidence.)

17   BY MS. GURSKIS:

18   Q.   What's going on in this text exchange between you and

19   Mr. Saliba, Mr. Ramamurthy?

20   A.   This is, like, a New Year's kind of salutation.  Happy New

21   Year's Eve, Nick.  Lots of new samples coming in, looking

22   forward to seeing you, da, da, da.  Flying to Atlanta.  Got

23   20 more reps.  Let's bring in 100 million.

24   Q.   Did you actually have 20 new reps?

25   A.   No.  Maybe I had, like, five or something.

1   Q.   So why did you tell Mr. Saliba that you had 20?

2   A.   I like to tell them things like this so they kind of know

3   that I'm thinking of them, that they're my priority, that I'm

4   working on this thing, so that they don't stiff me.  So that I

5   make sure that my company gets paid, so I can pay my employees.

6   I do this a lot.

7        I do a lot of things like this, where I will just throw

8   things out there, that I'm working on this, I'm working on

9   that.  So that way, they know that -- that I'm in their mind,

10  that I'm doing things, so don't stiff Rama, pay Rama, because

11  he's working on this for us.

12        MS. GURSKIS:  I'm turning to 1245-B, that April 28,

13  2017 text exchange.

14  BY MS. GURSKIS:

15  Q.   Mr. Ramamurthy, do you know what that text was about?

16  A.   (Witness reading sotto voce.)

17        Okay.  Yes.  April 28, 2017.  So it looks like this is

18  around the period when there was some trouble with the billing.

19  And I use the word "adjudicate."  Adjudicate means when

20  Medicare approves something on that Explanation of Benefits, it

21  adjudicates.  That means, Medicare has agreed to pay that

22  amount, and that means it's good as gold.  That money's coming

23  in.

24        So I say, this month's numbers are flop.  Like, what's

25  going on?  There's really nothing showing up.  Nothing

1   adjudicated yet.  And then it looks like he's gonna call me in

2   a little bit.

3   Q.  And is this just a continuation of that conversation?

4   A.  Yes.

5   Q.  And turning to 1245-C.

6   A.  Yeah.  I'm in Monaco, Monte Carlo, with a friend of mine,

7   on his yacht.

8   Q.  Were you actually sailing around the South of France?

9   A.  Yes.

10  Q.  Did you leave the dock?

11  A.  No, we didn't sail.  We just partied on his boat.  It

12  didn't leave the dock, though.

13  Q.  Is this a continuation of that text exchange?

14  A.  Yes.

15  Q.  Why were you sending these messages to Mr. Saliba?

16  A.  This is more of, kind of, what I do to just know that I'm

17  moving in circles with very wealthy people so that they know

18  not to stiff me.  Send Rama the money because you don't know

19  what he might -- what kind of connection he might have, what he

20  might bring to the table in the future.

21      So I showed them little vignettes of my life, then they

22  wouldn't stop the money to send to me, because then I'd be in a

23  problem to pay all the employees that I had running around,

24  that I was kind of fronting money to.

25  Q.  So you were exaggerating to get paid?

1  A.  Yes.

2  Q.  In terms -- you mentioned Nicholas Vartanian earlier.

3      How often were you communicating with Mr. Vartanian?

4  A.  For the time that he was working there, I think maybe twice

5  a week, he would send me emails or a text exchange.

6  Q.  What kinds of things would you talk about?

7  A.  Mainly, billing, ICD-10 codes, CPT-10 codes.

8         MS. GURSKIS:  Your Honor, at this time, the government

9  would like to introduce Exhibits 1318, 1319 -- sorry -- 1318

10  and 1318-A, 1319, 1324 and 1324-A, 1325 and 1325-A, and 1338

11  and 1338-A.

12         THE COURT:  Those are all being admitted without

13  objection as Mr. Sadow stated earlier.  So you may proceed.

14         (Government Exhibits 1318, 1318-A, 1319, 1324, 1324-A,

15         1325, 1325-A, 1338, and 1338-A were received in evidence.)

16         MS. GURSKIS:  May I approach the witness, Your Honor?

17         THE COURT:  You may.

18  BY MS. GURSKIS:

19  Q.  I just handed the witness what's just been admitted as

20  Government's Exhibit 1318 and 1318-A.

21         MS. GURSKIS:  May I publish to the jury?

22         THE COURT:  You may.

23  BY MS. GURSKIS:

24  Q.  Who is this email from, Mr. Ramamurthy?

25  A.  This is from Nicholas Vartanian.

1    Q.   And what is he e-mailing you about?

2    A.   He is e-mailing me the best ICD-10 codes to use so that all

3    of our samples go through.

4    Q.   Turning to 1318-A.  Did you do anything with this

5    information that you received from Mr. Vartanian?

6    A.   Yes.  I distributed this to all of my marketing reps.

7    Q.   And did they do anything with the information?

8    A.   They distributed it to their physicians.

9    Q.   What about the marketing reps who were not involved with

10   the brick-and-mortar doctors?

11   A.   They used this information, although to what extent, I

12   don't know.

13   Q.   Okay.  Could you read the second sentence beginning with

14   educate?

15   A.   Educate all of your collectors that if one of the following

16   codes is used for a PGx sample, it gives the specimen -- it

17   gives a specimen -- that's not even right.  Okay.  Hold on --

18   it gives the specimen the best chance to be paid.

19           MS. GURSKIS:  May I approach the witness, Your Honor?

20           THE COURT:  You may.

21           MS. GURSKIS:  May I publish Government's Exhibit 1319?

22           THE COURT:  You may.

23   BY MS. GURSKIS:

24   Q.   Is this a continuation of that email we just looked at,

25   Mr. Ramamurthy?

1    A.    Yes.

2    Q.    What's happening in this email exchange?

3    A.    Good morning.  I think this would be better discussed over

4    the phone.  Whenever you're free, just give me a call.

5         I'm asking him how many of the codes do we need -- do you

6    need to have a cardiac diagnosis code and a behavioral

7    diagnosis code or either-or.  I'm trying to ask him

8    specifically what's needed for this to go through.

9    Q.    And then he says, this would be best discussed over the

10   phone?

11   A.    Yes.

12   Q.    Did you ever have a conversation with him about why it

13   would be best discussed over the phone, if you can recall?

14   A.    No, I cannot.

15   Q.    Okay.  Did you ever discuss the PGx codes with Mr. Patel?

16   A.    I don't remember if I did.

17            MS. GURSKIS:  May I approach the witness, Your Honor?

18            THE COURT:  You may.

19            MS. GURSKIS:  May I publish Government's Exhibit?

20            THE COURT:  You may.

21            MS. GURSKIS:  I'm showing the witness what's just been

22   admitted as Government's Exhibit 1324 and 1324-A.

23   BY MS. GURSKIS:

24   Q.    Who is this email from, Mr. Ramamurthy?

25   A.    Nicholas Vartanian.

1   Q.   And what is the subject of the email?

2   A.   Cancer genetic testing codes.

3   Q.   What was -- did you do anything with the information

4   conveyed in this email?

5   A.   Yes.  This is important because you can see all these CPT

6   codes here.  These are codes that are -- that you can bill for.

7   Each one of these represents an allele on a human genome, on a

8   chromosome.  So you can see there's an APC gene up here.

9   There's a PTEN gene down here.  Then you can see there's a

10  BRCA1 down here.

11      These are all responsible for different inheritable

12  cancers.  They can -- they cover many different organs or

13  different types of cancers depending on whatever family history

14  you have.  You may a mutation in any of these places, and each

15  one of these CPT codes is money.

16      And the most money is BRCA.  If you see predict B with

17  breast, BRCA1, BRCA2, that in itself is, like, two grand.  So

18  really, I told the reps to focus on the predict B panel with

19  the BRCA in it, because that's the full ticket.

20          MS. GURSKIS:  May I approach the witness, Your Honor?

21          THE COURT:  You may.

22          MS. GURSKIS:  May I publish Government's Exhibit 1325

23  and 1325-A?

24          THE COURT:  You may.

25          THE WITNESS:  Oh, wow.

1    BY MS. GURSKIS:

2    Q.   What's going on in this email, Mr. Ramamurthy?

3    A.   This is including the charge amounts for each of these

4    CPT codes.

5    Q.   So this is the attachment to the email that I have on the

6    screen, Mr. Ramamurthy, Government's Exhibit 1325-A?

7    A.   (No verbal response.)

8    Q.   What did you do with this information?

9    A.   I'm not particularly proud of this bit.  I think here you

10   can see the real magnitude of what is possible.  The BRCA is

11   5,000.  The full PTEN, that's 1,500.  If you order a

12   comprehensive panel, you put all this together, this is upwards

13   of $9,000 from just someone's saliva.  Imagine you collect ten

14   of these an hour, you might have made yourself a hundred

15   thousand dollars.

16   Q.   I heard you say you're not particularly proud of this?

17   A.   No.

18   Q.   What do you mean?

19   A.   This is a lot of money, and a lot of people we took

20   advantage of.

21        MS. GURSKIS:  May I approach the witness, Your Honor?

22        THE COURT:  You may.

23        MS. GURSKIS:  May I publish to the jury?

24        THE COURT:  You may.

25   BY MS. GURSKIS:

1    Q.   What's going on in this email, Mr. Ramamurthy?

2    A.   More CPT codes.

3    Q.   And you mentioned you weren't sure if you discussed the PGx

4    coding specifically with Mr. Patel.

5         Did you discuss coding generally with Mr. Patel?

6    A.   Yes.  With cancer genetic testing, absolutely.

7    Q.   Okay.  Can you be more specific about that?

8    A.   I would ask him what pays the most, and he would tell me.

9    Q.   And did Mr. Vartanian work at LabSolutions the entire time

10   that you were there?

11   A.   No.  I believe he dropped off after a few months.

12   Q.   Did anybody else take over for him?

13   A.   A guy named John Berarducci.

14   Q.   And how often did you communicate with Mr. Berarducci?

15   A.   I really only liked to talk to him around payday time.

16   Q.   Okay.  And what would you talk to him about?

17   A.   Getting paid.

18        THE WITNESS:  I'm sorry.  Is it possible to take a

19   quick one-minute bathroom break?

20        THE COURT:  Yes, absolutely.  We can do that.

21        Folks, go ahead and leave your notepads on your chairs

22   so we can take a brief bathroom break for the witness.  And

23   let's take advantage of that.  We'll come back in just a

24   moment.  All rise for the jury.

25        THE COURT SECURITY OFFICER:  All rise.

1          (Jury exits at 3:54 p.m.)

2          THE COURT:  We'll go ahead and give ourselves a

3    restroom break, if anyone needs it.

4          (Court recessed at 3:54 p.m.)

5          (Back on the record at 4:10 p.m.)

6          THE COURT:  Let's go ahead and bring in our jurors.

7          THE COURT SECURITY OFFICER:  All rise for the jury.

8          (Jury enters at 4:11 p.m.)

9          THE COURT:  Be seated, everyone.  Ladies and gentlemen

10   of the jury, we will resume with direct examination right now.

11         Go ahead, Ms. Gurskis.

12         MS. GURSKIS:  Thank you, Your Honor.

13         At this time the government would like to move in

14   Government's Exhibits 1866 and 1337.

15         THE COURT:  Those will be admitted as we heard earlier,

16   without objection.

17         (Government Exhibits 1866 and 1337 were received in

18         evidence.)

19   BY MS. GURSKIS:

20   Q.  Mr. Ramamurthy, when we left off you were mentioning that

21   you had communicated sometimes with Mr. Berarducci at

22   LabSolutions.

23         Did you ever meet someone named Sonal Jariwala?

24   A.  Yes.

25   Q.  Who is she?

1    A.   That is Minal's sister.

2    Q.   Did she have a role at LabSolutions?

3    A.   Yeah, kind of.  I communicated with her sometimes.  I would

4    send her physician registration forms.  But really, I didn't

5    communicate with her that much.

6    Q.   A little bit earlier you were talking about the way in

7    which you and your company were paid, and I believe you said

8    that you and Q Health received a cut of Medicare

9    reimbursements?

10   A.   That is correct.

11        MS. GURSKIS:  Your Honor, may I publish Government's

12   Exhibit 1337?

13        THE COURT:  You may.

14   BY MS. GURSKIS:

15   Q.   Who is this email from, Mr. Ramamurthy?

16   A.   It's from me to Nicholas.

17   Q.   And who's copied?

18   A.   Minal.

19   Q.   And who is Frank?

20   A.   Frank works for me.  He's, like, our numbers guy.  He'll

21   interface with Nicholas if there's missing data, or if he's

22   trying to pull some data from adjudications for Nicholas.  So

23   they're, like, numbers people.

24   Q.   Can you explain what's being shown on the screen right now,

25   on Government's Exhibit 1337?

1    A.   This is a commission breakdown.   45 percent is what I make.

2    The cost of goods per test is $600.   So it looks like there was

3    total, 150 samples, 32 of them were paid out, total payments

4    received, 126,000.   Then they deduct the cost of goods.   It

5    looks like 48,000 is the commission calculation.   And it says

6    50,000 paid to date.

7    Q.   Okay.   And what is cost of goods?

8    A.   Cost of goods is, like -- it's a fixed cost that is

9    incurred with every test.   It includes the kit, but to what

10   else it includes, I'm not sure.   But it happens with every

11   sample you do.   There is a cost of goods that my company has to

12   take.

13   Q.   Did you ever discuss the cost of goods with Mr. Patel?

14   A.   I did.   You know, I always wanted to get a lower cost of

15   goods.   But I remember, when I was at LabSolutions, in the

16   kitchen, I overheard a conversation between Minal and Nick

17   Saliba --

18   Q.   Okay.   And just one moment, Mr. Ramamurthy.

19        MS. GURSKIS:   Your Honor, may I publish a portion of

20   what's already been admitted of Government's Exhibit 1123?

21        THE COURT:   You may.

22   BY MS. GURSKIS:

23   Q.   Do you recognize this, Mr. Ramamurthy?

24   A.   This is the kitchen that I would often sit at at

25   LabSolutions.

1    Q.   Okay.  And I think you were about to talk about a

2    conversation that you remember in the kitchen.

3    A.   Yeah.  I was over here in front of the island, and I

4    overheard Nick and Minal discussing that Medicare was inquiring

5    what their cost of goods was.  And they had discussed or

6    decided that they're going to tell Medicare that their costs of

7    goods was a thousand per test.

8    Q.   Okay.  And that should be a touchscreen.  Can you circle on

9    the screen where Mr. Patel was and where Mr. Saliba was during

10   that conversation?

11   A.   They were actually in front.  So all the way in front of

12   this area, over here -- am I doing anything with this touch?

13   No?  All the way in front of the area is an open area that has

14   some windows.  So they were in kind of that open space and I

15   was standing right in front of this island right here.

16   Q.   Okay.  And did they say anything else beyond the fact that

17   they were going to announce that it was a $1,000 cost of goods?

18   A.   Yes.  I asked Minal why, and he said it's to keep the

19   billing amount where it is, because if they tell Medicare that

20   the cost of goods is less, then Medicare will reduce the

21   billing amount.

22   Q.   How often did you speak to Mr. Patel about Medicare

23   reimbursement?

24   A.   Couple of times a week.

25   Q.   How often did you discuss the quality of the tests?

1    A.   Not as much.  It came up.  You know, they were -- it came

2    up.  He would often brag that the machines were really good,

3    the sequencers were state of the art.  But that didn't come up

4    very often.

5           MS. GURSKIS:  Your Honor, at this time the government

6    would like to move into evidence Government's Exhibit 1364 and

7    1364-A, as well as Government's Exhibit 1369.

8           THE COURT:  Those will be admitted without objection.

9        (Government Exhibits 1364, 1364-A, and 1369 were received

10       in evidence.)

11          MS. GURSKIS:  May I publish?

12          THE COURT:  You may.

13   BY MS. GURSKIS:

14   Q.   I have on the screen Government's Exhibit 1364.

15          Mr. Ramamurthy, who is this email from?

16   A.   This is from John Berarducci.

17   Q.   And who else is on the email?

18   A.   Me, Minal, Tushar, Nick, and Sonal.

19   Q.   Who's Tushar?

20   A.   That's Minal's brother.

21   Q.   And what is John emailing you about?

22   A.   My commission.  It looks like I made 74,000 for the second

23   half of January.

24   Q.   Is that a good month, a bad month, an average month?

25   A.   This is an average month.

1    Q.   And now it's showing you Government's Exhibit 1369.

2         Who is this email from?

3    A.   This is from me to Minal and Nick and Sonal, and I've put

4    John Schulte on this from my company as well.

5    Q.   Why were you sending this email?

6    A.   Good morning, buddy.  My payment report is extremely low

7    this period.  I was averaging 75K.  This month only -- period,

8    only 17.  Can we discuss why the billing is so low when we are

9    only increasing the number of samples we are doing?

10        Yeah.  So it looks like there was a period where the

11   billing kind of got off track, and I had a lot of samples

12   sitting there, and they were not getting billed.

13   Q.   Why were you contacting Mr. Patel about that?

14   A.   I usually contact him directly on things, because I don't

15   want to have someone else to have a go-between between me and

16   him.  And I told him this from the very beginning, that it

17   doesn't really matter to me who he brings on.  I'm going to

18   deal directly with him.

19        If it comes -- about money, business, marketing,

20   adjudications, I'm going to come directly to you because you're

21   the one I started doing business with, and I don't want to be

22   moved around to different people in kind of a shuffle of trying

23   to figure out what's happening, am I getting paid, is your lab

24   going under.  I'm just going to ask you directly.

25   Q.   Shifting gears for a moment, how long have you been in

1    custody, Mr. Ramamurthy?

2    A.   Three years and a few months.

3    Q.   Since about October of 2019; does that sound right?

4    A.   That's right.

5    Q.   Have you been in custody since before your sentencing date?

6    A.   Yes.

7    Q.   Why?

8    A.   I violated my bond.

9    Q.   Can you tell us, in a few sentences, what you did to

10   violate your bond conditions?

11   A.   I was prohibited from doing healthcare business, or

12   engaging in any kind of healthcare conspiracy, and -- and

13   taking meetings outside of the area that I'm supposed to be at

14   during my probation period.  And I violated both.  I set up

15   another deal with Brett, with a different lab, to try to get

16   some samples, and I took a meeting with him in Fort Lauderdale,

17   which is outside of my area that I'm allowed to be in.

18   Q.   So while you were on bond, you tried to get more samples,

19   you said.

20        What type of samples?

21   A.   Cancer genetic test samples.

22   Q.   So you continued to do this while out on bond.

23   A.   I did.

24   Q.   Why?

25   A.   Money, greed.

1   Q.   Did you think you wouldn't get caught?

2   A.   I didn't think I would get caught, but when I took that

3   meeting with Brett, I was really nervous.  Like, I knew I had

4   messed up.  I knew I had taken it too far.

5   Q.   Okay.  And turning back to this scheme, you mentioned

6   earlier -- actually, just a moment ago -- that LabSolutions

7   paid your company based on Medicare reimbursements?

8   A.   Yes.

9   Q.   Were you paid at regular intervals?

10  A.   In the beginning, I was paid twice a month, and then after

11  that I was paid every month.  But sometimes it didn't always

12  end up that way.  A lot of times, I was paid late.  There was

13  some problem with this or that in the lab.  They were always

14  shifting around with the money, which made me uncomfortable.

15  Q.   You spoke a moment ago about the average amount you were

16  collecting in a month, I think you said was about $75,000.

17       Do you remember that?

18  A.   (No verbal response.)

19  Q.   Did that amount fluctuate, or was it pretty consistently

20  hovering around $75,000?

21  A.   No.  Some months I'd brought in a quarter million.  Some

22  months, less.  When the billing wasn't working correctly, or

23  there was some problem with the telemedicine, everything would

24  plummet, and I would walk out with, maybe, 10 grand, 17 grand.

25  But the number fluctuated.  But I think at the high point, it

1    was a quarter of a million a month.

2    Q.   A quarter of a million a month?

3    A.   Yes.

4    Q.   How much of that quarter of a million a month was

5    LabSolutions samples?

6    A.   All of it.

7    Q.   You mentioned earlier that you sometimes spoke about

8    regulations with Minal Patel.  Do you recall that earlier

9    today?

10   A.   Yes.

11   Q.   Do you ever remember discussing with him any shift in

12   regulations or shift in coverage, anything like that?

13   A.   So there was a push for -- to do this expeditiously, to do

14   this very fast, very quickly, because we didn't know when the

15   regulations would change.  Minal made this very clear to me

16   that there was this window of opportunity where the criteria

17   was very open.  It's something called a MAC LCD.

18        I don't know what MAC stands for, but LCD is local coverage

19   determination in this place called Cahaba.  Cahaba is like a

20   territory in America.  There's, like, different territories in

21   America, right?  Maybe five or six of them for Medicare

22   coverage.  And Minal's lab is located in the Cahaba district.

23   And the requirement for this test, the criteria in Cahaba, is,

24   like, no criteria.  It's, like, just a family history of

25   cancer, you can get the test.

1      They didn't know how long this was going to last.  And

2   eventually, there was a change.  But in that meantime, they

3   were, like, just get as many samples as possible.

4   Q.  And the information about the criteria under Cahaba, who

5   did you receive that from?

6   A.  From Minal, from Brett, from Nicholas Vartanian, Omar.

7   Everyone told me that.

8   Q.  Was there any discussion about how this might affect

9   reimbursement or the business model, anything like that?

10  A.  Yeah, this would collapse the business model.  I mean, as

11  soon as it changes, there's no more business.

12  Q.  Did you discuss that with Mr. Patel specifically?

13  A.  I did, and -- because there came a point -- yeah.  There

14  came a point when I was going to switch to Palmetto.  Palmetto

15  was going to absorb Cahaba, and Palmetto's criteria is very

16  strict.  It would eliminate 95 percent of all the samples that

17  we could submit.

18      But Minal told me he wasn't worried.  His exact phrase

19  was -- I remember this -- it was at the Setai hotel.  He told

20  me I'm not a one -- the lab is not a one-trick pony.  Like, I

21  got a backup license.  In case anything happens to this lab

22  license, I have another lab license in a place that'll work, or

23  that will -- we'll find a way for it to work.

24      So if any audit happens or if the billing doesn't work

25  anymore in this area, I have a backup plan.

1   Q.   Did he say where that other location was?

2   A.   I want to say Pennsylvania, but I'm not 100 percent.  So I

3   don't want to say anything, actually.

4   Q.   Okay.  Did you discuss the shift from Palmetto to Cahaba, I

5   think you said, with Mr. Hirsch?

6   A.   Yes, I did.

7   Q.   Do you recall ever discussing it with Mr. Youngswick?

8   A.   Yes, we were all in the loop about this.  We were all very

9   anxious about what was going to happen.

10       MS. GURSKIS:  Your Honor, the government would like to

11  admit two subsections of Government's Exhibit 1214, 1214-A and

12  1214-B.

13       THE COURT:  That will be admitted without objection at

14  this time.

15       (Government Exhibits 1214-A and 1214-B were received in

16       evidence.)

17       MS. GURSKIS:  May I publish 1214-A, Your Honor?

18       THE COURT:  You may.

19  BY MS. GURSKIS:

20  Q.   Mr. Ramamurthy, can you read what you wrote on February 27,

21  2018, where I just put a little dot?

22  A.   Sure.  I heard Cahaba ends July.  Is CGx over?  He responds

23  not at all.  PGx is ending, which is a different kind of test.

24  CGx moved from Cahaba to Palmetto.

25       MS. GURSKIS:  May I publish 1214-B, Your Honor?

1           THE COURT:  You may.

2    BY MS. GURSKIS:

3    Q.   And looking at the text message beginning March 13, 2018,

4    where that blue line is, Mr. Ramamurthy, can you read that?

5    A.   Minal just called me, said he is struggling with Palmetto.

6    Keith says, yes, hopefully can be fixed.  I say, oh, wow.  Does

7    Clio have it figured out?

8           This is a different lab.

9           And then, I've got many samples on the way.

10          Keith says, there are issues.  I'll call you.

11   Q.   Do you remember anything specific about those conversations

12   with Minal Patel about Palmetto other than what you just told

13   us about?

14   A.   No.

15   Q.   Aside from Minal Patel, did anyone else at LabSolutions

16   educate you on potentially changing MAC coverage or LCDs?

17   A.   Nick Saliba.

18   Q.   Anybody else?

19   A.   Jon Berarducci.  Everyone -- this was issues on the front

20   of everyone's minds at the lab.

21   Q.   Speaking more broadly, did LabSolutions have any type of

22   training program that you were aware of?

23   A.   I think towards the end, there were some webinars, some

24   seminars -- webinars that salespeople could go to, yeah.

25   Q.   Towards the end?

1   A.   Yeah.   Probably towards the end of our business

2   relationship, maybe a year and a half into this.

3   Q.   Do you know what those webinars were about?

4   A.   I honestly never went to them, so, no.

5   Q.   Was there anything else that was part of any type of

6   training or compliance program that you can recall?

7   A.   Yeah.   Towards the end, before you got paid, you would be

8   sent this one-page thing that said something about compliance,

9   and you would have to click the DocuSign in order to get paid.

10  So you would just click the thing, and it would register in the

11  system, and it would send you a wire.

12          MS. GURSKIS:   Your Honor, at this time, the government

13  would like to move into evidence Government's Exhibit 667-A and

14  667-B.

15          THE COURT:   That will be admitted at this time.

16      (Government Exhibits 667-A and 667-B were received in

17      evidence.)

18          MS. GURSKIS:   May I publish, Your Honor?

19          THE COURT:   You may.

20  BY MS. GURSKIS:

21  Q.   Showing you Government's Exhibit 667-A, is this in

22  reference to what you were just describing?

23  A.   Yes.   This is exactly what I was talking about.

24  Q.   And this is Government's Exhibit 667-B.   Is this the

25  agreement you were referencing?

1    A.   Yes.

2    Q.   And here it says, The following compliance rules are to be

3    agreed upon and adhered to by the distributor.  Each business

4    associate distributor acting as an independent contractor

5    agrees they will not and have not, and there is a list of

6    criteria, and I just highlighted influence test ordering

7    patterns that would lead to medically unnecessary tests.

8         What is your reaction to seeing that on the screen here,

9    Mr. Ramamurthy?  Is that true?

10   A.   Oh.  Well, I mean, they were giving us the ICD-10 codes,

11   and they were telling us what CPT codes to use to bundle it, so

12   that's not true at all.  We were totally influenced on ordering

13   patterns.

14   Q.   Was that something that Mr. Patel was aware of?

15   A.   Absolutely.

16   Q.   How would you describe the compliance program overall at

17   LabSolutions?

18   A.   Window dressing.

19   Q.   What do you mean "window dressing"?

20   A.   It's the appearance of compliance without there actually

21   being any compliance enforcement or anything.  I mean, Minal

22   said he had a lawyer, but I never talked to him.  I never met

23   him.  There was no compliance, auditing.  There was nothing.

24   Q.   No compliance training that you had to complete?

25   A.   No.

1   Q.   Earlier today, you had discussed some of the marketing

2   strategies, including advertising?

3   A.   Yes.

4        MS. GURSKIS:  Your Honor, at this time the government

5   moves to admit Government's Exhibit 1875, 1334.

6        THE COURT:  Those will be admitted without objection.

7        (Government Exhibits 1875, 1334 were received in

8        evidence.)

9        MS. GURSKIS:  And 1004 as well.

10       THE COURT:  Also admitted without objection.

11       (Government Exhibit 1004 was received in evidence.)

12       MS. GURSKIS:  Your Honor, may I publish Exhibit 1875?

13       THE COURT:  Yes, you may.

14  BY MS. GURSKIS:

15  Q.   Mr. Ramamurthy, can you explain what's going on in this

16  email?

17  A.   This is an email that I'm sending Minal about ad time that

18  I was buying for a commercial, that my company produced, to be

19  aired on Univision, and I asked him for 50 grand because we had

20  already sent in samples.  So I was asking for an advance on

21  those samples that I've already sent in.

22  Q.   And what is Univision?

23  A.   Univision is, I guess, Hispanic television network with a

24  very large viewership in the area of Texas that I live in.

25  Q.   I'm showing you now Government's Exhibit 1334.  What is

1   this email?

2   A.   This is a script that I sent to Minal of the commercial.

3   Q.   Who is Meenakshi Ramamurthy?

4   A.   That's my sister.

5   Q.   Who wrote this script?

6   A.   My sister.

7   Q.   Turning down the page here where it says, female patient, I

8   knew I had cancer in my family, and I was worried.

9        What was your -- what was the purpose of having that kind

10   of language in this commercial?

11   A.   To provide urgency for someone who saw this.  Provoke a

12   reaction for them to get the test, because this was -- there

13   was a limited window of time for us to get these tests done.

14        MS. GURSKIS:  Your Honor, at this time we would like to

15   play a short video for the jury, Government's Exhibit 1004.

16        THE COURT:  You may proceed.

17        MR. SADOW:  I assume we're playing the entire video?

18        MS. GURSKIS:  It's 30 seconds long.

19        THE COURT:  Yes, you may proceed.

20   (Video was published.)

21   (Video was paused.)

22        MR. SADOW:  Excuse me.  It's unclear.  I can't hear it.

23        THE COURT:  I can hear it.  It just has a little bit of

24   an echo folks.

25        MS. GURSKIS:  It might be the mic.

 1          THE COURT:  Yeah, the mic might be picking it up.  If

 2   you can start from the beginning, please.

 3          (Video was published.)

 4          (Video was paused.)

 5   BY MS. GURSKIS:

 6   Q.   And you said this ad was played on Univision?

 7   A.   That's correct.

 8   Q.   What is Univision?

 9   A.   It's a Hispanic network in our area that's very popular.

10   Q.   In your area of Texas where you're from?

11   A.   Yes.

12   Q.   And did this ad end up airing?

13   A.   It did.

14   Q.   Did you share the ad with Mr. Patel or just the script?

15   A.   I don't remember.

16   Q.   And what was the goal of the ad?

17   A.   The goal of the ad was to get awareness of this test in the

18   community, so we would be met with less resistance when we

19   would have health fairs or solicit people for the test.

20          MS. GURSKIS:  And at this time, Your Honor, the

21   government would like to admit Government's Exhibit 1247 and

22   1234.

23          THE COURT:  Those will be admitted at this time without

24   objection.

25          (Government Exhibits 1247 and 1234 were received in

1      evidence.)

2           MS. GURSKIS:  May I publish, Your Honor?

3           THE COURT:  You may.

4   BY MS. GURSKIS:

5   Q.  Mr. Patel [sic], in addition to advertising, do you recall

6   any other marketing projects that you and Minal Patel

7   discussed?

8   A.  Was that for me?

9   Q.  Yes.  Mr. Ramamurthy, do you recall any other marketing

10  projects that you and Mr. Patel discussed?

11  A.  Yes.  There was talk of -- let's see.  Let's see.  I know

12  there was an oncology group in California that he wanted to do

13  some kind of a research study with, so that all their patients

14  in that group would get their testing done at LabSolutions.

15  And he was very excited about that.  That would have been a lot

16  of samples.

17       There was talk of getting all of the samples from the

18  Hard Rock Casino Hotel, because all the employees there had

19  United, and United covered the test.  So there was -- there was

20  talk of that -- he really got excited when there were projects

21  that involved getting a lot of samples, like, 10,000 samples,

22  20,000 samples, because you could imagine the numbers that that

23  would equate to.

24          MS. GURSKIS:  May I publish Government's Exhibit 1247?

25          THE COURT:  You may.

1   BY MS. GURSKIS:

2   Q.   Is this text message in reference to the model you were

3   just talking about at Hard Rock?

4   A.   Yes.  This is in reference to the Hard Rock hotel hustle.

5   Q.   Who is Mike L?

6   A.   This is very funny, actually.  Mike L is Michael Lohan,

7   Lindsey Lohan's father.

8   Q.   And why were you and Mr. Patel discussing the Hard Rock

9   Casino with Lindsey Lohan's father?

10  A.   Well, the story is that Michael Lohan owned a rehab because

11  of his daughter, obviously; she had struggled with addiction.

12  So that brought him into the medical business.  That's how he

13  knew Brett.

14       And Brett and Michael started thinking about ways to

15  generate a lot of samples, and I think they knew -- between the

16  two of them, they had a contact at United Healthcare, and they

17  had a contact at the Hard Rock.  Because Brett was always at

18  the Hard Rock gambling in the high roller area.  I've been

19  there with him a couple of times.  They all know him there.

20  He's there all the time.

21       So he had been there.  Someone else had him in at United,

22  and they were discussing how to do this thing, where they would

23  just get an obscene amount of samples.

24  Q.   Okay.  So this text is from Mike L.  And you said his

25  daughter's name is -- who is his daughter?

1    A.   Lindsey Lohan.

2    Q.   The actress?

3    A.   That's correct.

4    Q.   And great idea with the donations, every cancer foundation

5    will jump onboard.

6         MR. SADOW:   Could you show, please, the last one, what

7    message number that was?

8         MS. GURSKIS:   Sure.   That was Message No. 91.

9    BY MS. GURSKIS:

10   Q.   And it looks like the next message is from you,

11   Mr. Ramamurthy.   I'll zoom in so you can read that.

12   A.   We need full access and cooperation from their human

13   resources department.   Let's shoot for a pilot health fair

14   December 13th.

15   Q.   And that pilot health fair was going to be where?

16   A.   At the Hard Rock, for the employees.

17   Q.   So shifting a little bit in the chain here, this is

18   line 116, from Mike Lohan.

19        Can you read that message, Mr. Ramamurthy?

20   A.   From what I understand, the Hard Rock has already reached

21   out to Nick to make the connection between United Healthcare

22   and LabSolutions.   I told you so.   So much for the naysayers.

23   Q.   And the next message is also from him, and he says what?

24   A.   I just hope the point person at LabSolutions follows

25   through.

1   Q.   Okay.  Again, what's he talking about here?

2   A.   We have David behind us.  I don't remember who David is.

3   From here, make the necessary calls, set it up with Fred, tell

4   him to use my reps, we need to discuss.  I'm not giving away

5   30 percent if we can do it ourselves for less.

6        I remember this.  Mike Lohan was very aggressive with

7   business terms.  He really wanted everyone to do the work

8   and he would keep all the money, or he was just fine with it if

9   he could do it himself and had to cut everyone out.  And this

10  was not really my deal.

11       I'm just volunteering to help if I can, you know, so I

12  didn't really push the agenda one way or the other.  I was

13  ready, of course, to take money, but I could sense that Mike

14  was very, very territorial and protective about this deal.

15  Q.   Okay.  So the next two messages are from you, lines 119 and

16  120.  Can you read those two lines?

17  A.   I can handle all the logistics with my reps.  I got this

18  covered.  It's all good.

19  Q.   And then this final message from Mike Lohan, on line 121,

20  can you read that?

21  A.   Hey guys, as I told you, the deal with the Hard Rock will

22  go through, and this is only the beginning because I am getting

23  all the rest.  There seems, however, to be some confusion.

24  This is my deal with the Hard Rock.  Yes, Brett, you are my

25  partner but when the money was needed, no one came up with it.

1    As far as I'm concerned, the upcoming meeting on Thursday is

2    between the Hard Rock, United Healthcare, Minal, and me.  If

3    anyone else wants to be involved, we can discuss it and come to

4    terms with it.

5    Q.  Do you know if this Hard Rock campaign ever took off?

6    A.  No -- well, actually I don't know.  I was out of the loop

7    before any of that kind of happened.

8         MS. GURSKIS:  Your Honor, may I publish Government's

9    Exhibit 1234?

10        THE COURT:  You may.

11   BY MS. GURSKIS:

12   Q.  Can you read the message from you and then I'll read the

13   response?

14   A.  I just had a meeting with Rick Hilton of the Hilton family.

15   He's very interested in the lab stuff, especially CGx.

16   Q.  That's pretty cool.

17   A.  Paris Hilton's father, LOL.  He thinks this is a home run.

18   Q.  Did you actually have this meeting with Mr. Hilton?

19   A.  I did.

20   Q.  And then what's the next message that you send?

21   A.  Let's plan for meeting tonight in Brickell, Miami.  They

22   have a meeting with Brett's connect as well as ^ * Levine's

23   (phonetic) rep group.

24   Q.  And then you send this message.  What's the caption beneath

25   it?

1   A.   Look who Nyan (phonetic) brought to the club last night.

2   Q.   And then you see Minal Patel says LOL.  And then you say?

3   What do you say?

4   A.   Oh, nine.

5   Q.   Who is the guy with nine?

6   A.   Jermaine Dupri, famous music producer.  He discovered

7   Usher, was married to Janet Jackson.

8   Q.   Yes.

9   A.   He's from Atlanta also.  Money bag, money bag.

10  Q.   Does he want to do CGx?

11       And then you respond?

12  A.   Yes, he does.  Nine is on it.

13  Q.   There we go.  And then someone says, I have Tyson, Mike and

14  his wife.  I have Holyfield.

15  A.   Put them all together for a TV commercial.

16  Q.   They should do one together.  Yes.

17  A.   I'll cover costs of production.  My sister is working on a

18  TV show right now.  I'll just hire them.

19  Q.   You gonna invoice me?  LOL.

20  A.   Ha ha ha.  Just keep an eye on the samples.  I'll handle

21  the rest.

22  Q.   And then you respond with a kiss face emoji, it looks like,

23  and then Minal Patel responds, 10-4.

24       What were you talking about in that conversation about Mike

25  Tyson?

1    A.   We were talking about shooting a CGx commercial with some

2    celebrities, Mike Tyson, Holyfield.

3    Q.   Did that ever happen?

4    A.   Not to my knowledge.

5    Q.   How did your relationship with LabSolutions ultimately end?

6    A.   Well, things stopped adjudicating, so there really wasn't

7    any reason to send samples in anymore.  So that was it.  It

8    ended.

9         MS. GURSKIS:  Your Honor, at this time the government

10   would like to move in Exhibits 1414, 1414-A, 1415, and 1416.

11        THE COURT:  Those will be moved in at this time without

12   objection.

13        (Government Exhibits 1414, 1414-A, 1415, and 1416 were

14        received in evidence.)

15   BY MS. GURSKIS:

16   Q.   Were you ever disciplined by LabSolutions, Mr. Patel (sic)?

17   A.   This is for me?

18   Q.   I'm sorry, Mr. Ramamurthy.

19   A.   Not really disciplined.  I was served with a cease and

20   desist order at one point in our relationship.

21   Q.   Okay.

22        MS. GURSKIS:  Your Honor, may I publish Government's

23   Exhibit 1414 and 1414-A?

24        THE COURT:  You may.

25   BY MS. GURSKIS:

1    Q.   Who is this email from?

2    A.   This is from Minal.

3    Q.   To you?

4    A.   That's correct.

5    Q.   And what's the date?

6    A.   Wednesday, the 26th of July, 2017.

7    Q.   And, Mr. Ramamurthy, if you could read this letter.  So

8    first, what's the subject on the re line?

9    A.   Subject.  Termination of business relationship between

10   LabSolutions, LLC and Q Health Services, LLC, cease and desist.

11   Q.   Okay.  And then what does this say after that?

12   A.   This correspondence is being written in order to inform you

13   that effective immediately LabSolutions will no longer conduct

14   business of any kind with Q Health.  Certain inconsistencies

15   and discrepancies on the part of your office that were

16   recognized by agents of LabSolutions that caused great concern.

17        LabSolutions strives to comply with all laws and

18   regulations surrounding molecular genetic testing specifically,

19   and the healthcare industry generally.

20        LabSolutions and its officers further demand that all

21   parties with which it has done business similarly adhere to the

22   strictest standards regarding compliance with relevant laws and

23   regulations.  Accordingly, the relationship between Q Health,

24   LLC, and LabSolutions must cease.

25        Please cease and desist in the submission of any laboratory

1    testing, requisitions via referral sources associated with

2    Q Health, LLC, immediately.  Any requisitions that are sent

3    following this correspondence will be rejected and returned.

4         Please discontinue the use of any LabSolutions equipment

5    and discontinue any and all association between Q Health and

6    LabSolutions immediately.

7    Q.   And whose name is at the bottom?

8    A.   Minal Patel.

9    Q.   Did that letter -- did you ever discuss that letter with

10   Mr. Patel?

11   A.   I did.  I took a phone call with him and Nick immediately

12   upon receipt of that letter.

13   Q.   What do you remember happening during that call?

14   A.   I remember that they told me that there is, like, a pile of

15   my samples at the lab that are trash, that they weren't going

16   to take them, that the information is wrong, the ICD-10 codes

17   are not correct, it's not billable, that they didn't want

18   anymore of my samples because it was too much of a headache to

19   sort through, to see if they were good to bill or not to bill.

20        And, of course, there were complaints about, like,

21   collection methods as well.  But generally, they couldn't bill

22   a lot of my samples because the ICD-10 codes were not the ones

23   that always went through all the time.

24   Q.   And what happened after that call?

25   A.   Nothing.  We continued business for months and months.

 1            MS. GURSKIS:  May I publish Government's Exhibit 1415?

 2            THE COURT:  Yes, you may.

 3    BY MS. GURSKIS:

 4    Q.  What's the date on this email, Mr. Ramamurthy?

 5    A.  This is the same month, July, 31, 2017, the Monday.

 6    Q.  So a few days after you received the cease-and-desist

 7    letter?

 8    A.  That is right.

 9    Q.  And who is this email to?

10    A.  This is to Minal from me.

11    Q.  And what are you sending him?

12    A.  This is my itinerary for a reservation at the Faena Hotel

13    in Miami Beach.

14    Q.  Do you remember why you were sending that to him?

15    A.  Yeah.  I was inviting him to come along with me because

16    usually we would hang out every month, and hang out and party.

17            MS. GURSKIS:  Your Honor, may I publish Government's

18    Exhibit 1416?

19            THE COURT:  You may.

20    BY MS. GURSKIS:

21    Q.  And this is also from that day, I believe, Mr. Ramamurthy.

22        And what is this email about?

23    A.  So Nick says, I'll be in the office.  Safe travels.  I say,

24    Hi, guys, I land at noon tomorrow.  See you in the afternoon.

25        Frank is in this one also, my numbers guy.  He says, Hello,

1    Nick and Minal, I'll be flying into town late tonight.  When

2    will you be available to meet with Rama and I tomorrow?  My

3    flight back to Los Angeles is around 7:00 p.m. on Tuesday.

4    Thanks, Frank.

5        So it looks like Frank was sent to the lab to work on

6    samples, numbers, any discrepancies.  I don't know if I went to

7    this meeting or not, but I went to Miami.  I know that.

8    Q.   And you continued to do business with Mr. Patel?

9    A.   Absolutely.

10        MS. GURSKIS:  If I could have a moment, Your Honor?

11        THE COURT:  You may.

12   BY MS. GURSKIS:

13   Q.   So who is in charge at LabSolutions, Mr. Ramamurthy?

14   A.   Minal is in charge, but Nick Saliba runs like the

15   day-to-day stuff.  In the beginning, Minal was really, really

16   hands-on.  He was not so much hands-on towards the end.  He was

17   really flying around and partying a lot, hanging out with me.

18        He was still in the loop, though, because he would always

19   peel off and take phone calls.  He knew what was happening at

20   the lab.  But, yeah, he ran things at the lab, but Nick was

21   really in charge of the day-to-day stuff towards the end.

22   Q.   And who designed this whole operation?

23   A.   Minal designed this entire thing.  He's the architect of

24   the whole thing.

25        MS. GURSKIS:  No further questions.  Thank you, Your

1    Honor.

2         THE COURT:  Thank you.  Sidebar for a second, please.

3         (The following proceedings were held sidebar:)

4         THE COURT:  Mr. Sadow, I don't want to break up your

5    flow.

6         MR. SADOW:  I have hours and hours.

7         THE COURT:  Can you give me 30 minutes to --

8         MR. SADOW:  Well, first thing we have to do is I'll be

9    moving in about 30 government exhibits, so we'll have to deal

10   with that first.

11        THE COURT:  Let's try and take advantage and try to

12   advance the ball.  Give me until 5:30.

13        MR. SADOW:  But I have to move these in.

14        MS. GURSKIS:  I don't know if there's hearsay issues or

15   anything like that.

16        MR. SADOW:  No.  They're all -- we're going to need a

17   few minutes to do that.

18        THE COURT:  Move them in, even if I just get a little

19   started.  I don't know how long it's going to take.  I'll give

20   them a five-minute break.

21        (Proceedings returned to open court.)

22        THE COURT:  Folks, let me go ahead and do this:  If you

23   would all indulge me, please.  I need to do a few minutes of

24   housekeeping.  I know it's 5:00 o'clock, but we need to get a

25   couple of things in place before we let you go at 5:30.

1          If you would leave your notepads, please, on your

2     chairs.  Go ahead and go to the jury room, and I will bring you

3     out momentarily.

4          You are excused.

5      (Jury exits at 5:02 p.m.)

6          THE COURT:  Please be seated, everyone.  As we were

7     stating at sidebar, there are a number of exhibits that

8     Mr. Sadow is going to request to be moved into evidence off the

9     government's exhibit list, so let's go ahead and meet and

10    confer right now and see if we can get agreement on what those

11    are, and perhaps we can move those in similar to the way that

12    we moved in the government's set of exhibits without objection.

13         We can do that in the presence of jury before we break.

14         MR. SADOW:  Okay.  So I'll start reading off the list.

15         THE COURT:  Yes.

16         MR. SADOW:  Let me know when you're ready.

17         MS. GURSKIS:  I've got my list.

18         MR. SADOW:  1326, 1327, 1327-A, 1328, 1328-A, 1329,

19    1330, 1331, 1332, 1332-A, 1333, 1334-A, 1336, 1338-A, 1343,

20    1343-A, 1345 --

21         MS. GURSKIS:  Do you mind going a little slower,

22    Mr. Sadow?

23         THE COURT:  1335 is the last one I heard.

24         MR. SADOW:  1345.

25         MS. GURSKIS:  I believe you said 1336 and --

```
 1              THE COURT:  1338-A after 1336.  1343, 1343-A, 1345, the
 2    last few.
 3              MR. SADOW:  Right.  That's where I stopped.
 4              THE COURT:  Yes.
 5              MR. SADOW:  You all up?
 6              MS. GURSKIS:  Yes.
 7              THE COURT:  Okay.
 8              MR. SADOW:  1360, 1375, 1376, 1382, 1385, 1385-A,
 9    1399-A through G, 1404, 1453, 1454, 1455, 1455-A, 1456, 1457,
10    1460, and 1463.
11              And then I have one, two, three -- then I have Defense
12    Exhibits A-1 through A-5.
13              And I would -- if those are admitted, we will be
14    publishing those through the computer.  We will not go back and
15    forth.
16              THE COURT:  Okay.  Very good.  If I can get, as soon as
17    the government's had a chance to look at those, a position from
18    the government, if there's any objection to any of those listed
19    exhibits.
20              MR. RAFFERTY:  Your Honor?
21              THE COURT:  Yes.
22              MR. RAFFERTY:  I'm sorry to interrupt.  If there's
23    going to be objections from the government, it seems like maybe
24    the witness -- if the witness could be removed from the
25    courtroom.
```

1          THE COURT:  Yes.  Let me go ahead and -- before I take

2     him down, I'm trying to make it a little easier for my

3     marshals.

4          Let me just see if we even have objections.  If we do,

5     we can litigate it outside his defense.

6          MS. GURSKIS:  I looked at the hard copies from

7     Mr. Sadow.  The defense exhibits are all fine.  I'm just now

8     measuring up the other ones to my exhibit list for the

9     government.

10          THE COURT:  Okay.

11         (Discussion was held off the record.)

12          MR. SADOW:  Certainly, if we wind up breaking --

13     because we're not going to have that much time.  To the extent

14     the government wants to make copies of these, we can do that.

15     Otherwise, of course, they're all -- they're exhibits, so...

16          THE COURT:  Sure.

17          MR. SADOW:  I'm sorry.  I put these together, as Your

18     Honor may understand, at the last minute.

19          THE COURT:  Sure.

20          MS. GURSKIS:  So I just looked at the first set, 1326

21     through 1334-A.  No objections.  And I do believe, according to

22     my notes, that 1334 and 1334-A were actually already admitted.

23          MR. SADOW:  I think 1334 was admitted.  At least on the

24     list you gave me, 1334-A didn't appear.  So I just want to make

25     sure.

1          THE COURT:  Okay.  So far, so good.  You only have a

2     few more to review.

3          MS. GURSKIS:  No objection to 1336 or 1338 or 1338-A or

4     1343, 1343-A and 1345.  And no objection to 1360.

5          No objection to 1375 or 1376 or 1382.

6          These are all fine, Your Honor.

7          THE COURT:  Very good.  So here's what we'll go ahead

8     and do, Mr. Sadow.  Let's go ahead, and bring our jurors back

9     in.  If you would like, perhaps just move in all those exhibits

10    in their presence.  We'll move them into evidence.

11         I think at this point that may be all we'll do, and we

12    can start tomorrow at 10:00 with the cross-examination.  I

13    think it just makes the most sense.

14         So let me bring the jurors back in to give them some

15    final instructions.  Thanks, guys.

16         THE COURT SECURITY OFFICER:  All rise.

17    (Jury enters at 5:11 p.m.)

18         THE COURT:  All right.  Please be seated, everyone.

19         So, ladies and gentlemen, we're going to do just a

20    little bit of housekeeping, and then we're going to be done.

21    Okay?

22         As you all know, we'll be conducting the

23    cross-examination of the witness next, by Mr. Sadow.  We're

24    going to go ahead and allow Mr. Sadow to move some exhibits

25    into evidence similarly to the way in which we allowed the

1    government to do so.

2         Mr. Sadow, if you want to go ahead and formally move

3    the list of exhibits into evidence that you will rely on for

4    the cross-examination of the witness.

5         MR. SADOW:  Thank you for your indulgence, Your Honor.

6    It's a long list, but I'll go slow.

7         These are all government marked exhibits that they have

8    not put in:  1326, 1327, 1327-A, 1328, 1328-A, 1329, 1330,

9    1331, 1332, 1332-A, 1333, 1334-A, 1336, 1336, 1338-A, 1343,

10   1343-A, 1345, 1360, 1375, 1376, 1382, 1385, 1385-A, 1399-A

11   and B and C and D and E and F and G, 1404, 1453, 1454, 1455,

12   1455-A, 1456, 1457, 1460 and 1463.

13        Those are the government exhibits that I moved into

14   evidence.

15        THE COURT:  And at this point, I believe there's no

16   objection to any of those, correct?

17        MS. GURSKIS:  That's correct, Your Honor.

18        THE COURT:  All right.  Those will all be admitted at

19   this time.

20        (Government Exhibits 1326, 1327, 1327-A, 1328, 1328-A,

21   1329, 1330, 1331, 1332, 1332-A, 1333, 1334-A, 1336, 1336,

22   1338-A, 1343, 1343-A, 1345, 1360, 1375, 1376, 1382, 1385,

23   1385-A, 1399-A and B and C and D and E and F and G, 1404, 1453,

24   1454, 1455, 1455-A, 1456, 1457, 1460 and 1463 were received in

25   evidence.)

 1              And now you have a few defense exhibits?

 2              MR. SADOW:  Yes.  I have A-1, A-2, A-3, A-4, and A-5.

 3              THE COURT:  Any other ones?

 4              MR. SADOW:  That was it.

 5              THE COURT:  All right.  Any objection to those set of

 6    exhibits?

 7              MS. GURSKIS:  No, Your Honor.  Thank you.

 8              THE COURT:  All right.  Those will also be admitted

 9    without objection.

10              (Defense Exhibits A-1, A-2, A-3, A-4, and A-5 were

11    received in evidence.)

12              MR. SADOW:  Thank you.

13              I can do a couple of minutes, but I think it's probably

14    better to break.

15              THE COURT:  No.  I think it makes sense at this point,

16    folks, so we don't have a disjointed examination that we break

17    here.

18              Okay.  So tomorrow, same schedule.  We'll have

19    everybody report at 10:00 a.m.  Please be here by 10:00.  We

20    will get you out as soon as we are ready to go, and we will

21    pick up with the cross-examination of the witness by Mr. Sadow.

22              Remember, of course, as I let you all head out this

23    evening, you've heard quite a bit of testimony today.  By my

24    count, we're on, I believe, our fourth witness.

25              I want to make sure that you all remember that should

 1    family and friends ask any of you what's going on and what the

 2    case is about, please continue to let them know that you are

 3    unable to discuss the case with them.  Similarly, do not

 4    discuss the case with one another.

 5         All your impressions about the evidence and what you've

 6    heard must be saved until the end of the case, when you are all

 7    deliberating, after you've heard all the evidence, instructions

 8    on the law and the closing arguments of the lawyers.

 9         Remember tomorrow morning, should you run into any

10    lawyers, take no offense if they avoid you.  Ethical rules

11    require that they do so.  And certainly, this evening, do not

12    have any temptation to go online either for social media

13    engagement regarding your service or, of course, to do any

14    research regarding anything you may have heard, any people or

15    places that you've seen in the exhibits, et cetera.  So please

16    continue, as I know you have, to keep all of those rules.

17         A few of you have needed some additional assistance

18    from the Court.  This afternoon I drafted another letter.  I

19    know that someone's employer was inquiring.  That's ready to

20    go.  We'll get you that.  I know that we may not have heard

21    back from certain other employers or professors.  If there's

22    anything else I can do, let me know.  I think I drafted at

23    least three or four letters for all of you specifically

24    designed to help several of you who have had issues with your

25    service and people asking about your service.  So hopefully

1    that'll take care of it.  But, of course, if anything else

2    arises, just let my courtroom deputy know, and we'll see what

3    we can do.

4            So with that being said, I hope everyone gets home

5    safe.  Have a great evening.  Please leave your notepads in the

6    jury room.  We'll see you all back in there at 10:00 a.m.  You

7    are excused.

8            THE COURT SECURITY OFFICER:  All rise.

9        (Jury exits at 5:16 p.m.)

10           THE COURT:  We can go ahead and excuse the witness.

11   Thank you, guys.  See you in the morning.

12           MR. SADOW:  Your Honor, can we make sure that the --

13   the witness needs to still be here for a second.

14           THE COURT:  Give me one second.  Yes.

15           MR. SADOW:  Just make sure the witness understands,

16   between now and tomorrow morning --

17           THE COURT:  Yeah.  Just, obviously, so you're aware,

18   sir, no communication with anyone.  You're still under oath.

19   You remain under oath until tomorrow, so you should not be

20   discussing your testimony with anyone at all.

21           You understand, right?

22           THE WITNESS:  Okay.

23           THE COURT:  Very good.  Thank you.

24           All right.  Please be seated everyone.  Let's just

25   briefly do some housekeeping.

1          So, Mr. Sadow, I imagine there's quite a bit of

2     material you want to cover.  But just in large part, to

3     realistically manage expectations for tomorrow, as we figure

4     out the lineup, what do you estimate will be the amount of time

5     you need for your cross, just realistically?

6          I know that there's material you need to cover.  I'm

7     not going to cut you short, but I want to make sure that we

8     plan ahead, and hopefully we can get a sense of when we will be

9     done with Mr. Ramamurthy's examination.

10         What's your general sense?

11         MR. SADOW:  If everything went perfect --

12         THE COURT:  Yes.

13         MR. SADOW:  -- I could be done by lunch.

14         THE COURT:  Okay.

15         MR. SADOW:  That having been said, perfection doesn't

16    typically happen in cross-examination.  So we could go into at

17    least a few minutes after the lunch hour.

18         THE COURT:  I can live with that.  If we can at least

19    focus our morning, and hopefully things do go smoothly, that's

20    about two hours, give or take.  And my hope is that we'll get a

21    lot covered.  If it spills over slightly, really almost two and

22    a half, if I break at 12:30, as I've been doing, I think we may

23    be able to make some headway, and perhaps by the early

24    afternoon, we're turning it back to redirect.

25         So assuming that's our perfect schedule, can I ask the

1    government who we have on standby, ready to go for tomorrow

2    afternoon?  Because I don't think we will have anyone taking

3    the stand outside from Mr. Ramamurthy until after lunch.

4         MS. DE BOER:  Yes, Your Honor.  So we have five

5    witnesses who are traveling in.  They're either here or will be

6    here tonight and tomorrow morning.  Four of the five are fairly

7    short, some perhaps as short as the shorter witnesses today.

8    Some may be slightly longer than that, but still short.

9         A fifth is Dr. Magliocco, who is our medical expert.

10   We're obviously wise to the Court's admonition yesterday, not

11   to repeat any testimony, and we'll endeavor not to do that.  So

12   we will try to shorten him, but I think he's about two hours on

13   direct.

14        I don't know that we get through all five of those

15   tomorrow, so we're going to have to do some work tonight to see

16   whose travel schedules are the most flexible because many of

17   these witnesses were supposed to go home tomorrow night.

18        I know at least one of them, it's Dr. Slomovitz, he's a

19   doctor for one of the account beneficiaries.  He's an

20   oncologist that carved out a set window of a time.  So we may

21   have to take him out of order, but he'll be short.

22        So the witnesses I'm talking about are Dr. Magliocco,

23   the medical expert, Kimberly Foss, who's a practitioner for a

24   beneficiary, Dr. Slomovitz, patient W.H., Heller, who will be

25   short, and Stacey Adair, who's a former employee.

1          THE COURT:  So I think what we should plan on,

2     depending on the travel schedule, is we should have, I think,

3     Ms. Foss, Adair, and W.H. would be a perfect world, I think if

4     we can get two of them, at a minimum done, after we're done

5     with Mr. Ramamurthy.  That would at least advance the ball.  In

6     a perfect world, three of them.

7          I think we can almost certainly bank on the fact that

8     Dr. Magliocco and Dr. Slomovitz would not be on deck tomorrow.

9     I don't realistically think that they're going to be testifying

10    tomorrow.

11         MS. DE BOER:  Sorry, Your Honor, if I wasn't clear.

12    Slomovitz has to go tomorrow.  He's the oncologist who was a

13    doctor for one of the account beneficiaries who has carved out

14    a window of time to testify.

15         THE COURT:  Yeah, that wasn't clear.  So he has to

16    testify tomorrow.

17         MS. DE BOER:  Correct.  And we'll work with the others,

18    the other three, besides Magliocco, to figure out who can go,

19    who could be moved, if we have to.  We'll sort that out between

20    tonight and tomorrow.

21         We'll endeavor to get as far as possible tomorrow,

22    obviously, but we'll figure out who are the ones that have the

23    flexibility if they have to carryover to the next day.

24         THE COURT:  So our plan tomorrow is once we finish

25    Mr. Ramamurthy, to put Dr. Slomovitz on after that; is that

1    right?

2              MS. DE BOER:  Yes, Your Honor.

3              THE COURT:  Okay.  And Dr. Slomovitz does not sound, to

4    me at least, to be as short a witness as Foss and others; is

5    that right?

6              MS. GURSKIS:  He won't be, but he'll be fairly -- he

7    won't be long.

8              THE COURT:  Okay.  Well, let's see here.  I think then

9    we should, just in the abundance of caution, if things go

10   perfect, I don't want to lose any available time.  Perhaps we

11   can have whoever of those remaining witnesses can be on

12   the standby and available of the combination of Foss, Adair, or

13   W.H.

14             Maybe there's one that's quite short and doesn't have

15   much of an issue being on standby.  If we can get through

16   Slomovitz and we have any time, maybe we can take care of one

17   of those witnesses.  And if that's the case, then it looks to

18   me like Friday we're moving into the remaining folks.

19             So whoever we don't reach between Foss, W.H., and

20   Adair, and then presumably, Magliocco.  Is that the lineup that

21   takes us to the end of the week?

22             MS. DE BOER:  Correct, Your Honor.  We have two other

23   potential witnesses for the rest of the week, or three others

24   if we -- that's a bit ambitious.  But for Friday, we have Amy

25   Roebuck who is a former employee.  She's flying in.  And then

1    we have Dr. Yogel, who is a doctor for one of the account

2    beneficiaries.  Both should be relatively short.  And supposing

3    we had extra time, we would probably start Marc Sporn.

4           THE COURT:  Yeah.  I think, realistically, Sporn

5    probably won't be testifying this week.  I find that hard to

6    believe, just based on what you're telling me and the

7    sequencing.  But it's important that we try to plan ahead.

8           So at least I think -- if I can get through -- and

9    again, Magliocco's testimony, I would presume, will be

10   streamlined given how much we heard from Ms. McMillan.

11          But in a perfect world, I think we're keeping a decent

12   schedule if between tomorrow and Friday we're able to take care

13   of Dr. Slomovitz, Kimberly Foss, W.H., Stacey Adair, and

14   Dr. Magliocco.

15          I mean, if we can get through that in the next two

16   days, I think that's realistic, with an outside chance we would

17   reach someone like Roebuck or Yogel.

18          Does that make sense?

19          MS. DE BOER:  It does, Your Honor.  Yes, thank you.

20          THE COURT:  If we go that route, I think that Roebuck

21   and Yogel may, depending on how fast those witnesses go, they

22   may need to be in on Monday, in the morning.  I mean, I just --

23   look, I have faith that you guys keep it moving, but what I've

24   seen thus far and the pace at which it's going does not make me

25   extremely confident that we can get through this many folks in

1    the next 48 hours.

2          Certainly, though, Roebuck, Yogel and Sporn could be

3    tackled in the beginning -- on Monday of next week, right?

4          MS. DE BOER:  Yes, Your Honor.

5          THE COURT:  Okay.  All right.  So I think, Mr. Sadow,

6    the purpose of this also is so that we can really streamline

7    everything for everyone and we know what the lineup is.  I

8    think that Ramamurthy obviously is the primary focus for

9    tomorrow.

10         Some of these other witnesses do not seem to be --

11   well, let me take that back.  I don't know how detailed we're

12   going to need to get with Dr. Slomovitz.  But at least this

13   gives you a sense of my ideal lineup for the next 48 hours in

14   preparation.  And I think it's doable.

15         We're just going to have to see how the afternoon plays

16   tomorrow.

17         Any concerns on the defense side with this lineup?

18   Certainly it puts Sporn into next week, so there needs to be no

19   preparation for him until Monday, I would say.

20         What do you guys think?

21         MR. SADOW:  That prep's already been done.

22         THE COURT:  Well, refresh.  I think a refreshing of the

23   prep, I guess is the way to put it, right?

24         MR. SADOW:  Yes, sir.

25         THE COURT:  Okay.  All right.  So this schedule works

1    for me.  Can I just on an outside whim get a sense, getting me

2    through Sporn?  I like to plan ahead.  I mean, I know we have a

3    lot of folks left after that, but looking at the pace of where

4    we're at, do we have a couple more days of testimony, ballpark,

5    from the government at that point?

6         MS. DE BOER:  I think we would go through at least the

7    end of next week.  I think we could rest our case the following

8    Monday, just depending on how things go.

9         THE COURT:  Okay.  That's good.  I think if we have a

10   chance, an outside chance, depending on the speed of some of

11   these other smaller witnesses, that we're looking at winding

12   down the government's case by the end of next week and maybe

13   spilling over a little bit.

14        I would prefer that, obviously, because then it gives

15   me essentially a week or little over a week for the defense to

16   put on whatever case they want to put on.  So I think that's

17   realistic.  And hopefully we can beat that expectation.

18        But certainly I know that, for example, Sporn will

19   probably be lengthy, similar to what I expect from tomorrow

20   morning with Ramamurthy.  All right.  So that gives me a good

21   lineup for tomorrow.

22        Let's see how we do in the afternoon, and hopefully we

23   can get through Dr. Slomovitz without it becoming too belabored

24   and then it'll put us a little more back on track.

25        MR. SADOW:  Your Honor, we may be able to assist just a

 1    little bit.

 2              THE COURT:  Sure.

 3              MR. SADOW:  The government doesn't have to tell us

 4    everything in advance, but there are a number of still

 5    cooperative witnesses.  Those are the long ones.

 6              THE COURT:  Sure.

 7              MR. SADOW:  So if they are eliminating any of those,

 8    that would be something which I think would assist the Court,

 9    obviously would assist the defense as well.

10              THE COURT:  Yeah.  I think what I'm going to do on is

11    that front -- because I understand your perspective on it, is

12    let's reevaluate on Friday, when I get to Friday afternoon, and

13    I start planning out a little more.  I like to almost have

14    48 hours of notice, not just 24.  I like to know what's coming.

15              So I think I can map-out through Tuesday and then we'll

16    get a little clarification about who, if anybody, on the

17    cooperating side is going to be called next week.  But I think

18    that'll help us.

19              At least for this week, it looks to me like the only

20    cooperator is really Ramamurthy for this week, right?

21              MS. DE BOER:  That's likely.

22              THE COURT:  All right.  So at least we know that.  And

23    we'll see how we do on Friday afternoon.

24              MR. SADOW:  You see, "that's likely" is the concern.

25              THE COURT:  Well, I'll say this.  I'm looking at my

1    schedule here and everybody else they want to cover between now

2    and Friday are not cooperators, after Ramamurthy, and I think

3    getting through them is important.

4         So sequencing-wise I don't want to be disrupted either.

5    This is the setup that I'm planning on.  So I don't think we're

6    going to have any problems sticking to the script for the next

7    48 hours.  All right?

8         MS. DE BOER:  Agreed, Your Honor.

9         One other matter.  The records custodian issue that I

10   brought up this morning.

11        THE COURT:  Yes.

12        MS. DE BOER:  With respect to patient files and billing

13   reports from MyOnCallDoc, which is Government's Exhibit 443-A

14   through C, and then 444 and 446 are samples of that.

15        THE COURT:  We had held off on that because it just

16   didn't make sense at the time.  Can I get perhaps a position

17   from the defense on this?  There was a concern again on -- I

18   believe it was an authenticity problem.  Is that what they're

19   raising?

20        MR. SADOW:  Absolutely.

21        THE COURT:  Okay.  So tell me, gentlemen, we have an

22   issue with this exhibit?

23        MR. SADOW:  I can actually call up the exhibit and edit

24   it in front of you.

25        THE COURT:  What is it?  I don't want to take too long

1    on it before I let everyone break.  But can you give me a sense

2    of what it looks like?  That would help, if I know which one it

3    is.

4         MS. DE BOER:  443-A?

5         MR. SADOW:  My MyOnCallDoc exhibit, when you call it up

6    on preview, on the MAC, actually allows me to highlight and

7    potentially edit what's there, and the government has shown us

8    edited parts of those exhibits.  So if those are editable -- is

9    that the right word -- then there's an issue about whether or

10   not they are really business records.

11        Someone's going to have to come in and say that that's

12   the way they were when they were received by them, because it's

13   late production.  I think the production is into 20- -- maybe

14   2021.

15        THE COURT:  Okay.  So that gives me a little more

16   sense.  I was trying to figure out what the genesis of the

17   objection is.

18        Now, on the certification, the 902 -- which we have,

19   right, Ms. de Boer?

20        MS. DE BOER:  Yes, Your Honor.

21        THE COURT:  Does it set forth that these items are

22   unedited?  I guess that's really the main concern, that what

23   we're looking at is a spliced or edited portion of them as

24   opposed to the total document?

25        MS. DE BOER:  So these are the patient files that the

1    telemed company produced to the government in response to a

2    subpoena.  And, yes, the patient files are editable, as are,

3    really, any PDF.

4         THE COURT:  Sure.

5         MS. DE BOER:  The certification itself does not say

6    they're unedited.  We can contact the records custodian and

7    amend that certification if that's the concern.  I can assure

8    you we have not edited them.  But they are fillable PDFs.  Some

9    of them are at least, as many PDFs are.

10        THE COURT:  Yeah.  I think, from what I understood, the

11   concern is because he recognizes that they can be edited, that

12   what you have provided by way of subpoena is true and accurate

13   and was the document as it was in the possession or custody or

14   control of the entity that produced it.

15        I mean, if Mr. Sadow -- I think if we got a 902 that

16   made that clear, would that resolve this particular concern?

17        MR. SADOW:  The answer to that is, unfortunately, no,

18   because my MyOnCallDoc, which is Chris Long --

19        MR. RAFFERTY:  No.  Craig Long.

20        MR. SADOW:  Craig Long.  I'm sorry.  Why he hasn't been

21   charged in this case, I have no idea, but he is a player

22   throughout the entire period of time.  He's not the one that

23   authenticated this.  Someone else, who now is claiming to be in

24   a position of authority years after the fact, is doing the

25   authentication.  And to be perfectly honest, I don't trust the

1    authentication.  We know, from documents that we have, that

2    they shouldn't be changeable because ours are the originals.

3            So this is one of those in which there's a real issue

4    about authenticity, and the government can call somebody in

5    here and let them be under oath and say that's exactly the way

6    they were when they came in and not the way they were two years

7    after the fact.

8            THE COURT:  I guess my only retort to that is, I don't

9    see a reason -- if the government gets a revised 902 and

10   provides it to me, I would overrule that concern.  I mean, you

11   can establish authenticity that way.

12           If there's a concern, based upon what I'm hearing, that

13   these documents are authenticated after the fact or have been

14   modified, I would feel comfortable and I would overrule

15   defense's objection if indeed I had confirmation in the

16   certification that these haven't been edited in any way, shape,

17   or form.

18           And I can imagine that wouldn't be hard to procure if

19   indeed there were no edits made.

20           MS. DE BOER:  I agree, Your Honor.  We will endeavor to

21   do that.  And just to be clear, the individual who signed the

22   certification is the president of MyOnCallDoc.

23           THE COURT:  Well, that was my next question, who

24   certified?  Because there seems to be a concern about that.

25   But if it's someone of authority who looked at the records --

1    let's put it this way:  I don't need them in here telling me

2    what I can get in the certification if it's modified to cover

3    this concern.

4         And I have to see it.  But if I can get that -- now, if

5    something comes up, and he can't make that representation, or

6    it's not as clean as simply stating that, we'll deal with that

7    when it comes.  And then maybe I do need to get an explanation

8    from him, and we may have to have someone show up here to

9    testify.

10        But for now, I would feel better if we had a revised

11   certification, and that would give me, at least, the comfort

12   that we can bring these in from an authenticity standpoint.  So

13   why don't we just try do get that.

14        I know you guys prefer to have him here.  I'll tell you

15   this:  I think it's within my discretion under 902 for

16   authenticity, that if I feel satisfied that person is in a

17   position of representing the records are what they say they

18   are, and they're regularly maintained in the business files of

19   the OnCall and there's no concern, that's fine.

20        But certainly, I don't think it hurts to have a very

21   clear certification that maintains that there have been no

22   modifications, changes, or edits to these documents, that they

23   are produced as they have been maintained from their inception

24   in the files of the business.

25        And I'd like to have something like that to cure this

1  concern before I let them in.  All right?

2         MR. SADOW:  And obviously the rulings the Court makes,

3  we live by.  We're going to tell you right now, though, when

4  they come in -- when they're offered, at that point in time,

5  we're going to seek permission to show that they are not

6  reliable through whatever process --

7         THE COURT:  Sure.

8         MR. SADOW:  We won't have someone to cross-examine,

9  though.  So at that point in time, we're going to call the

10  government agent and say take the stand, and we're going to

11  show you why they're not reliable.

12         Literally, we have an original document which is

13  different and not -- not something that you can change.  Okay?

14  So the question here -- and why it's so important -- because we

15  think they changed them and then sent along the original to us

16  after any changes were made.

17         THE COURT:  So do you have, for example -- do you have

18  a -- just to give me a sense of the edits, are you saying that

19  currently the defense has one of these records in full form

20  that is clearly different than the ones the government is

21  moving in?

22         I mean -- because, again, I can't work off any sort of

23  speculation.  If I have an exhibit that the defense camp has,

24  that is literally a thorough or unredacted or unmodified

25  version of what the government's moving in as authentic, then I

1    would want to look at that in camera to determine why that is.

2    And then I may have a bigger problem.  But I don't know that

3    it's that lined up.

4         Is that --

5         MR. SADOW:  We'll get -- we'll have something on this

6    for the Court, say, at some point tomorrow, for the Court to

7    look at.  The government really needs to show you what they've

8    done with it and explain in some form or fashion how they've

9    gone about doing it.  That's the concern.

10        THE COURT:  Well, I guess, Ms. de Boer, all I would ask

11   is -- I mean -- and again, these records, so I'm clear, are

12   primarily being introduced or utilized by which witness again?

13        MS. DE BOER:  Dr. Magliocco, Your Honor.  They're

14   patient files, and he'll be focusing on just a handful, mostly

15   the account beneficiaries and the folks who are testifying.

16        THE COURT:  Okay.  So what I just need to see -- I

17   mean, look, this is quite straightforward.  If I can see what

18   the records are from Dr. Magliocco, and then I would have to

19   see from the defense -- if it's going to raise authenticity up

20   to a certain level of concern, I would have to see a record

21   that the government has, that they plan on bringing in through

22   Magliocco, that the defense also has, but clearly shows

23   additional material that, for whatever reason, has been

24   redacted or removed from the patient files the government is

25   seeking to introduce through Dr. Magliocco.

1          I mean, it's -- that's what it is.  I mean, I -- if I

2     have something like that, then certainly, I'm going to be

3     worried about the fact that what I'm showing the jury -- forget

4     about being authentic.  It may just be completely incomplete.

5          It may be missing sections in those patient files, or

6     it could be something that has been redacted in the normal

7     course.  I don't know.

8          So I guess the easiest thing to do is, if the

9     government wants to, tomorrow morning, just show me or give me

10    a copy of what the records that Dr. Magliocco's going to rely

11    on look like, or what they are.

12         And then I would just ask the defense, if you have

13    something that indicates to me that it has been improperly or

14    inadvertently modified, that you would show me a record that

15    matches what they're giving me from the government and tells me

16    or at least explains to me what's been removed.

17         I mean, unless I'm misunderstanding something, you're

18    insinuating that you have a record that is more fulsome and

19    complete than what the government is trying to pass on as

20    authentic.

21         Am I describing this right, or am I misunderstanding?

22         MR. SADOW:  I think you're describing it right.

23         Our concern is that when the record came into

24    MyOnCallDoc --

25         THE COURT:  Right.

1          MR. SADOW:  -- they made changes, and they may have

2    then turned over the document with the changes to LabSolutions.

3    The government, at least as they proposed, they're going to

4    show that changes were made, and they want to leave the

5    impression, in some form or fashion, that LabSolutions made the

6    changes.

7          And we want to be able to show that we didn't make the

8    changes, and we have the original document, not a copy.  We

9    have the original document that was sent to us to be able to

10   show what they have versus what we have, which is why I'm

11   trying to suggest that the authenticity issue lies with my

12   MyOnCallDoc in the inference that the government may choose to

13   draw or want to draw about who is able to make changes to these

14   docs.

15         THE COURT:  Okay.

16         MS. DE BOER:  If I could speak to that.

17         THE COURT:  Yeah.

18         MS. DE BOER:  That's not at all what we're doing.  This

19   is the first I've even heard of this theory.

20         Dr. Magliocco is going to be presented with patient

21   files primarily for the patients that had been put at issue in

22   this case.  And he's going to say this is not the appropriate

23   testing.  Can you tell from this, the information here, was

24   there a doctor-patient relationship?  It's expert opinion.

25         He's not saying who changed what.  He's not in a

1   position to say that.  I don't know who changed what.  It's not

2   really at issue in this case.  And I think the flow that

3   Mr. Sadow is describing from the telemarketer to the telemed --

4   that's how these patient files get generated.  Of course, the

5   telemed would have done something, including, at least, apply

6   the doctor's signature.

7        So what he's describing to me makes total sense in

8   terms of there would be an evolution of these files over time.

9   We have had files that were provided to us directly from

10  MyOnCallDoc.  Those were the files they maintained.  The

11  business record says that, and will be updated in accordance

12  with Your Honor's suggestions.

13       I think, at that point, particularly from

14  Dr. Magliocco's testimony, we should be all clear.

15       THE COURT:  Yeah.  Well, that's what I was going to

16  say.  Now that I've gotten kind of the heart -- because I was

17  unclear until just now exactly what the concern is.

18       I think that the testimony of Dr. Magliocco is not

19  going to touch on any of this because the testimony of

20  Dr. Magliocco is going to focus on medical necessity, not

21  complete or incomplete files.  If he can divine from the

22  document whether this was necessary and medically necessary,

23  that's what he's here to do.

24       It's not that there will be something else in that

25  document that he has not been privy to that will impact his

1    testimony.  Doesn't sound like that's what's happening here.  I

2    think in the abundance of caution, we can supplement the 902

3    anyway, but I am less concerned based upon what Dr. Magliocco

4    is going to point out -- and, look, I don't think anyone stops

5    us from finding -- at least the Court, from finding that the

6    902 is sufficient for authenticity, and let's move on.

7         If they want to raise this issue later -- I'm not sure

8    how.  From a relevancy standpoint, it would be objected.  But

9    if they wanted to somehow point out the fact that these have

10   been modified over time, and it wasn't on LabSolutions to do

11   so, let's see how that plays out.  But it doesn't sound like

12   that's the thrust of your exam anyway.

13        It's not that you're insinuating that LabSolutions has

14   been playing around with the records.  It's just there's

15   nothing in these medical records that are authentic to support

16   the fact that these genetic tests were medically necessary,

17   right?

18        MS. DE BOER:  That's exactly right, Your Honor.  And I

19   think the point I'm hearing from the defense is perhaps the

20   telemed fooled LabSolutions, and if they want to put on a

21   witness or perhaps a cooperator on that point, have at it.

22        THE COURT:  Yeah.  I was going to say, that to me is a

23   fine line of examination.  I just don't know that it stops us

24   from using them under 902.  That's my issue.

25        MR. SADOW:  I can actually -- if we can approach, I can

1    just show you what we're talking about.

2              THE COURT:  Yeah, you may approach for a moment.  Let

3    me just take a look at it, and I can see what you're talking

4    about.

5              MR. SADOW:  And I'm looking at 418-A.

6              THE COURT:  418-A?

7              MR. SADOW:  This can't possibly be the document.

8              MS. DE BOER:  If you go to 418 -- so 418 was attached

9    to an email sent from MyOnCallDoc to LabSolutions.  That's what

10   LabSolutions received.  418-A --

11             MR. SADOW:  We actually have a signature on this.

12             MS. DE BOER:  I'm sorry.  So 418-A is just screenshots

13   from 418.

14             THE COURT:  Okay.

15             MS. DE BOER:  He's not testifying to this.

16             THE COURT:  Okay.

17             MS. DE BOER:  He's just testifying to straight patient

18   files.

19             MR. SADOW:  That's what I'm trying to tell you.

20   They're -- Brian, is it 418?  Don't we have -- we have the

21   original of one of those.

22             MR. RAFFERTY:  Yeah.  Your Honor, I think the question

23   is, 418-A is a document.  If you look at it, it appears to be

24   created -- if you could bring it up for a second.

25             This is part of the document contained what's called a

1    screenshot of -- this is Exhibit 418-A.  It is identified on

2    the exhibit list as a screenshot.  Okay?

3         A screenshot is something that somebody has created,

4    right?  You see on the right-hand side of the document, you

5    have comments, who edited it, stuff like that.  This was

6    clearly not something that this company, whoever produced this,

7    maintained in this manner.  This was done at someone's

8    direction, probably the government's, to show what was added or

9    something else.

10        And so I think the principle objection is, this should

11   not be introduced into evidence pursuant to any business

12   certification because it's not a business record.  This was

13   created for litigation.

14        THE COURT:  I'm being told this one is not going to be

15   used, though.

16        MS. DE BOER:  Not by Magliocco.  And I agree, Your

17   Honor, this is a screenshot that I made, and another witness

18   may or may not testify as to what was fillable in the process

19   that orders that were created.

20        THE COURT:  So this one will not be used tomorrow, and

21   it's not being used for -- again, it's not being held out as an

22   authentic record at all tomorrow.  So this is not going to be

23   used.  And the one that you were going to use, the other 1418,

24   it's not the markup?

25        MS. DE BOER:  No.  I'm going to use hard drives of the

1    full set of patient files for MyOnCallDoc that were

2    LabSolutions' patient files.

3          THE COURT:  Well, I feel better, guys, if we're not

4    using that other one.  Because I agree, there's margin markups.

5    So that looks problematic to me.  But we're not using that with

6    Magliocco.

7          MS. DE BOER:  Correct.

8          THE COURT:  At least that -- that way it's not -- I

9    don't think there's an authenticity problem.  We're just not

10   even going to use it.  We're not presenting them with it.  When

11   we decide it, if we do, maybe we've got to talk about the

12   screenshot issue, but for tomorrow, or for Friday, it doesn't

13   sound like we're going to have a problem with that one.

14         MR. SADOW:  The difficulty -- and I understand what the

15   Court is saying.  But the difficulty is he's going to be

16   saying, based on this patient record, here is my opinion.  And

17   we're telling you that this may not, in fact, be the patient

18   record.  This may be something that was done after the fact by

19   MyOnCall or somewhere else along the line.

20         So he's reviewing something which is not, in fact, a

21   document that was -- should be reviewed by anyone, because it

22   could have been edited.

23         THE COURT:  I think the challenge was this one is not

24   forming a basis of his opinion, right?

25         MS. DE BOER:  Correct.

1          THE COURT:  So the concern we have here on this

2    modified document is that the patient hard drives being used

3    will not have these types of markings.  I don't know.  I

4    haven't seen them.  But we're not going to have the same

5    concern that we have on 418 throughout the patient files.

6          MS. DE BOER:  He's testifying to -- well, we can even

7    limit his primary testimony to the ones that were emailed to

8    LabSolutions.  I mean, that's really what we're focused on.

9    The count of patient and those are the emails on the exhibit

10   list.

11         There's a chunk of other patient files that he has

12   reviewed that were provided by LabSolutions, and if they want

13   to cross him on what is the actual one, his opinion is going to

14   be the same.

15         MR. SADOW:  It tends to suggest that the issue is not

16   what they intended to try to do with the exhibit.  And it

17   basically, what they're saying is we're only going to be using

18   that part -- I mean, if he's not going to make reference to

19   codes, or he's not going to make reference to anything else

20   that's on there, that's fine.

21         But if he's going to start talking about this code

22   shouldn't have been used or that code shouldn't have been used,

23   then he may be relying on a document in which, in fact, that

24   code was never there or it was changed.  That's the concern.

25         MS. DE BOER:  And he's not a billing expert, Your

1    Honor.

2         THE COURT:  I don't think he's going to talk about

3    codes, right?

4         MS. DE BOER:  Not in any type of detail, no.

5         MR. SADOW:  I'd still like the authenticity that it

6    conformed --

7         THE COURT:  Yeah.  I think we're going to do that.

8    We'll get the modified one.  But it sounds like it's less of a

9    concern because the scope of the doctor's testimony will be

10   more about medical necessity as opposed to coding.  He's not

11   going to be going into the checking of forms or the editing of

12   forms, nor does it sound like the form that you flagged is even

13   part of his testimony.  That 418-A, that particular form --

14   that patient is, but that form that looks modified will not be.

15        I would suggest that anything that is in the email

16   files is probably what the government should be driving their

17   examination from to avoid this coming up midstream.  And if we

18   can do that and go that route, it's cleaner with the revised

19   certification and --

20        MR. SADOW:  Has he seen the modified file?  Has someone

21   shown him these screenshots?

22        MS. DE BOER:  I don't believe I have.  I'll

23   double-check.

24        THE COURT:  But I think we can get ahead of it.

25   Because certainly if I get a modified 902 and we're not

1    focusing on the sections of these files that have been

2    purportedly modified or could have been modified, then I do not

3    believe we're going to run into a problem where the doctor will

4    be looking at exhibits or patient files that are not authentic.

5           So I think we've -- we've stepped away from the issue.

6    I think tomorrow, or Friday, when Dr. Magliocco testifies, if

7    the government focuses on the use of the emails, which I think

8    are the set of documents to LabSolutions that are probably in

9    the best shape, in that they don't have any concerns about the

10   OnCall doing anything to them, then that way we can probably

11   sidestep the entire issue.

12          But the other part of that is what we've just

13   discussed, and that is Magliocco is not going to get into, as

14   far as I can tell, a large discussion of CPT codes or proper

15   coding, but more so a medical opinion, expert opinion on

16   medical necessity for genetic testing based on what he's seen.

17          And I get a sense, Ms. de Boer, that the patient files

18   will not have any problems in that he's looking at medical

19   information in those files that was not subject to these types

20   of edits.  It's not the same -- I mean, I see what is being

21   pointed out to me in 418.  There's check boxes and comments.

22   I'm assuming the patient hard drive files are not going to have

23   that same problem.

24          MS. DE BOER:  We'll double-check, Your Honor, but just

25   so the Court is clear, part of how these get created is

1    telemarketers fill them out.

2         THE COURT:  Right.

3         MS. DE BOER:  And then they get approved or changed or

4    whatever by a doctor.  So there's an evolution to that.  And

5    what MyOnCallDoc gave us was their records.

6         THE COURT:  I don't disagree with you there.  That's

7    what I'm saying.  So from an authenticity standpoint under 902,

8    if what they have in their possession is what they received,

9    right, and they have not further modified, I'm letting them in

10   under 902 with that revised certification.

11        I do not need to concern myself with bringing in a

12   records custodian to lay that predicate.  They are going to

13   come in.  And to your point earlier, if there is a concern on

14   cross for the doctor about these modified forms, that's what

15   the cross will be for.  I mean, we'll tease it out, and the

16   defense can go into that.

17        But I'm not too worried about just the baseline

18   evidentiary threshold for authenticity is going to be met with

19   a slightly modified 902 certificate.  I don't need anymore.  So

20   they're gonna come in.  If there's an opening for cross because

21   of this purported modification, they'll be able to ask it, but

22   I suspect from what I've heard that in his direct examination,

23   looking at the patient files, that particular edited one will

24   not be at issue and hopefully the other ones he's looking at

25   don't suffer from the same editable quality, I guess is the way

1    to phrase it, that that one was.

2            MS. DE BOER:  Thank you, Your Honor.

3            THE COURT:  All right.  When you get that revised

4    certification in, just let me know, Ms. de Boer, and then I

5    will again formally make it clear that they're all going to

6    come in.

7            If at any point, to Mr. Sadow's suggestion, you just

8    want to let the doctor know about the potential for

9    modification, I don't see any reason why that would be a

10   problem.

11           I don't think it is because it sounds like the hard

12   drives and the patient files and the emails are not subject to

13   modification in the same way.  So I think we're going to be all

14   right.

15           But that will satisfy -- Mr. Sadow, what I will say to

16   you guys on the defense side, I'm going to live with the

17   revised certification.  I'm going to find there's no

18   authenticity problem.  If there's something in the

19   Dr. Magliocco testimony that opens the door to you raising this

20   issue, and it's not outside the scope of direct, then have at

21   it.

22           I mean, if there's something about the trustworthiness

23   of the boxes checked, the fact that they are modified over

24   time, that seems to me to be fair, and you guys can raise it.

25           MR. SADOW:  Thank you.

1          THE COURT:  Thank you.  All right.

2          MS. DE BOER:  Thank you, Your Honor.

3          One other request or suggestion.  We would be open to

4     starting earlier, at 9:30 on any days that the Court would like

5     to, to keep it moving.

6          THE COURT:  We may need to.  I don't want to do it

7     today because I kind of let them know, but I suspect that maybe

8     I'll ask them if they could accommodate and come in a bit

9     earlier on Friday just so we can get ahead.

10         It really is all situational.  It depends in large part

11    about how much we can get done tomorrow when we finish the

12    cross-examination of Ramamurthy.

13         So I agree with you.  And perhaps if we don't

14    necessarily do it this week, maybe we modify slightly next

15    week.  But I think we're okay.  That extra 30 minutes, I mean,

16    to me, for tomorrow won't necessary disrupt anything.  If we

17    can get through Ramamurthy and Slomovitz and maybe we get lucky

18    and squeeze in one more, I think we'll be in good shape.

19         And if we don't, I'll let them know, look, we need them

20    to be here at 9:30 or even 9:00, depending on how far we get.

21         MS. DE BOER:  Thank you, Your Honor.

22         THE COURT:  That makes sense.  In no way, shape, or

23    form, other than obviously some of the housekeeping, do I want

24    the jurors having to stay past 5:30.  But I can extend the

25    start time for sure.

1          Okay.  Anything else on the government's end before we

2    break for the evening?

3          MS. DE BOER:  No, Your Honor.  Thank you.

4          THE COURT:  All right.  Anything else on the defense

5    end before we break?

6          MR. SADOW:  No, Your Honor.  Thank you.

7          THE COURT:  Okay.  You got it.  So we'll see each other

8    at 10:00 a.m., and we'll get started with the cross-examination

9    of Mr. Ramamurthy.  We're in recess, guys.

10          (Court recessed at 5:55 p.m.)

11                    C E R T I F I C A T E

12

13

14          I hereby certify that the foregoing is an

15    accurate transcription of the proceedings in the

16    above-entitled matter.

17

18

     DATE:   November 30, 2022   /s/Ilona Lupowitz
19                                ILONA LUPOWITZ, CRR, RPR, RMR
                                  Official Court Reporter
20                                United States District Court
                                  299 East Broward Boulevard
21                                Fort Lauderdale, Florida 33301
                                  (954) 769-5568
22

23

24

25

**$**

**$1,000** [1] - 169:17
**$3,000** [1] - 141:1
**$350,000** [1] - 61:11
**$600** [1] - 168:2
**$75,000** [2] - 173:16, 173:20
**$9,000** [3] - 130:8, 131:13, 164:13

**'**
**_**

**'13** [1] - 38:3
**'14** [2] - 44:1, 45:20
**'15** [1] - 51:3
**'17** [1] - 113:13
**'18** [1] - 113:13

**/**

**/s/Ilona** [1] - 231:18

**1**

**1** [5] - 1:7, 104:21, 105:2, 105:4, 142:13
**1,500** [1] - 164:11
**10** [3] - 45:13, 151:7, 173:24
**10,000** [1] - 183:21
**10-4** [1] - 188:23
**10/22** [4] - 45:20, 51:3
**10/28/14** [1] - 45:23
**100** [2] - 157:23, 176:2
**1004** [4] - 3:13, 180:9, 180:11, 181:15
**10:00** [5] - 198:12, 200:19, 202:6, 231:8
**10:19** [1] - 1:5
**10:35** [1] - 14:25
**11** [2] - 38:2, 87:8
**11/1/2016** [1] - 138:13
**110** [2] - 104:10, 105:24
**111** [1] - 2:15
**1123** [6] - 3:6, 147:9, 147:17, 147:24, 147:25, 168:20
**115** [2] - 2:17, 3:5
**116** [1] - 185:18
**1170** [1] - 2:6
**119** [1] - 186:15
**12** [1] - 116:6
**120** [1] - 186:16
**121** [1] - 186:19
**1214** [1] - 176:11
**1214-A** [4] - 3:12, 176:11, 176:15, 176:17
**1214-B** [4] - 3:12, 176:12, 176:15, 176:25

**1234** [4] - 3:14, 182:22, 182:25, 187:9
**1245** [1] - 156:25
**1245-A** [4] - 3:7, 156:25, 157:7, 157:15
**1245-B** [3] - 3:7, 156:25, 157:7, 157:15, 158:12
**1245-C** [5] - 3:8, 156:25, 157:7, 157:15, 159:5
**1247** [4] - 3:14, 182:21, 182:25, 183:24
**125** [1] - 2:18
**126,000** [1] - 168:4
**12:11** [2] - 103:18, 103:23
**12:19** [2] - 103:24, 104:1
**12:25** [1] - 109:1
**12:27** [1] - 110:12
**12:30** [1] - 203:22
**13** [2] - 30:10, 177:3
**1318** [5] - 3:8, 160:9, 160:14, 160:20
**1318-A** [5] - 3:8, 160:10, 160:14, 160:20, 161:4
**1319** [5] - 3:8, 160:9, 160:10, 160:14, 161:21
**1324** [4] - 3:9, 160:10, 160:14, 162:22
**1324-A** [4] - 3:9, 160:10, 160:14, 162:22
**1325** [4] - 3:9, 160:10, 160:15, 163:22
**1325-A** [5] - 3:9, 160:10, 160:15, 163:23, 164:6
**1326** [5] - 3:15, 195:18, 197:20, 199:8, 199:20
**1327** [4] - 3:15, 195:18, 199:8, 199:20
**1327-A** [4] - 3:15, 195:18, 199:8, 199:20
**1328** [4] - 3:16, 195:18, 199:8, 199:20
**1328-A** [4] - 3:16, 195:18, 199:8, 199:20
**1329** [4] - 3:16, 195:18, 199:8, 199:21
**1330** [4] - 3:16, 195:19, 199:8, 199:21
**1331** [4] - 3:16, 195:19, 199:9, 199:21
**1332** [4] - 3:16, 195:19, 199:9, 199:21
**1332-A** [4] - 3:17, 195:19, 199:9, 199:21
**1333** [4] - 3:17, 195:19, 199:9, 199:21
**1334-A** [7] - 3:17, 195:19, 197:21, 197:22, 197:24,

**199:9, 199:21**
**1335** [1] - 195:23
**1336** [10] - 3:17, 195:19, 195:25, 196:1, 198:3, 199:9, 199:21
**1337** [5] - 3:10, 166:14, 166:17, 167:12, 167:25
**1338** [4] - 3:9, 160:10, 160:15, 198:3
**1338-A** [9] - 3:10, 3:18, 160:11, 160:15, 195:19, 196:1, 198:3, 199:9, 199:22
**134** [1] - 94:1
**1343** [6] - 3:18, 195:19, 196:1, 198:4, 199:9, 199:22
**1343-A** [6] - 3:18, 195:20, 196:1, 198:4, 199:10, 199:22
**1345** [7] - 3:18, 195:20, 195:24, 196:1, 198:4, 199:10, 199:22
**1351** [3] - 3:7, 149:18, 149:24
**1351-A** [4] - 3:7, 149:19, 149:24, 151:2
**1360** [5] - 3:18, 196:8, 198:4, 199:10, 199:22
**1364** [4] - 3:11, 170:6, 170:9, 170:14
**1364-A** [3] - 3:11, 170:7, 170:9
**1369** [4] - 3:11, 170:7, 170:9, 171:1
**137** [1] - 3:5
**1375** [5] - 3:19, 196:8, 198:5, 199:10, 199:22
**1376** [5] - 3:19, 196:8, 198:5, 199:10, 199:22
**138** [1] - 3:6
**1382** [5] - 3:19, 196:8, 198:5, 199:10, 199:22
**1385** [4] - 3:19, 196:8, 199:10, 199:22
**1385-A** [4] - 3:19, 196:8, 199:10, 199:23
**1399-A** [4] - 3:19, 196:9, 199:10, 199:23
**13th** [1] - 185:14
**1400** [1] - 1:16
**1404** [4] - 3:21, 196:9, 199:11, 199:23
**1414** [4] - 3:14, 189:10, 189:13, 189:23
**1414-A** [4] - 3:14, 189:10, 189:13, 189:23
**1415** [4] - 3:14, 189:10, 189:13, 192:1
**1416** [4] - 3:15, 189:10, 189:13, 192:18
**1418** [1] - 223:23
**1453** [4] - 3:21, 196:9,

**199:11, 199:23**
**1454** [4] - 3:21, 196:9, 199:11, 199:24
**1455** [4] - 3:21, 196:9, 199:11, 199:24
**1455-A** [4] - 3:21, 196:9, 199:12, 199:24
**1456** [4] - 3:21, 196:9, 199:12, 199:24
**1457** [4] - 3:22, 196:9, 199:12, 199:24
**1460** [4] - 3:22, 196:10, 199:12, 199:24
**1463** [4] - 3:22, 196:10, 199:12, 199:24
**147** [1] - 3:6
**149** [1] - 3:7
**15** [1] - 110:11
**150** [3] - 25:19, 31:20, 168:3
**1500** [3] - 21:8, 66:22, 67:3
**157** [1] - 3:7
**16** [5] - 2:13, 3:2, 3:24, 46:13, 150:3
**160** [1] - 3:8
**166** [1] - 3:10
**17** [3] - 48:22, 171:8, 173:24
**170** [1] - 3:11
**176** [1] - 3:12
**178** [1] - 3:12
**17th** [1] - 45:7
**180** [2] - 3:13, 3:13
**182** [1] - 3:14
**1866** [3] - 3:10, 166:14, 166:17
**1875** [4] - 3:13, 180:5, 180:7, 180:12
**189** [1] - 3:14
**19** [1] - 94:13
**19-80181** [1] - 4:2
**19-CR-80181-RAR-1** [1] - 1:2
**199** [1] - 3:15
**1:45** [4] - 108:3, 108:4, 108:24, 110:10

**2**

**2** [6] - 50:19, 104:21, 105:4, 105:10, 105:13, 105:19
**20** [9] - 34:10, 34:11, 47:11, 91:11, 116:1, 157:23, 157:24, 158:1, 212:13
**20,000** [1] - 183:22
**20-plus** [1] - 19:3
**200** [11] - 3:24, 3:25, 8:2, 9:19, 11:6, 16:1, 16:12, 31:20, 84:13, 84:15, 97:25
**20005** [1] - 1:16

**2007** [1] - 19:4
**201-A** [1] - 75:4
**201-B** [1] - 81:12
**201-C** [1] - 81:12
**2010** [1] - 19:5
**2011** [6] - 9:25, 86:9, 87:11, 87:18, 87:22, 98:17
**2012** [1] - 98:21
**2013** [2] - 38:2, 85:13
**2014** [21] - 8:5, 8:20, 9:5, 9:6, 9:9, 9:23, 10:6, 37:19, 40:3, 45:7, 85:9, 85:16, 85:19, 85:21, 87:12, 87:15, 87:18, 90:14, 93:12, 95:21, 98:6
**2015** [4] - 48:25, 49:6, 125:23, 129:3
**2016** [2] - 129:8, 129:15
**2017** [6] - 10:4, 150:3, 158:13, 158:17, 190:6, 192:5
**2018** [5] - 116:7, 116:15, 116:19, 176:21, 177:3
**2019** [1] - 172:3
**2021** [1] - 212:14
**2022** [2] - 1:4, 231:18
**2052** [1] - 1:19
**209-A** [11] - 9:6, 32:6, 32:8, 32:11, 32:13, 37:18, 41:24, 43:14, 43:15, 44:7, 99:7
**209-B** [5] - 3:2, 15:22, 16:9, 37:16, 38:4
**209-C** [4] - 3:2, 15:22, 16:9, 38:19
**209-D** [4] - 3:2, 15:22, 16:9, 39:17
**209-E** [5] - 3:3, 15:22, 16:9, 40:10, 41:6
**209-G** [4] - 3:3, 15:22, 16:9, 41:13
**209-H** [5] - 3:3, 15:22, 16:10, 42:25, 43:2
**21** [1] - 68:9
**21,000** [1] - 81:17
**21,561** [1] - 81:12
**210-A** [7] - 9:6, 43:14, 43:15, 43:17, 43:21, 44:4, 99:13
**210-B** [4] - 3:3, 15:23, 16:10, 45:4
**212-A** [4] - 9:6, 45:12, 45:15, 85:21
**212-B** [4] - 3:3, 15:23, 16:10, 48:14
**213** [1] - 54:11
**213-A** [1] - 48:22
**213-B** [2] - 54:12
**213-D** [1] - 50:19
**214-A** [1] - 51:8
**214-B** [4] - 3:3, 15:23, 16:10, 51:24

**214-C** [4] - 3:4, 15:23, 16:10, 52:13
**214-D** [4] - 3:4, 15:23, 16:10, 52:21
**215** [2] - 53:12, 53:13
**22** [2] - 51:8, 53:13
**220** [1] - 99:25
**22nd** [2] - 136:21, 136:22
**24** [1] - 210:14
**24-D** [1] - 68:12
**2400** [1] - 2:6
**243** [4] - 3:4, 15:23, 16:10, 67:1
**247** [4] - 3:4, 15:23, 16:10, 28:23
**25th** [1] - 13:21
**26** [1] - 34:11
**260** [1] - 1:18
**26th** [1] - 190:6
**27** [1] - 176:20
**28** [3] - 41:24, 158:12, 158:17
**29** [3] - 30:7, 30:10, 33:5
**299** [2] - 1:23, 231:20
**2:00** [1] - 110:10
**2:17** [1] - 110:13
**2:18** [1] - 110:17
**2:32** [1] - 122:15
**2:33** [1] - 123:6
**2:41** [2] - 123:7, 123:10

## 3

**3** [1] - 1:6
**30** [8] - 1:4, 97:8, 181:18, 186:5, 194:7, 194:9, 230:15, 231:18
**30,000** [1] - 61:20
**30303** [1] - 1:19
**30305** [1] - 2:4
**30309** [1] - 2:7
**31** [1] - 192:5
**3131** [1] - 2:3
**319** [1] - 93:25
**32** [2] - 94:9, 168:3
**33** [3] - 36:5, 37:23, 43:15
**3301** [1] - 1:24
**33301** [1] - 231:21
**34** [1] - 43:15
**358** [1] - 6:11
**38** [1] - 112:4
**3:27** [1] - 4:10
**3:54** [2] - 166:1, 166:4

## 4

**40** [1] - 156:5
**408-C** [5] - 3:5, 115:7, 115:11, 115:14, 119:1
**418** [6] - 222:8, 222:13,

222:20, 225:5, 227:21
**418-A** [7] - 222:5, 222:6, 222:10, 222:12, 222:23, 223:1, 226:13
**443-A** [2] - 211:13, 212:4
**444** [1] - 211:14
**446** [1] - 211:14
**45** [1] - 168:1
**450** [4] - 3:5, 136:7, 136:18, 137:4
**48** [6] - 29:5, 29:6, 208:1, 208:13, 210:14, 211:7
**48,000** [1] - 168:5
**4:10** [1] - 166:5
**4:11** [1] - 166:8

## 5

**5** [6] - 92:21, 93:5, 139:2, 139:6, 154:21, 154:23
**5,000** [1] - 164:11
**5/26/2015** [1] - 49:10
**50** [2] - 92:20, 180:19
**50,000** [1] - 168:6
**50-page** [1] - 32:16
**540** [1] - 93:25
**59** [1] - 93:25
**5:00** [1] - 194:24
**5:02** [1] - 195:5
**5:11** [1] - 198:17
**5:16** [1] - 202:9
**5:30** [3] - 194:12, 194:25, 230:24
**5:55** [2] - 1:5, 231:10

## 6

**6** [1] - 43:25
**6/27** [1] - 43:25
**6/5** [2] - 48:25, 49:6
**62** [1] - 116:6
**665** [5] - 3:6, 137:21, 138:6, 138:15, 138:19
**665-A** [4] - 3:6, 137:22, 138:15, 138:19
**667-A** [4] - 3:12, 178:13, 178:16, 178:21
**667-B** [4] - 3:12, 178:14, 178:16, 178:24

## 7

**74,000** [1] - 170:22
**75K** [1] - 171:7
**769-5568** [2] - 1:24, 231:21
**7:00** [1] - 193:3
**7:30** [1] - 12:4

## 8

**8** [3] - 139:5, 139:6, 139:7
**855** [8] - 26:19, 28:2, 28:10, 28:13, 28:25, 39:10, 99:3, 100:11
**855B** [1] - 100:5
**855s** [4] - 85:12, 95:22, 100:2, 100:17
**86141** [2] - 91:5, 98:25
**8:00** [1] - 12:16
**8th** [1] - 1:16

## 9

**90-95** [1] - 151:7
**902** [11] - 212:18, 213:15, 214:9, 215:15, 221:2, 221:6, 221:24, 226:25, 228:7, 228:10, 228:19
**902(11** [1] - 9:11
**902.11** [1] - 6:10
**91** [1] - 185:8
**95** [1] - 175:16
**954** [2] - 1:24, 231:21
**97** [1] - 2:13
**9:00** [1] - 230:20
**9:30** [2] - 230:4, 230:20

## A

**A-1** [4] - 3:25, 196:12, 200:2, 200:10
**A-2** [3] - 3:25, 200:2, 200:10
**A-3** [3] - 3:25, 200:2, 200:10
**A-4** [3] - 3:25, 200:2, 200:10
**A-5** [4] - 3:25, 196:12, 200:2, 200:10
**a.m** [5] - 1:5, 14:25, 200:19, 202:6, 231:8
**ability** [2] - 20:22, 22:3
**able** [14] - 7:22, 11:7, 56:4, 129:10, 136:14, 153:10, 153:12, 203:23, 207:12, 209:25, 219:7, 219:9, 219:13, 228:21
**above-entitled** [1] - 231:16
**absent** [2] - 13:16, 14:10
**absolutely** [8] - 113:17, 123:4, 139:19, 165:6, 165:20, 179:15, 193:9, 211:20
**absorb** [1] - 175:15
**abundance** [2] - 206:9, 221:2
**accept** [2] - 64:3, 64:4
**access** [1] - 185:12
**accidentally** [1] - 109:15
**accommodate** [1] - 230:8
**accordance** [2] - 139:15,

220:11
**according** [5] - 65:5, 90:1, 101:18, 102:7, 197:21
**accordingly** [1] - 190:23
**account** [5] - 81:4, 204:19, 205:13, 207:1, 217:15
**accounted** [1] - 4:4
**accreditation** [1] - 27:21
**accredited** [1] - 27:23
**accurate** [3] - 20:24, 213:12, 231:15
**acknowledging** [1] - 38:14
**Act** [6] - 24:3, 24:4, 27:14, 59:3, 61:5, 107:15
**acting** [1] - 179:4
**action** [2] - 21:21, 121:16
**activities** [1] - 142:24
**actress** [1] - 185:2
**actual** [1] - 225:13
**ad** [6] - 180:17, 182:6, 182:12, 182:14, 182:16, 182:17
**Adair** [5] - 204:25, 205:3, 206:12, 206:20, 207:13
**add** [1] - 13:19
**added** [1] - 223:8
**addiction** [2] - 112:19, 184:11
**addition** [6] - 15:25, 61:25, 63:10, 145:7, 145:18, 183:5
**additional** [6] - 7:25, 11:22, 24:9, 76:15, 201:17, 217:23
**address** [15] - 10:22, 32:18, 33:17, 33:19, 33:22, 46:2, 46:5, 46:6, 46:9, 47:4, 48:18, 52:19, 52:24, 76:10, 94:6
**address..** [1] - 33:16
**addressed** [4] - 39:24, 94:1, 94:2, 94:9
**addresses** [1] - 8:5
**adhere** [3] - 20:25, 27:8, 190:21
**adhered** [1] - 179:3
**adjudicate** [2] - 158:19
**adjudicated** [1] - 159:1
**adjudicates** [1] - 158:21
**adjudicating** [1] - 189:6
**adjudications** [2] - 167:22, 171:20
**administrative** [2] - 74:21, 124:25
**administrator** [2] - 125:5, 152:21
**administrators** [1] - 141:5
**admit** [9] - 16:3, 126:5, 136:17, 138:14, 147:16, 157:6, 176:11, 180:5, 182:21
**admitted** [24] - 8:8, 9:17, 115:11, 136:24, 138:18, 147:24, 149:20, 157:8,

160:12, 160:19, 162:22, 166:15, 168:20, 170:8, 176:13, 178:15, 180:6, 180:10, 182:23, 196:13, 197:22, 197:23, 199:18, 200:8
**admonition** [1] - 204:10
**adult** [3] - 135:11, 145:22, 146:16
**advance** [7] - 17:2, 18:22, 96:12, 180:20, 194:12, 205:5, 210:4
**advanced** [1] - 6:7
**advantage** [4] - 126:15, 164:20, 165:23, 194:11
**advertise** [2] - 72:9, 73:3
**advertisement** [1] - 151:4
**advertising** [3] - 72:8, 180:2, 183:5
**advice** [2] - 60:25, 66:13
**advise** [2] - 4:24, 5:22
**advised** [1] - 4:19
**advisory** [3] - 19:13, 19:15, 19:17
**advocate** [1] - 23:22
**advocated** [2] - 24:9, 24:11
**affect** [1] - 175:8
**affected** [1] - 92:21
**affects** [2] - 112:12, 112:17
**Affordable** [2] - 24:3, 24:4
**afraid** [1] - 28:5
**afternoon** [2] - 11:24, 13:9, 97:22, 97:23, 108:7, 108:8, 109:4, 109:10, 111:10, 115:17, 124:3, 124:4, 154:14, 192:24, 201:18, 203:24, 204:2, 208:15, 209:22, 210:12, 210:23
**afterwards** [1] - 124:23
**agencies** [1] - 42:17
**agency** [7] - 42:1, 42:12, 46:16, 46:23, 84:21, 84:24, 94:15
**agenda** [1] - 186:12
**agent** [1] - 216:10
**agents** [2] - 156:5, 190:16
**aggressive** [5] - 82:22, 82:23, 82:25, 83:2, 186:6
**ago** [6] - 116:1, 128:25, 148:18, 151:21, 173:6, 173:15
**agree** [13] - 51:20, 52:9, 53:21, 55:2, 58:10, 59:11, 59:14, 59:17, 60:2, 214:20, 223:16, 224:4, 230:13
**agreed** [5] - 9:7, 128:5, 158:21, 179:3, 211:8
**Agreement** [1] - 138:8
**agreement** [8] - 54:17,

128:2, 128:6, 128:15, 138:24, 139:15, 178:25, 195:10
**agrees** [1] - 179:5
**ahead** [43] - 5:8, 7:5, 7:10, 9:16, 10:10, 10:15, 10:22, 11:3, 11:5, 13:12, 14:20, 50:10, 57:15, 60:9, 97:15, 99:22, 105:7, 106:19, 108:9, 110:14, 115:13, 117:13, 117:22, 117:25, 123:4, 165:21, 166:2, 166:6, 166:11, 194:22, 195:2, 195:9, 197:1, 198:7, 198:8, 198:24, 199:2, 202:10, 203:8, 207:7, 209:2, 226:24, 230:9
**aired** [1] - 180:19
**airing** [1] - 182:12
**airport** [2] - 130:25, 131:2
**Alabama** [2] - 39:7, 93:4
**alarm** [1] - 142:10
**alarming** [1] - 153:18
**alert** [1] - 5:5
**alerts** [1] - 17:16
**allele** [1] - 163:7
**alleles** [1] - 130:3
**allotted** [1] - 108:11
**allow** [6] - 10:11, 11:3, 62:11, 62:18, 105:5, 198:24
**allowed** [6] - 50:8, 62:14, 91:10, 107:7, 172:17, 198:25
**allowing** [1] - 28:15
**allows** [1] - 212:6
**almost** [5] - 72:25, 112:18, 203:21, 205:7, 210:13
**alone** [1] - 140:25
**ambitious** [1] - 206:24
**amend** [1] - 213:7
**amended** [3] - 43:21, 45:19, 46:1
**Amended** [1] - 48:24
**AMERICA** [1] - 1:3
**America** [3] - 4:3, 174:20, 174:21
**amount** [10] - 8:25, 79:22, 130:7, 158:22, 169:19, 169:21, 173:15, 173:19, 184:23, 203:4
**amounts** [1] - 164:3
**Amy** [1] - 206:24
**analysis** [3] - 22:6, 87:11, 98:16
**analyzed** [2] - 98:9, 98:12
**Angeles** [1] - 193:3
**angry** [1] - 154:4
**announce** [1] - 169:17
**answer** [6] - 25:23, 50:9, 61:15, 71:13, 102:1, 213:17
**Anti** [10] - 19:22, 59:6,

59:11, 59:15, 59:18, 60:1, 60:5, 60:11, 61:3, 62:1
**Anti-Kickback** [10] - 19:22, 59:6, 59:11, 59:15, 59:18, 60:1, 60:5, 60:11, 61:3, 62:1
**anticipate** [1] - 5:10
**anxious** [1] - 176:9
**anyplace** [1] - 135:11
**anyway** [2] - 221:3, 221:12
**AP** [2] - 78:22, 78:23
**apartment** [1] - 31:3
**APC** [1] - 163:8
**apologize** [2] - 28:6, 139:10
**appeal** [3] - 21:25, 22:1, 22:3
**appear** [3] - 36:19, 100:5, 197:24
**appearance** [1] - 179:20
**Appearances** [1] - 2:1
**APPEARANCES** [1] - 1:11
**Appendix** [1] - 94:16
**application** [14] - 30:5, 38:15, 39:18, 40:5, 40:7, 41:18, 41:20, 41:21, 46:1, 48:17, 99:10, 99:15, 100:4, 100:5
**applications** [3] - 43:17, 55:3, 55:10
**applies** [2] - 62:5, 65:7
**apply** [5] - 55:23, 65:10, 65:15, 83:19, 220:5
**appointment** [1] - 120:14
**appointments** [1] - 114:7
**appreciate** [2] - 94:10, 122:25
**approach** [24] - 34:15, 37:6, 44:9, 47:18, 49:7, 50:21, 67:6, 75:11, 77:21, 84:8, 84:14, 97:5, 136:4, 137:18, 147:6, 149:15, 156:22, 160:16, 161:19, 162:17, 163:20, 164:21, 221:25, 222:2
**appropriate** [3] - 101:20, 102:5, 219:22
**approval** [1] - 41:20
**approve** [1] - 28:17
**approved** [3] - 41:18, 152:24, 228:3
**approves** [2] - 28:16, 158:20
**April** [2] - 158:12, 158:17
**architect** [2] - 128:1, 193:23
**area** [14] - 41:4, 134:9, 134:12, 148:9, 169:12, 169:13, 172:13, 172:17, 175:25, 180:24, 182:9, 182:10, 184:18
**areas** [2] - 92:16, 143:13

**arguably** [1] - 13:10

**arguments** [1] - 201:8

**arises** [1] - 202:2

**arising** [1] - 14:3

**arrangements** [3] - 5:24, 6:2, 123:17

**art** [1] - 170:3

**article** [2] - 105:18, 127:11

**ascension** [3] - 144:15, 144:18

**aside** [4] - 12:17, 12:23, 140:20, 177:15

**aspect** [3] - 26:11, 61:7, 66:14

**aspects** [2] - 19:14, 60:11

**asserted** [1] - 121:12

**assess** [1] - 144:13

**assist** [4] - 100:23, 209:25, 210:8, 210:9

**assistance** [1] - 201:17

**assisted** [2] - 111:21, 112:13

**associate** [1] - 179:4

**associated** [2] - 30:15, 191:1

**association** [1] - 191:5

**assume** [8] - 17:1, 17:9, 20:13, 63:12, 63:22, 64:6, 109:16, 181:17

**assuming** [3] - 109:19, 203:25, 227:22

**assurance** [1] - 14:13

**assure** [1] - 213:7

**asterisk** [6] - 32:2, 37:9, 44:14, 44:22, 44:24, 48:7

**Aston** [2] - 131:2, 132:1

**Athens** [5] - 46:21, 52:3, 52:18, 52:24, 53:2

**Atlanta** [12] - 1:19, 2:4, 2:7, 33:2, 46:5, 130:13, 132:2, 134:9, 141:16, 150:8, 157:22, 188:9

**attached** [1] - 222:8

**attachment** [2] - 151:1, 164:5

**attended** [1] - 116:16

**attention** [2] - 38:8, 108:1

**attorney** [2] - 31:7, 31:23

**attorneys** [2] - 16:17, 31:9

**audio** [1] - 63:4

**audiovisual** [1] - 63:1

**audit** [2] - 142:15, 175:24

**auditing** [1] - 179:23

**auditors** [1] - 142:9

**authentic** [6] - 216:25, 218:4, 218:20, 221:15, 223:22, 227:4

**authenticated** [2] - 213:23, 214:13

**authentication** [2] - 213:25, 214:1

**authenticity** [16] - 6:9, 6:15, 6:19, 211:18, 214:4, 214:11, 215:12, 215:16, 217:19, 219:11, 221:6, 224:9, 226:5, 228:7, 228:18, 229:18

**authority** [4] - 68:25, 69:2, 213:24, 214:25

**authorization** [2] - 54:16, 54:22

**authorized** [6] - 99:9, 100:8, 100:9, 100:10, 100:15, 107:19

**automatic** [1] - 103:5

**automatically** [1] - 102:15

**available** [6] - 7:3, 17:9, 100:15, 193:2, 206:10, 206:12

**Avenue** [1] - 1:16

**average** [3] - 170:24, 170:25, 173:15

**averaging** [1] - 171:7

**avoid** [2] - 201:10, 226:17

**aware** [6] - 4:5, 27:19, 149:12, 177:22, 179:14, 202:17

**awareness** [1] - 182:17

---

# B

**back-dooring** [2] - 101:21, 102:6

**background** [2] - 9:2, 16:23, 144:1

**backup** [2] - 175:21, 175:25

**bad** [2] - 155:5, 170:24

**bag** [2] - 188:9

**BAKER** [1] - 2:5

**Baker** [1] - 60:21

**ball** [3] - 153:24, 194:12, 205:5

**ballpark** [1] - 209:4

**bank** [3] - 101:7, 101:9, 205:7

**base** [1] - 144:4

**based** [17] - 8:13, 13:3, 76:22, 89:22, 103:2, 103:5, 103:9, 127:11, 131:16, 151:11, 152:24, 173:7, 207:6, 214:12, 221:3, 224:16, 227:16

**baseline** [1] - 228:17

**basic** [2] - 20:9, 21:1

**basis** [1] - 224:24

**bathroom** [2] - 165:19, 165:22

**BEACH** [1] - 1:2

**Beach** [2] - 111:21, 192:13

**beat** [1] - 209:17

**became** [3] - 131:25, 153:13, 153:14

**become** [3] - 26:23, 39:19, 72:22

**becoming** [1] - 209:23

**bed** [1] - 64:12

**BEFORE** [1] - 1:10

**began** [1] - 98:19

**begin** [4] - 11:5, 15:16, 109:10, 137:13

**beginning** [14] - 9:5, 9:15, 67:11, 91:3, 93:24, 95:5, 161:13, 171:16, 173:10, 177:3, 182:2, 186:22, 193:15, 208:3

**behalf** [3] - 15:7, 16:3, 78:18

**behavioral** [1] - 162:6

**behind** [1] - 186:2

**belabored** [2] - 13:11, 209:23

**bells** [1] - 142:10

**beneath** [1] - 187:24

**beneficiaries** [9] - 23:18, 91:11, 105:12, 145:20, 151:19, 204:19, 205:13, 207:2, 217:15

**beneficiary** [6] - 20:14, 21:24, 75:19, 78:4, 111:23, 204:24

**beneficiary's** [1] - 109:15

**benefit** [4] - 8:17, 82:17, 89:12, 89:25

**Benefits** [2] - 129:25, 158:20

**benefits** [1] - 84:6

**Berarducci** [5] - 165:13, 165:14, 166:21, 170:16, 177:19

**Bernadette** [1] - 56:20

**best** [6] - 133:9, 161:2, 161:18, 162:9, 162:13, 227:9

**better** [4] - 162:3, 200:14, 215:10, 224:3

**between** [27] - 5:24, 23:18, 61:20, 63:8, 63:14, 65:8, 65:11, 71:19, 88:11, 138:3, 143:18, 157:4, 157:18, 168:16, 171:15, 184:15, 185:21, 187:2, 190:9, 190:23, 191:5, 202:16, 205:19, 206:19, 207:12, 211:1

**beyond** [3] - 141:14, 154:9, 169:16

**BG** [2] - 79:24, 80:1

**Bice** [2] - 38:24, 38:25

**big** [2] - 10:25, 31:16

**bigger** [1] - 217:2

**bill** [27] - 20:22, 21:2, 21:4,

21:11, 30:6, 56:11, 64:24, 68:22, 74:5, 76:23, 83:18, 83:21, 84:1, 100:18, 102:13, 106:15, 106:22, 131:13, 131:21, 133:2, 133:11, 142:19, 144:22, 163:6, 191:19, 191:21

**billable** [2] - 144:17, 191:17

**billed** [6] - 77:1, 79:12, 104:13, 126:14, 126:18, 171:12

**biller** [3] - 42:20, 46:18, 46:21

**billers** [1] - 72:11

**Billing** [3] - 32:20, 32:21, 42:12

**billing** [50] - 10:3, 18:4, 41:25, 42:11, 42:18, 46:16, 46:23, 46:24, 65:12, 66:17, 66:18, 68:22, 71:7, 71:10, 72:8, 72:9, 72:12, 72:20, 72:24, 73:6, 73:9, 73:12, 73:15, 75:8, 81:22, 131:8, 131:10, 132:14, 132:20, 133:24, 141:12, 142:7, 142:12, 142:14, 142:18, 142:20, 144:21, 149:7, 149:10, 158:18, 160:7, 169:19, 169:21, 171:8, 171:11, 173:22, 175:24, 211:12, 225:25

**bills** [3] - 66:6, 66:21, 156:16

**binding** [1] - 100:4

**binds** [2] - 99:11, 99:16

**bingo** [3] - 135:10, 145:22, 146:16

**Birmingham** [1] - 39:7

**birth** [6] - 35:1, 35:8, 35:9, 35:23, 76:10, 78:6

**bit** [24] - 7:14, 9:4, 10:24, 19:6, 19:19, 24:24, 61:25, 66:16, 68:21, 82:21, 105:6, 151:14, 159:2, 164:9, 167:6, 181:23, 185:17, 198:20, 200:23, 203:1, 206:24, 209:13, 210:1, 230:8

**bite** [1] - 5:6

**bits** [1] - 151:5

**blank** [3] - 27:12, 28:25, 106:3

**blepharoplasty** [2] - 94:7, 94:9

**blood** [2] - 64:18, 116:23

**blow** [1] - 119:18

**Blue** [2] - 116:3, 133:20

**blue** [3] - 127:13, 127:19, 177:4

**board** [1] - 109:20

**boat** [1] - 159:11

**Boer** [4] - 212:19, 217:10, 227:17, 229:4

**BOER** [56] - 1:13, 4:7, 4:9, 5:10, 6:4, 6:6, 6:22, 7:2, 7:4, 14:16, 28:20, 50:8, 109:7, 109:11, 109:21, 110:1, 110:8, 122:18, 204:4, 205:11, 205:17, 206:2, 206:22, 207:19, 208:4, 209:6, 210:21, 211:8, 211:12, 212:4, 212:20, 212:25, 213:5, 214:20, 217:13, 219:16, 219:18, 221:18, 222:8, 222:12, 222:15, 222:17, 223:16, 223:25, 224:7, 224:25, 225:6, 225:25, 226:4, 226:22, 227:24, 228:3, 229:2, 230:2, 230:21, 231:3

**bond** [4] - 172:8, 172:10, 172:18, 172:22

**booth** [5] - 117:6, 117:7, 117:8, 117:15, 117:16

**born** [4] - 35:13, 35:15, 35:21, 36:21

**boss** [2] - 143:12, 143:14

**bottom** [5] - 67:15, 95:1, 96:5, 130:8, 191:7

**bought** [4] - 31:3, 31:6, 101:7, 131:24

**Boulevard** [2] - 1:23, 231:20

**box** [3] - 68:7, 68:8, 144:9

**Box** [2] - 68:9, 68:12

**boxes** [3] - 67:15, 227:21, 229:23

**braces** [3] - 113:8, 113:9

**brag** [1] - 170:2

**brain** [1] - 127:23

**BRCA** [6] - 130:2, 140:23, 163:16, 163:19, 164:10

**BRCA1** [2] - 163:10, 163:17

**BRCA2** [1] - 163:17

**break** [25] - 5:3, 5:13, 97:9, 103:11, 103:14, 103:20, 107:25, 108:10, 110:2, 110:4, 110:20, 122:7, 122:10, 165:19, 165:22, 166:3, 194:4, 194:20, 195:13, 200:14, 200:16, 203:22, 212:1, 231:2, 231:5

**breakdown** [1] - 168:1

**breaking** [1] - 197:12

**breast** [2] - 140:24, 163:17

**Brett** [20] - 129:9, 129:12, 129:13, 129:14, 129:22, 130:2, 130:9, 130:22, 154:15, 155:1, 155:8, 155:9, 155:10, 172:15, 173:3, 175:6, 184:13, 184:14,

184:17, 186:24

**Brett's** [1] - 187:22

**Brian** [2] - 16:17, 222:20

**BRIAN** [1] - 2:5

**bribes** [2] - 59:13

**brick** [1] - 161:10

**brick-and-mortar** [1] - 161:10

**Brickell** [1] - 187:21

**brief** [5] - 4:7, 103:14, 122:7, 148:10, 165:22

**briefly** [4] - 97:5, 109:3, 125:8, 202:25

**bring** [26] - 6:15, 6:23, 14:22, 28:22, 32:8, 41:6, 41:25, 42:2, 66:25, 75:5, 77:15, 77:16, 77:17, 84:15, 103:20, 108:5, 110:7, 114:7, 157:23, 159:20, 166:6, 195:2, 198:8, 198:14, 215:12, 222:24

**bringing** [4] - 9:10, 156:13, 217:21, 228:11

**brings** [2] - 151:16, 171:17

**broached** [1] - 142:16

**broad** [1] - 11:2

**broadly** [1] - 177:21

**brochure** [2] - 146:22

**brochures** [1] - 148:15

**broke** [2] - 15:4, 132:21

**broker** [1] - 154:19

**brother** [1] - 170:20

**brought** [9] - 4:15, 4:17, 7:21, 121:6, 141:12, 173:21, 184:12, 188:1, 211:10

**Broward** [2] - 1:23, 231:20

**buddies** [1] - 155:2

**buddy** [2] - 155:7, 171:6

**build** [1] - 58:12

**building** [1] - 146:9

**builds** [1] - 146:5

**bullet** [3] - 88:18, 90:8, 92:11

**bunch** [19] - 19:13, 19:24, 23:4, 56:13, 58:17, 62:4, 67:11, 67:23, 68:1, 69:12, 70:8, 76:9, 76:11, 79:1, 82:2, 96:13, 96:15, 96:17, 132:23

**bundle** [2] - 140:15, 179:11

**bundling** [1] - 140:21

**business** [42] - 6:12, 6:14, 42:15, 74:19, 124:25, 130:17, 134:21, 137:9, 141:13, 145:3, 145:7, 149:8, 151:25, 152:13, 152:18, 152:21, 153:11, 154:16, 154:17, 155:3, 171:19, 171:21, 172:11, 175:9, 175:10, 175:11, 178:1, 179:3, 184:12, 186:7, 190:9,

190:14, 190:21, 191:25, 193:8, 212:10, 215:18, 215:24, 220:11, 223:11, 223:12

**busy** [1] - 108:9

**but..** [1] - 45:21

**buying** [2] - 100:20, 180:18

**buys** [1] - 39:9

**BY** [122] - 1:20, 2:13, 2:13, 2:15, 2:17, 2:18, 16:14, 28:24, 30:9, 31:1, 32:10, 33:7, 34:18, 36:7, 37:8, 37:17, 37:25, 38:20, 40:12, 40:24, 41:14, 42:4, 43:1, 43:16, 44:13, 45:5, 45:14, 46:17, 47:13, 47:21, 48:15, 48:23, 50:12, 50:20, 51:9, 51:25, 52:14, 52:22, 53:14, 54:15, 57:16, 57:25, 60:10, 61:17, 67:2, 67:10, 71:15, 75:7, 75:15, 76:5, 76:14, 76:17, 77:19, 77:24, 78:3, 78:16, 78:25, 79:17, 79:25, 80:4, 84:17, 86:5, 87:9, 88:4, 90:9, 93:16, 94:14, 95:20, 96:4, 97:21, 99:24, 102:3, 104:8, 105:9, 106:20, 111:9, 115:16, 117:14, 118:1, 119:5, 119:14, 119:20, 120:9, 120:23, 121:2, 121:20, 124:2, 127:17, 136:8, 137:5, 137:23, 138:23, 147:10, 148:4, 150:1, 157:1, 157:17, 158:14, 160:18, 160:23, 161:23, 162:23, 164:1, 164:25, 166:19, 167:14, 168:22, 170:13, 176:19, 177:2, 178:20, 180:14, 182:5, 183:4, 184:1, 185:9, 187:11, 189:15, 189:25, 192:3, 192:20, 193:12

## C

**C-reactive** [2] - 91:6, 91:16

**C.N** [5] - 2:14, 109:5, 110:25, 111:4, 111:7

**Cabanas** [1] - 111:21

**Cahaba** [18] - 38:6, 39:2, 39:3, 74:8, 74:10, 74:13, 74:14, 74:19, 83:2, 174:19, 174:22, 174:23, 175:4, 175:15, 176:4, 176:22, 176:24

**calculation** [1] - 168:5

**California** [1] - 183:12

**camera** [1] - 217:1

**camp** [1] - 216:23

**campaign** [1] - 187:5

**cancer** [30] - 113:9, 113:10, 113:12, 113:20, 113:21, 114:1, 114:11, 116:9, 116:10, 117:17, 118:10, 118:13, 121:25, 130:5, 131:15, 131:16, 131:17, 140:24, 140:25, 151:6, 151:10, 151:11, 153:22, 163:2, 165:6, 172:21, 174:25, 181:8, 185:4

**cancers** [2] - 163:12, 163:13

**cannot** [2] - 89:17, 162:14

**CAP** [2] - 27:20, 27:23

**capable** [1] - 102:8

**capacity** [1] - 130:20

**caption** [1] - 187:24

**captured** [1] - 77:2

**car** [1] - 23:15

**Carbon** [1] - 131:3

**card** [2] - 29:20, 150:19

**cardiac** [2] - 111:15, 162:6

**care** [16] - 15:17, 62:18, 102:21, 106:23, 112:3, 112:13, 121:21, 124:22, 135:14, 135:18, 139:23, 140:6, 152:7, 202:1, 206:16, 207:12

**Care** [2] - 24:3, 24:4

**career** [1] - 111:15

**cares** [3] - 135:11, 145:22, 146:16

**Carlo** [1] - 159:6

**Carolina** [1] - 78:7

**carryover** [1] - 205:23

**carved** [2] - 204:20, 205:13

**CASE** [1] - 1:2

**case** [29] - 4:2, 4:23, 6:16, 10:1, 49:14, 58:7, 58:9, 61:12, 63:19, 74:8, 76:25, 79:12, 83:23, 89:15, 104:12, 104:14, 106:6, 175:21, 201:2, 201:3, 201:4, 201:6, 206:17, 209:7, 209:12, 209:16, 213:21, 219:22, 220:2

**Casino** [2] - 183:18, 184:9

**cath** [1] - 111:15

**caught** [2] - 173:1, 173:2

**caused** [2] - 98:13, 190:16

**caution** [2] - 206:9, 221:2

**cease** [5] - 189:19, 190:10, 190:24, 190:25, 192:6

**cease-and-desist** [1] - 192:6

**celebrities** [1] - 189:2

**cell** [8] - 131:4, 134:10, 134:12, 134:13, 134:21, 135:4, 135:5, 150:8

**CEO** [5] - 25:21, 25:22,

25:25, 26:14, 49:20
**certain** [14] - 6:10, 13:6, 13:13, 23:22, 91:11, 91:23, 92:16, 104:13, 104:19, 142:7, 152:23, 190:14, 201:21, 217:20
**certainly** [14] - 10:9, 10:19, 10:21, 14:11, 108:19, 197:12, 201:11, 205:7, 208:2, 208:18, 209:18, 215:20, 218:2, 226:25
**certificate** [4] - 6:10, 6:13, 9:11, 228:19
**certification** [30] - 27:1, 27:4, 27:5, 27:6, 27:9, 27:18, 27:20, 27:25, 36:9, 44:3, 44:6, 44:7, 45:15, 47:22, 49:8, 53:15, 103:8, 212:18, 213:5, 213:7, 214:16, 214:22, 215:2, 215:11, 215:21, 223:12, 226:19, 228:10, 229:4, 229:17
**certified** [7] - 26:19, 26:22, 27:15, 69:6, 69:8, 72:22, 214:24
**certify** [1] - 231:14
**cetera** [3] - 110:6, 127:7, 201:15
**CFO** [4] - 26:2, 26:15, 51:15, 53:22
**CGx** [8] - 73:14, 79:12, 90:10, 176:22, 176:24, 187:15, 188:10, 189:1
**chain** [2] - 143:20, 185:17
**chairs** [4] - 103:13, 122:7, 165:21, 195:2
**Chaka** [1] - 120:1
**challenge** [1] - 224:23
**challenges** [3] - 24:21, 73:15, 74:1
**chance** [5] - 161:18, 196:17, 207:16, 209:10
**change** [8] - 13:2, 14:2, 49:12, 73:24, 98:20, 174:15, 175:2, 216:13
**changeable** [1] - 214:2
**changed** [6] - 73:23, 216:15, 219:25, 220:1, 225:24, 228:3
**changes** [12] - 14:14, 152:2, 152:5, 175:11, 215:22, 216:16, 219:1, 219:2, 219:4, 219:6, 219:8, 219:13
**changing** [2] - 123:17, 177:16
**chaos** [2] - 153:13, 153:14
**charge** [8] - 26:7, 56:25, 132:13, 152:22, 164:3, 193:13, 193:14, 193:21

**charged** [1] - 213:21
**charges** [1] - 133:13
**charts** [1] - 145:10
**check** [5] - 106:3, 110:5, 226:23, 227:21, 227:24
**checked** [1] - 229:23
**checking** [2] - 144:9, 226:11
**child** [1] - 127:23
**chiropractor** [1] - 116:25
**choose** [1] - 219:12
**chose** [1] - 71:22
**Chris** [2] - 5:18, 213:18
**chromosome** [1] - 163:8
**chunk** [1] - 225:11
**circle** [2] - 130:16, 169:8
**circles** [1] - 159:17
**circumstances** [4] - 13:17, 14:3, 14:10, 22:8
**City** [1] - 111:17
**city** [2] - 33:17, 36:20
**claim** [12] - 21:14, 21:17, 21:22, 21:24, 22:2, 22:5, 22:9, 75:19, 80:22, 102:12, 102:21, 102:24
**claiming** [1] - 213:23
**claims** [14] - 20:25, 65:5, 65:18, 66:8, 66:9, 74:25, 75:2, 81:4, 82:22, 102:15, 102:20, 102:23, 106:5, 106:7
**clarification** [1] - 210:16
**clarify** [1] - 10:11
**classes** [1] - 69:12
**clean** [1] - 215:6
**cleaner** [1] - 226:18
**clear** [16] - 8:19, 107:12, 108:21, 121:10, 134:16, 134:17, 174:15, 205:11, 205:15, 213:16, 214:21, 215:21, 217:11, 220:14, 227:25, 229:5
**clearer** [1] - 28:7
**clearly** [7] - 6:12, 8:13, 50:6, 102:23, 216:20, 217:22, 223:6
**clerk** [1] - 84:12
**CLIA** [7] - 27:1, 27:4, 27:5, 27:6, 27:9, 27:11, 27:15
**click** [2] - 178:9, 178:10
**Clifford** [1] - 40:15
**clinical** [12] - 27:13, 55:22, 86:23, 87:1, 91:12, 91:23, 93:19, 93:25, 94:6, 124:11, 124:15, 129:5
**Clio** [1] - 177:7
**close** [1] - 37:11
**closing** [4] - 31:7, 31:9, 31:21, 201:8
**closings** [1] - 50:4
**clothing** [1] - 127:12

**club** [1] - 188:1
**CMS** [20] - 8:20, 38:6, 38:14, 39:10, 41:15, 41:17, 52:23, 55:3, 84:21, 87:2, 90:5, 90:6, 94:23, 95:5, 95:6, 95:9, 95:12, 95:22
**Code** [3] - 19:24, 20:2, 91:5
**code** [15] - 68:18, 78:11, 98:25, 99:1, 101:19, 102:12, 133:1, 133:9, 162:6, 162:7, 225:21, 225:22, 225:24
**coder** [2] - 69:6, 72:22
**coders** [2] - 69:8, 74:3
**Codes** [3] - 105:21, 105:25, 106:3
**codes** [86] - 9:25, 10:4, 29:13, 68:4, 68:5, 68:10, 68:12, 69:22, 69:25, 70:2, 70:14, 70:16, 72:18, 72:19, 73:20, 73:25, 74:5, 76:18, 76:19, 77:10, 77:12, 78:15, 78:17, 79:1, 83:4, 83:16, 83:19, 83:21, 83:24, 84:1, 84:2, 84:4, 86:10, 87:11, 87:22, 88:19, 88:24, 89:4, 89:5, 90:21, 93:5, 94:6, 98:20, 101:13, 101:16, 101:21, 102:6, 102:7, 102:9, 102:12, 104:13, 104:16, 104:19, 104:22, 105:13, 105:19, 130:6, 132:23, 132:24, 133:10, 133:11, 133:14, 133:15, 133:24, 152:2, 160:7, 161:2, 161:16, 162:5, 162:15, 163:2, 163:6, 163:15, 164:4, 165:2, 179:10, 179:11, 191:16, 191:22, 225:19, 226:3, 227:14
**coding** [6] - 68:22, 152:6, 165:4, 165:5, 226:10, 227:15
**coffee** [1] - 108:5
**COLA** [3] - 27:18, 27:20, 27:25
**cold** [1] - 132:25
**collapse** [1] - 175:10
**collect** [9] - 134:7, 134:14, 143:22, 145:13, 145:15, 145:16, 145:20, 146:17, 164:13
**collected** [2] - 76:22, 136:3
**collecting** [4] - 146:20, 150:22, 153:19, 173:16
**collection** [2] - 137:14, 191:21
**collector** [1] - 145:15
**collectors** [2] - 143:21, 161:15
**college** [2] - 25:6, 25:14
**colon** [1] - 151:6

**Column** [3] - 78:10, 78:23
**column** [1] - 79:18
**columns** [1] - 67:23
**combination** [2] - 104:21, 206:12
**comfort** [1] - 215:11
**comfortable** [1] - 214:14
**coming** [7] - 6:7, 72:19, 125:1, 157:21, 158:22, 210:14, 226:17
**comments** [3] - 94:15, 223:5, 227:21
**commercial** [5] - 180:18, 181:2, 181:10, 188:15, 189:1
**commercials** [1] - 145:23
**commission** [3] - 168:1, 168:5, 170:22
**commit** [1] - 126:4
**commitment** [2] - 146:5, 146:9
**communicate** [5] - 82:21, 153:5, 156:17, 165:14, 167:5
**communicated** [2] - 166:21, 167:3
**communicating** [2] - 143:5, 160:3
**communication** [1] - 202:18
**communities** [3] - 134:8, 145:24, 146:1
**community** [3] - 143:21, 150:7, 182:18
**companies** [6] - 29:22, 29:25, 30:2, 72:8, 73:2, 126:23
**company** [35] - 23:23, 30:17, 32:22, 46:8, 47:1, 47:14, 47:25, 50:1, 57:17, 57:19, 71:4, 71:6, 126:21, 126:25, 127:1, 127:4, 134:3, 138:3, 138:4, 143:11, 144:21, 146:14, 153:1, 153:12, 156:12, 156:19, 158:5, 167:7, 168:11, 171:4, 173:7, 180:18, 213:1, 223:6
**Compass** [2] - 124:20, 125:1
**competent** [1] - 155:8
**complaint** [4] - 150:11, 150:20, 150:23, 150:25
**complaints** [3] - 149:13, 153:15, 191:20
**complete** [8] - 15:10, 97:15, 97:16, 103:12, 124:11, 179:24, 218:19, 220:21
**completed** [2] - 15:4, 15:10
**completely** [3] - 89:9, 89:20, 218:4
**complexity** [1] - 106:11
**compliance** [13] - 26:4,

58:25, 61:1, 61:21, 178:6, 178:8, 179:2, 179:16, 179:20, 179:21, 179:23, 179:24, 190:22

**complicated** [15] - 29:21, 59:8, 59:9, 59:12, 72:14, 72:21, 73:9, 73:12, 106:14, 106:21, 106:24, 106:25, 107:3, 107:4, 107:9

**complies** [1] - 81:5

**comply** [3] - 9:8, 107:17, 190:17

**component** [2] - 63:1, 63:4, 64:24

**compounding** [3] - 125:17, 126:23, 130:16

**compounds** [4] - 125:6, 125:8, 125:9, 126:9

**comprehensive** [3] - 140:15, 140:18, 164:12

**computer** [1] - 196:14

**Comtron** [6] - 71:4, 71:7, 71:10, 71:16, 71:19, 72:6

**conceal** [1] - 81:19

**concept** [3] - 106:15, 106:21, 106:25

**concepts** [1] - 108:17

**concern** [25] - 8:20, 13:22, 190:16, 210:24, 211:17, 212:22, 213:7, 213:11, 213:16, 214:10, 214:12, 214:24, 215:3, 215:19, 216:1, 217:9, 217:20, 218:23, 220:17, 225:1, 225:5, 225:24, 226:9, 228:11, 228:13

**concerned** [2] - 187:1, 221:3

**concerns** [8] - 4:5, 5:4, 6:3, 8:4, 16:3, 110:6, 208:17, 227:9

**conclude** [1] - 35:20

**concluded** [1] - 97:24

**concluding** [1] - 95:23

**conclusion** [1] - 89:23

**concurs** [3] - 95:6, 95:9, 95:13

**conditions** [2] - 65:14, 81:5, 172:10

**condo** [2] - 131:6, 132:3

**conduct** [2] - 126:5, 190:13

**conducting** [2] - 15:8, 198:22

**confer** [1] - 195:10

**conference** [2] - 147:12, 148:5

**conferred** [1] - 7:20

**confident** [1] - 207:25

**confirm** [1] - 110:1

**confirmation** [1] - 214:15

**Confirmatrix** [3] - 155:25, 156:5, 156:11

**confirmed** [1] - 131:6

**conformed** [1] - 226:6

**confuse** [1] - 10:9

**confusion** [1] - 186:23

**congregate** [1] - 135:11

**connect** [1] - 187:22

**connection** [5] - 103:5, 103:9, 107:18, 159:19, 185:21

**considerable** [1] - 8:25

**considered** [1] - 140:13

**consistency** [2] - 87:3, 146:10

**consistent** [2] - 50:3, 50:13

**consistently** [1] - 173:19

**conspiracy** [2] - 126:4, 172:12

**constantly** [1] - 112:25

**consult** [1] - 143:24

**contact** [17] - 30:12, 30:14, 30:18, 30:21, 30:23, 33:8, 33:22, 38:16, 40:9, 43:12, 100:7, 100:13, 132:1, 171:14, 184:16, 184:17, 213:6

**contacting** [2] - 148:24, 171:13

**contacts** [1] - 143:8

**contained** [1] - 222:25

**contents** [3] - 99:10, 99:15, 100:3

**context** [1] - 82:12

**continuation** [3] - 159:3, 159:13, 161:24

**continue** [7] - 62:18, 62:22, 104:4, 105:7, 108:14, 201:2, 201:16

**continued** [5] - 2:1, 87:19, 172:22, 191:25, 193:8

**contract** [5] - 57:21, 74:21, 137:15, 138:3, 138:10

**contractor** [2] - 19:5, 179:4

**contracts** [1] - 127:6

**Control** [1] - 75:23

**control** [1] - 213:14

**convenient** [1] - 5:13

**conversation** [8] - 140:20, 154:7, 159:3, 162:12, 168:16, 169:2, 169:10, 188:24

**conversations** [3] - 140:21, 154:7, 177:11

**conversely** [2] - 93:2, 93:4

**conversions** [1] - 149:6

**conveyed** [1] - 163:4

**Cooke** [2] - 150:6, 150:10

**cool** [1] - 187:16

**cooperate** [1] - 128:5

**cooperating** [1] - 210:17

**cooperation** [1] - 185:12

**cooperative** [1] - 210:5

**cooperator** [2] - 210:20, 221:21

**cooperators** [1] - 211:2

**copied** [1] - 167:17

**copies** [2] - 197:6, 197:14

**copy** [9] - 11:9, 28:25, 67:3, 84:11, 84:12, 94:18, 94:19, 218:10, 219:8

**corner** [2] - 32:18, 49:3

**correct** [87] - 6:4, 6:22, 21:2, 21:23, 22:4, 23:14, 24:23, 25:1, 25:2, 26:17, 27:3, 29:18, 30:16, 31:19, 31:22, 31:25, 33:24, 34:1, 34:2, 34:3, 34:5, 34:6, 35:5, 36:3, 36:4, 36:22, 38:13, 38:18, 39:22, 40:8, 40:13, 41:9, 41:19, 41:22, 43:18, 45:8, 46:20, 48:8, 48:21, 52:11, 52:16, 52:19, 53:7, 53:9, 58:18, 58:23, 59:6, 59:22, 62:6, 62:7, 63:9, 65:7, 65:8, 65:16, 67:20, 68:2, 69:17, 71:23, 76:24, 77:3, 77:4, 77:9, 79:11, 80:21, 89:15, 91:18, 94:7, 109:6, 109:7, 109:19, 121:12, 121:13, 122:17, 126:2, 147:15, 154:24, 167:10, 182:7, 185:3, 190:4, 191:17, 199:16, 199:17, 205:17, 206:22, 224:7, 224:25

**correctly** [3] - 9:22, 148:21, 173:22

**correlating** [1] - 88:17

**correlation** [1] - 88:11

**correspondence** [5] - 18:2, 46:2, 55:3, 190:12, 191:3

**cost** [18] - 86:11, 86:16, 86:18, 88:5, 88:12, 88:17, 118:18, 168:2, 168:4, 168:7, 168:8, 168:11, 168:13, 168:14, 169:5, 169:17, 169:20

**costs** [2] - 169:6, 188:17

**counsel** [3] - 13:16, 15:13, 104:6

**counselor** [1] - 120:19

**count** [2] - 200:24, 225:9

**country** [2] - 35:15, 92:17

**couple** [18] - 47:16, 56:6, 69:19, 69:20, 102:19, 103:11, 126:7, 130:23, 134:3, 141:15, 143:15, 152:8, 152:10, 169:24, 184:19, 194:25, 200:13, 209:4

**course** [15] - 8:8, 8:25, 20:24, 65:17, 77:5, 82:3, 108:12, 186:13, 191:20, 197:15, 200:22, 201:13, 202:1, 218:7, 220:4

**courses** [1] - 69:12

**COURT** [256] - 1:1, 4:2, 4:8, 5:1, 6:1, 6:5, 6:18, 6:23, 7:3, 7:5, 7:9, 7:14, 7:18, 9:14, 10:7, 10:10, 11:11, 11:16, 11:19, 12:25, 14:7, 14:17, 14:20, 14:24, 15:1, 15:19, 15:24, 16:2, 16:7, 34:16, 37:7, 44:11, 47:20, 50:10, 57:13, 57:23, 60:8, 61:14, 67:8, 71:12, 75:13, 76:2, 77:22, 84:10, 84:14, 96:3, 96:24, 97:3, 97:6, 97:10, 97:14, 99:21, 101:25, 103:10, 103:17, 103:19, 103:25, 104:2, 105:5, 106:18, 107:21, 107:24, 108:25, 109:2, 109:8, 109:12, 109:19, 109:23, 110:3, 110:9, 110:14, 110:16, 110:18, 111:1, 114:15, 114:19, 114:23, 115:1, 115:4, 115:9, 115:11, 117:12, 117:21, 119:2, 121:9, 121:14, 121:19, 122:4, 122:14, 122:16, 122:19, 122:20, 122:22, 122:24, 122:25, 123:4, 123:8, 123:9, 123:11, 123:14, 123:16, 127:16, 136:5, 136:19, 136:22, 136:24, 137:3, 137:19, 138:16, 138:18, 138:22, 147:7, 147:18, 147:23, 148:3, 149:16, 149:20, 149:23, 156:23, 157:8, 157:12, 160:12, 160:17, 160:22, 161:20, 161:22, 162:18, 162:20, 163:21, 163:24, 164:22, 164:24, 165:20, 165:25, 166:2, 166:6, 166:7, 166:9, 166:15, 167:13, 168:21, 170:8, 170:12, 176:13, 176:18, 177:1, 178:15, 178:19, 180:6, 180:10, 180:13, 181:16, 181:19, 181:23, 182:1, 182:23, 183:3, 183:25, 187:10, 189:11, 189:24, 192:2, 192:19, 193:11, 194:2, 194:4, 194:7, 194:11, 194:18, 194:22, 195:6, 195:15, 195:23, 196:1, 196:4, 196:7, 196:16, 196:21, 197:1, 197:10, 197:16, 197:19, 198:1,

198:7, 198:16, 198:18, 199:15, 199:18, 200:3, 200:5, 200:8, 200:15, 202:8, 202:10, 202:14, 202:17, 202:23, 203:12, 203:14, 203:18, 205:1, 205:15, 205:24, 206:3, 206:8, 207:4, 207:20, 208:5, 208:22, 208:25, 209:9, 210:2, 210:6, 210:10, 210:22, 210:25, 211:11, 211:15, 211:21, 211:25, 212:15, 212:21, 213:4, 213:10, 214:8, 214:23, 216:7, 216:17, 217:10, 217:16, 218:25, 219:15, 219:17, 220:15, 221:22, 222:2, 222:6, 222:14, 222:16, 223:14, 223:20, 224:3, 224:8, 224:23, 225:1, 226:2, 226:7, 226:24, 228:2, 228:6, 229:3, 230:1, 230:6, 230:22, 231:4, 231:7

**Court** [27] - 1:22, 1:23, 4:1, 4:24, 5:22, 7:22, 9:14, 13:16, 13:18, 13:20, 14:6, 103:23, 110:12, 123:6, 166:4, 201:18, 210:8, 216:2, 217:6, 221:5, 224:15, 227:25, 230:4, 231:10, 231:19, 231:20

**court** [6] - 7:14, 97:13, 109:21, 117:24, 121:10, 194:21

**Court's** [3] - 10:10, 108:14, 204:10

**courtroom** [3] - 127:8, 196:25, 202:2

**COURTROOM** [2] - 111:3, 111:5

**cover** [11] - 28:8, 79:10, 81:21, 140:15, 153:11, 163:12, 188:17, 203:2, 203:6, 211:1, 215:2

**Coverage** [4] - 8:11, 8:12, 85:1, 89:19

**coverage** [39] - 8:4, 9:8, 11:2, 23:3, 24:5, 24:10, 65:10, 65:13, 69:4, 73:22, 73:23, 82:8, 85:7, 85:13, 86:20, 87:4, 88:19, 88:25, 89:3, 89:6, 89:8, 90:20, 91:5, 91:10, 91:13, 91:24, 92:12, 94:20, 94:21, 95:23, 95:24, 98:12, 98:13, 98:18, 105:18, 174:12, 174:18, 174:22, 177:16

**covered** [23] - 23:4, 23:13, 23:19, 23:22, 23:23, 53:1, 55:7, 63:5, 63:9, 63:15,

68:22, 74:17, 74:20, 77:7, 80:20, 81:21, 82:11, 92:4, 92:22, 183:19, 186:18, 203:21

**covering** [4] - 74:16, 74:22, 74:23, 108:8

**COVID** [2] - 62:8

**CPT** [26] - 56:8, 56:9, 56:12, 68:5, 68:12, 68:18, 69:22, 70:14, 73:19, 73:25, 76:19, 91:5, 98:21, 101:13, 101:16, 101:18, 101:21, 102:12, 105:15, 163:5, 163:15, 164:4, 165:2, 179:11, 227:14

**CPT-10** [1] - 160:7

**Craig** [3] - 60:23, 213:19, 213:20

**cream** [2] - 125:11

**creams** [1] - 125:9

**create** [1] - 85:7

**Create** [1] - 8:11

**created** [8] - 73:15, 90:18, 95:23, 222:24, 223:3, 223:13, 223:19, 227:25

**creates** [1] - 74:1

**creating** [1] - 94:20

**credential** [1] - 28:10

**credentialed** [2] - 28:14, 29:17

**Credentialing** [2] - 41:2, 42:6

**credentialing** [11] - 30:1, 30:2, 30:4, 32:22, 42:17, 46:7, 46:8, 47:2, 47:4, 55:7, 81:24

**crime** [2] - 126:1, 128:13

**CRIMINAL** [1] - 1:15

**criteria** [7] - 145:11, 174:16, 174:23, 174:24, 175:4, 175:15, 179:6

**Cross** [1] - 133:20

**cross** [25] - 7:16, 9:13, 9:15, 12:8, 12:19, 15:8, 15:13, 15:16, 105:6, 106:7, 114:15, 198:12, 198:23, 199:4, 200:21, 203:5, 203:16, 216:8, 225:13, 228:14, 228:15, 228:20, 230:12, 231:8

**CROSS** [2] - 2:13, 16:13

**cross-examination** [13] - 7:16, 9:13, 9:15, 15:8, 105:6, 114:15, 198:12, 198:23, 199:4, 200:21, 203:16, 230:12, 231:8

**CROSS-EXAMINATION** [2] - 2:13, 16:13

**cross-examine** [1] - 216:8

**Cross/Blue** [1] - 116:3

**CRP** [4] - 91:8, 91:10,

91:12, 91:16

**CRR** [2] - 1:21, 231:19

**cup** [1] - 150:15

**cure** [1] - 215:25

**custodian** [5] - 6:15, 6:24, 211:9, 213:6, 228:12

**custody** [5] - 13:20, 13:23, 172:1, 172:5, 213:13

**customized** [3] - 125:9, 125:12, 125:13

**cut** [5] - 4:11, 154:23, 167:8, 186:9, 203:7

**CUYLER** [1] - 1:14

**CXXX** [1] - 77:17

**CXXXXXX** [1] - 111:7

**cycle** [5] - 43:8, 70:19, 70:21, 71:1, 71:10

**cycles** [1] - 43:3

**cyclobenzaprine** [1] - 125:10

# D

**D.C** [1] - 1:16

**D.D** [2] - 38:24, 38:25

**D.J** [4] - 54:12, 76:12, 78:10, 95:19

**D.N** [1] - 111:18

**daily** [1] - 143:6

**Daniel** [2] - 96:6, 96:8

**data** [9] - 18:4, 18:17, 74:25, 75:2, 75:8, 104:17, 144:12, 167:21, 167:22

**database** [1] - 98:13

**DATE** [1] - 231:18

**date** [25] - 35:8, 35:9, 35:23, 36:18, 37:18, 38:1, 43:25, 45:21, 49:4, 49:10, 51:3, 54:3, 76:10, 78:6, 98:5, 113:14, 136:20, 138:12, 138:13, 150:2, 168:6, 172:5, 190:5, 192:4

**dated** [4] - 45:6, 45:19, 48:25, 85:9

**daughter** [2] - 184:11, 184:25

**daughter's** [1] - 184:25

**David** [3] - 71:24, 186:2

**day-to-day** [5] - 112:14, 152:21, 156:20, 193:15, 193:21

**days** [6] - 130:23, 146:6, 192:6, 207:16, 209:4, 230:4

**DE** [56] - 1:13, 4:7, 4:9, 5:10, 6:4, 6:6, 6:22, 7:2, 7:4, 14:16, 28:20, 50:8, 109:7, 109:11, 109:21, 110:1, 110:8, 122:18, 204:4, 205:11, 205:17, 206:2, 206:22, 207:19, 208:4,

209:6, 210:21, 211:8, 211:12, 212:4, 212:20, 212:25, 213:5, 214:20, 217:13, 219:16, 219:18, 221:18, 222:8, 222:12, 222:15, 222:17, 223:16, 223:25, 224:7, 224:25, 225:6, 225:25, 226:4, 226:22, 227:24, 228:3, 229:2, 230:2, 230:21, 231:3

**de** [4] - 212:9, 217:10, 227:17, 229:4

**deal** [9] - 155:8, 171:18, 172:15, 186:10, 186:14, 186:21, 186:24, 194:9, 215:6

**dealing** [2] - 8:23, 112:5

**December** [4] - 38:2, 38:3, 85:13, 185:14

**decent** [1] - 207:11

**decide** [4] - 21:16, 128:21, 144:23, 224:11

**decided** [4] - 14:2, 22:5, 131:23, 169:6

**decides** [4] - 20:16, 21:21, 22:2, 22:8

**deciding** [1] - 74:19

**decision** [6] - 12:22, 14:3, 21:14, 21:18, 21:25, 22:3

**deck** [1] - 205:8

**deduct** [1] - 168:4

**defeats** [1] - 12:6

**defendant** [2] - 127:15, 136:6

**DEFENDANT** [2] - 1:17, 2:2

**Defendant** [1] - 1:7

**Defendant's** [1] - 16:1

**DEFENDANT'S** [1] - 3:23

**defending** [1] - 150:12

**defense** [23] - 4:9, 6:9, 9:19, 11:11, 15:7, 15:13, 15:21, 197:5, 197:7, 200:1, 208:17, 209:15, 210:9, 211:17, 216:19, 216:23, 217:19, 217:22, 218:12, 221:19, 228:16, 229:16, 231:4

**Defense** [6] - 8:2, 16:12, 84:13, 97:25, 196:11, 200:10

**defense's** [1] - 214:15

**defined** [3] - 86:21, 87:1, 93:19

**degree** [1] - 133:20

**deliberately** [2] - 151:13, 151:18

**deliberating** [1] - 201:7

**demand** [1] - 190:20

**dementia** [4] - 112:10, 112:11, 112:14, 112:17

**denied** [1] - 22:1

**deny** [2] - 102:15, 102:25

department [1] - 185:13
Department [2] - 8:9, 84:18
DEPARTMENT [1] - 1:15
depended [1] - 92:4
deputy [1] - 202:2
DEPUTY [2] - 111:3, 111:5
describe [6] - 91:16, 131:1, 133:9, 137:6, 143:10, 179:16
described [5] - 39:17, 43:21, 45:18, 105:18, 135:6
describing [8] - 119:10, 148:6, 148:18, 178:22, 218:21, 218:22, 220:3, 220:7
description [2] - 79:6, 127:21
designate [1] - 30:18
designed [5] - 8:16, 86:16, 193:22, 193:23, 201:24
desire [1] - 157:13
desist [4] - 189:20, 190:10, 190:25, 192:6
detail [1] - 226:4
detailed [1] - 208:11
detect [2] - 140:24, 151:10
detected [2] - 120:11, 142:24
detection [2] - 151:8, 151:9
detects [1] - 151:10
determination [6] - 11:2, 22:16, 82:8, 91:25, 95:23, 174:19
Determinations [2] - 8:11, 85:2
determinations [4] - 8:4, 13:1, 73:22, 94:20
determine [3] - 22:19, 98:13, 217:1
develop [6] - 55:24, 56:5, 57:2, 58:2, 58:11, 88:10
developed [3] - 56:6, 56:7, 56:8
developing [1] - 24:13
development [2] - 56:16, 124:25
diabetes [4] - 4:18, 5:5, 110:6, 112:9
diabetic [1] - 121:6
diagnosis [11] - 68:9, 68:10, 68:18, 70:2, 70:16, 77:12, 78:15, 79:1, 132:24, 162:6, 162:7
diagnostic [1] - 94:6
different [46] - 19:14, 23:21, 27:6, 29:9, 30:19, 36:2, 47:14, 51:10, 52:7, 55:20, 56:7, 56:12, 56:13, 56:14, 56:18, 62:4, 62:17, 68:4, 70:8, 78:17, 82:2, 82:5, 94:5, 96:13, 96:15, 96:17, 105:14, 127:7, 130:3, 130:6,

133:13, 140:11, 140:13, 147:20, 153:1, 163:11, 163:12, 163:13, 171:22, 172:15, 174:20, 176:23, 177:8, 216:13, 216:20
differently [5] - 82:21, 86:21, 88:20, 89:4, 152:4
difficulties [1] - 8:21
difficulty [2] - 224:14, 224:15
DIRECT [6] - 2:15, 2:17, 2:18, 111:8, 115:15, 124:1
direct [15] - 15:5, 24:12, 25:22, 28:5, 32:14, 77:6, 82:16, 140:1, 145:9, 145:23, 166:10, 204:13, 228:22, 229:20
direct-to-patient [1] - 145:23
direct-to-physician [2] - 140:1, 145:9
directed [1] - 134:2
direction [1] - 223:8
directly [6] - 19:5, 171:14, 171:18, 171:20, 171:24, 220:9
directs [1] - 101:18
disadvantage [1] - 12:15
disadvantaged [1] - 145:24
disagree [4] - 10:13, 58:5, 92:5, 228:6
disagreements [1] - 23:18
disciplined [2] - 189:16, 189:19
disclosed [1] - 8:1
discontinue [2] - 191:4, 191:5
discovered [2] - 129:6, 188:6
discrepancies [2] - 190:15, 193:6
discretion [1] - 215:15
discuss [25] - 108:15, 133:23, 134:1, 139:20, 139:21, 140:3, 140:8, 141:21, 146:15, 149:2, 151:23, 153:25, 156:6, 162:15, 165:5, 168:13, 169:25, 171:8, 175:12, 176:4, 186:4, 187:3, 191:9, 201:3, 201:4
discussed [12] - 5:21, 108:17, 135:7, 162:3, 162:9, 162:13, 165:3, 169:5, 180:1, 183:7, 183:10, 227:13
discussing [6] - 169:4, 174:11, 176:7, 184:8, 184:22, 202:20
discussion [3] - 133:17, 175:8, 227:14

Discussion [1] - 197:11
discussions [1] - 132:15
disease [2] - 105:16, 133:1
disjointed [1] - 200:16
disrupt [1] - 230:16
disrupted [1] - 211:4
distributed [2] - 161:6, 161:8
Distribution [1] - 138:8
distributor [2] - 179:3, 179:4
District [2] - 1:23, 231:20
DISTRICT [3] - 1:1, 1:1, 1:10
district [1] - 174:22
divine [1] - 220:21
DIVISION [2] - 1:2, 1:15
doable [1] - 208:14
Doc [1] - 64:12
dock [2] - 159:10, 159:12
Docket [1] - 6:11
docs [1] - 219:14
doctor [38] - 20:16, 20:20, 25:1, 25:8, 25:10, 63:8, 63:14, 64:15, 64:24, 65:3, 65:21, 65:23, 66:1, 66:6, 106:22, 107:4, 114:9, 120:4, 120:6, 120:14, 120:17, 121:6, 121:21, 121:23, 134:6, 144:8, 148:22, 148:24, 153:16, 204:19, 205:13, 207:1, 219:24, 227:3, 228:4, 228:14, 229:8
doctor's [6] - 22:19, 22:23, 146:6, 149:9, 220:6, 226:9
doctor-patient [1] - 219:24
doctors [6] - 62:11, 114:5, 126:13, 152:14, 152:17, 161:10
document [61] - 8:2, 8:4, 8:9, 8:19, 8:21, 11:25, 29:3, 29:4, 29:12, 30:8, 31:11, 32:19, 34:11, 34:14, 34:19, 37:22, 42:11, 43:11, 45:6, 46:14, 47:12, 50:23, 51:10, 54:6, 54:7, 68:19, 78:22, 81:7, 81:12, 84:18, 85:1, 89:18, 95:5, 95:18, 96:5, 96:19, 96:21, 99:19, 114:2, 136:9, 137:7, 137:9, 138:5, 138:9, 151:3, 212:24, 213:13, 216:12, 219:2, 219:8, 219:9, 220:22, 220:25, 222:7, 222:23, 222:25, 223:4, 224:21, 225:2, 225:23
documentation [1] - 58:8
documented [1] - 102:9
documents [20] - 9:5, 9:6, 12:7, 17:14, 17:25, 28:4,

30:19, 30:22, 31:16, 32:13, 32:16, 50:4, 85:11, 96:13, 101:6, 137:24, 214:1, 214:13, 215:22, 227:8
DocuSign [2] - 138:7, 178:9
dollar [1] - 130:7
dollars [4] - 80:12, 142:8, 142:14, 164:15
DONALD [1] - 2:2
donations [1] - 185:4
done [25] - 21:15, 56:17, 56:19, 62:17, 65:12, 98:21, 126:13, 140:18, 144:12, 144:11, 154:9, 181:13, 183:14, 190:21, 198:20, 203:9, 203:13, 205:4, 208:21, 217:8, 220:5, 223:7, 224:18, 230:11
Donelson [1] - 60:21
door [1] - 229:19
dooring [2] - 101:21, 102:6
dot [1] - 176:21
dotted [2] - 101:3, 101:4
double [2] - 226:23, 227:24
double-check [2] - 226:23, 227:24
down [18] - 7:14, 28:8, 40:18, 40:21, 67:15, 77:17, 78:21, 80:3, 84:16, 92:11, 103:22, 132:21, 140:12, 163:9, 163:10, 181:7, 197:2, 209:12
Dr [25] - 56:20, 204:9, 204:18, 204:22, 204:24, 205:8, 205:25, 206:3, 207:1, 207:13, 207:14, 208:12, 209:23, 217:13, 217:18, 217:25, 218:10, 219:20, 220:14, 220:18, 220:20, 221:3, 227:6, 229:19
drafted [2] - 201:18, 201:22
draw [4] - 10:19, 150:15, 219:13
drawing [1] - 27:12
dressing [2] - 179:18, 179:19
Drive [1] - 2:3
drive [1] - 227:22
drives [3] - 223:25, 225:2, 229:12
driving [3] - 131:3, 131:5, 226:16
drooping [1] - 94:8
dropped [3] - 124:10, 153:24, 165:11
dude [1] - 156:8
duly [3] - 111:4, 115:3, 123:25
Dupri [1] - 188:6
during [26] - 8:8, 8:25, 9:12,

24:12, 28:4, 32:14, 42:5, 61:11, 62:21, 63:13, 63:19, 66:18, 77:5, 82:2, 84:5, 91:4, 123:17, 124:17, 124:18, 124:21, 131:22, 135:15, 141:19, 169:9, 172:14, 191:13

**duties** [1] - 139:14

---

# E

**e-mailing** [2] - 161:1, 161:2
**earliest** [2] - 10:5, 13:21
**early** [5] - 74:7, 113:13, 151:7, 151:9, 203:23
**easier** [3] - 28:7, 151:20, 197:2
**easiest** [1] - 218:8
**East** [2] - 1:23, 231:20
**easy** [4] - 69:10, 69:16, 72:16, 72:18
**echo** [2] - 13:6, 181:24
**edges** [1] - 105:6
**edit** [3] - 82:22, 211:23, 212:7
**editable** [3] - 212:8, 213:2, 228:25
**edited** [8] - 212:8, 212:23, 213:8, 213:11, 214:16, 223:5, 224:22, 228:23
**editing** [3] - 56:9, 90:24, 226:11
**edits** [4] - 214:19, 215:22, 216:18, 227:20
**educate** [4] - 111:13, 161:14, 161:15, 177:16
**educated** [1] - 70:14
**effect** [1] - 10:5
**effecting** [1] - 112:14
**effective** [2] - 153:8, 190:13
**efficiency** [1] - 13:10
**effort** [2] - 12:3, 13:7
**either** [9] - 27:21, 28:16, 55:22, 57:19, 71:22, 162:7, 201:12, 204:5, 211:4
**either-or** [1] - 162:7
**electronic** [3] - 21:18, 21:20, 54:16
**electronically** [6] - 21:6, 21:11, 21:15, 21:16, 67:5, 67:21
**eleventh** [1] - 13:2
**eliminate** [1] - 175:16
**eliminating** [1] - 210:7
**email** [42] - 33:16, 33:17, 33:22, 38:21, 39:9, 39:12, 40:13, 40:18, 40:20, 41:6, 46:6, 46:9, 47:4, 113:18, 138:9, 150:2, 150:4, 150:10, 151:1, 160:24, 161:24,

162:2, 162:24, 163:1, 163:4, 164:2, 164:5, 165:1, 167:15, 170:15, 170:17, 171:2, 171:5, 180:16, 180:17, 181:1, 190:1, 192:4, 192:9, 192:22, 222:9, 226:15
**emailed** [1] - 225:7
**emailing** [1] - 170:21
**emails** [6] - 61:20, 71:19, 160:5, 225:9, 227:7, 229:12
**EMILY** [1] - 1:13
**emoji** [1] - 188:22
**employ** [1] - 146:12
**employed** [2] - 57:7, 134:19
**employee** [2] - 204:25, 206:25
**employees** [7] - 25:17, 25:19, 26:13, 158:5, 159:23, 183:18, 185:16
**employer** [1] - 201:19
**employers** [1] - 201:21
**employing** [1] - 145:20
**enact** [1] - 22:9
**encounter** [4] - 63:8, 65:16, 66:7, 79:7
**end** [23] - 10:25, 11:13, 14:8, 14:18, 64:16, 101:12, 135:23, 145:20, 173:12, 177:23, 177:25, 178:1, 178:7, 182:12, 189:5, 193:16, 193:21, 201:6, 206:21, 209:7, 209:12, 231:1, 231:5
**endeavor** [3] - 204:11, 205:21, 214:20
**ended** [1] - 189:8
**ending** [1] - 176:23
**ends** [1] - 176:22
**energies** [1] - 13:13
**enforcement** [2] - 142:25, 179:21
**engagement** [1] - 201:13
**engaging** [1] - 172:12
**enroll** [2] - 100:10, 100:13
**enrollment** [7] - 17:23, 18:1, 18:17, 32:13, 43:22, 45:19, 53:8
**Enrollment** [1] - 48:25
**enter** [1] - 108:5
**enters** [6] - 14:25, 104:1, 110:17, 123:10, 166:8, 198:17
**entire** [6] - 12:14, 165:9, 181:17, 193:23, 213:22, 227:11
**entirely** [1] - 10:8
**entitled** [4] - 8:9, 46:15, 48:24, 231:16
**entity** [4] - 57:24, 77:1, 126:21, 213:14

**Entry** [1] - 6:11
**envelope** [1] - 33:19
**EOB** [1] - 129:24
**equate** [1] - 183:23
**equipment** [1] - 191:4
**escort** [1] - 122:22
**especially** [2] - 73:9, 187:15
**essentially** [3] - 19:4, 28:13, 209:15
**establish** [1] - 214:11
**estimate** [1] - 203:4
**et** [3] - 110:6, 127:7, 201:15
**ethical** [1] - 201:10
**evaluate** [1] - 87:4
**evaluation** [1] - 10:21
**Eve** [1] - 157:21
**evening** [7] - 13:8, 15:3, 132:8, 200:23, 201:11, 202:5, 231:2
**eventually** [2] - 131:24, 175:2
**evidence** [38] - 9:12, 15:21, 16:1, 16:8, 16:11, 16:12, 75:3, 115:8, 115:12, 115:14, 119:3, 137:4, 138:20, 147:25, 149:19, 149:25, 157:16, 160:15, 166:18, 170:6, 170:10, 176:16, 178:13, 178:17, 180:8, 180:11, 183:1, 189:14, 195:8, 198:10, 198:25, 199:3, 199:14, 199:25, 200:11, 201:5, 201:7, 223:11
**evidentiary** [1] - 228:18
**evolution** [2] - 220:8, 228:4
**evolving** [1] - 10:18
**exact** [1] - 175:18
**exactly** [9] - 29:19, 32:2, 66:11, 90:1, 135:25, 178:23, 214:5, 220:17, 221:18
**exaggerating** [1] - 159:25
**exam** [1] - 221:12
**examination** [25] - 7:16, 8:8, 9:13, 9:15, 15:5, 15:8, 66:18, 77:6, 103:12, 105:6, 108:18, 114:15, 166:10, 198:12, 198:23, 199:4, 200:16, 200:21, 203:9, 203:16, 221:23, 226:17, 228:22, 230:12, 231:8
**EXAMINATION** [9] - 2:13, 2:13, 2:15, 2:17, 16:13, 97:20, 111:8, 115:15, 124:1
**examine** [1] - 216:8
**example** [10] - 20:13, 24:3, 63:18, 66:1, 77:15, 91:4, 92:20, 94:7, 209:18, 216:17
**except** [2] - 124:18, 134:23
**exception** [1] - 124:19

**exceptions** [1] - 77:7
**exchange** [7] - 128:11, 128:19, 157:18, 158:13, 159:13, 160:5, 162:2
**excise** [1] - 109:24
**excited** [2] - 183:15, 183:20
**excuse** [5] - 108:23, 109:3, 127:1, 181:22, 202:10
**excused** [5] - 103:16, 107:22, 122:13, 195:4, 202:7
**execute** [1] - 127:25
**exercise** [1] - 144:9
**Exhibit** [59] - 3:1, 3:23, 6:11, 8:2, 9:19, 11:6, 16:1, 16:12, 28:23, 53:13, 67:1, 84:13, 97:25, 99:7, 99:13, 99:25, 104:10, 105:24, 115:7, 115:14, 136:7, 136:18, 137:4, 137:21, 147:9, 147:17, 147:25, 151:2, 156:25, 160:20, 161:21, 162:19, 162:22, 163:22, 164:6, 167:12, 167:25, 168:20, 170:6, 170:7, 170:14, 171:1, 176:11, 178:13, 178:21, 178:24, 180:5, 180:11, 180:12, 180:25, 181:15, 182:21, 183:24, 187:9, 189:23, 192:1, 192:18, 211:13, 223:1
**exhibit** [18] - 7:20, 7:25, 8:1, 8:8, 9:4, 10:4, 33:6, 43:20, 148:2, 195:9, 197:8, 211:22, 211:23, 212:5, 216:23, 223:2, 225:9, 225:16
**Exhibits** [22] - 15:22, 16:9, 138:15, 138:19, 149:18, 149:24, 157:7, 157:15, 160:9, 160:14, 166:14, 166:17, 170:9, 176:15, 178:16, 180:7, 182:25, 189:10, 189:13, 196:12, 199:20, 200:10
**exhibits** [27] - 7:12, 7:15, 7:19, 7:21, 7:23, 9:16, 11:22, 11:23, 15:18, 16:4, 147:20, 194:9, 195:7, 195:12, 196:19, 197:7, 197:15, 198:9, 198:24, 199:3, 199:7, 199:13, 200:1, 200:6, 201:15, 212:8, 227:4
**EXHIBITS** [2] - 3:1, 3:23
**exist** [1] - 8:16
**exits** [6] - 103:18, 109:1, 122:15, 166:1, 195:5, 202:9
**expect** [4] - 5:15, 97:15, 108:4, 209:19
**expectation** [3] - 152:16, 152:23, 209:17

**expectations** [2] - 152:19, 203:3

**expeditiously** [1] - 174:13

**expensive** [2] - 131:22, 140:23

**experience** [7] - 18:24, 19:6, 50:3, 50:14, 73:3, 73:6, 141:9

**expert** [6] - 36:23, 204:9, 204:23, 219:24, 225:25, 227:15

**expertise** [3] - 8:15, 9:1, 143:13

**experts** [9] - 55:9, 58:1, 58:5, 58:10, 74:3, 81:22, 81:23, 81:24

**explain** [11] - 82:12, 83:18, 112:16, 120:15, 143:16, 143:19, 150:18, 154:20, 167:24, 180:15, 217:8

**explained** [1] - 142:6

**explains** [1] - 218:16

**Explanation** [2] - 129:24, 158:20

**explanation** [1] - 215:7

**explanations** [1] - 82:5

**expo** [1] - 116:23

**exposition** [2] - 116:16, 117:1

**extend** [1] - 230:24

**extensive** [1] - 18:24

**extent** [2] - 161:11, 197:13

**extenuating** [1] - 13:16, 14:10

**extra** [2] - 207:3, 230:15

**extremely** [2] - 171:6, 207:25

**eye** [1] - 188:20

**eyelids** [1] - 94:8

---

### F

**face** [1] - 188:22

**facility** [1] - 112:13

**fact** [22] - 10:19, 29:15, 29:22, 55:9, 83:8, 105:12, 107:4, 146:15, 151:6, 169:16, 205:7, 213:24, 214:7, 214:13, 218:3, 221:9, 221:16, 224:17, 224:18, 224:20, 225:23, 229:23

**facts** [1] - 64:23

**Faena** [1] - 192:12

**fair** [12] - 19:7, 20:17, 21:20, 24:13, 35:20, 60:12, 117:6, 128:18, 128:20, 185:13, 185:15, 229:24

**fairly** [2] - 204:6, 206:6

**fairs** [2] - 145:22, 182:19

**faith** [1] - 207:23

**familiar** [3] - 19:17, 31:9, 50:23

**familiarity** [1] - 20:4

**family** [14] - 80:5, 80:9, 80:16, 80:19, 80:25, 108:16, 124:15, 131:16, 139:12, 163:13, 174:24, 181:8, 187:14, 201:1

**famous** [1] - 188:6

**far** [10] - 122:12, 124:9, 134:3, 173:4, 187:1, 198:1, 205:21, 207:24, 227:14, 230:20

**Farah** [1] - 120:1

**fashion** [2] - 217:8, 219:5

**fast** [2] - 112:22, 174:14, 207:21

**faster** [1] - 151:20

**father** [4] - 136:16, 184:7, 184:9, 187:17

**fax** [1] - 34:2

**FBI** [3] - 155:24, 156:2, 156:5

**FDC** [1] - 125:25

**fear** [1] - 151:14

**February** [2] - 142:12, 176:20

**federal** [1] - 107:7

**Federal** [1] - 19:24

**FedEx** [1] - 145:17

**felt** [1] - 155:5

**female** [1] - 181:7

**few** [17] - 77:7, 92:13, 108:8, 118:22, 124:15, 129:5, 134:2, 142:8, 165:11, 172:2, 172:9, 192:6, 194:17, 194:23, 196:2, 198:2, 200:1, 201:17, 203:17

**Fiber** [1] - 131:3

**field** [3] - 102:6, 125:20, 141:10

**fifth** [1] - 204:9

**figure** [4] - 40:19, 171:23, 203:3, 205:18, 205:22, 212:16

**figured** [5] - 109:23, 127:24, 133:2, 133:7, 177:7

**file** [2] - 12:7, 226:20

**files** [29] - 6:10, 6:12, 211:12, 212:25, 213:2, 215:18, 215:24, 217:14, 217:24, 218:5, 219:21, 220:4, 220:8, 220:9, 220:10, 220:21, 222:18, 224:1, 224:2, 225:5, 225:11, 226:16, 227:1, 227:4, 227:17, 227:19, 227:22, 228:23, 229:12

**fill** [3] - 29:23, 145:16, 228:1

**fillable** [2] - 213:8, 223:18

**filling** [2] - 29:16, 50:4

**fills** [1] - 30:17

**final** [2] - 186:19, 198:15

**finally** [1] - 87:2

**finance** [2] - 101:21, 102:6

**financial** [2] - 5:24, 6:2

**financially** [2] - 99:11, 99:16

**findings** [3] - 87:10, 87:21, 87:25

**fine** [8] - 105:7, 117:22, 186:8, 197:7, 198:6, 215:19, 221:23, 225:20

**finish** [5] - 50:9, 60:9, 103:14, 205:24, 230:11

**firm** [2] - 60:17, 60:21

**first** [38] - 22:18, 32:13, 53:18, 54:14, 75:6, 76:6, 85:12, 87:16, 88:9, 93:24, 95:17, 95:18, 98:8, 99:8, 99:14, 109:5, 129:1, 130:24, 131:1, 132:2, 132:16, 133:24, 134:5, 136:3, 138:5, 138:9, 141:7, 141:17, 143:20, 143:25, 147:13, 155:12, 190:8, 194:8, 194:10, 197:20, 219:19

**five** [7] - 103:20, 157:25, 174:21, 194:20, 204:4, 204:6, 204:14

**five-minute** [2] - 103:20, 194:20

**fix** [1] - 154:8

**fixed** [2] - 168:8, 177:6

**flabbergasted** [1] - 130:9

**flag** [2] - 94:13, 142:13

**flagged** [1] - 226:12

**flags** [2] - 142:5, 142:9

**flexibility** [1] - 205:23

**flexible** [1] - 204:16

**flight** [1] - 193:3

**floor** [5] - 15:14, 104:6, 124:24, 125:5, 147:13

**Floor** [1] - 1:16

**flop** [1] - 158:24

**FLORIDA** [1] - 1:1

**Florida** [7] - 1:3, 1:24, 111:17, 111:22, 115:20, 116:21, 231:21

**flow** [3] - 122:10, 194:5, 220:2

**flu** [1] - 132:25

**fluctuate** [1] - 173:19

**fluctuated** [1] - 173:25

**fluent** [1] - 150:24

**flux** [1] - 10:17

**fly** [2] - 129:20, 130:13

**flying** [4] - 157:22, 193:1, 193:17, 206:25

**focus** [6] - 13:13, 112:19, 163:18, 203:19, 208:8, 220:20

**focused** [1] - 225:8

**focuses** [1] - 227:7

**focusing** [2] - 217:14, 227:1

**folks** [17] - 4:12, 23:21, 29:23, 55:24, 59:23, 62:11, 62:14, 67:19, 123:19, 165:21, 181:24, 194:22, 200:16, 206:18, 207:25, 209:3, 217:15

**follow** [4] - 69:3, 108:14, 139:16, 148:16

**following** [7] - 65:6, 97:7, 161:15, 179:2, 191:3, 194:3, 209:7

**follows** [1] - 185:24

**food** [1] - 4:19

**fooled** [1] - 221:20

**FOR** [3] - 1:13, 1:17, 2:2

**foregoing** [1] - 231:14

**forget** [2] - 58:9, 218:3

**forgive** [1] - 57:4

**form** [23] - 21:8, 43:22, 45:19, 48:25, 53:8, 66:23, 67:3, 67:17, 76:21, 101:23, 106:17, 109:17, 136:12, 137:7, 148:22, 214:17, 216:19, 217:8, 219:5, 226:12, 226:13, 226:14, 230:23

**formally** [2] - 199:2, 229:5

**former** [2] - 204:25, 206:25

**forming** [1] - 224:24

**forms** [10] - 17:23, 18:1, 18:17, 45:15, 73:12, 95:22, 167:4, 226:11, 226:12, 228:14

**Fort** [3] - 1:24, 172:16, 231:21

**forth** [2] - 196:15, 212:21

**forward** [2] - 14:14, 157:22

**Foss** [6] - 204:23, 205:3, 206:4, 206:12, 206:19, 207:13

**foundation** [2] - 9:1, 185:4

**founded** [1] - 103:2

**four** [2] - 201:23, 204:6

**fourth** [4] - 124:10, 124:24, 125:5, 200:24

**Fox** [2] - 60:17, 61:21

**frame** [2] - 63:13, 63:19

**France** [1] - 159:8

**Frank** [5] - 167:19, 167:20, 192:25, 193:4, 193:5

**frankly** [1] - 31:8

**fraud** [1] - 126:4

**FRAUD** [1] - 1:15

**Fred** [1] - 186:3
**free** [6] - 31:20, 114:19, 122:4, 134:10, 134:21, 162:4
**Friday** [12] - 150:14, 150:20, 206:18, 206:24, 207:12, 210:12, 210:23, 211:2, 224:12, 227:6, 230:9
**friend** [2] - 129:9, 159:6
**friends** [2] - 108:16, 201:1
**front** [15] - 4:18, 31:12, 31:16, 43:23, 43:24, 98:5, 138:5, 169:3, 169:11, 169:13, 169:15, 177:19, 210:11, 211:24
**fronting** [1] - 159:24
**Frontotemporal** [1] - 112:17
**frontotemporal** [2] - 112:10, 112:11
**fruit** [2] - 145:25, 146:13
**full** [5] - 163:19, 164:11, 185:12, 216:19, 224:1
**fulsome** [1] - 218:18
**fun** [1] - 151:6
**functioning** [1] - 148:13
**functions** [1] - 131:7
**funds** [1] - 54:16
**funnel** [1] - 146:5
**funny** [1] - 184:6
**furthermore** [2] - 86:20, 105:18
**future** [2] - 151:11, 159:20

# G

**G's** [1] - 130:11
**gambling** [2] - 112:20, 184:18
**GARLAND** [1] - 2:3
**gears** [1] - 171:25
**gene** [10] - 130:2, 130:3, 140:23, 140:24, 140:25, 141:1, 141:3, 153:23, 163:8, 163:9
**general** [4] - 21:1, 24:25, 96:9, 203:10
**General** [4] - 8:3, 8:10, 84:23, 85:24
**generally** [5] - 79:10, 143:16, 165:5, 190:19, 191:21
**generate** [1] - 184:15
**generated** [1] - 220:4
**genes** [9] - 55:20, 56:13, 56:15, 140:9, 140:11, 140:12, 140:16, 140:22, 151:12
**genesis** [1] - 212:16
**genetic** [37] - 8:23, 10:3, 17:20, 23:25, 24:5, 24:10,

24:12, 24:17, 58:2, 73:24, 74:5, 74:23, 79:7, 84:1, 98:18, 99:1, 104:24, 107:5, 116:9, 116:10, 120:19, 125:7, 125:18, 126:10, 127:23, 128:24, 129:1, 129:11, 131:19, 143:16, 143:17, 163:2, 165:6, 172:21, 190:18, 221:16, 227:16
**genetics** [5] - 55:12, 55:14, 55:16, 58:11, 81:23
**genome** [1] - 163:7
**gentlemen** [11] - 15:2, 97:14, 104:3, 107:24, 110:19, 121:9, 122:5, 123:12, 166:9, 198:19, 211:21
**Georgia** [16] - 1:19, 2:4, 2:7, 33:2, 46:5, 46:21, 52:4, 52:8, 52:24, 53:2, 93:4, 93:11, 93:12, 134:8, 135:2, 147:1
**geriatric** [1] - 139:21
**geriatrician** [1] - 135:14
**giant** [1] - 23:9
**given** [11] - 11:20, 11:22, 11:24, 66:2, 89:8, 89:19, 94:18, 94:19, 114:4, 146:9, 207:10
**go-between** [1] - 171:15
**goal** [3] - 110:3, 182:16, 182:17
**gold** [1] - 158:22
**gonna** [7] - 113:20, 142:4, 144:23, 144:24, 159:1, 188:19, 228:20
**goods** [11] - 168:2, 168:4, 168:7, 168:8, 168:11, 168:13, 168:15, 169:5, 169:7, 169:17, 169:20
**govern** [2] - 58:18, 90:5
**government** [94] - 4:6, 7:12, 8:1, 8:24, 11:6, 12:11, 12:25, 13:15, 14:13, 15:9, 16:3, 16:9, 18:11, 26:10, 37:4, 56:20, 60:14, 71:22, 75:3, 83:13, 83:16, 102:11, 108:13, 109:16, 109:19, 110:21, 114:24, 115:4, 115:7, 115:14, 123:13, 123:20, 126:20, 128:3, 128:5, 128:10, 128:15, 134:11, 136:17, 137:4, 138:14, 138:19, 147:16, 147:25, 149:24, 157:6, 157:15, 160:8, 160:14, 166:13, 166:17, 170:5, 170:9, 176:10, 176:15, 178:12, 178:16, 180:4,

180:7, 180:11, 182:21, 182:25, 189:9, 189:13, 194:9, 196:18, 196:23, 197:9, 197:14, 199:1, 199:7, 199:13, 199:20, 204:1, 209:5, 210:3, 212:7, 213:1, 214:4, 214:9, 216:10, 216:20, 217:7, 217:21, 217:24, 218:9, 218:15, 218:19, 219:3, 219:12, 226:16, 227:7
**GOVERNMENT** [1] - 1:13
**Government** [3] - 15:22, 28:23, 66:25, 111:4, 115:3, 123:24, 123:25, 136:18
**government's** [15] - 7:1, 7:19, 9:19, 9:21, 14:7, 110:23, 114:21, 147:20, 195:9, 195:12, 196:17, 209:12, 216:25, 223:8, 231:1
**GOVERNMENT'S** [1] - 3:1
**Government's** [41] - 99:7, 99:13, 99:25, 104:9, 105:24, 136:7, 137:21, 138:15, 147:9, 147:17, 149:18, 151:2, 156:25, 160:20, 161:21, 162:19, 162:22, 163:22, 164:6, 166:14, 167:11, 167:25, 168:20, 170:6, 170:7, 170:14, 171:1, 176:11, 178:13, 178:21, 178:24, 180:5, 180:25, 181:15, 182:21, 183:24, 187:8, 189:22, 192:1, 192:17, 211:13
**governs** [1] - 107:14
**grabbing** [1] - 144:7
**graduate** [2] - 25:6, 25:14
**grand** [4] - 163:17, 173:24, 180:19
**great** [4] - 108:24, 185:4, 190:16, 202:5
**greed** [1] - 172:25
**grey** [2] - 127:13, 127:19
**Griner** [2] - 152:23, 154:11
**ground** [3] - 135:3, 145:24, 150:8
**group** [4] - 56:11, 183:12, 183:14, 187:23
**grouping** [1] - 55:21
**groupings** [1] - 104:18
**growing** [1] - 90:11
**guard** [1] - 115:24
**guess** [17] - 72:10, 73:5, 75:8, 82:10, 129:5, 133:9, 134:8, 140:1, 145:24, 180:23, 208:23, 212:22, 214:8, 217:10, 218:8, 228:25
**guessing** [1] - 73:8
**guidance** [4] - 17:14, 59:18,

69:4, 86:18
**guidelines** [1] - 101:18
**guilty** [4] - 126:1, 126:3, 126:5, 126:22
**Gurskis** [4] - 7:20, 7:24, 104:4, 166:11
**GURSKIS** [139] - 1:13, 2:13, 2:15, 2:18, 9:21, 10:8, 11:9, 16:5, 57:11, 57:22, 60:7, 61:13, 71:11, 97:5, 97:8, 97:12, 97:19, 97:21, 99:23, 99:24, 102:3, 104:7, 104:8, 105:9, 106:20, 107:20, 110:24, 111:9, 114:13, 123:23, 124:2, 127:14, 127:17, 136:4, 136:6, 136:8, 136:17, 136:21, 137:1, 137:5, 137:18, 137:20, 137:23, 138:14, 138:21, 138:23, 147:6, 147:8, 147:10, 147:16, 147:22, 148:1, 148:4, 149:15, 149:17, 149:21, 150:1, 156:22, 156:24, 157:1, 157:6, 157:14, 157:17, 158:12, 158:14, 160:8, 160:16, 160:18, 160:21, 160:23, 161:19, 161:21, 161:23, 162:17, 162:19, 162:21, 162:23, 163:20, 163:22, 164:1, 164:21, 164:23, 164:25, 166:12, 166:19, 167:11, 167:14, 168:19, 168:22, 170:5, 170:11, 170:13, 176:10, 176:17, 176:19, 176:25, 177:2, 178:12, 178:18, 178:20, 180:4, 180:9, 180:12, 180:14, 181:14, 181:18, 181:25, 182:5, 182:20, 183:2, 183:4, 183:24, 184:1, 185:8, 185:9, 187:8, 187:11, 189:9, 189:15, 189:22, 189:25, 192:1, 192:3, 192:17, 192:20, 193:10, 193:12, 193:25, 194:14, 195:17, 195:21, 195:25, 196:6, 197:6, 197:20, 198:3, 199:17, 200:7, 206:6
**guy** [8] - 130:12, 132:7, 155:21, 156:8, 165:13, 167:20, 188:5, 192:25
**guys** [20] - 11:12, 13:17, 108:6, 110:15, 122:25, 123:5, 123:16, 123:17, 148:13, 186:21, 192:24, 198:15, 202:11, 207:23, 208:20, 215:14, 224:3, 229:16, 229:24, 231:9

**H**

hacking [1] - 133:10
half [6] - 33:6, 86:9, 87:22, 170:23, 178:2, 203:22
halls [3] - 135:10, 145:22, 146:16
hand [6] - 32:18, 49:3, 84:14, 111:3, 134:11, 223:4
handed [8] - 118:6, 136:6, 137:25, 147:8, 147:11, 156:24, 157:2, 160:19
handful [2] - 124:16, 217:14
handle [4] - 6:18, 153:13, 186:17, 188:20
handling [1] - 152:21
hands [2] - 193:16
hands-on [2] - 193:16
handwriting [8] - 34:12, 34:14, 34:22, 36:3, 36:19, 36:20, 36:23, 49:16
handwritten [3] - 49:14, 49:18, 51:1
hang [5] - 87:7, 94:13, 155:3, 192:16
hanging [4] - 145:25, 146:13, 151:24, 193:17
Happy [1] - 157:20
harbors [1] - 60:4
Hard [12] - 183:18, 184:3, 184:4, 184:8, 184:17, 184:18, 185:16, 185:20, 186:21, 186:24, 187:2, 187:5
hard [8] - 13:24, 197:6, 207:5, 214:18, 223:25, 225:2, 227:22, 229:11
harder [1] - 123:18
Harry [1] - 72:2
Harvard [1] - 59:25
Harvard-trained [1] - 59:25
head [3] - 30:23, 37:20, 200:22
headache [1] - 191:18
heading [3] - 87:25, 90:25, 93:17
headway [1] - 203:23
Health [15] - 8:10, 75:23, 84:19, 119:15, 124:20, 125:1, 127:2, 127:4, 143:18, 167:8, 190:10, 190:14, 190:23, 191:2, 191:5
health [10] - 62:21, 112:5, 112:9, 126:17, 133:18, 145:22, 182:19, 185:13, 185:15
healthcare [13] - 58:18, 58:22, 72:9, 72:11, 102:20, 107:7, 111:25, 113:4, 114:4, 126:4, 172:11, 172:12,

190:19
Healthcare [3] - 184:16, 185:21, 187:2
hear [4] - 71:4, 148:21, 181:22, 181:23
heard [22] - 39:3, 57:6, 57:9, 57:12, 57:19, 107:11, 108:12, 108:15, 145:3, 152:5, 164:16, 166:15, 176:22, 195:23, 200:23, 201:6, 201:7, 201:14, 201:20, 207:10, 219:19, 228:22
hearing [3] - 7:6, 214:12, 221:19
hears [1] - 64:15
hearsay [2] - 117:11, 194:14
heart [1] - 220:16
Hegde [2] - 57:5, 57:7
held [5] - 97:7, 194:3, 197:11, 211:15, 223:21
Heller [1] - 204:24
Hello [1] - 192:25
hello [1] - 115:18
help [11] - 28:19, 64:14, 69:3, 86:16, 122:25, 151:8, 151:9, 186:11, 201:24, 210:18, 212:2
helped [2] - 55:9, 57:1
helps [1] - 82:12
hereby [1] - 231:14
hereditary [1] - 131:15
HHS [5] - 8:20, 84:24, 89:22, 90:3, 92:9
Hi [1] - 192:24
HIC [1] - 75:21
high [6] - 91:6, 153:2, 153:4, 153:10, 173:25, 184:18
high-sensitivity [1] - 91:6
higher [1] - 89:17
higher-up [1] - 89:17
highest [1] - 101:19
highlight [6] - 33:6, 34:14, 36:6, 40:20, 86:3, 212:6
highlighted [1] - 179:6
highlighting [1] - 99:19
highly [2] - 102:8, 105:14
Hilton [3] - 187:14, 187:18
Hilton's [1] - 187:17
himself [1] - 10:3, 25:22, 186:9
hire [2] - 134:13, 188:18
hired [4] - 140:1, 147:1, 148:11, 153:12
hiring [1] - 156:8
Hirsch [7] - 129:14, 129:18, 130:14, 130:17, 130:22, 154:15, 176:5

Hispanic [2] - 180:23, 182:9
historically [1] - 10:17
history [8] - 80:6, 80:9, 80:16, 80:19, 80:25, 131:16, 163:13, 174:24
hit [2] - 62:8, 135:2
hmm [2] - 47:7, 69:21
hold [3] - 7:8, 76:16, 161:17
Holden [1] - 60:23
Holliday [14] - 33:12, 38:8, 38:15, 39:15, 39:25, 40:13, 40:21, 41:16, 42:5, 43:12, 43:13, 45:10, 47:16, 52:7
Holliday's [1] - 40:25
Holyfield [2] - 188:14, 189:2
home [8] - 63:20, 63:23, 63:24, 64:7, 64:8, 187:17, 202:4, 204:17
homes [1] - 135:10
honest [1] - 213:25
honestly [1] - 178:4
Honor [126] - 4:7, 5:10, 5:22, 6:4, 6:22, 7:2, 7:8, 7:17, 8:19, 9:11, 9:22, 12:13, 14:16, 14:19, 15:15, 15:16, 15:25, 16:6, 34:15, 37:6, 44:10, 47:19, 50:8, 57:11, 57:22, 67:9, 75:12, 76:1, 78:1, 84:12, 96:2, 96:23, 96:25, 97:5, 97:19, 99:18, 99:23, 101:24, 104:7, 105:3, 106:16, 109:7, 109:11, 109:14, 110:1, 110:24, 114:14, 114:16, 114:22, 114:24, 115:6, 117:10, 117:19, 121:8, 122:3, 122:18, 122:20, 123:2, 123:14, 123:23, 136:4, 137:1, 137:18, 138:14, 138:21, 147:6, 147:16, 148:1, 149:15, 149:21, 156:22, 157:6, 160:8, 160:16, 161:19, 162:17, 163:20, 164:21, 166:12, 167:11, 168:19, 170:5, 176:10, 176:17, 176:25, 178:12, 178:18, 180:4, 180:12, 181:14, 182:20, 183:2, 187:8, 189:9, 189:22, 192:17, 193:10, 194:1, 196:20, 197:18, 198:6, 199:5, 199:17, 200:7, 202:12, 204:4, 205:11, 206:2, 206:22, 207:19, 208:4, 209:25, 211:8, 212:20, 214:20, 217:13, 221:18, 222:22, 223:17, 226:1, 227:24, 229:2, 230:2,

230:21, 231:3, 231:6
Honor's [1] - 220:12
Honorable [1] - 1:22
HONORABLE [1] - 1:10
hope [6] - 6:25, 15:3, 110:19, 185:24, 202:4, 203:20
hopefully [10] - 65:24, 109:9, 150:19, 177:6, 201:25, 203:8, 203:19, 209:17, 209:22, 228:24
hoping [1] - 128:18
hopped [1] - 129:20
host [1] - 29:9
HOSTETLER [1] - 2:5
hot [1] - 153:20
Hotel [3] - 129:21, 183:18, 192:12
hotel [3] - 141:25, 175:19, 184:4
hotels [1] - 131:23
hour [4] - 13:2, 110:10, 164:14, 203:17
hours [9] - 150:18, 194:6, 203:20, 204:12, 208:1, 208:13, 210:14, 211:7
house [10] - 31:3, 31:6, 37:12, 100:20, 101:7, 112:25, 113:2, 132:3, 132:8, 144:22
housekeeping [8] - 4:5, 14:8, 15:17, 109:14, 194:24, 198:20, 202:25, 230:23
houses [1] - 50:4
hovering [1] - 173:20
hs [4] - 91:8, 91:10, 91:12, 91:16
hs-CRP [4] - 91:8, 91:10, 91:12, 91:16
HTC [1] - 75:20
Human [2] - 8:10, 84:19
human [4] - 21:18, 21:21, 163:7, 185:12
hundred [1] - 164:14
Hurley [1] - 40:15
hurts [1] - 215:20
hustle [4] - 135:4, 135:5, 150:9, 184:4

**I**

ICD-10 [10] - 69:25, 132:24, 133:1, 133:9, 152:2, 160:7, 161:2, 179:10, 191:16, 191:22
idea [4] - 121:7, 153:20, 185:4, 213:21
ideal [1] - 208:13
ideas [2] - 125:1, 125:6
identification [5] - 34:20,

245

136:7, 137:21, 147:9, 149:18
**identified** [2] - 127:15, 223:1
**identify** [3] - 75:25, 76:1, 127:11
**II** [2] - 1:10, 1:22
**illustrate** [1] - 10:16
**ILONA** [2] - 1:21, 231:19
**Ilona** [1] - 109:23
**imagine** [5] - 73:8, 164:13, 183:22, 203:1, 214:18
**immediate** [1] - 139:12
**immediately** [6] - 129:20, 135:22, 190:13, 191:2, 191:6, 191:11
**impact** [1] - 220:25
**impacts** [1] - 6:24
**impair** [1] - 94:8
**implement** [1] - 68:25
**implicate** [1] - 5:21
**implicates** [1] - 7:9
**important** [7] - 39:19, 40:7, 41:20, 163:5, 207:7, 211:3, 216:14
**impression** [1] - 219:5
**impressions** [1] - 201:5
**improperly** [1] - 218:13
**improvement** [1] - 27:14
**in-house** [1] - 144:22
**in-person** [1] - 146:24
**in..** [1] - 126:24
**inadvertently** [1] - 218:14
**incarcerated** [1] - 4:17
**inception** [1] - 215:23
**incident** [1] - 150:11
**include** [2] - 11:6, 17:9
**included** [2] - 141:2, 141:3
**includes** [4] - 11:21, 76:10, 168:9, 168:10
**including** [5] - 9:8, 125:17, 164:3, 180:2, 220:5
**income** [2] - 134:11, 134:21
**incomplete** [2] - 218:4, 220:21
**inconsistencies** [3] - 8:6, 85:7, 190:14
**Inconsistencies** [1] - 8:11
**inconsistency** [2] - 94:20, 95:24
**inconsistently** [5] - 86:22, 86:23, 87:2, 93:20, 94:2
**increase** [4] - 87:3, 149:5, 149:7, 149:10
**increasing** [1] - 171:9
**incurred** [1] - 168:9
**indeed** [2] - 214:15, 214:19
**indemnification** [1] - 139:7
**independent** [2] - 108:16, 179:4

**India** [2] - 35:6, 36:20
**indicate** [2] - 81:5, 105:13
**indicated** [1] - 16:6
**indicates** [2] - 80:15, 218:13
**indicating** [2] - 6:13, 12:7
**indications** [2] - 91:12, 91:23
**individual** [7] - 26:7, 60:15, 71:24, 72:2, 72:4, 143:12, 214:21
**indulge** [1] - 194:23
**indulgence** [1] - 199:5
**industry** [4] - 19:3, 73:4, 129:9, 190:19
**inference** [1] - 219:12
**inflow** [1] - 70:24
**influence** [2] - 139:13, 179:6
**influenced** [1] - 179:12
**inform** [1] - 190:12
**Information** [1] - 75:23
**information** [37] - 16:23, 17:20, 18:10, 18:13, 18:14, 18:16, 26:10, 28:15, 28:16, 29:9, 33:8, 34:4, 42:1, 46:16, 67:4, 67:11, 68:1, 75:16, 76:15, 76:21, 76:22, 77:2, 102:10, 102:22, 102:24, 116:25, 135:15, 144:1, 161:5, 161:7, 161:11, 163:3, 164:8, 175:4, 191:16, 219:23, 227:19
**informed** [2] - 4:9, 41:17
**inheritable** [1] - 163:11
**inherited** [1] - 151:12
**initial** [7] - 22:16, 66:21, 108:13, 132:9, 135:16, 140:20, 146:4
**initials** [3] - 76:1, 76:4, 76:6
**initiate** [1] - 137:13
**input** [1] - 90:6
**inquiring** [2] - 169:4, 201:19
**insinuating** [2] - 218:18, 221:13
**Inspector** [4] - 8:3, 8:10, 84:23, 85:24
**inspector** [1] - 96:9
**instead** [1] - 48:7
**instructions** [15] - 99:12, 99:17, 108:14, 198:15, 201:7
**insurance** [15] - 23:9, 23:10, 23:11, 23:13, 23:15, 23:16, 23:22, 82:10, 116:2, 126:17, 126:19, 126:20, 133:18
**intend** [4] - 4:13, 7:13, 7:15, 8:7
**intended** [1] - 225:16

**interact** [1] - 130:19
**interacted** [1] - 132:10
**interaction** [4] - 21:19, 63:14, 65:7, 65:11
**interactions** [1] - 73:1
**interested** [4] - 133:21, 139:24, 187:15
**interface** [2] - 156:19, 167:21
**internal** [1] - 146:10
**interpretation** [2] - 144:20, 153:17
**interpretations** [1] - 71:16
**interrupt** [1] - 196:22
**interstate** [1] - 106:8
**intervals** [1] - 173:9
**interviewed** [1] - 13:24
**introduce** [3] - 9:12, 160:9, 217:25
**introduced** [6] - 10:5, 75:3, 132:21, 154:21, 217:12, 223:11
**introducing** [2] - 5:19, 7:13, 7:15
**investigative** [1] - 84:24
**inviting** [1] - 192:15
**invoice** [1] - 188:19
**involve** [1] - 125:3
**involved** [15] - 56:8, 58:6, 58:7, 106:23, 111:25, 114:10, 126:22, 135:23, 152:17, 154:15, 154:17, 155:13, 161:9, 183:21, 187:3
**involvement** [1] - 114:4
**involves** [1] - 74:8
**irrelevant** [3] - 9:22, 10:8, 10:9
**island** [2] - 169:3, 169:15
**issuance** [1] - 73:19
**issue** [30] - 4:25, 5:14, 6:6, 6:8, 6:19, 6:20, 9:15, 10:1, 14:1, 53:24, 61:11, 66:12, 91:12, 156:20, 206:15, 211:9, 211:22, 212:9, 214:3, 219:11, 219:21, 220:2, 221:7, 221:24, 224:12, 225:15, 227:5, 227:11, 228:24, 229:20
**issued** [2] - 82:13, 84:18, 85:24, 87:11, 87:15, 87:18, 90:3, 90:14, 98:23
**issues** [10] - 4:5, 4:7, 7:1, 14:5, 112:5, 112:9, 177:10, 177:19, 194:14, 201:24
**it'll** [3] - 5:15, 5:16, 209:24
**item** [1] - 88:6
**items** [12] - 86:12, 86:20, 88:10, 88:12, 88:13, 92:12, 92:13, 92:20, 92:22, 98:14, 113:4, 212:21

**itinerary** [1] - 192:12
**itself** [6] - 9:24, 29:19, 72:20, 95:23, 163:17, 213:5
**IV** [1] - 151:7

**J**

**Jackson** [1] - 188:7
**Jacksonville** [1] - 116:21
**jail** [1] - 101:12
**JAMIE** [1] - 1:13
**Janet** [1] - 188:7
**January** [3] - 37:19, 85:9, 85:16, 95:21, 98:6, 142:12, 150:3, 170:23
**jargon** [1] - 146:2
**Jariwala** [4] - 51:13, 53:19, 54:5, 166:23
**Jensen** [1] - 111:21
**Jermaine** [1] - 188:6
**Jersey** [1] - 129:6
**job** [6] - 22:19, 22:23, 23:1, 111:12, 145:15, 148:14
**John** [9] - 125:4, 129:3, 130:15, 152:19, 156:18, 165:13, 170:16, 170:21, 171:4
**join** [1] - 109:16
**Jon** [1] - 177:19
**Juan** [1] - 114:9
**judge** [1] - 128:23
**JUDGE** [1] - 1:10
**judgment** [2] - 112:12, 112:18
**July** [5] - 45:7, 85:19, 176:22, 190:6, 192:5
**jump** [1] - 185:5
**June** [1] - 116:19
**JURORS** [1] - 121:18
**jurors** [8] - 4:4, 103:11, 110:14, 123:8, 166:6, 198:8, 198:14, 230:24
**Jury** [12] - 14:25, 103:18, 104:1, 109:1, 110:17, 122:15, 123:10, 166:1, 166:8, 195:5, 198:17, 202:9
**JURY** [1] - 1:9
**jury** [34] - 4:18, 5:2, 5:4, 5:9, 10:9, 11:12, 14:22, 14:24, 15:2, 83:18, 97:14, 103:20, 107:25, 108:3, 108:5, 108:11, 108:23, 108:24, 110:7, 110:19, 122:5, 137:2, 138:21, 149:22, 160:21, 164:23, 165:24, 166:7, 166:10, 181:15, 195:2, 195:13, 202:6, 218:3
**JUSTICE** [1] - 1:15

## K

**K-RAS** [1] - 130:3
**Kate** [1] - 72:4
**KATHERINE** [1] - 1:14
**keep** [20] - 6:16, 13:9,
14:12, 55:6, 70:13, 74:4,
76:12, 76:13, 78:12, 78:24,
79:23, 86:19, 94:3, 133:14,
169:18, 186:8, 188:20,
201:16, 207:23, 230:5
**keeping** [2] - 10:23, 207:11
**Keith** [6] - 130:18, 154:25,
155:1, 155:5, 177:6, 177:10
**Kelly** [3] - 52:8, 52:19, 53:4
**kept** [1] - 129:3
**Kickback** [10] - 19:22, 59:6,
59:11, 59:15, 59:18, 60:1,
60:5, 60:11, 61:3, 62:1
**kickback** [1] - 107:5
**kickbacks** [2] - 107:7,
107:9
**Kimberly** [2] - 204:23,
207:13
**kind** [62] - 12:6, 12:19,
31:17, 31:23, 50:23, 55:6,
56:13, 101:21, 113:9, 116:2,
118:4, 126:13, 130:4,
130:16, 132:20, 132:21,
132:25, 135:11, 143:16,
143:19, 144:6, 145:11,
146:2, 146:8, 146:10,
146:23, 146:24, 147:4,
148:12, 148:17, 150:11,
150:12, 150:22, 151:13,
151:14, 151:15, 151:17,
155:1, 155:2, 155:3, 155:5,
155:6, 156:15, 157:20,
158:2, 159:16, 159:19,
159:24, 167:3, 169:14,
171:11, 171:22, 172:12,
176:23, 181:9, 183:13,
187:7, 190:14, 220:16, 230:7
**kinds** [5] - 9:3, 29:9, 29:13,
76:15, 160:6
**kiss** [1] - 188:22
**kit** [1] - 168:9
**kitchen** [3] - 168:16,
168:24, 169:2
**kits** [1] - 137:13
**KM** [1] - 76:6
**knee** [1] - 113:8
**knowledge** [8] - 8:15, 73:1,
73:5, 74:24, 116:9, 144:4,
150:25, 189:4
**knowledgeable** [1] - 150:24
**knows** [4] - 5:5, 9:22,
13:20, 155:10

## L

**lab** [77] - 5:18, 5:25, 20:10,
20:12, 20:16, 20:19, 20:22,
21:1, 21:2, 22:2, 25:1, 25:3,
25:6, 26:24, 27:7, 30:15,
32:24, 56:12, 56:25, 64:17,
64:21, 65:18, 65:20, 66:5,
66:8, 100:7, 100:18, 106:15,
106:22, 111:15, 129:4,
129:6, 130:21, 131:7, 131:8,
131:21, 132:4, 132:5, 132:6,
132:16, 137:13, 140:17,
141:9, 141:11, 141:13,
142:11, 143:14, 144:13,
145:17, 148:12, 150:19,
152:1, 155:10, 155:13,
155:24, 156:1, 156:9,
171:23, 172:15, 173:13,
174:22, 175:20, 175:21,
175:22, 177:8, 177:20,
187:15, 191:15, 193:5,
193:20
**lab's** [1] - 23:1
**laboratories** [1] - 127:7
**laboratory** [13] - 32:20,
65:2, 65:3, 129:10, 130:12,
131:24, 132:10, 132:11,
136:14, 137:12, 139:13,
141:5, 190:25
**Laboratory** [4] - 27:13,
32:21, 42:12, 138:8
**labs** [3] - 24:24, 73:9, 83:4
**LabSolutions** [107] - 17:25,
24:25, 25:16, 25:17, 25:19,
26:11, 26:16, 26:21, 27:15,
27:23, 32:24, 38:8, 38:9,
38:11, 40:1, 42:20, 43:21,
45:19, 46:24, 47:2, 48:25,
52:3, 52:24, 53:1, 56:17,
57:1, 57:8, 58:2, 60:14, 61:1,
61:8, 61:10, 61:21, 70:18,
70:19, 71:1, 71:6, 71:9,
71:20, 72:24, 76:25, 77:1,
78:18, 79:12, 80:22, 81:13,
83:8, 83:13, 83:16, 83:23,
84:2, 93:10, 107:18, 119:21,
131:25, 132:13, 135:21,
137:16, 138:25, 141:7,
141:8, 141:18, 143:2, 143:8,
143:10, 143:18, 146:22,
147:2, 148:20, 149:12,
155:14, 155:23, 165:9,
166:22, 167:2, 168:15,
168:25, 173:6, 174:5,
177:15, 177:21, 179:17,
183:14, 185:22, 185:24,
189:5, 189:16, 190:10,
190:13, 190:16, 190:17,
190:20, 190:24, 191:4,

191:6, 193:13, 219:2, 219:5,
221:10, 221:13, 221:20,
222:9, 222:10, 225:8,
225:12, 227:8
**LabSolutions'** [1] - 224:2
**lacks** [1] - 87:3
**ladies** [10] - 15:2, 97:14,
104:3, 107:24, 110:19,
121:9, 122:5, 123:12, 166:9,
198:19
**lady** [1] - 52:7
**land** [1] - 192:24
**language** [1] - 181:10
**large** [4] - 180:24, 203:2,
227:14, 230:10
**last** [27] - 5:21, 8:24, 12:4,
12:17, 13:24, 14:14, 29:3,
32:8, 32:9, 44:6, 47:14,
47:16, 53:19, 78:24, 81:21,
90:8, 91:2, 92:25, 93:23,
95:12, 129:13, 175:1, 185:6,
188:1, 195:23, 196:2, 197:18
**last-minute** [1] - 14:14
**late** [6] - 10:6, 11:24,
113:13, 173:12, 193:1,
212:13
**latter** [1] - 47:5
**Lauderdale** [3] - 1:24,
172:16, 231:21
**LAURIE** [1] - 2:12
**law** [14] - 19:22, 20:4, 23:5,
58:15, 59:23, 60:17, 60:21,
107:13, 107:12, 107:14,
107:17, 126:8, 142:25, 201:8
**LAW** [1] - 1:18
**laws** [4] - 99:11, 99:16,
190:17, 190:22
**lawyer** [8] - 20:6, 31:15,
58:20, 60:19, 60:23, 100:23,
101:4, 179:22
**lawyer's** [1] - 50:14
**lawyers** [13] - 13:5, 50:5,
58:22, 58:25, 59:2, 59:5,
59:15, 59:25, 60:25, 61:11,
108:19, 201:8, 201:10
**lay** [1] - 228:12
**laying** [2] - 9:1, 64:11
**LBS** [5] - 41:2, 42:6, 42:8,
42:16, 42:20
**LCD** [16] - 10:1, 82:8,
84:16, 85:13, 86:10, 87:23,
89:9, 89:10, 89:20, 89:21,
91:4, 93:6, 94:1, 98:13,
174:17, 174:18
**LCDs** [48] - 8:6, 8:15, 8:16,
8:22, 9:8, 10:4, 10:21, 19:10,
23:3, 68:23, 69:1, 70:6,
71:17, 71:20, 81:25, 82:2,
85:5, 86:11, 86:16, 86:20,
86:21, 87:1, 87:3, 87:4, 88:5,

88:10, 88:12, 88:17, 88:24,
89:3, 89:6, 89:14, 89:16,
90:18, 90:20, 91:10, 91:12,
92:17, 92:19, 92:21, 93:1,
93:19, 94:2, 94:5, 94:9,
177:16
**LCDs'** [2] - 88:19, 92:11
**lead** [2] - 130:5, 179:7
**learn** [5] - 29:16, 69:22,
116:12, 129:1, 156:1
**learning** [1] - 24:16
**least** [23] - 89:15, 89:24,
95:16, 95:21, 197:23,
201:23, 203:17, 203:18,
204:18, 205:5, 206:4, 207:8,
208:12, 209:6, 210:19,
210:22, 213:9, 215:11,
218:16, 219:3, 220:5, 221:5,
224:8
**leave** [11] - 13:5, 103:13,
108:22, 122:6, 155:6,
159:10, 159:12, 165:21,
195:1, 202:5, 219:4
**leaving** [1] - 91:13
**left** [8] - 44:14, 49:3, 75:17,
110:20, 119:24, 155:20,
166:20, 209:3
**left-hand** [1] - 49:3
**legal** [5] - 19:18, 19:19,
58:13, 81:22, 100:16
**legality** [1] - 61:7
**legally** [3] - 99:11, 99:16,
100:4
**legislation** [1] - 89:17
**length** [2] - 29:6, 106:10
**lengthier** [1] - 122:8
**lengthy** [3] - 29:21, 29:22,
209:19
**less** [9] - 82:22, 143:3,
150:17, 169:20, 173:22,
182:18, 186:5, 221:3, 226:8
**lesser** [1] - 133:20
**Letoria** [1] - 150:6
**letter** [21] - 38:5, 38:14,
39:22, 39:24, 40:5, 41:15,
41:17, 43:2, 45:6, 52:18,
52:23, 118:22, 119:9,
119:16, 119:23, 190:7,
191:9, 191:12, 192:7, 201:18
**letters** [4] - 48:16, 52:1,
52:15, 201:23
**letting** [1] - 228:9
**level** [3] - 124:25, 142:7,
217:20
**levels** [2] - 13:10, 27:6
**Levine's** [1] - 187:22
**Levinson** [2] - 96:6, 96:8
**library** [1] - 29:19
**license** [3] - 175:21, 175:22
**lie** [2] - 101:7, 101:9

lies [1] - 219:11
lieu [1] - 4:13
life [4] - 31:4, 31:11, 112:14, 159:21
light [2] - 127:13, 127:18
likelihood [1] - 151:11
likely [2] - 210:21, 210:24
limit [1] - 225:7
limited [8] - 86:20, 88:19, 88:24, 89:3, 89:6, 92:12, 130:20, 181:13
Lindsey [3] - 184:7, 184:9, 185:1
line [10] - 50:25, 101:3, 101:4, 120:10, 177:4, 185:18, 186:19, 190:8, 221:23, 224:19
lined [1] - 217:3
lines [3] - 106:7, 186:15, 186:16
lineup [7] - 109:4, 203:4, 206:20, 208:7, 208:13, 208:17, 209:21
lining [1] - 13:8
links [1] - 29:15
list [24] - 7:20, 9:4, 9:16, 10:4, 11:20, 11:22, 13:6, 13:8, 13:18, 16:4, 43:20, 55:6, 130:6, 133:15, 179:5, 195:9, 195:14, 195:17, 197:8, 197:24, 199:3, 199:6, 223:2, 225:10
listed [4] - 51:15, 56:18, 78:6, 196:18
listen [2] - 150:15, 150:16
literally [3] - 19:9, 216:12, 216:24
litigate [1] - 197:5
litigation [1] - 223:13
live [9] - 8:17, 76:10, 82:17, 84:6, 115:19, 180:24, 203:18, 216:3, 229:16
lived [3] - 89:11, 89:24, 92:4
lives [2] - 151:8, 151:9
living [4] - 111:11, 111:21, 125:15, 135:13
LLC [4] - 190:10, 190:24, 191:2
LLP [1] - 2:5
lobby [3] - 147:2, 148:5, 148:8
lobe [3] - 112:10, 112:11, 112:17
local [8] - 8:4, 82:8, 91:24, 94:20, 95:23, 105:18, 156:4, 174:18
Local [2] - 8:10, 85:1
located [4] - 32:25, 38:9, 46:21, 174:22

location [1] - 176:1
locations [1] - 135:7
LOEB [1] - 2:3
logistically [1] - 6:24
logistics [2] - 4:16, 186:17
Lohan [6] - 184:6, 184:10, 185:1, 185:18, 186:6, 186:19
Lohan's [2] - 184:7, 184:9
LOL [3] - 187:17, 188:2, 188:19
look [22] - 35:1, 36:18, 44:18, 46:2, 47:4, 49:3, 50:22, 54:22, 58:8, 87:21, 94:18, 188:1, 196:17, 207:23, 217:1, 217:7, 217:17, 218:11, 221:4, 222:3, 222:23, 230:19
looked [6] - 18:18, 121:7, 161:24, 197:6, 197:20, 214:25
looking [21] - 9:25, 34:13, 34:19, 42:11, 70:24, 76:6, 89:22, 90:2, 104:17, 151:3, 157:21, 177:3, 209:3, 209:11, 210:25, 212:23, 222:5, 227:4, 227:18, 228:23, 228:24
looks [16] - 35:6, 35:8, 77:25, 89:22, 158:17, 159:1, 168:2, 168:5, 170:22, 171:10, 185:10, 188:22, 193:5, 206:17, 210:19, 212:2, 224:5, 226:14
loop [3] - 176:8, 187:6, 193:18
Los [1] - 193:3
lose [2] - 14:8, 206:10
Lotus [1] - 119:15
lousy [2] - 63:25, 64:13
low [6] - 134:11, 134:21, 145:25, 146:13, 171:6, 171:8
low-hanging [2] - 145:25, 146:13
low-income [1] - 134:21
lower [1] - 168:14
Lowsar [1] - 71:24
lucky [1] - 230:17
lunch [14] - 5:12, 97:10, 97:16, 103:15, 107:25, 108:10, 108:20, 108:24, 109:3, 109:13, 110:19, 203:13, 203:17, 204:3
Lupowitz [1] - 231:18
LUPOWITZ [2] - 1:21, 231:19

MAC [9] - 67:23, 68:25, 74:8, 74:10, 93:17, 174:17, 174:18, 177:16, 212:6
machines [1] - 170:2
MACs [11] - 21:13, 24:22, 39:4, 77:2, 82:13, 82:21, 82:25, 88:9, 91:12, 92:19
Madhuri [3] - 57:5, 57:7, 57:21
Magliocco [19] - 204:9, 204:22, 205:8, 205:18, 206:20, 207:14, 217:13, 217:18, 217:22, 217:25, 219:20, 220:18, 220:20, 221:3, 223:16, 224:6, 227:6, 227:13, 229:19
Magliocco's [3] - 207:9, 218:10, 220:14
magnitude [2] - 144:5, 164:10
mail [1] - 118:24
mailing [3] - 113:18, 161:1, 161:2
main [1] - 212:22
Maine [8] - 32:20, 32:25, 33:18, 33:19, 38:10, 38:11, 42:22, 48:18
maintained [4] - 215:18, 215:23, 220:10, 223:7
maintains [1] - 215:21
major [1] - 14:14
manage [2] - 140:5, 203:3
management [2] - 70:19, 70:21
managers [2] - 71:2, 71:10
managing [1] - 70:25
manner [2] - 7:23, 223:7
manuals [1] - 99:4
map [1] - 210:15
map-out [1] - 210:15
Maple [1] - 2:3
Marc [1] - 207:3
March [2] - 40:3, 177:3
margin [1] - 224:4
mark [2] - 25:22, 31:23
marked [6] - 75:3, 136:7, 137:21, 147:9, 149:18, 199:7
Marked [1] - 3:23
markers [1] - 130:2
market [1] - 126:12
marketed [3] - 125:13, 125:17, 126:9
marketers [5] - 5:25, 134:13, 140:1
marketing [21] - 26:8, 125:3, 125:6, 125:20, 127:6, 133:25, 134:1, 134:19, 135:6, 139:21, 139:24, 140:3, 145:23, 152:3, 152:5, 161:6, 161:9, 171:19, 180:1,

183:6, 183:9
markings [1] - 225:3
markup [1] - 223:24
markups [1] - 224:4
married [3] - 111:18, 112:4, 188:7
Marshal's [1] - 13:22
marshals [3] - 4:15, 4:19, 197:3
Martin [2] - 131:3, 132:1
mass [1] - 125:13
massive [1] - 98:20
matches [1] - 218:15
material [3] - 203:2, 203:6, 217:23
materials [2] - 17:4, 17:6
matter [7] - 25:1, 66:21, 109:14, 121:11, 171:17, 211:9, 231:16
matters [1] - 14:9
McMillan [20] - 5:11, 5:15, 7:3, 7:16, 8:9, 9:13, 11:1, 14:21, 15:5, 15:6, 16:15, 31:2, 97:22, 99:8, 103:22, 104:5, 104:9, 107:22, 108:18, 207:10
MCMILLAN [1] - 2:12
mean [29] - 53:12, 55:12, 82:6, 133:8, 153:14, 154:23, 155:8, 164:18, 175:10, 179:10, 179:19, 179:21, 207:15, 207:22, 209:2, 213:15, 214:10, 216:22, 217:11, 217:17, 218:1, 218:17, 225:8, 225:18, 227:20, 228:15, 229:22, 230:15
meaning [1] - 87:19
means [12] - 22:13, 24:16, 43:6, 43:7, 82:8, 88:16, 94:5, 142:23, 153:18, 158:19, 158:21, 158:22
meant [3] - 120:12, 120:15, 120:24
meantime [1] - 175:2
measuring [1] - 197:8
med [2] - 124:10, 152:20
Medicaid [3] - 126:19, 133:20, 133:21
medical [20] - 19:4, 58:8, 65:17, 102:9, 118:11, 124:12, 125:16, 125:20, 145:4, 145:5, 150:24, 184:12, 204:9, 204:23, 220:20, 221:15, 226:10, 227:15, 227:16, 227:18
Medical [1] - 46:15
medically [9] - 20:17, 22:19, 65:23, 65:24, 66:1,

## M

ma'am [5] - 25:23, 50:7, 97:1, 102:1, 114:17

248

144:3, 179:7, 220:22, 221:16
**Medicare** [106] - 8:11, 8:17, 10:18, 10:25, 11:2, 17:20, 17:23, 17:25, 18:25, 19:5, 19:7, 19:11, 19:14, 20:14, 20:23, 20:25, 21:2, 21:4, 21:11, 21:13, 21:21, 21:24, 22:2, 22:5, 22:8, 22:9, 23:7, 23:9, 24:21, 26:23, 27:5, 28:15, 28:16, 28:17, 30:5, 30:6, 34:19, 39:19, 43:8, 43:9, 43:21, 45:19, 48:25, 53:8, 64:2, 66:6, 66:22, 74:21, 77:2, 77:12, 79:9, 79:13, 80:10, 80:22, 81:13, 81:17, 82:17, 84:6, 85:7, 89:12, 89:25, 92:4, 94:21, 95:24, 98:12, 98:18, 99:12, 99:17, 100:10, 100:13, 100:14, 101:22, 102:7, 102:13, 102:15, 103:2, 106:11, 106:22, 107:18, 111:23, 116:3, 116:5, 116:7, 126:19, 129:25, 131:13, 133:11, 133:15, 133:17, 133:21, 135:9, 135:20, 142:15, 142:24, 144:22, 144:23, 158:20, 158:21, 167:8, 169:4, 169:6, 169:19, 169:20, 169:22, 173:7, 174:21
**Medicare-related** [1] - 17:20
**medication** [1] - 125:9
**medicine** [2] - 90:12, 124:16
**Meenakshi** [1] - 181:3
**meet** [15] - 63:20, 64:5, 64:6, 65:13, 65:18, 130:12, 130:14, 130:24, 132:6, 142:14, 145:11, 166:23, 193:2, 195:9
**meeting** [21] - 129:22, 129:23, 131:1, 132:9, 135:16, 141:22, 147:1, 147:2, 147:3, 147:4, 147:12, 148:8, 148:10, 172:16, 173:3, 187:1, 187:14, 187:18, 187:21, 187:22, 193:7
**meetings** [6] - 132:15, 141:18, 141:21, 146:24, 155:12, 172:13
**melee** [1] - 156:9
**member** [2] - 75:19, 145:14
**members** [1] - 139:12
**memo** [2] - 8:5, 9:9
**memos** [2] - 17:18, 17:19
**mention** [2] - 11:23, 105:24
**mentioned** [12] - 133:17,

135:12, 139:20, 141:6, 143:15, 151:21, 154:14, 160:2, 165:3, 173:5, 174:7
**mentioning** [2] - 128:25, 166:20
**menu** [2] - 140:13, 140:14
**Message** [1] - 185:8
**message** [10] - 177:3, 184:2, 185:7, 185:10, 185:19, 185:23, 186:19, 187:12, 187:20, 187:24
**messages** [3] - 157:4, 159:15, 186:15
**messed** [1] - 173:4
**met** [11] - 65:17, 129:21, 130:15, 132:7, 132:8, 141:6, 141:14, 155:13, 179:22, 182:18, 228:18
**method** [1] - 145:18
**methods** [1] - 191:21
**metropolitan** [1] - 134:9
**Miami** [5] - 1:3, 125:25, 187:21, 192:13, 193:7
**mic** [2] - 181:25, 182:1
**Michael** [4] - 150:17, 184:6, 184:10, 184:14
**microphone** [2] - 75:14, 111:6
**mid** [2] - 10:6, 129:15
**middle** [3] - 68:16, 95:1, 120:8
**midstream** [1] - 226:17
**might** [13] - 11:18, 34:11, 58:2, 65:15, 82:22, 101:12, 159:19, 159:20, 164:14, 175:8, 181:25, 182:1
**Mike** [10] - 184:5, 184:6, 184:24, 185:18, 186:6, 186:13, 186:19, 188:13, 188:24, 189:2
**Miles** [1] - 72:2
**million** [7] - 142:9, 142:13, 157:23, 173:21, 174:1, 174:2, 174:4
**millions** [2] - 142:8, 142:14
**Minal** [65] - 4:3, 16:18, 35:18, 36:12, 44:18, 46:9, 52:10, 61:10, 72:25, 107:19, 127:20, 127:22, 130:13, 130:24, 131:1, 132:2, 132:15, 132:21, 133:5, 133:6, 134:3, 141:5, 141:12, 141:19, 142:16, 143:2, 143:5, 143:9, 143:10, 143:13, 144:25, 147:3, 149:2, 150:5, 151:21, 154:21, 156:3, 156:15, 167:18, 168:16, 169:4, 169:18, 170:18, 171:3, 174:8, 174:15, 175:6,

175:18, 177:5, 177:12, 177:15, 179:21, 180:17, 181:2, 183:6, 187:2, 188:2, 188:23, 190:2, 191:8, 192:10, 193:1, 193:14, 193:15, 193:23
**MINAL** [1] - 1:6
**Minal's** [6] - 127:23, 138:4, 146:14, 167:1, 170:20, 174:22
**mind** [4] - 121:15, 152:11, 158:9, 195:21
**minds** [1] - 177:20
**mine** [2] - 129:9, 159:6
**minimum** [2] - 10:1, 205:4
**Minish** [3] - 52:8, 52:19, 53:4
**minute** [9] - 14:14, 21:10, 54:14, 58:9, 103:20, 123:2, 165:19, 194:20, 197:18
**minutes** [7] - 97:8, 194:7, 194:17, 194:23, 200:13, 203:17, 230:15
**misguided** [1] - 10:20
**misleading** [2] - 151:13, 151:18
**missing** [3] - 123:14, 167:21, 218:5
**misspelled** [1] - 77:25
**misunderstanding** [2] - 218:17, 218:21
**misuse** [1] - 88:10
**MMA** [1] - 87:5
**mmm-hmm** [2] - 47:7, 69:21
**model** [4] - 134:21, 175:9, 175:10, 184:2
**modification** [3] - 228:21, 229:9, 229:13
**modifications** [1] - 215:22
**modified** [15] - 214:14, 215:2, 218:14, 221:10, 225:2, 226:8, 226:14, 226:20, 226:25, 227:2, 228:9, 228:14, 228:19, 229:23
**modify** [1] - 230:14
**MoIDX** [3] - 83:6, 83:8, 83:14
**molecular** [2] - 104:21, 190:18
**mom** [4] - 134:5, 139:17, 139:18, 139:20
**mom's** [2] - 134:6, 135:1
**moment** [16] - 41:25, 96:2, 96:23, 114:22, 122:12, 128:25, 129:12, 148:18, 151:21, 165:24, 168:18, 171:25, 173:6, 173:15, 193:10, 222:2

**momentarily** [1] - 195:3
**Monaco** [1] - 159:6
**Monday** [7] - 11:23, 150:3, 192:5, 207:22, 208:3, 208:19, 209:8
**money** [32] - 22:11, 22:13, 43:9, 54:21, 70:24, 81:3, 112:21, 118:19, 125:2, 126:14, 126:16, 131:12, 133:16, 144:25, 145:1, 154:18, 159:18, 159:22, 159:24, 163:15, 163:16, 164:19, 171:19, 172:25, 173:14, 186:8, 186:13, 186:25, 188:9
**money's** [1] - 158:22
**Monte** [1] - 159:6
**month** [18] - 141:15, 142:8, 155:17, 155:18, 156:21, 170:24, 170:25, 171:7, 173:10, 173:11, 173:16, 174:1, 174:2, 174:4, 192:5, 192:16
**month's** [1] - 158:24
**months** [11] - 69:19, 69:20, 72:22, 129:5, 153:19, 165:11, 172:2, 173:21, 173:22, 191:25
**morning** [16] - 15:2, 15:16, 16:15, 16:16, 16:19, 162:3, 171:6, 201:9, 202:11, 202:16, 203:19, 204:6, 207:22, 209:20, 211:10, 218:9
**mortar** [1] - 161:10
**mortgage** [1] - 23:15
**most** [7] - 102:8, 124:18, 140:23, 163:16, 165:8, 198:13, 204:16
**mostly** [2] - 126:20, 217:14
**motels** [1] - 131:23
**mother** [5] - 135:12, 135:13, 135:18, 135:23, 136:16
**move** [24] - 6:16, 14:11, 15:21, 16:1, 57:13, 57:23, 102:20, 117:22, 128:24, 147:19, 147:21, 149:19, 166:13, 170:6, 178:13, 189:10, 194:13, 194:18, 195:11, 198:9, 198:10, 198:24, 199:2, 221:6
**moved** [9] - 16:7, 112:13, 171:22, 176:24, 189:11, 195:8, 195:12, 199:13, 205:19
**moves** [6] - 115:7, 136:17, 138:14, 147:16, 157:6, 180:5
**moving** [8] - 102:23, 159:17, 194:9, 206:18,

207:23, 216:21, 216:25, 230:5

**MR** [222] - 2:13, 7:8, 7:11, 7:17, 7:19, 11:10, 11:14, 11:15, 11:17, 11:20, 13:19, 14:19, 15:15, 15:20, 15:25, 16:14, 28:18, 28:22, 28:24, 30:7, 30:9, 30:24, 31:1, 32:7, 32:10, 33:5, 33:7, 34:10, 34:17, 34:18, 36:5, 36:7, 37:6, 37:8, 37:16, 37:17, 37:22, 37:25, 38:19, 38:20, 40:10, 40:12, 40:18, 40:24, 41:13, 41:14, 41:23, 42:4, 42:25, 43:1, 43:14, 43:16, 44:9, 44:12, 44:13, 45:4, 45:5, 45:12, 45:14, 46:13, 46:17, 47:11, 47:13, 47:18, 47:21, 48:14, 48:15, 48:22, 48:23, 50:12, 50:19, 50:20, 51:8, 51:9, 51:24, 51:25, 52:13, 52:14, 52:21, 52:22, 53:12, 53:14, 54:11, 54:15, 57:16, 57:25, 60:10, 61:17, 66:25, 67:2, 67:6, 67:9, 67:10, 71:15, 75:5, 75:7, 75:11, 75:14, 75:15, 75:24, 76:3, 76:5, 76:12, 76:14, 76:16, 76:17, 77:16, 77:19, 77:21, 77:23, 77:24, 78:1, 78:3, 78:10, 78:16, 78:21, 78:25, 79:15, 79:17, 79:23, 79:25, 80:3, 80:4, 84:8, 84:11, 84:15, 84:17, 86:2, 86:5, 87:7, 87:9, 88:2, 88:4, 90:8, 90:9, 93:15, 93:16, 94:12, 94:14, 95:17, 95:20, 96:2, 96:4, 96:23, 96:25, 99:18, 101:23, 105:3, 106:16, 109:14, 109:25, 114:16, 114:22, 115:10, 117:10, 117:19, 119:4, 121:8, 122:3, 123:2, 136:20, 136:23, 138:17, 147:19, 157:10, 181:17, 181:22, 185:6, 194:6, 194:8, 194:13, 194:16, 195:14, 195:16, 195:18, 195:24, 196:3, 196:5, 196:8, 196:20, 196:22, 197:12, 197:17, 197:23, 199:5, 200:2, 200:4, 200:12, 202:12, 202:15, 203:11, 203:13, 203:15, 208:21, 208:24, 209:25, 210:3, 210:7, 210:24, 211:20, 211:23, 212:5, 213:17, 213:19, 213:20, 216:2, 216:8, 217:5, 218:22, 219:1, 221:25, 222:5, 222:7, 222:11, 222:19, 222:22, 224:14, 225:15, 226:5,

226:20, 229:25, 231:6
**MS** [214] - 2:13, 2:15, 2:17, 2:18, 4:7, 4:9, 5:10, 6:4, 6:6, 6:22, 7:2, 7:4, 9:21, 10:8, 11:9, 14:16, 16:5, 28:20, 50:8, 57:11, 57:22, 60:7, 61:13, 71:11, 97:5, 97:8, 97:12, 97:19, 97:21, 99:23, 99:24, 102:3, 104:7, 104:8, 105:9, 106:20, 107:20, 109:7, 109:11, 109:21, 110:1, 110:8, 110:24, 111:9, 114:13, 114:24, 115:6, 115:16, 117:14, 118:1, 119:1, 119:5, 119:12, 119:14, 119:17, 119:20, 120:8, 120:9, 120:21, 120:23, 121:1, 121:2, 121:13, 121:20, 122:2, 122:18, 123:23, 124:2, 127:14, 127:17, 136:4, 136:6, 136:8, 136:17, 136:21, 137:1, 137:5, 137:18, 137:20, 137:23, 138:14, 138:21, 138:23, 147:6, 147:8, 147:10, 147:16, 147:22, 148:1, 148:4, 149:15, 149:17, 149:21, 150:1, 156:22, 156:24, 157:1, 157:6, 157:14, 157:17, 158:12, 158:14, 160:8, 160:16, 160:18, 160:21, 160:23, 161:19, 161:21, 161:23, 162:17, 162:19, 162:21, 162:23, 163:20, 163:22, 164:1, 164:21, 164:23, 164:25, 166:12, 166:19, 167:11, 167:14, 168:19, 168:22, 170:5, 170:11, 170:13, 176:10, 176:17, 176:19, 176:25, 177:2, 178:12, 178:18, 178:20, 180:4, 180:9, 180:12, 180:14, 181:14, 181:18, 181:25, 182:5, 182:20, 183:2, 183:4, 183:24, 184:1, 185:8, 185:9, 187:8, 187:11, 189:9, 189:15, 189:22, 189:25, 192:1, 192:3, 192:17, 192:20, 193:10, 193:12, 193:25, 194:14, 195:17, 195:21, 195:25, 196:6, 197:6, 197:20, 198:3, 199:17, 200:7, 204:4, 205:11, 205:17, 206:2, 206:6, 206:22, 207:19, 208:4, 209:6, 210:21, 211:8, 211:12, 212:4, 212:20, 212:25, 213:5, 214:20, 217:13, 219:16, 219:18,

221:18, 222:8, 222:12, 222:15, 222:17, 223:16, 223:25, 224:7, 224:25, 225:6, 225:25, 226:4, 226:22, 227:24, 228:3, 229:2, 230:2, 230:21, 231:3
**multiple** [3] - 11:23, 56:6, 105:14
**music** [1] - 188:6
**must** [3] - 108:21, 190:24, 201:6
**mutation** [2] - 130:4, 163:14
**MyOnCall** [1] - 224:19
**MyOnCallDoc** [10] - 211:13, 212:5, 213:18, 214:22, 218:24, 219:12, 220:10, 222:9, 224:1, 228:5

# N

**N-x-x** [1] - 111:7
**N.'s** [2] - 111:25, 114:4
**N/A** [4] - 34:20, 35:4, 36:3, 36:24
**name** [33] - 16:17, 32:2, 33:11, 35:17, 36:11, 44:15, 44:22, 48:1, 49:14, 50:25, 51:5, 51:17, 53:18, 53:19, 56:22, 56:24, 57:4, 57:6, 60:15, 67:12, 77:16, 77:17, 78:2, 78:24, 96:5, 109:15, 111:6, 127:18, 127:20, 129:13, 130:13, 184:25, 191:7
**named** [17] - 40:15, 57:17, 60:19, 60:21, 60:23, 71:24, 72:2, 72:4, 114:9, 129:9, 132:7, 132:8, 141:6, 155:13, 155:21, 165:13, 166:23
**names** [3] - 75:24, 76:3, 109:17
**national** [1] - 87:4
**nature** [4] - 10:16, 19:18, 58:18, 105:15
**naysayers** [1] - 185:22
**NCDs** [5] - 19:10, 23:3, 68:23, 70:6, 71:20
**NE** [1] - 2:3
**nearly** [3] - 143:6, 151:22, 151:25
**neat** [5] - 34:22, 34:24, 35:4, 49:16
**necessarily** [5] - 30:14, 56:14, 65:15, 102:24, 230:14
**necessary** [10] - 20:17, 22:19, 65:23, 65:25, 66:2, 186:3, 220:22, 221:16, 230:16
**necessity** [4] - 65:17,

220:20, 226:10, 227:16
**neck** [1] - 113:9
**need** [40] - 4:5, 14:11, 20:24, 25:1, 25:3, 25:6, 28:18, 56:15, 87:16, 100:13, 102:12, 103:11, 107:1, 122:9, 130:11, 135:1, 135:2, 151:16, 152:2, 152:24, 153:2, 162:5, 162:6, 185:12, 186:4, 194:16, 194:23, 194:24, 203:5, 203:6, 207:22, 208:12, 215:1, 215:7, 217:16, 228:11, 228:19, 230:6, 230:19
**needed** [7] - 34:4, 127:25, 144:5, 153:8, 162:8, 186:25, 201:17
**needs** [11] - 4:22, 4:23, 5:6, 63:4, 68:18, 103:19, 106:23, 166:3, 202:13, 208:18, 217:7
**nervous** [1] - 173:3
**network** [2] - 180:23, 182:9
**never** [10] - 57:6, 57:9, 57:19, 119:16, 119:23, 120:3, 178:4, 179:22, 225:24
**new** [19] - 8:22, 24:16, 24:19, 47:14, 55:16, 73:14, 73:19, 73:22, 87:4, 90:10, 90:18, 90:21, 91:15, 111:23, 150:14, 152:1, 157:21, 157:24
**New** [5] - 1:16, 129:6, 129:20, 157:20
**news** [2] - 156:3, 156:4
**next** [56] - 12:23, 32:2, 44:14, 44:22, 48:9, 49:22, 50:15, 51:5, 51:17, 53:24, 54:3, 54:23, 57:15, 58:13, 79:6, 86:2, 88:2, 88:18, 91:3, 91:7, 91:9, 92:11, 93:15, 95:9, 110:4, 110:21, 110:23, 114:21, 121:1, 122:7, 122:12, 122:16, 123:13, 123:20, 123:22, 130:6, 130:7, 132:5, 142:16, 185:10, 185:23, 186:15, 187:20, 198:23, 205:23, 207:15, 208:1, 208:3, 208:13, 208:18, 209:7, 209:12, 210:17, 211:6, 214:23, 230:14
**nice** [3] - 15:3, 110:19, 131:3
**Nicholas** [15] - 132:7, 132:12, 132:16, 132:21, 133:5, 133:6, 140:17, 142:1, 160:2, 160:25, 162:25, 167:16, 167:21, 167:22, 175:6
**Nicholas'** [1] - 132:20

**Nick** [15] - 155:21, 156:19, 156:21, 157:21, 168:16, 169:4, 170:18, 171:3, 177:17, 185:21, 191:11, 192:23, 193:1, 193:14, 193:20

**night** [5] - 12:4, 12:17, 13:25, 188:1, 204:17

**Nine** [1] - 188:12

**nine** [3] - 130:11, 188:4, 188:5

**NO** [1] - 1:2

**none** [2] - 116:11, 129:7

**nonstop** [1] - 112:25

**noon** [1] - 192:24

**normal** [2] - 112:19, 218:6

**North** [1] - 78:6

**notepads** [7] - 15:11, 103:13, 108:23, 122:6, 165:21, 195:1, 202:5

**notes** [1] - 197:22

**nothing** [11] - 14:2, 16:5, 59:25, 72:25, 117:21, 142:11, 158:25, 179:23, 191:25, 221:15

**notice** [7] - 12:6, 12:9, 12:11, 30:19, 34:7, 40:7, 210:14

**notion** [1] - 13:21

**November** [3] - 1:4, 13:21, 231:18

**NPI** [1] - 34:24

**Number** [1] - 75:23

**number** [24] - 4:2, 4:9, 7:11, 7:15, 9:6, 33:25, 34:2, 34:20, 35:11, 35:25, 36:16, 48:3, 49:18, 68:8, 75:20, 75:21, 88:11, 152:24, 171:9, 173:25, 185:7, 195:7, 210:4

**numbers** [8] - 68:1, 68:7, 158:24, 167:20, 167:23, 183:22, 192:25, 193:6

**numerous** [1] - 132:10

**nursing** [1] - 135:10

**NW** [1] - 1:18

**Nyan** [1] - 188:1

## O

**o'clock** [3] - 12:16, 110:10, 194:24

**oath** [3] - 202:18, 202:19, 214:5

**object** [6] - 99:18, 101:23, 105:3, 106:16, 117:10, 147:21

**objected** [1] - 221:8

**objecting** [1] - 6:9

**objection** [44] - 6:14, 7:12, 9:18, 11:4, 11:7, 16:6, 57:11,
57:22, 60:7, 61:13, 71:11, 115:9, 115:10, 117:19, 119:2, 119:4, 121:8, 136:19, 136:23, 138:16, 138:17, 147:18, 147:19, 149:20, 157:9, 160:13, 166:16, 170:8, 176:13, 180:6, 180:10, 182:24, 189:12, 195:12, 196:18, 198:3, 198:4, 198:5, 199:16, 200:5, 200:9, 212:17, 214:15, 223:10

**objections** [5] - 7:21, 16:2, 196:23, 197:4, 197:21

**obligations** [1] - 9:8

**obscene** [1] - 184:23

**obtain** [1] - 135:8

**obtained** [1] - 148:21

**obviously** [12] - 6:23, 11:6, 55:13, 184:11, 202:17, 204:10, 205:22, 208:8, 209:14, 210:9, 216:2, 230:23

**occur** [1] - 83:25

**occurred** [2] - 98:16, 102:10

**October** [6] - 9:25, 85:21, 86:9, 87:22, 98:17, 172:3

**Odessa** [1] - 115:20

**OF** [5] - 1:1, 1:3, 1:9, 1:15, 1:18

**offense** [2] - 108:21, 201:10

**offered** [4] - 121:11, 121:14, 140:9, 216:4

**OFFICE** [1] - 1:18

**Office** [4] - 8:3, 8:10, 84:23, 85:24

**office** [9] - 50:14, 132:22, 134:6, 136:13, 137:13, 145:12, 148:16, 190:15, 192:23

**officer** [1] - 26:4

**OFFICER** [13] - 103:17, 103:25, 108:25, 110:16, 112:14, 122:20, 122:24, 123:9, 123:14, 165:25, 166:7, 198:16, 202:8

**officers** [1] - 190:20

**offices** [1] - 145:19

**official** [2] - 100:9, 107:19

**Official** [2] - 1:22, 231:19

**often** [13] - 23:18, 90:21, 143:4, 152:7, 156:17, 156:18, 160:3, 165:14, 168:24, 169:22, 169:25, 170:2, 170:4

**OIG** [5] - 8:2, 8:20, 17:18, 17:19, 95:2

**OIG's** [1] - 87:10

**OIG-related** [1] - 8:2

**old** [2] - 135:11, 135:14

**older** [2] - 135:9

**Omar** [11] - 132:8, 132:9, 132:10, 141:6, 141:8, 141:9, 141:17, 141:18, 141:25, 155:13, 175:6

**onboard** [1] - 185:5

**OnCall** [2] - 215:19, 227:10

**once** [17] - 15:9, 36:18, 45:8, 46:18, 49:7, 49:22, 50:25, 51:5, 62:8, 92:16, 101:2, 108:5, 146:4, 148:16, 156:18, 156:21, 205:24

**oncologist** [2] - 204:20, 205:12

**oncologists** [1] - 140:3

**oncology** [2] - 140:3, 183:12

**one** [118] - 4:9, 4:11, 4:15, 7:25, 9:24, 11:25, 12:23, 14:6, 16:17, 21:13, 31:8, 32:13, 32:16, 37:4, 39:4, 43:17, 43:24, 44:14, 44:18, 45:15, 45:18, 47:15, 48:16, 48:17, 52:1, 52:3, 52:8, 52:15, 52:23, 53:15, 63:7, 76:6, 77:2, 79:4, 79:20, 81:21, 85:12, 85:16, 85:19, 86:10, 86:15, 87:23, 88:24, 89:5, 89:8, 89:19, 94:1, 94:7, 96:23, 98:9, 98:12, 98:16, 102:19, 104:24, 104:25, 108:12, 109:14, 112:3, 123:1, 123:15, 127:2, 130:7, 131:23, 134:18, 141:10, 141:25, 145:12, 150:7, 150:20, 152:22, 155:12, 161:15, 163:7, 163:15, 165:19, 168:18, 171:21, 175:20, 178:8, 185:6, 186:12, 186:25, 188:16, 189:20, 192:25, 195:23, 196:11, 201:4, 202:14, 204:18, 204:19, 205:13, 206:14, 206:16, 207:1, 211:9, 212:2, 213:22, 214:3, 216:19, 222:21, 223:14, 223:20, 223:23, 224:4, 224:13, 224:23, 225:13, 226:8, 228:23, 229:1, 230:3, 230:18

**one's** [1] - 153:23

**one-minute** [1] - 165:19

**one-page** [1] - 178:8

**one-trick** [1] - 175:20

**one-week** [2] - 9:24, 98:12

**ones** [10] - 90:5, 125:12, 191:22, 197:8, 200:3, 205:22, 210:5, 216:20, 225:7, 228:24

**online** [3] - 4:2, 73:2,
201:12

**onwards** [1] - 125:23

**open** [7] - 91:13, 97:13, 169:13, 169:14, 174:17, 194:21, 230:3

**opening** [2] - 6:3, 228:20

**opens** [1] - 229:19

**operation** [3] - 5:18, 143:17, 193:22

**operations** [3] - 26:11, 61:7, 149:2

**opinion** [6] - 219:24, 224:16, 224:24, 225:13, 227:15

**opinions** [5] - 9:2, 9:3, 19:13, 19:15, 19:17

**opportunity** [2] - 156:10, 174:16

**opposed** [3] - 10:23, 212:24, 226:10

**opposing** [1] - 13:16

**options** [1] - 140:13

**Order** [1] - 4:1

**order** [26] - 6:16, 20:17, 22:18, 26:22, 62:11, 62:17, 63:5, 70:9, 83:18, 100:13, 102:12, 106:15, 106:21, 107:5, 136:12, 141:2, 141:4, 149:2, 149:4, 149:8, 149:9, 164:11, 178:9, 189:20, 190:12, 204:21

**ordered** [3] - 20:20, 65:3, 134:23

**ordering** [3] - 65:24, 179:6, 179:12

**orders** [4] - 65:21, 104:18, 106:22, 223:19

**organization** [2] - 24:7, 24:9

**organizations** [1] - 23:25

**organs** [1] - 163:12

**origin** [1] - 131:20

**original** [5] - 216:12, 216:15, 219:8, 219:9, 222:21

**originals** [1] - 214:2

**otherwise** [2] - 152:25, 197:15

**ourselves** [2] - 166:2, 186:5

**out-of-court** [1] - 121:10

**outflow** [1] - 70:24

**outreach** [1] - 150:7

**outside** [12] - 5:4, 7:4, 72:11, 117:24, 172:13, 172:17, 197:5, 204:3, 207:16, 209:1, 209:10, 229:20

**ovarian** [1] - 140:25

**overall** [1] - 179:16

**overeating** [1] - 112:20

**overheard** [2] - 168:16,

169:4
**overlapped** [1] - 155:18
**overpriced** [1] - 126:9
**override** [2] - 89:17, 154:22
**overrule** [2] - 214:10, 214:14
**overruled** [8] - 11:4, 60:8, 61:14, 71:12, 99:21, 101:25, 106:18
**overutilization** [1] - 88:10
**own** [10] - 9:3, 18:18, 23:16, 25:1, 25:3, 25:5, 25:6, 69:1, 143:13, 146:10
**owned** [1] - 184:10
**owner** [4] - 25:22, 30:15, 35:18, 36:14
**owns** [2] - 130:12, 143:14

## P

**p.m** [23] - 1:5, 4:10, 103:18, 103:23, 103:24, 104:1, 109:1, 110:12, 110:13, 110:17, 122:15, 123:6, 123:7, 123:10, 166:1, 166:4, 166:5, 166:8, 193:3, 195:5, 198:17, 202:9, 231:10
**P.W** [4] - 2:16, 109:5, 114:25, 115:3
**pace** [3] - 14:12, 207:24, 209:3
**page** [49] - 29:3, 30:7, 30:10, 32:3, 32:8, 32:9, 33:5, 34:10, 34:13, 36:5, 37:23, 41:24, 43:15, 45:13, 46:13, 47:11, 48:22, 50:19, 51:8, 53:12, 53:13, 54:13, 54:14, 54:19, 68:16, 75:6, 86:2, 87:7, 87:8, 87:16, 88:2, 91:3, 91:7, 93:15, 94:13, 95:2, 95:9, 95:17, 95:18, 119:18, 120:22, 121:1, 139:2, 139:6, 178:8, 181:7
**PAGE** [1] - 2:11
**pages** [6] - 29:4, 29:6, 31:17, 31:20, 31:23, 32:1
**Pages** [1] - 1:7
**paid** [33] - 22:9, 29:23, 43:6, 54:20, 65:1, 65:2, 65:3, 65:6, 79:20, 79:21, 80:10, 81:2, 81:7, 81:9, 81:10, 107:5, 130:1, 148:13, 158:5, 159:25, 161:18, 165:17, 167:7, 168:3, 168:6, 171:23, 173:7, 173:9, 173:10, 173:11, 173:12, 178:7, 178:9
**pain** [1] - 125:10
**Palm** [1] - 111:17
**PALM** [1] - 1:2
**Palmetto** [15] - 74:10,

74:13, 83:2, 83:18, 83:23, 83:25, 84:3, 84:4, 175:14, 176:4, 176:24, 177:5, 177:12
**Palmetto's** [2] - 83:14, 175:15
**pan** [1] - 153:20
**panel** [7] - 56:9, 56:12, 56:13, 140:15, 163:18, 164:12
**paneling** [1] - 140:20
**panels** [15] - 55:18, 55:19, 55:20, 55:21, 55:24, 56:5, 56:7, 56:16, 58:3, 58:6, 58:11, 58:12, 104:12, 140:18
**paper** [7] - 67:3, 67:17, 67:19, 84:11, 84:12, 114:2, 121:6
**paperwork** [2] - 100:24, 101:2, 145:16
**paragraph** [2] - 93:23, 95:12
**parents** [1] - 151:12
**Paris** [1] - 187:17
**part** [24] - 6:8, 10:14, 11:4, 30:4, 32:11, 39:19, 47:5, 63:7, 64:11, 69:6, 74:8, 76:23, 111:12, 118:20, 155:7, 178:5, 190:15, 203:2, 222:25, 225:18, 226:13, 227:12, 227:25, 230:10
**Part** [11] - 18:6, 18:7, 18:8, 21:9, 21:10, 66:22, 86:9, 87:22, 88:6, 92:12, 98:14
**part-time** [1] - 111:12
**participated** [1] - 127:8
**particular** [24] - 9:9, 32:3, 47:25, 59:5, 63:8, 66:12, 79:12, 80:22, 83:23, 84:21, 89:18, 91:2, 98:22, 113:5, 125:3, 126:17, 140:9, 140:22, 141:21, 154:6, 213:16, 226:13, 228:23
**particularly** [3] - 164:9, 164:16, 220:13
**partied** [1] - 159:11
**parties** [1] - 190:21
**partner** [3] - 130:17, 155:1, 186:25
**parts** [1] - 212:8
**party** [1] - 192:16
**partying** [1] - 193:17
**pass** [3] - 70:11, 97:2, 218:19
**passed** [2] - 70:9, 70:13
**passing** [1] - 134:13
**past** [2] - 117:16, 230:24
**PATEL** [1] - 1:6
**Patel** [96] - 4:3, 9:5, 10:3, 10:20, 10:21, 16:18, 25:8, 25:25, 26:2, 26:5, 26:8,

35:18, 36:12, 36:20, 37:1, 38:17, 39:13, 40:8, 41:7, 41:10, 41:21, 43:11, 44:19, 44:24, 45:8, 46:9, 48:11, 48:20, 49:24, 52:10, 53:6, 54:25, 55:4, 61:1, 61:10, 66:13, 72:25, 85:12, 95:21, 107:19, 127:20, 127:22, 130:24, 131:1, 131:18, 132:2, 132:15, 133:6, 133:18, 133:23, 134:20, 135:7, 135:15, 137:9, 139:18, 139:22, 140:8, 140:22, 141:19, 142:20, 143:2, 143:5, 145:8, 146:15, 147:14, 149:3, 149:9, 151:21, 153:5, 154:1, 154:11, 154:12, 156:6, 162:15, 165:4, 165:5, 168:13, 169:9, 169:22, 171:13, 174:8, 175:12, 177:12, 177:15, 179:14, 182:14, 183:5, 183:6, 183:10, 184:8, 188:2, 188:23, 189:16, 191:8, 191:10, 193:8
**Patel's** [5] - 35:9, 44:15, 48:1, 50:25, 143:10
**pathology** [1] - 104:22
**patience** [1] - 97:17
**patient** [43] - 5:17, 6:10, 6:12, 22:24, 23:1, 63:8, 63:14, 65:8, 65:11, 68:1, 104:24, 110:2, 110:4, 124:22, 132:24, 145:23, 148:25, 181:7, 204:24, 211:12, 212:25, 213:2, 217:14, 217:24, 218:5, 219:20, 219:24, 220:4, 222:17, 224:1, 224:2, 224:16, 224:17, 225:2, 225:5, 225:9, 225:11, 226:14, 227:4, 227:17, 227:22, 228:23, 229:12
**patient's** [3] - 67:12, 106:23, 107:1
**patients** [15] - 75:25, 111:13, 124:17, 124:18, 124:23, 135:18, 135:20, 136:2, 145:12, 150:18, 152:7, 152:14, 153:25, 183:13, 219:21
**patterns** [2] - 179:7, 179:13
**paused** [2] - 181:21, 182:4
**pay** [16] - 21:14, 21:16, 21:22, 21:24, 22:2, 22:5, 101:22, 102:7, 118:15, 144:23, 144:24, 152:25, 158:5, 158:10, 158:21, 159:23

**payday** [1] - 165:15
**paying** [2] - 144:24, 152:25
**payment** [12] - 22:6, 43:3, 43:8, 63:16, 64:5, 65:13, 79:18, 81:5, 102:11, 103:5, 118:15, 171:6
**payments** [1] - 168:3
**pays** [2] - 156:15, 165:8
**PC** [2] - 1:18, 2:3
**PDF** [1] - 213:3
**PDFs** [2] - 213:8, 213:9
**Peachtree** [1] - 1:18
**Peactree** [1] - 2:6
**peel** [1] - 193:19
**Pennsylvania** [2] - 93:11, 176:2
**people** [38] - 55:4, 56:6, 58:12, 62:18, 102:8, 126:10, 126:11, 126:15, 127:25, 134:9, 134:11, 135:3, 135:9, 135:10, 135:11, 135:14, 143:12, 143:22, 144:2, 145:11, 146:1, 149:6, 150:8, 150:15, 150:16, 150:17, 152:25, 153:15, 156:11, 156:12, 159:17, 164:19, 167:23, 171:22, 182:19, 201:14, 201:25
**Pepsi** [1] - 4:22
**per** [2] - 168:2, 169:7
**percent** [12] - 92:20, 92:21, 93:5, 93:25, 151:7, 154:21, 154:23, 168:1, 175:16, 176:2, 186:5
**percentage** [3] - 153:2, 153:4, 153:10
**perfect** [6] - 203:11, 203:25, 205:3, 205:6, 206:10, 207:11
**perfection** [1] - 203:15
**perfectly** [1] - 213:25
**performs** [1] - 20:19
**perhaps** [13] - 18:2, 22:11, 79:24, 102:5, 195:11, 198:9, 203:23, 204:7, 206:10, 211:16, 221:19, 221:21, 230:13
**period** [12] - 9:24, 61:11, 91:4, 98:12, 98:16, 143:4, 158:18, 171:7, 171:10, 172:14, 213:22
**periods** [1] - 10:13
**PerkinElmer** [1] - 57:17
**permission** [2] - 157:13, 216:5
**permitted** [1] - 14:5
**person** [33] - 30:12, 30:14, 30:18, 30:21, 30:23, 33:8, 33:11, 33:22, 38:16, 40:9, 43:12, 51:10, 52:7, 54:8,

56:25, 57:1, 57:4, 57:12, 100:8, 100:13, 101:3, 107:16, 112:19, 117:8, 117:15, 127:11, 127:18, 144:2, 146:24, 151:14, 155:8, 185:24, 215:16
**personality** [2] - 112:12, 112:17
**personally** [3] - 18:17, 32:23, 96:10
**perspective** [1] - 210:11
**pertains** [1] - 6:6
**Petersen** [1] - 60:19
**PGx** [5] - 129:3, 161:16, 162:15, 165:3, 176:23
**Ph.D** [1] - 56:23
**Ph.D.'s** [1] - 55:25
**pharma** [1] - 140:2
**pharmaceutical** [1] - 125:17
**Pharmaceutical** [1] - 127:6
**pharmacies** [1] - 127:7
**pharmacogenomic** [1] - 129:4
**pharmacy** [1] - 155:10
**phone** [23] - 33:25, 48:3, 49:18, 62:15, 63:13, 64:12, 113:1, 113:2, 113:17, 113:18, 113:22, 113:24, 134:21, 135:4, 135:5, 150:8, 154:1, 156:3, 162:4, 162:10, 162:13, 191:11, 193:19
**phones** [4] - 131:4, 134:10, 134:12, 134:14
**phonetic** [5] - 71:25, 72:4, 150:6, 187:23, 188:1
**phonetic)** [1] - 38:24
**phrase** [2] - 175:18, 229:1
**physician** [11] - 65:8, 65:11, 66:9, 119:24, 139:23, 139:24, 140:1, 143:23, 145:9, 145:10, 167:4
**physician's** [1] - 136:13
**physicians** [6] - 56:8, 72:19, 139:22, 139:23, 140:6, 161:8
**physicians'** [1] - 145:19
**pick** [2] - 110:20, 200:21
**picked** [2] - 130:25, 131:2
**picking** [2] - 72:18, 182:1
**picture** [1] - 10:25
**piece** [6] - 31:3, 31:6, 101:2, 121:6, 151:4, 152:17
**pile** [1] - 191:14
**pilot** [3] - 133:14, 185:13, 185:15
**PIM** [1] - 89:16
**pitch** [1] - 150:24
**pitched** [1] - 136:1
**place** [15] - 22:18, 35:1,

37:14, 50:15, 63:12, 89:9, 89:10, 89:20, 89:21, 116:20, 131:5, 147:13, 174:19, 175:22, 194:25
**places** [3] - 146:17, 163:14, 201:15
**plan** [14] - 5:8, 9:17, 14:9, 87:3, 108:8, 128:1, 175:25, 187:21, 203:8, 205:1, 205:24, 207:7, 209:2, 217:21
**plane** [1] - 129:21
**planning** [3] - 13:3, 210:13, 211:5
**plans** [1] - 151:24
**platform** [3] - 153:8, 153:9, 153:24
**play** [1] - 181:15
**played** [1] - 182:6
**player** [1] - 213:21
**playing** [3] - 12:19, 181:17, 221:14
**plays** [2] - 208:15, 221:11
**plea** [4] - 126:22, 128:2, 128:6, 128:15
**plead** [1] - 126:3
**pled** [2] - 126:1, 126:5
**plugging** [1] - 151:19
**plummet** [1] - 173:24
**point** [29] - 4:20, 8:22, 8:24, 9:9, 21:20, 87:24, 88:18, 89:15, 92:11, 131:21, 173:25, 175:13, 175:14, 185:24, 189:20, 198:11, 199:15, 200:15, 209:5, 216:4, 216:9, 217:6, 220:13, 221:4, 221:9, 221:19, 221:21, 228:13, 229:7
**pointed** [3] - 14:6, 45:1, 227:21
**policies** [1] - 23:19
**policy** [5] - 23:9, 23:10, 23:11, 23:13, 23:15, 23:16, 94:21
**pony** [1] - 175:20
**poor** [3] - 126:10, 134:8, 135:3
**popular** [1] - 182:9
**populations** [1] - 126:10
**portion** [3] - 145:1, 168:19, 212:23
**position** [11] - 9:20, 9:21, 36:14, 59:14, 63:13, 139:12, 196:17, 211:16, 213:24, 215:17, 220:1
**possession** [2] - 213:13, 228:8
**possible** [9] - 14:10, 126:14, 140:19, 142:4, 152:11, 164:10, 165:18, 175:3, 205:21

**possibly** [1] - 222:7
**post** [1] - 22:6
**post-payment** [1] - 22:6
**postpayment** [1] - 22:11
**potential** [5] - 4:16, 4:24, 128:16, 206:23, 229:8
**potentially** [4] - 12:1, 100:23, 177:16, 212:7
**practice** [3] - 48:9, 51:17, 139:21
**practices** [1] - 140:4
**practitioner** [1] - 204:23
**predates** [1] - 10:1
**predicate** [1] - 228:12
**predict** [2] - 163:16, 163:18
**prefer** [2] - 209:14, 215:14
**preferred** [2] - 136:12, 137:7
**prep** [1] - 208:23
**prep's** [1] - 208:21
**prepaid** [4] - 134:10, 135:4, 135:5, 150:8
**preparation** [4] - 6:20, 13:11, 208:14, 208:19
**preparations** [1] - 17:2
**prepared** [3] - 8:3, 12:18, 31:11
**preparing** [2] - 12:3, 12:10
**prescriptions** [2] - 126:13, 153:10
**presence** [5] - 5:4, 86:11, 88:5, 195:13, 198:10
**present** [1] - 4:4
**presentation** [1] - 11:5
**presented** [1] - 219:20
**presenting** [1] - 224:10
**presents** [3] - 24:21, 90:10, 112:18
**president** [1] - 214:22
**pressure** [1] - 116:24
**presumably** [4] - 7:16, 33:25, 121:11, 206:20
**presume** [1] - 207:9
**pretty** [7] - 34:22, 34:24, 56:4, 59:12, 72:21, 173:19, 187:16
**prevalent** [1] - 92:17
**prevent** [1] - 88:10
**preview** [1] - 212:6
**previously** [2] - 16:5, 147:8
**primarily** [3] - 135:18, 217:12, 219:21
**primary** [6] - 139:23, 140:6, 143:7, 143:8, 208:8, 225:7
**principle** [1] - 223:10
**priority** [1] - 158:3
**Prison** [1] - 125:25
**privacy** [1] - 75:25
**private** [2] - 23:16, 126:19

**privy** [1] - 220:25
**probation** [1] - 172:14
**problem** [14] - 87:19, 89:14, 122:24, 159:23, 173:13, 173:23, 211:18, 217:2, 224:9, 224:13, 227:3, 227:23, 229:10, 229:18
**problematic** [1] - 224:5
**problems** [5] - 64:16, 90:11, 90:18, 211:6, 227:18
**procedural** [1] - 76:18
**procedure** [11] - 9:25, 86:9, 87:22, 88:19, 88:24, 89:4, 89:5, 90:21, 93:5, 94:5, 104:13
**procedures** [1] - 105:14
**proceed** [6] - 97:18, 115:4, 121:19, 160:13, 181:16, 181:19
**proceedings** [3] - 97:7, 194:3, 231:15
**Proceedings** [2] - 97:13, 194:21
**process** [28] - 20:9, 20:12, 20:16, 22:15, 26:18, 27:9, 29:17, 29:19, 30:4, 34:4, 39:18, 39:19, 39:22, 67:24, 69:3, 72:14, 72:20, 83:6, 83:8, 144:17, 145:2, 146:11, 148:18, 149:5, 149:7, 152:12, 216:6, 223:18
**processed** [1] - 81:3
**processes** [3] - 26:21, 27:7, 105:17
**procure** [1] - 214:18
**produced** [8] - 8:5, 18:20, 125:14, 180:18, 213:1, 213:14, 215:23, 223:6
**producer** [1] - 188:6
**production** [3] - 188:17, 212:13
**products** [3] - 125:3, 125:17, 126:12
**professional** [1] - 118:11
**professor** [1] - 124:24
**professors** [1] - 201:21
**program** [9] - 83:14, 99:12, 99:17, 133:19, 177:22, 178:6, 179:16
**programs** [1] - 126:17
**prohibited** [3] - 90:20, 91:5, 172:11
**projects** [4] - 143:13, 183:6, 183:10, 183:20
**promise** [2] - 13:15, 100:3
**promised** [3] - 107:16, 128:8, 128:11
**promises** [1] - 100:17
**pronounce** [1] - 53:18
**propensity** [3] - 131:16,

140:24, 153:22
**proper** [1] - 227:14
**property** [2] - 31:3, 31:6
**proposed** [1] - 219:3
**proposition** [1] - 21:1
**protect** [1] - 75:25
**protective** [1] - 186:14
**protein** [2] - 91:6, 91:16
**proud** [2] - 164:9, 164:16
**provide** [3] - 18:18, 69:4, 181:11
**provided** [7] - 18:10, 60:25, 71:16, 82:5, 213:12, 220:9, 225:12
**provider** [7] - 26:23, 28:17, 39:20, 65:13, 100:10, 136:15, 137:7
**provider's** [2] - 81:3, 136:12
**providers** [3] - 72:9, 72:11, 102:21
**provides** [1] - 214:10
**providing** [1] - 102:21
**provision** [2] - 139:14, 139:16
**provisions** [1] - 24:4
**provoke** [1] - 181:11
**psoriasis** [1] - 133:1
**psychiatry** [3] - 124:15, 124:19, 124:21
**PTEN** [3] - 130:3, 163:9, 164:11
**public** [1] - 62:21
**publicly** [1] - 17:9
**publish** [28] - 69:2, 69:3, 92:19, 119:1, 119:3, 137:1, 138:21, 148:1, 149:21, 157:13, 160:21, 161:21, 162:19, 163:22, 164:23, 167:11, 168:19, 170:11, 176:17, 176:25, 178:18, 180:12, 183:2, 183:24, 187:8, 189:22, 192:1, 192:17
**published** [3] - 9:23, 181:20, 182:3
**publishing** [1] - 196:14
**pull** [4] - 46:15, 84:16, 151:2, 167:22
**pulled** [1] - 154:15
**Puntillo** [3] - 119:12, 119:17, 120:21
**purported** [1] - 228:21
**purportedly** [1] - 227:2
**purpose** [4] - 12:6, 137:11, 181:9, 208:6
**pursuant** [2] - 128:2, 223:11
**push** [3] - 4:21, 174:13, 186:12
**pushed** [1] - 144:13

**put** [39] - 12:23, 31:12, 31:16, 32:1, 35:8, 44:24, 48:3, 48:5, 48:11, 49:24, 50:15, 51:20, 54:5, 54:7, 54:11, 54:12, 81:3, 100:15, 127:24, 142:2, 144:12, 144:14, 144:16, 157:11, 157:12, 164:12, 171:3, 176:21, 188:15, 197:17, 199:8, 205:25, 208:23, 209:16, 209:24, 215:1, 219:21, 221:20
**puts** [2] - 12:14, 151:14, 208:18
**putting** [2] - 12:17, 67:4

## Q

**qualification** [1] - 64:4
**qualifications** [2] - 64:5, 64:6
**qualifies** [1] - 64:1
**qualify** [1] - 63:16
**quality** [2] - 169:25, 228:25
**quarter** [5] - 110:10, 173:21, 174:1, 174:2, 174:4
**questioning** [1] - 97:24
**questions** [16] - 16:20, 25:23, 99:3, 100:20, 101:13, 105:20, 106:5, 106:10, 107:20, 114:13, 114:16, 122:2, 122:3, 150:19, 151:17, 193:25
**quick** [4] - 5:6, 11:17, 103:11, 165:19
**quickly** [3] - 43:2, 121:1, 174:14
**quite** [9] - 9:4, 19:6, 31:8, 35:4, 90:1, 200:23, 203:1, 206:14, 217:17
**quote** [2] - 8:16, 82:15

## R

**R.C** [2] - 77:25, 78:4
**radar** [3] - 142:19, 142:21, 142:23
**Rafferty** [19] - 7:7, 9:22, 11:5, 11:12, 14:17, 15:7, 15:14, 16:17, 28:20, 50:11, 97:24, 98:25, 99:3, 100:20, 101:13, 104:11, 105:20, 106:10, 107:11
**RAFFERTY** [161] - 2:5, 2:13, 7:8, 7:11, 7:17, 7:19, 11:10, 11:14, 14:19, 15:15, 15:20, 15:25, 16:14, 28:18, 28:22, 28:24, 30:7, 30:9, 30:24, 31:1, 32:7, 32:10, 33:5, 33:7, 34:10, 34:17,

34:18, 36:5, 36:7, 37:6, 37:8, 37:16, 37:17, 37:22, 37:25, 38:19, 38:20, 40:10, 40:12, 40:18, 40:24, 41:13, 41:14, 41:23, 42:4, 42:25, 43:1, 43:14, 43:16, 44:9, 44:12, 44:13, 45:4, 45:5, 45:12, 45:14, 46:13, 46:17, 47:11, 47:13, 47:18, 47:21, 48:14, 48:15, 48:22, 48:23, 50:12, 50:19, 50:20, 51:8, 51:9, 51:24, 51:25, 52:13, 52:14, 52:21, 52:22, 53:12, 53:14, 54:11, 54:15, 57:16, 57:25, 60:10, 61:17, 66:25, 67:2, 67:6, 67:9, 67:10, 71:15, 75:5, 75:7, 75:11, 75:14, 75:15, 75:24, 76:3, 76:5, 76:12, 76:14, 76:16, 76:17, 77:16, 77:19, 77:21, 77:23, 77:24, 78:1, 78:3, 78:10, 78:16, 78:21, 78:25, 79:15, 79:17, 79:23, 79:25, 80:3, 80:4, 84:8, 84:11, 84:15, 84:17, 86:2, 86:5, 87:7, 87:9, 88:2, 88:4, 90:8, 90:9, 93:15, 93:16, 94:12, 94:14, 95:17, 95:20, 96:2, 96:4, 96:23, 96:25, 99:18, 101:23, 105:3, 106:16, 109:14, 109:25, 114:16, 114:22, 115:10, 117:10, 117:19, 119:4, 121:8, 122:3, 123:2, 196:20, 196:22, 213:19, 222:22
**raided** [2] - 155:24, 156:1
**raiding** [1] - 156:5
**raise** [6] - 111:3, 142:4, 142:9, 217:19, 221:7, 229:24
**raising** [2] - 211:19, 229:19
**Rama** [4] - 158:10, 159:18, 193:2
**Ramamurthy** [72] - 4:10, 4:13, 5:1, 5:12, 11:21, 11:24, 11:25, 12:4, 12:5, 12:17, 13:19, 13:22, 14:4, 109:10, 110:5, 122:17, 122:19, 122:22, 123:24, 124:3, 125:8, 128:25, 135:12, 136:9, 137:6, 137:16, 137:24, 138:24, 139:3, 139:8, 147:11, 148:5, 150:2, 151:3, 157:2, 157:19, 158:15, 160:24, 161:25, 162:24, 164:2, 164:6, 165:1, 166:20, 167:15, 168:18, 168:23, 170:15, 172:1, 176:20, 177:4, 179:9, 180:15, 181:3, 183:9, 185:11, 185:19, 189:18, 190:7, 192:4, 192:21,

193:13, 204:3, 205:5, 205:25, 208:8, 209:20, 210:20, 211:2, 230:12, 230:17, 231:9
**RAMAMURTHY** [2] - 2:18, 123:25
**Ramamurthy's** [2] - 12:8, 203:9
**ramifications** [1] - 144:6
**ran** [3] - 66:5, 130:16, 193:20
**rapidly** [1] - 24:13
**rare** [1] - 105:17
**rarely** [2] - 105:16, 105:19
**RAS** [1] - 130:3
**rate** [2] - 88:13, 151:7
**rather** [2] - 9:10, 10:22
**re** [1] - 190:8
**reach** [2] - 206:19, 207:17
**reached** [1] - 185:20
**reaching** [1] - 129:18
**reaction** [3] - 156:14, 179:8, 181:12
**reactive** [2] - 91:6, 91:16
**read** [32] - 7:22, 31:20, 46:7, 49:16, 59:18, 79:7, 86:8, 89:7, 89:18, 91:2, 93:23, 96:13, 96:15, 96:19, 98:3, 98:7, 99:8, 99:10, 99:14, 99:15, 100:1, 151:15, 161:13, 176:20, 177:4, 185:11, 185:19, 186:16, 186:20, 187:12, 190:7
**reading** [11] - 9:16, 9:23, 47:5, 86:19, 87:24, 89:2, 94:3, 94:10, 100:3, 158:16, 195:14
**reads** [2] - 90:20, 93:19
**ready** [10] - 4:4, 97:18, 115:5, 123:8, 146:6, 186:13, 195:16, 200:20, 201:19, 204:1
**real** [5] - 43:2, 148:12, 148:14, 164:10, 214:3
**realistic** [2] - 207:16, 209:17
**realistically** [4] - 203:3, 203:5, 205:9, 207:4
**really** [57] - 10:15, 12:19, 13:3, 13:9, 13:17, 63:18, 63:19, 64:12, 64:13, 68:7, 73:23, 98:10, 116:14, 118:20, 120:13, 125:13, 126:11, 133:21, 139:23, 140:6, 140:13, 141:1, 141:3, 144:2, 144:3, 144:6, 145:4, 150:23, 152:9, 156:18, 158:25, 163:18, 165:15, 167:4, 170:2, 171:17, 173:3, 183:20, 186:7, 186:10,

186:12, 189:6, 189:19,
193:15, 193:17, 193:21,
203:21, 208:6, 210:20,
212:10, 212:22, 213:3,
217:7, 220:2, 225:8, 230:10
**rearranged** [1] - 4:12
**reason** [6] - 13:23, 63:7,
189:7, 214:9, 217:23, 229:9
**reasons** [2] - 64:1, 102:19
**receipt** [3] - 38:14, 129:25,
191:12
**receive** [4] - 62:18, 128:18,
146:19, 175:5
**Received** [2] - 3:1, 3:23
**received** [33] - 12:10,
16:11, 16:12, 112:23, 113:8,
113:22, 113:25, 115:14,
118:23, 119:9, 137:4,
138:19, 147:25, 149:24,
157:16, 160:15, 161:5,
166:17, 167:8, 168:4, 170:9,
176:15, 178:16, 180:7,
180:11, 182:25, 189:14,
192:6, 199:24, 200:11,
212:12, 222:10, 228:8
**receiving** [3] - 118:21,
149:12, 154:1
**recess** [2] - 110:11, 231:9
**recessed** [5] - 103:23,
110:12, 123:6, 166:4, 231:10
**recognize** [8] - 13:2,
102:25, 119:6, 136:9,
137:24, 147:11, 157:2,
168:23
**recognized** [1] - 190:16
**recognizes** [1] - 213:11
**recommendations** [3] -
94:25, 95:2, 128:19
**recommended** [3] - 130:22,
134:20, 134:23
**record** [21] - 6:24, 7:23,
9:16, 86:8, 103:24, 110:13,
111:6, 123:7, 127:14,
127:16, 166:5, 197:11,
217:20, 218:14, 218:18,
218:23, 220:11, 223:12,
223:22, 224:16, 224:18
**recorded** [1] - 6:3
**recordings** [1] - 5:21
**records** [16] - 6:13, 6:14,
19:4, 211:9, 212:10, 213:6,
214:25, 215:17, 216:19,
217:11, 217:18, 218:10,
221:14, 221:15, 228:5,
228:12
**recoup** [2] - 22:10, 22:11
**rectify** [1] - 154:9
**red** [3] - 142:5, 142:9,
142:13
**redacted** [3] - 109:17,

217:24, 218:6
**redirect** [9] - 10:12, 10:22,
15:9, 97:4, 97:9, 97:15,
97:16, 104:4, 203:24
**REDIRECT** [2] - 2:13, 97:20
**reduce** [2] - 151:20, 169:20
**reduced** [1] - 128:22
**reduction** [2] - 128:16,
128:18
**reevaluate** [1] - 210:12
**refer** [1] - 139:12
**reference** [5] - 178:22,
184:2, 184:4, 225:18, 225:19
**referenced** [1] - 6:2
**references** [1] - 29:12
**referencing** [1] - 178:25
**referral** [2] - 139:13, 191:1
**referred** [2] - 5:17, 5:23
**referring** [2] - 131:11, 133:4
**refers** [1] - 82:10
**reflect** [2] - 127:14, 127:16
**reflecting** [1] - 4:11
**refresh** [1] - 208:22
**refreshing** [1] - 208:22
**regarding** [8] - 5:4, 6:3,
18:17, 108:16, 110:6,
190:22, 201:13, 201:14
**regardless** [1] - 84:5
**regards** [2] - 27:10, 58:7
**REGINALD** [1] - 1:14
**register** [2] - 137:12,
178:10
**registers** [1] - 136:13
**registration** [1] - 167:4
**regular** [1] - 173:9
**regularly** [2] - 74:4, 215:18
**regulation** [1] - 27:8
**Regulations** [1] - 19:24
**regulations** [22] - 9:2,
17:12, 18:18, 19:7, 19:9,
20:25, 29:13, 62:9, 65:5,
65:6, 65:19, 99:12, 99:17,
106:11, 107:11, 107:14,
152:6, 174:8, 174:12,
174:15, 190:18, 190:23
**rehab** [1] - 184:10
**reimbursed** [3] - 66:5, 66:6,
101:17
**reimbursement** [2] -
169:23, 175:9
**reimbursements** [2] -
167:9, 173:7
**rejected** [3] - 40:5, 40:8,
191:3
**rejection** [1] - 53:8
**related** [8] - 8:2, 17:20,
17:25, 18:2, 19:10, 26:15,
74:22, 124:22
**relates** [2] - 9:24, 136:15
**relating** [1] - 113:4

**relationship** [7] - 143:1,
178:2, 189:5, 189:20, 190:9,
190:23, 219:24
**relatively** [2] - 109:9, 207:2
**relaxed** [3] - 62:9, 62:14,
62:22
**relayed** [2] - 154:12, 154:13
**relevance** [1] - 8:14
**relevancy** [2] - 10:14, 221:8
**relevant** [1] - 190:22
**reliable** [2] - 216:6, 216:11
**rely** [2] - 199:3, 218:10
**relying** [1] - 225:23
**remain** [1] - 202:19
**remaining** [3] - 91:13,
206:11, 206:18
**remember** [30] - 31:8,
44:16, 85:14, 85:17, 85:19,
85:21, 113:7, 118:20, 132:9,
150:22, 154:5, 154:6,
155:15, 162:16, 168:15,
169:2, 173:17, 174:11,
175:19, 177:11, 182:15,
186:2, 186:6, 191:13,
191:14, 192:14, 200:22,
200:25, 201:9
**remind** [1] - 108:12
**removed** [3] - 196:24,
217:24, 218:16
**renew** [1] - 11:7
**renowned** [1] - 57:10
**rep** [5] - 139:11, 145:4,
150:14, 187:23
**repeat** [2] - 102:2, 204:11
**repeatedly** [1] - 8:15
**replace** [2] - 74:13, 155:20
**replaced** [1] - 74:10
**report** [16] - 9:23, 85:24,
87:10, 87:15, 90:1, 90:15,
91:21, 92:7, 94:19, 97:25,
98:3, 98:5, 98:22, 144:20,
171:6, 200:19
**REPORTED** [1] - 1:20
**reporter** [2] - 7:14, 109:22
**Reporter** [2] - 1:22, 231:19
**reports** [1] - 211:13
**represent** [1] - 16:18
**representation** [1] - 215:5
**Representative** [1] - 138:8
**representative** [1] - 128:10
**representing** [1] - 215:17
**represents** [2] - 139:11,
163:7
**reps** [12] - 140:2, 146:19,
147:2, 148:10, 149:13,
157:23, 157:24, 161:6,
161:9, 163:18, 186:4, 186:17
**request** [2] - 195:8, 230:3
**require** [2] - 6:7, 201:11
**required** [1] - 12:16

**requirement** [1] - 174:23
**requirements** [5] - 63:21,
63:24, 73:22, 73:23, 152:3
**requires** [1] - 27:5
**requisitions** [4] - 56:18,
104:18, 191:1, 191:2
**reread** [1] - 87:1
**research** [4] - 96:17,
108:16, 183:13, 201:14
**reservation** [1] - 192:12
**reside** [3] - 111:16, 111:20,
125:24
**residencies** [1] - 124:11
**resistance** [4] - 126:11,
146:1, 151:20, 182:18
**resolve** [1] - 213:16
**resolved** [1] - 6:8
**resources** [1] - 185:13
**respect** [22] - 5:14, 5:16,
5:20, 9:10, 15:17, 17:1,
18:25, 20:16, 22:16, 22:22,
25:16, 26:18, 60:4, 60:14,
65:20, 66:12, 70:18, 72:24,
73:14, 73:24, 74:25, 211:12
**respond** [2] - 188:11,
188:22
**responds** [4] - 95:9, 95:12,
176:22, 188:23
**response** [2] - 82:16, 95:6,
164:7, 173:18, 187:13, 213:1
**responsibilities** [2] -
100:16, 139:14
**responsibility** [1] - 101:5
**responsible** [6] - 65:18,
66:8, 66:9, 100:7, 101:3,
163:11
**rest** [7] - 79:8, 108:9,
120:21, 186:23, 188:21,
206:23, 209:7
**restate** [2] - 65:9, 105:8
**restricted** [2] - 89:8, 89:19
**restriction** [1] - 91:14
**restrictions** [1] - 92:1
**restroom** [5] - 103:12,
103:19, 110:4, 122:9, 166:3
**result** [2] - 64:22, 65:16
**results** [11] - 22:22, 22:23,
73:19, 107:1, 113:23,
113:25, 118:21, 121:5,
121:21, 121:23, 153:17
**resume** [1] - 166:10
**retained** [1] - 58:2
**retire** [1] - 115:25
**retired** [3] - 111:12, 115:22,
115:23
**retirement** [1] - 111:14
**retort** [1] - 214:8
**return** [1] - 32:18
**returned** [3] - 97:13, 191:3,
194:21

**returning** [1] - 125:15
**revenue** [4] - 70:19, 70:21, 71:1, 71:10
**reverse** [1] - 133:13
**review** [6] - 17:19, 18:14, 22:11, 91:4, 94:9, 198:2
**reviewed** [5] - 17:4, 18:21, 27:7, 224:21, 225:12
**reviewer** [1] - 58:8
**reviewing** [2] - 19:4, 224:20
**reviews** [1] - 28:16
**revised** [6] - 214:9, 215:10, 226:18, 228:10, 229:3, 229:17
**rich** [1] - 112:21
**Rick** [1] - 187:14
**rid** [1] - 97:11
**ride** [1] - 132:1
**right-hand** [2] - 32:18, 223:4
**rise** [12] - 14:24, 103:17, 103:25, 108:25, 110:16, 122:14, 123:9, 165:24, 165:25, 166:7, 198:16, 202:8
**RMR** [2] - 1:21, 231:19
**robot** [1] - 133:16
**Rock** [12] - 183:18, 184:3, 184:4, 184:8, 184:17, 184:18, 185:16, 185:20, 186:21, 186:24, 187:2, 187:5
**RODOLFO** [1] - 1:10
**Rodolfo** [1] - 1:22
**Roebuck** [4] - 206:25, 207:17, 207:20, 208:2
**role** [3] - 141:8, 143:10, 167:2
**roller** [1] - 184:18
**ROOKARD** [22] - 1:14, 2:17, 114:24, 115:6, 115:16, 117:14, 118:1, 119:1, 119:5, 119:12, 119:14, 119:17, 119:20, 120:8, 120:9, 120:21, 120:23, 121:1, 121:2, 121:13, 121:20, 122:2, 122:19, 224:14, 225:15, 226:5, 226:20, 229:25, 231:6
**room** [9] - 108:3, 108:5, 108:11, 108:23, 108:24, 147:12, 148:5, 195:2, 202:6
**rotation** [2] - 124:19, 124:21
**rotations** [6] - 124:11, 124:15, 124:16, 124:17, 124:18, 129:5
**Rothschild** [2] - 60:17, 61:21
**roughly** [2] - 125:22, 155:17
**route** [2] - 207:20, 226:18
**routine** [1] - 102:17
**rows** [1] - 67:23
**RPR** [2] - 1:21, 231:19

**RUIZ** [1] - 1:10
**Ruiz** [1] - 1:22
**rules** [12] - 9:2, 10:18, 10:20, 19:7, 19:9, 62:9, 62:14, 62:22, 107:17, 179:2, 201:10, 201:16
**ruling** [1] - 6:19
**rulings** [1] - 216:2
**run** [6] - 55:21, 108:20, 144:19, 187:17, 201:9, 227:3
**running** [2] - 65:4, 159:23
**runs** [3] - 64:21, 65:2, 193:14

# S

**S2** [1] - 6:11
**Saco** [7] - 32:25, 33:18, 33:19, 38:10, 38:11, 42:22, 48:18
**Sadow** [18] - 11:16, 147:23, 157:9, 160:13, 194:4, 195:8, 195:22, 197:7, 198:8, 198:23, 198:24, 199:2, 200:21, 203:1, 208:5, 213:15, 220:3, 229:15
**SADOW** [64] - 1:17, 1:18, 11:15, 11:17, 11:20, 13:19, 136:20, 136:23, 138:17, 147:19, 157:10, 181:17, 181:22, 185:6, 194:6, 194:8, 194:13, 194:16, 195:14, 195:16, 195:18, 195:24, 196:3, 196:5, 196:8, 197:12, 197:17, 197:23, 199:5, 200:2, 200:4, 200:12, 202:12, 202:15, 203:11, 203:13, 203:15, 208:21, 208:24, 209:25, 210:3, 210:7, 210:24, 211:20, 211:23, 212:5, 213:17, 213:20, 216:2, 216:8, 217:5, 218:22, 219:1, 221:25, 222:5, 222:7, 222:11, 222:19, 224:14, 225:15, 226:5, 226:20, 229:25, 231:6
**Sadow's** [1] - 229:7
**safe** [2] - 60:4, 202:5
**Safe** [1] - 192:23
**sail** [1] - 159:11
**sailing** [1] - 159:8
**Sales** [1] - 138:8
**sales** [9] - 26:8, 101:20, 102:6, 139:11, 145:4, 146:4, 149:13, 150:24
**salespeople** [1] - 177:24
**Saliba** [12] - 155:21, 155:22, 156:17, 156:19, 157:4, 157:19, 158:1, 159:15, 168:17, 169:9,

177:17, 193:14
**saliva** [5] - 117:4, 117:5, 130:11, 134:14, 164:13
**salutation** [1] - 157:20
**sample** [22] - 55:22, 67:3, 104:25, 130:11, 131:12, 131:14, 143:25, 144:1, 144:13, 144:14, 144:15, 144:17, 146:4, 146:8, 146:9, 148:19, 148:21, 149:8, 154:18, 161:16, 168:11
**samples** [54] - 129:7, 133:21, 134:5, 134:6, 134:8, 134:14, 135:2, 135:3, 135:8, 136:3, 136:14, 139:17, 139:18, 142:2, 143:22, 144:7, 145:13, 145:15, 145:21, 146:17, 146:20, 150:23, 151:20, 153:19, 154:22, 157:21, 161:3, 168:3, 171:9, 171:11, 172:16, 172:18, 172:20, 172:21, 174:5, 175:3, 175:16, 177:9, 180:20, 180:21, 183:16, 183:17, 183:21, 183:22, 184:15, 184:23, 188:20, 189:7, 191:15, 191:18, 191:22, 193:6, 211:14
**SAMUEL** [2] - 2:2, 2:3
**satisfied** [1] - 215:16
**satisfy** [1] - 229:15
**save** [1] - 151:8
**saved** [1] - 201:6
**saves** [1] - 151:9
**saw** [1] - 30:20, 36:20, 42:8, 49:8, 56:18, 80:9, 104:20, 124:18, 124:23, 130:8, 181:11
**scar** [1] - 125:11
**schedule** [2] - 4:11, 13:3, 63:20, 63:25, 64:10, 143:24, 200:18, 203:25, 205:2, 207:12, 208:25, 211:1
**schedules** [1] - 204:16
**scheduling** [2] - 14:1, 14:5
**scheme** [3] - 127:9, 127:22, 173:5
**school** [7] - 59:23, 124:7, 124:9, 124:10, 124:12, 125:16, 152:20
**Schulte** [6] - 125:4, 129:3, 130:15, 152:19, 156:18, 171:4
**scientist** [2] - 25:3, 25:12
**scientists** [1] - 56:2
**scope** [3] - 105:6, 226:9, 229:20
**screen** [22] - 28:20, 34:15, 40:23, 43:14, 43:24, 44:9,

47:18, 49:7, 50:21, 67:6, 75:11, 77:21, 80:14, 80:16, 84:16, 104:9, 139:8, 164:6, 167:24, 169:9, 170:14, 179:8
**screening** [12] - 77:7, 77:10, 77:13, 79:7, 79:10, 79:13, 80:5, 80:9, 80:23, 81:13, 81:17, 113:9
**screenshot** [5] - 223:1, 223:2, 223:3, 223:17, 224:12
**screenshots** [2] - 222:12, 226:21
**screwed** [1] - 74:14
**script** [4] - 181:2, 181:5, 182:14, 211:6
**scripts** [1] - 152:24
**scroll** [2] - 40:22, 78:14, 79:21
**seated** [13] - 5:3, 5:8, 15:1, 104:2, 108:6, 109:2, 110:18, 111:5, 123:11, 166:9, 195:6, 198:18, 202:24
**seating** [1] - 123:17
**second** [33] - 5:14, 24:25, 26:19, 30:25, 32:8, 32:9, 41:7, 41:24, 45:19, 46:1, 54:13, 54:19, 67:7, 76:16, 78:13, 86:13, 87:8, 88:23, 89:3, 93:23, 94:13, 110:2, 119:17, 134:7, 153:16, 161:13, 170:22, 194:2, 202:13, 202:14, 222:24
**second-to-last** [3] - 32:8, 32:9, 93:23
**seconds** [1] - 181:18
**section** [12] - 41:25, 42:2, 46:15, 86:3, 98:15, 100:18, 105:15, 119:13, 119:18, 120:8, 139:10, 139:11
**SECTION** [1] - 1:15
**Section** [3] - 30:10, 139:6, 139:7
**sections** [6] - 19:25, 20:2, 23:5, 58:17, 218:5, 227:1
**secure** [1] - 107:5
**SECURITY** [13] - 103:17, 103:25, 108:25, 110:16, 122:14, 122:20, 122:24, 123:9, 123:14, 165:25, 166:7, 198:16, 202:8
**Security** [3] - 35:11, 35:25, 107:15
**security** [1] - 115:24
**see** [154] - 10:24, 15:3, 15:5, 28:10, 29:1, 30:10, 30:12, 31:13, 31:15, 32:4, 32:11, 32:18, 33:11, 33:13, 34:19, 34:20, 35:2, 35:17, 36:11, 37:9, 38:1, 38:5, 38:9, 38:21, 38:23, 40:18, 40:22,

40:25, 41:2, 42:2, 42:11, 42:13, 43:4, 43:15, 43:20, 43:25, 44:20, 45:21, 45:23, 45:24, 46:2, 46:5, 46:18, 46:19, 49:1, 49:3, 49:14, 50:25, 51:3, 51:5, 51:18, 52:5, 53:20, 53:22, 54:1, 54:3, 62:11, 67:13, 68:7, 68:9, 71:19, 76:6, 76:7, 77:15, 77:20, 78:8, 79:2, 79:4, 79:6, 79:21, 80:1, 80:7, 80:9, 85:3, 86:6, 87:25, 88:7, 88:8, 88:14, 88:21, 88:22, 89:1, 92:14, 92:23, 92:24, 93:2, 93:8, 93:17, 93:21, 94:15, 94:23, 95:1, 95:3, 95:7, 95:10, 95:14, 95:25, 96:5, 98:15, 104:13, 105:16, 105:19, 105:24, 106:1, 108:24, 110:9, 114:2, 116:24, 117:17, 118:10, 123:8, 123:18, 124:17, 127:8, 130:21, 138:7, 148:17, 150:14, 163:5, 163:8, 163:9, 163:16, 164:10, 183:11, 188:2, 191:19, 192:24, 195:10, 197:4, 202:2, 202:6, 202:11, 204:15, 206:8, 208:15, 209:22, 210:23, 210:24, 214:9, 215:4, 217:16, 217:17, 217:19, 217:20, 221:11, 222:3, 223:4, 227:20, 229:9, 231:7

**seeing** [2] - 157:22, 179:8

**seek** [1] - 216:5

**seeking** [2] - 8:7, 217:25

**seem** [1] - 208:10

**select** [2] - 18:13, 101:19

**selected** [4] - 18:16, 101:16, 102:9

**selecting** [3] - 101:21, 102:6, 102:8

**selection** [2] - 104:11, 105:13

**sell** [1] - 131:23

**seminars** [1] - 177:24

**send** [15] - 43:9, 129:6, 137:13, 142:3, 144:22, 144:25, 153:3, 159:18, 159:22, 160:5, 167:4, 178:11, 187:20, 187:24, 189:7

**sending** [7] - 38:14, 39:9, 159:15, 171:5, 180:17, 192:11, 192:14

**senior** [2] - 116:16, 116:23

**sense** [17] - 114:4, 151:16, 186:13, 198:13, 200:15, 203:8, 203:10, 207:18,

208:13, 209:1, 211:16, 212:1, 212:16, 216:18, 220:7, 227:17, 230:22

**sensitivity** [1] - 91:6

**sent** [27] - 39:12, 39:15, 40:8, 40:9, 41:7, 41:21, 43:11, 43:12, 45:8, 45:10, 48:17, 52:3, 52:18, 53:4, 67:23, 144:2, 150:10, 154:18, 178:8, 180:20, 180:21, 181:2, 191:2, 193:5, 216:15, 219:9, 222:9

**sentence** [17] - 88:9, 88:23, 89:3, 89:7, 91:2, 91:9, 92:25, 93:2, 93:24, 98:8, 99:8, 99:14, 127:21, 128:16, 128:19, 128:21, 161:13

**sentenced** [1] - 128:13

**sentences** [2] - 126:7, 172:9

**sentencing** [1] - 172:5

**Senthil** [2] - 4:10, 123:24

**SENTHIL** [2] - 2:18, 123:25

**September** [2] - 136:21, 136:22

**sequencers** [1] - 170:3

**sequencing** [2] - 207:7, 211:4

**sequencing-wise** [1] - 211:4

**served** [1] - 189:19

**serves** [1] - 28:13

**service** [6] - 65:12, 89:8, 89:19, 201:13, 201:25

**services** [14] - 73:3, 86:12, 86:21, 88:6, 88:11, 88:12, 88:13, 92:12, 92:13, 92:21, 92:22, 98:14, 139:13, 139:15

**Services** [9] - 8:10, 32:20, 32:21, 42:12, 84:19, 127:2, 127:3, 127:4, 190:10

**set** [14] - 120:14, 123:4, 133:10, 133:13, 142:10, 172:14, 186:3, 195:12, 197:20, 200:5, 204:20, 212:21, 224:1, 227:8

**Setai** [1] - 175:19

**setup** [2] - 116:22, 211:5

**seven** [1] - 148:10

**several** [8] - 30:22, 56:14, 56:18, 85:20, 105:13, 112:9, 113:8, 201:24

**shape** [4] - 214:16, 227:9, 230:18, 230:22

**share** [2] - 135:15, 182:14

**sharp** [1] - 56:4

**Shawn** [2] - 152:23, 154:8

**Shield** [1] - 116:3

**shift** [3] - 174:11, 174:12, 176:4

**shifting** [3] - 171:25, 173:14, 185:17

**shirt** [2] - 127:13, 127:19

**shocked** [1] - 130:9

**shoe** [1] - 116:24

**shoot** [1] - 185:13

**shooting** [1] - 189:1

**short** [14] - 109:9, 129:22, 144:10, 147:3, 181:15, 203:7, 204:7, 204:8, 204:21, 204:25, 206:4, 206:14, 207:2

**shortcut** [1] - 13:12

**shorten** [1] - 204:12

**shorter** [2] - 109:4, 204:7

**show** [18] - 61:23, 71:22, 121:14, 131:8, 148:12, 185:6, 188:18, 215:8, 216:5, 216:11, 217:7, 218:9, 218:14, 219:4, 219:7, 219:10, 222:1, 223:8

**showed** [3] - 129:24, 156:3, 159:21

**showing** [3] - 137:20, 149:17, 158:25, 162:21, 171:1, 178:21, 180:25, 218:3

**shown** [5] - 10:15, 47:16, 167:24, 212:7, 226:21

**shows** [2] - 81:7, 217:22

**shuffle** [1] - 171:22

**sic** [5] - 24:7, 38:8, 89:10, 183:5, 189:16

**sick** [3] - 63:18, 63:19, 64:13

**side** [13] - 7:1, 11:11, 13:12, 119:24, 145:3, 145:7, 145:8, 145:9, 152:13, 208:17, 210:17, 223:4, 229:16

**sidebar** [4] - 97:7, 194:2, 194:3, 195:7

**sidestep** [1] - 227:11

**Sigh** [1] - 114:9

**sign** [9] - 31:12, 31:24, 32:3, 37:14, 45:1, 50:1, 50:5, 50:16, 51:21

**signature** [16] - 36:6, 36:8, 37:1, 49:22, 50:25, 53:25, 54:22, 54:23, 99:9, 99:10, 99:15, 100:4, 101:3, 101:4, 220:6, 222:11

**signatures** [2] - 50:22, 103:8

**signed** [17] - 9:5, 9:6, 36:18, 36:19, 44:4, 48:9, 51:6, 54:8, 85:12, 85:16, 85:23, 100:18, 137:15, 138:3, 138:25, 150:17, 214:21

**signer** [2] - 100:4, 100:8, 100:9, 100:11, 100:15

**significance** [2] - 104:23,

120:11

**significant** [2] - 8:14, 105:10

**signing** [6] - 9:7, 50:6, 95:22, 101:2, 101:5, 148:22

**signs** [1] - 136:13

**similar** [13] - 7:23, 12:8, 18:19, 44:6, 45:6, 55:22, 86:21, 86:23, 87:1, 93:19, 195:11, 209:19

**similarly** [3] - 190:21, 198:25, 201:3

**simply** [1] - 215:6

**single** [6] - 10:1, 29:6, 100:5, 100:18, 130:7

**single-spaced** [1] - 29:6

**sip** [1] - 5:6

**sister** [4] - 167:1, 181:4, 181:6, 188:17

**sit** [2] - 111:12, 168:24

**sitting** [3] - 144:16, 153:20, 171:12

**situation** [3] - 55:22, 153:25, 154:10

**situational** [1] - 230:10

**six** [1] - 174:21

**SKR** [2] - 127:2, 127:5

**slash** [1] - 34:20

**slightly** [4] - 203:21, 204:8, 228:19, 230:14

**Slomovitz** [11] - 204:18, 204:24, 205:8, 205:12, 205:25, 206:3, 206:16, 207:13, 208:12, 209:23, 230:17

**Slow** [1] - 7:14

**slow** [1] - 199:6

**slower** [1] - 195:21

**smaller** [1] - 209:11

**smoothly** [1] - 203:19

**snacks** [1] - 4:22

**so..** [1] - 197:15

**social** [2] - 108:19, 201:12

**Social** [3] - 35:11, 35:25, 107:15

**soles** [1] - 116:24

**solicit** [1] - 182:19

**someone** [18] - 54:7, 100:14, 108:4, 117:6, 118:6, 120:14, 132:8, 166:23, 171:15, 181:11, 184:21, 188:13, 207:17, 213:23, 214:25, 215:8, 216:8, 226:20

**sometimes** [6] - 32:1, 155:6, 166:21, 167:3, 173:11, 174:7

**somewhere** [3] - 63:24, 63:25, 224:19

**Sonal** [5] - 51:11, 51:13, 166:23, 170:18, 171:3

**soon** [3] - 175:11, 196:16, 200:20

**sorry** [25] - 7:9, 11:10, 25:24, 32:7, 40:21, 42:3, 78:1, 79:24, 95:19, 101:8, 119:18, 127:18, 134:16, 139:9, 139:10, 148:1, 152:10, 160:9, 165:18, 189:18, 196:22, 197:17, 205:11, 213:20, 222:12

**sort** [9] - 13:5, 31:3, 37:11, 91:15, 134:20, 152:4, 191:19, 205:19, 216:22

**sorts** [1] - 60:11

**sotto** [1] - 158:16

**sought** [1] - 66:13

**sound** [6] - 172:3, 206:3, 221:1, 221:11, 224:13, 226:12

**sounds** [2] - 226:8, 229:11

**sources** [1] - 191:1

**South** [1] - 159:8

**SOUTHERN** [1] - 1:1

**space** [6] - 10:16, 10:17, 24:1, 131:24, 148:22, 169:14

**spaced** [1] - 29:6

**speaking** [2] - 143:16, 177:21

**specialists** [1] - 150:7

**specialize** [5] - 58:22, 58:25, 59:2, 59:5, 59:15

**specialized** [1] - 105:14

**specific** [8] - 77:10, 104:18, 112:8, 126:5, 133:8, 153:7, 165:7, 177:11

**specifically** [10] - 8:21, 90:17, 105:1, 105:10, 113:14, 162:8, 165:4, 175:12, 190:18, 201:23

**specificity** [1] - 101:19

**specimen** [3] - 161:16, 161:17, 161:18

**speculation** [1] - 216:23

**speed** [2] - 74:4, 209:10

**spell** [1] - 111:6

**spent** [6] - 8:24, 9:4, 12:2, 61:10, 99:4, 103:1

**spilling** [1] - 209:13

**spills** [1] - 203:21

**spinal** [1] - 131:20

**spit** [5] - 117:18, 118:5, 118:6, 121:15, 150:15

**spits** [1] - 133:16

**spliced** [1] - 212:23

**split** [1] - 43:14

**spoken** [1] - 109:21

**Sporn** [17] - 4:14, 11:21, 11:23, 12:2, 12:3, 12:5, 12:12, 12:14, 12:18, 13:23, 14:4, 207:3, 207:4, 208:2,

208:18, 209:2, 209:18

**Sporn's** [1] - 12:7

**spreadsheet** [1] - 75:8

**squarely** [1] - 9:9

**squeeze** [1] - 230:18

**Stacey** [2] - 204:25, 207:13

**stack** [1] - 31:16

**staff** [3] - 71:2, 108:4, 145:14

**Stage** [2] - 151:6, 151:7

**stand** [13] - 4:20, 5:2, 5:7, 7:6, 14:21, 14:23, 15:6, 27:11, 110:5, 122:23, 123:21, 204:3, 216:10

**standards** [1] - 190:22

**standby** [2] - 204:1, 206:12, 206:15

**standing** [1] - 169:15

**standpoint** [3] - 215:12, 221:8, 228:7

**stands** [2] - 27:5, 174:18

**star** [1] - 32:2

**Stark** [2] - 59:3, 61:5

**start** [13] - 10:3, 12:17, 110:7, 131:19, 135:21, 145:12, 182:2, 195:14, 198:12, 207:3, 210:13, 225:21, 230:25

**started** [6] - 125:5, 142:11, 171:21, 184:14, 194:19, 231:8

**starting** [5] - 4:6, 12:16, 75:16, 137:6, 230:4

**state** [10] - 50:10, 89:9, 89:10, 89:20, 89:21, 93:10, 106:7, 121:14, 139:6, 170:3

**statement** [3] - 24:14, 47:22, 49:8

**statements** [5] - 5:19, 6:3, 53:15, 103:8, 121:10

**STATES** [4] - 1:1, 1:3, 1:10, 1:15

**States** [5] - 1:23, 4:3, 20:2, 110:24, 231:20

**states** [21] - 86:10, 86:21, 87:23, 88:12, 88:20, 88:25, 89:4, 89:6, 89:16, 90:21, 91:5, 91:11, 91:13, 91:19, 91:22, 92:1, 92:13, 92:21, 92:22, 93:1, 93:4

**stating** [2] - 195:7, 215:6

**Statute** [10] - 19:22, 59:6, 59:12, 59:16, 59:18, 60:1, 60:5, 60:12, 61:3, 62:1

**statutes** [7] - 9:2, 17:10, 29:12, 58:17, 59:8, 62:4, 96:15

**stay** [3] - 108:19, 154:17, 230:24

**staying** [1] - 132:3

**steer** [1] - 108:21

**STENOGRAPHICALLY** [1] - 1:20

**step** [2] - 103:22, 123:2

**stepped** [1] - 227:5

**steps** [4] - 87:2, 148:18, 149:6, 152:12

**Steve** [1] - 60:19

**STEVEN** [2] - 1:17, 1:18

**stick** [4] - 13:8, 13:17, 14:9, 152:11

**sticking** [1] - 211:6

**stiff** [3] - 158:4, 158:10, 159:18

**still** [8] - 141:17, 152:20, 193:18, 202:13, 202:18, 204:8, 210:4, 226:5

**stood** [1] - 42:8

**stop** [5] - 76:16, 86:13, 94:10, 129:12, 159:22

**stopped** [3] - 117:16, 189:6, 196:3

**stops** [2] - 221:4, 221:23

**story** [5] - 131:20, 156:4, 184:10

**straight** [3] - 8:22, 16:24, 222:17

**straightforward** [1] - 217:17

**strategies** [1] - 134:1, 134:19, 135:6, 145:19, 180:2

**strategy** [2] - 133:25, 146:12

**stray** [1] - 122:11

**streamline** [2] - 149:5, 208:6

**streamlined** [1] - 207:10

**Street** [2] - 1:18, 2:6

**strict** [1] - 175:16

**strictest** [1] - 190:22

**strives** [1] - 190:17

**struggled** [1] - 184:11

**struggling** [1] - 177:5

**studied** [1] - 72:21

**study** [7] - 60:1, 69:18, 70:4, 70:6, 70:8, 98:7, 183:13

**stuff** [11] - 29:13, 31:24, 76:9, 76:11, 87:18, 112:9, 156:20, 187:15, 193:15, 193:21, 223:5

**stumbling** [1] - 134:17

**subject** [14] - 16:2, 58:13, 86:10, 87:23, 88:24, 89:5, 93:5, 94:19, 142:17, 163:1, 190:8, 190:9, 227:19, 229:12

**subjected** [1] - 85:12

**subjects** [2] - 28:8, 28:9

**submission** [2] - 37:18, 190:25

**submissions** [1] - 107:18

**submit** [5] - 21:11, 67:19, 100:18, 136:14, 175:17

**submitted** [8] - 21:6, 43:18, 66:22, 67:21, 76:22, 78:17, 106:6, 154:22

**submitting** [7] - 20:24, 65:5, 65:18, 66:9, 66:10, 100:7, 102:10

**subpoena** [2] - 213:2, 213:12

**subsections** [1] - 176:11

**subsets** [1] - 156:24

**sudden** [1] - 142:12

**suffer** [1] - 228:25

**sufficient** [1] - 221:6

**suggest** [3] - 219:11, 225:15, 226:15

**suggested** [2] - 24:4, 24:6

**suggestion** [2] - 229:7, 230:3

**suggestions** [1] - 220:12

**suggests** [2] - 89:14, 89:24

**suit** [2] - 127:13, 127:19

**suite** [1] - 129:21

**Suite** [2] - 1:19, 2:6

**summer** [1] - 129:8

**Sunday** [1] - 11:21

**supersede** [1] - 89:17

**supplement** [1] - 221:2

**supplier** [2] - 99:11, 99:16

**supply** [1] - 143:19

**support** [1] - 221:15

**suppose** [1] - 63:18

**supposed** [5] - 34:5, 37:14, 125:12, 172:13, 204:17

**supposing** [1] - 207:2

**surgery** [4] - 94:7, 124:16, 131:20, 131:22

**surmise** [1] - 60:3

**surprise** [1] - 81:14

**surprised** [1] - 131:22

**surrounding** [1] - 190:18

**survival** [1] - 151:7

**Susan** [1] - 38:8

**suspect** [3] - 10:14, 228:22, 230:7

**sustain** [1] - 121:9

**sustained** [3] - 57:14, 117:12, 117:23

**Suzanne** [9] - 33:11, 39:25, 40:13, 40:21, 41:16, 43:12, 43:13, 47:16, 52:7

**swear** [2] - 111:2, 115:2

**swiftly** [1] - 14:11

**switch** [1] - 175:14

**sworn** [3] - 111:4, 115:3, 123:25

**symptoms** [1] - 64:13

**system** [8] - 81:4, 102:20, 102:21, 103:2, 103:6, 103:9, 107:8, 178:11
**Systems** [1] - 124:20

**T**

**table** [1] - 159:20
**tackle** [1] - 109:8
**tackled** [1] - 208:3
**tag** [1] - 31:17
**tags** [1] - 37:14
**talks** [2] - 8:21, 64:15
**target** [1] - 101:17
**targeting** [1] - 146:12
**team** [4] - 135:2, 147:1, 147:4, 148:11
**tease** [1] - 228:15
**technology** [10] - 8:22, 24:13, 24:19, 55:16, 73:14, 73:19, 90:10, 90:11, 90:18, 90:21
**telehealth** [10] - 62:2, 62:3, 63:16, 63:17, 63:20, 63:21, 64:1, 65:10, 65:12, 66:14
**telemarketer** [2] - 113:16, 220:3
**telemarketers** [2] - 112:24, 228:1
**telemed** [4] - 213:1, 220:3, 220:5, 221:20
**telemedicine** [21] - 62:1, 62:5, 64:25, 65:7, 65:10, 126:12, 143:19, 143:23, 144:8, 145:3, 145:8, 148:22, 152:13, 152:22, 152:25, 153:1, 153:8, 153:9, 153:12, 153:23, 173:23
**telephone** [1] - 36:16
**television** [2] - 145:23, 180:23
**temptation** [1] - 201:12
**ten** [2] - 150:17, 164:13
**tends** [1] - 225:15
**Tennessee** [1] - 93:5
**termination** [1] - 190:9
**terms** [11] - 10:24, 11:2, 65:10, 108:17, 139:15, 148:19, 153:4, 160:2, 186:7, 187:4, 220:8
**terrible** [1] - 34:12
**territorial** [1] - 186:14
**territories** [1] - 174:20
**territory** [1] - 174:20
**test** [77] - 20:17, 20:19, 21:2, 22:19, 22:22, 22:23, 64:18, 64:21, 65:2, 65:4, 65:21, 66:2, 66:5, 69:14, 69:16, 69:18, 70:9, 72:21, 77:13, 79:12, 80:5, 80:9,

80:23, 83:24, 91:8, 91:15, 91:16, 92:3, 104:18, 106:22, 107:1, 107:6, 113:10, 113:12, 113:15, 113:19, 113:23, 117:4, 117:5, 118:2, 118:4, 118:10, 118:16, 118:21, 130:4, 131:14, 131:15, 133:7, 133:11, 136:1, 139:25, 141:10, 144:6, 144:10, 144:11, 144:21, 150:18, 151:8, 151:9, 151:10, 151:17, 168:2, 168:9, 169:7, 172:21, 174:23, 174:25, 176:23, 179:6, 181:12, 182:17, 183:12, 183:19
**tested** [2] - 55:20, 140:10
**testified** [11] - 8:14, 9:7, 18:24, 19:19, 24:12, 45:16, 63:1, 74:7, 77:5, 89:11, 96:19
**testifies** [1] - 227:6
**testify** [5] - 128:8, 205:14, 205:16, 215:9, 223:18
**testifying** [10] - 12:5, 12:13, 44:3, 128:2, 205:9, 207:5, 217:15, 222:15, 222:17, 225:6
**testimony** [29] - 7:10, 8:13, 8:25, 11:1, 16:20, 17:1, 17:2, 18:22, 42:5, 82:3, 84:5, 96:12, 98:3, 108:13, 128:11, 128:19, 200:23, 202:20, 204:11, 207:9, 209:4, 220:14, 220:18, 220:19, 221:1, 225:7, 226:9, 226:13, 229:19
**testing** [39] - 8:23, 10:3, 17:21, 24:1, 24:5, 24:10, 24:13, 24:17, 55:25, 73:14, 73:24, 74:5, 74:23, 84:1, 98:19, 99:1, 104:24, 116:9, 116:10, 125:18, 126:23, 127:23, 128:24, 129:2, 129:3, 129:4, 129:11, 131:19, 133:14, 139:13, 143:16, 143:17, 163:2, 165:6, 183:14, 190:18, 191:1, 219:23, 227:16
**tests** [26] - 22:18, 55:21, 56:11, 56:14, 56:18, 57:2, 65:15, 65:20, 65:25, 77:7, 77:10, 79:10, 91:10, 91:13, 91:20, 125:7, 126:10, 133:3, 140:8, 140:21, 140:22, 151:19, 169:25, 179:7, 181:13, 221:16
**Texas** [3] - 124:8, 180:24, 182:10
**text** [10] - 155:7, 157:4,

157:18, 158:13, 158:15, 159:13, 160:5, 177:3, 184:2, 184:24
**that'll** [5] - 99:21, 138:18, 175:22, 202:1, 210:18
**THE** [273] - 1:10, 1:13, 1:17, 2:2, 4:2, 4:8, 5:1, 6:1, 6:5, 6:18, 6:23, 7:3, 7:5, 7:9, 7:14, 7:18, 9:14, 10:7, 10:10, 11:11, 11:16, 11:19, 12:25, 14:7, 14:17, 14:20, 14:24, 15:1, 15:19, 15:24, 16:2, 16:7, 34:16, 37:7, 44:11, 47:20, 50:10, 57:13, 57:23, 60:8, 61:14, 61:16, 67:8, 71:12, 71:14, 75:13, 76:2, 77:22, 84:10, 84:14, 96:3, 96:24, 97:3, 97:6, 97:10, 97:14, 99:21, 101:25, 102:2, 103:10, 103:17, 103:19, 103:25, 104:2, 105:5, 105:8, 106:18, 107:21, 107:23, 107:24, 108:25, 109:2, 109:8, 109:12, 109:19, 109:23, 110:3, 110:9, 110:14, 110:16, 110:18, 111:1, 111:3, 111:5, 111:7, 114:15, 114:18, 114:19, 114:23, 115:1, 115:4, 115:9, 115:11, 117:12, 117:20, 117:21, 119:2, 121:9, 121:14, 121:18, 121:19, 122:4, 122:14, 122:16, 122:19, 122:20, 122:22, 122:24, 122:25, 123:4, 123:8, 123:9, 123:11, 123:14, 123:16, 127:16, 136:5, 136:19, 136:22, 136:24, 137:3, 137:19, 138:16, 138:18, 138:22, 147:7, 147:18, 147:23, 148:3, 149:16, 149:20, 149:23, 156:23, 157:8, 157:12, 160:12, 160:17, 160:22, 161:20, 161:22, 162:18, 162:20, 163:21, 163:24, 163:25, 164:22, 164:24, 165:18, 165:20, 165:25, 166:2, 166:6, 166:7, 166:9, 166:15, 167:13, 168:21, 170:8, 170:12, 176:13, 176:18, 177:1, 178:15, 178:19, 180:6, 180:10, 180:13, 181:16, 181:19, 181:23, 182:1, 182:23, 183:3, 183:25, 187:10, 189:11, 189:24, 192:2, 192:19, 193:11, 194:2, 194:4, 194:7, 194:11, 194:18, 194:22, 195:6, 195:15, 195:23, 196:1,

196:4, 196:7, 196:16, 196:21, 197:1, 197:10, 197:16, 197:19, 198:1, 198:7, 198:16, 198:18, 199:15, 199:18, 200:3, 200:5, 200:8, 200:15, 202:8, 202:10, 202:14, 202:17, 202:22, 202:23, 203:12, 203:14, 203:18, 205:1, 205:15, 205:24, 206:3, 206:8, 207:4, 207:20, 208:5, 208:22, 208:25, 209:9, 210:2, 210:6, 210:10, 210:22, 210:25, 211:11, 211:15, 211:21, 211:25, 212:15, 212:21, 213:4, 213:10, 214:8, 214:23, 216:7, 216:17, 217:10, 217:16, 218:25, 219:15, 219:17, 220:15, 221:22, 222:2, 222:6, 222:14, 222:16, 223:14, 223:20, 224:3, 224:8, 224:23, 225:1, 226:2, 226:7, 226:24, 228:2, 228:6, 229:3, 230:1, 230:6, 230:22, 231:4, 231:7
**themselves** [1] - 145:19
**theory** [1] - 219:19
**thereafter** [1] - 132:11
**therefore** [2] - 5:20, 24:21
**they've** [4] - 14:3, 27:7, 217:7, 217:8
**thick** [1] - 12:7
**thinking** [5] - 102:22, 105:10, 141:17, 158:3, 184:14
**thinks** [1] - 187:17
**Third** [1] - 48:24
**third** [4] - 5:15, 6:6, 40:20, 48:24
**thorough** [1] - 216:24
**thousand** [2] - 164:15, 169:7
**thousands** [2] - 19:9, 80:12
**three** [16] - 4:7, 7:1, 10:2, 91:5, 93:4, 125:21, 127:21, 144:19, 146:6, 150:17, 172:2, 196:11, 201:23, 205:6, 205:18, 206:23
**threshold** [2] - 142:15, 228:18
**throughout** [7] - 29:10, 29:12, 30:19, 95:5, 108:18, 213:22, 225:5
**throw** [3] - 142:8, 146:2, 158:7
**throwing** [1] - 125:6
**thrust** [1] - 221:12
**Thursday** [1] - 187:1
**ticket** [1] - 163:19

**Tier** [8] - 104:21, 105:2, 105:4, 105:10, 105:13, 105:19
**tier** [2] - 105:1, 105:2
**tiers** [1] - 104:19
**timing** [1] - 13:3
**title** [3] - 40:25, 48:5, 85:1
**Tobin** [2] - 60:15, 66:13
**today** [20] - 4:11, 4:13, 5:15, 6:19, 6:25, 12:1, 13:6, 96:12, 98:3, 100:2, 127:8, 128:2, 128:11, 128:19, 143:15, 174:9, 180:1, 200:23, 204:7, 230:7
**together** [11] - 55:21, 56:11, 104:14, 127:25, 144:12, 149:4, 155:4, 164:12, 188:15, 188:16, 197:17
**tomorrow** [37] - 4:12, 6:7, 6:20, 12:1, 131:9, 192:24, 193:2, 198:12, 200:18, 201:9, 202:16, 202:19, 203:3, 204:1, 204:6, 204:15, 204:17, 205:8, 205:10, 205:12, 205:16, 205:20, 205:21, 205:24, 207:12, 208:9, 208:16, 209:19, 209:21, 217:6, 218:9, 223:20, 223:22, 224:12, 227:6, 230:11, 230:16
**tomorrow's** [1] - 6:21
**tonight** [5] - 187:21, 193:1, 204:6, 204:15, 205:20
**took** [8] - 117:4, 126:15, 147:12, 164:19, 172:16, 173:2, 187:5, 191:11
**top** [17] - 30:10, 30:23, 33:6, 37:20, 40:11, 45:23, 49:3, 67:12, 78:13, 79:21, 88:3, 91:7, 94:16, 119:13, 119:18, 119:21, 120:10
**topic** [1] - 94:6
**topics** [5] - 86:22, 86:23, 87:2, 93:19, 93:25
**total** [6] - 93:24, 93:25, 168:3, 212:24, 220:7
**totally** [1] - 179:12
**touch** [3] - 28:20, 169:12, 220:19
**touchscreen** [1] - 169:8
**towards** [7] - 95:1, 177:23, 177:25, 178:1, 178:7, 193:16, 193:21
**town** [1] - 193:1
**track** [4] - 6:17, 55:6, 171:11, 209:24
**traditional** [1] - 140:2
**trained** [3] - 59:25, 144:3, 150:14

**training** [7] - 145:4, 145:5, 146:19, 146:21, 177:22, 178:6, 179:24
**TRANSCRIPT** [1] - 1:9
**transcript** [1] - 109:18
**transcription** [1] - 231:15
**transfer** [1] - 54:16
**transmittal** [1] - 138:9
**trash** [1] - 191:15
**travel** [4] - 4:12, 130:21, 204:16, 205:2
**traveling** [1] - 204:5
**travels** [1] - 192:23
**treat** [3] - 22:23, 23:1, 114:5
**treated** [2] - 62:12, 114:9
**treating** [1] - 148:24
**treatment** [1] - 107:2
**trial** [1] - 4:3
**TRIAL** [1] - 1:9
**TriCare** [1] - 126:19
**trick** [1] - 175:20
**tried** [2] - 129:6, 172:18
**trip** [4] - 132:2, 141:7, 141:17, 141:19
**trouble** [2] - 47:5, 158:18
**true** [7] - 20:24, 130:10, 139:16, 142:18, 179:9, 179:12, 213:12
**trust** [4] - 103:2, 103:5, 103:9, 213:25
**trust-based** [3] - 103:2, 103:5, 103:9
**trustworthiness** [1] - 229:22
**truth** [3] - 121:11, 128:8, 151:5
**truthful** [1] - 151:4
**truthfully** [1] - 10:12
**try** [15] - 4:21, 13:9, 14:9, 53:18, 78:21, 133:11, 133:13, 146:17, 172:15, 194:11, 204:12, 207:7, 215:13, 225:16
**trying** [10] - 74:4, 102:20, 162:7, 167:22, 171:22, 197:2, 212:16, 218:19, 219:11, 222:19
**tube** [4] - 117:18, 118:5, 118:6, 121:15
**Tuesday** [2] - 193:3, 210:15
**turn** [9] - 9:14, 15:7, 15:12, 28:2, 76:2, 104:3, 110:20, 123:12, 123:19
**turned** [1] - 219:2
**turning** [9] - 116:9, 116:15, 158:12, 159:5, 161:4, 173:5, 181:7, 203:24
**Tushar** [2] - 170:18, 170:19
**TV** [2] - 188:15, 188:18
**twice** [3] - 156:21, 160:4,

173:10
**two** [24] - 5:11, 88:23, 89:5, 109:8, 110:3, 127:21, 131:4, 143:3, 143:4, 144:19, 151:22, 163:17, 176:11, 184:16, 186:15, 186:16, 196:11, 203:20, 203:21, 204:12, 205:4, 206:22, 207:15, 214:6
**two-or-three-sentence** [1] - 127:21
**two-year** [1] - 143:4
**type** [9] - 104:16, 127:4, 131:14, 135:18, 146:19, 172:20, 177:21, 178:5, 226:4
**types** [9] - 13:1, 56:7, 104:19, 125:6, 139:22, 140:8, 163:13, 225:3, 227:19
**typewritten** [6] - 34:7, 35:17, 36:11, 36:14, 36:16, 47:25
**typically** [8] - 55:25, 58:5, 65:20, 66:22, 67:19, 135:9, 151:23, 203:16
**Tyson** [3] - 188:13, 188:25, 189:2

## U

**U.S** [1] - 13:22
**ultimately** [4] - 128:21, 130:21, 135:21, 189:5
**unable** [1] - 201:3
**unavailable** [1] - 13:23
**uncertain** [2] - 10:16, 120:11
**unclear** [2] - 181:22, 220:17
**uncomfortable** [1] - 173:14
**under** [22] - 64:1, 64:23, 78:23, 84:21, 87:25, 89:3, 93:17, 98:7, 99:8, 125:4, 142:19, 142:21, 142:23, 171:24, 175:4, 202:18, 202:19, 214:5, 215:15, 221:24, 228:7, 228:10
**understood** [7] - 12:25, 14:7, 14:16, 18:21, 22:15, 65:20, 213:10
**undivided** [1] - 108:1
**unedited** [2] - 212:22, 213:6
**unfortunately** [2] - 146:21, 213:17
**unique** [3] - 90:11, 90:17
**unit** [1] - 88:12
**UNITED** [4] - 1:1, 1:3, 1:10, 1:15
**United** [11] - 1:23, 4:3, 20:2, 110:24, 183:19, 184:16, 184:21, 185:21, 187:2,

231:20
**universe** [1] - 18:21
**Univision** [5] - 180:19, 180:22, 180:23, 182:6, 182:8
**unless** [1] - 218:17
**unmodified** [1] - 216:24
**unnecessary** [1] - 179:7
**unplug** [2] - 112:25, 113:2
**unredacted** [1] - 216:24
**unrelated** [2] - 86:11, 88:5
**unrestricted** [2] - 89:9, 89:20
**up** [70] - 6:3, 10:19, 13:5, 13:8, 13:10, 28:22, 32:8, 54:11, 54:12, 64:11, 66:25, 74:4, 74:14, 75:5, 77:15, 77:16, 77:17, 84:15, 89:17, 97:10, 101:12, 104:9, 110:20, 111:1, 115:1, 119:18, 120:14, 122:10, 123:5, 125:1, 130:25, 131:2, 133:14, 135:23, 136:13, 139:8, 145:20, 148:16, 149:4, 150:17, 152:8, 152:10, 158:25, 163:8, 170:1, 170:2, 170:3, 172:14, 173:4, 173:12, 182:1, 182:12, 186:3, 186:25, 194:4, 196:5, 197:8, 197:12, 200:21, 211:10, 211:23, 212:5, 215:5, 215:8, 217:3, 217:19, 222:24, 226:17
**upcoming** [1] - 187:1
**updated** [2] - 73:25, 220:11
**upwards** [1] - 164:12
**urgency** [2] - 151:16, 181:11
**urgent** [1] - 129:19
**urine** [1] - 64:18
**user** [1] - 101:18
**uses** [1] - 84:1
**Usher** [1] - 188:7
**USPTF** [1] - 24:7
**utilization** [5] - 86:12, 86:16, 88:6, 88:13, 88:17
**utilized** [1] - 217:12
**utilizing** [1] - 9:17

## V

**vacations** [1] - 151:24
**value** [2] - 10:24, 24:17
**variant** [1] - 120:11
**variation** [1] - 98:13
**various** [7] - 9:2, 9:8, 20:2, 29:15, 94:25, 125:6, 130:2
**Vartanian** [16] - 132:7, 132:12, 132:16, 133:5, 133:6, 133:18, 133:23, 134:20, 135:7, 160:2, 160:3,

160:25, 161:5, 162:25,
165:9, 175:6
  **vendors** [2] - 127:7, 152:22
  **Ventures** [2] - 127:2, 127:5
  **verbal** [2] - 164:7, 173:18
  **version** [2] - 150:12, 216:25
  **versus** [2] - 4:3, 219:10
  **via** [1] - 191:1
  **video** [7] - 62:15, 64:11,
64:23, 156:3, 156:7, 181:15,
181:17
  **Video** [4] - 181:20, 181:21,
182:3, 182:4
  **view** [1] - 10:11
  **viewership** [1] - 180:24
  **vignettes** [1] - 159:21
  **violate** [2] - 126:8, 172:10
  **violated** [2] - 172:8, 172:14
  **visibility** [2] - 152:13,
152:16
  **vision** [1] - 94:8
  **visit** [8] - 63:20, 64:1,
64:10, 64:25, 132:4, 132:16,
133:24, 141:16
  **visited** [2] - 131:25, 132:5
  **visual** [1] - 63:4
  **voce** [1] - 158:16
  **volume** [1] - 153:13
  **Volume** [1] - 1:6
  **volunteering** [1] - 186:11
  **vs** [1] - 1:5
  **vulnerable** [1] - 126:10

---

## W

  **W.H** [5] - 204:24, 205:3,
206:13, 206:19, 207:13
  **Waldorf** [1] - 129:21
  **walk** [1] - 173:24
  **walking** [2] - 117:9, 117:16
  **wants** [3] - 187:3, 197:14,
218:9
  **Washington** [1] - 1:16
  **watched** [1] - 12:13
  **watching** [1] - 156:6
  **Watt** [2] - 60:15, 66:13
  **ways** [3] - 23:9, 55:20,
184:14
  **wealthy** [1] - 159:17
  **wearing** [1] - 127:12
  **webinars** [3] - 177:23,
177:24, 178:3
  **websites** [1] - 29:15
  **Wednesday** [1] - 190:6
  **week** [24] - 5:21, 9:24,
98:12, 98:16, 124:23,
148:16, 156:18, 156:21,
160:5, 169:24, 206:21,
206:23, 207:5, 208:3,
208:18, 209:7, 209:12,

209:15, 210:17, 210:19,
210:20, 230:14, 230:15
  **week-analysis** [1] - 98:16
  **weekly** [1] - 71:9
  **weeks** [2] - 118:22, 144:19
  **welcome** [3] - 110:18,
147:4, 148:11
  **Wellness** [1] - 119:15
  **WEST** [1] - 1:2
  **whim** [1] - 209:1
  **whine** [1] - 11:17
  **WHINE** [1] - 11:18
  **white** [2] - 5:18, 5:20
  **White's** [1] - 5:18
  **whiteboard** [1] - 132:22
  **whole** [19] - 12:6, 19:13,
27:8, 36:6, 42:2, 55:2, 58:17,
67:11, 75:16, 76:9, 76:11,
79:9, 95:18, 128:1, 130:12,
140:14, 156:4, 193:22,
193:24
  **wife** [1] - 188:14
  **Wildemore** [1] - 56:21
  **wind** [1] - 197:12
  **winding** [1] - 209:11
  **window** [6] - 174:16,
179:18, 179:19, 181:13,
204:20, 205:14
  **windows** [1] - 169:14
  **wire** [1] - 178:11
  **wires** [1] - 106:8
  **wise** [2] - 204:10, 211:4
  **witness** [71] - 4:12, 4:20,
5:2, 5:14, 5:17, 6:7, 6:16,
6:21, 9:7, 9:11, 10:15, 12:1,
12:10, 12:13, 12:21, 14:23,
15:10, 50:8, 84:8, 97:2,
97:11, 97:16, 108:13, 110:2,
110:4, 110:21, 110:23,
111:4, 114:21, 115:3,
121:15, 122:8, 122:12,
122:16, 122:23, 123:20,
123:22, 123:25, 127:14,
136:4, 137:18, 137:20,
147:6, 147:8, 149:15,
149:17, 156:22, 156:24,
158:16, 160:16, 160:19,
161:19, 162:17, 162:21,
163:20, 164:21, 165:22,
196:24, 198:23, 199:4,
200:21, 200:24, 202:10,
202:13, 202:15, 206:4,
217:12, 221:21, 223:17
  **WITNESS** [12] - 2:11, 61:16,
71:14, 102:2, 105:8, 107:23,
111:7, 114:18, 117:20,
163:25, 165:18, 202:22
  **witnesses** [19] - 5:11,
11:20, 13:13, 14:12, 108:8,
109:5, 109:9, 110:4, 204:5,

204:7, 204:17, 204:22,
206:11, 206:17, 206:23,
207:21, 208:10, 209:11,
210:5
  **woozy** [1] - 4:21
  **word** [4] - 28:10, 91:3,
158:19, 212:9
  **words** [1] - 12:19
  **works** [11] - 10:25, 41:4,
84:24, 130:12, 131:8,
131:10, 131:12, 132:19,
133:12, 167:20, 208:25
  **world** [4] - 57:10, 205:3,
205:6, 207:11
  **world-renowned** [1] -
57:10
  **worried** [4] - 175:18, 181:8,
218:3, 228:17
  **worries** [1] - 109:24
  **worry** [2] - 13:13, 142:3
  **wound** [1] - 125:11
  **wow** [2] - 163:25, 177:6
  **writing** [1] - 46:7
  **written** [2] - 94:23, 190:12
  **wrote** [7] - 28:7, 36:2, 36:3,
77:16, 92:8, 176:20, 181:5
  **Wulf** [3] - 5:16, 5:17, 109:5

---

## X

  **Xs** [2] - 54:5, 54:7

---

## Y

  **yacht** [1] - 159:7
  **year** [3] - 124:10, 143:4,
178:2
  **Year's** [2] - 157:20, 157:21
  **years** [14] - 10:2, 19:3, 73:6,
112:4, 116:1, 116:6, 125:19,
125:21, 143:3, 151:22,
172:2, 213:24, 214:6
  **yell** [1] - 154:8
  **yesterday** [31] - 4:10, 8:13,
10:5, 11:25, 12:13, 13:5,
14:3, 15:4, 16:21, 19:20,
23:12, 30:20, 32:14, 36:9,
39:4, 43:18, 44:3, 54:17,
55:13, 77:6, 80:19, 82:16,
86:15, 86:17, 99:4, 99:20,
100:2, 103:1, 108:2, 204:10
  **Yogel** [4] - 207:1, 207:17,
207:21, 208:2
  **York** [2] - 1:16, 129:20
  **Youngswick** [4] - 130:18,
130:19, 154:25, 176:7
  **yourself** [1] - 164:14

---

## Z

  **Z-1379** [1] - 79:4
  **Zakh** [1] - 72:4
  **zero** [1] - 142:11
  **ZIP** [2] - 78:11
  **zoom** [3] - 98:11, 119:12,
185:11