```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
2                      WEST PALM BEACH DIVISION
                     CASE NO. 19-CR-80181-RAR-1
3
     UNITED STATES OF AMERICA,           Miami, Florida
4
                                         December 1, 2022
5            vs.
                                         10:09 a.m. - 5:47 p.m.
6
     MINAL PATEL,                         Volume 4
7
                   Defendant.            Pages 1 to 268
8    _____

9
                       TRANSCRIPT OF JURY TRIAL
10          BEFORE THE HONORABLE RODOLFO A. RUIZ, II
                    UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12

13   FOR THE GOVERNMENT:        JAMIE DE BOER
                                EMILY GURSKIS
14                              REGINALD CUYLER
                                KATHERINE ROOKARD
15                              UNITED STATES DEPARTMENT OF JUSTICE
                                CRIMINAL DIVISION, FRAUD SECTION
16                              1400 New York Avenue, 8th Floor
                                Washington, D.C. 20005
17
     FOR THE DEFENDANT:         STEVEN H. SADOW
18                              LAW OFFICE OF STEVEN H. SADOW, PC
                                260 Peachtree Street NW
19                              Suite 2052
                                Atlanta, Georgia 30303
20
     STENOGRAPHICALLY REPORTED BY:
21
                                ILONA LUPOWITZ, CRR, RPR, RMR
22                              Official Court Reporter to:
                                The Honorable Rodolfo A. Ruiz, II
23                              United States District Court
                                299 East Broward Boulevard
24                              Fort Lauderdale, Florida 3301
                                (954) 769-5568
25
```

```
 1   (Appearances continued)

 2
     FOR THE DEFENDANT:              DONALD F. SAMUEL
 3                                   GARLAND, SAMUEL & LOEB, PC
                                     3131 Maple Drive NE
 4                                   Atlanta Georgia 30305

 5                                   BRIAN T. RAFFERTY
                                     BAKER & HOSTETLER, LLP
 6                                   1170 Peactree Street, Suite
                                     2400
 7                                   Atlanta, Georgia 30309

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          I N D E X

2    WITNESS                                         PAGE

3    SENTHIL RAMAMURTHY

4    CROSS-EXAMINATION BY MR. SADOW                   11
     REDIRECT EXAMINATION BY MS. GURSKIS             104
5
     BRIAN SLOMOVITZ, MD
6
     DIRECT EXAMINATION BY MS. GURSKIS               122
7    CROSS-EXAMINATION BY MR. RAFFERTY               131
     REDIRECT EXAMINATION BY MS. GURSKIS             142
8
     W.H.
9
     DIRECT EXAMINATION BY MS. GURSKIS               147
10   CROSS-EXAMINATION BY MR. RAFFERTY               153
     REDIRECT EXAMINATION BY MS. GURSKIS             156
11   RECROSS-EXAMINATION BY MR. RAFFERTY             157

12   STACEY ADAIR

13   DIRECT EXAMINATION BY MS. DE BOER               158
     CROSS-EXAMINATION BY MR. SAMUEL                 184
14   REDIRECT EXAMINATION BY MS. DE BOER             213

15                   GOVERNMENT'S EXHIBITS

16

17   Exhibit                                     Received

18   478-A, B and C                                 128
19   478                                            135
     1372, 1383, and                                165
20   667-B

21                   DEFENDANT'S EXHIBITS

22

23

24   Exhibit                    Marked        Received
     D                                           157
25   B-1 through B-10                            187

```
1              (Call to the Order of the Court.)
2              THE COURT:  Good morning, everyone.  Please be seated.
3              All right.  We are back this morning in the trial of
4    United States of America versus Minal Patel, Case Number
5    19-80181.
6              All jurors are now present and accounted for.  Our last
7    one just arrived.  I wanted to let all parties know that I
8    checked in with the jury about starting at 9:00 tomorrow.  They
9    are all unanimously in agreement that in order to kind of make
10   up a little bit of lost time, we're going to go ahead and start
11   tomorrow at 9:00.
12             So I wanted to let you all know as well so you can plan
13   ahead, and that way the jurors are making the necessary
14   arrangements with family and work so they can come in a little
15   early, and they're all on board.  They are certainly ready to
16   go.
17             So with that being said, any housekeeping issues before
18   I bring them in on behalf of the government?
19             MS. DE BOER:  Just wanted to confirm if the witness is
20   set in terms of had a meal this morning and has what he needs
21   in that regard.
22             THE COURT:  Thank you.  Mr. Ramamurthy, I want to
23   double-check as we did the other day.
24             Are you feeling all right?
25             THE WITNESS:  Feeling good.
```

1           THE COURT:  At any point, let me know if you need a

2     Pepsi or sugar; we'll get it to you.

3           THE WITNESS:  All right, Your Honor.

4           THE COURT:  I'll keep an eye on him.

5           MS. DE BOER:  Thank you, Your Honor.

6           The second issue is we would request that we get an

7     electronic copy of defendant's exhibits, which we were supposed

8     to be provided last week.  Anything that is currently marked in

9     their exhibit list, if they are intending use as case-in-chief

10    substantive evidence, we would appreciate receiving a copy of

11    that so we're not receiving it, you know, minutes before it's

12    being introduced, and we can move efficiently.

13          And along those same lines, you know, I understand with

14    Mr. Ramamurthy that Mr. Sadow is in a position where he's

15    preparing his cross in court and didn't have the opportunity to

16    identify for us the long list of documents that he introduced

17    yesterday.

18          I think, you know, certainly he said he's prepared for

19    Sporn, and our, I think, universal intention is for everyone to

20    be prepared and on notice going forward.  So we would ask for a

21    little bit more of a heads-up of what's coming in terms of

22    documents in cross.  Because, frankly, the exhibits that were

23    admitted yesterday, even though many of them were on the

24    government exhibit list, are not necessarily admissible when

25    put in through the defense and not necessarily admissible for a

1    substantive basis.

2         So that ship has sailed.  They're in.  But the way it

3    was done yesterday -- I think, you know, we would appreciate a

4    little more time to, you know, deal with that kind of stuff

5    going forward.

6         THE COURT:  All right.  Understood.  So I think on the

7    defense team, I mean, we've done a little bit of what's good

8    for the goose is good for the gander, right?  The same way we

9    wanted to make sure the government didn't change midstream.

10        I can't imagine it will be a problem for you all to

11   give a little more heads-up, especially when we have a large

12   number of exhibits that we're moving in.  So as we plan ahead

13   for the remainder of this week, can we go ahead and try at

14   least to give a bit more heads-up on what we're going to be

15   moving in or using on the defense side?

16        MR. RAFFERTY:  Of course, Your Honor.  I could speak to

17   Ms. McMillan.  The government was kind enough to send me a list

18   of all these exhibits that they planned on using, and I

19   understand for efficiency purposes and for other reasons they

20   may choose during the course of their direct that they're just

21   not going to go certain places.

22        From my perspective, you know, once they've identified

23   something that they plan on using, I planned on using it too.

24   And so if they choose not to use it, I could either call her

25   back, or we can just go forward.

1          So I don't think with respect to Ms. McMillan there can

2    be any real surprise with what I was going to ask her.  I mean,

3    they told me what they were going to use.  I was going to use

4    the same things.

5          THE COURT:  I don't think that's a concern.  Their

6    concern is Ramamurthy and the movement of exhibits yesterday.

7    That's really what we're worried about.

8          MS. DE BOER:  Just one brief follow-up, Your Honor.

9    And I completely understand where Mr. Rafferty is coming from

10   on that particular point, but I think the one issue that the

11   government had was there was the OIG report that he used to

12   cross Ms. McMillan.

13         I was not provided that until about 25 minutes before

14   she took the stand, and I was emailed it and I was in a

15   position where I was reviewing it on my phone before she took

16   the stand.  So something like that I would imagine was probably

17   in their palms a little bit prior to their testimony.

18         So that would be an instance of something we would have

19   appreciated receiving with a little bit more time to look at.

20         MR. RAFFERTY:  I can speak to that, Your Honor.  In

21   fact, I obtained that through one of my colleagues after

22   midnight, the night after she testified, because it was

23   surprising to me the degree to which she was so certain about

24   these LCDs.  That was part of what we did.

25         We researched.  I sent it to the government the next

1    morning after I had a chance to read it when I got up in the

2    morning.

3           THE COURT:  Let's do this.  I don't want to waste any

4    more time on this point.  So we can get started on the

5    cross-examination, let us all just agree -- and this applies to

6    both sides.

7           Just that we've discussed giving heads-up notice on the

8    witnesses that are in the lineup, so we can sufficiently

9    prepare and be efficient, I would just ask that to the extent

10   that we have exhibits that we know we're going to use and we've

11   identified them for a particular witness, that we avoid

12   providing them on the eve of examination.

13          We need to try to get them as early as reasonably

14   practical.  Because I agree with you, Mr. Rafferty, you could

15   have something you found at the eleventh hour.  So I'm not

16   asking you to do the impossible.  But to the extent we have

17   certain exhibits, certainly the ones that we moved in yesterday

18   that we are thinking about using -- the sooner we can let each

19   side know that we're going to use them, the better off we'll be

20   so that I can avoid unnecessary sidebar delay.

21          So I would just ask everyone to make that effort going

22   forward.

23          MR. RAFFERTY:  We will, Your Honor.

24          THE COURT:  All right.  Very good.

25          MR. RAFFERTY:  On the defense side, there's one

1    housekeeping issue.

2            THE COURT:  Yes.

3            MR. RAFFERTY:  You may have seen on the docket, Your

4    Honor, that a motion to quash was filed on behalf of a company

5    called PerkinElmer --

6            THE COURT:  I did see that.

7            MR. RAFFERTY:  -- a law firm by the name of Manatt,

8    Phelps.

9            I have been in contact with that law firm.  They

10   actually emailed me yesterday while we were in court asking

11   about status.  We are in the process of drafting a response to

12   that motion to quash.  But I just wanted to get that on the

13   Court's radar.  I'm happy to communicate by email about

14   scheduling a hearing.

15           Obviously, we're going to oppose that motion.  We may

16   need a hearing, and those lawyers may need to come down here --

17   I think they're from Boston and New York -- to be heard with

18   respect to that.

19           So I just wanted to make the Court aware of that.  I

20   know we had until sometime next week perhaps to file a

21   response, but if you'd like us to file something by this

22   weekend, we can do that.

23           THE COURT:  I think we're okay.  I did see it come up

24   on the radar, and I did start looking at it.  I'm thinking

25   about the timing of when you're going to need a ruling.  We're

1   probably in good shape if you guys have it to me by Tuesday of

2   next week.

3          MR. RAFFERTY:  Okay.

4          THE COURT:  I'm thinking ahead that we can probably set

5   a hearing at some point later next week.

6          Does that make sense to you?

7          MR. RAFFERTY:  Yes, Your Honor.

8          THE COURT:  I think timing-wise that will work so I can

9   get a ruling.  Even if they're out of time -- I mean, certainly

10  I may even be able to do it over Zoom if I have to, just

11  something quickly to get it on calendar.  I'll figure it out.

12  But I didn't want to wait at least until I saw your response

13  before I said anything.

14         MR. RAFFERTY:  Thank you.

15         THE COURT:  I'll keep a eye out for it.  Thank you.

16         All right.  I think we're ready to go.  If we could go

17  ahead and get our jury, guys.  Thank you.

18         THE COURT SECURITY OFFICER:  All rise for the jury.

19      (Jury enters at 10:17 a.m.)

20         THE COURT:  All right.  Please be seated, everyone.

21  Good morning, again, ladies and gentlemen of the jury.  We are

22  going to pick up where we left off yesterday.

23         You may recall that the direct examination was

24  completed by the government, and as we explained when we began

25  the trial process, now comes the cross-examination, as you've

1    already seen, by the defense, of Mr. Ramamurthy.

2          So we all have our notepads, it seems, and we're ready

3    to go.  I'll turn it over to Mr. Sadow.

4          Counsel, the floor is yours.

5          MR. SADOW:  Thank you, Your Honor.

6          (Government witness, SENTHIL RAMAMURTHY, previously

7    sworn.)

8                        CROSS-EXAMINATION

9    BY MR. SADOW:

10   Q.  Good morning, sir.

11   A.  Good morning.

12   Q.  To start off, I want to make sure we're crystal clear on a

13   couple of points.  Okay?

14   A.  (No verbal response.)

15   Q.  You have to say "yes" or "no."

16   A.  Yes, sir.

17   Q.  First, according to your testimony, Minal Patel ordered or

18   directed you to do almost everything when it came to marketing,

19   correct?

20   A.  Yes.

21   Q.  And according to your testimony yesterday, your mother

22   became involved with LabSolutions and Minal Patel because he

23   asked you to get her involved, correct?

24   A.  That is correct.

25   Q.  There's no doubt about either of those, correct?

1   A.   That is correct.

2   Q.   Okay.  Now, let's explore you before Minal Patel and after

3   Minal Patel, and then we're going to get to the Minal Patel

4   time period.  Okay?

5   A.   Okay.

6   Q.   Okay.  You were born in 1981, correct?

7   A.   Yes.

8   Q.   You were born in the Bronx, in New York?

9   A.   Yes.

10   Q.   At some point, you moved to Texas?

11   A.   Yes.

12   Q.   Your mother and father are physicians?

13   A.   Yes.

14   Q.   You excelled in academics in school, correct?

15   A.   I did.

16   Q.   In fact, you entered high school at the age of 12, didn't

17   you?

18   A.   It was 12 or 13, yeah.

19   Q.   Well, I mean, it's your life.

20   A.   I don't remember.

21   Q.   You don't remember?

22   A.   I was 12 or 13.  I don't remember the exact year -- exact

23   age.

24   Q.   Okay.  And you were accepted at the University of Houston

25   at age 16, correct?

```
 1  A.  Correct.

 2  Q.  So fair to say you're a very intelligent individual,

 3  correct?

 4  A.  I'm pretty smart, I guess.  I'm okay, yeah.

 5  Q.  Well, you don't need to be humble here.  You can be honest.

 6      People that go to high school at age 12 and get accepted to

 7  college at age 16 are intelligent, correct?

 8  A.  Yeah.

 9  Q.  Right?

10  A.  Yeah.

11  Q.  And you went to medical school, correct?

12  A.  I did.

13  Q.  And did you graduate -- first of all, you went to college,

14  correct?

15  A.  I did.

16  Q.  Graduated from college, correct?

17  A.  I did.

18  Q.  Went to medical school, correct?

19  A.  I did.

20  Q.  And you told us yesterday that at some point you started a

21  rotation, something of that nature -- was it your third or

22  fourth year in medical school?

23  A.  My third.

24  Q.  Third.

25      And that rotation, for those of us who are not doctors,
```

1    what does that mean?  What were you doing when you start a

2    rotation in your third year?

3    A.   In a rotation, you are assigned tasks of interviewing

4    patients, shadowing physicians, learning how things are done in

5    the field, in a clinic.  That's typically what you're supposed

6    to do in a rotation.

7    Q.   And is that what you were doing?

8    A.   In all of my rotations, with the exception of my psychiatry

9    rotation at Compass Health.

10   Q.   And where were you in this rotation -- this third-year

11   rotation?

12   A.   In Miami.

13   Q.   University of Miami?

14   A.   No, Compass Health.

15   Q.   Compass Health.

16        And does that put you in time frame of 2014?

17   A.   I think so.  2014 or early 2015.  I think it actually was

18   2014, fall, yeah.

19   Q.   And at that point, you're not in your early 20s; you're

20   approximately 33 years old, correct?

21   A.   Was I younger?  32 or 33.

22   Q.   I don't know.  I guess I'm kind of asking you.

23   A.   2022.  So let's see here.  I think I was 32.

24   Q.   Okay.  Now, in the year 2014, you came in contact with a

25   gentleman named -- is it Scholtes?

1   A.   That is correct.

2   Q.   So you and Mr. Scholtes, in the year 2014, began a scheme

3   to defraud, correct?

4   A.   That is correct.

5   Q.   Now, you didn't know Minal Patel in 2014, did you?

6   A.   I did not.

7   Q.   So let's talk about your scheme to defraud before you have

8   contact with Minal Patel.  Okay?

9   A.   Okay.

10  Q.   The scheme began in September of 2014, correct?

11  A.   Yes.

12  Q.   And continued until July of 2015, correct?

13  A.   No, it went longer than that.  John Scholtes continued

14  working with me while I was working with Minal.

15  Q.   I'm talking about the scheme to defraud -- I appreciate

16  that, but I'm talking about the scheme to defraud pre your

17  testimony about Minal Patel.

18       So let's talk about the scheme to defraud that had to do

19  with compounding, and then I'll ask you what that is, and

20  pharmacies.  Okay?

21       So I'll give you that ending date one more time.  July

22  of 2015, correct?

23  A.   Yes.  The compounding finished in that summer period of

24  that year.

25  Q.   Well, I'm going to be really exact to make sure everyone

1    knows.  You did something before you pled guilty, or at the

2    same time that you pled guilty, called a factual proffer; did

3    you not?

4    A.  I did.

5    Q.  And you verified that factual proffer in the scheme to

6    defraud that I'm asking you about with your signature, correct?

7    A.  I did.

8    Q.  And you did it and verified the scheme to defraud that I'm

9    asking you about between September of 2014 and July of 2015.

10   You verified that in court; did you not?

11   A.  Yes.

12   Q.  So what I'm asking you right now, so that there's not any

13   question about it, I'm asking you about facts that you have

14   admitted previously, concerning this scheme to defraud, between

15   September 2014 and July of 2015.  Okay?

16   A.  Okay.

17   Q.  Okay.  So you conspired in that scheme -- let's call it --

18   well, let's get some context.

19        What's compounding?

20   A.  Compounding are creams that have medication in it that a

21   physician can order for you, and they can be used for treating

22   pain, wounds, scars, basically any medication that can be

23   delivered topically, through the skin.

24        The compounds that we were doing, they weren't really

25   customized, per se.  They were produced in larger batches.  The

1    adjudication amounts were very high, in the order of, maybe,

2    $20,000 per tube.

3    Q.   Okay.  And this compounding had to do or was done in

4    connection with pharmacies, correct?

5    A.   That is correct.

6    Q.   Okay.  How many pharmacies?

7    A.   I think between five and seven.

8    Q.   Five and seven pharmacies.  All right.  Let's go a little

9    further.

10        You conspired with Mr. Scholtes, correct?

11   A.   Yes, I did.

12   Q.   I'm keeping the time frame here.  This is September of '14

13   to July of '15, right?  So we're talking a little less than a

14   year.  Okay?

15   A.   Yes.

16   Q.   You conspired with a gentleman, the last name is Mauzy,

17   M-a-u-z-y, correct?

18   A.   Yes.

19   Q.   Who is Mauzy?

20   A.   He worked for my company or his company worked for my

21   company.  They did -- he was in charge of computer stuff for

22   his company, and they did marketing for my company.

23   Q.   And your company was?

24   A.   SKR Services and Ventures, LLC.

25   Q.   Was that the only company that you had for this time frame?

1  A.  I think this is the only company.  The brand name was Med

2  Health Quest, and Anthony's company was called Med Health Quest

3  Ventures, LLC.

4  Q.  And where did you meet Mr. Mauzy?

5  A.  I met him in my 20s, in Austin, when we were both kind of

6  DJ-ing parties.

7  Q.  And then as part of this conspiracy, a Mr. Sahs?  S-a-h-s,

8  for the court reporter.

9  A.  Yes.  He was also in Anthony's company.

10  Q.  All right.  And Mr. Mahbubani.  I may be mispronouncing it,

11  and I apologize to him.  But it's M-a-h-b-u-b-a-n-i, again for

12  the court reporter.

13  A.  Yes.

14  Q.  Who was he?

15  A.  Mahbubani was also part of that company.

16  Q.  And Asef (phonetic) Uddin, U-d-d-i-n?

17  A.  Is it Asef or Asif (phonetic)?  Asif Uddin, he -- he had

18  his own marketing company that operated separately from those

19  guys, and, yeah, he also marketed compounds as well.

20  Q.  These people all worked for you, correct?

21  A.  Yes.

22  Q.  And let's add one more person to that conspiracy, a

23  Dr. Ramamurthy.  Who's that?

24  A.  That's my mom.

25  Q.  So in your scheme to defraud between September of 2014 and

1   June of 2015 you brought your mother into it?

2   A.   I did.

3   Q.   And that had nothing to do with Mr. Patel, did it?

4   A.   At this point in time, no.

5   Q.   At this point in time.  You brought her into a scheme to

6   defraud.

7        What did you have her do in the scheme to defraud?

8   A.   She wrote compound prescriptions.

9   Q.   Oh, she did more than that.  Didn't she forge other

10  physicians' names?

11  A.   Not that I'm aware of.

12  Q.   Well, then, we'll go a little further in this.

13       And what program, federal program, or quasi-federal

14  program, were you defrauding?

15  A.   Tricare.

16  Q.   And who was Tricare?  What did Tricare take care of?

17  A.   Armed services.

18  Q.   Armed services.  So your scheme to defraud involved the

19  military, correct?

20  A.   Correct.

21  Q.   So tell us, what were you doing to defraud with the

22  military?

23  A.   We marketed compounds to people in the military through

24  direct marketing.  I had these two marketing teams, one with a

25  Asif, and one with the other three individuals, and they would

1   go to army bases and sign up servicemen for compounding.

2   Q.   How did you get onto the military bases?

3   A.   I believe that people in those marketing companies had

4   access to those bases through contacts that they had.

5   Q.   You believe or you know for a fact?  Let's not use words

6   that leave it open.

7        You knew for a fact how those individuals got on the

8   military bases, correct?

9   A.   It is a fact that they had contacts to get to those bases,

10  and I did know about that.

11  Q.   And you paid -- well, let's go a little further.  You and

12  your co-conspirators that we've gone over received 3.4 million

13  in kickbacks during that time period, didn't you?

14  A.   I don't remember the exact number, but if that is the

15  number from the proffer, then that is correct.

16  Q.   If there's a doubt on that, I'll be more than happy to show

17  it to you.  But I'll tell you, for purposes of the record, that

18  it's 3.4 million.

19  A.   Okay.

20  Q.   And there were Tricare prescriptions for approximately

21  1,066 beneficiaries in Pharmacies 1 and Pharmacies 2, correct?

22  A.   If that's from the proffer, then that is correct.

23  Q.   Well, where did the information come from in the proffer?

24       I'm assuming that the facts were accurate, correct?

25  A.   I think the numbers came from things that were in our

1    discovery, such as wire transfers and EOBs, the Explanation of

2    Benefits from the insurance carriers, so that would make them

3    accurate in the proffer.

4    Q.  All right.  And the pharmacies, where were these pharmacies

5    located, at least Pharmacies 1 and 2?

6    A.  I think Pharmacy 1 is in Florida.  I think Pharmacy 2 is in

7    Texas.  I'm not 100 percent.

8    Q.  When you say you think, is it --

9    A.  I'm not 100 percent because I dealt with many different

10   pharmacies.  This was years ago.

11   Q.  Well, we'll come back to that.

12        Who made contacts with the pharmacies?

13   A.  I think pharmacy one, I made contact with.  Pharmacy 2, I

14   believe John Scholtes made contact with.

15   Q.  And how did you approach the pharmacy with your scheme to

16   defraud?  What did you tell them?

17   A.  Actually, I was invited by the pharmacies, through their

18   billing company.

19   Q.  Well, how did you get invited?  I assume that you had to

20   know somebody.  Invitations from pharmacies, at least in some

21   experiences, don't just come in the mail.

22        How did you get invited?

23   A.  Okay.  From one of the pharmacies, I had a friend of mine

24   who was a physician in Los Angeles, and he knew of a fellow who

25   had a billing company that was doing compounding.  And so he --

1    I guess exchanged information with me, and I took a call with

2    them.  And they recruited me to be a marketer for them.  That

3    was one company.

4    Q.  Marketing for the pharmacy?

5    A.  Well, the contract was with the billing company.  The

6    billing company paid us.

7    Q.  Oh, the billing company paid you.  So the kickbacks of

8    3.4 million came from the billing company?

9    A.  Yes.

10   Q.  Okay.  So you had experience in dealing -- you then dealt

11   with the billing company, correct?

12   A.  That's correct.

13   Q.  Who was your physician friend that introduced you?

14   A.  His name is Pravin Shaw.

15   Q.  And how much did he get paid for introducing you?

16   A.  He didn't make any money for the introduction, but he was

17   doing business with that pharmacy as well.

18   Q.  Compounding?

19   A.  Yes.  So he was making his -- he had his own marketing

20   business going on.

21   Q.  Marketing as in fraud?

22   A.  I don't know if he was committing fraud, but he was

23   marketing compounding.

24   Q.  You don't know whether he was committing fraud?

25   A.  If I knew, I would disclose that, but I don't.

1  Q.  You know, the other day, yesterday, you characterized

2  Mr. Minal Patel as the architect of the scheme that you were

3  testifying about, right?

4  A.  I did.

5  Q.  Who's the architect of this scheme, the one that we're

6  talking about right now?

7  A.  John Scholtes and me.

8  Q.  So architect is -- it was an easy word for you to use

9  yesterday because you were, in fact, an architect of a scheme

10  before you ever met Minal Patel, correct?

11  A.  This is correct.

12  Q.  In fact -- and we'll talk about this a little later.  Okay?

13      That scheme -- did your mother get paid for that?

14  A.  No, she did not.

15  Q.  She was -- she was involved just because you needed her

16  assistance?

17  A.  That is correct.

18  Q.  But all of these compounding matters and the money and the

19  kickbacks of 3.4 million, that had no medicinal value at all,

20  correct?

21  A.  Could you repeat the question?

22  Q.  The compounding had nothing to do with the medical

23  necessity of any of the beneficiaries that were targeted by you

24  and your marketers, correct?

25  A.  One more time.

1   Q.   Okay.

2   A.   Sorry, I'm just trying to phrase the right answer in a

3   complete way.

4   Q.   All right.  We'll go for number three.

5        The marketing of the compound -- the compounding creams, or

6   the compounds which involved creams, was not designed in any

7   way for the medical necessity of the beneficiaries, correct?

8   A.   The marketing was not designed for the benefit of the

9   beneficiaries.

10   Q.   Right.  And you made a great deal of money through that

11   scheme, did you not?

12   A.   I did.

13   Q.   Tell us, how much money did you make?

14   A.   I'm not certain the exact number, but it was a lot.

15   Q.   Give us a rough estimate.

16   A.   Between half a million and a million went directly to me,

17   maybe.

18        What does it say in the proffer, so I can be accurate?

19   Q.   Well, let's not deal with the proffer.  Let's deal with

20   your memory, your recollection of events.

21        You know how much money you made.  Tell us how much money

22   you made.

23   A.   Out of 3.4, I would estimate I made 1.2.

24   Q.   Oh.  So we went from 500,000, to a million, to 1.2.

25        Do you want to go one more time, or do you think you'll

1   stop at 1.2?

2   A.   I think 1.2.

3   Q.   Okay.  And you kicked backed moneys to all of your

4   marketers, right?

5   A.   All marketers were paid, correct.

6   Q.   Right.  And Tricare paid through just one or two

7   pharmacies -- and you've already told us there may have been

8   between five and seven.

9        Tricare paid about $6.3 million, didn't it?

10  A.   Excuse me?  They paid 6.7 to --

11  Q.   6.3.  Tricare paid 6.3 in total, did it not?

12  A.   What was the 3.4?

13  Q.   That was kickbacks just to you and your folks.

14  A.   From?

15  Q.   I can't answer the questions.  You see, this is your scheme

16  to defraud.  That's why I'm asking you about it.

17       So you tell me.  Is there an issue about where the 3.4 came

18  from, 3.4 million?

19  A.   I'm just confused about how you're dividing up the number.

20  There's 3.4, and then there's 6.7.  I just want to be clear

21  which amount is which.

22  Q.   Okay.  Well, if it's unclear, I'll do my best.

23       The 3.4 is kickbacks.

24       Do you know what a kickback is?

25  A.   Oh, this is the money that was paid to us by the billing

1    company.

2         So 6.7, you're saying, is the total that was billed to

3    Tricare?

4    Q.   Okay.  What I said was 6.3, but that's the money that I'm

5    suggesting to you that you agreed was paid to Tricare from

6    Pharmacies 1 and 2.

7    A.   Okay.  That does sound correct, yes.

8    Q.   Okay.  So if you got 3.4 and Tricare paid 6.3, that would

9    suggest the pharmacies must have made out -- made a killing

10   too, right, at least or close to $3 million?

11   A.   Yes.

12   Q.   Okay.  Who were the pharmacies that you were dealing with?

13        Did you tell the government?

14   A.   I don't remember their names.

15   Q.   You don't remember their names.

16        They made $3 million from your scheme during the period of

17   less than a year, but you don't know their names?

18   A.   No, I don't know the name of the billing company.

19   Q.   The billing company.

20        Well, how much did the billing company make?

21   A.   I think their cut -- and I'm just thinking -- it was -- I

22   heard it was between 15 and 10 percent of the total adjudicated

23   value.

24   Q.   What were the names of the billing companies?

25   A.   NHS Billing.

1   Q.   And did you talk to the government about that?

2   A.   I did, and they were sentenced.  They pled guilty.

3   Q.   Let's go back to your mother.

4        Isn't it a fact that your mother, Dr. Ramamurthy, ratified

5   prescriptions or forged the names of doctors under her employ

6   but never examined any of the patients?

7   A.   I don't know exactly what my mom did.

8   Q.   Well, then, why did you make that -- agree to that factual

9   statement in your factual proffer?

10  A.   I do know that she --

11  Q.   No.  My question was, then why did you agree to that in

12  your factual proffer?  And your answer would be as to why you

13  agreed to it.

14  A.   Because I'm almost certain that it was true.

15  Q.   Well, when you did your factual proffer, did you say I'm

16  almost certain that this is true, or did you just agree --

17  oftentimes, as in the case of Dr. Ramamurthy, who ratified

18  prescriptions, who forged the name of a doctor under her

19  employ, the doctor never even examined the patient.

20       You didn't say almost.  That's your factual proffer, is it

21  not?

22  A.   Let me elaborate.

23  Q.   No, no.

24  A.   I want to elaborate.

25           MS. DE BOER:  Your Honor, I'm going to object to that.

```
1              THE COURT:  No, no, no.  Hold on a second.

2              Let's pose the question.  But he does get an

3    opportunity, Mr. Sadow.  Let him explain.

4              MR. SADOW:  All I'm asking at this point is, was that

5    his factual proffer, and if the answer to that is whatever it

6    may be, and if he chooses to explain, I certainly understand.

7              THE COURT:  Yeah.  Go ahead.

8              THE WITNESS:  Can I elaborate?

9              THE COURT:  You may.  Go ahead, Mr. Ramamurthy.

10             You may elaborate.

11             THE WITNESS:  Thank you, Your Honor.

12             I was not sitting in my mom's office while she was

13   committing these acts, but I believe that she did commit these

14   acts.

15   BY MR. SADOW:

16   Q.  In furtherance of your scheme to defraud --

17   A.  Yes.

18   Q.  -- right?

19   A.  Correct.

20   Q.  Now, did you do this out of greed?

21   A.  Yes.

22   Q.  Did you do it because you were in need of attention?  I

23   know that sounds strange, but did you do it because you were in

24   need of attention?

25   A.  I think I do have a desire to be -- I think I do have
```

1    ambition and a desire to be known, so in a sense, yes.

2    Q.   But was it as much out of a need for attention as it was

3    for greed?

4    A.   No, the greed is definitely the main component.

5    Q.   So then why did you have your lawyer put in a sentencing

6    memorandum that the reason you got involved in this is much for

7    a need of intention -- need for attention as much as for greed?

8    A.   I don't remember this memorandum.

9    Q.   Oh, you remember.  The sentencing memorandum, the one that

10   you used to try to get a lesser sentence after you pled guilty

11   and gave that to the judge to convince the judge not to send

12   you to jail for as long as the guidelines.

13        Do you remember?

14   A.   I haven't read that statement in many years.

15   Q.   Well, but it was a statement on your behalf; that is, you

16   were trying to convince a judge that you weren't there only for

17   greed; that you were doing this as much for attention as you

18   were for greed, correct?

19        MS. GURSKIS:  Objection.  Asked and answered.

20        THE COURT:  Overruled.

21        You may answer.

22        THE WITNESS:  I do enjoy attention.

23   BY MR. SADOW:

24   Q.   That wasn't my question.

25        My question is, you were trying to convince a judge to give

1    you a lesser sentence, and you were trying to characterize the

2    reason, your motivation for this, as much a need of attention

3    as it was greed, correct?

4    A.   I would like a lesser sentence.

5    Q.   Okay.  My question -- I thought it was clear.  I'll try one

6    more time.

7         The reason you did that is to try to persuade the judge

8    that your motivation for your conduct was as much in your need

9    for attention as it was for greed.

10        Is that true or not true?

11   A.   I was motivated by multiple factors.

12   Q.   I don't want to waste everyone's time, so I'm not going to

13   ask it again.

14        When did you first become knowledgeable about CGx?

15   A.   This was in 2016, I believe, early in the year.

16   Q.   2016, early in the year, that's your testimony?

17   A.   Let me see.  I was working with John Scholtes at this

18   rotation, and he had a laboratory that was doing PGx testing,

19   pharmacogenomics.

20        And a few months after that is when I learned about cancer

21   genomic testing.

22   Q.   When I'm asking you, I'm asking you about the year.

23   A.   As I said, it was in 2016.

24   Q.   Okay.  It was, in fact, in 2014, because you and Scholtes

25   tried to figure out a way to use CGx or PGx to make money

1   before you ever got anywhere near Minal Patel, but you couldn't

2   figure out how to do it, right?

3   A.   We did try to do CGx testing with another laboratory, and

4   that did not work out.

5   Q.   And that gave rise to your compounding scheme, didn't it?

6        You couldn't make money with CGx, so you moved on to

7   compounding, correct?

8   A.   No, that is not correct.

9   Q.   When you first came in -- well, let's move -- we're going

10  to move from 2015 July -- okay?  We're going to move from 2015

11  July to September of 2018.  Okay?  We're skipping the period of

12  July 2016, and we're going all the way to September of 2018.

13  We're going to return to that other period, but right now,

14  let's go to September of 2018.  Okay?

15       What happened in September of 2018?

16  A.   Is this when I was arrested or indicted?

17  Q.   Well, again, I'm not allowed to tell you, but do you not

18  remember when it was that you were arrested?

19  A.   Not exactly.  I do not.

20  Q.   Well, I'll help you out a little bit.  Let's just say your

21  first initial appearance in court -- in federal court was on

22  September 20th of 2018.  Okay?

23  A.   Okay.

24  Q.   Okay.  And where were you arrested, what geographical area?

25  A.   Texas.

1  Q.  Texas.

2      And I assume you didn't know that it was coming.

3  A.  No.

4  Q.  Did they seize your phone?

5  A.  No.

6  Q.  Where was your phone?

7  A.  At my house.

8  Q.  Did the government ever get your phone?

9  A.  I don't think they did.

10 Q.  Okay.  So if they didn't get your phone in September

11 of 2018, what happened to it?

12 A.  I don't know.

13 Q.  Well, it's your phone.

14 A.  I have a few phones.

15 Q.  You don't know what happened to the phone that you were

16 using in September of 2018?

17 A.  I do not.

18 Q.  Did the government, be it this government or the

19 government -- that is, these prosecutors or the prosecutors

20 that handled your case, did they ever ask you for that phone?

21 A.  I don't remember.

22 Q.  Did you ever turn it over to them?

23 A.  I don't remember.

24 Q.  You don't remember.

25     Do you remember making bond on the same date, November --

```
1    excuse me -- September 20th of 2018?
2    A.  The bond happened a few days after my arrest.
3    Q.  And you were released on a bond of $250,000, that you had
4    to put down 10 percent, correct?
5    A.  Is that what it says in the court document?
6    Q.  I'm asking you.
7    A.  I don't remember.
8    Q.  You don't remember how you made your bond?
9    A.  The exact amount, I don't remember.
10   Q.  Were you released on bond?
11   A.  I was.
12   Q.  And what were the conditions of your bond?
13   A.  I was on an ankle monitor.  I was prohibited from travel,
14   prohibited from leaving my house for, I think, a few months.
15   Q.  Well, let's just stay with when you were first released on
16   bond.  We're going to get to you leaving from your house.
17   A.  And I was prohibited from engaging in healthcare business.
18   Q.  Okay.  You understood those were your conditions, correct?
19   A.  I did.
20   Q.  So you knew -- you knew that you were not supposed to be in
21   the healthcare business after you were released on bond, right?
22   A.  Yes.
23   Q.  And you would have gone before a judge -- do you remember
24   whether you were in Florida -- Southern District of Florida or
25   in Texas when you were released?
```

1   A.   Texas.

2   Q.   Texas.

3        Do you remember going before a judge, and the judge asking

4   you whether you understood the conditions of your bond?

5   A.   Yes.

6   Q.   And you promised the judge that you would abide by those

7   conditions of your bond, right?

8   A.   I did.

9   Q.   Tell the jury, how long did it take for you to violate any

10  of the conditions of your bond?

11  A.   I think, within a month or two, I was already engaged in

12  another conspiracy for genetic testing.

13  Q.   So you get arrested on a federal indictment in September

14  of 2018, right?

15  A.   Yes.

16  Q.   You go before a judge, and you promise to abide by the

17  conditions of your bond, correct?

18  A.   Yes.

19  Q.   Correct?

20  A.   Yes.

21  Q.   And within a very short period of time -- and I would

22  suggest to you it might be as early as two or three weeks --

23  but in a short period of time after you've made this promise to

24  a federal judge to get released on bond, you began engaging,

25  once again, in criminal activity, correct?

1    A.   That is correct.

2    Q.   But that had nothing to do with Mr. Patel, did it?

3    A.   (No verbal response.)

4    Q.   Oh, you don't have to think that hard.  You know exactly

5    who it involved.  Come on.

6    A.   No, it did not involve Minal Patel at all.

7    Q.   Okay.  It involved a gentleman by the name of Brett Hirsch,

8    right?

9    A.   Correct.

10   Q.   Correct?

11   A.   Correct.

12   Q.   And it involved another laboratory, didn't it?

13   A.   Correct.

14   Q.   And that other laboratory was what laboratory?

15   A.   Clio.

16   Q.   Clio.  Owned by Mr. Satary, correct?

17   A.   Yes.

18   Q.   Now, you didn't tell Brett Hirsch that you'd been charged

19   by the feds, did you, at that time?

20   A.   At that time, no.

21   Q.   And you continued dealing with Mr. Hirsch to set up this

22   new fraud for months and months and months, didn't you?

23   A.   I do acknowledge this, yes.

24   Q.   You do acknowledge this?

25   A.   That is correct.

1    Q.   Okay.  And you would use, would you not, your visits --

2    that is when you were living in Texas, correct?

3    A.   Yes.

4    Q.   The only time you were allowed to travel to Florida up

5    until -- I'm going to give you a date -- until March of 2019.

6    The only times you were allowed to travel from Texas, where you

7    lived, to Florida, to Miami, the Southern District of Florida,

8    was for court appearances, correct?

9    A.   Yes.

10   Q.   And when you would come on court appearances, you would

11   make arrangements to meet with Mr. Hirsch, correct?

12   A.   I met with Mr. Hirsch.  Yes, I did make arrangements to do

13   this.

14   Q.   That is, you were using the judicial process, that is, the

15   process of having to come to court for the purpose of

16   continuing your conspiracy with Mr. Hirsch, correct?

17   A.   Yes.

18   Q.   But it didn't stop there, did it?  Because you had your

19   lawyer file a motion to modify your bond conditions, to let you

20   out of home detention with GPS monitoring, didn't you?

21   A.   Yes.

22   Q.   And you did that in March of 2019, correct?

23   A.   Is that what the court documents say?

24   Q.   Like I said, I'm not allowed to testify, but I'll make a

25   representation that I could back that up.

1    A.   Okay.   Correct.

2    Q.   And the purpose of that was so that you could further your

3    scheme, your new conspiracy, right?

4    A.   It was one of the purposes of it, yes.

5    Q.   Well, when you were able then to come to Miami, that is,

6    you didn't have home detention anymore, you would be able to

7    stay here for a couple of days at a time, right?

8    A.   Yes.

9    Q.   And without a GPS monitor, it wouldn't show exactly where

10   you were when you were in Miami, right?

11   A.   I'm sorry.   I didn't hear all that.

12   Q.   Without a GPS, a Global Positioning System monitor, you

13   know, one of those bracelets --

14   A.   Microphone?   I am not able to hear it so well.

15        THE COURT:   I think just speak into the microphone,

16   Mr. Sadow.

17        MR. SADOW:   I'm sorry.   I didn't realize he was having

18   problems hearing me.

19   BY MR. SADOW:

20   Q.   Without the GPS monitor, no one was able to tell precisely

21   where you were when you came to Miami, correct?

22   A.   Yes.

23   Q.   Which enabled you, when you were staying here for more than

24   a day or two, to meet with Mr. Hirsch, and the government,

25   because the GPS wasn't on, wouldn't be able to know where you

1   were when you were here, correct?

2   A.   Yes.

3   Q.   Now, let's talk about the scheme that you were trying to

4   hatch there.

5        It involved a guy named Max, right?

6   A.   Yes.

7   Q.   And Max didn't even live in the United States, did he?

8   A.   At that time, no.

9   Q.   He lived in Mexico, didn't he?

10  A.   During this period, yes.

11  Q.   And you wanted -- you wanted to set up some type of an

12  arrangement with Max in Mexico that would make you money in

13  CGx, right?

14  A.   This is correct.

15  Q.   And did Max have a lab?

16  A.   Max does not own a lab.

17  Q.   What was Max's role to be?

18  A.   He would handle the business with the laboratory between

19  Brett.

20  Q.   So Max was going to work with you, Brett Hirsch, and Clio

21  Labs, with Mr. Satary, correct?

22  A.   Correct.

23  Q.   Now, when you were first indicted, you were only indicted

24  for your Tricare compounding scheme to defraud, correct?

25  A.   Yes, that was the initial indictment.

1  Q.  And then there was a second indictment that was returned

2  sometime in early 2019, and that second indictment involved

3  your mother, right?

4  A.  Yes.

5  Q.  But it still only dealt with the Tricare compounding,

6  correct?

7  A.  The second indictment was only with compounding.

8  Q.  And then you were indicted in April of 2019 with a

9  second -- what's called a second superseding indictment, which

10 really means the third indictment.

11     And that one then said something about CGx, correct?

12 A.  That indictment included charges for CGx.

13 Q.  But even after you were charged with CGx crimes, you still

14 continued your conspiracy, your new conspiracy, with Brett

15 Hirsch and Max and Satary and the Clio Lab, correct?

16 A.  Yes.

17 Q.  And that went on from April to May to June to July to

18 September of 2019, right?

19 A.  Correct.

20 Q.  So for basically almost a whole 'nother year, you were

21 engaged in another conspiracy, right?

22 A.  Yes.

23 Q.  And then the government got wind of it, didn't it?

24 A.  Yes.

25 Q.  And they got wind of it because you didn't know that Brett

```
1   Hirsch had begun cooperating with the government, correct?
2   A.   It was around that time that Brett was cooperating.
3   Q.   And you didn't know that Brett Hirsch had turned over his
4   phone to the government, correct?
5   A.   At that time, I did not.
6   Q.   But, in fact, he had, right?
7   A.   Yes.
8   Q.   And lo and behold, on his phone -- on his phone were all
9   the text messages that you had been sending, transmitting back
10  and forth with him, since your release in September of 2018,
11  correct?
12  A.   Correct.
13  Q.   So there is a record, right, of the text messages between
14  you and Brett Hirsch, right?
15  A.   That record does exist.
16  Q.   Where is the record of the text messages between you and
17  Minal Patel?
18       Where is your phone that shows those text messages?
19  A.   I don't know.
20  Q.   Because you have been prepared by the government.
21       Have they shown you any text messages between Minal Patel
22  and you after January of 2017?
23  A.   (No verbal response.)
24  Q.   The simple answer is no, right?
25  A.   I'm not sure.
```

1   Q.   But you texted him every day, you told the government.

2        Every single day, right?

3   A.   That group chat that we saw yesterday, with Michael Lohan

4   and Minal, what is the date on that?

5        Is that date in this time period or before?

6   Q.   Well, I can't answer that, but we will get to it, because

7   we're going to go back to it.

8        I'm talking about you and Minal, you and Minal, not anyone

9   else, just the two of you texting, that you've told us you

10  communicated almost every day with him.

11       Where are those text messages?

12  A.   In this time period, we did not communicate that

13  frequently.

14  Q.   I'm not talking about this time period.  I'm talking about

15  anytime after January of 2017.

16       Where are the corroborating text messages of all your

17  communications with Minal Patel?

18  A.   Shouldn't they be on Minal's phone?

19  Q.   You want me to answer that?  You know that they're not

20  because you didn't communicate anything with Mr. Patel by text

21  message that had anything to do with criminal activity, did

22  you?

23  A.   (No verbal response.)

24  Q.   It's okay.  You can say yes when you know the answer is

25  yes.  You don't have to think about it.  Just answer the

1    question the right way, yes.

2    A.  I don't have to think?  I'll take a second and think about

3    it.

4        I don't think there were any text messages in that period

5    between me and Minal.

6    Q.  And there were no emails in which Mr. Minal Patel was

7    telling you, according to what you've testified to, to do

8    anything with marketing, correct?

9    A.  No, no emails.

10   Q.  Not one.

11   A.  Not that I can think of, no.

12   Q.  No, not one, right?

13   A.  That's right.

14   Q.  No text messages, no emails, nothing to back up what you

15   say, correct?

16   A.  When you say "to back up" what I say, what is that in the

17   context of?

18   Q.  In the context of Mr. Minal Patel.  According to your

19   testimony, he was directing and ordering you to do essentially

20   everything, but you don't have a single document that backs

21   that up, do you?

22   A.  Is this the time period when Minal and I were doing

23   business?

24   Q.  Yeah, January of '17.  Do you remember?  I said from

25   January of '17 on.

 1    A.   We were communicating on a near daily basis.

 2    Q.   And that's what I'm asking you.  Where is the written proof

 3    of any of that?

 4    A.   It would be either on my phone or Minal's phone.

 5    Q.   And where is your phone?

 6    A.   I don't know where my phone is.

 7    Q.   Has the government shown you -- okay, because they've sat

 8    with you on multiple occasions, correct?

 9    A.   Correct.

10    Q.   In fact, just so the jury understands, when you were going

11    over exhibits with the government yesterday, you'd been over,

12    if not all of them, the vast majority of those exhibits outside

13    of court with the government, hadn't you?

14    A.   That is correct.

15    Q.   So yesterday was not an "I'm seeing this exhibit, and I'm

16    now giving you my impression."

17         You had already gone over all of those with the government.

18         That wasn't new to you yesterday, was it?

19    A.   No, it was not new to me.

20    Q.   How many times have you met with the government in October

21    or November of this year?

22    A.   I believe, four or five times.

23    Q.   Let's return to the government finding out about your

24    conspiracy, your postrelease from jail conspiracy.  Okay?

25    A.   Okay.

1   Q.   When you were first released in September of 2018, you got

2   interviewed, did you not, by the United States Probation

3   Department, right?

4   A.   Yes.

5   Q.   And the probation officer told you that it was most

6   important for you to be truthful, correct?

7   A.   Yes.

8   Q.   But you weren't, were you?

9   A.   At that time, no.

10  Q.   At that time, no.

11       In fact, you told the probation officer that you had been

12  unemployed since 2016, right?

13  A.   (No verbal response.)

14  Q.   Right?

15  A.   I don't know if that's correct.  2016, I was still in

16  business.

17  Q.   No, I'm not suggesting that what you told them was correct.

18  I'm suggesting you lied, l-i-e-d, lied to U.S. Probation

19  Department and said that you were unemployed since 2016,

20  correct?

21  A.   I said unemployed or self-employed?

22  Q.   I have a motion to revoke bond that was filed by the

23  government on September 27, 2019.

24       Could I show this to you to see if it refreshes your

25  recollection, whether you said unemployed?

 1   A.   Yes.

 2   Q.   You'd like to see it?

 3   A.   Yes.

 4        THE COURT:   You may approach and show it to him.

 5        MR. SADOW:   Unfortunately, this has a staple.   Would

 6   you like me to -- it's okay.

 7   BY MR. SADOW:

 8   Q.   If you'd like to look at the last few lines.

 9   A.   Thank you, sir.

10   Q.   Unemployed, correct?

11   A.   Correct.

12   Q.   So you lied to the United States Probation office, and the

13   purpose of that lie was so that you could help yourself in

14   getting out of jail, right?

15   A.   Correct.

16   Q.   So as soon as you got the opportunity, the first time you

17   had interaction with the federal government after your arrest,

18   when someone from the United States Probation Office, who works

19   for the court, comes to you and tells you, tell me the truth,

20   you lied, right?

21   A.   I did lie on this -- this occasion to the probation, yes.

22   Q.   And that was because it would benefit and help you, right?

23   A.   That is correct.

24   Q.   All right.   So you wind up giving -- do you have to turn

25   yourself in when the government files the motion to revoke

1    bond, or do they come to arrest you again?

2    A.    I turned myself in.

3    Q.    And you go to a court.    You go to a judge.

4          There's a hearing on the government's motion to revoke

5    bond, right?

6    A.    Correct.

7    Q.    And that takes place early in October of 2019, correct?

8    A.    Yes.

9    Q.    And it takes the judge 25 minutes to find that you violated

10   the conditions of your bond on healthcare, as well as

11   committing new crimes, correct?

12   A.    Yes.

13   Q.    And then you go to jail, right?

14   A.    I do.

15   Q.    But I want to stay with the government's motion.    Okay?

16         Did you tell Mr. Hirsch -- wait a second.

17         Did you hold yourself out to be a doctor?

18   A.    I was in medical school.

19   Q.    That's not what I -- that's not what I asked you.

20         I said, did you hold yourself out to be a doctor?

21   A.    At some times, yes.

22   Q.    And what was the purpose of that?

23   A.    So people would know that I was knowledgeable about

24   medicine when I was engaged in healthcare business.

25   Q.    But that's a lie too, correct?

```
 1   A.   That's correct.

 2   Q.   And when you were texting with Mr. Hirsch, did you tell

 3   Mr. Hirsch that you were traveling to Atlanta?

 4   A.   What is the date of this text?

 5   Q.   Let's see.  December 26, 2018.

 6   A.   This is after my --

 7   Q.   Yes.

 8   A.   -- my getting a bond?

 9   Q.   Yes, sir.

10   A.   Yes, but I did not go to Atlanta.

11   Q.   Of course you didn't, because you weren't allowed, at that

12   point, to leave South Texas, or leave Texas where you lived,

13   unless it was to come to court in Miami, right?

14   A.   Correct.

15   Q.   So you were lying to your newest conspirator, or to

16   Mr. Hirsch, about going to Atlanta, right?

17   A.   Yes.

18   Q.   Why were you lying to him about going to Atlanta?

19   A.   To give the appearance that everything was okay.

20   Q.   You mean to mislead, to misrepresent, right?

21   A.   Yes.

22   Q.   But you didn't do it just once.

23        Now I'm looking at one on October the 4th, 2019.

24        Text is, I'm going away, Atlanta.

25        You did it again, didn't you?
```

```
 1   A.   Is this the same text, in the same month?

 2   Q.   No.   This is a new one, new text.

 3   A.   Same month?

 4   Q.   No, no.   I think I said -- sometimes it's hard for me to

 5   see, so let me put these on.

 6        February the 4th, 2019.

 7   A.   February, not October?

 8   Q.   Correct, not October.   February.

 9        New text.   New lie, right?

10   A.   Yes.

11   Q.   And the same purpose?

12   A.   Same purpose.

13   Q.   Same purpose.

14        Did you want to open an offshore account in Mexico?

15   A.   Offshore, yes.   Mexico, no.

16   Q.   Offshore where?   I'm sorry.   I have got the country wrong.

17        Where did you want to set up the offshore account?

18   A.   I'm not sure, but at the time I was thinking of a few

19   different countries.

20   Q.   Well, just for the sake of it, give us a few.

21   A.   I thought about somewhere Dutch.

22   Q.   Dutch.   Okay.

23   A.   So maybe one of the Caribbean Dutch islands, or maybe

24   Seychelles or Cook Islands.

25   Q.   And this is, of course, after you're indicted and while
```

1   you're on bond, correct?

2   A.   That's correct.

3   Q.   And let me see if I can guess.  Would the reason be to hide

4   your assets?

5   A.   If I was able to make any money in this venture, I would

6   try to park it offshore.

7   Q.   So the answer would be yes, so I could hide my assets?

8   A.   If I had assets, yes.

9   Q.   But whether you were successful or unsuccessful, the

10  purpose for considering an offshore account was to hide it,

11  correct?

12  A.   Correct.

13  Q.   And who would you be hiding it from?

14  A.   Everyone.

15  Q.   Well, let's be more specific.

16       You were under indictment, correct?

17  A.   Yes.

18  Q.   There was a forfeiture allegation in the indictment,

19  correct?

20  A.   That is correct.

21  Q.   Forfeiture, meaning that the United States was attempting

22  to tell you that they were seeking to take your assets and

23  forfeit them, that is, to take them away from you, right?

24  A.   That is the meaning of forfeiture, correct.

25  Q.   So the offshore account would be to hide the assets from

1    the United States government, right?

2    A.   At this point in time, I didn't have any assets, but if I

3    did make money in this new conspiracy, I would have parked them

4    offshore.

5    Q.   So let's see.  You made a million two, I think you said, in

6    Tricare, thereabouts?

7    A.   In 2016.

8    Q.   Right.  And then according to everything you've testified

9    to insofar as the time period of July of '16 to a couple of

10   months into '18, you made how much money?

11   A.   Say that again.

12   Q.   How much money did you make when you were doing marketing

13   in connection with CGx that you've testified about?

14   A.   I think the company pulled in 900,000.  I probably kept

15   300- to 400,000 of that.

16   Q.   Okay.  So you had, give or take, a million five over the

17   period of three years, but by the time you got arrested,

18   according to you, you had no money?

19   A.   That's correct.

20   Q.   And you'd tell the truth about that, wouldn't you?

21   A.   I'm telling the truth right now about that, yes.

22   Q.   How much money have you paid towards your forfeiture that

23   you pled guilty to?

24   A.   I don't believe I paid anything.

25   Q.   Not a nickel, right?

1        How much have you paid in restitution?

2   A.   Nothing.

3   Q.   Nothing.

4        And your position -- and if you had money, or if the

5   government found your money, that would go to forfeiture or

6   restitution, right?

7   A.   It would.

8   Q.   It would.  But you don't have any?

9   A.   I don't have a nickel to my name at this time.

10  Q.   Right.

11  A.   I have no money.

12  Q.   Right.

13       And who did you tell probation you were living with in

14  2016?

15  A.   My parents.

16  Q.   And that was a lie too, wasn't it?

17  A.   No.  I was living with my parents.

18  Q.   You were living with your parents.

19       You weren't living in Los Angeles, or Miami, or all the

20  other places, right?

21  A.   While under probation period, I was living in my parents'

22  house.

23  Q.   No, no, no.  Maybe my question was unclear, so let me try

24  again.

25       When you were arrested in 2018 and U.S. Probation came to

1    you and said tell us the truth, did you tell them you were

2    living with your parents in 2016?

3    A.   At that time -- oh, in 2016?

4    Q.   Yes.

5    A.   Back in 2016.  Oh.

6         Back in 2016, I stayed at my parents' house about a week of

7    the month, and the rest of the time I was traveling.

8    Q.   I'm asking you, did you tell them you were living with your

9    parents?

10   A.   Yes.

11   Q.   And the reason for that is because you wanted to give

12   stability, if you were released on bond, that you had been in a

13   specific place, and that's where you got put, wasn't it, with

14   your parents, right?

15   A.   I was living with my parents about a week out of the month

16   during that time.

17   Q.   Well, math has never been my strong point, but if a week

18   out of the month means your parents, that means three weeks of

19   the month you weren't living with them, right?

20   A.   Yeah, I was hanging out with Minal a lot of that time.

21   Q.   Right.  Hanging out with Minal, right?

22   A.   Correct.

23   Q.   We've seen -- just to touch on this, before we move into

24   something, if I understand, you've shown travel records that

25   involved two different occasions when you were with Minal,

1   right?

2   A.   Yes.

3   Q.   Where are all the other travel records that you say that

4   you were with him all the time -- traveling with Minal?

5   A.   Are they in the discovery?   I don't have access to it.

6   Q.   No.

7        Did the government show you any travel records besides

8   those two?

9   A.   Those were the only two travel records that I had seen.

10  Q.   Right.   Okay.

11       So the government didn't appear to have any others to show

12  you.

13       At least they didn't show you any, did they?

14  A.   That is correct.

15  Q.   All right.   When did you get your Lamborghini SUV?

16  A.   I did not get a Lamborghini SUV.

17  Q.   So why would you tell Mr. Hirsch on April 22, 2019, Happy

18  Easter, my brother.   My new toy.   It's the only Lamborghini SUV

19  in Miami?

20  A.   To signify that things were still okay with me.   I --

21  Q.   You mean -- I'm sorry.   I cut you off.

22  A.   I sent him a picture of a friend of mine's Lamborghini that

23  he had just purchased.

24  Q.   That kind of translates into another lie, right?

25  A.   Correct.

1    Q.   Okay.

2          MR. SADOW:  Would it be okay to ask for the Court for a

3    five-minute break?

4          THE COURT:  Sure.  We'll take a five-minute break.

5          Folks, go ahead and leave your notepads on the chairs,

6    please.  Let's go ahead and take a quick break.  Everyone is

7    excused.

8          THE COURT SECURITY OFFICER:  All rise.

9       (Jury exits at 11:30 a.m.)

10         THE COURT:  Please be seated, everyone.  I don't know,

11   Mr. Ramamurthy, do you -- does he need a restroom break?  Yeah,

12   let's go ahead and take one for him as well.  Thank you, guys.

13   Five-minute restroom break.

14      (Court recessed at 11:31 a.m.)

15      (Back on the record at 11:38 a.m.)

16         THE COURT:  Mr. Sadow, just for planning purposes, do

17   you have any kind of sense, range-wise, on how much you got

18   left?

19         MR. SADOW:  I hesitate to tell it in front of the

20   witness, but within the range that I spoke to you yesterday.

21         THE COURT:  That's fine.  That's clear enough for me.

22         THE COURT SECURITY OFFICER:  All rise.

23      (Jury enters at 11:40 a.m.)

24         THE COURT:  Please be seated, everyone.  We're waiting

25   for one more juror.

1          All right.  Turning it back to you, Mr. Sadow.  You may

2     proceed when you're ready.

3          MR. SADOW:  Thank you.

4          At this time, Your Honor, with the Court's permission,

5     I'm going to start publishing all of the government exhibits

6     that weren't admitted, that I sought to admit yesterday.

7          THE COURT:  Very good.  Standing permission for that is

8     granted on all of those exhibits.  You may publish.

9          MR. SADOW:  So without, obviously, going against the

10    Court's wishes, is it okay if I just tell the --

11         THE COURT:  You may; you may.  You can just put them up

12    as in normal course.  They're all admitted, folks, and so you

13    can go ahead and show them to the jury.

14         MR. SADOW:  Let's start with 326.  I'm sorry, 1326,

15    wrong one.  If you will simply -- when we put these up, if I

16    may ask you, let's go always from and to first.  Are you able

17    to -- right.  Put it so they can see it.  All right.

18    BY MR. SADOW:

19    Q.  What I'm going to do now, sir, is publish exhibits, and I

20    just want you to see each one of them.  Okay?  And as I publish

21    them, if you see anything that suggests that Mr. Patel has

22    ordered or directed you to do something illegal, you let us

23    know.  Okay?

24         This is 1326, this is between Mr. Vartanian and you, right?

25    A.  Correct.

1   Q.   And it's a PGx sample report, correct?

2   A.   Correct.

3   Q.   November 12, 2016, correct?

4   A.   Correct.

5   Q.   Mr. Patel's not even on this one, right?

6   A.   He is not.

7   Q.   Okay.  Next one, 1327.  Here is the same, Vartanian to you,

8   correct?

9   A.   Correct.

10  Q.   CPT cancer with charge amount, correct?

11  A.   Correct.

12  Q.   And attachments, right?

13  A.   Correct.

14  Q.   No Mr. Patel, correct?

15  A.   He is not in this email.

16  Q.   Okay.  Next one is 1327-A.

17       And this is the attachment to 1327, correct?

18  A.   Correct.

19  Q.   1328.  And you see the yellow sticker on each one?  That

20  means it was pre-marked by the government, okay?

21       Here we go again, same, Vartanian to you, correct?

22  A.   Correct.

23  Q.   PGx codes, right?

24  A.   That is right.

25  Q.   Mr. Patel's not on it, right?

1    A.   He is not.

2    Q.   1328-A, and those are the codes, correct?

3    A.   Those are the ICD codes.

4    Q.   And you know all about these ICD codes that you were

5    talking about yesterday from your medical training, correct?

6    A.   Yes.

7    Q.   Medical training that you had gone to school for, correct?

8    A.   Yes.

9    Q.   That you actually knew about before you ever met Minal

10   Patel, correct?

11   A.   That's correct.

12   Q.   1329.  And this is from a Frank -- I don't know how to

13   pronounce his last name, N-g-o?

14        MS. DE BOER:  I'm sorry.  The witness is not on this

15   email.

16        THE COURT:  It's okay.  You may go ahead if he

17   recognizes it, recognizes any of the players.

18        MR. SADOW:  It's admitted.

19        THE COURT:  It's admitted, yeah.  I think it was a

20   relevancy objection, but you can ask about it.  It's overruled.

21        MR. SADOW:  Okay.

22   BY MR. SADOW:

23   Q.   This is from Tamara Miguez.  Subject:  B. Villegas.  To:

24   Frank N-g-o.  Do you know all those people?

25   A.   I know who Tamara is.  I know who Frank is.  I do.

1   Q.   Who is that?  Who is Tamara?

2   A.   Tamara is a sales rep that works for my company.

3   Q.   What company?

4   A.   This is Q Health Services at this point.

5   Q.   Then why does it say Rose Shore?

6   A.   Rose Shore is the payroll company for Q Health.

7   Q.   So it's part of Q Health.

8   A.   Yes.

9   Q.   Okay.  And who is B. Villegas?

10  A.   I don't remember who that is.

11  Q.   Don't know.

12  A.   Don't know.

13  Q.   Date is November 17, 2016, correct?

14  A.   Correct.

15  Q.   And it's to Frank, right?

16  A.   Yes.

17  Q.   And Frank is the person who you said worked for your

18  company.

19  A.   He's our numbers guy.

20  Q.   He's your numbers guy.  Well, he's more than a numbers guy,

21  isn't he?  Come on.

22  A.   I hired him to do primarily numbers work.

23  Q.   I didn't ask you just what you hired him for.  He did a lot

24  more than just numbers, correct?

25  A.   Yeah, he filled a few roles.

1   Q.   Okay.  What roles did he fill?

2   A.   He was John Scholtes' assistant.  Anything related with

3   numbers or data that was missing, or discrepancies of things

4   that need to be done with the lab, Frank would deal with.

5   Q.   Okay.  And Frank then sends this along to Mr. Vartanian,

6   right?

7   A.   Yes.

8   Q.   Again, on B. Villegas, correct?

9   A.   Correct.

10  Q.   But you don't know who B. Villegas is?

11  A.   Don't remember.

12  Q.   Put a time frame on here, so I understand.

13  A.   11/18/2016.

14  Q.   You went to New York and met with Brett Hirsch and others

15  in July of 2016, correct?

16  A.   Correct.

17  Q.   Now, I remember specifically that you started off your

18  testimony yesterday by telling us that -- this is my word, not

19  yours -- that you were kind of astounded or amazed when you saw

20  the EOB, Explanation of Benefits, for $9,000 when you were up

21  in New York having to do with CGx, correct?

22  A.   Correct.

23  Q.   And that 9,000 was very specific, wasn't it?  That is, that

24  stood out to you.

25  A.   The number stood out to me.

1    Q.   Right.  And when that number stood out to you -- because

2    then later, you said that when you came into contact with

3    Mr. Patel, that $9,000 figure came up again, right?

4    A.   Yes.

5    Q.   Correct?

6    A.   Yes.

7    Q.   When you first talked to the government, on January the 8,

8    2020, it wasn't 9,000, was it?  You told them another number,

9    didn't you?

10   A.   I don't recall specifically.

11   Q.   Well, didn't you tell them it was 18,000?

12   A.   I don't think I did.

13        MR. SADOW:  May I approach, Your Honor?

14        THE COURT:  You may.

15        MS. DE BOER:  Objection, Your Honor.  He hasn't said

16   he's forgotten.

17        THE COURT:  Overruled.  You can show it to him.

18   BY MR. SADOW:

19   Q.   Am I right that you told the government 18,000?

20   A.   No, you're right.  You're right.

21   Q.   But wait.  When you met with the government on December

22   the 3rd of 2021 -- well, this is going to take me...

23        I thought this would happen.  So many reports.  I'm going

24   to have to find it, but I'm going to tell you, and I'll show it

25   to you before we're done.

1      On another occasion, you told them it was $10,000, didn't

2   you?

3   A.   If that's what the statement says, then, yes.

4   Q.   So it goes 18,000, then it goes 10,000, then it goes 9,000,

5   right?

6   A.   It appears so, yes.

7   Q.   It can only be one number.  It doesn't change, does it?

8   That is, if you're telling the truth.

9   A.   I remember the number being a large number that astounded

10  me.

11  Q.   Okay.  And are you just then telling the jury that when you

12  said 9,000 yesterday, that was just a guess?

13  A.   That was the number that sticks in my head, 9,000.

14  Q.   But it didn't stick in your head when you first talked to

15  the government, right?

16  A.   No.  I think I said a larger number previously.

17  Q.   Yeah, the 18,000, right?

18  A.   Yeah.

19  Q.   And that was right after you had pled guilty, right?

20  A.   Yes.

21  Q.   In fact, what happened was, when your bond got revoked, it

22  didn't take you but two months to decide to plead guilty,

23  right?

24  A.   Correct.

25  Q.   And it didn't take you more than, what, a month after you

1   pled guilty, or less than a month, to start cooperating, right?

2   A.   Correct.

3   Q.   And the reason for your cooperating is because that's the

4   way you get a lesser sentence, right?

5   A.   Right.

6   Q.   But when you went to sentencing, the government, the first

7   time, didn't cut you a break, did they?

8   A.   No.

9   Q.   You argued that you didn't have a leadership role, that is,

10   that you weren't a leader of that Tricare conspiracy, right?

11   A.   Yes.

12   Q.   But the government's position was, you were the leader of

13   every one, wasn't it?

14   A.   At that point in time, that was the government's decision.

15   Q.   Well, at that point in time, you had already been talked to

16   twice by the government when you got to sentencing about

17   Tricare, correct?

18   A.   I think so.  That's correct, yeah.

19   Q.   So even after you told them, I assume, that you weren't the

20   leader, that didn't change their mind.  They went to the judge

21   and said, yes, you were, right?

22   A.   Yes, but they did proceed to go after the billing company.

23   Q.   Yeah.  But you told them that you weren't the leader, and

24   the government went and told the judge that you were the

25   leader, right?

1   A.   Correct.

2   Q.   And the judge found that you were the leader, right?

3   A.   Yes.

4   Q.   And that gave you your sentence of -- a part of your

5   sentence of 120 months, ten years in jail, correct?

6   A.   Correct.

7   Q.   And that's when your lawyer said that your crime, that is,

8   what you pled guilty to -- and this is in your sentencing

9   memorandum -- was an aberration.

10       Aberration, right?  Isn't that what he said?

11   A.   Yes.

12   Q.   What does aberration mean?

13   A.   Something abnormal, an outlier in a usually smooth road.

14   Q.   All right.  So you had started criminal activity in 2014.

15   We've already talked about that.

16       You get arrested in September of 2018.  Within weeks, you

17   engage in criminal activity again, until you get caught about a

18   year later.  But you had your lawyer go to the judge and argue

19   that this, what would wind up being, according to you, a crime

20   spree of five years, was an aberration, right?

21   A.   Yes.

22   Q.   And the reason for that was because you wanted to try to

23   paint a picture of you as something different than you really

24   are, right?

25   A.   Yes.

1    Q.   That is, in your way of doing it, it's like lying to the

2    judge through the lawyer that you had representing you, isn't

3    it?

4    A.   Yes.

5    Q.   So the lying -- and we went through with Brett Hirsch, and

6    you went to the judge -- it doesn't stop, does it?

7    A.   No.

8    Q.   All right.  Let's see.  Where were we?  Let's go to 1330.

9    All right.  Let's see who's on this one.

10        Looks like the same people, November 18th of 2016?

11   A.   Yes.

12   Q.   No Minal Patel, correct?

13   A.   That is correct.

14   Q.   All right.  Next one, 1331.  That was 1331.

15        1331, again, no Minal Patel, correct?

16   A.   Correct.

17   Q.   Let's go to 1332.

18        No Minal Patel, correct?

19   A.   He's not on this one.

20   Q.   Okay.  1332-A.  That goes with 1331 -- I'm sorry, goes with

21   1332, correct?

22   A.   Yes.

23   Q.   Okay.  1333.  Let's open it up.

24        Now, this is an interesting one.  Let's go from the top

25   down to the bottom.

```
 1        This is from you to Minal, correct?
 2   A.   And other parties, correct.
 3   Q.   Right.  Omar, right?
 4   A.   Yeah.
 5   Q.   Omar.  That's the Omar you were talking about yesterday?
 6   A.   Yes.
 7   Q.   And the date is November 23, 2016, right?
 8   A.   Yes.
 9   Q.   And it also includes Mr. Vartanian, correct?
10   A.   Mmm-hmm.
11   Q.   Now, as an aside, who signed the agreement, the laboratory
12   services agreement?
13   A.   I did.
14   Q.   Who signed for LabSolutions?
15   A.   I believe it was Omar.
16   Q.   Yes, Omar, not Minal Patel.  Omar, Omar Aleem, right?
17   A.   Yeah.
18   Q.   And that was in September -- September 22nd of 2016, right?
19   A.   This was the first contract I signed with them.
20   Q.   That's fine.  But still it's in September of 2016, correct?
21   A.   Correct.
22   Q.   In fact, I think -- my recollection is it was, like, 1414
23   and 1414-A.
24        Now, what are we talking about on this?  If you show -- can
25   you see it?
```

1    A.   Please forward to your attorney for review.  I just sent it

2    to mine.  The ad begins airing Monday afternoon.  Edits can be

3    done Monday morning.

4    Q.   Now, that's the ad we saw a video of, isn't it?

5    A.   Correct.

6    Q.   When the government played the video, they didn't show you

7    that you had written Mr. Patel an email saying that you had

8    shown that to your lawyer, did you?

9    A.   No, they did not.

10   Q.   And you're asking Mr. Patel to show it to his lawyer,

11   right?

12   A.   I am.

13   Q.   And the lawyer in that grouping --

14        MR. SADOW:  Go down below.

15   BY MR. SADOW:

16   Q.   You see at the very bottom where it says Yussuf Aleem,

17   member?

18        Do you see that?

19   A.   Yes.

20   Q.   That's the lawyer, isn't it?

21   A.   I believe so, yes.

22   Q.   So that ad was fleshed out by your lawyer, according to

23   this document, and by Mr. Patel's lawyer, correct?

24   A.   Yes.

25   Q.   1334-A.  And what is this?

```
 1   A.   This is the script for the commercial.

 2   Q.   Written by?

 3   A.   My sister.

 4   Q.   Did you -- according to what you testified to, your

 5   testimony, you're right in the midst of criminal activity,

 6   right?

 7   A.   Yes.

 8   Q.   Did you tell your sister that you were in the midst of

 9   criminal activity?

10   A.   No.

11   Q.   So as far as your sister is concerned, in this whole ad

12   that the government played yesterday, it was business, wasn't

13   it?

14   A.   Yes.

15   Q.   And that's the way -- when you do business, you send it to

16   lawyers, right?

17   A.   That's correct.

18   Q.   And you can use ads in business, can't you?

19   A.   Absolutely.

20   Q.   1336.  No Minal Patel, right?

21   A.   He's not here.

22   Q.   Okay.  And the subject on this is Michael Flores, M.D.

23        Do you know who that is?

24   A.   I do.

25   Q.   Who is it?
```

 1   A.   He is a physician -- family practice physician in the

 2   Rio Grande Valley.

 3   Q.   Is that someone that you had involved with CGx?

 4   A.   Yes.

 5   Q.   And PGx?

 6   A.   I'm not sure if he wrote PGx, but it's possible he did.

 7   Q.   Did Mr. Flores -- did he know what he was doing was

 8   criminal?

 9   A.   I'm not sure.

10   Q.   Well, I mean, the whole idea -- if I understood, Mr. Patel

11   had ordered you -- directed you to go to doctors, to do things

12   illegal in CGx, right?

13   A.   Correct.

14   Q.   So either Flores was involved, or he wasn't involved.   You

15   agree, right?

16   A.   Yes.

17   Q.   And he wasn't, was he?

18   A.   I'm not 100 percent sure whether or not he was involved.

19   Q.   Well, who brought him in?

20   A.   A rep named Robert Carranza (phonetic).   He was the local

21   rep on the ground for the doctors' offices in the Valley.

22   Q.   In the Valley?

23   A.   Yes.

24   Q.   And he worked for --

25   A.   For me.

1   Q.   And you paid him money?

2   A.   I did pay him.

3   Q.   And Mr. Flores, does he actually have a practice?

4   A.   He does have a practice.

5   Q.   Is it called a brick-and-mortar?  It wasn't telemedicine,

6   was it?

7   A.   No, it was brick and mortar.

8   Q.   Brick and mortar is when -- as we all kind of talked about

9   it -- it's not as much with retail as we used to, but that's

10  when you actually have an office in a store, right?

11  A.   Yes.

12         MR. SADOW:  All right.  Next number is -- what is this?

13  36?  Let's go to 1338-A.

14  BY MR. SADOW:

15  Q.   This is the second part of 1338, I believe, that was

16  introduced yesterday.  I just want to make sure we have it

17  complete.  Okay?

18  A.   Yes.

19  Q.   1343.  Again, Vartanian to you, right?

20  A.   Yes.

21  Q.   Forward QHL.  Do you know what that is?

22  A.   Q Health -- I don't know what the L is.

23  Q.   That's your company, though, right?

24  A.   Yes, it's probably about my company, yes.

25  Q.   Is Mr. Patel on that?

```
 1    A.   No, he's not.

 2    Q.   You know, as an aside, I'm going to take you to the

 3    kitchen.

 4         Do you remember the kitchen?

 5    A.   Yes, I do.

 6    Q.   And you gave us the outlay of what took place, according to

 7    your testimony, between Mr. Saliba and Mr. Patel and the cost

 8    of goods or the services of the lab.

 9         Remember?

10    A.   Yes.

11    Q.   According to your testimony, how it wasn't supposed to

12    be -- you can't tell Medicare what it really costs because

13    they'll reduce the rate?

14    A.   Yes.

15    Q.   The interesting part that I want to ask you about your

16    testimony is, you said that Medicare had reached out to

17    LabSolutions about the cost of the test, remember?

18    A.   Yes.

19    Q.   Now, Medicare doesn't just pick up the phone and call and

20    say, hey, we want to talk to you about the cost of the test,

21    does it?

22    A.   I'm not sure.

23    Q.   They sent something in writing, right?

24    A.   I wouldn't know these things.

25    Q.   Did the government -- in all the times you've ever talked
```

1    to the government, have they ever shown you one thing from

2    Medicare, one document in which they wanted to know the cost of

3    anything?

4    A.   No.

5    Q.   No.

6         But that would be very important to corroborate that this

7    kitchen conversation took place, right?

8    A.   That would be helpful.

9    Q.   That would be very supportive of Medicare, if you had a

10   document, and you said, you see here?  Here is the document I

11   was talking about.

12        But according to your interaction with the government, it

13   purely doesn't exist, does it?

14   A.   To the extent of what I had seen, I can only say that I

15   haven't seen anything like that.

16   Q.   Well, every exhibit you had testified to yesterday, you'd

17   seen before, right?

18   A.   I have.

19   Q.   And you have had access to discovery, didn't you?

20   A.   No.

21   Q.   You had access to discovery in your case.

22   A.   In my case, yes.  I couldn't see discovery in this case.

23   Q.   And you've been cooperating with the government since we've

24   talked about -- it would be December of 2020, right?  I'm

25   sorry.  It would be -- I have to figure back out when you were

1   sentenced.

2       Yes, it would have been November or December of 2019,

3   correct?

4   A.   Yes.

5   Q.   So in the year from December of 2019 until now, which is

6   almost three years, no one has brought you that document, have

7   they?

8   A.   No.

9   Q.   But you've told that same story since the beginning,

10  haven't you?  Right?

11  A.   I have.

12  Q.   You have?

13  A.   I have.

14  Q.   And by the way, when did that take place, just to get a

15  time period?

16  A.   The meeting --

17  Q.   Yeah.

18  A.   -- in the kitchen?

19  Q.   Yeah, in the kitchen.

20  A.   This was about two months after Nick Saliba had come on

21  board.

22  Q.   But no document?

23  A.   No document.

24  Q.   In your many years dealing with Tricare and Medicare, have

25  you ever had anybody ask you or any of the pharmacies about a

1   cost of goods?

2   A.   (No verbal response.)

3   Q.   The simple answer is "no," isn't it?

4   A.   With the compounding, there was -- they had, like, some

5   kind of a fixed amount that they would take -- I'm trying to

6   remember the term for it.  It was, like -- we didn't call it

7   cost of goods, but it was cost of, like, the ingredients.

8   Q.   No, no, no.  That's not what I'm asking you.

9        What I'm asking you, have you ever seen from Medicare a

10  justification for cost of goods?

11  A.   I wouldn't directly see it, but I wouldn't deal a lot with

12  those things.

13  Q.   But you what?

14  A.   I wouldn't be the person who would deal with that.  It

15  would be a pharmacy or a laboratory.

16  Q.   Anybody from the pharmacy ever tell you they had such a

17  thing?

18  A.   It's possible, but I do not recall.

19        MR. SADOW:  All right.  Next number.  1343-A.  This is

20  just in addition to 1343, what we just talked about.

21        Now let's go to 1345.  This one we want to publish a

22  little bit more.  Let's go to the top.

23  BY MR. SADOW:

24  Q.   This is you, right?

25  A.   Mmm-hmm.

```
 1   Q.   And you're writing to Frank, right?

 2   A.   Yes.

 3   Q.   And Latoria Cooke, right?

 4   A.   Yes.

 5   Q.   Who is Latoria Cooke?

 6   A.   She's the team leader of the collectors in Atlanta.

 7   Q.   That is, she works for you.

 8   A.   She works for me.

 9   Q.   And Shawn Griner?

10   A.   Yes, he runs the telemedicine company that we were using.

11   Q.   And Michael Lockett?

12   A.   I don't remember who he is.

13   Q.   And it's cc'd to Mr. Vartanian, right?

14   A.   Yes.

15   Q.   And Amina Rama?

16   A.   Yes.

17   Q.   Who's that?

18   A.   My sister.

19   Q.   Wait.  I thought she was only involved -- is this a

20   different sister?

21   A.   Same sister.

22   Q.   I thought she was only involved, according to you, in the

23   video.

24   A.   She helped out with a couple of other things --

25   Q.   Yeah?  Like what?
```

 1   A.   My taxes.  She would coordinate taxes, and she would run

 2   payroll with the accountant.

 3   Q.   So this is going to be a payroll email?

 4   A.   I haven't read the email.

 5   Q.   Do you want to make sure, before we go down the rest of the

 6   email, you want to tell us what your sister -- what all she

 7   did?

 8   A.   She may have done other things but --

 9   Q.   She may have or did?

10   A.   I don't know.  She may have done other activities, but I

11   know that her main jobs were doing the payroll once a month and

12   coordinating taxes with my accountants.

13   Q.   But here, even if that's all she did, you've gotten your

14   sister, according to you, involved in what you knew clearly at

15   the time was criminal activity, right?

16   A.   Yes.

17   Q.   Why would you do that to your sister?

18   A.   Greed.

19   Q.   Greed.  You would put your sister on the block for greed?

20   A.   I did.

21   Q.   Let's go to the rest of it.

22        Can you see that?

23   A.   I'm reading it.

24   Q.   When you're done, let me know.

25   A.   I've read it.

1    Q.   Let's look at the last two lines before the "Happy

2    holidays, Dr. Rama."

3         Dr. Rama is you, right?

4    A.   That's me.

5    Q.   But you're not Dr. Rama.

6    A.   I'm not.

7    Q.   You're signing it, Dr. Rama.

8    A.   I am.

9    Q.   And you went by -- if it wasn't Dr. Rama, you went by Rama

10   at this point, right?

11   A.   Yes.

12   Q.   And the last two lines, and this is to all the people we

13   just talked about.

14        And worst of all, this is an unnecessary interruption in

15   quality patient care.  It makes us look tremendously bad in

16   front of our patients.

17        Right?

18   A.   This is correct.

19   Q.   And you sent this email -- let's go back to the date.  This

20   is December 23rd of 2016, correct?

21   A.   Yes.

22   Q.   And this is -- you're sending it to Frank, who I'm assuming

23   was knowledgeable about the criminal activity, right?

24   A.   Possibly.

25   Q.   Possibly.  The man worked with you for how long?

1    A.   Two years.

2    Q.   Two years.  And it's possible that he knew about criminal

3    activity?  Or maybe he didn't know it was criminal.  Which one

4    was it?

5    A.   I can't speak to that.  I never had a conversation with him

6    about it.

7    Q.   What about Latoria Cooke?  She knew it was criminal, right?

8    A.   I think she did, yes.

9    Q.   Right.  So why would you send this email to Frank and

10   Latoria and Griner and whoever this Lockett character is, with

11   cc's to Vartanian, Rama, your sister, and Minal?  So you left

12   Minal out of that.

13        Minal is on this one, isn't he?

14   A.   Yes.

15   Q.   And on the bottom, when it said quality patient care, why

16   would you send such an email?

17   A.   Because if there's missing information on claims and things

18   aren't getting processed, that's a delay in getting reports to

19   patients.  And that does not look good.

20   Q.   But I'm talking about the quality patient care part, where

21   it talks about, it makes us look tremendously bad in front of

22   our patients.

23        Why would you send that if this was criminal?

24   A.   It's possible for something to be criminal and still have

25   quality patient care involved.  Getting the results done on a

1   timely basis.  Those two things are not contradictions.

2   Q.  They're not?

3   A.  No, they're not.

4   Q.  This was a government exhibit, right?

5   A.  I'll agree with you, if you have the badge on it, yeah.

6         MR. SADOW:  Show us the badge.

7         THE WITNESS:  Okay, yes.

8   BY MR. SADOW:

9   Q.  Did the government go over this with you before you

10  testified?

11  A.  No.

12  Q.  They didn't.  All right.

13      1360.  What is that?

14  A.  From me to Minal.  It's an invite for -- looks like a

15  medical factoring meeting.

16  Q.  Right?

17  A.  Yes.

18  Q.  Clearly, this is to Minal, right?  So there's no question

19  about him receiving this, right?

20  A.  Yes.

21  Q.  And there was a medical factoring meeting being held where?

22  A.  Over the phone?

23  Q.  Over the phone?  I don't know.  I'm asking you.

24  A.  I think it looks like a phone call, like a Google chat

25  invite.

```
 1   Q.   Well, let's go to the rest of it.

 2   A.   Oh, where -- okay.  So this is at the Faena Hotel.

 3   Q.   Where?

 4   A.   At the Faena Hotel.

 5   Q.   So it's business.  Business at the hotel, right?

 6   A.   Yes.

 7   Q.   Next, 1375.  And who is this to?

 8   A.   From John Scholtes, to me, Nick, Minal, and Frank.

 9   Q.   And what does it say?

10   A.   Medicaid low reimbursement.

11   Q.   And what's the date?

12   A.   Monday, 20th February '17.

13   Q.   All right.  Let's go to the email.

14   A.   I've read it.

15   Q.   So do I understand that this is a criminal activity, but

16   it's put in an email, right?

17   A.   Yes.

18   Q.   All you're doing here is saying the amount of money that

19   you expected to receive is less than -- is coming in less than

20   you expected, right?

21   A.   This is the main topic of this email.

22   Q.   Right?  Isn't this email simply saying, I expected to make

23   more money, but I'm not making more money?  Right?

24   A.   That is the gist of this email.

25   Q.   That's it.  That's all it says, right?  It doesn't say
```

1    anything about let's go out to the community and violate any

2    laws, or look after poverty people.

3        It doesn't say any of that, does it?

4    A.   No.

5    Q.   Do you have a single email, a single text message,

6    anything, one document, just one, in which any of that stuff is

7    reduced to writing?  Anything?  Even in a text message.

8    A.   (No verbal response.)

9    Q.   The answer is no, right?

10   A.   I haven't been shown anything like that from the discovery

11   that I've seen.

12   Q.   Let's --

13   A.   But I've only seen bits of the discovery.

14   Q.   But that translates into government hasn't shown you any

15   such thing, correct?  Right?

16   A.   Of the exhibits that I've seen from the government, nothing

17   talk about what you're saying.

18   Q.   Okay.  1375, that was...

19       Now we're at 1376.  Okay.  Let's see who it is.

20   A.   From Minal to --

21   Q.   You.

22   A.   -- me, Nick, John, Frank.

23   Q.   Okay.  And what does it say?

24   A.   Let's do tomorrow.  I need to look at it.

25   Q.   That's it, right?

```
 1   A.   That is it.
 2   Q.   Business email.  Received business email and a response
 3   business email.
 4        Right?
 5   A.   Right.
 6   Q.   Okay.  Next number, 1382.  And this is from Frank to you,
 7   right?
 8   A.   Yes.
 9   Q.   Doesn't involve Minal Patel at all, does it?
10   A.   He's not on this email chain.
11   Q.   Okay.  1385.  What do we got?
12   A.   From John to me, Minal, Frank, Nick, Tushar, yeah.
13   Q.   And what is it?
14   A.   It's a commission report for my company's activity.
15   Q.   Right.  And does it have an amount of money?
16   A.   It probably should, yeah.
17   Q.   Okay.  Let's go to 1385-A.
18        This is the commission that you received for that time
19   period, right?
20   A.   Correct.
21   Q.   Nothing being hidden.  It's flat-out open, in an email and
22   an attachment, right?
23   A.   That's right.
24   Q.   Nothing other than this is the amount of money you made
25   from the business in this time period, right?
```

1  A.   Correct.

2  Q.   Okay.  1399, we're going to go A, B, C, D, E, F, and G.

3       Now, what is this?

4  A.   This is a training guide put together by myself and John

5  Scholtes.

6  Q.   A training -- to train who?

7  A.   Reps.

8  Q.   Reps.  So you put together a training guide for your reps,

9  right?

10 A.   We did.

11 Q.   And this is the -- this is a training guide -- let's see.

12 You were sending your reps, according to you, at the direction

13 or order of Mr. Patel, out into the community to do all these

14 terrible things, right?

15 A.   Right.

16 Q.   But you put it in a written document, Bright Waters Health,

17 genetics training guide, right?

18 A.   Correct.

19 Q.   So this should have that stuff in it, about what to go out

20 and do, right?

21 A.   This guide will contain -- I haven't seen this in a while,

22 but it will contain information about the product and ways to

23 convert beneficiaries to be in the program.

24 Q.   Okay.  Let's see what it says.  Let's go to 1399-B.

25      What is that?

1    A.   It looks like LabSolutions literature on cancer genomics.

2    Q.   Okay.  Does it have another page?  Are we ready to go to

3    1399-C?

4         MR. SADOW:  Go to the pages.

5    BY MR. SADOW:

6    Q.   This is saying, what is genetic testing, right?

7    A.   Yes.

8    Q.   Is there anything in there -- you can read through it real

9    quick -- that says genetic testing tells you if you have

10   cancer?

11   A.   (Witness reading.)

12   Q.   And when you're done reading, you can just answer no

13   because it doesn't.

14   A.   Can you repeat your question?

15   Q.   Yeah.  There's no misrepresentations in that at all about

16   this would tell you if you have cancer, right?

17   A.   That's correct.

18   Q.   It's exactly what hereditary cancer testing is, correct?

19   A.   It's a pretty accurate depiction of what the process is.

20   Q.   And it's your process, that is, it's part of your training

21   material, correct?

22   A.   That is correct.

23   Q.   All right.

24        MR. SADOW:  Do we have more pages?  Keep going.

25   BY MR. SADOW:

1   Q.   Do you see that?  What's that say?  Does someone who

2   inherits a cancer predisposing mutation always get cancer?

3        What's the first word that's on after that?

4   A.   No.

5   Q.   No.  So any idea that they're telling people that you have

6   cancer, if you have the gene, is shown to be incorrect by your

7   own material, isn't it?

8   A.   Yes, just by popping positive on the test doesn't mean that

9   you have cancer.

10  Q.   And the next part is, who should consider genetic testing

11  for cancer risk, right?

12       Anything in there a misrepresentation?

13  A.   (Witness reading.)

14       This is all pretty textbook accurate stuff.

15       MR. SADOW:  Is there more pages?  I don't want to keep

16  going through to make all this, but --

17  BY MR. SADOW:

18  Q.   You're the one that made the brochure that this is part of.

19  There's not a misrepresentation in any of this, is there?

20  A.   So far, no.

21  Q.   No.  Okay.  Let's go to 1339-C.

22       What is that?

23  A.   This is the family health questionnaire made by

24  LabSolutions that we would give to potential beneficiaries in

25  the field or in doctors' offices to screen them for the

1   criteria for the test.

2   Q.   It's a screening tool, correct?

3   A.   Yes.

4   Q.   Does it say on there anything about what the answer should

5   be?

6   A.   No.

7   Q.   Next, 1399-D.  And again, these are all government-marked

8   exhibits, right?

9   A.   Yes.

10   Q.   That were not shown to you, correct?

11   A.   I've seen these ICD-10 codes.  They've shown it to me.

12   Q.   Oh, they did?

13   A.   This page, yes.

14   Q.   This page.  But the rest of it, no?

15   A.   No.

16   Q.   And what does this say?

17   A.   These are ICD-10 codes that would fit the billable criteria

18   for the tests.

19   Q.   For history of what?

20   A.   Various malignant neoplasms, cancers.

21   Q.   1339-E, what is this?

22   A.   This is the order form -- the molecular diagnostics

23   requisition form that will be filled out with the physician's

24   authorization to run any of these tests that are in this area.

25   Q.   Okay.  1399-F, what is this?

1    A.   This is a LabSolutions brochure on the risk assessment of

2    hereditary cancers.

3    Q.   Which goes through the nature of the CGx testing that

4    LabSolutions was doing, correct?

5    A.   Yes.

6    Q.   And 1399-G, what is that?

7    A.   This looks like a sample interpretation, what you would get

8    once the test was run.  It'll give you test results in the

9    summary.  See at the bottom, it says -- to a physician, who

10   could kind of read this out.  Give a severity score on the far

11   right.

12         That's important to know how likely it is that you would

13   get cancer.  Pop frequency could be an important indicator.  A

14   lot of this is beyond my knowledge.  You would need, like,

15   somebody who really knows how to read these.

16   Q.   You mean -- I don't mean to be disrespectful --

17   A.   You probably need an oncologist.

18   Q.   You mean, a real doctor, don't you?

19   A.   Yeah.

20   Q.   1404.

21   A.   This is from Nick to John -- no, to me, John, Sonal, Minal,

22   and Tushar.

23   Q.   Another business email talking about commissions, correct?

24   A.   Yeah.

25   Q.   Okay.  1453.

1    A.   When does the wire go out?

2    Q.   That's your question, right?

3    A.   Yeah.

4    Q.   All you're asking Minal Patel is when do you receive your

5    commission payment, correct?

6    A.   Correct.

7    Q.   Okay.  1454.  Do you see that one?

8    A.   Yes.  It says from John, FYI, keep in mind, Rama did not

9    follow the mandatory direction that Nick gave him.

10   Q.   That's an internal email that followed up about your wire,

11   right?

12   A.   Okay.

13   Q.   Right?

14   A.   I'm assuming so, yes.

15   Q.   Okay.  1456.  This is a conference call in February

16   of 2018, right?

17   A.   Right.

18   Q.   And what does the body say?

19   A.   Hello all.  I reached out to Camille.  We're all on the

20   same page.  All good.  She's gathering the info needed, and we

21   should be good to go.  Thanks everyone, John.

22   Q.   What's the bottom?  What did you write?

23   A.   You requested a conference call on progress and criteria at

24   12:30 p.m., but your phone is off, LOL.  Camille is standing

25   by.  Please reach out to her so she can train the rep or send

1    us a sample format of what you would like.  The physician for

2    Bryan Clinic had been patient all week and is standing by to be

3    trained by Camille on the new protocol.  Thanks.

4    Q.  So this is -- this is you telling Minal that you have

5    someone standing by that's ready to be trained, correct?

6    A.  Yes.

7    Q.  Training, correct?

8    A.  Yes.

9    Q.  Bryan Clinic.  Where's the Bryan Clinic?

10   A.  I think it's in the Rio Grande Valley.  I'm not 100 percent

11   sure.

12   Q.  Let's go to the next one, 1455.

13        MR. SADOW:  That's 56?  Go to 1455.

14   BY MR. SADOW:

15   Q.  What is that?  Hello -- this is from Camille.  Who's

16   Camille?

17   A.  Camille also works with us in the office, with Frank.  She

18   does a lot of the overflow work that Frank doesn't do.  She's

19   kind of like Frank's assistant.

20   Q.  All right.  And this is an email from her to

21   Jon Berarducci, in which you are cc'd, in which your sister is

22   cc'd, correct?

23   A.  Yes.

24   Q.  And it's then sent from you to Minal, correct?

25   A.  Yes.

1   Q.   And it talks in terms of progress notes of the Bryan

2   Clinic, correct?

3   A.   From the Bryan Clinic for 24 CGx tests submitted to date.

4   Q.   And that's a brick-and-mortar location; is it not?

5   A.   This is brick and mortar.

6   Q.   It's got nothing to do with telemarketing, does it?

7   A.   No, it's brick and mortar.

8   Q.   In fact, just to be as clear as we can be, after you

9   received the cease-and-desist letter in the end of July of

10  2017, the only work that you were permitted to do had to do

11  with brick and mortar, wasn't it?

12  A.   I'm not 100 percent on that, but I think that's correct.

13  Q.   Well, do you remember you talked about the telephone call

14  that you said you had with Nick Saliba, Mr. Patel, after the

15  cease-and-desist letter went out?

16  A.   Yes.

17  Q.   Remember?

18  A.   Yes.

19  Q.   And you said it was immediate, correct?

20  A.   What was immediate?

21  Q.   That you had spoke to Nick and Mr. Patel immediately,

22  right?

23  A.   Yes.

24  Q.   And that it was -- I think your terminology was business as

25  usual, correct?

1    A.   Correct.

2    Q.   But it wasn't business as usual, was it?

3    A.   No, it was business as usual.  We kept on doing business.

4    Q.   But it was brick and mortar only then, wasn't it?  No more

5    telemarketing.

6    A.   I'm not 100 percent certain of that.

7         MR. SADOW:  Your Honor, I'll publish A-3 at this point.

8         THE COURT:  Sure.

9    BY MR. SADOW:

10   Q.   Can you see that?

11   A.   I do see this.  It's from me to Frank and Meena.

12   Q.   And what's the date?

13   A.   8/23/2017.

14   Q.   It's not sometime in July, is it?  It's some 20 days later,

15   isn't it?

16   A.   Yes.

17   Q.   And it says, Nick just called me.  And it's Nick Saliba

18   just called you, right?

19   A.   Yes.

20   Q.   And it says, They will accept our brick and mortar, right?

21   A.   Yes.

22   Q.   You had to convince them, along with Frank, to accept

23   anything at that point, didn't you?

24   A.   There was a time where we had to have a conversation and

25   talk about continuing the business, and we did convince them to

1    continue.

2    Q.   And that was after the cease-and-desist letter, wasn't it?

3    A.   Yes.

4    Q.   And that's the email that you sent to Frank indicating that

5    you had finally convinced Nick to allow you to do brick and

6    mortar, correct?

7    A.   I think so, yes.

8    Q.   So it wasn't just business as usual.  You had to convince

9    LabSolutions and the CEO, Nick Saliba, and the only way you

10   could do so is to assure that it would be brick and mortar and

11   not telemarketing, correct?

12   A.   It's possible, but I don't remember.

13   Q.   Well, we have the email.

14   A.   Yeah, but I don't think there was ever any stop in us

15   sending samples.  The samples were still being sent during this

16   whole period.

17   Q.   Do you have anything in writing that says I did

18   telemarketing after that?  One thing.

19   A.   I don't know.  I haven't been shown anything like that.

20   Q.   That is, the government hasn't shown you anything, correct?

21   A.   Correct.

22   Q.   Let's go back now to 1455-A.  1455-A has many -- what's

23   that say?

24   A.   I, Bernadette Abregunda -- I don't know if I'm saying that

25   right -- FNP -- that's a family nurse practitioner of the

1    Bryan Clinic located at 110 The Pamela Drive in Mission, Texas,

2    ordered a cancer screening test on 10/12/2017 for a patient

3    named Gonzalez, Jorge, date of birth, 11/24/1969, signed by

4    FNP.

5    Q.   Now, we already talked about what the Bryan Clinic was,

6    right?

7    A.   Yeah.

8    Q.   Brick and mortar, right?

9    A.   Yes.

10   Q.   In Mission, Texas.  I must admit, I don't know where that

11   is.

12   A.   It's a tiny town in the Rio Grande Valley.

13   Q.   Rio Grande Valley.

14        Is that where your father and mother's practice was?

15   A.   Yes, they are in this area.

16   Q.   They're in that area.  Okay.

17        And do you know this person?

18   A.   No.

19        MR. SADOW:  If you go through page after page after

20   page.

21        Keep going.

22   BY MR. SADOW:

23   Q.   These are all signed for brick and mortar, right?

24   A.   Yes.  I believe these were supposed to be progress notes

25   that are signed, but they're really kind of -- there isn't

1   really much to this progress note.  It's not really robust at

2   all.

3   Q.  It's not robust?

4   A.  No.

5   Q.  Okay.  Who is the one that's turning that one in?

6   A.  The provider.

7   Q.  The provider.

8       Are they turning it in to you?

9   A.  To us or to LabSolutions.

10  Q.  How much was this being paid, these people?

11  A.  The physicians?

12  Q.  Yeah.

13  A.  No, they were not -- to my knowledge, they were not paid.

14  Q.  What was that?  The physicians were not paid?

15  A.  To my knowledge, this physician was not paid.

16  Q.  That means they weren't getting any kind of -- even your

17  terminology -- any kind of kickback?

18  A.  The rep in charge of this account may have brought, like,

19  tacos in the morning --

20  Q.  Tacos.

21  A.  -- or lunch for the clinic.

22  Q.  Tacos.  That might be the kickback.  I mean, it could be

23  really good tacos, but that's the kickback?

24  A.  Those were the kinds of things, tacos, and lunch sometimes,

25  or sometimes we would pay a collector in the office to -- it

1    was her job to basically be in charge of collecting the

2    samples.  You would pay her an hourly rate.

3    Q.  But that's a collector, not the physician, right?

4    A.  That's correct.

5    Q.  So the physician wasn't being paid to do this, correct?

6    A.  To my knowledge, I don't think so.

7    Q.  Okay.  We only have a couple more.  In fact, I think we've

8    been through enough of these.

9         MR. SADOW:  Your Honor, I'm going to publish just a

10   couple more documents, and then I'll be done.

11        Do you want me to do that after lunch?

12        THE COURT:  No, I'd like you to finish.  Go ahead.

13   Thank you.

14        MR. SADOW:  All right.  With me playing with this

15   electronic equipment, anything can happen.

16   BY MR. SADOW:

17   Q.  This is Defense Exhibit A-1.  This is an email, CGx email

18   from Berarducci to you, 20th of February, 2017, right?

19   A.  Right.

20   Q.  And these appear to be some kind of family history codes,

21   right?

22   A.  Yes.

23   Q.  No.  Wait a second.  These are Medicare codes?

24   A.  Yes.

25   Q.  For family history?

1   A.   These are all ICD-10 codes for family history of malignant

2   neoplasms of various organs; urinary tract, kidney, bladder,

3   prostate, et cetera.

4   Q.   But they're all family history codes, right?

5   A.   Yes.

6   Q.   They're not personal history codes, right?

7   A.   These are not personal history codes.

8   Q.   No, these are all for family history and family history

9   alone, right?

10   A.   Yes.

11   Q.   This is A-4.  This is an email from you to Camille and your

12   sister, right?

13   A.   Yes.

14   Q.   And it's from LabSolutions to you, right?

15   A.   Yes.

16   Q.   In March of 2018, right?

17   A.   March of 2018.

18   Q.   And by you sending it along to Camille and along to your

19   sister, you're telling them that this is some message that they

20   need to be aware of and follow, right?

21   A.   Correct.

22   Q.   And they're telling you about the updates that deal with

23   PGx and CGx, correct?

24   A.   Yes.

25   Q.   And with LCDs, right?

1    A.   Yes.

2    Q.   And what is it saying in the update about medical necessity

3    requirements?

4    A.   Current medical necessity requirements are limited to

5    personal cancer history.

6         This is when the window kind of closed.

7         However, these personal histories do not seem to be limited

8    to breast or ovarian cancers.  Personal histories have been

9    expanded outside breast or ovarian to things like melanoma,

10   prostate, et cetera.

11   Q.   What does it say about CGx specimens?

12   A.   It says, Limit all CGx specimens sent to include personal

13   history.

14   Q.   This is when, using your terminology, Cahaba was taken over

15   or merged, or whatever the word was, with Palmetto, correct?

16   A.   Correct.

17   Q.   This is when Cahaba, who took family history, was either

18   taken over or replaced by Palmetto, which didn't take family

19   history, right?

20   A.   Yes.

21   Q.   And this is LabSolutions making it clear to everyone that

22   family history at Palmetto was not going to be accepted

23   anymore, right?

24        (Court reporter clarification.)

25   Q.   That LabSolutions was making it clear to all of the field

1    reps, that family history was not going to be accepted by

2    Palmetto, correct?

3    A.   Correct.

4    Q.   And to do personal history, right?

5    A.   Yes.

6    Q.   The LCD changed.   The math changed.   LabSolutions changed.

7    Right?

8    A.   Yes.

9    Q.   And that was the CGx.   This is the PGx, right?   Correct?

10   A.   Correct.

11   Q.   And it, once again, indicates that now that the MAC has

12   changed, that is from Cahaba to Palmetto, that certain

13   regulations and guidelines concerning Palmetto are different,

14   right?

15   A.   Yes, there's been a shift in the ICD-10 codes.

16   Q.   And this is what businesses do.   If there's a change, they

17   notify their field reps if there's a change, right?

18   A.   Correct.

19        MR. SADOW:   And the last exhibit I want to publish,

20   Your Honor, which is A-7.

21   BY MR. SADOW:

22   Q.   This essentially is the start of your interaction with

23   LabSolutions, correct?

24   A.   September 15, 2016, that's correct.

25   Q.   And the email is from Omar, right?

1   A.   Yes.

2   Q.   And cc'd on it is Brett Hirsch, right?

3   A.   Uh-huh.

4   Q.   Scholtes, right?

5   A.   Yeah.

6   Q.   Stacey Adair, who works at LabSolutions, right?

7   A.   Yes.

8   Q.   Shelbi Davis, who works at LabSolutions, correct?

9   A.   Yes.

10  Q.   Sonal, which you've identified as Mr. Patel's sister.

11  A.   Yes.

12  Q.   And Minal, correct?

13  A.   Yes.

14  Q.   And Nicholas would be Nicholas Vartanian, right?

15  A.   Yeah.

16  Q.   And if you'll read it, what does it say?

17  A.   Rama, it was a real pleasure speaking with you over the

18  past couple of days.  Please excuse my delay in getting you out

19  some info, my friend.  Has been quite a week.  I should have a

20  contract ready for you by the end of business today.

21       Attached you will find some key marketing materials.  They

22  should serve to give you a quick feel for the lab and the

23  quality of service we aim to provide.  I will give you a ring

24  tomorrow to discuss plan of action.

25       I'm copying Shelbi Davis, our director, account management,

1    and Stacey Adair, our national sales trainer.  If you think --

2    I think you will find both of them to be instrumental in

3    getting you going, as well as an absolute pleasure to work

4    with.  I'm sure they will both take a moment to introduce

5    themselves and lend a helping hand.  Omar, sincerely.

6    Q.   This is the essence of a business email, introducing a

7    company to do business with a new representative, correct?

8    A.   Yes.

9    Q.   This is what you would expect from a business to send out,

10   to identify the individuals that you would be working with in

11   conducting business, correct?

12   A.   Correct.

13   Q.   And it was after this that Omar sent you the contract,

14   right?

15   A.   Yes.

16   Q.   So then I can finish this up very simply:  Your sentence

17   doesn't get cut unless the government goes to a judge and files

18   what's called a Rule 35, right?

19   A.   That's correct.

20   Q.   And if the government doesn't choose to do it, your

21   ten-year sentence doesn't get reduced, right?

22   A.   Right.

23   Q.   A judge cannot do it on himself or herself, right?

24   A.   Not that I'm aware of, no.

25   Q.   And defense lawyers cannot do it alone, can they?

1    A.   No.

2    Q.   The only entity that can get your sentence of 120 months

3    reduced is sitting at the table where the government is, that

4    had you on direct examination, right?

5    A.   That is correct.

6    Q.   They make the decision whether they're going to help you or

7    not, right?

8    A.   I don't know if it's them specifically.  I think it's the

9    prosecutor on my case.

10   Q.   Which is still a government prosecutor, right?

11   A.   Correct.

12   Q.   And pursuant to your plea agreement, it's up to them, and

13   them alone, right?

14   A.   Correct.

15   Q.   How much help do you think you'd get if you said, you know,

16   I didn't do criminal business with Minal Patel?

17        MS. GURSKIS:   Objection.

18   BY MR. SADOW:

19   Q.   Zero, right?

20        THE COURT:  Overruled.

21   BY MR. SADOW:

22   Q.   Zero, right?  You wouldn't get any help, would you?

23   A.   Could you say the question again?

24   Q.   If you didn't come in here and say I was ordered and

25   directed by Minal Patel, how much help do you think you'd get?

1    None, right?

2    A.   That isn't correct.

3    Q.   No?

4    A.   No, because I've helped out in other cases.

5    Q.   Oh.  So you're not doing this for help.  Is that what

6    you're trying to tell us?

7    A.   I'm not saying that, no.

8    Q.   Okay.

9           MR. SADOW:  That's all I have, Your Honor.

10          THE COURT:  Thank you.

11          Ladies and gentlemen of the jury, we're going to go

12   ahead and break for lunch.  When we return, we will go ahead

13   and complete this witness's testimony through the government's

14   redirect and then move on to our next witness this afternoon.

15          Please remember to leave your notepads in the jury

16   room.  I'm going to ask that everyone please be in the jury

17   room, ready to go, just before 2:00 o'clock.  It'll give us

18   about an hour and 15 minutes.

19          And, of course, do not discuss anything you have seen,

20   you have heard, with one another, with family or friends.

21   Conduct no research whatsoever regarding what you've heard in

22   this trial.  Stay off social media.

23          And take no offense if you were to bump into any of the

24   lawyers while you're out at lunch, since they have to steer

25   clear of you.

1            So with that being said, have a nice lunch break.

2    We'll see you all in the jury room, just before, maybe five

3    till 2:00, and I'll bring you guys some coffee.  You are

4    excused.

5            (Jury exits at 12:48 p.m.)

6            THE COURT:  All right.  Please be seated, everyone.

7    Briefly, before we break, the Court will necessitate a little

8    bit of space, if you can make some, on your tables.  I have a

9    sentencing that will be done in this courtroom at 1:30.  So it

10   should not take more than 30 minutes, so we can start and

11   resume right on time.

12           But just please, if you could, you don't have to move

13   everything out of the way, but you might want to make a little

14   bit of space at counsels' tables for my sentencing.

15           Aside from that, housekeeping-wise, we will complete

16   the testimony of Mr. Ramamurthy when we return.  I just wanted

17   to confirm that soon thereafter, I expect the government will

18   be calling Dr. Slomovitz.

19           Is that still the plan?

20           MS. GURSKIS:  Yes, Your Honor.

21           THE COURT:  All right.  Very good.  Let's see how

22   quickly we can move through that and then perhaps get to

23   another one of our standby witnesses, whether it be Adair,

24   W.H., or Kimberly Foss.  We'll see where we're at.  Okay.

25           Anything else before I go ahead and break on behalf of

1   the government?

2          MS. DE BOER:  No, Your Honor.  Thank you.

3          THE COURT:  All right.  Anything else on the defense

4   team?

5          MR. SADOW:  No, Your Honor.

6          THE COURT:  All right.  Thank you, guys.  Enjoy your

7   lunch.  We'll be back just before 2:00 o'clock.  We're in

8   recess.

9       (Court recessed at 12:50 p.m.)

10      (Back on the record at 2:23 p.m.)

11         THE COURT:  Please be seated, everyone.  All our jurors

12  are ready to go.  We'll go ahead -- any last-minute issues

13  before I bring them in?

14         I think we should be good.

15         MS. DE BOER:  Well, Your Honor, we're not sure how far

16  we'll get this afternoon.  So we have -- the lineup is

17  Slomovitz, H., Adair, and then we've got a couple other

18  witnesses here if we need them, the ones we discussed

19  yesterday.

20         THE COURT:  Perfect.  All right.  Let's go for broke.

21  As far as we can go, the better.  Let's see how long your

22  redirect takes.  Hopefully that'll keep us moving.

23         All right.  Let's go ahead and bring them in, please.

24         THE COURT SECURITY OFFICER:  All rise.

25      (Jury enters at 2:25 p.m.)

```
1              THE COURT:  All right.  Please be seated, everyone.

2              I hate to say it, but I don't know if -- for our one

3    juror, the score is one, zero, Germany.  I was watching for

4    you.  I was cheering for Costa Rica, and I'll let you know if

5    there's a development on that.

6              All right.  We're going to turn it back to the

7    government at this time.  They're going to continue on with

8    Mr. Ramamurthy for his redirect examination.

9              Ms. Gurskis, the floor is yours.

10             MS. GURSKIS:  Thank you, Your Honor.

11                         REDIRECT EXAMINATION

12   BY MS. GURSKIS:

13   Q.   Good afternoon, Mr. Ramamurthy.

14   A.   Good afternoon.

15   Q.   Mr. Sadow, asked you a bunch of questions about the fraud

16   you committed and compounding scheme.

17             Do you recall that?

18   A.   I do.

19   Q.   Fraud is lies for money, right?

20   A.   Fraud is lies for money.

21   Q.   Did you continue to lie for money when you got into cancer

22   genetic testing?

23   A.   I definitely did.

24   Q.   What were the lies in that scheme?

25   A.   Well, it begins with the patients, the beneficiaries.
```

1   You'll lie to them about their need for the test.  You build

2   commitment by getting the sample first and getting the doctor

3   to get back at them later with the consult.

4        The medical necessity is questionable because we're

5   collecting the sample first, without the doctor ever coming

6   into the picture.  The sales reps were undertrained, without

7   medical training.  I mean, they had a couple of brochures, but

8   a couple of brochures is, I don't think, enough to suffice, to

9   be out there, collecting samples with a test that has

10  ramifications like this.

11       Tests were bundled in the billing, for maximum billing, for

12  maximum profits.  We put everything together in comprehensive

13  panels when possible.  And we used the ICD-10 codes that we

14  knew to be the ones that always unlocked the money box.

15  Q.  You said "we" put together.  Who is "we"?

16  A.  Myself, Minal Patel, John Scholtes, Nick Saliba, and a few

17  other people.

18  Q.  Who figured out how to lie for people to get cancer genetic

19  testing?

20  A.  Minal Patel.

21  Q.  And you told Mr. Sadow that your pharmacy compounding

22  scheme predated your cancer genetic testing scheme, right?

23  A.  Yes.

24  Q.  If you already had a scheme going, why switch to cancer

25  genetic testing?

1    A.   Well, the compounding, it slowed down.  That had happened.

2    But also, this was so much more easy.  I mean, it was a bubble.

3    It was just -- when I think about the hustle that it was, when

4    I reflected upon this in prison, I see all these people here

5    today.

6         If me and Minal collected all of your samples right now,

7    we'd have a million dollars in six weeks.  So when I think

8    about that, how brilliant he was to leverage the technology

9    into this bubble that -- I mean, who could resist this?  I

10   couldn't resist it, for sure.  The avarice, the greed.  I mean,

11   the amount of money you could flip so quickly.  It was a

12   feeding frenzy.

13        And he was the ringleader of this entire thing.  This was a

14   huge circus that he put on.  And because he controlled the

15   billing -- this is what I learned in this business.  It's

16   whoever controls the billing is at the top of the pyramid.  If

17   you know the numbers and you know how to bill, you're the one

18   who gets the money, and you choose who to work with.

19   Q.   Had you had any success with cancer genetic testing before

20   you started working with Minal Patel?

21   A.   No.

22   Q.   Mr. Sadow asked you a lot of questions about lies on your

23   cross-examination.

24        Do you recall that?

25   A.   Yes, I do.

1    Q.   You lied a lot; is that fair to say?

2    A.   That is absolutely fair to say.

3    Q.   You committed a lot of crimes; is that fair to say?

4    A.   That is absolutely fair to say.

5    Q.   And that's why you're here?

6    A.   That's exactly why I'm here.

7    Q.   And in the course of your business relationship with

8    Mr. Patel, there were things that you shared with him that were

9    truthful about what you were doing to solicit Medicare

10   beneficiaries; is that true?

11   A.   Yes.  We kept a very open and transparent dialogue.

12   Q.   What did you tell Mr. Patel about your marketing

13   strategies?

14   A.   Everything.  All the details.  Everything granularly.  What

15   we were doing.  It was what he wanted us to do.  And then I

16   would execute the plan, and I'd go back to him and say, is this

17   how you want it done?  Is this, like, you know, your vision?

18        Like, we're in the community.  I hired these people who are

19   giving out the prepaid cell phones.  They're out there.

20   They're doing it.  We have the telemedicine lined up with

21   Shawn.  You know Shawn.  You're also sending samples through

22   Shawn.  So all the details were discussed.  I sent him the

23   script for the commercial, all the PPOF forms, brochures.

24   Everything was out there for him.

25   Q.   And you spoke with Mr. Sadow about how -- after your

1    business with Minal Patel, you were trying to, or you were in

2    business with another lab owner named Khalid Satary.

3         Do you recall that?

4    A.   Yes.

5    Q.   And how much of your genetic testing business was with

6    Mr. Patel versus Mr. Satary?

7    A.   So this courtroom is the size of the business in total.

8    Maybe that water bottle is what I did -- one of those water

9    bottles -- the volume of that water volume is what I did with

10   Khalid Satary.  The rest was with Minal Patel.

11   Q.   And when you were working with Minal Patel, how often were

12   you communicating with Mr. Patel?

13   A.   Every single day, nearly.

14   Q.   And how often were you communicating with Mr. Satary?

15   A.   I had met Khalid Satary once for five minutes in a New York

16   hotel lobby, and I never talked to him after that.

17   Q.   So how did that operation work in terms of who you

18   communicated with?

19   A.   Completely through Brett Hirsch.

20   Q.   It's no secret that you involved your family in this; is

21   that true?

22   A.   That is correct.

23   Q.   Who asked you to get your mom to begin signing cancer

24   genetic testing orders?

25   A.   Minal Patel.

```
 1   Q.   And what kind of patients did your mom primarily see in her

 2   practice?

 3   A.   Nearly all of them were Medicare.

 4   Q.   You were also asked about your mom forging signatures.

 5        Do you recall that?

 6   A.   I do recall that.

 7   Q.   And I know I haven't been outside today, but some people

 8   came in and had umbrellas or saw that the ground was wet.

 9        Based on this deduction, what might you infer?

10   A.   It's probably raining, or someone jumped in a pool.

11   Q.   Why do you believe that your mom forged signatures?

12   A.   Because that's what she signed in her plea agreement.

13   Q.   And your mom was convicted, or she pled guilty to a crime

14   too; is that right?

15   A.   That's true.

16   Q.   Did anybody else in this scheme also involve their family?

17   A.   Yeah, Minal.

18   Q.   Who did he involve?

19   A.   His sister, his brother, as far as I know.

20   Q.   And what roles -- what were their roles at LabSolutions?

21   Do you know?

22   A.   No, I don't really know.  I didn't interact with them very

23   much, to be honest.  Actually, I don't know their role so I

24   won't speak to anything about that.

25   Q.   But who was in charge at LabSolutions?
```

1   A.  Minal was completely in charge.

2   Q.  Mr. Sadow went through a bunch of emails with you that were

3   sent to you by Mr. Vartanian.

4       Do you recall that?

5   A.  Yes.

6   Q.  And some of those, you were discussing, or he was sending

7   you information about charged amounts and sample reports and

8   things like that.

9       Do you remember that?

10  A.  Yes.

11  Q.  Who is Mr. Vartanian's boss?

12  A.  Minal.

13  Q.  In your observations, how much was Mr. Vartanian consulting

14  or working with Minal Patel?

15  A.  Completely, completely.  I mean, Nicholas would not go out

16  of his way to do something unless Minal authorized or did it.

17  He was on a very short leash.

18  Q.  And just a moment ago, you said that you communicated with

19  Mr. Patel almost every day, I believe I heard you say.

20  A.  Absolutely.

21  Q.  Did that include telephone calls?

22  A.  Yes.

23  Q.  How much of that communication was over the phone?

24  A.  Most of it was text, but we definitely talked on the phone

25  a lot.

 1   Q.   And you also occasionally had emails with him too, right?

 2   A.   Yes.

 3        MS. GURSKIS:   Your Honor, may I have permission to

 4   publish a couple of exhibits on the ELMO?

 5        THE COURT:   You may.

 6   BY MS. GURSKIS:

 7   Q.   This is Government's Exhibit 1345, which I believe you just

 8   reviewed with Mr. Sadow.

 9   A.   Yes.

10   Q.   Who is this email from?

11   A.   I can't actually see it.

12   Q.   I'm sorry.

13   A.   It is from me to a few different people:  Nick, Frank,

14   Latoria, my sister, Shawn Griner, Minal.

15   Q.   Who is Shawn Griner?

16   A.   Shawn Griner is the owner of a telemedicine platform.

17   Q.   And Mr. Sadow directed your attention to -- let me know if

18   you need me to zoom in further, Mr. Ramamurthy -- this section

19   here, right?

20   A.   Yes.

21   Q.   What patient care was being provided at all by you guys?

22   A.   The patient care, I think, is when you get those

23   interpretation reports from the tests that are done on the

24   patients in a timely basis to their primary care provider.

25   Q.   In the scope of the telemedicine aspect of this scheme, do

1    you know if you were ever dealing with the patients' primary

2    care providers?

3    A.   Yeah, I don't think so.

4    Q.   Were you at all concerned about patients complaining?

5    A.   Yes.

6    Q.   Why were you concerned about that?

7    A.   This is a problem because when complaints come, the feds

8    come, or the OIG, or Medicare, and it was expressed to me

9    numerous times, by Minal and Omar, that everything needed to be

10   done in a way where we flew under the radar, under the radar

11   for billing, so -- because they're already billing so much, so

12   they can bill more.

13        Under the radar with everything getting done and reports

14   getting out.  Under the radar of not blatantly giving huge

15   kickbacks to doctors.  Under the radar of -- just, like --

16   don't just go and sign up a bunch of dead people or just

17   collect random samples from people and fill out the paperwork.

18        Those things are red flags.  Don't do those things.

19   Because if you do that, you will attract attention.

20   Q.   And drawing your attention to some other aspects of this

21   email that are in all capitals.

22        Can you read that, Mr. Ramamurthy?

23   A.   I repeat, all claims are on hold.  There's some kind of --

24   Q.   Yeah, I'm sorry about that.  I'm trying to get out of that.

25   Can you read the --

1    A.   Yes.   I repeat, none of our Georgia claims are getting paid

2    because of the missing info below.

3    Q.   None of our Georgia claims are getting paid?

4    A.   Yes.

5    Q.   So what was the primary concern when you're sending this

6    email?

7    A.   I mean, I got to pay the reps.   Otherwise, there's no

8    business.   So money is the primary motivating factor of this

9    email.

10   Q.   Money is the primary motivating factor; is that what you

11   said?

12   A.   Money is the primary motivating factor.

13         MS. GURSKIS:   I'm showing now Government's

14   Exhibit 1375.

15   BY MS. GURSKIS:

16   Q.   Can you read whose on this email, Mr. Ramamurthy?

17   A.   This is from John Scholtes, who worked for me, to myself,

18   Nick Saliba, Minal Patel, and Frank.

19   Q.   And there's an original email down here that's also from

20   you.

21         What was your concern in sending this email?

22   A.   Money.

23   Q.   And when you say here, These numbers actually put me in the

24   red after rep and telemed costs.

25         Is that sales reps and telemedicine companies?

1  A.   Yes.   This is -- so this together is, like, 4,000, $5,000.

2  If I get a cut, maybe I'll get 2,000 of this.   That's already

3  for every sample.   That's what I would pay the rep plus what I

4  would pay the telemed doctors.   So that puts me in the red.

5  Q.   Because you're paying the rep and you're paying the

6  telemed?

7  A.   Correct.

8  Q.   And what are you paying the rep for?

9  A.   I'm paying the rep to collect the sample and push it to the

10  telemedicine platform.

11  Q.   And what are you paying the telemed for?

12  A.   I'm paying the telemed doctors to ratify as many scripts as

13  possible.

14  Q.   And what were Minal Patel and LabSolutions paying you for?

15  A.   To bring in as many samples as possible.

16  Q.   Yesterday you laid out each step of the scheme in detail.

17      Do you recall that?

18  A.   Yes.

19  Q.   Did you communicate about the scheme in detail like that

20  over email with your co-conspirators?

21  A.   I don't know if I recall putting it into email.

22  Q.   Did you reduce your crimes to writing?

23  A.   You know, putting it that way, I -- I -- even I'm not dumb

24  enough to kind of put it in writing.

25      MS. GURSKIS:   This is now Government's Exhibit 1351.

1    BY MS. GURSKIS:

2    Q.  This is another email that we looked at yesterday.  Do you

3    recall that, Mr. Ramamurthy?

4    A.  Yes, I do.

5    Q.  And you're sending this email to Mr. Patel?

6    A.  Yes.

7         MS. GURSKIS:  I'm sorry, Your Honor.  We'll put it on

8    the ELMO, 1351-A.  Thank you.

9    BY MS. GURSKIS:

10   Q.  That "fun fact" that's on there, Mr. Ramamurthy --

11   A.  Yes.

12   Q.  -- was that really factual as it applied to this test?

13   A.  It is a medical fact.  However, it is deliberately

14   misleading in promoting this test.  It kind of, like, brings

15   out fear in someone so that they kind of feel pressured.

16   Because this test does not detect if you get cancer or not.

17   Q.  Okay.  And Mr. Patel -- you shared this ad with -- or I'm

18   sorry, you shared this pitch with Mr. Patel, right?

19   A.  Yes.

20   Q.  And Mr. Sadow asked you some questions about your

21   sentencing.

22        Do you recall that?

23   A.  Yes.

24   Q.  And that the government had made certain recommendations

25   about whether you led the scheme as part of your sentencing

1   hearing.

2       Do you recall that?

3   A.   Yes.

4   Q.   He also asked you some questions about your cooperation.

5       Do you have recall that?

6   A.   Yes.

7   Q.   Who do you understand determines your sentence, the judge

8   or the prosecution?

9   A.   The judge.

10  Q.   Do you have an understanding about whether the outcome of

11  this case, in terms of if anybody is convicted or not, will

12  influence whether the government decides to ask for a reduction

13  in your case?

14  A.   No, there's no connection.

15  Q.   And you were also asked a lot of questions about your plea

16  agreement.

17      Do you recall that?

18  A.   Yes.

19  Q.   Did your plea agreement obligate you to tell the truth when

20  communicating with the government?

21  A.   Yes, it did.  I don't want to catch a perjury charge, so,

22  yeah, I have to be truthful in all these things.  And I was

23  told to be truthful in these kind of proceedings, even if it

24  doesn't help the government.

25  Q.   And as part of your sentencing, your lawyer made some

1   arguments on your behalf, right?

2   A.   Yes.

3   Q.   And in an attempt to reduce your sentence, but not walking

4   away from the fact; as you've admitted many times today that

5   you did commit crimes, right?

6   A.   That's correct.

7   Q.   Mr. Sadow, I believe, also showed you communication

8   regarding a lawyer.  Do you recall that, a Mr. Yussuf Aleem?

9   A.   Is this with the commercial?

10  Q.   Yes.

11  A.   Okay.  I never met the person, but I remember this exhibit.

12  Q.   Okay.  And you also mentioned that you shared information

13  about the ad with your own lawyer.

14  A.   Yes.

15  Q.   Did you ever tell a lawyer about getting your mom involved

16  when it was happening, during the conspiracy?

17  A.   I don't recall.

18  Q.   Did you ever tell a lawyer about how you and Mr. Patel were

19  targeting vulnerable people, like the elderly and the poor?

20  A.   No, I left that out.

21  Q.   And Mr. Sadow also asked you a lot of questions about legal

22  documents, and I believe you said on direct that you've been in

23  custody for about three years?

24  A.   That is correct.

25  Q.   Have you had access to your full legal docket in the three

1    or so years that you've been in custody?

2    A.   Absolutely not.

3    Q.   Do you remember each and every morsel of what was said in

4    the legal filings in your case?

5    A.   There are so many hundreds of thousands of documents,

6    absolutely not.

7    Q.   And Mr. Sadow also asked you some questions about money and

8    your current financial state.

9         Do you recall that?

10   A.   Yes.

11   Q.   What did you spend your money on?

12   A.   Cars, traveling, hanging out with Minal.  It takes a lot of

13   money to keep up with Minal.

14   Q.   What did Mr. Patel spend his money on?

15   A.   Oh, clothes, hotels, vacations.  You know, we liked to go

16   to Vegas, buy bottles at clubs.  I mean, you could spend easily

17   100,000 in a weekend doing that.

18   Q.   And Mr. Sadow also asked you some questions about the EOB,

19   or Explanation of Benefits, that you explained Mr. Hirsch

20   showed you right around when you got involved in the scheme.

21        Do you remember that?

22   A.   I do.

23   Q.   When was the last time you looked at that EOB?

24   A.   Is it 2022 now?  And that was in 2015 or '16.  That is six

25   years ago.

1    Q.   And what was memorable to you about that circumstance, that

2    interaction with Mr. Hirsch?

3    A.   That I was summoned there, like, I was in L.A., and he was,

4    like, you need to come and look at this EOB.  And when he says

5    that, that means something's happening.  So I flew out there,

6    like, the next day.

7         And I got to the Waldorf, I had a suite there.  And he came

8    in for 20 minutes.  And I saw that EOB, and that was, like,

9    Christmas because that was so much money for so little work.

10   Q.   So you remember that it was a lot of money for not doing a

11   lot.

12        Is that fair?

13   A.   That is absolutely fair.

14   Q.   Okay.  And do different tests -- different genetic tests

15   pay different amounts, tests for different DNA?

16   A.   Depending on which panel you choose, it can be as little as

17   $600 to all the way up to -- I mean, it depends also on the

18   insurance.  I've seen Blue Cross once go for, like, 14,000.

19   You know, so it depends on what the insurance will pay, and it

20   also depends on the combination of panels you put together.

21   Q.   The combination of panels; is that what you said?

22   A.   That's correct.

23        MS. GURSKIS:  Ms. Puntillo, can you pull up 1399-F?

24   BY MS. GURSKIS:

25   Q.   Mr. Sadow asked you some questions about some of the

 1    training documents and materials that were provided to you by

 2    LabSolutions.

 3         Do you recall that?

 4    A.   Yes.

 5    Q.   And it included a requisition form.

 6         Do you recall that?

 7    A.   I do remember that.

 8    Q.   And you've spoken about a panel and about how different

 9    tests can be worth -- or reimbursable for different amounts of

10    money?

11    A.   Yes.

12    Q.   Do you recall there being a choice in the type of panel on

13    the requisition form that was given to you by LabSolutions?

14    A.   Oh, wow.  You know, we should look at that again.

15    Q.   Okay.

16    A.   There might be a couple of choices, and there might not

17    even be a choice, to be honest.

18    Q.   Okay.  We can come back to that.

19         Mr. Sadow also asked you questions about the LCDs and

20    changing an LCDs and discussing that with Mr. Patel.

21         Do you remember that?

22    A.   I do.

23    Q.   Did anything change in the LCDs about whether the tests

24    needed to be ordered to help the patient?

25    A.   No, that criteria didn't change, just the ICD-10 codes.

1          MS. GURSKIS:  Your Honor, may I have one moment?

2          THE COURT:  You may.

3          MS. GURSKIS:  Okay.  I believe we have the form up on

4    the screen now.  I apologize.  It's 1399-E, not F.

5          Ms. Puntillo, could you zoom in on the molecular

6    diagnostic section?

7          THE WITNESS:  Okay.  There is no choice.

8    BY MS. GURSKIS:

9    Q.   There is no choice.

10   A.   There is no choice.  You click predict and you get all

11   these alleles, and that's money; a thousand, 500, 2,000, 3,000.

12   It's a huge check.

13   Q.   Mr. Ramamurthy, why did you plead guilty?

14   A.   Honestly, because if I went to trial and lost, because of

15   these crimes I did, I would have gotten a lot -- a lot of time.

16   At least this way I get -- I mean, it's a lot of time, but it's

17   still less than what I would have gotten if I went to trial.

18   And I would have lost.

19         MS. GURSKIS:  No further questions.  Thank you, Your

20   Honor.

21         THE WITNESS:  Thank you.

22         THE COURT:  Thank you very much.

23         Ladies and gentlemen, let's go ahead -- give me one

24   second to let my jurors exit.  Go ahead and leave your note

25   pads.  If you need to use the restroom real quick, we're going

1    to clear the stand and get our next witnesses ready to go.

2    This will only be about five minutes.

3         THE COURT SECURITY OFFICER:  All rise.

4         (Jury exits at 2:54 p.m.)

5         THE COURT:  All right.  We can go ahead and excuse the

6    witness.  Thank you very much, Mr. Ramamurthy.

7         (Back on the record at 3:06 p.m.)

8         THE COURT:  Okay.  Do we have Dr. Slomovitz ready, I

9    presume?  Is that you, sir?  Give me one second.  We'll get you

10   up to swear you in.  Let's get our jury, please.

11        (Jury enters at 3:07 p.m.)

12        THE COURT:  Please be seated, everyone.

13        Okay.  Turning back to the government, government's

14   next witness, please.

15        MS. GURSKIS:  Thank you, Your Honor.  The United States

16   calls Dr. Brian Slomovitz.

17        THE COURT:  All right.  Come on up, Doctor, and we're

18   going to swear you in.

19        THE COURTROOM DEPUTY:  Please raise your right hand.

20        (Government witness, BRIAN SLOMOVITZ, MD, duly sworn.)

21        THE COURTROOM DEPUTY:  Please be seated.  Speak into

22   the microphone and say and spell your name for the record.

23        THE WITNESS:  Hi.  My name is Brian Slomovitz.

24   B-r-i-a-n, S, as in Sam, l-o-m-o, V as in Victor, i-t-z.

25                         DIRECT EXAMINATION

1    BY MS. GURSKIS:

2    Q.   Good afternoon, Doctor.

3    A.   Hi.

4    Q.   Where do you currently work?

5    A.   At Mount Sinai Medical Center here in Miami Beach.

6    Q.   And what do you do at Mount Sinai Medical Center?

7    A.   I'm the director of gynecologic oncology.

8    Q.   So I assume you went to medical school.

9    A.   Yes.

10   Q.   And where did you go to medical school?

11   A.   New Jersey Medical School, which was UMDNJ, now it's

12   Rutgers.

13   Q.   And after medical school, did you complete any residencies

14   or fellowships?

15   A.   Yes.  I did a residency in obstetrics and gynecology at New

16   York Presbyterian Hospital (Cornell), and then I went on to do

17   a fellowship in gynecologic oncology at the University of Texas

18   MD Anderson Cancer Center.

19   Q.   And how long have you been at Mount Sinai?

20   A.   I've been at Mount Sinai for about a year and a half, a

21   little more.

22   Q.   What position did you hold prior to moving to Mount Sinai?

23   A.   For the year prior to Mount Sinai, I was a gynecologic

24   oncologist at Broward General.  Prior to that, I was the

25   division director of gynecologic oncology at the University of

1    Miami, Sylvester.

2    Q.   Do you also hold some teaching positions?

3    A.   Yeah.  I was a professor of obstetrics and gynecology, and

4    I had a dual appointment as a professor in genetics.

5    Q.   Are you familiar with cancer genetic testing?

6    A.   Yes, I am.

7    Q.   Do you use cancer genetic testing with your oncology

8    patients?

9    A.   In select patients, yes, I do.

10   Q.   In select patients?

11   A.   Yes.

12   Q.   When do you order a test in those select circumstances?

13   A.   So when we talk about cancer genetic testing, there's

14   heredity testing where we test someone to see if they're

15   increased risk for predisposition of cancer, and we also do

16   what we call tissue testing to see if the tumor itself has any

17   targetable mutations that can help with therapeutic approaches.

18        In patients that have a strong family history, were to fit

19   into certain clinical criteria, then what I would do is

20   heredity testing to see if they have a predisposition and also

21   families, to help prevent cancer.

22        In those patients that have a high-risk cancer, one that's

23   advanced stage or a high risk for occurrence, then I would go

24   ahead and order what we call next-generation sequencing with

25   somatic testing where we're looking for a targetable mutation,

1   meaning if there's any of the drugs out there that we can use

2   to help treat it.

3   Q.   So are the tests used to guide your treatment of the

4   patient?

5   A.   In those high-risk patients, to help guide the treatment or

6   to come up with treatment options if they fail their current

7   treatment, yes.

8   Q.   And when you're deciding to order a test for a patient,

9   what is the patient's general reaction when you're explaining

10   that this is something that, you know, they might need?

11   A.   Well, so we always explain -- the patient's really the

12   captain of the ship, and it's our job to help guide the

13   patients and better educate them.

14       When we're talking about doing tissue testing, we talk

15   about the fact that it is high risk for reoccurrence, and it

16   can come back, and when and if it does come back, we want to

17   have all the tools possible to come up with the next best

18   treatment options.

19   Q.   Do patients ever have any kind of emotional reaction when

20   they're waiting for the test results?

21   A.   Yeah, a lot of times they are anxious.  A lot of women who

22   have -- I treat women.  So a lot of women who have recurrent

23   disease, they want to make sure that there's more options for

24   them.  So on the counter side, some of our patients say, Doc,

25   whatever you want to do.  Just help me beat this.  So there's a

1    little less explaining to do.

2        But there is a process of letting the patients know what

3    we're doing.

4    Q.   And how -- once you run the tests, how do you provide the

5    results to your patient?

6    A.   There's -- for hereditary testing, it's actually -- the

7    companies that we use -- it's nice -- they have a pamphlet and

8    information for the test patients, particularly for the

9    negative testing.  Those patients who have positive testing, we

10   bring them in for face-to-face counseling, either myself or I

11   refer them to a genetics counselor or a genetics specialist.

12       For somatic testing, we will talk to them about the

13   treatment options if there were, in fact, any targetable

14   mutations that were identified and then talk about those, or if

15   not, we tell them that we're going to continue with the

16   standard of care.

17   Q.   How important is that discussion that you have with the

18   patient about the test results?

19   A.   I think it's more important when there's a positive test

20   that will change things.  When there's a negative test, it's

21   still important to inform the patient, but it's not as -- it's

22   not as long of a conversation just because we're basically

23   saying there's nothing -- additional information we learned

24   from that testing.

25       I just want to be clear, in the hereditary testing, if

1    it's, in fact, positive, it's not only testing the patient but

2    encouraging the patient's relative who may be at risk to either

3    come see myself or one of the specialists to get the

4    appropriate care.

5    Q.   You mentioned that one of your prior positions was at the

6    University of Miami?

7    A.   Yes.

8    Q.   While you were at the University of Miami, did you treat a

9    patient named V.H.?

10   A.   Yes.

11   Q.   Did Ms. H. have cancer?

12   A.   Yes.

13   Q.   Do you recall what type of cancer she had?

14   A.   She had endometrial cancer -- a Grade 1 endometrial cancer,

15   and clinically, she would be Stage 1.

16   Q.   What is Grade 1 endometrial cancer?

17   A.   So when we talk about cancers, we look at the -- it's the

18   way to describe a cell and the way it looks under a microscope.

19   There's precancers, which are -- it's a progression.  Precancer

20   is sort of like a higher predisposition to becoming a cancer.

21       The first step after precancer is the cancer.  It starts as

22   Grade 1.  So it's the earliest type of cell we can see or a

23   relatively low-risk grade for endometrial cancer.

24   Q.   And you said Stage 1.  What is that?

25   A.   So when we stage endometrial cancers, typically we stage

1    them in what we call surgical pathologically where we do a

2    hysterectomy or remove the uterus and look at it under a

3    microscope, and then we determine based on depth of invasion

4    into the muscle, lymph node status, different pathological

5    factors, what stage they would be.

6        Now, Ms. H. had multiple medical comorbidities.  She had a

7    prior transplant.  She was obese.  She had health problems that

8    didn't make her a good candidate for surgery, and those women

9    who are not candidates for surgery, we go away from the

10   surgical pathologic staging and we do clinical staging based on

11   the size of the uterus, the imaging reports, and the grading as

12   well.

13       So because we never did a hysterectomy on Ms. H., she would

14   be considered Clinical Stage 1.

15   Q.   Thank you.

16       MS. GURSKIS:  Your Honor, at this time, the government

17   would like to move in Government's Exhibit 478-A, B, and C.

18       THE COURT:  Any objection?

19       MR. RAFFERTY:  No objection, Your Honor.

20       THE COURT:  Thank you.  Those will be admitted at this

21   time.

22       (Government Exhibits 478-A, B and C were received in

23       evidence.)

24       MS. GURSKIS:  Thank you, Your Honor.  Do I have

25   permission to publish?

 1            THE COURT:  You do.

 2    BY MS. GURSKIS:

 3    Q.   What is this document, Dr. Slomovitz?

 4    A.   This document is a copy of a medical record from an

 5    interaction that I had with Ms. H., a follow-up visit.

 6            MS. GURSKIS:  And if you could turn to the second page,

 7    Ms. Puntillo.

 8    BY MS. GURSKIS:

 9    Q.   Are you able to see that on the screen, Dr. Slomovitz?

10    A.   Yes.

11    Q.   Did you order a genetic test for Ms. H.?

12    A.   I did not.

13    Q.   Is there anything on this particular page of the medical

14    record that guided or reflects the support for your decision

15    about why you didn't order one for her?

16    A.   So Grade 1 tumors are relatively low risk, and she did not

17    have a strong family history, and she also had obesity.  The

18    guidelines do not recommend germline genetic testing for the

19    patient because of the low family history, and there's more

20    likely nonhereditary reasons for getting the cancer.

21            And in a similar fashion, given it's a low-risk disease,

22    there would be no need for tissue testing because the

23    likelihood that she would need additional therapeutic --

24    targetable therapeutic therapy was very, very, very, very low.

25    These cancers rarely reoccur.

1  Q.  So it was not medically necessary for Ms. H. in this

2  particular circumstance?

3  A.  That's correct.

4  Q.  And were you aware of her ever getting a genetic test from

5  anybody else?

6  A.  I was not.

7  Q.  Did she ever provide you the results of a genetic test that

8  she received?

9  A.  Not that I'm aware of.  Not that I -- no.

10  Q.  So there were no genetic test results that were ever used

11  in her care?

12  A.  That's correct.

13       MS. GURSKIS:  One moment, Your Honor.

14       THE COURT:  Sure.

15  BY MS. GURSKIS:

16  Q.  So if you didn't give her a genetic test, how did you

17  decide to treat her -- what the appropriate course of treatment

18  was for Ms. H.?

19  A.  So Grade 1 tumors typically are driven by estrogen,

20  hormonal therapies -- or are hormonal-driven.  So in order to

21  counteract the estrogen-driven process, we treat with

22  progesterone, which helps to balance out the endometrium to

23  prevent it from growing.

24       The method of choice that we chose for her was what we call

25  a progestin-containing IUD or intrauterine device.  Most people

1    when they hear intrauterine device, they think of birth

2    control, but we actually use it as a therapeutic approach with

3    women with endometrial cancer who we want to give a localized

4    approach to balance out the estrogen with a progestin-secreting

5    IUD, or intrauterine device.

6    Q.   And was that treatment successful for Ms. H.?

7    A.   So at the last follow-up, there's no evidence of disease

8    that I last saw her, and this last note was from several years

9    after she was diagnosed.

10            MS. GURSKIS:  No further questions.  Thank you.

11            THE COURT:  Thank you.  Cross-examination.

12            MR. RAFFERTY:  Thank you, Your Honor.

13                      CROSS-EXAMINATION

14   BY MR. RAFFERTY:

15   Q.   Good afternoon, Dr. Slomovitz.

16   A.   Hi.

17   Q.   My name is Brian Rafferty, and I'm one of the attorneys

18   that represents Minal Patel.  I just have some questions for

19   you.

20            Starting with the process by which you order laboratory

21   tests.  In addition to the occasional time where you might

22   order a CGx test, do you order other tests in your practice?

23   A.   Can you -- what do you mean by "CGx"?

24   Q.   Cancer genetic testing.

25   A.   Okay.  So --

1   Q.   Other than cancer genetic testing, do you order other kind

2   of blood tests?

3   A.   Yes.

4   Q.   Do you occasionally order urine tests?

5   A.   Yes.

6   Q.   And when you order those tests, do you fill out some sort

7   of form?

8   A.   Actually, for a urine test, it's all computerized now.  So

9   through the electronic medical record we order it, and we would

10  sign off on it.

11  Q.   And when you say it's computerized, is there, like, an

12  electronic signature of some kind?

13  A.   That's correct.

14  Q.   So when you order a test an electronic signature might

15  appear on some form; is that right?

16  A.   So the typical urine test and the standard test that we do

17  are run within the hospital labs.  So when I say I sign a form

18  electronically, it's based on the hospital's electronic medical

19  record, which both at University of Miami and where I am now is

20  what's called Epic, which is one of the more common.  So I'm

21  not signing a form from a company.  I'm signing the in-hospital

22  electronic medical record.

23  Q.   Understood.

24       From time to time, have you ever ordered tests that have

25  been sent to outside laboratories?

1  A.  Including cancer genetic tests?

2  Q.  No.  I'm talking about any kind of test, blood test, urine

3  test or some other kind of test.

4  A.  No.  So if it happens to be a test that's not run by our

5  lab, the -- our lab will send the test out.  So when I order it

6  through my Mount Sinai lab, I'm ordering it, signing it within

7  the Mount Sinai medical record, and then the lab will send it

8  out.

9  Q.  So if the lab can't do it within the hospital, it might

10  send it to an outside lab?

11  A.  That is correct.

12  Q.  Have you ever had an instance when a lab called you to

13  challenge a test that you ordered?

14  A.  Can you define "challenge"?

15  Q.  Questioning the medical necessity of a test that you

16  ordered.

17  A.  I'm thinking back 16 years.  I don't think challenged.

18  They may have told me that there's a newer, better test.  I

19  have would hear about it and either agree or not agree.  But

20  not to say no, that test shouldn't be ordered.

21  Q.  So you've never had an instance where a lab said,

22  Dr. Slomovitz, I don't think that test is medically necessary,

23  have you?

24  A.  Not that I'm -- not that I could recall.

25  Q.  Now, with respect to the tests that you have ordered, it's

1    your job, as the doctor, to make the determination that the

2    test you're ordering is medically necessary, right?

3    A.   That is correct.

4    Q.   And it's your job to use those tests, as the doctor, to

5    treat your patient, right?

6    A.   That's correct.

7    Q.   It is not the lab's job to use the tests you ordered to

8    treat your patients?

9    A.   That's correct.

10   Q.   With respect to the cancer genetic testing, you said you've

11   ordered that from time to time in your career, right?

12   A.   Several times, correct.

13   Q.   And once you've gotten the results of those kinds of tests,

14   you indicate that it was either you or an outside counseling

15   service that might provide genetic counseling; is that right?

16   A.   No.  So the service that I use provides a pamphlet that I

17   will give to the patient.  But they, in fact, do not contact

18   the patient directly, nor have a genetic service representative

19   contact the patient.  I direct the care.

20   Q.   That's what I'm getting at.  It's not the lab's job to

21   provide the genetic counseling if you order one of these tests,

22   right?  It's your job.

23   A.   Correct, or my delegate.

24   Q.   Exactly.

25        MR. RAFFERTY:  Your Honor, at this time I know the

1    government's offered in 478-A, B, and C.  The government has on

2    its exhibit list 478, which is the entirety of the medical

3    records, and I would offer those into evidence at this time.

4         MS. GURSKIS:  No objection, Your Honor.

5         THE COURT:  We can go ahead and admit those.

6         (Government Exhibit 478 was received in evidence.)

7    BY MR. RAFFERTY:

8    Q.  This is page 1 of a full set of records from the University

9    of Miami Hospital and clinics.

10        Do you see that, doctor?

11   A.  My screen just went out.

12        MR. RAFFERTY:  It went off again.

13   BY MR. RAFFERTY:

14   Q.  You see that?

15   A.  Yes, sir.

16   Q.  Okay.

17        MR. RAFFERTY:  Can we bring up page 460 of this

18   document?

19        If I can approach the screen, Your Honor?

20        THE COURT:  You may.

21        MR. RAFFERTY:  Thank you.

22        And if you could highlight, P.J., the top part of this

23   document, the top half?

24   BY MR. RAFFERTY:

25   Q.  And this document here, Dr. Slomovitz, says here under

1    indications, endometrial cancer.

2          Do you see that?

3    A.   Yes, sir.

4    Q.   And that means that she has a personal history of cancer;

5    is that right?

6    A.   Yes, sir.

7    Q.   Okay.

8          MR. RAFFERTY:  If we can go to page 478, and if we can

9    highlight the bottom half of this page.

10   BY MR. RAFFERTY:

11   Q.   And you may have been asked about this, but this is another

12   page where it also indicates that she has a personal history of

13   endometrial cancer.

14   A.   Yes.

15   Q.   Is there another word for endometrial cancer?

16   A.   Well, there's several words, starting with uterine cancer.

17   Q.   So that's also called uterine cancer?

18   A.   The most common type of uterine cancer is endometrial

19   cancer.  Endometrium is the inner lining of the uterus.

20   Q.   So a more general way of describing that is to call it

21   uterine cancer?

22   A.   Correct.

23   Q.   Sorry if I'm asking you silly questions.

24   A.   No, sir.

25         MR. RAFFERTY:  If we can bring up page 322 of this

1    document?  If we can just highlight the top part of this

2    document, this page for me, PJ?  I'm sorry.  I meant the

3    questionnaire part.  This is medical history questionnaire.

4    BY MR. RAFFERTY:

5    Q.   Doctor, you're familiar with this kind of questionnaire,

6    where folks answer questions?

7    A.   This type of questionnaire, yes.

8    Q.   Okay.  And you see the signature there at the bottom that

9    appears to be the signature of Ms. H.

10        Do you see that?

11   A.   Yes, sir.

12   Q.   Do you see the --

13            MR. RAFFERTY:  If we could highlight the second

14   question from the bottom where it says, Is there a history of

15   breast cancer in your family?

16            THE WITNESS:  Yes, sir.

17   BY MR. RAFFERTY:

18   Q.   It says that she has a history of breast cancer and that

19   her mother had breast cancer, right?

20   A.   Yes, sir.

21            MR. RAFFERTY:  If we can bring up page 790.  And if we

22   can highlight under Family History.

23   BY MR. RAFFERTY:

24   Q.   So the prior page said that she had a history of breast

25   cancer with her mother, right?

1    A.   Self-reported, yes, sir.

2    Q.   Yes.

3         And this page says that she also has some cancer history

4    with her maternal grandmother too.

5         Do you see that?

6    A.   Yes, sir.

7              MR. RAFFERTY:   If we can go to page 488.

8    BY MR. RAFFERTY:

9    Q.   I just wanted to ask you this practically speaking.

10             MR. RAFFERTY:   If we can highlight the middle of this

11   page.

12   BY MR. RAFFERTY:

13   Q.   And this is at the end of one of your interactions with

14   Ms. H.  It says, I, Amy Saliba, am serving as a scribe to

15   document services personally performed by you, right, Doctor?

16   A.   Yes, sir.

17   Q.   So part of what you have at the hospital at this point in

18   time was somebody who could sign for you.

19   A.   No, no.

20   Q.   No?

21   A.   If you notice, below that it's my attestation.  So she

22   signed for herself that she was a scribe, but I signed the

23   note.

24             MR. RAFFERTY:   Okay.  Could we scroll down to show

25   that, the bottom half of the page there?  Where it says --

1   BY MR. RAFFERTY:

2   Q.   You're talking about where it says electronically signed,

3   right?

4   A.   Yes, sir.

5   Q.   Okay.  With respect to when you order tests, you can order

6   tests -- can you call them in?

7   A.   Depending on the test.  But for the most -- it's possible

8   to do a verbal order to a nurse.

9   Q.   A verbal order to a nurse.

10      So from time to time a nurse could order for you as well?

11  A.   Within the hospital.  When I'm ordering genetic tests on

12  the outside, like I do for hereditary testing, I have to sign

13  it myself.

14  Q.   Okay.  Now, throughout that exhibit there's a number of

15  different doctors that are referenced in there.  I'm just going

16  to ask you if you know any of these folks.

17      Dr. Saltzman, do you know him?

18  A.   No.

19  Q.   Do you know Dr. Livingston?

20  A.   In what -- I know some Dr. Livingston, but you have to be

21  specific.

22  Q.   They were all employed there at that same hospital, at

23  University of Miami.  That's all I could really tell you, sir.

24  A.   There is a couple of thousand people there, sir.  But I

25  know there was one who was a former chair of surgery.

1   Livingstone would be his name.

2   Q.   Okay.  With respect to your practice as a -- as an

3   oncologist, from time to time, are you familiar with patients

4   seeking a second opinion?

5   A.   Yes, sir.

6   Q.   That's not uncommon in the area of oncology, is it?

7   A.   I actually encourage it sometimes.

8   Q.   So you might offer some advice about what course of

9   treatment or how to proceed to a patient, and you might

10   encourage them to go to somebody else, to see what they think;

11   is that right?

12   A.   Typically in my practice, they come to me for a second or

13   third opinion, but, yes.

14   Q.   So there are instances where somebody else has suggested to

15   them a course of treatment, a test to take, and they go to

16   somebody else, like you, if that's the right course of

17   treatment for them?

18   A.   Right means -- there's either right or wrong.  It could be

19   another opinion.

20   Q.   Exactly.  That's my point, sir.  You might offer an opinion

21   about how to proceed, and another doctor might offer a

22   different opinion about how to proceed, right?

23   A.   Correct.

24   Q.   And just because they offer a different opinion, that

25   doesn't mean you're wrong, right?  It's just a different

1  opinion.

2  A.  Correct.

3  Q.  And the other doctor's opinion, which you might disagree

4  with, isn't necessarily wrong either.  Right?

5  A.  Well, it depends, because sometimes they may state an

6  opinion may be the current guidelines are this, and they may be

7  wrong.  They might not know what the guidelines are.

8  Q.  Okay.  So in those instances they may be wrong.

9  A.  Correct.  So, right.  So has an opinion ever been wrong?

10  The answer is yes.

11  Q.  Yes.

12      And doctors have different opinions about how to best

13  proceed, though, sometimes in treating their patients, right?

14  A.  Correct.

15  Q.  And I might think, as a doctor, that I think the patient

16  should be treated this way.  You, as a doctor, might think the

17  patient should be treated that way.  Of course I'm not a

18  doctor.  I'm just giving you an example.

19      Do you get what I'm saying?

20  A.  I understand what you're saying.

21  Q.  And just because you and I might disagree on how to treat a

22  patient, that doesn't mean that I'm wrong, does it?

23  A.  Correct.

24          MR. RAFFERTY:  If I can have a moment, Your Honor?

25          THE COURT:  You may.

1   BY MR. RAFFERTY:

2   Q.   Thank you, doctor.  I appreciate your time.

3        MR. RAFFERTY:  I have no further questions, Your Honor.

4        THE COURT:  Thank you.

5        Redirect?

6        MS. GURSKIS:  Thank you, Your Honor.

7                        REDIRECT EXAMINATION

8   BY MS. GURSKIS:

9   Q.   Dr. Slomovitz, Mr. Rafferty asked you some questions about

10  whether a lab ever challenged a test that you had ordered.

11       Do you recall that?

12  A.   I recall the question, yes.

13  Q.   And is that because you order cancer genetic testing when

14  it is he medically necessary?

15  A.   Yes.

16  Q.   How often do you order hereditary cancer genetic testing in

17  your practice?

18  A.   Well, I order them -- I order them often.  Again, depending

19  on the family history and depending on the risk of recurrence

20  and the aggressiveness of the cancer.

21  Q.   How many patients do you typically see a week?

22  A.   Oh, gosh.  It depends on the week.  But when I was at the

23  University of Miami, I saw about 90 a week.

24  Q.   90 a week?

25  A.   Now I'm seeing about 40 a week, 40, 50.

1   Q.   Percentage-wise, in that 40 or 90 group, how many of those

2   are you ordering hereditary cancer genetic tests for?

3   A.   So per week I may be doing one or two, because we do it

4   only once.  So a lot of patients are revisits and follow-ups.

5   So even though I have a high volume, a lot of the patients are

6   following up with me for a long period of time and we only do

7   the testing one time.

8   Q.   What portion of your overall patient body would you say you

9   order it for?  That may have been a better question.

10  A.   20 to 30 percent.

11  Q.   20 to 30 percent?

12  A.   Yes, ma'am.

13  Q.   Have you ever accepted money from a lab in exchange for

14  referring a lab test to that lab?

15  A.   Never.

16  Q.   Mr. Rafferty also showed you a questionnaire that was

17  filled out by Ms. H.

18       Do you recall that?

19  A.   Yes.

20  Q.   What else, besides that questionnaire, do you use in coming

21  up with a treatment plan for a cancer patient?

22  A.   That questionnaire had nothing to do with my practice.

23  That questionnaire was prior to a transvaginal ultrasound that

24  was being done.  And I never saw that -- I don't remember

25  seeing it, but I looked quickly at the order.

1    That was prior to a transvaginal ultrasound being done,

2    which is not done by an oncologic specialist.  It's done by a

3    radiologist.  If I read the date correctly, it was in 2020,

4    which is long after I saw the patient.  Usually we were testing

5    a lot earlier.

6        So I don't really rely on that because it's not done by

7    someone who appropriately is trained to do cancer genetics.

8    For example, when it said family history, it said mother.  That

9    may have meant the maternal side of the family.  And also,

10   we're talking about breast cancer history, it's extremely

11   important to determine whether it was premenopausal breast

12   cancer or younger women or postmenopausal breast cancer.

13       Breast cancer is very, very, very common, and we don't --

14   even with a family history of postmenopausal breast cancer, we

15   don't very often order cancer genetic testing because it's that

16   common.

17   Q.  So in terms of the pre- and postmenopausal breast cancer

18   and the decision to order the test, am I understanding you

19   correctly when you say you order it more frequently for a

20   premenopausal history of breast cancer or personal history of

21   cancer?

22   A.  When we look at the guidelines for who we're going to order

23   tests for, it's more likely testing for premenopausal breast

24   cancer.

25       The other thing I want to add, which isn't well known, the

1    genetic testing or the hereditary testing we do for endometrial

2    cancer is used to identify one of -- the disease associated

3    with the predisposition, and that's something called Lynch

4    syndrome or HNPCC.  Lynch syndrome or HNPCC does not, in fact,

5    increase the risk of breast cancer.

6         So when we consider breast cancer as a family history to do

7    genetic testing, that's linked with ovarian cancer, where we do

8    the BRCA1 and BRCA2 testing.  Those being the most common.  But

9    when I'm considering doing testing for my endometrial cancer

10   patients, significant family history is pancreatic, colorectal,

11   and endometrial cancer.  Prostate cancer as well.

12   Q.  And I think you said the questionnaire wasn't something

13   that was really involved at all in your treatment of Ms. H.

14        In your practice, how -- how important is that interaction

15   with the patient?

16        And let me ask the first question:  How important is the

17   interaction with the patient in developing the plan of care?

18   A.  Extremely critical to discuss with a patient.  More

19   importantly, discussion of the protein positives.  So if they

20   bring up something, it requires a second and third level of

21   questioning to determine how -- the risk associated with that.

22   Q.  And how important is it to have something beyond that

23   little questionnaire piece of paper when making decisions --

24   medical decisions for people who have had or are currently

25   suffering from cancer?

1    A.   Typically, my practice, we actually verify the information

2    four times.  The patient questionnaire, the nursing intake, and

3    then I'm fortunate to have a nurse practitioner and residents

4    working with me in my clinic.  So on their intake, they would

5    verify that.  And then, finally, my time of interview and

6    interaction.

7         So, again, the pertinent negatives, we go through quickly,

8    but the pertinent positives requires, and we do a higher level

9    of questioning.

10   Q.   Okay.  So based on those kind of four buckets of

11   information that you were talking about, you made a decision

12   for a course of treatment for Ms. H.?

13   A.   That's correct.

14   Q.   That did not include a hereditary cancer genetic test?

15   A.   That's correct.

16   Q.   And why didn't you order that test for her?

17   A.   Her personal history and her family history didn't raise

18   any red flags or didn't -- you know, the guidelines that we

19   followed wouldn't have been part of the guidelines to do the

20   testing.

21        And secondly, her good prognosis from endometrial cancer

22   didn't raise any -- any indications to do further testing to

23   identify a target, if she needs further therapy.  The

24   likelihood she would need more therapy is very, very, very low.

25        MS. GURSKIS:  No further questions.  Thank you.

1          THE COURT:  Thank you.

2          Thank you, Doctor.  You're excused.  Thank you for your

3     time.

4          Government's next witness?

5          MS. GURSKIS:  The government calls W.H.

6          THE COURT:  Come on up, ma'am.  Make your way up to the

7     witness stand, and we'll swear you in.  It's right over here.

8     Thank you.

9          (Government witness, W.H., duly sworn.)

10          THE COURTROOM DEPUTY:  Please be seated and speak into

11    the microphone.  Say and spell your name for the record.

12          THE WITNESS:  My name is W., W-x-x-x-x.  H., H-x,

13    double x, x-x.

14                         DIRECT EXAMINATION

15    BY MS. GURSKIS:

16    Q.  Good afternoon, ma'am.

17    A.  Good afternoon.

18    Q.  Where do you currently reside?

19    A.  I live in Delray Beach.  Do you want the exact street and

20    address?

21    Q.  No.  Delray Beach is fine.  Thank you.

22          What do you do for a living?

23    A.  I currently am actually training service dogs for people

24    who need them for their disabilities.

25    Q.  And prior to training service dogs, what did you do for a

1   living?

2   A.   I was in the medical field, in psychology and psychiatry.

3   Q.   What is your educational background?

4   A.   I have two bachelor's degrees.  One is Bachelor of Arts;

5   one of Bachelor of Science.  I have a master's degree in MFS

6   and also MFA.  I have two Ph.D.'s and the M.D.

7   Q.   And, Dr. H., have you ever had cancer?

8   A.   Yes.  I was diagnosed with pancreatic cancer in August

9   of 2006.

10   Q.   Have you heard of something called a cancer genetic test or

11   a CGx test?

12   A.   Yes.

13   Q.   How did you first learn about a cancer genetic test?

14   A.   I got a call -- it's either late 2018 or 2019.  I had been

15   qualified, because of back injuries, to become disabled

16   officially, legally.  And as a result, I was given Medicare.

17   And very out of the blue, I get a call from a gentleman who

18   says, are you W.H.?  Are you living at such and such address?

19   You qualify for a genetic test to see if you have any

20   predisposition to cancer.

21       I said, what would this cost?  And he said, well, it's

22   worth $10,000.  I said, wait a minute.  I have can't afford

23   that.  I'm on disability.

24   Q.   No, no, no.  Medicare pays for everything.

25   A.   I said, but there would be a co-pay, right?  And he said,

1    no, it's completely free to you.  I said, okay.  I understand

2    how genetic testing is done, and I went through it with him,

3    swabbing cheeks, and putting it in a sterile envelope.  He

4    said, I'll send you the kit.  Just follow the directions and

5    mail it back in the inside envelope.

6        Okay.  And in a couple of weeks, in the postbox, there it

7    was in a bubble pack -- tan bubble pack.  And I opened it.  I

8    followed the directions.  I swabbed.  I was careful.  And I

9    sent it back.  And then there was a while.  I didn't hear

10   anything.

11   Q.  And in the period where you didn't hear anything, did you

12   do any kind of follow-up to inquire about the results?

13   A.  I called the number that had been the number on my caller

14   ID and left a message.  Shortly thereafter -- so it was roughly

15   a month later, I got a call back from a doctor -- a man who

16   said he was a doctor.  I can't say that I know that he was.

17   And he said my name is Dr. So and so, and I'm calling because

18   you wanted to know the results.

19       There were 14 tests done.  And he went through the

20   different systems of testing and what kinds of cancer I was

21   tested for in terms of DNA.  And the bottom line was, I have

22   great news here, there were absolutely -- none of the tests

23   showed you had any predisposition, as far as DNA, to having

24   cancer.  And I was a little stunned, because I hadn't mentioned

25   2006 or anything.

1      And I said, well, that's good news.  I have a question.  I
2  was diagnosed with pancreatic cancer, Stage 3 and a half to 4,
3  in -- well, August of 2006; had surgery in September and chemo.
4  I was given 6 to 12 months.  It's still in my blood and in my
5  lymph, and I can't understand why that would be.  I mean, it's
6  a miracle, in remission, but how come it didn't come up in the
7  test?  I don't get it.
8      And he said, well, can you tell me a little bit what was
9  going on in your life when you were diagnosed.  So I explained.
10         MR. RAFFERTY:  Can we just approach for a moment?
11         THE COURT:  Sidebar.
12      (The following proceedings were held sidebar:)
13         MR. RAFFERTY:  There's a whole lot of hearsay being
14  said here.  I'm trying to be as patient as I can, but I think
15  what she's talking about here is what the doctor's saying --
16  what she's saying, I mean --
17         MS. GURSKIS:  There might be exceptions too because she
18  is talking about it for the effect on her.
19         MR. RAFFERTY:  I feel it's objectionable, Your Honor,
20  and I think the government is eliciting it on purpose.
21         THE COURT:  I'll say this.  Most of the beginning part
22  is mostly for diagnostic, so that's why I was expecting you
23  weren't objecting --
24         MR. RAFFERTY:  Yes.
25         THE COURT:  -- which I'm fine with.  I mean, I think

1   some of this is getting a little closer to state of mind.  I'm

2   fine with it.  Continue on.

3          If you object, I'm going to give a curative that it's

4   not for the truth of the matter asserted.  I'm going to let her

5   ask it.  Go ahead and ask it.

6          (Proceedings returned to open court.)

7   BY MS. GURSKIS:

8   Q.  All right.  So you were mentioning you got the call from

9   somebody who said he was a doctor?

10  A.  Yes.

11  Q.  Were you provided any paper documentation relating to your

12  test results?

13  A.  No, I asked for it.  I gave my email.  I was told it would

14  be sent, but it never was.

15  Q.  Have you ever heard of a doctor named Huan Tsai?

16  A.  No.

17  Q.  Did you have a primary care doctor at the time that this

18  test was ordered for you?

19  A.  No, I did not.

20  Q.  Did you ever discuss or bring the results or the fact that

21  you had this test to any doctor who is otherwise treating you?

22  A.  No.

23  Q.  So were the test results ever used in your care?

24  A.  No.

25  Q.  Was this the only time that you received a telemarketing

1    call about a genetic test?

2    A.  No, it wasn't.

3    Q.  And moving back in time just a little bit, did you speak

4    with a doctor prior to the test being ordered?

5    A.  The person who first called me did not represent himself as

6    a doctor.  So I spoke to someone, supposedly from the lab doing

7    this.  Previously, with any other doctor that I've seen, who

8    was definitely a doctor who I met, no, I never discussed

9    genetic testing.  There was no reason, and I certainly couldn't

10   afford it, because I was dealing with the cancer, the prognosis

11   I got of 6 to 12 months.

12        My surgeon calling, et cetera, and saying, are you still

13   alive?  The fact that I had exceeded his prognosis.  What he

14   asked for was, can I have permission to produce articles?

15   Because this is a miraculous remission that doesn't make sense.

16   Q.  Well, let's just focus on -- sorry to cut you off, Dr. H.

17   So you didn't -- aside from that initial call from somebody who

18   you said you did not believe was a doctor --

19   A.  Correct.

20   Q.  -- did you receive any communication from somebody before

21   the test was ordered who is a doctor?

22   A.  No.

23   Q.  Did the person who spoke to you or anybody at all consult

24   with you about any potential risks in taking the test?

25   A.  No.

1    Q.   Did this test help you in any way?

2    A.   The first moments of this call back from the supposed

3    doctor telling me there was no cancer predisposition made me

4    feel a little positive about staying in a remission.  But it

5    was momentary when I did reveal that I had cancer, and I knew I

6    was in remission.  I was not cured.  It disappeared once I got

7    the explanation.

8    Q.   Okay.

9           MS. GURSKIS:  No further questions.  Thank you.

10          MR. RAFFERTY:  Cross-examination very briefly, Your

11   Honor.

12          THE COURT:  Sure.

13                        CROSS-EXAMINATION

14   BY MR. RAFFERTY:

15   Q.   Good afternoon, Ms. H.  My name is Brian Rafferty, and I'm

16   one of the attorneys who represents Minal Patel.  I just have a

17   few questions for you.

18   A.   Sure.

19   Q.   The person you spoke with on the phone, you don't know

20   where that person was, right?

21   A.   Well, the phone number was a Florida area code.  I assumed

22   that was right.

23   Q.   But you don't know if he was a doctor or what he was?

24   A.   Correct.

25   Q.   Okay.  With respect to the actual package that came to you

1    in the mail that you described, was there some paperwork with

2    it?

3    A.   Just instructions on how to swab and how to insert the two

4    swabs directly so they didn't get tainted.

5          MR. RAFFERTY:  If I can approach the witness, Your

6    Honor?

7          THE COURT:  Yes, you may.

8          MS. GURSKIS:  What's that exhibit, Mr. Rafferty?

9          MR. RAFFERTY:  Defendant's Exhibit D.

10          MS. GURSKIS:  I haven't seen that.  If I can look at it

11    for a moment.

12       (Discussion was held off the record.)

13          MS. GURSKIS:  No objection.

14          MR. RAFFERTY:  May I approach?

15          THE COURT:  You may approach.

16          MR. RAFFERTY:  Your Honor, if I can stay up here for a

17    moment.

18          THE COURT:  Yes, it's okay.  You can stay there, as

19    long as we have a microphone so we can hear.

20    BY MR. RAFFERTY:

21    Q.   Doctor, I'm handing you what's been marked as Defendant's

22    Exhibit D.

23       Do you recognize that at all?

24    A.   I recognize my signature and the date, but I don't

25    recognize anything on here other than that.  Can I look at

1    other pages?

2    Q.   Of course.  And as you're looking at it, if you can look at

3    the third page.  Take a look at the bottom right-hand corner.

4    A.   Yes, I see.

5    Q.   Is that your signature there?

6    A.   Not quite.  It's similar, but it's not my exact signature,

7    no.

8    Q.   If you can look at the fourth page.

9    A.   That's yet another version.

10   Q.   And how about the fifth page?

11   A.   Again, it doesn't look like my signature.  It's similar,

12   but not identical, no.

13   Q.   Okay.  But the first page -- how about the card in the

14   back?  I'm sorry.  Do you recognize that at all?

15   A.   No, that's not my handwriting.

16   Q.   Okay.  Now, after you got the test results -- I should say,

17   the test kit, you said you swabbed yourself; is that right?

18   A.   Right.

19   Q.   And then you sent it back in in a package?

20   A.   It was an inner-bubble package.  It was just big enough for

21   the two swabs and the envelope they go in.

22   Q.   Okay.  And did you take it to the post office?

23   A.   I just put it in the mailbox and put the flag up.  It had

24   postage already on it.

25   Q.   Okay.  And do you know where you sent it?

1    A.   I don't remember the address on it, I'm sorry.

2    Q.   Okay.

3         MR. RAFFERTY:   If I could have a moment, Your Honor?

4         THE COURT:  Sure.

5         MR. RAFFERTY:   I have no further questions, Your Honor.

6    Thank you.

7         MS. GURSKIS:  Very briefly, Your Honor.

8         THE COURT:  Sure.

9         MS. GURSKIS:   Your Honor, may I publish the exhibit on

10   the ELMO?

11        THE COURT:  You may.

12                    REDIRECT EXAMINATION

13   BY MS. GURSKIS:

14   Q.   Dr. H., do you recognize Huan Tsai's name on this form?

15   A.   I'm sorry.  No.

16   Q.   And do you see the box checked here, where it says, Predict

17   hereditary cancer risk assessment?

18   A.   Yes, I see it.

19   Q.   A lot of letters here.  Did anybody explain to you what any

20   of that meant?

21   A.   No.

22        MS. GURSKIS:  No further questions.  Thank you, Your

23   Honor.

24        MR. RAFFERTY:   Your Honor, brief redirect [sic]?

25        THE COURT:  Very brief.  It's recross.

1          MR. RAFFERTY:  Thank you.  Your Honor, I didn't

2     introduce this into evidence.  I'd introduce Defense Exhibit D

3     into evidence at this time.

4          THE COURT:  Any objection to Defense Exhibit D?

5          MS. GURSKIS:  No, Your Honor.

6          THE COURT:  All right.  That'll be admitted at this

7     time.

8          Brief recross, please.

9       (Defense Exhibit D was received in evidence.)

10                    RECROSS-EXAMINATION

11    BY MR. RAFFERTY:

12    Q.  Ms. H., that's your signature on the document?

13    A.  Yeah, it looks like my signature.

14    Q.  And this is what you indicate is not your signature,

15    correct?

16    A.  No.  That's a sloppy copy of my signature.  It's not my

17    handwriting.

18    Q.  Same here?

19    A.  Yes.

20    Q.  Same here; is that right?

21    A.  Correct.

22    Q.  Okay.

23          MR. RAFFERTY:  That's all I have, Your Honor.

24          THE COURT:  Thank you.

25          Any need for any redirect, Ms. Gurskis?

```
 1              MS. GURSKIS:  No, thank you, Your Honor.

 2              THE COURT:  All right.  Thank you.

 3              Thank you so much.  You're excused.

 4              Government's next witness?

 5              MS. DE BOER:  Thank you, Your Honor.

 6              The government calls Stacey Adair.

 7              THE COURT:  All right.  Hi, ma'am.  Remain standing.

 8    We're going to swear you in.

 9              THE COURTROOM DEPUTY:  Please raise your right hand.

10              (Government witness, STACEY ADAIR, duly sworn.)

11              THE COURTROOM DEPUTY:  Please be seated.  Speak into

12    the microphone, say and spell your name for the record.

13              THE WITNESS:  My name is Stacey Adair, S-t-a-c-e-y,

14    A-d-a-i-r.

15              MS. DE BOER:  Your Honor, may I proceed?

16              THE COURT:  You may.

17              MS. DE BOER:  Thank you.

18                         DIRECT EXAMINATION

19    BY MS. DE BOER:

20    Q.  Good afternoon, Ms. Adair.

21    A.  Good afternoon.

22    Q.  What do you do for a living?

23    A.  I'm a sales enablement specialist for a medical device

24    company.

25              (Court reporter clarification.)
```

1   BY MS. DE BOER:

2   Q.   And, Ms. Adair, I think that microphone might move closer

3   to you.  It might make it a little easier.  That one doesn't

4   move, all right.  Go ahead and speak up if you can.  We would

5   appreciate it.

6   A.   Okay.

7   Q.   Where do you currently live?

8   A.   I live in Richmond, Texas.

9   Q.   And can you describe to the jury a little bit more about

10  what you do in your current job?

11  A.   Sure.

12       I help the sales team improve and grow.  I'm in the

13  cardiology division of the company, so it's up to us to have

14  projects to help them become more efficient and better at what

15  they do.

16  Q.   And what kind of medical devices does your company deal

17  with?

18  A.   They deal with quite a lot in urology, peripheral

19  interventions in urology, and where I am is cardiology, and we

20  specialize in minimally invasive products, things like stents,

21  pacemakers, stroke prevention; those type of products.

22  Q.   Did you ever work at LabSolutions?

23  A.   Yes.

24  Q.   Approximately what was the time period when you were

25  employed at the lab?

1    A.   It was sometime between -- I want to say July of 2016 to

2    June of 2017.

3    Q.   Okay.  And before you came over to LabSolutions, how did

4    you hear about that opening?

5    A.   I heard about it from my previous boss, my former boss from

6    a previous company.  We both worked at a different lab.  I

7    reported to him.  He was the president of sales.  So he reached

8    out to me because he was looking at taking on a similar role

9    for LabSolutions.

10        And he told me that they had discussed that they wanted to

11   do something similar to what we did at the lab we both worked

12   in before, which was really build and grow a sales team,

13   and bake more processes and all of the things we had done,

14   implement a lot of technology platforms, like customer

15   relationship management platforms, and things that help track

16   what the sales reps are doing.

17        So he reached out --

18   Q.   Let me just stop you there.  You mentioned, you were just

19   describing what you were doing before you went to LabSolutions?

20   A.   Yes.

21   Q.   What was the name of the company that you were working at?

22   A.   Castle Medical.

23   Q.   And what was your role at Castle?

24   A.   I was a national sales trainer.

25   Q.   What type of company was Castle?

1    A.   A clinical laboratory.

2    Q.   Do you remember what type of lab testing Castle specialized

3    in?

4    A.   We did a lot of toxicology, some routine blood work, some

5    pharmacogenetics.

6    Q.   And you mentioned your boss at Castle had been the one who

7    advised you of this potential opening at LabSolutions?

8    A.   Yes.

9    Q.   What was it that he told you about the opening that got you

10   interested?

11   A.   He told me that they were still at the beginning stages of

12   building a sales force, that they had maybe -- I can't recall

13   the number -- let's say five to ten W-2 sales employees and

14   that they wanted to grow the team similar to what we had done.

15        Because when we started at Castle Medical, it was also at

16   the beginning stages and there were just a handful of reps, and

17   we grew that to about 90 or so sales reps with about seven

18   regional vice presidents.

19        So my understanding is that we were looking to do something

20   similar.

21   Q.   Okay.  And so I take it you ultimately applied to

22   LabSolutions and landed the job?

23   A.   Yes.

24   Q.   What was the application process like?  What did you learn

25   about the lab through that process?

1    A.    Well, I guess it wasn't necessarily a traditional

2    application, where I filled out an application.  My former boss

3    just connected me to the people at the lab.  A gentleman named

4    Omar was the one that reached out to me and kind of went

5    through the interview process, and spoke to me on the phone.

6    And then when they decided to bring me onboard, they did fly me

7    out to the lab so that I could meet everybody.

8    Q.    And when you were meeting everybody, how was your potential

9    role presented to you?  What were you going to be doing at the

10   lab?

11   A.    Similar to what I just mentioned, that I would be kind of

12   training and help growing the existing sales team, and kind of

13   handle all of the things I used to do, which was train on what

14   the different lab tests were, how to fill out requisition

15   forms, how to bring on, you know, the clients with the right

16   forms, putting in place the platforms that we had used prior.

17        We used -- hc1 was our CRM, so we were potentially looking

18   at doing the same thing for LabSolutions, which is just a way

19   for the sales reps to log all their activities so we can see

20   what they do day in, day out, and make sure that everything is

21   going as we expect.

22        As well as a sales enablement platform which is basically

23   just a fancy way to say, like, the things that help them sell

24   out in the field.  So whether it's the documents that they need

25   to show physicians, things that help them differentiate the lab

1   from other labs.  So it was in that fashion.

2   Q.  And you said you flew out to the lab to meet everybody.

3       Who did you meet?

4   A.  I met Omar in person.  I met Minal.  I met Sonal and

5   Shelbi.  And I want to say the sales manager at that time was

6   Matt.

7   Q.  Okay.  When you were hired, did your former boss, did he

8   end up coming over with you to LabSolutions at that time?

9   A.  He did not.  So the arrangement was that he was still

10  working through -- I guess the contracts and things for his

11  end, but wanted me to go ahead and get started so I could at

12  least start learning the lab things, start putting some basic

13  training in place.

14      He did not come over, and then it kind of just kept getting

15  stretched out and stretched out, and then he eventually never

16  came over.

17  Q.  And let me stop you right there for a second.

18      So when you first started working at LabSolutions in 2016,

19  what was your understanding of how the sales force and

20  marketing for the lab worked?

21  A.  I understood that it was similar to what I knew at Castle,

22  which is, you know, full-time W-2 employees who would be given

23  a territory or a region that they would be covering, and that

24  they would call on physicians at medical facilities to kind of

25  find out what their pain points are, see where this lab would

1    be a better fit from the lab they are currently using, and kind

2    of just growing that so that the markets that were not covered

3    would get some sales coverage.

4    Q.   Okay.  And was it, in fact, W-2 employees within the lab

5    with different territories?

6    A.   No.  So -- yes and no.  It was, with that handful when I

7    came onboard, there was an existing sales team.  But then they

8    were eventually phased out, and they had moved to fully a

9    distributor model.

10   Q.   And for those of us that haven't worked in this industry,

11   what's a distributor model?

12   A.   Sure.

13        So a distributor is not a full-time W-2 employee.  They are

14   a 1099.  So they are independent salespeople, basically, or

15   marketers.  A lot of them will represent multiple lines and

16   products from different areas.  There's no -- there's no

17   constraints, I guess, so as a distributor they can be selling

18   four or five or six different products, and they just add the

19   service line to what they're currently already doing.

20   Q.   What was your reaction to the phasing out of the W-2 sales

21   reps and the transition to this distributor model?

22   A.   I wasn't -- it wasn't ideal.  I'm not a big fan of the

23   distributor model.  And, you know, my -- I don't have a lot of

24   expertise in the distributor model.  So it wasn't what I was

25   hoping for.

1    I would have much rather they had stayed with the W-2.

2    There's just some challenges with the distributor model because

3    you lose, you know, a lot of control over what you can expect

4    that they do.

5    Q.   And once the transition began to the distributor model, did

6    you participate in the development of some agreements and

7    trainings for the distributors?

8    A.   The trainings and compliance agreement, but not their --

9    not their employment agreements.

10   Q.   Okay.  Not their distributor agreement --

11   A.   Not their distributor agreement, exactly, but just clinical

12   training for them, process training, and compliance training,

13   and agreements.

14   Q.   Okay.

15        MS. DE BOER:  And at this time, Your Honor, the

16   government would move into evidence -- I believe without

17   objection -- Government Exhibit 1372, 1383, and 667-B.

18        THE COURT:  Any objection to those?

19        MR. SAMUEL:  No objection.

20        THE COURT:  All right.  We'll move those in at this

21   time.

22     (Government Exhibits 1372, 1383, and 667-B were received

23     in evidence.)

24        MS. DE BOER:  May I publish, Your Honor?

25        THE COURT:  You may.

```
 1              MS. DE BOER:  I'm now showing Government Exhibit 1372.

 2   BY MS. DE BOER:

 3   Q.   Ms. Adair, do you recognize this email?

 4   A.   Yes.

 5   Q.   To be clear, you and I have met before?

 6   A.   Yes.

 7   Q.   We've spoken several times?

 8   A.   Yes.

 9   Q.   And we've spoken about this email?

10   A.   Yes.

11   Q.   This is an email from you to Jonathan Hayes, Nick Saliba,

12   and Jon Berarducci in February of 2017?

13   A.   Yes.

14   Q.   Who was Jonathan Hayes?

15   A.   He was our HR personnel manager/director.  I'm not sure of

16   the title in HR.

17   Q.   And Nick Saliba?

18   A.   I don't know his official title either.  I don't recall,

19   but he was, like, the VP or president or director of sales.

20   Q.   Okay.  And Jon Berarducci?

21   A.   He was a sales manager.

22   Q.   And of the people that are on this email, I guess, who

23   ranked highest on the company?

24   A.   Nick.

25   Q.   And who did Nick report to, if anyone?
```

1   A.   Minal.

2   Q.   And this is titled a Compliance Agreement Outline.  And

3   this is an email that you sent.  And so we're not going to read

4   the whole thing, but do you see here -- the first sentence, you

5   say:  Here is a recap of the compliance agreement that we have

6   discussed.

7        Do you see that?

8   A.   Yes, yes.

9   Q.   And then you go on to outline some instructions, and then

10  you provide here an outline of what needs to be included in the

11  compliance agreement.

12       Do you see that?

13  A.   Yes.

14  Q.   And you have a few different sections, and you identify a

15  few laws that need to be addressed?

16  A.   Yes.

17  Q.   And then at the very bottom here, you have a bullet point

18  list of specific compliance rules.

19  A.   Yes.

20  Q.   We don't need to read every single one of them, but could

21  you describe to the folks of the jury what these rules

22  generally covered.

23  A.   Absolutely.  So one of the things that's really important

24  in any type of medical sales, that really falls under the

25  Anti-Kickback Statute, so a lot of this does pertain to that

1    where no one connected to the lab can pay a physician or their

2    staff or their relative any kind of -- anyone who's connected

3    to a physician cannot be paid as an enticement for sending

4    samples over to the lab.

5        So a lot of the things here are similar.  Like, not leasing

6    space in a physician office, is still related to that because

7    it can be an enticement where, you know, the doctor will make

8    money off of the lease, so it might entice him to send samples

9    to your lab.  So that's what most of this is -- most of that is

10   covering.

11   Q.   Okay.  And do you recall if there was an attorney involved

12   at all in the development of the compliance agreement?

13   A.   Yes.  I do not recall his name.  And he was the one who

14   helped draft this and also did the initial webinar training to

15   a group of distributors to cover all of this and do the

16   education on what these laws meant and why you had to make sure

17   to follow these rules.

18   Q.   Okay.  How much, if any, direct contact did you have with

19   this attorney?

20   A.   Not much direct contact, just during the -- just during the

21   setup of this webinar.

22   Q.   If you know, who managed the relationship between the lab

23   and the attorney?

24   A.   I believe it was Minal.

25   Q.   So I'm going to switch from Government Exhibit 1372, which

```
 1   was from February 20, 2017, and now I'm going to show you
 2   what's been admitted as Government Exhibit 1383.
 3        It's another email that you received, correct?
 4   A.   Yes.
 5   Q.   And it's seven days later, a week later, February 27th,
 6   right?
 7   A.   Mmm-hmm.  Yes.
 8   Q.   And it's also about the LabSolutions compliance agreement;
 9   is that correct?
10   A.   Yes, yes.
11   Q.   And Mr. Saliba is the one who sent this to you, and he
12   copied Sonal Jariwala, Jon Berarducci, Jonathan Hayes, and
13   Shelbi Davis; is that right?
14   A.   Yes.
15   Q.   So we've got two new names here.  Who is Sonal?
16   A.   Sonal is Minal's sister, and she was, I believe, in
17   operations.
18   Q.   Among the people that we've talked about so far, based on
19   your observations only, where did Sonal fit in the hierarchy at
20   the lab in relation to, say, Nick Saliba, Jon Berarducci?
21   A.   Oh, I would say, I guess she would be more equal to, like,
22   Nick Saliba.
23   Q.   And the other individual here that you -- I think you
24   mentioned a Shelbi at the beginning of your testimony.
25        Is this the same Shelbi?
```

1    A.   Yes.

2    Q.   What was Shelbi's role in the lab?

3    A.   She handled a lot of things on the lab end.  I apologize.

4    I don't recall her actual title, but she dealt with all the

5    day-to-day things going on in the lab, dealing with -- let's

6    say, if a distributor brought on a client, they would submit

7    the forms, and Shelbi would be the one to kind of get that

8    process starting.  So it was kind of -- she was, like, I guess,

9    the in-between between the distributors and the lab.

10   Q.   How did Shelbi's role differ from your role?

11   A.   So she was actually involved in what was going on in the

12   lab.  She was present in the lab.  She was officed out of the

13   lab, where I was remote and really just did more on education.

14   Q.   Okay.  And just to scroll down here, Nick is responding,

15   yes, excellent point on your email.  You're commenting on

16   information that's going to be conveyed at a compliance

17   webinar; is that correct?

18   A.   Yes.

19   Q.   I'm leading you a little bit to keep you moving, but do you

20   see the reference here to mandatory compliance training

21   webinar?

22   A.   Yes.

23   Q.   Is this an example of the webinars you had mentioned?

24   A.   Yes.

25   Q.   Can you give the jury a taste of what kind of happened at

1    these webinars?

2    A.   Sure.

3         So we started doing these webinars.  We actually

4    outsourced, like, some of the compliance presentation portion.

5    There was an expert in the lab space who would do these

6    presentations live, but because we had a need to do them so

7    often, we just requested that we purchase the services to

8    create the compliance training.

9         That went to the lawyer to be tweaked for us and make sure

10   that it looked right.  And if there was anything he wanted to

11   add.  And the first training, or it might have been even the

12   first two trainings, the lawyer held those webinars and hosted

13   the webinars, and it was just an education where there were

14   multiple sides that went through each of the different laws

15   that affect the medical space.  So the ones that were listed

16   earlier, the Anti-Kickback, the Stark laws, et cetera, went

17   through each of them and gave examples of where other companies

18   have gotten in trouble because of those laws.

19        And then, you know, time for question and answer

20   afterwards.  Once they went to the webinar, they agreed and

21   signed off that they did understand everything that was

22   presented to them.

23   Q.   And do you see here one of the things you suggested to add?

24   Let me see if we can zoom in a little.

25        Is there suggestions that you had on the compliance

1    agreement?

2    A.   Yes.

3    Q.   And do you see a suggestion here, can we add will not forge

4    signatures, and the second bullet is, influence test ordering

5    pattern that would lead to medically unnecessary tests?

6    A.   Yes.

7    Q.   What did you mean by that?

8    A.   With any log test, whether it goes to government or private

9    insurer, it has to have medical necessity, meaning you can't

10   just go in and have a doctor order a test because you feel like

11   you want to have that test done.  There's always some rules

12   about what is deemed medically necessary for different types of

13   tests.

14        So I just wanted to make sure we included language that was

15   really clear, that they could not influence a doctor on what

16   test.  The doctor is the only one that can decide what test to

17   order for their patient and cannot have any outside influence

18   from nonmedical people.

19   Q.   Now I'm going to show you what has been admitted as

20   Government Exhibit 667-B, and I'm going to start on the third

21   page of this exhibit which ends in Bates stamp 244.  I'll zoom

22   out a little for you.

23        Do you recognize these -- this distributor compliance

24   agreement?

25   A.   Yes.

1    Q.   Okay.  And this is the first page of one of these

2    agreements?

3    A.   Yes.

4    Q.   And this first page has some introductory language; is that

5    fair?

6    A.   Yes.

7    Q.   Regarding the lab's commitment to compliance; is that fair?

8    A.   Yes, yes.

9    Q.   And the purpose of the agreement?

10   A.   Yes.

11   Q.   Okay.  I'm going to turn to the next page of the document,

12   which outlines the False Claims Act, the Anti-Kickback Statute,

13   and the Stark Law?

14   A.   Yes.

15   Q.   Were those some of the same laws mentioned in your bullet

16   point list of what we need to develop?

17   A.   Yes.

18   Q.   Okay.  Then I'm going to turn to the last page here.

19        And do you see some of the same bullet points that you had

20   identified?

21   A.   Yes.

22   Q.   Including bullet point number three, Don't influence the

23   ordering patterns that would lead to medically unnecessary

24   tests?

25   A.   Yes.

1   Q.   And don't pay physicians or staff members or relatives for

2   samples?

3   A.   Yes.

4   Q.   Okay.  And this is a signed version by Rama Kumar from

5   Q Health Services; is that correct?

6   A.   Yes.

7   Q.   Did you participate in any of the webinars or any trainings

8   with distributors while you worked at LabSolutions?

9   A.   Yes.

10   Q.   What, if anything, was raised by distributors on those

11   webinars that gave you any concern that distributors might have

12   been influencing ordering patterns?

13   A.   Well, for the most part, like I mentioned before, our

14   webinars were really clinically based or process based, but we

15   do open up things for questions and answers and sometimes

16   distributors would ask questions that were specific to however

17   their distributor groups' arrangements were.

18        So there were some questions that came across that I found

19   either confusing or concerning.  So, for instance, I had a

20   distributor rep at one call ask a question on what they were

21   doing in a call center, which is not something I was familiar

22   with, nor did I think it made a whole lot of sense.

23        And then there were some questions on, like, the

24   telemedicine process, which is another thing that I'm -- was

25   not familiar with and didn't really see as a venue where, you

1   know, the lab --

2           MR. SADOW:  Excuse me.  Can we approach for a minute?

3           THE COURT:  Yes.

4       (The following proceedings were held sidebar:)

5           MR. SADOW:  I'm not sure that this witness is qualified

6   to make a determination of judgment as to what her opinion is

7   about what is or is not appropriate unless they qualify her as

8   such.  The mere fact that she worked there or has done this is

9   not a lay opinion based on observations.  It's based on her own

10  personal feelings, which has no basis in fact.

11          MS. DE BOER:  She's offering her reaction to inform she

12  learned she's about to testify about who she brought that up to

13  and what the impact was, and that there were no changes.  I

14  think this is relevant testimony for that purpose, and I can --

15          MR. SADOW:  She can certainly say, after hearing from

16  the distributors, I went to so and so and said X, Y, Z.  It's

17  the feelings before that, which are irrelevant.

18          MS. DE BOER:  She should be able to explain why she did

19  that.

20          THE COURT:  Why don't we ask a new question on this and

21  move away from this.

22      (Proceedings returned to open court.)

23          THE COURT:  You may proceed when ready.

24          MR. SADOW:  Sorry.

25          THE COURT:  No, it's okay.

1   BY MS. DE BOER:

2   Q.  Ms. Adair, let me get back to some of these trainings that

3   we were just talking about and the information and questions

4   that were raised to you on some of these trainings.  And you

5   mentioned there was a question from a distributor about call

6   centers.

7   A.  Yes.

8   Q.  What, if anything, were you told or instructed by your

9   supervisors at LabSolutions regarding the use of call centers

10  to market to patients?

11  A.  They did not give me any information.  I just mentioned it

12  to them, that this kind of question came up, and that I was

13  confused by it and concerned by it, and then I was told that

14  they would handle it.

15  Q.  What understanding did you have when you joined

16  LabSolutions as to whether or not distributors would be

17  engaging call centers to market to patients?

18  A.  None.  I'd never heard of anyone using a call center for a

19  lab, lab marketing.  It was not even on my radar because it was

20  not something I had ever heard of and it was not something that

21  was present when I first started.

22  Q.  And why did you feel the need to raise -- well, let's just

23  start with first, who did you raise your concerns about call

24  centers to?

25  A.  John Berarducci.

1  Q.  And why did you feel the need to raise any issue about call

2  centers to John?

3  A.  Well, I wasn't sure if he was aware that that was

4  happening, so I wanted to make sure he knew about it and would

5  address it or, you know, instruct me on how to address it.

6  Because again it's just not something I had ever heard of.

7  Q.  Did you ever hear of any other questions on the trainings

8  that caused you any concern?

9  A.  Yeah.  So in the telemarketing side, again -- I mean,

10  telemarketing -- telemedicine side, not something I was super

11  familiar.  I was very much just part of a very traditional type

12  of sales, so that was not something that I knew how to handle.

13      And something about someone pairing this with cell phone

14  services or they're marketing cell phone services.  But I

15  really don't know much more than that on it.

16  Q.  And what, if any, concerns did the pairing with cell phone

17  services give you?

18  A.  Again, it's not a health-related product, so I was very,

19  again, concerned by that because, in my eyes, there's really

20  just one way to market, which is to go and speak to physicians

21  at their facilities directly, to see if there was a benefit to

22  replacing their current lab.  That's about as much as I saw the

23  process going.  So anything that went outside of that,

24  especially if it was partnered with something that was not

25  related to healthcare, was concerning.

1    Q.  And let me just shift gears for a second.  You had

2    mentioned at the beginning that one of the things you thought

3    you'd do when you got to LabSolutions was integrate some kind

4    of -- you called it, I think, a CRM?

5    A.  Yes.

6    Q.  Did you ever take any steps to do that?  What did you do in

7    that regard?

8    A.  Yes.  So we did have some demos of hc1 even though I had

9    used it for a prior company --

10   Q.  And let me just stop you.  What is the name of the software

11   you just mentioned?

12   A.  hc1.

13   Q.  Okay.

14   A.  It is a CRM that is specific to the lab space.  So it had

15   stronger integrations with the lab.  So, for instance, in my

16   previous lab we used a lab information software and that

17   integrated with the CRM, so that as soon as a lab sample got

18   accession by the lab, meaning it was processed in, it would in

19   realtime show up in the CRM.

20        So we were able to see right away what was coming in that

21   day, what type of test was coming in that day, and we would

22   have an understanding, whether it was as a whole team or by rep

23   or by region, what was coming in and what the breakdown was for

24   of the different types of tests.

25   Q.  And what, if any, proposal did you make to LabSolutions to

1    use a product like the one you're describing?

2    A.   So we did go through the demo and I had hc1 create a

3    proposal for LabSolutions that I sent to Minal that had kind of

4    what the benefits and the features were, what was included, and

5    the pricing for it.

6    Q.   And what happened with that proposal?

7    A.   It just -- we never went through with it.

8    Q.   Do you know who made that decision?

9    A.   I'm not 100 percent sure.

10   Q.   That's okay.

11        Let me ask you:  What, if any -- you mentioned some

12   questions from marketers on these calls, on these webinars.

13   What, if any, visibility did you have into how the marketers

14   marketed their -- these tests?

15   A.   None.

16   Q.   And what was your title at LabSolutions?

17   A.   National sales trainer.

18   Q.   And would sales encompass the marketers and distributors?

19   A.   Yes.

20   Q.   What visibility did you have into the volume of samples

21   being referred to LabSolutions by the distributors?

22   A.   None.

23   Q.   What visibility did you have into the mix of tests being

24   referred?  So, for example, did you have insight into whether

25   it was mostly genetic testing, or mostly toxicology, or mostly

1   blood work, or what the combination was?

2   A.   No.

3   Q.   How, if at all, did that differ from your prior position?

4   A.   Well, prior, I could see everything.  Like I said, we had

5   everything realtime in CRM.  So I could pull a report at any

6   time of day that would span any amount of time that I put in.

7   So if I wanted to see the last 30 days, the last 90 days, I

8   could do so.

9   Q.   And this lack of visibility into how distributors were

10  marketing and what they were referring, how, if at all, did

11  that contribute to your concerns referenced here about the

12  potential ordering patterns and influencing ordering patterns?

13  A.   Well, I just felt like that was really just not something

14  that fell in my lap like it did before in the previous lab, so

15  I feel like I was really just kind of boxed into just training

16  them on what the tests were and how to fill out acquisition

17  forms and all of those things.

18       And I felt like I really couldn't contribute a whole lot to

19  the processes because I couldn't see anything.  Which is why,

20  whenever things did come up with questions, I would just pass

21  them on because I didn't really know how to handle those.

22  Q.   Okay.  And you had mentioned a question coming up about

23  telemedicine.  So let's turn to that for a second.

24       What understanding did you have, if any, about the extent

25  to which LabSolutions acquired patients through telemedicine

1    referrals?

2    A.   I just don't know, like, to what extent they were doing it.

3    There were some questions.  People wanted to be trained more on

4    the telemedicine process, but that's not something I trained on

5    because it's not something I knew of.

6         So I really don't know.  I can't say whether they were

7    doing a lot of telemedicine or not.

8    Q.   And what, if any, understanding do you have as to whether

9    telemedicine companies were being paid?

10   A.   I know nothing about that.

11   Q.   Let me switch gears for a second.

12        What did you understand to be the financial relationship

13   between LabSolutions and the distributors that LabSolutions

14   contracted with?

15   A.   As far as them being paid, distributors?  I understood that

16   they were being paid like a typical 1099, which is usually

17   straight commission, no salary.  So they just get paid if they

18   produced.

19   Q.   Okay.  And were you ever shown the distributor contracts

20   that set forth those percentages?

21   A.   I don't recall.  I mean, I'm sure it has passed through

22   some emails, but I don't recall ever, like, reading it, or at

23   least I don't know what those percentages are.

24   Q.   Okay.  Who was in charge of managing the relationships with

25   distributors at LabSolutions?

1    A.   I believe the main person would be John Berarducci, and

2    then Nick Saliba.

3    Q.   And who at the lab brought in distributors?

4    A.   I heard of them coming through many channels.  Sometimes it

5    was from a relationship that maybe John or Nick or Omar or

6    Minal had.  Or sometimes they would find the lab and just call

7    and want to be a distributor.  So I -- I mean, there was a lot

8    of mix of different scenarios.

9    Q.   Okay.  At some point, did you leave your employment at

10   LabSolutions?

11   A.   Yes.

12   Q.   Why did you leave?

13   A.   Well, I left because it really wasn't what I thought it was

14   going to be.  But, you know, I waited a while, hoping that my

15   previous boss was going to come onboard, because I figured once

16   he came onboard we would get into what we were really thinking

17   was going to happen.

18        But then, once, you know, he got -- that was strung along a

19   little bit.  But once he got that definitive that he wasn't

20   coming, then I knew that this wasn't going to be a long-term

21   thing for me.

22   Q.   And how, if at all, did your concerns about call centers

23   and the like, how did that factor into your decision to leave?

24   A.   Yes, that was definitely a factor, because I was already a

25   little bit wary of the lab space just in general, to begin

1   with.  So once I started hearing that, I just knew I just

2   didn't want to be in the lab space at all anymore.

3   Q.   Okay.  And when you left LabSolutions, did you have to

4   notify the distributors and other people that you were in touch

5   with that you were leaving?

6   A.   Yes.  I did send an email because they all contacted me

7   through my personal cell phone.  I did not have a company one.

8   So all the calls and texts, you know, would keep coming, so I

9   did send a nice message to kind of just say my good-byes and

10  let them know I was no longer going to be at LabSolutions.

11  Q.   And did you tell them, hey, I'm leaving because I'm

12  concerned about what you're doing?

13  A.   No.

14  Q.   Why not?

15  A.   It's just not my -- whenever I leave, I just try to leave

16  on a positive note and move on, so...

17  Q.   So what kind of things did you say to them when you left?

18  A.   Oh, I'm sure it's my standard, like, it was a great

19  opportunity, or it's been a pleasure to work with you, and I

20  enjoyed working with you, and, you know, usually some kind of

21  best wishes or something like that, so...

22  Q.   But why did you really leave?

23  A.   I left because I just -- I wasn't comfortable.

24  Q.   Okay.

25          MS. DE BOER:  One moment, Your Honor.

```
 1              THE COURT:  Sure.
 2          (Discussion was held off the record.)
 3   BY MS. DE BOER:
 4   Q.  Ms. Adair, thank you.
 5              MS. DE BOER:  I'll pass the witness for
 6   cross-examination.
 7              THE COURT:  Thank you.
 8              Mr. Samuel, cross-examination.
 9                         CROSS-EXAMINATION
10   BY MR. SAMUEL:
11   Q.  Good afternoon, Ms. Adair.  My name is Don Samuel.
12   A.  Good afternoon.
13   Q.  We've never met before, have we?
14   A.  No.
15   Q.  Okay.  If you can get a little closer to the microphone --
16   A.  Sorry.
17   Q.  -- that would be great, that way the jurors can hear, and I
18   can hear.
19        So I want to kind of review a lot of what was just
20   discussed on direct examination, and look at some examples of
21   the training that you did --
22   A.  Yes.
23   Q.  -- and how you first came to work at LabSolutions, which
24   was in the summer of 2016, correct?
25   A.  Yes.
```

1    Q.   And you were living in -- I don't remember the name of the

2    town.

3    A.   Well, I was living in Houston.

4    Q.   Houston.

5         And, in fact, were you -- with the job you had then with

6    Castle, were you providing your services remotely to Castle --

7    A.   Yes.

8    Q.   -- or were they --

9         Did they have local facilities in Texas?

10   A.   It was remote.

11   Q.   Okay.  And, in fact, when it came time to work at

12   LabSolutions, you continued that, of doing that remotely,

13   correct?

14   A.   Yes.

15   Q.   So you weren't located in Atlanta, Georgia, right?

16   A.   No, sir.

17   Q.   You were located, needless to say, in LabSolutions'

18   offices?

19   A.   I'm sorry?

20   Q.   You weren't located --

21   A.   No.

22   Q.   You weren't physically located in LabSolutions' offices?

23   A.   No.

24   Q.   You did all your work from your office or your home office

25   in Houston, correct?

1    A.   Yes.

2    Q.   And how many times did you actually come to Atlanta and

3    meet with the folks at LabSolutions?

4    A.   I would say probably three times.

5    Q.   Three times in the course of the year that you worked

6    there?

7    A.   Yes.

8    Q.   So you met face to face with either Minal Patel, or

9    Nick Saliba, Jon Berarducci, all these people, at most, one or

10   two times unless they were all there each of the three times?

11   A.   Yes.

12   Q.   But you would have phone calls with Mr. Saliba, correct?

13   A.   Yes.

14   Q.   And you would have phone calls with Mr. Berarducci,

15   correct?

16   A.   Yes.

17   Q.   When you applied for the job, you sent a letter to --

18   excuse me, an email.  People don't write letters anymore, of

19   course.

20        You sent an email on June 16th, and that --

21        MR. SAMUEL:  Your Honor, I'd like to introduce into

22   evidence, I understand without objection, B-1 through B-10.

23        THE COURT:  Is that correct, no objection?

24        MS. DE BOER:  No objection.

25        THE COURT:  All right.  We'll admit that at this time.

1          (Defense Exhibits B-1 through B-10 were received in

2     evidence.)

3          THE COURT:  You may publish it.

4          MR. SAMUEL:  Let's put B-1 up on the screen, if you

5     could.

6          There we go.  Even better.

7     BY MR. SAMUEL:

8     Q.  So this is the email you wrote in June of 2016, right, to

9     Omar, who was one of the owners of LabSolutions at the time,

10    and Minal, correct?

11    A.  Yes.

12    Q.  You had not met them personally, right?

13    A.  No.

14    Q.  But this was kind of a cover letter to your résumé

15    seeking -- you know, you wanted them to hire you, correct?

16    A.  Yes.

17    Q.  And you talked about how your specialty was kind of the

18    need for a national sales trainer position, correct?

19    A.  Yes.

20    Q.  It was a training position that was the real focus of your

21    job application, so to speak?

22    A.  Yes.

23    Q.  And you told them that on the phone, right?

24    A.  Yes.

25    Q.  And your former boss, who had recommended it, recommended

1   you to them because of your skills in setting up training

2   programs, correct?

3   A.   Yes.

4   Q.   You are not a compliance person, correct?

5   A.   No.

6   Q.   You don't teach the law to the distributors, correct?

7   A.   No.

8   Q.   You don't -- I'm not going to prolong this, but you don't

9   teach law to anybody, do you?

10  A.   No.

11  Q.   That's not your job?

12  A.   No.

13  Q.   Your job is to train staff into how to be better at their

14  job, right?

15  A.   Yes.

16  Q.   We keep losing you.

17  A.   I'm sorry.  I don't know if it's the angle --

18  Q.   It's not your fault.  It's not your fault.  You don't have

19  to apologize.  You may just have to repeat it every once in a

20  while.

21       When I can't hear you, I'll let you know.

22  A.   Okay.

23  Q.   So let's turn to page 2, if we could, and this is your

24  actual résumé here.  I'm not going to read it all.  The jury

25  will have it, ultimately.

 1        But just the second paragraph, my name is -- do you see

 2    that?  My name is Stacey Adair, and I'm a results-driven

 3    innovative sales management professional with skills and

 4    expertise to succeed in the competitive -- typical résumé

 5    language?

 6    A.  Yes.

 7    Q.  And then the next paragraph, you're showing what your

 8    capabilities are?

 9    A.  Yes.

10    Q.  Building internal, external relationships.  Again, that's

11    part of having the sales force be motivated, right?

12    A.  Yes.

13    Q.  And to be -- effective processes for management training,

14    again, and communications, right?

15    A.  Yes.

16    Q.  And if we go down to just the bullet points after that, you

17    can see that number two is sales training, right?

18    A.  Yes.

19    Q.  Training is your forte, right?

20    A.  Yes.

21    Q.  Okay.  And, in fact, your résumé was persuasive, and it was

22    a winning résumé and winning email, and you got the job.

23        MR. SAMUEL:  If we can go one or two more pages.  Yeah.

24    Just the bullet point there, training, development and

25    implementation.

1          Do you see that, P.J.?  I think --

2     BY MR. SAMUEL:

3     Q.  There you go.  Training, development, implementation.

4          Again, I'm just conveying what you were conveying to them,

5     which is I'm going to help the training system be implemented,

6     correct?

7     A.  Yes.

8     Q.  Very good.

9          I'm curious, although we've all lived through COVID,

10    obviously, so we all know what it's like to work remotely.  How

11    is it -- how are you able to kind of keep up with the program

12    there when you're living in Houston and everybody in the

13    company, really, other than the distributors and the sales

14    force, are in Atlanta?

15    A.  What do you mean by keeping up with the program?

16    Q.  Well, how do you understand what are the relationships, how

17    their operation works, how they do things, how they accomplish

18    their sales, the volume of sales you were talking about?

19         How do you keep up with that when you're sitting in your

20    home office in Houston?

21    A.  There were a lot of meetings, phone calls.  But a lot of

22    that is stuff that I didn't know because I was, like you said,

23    remote.

24    Q.  So that explains a lot of how this company works

25    reflected -- was not known to you just because of the nature of

1  being a remote employee, right?

2  A.  Yes.

3  Q.  Very good.  Thank you.

4      And let's see, you -- when you were answering the

5  prosecutor's questions, you talked about your lack of

6  familiarity with telemedicine, correct?

7  A.  Yes.

8  Q.  That wasn't part of your experience, right?

9  A.  Correct.

10  Q.  Okay.  Nothing wrong with telemedicine.  That just wasn't

11  your forte?

12  A.  Correct.

13  Q.  Your forte, really, coming into this job was training, what

14  we refer to at times as brick-or-mortar operations, correct?

15  A.  Correct.

16  Q.  And when you we say "brick and mortar," what we mean

17  there's a doctor's office with brick and mortar, a front door,

18  doorbell, and a receptionist.

19      That's what a brick-and-mortar doctor's office is like,

20  right?

21  A.  Yes.

22  Q.  And you came to learn a lot of what LabSolutions did -- and

23  we'll talk about some of the lawyers you interacted with

24  through this connection -- was through telemedicine as opposed

25  to brick and mortar, right?

1   A.   Correct.

2   Q.   And you were learning, actually.  You weren't just

3   training.  You were actually learning by hearing about the

4   discussions from distributors and no doubt from talking to

5   Mr. Berarducci, talking to Mr. -- to Omar, talking to

6   Mr. Patel, talking to Mr. Saliba, about the telemedicine aspect

7   of LabSolutions' business; am I right?

8   A.   No, I never learned it.

9   Q.   You never learned it?

10  A.   I never learned what they were doing.

11  Q.   So you certainly weren't training anybody about it?

12  A.   No, I did not train anyone on telemedicine.

13  Q.   Okay.  When you went to LabSolutions, did you visit their

14  offices -- the three times you went, you visited the offices on

15  Northside Drive in Atlanta; is that right?

16  A.   Yes.

17  Q.   It's not like a warehouse somewhere.  It's a very handsome

18  office, isn't it?

19  A.   Yes.

20  Q.   Just outside downtown Atlanta, right?

21  A.   Yes.

22  Q.   And it's a big operation, correct?

23  A.   Yes.  From what I recall, yes.

24  Q.   I mean, did you see all the laboratory machines there, all

25  the --

1   A.   Yes, I did.

2   Q.   You saw all the technicians doing all the lab work there?

3   A.   Yes, I did.

4   Q.   They had a Ph.D. scientist there every day.  They had a

5   doctor there everyday.  They had 45 to 50 technicians,

6   employees on-site there running all these machines; is that

7   right?

8   A.   I don't know the specifics, but in general, yes.

9   Q.   They were testing -- doing blood testing, right?

10   A.   Yes.

11   Q.   They were doing urine testing for drugs and alcohol, that

12   kind of thing, right?

13   A.   Yes.

14   Q.   And they also were doing genetic testing, right?

15   A.   Yes.

16   Q.   This wasn't -- you ever hear the expression, a Potemkin

17   village?  Do you know what that means?

18   A.   No.

19   Q.   That's like a fake storefront.

20   A.   Oh.

21   Q.   It's like -- Hollywood uses them.  You got a front door

22   with nothing behind it.

23        This was a real operating, you know, full-scale laboratory,

24   right?

25   A.   Correct.

1    Q.   All right.   State-of-the-art genetic testing was being done

2    there, correct?

3    A.   From what I understand, correct.

4    Q.   They had millions of dollars, millions of dollars in

5    hardware, meaning, the machines.

6    A.   I don't know the dollar amount, but they are expensive, so,

7    probably yes.

8    Q.   They had chromatography machines and mass spectrometers,

9    all these devices that are used to test blood, urine, and to do

10   the genetic testing, right?

11   A.   Yes.

12   Q.   Do you have any idea how many tests were actually being run

13   a day?

14   A.   No, I don't.

15   Q.   Okay.   So I want to talk to you about some of the training.

16   You know what?   I have to apologize in advance.   Some of these

17   may be the same exact exhibits you've looked at.   I'm going to

18   go through them quickly.

19        I just want to show the jury all the training that you

20   accomplished in just the one year that you were there.   Okay?

21   A.   Okay.

22        MR. SAMUEL:   So if we could start with B-4 and we're

23   going to go with numerical order for a while.

24        B-4 -- you can't start with the very top one because

25   it's got a date that it was forwarded to someone.

1    Q.   But this is an email from you on August 19th.

2         Do you see that?

3              MR. SAMUEL:  Will you help me, P.J., a little bit.

4              THE WITNESS:  Yes.

5    BY MR. SAMUEL:

6    Q.   Oh, you can see it.  Good.  Okay.  I'm going to use this.

7              MR. SAMUEL:  And the jury, you all see that, right?

8    Okay.

9    BY MR. SAMUEL:

10   Q.   So we're talking about, you know, doing three days' worth

11   of training on this one.  This was in August of 2016, within

12   two months of being there, correct?

13   A.   Yes.

14   Q.   Okay.  And it was going to be a series of three webinars

15   about different things that the distributors needed to know,

16   correct?

17   A.   Yes.

18   Q.   And included in it was, as you showed the prosecutor,

19   compliance issues.  LabSolutions wanted the distributors to

20   know various compliance things.  They had to comply.  That's

21   what compliance is, right?  We weren't keeping it a secret from

22   the distributors, were we?

23   A.   Yes.  But at this time, that was not yet in place.

24   Q.   What were these webinars about?  And then we'll get to the

25   subsequent --

1   A.   Sure.

2        Well, I modeled them from what I used to do in my previous

3   lab, so it was a lot of the basics, like, lab terminology,

4   basic things, why would you get these different tests, what are

5   the tests that our lab does, what do the acquisition forms look

6   like, the rep forms, how would you fill it out.

7   Q.   So this would really be for the brand-new distributors to

8   understand this is what blood is, this is what a requisition

9   form is?

10  A.   Yes.

11  Q.   Okay.  All right.  And then you talked, I think a couple of

12  days later --

13       MR. SAMUEL:  If you just drop down a little bit.

14  BY MR. SAMUEL:

15  Q.   There will be a training site so people can log on and

16  watch the webinar so they don't always have to be live,

17  correct?

18  A.   Yes.

19  Q.   If you want to be a rep -- sales distributor for

20  LabSolutions, you must go through this training program,

21  correct?

22  A.   I'll be honest.  I don't know if they were held accountable

23  that they must attend.  I'm not 100 percent sure.  But that was

24  the goal, yes, that if they were gonna come onboard, they had

25  to go through training.

1    Q.   We'll see in a later one, one of the training manuals, you

2    specifically said this one will be mandatory, right?

3    A.   Yes.

4    Q.   Do you remember that?

5    A.   Well -- yeah.

6    Q.   We'll get to it in three minutes, trust me.

7    A.   Thanks.

8    Q.   In fact, you actually kept track of who, or your computer

9    was able to keep track of who logged on and who didn't so you

10   know who was not attending, who should be, correct?

11   A.   Yes.

12        MR. SAMUEL:   Can we drop down, P.J. -- excuse me.   B-5.

13   BY MR. SAMUEL:

14   Q.   This is just a couple of months later, more training

15   webinars.   This is addressed to yourself, so I assume it goes

16   to -- when I see that in an email, you weren't playing

17   Solitaire.   This was an email to a big group?

18   A.   Yes, it was.   Yes.

19   Q.   And this was just two months later in October of 2016, and

20   now we're having another three-day session, correct?

21   A.   Yes.

22   Q.   Okay.   This is going to be -- you're going to have one on

23   molecular testing, right?

24   A.   Yes.

25   Q.   Pharmacogenetics, right?

1    A.   Yes.

2    Q.   Then there's going to be a specific one on October 7th.

3    This is still back in 2016.  Hereditary cancer training?

4    A.   Yes.

5    Q.   All the distributors were taught about that, right?  There

6    was no --

7    A.   These are the ongoing webinars that I just held daily.  So

8    they were just open to whoever needed to come.

9    Q.   All right.

10   A.   Yes.

11   Q.   And then I have also web-ordering electronic requisitions,

12   right?

13   A.   Yes.

14   Q.   So people aren't using paper anymore, right?

15   A.   Right.

16   Q.   Okay.  All right.  It was certainly no secret, though, that

17   genetic testing was part of the training that was going on?

18   A.   Absolutely.

19   Q.   For the new -- okay.  And then I just noticed that in B-6

20   is like three days later, four days later, another series of

21   four webinars available for people to log on.  Again, training

22   distributors, what the company's doing, how the company should

23   operate, and then as we'll see when we get into more training,

24   right?

25   A.   Yes.  We just had rotating webinars, mmm-hmm.

 1   Q.   Okay.  And B-7, now we're going forward about five months.
 2   And if you could just highlight the top of that.  This is one
 3   that ends up getting forwarded to you.
 4        But you see it's originally from Nick Saliba.  Who is Nick
 5   Saliba?
 6   A.   Nick Saliba, I don't know his title, director of sales,
 7   president of sales, vice president of sales, something like
 8   that.
 9   Q.   Can I give you another choice?
10   A.   Sure.
11   Q.   CEO.
12   A.   Oh, okay.
13   Q.   Okay.
14   A.   I was a little off.  I apologize.
15   Q.   That's all right.
16        Do you think maybe he was the chief executive officer?
17   A.   I guess so.
18   Q.   And Tobin Watt, that's a name we haven't heard in a couple
19   of days here.  Who's Tobin Watt?
20   A.   I don't know.
21   Q.   Okay.  Do you remember talking with a lawyer about the
22   training and doing the compliance training?
23   A.   Yes.
24   Q.   Does the name Tobin Watt ring a bell?
25   A.   Was he the lawyer?

1    Q.   Well, do you think maybe he was the lawyer?

2    A.   I guess I'm guessing now that he was the lawyer.

3    Q.   Okay.  I wouldn't mislead you.

4         So this is Tobin Watt who's now getting involved in the

5    training program in March of 2017, correct?

6    A.   Yes.

7    Q.   Okay.  And now we're talking specifically about compliance

8    programs that are going to be designed in the afternoon,

9    correct?

10   A.   Yes.

11   Q.   And you'll see, originally it was the CEO of the company

12   communicating with the lawyer, right?

13   A.   Yes.

14   Q.   Making sure he had the call-in number --

15   A.   Yes.

16   Q.   -- for the call for the compliance program, make sure there

17   were no questions.  And then it was forwarded to you, so you

18   would say that the lawyer was going to be involved, correct?

19   A.   Yes.

20   Q.   All right.  And in fact that's what happened, right?

21   A.   Yes, he did --

22   Q.   Tobin Watt ended up conducting a lot of the compliance

23   programs.

24   A.   Yes.

25   Q.   Do you remember -- I understand you don't remember his

1    name, but the lawyer who participated, if you want to assume it

2    was Tobin Watt, because of the email, he was experienced?

3    A.   Yes.  As far as I know, he was a healthcare attorney.

4    Q.   Yes.  With a big firm?

5    A.   Yes.

6    Q.   And clearly knew the answers to questions, right?

7    A.   Yes.

8    Q.   Okay.  You wouldn't -- and I don't mean it with -- I mean

9    this with all due respect.  You wouldn't say that you know more

10   about the legality than Tobin Watt would, would you?

11   A.   No.  We had him do that webinar so I could learn from him

12   how to present it.

13   Q.   Okay.  So he was teaching not only the distributors, he was

14   teaching you as kind of a collateral benefit so that you could

15   do it in the future, right?

16   A.   Yes.

17   Q.   All right.

18        THE COURT:  Mr. Samuel, let me give you a pause there.

19   I think our jurors need just a brief break.  So let me do that.

20        MR. SAMUEL:  Sure.

21        THE COURT:  Ladies and gentlemen, go ahead and leave

22   your notepads and your chairs.  Let's give you all a brief

23   restroom break and we'll come right back out as soon as you're

24   all accounted for.  Thank you.

25        (Jury exits at 4:53 p.m.)

```
 1          THE COURT:  All right.  If anyone needs the restroom,

 2   five-minute break, you can go ahead and do so, please.

 3          (Court recessed at 4:53 p.m.)

 4          (Back on the record at 5:02 p.m.)

 5          THE COURT:  Let's bring in our jurors.

 6          THE COURT SECURITY OFFICER:  All rise.

 7          (Jury enters at 5:02 p.m.)

 8          THE COURT:  Please be seated, everyone.

 9          All right.  Mr. Samuel, we'll turn it back to you to

10   continue your questioning.

11   BY MR. SAMUEL:

12   Q.  Ms. Adair, I'm now going to show you Exhibit B-8.  You got

13   it up on your screen there?

14   A.  Yes.

15   Q.  Okay, good.  So now we're talking about compliance

16   training, correct?

17   A.  Yes.

18   Q.  And this is May of 2017, right?  You've now been there

19   for --

20   A.  Yes.

21   Q.  -- eight or nine months, right?

22   A.  Yes.

23   Q.  And this talks about wanting to make the attendance

24   mandatory, right?

25   A.  Yes.
```

1    Q.   Which you thought was important because --

2    A.   Yes.

3    Q.   -- your job was important, training was important, keeping

4    the distributors educated was very important to you, correct?

5    A.   Yes.  And it was important to note that here because most

6    things that you do for distributors typically are difficult to

7    be mandatory.  That's why we -- there was so much stress to

8    make this one mandatory, yes.

9    Q.   Right.  So it's mandatory, and this is the one where --

10   it's not on this page here, but you actually recorded the

11   distributors who didn't participate, right?  It was like they

12   were truant, kind of, right; like they were skipping school,

13   right?

14   A.   Well, there were just multiple options they had to attend

15   something, yes.

16   Q.   But you actually recorded and reported -- you had a program

17   that reported who didn't sign up, who, you know, registered as

18   distributors and it was reported up to Nick and -- excuse me --

19   Mr. Saliba and to Berarducci.

20   A.   Yeah, I believe so because they had to attend in order to

21   receive the agreement to sign.

22   Q.   Okay.

23   A.   Yes.

24   Q.   So by May of 2017, the distributors are being told, this is

25   a game.  You're going to participate, or you're not going to

1    get paid, right?

2    A.   Yes.  I assume there was a payment.  I don't know that

3    part, but, yes.

4    Q.   Then we'll go to B-9.  And now it's June 8th, about a month

5    later.  And again, we have -- it's a little confusing because

6    obviously the emails are getting merged here.

7         But you see Nick Saliba is writing to you, right?  He's

8    writing to you, but it says, good morning, Toby.

9    A.   Yes.

10   Q.   Toby is Toby Watt, right?

11   A.   Yes.

12   Q.   The lawyer, right?

13   A.   Yes.

14   Q.   And he's the one being told this is when the meeting -- the

15   compliance meeting is today.  I want to make sure you're going

16   to be there on June 12th.  Please confirm your availability to

17   host the webinar next week, right?

18   A.   Yes.

19   Q.   And, in fact, these were live-hosted webinars where he

20   would participate, right?

21   A.   Yes.

22   Q.   And it was during these types of webinars as opposed to the

23   recorded ones where distributors would ask questions, right?

24   A.   Yes.

25   Q.   And what's significant about that is nobody told the

1    distributors, keep your mouth shut, did they?

2    A.   No.

3    Q.   They were encouraged to ask questions, right?

4    A.   Yes.

5    Q.   Just like in a good college class, or any school, you want

6    people to participate in the education process, right?

7    A.   Yes.

8    Q.   You want them to ask questions, because if they're worried

9    about something, you want to give them an answer, right?

10   A.   Yes.

11   Q.   Rather than telling them, you know, just be quiet and look

12   at your Facebook page in the middle of class, right?

13   A.   Yes.

14   Q.   You want them participating.  And you encouraged it.  And

15   Toby Watt encouraged it.  And that's why when you were asked --

16   answering the prosecutor's questions, the distributors were

17   asking questions, and you would do your best to answer them; am

18   I right?

19   A.   I'm sorry.  I missed -- are you referring directly to the

20   question he was asking about or just in general?

21   Q.   Well, in general.  I don't need to know every specific

22   question that was asked.

23        But when people would ask questions, the lawyer was there

24   to answer, correct?

25   A.   Yes, yes.

1   Q.   And he wouldn't say, I'm not going to answer that, that's a

2   secret?

3   A.   Correct.

4   Q.   You never heard Toby say anything like that, did you?

5   A.   No, no.

6   Q.   And I'm almost finished now.

7        I noticed -- now, I'm going to go back to B-2.

8        This last one was June, and you left about a month after

9   that, the last one we did with Toby?

10  A.   Yes.

11  Q.   You left about a month later.  I say left.  You just

12  unplugged because you stayed in Houston the whole time anyway,

13  right?

14  A.   Yes.

15  Q.   Okay.  So I want to go back to February of 2017 and just

16  take a look at this email.  This was from Jonathan Hayes,

17  right?

18       He was head of head of HR at LabSolutions, right?

19  A.   Yes.

20  Q.   And he's writing to you and to Nick, right?

21  A.   Yes.

22  Q.   And this email really doesn't deal specifically with

23  genetic testing, but I was curious about the -- what's

24  sometimes referred to as the AKS.

25       Do you know what AKS is?

1    A.   Yes.

2    Q.   What is AKS?

3    A.   The Anti-Kickback Statute.

4    Q.   Right.

5         The statute passed by Congress that said there shouldn't be

6    any money paid to refer medical business, right?

7    A.   Yes.

8    Q.   And it got even more confusing because it wasn't just cash.

9    You're not supposed -- I think this morning we learned that

10   maybe you can give a taco to someone, but other than that, you

11   can't do much, right?

12   A.   Correct.   Anything that is deemed to having any kind of

13   value.

14   Q.   Right.

15        And this email in particular talks about a specific thing

16   that you wanted the distributors to know, right?   And this

17   email deals with, can we give supplies to them, right?

18   A.   Yes.   Can I see the --

19   Q.   You absolutely can.   You want to see the whole one?

20   A.   I see it now.   I see it now.

21   Q.   Okay.   I'm going to provide you some context, but you read

22   it, so you're comfortable with it.

23   A.   Okay.

24   Q.   So here's the context.   The distributors, as you said, were

25   what we call 1099s, right?

1   A.   Correct.

2   Q.   And a 1099 means they weren't employed by LabSolutions,

3   correct?

4   A.   Correct.

5   Q.   They didn't get a paycheck every week and have federal tax

6   withholding and Social Security withholding, correct?

7   A.   Correct.

8   Q.   That's what an employee gets?

9   A.   Yes.

10  Q.   A 1099 is a contractor?

11  A.   Yes.

12  Q.   You can have someone come to your house and build a deck,

13  and that's a 1099 person, right?

14  A.   Correct.

15  Q.   You write him a check; he's not an employee of yours?

16  A.   Correct.

17  Q.   The distributors -- the model that the lawyers had set up

18  before you were there or while you were getting there, is the

19  distributors would be 1099 people.  That's just a nickname for

20  no reason, meaning they are contractors and not employees,

21  right?

22  A.   Correct.

23  Q.   Now, let's figure out how the Kickback Statute possibly

24  relates to this here, why this email talks about a specific

25  problem that was addressed.

1    A.   Mmm-hmm.

2    Q.   And it was from Jonathan Hayes and Nick Saliba, the CEO.

3    What are we allowed to give contractors, right, without

4    violating the Kickback Statute?  What can we give them other

5    than paying them for the service they're providing?

6         And the specific question was, can we do things like give

7    them lab coats, or gloves, or things like that, right?  That's

8    what the issue was that was being raised here.

9         MR. SAMUEL:  Look down to February 17, 2017, P.J.

10        Do you see the last paragraph?  Do you see that?  There

11   you go.

12   BY MR. SAMUEL:

13   Q.   They're talking about are we allowed to give all these

14   contractors gloves and alcohol pads and Band-Aids and stuff

15   like that, and the answer basically was no, that would be like

16   a kickback.  You're providing something to them.  All you can

17   give them is the swabs.

18   A.   That's what this is referring -- giving them to the actual

19   clinics, not the distributors, just for clarification.

20   Q.   To anybody, right?  That's what was agreed to, right?

21   A.   Mmm-hmm.

22   Q.   And that shows the level of detail that Mr. Saliba, who's

23   the CEO, and the other people at LabSolutions paid attention to

24   the Anti-Kickback Statute, right?

25        They wanted to be really careful about, and as it says

1  here, conservative about complying with the law, right?

2  A.  Yes.

3  Q.  And they included you in this --

4  A.  Well, that was from me.

5  Q.  They included you in the dialogue, and then it became part

6  of the training, right?

7  A.  I guess.  I'm so sorry.  Can we just -- just step back?

8      I just want to clarify because I'm getting confused by your

9  questions.

10 Q.  You should.  You should.

11 A.  This email that outlines what are prohibited items was from

12 me.  Because items like these cannot be given to the clinic,

13 and they can only be given to if there's a collector employed

14 there.  And that is Jonathan's reply to me, agreeing, and that

15 he didn't realize that it was being done, and we were going to

16 cover it in compliance training.

17 Q.  And Jonathan was the LabSolutions person, who said I agree

18 with you.  We're going to comply with that, right?

19 A.  Correct.

20 Q.  And then one more specific one I wanted to look at was

21 March 29, 2017, which is B-3.  And just in very general terms,

22 this is you writing to Sonal.

23     That's Minal Patel's sister, right?

24 A.  Yes.

25 Q.  And also to Nick Saliba, Jon Berarducci, Shelbi Davis.

1    This was talking about how to train people about the coding,

2    correct?

3    A.   I don't recall what this is specifically referring to.  It

4    looks like something about the forms.  It looks like it was

5    some kind of form that needed to accompany the cancer testing.

6    So it might be the screening form because there was a mandatory

7    screening form.

8    Q.   And that all became part of your training for subsequent

9    classes, right?

10   A.   Right.  Correct.

11   Q.   Okay.  And that was just about it, Ms. Adair.  I appreciate

12   your time.  I just want to finish just where the prosecutor

13   finished.

14        It comes to be, you know, a month after the last training

15   session, your former partner -- you had a noncompete clause or

16   something that he couldn't come join you.  And you just weren't

17   as comfortable as you were -- your comfort zone was brick and

18   mortar, right?

19        Going to doctor's offices and getting them to use your lab,

20   right?

21   A.   Correct.

22   Q.   And you wrote a very nice letter, just like you described

23   to the prosecutor?

24   A.   Right.

25        MR. SAMUEL:  And if we could put it up.

1    BY MR. SAMUEL:

2    Q.   Do you mind if I put it up?

3    A.   That's fine.

4         MR. SAMUEL:  This is B-10, Your Honor.

5    BY MR. SAMUEL:

6    Q.   Would you mind reading it to the jury?

7    A.   Sure.

8         It says, Dear team, I would like you all to know that it's

9    really been a pleasure working with all of you.  I have enjoyed

10   my time here, but I have made a difficult decision to move into

11   a whole new area of medical sales to further my career.

12        I have attached my resignation letter as well as a

13   checklist for all the tasks, duties, and service platforms that

14   I will need to transition over.  I want to make sure that

15   everything on the list is properly taken care of over the next

16   two weeks so that this transition will be a smooth one.  Of

17   course, if there's anything that you feel is missing from this

18   list, please let me know so I can make sure that it is also

19   covered.

20        Please feel free to reach out to me at any time you need

21   assistance or if you'd just like to say hi.  My personal email

22   is.  I'll read the email, SASA77 --

23   Q.   You don't have to say that.

24   A.   Okay.  My cell phone will stay the same.  Thank you for the

25   opportunity to work with you, and I wish you all the best.

1    Q.   Thank you.

2          MR. SAMUEL:  Did I move in B-1 through B-10?

3          THE COURT:  I believe so.  But in an abundance of

4    caution, we can move them in.

5          MS. DE BOER:  They were all moved in, Your Honor.

6          THE COURT:  That's what I thought.

7          Redirect, please.

8                          REDIRECT EXAMINATION

9    BY MS. DE BOER:

10   Q.   Very briefly, Ms. Adair.  You were asked about the résumé

11   that you gave to LabSolutions when you were applying to work

12   there.

13         Do you remember that?

14   A.   Yes.

15   Q.   And the defense asked you about how qualified you were to

16   take this position, right?

17   A.   Yes.

18   Q.   You were qualified, right?

19   A.   Yes.

20   Q.   And you brought to LabSolutions all of the experience that

21   you had working at a different lab in a similar position,

22   right?

23   A.   Yes.

24   Q.   And what was it about the shift, the phasing out of W-2

25   sales force, and the phasing in of the distributor model that

1  made you a bit uncomfortable?

2  A.  There were a few things:  One, just the sheer volume of

3  them.  It just really seemed to grow very quickly, and there

4  were very, very many.  And then just the distributor model in

5  general is a little bit challenging because you have no

6  control, really, over what is done; not like with a W-2, where

7  there are different repercussions for not doing things the

8  proper way.

9  Q.  Okay.  Let me just stop you there.  And we looked at the

10  compliance agreements and we talked a lot about -- you talked

11  to the defense a lot about the trainings that were done in

12  terms of compliance, right?

13  A.  Yes.

14  Q.  So that was all about let's tell the distributors, do the

15  right thing, right?

16  A.  Correct.

17  Q.  Don't do the wrong thing, right?

18  A.  Correct.

19  Q.  What, if any, tools were you given in order to ensure or

20  detect when the wrong thing was being done?

21  A.  We didn't have any tools in place.  I don't know if that

22  was actually possible.

23  Q.  What, if any, visibility did you have into what the

24  marketers actually did to market the lab?

25  A.  None.

1    Q.   What, if any, visibility did you have into the volume of

2    samples any given marketer was referring?

3    A.   None.

4    Q.   What, if any, visibility did you have into the mix of

5    samples, all genetic testing, all tox, all blood, or anything?

6    A.   None.

7    Q.   And what, if any, visibility did you have into the use of

8    call centers, aside from the time that it was posed as a

9    question?

10   A.   None.

11   Q.   What, if any, visibility did you have into the pairing of

12   genetic testing with free cell phones, other than the one time

13   it was posed to you?

14   A.   None.

15           MR. SAMUEL:  Your Honor --

16           THE COURT:  Over -- go ahead.

17           MR. SAMUEL:  Are you saying overruled?  I haven't --

18           THE COURT:  Because there's really nothing wrong with

19   that question.

20           But go ahead.  All right?  Can we finish, please?

21           MS. DE BOER:  I have one last question for Ms. Adair.

22           THE COURT:  Thank you.

23   BY MS. DE BOER:

24   Q.   Ma'am, when you raised these types of concerns to John

25   Berarducci, how satisfied were you with the response that you

1    got?

2    A.   Well, I like to kind of know detail, so I guess not that

3    satisfied because I didn't get to kind of see what happened to

4    the things that I posed.  I -- yeah, so...

5    Q.   Thank you, Ms. Adair.

6            MS. DE BOER:  No further questions.

7            THE COURT:  Thank you, Ms. Adair.  You're excused.

8            THE WITNESS:  Thank you.

9            THE COURT:  Okay, ladies and gentlemen.  It's just

10   about 5:20, so we're going to conclude with that witness.

11   We're at a natural breaking point at the end of the day.

12           A few words before we let you all go for the evening.

13   As we discussed this morning, we're going to start tomorrow at

14   9:00 a.m. as opposed to 10:00 a.m. in the hopes that we advance

15   the ball a little further before we head into the weekend.

16           We've made up some ground this afternoon but we have a

17   little more work to do to get to a place that I think will keep

18   us on schedule heading into Monday morning.  Okay?

19           Remember, of course, as you make your way out, to leave

20   your notepads in the room.  If anyone is running late tomorrow,

21   please call my courtroom deputy and let us know.  Since we are

22   starting a little earlier, I cannot, of course, start without

23   all of you here, so my hope is everyone makes it on time so we

24   can have you seated by 9:00 o'clock.

25           When you get home, family is going to ask, now it's

1    been a few days of testimony, you know a lot more than you did

2    24 or 48 hours ago.  Certainly, please continue to explain to

3    them that you cannot discuss the case with them just as you

4    cannot discuss the case with each other until the very end,

5    until you've heard everything in the case.

6         Please continue to abide by my rules regarding social

7    media use and staying off the internet and any other research

8    tool to look up people, places, or things, in the case.  And if

9    you bump into any lawyers and they avoid you, take no offense

10   from that when you come in tomorrow morning.

11        So with that being said, I hope everyone has a nice

12   evening.  We will see you all in the jury room tomorrow at

13   9:00 a.m.  You are excused.

14        (Jury exits at 5:20 p.m.)

15        (Back on the record at 5:21 p.m.)

16        THE COURT:  All right, everyone.  Please be seated.  So

17   I can get a sense of tomorrow's lineup, I think that we have

18   discussed the possibility of having Amy Roebuck.  We also

19   talked about Kimberly Foss, Dr. Yogel, and possibly

20   Dr. Magliocco.  I don't think that Mr. Sporn would be called

21   tomorrow.  That seems to me to be better left for Monday, given

22   that his testimony will be longer, similar to the other

23   cooperator that we heard from today.

24        So what of that lineup, those names, are we expecting

25   tomorrow?  Is that whose on standby, or did we change things

1   around?

2          MS. DE BOER:  A couple.  One subtraction, I guess.

3          THE COURT:  Okay.

4          MS. DE BOER:  I think Yogel is going to have to move to

5   next week.

6          THE COURT:  Okay.

7          MS. DE BOER:  He's a short witness anyway.  And so

8   definitely tomorrow will be Magliocco, Foss, and Roebuck, and

9   the precise order, I think we need to discuss tonight, but they

10  will all go tomorrow.

11         And I think there's a chance we'll start Sporn

12  tomorrow.  I think we've got a good pace today.  We got through

13  what we anticipated getting through today.  I think there's a

14  chance, especially if we're starting at 9:00.

15         THE COURT:  Sure.  So Magliocco, Roebuck, and Foss,

16  then, are the three that -- did I get that right, for tomorrow?

17         MS. DE BOER:  Correct.

18         THE COURT:  Okay.  So we do that, and I know that that

19  also worked with some of the scheduling on the witness side you

20  had mentioned, then I don't think there's a problem.  I presume

21  we probably wouldn't complete or get near completing Foss, but

22  maybe we make some inroads in his direct before we break.

23         Is that possible?

24         MS. DE BOER:  Sporn, you mean?

25         THE COURT:  Sporn.  I apologize.  Not Foss.  Foss, I

1    think, will finish because that's shorter, right?

2         MS. DE BOER:  Correct.

3         THE COURT:  Okay.  I think if we cover Magliocco,

4    Roebuck, and Foss tomorrow, and depending how long that takes

5    us, we will at least begin the groundwork on Sporn, and then

6    knowing we have Dr. Yogel probably for next week, that gets us

7    where we were hoping to be getting into the weekend.  I think

8    we're in a good pace now.

9         MS. DE BOER:  Yes, Your Honor.

10        THE COURT:  Anything else on the government's side

11   regarding tomorrow's lineup or anything else at all before we

12   conclude today?

13        MS. DE BOER:  Just briefly, Your Honor.  We did obtain

14   the certificate as discussed and I'm happy to hand it up to the

15   Court, if you would like.

16        THE COURT:  The 902?  Sure.  Did you get a chance to

17   see it, guys, the revised 902?  This is the one that dealt with

18   anything being altered or edited.

19        MR. SADOW:  We've seen it.

20        THE COURT:  I know it may not satisfy you, but just

21   want to make sure you saw it.

22        MR. SADOW:  We've definitely seen it.

23        THE COURT:  Okay.  All right.

24        MS. DE BOER:  And if I could add some additional

25   clarity to what we discussed yesterday as well.

1          THE COURT:  Yes, please do.

2          MS. DE BOER:  So in going back and reviewing, I know

3     Your Honor had suggested to focus Dr. Magliocco's testimony on

4     requisitions and patient files where we have the email where

5     that was transmitted to LabSolutions.  That might be the

6     cleanest way to do it.

7          And in looking at those emails again last night, it's

8     the fillable, editable PDFs that were transmitted to

9     LabSolutions.  That makes sense when you think about this is a

10    telemedicine company, these are electronic documents.  This is

11    information that's being input, this is how it was created and

12    stored.

13         So this is how it was transmitted to LabSolutions.  And

14    the defense has those emails with that transmission.

15         THE COURT:  Okay.

16         MS. DE BOER:  But in any event, Dr. Magliocco is not

17    testifying about that.  He's testifying about here's

18    information in the patient charts and what are his opinions

19    based on that information.

20         THE COURT:  Right.  And so going back to our sidebar,

21    our discussion yesterday, nothing precludes the defense, if

22    they want to on cross, to draw out some of these issues.  I

23    mean, he's going to really be focusing on the patient files and

24    his expert opinion, and it doesn't really have a lot to do with

25    how they were filled out.

1          I mean, I don't think that's really the focus of his

2     testimony, right?

3          MS. DE BOER:  Correct, Your Honor.

4          And frankly, the requisitions themselves are actually

5     less of a focus than the charts that back up the requisitions,

6     which didn't, at least appear to me to have the same issue

7     that the defense was raising and the requisition was sort of

8     more about, well, here's the tests that were ordered, and then

9     he's going to talk about, well, okay, what backed that up and

10    was that medically appropriate.

11         THE COURT:  Okay.  Yeah.  I mean, his medical testimony

12    I think takes him a little bit outside these concerns

13    regarding, you know, the documents being edited or editable.

14    So I'm fine with that.  I'm looking here at the revised 902

15    certificate.  I'm also satisfied that further moots any

16    concerns about the records being produced in the

17    regularly-conducted business activity of the entity.

18         So with this, and the scope of his testimony, I no

19    longer have any concerns that this is now going to get

20    sidetracked by edited PDF forms.  I don't think that's really

21    going to be the thrust of the testimony.

22         But again, if the defense wants to raise some issues

23    there, there's nothing really preventing them from doing so.

24    If they want to try to get a better sense of his opinion on

25    medical necessity being based on data that is straightforward,

1    that is accurate, there can be some, presumably, questions that

2    touch on that.  I don't think that's going to be an issue.

3            MS. DE BOER:  Fair enough, Your Honor.

4            THE COURT:  All right.  Okay.  Yes, on the defense side

5    on this point or if there's anything else.

6            MR. SADOW:  Just briefly on this point.

7            THE COURT:  Yes.

8            MR. SADOW:  My assumption from what was just said by

9    the government and, of course, by the Court, is that they're

10   not going to be calling into question the requisition form with

11   this witness.  That is, they're not going to be bringing out

12   testimony that there is something wrong with the medical

13   history, which as a result of the requisition form -- they

14   certainly can bring out what the form says, but if they don't

15   go into the form as far as there being any issue with the form

16   itself, then I doubt we will be bringing up any issue with the

17   form either.

18           I just want to make sure that we don't get in the

19   middle of the testimony and then he says, by the way, I've

20   looked at this requisition form and I have to comment about you

21   can do this, you can do that, or it doesn't appear to be a

22   final product.  As long as we're staying out of that, we're

23   fine.

24           THE COURT:  And I think we are.  I mean, my

25   understanding, Ms. de Boer, that's not at all the concern.

1    He's taking them at face value and making a determination as to

2    whether they were evidence to support medical necessity, right?

3            MS. DE BOER:  Exactly, Your Honor.

4            THE COURT:  I agree.  I think we're all speaking the

5    same language on this point.  So I don't think we're going to

6    even need to get into this at all, given the scope of

7    questioning.  I agree.

8            MR. SADOW:  Second point has to do with Sporn.

9            THE COURT:  Yes.

10           MR. SADOW:  I don't have any problem if the government

11   runs out of witnesses and needs to put Sporn up on direct.  I

12   just don't want to be left at 4:45 or 5:00 o'clock for Sporn

13   for cross-examination.

14           THE COURT:  No, it will not happen.  I can guarantee

15   you that.  Even starting a little earlier, even getting through

16   Magliocco, getting through Roebuck and getting through Foss, if

17   we can get to Sporn, which would be great, if we could get even

18   to the end of Sporn's direct, which I would be surprised if we

19   do, but if that somehow comes to pass, we'll call it.

20           I'm not going to have you start, you know, at 4:00,

21   your cross.  In a best-case scenario, begin on Monday, is what

22   I think.  Similar to what happened with Ramamurthy.

23           MR. SADOW:  I have no problem and I appreciate that.

24           And for the record, I have sent along potential

25   exhibits to the government.  They are not marked yet, but I

1    have sent them the documents so that we are in compliance with

2    what the Court asked for this morning.

3            THE COURT:  Very good.

4            MR. SADOW:  I have a legal issue, though, we're going

5    to raise it, with Rafferty.

6            THE COURT:  Sure.

7            MR. RAFFERTY:  I actually have two issues, if I could

8    go to the podium.  The first issue has to do with Magliocco in

9    this sense.

10           THE COURT:  Okay.

11           MR. RAFFERTY:  The Court has already addressed the fact

12   that we heard quite a bit from the government witness

13   yesterday --

14           THE COURT:  McMillan.  And you're worried about a

15   cumulative objection.

16           MR. RAFFERTY:  We now heard from an expert.  He

17   basically was identified as an expert.  Dr. -- I can't remember

18   his name.  He testified today.  He provided a lot of testimony

19   about the medical necessity of cancer testing and when it is

20   necessary and when it's not and his beliefs and the rest of it.

21           The only thing I would ask, Your Honor, is, to move

22   things along for everyone, I don't think we need to rehash all

23   the ground we've heard over the last two days about the medical

24   necessity of cancer genetic testing.

25           There are a few patients, I assume, this expert is

1    going to testify to.  If we can focus the testimony on those

2    patients and move this along, I think we would probably all

3    appreciate that.

4           THE COURT:  Let me address that.  I'm glad you raised

5    that, Mr. Rafferty.

6           I would assume that that is what the government is

7    going to do tomorrow.  We should have Dr. Magliocco coming in

8    and understanding you may need a couple of setup questions for

9    just a little context, as to the scope of his review and what

10   he's looking for, the focus of his testimony needs to be actual

11   application of the appropriateness and the necessity of medical

12   tests to specific patients, not getting into big picture

13   genetic testing principles and some of the stuff we've heard

14   from prior witnesses.

15          Is that what I'm going to get tomorrow from

16   Dr. Magliocco, that it's going to be more tailored to that

17   review and less general explanation and expert testimony about

18   the appropriateness of genetic testing as a diagnostic tool for

19   cancer?

20          Can I get a sense of that?

21          MS. DE BOER:  It is going to be more tailored, Your

22   Honor.  I would add that I actually timed the amount of time

23   Slomovitz spent speaking about this in anticipation of this

24   objection.  It was six minutes.  So we really haven't heard

25   that much.

1          But I agree, the principles are sort of basic.  There

2     will be a little more detail that I will get out in the

3     beginning to lay some foundation for what's coming next.  But

4     the focus will be on several specific patients and specific

5     charts.

6          THE COURT:  So the one thing I will say is, I will give

7     you have an opportunity to try to frame it a little bit.  But

8     to the extent we can, we need to keep that background material

9     tight and avoid any duplicative testimony.

10          Certainly, I am all for getting Magliocco to dive into

11     the patient files, what he saw, what he reviewed, why he finds

12     the orders relating to genetic testing medically unnecessary.

13     That's really what I want him to focus on.  I'll give you a

14     little leeway at the start, but I fully expect, if not raised

15     by Mr. Rafferty, if I feel that it's the same thing again, I

16     will ask you to move on.

17          So just try to streamline that intro, so we can jump

18     right into something that is a bit new for the jurors.  Because

19     I tend to agree that there will probably be a little -- minimal

20     overlap at the start, which I'm fine with.  But if I find that

21     he's giving us another deep dive into what we heard from

22     McMillan or Slomovitz, it may get to the point where I find it

23     duplicative.  So we'll patrol that.

24          MS. DE BOER:  Understood.

25          THE COURT:  Thank you.

1          MR. RAFFERTY:  The issue and concern I have with

2    Ms. Foss, it requires a little bit of background, if I can

3    provide it.

4          THE COURT:  This is your second point.  The first was

5    Magliocco.  We're all on the same page.

6          Tell me what's going on with Foss.  Go ahead.

7          MR. RAFFERTY:  My understanding from the records that

8    the government has produced and from the reports of interview

9    and *Jencks* material is that the patient she's going to be

10   talking about, Ms. Adams, was the subject of a test that was

11   performed sometime in July or so of 2019.

12         She receives those test results, brings them to her

13   primary care physician, who I understand refers her to the

14   genetic counseling, and that's where Ms. Foss comes into play,

15   and that's in September of 2019.

16         The timeline is important because it's also in

17   September of 2019 that the government issues an indictment

18   against Mr. Patel and a very large press release announcing

19   Operation Double Helix.

20         It is not until April of 2020, it appears from my

21   review of these records, that the counseling actually happens,

22   and the records that the government has produced -- and it's

23   Government's Exhibit 410 are the records of the patient's

24   counseling sessions at this particular North Carolina facility.

25         In the records, on page 24, there's an indication that

1    Ms. Foss does some research and sees that LabSolutions has been

2    put out of business, and there have been allegations of

3    Medicare fraud.  And then there's further allegations on

4    page 59 about how Mr. Patel has been indicted for healthcare

5    fraud.

6            And the concern that I have, Your Honor, is -- and I

7    understand that aspect of her testimony where she's going to

8    talk about backgrounds related to genetic counseling and all of

9    the rest of the things she's going to say.

10           My concern is that the reason why she reports this

11   hotline complaint, which she does on April 23rd of 2020,

12   appears to be in part because of the government's own press

13   release where they announce the indictment of Mr. Patel who is

14   presumed innocent.  And the reason why the laboratory is

15   closed, which is also contained in these records, is because he

16   was indicted.

17           It was shortly thereafter that all of his funds, or

18   perhaps before were seized, and LabSolutions was effectively

19   closed down.  So what I would ask, Your Honor, is with respect

20   to her testimony, she should not be permitted to testify about

21   research that she's done, or things that she found out on the

22   internet, and why she called the hotline complaint.

23           If she wants to say she called the hotline complaint

24   because she saw that the test results that this patient

25   received appeared to be inaccurate, a new test was done and she

1    calls the hotline, that's one thing.  But I think if she's

2    going to testify that she researched LabSolutions and

3    Mr. Patel, and saw he was indicted, and found out about it

4    because the government issued its own press release, I think

5    that's improper.  I don't think that's proper testimony.

6          The other aspect of my objection is the content of

7    these records, which I can work with the government on.  But I

8    would ask that the records be redacted so that any reference to

9    the fact that Medicare fraud or anything else, which is all

10   found out by Ms. Foss because of the government's press

11   release, should be stricken from the documents.

12         It's on page 24 and page 59.

13         THE COURT:  24 and 59.

14         MR. RAFFERTY:  So that's the essence of my concern.  I

15   just think that it's not proper testimony, and so I would

16   object under 403.

17         THE COURT:  Okay.

18         MR. SADOW:  Your Honor, let me add to that, so the

19   Court knows.

20         THE COURT:  Sure.

21         MR. SADOW:  They're in the middle of August of 2019.

22   Approximately $20 million were seized from LabSolutions and are

23   subject of the forfeiture from the original indictment.

24   Approximately 10, $11 million belonging to Mr. Patel were

25   seized.

1          When he was indicted at the end of September, one of

2     the conditions of his bond is he was no longer to be involved

3     in the healthcare field.  So as you can imagine, at that point,

4     that put LabSolutions in the position where it shut down.  And

5     that's the factual predicate for what Mr. Rafferty has just

6     told the Court.

7          THE COURT:  So let me hear government's response on

8     Ms. Foss as to whether or not I should even be concerned that

9     there will be a mention of her use of the hotline and the fact

10     that it may have been prompted in part, at least, by the

11     government's press release or information she found through her

12     research into what happened with LabSolutions.

13          MS. GURSKIS:  Yes, Your Honor.

14          First, at the outset, I don't know that it was

15     specifically related to the press release, but this is,

16     unfortunately, another instance of something catching us off

17     guard.

18          This would have been something -- it's a reasonable

19     request.  We would have been happy to agree with it if this is

20     something that -- this witness has been on our list since the

21     beginning.  So if we had had the opportunity to confer about

22     it, we wouldn't even had -- have wasted the Court's time

23     because it's a reasonable request.

24          I just ask again -- when Ms. H. was on the stand, I was

25     handed an exhibit that I had never seen before, after

1  Your Honor had made the admonition this morning.  So that is a

2  little bit frustrating.

3       And with regard to the eliciting generally, questioning

4  regarding her report to the hotline, I think the parameters

5  proposed by Mr. Rafferty are entirely reasonable, that we would

6  elicit the testimony simply to say that based on her

7  observations of what she saw in the medical records, that that

8  caused her concern, and she reported it to fraud.  And we will

9  narrow the scope so there is no mention of her Googling and

10  seeing anything on the internet about any type of allegations

11  against the lab or against Mr. Patel.

12       THE COURT:  Very good.

13       How do you feel, Ms. Gurskis, about the request on 24

14  and 59 to make some redactions to this effect?

15       MS. GURSKIS:  That's fine.

16       THE COURT:  Okay.  So it sounds to me like we have an

17  agreement that when Ms. Foss is questioned, the focus will be

18  observations gleaned from medical records as opposed to making

19  any mention of independent research or the hotline.  She will

20  not be asked that.

21       I think that it may make sense, if you want me to do it

22  or you guys, to explain to her the Court's ruling when she

23  takes the stand.  I can do that as well, just to let her know

24  there should be no mention, just in case she may volunteer it.

25       I can see a question coming to her that she may not

1    understand is limiting in that regard.  So I'm happy to do it

2    when she takes the stand, if you want me to just instruct her

3    and remind her that we should be making no mention of that

4    research and no mention of the press release.

5            And then we'll make sure those exhibits aren't put up

6    until we've made the necessary redactions on 24 and 59.

7            So, Mr. Rafferty, it sounds like we have an agreement

8    exactly on your concern, right?

9            MR. RAFFERTY:  Your Honor, I raised it now so that this

10   could be resolved so that by the time she testifies we don't

11   have to deal with this.  I'm not trying to surprise the

12   government.  I'm reading these records, there's a sentence here

13   and a sentence there, it takes me a little bit of time to

14   figure out this chronology and how this all happened.  That's

15   the reason I raised it.

16           If I didn't raise it and I waited until she testified,

17   who knows what would have happened.  It would have been very

18   prejudicial to Mr. Patel.  I'm doing my best to go through all

19   these exhibits and identify them so that these issues can be

20   fixed.

21           THE COURT:  Sure.  I don't disagree.  I think to

22   Ms. Gurskis's point, though, I think we've had a couple of

23   these where there's been complete agreement.  So my only point

24   is, it may make sense just to briefly meet and confer, you

25   know, before you bring it to the Court, I'm happy to help but

1    it doesn't sound like we've had much disagreement on the need

2    to make certain redactions and limit testimony.

3            I mean, really, if we go back and look at how the whole

4    concern started with the edited PDF on Magliocco, we've mooted

5    that.  That probably could have been worked out.  I know it's

6    situational.  So I'm not faulting anybody for having to bring

7    it up now and I'd rather be getting ahead of it.  I agree with

8    you, Mr. Rafferty.

9            But certainly I think when we head into the weekend and

10   we get things lined up for Mr. Sporn's cross and other things

11   with Dr. Yogel, let's make sure we communicate because there

12   may be some of this that you guys may not even need Court

13   intervention on.  I'm happy to do it.  But I agree, we seem to

14   be in agreement and I have no issue with getting ahead of it.

15           So it sounds to me like we've cleaned up any concern

16   with both Magliocco's testimony, the scope of it, any 403

17   concerns, with Foss's testimony, redactions, observations of

18   medical records.

19           Is there anything else on the defense side with

20   tomorrow's lineup that we want to try to get ahead of or is

21   that covered?

22           MR. RAFFERTY:  That covers it, Your Honor.  Thank you.

23           THE COURT:  You got it.

24           And on the government's end, anything else, guys,

25   that we need to address or have we covered it?

1          MS. DE BOER:  I'm sorry to keep bringing up exhibits,

2     Your Honor, but the defense has an exhibit list which I believe

3     they filed but they certainly haven't given to us.  We don't

4     have a set of marked exhibits that correspond to that list, and

5     I know they walked over and said this is in the reciprocal

6     discovery, but if it doesn't have an exhibit sticker on it, I

7     can't match it up and figure out what's happening.

8          THE COURT:  Let me ask you.  I think -- I thought I

9     heard that we have -- Mr. Sadow, you've transmitted exhibits

10    you guys are going to need for tomorrow.  Did I understand that

11    right?

12         MR. SADOW:  For Mr. Sporn.

13         THE COURT:  Oh, for Mr. Sporn.  Do we have any issues?

14    Just so we don't have any issues with this.  Looking at

15    tomorrow's lineup, looking at Magliocco, Roebuck, and Foss,

16    because I think that's really all we would really need to get

17    to in terms of before cross-examinations, not Sporn.

18         Can I ask if there are defense exhibits relevant to

19    those three, that we transmit those earlier this evening when

20    we wrap up here today?  Just so that we can get ahead of it

21    tomorrow.  I don't know if there are.  There may not be.

22         MR. RAFFERTY:  As it relates to Magliocco and Foss, I

23    don't anticipate any exhibits, Your Honor.  Other than if the

24    government has an exhibit that they choose not to introduce,

25    something like that.  But I have no exhibits that I intend on

1    using with that.

2         THE COURT:  And that's fine.  We had that happen today,

3    Mr. Samuel, in your examination.  We used a number of

4    government exhibits.  So they have them.  I think if you want

5    to point out on which ones you want to rely on with some

6    anticipation, that'll do it.  Just so we know, like we did

7    earlier, that there's no objection to them.

8         Yes, Mr. Samuel.

9         MR. SAMUEL:  I was going to say, on behalf of -- with

10   regard to witness Roebuck, I'm going to be sending to the

11   government tonight.  I told them a couple of hours ago I'm

12   going to be sending them page numbers from the disclosure we

13   got from the --

14        THE COURT:  From theirs.

15        MR. SAMUEL:  I don't even have a number of exhibits

16   yet, but maybe ten pages total.

17        THE COURT:  But it's the government's exhibits on

18   Roebuck?  It's yours.  Okay.

19        MR. SADOW:  The government produced it to us, you know,

20   whatever, two years ago.  It's a long story.  But I told them

21   I'll get them those pages tonight.

22        THE COURT:  Okay.  And ten pages is doable.  It's not

23   like we're dumping a lot at the eleventh hour.

24        MR. SADOW:  That's all we're talking about.  I know we

25   are attempting to do what the Court has ordered and that's

1    appropriate.  I'd like the Court to keep in mind, every time we

2    turn over an exhibit to the government that we're going to

3    potentially use on cross-examination, that's basically like

4    saying, okay, here's our strategy on our cross-examination.

5    Now, you take that exhibit and make sure that you educate your

6    witness so that we don't get to use it appropriately on cross.

7         I can understand if we're talking about hundreds of

8    pages that the government couldn't digest, but, for example,

9    with -- what's his name, Ramamurthy?

10        THE COURT:  Ramamurthy, yeah.

11        MR. SADOW:  We're talking about, like, 15 pages.  We're

12   going through 25 million pages that the government's giving.

13   And while I understand the government wants to be prepared, I

14   don't want them to know everything I'm doing on

15   cross-examination.  It kind of takes away from the idea of

16   cross-examination.  So nobody is doing it in a fashion so the

17   government isn't prepared.  That's why, as soon as I figured

18   out today what I was going to use on Sporn, and there are

19   thousands and thousands of pages, I sent them to them.

20        Do I have an exhibit list with a sticker on it yet?

21   No.  When I'm sitting here doing it, I can't arrange that.  But

22   I don't want them taking those and going to Sporn saying, well,

23   the defense is going to ask you about these.  What's your

24   position?

25        I'll tell you what I will do, if the government wants

1  to agree, I'll give them the exhibits.  They don't talk to the

2  witness about them.

3       THE COURT:  I think the important thing is there's

4  certainly a balance, right?  I'm not trying to prejudice either

5  side in their strategy, and I do recognize that producing some

6  of these exhibits at an early date would impact, negatively

7  impact any cross-examination, certainly eliminate any element

8  of surprise or strategy, and I'm not interested in doing that

9  for either side.

10       But I do think that we can, even if it's just briefly

11  before that witness is crossed, if we have some documents that

12  will at least eliminate the need for an unnecessary sidebar or

13  the potential of having a question asked that I need to make a

14  preliminary ruling on.

15       That's really what I'm trying to avoid.  So I know your

16  point is well-taken, Mr. Sadow, but I just think that it's a

17  balance, right?  I don't want to have this be like you have to

18  show the playbook, you know, a week in advance.  That's not

19  what I'm asking for.  I think it just -- and especially, as you

20  pointed out, when it's really voluminous, that's really what

21  I'm more concerned about.

22       So as long as we stick with that and we try to give a

23  little bit of a heads up so that I don't get necessarily

24  delayed and it breaks up -- truthfully, it breaks up one of the

25  cross-examinations, which I don't want either because the flow

1    could get interrupted on something.

2         If I can get ahead of that because the production lets

3    me moot or rule on an objection from the government as to the

4    defense exhibit, I think that actually benefits the defense's

5    presentation in cross, without prejudicing them in terms of

6    giving away their playbook.

7         So as long as you just have a balance on that,

8    certainly we know what's expected here and I don't want to

9    unnecessarily prejudice anyone in their presentation of their

10   case and their theory.

11        So let's just keep that in mind.  Again, I don't think

12   I need to sit here and babysit too much more on this point.  I

13   just want everyone to try to give a little bit of a heads up as

14   you've done the last few days and that will keep things moving.

15   That's all.

16        MR. SADOW:  Thank you.

17        THE COURT:  You got it.

18        Anything else, guys, on the defense side?

19        MR. SADOW:  No, Your Honor.

20        THE COURT:  All right.  Government's good?

21        MS. DE BOER:  Yes, Judge.

22        THE COURT:  All right.  So tomorrow, just so everyone

23   knows, I believe during my lunch hour we're going to have a few

24   telephonic civil hearings.  I don't want to interrupt anything,

25   so you are free to leave things as they are.  No need to

1    arrange anything like we did for the sentencing today.

2            So we'll be here tomorrow at 9:00 a.m.  All right?  You

3    got it, guys.

4            We're in recess.

5       (Court recessed at 5:47 p.m.)

6

                    C E R T I F I C A T E

7

8

9        I hereby certify that the foregoing is an

10   accurate transcription of the proceedings in the

11   above-entitled matter.

12

13

     DATE:   December 1, 2022   /s/Ilona Lupowitz
14                              ILONA LUPOWITZ, CRR, RPR, RMR
                                Official Court Reporter
15                              United States District Court
                                299 East Broward Boulevard
16                              Fort Lauderdale, Florida 33301
                                (954) 769-5568
17

18

19

20

21

22

23

24

25

## $

**$10,000** [2] - 61:1, 148:22
**$11** [1] - 229:24
**$20** [1] - 229:22
**$20,000** [1] - 17:2
**$250,000** [1] - 33:3
**$5,000** [1] - 114:1
**$600** [1] - 119:17
**$9,000** [2] - 59:20, 60:3

## '

**'14** [1] - 17:12
**'15** [1] - 17:13
**'16** [2] - 50:9, 118:24
**'17** [3] - 42:24, 42:25, 79:12
**'18** [1] - 50:10
**'nother** [1] - 39:20

## /

**/s/Ilona** [1] - 239:13

## 1

**1** [16] - 1:4, 1:7, 20:21, 21:5, 21:6, 26:6, 127:14, 127:15, 127:16, 127:22, 127:24, 128:14, 129:16, 130:19, 135:8, 239:13
**1,066** [1] - 20:21
**1.2** [4] - 24:23, 24:24, 25:1, 25:2
**10** [3] - 26:22, 33:4, 229:24
**10,000** [1] - 61:4
**10/12/2017** [1] - 92:2
**100** [8] - 21:7, 21:9, 68:18, 88:10, 89:12, 90:6, 179:9, 196:23
**100,000** [1] - 118:17
**104** [1] - 3:4
**1099** [6] - 164:14, 181:16, 208:2, 208:10, 208:13, 208:19
**1099s** [1] - 207:25
**10:00** [1] - 216:14
**10:09** [1] - 1:5
**10:17** [1] - 10:19
**11** [1] - 3:4
**11/18/2016** [1] - 59:13
**11/24/1969** [1] - 92:3
**110** [1] - 92:1
**1170** [1] - 2:6
**11:30** [1] - 54:9
**11:31** [1] - 54:14
**11:38** [1] - 54:15
**11:40** [1] - 54:23
**12** [7] - 12:16, 12:18, 12:22, 13:6, 56:3, 150:4, 152:11

**120** [2] - 63:5, 100:2
**122** [1] - 3:6
**128** [1] - 3:18
**12:30** [1] - 87:24
**12:48** [1] - 102:5
**12:50** [1] - 103:9
**12th** [1] - 204:16
**13** [2] - 12:18, 12:22
**131** [1] - 3:7
**1326** [2] - 55:14, 55:24
**1327** [2] - 56:7, 56:17
**1327-A** [1] - 56:16
**1328** [1] - 56:19
**1328-A** [1] - 57:2
**1329** [1] - 57:12
**1330** [1] - 64:8
**1331** [4] - 64:14, 64:15, 64:20
**1332** [2] - 64:17, 64:21
**1332-A** [1] - 64:20
**1333** [1] - 64:23
**1334-A** [1] - 66:25
**1336** [1] - 67:20
**1338** [1] - 69:15
**1338-A** [1] - 69:13
**1339-C** [1] - 84:21
**1339-E** [1] - 85:21
**1343** [2] - 69:19, 73:20
**1343-A** [1] - 73:19
**1345** [2] - 73:21, 111:7
**135** [1] - 3:19
**1351** [1] - 114:25
**1351-A** [1] - 115:8
**1360** [1] - 78:13
**1372** [5] - 3:19, 165:17, 165:22, 166:1, 168:25
**1375** [2] - 79:7, 80:18, 113:14
**1376** [1] - 80:19
**1382** [1] - 81:6
**1383** [4] - 3:19, 165:17, 165:22, 169:2
**1385** [1] - 81:11
**1385-A** [1] - 81:17
**1399** [1] - 82:2
**1399-B** [1] - 82:24
**1399-C** [1] - 83:3
**1399-D** [1] - 85:7
**1399-E** [1] - 121:4
**1399-F** [2] - 85:25, 119:23
**1399-G** [1] - 86:6
**14** [1] - 149:19
**14,000** [1] - 119:18
**1400** [1] - 1:16
**1404** [1] - 86:20
**1414** [1] - 65:22
**1414-A** [1] - 65:23
**142** [1] - 3:7
**1453** [1] - 86:25

**1454** [1] - 87:7
**1455** [2] - 88:12, 88:13
**1455-A** [2] - 91:22
**1456** [1] - 87:15
**147** [1] - 3:9
**15** [4] - 26:22, 97:24, 101:18, 236:11
**153** [1] - 3:10
**156** [1] - 3:10
**157** [2] - 3:11, 3:24
**158** [1] - 3:13
**16** [3] - 12:25, 13:7, 133:17
**165** [1] - 3:19
**16th** [1] - 186:20
**17** [2] - 58:13, 209:9
**18,000** [4] - 60:11, 60:19, 61:4, 61:17
**184** [1] - 3:13
**187** [1] - 3:25
**18th** [1] - 64:10
**19-80181** [1] - 4:5
**19-CR-80181-RAR-1** [1] - 1:2
**1981** [1] - 12:6
**19th** [1] - 195:1
**1:30** [1] - 102:9

## 2

**2** [6] - 20:21, 21:5, 21:6, 21:13, 26:6, 188:23
**2,000** [2] - 114:2, 121:11
**20** [5] - 90:14, 119:8, 143:10, 143:11, 169:1
**20005** [1] - 1:16
**2006** [3] - 148:9, 149:25, 150:3
**2014** [12] - 14:16, 14:17, 14:18, 14:24, 15:2, 15:5, 15:10, 16:9, 16:15, 18:25, 30:24, 63:14
**2015** [9] - 14:17, 15:12, 15:22, 16:9, 16:15, 19:1, 31:10, 118:24
**2016** [29] - 30:15, 30:16, 30:23, 31:12, 44:12, 44:15, 44:19, 50:7, 51:14, 52:2, 52:3, 52:5, 52:6, 56:3, 58:13, 59:15, 64:10, 65:7, 65:18, 65:20, 76:20, 97:24, 160:1, 163:18, 184:24, 187:8, 195:11, 197:19, 198:3
**2017** [31] - 40:22, 41:15, 89:10, 94:18, 160:2, 166:12, 169:1, 200:5, 202:18, 203:24, 206:15, 209:9, 210:21
**2018** [18] - 31:11, 31:12, 31:14, 31:15, 31:22, 32:11, 32:16, 33:1, 34:14, 40:10,

**44:1, 47:5, 51:25, 63:16,**
87:16, 95:16, 95:17, 148:14
**2019** [17] - 36:5, 36:22, 39:2, 39:8, 39:18, 44:23, 46:7, 47:23, 48:6, 53:17, 72:2, 72:5, 148:14, 227:11, 227:15, 227:17, 229:21
**2020** [5] - 60:8, 71:24, 144:3, 227:20, 228:11
**2021** [1] - 60:22
**2022** [4] - 1:4, 14:23, 118:24, 239:13
**2052** [1] - 1:19
**20s** [2] - 14:19, 18:5
**20th** [4] - 31:22, 33:1, 79:12, 94:18
**213** [1] - 3:14
**22** [1] - 53:17
**22nd** [2] - 65:18
**23** [1] - 65:7
**23rd** [2] - 76:20, 228:11
**24** [7] - 89:3, 217:2, 227:25, 229:12, 229:13, 231:13, 232:6
**2400** [1] - 2:6
**244** [1] - 172:21
**25** [3] - 7:13, 46:9, 236:12
**26** [1] - 47:5
**260** [1] - 1:18
**268** [1] - 1:7
**27** [1] - 44:23
**27th** [1] - 169:5
**29** [1] - 210:21
**299** [2] - 1:23, 239:15
**2:00** [3] - 101:17, 102:3, 103:7
**2:23** [1] - 103:10
**2:25** [1] - 103:25
**2:54** [1] - 122:4

## 3

**3** [3] - 26:10, 26:16, 150:2
**3,000** [1] - 121:11
**3.4** [11] - 20:12, 20:18, 22:8, 23:19, 24:23, 25:12, 25:17, 25:18, 25:20, 25:23, 26:8
**30** [4] - 102:10, 143:10, 143:11, 180:7
**300** [1] - 50:15
**30303** [1] - 1:19
**30305** [1] - 2:4
**30309** [1] - 2:7
**3131** [1] - 2:3
**32** [2] - 14:21, 14:23
**322** [1] - 136:25
**326** [1] - 55:14
**33** [2] - 14:20, 14:21
**3301** [1] - 1:24
**33301** [1] - 239:16

**35** [1] - 99:18
**36** [1] - 69:13
**3:06** [1] - 122:7
**3:07** [1] - 122:11
**3rd** [1] - 60:22

**4**

**4** [2] - 1:6, 150:2
**4,000** [1] - 114:1
**40** [3] - 142:25, 143:1
**400,000** [1] - 50:15
**403** [2] - 229:16, 233:16
**410** [1] - 227:23
**45** [1] - 193:5
**460** [1] - 135:17
**478** [4] - 3:19, 135:2, 135:6, 136:8
**478-A** [4] - 3:18, 128:17, 128:22, 135:1
**48** [1] - 217:2
**488** [1] - 138:7
**4:00** [1] - 223:20
**4:45** [1] - 223:12
**4:53** [2] - 201:25, 202:3
**4th** [2] - 47:23, 48:6

**5**

**50** [2] - 142:25, 193:5
**500** [1] - 121:11
**500,000** [1] - 24:24
**56** [1] - 88:13
**59** [5] - 228:4, 229:12, 229:13, 231:14, 232:6
**5:00** [1] - 223:12
**5:02** [2] - 202:4, 202:7
**5:20** [2] - 216:10, 217:14
**5:21** [1] - 217:15
**5:47** [2] - 1:5, 239:5

**6**

**6** [2] - 150:4, 152:11
**6.3** [5] - 25:9, 25:11, 26:4, 26:8
**6.7** [3] - 25:10, 25:20, 26:2
**667-B** [4] - 3:20, 165:17, 165:22, 172:20

**7**

**769-5568** [2] - 1:24, 239:16
**790** [1] - 137:21
**7th** [1] - 198:2

**8**

**8** [1] - 60:7
**8/23/2017** [1] - 90:13

**8th** [2] - 1:16, 204:4

**9**

**9,000** [5] - 59:23, 60:8, 61:4, 61:12, 61:13
**90** [5] - 142:23, 142:24, 143:1, 161:17, 180:7
**900,000** [1] - 50:14
**902** [3] - 219:16, 219:17, 221:14
**954** [2] - 1:24, 239:16
**9:00** [7] - 4:8, 4:11, 216:14, 216:24, 217:13, 218:14, 239:2

**A**

**A-1** [1] - 94:17
**A-3** [1] - 90:7
**A-4** [1] - 95:11
**A-7** [1] - 97:20
**A-d-a-i-r** [1] - 158:14
**a.m** [10] - 1:5, 10:19, 54:9, 54:14, 54:15, 54:23, 216:14, 217:13, 239:2
**aberration** [4] - 63:9, 63:10, 63:12, 63:20
**abide** [3] - 34:6, 34:16, 217:6
**able** [13] - 10:10, 37:5, 37:6, 37:14, 37:20, 37:25, 49:5, 55:16, 129:9, 175:18, 178:20, 190:11, 197:9
**abnormal** [1] - 63:13
**above-entitled** [1] - 239:11
**Abregunda** [1] - 91:24
**absolute** [1] - 99:3
**absolutely** [11] - 67:19, 107:2, 107:4, 110:20, 118:2, 118:6, 119:13, 149:22, 167:23, 198:18, 207:19
**abundance** [1] - 213:3
**academics** [1] - 12:14
**accept** [2] - 90:20, 90:22
**accepted** [5] - 12:24, 13:6, 96:22, 97:1, 143:13
**access** [5] - 20:4, 53:5, 71:19, 71:21, 117:25
**accession** [1] - 178:18
**accompany** [1] - 211:5
**accomplish** [1] - 190:17
**accomplished** [1] - 194:20
**according** [15] - 11:17, 11:21, 42:7, 42:18, 50:8, 50:18, 63:19, 66:22, 67:4, 70:6, 70:11, 71:12, 74:22, 75:14, 82:12
**account** [6] - 48:14, 48:17, 49:10, 49:25, 93:18, 98:25

**accountable** [1] - 196:22
**accountant** [1] - 75:2
**accountants** [1] - 75:12
**accounted** [2] - 4:6, 201:24
**accurate** [7] - 20:24, 21:3, 24:18, 83:19, 84:14, 222:1, 239:10
**acknowledge** [2] - 35:23, 35:24
**acquired** [1] - 180:25
**acquisition** [2] - 180:16, 196:5
**Act** [1] - 173:12
**action** [1] - 98:24
**activities** [2] - 75:10, 162:19
**activity** [12] - 34:25, 41:21, 63:14, 63:17, 67:5, 67:9, 75:15, 76:23, 77:3, 79:15, 81:14, 221:17
**acts** [2] - 28:13, 28:14
**actual** [2] - 153:25, 170:4, 188:24, 209:18, 225:10
**ad** [6] - 66:2, 66:4, 66:22, 67:11, 115:17, 117:13
**ADAIR** [2] - 3:12, 158:10
**Adair** [19] - 98:6, 99:1, 102:23, 103:17, 158:6, 158:13, 158:20, 159:2, 166:3, 176:2, 184:4, 184:11, 189:2, 202:12, 211:11, 213:10, 215:21, 216:5, 216:7
**Adams** [1] - 227:10
**add** [9] - 18:22, 144:25, 164:18, 171:11, 171:23, 172:3, 219:24, 225:22, 229:18
**addition** [2] - 73:20, 131:21
**additional** [2] - 126:23, 129:23, 219:24
**address** [4] - 147:20, 148:18, 156:1, 177:5, 225:4, 233:25
**addressed** [4] - 167:15, 197:15, 208:25, 224:11
**adjudicated** [1] - 26:22
**adjudication** [1] - 17:1
**admissible** [2] - 5:24, 5:25
**admit** [4] - 55:6, 92:10, 135:5, 186:25
**admitted** [11] - 5:23, 16:14, 55:6, 55:12, 57:18, 57:19, 117:4, 128:20, 157:6, 169:2, 172:19
**admonition** [1] - 231:1
**ads** [1] - 67:18
**advance** [3] - 194:16, 216:14, 237:18
**advanced** [1] - 124:23
**advice** [1] - 140:8

**advised** [1] - 161:7
**affect** [1] - 171:15
**afford** [2] - 148:22, 152:10
**afternoon** [16] - 66:2, 101:14, 103:16, 104:13, 104:14, 123:2, 131:15, 147:16, 147:17, 153:15, 158:20, 158:21, 184:11, 184:12, 200:8, 216:16
**afterwards** [1] - 171:20
**age** [5] - 12:16, 12:23, 12:25, 13:6, 13:7
**aggressiveness** [1] - 142:20
**ago** [6] - 21:10, 110:18, 118:25, 217:2, 235:11, 235:20
**agree** [18] - 8:5, 8:14, 27:8, 27:11, 27:16, 68:15, 78:5, 133:19, 210:17, 223:4, 223:7, 226:1, 226:19, 230:19, 233:7, 233:13, 237:1
**agreed** [4] - 26:5, 27:13, 171:20, 209:20
**agreeing** [1] - 210:14
**Agreement** [1] - 167:2
**agreement** [22] - 4:9, 65:11, 65:12, 100:12, 109:12, 116:16, 116:19, 165:8, 165:10, 165:11, 167:5, 167:11, 168:12, 169:8, 172:1, 172:24, 173:9, 203:21, 231:17, 232:7, 232:23, 233:14
**agreements** [5] - 165:6, 165:9, 165:13, 173:2, 214:10
**ahead** [37] - 4:10, 4:13, 6:12, 6:13, 10:4, 10:17, 28:7, 28:9, 54:5, 54:6, 54:12, 55:13, 57:16, 94:12, 101:12, 102:25, 103:12, 103:23, 121:23, 121:24, 122:5, 124:24, 135:5, 151:5, 159:4, 163:11, 201:21, 202:2, 215:16, 215:20, 227:6, 233:7, 233:14, 233:20, 234:20, 238:2
**Aids** [1] - 209:14
**aim** [1] - 98:23
**airing** [1] - 66:2
**AKS** [3] - 206:24, 206:25, 207:2
**alcohol** [2] - 193:11, 209:14
**Aleem** [3] - 65:16, 66:16, 117:8
**alive** [1] - 152:13
**allegation** [1] - 49:18
**allegations** [3] - 228:2, 228:3, 231:10
**alleles** [1] - 121:11

**allow** [1] - 91:5
**allowed** [7] - 31:17, 36:4, 36:6, 36:24, 47:11, 209:3, 209:13
**almost** [9] - 11:18, 27:14, 27:16, 27:20, 39:20, 41:10, 72:6, 110:19, 206:6
**alone** [3] - 95:9, 99:25, 100:13
**altered** [1] - 219:18
**amazed** [1] - 59:19
**ambition** [1] - 29:1
**America** [1] - 4:4
**AMERICA** [1] - 1:3
**Amina** [1] - 74:15
**amount** [11] - 25:21, 33:9, 56:10, 73:5, 79:18, 81:15, 81:24, 106:11, 180:6, 194:6, 225:22
**amounts** [4] - 17:1, 110:7, 119:15, 120:9
**Amy** [2] - 138:14, 217:18
**Anderson** [1] - 123:18
**Angeles** [2] - 21:24, 51:19
**angle** [1] - 188:17
**ankle** [1] - 33:13
**announce** [1] - 228:13
**announcing** [1] - 227:18
**answer** [23] - 24:2, 25:15, 27:12, 28:5, 29:21, 40:24, 41:6, 41:19, 41:24, 41:25, 49:7, 73:3, 80:9, 83:12, 85:4, 137:6, 141:10, 171:19, 205:9, 205:17, 205:24, 206:1, 209:15
**answered** [1] - 29:19
**answering** [2] - 191:4, 205:16
**answers** [2] - 174:15, 201:6
**Anthony's** [2] - 18:2, 18:9
**Anti** [5] - 167:25, 171:16, 173:12, 207:3, 209:24
**Anti-Kickback** [5] - 167:25, 171:16, 173:12, 207:3, 209:24
**anticipate** [1] - 234:23
**anticipated** [1] - 218:13
**anticipation** [2] - 225:23, 235:6
**anxious** [1] - 125:21
**anytime** [1] - 41:15
**anyway** [2] - 206:12, 218:7
**apologize** [7] - 18:11, 121:4, 170:3, 188:19, 194:16, 199:14, 218:25
**appear** [5] - 53:11, 94:20, 132:15, 221:6, 222:21
**appearance** [2] - 31:21, 47:19
**APPEARANCES** [1] - 1:11

**Appearances** [1] - 2:1
**appearances** [2] - 36:8, 36:10
**appeared** [1] - 228:25
**application** [5] - 161:24, 162:2, 187:21, 225:11
**applied** [3] - 115:12, 161:21, 186:17
**applies** [1] - 8:5
**applying** [1] - 213:11
**appointment** [1] - 124:4
**appreciate** [8] - 5:10, 6:3, 15:15, 142:2, 159:5, 211:11, 223:23, 225:3
**appreciated** [1] - 7:19
**approach** [11] - 21:15, 45:4, 60:13, 131:2, 131:4, 135:19, 150:10, 154:5, 154:14, 154:15, 175:2
**approaches** [1] - 124:17
**appropriate** [5] - 127:4, 130:17, 175:7, 221:10, 236:1
**appropriately** [1] - 144:7, 236:6
**appropriateness** [2] - 225:11, 225:18
**April** [5] - 39:8, 39:17, 53:17, 227:20, 228:11
**architect** [4] - 23:2, 23:5, 23:8, 23:9
**area** [7] - 31:24, 85:24, 92:15, 92:16, 140:6, 153:21, 212:11
**areas** [1] - 164:16
**argue** [1] - 63:18
**argued** [1] - 62:9
**arguments** [1] - 117:1
**armed** [2] - 19:17, 19:18
**army** [1] - 20:1
**arrange** [2] - 236:21, 239:1
**arrangement** [2] - 38:12, 163:9
**arrangements** [4] - 4:14, 36:11, 36:12, 174:17
**arrest** [3] - 33:2, 45:17, 46:1
**arrested** [7] - 31:16, 31:18, 31:24, 34:13, 50:17, 51:25, 63:16
**arrived** [1] - 4:7
**art** [1] - 194:1
**articles** [1] - 152:14
**Arts** [1] - 148:4
**Asef** [2] - 18:16, 18:17
**aside** [5] - 65:11, 70:2, 102:15, 152:17, 215:8
**Asif** [3] - 18:17, 19:25
**aspect** [4] - 111:25, 192:6, 228:7, 229:6
**aspects** [1] - 112:20

**asserted** [1] - 151:4
**assessment** [2] - 86:1, 156:17
**assets** [6] - 49:4, 49:7, 49:8, 49:22, 49:25, 50:2
**assigned** [1] - 14:3
**assistance** [2] - 23:16, 212:21
**assistant** [2] - 59:2, 88:19
**associated** [2] - 145:2, 145:21
**assume** [9] - 21:19, 32:2, 62:19, 123:8, 197:15, 201:1, 204:2, 224:25, 225:6
**assumed** [1] - 153:21
**assuming** [3] - 20:24, 76:22, 87:14
**assumption** [1] - 222:8
**assure** [1] - 91:10
**astounded** [2] - 59:19, 61:9
**Atlanta** [14] - 1:19, 2:4, 2:7, 47:3, 47:10, 47:16, 47:18, 47:24, 74:6, 185:15, 186:2, 190:14, 192:15, 192:20
**attached** [2] - 98:21, 212:12
**attachment** [2] - 56:17, 81:22
**attachments** [1] - 56:12
**attempt** [1] - 117:3
**attempting** [2] - 49:21, 235:25
**attend** [3] - 196:23, 203:14, 203:20
**attendance** [1] - 202:23
**attending** [1] - 197:10
**attention** [12] - 28:22, 28:24, 29:2, 29:7, 29:17, 29:22, 30:2, 30:9, 111:17, 112:19, 112:20, 209:23
**attestation** [1] - 138:21
**attorney** [6] - 66:1, 168:11, 168:19, 168:23, 201:3
**attorneys** [2] - 131:17, 153:16
**attract** [1] - 112:19
**August** [5] - 148:8, 150:3, 195:1, 195:11, 229:21
**Austin** [1] - 18:5
**authorization** [1] - 85:24
**authorized** [1] - 110:16
**availability** [1] - 204:16
**available** [1] - 198:21
**avarice** [1] - 106:10
**Avenue** [1] - 1:16
**avoid** [5] - 8:11, 8:20, 217:9, 226:9, 237:15
**aware** [7] - 9:19, 9:11, 95:20, 99:24, 130:4, 130:9, 177:3

**B**

**B-1** [5] - 3:25, 186:22, 187:1, 187:4, 213:2
**B-10** [5] - 3:25, 186:22, 187:1, 212:4, 213:2
**B-2** [1] - 206:7
**B-3** [1] - 210:21
**B-4** [2] - 194:22, 194:24
**B-5** [1] - 197:12
**B-6** [1] - 198:19
**B-7** [1] - 199:1
**B-8** [1] - 202:12
**B-9** [1] - 204:4
**babysit** [1] - 238:12
**Bachelor** [2] - 148:4, 148:5
**bachelor's** [1] - 148:4
**backed** [2] - 25:3, 221:9
**background** [3] - 148:3, 226:8, 227:2
**backgrounds** [1] - 228:8
**backs** [1] - 42:20
**bad** [2] - 76:15, 77:21
**badge** [2] - 78:5, 78:6
**bake** [1] - 160:13
**BAKER** [1] - 2:5
**balance** [5] - 130:22, 131:4, 237:4, 237:17, 238:7
**ball** [1] - 216:15
**Band** [1] - 209:14
**Band-Aids** [1] - 209:14
**based** [13] - 109:9, 128:3, 128:10, 132:18, 146:10, 169:18, 174:14, 175:9, 220:19, 221:25, 231:6
**bases** [5] - 20:1, 20:2, 20:4, 20:8, 20:9
**basic** [3] - 163:12, 196:4, 226:1
**basics** [1] - 196:3
**basis** [5] - 6:1, 43:1, 78:1, 111:24, 175:10
**batches** [1] - 16:25
**Bates** [1] - 172:21
**BEACH** [1] - 1:2
**Beach** [2] - 123:5, 147:19, 147:21
**beat** [1] - 125:25
**became** [3] - 11:22, 210:5, 211:8
**become** [3] - 30:14, 148:15, 159:14
**becoming** [1] - 127:20
**BEFORE** [1] - 1:10
**began** [5] - 10:24, 15:2, 15:10, 34:24, 165:5
**begin** [4] - 108:23, 182:25, 219:5, 223:21
**beginning** [8] - 72:9,

150:21, 161:11, 161:16, 169:24, 178:2, 226:3, 230:21
**begins** [2] - 66:2, 104:25
**begun** [1] - 40:1
**behalf** [6] - 4:18, 9:4, 29:15, 102:25, 117:1, 235:9
**behind** [1] - 193:22
**behold** [1] - 40:8
**beliefs** [1] - 224:20
**bell** [1] - 199:24
**belonging** [1] - 229:24
**below** [3] - 66:14, 113:2, 138:21
**beneficiaries** [8] - 20:21, 23:23, 24:7, 24:9, 82:23, 84:24, 104:25, 107:10
**benefit** [4] - 24:8, 45:22, 177:21, 201:14
**benefits** [2] - 179:4, 238:4
**Benefits** [3] - 21:2, 59:20, 118:19
**Berarducci** [14] - 88:21, 94:18, 166:12, 166:20, 169:12, 169:20, 176:25, 182:1, 186:9, 186:14, 192:5, 203:19, 210:25, 215:25
**Bernadette** [1] - 91:24
**best** [8] - 25:22, 125:17, 141:12, 183:21, 205:17, 212:25, 223:21, 232:18
**best-case** [1] - 223:21
**better** [11] - 8:19, 103:21, 125:13, 133:18, 143:9, 159:14, 164:1, 187:6, 188:13, 217:21, 221:24
**between** [19] - 16:9, 16:14, 17:7, 18:25, 24:16, 25:8, 26:22, 38:18, 40:13, 40:16, 40:21, 42:5, 55:24, 70:7, 160:1, 168:22, 170:9, 181:13
**beyond** [2] - 86:14, 145:22
**big** [6] - 155:20, 164:22, 192:22, 197:17, 201:4, 225:12
**bill** [2] - 106:17, 112:12
**billable** [1] - 85:17
**billed** [1] - 26:2
**billing** [19] - 21:18, 21:25, 22:5, 22:6, 22:7, 22:8, 22:11, 25:25, 26:18, 26:19, 26:20, 26:24, 62:22, 105:11, 106:15, 106:16, 112:11
**Billing** [1] - 26:25
**birth** [2] - 92:3, 131:1
**bit** [29] - 4:10, 5:21, 6:7, 6:14, 7:17, 7:19, 31:20, 73:22, 102:8, 102:14, 150:8, 152:3, 159:9, 170:19, 182:19, 182:25, 195:3, 196:13, 214:1, 214:5,

221:12, 224:12, 226:7, 226:18, 227:2, 231:2, 232:13, 237:23, 238:13
**bits** [1] - 80:13
**bladder** [1] - 95:2
**blatantly** [1] - 112:14
**block** [1] - 75:19
**blood** [9] - 132:2, 133:2, 150:4, 161:4, 180:1, 193:9, 194:9, 196:8, 215:5
**blue** [1] - 148:17
**Blue** [1] - 119:18
**board** [2] - 4:15, 72:21
**body** [2] - 87:18, 143:8
**BOER** [50] - 1:13, 3:13, 3:14, 4:19, 5:5, 7:8, 27:25, 57:14, 60:15, 103:2, 103:15, 158:5, 158:15, 158:17, 158:19, 159:1, 165:15, 165:24, 166:1, 166:2, 175:11, 175:18, 176:1, 183:25, 184:3, 184:5, 186:24, 213:5, 213:9, 215:21, 215:23, 216:6, 218:2, 218:4, 218:7, 218:17, 218:24, 219:2, 219:9, 219:13, 219:24, 220:2, 220:16, 221:3, 222:3, 223:3, 225:21, 226:24, 234:1, 238:21
**Boer** [1] - 222:25
**bond** [23] - 32:25, 33:2, 33:3, 33:8, 33:10, 33:12, 33:16, 33:21, 34:4, 34:7, 34:10, 34:17, 34:24, 36:19, 44:22, 46:1, 46:5, 46:10, 47:8, 49:1, 52:12, 61:21, 230:2
**born** [2] - 12:6, 12:8
**boss** [8] - 110:11, 160:5, 161:6, 162:2, 163:7, 182:15, 187:25
**Boston** [1] - 9:17
**bottle** [1] - 108:8
**bottles** [2] - 108:9, 118:16
**bottom** [12] - 64:25, 66:16, 77:15, 86:9, 87:22, 136:9, 137:8, 137:14, 138:25, 149:21, 155:3, 167:17
**Boulevard** [2] - 1:23, 239:15
**box** [2] - 105:14, 156:16
**boxed** [1] - 180:15
**bracelets** [1] - 37:13
**brand** [2] - 18:1, 196:7
**brand-new** [1] - 196:7
**BRCA1** [1] - 145:8
**BRCA2** [1] - 145:8
**break** [14] - 54:3, 54:4, 54:6, 54:11, 54:13, 62:7,

101:12, 102:1, 102:7, 102:25, 201:19, 201:23, 202:2, 218:22
**breakdown** [1] - 178:23
**breaking** [1] - 216:11
**breaks** [2] - 237:24
**breast** [16] - 96:8, 96:9, 137:15, 137:18, 137:19, 137:24, 144:10, 144:11, 144:12, 144:13, 144:14, 144:17, 144:20, 144:23, 145:5, 145:6
**Brett** [13] - 35:7, 35:18, 38:19, 38:20, 39:14, 39:25, 40:2, 40:3, 40:14, 59:14, 64:5, 98:2, 108:19
**Brian** [4] - 122:16, 122:23, 131:17, 153:15
**BRIAN** [4] - 2:5, 3:5, 122:20, 122:24
**brick** [19] - 69:5, 69:7, 69:8, 89:4, 89:5, 89:7, 89:11, 90:4, 90:20, 91:5, 91:10, 92:8, 92:23, 191:14, 191:16, 191:17, 191:19, 191:25, 211:17
**brick-and-mortar** [3] - 69:5, 89:4, 191:19
**brick-or-mortar** [1] - 191:14
**brief** [6] - 7:8, 156:24, 156:25, 157:8, 201:19, 201:22
**briefly** [8] - 102:7, 153:10, 156:7, 213:10, 219:13, 222:6, 232:24, 237:10
**Bright** [1] - 82:16
**brilliant** [1] - 106:8
**bring** [17] - 4:18, 102:3, 103:13, 103:23, 114:15, 126:10, 135:17, 136:25, 137:21, 145:20, 151:20, 162:6, 162:15, 202:5, 222:14, 232:25, 233:6
**bringing** [3] - 222:11, 222:16, 234:1
**brings** [2] - 115:14, 227:12
**brochure** [2] - 84:18, 86:1
**brochures** [3] - 105:7, 105:8, 107:23
**broke** [1] - 103:20
**Bronx** [1] - 12:8
**brother** [2] - 53:18, 109:19
**brought** [9] - 19:1, 19:5, 68:19, 72:6, 93:18, 170:6, 175:12, 182:3, 213:20
**Broward** [3] - 1:23, 123:24, 239:15
**Bryan** [7] - 88:2, 88:9, 89:1, 89:3, 92:1, 92:5

**bubble** [5] - 106:2, 106:9, 149:7, 155:20
**buckets** [1] - 146:10
**build** [3] - 105:1, 160:12, 208:12
**building** [2] - 161:12, 189:10
**bullet** [7] - 167:17, 172:4, 173:15, 173:19, 173:22, 189:16, 189:24
**bump** [2] - 101:23, 217:9
**bunch** [3] - 104:15, 110:2, 112:16
**bundled** [1] - 105:11
**business** [41] - 22:17, 22:20, 33:17, 33:21, 38:18, 42:23, 44:16, 46:24, 67:12, 67:15, 67:18, 79:5, 81:2, 81:3, 81:25, 86:23, 89:24, 90:2, 90:3, 90:25, 91:8, 98:20, 99:6, 99:7, 99:9, 99:11, 100:16, 106:15, 107:7, 108:1, 108:2, 108:5, 108:7, 113:8, 192:7, 207:6, 221:17, 228:2
**businesses** [1] - 97:16
**buy** [1] - 118:16
**BY** [83] - 1:20, 3:4, 3:4, 3:6, 3:7, 3:7, 3:9, 3:10, 3:10, 3:11, 3:13, 3:13, 3:14, 11:9, 28:15, 29:23, 37:19, 45:7, 55:18, 57:22, 60:18, 66:15, 69:14, 73:23, 78:8, 83:5, 83:25, 84:17, 88:14, 90:9, 92:22, 94:16, 97:21, 100:18, 100:21, 104:12, 111:6, 113:15, 115:1, 115:9, 119:24, 121:8, 123:1, 129:2, 129:8, 130:15, 131:14, 135:7, 135:13, 135:24, 136:10, 137:4, 137:17, 137:23, 138:8, 138:12, 139:1, 142:1, 142:8, 147:15, 151:7, 153:14, 154:20, 156:13, 157:11, 158:19, 159:1, 166:2, 176:1, 184:3, 184:10, 187:7, 190:2, 195:5, 195:9, 196:14, 197:13, 202:11, 209:12, 212:1, 212:5, 213:9, 215:23
**byes** [1] - 183:9

## C

**Cahaba** [3] - 96:14, 96:17, 97:12
**calendar** [1] - 10:11
**call-in** [1] - 200:14
**caller** [1] - 149:13
**Camille** [8] - 87:19, 87:24,

88:3, 88:15, 88:16, 88:17, 95:11, 95:18

**cancer** [98] - 30:20, 56:10, 83:1, 83:10, 83:16, 83:18, 84:2, 84:6, 84:9, 84:11, 86:13, 92:2, 96:5, 104:21, 105:18, 105:22, 105:24, 106:19, 108:23, 115:16, 124:5, 124:7, 124:13, 124:15, 124:21, 124:22, 127:11, 127:13, 127:14, 127:16, 127:20, 127:21, 127:23, 129:20, 131:3, 131:24, 132:1, 133:1, 134:10, 136:1, 136:4, 136:13, 136:15, 136:16, 136:17, 136:18, 136:19, 136:21, 137:15, 137:18, 137:19, 137:25, 138:3, 142:13, 142:16, 142:20, 143:2, 143:21, 144:7, 144:10, 144:12, 144:13, 144:14, 144:15, 144:17, 144:20, 144:21, 144:24, 145:2, 145:5, 145:6, 145:7, 145:9, 145:11, 145:25, 146:14, 146:21, 148:7, 148:8, 148:10, 148:13, 148:20, 149:20, 149:24, 150:2, 152:10, 153:3, 153:5, 156:17, 198:3, 211:5, 224:19, 224:24, 225:19

**Cancer** [1] - 123:18

**cancers** [6] - 85:20, 86:2, 96:8, 127:17, 127:25, 129:25

**candidate** [1] - 128:8

**candidates** [1] - 128:9

**cannot** [8] - 99:23, 99:25, 168:3, 172:17, 210:12, 216:22, 217:3, 217:4

**capabilities** [1] - 189:8

**capitals** [1] - 112:21

**captain** [1] - 125:12

**card** [1] - 155:13

**cardiology** [2] - 159:13, 159:19

**care** [18] - 19:16, 76:15, 77:15, 77:20, 77:25, 111:21, 111:22, 111:24, 112:2, 126:16, 127:4, 130:11, 134:19, 145:17, 151:17, 151:23, 212:15, 227:13

**career** [2] - 134:11, 212:11

**careful** [2] - 149:8, 209:25

**Caribbean** [1] - 48:23

**Carolina** [1] - 227:24

**Carranza** [1] - 68:20

**carriers** [1] - 21:2

**cars** [1] - 118:12

**case** [17] - 5:9, 27:17,

32:20, 71:21, 71:22, 100:9, 116:11, 116:13, 118:4, 217:3, 217:4, 217:5, 217:8, 223:21, 231:24, 238:10

**CASE** [1] - 1:2

**Case** [1] - 4:4

**case-in-chief** [1] - 5:9

**cases** [1] - 101:4

**cash** [1] - 207:8

**Castle** [9] - 160:22, 160:23, 160:25, 161:2, 161:6, 161:15, 163:21, 185:6

**catch** [1] - 116:21

**catching** [1] - 230:16

**caught** [1] - 63:17

**caused** [2] - 177:8, 231:8

**caution** [1] - 213:4

**cc'd** [4] - 74:13, 88:21, 88:22, 98:2

**cc's** [1] - 77:11

**cease** [3] - 89:9, 89:15, 91:2

**cease-and-desist** [3] - 89:9, 89:15, 91:2

**cell** [9] - 107:19, 127:18, 127:22, 177:13, 177:14, 177:16, 183:7, 212:24, 215:12

**center** [2] - 174:21, 176:18

**Center** [3] - 123:5, 123:6, 123:18

**centers** [7] - 176:6, 176:9, 176:17, 176:24, 177:2, 182:22, 215:8

**CEO** [5] - 91:9, 199:11, 200:11, 209:2, 209:23

**certain** [11] - 6:21, 7:23, 8:17, 24:14, 27:14, 27:16, 90:6, 97:12, 115:24, 124:19, 233:2

**certainly** [17] - 4:15, 5:18, 8:17, 10:9, 28:6, 152:9, 175:15, 192:11, 198:16, 217:2, 222:14, 226:10, 233:9, 234:3, 237:4, 237:7, 238:8

**certificate** [2] - 219:14, 221:15

**certify** [1] - 239:9

**cetera** [4] - 95:3, 96:10, 152:12, 171:16

**CGx** [22] - 30:14, 30:25, 31:3, 31:6, 38:13, 39:11, 39:12, 39:13, 50:13, 59:21, 68:3, 68:12, 86:3, 89:3, 94:17, 95:23, 96:11, 96:12, 97:9, 131:22, 131:23, 148:11

**chain** [1] - 81:10

**chair** [1] - 139:25

**chairs** [2] - 54:5, 201:22

**challenge** [2] - 133:13, 133:14

**challenged** [1] - 133:17, 142:10

**challenges** [1] - 165:2

**challenging** [1] - 214:5

**chance** [4] - 8:1, 218:11, 218:14, 219:16

**change** [8] - 6:9, 61:7, 62:20, 97:16, 97:17, 120:23, 120:25, 126:20, 217:25

**changed** [4] - 97:6, 97:12

**changes** [1] - 175:13

**changing** [1] - 120:20

**channels** [1] - 182:4

**character** [1] - 77:10

**characterize** [1] - 30:1

**characterized** [1] - 23:1

**charge** [8] - 17:21, 56:10, 93:18, 94:1, 109:25, 110:1, 116:21, 181:24

**charged** [3] - 35:18, 39:13, 110:7

**charges** [1] - 39:12

**charts** [3] - 220:18, 221:5, 226:5

**chat** [2] - 41:3, 78:24

**check** [3] - 4:23, 121:12, 208:15

**checked** [2] - 4:8, 156:16

**checklist** [1] - 212:13

**cheeks** [1] - 149:3

**cheering** [1] - 104:4

**chemo** [1] - 150:3

**chief** [2] - 5:9, 199:16

**choice** [7] - 120:12, 120:17, 121:7, 121:9, 121:10, 130:24, 199:9

**choices** [1] - 120:16

**choose** [6] - 6:20, 6:24, 99:20, 106:18, 119:16, 234:24

**chooses** [1] - 28:6

**chose** [1] - 130:24

**Christmas** [1] - 119:9

**chromatography** [1] - 194:8

**chronology** [1] - 232:14

**circumstance** [2] - 119:1, 130:2

**circumstances** [1] - 124:12

**circus** [1] - 106:14

**civil** [1] - 238:24

**claims** [4] - 77:17, 112:23, 113:1, 113:3

**Claims** [1] - 173:12

**clarification** [2] - 96:24, 158:25, 209:19

**clarify** [1] - 210:8

**clarity** [1] - 219:25

**class** [2] - 205:5, 205:12

**classes** [1] - 211:9

**clause** [1] - 211:15

**cleaned** [1] - 233:15

**cleanest** [1] - 220:6

**clear** [12] - 11:12, 15:20, 30:5, 54:21, 89:8, 96:21, 96:25, 101:25, 122:1, 126:25, 166:5, 172:15

**clearly** [3] - 75:14, 78:18, 201:6

**click** [1] - 121:10

**client** [1] - 170:6

**clients** [1] - 162:15

**clinic** [4] - 14:5, 93:21, 146:4, 210:12

**Clinic** [7] - 88:2, 88:9, 89:2, 89:3, 92:1, 92:5

**Clinical** [1] - 128:14

**clinical** [4] - 124:19, 128:10, 161:1, 165:11

**clinically** [2] - 127:15, 174:14

**clinics** [2] - 135:9, 209:19

**Clio** [4] - 35:15, 35:16, 38:20, 39:15

**close** [1] - 26:10

**closed** [3] - 96:6, 228:15, 228:19

**closer** [3] - 151:1, 159:2, 184:15

**clothes** [1] - 118:15

**clubs** [1] - 118:16

**co** [3] - 20:12, 114:20, 148:25

**co-conspirators** [2] - 20:12, 114:20

**co-pay** [1] - 148:25

**coats** [1] - 209:7

**code** [1] - 153:21

**codes** [15] - 56:23, 57:2, 57:3, 57:4, 85:11, 85:17, 94:20, 94:23, 95:1, 95:4, 95:6, 95:7, 97:15, 105:13, 120:25

**coding** [1] - 211:1

**coffee** [1] - 102:3

**collateral** [1] - 201:14

**colleagues** [1] - 7:21

**collect** [2] - 112:17, 114:9

**collected** [1] - 106:6

**collecting** [3] - 94:1, 105:5, 105:9

**collector** [2] - 93:25, 94:3, 210:13

**collectors** [1] - 74:6

**college** [4] - 13:7, 13:13, 13:16, 205:5

**colorectal** [1] - 145:10

combination [3] - 119:20, 119:21, 180:1
comfort [1] - 211:17
comfortable [3] - 183:23, 207:22, 211:17
coming [18] - 5:21, 7:9, 32:2, 79:19, 105:5, 143:20, 163:8, 178:20, 178:21, 178:23, 180:22, 182:4, 182:20, 183:8, 191:13, 225:7, 226:3, 231:25
comment [1] - 222:20
commenting [1] - 170:15
commercial [3] - 67:1, 107:23, 117:9
commission [4] - 81:14, 81:18, 87:5, 181:17
commissions [1] - 86:23
commit [2] - 28:13, 117:5
commitment [2] - 105:2, 173:7
committed [2] - 104:16, 107:3
committing [4] - 22:22, 22:24, 28:13, 46:11
common [5] - 132:20, 136:18, 144:13, 144:16, 145:8
communicate [5] - 9:13, 41:12, 41:20, 114:19, 233:11
communicated [3] - 41:10, 108:18, 110:18
communicating [5] - 43:1, 108:12, 108:14, 116:20, 200:12
communication [3] - 110:23, 117:7, 152:20
communications [2] - 41:17, 189:14
community [3] - 80:1, 82:13, 107:18
comorbidities [1] - 128:6
companies [6] - 20:3, 26:24, 113:25, 126:7, 171:17, 181:9
company [50] - 9:4, 17:20, 17:21, 17:22, 17:23, 17:25, 18:1, 18:2, 18:9, 18:15, 18:18, 21:18, 21:25, 22:3, 22:5, 22:6, 22:7, 22:8, 22:11, 26:1, 26:18, 26:19, 26:20, 50:14, 58:2, 58:3, 58:6, 58:18, 62:22, 69:23, 69:24, 74:10, 99:7, 132:21, 158:24, 159:13, 159:16, 160:6, 160:21, 160:25, 166:23, 178:9, 183:7, 190:13, 190:24, 198:22, 200:11, 220:10
company's [2] - 81:14, 198:22
Compass [3] - 14:9, 14:14, 14:15
competitive [1] - 189:4
complaining [1] - 112:4
complaint [3] - 228:11, 228:22, 228:23
complaints [1] - 112:7
complete [7] - 24:3, 69:17, 101:13, 102:15, 123:13, 218:21, 232:23
completed [1] - 10:24
completely [6] - 7:9, 108:19, 110:1, 110:15, 149:1
completing [1] - 218:21
compliance [28] - 165:8, 165:12, 167:5, 167:11, 167:18, 168:12, 169:8, 170:16, 170:20, 171:4, 171:8, 171:25, 172:23, 173:7, 188:4, 195:19, 195:20, 195:21, 199:22, 200:7, 200:16, 200:22, 202:15, 204:15, 210:16, 214:10, 214:12, 224:1
Compliance [1] - 167:2
comply [2] - 195:20, 210:18
complying [1] - 210:1
component [1] - 29:4
compound [2] - 19:8, 24:5
compounding [21] - 15:19, 15:23, 16:19, 16:20, 17:3, 20:1, 21:25, 22:18, 22:23, 23:18, 23:22, 24:5, 31:5, 31:7, 38:24, 39:5, 39:7, 73:4, 104:16, 105:21, 106:1
compounds [4] - 16:24, 18:19, 19:23, 24:6
comprehensive [1] - 105:12
computer [2] - 17:21, 197:8
computerized [2] - 132:8, 132:11
concern [15] - 7:5, 7:6, 113:5, 113:21, 174:11, 177:8, 222:25, 227:1, 228:6, 228:10, 229:14, 231:8, 232:8, 233:4, 233:15
concerned [8] - 67:11, 112:4, 112:6, 176:13, 177:19, 183:12, 230:8, 237:21
concerning [4] - 16:14, 97:13, 174:19, 177:25
concerns [9] - 176:23, 177:16, 180:11, 182:22, 215:24, 221:12, 221:16, 221:19, 233:17
conclude [2] - 216:10, 219:12

conditions [9] - 33:12, 33:18, 34:4, 34:7, 34:10, 34:17, 36:19, 46:10, 230:2
conduct [2] - 30:8, 101:21
conducted [1] - 221:17
conducting [2] - 99:11, 200:22
confer [2] - 230:21, 232:24
conference [2] - 87:15, 87:23
confirm [3] - 4:19, 102:17, 204:16
confused [3] - 25:19, 176:13, 210:8
confusing [3] - 174:19, 204:5, 207:8
Congress [1] - 207:5
connected [3] - 162:3, 168:1, 168:2
connection [4] - 17:4, 50:13, 116:14, 191:24
conservative [1] - 210:1
consider [2] - 84:10, 145:6
considered [1] - 128:14
considering [2] - 49:10, 145:9
conspiracy [13] - 18:7, 18:22, 34:12, 36:16, 37:3, 39:14, 39:21, 43:24, 50:3, 62:10, 117:16
conspirator [1] - 47:15
conspirators [2] - 20:12, 114:20
conspired [3] - 16:17, 17:10, 17:16
constraints [1] - 164:17
consult [2] - 105:3, 152:23
consulting [1] - 110:13
contact [10] - 9:9, 14:24, 15:8, 21:13, 21:14, 60:2, 34:17, 134:19, 168:18, 168:20
contacted [1] - 183:6
contacts [3] - 20:4, 20:9, 21:12
contain [2] - 82:21, 82:22
contained [1] - 228:15
containing [1] - 130:25
content [1] - 229:6
context [6] - 16:18, 42:17, 42:18, 207:21, 207:24, 225:9
continue [8] - 91:1, 104:7, 104:21, 126:15, 151:2, 202:10, 217:2, 217:6
continued [6] - 2:1, 15:12, 15:13, 35:21, 39:14, 185:12
continuing [2] - 36:16, 90:25
contract [4] - 22:5, 65:19, 98:20, 99:13

contracted [1] - 181:14
contractor [1] - 208:10
contractors [3] - 208:20, 209:3, 209:14
contracts [2] - 163:10, 181:19
contradictions [1] - 78:1
contribute [2] - 180:11, 180:18
control [3] - 131:2, 165:3, 214:6
controlled [1] - 106:14
controls [1] - 106:16
conversation [4] - 71:7, 77:5, 90:24, 126:22
convert [1] - 82:23
conveyed [1] - 170:16
conveying [2] - 190:4
convicted [2] - 109:13, 116:11
convince [6] - 29:11, 29:16, 29:25, 90:22, 90:25, 91:8
convinced [1] - 91:5
Cook [1] - 48:24
Cooke [3] - 74:3, 74:5, 77:7
cooperating [5] - 40:1, 40:2, 62:1, 62:3, 71:23
cooperation [1] - 116:4
cooperator [1] - 217:23
coordinate [1] - 75:1
coordinating [1] - 75:12
copied [1] - 169:12
copy [4] - 5:7, 5:10, 129:4, 157:16
copying [1] - 98:25
Cornell [1] - 123:16
corner [1] - 155:3
correct [302] - 11:19, 11:23, 11:24, 11:25, 12:1, 12:6, 12:14, 12:25, 13:1, 13:3, 13:7, 13:11, 13:14, 13:16, 13:18, 14:20, 15:1, 15:3, 15:4, 15:10, 15:12, 15:22, 16:6, 17:4, 17:5, 17:10, 17:17, 18:20, 19:19, 19:20, 20:8, 20:15, 20:21, 20:22, 20:24, 22:11, 22:12, 23:10, 23:11, 23:17, 23:20, 23:24, 24:7, 25:5, 26:7, 28:19, 29:18, 30:3, 31:7, 31:8, 33:4, 33:18, 34:17, 34:19, 34:25, 35:1, 35:9, 35:10, 35:11, 35:13, 35:16, 35:25, 36:2, 36:8, 36:11, 36:16, 36:22, 37:1, 37:21, 38:1, 38:14, 38:21, 38:22, 38:24, 39:6, 39:11, 39:15, 39:19, 40:1, 40:4, 40:11, 40:12, 42:8, 42:15, 43:8, 43:9, 43:14, 44:6, 44:15, 44:17, 44:20,

45:10, 45:11, 45:15, 45:23, 46:6, 46:7, 46:11, 46:25, 47:1, 47:14, 48:8, 49:1, 49:2, 49:11, 49:12, 49:16, 49:19, 49:20, 49:24, 50:19, 52:22, 53:14, 53:25, 55:25, 56:1, 56:2, 56:3, 56:4, 56:8, 56:9, 56:10, 56:11, 56:13, 56:14, 56:17, 56:18, 56:21, 56:22, 57:2, 57:5, 57:7, 57:10, 57:11, 58:13, 58:14, 58:24, 59:8, 59:9, 59:15, 59:16, 59:21, 59:22, 60:5, 61:24, 62:2, 62:17, 62:18, 63:1, 63:5, 63:6, 64:12, 64:13, 64:15, 64:16, 64:18, 64:21, 65:1, 65:2, 65:9, 65:20, 65:21, 66:5, 66:23, 67:17, 68:13, 72:3, 76:18, 76:20, 80:15, 81:20, 82:1, 82:18, 83:17, 83:18, 83:21, 83:22, 85:2, 85:10, 86:4, 86:23, 87:5, 87:6, 88:5, 88:7, 88:22, 88:24, 89:2, 89:12, 89:19, 89:25, 90:1, 91:6, 91:11, 91:20, 91:21, 94:4, 94:5, 95:21, 95:23, 96:15, 96:16, 97:2, 97:3, 97:9, 97:10, 97:18, 97:23, 97:24, 98:8, 98:12, 99:7, 99:11, 99:12, 99:19, 100:5, 100:11, 100:14, 101:2, 108:22, 114:7, 117:6, 117:24, 119:22, 130:3, 130:12, 132:13, 133:11, 134:3, 134:6, 134:9, 134:12, 134:23, 136:22, 140:23, 141:2, 141:9, 141:14, 141:23, 146:13, 146:15, 152:19, 153:24, 157:15, 157:21, 169:3, 169:9, 170:17, 174:5, 184:24, 185:13, 185:25, 186:12, 186:15, 186:23, 187:10, 187:15, 187:18, 188:2, 188:4, 188:6, 190:6, 191:6, 191:9, 191:12, 191:14, 191:15, 192:1, 192:22, 193:25, 194:2, 194:3, 195:12, 195:16, 196:17, 196:21, 197:10, 197:20, 200:5, 200:9, 200:18, 202:16, 203:4, 205:24, 206:3, 207:12, 208:1, 208:3, 208:4, 208:6, 208:7, 208:14, 208:16, 208:22, 210:19, 211:2, 211:10, 211:21, 214:16, 214:18, 219:2, 221:3
**Correct** [1] - 218:17
**correctly** [2] - 144:3, 144:19

**correspond** [1] - 234:4
**corroborate** [1] - 71:6
**corroborating** [1] - 41:16
**cost** [9] - 70:7, 70:17, 70:20, 71:2, 73:1, 73:7, 73:10, 148:21
**Costa** [1] - 104:4
**costs** [2] - 70:12, 113:24
**counsel** [1] - 11:4
**counseling** [8] - 126:10, 134:14, 134:15, 134:21, 227:14, 227:21, 227:24, 228:8
**counselor** [1] - 126:11
**counsels'** [1] - 102:14
**counter** [1] - 125:24
**counteract** [1] - 130:21
**countries** [1] - 48:19
**country** [1] - 48:16
**couple** [21] - 11:13, 37:7, 50:9, 74:24, 94:7, 94:10, 98:18, 103:17, 105:7, 105:8, 111:4, 120:16, 139:24, 149:6, 196:11, 197:14, 199:18, 218:2, 225:8, 232:22, 235:11
**course** [20] - 6:16, 6:20, 47:11, 48:25, 55:12, 101:19, 107:7, 130:17, 140:8, 140:15, 140:16, 141:17, 146:12, 155:2, 186:5, 186:19, 212:17, 216:19, 216:22, 222:9
**COURT** [157] - 1:1, 4:2, 4:22, 5:1, 5:4, 6:6, 7:5, 8:3, 8:24, 9:2, 9:6, 9:23, 10:4, 10:8, 10:15, 10:18, 10:20, 28:1, 28:7, 28:9, 29:20, 37:15, 45:4, 54:4, 54:8, 54:10, 54:16, 54:21, 54:22, 54:24, 55:7, 55:11, 57:16, 57:19, 60:14, 60:17, 90:8, 94:12, 100:20, 101:10, 102:6, 102:21, 103:3, 103:6, 103:11, 103:20, 103:24, 104:1, 111:5, 121:2, 121:22, 122:3, 122:5, 122:8, 122:12, 122:17, 128:18, 128:20, 129:1, 130:14, 131:11, 135:5, 135:20, 141:25, 142:4, 147:1, 147:6, 150:11, 150:21, 150:25, 153:12, 154:7, 154:15, 154:18, 156:4, 156:8, 156:11, 156:25, 157:4, 157:6, 157:24, 158:2, 158:7, 158:16, 165:18, 165:20, 165:25, 175:3, 175:20, 175:23, 175:25, 184:1, 184:7, 186:23, 186:25,

187:3, 201:18, 201:21, 202:1, 202:5, 202:6, 202:8, 213:3, 213:6, 215:16, 215:18, 215:22, 216:7, 216:9, 217:16, 218:3, 218:6, 218:15, 218:18, 218:25, 219:3, 219:10, 219:16, 219:20, 219:23, 220:1, 220:15, 220:20, 221:11, 222:4, 222:7, 222:24, 223:4, 223:9, 223:14, 224:3, 224:6, 224:10, 224:14, 225:4, 226:6, 226:25, 227:4, 229:13, 229:17, 229:20, 230:7, 231:12, 231:16, 232:21, 233:23, 234:8, 234:13, 235:2, 235:14, 235:17, 235:22, 236:10, 237:3, 238:17, 238:20, 238:22
**court** [19] - 5:15, 9:10, 16:10, 18:8, 18:12, 31:21, 33:5, 36:8, 36:10, 36:15, 36:23, 43:13, 45:19, 46:3, 47:13, 151:6, 158:25, 175:22
**Court** [23] - 1:22, 1:23, 4:1, 9:19, 54:2, 54:14, 96:24, 102:7, 103:9, 202:3, 219:15, 222:9, 224:2, 224:11, 229:19, 230:6, 232:25, 233:12, 235:25, 236:1, 239:5, 239:14, 239:15
**Court's** [5] - 9:13, 55:4, 55:10, 230:22, 231:22
**COURTROOM** [5] - 122:19, 122:21, 147:10, 158:9, 158:11
**courtroom** [3] - 102:9, 108:7, 216:21
**cover** [4] - 168:15, 187:14, 210:16, 219:3
**coverage** [1] - 164:3
**covered** [3] - 164:2, 167:22, 212:19, 233:21, 233:25
**covering** [2] - 163:23, 168:10
**covers** [1] - 233:22
**COVID** [1] - 190:9
**CPT** [1] - 56:10
**creams** [3] - 16:20, 24:5, 24:6
**create** [2] - 171:8, 179:2
**created** [1] - 220:11
**crime** [3] - 63:7, 63:19, 109:13
**crimes** [6] - 39:13, 46:11, 107:3, 114:22, 117:5, 121:15
**CRIMINAL** [1] - 1:15
**criminal** [16] - 34:25, 41:21, 63:14, 63:17, 67:5, 67:9,

68:8, 75:15, 76:23, 77:2, 77:3, 77:7, 77:23, 77:24, 79:15, 100:16
**criteria** [5] - 85:1, 85:17, 87:23, 120:25, 124:19
**critical** [1] - 145:18
**CRM** [6] - 162:17, 178:4, 178:14, 178:17, 178:19, 180:5
**CROSS** [8] - 3:4, 3:7, 3:10, 3:13, 11:8, 131:13, 153:13, 184:9
**cross** [23] - 5:15, 5:22, 7:12, 8:5, 10:25, 106:23, 131:11, 153:10, 184:6, 184:8, 220:22, 223:13, 223:21, 233:10, 234:17, 236:3, 236:4, 236:6, 236:15, 236:16, 237:7, 237:25, 238:5
**Cross** [1] - 119:18
**cross-examination** [13] - 8:5, 10:25, 106:23, 131:11, 153:10, 184:6, 184:8, 223:13, 236:3, 236:4, 236:15, 236:16, 237:7
**CROSS-EXAMINATION** [8] - 3:4, 3:7, 3:10, 3:13, 11:8, 131:13, 153:13, 184:9
**cross-examinations** [2] - 234:17, 237:25
**crossed** [1] - 237:11
**CRR** [2] - 1:21, 239:14
**crystal** [1] - 11:12
**cumulative** [1] - 224:15
**curative** [1] - 151:3
**cured** [1] - 153:6
**curious** [2] - 190:9, 206:23
**current** [6] - 96:4, 118:8, 125:6, 141:6, 159:10, 177:22
**custody** [2] - 117:23, 118:1
**customer** [1] - 160:14
**customized** [1] - 16:25
**cut** [6] - 26:21, 53:21, 62:7, 99:17, 114:2, 152:16
**CUYLER** [1] - 1:14

**D**

**D.C** [1] - 1:16
**daily** [2] - 43:1, 198:7
**data** [2] - 59:3, 221:25
**date** [17] - 15:21, 32:25, 36:5, 41:4, 41:5, 47:4, 58:13, 65:7, 76:19, 79:11, 89:3, 90:12, 92:3, 144:3, 154:24, 194:25, 237:6
**DATE** [1] - 239:13
**Davis** [4] - 98:8, 98:25, 169:13, 210:25
**day-to-day** [1] - 170:5

**days** [14] - 33:2, 37:7, 90:14, 98:18, 169:5, 180:7, 196:12, 198:20, 199:19, 217:1, 224:23, 238:14

**days'** [1] - 195:10

**de** [1] - 222:25

**DE** [50] - 1:13, 3:13, 3:14, 4:19, 5:5, 7:8, 27:25, 57:14, 60:15, 103:2, 103:15, 158:5, 158:15, 158:17, 158:19, 159:1, 165:15, 165:24, 166:1, 166:2, 175:11, 175:18, 176:1, 183:25, 184:3, 184:5, 186:24, 213:5, 213:9, 215:21, 215:23, 216:6, 218:2, 218:4, 218:7, 218:17, 218:24, 219:2, 219:9, 219:13, 219:24, 220:2, 220:16, 221:3, 222:3, 223:3, 225:21, 226:24, 234:1, 238:21

**dead** [1] - 112:16

**deal** [12] - 6:4, 24:10, 24:19, 59:4, 73:11, 73:14, 95:22, 159:16, 159:18, 206:22, 232:11

**dealing** [7] - 22:10, 26:12, 35:21, 72:24, 112:1, 152:10, 170:5

**deals** [1] - 207:17

**dealt** [5] - 21:9, 22:10, 39:5, 170:4, 219:17

**Dear** [1] - 212:8

**December** [8] - 1:4, 47:5, 60:21, 71:24, 72:2, 72:5, 76:20, 239:13

**decide** [3] - 61:22, 130:17, 172:16

**decided** [1] - 162:6

**decides** [1] - 116:12

**deciding** [1] - 125:8

**decision** [8] - 62:14, 100:6, 129:14, 144:18, 146:11, 179:8, 182:23, 212:10

**decisions** [2] - 145:23, 145:24

**deck** [1] - 208:12

**deduction** [1] - 109:9

**deemed** [2] - 172:12, 207:12

**deep** [1] - 226:21

**Defendant** [1] - 1:7

**DEFENDANT** [2] - 1:17, 2:2

**defendant's** [1] - 5:7

**Defendant's** [2] - 154:9, 154:21

**DEFENDANT'S** [1] - 3:21

**defense** [20] - 5:25, 6:7, 6:15, 8:25, 11:1, 99:25, 103:3, 213:15, 214:11,

220:14, 220:21, 221:7, 221:22, 222:4, 233:19, 234:2, 234:18, 236:23, 238:4, 238:18

**Defense** [5] - 94:17, 157:2, 157:4, 157:9, 187:1

**defense's** [1] - 238:4

**define** [1] - 133:14

**definitely** [7] - 29:4, 104:23, 110:24, 152:8, 182:24, 218:8, 219:22

**definitive** [1] - 182:19

**defraud** [17] - 15:3, 15:7, 15:15, 15:16, 15:18, 16:6, 16:8, 16:14, 18:25, 19:6, 19:7, 19:18, 19:21, 21:16, 25:16, 28:16, 38:24

**defrauding** [1] - 19:14

**degree** [2] - 7:23, 148:5

**degrees** [1] - 148:4

**delay** [3] - 8:20, 77:18, 98:18

**delayed** [1] - 237:24

**delegate** [1] - 134:23

**deliberately** [1] - 115:13

**delivered** [1] - 16:23

**Delray** [2] - 147:19, 147:21

**demo** [1] - 179:2

**demos** [1] - 178:8

**DEPARTMENT** [1] - 1:15

**Department** [2] - 44:3, 44:19

**depiction** [1] - 83:19

**depth** [1] - 128:3

**deputy** [1] - 216:21

**DEPUTY** [5] - 122:19, 122:21, 147:10, 158:9, 158:11

**describe** [3] - 127:18, 159:9, 167:21

**described** [2] - 154:1, 211:22

**describing** [2] - 136:20, 160:19, 179:1

**designed** [3] - 24:6, 24:8, 200:8

**desire** [2] - 28:25, 29:1

**desist** [3] - 89:9, 89:15, 91:2

**detail** [5] - 114:16, 114:19, 209:22, 216:2, 226:2

**details** [2] - 107:14, 107:22

**detect** [2] - 115:16, 214:20

**detention** [2] - 36:20, 37:6

**determination** [3] - 134:1, 175:6, 223:1

**determine** [3] - 128:3, 144:11, 145:21

**determines** [1] - 116:7

**develop** [1] - 173:16

**developing** [1] - 145:17

**development** [5] - 104:5, 165:6, 168:12, 189:24, 190:3

**device** [4] - 130:25, 131:1, 131:5, 158:23

**devices** [2] - 159:16, 194:9

**diagnosed** [4] - 131:9, 148:8, 150:2, 150:9

**diagnostic** [3] - 121:6, 150:22, 225:18

**diagnostics** [1] - 85:22

**dialogue** [2] - 107:11, 210:5

**differ** [2] - 170:10, 180:3

**different** [34] - 21:9, 48:19, 52:25, 63:23, 74:20, 97:13, 111:13, 119:14, 119:15, 120:8, 120:9, 128:4, 139:15, 140:22, 140:24, 140:25, 141:12, 149:20, 160:6, 162:14, 164:5, 164:16, 164:18, 167:14, 171:14, 172:12, 178:24, 182:8, 195:15, 196:4, 213:21, 214:7

**differentiate** [1] - 162:25

**difficult** [2] - 203:6, 212:10

**digest** [1] - 236:8

**DIRECT** [6] - 3:6, 3:9, 3:13, 122:25, 147:14, 158:18

**direct** [12] - 6:20, 10:23, 19:24, 100:4, 117:22, 134:19, 168:18, 168:20, 184:20, 218:22, 223:11, 223:18

**directed** [5] - 11:18, 55:22, 68:11, 100:25, 111:17

**directing** [1] - 42:19

**direction** [2] - 82:12, 87:9

**directions** [2] - 149:4, 149:8

**directly** [6] - 24:16, 73:11, 134:18, 154:4, 177:21, 205:19

**director** [5] - 98:25, 123:7, 123:25, 166:19, 199:6

**disabilities** [1] - 147:24

**disability** [1] - 148:23

**disabled** [1] - 148:15

**disagree** [3] - 141:3, 141:21, 232:21

**disagreement** [1] - 233:1

**disappeared** [1] - 153:6

**disclose** [1] - 22:25

**disclosure** [1] - 235:12

**discovery** [8] - 21:1, 53:5, 71:19, 71:21, 71:22, 80:10, 80:13, 234:6

**discrepancies** [1] - 59:3

**discuss** [7] - 98:24, 101:19, 145:18, 151:20, 217:3, 217:4, 218:9

**discussed** [11] - 8:7, 103:18, 107:22, 152:8, 160:10, 167:6, 184:20, 216:13, 217:18, 219:14, 219:25

**discussing** [2] - 110:6, 120:20

**discussion** [3] - 126:17, 145:19, 220:21

**Discussion** [2] - 154:12, 184:2

**discussions** [1] - 192:4

**disease** [4] - 125:23, 129:21, 131:7, 145:2

**disrespectful** [1] - 86:16

**distributor** [21] - 164:9, 164:11, 164:13, 164:17, 164:21, 164:23, 164:24, 165:2, 165:5, 165:10, 165:11, 170:6, 172:23, 174:17, 174:20, 176:5, 181:19, 182:7, 196:19, 213:25, 214:4

**distributors** [41] - 165:7, 168:15, 170:9, 174:8, 174:10, 174:11, 174:16, 175:16, 176:16, 179:18, 179:21, 180:9, 181:13, 181:15, 181:25, 182:3, 183:4, 188:6, 190:13, 192:4, 195:15, 195:19, 195:22, 196:7, 198:5, 198:22, 201:13, 203:4, 203:6, 203:11, 203:18, 203:24, 204:23, 205:1, 205:16, 207:16, 207:24, 208:17, 208:19, 209:19, 214:14

**District** [4] - 1:23, 33:24, 36:7, 239:15

**DISTRICT** [3] - 1:1, 1:1, 1:10

**dive** [2] - 226:10, 226:21

**dividing** [1] - 25:19

**division** [2] - 123:25, 159:13

**DIVISION** [2] - 1:2, 1:15

**DJ** [1] - 18:6

**DJ-ing** [1] - 18:6

**DNA** [3] - 119:15, 149:21, 149:23

**doable** [1] - 235:22

**Doc** [1] - 125:24

**docket** [2] - 9:3, 117:25

**Doctor** [4] - 122:17, 123:2, 138:15, 147:2

**doctor** [36] - 27:18, 27:19, 46:17, 46:20, 86:18, 105:2, 105:5, 134:1, 134:4, 135:10, 137:5, 140:21, 141:15, 141:16, 141:18, 142:2,

149:15, 149:16, 151:9, 151:15, 151:17, 151:21, 152:4, 152:6, 152:7, 152:8, 152:18, 152:21, 153:3, 153:23, 154:21, 168:7, 172:10, 172:15, 172:16, 193:5
**doctor's** [5] - 141:3, 150:15, 191:17, 191:19, 211:19
**doctors** [8] - 13:25, 27:5, 68:11, 112:15, 114:4, 114:12, 139:15, 141:12
**doctors'** [2] - 68:21, 84:25
**document** [21] - 33:5, 42:20, 66:23, 71:2, 71:10, 72:6, 72:22, 72:23, 80:6, 82:16, 129:3, 129:4, 135:18, 135:23, 135:25, 137:1, 137:2, 138:15, 157:12, 173:11
**documentation** [1] - 151:11
**documents** [13] - 5:16, 5:22, 36:23, 94:10, 117:22, 118:5, 120:1, 162:24, 220:10, 221:13, 224:1, 229:11, 237:11
**dogs** [2] - 147:23, 147:25
**dollar** [1] - 194:6
**dollars** [3] - 106:7, 194:4
**Don** [2] - 184:11
**DONALD** [1] - 2:2
**done** [37] - 6:3, 6:7, 14:4, 17:3, 59:4, 60:25, 66:3, 75:8, 75:10, 75:24, 77:25, 83:12, 94:10, 102:9, 107:17, 111:23, 112:10, 112:13, 143:24, 144:1, 144:2, 144:6, 149:2, 149:19, 160:13, 161:14, 172:11, 175:8, 194:1, 210:15, 214:6, 214:11, 214:20, 228:21, 228:25, 238:14
**door** [2] - 191:17, 193:21
**doorbell** [1] - 191:18
**double** [2] - 4:23, 147:13
**Double** [1] - 227:19
**double-check** [1] - 4:23
**doubt** [4] - 11:25, 20:16, 192:4, 222:16
**down** [15] - 9:16, 33:4, 64:25, 66:14, 75:5, 106:1, 113:19, 138:24, 170:14, 189:16, 196:13, 197:12, 209:9, 228:19, 230:4
**downtown** [1] - 192:20
**Dr** [33] - 18:23, 27:4, 27:17, 76:2, 76:3, 76:5, 76:7, 76:9, 102:18, 122:8, 122:16, 129:3, 129:9, 131:15,

133:22, 135:25, 139:17, 139:19, 139:20, 142:9, 148:7, 149:17, 152:16, 156:14, 217:19, 217:20, 219:6, 220:3, 220:16, 224:17, 225:7, 225:16, 233:11
**draft** [1] - 168:14
**drafting** [1] - 9:11
**draw** [1] - 220:22
**drawing** [1] - 112:20
**Drive** [3] - 2:3, 92:1, 192:15
**driven** [4] - 130:19, 130:20, 130:21, 189:2
**drop** [2] - 196:13, 197:12
**drugs** [2] - 125:1, 193:11
**dual** [1] - 124:4
**due** [1] - 201:9
**duly** [3] - 122:20, 147:9, 158:10
**dumb** [1] - 114:23
**dumping** [1] - 235:23
**duplicative** [2] - 226:9, 226:23
**during** [11] - 6:20, 20:13, 26:16, 38:10, 52:16, 91:15, 117:16, 168:20, 204:22, 238:23
**Dutch** [3] - 48:21, 48:22, 48:23
**duties** [1] - 212:13

## E

**earliest** [1] - 127:22
**early** [10] - 4:15, 8:13, 14:17, 14:19, 30:15, 30:16, 34:22, 39:2, 46:7, 237:6
**easier** [1] - 159:3
**easily** [1] - 118:16
**East** [2] - 1:23, 239:15
**Easter** [1] - 53:18
**easy** [2] - 23:8, 106:2
**editable** [2] - 220:8, 221:13
**edited** [4] - 219:18, 221:13, 221:20, 233:4
**edits** [1] - 66:2
**educate** [2] - 125:13, 236:5
**educated** [1] - 203:4
**education** [4] - 168:16, 170:13, 171:13, 205:6
**educational** [1] - 148:3
**effect** [2] - 150:18, 231:14
**effective** [1] - 189:13
**effectively** [1] - 228:18
**efficiency** [1] - 6:19
**efficient** [2] - 8:9, 159:14
**efficiently** [1] - 5:12
**effort** [1] - 8:21
**eight** [1] - 202:21

**either** [19] - 6:24, 11:25, 43:4, 68:14, 96:17, 126:10, 127:2, 133:19, 134:14, 140:18, 141:4, 148:14, 166:18, 174:19, 186:8, 222:17, 237:4, 237:9, 237:25
**elaborate** [4] - 27:22, 27:24, 28:8, 28:10
**elderly** [1] - 117:19
**electronic** [9] - 5:7, 94:15, 132:9, 132:12, 132:14, 132:18, 132:22, 198:11, 220:10
**electronically** [2] - 132:18, 139:2
**element** [1] - 237:7
**eleventh** [2] - 8:15, 235:23
**elicit** [1] - 231:6
**eliciting** [2] - 150:20, 231:3
**eliminate** [2] - 237:7, 237:12
**ELMO** [3] - 111:4, 115:8, 156:10
**email** [68] - 9:13, 56:15, 57:15, 66:7, 75:3, 75:4, 75:6, 76:19, 77:9, 77:16, 79:13, 79:16, 79:21, 79:22, 79:24, 80:5, 81:2, 81:3, 81:10, 81:21, 86:23, 87:10, 88:20, 91:4, 91:13, 94:17, 95:11, 97:25, 99:6, 111:10, 112:21, 113:6, 113:9, 113:16, 113:19, 113:21, 114:20, 114:21, 115:2, 115:5, 151:13, 166:3, 166:9, 166:11, 166:22, 167:3, 169:3, 170:15, 183:6, 186:18, 186:20, 187:8, 189:22, 195:1, 197:16, 197:17, 201:2, 206:16, 206:22, 207:15, 207:17, 208:24, 210:11, 212:21, 212:22, 220:4
**emailed** [2] - 7:14, 9:10
**emails** [9] - 42:6, 42:9, 42:14, 110:2, 111:1, 181:22, 204:6, 220:7, 220:14
**EMILY** [1] - 1:13
**emotional** [1] - 125:19
**employ** [2] - 27:5, 27:19
**employed** [5] - 44:21, 139:22, 159:25, 208:2, 210:13
**employee** [4] - 164:13, 191:1, 208:8, 208:15
**employees** [5] - 161:13, 163:22, 164:4, 193:6, 208:20
**employment** [2] - 165:9, 182:9
**enabled** [1] - 37:23

**enablement** [2] - 158:23, 162:22
**encompass** [1] - 179:18
**encourage** [2] - 140:7, 140:10
**encouraged** [3] - 205:3, 205:14, 205:15
**encouraging** [1] - 127:2
**end** [11] - 89:9, 98:20, 138:13, 163:8, 163:11, 170:3, 216:11, 217:4, 223:18, 230:1, 233:24
**ended** [2] - 200:22
**ending** [1] - 15:21
**endometrial** [14] - 127:14, 127:16, 127:23, 127:25, 131:3, 136:1, 136:13, 136:15, 136:18, 145:1, 145:9, 145:11, 146:21
**endometrium** [2] - 130:22, 136:19
**ends** [2] - 172:21, 199:3
**engage** [1] - 63:17
**engaged** [3] - 34:11, 39:21, 46:24
**engaging** [3] - 33:17, 34:24, 176:17
**enjoy** [2] - 29:22, 103:6
**enjoyed** [2] - 183:20, 212:9
**ensure** [1] - 214:19
**entered** [1] - 12:16
**enters** [5] - 10:19, 54:23, 103:25, 122:11, 202:7
**entice** [1] - 168:8
**enticement** [2] - 168:3, 168:7
**entire** [1] - 106:13
**entirely** [1] - 231:5
**entirety** [1] - 135:2
**entitled** [1] - 239:11
**entity** [2] - 100:2, 221:17
**envelope** [3] - 149:3, 149:5, 155:21
**EOB** [5] - 59:20, 118:18, 118:23, 119:4, 119:8
**EOBs** [1] - 21:1
**Epic** [1] - 132:20
**equal** [1] - 169:21
**equipment** [1] - 94:15
**especially** [4] - 6:11, 177:24, 218:14, 237:19
**essence** [2] - 99:6, 229:14
**essentially** [2] - 42:19, 97:22
**estimate** [2] - 24:15, 24:23
**estrogen** [3] - 130:19, 130:21, 131:4
**estrogen-driven** [1] - 130:21
**et** [4] - 95:3, 96:10, 152:12,

171:16
**eve** [1] - 8:12
**evening** [3] - 216:12, 217:12, 234:19
**event** [1] - 220:16
**events** [1] - 24:20
**eventually** [2] - 163:15, 164:8
**everyday** [1] - 193:5
**evidence** [13] - 5:10, 128:23, 131:7, 135:3, 135:6, 157:2, 157:3, 157:9, 165:16, 165:23, 186:22, 187:2, 223:2
**exact** [9] - 12:22, 15:25, 20:14, 24:14, 33:9, 147:19, 155:6, 194:17
**exactly** [11] - 27:7, 31:19, 35:4, 37:9, 83:18, 107:6, 134:24, 140:20, 165:11, 223:3, 232:8
**examination** [19] - 8:5, 8:12, 10:23, 10:25, 100:4, 104:8, 106:23, 131:11, 153:10, 184:6, 184:8, 184:20, 223:13, 235:3, 236:3, 236:4, 236:15, 236:16, 237:7
**EXAMINATION** [24] - 3:4, 3:4, 3:6, 3:7, 3:7, 3:9, 3:10, 3:10, 3:11, 3:13, 3:13, 3:14, 11:8, 104:11, 122:25, 131:13, 142:7, 147:14, 153:13, 156:12, 157:10, 158:18, 184:9, 213:8
**examinations** [2] - 234:17, 237:25
**examined** [2] - 27:6, 27:19
**example** [5] - 141:18, 144:8, 170:23, 179:24, 236:8
**examples** [2] - 171:17, 184:20
**exceeded** [1] - 152:13
**excelled** [1] - 12:14
**excellent** [1] - 170:15
**exception** [1] - 14:8
**exceptions** [1] - 150:17
**exchange** [1] - 143:13
**exchanged** [1] - 22:1
**excuse** [8] - 25:10, 33:1, 98:18, 122:5, 175:2, 186:18, 197:12, 203:18
**excused** [6] - 54:7, 102:4, 147:2, 158:3, 216:7, 217:13
**execute** [1] - 107:16
**executive** [1] - 199:16
**exhibit** [20] - 5:9, 5:24, 43:15, 71:16, 78:4, 97:19, 117:11, 135:2, 139:14, 154:8, 156:9, 172:21, 230:25, 234:2, 234:6,

234:24, 236:2, 236:5, 236:20, 238:4
**Exhibit** [20] - 3:17, 3:24, 94:17, 111:7, 113:14, 114:25, 128:17, 135:6, 154:9, 154:22, 157:2, 157:4, 157:9, 165:17, 166:1, 168:25, 169:2, 172:20, 202:12, 227:23
**Exhibits** [3] - 128:22, 165:22, 187:1
**exhibits** [30] - 5:7, 5:22, 6:12, 6:18, 7:6, 8:10, 8:17, 43:11, 43:12, 55:5, 55:8, 55:19, 80:16, 85:8, 111:4, 194:17, 223:25, 232:5, 232:19, 234:1, 234:4, 234:9, 234:18, 234:23, 234:25, 235:4, 235:15, 235:17, 237:1, 237:6
**EXHIBITS** [2] - 3:15, 3:21
**exist** [2] - 40:15, 71:13
**existing** [2] - 162:12, 164:7
**exit** [1] - 121:24
**exits** [5] - 54:9, 102:5, 122:4, 201:25, 217:14
**expanded** [1] - 96:9
**expect** [5] - 99:9, 102:17, 162:21, 165:3, 226:14
**expected** [4] - 79:19, 79:20, 79:22, 238:8
**expecting** [2] - 150:22, 217:24
**expensive** [1] - 194:6
**experience** [3] - 22:10, 191:8, 213:20
**experienced** [1] - 201:2
**experiences** [1] - 21:21
**expert** [6] - 171:5, 220:24, 224:16, 224:17, 224:25, 225:17
**expertise** [2] - 164:24, 189:4
**explain** [7] - 28:3, 28:6, 125:11, 156:19, 175:18, 217:2, 231:22
**explained** [2] - 10:24, 118:19, 150:9
**explaining** [2] - 125:9, 126:1
**explains** [1] - 190:24
**explanation** [2] - 153:7, 225:17
**Explanation** [3] - 21:1, 59:20, 118:19
**explore** [1] - 12:2
**expressed** [1] - 112:8
**expression** [1] - 193:16
**extent** [6] - 8:9, 8:16, 71:14, 180:24, 181:2, 226:8

**external** [1] - 189:10
**extremely** [2] - 144:10, 145:18
**eye** [2] - 5:4, 10:15
**eyes** [1] - 177:19

## F

**face** [5] - 126:10, 186:8, 223:1
**face-to-face** [1] - 126:10
**Facebook** [1] - 205:12
**facilities** [3] - 163:24, 177:21, 185:9
**facility** [1] - 227:24
**fact** [38] - 7:21, 12:16, 20:5, 20:7, 20:9, 23:9, 23:12, 27:4, 30:24, 40:6, 43:10, 44:11, 61:21, 65:22, 89:8, 94:7, 115:10, 115:13, 117:4, 125:15, 126:13, 127:1, 134:17, 145:4, 151:20, 152:13, 164:4, 175:8, 175:10, 185:5, 185:11, 189:21, 197:8, 200:20, 204:19, 224:11, 229:9, 230:9
**factor** [5] - 113:8, 113:10, 113:12, 182:23, 182:24
**factoring** [2] - 78:15, 78:21
**factors** [2] - 30:11, 128:5
**facts** [2] - 16:13, 20:24
**factual** [10] - 16:2, 16:5, 27:8, 27:9, 27:12, 27:15, 27:20, 28:5, 115:12, 230:5
**Faena** [2] - 79:2, 79:4
**fail** [1] - 125:6
**fair** [10] - 13:2, 107:1, 107:2, 107:3, 107:4, 119:12, 119:13, 173:5, 173:7, 222:3
**fake** [1] - 193:19
**fall** [1] - 14:18
**falls** [1] - 167:24
**False** [1] - 173:12
**familiar** [6] - 124:5, 137:5, 140:3, 174:21, 174:25, 177:11
**familiarity** [1] - 191:6
**families** [1] - 124:21
**family** [29] - 4:14, 68:1, 84:23, 91:25, 94:20, 94:25, 95:1, 95:4, 95:8, 96:17, 96:18, 96:22, 97:1, 101:20, 108:20, 109:16, 124:18, 129:17, 129:19, 137:15, 142:19, 144:8, 144:9, 144:14, 145:6, 145:10, 146:17, 216:25
**Family** [1] - 137:22
**fan** [1] - 164:22
**fancy** [1] - 162:23

**far** [11] - 67:11, 84:20, 86:10, 103:15, 103:21, 109:19, 149:23, 169:18, 181:15, 201:3, 222:15
**fashion** [3] - 129:21, 163:1, 236:16
**father** [2] - 12:12, 92:14
**fault** [1] - 188:18
**faulting** [1] - 233:6
**fear** [1] - 115:15
**features** [1] - 179:4
**February** [14] - 48:6, 48:7, 48:8, 79:12, 87:15, 94:18, 166:12, 169:1, 169:5, 206:15, 209:9
**federal** [7] - 19:13, 31:21, 34:13, 34:24, 45:17, 208:5
**feds** [2] - 35:19, 112:7
**feeding** [1] - 106:12
**feelings** [2] - 175:10, 175:17
**fell** [1] - 180:14
**fellow** [1] - 21:24
**fellowship** [1] - 123:17
**fellowships** [1] - 123:14
**felt** [2] - 180:13, 180:18
**few** [19] - 30:20, 32:14, 33:2, 33:14, 45:8, 48:18, 48:20, 58:25, 105:16, 111:13, 153:17, 167:14, 167:15, 214:2, 216:12, 217:1, 224:25, 238:14, 238:23
**field** [7] - 14:5, 84:25, 96:25, 97:17, 148:2, 162:24, 230:3
**fifth** [1] - 155:10
**figure** [8] - 10:11, 30:25, 31:2, 60:3, 71:25, 208:23, 232:14, 234:7
**figured** [3] - 105:18, 182:15, 236:17
**file** [3] - 9:20, 9:21, 36:19
**filed** [3] - 9:4, 44:22, 234:3
**files** [5] - 45:25, 99:17, 220:4, 220:23, 226:11
**filings** [1] - 118:4
**fill** [6] - 59:1, 112:17, 132:6, 162:14, 180:16, 196:6
**fillable** [1] - 220:8
**filled** [5] - 58:25, 85:23, 143:17, 162:2, 220:25
**final** [1] - 222:22
**finally** [2] - 91:5, 146:5
**financial** [2] - 118:8, 181:12
**fine** [11] - 54:21, 65:20, 147:21, 150:25, 151:2, 212:3, 221:14, 222:23, 226:20, 231:15, 235:2
**finish** [5] - 94:12, 99:16,

211:12, 215:20, 219:1
**finished** [3] - 15:23, 206:6, 211:13
**firm** [3] - 9:7, 9:9, 201:4
**first** [35] - 11:17, 13:13, 30:14, 31:9, 31:21, 33:15, 38:23, 44:1, 45:16, 55:16, 60:7, 61:14, 62:6, 65:19, 84:3, 105:2, 105:5, 127:21, 145:16, 148:13, 152:5, 153:2, 155:13, 163:18, 167:4, 171:11, 171:12, 173:1, 173:4, 176:21, 176:23, 184:23, 224:8, 227:4, 230:14
**fit** [4] - 85:17, 124:18, 164:1, 169:19
**five** [16] - 17:7, 17:8, 25:8, 43:22, 50:16, 54:3, 54:4, 54:13, 63:20, 102:2, 108:15, 122:2, 161:13, 164:18, 199:1, 202:2
**five-minute** [4] - 54:3, 54:4, 54:13, 202:2
**fixed** [2] - 73:5, 232:20
**flag** [1] - 155:23
**flags** [2] - 112:18, 146:18
**flat** [1] - 81:21
**flat-out** [1] - 81:21
**fleshed** [1] - 66:22
**flew** [3] - 112:10, 119:5, 163:2
**flip** [1] - 106:11
**Floor** [1] - 1:16
**floor** [2] - 11:4, 104:9
**Flores** [4] - 67:22, 68:7, 68:14, 69:3
**FLORIDA** [1] - 1:1
**Florida** [10] - 1:3, 1:24, 21:6, 33:24, 36:4, 36:7, 153:21, 239:16
**flow** [1] - 237:25
**fly** [1] - 162:6
**FNP** [2] - 91:25, 92:4
**focus** [10] - 152:16, 187:20, 220:3, 221:1, 221:5, 225:1, 225:10, 226:4, 226:13, 231:17
**focusing** [1] - 220:23
**folks** [7] - 25:13, 54:5, 55:12, 137:6, 139:16, 167:21, 186:3
**follow** [9] - 7:8, 87:9, 95:20, 129:5, 131:7, 143:4, 149:4, 149:12, 168:17
**follow-up** [4] - 7:8, 129:5, 131:7, 149:12
**follow-ups** [1] - 143:4
**followed** [3] - 87:10, 146:19, 149:8

**following** [3] - 143:6, 150:12, 175:4
**FOR** [3] - 1:13, 1:17, 2:2
**force** [5] - 161:12, 163:19, 189:11, 190:14, 213:25
**foregoing** [1] - 239:9
**forfeit** [1] - 49:23
**forfeiture** [6] - 49:18, 49:21, 49:24, 50:22, 51:5, 229:23
**forge** [2] - 19:9, 172:3
**forged** [2] - 27:5, 27:18, 109:11
**forging** [1] - 109:4
**forgotten** [1] - 60:16
**form** [21] - 85:22, 85:23, 120:5, 120:13, 121:3, 132:7, 132:15, 132:17, 132:21, 156:14, 196:9, 211:5, 211:6, 211:7, 222:10, 222:13, 222:14, 222:15, 222:17, 222:20
**format** [1] - 88:1
**former** [6] - 139:25, 160:5, 162:2, 163:7, 187:25, 211:15
**forms** [9] - 107:23, 162:15, 162:16, 170:7, 180:17, 196:5, 196:6, 211:4, 221:20
**Fort** [2] - 1:24, 239:16
**forte** [3] - 189:19, 191:11, 191:13
**forth** [2] - 40:10, 181:20
**fortunate** [1] - 146:3
**forward** [7] - 5:20, 6:5, 6:25, 8:22, 66:1, 69:21, 199:1
**forwarded** [3] - 194:25, 199:3, 200:17
**Foss** [18] - 102:24, 217:19, 218:8, 218:15, 218:21, 218:25, 219:4, 223:16, 227:2, 227:6, 227:14, 228:1, 229:10, 230:8, 231:17, 234:15, 234:22
**Foss's** [1] - 233:17
**foundation** [1] - 226:3
**four** [6] - 43:22, 146:2, 146:10, 164:18, 198:20, 198:21
**fourth** [2] - 13:22, 155:8
**frame** [5] - 14:16, 17:12, 17:25, 59:12, 226:7
**Frank** [21] - 57:12, 57:24, 57:25, 58:15, 58:17, 59:4, 59:5, 74:1, 76:22, 77:9, 79:8, 80:22, 81:6, 81:12, 88:17, 88:18, 90:11, 90:22, 91:4, 111:13, 113:18
**Frank's** [1] - 88:19
**frankly** [2] - 5:22, 221:4
**fraud** [11] - 22:21, 22:22,

22:24, 35:22, 104:15, 104:19, 104:20, 228:3, 228:5, 229:9, 231:8
**FRAUD** [1] - 1:15
**free** [4] - 149:1, 212:20, 215:12, 238:25
**frenzy** [1] - 106:12
**frequency** [1] - 86:13
**frequently** [2] - 41:13, 144:19
**friend** [4] - 21:23, 22:13, 53:22, 98:19
**friends** [1] - 101:20
**front** [5] - 54:19, 76:16, 77:21, 191:17, 193:21
**frustrating** [1] - 231:2
**full** [5] - 117:25, 135:8, 163:22, 164:13, 193:23
**full-scale** [1] - 193:23
**full-time** [2] - 163:22, 164:13
**fully** [2] - 164:8, 226:14
**fun** [1] - 115:10
**funds** [1] - 228:17
**furtherance** [1] - 28:16
**future** [1] - 201:15
**FYI** [1] - 87:8

**G**

**game** [1] - 203:25
**gander** [1] - 6:8
**GARLAND** [1] - 2:3
**gathering** [1] - 87:20
**gears** [2] - 178:1, 181:11
**gene** [1] - 84:6
**general** [2] - 125:9, 136:20, 182:25, 193:8, 205:20, 205:21, 210:21, 214:5, 225:17
**General** [1] - 123:24
**generally** [2] - 167:22, 231:3
**generation** [1] - 124:24
**genetic** [56] - 34:12, 83:6, 83:9, 84:10, 104:22, 105:18, 105:22, 105:25, 106:19, 108:5, 108:24, 119:14, 124:5, 124:7, 124:13, 129:11, 129:18, 130:4, 130:7, 130:10, 130:16, 131:24, 132:1, 133:1, 134:10, 134:15, 134:18, 134:21, 139:11, 142:13, 142:16, 143:2, 144:15, 145:1, 145:7, 146:14, 148:10, 148:13, 148:19, 149:2, 152:1, 152:9, 179:25, 193:14, 194:1, 194:10, 198:17, 206:23, 215:5,

215:12, 224:24, 225:13, 225:18, 226:12, 227:14, 228:8
**genetics** [5] - 82:17, 124:4, 126:11, 144:7
**genomic** [1] - 30:21
**genomics** [1] - 83:1
**gentleman** [5] - 14:25, 17:16, 35:7, 148:17, 162:3
**gentlemen** [5] - 10:21, 101:11, 121:23, 201:21, 216:9
**geographical** [1] - 31:24
**Georgia** [6] - 1:19, 2:4, 2:7, 113:1, 113:3, 185:15
**Germany** [1] - 104:3
**germline** [1] - 129:18
**gist** [1] - 79:24
**given** [12] - 120:13, 129:21, 148:16, 150:4, 163:22, 210:12, 210:13, 214:19, 215:2, 217:21, 223:6, 234:3
**glad** [1] - 225:4
**gleaned** [1] - 231:18
**Global** [1] - 37:12
**gloves** [2] - 209:7, 209:14
**goal** [1] - 196:24
**gonna** [1] - 196:24
**Gonzalez** [1] - 92:3
**good-byes** [1] - 183:9
**goods** [4] - 70:8, 73:1, 73:7, 73:10
**Google** [1] - 78:24
**Googling** [1] - 231:9
**goose** [1] - 6:8
**gosh** [1] - 142:22
**government** [96] - 4:18, 5:24, 6:9, 6:17, 7:11, 7:25, 10:24, 26:13, 27:1, 32:8, 32:18, 32:19, 37:24, 39:23, 40:1, 40:4, 40:20, 41:1, 43:7, 43:11, 43:13, 43:17, 43:20, 43:23, 44:23, 45:17, 45:25, 50:1, 51:5, 53:7, 53:11, 55:5, 56:20, 60:7, 60:19, 60:21, 61:15, 62:6, 62:16, 62:24, 66:6, 67:12, 70:25, 71:1, 71:12, 71:23, 78:4, 78:9, 80:14, 80:16, 85:7, 91:20, 99:17, 99:20, 100:3, 100:10, 102:17, 103:1, 104:7, 115:24, 116:12, 116:20, 116:24, 122:13, 128:16, 128:22, 135:1, 135:6, 147:5, 150:20, 158:6, 165:16, 165:22, 172:8, 222:9, 223:10, 223:25, 224:12, 225:6, 227:8, 227:17, 227:22, 229:4, 229:7, 232:12, 234:24, 235:4,

235:11, 235:19, 236:2,
236:8, 236:13, 236:17,
236:25, 238:3
**GOVERNMENT** [1] - 1:13
**Government** [9] - 11:6,
122:20, 147:9, 158:10,
165:17, 166:1, 168:25,
169:2, 172:20
**GOVERNMENT'S** [1] - 3:15
**government's** [18] - 46:4,
46:15, 62:12, 62:14, 101:13,
122:13, 135:1, 147:4, 158:4,
219:10, 228:12, 229:10,
230:7, 230:11, 233:24,
235:17, 236:12, 238:20
**Government's** [5] - 111:7,
113:13, 114:25, 128:17,
227:23
**government-marked** [1] -
85:7
**GPS** [5] - 36:20, 37:9,
37:12, 37:20, 37:25
**Grade** [5] - 127:14, 127:16,
127:22, 129:16, 130:19
**grade** [1] - 127:23
**grading** [1] - 128:11
**graduate** [1] - 13:13
**graduated** [1] - 13:16
**Grande** [4] - 68:2, 88:10,
92:12, 92:13
**grandmother** [1] - 138:4
**granted** [1] - 55:8
**granularly** [1] - 107:14
**great** [5] - 24:10, 149:22,
183:18, 184:17, 223:17
**greed** [12] - 28:20, 29:3,
29:4, 29:7, 29:17, 29:18,
30:3, 30:9, 75:18, 75:19,
106:10
**grew** [1] - 161:17
**Griner** [5] - 74:9, 77:10,
111:14, 111:15, 111:16
**ground** [4] - 68:21, 109:8,
216:16, 224:23
**groundwork** [1] - 219:5
**group** [4] - 41:3, 143:1,
168:15, 197:17
**grouping** [1] - 66:13
**groups'** [1] - 174:17
**grow** [4] - 159:12, 160:12,
161:14, 214:3
**growing** [3] - 130:23,
162:12, 164:2
**guarantee** [1] - 223:14
**guard** [1] - 230:17
**guess** [16] - 13:4, 14:22,
22:1, 49:3, 61:12, 162:1,
163:10, 164:17, 166:22,
169:21, 170:8, 199:17,
200:2, 210:7, 216:2, 218:2

**guessing** [1] - 200:2
**guide** [8] - 82:4, 82:8,
82:11, 82:17, 82:21, 125:3,
125:5, 125:12
**guided** [1] - 129:14
**guidelines** [8] - 29:12,
97:13, 129:18, 141:6, 141:7,
144:22, 146:18, 146:19
**guilty** [5] - 16:1, 16:2,
27:2, 29:10, 50:23, 61:19,
61:22, 62:1, 63:8, 109:13,
121:13
**GURSKIS** [55] - 1:13, 3:4,
3:6, 3:7, 3:9, 3:10, 29:19,
100:17, 102:20, 104:10,
104:12, 111:3, 111:6,
113:13, 113:15, 114:25,
115:1, 115:7, 115:9, 119:23,
119:24, 121:1, 121:3, 121:8,
121:19, 122:15, 123:1,
128:16, 128:24, 129:2,
129:6, 129:8, 130:13,
130:15, 131:10, 135:4,
142:6, 142:8, 146:25, 147:5,
147:15, 150:17, 151:7,
153:9, 154:8, 154:10,
154:13, 156:7, 156:9,
156:13, 156:22, 157:5,
158:1, 230:13, 231:15
**Gurskis** [3] - 104:9, 157:25,
231:13
**Gurskis's** [1] - 232:22
**guy** [4] - 38:5, 58:19, 58:20
**guys** [14] - 10:1, 10:17,
18:19, 54:12, 102:3, 103:6,
111:21, 219:17, 231:22,
233:12, 233:24, 234:10,
238:18, 239:3
**gynecologic** [4] - 123:7,
123:17, 123:23, 123:25
**gynecology** [2] - 123:15,
124:3

# H

**half** [6] - 24:16, 123:20,
135:23, 136:9, 138:25, 150:2
**hand** [5] - 99:5, 122:19,
155:3, 158:9, 219:14
**handed** [1] - 230:25
**handful** [2] - 161:16, 164:6
**handing** [1] - 154:21
**handle** [5] - 38:18, 162:13,
176:14, 177:12, 180:21
**handled** [2] - 32:20, 170:3
**handsome** [1] - 192:17
**handwriting** [2] - 155:15,
157:17
**hanging** [3] - 52:20, 52:21,
118:12

**happy** [7] - 9:13, 20:16,
219:14, 230:19, 232:1,
232:25, 233:13
**Happy** [2] - 53:17, 76:1
**hard** [2] - 35:4, 48:4
**hardware** [1] - 194:5
**hatch** [1] - 38:4
**hate** [1] - 104:2
**Hayes** [5] - 166:11, 166:14,
169:12, 206:16, 209:2
**hc1** [4] - 162:17, 178:8,
178:12, 179:2
**head** [6] - 61:13, 61:14,
206:18, 216:15, 233:9
**heading** [1] - 216:18
**heads** [6] - 5:21, 6:11, 6:14,
8:7, 237:23, 238:13
**heads-up** [4] - 5:21, 6:11,
6:14, 8:7
**Health** [11] - 14:9, 14:14,
14:15, 18:2, 58:4, 58:6, 58:7,
69:22, 82:16, 174:5
**health** [3] - 84:23, 128:7,
177:18
**health-related** [1] - 177:18
**healthcare** [8] - 33:17,
33:21, 46:10, 46:24, 177:25,
201:3, 228:4, 230:3
**hear** [14] - 37:11, 37:14,
131:1, 133:19, 149:9,
149:11, 154:19, 160:4,
177:7, 184:17, 184:18,
188:21, 193:16, 230:7
**heard** [23] - 9:17, 26:22,
101:20, 101:21, 110:19,
148:10, 151:15, 160:5,
176:18, 176:20, 177:6,
182:4, 199:18, 206:4, 217:5,
217:23, 224:12, 224:16,
224:23, 225:13, 225:24,
226:21, 234:9
**hearing** [9] - 9:14, 9:16,
10:5, 37:18, 46:4, 116:1,
175:15, 183:1, 192:3
**hearings** [1] - 238:24
**hearsay** [1] - 150:13
**held** [8] - 78:21, 150:12,
154:12, 171:12, 175:4,
184:2, 196:22, 198:7
**Helix** [1] - 227:19
**hello** [2] - 87:19, 88:15
**help** [26] - 31:20, 45:13,
45:22, 100:6, 100:15,
100:22, 100:25, 101:5,
116:24, 120:24, 124:17,
124:21, 125:2, 125:5,
125:12, 125:25, 153:1,
159:12, 159:14, 160:15,
162:12, 162:23, 162:25,
190:5, 195:3, 232:25

**helped** [3] - 74:24, 101:4,
168:14
**helpful** [1] - 71:8
**helping** [1] - 99:5
**helps** [1] - 130:22
**hereby** [1] - 239:9
**hereditary** [11] - 83:18,
86:2, 126:6, 126:25, 139:12,
142:16, 143:2, 145:1,
146:14, 156:17, 198:3
**heredity** [2] - 124:14,
124:20
**herself** [2] - 99:23, 138:22
**hesitate** [1] - 54:19
**hi** [5] - 122:23, 123:3,
131:16, 158:7, 212:21
**hidden** [1] - 81:21
**hide** [4] - 49:3, 49:7, 49:10,
49:25
**hiding** [1] - 49:13
**hierarchy** [1] - 169:19
**high** [8] - 12:16, 13:6, 17:1,
124:22, 124:23, 125:5,
125:15, 143:5
**high-risk** [2] - 124:22,
125:5
**higher** [2] - 127:20, 146:8
**highest** [1] - 166:23
**highlight** [7] - 135:22,
136:9, 137:1, 137:13,
137:22, 138:10, 199:2
**himself** [2] - 99:23, 152:5
**hire** [1] - 187:15
**hired** [4] - 58:22, 58:23,
107:18, 163:7
**Hirsch** [23] - 35:7, 35:18,
35:21, 36:11, 36:12, 36:16,
37:24, 38:20, 39:15, 40:1,
40:3, 40:14, 46:16, 47:2,
47:3, 47:16, 53:17, 59:14,
64:5, 98:2, 108:19, 118:19,
119:2
**histories** [2] - 96:7, 96:8
**history** [37] - 85:19, 94:20,
94:25, 95:1, 95:4, 95:6, 95:7,
95:8, 96:5, 96:13, 96:17,
96:19, 96:22, 97:1, 97:4,
124:18, 129:17, 129:19,
136:4, 136:12, 137:3,
137:14, 137:18, 137:24,
138:3, 142:19, 144:8,
144:10, 144:14, 144:20,
145:6, 145:10, 146:17,
222:13
**History** [1] - 137:22
**hmm** [6] - 65:10, 73:25,
169:7, 198:25, 209:1, 209:21
**HNPCC** [2] - 145:4
**hold** [5] - 28:1, 46:17,
46:20, 112:23, 123:22, 124:2

holidays [1] - 76:2
Hollywood [1] - 193:21
home [5] - 36:20, 37:6, 185:24, 190:20, 216:25
honest [4] - 13:5, 109:23, 120:17, 196:22
honestly [1] - 121:14
Honor [80] - 5:3, 5:5, 6:16, 7:8, 7:20, 8:23, 9:4, 10:7, 11:5, 27:25, 28:11, 55:4, 60:13, 60:15, 90:7, 94:9, 97:20, 101:9, 102:20, 103:2, 103:5, 103:15, 104:10, 111:3, 115:7, 121:1, 121:20, 122:15, 128:16, 128:19, 128:24, 130:13, 131:12, 134:25, 135:4, 135:19, 141:24, 142:3, 142:6, 150:19, 153:11, 154:6, 154:16, 156:3, 156:5, 156:7, 156:9, 156:23, 156:24, 157:1, 157:5, 157:23, 158:1, 158:5, 158:15, 165:15, 165:24, 183:25, 186:21, 212:4, 213:5, 215:15, 219:9, 219:13, 220:3, 221:3, 222:3, 223:3, 224:21, 225:22, 228:6, 228:19, 229:18, 230:13, 231:1, 232:9, 233:22, 234:2, 234:23, 238:19
Honorable [1] - 1:22
HONORABLE [1] - 1:10
hope [2] - 216:23, 217:11
hopefully [1] - 103:22
hopes [1] - 216:14
hoping [3] - 164:25, 182:14, 219:7
hormonal [2] - 130:20
hormonal-driven [1] - 130:20
Hospital [2] - 123:16, 135:9
hospital [6] - 132:17, 132:21, 133:9, 138:17, 139:11, 139:22
hospital's [1] - 132:18
host [1] - 204:17
hosted [2] - 171:12, 204:19
HOSTETLER [1] - 2:5
Hotel [2] - 79:2, 79:4
hotel [2] - 79:5, 108:16
hotels [1] - 118:15
hotline [7] - 228:11, 228:22, 228:23, 229:1, 230:9, 231:4, 231:19
hour [4] - 8:15, 101:18, 235:23, 238:23
hourly [1] - 94:2
hours [2] - 217:2, 235:11
house [6] - 32:7, 33:14,

33:16, 51:22, 52:6, 208:12
housekeeping [3] - 4:17, 9:1, 102:15
housekeeping-wise [1] - 102:15
Houston [7] - 12:24, 185:3, 185:4, 185:25, 190:12, 190:20, 206:12
HR [3] - 166:15, 166:16, 206:18
Huan [2] - 151:15, 156:14
huge [3] - 106:14, 112:14, 121:12
humble [1] - 13:5
hundreds [2] - 118:5, 236:7
hustle [1] - 106:3
HX [1] - 147:12
hysterectomy [2] - 128:2, 128:13

I

i-t-z [1] - 122:24
ICD [2] - 57:3, 57:4
ICD-10 [6] - 85:11, 85:17, 95:1, 97:15, 105:13, 120:25
ID [1] - 149:14
idea [4] - 68:10, 84:5, 194:12, 236:15
ideal [1] - 164:22
identical [1] - 155:12
identified [6] - 6:22, 8:11, 98:10, 126:14, 173:20, 224:17
identify [6] - 5:16, 99:10, 145:2, 146:23, 167:14, 232:19
ll [2] - 1:10, 1:22
illegal [2] - 55:22, 68:12
ILONA [2] - 1:21, 239:14
imagine [3] - 6:10, 7:16, 230:3
imaging [1] - 128:11
immediate [2] - 89:19, 89:20
immediately [1] - 89:21
impact [3] - 175:13, 237:6, 237:7
implement [1] - 160:14
implementation [2] - 189:25, 190:3
implemented [1] - 190:5
important [19] - 44:6, 71:6, 86:12, 86:13, 126:17, 126:19, 126:21, 144:11, 145:14, 145:16, 145:22, 167:23, 203:1, 203:3, 203:4, 203:5, 227:16, 237:3
importantly [1] - 145:19
impossible [1] - 8:16

impression [1] - 43:16
improper [1] - 229:5
improve [1] - 159:12
in-between [1] - 170:9
in-hospital [1] - 132:21
inaccurate [1] - 228:25
include [3] - 96:12, 110:21, 146:14
included [8] - 39:12, 120:5, 167:10, 172:14, 179:4, 195:18, 210:3, 210:5
includes [1] - 65:9
including [2] - 133:1, 173:22
incorrect [1] - 84:6
increase [1] - 145:5
increased [1] - 124:15
independent [2] - 164:14, 231:19
indicate [2] - 134:14, 157:14
indicates [2] - 97:11, 136:12
indicating [1] - 91:4
indication [1] - 227:25
indications [2] - 136:1, 146:22
indicator [1] - 86:13
indicted [9] - 31:16, 38:23, 39:8, 48:25, 228:4, 228:16, 229:3, 230:1
indictment [13] - 34:13, 38:25, 39:1, 39:2, 39:7, 39:9, 39:10, 39:12, 49:16, 49:18, 227:17, 228:13, 229:23
individual [2] - 13:2, 169:23
individuals [3] - 19:25, 20:7, 99:10
industry [1] - 164:10
infer [1] - 109:9
influence [5] - 116:12, 172:4, 172:15, 172:17, 173:22
influencing [2] - 174:12, 180:12
info [3] - 87:20, 98:19, 113:2
inform [2] - 126:21, 175:11
information [18] - 20:23, 22:1, 77:17, 82:22, 110:7, 117:12, 126:8, 126:23, 146:1, 146:11, 170:16, 176:3, 176:11, 178:16, 220:11, 220:18, 220:19, 230:11
ing [1] - 18:6
ingredients [1] - 73:7
inherits [1] - 84:2
initial [4] - 31:21, 38:25, 152:17, 168:14

injuries [1] - 148:15
inner [2] - 136:19, 155:20
inner-bubble [1] - 155:20
innocent [1] - 228:14
innovative [1] - 189:3
input [1] - 220:11
inquire [1] - 149:12
inroads [1] - 218:22
insert [1] - 154:3
inside [1] - 149:5
insight [1] - 179:24
insofar [1] - 50:9
instance [6] - 7:18, 133:12, 133:21, 174:19, 178:15, 230:16
instances [2] - 140:14, 141:8
instruct [2] - 177:5, 232:2
instructed [1] - 176:8
instructions [2] - 154:3, 167:9
instrumental [1] - 99:2
insurance [3] - 21:2, 119:18, 119:19
insurer [1] - 172:9
intake [2] - 146:2, 146:4
integrate [1] - 178:3
integrated [1] - 178:17
integrations [1] - 178:15
intelligent [2] - 13:2, 13:7
intend [1] - 234:25
intending [1] - 5:9
intention [2] - 5:19, 29:7
interact [1] - 109:22
interacted [1] - 191:23
interaction [8] - 45:17, 71:12, 97:22, 119:2, 129:5, 145:14, 145:17, 146:6
interactions [1] - 138:13
interested [2] - 161:10, 237:8
interesting [2] - 64:24, 70:15
internal [2] - 87:10, 189:10
internet [3] - 217:7, 228:22, 231:10
interpretation [2] - 86:7, 111:23
interrupt [1] - 238:24
interrupted [1] - 238:1
interruption [1] - 76:14
intervention [1] - 233:13
interventions [1] - 159:19
interview [3] - 146:5, 162:5, 227:8
interviewed [1] - 44:2
interviewing [1] - 14:3
intrauterine [1] - 130:25, 131:1, 131:5

253

**intro** [1] - 226:17
**introduce** [5] - 99:4, 157:2, 186:21, 234:24
**introduced** [4] - 5:12, 5:16, 22:13, 69:16
**introducing** [2] - 22:15, 99:6
**introduction** [1] - 22:16
**introductory** [1] - 173:4
**invasion** [1] - 128:3
**invasive** [1] - 159:20
**invitations** [1] - 21:20
**invite** [2] - 78:14, 78:25
**invited** [3] - 21:17, 21:19, 21:22
**involve** [4] - 35:6, 81:9, 109:16, 109:18
**involved** [29] - 11:22, 11:23, 19:18, 23:15, 24:6, 29:6, 35:5, 35:7, 35:12, 38:5, 39:2, 52:25, 68:3, 68:14, 68:18, 74:19, 74:22, 75:14, 77:25, 108:20, 117:15, 118:20, 145:13, 168:11, 170:11, 200:4, 200:18, 230:2
**irrelevant** [1] - 175:17
**islands** [1] - 48:23
**Islands** [1] - 48:24
**issue** [14] - 5:6, 7:10, 9:1, 25:17, 177:1, 209:8, 221:6, 222:2, 222:15, 222:16, 224:4, 224:8, 227:1, 233:14
**issued** [1] - 229:4
**issues** [10] - 4:17, 103:12, 195:19, 220:22, 221:22, 224:7, 227:17, 232:19, 234:13, 234:14
**it'll** [2] - 86:8, 101:17
**items** [2] - 210:11, 210:12
**itself** [2] - 124:16, 222:16
**IUD** [2] - 130:25, 131:5

**J**

**jail** [5] - 29:12, 43:24, 45:14, 46:13, 63:5
**JAMIE** [1] - 1:13
**January** [5] - 40:22, 41:15, 42:24, 42:25, 60:7
**Jariwala** [1] - 169:12
**Jencks** [1] - 227:9
**Jersey** [1] - 123:11
**job** [18] - 94:1, 125:12, 134:1, 134:4, 134:7, 134:20, 134:22, 159:10, 161:22, 185:5, 186:17, 187:21, 188:11, 188:13, 188:14, 189:22, 191:13, 203:3
**jobs** [1] - 75:11
**John** [20] - 15:13, 21:14,

23:7, 30:17, 59:2, 79:8, 80:22, 81:12, 82:4, 86:21, 87:8, 87:21, 105:16, 113:17, 176:25, 177:2, 182:1, 182:5, 215:24
**join** [1] - 211:16
**joined** [1] - 176:15
**Jon** [7] - 88:21, 166:12, 166:20, 169:12, 169:20, 186:9, 210:25
**Jonathan** [6] - 166:11, 166:14, 169:12, 206:16, 209:2, 210:17
**Jonathan's** [1] - 210:14
**Jorge** [1] - 92:3
**JUDGE** [1] - 1:10
**Judge** [1] - 238:21
**judge** [23] - 29:11, 29:16, 29:25, 30:7, 33:23, 34:3, 34:6, 34:16, 34:24, 46:3, 46:9, 62:20, 62:24, 63:2, 63:18, 64:2, 64:6, 99:17, 99:23, 116:7, 116:9
**judgment** [1] - 175:6
**judicial** [1] - 36:14
**July** [15] - 15:12, 15:21, 16:9, 16:15, 17:13, 31:10, 31:11, 31:12, 39:17, 50:9, 59:15, 89:9, 90:14, 160:1, 227:11
**jump** [1] - 226:17
**jumped** [1] - 109:10
**June** [8] - 19:1, 39:17, 160:2, 186:20, 187:8, 204:4, 204:16, 206:8
**juror** [2] - 54:25, 104:3
**jurors** [8] - 4:6, 4:13, 103:11, 121:24, 184:17, 201:19, 202:5, 226:18
**jury** [21] - 4:8, 10:17, 10:18, 10:21, 34:9, 43:10, 55:13, 61:11, 101:11, 101:15, 101:16, 102:2, 122:10, 159:9, 167:21, 170:25, 188:24, 194:19, 195:7, 212:6, 217:12
**JURY** [1] - 1:9
**Jury** [10] - 10:19, 54:9, 54:23, 102:5, 103:25, 122:4, 122:11, 201:25, 202:7, 217:14
**JUSTICE** [1] - 1:15
**justification** [1] - 73:10

**K**

**KATHERINE** [1] - 1:14
**keep** [21] - 5:4, 10:15, 83:24, 84:15, 87:8, 92:21, 103:22, 118:13, 170:19,

183:8, 188:16, 190:11, 190:19, 197:9, 205:1, 216:17, 226:8, 234:1, 236:1, 238:11, 238:14
**keeping** [4] - 17:12, 190:15, 195:21, 203:3
**kept** [5] - 50:14, 90:3, 107:11, 163:14, 197:8
**key** [1] - 98:21
**Khalid** [3] - 108:2, 108:10, 108:15
**Kickback** [7] - 167:25, 171:16, 173:12, 207:3, 208:23, 209:4, 209:24
**kickback** [5] - 25:24, 93:17, 93:22, 93:23, 209:16
**kickbacks** [6] - 20:13, 22:7, 23:19, 25:13, 25:23, 112:15
**kicked** [1] - 25:3
**kidney** [1] - 95:2
**killing** [1] - 26:9
**Kimberly** [2] - 102:24, 217:19
**kind** [61] - 4:9, 6:4, 6:17, 14:22, 18:5, 53:24, 54:17, 59:19, 69:8, 73:5, 86:10, 88:19, 92:25, 93:16, 93:17, 94:20, 96:6, 109:1, 112:23, 114:24, 115:14, 115:15, 116:23, 125:19, 132:1, 132:12, 133:2, 133:3, 137:5, 146:10, 149:12, 159:16, 162:4, 162:11, 162:12, 163:14, 163:24, 164:1, 168:2, 170:7, 170:8, 170:25, 176:12, 178:3, 179:3, 180:15, 183:9, 183:17, 183:20, 184:19, 187:14, 187:17, 190:11, 193:12, 197:3, 211:5, 216:2, 216:3, 236:15
**kinds** [3] - 93:24, 134:13, 149:20
**kit** [2] - 149:4, 155:17
**kitchen** [5] - 70:3, 70:4, 71:7, 72:18, 72:19
**knowing** [1] - 219:6
**knowledge** [4] - 86:14, 93:13, 93:15, 94:6
**knowledgeable** [3] - 30:14, 46:23, 76:23
**known** [3] - 29:1, 144:25, 190:25
**knows** [5] - 16:1, 86:15, 229:19, 232:17, 238:23
**Kumar** [1] - 174:4

**L**

**L.A** [1] - 119:3

**lab** [72] - 38:15, 38:16, 59:4, 70:8, 98:22, 108:2, 133:5, 133:6, 133:7, 133:9, 133:10, 133:12, 133:21, 142:10, 143:13, 143:14, 152:6, 159:25, 160:6, 160:11, 161:2, 161:25, 162:3, 162:7, 162:10, 162:14, 162:25, 163:2, 163:12, 163:20, 163:25, 164:1, 164:4, 168:1, 168:4, 168:9, 168:22, 169:20, 170:2, 170:3, 170:5, 170:9, 170:12, 170:13, 171:5, 175:1, 176:19, 177:22, 178:14, 178:15, 178:16, 178:17, 178:18, 180:14, 182:3, 182:6, 182:25, 183:2, 193:2, 196:3, 196:5, 209:7, 211:19, 213:21, 214:24, 231:11
**Lab** [1] - 39:15
**lab's** [3] - 134:7, 134:20, 173:7
**laboratories** [1] - 132:25
**laboratory** [13] - 30:18, 31:3, 35:12, 35:14, 38:18, 65:11, 73:15, 131:20, 161:1, 192:24, 193:23, 228:14
**Labs** [1] - 38:21
**labs** [2] - 132:17, 163:1
**LabSolutions** [69] - 11:22, 65:14, 70:17, 83:1, 84:24, 86:1, 86:4, 91:9, 93:9, 95:14, 96:21, 96:25, 97:6, 97:23, 98:6, 98:8, 109:20, 109:25, 114:14, 120:2, 120:13, 159:22, 160:3, 160:9, 160:19, 161:7, 161:22, 162:18, 163:8, 163:18, 169:8, 174:8, 176:9, 176:16, 178:3, 178:25, 179:3, 179:16, 179:21, 180:25, 181:13, 181:25, 182:10, 183:3, 183:10, 184:23, 185:12, 186:3, 187:9, 191:22, 192:13, 195:19, 196:20, 206:18, 208:2, 209:23, 210:17, 213:11, 213:20, 220:5, 220:9, 220:13, 228:1, 228:18, 229:2, 229:22, 230:4, 230:12
**LabSolutions'** [3] - 185:17, 185:22, 192:7
**lack** [2] - 180:9, 191:5
**ladies** [5] - 10:21, 101:11, 121:23, 201:21, 216:9
**laid** [1] - 114:16
**Lamborghini** [4] - 53:15, 53:16, 53:18, 53:22
**landed** [1] - 161:22

**language** [4] - 172:14, 173:4, 189:5, 223:5
**lap** [1] - 180:14
**large** [3] - 6:11, 61:9, 227:18
**larger** [2] - 16:25, 61:16
**last** [24] - 4:6, 5:8, 17:16, 45:8, 57:13, 76:1, 76:12, 97:19, 103:12, 118:23, 131:7, 131:8, 173:18, 180:7, 206:8, 206:9, 209:10, 211:14, 215:21, 220:7, 224:23, 238:14
**last-minute** [1] - 103:12
**late** [2] - 148:14, 216:20
**Latoria** [5] - 74:3, 74:5, 77:7, 77:10, 111:14
**Lauderdale** [1] - 1:24, 239:16
**law** [5] - 9:7, 9:9, 188:6, 188:9, 210:11
**LAW** [1] - 1:18
**Law** [1] - 173:13
**laws** [7] - 80:2, 167:15, 168:16, 171:14, 171:16, 171:18, 173:15
**lawyer** [27] - 29:5, 36:19, 63:7, 63:18, 64:2, 66:8, 66:10, 66:13, 66:20, 66:22, 66:23, 116:25, 117:8, 117:13, 117:15, 117:18, 171:9, 171:12, 199:21, 199:25, 200:1, 200:2, 200:12, 200:18, 201:1, 204:12, 205:23
**lawyers** [7] - 9:16, 67:16, 99:25, 101:24, 191:23, 208:17, 217:9
**lay** [2] - 175:9, 226:3
**LCD** [1] - 97:6
**LCDs** [5] - 7:24, 95:25, 120:19, 120:20, 120:23
**lead** [2] - 172:5, 173:23
**leader** [7] - 62:10, 62:12, 62:20, 62:23, 62:25, 63:2, 74:6
**leadership** [1] - 62:9
**leading** [1] - 170:19
**learn** [4] - 148:13, 161:24, 191:22, 201:11
**learned** [8] - 30:20, 106:15, 126:23, 175:12, 192:8, 192:9, 192:10, 207:9
**learning** [4] - 14:4, 163:12, 192:2, 192:3
**lease** [1] - 168:8
**leash** [1] - 110:17
**leasing** [1] - 168:5
**least** [13] - 6:14, 10:12, 21:5, 21:20, 26:10, 53:13,

121:16, 163:12, 181:23, 219:5, 221:6, 230:10, 237:12
**leave** [15] - 20:6, 47:12, 54:5, 101:15, 121:24, 182:9, 182:12, 182:23, 183:15, 183:22, 201:21, 216:19, 238:25
**leaving** [4] - 33:14, 33:16, 183:5, 183:11
**led** [1] - 115:25
**leeway** [1] - 226:14
**left** [14] - 10:22, 54:18, 77:11, 117:20, 149:14, 182:13, 183:3, 183:17, 183:23, 206:8, 206:11, 217:21, 223:12
**legal** [4] - 117:21, 117:25, 118:4, 224:4
**legality** [1] - 201:10
**legally** [1] - 148:16
**lend** [1] - 99:5
**less** [9] - 17:13, 26:17, 62:1, 79:19, 121:17, 126:1, 221:5, 225:17
**lesser** [4] - 29:10, 30:1, 30:4, 62:4
**letter** [7] - 89:9, 89:15, 91:2, 186:17, 187:14, 211:22, 212:12
**letters** [2] - 156:19, 186:18
**letting** [1] - 126:2
**level** [3] - 145:20, 146:8, 209:22
**leverage** [1] - 106:8
**lie** [9] - 45:13, 45:21, 46:25, 48:9, 51:16, 53:24, 104:21, 105:1, 105:18
**lied** [5] - 44:18, 45:12, 45:20, 107:1
**LIED** [1] - 44:18
**lies** [4] - 104:19, 104:20, 104:24, 106:22
**life** [2] - 12:19, 150:9
**likelihood** [2] - 129:23, 146:24
**likely** [3] - 86:12, 129:20, 144:23
**Limit** [1] - 96:12
**limit** [1] - 233:2
**limited** [2] - 96:4, 96:7
**limiting** [1] - 232:1
**line** [2] - 149:21, 164:19
**lined** [2] - 107:20, 233:10
**lines** [5] - 5:13, 45:8, 76:1, 76:12, 164:15
**lineup** [7] - 8:8, 103:16, 217:17, 217:24, 219:11, 233:20, 234:15
**lining** [1] - 136:19
**linked** [1] - 145:7

**list** [13] - 5:9, 5:16, 5:24, 6:17, 135:2, 167:18, 173:16, 212:15, 212:18, 230:20, 234:2, 234:4, 236:20
**listed** [1] - 171:15
**literature** [1] - 83:1
**live** [7] - 38:7, 147:19, 159:7, 159:8, 171:6, 196:16, 204:19
**live-hosted** [1] - 204:19
**lived** [4] - 36:7, 38:9, 47:12, 190:9
**living** [17] - 36:2, 51:13, 51:17, 51:18, 51:19, 51:21, 52:2, 52:8, 52:15, 52:19, 147:22, 148:1, 148:18, 158:22, 185:1, 185:3, 190:12
**Livingston** [2] - 139:19, 139:20
**livingstone** [1] - 140:1
**LLC** [2] - 17:24, 18:3
**LLP** [1] - 2:5
**lo** [1] - 40:8
**lobby** [1] - 108:16
**local** [2] - 68:20, 185:9
**localized** [1] - 131:3
**located** [6] - 21:5, 92:1, 185:15, 185:17, 185:20, 185:22
**location** [1] - 89:4
**Lockett** [2] - 74:11, 77:10
**LOEB** [1] - 2:3
**log** [4] - 162:19, 172:8, 196:15, 198:21
**logged** [1] - 197:9
**Lohan** [1] - 41:3
**LOL** [1] - 87:24
**LOMO** [1] - 122:24
**long-term** [1] - 182:20
**look** [27] - 7:19, 45:8, 76:1, 76:15, 77:19, 77:21, 80:2, 80:24, 119:4, 120:14, 127:17, 128:2, 144:22, 154:10, 154:25, 155:2, 155:3, 155:8, 155:11, 184:20, 196:5, 205:11, 206:16, 209:9, 210:20, 217:8, 233:3
**looked** [7] - 115:2, 118:23, 143:25, 171:10, 194:17, 214:9, 222:20
**looking** [12] - 9:24, 47:23, 124:25, 155:2, 160:8, 161:19, 162:17, 220:7, 221:14, 225:10, 234:14, 234:15
**looks** [6] - 64:10, 78:14, 78:24, 83:1, 86:7, 127:18, 157:13, 211:4
**Los** [2] - 21:24, 51:19

**lose** [1] - 165:3
**losing** [1] - 188:16
**lost** [3] - 4:10, 121:14, 121:18
**low** [7] - 79:10, 127:23, 129:16, 129:19, 129:21, 129:24, 146:24
**low-risk** [2] - 127:23, 129:21
**lunch** [8] - 93:21, 93:24, 94:11, 101:12, 101:24, 102:1, 103:7, 238:23
**Lupowitz** [1] - 239:13
**LUPOWITZ** [1] - 1:21, 239:14
**lying** [4] - 47:15, 47:18, 64:1, 64:5
**lymph** [2] - 128:4, 150:5
**Lynch** [2] - 145:3, 145:4

# M

**M.D** [2] - 67:22, 148:6
**ma'am** [5] - 143:12, 147:6, 147:16, 158:7, 215:24
**MAC** [1] - 97:11
**machines** [4] - 192:24, 193:6, 194:5, 194:8
**Magliocco** [14] - 217:20, 218:8, 218:15, 219:3, 220:16, 223:16, 224:8, 225:7, 225:16, 226:10, 227:5, 233:4, 234:15, 234:22
**Magliocco's** [2] - 220:3, 233:16
**Mahbubani** [2] - 18:10, 18:15
**MAHBUBANI** [1] - 18:11
**mail** [3] - 21:21, 149:5, 154:1
**mailbox** [1] - 155:23
**main** [4] - 29:4, 75:11, 79:21, 182:1
**majority** [1] - 43:12
**malignant** [2] - 85:20, 95:1
**man** [2] - 76:25, 149:15
**managed** [1] - 168:22
**management** [4] - 98:25, 160:15, 189:3, 189:13
**manager** [2] - 163:5, 166:21
**manager/director** [1] - 166:15
**managing** [1] - 181:24
**Manatt** [1] - 9:7
**mandatory** [8] - 87:9, 170:20, 197:2, 202:24, 203:7, 203:8, 203:9, 211:6
**manuals** [1] - 197:1
**Maple** [1] - 2:3

255

**March** [6] - 36:5, 36:22, 95:16, 95:17, 200:5, 210:21

**Marked** [1] - 3:24

**marked** [6] - 5:8, 56:20, 85:7, 154:21, 223:25, 234:4

**market** [4] - 176:10, 176:17, 177:20, 214:24

**marketed** [3] - 18:19, 19:23, 179:14

**marketer** [2] - 22:2, 215:2

**marketers** [8] - 23:24, 25:4, 25:5, 164:15, 179:12, 179:13, 179:18, 214:24

**marketing** [20] - 11:18, 17:22, 18:18, 19:24, 20:3, 22:4, 22:19, 22:21, 22:23, 24:5, 24:8, 42:8, 50:12, 98:21, 107:12, 163:20, 176:19, 177:14, 180:10

**markets** [1] - 164:2

**mass** [1] - 194:8

**master's** [1] - 148:5

**match** [1] - 234:7

**material** [4] - 83:21, 84:7, 226:8, 227:9

**materials** [2] - 98:21, 120:1

**maternal** [2] - 138:4, 144:9

**math** [2] - 52:17, 97:6

**Matt** [1] - 163:6

**matter** [2] - 151:4, 239:11

**matters** [1] - 23:18

**Mauzy** [3] - 17:16, 17:19, 18:4

**MAUZY** [1] - 17:17

**Max** [7] - 38:5, 38:7, 38:12, 38:15, 38:16, 38:20, 39:15

**Max's** [1] - 38:17

**maximum** [2] - 105:11, 105:12

**McMillan** [5] - 6:17, 7:1, 7:12, 224:14, 226:22

**MD** [3] - 3:5, 122:20, 123:18

**me..** [1] - 60:22

**meal** [1] - 4:20

**mean** [44] - 6:7, 7:2, 10:9, 12:19, 14:1, 47:20, 53:21, 63:12, 68:10, 84:8, 86:16, 86:18, 93:22, 105:7, 106:2, 106:9, 106:10, 110:15, 113:7, 118:16, 119:17, 121:16, 131:23, 140:25, 141:22, 150:5, 150:16, 150:25, 172:7, 177:9, 181:21, 182:7, 190:15, 191:16, 192:24, 201:8, 218:24, 220:23, 221:1, 221:11, 222:24, 233:3

**meaning** [7] - 49:21, 49:24, 125:1, 172:9, 178:18, 194:5, 208:20

**means** [10] - 39:10, 52:18, 56:20, 93:16, 119:5, 136:4, 140:18, 193:17, 208:2

**meant** [4] - 137:2, 144:9, 156:20, 168:16

**Med** [2] - 18:1, 18:2

**media** [2] - 101:22, 217:7

**Medicaid** [1] - 79:10

**Medical** [5] - 123:5, 123:6, 123:11, 160:22, 161:15

**medical** [48] - 13:11, 13:18, 13:22, 23:22, 24:7, 46:18, 57:5, 57:7, 78:15, 78:21, 96:2, 96:4, 105:4, 105:7, 115:13, 123:8, 123:10, 123:13, 128:6, 129:4, 129:13, 132:9, 132:18, 132:22, 133:7, 133:15, 135:2, 137:3, 145:24, 148:2, 158:23, 159:16, 163:24, 167:24, 171:15, 172:9, 207:6, 212:11, 221:11, 221:25, 222:12, 223:2, 224:19, 224:23, 225:11, 231:7, 231:18, 233:18

**medically** [9] - 130:1, 133:22, 134:2, 142:14, 172:5, 172:12, 173:23, 221:10, 226:12

**Medicare** [15] - 70:12, 70:16, 70:19, 71:2, 71:9, 72:24, 73:9, 94:23, 107:9, 109:3, 112:8, 148:16, 148:24, 228:3, 229:9

**medication** [2] - 16:20, 16:22

**medicinal** [1] - 23:19

**medicine** [1] - 46:24

**Meena** [1] - 90:11

**meet** [8] - 18:4, 36:11, 37:24, 162:7, 163:2, 163:3, 186:3, 232:24

**meeting** [6] - 72:16, 78:15, 78:21, 162:8, 204:14, 204:15

**meetings** [1] - 190:21

**melanoma** [1] - 96:9

**member** [1] - 66:17

**members** [1] - 174:1

**memorable** [1] - 119:1

**memorandum** [4] - 29:6, 29:8, 29:9, 63:9

**memory** [1] - 24:20

**mention** [6] - 230:9, 231:9, 231:19, 231:24, 232:3, 232:4

**mentioned** [17] - 117:12, 127:5, 149:24, 160:18, 161:6, 162:11, 169:24, 170:23, 173:15, 174:13, 176:5, 176:11, 178:2, 178:11, 179:11, 180:22,
218:20

**mentioning** [1] - 151:8

**mere** [1] - 175:8

**merged** [2] - 96:15, 204:6

**message** [6] - 41:21, 80:5, 80:7, 95:19, 149:14, 183:9

**messages** [9] - 40:9, 40:13, 40:16, 40:18, 40:21, 41:11, 41:16, 42:4, 42:14

**met** [17] - 18:5, 23:10, 36:12, 43:20, 57:9, 59:14, 60:21, 108:15, 117:11, 152:8, 163:4, 166:5, 184:13, 186:8, 187:12

**method** [1] - 130:24

**Mexico** [4] - 38:9, 38:12, 48:14, 48:15

**MFA** [1] - 148:6

**MFS** [1] - 148:5

**Miami** [18] - 1:3, 14:12, 14:13, 36:7, 37:5, 37:10, 37:21, 47:13, 51:19, 53:19, 123:5, 124:1, 127:6, 127:8, 132:19, 135:9, 139:23, 142:23

**Michael** [3] - 41:3, 67:22, 74:11

**microphone** [8] - 37:14, 37:15, 122:22, 147:11, 154:19, 158:12, 159:2, 184:15

**microscope** [2] - 127:18, 128:3

**middle** [4] - 138:10, 205:12, 222:19, 229:21

**midnight** [1] - 7:22

**midst** [2] - 67:5, 67:8

**midstream** [1] - 6:9

**might** [28] - 34:22, 93:22, 102:13, 109:9, 120:16, 125:10, 131:21, 132:14, 133:9, 134:15, 140:8, 140:9, 140:20, 140:21, 141:3, 141:7, 141:15, 141:16, 141:21, 150:17, 159:2, 159:3, 168:8, 171:11, 174:11, 211:6, 220:5

**Miguez** [1] - 57:23

**military** [5] - 19:19, 19:22, 19:23, 20:2, 20:8

**million** [12] - 20:12, 20:18, 22:8, 23:19, 24:16, 24:24, 25:9, 25:18, 26:10, 26:16, 50:5, 50:16, 106:7, 229:22, 229:24, 236:12

**millions** [2] - 194:4

**Minal** [80] - 4:4, 11:17, 11:22, 12:2, 12:3, 15:5, 15:8, 15:14, 15:17, 23:2, 23:10, 31:1, 35:6, 40:17, 40:21,

41:4, 41:8, 41:17, 42:5, 42:6, 42:18, 42:22, 52:20, 52:21, 52:25, 53:4, 57:9, 64:12, 64:15, 64:18, 65:1, 65:16, 67:20, 77:11, 77:12, 77:13, 78:14, 78:18, 79:8, 80:20, 81:9, 81:12, 86:21, 87:4, 88:4, 88:24, 98:12, 100:16, 100:25, 105:16, 105:20, 106:6, 106:20, 108:1, 108:10, 108:11, 108:25, 109:17, 110:1, 110:12, 110:14, 110:16, 111:14, 112:9, 113:18, 114:14, 118:12, 118:13, 131:18, 153:16, 163:4, 167:1, 168:24, 179:3, 182:6, 186:8, 187:10, 210:23

**MINAL** [1] - 1:6

**Minal's** [3] - 41:18, 43:4, 169:16

**mind** [7] - 62:20, 87:8, 151:1, 212:2, 212:6, 236:1, 238:11

**mine** [2] - 21:23, 66:2

**mine's** [1] - 53:22

**minimal** [1] - 226:19

**minimally** [1] - 159:20

**minute** [7] - 54:3, 54:4, 54:13, 103:12, 148:22, 175:2, 202:2

**minutes** [10] - 5:11, 7:13, 46:9, 101:18, 102:10, 108:15, 119:8, 122:2, 197:6, 225:24

**miracle** [1] - 150:6

**miraculous** [1] - 152:15

**mislead** [2] - 47:20, 200:3

**misleading** [1] - 115:14

**mispronouncing** [1] - 18:10

**misrepresent** [1] - 47:20

**misrepresentation** [2] - 84:12, 84:19

**misrepresentations** [1] - 83:15

**missed** [1] - 205:19

**missing** [4] - 59:3, 77:17, 113:2, 212:17

**Mission** [2] - 92:1, 92:10

**mix** [3] - 179:23, 182:8, 215:4

**mmm-hmm** [6] - 65:10, 73:25, 169:7, 198:25, 209:1, 209:21

**model** [10] - 164:9, 164:11, 164:21, 164:23, 164:24, 165:2, 165:5, 208:17, 213:25, 214:4

**modeled** [1] - 196:2

**modify** [1] - 36:19
**molecular** [3] - 85:22, 121:5, 197:23
**mom** [8] - 18:24, 27:7, 108:23, 109:1, 109:4, 109:11, 109:13, 117:15
**mom's** [1] - 28:12
**moment** [10] - 99:4, 110:18, 121:1, 130:13, 141:24, 150:10, 154:11, 154:17, 156:3, 183:25
**momentary** [1] - 153:5
**moments** [1] - 153:2
**Monday** [6] - 66:2, 66:3, 79:12, 216:18, 217:21, 223:21
**money** [47] - 22:16, 23:18, 24:10, 24:13, 24:21, 25:25, 26:4, 30:25, 31:6, 38:12, 49:5, 50:3, 50:10, 50:12, 50:18, 50:22, 51:4, 51:5, 51:11, 69:1, 79:18, 79:23, 81:15, 81:24, 104:19, 104:20, 104:21, 105:14, 106:11, 106:18, 113:8, 113:10, 113:12, 113:22, 118:7, 118:11, 118:13, 118:14, 119:9, 119:10, 120:10, 121:11, 143:13, 168:8, 207:6
**moneys** [1] - 25:3
**monitor** [4] - 33:13, 37:9, 37:12, 37:20
**monitoring** [1] - 36:20
**month** [15] - 34:11, 48:1, 48:3, 52:7, 52:15, 52:18, 52:19, 61:25, 62:1, 75:11, 149:15, 204:4, 206:8, 206:11, 211:14
**months** [17] - 30:20, 33:14, 35:22, 50:10, 61:22, 63:5, 72:20, 100:2, 150:4, 152:11, 195:12, 197:14, 197:19, 199:1, 202:21
**moot** [1] - 238:3
**mooted** [1] - 233:4
**moots** [1] - 221:15
**morning** [17] - 4:2, 4:3, 4:20, 8:1, 8:2, 10:21, 11:10, 11:11, 66:3, 93:19, 204:8, 207:9, 216:13, 216:18, 217:10, 224:2, 231:1
**morsel** [1] - 118:3
**mortar** [19] - 69:5, 69:7, 69:8, 89:4, 89:5, 89:7, 89:11, 90:4, 90:20, 91:6, 91:10, 92:8, 92:23, 191:14, 191:16, 191:17, 191:19, 191:25, 211:18
**most** [12] - 44:5, 110:24,

130:25, 136:18, 139:7, 145:8, 150:21, 168:9, 174:13, 186:9, 203:5
**mostly** [4] - 150:22, 179:25
**mother** [10] - 11:21, 12:12, 19:1, 23:13, 27:3, 27:4, 39:3, 137:19, 137:25, 144:8
**mother's** [1] - 92:14
**motion** [8] - 9:4, 9:12, 9:15, 36:19, 44:22, 45:25, 46:4, 46:15
**motivated** [2] - 30:11, 189:11
**motivating** [3] - 113:8, 113:10, 113:12
**motivation** [2] - 30:2, 30:8
**Mount** [8] - 123:5, 123:6, 123:19, 123:20, 123:22, 123:23, 133:6, 133:7
**mouth** [1] - 205:1
**move** [5] - 5:12, 31:9, 31:10, 52:23, 101:14, 102:12, 102:22, 128:17, 159:2, 159:4, 165:16, 165:20, 175:21, 183:16, 212:10, 213:2, 213:4, 218:4, 224:21, 225:2, 226:16
**moved** [5] - 8:17, 12:10, 31:6, 164:8, 213:5
**movement** [1] - 7:6
**moving** [7] - 6:12, 6:15, 103:22, 123:22, 152:3, 170:19, 238:14
**MR** [165] - 3:4, 3:7, 3:10, 3:11, 3:13, 6:16, 7:20, 8:23, 8:25, 9:3, 9:7, 10:3, 10:7, 10:14, 11:5, 11:9, 28:4, 28:15, 29:23, 37:17, 37:19, 45:5, 45:7, 54:2, 54:19, 55:3, 55:9, 55:14, 55:18, 57:18, 57:21, 57:22, 60:13, 60:18, 66:14, 66:15, 69:12, 69:14, 73:19, 73:23, 78:6, 78:8, 83:4, 83:5, 83:24, 83:25, 84:15, 84:17, 88:13, 88:14, 90:7, 90:9, 92:19, 92:22, 94:9, 94:14, 94:16, 97:19, 97:21, 100:18, 100:21, 101:9, 103:5, 128:19, 131:12, 131:14, 134:25, 135:7, 135:12, 135:13, 135:17, 135:21, 135:24, 136:8, 136:10, 136:25, 137:4, 137:13, 137:17, 137:21, 137:23, 138:7, 138:8, 138:10, 138:12, 138:24, 139:1, 141:24, 142:1, 142:3, 150:10, 150:13, 150:19, 150:24, 153:10, 153:14, 154:5,

154:9, 154:14, 154:16, 154:20, 156:3, 156:5, 156:24, 157:1, 157:11, 157:23, 165:19, 175:2, 175:5, 175:15, 175:24, 184:10, 186:21, 187:4, 187:7, 189:23, 190:2, 194:22, 195:3, 195:5, 195:7, 195:9, 196:13, 196:14, 197:12, 197:13, 201:20, 202:11, 209:9, 209:12, 211:25, 212:1, 212:4, 212:5, 213:2, 215:15, 215:17, 219:19, 219:22, 222:6, 222:8, 223:8, 223:10, 223:23, 224:4, 224:7, 224:11, 224:16, 227:1, 227:7, 229:14, 229:18, 229:21, 232:9, 233:22, 234:12, 234:22, 235:9, 235:15, 235:19, 235:24, 236:11, 238:16, 238:19
**MS** [103] - 3:4, 3:6, 3:7, 3:9, 3:10, 3:13, 3:14, 4:19, 5:5, 7:8, 27:25, 29:19, 57:14, 60:15, 100:17, 102:20, 103:2, 103:15, 104:10, 104:12, 111:3, 111:6, 113:13, 113:15, 114:25, 115:1, 115:7, 115:9, 119:23, 119:24, 121:1, 121:3, 121:8, 121:19, 122:15, 123:1, 128:16, 128:24, 129:2, 129:6, 129:8, 130:13, 130:15, 131:10, 135:4, 142:6, 142:8, 146:25, 147:5, 147:15, 150:17, 151:7, 153:9, 154:8, 154:10, 154:13, 156:7, 156:9, 156:13, 156:22, 157:5, 158:1, 158:5, 158:15, 158:17, 158:19, 159:1, 165:15, 165:24, 166:1, 166:2, 175:11, 175:18, 176:1, 183:25, 184:3, 184:5, 186:24, 213:5, 213:9, 215:21, 215:23, 216:6, 218:2, 218:4, 218:7, 218:17, 218:24, 219:2, 219:9, 219:13, 219:24, 220:2, 220:16, 221:3, 222:3, 223:3, 225:21, 226:24, 230:13, 231:15, 234:1, 238:21
**multiple** [6] - 30:11, 43:8, 128:6, 164:15, 171:14, 203:14
**muscle** [1] - 128:4
**must** [4] - 26:9, 92:10, 196:20, 196:23
**mutation** [2] - 84:2, 124:25

**mutations** [2] - 124:17, 126:14

## N

**N-g-o** [1] - 57:24
**name** [32] - 9:7, 17:16, 18:1, 22:14, 26:18, 27:18, 35:7, 51:9, 57:13, 122:22, 122:23, 131:17, 140:1, 147:11, 147:12, 149:17, 153:15, 156:14, 158:12, 158:13, 160:21, 168:13, 178:10, 184:11, 185:1, 189:1, 189:2, 199:18, 199:24, 201:1, 224:18, 236:9
**named** [8] - 14:25, 38:5, 68:20, 92:3, 108:2, 127:9, 151:15, 162:3
**names** [8] - 19:10, 26:14, 26:15, 26:17, 26:24, 27:5, 169:15, 217:24
**narrow** [1] - 231:9
**national** [4] - 99:1, 160:24, 179:17, 187:18
**natural** [1] - 216:11
**nature** [3] - 13:21, 86:3, 190:25
**NE** [1] - 2:3
**near** [3] - 31:1, 43:1, 218:21
**nearly** [2] - 108:13, 109:3
**necessarily** [5] - 5:24, 5:25, 141:4, 162:1, 237:23
**necessary** [8] - 4:13, 130:1, 133:22, 134:2, 142:14, 172:12, 224:20, 232:6
**necessitate** [1] - 102:7
**necessity** [12] - 23:23, 24:7, 96:2, 96:4, 105:4, 133:15, 172:9, 221:25, 223:2, 224:19, 224:24, 225:11
**need** [56] - 5:1, 8:13, 9:16, 9:25, 13:5, 28:22, 28:24, 29:2, 29:7, 30:2, 30:8, 54:11, 59:4, 80:24, 86:14, 86:17, 95:20, 103:18, 105:1, 111:18, 119:4, 121:25, 125:10, 129:22, 129:23, 146:24, 147:24, 157:25, 162:24, 167:15, 167:20, 171:6, 173:16, 176:22, 177:1, 187:18, 201:19, 205:21, 212:14, 212:20, 218:9, 223:6, 224:22, 225:8, 226:8, 233:1, 233:12, 233:25, 234:10, 234:16, 237:12, 237:13, 238:12, 238:25
**needed** [7] - 23:15, 87:20, 112:9, 120:24, 195:15,

198:8, 211:5
**needless** [1] - 185:17
**needs** [6] - 4:20, 146:23, 167:10, 202:1, 223:11, 225:10
**negative** [2] - 126:9, 126:20
**negatively** [1] - 237:6
**negatives** [1] - 146:7
**neoplasms** [2] - 85:20, 95:2
**never** [21] - 27:6, 27:19, 52:17, 77:5, 108:16, 117:11, 128:13, 133:21, 143:15, 143:24, 151:14, 152:8, 163:15, 176:18, 179:7, 184:13, 192:8, 192:9, 192:10, 206:4, 230:25
**New** [8] - 1:16, 9:17, 12:8, 59:14, 59:21, 108:15, 123:11, 123:15
**new** [21] - 35:22, 37:3, 39:14, 43:18, 43:19, 46:11, 48:2, 48:9, 50:3, 53:18, 88:3, 99:7, 169:15, 175:20, 196:7, 198:19, 212:11, 226:18, 228:25
**newer** [1] - 133:18
**newest** [1] - 47:15
**news** [2] - 149:22, 150:1
**next** [29] - 7:25, 9:20, 10:2, 10:5, 56:7, 56:16, 64:14, 69:12, 73:19, 79:7, 81:6, 84:10, 85:7, 88:12, 101:14, 119:6, 122:1, 122:14, 124:24, 125:17, 147:4, 158:4, 173:11, 189:7, 204:17, 212:15, 218:5, 219:6, 226:3
**next-generation** [1] - 124:24
**NGO** [1] - 57:13
**NHS** [1] - 26:25
**nice** [5] - 102:1, 126:7, 183:9, 211:22, 217:11
**Nicholas** [3] - 98:14, 110:15
**Nick** [33] - 72:20, 79:8, 80:22, 81:12, 86:21, 87:9, 89:14, 89:21, 90:17, 91:5, 91:9, 105:16, 111:13, 113:18, 166:11, 166:17, 166:24, 166:25, 169:20, 169:22, 170:14, 182:2, 182:5, 186:9, 199:4, 199:6, 203:18, 204:7, 206:20, 209:2, 210:25
**nickel** [2] - 50:25, 51:9
**nickname** [1] - 208:19
**night** [2] - 7:22, 220:7
**nine** [1] - 202:21
**NO** [1] - 1:2

**nobody** [2] - 204:25, 236:16
**node** [1] - 128:4
**noncompete** [1] - 211:15
**none** [12] - 101:1, 113:1, 113:3, 149:22, 176:18, 179:15, 179:22, 214:25, 215:3, 215:6, 215:10, 215:14
**nonhereditary** [1] - 129:20
**nonmedical** [1] - 172:18
**normal** [1] - 55:12
**North** [1] - 227:24
**Northside** [1] - 192:15
**note** [6] - 93:1, 121:24, 131:8, 138:23, 183:16, 203:5
**notepads** [5] - 11:2, 54:5, 101:15, 201:22, 216:20
**notes** [2] - 89:1, 92:24
**nothing** [18] - 19:3, 23:22, 35:2, 42:14, 51:2, 51:3, 80:16, 81:21, 81:24, 89:6, 126:23, 143:22, 181:10, 191:10, 193:22, 215:18, 220:21, 221:23
**notice** [3] - 5:20, 8:7, 138:21
**noticed** [2] - 198:19, 206:7
**notify** [2] - 97:17, 183:4
**November** [7] - 32:25, 43:21, 56:3, 58:13, 64:10, 65:7, 72:2
**Number** [1] - 4:4
**number** [27] - 6:12, 20:14, 20:15, 24:4, 24:14, 25:19, 59:25, 60:1, 60:8, 61:7, 61:9, 61:13, 61:16, 69:12, 73:19, 81:6, 139:14, 149:13, 153:21, 161:13, 173:22, 189:17, 200:14, 235:3, 235:15
**numbers** [10] - 20:25, 58:19, 58:20, 58:22, 58:24, 59:3, 106:17, 113:23, 235:12
**numerical** [1] - 194:23
**numerous** [1] - 112:9
**nurse** [5] - 91:25, 139:8, 139:9, 139:10, 146:3
**nursing** [1] - 146:2
**NW** [1] - 1:18

**O**

**o'clock** [4] - 101:17, 103:7, 216:24, 223:12
**obese** [1] - 128:7
**obesity** [1] - 129:17
**object** [3] - 27:25, 151:3, 229:16
**objecting** [1] - 150:23
**objection** [20] - 29:19,

57:20, 60:15, 100:17, 128:18, 128:19, 135:4, 154:13, 157:4, 165:17, 165:18, 165:19, 186:22, 186:23, 186:24, 224:15, 225:24, 229:6, 235:7, 238:3
**objectionable** [1] - 150:19
**obligate** [1] - 116:19
**observations** [6] - 110:13, 169:19, 175:9, 231:7, 231:18, 233:17
**obstetrics** [2] - 123:15, 124:3
**obtain** [1] - 219:13
**obtained** [1] - 7:21
**obviously** [4] - 9:15, 55:9, 190:10, 204:6
**occasion** [2] - 45:21, 61:1
**occasional** [1] - 131:21
**occasionally** [2] - 111:1, 132:4
**occasions** [2] - 43:8, 52:25
**occurrence** [1] - 124:23
**October** [7] - 43:20, 46:7, 47:23, 48:7, 48:8, 197:19, 198:2
**OF** [5] - 1:1, 1:3, 1:9, 1:15, 1:18
**offense** [2] - 101:23, 217:9
**offer** [5] - 135:3, 140:8, 140:20, 140:21, 140:24
**offered** [1] - 135:1
**offering** [1] - 175:11
**Office** [1] - 45:18
**office** [13] - 28:12, 45:12, 69:10, 88:17, 93:25, 155:22, 168:6, 185:24, 190:20, 191:17, 191:19, 192:18
**OFFICE** [1] - 1:18
**officed** [1] - 170:12
**OFFICER** [6] - 10:18, 54:8, 54:22, 103:24, 122:3, 202:6
**officer** [3] - 44:5, 44:11, 199:16
**offices** [7] - 68:21, 84:25, 185:18, 185:22, 192:14, 211:19
**official** [1] - 166:18
**Official** [2] - 1:22, 239:14
**officially** [1] - 148:16
**offshore** [8] - 48:14, 48:15, 48:16, 48:17, 49:6, 49:10, 49:25, 50:4
**often** [6] - 108:11, 108:14, 142:16, 142:18, 144:15, 171:7
**oftentimes** [1] - 27:17
**OIG** [2] - 7:11, 112:8
**old** [1] - 14:20
**Omar** [16] - 65:3, 65:5,

65:15, 65:16, 97:25, 99:5, 99:13, 112:9, 162:4, 163:4, 182:5, 187:9, 192:5
**on-site** [1] - 193:6
**onboard** [5] - 162:6, 164:7, 182:15, 182:16, 196:24
**once** [19] - 6:22, 34:25, 47:22, 75:11, 86:8, 97:11, 108:15, 119:18, 126:4, 134:13, 143:4, 153:6, 165:5, 171:20, 182:15, 182:18, 182:19, 183:1, 188:19
**oncologic** [1] - 144:2
**oncologist** [3] - 86:17, 123:24, 140:3
**oncology** [5] - 123:7, 123:17, 123:25, 124:7, 140:6
**one** [128] - 4:7, 7:8, 7:10, 7:21, 8:25, 15:21, 18:22, 19:24, 19:25, 21:13, 21:23, 22:3, 23:5, 23:25, 24:25, 25:6, 29:9, 30:5, 37:4, 37:13, 37:20, 39:11, 42:10, 42:12, 47:23, 48:2, 48:23, 54:12, 54:25, 55:15, 55:20, 56:5, 56:7, 56:16, 56:19, 61:7, 62:13, 64:9, 64:14, 64:19, 64:24, 71:1, 71:2, 72:6, 73:21, 77:3, 77:13, 80:6, 84:18, 87:7, 88:12, 91:18, 93:5, 101:20, 102:23, 104:2, 104:3, 106:17, 108:8, 121:1, 121:23, 122:9, 124:22, 127:3, 127:5, 129:15, 130:13, 131:17, 132:20, 134:21, 138:13, 139:25, 143:3, 143:7, 145:2, 148:4, 148:5, 153:16, 159:3, 161:6, 162:4, 167:20, 167:23, 168:1, 168:13, 169:11, 170:7, 171:23, 172:16, 173:1, 174:20, 177:20, 178:2, 179:1, 183:7, 183:25, 186:9, 187:9, 189:23, 194:20, 194:24, 195:11, 197:1, 197:2, 197:22, 198:2, 199:2, 203:8, 203:9, 204:14, 206:8, 206:9, 207:19, 210:20, 212:16, 214:2, 215:12, 215:21, 218:2, 219:17, 226:6, 229:1, 230:1, 237:24
**ones** [6] - 8:17, 103:18, 105:14, 171:15, 204:23, 235:5
**ongoing** [1] - 198:7
**open** [9] - 20:6, 48:14, 64:23, 81:21, 107:11, 151:6, 174:15, 175:22, 198:8
**opened** [1] - 149:7

**opening** [3] - 160:4, 161:7, 161:9

**operate** [1] - 198:23

**operated** [1] - 18:18

**operating** [1] - 193:23

**Operation** [1] - 227:19

**operation** [3] - 108:17, 190:17, 192:22

**operations** [2] - 169:17, 191:14

**opinion** [14] - 140:4, 140:13, 140:19, 140:20, 140:22, 140:24, 141:1, 141:3, 141:6, 141:9, 175:6, 175:9, 220:24, 221:24

**opinions** [2] - 141:12, 220:18

**opportunity** [7] - 5:15, 28:3, 45:16, 183:19, 212:25, 226:7, 230:21

**oppose** [1] - 9:15

**opposed** [4] - 191:24, 204:22, 216:14, 231:18

**options** [5] - 125:6, 125:18, 125:23, 126:13, 203:14

**Order** [1] - 4:1

**order** [43] - 4:9, 16:21, 17:1, 82:13, 85:22, 124:12, 124:24, 125:8, 129:11, 129:15, 130:20, 131:20, 131:22, 132:1, 132:4, 132:6, 132:9, 132:14, 133:5, 134:21, 139:5, 139:8, 139:9, 139:10, 142:13, 142:16, 142:18, 143:9, 143:25, 144:15, 144:18, 144:19, 144:22, 146:16, 172:10, 172:17, 194:23, 203:20, 214:19, 218:9

**ordered** [19] - 11:17, 55:22, 68:11, 92:2, 100:24, 120:24, 132:24, 133:13, 133:16, 133:20, 133:25, 134:7, 134:11, 142:10, 151:18, 152:4, 152:21, 221:8, 235:25

**ordering** [11] - 42:19, 133:6, 134:2, 139:11, 143:2, 172:4, 173:23, 174:12, 180:12, 198:11

**orders** [2] - 108:24, 226:12

**organs** [1] - 95:2

**original** [2] - 113:19, 229:23

**originally** [2] - 199:4, 200:11

**otherwise** [2] - 113:7, 151:21

**outcome** [1] - 116:10

**outlay** [1] - 70:6

**outlier** [1] - 63:13

**Outline** [1] - 167:2

**outline** [2] - 167:9, 167:10

**outlines** [2] - 173:12, 210:11

**outset** [1] - 230:14

**outside** [11] - 43:12, 96:9, 109:7, 132:25, 133:10, 134:14, 139:12, 172:17, 177:23, 192:20, 221:12

**outsourced** [1] - 171:4

**ovarian** [3] - 96:8, 96:9, 145:7

**overall** [1] - 143:8

**overflow** [1] - 88:18

**overlap** [1] - 226:20

**overruled** [5] - 29:20, 57:20, 60:17, 100:20, 215:17

**own** [8] - 18:18, 22:19, 38:16, 84:7, 117:13, 175:9, 228:12, 229:4

**owned** [1] - 35:16

**owner** [2] - 108:2, 111:16

**owners** [1] - 187:9

## P

**P.J** [5] - 135:22, 190:1, 195:3, 197:12, 209:9

**p.m** [40] - 1:5, 87:24, 102:5, 103:9, 103:10, 103:25, 122:4, 122:7, 122:11, 201:25, 202:3, 202:4, 202:7, 217:14, 217:15, 239:5

**pace** [2] - 218:12, 219:8

**pacemakers** [1] - 159:21

**pack** [2] - 149:7

**package** [3] - 153:25, 155:19, 155:20

**pads** [2] - 121:25, 209:14

**PAGE** [1] - 3:2

**page** [40] - 83:2, 85:13, 85:14, 87:20, 92:19, 92:20, 129:6, 129:13, 135:8, 135:17, 136:8, 136:9, 136:12, 136:25, 137:2, 137:21, 137:24, 138:3, 138:7, 138:11, 138:25, 155:3, 155:8, 155:10, 155:13, 172:21, 173:1, 173:4, 173:11, 173:18, 188:23, 203:10, 205:12, 227:5, 227:25, 228:4, 229:12, 235:12

**Pages** [1] - 1:7

**pages** [12] - 83:4, 83:24, 84:15, 155:1, 189:23, 235:16, 235:21, 235:22, 236:8, 236:11, 236:12, 236:19

**paid** [32] - 20:11, 22:6,

22:7, 22:15, 23:13, 25:5, 25:6, 25:9, 25:10, 25:11, 25:25, 26:5, 26:8, 50:22, 50:24, 51:1, 69:1, 93:10, 93:13, 93:14, 93:15, 94:5, 113:1, 113:3, 168:3, 181:9, 181:15, 181:16, 181:17, 204:1, 207:6, 209:23

**pain** [2] - 16:22, 163:25

**paint** [1] - 63:23

**pairing** [3] - 177:13, 177:16, 215:11

**PALM** [1] - 1:2

**Palmetto** [6] - 96:15, 96:18, 96:22, 97:2, 97:12, 97:13

**palms** [1] - 7:17

**Pamela** [1] - 92:1

**pamphlet** [2] - 126:7, 134:16

**pancreatic** [3] - 145:10, 148:8, 150:2

**panel** [3] - 119:16, 120:8, 120:12

**panels** [3] - 105:13, 119:20, 119:21

**paper** [3] - 145:23, 151:11, 198:14

**paperwork** [2] - 112:17, 154:1

**paragraph** [3] - 189:1, 189:7, 209:10

**parameters** [1] - 231:4

**parents** [8] - 51:15, 51:17, 51:18, 52:2, 52:9, 52:14, 52:15, 52:18

**parents'** [2] - 51:21, 52:6

**park** [1] - 49:6

**parked** [1] - 50:3

**part** [29] - 7:24, 18:7, 18:15, 58:7, 63:4, 69:15, 70:15, 77:20, 83:20, 84:10, 84:18, 115:25, 116:25, 135:22, 137:1, 137:3, 138:17, 146:19, 150:21, 174:13, 177:11, 189:11, 191:8, 198:17, 204:3, 210:5, 211:8, 228:12, 230:10

**participate** [6] - 165:6, 174:7, 203:11, 203:25, 204:20, 205:6

**participated** [1] - 201:1

**participating** [1] - 205:14

**particular** [6] - 7:10, 8:11, 129:13, 130:2, 207:15, 227:24

**particularly** [1] - 126:8

**parties** [3] - 4:7, 18:6, 65:2

**partner** [1] - 211:15

**partnered** [1] - 177:24

**pass** [3] - 180:20, 184:5,

223:19

**passed** [2] - 181:21, 207:5

**past** [1] - 98:18

**Patel** [74] - 4:4, 11:17, 11:22, 12:2, 12:3, 15:5, 15:8, 15:17, 19:3, 23:2, 23:10, 31:1, 35:2, 35:6, 40:17, 40:21, 41:17, 41:20, 42:6, 42:18, 55:21, 56:14, 57:10, 60:3, 64:12, 64:15, 64:18, 65:16, 66:7, 66:10, 67:20, 68:10, 69:25, 70:7, 81:9, 82:13, 87:4, 89:14, 89:21, 100:16, 100:25, 105:16, 105:20, 106:20, 107:8, 107:12, 108:1, 108:6, 108:10, 108:11, 108:12, 108:25, 110:14, 110:19, 113:18, 114:14, 115:5, 115:17, 115:18, 117:18, 118:14, 120:20, 131:18, 153:16, 186:8, 192:6, 227:18, 228:4, 228:13, 229:3, 229:24, 231:11, 232:18

**PATEL** [1] - 1:6

**Patel's** [5] - 56:5, 56:25, 66:23, 98:10, 210:23

**pathologic** [1] - 128:10

**pathological** [1] - 128:4

**pathologically** [1] - 128:1

**patient** [41] - 27:19, 76:15, 77:15, 77:20, 77:25, 88:2, 92:2, 111:21, 111:22, 120:24, 125:4, 125:8, 126:5, 126:18, 126:21, 127:1, 127:9, 129:19, 134:5, 134:17, 134:18, 134:19, 140:9, 141:15, 141:17, 141:22, 143:8, 143:21, 144:4, 145:15, 145:17, 145:18, 146:2, 150:14, 172:17, 220:4, 220:18, 220:23, 226:11, 227:9, 228:24

**patient's** [4] - 125:9, 125:11, 127:2, 227:23

**patients** [35] - 14:4, 27:6, 76:16, 77:19, 77:22, 104:25, 109:1, 111:24, 112:4, 124:8, 124:9, 124:10, 124:18, 124:22, 125:5, 125:13, 125:19, 125:24, 126:2, 126:8, 126:9, 134:8, 140:3, 141:13, 142:21, 143:4, 143:5, 145:10, 176:10, 176:17, 180:25, 224:25, 225:2, 225:12, 226:4

**patients'** [1] - 112:1

**patrol** [1] - 226:23

**pattern** [1] - 172:5
**patterns** [4] - 173:23, 174:12, 180:12
**pause** [1] - 201:18
**pay** [11] - 69:2, 93:25, 94:2, 113:7, 114:3, 114:4, 119:15, 119:19, 148:25, 168:1, 174:1
**paycheck** [1] - 208:5
**paying** [8] - 114:5, 114:8, 114:9, 114:11, 114:12, 114:14, 209:5
**payment** [2] - 87:5, 204:2
**payroll** [4] - 58:6, 75:2, 75:3, 75:11
**pays** [1] - 148:24
**PC** [2] - 1:18, 2:3
**PDF** [2] - 221:20, 233:4
**PDFs** [1] - 220:8
**Peachtree** [1] - 1:18
**Peactree** [1] - 2:6
**people** [41] - 13:6, 18:20, 19:23, 20:3, 46:23, 57:24, 64:10, 76:12, 80:2, 84:5, 93:10, 105:17, 105:18, 106:4, 107:18, 109:7, 111:13, 112:16, 112:17, 117:19, 130:25, 139:24, 145:24, 147:23, 162:3, 166:22, 169:18, 172:18, 181:3, 183:4, 186:9, 186:18, 196:15, 198:14, 198:21, 205:6, 205:23, 208:19, 209:23, 211:1, 217:8
**Pepsi** [1] - 5:2
**per** [3] - 16:25, 17:2, 143:3
**percent** [12] - 21:7, 21:9, 26:22, 33:4, 68:18, 88:10, 89:12, 90:6, 143:10, 143:11, 179:9, 196:23
**percentage** [1] - 143:1
**percentage-wise** [1] - 143:1
**percentages** [2] - 181:20, 181:23
**perfect** [1] - 103:20
**performed** [2] - 138:15, 227:11
**perhaps** [3] - 9:20, 102:22, 228:18
**period** [24] - 12:4, 15:23, 20:13, 26:16, 31:11, 31:13, 34:21, 34:23, 38:10, 41:5, 41:12, 41:14, 42:4, 42:22, 50:9, 50:17, 51:21, 72:15, 81:19, 81:25, 91:16, 143:6, 149:11, 159:24
**peripheral** [1] - 159:18
**perjury** [1] - 116:21
**PerkinElmer** [1] - 9:5
**permission** [5] - 55:4, 55:7,

111:3, 128:25, 152:14
**permitted** [2] - 89:10, 228:20
**person** [14] - 18:22, 58:17, 73:14, 92:17, 117:11, 152:5, 152:23, 153:19, 153:20, 163:4, 182:1, 188:4, 208:13, 210:17
**personal** [14] - 95:6, 95:7, 96:5, 96:7, 96:8, 96:12, 97:4, 136:4, 136:12, 144:20, 146:17, 175:10, 183:7, 212:21
**personally** [2] - 138:15, 187:12
**personnel** [1] - 166:15
**perspective** [1] - 6:22
**persuade** [1] - 30:7
**persuasive** [1] - 189:21
**pertain** [1] - 167:25
**pertinent** [2] - 147:6, 146:8
**PGx** [8] - 30:18, 30:25, 56:1, 56:23, 68:5, 68:6, 95:23, 97:9
**Ph.D** [1] - 193:4
**Ph.D.'s** [1] - 148:6
**pharmacies** [15] - 15:20, 17:4, 17:6, 17:8, 21:4, 21:10, 21:12, 21:17, 21:20, 21:23, 25:7, 26:9, 26:12, 72:25
**Pharmacies** [4] - 20:21, 21:5, 26:6
**pharmacogenetics** [2] - 161:5, 197:25
**pharmacogenomics** [1] - 30:19
**Pharmacy** [3] - 21:6, 21:13
**pharmacy** [7] - 21:13, 21:15, 22:4, 22:17, 73:15, 73:16, 105:21
**phased** [1] - 164:8
**phasing** [3] - 164:20, 213:24, 213:25
**Phelps** [1] - 9:8
**phone** [36] - 7:15, 32:4, 32:6, 32:8, 32:10, 32:13, 32:15, 32:20, 40:4, 40:8, 40:18, 41:18, 43:4, 43:5, 43:6, 70:19, 78:22, 78:23, 78:24, 87:24, 110:23, 110:24, 153:19, 153:21, 162:5, 177:13, 177:14, 177:16, 183:7, 186:12, 186:14, 187:23, 190:21, 212:24
**phones** [3] - 32:14, 107:19, 215:12
**phonetic** [2] - 18:16, 18:17
**phonetic)** [1] - 68:20
**phrase** [1] - 24:2

**physically** [1] - 185:22
**physician** [14] - 16:21, 21:24, 22:13, 68:1, 86:9, 88:1, 93:15, 94:3, 94:5, 168:1, 168:3, 168:6, 227:13
**physician's** [1] - 85:23
**physicians** [8] - 12:12, 14:4, 93:11, 93:14, 162:25, 163:24, 174:1, 177:20
**physicians'** [1] - 19:10
**pick** [2] - 10:22, 70:19
**picture** [4] - 53:22, 63:23, 105:6, 225:12
**piece** [1] - 145:23
**pitch** [1] - 115:18
**PJ** [1] - 137:2
**place** [10] - 46:7, 52:13, 70:6, 71:7, 72:14, 162:16, 163:13, 195:23, 214:21, 216:17
**places** [3] - 6:21, 51:20, 217:8
**plan** [8] - 4:12, 6:12, 6:23, 98:24, 102:19, 107:16, 143:21, 145:17
**planned** [2] - 6:18, 6:23
**planning** [1] - 54:16
**platform** [3] - 111:16, 114:10, 162:22
**platforms** [4] - 160:14, 160:15, 162:16, 212:13
**play** [1] - 227:14
**playbook** [2] - 237:18, 238:6
**played** [2] - 66:6, 67:12
**players** [1] - 57:17
**playing** [2] - 94:14, 197:16
**plea** [4] - 100:12, 109:12, 116:15, 116:19
**plead** [2] - 61:22, 121:13
**pleasure** [4] - 98:17, 99:3, 183:19, 212:9
**pled** [9] - 16:1, 16:2, 27:2, 29:10, 50:23, 61:19, 62:1, 63:8, 109:13
**plus** [1] - 114:3
**podium** [1] - 224:8
**point** [40] - 5:1, 7:10, 8:4, 10:5, 12:10, 13:20, 14:19, 19:4, 19:5, 28:4, 47:12, 50:2, 52:17, 58:4, 62:14, 62:15, 76:10, 90:7, 90:23, 138:17, 140:20, 167:17, 170:15, 173:16, 173:22, 182:9, 189:24, 216:11, 222:5, 222:6, 223:5, 223:8, 226:22, 227:4, 230:3, 232:22, 232:23, 235:5, 237:16, 238:12
**pointed** [1] - 237:20

**points** [4] - 11:13, 163:25, 173:19, 189:16
**pool** [1] - 109:10
**poor** [1] - 117:19
**pop** [1] - 86:13
**popping** [1] - 84:8
**portion** [2] - 143:8, 171:4
**pose** [1] - 28:2
**posed** [3] - 215:8, 215:13, 216:4
**position** [12] - 5:14, 7:15, 51:4, 62:12, 123:22, 180:3, 187:18, 187:20, 213:16, 213:21, 230:4, 236:24
**Positioning** [1] - 37:12
**positions** [2] - 124:2, 127:5
**positive** [6] - 84:8, 126:9, 126:19, 127:1, 153:4, 183:16
**positives** [2] - 145:19, 146:8
**possibility** [1] - 217:18
**possible** [12] - 68:6, 73:18, 77:2, 77:24, 91:12, 105:13, 114:13, 114:15, 125:17, 139:7, 214:22, 218:23
**possibly** [4] - 76:24, 76:25, 208:23, 217:19
**post** [1] - 155:22
**postage** [1] - 155:24
**postbox** [1] - 149:6
**postmenopausal** [3] - 144:12, 144:14, 144:17
**postrelease** [1] - 43:24
**Potemkin** [1] - 193:16
**potential** [7] - 84:24, 152:24, 161:7, 162:8, 180:12, 223:24, 237:13
**potentially** [2] - 162:17, 236:3
**poverty** [1] - 80:2
**PPOF** [1] - 107:23
**practical** [1] - 8:14
**practically** [1] - 138:9
**practice** [12] - 68:1, 69:3, 69:4, 92:14, 109:2, 131:22, 140:2, 140:12, 142:17, 143:22, 145:14, 146:1
**practitioner** [2] - 91:25, 146:3
**Pravin** [1] - 22:14
**pre** [3] - 15:16, 56:20, 144:17
**pre-marked** [1] - 56:20
**precancer** [1] - 127:19, 127:21
**precancers** [1] - 127:19
**precise** [1] - 218:9
**precisely** [1] - 37:20
**precludes** [1] - 220:21
**predated** [1] - 105:22

**predicate** [1] - 230:5
**predict** [1] - 121:10
**Predict** [1] - 156:16
**predisposing** [1] - 84:2
**predisposition** [7] - 124:15, 124:20, 127:20, 145:3, 148:20, 149:23, 153:3
**prejudice** [2] - 237:4, 238:9
**prejudicial** [1] - 232:18
**prejudicing** [1] - 238:5
**preliminary** [1] - 237:14
**premenopausal** [3] - 144:11, 144:20, 144:23
**prepaid** [1] - 107:19
**prepare** [1] - 8:9
**prepared** [5] - 5:18, 5:20, 40:20, 236:13, 236:17
**preparing** [1] - 5:15
**Presbyterian** [1] - 123:16
**prescriptions** [4] - 19:8, 20:20, 27:5, 27:18
**present** [4] - 4:6, 170:12, 176:21, 201:12
**presentation** [3] - 171:4, 238:5, 238:9
**presentations** [1] - 171:6
**presented** [2] - 162:9, 171:22
**president** [4] - 160:7, 166:19, 199:7
**presidents** [1] - 161:18
**press** [7] - 227:18, 228:12, 229:4, 229:10, 230:11, 230:15, 232:4
**pressured** [1] - 115:15
**presumably** [1] - 222:1
**presume** [2] - 122:9, 218:20
**presumed** [1] - 228:14
**pretty** [3] - 13:4, 83:19, 84:14
**prevent** [2] - 124:21, 130:23
**preventing** [1] - 221:23
**prevention** [1] - 159:21
**previous** [6] - 160:5, 160:6, 178:16, 180:14, 182:15, 196:2
**previously** [4] - 11:6, 16:14, 61:16, 152:7
**pricing** [1] - 179:5
**primarily** [2] - 58:22, 109:1
**primary** [8] - 111:24, 112:1, 113:5, 113:8, 113:10, 113:12, 151:17, 227:13
**principles** [2] - 225:13, 226:1
**prison** [1] - 106:4
**private** [1] - 172:8
**Probation** [5] - 44:2, 44:18,

45:12, 45:18, 51:25
**probation** [5] - 44:5, 44:11, 45:21, 51:13, 51:21
**problem** [6] - 6:10, 112:7, 208:25, 218:20, 223:10, 223:23
**problems** [2] - 37:18, 128:7
**proceed** [8] - 55:2, 62:22, 140:9, 140:21, 140:22, 141:13, 158:15, 175:23
**proceedings** [4] - 116:23, 150:12, 175:4, 239:10
**Proceedings** [2] - 151:6, 175:22
**process** [19] - 9:11, 10:25, 36:14, 36:15, 83:19, 83:20, 126:2, 130:21, 131:20, 161:24, 161:25, 162:5, 165:12, 170:8, 174:14, 174:24, 177:23, 181:4, 205:6
**processed** [2] - 77:18, 178:18
**processes** [3] - 160:13, 180:19, 189:13
**produce** [1] - 152:14
**produced** [6] - 16:25, 181:18, 221:16, 227:8, 227:22, 235:19
**producing** [1] - 237:5
**product** [4] - 82:22, 177:18, 179:1, 222:22
**production** [1] - 238:2
**products** [4] - 159:20, 159:21, 164:16, 164:18
**professional** [1] - 189:3
**professor** [2] - 124:3, 124:4
**proffer** [13] - 16:2, 16:5, 20:15, 20:22, 20:23, 21:3, 24:18, 24:19, 27:9, 27:12, 27:15, 27:20, 28:5
**profits** [1] - 105:12
**progesterone** [1] - 130:22
**progestin** [2] - 130:25, 131:4
**progestin-containing** [1] - 130:25
**progestin-secreting** [1] - 131:4
**prognosis** [3] - 146:21, 152:10, 152:13
**program** [10] - 19:13, 19:14, 82:23, 190:11, 190:15, 196:20, 200:5, 200:16, 203:16
**programs** [3] - 188:2, 200:8, 200:23
**progress** [4] - 87:23, 89:1, 92:24, 93:1
**progression** [1] - 127:19
**prohibited** [4] - 33:13,

33:14, 33:17, 210:11
**projects** [1] - 159:14
**prolong** [1] - 188:8
**promise** [2] - 34:16, 34:23
**promised** [1] - 34:6
**promoting** [1] - 115:14
**prompted** [1] - 230:10
**pronounce** [1] - 57:13
**proof** [1] - 43:2
**proper** [3] - 214:8, 229:5, 229:15
**properly** [1] - 212:15
**proposal** [3] - 178:25, 179:3, 179:6
**proposed** [1] - 231:5
**prosecution** [1] - 116:8
**prosecutor** [5] - 100:9, 100:10, 195:18, 211:12, 211:23
**prosecutor's** [2] - 191:5, 205:16
**prosecutors** [2] - 32:19
**prostate** [3] - 95:3, 96:10, 145:11
**protein** [1] - 145:19
**protocol** [1] - 88:3
**provide** [8] - 98:23, 126:4, 130:7, 134:15, 134:21, 167:10, 207:21, 227:3
**provided** [6] - 5:8, 7:13, 111:21, 120:1, 151:11, 224:18
**provider** [3] - 93:6, 93:7, 111:24
**providers** [1] - 112:2
**provides** [1] - 134:16
**providing** [4] - 8:12, 185:6, 209:5, 209:16
**psychiatry** [2] - 14:8, 148:2
**psychology** [1] - 148:2
**publish** [12] - 55:8, 55:19, 55:20, 73:21, 90:7, 94:9, 97:19, 111:4, 128:25, 156:9, 165:24, 187:3
**publishing** [1] - 55:5
**pull** [2] - 119:23, 180:5
**pulled** [1] - 50:14
**Puntillo** [3] - 119:23, 121:5, 129:7
**purchase** [1] - 171:7
**purchased** [1] - 53:23
**purely** [1] - 71:13
**purpose** [1] - 36:15, 37:2, 45:13, 46:22, 48:11, 48:12, 48:13, 49:10, 150:20, 173:9, 175:14
**purposes** [4] - 6:19, 20:17, 37:4, 54:16
**pursuant** [1] - 100:12
**push** [1] - 114:9

**put** [32] - 5:25, 14:16, 29:5, 33:4, 48:5, 52:13, 55:11, 55:15, 55:17, 59:12, 75:19, 79:16, 82:4, 82:8, 82:16, 105:12, 105:15, 106:14, 113:23, 114:24, 115:7, 119:20, 155:23, 180:6, 187:4, 211:25, 212:2, 223:11, 228:2, 230:4, 232:5
**puts** [1] - 114:4
**putting** [5] - 114:21, 114:23, 149:3, 162:16, 163:12
**pyramid** [1] - 106:16

## Q

**QHL** [1] - 69:21
**qualified** [4] - 148:15, 175:5, 213:15, 213:18
**qualify** [2] - 148:19, 175:7
**quality** [5] - 76:15, 77:15, 77:20, 77:25, 98:23
**quash** [2] - 9:4, 9:12
**quasi** [1] - 19:13
**quasi-federal** [1] - 19:13
**Quest** [2] - 18:2
**questionable** [1] - 105:4
**questioned** [1] - 231:17
**questioning** [6] - 133:15, 145:21, 146:9, 202:10, 223:7, 231:3
**questionnaire** [12] - 84:23, 137:3, 137:5, 137:7, 143:16, 143:20, 143:22, 143:23, 145:12, 145:23, 146:2
**questions** [45] - 25:15, 104:15, 106:22, 115:20, 116:4, 116:15, 117:21, 118:7, 118:18, 119:25, 120:19, 121:19, 131:10, 131:18, 136:23, 137:6, 142:3, 142:9, 146:25, 153:9, 153:17, 156:5, 156:22, 174:15, 174:16, 174:18, 174:23, 176:3, 177:7, 179:12, 180:20, 181:3, 191:5, 200:17, 201:6, 204:23, 205:3, 205:8, 205:16, 205:17, 205:23, 210:9, 216:6, 222:1, 225:8
**quick** [4] - 54:6, 83:9, 98:22, 121:25
**quickly** [7] - 10:11, 102:22, 106:11, 143:25, 146:7, 194:18, 214:3
**quiet** [1] - 205:11
**quite** [4] - 98:19, 155:6, 159:18, 224:12

## R

**radar** [8] - 9:13, 9:24, 112:10, 112:13, 112:14, 112:15, 176:19
**radiologist** [1] - 144:3
**RAFFERTY** [66] - 2:5, 3:7, 3:10, 3:11, 6:16, 7:20, 8:23, 8:25, 9:3, 9:7, 10:3, 10:7, 10:14, 128:19, 131:12, 131:14, 134:25, 135:7, 135:12, 135:13, 135:17, 135:21, 135:24, 136:8, 136:10, 136:25, 137:4, 137:13, 137:17, 137:21, 137:23, 138:7, 138:8, 138:10, 138:12, 138:24, 139:1, 141:24, 142:1, 142:3, 150:10, 150:13, 150:19, 150:24, 153:10, 153:14, 154:5, 154:9, 154:14, 154:16, 154:20, 156:3, 156:5, 156:24, 157:1, 157:11, 157:23, 224:7, 224:11, 224:16, 227:1, 227:7, 229:14, 232:9, 233:22, 234:22
**Rafferty** [14] - 7:9, 8:14, 131:17, 142:9, 143:16, 153:15, 154:8, 224:5, 225:5, 226:15, 230:5, 231:5, 232:7, 233:8
**raining** [1] - 109:10
**raise** [10] - 122:19, 146:17, 146:22, 158:9, 176:22, 176:23, 177:1, 221:22, 224:5, 232:16
**raised** [8] - 174:10, 176:4, 209:8, 215:24, 225:4, 226:14, 232:9, 232:15
**raising** [1] - 221:7
**Rama** [11] - 74:15, 76:2, 76:3, 76:5, 76:7, 76:9, 77:11, 87:8, 98:17, 174:4
**RAMAMURTHY** [2] - 3:3, 11:6
**Ramamurthy** [22] - 4:22, 5:14, 7:6, 11:1, 18:23, 27:4, 27:17, 28:9, 54:11, 102:16, 104:8, 104:13, 111:18, 112:22, 113:16, 115:3, 115:10, 121:13, 122:6, 223:22, 236:9, 236:10
**ramifications** [1] - 105:10
**random** [1] - 112:17
**range** [2] - 54:17, 54:20
**range-wise** [1] - 54:17
**ranked** [1] - 166:23
**rarely** [1] - 129:25
**rate** [2] - 70:13, 94:2

**rather** [3] - 165:1, 205:11, 233:7
**ratified** [2] - 27:4, 27:17
**ratify** [1] - 114:12
**reach** [2] - 87:25, 212:20
**reached** [5] - 70:16, 87:19, 160:7, 160:17, 162:4
**reaction** [4] - 125:9, 125:19, 164:20, 175:11
**read** [18] - 8:1, 29:14, 75:4, 75:25, 79:14, 83:8, 86:10, 86:15, 98:16, 112:22, 112:25, 113:16, 144:3, 167:3, 167:20, 188:24, 207:21, 212:22
**reading** [7] - 75:23, 83:11, 83:12, 84:13, 181:22, 212:6, 232:12
**ready** [12] - 4:15, 10:16, 11:2, 55:2, 83:2, 88:5, 98:20, 101:17, 103:12, 122:1, 122:8, 175:23
**real** [7] - 7:2, 83:8, 86:18, 98:17, 121:25, 187:20, 193:23
**realize** [2] - 37:17, 210:15
**really** [56] - 7:7, 15:25, 16:24, 39:10, 63:23, 70:12, 86:15, 92:25, 93:1, 93:23, 109:22, 115:12, 125:11, 139:23, 144:6, 145:13, 160:12, 167:23, 167:24, 170:13, 172:15, 174:14, 174:25, 177:15, 177:19, 180:13, 180:15, 180:18, 180:21, 181:6, 182:13, 182:16, 183:22, 190:13, 191:13, 196:7, 206:22, 209:25, 212:9, 214:3, 214:6, 215:18, 220:23, 220:24, 221:1, 221:20, 221:23, 225:24, 226:13, 233:3, 234:16, 237:15, 237:20
**realtime** [1] - 178:19, 180:5
**reason** [12] - 29:6, 30:2, 30:7, 49:3, 52:11, 62:3, 63:22, 152:9, 208:20, 228:10, 228:14, 232:15
**reasonable** [3] - 230:18, 230:23, 231:5
**reasonably** [1] - 8:13
**reasons** [2] - 6:19, 129:20
**recap** [1] - 167:5
**receive** [4] - 79:19, 87:4, 152:20, 203:21
**received** [13] - 20:12, 81:2, 81:18, 89:9, 128:22, 130:8, 135:6, 151:25, 157:9, 165:22, 169:3, 187:1, 228:25
**Received** [2] - 3:17, 3:24

**receives** [1] - 227:12
**receiving** [4] - 5:10, 5:11, 7:19, 78:19
**receptionist** [1] - 191:18
**recess** [2] - 103:8, 239:4
**recessed** [4] - 54:14, 103:9, 202:3, 239:5
**reciprocal** [1] - 234:5
**recognize** [8] - 154:23, 154:24, 154:25, 155:14, 156:14, 166:3, 172:23, 237:5
**recognizes** [2] - 57:17
**recollection** [3] - 24:20, 44:25, 65:22
**recommend** [1] - 129:18
**recommendations** [1] - 115:24
**recommended** [2] - 187:25
**record** [21] - 20:17, 40:13, 40:15, 40:16, 54:15, 103:10, 122:7, 122:22, 129:4, 129:14, 132:9, 132:19, 132:22, 133:7, 147:11, 154:12, 158:12, 184:2, 202:4, 217:15, 223:24
**recorded** [3] - 203:10, 203:16, 204:23
**records** [19] - 52:24, 53:3, 53:7, 53:9, 135:3, 135:8, 221:16, 227:7, 227:21, 227:22, 227:23, 227:25, 228:15, 229:7, 229:8, 231:7, 231:18, 232:12, 233:18
**recross** [2] - 156:25, 157:8
**RECROSS** [2] - 3:11, 157:10
**RECROSS-EXAMINATION** [2] - 3:11, 157:10
**recruited** [1] - 22:2
**recurrence** [1] - 142:19
**recurrent** [1] - 125:22
**red** [4] - 112:18, 113:24, 114:4, 146:18
**redacted** [1] - 229:8
**redactions** [4] - 231:14, 232:6, 233:2, 233:17
**redirect** [7] - 101:14, 103:22, 104:8, 142:5, 156:24, 157:25, 213:7
**REDIRECT** [5] - 3:4, 3:7, 3:10, 3:14, 104:11, 142:7, 156:12, 213:8
**reduce** [3] - 70:13, 114:22, 117:3
**reduced** [3] - 80:7, 99:21, 100:3
**reduction** [1] - 116:12
**refer** [3] - 126:11, 191:14, 207:6

**reference** [2] - 170:20, 229:8
**referenced** [2] - 139:15, 180:11
**referrals** [1] - 181:1
**referred** [3] - 179:21, 179:24, 206:24
**referring** [6] - 143:14, 180:10, 205:19, 209:18, 211:3, 215:2
**refers** [1] - 227:13
**reflected** [2] - 106:4, 190:25
**reflects** [1] - 129:14
**refreshes** [1] - 44:24
**regard** [5] - 4:21, 178:7, 231:3, 232:1, 235:10
**regarding** [8] - 101:21, 117:8, 173:7, 176:9, 217:6, 219:11, 221:13, 231:4
**REGINALD** [1] - 1:14
**region** [2] - 163:23, 178:23
**regional** [1] - 161:18
**registered** [1] - 203:17
**regularly** [1] - 221:17
**regularly-conducted** [1] - 221:17
**regulations** [1] - 97:13
**rehash** [1] - 224:22
**reimbursable** [1] - 120:9
**reimbursement** [1] - 79:10
**related** [6] - 59:2, 168:6, 177:18, 177:25, 228:8, 230:15
**relates** [2] - 208:24, 234:22
**relating** [2] - 151:11, 226:12
**relation** [1] - 169:20
**relationship** [5] - 107:7, 160:15, 168:22, 181:12, 182:5
**relationships** [3] - 181:24, 189:10, 190:16
**relative** [2] - 127:2, 168:2
**relatively** [2] - 127:23, 129:16
**relatives** [1] - 174:1
**release** [8] - 40:10, 227:18, 228:13, 229:4, 229:11, 230:11, 230:15, 232:4
**released** [8] - 33:3, 33:10, 33:15, 33:21, 33:25, 34:24, 44:1, 52:12
**relevancy** [1] - 57:20
**relevant** [2] - 175:14, 234:18
**rely** [2] - 144:6, 235:5
**remain** [1] - 158:7
**remainder** [1] - 6:13
**remember** [51] - 12:20,

12:21, 12:22, 20:14, 26:14, 26:15, 29:8, 29:9, 29:13, 31:18, 32:21, 32:23, 32:24, 32:25, 33:7, 33:8, 33:9, 33:23, 34:3, 42:24, 58:10, 59:11, 59:17, 61:9, 70:4, 70:9, 70:17, 73:6, 74:12, 89:13, 89:17, 91:12, 101:15, 110:9, 117:11, 118:3, 118:21, 119:10, 120:7, 120:21, 143:24, 156:1, 161:2, 185:1, 197:4, 199:21, 200:25, 213:13, 216:19, 224:17

**remind** [1] - 232:3
**remission** [4] - 150:6, 152:15, 153:4, 153:6
**remote** [4] - 170:13, 185:10, 190:23, 191:1
**remotely** [3] - 185:6, 185:12, 190:10
**remove** [1] - 128:2
**reoccur** [1] - 129:25
**reoccurrence** [1] - 125:15
**rep** [14] - 58:2, 68:20, 68:21, 87:25, 93:18, 113:24, 114:3, 114:5, 114:8, 114:9, 174:20, 178:22, 196:6, 196:19
**repeat** [5] - 23:21, 83:14, 112:23, 113:1, 188:19
**repercussions** [1] - 214:7
**replaced** [1] - 96:18
**replacing** [1] - 177:22
**reply** [1] - 210:14
**report** [6] - 7:11, 56:1, 81:14, 166:25, 180:5, 231:4
**REPORTED** [1] - 1:20
**reported** [6] - 138:1, 160:7, 203:16, 203:17, 203:18, 231:8
**reporter** [4] - 18:8, 18:12, 96:24, 158:25
**Reporter** [2] - 1:22, 239:14
**reports** [8] - 60:23, 77:18, 110:7, 111:23, 112:13, 128:11, 227:8, 228:10
**represent** [2] - 152:5, 164:15
**representation** [1] - 36:25
**representative** [1] - 99:7, 134:18
**representing** [1] - 64:2
**represents** [2] - 131:18, 153:16
**reps** [14] - 82:7, 82:8, 82:12, 97:1, 97:17, 105:6, 113:7, 113:25, 160:16, 161:16, 161:17, 162:19, 164:21

**request** [4] - 5:6, 230:19, 230:23, 231:13
**requested** [2] - 87:23, 171:7
**requirements** [2] - 96:3, 96:4
**requires** [3] - 145:20, 146:8, 227:2
**requisition** [9] - 85:23, 120:5, 120:13, 162:14, 196:8, 221:7, 222:10, 222:13, 222:20
**requisitions** [4] - 198:11, 220:4, 221:4, 221:5
**research** [7] - 101:21, 217:7, 228:1, 228:21, 230:12, 231:19, 232:4
**researched** [2] - 7:25, 229:2
**reside** [1] - 147:18
**residencies** [1] - 123:13
**residency** [1] - 123:15
**residents** [1] - 146:3
**resignation** [1] - 212:12
**resist** [2] - 106:9, 106:10
**resolved** [1] - 232:10
**respect** [9] - 7:1, 9:18, 133:25, 134:10, 139:5, 140:2, 153:25, 201:9, 228:19
**responding** [1] - 170:14
**response** [13] - 9:11, 9:21, 10:12, 11:14, 35:3, 40:23, 41:23, 44:13, 73:2, 80:8, 81:2, 215:25, 230:7
**rest** [8] - 52:7, 75:5, 75:21, 79:1, 85:14, 108:10, 224:20, 228:9
**restitution** [2] - 51:1, 51:6
**restroom** [5] - 54:11, 54:13, 121:25, 201:23, 202:1
**result** [2] - 148:16, 222:13
**results** [17] - 77:25, 86:8, 125:20, 126:5, 126:18, 130:7, 130:10, 134:13, 149:12, 149:18, 151:12, 151:20, 151:23, 155:16, 189:2, 227:12, 228:24
**results-driven** [1] - 189:2
**resume** [1] - 102:11
**retail** [1] - 69:9
**return** [4] - 31:13, 43:23, 101:12, 102:16
**returned** [3] - 39:1, 151:6, 175:22
**reveal** [1] - 153:5
**review** [5] - 66:1, 184:19, 225:9, 225:17, 227:21
**reviewed** [2] - 111:8, 226:11
**reviewing** [2] - 7:15, 220:2

**revised** [2] - 219:17, 221:14
**revisits** [1] - 143:4
**revoke** [3] - 44:22, 45:25, 46:4
**revoked** [1] - 61:21
**Rica** [1] - 104:4
**Richmond** [1] - 159:8
**right-hand** [1] - 155:3
**ring** [2] - 98:23, 199:24
**ringleader** [1] - 106:13
**Rio** [4] - 68:2, 88:10, 92:12, 92:13
**rise** [7] - 10:18, 31:5, 54:8, 54:22, 103:24, 122:3, 202:6
**risk** [15] - 84:11, 86:1, 124:15, 124:22, 124:23, 125:5, 125:15, 127:2, 127:23, 129:16, 129:21, 142:19, 145:5, 145:21, 156:17
**risks** [1] - 152:24
**RMR** [2] - 1:21, 239:14
**road** [1] - 63:13
**Robert** [1] - 68:20
**robust** [2] - 93:1, 93:3
**RODOLFO** [1] - 1:10
**Rodolfo** [1] - 1:22
**Roebuck** [8] - 217:18, 218:8, 218:15, 219:4, 223:16, 234:15, 235:10, 235:18
**role** [9] - 38:17, 62:9, 109:23, 160:8, 160:23, 162:9, 170:2, 170:10
**roles** [4] - 58:25, 59:1, 109:20
**ROOKARD** [1] - 1:14
**room** [5] - 101:16, 101:17, 102:2, 216:20, 217:12
**Rose** [1] - 58:5
**rose** [1] - 58:6
**rotating** [1] - 198:25
**rotation** [6] - 13:21, 13:25, 14:2, 14:3, 14:6, 14:9, 14:10, 14:11, 30:18
**rotations** [1] - 14:8
**rough** [1] - 24:15
**roughly** [1] - 149:14
**routine** [1] - 161:4
**RPR** [2] - 1:21, 239:14
**RUIZ** [1] - 1:10
**Ruiz** [1] - 1:22
**Rule** [1] - 99:18
**rule** [1] - 238:3
**rules** [5] - 167:18, 167:21, 168:17, 172:11, 217:6
**ruling** [4] - 9:25, 10:9, 231:22, 237:14
**run** [7] - 75:1, 85:24, 86:8, 126:4, 132:17, 133:4, 194:12

**running** [2] - 193:6, 216:20
**runs** [2] - 74:10, 223:11
**Rutgers** [1] - 123:12
**résumé** [6] - 187:14, 188:24, 189:4, 189:21, 189:22, 213:10

## S

**SADOW** [72] - 1:17, 1:18, 3:4, 11:5, 11:9, 28:4, 28:15, 29:23, 37:17, 37:19, 45:5, 45:7, 54:2, 54:19, 55:3, 55:9, 55:14, 55:18, 57:18, 57:21, 57:22, 60:13, 60:18, 66:14, 66:15, 69:12, 69:14, 73:19, 73:23, 78:6, 78:8, 83:4, 83:5, 83:24, 83:25, 84:15, 84:17, 88:13, 88:14, 90:7, 90:9, 92:19, 92:22, 94:9, 94:14, 94:16, 97:19, 97:21, 100:18, 100:21, 101:9, 103:5, 175:2, 175:5, 175:15, 175:24, 219:19, 219:22, 222:6, 222:8, 223:8, 223:10, 223:23, 224:4, 229:18, 229:21, 234:12, 235:19, 235:24, 236:11, 238:16, 238:19
**Sadow** [22] - 5:14, 11:3, 28:3, 37:16, 54:16, 55:1, 104:15, 105:21, 106:22, 107:25, 110:2, 111:8, 111:17, 115:20, 117:7, 117:21, 118:7, 118:18, 119:25, 120:19, 234:9, 237:16
**Sahs** [1] - 18:7
**SAHS** [1] - 18:7
**sailed** [1] - 6:2
**sake** [1] - 48:20
**salary** [1] - 181:17
**sales** [40] - 58:2, 99:1, 105:6, 113:25, 158:23, 159:12, 160:7, 160:12, 160:16, 160:24, 161:12, 161:13, 161:17, 162:12, 162:19, 162:22, 163:5, 163:19, 164:3, 164:7, 164:20, 166:19, 166:21, 167:24, 177:12, 179:17, 179:18, 187:18, 189:3, 189:11, 189:17, 190:13, 190:18, 196:19, 199:6, 199:7, 212:11, 213:25
**salespeople** [1] - 164:14
**Saliba** [25] - 70:7, 72:20, 89:14, 90:17, 91:9, 105:16, 113:18, 138:14, 166:11, 166:17, 169:11, 169:20,

169:22, 182:2, 186:9, 186:12, 192:6, 199:4, 199:5, 199:6, 203:19, 204:7, 209:2, 209:22, 210:25

**Saltzman** [1] - 139:17

**Sam** [1] - 122:24

**sample** [9] - 56:1, 86:7, 88:1, 105:2, 105:5, 110:7, 114:3, 114:9, 178:17

**samples** [14] - 91:15, 94:2, 105:9, 106:6, 107:21, 112:17, 114:15, 168:4, 168:8, 174:2, 179:20, 215:2, 215:5

**SAMUEL** [32] - 2:2, 2:3, 3:13, 165:19, 184:10, 186:21, 187:4, 187:7, 189:23, 190:2, 194:22, 195:3, 195:5, 195:7, 195:9, 196:13, 196:14, 197:12, 197:13, 201:20, 202:11, 209:9, 209:12, 211:25, 212:1, 212:4, 212:5, 213:2, 215:15, 215:17, 235:9, 235:15

**Samuel** [6] - 184:8, 184:11, 201:18, 202:9, 235:3, 235:8

**SASA77** [1] - 212:22

**sat** [1] - 43:7

**Satary** [8] - 35:16, 38:21, 39:15, 108:2, 108:6, 108:10, 108:14, 108:15

**satisfied** [3] - 215:25, 216:3, 221:15

**satisfy** [1] - 219:20

**saw** [17] - 10:12, 41:3, 59:19, 66:4, 109:8, 119:8, 131:8, 142:23, 143:24, 144:4, 177:22, 193:2, 219:21, 226:11, 228:24, 229:3, 231:7

**scale** [1] - 193:23

**scars** [1] - 16:22

**scenario** [1] - 223:21

**scenarios** [1] - 182:8

**schedule** [1] - 216:18

**scheduling** [2] - 9:14, 218:19

**scheme** [38] - 15:2, 15:7, 15:10, 15:15, 15:16, 15:18, 16:5, 16:8, 16:14, 16:17, 18:25, 19:5, 19:7, 19:18, 21:15, 23:2, 23:5, 23:9, 23:13, 24:11, 25:15, 26:16, 28:16, 31:5, 37:3, 38:3, 38:24, 104:16, 104:24, 105:22, 105:24, 109:16, 111:25, 114:16, 114:19, 115:25, 118:20

**Scholtes** [13] - 14:25, 15:2,

15:13, 17:10, 21:14, 23:7, 30:17, 30:24, 79:8, 82:5, 98:4, 105:16, 110:17

**Scholtes'** [1] - 59:2

**school** [13] - 12:14, 12:16, 13:6, 13:11, 13:18, 13:22, 46:18, 57:7, 123:8, 123:10, 123:13, 203:12, 205:5

**School** [1] - 123:11

**Science** [1] - 148:5

**scientist** [1] - 193:4

**scope** [6] - 111:25, 221:18, 223:6, 225:9, 231:9, 233:16

**score** [2] - 86:10, 104:3

**screen** [7] - 84:25, 121:4, 129:9, 135:11, 135:19, 187:4, 202:13

**screening** [4] - 85:2, 92:2, 211:6, 211:7

**scribe** [2] - 138:14, 138:22

**script** [2] - 67:1, 107:23

**scripts** [1] - 114:12

**scroll** [2] - 138:24, 170:14

**se** [1] - 16:25

**seated** [14] - 4:2, 10:20, 54:10, 54:24, 102:6, 103:11, 104:1, 122:12, 122:21, 147:10, 158:11, 202:8, 216:24, 217:16

**second** [26] - 5:6, 28:1, 39:1, 39:2, 39:7, 39:9, 42:2, 46:16, 69:15, 94:23, 121:24, 122:9, 129:6, 137:13, 140:4, 140:12, 145:20, 163:17, 172:4, 178:1, 180:23, 181:11, 189:1, 223:8, 227:4

**secondly** [1] - 146:21

**secret** [4] - 108:20, 195:21, 198:16, 206:2

**secreting** [1] - 131:4

**section** [2] - 111:18, 121:6

**SECTION** [1] - 1:15

**sections** [1] - 167:14

**Security** [1] - 208:6

**SECURITY** [6] - 10:18, 54:8, 54:22, 103:24, 122:3, 202:6

**see** [98] - 9:6, 9:23, 14:23, 25:15, 30:17, 44:24, 45:2, 47:5, 48:5, 49:3, 50:5, 55:17, 55:20, 55:21, 56:19, 64:8, 64:9, 65:25, 66:16, 66:18, 71:10, 71:22, 73:11, 75:22, 80:19, 82:11, 82:24, 84:1, 86:9, 87:7, 90:10, 90:11, 102:2, 102:21, 102:24, 103:21, 106:4, 109:1, 111:11, 124:14, 124:16, 124:20, 127:3, 127:22, 129:9, 135:10, 135:14,

136:2, 137:8, 137:10, 137:12, 138:5, 140:10, 142:21, 148:19, 155:4, 156:16, 156:18, 162:19, 163:25, 167:4, 167:7, 167:12, 170:20, 171:23, 171:24, 172:3, 173:19, 174:25, 177:21, 178:20, 180:4, 180:7, 180:19, 189:1, 189:17, 190:1, 191:4, 192:24, 195:2, 195:6, 195:7, 197:1, 197:16, 198:23, 199:4, 200:11, 204:7, 207:18, 207:19, 207:20, 209:10, 216:3, 217:12, 219:17, 231:25

**seeing** [4] - 43:15, 142:25, 143:25, 231:10

**seeking** [3] - 49:22, 140:4, 187:15

**seem** [2] - 96:7, 233:13

**sees** [1] - 228:1

**seize** [1] - 207:2

**seized** [3] - 228:18, 229:22, 229:25

**select** [3] - 124:9, 124:10, 124:12

**self** [2] - 44:21, 138:1

**self-employed** [1] - 44:21

**self-reported** [1] - 138:1

**sell** [1] - 162:23

**selling** [1] - 164:17

**send** [15] - 6:17, 29:11, 67:15, 77:9, 77:16, 77:23, 87:25, 99:9, 133:5, 133:7, 133:10, 149:4, 168:8, 183:6, 183:9

**sending** [3] - 40:9, 76:22, 82:12, 91:15, 95:18, 107:21, 110:6, 113:5, 113:21, 115:5, 168:3, 235:10, 235:12

**sends** [1] - 59:5

**sense** [12] - 10:6, 29:1, 54:17, 152:15, 174:22, 217:17, 220:9, 221:24, 224:9, 225:20, 231:21, 232:24

**sent** [25] - 7:25, 53:22, 66:1, 70:23, 76:19, 88:24, 91:4, 91:15, 96:12, 99:13, 107:22, 110:3, 132:25, 149:9, 151:14, 155:19, 155:25, 167:3, 169:11, 179:3, 186:17, 186:20, 223:24, 224:1, 236:19

**sentence** [14] - 29:10, 30:1, 30:4, 62:4, 63:4, 63:5, 99:16, 99:21, 100:2, 116:7, 117:3, 167:4, 232:12, 232:13

**sentenced** [2] - 27:2, 72:1

**sentencing** [11] - 29:5, 29:9, 62:6, 62:16, 63:8, 102:9, 102:14, 115:21, 115:25, 116:25, 239:1

**SENTHIL** [2] - 3:3, 11:6

**separately** [1] - 18:18

**September** [27] - 15:10, 16:9, 16:15, 17:12, 18:25, 31:11, 31:12, 31:14, 31:15, 31:22, 32:10, 32:16, 33:1, 34:13, 39:18, 40:10, 44:1, 44:23, 63:16, 65:18, 65:20, 97:24, 150:3, 227:15, 227:17, 230:1

**sequencing** [1] - 124:24

**series** [2] - 195:14, 198:20

**serve** [1] - 98:22

**service** [9] - 98:23, 134:15, 134:16, 134:18, 147:23, 147:25, 164:19, 209:5, 212:13

**servicemen** [1] - 20:1

**Services** [3] - 17:24, 58:4, 174:5

**services** [10] - 19:17, 19:18, 65:12, 70:8, 138:15, 171:7, 177:14, 177:17, 185:6

**serving** [1] - 138:14

**session** [2] - 197:20, 211:15

**sessions** [1] - 227:24

**set** [9] - 4:20, 10:4, 35:21, 38:11, 48:17, 135:8, 181:20, 208:17, 234:4

**setting** [1] - 188:1

**setup** [2] - 168:21, 225:8

**seven** [5] - 17:7, 17:8, 25:8, 161:17, 169:5

**several** [5] - 131:8, 134:12, 136:16, 166:7, 226:4

**severity** [1] - 86:10

**Seychelles** [1] - 48:24

**shadowing** [1] - 14:4

**shape** [1] - 10:1

**shared** [4] - 107:8, 115:17, 115:18, 117:12

**Shaw** [1] - 22:14

**Shawn** [7] - 74:9, 107:21, 107:22, 111:14, 111:15, 111:16

**sheer** [1] - 214:2

**Shelbi** [8] - 98:8, 98:25, 163:5, 169:13, 169:24, 169:25, 170:7, 210:25

**Shelbi's** [2] - 170:2, 170:10

**shift** [3] - 97:15, 178:1, 213:24

**ship** [2] - 6:2, 125:12

**Shore** [2] - 58:5, 58:6

**short** [4] - 34:21, 34:23,

110:17, 218:7
**shorter** [1] - 219:1
**shortly** [2] - 149:14, 228:17
**show** [22] - 20:16, 37:9, 44:24, 45:4, 53:7, 53:11, 53:13, 55:13, 60:17, 60:24, 65:24, 66:6, 66:10, 78:6, 138:24, 162:25, 169:1, 172:19, 178:19, 194:19, 202:12, 237:18
**showed** [5] - 117:7, 118:20, 143:16, 149:23, 195:18
**showing** [3] - 113:13, 166:1, 189:7
**shown** [13] - 40:21, 43:7, 52:24, 66:8, 71:1, 80:10, 80:14, 84:6, 85:10, 85:11, 91:19, 91:20, 181:19
**shows** [2] - 40:18, 209:22
**shut** [2] - 205:1, 230:4
**sic** [1] - 156:24
**side** [14] - 6:15, 8:19, 8:25, 125:24, 144:9, 177:9, 177:10, 218:19, 219:10, 222:4, 233:19, 237:5, 237:9, 238:18
**sidebar** [6] - 8:20, 150:11, 150:12, 175:4, 220:20, 237:12
**sides** [2] - 8:6, 171:14
**sidetracked** [1] - 221:20
**sign** [8] - 20:1, 112:16, 132:10, 132:17, 138:18, 139:12, 203:17, 203:21
**signature** [13] - 16:6, 132:12, 132:14, 137:8, 137:9, 154:24, 155:5, 155:6, 155:11, 157:12, 157:13, 157:14, 157:16
**signatures** [3] - 109:4, 109:11, 172:4
**signed** [12] - 65:11, 65:14, 65:19, 92:3, 92:23, 92:25, 109:12, 138:22, 139:2, 171:21, 174:4
**significant** [2] - 145:10, 204:25
**signify** [1] - 53:20
**signing** [5] - 76:7, 108:23, 132:21, 133:6
**silly** [1] - 136:23
**similar** [12] - 129:21, 155:6, 155:11, 160:8, 160:11, 161:14, 161:20, 162:11, 163:21, 168:5, 213:21, 217:22
**Similar** [1] - 223:22
**simple** [2] - 40:24, 73:3
**simply** [4] - 55:15, 79:22, 99:16, 231:6

**Sinai** [8] - 123:5, 123:6, 123:19, 123:20, 123:22, 123:23, 133:6, 133:7
**sincerely** [1] - 99:5
**single** [6] - 41:2, 42:20, 80:5, 108:13, 167:20
**sister** [19] - 67:3, 67:8, 67:11, 74:18, 74:20, 74:21, 75:6, 75:14, 75:17, 75:19, 77:11, 88:21, 95:12, 95:19, 98:10, 109:19, 111:14, 169:16, 210:23
**sit** [1] - 238:12
**site** [2] - 193:6, 196:15
**sitting** [4] - 28:12, 100:3, 190:19, 236:21
**situational** [1] - 233:6
**six** [4] - 106:7, 118:24, 164:18, 225:24
**size** [2] - 108:7, 128:11
**skills** [2] - 188:1, 189:3
**skin** [1] - 16:23
**skipping** [2] - 31:11, 203:12
**SKR** [1] - 17:24
**Slomovitz** [13] - 102:18, 103:17, 122:8, 122:16, 122:23, 129:3, 129:9, 131:15, 133:22, 135:25, 142:9, 225:23, 226:22
**SLOMOVITZ** [2] - 3:5, 122:20
**sloppy** [1] - 157:16
**slowed** [1] - 106:1
**smart** [1] - 13:4
**smooth** [2] - 63:13, 212:16
**so..** [3] - 183:16, 183:21, 216:4
**social** [2] - 101:22, 217:6
**Social** [1] - 208:6
**software** [2] - 178:10, 178:16
**solicit** [1] - 107:9
**Solitaire** [1] - 197:17
**somatic** [2] - 124:25, 126:12
**someone** [13] - 45:18, 68:3, 84:1, 88:5, 109:10, 115:15, 124:14, 144:7, 152:6, 177:13, 194:25, 207:10, 208:12
**something's** [1] - 119:5
**sometime** [5] - 9:20, 39:2, 90:14, 160:1, 227:11
**sometimes** [10] - 48:4, 93:24, 93:25, 140:7, 141:5, 141:13, 174:15, 182:4, 182:6, 206:24
**somewhere** [2] - 48:21, 192:17
**Sonal** [8] - 86:21, 98:10,

163:4, 169:12, 169:15, 169:16, 169:19, 210:22
**soon** [5] - 45:16, 102:17, 178:17, 201:23, 236:17
**sooner** [1] - 8:18
**sorry** [26] - 24:2, 37:11, 37:17, 48:16, 53:21, 55:14, 57:14, 64:20, 71:25, 111:12, 112:24, 115:7, 115:18, 136:23, 137:2, 152:16, 155:14, 156:1, 156:15, 175:24, 184:16, 185:19, 188:17, 205:19, 210:7, 234:1
**sort** [4] - 127:20, 132:6, 221:7, 226:1
**sought** [1] - 55:6
**sound** [2] - 26:7, 233:1
**sounds** [4] - 28:23, 231:16, 232:7, 233:15
**South** [1] - 47:12
**SOUTHERN** [1] - 1:1
**Southern** [2] - 33:24, 36:7
**space** [6] - 102:8, 102:14, 168:6, 171:5, 171:15, 178:14, 182:25, 183:2
**span** [1] - 180:6
**speaking** [4] - 98:17, 138:9, 223:4, 225:23
**specialist** [3] - 126:11, 144:2, 158:23
**specialists** [1] - 127:3
**specialize** [1] - 159:20
**specialized** [1] - 161:2
**specialty** [1] - 187:17
**specific** [16] - 49:15, 52:13, 59:23, 139:21, 167:18, 174:16, 178:14, 198:2, 205:21, 207:15, 208:24, 209:6, 210:20, 225:12, 226:4
**specifically** [8] - 59:17, 60:10, 100:8, 197:2, 200:7, 206:22, 211:3, 230:15
**specifics** [1] - 193:8
**specimens** [2] - 96:11, 96:12
**spectrometers** [1] - 194:8
**spell** [3] - 122:22, 147:11, 158:12
**spend** [3] - 118:11, 118:14, 118:16
**spent** [1] - 225:23
**spoken** [3] - 120:8, 166:7, 166:9
**Sporn** [15] - 5:19, 217:20, 218:11, 218:24, 218:25, 219:5, 223:8, 223:11, 223:12, 223:17, 234:12, 234:13, 234:17, 236:18, 236:22
**Sporn's** [2] - 223:18,

233:10
**spree** [1] - 63:20
**stability** [1] - 52:12
**STACEY** [3] - 3:12, 158:10, 158:13
**Stacey** [5] - 98:6, 99:1, 158:6, 158:13, 189:2
**staff** [3] - 168:2, 174:1, 188:13
**Stage** [4] - 127:15, 127:24, 128:14, 150:2
**stage** [4] - 124:23, 127:25, 128:5
**stages** [2] - 161:11, 161:16
**staging** [1] - 128:10
**stamp** [1] - 172:21
**stand** [7] - 7:14, 7:16, 122:1, 147:7, 230:24, 231:23, 232:2
**standard** [3] - 126:16, 132:16, 183:18
**standby** [2] - 102:23, 217:25
**standing** [5] - 55:7, 87:24, 88:2, 88:5, 158:7
**staple** [1] - 45:5
**Stark** [2] - 171:16, 173:13
**start** [21] - 4:10, 9:24, 11:12, 14:1, 55:5, 55:14, 62:1, 97:22, 102:10, 163:12, 172:20, 176:23, 194:22, 194:24, 216:13, 216:22, 218:11, 223:20, 226:14, 226:20
**started** [12] - 8:4, 13:20, 59:17, 63:14, 106:20, 161:15, 163:11, 163:18, 171:3, 176:21, 183:1, 233:4
**starting** [7] - 4:8, 131:20, 136:16, 170:8, 216:22, 218:14, 223:15
**starts** [1] - 127:21
**state** [4] - 118:8, 141:5, 151:1, 194:1
**state-of-the-art** [1] - 194:1
**statement** [4] - 27:9, 29:14, 29:15, 61:3
**States** [10] - 1:23, 4:4, 38:7, 44:2, 45:12, 45:18, 49:21, 50:1, 122:15, 239:15
**STATES** [4] - 1:1, 1:3, 1:10, 1:15
**status** [2] - 9:11, 128:4
**Statute** [6] - 167:25, 173:12, 207:3, 208:23, 209:4, 209:24
**statute** [1] - 207:5
**stay** [7] - 33:15, 37:7, 46:15, 101:22, 154:16, 154:18, 212:24

**stayed** [3] - 52:6, 165:1, 206:12
**staying** [4] - 37:23, 153:4, 217:7, 222:22
**steer** [1] - 101:24
**STENOGRAPHICALLY** [1] - 1:20
**stents** [1] - 159:20
**step** [3] - 114:16, 127:21, 210:7
**steps** [1] - 178:6
**sterile** [1] - 149:3
**STEVEN** [2] - 1:17, 1:18
**stick** [2] - 61:14, 237:22
**sticker** [3] - 56:19, 234:6, 236:20
**sticks** [1] - 61:13
**still** [17] - 39:5, 39:13, 44:15, 53:20, 65:20, 77:24, 91:15, 100:10, 102:19, 121:17, 126:21, 150:4, 152:12, 161:11, 163:9, 168:6, 198:3
**stood** [3] - 59:24, 59:25, 60:1
**stop** [8] - 25:1, 36:18, 64:6, 91:14, 160:18, 163:17, 178:10, 214:9
**store** [1] - 69:10
**stored** [1] - 220:12
**storefront** [1] - 193:19
**story** [2] - 72:9, 235:20
**straight** [1] - 181:17
**straightforward** [1] - 221:25
**strange** [1] - 28:23
**strategies** [1] - 107:13
**strategy** [3] - 236:4, 237:5, 237:8
**streamline** [1] - 226:17
**Street** [2] - 1:18, 2:6
**street** [1] - 147:19
**stress** [1] - 203:7
**stretched** [2] - 163:15
**stricken** [1] - 229:11
**stroke** [1] - 159:21
**strong** [3] - 52:17, 124:18, 129:17
**stronger** [1] - 178:15
**strung** [1] - 182:18
**stuff** [8] - 6:4, 17:21, 80:6, 82:19, 84:14, 190:22, 209:14, 225:13
**stunned** [1] - 149:24
**subject** [4] - 57:23, 67:22, 227:10, 229:23
**submit** [1] - 170:6
**submitted** [1] - 89:3
**subsequent** [2] - 195:25, 211:8

**substantive** [2] - 5:10, 6:1
**subtraction** [1] - 218:2
**succeed** [1] - 189:4
**success** [1] - 106:19
**successful** [2] - 49:9, 131:6
**suffering** [1] - 145:25
**suffice** [1] - 105:8
**sufficiently** [1] - 8:8
**sugar** [1] - 5:2
**suggest** [2] - 26:9, 34:22
**suggested** [3] - 140:14, 171:23, 220:3
**suggesting** [3] - 26:5, 44:17, 44:18
**suggestion** [1] - 172:3
**suggestions** [1] - 171:25
**suggests** [1] - 55:21
**Suite** [2] - 1:19, 2:6
**suite** [1] - 119:7
**summary** [1] - 86:9
**summer** [2] - 15:23, 184:24
**summoned** [1] - 119:3
**super** [1] - 177:10
**superseding** [1] - 39:9
**supervisors** [1] - 176:9
**supplies** [1] - 207:17
**support** [2] - 129:14, 223:2
**supportive** [1] - 71:9
**supposed** [7] - 5:7, 14:5, 33:20, 70:11, 92:24, 153:2, 207:9
**supposedly** [1] - 152:6
**surgeon** [1] - 152:12
**surgery** [4] - 128:8, 128:9, 139:25, 150:3
**surgical** [2] - 128:1, 128:10
**surprise** [3] - 7:2, 232:11, 237:8
**surprised** [1] - 223:18
**surprising** [1] - 7:23
**SUV** [3] - 53:15, 53:16, 53:18
**swab** [1] - 154:3
**swabbed** [2] - 149:8, 155:17
**swabbing** [1] - 149:3
**swabs** [3] - 154:4, 155:21, 209:17
**swear** [4] - 122:10, 122:18, 147:7, 158:8
**switch** [3] - 105:24, 168:25, 181:11
**sworn** [4] - 11:7, 122:20, 147:9, 158:10
**Sylvester** [1] - 124:1
**syndrome** [2] - 145:4
**system** [1] - 190:5
**System** [1] - 37:12
**systems** [1] - 149:20

**T**

**table** [1] - 100:3
**tables** [2] - 102:8, 102:14
**taco** [1] - 207:10
**tacos** [5] - 93:19, 93:20, 93:22, 93:23, 93:24
**tailored** [2] - 225:16, 225:21
**tainted** [1] - 154:4
**talks** [5] - 77:21, 89:1, 202:23, 207:15, 208:24
**Tamara** [4] - 57:23, 57:25, 58:1, 58:2
**tan** [1] - 149:7
**target** [1] - 146:23
**targetable** [4] - 124:17, 124:25, 126:13, 129:24
**targeted** [1] - 23:23
**targeting** [1] - 117:19
**tasks** [2] - 14:3, 212:13
**taste** [1] - 170:25
**taught** [1] - 198:5
**tax** [1] - 208:5
**taxes** [3] - 75:1, 75:12
**teach** [2] - 188:6, 188:9
**teaching** [3] - 124:2, 201:13, 201:14
**team** [10] - 6:7, 74:6, 103:4, 159:12, 160:12, 161:14, 162:12, 164:7, 178:22, 212:8
**teams** [1] - 19:24
**technicians** [2] - 193:2, 193:5
**technology** [2] - 106:8, 160:14
**telemarketing** [7] - 89:6, 90:5, 91:11, 91:18, 151:25, 177:9, 177:10
**telemed** [5] - 113:24, 114:4, 114:6, 114:11, 114:12
**telemedicine** [20] - 69:5, 74:10, 107:20, 111:16, 111:25, 113:25, 114:10, 174:24, 177:10, 180:23, 180:25, 181:4, 181:7, 181:9, 191:6, 191:10, 191:24, 192:6, 192:12, 220:10
**telephone** [2] - 89:13, 110:21
**telephonic** [1] - 238:24
**ten** [5] - 63:5, 99:21, 161:13, 235:16, 235:22
**ten-year** [1] - 99:21
**tend** [1] - 226:19
**term** [2] - 73:6, 182:20
**terminology** [4] - 89:24, 93:17, 96:14, 196:3
**terms** [11] - 4:20, 5:21, 89:1, 108:17, 116:11,

144:17, 149:21, 210:21, 214:12, 234:17, 238:5
**terrible** [1] - 82:14
**territories** [1] - 164:5
**territory** [1] - 163:23
**test** [77] - 70:17, 70:20, 84:8, 85:1, 86:8, 92:2, 105:1, 105:9, 115:12, 115:14, 115:16, 124:12, 124:14, 125:8, 125:20, 126:8, 126:18, 126:19, 126:20, 129:11, 130:4, 130:7, 130:10, 130:16, 131:22, 132:8, 132:14, 132:16, 133:2, 133:3, 133:4, 133:5, 133:13, 133:15, 133:18, 133:20, 133:22, 134:2, 139:7, 140:15, 142:10, 143:14, 144:18, 146:14, 146:16, 148:10, 148:11, 148:13, 148:19, 150:7, 151:12, 151:18, 151:21, 151:23, 152:1, 152:4, 152:21, 152:24, 153:1, 155:16, 155:17, 172:4, 172:8, 172:10, 172:11, 172:16, 178:21, 194:9, 227:10, 227:12, 228:24, 228:25
**tested** [1] - 149:21
**testified** [9] - 7:22, 42:7, 50:8, 50:13, 67:4, 71:16, 78:10, 224:18, 232:16
**testifies** [1] - 232:10
**testify** [5] - 36:24, 175:12, 225:1, 228:20, 229:2
**testifying** [3] - 23:3, 220:17
**testimony** [37] - 7:17, 11:17, 11:21, 15:17, 30:16, 42:19, 59:18, 67:5, 70:7, 70:11, 70:16, 101:13, 102:16, 169:24, 175:14, 217:1, 217:22, 220:3, 221:2, 221:11, 221:18, 221:21, 222:12, 222:19, 224:18, 225:1, 225:10, 225:17, 226:9, 228:7, 228:20, 229:5, 229:15, 231:6, 233:2, 233:16, 233:17
**testing** [72] - 30:18, 30:21, 31:3, 34:12, 83:6, 83:9, 83:18, 84:10, 86:3, 104:22, 105:19, 105:22, 105:25, 106:19, 108:5, 108:24, 124:5, 124:7, 124:13, 124:14, 124:16, 124:20, 124:25, 125:14, 126:6, 126:9, 126:12, 126:24, 126:25, 127:1, 129:18, 129:22, 131:24, 132:1,

134:10, 139:12, 142:13,
142:16, 143:7, 144:4,
144:15, 144:23, 145:1,
145:7, 145:8, 145:9, 146:20,
146:22, 149:2, 149:20,
152:9, 161:2, 179:25, 193:9,
193:11, 193:14, 194:1,
194:10, 197:23, 198:17,
206:23, 211:5, 215:5,
215:12, 224:19, 224:24,
225:13, 225:18, 226:12

**tests** [44] - 85:18, 85:24,
89:3, 105:11, 111:23,
119:14, 119:15, 120:9,
120:23, 125:3, 126:4,
131:21, 131:22, 132:2,
132:4, 132:6, 132:24, 133:1,
133:25, 134:4, 134:7,
134:13, 134:21, 139:5,
139:6, 139:11, 143:2,
144:23, 149:19, 149:22,
162:14, 172:5, 172:13,
173:24, 178:24, 179:14,
179:23, 180:16, 194:12,
196:4, 196:5, 221:8, 225:12

**Texas** [16] - 12:10, 21:7,
31:25, 32:1, 33:25, 34:1,
34:2, 36:2, 36:6, 47:12, 92:1,
92:10, 123:17, 159:8, 185:9

**text** [18] - 40:9, 40:13,
40:16, 40:18, 40:21, 41:11,
41:16, 41:20, 42:4, 42:14,
47:4, 47:24, 48:1, 48:2, 48:9,
80:5, 80:7, 110:24

**textbook** [1] - 84:14

**texted** [1] - 41:1

**texting** [2] - 41:9, 47:2

**texts** [1] - 183:8

**that'll** [3] - 103:22, 157:6,
235:6

**THE** [179] - 1:10, 1:13, 1:17,
2:2, 4:2, 4:22, 4:25, 5:1, 5:3,
5:4, 6:6, 7:5, 8:3, 8:24, 9:2,
9:6, 9:23, 10:4, 10:8, 10:15,
10:18, 10:20, 28:1, 28:7,
28:8, 28:9, 28:11, 29:20,
29:22, 37:15, 45:4, 54:4,
54:8, 54:10, 54:16, 54:21,
54:22, 54:24, 55:7, 55:11,
57:16, 57:19, 60:14, 60:17,
78:7, 90:8, 94:12, 100:20,
101:10, 102:6, 102:21,
103:3, 103:6, 103:11,
103:20, 103:24, 104:1,
111:5, 121:2, 121:7, 121:21,
121:22, 122:3, 122:5, 122:8,
122:12, 122:17, 122:19,
122:21, 122:23, 128:18,
128:20, 129:1, 130:14,
131:11, 135:5, 135:20,

137:16, 141:25, 142:4,
147:1, 147:6, 147:10,
147:12, 150:11, 150:21,
150:25, 153:12, 154:7,
154:15, 154:18, 156:4,
156:8, 156:11, 156:25,
157:4, 157:6, 157:24, 158:2,
158:7, 158:9, 158:11,
158:13, 158:16, 165:18,
165:20, 165:25, 175:3,
175:20, 175:23, 175:25,
184:1, 184:7, 186:23,
186:25, 187:3, 195:4,
201:18, 201:21, 202:1,
202:5, 202:6, 202:8, 213:3,
213:6, 215:16, 215:18,
215:22, 216:7, 216:8, 216:9,
217:16, 218:3, 218:6,
218:15, 218:18, 218:25,
219:3, 219:10, 219:16,
219:20, 219:23, 220:1,
220:15, 220:20, 221:11,
222:4, 222:7, 222:24, 223:4,
223:9, 223:14, 224:3, 224:6,
224:10, 224:14, 225:4,
226:6, 226:25, 227:4,
229:13, 229:17, 229:20,
230:7, 231:12, 231:16,
232:21, 233:23, 234:8,
234:13, 235:2, 235:14,
235:17, 235:22, 236:10,
237:3, 238:17, 238:20,
238:22

**theirs** [1] - 235:14

**themselves** [2] - 99:5,
221:4

**theory** [1] - 238:10

**therapeutic** [4] - 124:17,
129:23, 129:24, 131:2

**therapies** [1] - 130:20

**therapy** [3] - 129:24,
146:23, 146:24

**thereabouts** [1] - 50:6

**thereafter** [3] - 102:17,
149:14, 228:17

**they've** [3] - 6:22, 43:7,
85:11

**thinking** [7] - 8:18, 9:24,
10:4, 26:21, 48:18, 133:17,
182:16

**third** [10] - 13:21, 13:23,
13:24, 14:2, 14:10, 39:10,
140:13, 145:20, 155:3,
172:20

**third-year** [1] - 14:10

**thousand** [2] - 121:11,
139:24

**thousands** [3] - 118:5,
236:19

**three** [20] - 19:25, 24:4,

34:22, 50:17, 52:18, 72:6,
117:23, 117:25, 173:22,
186:4, 186:5, 186:10,
192:14, 195:10, 195:14,
197:6, 197:20, 198:20,
218:16, 234:19

**three-day** [1] - 197:20

**throughout** [1] - 139:14

**thrust** [1] - 221:21

**tight** [1] - 226:9

**timed** [1] - 225:22

**timeline** [1] - 227:16

**timely** [2] - 78:1, 111:24

**timing** [2] - 9:25, 10:8

**timing-wise** [1] - 10:8

**tiny** [1] - 92:12

**tissue** [3] - 124:16, 125:14,
129:22

**title** [5] - 166:16, 166:18,
170:4, 179:16, 199:6

**titled** [1] - 167:2

**Tobin** [7] - 199:18, 199:19,
199:24, 200:4, 200:22,
201:2, 201:10

**Toby** [5] - 204:8, 204:10,
205:15, 206:4, 206:9

**toby** [1] - 204:10

**today** [14] - 98:20, 106:5,
109:7, 117:4, 204:15,
217:23, 218:12, 218:13,
219:12, 224:18, 234:20,
235:2, 236:18, 239:1

**together** [6] - 82:4, 82:8,
105:12, 105:15, 114:1,
119:20

**tomorrow** [21] - 4:8, 4:11,
80:24, 98:24, 216:13,
216:20, 217:10, 217:12,
217:21, 217:25, 218:8,
218:10, 218:12, 218:16,
219:4, 225:7, 225:15,
234:10, 234:21, 238:22,
239:2

**tomorrow's** [4] - 217:17,
219:11, 233:20, 234:15

**tonight** [3] - 218:9, 235:11,
235:21

**took** [6] - 7:14, 7:15, 22:1,
70:6, 71:7, 96:17

**tool** [3] - 85:2, 217:8,
225:18

**tools** [3] - 125:17, 214:19,
214:21

**top** [8] - 64:24, 73:22,
106:16, 135:22, 135:23,
137:1, 194:24, 199:2

**topic** [1] - 79:21

**topically** [1] - 16:23

**total** [5] - 25:11, 26:2,
26:22, 108:7, 235:16

**touch** [3] - 52:23, 183:4,
222:2

**towards** [1] - 50:22

**town** [2] - 92:12, 185:2

**tox** [1] - 215:5

**toxicology** [2] - 161:4,
179:25

**toy** [1] - 53:18

**track** [3] - 160:15, 197:8,
197:9

**tract** [1] - 95:2

**traditional** [2] - 162:1,
177:11

**train** [6] - 82:6, 87:25,
162:13, 188:13, 192:12,
211:1

**trained** [5] - 88:3, 88:5,
144:7, 181:3, 181:4

**trainer** [4] - 99:1, 160:24,
179:17, 187:18

**training** [56] - 57:5, 57:7,
82:4, 82:6, 82:8, 82:11,
82:17, 83:20, 88:7, 105:7,
120:1, 147:23, 147:25,
162:12, 163:13, 165:12,
168:14, 170:20, 171:8,
171:11, 180:15, 184:21,
187:20, 188:1, 189:13,
189:17, 189:19, 189:24,
190:3, 190:5, 191:13, 192:3,
192:11, 194:15, 194:19,
195:11, 196:15, 196:20,
196:25, 197:1, 197:14,
198:3, 198:17, 198:21,
198:23, 199:22, 200:5,
202:16, 203:3, 210:6,
210:16, 211:8, 211:14

**trainings** [8] - 165:7, 165:8,
171:12, 174:7, 176:2, 176:4,
177:7, 214:11

**TRANSCRIPT** [1] - 1:9

**transcription** [1] - 239:10

**transfers** [1] - 21:1

**transition** [4] - 164:21,
165:5, 212:14, 212:16

**translates** [2] - 53:24,
80:14

**transmission** [1] - 220:14

**transmit** [1] - 234:19

**transmitted** [4] - 220:5,
220:8, 220:13, 234:9

**transmitting** [1] - 40:9

**transparent** [1] - 107:11

**transplant** [1] - 128:7

**transvaginal** [2] - 143:23,
144:1

**travel** [7] - 33:13, 36:4,
36:6, 52:24, 53:3, 53:7, 53:9

**traveling** [4] - 47:3, 52:7,
53:4, 118:12

**treat** [8] - 125:2, 125:22, 127:8, 130:17, 130:21, 134:5, 134:8, 141:21
**treated** [2] - 141:16, 141:17
**treating** [3] - 16:21, 141:13, 151:21
**treatment** [14] - 125:3, 125:5, 125:6, 125:7, 125:18, 126:13, 130:17, 131:6, 140:9, 140:15, 140:17, 143:21, 145:13, 146:12
**tremendously** [2] - 76:15, 77:21
**trial** [5] - 4:3, 10:25, 101:22, 121:14, 121:17
**TRIAL** [1] - 1:9
**Tricare** [16] - 19:15, 19:16, 20:20, 25:6, 25:9, 25:11, 26:3, 26:5, 26:8, 38:24, 39:5, 50:6, 62:10, 62:17, 72:24
**tried** [1] - 30:25
**trouble** [1] - 171:18
**truant** [1] - 203:12
**true** [7] - 27:14, 27:16, 30:10, 107:10, 108:21, 109:15
**trust** [1] - 197:6
**truth** [7] - 45:19, 50:20, 50:21, 52:1, 61:8, 116:19, 151:4
**truthful** [4] - 44:6, 107:9, 116:22, 116:23
**truthfully** [1] - 237:24
**try** [16] - 6:13, 8:13, 29:10, 30:5, 30:7, 31:3, 49:6, 51:23, 63:22, 183:15, 221:24, 226:7, 226:17, 233:20, 237:22, 238:13
**trying** [13] - 24:2, 29:16, 29:25, 30:1, 38:3, 73:5, 101:6, 108:1, 112:24, 150:14, 232:11, 237:4, 237:15
**Tsai** [1] - 151:15
**Tsai's** [1] - 156:14
**tube** [1] - 17:2
**Tuesday** [1] - 10:1
**tumor** [1] - 124:16
**tumors** [2] - 129:16, 130:19
**turn** [11] - 11:3, 32:22, 45:24, 104:6, 129:6, 173:11, 173:18, 180:23, 188:23, 202:9, 236:2
**turned** [2] - 40:3, 46:2
**turning** [4] - 55:1, 93:5, 93:8, 122:13
**Tushar** [2] - 81:12, 86:22
**tweaked** [1] - 171:9
**twice** [1] - 62:16
**two** [33] - 19:24, 25:6,

34:11, 34:22, 37:24, 41:9, 50:5, 52:25, 53:8, 53:9, 61:22, 72:20, 76:1, 76:12, 77:1, 77:2, 78:1, 143:3, 148:4, 148:6, 154:3, 155:21, 169:15, 171:12, 186:10, 189:17, 189:23, 195:12, 197:19, 212:16, 224:7, 224:23, 235:20
**type** [13] - 38:11, 120:12, 127:13, 127:22, 136:18, 137:7, 159:21, 160:25, 161:2, 167:24, 177:11, 178:21, 231:10
**types** [4] - 172:12, 178:24, 204:22, 215:24
**typical** [3] - 132:16, 181:16, 189:4
**typically** [7] - 14:5, 127:25, 130:19, 140:12, 142:21, 146:1, 203:6

---

## U

**U.S** [2] - 44:18, 51:25
**Uddin** [2] - 18:16, 18:17
**UDDIN** [1] - 18:16
**ultimately** [2] - 161:21, 188:25
**ultrasound** [2] - 143:23, 144:1
**umbrellas** [1] - 109:8
**UMDNJ** [1] - 123:11
**unanimously** [1] - 4:9
**unclear** [2] - 25:22, 51:23
**uncomfortable** [1] - 214:1
**uncommon** [1] - 140:6
**under** [15] - 27:5, 27:18, 49:16, 51:21, 112:10, 112:13, 112:14, 112:15, 127:18, 128:2, 135:25, 137:22, 167:24, 229:16
**understood** [8] - 6:6, 33:18, 34:4, 68:10, 132:23, 163:21, 181:15, 226:24
**undertrained** [1] - 105:6
**unemployed** [5] - 44:12, 44:19, 44:21, 44:25, 45:10
**unfortunately** [2] - 45:5, 230:16
**UNITED** [4] - 1:1, 1:3, 1:10, 1:15
**United** [10] - 1:23, 4:4, 38:7, 44:2, 45:12, 45:18, 49:21, 50:1, 122:15, 239:15
**universal** [1] - 5:19
**University** [10] - 12:24, 14:13, 123:17, 123:25, 127:6, 127:8, 132:19, 135:8, 139:23, 142:23

**unless** [5] - 47:13, 99:17, 110:16, 175:7, 186:10
**unlocked** [1] - 105:14
**unnecessarily** [1] - 238:9
**unnecessary** [6] - 8:20, 76:14, 172:5, 173:23, 226:12, 237:12
**unplugged** [1] - 206:12
**unsuccessful** [1] - 49:9
**up** [94] - 4:10, 5:21, 6:11, 6:14, 7:8, 8:1, 8:7, 9:23, 10:22, 20:1, 25:19, 35:21, 36:4, 36:25, 38:11, 42:14, 42:16, 42:21, 45:24, 48:17, 55:11, 55:15, 59:20, 60:3, 63:19, 64:23, 70:19, 87:10, 99:16, 100:12, 107:20, 112:16, 118:13, 119:17, 119:23, 121:3, 122:10, 122:17, 125:6, 125:17, 129:5, 131:7, 135:17, 136:25, 137:21, 143:6, 143:21, 145:20, 147:6, 149:12, 150:6, 154:16, 155:23, 159:4, 159:13, 163:8, 174:15, 175:12, 176:12, 178:19, 180:20, 180:22, 187:4, 188:1, 190:11, 190:15, 190:19, 199:3, 200:22, 202:13, 203:17, 203:18, 208:17, 211:25, 212:2, 216:16, 217:8, 219:14, 221:5, 221:9, 222:16, 223:11, 232:5, 233:7, 233:10, 233:15, 234:1, 234:7, 234:20, 237:23, 237:24, 238:13
**update** [1] - 96:2
**updates** [1] - 95:22
**ups** [1] - 143:4
**urinary** [1] - 95:2
**urine** [6] - 132:4, 132:8, 132:16, 133:2, 193:11, 194:9
**urology** [2] - 159:18, 159:19
**uses** [1] - 193:21
**usual** [4] - 89:25, 90:2, 90:3, 91:8
**uterine** [4] - 136:16, 136:17, 136:18, 136:21
**uterus** [3] - 128:2, 128:11, 136:19

---

## V

**V.H** [1] - 127:9
**vacations** [1] - 118:15
**Valley** [6] - 68:2, 68:21, 68:22, 88:10, 92:12, 92:13
**value** [4] - 23:19, 26:23,

207:13, 223:1
**various** [3] - 85:20, 95:2, 195:20
**Vartanian** [11] - 55:24, 56:7, 56:21, 59:5, 65:9, 69:19, 74:13, 77:11, 98:14, 110:3, 110:13
**Vartanian's** [1] - 110:11
**vast** [1] - 43:12
**Vegas** [1] - 118:16
**venture** [1] - 49:5
**Ventures** [2] - 17:24, 18:3
**venue** [1] - 174:25
**verbal** [9] - 11:14, 35:3, 40:23, 41:23, 44:13, 73:2, 80:8, 139:8, 139:9
**verified** [3] - 16:5, 16:8, 16:10
**verify** [2] - 146:1, 146:5
**version** [2] - 155:9, 174:4
**versus** [2] - 4:4, 108:6
**vice** [2] - 161:18, 199:7
**Victor** [1] - 122:24
**video** [3] - 66:4, 66:6, 74:23
**village** [1] - 193:17
**Villegas** [4] - 57:23, 58:9, 59:8, 59:10
**violate** [2] - 34:9, 80:1
**violated** [1] - 46:9
**violating** [1] - 209:4
**visibility** [9] - 179:13, 179:20, 179:23, 180:9, 214:23, 215:1, 215:4, 215:7, 215:11
**vision** [1] - 107:17
**visit** [2] - 129:5, 192:13
**visited** [1] - 192:14
**visits** [1] - 36:1
**volume** [7] - 108:9, 143:5, 179:20, 190:18, 214:2, 215:1
**Volume** [1] - 1:6
**voluminous** [1] - 237:20
**volunteer** [1] - 231:24
**VP** [1] - 166:19
**vs** [1] - 1:5
**vulnerable** [1] - 117:19

---

## W

**W-2** [8] - 161:13, 163:22, 164:4, 164:13, 164:20, 165:1, 213:24, 214:6
**W-x-x-x-x** [1] - 147:12
**W.H** [5] - 3:8, 102:24, 147:5, 147:9, 148:18
**wait** [6] - 10:12, 46:16, 60:21, 74:19, 94:23, 148:22
**waited** [2] - 182:14, 232:16
**waiting** [2] - 54:24, 125:20
**Waldorf** [1] - 119:7

**walked** [1] - 234:5
**walking** [1] - 117:3
**wants** [4] - 221:22, 228:23, 236:13, 236:25
**warehouse** [1] - 192:17
**wary** [1] - 182:25
**was.,** [1] - 80:18
**Washington** [1] - 1:16
**waste** [2] - 8:3, 30:12
**wasted** [1] - 230:22
**watch** [1] - 196:16
**watching** [1] - 104:3
**water** [3] - 108:8, 108:9
**Waters** [1] - 82:16
**Watt** [9] - 199:18, 199:19, 199:24, 200:4, 200:22, 201:2, 201:10, 204:10, 205:15
**ways** [1] - 82:22
**web** [1] - 198:11
**web-ordering** [1] - 198:11
**webinar** [8] - 168:14, 168:21, 170:17, 170:21, 171:20, 196:16, 201:11, 204:17
**webinars** [17] - 170:23, 171:1, 171:3, 171:12, 171:13, 174:7, 174:11, 174:14, 179:12, 195:14, 195:24, 197:15, 198:7, 198:21, 198:25, 204:19, 204:22
**week** [22] - 5:8, 6:13, 9:20, 10:2, 10:5, 52:6, 52:15, 52:17, 88:2, 98:19, 142:21, 142:22, 142:23, 142:24, 142:25, 143:3, 169:5, 204:17, 208:5, 218:5, 219:6, 237:18
**weekend** [5] - 9:22, 118:17, 216:15, 219:7, 233:9
**weeks** [6] - 34:22, 52:18, 63:16, 106:7, 149:6, 212:16
**well-taken** [1] - 237:16
**WEST** [1] - 1:2
**wet** [1] - 109:8
**whatsoever** [1] - 101:21
**whole** [13] - 39:20, 67:11, 68:10, 91:16, 150:13, 167:4, 174:22, 178:22, 180:18, 206:12, 207:19, 212:11, 233:3
**wind** [4] - 39:23, 39:25, 45:24, 63:19
**window** [1] - 96:6
**winning** [2] - 189:22
**wire** [3] - 21:1, 87:1, 87:10
**wise** [4] - 10:8, 54:17, 102:15, 143:1
**wish** [1] - 212:25

**wishes** [2] - 55:10, 183:21
**withholding** [2] - 208:6
**WITNESS** [15] - 3:2, 4:25, 5:3, 28:8, 28:11, 29:22, 78:7, 121:7, 121:21, 122:23, 137:16, 147:12, 158:13, 195:4, 216:8
**witness** [29] - 4:19, 8:11, 11:6, 54:20, 57:14, 83:11, 84:13, 101:14, 122:6, 122:14, 122:20, 147:4, 147:7, 147:9, 154:5, 158:4, 158:10, 175:5, 184:5, 216:10, 218:7, 218:19, 222:11, 224:12, 230:20, 235:10, 236:6, 237:2, 237:11
**witness's** [1] - 101:13
**witnesses** [6] - 8:8, 102:23, 103:18, 122:1, 223:11, 225:14
**women** [6] - 125:21, 125:22, 128:8, 131:3, 144:12
**word** [5] - 23:8, 59:18, 84:3, 96:15, 136:15
**words** [3] - 20:5, 136:16, 216:12
**works** [9] - 45:18, 58:2, 74:7, 74:8, 88:17, 98:6, 98:8, 190:17, 190:24
**worried** [3] - 7:7, 205:8, 224:14
**worst** [1] - 76:14
**worth** [3] - 120:9, 148:22, 195:10
**wounds** [1] - 16:22
**wow** [1] - 120:14
**wrap** [1] - 234:20
**write** [3] - 87:22, 186:18, 208:15
**writing** [10] - 70:23, 74:1, 80:7, 91:17, 114:22, 114:24, 204:7, 204:8, 206:20, 210:22
**written** [4] - 43:2, 66:7, 67:2, 82:16
**wrote** [4] - 19:8, 68:6, 187:8, 211:22

**X**

**x-x** [1] - 147:13

**Y**

**year** [21] - 12:22, 13:22, 14:2, 14:10, 14:24, 15:2, 15:24, 17:14, 26:17, 30:15, 30:16, 30:22, 39:20, 43:21, 63:18, 72:5, 99:21, 123:20, 123:23, 186:5, 194:20
**years** [16] - 14:20, 21:10,

29:14, 50:17, 63:5, 63:20, 72:6, 72:24, 77:1, 77:2, 117:23, 118:1, 118:25, 131:8, 133:17, 235:20
**yellow** [1] - 56:19
**yesterday** [30] - 5:17, 5:23, 6:3, 7:6, 8:17, 9:10, 10:22, 11:21, 13:20, 23:1, 23:9, 41:3, 43:11, 43:15, 43:18, 54:20, 55:6, 57:5, 59:18, 61:12, 65:5, 67:12, 69:16, 71:16, 103:19, 114:16, 115:2, 219:25, 220:21, 224:13
**Yogel** [4] - 217:19, 218:4, 219:6, 233:11
**York** [7] - 1:16, 9:17, 12:8, 59:14, 59:21, 108:15, 123:16
**younger** [2] - 14:21, 144:12
**yourself** [6] - 45:13, 45:25, 46:17, 46:20, 155:17, 197:15
**Yussuf** [2] - 66:16, 117:8

**Z**

**zero** [3] - 100:19, 100:22, 104:3
**zone** [1] - 211:17
**Zoom** [1] - 10:10
**zoom** [4] - 111:18, 121:5, 171:24, 172:21