```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                     WEST PALM BEACH DIVISION
                      CASE NO. 19-CR-80181-RAR-1
 3
      UNITED STATES OF AMERICA,            Miami, Florida
 4
                                           December 2, 2022
 5           vs.
                                           9:15 a.m. - 5:11 p.m.
 6
      MINAL PATEL,                         Volume 5
 7
                    Defendant.             Pages 1 to 269
 8    _____

 9
                      TRANSCRIPT OF JURY TRIAL
10         BEFORE THE HONORABLE RODOLFO A. RUIZ, II
                      UNITED STATES DISTRICT JUDGE
11
      APPEARANCES:
12

13    FOR THE GOVERNMENT:      JAMIE DE BOER
                               EMILY GURSKIS
14                             REGINALD CUYLER
                               KATHERINE ROOKARD
15                             UNITED STATES DEPARTMENT OF JUSTICE
                               CRIMINAL DIVISION, FRAUD SECTION
16                             1400 New York Avenue, 8th Floor
                               Washington, D.C. 20005
17
      FOR THE DEFENDANT:       STEVEN H. SADOW
18                             LAW OFFICE OF STEVEN H. SADOW, PC
                               260 Peachtree Street NW
19                             Suite 2052
                               Atlanta, Georgia 30303
20
      STENOGRAPHICALLY REPORTED BY:
21
                               ILONA LUPOWITZ, CRR, RPR, RMR
22                             Official Court Reporter to:
                               The Honorable Rodolfo A. Ruiz, II
23                             United States District Court
                               299 East Broward Boulevard
24                             Fort Lauderdale, Florida 3301
                               (954) 769-5568
25
```

```
 1   (Appearances continued)

 2
     FOR THE DEFENDANT:          DONALD F. SAMUEL
 3                               GARLAND, SAMUEL & LOEB, PC
                                 3131 Maple Drive NE
 4                               Atlanta Georgia 30305

 5                               BRIAN T. RAFFERTY
                                 BAKER & HOSTETLER, LLP
 6                               1170 Peactree Street, Suite
                                 2400
 7                               Atlanta, Georgia 30309

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           I N D E X

2    WITNESS                                                  PAGE

3    ANTHONY MAGLIOCCO, M.D.,

4    DIRECT EXAMINATION BY MS. DE BOER                          8
     CROSS-EXAMINATION BY MR. RAFFERTY                         74
5

6    DIRECT EXAMINATION BY MS. GURSKIS                        100
     CROSS-EXAMINATION BY MR. RAFFERTY                        118
7

     AMY ROEBUCK
8
     DIRECT EXAMINATION BY MS. GURSKIS                        135
9    CROSS-EXAMINATION BY MR. SAMUEL                          160
     REDIRECT EXAMINATION BY MS. GURSKIS                      197
10

     MARC SPORN
11
     DIRECT EXAMINATION BY MS. DE BOER                        203
12

13                    GOVERNMENT'S EXHIBITS

14
     Exhibit                                              Received
15
     411-A and B, 412-A                                        8
16   and B, 413-A and B,
     414-A and B, 415-A
17   and B, 416-A and B,
     417, 417-A through
18   J, 424, 424-A
     through J, 425,
19   425-A through J,
     430, 530-A through
20   J, 436, 436-A
     through H, 442,
21   443-A, B, and C,
     444-A and B, 446,
22   447, 475, 476, 477
     410                                                     104
23   1723                                                    137
     E-1, E-2, and E-4                                       175
24   through E-14
     1913 and 1913-A to                                      215
25   C, 1915 and 1915-A,
     1916 and 1916-A to D

 1            (Call to the Order of the Court.)

 2        THE COURT:  We are here this morning continuing our

 3   trial in Case No. 19-80181, United States of America versus

 4   Minal Patel.  All jurors are now here, present and accounted

 5   for.

 6        I understand that we were testing some audio on a

 7   video.  Do we have a sense of how that's going to work?

 8        MS. DE BOER:  I think we've got it working, Your Honor.

 9   Thank you.

10        THE COURT:  Great.  One thing I did want to mention

11   just as an aside, we can deal with it a little later today.  We

12   have one juror, I think she's Juror 7, Lilybett Martinez.  You

13   may remember we discussed her flight schedule.  She was the

14   juror that flies out tonight, and then flies back I believe

15   Monday morning.  She advised us that her flight back Monday

16   morning is to Fort Lauderdale; it is not a flight to Miami

17   International.  So I might need to have a discussion with you

18   all because she certainly is going to plan on coming straight

19   here, but we could run the risk of really losing a chunk of

20   time on Monday morning if she's unable to change her flight.

21   We asked her to try to do so.  She's attempted it.  I don't

22   think she's had any success.

23        So at some point later today, let's all just touch base

24   on this.  I don't know that we're going to reach the conclusion

25   that she should be excused if we think it's too big a loss of

 1   time, but she's the only one that has raised this issue.

 2   Everybody else is hanging in there without any problems.  But

 3   Ms. Martinez said she just can't seem to get a later flight.

 4   I'm not sure exactly when it lands, but certainly we all know

 5   how traffic is, and that's banking on the fact that the airline

 6   lands when it says it will.

 7        So I just want us to think about that.  And if we all

 8   tend to agree that it's too risky to lose a chunk of Monday,

 9   then we may want to excuse her.  She's trying.  I can't really

10   ask for anything else.  So just want to flag that.  We'll talk

11   about that a little bit later today.

12        Now, before I bring out the jury, any issues, any

13   concerns from the government?

14        MS. DE BOER:  No, Your Honor.  And we'll plan to move

15   in some exhibits at the beginning of Dr. Magliocco's testimony,

16   who will be our first witness this morning.  And I think some

17   of them will be subject to the certification objection that was

18   litigated, but I understand that there aren't many other

19   objections.

20        THE COURT:  Okay.  And again, so absent that

21   certification concern, do we have any other problems with those

22   exhibits on the defense side?

23        MR. RAFFERTY:  No, Your Honor.  We stand on the

24   objections that Mr. Sadow has already articulated with respect

25   to those exhibits.  If the Court wants, we can restate those,

1    but I think we'll just stand on what's already been said.

2         THE COURT:  That's fine.  The Court will note them for

3    the record when we move them in.  We've overruled those now

4    that the Court's felt comfortable on the revised 902 and we've

5    discussed a little bit more about how those exhibits will be

6    used.

7         Anything else on the government's end with our first

8    witness?

9         MS. DE BOER:  No, Your Honor.  Thank you.

10         THE COURT:  Anything else from the defense team before

11    we go ahead and get started?

12         MR. RAFFERTY:  No, Your Honor, thank you.

13         THE COURT:  Very good.  All right.  Let's go ahead and

14    get our jurors, please.  Thank you.

15         THE COURT SECURITY OFFICER:  All rise for the jurors.

16         (Jury enters at 9:19 a.m.)

17         THE COURT:  Please be seated, everyone.  Good morning,

18    ladies and gentlemen of the jury.  Happy Friday.  Did everyone

19    who wanted a doughnut get a doughnut?

20         THE JURORS:  Yes.

21         THE COURT:  Good.  Glad to hear that.  It's always good

22    to kick off your Friday after a long first week of trial with a

23    little sugar, so that's going to keep you guys nice and alert.

24         So you may recall, we ended with a witness yesterday,

25    and so the government will continue to present their

1    case-in-chief.  I'm going to turn it over to the government to

2    call their next witness.  I see everyone's got their notepads

3    ready to go.

4         So, Ms. de Boer, government's next witness.

5         MS. DE BOER:  Thank you, Your Honor.  The United States

6    calls Dr. Anthony Magliocco.

7         THE COURT:  All right.  We'll get Dr. Magliocco up

8    here.  Hey, Doctor, come on up.  We're going to swear you in

9    here to my left.

10        THE COURTROOM DEPUTY:  Please raise your hand.

11        (Government witness, ANTHONY MAGLIOCCO, M.D., duly

12   sworn.)

13        THE COURTROOM DEPUTY:  Please be seated.  Speak into

14   the microphone.  Say and spell your name for the record.

15        THE WITNESS:  Good morning.  My name is Dr. Anthony

16   Martin Magliocco, and A-n-t-h-o-n-y, second name Martin,

17   M-a-r-t-i-n, Magliocco, M-a-g-l-i-o-c-c-o.

18        MS. DE BOER:  Your Honor, before we begin with

19   Dr. Magliocco's testimony, the government has several exhibits

20   to move into evidence at this time.

21        THE COURT:  Yes.  And I understand that we have, absent

22   one objection that we've addressed, no other issues with this

23   list; is that right, Mr. Rafferty?

24        MR. RAFFERTY:  That is correct, Your Honor.

25        THE COURT:  Very good.  So based upon the prior ruling

1  from the Court, let's go identify and move those exhibits in.

2  Go ahead.

3          MS. DE BOER:  Thank you, Your Honor.  Government's

4  Exhibit 411-A and B, 412-A and B, 413-A and B, 414-A and B,

5  415-A and B, 416-A and B, 417-A through J, 424-A through J,

6  425-A through J, 429, and 429-A through D.  And I should

7  clarify that 417 and 424 and 425, the cover exhibit, as well as

8  A and through J, as well.  430 and 430-A through J, 436 and

9  436-A through H, 442, 443-A, B, and C, 444-A and B, 446, 447,

10  475, 476, and 477.

11          THE COURT:  All right.  All of those will be admitted

12  subject to the Court's prior rulings on specific objections

13  into evidence at this time.  You may proceed.

14      (Government Exhibits 411-A and B, 412-A and B, 413-A and

15      B, 414-A and B, 415-A and B, 416-A and B, 417, 417-A

16      through J, 424, 424-A through J, 425, 425-A through J,

17      430, 530-A through J, 436, 436-A through H, 442, 443-A, B,

18      and C, 444-A and B, 446, 447, 475, 476, 477 were received

19      in evidence.)

20          MS. DE BOER:  Thank you, Your Honor.

21                    ^ * DIRECT EXAMINATION

22  BY MS. DE BOER:

23  Q.  Good morning, Doctor.

24  A.  Good morning.

25  Q.  You obviously hold a medical degree?

1   A.   Yes, I do.

2   Q.   When did you obtain your medical degree?

3   A.   I graduated in 1987 from the University of Alberta.

4   Q.   And, Doctor, if I can ask you to just speak up, if you can.

5   A.   I'll try.

6   Q.   Thank you.

7   A.   Yeah.

8   Q.   What is your medical specialty?

9   A.   I have a medical degree in general medicine, and then I've

10  done specialty training in anatomic pathology where I conducted

11  four years of training.  And then I did an additional

12  fellowship in molecular pathology at Fox Chase in Philadelphia.

13  Q.   If you can put into layman's terms for us, what is

14  molecular pathology?

15  A.   Molecular pathology -- so pathology is the medical

16  specialty of laboratory science where I was trained how to

17  examine body fluids and human tissues to make diagnostic --

18  specific diagnoses and to render medical information for

19  medical practitioners to use that information to treat

20  patients.

21  Q.   Do you hold any medical licenses?

22  A.   Yes, I do.

23  Q.   Where are you licensed?

24  A.   I'm licensed in the state of Florida.

25  Q.   Where are you currently employed?

1   A.   I'm employed at Protean BioDiagnostics, which is a

2   laboratory in Orlando, Florida.

3   Q.   What kind of lab is Protean?

4   A.   Protean is considered a national reference lab for cancer

5   testing, complex testing, and esoteric lab testing.  So it

6   provides a variety of testing services, including examination

7   of tissue, genetic testing, molecular testing, and other types

8   of special tests, mostly for cancer patients.

9   Q.   What is your current role at Protean?

10   A.   So I'm the medical director of Protean.  I'm a practicing

11   pathologist at Protean.  I'm also the founder and CEO and

12   president of Protean.

13   Q.   When did you found Protean?

14   A.   I founded it in October of 2017.

15   Q.   And before Protean, where did you work?

16   A.   I worked at the Moffitt Cancer Center; commenced there in

17   2011.  I was chair of the Department of Pathology at Moffitt

18   for eight years.

19   Q.   What did you do as chair of pathology?

20   A.   So my role as chair of the anatomic pathology department

21   was to oversee all of the activities of the department, that

22   included provision of medical testing services to the Moffitt

23   doctors and patients.  I was also responsible for the hiring

24   and discipline of the pathologists that worked there.  There's

25   over 30 of them.  I was responsible for the educational

1   activities of the department.  It had a residency and

2   fellowship training programs.  I was also responsible for the

3   research activities in the department, to lead that and provide

4   guidance to the department.

5   Q.  Other than your role as chair of the pathology department

6   at Moffitt, did you serve in any other positions at Moffitt?

7   A.  Yes, I had multiple roles at Moffitt.  So I was a

8   practicing pathologist.  I was the executive director of

9   esoteric lab services, which meant that I oversaw the

10  development of new laboratory tests at Moffitt and oversaw

11  their implementation.  These included molecular tests and

12  genetic testing at Moffitt.  I also ran a research program at

13  Moffitt, so I ran a research lab at Moffitt where I had

14  students and fellows that conducted research under federal

15  programs.  I was director of something called Moffitt Tissue

16  Core, which was the tissue bank that supported clinical trials

17  and other research activities at Moffitt.  And I was professor

18  of pathology and oncology where I taught both undergraduate,

19  graduate students, and fellows at Moffitt.

20  Q.  And over the course of your career, have you been involved

21  in treating patients who are suffering from cancer?

22  A.  Yes.  For my entire career, I've been directly involved in

23  treatment of patients with cancer.

24  Q.  What is the role that you serve as a molecular pathologist

25  in treating cancer?

1    A.   The main role of a molecular pathologist is in assisting

2    with the diagnosis of cancer, analysis of cancer tissues and

3    blood and genetics from cancer patients that help make the

4    diagnosis of cancer, to classify the cancer, and also to plan

5    treatment for the cancer patients.

6    Q.   And do you focus on any particular type of cancer or just

7    cancer generally?

8    A.   I have expertise across all types of cancer, but my

9    specific subspecialty interests are in breast and women's

10   cancer, although I have extensive experience in lung, GI, and

11   many other types of cancer over my career.

12   Q.   You mentioned being part of research in connection with the

13   tissue bank at Moffitt.  Other than that experience, what, if

14   any, other research institutions have you been involved with?

15   A.   I was involved with something called the cooperative

16   groups.  The cooperative groups are a network of academic

17   centers in the U.S. that conduct clinical trials.  So these are

18   where the major practice changing trials are conducted.  So

19   hundreds of trials, Phase 2 and Phase 3 trials are conducted.

20   I was involved in the administration of the cooperative groups

21   for over ten years.  I was chair of pathology at the RTOG, the

22   Radiation Therapy Oncology Group, and I've conducted clinical

23   trials with the Southwest Oncology Group, numerous trials in GI

24   cancer.  I was also involved with multiple clinical trial

25   groups in Canada and across the U.K., as well.

1  Q.   Do you have any experience in teaching courses pertaining

2  to oncology or pathology?

3  A.   Yes.  I've taught courses through my entire career at

4  multiple levels, including undergraduate biology courses,

5  graduate in medicine courses and cancer biology and

6  epidemiology.  I supervised many thesis, Ph.D. thesis and

7  master's students' thesis.  I've been director of fellowship

8  training programs.  I created a fellowship training program in

9  molecular pathology, and one in digital pathology imaging.  And

10 I also continue to train expert physicians with continuing

11 medical education, continuously involved in various courses

12 around the world, teaching cancer experts about new

13 technologies and new uses of cancer technology.

14 Q.   And aside from what we've covered, have you been involved

15 in any other trainings or residencies or fellowships pertaining

16 to cancer or to genetic testing?

17 A.   I've been involved in multiple types of training.  And in

18 Saskatchewan, I established a hereditary cancer program for the

19 province when I was there.  I was involved in a variety of

20 hereditary cancer programs in Alberta before I came to the

21 U.S., and have been involved in multiple types of training,

22 including educational programs for patients, as well.

23 Q.   Okay.  In the various roles that you've held, have you

24 become familiar with both cancer genetic testing and

25 pharmacogenetic testing?

```
 1   A.   Yes, I have.

 2   Q.   Are you familiar with the purposes of these tests?

 3   A.   Yes, I am.

 4   Q.   With the clinical uses of these tests?

 5   A.   That's correct.

 6   Q.   With the circumstances under which these tests are

 7   medically appropriate?

 8   A.   Yes.

 9   Q.   Are you familiar with how to interpret the results of these

10   tests?

11   A.   Yes, I am.

12   Q.   And how to use these tests in treating patients?

13   A.   Yes.

14   Q.   Do you have experience consulting patients on genetic

15   testing?

16   A.   Yes, I do.

17   Q.   Do you have experience ordering those kinds of tests?

18   A.   Yes.

19   Q.   Have you personally interpreted the results of those tests?

20   A.   Yes, I have.

21   Q.   Have you published papers on topics pertaining to cancer

22   research?

23   A.   Yes, I have.

24   Q.   What kinds of topics?

25   A.   I published topics on the development of new types of tests
```

1    for cancer diagnosis in molecular diagnostics, new types of

2    blood tests to follow patients with cancer, use of various

3    types of FDA-approved tests, and also implementation of tests,

4    international testing programs.  I've been involved in several

5    white papers and guideline papers on how to appropriately use

6    testing in government programs, particularly in Canada.

7    Q.   And have you previously testified as a medical expert in

8    criminal trials pertaining to genetic testing?

9    A.   Yes, I have.

10   Q.   How many times?

11   A.   At two times previous to this.  This would be the third

12   case.

13   Q.   Thank you, Dr. Magliocco.

14         MS. DE BOER:  Your Honor, at this time, the United

15   States moves to qualify the doctor as an expert under Rule 702

16   on topics of cancer, genetic testing, and pharmacogenetic

17   testing generally, the purposes of these tests, the clinically

18   appropriate uses of these tests, and how to interpret and use

19   the results.

20         THE COURT:  You may proceed.

21   BY MS. DE BOER:

22   Q.   All right, Doctor.  So just to orient you.  You weren't

23   here for this, but we have actually heard a fair amount in this

24   trial about what cancer genetic testing and what

25   pharmacogenetic testing is.  So I'm not going to ask you about

1    that in great detail.

2         But if you could, just to orient all of us, and so that

3    we're on the same page, could you just give us the bottom line.

4    Starting with cancer genetic tests, and then we'll talk about

5    pharmacogenetic tests, how are cancer tests used in treating

6    patients?

7    A.    Right.  This is a great question.  There are actually two

8    types of cancer genetic tests.  There's one called germline

9    testing, and the second type is somatic testing.  I'll start

10   with somatic testing.

11        Somatic testing refers to the cancer tumor itself.  This is

12   where a piece of tumor is removed from a patient.  It's

13   essentially analyzed in a lab to measure the genetic

14   information in that cancer specimen.  So in that analysis, the

15   lab will uncover information about the inherited genes.  So

16   these are the genes that come from the mother and the father.

17   But also damage to those genes that occurs as the cancer

18   developed.

19        So, for example, if a person was exposed to tobacco or

20   other types of carcinogens, certain genes become mutated and

21   altered.  That information's useful in planning the treatment

22   and diagnosing the cancer.  So that is a type -- that's called

23   somatic testing, and that's done on the tumor tissue.

24        The second type of testing is one that's called germline.

25   This is where we're looking at the makeup of a person in terms

 1    of what did they inherit from their mother and father, what

 2    genes does that person have in every cell of their body.

 3    There's between 20- and 30,000 human genes.  And basically, the

 4    testing evaluates a set of those genes to determine if they're

 5    normal or abnormal.  If they're abnormal, that information

 6    could indicate that this patient is prone to a disease or

 7    genetic condition, something like cystic fibrosis or sickle

 8    cell anemia, but also cancer risk.

 9        So genetic testing is used to determine a person's risk of

10    developing cancer and other diseases.  So it's utilized when

11    that information is important for managing a patient.

12        So typically, the situation where that is used is where you

13    have a patient where you've been -- or a patient from a family

14    that you know is of high risk of cancer.  So when you have a

15    patient in your practice, you may ask them, tell me about your

16    family, and they will tell you that in their family there were

17    many instances of cancer in the immediate family members.  And

18    by immediate family members, we mean the mother, the father,

19    the aunts, the uncles, the grandparents, the children, the

20    sisters, the brothers.  These are considered first-degree

21    relatives.

22        And if there is a strong incidence of cancer in that group,

23    if the cancers occurs at a young age, which is generally before

24    the age of 50, or if the cancers are unusual, for example,

25    variants are considered unusual cancer, these can all be

1   indications that that family is cancer prone, which means that

2   they could have a cancer gene in that family which is passed

3   from generation to generation.

4       And so if one of the family members happens to inherit that

5   faulty gene, that particular individual will be at increased

6   risk of cancer in their lifetime.  Now, it doesn't mean they're

7   destined to get cancer, but it means that they could get cancer

8   at a much younger age, and that they might be prone to certain

9   types of cancer.

10      So being aware that your patient is at high risk of cancer

11  can allow you to modify screening programs or even consider

12  prophylactic surgery for a patient.  So understanding this

13  information, it's very useful for a practitioner to understand

14  how we treat a patient.

15  Q.   Thanks, Doctor.  And let me ask you briefly about

16  pharmacogenetic testing.

17      Can you just give the bottom line to the jury of what that

18  type of testing is and how it's used in treatment typically?

19  A.   Sure.  As you know, every person is different.  We all look

20  different, we all have different genes, even if we're identical

21  twins.  There might still be slight differences even between

22  identical twins.

23      Now, humans or patients will respond different to therapy.

24  So for certain treatments, some treatments may be completely

25  ineffective in a patient.  They may be completely resistant to

1    a treatment, whereas, the same dose of a treatment could

2    actually kill another patient, that patient could be very toxic

3    to that -- that treatment could be very toxic to that patient.

4         That variation between individuals, one aspect of it is

5    drug metabolism.  So we each have different enzymes that

6    metabolize drugs, meaning, that some people can eliminate a

7    drug much faster than another person, so that if they're given

8    a high dose of the drug, they can -- it doesn't bother them.

9    Whereas, another patient may have an enzyme that doesn't work

10   as well, so that even a normal dose of the drug can quickly

11   become toxic in that patient and actually kill that patient.

12        One way to determine if a patient is sensitive or what we

13   call toxic to a drug is to do a test called pharmacogenetic

14   tests.  And that test looks at a set of enzymes.  There's

15   actually dozens of them involved in drug metabolism.  And it

16   can give a readout as to whether the patient is going to be

17   sensitive or insensitive to a drug.  And then a doctor or a

18   pharmacist can adjust the dose of the drug so that that patient

19   will have a safe dose.  So that's the general use of

20   pharmacogenetic information.

21   Q.   Okay.  And, Doc, when you were giving your background

22   earlier, you indicated that you have experience using both of

23   these tests; is that correct?

24   A.   That's correct.

25   Q.   Okay.  So is it fair to say that, in your opinion, these

1    tests could be very valuable when they are used appropriately?

2    A.   Absolutely, these are very valuable tests when used

3    appropriately.

4    Q.   Okay.  I don't want to spend too much time on the

5    background of these tests, because, like I said, we have heard

6    a little bit about it.  So let me shift gears for a second.

7         One thing that we have not focused on yet that I'd like to

8    ask you about is the documentation of patient charts.

9         So as a treating physician, are you familiar with the

10   importance of documenting a patient's medical chart?

11   A.   Yes, absolutely.

12   Q.   And what is the purpose of a medical chart?

13   A.   The medical chart is a very important record.  It's a legal

14   document.  We've been taught this from the first days of

15   medical school, that the medical record is extremely important

16   to be accurate and complete.

17        So the purpose of the medical record is to document

18   encounters with the patient.  So every time there's an

19   encounter with the patient, the doctor's obliged to complete a

20   medical record to document that encounter.  Basically, why did

21   that encounter happen, what was the assessment of that

22   encounter, what occurred during the encounter, if there's any

23   treatment plans for testing needed, and to make a follow-up

24   plan.  So the medical record is extremely important to document

25   that.  And there's several reasons for that.

1      So one is so that the encounter was documented, so that

2   when the patient comes back, the doctor can refresh their

3   memory as to what happened to this patient, why were certain

4   tests done, what to expect on follow-up.

5      Also, it's important for continuity of care because

6   patients will frequently be seen by other doctors, so that the

7   medical record will be shared with other doctors, so that when

8   a patient is transferred or the care is transferred to another

9   physician, that that record can be shared with that other

10   physician so they can understand why that happened to the

11   patient, and why those things occurred.

12      The third reason is for insurance programs.  That insurance

13   programs require documentation of why certain procedures were

14   done, so they need evidence of why those procedures were done

15   and that those procedures were actually done to allow for

16   payment to occur.  So those are some of the reasons why medical

17   records are important.

18   Q.   Okay.  And when it comes to cancer genetic testing, what

19   type of information should be documented in a patient's chart

20   when a doctor is considering ordering cancer genetic testing?

21   A.   There's several points.  Genetic testing is just one test

22   that's part of the continuity of care.  So presumably, a

23   physician will be taking care of a patient for a particular

24   purpose.  So that physician should be documenting why are they

25   taking care of their patient, what is their relationship to the

1  patient, why has that patient come to their practice.  And then

2  if the physician is contemplating a genetic test, they should

3  have an indication of why they think the genetic test is

4  appropriate.

5      Normally, there would be a documentation of the patient's

6  medical history, and also the patient's family medical history,

7  as well.  So those would all be components of a proper

8  documentation.

9      In addition, there would be a discussion of why a -- why a

10  genetic test might be appropriate.  And also an indication of

11  if the doctor had discussed this with the patient, and if the

12  patient had any questions or concerns about this.

13      For genetic testing, informed consent is always very

14  critical.  And also before embarking on a genetic test, the

15  medical records should be complete.  So the doctor would

16  normally have external medical records sent to their office

17  when a patient comes over.  So the patient may come with their

18  own medical records, or the doctor's office will contact

19  previous doctors to get the complete medical record over so

20  that a doctor would have a complete record for that particular

21  patient that they've treated.

22  Q.  Okay.  And, Doc, let's move into some of the specific

23  patient files pertaining to this case.

24      Have you reviewed patient files that were provided to you

25  by the government?

1   A.   Yes, I have.

2   Q.   And can you just give the jury a sense of what was provided

3   to you.

4   A.   Yes.  There were numerous types of files provided to me.

5   Some were recordings and others were copies of pieces of paper

6   with medical information on them.  Those are provided to me to

7   review in advance and -- on my own for further discussion.

8   Q.   Okay.  And just to put a finer point on it, the documents

9   that were provided to you, did they include patient charts like

10  you've been discussing?

11  A.   Yes.  There were numerous patient charts provided.  There

12  were several dozens provided to me to review.

13  Q.   Okay.  And did it also include test requisition orders?

14  A.   Yes.  There were test requisition orders, as well.

15  Q.   Okay.  And I'm going to show you a few specific examples

16  here in a second.  But at a high level, can you just describe

17  for the jury the types of things that you saw consistently

18  across these files.

19  A.   Yes.  I observed that these medical records were extremely

20  brief.  They were generally one or two pages long, and were in

21  my opinion often internally contradictory, and had very

22  superficial information recorded in those files that I was

23  provided.

24  Q.   Okay.  So we're going to show you a few examples, Doctor,

25  starting with Government Exhibit 417-C.  I'll zoom in a little

```
 1   bit.  All right.

 2        Is this one of the records you reviewed, Doctor?

 3   A.   Yes.

 4   Q.   And do you see here, patient name is H.K.?

 5   A.   Yes, I see that.

 6   Q.   The facility name is MyOnCallDoc, LLC Telehealth?

 7   A.   Yes.

 8   Q.   And on the left-hand side there is a note type called a

 9   SOAP note?

10   A.   Yes.

11   Q.   And seen by Dr. Huan Tsai?

12   A.   Yes, I see that.

13   Q.   On May 25, 2018?

14   A.   Correct.

15   Q.   And then do you see here the chief complaint?

16   A.   Yes, I do.

17   Q.   What is that?

18   A.   It says, for genetic cancer testing.

19   Q.   When you are documenting patient charts, or you are

20   receiving patient charts from doctors that you work with for

21   further evaluation, how do you typically document a patient's

22   complaint?

23   A.   Well, typically, there would be a description of the

24   current illness.  You might have an inscription, this is a

25   39-year-old patient with prostate cancer with a strong family
```

1    history who is under treatment, and is being sent for

2    additional assessment for additional genetic testing.  Maybe a

3    complaint like that.

4        Or a patient will present themselves saying they have a

5    diagnosis of cancer and require an additional opinion on how to

6    manage their condition.

7        Or if you're in a clinic, they may come with a complaint

8    such as nausea, vomiting, or constipation, something of that

9    nature.

10   Q.  And do you see up here, the very top is a little hard to

11   read, there is a notation that starts with IDGAF, and then

12   there's some letters and numbers afterwards?

13   A.  Yes, I see that.

14   Q.  Okay.  And then we're going to scroll down on this.

15       Moving further down the page, do you see the patient's

16   contact information?

17   A.  Yes, I see that.

18   Q.  And do you see that Ms. K.'s email is recorded as

19   H.K.@nothing.com?

20   A.  Yes, I note that.

21   Q.  Do you see there's nothing recorded for the patient's

22   family information?

23   A.  I note that, yes.

24   Q.  And under patient notes, there's a notation, IDGAF.  Do you

25   see that?

```
 1   A.   Yes, I do.
 2   Q.   And under insurance, do you see there's a notation for self
 3   pay?
 4   A.   Yes, I note that.
 5   Q.   Did you ever see anything consistent with that in these
 6   types of records?
 7   A.   Do I see -- I don't understand.
 8   Q.   That's fine.  We'll get to it in a second.
 9        Going to the second page of Government's Exhibit 417-C --
10   all right.
11        Do you see here, the current diagnoses?
12   A.   Yes I see current diagnoses and C codes, yeah.
13   Q.   What is reflected here?
14   A.   There are four current diagnoses listed, personal history
15   of other malignant neoplasm, kidney, family history of
16   malignant neoplasm of other organs, family history of malignant
17   neoplasm of kidney, family history of malignant neoplasm of
18   breast.
19   Q.   And if you were receiving a chart like this from another
20   practitioner and you saw current diagnosis, personal history
21   and malignant neoplasm of the kidney, would you be able to
22   determine from that whether this patient actively has kidney
23   cancer or had it in the past?
24   A.   None of that information was provided on this record.
25   Q.   Okay.  And then under historical diagnosis, it says, no
```

1   historical diagnoses?

2   A.   That's correct.

3   Q.   Under drug and food allergies, nothing recorded?

4   A.   That is correct.

5   Q.   Under environmental allergies, nothing recorded?

6   A.   That is correct.

7   Q.   Active medication and historical medications, nothing

8   recorded?

9   A.   Agree.

10   Q.   Immunizations, nothing recorded?

11   A.   Correct.

12   Q.   Okay.  Now, we go to past medical history.  This is page 3

13   of the exhibit.

14        Do you see there, there's a notation under the title,

15   family health history?

16   A.   Yes, I do.

17   Q.   And it says, cancer test 2, 3, 4.  Do you know what 2, 3, 4

18   is?

19   A.   I have no idea.

20   Q.   And then there's a Medicare policy number; is that right?

21   A.   I see a number there that says Medicare, yes.

22   Q.   Okay.  On the front page it said, self pay, now it says

23   Medicare; is that right?

24   A.   Correct.

25   Q.   And then it says, past medical history, patient kidney;

1    father brain, kidney; sister, breast cancer at 49; is that

2    correct?

3    A.   Yes.

4    Q.   Again, in this document, can you tell when the patient had

5    kidney cancer?

6    A.   No, we can't.  We can't even tell if this is kidney cancer.

7    It just says, patient, kidney.  They could have some other

8    kidney problem.

9    Q.   Can you tell how the patient was treated for their kidney

10   problem?

11   A.   There's no additional information here.

12   Q.   Can you tell whether any treatments were successful?

13   A.   No, you cannot tell.

14   Q.   In your experience, Doctor -- and we'll just go to the --

15   finish out this record.  There's family health history, no

16   health history recorded.  Advanced directive, no advanced

17   directives recorded; is that correct?

18   A.   That's correct.

19   Q.   Implantable devices, no device is recorded; is that

20   correct?

21   A.   Correct.

22   Q.   And then at the very end of this form -- and this is the

23   last page of the exhibit -- there is something called

24   subjective.

25        And it says, answered call, no particular questions; is

1    that correct?

2    A.  That's what it says.

3    Q.  And then it -- we'll zoom in a little bit.  I'm not sure if

4    you can really see it.

5    A.  Sure.

6    Q.  Hopefully, that's a little better.  And then it says,

7    objective, no particular symptoms or complaints.

8         Do you see that?

9    A.  That's correct.

10   Q.  And then assessment, will order lab req form?

11   A.  Correct.

12   Q.  Screening, intervention, assessments, no screening,

13   interventions, assessments recorded?

14   A.  Correct.

15   Q.  So based on what you've seen in this patient file,

16   Dr. Magliocco, what understanding can you divine, if any, about

17   what the conditions of this patient are?

18   A.  I really can't.  This is a very superficial record that's

19   very incomplete and internally contradictory, with just some

20   brief points about possible personal and family history of

21   cancer without any real details here.  And it sounds like the

22   physician was calling the patient directly.  So it's a very

23   unusual type of history form, in my experience.

24   Q.  Okay.  And what, if any, additional information would you

25   need in order to make an evaluation of whether this patient is

1    a good candidate for cancer genetic testing?

2    A.   Well, I would need to have a continuity of care.  So I'd

3    need to understand from the patient's current physician what is

4    happening with this patient, what is their current condition,

5    why are they being referred to me, what has been done in the

6    past, what information -- particularly, if they are being

7    referred for genetic consultation, I'd need to know whether

8    they have any previous genetic consultations, what is the

9    family history, what is the personal history.

10        I just can't take the patient's word for it.  I also need

11   documentation, medical records from other providers and other

12   labs and pathology reports so I would have a complete medical

13   assessment for that patient, so I could determine if the

14   patient was -- if genetic counseling and testing is appropriate

15   for that patient to initiate those next steps.

16   Q.   And what, if any, documentation is there in this record of

17   a legitimate doctor-physician -- doctor-patient relationship

18   existing between patient H.K. and Dr. Huan Tsai?

19   A.   In this particular document, there's no evidence of any

20   doctor-patient relationship existing before or even during this

21   encounter.

22   Q.   Can you explain to the jury what is the importance, if any,

23   of an existing or some type of doctor-patient relationship

24   between the patient who is seeking genetic testing and the

25   doctor who is considering ordering it?

1   A.   Well, obviously, when a patient comes to a physician,

2   that's an extremely special and considered a sacred and special

3   relationship, where a patient is placing their care in the

4   hands of a physician, and actually placing trust in that

5   physician, that that physician will be doing what's best for

6   the patient, in their opinion.  That's the sworn duty of a

7   physician; first, do no harm.  That's what we're taught.

8        We're there to advise our patients as to what we think is

9   the best course of treatment for them, to listen to them, to

10  understand what their condition is.  And in my opinion, that

11  physician should take somewhat of a holistic approach and

12  really understand what is the condition of this patient, what

13  is their mental status, what is their physical well-being, and

14  how can I help this patient as a physician.  Because I

15  understand this patient is placing their trust in me, and I

16  need to do my best for that patient during the encounter so

17  that I can help that patient on their journey.  Because

18  patients will encounter physicians in times of trouble and

19  distress, and it's a very important relationship, and there's

20  an awful amount of trust that occurs between a physician and a

21  patient.

22  Q.   Okay.  And just going back up here to the medical history

23  for this patient.  So let's just accept this as true, at face

24  value, the patient had some kind of kidney issue, perhaps

25  kidney cancer, unclear if it's in the past or current, father

1    with brain and kidney, potentially, cancer; sister with breast

2    cancer at 49.  So just take that as truth, okay, for the

3    purposes of my question.

4          Is there a potential that maybe this is someone who might

5    be able to benefit from one of these genetic tests?

6    A.   Absolutely.  This is a very, very strong history of cancer

7    in the patient's family if these are, indeed, correct,

8    absolutely.

9    Q.   But what, if any, documentation is there anywhere in this

10   medical chart about why this test is being ordered?

11   A.   I see no documentation in the material that I reviewed as

12   to why this test has been ordered.

13   Q.   And what, if any, documentation is there as to what's the

14   plan, what is going to be done with this test, what are the

15   next steps?

16   A.   In this document, there's absolutely no documentation

17   regarding that.

18   Q.   And how important are those concepts in determining whether

19   a test is actually medically necessary?

20   A.   They're absolutely important, particularly for genetic

21   tests, because the results of those tests are very important,

22   not only for the patient but they actually have implications

23   for the patient's family.  So they should not be undertaken

24   lightly.

25         So these tests are ordered for a particular purpose, and

1    the results have to be taken into context, and usually an

2    action plan is created based on the results of those tests.

3    Q.   And is there any documentation in this patient's file as to

4    a discussion of the risks versus the benefits of taking one of

5    these tests?

6    A.   I saw no discussion of those -- of an informed consent

7    where those important things were discussed or documented.

8    Q.   And are there risks to these types of tests?

9    A.   Absolutely.  Every test comes with risks.  And genetic

10   tests have more risks than usual tests.  So there are many

11   risks that come with genetic tests.

12   Q.   Can you explain that to the jury.

13   A.   Sure.  A genetic test is a complicated test.  As I said, it

14   has information for the patient, and also for the patient's

15   family.  So the information that comes back can be quite

16   concerning to a patient.

17        So, for example, a test may come back that's positive, it

18   may come back and say you carry a gene that's mutated, and you

19   may have an increased risk of cancer.  The patient may take

20   this out of context, or may not understand and assume that they

21   actually have cancer, and they may become alarmed with that.

22   They may also become distressed saying, oh, now I have this

23   gene that's going to doom me to getting cancer.  And this may

24   impact their behavior going forward.

25        They might utilize that information to make that decision

1    about surgery.  They may have undertaken bilateral mastectomies

2    or oophorectomy or other surgical procedures that could be

3    life-altering.  So these decisions are -- weigh heavily on a

4    patient.

5        Some patients become concerned that if they do carry a

6    faulty gene, they could pass it on to their children and become

7    guilty, saying oh, my God, I have to worry about my children

8    now, that they carry this gene, and I've passed this on to

9    them.

10       They might actually have to be financially responsible for

11   the test.  Certain tests may not be covered by insurance, and

12   then the lab may actually go after the patient to get a co-pay

13   or get payment from the patient for that particular test.

14       The test could actually be -- come back rarely in error, so

15   they could possibly get a result that says they do have a

16   faulty gene when they don't.  So that could lead to all sorts

17   of things.

18       Now, if the test comes back where it's negative, the

19   patient may interpret, oh, I'm free and clear of cancer, I'm

20   not gonna get cancer.  That's not what negative means.  It

21   means you don't carry a high-risk gene.  You could still have

22   cancer, you could get cancer.  So a negative test does not mean

23   that you're free of cancer.  So a patient may misinterpret that

24   and stop doing screening.  They may actually have an underlying

25   cancer that may confuse them.

1       So there are many, many factors that a test like this could

2    lead to concern and problems for a patient.  So they're very

3    complicated tests.  And generally, all of these things need to

4    be discussed with the patient prior to ordering the test,

5    because usually, when I work with a patient, I'll tell them all

6    these things, and then they'll say I want to think about it.

7    Then they go away and think about it for a week, and some say I

8    don't want it; others will come back and have additional

9    testing or questions before they go on for testing.

10   Q.  And is there any documentation in this file that that

11   discussion happened?

12   A.  I don't see any discussion or documentation regarding a

13   discussion like that.

14   Q.  Okay.  And since you mentioned the possibility of patients

15   on their own misinterpreting these results to their detriment,

16   who should be interpreting the results and conveying that

17   information to the patient?

18   A.  No, absolutely, it should be an expert.  In fact, it's

19   thought that many general practitioners or even cancer

20   specialists are ill-equipped to fully understand genetic

21   testing because it is so complicated, that ideally a genetic

22   test expert would be the one to discuss not only with the

23   patient, but potentially the patient's physician what the

24   results mean.

25       So I frequently actually have to talk to a patient's

1    oncologist to explain what a genetic test result means, so they

2    fully understand it, because these results are so complicated.

3    In fact, the knowledge is changing on a week-by-week basis.  As

4    humans, as we learn more and more about cancer genetics, that

5    the implications are changing almost on a daily basis, and it's

6    very hard for non-experts to keep up.

7         So the results are so complicated that an expert should

8    deliver them first to the physician, and then the patient, so

9    all the questions will be answered.

10   Q.   Okay.  And sticking with the results of these tests for a

11   second, what good is it to the patient, let's just say they

12   never get their results, what good is this test to the patient?

13   A.   Well, obviously, no good at all.  That's a waste of the

14   test if that test was not being reported back to the patient or

15   their physician.

16   Q.   What if the test results are simply mailed to the patient,

17   along with a cover letter or a notation that says, hey,

18   patient, take this to your real doctor?

19   A.   Yeah, this is very concerning.  Patients are not properly

20   equipped to receive this type of information.  And putting that

21   burden on the patient actually burdens them in a way that, in

22   my opinion, is unconscionable to make a patient deal with that

23   type of information in the mail.  That could scare the patient

24   when they get the result.  They don't know who they should go

25   to to get answers about this.  And it can be extremely

1    concerning for a patient to get a result like that in the mail

2    without specifically anybody to answer any concerns or

3    questions they have about it.

4    Q.   And then just wrapping up with this chart for Ms. K., were

5    you able to -- based on the information that's available to you

6    in this chart, which you've already described to the jury, was

7    this -- was a cancer genetic test medically necessary for

8    Ms. K.?

9    A.   I can't determine that from this information.

10   Q.   Okay.  Let's move to Government's Exhibit 417-D, which is

11   the test requisition for Ms. K.

12        Do you see Ms. K.'s name at the top of 417-D?

13   A.   Yes, I do.  I see her name here.

14   Q.   And do you see here it's a little bit faint, but Medicare

15   is checked off as the type of insurance?

16   A.   Yes, I see that.

17   Q.   And do you see there's several ICD-10 diagnoses codes under

18   in the chart?

19   A.   Yes.

20   Q.   And the provider, the doctor that ordered this is Huan

21   Tsai, the same doctor that was on the chart that we looked at;

22   is that correct?

23   A.   Correct.

24   Q.   And it says the test was collected via saliva collection?

25   A.   That is correct.

1   Q.   Can you just explain to the jury briefly how cancer genetic

2   test samples are generally taken.

3   A.   There's different ways to do a cancer genetic test.   So

4   certainly, saliva collection is one.   This is where a kit is

5   provided to a patient, and they will release saliva and put it

6   into a tube.   Often has a preservative in it.   They mix it, and

7   it's collected; it could be mailed in.   This will stabilize the

8   sample.

9        There's also other ways, where a patient can take a cheek

10   swab inside of their mouth.   They can also do a test on a blood

11   sample.

12        So there are many different ways that the tissue can be

13   sampled from the patient.   Or even a hair can be used for

14   genetic testing and for analysis.

15   Q.   Okay.   And do you see here that the test that's checked

16   off -- we'll zoom in a tad -- it's called the predict

17   hereditary cancer risk assessment test?

18   A.   Yes, I see that.

19   Q.   And then next to -- sorry.   Next to the test, there's a

20   bunch of different -- are these genes that are listed?

21   A.   Yeah, these are standard gene abbreviations that indicate a

22   variety of human genes.

23   Q.   Okay.   And are there over a couple dozen listed there?

24   A.   Yeah, there are many, many genes listed here, yes.

25   Q.   Okay.   In terms of the way that this test requisition is

```
 1   set up, there's a couple of different cancer genetic test
 2   options.
 3        There are two different panel options; is that correct?
 4   A.  Yes, I see that.
 5   Q.  Is there an option for the provider to order -- select
 6   their own genes, and which genes they want to order?
 7   A.  There does not appear to be on this form.
 8   Q.  Okay.  And I'm going to go to the second page of this form,
 9   which is the informed consent page.
10        Are you familiar with written informed consent pages?
11   A.  Yes, I am.
12   Q.  And is that a common practice, to have a written informed
13   consent?
14   A.  Normally, you will have a written informed consent, yes.
15   Q.  Is that in lieu of or on top of the discussion with the
16   patient about risks and benefits that you described?
17   A.  It's in addition to.  So normally, that discussion is to
18   occur -- normally, there's a verbal discussion of informed
19   consent with a patient before they sign an informed consent
20   form with a witness, indicating that there was a discussion of
21   why a test was ordered, how a test is done, how the results
22   would come back, the pros and cons.  So normally, there's a
23   discussion like that with the counselor or the physician, and
24   then those are signed off.
25        Now, there may be an additional one that's signed off,
```

1   because often there are additional informed consents when a

2   patient is doing testing, at the time of the testing, where

3   they will also have another form to sign out.  So you'll get

4   multiple informed consents from a patient regarding a

5   procedure.  Even a procedure as simple as a blood test will

6   have informed consents with them.

7   Q.   And did Ms. K., in the files you reviewed, was she ordered

8   a prenatal genetic test?

9   A.   No, not on the test requisition form you just previously

10  showed.

11  Q.   But what informed consent is this?

12  A.   Yeah.  This one says noninvasive prenatal discover patient

13  informed consent.  From my assessment of this form, this is

14  designed for women who are pregnant, to do a neonatal

15  assessment to determine if their fetus has an underlying

16  genetic alteration.

17       So this is an informed consent for a non-invasive prenatal

18  testing, which is really testing of the fetus using a blood

19  sample from the mother.  And the fetal blood circulates in the

20  mother's blood.  And you can analyze that fetal genetic makeup

21  using a blood sample.  So this is a different type of test than

22  the genetic test that we were discussing previously.

23  Q.   And this prenatal test, this is not the test that the

24  record indicated was ordered for Ms. K.?

25  A.   No.  There's no prenatal test on that requisition form that

1    I can see.

2    Q.   And are the discussions of the risks and benefits with the

3    patient different if they're getting the hereditary cancer test

4    as opposed to the prenatal test?

5    A.   Absolutely.   The prenatal tests, you're obviously looking

6    for chromosomal abnormalities in children so a woman can make

7    an assessment on whether to take that pregnancy to term.

8    You're really looking at inherited conditions to the fetus.

9    You're not really assessing cancer risks in the fetus.   You're

10   literally looking at other types of genes and whether they're

11   trisomy 21 or other types of genetic alterations that can

12   really impair their life and potential ability for a child to

13   live following birth.   So that's where a prenatal testing is

14   utilized.

15   Q.   Okay.   So we're going to look at a different patient, Doc.

16   We're going to look at Government Exhibit 417-A.   This is the

17   first page of 417-A.   And this is the chart for the patient,

18   E.G.

19        Do you recall reviewing this previously?

20   A.   Yes, I do.

21   Q.   Again, we'll move quickly through this one.   This is

22   patient's name, E.G., right?

23   A.   Yes.

24   Q.   Facility, MyOnCallDoc, LLC Telehealth?

25   A.   Yes.

1   Q.   And again, note type, SOAP note, and the doctor is the same

2   doctor, Huan Tsai?

3   A.   Yes.

4   Q.   And the chief complaint here?

5   A.   For genetic cancer testing, it says.

6   Q.   Is that the exact same chief complaint that was on Ms. K.'s

7   chart?

8   A.   It seems to be word for word, yes.

9   Q.   And do you see the email address, E.G.@nothing.com?

10  A.   That's correct.

11  Q.   And do you see up here, right up there, I know it's hard to

12  read, references to some number and letter, combination of

13  numbers or letters, IDGAF, and then some other numbers and

14  letters?

15  A.   Yes, I see that.

16  Q.   Any clue what that is?

17  A.   It looks like a personal record number.  I don't know what

18  it is.  Like, a medical record number.

19  Q.   And you don't know -- you have no sense of what that means?

20  A.   No.  Typically, in a medical record system, you assign a

21  unique ID to a patient that's in there.  So it's probably a

22  unique ID for a particular patient encounter.

23  Q.   Okay.  And then scrolling down, similarly, in this one, no

24  family information entered?

25  A.   It's blank on this one.

1   Q.   Patient note says, IDGAF?

2   A.   Yes, it does.

3   Q.   Insurance says, self pay?

4   A.   That's correct.

5   Q.   And vitals, no vitals recorded?

6   A.   Correct.

7   Q.   And then going to the second page of Government

8   Exhibit 417-A, starting at the top, current diagnosis, personal

9   history of malignant neoplasm of prostate.

10        Do you see that?

11  A.   Yes, correct.

12  Q.   Can you tell from the way this is described here whether

13  Mr. G. presently had prostate cancer or whether he had it

14  previously?

15  A.   There's no way to determine that from this record.

16  Q.   All right.  And can you tell from this whether -- if he had

17  it previously, how he was treated, and if it was successfully

18  resolved?

19  A.   No, absolutely not.

20  Q.   You mentioned previously that you would take additional

21  steps to verify information reported by a patient, and that you

22  might seek additional sources of information; is that correct?

23  A.   That's correct, yes.

24  Q.   Have you ever encountered a situation where a patient is a

25  poor historian of aspects about their own health?

1   A.   Absolutely, all the time.

2   Q.   Can you explain what you mean to the jury?

3   A.   Well, a patient, especially an elderly patient, they become

4   forgetful or they may not be a medical expert, and they may

5   know what sub type of cancer they have or what stage it is or

6   grade of it.

7        They may not know what sort of therapy they had or whether

8   they had -- what type of chemotherapy.  They may not know what

9   tests were ordered on them before, what the results of those

10  tests are, because it's extremely complex.

11       So when you're assuming the care of a patient, you really

12  want to have their medical record transferred to you.  So

13  whenever I take on a new patient, often the patient will have a

14  whole bunch of their own medical records, so I'll have them

15  send that over to me, usually by secure fax or a way they can

16  send them over.  But also when I know who their previous

17  doctors are, I'll write to their previous doctors and get their

18  medical records sent over to me, as well.

19       You really need to have a complete medical history of the

20  patient as to what's happened to them in the past, so that you

21  can properly plan for if they do need additional testing, and

22  what sort of tests they need, and what their future therapy

23  might be.

24       And also, you need to know who to communicate results to.

25  Because usually, there's a care team, particularly with

1   patients who have cancer, they may have multiple members on

2   their care team.  They may have surgeons and medical

3   oncologists, nurse practitioners, and even a psychiatrist

4   working with them.  So there are many people that may need to

5   know the medical records.

6       If you do additional treatments or testing, those people

7   should get those results back, unless the patient asks you not

8   to share certain records with people, then you would go by the

9   patient's wishes in those instances.

10  Q.  And we'll move through the rest of this form again here.

11      Historical diagnoses, drug allergies, food allergies,

12  environmental allergies, active medication, historical

13  medication, immunizations.

14      Those are all nothing recorded, correct?

15  A.  Correct, they're all negative, yes.

16  Q.  And then we get down to past medical history.  And there is

17  a Medicare number, and it says, patient prostate, right?

18  A.  It says under family health history, cancer test, patient

19  prostate.

20  Q.  And does this give you any more insight into the questions

21  that you just asked?

22  A.  No, it's even more confusing because now I'm wondering is

23  there a family history of prostate.  It doesn't say cancer.  So

24  I don't know what that means, patient prostate.

25  Q.  And then we'll go to page 3 of this exhibit.  And starting

1    from the top, no family health history recorded?

2    A.   Correct.

3    Q.   No advanced directives?

4    A.   Right.

5    Q.   No devices?

6    A.   Right.

7    Q.   And then again here, for Mr. G., subjective complaint.

8    Answered call, aware of test, no particular questions, correct?

9    A.   Correct.

10   Q.   Objective, no particular symptoms or complaints, correct?

11   A.   Correct.

12   Q.   Assessment, will order lab rec form?

13   A.   Yes.

14   Q.   Screening assessments, assessments, no screenings

15   intervention assessments recorded.

16   A.   That's correct.

17   Q.   Is Mr. G.'s subjective, objective complaints and

18   assessments, word for word, the same as Ms. K.'s?

19        Let me see if I can get them both on the page for you.

20        We'll do it this way.  The top is G.  The bottom is K.

21   A.   They appear to be identical, even for the lowercase on the

22   beginning of the sentence.

23   Q.   All right.  So now, we're going to move to Government

24   Exhibit 417-B, which is the requisition form for Mr. G.

25        And do you see here his name on the top of the form?

1    A.   Yeah.  Yes, I see that.

2    Q.   And do you see a Medicare number entered here?

3    A.   Correct.

4    Q.   A diagnosis code entered?

5    A.   Yes.

6    Q.   And then the same doctor, Huan Tsai?

7    A.   That's correct.

8    Q.   And then again, a saliva collection and the hereditary

9    cancer risk assessment with a couple dozen or more genes

10   selected?

11   A.   Correct, yes.

12   Q.   And then turning to the second page of Government

13   Exhibit 417-B, it's the same prenatal informed consent for

14   Mr. E.G.?

15   A.   Yes, it appears to be the same, prenatal.

16   Q.   Okay.

17   A.   Testing form.

18   Q.   So having reviewed a second patient's file, Mr. G.'s file,

19   what, if any, opinion can you render to the jury about whether

20   there was a legitimate doctor-patient relationship between

21   Dr. Huan Tsai and patient E.G.?

22   A.   If there was one, it's not apparent here.  These are very

23   superficially completed forms.  Inherently inconsistent and

24   appear to be erroneous with these non-invasive prenatal tests

25   to be unlikely that this patient requires prenatal testing.

1  Q.   And what about whether E.G. actually needed a hereditary

2  cancer test for several dozen genes.

3       Is that something that is apparent in these records?

4  A.   There's no indication why this patient requires that test.

5  The patient could, but that information is not actually

6  recorded in these documents.

7  Q.   Okay.  Now, what about any plan of action or why this test

8  is being ordered for the patient?

9  A.   None of that was indicated in the documents that I

10  reviewed.

11  Q.   And how important is it for there to be a reason why the

12  test is ordered and a plan of action when you're evaluating

13  whether a patient needs this?

14  A.   It's essential.  Because when a physician orders a test,

15  they actually make a medical attestation that says, in my

16  opinion, this test is necessary for the treatment of this

17  patient, and I am swearing that I need this information, that

18  I'm going to use this information to treat the patient.  And

19  that's what an attestation is.

20       So the doctor and the insurance program takes the doctor

21  for their word, saying, okay, I believe that you've properly

22  assessed this patient, and that this is medically appropriate,

23  and that we will pay for this very expensive test so that you

24  can properly treat this patient.

25  Q.   Okay.  Now, we're going to move to Government

1    Exhibit 424-C, which is patient V.H.  By the way,

2    Dr. Magliocco, do you happen to know Dr. Brian Slomovitz who

3    treated Ms. H.'s cancer?

4    A.   No, I'm sorry, I don't.

5    Q.   Do you see here the patient V.H. in the same MyOnCallDoc,

6    LLC Telehealth?

7    A.   Yes, I see that.

8    Q.   Do you see here the same doctor, Huan Tsai?

9    A.   Yes, I do.

10   Q.   Is this the exact same chief complaint?

11   A.   Absolutely.

12   Q.   For genetic testing?

13   A.   Yes.

14   Q.   And then, similarly, scanned information through the

15   contact and family information?

16   A.   That's correct.

17   Q.   And then do you see here the same notation of IDGAF under

18   patient note?

19   A.   Yes, I note that.

20   Q.   Going to the second page of Government's Exhibit 424-C,

21   under past medical history, do you see where it says, genetic

22   susceptibility for medical necessity?

23   A.   Yes, I see that.

24   Q.   Do you understand what genetic susceptibility for medical

25   necessity means?

1    A.   No, I don't.

2    Q.   And then you see, patient, uterine cancer; colon cancer

3    aunt; breast cancer, mother.

4         Do you see that?

5    A.   Yeah, I see those notes, yes.

6    Q.   Do you have any understanding based on this documentation

7    of what that means in terms of what this patient has

8    experienced, what this patient has been treated for, or

9    anything?

10   A.   No.  It's very inconclusive as to what that means.

11   Q.   If Ms. H. presented to you and this was the information

12   that you had, what additional steps would you take in assessing

13   whether this patient might be a candidate for genetic testing?

14   A.   When a patient presents to me, I first interview the

15   patient as to why they're coming to me, and I get a current

16   medical condition and past medical history, family history.  So

17   I would take an interview.

18        First step I would do is if I have a patient in front of

19   me, interview them, gather as much information as I can about

20   why they're seeing me, and what their chief concerns are.  And

21   I would gather information about their previous doctors, who

22   they are, and where they've been treated previously.  I'd ask

23   the patient if they have any of their own medical records in

24   their possession, and I would obtain all that information to

25   put into their medical records so I would have a complete

 1   record for that patient.

 2   Q.   Okay.  And then, here again, the subjective, objective

 3   complaints, the assessment, and the screens and interventions,

 4   are those -- well, not quite word for word, but pretty close to

 5   what we saw before?

 6   A.   It's very similar.

 7   Q.   If you were presented with this description of Ms. H.'s

 8   medical conditions, would you feel comfortable signing off on a

 9   requisition for a panel of cancer genetic tests?

10   A.   No, I most certainly would not.

11   Q.   All right.  Now, we're going to move to Government

12   Exhibit 424-D, which is the requisition for Ms. H.  I'll move

13   quickly through this.

14        You see that it is Ms. H.'s name on this requisition?

15   A.   Correct.

16   Q.   You see the Medicare number?

17   A.   Yes.

18   Q.   And you see the ICD-10 diagnosis codes?

19   A.   Yes.

20   Q.   And the same provider, Huan Tsai?

21   A.   Yes, I do.

22   Q.   And the same test ordered for this patient, the same panel

23   of genes?

24   A.   Correct.

25   Q.   And then we'll go to the second page of this exhibit, of

1   this requisition exhibit.

2       Is this also the prenatal informed consent for Ms. H.?

3   A.  Yes, it is.

4   Q.  All right.  Do you see any indication that Ms. H. was

5   ordered a prenatal genetic test?

6   A.  No, I don't.  And I'm not sure what her age is, but she

7   seems to being of advanced age, as well.

8   Q.  Thank you.  If I can ask you to keep your voice up.

9   A.  Sure, I'll try.

10  Q.  Thank you.  So we've been through three patients, and I

11  want to just show you two more briefly, Doc.  I'm going to show

12  you Government's Exhibit 436-C, which is for patient D.N.

13      Do you see that?

14  A.  Yes, I do.

15  Q.  And same telehealth company listed as the facility?

16  A.  Yes, correct.

17  Q.  Same doctor listed as the ordering provider?

18  A.  Yes.

19  Q.  Chief complaint for genetic cancer testing?

20  A.  Right.

21  Q.  All right.  Several current diagnoses with diagnoses codes

22  listed?

23  A.  Yes, I see that, multiple codes listed, yes.

24  Q.  And from this, can you make any sense of what the patient

25  actually had and when?

1   A.   It's very difficult.  Just very brief commentary, personal

2   history of malignant melanoma.  Looks like some family history

3   of malignant neoplasms, and prostate, genetic.  So, it's very

4   brief.  There's not some allusion there might be familial and

5   personal history of cancer here.

6   Q.   Okay.  Let me ask you a hypothetical question.  So we'll

7   just use Mr. N. as our hypothetical patient.  Okay?  So let's

8   assume that Mr. N. received a call from a telemarketer who

9   documented this information here.

10        Are you with me so far?

11  A.   Mmm-hmm.

12  Q.   Let's also assume that Mr. N. has a dementia diagnosis.

13  How, if at all, would you rely on this information documented

14  by a telemarketer?

15  A.   It would be completely unreliable.

16  Q.   Can you explain that to the jury?

17  A.   Well, first of all, medical assessments should never be

18  done by telemarketers.  I have no idea what their training

19  is -- sorry.  You can't hear me.

20        So a medical assessment should not be done via

21  telemarketing.  They should be done by proper patient encounter

22  and interview so that they can be properly attained.  If a

23  patient is demented, they may not be capable of giving an

24  accurate assessment of either their personal medical history or

25  their family's personal medical history.

1       And this information is protected medical information, PHI,

2   under HIPAA.  So one would need informed consent from the

3   patient to actually obtain their additional medical

4   information.  So you would either need to attain that from the

5   patient or their guardian, if the patient was not mentally

6   competent, to get that information and move it over into the

7   medical record.  So certainly, telemarketing is not an

8   acceptable way to conduct a patient enrollment or a patient

9   interview by any measure whatsoever.

10  Q.  And sticking on the topic of telemarketing for a second,

11  Doctor.  You know, we've looked at a few different patients

12  that there is some documentation in a chart that they may have

13  had some kind of cancer at some point.  We don't know when.  We

14  don't know how it resolved, if it resolved; is that fair?

15  A.  That's correct.

16  Q.  Okay.  So is there theoretical possibility that someone in

17  this group that we've looked at so far, or in the larger

18  universe of patient files you have provided, is there a

19  possibility that one of those patients could have benefit from

20  this test?

21  A.  Well, I expect that many of those patients, or the many,

22  many, many, many patients, and statistically I would assume

23  that many of those patients would actually benefit from proper

24  genetic testing, from proper management and proper treatment

25  based on those genetic results.  And also, their family could

1    benefit from those results, as well.  If they had children,

2    they're at high genetic risk, they might be able to prevent the

3    development of cancer, and perhaps even save their lives if

4    they had that information available to them.

5    Q.   Let's assume, for example, that we've got a pool of 27,000

6    patients.  Are you with me?

7    A.   Yes.

8    Q.   Somebody in that 27,000 might be a good candidate for one

9    of these tests; is that correct?

10   A.   Yeah.  I assume anywhere from 4 to 5 percent of the

11   population are good candidates for genetic testing.

12   Q.   Okay.  And so, you know, a broken clock is read twice a

13   day.  Statistically, there's going to be somebody in this

14   27,000.

15        Can that person be found through telemarketing?

16   A.   Absolutely not.

17   Q.   Why?

18   A.   Telemarketing is not an appropriate way to conduct a

19   medical assessment or an encounter.  That patient needs to be

20   in the care of a physician.  They need to be assessed, and they

21   need to be referred for proper medical assessment, proper

22   testing, and proper treatment.

23   Q.   Okay.  And I'm going to show you the last page of Mr. N.'s

24   file here.  Just at the top here, this number 234, is that

25   significant to you in any way?

1  A.   No.  But we've seen it a few times.

2  Q.   And then you see here, patient, melanoma; brother,

3  leukemia; dad, prostate.

4  A.   Yes.

5  Q.   And then the all caps says, genetic susceptibility for

6  medical necessity?

7  A.   Correct.

8  Q.   Again, does that give you any further information about

9  answering the questions you would need to have answered?

10  A.   No.  It generates worry that this family does have cancer

11  in it, and this patient does have a history of melanoma, that

12  this patient needs more careful scrutiny.  This patient may

13  carry one of the rare types of genes that are associated with

14  melanoma predisposition, prostate and pancreatic cancer.

15      So this could definitely be a cancer-prone family who would

16  require additional proper assessment, proper family history,

17  proper assessment of this patient to determine if they are

18  eligible and could benefit from proper treatment and further

19  follow-up, the proper testing, further follow-up.

20  Q.   And then again, with the subjective, objective, and

21  assessment, is it pretty much the same as what we've seen in

22  the last several files?

23  A.   Yes, it's identical.

24  Q.   Okay.  We're going to do one more of these.  It's a little

25  bit different.  So this is going to be Government

1  Exhibit 425-C.  So I'm going to show you the front page of

2  this.  A.K. is the patient?

3  A.  Yes.

4  Q.  My MyOnCallDoc is the telehealth company?

5  A.  I see that.

6  Q.  And this is a different doctor, Mary Wendt.  Do you see

7  that?

8  A.  Yes.

9  Q.  But the same IDGAF, and then some letters and numbers after

10  that, correct?

11  A.  Yes.

12  Q.  Same note, chief complaint?

13  A.  Right.

14  Q.  This one actually says no chief complaint?

15  A.  Right.  The other ones had a different note there.

16  Q.  So I'm going to take you -- we're going to skip to the last

17  page of this requisition -- or this chart, page 3.

18      Do you see there, subjective, increased risk for genetic

19  cancer?

20  A.  Yes, I see that.

21  Q.  And do you see there, objective, no hoarse voice or slurred

22  speech?

23  A.  Yes, I note that.

24  Q.  What?

25  A.  Right, that seems to be out of order or unrelated.

1  Q.   Okay.  Does that help you at all in assessing whether this
2  patient needed a test?
3  A.   No.  Clearly not.
4  Q.   All right.  And then the assessment is increased risk for a
5  genetic cancer?
6  A.   Yes.
7  Q.   And the plan is CGx testing.  Do you see that?
8  A.   Yes, I see that.
9  Q.   We've been talking a little bit about telemarketing.
10      Now, I'm going to play for you a call.  Before we do, were
11  you provided several examples of what the government
12  represented to you to be telemarketing calls involving some of
13  the patients that we had talked about today?
14  A.   Yes, I was given several audio files that I could listen to
15  of recorded calls.
16  Q.   We're only going to listen to one call today to be
17  expeditious about this.
18      But could you just describe for the jury before we play it
19  the types of things that you heard that were common in these
20  calls?
21  A.   To me, I've encountered several telemarketers in the past
22  trying to sell me condos and trips.  And these appear to be
23  very similarly structured, in that there's a call, I've won
24  something, and be given a prize.  They need some information,
25  some very personal information from me, and that they're going

1   to do something to help me.

2       So this is the typical formula that I've observed with

3   condo developments and free trips to Disney World and cruises

4   and whatnot, that are disguised as opportunities to sell me

5   things that I don't need.

6   Q.  Okay.

7           MS. DE BOER:  And, Your Honor, we're about to play

8   Government Exhibit 414-A, but we have a transcript to hand out

9   to the jury, which is 414-B.

10          THE COURT:  Okay.  You may proceed.

11          MS. DE BOER:  Thank you, Your Honor.

12          Does everyone have one?  Ms. Puntillo, could you please

13  play 414-A?  Oh, I'm sorry, Ms. Harper.

14      (Video was published.)

15      (Video was paused.)

16  BY MS. DE BOER:

17  Q.  We're going to pause it right there, Doc.  So far, what

18  we've heard about is a dining gift certificate, a grocery gift

19  certificate, and signing up for something called Better

20  Healthcare; is that correct?

21  A.  Yes.

22  Q.  So we haven't heard anything about a cancer genetic test at

23  this point?

24  A.  No.  There was a slight mention, I think, in the first part

25  about it, but correct.

1    Q.   And Doc --

2              MS. DE BOER:  Your Honor, may I hand the witness a

3    transcript so he can follow?

4              THE COURT:  You may.

5              THE WITNESS:  Thank you.

6              MS. DE BOER:  Okay.  Ms. Harper, we can continue

7    playing.

8              THE WITNESS:  Thank you.

9         (Video was published.)

10        (Video was paused.)

11   BY MS. DE BOER:

12   Q.   Okay.  So now, we've seen the first reference to genetic

13   tests; is that correct?

14   A.   Yes.

15   Q.   And it's coming after the prospect of a gift card that

16   they've been -- that they've won or somehow been entitled to,

17   in signing up for this Better Healthcare service; is that

18   correct?

19   A.   Yes.

20   Q.   What is your opinion on, so far, what has happened in this

21   call in terms of the medical appropriateness of how the test is

22   being introduced to the patient?

23   A.   I'm extremely concerned.

24   Q.   Can you explain?

25   A.   This appears to be an attempt to get personal information

1    from a patient.  And we know how that can be really important

2    or problematic.  So we have someone we don't know who they are,

3    who's doing this call, the telemarketer.  We don't know if

4    they're a qualified medical professional.  They're contacting a

5    patient.  They're telling them they've won steak dinners or

6    that they've won a restaurant, and now they're telling them

7    they're qualified for a medical test.  And now they're trying

8    to get personal health information from the patient over the

9    telephone.  Personal health information and insurance

10   information, very private information from a patient.

11       We don't know who this person is.  The patient doesn't know

12   who they are.  The patient is being, in my opinion, tricked to

13   give this information over the phone to someone they don't know

14   who they are.  Again, this is very sensitive, private

15   information that they're sharing over the telephone.

16           MS. DE BOER:  Can we continue to play?

17        (Video was published.)

18        (Video was paused.)

19   BY MS. DE BOER:

20   Q.  We're going to stop you right there for a second.

21       Dr. Magliocco, is it appropriate to consult with patients

22   about cancer genetic tests while they're driving?

23   A.  In my opinion, absolutely not.

24   Q.  Why not?

25   A.  They're distracted, it could be a hazard on the road,

1  they're clearly not focused on the matters at hand, they're in

2  really no position to give appropriate information and

3  appropriate informed consent in my opinion.

4          MS. DE BOER:  Okay.  We can keep going.

5       (Video was published.)

6       (Video was paused.)

7  BY MS. DE BOER:

8  Q.  Let me stop there for a second, Doc, and ask you,

9  hypothetically, let's assume that A.K., the patient in this

10  instance, was at some point connected for a quick phone call

11  with a network doctor to reverify this information.

12          In your opinion, is that sufficient to determine whether

13  Ms. K. would need this test?

14  A.  No, absolutely not.

15  Q.  What else would need to be done?

16  A.  This patient needs to be part of a continuity of care.

17  They need to be referred by their medical provider to someone

18  who's going to consider them for genetic counseling.  They need

19  to be properly assessed with their current condition, their

20  holistic assessment, what other medical conditions do they

21  have, whether testing is appropriate.

22          If it is appropriate, then they need to have a proper

23  counseling as to what the test is and why it needs to be done.

24  They need a proper family history.  And then things need to

25  proceed with an action plan as to why is the test being done

1    and what's going to happen with the results.

2    Q.   Okay.  And at this point in the call, have you heard any

3    discussions of the risks of a cancer genetic test?

4    A.   No.   There's no discussion of risks or benefits in this

5    call.

6    Q.   Right.  I was going to ask, even the benefits of the test,

7    is this discussed with the patient?

8    A.   Not at all.

9    Q.   Or any discussion so far of how we're going to use this

10   test to help you?

11   A.   Absolutely not.

12   Q.   Okay.

13        MS. DE BOER:  We can continue to play.

14     (Video was published.)

15     (Video was paused.)

16   BY MS. DE BOER:

17   Q.   Okay.  So, Doc, just a couple of last questions on this

18   call.  Now that you've heard how Ms. K. was signed up to take

19   one of these tests, how, if at all, does that affect your

20   opinion about the medical necessity of this test for Ms. K.?

21   A.   It alarms me.

22   Q.   Okay.  I want to move to a slightly different subject for a

23   minute, and that's the subject of telemedicine.

24        Are you familiar with telemedicine?

25   A.   Yes, I am.

1   Q.   All right.  So assume that Ms. K. was then connected to a

2   telemedicine physician who spoke to her over the phone, but not

3   over any type of video platform.

4        What is the implication of that in terms of the ability to

5   evaluate the patient?

6   A.   Right.  So one should be quite different.  Telemarketing is

7   quite different than telemedicine.  Telemedicine has come more

8   in use now, pretty big during COVID, so that patients can stay

9   at home and have a medical encounter.  The encounter is

10  designed to be the same as if the patient was in the office.

11  So ideally, there should be a video link so that a physician

12  could actually see the patient.

13       I prefer to do these types of meetings where I can see the

14  patient, because I can see whether the patient is paying

15  attention or if they look worried or if they're concerned.  So

16  they can also see me, so that they can see that I'm paying

17  attention to them, as well, and that they can see, and I can

18  understand if the information appears to be going back and

19  forth.

20       So, essentially, a telemedicine consult is designed to be

21  exactly the same as an in-office visit where you have the visit

22  with the patient or you greet them, you have an interview with

23  them, you discuss their medical condition, what are their chief

24  concerns.  Because sometimes their chief concern may be they're

25  having some stress or depression or something else that's --

1    that you need to assess, as well.

2         And often patients will have comorbidities.  They may have

3    problems with diabetes, or they may have arthritis or other

4    things that are completely unrelated to their cancer, and you

5    need to know about all of those things.

6         So a telemedicine consultation is a formal meeting between

7    a doctor and a patient designed to be just like if they were in

8    the office with the patient.

9    Q.   Okay.  And you use telemedicine; is that correct?

10   A.   Yes, I do.

11   Q.   And have you used telemedicine to order cancer genetic

12   tests?

13   A.   Yes, I do.

14   Q.   What is the relationship that you have with the patients

15   that you use telemedicine for in ordering these tests?

16   A.   Usually, I've already had multiple encounters with them,

17   that they've come to me for other issues, that I've been

18   working with them.  And then we come to the conclusion that a

19   genetic test might be appropriate for them.  So they already

20   know me.  We have a discussion about why a genetic test might

21   be appropriate.  I explain to the patient why I think a genetic

22   test might be useful.  It might be useful to help -- treatment

23   for a patient, if they do have cancer.  It may be useful to

24   determine how they should adjust the risk of cancer.  If

25   they're at high risk, they may want screening or consider

1   surgery.  So we have all those discussions prior with the

2   patient prior to them embarking.

3        And then frequently a patient will tell me they want to

4   wait, to think about it, they want to discuss it with their

5   family members.  And half of the time, they don't come back.

6   But half the time, they come back a week later and say, okay,

7   I'm ready.  And they may have some additional questions about

8   it.  So that's the typical encounter I may have with my

9   patients that are seeking testing.

10  Q.  Okay.  Now, assume for the purposes of my next question --

11  so we've looked at a number of these charts.  I'm just going to

12  put up -- this is Ms. K.'s chart, Government's Exhibit 425-C,

13  again, I'm just putting up one of them.  And I'm going to ask

14  you to assume these are --

15       Dr. Magliocco, for this question, please assume that the

16  charts that we've been looking at like this one are the output

17  of a telemedicine encounter.  Okay?

18  A.  Yes.

19  Q.  After reviewing the output of this encounter, after

20  reviewing these charts, what is your opinion as to whether

21  telemedicine was properly used here?

22  A.  There's no indication this was an appropriate telemedicine

23  consultation, as far as I can tell.

24  Q.  Okay.  Now, a different set of facts for you to assume.

25  This is a hypothetical question.  So assume that it was not a

1    doctor that filled this information out, and that no

2    telemedicine visit actually occurred.  Assume instead that this

3    information was filled out based on the call that we just

4    heard.

5         What impact does that have on your opinion?

6    A.  Yeah.  It's very concerning, very concerning.

7    Q.  All right.  Now, one last thing on telemedicine and

8    telemarketing.  We've heard the phrase, opt in, used in this

9    trial as in a patient agreed to receive a telemarketing call of

10   some sort.

11        Does that affect your opinion at all on the appropriateness

12   of using telemarketing and telemedicine in the way you've seen

13   it used here?

14   A.  That doesn't make it right.

15   Q.  Explain that to the jury.

16   A.  Well, first of all, telemarketing is not appropriate for

17   patient care.  Patient care is a continuity of care where

18   medical professionals manage the patient, and the patient is

19   transferred to other medical professionals who are responsible

20   for the continuing care of that patient.  So telemarketing is

21   never right for a patient for appropriate medical care, in my

22   opinion.

23        If a patient is -- because we saw in the encounter on the

24   telemarketing that very private information was obtained from

25   the patient.  This could be, you know, to obtain Social

1   Security numbers for fraud, or using it for other purposes.

2   This patient is a victim.  They've been tricked into giving up

3   very private information about their Social Security number

4   about their medical record.  They're basically giving away a

5   blank check to someone saying you can go into my bank account,

6   you can go into my --

7           MR. RAFFERTY:  Your Honor, I think the answer is going

8   well beyond --

9           THE COURT:  I agree.  Sustained on that front.  Let's

10  go to the next question.

11          THE WITNESS:  That's just my opinion.

12  BY MS. DE BOER:

13  Q.  Thank you, Doctor.  Let me ask you a different question.

14  Do you, in your practice -- I'm going to switch gears a little

15  bit.

16          In your practice, do you treat Medicare patients?

17  A.  Yes.

18  Q.  And have you ever ordered cancer genetic tests for Medicare

19  patients?

20  A.  Yes.

21  Q.  How do you typically get those patients?

22  A.  The patients are referred to me by an oncologist.

23  Q.  Are you familiar with this sort of once-in-a-lifetime

24  concept for genetic testing?

25  A.  Yes.

```
 1   Q.   Can you explain that to the jury?

 2   A.   So typically, insurance programs assume that your genetic

 3   test makeup won't change over your lifetime, and you're only

 4   approved for one test.  So you get one test.  And once that's

 5   completed, the insurance program will not pay for another test.

 6   They say you have your test already.  That information should

 7   be used by doctors to make any treatment decisions.  So they

 8   won't approve another test.

 9        So if that test is done, the patient or the lab would then

10   become liable for payment of it.  So the responsibility would

11   then fall back onto the patient.

12   Q.   Okay.  So we're going to switch gears to a slightly

13   different topic now, Dr. Magliocco.  We've got a little bit

14   more to cover, but not too much.

15        So your testimony today is as an expert witness, correct?

16   A.   Yes.

17   Q.   And have you been hired by the United States Department of

18   Justice to consult on this and other cases?

19   A.   Yes, I have.

20   Q.   In other words, are you getting paid for your time spent on

21   this case?

22   A.   Yes, I am.

23   Q.   How are you being paid?

24   A.   I'm paid on an hourly basis for my opinions on this matter.

25   Q.   And what is your hourly rate?
```

1   A.   My current hourly rate is $400 per hour.

2   Q.   Okay.  And does your contract with the government, does it

3   cover not just this case, but several other genetic testing

4   cases that you're assisting on?

5   A.   Yes, it does.

6   Q.   And in total, on all of those cases, approximately how much

7   have you billed to the government so far?

8   A.   I've billed approximately $30,000 to date.

9   Q.   Okay.  And have you testified in another genetic testing --

10  in multiple other genetic testing cases under that contract?

11  A.   Yes, I have.

12  Q.   And you were paid for your time in those cases?

13  A.   Yes.

14  Q.   And to be clear, have you have testified -- have I been the

15  person examining you in one of those cases before?

16  A.   Yes, you were.

17  Q.   Okay.  And does your payment in any way depend on the

18  outcome of this case or of any of the cases that you are

19  assisting the government in?

20  A.   No, not at all.

21  Q.   What is your role?

22  A.   My role is to give my opinion on the evidence that's

23  provided to me.

24  Q.   Okay.  Now, there's one last topic I want to cover with

25  you, Dr. Magliocco, and that -- we're going to shift to the

1   topic of the lab itself.

2       Do you operate a lab?

3   A.   Yes, I do.

4   Q.   And remind the jury, what type of lab is it?

5   A.   It's a cancer diagnostic lab, a reference lab.  It holds

6   medical licenses in Florida and multiple other states, and it's

7   accredited by the College of American Pathologists.  It's

8   licensed to conduct diagnostic testing.  It's focused on cancer

9   patients.  So it analyzes tissue, performs molecular analysis,

10  it performs genetic analysis, it performs blood testing, and

11  other types of special testing.

12  Q.   Okay.  What, if any, influence is appropriate for a lab to

13  exert over a doctor's ordering patterns?

14  A.   It has no role in that activity.

15  Q.   Can you explain why that's the case?

16  A.   Well, the role of a lab is to support a doctor that's

17  ordering tests.  So the lab will provide ordering of tests.

18  However, a lab also has a role to educate.  So a doctor may

19  call a lab and ask about a test or how a test should be

20  appropriately used.  Or if a doctor gets a result from the lab,

21  the doctor may have some questions about what the result means.

22      And typically, the doctor should talk to someone called the

23  medical lab director.  Every lab has a medical lab director.

24  They are the physician that is licensed, and it's their job to

25  oversee the operation of the lab, to make sure that the lab is

1    conducting its testing in a medically compliant way, and that

2    the testing is quality and accurate.  So they're usually the

3    ones that an external doctor would talk to about tests.

4    Q.   And what, if any, financial arrangement is appropriate

5    between a lab and a physician or a physician's office that is

6    referring specimens to the lab?

7    A.   No arrangement is allowed or should occur -- can occur.

8    Q.   What if you put a middleman in between the lab and the

9    physician to make it so that the lab is not directly paying?

10   A.   That's inappropriate.

11   Q.   And why is that?

12   A.   The lab should be utilized on the basis of medical

13   necessity, which is the assessment of a physician, as they sign

14   that this test is medically necessary.  I'm sending it to this

15   lab on the basis that I believe that this lab is a high-quality

16   lab, and will provide the results that I need as a physician,

17   and I need this result to properly treat my patient.

18        That should be the only factor that controls where a doctor

19   sends their test, that the lab has high quality, that they have

20   the test that they need, and that they have a good turnaround

21   time.

22        So those are the factors that should encourage use of a

23   lab, not any sort of financial assessments or inducements,

24   which are not allowed.

25   Q.   Thank you, Dr. Magliocco.  I have no further questions.

1          THE COURT:  Ladies and gentlemen, we're going to go

2     ahead at this point, because it's a good breaking point, to

3     take a 15-minute break.  So everybody can use the restroom,

4     stretch out, you have to check in with any family or friends.

5          So it's about 10:55, so I would ask everybody to please

6     be back in the jury room at just 10 past 11 so we can bring

7     everybody back in.  And we're going to go ahead at that time

8     and begin the cross-examination.  You are excused.

9     (Jury exits at 10:55 a.m.)

10          THE COURT:  Thank you, everyone.  Please be seated.

11    Doctor, you're also free to step down to take your break.  All

12    right.  We're on a 15-minute break.  We'll see each other at 10

13    past 11.

14          MS. DE BOER:  Thank you, Your Honor.

15          THE COURT:  You're welcome.

16    (Court recessed at 10:56 a.m.)

17    (Back on the record at 11:15 a.m.)

18          THE COURT:  Are you ready to go, Mr. Rafferty?

19          MR. RAFFERTY:  Yes, Your Honor.  The only thing I'd

20    ask, can the government collect the transcripts?

21    (Discussion was held off the record.)

22          THE COURT:  We can go ahead and round them up.  We're

23    ready.  Yes, thank you.

24          THE COURT SECURITY OFFICER:  All rise.

25    (Jury enters at 11:17 a.m.)

```
 1            THE COURT:  Please be seated, everyone.  Welcome back,
 2    ladies and gentlemen of the jury.  At this time we'll turn it
 3    over to defense counsel, Mr. Rafferty, to begin his
 4    cross-examination.
 5            Go ahead, Counsel.
 6            MR. RAFFERTY:  Thank you, Your Honor.
 7            THE COURT:  You're welcome.
 8                        CROSS-EXAMINATION
 9    BY MR. RAFFERTY:
10    Q.  Good morning, Doctor.
11    A.  Good morning.
12    Q.  We met outside.  My name is Brian Rafferty, and I'm one of
13    the attorneys that represents Minal Patel.
14    A.  Pleasure to meet you.
15    Q.  Pleasure to meet you.  I have some questions that I wanted
16    to ask you, beginning with -- and I may have an old resume.
17    A.  Sure.
18    Q.  You are a president and CEO of Protean BioDiagnostics; is
19    that right?
20    A.  That's correct.
21    Q.  Now, the resume I have says it's in Tampa, Florida.  Did
22    you testify that it's in Orlando?
23    A.  Yes, I moved to Orlando in 2020, right before COVID.
24    Q.  And the way that you operate the lab as the president and
25    CEO, I think you said you consult with oncologists?
```

 1   A.   Yes.   There's actually two types of practice.   So the lab

 2   operates as a lab.   I'm the medical director of the lab and

 3   also the owner of it.   But I also conduct an independent

 4   practice as a physician and a precision medicine consultant.

 5   Q.   And with respect to precision medicine, if you choose to

 6   order a test, do you refer that test to yourself?

 7   A.   No.   Usually, the test is ordered by a physician, and that

 8   goes to the lab, or I may refer it to other labs, as well.

 9   Q.   I see.   Okay.   I want to go through your background

10   briefly, if I could.   But before I do that, I just want to make

11   sure I understand the universe of things that you've seen in

12   preparation for your testimony.

13        I think you said you've looked at the chart notes and the

14   medical records that you testified about during direct?

15   A.   That's correct.

16   Q.   You listened to some recordings; is that right?

17   A.   Yes.

18   Q.   And you reviewed some requisition forms in this case?

19   A.   Correct.

20   Q.   Is there anything else that you reviewed in preparation for

21   your testimony?

22   A.   There were additional records, several dozen, or a couple

23   of hundred, that were made available for me to look at.

24   Q.   But medical records; is that right?

25   A.   Yes.

1   Q.   Did you actually speak to any patients?

2   A.   No, I did not.

3   Q.   Did you actually speak to any of the doctors that ordered

4   these tests?

5   A.   No, I did not.

6   Q.   Okay.  So you have a pretty extensive background in

7   chemistry and genetics and as a doctor; is that right?

8   A.   That's correct.

9   Q.   You said you graduated in 1987 from the University of

10  Alberta in Canada?

11  A.   That's right.

12  Q.   Before that, you got a B.S. in science, in Canada, as well?

13  A.   That's correct.  At the --

14  Q.   With a minor in chemistry?

15  A.   Yes, at Lethbridge.

16  Q.   And you have some pretty significant postgraduate training

17  in this same area?

18  A.   Yes, I do.

19  Q.   You served as a pathology resident?

20  A.   Yes.

21  Q.   A postdoctoral research fellow?

22  A.   Yes.

23  Q.   You're the president and CEO of a lab right now?

24  A.   That's correct.

25  Q.   You've been a scientific director?

1   A.   Yes.

2   Q.   A director of the Moffitt Morsani Molecular Diagnostics

3   Lab?

4   A.   That's correct.

5   Q.   A medical director of another CLIA lab?

6   A.   Yes.

7   Q.   Suffice to say, you have fairly extensive experience in the

8   area of genetics and laboratory operations and medicine.

9   A.   Yes, I believe so.

10  Q.   Okay.  Now, your opinions here today are based on all that

11  experience, training, and background; is that right?

12  A.   Yes.

13  Q.   And that's what allows you to raise questions about the

14  medical judgments of the doctors that order some of these

15  tests?

16  A.   I can review the material presented to me and give my

17  opinion on the matter, yes.

18  Q.   And it's that background that allows you to criticize the

19  doctors that have filled out the chart notes you reviewed and

20  ordered the tests?

21  A.   I can comment on the evidence presented.  So those are the

22  comments I'm making.

23  Q.   So the answer to my question is yes?

24  A.   To the extent of what I've seen regarding their activities.

25  Q.   Okay.  Now, you own a lab; is that right?

```
 1    A.   Yes.

 2    Q.   You understand that you don't need to be a Ph.D. or a

 3    doctor to own a lab?

 4    A.   That's correct.

 5    Q.   You don't need to be a scientist to own a lab?

 6    A.   Correct.

 7    Q.   You don't even need to be a college graduate to own a lab?

 8    A.   That's correct.

 9    Q.   Now, did you look into the background of any of the

10    individuals who helped run LabSolutions?

11    A.   No.

12    Q.   Did you look into the background of Minal Patel?

13    A.   No.

14    Q.   Did you know that Mr. Patel was not a physician?

15    A.   No, I didn't know that.

16    Q.   Did you know that he's not a Ph.D.?

17    A.   No, I don't know that.

18    Q.   Did you know that he's not a scientist?

19    A.   No, I didn't know that.

20    Q.   Did you know that he's not a college graduate?

21    A.   No.

22    Q.   Now, an individual like Mr. Patel, who owns a lab, who has

23    that sort of background, might hire somebody like yourself to

24    serve as his laboratory director; is that right?

25    A.   That's correct.
```

1   Q.   Somebody with similar background and expertise as you to

2   run the lab.

3   A.   That is correct.

4   Q.   Okay.  So I want to ask you a little bit about the lab

5   director to see if her background and experience sounds similar

6   to your own.  Okay?

7   A.   Sure.

8   Q.   Okay.  Did you ever hear the name, Bernadette Wildemore?

9   A.   I can't recall right now.

10  Q.   Okay.  Did you know that Bernadette Wildemore was the

11  laboratory director at LabSolutions during the time period that

12  you've been testifying to?

13         MS. DE BOER:  Objection, Your Honor.  He testified he

14  doesn't know this person.

15         THE COURT:  I'm going to go ahead and allow him to

16  answer.  It's overruled.

17         THE WITNESS:  No, I did not know who was the director

18  of the lab.

19  BY MR. RAFFERTY:

20  Q.   Did you know that she graduated from Rutgers in New Jersey?

21  A.   No, I did not.

22  Q.   Did you know that she has a master's from Thomas Jefferson

23  University in Philadelphia?

24  A.   No, I did not know that.

25  Q.   Are you familiar with that university?

1   A.   Yes, I am.  I have many colleagues that work there.

2   Q.   And they have a medical school.

3   A.   Absolutely.

4   Q.   It's a fair regarded -- well-regarded medical school; is it

5   not?

6   A.   Absolutely, a great school.

7   Q.   Did you know that Ms. Wildemore graduated from that medical

8   school?

9   A.   No, I do not know Ms. Wildemore, or Dr. Wildemore.

10  Q.   Did you know she did a residency in pathology at Thomas

11  Jefferson University?

12  A.   No, I did not know that.

13  Q.   And did you know she did a fellowship in molecular genetic

14  pathology at a university called Harvard?

15  A.   No, I did not know that.

16  Q.   Are you familiar with Harvard?

17  A.   I've heard of it, yes.

18  Q.   It's a good university?

19  A.   Apparently.

20  Q.   Apparently?

21  A.   Yes.

22  Q.   Not a fan of Harvard, are you?

23  A.   I wasn't -- I didn't go there, but I understand it's a top

24  university.

25  Q.   It's a top university here in the United States, right?

```
 1   A.   Absolutely.

 2   Q.   Did you know she also did a fellowship at the University of

 3   North Carolina?

 4   A.   That's great.  Yes.  No, I did not know that.

 5   Q.   And she's got decades of experience in running labs.  Did

 6   you know that?

 7   A.   No, I did not know that.

 8   Q.   She has a similar background to yourself; is that right?

 9   A.   Apparently, yes, from what you told me.

10   Q.   And did you know that she was interviewed twice by the

11   government?

12   A.   No, I have no knowledge of that.

13   Q.   And did you try and speak to Ms. Wildemore about her

14   operations of LabSolutions?

15   A.   Absolutely not.

16   Q.   So you did not participate in the interviews that these

17   prosecutors conducted of Ms. Wildemore?

18   A.   No, I did not.

19   Q.   Did you know that they interviewed her just a month ago?

20   A.   No, I did not.

21   Q.   With respect to your lab --

22   A.   Yes.

23   Q.   -- do you have requisition forms?

24   A.   Yes, I do.

25   Q.   And did you help develop those requisition forms?
```

1   A.   Yes.

2   Q.   And did you use your background and expertise as both a

3   scientist and a doctor to develop the tests on those

4   requisition forms?

5   A.   Yes, I did.

6   Q.   And did it take you some time?

7   A.   It takes a lot of time, yes.

8   Q.   Did you consult with other people in designing those?

9   A.   Yes.

10   Q.   Did you consult with other scientists?

11   A.   Yes.

12   Q.   Did you consult with some lay people?

13   A.   Yes, yes.

14   Q.   Okay.  Did you know that Ms. Wildemore has told the

15   government that she helped develop the requisition forms at

16   LabSolutions?

17   A.   No, I do not know that person.

18   Q.   The very requisition forms that you have been shown during

19   the course of your testimony here today.

20        Did you know that she helped develop those?

21   A.   No, I did not know that.

22   Q.   The government did not tell you that?

23   A.   No.

24   Q.   With respect to the tests that are run at your lab --

25   A.   Yes.

1   Q.   -- you, as the laboratory director, are in some ways, I

2   guess, responsible for the tests.

3   A.   Yes.  The medical lab director is responsible for the

4   tests.

5   Q.   Because you have the background, the scientific experience,

6   and all the rest of that, that allows you to be the laboratory

7   director at your lab.

8   A.   Correct.  You also hold the license for the lab as a

9   medical director.

10  Q.   I'm sorry, sir.  I couldn't hear you.

11  A.   As a medical director, you have a licensed responsibility

12  to oversee the lab, yes.

13  Q.   You have a licensed responsibility as the medical director

14  of a lab that requires you to oversee the lab testing that's

15  done at that lab; is that right?

16  A.   Correct.

17  Q.   And there are various certifications that one gets as a

18  laboratory director that you only get to keep if you fulfill

19  those responsibilities, right?

20  A.   Correct.

21  Q.   Have you ever heard of a CLIA certification?

22  A.   Yes, I have.

23  Q.   And what's that?

24  A.   It's a certification -- it's a license to operate a medical

25  diagnostic lab provided by the state of Florida.

1   Q.   Are there CLIA certifications for each state?

2   A.   Yes.

3   Q.   And do you know what it means to have a COLA certification?

4   A.   A COLA is a different accreditation body that can provide

5   certifications.

6   Q.   Is that also for labs?

7   A.   Yes.

8   Q.   Is it easy to get a COLA certification?

9   A.   No, none of them are easy.

10   Q.   Is it easy to get a CLIA certification?

11   A.   No, it's not easy to get any certification.

12   Q.   Have you ever heard of -- I think it's called CAP

13   accreditation?

14   A.   Yes, I'm a CAP inspector.

15   Q.   What is that?

16   A.   That's a College of American Pathologists.  It's an

17   organization of pathologists that oversee laboratory

18   accreditation.  And it also oversees education of pathologists,

19   and is also a government lobby for pathologists to further

20   pathology issues with the federal government.

21   Q.   It's not easy to get CAP accreditation either, is it?

22   A.   No, it's not.

23   Q.   Did you know that LabSolutions is CLIA certified?

24   A.   No, I did not.

25   Q.   Did you know that LabSolutions was COLA certified?

1    A.    No.

2    Q.    Did you know that LabSolutions had CAP accreditation?

3    A.    No, I did not know that.

4    Q.    Now, the person that helps make sure that happens is the

5    laboratory director, right?

6    A.    Correct.

7    Q.    So Ms. Wildemore, presumably, had some role in making sure

8    that LabSolutions got CLIA certified, COLA certified, and CAP

9    accredited?

10    A.    I would assume so, yes.

11    Q.    Is that a continuing -- are there continuing requirements

12    to have CLIA certifications, COLA certifications, and CAP

13    accreditation?

14    A.    Yes.

15    Q.    And what are those?

16    A.    The lab must do internal testing once every year.  They

17    have to engage in proficiency testing to ensure that the lab

18    certification and accuracy is correct, and they have on-site

19    inspections typically every two years.

20    Q.    So folks come to the lab.  Do they announce that they're

21    coming?

22    A.    No, they have a surprise visit.  You have a window of time

23    when you're expecting them.

24    Q.    And who does the inspections; are they government folks?

25    A.    No.

1   Q.   Who does it?

2   A.   It's peers.

3   Q.   Peers.  Peers in the industry?

4   A.   Correct.

5   Q.   They may show up at LabSolutions, for example, if they get

6   a CLIA certification, unannounced, to do an inspection; is that

7   right?

8   A.   That is correct.

9   Q.   And is the same true of CAP?

10  A.   Yes.

11  Q.   And is the same true of COLA?

12  A.   Yeah.  I don't know COLA very well, but I assume it's true.

13  Q.   And it's because of those unannounced visits that a lab has

14  to have processes in place and things in order because you

15  never know when they're going to show up.

16  A.   That is correct.

17  Q.   And it's the responsibility of Dr. Wildemore to make sure

18  that that was happening at LabSolutions.

19  A.   Yes.

20  Q.   In addition to being ready for these inspections, do labs

21  typically have to have standard operating procedures?

22  A.   They must have.

23  Q.   Yes.  And so in order to get CLIA certified, COLA

24  certified, or CAP accredited, you have to have standard

25  operating procedures, right?

 1   A.   That is correct.

 2   Q.   They're called SOPs?

 3   A.   Yes.

 4   Q.   And the lab director is responsible for coming up with

 5   those SOPs, right?

 6   A.   Yes, in conjunction with other lab staff, yes.

 7   Q.   And so it would be Dr. Wildemore's responsibility to have

 8   SOPs at LabSolutions in place, correct?

 9   A.   Yes.

10   Q.   And if you don't have those in place, you may lose your CAP

11   accreditation?

12   A.   Correct.

13   Q.   You may lose your COLA accreditation?

14   A.   Yes.

15   Q.   You may lose your CLIA accreditation?

16   A.   That's right.

17   Q.   And the government didn't tell you anything about any of

18   the standard operating procedures or anything else that

19   Dr. Wildemore did to maintain operations at LabSolutions?

20   A.   No, I was not aware of any of those.

21   Q.   Do you know if you need to have CAP accreditation, CLIA

22   certifications, or COLA certifications, to bill Medicare?

23   A.   I believe you do need to have those, yes.

24   Q.   Can Medicare also come to do random inspections of labs?

25   A.   Absolutely.

1    Q.   At any time, correct?

2    A.   Yes.

3    Q.   They can show up at any moment to inspect the lab, right?

4    A.   Correct.

5    Q.   And if you don't have your things in order, they can

6    suspend your ability to bill Medicare, right?

7    A.   Absolutely, yes.

8    Q.   And it is the lab director's responsibility, Dr. Wildemore,

9    therefore, to make sure things were in place so that they can

10   continue to be a Medicare provider?

11   A.   That is correct.

12   Q.   Now, you said that these tests, the genetic tests that

13   you've testified to, even the most trained doctors may not

14   understand how those tests can be used to treat patients; is

15   that right?

16   A.   That is correct.

17   Q.   So from time to time, you will go ahead and actually

18   educate doctors about what these tests mean so they can

19   probably treat their patients?

20   A.   Yes.

21   Q.   Now, ultimately, it's the doctor's responsibility that

22   orders a test to ensure the medical necessity of that test,

23   correct?

24   A.   Yes, they're the ones that are ordering and signing that.

25   Q.   And it's the doctor's responsibility to use that test to

1    treat their patient; is that right?

2    A.   That is correct.

3    Q.   Now, a lot of your testimony this morning was about your

4    observations concerning the documentation of patient

5    encounters; is that right?

6    A.   Correct.

7    Q.   And based on your review of the various documents -- 417, I

8    think, was one of them, 417-C, you were critical of the

9    documentation that was provided by the doctor; is that right?

10   A.   Yes.

11   Q.   And I think with respect to 417-C, that was patient H.K. or

12   K.  Do you remember that?

13   A.   Vaguely.  I don't have it in front of me.

14        MR. RAFFERTY:  Can we bring up 417-C.  If we could

15   highlight the top, just the name.

16   BY MR. RAFFERTY:

17   Q.   Dr. Magliocco, that's the notes of the encounter with

18   Ms. K., right?

19   A.   Currently, yes.

20   Q.   And you were critical of the documentation of the doctor in

21   this case.

22        MR. RAFFERTY:  And if we could go to the right-hand

23   side of the page.  The top.

24   BY MR. RAFFERTY:

25   Q.   And that would be Dr. Huan Tsai, right?

1   A.   Correct.

2   Q.   And you were critical of Dr. Tsai's documentation in this

3   particular encounter; is that right?

4   A.   Yes.

5   Q.   But you couldn't conclude, if I understood your testimony

6   correctly, that the test he ordered was medically necessary or

7   not; is that right?

8   A.   That is correct.

9   Q.   And that's because there's just not enough information that

10  Dr. Tsai put in here to justify the test; is that right?

11  A.   Yes.

12  Q.   And you also testified -- I'm sorry.  Did I interrupt you,

13  sir?

14  A.   No, no, you didn't.  I just said, yes, the information was

15  inadequate as --

16  Q.   Inadequate.  Okay.

17       But you also can't say the test wasn't medically necessary,

18  you just didn't have enough information; is that right?

19  A.   That is correct.

20       MR. RAFFERTY:  And if we can go to the last page.

21  BY MR. RAFFERTY:

22  Q.   I think, if you go to the top half of the page, where it

23  says, past medical history, I think you've testified that she

24  would be potentially a strong candidate for the test.

25  A.   The information is hard to understand.  If this is actually

1    correct, that the patient had kidney cancer, and that their

2    father had brain, kidney, and breast cancer, this patient would

3    be a strong candidate for genetic testing.

4    Q.   And in fact, I think you testified that many of the

5    patients that you saw could potentially benefit -- or the files

6    for the patients that you saw could potentially benefit from

7    the kind of testing we're talking about here today.

8    A.   Yeah.   There's no question, many of these patients could

9    potentially benefit from genetic testing.

10   Q.   Your main criticism is the doctor didn't do a good job,

11   whether it's Dr. Tsai or somebody else, in documenting the need

12   for the test, correct?

13   A.   Absolutely.

14   Q.   And it is the doctor's job to properly document his

15   encounter with his or her patient?

16   A.   That is correct.

17   Q.   It is not the lab's job to make sure that the doctor is

18   properly documenting in his patient files.

19   A.   That's not the lab's job.   The doctor needs to document

20   their encounter.

21   Q.   It's the doctor's job to document the encounter, correct?

22   A.   Correct.

23   Q.   Because I think you said that the doctor's own medical

24   records are like legal documents.

25   A.   They are legal documents.

1   Q.   They are legal documents.   They are critically important,

2   and the doctor has to do a good job of documenting the

3   encounter with the patient; is that right?

4   A.   Absolutely.

5   Q.   And it is the doctor's job to discuss, I think you said,

6   the risks of the test?

7   A.   Yes.

8   Q.   It is the doctor's job to discuss the benefits of the test?

9   A.   Yes.

10  Q.   It is the doctor's job to use the test.

11  A.   Correct.

12  Q.   It is not the lab's job to do any of those things?

13  A.   The lab does not normally do those things.

14  Q.   And I'm not going to go through all the different notes

15  that you've already testified to.   But suffice it to say that

16  with respect to all of them, your criticism with all of the

17  notes that you've seen is directed at the doctor and the

18  documentation of those doctors that did that.

19  A.   That is the information I had, and was asked to comment on.

20  Q.   The last piece that I wanted to talk to you about for a

21  second are these recordings.   We've listened to one recording.

22  You've listened to some others.

23       Number one, did you know that those recordings were never

24  sent to LabSolutions?

25  A.   No.

1  Q.  Did you know that there might be recordings with the

2  doctors, too?

3  A.  I don't know that.

4  Q.  The government did not tell you that LabSolutions never got

5  those recordings?

6  A.  No.

7  Q.  The government did not tell you that the doctors' encounter

8  with patients was often recorded, as well?

9  A.  No, I was not told that.

10       MR. RAFFERTY:  If I could have a moment, Your Honor?

11       THE COURT:  You may.

12    (Discussion was held off the record.)

13  BY MR. RAFFERTY:

14  Q.  Have you ever heard of an entity called my MyOnCallDoc?

15  A.  MyOnCallDoc?  No, I haven't.

16  Q.  Are you familiar with telemedicine companies generally?

17  A.  Not really.  A little bit.

18  Q.  Do you know if MyOnCallDoc is a telemedicine company?

19  A.  I have no idea.

20  Q.  Do you know if MyOnCallDoc had the responsibilities to

21  maintain recordings between the patients and doctors?

22  A.  I don't know.

23  Q.  Do you know if MyOnCallDoc provided recordings to the

24  government, the recordings of encounters between the patients

25  and the doctors?

1   A.   No, I have no idea.

2         MR. RAFFERTY:   I think that's all I have, Your Honor.

3   I have no further questions.

4         THE COURT:   Thank you, Mr. Rafferty.   Redirect?

5         MS. DE BOER:   Thank you, Your Honor.

6                        ^ * REDIRECT EXAMINATION

7   BY MS. DE BOER:

8   Q.   Dr. Magliocco, you were asked some questions by the defense

9   about the fact that you did not speak to patients or interview

10  patients that we talked about today.

11        Do you recall that question?

12  A.   Yes.

13  Q.   Did you need to speak with any of those patients to know

14  that the records that we looked at are completely

15  cookie-cutter?

16  A.   No, I did not need to interview the patients.

17  Q.   And you were asked about telemarketing just now and those

18  phone calls, the phone calls that we listened to.

19        Is telemarketing ever an appropriate way to determine if

20  somebody needs a cancer genetic test?

21  A.   It's never appropriate.

22  Q.   Why not?

23  A.   It's not the appropriate practice of medicine.   The patient

24  needs to be referred by their care provider for genetic

25  testing, if that's in their care plan.

1  Q.  Let me ask you, has your lab ever been approached by a

2  telemarketing operation as a way to market?

3  A.  Yes, it has actually.

4  Q.  And what was your response?

5  A.  My response was it's an inappropriate way to obtain

6  patients.

7  Q.  And Mr. Rafferty asked you some questions about how the lab

8  never got those telemarketing calls.

9      What, if any, questions did Mr. Rafferty ask you about what

10  payments the lab was making for telemarketing to occur?

11  A.  I don't believe there was any questions on that from him.

12  Q.  And all those cookie-cutter patient files that we looked

13  at, these patients that we looked at together, they were

14  ordered the same tests; is that correct?

15  A.  Yes.

16  Q.  And the document said almost verbatim the same thing for

17  many of those patients; is that correct?

18  A.  That's correct.

19  Q.  All right.  So what does that say to you -- let me back up

20  for a second.

21      We looked at a few, right?

22      Did you look at others?

23  A.  Yes, I looked at a lot.

24  Q.  And how similar were the ones that you looked at to what we

25  saw in court today?

1    A.   Many were precisely the same.  But mostly they were similar

2    in the documentation and the way that events were documented,

3    meaning, that they were very brief.

4    Q.   So what, if anything, does that say to you about the

5    medical process that was utilized here?

6    A.   It implies to me that it was done very quickly and

7    superficially and incompletely.  So that was the impression I

8    had by reviewing many, many of these documents, dozens and

9    dozens of them, that they were done, apparently, in haste, with

10   very brief notes, sometimes just words, incomplete sentences,

11   and often contradictory information in the report.  And as you

12   pointed out, parts of reports that didn't appear to be

13   appropriate, for example, pregnancy, prenatal testing with a

14   cancer patient.

15   Q.   Okay.  And Mr. Rafferty asked you a lot of questions about

16   your opinion about whether these patients, in fact, needed the

17   test.  In other words, whether they could be people who

18   qualified for this types of test.

19        Do you remember those questions?

20   A.   Yes.

21   Q.   Put aside whether they qualify for a test.  What about the

22   consideration of, is this a test that's going to be used to

23   help the patient?  How does that factor into your analysis?

24   A.   Well, that's the primary purpose of ordering a test.  Tests

25   are expensive and costly, and they have risks.  So a doctor is

1   considering to order a test because they believe it's medically

2   necessary.  They're actually signing a document saying this

3   test is medically necessary, and I'm going to use the

4   information to treat my patient.  That's why -- what's what a

5   doctor does when they order a test.

6   Q.  Okay.  And if the test is not used to help the patient and

7   there's no plan for using the test to help the patient, if the

8   patient actually needs the test, isn't that worse?

9   A.  Yes, in my opinion, that would be almost worse, yes.

10  Q.  And you were asked a lot of questions about the role of a

11  lab versus the role of a doctor, correct?

12  A.  Yes.

13  Q.  And they have different roles; is that fair?

14  A.  Yes.

15  Q.  All right.  And you were also asked questions about the

16  role of a non-medical lab owner and the role of a medical lab

17  director.

18      Do you recall those questions?

19  A.  Yes, I do.

20  Q.  And they have different roles; is that fair?

21  A.  Yes, they do.

22  Q.  Regardless of what hat you have on, is it ever -- does

23  everybody, including the lab owner and the medical director,

24  have to play by the rules?

25  A.  Absolutely, there are rules that govern the operation of

1    labs.

2    Q.   Okay.  And regardless of whether you're the non-medical

3    owner or you're the medical director, is it ever appropriate to

4    pay for a doctor's order?

5    A.   It's never appropriate to pay for a doctor's order.

6    Q.   All right.  And is it appropriate for a non-medical lab

7    owner to pay for doctors' orders and then blame his medical

8    director?

9         MR. RAFFERTY:  Your Honor, object.  There's no evidence

10   of that.  It's an objectionable question.

11        THE COURT:  Overruled.  You may answer.

12        THE WITNESS:  That is inappropriate, in my opinion.

13   BY MS. DE BOER:

14   Q.   Okay.  And going back to those telemarketing calls for a

15   second, is it ever appropriate to prey on people's fear of

16   cancer to convince them to take a genetic test?

17        MR. RAFFERTY:  Objection to the form of the question,

18   Your Honor.

19        THE COURT:  Overruled.

20        THE WITNESS:  It's never -- patients who have cancer

21   are vulnerable.  Elderly patients are vulnerable.  It's never

22   appropriate to take advantage of them.

23   BY MS. DE BOER:

24   Q.   All right.  And last question, Dr. Magliocco:  Do you

25   recall the reference in many of those charts that we looked at

1    to IDGAF?

2    A.   Yes.

3         MR. RAFFERTY:  I'm going to object.  This is outside

4    the scope of redirect.  I didn't ask anything about IGDAF.

5         THE COURT:  Understood.  Overruled.  You may answer.

6    BY MS. DE BOER:

7    Q.   This is just a yes-or-no question, Doc.  Do you know what

8    IGDAF stands for?

9    A.   No, I don't.

10   Q.   Good for you.

11        MR. RAFFERTY:  Brief redirect, Your Honor?

12        THE COURT:  Very brief, please.

13        MR. RAFFERTY:  Thank you, Your Honor.

14                    RECROSS-EXAMINATION

15   BY MR. RAFFERTY:

16   Q.   Doctor, you were asked about the role of the medical

17   director, again, on redirect; is that right?

18   A.   Yes.

19   Q.   As the medical director of a lab, if you ever saw something

20   inappropriate, you'd have the ability to shut that lab down,

21   right?

22   A.   Yes.

23   Q.   Do you know if Dr. Wildemore ever did that?

24   A.   I don't know Dr. Wildemore or what she did.

25        MR. RAFFERTY:  No further questions, Your Honor.

```
 1            THE COURT:  Anything else, Ms. de Boer?

 2            MS. DE BOER:  No, Your Honor.  Thank you.

 3            THE COURT:  Thank you very much, Doctor.  You're

 4   excused.

 5            THE WITNESS:  Thank you.

 6            THE COURT:  You're welcome.

 7            Government's next witness?

 8            MS. GURSKIS:  The United States calls Kimberly Foss.

 9            THE COURT:  Okay.  Hi, ma'am.  Come on up.  We'll swear

10   you in.

11            THE COURTROOM DEPUTY:  Please raise your right hand.

12            (Government witness, KIMBERLY FOSS, duly sworn.)

13            THE COURTROOM DEPUTY:  Please be seated.  Speak into

14   the microphone say, and spell your name for the record.

15            THE WITNESS:  My name is Kimberly Foss,

16   K-i-m-b-e-r-l-y, F-o-s-s.

17                      ^ * DIRECT EXAMINATION

18   BY MS. GURSKIS:

19   Q.  Good morning, Ms. Foss.

20   A.  Good morning.

21   Q.  Where are you from?

22   A.  I live in North Carolina.

23   Q.  What is your educational background?

24   A.  I have a degree in biology, a -- an undergraduate degree in

25   biology with a minor in chemistry, and I have a master's of
```

 1   science in genetic counseling.

 2   Q.   Are you currently employed as a genetic counselor?

 3   A.   I am.  I work at the University of North Carolina at Chapel

 4   Hill.

 5        MR. RAFFERTY:  Your Honor, can the witness just be

 6   asked to speak up?  I'm having a hard time hearing.

 7        THE COURT:  Speak as loud as you can into the

 8   microphone.  Thank you.

 9        THE WITNESS:  No worries.

10   BY MS. GURSKIS:

11   Q.   Do you use cancer genetic tests in your practice?

12   A.   I do.

13   Q.   Can you briefly explain to the jury what exactly a genetic

14   counselor does.

15   A.   Yeah, absolutely.  So I'm a medical provider.  I meet with

16   patients and families that have a personal or family history

17   that's suggestive of a genetic condition, with a cancer clinic

18   that's -- individuals that have a personal history of cancer, a

19   family history of cancer, and we utilize that information to

20   determine if genetic testing makes sense for them.

21        Most cancer is actually sporadic or random, and is not

22   associated with a germline or a genetic change that you got

23   from your parents or other family members.  So not everybody

24   needs genetic testing.  But a genetic counselor will take your

25   personal history, your family history, and then decide if

1    genetic testing makes sense for you.

2         And then we provide education on what genetic testing does,

3    the limits -- the limitations of genetic testing, the benefits

4    of genetic testing.  And then we help coordinate that test for

5    the individual.

6         And on the back end, when the results come back, we provide

7    information about what that test means for their ongoing

8    medical management and what that means for their family

9    members.

10   Q.  So I heard you say that you -- when you provide the results

11   to the patient, it helps you work with a patient to make

12   decisions on their ongoing medical management?

13   A.  That's right.

14   Q.  So is that your primary use of genetic tests in your

15   practice?

16   A.  Yes.  Most of the time, genetic testing is going to be used

17   to help figure out how to take care of someone.  So if you

18   already have cancer, it's figuring out if there's certain

19   treatments that make more sense for you, or if there's

20   screening that we need to be doing for other types of cancer

21   that you might have a higher risk for.

22        If you have a family history of cancer, it's figuring out,

23   do you need to get screening more frequently than other

24   individuals, do you need to start your screening at a younger

25   age, because you have a higher risk of developing cancer based

1    on a genetic change.

2    Q.   Is the type of cancer genetic test important in your

3    practice?

4    A.   Yes, very.

5    Q.   Can you explain what you mean?

6    A.   So there's a lot of genetic tests.  We have over 20,000

7    genes in our body.  That's a ton of information.  And it really

8    takes an experienced provider to determine, based on your

9    specific personal history, your specific family history, what

10   genes do we need to look at for you.  We don't need to look at

11   20,000 genes for every single person that comes into the

12   hospital.  Usually, it's one gene or two genes.  It might even

13   be ten genes.  But usually, it's pretty specific on what we

14   need to test based on the specific personal or family history.

15        So the test is very important, and that's one of the main

16   things that genetic counselors do, is figure out what test

17   makes sense for this person, because we want to make sure that

18   we're looking at the right thing.  We don't need to look at

19   things that are not relevant to that particular clinical

20   situation.

21   Q.   And how does the cost of the test or insurance coverage

22   factor into your decision of whether to order a cancer genetic

23   test for one of your patients?

24   A.   It's probably the biggest.  So as a medical provider, we

25   have a responsibility to only order tests that are medically

1    necessary for our patients.  So genetic tests are expensive.

2    And so we want to make sure that we only test what's important

3    to that person.

4        Most medical insurance companies have pretty specific

5    guidelines on who they think has a high enough pretest

6    probability.  So based on your personal history, your family

7    history, is the chance that you have a genetic change high

8    enough that it's worth doing a expensive test, like a genetic

9    test.  So we want to make sure that it's a good test, that it's

10   going to give us information that's relevant to that person.

11       Now, people can self pay for tests, but it's my job as the

12   provider that I recommend tests that I think are going to be

13   useful and not recommend tests that are not going to be helpful

14   or important for that individual moving forward.

15   Q.  Ms. Foss, have you ever treated a patient named K.A.?

16   A.  Yes.

17       MS. GURSKIS:  Your Honor, at this time the government

18   wishes to admit Government's Exhibit 410, which includes the

19   redactions that Mr. Rafferty requested yesterday.

20       THE COURT:  Any objection?

21       MR. RAFFERTY:  No objection, except as previously

22   stated.

23       THE COURT:  No objections.  That'll be admitted at this

24   time.

25       (Government Exhibit 410 was received in evidence.)

1    BY MS. GURSKIS:

2    Q.   How did Ms. A. come to be your patient?

3    A.   She was referred by her primary care physician, the doctor

4    that she goes to on a regular basis for check-ups, because she

5    had a -- she had brought an abnormal genetic test result to her

6    primary care physician.  That physician was unfamiliar with the

7    condition that was diagnosed by that report.  And so they

8    referred her to the genetics department at the university.

9    Q.   So I'm going to show you the first page of what's been just

10   admitted as Government's Exhibit 410.

11        Is this the referral?

12   A.   Yes.  So when a patient's referred to our group, we ask

13   that the referring provider give us medical records so we can

14   better understand why the patient's being referred to us.  So

15   this is the front sheet that basically tells us that this is a

16   physician's assistant that this patient sees on a regular

17   basis, that's requesting that the individual be seen by a

18   genetics provider.

19   Q.   And did you review the results prior to meeting with Ms.

20   A.?

21   A.   Yes.  The primary care provider included the genetic test

22   report in the referral.

23        MS. GURSKIS:  I'm now showing the third page of

24   Government's Exhibit 410.

25   BY MS. GURSKIS:

1   Q.   Do you recognize this document, Ms. Foss?

2   A.   I do.

3   Q.   What is it?

4   A.   So this is a genetic test report.  So this is what the lab

5   gave to the patient after -- to summarize the results of her

6   genetic test.

7   Q.   And moving to the middle of the page, I see something

8   called, result summary, positive.  Pathogenic variant detected.

9   Variant identified, VHL.  And then there is a disease that's

10  highlighted, hereditary cancer, predisposing syndrome.

11  A.   That's right.

12  Q.   A lot of complicated sounding things.

13  A.   Yeah.  Genetics is complicated.

14  Q.   What is VHL?

15  A.   So in this specific report, anything that is in capital

16  letters and is italicized is the name of a gene.  So VHL is

17  indicating a specific gene that was looked at.  And many people

18  probably already know this, but just being a genetic counselor,

19  I have to explain what these are.

20       So genes are pieces of DNA that we have inside every single

21  cell of our body.  If we were to take one cell and open the

22  nucleus, we would have 46 pairs of chromosomes, and those

23  chromosomes are just pieces of DNA that are wound up really,

24  really tightly.

25       So when you get a genetic test, and you take that sample,

1   they break open the cells, and they take the chromosomes and

2   actually unwind them, and then they focus in on a certain

3   segment of DNA, and that segment is known as a gene.

4       So with this particular genetic testing, they looked at

5   specific genes that are associated with an increased risk for

6   cancer.  And this particular report is telling us that in the

7   VHL gene, there was a mutation or a change.  So the C dot

8   indicates at position 257 of this specific VHL gene, there's

9   typically a letter C in that position, and in this individual

10  there was a letter G.  So that one letter switch changed the

11  function of the gene.

12  Q.   And what does VHL stand for?

13  A.   Von Hippel-Lindau Syndrome.  It is a hereditary cancer,

14  predisposing syndrome, like the report indicates.  Individuals

15  that have a change in this gene have an increased risk to

16  develop certain types of tumors and cysts in their body.

17  Q.   Do people who have VHL develop symptoms early on in life,

18  later on, never develop symptoms?

19  A.   Yeah.  So VHL is a condition that we call highly penetrant.

20  So which is a way of saying if you have a change in this gene,

21  it's almost certain you will have symptoms of the condition.

22  One reference will say it's up to 97 percent of individuals

23  that have a change in the VHL gene will have some symptoms by

24  the age of 60.

25  Q.   And I think I heard you say something about tumors.  Could

1   you very briefly explain what those symptoms might be, how they

2   would manifest in somebody.

3   A.   Absolutely.  So I'm going to say a lot of words that might

4   be unknown or unfamiliar.  But there's a certain type of tumor

5   called a hemangioblastoma.  That's very common with VHL.  And

6   that can happen in the central nervous system, so the spine or

7   the brain.  There can be hemangioblastomas in the eye, in the

8   retina.  There can be something called an endolymphatic sac

9   tumor, which happens in the inner ear.  There can be cysts in

10  the kidneys, the pancreas, the genital tract.  There can be

11  renal cell carcinoma, which is a certain type of kidney cancer.

12      So symptoms would be cysts or tumors in the body.  There

13  can also be hearing loss, if there's one of those tumors in the

14  inner ear.  There could be changes to vision, which would

15  indicate tumors in the eye.

16  Q.   Is that a difficult condition for somebody to manage?

17  A.   Yes, it is -- again, it's very penetrant, meaning, a lot of

18  people get symptoms.  It can actually happen -- the symptoms

19  can start very early.  So we actually recommend screening in

20  childhood, which is unusual for a cancer predisposition

21  syndrome.  Usually, those are adult-onset conditions.  This is

22  one that we can see those tumors earlier in life.  So we

23  actually start screening someone in childhood with MRIs, blood

24  tests.  You know, they do MRIs of the brain, MRIs of the

25  abdomen, looking at the kidneys.

1      So it's a very comprehensive workup that's required for

2  management of this condition.

3  Q.   Did you ultimately meet with Ms. A. or have an appointment

4  with her?

5  A.   I did.

6  Q.   Do you recall your first appointment with her?

7  A.   I do.

8  Q.   What happened during that appointment?

9  A.   So I was under the assumption that she had this genetic

10  condition.  So the first thing to do was to take a full

11  personal and family history.  The notes that I had gotten from

12  her provider had not mentioned any personal history of cancer,

13  but I wanted to make sure that that was all correct.

14      I was surprised, this being someone in their late 70s, with

15  absolutely no tumors or symptoms consistent with VHL.  That was

16  surprising to me, again, thinking these are people that usually

17  have symptoms, and can get them fairly early on.  In addition,

18  I took a full family history.  Again, if this is a genetic

19  change, it's an autosomal dominant condition, which just means

20  we have two copies of this gene in our body.  We get one from

21  our mom and one from our dad.  And so the vast majority of the

22  time, probably about 80 percent of the time that someone has a

23  VHL mutation, they've inherited that either from their mom or

24  their dad.  So we would expect to see a family history of these

25  cysts and tumors, as well, either from parents, aunts, uncles,

1   grandparents.

2       I took her family history.  She has two children in their

3   40s and 50s, no cysts or tumors.  She has a brother.  Two

4   parents that lived into their 80s, no cysts or tumors.  Both

5   parents had many siblings.  And the family history had

6   absolutely nothing that was consistent with VHL.

7   Q.   I'm going to show you page 59 of Government's Exhibit 410.

8       Do you recognize this, Ms. Foss?

9   A.   Yes.

10  Q.   What is this?

11  A.   This is the note that I wrote after meeting with the

12  patient.

13  Q.   And then under assessment, is that describing what you were

14  just explaining to the jury?

15  A.   Yes.

16  Q.   And did you come up with a plan of care for Ms. A., based

17  on this appointment?

18  A.   I did.  And actually, this note was written, I would say, a

19  few days -- I tried to take a couple of days before I wrote

20  this note.  Because after I met with the patient and her

21  personal and family history were inconsistent with the

22  condition, I wanted to make sure I understood the genetic tests

23  that she had.  So I made multiple attempts to call the

24  laboratory --

25          MR. RAFFERTY:  Your Honor, if we can approach?

1           THE COURT:  Come sidebar.

2           (The following proceedings were held sidebar:)

3           MR. RAFFERTY:  We are going down the road that I raised

4    yesterday.  I am concerned, Your Honor, that she's about to

5    talk about the multiple attempts to call the lab.  The lab is

6    closed because of the indictment, so she shouldn't be

7    testifying about how she tried to call them because -- the

8    reason they can't answer is because the government indicted Mr.

9    Patel and the lab got closed.

10          THE COURT:  Right.

11          MR. RAFFERTY:  So I'm asking her to move on.

12          THE COURT:  You've already told her, so she knows.

13          MR. RAFFERTY:  Can we excuse the jury and have the

14   Court instruct her to not talk about this?

15          THE COURT:  It might not be a bad idea to do that.

16          Can you stay away from this for a few minutes, before I

17   break?

18          MS. GURSKIS:  I just want to clear up -- my

19   admonishment was exactly what was discussed yesterday, which is

20   there is to be no mention of her Googling the lab or any press

21   about the lab.

22          MR. RAFFERTY:  She started to say -- the reason she

23   can't reach the lab is because the government issued an

24   indictment.  The lab was closed.

25          THE COURT:  No, I understand.

 1          MR. RAFFERTY:  So I would ask that we move on from this

 2    area.

 3          THE COURT:  Just try to move on.  But I'm going to --

 4    if something starts, I'll shut it down.  But let's keep it

 5    moving.

 6          (Proceedings returned to open court.)

 7    BY MS. GURSKIS:

 8    Q.   Hi, Ms. Foss.  Sorry about that.

 9          So moving on from the phone calls that you were just

10    referring to, did you discuss this particular case or patient

11    with other people in your practice?

12    A.   I did.

13    Q.   And did that inform the medical decisions that you made in

14    this particular circumstance?

15    A.   It did.

16    Q.   Can you explain that?

17    A.   So I work in a group of medical geneticists and other

18    genetic counselors, both in the clinic and in the lab, just to

19    talk through the scenario of an individual testing positive for

20    a rare genetic condition, did not have a personal and family

21    history that was consistent with that particular condition.

22    And therefore, we determined that the best step would be to

23    order analysis of that same exact gene in a different

24    laboratory.

25    Q.   And did you ultimately decide to do that?

1    A.   We did.

2    Q.   And did you order those tests?

3    A.   Yes.

4    Q.   Okay.  And did Ms. A. explain to you anything about the

5    provider who had ordered the test for her?

6    A.   Yes.  So in order to really understand the situation, I

7    wanted to better understand how she had the genetic test that

8    she had.  This is all -- what she remembers was that someone

9    called her and told her --

10            MR. RAFFERTY:  Your Honor, I'm going to object at this

11   point on hearsay.

12            THE COURT:  Let's go ahead and not discuss anything

13   that was stated to you outside of court, ma'am.

14            MS. GURSKIS:  Your Honor, it is in the course of a

15   medical appointment.

16            THE COURT:  Let's just move on to another question, if

17   we could, please.

18            MS. GURSKIS:  Yes, Your Honor.

19   BY MS. GURSKIS:

20   Q.   Did you ever have any communication or contact with the

21   provider who ordered the test for Ms. A?

22   A.   No.  I tried to reach out to them and wasn't able to.

23            MR. RAFFERTY:  Your Honor, I object.

24            THE COURT:  It's all right.  Let's move on.  That's

25   fine.

1    BY MS. GURSKIS:

2    Q.   So you ultimately ordered another test for Ms. A.

3    A.   Yes.

4    Q.   Okay.  And what were the results of that test?

5    A.   They were negative.  Meaning, she did not -- the other

6    laboratory did not find a genetic change in the VHL gene.

7    Q.   And moving back to your first appointment with Ms. A., what

8    was her demeanor when discussing the plan of care and VHL and

9    the other things at issue in her medical appointment?

10   A.   She was overwhelmed.  This was something she was unfamiliar

11   with.  She felt caught off guard, unprepared, uneducated on

12   what exactly was done and what this meant for her.

13        This is also someone who is on a fixed income, and so she

14   was very nervous about the cost of screening, the time

15   commitment.  She has other medical issues in which she sees

16   other providers.  So to add a pretty comprehensive screening on

17   a regular basis, she was nervous about the time commitment.

18   She was nervous about out-of-pocket expenses, and if these

19   things would be covered by her medical insurance.

20        Overall, she has kids, grandkids.  She was very, very

21   nervous about the implications for her family, and that they

22   would also have an increased risk for cancer.

23   Q.   So I think you said when you had the test rerun, you did

24   not observe the VHL in that particular test?

25   A.   No.

1  Q.  Is that unusual for you to see two totally different

2  results from genetic tests?

3  A.  Yes, very.

4  Q.  Did you provide the new results of the test to Ms. A.?

5  A.  I did.

6      MS. GURSKIS:  I'm now showing the witness page 24 of

7  Government's 410.

8  BY MS. GURSKIS:

9  Q.  What is this document, Ms. Foss?

10  A.  This is a results summary letter.

11  Q.  Okay.  So in the first sentence, it says, It was a pleasure

12  speaking with you at the UNC Cancer Genetics Clinic on

13  April 21, 2020.

14      Prior to sending this letter, did you have a consultation

15  with her regarding her results?

16  A.  Yes.  So this -- this letter was written after the

17  additional genetic testing was ordered.

18  Q.  And what happened during the consultation with her

19  regarding the results from the different test?

20  A.  So we explained that on the additional genetic testing, we

21  did not find any changes in the VHL gene.

22  Q.  What was her reaction to that?

23  A.  Overall, I believe she was relieved.  She felt -- she was

24  very glad that she did not have this increased risk of cancer.

25  She was very glad that she was not going to have extensive,

1  comprehensive medical workup on a regular basis.  And I think

2  she was also very glad that her family members -- that we were

3  not going to recommend any genetic testing for her children,

4  her brother, nieces, nephews, grandkids.  It goes on.

5       But I think also she was very confused on why she had had

6  two of the same tests that gave her two separate results.  And

7  I think she had a lot of questions on why there was a different

8  answer on the two tests that she had had.  I think it was

9  confusing, but it also made her feel a little bit untrustworthy

10  of genetic testing in general.

11       MR. RAFFERTY:  Your Honor, I think we're going well

12  beyond the question that was asked by the government.

13       THE COURT:  Overruled.  Let's go ahead and stay on task

14  here a little bit.  I think we've heard a lot about the

15  background and what was discussed.  So next question.

16       MS. GURSKIS:  Thank you, Your Honor.

17  BY MS. GURSKIS:

18  Q.  I just want to draw your attention for a moment back to the

19  original form -- original test that was provided to you by

20  Ms. A. from LabSolutions, the first test.

21       MS. GURSKIS:  And this is page 5.

22  BY MS. GURSKIS:

23  Q.  Do you see this says it has been reviewed and approved by

24  somebody identifying themselves as a laboratory director?

25  A.  That's right.

1    Q.   And the date on the report is July 11, 2019?

2    A.   Yes.

3    Q.   Then it looks like there's a note on the bottom, July 9,

4    2019, refer to genetic counseling B.

5         Is that your notation?

6    A.   No.

7    Q.   And what is this mutations in the family section here?

8    A.   On the laboratory report, it's indicating that because the

9    test indicated a mutation in the individual, that the -- that

10   family members may also be at risk.  And again, this is an

11   autosomal dominant condition.  So if one of your two copies are

12   changed, you have a 50/50 chance of passing that gene change

13   down to your children.  So we always recommend testing

14   first-degree relatives when we identify an autosomal dominant

15   condition in an individual.

16   Q.   How often have you had two completely different results

17   from two different labs in your practice?

18   A.   This was the first time, in my experience.

19   Q.   Did you take any further action after this event with

20   Ms. A.?

21   A.   Yes.  Based on all the information that she had given me,

22   and the two separate lab reports, I reported this case to the

23   Medicare fraud line.

24   Q.   And prior to ordering that second test, did you have any

25   concerns about insurance coverage for the second test?

1    A.   Yes.  Both myself and the patient were somewhat concerned

2    that her insurance would not pay for a genetic test of a gene

3    that she had already had genetic testing for.  So I was able to

4    communicate with the laboratory that we ordered the second test

5    from, and we tried very hard to make sure we emphasized the

6    unique circumstances of this case to help the insurance

7    understand this was not a repeat test, we were aware that she

8    had been tested for the gene, and that they need to agree with

9    that.

10   Q.   And the insurance was?

11   A.   Medicare.

12   Q.   Do you know if Medicare ended up covering her second test?

13   A.   I'm not sure.  I don't know.

14        MS. GURSKIS:  Nothing further.  Thank you, Your Honor.

15        THE COURT:  Thank you very much.

16        MR. RAFFERTY:  I could be brief, Judge.

17        THE COURT:  Yeah.  If you could, Mr. Rafferty.  Thank

18   you so much.

19                        CROSS-EXAMINATION

20   BY MR. RAFFERTY:

21   Q.   Good morning, Ms. Foss.

22   A.   Good morning.

23   Q.   Thank you for coming here today.  Can you tell us again

24   what your educational background is.

25   A.   Yeah.  I have an undergraduate degree in biology and

1    chemistry, and I have a master's in science and genetic

2    counseling.

3    Q.   And how long have you been doing that?

4    A.   Ten years.

5    Q.   And with respect to this patient, it sounds like what's

6    happened -- what happened is she took some sort of genetic

7    test; is that right?

8    A.   Yes.

9    Q.   She received those results from that lab, right?

10   A.   Yes.

11   Q.   The lab results, she took to her doctor, right?

12   A.   Yes.

13   Q.   And her doctor referred her to genetic counseling, to you;

14   is that right?

15   A.   That's right.

16   Q.   And you've been in the healthcare field for a fairly long

17   period of time, I guess, right?

18   A.   Ten years.

19   Q.   And mistakes happen in healthcare; isn't that right?

20   A.   Yes.

21   Q.   There's something called malpractice, right?

22   A.   Yes.

23   Q.   Doctors make mistakes?

24   A.   Yes.

25   Q.   Laboratories make mistakes?

1    A.   Yes.

2    Q.   Laboratories make mistakes at times because of human error,

3    somebody makes some sort of misstep when they're doing the

4    test; is that right?

5    A.   Yes.

6    Q.   There are instances with these instruments where the

7    instruments might malfunction, correct?

8    A.   Yes.

9    Q.   There's software error?

10   A.   Yes.

11   Q.   There's all sorts of things that go on that could produce

12   an inaccurate test result; isn't that right?

13   A.   That's right.

14   Q.   Have you ever heard of something called Sanger?

15   A.   Sanger sequencing.

16   Q.   What's that?

17   A.   It is a technology that's used to sequence genes.

18   Q.   And you're familiar with that?

19   A.   Yes.

20   Q.   Is there a way to Sanger test results that come back

21   positive?

22   A.   Yes.

23   Q.   Have you ever heard of a company called QIAGEN?

24   A.   Yes.

25   Q.   What's that?

1   A.   It's a genetic testing -- it's a company that makes

2   products that can assist in genetic testing protocols.

3   Q.   Do you know if there was any contract between QIAGEN and

4   LabSolutions?

5   A.   I have no idea.

6   Q.   Do you know anything about the background of Dr. Wildemore

7   that was on the document you saw?

8   A.   I do not.

9   Q.   Do you know if LabSolutions had any other genetics

10  specialists that were on staff?

11  A.   Yes.

12  Q.   Have you ever heard of a company called PerkinElmer?

13  A.   Yes.

14  Q.   And that's a fairly large, well known, genetic testing

15  company, right?  It's publicly traded, right?

16  A.   That's right.

17  Q.   Have you ever heard of a lady by the name of Madhuri Hegde?

18  A.   No.

19  Q.   Did you know she works at PerkinElmer?

20  A.   I did not know that.

21  Q.   Did you know she was also a consultant at LabSolutions?

22  A.   I did not know.

23  Q.   Did you know she had a contract with LabSolutions?

24  A.   I do not.

25         MR. RAFFERTY:  If I can have a moment?

1                THE COURT:  Sure.

2           (Discussion was held off the record.)

3                MR. RAFFERTY:  I have no further questions, Your Honor.

4      Thank you.

5                THE COURT:  Thank you, Mr. Rafferty.

6                Any redirect?

7                MS. GURSKIS:  Nothing from the government, Your Honor.

8                THE COURT:  Thank you very much, ma'am.  You're

9      excused.

10               All right, ladies and gentlemen of the jury.  It makes

11     sense for me to go ahead now and take our lunch break, it's

12     just about 12:20, before we get into another witness too deep

13     into the lunch hour.

14               Let's go ahead and give you guys until 1:45.  So that

15     will give me an opportunity to clear up some stuff over the

16     lunch break that I need to handle for you all.  But that's

17     going to be our reunion time.  So if you would all be in the

18     jury room by then, and we'll begin with our next witness for

19     the government.

20               Please remember, of course, that should you run into

21     anyone from either side, government or defense, when you're

22     frequenting any lunch establishments, that you take no offense

23     if they leave the establishment when they see you, as they

24     must.

25               And certainly, don't discuss what you have heard, what

1   you have seen with anyone else in the jury, with family or

2   friends, or to even engage in any sort of research, independent

3   research, through Google or WebMD or anything else on the

4   internet.  And please continue to stay off social media as you

5   have done up until this point.

6          You can go ahead and leave your notepads in the jury

7   room.  Take them with you now.  We will go ahead and take our

8   break at this time.  You're excused.

9          MR. SADOW:  Your Honor, one second before we do that?

10  Can we just approach?

11         THE COURT:  Sure.  Give me one second, folks.

12     (The following proceedings were held sidebar:)

13         MR. SADOW:  We're wrestling with the issue on No. 7.

14  We're not sure who that is.  Is there a way for you to identify

15  who that person is before we go, maybe just to stand up for a

16  second to see which one it is?

17         THE COURT:  Why don't we do this.  I'm going to mention

18  her by name and have her share a flight update, and that way we

19  all know.

20         MS. DE BOER:  Thank you.

21     (Proceedings returned to open court.)

22         THE COURT:  Before I let you go, I don't want to single

23  anybody out, but, Ms. Martinez, Lilybett Martinez, if you would

24  hang back with us, I just want to touch base with you on a

25  scheduling issue.

1          Everybody else, you're free to go and have your lunch

2     break.  Thank you very much.

3          THE COURT SECURITY OFFICER:  All rise.

4        (Jury exits at 12:20 p.m.)

5          THE COURT:  Please have a seat, ma'am.

6          So, Ms. Martinez, I don't want to single you out and

7     belabor this, but my courtroom deputy has indicated that you've

8     really gone above and beyond trying to see if you can fix your

9     flight.  I really appreciate your efforts.  My understanding is

10    you have a flight that leaves this evening.

11         Am I right on that?

12         THE JUROR:  Yes.

13         THE COURT:  What time does it leave tonight?

14         THE JUROR:  At 10:00.

15         THE COURT:  And we're going to get you out way in

16    advance of that.  And the challenge is becoming the flight

17    return.

18         I understand you won't land until Monday; is that

19    right?

20         THE JUROR:  Yes.

21         THE COURT:  And has there been any possibility of

22    moving it to Sunday evening, or you can't find an option?

23         THE JUROR:  I can't find an option.

24         THE COURT:  Couldn't find an option.  All right.

25         Where are you headed by the way, just so I know?

1          THE JUROR:  Nashville.

2          THE COURT:  Nashville.  When you come back on Monday,

3     when does the flight land?

4          THE JUROR:  It lands at, like, 8:58 or something.

5          THE COURT:  So close to 9:00 o'clock.  The challenge

6     is, as I understand it, it's not landing in Miami

7     International, right; it lands in Fort Lauderdale, at around

8     8:58, 9:00 o'clock.  Okay.

9          I'm going to talk about it with the lawyers because,

10    obviously, we may have to make some accommodations on Monday.

11    So in the event that you are landing in Fort Lauderdale around

12    that time, and it's on time, if we start, we may have to start,

13    obviously, a bit later.  So I just want to figure out what I'm

14    going to do regarding your schedule.

15         THE JUROR:  I'm sorry.

16         THE COURT:  It's okay.  I know you've done everything

17    you can.  And you've alerted us to it, and you've tried.  I

18    can't ask for anything more.  Let me touch base with the

19    lawyers.  If we change our plan at all, we will let you know.

20    Okay?

21         THE JUROR:  Thank you.

22         THE COURT:  Have a great lunch.  You're welcome.

23         (Juror exits.)

24         THE COURT:  Okay.  Everyone please be seated.

25         Look, I will tell you, I'm not terribly optimistic

1    about her sticking around with us, if only because logistics

2    from Broward, from Fort Lauderdale to here, at that time of

3    day, assuming no delays and she comes straight, we'll be lucky

4    if she's here by 11, 11:30.

5         So again, we're making good progress.  I don't think

6    it's a deal breaker.  If we feel strongly that we can start a

7    little later on Monday and still stay on schedule, great.  But

8    this is why we have 16 jurors.  So unless someone feels like we

9    really can just work with her schedule and start a little

10   later, perhaps the start time on Monday is 1:00 o'clock, and we

11   just tell the jurors have lunch before you even come.  I mean,

12   that would be what I would suggest to give everyone a cushion,

13   if we feel really strong about allowing her to continue to

14   participate.

15        Does the government have any feelings on this point?

16        MS. DE BOER:  Yes, Your Honor.  We would prefer to keep

17   the juror.  We think your suggestion of -- suggestion that the

18   jury eat a bigger breakfast or eat lunch early and we start

19   later, I think that will make up a little bit of the time.  I

20   think we've made up some time this week already that we had

21   lost.  For example, two days ago, we didn't anticipate starting

22   Sporn.

23        THE COURT:  Didn't anticipates starting Sporn, and it

24   looks like, certainly, we're probably going to be able to do

25   that without a problem, right?

 1          MS. DE BOER:  I would agree.

 2          THE COURT:  Yeah.

 3          MS. DE BOER:  And we're going to continue to evaluate

 4   our case and cut where we can.  We already have cut one witness

 5   that we thought would testify yesterday.

 6          So I think we're endeavoring to move this along, and

 7   that's been successful.  I'd like to keep the juror.  We think

 8   that starting a little bit later and taking a shorter break

 9   would sort of be the best way to meet in the middle.

10          THE COURT:  Okay.  What do you think on the defense

11   side, guys?

12          MR. SADOW:  We think we need to talk about it.

13          THE COURT:  Okay.  Not a problem.  We have plenty of

14   time to decide; you guys let me know.  Certainly, my proposal

15   would be to either excuse her, and we can go ahead and use one

16   of our four alternates, or I would have a later start.

17          I think -- frankly, I think it makes more sense just

18   simply to tell all jurors we're going to start right on time,

19   to be here by, let's say, even 12:30, and we would all have an

20   earlier lunch and not have a lunch break, and just do,

21   essentially, a half day, one to five, let's say with a break at

22   3:00 o'clock.  That would probably be the way to manage it for

23   that witness -- excuse me -- that juror.  That would be the

24   only thing I'd consider.  I don't think it's realistic to say

25   we're going to start at 11:00.  I mean, I could also try saying

1    I want everyone here by 11:00 o'clock.  And if she can give an

2    hour of her attendance from 11:00 to 12:30, that would be

3    great.  So that also might be another opportunity, just to tell

4    all the jurors we're going to have a later start and

5    accommodate, and I'll make the start time 11:00 o'clock.  I

6    think, certainly, even if she lands at 9:00, even with a delay,

7    we're looking at her getting here by 11:00 straight from Fort

8    Lauderdale, it can be done.

9         So I'm flirting with those two ideas.  Let the defense

10   sit down.  You guys talk about it.  Let me know what you

11   prefer.  And we'll reconvene and make a judgment call by the

12   end of today.

13        MR. SADOW:  We'll be able to give you an answer as soon

14   as lunch --

15        THE COURT:  Sure.  Just let me know.  And you all tell

16   me what you think in terms of if we're going to keep her, what

17   you prefer to do, if we want to have a later start, and when

18   that would be.  I think that might be the best option.

19        MR. SADOW:  Our only concern, and this is what we've

20   been discussing, is at some point, I know the government's

21   moving through, and I think they're optimistic about trying to

22   finish next week.  I'm not quite as optimistic as they are.

23   And I'm concerned that we're going to get into the third week,

24   and then the emphasis is going to be on the defense to put it

25   up in a quick session.  And we don't really want to be in

1    that -- the jurors at that point are going to be -- you know,

2    we've had the government up for three weeks, let's get this

3    done.  Losing a half a day could be a problem.  But let us talk

4    about it.

5         THE COURT:  I agree.  That's my concern, too.  I don't

6    want to put the defense in a bad spot and have us crunched for

7    time at the end as the holidays approach.  And I also agree

8    with you that my biggest focus here is getting the government

9    to rest at some point by the end of next week.  So I think we

10   have some options.

11        Let me ask before we break, also, on the government's

12   end, how are we looking then for our next witness now that

13   Ms. Foss is done?

14        Is Mr. Sporn the witness for this afternoon.

15        MS. DE BOER:  It will be Amy Roebuck first, and then

16   Mr. Sporn.

17        THE COURT:  Very good.  And I don't think Ms. Roebuck,

18   it sounded like, is going to be a lengthy witness.

19        MS. GURSKIS:  No, Your Honor.

20        THE COURT:  So that works for me.  If we go with

21   Roebuck, get Roebuck done, get Sporn started, probably try to

22   get through Sporn's direct is my goal.  As I said, we're going

23   to not have the cross begin on Sporn this afternoon.  So our

24   goal really is just to see if we can complete Sporn's direct,

25   or get close to it.  And let the cross pick up on Monday.  And

1    then I think we have Dr. Yogel probably on Monday, is what it

2    sounds like.

3          MS. DE BOER:  We need to confirm with him, and we'll

4    talk over lunch to figure out --

5          THE COURT:  What Monday looks like.

6          MS. DE BOER:  And it may depend on when we start, too.

7          THE COURT:  That's what I wanted to do.  So as the

8    defense is looking into their situation for Monday, as well, I

9    think it might be worthwhile for the government to look at what

10   Monday would bring in terms of lineup.  Because that's going to

11   matter, right.

12         You guys have to bank on the fact that if we're letting

13   this juror go, then your witness lineup won't really be limited

14   because we're going to probably start again early.  But if we

15   are going to have her show up a little later, you just want to

16   make sure we plan someone to be back up once we're done with

17   Sporn, if that's how far we get, right?  That would be the

18   goal.

19         MS. DE BOER:  Right.

20         THE COURT:  Okay.

21         MR. SADOW:  And obviously, our position or my position,

22   in particular, is if there's going to be a cooperating witness

23   on Monday, please just let me know who that is, and let's not

24   change it on Sunday.

25         THE COURT:  I don't think.  So I think the only

1    cooperator we'll be dealing with is Sporn.  I think Sporn is

2    going to be -- Sporn will be the one witness that will be

3    crossed on Monday, is what it sounds like.

4          MS. DE BOER:  That one witness that would be crossed, I

5    think.  I think it depends on if we have a full day Monday, it

6    could be a cooperator.  If we don't have a full day, we have to

7    sort out some travel and maybe get another employee here or

8    patient.  We'll sort it out.

9          THE COURT:  Okay.  So keep me posted.  If you guys can

10   look into it over the lunch hour, and let me know what you're

11   thinking.  And then we can go forward and make a judgment call

12   when we get back.  So with that being said --

13         MR. SAMUEL:  Your Honor?

14         THE COURT:  Yes.

15         MR. SAMUEL:  On the afternoon witness, Roebuck.

16         THE COURT:  Yes.

17         MR. SAMUEL:  Ms. Gurskis and I are trying to work out a

18   few issues.  If we don't work them out, we may need your

19   attention a few minutes before the jury comes out.

20         THE COURT:  Thanks.  I'll come out and see if you guys

21   have worked out the issues when we come back from recess.

22         Thank you.

23         We're going to take our lunch break at this time.

24   We're in recess.

25         MS. DE BOER:  Thank you, Your Honor.

1          THE COURT:  You got it.

2        (Court recessed at 12:29 p.m.)

3        (Back on the record at 2:18 p.m.)

4          THE COURT:  Back from lunch in the United States versus

5    Patel.

6          First thing we wanted to deal with -- the jury is ready

7    to go.  Any issues, Ms. Gurskis, on evidence that I believe you

8    wanted to confirm with Mr. Samuel about?

9          MS. GURSKIS:  No.  I met with Mr. Samuel over the lunch

10   break.  We agreed to sort of extractions to what has been

11   marked as Government's Exhibit 1723.  So we will make sure that

12   the version that goes back to the jury has these pretty

13   significant chunks of pages removed, which Mr. Samuel and I

14   discussed.

15         THE COURT:  Very good.

16         And am I clear -- and apologies if I forgot.  Our next

17   witness is not going to be Sporn.  It's Roebuck, right?  Did I

18   get that right?

19         MS. GURSKIS:  Yes, that's correct, Your Honor.

20         THE COURT:  So that's taken care of.  So that works.

21         Mr. Sadow, yes, I wanted to hear the defense's view on

22   Ms. Martinez, the juror who has the flight conflict on Monday.

23         Do you guys have a sense on what you would prefer to

24   do?

25         MR. SADOW:  Our preference would not be to waste an

1   entire morning.  Our concern will be that we're going to run

2   out of time on the defense.  Unfortunately, if we're pushing,

3   that might be held against us.

4        THE COURT:  You know what?  I thought about it too.  I

5   have to say, I share in that concern.  I don't doubt you guys

6   are keeping up the pace, but losing a whole morning to me on

7   week two is a lot.  So I tend to agree.  This is the reason why

8   we have 16 jurors.

9        She did do everything she could humanly possibly do.

10  And I even gave her a letter in the hopes it would help

11  transfer a flight so maybe they would give some exception to

12  her.  But there's nothing else that we can do.  If we find

13  ourselves with her flight delayed, we may lose a whole day,

14  right, waiting for her, and it will be a waste of time.  It is

15  too risky.

16        So the Court is prepared to let Ms. Martinez go.  I

17  don't want to make a show of it now in the middle of what's

18  going on.  I'm going to keep her here, but when we finish at

19  5:00 o'clock, I will let her know her service has come to an

20  end.  And we'll move into using our first alternate, who on my

21  list is going to be Mr. Santana Martinez, Juror 13, becomes

22  Juror 12.

23        Okay?  So we will take care of that.  I appreciate the

24  government's understanding.  I have no doubt you'll be able to

25  finish.  But I also don't want you to be under the gun as we

1    are pushing to wrap up next Friday on the government's side.

2            I'm glad we talked through it.  Let's go ahead and get

3    back on pace here.  We're going to go ahead and get our jurors.

4            We are going to bring up Ms. Roebuck next.  Go ahead

5    and bring them in.  Thank you.

6            THE COURT SECURITY OFFICER:  All rise for the jury.

7        (Jury enters at 2:21 p.m.)

8            THE COURT:  Please be seated, everyone.  Welcome back,

9    ladies and gentlemen.  I trust that if you wanted coffee, you

10   got coffee, I hope.

11           All right.  Very good.  Thank you, guys.  I know that's

12   what we need on a Friday afternoon at 2:20.  Okay?

13           So we'll pick up where we left off, and turn it back to

14   the government for our next witness.

15           Government's witness.

16           MS. GURSKIS:  Thank you, Your Honor.  The government

17   calls Amy Roebuck.

18           THE COURT:  All right.  We'll get Ms. Roebuck on up

19   here.

20           Good afternoon, ma'am.  We're going to have you come

21   around here and have you sworn in.

22           THE COURTROOM DEPUTY:  Please raise your right hand.

23       (Government witness, AMY ROEBUCK, duly sworn.)

24           THE COURTROOM DEPUTY:  Please be seated.  Speak into

25   the microphone, say and spell your name for the record.

 1          THE WITNESS:  It's Amy, A-m-y.  Last name, Roebuck,

 2   R-o-e-b-u-c-k.

 3                    DIRECT EXAMINATION

 4   BY MS. GURSKIS:

 5   Q.   Good afternoon, Ms. Roebuck.

 6   A.   Good afternoon.

 7   Q.   Where are you from?

 8   A.   I am from the Atlanta, Georgia, area.

 9   Q.   What is your educational background?

10   A.   I have a bachelor's degree in history and political

11   science, a master's in education and also a doctorate in law.

12   Q.   Can you briefly tell the jury what types of jobs you've

13   held since graduating law school?

14   A.   Certainly.  I started my career as a real estate attorney

15   and did that for 12 to 15 years, and then switched over to a

16   new area of law, which was healthcare compliance, and I have

17   been in that field for about six years now.

18   Q.   Have you ever worked at a company called LabSolutions?

19   A.   Briefly.

20   Q.   You said "briefly."  How long did you work at LabSolutions?

21   A.   I was there -- began on July 15th of 2019 and worked there

22   approximately four weeks until the company was closed, around

23   mid-August, the same year.

24   Q.   You said you worked in the healthcare industry for about

25   six years?

1   A.   In compliance specifically.

2   Q.   Okay.

3   A.   But I did work for an additional ten years on a part-time

4   basis at a couple of hospitals in the Metro Atlanta area.

5   Q.   What role did you have at the hospitals?

6   A.   I began there with billing and insurance, doing some of the

7   business office task, registering patients, and then parlayed

8   that into compliance positions.  My first compliance position

9   was as a compliance analyst.

10       I then left the hospital that I was at for over a decade

11   and took a promotion, which was as the privacy officer of

12   another hospital in the Metro Atlanta area.

13   Q.   Was your experience at LabSolutions the first time you

14   worked at a lab?

15   A.   It was.

16   Q.   What was your job title?

17   A.   Compliance officer.

18   Q.   How did you find out about the position?

19   A.   I found it on a job board.  I believe it was

20   ziprecruiter.com.

21   Q.   After finding the job on ZipRecruiter what happened next in

22   the hiring process?

23   A.   I was originally called by the director of human resources

24   there and did a phone screening.  I came in the next week, I

25   believe, and had a meeting with the human resources director as

1   well as the CEO of LabSolutions.

2   Q.   Do you remember the names of the human resources director

3   and the CEO?

4   A.   The human resources director was Donna Krüger, and the CEO

5   for LabSolutions was Nick Saliba.

6   Q.   Before you started the job, what was your understanding of

7   what the compliance officer position would involve?

8   A.   From my conversations with Mr. Saliba, it was my

9   understanding that this role was to come in and be an in-house

10   compliance specialist, to sort of marry the different

11   components of compliance -- healthcare compliance under the

12   laboratory setting and sort of oversee the day-to-day tasks

13   that were related to compliance.

14   Q.   Were you replacing anybody?

15   A.   No, ma'am.  It was a new position that was created.

16   Q.   So was part of your job creating that program?

17   A.   It was.

18        MS. GURSKIS:  Your Honor, at this time, the government

19   would like to move in Government's Exhibit 1723 subject to the

20   page removals previously agreed to with Mr. Samuel.

21        THE COURT:  Any objection, Mr. Samuel?

22        MR. SAMUEL:  No objection.

23        THE COURT:  Very good.  We'll admit it at this time.

24        (Government Exhibit 1723 was received in evidence.)

25        MS. GURSKIS:  Permission to publish, Your Honor?

 1          THE COURT:  Granted.

 2          MS. GURSKIS:  Thank you.

 3    BY MS. GURSKIS:

 4    Q.   Do you see this document on the screen, Ms. Roebuck?

 5    A.   Yes, ma'am.

 6    Q.   What is it?

 7    A.   This appears to be the job description for the compliance

 8    officer position at LabSolutions.

 9    Q.   And turning your attention to the duties and

10    responsibilities, who was the compliance officer going to be

11    reporting to according to this job post?

12    A.   To me, it appeared that it would be reporting to the CEO

13    and the governing body for LabSolutions.

14    Q.   Is that who you ultimately ended up reporting to?

15    A.   It was not.  When I started the position, there was some

16    discussion, and there appeared to be confusion to me as to who

17    would actually be the supervisor for this position.  It was

18    ultimately decided that I would report to the director of human

19    resources.

20    Q.   Was that pretty standard, to report to the director of

21    human resources as the compliance officer?

22    A.   It has not been, in my experience.  In previous compliance

23    positions that I've held, I have reported to the chief

24    compliance officer when I worked beneath that position.

25          Typically, from my experience in the hospital healthcare

1    field, normally there is a reporting to the CEO of the

2    organization as well as a governing board.

3    Q.   So more consistent with what is in this --

4    A.   That is correct.  Yes, ma'am.

5    Q.   And you mentioned you have worked in compliance roles at

6    other companies.

7         At the other companies you worked for, what was the role of

8    the compliance officer?

9    A.   The compliance officer was to oversee the daily compliance

10   activities.  They were to maintain policies and procedures for

11   employees regarding healthcare compliance issues.  They would

12   consult with external and internal stakeholders within the

13   organization, so you were typically speaking with any legal

14   counsel that might represent the organization as it related

15   strictly to compliance issues.

16        We would do auditing and monitoring of certain activities,

17   maintain HIPAA compliance, and the chief compliance officer in

18   each of those positions oversaw the daily in-and-out operations

19   of the compliance program within the organization.

20   Q.   And taking you back to when you started, I think you

21   mentioned that it was a little bit disjointed, or not

22   necessarily prepared for your arrival.

23        Can you describe what you remember about your first day at

24   work?

25   A.   When I got there originally, there was, I guess, just some

1   administrative tasks to be performed, regular paperwork that I

2   would have expected to complete as a new employee.

3        I remember having a working lunch with my immediate

4   supervisor, the director of human resources.  We sort of talked

5   about and collaborated about some of the things that -- I asked

6   her to point out that she would see as compliance issues that

7   might be HR-related.

8        I also did some inquisition to see if there were any

9   employees of the lab that were maybe not called compliance

10  professionals or compliance specialists but were handling

11  compliance roles within the organization.

12  Q.   And did you learn anything about whether there were any of

13  those types of employees at the organization?

14  A.   My understanding was that there was not.  Of course, human

15  resources, the director was doing certain compliance

16  initiatives.  They were dealing with employment laws and those

17  sorts of things, handbooks, policies, things that would be HR

18  compliance and with governmental regulations for labor law.

19  But there were no specific healthcare compliance tasks that I

20  was made aware of.

21  Q.   Was this the first time you worked at a company that didn't

22  already have a compliance program in place, whether it was

23  informal or formal?

24  A.   Yes, ma'am.

25  Q.   You mentioned that you met or worked under Ms. Krüger, who

```
 1   I think you said was the director of HR?
 2   A.  Yes, ma'am.
 3   Q.  And that you interviewed with the CEO, Mr. Saliba?
 4   A.  That's correct.
 5   Q.  What other employees of the lab did you meet?
 6   A.  I had a meeting just in passing with the other officers of
 7   the company, the CFO, the CEO.  I also met with the vice
 8   president of sales, director of sales, and those were primarily
 9   the officers at the company.
10       I did also meet some of the sales reps.  They would come in
11   for onboarding, and I would do some healthcare compliance
12   overview for them.
13   Q.  The sales reps who you mentioned meeting, were they
14   employees of the company, or were these contractors?
15   A.  They appeared to be contractors.  I did also work with, not
16   directly, but just in passing -- was introduced to the billing
17   department, the laboratory employees, but no real working
18   relationship with those folks.
19   Q.  You mentioned some of the upper-level folks who you met.
20   A.  Mmm-hmm.
21   Q.  I heard you say VP of sales.  Who was that?
22   A.  Jon Berarducci.
23   Q.  And who was the CFO who you said you met?
24   A.  Sonal.
25   Q.  Do you remember Sonal's last name?
```

1   A.   I do not recall her last name.

2   Q.   Okay.  And did you meet the owner of the lab?

3   A.   I did meet Minal Patel.

4   Q.   Okay.  And turning to Mr. Patel for a second, the owner,

5   what was your understanding of his role at the organization?

6   A.   My understanding was that he ran the day-to-day operations,

7   oversaw all of the daily tasks for the laboratory, and he was

8   the chief officer there in charge of the day-to-day.

9   Q.   What gave you that impression?

10  A.   I was never given any specific title or specific tasks.  It

11  was more related to conversations from the other employees who

12  said that he ran the company --

13         MR. SAMUEL:  Object to hearsay.

14         THE WITNESS:  -- that he was never --

15         MR. SAMUEL:  Object to hearsay.

16         THE COURT:  One second.  One second, ma'am.  That's

17  going to be sustained, okay?

18         Let's not talk about what was said outside of the

19  courtroom.  I'll let you know if you can answer.

20         That's sustained.  Next question.

21  BY MS. GURSKIS:

22  Q.   Did you have any direct contact with Mr. Patel that you can

23  recall?

24  A.   I met him originally in passing.  I did have one phone

25  conversation with him.  During the short duration that I was

1    there, we did not interact other than those two events.

2    Q.   And the phone conversation that you had with Mr. Patel,

3    what do you recall about talking with him?

4    A.   There was an issue that was given to me regarding a patient

5    who had attended a health fair.  Apparently, according to the

6    information I was given, the health fair was not supposed to

7    bill for testing that was received; it was a free service that

8    was used for testing for potential health issues in the future.

9         Apparently, one of the patients from the health lab did

10   receive a bill.  She had called and spoke with someone in the

11   billing department at LabSolutions --

12        MR. SAMUEL:  Your Honor --

13        MS. GURSKIS:  She's relaying conversation with

14   Mr. Patel.

15        THE COURT:  That was my understanding too.

16        MR. SAMUEL:  That was not clear to me.

17        THE COURT:  Yeah.  No.  That's my understanding too.

18   It's Patel information, correct.  Understood.

19        Continue, ma'am.

20        THE WITNESS:  In regards to that, he did call with a

21   follow-up call.  He asked me to give a -- place a phone call to

22   one of the employees who conducted the health fair to discuss

23   the situation.

24        Apparently, in the beginning, the patient was -- felt

25   comfortable that the billing was being done correctly, that the

1   insurance was being resolved, and that these charges were going

2   to be removed from her account.  When that didn't happen, I was

3   asked to call the individual who conducted the health fair and

4   discuss the matter further in detail.

5   BY MS. GURSKIS:

6   Q.   Okay.  And who did Mr. Patel tell you to call?

7   A.   Chris Miano.

8   Q.   Okay.  What do I have here on the screen, Ms. Roebuck?  Do

9   you recognize that?

10  A.   Yes, ma'am.  These look like my notes that I took while

11  employed at LabSolutions.

12  Q.   And down here, I'm seeing a notation called Chris Miano?

13  A.   Yes, that's correct.

14  Q.   Did you get any other understanding from Mr. Patel about

15  exactly what was happening at the health fair?

16  A.   I did not.

17  Q.   Okay.  And aside from -- and in terms of Mr. Miano's role

18  with LabSolutions, what was your understanding of his

19  relationship with the company?

20  A.   I was told that he basically conducted health fairs for

21  LabSolutions.  I wasn't given any specifics as to whether or

22  not he was employed or otherwise.

23  Q.   Okay.  And did you receive any other information or learn

24  anything during your time at LabSolutions about how

25  LabSolutions marketed its tests?

1    A.   I did not.

2    Q.   No one told you?

3    A.   No, ma'am.

4    Q.   You didn't get any kind of pamphlet or training or anything

5    on that?

6    A.   No, ma'am, not to my recollection.

7    Q.   Did you get any kind of information on the compensation

8    structure for these marketers?

9    A.   I did not.

10   Q.   And you mentioned that Mr. Patel was, I think, at the helm

11   of LabSolutions, and you also mentioned Sonal.

12   A.   Yes, ma'am.

13   Q.   And how often would you interact with Sonal?

14   A.   I remember having sort of a meet-and-greet with her with my

15   direct supervisor initially upon being hired.  I can only

16   recall one other situation when I had any actual interaction

17   with her.

18   Q.   Okay.  And what do you recall about that interaction with

19   her?

20   A.   We had a meeting regarding DocuSign, which was a system put

21   in place for digital signing of certain documents.  The vice

22   president of sales, Jon Berarducci, had asked me to assist with

23   reviewing some documents for him in DocuSign.

24       We had called because we were unsure who the signers were

25   for the computer system.  Jon had assumed, according to him,

1    that he was the only signer that was still allowed to sign

2    documents in the system.  So we got on a conference call with

3    the DocuSign rep to discuss signing privileges, adding or

4    amending signers for the system.

5    Q.  Okay.  And was that the only time that you had interactions

6    with Mr. Berarducci regarding DocuSign?

7    A.  I had met with him previously on a few occasions where he

8    conducted some training on how to use the DocuSign system.  I

9    had met with him maybe a handful of times in the last two weeks

10   of my employment there regarding the system.

11   Q.  Okay.  And did you use DocuSign?

12   A.  I was able to go in and review, but I didn't have signing

13   authority in DocuSign.

14   Q.  Okay.  Did there ever come a time that you saw your name on

15   DocuSign documents?

16   A.  There was.

17   Q.  Okay.  Can you tell us about that?

18   A.  Right before the raid, the last week that I was there, I

19   began to see some documents that appeared had been signed off

20   with my name, but I didn't have signing authority.  So it was

21   brought to my attention that the only person that could have

22   done that was Jon Berarducci because he was the signer for

23   DocuSign.

24   Q.  Sorry.  Did you say you saw some documents that had your

25   signature on it but that you had not seen before?

1    A.   My name that I had not seen before, yes.

2    Q.   What type of documents were they?

3    A.   They appeared to be contracts.

4    Q.   Contracts?

5    A.   Yes, ma'am.

6    Q.   What type of contracts?

7    A.   They looked to be contracts with representatives detailing

8    commissions and statements.

9    Q.   And had you ever seen anything before about commissions

10   prior to seeing your name on those materials?

11   A.   I had seen it in the training process with Jon, and I had

12   reviewed some to look at the language of the contract to see if

13   there were any changes that needed to be made in terms of

14   updating the documents.  It was a -- I guess a template that

15   was created prior to my arrival there.  So I had reviewed them,

16   but I had not authorized or signed off on them.

17   Q.   What was your reaction to that?

18   A.   Stunned.  I really wasn't sure how that was possible

19   without my permission to do so.  When it came to my attention,

20   I added that to a list of things that I had planned to discuss

21   with Nick Saliba when we met next.

22   Q.   Were there any other DocuSign concerns that you had while

23   at LabSolutions?

24   A.   One other.  When we called the DocuSign rep, Sonal asked if

25   they could give us the names of the individuals who were the

1    authorized signers on the account.

2       There was an employee that was mentioned that I don't

3    recall the name.  And I believe it was Sonal that stated that

4    she no longer worked with the company, but that Sonal was using

5    that as her sign -- her signature in DocuSign.

6    Q.  She was using an employee's signature who no longer worked

7    at the company?

8    A.  Previous employee, yes, ma'am.

9    Q.  Okay.  Is this another page of your notes?

10   A.  Yes, ma'am.

11   Q.  Does that refresh your memory as to who the former employee

12   might be?

13   A.  It does now, yes, ma'am.

14   Q.  And what was her name?

15   A.  Stacey Adair.

16   Q.  And what year were you working at the company?

17   A.  2019.

18   Q.  Do have any recollection of when Stacey Adair was an

19   employee -- or did you ever learn when Stacey Adair was an

20   employee of the company?

21   A.  I did not.  I was just told she was a former employee.

22   Q.  How would you describe the culture at LabSolutions?

23   A.  It was a bit different than what I was accustomed to.  I

24   guess, with my experience being more in a law firm or a

25   healthcare system, there was more of an interdepartmental

1  reliance, more collaboration between departments to kind of

2  understand how the entire process worked and the workflow of

3  the company and the organization.

4       I did not find that at LabSolutions.  It seemed a bit

5  different in terms of the employee connection.  From what I

6  gathered, just from walkthroughs or areas that I was permitted

7  to walk through based on my clearance, that a lot of employees

8  knew their department and knew their task, but they didn't have

9  a good grasp of what other employees within other departments

10 were doing or what their job functions were.

11 Q.  And that was unusual to you or normal in the culture?

12 A.  It was unusual to me.  Like I say, based on other places

13 I've been employed, I've seen more of a cohesive employee group

14 that was more process-oriented than LabSolutions appeared to

15 be.

16 Q.  Okay.  Would it be fair to describe it as siloed?

17 A.  It appeared that way to me.

18 Q.  You mentioned just a moment ago about the areas that you

19 were being permitted to walk through.

20 A.  Yes, ma'am.

21 Q.  Can you explain or add a little more color to what you mean

22 by that.

23 A.  Sure.  The lab itself, the building that it was in, had a,

24 I guess, standard security screener where you could go in with

25 card access to enter the building.

1    I was employed there for almost a month to the date, and I

2    never received any kind of access to that front door.  I don't

3    know if that was common or uncommon.  The other employees

4    appeared to be coming and going with access cards, but mine

5    would not allow me to access the door.

6    Within the building, I was in an office on the second floor

7    that I shared with another employee at LabSolutions, and I did

8    not have a key to unlock that door.  I was given one, I think,

9    in the days leading up to the raid, but I was never allowed to

10    come and go freely into that office.  I would have to sit and

11    wait for the other employee to get there before I could enter

12    the office to work for the day.

13    Q.  And what role did the other employee have?

14    A.  She was a bookkeeper.

15    Q.  Okay.  So on a typical day for you, can you walk us through

16    what that would look like, including getting to the office and

17    maybe waiting for somebody to let you in, how that would work.

18    A.  Sure.  Yes.  So I would typically get there early in the

19    morning, maybe 8:00 or so.  I think the other girl was

20    scheduled to come in at 8:30.

21    Typically I would have to wait outside until someone was at

22    the front desk that could allow me into the building.  Once I

23    was in the building, I typically went upstairs, and I often sat

24    on the floor waiting to get into the office when the other

25    employee arrived.

1       There were a couple of occasions, I believe, when one of

2   her children had a doctor's appointment.  I guess no one was

3   aware she was coming in later than normal, and I had to wait

4   until her arrival to go into the office.

5   Q.   How long would you have to wait in those situations?

6   A.   Sometimes between a half an hour on a standard day.  If she

7   was late due to traffic, it could be 45 minutes.  There were

8   occasions when I was there over an hour.

9   Q.   And in terms of the actual day-to-day and what you were

10  working on, what did the job ultimately look like when you

11  arrived at LabSolutions?

12  A.   It was very disjointed.  I couldn't find things that I

13  thought would have been very instrumental to basic compliance

14  within the laboratory.

15      I had spoken with my direct supervisor for some direction

16  to kind of point me into what current policies and procedures

17  they had in place for compliance matters, if they had any

18  billing policies and procedures that were already in place,

19  HIPAA compliance, that sort of thing, for patient privacy.

20      So I was trying to gather and ascertain if there were any

21  parts of the program that were in place being handled by other

22  people.  And I did not find -- I was given a couple, I believe,

23  of human resources policies that the supervisor there had

24  drafted, but that was all that I was given in terms of existing

25  compliance policies.

1   Q.   Okay.  So in terms of the substantive work that you were

2   doing each day --

3   A.   Yes, ma'am.

4   Q.   -- what did that look like?

5   A.   I was trying to do simple things, like start with some

6   policies and procedures for the employees.  HIPAA training was

7   very high on my priority list at the time, dealing with the

8   amount of private information that was going through the lab.

9        I did try to meet with some of the folks in the billing

10   department to see if they had some established procedures that

11   were written or otherwise.  I did do some basic compliance

12   training, as I said earlier, for some of the representatives

13   that were onboarded.

14        I did meet with Nick in passing a couple of times about

15   just some very broad issues to look into, that he wanted more

16   information on, that related to compliance.  And then I met

17   with Jon Berarducci regarding the contract training.

18   Q.   The contract training?

19   A.   Yes, ma'am.

20   Q.   How much of your day-to-day was relating to contracts

21   versus the other stuff?

22   A.   When I first started, very little of it.  I was not

23   initially tasked with doing anything that had to do with

24   contract review.  As the few weeks progressed, when I got

25   closer to the end of my employment there, we were meeting about

1   half a day every day to look at contract issues and training.

2   Q.   And aside from the contract issues and training, what --

3   were there other compliance tasks or things that you were

4   working on at the company?

5   A.   I did do some other things.   Sanction checks for new

6   representatives that were onboarded, but the aforementioned are

7   the main things that I was focusing on in the first days.   And

8   also just trying to get as much information I could as how --

9   as to what the departments did and how they processed

10  information so that I could look for any issues that needed to

11  be resolved immediately.

12  Q.   And in terms of your focus, it sounds like particularly

13  towards the end of your employment a big focus of that was this

14  review of contracts or discussions regarding contracts?

15  A.   Yes, ma'am.

16  Q.   In terms of compliance tasks or concerns, was there

17  anything that you learned about or were focusing in on

18  particularly in those last couple of weeks?

19  A.   I did take some time at the beginning to look into things,

20  since I wasn't accustomed to working for a laboratory, and it

21  was my first experience there.   I did do some research to kind

22  of look at some of the bigger issues that are a problem in

23  relation to laboratory compliance.

24       I wanted to make sure that I was, you know, updated on

25  things that are being seen the most, things that are being, I

1    guess, updated, as we would say, under the law -- state and

2    federal law.  So I did do a good bit of research as well.

3    Q.   And in terms of the contracts -- just moving back to that

4    for one moment.

5         Was there a particular aspect of the contracts that you

6    were supposed to focus on, or was it a more general review?

7    A.   It was a more general review, but one of the things I did

8    mention in passing was that I wanted to do some research into

9    commission percentages, that sort of thing, what was standard

10   for the industry, because I didn't have, I guess, a good

11   knowledge base to work from on that point.

12   Q.   On commission percentage; is that what you said?

13   A.   Correct.

14   Q.   And were you aware of any legal issues or other problems

15   that may have been going on at LabSolutions?

16   A.   I was not.  The only issue, I think, that I was really

17   looped into was the issue with the patient's account that we

18   spoke about earlier.  I was never privy to any discussions with

19   management or the officers of the company as to any other

20   business of the company, especially legal.  No outside counsel,

21   none of that, so...

22   Q.   Were you aware of whether a federal grand jury subpoena had

23   ever been issued to LabSolutions?

24   A.   I was not.

25   Q.   Nobody ever talked to you about that?

1   A.   Not to my knowledge.  I was unaware completely of that.

2   Q.   When did you stop working at LabSolutions?

3   A.   The morning of August the 16th, 2019, when the FBI raided

4   the company.

5   Q.   Okay.  Let's talk about that day.

6   A.   Sure.

7   Q.   What do you remember about -- I guess, starting with

8   arriving to work that day.  What do you remember about that?

9   A.   I actually came in that way -- I had -- day late because I

10  had a doctor's appointment that morning, so I arrived an hour

11  or so later than my normal starting time.

12       I recall that when I came into the building, I was waived

13  in as usual with security.  I started upstairs in the lab, to

14  the area where my office was located.  As I was ascending those

15  stairs, we heard some noise downstairs, where the lab area was.

16  I was concerned that there was an accident in the lab.  Maybe

17  there was someone that had been injured while working in the

18  lab.

19       So I opened the door to go back downstairs to check if

20  there were any safety concerns or to assist, if possible, and

21  that's when the FBI came through the building, and I was

22  escorted to the front lobby.

23  Q.   Okay.  Did you have any personal interaction with the FBI?

24  A.   I did.

25  Q.   And speaking specifically about your interaction with the

1    FBI, that also involved Jon Berarducci?

2    A.  Correct.

3    Q.  Can you talk about that?

4    A.  Sure.  That morning none of the officers were there.

5    Nick Saliba was not there.  I believe it was a Friday, if I'm

6    not mistaken.  It was toward the end of the workweek.  And that

7    was not atypical, for them not to be there on Fridays or to

8    come in later on Fridays, so I didn't think much about that.

9         Jon was there.  He was the only other supervisor, I guess,

10   within the building beside my direct supervisor.  And they

11   gathered all of the employees in the lobby that morning.  Of

12   course, we had to surrender phones, bags, that sort of thing.

13        I waited maybe an hour or so in there, and I saw one of the

14   agents outside talking to Jon, and I overheard the

15   conversation.  Jon turned and pointed to me and told the FBI

16   that I was the attorney.  I was the one they needed to talk to,

17   and then he conveniently got in his vehicle and left.

18   Q.  He got in his vehicle and left?

19   A.  Yes, ma'am.

20   Q.  What kind of vehicle did he drive?

21   A.  I believe it was a truck -- pickup truck.

22   Q.  After Mr. Berarducci left in the truck, did you see him

23   come back?

24   A.  I did not.

25   Q.  And were you the attorney for LabSolutions?

1    A.   I was not.  I am a licensed Florida attorney.  And as I

2    said earlier, that I was not hired in any legal capacity to

3    represent LabSolutions.  I was strictly hired has a compliance

4    officer.

5    Q.   And after that interaction where Mr. Berarducci left, did

6    anybody else from the executive level come to the lab that day?

7    A.   I was there probably three to four hours after the raid

8    took place, and I never saw anyone return.  I did see -- maybe

9    two hours into the situation, there was an elderly gentleman

10   who was being escorted at the sidewalk waiving some papers who

11   said he was the attorney for LabSolutions.  But other than

12   that, I'm not aware of anyone returning.

13   Q.   And had you ever met the gentleman before who said he was

14   the attorney for LabSolutions?

15   A.   No, ma'am, I had not.

16   Q.   I know you weren't at LabSolutions for very long, about

17   four or five weeks, but why did you stay?

18   A.   I enjoyed compliance.  I thought there was an opportunity

19   there to build a good program.  From my understanding, what I

20   learned in the weeks that I was there, it was a successful

21   company.  However, the longer I was there, things just didn't

22   seem to fit.

23        Didn't really have any evidence of anything specific, but

24   there were just a lot of little coincidences and things that

25   just gave me a bad gut feeling.  I had decided that I was going

1   to give it one more meeting with Nick Saliba.  He was, I guess,

2   the officer I was most comfortable with, that I had worked with

3   and talked to and spoke with more on a daily basis than the

4   others.

5       I did have a list that I was going to present to him of

6   things that just were a little off, or that maybe my

7   understanding wasn't correct, since I was new to the laboratory

8   environment, but the raid occurred before I was able to have

9   that meeting with him the following week.

10  Q.  You mentioned that there were some little things that were

11  concerning to you?

12  A.  Yes, ma'am.

13  Q.  What were the little things that were concerning to you?

14  A.  One thing, I guess, was just the inability to get in and

15  out of the office.  I know that sounds like a very minute thing

16  or a tedious thing.  And I'm sure there were reasons for that

17  access being limited, but it was never explained to me in any

18  way that made sense, as far as compliance or otherwise.

19      In addition, typically, when I have worked in the role of a

20  compliance professional, one of the things that's very

21  important is rounding, is going into different areas within the

22  workspace or within the organization that you work in to look

23  for things that maybe are not compliant, to educate the staff,

24  and then to do better policies and procedures going forward.

25      And because of the limited access that I had -- I was not

1  allowed to go, really, into the laboratory part of the building

2  without usually the assistance of my direct supervisor.  So I

3  couldn't go in and audit for things that to me seemed to be

4  very traditional, basic compliance matters.

5  Q.  Okay.  I'm going to show you page 67 -- or the bottom Bates

6  is 67 of Government's 410.

7       Is this the list you were referencing, or is this something

8  else?

9  A.  This is one of the lists.  These are notes that I took from

10 a meeting with Jon that we had on July 24th.  He was going over

11 some of the steps and the training that he wanted incorporated

12 into the onboarding process, which include having certain forms

13 filled out, performing sanction checks on any vendors or reps.

14      And I remember, I did make a note at the bottom of this

15 page in reference to contracts.  Jon did tell me, don't put

16 recommendations or guidance in emails to anyone regarding

17 compliance matters.  And then he also went on to say that there

18 were some advances that were coming out for some of the reps,

19 and a few new contracts, but he would send those himself.

20 Q.  Okay.  Let's talk about, I guess, both of those things.

21      So am I hearing you correctly that Mr. Berarducci told you

22 not to put recommendations or guidance regarding compliance in

23 writing?

24 A.  Yes, ma'am.

25 Q.  And separately, that this new compensation material, that

1    he would take care of sending?

2    A.  Yes, ma'am.

3    Q.  Why were those two things something that you decided to

4    write down?

5    A.  Because they just didn't sit right with me.  I'm not really

6    sure why you would hire a compliance professional, and then

7    tell them not to give you any advice regarding compliance

8    matters, or ask them to help you with contracts and then let

9    you know that they're contracts that they don't want you to

10   send, that those are going to go specifically from the vice

11   president of sales.

12             MS. GURSKIS:  One moment, Your Honor.

13             THE COURT:  Sure.

14       (Discussion was held off the record.)

15             MS. GURSKIS:  Nothing further.  Thank you.

16             THE COURT:  Cross-examination, Mr. Samuel.

17             MR. SAMUEL:  May I begin, Your Honor?

18             THE COURT:  You may.

19                       CROSS-EXAMINATION

20   BY MR. SAMUEL:

21   Q.  Ms. Roebuck, my name is Don Samuel.  I have also practice

22   law in Atlanta.

23   A.  It's nice to meet you.

24   Q.  Good to meet you too.

25             We never met before, have we?

1    A.   We have not.

2    Q.   Or talked on the phone?

3    A.   No, we have not.

4    Q.   Where are you practicing now, by the way?

5    A.   I'm currently in between positions.  I just left a law firm

6    in Atlanta that did healthcare reimbursement law.  And so I'm

7    looking to start job hunting after the first of the year.  I

8    had a few medical procedures to take care of first.

9    Q.   I want to emphasize something that you mentioned a few

10   times already.

11        The grand total of your experience with LabSolutions was

12   about 22 days; is that right?

13   A.   Sounds about right.

14   Q.   Yeah.

15        You came on July 15th, and you left on August 16th.  You

16   didn't work on Saturdays or Sundays, right?

17   A.   No, sir.

18   Q.   And on Fridays, most of the senior staff wasn't there,

19   right?

20   A.   Correct.

21   Q.   Mr. Saliba is the CEO of the company, right -- was the CEO

22   of the company, right?

23   A.   He was, correct.

24   Q.   Right.  And he actually commuted from Tennessee, correct?

25   A.   That's correct.

1    Q.   All right.  You mentioned, by the way, early on in your

2    testimony that Mr. Patel kind of ran the day-to-day operations,

3    right?

4    A.   Yes.

5    Q.   But the fact of the matter is he wasn't there very much at

6    all, was he, during the 22 days you were there?

7    A.   I did not see him very often.

8    Q.   Right.  So if he was running the day-to-day operations,

9    that's because someone told you that or because you just

10   surmised it.

11        But he wasn't actually there, was he?

12   A.   He was not there often.

13   Q.   Right.  And even in this relatively small -- the corporate

14   office as opposed to the lab itself, all one building, you only

15   talked to him one time in the 22 days you were there?

16   A.   Twice.

17   Q.   Twice?

18   A.   The day that I met him and then the one phone conversation.

19   Q.   Yes.  The day that you met him --

20   A.   Correct.

21   Q.   -- and then one phone call --

22   A.   Yes, sir.

23   Q.   -- to deal with this episode at the healthcare with

24   Mr. Miano, right?

25   A.   Correct.

1  Q.  Okay.  So your view that he ran the day-to-day operations

2  was really just an assumption on your part as opposed to

3  actually observing him doing anything on a day-by-day basis,

4  right?

5  A.  I did not have an occasion to observe him.  I was informed

6  by my direct supervisor that he was the owner.

7  Q.  The owner.

8  A.  Yes.

9  Q.  No doubt he owns the lab, right?

10 A.  Right.

11 Q.  All right.  And so the person you spent a lot of time with,

12 just from looking at your notes and, you know, the notes you

13 shared with us this afternoon and with some of the other

14 material we've been given, was the HR director, right?

15 A.  Correct.

16 Q.  And then Mr. Berarducci a lot, right?

17 A.  Yes, sir.

18 Q.  Mr. Berarducci was in charge of sales and marketing, right?

19 A.  That's correct.

20 Q.  Okay.  He had a very specific job.  He was the boss of

21 sales and marketing, right?

22 A.  That's what it appeared to me, yes.

23 Q.  And Sonal -- S-o-n-a-l -- was kind of operations and

24 finance and stuff like that, correct?

25 A.  Yes, sir.

1    Q.   Okay.  And then you had the HR person?

2    A.   Correct.

3    Q.   Ms. -- not Kugler, but --

4    A.   Krüger.

5    Q.   -- Krüger.

6         And when you came in, you came in to a nonexistent office

7    known as compliance, right?

8    A.   That's correct.

9    Q.   Because the company wanted to develop a compliance office;

10   is that right?

11   A.   That's what I was told.

12   Q.   And that's a good thing to have, right?

13   A.   Typically, yes.

14   Q.   Yeah.  The laws regarding healthcare are as complicated as

15   any laws in this country, right?

16   A.   That is correct.

17   Q.   They are more complicated than the tax code these days,

18   right?

19   A.   Yes, sir.

20   Q.   And that's why people like you, you know, when you get

21   trained in healthcare, it's not a simple matter, is it?

22   A.   It is not.

23   Q.   Even for people who are in the healthcare business, right?

24   A.   Correct.

25   Q.   One of the problems is you've got regulations, you've got

1    the Department of Health and Human Services, you've got the

2    Department of Justice writing regulations, right?

3    A.   Sure.

4    Q.   And they're as complicated as possible to understand,

5    right?

6    A.   Right.

7    Q.   And there's some of them that you don't even know, even

8    though you, as a lawyer, specialize in that kind of stuff,

9    right?

10   A.   Correct.

11   Q.   And then you have Congress passing laws, right?

12   A.   That's correct.

13   Q.   And they change the laws, right?

14   A.   Yes.

15   Q.   And they change the laws frequently, right?

16   A.   Yes, sir.

17   Q.   And in fact, they changed the law just before you arrived

18   there, didn't they?

19   A.   They did.

20   Q.   And you know that that's something that's known as EKRA,

21   E-K-R-A, right?

22   A.   Correct.

23   Q.   And that's --

24        MS. GURSKIS:  Your Honor, I'm going to object.  This is

25   far outside the scope of direct.

```
 1            THE COURT:  I'm going to permit it.  Go ahead.  It's
 2  overruled.
 3  BY MR. SAMUEL:
 4  Q.   EKRA kind of changed the relationship between the different
 5  parties in the healthcare business, right?
 6  A.   Yes.
 7  Q.   Labs, doctors, marketing.  Okay.
 8            And you, as a lawyer and in compliance, the reason they
 9  wanted you there is to help unravel all that for them, correct?
10  That's what you were told your job was going to be, right?
11  Make sure we get it right.
12  A.   Primarily, yes.
13  Q.   Okay.  I know you said a few times that you've worked in
14  compliance.  But your prior job, as I understand, was actually
15  focusing on privacy, HIPAA compliance, right?
16  A.   That is correct.
17  Q.   Okay.  And that had been for a few years, right?
18  A.   It was, as a part of an overall compliance program.
19  Q.   Right.  But then you saw this opportunity.  And again, I
20  don't -- I'm not making light of it, but for 22 days, you were
21  the compliance officer at LabSolutions, right?
22  A.   Sure.
23  Q.   Okay.  And so one of the problems you -- well, there was
24  the problem with the key, right?
25  A.   Right.
```

1  Q.  Clearly, you said maybe it's trivial, but it's an

2  incredible annoyance not to be able to get in if you were going

3  to be the one to come in early, right?

4  A.  It was to me, yes.

5  Q.  But still, stuff like that happens.  I'm a lawyer;

6  sometimes I can't get in my front door, right?  I mean, it

7  happens, right?

8  A.  Sure.

9  Q.  We couldn't get in the courtroom today after lunch because

10  it was locked.

11      It's an annoyance, right?

12  A.  Yes.

13  Q.  Okay.  In fact, they actually worked that out.  You got the

14  key like the day before the FBI showed up, right?

15  A.  Correct.

16  Q.  So that got worked out, right?

17  A.  Eventually, yes.

18  Q.  Yeah.  And the other problem was the inability to have

19  access, as you thought the compliance officer ought to have,

20  throughout the building, right?

21  A.  Yes.  If the compliance officer is going to be tasked with

22  overseeing the day-to-day compliance matters of the

23  organization, I feel like they should be able to access the

24  organization.

25  Q.  Right.  But you recognize that someone shouldn't be walking

1   around a laboratory, right?

2   A.   I'm sorry.  Could you repeat that?

3   Q.   Someone who's not properly clothed and sterilized and

4   everything that happens, you can't be walking around a

5   laboratory with a -- you know, with a pen and taking notes or

6   anything, right?

7   A.   Right.  But I would have expected that they would have

8   advised on proper procedures for entering areas that were

9   clinical in nature.

10  Q.   You saw the lab, right?

11  A.   Through a glass wall.

12  Q.   Huh?

13  A.   Through a glass wall, yes.

14  Q.   Right.  People weren't allowed to walk in and out.  Lawyers

15  weren't allowed to walk in, compliance officers; nobody was

16  allowed to walk in among all the machines, right?

17  A.   Right.

18  Q.   And how many technicians would you see there working with

19  all these machines that they had and all of the testing that

20  was going on?

21  A.   A handful.

22  Q.   Okay.  And were there about 40 people on site working there

23  in the various departments?

24  A.   I will be honest, the only access I can -- areas I can

25  attest to were the building that I was in, the lower floor,

 1    and the upper level.  There was probably a total of 30 to

 2    40 employees in that area.

 3    Q.  Okay.  And -- I mean, you saw the machines through the

 4    glass wall?

 5    A.  Sure.

 6    Q.  You saw the blood being tested, right?

 7    A.  Sure.

 8    Q.  Urine being tested?

 9    A.  Sure.

10    Q.  Genetic testing?  Millions of dollars' worth of laboratory

11    machinery, right?

12    A.  Right.

13    Q.  Okay.  And you did have a few meetings with Nick Saliba,

14    the CEO, right?  You had access to him?

15    A.  We had a few conversations.  I wouldn't consider them

16    meetings other than the initial meeting upon hire.

17    Q.  Okay.  You exchanged emails with him?  We're going to --

18    A.  Yes.

19    Q.  -- look at some of those emails.

20    A.  Sure.

21    Q.  He had sent you emails he wanted you to --

22    A.  Correct.

23    Q.  -- of things he wanted you to do, right?

24    A.  Correct.

25    Q.  And you'd write back to him, right?

1   A.   I would respond to the emails, correct.

2   Q.   And again, one of the problems with Nick is that -- excuse

3   me -- Mr. Saliba is that he commutes from Tennessee.

4   A.   True.

5   Q.   So, you know, there's a lot of remote work going on.

6        Mr. Berarducci was there almost every day, right?

7   A.   Yes.

8   Q.   Jon -- J-o-n --

9   A.   Correct.

10  Q.   -- Berarducci, just because of how hard it is to spell.

11       And your compliance program -- it's not like you walked

12  into a compliance program that was deficient.  There was no

13  compliance program until you got there.  They wanted you to

14  create it, right?

15  A.   Right.

16  Q.   Okay.  And you were qualified.

17  A.   Correct.

18  Q.   Okay.  But in 22 days, there was just so much you could get

19  done, right?

20  A.   Right.

21  Q.   And you knew that some of the compliance that was going on

22  dealt with EKRA, right?  This new law that had come out, right?

23  A.   I knew that it was applicable.

24  Q.   I lost the beginning of --

25  A.   Sorry.

 1   Q.   My fault.  Go ahead.

 2   A.   I knew that it was applicable since it had just been

 3   passed, yes.

 4   Q.   Okay.  And is it correct that you knew that there were

 5   outside lawyers working on some of these issues?  I'm not going

 6   to get into specifics, but just you knew there were lawyers who

 7   worked for the company who weren't in-house.

 8   A.   I don't know that I was ever told that, to be honest with

 9   you.  I assumed that they were outside lawyers since there

10   wasn't an in-house counsel.

11   Q.   Okay.  We'll look at some emails and talk about that in a

12   moment.

13        All right.  You never worked at a lab before as a

14   compliance officer?

15   A.   That's correct.

16   Q.   So that was a new territory for you too.

17   A.   That was new for me, yes.

18   Q.   Okay.  You knew that there was a doctor on site

19   providing -- the medical doctor who was the head of the lab's

20   medical unit, Dr. B?  Do you remember her?

21   A.   I do, vaguely.

22   Q.   What's her last name; do you remember?

23   A.   I do not.

24   Q.   Bernadette?  No?  Yes?

25   A.   Sounds correct.  I really don't recall.

1  Q.  Okay.  You knew she was there.  You knew that there was a

2  scientist there who was a geneticist?

3  A.  I don't know that I met the geneticist.

4  Q.  You knew that there was a billing department -- a woman

5  named Cecilia ran the billing department?

6  A.  I was aware that there was a billing department, yes.

7  Q.  Did you talk to Cecilia about --

8  A.  I did.  I did, because I believe she handled this account.

9  Q.  And, of course, Mr. Berarducci is dealing with marketing

10  and distributors, right?

11  A.  Yes, sir.

12  Q.  All right.  So I want to talk about some of the work you

13  did.  Let me preface it by this:  Do you think there was some

14  confusion among Mr. Berarducci, maybe Nick Saliba, about where

15  exactly is the line between compliance and the law?

16  A.  I would think so.  I would assume so.

17  Q.  Assumed that there was confusion about that?

18  A.  Or that there was additional training that needed to be

19  provided.  I wouldn't expect them to be experts, necessarily,

20  as non-attorneys.

21  Q.  Okay.  I mean, you can educate all of us in the courtroom

22  today, perhaps.  What -- compliance means compliance with the

23  law, right?

24  A.  Correct.

25  Q.  And lawyers deal with the law, right?

```
 1   A.   Correct.
 2   Q.   So sometimes what a compliance officer is doing is
 3   virtually the same thing that a lawyer's doing, right?
 4   A.   It can be.
 5   Q.   I mean, if someone asked me to come and provide legal
 6   advice, I guess you can say I'm telling them how to be
 7   compliant.  Compliant means comply with the law, right?
 8   A.   Correct.
 9   Q.   And a compliance officer may very well be a lawyer like
10   you.
11   A.   Correct.
12   Q.   Makes you a better compliance officer because you've got
13   that educational background, right?
14   A.   Yes.
15   Q.   You know how to read a statute.  You know how to read the
16   regulations.  You know how they all fit together.  So you can
17   be a very good compliance officer, but you're still a lawyer,
18   right?
19   A.   Correct.
20   Q.   You don't get a Ph.D. in compliance.  You get a J.D. in
21   law, like we do -- like you and I do, right?
22   A.   Yes.
23   Q.   So it might not have been unusual for Mr. Berarducci to
24   think of you as a lawyer because you were a lawyer, right?
25   A.   Correct.
```

1    Q.   You got to --

2    A.   Correct.

3    Q.   There you go.

4         So when the FBI came and he said, she's the lawyer, there

5    ain't no other lawyer there at that point in time, was there?

6    A.   No.

7    Q.   But another lawyer -- I'm sorry?

8    A.   I'm sorry.  It's just a little misleading.

9    Q.   Well, you are a lawyer.

10   A.   I am a lawyer, yeah.

11   Q.   You're providing compliance advice, and for someone like

12   Mr. Berarducci, who's not a lawyer, not a specialist, he may

13   have thought, well, she's the only lawyer here.  She's the one

14   who ought to be talking to these agents, right?

15   A.   Yes, that could have occurred to him.

16   Q.   Okay.  So I want to go through some emails now, and then

17   we'll wrap up.  Let's take a look at E-1.  It should show up on

18   your screen there.

19        Most of these emails are either written by you or to you,

20   but we'll -- P.J. will highlight the "To:" and "From:" in each

21   one.

22        This is an email on August 15th, which would have been

23   T minus one day, right?

24   A.   Correct.

25   Q.   This would have been the day before -- we're not exactly

1    going in chronological order, are we?

2    A.   Sure.  No.

3    Q.   But this is an example of the kind of email you have would

4    sent out to Damon Reed, right, you copied Mr. Berarducci.  You

5    copied Minal Patel --

6         MS. GURSKIS:  Sorry.  I don't believe this has been

7    marked in evidence or has been marked for identification.

8         MR. SAMUEL:  Your Honor, I apologize.  I move E-1

9    through E- -- I think 10 is my last one.  No, 14 -- E-13, E-14.

10   E-1 through E-14.

11        THE COURT:  Any objection?

12        MS. GURSKIS:  There was an objection to one of the

13   documents.  I'm not sure if that was introduced with that set.

14        MR. SAMUEL:  When I get to that one -- I marked it.  I

15   will tell you right now which one it is.  It is E-3.  When I

16   get to that, I'll stop.

17        THE COURT:  Okay.

18        MR. SAMUEL:  E -- so E-1, E-2, and E-4 through -14 are

19   in.

20        THE COURT:  Very good.  So we'll be admitting those

21   specific 13, I believe it is, exhibits under letter E without

22   objection; is that right on the government's side?

23        MS. GURSKIS:  It is, Your Honor.

24        THE COURT:  That'll be admitted at this time.

25        (Government Exhibits E-1, E-2, and E-4 through E-14 were

1          received in evidence.)

2     BY MR. SAMUEL:

3     Q.   Let's start with E-1.  Let's put that back up on the

4     screen.

5          This is a typical email that you would write to Damon Reed,

6     telling him that you had heard from Minal that he wanted to

7     provide documents.  He wanted to become a distributor, correct?

8     And you needed compliance documents, right?

9     A.   Correct.

10    Q.   And this was -- a lot of what you were doing as time went

11    on -- of course, we're talking about 22 days.  But towards the

12    end, you were getting people, distributors, marketers, people

13    who -- even Mr. Berarducci or someone else introduced to you --

14    you were making sure they filed the paperwork that showed they

15    understood what the law required, right?

16    A.   I was sending these out when they were sent to me advised

17    to CC Jon, Minal, and Nick.  I believe the documents that went

18    with these were in the DocuSign system already, so I didn't

19    create any of these documents, to the best of my knowledge.

20    Q.   And if I said you did, I didn't mean to.

21         But you're communicating -- telling distributors we need to

22    sign these documents if you want to become a distributor,

23    correct?

24    A.   Correct.

25    Q.   Okay.  And then let's take a look at E-2.  This is the same

1   day.

2          MR. SAMUEL:  Can you do the bottom one first, please?

3   BY MR. SAMUEL:

4   Q.  This is an email you received from Nick Saliba, right, on

5   August 13th?

6   A.  Yes.

7   Q.  And he's saying that it is important in vetting all these

8   new people -- people who wanted to be a distributor or a

9   marketer, they want to do background checks on these people,

10  right?

11  A.  Correct.

12  Q.  Good policy, right?

13  A.  Correct.

14  Q.  And they asked you to do that.  This is not for only

15  in-house employees and W-2, as we call people, you know,

16  getting a paycheck.

17  A.  Sure.

18  Q.  But also the contract employers, right, the marketers, the

19  people we sometimes referred to as 1099s?

20  A.  Right.

21  Q.  The people who -- they don't work for us, but we want to

22  make sure even those people are doing things in the right way,

23  right?

24  A.  Sure.

25  Q.  So Nick is reminding you, Amy, and Donna, who's HR --

1   you're Amy, and Donna is HR?

2   A.   Correct.

3   Q.   Make sure we get background checks on all these people

4   before we let them become representatives of our company,

5   either as a contractor or employer, right?

6   A.   Correct.

7   Q.   And you wrote back to them, right?  You wrote back and

8   said, I'm on it, right?

9   A.   Correct.

10   Q.   Just wanted to let you know that I've already been

11   running -- OIG is the Office of the Inspector General, right?

12   A.   Correct.

13   Q.   Exclusion searches, meaning anybody who's had trouble with

14   the department before, right?

15   A.   Correct.

16   Q.   And all these individuals and all the companies, making

17   sure that they're all kosher, right?

18   A.   Correct.

19   Q.   It's not a legal term, but, you know, they're all okay,

20   right?

21   A.   In terms of the OIG exclusion search, yes.

22   Q.   In addition -- I'm down to the third line.

23        In addition, I've conducted searches on the 1099 employees

24   that I'm aware of, right?

25   A.   Right.

1   Q.   Again, we're not just dealing with the 40 people on-site or

2   however many employees.  Even the contractors.

3   A.   Correct.

4        MR. SAMUEL:  Can we skip to E-9, please?  If you can do

5   the headline, from Amy to Nick.  But I want to start on the

6   bottom and work our way up.  Okay?

7   BY MR. SAMUEL:

8   Q.   So the bottom one is someone named Chris Miano -- who you

9   talked about.  We're going to talk a little bit more about

10  him -- writing to Minal, Jon, and you, correct?

11  A.   Correct.

12  Q.   And he is trying to get -- to become a distributor, right,

13  or a contractor?

14  A.   That was my understanding.

15  Q.   He's trying to get on board?

16  A.   Correct.

17  Q.   And this is July 31st.  And he says, Nick, based on our

18  conversation today, whatever that was, I've updated our

19  internal processes -- this is his company, right?

20  A.   Mmm-hmm.

21  Q.   He's referring to his company.

22       -- for your compliance officer's review.  In other words,

23  Nick had said if you want to come work with us, you're going to

24  have to send us your internal paperwork so our compliance

25  officer, Amy Roebuck, can take a look at it, correct?

1    A.   Correct.

2    Q.   And he agreed to make all the changes that were made.

3         MR. SAMUEL:  So now let's go up.

4    BY MR. SAMUEL:

5    Q.   He says, Let me know if anything else is required.

6         So then Nick sends an email to you, right?

7    A.   Correct.

8    Q.   Same day.  Hope you had a great weekend.  Did you get a

9    chance to review Chris's processes?

10        That's referring to the email he had gotten below, right?

11   A.   Yes.

12   Q.   This is the current day-by-day stuff you were doing.  This

13   is now your third week of right work, right?

14   A.   Correct.

15   Q.   You were there a total of four weeks.  This is August 5th.

16   A.   Correct.

17   Q.   You're already reviewing outsiders who want to work for the

18   company, to make sure they're all doing it -- they are all on

19   the up-and-up, right?

20   A.   Correct.

21   Q.   And let's go to No. 3, which is at the top.  And here's

22   what you say:  I'm doing it.  Just like the last email.  I'm on

23   it.

24        And this is with respect to Chris Miano specifically,

25   right?  And you had some suggestions to make, right, as to how

1    he even can make his processes better?

2    A.   Preliminary, yes.

3    Q.   Huh?

4    A.   Preliminary.

5    Q.   Right.  So that you could advise Minal and Nick and

6    Berarducci, this guy's worth signing up.  He's got to clean up

7    some of his paperwork, though, right?

8    A.   Correct.

9    Q.   And you had four suggestions.  One is kind of wordsmithing

10   the paragraph, correct?

11   A.   Mmm-hmm.

12   Q.   Say "yes" or "no" for the court reporter.

13   A.   Correct.  Sorry.

14   Q.   We would appreciate that.

15        And No. 2, there are some HIPAA issues, and we all know

16   what that means, privacy issues with patients, correct?

17   A.   Correct.

18   Q.   And that was your specialty because you had just spent a

19   couple of years working on patient privacy, correct?

20   A.   Correct.

21   Q.   And then No. 3, something about document preservation,

22   keeping the cards in existence for a couple of years.  And

23   four, some issues dealing with standard of care, right?

24   A.   Correct.

25   Q.   This is -- without getting into details of any of these,

1    the point was they wanted you to help them make sure their

2    marketers and distributors had good processes in place, good

3    paperwork in place, and you were doing your job exactly right

4    by saying this is how they ought to improve it, right?

5    A.  Correct.

6         MR. SAMUEL:  Now can we go to E-10.

7    BY MR. SAMUEL:

8    Q.  This is actually back in time.  I apologize for that.  I

9    should have done it chronological.

10        This is the same kind of form that was sent to him that was

11   sent to the very first person; fill out the forms and provide

12   us all the documentation we need before we can evaluate you,

13   right?

14   A.  Correct.

15   Q.  Okay.  That's what E-10 is.  Same guy, Chris Miano, that

16   kind of came to a head in the last set of --

17   A.  Sure.

18        MR. SAMUEL:  Okay.  And then I want to talk about E-3.

19   And I'll come to the side bench, Your Honor, because I

20   understand there's an objection to that.

21        THE COURT:  Okay.  Come on up.

22       (The following proceedings were held sidebar:)

23        THE COURT:  Okay.  Do you want to hold this?  I'll look

24   at the cleaner one.  What do we got?

25        MR. SAMUEL:  So I'm really following the same pattern.

1    She's talked about silos, and talked about I couldn't get

2    access to the lab, and I couldn't get access to give

3    information I needed to see all the processes.  I'm just using

4    this to show that she had communications with outside counsel,

5    which she actually said she never did, that she remembered.

6    I'm not getting into the content of it.

7            MS. GURSKIS:  But this isn't actually with outside

8    counsel.  That's what I think is confusing about this.  There's

9    a huge chain here that happens.

10           So it's forwarded from Karen Miles, who's not -- she's

11   a secretary.  So the secretary -- the attorney gives it to the

12   secretary; the secretary gives it to Minal and Nick; and then

13   Nick gives it to Amy.  So Amy never has any of actual direct

14   contact with Mr. Watt.

15           MR. SAMUEL:  I agree.

16           THE COURT:  I mean, if you qualify and explain to

17   her --

18           MR. SAMUEL:  I'm just showing that she's --

19           THE COURT:  She's being copied on it.  Generally, I'm

20   going to let it go.  In terms of her having access to

21   information, that's fine.  I'm not going to dwell on it.

22           MR. SAMUEL:  You'll see in the very next one, she said

23   I've read all this case law, so I'm keeping up with it for you.

24   I'm sure she was a good compliance officer, and that's what

25   they expected.

1          MS. DE BOER:  I just want to make sure that the

2     attachment to this email --

3          MS. GURSKIS:  It's a legal memo from the lawyer.

4          THE COURT:  No, it's just paper flow.

5          MR. SAMUEL:  I'm not putting it in the middle today.

6          THE COURT:  That's fine.  We can work with that.  All

7     right.

8          (Proceedings returned to open court.)

9          THE COURT:  You may proceed whenever you're ready.

10          MR. SAMUEL:  Okay.  E-3, if we could, P.J.  And I want

11     to do this also in the correct chronological order.

12     BY MR. SAMUEL:

13     Q.  Have you seen this?  Did the government show this to you

14     during lunch or something?

15     A.  I don't recall seeing this.

16     Q.  Okay.  This is July 16.  So this is, like, within a couple

17     of days of you getting there, right?

18     A.  Correct.

19     Q.  And there's actually three different emails here.  The one

20     in the middle, please see attached, is the first

21     chronologically.

22          You would have seen the whole thread, but I just want to

23     make it clear.

24     A.  Okay.

25     Q.  So the one in the middle is someone named Karen Miles --

1   who's a legal assistant to Tobin Watt, right? -- sending a

2   document to Minal, Nick, and copying it to Tobin, correct?

3   A.   It appears to be, yes.

4   Q.   Okay.  And that's on February 15th.  And -- February 15th,

5   so that's quite a while ago, right?

6   A.   Right.

7   Q.   So a legal document has been sent from Tobin Watt -- Toby

8   Watt to Minal and Nick.

9        And then on July 16th, Nick says to you, pursuant to our

10   discussion -- okay.  This is now a day after you've gotten

11   there -- I'm sending several emails regarding HR 6 -- we'll

12   come back to that in a second -- please review and we'll

13   discuss this afternoon.

14       Okay.  And then the very same day -- and because it is

15   Greenwich Mean Time instead of our time, I can't tell what time

16   it is.

17        (Court reporter clarification.)

18   BY MR. SAMUEL:

19   Q.   It's Greenwich Mean Time, so I can't figure out what time

20   it is in England.

21       You respond, will do.  Thanks for forwarding.

22   A.   Correct.

23   Q.   Okay.  So several months earlier, the lawyer's office sends

24   something to Nick.  Nick has a conversation with you he refers

25   to and then sends a copy of it to you, please review.  And

1   later that day, you say, I will do, thank you, and thanks for

2   forwarding.

3       Okay.  Now, I'm not going to get into the content of what

4   that actual document is today.  But do you know what HR 6

5   refers to?

6   A.  I don't think I did at the time.

7   Q.  Do you know today?

8   A.  Since I haven't worked in this area in three years, no, I

9   don't recall.

10  Q.  If I were to suggest that it might have been something

11  called EKRA, is that another name for HR 6?

12  A.  Correct.

13  Q.  HR 6 is House of Representatives Bill No. 6, right?

14  A.  Sure.

15  Q.  But everybody came to know it as EKRA, E-K-R-A.

16      And again, I'm not going to get into the memo that was

17  written, but they sent that to you to review, correct?

18  A.  It appears so.

19  Q.  Okay.  Do you remember it today?

20  A.  I'm certain that I received it and I reviewed it.  I don't

21  remember the act of actually doing it.  It's been three years

22  ago, so...

23  Q.  No problem.  No problem.

24      But you knew it came from Tobin Watt, correct?  Toby Watt.

25  A.  Correct.  I didn't know who that was at the time.

 1    Q.   No problem.

 2         Do you recognize the name of the law firm, Fox Rothschild?

 3    A.   Yes.

 4    Q.   Okay.  And that's on the document, right?

 5    A.   Correct.

 6    Q.   So you know Fox Rothschild is a pretty decent-sized firm,

 7    right?

 8    A.   Correct.

 9    Q.   And it has a big Atlanta office, right?

10    A.   Correct.

11    Q.   And you knew this had something to do with legal problems,

12    right -- legal issues?

13    A.   Legal issues, yes.

14    Q.   Okay.  And they wanted you on top of that too, right?

15    A.   Correct.

16    Q.   Nick and, you know, Berarducci at least -- because you

17    talked with them -- they wanted you to understand this stuff to

18    make sure you could help them, right?

19    A.   I would assume so, yes.  Although I don't recall ever

20    having a conversation with Nick about it.

21    Q.   Okay.

22    A.   An email was sent.

23    Q.   Well, you -- remember the email said, as we discussed

24    yesterday, I'm sending you an email, right?

25         That's what he says to you?

```
1    A.   He did.  I'm not denying that.  I just don't know if we had
2    the follow-up discussion that --
3    Q.   Got it.
4    A.   -- we had planned on.
5    Q.   Got it.
6         He talked to you about it the day before --
7    A.   He said, I'm sending you an email, mmm-hmm.
8    Q.   Well, then let's take a look at E-8.  Again, we'll -- it
9    starts kind of in the middle of the last thread.
10        MR. SAMUEL:  Are we at E-8, P.J.?  Okay.
11   BY MR. SAMUEL:
12   Q.   So now you see it begins the same one, February 15th,
13   right?
14   A.   Correct.
15   Q.   And this is Karen Miles, Tobin Watt's assistant, sending it
16   to Nick; and then Nick sending to you, per our discussion,
17   sending several emails regarding HR 6.
18        This is the same thread --
19   A.   Sure.
20   Q.   -- as the last one, right?
21        And then you say, will do.  Thanks for forwarding, right?
22   A.   Correct.
23   Q.   And then it's a few days later; you say, I think that I
24   only got copied on the draft letter from Tobin.  I have read
25   most of the pertinent case law, I believe, but I wanted to see
```

1   if you would be able to forward the communication that had the

2   entire advisory opinion.

3       Let's unpack that just a little bit.

4   A.   Sure.

5   Q.   So he had previously sent you some portion of what Mr. Watt

6   had said, right?

7   A.   That's correct.

8   Q.   Like cover letters and stuff like that.  But at some point,

9   there was actually a formal legal opinion, right?

10  A.   Correct.

11  Q.   I'm not going to get into the content today.  But Nick was

12  sending it to you, right?

13  A.   He forwarded it to me, yes; that's correct.

14  Q.   Right.  And you said I got to some of the draft letters

15  from Tobin, the preliminary documents, and I started reading

16  most of the pertinent cases here, right?

17  A.   Correct.

18  Q.   And when lawyers talk about reading cases, that's what we

19  talk when we're reading law, right?

20  A.   Sure.

21  Q.   We're reading what judges have written about these new

22  statutes, right?

23  A.   That's correct.

24  Q.   Okay.  And that's what you were studying during this time

25  period, right?

1    A.   Correct.

2    Q.   Because the company wanted you to be on top of this stuff,

3    right?

4    A.   Right.

5    Q.   And you were doing just what you were supposed to do,

6    right?

7    A.   Correct.

8    Q.   Now, let's take a look at E-4.  You'll see in E-4 -- again,

9    working our way up, I guess -- Nick is writing to Jon.

10   Sometime today, please set some time aside to meet with Amy to

11   go over sales contracts, right?

12   A.   Correct.

13   Q.   Which was very much related to EKRA, right?

14   A.   Correct.

15   Q.   Okay.  So everybody -- this is right after you start

16   working there -- is interested in you helping them understand

17   how to deal with EKRA, right?

18   A.   Correct.

19   Q.   Okay.  And then you write back and say, I'm about to step

20   out to lunch, but I'll meet with you after lunch to review this

21   stuff with you, right?

22   A.   Yes.

23   Q.   All right.  You talked about a problem with the health

24   fairs, right?  That was one of the projects you got involved

25   in, right?

```
 1    A.  Correct.

 2          MR. SAMUEL:  Could we have E-5.

 3    BY MR. SAMUEL:

 4    Q.  Do you remember that what had happened with this health

 5    fair issue was that someone had gone to a health fair -- a

 6    patient, a customer, had gone to a health fair, was led to

 7    believe by someone there, whoever ran that health fair, that it

 8    was free, right?

 9    A.  Correct.

10    Q.  And that the problem, you probably figured out, was this

11    person didn't have Medicare, right?

12    A.  Correct.

13    Q.  She had private insurance --

14    A.  Correct.

15    Q.  -- right?

16          And so when she had her genetic test done, the private

17    insurance did bill her, right?

18    A.  Yes.

19    Q.  The way in which they billed her was they wrote -- they

20    said we're applying this to the deductible, right?

21    A.  Yes.

22    Q.  Okay.  And so she was unhappy, right?

23    A.  Yes.

24    Q.  But she wasn't unhappy with LabSolutions; she was unhappy

25    with the doctor, right?
```

1   A.   I believe that was the case.

2   Q.   Right.  Because what happened was she complained to a TV

3   station, right?

4   A.   Yes.

5        MS. GURSKIS:  Objection.  It sounds like the attorney

6   is testifying.

7        THE COURT:  Overruled.  You may continue.

8   BY MR. SAMUEL:

9   Q.   Do you remember the reason the lab asked you to get

10  involved is because a TV reporter was calling?  Do you remember

11  that?

12  A.   Yes.

13  Q.   Okay.  And you didn't really have to deal with it.  You

14  were aware of it.  But ultimately, a lawyer got involved named

15  James Holloway.

16       Do you remember that?

17  A.   I do.

18  Q.   I think in -- I'm sorry?

19  A.   Sorry.  I do.

20  Q.   You may not remember the name, but it was actually a lawyer

21  from Baltimore that got involved --

22  A.   Yes.

23  Q.   -- who was another outside lawyer who worked for

24  LabSolutions, correct?

25  A.   I believe that was my understanding, yes.

 1   Q.   And he made a recommendation to the company and said, look,
 2   this woman is upset with the doctor.  She's not upset with
 3   LabSolutions.  He wrote this all out to you.  Just cancel the
 4   request for testing, right?  Put it behind you.  Just be done
 5   with it, right?  And LabSolutions did that, right?
 6   A.   To the best of my knowledge.
 7   Q.   Okay.  Well, it was an email to you explaining what was
 8   going to be done by Mr. Holloway.  It's on page 2 --
 9   A.   Okay.
10   Q.   -- of this email series that gets sent to you.
11        Problem solved, right?  That's the whole issue, was just
12   that, that the person didn't have Medicare but had private
13   insurance, and private insurance billed her, right?
14   A.   Correct.
15   Q.   Ma'am, I have a series of documents here that deal with
16   DocuSign.  Let's just cut to the quick and not go through all
17   the exhibits.
18        DocuSign, for those people who don't know, is a way that
19   official documents can be signed without having to go to a
20   lawyer's office and sign them, right?
21   A.   Correct.
22   Q.   If someone wants me to sign a document and it's going to be
23   somewhat official, they can send it to me over the internet and
24   with something called DocuSign, I say, yeah, go ahead and put
25   my signature on that document.

1        I never put pen to paper, right?

2    A.   Right.

3    Q.   And that's just what DocuSign is.  It's just an internet

4    tool, right?

5    A.   Correct.

6    Q.   And you knew that you have to get enrolled with DocuSign,

7    right, with the company?

8    A.   To be a signer, yes.

9    Q.   Customers can always sign.  You can send something to me

10   and say, Mr. Samuel, if you want the benefit, sign your name.

11   I can do that.

12        But you, as the originator of the document, have to be

13   enrolled with DocuSign, right?

14   A.   Correct.

15   Q.   But DocuSign had a training program, right?

16   A.   It's possible.  I wasn't familiar with it.

17   Q.   And they wouldn't let you sign up until you went through

18   their training program.

19        Do you remember that?

20   A.   That's possible.

21   Q.   Okay.  Let me show you Exhibit E-14.

22        This is you?

23   A.   Yes, I see that now.

24   Q.   And they said your training program so that you could

25   become a DocuSign -- whatever you call it -- signer -- we can

1    do that on the 27th, the 29th or the 30th.

2         This is all of August, by the way, right?

3    A.   Correct.

4    Q.   And they were going to have you and Sonal and Berarducci,

5    all attend their little training session on how to be someone

6    who could sign a document on the internet, right?

7    A.   Correct.

8    Q.   Okay.  And you said you could do it that day, right?

9    A.   Yes.

10   Q.   And you had to wait until that day until you could be

11   officially enrolled in DocuSign, right?

12        That's what they were telling you, right?

13   A.   Yes, provided they added me as a signer.

14   Q.   Right.

15        This is what this whole -- this is kind of like the key

16   that we started out with.  It was just an incredible

17   inconvenience that you couldn't get enrolled in DocuSign until

18   the DocuSign company's next available date, which was going to

19   be August 27th, at 8:00 a.m., Pacific Time, right?

20   A.   Yes.  I guess my confusion was, if I couldn't attend the

21   training and be added as an authorized signer, no document

22   should have been leaving with my name on them.

23   Q.   I understand that.  We don't know how that happened, do we?

24   A.   I can only assume.

25   Q.   Because DocuSign needed you to come to this program before

1   you could be the official signer.

2       And what day did the FBI come to your office?

3   A.  August the 16th.

4   Q.  August 16th.

5       So you never got to be an official DocuSign signer, did

6   you?

7   A.  No.  So no documents should have been executed with my

8   signature.

9   Q.  Right.  Okay.

10      On the day of the raid was Nick Saliba there, or was he in

11  Tennessee?

12  A.  I believe he was traveling to Tennessee.

13  Q.  And Minal was not there, correct?

14  A.  Was not.

15  Q.  As you said, he was there only a couple -- just a few

16  days -- for the 22 days that you worked there?

17  A.  Sure.

18  Q.  You did say that a lawyer showed up.  In one of your

19  interviews, you said he didn't seem like a very powerhouse

20  lawyer; is that right?

21      Do you remember saying that?

22  A.  I do remember saying that.  He had -- I would assume that

23  he had not been prepared to come there with files and dressed

24  accordingly to respond to a raid, but he did not appear to be

25  an attorney that appeared to be professional in stature just

1    from a visible.

2    Q.   Did he introduce himself to you and say my name is

3    Tobin Watt?

4    A.   He did not.

5    Q.   Do you know now that that was Tobin Watt who came?

6    A.   I do not.

7    Q.   If you saw a picture, would you be able to recognize the

8    person who was there?

9    A.   I would not.  He came up to the other side of the building.

10   I was being interviewed by the FBI agents on another side, so I

11   only saw him walk up the sidewalk.

12   Q.   You know from looking at the last document that he is a

13   senior partner at Fox Rothschild, correct?

14   A.   And as I said, I'm sure he wasn't prepared to come there

15   that day with a suit and tie for any occasion.  He was dressed

16   very casually.

17   Q.   You don't think less of him, do you?

18   A.   I'm sure he's a fantastic lawyer.

19   Q.   Right.  Okay.

20           MR. SAMUEL:  That's all.  Thank you, Your Honor.

21           THE COURT:  Redirect?

22           MS. GURSKIS:  Thank you, Your Honor.

23                        REDIRECT EXAMINATION

24   BY MS. GURSKIS:

25   Q.   Just briefly, Ms. Roebuck.

1    A.   Sure.

2    Q.   Compliance is a good thing, right?

3    A.   It is.

4    Q.   How important is having the full picture when advising on

5    compliance?

6    A.   It's imperative.

7    Q.   Did you have a full picture at LabSolutions?

8    A.   I did not.

9    Q.   Did you know how marketers got samples?

10   A.   I did not.

11   Q.   Did you know how marketers were paid?

12   A.   I did not.

13   Q.   And you were asked some questions about EKRA and the

14   Anti-Kickback Statute and Medicare by Mr. Samuel.

15        Do you remember that?

16   A.   Yes.

17   Q.   Are kickbacks illegal in Medicare?

18   A.   They are.

19   Q.   Has there ever been any law that has changed whether

20   kickbacks in exchange for Medicare referrals are illegal?

21   A.   Yes, there have been changes, but they've never been deemed

22   legal.

23   Q.   They've never been deemed legal?

24   A.   Correct.

25   Q.   And finally, Mr. Samuel asked you some questions about

1   being a lawyer.

2   A.   Correct.

3   Q.   Do you recall that?

4        Did Jon Berarducci ever come to you for legal advice?

5   A.   He did not.

6   Q.   Did Minal Patel ever come to you for legal advice?

7   A.   No.  I only spoke to him on those two occasions.

8   Q.   Was the first time Jon Berarducci came to you as a lawyer

9   when the FBI showed up?

10  A.   It was.

11  Q.   And you were about to say something, about something being

12  misleading, I think, on cross-examination, when Mr. Samuel was

13  asking you about that encounter with regard to Mr. Berarducci

14  and the FBI.

15       Do you recall what that was?  I wanted to make sure that

16  you had a chance to respond.

17  A.   Sure.  I would think that if someone came to me and asked

18  me where the lawyer was, I would assume, even as a layperson,

19  that you meant the lawyer for the organization that was being

20  raided.

21       I wouldn't think you were just asking in general, do you

22  have anybody here that is licensed to practice law, because

23  they don't necessarily work in attorney functions all of the

24  time.  It just seemed odd to me.

25            MS. GURSKIS:  Nothing further.  Thank you.

1          THE COURT:  Thank you, ma'am.  You are excused.

2          THE WITNESS:  Thank you.

3          MR. SADOW:  Your Honor, before we go to any further

4    witness or events for today, can we speak to you briefly?

5          THE COURT:  Sure.  Let's go ahead and take advantage of

6    this moment.

7          Folks, if you would leave your notepads on your chairs.

8    Let's take about a 15-minute break, and we'll resume at

9    4:00 o'clock.  So just leave everything on your chairs, and

10   we'll get back with you in just a moment.  Please feel free to

11   take a break at this time.

12         THE COURT SECURITY OFFICER:  All rise for the jury.

13         (Jury exits at 3:47 p.m.)

14         THE COURT:  Please be seated, everyone.

15         Okay.  Let's take a moment and address housekeeping,

16   Mr. Sadow.  What do we have on deck?

17         MR. SADOW:  Here's my question to the Court:  If we

18   start in the next few minutes on Mr. Sporn --

19         THE COURT:  Yes.

20         MR. SADOW:  -- you may get an hour and then you're

21   going to be in the middle of direct examination.  Once direct

22   examination has started, Question 1:  Is the government allowed

23   to talk to him about -- will the government then be in a

24   position to still talk to him during his examination in case --

25   whatever the first hour brings up other questions?

1           That's my first question.

2           THE COURT:  My answer to that is no.  Once we -- the

3    train has left the station, he's under oath, and we're not

4    going to have him being instructed or anyone shaping the

5    content of his testimony until over the weekend when he

6    finishes his direct on Monday.  So, no, that would not be my

7    intention.

8           MR. SADOW:  Okay.  So that was my concern.  So if the

9    Court would want to proceed -- I guess it's up to the

10   government whether they would like to do it in a different

11   fashion.

12          THE COURT:  Any concerns from the government?

13          MS. DE BOER:  No.  And obviously we wouldn't be talking

14   to a fact witness once he takes the stand.  He's been advised

15   that he can't talk to anybody once he takes the stand.

16          THE COURT:  So I figured you guys were in agreement

17   with me that that's not even going to be an issue with the

18   government, so I didn't check with you before I told them the

19   ruling.

20          So we'll go ahead then and make that plan.  I think he

21   is the next witness you want to start off with, right?

22          MS. DE BOER:  Exactly.  He's here.

23          THE COURT:  Let's see how far we get.  I'm going to

24   give them until 4:00 o'clock.  My court reporter and I will

25   take a break and go to the restroom.  I think we have an hour.

 1    We'll go until 5:00 o'clock, and we'll call it.

 2         Just so you know at planning in your examination, if

 3    you find yourself at a good point -- if it's a minute past

 4    five, that's fine.  Just figure out how it works, and then

 5    we'll break for the weekend.

 6         MS. DE BOER:  Perfect.

 7         THE COURT:  The only thing is I want a few minutes at

 8    the end to let Ms. Martinez know she won't be joining us.

 9         Did you have a second question, Mr. Sadow, or did I

10    take care of it?

11         MR. SADOW:  You took care of it.

12         THE COURT:  Go ahead, everyone, and take that break

13    now, because we'll be going for another hour.

14         (Court recessed at 3:50 p.m.)

15         (Back on the record at 4:18 p.m.)

16         THE COURT:  Go ahead and bring them in, please.

17         (Jury enters at 4:19 p.m.)

18         THE COURT:  All right.  Please be seated, everyone.

19    We're going to go ahead and get started with our next witness

20    and end again just before 5:00 so we'll get everybody home so

21    you can enjoy the weekend and get a break.

22         So I'll turn it back over to the government at this

23    time.  Ms. de Boer.

24         MS. DE BOER:  Thank you, Your Honor.  The United States

25    calls Marc Sporn.

```
 1            THE COURT:  All right.  Come on up, Mr. Sporn, and
 2    we'll swear you in.
 3            THE COURTROOM DEPUTY:  Please raise your right hand.
 4            (Government witness, MARC SPORN, duly sworn.)
 5            THE COURTROOM DEPUTY:  Please be seated.  Speak into
 6    the microphone, say and spell your name for the record.
 7            THE WITNESS:  Marc Sporn, M-a-r-c, S-p-o-r-n.
 8                       DIRECT EXAMINATION
 9    BY MS. DE BOER:
10    Q.  Good afternoon, Mr. Sporn.
11    A.  Good afternoon.
12    Q.  And if I could ask you to just speak into the mic as much
13    as possible and speak up if you can.
14    A.  Sure.
15    Q.  Mr. Sporn, have you pled guilty to a federal crime?
16    A.  I have.
17    Q.  What did you plead to?
18    A.  Tax fraud and healthcare fraud.
19    Q.  Can you explain to the jury at a high level, because we'll
20    unpack it all, what did you do that was wrong?
21    A.  Well, with the tax case, I was delinquent in filing my
22    taxes, and I didn't pay my taxes; and that's why I pled to tax
23    fraud.
24        And healthcare fraud, I was -- I assisted in submitting
25    claims for reimbursement to Medicare.
```

1    Q.   And can you explain a little bit more to the jury about

2    your role in that and what you did that was wrong?

3    A.   In which one?

4    Q.   The healthcare.  Focus on the healthcare, please.

5    A.   Sure.  So in the healthcare part, I had a call center that

6    generated -- that generated -- solicited individuals for

7    genetic tests.

8         And the way that we marketed to these people were quite

9    misleading.  We would run advertising, get your free genetic

10   test; Medicare covers the test.  And -- and the name that we

11   used to solicit them was a name called LabCorp Services.  So

12   the combination of LabCorp services is like LabCorp Request,

13   like a major lab that anybody would know.  So that in itself

14   was very, very misleading.

15        The other part of it is that we told them that there was

16   absolutely no cost to the test; that, again, their Medicare

17   benefits covered those tests.

18        And again, we only targeted Medicare beneficiaries.  How

19   did we know they were Medicare beneficiaries?  We had software

20   that we used to check somebody's first name, last name, their

21   address, all their information; it's called MVP.

22        So we were able to verify that, in fact, before we even

23   called them, that they were a Medicare recipient and that

24   Medicare would reimburse for these tests, which were cancer

25   tests and PGx tests, which are known as pharma genetic

1   testing.

2   Q.  And let me stop you right there, Mr. Sporn.  So you just

3   described the telemarketing side.

4       Was there another piece to the healthcare fraud that you

5   were involved in?

6   A.  Yes.  So the second part is I had a company that was a

7   telehealth company, and after -- after the telemarketing was

8   done, the paperwork was shifted over to telehealth doctors.

9       And the telehealth doctors would review these orders or not

10  review these orders and sign off on them, and -- just like a

11  regular prescription, like you go to a pharmacy that your

12  doctor gives you.  Or, for example, if your doctor gives --

13  orders a blood test.

14      So these doctors had no interaction or patient -- direct

15  patient relationship.  They didn't even know who these patients

16  were.

17      Along with the doctors' orders, they signed another

18  document which was necessary to bill Medicare, which is called

19  a letter of medical necessity.  And each letter of medical

20  necessity was not unique.  They were all the same letters of

21  medical necessity.  As the actual requisitions to order the

22  tests, they were all not unique, to say the least.

23  Q.  And, Mr. Sporn, let me ask you:  Did you make money doing

24  this?

25  A.  Yes, I did.

1    Q.    Who paid you?

2    A.    The lab.

3    Q.    And was it just one lab, or were there multiple labs?

4    A.    I dealt with multiple labs.

5    Q.    Can you tell the jury what were some of the labs you dealt

6    with.

7    A.    Sure.  I dealt with LabSolutions, BestCare Labs, a lab

8    called Suretox, and another one called Fine Life Sciences

9    (phonetic).

10   Q.    All right.  In addition to labs paying you, did you get

11   paid through any type of middlemen?

12   A.    Yes, I did.

13   Q.    Explain how that worked to the jury.

14   A.    Well, on the telehealth side, these so-called middlemen or

15   marketing groups used our platform, and they paid us a fee for

16   every prescription and doctor order that was generated.  So

17   that's one thing.

18        The second thing is there was a -- another marketing group

19   that contracted with my call center.  So we leased them our

20   reps, we supplied them leads, and they covered an overhead.  It

21   was a company called Alite Lab Services.

22        So we were doing the sales for them in my telemarketing

23   arm.  And again, just like with my own business, the orders

24   were shifted to the telehealth doctors, who signed those orders

25   and the letters of medical necessity.

1   Q.  Let me stop you there, Mr. Sporn.

2       Can you explain to the jury, as relevant to this case, who

3   were some of the marketers that you worked with?

4   A.  A gentleman by the name of Will Slagle, who actually

5   introduced me to the business.  He had a family -- a business

6   called Our Family Genes.  Two other gentlemen by the name of

7   Brett Hirsch and Keith Youngswick, who I just referenced, had a

8   company called Alite Labs.  The labs themselves, Mr. Patel, his

9   employees, Nick Saliba, Jon Berarducci, as well as other

10  individuals at other labs.

11  Q.  Okay.

12  A.  And as well as the telehealth doctors.

13  Q.  Okay.  Thank you.

14      So you mentioned Mr. Patel.  Do you see Mr. Patel in the

15  courtroom today?

16  A.  I do.

17  Q.  Can you please identify him by where he's sitting and an

18  article of clothing that he's wearing.

19  A.  Over there, at the end.  White -- I guess it's a white

20  shirt, grey sport jacket.

21      MS. DE BOER:  May the record reflect that the witness

22  has identified the defendant.

23      THE COURT:  The record will reflect it.

24  BY MS. DE BOER:

25  Q.  Okay.  Mr. Sporn, at a high level, can you explain to the

1   jury what Mr. Patel personally -- what his role was in this.

2   A.   Well, he was the owner of LabSolutions.  And to my

3   knowledge, the other individuals that I dealt with at

4   LabSolutions besides Mr. Patel, Jon Berarducci and Nick Saliba,

5   directly reported to Mr. Patel.

6   Q.   And why was it important to you to have a lab involved in

7   this?

8   A.   If there was no lab that we couldn't submit any of these

9   orders to, then there would be no -- no dollars or kickbacks,

10  as it's called in the industry, coming back to my company.  So

11  there would not -- there would not be any money made from doing

12  this.

13  Q.   And how, if at all, did Mr. Patel influence the nature of

14  the tests and what specific tests were being ordered?

15  A.   So my company is a -- the telehealth side was a virtual

16  company, unlike a doctor's office.

17       So if you go into a doctor's office, a doctor or a nurse

18  usually writes out that prescription.  In this case, the

19  requisition that was supplied to order these tests had to be

20  formatted to our electronic system.  So every time that a

21  requisition was done, we had to send it to LabSolutions for

22  their approval, because everything was computer-generated and

23  electronic.

24       Additionally, along with that was a letter of medical

25  necessity, and those letters of medical necessity represented

1    genes that corresponded with the requisition.

2        So in this case, we were told initially that when we sent

3    the requisition over, to only check off a comprehensive panel,

4    which means that -- I don't recall the amount of genes.  Let's

5    just call it 40 genes for the sake of conversation.  So it's a

6    full panel, which means that Medicare would pay the lab the

7    most amount of money for that panel.  So --

8    Q.  Mr. Patel -- Mr. Sporn, let me interrupt you for a second.

9        MR. SADOW:  I prefer that he not be interrupted.  Let

10   him continue his answer.

11       THE COURT:  Understood.  I'll allow it.  It's okay.

12   Let's ask him the question.

13   BY MS. DE BOER:

14   Q.  And I wanted to ask about something that you were

15   specifically talking about there, because you said the term

16   "we" at one point.  I just want to get some clarity.

17       So can you be specific with the jury about what, if

18   anything, Mr. Patel told you about the comprehensive panel that

19   you're describing.

20   A.  Yes.  Well, the comprehensive panel -- by checking the

21   comprehensive panel, it would generate the highest

22   reimbursements from Medicare.

23       So, for example, just using a number now, so say there's

24   42 genes on a panel.  Going to a conventional doctor's office

25   who has a patient-client relationship, whereas we did not have

1   one, would diagnose you and say, okay, I'm going to check this

2   panel -- this ICD code or this CPT code; I'll check this one.

3   So they may only run three, four, five, six CPT codes.

4        Where in this case, there was 40 or 42 codes checked.  And

5   if you had the corresponding what they call ICD-10 codes --

6   which are billing codes -- that's what Medicare pays you on.

7   So this would allow for the highest reimbursement.

8        So, for example, as opposed to getting paid a thousand

9   dollars for a test, potentially you could get paid $10,000 or

10  $4,000 for a test by having all these genes checked off, if

11  that makes sense.

12  Q.  And now, Mr. Sporn, what, if anything, did Mr. Patel ever

13  tell you about the volume of tests he wanted referred?

14  A.  Send as many tests as you can send.

15  Q.  And what, if anything -- well, let me back up for a second.

16       Who was paying you from LabSolutions?

17  A.  LabSolutions was paying us.  Mr. Patel, through, I guess,

18  his bookkeeping department who made the wires at the time of

19  paying the kickbacks.

20  Q.  And what I'm asking is, more specifically, did you ever

21  discuss the fact of these payments, these wires, with

22  Mr. Patel?

23  A.  Initially, at the early stages, no, I did not.  Mr. Slagle,

24  at my -- at the beginning -- so at the beginning of my

25  relationship, I dealt with LabSolutions through a third party

1  who had an agreement with them, the company that I just

2  mentioned, Our Family Genes, Will Slagle's company.

3      It wasn't until sometime early '18 that we had a contract

4  directly with the lab.

5  Q.  Okay.  And we're going to get into that evolution here in a

6  second.  But before we do that, let's take a step back.

7      And can you explain to the jury, what were the names of the

8  companies you had that were involved in this?

9  A.  Sure.  CPL Media; MediPak d/b/a CPL Media; INS Co., LLC;

10  Medtech Worldwide; RealTime Physicians, also known as 24-Hour

11  Virtual MD.

12  Q.  Okay.  So taking those each on their own:  CPL, what was

13  CPL?

14  A.  So CPL was the telemarketing company.  So when you

15  telemarket in the State of Florida to an individual, not to a

16  business, but to direct consumers -- you know, we all get these

17  robocalls that we click off all the time -- with that said, you

18  have to be licensed by the Department of Agriculture, who

19  enforces the telemarketing rules.

20      So not only does the company have to be licensed and you

21  have to put up a bond to telemarket, each and every one of your

22  salespeople have to be licensed.

23      So CPL was the marketing company.  And depending on how we

24  generated the leads, there were various d/b/a's.  So as I

25  mentioned earlier, we called up as LabCorp. Services, so that

1    was a d/b/a of CPL Media Group, Inc., as an example.

2        So that's -- go ahead.

3    Q.   And now you mentioned Medtech, RealTime Physicians, 24-hour

4    physicians.

5        Can you explain, what were those companies?

6    A.   Sure.  They're virtually -- they were virtually one in the

7    same; that was the telehealth company.

8    Q.   And you said INS, another company.  What was that?

9    A.   INS was a marketing company.  At one point, Mr. Patel came

10   to me and said, I know you have this telehealth company.  Can

11   you maybe get your marketers using your telehealth company,

12   your services, to onboard with our lab, and we will pay you a

13   commission or an override on what they're getting?  That's what

14   that company was for.

15   Q.   Okay.  Now, the CPL and Medtech -- I'm just going to sort

16   of use one name for each side, the telemarketing and

17   telehealth -- what was the purpose of having them as separate

18   entities?

19   A.   Well, one was a marketing company, and one was a telehealth

20   company, obviously.  But it would not be cost-effective for a

21   doctor or a medical professional to call an individual

22   consumer.

23       So, in other words, it would have been cost prohibitive.

24   It would have cost ten times the amount of money for a doctor

25   to call an individual and go through a very extensive script

1  convincing somebody to take these tests as opposed to a weekly

2  salaried employee on the phone, that was a nonmedical

3  professional.

4  Q.  Okay.  Now, can you explain to the jury, as you were going

5  through this process and doing the work that you've described,

6  did you ever develop an understanding of what are the basic

7  things that you need to have in place in order to get money

8  from Medicare when it comes to genetic testing?

9  A.  Well, obviously you need a Medicare beneficiary.  You need

10  a doctor's order.  You need a letter of medical necessity.  And

11  you need a specimen that -- that somebody -- the individual

12  took -- in this case, it was a swab test -- so the lab could

13  run the test and have results sent out.

14      And in this case, we were sending out the results, not the

15  lab.  So all that paperwork is documented, so you could submit

16  a billing claim to be reimbursed to Medicare to get paid.

17  Q.  Was it important to you to secure a high volume of

18  patients?

19  A.  Of course it was.

20  Q.  Did you, in fact, secure a high volume of patients who said

21  yes to taking one of those tests?

22  A.  Yes, we did.

23  Q.  And doctors' orders -- what was your understanding of why a

24  doctor's order was necessary to bill Medicare for genetic

25  testing?

1    A.   As I said before, it's no different than a prescription.

2    You can't go to a pharmacy and get your medication.   So in this

3    case, unless a doctor signed an order -- and the doctors, by

4    the way, had to be what they call PECOS certified doctors,

5    meaning PECOS doctors are only able to treat or sign orders for

6    Medicare patients.   If they were not, Medicare would not

7    reimburse for those orders.

8    Q.   And as for the patients, was it important for you to get --

9    secure a high volume of doctors' orders?

10   A.   Of course it was.

11   Q.   Did the doctors that worked for your telemedicine company,

12   in fact, approve a high volume of doctors' orders?

13   A.   They did.

14   Q.   Approximately what percent of the orders submitted to

15   them -- approximately what percent was approved versus denied?

16   A.   Approximately 98 percent.

17   Q.   98 percent what?

18   A.   Were approved.

19   Q.   Okay.   So what's the bottom line here?   What were you

20   paying the doctors to do?

21   A.   To sign doctor orders.

22   Q.   And how were you getting paid for those orders?

23   A.   I was getting paid by the lab.

24   Q.   All right.   We're going to talk through --

25            MS. DE BOER:   Your Honor, I'm about to move to

1   documents.

2          THE COURT:  We're okay.  We have about another

3   15 minutes.

4          MS. DE BOER:  Perfect.

5   BY MS. DE BOER:

6   Q.  So, Mr. Sporn, we're going to talk about the process that

7   you've outlined a little bit.  So we're going to start with the

8   advertising process.  Okay?

9          So just hang on a minute.  I'll put up a document here in a

10  second.

11         MS. DE BOER:  Your Honor, at this time, the government

12  would mark for admission and move in Government Exhibit 1913

13  and 1913-A to C, 1915 and 1915-A, 1916 and 1916-A to D.

14         THE COURT:  Any objection on those?

15         MR. SADOW:  Once again, there will be no objections.

16  They can just offer it all in.

17         THE COURT:  Very good.  Those will all be admitted at

18  this time.

19         MS. GURSKIS:  Thank you, Your Honor.  Thank you,

20  Mr. Sadow.

21         (Government Exhibits 1913 and 1913-A to C, 1915 and

22         1915-A, 1916 and 1916-A to D were received in evidence.)

23  BY MS. DE BOER:

24  Q.  All right, Mr. Sporn.  I'm showing you what has been

25  admitted as Government Exhibit 1913.  I'm going to start here

1    at the top.

2         Do you see this is an email that you received?

3    A.   Yes, it is.

4    Q.   All right.  And just for the jury's clarification, who's

5    Matt Eggen?

6    A.   So Matt Eggen was -- so in my -- in my operation, if I can

7    call it that, we had two floors in an office building,

8    approximately 18,000 square feet.  And the building was three

9    stories.  On the third floor was the telehealth side, and also

10   where we processed the specimens, the shipping and the

11   receiving to the individuals who received them back.  And on

12   the second floor was the call center side.

13        So Matt was involved with marketing on his own, but also

14   marketing -- was -- introduced me to Brett Hirsch and

15   Keith Youngswick, who were Alite Labs, who were market -- that

16   we were marketing for -- subcontract- -- subcontracting with,

17   so to speak.

18   Q.   Okay.  And to be clear, ms@medtech, is that your email?

19   A.   It is.

20   Q.   And this is from November of 2018; is that correct?

21   A.   Correct.

22   Q.   Okay.  And do you see all of the attachments here?

23   A.   Yes.

24   Q.   And the subject of the email is launch.

25        Do you see that?

1    A.   I --

2    Q.   Did you see it?

3    A.   I didn't see launch.

4    Q.   I'm sorry.  The subject of the email is launch.

5    A.   Yes, I'm sorry.

6    Q.   So I'm going to show you the attachments to the email.  So

7    this is Government Exhibit 1913-A.  We'll zoom in.

8         MR. SADOW:  Your Honor, the only thing I may request is

9    when the government is publishing an exhibit to get a date so

10   it makes it clear.

11        THE COURT:  To the extent possible, go ahead.

12        MS. GURSKIS:  I think we established that the date of

13   this email was November 6th, specifically, of 2018.

14        THE COURT:  You may proceed.

15   BY MS. DE BOER:

16   Q.   All right.  This is the first attachment to the email,

17   Mr. Sporn.  It's Government Exhibit 1913-A.  What are we

18   looking at here?

19   A.   You're looking at an advertisement.  If I may, I'll read

20   it.

21   Q.   Can you just walk the jury through where -- first of all,

22   where would this advertisement be placed?

23   A.   So if you ever -- so in this -- this particular

24   advertisement went on a website, I believe, called

25   getfreestuff.com.

1   Q.   Okay.  And what was getfreestuff.com?

2   A.   It's basically -- it's a -- it's hard to explain.

3        Has anybody ever clicked on a link where you go to Yahoo!,

4   and it takes you to, like, a survey?  So it's a survey path.

5   So the publisher in this case would have already had somebody's

6   first name, last name, phone number, address, so on and so

7   forth.

8        So -- and they're asking a whole bunch of questions.  So as

9   it says, we're finding more free samples for you.  So this one

10  says, Have you or a loved one had cancer?  And if they click

11  "yes," it became a lead.

12  Q.   What would happen if the patient clicked "yes" on this ad?

13  What would be the next step?

14  A.   They would post it into our lead system.

15  Q.   And then --

16  A.   And there -- excuse me a second.  My throat's a little dry.

17       THE COURT:  We can get you some water.  You have some

18  there?

19       THE WITNESS:  I come equipped.

20       THE COURT:  All right.  Very good.

21       THE WITNESS:  So after the lead came in, we would --

22  well, first of all, we would have the leads come in at

23  approximately -- starting at 5:00 a.m. and turn off at

24  5:00 p.m.  Why?  Because if the leads came in at 12,

25  1:00 o'clock, there's a high probability that we're never gonna

1  get this person back on the phone, especially since the call

2  center typically started between 8:00 and 9:00 in the morning

3  calling.

4       But before the lead actually went into the dialer, they

5  were batched and put through the system that I said before,

6  MVP.  So MVP verified that the individual who submitted the

7  lead actually had Medicare Part B, because if they didn't have

8  Medicare Part B, there was no sense in calling them because it

9  would be unlikely that the lab would be reimbursed for the

10  sample.

11  BY MS. DE BOER:

12  Q.  And, Mr. Sporn, let me ask you and direct you specifically

13  to this ad.  And we'll zoom in a little here.

14       Do you see how over here this is phrased as a -- framed as

15  a "bonus deal"?

16  A.  Yes.

17  Q.  And then the ad itself asks, Have you or a loved one had

18  cancer?  If you have Medicare Part B, you could be eligible to

19  receive a free cancer screening.

20       Do you see that?

21  A.  Of course I do.

22  Q.  What was the purpose of advertising these tests to patients

23  as free?

24  A.  Well, if they had to pay for the test, the probability is

25  that they never would have signed up or agreed to take these

1    tests.

2    Q.   And down here it says, By submitting yes on this ad, I

3    consent to have a representative from Innovative Lab Services,

4    LLC, contact me at this number.

5         And that is a place for the patient to enter their number?

6    A.   Correct.

7    Q.   Was this the only type of ad, or were there similar

8    questions presented for patients to click on?

9    A.   No, there were others.  So what we used to do -- similar to

10   this, but there was numerous other ones.  We used to rotate

11   them to see -- just us like any advertiser -- what somebody

12   would respond to.

13        So, in other words, just like on a TV commercial, you may

14   see for the same product three different ads.  The reason why

15   they do that is because they want to determine which ad has the

16   best draw.

17        So in this case, we were rotating ads to see where we

18   were -- how we were -- which produced the most amount of leads.

19   Q.   And now I'm going to turn to 1913-B.

20        Is this part of the same type of advertisement?

21   A.   Yes, it is.

22   Q.   Okay.  Would you like to participate in a cancer screening?

23        Then we're going to turn to 1913-C.  Has it been a while

24   since your last cancer screening?

25        Why was that question asked?

1    A.   Because the probability, as I -- first of all, I am

2    rotating the advertisement.  It backs into that.  But the

3    probability is that most people haven't had a cancer screening.

4    Even if you've gone -- a lot of people, even if they've gone

5    for a colonoscopy, for example, they don't know that they're

6    possibly being screened for cancer.

7         So psychologically, it's inducing the individual to sign up

8    and take the test or be solicited by the agent on the phone.

9    Q.   I'm going to show you admitted Government Exhibit 1916.

10        And, Mr. Sporn, is this an email from someone named

11   Jessie Dugan to you regarding leads?

12   A.   Yes.

13   Q.   Who's Jessie?

14   A.   So that was one of the marketing companies that ran these

15   ads, so they had their own relationship with Get Free Meds, the

16   Yahoos of the world, so on and so forth.  We used many

17   different companies like these.  It was the media company, call

18   it.

19   Q.   And this email is dated February 12, 2019; is that correct?

20   A.   Correct.

21   Q.   And you see here a bunch of other attachments?

22   A.   I do.

23   Q.   Are these additional ads?

24   A.   They could be, but I'd have to see them.

25   Q.   Okay.  So I'm showing you 1916-A.

1        Is this the label or the logo for Lab Services?

2    A.  Yes, it is.

3    Q.  All right.  And this one is, Do you want to catch signs of

4    cancer early; is that correct?

5    A.  Correct.

6    Q.  And again, the same reference to, If you have Medicare, you

7    might get a free cancer screening?

8    A.  Yes.

9    Q.  Okay.  1916-B, another Lab Services ad.

10       Do you want to stop cancer in its tracks; is that correct?

11   A.  Correct.

12   Q.  And another reference to the free cancer screening?

13   A.  Correct.

14   Q.  1916-C, Lab Services.  Does the fear of cancer keep you up

15   at night, and another reference to the free cancer screening?

16   A.  Correct.

17   Q.  And 1916-D, Are you or your family at risk of cancer?

18   A.  Correct.

19   Q.  Why pose questions in a way regarding the fear of cancer?

20   A.  To create the sense of urgency.  Obviously, where there's a

21   sense of urgency, where there's a fear, somebody's apt to agree

22   to take one of these tests.

23   Q.  Okay.

24       MS. DE BOER:  Your Honor, I'm about to move to a

25   different part of the process.  So if this is a good stopping

1   point...

2           THE COURT:  Yeah, I think it's a good idea.  Let's do

3   that.

4           Thank you very much, Mr. Sporn.  We're going to go

5   ahead and excuse you at this time.

6           THE WITNESS:  Thank you.

7           THE COURT:  Thank you.  We'll see you on Monday.

8           Okay.  Ladies and gentlemen of the jury, that completes

9   our testimony for the week.  Let me give you a little bit of a

10  preview of what I would like to do heading into Monday.

11          So if it's not too much trouble, I think that today we

12  were quite successful in starting at 9:00.  We made a lot of

13  movement.  By my count, we've covered 10-1/2 witnesses or so in

14  four days.  So we are really doing what we need to be doing to

15  keep everything on track.  And I know that the government and

16  the defense are doing the same thing because they don't want to

17  waste any of your time.

18          So I'm going to ask that everyone, just like today,

19  come in on Monday at 9:00, be here by 9:00.  As soon as

20  everybody is here, we'll get started.  We'll put Mr. Sporn back

21  on the stand, and our goal is to see if we can complete his

22  testimony throughout the course of Monday.  And we'll see if we

23  have any time to move on to other witnesses once that is done.

24          Then we will continue on into the week.  I'm working

25  with the government and will continue to do so -- and the

1    defense -- to get a lineup ready to go for the following week.

2    And I expect that at some point in the middle of next week, I

3    will have a very good sense, since it'll be just about the

4    midpoint of our trial period, about how we're doing exactly on

5    our range of time and schedule.

6         But I can assure all of you that we're going to

7    continue to make sure that we don't waste anyone's time and we

8    streamline the presentation of evidence as much as possible.

9         So, obviously, it's incumbent upon me as you take a

10   weekend break -- since we're not going to see each other for a

11   few days -- that you have a well-deserved break.  You have been

12   fantastic.  I want to thank you for how much you've been paying

13   attention, how timely you've been.  I can tell that you're all

14   locked in; you're following the evidence.  And we couldn't ask

15   anything more other than keeping an open mind, listening

16   carefully.

17        Remember that everything that's coming into evidence --

18   I know we've had a lot of documents admitted -- you will get a

19   chance to see all of that at the end.  So I don't want anyone

20   to think, oh, I really wanted to have another minute with that

21   image.  You will get a chance.  That email -- all of that will

22   go back.  So I want you guys to feel certain that you are going

23   to have an ability to review all of the evidence at the end of

24   the case.

25        When you go to the jury room today, make sure you leave

1  your notepads; don't take them with you.  Take any personal

2  effects, anything else you may need.  When you come in on

3  Monday, of course, if you run into the lawyers, take no offense

4  if they avoid you.

5       And when you're home this weekend, please continue to

6  abide by all the rules that govern your behavior.  Certainly

7  you may, once again, have family or friends or employers ask

8  about what's going on.  You can only tell them the dates of

9  your service, the time you have to be here, et cetera.  You

10  cannot discuss anything about the case with them.

11       Please resist any temptation whatsoever to do any

12  research, although I would imagine -- I've listened to this for

13  five days -- the last thing any of you are probably going to do

14  is go online and read more about it.  So I don't feel I'm going

15  to have to worry about that.

16       But I urge you, that, you know, if your curiosity gets

17  the best of you, do not go online and look up any people,

18  places, or things related to any events in this trial.

19       Certainly do not talk to one another.  I'm sure there's

20  a temptation, because it's human nature, to think about these

21  things and wonder what the person next to you is thinking about

22  all this evidence.  You've got to wait until the end of the

23  case before you do that.  Remember that premature discussions

24  or preliminary discussions really will lead to premature

25  decisions.

1          So keep all of those rules in mind.  You guys have been

2    great.  And, of course, stay off social media, no engagement of

3    social media regarding your jury service.

4          So those are the rules of the road.  I have no doubt

5    you guys have adhered to all of them since the beginning.  I

6    sincerely appreciate it; the lawyers appreciate it.

7          It has been a very long week, and I want you guys to

8    get some rest so that we come back refreshed at 9:00 a.m. on

9    Monday to continue on with this trial.  So thank you all so

10   much for your service thus far.

11         I would ask that Ms. Martinez stay behind for just a

12   moment so I can discuss travel issues.  But everyone else, you

13   are free to exit at this time.

14         THE COURT SECURITY OFFICER:  All rise.

15         (Jury exits at 4:58 p.m.)

16         THE COURT:  Please be seated, everyone.

17         Okay.  So, Ms. Martinez, I've had a discussion with the

18   lawyers.  First and foremost, I want to thank you for how

19   dedicated you've been because I know that you did everything in

20   your power to try to stick with us.  We really did not want to

21   excuse you; we wanted you to stay through on this trial.

22         But as you know, we have a lot of material to cover.

23   And there's a risk that if, you know, heaven forbid, the flight

24   is delayed or we can't get you to start, we're going to lose

25   potentially half a day, if not more.

1        So we've made a decision amongst all ourselves that

2    we're going to excuse you from further service.  So your

3    service has come to an end.  Okay.  You're not going to have to

4    return on Monday.

5        My courtroom deputy will give you any further

6    instructions.  So when you go to leave now, make sure she has

7    your badge.  Leave your notepad with her, and we'll shred it,

8    so you won't have to worry about that.  But I just wanted to

9    thank you on behalf of the lawyers and the court system for

10   your service.  We'll get you documentation if you need anything

11   evidencing your service, but it has come to an end, okay?

12       We just didn't want you worrying about that and trying

13   to rush back.  And we really, really appreciate your

14   willingness to try and make it work.  I know you tried.

15   There's just nothing else I can ask from you, and I don't want

16   to run the risk of having to delay the trial, okay?

17       Well, thank you so much.  Hope you enjoy your trip.

18   And now you don't have to worry about rushing back when you

19   land in Fort Lauderdale on Monday.  Okay?  You're excused.

20   Thank you, ma'am.  Have a great rest of your day.

21       (Juror exits at 4:59 p.m.)

22       THE COURT:  All right.  Everyone please be seated.

23       So again, we've excused that one juror.  We've taken

24   care of that.

25       Gentlemen, you needed to make a phone call.  I don't

1    want to delay you as to your other trial.

2           MR. SADOW:  But at the same time, we have a couple of

3    quick questions for the Court.

4           THE COURT:  Yeah.  Sure.  I just didn't know if you had

5    to rush out on that.  But I'm happy to do that first.  Let's do

6    the housekeeping before we finish.  Go ahead.  We're good.  Go

7    ahead.

8           MR. SADOW:  First, we're going to need the courtroom

9    opened earlier, obviously.

10          THE COURT:  Sure.

11          MR. SADOW:  Can we shoot for 8:30?

12          THE COURT:  As soon as I get my courtroom deputy, I'll

13   ask her.  I don't see a problem with that at all.  We should be

14   able to do it earlier.

15          MR. SADOW:  And we need the rooms open let's say

16   8:00 o'clock, the conference room.

17          THE COURT:  So 8:30 courtroom, and we'll do the

18   conference room at 8:00 a.m.  Got it.

19          MR. SADOW:  What time does the courthouse open?

20          THE COURT:  That's a good question.  I think it's 7:00,

21   but I'm not positive.  But maybe the government may know.  I

22   have to double check, but I can find out for you.

23          MR. SADOW:  If it can be open as early as 7:45 on the

24   conference room, if the courthouse is open, we'll shoot for

25   7:45.  It's a lot easier for us to work here than it is to try

1    to rush over.

2            THE COURT:  Not a problem.  And I'm going to find

3    out -- we'll talk to my CSOs and see if we can figure out a way

4    to get all this opened up.  But assuming the courthouse is

5    open, which I believe it should be without a problem, I'll see

6    if I can get a 7:45 on the conference room, and you said,

7    again, 8:30 on the courtroom works?

8            MR. SADOW:  Yes.

9            THE COURT:  Okay.  Got it.  All right.

10           MR. SADOW:  And then we need -- Monday is going to be a

11   long day, I can suggest to the Court, with Mr. Sporn.  But we

12   need some indication of who's coming next.

13           THE COURT:  Yes.  That was going to be my next

14   question.  So let me hear from the government.

15           What's our plan for our next witness if we are able to

16   get through Mr. Sporn?  I don't know if the plan is to have a

17   witness like Dr. Yogel on next.  Maybe that needs to get moved

18   around.  But what are we thinking as a backup after Sporn is

19   done?

20           MS. DE BOER:  Yes, Your Honor.  Over the lunch break,

21   we rearranged travel for two witnesses who will now be flying

22   down in time to testify on Monday afternoon, if necessary.

23   They are Nicholas Vartanian and Jonathan Hayes.

24           THE COURT:  Okay.

25           MS. DE BOER:  And if we don't get to them or if we

1    don't get to both of them on Monday, they will be able to be

2    here on Tuesday too.

3         THE COURT:  Okay.  So Vartanian and -- I'm sorry.  I

4    missed the name of the other one.

5         MS. DE BOER:  Hayes.

6         THE COURT:  Hayes.  Okay.  Good.  So it looks like we

7    have as a backup, if we can get to them, Vartanian and Hayes.

8    And if we don't get to both of them or only one, whoever is

9    remaining from those two will lead off Tuesday post Mr. Sporn,

10   right?

11        MS. DE BOER:  Yes.

12        THE COURT:  All right.

13        MR. SADOW:  As long as I'm clear from that, a

14   cooperating witness is not going to be showing up on Monday.

15        THE COURT:  Oh, I can't figure that there would ever be

16   enough time for that.  I mean, I think --

17        MR. SADOW:  I just want to know if I'm getting prepped,

18   I'm going to be prepping Sporn, and please don't tell me on

19   Sunday in the middle of the day that you've changed and you're

20   bringing your cooperating witness.

21        THE COURT:  No.  It sounds to me like, based on travel

22   arrangements, that Sporn is the focus on Monday.  At best case,

23   we can get through Hayes and Vartanian.  Perhaps the only thing

24   I would ask, just so we get ahead of it -- because we're going

25   to be very focused on Sporn -- assuming we do get through one

1    or both of them, I don't need to go beyond Tuesday afternoon,

2    but do we have a sense of who could be called Tuesday

3    afternoon?  Because I could see a situation if we think there's

4    a cooperator coming that day, we're going to want to know that

5    too.  So I don't know.

6         MS. DE BOER:  Yes, Your Honor.  I think at some point

7    on Tuesday, we are likely to call Shawn Griner, who is a

8    cooperator.

9         THE COURT:  Okay.

10        MS. DE BOER:  There are a couple of other witnesses for

11   Tuesday, smaller witnesses, a beneficiary, W.I.  And if

12   necessary, because I think the defense has some objections to

13   cell phone evidence from Mr. Patel's cell phone, we will call

14   an analyst that extracted the phone.

15        So those are the possibilities for Tuesday at least at

16   this point.

17        THE COURT:  Okay.  And I was going to ask you, what do

18   we have in terms of Hayes and Vartanian?  Are those lengthy

19   witnesses?  I don't necessarily know.

20        MS. DE BOER:  I don't think so.  I would say comparable

21   to Roebuck.

22        THE COURT:  Okay.  Okay.

23        MS. DE BOER:  So middle of the road.

24        THE COURT:  Okay.  That's a good example.

25        MR. SADOW:  Vartanian is going to be a little longer.

1          THE COURT:  Okay.

2          MR. SADOW:  I have a few more questions for him.

3          THE COURT:  I think the important thing, then, for

4    everyone to prep on is there's an outside chance that we could

5    get to another lengthier witness Tuesday afternoon.  I

6    understand we have W.I., when we know that the beneficiaries

7    are quite quick, and the potential analyst.

8          But I think it would be important that we at least look

9    forward to the possibility of having an additional cooperator

10   take the stand at some point late Tuesday.  Sounds to me like,

11   even in the best-case scenario, you would probably not be

12   beginning the cross-examination, Mr. Sadow, of -- and I'm

13   sorry; I'm forgetting what the other cooperator's --

14         MR. SADOW:  Shawn Griner.

15         THE COURT:  Griner.  Thank you.  I don't think there's

16   any way that you would be doing a cross of Mr. Griner on

17   Tuesday.  So I think, if you're planning ahead, after Sporn,

18   you're looking at maybe basically 24 hours before you're doing

19   a cross of Griner.  So that way, you can plan ahead.

20         MR. SADOW:  That's fine.  And I'll be working on

21   Mr. Griner as well over the weekend.  I again request, please

22   don't send me an email Sunday afternoon that says, by the way,

23   we decided not to go with Griner; we're moving on to somebody

24   else.

25         THE COURT:  Yeah.  For me, the biggest thing is that we

1    don't move anyone out of sequence that is a significant

2    cooperating witness with a lot of voluminous discovery review

3    and prep.  But to me, right now, given that flight arrangements

4    have been made, this looks like a very reasonable lineup.

5    That'll take us into Tuesday, potentially Wednesday.

6            I mean, if by Wednesday -- I mean, let's think about it

7    this way.  If we finish Sporn, Hayes, Vartanian, W.I.,

8    potential analyst, and Griner -- I mean, if you're telling me

9    we've got about six witnesses, by my count, through Wednesday,

10   you know, I have to think at that point -- and I know Dr. Yogel

11   is out there too.  But I have to think coming in by Thursday,

12   we are very much in a good position for the government to shoot

13   for a potential resting of their case by Friday.

14           MR. SADOW:  I don't think that's even within the realm

15   of possibility.  They still have Hirsch --

16           THE COURT:  Okay.

17           MR. SADOW:  -- McKeon.

18           THE COURT:  Well, this is assuming they're going to

19   call them all.  I don't know, but maybe I can just get a sense.

20   I don't know.  I'm just asking this realistically from the

21   government's perspective:  If we get through that to-do list,

22   if you will, by the middle of next week -- I'm just curious --

23   if we're, in the government's view, ahead of schedule?  I don't

24   know.  It seems like we would be.

25           MS. DE BOER:  I think we're right about on schedule.

1          THE COURT:  Okay.

2          MS. DE BOER:  I wanted to get a little farther with

3     Sporn by the end of this week, but we're not that far off.  I

4     think starting at 9:00 certainly helps.  I think the following

5     Monday is more likely to be the day we rest.

6          Because I think -- for example, Mike Petron from Stout

7     is the financial analyst.  It's not a cooperating witness, but

8     it's going to be lengthy.  There's a lot of financial analysis

9     to explain.  It's not going to be terribly lengthy, but there's

10    a couple of witnesses like that that are not short.  So I do

11    think Monday is more realistic.

12         MR. SADOW:  Your Honor needs to understand, Hirsch is

13    going to be potentially a day.

14         THE COURT:  Okay.

15         MR. SADOW:  And McKeon, if not a day, pretty close to a

16    day.  So you're talking about -- that's theoretically going on

17    a Wednesday, a Thursday, and a Friday, and there are other

18    cooperators.  There is Orr that's at least a possibility.

19         So I don't want the Court to understand this to be --

20    that's why we're asking the government.  They don't have to

21    tell us everything, but if the Court's trying to be efficient,

22    are they calling McKeon, are they calling Orr, are they calling

23    Hirsch, because those are long, long witnesses.

24         THE COURT:  Well, I'll say this, I mean, I think at

25    this point we have to reevaluate and see how things are going

1    when I get into Wednesday.  If I can get through this lineup

2    that's already been blocked off with knocking out Mr. Sporn and

3    getting through a couple of these smaller witnesses up until

4    when we get to Griner, I can then reevaluate and see how things

5    are looking in the middle of next week.

6          And then I can try to -- to build out and see if we are

7    indeed getting closer by Monday of the following week to the

8    government wrapping up their case-in-chief.

9          So let's just reevaluate it at that time.  I mean, at

10   this point, we just have to keep pressing on.  We'll start at

11   nine on Monday, and then we'll see how far we get.  Certainly

12   we've got to get Sporn done on Monday and try to knock out at

13   least another witness.  That's what we have to do to get back

14   to where we need to go.

15         I just think that at some point -- you know, we have

16   such a large volume of witnesses.  There is a lot of baseline

17   information that this jury knows.  So as we start to stack

18   witnesses on witnesses, we have to start keeping in mind that

19   we don't necessarily need, other than the very key fundamental

20   relationships being, you know, fleshed out and the roles of

21   these individuals -- we want to shortcut, if we can, some of

22   the questioning of these witnesses so we don't necessarily

23   double back over backdrop information as to LabSolutions that

24   we've covered with other witnesses.

25         So we have to try to make that effort in some of these

1    directs to just keep them a little bit tighter.  And if we can

2    do that, we can get ourselves where we need to be in the middle

3    of next week.

4         So that's the lineup.  The Court's aware of it.  You

5    know, look, I think everyone here has a vested interest.  I

6    agree that from the defense camp -- certainly, the defense -- I

7    would agree with you guys.  I mean, no one wants to be up

8    against a wall as we get closer to the end.

9         But certainly, as we get closer to the end, there's

10   also a bigger risk, and, that is, we get too close to the

11   holidays.  If I'm the government, the last thing I want is

12   everybody to be gone from December 22nd until January 6th

13   because that's going to happen.  And good luck remembering half

14   the stuff that they put on for two weeks.

15        So you guys are masters of your own fate.  It's not

16   just the defense that has to worry about being up against the

17   wall.  I'm not going to let the defense be jammed on the

18   holidays.  It's just not fair.  And if it takes them longer

19   than it does because they didn't get their case-in-chief until

20   three days before the end of the trial period, let's hope these

21   jurors have a good memory.

22        So you decide what you want to do.  Okay?  So that is

23   just the reality of it.

24        So with that being said, anything else on the

25   government's side, just housekeeping before I wrap up for the

1    day?

2           And I know you guys have your call in about five.  So

3    anything else?

4           MS. DE BOER:  Not really, Your Honor, other than we are

5    evaluating cutting witnesses, and I think particularly after we

6    see the cross of Sporn, we will have a much better idea of what

7    else we need to put on to wrap this up.

8           THE COURT:  Okay.  Good.  I'm glad to hear that.  We

9    need to keep evaluating the need for some of these folks

10   depending on how the performance goes from others.  So that

11   makes sense to me.

12          On the defense side, guys, is there anything we need to

13   be aware of before we wrap up and you guys take your call?

14          MR. SADOW:  Nope.  We'll be ready to go on Monday.

15          THE COURT:  All right.  Okay.  Gracie, really quick, as

16   I am letting them pack up, they are hoping that on Monday we

17   can open up the conference room at 7:45, and then the courtroom

18   will be open at 8:30.  So I don't know if you can make that

19   happen.  But we are going to start at 9:00.  So that will be

20   great.

21          Have a great weekend.  Thank you, all.  We'll see you

22   all Monday morning at 9:00 a.m.  We're in recess.  You got it.

23          MR. SADOW:  Thank you, Your Honor.

24          MS. DE BOER:  Thank you, Your Honor.

25          THE COURT:  You got it, guys.

```
 1            (Court recessed at 5:11 p.m.)

 2

 3                        C E R T I F I C A T E

 4

 5

 6            I hereby certify that the foregoing is an

 7    accurate transcription of the proceedings in the

 8    above-entitled matter.

 9

10
      DATE:   December 2, 2022   /s/Ilona Lupowitz
11                               ILONA LUPOWITZ, CRR, RPR, RMR
                                 Official Court Reporter
12                               United States District Court
                                 299 East Broward Boulevard
13                               Fort Lauderdale, Florida 33301
                                 (954) 769-5568
14

15

16

17

18

19

20

21

22

23

24

25
```

## $

**$10,000** [1] - 210:9
**$30,000** [1] - 70:8
**$4,000** [1] - 210:10
**$400** [1] - 70:1

## '

**'18** [1] - 211:3

## /

**/s/Ilona** [1] - 238:10

## 1

**1** [2] - 1:7, 200:22
**10** [3] - 73:6, 73:12, 175:9
**10-1/2** [1] - 223:13
**100** [1] - 3:6
**104** [1] - 3:22
**1099** [1] - 178:23
**1099s** [1] - 177:19
**10:00** [1] - 124:14
**10:55** [2] - 73:5, 73:9
**10:56** [1] - 73:16
**11** [4] - 73:6, 73:13, 117:1, 126:4
**1170** [1] - 2:6
**118** [1] - 3:6
**11:00** [5] - 127:25, 128:1, 128:2, 128:5, 128:7
**11:15** [1] - 73:17
**11:17** [1] - 73:25
**11:30** [1] - 126:4
**12** [4] - 133:22, 135:15, 218:24, 221:19
**12:20** [2] - 122:12, 124:4
**12:29** [1] - 132:2
**12:30** [2] - 127:19, 128:2
**13** [2] - 133:21, 175:21
**135** [1] - 3:8
**137** [1] - 3:23
**13th** [1] - 177:5
**14** [2] - 175:9, 175:18
**1400** [1] - 1:16
**15** [2] - 135:15, 215:3
**15-minute** [3] - 73:3, 73:12, 200:8
**15th** [6] - 135:21, 161:15, 174:22, 185:4, 188:12
**16** [3] - 126:8, 133:8, 184:16
**160** [1] - 3:9
**16th** [5] - 155:3, 161:15, 185:9, 196:3, 196:4
**1723** [4] - 3:23, 132:11, 137:19, 137:24
**175** [1] - 3:23

## 1 (cont.)

**18,000** [1] - 216:8
**19-80181** [1] - 4:3
**19-CR-80181-RAR-1** [1] - 1:2
**1913** [4] - 3:24, 215:12, 215:21, 215:25
**1913-A** [5] - 3:24, 215:13, 215:21, 217:7, 217:17
**1913-B** [1] - 220:19
**1913-C** [1] - 220:23
**1915** [3] - 3:25, 215:13, 215:21
**1915-A** [3] - 3:25, 215:13, 215:22
**1916** [4] - 3:25, 215:13, 215:22, 221:9
**1916-A** [4] - 3:25, 215:13, 215:22, 221:25
**1916-B** [1] - 222:9
**1916-C** [1] - 222:14
**1916-D** [1] - 222:17
**197** [1] - 3:9
**1987** [2] - 9:3, 76:9
**1:00** [2] - 126:10, 218:25
**1:45** [1] - 122:14

## 2

**2** [7] - 1:4, 12:19, 27:17, 181:15, 193:8, 238:10
**20** [1] - 17:3
**20,000** [2] - 103:6, 103:11
**20005** [1] - 1:14
**2011** [1] - 10:17
**2017** [1] - 10:14
**2018** [3] - 24:13, 216:20, 217:13
**2019** [6] - 117:1, 117:4, 135:21, 148:17, 155:3, 221:19
**2020** [2] - 74:23, 115:13
**2022** [2] - 1:4, 238:10
**203** [1] - 3:11
**2052** [1] - 1:19
**21** [2] - 41:11, 115:13
**215** [1] - 3:24
**22** [7] - 161:12, 162:6, 162:15, 166:20, 170:18, 176:11, 196:16
**22nd** [1] - 236:12
**234** [1] - 55:24
**24** [2] - 115:6, 232:18
**24-hour** [2] - 211:10, 212:3
**2400** [1] - 2:6
**24th** [1] - 159:10
**25** [1] - 24:13
**257** [1] - 107:8
**260** [1] - 1:18
**27,000** [3] - 55:5, 55:8, 55:14

## 2 (cont.)

**27th** [2] - 195:1, 195:19
**299** [2] - 1:23, 238:12
**29th** [1] - 195:1
**2:18** [1] - 132:3
**2:20** [1] - 134:12
**2:21** [1] - 134:7

## 3

**3** [8] - 12:19, 27:12, 27:17, 45:25, 57:17, 180:21, 181:21
**30** [2] - 10:25, 169:1
**30,000** [1] - 17:3
**30303** [1] - 1:19
**30305** [1] - 2:4
**30309** [1] - 2:7
**30th** [1] - 195:1
**3131** [1] - 2:3
**31st** [1] - 179:17
**3301** [1] - 1:24
**33301** [1] - 238:13
**39-year-old** [1] - 24:25
**3:00** [1] - 127:22
**3:47** [1] - 200:13
**3:50** [1] - 202:14

## 4

**4** [3] - 27:17, 55:10
**40** [5] - 168:22, 169:2, 179:1, 209:5, 210:4
**40s** [1] - 110:3
**410** [8] - 3:22, 104:18, 104:25, 105:10, 105:24, 110:7, 115:7, 159:6
**411-A** [3] - 3:15, 8:4, 8:14
**412-A** [3] - 3:15, 8:4, 8:14
**413-A** [3] - 3:16, 8:4, 8:14
**414-A** [5] - 3:16, 8:4, 8:15, 59:8, 59:13
**414-B** [1] - 59:9
**415-A** [3] - 3:16, 8:5, 8:15
**416-A** [3] - 3:17, 8:5, 8:15
**417** [4] - 3:17, 8:7, 8:15, 89:7
**417-A** [6] - 3:17, 8:5, 8:15, 41:16, 41:17, 43:8
**417-B** [2] - 46:24, 47:13
**417-C** [5] - 23:25, 26:9, 89:8, 89:11, 89:14
**417-D** [2] - 37:10, 37:12
**42** [2] - 209:24, 210:4
**424** [3] - 3:18, 8:7, 8:16
**424-A** [3] - 3:18, 8:5, 8:16
**424-C** [2] - 49:1, 49:20
**424-D** [1] - 51:12
**425** [3] - 3:18, 8:7, 8:16
**425-A** [3] - 3:19, 8:6, 8:16
**425-C** [2] - 57:1, 66:12
**429** [1] - 8:6

## 4 (cont.)

**429-A** [1] - 8:6
**430** [3] - 3:19, 8:8, 8:17
**430-A** [1] - 8:8
**436** [3] - 3:20, 8:8, 8:17
**436-A** [3] - 3:20, 8:9, 8:17
**436-C** [1] - 52:12
**442** [3] - 3:20, 8:9, 8:17
**443-A** [3] - 3:21, 8:9, 8:17
**444-A** [3] - 3:21, 8:9, 8:18
**446** [3] - 3:21, 8:9, 8:18
**447** [3] - 3:22, 8:9, 8:18
**45** [1] - 151:7
**46** [1] - 106:22
**475** [3] - 3:22, 8:10, 8:18
**476** [3] - 3:22, 8:10, 8:18
**477** [3] - 3:22, 8:10, 8:18
**49** [2] - 28:1, 32:2
**4:00** [2] - 200:9, 201:24
**4:18** [1] - 202:15
**4:19** [1] - 202:17
**4:58** [1] - 226:15
**4:59** [1] - 227:21

## 5

**5** [3] - 1:6, 55:10, 116:21
**50** [1] - 17:24
**50/50** [1] - 117:12
**50s** [1] - 110:3
**530-A** [2] - 3:19, 8:17
**59** [1] - 110:7
**5:00** [5] - 133:19, 202:1, 202:20, 218:23, 218:24
**5:11** [2] - 1:5, 238:1
**5th** [1] - 180:15

## 6

**6** [6] - 185:11, 186:4, 186:11, 186:13, 188:17
**60** [1] - 107:24
**67** [2] - 159:5, 159:6
**6th** [2] - 217:13, 236:12

## 7

**7** [2] - 4:12, 123:13
**702** [1] - 15:15
**70s** [1] - 109:14
**74** [1] - 3:4
**769-5568** [2] - 1:24, 238:13
**7:00** [1] - 228:20
**7:45** [4] - 228:23, 228:25, 229:6, 237:17

## 8

**8** [1] - 3:4, 3:15
**80** [1] - 109:22
**80s** [1] - 110:4

**8:00** [5] - 150:19, 195:19, 219:2, 228:16, 228:18
**8:30** [5] - 150:20, 228:11, 228:17, 229:7, 237:18
**8:58** [2] - 125:4, 125:8
**8th** [1] - 1:16

## 9

**9** [1] - 117:3
**902** [1] - 6:4
**954** [2] - 1:24, 238:13
**97** [1] - 107:22
**98** [2] - 214:16, 214:17
**9:00** [11] - 125:5, 125:8, 128:6, 219:2, 223:12, 223:19, 226:8, 234:4, 237:19, 237:22
**9:15** [1] - 1:5
**9:19** [1] - 6:16

## A

**A-m-y** [1] - 135:1
**A.K** [2] - 57:2, 62:9
**a.m** [11] - 1:5, 6:16, 73:9, 73:16, 73:17, 73:25, 195:19, 218:23, 226:8, 228:18, 237:22
**abbreviations** [1] - 38:21
**abdomen** [1] - 108:25
**abide** [1] - 225:6
**ability** [5] - 41:12, 64:4, 88:6, 99:20, 224:23
**able** [20] - 26:21, 32:5, 37:5, 55:2, 113:22, 118:3, 126:24, 128:13, 133:24, 146:12, 158:8, 167:2, 167:23, 189:1, 197:7, 204:22, 214:5, 228:14, 229:15, 230:1
**abnormal** [3] - 17:5, 105:5
**abnormalities** [1] - 41:6
**above-entitled** [1] - 238:8
**absent** [2] - 5:20, 7:21
**absolutely** [30] - 20:2, 20:11, 32:6, 32:8, 32:16, 32:20, 33:9, 35:18, 41:5, 43:19, 44:1, 49:11, 55:16, 61:23, 62:14, 63:11, 80:3, 80:6, 81:1, 81:15, 87:25, 88:7, 91:13, 92:4, 97:25, 101:15, 108:3, 109:15, 110:6, 204:16
**academic** [1] - 12:16
**accept** [1] - 31:23
**acceptable** [1] - 54:8
**access** [13] - 149:25, 150:2, 150:4, 150:5, 158:17, 158:25, 167:19, 167:23, 168:24, 169:14, 183:2,
183:20
**accident** [1] - 155:16
**accommodate** [1] - 128:5
**accommodations** [1] - 125:10
**according** [3] - 138:11, 143:5, 145:25
**accordingly** [1] - 196:24
**account** [5] - 68:5, 144:2, 148:1, 154:17, 172:8
**accounted** [1] - 4:4
**accreditation** [10] - 84:4, 84:13, 84:18, 84:21, 85:2, 85:13, 87:11, 87:13, 87:15, 87:21
**accredited** [3] - 71:7, 85:9, 86:24
**accuracy** [1] - 85:18
**accurate** [4] - 20:16, 53:24, 72:2, 238:7
**accustomed** [2] - 148:23, 153:20
**act** [1] - 186:21
**action** [5] - 33:2, 48:7, 48:12, 62:25, 117:19
**active** [2] - 27:7, 45:12
**actively** [1] - 26:22
**activities** [7] - 10:21, 11:1, 11:3, 11:17, 77:24, 139:10, 139:16
**activity** [1] - 71:14
**actual** [5] - 145:16, 151:9, 183:13, 186:4, 205:21
**ad** [7] - 218:12, 219:13, 219:17, 220:2, 220:7, 220:15, 222:9
**Adair** [3] - 148:15, 148:18, 148:19
**add** [2] - 114:16, 149:21
**added** [3] - 147:20, 195:13, 195:21
**adding** [1] - 146:3
**addition** [8] - 22:9, 39:17, 86:20, 109:17, 158:19, 178:22, 178:23, 206:10
**additional** [24] - 9:11, 25:2, 25:5, 28:11, 29:24, 35:8, 39:25, 40:1, 43:20, 43:22, 44:21, 45:6, 50:12, 54:3, 56:16, 66:7, 75:22, 115:17, 115:20, 136:3, 172:18, 221:23, 232:9
**additionally** [1] - 208:24
**address** [4] - 42:9, 200:15, 204:21, 218:6
**addressed** [1] - 7:22
**adhered** [1] - 226:5
**adjust** [2] - 19:18, 65:24
**administration** [1] - 12:20
**administrative** [1] - 140:1
**admission** [1] - 215:12
**admit** [2] - 104:18, 137:23
**admitted** [8] - 8:11, 104:23, 105:10, 175:24, 215:17, 215:25, 221:9, 224:18
**admitting** [1] - 175:20
**admonishment** [1] - 111:19
**ads** [4] - 220:14, 220:17, 221:15, 221:23
**adult** [1] - 108:21
**adult-onset** [1] - 108:21
**advance** [2] - 23:7, 124:16
**advanced** [4] - 28:16, 46:3, 52:7
**advances** [1] - 159:18
**advantage** [2] - 98:22, 200:5
**advertisement** [5] - 217:19, 217:22, 217:24, 220:20, 221:2
**advertiser** [1] - 220:11
**advertising** [3] - 204:9, 215:8, 219:22
**advice** [5] - 160:7, 173:6, 174:11, 199:4, 199:6
**advise** [2] - 31:8, 181:5
**advised** [4] - 4:15, 168:8, 176:16, 201:14
**advising** [1] - 198:4
**advisory** [1] - 189:2
**affect** [2] - 63:19, 67:11
**aforementioned** [1] - 153:6
**afternoon** [16] - 129:14, 129:23, 131:15, 134:12, 134:20, 135:5, 135:6, 163:13, 185:13, 203:10, 203:11, 229:22, 231:1, 231:3, 232:5, 232:22
**afterwards** [1] - 25:12
**age** [7] - 17:23, 17:24, 18:8, 52:6, 52:7, 102:25, 107:24
**agent** [1] - 221:8
**agents** [3] - 156:14, 174:14, 197:10
**ago** [5] - 81:19, 126:21, 149:18, 185:5, 186:22
**agree** [12] - 5:8, 27:9, 68:9, 118:8, 127:1, 129:5, 129:7, 133:7, 183:15, 222:21, 236:6, 236:7
**agreed** [5] - 67:9, 132:10, 137:20, 180:2, 219:25
**agreement** [2] - 201:16, 211:1
**Agriculture** [1] - 211:18
**ahead** [36] - 6:11, 6:13, 8:2, 73:2, 73:7, 73:22, 74:5, 79:15, 88:17, 113:12, 116:13, 122:11, 122:14, 123:6, 123:7, 127:15, 134:2,
134:3, 134:4, 166:1, 171:1, 193:24, 200:5, 201:20, 202:12, 202:16, 202:19, 212:2, 217:11, 223:5, 228:6, 228:7, 230:24, 232:17, 232:19, 233:23
**ain't** [1] - 174:5
**airline** [1] - 5:5
**alarmed** [1] - 33:21
**alarms** [1] - 63:21
**Alberta** [2] - 9:3, 13:20, 76:10
**alert** [1] - 6:23
**alerted** [1] - 125:17
**Alite** [3] - 206:21, 207:8, 216:15
**allergies** [5] - 27:3, 27:5, 45:11, 45:12
**allow** [7] - 18:11, 21:15, 79:15, 150:5, 150:22, 209:11, 210:7
**allowed** [9] - 72:7, 72:24, 146:1, 150:9, 159:1, 168:14, 168:15, 168:16, 200:22
**allowing** [1] - 126:13
**allows** [3] - 77:13, 77:18, 83:6
**allusion** [1] - 53:4
**almost** [6] - 36:5, 95:16, 97:9, 107:21, 150:1, 170:6
**alteration** [1] - 40:16
**alterations** [1] - 41:11
**altered** [1] - 16:21
**altering** [1] - 34:3
**alternate** [1] - 133:20
**alternates** [1] - 127:16
**amending** [1] - 146:4
**AMERICA** [1] - 1:3
**America** [1] - 4:3
**American** [2] - 71:7, 84:16
**amount** [7] - 15:23, 31:20, 152:8, 209:4, 209:7, 212:24, 220:18
**AMY** [2] - 3:7, 134:23
**Amy** [10] - 129:15, 134:17, 135:1, 177:25, 178:1, 179:5, 179:25, 183:13, 190:10
**analysis** [8] - 12:2, 16:14, 38:14, 71:9, 71:10, 96:23, 112:23, 234:8
**analyst** [5] - 136:9, 231:14, 232:7, 233:8, 234:7
**analyze** [1] - 40:20
**analyzed** [1] - 16:13
**analyzes** [1] - 71:9
**anatomic** [2] - 9:10, 10:20
**anemia** [1] - 17:8
**announce** [1] - 85:20
**annoyance** [2] - 167:2, 167:11

**answer** [12] - 37:2, 68:7, 77:23, 79:16, 98:11, 99:5, 111:8, 116:8, 128:13, 142:19, 201:2, 209:10
**answered** [4] - 28:25, 36:9, 46:8, 56:9
**answering** [1] - 56:9
**answers** [1] - 36:25
**Anthony** [2] - 7:6, 7:15
**ANTHONY** [3] - 3:3, 7:11, 7:16
**Anti** [1] - 198:14
**Anti-Kickback** [1] - 198:14
**anticipate** [1] - 126:21
**anticipates** [1] - 126:23
**apologies** [1] - 132:16
**apologize** [2] - 175:8, 182:8
**apparent** [2] - 47:22, 48:3
**appear** [6] - 39:7, 46:21, 47:24, 58:22, 96:12, 196:24
**Appearances** [1] - 2:1
**APPEARANCES** [1] - 1:11
**appeared** [10] - 138:12, 138:16, 141:15, 146:19, 147:3, 149:14, 149:17, 150:4, 163:22, 196:25
**applicable** [2] - 170:23, 171:2
**applying** [1] - 191:20
**appointment** [9] - 109:3, 109:6, 109:8, 110:17, 113:15, 114:7, 114:9, 151:2, 155:10
**appreciate** [6] - 124:9, 133:23, 181:14, 226:6, 227:13
**approach** [4] - 31:11, 110:25, 123:10, 129:7
**approached** [1] - 95:1
**appropriate** [28] - 14:7, 15:18, 22:4, 22:10, 30:14, 48:22, 55:18, 61:21, 62:2, 62:3, 62:21, 62:22, 65:19, 65:21, 66:22, 67:16, 67:21, 71:12, 72:4, 94:19, 94:21, 94:23, 96:13, 98:3, 98:5, 98:6, 98:15, 98:22
**appropriately** [4] - 15:5, 20:1, 20:3, 71:20
**appropriateness** [2] - 60:21, 67:11
**approval** [1] - 208:22
**approve** [2] - 69:8, 214:12
**approved** [5] - 15:3, 69:4, 116:23, 214:15, 214:18
**April** [1] - 115:13
**apt** [1] - 222:21
**area** [11] - 76:17, 77:8, 112:2, 135:8, 135:16, 136:4, 136:12, 155:14, 155:15,

**areas** [5] - 149:6, 149:18, 158:21, 168:8, 168:24
**arm** [1] - 206:23
**arrangement** [2] - 72:4, 72:7
**arrangements** [2] - 230:22, 233:3
**arrival** [3] - 139:22, 147:15, 151:4
**arrived** [4] - 150:25, 151:11, 155:10, 165:17
**arriving** [1] - 155:8
**arthritis** [1] - 65:3
**article** [1] - 207:18
**articulated** [1] - 5:24
**ascending** [1] - 155:14
**ascertain** [1] - 151:20
**aside** [6] - 4:11, 13:14, 96:21, 144:17, 153:2, 190:10
**aspect** [2] - 19:4, 154:5
**aspects** [1] - 43:25
**assess** [1] - 65:1
**assessed** [3] - 48:22, 55:20, 62:19
**assessing** [3] - 41:9, 50:12, 58:1
**assessment** [22] - 20:21, 25:2, 29:10, 30:13, 38:17, 40:13, 40:15, 41:7, 46:12, 47:9, 51:3, 53:20, 53:24, 55:19, 55:21, 56:16, 56:17, 56:21, 58:4, 62:20, 72:13, 110:13
**assessments** [8] - 29:12, 29:13, 46:14, 46:15, 46:18, 53:17, 72:23
**assign** [1] - 42:20
**assist** [3] - 121:2, 145:22, 155:20
**assistance** [1] - 159:2
**assistant** [3] - 105:16, 185:1, 188:15
**assisted** [1] - 203:24
**assisting** [3] - 12:1, 70:4, 70:19
**associated** [3] - 56:13, 101:22, 107:5
**assume** [22] - 33:20, 53:8, 53:12, 54:22, 55:5, 55:10, 62:9, 64:1, 66:10, 66:14, 66:15, 66:24, 66:25, 67:2, 69:2, 85:10, 86:12, 172:16, 187:19, 195:24, 196:22, 199:18
**assumed** [3] - 145:25, 171:9, 172:17
**assuming** [5] - 44:11, 126:3, 229:4, 230:25, 233:18
**assumption** [2] - 109:9,

163:2
**assure** [1] - 224:6
**Atlanta** [9] - 1:19, 2:4, 2:7, 135:8, 136:4, 136:12, 160:22, 161:6, 187:9
**attached** [1] - 184:20
**attachment** [2] - 184:2, 217:16
**attachments** [3] - 216:22, 217:6, 221:21
**attain** [1] - 54:4
**attained** [1] - 53:22
**attempt** [1] - 60:25
**attempted** [1] - 4:21
**attempts** [2] - 110:23, 111:5
**attend** [2] - 195:5, 195:20
**attendance** [1] - 128:2
**attended** [1] - 143:5
**attention** [8] - 64:15, 64:17, 116:18, 131:19, 138:9, 146:21, 147:19, 224:13
**attest** [1] - 168:25
**attestation** [2] - 48:15, 48:19
**attorney** [10] - 135:14, 156:16, 156:25, 157:1, 157:11, 157:14, 183:11, 192:5, 196:25, 199:23
**attorneys** [2] - 74:13, 172:20
**atypical** [1] - 156:7
**audio** [2] - 4:6, 58:14
**audit** [1] - 159:3
**auditing** [1] - 139:16
**August** [10] - 135:23, 155:3, 161:15, 174:22, 177:5, 180:15, 195:2, 195:19, 196:3, 196:4
**aunt** [1] - 50:3
**aunts** [2] - 17:19, 109:25
**authority** [2] - 146:13, 146:20
**authorized** [3] - 147:16, 148:1, 195:21
**autosomal** [3] - 109:19, 117:11, 117:14
**available** [4] - 37:5, 55:4, 75:23, 195:18
**Avenue** [1] - 1:16
**avoid** [1] - 225:4
**aware** [14] - 18:10, 46:8, 87:20, 118:7, 140:20, 151:3, 154:14, 154:22, 157:12, 172:6, 178:24, 192:14, 236:4, 237:13
**awful** [1] - 31:20

## B

**B.S** [1] - 76:12
**bachelor's** [1] - 135:10
**backdrop** [1] - 235:23
**background** [22] - 19:21, 20:5, 75:9, 76:6, 77:11, 77:18, 78:9, 78:12, 78:23, 79:1, 79:5, 81:8, 82:2, 83:5, 100:23, 116:15, 118:24, 121:6, 135:9, 173:13, 177:9, 178:3
**backs** [1] - 221:2
**backup** [2] - 229:18, 230:7
**bad** [3] - 111:15, 129:6, 157:25
**badge** [1] - 227:7
**bags** [1] - 156:12
**BAKER** [1] - 2:5
**Baltimore** [1] - 192:21
**bank** [4] - 11:16, 12:13, 68:5, 130:12
**banking** [1] - 5:5
**base** [4] - 4:23, 123:24, 125:18, 154:11
**based** [19] - 7:25, 29:15, 33:2, 37:5, 50:6, 54:25, 67:3, 77:10, 89:7, 102:25, 103:8, 103:14, 104:6, 110:16, 117:21, 149:7, 149:12, 179:17, 230:21
**baseline** [1] - 235:16
**basic** [4] - 151:13, 152:11, 159:4, 213:6
**basis** [12] - 36:3, 36:5, 69:24, 72:12, 72:15, 105:4, 105:17, 114:17, 116:1, 136:4, 158:3, 163:3
**batched** [1] - 219:5
**Bates** [1] - 159:5
**BEACH** [1] - 1:2
**became** [2] - 218:11
**become** [14] - 13:24, 16:20, 19:11, 33:21, 33:22, 34:5, 34:6, 44:3, 69:10, 176:7, 176:22, 178:4, 179:12, 194:25
**becomes** [1] - 133:21
**becoming** [1] - 124:16
**BEFORE** [1] - 1:10
**began** [3] - 135:21, 136:6, 146:19
**begin** [6] - 7:18, 73:8, 74:3, 122:18, 129:23, 160:17
**beginning** [10] - 5:15, 46:22, 74:16, 143:24, 153:19, 170:24, 210:24, 226:5, 232:12
**begins** [1] - 188:12
**behalf** [1] - 227:9

**behavior** [2] - 33:24, 225:6
**behind** [2] - 193:4, 226:11
**belabor** [1] - 124:7
**below** [1] - 180:10
**bench** [1] - 182:19
**beneath** [1] - 138:24
**beneficiaries** [3] - 204:18,
204:19, 232:6
**beneficiary** [2] - 213:9,
231:11
**benefit** [9] - 32:5, 54:19,
54:23, 55:1, 56:18, 91:5,
91:6, 91:9, 194:10
**benefits** [8] - 33:4, 39:16,
41:2, 63:4, 63:6, 92:8, 102:3,
204:17
**Berarducci** [27] - 141:22,
145:22, 146:6, 146:22,
152:17, 156:1, 156:22,
157:5, 159:21, 163:16,
163:18, 170:6, 170:10,
172:9, 172:14, 173:23,
174:12, 175:4, 176:13,
181:6, 187:16, 195:4, 199:4,
199:8, 199:13, 207:9, 208:4
**Bernadette** [3] - 79:8,
79:10, 171:24
**beside** [1] - 156:10
**best** [12] - 31:5, 31:9,
31:16, 112:22, 127:9,
128:18, 176:19, 193:6,
220:16, 225:17, 230:22,
232:11
**best-case** [1] - 232:11
**BestCare** [1] - 206:7
**better** [7] - 29:6, 105:14,
113:7, 158:24, 173:12,
181:1, 237:6
**Better** [2] - 59:19, 60:17
**between** [19] - 17:3, 18:21,
19:4, 30:18, 30:24, 31:20,
47:20, 65:6, 72:5, 72:8,
93:21, 93:24, 121:3, 149:1,
151:6, 161:5, 166:4, 172:15,
219:2
**beyond** [4] - 68:8, 116:12,
124:8, 231:1
**big** [4] - 4:25, 64:8, 153:13,
187:9
**bigger** [3] - 126:18, 153:22,
236:10
**biggest** [3] - 103:24, 129:8,
232:25
**bilateral** [1] - 34:1
**Bill** [1] - 186:13
**bill** [7] - 87:22, 88:6, 143:7,
143:10, 191:17, 205:18,
213:24
**billed** [4] - 70:7, 70:8,
191:19, 193:13

**billing** [11] - 136:6, 141:16,
143:11, 143:25, 151:18,
152:9, 172:4, 172:5, 172:6,
210:6, 213:16
**BioDiagnostics** [2] - 10:1,
74:18
**biology** [5] - 13:4, 13:5,
100:24, 100:25, 118:25
**birth** [1] - 41:13
**bit** [27] - 5:11, 6:5, 20:6,
24:1, 29:3, 37:14, 56:25,
58:9, 68:15, 69:13, 79:4,
93:17, 116:9, 116:14,
125:13, 126:19, 127:8,
139:21, 148:23, 149:4,
154:2, 179:9, 189:3, 204:1,
215:7, 223:9, 236:1
**blame** [1] - 98:7
**blank** [2] - 42:25, 68:5
**blocked** [1] - 235:2
**blood** [12] - 12:3, 15:2,
38:10, 40:5, 40:18, 40:19,
40:20, 40:21, 71:10, 108:23,
169:6, 205:13
**board** [3] - 136:19, 139:2,
179:15
**body** [9] - 9:17, 17:2, 84:4,
103:7, 106:21, 107:16,
108:12, 109:20, 138:13
**Boer** [3] - 7:4, 100:1,
202:23
**BOER** [73] - 1:13, 3:4, 3:11,
4:8, 5:14, 6:9, 7:5, 7:18, 8:3,
8:20, 8:22, 15:14, 15:21,
59:7, 59:11, 59:16, 60:2,
60:6, 60:11, 61:16, 61:19,
62:4, 62:7, 63:13, 63:16,
68:12, 73:14, 79:13, 94:5,
94:7, 98:13, 98:23, 99:6,
100:2, 123:20, 126:16,
127:1, 127:3, 129:15, 130:3,
130:6, 130:19, 131:4,
131:25, 184:1, 201:13,
201:22, 202:6, 202:24,
203:9, 207:21, 207:24,
209:13, 214:25, 215:4,
215:5, 215:11, 215:23,
217:15, 219:11, 222:24,
229:20, 229:25, 230:5,
230:11, 231:6, 231:10,
231:20, 231:23, 233:25,
234:2, 237:4, 237:24
**bond** [1] - 211:21
**bonus** [1] - 219:15
**bookkeeper** [1] - 150:14
**bookkeeping** [1] - 210:18
**boss** [1] - 163:20
**bother** [1] - 19:8
**bottom** [10] - 16:3, 18:17,
46:20, 117:3, 159:5, 159:14,

177:2, 179:6, 179:8, 214:19
**Boulevard** [2] - 1:23,
238:12
**brain** [5] - 28:1, 32:1, 91:2,
108:7, 108:24
**break** [24] - 73:3, 73:11,
73:12, 107:1, 111:17,
122:11, 122:16, 123:8,
124:2, 127:8, 127:20,
127:21, 129:11, 131:23,
132:10, 200:8, 200:11,
201:25, 202:5, 202:12,
202:21, 224:10, 224:11,
229:20
**breaker** [1] - 126:6
**breakfast** [1] - 126:18
**breaking** [1] - 73:2
**breast** [6] - 12:9, 26:18,
28:1, 32:1, 50:3, 91:2
**Brett** [2] - 207:7, 216:14
**BRIAN** [1] - 2:5
**Brian** [2] - 49:2, 74:12
**brief** [9] - 23:20, 29:20,
53:1, 53:4, 96:3, 96:10,
99:11, 99:12, 118:16
**briefly** [11] - 18:15, 38:1,
52:11, 75:10, 101:13, 108:1,
135:12, 135:19, 135:20,
197:25, 200:4
**bring** [7] - 5:12, 73:6,
89:14, 130:10, 134:4, 134:5,
202:16
**bringing** [1] - 230:20
**brings** [1] - 200:25
**broad** [1] - 152:15
**broken** [1] - 55:12
**brother** [2] - 56:2, 110:3,
116:4
**brothers** [1] - 17:20
**brought** [2] - 105:5, 146:21
**Broward** [3] - 1:23, 126:2,
238:12
**build** [2] - 157:19, 235:6
**building** [15] - 149:23,
149:25, 150:6, 150:22,
150:23, 155:12, 155:21,
156:10, 159:1, 162:14,
167:20, 168:25, 197:9,
216:7, 216:8
**bunch** [4] - 38:20, 44:14,
218:8, 221:21
**burden** [1] - 36:21
**burdens** [1] - 36:21
**business** [8] - 136:7,
154:20, 164:23, 166:5,
206:23, 207:5, 211:16
**BY** [63] - 1:20, 3:4, 3:4, 3:6,
3:6, 3:8, 3:9, 3:9, 3:11, 8:22,
15:21, 59:16, 60:11, 61:19,
62:7, 63:16, 68:12, 74:9,

79:19, 89:16, 89:24, 90:21,
93:13, 94:7, 98:13, 98:23,
99:6, 99:15, 100:18, 101:10,
105:1, 105:25, 112:7,
113:19, 114:1, 115:8,
116:17, 116:22, 118:20,
135:4, 138:3, 142:21, 144:5,
160:20, 166:3, 176:2, 177:3,
179:7, 180:4, 182:7, 184:12,
185:18, 188:11, 191:3,
192:8, 197:24, 203:9,
207:24, 209:13, 215:5,
215:23, 217:15, 219:11

**C**

**camp** [1] - 236:6
**Canada** [4] - 12:25, 15:6,
76:10, 76:12
**cancel** [1] - 193:3
**cancer** [156] - 10:4, 10:8,
11:21, 11:23, 11:25, 12:2,
12:3, 12:4, 12:5, 12:6, 12:7,
12:8, 12:10, 12:11, 12:24,
13:5, 13:12, 13:13, 13:16,
13:18, 13:20, 13:24, 14:21,
15:1, 15:2, 15:16, 15:24,
16:4, 16:5, 16:8, 16:11,
16:14, 16:17, 16:22, 17:8,
17:10, 17:14, 17:17, 17:22,
17:25, 18:1, 18:2, 18:6, 18:7,
18:9, 18:10, 21:18, 21:20,
24:18, 24:25, 25:5, 26:23,
27:17, 28:1, 28:5, 28:6,
29:21, 30:1, 31:25, 32:1,
32:2, 32:6, 33:19, 33:21,
33:23, 34:19, 34:20, 34:22,
34:23, 34:25, 35:19, 36:4,
37:7, 38:1, 38:3, 38:17, 39:1,
41:3, 41:9, 42:5, 43:13, 44:5,
45:1, 45:18, 45:23, 47:9,
48:2, 49:3, 50:2, 50:3, 51:9,
52:19, 53:5, 54:13, 55:3,
56:10, 56:14, 56:15, 57:19,
58:5, 59:22, 61:22, 63:3,
65:4, 65:11, 65:23, 65:24,
68:18, 71:5, 71:8, 91:1, 91:2,
94:20, 96:14, 98:16, 98:20,
101:11, 101:17, 101:18,
101:19, 101:21, 102:18,
102:20, 102:22, 102:25,
103:2, 103:22, 106:10,
107:6, 107:13, 108:11,
108:20, 109:12, 114:22,
115:24, 204:24, 218:10,
219:18, 219:19, 220:22,
220:24, 221:3, 221:6, 222:4,
222:7, 222:10, 222:12,
222:14, 222:15, 222:17,
222:19
**Cancer** [2] - 10:16, 115:12

**cancer-prone** [1] - 56:15
**cancers** [2] - 17:23, 17:24
**candidate** [5] - 30:1, 50:13, 55:8, 90:24, 91:3
**candidates** [1] - 55:11
**cannot** [2] - 28:13, 225:10
**CAP** [10] - 84:12, 84:14, 84:21, 85:2, 85:8, 85:12, 86:9, 86:24, 87:10, 87:21
**capable** [1] - 53:23
**capacity** [1] - 157:2
**capital** [1] - 106:15
**caps** [1] - 56:5
**carcinogens** [1] - 16:20
**carcinoma** [1] - 108:11
**card** [2] - 60:15, 149:25
**cards** [2] - 150:4, 181:22
**care** [33] - 21:5, 21:8, 21:22, 21:23, 21:25, 30:2, 31:3, 44:11, 44:25, 45:2, 55:20, 62:16, 67:17, 67:20, 67:21, 94:24, 94:25, 102:17, 105:3, 105:6, 105:21, 110:16, 114:8, 132:20, 133:23, 160:1, 161:8, 181:23, 202:10, 202:11, 227:24
**career** [5] - 11:20, 11:22, 12:11, 13:3, 135:14
**careful** [1] - 56:12
**carefully** [1] - 224:16
**Carolina** [3] - 81:3, 100:22, 101:3
**carry** [5] - 33:18, 34:5, 34:8, 34:21, 56:13
**case** [35] - 7:1, 15:12, 22:23, 69:21, 70:3, 70:18, 71:15, 75:18, 89:21, 112:10, 117:22, 118:6, 127:4, 183:23, 188:25, 192:1, 200:24, 203:21, 207:2, 208:18, 209:2, 210:4, 213:12, 213:14, 214:3, 218:5, 220:17, 224:24, 225:10, 225:23, 230:22, 232:11, 233:13, 235:8, 236:19
**CASE** [1] - 1:2
**Case** [1] - 4:3
**case-in-chief** [3] - 7:1, 235:8, 236:19
**cases** [9] - 69:18, 70:4, 70:6, 70:10, 70:12, 70:15, 70:18, 189:16, 189:18
**casually** [1] - 197:16
**catch** [1] - 222:3
**caught** [1] - 114:11
**CC** [1] - 176:17
**Cecilia** [2] - 172:5, 172:7
**cell** [7] - 17:2, 17:8, 106:21, 108:11, 231:13

**cells** [1] - 107:1
**center** [4] - 204:5, 206:19, 216:12, 219:2
**Center** [1] - 10:16
**centers** [1] - 12:17
**central** [1] - 108:6
**CEO** [14] - 10:11, 74:18, 74:25, 76:23, 137:1, 137:3, 137:4, 138:12, 139:1, 141:3, 141:7, 161:21, 169:14
**certain** [14] - 16:20, 18:8, 18:24, 21:3, 21:13, 34:11, 45:8, 102:18, 107:2, 107:16, 107:21, 108:4, 108:11, 139:16, 140:15, 145:21, 159:12, 186:20, 224:22
**certainly** [16] - 4:18, 5:4, 38:4, 51:10, 54:7, 122:25, 126:24, 127:14, 128:6, 135:14, 225:6, 225:19, 234:4, 235:11, 236:6, 236:9
**certificate** [2] - 59:18, 59:19
**certification** [10] - 5:17, 5:21, 83:21, 83:24, 84:3, 84:8, 84:10, 84:11, 85:18, 86:6
**certifications** [7] - 83:17, 84:1, 84:5, 85:12, 87:22
**certified** [7] - 84:23, 84:25, 85:8, 86:23, 86:24, 214:4
**certify** [1] - 238:6
**cetera** [1] - 225:9
**CFO** [2] - 141:7, 141:23
**CGx** [1] - 58:7
**chain** [1] - 183:9
**chair** [5] - 10:17, 10:19, 10:20, 11:5, 12:21
**chairs** [2] - 200:7, 200:9
**challenge** [2] - 124:16, 125:5
**chance** [7] - 104:7, 117:12, 180:9, 199:16, 224:19, 224:21, 232:4
**change** [16] - 4:20, 69:3, 101:22, 103:1, 104:7, 107:7, 107:15, 107:20, 107:23, 109:19, 114:6, 117:12, 125:19, 130:24, 165:13, 165:15
**changed** [6] - 107:10, 117:12, 165:17, 166:4, 198:19, 230:19
**changes** [5] - 108:14, 115:21, 147:13, 180:2, 198:21
**changing** [3] - 12:18, 36:3, 36:5
**Chapel** [1] - 101:3
**charge** [2] - 142:8, 163:18

**charges** [1] - 144:1
**chart** [17] - 20:10, 20:12, 20:13, 21:19, 26:19, 32:10, 37:4, 37:6, 37:18, 37:21, 41:17, 42:7, 54:12, 57:17, 66:12, 75:13, 77:19
**charts** [9] - 20:8, 23:9, 23:11, 24:19, 24:20, 66:11, 66:16, 66:20, 98:25
**Chase** [1] - 9:12
**check** [10] - 68:5, 73:4, 105:4, 155:19, 201:18, 204:20, 209:3, 210:1, 210:2, 228:22
**check-ups** [1] - 105:4
**checked** [4] - 37:15, 38:15, 210:4, 210:10
**checking** [1] - 209:20
**checks** [4] - 153:5, 159:13, 177:9, 178:3
**cheek** [1] - 38:9
**chemistry** [4] - 76:7, 76:14, 100:25, 119:1
**chemotherapy** [1] - 44:8
**chief** [16] - 7:1, 24:15, 42:4, 42:6, 49:10, 50:20, 52:19, 57:12, 57:14, 64:23, 64:24, 138:23, 139:17, 142:8, 235:8, 236:19
**child** [1] - 41:12
**childhood** [2] - 108:20, 108:23
**children** [9] - 17:19, 34:6, 34:7, 41:6, 55:1, 110:2, 116:3, 117:13, 151:2
**choose** [1] - 75:5
**Chris** [5] - 144:7, 144:12, 179:8, 180:24, 182:15
**Chris's** [1] - 180:9
**chromosomal** [1] - 41:6
**chromosomes** [3] - 106:22, 106:23, 107:1
**chronological** [3] - 175:1, 182:9, 184:11
**chronologically** [1] - 184:21
**chunk** [2] - 4:19, 5:8
**chunks** [1] - 132:13
**circulates** [1] - 40:19
**circumstance** [1] - 112:14
**circumstances** [2] - 14:6, 118:6
**claim** [1] - 213:16
**claims** [1] - 203:25
**clarification** [2] - 185:17, 216:4
**clarify** [1] - 8:7
**clarity** [1] - 209:16
**classify** [1] - 12:4
**clean** [1] - 181:6

**cleaner** [1] - 182:24
**clear** [10] - 34:19, 70:14, 111:18, 122:15, 132:16, 143:16, 184:23, 216:18, 217:10, 230:13
**clearance** [1] - 149:7
**clearly** [3] - 58:3, 62:1, 167:1
**CLIA** [11] - 77:5, 83:21, 84:1, 84:10, 84:23, 85:8, 85:12, 86:6, 86:23, 87:15, 87:21
**click** [3] - 211:17, 218:10, 220:8
**clicked** [2] - 218:3, 218:12
**client** [1] - 209:25
**clinic** [3] - 25:7, 101:17, 112:18
**Clinic** [1] - 115:12
**clinical** [7] - 11:16, 12:17, 12:22, 12:24, 14:4, 103:19, 168:9
**clinically** [1] - 15:17
**clock** [1] - 55:12
**close** [5] - 51:4, 125:5, 129:25, 234:15, 236:10
**closed** [4] - 111:6, 111:9, 111:24, 135:22
**closer** [4] - 152:25, 235:7, 236:8, 236:9
**clothed** [1] - 168:3
**clothing** [1] - 207:18
**clue** [1] - 42:16
**co** [1] - 34:12
**Co** [1] - 211:9
**co-pay** [1] - 34:12
**code** [4] - 47:4, 164:17, 210:2
**codes** [6] - 26:12, 37:17, 51:18, 52:21, 52:23, 210:3, 210:4, 210:5, 210:6
**coffee** [2] - 134:9, 134:10
**cohesive** [1] - 149:13
**coincidences** [1] - 157:24
**COLA** [11] - 84:3, 84:4, 84:8, 84:25, 85:8, 85:12, 86:11, 86:12, 86:23, 87:13, 87:22
**collaborated** [1] - 140:5
**collaboration** [1] - 149:1
**colleagues** [1] - 80:1
**collect** [1] - 73:20
**collected** [2] - 37:24, 38:7
**collection** [3] - 37:24, 38:4, 47:8
**college** [2] - 78:7, 78:20
**College** [2] - 71:7, 84:16
**colon** [1] - 50:2
**colonoscopy** [1] - 221:5
**color** [1] - 149:21

**combination** [2] - 42:12, 204:12

**comfortable** [4] - 6:4, 51:8, 143:25, 158:2

**coming** [14] - 4:18, 50:15, 60:15, 85:21, 87:4, 118:23, 150:4, 151:3, 159:18, 208:10, 224:17, 229:12, 231:4, 233:11

**commenced** [1] - 10:16

**comment** [2] - 77:21, 92:19

**commentary** [1] - 53:1

**comments** [1] - 77:22

**commercial** [1] - 220:13

**commission** [3] - 154:9, 154:12, 212:13

**commissions** [2] - 147:8, 147:9

**commitment** [2] - 114:15, 114:17

**common** [4] - 39:12, 58:19, 108:5, 150:3

**communicate** [2] - 44:24, 118:4

**communicating** [1] - 176:21

**communication** [2] - 113:20, 189:1

**communications** [1] - 183:4

**commuted** [1] - 161:24

**commutes** [1] - 170:3

**comorbidities** [1] - 65:2

**companies** [9] - 93:16, 104:4, 139:6, 139:7, 178:16, 211:8, 212:5, 221:14, 221:17

**company** [58] - 52:15, 57:4, 93:18, 120:23, 121:1, 121:12, 121:15, 135:18, 135:22, 140:21, 141:7, 141:9, 141:14, 142:12, 144:19, 148:4, 148:7, 148:16, 148:20, 149:3, 153:4, 154:19, 154:20, 155:4, 157:21, 161:21, 161:22, 164:9, 171:7, 178:4, 179:19, 179:21, 180:18, 190:2, 193:1, 194:7, 205:6, 205:7, 206:21, 207:8, 208:10, 208:15, 208:16, 211:1, 211:2, 211:14, 211:20, 211:23, 212:7, 212:8, 212:9, 212:10, 212:11, 212:14, 212:19, 212:20, 214:11, 221:17

**company's** [1] - 195:18

**comparable** [1] - 231:20

**compensation** [2] - 145:7, 159:25

**competent** [1] - 54:6

**complained** [1] - 192:2

**complaint** [11] - 24:15, 24:22, 25:3, 25:7, 42:4, 42:6, 46:7, 49:10, 52:19, 57:12, 57:14

**complaints** [4] - 29:7, 46:10, 46:17, 51:3

**complete** [11] - 20:16, 20:19, 22:15, 22:19, 22:20, 30:12, 44:19, 50:25, 129:24, 140:2, 223:21

**completed** [2] - 47:23, 69:5

**completely** [7] - 18:24, 18:25, 53:15, 65:4, 94:14, 117:16, 155:1

**completes** [1] - 223:8

**complex** [2] - 10:5, 44:10

**compliance** [83] - 135:16, 136:1, 136:8, 136:9, 136:17, 137:7, 137:10, 137:11, 137:13, 138:7, 138:10, 138:21, 138:22, 138:24, 139:5, 139:8, 139:9, 139:11, 139:15, 139:17, 139:19, 140:6, 140:9, 140:10, 140:11, 140:15, 140:18, 140:19, 140:22, 141:11, 151:13, 151:17, 151:19, 151:25, 152:11, 152:16, 153:3, 153:16, 153:23, 157:3, 157:18, 158:18, 158:20, 159:4, 159:17, 159:22, 160:6, 160:7, 164:7, 164:9, 166:8, 166:14, 166:15, 166:18, 166:21, 167:19, 167:21, 167:22, 168:15, 170:11, 170:12, 170:13, 170:21, 171:14, 172:15, 172:22, 173:2, 173:9, 173:12, 173:17, 173:20, 174:11, 176:8, 179:22, 179:24, 183:24, 198:2, 198:5

**compliant** [4] - 72:1, 158:23, 173:7

**complicated** [10] - 33:13, 35:3, 35:21, 36:2, 36:7, 106:12, 106:13, 164:14, 164:17, 165:4

**comply** [1] - 173:7

**components** [2] - 22:7, 137:11

**comprehensive** [7] - 109:1, 114:16, 116:1, 209:3, 209:18, 209:20, 209:21

**computer** [2] - 145:25, 208:22

**computer-generated** [1] - 208:22

**concept** [1] - 68:24

**concepts** [1] - 32:18

**concern** [8] - 5:21, 35:2, 64:24, 128:19, 129:5, 133:1, 133:5, 201:8

**concerned** [7] - 34:5, 60:23, 64:15, 111:4, 118:1, 128:23, 155:16

**concerning** [8] - 33:16, 36:19, 37:1, 67:6, 89:4, 158:11, 158:13

**concerns** [10] - 5:13, 22:12, 37:2, 50:20, 64:24, 117:25, 147:22, 153:16, 155:20, 201:12

**conclude** [1] - 90:5

**conclusion** [2] - 4:24, 65:18

**condition** [21] - 17:7, 25:6, 30:4, 31:10, 31:12, 50:16, 62:19, 64:23, 101:17, 105:7, 107:19, 107:21, 108:16, 109:2, 109:10, 109:19, 110:22, 112:20, 112:21, 117:11, 117:15

**conditions** [5] - 29:17, 41:8, 51:8, 62:20, 108:21

**condo** [1] - 59:3

**condos** [1] - 58:22

**conduct** [5] - 12:17, 54:8, 55:18, 71:8, 75:3

**conducted** [11] - 9:10, 11:14, 12:18, 12:19, 12:22, 81:17, 143:22, 144:3, 144:20, 146:8, 178:23

**conducting** [1] - 72:1

**conference** [6] - 146:2, 228:16, 228:18, 228:24, 229:6, 237:17

**confirm** [2] - 130:3, 132:8

**conflict** [1] - 132:22

**confuse** [1] - 34:25

**confused** [1] - 116:5

**confusing** [3] - 45:22, 116:9, 183:8

**confusion** [4] - 138:16, 172:14, 172:17, 195:20

**Congress** [1] - 165:11

**conjunction** [1] - 87:6

**connected** [2] - 62:10, 64:1

**connection** [2] - 12:12, 149:5

**cons** [1] - 39:22

**consent** [16] - 22:13, 33:6, 39:9, 39:10, 39:13, 39:14, 39:19, 40:11, 40:13, 40:17, 47:13, 52:2, 54:2, 62:3, 220:3

**consents** [3] - 40:1, 40:4, 40:6

**consider** [5] - 18:11, 62:18,

65:25, 127:24, 169:15

**consideration** [1] - 96:22

**considered** [4] - 10:4, 17:20, 17:25, 31:2

**considering** [3] - 21:20, 30:25, 97:1

**consistent** [5] - 26:5, 109:15, 110:6, 112:21, 139:3

**consistently** [1] - 23:17

**constipation** [1] - 25:8

**consult** [8] - 61:21, 64:20, 69:18, 74:25, 82:8, 82:10, 82:12, 139:12

**consultant** [2] - 75:4, 121:21

**consultation** [5] - 30:7, 65:6, 66:23, 115:14, 115:18

**consultations** [1] - 30:8

**consulting** [1] - 14:14

**consumer** [1] - 212:22

**consumers** [1] - 211:16

**contact** [7] - 22:18, 25:16, 49:15, 113:20, 142:22, 183:14, 220:4

**contacting** [1] - 61:4

**contemplating** [1] - 22:2

**content** [4] - 183:6, 186:3, 189:11, 201:5

**context** [2] - 33:1, 33:20

**continue** [17] - 6:25, 13:10, 60:6, 61:16, 63:13, 88:10, 123:4, 126:13, 127:3, 143:19, 192:7, 209:10, 223:24, 223:25, 224:7, 225:5, 226:9

**continued** [1] - 2:1

**continuing** [5] - 4:2, 13:10, 67:20, 85:11

**continuity** [5] - 21:5, 21:22, 30:2, 62:16, 67:17

**continuously** [1] - 13:11

**contract** [12] - 70:2, 70:10, 121:3, 121:23, 147:12, 152:17, 152:18, 152:24, 153:1, 153:2, 177:18, 211:3

**contracted** [1] - 206:19

**contractor** [2] - 178:5, 179:13

**contractors** [3] - 141:14, 141:15, 179:2

**contracts** [14] - 147:3, 147:4, 147:6, 147:7, 152:20, 153:14, 154:3, 154:5, 159:15, 159:19, 160:8, 160:9, 190:11

**contradictory** [3] - 23:21, 29:19, 96:11

**controls** [1] - 72:18

**conveniently** [1] - 156:17

**conventional** [1] - 209:24

245

**conversation** [9] - 142:25, 143:2, 143:13, 156:15, 162:18, 179:18, 185:24, 187:20, 209:5

**conversations** [3] - 137:8, 142:11, 169:15

**conveying** [1] - 35:16

**convince** [1] - 98:16

**convincing** [1] - 213:1

**cookie** [2] - 94:15, 95:12

**cookie-cutter** [2] - 94:15, 95:12

**cooperating** [1] - 130:22, 230:14, 230:20, 233:2, 234:7

**cooperative** [3] - 12:15, 12:16, 12:20

**cooperator** [5] - 131:1, 131:6, 231:4, 231:8, 232:9

**cooperator's** [1] - 232:13

**cooperators** [1] - 234:18

**coordinate** [1] - 102:4

**copied** [4] - 175:4, 175:5, 183:19, 188:24

**copies** [3] - 23:5, 109:20, 117:11

**copy** [1] - 185:25

**copying** [1] - 185:2

**Core** [1] - 11:16

**corporate** [1] - 162:13

**correct** [226] - 7:24, 14:5, 19:23, 19:24, 24:14, 27:2, 27:4, 27:6, 27:11, 27:24, 28:2, 28:17, 28:18, 28:20, 28:21, 29:1, 29:9, 29:11, 29:14, 32:7, 37:22, 37:23, 37:25, 39:3, 42:10, 43:4, 43:6, 43:11, 43:22, 43:23, 45:14, 45:15, 46:2, 46:8, 46:9, 46:10, 46:11, 46:16, 47:3, 47:7, 47:11, 49:16, 51:15, 51:24, 52:16, 54:15, 55:9, 56:7, 57:10, 59:20, 59:25, 60:13, 60:18, 65:9, 69:15, 74:20, 75:15, 75:19, 76:8, 76:13, 76:24, 77:4, 78:4, 78:6, 78:8, 78:25, 79:3, 83:8, 83:16, 83:20, 85:6, 85:18, 86:4, 86:8, 86:16, 87:1, 87:8, 87:12, 88:1, 88:4, 88:11, 88:16, 88:23, 89:2, 89:6, 90:1, 90:8, 90:19, 91:1, 91:12, 91:16, 91:21, 91:22, 92:11, 95:14, 95:17, 95:18, 97:11, 109:13, 120:7, 132:19, 139:4, 141:4, 143:18, 144:13, 154:13, 156:2, 158:7, 161:20, 161:23, 161:24, 162:15, 162:20, 162:25, 163:15, 163:19, 163:24, 164:2,

164:8, 164:16, 164:24, 165:10, 165:12, 165:22, 166:9, 166:16, 167:15, 169:22, 169:24, 170:1, 170:9, 170:17, 171:4, 171:15, 171:25, 172:24, 173:1, 173:8, 173:11, 173:19, 173:25, 174:2, 174:24, 176:7, 176:9, 176:23, 176:24, 177:11, 177:13, 178:2, 178:6, 178:9, 178:12, 178:15, 178:18, 179:3, 179:10, 179:11, 179:16, 179:25, 180:1, 180:7, 180:14, 180:16, 180:20, 181:8, 181:10, 181:13, 181:16, 181:17, 181:19, 181:20, 181:24, 182:5, 182:14, 184:11, 184:18, 185:2, 185:22, 186:12, 186:17, 186:24, 186:25, 187:5, 187:8, 187:10, 187:15, 188:14, 188:22, 189:7, 189:10, 189:13, 189:17, 189:23, 190:1, 190:7, 190:12, 190:14, 190:18, 191:1, 191:9, 191:12, 191:14, 192:24, 193:14, 193:21, 194:5, 194:14, 195:3, 195:7, 196:13, 197:13, 198:24, 199:2, 216:20, 216:21, 220:6, 221:19, 221:20, 222:4, 222:5, 222:10, 222:11, 222:13, 222:16, 222:18

**correctly** [3] - 90:6, 143:25, 159:21

**corresponded** [1] - 209:1

**corresponding** [1] - 210:5

**cost** [6] - 103:21, 114:14, 204:16, 212:20, 212:23, 212:24

**cost-effective** [1] - 212:20

**costly** [1] - 96:25

**counsel** [6] - 74:3, 139:14, 154:20, 171:10, 183:4, 183:8

**Counsel** [1] - 74:5

**counseling** [7] - 30:14, 62:18, 62:23, 101:1, 117:4, 119:2, 119:13

**counselor** [5] - 39:23, 101:2, 101:14, 101:24, 106:18

**counselors** [2] - 103:16, 112:18

**count** [2] - 223:13, 233:9

**country** [1] - 164:15

**couple** [19] - 38:23, 39:1, 47:9, 63:17, 75:22, 110:19,

136:4, 151:1, 151:22, 152:14, 153:18, 181:19, 181:22, 184:16, 196:15, 228:2, 231:10, 234:10, 235:3

**course** [15] - 11:20, 31:9, 82:19, 113:14, 122:20, 140:14, 156:12, 172:9, 176:11, 213:19, 214:10, 219:21, 223:22, 225:3, 226:2

**courses** [5] - 13:1, 13:3, 13:4, 13:5, 13:11

**Court** [20] - 1:22, 1:23, 4:1, 5:25, 6:2, 8:1, 73:16, 111:14, 132:2, 133:16, 185:17, 200:17, 201:9, 202:14, 228:3, 229:11, 234:19, 238:1, 238:11, 238:12

**court** [8] - 95:25, 112:6, 113:13, 123:21, 181:12, 184:8, 201:24, 227:9

**COURT** [147] - 1:1, 4:2, 4:10, 5:20, 6:2, 6:10, 6:13, 6:15, 6:17, 6:21, 7:7, 7:21, 7:25, 8:11, 15:20, 59:10, 60:4, 68:9, 73:1, 73:10, 73:15, 73:18, 73:22, 73:24, 74:1, 74:7, 79:15, 93:11, 94:4, 98:11, 98:19, 99:5, 99:12, 100:1, 100:3, 100:6, 100:9, 101:7, 104:20, 104:23, 111:1, 111:10, 111:12, 111:15, 111:25, 112:3, 113:12, 113:16, 113:24, 116:13, 118:15, 118:17, 122:1, 122:5, 122:8, 123:11, 123:17, 123:22, 124:3, 124:5, 124:13, 124:15, 124:21, 124:24, 125:2, 125:5, 125:16, 125:22, 125:24, 126:23, 127:2, 127:10, 127:13, 128:15, 129:5, 129:17, 129:20, 130:5, 130:7, 130:20, 130:25, 131:9, 131:14, 131:16, 131:20, 132:1, 132:4, 132:15, 132:20, 133:4, 134:6, 134:8, 134:18, 137:21, 137:23, 138:1, 142:16, 143:15, 143:17, 160:13, 160:16, 160:18, 166:1, 175:11, 175:17, 175:20, 175:24, 182:21, 182:23, 183:16, 183:19, 184:4, 184:6, 184:9, 192:7, 197:21, 200:1, 200:5, 200:12, 200:14, 200:19, 201:2, 201:12, 201:16, 201:23, 202:7, 202:12, 202:16, 202:18, 203:1, 207:23, 209:11, 215:2,

215:14, 215:17, 217:11, 217:14, 218:17, 218:20, 223:2, 223:7, 226:14, 226:16, 227:22, 228:4, 228:10, 228:12, 228:17, 228:20, 229:2, 229:9, 229:13, 229:24, 230:3, 230:6, 230:12, 230:15, 230:21, 231:9, 231:17, 231:22, 231:24, 232:1, 232:3, 232:15, 232:25, 233:16, 233:18, 234:1, 234:14, 234:24, 237:8, 237:15, 237:25

**Court's** [4] - 6:4, 8:12, 234:21, 236:4

**courthouse** [1] - 228:19, 228:24, 229:4

**COURTROOM** [8] - 7:10, 7:13, 100:11, 100:13, 134:22, 134:24, 203:3, 203:5

**courtroom** [11] - 124:7, 142:19, 167:9, 172:21, 207:15, 227:5, 228:8, 228:12, 228:17, 229:7, 237:17

**cover** [7] - 8:7, 36:17, 69:14, 70:3, 70:24, 189:8, 226:22

**coverage** [2] - 103:21, 117:25

**covered** [7] - 13:14, 34:11, 114:19, 204:17, 206:20, 223:13, 235:24

**covering** [1] - 118:12

**covers** [1] - 204:10

**COVID** [2] - 64:8, 74:23

**CPL** [8] - 211:9, 211:12, 211:13, 211:14, 211:23, 212:1, 212:15

**CPT** [2] - 210:2, 210:3

**create** [3] - 170:14, 176:19, 222:20

**created** [4] - 13:8, 33:2, 137:15, 147:15

**creating** [1] - 137:16

**crime** [1] - 203:15

**criminal** [1] - 15:8

**CRIMINAL** [1] - 1:15

**critical** [4] - 22:14, 89:8, 89:20, 90:2

**critically** [1] - 92:1

**criticism** [2] - 91:10, 92:16

**criticize** [1] - 77:18

**CROSS** [6] - 3:4, 3:6, 3:9, 74:8, 118:19, 160:19

**cross** [10] - 73:8, 74:4, 129:23, 129:25, 160:16, 199:12, 232:12, 232:16, 232:19, 237:6

**CROSS-EXAMINATION** [6] - 3:4, 3:6, 3:9, 74:8, 118:19, 160:19

**cross-examination** [5] - 73:8, 74:4, 160:16, 199:12, 232:12

**crossed** [2] - 131:3, 131:4

**CRR** [2] - 1:21, 238:11

**cruises** [1] - 59:3

**crunched** [1] - 129:6

**CSOs** [1] - 229:3

**culture** [2] - 148:22, 149:11

**curiosity** [1] - 225:16

**curious** [1] - 233:22

**current** [16] - 10:9, 24:24, 26:11, 26:12, 26:14, 26:20, 30:3, 30:4, 31:25, 43:8, 50:15, 52:21, 62:19, 70:1, 151:16, 180:12

**cushion** [1] - 126:12

**customer** [1] - 191:6

**customers** [1] - 194:9

**cut** [3] - 127:4, 193:16

**cutter** [2] - 94:15, 95:12

**cutting** [1] - 237:5

**CUYLER** [1] - 1:14

**cystic** [1] - 17:7

**cysts** [5] - 107:16, 108:9, 108:12, 109:25, 110:3, 110:4

**D**

**D.C** [1] - 1:16

**D.N** [1] - 52:12

**d/b/a** [2] - 211:9, 212:1

**d/b/a's** [1] - 211:24

**dad** [3] - 56:3, 109:21, 109:24

**daily** [5] - 36:5, 139:9, 139:18, 142:7, 158:3

**damage** [1] - 16:17

**Damon** [2] - 175:4, 176:5

**date** [6] - 70:8, 117:1, 150:1, 195:18, 217:9, 217:12

**DATE** [1] - 238:10

**dated** [1] - 221:19

**dates** [1] - 225:8

**day-by-day** [2] - 163:3, 180:12

**day-to-day** [9] - 137:12, 142:6, 142:8, 151:9, 152:20, 162:2, 162:8, 163:1, 167:22

**days** [21] - 20:14, 110:19, 126:21, 150:9, 153:7, 161:12, 162:6, 162:15, 164:17, 166:20, 170:18, 176:11, 184:17, 188:23, 196:16, 223:14, 224:11, 225:13, 236:20

**de** [3] - 7:4, 100:1, 202:23

**DE** [73] - 1:13, 3:4, 3:11, 4:8, 5:14, 6:9, 7:5, 7:18, 8:3, 8:20, 8:22, 15:14, 15:21, 59:7, 59:11, 59:16, 60:2, 60:6, 60:11, 61:16, 61:19, 62:4, 62:7, 63:13, 63:16, 68:12, 73:14, 79:13, 94:5, 94:7, 98:13, 98:23, 99:6, 100:2, 123:20, 126:16, 127:1, 127:3, 129:15, 130:3, 130:6, 130:19, 131:4, 131:25, 184:1, 201:13, 201:22, 202:6, 202:24, 203:9, 207:21, 207:24, 209:13, 214:25, 215:4, 215:5, 215:11, 215:23, 217:15, 219:11, 222:24, 229:20, 229:25, 230:5, 230:11, 231:6, 231:10, 231:20, 231:23, 233:25, 234:2, 237:4, 237:24

**deal** [10] - 4:11, 36:22, 126:6, 132:6, 162:23, 172:25, 190:17, 192:13, 193:15, 219:15

**dealing** [6] - 131:1, 140:16, 152:7, 172:9, 179:1, 181:23

**dealt** [6] - 170:22, 206:4, 206:5, 206:7, 208:3, 210:25

**decade** [1] - 136:10

**decades** [1] - 81:5

**December** [3] - 1:4, 236:12, 238:10

**decent** [1] - 187:6

**decent-sized** [1] - 187:6

**decide** [4] - 101:25, 112:25, 127:14, 236:22

**decided** [4] - 138:18, 157:25, 160:3, 232:23

**decision** [3] - 33:25, 103:22, 227:1

**decisions** [5] - 34:3, 69:7, 102:12, 112:13, 225:25

**deck** [1] - 200:16

**dedicated** [1] - 226:19

**deductible** [1] - 191:20

**deemed** [2] - 198:21, 198:23

**deep** [1] - 122:12

**DEFENDANT** [2] - 1:17, 2:2

**Defendant** [1] - 1:7

**defendant** [1] - 207:22

**defense** [5] - 5:22, 6:10, 74:3, 94:8, 122:21, 127:10, 128:9, 128:24, 129:6, 130:8, 133:2, 223:16, 224:1, 231:12, 236:6, 236:16, 236:17, 237:12

**defense's** [1] - 132:21

**deficient** [1] - 170:12

**definitely** [1] - 56:15

**degree** [9] - 8:25, 9:2, 9:9, 17:20, 100:24, 117:14, 118:25, 135:10

**delay** [3] - 128:6, 227:16, 228:1

**delayed** [2] - 133:13, 226:24

**delays** [1] - 126:3

**delinquent** [1] - 203:21

**deliver** [1] - 36:8

**demeanor** [1] - 114:8

**demented** [1] - 53:23

**dementia** [1] - 53:12

**denied** [1] - 214:15

**denying** [1] - 188:1

**Department** [5] - 10:17, 69:17, 165:1, 165:2, 211:18

**DEPARTMENT** [1] - 1:15

**department** [16] - 10:20, 10:21, 11:1, 11:3, 11:4, 11:5, 105:8, 141:17, 143:11, 149:8, 152:10, 172:4, 172:5, 172:6, 178:14, 210:18

**departments** [2] - 149:1, 149:9, 153:9, 168:23

**depression** [2] - 64:25

**deputy** [3] - 124:7, 227:5, 228:12

**DEPUTY** [8] - 7:10, 7:13, 100:11, 100:13, 134:22, 134:24, 203:3, 203:5

**describe** [5] - 23:16, 58:18, 139:23, 148:22, 149:16

**described** [5] - 37:6, 39:16, 43:12, 205:3, 213:5

**describing** [2] - 110:13, 209:19

**description** [3] - 24:23, 51:7, 138:7

**deserved** [1] - 224:11

**designed** [4] - 40:14, 64:10, 64:20, 65:7

**designing** [1] - 82:8

**desk** [1] - 150:22

**destined** [1] - 18:7

**detail** [2] - 16:1, 144:4

**detailing** [1] - 147:7

**details** [2] - 29:21, 181:25

**detected** [1] - 106:8

**determine** [15] - 17:4, 17:9, 19:12, 26:22, 30:13, 37:9, 40:15, 43:15, 56:17, 62:12, 65:24, 94:19, 101:20, 103:8, 220:15

**determined** [1] - 112:22

**determining** [1] - 32:18

**detriment** [1] - 35:15

**develop** [9] - 81:25, 82:3, 82:15, 82:20, 107:16,

107:17, 107:18, 164:9, 213:6

**developed** [1] - 16:18

**developing** [2] - 17:10, 102:25

**development** [3] - 11:10, 14:25, 55:3

**developments** [1] - 59:3

**device** [1] - 28:19

**devices** [2] - 28:19, 46:5

**diabetes** [1] - 65:3

**diagnose** [1] - 210:1

**diagnosed** [1] - 105:7

**diagnoses** [9] - 9:18, 26:11, 26:12, 26:14, 27:1, 37:17, 45:11, 52:21

**diagnosing** [1] - 16:22

**diagnosis** [10] - 12:2, 12:4, 15:1, 25:5, 26:20, 26:25, 43:8, 47:4, 51:18, 53:12

**diagnostic** [4] - 9:17, 71:5, 71:8, 83:25

**diagnostics** [1] - 15:1

**Diagnostics** [1] - 77:2

**dialer** [1] - 219:4

**differences** [1] - 18:21

**different** [44] - 18:19, 18:20, 18:23, 19:5, 38:3, 38:12, 38:20, 39:1, 39:3, 40:21, 41:3, 41:15, 54:11, 56:25, 57:6, 57:15, 63:22, 64:6, 64:7, 66:24, 68:13, 69:13, 84:4, 92:14, 97:13, 97:20, 112:23, 115:1, 115:19, 116:7, 117:16, 117:17, 137:10, 148:23, 149:5, 158:21, 166:4, 184:19, 201:10, 214:1, 220:14, 221:17, 222:25

**difficult** [2] - 53:1, 108:16

**digital** [2] - 13:9, 145:21

**dining** [1] - 59:18

**dinners** [1] - 61:5

**DIRECT** [8] - 3:4, 3:6, 3:8, 3:11, 8:21, 100:17, 135:3, 203:8

**direct** [17] - 75:14, 129:22, 129:24, 142:22, 145:15, 151:15, 156:10, 159:2, 163:6, 165:25, 183:13, 200:21, 201:6, 205:14, 211:16, 219:12

**directed** [1] - 92:17

**direction** [1] - 151:15

**directive** [1] - 28:16

**directives** [2] - 28:17, 46:3

**directly** [6] - 11:22, 29:22, 72:9, 141:16, 208:5, 211:4

**director** [41] - 10:10, 11:8, 11:15, 13:7, 71:23, 75:2, 76:25, 77:2, 77:5, 78:24,

79:5, 79:11, 79:17, 83:1, 83:3, 83:7, 83:9, 83:11, 83:13, 83:18, 85:5, 87:4, 97:17, 97:23, 98:3, 98:8, 99:17, 99:19, 116:24, 136:23, 136:25, 137:2, 137:4, 138:18, 138:20, 140:4, 140:15, 141:1, 141:8, 163:14

**director's** [1] - 88:8

**directs** [1] - 236:1

**discipline** [1] - 10:24

**discover** [1] - 40:12

**discovery** [1] - 233:2

**discuss** [16] - 35:22, 64:23, 66:4, 92:5, 92:8, 112:10, 113:12, 122:25, 143:22, 144:4, 146:3, 147:20, 185:13, 210:21, 225:10, 226:12

**discussed** [10] - 4:13, 6:5, 22:11, 33:7, 35:4, 63:7, 111:19, 116:15, 132:14, 187:23

**discussing** [4] - 23:10, 40:22, 114:8, 128:20

**Discussion** [4] - 73:21, 93:12, 122:2, 160:14

**discussion** [21] - 4:17, 22:9, 23:7, 33:4, 33:6, 35:11, 35:12, 35:13, 39:15, 39:17, 39:18, 39:20, 39:23, 63:4, 63:9, 65:20, 138:16, 185:10, 188:2, 188:16, 226:17

**discussions** [7] - 41:2, 63:3, 66:1, 153:14, 154:18, 225:23, 225:24

**disease** [2] - 17:6, 106:9

**diseases** [1] - 17:10

**disguised** [1] - 59:4

**disjointed** [2] - 139:21, 151:12

**Disney** [1] - 59:3

**distracted** [1] - 61:25

**distress** [1] - 31:19

**distressed** [1] - 33:22

**distributor** [4] - 176:7, 176:22, 177:8, 179:12

**distributors** [4] - 172:10, 176:12, 176:21, 182:2

**District** [2] - 1:23, 238:12

**DISTRICT** [3] - 1:1, 1:1, 1:10

**divine** [1] - 29:16

**DIVISION** [2] - 1:2, 1:15

**DNA** [3] - 106:20, 106:23, 107:3

**Doc** [9] - 19:21, 22:22, 41:15, 52:11, 59:17, 60:1, 62:8, 63:17, 99:7

**Doctor** [12] - 7:8, 8:23, 9:4, 15:22, 18:15, 23:24, 24:2, 28:14, 54:11, 68:13, 74:10, 100:3

**doctor** [64] - 15:15, 19:17, 21:2, 21:20, 22:11, 22:15, 22:20, 30:17, 30:20, 30:23, 30:25, 36:18, 37:20, 37:21, 42:1, 42:2, 47:6, 47:20, 48:20, 49:8, 52:17, 57:6, 62:11, 65:7, 67:1, 71:16, 71:18, 71:20, 71:21, 71:22, 72:3, 72:18, 73:11, 76:7, 78:3, 82:3, 89:9, 89:20, 91:10, 91:17, 91:19, 92:2, 92:17, 96:25, 97:5, 97:11, 99:16, 105:3, 119:11, 119:13, 171:18, 171:19, 191:25, 193:2, 205:12, 206:16, 208:17, 212:21, 212:24, 214:3, 214:21

**doctor's** [20] - 20:19, 22:18, 71:13, 88:21, 88:25, 91:14, 91:21, 91:23, 92:5, 92:8, 92:10, 98:4, 98:5, 151:2, 155:10, 208:16, 208:17, 209:24, 213:10, 213:24

**doctor-patient** [4] - 30:17, 30:20, 30:23, 47:20

**doctor-physician** [1] - 30:17

**doctorate** [1] - 135:11

**doctors** [30] - 10:23, 21:6, 21:7, 22:19, 24:20, 44:17, 50:21, 69:7, 76:3, 77:14, 77:19, 88:13, 88:18, 92:18, 93:2, 93:21, 93:25, 119:23, 166:7, 205:8, 205:9, 205:14, 206:24, 207:12, 214:3, 214:4, 214:5, 214:11, 214:20

**doctors'** [6] - 93:7, 98:7, 205:17, 213:23, 214:9, 214:12

**document** [30] - 20:14, 20:17, 20:20, 20:24, 24:21, 28:4, 30:19, 32:16, 91:14, 91:19, 91:21, 95:16, 97:2, 106:1, 115:9, 121:7, 138:4, 181:21, 185:2, 185:7, 186:4, 187:4, 193:22, 193:25, 194:12, 195:6, 195:21, 197:12, 205:18, 215:9

**documentation** [23] - 20:8, 21:13, 22:5, 22:8, 30:11, 32:16, 32:9, 32:11, 32:13, 32:16, 33:3, 35:10, 35:12, 50:6, 54:12, 89:4, 89:9, 89:20, 90:2, 92:18, 96:2, 182:12, 227:10

**documented** [7] - 21:1,

21:19, 33:7, 53:9, 53:13, 96:2, 213:15

**documenting** [6] - 20:10, 21:24, 24:19, 91:11, 91:18, 92:2

**documents** [28] - 23:8, 48:6, 48:9, 89:7, 91:24, 91:25, 92:1, 96:8, 145:21, 145:23, 146:2, 146:15, 146:19, 146:24, 147:2, 147:14, 175:13, 176:7, 176:8, 176:17, 176:19, 176:22, 189:15, 193:15, 193:19, 196:7, 215:1, 224:18

**DocuSign** [26] - 145:20, 145:23, 146:3, 146:6, 146:8, 146:11, 146:13, 146:15, 146:23, 147:22, 147:24, 148:5, 176:18, 193:16, 193:18, 193:24, 194:3, 194:6, 194:13, 194:15, 194:25, 195:11, 195:17, 195:18, 195:25, 196:5

**dollars** [2] - 208:9, 210:9

**dollars'** [1] - 169:10

**dominant** [2] - 109:19, 117:11, 117:14

**Don** [1] - 160:21

**DONALD** [1] - 2:2

**done** [39] - 9:10, 16:23, 21:4, 21:14, 21:15, 30:5, 32:14, 39:21, 53:18, 53:20, 53:21, 62:15, 62:23, 62:25, 69:9, 83:15, 96:6, 96:9, 114:12, 123:5, 125:16, 128:8, 129:3, 129:13, 129:21, 130:16, 143:25, 146:22, 170:19, 182:9, 191:16, 193:4, 193:8, 205:8, 208:21, 223:23, 229:19, 235:12

**Donna** [3] - 137:4, 177:25, 178:1

**doom** [1] - 33:23

**door** [5] - 150:2, 150:5, 150:8, 155:19, 167:6

**dose** [5] - 19:1, 19:8, 19:10, 19:18, 19:19

**dot** [1] - 107:7

**double** [2] - 228:22, 235:23

**doubt** [4] - 133:5, 133:24, 163:9, 226:4

**doughnut** [2] - 6:19

**down** [15] - 25:14, 25:15, 42:23, 45:16, 73:11, 99:20, 111:3, 112:4, 117:13, 128:10, 144:12, 160:4, 178:22, 220:2, 229:22

**downstairs** [2] - 155:15, 155:19

**dozen** [4] - 38:23, 47:9, 48:2, 75:22

**dozens** [4] - 19:15, 23:12, 96:8, 96:9

**Dr** [36] - 5:15, 7:6, 7:7, 7:15, 7:19, 15:13, 24:11, 29:16, 30:18, 47:21, 49:2, 61:21, 66:15, 69:13, 70:25, 72:25, 80:9, 86:17, 87:7, 87:19, 88:8, 89:17, 89:25, 90:2, 90:10, 91:11, 94:8, 98:24, 99:23, 99:24, 121:6, 130:1, 171:20, 229:17, 233:10

**draft** [2] - 188:24, 189:14

**drafted** [1] - 151:24

**draw** [2] - 116:18, 220:16

**dressed** [2] - 196:23, 197:15

**Drive** [1] - 2:3

**drive** [1] - 156:20

**driving** [1] - 61:22

**drug** [10] - 19:5, 19:7, 19:8, 19:10, 19:13, 19:15, 19:17, 19:18, 27:3, 45:11

**drugs** [1] - 19:6

**dry** [1] - 218:16

**due** [1] - 151:7

**Dugan** [1] - 221:11

**duly** [4] - 7:11, 100:12, 134:23, 203:4

**duration** [1] - 142:25

**during** [15] - 20:22, 30:20, 31:16, 64:8, 75:14, 79:11, 82:18, 109:8, 115:18, 142:25, 144:24, 162:6, 184:14, 189:24, 200:24

**duties** [1] - 138:9

**duty** [1] - 31:6

**dwell** [1] - 183:21

# E

**E-1** [7] - 3:23, 174:17, 175:8, 175:10, 175:18, 175:25, 176:3

**E-10** [2] - 182:6, 182:15

**E-13** [1] - 175:9

**E-14** [5] - 3:24, 175:9, 175:10, 175:25, 194:21

**E-2** [4] - 3:23, 175:18, 175:25, 176:25

**E-3** [3] - 175:15, 182:18, 184:10

**E-4** [5] - 3:23, 175:18, 175:25, 190:8

**E-5** [1] - 191:2

**E-8** [2] - 188:8, 188:10

**E-9** [1] - 179:4

**E-K-R-A** [1] - 186:15

**E.G** [5] - 41:18, 41:22,

47:14, 47:21, 48:1
**E.G.@nothing.com** [1] - 42:9
**ear** [2] - 108:9, 108:14
**early** [12] - 107:17, 108:19, 109:17, 126:18, 130:14, 150:18, 162:1, 167:3, 210:23, 211:3, 222:4, 228:23
**easier** [1] - 228:25
**East** [2] - 1:23, 238:12
**easy** [5] - 84:8, 84:9, 84:10, 84:11, 84:21
**eat** [2] - 126:18
**educate** [4] - 71:18, 88:18, 158:23, 172:21
**education** [4] - 13:11, 84:18, 102:2, 135:11
**educational** [6] - 10:25, 13:22, 100:23, 118:24, 135:9, 173:13
**effective** [1] - 212:20
**effects** [1] - 225:2
**efficient** [1] - 234:21
**effort** [1] - 235:25
**efforts** [1] - 124:9
**Eggen** [2] - 216:5, 216:6
**eight** [1] - 10:18
**either** [9] - 53:24, 54:4, 84:21, 109:23, 109:25, 122:21, 127:15, 174:19, 178:5
**EKRA** [9] - 165:20, 165:21, 166:4, 170:22, 186:11, 186:15, 190:13, 190:17, 198:13
**elderly** [3] - 44:3, 98:21, 157:9
**electronic** [2] - 208:20, 208:23
**eligible** [2] - 56:18, 219:18
**eliminate** [1] - 19:6
**email** [27] - 25:18, 42:9, 174:22, 175:3, 176:5, 177:4, 180:6, 180:10, 180:22, 184:2, 187:22, 187:23, 187:24, 188:7, 193:7, 193:10, 216:2, 216:18, 216:24, 217:4, 217:6, 217:13, 217:16, 221:10, 221:19, 224:21, 232:22
**emails** [11] - 159:16, 169:17, 169:19, 169:21, 170:1, 171:11, 174:16, 174:19, 184:19, 185:11, 188:17
**embarking** [2] - 22:14, 66:2
**EMILY** [1] - 1:13
**emphasis** [1] - 128:24
**emphasize** [1] - 161:9
**emphasized** [1] - 118:5

**employed** [7] - 9:25, 10:1, 101:2, 144:11, 144:22, 149:13, 150:1
**employee** [15] - 131:7, 140:2, 148:2, 148:8, 148:11, 148:19, 148:20, 148:21, 149:5, 149:13, 150:7, 150:11, 150:13, 150:25, 213:2
**employee's** [1] - 148:6
**employees** [18] - 139:11, 140:9, 140:13, 141:5, 141:14, 141:17, 142:11, 143:22, 149:7, 149:9, 150:3, 152:6, 156:11, 169:2, 177:15, 178:23, 179:2, 207:9
**employer** [1] - 178:5
**employers** [2] - 177:18, 225:7
**employment** [4] - 140:16, 146:10, 152:25, 153:13
**encounter** [26] - 20:19, 20:20, 20:21, 20:22, 21:1, 30:21, 31:16, 31:18, 42:22, 53:21, 55:19, 64:9, 66:8, 66:17, 66:19, 67:23, 89:17, 90:3, 91:15, 91:20, 91:21, 92:3, 93:7, 199:13
**encountered** [2] - 43:24, 58:21
**encounters** [4] - 20:18, 65:16, 89:5, 93:24
**encourage** [1] - 72:22
**end** [24] - 6:7, 28:22, 102:6, 128:12, 129:7, 129:9, 129:12, 133:20, 152:25, 153:13, 156:6, 176:12, 202:8, 202:20, 207:19, 224:19, 224:23, 225:22, 227:3, 227:11, 234:3, 236:8, 236:9, 236:20
**endeavoring** [1] - 127:6
**ended** [3] - 6:24, 118:12, 138:14
**endolymphatic** [1] - 108:8
**enforces** [1] - 211:19
**engage** [2] - 85:17, 123:2
**engagement** [1] - 226:2
**England** [1] - 185:20
**enjoy** [2] - 202:21, 227:17
**enjoyed** [1] - 157:18
**enrolled** [4] - 194:6, 194:13, 195:11, 195:17
**enrollment** [1] - 54:8
**ensure** [2] - 85:17, 88:22
**enter** [3] - 149:25, 150:11, 220:5
**entered** [3] - 42:24, 47:2, 47:4
**entering** [1] - 168:8

**enters** [4] - 6:16, 73:25, 134:7, 202:17
**entire** [5] - 11:22, 13:3, 133:1, 149:2, 189:2
**entities** [1] - 212:18
**entitled** [2] - 67:16, 238:8
**entity** [1] - 93:14
**environment** [1] - 158:8
**environmental** [2] - 27:5, 45:12
**enzyme** [1] - 19:9
**enzymes** [2] - 19:5, 19:14
**epidemiology** [1] - 13:6
**episode** [1] - 162:23
**equipped** [3] - 35:20, 36:20, 218:19
**erroneous** [1] - 47:24
**error** [3] - 34:14, 120:2, 120:9
**escorted** [2] - 155:22, 157:10
**esoteric** [2] - 10:5, 11:9
**especially** [3] - 44:3, 154:20, 219:1
**essential** [1] - 48:14
**essentially** [3] - 16:13, 64:20, 127:21
**established** [3] - 13:18, 152:10, 217:12
**establishment** [1] - 122:23
**establishments** [1] - 122:22
**estate** [1] - 135:14
**et** [1] - 225:9
**evaluate** [3] - 64:5, 127:3, 182:12
**evaluates** [1] - 17:4
**evaluating** [3] - 48:12, 237:5, 237:9
**evaluation** [2] - 24:21, 29:25
**evening** [2] - 124:10, 124:22
**event** [2] - 117:19, 125:11
**events** [4] - 96:2, 143:1, 200:4, 225:18
**eventually** [1] - 167:17
**evidence** [17] - 7:20, 8:13, 8:19, 21:14, 30:19, 70:22, 77:21, 98:9, 104:25, 132:7, 137:24, 157:23, 175:7, 176:1, 215:22, 224:8, 224:14, 224:17, 224:23, 225:22, 231:13
**evidencing** [1] - 227:11
**evolution** [1] - 211:5
**exact** [3] - 42:6, 49:10, 112:23
**exactly** [11] - 5:4, 64:21, 101:13, 111:19, 114:12,

144:15, 172:15, 174:25, 182:3, 201:22, 224:4
**examination** [10] - 10:6, 73:8, 74:4, 160:16, 199:12, 200:21, 200:22, 200:24, 202:2, 232:12
**EXAMINATION** [18] - 3:4, 3:4, 3:6, 3:6, 3:8, 3:9, 3:9, 3:11, 8:21, 74:8, 94:6, 99:14, 100:17, 118:19, 135:3, 160:19, 197:23, 203:8
**examine** [1] - 9:17
**examining** [1] - 70:15
**example** [15] - 16:19, 17:24, 33:17, 55:5, 86:5, 96:13, 126:21, 175:3, 205:12, 209:23, 210:8, 212:1, 221:5, 231:24, 234:6
**examples** [3] - 23:15, 23:24, 58:11
**except** [1] - 104:21
**exception** [1] - 133:11
**exchange** [1] - 198:20
**exchanged** [1] - 169:17
**exclusion** [2] - 178:13, 178:21
**excuse** [9] - 5:9, 111:13, 127:15, 127:23, 170:2, 218:16, 223:5, 226:21, 227:2
**excused** [8] - 4:25, 73:8, 100:4, 122:9, 123:8, 200:1, 227:19, 227:23
**executed** [1] - 196:7
**executive** [2] - 11:8, 157:6
**exert** [1] - 71:13
**Exhibit** [30] - 3:14, 8:4, 23:25, 26:9, 37:10, 41:16, 43:8, 46:24, 47:13, 49:1, 49:20, 51:12, 52:12, 57:1, 59:8, 66:12, 104:18, 104:25, 105:10, 105:24, 110:7, 132:11, 137:19, 137:24, 194:21, 215:12, 215:25, 217:7, 217:17, 221:9
**exhibit** [7] - 8:7, 27:13, 28:23, 45:25, 51:25, 52:1, 217:9
**exhibits** [8] - 5:15, 5:22, 5:25, 6:5, 7:19, 8:1, 175:21, 193:17
**EXHIBITS** [1] - 3:13
**Exhibits** [3] - 8:14, 175:25, 215:21
**existence** [1] - 181:22
**existing** [3] - 30:18, 30:20, 30:23, 151:24
**exit** [1] - 226:13
**exits** [6] - 73:9, 124:4, 125:23, 200:13, 226:15, 227:21

**expect** [5] - 21:4, 54:21, 109:24, 172:19, 224:2

**expected** [3] - 140:2, 168:7, 183:25

**expecting** [1] - 85:23

**expeditious** [1] - 58:17

**expenses** [1] - 114:18

**expensive** [4] - 48:23, 96:25, 104:1, 104:8

**experience** [20] - 12:10, 12:13, 13:1, 14:14, 14:17, 19:22, 28:14, 29:23, 77:7, 77:11, 79:5, 81:5, 83:5, 117:18, 136:13, 138:22, 138:25, 148:24, 153:21, 161:11

**experienced** [2] - 50:8, 103:8

**expert** [8] - 13:10, 15:7, 15:15, 35:18, 35:22, 36:7, 44:4, 69:15

**expertise** [3] - 12:8, 79:1, 82:2

**experts** [3] - 13:12, 36:6, 172:19

**explain** [29] - 30:22, 33:12, 36:1, 38:1, 44:2, 53:16, 60:24, 65:21, 67:15, 69:1, 71:15, 101:13, 103:5, 106:19, 108:1, 112:16, 113:4, 149:21, 183:16, 203:19, 204:1, 206:13, 207:2, 207:25, 211:7, 212:5, 213:4, 218:2, 234:9

**explained** [2] - 115:20, 158:17

**explaining** [2] - 110:14, 193:7

**exposed** [1] - 16:19

**extensive** [5] - 12:10, 76:6, 77:7, 115:25, 212:25

**extent** [2] - 77:24, 217:11

**external** [3] - 22:16, 72:3, 139:12

**extracted** [1] - 231:14

**extractions** [1] - 132:10

**extremely** [7] - 20:15, 20:24, 23:19, 31:2, 36:25, 44:10, 60:23

**eye** [2] - 108:7, 108:15

---

# F

**F-o-s-s** [1] - 100:16

**face** [1] - 31:23

**facility** [3] - 24:6, 41:24, 52:15

**fact** [15] - 5:5, 35:18, 36:3, 91:4, 94:9, 96:16, 130:12, 162:5, 165:17, 167:13,
201:14, 204:22, 210:21, 213:20, 214:12

**factor** [3] - 72:18, 96:23, 103:22

**factors** [2] - 35:1, 72:22

**facts** [1] - 66:24

**faint** [1] - 37:14

**fair** [17] - 15:23, 19:25, 54:14, 80:4, 97:13, 97:20, 143:5, 143:6, 143:22, 144:3, 144:15, 149:16, 191:5, 191:6, 191:7, 236:18

**fairly** [4] - 77:7, 109:17, 119:16, 121:14

**fairs** [2] - 144:20, 190:24

**fall** [1] - 69:11

**familial** [1] - 53:4

**familiar** [12] - 13:24, 14:2, 14:9, 20:9, 39:10, 63:24, 68:23, 79:25, 80:16, 93:16, 120:18, 194:16

**families** [1] - 101:16

**Family** [2] - 207:6, 211:2

**family** [59] - 17:13, 17:16, 17:17, 17:18, 18:1, 18:2, 18:4, 22:6, 24:25, 25:22, 26:15, 26:16, 26:17, 27:15, 28:15, 29:20, 30:9, 32:7, 32:23, 33:15, 42:24, 45:18, 45:23, 46:1, 49:15, 50:16, 53:2, 54:25, 56:10, 56:15, 56:16, 62:24, 66:5, 73:4, 101:16, 101:19, 101:23, 101:25, 102:8, 102:22, 103:9, 103:14, 104:6, 109:11, 109:18, 109:24, 110:2, 110:5, 110:21, 112:20, 114:21, 116:2, 117:7, 117:10, 123:1, 207:5, 222:17, 225:7

**family's** [1] - 53:25

**fan** [1] - 80:22

**fantastic** [2] - 197:18, 224:12

**far** [14] - 53:10, 54:17, 59:17, 60:20, 63:9, 66:23, 70:7, 130:17, 158:18, 165:25, 201:23, 226:10, 234:3, 235:11

**fashion** [1] - 201:11

**faster** [1] - 19:7

**fate** [1] - 236:15

**father** [6] - 16:16, 17:1, 17:18, 28:1, 31:25, 91:2

**fault** [1] - 171:1

**faulty** [3] - 18:5, 34:6, 34:16

**fax** [1] - 44:15

**FBI** [11] - 155:3, 155:21, 155:23, 156:1, 156:15, 167:14, 174:4, 196:2,
197:10, 199:9, 199:14

**FDA** [1] - 15:3

**FDA-approved** [1] - 15:3

**fear** [4] - 98:15, 222:14, 222:19, 222:21

**February** [4] - 185:4, 188:12, 221:19

**federal** [5] - 11:14, 84:20, 154:2, 154:22, 203:15

**fee** [1] - 206:15

**feelings** [1] - 126:15

**feet** [1] - 216:8

**fellow** [1] - 76:21

**fellows** [2] - 11:14, 11:19

**fellowship** [6] - 9:12, 11:2, 13:7, 13:8, 80:13, 81:2

**fellowships** [1] - 13:15

**felt** [4] - 6:4, 114:11, 115:23, 143:24

**fetal** [2] - 40:19, 40:20

**fetus** [4] - 40:15, 40:18, 41:8, 41:9

**few** [24] - 23:15, 23:24, 54:11, 56:1, 95:21, 110:19, 111:16, 131:18, 131:19, 146:7, 152:24, 159:19, 161:8, 161:9, 166:13, 166:17, 169:13, 169:15, 188:23, 196:15, 200:18, 202:7, 224:11, 232:2

**fibrosis** [1] - 17:7

**field** [3] - 119:16, 135:17, 139:1

**figure** [8] - 102:17, 103:16, 125:13, 130:4, 185:19, 202:4, 229:3, 230:15

**figured** [2] - 191:10, 201:16

**figuring** [2] - 102:18, 102:22

**file** [6] - 29:15, 33:3, 35:10, 47:18, 55:24

**filed** [1] - 176:14

**files** [13] - 22:23, 22:24, 23:4, 23:18, 23:22, 40:7, 54:18, 56:22, 58:14, 91:5, 91:18, 95:12, 196:23

**filing** [1] - 203:21

**fill** [1] - 182:11

**filled** [4] - 67:1, 67:3, 77:19, 159:13

**finally** [1] - 198:25

**finance** [1] - 163:24

**financial** [4] - 72:4, 72:23, 234:7, 234:8

**financially** [1] - 34:10

**Fine** [1] - 206:8

**fine** [7] - 6:2, 26:8, 113:25, 183:21, 184:6, 202:4, 232:20

**finer** [1] - 23:8

**finish** [6] - 28:15, 128:22,
197:10, 199:9, 199:14

**finishes** [1] - 201:6

**firm** [4] - 148:24, 161:5, 187:2, 187:6

**first** [49] - 5:16, 6:7, 6:22, 17:20, 20:14, 31:7, 36:8, 41:17, 50:14, 50:18, 53:17, 59:24, 60:12, 67:16, 105:9, 109:6, 109:10, 114:7, 115:11, 116:20, 117:14, 117:18, 129:15, 132:6, 133:20, 136:8, 136:13, 139:23, 140:21, 152:22, 153:7, 153:21, 161:7, 161:8, 177:2, 182:11, 184:20, 199:8, 200:25, 201:1, 204:20, 217:16, 217:21, 218:6, 218:22, 221:1, 226:18, 228:5, 228:8

**first-degree** [2] - 17:20, 117:14

**fit** [2] - 157:22, 173:16

**five** [6] - 127:21, 157:17, 202:4, 210:3, 225:13, 237:2

**fix** [1] - 124:8

**fixed** [1] - 114:13

**flag** [1] - 5:10

**fleshed** [1] - 235:20

**flies** [2] - 4:14

**flight** [15] - 4:13, 4:15, 4:16, 4:20, 5:3, 123:18, 124:9, 124:10, 124:16, 125:3, 132:22, 133:11, 133:13, 226:23, 233:3

**flirting** [1] - 128:9

**Floor** [1] - 1:16

**floor** [5] - 150:6, 150:24, 168:25, 216:9, 216:12

**floors** [1] - 216:7

**FLORIDA** [1] - 1:1

**Florida** [10] - 1:3, 1:24, 9:24, 10:2, 71:6, 74:21, 83:25, 157:1, 211:15, 238:13

**flow** [1] - 184:4

**fluids** [1] - 9:17

**flying** [1] - 229:21

**focus** [8] - 12:6, 107:2, 129:8, 153:12, 153:13, 154:6, 204:4, 230:22

**focused** [4] - 20:7, 62:1, 71:8, 230:25

**focusing** [3] - 153:7, 153:17, 166:15

**folks** [8] - 85:20, 85:24, 123:11, 141:18, 141:19, 152:9, 200:7, 237:9

**follow** [8] - 15:2, 20:23, 21:4, 56:19, 60:3, 143:21, 188:2

**follow-up** [6] - 20:23, 21:4,

56:19, 143:21, 188:2
**following** [10] - 41:13, 111:2, 123:12, 158:9, 182:22, 182:25, 224:1, 224:14, 234:4, 235:7
**food** [2] - 27:3, 45:11
**FOR** [3] - 1:13, 1:17, 2:2
**forbid** [1] - 226:23
**foregoing** [1] - 238:6
**foremost** [1] - 226:18
**forgetful** [1] - 44:4
**forgetting** [1] - 232:13
**forgot** [1] - 132:16
**form** [18] - 28:22, 29:10, 29:23, 39:7, 39:8, 39:20, 40:3, 40:9, 40:13, 40:25, 45:10, 46:12, 46:24, 46:25, 47:17, 98:17, 116:19, 182:10
**formal** [3] - 65:6, 140:23, 189:9
**formatted** [1] - 208:20
**former** [2] - 148:11, 148:21
**forms** [9] - 47:23, 75:18, 81:23, 81:25, 82:4, 82:15, 82:18, 159:12, 182:11
**formula** [1] - 59:2
**Fort** [8] - 1:24, 4:16, 125:7, 125:11, 126:2, 128:7, 227:19, 238:13
**forth** [3] - 64:19, 218:7, 221:16
**forward** [6] - 33:24, 104:14, 131:11, 158:24, 189:1, 232:9
**forwarded** [2] - 183:10, 189:13
**forwarding** [3] - 185:21, 186:2, 188:21
**Foss** [10] - 100:8, 100:15, 100:19, 104:15, 106:1, 110:8, 112:8, 115:9, 118:21, 129:13
**FOSS** [1] - 100:12
**founded** [1] - 10:14
**founder** [1] - 10:11
**four** [11] - 9:11, 26:14, 127:16, 135:22, 157:7, 157:17, 180:15, 181:9, 181:23, 210:3, 223:14
**Fox** [4] - 9:12, 187:2, 187:6, 197:13
**framed** [1] - 219:14
**frankly** [1] - 127:17
**FRAUD** [1] - 1:15
**fraud** [7] - 68:1, 117:23, 203:18, 203:23, 203:24, 205:4
**free** [16] - 34:19, 34:23, 59:3, 73:11, 124:1, 143:7, 191:8, 200:10, 204:9, 218:9, 219:19, 219:23, 222:7,

222:12, 222:15, 226:13
**Free** [1] - 221:15
**freely** [1] - 150:10
**frequenting** [1] - 122:22
**frequently** [5] - 21:6, 35:25, 66:3, 102:23, 165:15
**Friday** [7] - 6:18, 6:22, 134:1, 134:12, 156:5, 233:13, 234:17
**Fridays** [3] - 156:7, 156:8, 161:18
**friends** [3] - 73:4, 123:2, 225:7
**front** [10] - 27:22, 50:18, 57:1, 68:9, 89:13, 105:15, 150:2, 150:22, 155:22, 167:6
**fulfill** [1] - 83:18
**full** [7] - 109:10, 109:18, 131:5, 131:6, 198:4, 198:7, 209:6
**fully** [2] - 35:20, 36:2
**function** [1] - 107:11
**functions** [2] - 149:10, 199:23
**fundamental** [1] - 235:19
**future** [2] - 44:22, 143:8

# G

**G.'s** [2] - 46:17, 47:18
**GARLAND** [1] - 2:3
**gather** [3] - 50:19, 50:21, 151:20
**gathered** [2] - 149:6, 156:11
**gears** [3] - 20:6, 68:14, 69:12
**gene** [26] - 18:2, 18:5, 33:18, 33:23, 34:6, 34:8, 34:16, 34:21, 38:21, 103:12, 106:16, 106:17, 107:3, 107:7, 107:8, 107:11, 107:15, 107:20, 107:23, 109:20, 112:23, 114:6, 115:21, 117:12, 118:2, 118:8
**General** [1] - 178:11
**general** [7] - 9:9, 19:19, 35:19, 116:10, 154:6, 154:7, 199:21
**generally** [8] - 12:7, 15:17, 17:23, 23:20, 35:3, 38:2, 93:16, 183:19
**generate** [1] - 209:21
**generated** [5] - 204:6, 206:16, 208:22, 211:24
**generates** [1] - 56:10
**generation** [2] - 18:3
**genes** [31] - 16:15, 16:16, 16:17, 16:20, 17:2, 17:3, 17:4, 18:20, 38:20, 38:22,

38:24, 39:6, 41:10, 47:9, 48:2, 51:23, 56:13, 103:7, 103:10, 103:11, 103:12, 103:13, 106:20, 107:5, 120:17, 209:1, 209:4, 209:5, 209:24, 210:10
**Genes** [2] - 207:6, 211:2
**genetic** [143] - 10:7, 11:12, 13:16, 13:24, 14:14, 15:8, 15:16, 15:24, 16:4, 16:8, 16:13, 17:7, 17:9, 21:18, 21:20, 21:21, 22:2, 22:3, 22:10, 22:13, 22:14, 24:18, 25:2, 30:1, 30:7, 30:8, 30:14, 30:24, 32:5, 32:20, 33:9, 33:11, 33:13, 35:20, 35:21, 36:1, 37:7, 38:1, 38:3, 38:14, 39:1, 40:8, 40:16, 40:20, 40:22, 41:11, 42:5, 49:12, 49:21, 49:24, 50:13, 51:9, 52:5, 52:19, 53:3, 54:24, 54:25, 55:2, 55:11, 56:5, 57:18, 58:5, 59:22, 60:12, 61:22, 62:18, 63:3, 65:11, 65:19, 65:20, 65:21, 68:18, 68:24, 69:2, 70:3, 70:9, 70:10, 71:10, 80:13, 88:12, 91:3, 91:9, 94:20, 94:24, 98:16, 101:1, 101:2, 101:11, 101:13, 101:17, 101:20, 101:22, 101:24, 102:1, 102:2, 102:3, 102:4, 102:14, 102:16, 103:1, 103:2, 103:6, 103:16, 103:22, 104:1, 104:7, 104:8, 105:5, 105:21, 106:4, 106:6, 106:18, 106:25, 107:4, 109:9, 109:18, 110:22, 112:18, 112:20, 113:7, 114:6, 115:2, 115:17, 115:20, 116:3, 116:10, 117:4, 118:2, 118:3, 119:1, 119:6, 119:13, 121:1, 121:2, 121:14, 169:10, 191:16, 204:7, 204:9, 204:25, 213:8, 213:24
**geneticist** [2] - 172:2, 172:3
**geneticists** [1] - 112:17
**genetics** [8] - 12:3, 36:4, 76:7, 77:8, 105:8, 105:18, 106:13, 121:9
**Genetics** [1] - 115:12
**genital** [1] - 108:10
**gentleman** [3] - 157:9, 157:13, 207:4
**gentlemen** [6] - 6:18, 73:1, 74:2, 122:10, 134:9, 207:6, 223:8, 227:25
**Georgia** [4] - 1:19, 2:4, 2:7, 135:8
**germline** [3] - 16:8, 16:24,

101:22
**getfreestuff.com** [2] - 217:25, 218:1
**GI** [2] - 12:10, 12:23
**gift** [3] - 59:18, 60:15
**girl** [1] - 150:19
**given** [13] - 19:7, 58:14, 58:24, 117:21, 142:10, 143:4, 143:6, 144:21, 150:8, 151:22, 151:24, 163:14, 233:3
**glad** [6] - 6:21, 115:24, 115:25, 116:2, 134:2, 237:8
**glass** [3] - 168:11, 168:13, 169:4
**goal** [4] - 129:22, 129:24, 130:18, 223:21
**God** [1] - 34:7
**gonna** [2] - 34:20, 218:25
**Google** [1] - 123:3
**Googling** [1] - 111:20
**govern** [2] - 97:25, 225:6
**governing** [2] - 138:13, 139:2
**government** [57] - 5:13, 6:25, 7:1, 7:19, 8:14, 15:6, 22:25, 58:11, 70:2, 70:7, 70:19, 73:20, 81:11, 82:15, 82:22, 84:19, 84:20, 85:24, 87:17, 93:4, 93:7, 93:24, 104:17, 104:25, 111:8, 111:23, 116:12, 122:7, 122:19, 122:21, 126:15, 129:2, 129:8, 130:9, 134:14, 134:16, 137:18, 137:24, 175:25, 184:13, 200:22, 200:23, 201:10, 201:12, 201:18, 202:22, 215:11, 215:21, 217:9, 223:15, 223:25, 228:21, 229:14, 233:12, 234:20, 235:8, 236:11
**Government** [18] - 7:11, 23:25, 41:16, 43:7, 46:23, 47:12, 48:25, 51:11, 56:25, 59:8, 100:12, 134:23, 203:4, 215:12, 215:25, 217:7, 217:17, 221:9
**GOVERNMENT** [1] - 1:13
**GOVERNMENT'S** [1] - 3:13
**Government's** [14] - 8:3, 26:9, 37:10, 49:20, 52:12, 66:12, 104:18, 105:10, 105:24, 110:7, 115:7, 132:11, 137:19, 159:6
**government's** [12] - 6:7, 7:4, 100:7, 128:20, 129:11, 133:24, 134:1, 134:15, 175:22, 233:21, 233:23, 236:25

governmental [1] - 140:18
Gracie [1] - 237:15
grade [1] - 44:6
graduate [4] - 11:19, 13:5, 78:7, 78:20
graduated [4] - 9:3, 76:9, 79:20, 80:7
graduating [1] - 135:13
grand [2] - 154:22, 161:11
grandkids [2] - 114:20, 116:4
grandparents [2] - 17:19, 110:1
granted [1] - 138:1
grasp [1] - 149:9
great [13] - 4:10, 16:1, 16:7, 80:6, 81:4, 125:22, 126:7, 128:3, 180:8, 226:2, 227:20, 237:20, 237:21
Greenwich [2] - 185:15, 185:19
greet [2] - 64:22, 145:14
grey [1] - 207:20
Griner [9] - 231:7, 232:14, 232:15, 232:16, 232:19, 232:21, 232:23, 233:8, 235:4
grocery [1] - 59:18
group [6] - 17:22, 54:17, 105:12, 112:17, 149:13, 206:18
Group [3] - 12:22, 12:23, 212:1
groups [5] - 12:16, 12:20, 12:25, 206:15
guard [1] - 114:11
guardian [1] - 54:5
guess [20] - 83:2, 119:17, 139:25, 147:14, 148:24, 149:24, 151:2, 154:1, 154:10, 155:7, 156:9, 158:1, 158:14, 159:20, 173:6, 190:9, 195:20, 201:9, 207:19, 210:17
guidance [3] - 11:4, 159:16, 159:22
guideline [1] - 15:5
guidelines [1] - 104:5
guilty [2] - 34:7, 203:15
gun [1] - 133:25
GURSKIS [51] - 1:13, 3:6, 3:8, 3:9, 100:8, 100:18, 101:10, 104:17, 105:1, 105:23, 105:25, 111:18, 112:7, 113:14, 113:18, 113:19, 114:1, 115:6, 115:8, 116:16, 116:17, 116:21, 116:22, 118:14, 122:7, 129:19, 132:9, 132:19, 134:16, 135:4, 137:18, 137:25, 138:2, 138:3,

142:21, 143:13, 144:5, 160:12, 160:15, 165:24, 175:6, 175:12, 175:23, 183:7, 184:3, 192:5, 197:22, 197:24, 199:25, 215:19, 217:12
Gurskis [2] - 131:17, 132:7
gut [1] - 157:25
guy [1] - 182:15
guys [22] - 6:23, 122:14, 127:11, 127:14, 128:10, 130:12, 131:9, 131:20, 132:23, 133:5, 134:11, 201:16, 224:22, 226:1, 226:5, 226:7, 236:7, 236:15, 237:2, 237:12, 237:13, 237:25

## H

H.'s [3] - 49:3, 51:7, 51:14
H.K [3] - 24:4, 30:18, 89:11
H.K.@nothing.com [1] - 25:19
hair [1] - 38:13
half [9] - 66:5, 66:6, 90:22, 127:21, 129:3, 151:6, 153:1, 226:25, 236:13
hand [5] - 7:10, 24:8, 59:8, 60:2, 62:1, 89:22, 100:11, 134:22, 203:3
handbooks [1] - 140:17
handful [2] - 146:9, 168:21
handle [1] - 122:16
handled [2] - 151:21, 172:8
handling [1] - 140:10
hands [1] - 31:4
hang [2] - 123:24, 215:9
hanging [1] - 5:2
happy [2] - 6:18, 228:5
hard [8] - 25:10, 36:6, 42:11, 90:25, 101:6, 118:5, 170:10, 218:2
harm [1] - 31:7
Harper [2] - 59:13, 60:6
Harvard [3] - 80:14, 80:16, 80:22
haste [1] - 96:9
hat [1] - 97:22
Hayes [7] - 229:23, 230:5, 230:6, 230:7, 230:23, 231:18, 233:7
hazard [1] - 61:25
head [2] - 171:19, 182:16
headed [1] - 124:25
heading [1] - 223:10
headline [1] - 179:5
health [21] - 27:15, 28:15, 28:16, 43:25, 45:18, 46:1, 61:8, 61:9, 143:5, 143:6,

143:8, 143:9, 143:22, 144:3, 144:15, 144:20, 190:23, 191:4, 191:5, 191:6, 191:7
Health [1] - 165:1
Healthcare [2] - 59:20, 60:17
healthcare [22] - 119:16, 119:19, 135:16, 135:24, 137:11, 138:25, 139:11, 140:19, 141:11, 148:25, 161:6, 162:23, 164:14, 164:21, 164:23, 166:5, 203:18, 203:24, 204:4, 204:5, 205:4
hear [7] - 6:21, 53:19, 79:8, 83:10, 132:21, 229:14, 237:8
heard [24] - 15:23, 20:5, 58:19, 59:18, 59:22, 63:2, 63:18, 67:4, 67:8, 80:17, 83:21, 84:12, 93:14, 102:10, 107:25, 116:14, 120:14, 120:23, 121:12, 121:17, 122:25, 141:21, 155:15, 176:6
hearing [3] - 101:6, 108:13, 159:21
hearsay [3] - 113:11, 142:13, 142:15
heaven [1] - 226:23
heavily [1] - 34:3
Hegde [1] - 121:17
held [11] - 13:23, 73:21, 93:12, 111:2, 122:2, 123:12, 133:3, 135:13, 138:23, 160:14, 182:22
helm [1] - 145:10
help [19] - 12:3, 31:14, 31:17, 58:1, 59:1, 63:10, 65:22, 81:25, 96:23, 97:6, 97:7, 102:4, 102:17, 118:6, 133:10, 160:8, 166:9, 182:1, 187:18
helped [3] - 78:10, 82:15, 82:20
helpful [1] - 104:13
helping [1] - 190:16
helps [3] - 85:4, 102:11, 234:4
hemangioblastoma [1] - 108:5
hemangioblastomas [1] - 108:7
hereby [1] - 238:6
hereditary [8] - 13:18, 13:20, 38:17, 41:3, 47:8, 48:1, 106:10, 107:13
hi [2] - 100:9, 112:8
high [19] - 17:14, 18:10, 19:8, 23:16, 34:21, 55:2, 65:25, 72:15, 72:19, 104:5,

104:7, 152:7, 203:19, 207:25, 213:17, 213:20, 214:9, 214:12, 218:25
high-quality [1] - 72:15
high-risk [1] - 34:21
higher [2] - 102:21, 102:25
highest [2] - 209:21, 210:7
highlight [2] - 89:15, 174:20
highlighted [1] - 106:10
highly [1] - 107:19
Hill [1] - 101:4
himself [2] - 159:19, 197:2
HIPAA [6] - 54:2, 139:17, 151:19, 152:6, 166:15, 181:15
Hippel [1] - 107:13
Hippel-Lindau [1] - 107:13
hire [4] - 69:17, 145:15, 157:2, 157:3
hiring [2] - 10:23, 136:22
Hirsch [5] - 207:7, 216:14, 233:15, 234:12, 234:23
historian [1] - 43:25
historical [5] - 26:25, 27:1, 27:7, 45:11, 45:12
history [57] - 22:6, 25:1, 26:14, 26:15, 26:16, 26:17, 26:20, 27:12, 27:15, 27:25, 28:15, 28:16, 29:20, 29:23, 30:9, 31:22, 32:6, 43:9, 44:19, 45:16, 45:18, 45:23, 46:1, 49:21, 50:16, 53:2, 53:5, 53:24, 53:25, 56:11, 56:16, 62:24, 90:23, 101:16, 101:18, 101:19, 101:25, 102:22, 103:9, 103:14, 104:6, 104:7, 109:11, 109:12, 109:18, 109:24, 110:2, 110:5, 110:21, 112:21, 135:10
hmm [5] - 53:11, 141:20, 179:20, 181:11, 188:7
hoarse [1] - 57:21
hold [4] - 8:25, 9:21, 83:8, 182:23
holds [1] - 71:5
holidays [3] - 129:7, 236:11, 236:18
holistic [2] - 31:11, 62:20
Holloway [2] - 192:15, 193:8
home [3] - 64:9, 202:20, 225:5
honest [2] - 168:24, 171:8
Honor [72] - 4:8, 5:14, 5:23, 6:9, 6:12, 7:5, 7:18, 7:24, 8:3, 8:20, 15:14, 59:7, 59:11,

60:2, 68:7, 73:14, 73:19, 74:6, 79:13, 93:10, 94:2, 94:5, 98:9, 98:18, 99:11, 99:13, 99:25, 100:2, 101:5, 104:17, 110:25, 111:4, 113:10, 113:14, 113:18, 113:23, 116:11, 116:16, 118:14, 122:3, 122:7, 123:9, 126:16, 129:19, 131:13, 131:25, 132:19, 134:16, 137:18, 137:25, 143:12, 160:12, 160:17, 165:24, 175:8, 175:23, 182:19, 197:20, 197:22, 200:3, 202:24, 214:25, 215:11, 215:19, 217:8, 222:24, 229:20, 231:6, 234:12, 237:4, 237:23, 237:24

**HONORABLE** [1] - 1:10
**Honorable** [1] - 1:22
**hope** [4] - 134:10, 180:8, 227:17, 236:20
**hopefully** [1] - 29:6
**hopes** [1] - 133:10
**hoping** - 237:16
**hospital** [4] - 103:12, 136:10, 136:12, 138:25
**hospitals** [2] - 136:4, 136:5
**HOSTETLER** [1] - 2:5
**hour** [12] - 70:1, 122:13, 128:2, 131:10, 151:6, 151:8, 155:10, 156:13, 200:20, 200:25, 201:25, 202:13
**hourly** [3] - 69:24, 69:25, 70:1
**hours** [3] - 157:7, 157:9, 232:18
**house** [4] - 137:9, 171:7, 171:10, 177:15
**House** [1] - 186:13
**housekeeping** [3] - 200:15, 228:6, 236:25
**HR** [12] - 140:7, 140:17, 141:1, 163:14, 164:1, 177:25, 178:1, 185:11, 186:4, 186:11, 186:13, 188:17
**HR-related** [1] - 140:7
**Huan** [9] - 24:11, 30:18, 37:20, 42:2, 47:6, 47:21, 49:8, 51:20, 89:25
**huge** [1] - 183:9
**human** [14] - 9:17, 17:3, 38:22, 120:2, 136:23, 136:25, 137:2, 137:4, 138:18, 138:21, 140:4, 140:14, 151:23, 225:20
**Human** [1] - 165:1
**humanly** [1] - 133:9
**humans** [2] - 18:23, 36:4

**hundred** [1] - 75:23
**hundreds** [1] - 12:19
**hunting** [1] - 161:7
**hypothetical** [3] - 53:6, 53:7, 66:25
**hypothetically** [1] - 62:9

**I**

**ICD** [1] - 210:2
**ICD-10** [3] - 37:17, 51:18, 210:5
**ID** [2] - 42:21, 42:22
**idea** [8] - 27:19, 53:18, 93:19, 94:1, 111:15, 121:5, 223:2, 237:6
**ideally** [2] - 35:21, 64:11
**ideas** [1] - 128:9
**identical** [4] - 18:20, 18:22, 46:21, 56:23
**identification** [1] - 175:7
**identified** [2] - 106:9, 207:22
**identify** [4] - 8:1, 117:14, 123:14, 207:17
**identifying** [1] - 116:24
**IDGAF** [7] - 25:11, 25:24, 42:13, 43:1, 49:17, 57:9, 99:1
**IGDAF** [2] - 99:4, 99:8
**II** [2] - 1:10, 1:22
**ill** [1] - 35:20
**ill-equipped** [1] - 35:20
**illegal** [2] - 198:17, 198:20
**illness** [1] - 24:24
**ILONA** [2] - 1:21, 238:11
**image** [1] - 224:21
**imagine** [1] - 225:12
**imaging** [1] - 13:9
**immediate** [3] - 17:17, 17:18, 140:3
**immediately** [1] - 153:11
**immunizations** [2] - 27:10, 45:13
**impact** [2] - 33:24, 67:5
**impair** [1] - 41:12
**imperative** [1] - 198:6
**implantable** [1] - 28:19
**implementation** [2] - 11:11, 15:3
**implication** [1] - 64:4
**implications** [3] - 32:22, 36:5, 114:21
**implies** [1] - 96:6
**importance** [2] - 20:10, 30:22
**important** [26] - 17:11, 20:13, 20:15, 20:24, 21:5, 21:17, 31:19, 32:18, 32:20, 32:21, 33:7, 48:11, 61:1,

92:1, 103:2, 103:15, 104:2, 104:14, 158:21, 177:7, 198:4, 208:6, 213:17, 214:8, 232:3, 232:8
**impression** [2] - 96:7, 142:9
**improve** [1] - 182:4
**in-and-out** [1] - 139:18
**in-house** [4] - 137:9, 171:7, 171:10, 177:15
**in-office** [1] - 64:21
**inability** [2] - 158:14, 167:18
**inaccurate** [1] - 120:12
**inadequate** [2] - 90:15, 90:16
**inappropriate** [4] - 72:10, 95:5, 98:12, 99:20
**Inc** [1] - 212:1
**incidence** [1] - 17:22
**include** [3] - 23:9, 23:13, 159:12
**included** [3] - 10:22, 11:11, 105:21
**includes** [1] - 104:18
**including** [5] - 10:6, 13:4, 13:22, 97:23, 150:16
**income** [1] - 114:13
**incomplete** [2] - 29:19, 96:10
**incompletely** [1] - 96:7
**inconclusive** [1] - 50:10
**inconsistent** [2] - 47:23, 110:21
**inconvenience** [1] - 195:17
**incorporated** [1] - 159:11
**increased** [8] - 18:5, 33:19, 57:18, 58:4, 107:5, 107:15, 114:22, 115:24
**incredible** [2] - 167:2, 195:16
**incumbent** [1] - 224:9
**indeed** [2] - 32:7, 235:7
**independent** [2] - 75:3, 123:2
**indicate** [2] - 17:6, 38:21, 108:15
**indicated** [5] - 19:22, 40:24, 48:9, 117:9, 124:7
**indicates** [2] - 107:8, 107:14
**indicating** [3] - 39:20, 106:17, 117:8
**indication** [6] - 22:3, 22:10, 48:4, 52:4, 66:22, 229:12
**indications** [1] - 18:1
**indicted** [1] - 111:8
**indictment** [2] - 111:6, 111:24
**individual** [16] - 18:5,

78:22, 102:5, 104:14, 105:17, 107:9, 112:19, 117:9, 117:15, 144:3, 211:15, 212:21, 212:25, 213:11, 219:6, 221:7
**individuals** [13] - 19:4, 78:10, 101:18, 102:24, 107:14, 107:22, 147:25, 178:16, 204:6, 207:10, 208:3, 216:11, 235:21
**inducements** [1] - 72:23
**inducing** [1] - 221:7
**industry** [4] - 86:3, 135:24, 154:10, 208:10
**ineffective** [1] - 18:25
**influence** [2] - 71:12, 208:13
**inform** [1] - 112:13
**informal** [1] - 140:23
**information** [87] - 9:18, 9:19, 16:14, 16:15, 17:5, 17:11, 18:13, 19:20, 21:19, 23:6, 23:22, 25:16, 25:22, 26:24, 28:11, 29:24, 30:6, 33:14, 33:15, 33:25, 35:17, 36:20, 36:23, 37:5, 37:9, 42:24, 43:21, 43:22, 48:5, 48:17, 48:18, 49:14, 49:15, 50:11, 50:19, 50:21, 50:24, 53:9, 53:13, 54:1, 54:4, 54:6, 55:4, 56:8, 58:24, 58:25, 60:25, 61:8, 61:9, 61:10, 61:13, 61:15, 62:2, 62:11, 64:18, 67:1, 67:3, 67:24, 68:3, 69:6, 90:9, 90:14, 90:18, 90:25, 92:19, 96:11, 97:4, 101:19, 102:7, 103:7, 104:10, 117:21, 143:6, 143:18, 144:23, 145:7, 152:8, 152:16, 153:8, 153:10, 183:3, 183:21, 204:21, 235:17, 235:23
**information's** [1] - 16:21
**informed** [19] - 22:13, 33:6, 39:9, 39:10, 39:12, 39:14, 39:18, 39:19, 40:1, 40:4, 40:6, 40:11, 40:13, 40:17, 47:13, 52:2, 54:2, 62:3, 163:5
**inherently** [1] - 47:23
**inherit** [2] - 17:1, 18:4
**inherited** [3] - 16:15, 41:8, 109:23
**initial** [1] - 169:16
**initiate** [1] - 30:15
**initiatives** [1] - 140:16
**injured** [1] - 155:17
**inner** [2] - 108:9, 108:14
**Innovative** [1] - 220:3
**inquisition** [1] - 140:8

**INS** [3] - 211:9, 212:8, 212:9
**inscription** [1] - 24:24
**insensitive** [1] - 19:17
**inside** [2] - 38:10, 106:20
**insight** [1] - 45:20
**inspect** [1] - 88:3
**inspection** [1] - 86:6
**inspections** [4] - 85:19, 85:24, 86:20, 87:24
**Inspector** [1] - 178:11
**inspector** [1] - 84:14
**instance** [1] - 62:10
**instances** [3] - 17:17, 45:9, 120:6
**instead** [2] - 67:2, 185:15
**institutions** [1] - 12:14
**instruct** [1] - 111:14
**instructed** [1] - 201:4
**instructions** [1] - 227:6
**instrumental** [1] - 151:13
**instruments** [2] - 120:6, 120:7
**insurance** [23] - 21:12, 26:2, 34:11, 37:15, 43:3, 48:20, 61:9, 69:2, 69:5, 103:21, 104:4, 114:19, 117:25, 118:2, 118:6, 118:10, 136:6, 144:1, 191:13, 191:17, 193:13
**intention** [1] - 201:7
**interact** [2] - 143:1, 145:13
**interaction** [6] - 145:16, 145:18, 155:23, 155:25, 157:5, 205:14
**interactions** [1] - 146:5
**interdepartmental** [1] - 148:25
**interest** [1] - 236:5
**interested** [1] - 190:16
**interests** [1] - 12:9
**internal** [4] - 85:16, 139:12, 179:19, 179:24
**internally** [2] - 23:21, 29:19
**International** [2] - 4:17, 125:7
**international** [1] - 15:4
**internet** [4] - 123:4, 193:23, 194:3, 195:6
**interpret** [3] - 14:9, 15:18, 34:19
**interpreted** [1] - 14:19
**interpreting** [1] - 35:16
**interrupt** [2] - 90:12, 209:8
**interrupted** [1] - 209:9
**intervention** [2] - 29:12, 46:15
**interventions** [2] - 29:13, 51:3

**interview** [8] - 50:14, 50:17, 50:19, 53:22, 54:9, 64:22, 94:9, 94:16
**interviewed** [4] - 81:10, 81:19, 141:3, 197:10
**interviews** [2] - 81:16, 196:19
**introduce** [1] - 197:2
**introduced** [6] - 60:22, 141:16, 175:13, 176:13, 207:5, 216:14
**invasive** [2] - 40:17, 47:24
**involve** [1] - 137:7
**involved** [22] - 11:20, 11:22, 12:14, 12:15, 12:20, 12:24, 13:11, 13:14, 13:17, 13:19, 13:21, 15:4, 19:15, 156:1, 190:24, 192:10, 192:14, 192:21, 205:5, 208:6, 211:8, 216:13
**involving** [1] - 58:12
**issue** [11] - 5:1, 31:24, 114:9, 123:13, 123:25, 143:4, 154:16, 154:17, 191:5, 193:11, 201:17
**issued** [2] - 111:23, 154:23
**issues** [25] - 5:12, 7:22, 65:17, 84:20, 114:15, 131:18, 131:21, 132:7, 139:11, 139:15, 140:6, 143:8, 152:15, 153:1, 153:2, 153:10, 153:22, 154:14, 171:5, 181:15, 181:16, 181:23, 187:12, 187:13, 226:12
**it'll** [1] - 224:3
**italicized** [1] - 106:16
**itself** [6] - 16:11, 71:1, 149:23, 162:14, 204:13, 219:17

**J**

**J.D** [1] - 173:20
**jacket** [1] - 207:20
**James** [1] - 192:15
**JAMIE** [1] - 1:13
**jammed** [1] - 236:17
**January** [1] - 236:12
**Jefferson** [2] - 79:22, 80:11
**Jersey** [1] - 79:20
**Jessie** [2] - 221:11, 221:13
**job** [26] - 71:24, 91:10, 91:14, 91:17, 91:19, 91:21, 92:2, 92:5, 92:8, 92:10, 92:12, 104:11, 136:16, 136:19, 136:21, 137:6, 137:16, 138:7, 138:11, 149:10, 151:10, 161:7, 163:20, 166:10, 166:14,

182:3
**jobs** [1] - 135:12
**joining** [1] - 202:8
**Jon** [20] - 141:22, 145:22, 145:25, 146:22, 147:11, 152:17, 156:1, 156:9, 156:14, 156:15, 159:10, 159:15, 170:8, 176:17, 179:10, 190:9, 199:4, 199:8, 207:9, 208:4
**JON** [8] - 170:8
**Jonathan** [1] - 229:23
**journey** [1] - 31:17
**Judge** [1] - 118:16
**JUDGE** [1] - 1:10
**judges** [1] - 189:21
**judgment** [2] - 128:11, 131:11
**judgments** [1] - 77:14
**July** [8] - 117:1, 117:3, 135:21, 159:10, 161:15, 179:17, 184:16, 185:9
**juror** [8] - 4:12, 4:14, 126:17, 127:7, 127:23, 130:13, 132:22, 227:23
**JUROR** [8] - 124:12, 124:14, 124:20, 124:23, 125:1, 125:4, 125:15, 125:21
**Juror** [4] - 12:5, 125:23, 133:21, 133:22, 227:21
**JURORS** [1] - 6:20
**jurors** [11] - 4:4, 6:14, 6:15, 126:8, 126:11, 127:18, 128:4, 129:1, 133:8, 134:3, 236:21
**jury** [48] - 5:12, 6:18, 18:17, 23:2, 23:17, 30:22, 33:12, 37:6, 38:1, 44:2, 47:19, 53:16, 58:18, 59:9, 67:15, 69:1, 71:4, 73:6, 74:2, 101:13, 110:14, 111:13, 122:10, 122:18, 123:1, 123:6, 126:18, 131:19, 132:6, 132:12, 134:6, 135:12, 154:22, 200:12, 203:19, 204:1, 206:5, 206:13, 207:2, 208:1, 209:17, 211:7, 213:4, 217:21, 223:8, 224:25, 226:3, 235:17
**Jury** [8] - 6:16, 73:9, 73:25, 124:4, 134:7, 200:13, 202:17, 226:15
**JURY** [1] - 1:9
**jury's** [1] - 216:4
**JUSTICE** [1] - 1:15
**Justice** [2] - 69:18, 165:2
**justify** [1] - 90:10

**K**

**K.'s** [5] - 25:18, 37:12, 42:6, 46:18, 66:12
**K.A** [1] - 104:15
**Karen** [3] - 183:10, 184:25, 188:15
**KATHERINE** [1] - 1:14
**keep** [17] - 6:23, 36:6, 52:8, 62:4, 83:18, 112:4, 126:16, 127:7, 128:16, 131:9, 133:18, 222:14, 223:15, 226:1, 235:10, 236:1, 237:9
**keeping** [5] - 133:6, 181:22, 183:23, 224:15, 235:18
**Keith** [2] - 207:7, 216:15
**key** [5] - 150:8, 166:24, 167:14, 195:15, 235:19
**kick** [1] - 6:22
**Kickback** [1] - 198:14
**kickbacks** [4] - 198:17, 198:20, 208:9, 210:19
**kidney** [17] - 26:15, 26:17, 26:21, 26:22, 27:25, 28:1, 28:5, 28:6, 28:7, 28:8, 28:9, 31:24, 31:25, 32:1, 91:1, 91:2, 108:11
**kidneys** [2] - 108:10, 108:25
**kids** [1] - 114:20
**kill** [2] - 19:2, 19:11
**Kimberly** [2] - 100:8, 100:15
**KIMBERLY** [2] - 100:12, 100:16
**kind** [21] - 10:3, 31:24, 54:13, 91:7, 145:4, 145:7, 149:1, 150:2, 151:16, 153:21, 156:20, 162:2, 163:23, 165:8, 166:4, 175:3, 181:9, 182:10, 182:16, 188:9, 195:15
**kinds** [2] - 14:17, 14:24
**kit** [1] - 38:4
**knock** [1] - 235:12
**knocking** [1] - 235:2
**knowledge** [7] - 36:3, 81:12, 154:11, 155:1, 176:19, 193:6, 208:3
**known** [6] - 107:3, 121:14, 164:7, 165:20, 204:25, 211:10
**knows** [2] - 111:12, 235:17
**kosher** [1] - 178:17
**Krüger** [4] - 137:4, 140:25, 164:4, 164:5
**Kugler** [1] - 164:3

## L

**lab** [124] - 10:3, 10:4, 10:5, 11:9, 11:13, 16:13, 16:15, 29:10, 34:12, 46:12, 69:9, 71:1, 71:2, 71:4, 71:5, 71:12, 71:16, 71:17, 71:18, 71:19, 71:20, 71:23, 71:25, 72:5, 72:6, 72:8, 72:9, 72:12, 72:15, 72:16, 72:19, 72:23, 74:24, 75:1, 75:2, 75:8, 76:23, 77:5, 77:25, 78:3, 78:5, 78:7, 78:22, 79:2, 79:4, 79:18, 81:21, 82:24, 83:3, 83:7, 83:8, 83:12, 83:14, 83:15, 83:25, 85:16, 85:17, 85:20, 86:13, 87:4, 87:6, 88:3, 88:8, 92:13, 95:1, 95:7, 95:10, 97:11, 97:16, 97:23, 98:6, 99:19, 99:20, 106:4, 111:5, 111:9, 111:20, 111:21, 111:23, 111:24, 112:18, 117:22, 119:9, 119:11, 136:14, 140:9, 141:5, 142:2, 143:9, 149:23, 152:8, 155:13, 155:15, 155:16, 155:18, 157:6, 162:14, 163:9, 168:10, 171:13, 183:2, 192:9, 204:13, 206:2, 206:3, 206:7, 208:6, 208:8, 209:6, 211:4, 212:12, 213:12, 213:15, 214:23, 219:9
**Lab** [6] - 77:3, 206:21, 220:3, 222:1, 222:9, 222:14
**lab's** [4] - 91:17, 91:19, 92:12, 171:19
**LabCorp** [4] - 204:11, 204:12, 211:25
**label** [1] - 222:1
**labor** [1] - 140:18
**laboratories** [2] - 119:25, 120:2
**laboratory** [28] - 9:16, 10:2, 11:10, 77:8, 78:24, 79:11, 83:1, 83:6, 83:18, 84:17, 85:5, 110:24, 112:24, 114:6, 116:24, 117:8, 118:4, 137:12, 141:17, 142:7, 151:14, 153:20, 153:23, 158:7, 159:1, 168:1, 168:5, 169:10
**Labs** [3] - 206:7, 207:8, 216:15
**labs** [15] - 30:12, 75:8, 81:5, 84:6, 86:20, 87:24, 98:1, 117:17, 166:7, 206:3, 206:4, 206:5, 206:10, 207:8, 207:10
**LabSolutions** [62] - 78:10, 79:11, 81:14, 82:16, 84:23, 84:25, 85:2, 85:8, 86:5, 86:18, 87:8, 87:19, 92:24, 93:4, 116:20, 121:4, 121:9, 121:21, 121:23, 135:18, 135:20, 136:13, 137:1, 137:5, 138:8, 138:13, 143:11, 144:11, 144:18, 144:21, 144:24, 144:25, 145:11, 147:23, 148:22, 149:4, 149:14, 150:7, 151:11, 154:15, 154:23, 155:2, 156:25, 157:3, 157:11, 157:14, 157:16, 161:11, 166:21, 191:24, 192:24, 193:3, 193:5, 198:7, 206:7, 208:2, 208:4, 208:21, 210:16, 210:17, 210:25, 235:23
**ladies** [5] - 6:18, 74:2, 122:10, 134:9, 223:8
**Ladies** [1] - 73:1
**lady** [1] - 121:17
**land** [3] - 124:18, 125:3, 227:19
**landing** [2] - 125:6, 125:11
**lands** [5] - 5:4, 5:6, 125:4, 125:7, 128:6
**language** [1] - 147:12
**large** [2] - 121:14, 235:16
**larger** [1] - 54:17
**last** [28] - 28:23, 55:23, 56:22, 57:16, 63:17, 67:7, 70:24, 90:20, 92:20, 98:24, 135:1, 141:25, 142:1, 146:9, 146:18, 153:18, 171:22, 175:9, 180:22, 182:16, 188:9, 188:20, 197:12, 204:20, 218:6, 220:24, 225:13, 236:11
**late** [4] - 109:14, 151:7, 155:9, 232:10
**Lauderdale** [8] - 1:24, 4:16, 125:7, 125:11, 126:2, 128:8, 227:19, 238:13
**launch** [3] - 216:24, 217:3, 217:4
**law** [24] - 135:11, 135:13, 135:16, 140:18, 148:24, 154:1, 154:2, 160:22, 161:5, 161:6, 165:17, 170:22, 172:15, 172:23, 172:25, 173:7, 173:21, 176:15, 183:23, 187:2, 188:25, 189:19, 198:19, 199:22
**LAW** [1] - 1:18
**laws** [6] - 140:16, 164:14, 164:15, 165:11, 165:13, 165:15
**lawyer** [25] - 165:8, 166:8, 167:5, 173:9, 173:17, 173:24, 174:4, 174:5, 174:7, 174:9, 174:10, 174:12, 174:13, 184:3, 192:14, 192:20, 192:23, 196:18, 196:20, 197:18, 199:1, 199:8, 199:18, 199:19
**lawyer's** [3] - 173:3, 185:23, 193:20
**lawyers** [12] - 125:9, 125:19, 168:14, 171:5, 171:6, 171:9, 172:25, 189:18, 225:3, 226:6, 226:18, 227:9
**lay** [1] - 82:12
**layman's** [1] - 9:13
**layperson** [1] - 199:18
**lead** [10] - 11:3, 34:16, 35:2, 218:11, 218:14, 218:21, 219:4, 219:7, 225:24, 230:9
**leading** [1] - 150:9
**leads** [6] - 206:20, 211:24, 218:22, 218:24, 220:18, 221:11
**learn** [4] - 36:4, 140:12, 144:23, 148:19
**learned** [2] - 153:17, 157:20
**leased** [1] - 206:19
**least** [8] - 187:16, 205:22, 231:15, 232:8, 234:18, 235:13
**leave** [8] - 122:23, 123:6, 124:13, 200:7, 200:9, 224:25, 227:6, 227:7
**leaves** [1] - 124:10
**leaving** [1] - 195:22
**led** [1] - 191:6
**left** [11] - 7:9, 24:8, 134:13, 136:10, 156:17, 156:18, 156:22, 157:5, 161:5, 161:15, 201:3
**left-hand** [1] - 24:8
**legal** [21] - 20:13, 91:24, 91:25, 92:1, 139:13, 154:14, 154:20, 157:2, 173:5, 178:19, 184:3, 185:1, 185:7, 187:11, 187:12, 187:13, 189:9, 198:22, 198:23, 199:4, 199:6
**legitimate** [2] - 30:17, 47:20
**lengthier** [1] - 232:5
**lengthy** [4] - 129:18, 231:18, 234:8, 234:9
**less** [1] - 197:17
**Lethbridge** [1] - 76:15
**letter** [15] - 36:17, 42:12, 107:9, 107:10, 115:10, 115:14, 115:16, 133:10, 175:21, 188:24, 205:19, 208:24, 213:10
**letters** [10] - 25:12, 42:13, 42:14, 57:9, 106:16, 189:8, 189:14, 205:20, 206:25, 208:25
**letting** [2] - 130:12, 237:16
**leukemia** [1] - 56:3
**level** [6] - 23:16, 141:19, 157:6, 169:1, 203:19, 207:25
**levels** [1] - 13:4
**liable** [1] - 69:10
**license** [2] - 83:8, 83:24
**licensed** [11] - 9:23, 9:24, 71:8, 71:24, 83:11, 83:13, 157:1, 199:22, 211:18, 211:20, 211:22
**licenses** [2] - 9:21, 71:6
**lieu** [1] - 39:15
**Life** [1] - 206:8
**life** [4] - 34:3, 41:12, 107:17, 108:22
**life-altering** [1] - 34:3
**lifetime** [3] - 18:6, 68:23, 69:3
**light** [1] - 166:20
**lightly** [1] - 32:24
**likely** [2] - 231:7, 234:5
**Lilybett** [2] - 4:12, 123:23
**limitations** [1] - 102:3
**limited** [3] - 130:13, 158:17, 158:25
**limits** [1] - 102:3
**Lindau** [1] - 107:13
**line** [6] - 16:3, 18:17, 117:23, 172:15, 178:22, 214:19
**lineup** [6] - 130:10, 130:13, 224:1, 233:4, 235:1, 236:4
**link** [2] - 64:11, 218:3
**list** [7] - 7:23, 133:21, 147:20, 152:7, 158:5, 159:7, 233:21
**listed** [8] - 26:14, 38:20, 38:23, 38:24, 52:15, 52:17, 52:22, 52:23
**listen** [3] - 31:9, 58:14, 58:16
**listened** [5] - 75:16, 92:21, 92:22, 94:18, 225:12
**listening** [1] - 224:15
**lists** [1] - 159:9
**literally** [1] - 41:10
**litigated** [1] - 5:18
**live** [2] - 41:13, 100:22
**lived** [1] - 110:4
**lives** [1] - 55:3
**LLC** [5] - 24:6, 41:24, 49:6, 211:9, 220:4
**LLP** [1] - 2:5
**lobby** [3] - 84:19, 155:22, 156:11
**located** [1] - 155:14

locked [2] - 167:10, 224:14
LOEB [1] - 2:3
logistics [1] - 126:1
logo [1] - 222:1
Look [1] - 125:25
look [36] - 18:19, 41:15, 41:16, 64:15, 75:23, 78:9, 78:12, 95:22, 103:10, 103:18, 130:9, 131:10, 144:10, 147:12, 150:16, 151:10, 152:4, 152:15, 153:1, 153:10, 153:19, 153:22, 158:22, 169:19, 171:11, 174:17, 176:25, 179:25, 182:23, 188:8, 190:8, 193:1, 225:17, 232:8, 236:5
looked [15] - 37:21, 54:11, 54:17, 66:11, 75:13, 94:14, 95:12, 95:13, 95:21, 95:23, 95:24, 98:25, 106:17, 107:4, 147:7
looking [17] - 16:25, 41:5, 41:8, 41:10, 66:16, 103:18, 108:25, 128:7, 129:12, 130:8, 161:7, 163:12, 197:12, 217:18, 217:19, 232:18, 235:5
looks [8] - 19:14, 42:17, 53:2, 117:3, 126:24, 130:5, 230:6, 233:4
looped [1] - 154:17
lose [6] - 5:8, 87:10, 87:13, 87:15, 133:13, 226:24
losing [3] - 4:19, 129:3, 133:6
loss [2] - 4:25, 108:13
lost [2] - 126:21, 170:24
loud [1] - 101:7
loved [2] - 218:10, 219:17
lower [1] - 168:25
lowercase [1] - 46:21
luck [1] - 236:13
lucky [1] - 126:3
lunch [22] - 122:11, 122:13, 122:16, 122:22, 124:1, 125:22, 126:11, 126:18, 127:20, 128:14, 130:4, 131:10, 131:23, 132:4, 132:9, 140:3, 167:9, 184:14, 190:20, 229:20
lung [1] - 12:10
Lupowitz [1] - 238:10
LUPOWITZ [2] - 1:21, 238:11

**M**

M-a-g-l-i-o-c-c-o [1] - 7:17
M.D [2] - 3:3, 7:11

ma'am [32] - 100:9, 113:13, 122:8, 124:5, 134:20, 137:15, 138:5, 139:4, 140:24, 141:2, 142:16, 143:19, 144:10, 145:3, 145:6, 145:12, 147:5, 148:8, 148:10, 148:13, 149:20, 152:3, 152:19, 153:15, 156:19, 157:15, 158:12, 159:24, 160:2, 193:15, 200:1, 227:20
machinery [1] - 169:11
machines [3] - 168:16, 168:19, 169:3
Madhuri [1] - 121:17
MAGLIOCCO [2] - 3:3, 7:11
Magliocco [15] - 7:6, 7:7, 7:16, 7:17, 15:13, 29:16, 49:2, 61:21, 66:15, 69:13, 70:25, 72:25, 89:17, 94:8, 98:24
Magliocco's [2] - 5:15, 7:19
mail [2] - 36:23, 37:1
mailed [2] - 36:16, 38:7
main [4] - 12:1, 91:10, 103:15, 153:7
maintain [4] - 87:19, 93:21, 139:10, 139:17
major [2] - 12:18, 204:13
majority [1] - 109:21
makeup [3] - 16:25, 40:20, 69:3
malfunction [1] - 120:7
malignant [8] - 26:15, 26:16, 26:17, 26:21, 43:9, 53:2, 53:3
malpractice [1] - 119:21
manage [1] - 25:6, 67:18, 108:16, 127:22
management [5] - 54:24, 102:8, 102:12, 109:2, 154:19
managing [1] - 17:11
manifest [1] - 108:2
Maple [1] - 2:3
MARC [3] - 3:10, 203:4, 203:7
Marc [2] - 202:25, 203:7
mark [1] - 215:12
marked [4] - 132:11, 175:7, 175:14
market [2] - 95:2, 216:15
marketed [2] - 144:25, 204:8
marketer [1] - 177:9
marketers [8] - 145:8, 176:12, 177:18, 182:2, 198:9, 198:11, 207:3, 212:11
marketing [13] - 163:18, 163:21, 166:7, 172:9, 206:15, 206:18, 211:23,

212:9, 212:19, 216:13, 216:14, 216:16, 221:14
marry [1] - 137:10
Martin [2] - 7:16
MARTIN [1] - 7:17
Martinez [11] - 4:12, 5:3, 123:23, 124:6, 132:22, 133:16, 133:21, 202:8, 226:11, 226:17
Mary [1] - 57:6
mastectomies [1] - 34:1
master's [5] - 13:7, 79:22, 100:25, 119:1, 135:11
masters [1] - 236:15
material [5] - 32:11, 77:16, 159:25, 163:14, 226:22
materials [1] - 147:10
Matt [3] - 216:5, 216:6, 216:13
matter [7] - 69:24, 77:17, 130:11, 144:4, 162:5, 164:21, 238:8
matters [6] - 62:1, 151:17, 159:4, 159:17, 160:8, 167:22
McKeon [3] - 233:17, 234:15, 234:22
MD [1] - 211:11
mean [2] - 17:18, 18:6, 34:22, 35:24, 44:2, 88:18, 103:5, 126:11, 127:25, 149:21, 167:6, 169:3, 172:21, 173:5, 176:20, 183:16, 230:16, 233:6, 233:8, 234:24, 235:9, 236:7
Mean [2] - 185:15, 185:19
meaning [6] - 19:6, 96:3, 108:17, 114:5, 178:13, 214:5
means [20] - 18:1, 18:7, 34:20, 34:21, 36:1, 42:19, 45:24, 49:25, 50:7, 50:10, 71:21, 84:3, 102:7, 102:8, 109:19, 172:22, 173:7, 181:16, 209:4, 209:6
meant [3] - 11:9, 114:12, 199:19
measure [2] - 16:13, 54:9
media [4] - 123:4, 221:17, 226:2, 226:3
Media [3] - 211:9, 212:1
medical [131] - 8:25, 9:2, 9:8, 9:9, 9:15, 9:18, 9:19, 9:21, 10:10, 10:22, 13:11, 15:7, 20:10, 20:12, 20:13, 20:15, 20:17, 20:20, 20:24, 21:7, 21:16, 22:6, 22:15, 22:16, 22:18, 22:19, 23:6, 23:19, 27:12, 27:25, 30:11, 30:12, 31:22, 32:10, 42:18, 42:20, 44:4, 44:12, 44:14, 44:18, 44:19, 45:2, 45:5,

45:16, 48:15, 49:21, 49:22, 49:24, 50:16, 50:23, 50:25, 51:8, 53:17, 53:20, 53:24, 53:25, 54:1, 54:3, 54:7, 55:19, 55:21, 56:6, 60:21, 61:4, 61:7, 62:17, 62:20, 63:20, 64:9, 64:23, 67:18, 67:19, 67:21, 68:4, 71:6, 71:23, 72:12, 75:2, 75:14, 75:24, 77:5, 77:14, 80:2, 80:4, 80:7, 83:3, 83:9, 83:11, 83:13, 83:24, 88:22, 90:23, 91:23, 96:5, 97:16, 97:23, 98:2, 98:3, 98:6, 98:7, 99:16, 99:19, 101:15, 102:8, 102:12, 103:24, 104:4, 105:13, 112:13, 112:17, 113:15, 114:9, 114:15, 114:19, 116:1, 161:8, 171:19, 171:20, 205:19, 205:21, 206:25, 208:24, 208:25, 212:21, 213:10
medically [11] - 14:7, 32:19, 37:7, 48:22, 72:1, 72:14, 90:6, 90:17, 97:1, 97:3, 103:25
Medicare [42] - 27:20, 27:21, 27:23, 37:14, 45:17, 47:2, 51:16, 68:16, 68:18, 87:22, 87:24, 88:6, 88:10, 117:23, 118:11, 118:12, 191:11, 193:12, 198:14, 198:17, 198:20, 203:25, 204:10, 204:16, 204:18, 204:19, 204:23, 204:24, 205:18, 209:6, 209:22, 210:6, 213:8, 213:9, 213:16, 213:24, 214:6, 219:7, 219:8, 219:18, 222:6
medication [4] - 27:7, 45:12, 45:13, 214:2
medications [1] - 27:7
medicine [6] - 9:9, 13:5, 75:4, 75:5, 77:8, 94:23
MediPak [1] - 211:9
Meds [1] - 221:15
Medtech [3] - 211:10, 212:3, 212:15
meet [16] - 74:14, 74:15, 101:15, 109:3, 127:9, 141:5, 141:10, 142:2, 142:3, 145:14, 152:9, 152:14, 160:23, 160:24, 190:10, 190:20
meet-and-greet [1] - 145:14
meeting [32] - 65:6, 105:19, 110:11, 136:25, 141:6, 141:13, 145:20, 152:25, 158:1, 158:9, 159:10, 169:16

**meetings** [3] - 64:13, 169:13, 169:16
**melanoma** [4] - 53:2, 56:2, 56:11, 56:14
**members** [9] - 17:17, 17:18, 18:4, 45:1, 66:5, 101:23, 102:9, 116:2, 117:10
**memo** [2] - 184:3, 186:16
**memory** [3] - 21:3, 148:11, 236:21
**mental** [1] - 31:13
**mentally** [1] - 54:5
**mention** [5] - 4:10, 59:24, 111:20, 123:17, 154:8
**mentioned** [20] - 12:12, 35:14, 43:20, 109:12, 139:5, 139:21, 140:25, 141:13, 141:19, 145:10, 145:11, 148:2, 149:18, 158:10, 161:9, 162:1, 207:14, 211:2, 211:25, 212:3
**met** [17] - 74:12, 110:20, 132:9, 140:25, 141:7, 141:19, 141:23, 142:24, 146:7, 146:9, 147:21, 152:16, 157:13, 160:25, 162:18, 162:19, 172:3
**metabolism** [2] - 19:5, 19:15
**metabolize** [1] - 19:6
**Metro** [2] - 136:4, 136:12
**Miami** [3] - 1:3, 4:16, 125:6
**Miano** [6] - 144:7, 144:12, 162:24, 179:8, 180:24, 182:15
**Miano's** [1] - 144:17
**mic** [1] - 203:12
**microphone** [5] - 7:14, 100:14, 101:8, 134:25, 203:6
**mid** [1] - 135:23
**mid-August** [1] - 135:23
**middle** [14] - 106:7, 127:9, 133:17, 184:5, 184:20, 184:25, 188:9, 200:21, 224:2, 230:19, 231:23, 233:22, 235:5, 236:2
**middleman** [1] - 72:8
**middlemen** [2] - 206:11, 206:14
**midpoint** [1] - 224:4
**might** [36] - 4:17, 18:8, 18:21, 22:10, 24:24, 32:4, 33:25, 34:10, 43:22, 44:23, 50:13, 53:4, 55:2, 55:8, 65:19, 65:20, 65:22, 78:23, 93:1, 102:21, 103:12, 108:1, 108:3, 111:15, 120:7, 128:3, 128:18, 130:9, 133:3, 139:14, 140:7, 148:12, 173:23, 186:10, 222:7

**Mike** [1] - 234:6
**Miles** [3] - 183:10, 184:25, 188:15
**millions** [1] - 169:10
**MINAL** [1] - 1:6
**Minal** [14] - 4:4, 74:13, 78:12, 142:3, 175:5, 176:6, 176:17, 179:10, 181:5, 183:12, 185:2, 185:8, 196:13, 199:6
**mind** [3] - 224:15, 226:1, 235:18
**mine** [1] - 150:4
**minor** [2] - 76:14, 100:25
**minus** [1] - 174:23
**minute** [5] - 63:23, 158:15, 202:3, 215:9, 224:20
**minutes** [6] - 111:16, 131:19, 151:7, 200:18, 202:7, 215:3
**misinterpret** [1] - 34:23
**misinterpreting** [1] - 35:15
**misleading** [4] - 174:8, 199:12, 204:9, 204:14
**missed** [1] - 230:4
**misstep** [1] - 120:3
**mistaken** [1] - 156:6
**mistakes** [4] - 119:19, 119:23, 119:25, 120:2
**mix** [1] - 38:6
**mmm-hmm** [5] - 53:11, 141:20, 179:20, 181:11, 188:7
**modify** [1] - 18:11
**Moffitt** [15] - 10:16, 10:17, 10:22, 11:6, 11:7, 11:10, 11:12, 11:13, 11:15, 11:17, 11:19, 12:13, 77:2
**molecular** [11] - 9:12, 9:14, 9:15, 10:7, 11:11, 11:24, 12:1, 13:9, 15:1, 71:9, 80:13
**Molecular** [1] - 77:2
**mom** [2] - 109:21, 109:23
**moment** [6] - 88:3, 93:10, 116:18, 121:25, 149:18, 154:4, 160:12, 171:12, 200:6, 200:10, 200:15, 226:12
**Monday** [40] - 4:15, 4:20, 5:8, 124:18, 125:2, 125:10, 126:7, 126:10, 129:25, 130:1, 130:5, 130:8, 130:10, 130:23, 131:3, 131:5, 132:22, 201:6, 223:7, 223:10, 223:19, 223:22, 225:3, 226:9, 227:4, 227:19, 229:10, 229:22, 230:1, 230:14, 230:22, 234:5, 234:11, 235:7, 235:11, 235:12, 237:14, 237:16,

237:22
**money** [5] - 205:23, 208:11, 209:7, 212:24, 213:7
**monitoring** [1] - 139:16
**month** [2] - 81:19, 150:1
**months** [1] - 185:23
**morning** [25] - 4:2, 4:15, 4:16, 4:20, 5:16, 6:17, 7:15, 8:23, 8:24, 74:10, 74:11, 89:3, 100:19, 100:20, 118:21, 118:22, 133:1, 133:6, 150:19, 155:3, 155:10, 156:4, 156:11, 219:2, 237:22
**Morsani** [1] - 77:2
**most** [14] - 51:10, 88:13, 101:21, 102:16, 104:4, 153:25, 158:2, 161:18, 174:19, 188:25, 189:16, 209:7, 220:18, 221:3
**mostly** [2] - 10:8, 96:1
**mother** [5] - 16:16, 17:1, 17:18, 40:19, 50:3
**mother's** [1] - 40:20
**mouth** [1] - 38:10
**move** [28] - 5:14, 6:3, 7:20, 8:1, 22:22, 37:10, 41:21, 45:10, 46:23, 48:25, 51:11, 51:12, 54:6, 63:22, 111:11, 112:1, 112:3, 113:16, 113:24, 127:6, 133:20, 137:19, 175:8, 214:25, 215:12, 222:24, 223:23, 233:1
**moved** [2] - 74:23, 229:17
**movement** [1] - 223:13
**moves** [1] - 15:15
**moving** [10] - 25:15, 104:14, 106:7, 112:5, 112:9, 114:7, 124:22, 128:21, 154:3, 232:23
**MR** [115] - 3:4, 3:6, 3:9, 5:23, 6:12, 7:24, 68:7, 73:19, 74:6, 74:9, 79:19, 89:14, 89:16, 89:22, 89:24, 90:20, 90:21, 93:10, 93:13, 94:2, 98:9, 98:17, 99:3, 99:11, 99:13, 99:15, 99:25, 101:5, 104:21, 110:25, 111:3, 111:11, 111:13, 111:22, 112:1, 113:10, 113:23, 116:11, 118:16, 118:20, 121:25, 122:3, 123:9, 123:13, 127:12, 128:13, 128:19, 130:21, 131:13, 131:15, 131:17, 132:25, 137:22, 142:13, 142:15, 143:12, 143:16, 160:17, 160:20, 166:3, 175:8, 175:14, 175:18, 176:2,

177:2, 177:3, 179:4, 179:7, 180:3, 180:4, 182:6, 182:7, 182:18, 182:25, 183:15, 183:18, 183:22, 184:5, 184:10, 184:12, 185:18, 188:10, 188:11, 191:2, 191:3, 192:8, 197:20, 200:3, 200:17, 200:20, 201:8, 202:11, 209:9, 215:15, 217:8, 228:2, 228:8, 228:11, 228:15, 228:19, 228:23, 229:8, 229:10, 230:13, 230:17, 231:25, 232:2, 232:14, 232:20, 233:14, 233:17, 234:12, 234:15, 237:14, 237:23
**MRIs** [3] - 108:23, 108:24
**MS** [121] - 3:4, 3:6, 3:8, 3:9, 3:11, 4:8, 5:14, 6:9, 7:5, 7:18, 8:3, 8:20, 8:22, 15:14, 15:21, 59:7, 59:11, 59:16, 60:2, 60:6, 60:11, 61:16, 61:19, 62:4, 62:7, 63:13, 63:16, 68:12, 73:14, 79:13, 94:5, 94:7, 98:13, 98:23, 99:6, 100:2, 100:8, 100:18, 101:10, 104:17, 105:1, 105:23, 105:25, 111:18, 112:7, 113:14, 113:18, 113:19, 114:1, 115:6, 115:8, 116:16, 116:17, 116:21, 116:22, 118:14, 122:7, 123:20, 126:16, 127:1, 127:3, 129:15, 129:19, 130:3, 130:6, 131:4, 131:25, 132:9, 132:19, 134:16, 135:4, 137:18, 137:25, 138:2, 138:3, 142:21, 143:13, 144:5, 160:12, 160:15, 165:24, 175:6, 175:12, 175:23, 183:7, 184:1, 184:3, 192:5, 197:22, 197:24, 199:25, 201:13, 201:22, 202:6, 202:24, 203:9, 207:21, 207:24, 209:13, 214:25, 215:4, 215:5, 215:11, 215:19, 215:23, 217:12, 217:15, 219:11, 222:24, 229:20, 229:25, 230:5, 230:11, 231:6, 231:10, 231:20, 231:23, 233:25, 234:2, 237:4, 237:24
**ms@medtech** [1] - 216:18
**multiple** [15] - 11:7, 12:24, 13:4, 13:17, 13:21, 40:4, 45:1, 52:23, 65:16, 70:10, 71:6, 110:23, 111:5, 206:3, 206:4
**must** [3] - 85:16, 86:22,

122:24
**mutated** [2] - 16:20, 33:18
**mutation** [3] - 107:7, 109:23, 117:9
**mutations** [1] - 117:7
**MVP** [3] - 204:21, 219:6
**MyOnCallDoc** [9] - 24:6, 41:24, 49:5, 57:4, 93:14, 93:15, 93:18, 93:20, 93:23

## N

**N.'s** [1] - 55:23
**name** [47] - 7:14, 7:15, 7:16, 24:4, 24:6, 37:12, 37:13, 41:22, 46:25, 51:14, 74:12, 79:8, 89:15, 100:14, 100:15, 106:16, 121:17, 123:18, 134:25, 135:1, 141:25, 142:1, 146:14, 146:20, 147:1, 147:10, 148:3, 148:14, 160:21, 171:22, 186:11, 187:2, 192:20, 194:10, 195:22, 197:2, 203:6, 204:10, 204:11, 204:20, 207:4, 207:6, 212:16, 218:6, 230:4
**named** [6] - 104:15, 172:5, 179:8, 184:25, 192:14, 221:10
**names** [3] - 137:2, 147:25, 211:7
**Nashville** [2] - 125:1, 125:2
**national** [1] - 10:4
**nature** [4] - 25:9, 168:9, 208:13, 225:20
**nausea** [1] - 25:8
**NE** [1] - 2:3
**necessarily** [6] - 139:22, 172:19, 199:23, 231:19, 235:19, 235:22
**necessary** [13] - 32:19, 37:7, 48:16, 72:14, 90:6, 90:17, 97:2, 97:3, 104:1, 205:18, 213:24, 229:22, 231:12
**necessity** [13] - 49:22, 49:25, 56:6, 63:20, 72:13, 88:22, 205:19, 205:20, 205:21, 206:25, 208:25, 213:10
**need** [77] - 4:17, 21:14, 29:25, 30:2, 30:3, 30:7, 30:10, 31:16, 35:3, 44:19, 44:21, 44:22, 44:24, 45:4, 48:17, 54:2, 54:4, 55:20, 55:21, 56:9, 58:24, 59:5, 62:13, 62:15, 62:17, 62:18, 62:22, 62:24, 65:1, 65:5, 72:16, 72:17, 72:20, 78:2,

78:5, 78:7, 87:21, 87:23, 91:11, 94:13, 94:16, 102:20, 102:23, 102:24, 103:10, 103:14, 103:18, 118:8, 122:16, 127:12, 130:3, 131:18, 134:12, 176:21, 182:12, 213:7, 213:9, 213:10, 213:11, 223:14, 225:2, 227:10, 228:8, 228:15, 229:10, 229:12, 231:1, 235:14, 235:19, 236:2, 237:7, 237:9, 237:12
**needed** [12] - 20:23, 48:1, 58:2, 96:16, 147:13, 153:10, 156:16, 172:18, 176:8, 183:3, 195:25, 227:25
**needs** [12] - 48:13, 55:19, 56:12, 62:16, 62:23, 91:19, 94:20, 94:24, 97:8, 101:24, 229:17, 234:12
**negative** [5] - 34:18, 34:20, 34:22, 45:15, 114:5
**neonatal** [1] - 40:14
**neoplasm** [6] - 26:15, 26:16, 26:17, 26:21, 43:9
**neoplasms** [1] - 53:3
**nephews** [1] - 116:4
**nervous** [5] - 108:6, 114:14, 114:17, 114:18, 114:21
**network** [2] - 12:16, 62:11
**never** [29] - 36:12, 53:17, 67:21, 86:15, 92:23, 93:4, 94:21, 95:8, 98:5, 98:20, 98:21, 107:18, 142:10, 142:14, 150:2, 150:9, 154:18, 157:8, 158:17, 160:25, 171:13, 183:5, 183:13, 194:1, 196:5, 198:21, 198:23, 218:25, 219:25
**New** [2] - 1:16, 79:20
**new** [19] - 11:10, 13:12, 13:13, 14:25, 15:1, 44:13, 115:4, 135:16, 137:15, 140:2, 153:5, 158:7, 159:19, 159:25, 170:22, 171:16, 171:17, 177:8, 189:21
**next** [37] - 7:2, 7:4, 30:15, 32:15, 38:19, 66:10, 68:10, 100:7, 116:15, 122:18, 128:22, 129:9, 129:12, 132:16, 134:1, 134:4, 134:14, 136:21, 136:24, 142:20, 147:21, 183:22, 195:18, 200:18, 201:21, 202:19, 218:13, 224:2, 225:21, 229:12, 229:13, 229:15, 229:17, 233:22, 235:5, 236:3

**nice** [2] - 6:23, 160:23
**Nicholas** [1] - 229:23
**Nick** [32] - 137:5, 147:21, 152:14, 156:5, 158:1, 169:13, 170:2, 172:14, 176:17, 177:4, 177:25, 179:5, 179:17, 179:23, 180:6, 181:5, 183:12, 183:13, 185:2, 185:8, 185:9, 185:24, 187:16, 187:20, 188:16, 189:11, 190:9, 196:10, 207:9, 208:4
**nieces** [1] - 116:4
**night** [1] - 222:15
**nine** [1] - 235:11
**NO** [1] - 1:2
**nobody** [2] - 154:25, 168:15
**noise** [1] - 155:15
**non** [7] - 36:6, 40:17, 47:24, 97:16, 98:2, 98:6, 172:20
**non-attorneys** [1] - 172:20
**non-experts** [1] - 36:6
**non-invasive** [2] - 40:17, 47:24
**non-medical** [3] - 97:16, 98:2, 98:6
**none** [5] - 26:24, 48:9, 84:9, 154:21, 156:4
**nonexistent** [1] - 164:6
**noninvasive** [1] - 40:12
**nonmedical** [1] - 213:2
**normal** [5] - 17:5, 19:10, 149:11, 151:3, 155:11
**normally** [8] - 22:5, 22:16, 39:14, 39:17, 39:18, 39:22, 92:13, 139:1
**North** [3] - 81:3, 100:22, 101:3
**notation** [8] - 25:11, 25:24, 26:2, 27:14, 36:17, 49:17, 117:5, 144:12
**note** [19] - 6:2, 24:8, 24:9, 25:20, 25:23, 26:4, 42:1, 43:1, 49:18, 49:19, 57:12, 57:15, 57:23, 110:11, 110:18, 110:20, 117:3, 159:14
**notepad** [1] - 227:7
**notepads** [4] - 7:2, 123:6, 200:7, 225:1
**notes** [15] - 25:24, 50:5, 75:13, 77:19, 89:17, 92:14, 92:17, 96:10, 109:11, 144:10, 148:9, 159:9, 163:12, 168:5
**nothing** [13] - 25:21, 27:3, 27:5, 27:7, 27:10, 45:14, 110:6, 118:14, 122:7, 133:12, 160:15, 199:25,

227:15
**November** [2] - 216:20, 217:13
**nucleus** [1] - 106:22
**number** [16] - 27:20, 27:21, 42:12, 42:17, 42:18, 45:17, 47:2, 51:16, 55:24, 66:11, 68:3, 92:23, 209:23, 218:6, 220:4, 220:5
**numbers** [5] - 25:12, 42:13, 57:9, 68:1
**numerous** [4] - 12:23, 23:4, 23:11, 220:10
**nurse** [2] - 45:3, 208:17
**NW** [1] - 1:18

## O

**o'clock** [12] - 125:5, 125:8, 126:10, 127:22, 128:1, 128:5, 133:19, 200:9, 201:24, 202:1, 218:25, 228:16
**oath** [1] - 201:3
**object** [7] - 98:9, 99:3, 113:10, 113:23, 142:13, 142:15, 165:24
**objection** [14] - 5:17, 7:22, 79:13, 98:17, 104:20, 104:21, 137:21, 137:22, 175:11, 175:12, 175:22, 182:20, 192:5, 215:14
**objectionable** [1] - 98:10
**objections** [6] - 5:19, 5:24, 8:12, 104:23, 215:15, 231:12
**objective** [6] - 29:7, 46:10, 46:17, 51:2, 56:20, 57:21
**obliged** [1] - 20:19
**observations** [1] - 89:4
**observe** [2] - 114:24, 163:5
**observed** [2] - 23:19, 59:2
**observing** [1] - 163:3
**obtain** [5] - 9:2, 50:24, 54:3, 67:25, 95:5
**obtained** [1] - 67:24
**obviously** [13] - 8:25, 31:1, 36:13, 41:5, 125:10, 125:13, 130:21, 201:13, 212:20, 213:9, 222:20, 224:9, 228:9
**occasion** [2] - 163:5, 197:15
**occasions** [4] - 146:7, 151:1, 151:8, 199:7
**occur** [5] - 21:16, 39:18, 72:7, 95:10
**occurred** [5] - 20:22, 21:11, 67:2, 158:8, 174:15
**occurs** [3] - 16:17, 17:23, 31:20
**October** [1] - 10:14

**odd** [1] - 199:24
**OF** [5] - 1:1, 1:3, 1:9, 1:15, 1:18
**offense** [2] - 122:22, 225:3
**offer** [1] - 215:16
**OFFICE** [1] - 1:18
**office** [26] - 22:16, 22:18, 64:10, 64:21, 65:8, 72:5, 136:7, 150:6, 150:10, 150:12, 150:16, 150:24, 151:4, 155:14, 158:15, 162:14, 164:6, 164:9, 185:23, 187:9, 193:20, 196:2, 208:16, 208:17, 209:24, 216:7
**Office** [1] - 178:11
**OFFICER** [6] - 6:15, 73:24, 124:3, 134:6, 200:12, 226:14
**officer** [23] - 136:11, 136:17, 137:7, 138:8, 138:10, 138:21, 138:24, 139:8, 139:9, 139:17, 142:8, 157:4, 158:2, 166:21, 167:19, 167:21, 171:14, 173:2, 173:9, 173:12, 173:17, 179:25, 183:24
**officer's** [1] - 179:22
**officers** [5] - 141:6, 141:9, 154:19, 156:4, 168:15
**official** [4] - 193:19, 193:23, 196:1, 196:5
**Official** [2] - 1:22, 238:11
**officially** [1] - 195:11
**often** [12] - 23:21, 38:6, 40:1, 44:13, 65:2, 93:8, 96:11, 117:16, 145:13, 150:23, 162:7, 162:12
**OIG** [2] - 178:11, 178:21
**old** [1] - 74:16
**on-site** [2] - 85:18, 179:1
**onboard** [1] - 212:12
**onboarded** [2] - 152:13, 153:6
**onboarding** [2] - 141:11, 159:12
**once** [12] - 68:23, 69:4, 85:16, 130:16, 150:22, 200:21, 201:2, 201:14, 201:15, 215:15, 223:23, 225:7
**once-in-a-lifetime** [1] - 68:23
**oncologist** [2] - 36:1, 68:22
**oncologists** [2] - 45:3, 74:25
**Oncology** [2] - 12:22, 12:23
**oncology** [2] - 11:18, 13:2
**one** [138] - 4:10, 4:12, 5:1, 7:22, 13:9, 16:8, 16:24, 18:4, 19:4, 19:12, 20:7, 21:1,

21:21, 23:20, 24:2, 32:5, 33:4, 35:22, 38:4, 39:25, 40:12, 41:21, 42:23, 42:25, 47:22, 54:2, 54:19, 55:8, 56:13, 56:24, 57:14, 58:16, 59:12, 63:19, 64:6, 66:13, 66:16, 67:7, 69:4, 70:15, 70:24, 74:12, 83:17, 89:8, 92:21, 92:23, 103:12, 103:15, 103:23, 106:21, 107:10, 107:22, 108:13, 108:22, 109:20, 109:21, 117:11, 123:9, 123:11, 123:16, 127:4, 127:15, 127:21, 131:2, 131:4, 142:16, 142:24, 143:9, 143:22, 145:2, 145:16, 147:24, 150:8, 151:1, 151:2, 154:4, 154:7, 156:13, 156:16, 158:1, 158:14, 158:20, 159:9, 160:12, 162:14, 162:15, 162:18, 162:21, 164:25, 166:23, 167:3, 170:2, 174:13, 174:21, 174:23, 175:9, 175:12, 175:14, 175:15, 177:2, 179:8, 181:9, 182:24, 183:22, 184:19, 184:25, 188:12, 188:20, 190:24, 196:18, 204:3, 206:3, 206:8, 206:17, 209:16, 210:1, 210:2, 211:21, 212:6, 212:9, 212:16, 212:19, 213:21, 218:9, 218:10, 219:17, 221:14, 222:3, 222:22, 225:19, 227:23, 230:4, 230:8, 230:25, 236:7
**ones** [5] - 57:15, 72:3, 88:24, 95:24, 220:10
**ongoing** [2] - 102:7, 102:12
**online** [1] - 225:14, 225:17
**onset** [1] - 108:21
**oophorectomy** [1] - 34:2
**open** [13] - 106:21, 107:1, 112:6, 123:21, 184:8, 224:15, 228:15, 228:19, 228:23, 228:24, 229:5, 237:17, 237:18
**opened** [3] - 155:19, 228:9, 229:4
**operate** [3] - 71:2, 74:24, 83:24
**operates** [1] - 75:2
**operating** [3] - 86:21, 86:25, 87:18
**operation** [4] - 71:25, 95:2, 97:25, 216:6
**operations** [9] - 77:8, 81:14, 87:19, 139:18, 142:6, 162:2, 162:8, 163:1, 163:23

**opinion** [26] - 19:25, 23:21, 25:5, 31:6, 31:10, 36:22, 47:19, 48:16, 60:20, 61:12, 61:23, 62:3, 62:12, 63:20, 66:20, 67:5, 67:11, 67:22, 68:11, 70:22, 77:17, 96:16, 97:9, 98:12, 189:2, 189:9
**opinions** [2] - 69:24, 77:10
**opportunities** [1] - 59:4
**opportunity** [4] - 122:15, 128:3, 157:18, 166:19
**opposed** [5] - 41:4, 162:14, 163:2, 210:8, 213:1
**opt** [1] - 67:8
**optimistic** [3] - 125:25, 128:21, 128:22
**option** [3] - 39:5, 124:22, 124:23, 124:24, 128:18
**options** [3] - 39:2, 39:3, 129:10
**Order** [1] - 4:1
**order** [30] - 29:10, 29:25, 39:5, 39:6, 46:12, 57:25, 65:11, 75:6, 77:14, 86:14, 86:23, 88:5, 97:1, 97:5, 98:4, 98:5, 103:22, 103:25, 112:23, 113:2, 113:6, 175:1, 184:11, 205:21, 206:16, 208:19, 213:7, 213:10, 213:24, 214:3
**ordered** [24] - 32:10, 32:12, 32:25, 37:20, 39:21, 40:7, 40:24, 44:9, 48:8, 48:12, 51:22, 52:5, 68:18, 75:7, 76:3, 77:20, 90:6, 95:14, 113:5, 113:21, 114:2, 115:17, 118:4, 208:14
**ordering** [11] - 14:17, 21:20, 30:25, 35:4, 52:17, 65:15, 71:13, 71:17, 88:24, 96:24, 117:24
**orders** [20] - 23:13, 23:14, 48:14, 88:22, 98:7, 205:9, 205:10, 205:13, 205:17, 206:23, 206:24, 208:9, 213:23, 214:5, 214:7, 214:9, 214:12, 214:14, 214:21, 214:22
**organization** [13] - 84:17, 139:2, 139:13, 139:14, 139:19, 140:11, 140:13, 142:5, 149:3, 158:22, 167:23, 167:24, 199:19
**organs** [1] - 26:16
**orient** [2] - 15:22, 16:2
**oriented** [1] - 149:14
**original** [2] - 116:19
**originally** [3] - 136:23, 139:25, 142:24
**originator** [1] - 194:12

**Orlando** [3] - 10:2, 74:22, 74:23
**Orr** [2] - 234:18, 234:22
**otherwise** [3] - 144:22, 152:11, 158:18
**ought** [3] - 167:19, 174:14, 182:4
**ourselves** [3] - 133:13, 227:1, 236:2
**out-of-pocket** [1] - 114:18
**outcome** [1] - 70:18
**outlined** [1] - 215:7
**output** [2] - 66:16, 66:19
**outside** [14] - 74:12, 99:3, 113:13, 142:18, 150:21, 154:20, 156:14, 165:25, 171:5, 171:9, 183:4, 183:7, 192:23, 232:4
**outsiders** [1] - 180:17
**overall** [3] - 114:20, 115:23, 166:18
**overhead** [1] - 206:20
**overheard** [1] - 156:14
**override** [1] - 212:13
**overruled** [8] - 6:3, 79:16, 98:11, 98:19, 99:5, 116:13, 166:2, 192:7
**oversaw** [4] - 11:9, 11:10, 139:18, 142:7
**oversee** [7] - 10:21, 71:25, 83:12, 83:14, 84:17, 137:12, 139:9
**overseeing** [1] - 167:22
**oversees** [1] - 84:18
**overview** [1] - 141:12
**overwhelmed** [1] - 114:10
**own** [18] - 22:18, 23:7, 35:15, 39:6, 43:25, 44:14, 50:23, 77:25, 78:3, 78:5, 78:7, 79:6, 91:23, 206:23, 211:12, 216:13, 221:15, 236:15
**owner** [10] - 75:3, 97:16, 97:23, 98:3, 98:7, 142:2, 142:4, 163:6, 163:7, 208:2
**owns** [2] - 78:22, 163:9

**P**

**P.J** [3] - 174:20, 184:10, 188:10
**p.m** [13] - 1:5, 124:4, 132:2, 132:3, 134:7, 200:13, 202:14, 202:15, 202:17, 218:24, 226:15, 227:21, 238:1
**pace** [2] - 133:6, 134:3
**Pacific** [1] - 195:19
**pack** [1] - 237:16
**page** [33] - 16:3, 25:15,

26:9, 27:12, 27:22, 28:23,
39:8, 39:9, 41:17, 43:7,
45:25, 46:19, 47:12, 49:20,
51:25, 55:23, 57:1, 57:17,
89:23, 90:20, 90:22, 105:9,
105:23, 106:7, 110:7, 115:6,
116:21, 137:20, 148:9,
159:5, 159:15, 193:8
**PAGE** [1] - 3:2
**Pages** [1] - 1:7
**pages** [3] - 23:20, 39:10,
132:13
**paid** [13] - 69:20, 69:23,
69:24, 70:12, 198:11, 206:1,
206:11, 206:15, 210:8,
210:9, 213:16, 214:22,
214:23
**pairs** [1] - 106:22
**PALM** [1] - 1:2
**pamphlet** [1] - 145:4
**pancreas** [1] - 108:10
**pancreatic** [1] - 56:14
**panel** [11] - 39:3, 51:9,
51:22, 209:3, 209:6, 209:7,
209:18, 209:20, 209:21,
209:24, 210:2
**paper** [3] - 23:5, 184:4,
194:1
**papers** [4] - 14:21, 15:5,
157:10
**paperwork** [7] - 140:1,
176:14, 179:24, 181:7,
182:3, 205:8, 213:15
**paragraph** [1] - 181:10
**parents** [4] - 101:23,
109:25, 110:4, 110:5
**parlayed** [1] - 136:7
**Part** [3] - 219:7, 219:8,
219:18
**part** [14] - 12:12, 21:22,
59:24, 62:16, 136:3, 137:16,
159:1, 163:2, 166:18, 204:5,
204:15, 205:6, 220:20,
222:25
**part-time** [1] - 136:3
**participate** [3] - 81:16,
126:14, 220:22
**particular** [23] - 12:6, 18:5,
21:23, 22:20, 28:25, 29:7,
30:19, 32:25, 34:13, 42:22,
46:8, 46:10, 90:3, 103:19,
107:4, 107:6, 112:10,
112:14, 112:21, 114:24,
130:22, 154:5, 217:23
**particularly** [7] - 15:6, 30:6,
32:20, 44:25, 153:12,
153:18, 237:5
**parties** [1] - 166:5
**partner** [1] - 197:13
**parts** [2] - 96:12, 151:21

**party** [1] - 210:25
**pass** [1] - 34:6
**passed** [3] - 18:2, 34:8,
171:3
**passing** [7] - 117:12, 141:6,
141:16, 142:24, 152:14,
154:8, 165:11
**past** [14] - 26:23, 27:12,
27:25, 30:6, 31:25, 44:20,
45:16, 49:21, 50:16, 58:21,
73:6, 73:13, 90:23, 202:3
**Patel** [32] - 4:4, 74:13,
78:12, 78:14, 78:22, 111:9,
132:5, 142:3, 142:4, 142:22,
143:2, 143:14, 143:18,
144:6, 144:14, 145:10,
162:2, 175:5, 199:6, 207:8,
207:14, 208:1, 208:4, 208:5,
208:13, 209:8, 209:18,
210:12, 210:17, 210:22,
212:9
**PATEL** [1] - 1:6
**Patel's** [1] - 231:13
**path** [1] - 218:4
**pathogenic** [1] - 106:8
**pathologist** [4] - 10:11,
11:8, 11:24, 12:1
**Pathologists** [2] - 71:7,
84:16
**pathologists** [4] - 10:24,
84:17, 84:18, 84:19
**pathology** [18] - 9:10, 9:12,
9:14, 9:15, 10:19, 10:20,
11:5, 11:18, 12:21, 13:2,
13:9, 30:12, 76:19, 80:10,
80:14, 84:20
**Pathology** [1] - 10:17
**patient** [240] - 16:12, 17:6,
17:11, 17:13, 17:15, 18:10,
18:12, 18:14, 18:25, 19:2,
19:3, 19:9, 19:11, 19:12,
19:16, 19:18, 20:8, 20:18,
20:19, 21:2, 21:3, 21:8,
21:11, 21:23, 21:25, 22:1,
22:11, 22:12, 22:17, 22:21,
22:23, 22:24, 23:9, 23:11,
24:4, 24:19, 24:20, 24:25,
25:4, 25:24, 26:22, 27:25,
28:4, 28:7, 28:9, 29:15,
29:17, 29:22, 29:25, 30:4,
30:13, 30:14, 30:15, 30:17,
30:18, 30:20, 30:23, 30:24,
31:1, 31:3, 31:6, 31:12,
31:14, 31:15, 31:16, 31:17,
31:21, 31:23, 31:24, 32:22,
33:14, 33:16, 33:19, 34:4,
34:12, 34:13, 34:19, 34:23,
35:2, 35:4, 35:5, 35:17,
35:23, 36:8, 36:11, 36:12,
36:14, 36:16, 36:18, 36:21,

36:22, 36:23, 37:1, 38:5,
38:9, 38:13, 39:16, 39:19,
40:2, 40:4, 40:12, 41:3,
41:15, 41:17, 42:21, 42:22,
43:1, 43:21, 43:24, 44:3,
44:11, 44:13, 44:20, 45:7,
45:17, 45:18, 45:24, 47:20,
47:21, 47:25, 48:4, 48:5,
48:8, 48:13, 48:17, 48:18,
48:22, 48:24, 49:1, 49:5,
49:18, 50:2, 50:7, 50:8,
50:13, 50:14, 50:15, 50:18,
50:23, 51:1, 51:22, 52:12,
52:24, 53:7, 53:21, 53:23,
54:3, 54:5, 54:8, 54:18,
55:19, 56:2, 56:11, 56:12,
56:17, 57:2, 58:2, 60:22,
61:1, 61:5, 61:8, 61:10,
61:11, 61:12, 62:9, 62:16,
63:7, 64:5, 64:10, 64:12,
64:14, 64:22, 65:7, 65:8,
65:21, 65:23, 66:2, 66:3,
67:9, 67:17, 67:18, 67:20,
67:21, 67:23, 67:25, 68:2,
69:9, 69:11, 72:17, 89:1,
89:4, 89:11, 91:1, 91:2,
91:15, 91:18, 92:3, 94:23,
95:12, 96:14, 96:23, 97:4,
97:6, 97:7, 97:8, 102:11,
104:15, 105:2, 105:16,
106:5, 110:12, 110:20,
112:10, 118:1, 119:5, 131:8,
143:4, 143:24, 151:19,
181:19, 191:6, 205:14,
205:15, 209:25, 218:12,
220:5
**patient's** [21] - 20:10,
21:19, 22:5, 22:6, 24:21,
25:15, 25:21, 30:3, 30:10,
32:7, 32:23, 33:3, 33:14,
35:23, 35:25, 41:22, 45:9,
47:18, 105:12, 105:14,
154:17
**patient-client** [1] - 209:25
**patients** [70] - 9:20, 10:8,
10:23, 11:21, 11:23, 12:3,
12:5, 13:22, 14:12, 14:14,
15:2, 16:6, 18:23, 21:6, 31:8,
31:18, 34:5, 35:14, 36:19,
45:1, 52:10, 54:11, 54:19,
54:21, 54:22, 54:23, 55:6,
58:13, 61:21, 64:8, 65:2,
65:14, 66:9, 68:16, 68:19,
68:21, 68:22, 71:9, 76:1,
88:14, 88:19, 91:5, 91:6,
91:8, 93:8, 93:21, 93:24,
94:9, 94:10, 94:13, 94:16,
95:6, 95:13, 95:17, 96:16,
98:20, 98:21, 101:16,
103:23, 104:1, 136:7, 143:9,
181:16, 205:15, 213:18,

213:20, 214:6, 214:8,
219:22, 220:8
**pattern** [1] - 182:25
**patterns** [1] - 71:13
**pause** [1] - 59:17
**paused** [5] - 59:15, 60:10,
61:18, 62:6, 63:15
**pay** [15] - 26:3, 27:22,
34:12, 43:3, 48:23, 69:5,
98:4, 98:5, 98:7, 104:11,
118:2, 203:22, 209:6,
212:12, 219:24
**paycheck** [1] - 177:16
**paying** [9] - 64:14, 64:16,
72:9, 206:10, 210:16,
210:17, 210:19, 214:20,
224:12
**payment** [4] - 21:16, 34:13,
69:10, 70:17
**payments** [2] - 95:10,
210:21
**pays** [1] - 210:6
**PC** [2] - 1:18, 2:3
**Peachtree** [1] - 1:18
**Peactree** [1] - 2:6
**PECOS** [2] - 214:4, 214:5
**peers** [3] - 86:2, 86:3
**pen** [2] - 168:5, 194:1
**penetrant** [2] - 107:19,
108:17
**people** [34] - 19:6, 45:4,
45:6, 45:8, 82:8, 82:12,
96:17, 104:11, 106:17,
107:17, 108:18, 109:16,
112:11, 151:22, 164:20,
164:23, 168:14, 168:22,
176:12, 177:8, 177:9,
177:15, 177:19, 177:21,
177:22, 178:3, 179:1,
193:18, 204:8, 221:3, 221:4,
225:17
**people's** [1] - 98:15
**per** [2] - 70:1, 188:16
**percent** [7] - 55:10, 107:22,
109:22, 214:14, 214:15,
214:16, 214:17
**percentage** [1] - 154:12
**percentages** [1] - 154:9
**perfect** [2] - 202:6, 215:4
**performance** [1] - 237:10
**performed** [1] - 140:1
**performing** [1] - 159:13
**performs** [3] - 71:9, 71:10
**perhaps** [5] - 31:24, 55:3,
126:10, 172:22, 230:23
**period** [5] - 79:11, 119:17,
189:25, 224:4, 236:20
**PerkinElmer** [2] - 121:12,
121:19
**permission** [2] - 137:25,

147:19

**permit** [1] - 166:1
**permitted** [2] - 149:6, 149:19
**person** [25] - 16:19, 16:25, 17:2, 18:19, 19:7, 55:15, 61:11, 70:15, 79:14, 82:17, 85:4, 103:11, 103:17, 104:3, 104:10, 123:15, 146:21, 163:11, 164:1, 182:11, 191:11, 193:12, 197:8, 219:1, 225:21
**person's** [1] - 17:9
**personal** [26] - 26:14, 26:20, 29:20, 30:9, 42:17, 43:8, 53:1, 53:5, 53:24, 53:25, 58:25, 60:25, 61:8, 61:9, 101:16, 101:18, 101:25, 103:9, 103:14, 104:6, 109:11, 109:12, 110:21, 112:20, 155:23, 225:1
**personally** [2] - 14:19, 208:1
**perspective** [1] - 233:21
**pertaining** [5] - 13:1, 13:15, 14:21, 15:8, 22:23
**pertinent** [2] - 188:25, 189:16
**Petron** [1] - 234:6
**PGx** [1] - 204:25
**Ph.D** [4] - 13:6, 78:2, 78:16, 173:20
**pharma** [1] - 204:25
**pharmacist** [1] - 19:18
**pharmacogenetic** [7] - 13:25, 15:16, 15:25, 16:5, 18:16, 19:13, 19:20
**pharmacy** [2] - 205:11, 214:2
**Phase** [2] - 12:19
**PHI** [1] - 54:1
**Philadelphia** [2] - 9:12, 79:23
**phone** [21] - 61:13, 62:10, 64:2, 94:18, 112:9, 136:24, 142:24, 143:2, 143:21, 161:2, 162:18, 162:21, 213:2, 218:6, 219:1, 221:8, 227:25, 231:13, 231:14
**phones** [1] - 156:12
**phonetic)** [1] - 206:9
**phrase** [1] - 67:8
**phrased** [1] - 219:14
**physical** [1] - 31:13
**physician** [36] - 20:9, 21:9, 21:10, 21:23, 21:24, 22:2, 29:22, 30:3, 30:17, 31:1, 31:4, 31:5, 31:7, 31:11, 31:14, 31:20, 35:23, 36:8,

36:15, 39:23, 48:14, 55:20, 64:2, 64:11, 71:24, 72:5, 72:9, 72:13, 72:16, 75:4, 75:7, 78:14, 105:3, 105:6
**physician's** [2] - 72:5, 105:16
**Physicians** [2] - 211:10, 212:3
**physicians** [3] - 13:10, 31:18, 212:4
**pick** [2] - 129:25, 134:13
**pickup** [1] - 156:21
**picture** [3] - 197:7, 198:4, 198:7
**piece** [3] - 16:12, 92:20, 205:4
**pieces** [2] - 23:5, 106:20, 106:23
**place** [15] - 86:14, 87:8, 87:10, 88:9, 140:22, 143:21, 145:21, 151:17, 151:18, 151:21, 157:8, 182:2, 182:3, 213:7, 220:5
**placed** [1] - 217:22
**places** [2] - 149:12, 225:18
**placing** [3] - 31:3, 31:4, 31:15
**plan** [21] - 4:18, 5:14, 12:4, 20:24, 32:14, 33:2, 44:21, 48:7, 48:12, 58:7, 62:25, 94:25, 97:7, 110:16, 114:8, 125:19, 130:16, 201:20, 229:15, 229:16, 232:19
**planned** [2] - 147:20, 188:4
**planning** [3] - 16:21, 202:2, 232:17
**plans** [1] - 20:23
**platform** [2] - 64:3, 206:15
**play** [7] - 58:10, 58:18, 59:7, 59:13, 61:16, 63:13, 97:24
**playing** [1] - 60:7
**plead** [1] - 203:17
**pleasure** [3] - 74:14, 74:15, 115:11
**pled** [2] - 203:15, 203:22
**plenty** [1] - 127:13
**pocket** [1] - 103:3
**point** [31] - 4:23, 23:8, 54:13, 59:23, 62:10, 63:2, 73:2, 113:11, 123:5, 126:15, 128:20, 129:1, 129:9, 140:6, 151:16, 154:11, 174:5, 182:1, 189:8, 202:3, 209:16, 212:9, 224:2, 231:6, 231:16, 232:10, 233:10, 234:25, 235:10, 235:15
**point..** [1] - 223:1
**pointed** [2] - 96:12, 156:15
**points** [2] - 21:21, 29:20

**policies** [8] - 139:10, 140:17, 151:16, 151:18, 151:23, 151:25, 152:6, 158:24
**policy** [2] - 27:20, 177:12
**political** [1] - 135:10
**pool** [1] - 55:5
**poor** [1] - 43:25
**population** [1] - 55:11
**portion** [1] - 189:5
**pose** [1] - 222:19
**position** [15] - 62:2, 107:8, 107:9, 130:21, 136:8, 136:18, 137:7, 137:15, 138:8, 138:15, 138:17, 138:24, 200:24, 233:12
**positions** [5] - 11:6, 136:8, 138:23, 139:18, 161:5
**positive** [5] - 33:17, 106:8, 112:19, 120:21, 228:21
**possession** [1] - 50:24
**possibilities** [1] - 231:15
**possibility** [5] - 35:14, 54:16, 54:19, 124:21, 232:9, 233:15, 234:18
**possible** [9] - 29:20, 147:18, 155:20, 165:4, 194:16, 194:20, 203:13, 217:11, 224:8
**possibly** [3] - 34:15, 133:9, 221:6
**post** [3] - 138:11, 218:14, 230:9
**postdoctoral** [1] - 76:21
**posted** [1] - 131:9
**postgraduate** [1] - 76:16
**potential** [6] - 32:4, 41:12, 143:8, 232:7, 233:8, 233:13
**potentially** [10] - 32:1, 35:23, 90:24, 91:5, 91:6, 91:9, 210:9, 226:25, 233:5, 234:13
**power** [1] - 226:20
**powerhouse** [1] - 196:19
**practice** [16] - 12:18, 17:15, 22:1, 39:12, 68:14, 68:16, 75:1, 75:4, 94:23, 101:11, 102:15, 103:3, 112:11, 117:17, 160:21, 199:22
**practicing** [3] - 10:10, 11:8, 161:4
**practitioner** [2] - 18:13, 26:20
**practitioners** [3] - 9:19, 35:19, 45:3
**precisely** [1] - 96:1
**precision** [2] - 75:4, 75:5
**predict** [1] - 38:16
**predisposing** [2] - 106:10, 107:14

**predisposition** [2] - 56:14, 108:20
**preface** [1] - 172:13
**prefer** [6] - 64:13, 126:16, 128:11, 128:17, 132:23, 209:9
**preference** [1] - 132:25
**pregnancy** [2] - 41:7, 96:13
**pregnant** [1] - 40:14
**preliminary** [4] - 181:2, 181:4, 189:15, 225:24
**premature** [2] - 225:23, 225:24
**prenatal** [15] - 40:8, 40:12, 40:17, 40:23, 40:25, 41:4, 41:5, 41:13, 47:13, 47:15, 47:24, 47:25, 52:2, 52:5, 96:13
**prep** [2] - 232:4, 233:3
**preparation** [2] - 75:12, 75:20
**prepared** [4] - 133:16, 139:22, 196:23, 197:14
**prepped** [1] - 230:17
**prepping** [1] - 230:18
**prescription** [4] - 205:11, 206:16, 208:18, 214:1
**present** [4] - 4:4, 6:25, 25:4, 158:5
**presentation** [1] - 224:8
**presented** [5] - 50:11, 51:7, 77:16, 77:21, 220:8
**presently** [1] - 43:13
**presents** [1] - 50:14
**preservation** [1] - 181:21
**preservative** [1] - 38:6
**president** [7] - 10:12, 74:18, 74:24, 76:23, 141:8, 145:22, 160:11
**press** [1] - 111:20
**pressing** [1] - 235:10
**presumably** [2] - 21:22, 85:7
**pretest** [1] - 104:5
**pretty** [12] - 51:4, 56:21, 64:8, 76:6, 76:16, 103:13, 104:4, 114:16, 132:12, 138:20, 187:6, 234:15
**prevent** [1] - 55:2
**preview** [1] - 223:10
**previous** [8] - 15:11, 22:19, 30:8, 44:16, 44:17, 50:21, 138:22, 148:8
**previously** [12] - 15:7, 40:9, 40:22, 41:19, 43:14, 43:17, 43:20, 50:22, 104:21, 137:20, 146:7, 189:5
**prey** [1] - 98:15
**primarily** [2] - 141:8, 166:12

**primary** [5] - 96:24, 102:14, 105:3, 105:6, 105:21
**priority** [1] - 152:7
**privacy** [5] - 136:11, 151:19, 166:15, 181:16, 181:19
**private** [9] - 61:10, 61:14, 67:24, 68:3, 152:8, 191:13, 191:16, 193:12, 193:13
**privileges** [1] - 146:3
**privy** [1] - 154:18
**prize** [1] - 58:24
**probability** [4] - 104:6, 218:25, 219:24, 221:1, 221:3
**problem** [17] - 28:8, 28:10, 126:25, 127:13, 129:3, 153:22, 166:24, 167:18, 186:23, 187:1, 190:23, 191:10, 193:11, 228:13, 229:2, 229:5
**problematic** [1] - 61:2
**problems** [9] - 5:2, 5:21, 35:2, 65:3, 154:14, 164:25, 166:23, 170:2, 187:11
**procedure** [2] - 40:5
**procedures** [15] - 21:13, 21:14, 21:15, 34:2, 86:21, 86:25, 87:18, 139:10, 151:16, 151:18, 152:6, 152:10, 158:24, 161:8, 168:8
**proceed** [7] - 8:13, 15:20, 59:10, 62:25, 184:9, 201:9, 217:14
**proceedings** [4] - 111:2, 123:12, 182:22, 238:7
**Proceedings** [3] - 112:6, 123:21, 184:8
**process** [10] - 96:5, 136:22, 147:11, 149:2, 149:14, 159:12, 213:5, 215:6, 215:8, 222:25
**process-oriented** [1] - 149:14
**processed** [2] - 153:9, 216:10
**processes** [6] - 86:14, 179:19, 180:9, 181:1, 182:2, 183:3
**produce** [1] - 120:11
**produced** [1] - 220:18
**product** [1] - 220:14
**products** [1] - 121:2
**professional** [6] - 61:4, 158:20, 160:6, 196:25, 212:21, 213:3
**professionals** [3] - 67:18, 67:19, 140:10
**professor** [1] - 11:17
**proficiency** [1] - 85:17
**program** [18] - 11:12, 13:8,

13:18, 48:20, 69:5, 137:16, 139:19, 140:22, 151:21, 157:19, 166:18, 170:11, 170:12, 170:13, 194:15, 194:18, 194:24, 195:25
**programs** [11] - 11:2, 11:15, 13:8, 13:20, 13:22, 15:4, 15:6, 18:11, 21:12, 21:13, 69:2
**progress** [1] - 126:5
**progressed** [1] - 152:24
**prohibitive** [1] - 212:23
**projects** [1] - 190:24
**promotion** [1] - 136:11
**prone** [4] - 17:6, 18:1, 18:8, 56:15
**proper** [16] - 22:7, 53:21, 54:23, 54:24, 55:21, 55:22, 56:16, 56:17, 56:18, 56:19, 62:22, 62:24, 168:8
**properly** [11] - 36:19, 44:21, 48:21, 48:24, 53:22, 62:19, 66:21, 72:17, 91:14, 91:18, 168:3
**prophylactic** [1] - 18:12
**proposal** [1] - 127:14
**pros** [1] - 39:22
**prosecutors** [1] - 81:17
**prospect** [1] - 60:15
**prostate** [10] - 24:25, 43:9, 43:13, 45:17, 45:19, 45:23, 45:24, 53:3, 56:3, 56:14
**Protean** [10] - 10:1, 10:3, 10:4, 10:9, 10:10, 10:11, 10:12, 10:13, 10:15, 74:18
**protected** [1] - 54:1
**protocols** [1] - 121:2
**provide** [11] - 11:3, 71:17, 72:16, 84:4, 102:2, 102:6, 102:10, 115:4, 173:5, 176:7, 182:11
**provided** [19] - 22:24, 23:2, 23:4, 23:6, 23:9, 23:11, 23:12, 23:23, 26:24, 38:5, 54:18, 58:11, 70:23, 83:25, 89:9, 93:23, 116:19, 172:19, 195:13
**provider** [17] - 37:20, 39:5, 51:20, 52:17, 62:17, 88:10, 94:24, 101:15, 103:8, 103:24, 104:12, 105:13, 105:18, 105:21, 109:12, 113:5, 113:21
**providers** [2] - 30:11, 114:16
**provides** [1] - 10:6
**providing** [2] - 171:19, 174:11
**province** [1] - 13:19
**provision** [1] - 10:22

**psychiatrist** [1] - 45:3
**psychologically** [1] - 221:7
**publicly** [1] - 121:15
**publish** [1] - 137:25
**published** [7] - 14:21, 14:25, 59:14, 60:9, 61:17, 62:5, 63:14
**publisher** [1] - 218:5
**publishing** [1] - 217:9
**Puntillo** [1] - 59:12
**purpose** [7] - 20:12, 20:17, 21:24, 32:25, 96:24, 212:17, 219:22
**purposes** [5] - 14:2, 15:17, 32:3, 66:10, 68:1
**pursuant** [1] - 185:9
**pushing** [2] - 133:2, 134:1
**put** [23] - 9:13, 23:8, 38:5, 50:25, 66:12, 72:8, 90:10, 96:21, 128:24, 129:6, 145:20, 159:15, 159:22, 176:3, 193:4, 193:24, 194:1, 211:21, 215:9, 219:5, 223:20, 236:14, 237:7
**putting** [3] - 36:20, 66:13, 184:5

## Q

**QIAGEN** [2] - 120:23, 121:3
**qualified** [4] - 61:4, 61:7, 96:18, 170:16
**qualify** [3] - 15:15, 96:21, 183:16
**quality** [3] - 72:2, 72:15, 72:19
**questioning** [1] - 235:22
**questions** [25] - 22:12, 28:25, 35:9, 36:9, 37:3, 45:20, 46:8, 56:9, 63:17, 66:7, 71:21, 72:25, 74:15, 77:13, 94:3, 94:8, 95:7, 95:9, 95:11, 96:15, 96:19, 97:10, 97:15, 97:18, 99:25, 116:7, 122:3, 198:13, 198:25, 200:25, 218:8, 220:8, 222:19, 228:3, 232:2
**quick** [6] - 62:10, 128:25, 193:16, 228:3, 232:7, 237:15
**quickly** [4] - 19:10, 41:21, 51:13, 96:6
**quite** [9] - 33:15, 51:4, 64:6, 64:7, 128:22, 185:5, 204:8, 223:12, 232:7

## R

**R-o-e-b-u-c-k** [1] - 135:2
**Radiation** [1] - 12:22
**Rafferty** [11] - 7:23, 73:18,

74:3, 74:12, 94:4, 95:7, 95:9, 96:15, 104:19, 118:17, 122:5
**RAFFERTY** [42] - 2:5, 3:4, 3:6, 5:23, 6:12, 7:24, 68:7, 73:19, 74:6, 74:9, 79:19, 89:14, 89:16, 89:22, 89:24, 90:20, 90:21, 93:10, 93:13, 94:2, 98:9, 98:17, 99:3, 99:11, 99:13, 99:15, 99:25, 101:5, 104:21, 110:25, 111:3, 111:11, 111:13, 111:22, 112:1, 113:10, 113:23, 116:11, 118:16, 118:20, 121:25, 122:3
**raid** [6] - 146:18, 150:9, 157:7, 158:8, 160:10, 196:24
**raided** [2] - 155:3, 199:20
**raise** [5] - 7:10, 77:13, 100:11, 134:22, 203:3
**raised** [2] - 5:1, 111:3
**ran** [9] - 11:12, 11:13, 142:6, 142:12, 162:2, 163:1, 172:5, 191:7, 221:14
**random** [2] - 87:24, 101:21
**range** [1] - 224:5
**rare** [2] - 56:13, 112:20
**rarely** [1] - 34:14
**rate** [2] - 69:25, 70:1
**reach** [3] - 4:24, 111:23, 113:22
**reaction** [2] - 115:22, 147:17
**read** [12] - 25:11, 42:12, 55:12, 173:15, 183:23, 188:24, 217:19, 225:14
**reading** [4] - 189:15, 189:18, 189:19, 189:21
**readout** [1] - 19:16
**ready** [9] - 7:3, 66:7, 73:18, 73:23, 86:20, 132:6, 184:9, 224:1, 237:14
**real** [4] - 29:21, 36:18, 135:14, 141:17
**realistic** [2] - 127:24, 234:11
**realistically** [1] - 233:20
**reality** [1] - 236:23
**really** [42] - 4:19, 5:9, 29:4, 29:18, 31:12, 40:18, 41:8, 41:9, 41:12, 44:11, 44:19, 61:1, 62:2, 93:17, 103:7, 106:23, 106:24, 113:6, 124:8, 124:9, 126:9, 126:13, 128:25, 129:24, 130:13, 147:18, 154:16, 157:23, 159:1, 160:5, 163:2, 171:25, 182:25, 192:13, 223:14, 224:20, 225:24, 226:20, 227:13, 237:4, 237:15
**realm** [1] - 233:14

**RealTime** [2] - 211:10, 212:3

**rearranged** [1] - 229:21

**reason** [8] - 21:12, 48:11, 111:8, 111:22, 133:7, 166:8, 192:9, 220:14

**reasonable** [1] - 233:4

**reasons** [3] - 20:25, 21:16, 158:16

**rec** [1] - 46:12

**receive** [5] - 36:20, 67:9, 143:10, 144:23, 219:19

**Received** [1] - 3:14

**received** [13] - 8:18, 53:8, 104:25, 119:9, 137:24, 143:7, 150:2, 176:1, 177:4, 186:20, 215:22, 216:2, 216:11

**receiving** [3] - 24:20, 26:19, 216:11

**recess** [3] - 131:21, 131:24, 237:22

**recessed** [4] - 73:16, 132:2, 202:14, 238:1

**recipient** [1] - 204:23

**recognize** [6] - 106:1, 110:8, 144:9, 167:25, 187:2, 197:7

**recollection** [2] - 145:6, 148:18

**recommend** [5] - 104:12, 104:13, 108:19, 116:3, 117:13

**recommendation** [1] - 193:1

**recommendations** [2] - 159:16, 159:22

**reconvene** [1] - 128:11

**record** [36] - 6:3, 7:14, 20:13, 20:15, 20:17, 20:20, 20:24, 21:7, 21:9, 22:19, 22:20, 26:24, 28:15, 29:18, 30:16, 40:24, 42:17, 42:18, 42:20, 43:15, 44:12, 51:1, 54:7, 68:4, 73:17, 73:21, 93:12, 100:14, 122:2, 132:3, 134:25, 160:14, 202:15, 203:6, 207:21, 207:23

**recorded** [18] - 23:22, 25:18, 25:21, 27:3, 27:5, 27:8, 27:10, 28:16, 28:17, 28:19, 29:13, 43:5, 45:14, 46:1, 46:15, 48:6, 58:15, 93:8

**recording** [1] - 92:21

**recordings** [9] - 23:5, 75:16, 92:21, 92:23, 93:1, 93:5, 93:21, 93:23, 93:24

**records** [21] - 21:17, 22:15, 22:16, 22:18, 23:19, 24:2,

26:6, 30:11, 44:14, 44:18, 45:5, 45:8, 48:3, 50:23, 50:25, 75:14, 75:22, 75:24, 91:24, 94:14, 105:13

**RECROSS** [1] - 99:14

**RECROSS-EXAMINATION** [1] - 99:14

**redactions** [1] - 104:19

**redirect** [6] - 94:4, 99:4, 99:11, 99:17, 122:6, 197:21

**REDIRECT** [3] - 3:9, 94:6, 197:23

**Reed** [2] - 175:4, 176:5

**reevaluate** [4] - 234:25, 235:4, 235:9

**refer** [3] - 75:6, 75:8, 117:4

**reference** [9] - 10:4, 60:12, 71:5, 98:25, 107:22, 159:15, 222:6, 222:12, 222:15

**referenced** [1] - 207:7

**references** [1] - 42:12

**referencing** [1] - 159:7

**referral** [2] - 105:11, 105:22

**referrals** [1] - 198:20

**referred** [13] - 30:5, 30:7, 55:21, 62:17, 68:22, 94:24, 105:3, 105:8, 105:12, 105:14, 119:13, 177:19, 210:13

**referring** [5] - 72:6, 105:13, 112:10, 179:21, 180:10

**refers** [3] - 16:11, 185:24, 186:5

**reflect** [2] - 207:21, 207:23

**reflected** [1] - 26:13

**refresh** [2] - 21:2, 148:11

**refreshed** [1] - 226:8

**regard** [1] - 199:13

**regarded** [2] - 80:4

**regarding** [23] - 32:17, 35:12, 40:4, 77:24, 115:15, 115:19, 125:14, 139:11, 143:4, 145:20, 146:6, 146:10, 152:17, 153:14, 159:16, 159:22, 160:7, 164:14, 185:11, 188:17, 221:11, 222:19, 226:3

**regardless** [2] - 97:22, 98:2

**regards** [1] - 143:20

**REGINALD** [1] - 1:14

**registering** [1] - 136:7

**regular** [6] - 105:4, 105:16, 114:17, 116:1, 140:1, 205:11

**regulations** [4] - 140:18, 164:25, 165:2, 173:16

**reimburse** [2] - 204:24, 214:7

**reimbursed** [2] - 213:16, 219:9

**reimbursement** [3] - 161:6,

203:25, 210:7

**reimbursements** [1] - 209:22

**related** [7] - 137:13, 139:14, 140:7, 142:11, 152:16, 190:13, 225:18

**relating** [1] - 152:20

**relation** [1] - 153:23

**relationship** [15] - 21:25, 30:17, 30:20, 30:23, 31:3, 31:19, 47:20, 65:14, 141:18, 144:19, 166:4, 205:15, 209:25, 210:25, 221:15

**relationships** [1] - 235:20

**relatively** [1] - 162:13

**relatives** [2] - 17:21, 117:14

**relaying** [1] - 143:13

**release** [1] - 38:5

**relevant** [3] - 103:19, 104:10, 207:2

**reliance** [1] - 149:1

**relieved** [1] - 115:23

**rely** [1] - 53:13

**remaining** [1] - 230:9

**remember** [28] - 4:13, 89:12, 96:19, 122:20, 137:2, 139:23, 140:3, 141:25, 145:14, 155:7, 155:8, 159:14, 171:20, 171:22, 186:19, 186:21, 187:23, 191:4, 192:9, 192:10, 192:16, 192:20, 194:19, 196:21, 196:22, 198:15, 224:17, 225:23

**remembered** [1] - 183:5

**remembering** [1] - 236:13

**remembers** [1] - 113:8

**remind** [1] - 71:4

**reminding** [1] - 177:25

**remote** [1] - 170:5

**removals** [1] - 137:20

**removed** [3] - 16:12, 132:13, 144:2

**renal** [1] - 108:11

**render** [2] - 9:18, 47:19

**rep** [2] - 146:3, 147:24

**repeat** [2] - 118:7, 168:2

**replacing** [1] - 137:14

**report** [11] - 96:11, 105:7, 105:22, 106:4, 106:15, 107:6, 107:14, 117:1, 117:8, 138:18, 138:20

**REPORTED** [1] - 1:20

**reported** [5] - 36:14, 43:21, 117:22, 138:23, 208:5

**reporter** [1] - 181:12, 185:17, 192:10, 201:24

**Reporter** [2] - 1:22, 238:11

**reporting** [4] - 138:11, 138:12, 138:14, 139:1

**reports** [3] - 30:12, 96:12, 117:22

**represent** [2] - 139:14, 157:3

**representative** [1] - 220:3

**representatives** [4] - 147:7, 152:12, 153:6, 178:4

**Representatives** [1] - 186:13

**represented** [2] - 58:12, 208:25

**represents** [1] - 74:13

**reps** [5] - 141:10, 141:13, 159:13, 159:18, 206:20

**req** [1] - 29:10

**request** [3] - 193:4, 217:8, 232:21

**Request** [1] - 204:12

**requested** [1] - 104:19

**requesting** [1] - 105:17

**require** [3] - 21:13, 25:5, 56:16

**required** [3] - 109:1, 176:15, 180:5

**requirements** [1] - 85:11

**requires** [3] - 47:25, 48:4, 83:14

**requisition** [22] - 23:13, 23:14, 37:11, 38:25, 40:9, 40:25, 46:24, 51:9, 51:12, 51:14, 52:1, 57:17, 75:18, 81:23, 81:25, 82:4, 82:15, 82:18, 208:19, 208:21, 209:1, 209:3

**requisitions** [1] - 205:21

**rerun** [1] - 114:23

**research** [15] - 11:3, 11:12, 11:13, 11:14, 11:17, 12:12, 12:14, 14:22, 76:21, 123:2, 123:3, 153:21, 154:2, 154:8, 225:12

**residencies** [1] - 13:15

**residency** [2] - 11:1, 80:10

**resident** [1] - 76:19

**resist** [1] - 225:11

**resistant** [1] - 18:25

**resolved** [5] - 43:18, 54:14, 144:1, 153:11

**resources** [9] - 136:23, 136:25, 137:2, 137:4, 138:19, 138:21, 140:4, 140:15, 151:23

**respect** [8] - 5:24, 75:5, 81:21, 82:24, 89:11, 92:16, 119:5, 180:24

**respond** [6] - 18:23, 170:1, 185:21, 196:24, 199:16, 220:12

**response** [2] - 95:4, 95:5

**responsibilities** [3] - 83:19,

93:20, 138:10
**responsibility** [9] - 69:10, 83:11, 83:13, 86:17, 87:7, 88:8, 88:21, 88:25, 103:25
**responsible** [8] - 10:23, 10:25, 11:2, 34:10, 67:19, 83:2, 83:3, 87:4
**rest** [6] - 45:10, 83:6, 129:9, 226:8, 227:20, 234:5
**restate** [1] - 5:25
**restaurant** [1] - 61:6
**resting** [1] - 233:13
**restroom** [2] - 73:3, 201:25
**result** [10] - 34:15, 36:1, 36:24, 37:1, 71:20, 71:21, 72:17, 105:5, 106:8, 120:12
**results** [39] - 14:9, 14:19, 15:19, 32:21, 33:1, 33:2, 35:15, 35:16, 35:24, 36:2, 36:7, 36:10, 36:12, 36:16, 39:21, 44:9, 44:24, 45:7, 54:25, 55:1, 63:1, 72:16, 102:6, 102:10, 105:19, 106:5, 114:4, 115:2, 115:4, 115:10, 115:15, 115:19, 116:6, 117:16, 119:9, 119:11, 120:20, 213:13, 213:14
**resume** [3] - 74:16, 74:21, 200:8
**retina** [1] - 108:8
**return** [3] - 124:17, 157:8, 227:4
**returned** [3] - 112:6, 123:21, 184:8
**returning** [1] - 157:12
**reunion** [1] - 122:17
**reverify** [1] - 62:11
**review** [20] - 23:7, 23:12, 77:16, 89:7, 105:19, 146:12, 152:24, 153:14, 154:6, 154:7, 179:22, 180:9, 185:12, 185:25, 186:17, 190:20, 205:9, 205:10, 224:23, 233:2
**reviewed** [13] - 22:24, 24:2, 32:11, 40:7, 47:18, 48:10, 75:18, 75:20, 77:19, 116:23, 147:12, 147:15, 186:20
**reviewing** [6] - 41:19, 66:19, 66:20, 96:8, 145:23, 180:17
**revised** [1] - 6:4
**right-hand** [1] - 89:22
**rise** [6] - 6:15, 73:24, 124:3, 134:6, 200:12, 226:14
**risk** [26] - 4:19, 17:8, 17:9, 17:14, 18:6, 18:10, 33:19, 34:21, 38:17, 47:9, 55:2, 57:18, 58:4, 65:24, 65:25,

102:21, 102:25, 107:5, 107:15, 114:22, 115:24, 117:10, 222:17, 226:23, 227:16, 236:10
**risks** [12] - 33:4, 33:8, 33:9, 33:10, 33:11, 39:16, 41:2, 41:9, 63:3, 63:4, 92:6, 96:25
**risky** [2] - 5:8, 133:15
**RMR** [2] - 1:21, 238:11
**road** [4] - 61:25, 111:3, 226:4, 231:23
**robocalls** [1] - 211:17
**RODOLFO** [1] - 1:10
**Rodolfo** [1] - 1:22
**Roebuck** [17] - 129:15, 129:17, 129:21, 131:15, 132:17, 134:4, 134:17, 134:18, 135:1, 135:5, 138:4, 144:8, 160:21, 179:25, 197:25, 231:21
**ROEBUCK** [2] - 3:7, 134:23
**role** [25] - 10:9, 10:20, 11:5, 12:1, 70:21, 70:22, 71:14, 71:16, 71:18, 85:7, 97:10, 97:11, 97:16, 99:16, 136:5, 137:9, 139:7, 142:5, 144:17, 150:13, 158:19, 204:2, 208:1
**roles** [7] - 11:7, 13:23, 97:13, 97:20, 139:5, 140:11, 235:20
**ROOKARD** [1] - 1:14
**room** [9] - 73:6, 122:18, 123:7, 224:25, 228:16, 228:18, 228:24, 229:6, 237:17
**rooms** [1] - 228:15
**rotate** [1] - 220:10
**rotating** [2] - 220:17, 221:2
**Rothschild** [3] - 187:2, 187:6, 197:13
**round** [1] - 73:22
**rounding** [1] - 158:21
**RPR** [2] - 1:21, 238:11
**RTOG** [1] - 12:21
**RUIZ** [1] - 1:10
**Ruiz** [1] - 1:22
**Rule** [1] - 15:15
**rules** [6] - 97:24, 97:25, 211:19, 225:6, 226:1, 226:4
**ruling** [2] - 7:25, 201:19
**rulings** [1] - 8:12
**run** [11] - 4:19, 78:10, 79:2, 82:24, 122:20, 133:1, 204:9, 210:3, 213:13, 225:3, 227:16
**running** [3] - 81:5, 162:8, 178:11
**rush** [3] - 227:13, 228:5, 229:1
**rushing** [1] - 227:18

**Rutgers** [1] - 79:20

**S**

**S-p-o-r-n** [1] - 203:7
**sac** [1] - 108:8
**sacred** [1] - 31:2
**SADOW** [37] - 1:17, 1:18, 123:9, 123:13, 127:12, 128:13, 128:19, 130:21, 132:25, 200:3, 200:17, 200:20, 201:8, 202:11, 209:9, 215:15, 217:8, 228:2, 228:8, 228:11, 228:15, 228:19, 228:23, 229:8, 229:10, 230:13, 230:17, 231:25, 232:2, 232:14, 232:20, 233:14, 233:17, 234:12, 234:15, 237:14, 237:23
**Sadow** [6] - 5:24, 132:21, 200:16, 202:9, 215:20, 232:12
**safe** [1] - 19:19
**safety** [1] - 155:20
**sake** [1] - 209:5
**salaried** [1] - 213:2
**sales** [11] - 141:8, 141:10, 141:13, 141:21, 145:22, 160:11, 163:18, 163:21, 190:11, 206:22
**salespeople** [1] - 211:22
**Saliba** [14] - 137:5, 137:8, 141:3, 147:21, 156:5, 158:1, 161:21, 169:13, 170:3, 172:14, 177:4, 196:10, 207:9, 208:4
**saliva** [4] - 37:24, 38:4, 38:5, 47:8
**sample** [6] - 38:8, 38:11, 40:19, 40:21, 106:25, 219:10
**sampled** [1] - 38:13
**samples** [3] - 38:2, 198:9, 218:9
**Samuel** [11] - 132:8, 132:9, 132:13, 137:20, 137:21, 160:16, 160:21, 194:10, 198:14, 198:25, 199:12
**SAMUEL** [41] - 2:2, 2:3, 3:9, 131:13, 131:15, 131:17, 137:22, 142:13, 142:15, 143:12, 143:16, 160:17, 160:20, 166:3, 175:8, 175:14, 175:18, 176:2, 177:2, 177:3, 179:4, 179:7, 180:3, 180:4, 182:6, 182:7, 182:18, 182:25, 183:15, 183:18, 183:22, 184:5, 184:10, 184:12, 185:18, 188:10, 188:11, 191:2,

191:3, 192:8, 197:20
**sanction** [2] - 153:5, 159:13
**Sanger** [2] - 120:14, 120:20
**sanger** [1] - 120:15
**Santana** [1] - 133:21
**Saskatchewan** [1] - 13:18
**sat** [1] - 150:23
**Saturdays** [1] - 161:16
**save** [1] - 55:3
**saw** [20] - 23:17, 26:20, 33:6, 51:5, 67:23, 91:5, 91:6, 95:25, 99:19, 121:7, 146:14, 146:24, 156:13, 157:8, 166:19, 168:10, 169:3, 169:6, 197:7, 197:11
**scanned** [1] - 49:14
**scare** [1] - 36:23
**scenario** [2] - 112:19, 232:11
**schedule** [7] - 4:13, 125:14, 126:7, 126:9, 224:5, 233:23, 233:25
**scheduled** [1] - 150:20
**scheduling** [1] - 123:25
**school** [6] - 20:15, 80:2, 80:4, 80:6, 80:8, 135:13
**science** [5] - 9:16, 76:12, 101:1, 119:1, 135:11
**Sciences** [1] - 206:8
**scientific** [2] - 76:25, 83:5
**scientist** [4] - 78:5, 78:18, 82:3, 172:2
**scientists** [1] - 82:10
**scope** [2] - 99:4, 165:25
**screen** [4] - 138:4, 144:8, 174:18, 176:4
**screened** [1] - 221:6
**screener** [1] - 149:24
**screening** [21] - 18:11, 29:12, 34:24, 46:14, 65:25, 102:20, 102:23, 102:24, 108:19, 108:23, 114:14, 114:16, 136:24, 219:19, 220:22, 220:24, 221:3, 222:7, 222:12, 222:15
**screenings** [1] - 46:14
**screens** [1] - 51:3
**script** [1] - 212:25
**scroll** [1] - 25:14
**scrolling** [1] - 42:23
**scrutiny** [1] - 56:12
**search** [1] - 178:21
**searches** [2] - 178:13, 178:23
**seat** [1] - 124:5
**seated** [6] - 6:17, 7:13, 73:10, 74:1, 100:13, 125:24, 134:8, 134:24, 200:14, 202:18, 203:5, 226:16, 227:22

**second** [41] - 7:16, 16:9, 16:24, 20:6, 23:16, 26:8, 26:9, 36:11, 39:8, 43:7, 47:12, 47:18, 49:20, 51:25, 54:10, 61:20, 62:8, 92:21, 95:20, 98:15, 117:24, 117:25, 118:4, 118:12, 123:9, 123:11, 123:16, 142:4, 142:16, 150:6, 185:12, 202:9, 205:6, 206:18, 209:8, 210:15, 211:6, 215:10, 216:12, 218:16

**secretary** [4] - 183:11, 183:12

**section** [1] - 117:7

**SECTION** [1] - 1:15

**secure** [4] - 44:15, 213:17, 213:20, 214:9

**Security** [2] - 68:1, 68:3

**SECURITY** [6] - 6:15, 73:24, 124:3, 134:6, 200:12, 226:14

**security** [2] - 149:24, 155:13

**see** [128] - 7:2, 24:4, 24:5, 24:12, 24:15, 25:10, 25:13, 25:15, 25:17, 25:18, 25:21, 25:25, 26:2, 26:5, 26:7, 26:11, 26:12, 27:14, 27:21, 29:4, 29:8, 32:11, 35:12, 37:12, 37:13, 37:14, 37:16, 37:17, 38:15, 38:18, 39:4, 41:1, 42:9, 42:11, 42:15, 43:10, 46:19, 46:25, 47:1, 47:2, 49:5, 49:7, 49:8, 49:17, 49:21, 49:23, 50:2, 50:4, 50:5, 51:14, 51:16, 51:18, 52:4, 52:13, 52:23, 56:2, 57:5, 57:6, 57:18, 57:20, 57:21, 58:7, 58:8, 64:12, 64:13, 64:14, 64:16, 64:17, 73:12, 75:9, 79:5, 106:7, 108:22, 109:24, 115:1, 116:23, 122:23, 123:16, 124:8, 129:24, 131:20, 138:4, 140:6, 140:8, 146:19, 147:12, 152:10, 156:22, 157:8, 162:7, 168:18, 183:3, 183:22, 184:20, 188:12, 188:25, 190:8, 194:23, 201:23, 207:14, 216:2, 216:22, 216:25, 217:2, 217:3, 219:14, 219:20, 220:11, 220:14, 220:17, 221:21, 221:24, 223:7, 223:21, 223:22, 224:10, 224:19, 228:13, 229:3, 229:5, 231:3, 234:25, 235:4, 235:6, 235:11, 237:6, 237:21

**seeing** [4] - 50:20, 144:12, 147:10, 184:15

**seek** [1] - 43:22

**seeking** [2] - 30:24, 66:9

**seem** [3] - 5:3, 157:22, 196:19

**sees** [2] - 105:16, 114:15

**segment** [1] - 107:3

**select** [1] - 39:5

**selected** [1] - 47:10

**self** [4] - 26:2, 27:22, 43:3, 104:11

**sell** [2] - 58:22, 59:4

**send** [11] - 44:15, 44:16, 159:19, 160:10, 179:24, 193:23, 194:9, 208:21, 210:14, 232:22

**sending** [13] - 72:14, 115:14, 160:1, 176:16, 185:1, 185:11, 187:24, 188:7, 188:15, 188:16, 188:17, 189:12, 213:14

**sends** [4] - 72:19, 180:6, 185:23, 185:25

**senior** [2] - 161:18, 197:13

**sense** [20] - 4:7, 23:2, 42:19, 52:24, 101:20, 102:1, 102:19, 103:17, 122:11, 127:17, 132:23, 158:18, 210:11, 219:8, 222:20, 222:21, 224:3, 231:2, 233:19, 237:11

**sensitive** [3] - 19:12, 19:17, 61:14

**sent** [16] - 22:16, 25:1, 44:18, 92:24, 169:21, 175:4, 176:16, 182:10, 182:11, 185:7, 186:17, 187:22, 189:5, 193:10, 209:2, 213:13

**sentence** [2] - 46:22, 115:11

**sentences** [1] - 96:10

**separate** [3] - 116:6, 117:22, 212:17

**separately** [1] - 159:25

**sequence** [2] - 120:17, 233:1

**sequencing** [1] - 120:15

**series** [2] - 193:10, 193:15

**serve** [3] - 11:6, 11:24, 78:24

**served** [1] - 76:19

**service** [10] - 60:17, 133:19, 143:7, 225:9, 226:3, 226:10, 227:2, 227:3, 227:10, 227:11

**services** [6] - 10:6, 10:22, 11:9, 204:12, 211:25, 212:12

**Services** [7] - 165:1, 204:11, 206:21, 220:3, 222:1, 222:9, 222:14

**session** [2] - 128:25, 195:5

**set** [7] - 17:4, 19:14, 39:1, 66:24, 175:13, 182:16, 190:10

**setting** [1] - 137:12

**several** [17] - 7:19, 15:4, 20:25, 21:21, 23:12, 37:17, 48:2, 52:21, 56:22, 58:11, 58:14, 58:21, 70:3, 75:22, 185:11, 185:23, 188:17

**shaping** [1] - 201:4

**share** [3] - 45:8, 123:18, 133:5

**shared** [4] - 21:7, 21:9, 150:7, 163:13

**sharing** [1] - 61:15

**Shawn** [2] - 231:7, 232:14

**sheet** [1] - 105:15

**shift** [2] - 20:6, 70:25

**shifted** [2] - 205:8, 206:24

**shipping** [1] - 216:10

**shirt** [1] - 207:20

**shoot** [3] - 228:11, 228:24, 233:12

**short** [2] - 142:25, 234:10

**shortcut** [1] - 235:21

**shorter** [1] - 127:8

**show** [20] - 23:15, 23:24, 52:11, 55:23, 57:1, 86:5, 86:15, 88:3, 105:9, 110:7, 130:15, 133:17, 159:5, 174:17, 183:4, 184:13, 194:21, 217:6, 221:9

**showed** [5] - 40:10, 167:14, 176:14, 196:18, 199:9

**showing** [6] - 105:23, 115:6, 183:18, 215:24, 221:25, 230:14

**shown** [1] - 82:18

**shred** [1] - 227:7

**shut** [2] - 99:20, 112:4

**siblings** [1] - 110:5

**sickle** [1] - 17:7

**side** [18] - 5:22, 24:8, 89:23, 122:21, 127:11, 134:1, 175:22, 182:19, 197:9, 197:10, 205:3, 206:14, 208:15, 212:16, 216:9, 216:12, 236:25, 237:12

**sidebar** [4] - 111:1, 111:2, 123:12, 182:22

**sidewalk** [2] - 157:10, 197:11

**sign** [16] - 39:19, 40:3, 72:13, 146:1, 148:5, 176:22, 193:20, 193:22, 194:9, 194:10, 194:17, 195:6, 205:10, 214:5, 214:21, 221:7

**signature** [2] - 146:25, 148:5, 148:6, 193:25, 196:8

**signed** [10] - 39:24, 39:25, 63:18, 146:19, 147:16, 193:19, 205:17, 206:24, 214:3, 219:25

**signer** [8] - 146:1, 146:22, 194:8, 194:25, 195:13, 195:21, 196:1, 196:5

**signers** [2] - 145:24, 146:4, 148:1

**significant** [4] - 55:25, 76:16, 132:13, 233:1

**signing** [10] - 51:8, 59:19, 60:17, 88:24, 97:2, 145:21, 146:3, 146:12, 146:20, 181:6

**signs** [1] - 222:3

**siloed** [1] - 149:16

**silos** [1] - 183:1

**similar** [8] - 51:6, 79:1, 79:5, 81:8, 95:24, 96:1, 220:7, 220:9

**similarly** [3] - 42:23, 49:14, 58:23

**simple** [3] - 40:5, 152:5, 164:21

**simply** [2] - 36:16, 127:18

**sincerely** [1] - 226:6

**single** [4] - 103:11, 106:20, 123:22, 124:6

**sister** [2] - 28:1, 32:1

**sisters** [1] - 17:20

**sit** [3] - 128:10, 150:10, 160:5

**site** [4] - 85:18, 168:22, 171:18, 179:1

**sitting** [1] - 207:17

**situation** [9] - 17:12, 43:24, 103:20, 113:6, 130:8, 143:23, 145:16, 157:9, 231:3

**situations** [1] - 151:5

**six** [4] - 135:17, 135:25, 210:3, 233:9

**sized** [1] - 187:6

**skip** [2] - 57:16, 179:4

**Slagle** [2] - 207:4, 210:23

**Slagle's** [1] - 211:2

**slight** [2] - 18:21, 59:24

**slightly** [2] - 63:22, 69:12

**Slomovitz** [1] - 49:2

**slurred** [1] - 57:21

**small** [1] - 162:13

**smaller** [2] - 231:11, 235:3

**so-called** [1] - 206:14

**so..** [2] - 154:21, 186:22

**SOAP** [2] - 24:9, 42:1

**Social** [2] - 67:25, 68:3

**social** [2] - 123:4, 226:2, 226:3

**software** [2] - 120:9, 204:19

**solicit** [1] - 204:11

**solicited** [2] - 204:6, 221:8

**solved** [1] - 193:11

**somatic** [4] - 16:9, 16:10, 16:11, 16:23

**someone** [32] - 32:4, 54:16, 61:2, 61:13, 62:17, 68:5, 71:22, 102:17, 108:23, 109:14, 109:22, 113:8, 114:13, 126:8, 130:16, 143:10, 150:21, 155:17, 162:9, 167:25, 168:3, 173:5, 174:11, 176:13, 179:8, 184:25, 191:5, 191:7, 193:22, 195:5, 199:17, 221:10

**sometime** [2] - 190:10, 211:3

**sometimes** [6] - 64:24, 96:10, 151:6, 167:6, 173:2, 177:19

**somewhat** [3] - 31:11, 118:1, 193:23

**SONAL** [1] - 163:23

**Sonal** [8] - 141:24, 145:11, 145:13, 147:24, 148:3, 148:4, 163:23, 195:4

**Sonal's** [1] - 141:25

**soon** [3] - 128:13, 223:19, 228:12

**SOPs** [3] - 87:2, 87:5, 87:8

**sorry** [21] - 38:19, 49:4, 53:19, 59:13, 83:10, 90:12, 112:8, 125:15, 146:24, 168:2, 170:25, 174:7, 174:8, 175:6, 181:13, 192:18, 192:19, 217:4, 217:5, 230:3, 232:13

**sort** [21] - 44:7, 44:22, 67:10, 68:23, 72:23, 78:23, 119:6, 120:3, 123:2, 127:9, 131:7, 131:8, 132:10, 137:10, 137:12, 140:4, 145:14, 151:19, 154:9, 156:12, 212:15

**sorts** [3] - 34:16, 120:11, 140:17

**sounded** [1] - 129:18

**sounding** [1] - 106:12

**sounds** [12] - 29:21, 79:5, 119:5, 130:2, 131:3, 153:12, 158:15, 161:13, 171:25, 192:5, 230:21, 232:10

**sources** [1] - 43:22

**SOUTHERN** [1] - 1:1

**Southwest** [1] - 12:23

**speaking** [3] - 115:12, 139:13, 155:25

**special** [4] - 10:8, 31:2, 71:11

**specialist** [2] - 137:10, 174:12

**specialists** [3] - 35:20, 121:10, 140:10

**specialize** [1] - 165:8

**specialty** [4] - 9:8, 9:10, 9:16, 181:18

**specific** [22] - 8:12, 9:18, 12:9, 22:22, 23:15, 103:9, 103:13, 103:14, 104:4, 106:15, 106:17, 107:5, 107:8, 140:19, 142:10, 157:23, 163:20, 175:21, 208:14, 209:17

**specifically** [9] - 37:2, 136:1, 155:25, 160:10, 180:24, 209:15, 210:20, 217:13, 219:12

**specifics** [2] - 144:21, 171:6

**specimen** [2] - 16:14, 213:11

**specimens** [2] - 72:6, 216:10

**speech** [1] - 57:22

**spell** [5] - 7:14, 100:14, 134:25, 170:10, 203:6

**spend** [1] - 20:4

**spent** [3] - 69:20, 163:11, 181:18

**spine** [1] - 108:6

**spoken** [1] - 151:15

**sporadic** [1] - 101:21

**Sporn** [43] - 126:22, 126:23, 129:14, 129:16, 129:21, 129:23, 130:17, 131:1, 131:2, 132:17, 200:18, 202:25, 203:1, 203:7, 203:10, 203:15, 205:2, 205:23, 207:1, 207:25, 209:8, 210:12, 215:6, 215:24, 217:17, 219:12, 221:10, 223:4, 223:20, 229:11, 229:16, 229:18, 230:9, 230:18, 230:22, 230:25, 232:17, 233:7, 234:3, 235:2, 235:12, 237:6

**SPORN** [2] - 3:10, 203:4

**Sporn's** [2] - 129:22, 129:24

**sport** [1] - 207:20

**spot** [1] - 129:6

**square** [1] - 216:8

**stabilize** [1] - 38:7

**Stacey** [3] - 148:15, 148:18, 148:19

**stack** [1] - 235:17

**staff** [4] - 87:6, 121:10, 158:23, 161:18

**stage** [1] - 44:5

**stages** [1] - 210:23

**stairs** [1] - 155:15

**stakeholders** [1] - 139:12

**stand** [8] - 5:23, 6:1, 107:12, 123:15, 201:14, 201:15, 223:21, 232:10

**standard** [9] - 38:21, 86:21, 86:24, 87:18, 138:20, 149:24, 151:6, 154:9, 181:23

**stands** [1] - 99:8

**start** [32] - 16:9, 102:24, 108:19, 108:23, 125:12, 126:6, 126:9, 126:10, 126:18, 127:16, 127:18, 127:25, 128:4, 128:5, 128:17, 130:6, 130:14, 152:5, 161:7, 176:3, 179:5, 190:15, 200:18, 201:21, 215:7, 215:25, 226:24, 235:10, 235:17, 235:18, 237:19

**started** [15] - 6:11, 111:22, 129:21, 135:14, 137:6, 138:15, 139:20, 152:22, 155:13, 189:15, 195:16, 200:22, 202:19, 219:2, 223:20

**starting** [12] - 16:4, 23:25, 43:8, 45:25, 126:21, 126:23, 127:8, 155:7, 155:11, 218:23, 223:12, 234:4

**starts** [3] - 25:11, 112:4, 188:9

**State** [1] - 211:15

**state** [4] - 9:24, 83:25, 84:1, 154:1

**statements** [1] - 147:8

**States** [10] - 1:23, 4:3, 7:5, 15:15, 69:17, 80:25, 100:8, 132:4, 202:24, 238:12

**STATES** [4] - 1:1, 1:3, 1:10, 1:15

**states** [1] - 71:6

**station** [2] - 192:3, 201:3

**statistically** [2] - 54:22, 55:13

**stature** [1] - 196:25

**status** [1] - 31:13

**statute** [1] - 173:15

**Statute** [1] - 198:14

**statutes** [1] - 189:22

**stay** [9] - 64:8, 111:16, 116:13, 123:4, 126:7, 157:17, 226:2, 226:11, 226:21

**steak** [1] - 61:5

**STENOGRAPHICALLY** [1] - 1:20

**step** [6] - 50:18, 73:11, 112:22, 190:19, 211:6, 218:13

**steps** [5] - 30:15, 32:15, 43:21, 50:12, 159:11

**sterilized** [1] - 168:3

**STEVEN** [2] - 1:17, 1:18

**stick** [1] - 226:20

**sticking** [3] - 36:10, 54:10, 126:1

**still** [8] - 18:21, 34:21, 126:7, 146:1, 167:5, 173:17, 200:24, 233:15

**stop** [8] - 34:24, 61:20, 62:8, 155:2, 175:16, 205:2, 207:1, 222:10

**stopping** [1] - 222:25

**stories** [1] - 216:9

**Stout** [1] - 234:6

**straight** [3] - 4:18, 126:3, 128:7

**streamline** [1] - 224:8

**Street** [2] - 1:18, 2:6

**stress** [1] - 64:25

**stretch** [1] - 73:4

**strictly** [2] - 139:15, 157:3

**strong** [6] - 17:22, 24:25, 32:6, 90:24, 91:3, 126:13

**strongly** [1] - 126:6

**structure** [1] - 145:8

**structured** [1] - 58:23

**students** [2] - 11:14, 11:19

**students'** [1] - 13:7

**studying** [1] - 189:24

**stuff** [11] - 122:15, 152:21, 163:24, 165:8, 167:5, 180:12, 187:17, 189:8, 190:2, 190:21, 236:14

**stunned** [1] - 147:18

**sub** [1] - 44:5

**subcontract** [1] - 216:16

**subcontracting** [1] - 216:16

**subject** [7] - 5:17, 8:12, 63:22, 63:23, 137:19, 216:24, 217:4

**subjective** [6] - 28:24, 46:7, 46:17, 51:2, 56:20, 57:18

**submit** [2] - 208:8, 213:15

**submitted** [2] - 214:14, 219:6

**submitting** [2] - 203:24, 220:2

**subpoena** [1] - 154:22

**subspecialty** [1] - 12:9

**substantive** [1] - 152:1

**success** [1] - 4:22

**successful** [4] - 28:12, 127:7, 157:20, 223:12

**successfully** [1] - 43:17

**suffering** [1] - 11:21

**suffice** [2] - 77:7, 92:15

**sufficient** [1] - 62:12
**sugar** [1] - 6:23
**suggest** [3] - 126:12, 186:10, 229:11
**suggestion** [2] - 126:17
**suggestions** [2] - 180:25, 181:9
**suggestive** [1] - 101:17
**suit** [1] - 197:15
**Suite** [2] - 1:19, 2:6
**summarize** [1] - 106:5
**summary** [2] - 106:8, 115:10
**Sunday** [4] - 124:22, 130:24, 230:19, 232:22
**Sundays** [1] - 161:16
**superficial** [2] - 23:22, 29:18
**superficially** [2] - 47:23, 96:7
**supervised** [1] - 13:6
**supervisor** [9] - 138:17, 140:4, 145:15, 151:15, 151:23, 156:9, 156:10, 159:2, 163:6
**supplied** [2] - 206:20, 208:19
**support** [1] - 71:16
**supported** [1] - 11:16
**supposed** [3] - 143:6, 154:6, 190:5
**Suretox** [1] - 206:8
**surgeons** [1] - 45:2
**surgery** [3] - 18:12, 34:1, 66:1
**surgical** [1] - 34:2
**surmised** [1] - 162:10
**surprise** [1] - 85:22
**surprised** [1] - 109:14
**surprising** [1] - 109:16
**surrender** [1] - 156:12
**survey** [2] - 218:4
**susceptibility** [3] - 49:22, 49:24, 56:5
**suspend** [1] - 88:6
**sustained** [3] - 68:9, 142:17, 142:20
**swab** [2] - 38:10, 213:12
**swear** [3] - 7:8, 100:9, 203:2
**swearing** [1] - 48:17
**switch** [3] - 68:14, 69:12, 107:10
**switched** [1] - 135:15
**sworn** [6] - 7:12, 31:6, 100:12, 134:21, 134:23, 203:4
**symptoms** [12] - 29:7, 46:10, 107:17, 107:18, 107:21, 107:23, 108:1,

108:12, 108:18, 109:15, 109:17
**syndrome** [3] - 106:10, 107:14, 108:21
**Syndrome** [1] - 107:13
**system** [14] - 42:20, 108:6, 145:20, 145:25, 146:2, 146:4, 146:8, 146:10, 148:25, 176:18, 208:20, 218:14, 219:5, 227:9

---

**T**

**tad** [1] - 38:16
**Tampa** [1] - 74:21
**targeted** [1] - 204:18
**task** [3] - 116:13, 136:7, 149:8
**tasked** [2] - 152:23, 167:21
**tasks** [7] - 137:12, 140:1, 140:19, 142:7, 142:10, 153:3, 153:16
**taught** [4] - 11:18, 13:3, 20:14, 31:7
**tax** [4] - 164:17, 203:18, 203:21, 203:22
**taxes** [2] - 203:22
**teaching** [2] - 13:1, 13:12
**team** [3] - 6:10, 44:25, 45:2
**technicians** [1] - 168:18
**technologies** [1] - 13:13
**technology** [2] - 13:13, 120:17
**tedious** [1] - 158:16
**Telehealth** [3] - 24:6, 41:24, 49:6
**telehealth** [15] - 52:15, 57:4, 205:7, 205:8, 205:9, 206:14, 206:24, 207:12, 208:15, 212:7, 212:10, 212:11, 212:17, 212:19, 216:9
**telemarket** [2] - 211:15, 211:21
**telemarketer** [1] - 53:8, 53:14, 61:3
**telemarketers** [2] - 53:18, 58:21
**Telemarketing** [1] - 64:6
**telemarketing** [25] - 53:21, 54:7, 54:10, 55:15, 55:18, 58:9, 58:12, 67:8, 67:9, 67:12, 67:16, 67:20, 67:24, 94:17, 94:19, 95:2, 95:8, 95:10, 98:14, 205:3, 205:7, 206:22, 211:14, 211:19, 212:16
**telemedicine** [19] - 63:23, 63:24, 64:2, 64:7, 64:20, 65:6, 65:9, 65:11, 65:15,

66:17, 66:21, 66:22, 67:2, 67:7, 67:12, 93:16, 93:18, 214:11
**telephone** [2] - 61:9, 61:15
**template** [1] - 147:14
**temptation** [2] - 225:11, 225:20
**ten** [6] - 12:21, 103:13, 119:4, 119:18, 136:3, 212:24
**tend** [2] - 5:8, 133:7
**Tennessee** [4] - 161:24, 170:3, 196:11, 196:12
**term** [3] - 41:7, 178:19, 209:15
**terms** [20] - 9:13, 16:25, 38:25, 50:7, 60:21, 64:4, 128:16, 130:10, 144:17, 147:13, 149:5, 151:9, 151:24, 152:1, 153:12, 153:16, 154:3, 178:21, 183:20, 231:18
**terribly** [2] - 125:25, 234:9
**territory** [1] - 171:16
**test** [169] - 19:13, 19:14, 21:21, 22:2, 22:3, 22:10, 22:14, 23:13, 23:14, 27:17, 32:10, 32:12, 32:14, 32:19, 33:9, 33:13, 33:17, 34:11, 34:13, 34:14, 34:18, 34:22, 35:1, 35:4, 35:22, 36:1, 36:12, 36:14, 36:16, 37:7, 37:11, 37:24, 38:2, 38:3, 38:10, 38:15, 38:17, 38:19, 38:25, 39:1, 39:21, 40:5, 40:8, 40:9, 40:21, 40:22, 40:23, 40:25, 41:3, 41:4, 45:18, 46:8, 48:2, 48:4, 48:7, 48:12, 48:14, 48:16, 48:23, 51:22, 52:5, 54:20, 58:2, 59:22, 60:21, 61:7, 62:13, 62:23, 62:25, 63:3, 63:6, 63:10, 63:20, 65:19, 65:20, 65:22, 69:3, 69:4, 69:5, 69:6, 69:8, 69:9, 71:19, 72:14, 72:19, 72:20, 75:6, 75:7, 88:22, 88:25, 90:6, 90:10, 90:17, 90:24, 91:12, 92:6, 92:8, 92:10, 94:20, 96:17, 96:18, 96:21, 96:22, 96:24, 97:1, 97:3, 97:5, 97:6, 97:7, 97:8, 98:16, 102:4, 102:7, 103:2, 103:14, 103:15, 103:16, 103:21, 103:23, 104:2, 104:8, 104:9, 105:5, 105:21, 106:4, 106:6, 106:25, 113:5, 113:7, 113:21, 114:2, 114:4, 114:23, 114:24, 115:4, 115:19, 116:19, 116:20, 117:9, 117:24, 117:25,

118:2, 118:4, 118:7, 118:12, 119:7, 120:4, 120:12, 120:20, 191:16, 204:10, 204:16, 205:13, 210:9, 210:10, 213:12, 213:13, 219:24, 221:8
**tested** [3] - 118:8, 169:6, 169:8
**testified** [10] - 15:7, 70:9, 70:14, 75:14, 79:13, 88:13, 90:12, 90:23, 91:4, 92:15
**testify** [3] - 74:22, 127:5, 229:22
**testifying** [3] - 79:12, 111:7, 192:6
**testimony** [12] - 5:15, 7:19, 69:15, 75:12, 75:21, 82:19, 89:3, 90:5, 162:2, 201:5, 223:9, 223:22
**testing** [107] - 4:6, 10:5, 10:6, 10:7, 10:22, 11:12, 13:16, 13:24, 13:25, 14:15, 15:4, 15:6, 15:8, 15:16, 15:17, 15:24, 15:25, 16:9, 16:10, 16:11, 16:23, 16:24, 17:4, 17:9, 18:16, 18:18, 20:23, 21:18, 21:20, 21:21, 22:13, 24:18, 25:2, 30:1, 30:14, 30:24, 35:9, 35:21, 38:14, 40:2, 40:18, 41:13, 42:5, 44:21, 45:6, 47:17, 54:24, 55:11, 55:22, 56:19, 58:7, 62:21, 66:9, 68:24, 70:3, 70:9, 70:10, 71:8, 71:10, 71:11, 72:1, 72:2, 83:14, 85:16, 85:17, 91:3, 91:7, 91:9, 94:25, 96:13, 101:20, 101:24, 102:1, 102:2, 102:3, 102:4, 102:16, 107:4, 112:19, 115:17, 115:20, 116:3, 116:10, 117:13, 118:3, 121:1, 121:2, 121:14, 143:7, 143:8, 168:19, 169:10, 193:4, 205:1, 213:8, 213:25
**tests** [99] - 10:8, 11:10, 11:11, 14:2, 14:4, 14:6, 14:10, 14:12, 14:17, 14:19, 14:25, 15:2, 15:3, 15:17, 15:18, 16:4, 16:5, 16:8, 19:14, 19:23, 20:1, 20:2, 20:5, 21:4, 32:5, 32:21, 32:25, 33:2, 33:5, 33:8, 33:10, 33:11, 34:11, 35:3, 36:10, 41:5, 44:9, 44:10, 44:22, 47:24, 51:9, 55:9, 60:13, 61:22, 63:19, 65:12, 65:15, 68:18, 71:17, 72:3, 76:4, 77:15, 77:20, 82:3,

82:24, 83:2, 83:4, 88:12, 88:14, 88:18, 95:14, 96:24, 101:11, 102:14, 103:6, 103:25, 104:1, 104:11, 104:12, 104:13, 108:24, 110:22, 113:2, 115:2, 116:6, 116:8, 144:25, 204:7, 204:17, 204:24, 204:25, 205:22, 208:14, 208:19, 210:13, 210:14, 213:1, 213:21, 219:22, 220:1, 222:22

**that'll** [3] - 104:23, 175:24, 233:5

**THE** [212] - 1:10, 1:13, 1:17, 2:2, 4:2, 4:10, 5:20, 6:2, 6:10, 6:13, 6:15, 6:17, 6:20, 6:21, 7:7, 7:10, 7:13, 7:15, 7:21, 7:25, 8:11, 15:20, 59:10, 60:4, 60:5, 60:8, 68:9, 68:11, 73:1, 73:10, 73:15, 73:18, 73:22, 73:24, 74:1, 74:7, 79:15, 79:17, 93:11, 94:4, 98:11, 98:12, 98:19, 98:20, 99:5, 99:12, 100:1, 100:3, 100:5, 100:6, 100:9, 100:11, 100:13, 100:15, 101:7, 101:9, 104:20, 104:23, 111:1, 111:10, 111:12, 111:15, 111:25, 112:3, 113:12, 113:16, 113:24, 116:13, 118:15, 118:17, 122:1, 122:5, 122:8, 123:11, 123:17, 123:22, 124:3, 124:5, 124:12, 124:13, 124:14, 124:15, 124:20, 124:21, 124:23, 124:24, 125:1, 125:2, 125:4, 125:5, 125:15, 125:16, 125:21, 125:22, 125:24, 126:23, 127:2, 127:10, 127:13, 128:15, 129:5, 129:17, 129:20, 130:5, 130:7, 130:20, 130:25, 131:9, 131:14, 131:16, 131:20, 132:1, 132:4, 132:15, 132:20, 133:4, 134:6, 134:8, 134:18, 134:22, 134:24, 135:1, 137:21, 137:23, 138:1, 142:14, 142:16, 143:15, 143:17, 143:20, 160:13, 160:16, 160:18, 166:1, 175:11, 175:17, 175:20, 175:24, 182:21, 182:23, 183:16, 183:19, 184:4, 184:6, 184:9, 192:7, 197:21, 200:1, 200:2, 200:5, 200:12, 200:14, 200:19, 201:2, 201:12, 201:16, 201:23, 202:7, 202:12, 202:16,

202:18, 203:1, 203:3, 203:5, 203:7, 207:23, 209:11, 215:2, 215:14, 215:17, 217:11, 217:14, 218:17, 218:19, 218:20, 218:21, 223:2, 223:6, 223:7, 226:14, 226:16, 227:22, 228:4, 228:10, 228:12, 228:17, 228:20, 229:2, 229:9, 229:13, 229:24, 230:3, 230:6, 230:12, 230:15, 230:21, 231:9, 231:17, 231:22, 231:24, 232:1, 232:3, 232:15, 232:25, 233:16, 233:18, 234:1, 234:14, 234:24, 237:8, 237:15, 237:25

**themselves** [3] - 25:4, 116:24, 207:8

**theoretical** [1] - 54:16

**theoretically** [1] - 234:16

**therapy** [3] - 18:23, 44:7, 44:22

**Therapy** [1] - 12:22

**therefore** [2] - 88:9, 112:22

**thesis** [3] - 13:6, 13:7

**they've** [12] - 22:21, 50:22, 60:16, 61:5, 61:6, 65:17, 68:2, 109:23, 198:21, 198:23, 221:4

**thinking** [4] - 109:16, 131:11, 225:21, 229:18

**third** [8] - 15:11, 21:12, 105:23, 128:23, 178:22, 180:13, 210:25, 216:9

**Thomas** [2] - 79:22, 80:10

**thousand** [1] - 210:8

**thread** [3] - 184:22, 188:9, 188:18

**three** [10] - 52:10, 129:2, 157:7, 184:19, 186:8, 186:21, 210:3, 216:8, 220:14, 236:20

**throat's** [1] - 218:16

**throughout** [2] - 167:20, 223:22

**Thursday** [2] - 233:11, 234:17

**tie** [1] - 197:15

**tighter** [1] - 236:1

**tightly** [1] - 106:24

**timely** [1] - 224:13

**tissue** [6] - 10:7, 11:16, 12:13, 16:23, 38:12, 71:9

**Tissue** [1] - 11:15

**tissues** [2] - 9:17, 12:2

**title** [3] - 27:14, 136:16, 142:10

**to-do** [1] - 233:21

**tobacco** [1] - 16:19

**Tobin** [9] - 185:1, 185:2, 185:7, 186:24, 188:15, 188:24, 189:15, 197:3, 197:5

**Toby** [2] - 185:7, 186:24

**today** [27] - 4:11, 4:23, 5:11, 58:13, 58:16, 69:15, 77:10, 82:19, 91:7, 94:10, 95:25, 118:23, 128:12, 167:9, 172:22, 179:18, 184:5, 186:4, 186:7, 186:19, 189:11, 190:10, 200:4, 207:15, 223:11, 223:18, 224:25

**together** [2] - 95:13, 173:16

**ton** [1] - 103:7

**tonight** [2] - 4:14, 124:13

**took** [10] - 109:18, 110:2, 119:6, 119:11, 136:11, 144:10, 157:8, 159:9, 202:11, 213:12

**tool** [1] - 194:4

**top** [17] - 25:10, 37:12, 39:15, 43:8, 46:1, 46:20, 46:25, 55:24, 80:23, 80:25, 89:15, 89:23, 90:22, 180:21, 187:14, 190:2, 216:1

**topic** [4] - 54:10, 69:13, 70:24, 71:1

**topics** [4] - 14:21, 14:24, 14:25, 15:16

**total** [4] - 70:6, 161:11, 169:1, 180:15

**totally** [1] - 115:1

**touch** [3] - 4:23, 123:24, 125:18

**toward** [1] - 156:6

**towards** [2] - 153:13, 176:11

**toxic** [4] - 19:2, 19:3, 19:11, 19:13

**track** [1] - 223:15

**tracks** [1] - 222:10

**tract** [1] - 108:10

**traded** [1] - 121:15

**traditional** [1] - 159:4

**traffic** [2] - 5:5, 151:7

**train** [2] - 13:10, 201:3

**trained** [3] - 9:16, 88:13, 164:21

**training** [26] - 9:10, 9:11, 11:2, 13:8, 13:17, 13:21, 53:18, 76:16, 77:11, 145:4, 146:8, 147:11, 152:6, 152:12, 152:17, 152:18, 153:1, 153:2, 159:11, 172:18, 194:15, 194:18, 194:24, 195:5, 195:21

**trainings** [1] - 13:15

**TRANSCRIPT** [1] - 1:9

**transcript** [2] - 59:8, 60:3

**transcription** [1] - 238:7

**transcripts** [1] - 73:20

**transfer** [1] - 133:11

**transferred** [4] - 21:8, 44:12, 67:19

**travel** [4] - 131:7, 226:12, 229:21, 230:21

**traveling** [1] - 196:12

**treat** [11] - 9:19, 18:14, 48:18, 48:24, 68:16, 72:17, 88:14, 88:19, 89:1, 97:4, 214:5

**treated** [7] - 22:21, 28:9, 43:17, 49:3, 50:8, 50:22, 104:15

**treating** [5] - 11:21, 11:25, 14:12, 16:5, 20:9

**treatment** [16] - 11:23, 12:5, 16:21, 18:18, 19:11, 19:3, 20:23, 25:1, 31:9, 48:16, 54:24, 55:22, 56:18, 65:22, 69:7

**treatments** [5] - 18:24, 28:12, 45:6, 102:19

**trial** [12] - 4:3, 6:22, 12:24, 15:24, 67:9, 224:4, 225:18, 226:9, 226:21, 227:16, 228:1, 236:20

**TRIAL** [1] - 1:9

**trials** [8] - 11:16, 12:17, 12:18, 12:19, 12:23, 15:8

**tricked** [2] - 61:12, 68:2

**tried** [6] - 110:19, 111:7, 113:22, 118:5, 125:17, 227:14

**trip** [1] - 227:17

**trips** [2] - 58:22, 59:3

**trisomy** [1] - 41:11

**trivial** [1] - 167:1

**trouble** [3] - 31:18, 178:13, 223:11

**truck** [3] - 156:21, 156:22

**true** [5] - 31:23, 86:9, 86:11, 86:12, 170:4

**trust** [4] - 31:4, 31:15, 31:20, 134:9

**truth** [1] - 32:2

**try** [14] - 4:21, 9:5, 52:9, 81:13, 112:3, 127:25, 129:21, 152:9, 226:20, 227:14, 228:25, 235:6, 235:12, 235:25

**trying** [13] - 5:9, 58:22, 61:7, 124:8, 128:21, 131:17, 151:20, 152:5, 153:8, 179:12, 179:15, 227:12, 234:21

**Tsai** [11] - 24:11, 30:18, 37:21, 42:2, 47:6, 47:21, 49:8, 51:20, 89:25, 90:10,

91:11
**Tsai's** [1] - 90:2
**tube** [1] - 38:6
**Tuesday** [11] - 230:2, 230:9, 231:1, 231:2, 231:7, 231:11, 231:15, 232:5, 232:10, 232:17, 233:5
**tumor** [5] - 16:11, 16:12, 16:23, 108:4, 108:9
**tumors** [10] - 107:16, 107:25, 108:12, 108:13, 108:15, 108:22, 109:15, 109:25, 110:3, 110:4
**turn** [7] - 7:1, 74:2, 134:13, 202:22, 218:23, 220:19, 220:23
**turnaround** [1] - 72:20
**turned** [1] - 156:15
**turning** [3] - 47:12, 138:9, 142:4
**TV** [3] - 192:2, 192:10, 220:13
**twice** [4] - 55:12, 81:10, 162:16, 162:17
**twins** [2] - 18:21, 18:22
**two** [32] - 15:11, 16:7, 23:20, 39:3, 52:11, 75:1, 85:19, 103:12, 109:20, 110:2, 110:3, 115:1, 116:6, 116:8, 117:11, 117:16, 117:17, 117:22, 126:21, 128:9, 133:7, 143:1, 146:9, 157:9, 160:3, 199:7, 207:6, 216:7, 229:21, 230:9, 236:14
**type** [26] - 12:6, 16:9, 16:22, 16:24, 18:18, 21:19, 24:8, 29:23, 30:23, 36:20, 36:23, 37:15, 40:21, 42:1, 44:5, 44:8, 64:3, 71:4, 103:2, 108:4, 108:11, 147:2, 147:6, 206:11, 220:7, 220:20
**types** [27] - 10:7, 12:8, 12:11, 13:17, 13:21, 14:25, 15:1, 15:3, 16:8, 16:20, 18:9, 23:4, 23:17, 26:6, 33:8, 41:10, 41:11, 56:13, 58:19, 64:13, 71:11, 75:1, 96:18, 102:20, 107:16, 135:12, 140:13
**typical** [4] - 59:2, 66:8, 150:15, 176:5
**typically** [19] - 17:12, 18:18, 24:21, 24:23, 42:20, 68:21, 69:2, 71:22, 85:19, 86:21, 107:9, 138:25, 139:13, 150:18, 150:21, 150:23, 158:19, 164:13, 219:2

## U

**U.K** [1] - 12:25
**U.S** [2] - 12:17, 13:21
**ultimately** [8] - 88:21, 109:3, 112:25, 114:2, 138:14, 138:18, 151:10, 192:14
**unable** [1] - 4:20
**unannounced** [2] - 86:6, 86:13
**unaware** [1] - 155:1
**UNC** [1] - 115:12
**unclear** [1] - 31:25
**uncles** [2] - 17:19, 109:25
**uncommon** [1] - 150:3
**unconscionable** [1] - 36:22
**uncover** [1] - 16:15
**under** [24] - 11:14, 14:6, 15:15, 25:1, 25:24, 26:2, 26:25, 27:3, 27:5, 27:14, 37:17, 45:18, 49:17, 49:21, 54:2, 70:10, 109:9, 110:13, 133:25, 137:11, 140:25, 154:1, 175:21, 201:3
**undergraduate** [4] - 11:18, 13:4, 100:24, 118:25
**underlying** [2] - 34:24, 40:15
**understood** [6] - 90:5, 99:5, 110:22, 143:18, 176:15, 209:11
**undertaken** [1] - 32:23, 34:1
**uneducated** [1] - 114:11
**unfamiliar** [1] - 105:6, 108:4, 114:10
**unfortunately** [1] - 133:2
**unhappy** [1] - 191:22, 191:24
**unique** [5] - 42:21, 42:22, 118:6, 205:20, 205:22
**unit** [1] - 171:20
**UNITED** [4] - 1:1, 1:3, 1:10, 1:15
**United** [10] - 1:23, 4:3, 7:5, 15:14, 69:17, 80:25, 100:8, 132:4, 202:24, 238:12
**universe** [2] - 54:18, 75:11
**University** [6] - 9:3, 76:9, 79:23, 80:11, 81:2, 101:3
**university** [6] - 79:25, 80:14, 80:18, 80:24, 80:25, 105:8
**unknown** [1] - 108:4
**unless** [3] - 45:7, 126:8, 214:3
**unlike** [1] - 208:16
**unlikely** [2] - 47:25, 219:9
**unlock** [1] - 150:8

**unpack** [2] - 189:3, 203:20
**unprepared** [1] - 114:11
**unravel** [1] - 166:9
**unrelated** [2] - 57:25, 65:4
**unreliable** [1] - 53:15
**unsure** [1] - 145:24
**untrustworthy** [1] - 116:9
**unusual** [8] - 17:24, 17:25, 29:23, 108:20, 115:1, 149:11, 149:12, 173:23
**unwind** [1] - 107:2
**up** [95] - 7:7, 7:8, 9:4, 20:23, 21:4, 25:10, 31:22, 36:6, 37:4, 39:1, 42:11, 52:8, 56:19, 59:19, 60:17, 63:18, 66:12, 66:13, 68:2, 73:22, 86:5, 86:15, 87:4, 88:3, 89:14, 95:19, 100:9, 101:6, 106:23, 107:22, 110:16, 111:18, 118:12, 122:15, 123:5, 123:15, 126:19, 126:20, 128:25, 129:2, 129:25, 130:15, 130:16, 133:6, 134:1, 134:4, 134:13, 134:18, 138:14, 143:21, 150:9, 167:14, 174:17, 176:3, 179:6, 180:3, 180:19, 181:6, 182:21, 183:23, 188:2, 190:9, 194:17, 196:18, 197:9, 197:11, 199:9, 200:25, 201:9, 203:1, 203:13, 210:15, 211:21, 211:25, 215:9, 219:25, 221:7, 222:14, 225:17, 229:4, 230:14, 235:3, 235:8, 236:7, 236:16, 236:25, 237:7, 237:13, 237:16, 237:17
**up-and-up** [1] - 180:19
**update** [1] - 123:18
**updated** [3] - 153:24, 154:1, 179:18
**updating** [1] - 147:14
**upper** [2] - 141:19, 169:1
**upper-level** [1] - 141:19
**ups** [1] - 105:4
**upset** [2] - 193:2
**upstairs** [2] - 150:23, 155:13
**urge** [1] - 225:16
**urgency** [2] - 222:20, 222:21
**urine** [1] - 169:8
**useful** [6] - 16:21, 18:13, 65:22, 65:23, 104:13
**uses** [3] - 13:13, 14:4, 15:18
**usual** [2] - 33:10, 155:13
**uterine** [1] - 50:2
**utilize** [2] - 33:25, 101:19

**utilized** [4] - 17:10, 41:14, 72:12, 96:5

## V

**V.H** [2] - 49:1, 49:5
**vaguely** [2] - 89:13, 171:21
**valuable** [2] - 20:1, 20:2
**value** [1] - 31:24
**variant** [2] - 106:8, 106:9
**variants** [1] - 17:25
**variation** [1] - 19:4
**variety** [3] - 10:6, 13:19, 38:22
**various** [7] - 13:11, 13:23, 15:2, 83:17, 89:7, 168:23, 211:24
**Vartanian** [7] - 229:23, 230:3, 230:7, 230:23, 231:18, 231:25, 233:7
**vast** [1] - 109:21
**vehicle** [3] - 156:17, 156:18, 156:20
**vendors** [1] - 159:13
**verbal** [1] - 39:18
**verbatim** [1] - 95:16
**verified** [1] - 219:6
**verify** [2] - 43:21, 204:22
**version** [1] - 132:12
**versus** [6] - 4:3, 33:4, 97:11, 132:4, 152:21, 214:15
**vested** [1] - 236:5
**vetting** [1] - 177:7
**VHL** [17] - 106:9, 106:14, 106:16, 107:7, 107:8, 107:12, 107:17, 107:19, 107:23, 108:5, 109:15, 109:23, 110:6, 114:6, 114:8, 114:24, 115:21
**via** [2] - 37:24, 53:20
**vice** [3] - 141:7, 145:21, 160:10
**victim** [1] - 68:2
**Video** [10] - 59:14, 59:15, 60:9, 60:10, 61:17, 61:18, 62:5, 62:6, 63:14, 63:15
**video** [3] - 4:7, 64:3, 64:11
**view** [3] - 132:21, 163:1, 233:23
**Virtual** [1] - 211:11
**virtual** [1] - 208:15
**virtually** [3] - 173:3, 212:6
**visible** [1] - 197:1
**vision** [1] - 108:14
**visit** [4] - 64:21, 67:2, 85:22
**visits** [1] - 86:13
**vitals** [2] - 43:5
**voice** [2] - 52:8, 57:21
**Volume** [1] - 1:6
**volume** [6] - 210:13,

213:17, 213:20, 214:9, 214:12, 235:16
**voluminous** [1] - 233:2
**vomiting** [1] - 25:8
**Von** [1] - 107:13
**VP** [1] - 141:21
**vs** [1] - 1:5
**vulnerable** [2] - 98:21

## W

**W-2** [1] - 177:15
**W.I** [3] - 231:11, 232:6, 233:7
**wait** [7] - 66:4, 150:11, 150:21, 151:3, 151:5, 195:10, 225:22
**waited** [1] - 156:13
**waiting** [3] - 133:14, 150:17, 150:24
**waived** [1] - 155:12
**waiving** [1] - 157:10
**walk** [8] - 149:7, 149:19, 150:15, 168:14, 168:15, 168:16, 197:11, 217:21
**walked** [1] - 170:11
**walking** [2] - 167:25, 168:4
**walkthroughs** [1] - 149:6
**wall** [5] - 168:11, 168:13, 169:4, 236:8, 236:17
**wants** [3] - 5:25, 193:22, 236:7
**Washington** [1] - 1:16
**waste** [5] - 36:13, 132:25, 133:14, 223:17, 224:7
**water** [1] - 218:17
**Watt** [9] - 183:14, 185:1, 185:7, 185:8, 186:24, 189:5, 197:3, 197:5
**Watt's** [1] - 188:15
**ways** [4] - 38:3, 38:9, 38:12, 83:1
**wearing** [1] - 207:18
**WebMD** [1] - 123:3
**website** [1] - 217:24
**Wednesday** [5] - 233:5, 233:6, 233:9, 234:17, 235:1
**week** [24] - 6:22, 35:7, 36:3, 66:6, 126:20, 128:22, 128:23, 129:9, 133:7, 136:24, 146:18, 158:9, 180:13, 223:9, 223:24, 224:1, 224:2, 226:7, 233:22, 234:3, 235:5, 235:7, 236:3
**week-by-week** [1] - 36:3
**weekend** [8] - 180:8, 201:5, 202:5, 202:21, 224:10, 225:5, 232:21, 237:21
**weekly** [1] - 213:1
**weeks** [9] - 129:2, 135:22,

146:9, 152:24, 153:18, 157:17, 157:20, 180:15, 236:14
**weigh** [1] - 34:3
**welcome** [6] - 73:15, 74:1, 74:7, 100:6, 125:22, 134:8
**well-being** [1] - 31:13
**well-deserved** [1] - 224:11
**well-regarded** [1] - 80:4
**Wendt** [1] - 57:6
**WEST** [1] - 1:2
**whatnot** [1] - 59:4
**whatsoever** [2] - 54:9, 225:11
**whereas** [3] - 19:1, 19:9, 209:25
**white** [1] - 15:5, 207:19
**whole** [7] - 44:14, 133:6, 133:13, 184:22, 193:11, 195:15, 218:8
**Wildemore** [15] - 79:8, 79:10, 80:7, 80:9, 81:13, 81:17, 82:14, 85:7, 86:17, 87:19, 88:8, 99:23, 99:24, 121:6
**Wildemore's** [1] - 87:7
**willingness** [1] - 227:14
**window** [1] - 85:22
**wires** [2] - 210:18, 210:21
**wishes** [2] - 45:9, 104:18
**WITNESS** [19] - 3:2, 7:15, 60:5, 60:8, 68:11, 79:17, 98:12, 98:20, 100:5, 100:15, 101:9, 135:1, 142:14, 143:20, 200:2, 203:7, 218:19, 218:21, 223:6
**witness** [43] - 5:16, 6:8, 6:24, 7:2, 7:4, 7:11, 39:20, 60:2, 69:15, 100:7, 100:12, 101:5, 115:6, 122:12, 122:18, 127:4, 127:23, 129:12, 129:14, 129:18, 130:13, 130:22, 131:2, 131:4, 131:15, 132:17, 134:14, 134:15, 134:23, 200:4, 201:14, 201:21, 202:19, 203:4, 207:21, 229:15, 229:17, 230:14, 230:20, 232:5, 233:2, 234:7, 235:13
**witnesses** [16] - 223:13, 223:23, 229:21, 231:10, 231:11, 231:19, 233:9, 234:10, 234:23, 235:3, 235:16, 235:18, 235:22, 235:24, 237:5
**woman** [3] - 41:6, 172:4, 193:2
**women** [1] - 40:14
**women's** [1] - 12:9

**won** [4] - 58:23, 60:16, 61:5, 61:6
**wonder** [1] - 225:21
**wondering** [1] - 45:22
**word** [8] - 30:10, 42:8, 46:18, 48:21, 51:4
**words** [7] - 69:20, 96:10, 96:17, 108:3, 179:22, 212:23, 220:13
**wordsmithing** [1] - 181:9
**workflow** [1] - 149:2
**works** [5] - 121:19, 129:20, 132:20, 202:4, 229:7
**workspace** [1] - 158:22
**workup** [2] - 109:1, 116:1
**workweek** [1] - 156:6
**World** [1] - 59:3
**world** [2] - 13:12, 221:16
**Worldwide** [1] - 211:10
**worried** [1] - 64:15
**worries** [1] - 101:9
**worry** [6] - 34:7, 56:10, 225:15, 227:8, 227:18, 236:16
**worrying** [1] - 227:12
**worse** [2] - 97:8, 97:9
**worth** [3] - 104:8, 169:10, 181:6
**worthwhile** [1] - 130:9
**wound** [1] - 106:23
**wrap** [5] - 134:1, 174:17, 236:25, 237:7, 237:13
**wrapping** [2] - 37:4, 235:8
**wrestling** [1] - 123:13
**write** [5] - 44:17, 160:4, 169:25, 176:5, 190:19
**writes** [1] - 208:18
**writing** [4] - 159:23, 165:2, 179:10, 190:9
**written** [9] - 39:10, 39:12, 39:14, 110:18, 115:16, 152:11, 174:19, 186:17, 189:21
**wrote** [6] - 110:11, 110:19, 178:7, 191:19, 193:3

## Y

**Yahoo** [1] - 218:3
**Yahoos** [1] - 221:16
**year** [4] - 85:16, 135:23, 148:16, 161:7
**years** [9] - 9:1, 10:18, 12:21, 85:19, 119:4, 119:18, 135:15, 135:17, 135:25, 136:3, 166:17, 181:19, 181:22, 186:8, 186:21
**yes-or-no** [1] - 99:7
**yesterday** [6] - 6:24, 104:19, 111:4, 111:19,

127:5, 187:24
**Yogel** [3] - 130:1, 229:17, 233:10
**York** [1] - 1:16
**young** [1] - 17:23
**younger** [2] - 18:8, 102:24
**Youngswick** [2] - 207:7, 216:15
**yourself** [4] - 75:6, 78:23, 81:8, 202:3

## Z

**ZipRecruiter** [1] - 136:21
**ziprecruiter.com** [1] - 136:20
**zoom** [5] - 23:25, 29:3, 38:16, 217:7, 219:13