```
 1                 UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
 2                  WEST PALM BEACH DIVISION
                   CASE NO. 19-CR-80181-RAR-1
 3
     UNITED STATES OF AMERICA,           Miami, Florida
 4
                                         December 5, 2022
 5          vs.
                                         9:25 a.m. - 4:43 p.m.
 6
     MINAL PATEL,                        Volume 6
 7
                 Defendant.              Pages 1 to 256
 8   _____

 9
                      TRANSCRIPT OF JURY TRIAL
10          BEFORE THE HONORABLE RODOLFO A. RUIZ, II
                   UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12

13   FOR THE GOVERNMENT:        JAMIE DE BOER
                                EMILY GURSKIS
14                              REGINALD CUYLER
                                KATHERINE ROOKARD
15                              UNITED STATES DEPARTMENT OF JUSTICE
                                CRIMINAL DIVISION, FRAUD SECTION
16                              1400 New York Avenue, 8th Floor
                                Washington, D.C. 20005
17
     FOR THE DEFENDANT:         STEVEN H. SADOW
18                              LAW OFFICE OF STEVEN H. SADOW, PC
                                260 Peachtree Street NW
19                              Suite 2052
                                Atlanta, Georgia 30303
20
     STENOGRAPHICALLY REPORTED BY:
21
                                ILONA LUPOWITZ, CRR, RPR, RMR
22                              Official Court Reporter to:
                                The Honorable Rodolfo A. Ruiz, II
23                              United States District Court
                                299 East Broward Boulevard
24                              Fort Lauderdale, Florida 3301
                                (954) 769-5568
25
```

```
 1   (Appearances continued)

 2
     FOR THE DEFENDANT:              DONALD F. SAMUEL
 3                                   GARLAND, SAMUEL & LOEB, PC
                                     3131 Maple Drive NE
 4                                   Atlanta Georgia 30305

 5                                   BRIAN T. RAFFERTY
                                     BAKER & HOSTETLER, LLP
 6                                   1170 Peactree Street, Suite
                                     2400
 7                                   Atlanta, Georgia 30309

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                            I N D E X

 2

 3   WITNESS
                                                      PAGE
 4

 5   CONTINUED DIRECT EXAMINATION BY MS. DE BOER         6
     CROSS-EXAMINATION BY MR. SADOW                    129
 6   REDIRECT EXAMINATION BY MS. DE BOER               204
     RECROSS-EXAMINATION BY MR. SADOW                  212
 7

 8                     GOVERNMENT'S EXHIBITS

 9

10
     Exhibit                                      Received
11
     1877 and 1878                                       7
12   1879, 1885, 1116,                                  19
     and 1884
13   1880                                               21
     1881, 1883, 1882,                                  23
14   1746, and 1746-A
     through C
15   1909 and 1910                                      36
     1909-A                                             38
16   1910-A                                             44
     1786 and 1786-A                                    46
17   422, 1808, and 1789                                56
     650, 650-A, 651,                                   64
18   654-A, and 652
     1912 and 442                                       80
19   1499, 1779, and                                    87
     1779-A
20   1911 and 1911-A                                    90
     1767, 1767-A through                              102
21   R, 1800, 1800-A,
     1786, 1786-A, 1802,
22   and 1802-A
     1778, 1778-A, 1792,                               105
23   1792-A and B, 1795,
     1795-A, 1806,
24   1806-A, 1817,
     1817-A, 1821, and
25   1821-A and B
     1225                                              107
```

```
 1   1783, 1783-A through                                112
     E, 1785, 1785-A,
 2   1908, 1908-A and B,
     and 1906
 3   1801, 1801-A, 1818,                                 117
     1818-A, 1813, and
 4   1813-A
     1223 and 1224                                       119
 5   1494                                                123
     1494-A                                              123
 6   155                                                 134
     1848 and 1848-A                                     196
 7   1908 and 1908-A                                     197
     135                                                 203
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    (Call to the Order of the Court.)

2            THE COURT:  Good morning, everyone.  Please be seated.

3     Okay.  We just got our last juror right now, so we have

4     everyone present and accounted for.

5            Let's go ahead and double-check and see if there's any

6     housekeeping concerns.  This is Case No. 19-80181, United

7     States of America versus Minal Patel.  We are now in our second

8     week of trial.

9            Turning to the government first, obviously we will be

10    recalling Mr. Sporn so the direct examination can continue.

11           But is there anything else that's on the radar,

12    government, before we resume?

13           MS. DE BOER:  No, Your Honor.  Thank you.

14           THE COURT:  Thank you.  Anything on the defense team,

15    guys, that we need to be aware of?

16           MR. SADOW:  No, Your Honor.

17           THE COURT:  Very good.  Okay.  So with that being said,

18    let's go round up our jurors.

19           THE COURT SECURITY OFFICER:  All rise.

20           (Jury enters at 9:27 a.m.)

21           THE COURT:  Please be seated, everyone.  Good morning,

22    ladies and gentlemen of the jury.  Good to see you all.  Hope

23    everyone had a very nice and restful weekend.  Welcome back.

24    Thank you all again for being here.

25           We're going to go ahead and resume where we left off.
```

1    As you find your last page in your notes, you may recall that

2    we had Mr. Sporn on the stand, and the government was

3    conducting their direct examination.  So we're going to turn it

4    back to Ms. de Boer to continue with that examination at this

5    time.

6            You all ready to go?  Yes?  Very good.  Thank you all.

7    All right.  If we could recall, please, Mr. Sporn.

8            MS. DE BOER:  United States calls Mr. Sporn.

9            THE COURT:  Come on up, sir.  You all remember that

10   Mr. Sporn continues to be under oath to tell the truth, so we

11   will not be reswearing him in.  He can just take the stand and

12   get started.

13           Good morning again, sir.  You may proceed whenever

14   you're ready.

15           MS. DE BOER:  Thank you, Your Honor.

16                   ^ * CONTINUED DIRECT EXAMINATION

17   BY MS. DE BOER:

18   Q.  Good morning, Mr. Sporn.

19   A.  Good morning.

20   Q.  If I can ask you to speak into the mic, speak up, keep your

21   voice up, if you can?

22   A.  Okay.

23   Q.  Thank you.

24           Do you recall on Friday, we had left off, we were talking

25   about the internet advertisements like this one:  Has the fear

1    of cancer struck you?

2    A.  Yes, ma'am.

3    Q.  And we were talking about the process of how a patient sort

4    of gets looped into the system, and I want to move into the

5    next step of the process.

6         MS. DE BOER:  So at this time, the government moves

7    into evidence Government Exhibit 1878 and 1877.

8         THE COURT:  And I don't believe we had any objection,

9    right?

10        MR. SADOW:  Correct, Your Honor.

11        THE COURT:  All right.  Very good.  Those will be

12   admitted at this time.

13        (Government Exhibits 1877 and 1878 were received in

14        evidence.)

15   BY MS. DE BOER:

16   Q.  All right.  Starting with Government Exhibit 1878,

17   Mr. Sporn, I'll zoom in on this so you can see it.

18        But do you recognize this?

19   A.  Yes.

20   Q.  Is that a copy of a call center script that your call

21   center would use?

22   A.  It's a copy -- yes, it's a copy of the script, but it's

23   objection and rebuttal script, not the actual sales script.

24   Q.  All right.  And starting at the first paragraph at the top

25   here:  Hi, this is So and So's name.  Is this name?  This is

1    your name, from company name.  How are you doing today?

2        And then do you see it says:  Lab Services specializes in

3    providing the at-home saliva test kits that are now covered by

4    your healthcare benefits?

5    A.  Yes, ma'am.

6    Q.  What was Lab Services?

7    A.  Lab Services was a marketing name that was used to solicit

8    individuals to induce them to take these genetic tests.

9    Q.  And the person who would be saying these words to a

10   patient, was this done over the phone, over video?  How was

11   this done?

12   A.  This was done over the phone.

13   Q.  Okay.  And the person that would be calling the patient and

14   saying -- going through this script with the patient, were they

15   medical professionals?

16   A.  No, they weren't.

17   Q.  What kind of background and training did they have?

18   A.  They didn't have any medical background.  They were just

19   regular salespeople.

20   Q.  Okay.  So when it states here that the at-home saliva test

21   kits are now covered by your healthcare benefits, were the

22   people that you hired to conduct these calls, were they

23   qualified to determine if a patient was, in fact, eligible for

24   one of these tests?

25   A.  No, they were just reading off of a script.

1   Q.   Okay.  What was the purpose of telling patients that these

2   benefits -- that these tests were covered by their healthcare

3   plan?

4   A.   The purpose was that obviously if somebody had to pay for a

5   test, they would not be inclined to go along with the call and

6   continue and take the test.

7   Q.   Okay.  And then, if we keep going -- I'll just zoom in a

8   touch more here.  If we keep going down this script, the next

9   section here in bold says:  I want to check to make sure that

10  you haven't already done an in-home saliva test paid for by

11  your insurance company.

12       Do you see that?

13  A.   Yes.

14  Q.   What was the purpose of asking if they had already done

15  one?

16  A.   Because if they already did one, it would be a waste of

17  time and money, and Medicare would not reimburse the lab for

18  it.

19  Q.   Okay.  And if Medicare did not reimburse the lab for it,

20  would you stand to make money off of that test?

21  A.   Of course not.

22  Q.   All right.  And we're going to keep plowing through this

23  here.

24       So down here, in this paragraph, it says:  Since you

25  haven't completed the test, we can go ahead and mail you your

1   test kit.  The best part of this is that the tests are fully

2   covered by your healthcare plan, so there are no out-of-pocket

3   costs to you.

4        Why is that being repeated to the patient here?

5   A.   To reiterate that they're not going to have to pay for the

6   test, so they would go ahead and take the test.

7   Q.   Okay.  And then this longer paragraph here, I'm going to

8   read the paragraph, and then you tell me if I've read it

9   correctly, okay, Mr. Sporn?  And I have a few questions for

10  you.

11  A.   Sure.

12  Q.   It says that:  The tests are for the risk of hereditary

13  family cancer.  Diseases such as cancer are known to be passed

14  along by our genes.  This test can give you early detection, as

15  well as insight for you and your whole family.  In addition,

16  each year, over two million adverse drug reactions will happen,

17  and these adverse reactions can lead to hospitalizations or

18  even death.  Medications respond uniquely to each individual,

19  and the test is recommended for Medicare patients who take

20  multiple medications.

21       I'm going to stop there.  Did I read that correctly?

22  A.   Yes, you did.

23  Q.   All right.  What was the purpose of talking about, let's

24  take the cancer genetic test to start with, what was the

25  purpose of talking about insight for you and your whole family?

1  A.  Well, it's -- it was sold as a preventative test, and

2  essentially for you and your whole family, meaning, that if you

3  take this test, you could tell your loved ones that you took

4  the test and instill the fear of God, so to speak, into

5  somebody.  But that's really the combination.

6      So meaning, it's also drilling -- when you get into the

7  questions of the script, it's drilling down to see if somebody

8  had a history of family cancer such as a relative, a distant

9  relative, any loved one.  So that could be added to the test,

10 the family cancer.

11 Q.  Okay.  And then the second part of this talked about

12 adverse drug reactions that can lead to kind of horrific

13 consequences as detailed in this; is that right?

14 A.  That's correct.

15 Q.  What was the purpose of talking about consequences like

16 hospitalization or death when talking about adverse drug

17 reactions?

18 A.  Well, essentially, to instill some sort of sense of fear so

19 the individual would continue and take the test.

20 Q.  Okay.  And it also says that the test is recommended for

21 Medicare patients.

22     Why did you say that to these patients?

23 A.  It was part of the script to, again, to induce them to take

24 the test -- a test.

25 Q.  Okay.  And then down here, at this last question on this

1    first page of the script:   Just to confirm, do you have

2    Medicaid/Tricare or government insurance?

3         And then the only options are no, or Medicaid Tricare

4    government insurance.

5         What was the purpose of differentiating between a

6    government-sponsored insurance plan and a private insurance

7    plan?

8    A.   Because we weren't soliciting to Medicaid Tricare, which is

9    a government insurance plan.   We were targeting Medicare.

10   Q.   We're going to go to the second page of Government 1878.

11   All right.

12        So the script goes on, Mr. Sporn, to indicate that the

13   caller is going to ask the patient some simple and noninvasive

14   questions of their medical history.

15        Do you see that?

16   A.   Yeah.   Let me just -- could I read it a second?

17   Q.   Yes, please, please.   Take your time.

18   A.   Correct.

19   Q.   Okay.   And then it says that the information that is being

20   collected will be reviewed by a physician to determine medical

21   necessity.

22        Do you see that, what I've highlighted?

23   A.   Yes.

24   Q.   So what understanding did you have when you were soliciting

25   these patients as to whether the tests had to be medically

1   necessary in order to be billed to Medicare?

2   A.   So after the person went through and answered the

3   questions, it had to be signed off by a medical provider that

4   was Medicare certified.

5   Q.   Okay.  And I guess what I'm asking -- and we'll get to the

6   doctor signature piece of this shortly.  But I guess what I'm

7   asking is, were you under the impression that just anybody

8   could get one of these tests paid for by Medicare, or did they

9   have to meet certain qualifications?

10  A.   They had to meet certain qualifications.

11  Q.   Okay.  Now, if we continue -- we're not going to go through

12  every page of this script, but if we were to continue, we see

13  all these questions, for example:  How often have you had dry

14  or itchy skin?  Do you see that?

15  A.   Correct.

16  Q.   And then:  Have you ever had polyps or an irregular finding

17  in a colonoscopy?  Do you see that?

18  A.   Correct.

19  Q.   And just to be clear, polyps, that's not necessarily

20  cancer; is that true?

21  A.   That is true.

22       MR. SADOW:  Your Honor, I'm going to object unless this

23  gentleman has a qualified medical background.

24       THE COURT:  Overruled.  He has some experience enough.

25  This is sufficiently close to lay witness testimony.  Given his

1    background, I'll allow it.  Go ahead.

2    BY MS. DE BOER:

3    Q.  All right.  We're not going to go through every single

4    question here, but if we were to keep going, we see questions

5    about whether or not the patient has ever experienced cancer?

6    A.  Correct.

7    Q.  Whether the cancer is active and what cancers are currently

8    active?

9    A.  Yes, ma'am.

10   Q.  And when you're asking the patient whether the cancer is

11   currently active, what are you asking?

12   A.  We're trying to drill down on the specific cancer if, in

13   fact, it was active.  So on the sheet, you obviously have a

14   series of intestine, colon, pancreas, liver, kidney, et cetera.

15   Q.  Okay.  And if we go to page 3 of Government Exhibit 1878,

16   we see more similar questions.

17        Any additional history of cancer that's not currently

18   active, right?

19   A.  Correct.

20   Q.  Okay.  And then, as we keep going, there are questions

21   regarding the patient's family history of cancer, correct?

22   A.  Correct.

23   Q.  There's actually several pages of questions, and we're not

24   going to go through every page of this.  But if we were to keep

25   flipping through this script, we'd see several pages of similar

1    types of questions.

2    A.   That's correct.

3    Q.   Okay.   The questions about personal and family history of

4    cancer, how did you come up with these questions?

5    A.   Well, originally, when I started this call center, part of

6    it was given to us by another gentleman by the name of Will

7    Slagle from Our Family Genes, and he had this script already

8    working with two other marketing firms that were working with

9    LabSolutions, so we followed along with what was presented to

10   us.

11   Q.   Okay.   And I'm going to fast-forward through some of these

12   additional questions about the patient's personal and family

13   history of cancer, and I'm going to turn to the page that's

14   Bates stamped ending in 74 of Government Exhibit 1878, and I'm

15   going to ask you about this paragraph here, Mr. Sporn.

16        If the patient states no -- well, and if we start further

17   up here, the question is:   May I mail you an in-home saliva

18   test to your home?

19        Do you see that?

20   A.   Correct.

21   Q.   And there's an instruction here that:   If the patient

22   states no, work to uncover and overcome objections.

23        Do you see that?

24   A.   Yes.

25   Q.   And it recommends that the caller tell the patient:

1    Mr. and Mrs. So and So, the test is a fully covered Medicare

2    service, and it's for the benefit of you and your family.

3    Would you mind sharing with me what concerns or reservations

4    you have about receiving the kit?

5        Do you see that?

6    A.   Yes.

7    Q.   What type of objections were common -- the patient said no,

8    what type of objections were they typically raising that needed

9    to be overcome?

10   A.   One of the objections is, well, you have sons and daughter,

11   Mr. and Mrs. Jones.  Even if you don't want to take the test,

12   don't you -- wouldn't you want to let your kids or your family

13   ones -- family members or loved ones know that you have cancer

14   or your genes may have cancer?

15       So the objections were basically instilling a type of fear

16   into the individual at the other end of the phone.

17   Q.   And what was the purpose of instilling this fear into

18   patients?

19   A.   To get them to take the test.

20   Q.   All right.  And if we kept going, we'd see -- in this

21   script, we'd see more questions about confirming, you know,

22   contact information and where do we mail the test and that sort

23   of information; is that fair?

24   A.   That's fair.

25   Q.   Okay.  Now, as we've gone through this script, we've seen

1    references to both the cancer genetic test and also to the test

2    that deals with adverse reactions to medication; is that right?

3    A.   That's correct.

4    Q.   And can you remind the jury, what is that test called?

5    A.   It's a PGx.  That's a pharma genetics [sic] test.  It tests

6    for medications.  So most seniors, as we know, they take some

7    sort of medications.  I guess I'm a senior now because I'm 60.

8    I take blood pressure and cholesterol pills.  So certain pills

9    interact with each other, and you know, when I started

10   cholesterol pills I used to get bad leg cramps, as an example.

11   So some of them, you know, the interactions, some of them could

12   be harmful to your health, actually.

13   Q.   So, Mr. Sporn, how often were these two tests -- well, let

14   me ask you first:  Were they ever -- did patients ever receive

15   both?

16   A.   Yes, they did.

17   Q.   What was the purpose of trying to get patients to say yes

18   to both of those tests?

19   A.   Because if they took two tests, obviously you would get

20   paid on a cancer test and a pharma genetic test.

21   Q.   And how often, in your experience, were the tests bundled

22   in that way?

23   A.   At least 70 percent of the time.

24   Q.   All right.  And I'm going to go to the last page of

25   Government Exhibit 1878, which is Bates stamp ending in 81.

1    All right.

2         Do you see at the top here it's titled Double for Spouse?

3    A.   Yes.

4    Q.   And then it says:  If the patient stated yes to being

5    married or has a significant other:  You stated that you are

6    married or you have a significant other, correct?

7         Do you see that?

8    A.   Yes, ma'am.

9    Q.   We can go ahead and ship two kits for the both of you.  We

10   will need to ask the same questions to them in order to ship

11   the second set.  Are they available to speak now, or can you

12   speak on their behalf?

13        Did I read that correctly?

14   A.   Yes, ma'am.

15   Q.   What was the purpose of, at the end of this long script,

16   saying, Okay, by the way, are you married, and can we give them

17   a kit?

18   A.   To obviously get another series of tests, so on the same

19   phone call you're getting -- instead of having one individual

20   taking potentially a cancer and a pharma genetic test, now

21   you're getting the possibility of having up to four tests.

22        MS. DE BOER:  At this time, Your Honor, the government

23   moves admission of Government Exhibit 1879, 1885, 1116, and

24   1884.

25        THE COURT:  Any objection?

```
 1              MR. SADOW:  No objection.

 2              THE COURT:  All right.  We'll move those in at this

 3    time.

 4          (Government Exhibits 1879, 1885, 1116, and 1884 were

 5          received in evidence.)

 6              MS. DE BOER:  All right.  I'm now publishing Government

 7    Exhibit 1116.

 8    BY MS. DE BOER:

 9    Q.   Mr. Sporn, do you recognize this?

10    A.   Yes.

11    Q.   What is this?

12    A.   That's a swab where the individual -- it was a swab that

13    the individuals were sent, so they would swab themselves and

14    put it back in an envelope.  Obviously, when it came back, we

15    would send it off to the lab.

16    Q.   Okay.  So sticking with, you know, we're tracking the

17    process here.  So we've gone through the internet ads, we've

18    gone through the telemarketing script.  So let's assume patient

19    says at the end of that script, yes, send me the test.

20          What's the next step at a high level?

21    A.   So to go through -- going through the process flow, if I

22    may use that -- is that okay?

23    Q.   All I'm asking is, patient says yes.  Then what?

24    A.   The kit is shipped.

25    Q.   And what's part of the kit?
```

1   A.   The specimen, a signature card that the patient has to

2   sign, authorizing them to -- to allow us to digitally impose

3   their signature on a requisition.  Also, instructions on how to

4   use the swab.

5   Q.   Okay.  So --

6   A.   And also a return envelope that they can put the specimen

7   back in and send it back to us.

8   Q.   Okay.  So at the time when the patient is mailed the kit,

9   has anything already gone to a doctor?

10   A.   No.

11   Q.   Why not?

12   A.   Because it would be cost prohibitive.

13   Q.   What do you mean?  Explain that to the jury.

14   A.   So if -- if a hundred -- if a hundred individuals went to

15   the doctor first, it would be very expensive because the

16   doctors were paid to sign these orders, and we may or may not

17   get back the actual specimen kit.

18        So essentially, if we sent out a hundred kits, we would

19   hope to get back approximately 60 to 65 percent of them.  But

20   if we had 100 percent signed and only got back 60, 65 percent,

21   the numbers would be -- mathematically, it wouldn't work.

22   Q.   And, Mr. Sporn, I just want to clarify because you're

23   saying if we sent out the kits and didn't get them back.  Sent

24   them to who?

25   A.   The individuals that we solicited.

1    Q.   The patients?

2    A.   Yes, that agreed to take the test.

3    Q.   Okay.  So not all patients would send back the kit.

4    A.   That's correct.

5    Q.   Okay.

6         MS. DE BOER:  At this time, Your Honor, the government

7    moves admission of Government Exhibit 1880.

8         THE COURT:  Any objection?

9         MR. SADOW:  No objection.

10        THE COURT:  That'll be admitted.

11        (Government Exhibit 1880 was received in evidence.)

12   BY MS. DE BOER:

13   Q.   So, Mr. Sporn, you had -- I'm going to show you Government

14   Exhibit 1880.  And you had mentioned a patient signature card?

15   A.   Yes.

16   Q.   Is that what this is?

17   A.   That is.

18   Q.   All right.  We're going to zoom in quite a bit here, and

19   we'll just have to read this slowly together.

20        So just to clarify, at the time the patient receives this

21   card, has there been any interaction with a doctor?

22   A.   No.

23   Q.   All right.  So this says -- and I'll zoom in a little more

24   in the hopes that folks can see it, but I know this is going to

25   be tough so I'll read it slowly.

1        I, the patient, having the test performed, acknowledge that

2   I have been offered the opportunity to discuss with a

3   healthcare provider the benefits, risks, and limitations of the

4   test to be performed.  I have discussed with the healthcare

5   provider ordering this test the reliability of positive or

6   negative test results and a level of certainty that a positive

7   test result for a given disease or condition serves as a

8   predictor of that disease or condition.  I have been informed

9   about the availability of genetic counseling.  I've read the

10  informed consent.

11       I'm sorry I had to move that back and forth, but did I read

12  that correctly?

13  A.   You did.  I'm a little dizzy but that's okay.

14  Q.   All right.  So, Mr. Sporn, if a patient had not had the

15  opportunity to talk to a doctor before being sent this test,

16  what was the purpose of having them sign this card?

17  A.   The point of having them sign this card is that if their

18  signature was not -- did not end up on the requisition along

19  with the provider, then the requisition and the specimen would

20  not be able to be sent to the lab, and the lab would not get

21  reimbursed, and we would not get paid.

22  Q.   Okay.  And just zooming back out here -- I mean, I had to

23  zoom in quite a bit to even read that, correct?

24  A.   Correct.

25  Q.   So how fine of print would you call this?

1    A.   It's -- unless you had very strong -- very good eyes or

2    powerful reading glasses like I have, it's -- it would be very

3    hard to read it.

4    Q.   Okay.

5         MS. DE BOER:   At this time, Your Honor, the government

6    moves admission of Government's Exhibits 1881, 1883, 1882, and

7    1746 and 1746-A through C.

8              THE COURT:   Any objection?

9              MR. SADOW:   No objection.

10             THE COURT:   Thank you.   Those will be admitted.

11        (Government Exhibits 1881, 1883, 1882, 1746, and 1746-A

12          through C were received in evidence.)

13   BY MS. DE BOER:

14   Q.   Okay.  And so, Mr. Sporn, I want to keep going through our

15   process here.  So let's say we have a patient -- one of the

16   65 percent, as you approximated, who sends the kit back.  All

17   right?  They swabbed.  They've sent the kit back.  They've

18   signed that card.

19        What is the next step in the process?

20   A.   So the next step in the process is that the order is

21   received and the -- it's pushed over to the doctor's portal.

22   It's called a real-time physicians' doctor portal, along

23   with -- if they had family history, with the family history

24   chart, and also letter of medical necessity and some what they

25   call SOAP notes, like, the intake notes of a doctor to review.

1  Q.  So a bunch of information is pushed over into a portal of

2  some sort for doctors.

3  A.  Correct.

4  Q.  All right.  Who generates the information that is then made

5  available to the doctors?

6  A.  It's all generated off of the scripts that were read

7  before.  So it's all -- as I said before, logic-based script.

8  So that's what gets pushed over with the ICD codes on the

9  script based on the questions and answers.

10 Q.  Okay.  So just explain to the jury, mechanically, who is

11 filling out this information and what all are they filling out

12 before it gets to the doctor?

13 A.  A telemarketing agent is reading through a script and

14 checking off the appropriate responses.  And once that is done,

15 the kit is shipped, and when the kit comes back in and is

16 marked received, all that information is transposed and pushed

17 over to the doctor's portal.

18 Q.  Okay.  So I'm going to show you what has been admitted as

19 Government Exhibit 1746, Mr. Sporn.

20     Do you see that this is an email at the top of the chain?

21 It's from MS@Medtechww.com.

22 A.  Yes.

23 Q.  Who's that?

24 A.  That's myself.

25 Q.  Okay.  So we're going to start down here with the first

1    email on the chain.

2         And do you see W. Slagle at Our Family Genes sends you an

3    email?

4    A.   Yes.

5    Q.   And it's dated February 1, 2018?

6    A.   Correct.

7    Q.   Okay.  And the subject line of this email is, Mark, for you

8    to review/approve and send to Alex if this makes sense,

9    correct?

10   A.   Correct.

11   Q.   So what is Will Slagle asking you to do?

12   A.   He's asking -- asking us to make changes to the algorithms

13   and some of the logic-based questions because there's

14   additional ICD-10 codes that need to be problegated (phonetic)

15   into the system?

16   Q.   And the requisitions themselves, the actual doctors'

17   orders, how did those get populated into the portal?

18   A.   Can you repeat that?  I'm sorry.

19   Q.   Sure.  Let me back up.  You worked with multiple labs,

20   correct?

21   A.   Correct.

22   Q.   Was each lab's requisition form the same, or did they have

23   their own preferences?

24   A.   Every lab had their own requisition.

25   Q.   Okay.  So we'll take LabSolutions.  You get a requisition

1   form from LabSolutions.

2       How do you translate this form into something that's then

3   in the portal that can be signed off on by a doctor?

4   A.   So it had to be reformatted for our portal and the

5   physician portal, because the requisite paper req,

6   traditionally, and I think as I stated on Friday, it had to be

7   formatted electronically so everything would fit into our

8   system.

9   Q.   Okay.  And let me ask you, when Will Slagle is referencing

10  in the headline of this email, the subject line of this email,

11  send this to Alex, who's Alex?

12  A.   Alex is a programmer who worked for me.

13  Q.   And is Alex someone involved in, as you put it, translating

14  the physical requisition forms into something on the portal?

15  A.   Correct.  So what would happen, just to interject, it would

16  have to go to -- we have a graphic artist who would have to

17  format it under certain parameters for the portal, and then it

18  would be pushed to Alex once it was approved by the lab.

19  Q.   Okay.  So we're going to go through this email.  And

20  Mr. Slagle titles this email:  Hi, Alex.

21      So why is he saying:  Hi, Alex?

22  A.   Because he wants to know that -- he wants to let Alex know

23  it's coming from him and to get him to do the work.  I mean, I

24  was always sent the emails because -- just protocol, because

25  Alex wasn't Mr. Slagle's employee; he was my employee.

1   Q.   Okay.  And on that note, Alex is not on the chain yet.

2   It's you and Mr. Slagle.

3   A.   Correct.

4   Q.   And the subject line of this email is marked for you to

5   review, approve, and send to Alex, if this makes sense.

6   A.   Correct.

7   Q.   And then Mr. Slagle's email starts:  Hi, Alex.

8   A.   Correct.

9   Q.   So what is he sending to you?

10  A.   He's sending requisitions that needed to be formatted.

11  Q.   Okay.  And so he says:  Attached are two different CGx

12  requisitions.  The only difference is the checkbox that orders

13  the specific test.  The lab has asked that -- and then we'll

14  take these in turn -- when the PDF February 2018 states to

15  order the personal test, then click the box for predict

16  personal breast ovarian cancer only.  When the PDF February

17  2018 states order the hereditary test, then click the box for

18  predict hereditary cancer risk assessment.

19       Do you see that?

20  A.   Correct.

21  Q.   So now we're going to go to Government Exhibit 1746-A,

22  which is one of the attachments.

23       What are we looking at here, Mr. Sporn?

24  A.   A reformatted requisition for our system with LabSolutions

25  with a -- I can't see it.  For one of the tests to be

1    pre-checked, which has all the markers for a specific test, the

2    breast ovarian cancer only.

3    Q.   Okay.  So this is the personal breast ovarian cancer test

4    that we read in the email.

5    A.   Correct.

6    Q.   And then now going to 1746-B, what are we looking at in

7    1746-B?

8    A.   You're looking at the predict hereditary cancer risk

9    assessment test.

10   Q.   Okay.  Why is it checked off if this is a blank

11   requisition?

12   A.   Because depending on the questions and the answers that an

13   individual would give, it would be checked off, one or the

14   other.

15   Q.   Okay.  And when -- I guess what I'm asking is, patient is

16   called -- patient is, by the telemarketer, and asked all of

17   those questions.  And eventually, this information is sent over

18   to the telemedicine side of the house.

19        What, if anything, is already filled out on the requisition

20   form that is sent to the doctor?

21   A.   All the information, the means of collection and which

22   specific test is delineated.  In this case, it would be either

23   the hereditary cancer risk assessment or the personal breast

24   ovarian.  Those were the options.

25   Q.   And so just zooming in on the test options down here, would

1   a test be checked off before the requisition was sent to the

2   doctor?

3   A.   Yes.

4   Q.   By whom?

5   A.   By us, through the system.

6   Q.   Okay.

7   A.   Before it ever got to the doctor, it was already --

8   everything was populated.

9   Q.   And what about these diagnoses codes, what information

10  would be included there?

11  A.   All the ICD codes were prepopulated.

12  Q.   All right.  And was this -- these boxes, were they checked

13  off and these diagnoses codes, were they checked off,

14  initially, by medical professionals?

15  A.   No, it was all based off the logic-based script.  Based on

16  the questions and the answers, it would problegate (phonetic)

17  an ICD-10 code or codes.

18  Q.   Now, I'm going to show you what has been admitted as

19  Government Exhibit 1746-C.  So cancer billing ICD-10 codes.

20       Do you see that at the top?

21  A.   Correct.

22  Q.   And I just highlighted a couple of examples here.  We'll

23  zoom in.

24       So the top, it says, personal history.  And then it says

25  Z85.3 breast, order the personal test.

1      Do you see that?

2   A.   I do.

3   Q.   So what is the instruction that you're being given through

4   Mr. Slagle?

5   A.   If it's breast, only check the personal test.  And that the

6   ICD is Z85.3.  Now, there may have been additional ICD-10 codes

7   problegated on the order based on the Q and A of the client.

8   Q.   Sure.  And there's lots of ICD-10 codes listed on this

9   sheet, right?

10   A.   Correct.

11   Q.   And if we go to Z85.40.  So you see that?

12   A.   Yes.

13   Q.   Female genital organ, order the hereditary test.  Do you

14   see that?

15   A.   I do.

16   Q.   So what instruction are you receiving from Mr. Slagle in

17   that example?

18   A.   Select the other test.

19   Q.   Okay.

20   A.   The hereditary.

21   Q.   And like you said, a patient, after speaking with one of

22   these telemarketers, they could have answered yes to all kinds

23   of questions about personal and family history, right?

24   A.   Correct.

25   Q.   And accordingly, there's all kinds of ICD-10 codes on this

1   chart, right?

2   A.   Yes, there's numerous ICD-10 codes.

3   Q.   And next to each ICD-10 code, what else is there?

4   A.   Instructions on what test to order.

5   Q.   Okay.  So I want to talk a little bit more about the

6   telemedicine side of this process for a second.  Okay?

7   A.   Okay.

8   Q.   So patient sends back the kit.  Their information is pushed

9   to the telemedicine side of the house.  Assume that for a

10  second.

11       What if any other information is the telemedicine company

12  or the telemedicine doctor specifically gathering about this

13  patient, other than the information populated by the

14  telemarketer?

15  A.   Nothing.  Everything is transposed for the provider.  The

16  requisition, as I stated before, the letter of medical

17  necessity, if they answer and completed the family history

18  questionnaire part, that was in there too, as well as just some

19  general SOAP notes or chart notes.

20  Q.   Okay.  And so, for example, did you contact the patient's

21  treating physician, for example, their primary care doctor, or

22  if they have cancer, their oncologist, to gather more

23  information about this patient?

24  A.   No.

25  Q.   Did you order results of any recent tests that the patient

1  had?  For example, maybe they had a colonoscopy last week.  Did

2  you order that test result?

3  A.   No.

4  Q.   Did you gather any other documentation from the patient's

5  existing medical record?

6  A.   No.

7  Q.   Why is it that you were willing to rely on what

8  telemarketers typed into a computer when you sent this off to

9  the telemedicine side of the house?

10  A.   Well, we were relying on the information that the

11  individual at the other end of the phone, based on the script,

12  provided to us.

13  Q.   All right.  How expensive would it have been for you to

14  gather this other information that I'm talking about, like

15  prior test results, or to talk to the oncologist or the primary

16  care provider for these patients?

17  A.   I don't know the exact cost, but it would have been cost

18  prohibitive.

19  Q.   What do you mean, cost prohibitive?

20  A.   Well, you know, you're paying a telemarketer a flat wage

21  of -- let's call it 800 to $1,000 a week, whereas, if you had a

22  doctor doing all this, it could run potentially into the

23  thousands of dollars per test.

24  Q.   Okay.  Now, the patient is now in the hands of the teledoc.

25  Assume that for a second.  Continuing with our discussion of

1    the process.  Explain to the jury how the telemedicine consults

2    worked.

3    A.   So depending on what state, there was a provider -- or

4    providers in each state -- a series of orders for the day were

5    put into a doctor's portal.  So Dr. Smith may have received 50

6    orders.  I'm just using a number now.  And Dr. Jones may have

7    received 80 orders.  And they were sent an email and a text and

8    a call to let them know that they had orders sitting in their

9    portal, please sign them, review them, and get them back to us

10   as soon as possible.

11   Q.   Okay.  And did you ever come to learn whether or not the

12   doctors were, in fact, speaking to the patients?

13   A.   They were not speaking to the patients.

14        MR. SADOW:  I'm going to object and ask for a time --

15   come to learn at what time period, Your Honor?

16        THE COURT:  Okay.  If you could clarify, please.

17   That's overruled.  Go ahead.

18        MS. DE BOER:  Yes.

19   BY MS. DE BOER:

20   Q.   Mr. Sporn, over time, did you learn any facts -- and please

21   specify how and when you learned them -- that led you to

22   believe that the doctors were not, in fact, contacting the

23   patients?

24   A.   So it would be physically impossible if --

25        MR. SADOW:  I'm going to object.  It's the time aspect

1    of it that was asked for.

2        THE COURT:  I'm going to let him qualify it.

3    Overruled.  Go ahead, Mr. Sporn.  You may explain.

4        THE WITNESS:  So Dr. Smith, as an example, had 50

5    orders, 80 orders.  Those orders would come back within a 10-,

6    15-minute period.  Sometimes they would come back at 1:00,

7    2:00 o'clock in the morning.  It would be physically impossible

8    for Dr. Smith to speak to 15, 20 --

9        MR. SADOW:  Your Honor, I'm going to -- respectfully, I

10   object.  I know he's explaining, but the question that was

11   asked --

12       THE COURT:  I heard the question.  It's overruled.  Sit

13   down.

14       Go ahead and finish, and then you can explain when you

15   became aware of it.  Okay?  Go ahead.

16       THE WITNESS:  So it would be physically impossible for

17   Dr. Smith to have spoken to 20, 30, 40, 50 patients, at 1:00,

18   2:00 o'clock in the morning, and have them all come back and

19   sitting in the portal, ready to be printed and sent back to the

20   lab.

21       As a matter of fact, after we learned this, we did an

22   audit on the time frame, an internal audit, because everything

23   in the portal is time stamped, IP stamped, and date stamped.

24   So every interaction that any provider ever made in the portal,

25   there's an interaction and a time that coordinates.  Most of

1   the orders that came back were done in one minute or under.

2   BY MS. DE BOER:

3   Q.   And, Mr. Sporn, let me ask you.   To Mr. Sadow's point, you

4   couldn't have learned this on Day 1 of doing this, right?

5   A.   No.

6   Q.   So explain to the jury, approximately when -- I'm not

7   asking you for a specific date.   But approximately how far into

8   doing this -- and let me just ask you the question differently.

9        Did you learn this while you were sending orders to

10  LabSolutions?

11  A.   At some point, yes.

12  Q.   Okay.   And what did you do when you learned this

13  information?

14  A.   We started making changes to the system.   One of the

15  things -- we sent out emails to the providers.   But as soon as

16  the doctors signed in:   Dear Provider:   Please make sure you

17  contact your patient or have some sort of means of

18  communication with your patient.

19       So that was one of the things that we did inside the

20  portal.

21  Q.   Okay.   So you're adding a note:   Dear Provider:   Please

22  contact the patient.

23       What, if anything, actually changed?

24  A.   After more audits, nothing.

25  Q.   All right.

1          THE COURT:  May I just qualify?  You said at some

2     point?  Do you have any sense of when that was?

3          THE WITNESS:  It was probably -- so -- we started with

4     Mr. Slagle's, as I mentioned, sometime the end of October,

5     beginning of November.

6          THE COURT:  Speak into the microphone.

7          THE WITNESS:  And I would say sometime -- the first

8     part of 2018, somewhere around February, March, in that range.

9     BY MS. DE BOER:

10    Q.   Okay.  And can you explain to the jury, over time, when you

11    were sending orders to LabSolutions, either directly or through

12    Mr. Slagle or others, roughly speaking, what was the volume of

13    orders and patients that you were sending to LabSolutions?

14    A.   Well, initially, when we started, everything that we were

15    marketing was going to LabSolutions.  You know, I -- I don't

16    recall the exact amount, but it was, you know, several

17    hundreds -- several hundred cancers, a lot more PGxs in a month

18    that went over.

19    Q.   Okay.

20         MS. DE BOER:  At this time, Your Honor, the government

21    moves admission of Government Exhibit 1909 and 1910.

22         THE COURT:  Any objection?

23         MR. SADOW:  No objection.

24         THE COURT:  Those will be admitted.

25         (Government Exhibits 1909 and 1910 were received in

```
 1        evidence.)

 2             MS. DE BOER:  Ms. Harper, I'm going to switch over to

 3   your computer.  If we could pull up 1909, please.

 4   BY MS. DE BOER:

 5   Q.   Okay.  Mr. Sporn, do you recognize this spreadsheet?

 6   A.   Yes.

 7   Q.   Okay.

 8             MS. DE BOER:  And I know, ladies and gentlemen of the

 9   jury, you probably can't see it perfectly.  We're going to fix

10   that for you in a second, so bear with me.

11             Ms. Harper --

12   BY MS. DE BOER:

13   Q.   I guess, Mr. Sporn, could you just at a high level explain,

14   what does this spreadsheet show?

15   A.   So it shows the number of orders by patient's name and what

16   the test was for, waiting to be returned by the doctor.

17   Q.   Okay.

18             MS. DE BOER:  And, Ms. Harper, could I ask you to

19   filter on Column D, which is the status column.  Okay.  And,

20   Ms. Harper, you read my mind, and you filtered to the status

21   returned by doctor denied.

22   BY MS. DE BOER:

23   Q.   Do you see that, Mr. Sporn?

24   A.   I do.

25             MS. DE BOER:  Your Honor, may I approach the witness?
```

 1          THE COURT:  You may.

 2    BY MS. DE BOER:

 3    Q.  Mr. Sporn, so that we have a way to actually show this to

 4    the jury, I've taken a screenshot of what you see on your

 5    screen, and I've handed it to you.

 6         Could you just confirm that it does match what you see on

 7    your screen?

 8    A.  Yes, it does.

 9    Q.  All right.

10          MS. DE BOER:  Your Honor, at this time the government

11    would mark this as 1909-A and move admission.

12          THE COURT:  Any objection?

13          MR. SADOW:  No, Your Honor.

14          THE COURT:  All right.  We can admit this one as well,

15    please.

16         (Government Exhibit 1909-A was received in evidence.)

17          MS. DE BOER:  We're going to go back to the document

18    camera for a second so we can show the jury what we were doing.

19    All right.

20    BY MS. DE BOER:

21    Q.  All right.  So this is a screenshot of the Excel that we

22    were just looking at as it's been filtered, and I'm going to

23    zoom in on Column D.  And do you see, Mr. Sporn, that Column D

24    has been filtered only to select the return by doctor denied?

25    A.  Correct.

1    Q.   Explain to the jury what that means, that the doctor denied

2    it.

3    A.   The doctor, for whatever reason, chose not to sign the

4    order.

5    Q.   Okay.  And if we go down to the bottom, do you see that

6    there were 182 of 8,443 records that had a doctor denied the

7    order?

8    A.   Correct.

9    Q.   All right.  And if my math is correct, Mr. Sporn, that

10   means about 2.1 percent of the entries on this spreadsheet, on

11   Government Exhibit 1909, the doctor denied the order.

12   A.   Correct.

13   Q.   Which means that approximately 98 percent of the time, the

14   doctor did not deny the order?

15   A.   That is correct.

16   Q.   How, if at all, is that consistent with your

17   contemporaneous understanding of what the doctors were doing?

18   A.   I don't quite understand your question.

19   Q.   Sorry.  This is just one.  You mentioned audit

20   spreadsheets, how you do these audits, right?

21   A.   Correct.

22   Q.   Is this an example?

23   A.   No.  Well, no.  This is a report.  So on a daily basis, I

24   would pull down reports to see what the various statuses of

25   orders were, and obviously the big one was pending doctor.  And

1    they were sent to a couple of people inside my organization to

2    chase down the doctors, to get the orders back.  So that's

3    really the purpose of why I ran these reports every day.

4    Q.   And you ran reports like this roughly daily, you said?

5    A.   First thing in the morning, typically, about 8:00 a.m., and

6    at the end of the day, sometimes 4:00, 5:00 o'clock, or even

7    6:00, so we knew which doctors to call at nighttime and chase

8    them so we'd have orders back for the next morning.

9    Q.   Why was it so important for you to have this information

10   both at the beginning and the end of your day?

11   A.   So we could keep a steady flow of orders coming in and

12   monitor which doctors were timely in turning around the orders

13   and doctors that were not timely.  That if they weren't timely,

14   we rerouted orders to other providers in their state.

15   Q.   And the 2 percent denial rate, now, obviously there were

16   lots of other statuses in there that we didn't examine; is that

17   fair?

18   A.   That is fair.

19   Q.   What are some of the other statuses?

20   A.   Missing information could be one.  So in other words, if

21   the order came back, maybe the patient didn't put the signature

22   card in, or maybe they put the signature card in and the

23   specimen wasn't in the envelope.  I mean, there's a whole host

24   of statuses in there.  Unable to process.  That was another

25   status.  And there's various meanings for that.  They were just

1    our own internal statuses.

2         So it could have been that there was a glitch from the

3    logic-based script populating ICD-10 codes, and somebody had to

4    physically examine what was said in that order and go through

5    it and repopulate it.  So there's a whole host of reasons.  I

6    mean, I think there's maybe 40 different statuses in the

7    system.

8    Q.   Okay.  Now, did it ever happen that you had a doctor that

9    was not moving at the pace that you wanted or who denied too

10   many orders, in your view?

11   A.   Yes.

12   Q.   Can you explain to the jury what would happen in those

13   circumstances?

14   A.   So I think I sort of indicated a little of that before.

15   But, A, if the doctor was not timely in sending back the

16   order -- that's why I ran the reports at least twice a day --

17   and they didn't turn them back in 24 to 48 hours, we would find

18   another provider in that state.

19        Also, we looked at the approval versus denial rate.  So if

20   a particular provider, for example, just simply denied all

21   their orders, they were not sent any more orders.

22   Q.   Okay.

23         MS. DE BOER:  Now, Ms. Harper, I'm going to ask you to

24   bring up what has been admitted as Government Exhibit 1910.

25         THE WITNESS:  Do you need this back or --

 1   BY MS. DE BOER:

 2   Q.   I'll come grab it from you in a second.

 3        Mr. Sporn, do you recognize this spreadsheet?

 4   A.   Yes.

 5   Q.   Okay.  And you see that there's multiple tabs at the

 6   bottom?

 7   A.   Yeah.

 8        MS. DE BOER:  Ms. Harper, I'm going to ask you to go to

 9   the second tab which states:  Accountability order total days.

10   BY MS. DE BOER:

11   Q.   Now, Mr. Sporn, there's a couple of columns here that I

12   want to focus on.

13        MS. DE BOER:  Ladies and gentlemen, I understand you

14   may not be able to see this perfectly.  We'll try to fix this

15   for you in a second.

16   BY MS. DE BOER:

17   Q.   So Column C, do you see that?

18   A.   Yep.

19   Q.   It says:  Denied by Doctor, YN.  Yes, no?

20   A.   That's what it means, yes or no.

21   Q.   What does that column mean?

22   A.   That means that the doctor approved an order or denied an

23   order.

24        MS. DE BOER:  Now, Ms. Harper, can I ask you to filter

25   on that column and see what the options are.

1  BY MS. DE BOER:

2  Q.   Is it only no, Mr. Sporn?

3  A.   Yes.

4  Q.   Okay.  What does that mean?

5  A.   That means that the doctor signed every -- every order that

6  is on this particular spreadsheet was signed by a provider.

7  Q.   Okay.

8       MS. DE BOER:  Your Honor, may I approach the witness?

9       THE COURT:  You may.

10  BY MS. DE BOER:

11  Q.   Okay.  So, Mr. Sporn, I've done the same thing here.  I'm

12  taking a screenshot of what we just showed you.

13       MS. DE BOER:  Ms. Harper, if you could hover over the

14  filter again so Mr. Sporn can see this.

15  BY MS. DE BOER:

16  Q.   Can you confirm, Mr. Sporn, that the screenshot I provided

17  to you matches what you see on your screen currently?

18  A.   Yes, it does.

19  Q.   All right.

20       MS. DE BOER:  At this time, Your Honor, I would mark

21  this screenshot as Government Exhibit 1910-A and move

22  admission.

23       THE COURT:  Any objection?

24       MR. SADOW:  No objection.

25       THE COURT:  We'll move that in at this time.

 1         (Government Exhibit 1910-A was received in evidence.)

 2    BY MS. DE BOER:

 3    Q.  And just so that the jury can see what we were looking at,

 4    Mr. Sporn, this is going to be Government Exhibit 1910-A, and

 5    I'm going to zoom in here on Column C, denied by doctor, yes or

 6    no.

 7         And then the filter option is up, and the only option is

 8    no; is that correct?

 9    A.   Correct.  I mean, if there would have been a Y there, it

10    would be problegated, but there was no why, so that's correct.

11    Q.   Okay.

12         MS. DE BOER:  And now, Ms. Harper, we're going to go

13    back to you for a second and do one more thing on Government

14    Exhibit 1910.  All right.

15         Ms. Harper, do you see Column B there, start to end in

16    minutes?

17    BY MS. DE BOER:

18    Q.  Mr. Sporn, can you explain to the jury what that column

19    means?

20    A.   Sure.  The time it took the doctor to review and sign the

21    order.

22         So anything with a 1 would be up to a minute.  Anything

23    with 0 is, you know, somebody just signing the order and

24    pushing it through.

25         MS. DE BOER:  And, Ms. Harper, can you filter on that?

1    And what I'm going to ask you to do is go to number filters and

2    go to greater than or equal to, and let's type in 20.  And go

3    ahead and filter.

4    BY MS. DE BOER:

5    Q.  So we typed in 20, Mr. Sporn, so we're filtering down to

6    entries that are greater than or equal to 20 on the start to

7    end in minutes.

8         So explain to the jury what that means if start to end in

9    minutes is greater than or equal to 20.

10   A.  So obviously for the doctor to either review or doing

11   something else, it was over 20 minutes.  So it's a time frame,

12   obviously.  So one of the columns says 85 minutes on here.

13   Another one says 45 minutes.  One says 419 minutes.

14   Q.  And, Mr. Sporn, some say over a thousand minutes.

15   A.  Correct.

16   Q.  All right.  Did you believe that doctors spent over a

17   thousand minutes talking to these patients?

18   A.  No, because when we went back in to do our audits --

19   and remember I said everything was time stamped, date stamped?

20   The doctor's portal was stagnant.  In other words, maybe they

21   went for a cup of coffee, maybe they got a phone call.  Who

22   knows what the doctor was doing or, you know, what -- where

23   they were.  You know, maybe they had an emergency.

24        So that would typically be somebody just leaving their

25   computer on, leaving the portal on, and not touching it.

1   Q.   Okay.  Now, Mr. Sporn, I'm going to ask you to look at the

2   bottom left hand of your screen.  And when we filtered for

3   Column C, for over 20 minutes, do you see that it's 34 of 3,696

4   records?

5   A.   Correct.

6   Q.   So just doing the math, is that less than 1 percent?

7   A.   Yes, ma'am.

8   Q.   The doctor's computer portal was accessed for more than

9   20 minutes?

10  A.   That is correct.

11  Q.   How, if at all, is that -- the number here -- I mean, this

12  is just one snapshot in time.  How, if at all, is that

13  consistent with your general experience on the telemedicine

14  side?

15  A.   It's consistent across the boards.

16  Q.   Okay.

17         MS. DE BOER:  At this time, Your Honor, the government

18  moves admission of Government's Exhibit 1786 and 1786-A.

19         THE COURT:  Any objection?

20         MR. SADOW:  No objection.

21         THE COURT:  All right.  Those will be admitted.

22     (Government Exhibits 1786 and 1786-A were received in

23     evidence.)

24  BY MS. DE BOER:

25  Q.   All right.  So, Mr. Sporn, we are almost done here with

1    talking through the process, and I'm going to show you an

2    example -- couple of examples of the completed patient file

3    that might come out of this process, okay?  And we're going to

4    start with Government Exhibit 1786-A, and we'll go to the

5    portion of the document that ends in Bates stamp 14317.

6        Okay.  So, Mr. Sporn, what are we looking at in this

7    document?

8    A.   It's called clinical summary.  Basically it's demographics

9    of the patient, first name, last name, date of birth, so on and

10   so forth.

11   Q.   Okay.  And this clinical summary, is it part of a broader

12   document?

13   A.   It is.

14   Q.   What is it part of?

15   A.   It's part of the general information called the SOAP notes,

16   part of the letter of medical necessity, and part of the

17   requisition.

18   Q.   And who generated this -- is it okay if I just call it a

19   patient chart?

20   A.   Sure.

21   Q.   All right.  Who generated the patient chart?

22   A.   The system generated based on the Q and A or the questions

23   asked of the individual on the phone.

24   Q.   Now, going to the next page of Government Exhibit 1786-A

25   which ends in Bates stamp 14318, is this a continuation of the

1   patient's chart?

2   A.  It is.

3   Q.  And directing you down at the bottom, do you see the chief

4   complaint?

5   A.  I do.

6   Q.  Okay.  And it says the patient's main complaint is that

7   they have had a previous personal/family history of cancer and

8   would like to be better informed of any further risks to them

9   and their loved ones.

10      Do you see that?

11  A.  I do.

12  Q.  All right.  And going to the next page of this exhibit

13  which ends in 14319, is this a continuation of the chart that's

14  generated through this process?

15  A.  Correct.

16  Q.  And do you see the paragraph on plan and treatment goals?

17  A.  I do.

18  Q.  It starts out by saying:  This patient presents with an

19  atypical personal and/or family history of cancer?

20  A.  Correct.

21  Q.  And then there's more information in this paragraph.

22      Is there anything in this paragraph about the plan and the

23  goals for this patient that's actually specific to the patient?

24  A.  Well, if -- if they were positive, a referral to a genetics

25  specialist.  But overall, no.

1   Q.   In other words, if we were to pull another patient's file,

2   how similar would the plan and treatment goals section look?

3   A.   There would be -- other than their name and phone number,

4   ICD-10 codes, all of them would virtually be the same.

5   Q.   Okay.  And then going to the next page of the patient

6   chart, which is Bates stamp 14320, do you see here that it

7   says:  Your medical notes will be professionally reviewed by

8   our telemedicine nursing staff and sent to a telemedicine

9   doctor licensed in your state.  The doctor will call you

10  directly if they have any questions?

11  A.   Correct.

12  Q.   What is that saying to the patient?

13  A.   That's saying to the patient that based on the information

14  that they provided over the phone, one of our staff is

15  reviewing the order and sending it over to the doctor.  And at

16  the doctor's discretion, if they have any questions, they will

17  reach out to the patient.

18  Q.   Okay.  Now, this is a chart note we've been looking at.  If

19  we look down to the bottom here, it's for patient P.S., P.S.,

20  right?

21  A.   P., yes, S.

22  Q.   Now, if we go to the next page of this exhibit, which the

23  Bates stamp ends in 14322, you had mentioned a couple of times

24  a letter of medical necessity?

25  A.   Correct.

1  Q.  Is that what this is?

2  A.  It is.

3  Q.  What was the purpose -- and just to be clear, we're still

4  in the same patient's file?

5  A.  Correct.

6  Q.  All right.  What was the purpose of this letter of medical

7  necessity?

8  A.  Because without a letter of medical necessity, the Medicare

9  would not reimburse the lab.  And obviously, my group would not

10  be able to get paid.

11  Q.  Okay.  And were letters of medical necessity provided to

12  the lab?

13  A.  Yes.

14  Q.  What other pieces of documentation were provided to the

15  lab?

16  A.  The clinical summary or the medical history, as you -- from

17  your previous exhibit, and the requisition, and if they had a

18  history of family cancer, they answered that portion, the

19  family history questionnaire was presented, as well.

20  Q.  Okay.  And we're not going to read everything in this

21  letter, but it starts out by saying that:  Cancer is a very

22  serious medical issue and is a leading cause of death.

23      Is that correct?

24  A.  That is correct.

25  Q.  I guess at a high level, what does this letter say?

1   A.   It's justifying the -- it's justifying the means for

2   delivering the test so it could be billed to Medicare.

3   Q.   Okay.  So, I mean, this first paragraph says:  Cancer is

4   bad, right?

5   A.   Correct.

6   Q.   And then, if we look at this next paragraph here:  The

7   medical community has isolated mutations and genetic coding

8   that causes hereditary cancer?

9   A.   Correct.

10   Q.   So is this paragraph saying there is such a thing as a

11   cancer genetic test?

12   A.   Yes.

13   Q.   And if we go to this next paragraph, it starts by saying:

14   There's over 240 unique known cancer genes.

15        Do you see that?

16   A.   I do.

17   Q.   So is this saying there are genes that have been determined

18   to be associated with cancer?

19   A.   Yes.  Yes, it does.

20   Q.   Okay.  And if we go to the second page of this letter,

21   which ends in Bates stamp 14323, that same paragraph continues,

22   and then we just continue to talk about what cancer genetic

23   tests are; is that fair?

24   A.   Correct.

25   Q.   So, so far, in two pages of this letter of medical

 1   necessity for a particular patient, is there anything specific

 2   to this patient and why this patient needs this specific test?

 3   A.   No, they were all in same.  In fact, each letter of medical

 4   necessity was specific to the lab.  And this one is specific to

 5   the tests that were ordered through LabSolutions.  Because if

 6   you go up, it says 42 genes, and it lists the different genes.

 7   And that was specific to one of the tests that were

 8   pre-checked.

 9   Q.   Okay.  Go to the next page of this letter which ends in

10   Bates stamp 14324.  This paragraph down here at the bottom:

11   The genes in the tests are warranted to identify -- I'm sorry,

12   not quite at the bottom, second to last paragraph.

13        The genes in the tests are warranted to identify the risks

14   of cancer and detect cancer early and to reduce morbidity and

15   mortality.  This genetic testing will help estimate a patient's

16   risk to develop and potentially die of cancer.  It will also

17   directly impact the patient's medical management.

18        Did I read that correctly?

19   A.   You did.

20   Q.   What, if any, expectation did you have that these tests

21   were being used by your teledocs to directly impact the

22   patient's medical management?

23   A.   None, none.  The doctors signed the orders.  We were

24   instructed by the lab, at some point, to go into a portal, pull

25   the results down, and send them to the patients.

1   Q.   All right.  So this statement that's highlighted right here

2   in this paragraph, is that true?

3   A.   No.

4   Q.   How, if at all, were these letters used to justify bills

5   submitted to Medicare?

6   A.   Well, they were necessary -- they were necessary as part of

7   the process with all the paperwork to get reimbursed from

8   Medicare.

9   Q.   All right.  Now, Mr. Sporn, I want to take a step back for

10  a second.  We've talked through the process.

11       Over time, as you got more involved in genetic testing,

12  what, if anything, did you learn about the benefits to you of

13  targeting Medicare versus focusing on other types of insurance?

14  A.   So Medicare was the primary focus due to the fact that the

15  turnaround time in getting paid by Medicare typically was

16  anywhere from three to four weeks, which -- to the lab, which

17  means that we would get paid sooner.  If we were targeting

18  regular insurance, there may be a need for a prior

19  authorization.  It may be denied by the insurance company.

20       And the last part, you may or may not ever get paid.  So we

21  could go that you'd get the luck of the draw and get paid

22  within 60 days on a private insurance, or sometimes it would be

23  a year or longer before you would get it, if they, in fact,

24  paid it.

25       So the whole point was Medicare, once we verified that they

1   were a Medicare Part B recipient, that the probability of

2   getting paid in a three- to four-week period was very great.

3   Q.  So, Mr. Sporn, thinking through the doctors that you worked

4   with at your telemed company, where did you find them, how did

5   you hire them?

6   A.  The bulk of them were hired through a series of locum

7   tenens companies.

8   Q.  And were you looking specifically for oncologists?

9   A.  No.

10  Q.  Were you looking specifically for geneticists?

11  A.  No.

12  Q.  What were the qualifications that you had for the doctors

13  that you employed?

14  A.  That they were PECOS-certified doctors, which means that

15  they were credentialed by Medicare so they could write a

16  prescription or, in this case, a requisition for a Medicare

17  patient.

18  Q.  All right.  Let's talk about the test results for a second.

19  As far as you knew, the labs that you worked with, including

20  LabSolutions, were these tests actually being run?

21  A.  I would assume they were being run.  I never was at the

22  facility, so I...

23  Q.  Fair enough.  Fair enough.  You were under the belief that

24  these tests were being run; is that fair?

25  A.  That is fair.

1    Q.   Okay.  What happened to the test results?

2    A.   The test results were -- well, initially, when we first

3    started, it was my understanding that the lab was sending out

4    the test results.  It was many months after I found out that

5    there was a portal where the results were there, and they had

6    to be printed -- printed out, and they were very -- some of

7    them were, you know, a lot of pages.  And we had to mail them

8    to the patients.

9    Q.   And we had to mail them, meaning, your companies.

10   A.   My company.  I'm sorry.

11   Q.   Okay.  And paint the picture for the jury.  What exactly is

12   being mailed to the patient?

13   A.   The actual results of the test.

14   Q.   And was there any kind of cover letter or any other

15   information mailed along with the results?

16   A.   Yes.  So we put a cover letter in, stating:  Dear

17   Mr. and Mrs. Jones, Please find your test results for your

18   cancer test, or your pharma genetic test, your genetics,

19   whatever test it was for.  Should you have any questions or

20   concerns, please call us at (800) 555-1212, and one of our

21   customer service reps will assist you further.  That type of

22   letter.

23   Q.   Okay.  What, if anything, did the letters instruct the

24   patients to do with their results?

25   A.   If they had any concerns, call us.  If they had any

 1   concerns, you know, that they should talk to a medical

 2   provider.

 3   Q.   Okay.  And what, if any, expectation did you have that your

 4   telemed doctors were going to continue to provide treatment to

 5   those patients based on those results?

 6   A.   Slim to none.

 7   Q.   Were you paying your teledocs any more to perform any

 8   further treatment on the patients?

 9   A.   No.

10   Q.   All right.

11        MS. DE BOER:  Your Honor, I'm about to switch gears.

12   Happy to keep going.  I don't know when you want to take the

13   break.

14        THE COURT:  Go ahead and keep going.

15        MS. DE BOER:  Okay.  At this time, the government would

16   move into evidence Government Exhibit 422, 1808, and 1789.

17        THE COURT:  Any objection?

18        MR. SADOW:  No objection.

19        THE COURT:  We'll admit those at this time.

20     (Government Exhibits 422, 1808, and 1789 were received in

21      evidence.)

22   BY MS. DE BOER:

23   Q.   All right.  So, Mr. Sporn, we talked through how your

24   company worked in the process, and now I want to turn to

25   LabSolutions and Mr. Patel.  Okay?

1   A.   Okay.

2   Q.   So what, if any, instructions did you ever receive or

3   information did you ever receive from Mr. Patel regarding the

4   benefits of billing Medicare versus private insurance?

5   A.   Well, there's -- there was emails, there was a text message

6   communication with Mr. Patel, there was various conversations

7   with Mr. Patel.

8   Q.   And what I'm asking you is, in sum, what, if anything, did

9   Mr. Patel tell you about the benefits of billing Medicare

10  versus other types of insurance?

11  A.   Well, exactly what I've laid out there.  Medicare --

12  Medicare, as long as they have Part B, the turnaround time was

13  extremely quick, and you were assured essentially to get paid.

14  Whereas, if you submitted a claim for private insurance, the

15  process flow was a lot greater because it required, in most

16  cases, most insurances, a prior authorization.  Or you, as I

17  stated before, you may or may not get billed -- get paid,

18  excuse me.

19  Q.   What, if any, understanding did you have as to how much

20  Patel's lab billed, you know, any particular sample to Medicare

21  for?

22  A.   Depending on the genes, I believe that on a PGx -- and

23  don't hold me to the number -- they were billing in excess of

24  $4,000 for a PGx.  Not that they received that amount, but

25  that's what they were billing.  And depending on the cancer

1    test, in excess of $10,000 was being billed.  And again, not to

2    say that they received that amount.

3    Q.   Okay.  Now, do you remember on Friday you had explained to

4    the jury the -- I'm going to call it three different companies.

5    I realize there were some d/b/a names that you explained to the

6    jury, but three different companies that you explained?

7    A.   Yes.

8    Q.   And do you remember explaining one of them called INS?

9    A.   Yes.

10   Q.   Could you just very briefly -- I don't want to repeat a lot

11   of testimony, but just briefly refresh the jury on what INS's

12   role was?

13   A.   INS was set up as a representative by Mr. Patel and

14   LabSolutions to onboard other marketers that were using the

15   telehealth platform.  So it wasn't just my company and my

16   marketing using them.  There might have been 100 other

17   marketing companies paying that company to generate doctors'

18   orders for prescriptions, marketing groups, other telemarketing

19   companies, if that makes sense.

20   Q.   All right.  I'm going to show you what's been admitted as

21   Government Exhibit 1808.  And we're going to start with the

22   first email in the chain, which is the bottom email.  All

23   right?

24        And this is an email from Alexi Bethel on November 5, 2018?

25   A.   Correct.

1    Q.   Who is Alexi?

2    A.   He was a -- he was another -- one of the reference

3    marketing groups that used our portal to generate orders.

4    Q.   All right.  I'll just zoom in here so everyone can see.

5         And Mr. Bethel says:  To whom this concerns.  Please move

6    our contract under KBC, LLC to Michelle Larkin, INS Co., LLC.

7         What is this talking about?

8    A.   So exactly what we spoke about before.  So Bethel's company

9    was already contracted with LabSolutions.  And since he was

10   marketing through our portal, he actually was one of the first

11   people that we moved onto the INS code umbrella to

12   LabSolutions.

13   Q.   And who is Michelle Larkin?

14   A.   That happens to be my fiancee.

15   Q.   Why was her name associated with INS?

16   A.   So it would appear that it was a separate entity, and that

17   I'm not involved.

18   Q.   If we go up, who did you forward Alexi's email to?

19   A.   Minal Patel.

20   Q.   On November 5, 2018?

21   A.   Correct.

22   Q.   Why did you just forward it to Minal and not to other

23   people at LabSolutions?

24   A.   Because my conversation with him was, you know, since you

25   have this big network, please get me more clients, and we'll

1   pay you an overwrite.  So I wanted to make sure that it was

2   moved over.

3   Q.   Okay.  And another company that I asked you about last

4   week, when I was asking you to explain your three companies to

5   the jury, was Real Time Physicians?

6   A.   Correct.

7   Q.   And just briefly, because I don't want to get repetitive

8   here, but refresh the jury on what Real Time Physicians was.

9   A.   So that was the telehealth company -- telehealth company.

10  They had the appearance of a real practice, because they had an

11  NPI number, which is a national provider number.

12  Q.   I'm going to show you what has been admitted as Government

13  Exhibit 1789.

14       Is this an email from you to Mr. Patel on August 9th of

15  2018?

16  A.   It is.

17  Q.   All right.  And then you say:  Minal, use Real Time

18  Physicians.

19       Do you see that?

20  A.   Correct.

21  Q.   Why does it have a Las Vegas address?

22  A.   Well, that's where it was domiciled.  And the person who

23  was in charge of the company, who was the face of the company,

24  so to speak, lived in Las Vegas at the time.

25  Q.   Who was that?

```
 1   A.   Dr. Al Needleman, who's a Ph.D., not a real doctor.

 2   Q.   Okay.  Where were your operations physically located?

 3   Where did the action happen?

 4   A.   Boca Raton.

 5   Q.   In Florida.

 6   A.   In Florida.

 7   Q.   Okay.  And then you provide a couple, you say, example, DME

 8   clients, example, lab client, Will Slagle?

 9   A.   Correct.

10   Q.   And focusing on this paragraph on the bottom, you say:  We

11   have been in the telemedicine space since 2008, starting out as

12   a PM -- PM provider to various limited medical health plans

13   since 2013, expanded into the RX, DME, and lab space.

14        Do you see that?

15   A.   I do.

16   Q.   And just briefly, what's DME?  What does that stand for?

17   A.   Durable Medical Equipment company.

18   Q.   So like back braces, knee braces, that kind of thing?

19   A.   Correct.

20   Q.   Okay.  And RX, what does that stand for?

21   A.   RX was targeted towards compounding, and what they also

22   call single NDC kits.

23   Q.   And compounding is what?

24   A.   Compounding pharmaceuticals.

25   Q.   Like pain creams?
```

1  A.  Pain creams, scar creams.

2  Q.  Okay.  Now, before you got into the genetic testing space,

3  were you doing compounding and DME through a similar process

4  like the one we just discussed?

5  A.  Yes.

6  Q.  All right.  Why are you telling Mr. Patel about that

7  background?

8  A.  Just to give him -- you know, to let him know that we've

9  been involved in some -- for a long period of time, as I

10  stated, since 2008, we started off with contracting through

11  another company when we were in the insurance business.  So

12  we -- we're selling what they call limited -- family -- limited

13  medical benefit plans, and we included the services of

14  telehealth in those plans.

15  Q.  Okay.  Why did you -- well, let me just ask you:  Did you

16  completely switch over from DME and compounding to genetic

17  testing, or were you sort of juggling all three balls at once?

18  A.  So at some point, my own internal marketing, sometime in

19  '17, early '18, were strictly for genetic testing.  Other

20  marketers that we used in the portal, some did labs, some did

21  DME and labs, some just did pharmacy.

22       As I indicated before, there may have been close to 100

23  clients using -- when I say clients, marketers with call

24  centers, using our process flow and systems that we created.

25  Q.  And thinking of the time frame, 2018 and 2019, what was the

1  bulk of your marketing and telemedicine efforts?  Was it

2  focused on genetic testing, was it focused on DME, or was it

3  focused on compounding?

4  A.  My own internal efforts were strictly genetic testing.

5  Q.  Okay.  And if we keep going on this exhibit, you note that

6  you have a state-of-the-art telehealth platform.  This is --

7  there you go:  State-of-the-art telehealth platform.  Basically

8  a practice in a box.

9      Do you see that?

10 A.  I do.

11 Q.  Okay.  Mr. Sporn, did your companies enter into any written

12 agreements with Mr. Patel's lab?

13 A.  Yes.

14 Q.  What did those written agreements indicate that you were

15 doing for the lab?

16 A.  They -- well, I have to see the agreement in front of me.

17 Q.  We can do that.

18 A.  But they were a marketing -- it was a marketing agreement,

19 and I believe there was what they call a BAA, which is a

20 business associate agreement with the lab.

21 Q.  Okay.

22      MS. DE BOER:  At this time, Your Honor, the government

23 would move admission of Government's Exhibit 650 and 650-A,

24 651, 654-A, and 652.

25      THE COURT:  Any objection?

1          MR. SADOW:  No, Your Honor.

2          THE COURT:  Thank you.  Those will be admitted at this

3    time.

4          MS. DE BOER:  Thank you, Your Honor.

5          (Government Exhibits 650, 650-A, 651, 654-A, and 652 were

6          received in evidence.)

7    BY MS. DE BOER:

8    Q.  So, Mr. Sporn, I'm showing you what has been admitted as

9    Government Exhibit 650.  And is this an email from you to

10   John@LabSolutions.com and Will Slagle?

11   A.  It is.

12   Q.  And who is John?

13   A.  To my knowledge, John was the vice president of

14   LabSolutions.

15   Q.  Okay.  And you say here in the body of the email:  Please

16   see attached agreement signed?

17   A.  Correct.

18   Q.  And this is from February 8th of 2018; is that correct?

19   A.  Correct.

20   Q.  All right.  And we're going to go to Government

21   Exhibit 650-A.

22        Is this a copy of a partially executed agreement?

23   A.  It is.

24   Q.  All right.  And this is called a laboratory test

25   distribution agreement?

1    A.   Correct.

2    Q.   And it's dated December 1, 2017?

3    A.   Correct.

4    Q.   Between CPL Media Group, d/b/a Medical Services, d/b/a,

5    Medipak, d/b/a Lab Services.

6    A.   Correct.

7    Q.   And that's your company?

8    A.   It is.

9    Q.   All right.  And it's between your company and LabSolutions;

10   is that correct?

11   A.   That is correct.

12   Q.   All right.  So I'm going to focus you first on this

13   paragraph right here.  Okay, Mr. Sporn?

14        Do you see that it says that the sales rep -- is that your

15   company?

16   A.   That is.

17   Q.   And LabSolutions desires for sales rep to promote, sell,

18   recommend, and endorse the laboratories testing services to,

19   and establish relationships with physicians, clinics, medical

20   practices, and other healthcare providers?

21   A.   That's what it says.

22   Q.   Okay.  And then down here in paragraph 1 of the agreement,

23   do you see where it says that the sales rep -- and that's you,

24   right?

25   A.   That is.

1   Q.   Will use diligent and business-like efforts to market the

2   testing services to healthcare providers hereunder.

3   A.   Correct.

4   Q.   Is there anything in what we've looked at so far in this

5   agreement that discuss telemarketing or direct marketing or

6   solicitation of patients?

7   A.   No.

8   Q.   Were you marketing to healthcare providers?

9   A.   No.

10  Q.   Why not put in the agreement, we're marketing directly to

11  patients?

12  A.   I don't -- I'm not the attorney, but -- who prepared the

13  agreement.  But it was -- the agreements essentially said one

14  thing, and we were doing another thing, and obviously the lab

15  knew what we were doing.

16  Q.   And, Mr. Sporn, let me just ask you:  Why sign or enter

17  into a contract, why have your company committed to a contract

18  that doesn't reflect what you were really being paid to do?

19  A.   So we can get paid.

20  Q.   What do you mean, so you can get paid?

21  A.   So we can get paid our kickbacks.  If we didn't sign the

22  agreement, we wouldn't have gotten paid by the lab.

23  Q.   Okay.  We're going to go the second page of this agreement,

24  to paragraph 6.  So this is what defines the payment terms.

25       And it says that:  LabSolutions will pay the sales rep a

1    commission of 45 percent of the monthly net revenue?

2    A.   Correct.

3    Q.   And then it defines net revenue.  Can you just explain to

4    the jury what the net revenue meant?

5    A.   So just round numbers.  If the lab received $2,000 on

6    something they had a fee for the cost to run the specimen, I

7    don't have the fee schedule in front of me, but I think the PGx

8    was $100.  It would deduct the $100 off, and it would take a

9    5 percent billing fee, because that's what they represented

10   they were paying their billing company to bill for services.

11        So just to do simple math, we really weren't receiving --

12   if they got a thousand dollars, we weren't receiving $450, we

13   were receiving $1,000, less 5 percent -- and I'm just rounding

14   numbers now -- and less the cost of running the test.  And then

15   we would get our 45 percent from that.

16   Q.   So, Mr. Sporn, in these telemarketing calls if the patient

17   said no way and hung up the phone, did you get the 45 percent?

18   A.   Absolutely not.

19   Q.   If the doctor said no and denied the order, did you get the

20   45 percent?

21   A.   No.

22   Q.   So what was the way to make money in this business?

23   A.   The more volume that we did.  It was a volume-based game.

24   So the more orders that we submitted, obviously the more we

25   could make.  Also, you know, there was a lot of moving parts

1    inside of our organization from telemarketers, cost of leads,

2    staff that would review orders, doctors, so on and so forth.

3    So it had to be a volume-based business.

4    Q.   All right.  Now, I'm going to show you what has been

5    admitted as Government Exhibit 651.

6         So, Mr. Sporn, at some point, did this agreement get fully

7    executed?

8    A.   Yes.

9    Q.   I'm showing you the signature page.  Whose name appears for

10   LabSolutions?

11   A.   Jon Berarducci.

12   Q.   And whose name appears for your company, CPL?

13   A.   Steven Goldberg.

14   Q.   Who was Steven Goldberg?

15   A.   He was the president of my company.

16   Q.   And why did he sign it and not you?

17   A.   Because he was the president of the company, just like Jon

18   Berarducci may have signed for LabSolutions.

19   Q.   Okay.  Mr. Sporn, at some point, did the way in which you

20   were being paid, this percentage-based arrangement, did that

21   change?

22   A.   It did.

23   Q.   Can you explain to the jury what the change was.

24   A.   At some point, the lab came to me and said that we cannot

25   pay you that way because there's concerns with what they call

1    EKRA.   EKRA was a law on paying kickbacks.   Percentage-based

2    agreements were thought to be deemed as illegal in Medicare.

3    So they went to a flat fee agreement.   The flat fee agreement

4    was backed in -- calculated based on a dollar amount, based on

5    the orders that we were submitting to them previously, on a

6    monthly basis, so they could figure out, under that flat fee,

7    how much to pay us on a monthly basis.

8    Q.   All right.   I'm going to show you what has been admitted as

9    Government Exhibit 652.

10        And do you see that this is another laboratory distribution

11   agreement between CPL, your company, and LabSolutions?

12   A.   Yes.

13   Q.   And this is from January 1, 2019?

14   A.   Correct.

15   Q.   And then, again, do you see here in this paragraph:   Sales

16   rep in LabSolutions desire for sales rep to promote

17   LabSolutions' testing services to healthcare providers?

18   A.   Correct.

19   Q.   So even though the payment terms ultimately changed in your

20   arrangement, the description of what you were being paid to do,

21   did that ever change?

22   A.   No.

23   Q.   Why didn't that change?

24   A.   I have no idea.   I wasn't the attorney who wrote the

25   document.

1   Q.   And these documents, these agreements, did you come up with

2   them and give them to the lab, or did the lab come up with them

3   and give them to you?

4   A.   No, the lab gave them to us.

5   Q.   And if you didn't sign this agreement, what would have

6   happened?

7   A.   We wouldn't have gotten paid.

8   Q.   At this point in time, in January of 2019, did you all of a

9   sudden start marketing to healthcare providers instead of

10  directly to patients?

11  A.   No.

12  Q.   So let's go look at the payment terms.  You mentioned that

13  things switched to a flat fee.

14       So this says a $200,000 a month fee, correct?

15  A.   Correct.

16  Q.   And then it says that:  This monthly fee will not be

17  adjusted based off of patient referrals, specimen volume, or

18  revenue generated.

19       Do you see that?

20  A.   I do.

21  Q.   In reality, how was this 200,000 calculated?

22  A.   From what we were submitting historically through the lab

23  and what they were paying us prior.

24  Q.   So how, if at all, was it based on the volume and value of

25  patient referrals?

1    A.   It wasn't.  So basically, what happened was the lab took an

2    average sum of what they were paying us on a monthly basis, and

3    that's how they calculated this monthly fee agreement.  And if

4    we didn't keep up with X volume to maintain this, you know, we

5    were told that the agreement may be canceled at sometime in the

6    future.

7    Q.   Okay.  Now, Mr. Sporn, were there also compliance

8    attestations that had to be signed at various points in time?

9    A.   Correct.

10   Q.   So I'm going to show you what has been admitted as

11   Government Exhibit 654-A.  And we're going to go to that

12   compliance attestation.

13        All right.  Do you see the title of this, independent

14   distributor compliance agreement?

15   A.   I do.

16   Q.   It says independent distributor.  Is that referring to your

17   company?

18   A.   It is.

19   Q.   Okay.  And then there's some introductory language here.

20   And I'm going to take you to the last page of this.

21        Do you see a bullet point list of things that each

22   distributor, meaning your company, agrees that they will not

23   do?

24   A.   I do.

25   Q.   And one of those, the first bullet, is pay physicians and

1    their staff members and relatives in exchange for their

2    samples?

3    A.   Correct.

4    Q.   What were you paying doctors to do?

5    A.   To write prescriptions.

6    Q.   And then the third bullet point says:  Influence test

7    ordering patterns that would lead to medically unnecessary

8    tests.

9         Do you see that?

10   A.   I do.

11   Q.   How, if at all, were you, in fact, influencing test

12   ordering patterns?

13   A.   We were calling patients and qualifying them through

14   logic-based scripts.  So we were doing the opposite of what

15   this stated.

16   Q.   And then create my own marketing materials.  Those call

17   center scripts, the call center script that we looked at, who

18   created that?

19   A.   Well, it was originally created by -- at work, presented to

20   me by Will Slagle, of Our Family Genes.  And as I stated

21   before, we adopted it and ran with it, may have made some

22   modifications just in some language changes over time.

23        I was told that it was vetted and approved by the lab when

24   we started with Mr. Slagle, that he was already doing business

25   and had a long-term relationship with LabSolutions due to the

1    fact that he had two other marketing groups, one out of Panama

2    City, and the other one -- I don't remember where they were out

3    of, it might have been out of Louisiana, that we were doing

4    substantial business with them already.

5    Q.   Okay.  And if these compliance attestations were not agreed

6    to, what was your understanding of whether you could get paid?

7    A.   We would not get paid.  Pertaining to those agreements,

8    sometimes we would get paid before we even sign the agreements

9    and get a phone call:  Hey, guys, a week later, can you please

10   sign them for us and send them back.

11   Q.   Okay.  So, Mr. Sporn, I want to switch gears slightly.  Did

12   they ever --

13        MS. DE BOER:  Your Honor, I saw you looking at me.  Do

14   you want me to keep going?  I'll keep going.

15        THE COURT:  No, no, keep going.

16        MR. RAFFERTY:  Your Honor, can we have a brief restroom

17   break?

18        THE COURT:  All right.  If you need it, we'll take one.

19   Go ahead, we'll break now.  I wanted to go a little longer

20   before we took our first two-hour break.  We'll go ahead and

21   take the 15-minute break that we normally take in the morning

22   at this time.

23        Please go ahead and leave your notepads on your chairs,

24   folks, and we'll be back in 11 minutes, 11:15.  You are

25   excused.

```
 1          (Jury exits at 11:02 a.m.)
 2              THE COURT:  Please be seated, everyone.  We'll take our
 3     15-minute break at this time.
 4              MS. DE BOER:  Thank you, Your Honor.
 5              THE COURT:  You're welcome.
 6          (Court recessed at 11:02 a.m.)
 7          (Back on the record at 11:26 a.m.)
 8              THE COURT:  Let's bring them in, please.
 9              THE COURT SECURITY OFFICER:  All rise.
10          (Jury enters at 11:26 a.m.)
11              THE COURT:  Please be seated, everyone.  All right.
12     Ladies and gentlemen of the jury, we're going to pick up where
13     we left off.
14              Ms. de Boer, the floor is yours.
15              MS. DE BOER:  Thank you, Your Honor.
16     BY MS. DE BOER:
17     Q.  All right, Mr. Sporn.  Did there ever come a time when
18     Mr. Patel visited your office in Boca?
19     A.  Yes.
20     Q.  Can you describe for the jury what that meeting consisted
21     of.
22     A.  Well, that was the first meeting in Boca.  I was introduced
23     to him by Brett Hirsch and Keith Youngswick.
24     Q.  Let me stop you there for a second and get a little more
25     background.
```

1      What was Mr. Hirsch and Mr. Youngswick, what were their

2   roles in this with respect to your operation?

3   A.   So they contracted with our telemarketing side, and also

4   the telehealth side for agents and reps to generate orders as

5   my company was generating.  So they were paying for that

6   service.  And they had a relationship with Mr. Patel.  That's

7   how I met them.

8   Q.   Okay.  And this initial meeting that you were about to

9   describe, who from LabSolutions attended the meeting?

10  A.   Minal Patel.

11  Q.   Anybody else from LabSolutions besides Mr. Patel?

12  A.   Not that I could remember.

13  Q.   Okay.  And you said Mr. Hirsch and Mr. Youngswick were

14  there, as well?

15  A.   Yes.

16  Q.   Who else was there, if anyone?

17  A.   Matt Eggen.

18  Q.   And let me stop you for a second.  Who's Matt?

19  A.   Matt -- it was another marketing group who operated out of

20  the second floor of my building.  So I had two floors in my

21  building, I had the second floor and the third floor.  Second

22  floor, just to be clear from last Friday, was where all the

23  telemarketing activities were.  It was approximately a 200-seat

24  call center on the second floor.  The third floor was where the

25  telehealth operated and where we received, in this case, the

1    PGx and CGx specimen samples, and they were shipped out of.

2    Q.   So getting back to the meeting that Mr. Patel attempted at

3    your office, can you walk the jury through what occurred at

4    this meeting.

5    A.   Well, it was a meet-and-greet.  Mr. Patel was shown a tour

6    of the facility.  When I was down there, Mr. Patel was

7    standing -- well, when I came -- initially came down, it was in

8    an office with Mr. Youngswick and Mr. Hirsch and Mr. Eggen, and

9    then, at some point, he got the tour, was taken over to the

10   sales floor, actually listening to agents make presentations on

11   the phone.

12        As a matter of fact, when an agent had a live person on the

13   phone going through pitch, the agent was told to raise their

14   hand, and everybody would walk over and listen to that agent

15   make their presentation.

16   Q.   And the presentation being based off of what?

17   A.   The logic-based script.

18   Q.   Like the script that we reviewed this morning?

19   A.   Yes, ma'am.

20   Q.   Okay.  And paint the picture for the jury.  At the time

21   that Mr. Patel visited the -- you called it the sales floor --

22   approximately -- I'm not asking for, you know, a pinpoint

23   number, but approximately how many telemarketers were there

24   doing these type of calls?

25   A.   Could have been in excess of 60, 70 people on the phone.

1   Q.   Okay.  What else, if anything, happened at this meeting?

2   A.   At that meeting, after that, we went up to the third floor.

3   We went to the shipping and receiving room.  Inside of the

4   shipping and receiving room.  And when I'm talking about

5   shipping and receiving, shipping out the specimen packages with

6   all the contents to the patients.  And when they came back in,

7   they would be received in that room and they would be put into

8   bins by their last name, A through Z bins.  So just like you go

9   to Walgreens, CVS, there was a bin, an A bin, a B bin, so on

10  and so forth, and that's where the specimens were lodged.  So

11  that was one part of the tour.

12  Q.   Let me ask you about the shipping and receiving room.  When

13  Mr. Patel visited that room, if you remember, approximately how

14  many shipping kits were in the room either ready to go out or

15  being received?

16  A.   I mean, just about every day there was always hundreds

17  getting ready to go out the door.  And, you know, depending on

18  which lab -- which lab, it was hundreds going back out to labs.

19  Q.   Okay.  Keep going.  I'm sorry.  I interrupted your

20  description.

21  A.   No problem.  And then there was a tour -- so on the third

22  floor, it was divided into two suites.  So that suite that I

23  just described was the shipping and receiving area, and also

24  where the specimens were stored.  Across the hall were IT

25  executive offices, and nurses were there and other staff,

1    people who reviewed these orders, made sure they were okay to

2    be pushed out through the doctors, so on and so forth, people

3    who communicated with the doctors -- the doctors to get the

4    orders back in.  So that was the other side of that floor.

5    Q.   And let's stick with the telemarketing side for a second.

6    You were describing what Mr. Patel witnessed on that floor.

7         When he heard your telemarketers placing these calls to

8    potential patients, did he tell you, stop this right now?

9    A.   No.

10   Q.   Did he tell you, I don't like this script?

11   A.   No.

12   Q.   What did he tell you, if anything?

13   A.   Nothing.  He just shook his head, and it seemed like

14   everything was great.

15   Q.   All right.  And when you took him to the shipping and

16   receiving room, did he tell you, hey, this is way too many

17   orders?

18   A.   No.

19   Q.   What did he tell you, if anything, about the volume of

20   orders he wanted?

21   A.   He wanted as many orders as possible.

22   Q.   And now, thinking to the telemedicine side, what, if

23   anything, did you show him during this meeting about how the

24   telemedicine worked?

25   A.   So there was a subsequent meeting and other meetings.  At

1    this time, we just did the tour.  At a later date, I showed

2    Mr. Patel our marketing portal, how it worked, and also the

3    doctor's portal, but it was not done at this first meeting.

4    Q.  Okay.  I'm sorry.  So there was a second meeting.  We'll

5    get to that in a second.

6        Is there anything else about this first meeting that I

7    haven't asked you about?

8    A.  No, it was just a general -- I mean, for my purposes,

9    because he was there with Mr. Youngswick and Mr. Hirsch, it was

10   the first time that I met Mr. Patel, and it was more like a

11   meet-and-greet, see the operation, take a tour, almost like a

12   dog-and-pony show.

13   Q.  Okay.  And this second meeting, where did that take place?

14   A.  Well, there was multiple meetings.  I don't know if it was

15   the second, third, or fourth meeting, but there was another

16   meeting at my offices.  Mr. Patel came to visit.

17   Q.  Okay.  And in this -- is this the meeting where you showed

18   him the portals?

19   A.  Correct.

20   Q.  And in this meeting, who else from LabSolutions was there

21   other than Mr. Patel?

22   A.  At the office, just Mr. Patel.

23   Q.  And was anyone else present from -- any other marketers or

24   anybody else present at this meeting?

25   A.  I don't think any other marketers were there at this

1    meeting.

2    Q.  So you were about to describe the portals that you showed

3    to Mr. Patel.  So please explain to the jury what you showed to

4    Mr. Patel in these portals.

5    A.  Sure.  So there are two portals, as I represented, one for

6    the marketers, where those logic-based scripts populated all

7    the information.  So I showed him how that worked.  And I also

8    showed him how the orders were pushed over, the different

9    statuses in the doctors' orders, and how the orders were routed

10   to the doctors, and all the paperwork and everything else that

11   went with it.  How it was in electronic form.  They had already

12   seen it in manual form, but I showed it to him in electronic

13   form at that time.

14            MS. DE BOER:  At this time, Your Honor, the government

15   moves into evidence Government's Exhibit 1912 and 442.

16            THE COURT:  Any objection?

17            MR. SADOW:  No, Your Honor.

18            THE COURT:  All right.  I will admit those at this

19   time.

20        (Government Exhibits 1912 and 442 were received in

21        evidence.)

22   BY MS. DE BOER:

23   Q.  So, Mr. Sporn, I'm showing you what has been admitted as

24   Government Exhibit 1912.  And these are a series of

25   screenshots.

1      Do you recognize this?

2  A.  Give me one second.  Yes.

3  Q.  All right.  And we'll zoom in here for the jury in a

4  second.  But can you just describe to the jury what it is that

5  we're looking at.

6  A.  The dashboard for the physician portal.

7  Q.  Okay.  We'll just zoom in.

8      So is this sort of like a homepage for the physicians, or

9  what -- what page are we looking at --

10 A.  So that's a homepage dedicated towards a specific

11 physician.

12 Q.  Okay.  And I know that the font is a little bit light here,

13 but does this say Real Time Physicians?

14 A.  It does.

15 Q.  And then what are these various numbers?  What is this

16 tracking?

17 A.  So 17 completed assessments.  That means that they signed

18 off on 17 assessments -- assessment.  They completed 27 total

19 orders.  And that's probably a dashboard for a count for the

20 week.  And obviously, it would change daily based on orders

21 coming in and out.  The pending assessments mean that there's

22 two orders pending -- pending a doctor's review and signature,

23 and there was three orders that were denied.  And this may have

24 encompassed, you know, a combination of the genetic orders.  It

25 could have encompassed this particular -- not knowing the

1    doctor or their orders in there, they can't see them, but it

2    could be DME orders and pharmacy orders in there, as well.

3    Q.   And then if we were to go all the way over to the left-hand

4    side of this, are there other, you know, tabs that the provider

5    could click on to go to different parts of the portal?

6    A.   Yes.

7    Q.   Okay.  And I'm going to go to the third page of Government

8    Exhibit 1912.  Zoom out here for you.

9         Is this another aspect of the doctor's portal?

10   A.   It is.

11   Q.   Okay.  And what is on this part of the portal?

12   A.   Well, this particular -- the order itself -- well, it gives

13   an order number, it tells you what the product group is.   In

14   this case it's a DME, because it's a brace knee order.

15   Q.   Okay.  And then we are going to go to the next page, fourth

16   page of Government's Exhibit 1912.

17        And is this a further screenshot of what the doctor might

18   see in the portal?

19   A.   Yes.

20   Q.   Okay.  So explain to the jury, what are we looking at here?

21   A.   Well, this is a -- well, it's a little different -- this is

22   a DME order form, or it appears to be, and it's a medical

23   necessity form that the doctor is signing off on.

24   Q.   Okay.  And this is for DME, so for a back brace or a knee

25   brace or something like that.  But the steps that we looked at

1   and the view of the portal that we're looking at, how similar

2   would it be for genetic testing?

3   A.   The same or similar.

4   Q.   Okay.  And so up here in the top left corner, what are

5   these buttons up here?

6   A.   Well, one says accept, deny, refresh.  Obviously, if they

7   accept, they click, it moves them through the paperwork where

8   they review and sign.  If they deny, they hit the deny button.

9   And for whatever reason, if their system timed out, or they got

10  stuck or they wanted to look at something, they would hit the

11  refresh button.

12  Q.   Okay.  And then over here -- I'll zoom in again -- there's

13  these bubbles.

14       What are these?

15  A.   So those are diagnostic codes.  Obviously, the next one

16  would say knee pain, medication.  So basically, it's a quick

17  cheat sheet for the doctor to review a chart.  It would

18  problegate promulgate based on what was submitted by the

19  marketer.

20  Q.   So when you say what was submitted by the marketer, so who

21  came up with this information that's here?

22  A.   We did.

23  Q.   Meaning who?

24  A.   My company.

25  Q.   Meaning who specifically?

1   A.   Myself and my IT team.

2   Q.   Okay.

3   A.   To expedite the time that it would take a doctor to look at

4   an order because it would be -- everything would be

5   pre-populated there.

6   Q.   And pre-populated by whom?

7   A.   By the -- well, based on the logic-based question and

8   answer, it would problegate what the specific codes were for a

9   product and give a general overview of a patient's claim, so to

10   speak, what they --

11   Q.   Okay.  Now, when you took Mr. Patel through the provider's

12   portal, obviously it would have been for genetic testing; is

13   that fair?

14   A.   That is fair.

15   Q.   Okay.  So now having seen an example, some screenshots of

16   the portal, can you give a little more color for the jury of

17   what specifically Mr. Patel was shown?

18   A.   Essentially, exactly what you see here, just the process

19   flow on how everything -- how both systems communicated with

20   each other.  So as we said before -- as I said before, the

21   salespeople, or the telemarketers, they're on the phones.

22   Those are based on logic-based scripts.  And after they're done

23   taking the information, they hit submit, it posts into the

24   sales portal.  Then the steps of -- A through Z steps in

25   connection with what we were doing with the genetics on how the

1    order gets shipped, how it's received, how it's digitally

2    imposed -- posed into the system and pushed over to the

3    doctor's side, and what the doctor would see, meaning, a

4    requisition, letter of medical necessity, clinical summary.

5    And if they had a history of family cancer, that would be in

6    there, as well.

7    Q.   Okay.  Aside from the meetings that you've just described

8    that occurred at your office, did you have any in-person

9    meetings with -- did you have any other in-person meetings

10   where you and Mr. Patel discussed the aspects of the business?

11   A.   Yes.  I had another meeting with him at The Breakers Hotel,

12   at a restaurant at The Breakers Hotel.  I had met Mr. Patel

13   there.  There was another meeting, could have been a week, two

14   weeks later, I don't remember the time frame, where Mr. Patel

15   came with another person from his lab, Nick Saliba, who I

16   believe is the president of the company.

17        I had a dinner meeting with Mr. Patel, just him and myself,

18   one night at a restaurant in Boca Raton called La Nouvelle

19   Maison, and we just wound up having drinks there.  And we

20   walked -- because I don't know if he liked the menu, didn't

21   like it.  But we walked over to another restaurant called

22   Trattoria Romana, which was directly next door, and

23   coincidentally, Mr. Hirsch and Mr. Youngswick were at the bar,

24   and they joined us for dinner.

25   Q.   Let me stop you right there, Mr. Sporn.  This particular

1    incident you're describing where you and Mr. Patel met for

2    drinks, what city was this in?

3    A.   In Boca Raton.

4    Q.   In Boca Raton?

5    A.   It was actually not to meet for drinks; it was actually to

6    have dinner at this restaurant.  But we wound up only having

7    drinks there.

8    Q.   Okay.  Fair enough.  And what, if anything, did you discuss

9    with Mr. Patel about your operations during that meeting?

10   A.   I mean, just a general overview, more business, you know,

11   just the -- everything that we've discussed here right now.

12   Q.   Well, for example, what, if anything, did you ever share

13   with Mr. Patel in terms of your concerns about, I think the way

14   you phrased it earlier, was the physical impossibility of the

15   doctors actually calling all of the patients?

16   A.   Yeah, no.  I was very clear that it would be impossible for

17   the doctors to contact each and every one of these individuals,

18   especially at the time frame that the orders were coming back.

19   You know, I had stated that -- as I stated before, that we made

20   some changes to the rep -- to the doctor's portal, please

21   contact -- you know, please make sure you contact your reps --

22   your patients, excuse me, things of that nature.

23           MS. DE BOER:  Okay.  At this time, Your Honor, the

24   government moves admission of Government's Exhibit 1499 and

25   1779 and 1779-A.

1          THE COURT:  Any objection?

2          MR. SADOW:  No objection.

3          THE COURT:  Those will be admitted.

4          MS. DE BOER:  Thank you, Your Honor.

5          (Government Exhibits 1499, 1779, and 1779-A were received

6          in evidence.)

7    BY MS. DE BOER:

8    Q.  So, Mr. Sporn, I'm going to show you what has been admitted

9    as Government Exhibit 1499.

10         And is this an email from you to Mr. Patel dated July 24th

11   of 2018?

12   A.  It is.

13   Q.  All right.  And I know it's a little tough -- I'll have to

14   move it over for you when we get to the end of the line.

15         But can you read to the jury what you said to Mr. Patel?

16   A.  Hi, Minal.  See blow CGx, we reduced to one page.  It has

17   all the information needed.  Also, we send the letter of

18   medical necessity separately.  Please approve, if possible,

19   this evening, so I can have it programmed, as my head

20   programmer's going on vacation Wednesday, late afternoon, and

21   do not want to lose any time.

22   Q.  Okay.  And then if we scroll down, what is it that you are

23   sending to Mr. Patel?

24   A.  A reworked version of the LabSolutions paper rider.

25   Q.  And do you see here that Medicare is already checked off?

1   A.   I do.

2   Q.   Saliva collection is already checked off?

3   A.   I do.

4   Q.   Fasting and room temperature are already checked off?

5   A.   Correct.

6   Q.   And then, if we go to the next page, do you see the number

7   of genes are already checked off?

8   A.   Correct.

9   Q.   And why were these already -- why was all this information

10   already checked off when you sent this to Mr. Patel?

11   A.   Because we were told that -- to check these specific genes,

12   also to make sure that the genes matched in the letter of

13   medical necessity, and that's why we were -- I was sending it

14   to Mr. Patel to review and approve to make sure that the proper

15   genes were checked and the genes matched with the letter of

16   medical necessity.

17   Q.   Why did you only send it to Mr. Patel, and why didn't you

18   copy Jon Berarducci or Nick Saliba, for example?

19   A.   I don't know why.  I think that as time -- well, I know as

20   time went on, I developed a relationship with Mr. Patel.

21   Besides, you know, things of this nature, there were some

22   billing issues.  I was helping Mr. Patel and his team do some

23   reconnaissance with what other labs were getting approved on

24   their billing codes and how they were getting codes.  So we

25   developed a relationship as time went on.

1   Q.   Okay.  And this is, you know, one example of a req form.

2   Did the req forms change over time?  Were there changes to the

3   forms?

4   A.   Yeah, there were changes.

5   Q.   Okay.  And every time there was a change, would you have to

6   make updates in your portal to reflect the change?

7   A.   Absolutely.  That was the purpose of, you know, sending

8   them back and forth for approval.

9   Q.   Okay.  I'm going to show you what has been admitted as

10  Government's Exhibit 1779.

11       Mr. Sporn, this is another email where you are cc'd, and

12  it's from the same date, July 24, 2018, as the email we just

13  looked at; is that correct?

14  A.   Correct.

15  Q.   And someone named Ricardo Correa is sending an email to

16  Alex Santa; is that correct?

17  A.   That is correct.

18  Q.   Who's Ricardo and who's Alex?

19  A.   So Ricardo was the gentleman that I mentioned before who

20  was the graphic artist.  He was the person who made sure

21  everything would problegate correctly in the portal.  And Alex

22  Santa was our head programmer.  So without the two of them,

23  nothing would work.

24  Q.   Okay.  And then I'm going to go to the attachment.  And you

25  see that there is an attachment referenced here?

1   A.   Yes.

2   Q.   So I'm going to go to the attachment which has been

3   admitted as 1779-A.  And what is this?

4   A.   That's a requisition for a cancer screening.

5   Q.   Okay.  And it's got the checkmarks already?

6   A.   Yes.

7   Q.   And would it have been Ricardo and Alex that would have

8   assisted in translating this into the portal?

9   A.   So Ricardo, again, did all the conversion by reproducing

10  LabSolutions' requisitions so it would fit into the portal, and

11  it would be passed over to Alex so he could program it in a

12  manner where everything would problegate with the patients'

13  information and so that the doctor could review it and sign it.

14  Q.   All right.

15        MS. DE BOER:  At this time, Your Honor, the government

16  moves admission of Government Exhibit 1911 and 1911-A.

17        THE COURT:  Any objection?

18        MR. SADOW:  No objection.

19        THE COURT:  It will be admitted at this time.

20        MS. DE BOER:  Thank you, Your Honor.

21     (Government Exhibits 1911 and 1911-A were received in

22      evidence.)

23  BY MS. DE BOER:

24  Q.   Mr. Sporn, I'm showing you what's been admitted as

25  Government's Exhibit 1911.  All right.  This one's a little

1   faint here.

2       But do you see this is an email being sent to John at

3   LabSolutions?

4   A.  Yes.

5   Q.  From February 21, 2018?

6   A.  Yes.

7   Q.  Will Slagle is copied?

8   A.  Yes.

9   Q.  Or bcc'd, I guess?

10  A.  Yes.

11  Q.  And do you also see where it says M.S.  and then the email

12  address after that is corrupted, but who is M.S.?

13  A.  It would have most probably been myself.

14  Q.  All right.  And then do you see that there's -- the subject

15  is compliance doc?

16  A.  Correct.

17  Q.  And there's an attachment here, and it says:  Hi, John, As

18  requested, please find attached the compliance doc.

19  A.  Correct.

20  Q.  And it's from Steven?

21  A.  Correct.

22  Q.  And then moving to Government's Exhibit 1911-A, which is

23  the attachment, do you recall this document?

24  A.  Yes.

25  Q.  And what is it that was being sent to LabSolutions?

1    A.   An overview of the whole process flow, as I've been talking

2    about since I started my testimony.

3    Q.   Okay.  And we won't make you repeat it all, Mr. Sporn.  And

4    this exhibit is, you know, 100-some pages, so we won't go

5    through every page.

6         But going to the second page of this attachment, which ends

7    in Bates stamp 42188, Section 1 here says:  Required product in

8    clinical training.

9    A.   Excuse me, I'm sorry.  You said something ended in 42188?

10   Q.   Yes, sir.  That's just for our record here.

11   A.   Oh, perfect.

12   Q.   There's a page number at the bottom.

13   A.   Oh, I gotcha.  I didn't know.

14   Q.   All right.  So Section 1, required product in clinical

15   training.

16        Do you see that?

17   A.   Yes.

18   Q.   And do you see the highlighted language:  All marketing

19   efforts are kept separate from all telemedicine operations?

20   A.   I do.

21   Q.   What did that mean?

22   A.   Exactly what it says, all marketing efforts were kept

23   separate from all telemedicine operations.

24   Q.   Okay.  And can you, I guess, explain to the jury, if you

25   had both the marketing and telemedicine operations, how were

```
1   they, in fact, separate?

2   A.   So a traditional marketing -- a traditional marketer would,

3   you know, go around to physician's office, leave reqs, elicit

4   to do business with LabSolutions, John's lab, whomever.  That's

5   a traditional marketing rep.

6        And historically, they would be paid as a 1099 employee and

7   possibly get a bonus and overwrite based on the number of

8   orders that were submitted to any facility.  I'm giving a

9   general overview.

10       Obviously, my operation was not that type of operation.  I

11  wasn't an operation that knocked on doctors' doors.  We were a

12  telemarketing operation, and we marketed directly to individual

13  consumers, and through our telehealth company we already had

14  doctors on staff that were getting paid to sign the doctor

15  orders.

16  Q.   And --

17  A.   So they're two distinctly different worlds.

18  Q.   I'm sorry.  I didn't mean to interrupt you, Mr. Sporn.

19  A.   No problem.

20  Q.   And they're distinct worlds.  But when Mr. Patel visited

21  your call center in Boca, and when you gave him the tour of the

22  telemed portal, how, if at all, did you show him how those two

23  worlds worked together?

24  A.   Well, I mean, it was quite obvious.  One is a virtual

25  environment, done over the phone.  Our office is not a doctor's
```

1  office, it's not a medical office, it's located in a medical --

2  in a regular office building.

3  Q.  Okay.  Then moving to Section 2 here under prospective

4  patients, do you see that it says:  Marketing groups reach out

5  to affiliate's current or previous patient's pharmacy or DME?

6  A.  I do.

7  Q.  To establish an interest in genetic testing?

8  A.  Yes.

9  Q.  Could you explain what that means to the jury?

10  A.  Sure.  So over the years of telemarketing and being in the

11  business, we acquired a large database of individuals.  That is

12  king.  So the same people that may have been marketed for DME

13  products or pharmacy products, or both, as long as they were

14  Medicare Part B patients, they were solicited for genetic

15  testing.  So the leads were reused for another product, and in

16  this case, genetic testing.

17  Q.  And, Mr. Sporn, if a patient had previously said yes when

18  solicited for DME or pharmacy product, what did you think the

19  odds were that they might say yes to another product?

20  A.  Probably better than 90 percent.

21  Q.  All right.  And then going to the initial patient education

22  here in Section 3, do you see the reference to inbound and

23  outbound telephony?

24  A.  You're on number 3, you said?

25  Q.  Yes, I'm sorry, right here.

1   A.   Okay.

2   Q.   And that word is a little strange, telephony, but no secret

3   that patients are being called?

4   A.   No secret.  Not at all.

5   Q.   All right.  And there's a discussion here in this paragraph

6   about a prospective patient is identified and medical history

7   is recorded in the database, the operations team reviews the

8   file to make sure it's complete and ships a specimen collection

9   kit to the address on file.

10      These shipments can include specimen collection supplies

11  for the CGx testing alone, PGx testing alone, or both CGx and

12  PGx testing.

13      Do you see that?

14  A.   I do.

15  Q.   So thinking back to the description of the process that you

16  gave us this morning where the patient is sent the test before

17  there's any involvement by a telemedicine doctor, is that

18  exactly what you told LabSolutions?

19  A.   If you don't mind, let me --

20  Q.   Please, take your time, Mr. Sporn.

21  A.   Yes, it was consistent in what was stated in this document.

22  Q.   And if we go down to Section 4, operations overview:

23  Following successful completion of the specimen collection

24  process.

25      So this is discussing what happens once we get the kit

1    back, right?

2    A.  That's correct.

3    Q.  All right.  Then what's highlighted here says:  Then a

4    review of the medical history information provided on the

5    intake is done and requisitions are created.  The creation of

6    the requisition includes the input of demographic information,

7    patient signature transfer, the addition of suggested billing

8    codes, and the selection of the correct genetic test.

9         How, if at all, is this consistent with the process that

10   you described this morning of we create the patient chart and

11   requisition and then it's sent to the doctor?

12   A.  It's very consistent.

13   Q.  And that's exactly what you told LabSolutions.

14   A.  Correct.

15   Q.  All right.  Going to the next page of this process overview

16   which ends in Bates stamp 42189, then we get to the

17   telemedicine, Section 5, correct?

18   A.  Correct.

19   Q.  The requisition is then uploaded to telemedicine.  The

20   requisitions are then shared with the physicians licensed in

21   the appropriate state, a telephone conversation between the

22   patient and the physician occurs.

23        There's nothing in this paragraph indicating that the

24   doctors ever did any kind of video, face-to-face consultation

25   with the patients; is that correct?

1   A.   That's correct.

2   Q.   Okay.  And you are saying here that a telephone

3   consultation between the patient and physician occurs, correct?

4   A.   I did say that, yes.

5   Q.   Did you ever provide different information to Mr. Patel?

6   A.   Well, as I stated before, it would be physically

7   impossible.  And these were actual -- an actual conversation,

8   that it would be impossible for Dr. Smith to return, for

9   example, 40 orders at 12:00 o'clock, 1:00 o'clock, 2:00 o'clock

10  in the morning, and speak to these people at 12:00, 1:00,

11  2:00 o'clock in the morning.

12  Q.   All right.  And then in the bottom of this paragraph, the

13  physician makes the sole determination to accept, deny, or

14  adjust the test.

15       And how often in reality did they deny the test?

16  A.   Well, denials were approximately 2 percent.  98 percent of

17  the orders were approved.  As far as the billing codes --

18  billing codes and the test that was ordered, everything was

19  pre-populated.  So it was already pre-filled out for the doctor

20  before he got it.

21  Q.   And then here it says:  Physician reimbursement is

22  unrelated to the ordering of genetic testing of patients.

23       If the doctor approved -- the doctors approved 98 percent

24  of the time, what were you really paying the doctors to do?

25  A.   To review the -- to sign the orders.

1   Q.  All right.  And then there's a section here on results.  Do

2   you see that?

3   A.  Yes.

4   Q.  Okay.  And this last paragraph here says:  Once the

5   physician has reviewed the results, a signed letter is provided

6   to the teams.  A letter signed by a physician directing the

7   patient to schedule and follow up -- the follow-up medical

8   appointment and/or genetic counseling and report are then sent

9   directly to the patient's home.

10  A.  Correct.

11  Q.  Okay.  We're going to fast-forward towards the end of this

12  document.

13       Mr. Sporn, we're going to go to the page that ends in

14  42311.  This is an attachment to the operations overview that

15  we looked at.

16       So Lab Services sales submission form:  Hi, Is this

17  Mr. and Mrs. So and So?  If yes, this is So and So from Lab

18  Services.  How are you doing today?

19       Do you see that?

20  A.  Yes.

21  Q.  So is this script a similar script that we looked at this

22  morning?

23  A.  Yes.

24  Q.  And this script was sent in a packet provided to

25  LabSolutions, correct?

1    A.   That is correct.

2    Q.   Including this paragraph highlighted below, this is a

3    simple-to-use test, it's a benefit to seniors, their family,

4    their children, and grandchildren, because diseases such as

5    cancer can be passed along by our genes.  The great part is

6    that the test helps not only you, but also your entire family.

7    All test results stay private, and are only shared -- are only

8    available to you and the physician.

9         Do you see that?

10   A.   I do.

11   Q.   And this was sent to LabSolutions?

12   A.   Correct.

13   Q.   All right.  Then going to the page ending in 43230.  This

14   is attachment 8 to the overview.

15        Is this the same patient authorization form that we looked

16   at previously?

17   A.   It is.

18   Q.   All right.  And we're not going to belabor this point, but

19   it indicates that:  I, the patient, having the testing

20   performed, acknowledge that I've been offered the opportunity

21   to discuss with a healthcare provider.

22        Is that correct?

23   A.   Correct.

24   Q.   By the time the patient receives this in the mail, have

25   they been provided any opportunity to discuss with a healthcare

1    provider?

2    A.   Not on -- not on our end, so the answer is no.

3    Q.   Okay.  And then finally, going to Attachment 9, which ends

4    in Bates stamp 42321.

5         Do you see this?

6    A.   Yes.

7    Q.   This says -- it's a LabSolutions form for patient genetic

8    counseling session request.

9         Do you see this?

10   A.   I do.

11   Q.   Did you ever interact with a genetic counselor at

12   LabSolutions?

13   A.   I personally never did.

14   Q.   Okay.  Now, Mr. Sporn, did there ever come a time where the

15   possibility of an exclusive relationship between your company

16   and LabSolutions was discussed?

17   A.   Can you expand on "exclusive" better?  I'm not --

18   Q.   Okay.  Did anyone ever ask you to send your samples to

19   LabSolutions rather than to other labs?

20   A.   Yes.

21   Q.   All right.  Can you explain that to the jury?

22   A.   Well, I was requested to send all my samples to

23   LabSolutions, and it happened based on another meeting with

24   a -- I guess, a competitor or a conversation with Mr. Patel,

25   that I had meeting with a gentleman by the name of Khalid

1    Katary (phonetic), came to my offices numerous times, and he

2    owned a -- another lab.

3        I don't know if they were in business at one point, but

4    Mr. Patel flipped out.  You can't do business with him.  I want

5    you to send all our orders to LabSolutions, send them to me, so

6    on and so forth.  And I never did business with Mr. Katary.

7    Q.  All right.  And did you continue to do business with

8    Mr. Patel after that conversation?

9    A.  Yes.

10   Q.  Okay.  Was there ever a time where LabSolutions returned

11   paperwork and samples to you to get more information about the

12   patients?

13   A.  Yes, numerous times.

14   Q.  Okay.  Can you explain to the jury what types of things --

15   what was the reason that forms would be returned, and what type

16   of information were you being asked to provide?

17   A.  Sure.  So there was several different types of

18   explanations.  So one could have been a request through a

19   specimen recollect, meaning, that they were trying to run the

20   test, and there wasn't enough specimen, so that we had to do a

21   specimen recollect, which means we had to send another package

22   and get the person to reswab themselves.  That's one example.

23       Another example is that -- missing ICD-10 codes, update

24   ICD-10 codes, things of that nature.

25   Q.  Okay.

1          MS. DE BOER:  At this time, Your Honor, the government

2    moves admission of Government's Exhibit 1767 and 1767-A through

3    R, 1800, and 1800-A, 1786 and 1786-A, and 1802 and 1802-A.

4          THE COURT:  Any objection?

5          MR. SADOW:  No, Your Honor.

6          THE COURT:  Those will be admitted at this time.

7          MS. DE BOER:  Thank you, Your Honor.

8          (Government Exhibits 1767, 1767-A through R, 1800,

9          1800-A, 1786, 1786-A, 1802, and 1802-A were received in

10         evidence.)

11   BY MS. DE BOER:

12   Q.  So, Mr. Sporn, we're not going to look at all of those, but

13   I am going to show you a couple of examples, okay?

14   A.  Sure.

15   Q.  I'm showing you what has been admitted as Government

16   Exhibit 1767.

17         And this an email from Will Slagle to a couple of people,

18   including yourself?

19   A.  It is.

20   Q.  Okay.  And the subject of this email, which is up here at

21   the top, says:  Full set of recollections that have been

22   recently requested.  Please make sure these were handled or are

23   handled.

24         Do you see that?

25   A.  Or are being handled.

1    Q.   Are being handled.   Thank you.   I'm reading sideways.

2         And do you see that this is from June 13, 2018?

3    A.   It is.

4    Q.   Okay.   And there's a bunch of attachments to this.

5    A.   Correct.

6    Q.   All right.   So we're going to look at one example, which is

7    going to be 1767-F.

8         Do you see that?

9    A.   Yes.

10   Q.   Okay.   And this -- at the top it says:   Medical necessity

11   holds for Monica at LabSolutions to LC Services?

12   A.   Correct.

13   Q.   All right.   Dated May 17, 2018?

14   A.   Correct.

15   Q.   And it says:   Good morning, Attached is a list of CGx

16   patients that are currently on hold due to not meeting CMS

17   guidelines for medical necessity.

18        Do you see that?

19   A.   I do.

20   Q.   Please review the list and provide any additional codes and

21   supporting documents to go along with the original submission.

22        Do you see that?

23   A.   I do.

24   Q.   And then there's a list of patients here.   Do you see that?

25   A.   I do.

1    Q.   So what would be the process when you receive something

2    from LabSolutions saying these patients don't meet medical

3    necessity requirements?

4    A.   So in the instance that you're -- the document that you're

5    showing, a couple of things could have happened.  It's possible

6    that diagnosis codes, for whatever reason, did not populate on

7    the requisition, and they were updated by one of the techs, or

8    another scenario could be that when the rep was on the phone

9    with the individual -- individual on the phone, they didn't

10   fully complete some of the questions.

11        And we actually had a form called a reverify form.  So we

12   would call back the patient or the individual and reconfirm

13   their information and drill down on what was noted missing.

14        And if, in fact, there was something missing, and the

15   person indicated that they had that, a new requisition was

16   populated with the correct ICD codes.  If they didn't have that

17   condition, then it was -- there was nothing we could do with

18   it.  We didn't process it.

19   Q.   Okay.  I'm going to show you what has been admitted as

20   Government Exhibit 1802, Mr. Sporn.

21        And is this an email from Jill Davis at Medtech to billing@

22   LabSolutions.com, copying you?

23   A.   It is.

24   Q.   From September 14, 2018?

25   A.   It is.

1    Q.   All right.   There's an attachment to this as well.   And the

2    title is called -- subject is lab PGx fixes?

3    A.   It is.

4    Q.   And the subject -- the body of the email says:   Here are

5    the patients that need to be coded differently.

6         Do you see that?

7    A.   I do.

8    Q.   And then there's a list of patients that follows it?

9    A.   Yes.

10   Q.   All right.   So is this the same -- similar type of thing,

11   when you've got a list like this, then your company would

12   undergo the processes that you just described?

13   A.   Absolutely.

14   Q.   Okay.

15        MS. DE BOER:   At this time, Your Honor, the United

16   States moves admission of Government Exhibit 1778 and 1778-A,

17   1792 and 1792-A and B, 1795 and 1795-A, 1806 and 1806-A, 1817

18   and 1817-A, and 1821 and 1821-A to B.

19        THE COURT:   Any objection?

20        MR. SADOW:   No objection.

21        THE COURT:   Those will be admitted at this time.

22        MS. DE BOER:   Thank you, Your Honor.

23    (Government Exhibits 1778, 1778-A, 1792, 1792-A and B,

24      1795, 1795-A, 1806, 1806-A, 1817, 1817-A, 1821, and 1821-A

25      and B were received in evidence.)

1   BY MS. DE BOER:

2   Q.   And I have good news, Mr. Sporn, we're not going to look at

3   every single one of those documents.

4        But I do want to ask you, at some point, did you hear about

5   any perceived changes in Medicare's coverage for cancer genetic

6   testing?

7   A.   Yes.

8   Q.   And can you describe to the jury, what, if any,

9   conversations did you have with Mr. Patel about that?

10  A.   Well, there was numerous conversations.  I mean, one was --

11  well, I stated before I was doing some recognizance with other

12  labs, and also a couple of other billing companies, because at

13  one point in time, LabSolutions was not getting reimbursed by

14  Medicare for their tests.

15       And why did that affect me?  Because if they're not getting

16  paid, I can't get paid.  So I -- I assisted in procuring

17  additional ICD billing codes.  And I wasn't alone.  Mr. Slagle

18  helped with it.  We consulted with -- as I stated before, some

19  other billing companies.

20       And naturally, since my system was processing for other

21  marketers that were using other labs, it was very easy for me

22  to look into what other labs were -- other marketers were

23  processing to be sent to other labs, if that makes sense from

24  the telehealth side.

25       So that was discussed.

1   Q.   Okay.

2         MS. DE BOER:   At this time, Your Honor, the United

3   States moves admission of Government Exhibit 1225.

4         THE COURT:   Any objection?

5         MR. SADOW:   No objection, Your Honor.

6         THE COURT:   That will be admitted.

7         (Government Exhibit 1225 was received in evidence.)

8   BY MS. DE BOER:

9   Q.   Mr. Sporn, I'm showing you 1225.   Do you recognize this

10   document?

11   A.   It looks like a screenshot from a cell phone.

12   Q.   Okay.   And if you need a paper copy of it, I'm happy to

13   hand one up to you, if it's hard for you to see it.

14   A.   That definitely would be impossible to read, this one.

15   Q.   Well, certainly that.

16         MS. DE BOER:   Your Honor, may I give the witness a

17   paper copy?

18         THE COURT:   You may.

19         THE WITNESS:   Thank you.   I still can't even read it.

20   BY MS. DE BOER:

21   Q.   Mr. Sporn, just take a second to look at the exhibit so

22   that you understand what it is.

23   A.   Yes.

24   Q.   You ready?

25   A.   Yes.

1   Q.   Okay.  So this is October 30th of 2018; is that correct?

2   A.   It is.

3   Q.   First of all, is this between you and Mr. Patel?

4   A.   It is.

5   Q.   And on October 30th, Mr. Patel sends you this screenshot,

6   which I agree is a little hard for all of us to read.

7        Do you see that?

8   A.   Correct.

9   Q.   And then you respond:  Palmetto?  That's Novitas.  We are

10   already prepared for this in order routing.

11        Do you see that?

12   A.   Correct.

13   Q.   And then going to the next page, it's the same text, and

14   then Mr. Patel responds:  Novitas, cool.  Was just released but

15   retro to May.

16        Do you see that?

17   A.   Yes.

18   Q.   And it says:  We know already coded in my system.

19        Do you see that?

20   A.   It says:  We know already coded in my system.

21   Q.   Thank you.  And then Mr. Patel says:  Cool, meet at Boca.

22   A.   Yes.  So that was another meeting.  If you look underneath

23   "Cool, meet at Boca Beach," beach club.  I believe he was

24   staying at the Boca resort, and I met him at the Boca resort.

25   He was there.  It was a short meeting, maybe 15, 20 minutes, in

1    the lobby.

2    Q.   Okay.  And what I want to ask you about, Mr. Sporn, is, you

3    know, what's this discussion about Palmetto and Novitas?

4    A.   Well, Medicare is divided into what they call MACs, and a

5    MAC -- one MAC, for example, may not have the same requirements

6    to get reimbursed than another MAC, even though it's all

7    Medicare, believe it or not.  So I'm just using an analogy.

8         So Palmetto may allow for family cancer, where Meridian

9    doesn't allow for family cancer, if that makes sense.  So it's

10   dependent on the MAC or the region.

11   Q.   Okay.  And did there come a time where you experienced any

12   disruptions in payments in a particular MAC?

13   A.   Yes.

14   Q.   Can you explain that to the jury?  What was -- what MAC was

15   disrupted?

16   A.   I believe it was Novitas, the MAC out of Georgia.  That's

17   been a couple of years now since --

18   Q.   Fair enough.  I won't hold you to the particular MAC.  But

19   the payments from Georgia, what happened to them?

20   A.   They stopped.

21   Q.   Okay.  And what did you and Mr. Patel do in response?

22   A.   Well, as I indicated before, I was doing recognizance with

23   other labs, other billing companies, to see what they were

24   doing.

25        Conjunctively, Mr. Patel said that that he was getting up

1    and running at another facility in Pennsylvania, which was

2    located in a different MAC.

3    Q.   Okay.  And let me ask you:  Do you recall seeing the

4    contract, before we took the break, between LabSolutions and

5    your company?

6    A.   Yes.

7    Q.   The contract that talked about marketing to healthcare

8    providers?

9    A.   Yes.

10   Q.   If what you were really doing was marketing to healthcare

11   providers, why did you send Mr. Patel a text message about

12   order routing?

13   A.   Because it was all done through our electronic system.  So

14   we had extensive spreadsheets that were logic-based

15   spreadsheets.  So for Novitas, we knew from billing what ICD-10

16   codes to problegate on an order.  If it was Palmetto, there

17   were different sequence that would problegate on an order.

18   Most of the time, they were same and similar, but there were

19   disparities between the different regions.  So that's what that

20   was about.

21   Q.   Okay.  And then when you say here, we know already coded in

22   my system, is that what you're talking about?

23   A.   Correct.

24   Q.   Okay.  And I'm going to show you what has been admitted as

25   Government Exhibit 1494.

```
 1   A.   Do you need this back?

 2   Q.   I'll come grab it from you.

 3        And this is an email between you and Mr. Patel, correct?

 4   A.   It is.

 5   Q.   Dated July 12, 2018?

 6   A.   Correct.

 7   Q.   And you have an attachment here, as well, correct?

 8   A.   Yes.

 9   Q.   And can you read to the jury what you said to Mr. Patel?

10   A.   Hi Minal, See attached.  Got this from a lab client in

11   Novitas.  Please identify with your billing team what

12   additional -- I'm assuming -- that can't be the right -- but

13   information is needed to ask in a triage from a patient to

14   better qualify for family history.

15   Q.   And then if we go to the attachment, 1494-A, this is

16   additional questions to ask; is that correct?

17   A.   Yes.

18   Q.   And it provides a list of common cancer symptoms?

19   A.   Correct.

20   Q.   And there's a whole list here.  If you go down the list,

21   you see things like abdominal pain, nausea, vomiting?

22   A.   Correct.

23   Q.   Some of these are fairly generic symptoms; is that fair to

24   say?

25   A.   It is.
```

1    Q.   What was the point of asking the patients about these

2    generic symptoms?

3    A.   Because the more ICD-10 codes that are problegated on an

4    order, the higher the probability that you'll get a

5    reimbursement.  So they may deny one, two, or three of them,

6    but they'll potentially pay on a series of other ICD-10 codes.

7    Q.   Okay.

8         MS. DE BOER:  Your Honor, the government at this point

9    moves admission of Government's Exhibit 1783 and 1783-A through

10   E, 1785 and 1785-A, 1908, 1908-A and B, and 1906.

11        THE COURT:  Any objection?

12        MR. SADOW:  No, Your Honor.

13        THE COURT:  Those will be admitted.

14        MS. DE BOER:  Thank you, Your Honor.

15        (Government Exhibits 1783, 1783-A through E, 1785,

16        1785-A, 1908, 1908-A and B, and 1906 were received in

17        evidence.)

18   BY MS. DE BOER:

19   Q.   Mr. Sporn, on Friday -- we're going to shift gears for a

20   second.  On Friday, you had indicated you were testifying today

21   pursuant to a guilty plea; is that correct?

22   A.   That is.

23   Q.   And have you been sentenced yet?

24   A.   I have been.

25   Q.   And did you receive a lengthy sentence?

1  A.  I did.

2  Q.  And is it fair to say that you are hoping to receive a

3  reduction in your sentence in exchange for cooperating with the

4  government, including in exchange for testifying?

5  A.  That is correct.

6  Q.  Has anybody promised you a reduction in your sentence?

7  A.  Absolutely not.

8  Q.  Can you explain to the jury, what is your understanding of

9  how a sentence reduction would work?

10  A.  The government would have to recommend a sentence

11  reduction, and it's ultimately up to the Judge to approve it.

12  So even if the prosecutors in my case submitted their request

13  for reduction, the Judge would have to approve it.

14  Q.  Okay.  And you said you've been sentenced already.

15      During the course of those proceedings, did you and the

16  government both file paperwork?

17  A.  Yes.

18  Q.  And by you, I mean your attorney filed on your behalf.

19  A.  Attorneys on my behalf.

20  Q.  Okay.  Was there a legal -- was there paperwork filed

21  concerning a legal issue called a role enhancement?

22  A.  Yes.

23  Q.  And did both you and the government recommend some type of

24  role enhancement given your role in the crime that you pled to?

25  A.  Yes.

 1   Q.   But did you both recommend different role enhancements?

 2   A.   Yes.

 3   Q.   Okay.  When you recommended a different role enhancement

 4   than what the government recommended, were you in any way

 5   disputing your guilt?

 6   A.   No.

 7   Q.   Was it simply a legal issue as to how a sentencing

 8   guideline should be calculated?

 9   A.   That is correct.

10   Q.   Okay.  And, Mr. Sporn, you had mentioned on Friday that you

11   didn't just plead to a healthcare fraud matter, you also pled

12   to a tax matter; is that correct?

13   A.   That is correct.

14   Q.   And even aside from your recent guilty plea in those

15   matters, have you run into trouble with the law in the past?

16   A.   Yes.

17   Q.   And have you had convictions for other offenses in the

18   past?

19   A.   About 30 years ago, yes.

20   Q.   Okay.  Over the course of engaging in the conduct, the

21   telemarketing telemedicine conduct that we've been talking

22   about Friday and today, did you involve any of your loved ones

23   in that?

24   A.   Yes.

25   Q.   Okay.  Who did you involve?

1   A.   My son worked -- well, my son has been -- had been working

2   with me since he was about 15.  He's now 33, 34.  Don't hold me

3   to the year.  And he was around the call centers and the

4   insurance business, he was in the -- involved in the pharmacy

5   business.  And when I started this business -- was presented

6   the business opportunity by Mr. Slagle, the gentleman that I

7   spoke about before, that I started this off with, he was

8   involved in the business.  At some point in time, he decided

9   not to be involved with the business anymore.

10  Q.   And let me ask you, Mr. Sporn:  Did there ever come a time

11  where your son -- so he's 34, 35 now.  So about how old was he

12  during the time that you were working with Mr. Patel?

13  A.   Well, it would have been -- we started with Slagle, 2017,

14  so he would have been five years younger.  So he would have

15  been 28, 29.

16  Q.   Okay.  And did there ever come a time where he confronted

17  you about what you were doing with genetic testing?

18  A.   Yes.

19  Q.   What did he tell you?

20  A.   He said quit.

21  Q.   Did you?

22  A.   No.

23  Q.   Why not?

24  A.   The money was too good.

25  Q.   At any point, were you ever known by a different name than

1    Marc Sporn?

2    A.   Yes.

3    Q.   And what name was that?

4    A.   Well, I had a couple of aliases in business.  It was Mark

5    Stein, Martin Stein, and I believe Martin Steinberg.

6    Q.   And did you ever -- were you ever introduced to Mr. Patel,

7    or did Mr. Patel ever know you as Stein?

8    A.   Yes.  When I was first introduced, Mr. Youngswick and

9    Mr. Hirsch introduced me as Mark, and Mark Stein to Mr. Patel.

10   Q.   And what was the purpose of that?

11   A.   Well, you know, I had involvement in a lot of other

12   insurance-related businesses, had the telehealth company, had

13   the marketing, I know Google too well, and I don't know if they

14   were concerned that it may leave a bad impression on Mr. Patel

15   or what.  But, you know, they were the one who made the

16   introduction that way, and I went along with it.

17   Q.   Okay.  Let's just call it what it is.  You lied to

18   Mr. Patel about who you were.

19   A.   Yes.

20   Q.   But what did you tell him about your process?

21   A.   Everything as I just represented.  He was shown everything,

22   A through Z.

23   Q.   Okay.

24        MS. DE BOER:  At this time, Your Honor, the government

25   moves into evidence Government's Exhibit 1801 and 1801-A, 1818

1    and 1818-A, and 1813 and 1813-A.

2           THE COURT:  Any objection?

3           MR. SADOW:  No.

4           THE COURT:  Those will be moved in.

5           MS. DE BOER:  Thank you, Your Honor.

6        (Government Exhibits 1801, 1801-A, 1818, 1818-A, 1813,

7        and 1813-A were received in evidence.)

8    BY MS. DE BOER:

9    Q.  Mr. Sporn, you mentioned earlier that LabSolutions was not

10   the only lab that you did business with.

11   A.  That's correct.

12   Q.  Do you know whether Mr. Patel was getting orders from

13   anyone besides you?

14   A.  Yes.

15   Q.  What do you know about that?

16   A.  Well, I know that he was getting orders from Alite Medical,

17   which was Keith Youngswick and Brett Hirsch's company, because

18   we were doing some of the marketing for them.  You know, he

19   also represented that he had other marketing groups that were

20   sending him orders.

21   Q.  Who's "he"?

22   A.  Mr. Patel.  I apologize.

23   Q.  Okay.  At some point, did you become aware that Mr. Patel,

24   among other people, had been charged in connection with this

25   matter?

1    A.   Yes.

2    Q.   Did you shut down your operation, close up shop at that

3    point?

4    A.   No, I don't think so.

5    Q.   Did you -- and --

6    A.   I don't know the exact dates, because it's been quite some

7    time.

8    Q.   That's fair.

9         After 2019 and into 2020, even later, did you continue to

10   conduct this business on some level?

11   A.   Yes, in 20 -- yes.  We did what they called a doctor chase

12   model.

13   Q.   Okay.

14   A.   So we moved away from telehealth, and we were contacting

15   the doctors directly.

16   Q.   And when you say "doctor chase," and you were contacting

17   doctors directly, what does that mean?

18   A.   So the same process flowed by speaking with the patient on

19   the phone; however, we would get -- find out their primary care

20   physician's name and phone number and send them the order --

21   send them the requisition and the paperwork after we completed

22   it, and would chase them to get the order back.  It's called --

23   in the industry, it's called doctor chase.

24   Q.   Okay.  So you moved to a model where you were using the

25   teledocs.  You were trying to contact a doctor that actually

1    had a relationship with the patient.

2    A.   Correct.

3    Q.   Explain to the jury how the volume of referrals differed

4    when you were working with telemed versus the doctor chase.

5    A.   Night and day.  Just an analogy.  Okay?  Simple math.

6         For every hundred orders, maybe we got back 15 to

7    20 percent, if we were lucky, of those hundred orders from the

8    primary care physician; as opposed to the telehealth side, we

9    got back 98 percent of the orders.

10   Q.   And so how profitable was telemed versus doctor chase?

11   A.   It was night and day.

12   Q.   Okay.

13        MS. DE BOER:  At this time, Your Honor, the government

14   moves admission of Government's Exhibit 1223 and 1224.

15        THE COURT:  Any objection?

16        MR. SADOW:  No objection.

17        THE COURT:  That'll be admitted.

18        MS. DE BOER:  Thank you, Your Honor.

19        (Government Exhibits 1223 and 1224 were received in

20        evidence.)

21   BY MS. DE BOER:

22   Q.   Okay, Mr. Sporn, I'm showing you what's been admitted as

23   Government Exhibit 1224.

24        Do you see that?

25   A.   I do.

1  Q.  And would it help you if you have a paper copy, or can you

2  see this okay?

3  A.  I can see it okay.

4  Q.  Okay.  Is this another text exchange between you and

5  Mr. Patel?

6  A.  It is.

7  Q.  All right.  And do you see where Mr. Patel says:  Also,

8  Georgia is back to paying again?

9  A.  Yes.

10  Q.  And then you respond:  Great, thanks.  Working hard at it,

11  and business, 10,000 CGx a month or bust.

12      Do you see that?

13  A.  I do.

14  Q.  Mr. Patel responds:  Yes.

15      Do you see that?

16  A.  I do.

17  Q.  And then you respond:  We will make it happen.

18      Do you see that?

19  A.  Yes.

20  Q.  How substantial of a client was LabSolutions for you?

21  A.  They were -- well, let me answer you this way, if I may.

22  They were my favorite because I enjoyed doing business with

23  Mr. Patel at the time.  However, the amount of volume that I

24  was sending to Mr. Patel was load balanced between multiple

25  other labs, because I had a very extensive overhead in

1   infrastructure, as I just represented, you know, to everybody,

2   and I needed to sort of load balance my orders and make sure I

3   got paid.

4   Q.   And then when you add in the orders that you were sending

5   to LabSolutions through Mr. Slagle and through Mr. Hirsch, then

6   how substantial of a client are they?

7   A.   Pretty substantial.

8   Q.   Okay.  Thank you, Mr. Sporn.  No further questions.

9          THE COURT:  Thank you very much, Mr. Sporn.

10         Ladies and gentlemen of the jury, we're going to break

11   at this time for lunch, since it is just about 12:30.  We will

12   go ahead and have you come back to the jury room in about an

13   hour and 15 minutes.  So we'll do 1:45.

14         Couple of reminders, of course, as we take our lunch

15   break.  Number one, please remember not to discuss what you've

16   heard with each other or with family and friends.  Do not

17   conduct any independent research regarding anything you've

18   heard thus far in the trial.  Continue to please stay off

19   social media, as you must.  And, of course, take no offense if

20   you run into any of the lawyers and they avoid you while you're

21   out having lunch.

22         Make sure you leave your notepads in the jury room.

23         We'll see you all back there at 1:45.  You are excused.

24   (Jury exits at 12:31 p.m.)

25         THE COURT:  Please be seated, everyone, as we're

1    exiting the jury.

2          Mr. Sporn, you're excused, if you want to step down.

3    Obviously you remain under oath, and we will pick up where we

4    left off on the cross-examination.

5          THE WITNESS:  So about an hour.

6          THE COURT:  About an hour and 15.  You can be here back

7    in court by 1:45.  All right?

8          Okay.  Any other housekeeping issues the Court needs to

9    be aware of before we take our lunch break on behalf of the

10   government?

11         MS. DE BOER:  Not at this time, Your Honor.

12         THE COURT:  Anything on behalf of the defense?

13         MR. SADOW:  No, your Honor.

14         THE COURT:  All right.  Very good.  We'll see everybody

15   back in court at 1:45.  We're in recess.

16         MS. DE BOER:  Thank you, Your Honor.

17         THE COURT:  You're welcome.

18      (Court recessed at 12:32 p.m.)

19      (Back on the record at 2:02 p.m.)

20         MS. DE BOER:  Your Honor, we have a couple of

21   objections to deal with quickly.

22         THE COURT:  Oh, perfect.  Let's go ahead and do that

23   quickly.  Let me go ahead -- what do we have?

24         MS. DE BOER:  Maybe Mr. Sporn should be excused for

25   this.

1      THE COURT:  Yeah.  If you don't mind, Mr. Sporn, let me

2   have you step down and step outside for just a second, and

3   we'll come get you in just a moment.

4      MS. DE BOER:  And while the witness is stepping out,

5   Your Honor, I had showed -- published Government's Exhibit 1494

6   and 1494-A.  I apparently did not move them in.  I believe

7   without objection, I'll move those in at this time.

8      THE COURT:  Is that correct?

9      MR. SADOW:  That's correct.

10      THE COURT:  Okay.  We'll admit those two at this time,

11   then, 1494 and 1494-A.

12      (Government Exhibits 1494 and 1494-A were received in

13       evidence.)

14      THE COURT:  All right.  So Mr. Sporn has exited.  So

15   tell me what the issue is before we start our cross.

16      MS. DE BOER:  Yes, Your Honor.  Two issues.  One is a

17   May 14, 2018, email that Mr. Sporn is not a party to.  It's a

18   defense exhibit.  I don't have it marked urgent, so I don't

19   know what number it's going to be.

20      MR. SADOW:  S-1.

21      MS. DE BOER:  S-1.  Since he is not a party to the

22   email, unless he recognizes and says he's seen it, it's not

23   already in evidence, so I don't think it's an appropriate

24   document to put in front of him.

25      He may be shown it and recognize it and say:  Yes, I

1   have seen it.  And that may solve the problem.  But until that

2   happens, we would object.

3          And then the bigger issue is what has been marked but

4   not admitted as Government Exhibit 1848 and 1848-A.  This is a

5   copy of a July 2019 legal memo from Toby Watt's law firm to

6   LabSolutions.  And it deals solely with EKRA and whether, under

7   EKRA, it would be appropriate to go back to a percentage-based

8   fee.

9          Apparently, a copy of this came into Mr. Sporn's

10  possession.  And I believe Government Exhibit 1848 is from

11  August of 2019.

12         We would object on several grounds.  No. 1, a memo

13  about EKRA at the very end of this conspiracy really isn't

14  relevant to the advice-of-counsel defense because it's, one,

15  not about a statute that's at issue in this case; there's no

16  charges pertaining to EKRA.  Regardless of what EKRA permitted,

17  the Anti-Kickback Statute was its own animal, and this memo

18  doesn't deal with it.

19         Two, it's coming in at the very end of the conspiracy.

20  So this isn't legal advice that was relied upon throughout the

21  conspiracy to justify the actions taken.  So it doesn't really

22  speak to anybody's intent, including the witness or Mr. Patel's

23  intent.

24         And third, I have put this document in front of

25  Mr. Sporn during interviews, and he doesn't recall it; he

1    doesn't recall how he received it; he doesn't recall what it

2    was about.

3         So there's really no substantive testimony that can

4    come of this.  This is really just a way to back-door what is

5    frankly an irrelevant part of the advice-of-counsel defense.

6    And to the extent it does become relevant, it should come in

7    through the appropriate witness, which is not Mr. Sporn.

8         THE COURT:  Okay.  So let's go ahead and take these

9    issues in turn.  First one is the Defense Exhibit S-1, which I

10   understand Mr. Sporn may or may not recognize.

11        Defense's response to that particular --

12        MR. SADOW:  Excuse me, Your Honor.  If he recognizes

13   it, I'll move its admission; if he doesn't recognize it, I will

14   not.

15        THE COURT:  Very good.  So that takes care of that.

16        How about this 1848 -- both 1848 and 1848-A?  I will

17   say this -- I don't know if this is going to be the defense's

18   perspective.  The first argument about the relevance of EKRA in

19   terms of how it fits into the Anti-Kickback Statute, I mean, I

20   would also imagine that we wouldn't have to necessarily have it

21   be so specific.  And by that, I mean that it shows a

22   willingness at least, from a state of mind perspective, to seek

23   advice of counsel in navigating some of the trickier portions

24   of Medicare.

25        So I don't know that it has to be so on point to be

1    relevant under 401.

2          Now, the other parts, in terms of its end of the

3    conspiracy, I mean, I have to say it seems like that's really a

4    jury's call.  I don't know how it fits into the long arc of the

5    conspiracy that it would give me a basis to keep it out as it

6    pertains to Mr. Patel's intent.

7          Now, again, I don't know; I haven't seen it.  So maybe

8    there's a little more to it.

9          But I'll turn it to you, Mr. Sadow, issues on 1848.

10         MR. SADOW:  Yes, Your Honor.  1848 is the email, and

11   the email is from this witness to this witness, and it is dated

12   August 19, 2019.  And it references the attachment being an

13   EKRA memorandum, and then 1848-A is the memorandum.

14         So this is a document that this witness sends to

15   himself on August the 19th, which is within the time frame of

16   the alleged conspiracy; it didn't end until the end of August.

17   So it's admissible as it's part of an email that he sent

18   himself.

19         The fact that he chooses not to remember what it is,

20   that's a whole other story.  But it is admissible.  It's his

21   email, and it's a memorandum attached to it.

22         THE COURT:  So I don't think he's going to have an

23   issue maybe once he's refreshed.  But it sounds to me like he's

24   going to know what we're talking about here.

25         I mean, Ms. de Boer, I'm struggling to see why we

1    wouldn't allow this to come in.  What weight it's given will be

2    up to the jury, but certainly this is something you could

3    address on redirect.

4         Is there anything else you wanted to point out on these

5    two exhibits?

6         MS. DE BOER:  Yes, Your Honor.  I mean, the memo is

7    straight hearsay at this point, Your Honor.  The exhibit that's

8    being discussed, Mr. Patel is not even a participant in it.

9    And so I don't see how it could go to, you know, effect on the

10   reader, I guess, in this circumstance.  It doesn't pertain to

11   the defendant's intent at this point.  I think it would be much

12   better placed through a witness that can actually speak to

13   these issues.

14        THE COURT:  Well, I don't know if he can.  And maybe he

15   can't.  I mean, it's similar to S-1.  I take it that if he

16   can't, we won't be moving in S-1 through this witness anyway.

17        So, I mean, what's the -- I guess the thinking on 1848,

18   Mr. Sadow, that this is something that he is copying to

19   himself, or I guess it's --

20        MR. SADOW:  Yes.

21        THE COURT:  -- to put it another way, he's e-mailing it

22   to himself.  But it's the July 29th legal memo from Watt to

23   LabSolutions.  So the thinking would be this is something that

24   he has presumably relied on or looked at, I would think.

25        MR. SADOW:  Well, I'm assuming he's going to have to

1    admit that it was provided to him by someone from LabSolutions

2    or a lawyer from LabSolutions and that, in that sense, he then

3    sent it to himself.  Whatever reason, I don't know yet, but --

4         THE COURT:  And let me ask you something, Mr. Sadow.  I

5    don't think you're attempting to offer the substantive legal

6    memorandum for its analysis, right?

7         MR. SADOW:  No.

8         THE COURT:  This would go towards presumably just

9    probative evidence of how they were going about -- if they were

10   doing any compliance or any kind of discussion of regulations,

11   this would be an example of that, I would take it.

12        MR. SADOW:  That's correct.  I do not intend to publish

13   the memorandum at all with this witness, just put it into

14   evidence.

15        THE COURT:  Okay.  All right.  I mean, let's -- so I'd

16   like to see how it plays out, Ms. de Boer.  I don't think

17   there's a position for me right now to take on keeping it out.

18   If we can lay a predicate with him at that point and I need to

19   give some sort of instruction when it comes in, I'll be happy

20   to do that.  But I don't think I'm in a position now where I

21   can say clearly that it doesn't satisfy 401 or has a 403

22   problem.  Okay?

23        MS. DE BOER:  Thank you, Your Honor.

24        THE COURT:  You're welcome.  All right.

25        Anything else on the government's end, or was that the

```
 1   last two things?
 2            MS. DE BOER:  That's it, Your Honor.  Thank you.
 3            THE COURT:  Okay.  On the defense side, anything else,
 4   Mr. Sadow, before I bring in the jury?
 5            MR. SADOW:  No, Your Honor.
 6            THE COURT:  All right.  Let's go ahead, if we could.
 7   If someone could let Mr. Sporn know.  Thank you.  We will get
 8   him back on the witness stand.  And now we can go round up our
 9   jurors.
10            THE COURT SECURITY OFFICER:  All rise for the jury.
11       (Jury enters at 2:12 p.m.)
12            THE COURT:  Please be seated, everyone.
13       Ladies and gentlemen of the jury, welcome back.  I hope
14   you had a nice lunch, and I think I squeezed in the coffee just
15   before we got started.  So hopefully if you wanted some, you
16   got some.
17       So, as you all know the way this works by now, we're
18   going to turn it over to Mr. Sadow, who will begin his
19   cross-examination of Mr. Sporn.
20       All right.  Counsel, the floor is yours.
21            MR. SADOW:  Thank you, Your Honor.
22                      CROSS-EXAMINATION
23   BY MR. SADOW:
24   Q.  Good afternoon, sir.
25   A.  Good afternoon.
```

1    Q.   Let's see if we can agree on one simple proposition to

2    start with.  Okay?

3         Deception is just another way of calling something a lie,

4    correct?

5    A.   Yes.

6    Q.   Okay.  So when I'm using the word "deception" throughout my

7    examination, I may interchange it with the word "lie."

8         Do you understand?

9    A.   I understand.

10        MR. SADOW:  Let's start with what has been admitted

11   into evidence as Government Exhibit 1911, if we might.  And if

12   we can blow that up so that the ladies and gentlemen of the

13   jury could see it.  I need to move it over a little bit.

14   BY MR. SADOW:

15   Q.   Now, you remember you were asked about this on direct

16   examination, correct?

17   A.   Yes.

18   Q.   And you can see it on your screen, correct?

19   A.   Yes, I can.

20   Q.   All right.  Now, this is from -- it says info information,

21   but it's really from you, right?

22   A.   I don't know whose email that is.

23   Q.   You don't know who sent that?

24   A.   No.  I know that -- I don't -- I can't tell you precisely

25   who info-info@exchangeadministrationgroup is.

1   Q.   Well --

2   A.   But I could tell you, you know, I was bcc'd on an email,

3   but I don't --

4   Q.   Okay.  Let's do it that way, then.  You know it's from

5   Steven, right?

6   A.   Yes, I do.

7   Q.   Okay.  Now, tell the ladies and gentlemen of the jury who

8   Steven is.

9   A.   Steven Goldberg was the president of CPL Media.

10   Q.   CPL Media, right?

11   A.   Correct.

12   Q.   CPL Media is the telemarketing company, correct?

13   A.   Correct.

14   Q.   All right.  Now, it's sent to Jon@LabSolutions.

15        And you understand that to be Jon Berarducci, correct?

16   A.   Yes, sir.

17   Q.   Now, it's the bcc I wanted to ask you about specifically,

18   leading into a whole series of questions.  The bcc is WSlagle,

19   right?

20   A.   Yes.

21   Q.   @ourfamilygenes, correct?

22   A.   Correct.

23   Q.   And that's the Slagle that you've been talking about on

24   direct examination, right?

25   A.   That is.

1    Q.   And the next one is M.S., right?

2    A.   Yes.

3    Q.   And M.S. is you?

4    A.   Yes, it could be.  I already said that.

5    Q.   All right.  Well, when you say "it could be," it is.  Let's

6    not deal in possibilities or probability.  M.S. is you,

7    correct?

8    A.   The only reason why I answered you, sir, is I don't

9    recognize exchange administration group email.

10   Q.   Is there anyone else that was working with Mr. Slagle or

11   Steven that went by the initials M.S.?

12   A.   Not that I'm aware of.

13   Q.   Okay.  So it's probably pretty safe to say that M.S. is

14   you, right?

15   A.   It could be, sure.

16   Q.   Okay.  Could be.

17        And the reason it's bcc as opposed to cc -- well, first of

18   all, you know what bcc means, right?

19   A.   Yes.

20   Q.   What does it mean?

21   A.   Blind copy.

22   Q.   That means that the individual that is receiving the email

23   doesn't know that you're getting a copy of it, correct?

24   A.   Correct.

25   Q.   And the reason that it's bcc and not cc is because you had

1   lied to Mr. Patel and told him that CPL Media was Mr. Steven

2   Goldberg's company, right?

3   A.   Steven Goldberg was the president of CPL.

4   Q.   That's not my question.

5        You had lied to Mr. Patel and told him that CPL Media was

6   Steven Goldberg's company, right?

7   A.   No.  I told him he was the president of CPL Media.

8   Q.   But who ran CPL?  Who owned the company?

9   A.   I was the owner.

10  Q.   And you concealed the ownership of CPL from Mr. Patel; did

11  you not?

12  A.   It never came up.

13  Q.   It never came up.

14       Are you certain of that?

15  A.   I'm pretty certain of it.

16  Q.   Pretty certain of it.

17       When you were telemarketing and telemedicine, didn't you

18  and Mr. Slagle agree that you would not tell Mr. Patel that you

19  were involved in the telemarketing because you were going to

20  tell him you were involved in the telemedicine?

21  A.   I agreed with Mr. Patel, but that's not what you asked me,

22  sir, before.  You said -- with Mr. Slagle.  You asked me if I

23  told -- denied that to Patel.

24  Q.   You refused to tell Mr. Patel -- you concealed from

25  Mr. Patel that you were the true owner of CPL, correct?

1  A.  It never came up with Mr. Patel and myself.

2  Q.  Never.  Who did you say owned CPL?

3  A.  I -- only --

4  Q.  Who did you say that --

5       THE COURT:  One at a time for my court reporter,

6  please.

7  BY MS. DE BOER:

8  Q.  Who did you say to Mr. Patel owned CPL, the telemarketing

9  company?

10  A.  I don't know that ownership ever came up.

11  Q.  It never came up.

12  A.  I'm not aware that it did.

13  Q.  Okay.  You know who received the checks for CPL?

14  A.  Yes.

15  Q.  Who?

16  A.  Medipak, d/b/a CPL Media Group.

17  Q.  Mr. Goldberg, correct?

18  A.  No.  I own Medipak d/b/a CPL.  They were wire transfers or

19  ACHs.

20       MR. SADOW:  I'll show you what I move into evidence as

21  Government Exhibit 155.

22       MS. DE BOER:  No objection to this summary exhibit

23  prepared by a consultant.

24       (Government Exhibit 155 was received in evidence.)

25       MR. SADOW:  If I may bring it to him?

```
 1              THE COURT:  Yes, you may.
 2   BY MR. SADOW:
 3   Q.  I represent to you that that is a summary exhibit listing
 4   all of the monies that were sent to Medipak doing business as
 5   CPL.  Okay?
 6   A.  That's what I just said.  It went to Medipak d/b/a --
 7   Q.  Is your name anywhere on there?
 8   A.  On Medipak?  It is.
 9   Q.  Is your name on the summary exhibit as having anything to
10   do with receiving the money?
11   A.  No.
12   Q.  No.  Whose name is on there as having received the money?
13   A.  Steven Goldberg.
14   Q.  And Steven Goldberg, who signed the contracts with
15   LabSolutions for CPL?
16   A.  Steven Goldberg.
17   Q.  Is there anything that you can present to us to suggest
18   that you told Mr. Patel that you had an ownership interest in
19   CPL?
20   A.  No.
21   Q.  Not a thing, right?
22   A.  No.
23   Q.  So the entire time that LabSolutions was dealing with CPL
24   and telemarketing, you concealed the fact that you were the
25   owner, right?
```

1    A.  I -- it never came up, so I don't know how I could conceal

2    something that never came up.

3    Q.  You got to be good friends with Mr. Patel, remember?  You

4    had all these conversations.  You went out to eat with him.

5    You had phone calls with him.  And it just never came up in a

6    year-and-a-half period of time that you were the true owner of

7    CPL.  That's your position?

8    A.  It is my position.

9    Q.  So why didn't you tell him?

10   A.  What for?

11   Q.  That's exactly right.  What for?  Because if you don't tell

12   him, he doesn't know, right?

13   A.  That's correct.

14   Q.  And therefore, why tell him the truth if you can just omit

15   something and keep it a secret, right?

16   A.  Correct.

17   Q.  Okay.  Well, let's go back.  Let's talk about deception.

18       Deception doesn't start with Mr. Patel; it goes all the way

19   back to 1989, doesn't it?

20   A.  In what respect, sir?

21   Q.  Well, let's talk about your six false statement

22   convictions, guilty pleas, in federal court, in the Southern

23   District of Florida in 1991.  You know what I'm talking about,

24   right?

25   A.  Yes.  I asked you to clarify it.

1   Q.   They were false statements, right?

2   A.   Yes, they were.

3   Q.   And would you tell the jury, what did you do with those

4   false statements?  Whose identity did you steal?

5   A.   I don't recall, sir.

6   Q.   You don't recall?

7   A.   No.

8   Q.   Wasn't it your grandfather-in-law?  Didn't you steal your

9   grandfather-in-law's identity?

10   A.   (No response).

11   Q.   Well, was it?

12   A.   I don't --

13   Q.   You don't remember?

14   A.   It was 30 years ago, sir.  So I don't remember all the

15   details.

16   Q.   You don't remember whose identity you stole?

17   A.   No.

18   Q.   Even 30 years ago?

19   A.   30 years ago, yes.

20   Q.   Okay.  How about Dr. Kaplus, K-a-p-l-u-s, DDS?  Does that

21   refresh your memory?

22   A.   It does.

23   Q.   Good.

24        What did you do -- how did you steal his identity?  What

25   did you do?

```
 1   A.  I don't recall, sir.

 2   Q.  You don't recall what crime -- how you committed the crime?

 3   A.  No.  Well, I recall what I did.

 4   Q.  Did you not submit false documents to Triangle Bank Leasing

 5   Corporation?

 6   A.  I did.

 7   Q.  And didn't you do that in his name?

 8   A.  I did.

 9   Q.  And didn't you do that in order to obtain money by false

10   pretenses?

11   A.  I did.

12   Q.  And didn't you do that in regard to a number of things

13   dealing with dental supply corporation and insurance?

14   A.  I --

15   Q.  Like Dr. Kaplus?

16   A.  I don't know about insurance, but it was a dental supply

17   company.

18   Q.  Didn't you get insurance under Dr. Kaplus' name?

19   A.  I don't recall, sir.

20   Q.  I realize that your position is it's a long time ago, but

21   this -- these false statements, these were acts of deception,

22   were they not?

23   A.  They were, but I paid the price.

24   Q.  And you paid the price.  But that's not all.

25       What else did you do in the same time period which resulted
```

1   in another conviction in the Southern District of Florida, this

2   time for busting out corporations?  What did you do?

3   A.   They were at the same time.

4   Q.   It's the same time, but they were different crimes, right?

5   A.   Correct.

6   Q.   Okay.  Well, tell us about this next crime, the one I just

7   asked you about.

8   A.   So I shifted assets from one company to another company.  I

9   never paid the creditors.

10  Q.   To who?

11  A.   I never paid the creditors.

12  Q.   You defrauded the creditors by moving assets from one

13  company to another company?

14  A.   I did.

15  Q.   Okay.  And did you do that knowingly, voluntarily?

16  A.   Yes.

17  Q.   And did you do it to make money?

18  A.   Yes.

19  Q.   Did you get assets as a result of it?

20  A.   Yes.

21  Q.   Okay.  And on both those cases, you have went into federal

22  court and received sentences, correct?

23  A.   Correct.

24  Q.   One, you received 27 months, and the other, you received

25  24 months, to be served at the same time, right?

```
 1   A.   That is correct, sir.

 2   Q.   And then you came out of prison, correct?

 3   A.   Yes.

 4   Q.   And you were on something called supervised release, right?

 5   A.   Correct.

 6   Q.   And that's akin to -- it's about the same thing as

 7   probation, right?

 8   A.   Yes.

 9   Q.   How long did it take you before you violated supervised

10   release?

11   A.   Three years.

12   Q.   Three years.

13        And what did you do to violate supervised release?

14   A.   I didn't supervise somebody who was working for me who did

15   something without my knowledge and I owned the company.  That's

16   what happened.

17   Q.   So you were accused of doing something, but you really

18   didn't do it.  Is that what you're telling us?

19   A.   So what happened was, I was in import and export of medical

20   supplies.  And what happened was, an employee shorts -- what

21   they call short-stopped some goods.  He went to a freight

22   forwarder and made a deal with him and removed the export

23   labels and the goods were never shipped out of the country and

24   they stayed here.

25        But at the time I had no knowledge, nor did I ever receive
```

 1   a charge for that.

 2   Q.  No, you didn't receive a charge for that, you're right.

 3       Instead, Judge Hoeveler revoked your supervised release

 4   when you gave him the same explanation you just gave the jury

 5   and sent you back to jail for 14 months, right?

 6   A.  Correct.

 7   Q.  So the explanation you gave us was not accepted by the

 8   judge, your supervised release was violated, you went back to

 9   jail, right?

10   A.  That is correct.

11   Q.  And then, after that, you didn't engage in any criminal

12   conduct for a long time?

13   A.  Well, until just this episode that happened with the

14   healthcare stuff and the taxes.

15   Q.  Oh, the taxes.  Let's talk about the taxes.  Let's deal

16   specifically with the taxes.

17       Did you file tax returns in the year 2000?

18   A.  No.

19   Q.  Did you file tax returns in the years 2002 to 2006?

20   A.  No.

21   Q.  Did you file tax returns in 2007 through 2011?

22   A.  No.

23   Q.  You do realize, of course, that not filing tax returns is a

24   crime, right?

25   A.  Correct.

1    Q.   So your criminal activity didn't just start again now; your

2    criminal activity started in the early 2000s, right?

3    A.   Yes.

4    Q.   And you still owe tax money for those years, do you not?

5    A.   Yes.   They're penalties.

6    Q.   Penalties.

7         Did you ever pay the tax on any of those years?

8    A.   Yeah.   I paid well over $7 million in taxes.

9    Q.   No, no.   For those years.   We haven't even gotten to the

10   most recent stuff.

11        Did you ever pay stuff -- taxes on those years?

12   A.   I don't know how they accounted it.   But I paid, like I

13   said, about $7 million plus.

14   Q.   Okay.   Well, let's talk -- let's talk about what gives rise

15   to your tax charge and conviction.

16        In 2014 and in 2015, you owned and operated several

17   companies, including Medi, M-e-d-i, Biotech, and Walmol,

18   W-a-l-m-o-l, Holdings, correct?

19   A.   That is correct.

20   Q.   You owned and operated these entities, but you disguised

21   your ownership by using nominee owners, right?

22   A.   That is correct.

23   Q.   That's called deception, right?

24   A.   In your words.

25   Q.   It's not deception to conceal your ownership through

1  nominee individuals?

2  A.  I did have nominee owners.

3  Q.  Are you disagreeing with me that that's a form of

4  deception?

5  A.  No.

6  Q.  Medi Biotech, what kind of company was that?

7  A.  That was a marketing company -- telemarketing company that

8  marketed compound medications.

9  Q.  It was a company that enticed customers with certain health

10  conditions to sign up to receive compounded prescription creams

11  from pharmacies and laboratories affiliated with that company,

12  right?

13  A.  From pharmacies.

14  Q.  And those pharmacies and laboratories billed the customers'

15  insurance companies for those compounded prescription creams

16  and paid kickbacks to you from the profits that they earned

17  from the insurance payments, right?

18  A.  Correct.

19  Q.  Neither the pharmacies, laboratories, nor your company,

20  Medi Biotech, ever collected the copayments for those

21  prescription creams, right?

22  A.  It wasn't Medi Biotech's obligation; we weren't the

23  pharmacy.  The pharmacy is supposed to collect copays.

24  Q.  I'll say it again.  Neither the pharmacies, laboratories,

25  nor Biotech ever collected the copayments for those

1   prescription creams from the customers, correct?

2   A.   To my knowledge, that's correct.

3   Q.   Well, that's what you put in your agreed-upon factual

4   proffer for the taxes, didn't you?

5   A.   Yes.  That's why I said, to my knowledge, that's correct.

6   Q.   And Walmol was a shell corporation which was used to open

7   bank accounts that received money transfers from Medi Biotech

8   bank accounts, right?

9   A.   Correct.  It was my holding company.

10  Q.   Okay.  You caused numerous bank accounts to be opened in

11  the names of these companies and eventually added yourself as

12  an authorized signatory to the accounts, correct?

13  A.   Correct.

14  Q.   In addition to transferring money between the accounts of

15  Medi Biotech and Walmol, you also paid personal expenses, such

16  as credit card bills, the purchase of fine jewelry, a lady's

17  diamond tennis bracelet worth $49,500, a diamond 18-karat men's

18  gold Rolex watch worth $26,750, an Audemars Piguet Royal Oak

19  Offshore watch worth 16,000, a 20-carat diamond necklace for

20  20,000, a customized 48-carat diamond necklace for 33,000, a

21  custom emerald-cut 48-carat diamond necklace for 92,000, a

22  men's Rolex Masterpiece for 45,000, a Patek Philippe watch for

23  36,000 and change, a 33.75-carat diamond tennis necklace for

24  40,000, another Rolex Yacht Master 18-karat gold watch for

25  25,000 and change, another Patek Philippe watch for 35,000,

1   another one for 42,000; luxury automobiles, including a

2   '65 Porsche, a '14 Mercedes, a 1971 Mercedes, a 65,000 Flying

3   Bentley Spur for 195,000; and -- let's see -- two luxury

4   yachts.  Right?

5       All of which you did through these nominee accounts, right?

6   A.  Yes.

7   Q.  And you didn't pay a nickel in taxes on it and didn't

8   declare it as income, correct?

9   A.  No, that's not correct.

10  Q.  At the time, 2014 and 2015, you didn't do anything with the

11  taxes, did you?

12  A.  The taxes weren't due yet.

13  Q.  When did you pay the taxes?

14  A.  So I paid the taxes --

15  Q.  In 2019, after the IRS began an investigation of you of

16  2018, right?

17  A.  In 2019.

18  Q.  After the IRS began an investigation of you in 2018,

19  correct?

20  A.  Correct.

21  Q.  You put the bank accounts in nominee names to pay for your

22  expenses.  You acquired the assets in other persons' or

23  corporate names in order to conceal assets and evade and avoid

24  the assessment of income tax, correct?

25  A.  Correct.

1   Q.   For the tax year of 2015, you diverted approximately

2   2.7 million in income, correct?

3   A.   Correct.

4   Q.   For the tax year of 2014, you diverted approximately

5   1.37 million in income, correct?

6   A.   Correct.

7   Q.   This is before you ever met Minal Patel, correct?

8   A.   Yes.

9   Q.   Okay.  So let's talk about -- were you involved in 2014, in

10  2015 not just in tax fraud with nominees, were you involved in

11  fraud with compounding creams?

12  A.   We marketed compounding creams.

13  Q.   Were you involved in fraud with that?

14  A.   If it was -- I don't -- yes, yes.

15  Q.   How about, were you involved with Durable Medical

16  Equipment, DME, for fraud?

17  A.   Yes.

18  Q.   And in the business of pharmacy or compounding cream and

19  other prescription fraud and Durable Medical Equipment fraud,

20  how much money did you make?

21  A.   DME, I really didn't make any money on.

22  Q.   Sorry?

23  A.   DME was not profitable.  The compounds were profitable.  I

24  can't give you the exact amount of monies made in the compound

25  business.

1    Q.   Didn't you tell the government on November 21st of 2022

2    that you made $400 million?

3    A.   No, I never said that.  I said the business may have

4    grossed -- grossed or generated adjudications of $400 million,

5    but I never made $400 [sic].  I wish I did.

6         MR. SADOW:  May I approach?

7         THE COURT:  You may.

8         MS. DE BOER:  Your Honor, we object to the use of the

9    interview report with the witness unless he's agreed that it

10   will refresh his recollection.

11        THE COURT:  Are we dealing with a different exhibit at

12   this point?

13        MR. SADOW:  No.  It's the same thing I'm talking about.

14        THE COURT:  You may go ahead and show it to him.

15        MR. SADOW:  I'm sorry?

16        THE COURT:  You may show it to him.  You may approach.

17   BY MR. SADOW:

18   Q.   Didn't you tell the government on November 21, 2022, that

19   you made $400 million?

20   A.   I don't know what the agent transposed or whoever

21   transposed this, but I never made $400 million.  Like I said, I

22   wish I did.

23   Q.   Okay.  Did you tell the government agent -- I'll do it a

24   different way, sorry.

25        On that date, which is November 21, 2022, you were

1    interviewed by FBI Agent Rodriguez, a DHH, which is Department

2    of Health and Human Services Office of Inspector General,

3    Special Agent Victoria Buono -- I may be mispronouncing it --

4    the woman that's sitting at the end of the table, right?

5    A.   Yes.

6    Q.   Also present was Ms. de Boer, correct?

7    A.   Who?

8    Q.   The prosecutor that asked you questions on direct

9    examination.

10   A.   Yes.

11   Q.   And is it your testimony that you did not say that you made

12   $400 million?

13   A.   That's correct.  I did not make $400 million.

14   Q.   Okay.  Let's continue with that.

15       And back on the years of the tax returns of 2000, 2002 to

16   2005, the government started trying to collect that money in

17   2007, correct?

18   A.   Correct.

19   Q.   And you evaded the payment of those taxes by transferring

20   assets into nominee names and other trusts utilizing the bank

21   accounts that you caused to be opened in other person's names,

22   successfully opening and closing multiple corporations that you

23   controlled to thwart the collection of taxes due and owing and

24   filing a Collection Information Statement in 2008 under penalty

25   of perjury that you earned no money and owed no assets, right?

 1   A.   Correct.

 2   Q.   So you hid the assets, right?

 3   A.   Yes.

 4   Q.   And then you stated under oath, kind of like the same oath

 5   that you're under today, that you didn't have any assets and

 6   didn't have any income, correct?

 7   A.   Correct.

 8   Q.   But that was a lie, right?

 9   A.   Yes.

10   Q.   And the lie was told to protect you, correct?

11   A.   Correct.

12   Q.   To further your ability to control and keep the assets,

13   right?

14   A.   I don't know what assets you're referring to, but --

15   Q.   I don't either.  I have to ask you.

16   A.   I don't know what assets there were in 2007, but...

17   Q.   We're talking about -- this is for the years -- the tax

18   years up to 2007.

19        You were asked to do a form by the IRS, and you lied on the

20   form, right?

21   A.   At that time -- at that time, I was out of money.

22   Q.   So you were out -- you had made money in the amount of --

23   according to what you agreed to, your total tax liability for

24   those years was $2,199,003 for the years of 2000, 2002 to 2005.

25        You made that much money, and your position is under oath

1  today that you didn't have any money?

2  A.   Correct.  I went through a bad divorce and spent a lot of

3  money, and I ran out of money.

4  Q.   So you did or didn't lie to the IRS?

5  A.   Listen, I didn't have the money.  I don't know what assets.

6  I lost the house in foreclosure.  So I don't know what assets

7  you're referring to.

8  Q.   Now, let's talk about the 2014 and 2015 period.

9       You incorporated Medi Biotech in the name of who?

10  A.   Michelle Larkin.

11  Q.   The initials being M.L.?

12  A.   Correct.

13  Q.   Who was your fiancée?

14  A.   Correct.

15  Q.   So you used her in your scheme to conceal assets, correct?

16  A.   It was a new business.

17  Q.   I didn't ask you that.  I asked you whether you schemed --

18  you used her in your scheme to conceal assets.

19  A.   Yes.

20  Q.   Okay.  And then Walmol Holdings, who was the nominee on

21  that?

22  A.   Michelle Larkin.

23  Q.   Okay.  Same thing, correct?

24  A.   Correct.

25  Q.   And did you incorporate Star Insurance Group and Star

1   Medical Supplies?

2   A.   No.   Star Medical Supplies was always owned by Michelle

3   Larkin.   And Star Insurance Group, I operated it, and it was

4   under my daughter's name.

5   Q.   So you used Ms. Larkin again with those companies, at least

6   one of them?

7   A.   No.   Star Medical was actually Ms. Larkin's company.   She

8   operated and ran the business.

9   Q.   And all of those were acts of deception, what we just went

10   through, in order to conceal assets, correct?

11   A.   You're saying that all of them are acts of deception, but

12   Star Medical was actually Ms. Larkin's company.

13   Q.   Forget that company.   All the other companies --

14   A.   You said all of them, so -- I can't agree with you.

15   Q.   Okay.   Then we'll eliminate Star -- the "stars."   We'll

16   take those out.

17   A.   Okay.

18   Q.   The rest of them were all involved in fraud, right?

19   A.   Yes.

20   Q.   And all of them were involved in you concealing, right?

21   A.   Yes.

22   Q.   And they were all involving acts of deception, correct?

23   A.   Yes.

24   Q.   And that led you into CGx and PGx, right?

25   A.   Yes.

1   Q.   Okay.

2        MR. SADOW:  Let's go back, if we can, to 1911 and 19-

3   -- let's do 1911-A.

4   BY MR. SADOW:

5   Q.   Now, who put this 1911-A together?

6   A.   I believe that was put together by Will Slagle.

7   Q.   And did you have any input in it at all?

8   A.   Yes.

9   Q.   What was your input?

10  A.   What was going on with the various process flows, how the

11  system works, sales, so on and so forth.

12  Q.   Now, did I understand on direct examination you said that

13  this is, in fact, the process that you used throughout your

14  dealings with LabSolutions?

15  A.   This was the -- this was the process that we used, yes.

16  Q.   Now, that being so, was there ever a time -- because this

17  is the process being followed, where does telemedicine fit in?

18  A.   Section B, telemedicine overview, outbound telemedicine

19  company, marketer, telemedicine company to position of sole

20  determination, inbound to telemedicine physicians to

21  telemedicine company to marketer.

22  Q.   So let's see if we can understand this.  First of all, with

23  the telemedicine, what was the name of the telemedicine

24  company?

25  A.   RealTime Physicians.

1    Q.   Was that in your name?

2    A.   No.

3    Q.   So you concealed the ownership of the telemedicine company

4    as well.

5    A.   Correct.

6    Q.   Whose name was it in?

7    A.   Dr. Al Needleman.

8    Q.   Who?

9    A.   Al Needleman.

10   Q.   And CPL was paid pursuant to the contract that we've gone

11   over and I showed you the last of assets, right?  I mean, list

12   of payments, right?

13   A.   Yes.

14   Q.   The telemedicine company was paid by whom?

15   A.   Telemedicine -- say that again, sir.

16   Q.   Telemedicine company was paid by whom?

17   A.   By CPL.

18   Q.   By CPL.

19        Okay.  So you didn't tell Mr. Patel that you were the true

20   owner of CPL, correct?

21   A.   Never came up.

22   Q.   The answer is I never told him.  Whether it came up or not,

23   you didn't tell him, right?

24   A.   That's correct.

25   Q.   Did you tell him you were the owner of the telemedicine

1   company?

2   A.   I may have.

3   Q.   Well, did you or didn't you?

4   A.   I don't recall.

5   Q.   Well, is there a single document in all that you've

6   reviewed, all of the government evidence that you have had a

7   chance to see in which you indicate you're the owner of the

8   telemedicine company?

9   A.   No.

10   Q.   Okay.  And the RealTime -- what's the name of the

11   telemedicine company?

12   A.   RealTime Physicians.

13   Q.   Right.  And where is a contract between LabSolutions and

14   RealTime?

15   A.   There is none.

16   Q.   There never was, right?

17   A.   Right.

18   Q.   LabSolutions was only doing business with the telemarketing

19   company, correct?

20   A.   Correct.

21   Q.   And the telemarketing company would reach out, and as

22   you've talked about, it would have interaction with

23   beneficiaries or patients, correct?

24   A.   Correct.

25   Q.   Those patients opted in to be contacted, did they not?

1    A.   They did.

2    Q.   Okay.  Now, let's explain what opted in means.

3    A.   So opted in, we saw a series of ads that were ran, and once

4    somebody goes through one of those paths that we spoke about,

5    you get free stuff, you go to Yahoo, you take a survey.

6    Somebody clicks yes, I'm interested in receiving a free genetic

7    test, as an example.

8    Q.   Is there anything in the general overview process about

9    opting in?

10   A.   Not on these pages.

11   Q.   What's this third-party opt-in patients?

12   A.   Excuse me?  I don't see anything.

13   Q.   2-V.

14   A.   I'm sorry.  I missed it.  Okay.

15   Q.   So you told LabSolutions, Mr. Berarducci, although you were

16   the bcc, he was told that there would be opt in, correct?

17   A.   Correct.

18   Q.   And that's what was done, opt in, right?

19   A.   Correct.

20   Q.   The telemarketing company did not just reach out to the

21   general population and start calling or -- excuse me -- cold

22   calling people, correct?

23   A.   That is correct.

24   Q.   The individuals that were contacted made the decision to

25   opt in to be contacted by telemarketers, correct?

 1   A.   Correct.

 2   Q.   Now, let's look at GX-1878.

 3        Do you remember this exhibit?

 4   A.   Yes.

 5   Q.   Okay.  What is 1878?

 6   A.   It's a script -- a sales script.

 7   Q.   And this sales script was put together by you and

 8   Mr. Slagle?

 9   A.   I believe so.

10   Q.   Okay.  And is it similar to the sales -- the sale slip or

11   questionnaire that was used in DME?

12   A.   Yes.

13   Q.   Is that basically where it came from, essentially?

14   A.   I don't know where it came from.  Before I got involved in

15   the CGx and PGx business, as I explained to you, the scripts

16   were already presented to me by Mr. Slagle.

17   Q.   So we would -- Mr. Slagle would be the one who would be

18   responsible, according to your testimony, for the use -- at

19   least the use of the -- what one might call a questionnaire

20   that was used by the telemarketers, right?

21   A.   You mean a logic-based script, is that what you're

22   referring to?

23   Q.   And maybe you can explain that a little better so I

24   and maybe others can better understand.  What is a logic-based

25   script?

1   A.  So I think there was illustration of it before.  It's a

2   very extensive script, asking the individual a bunch of

3   questions, health conditions, drilling down to see if any

4   members had family history of cancer, all sorts of questions

5   that would promulgate a potential order.

6   Q.  And in the use of 1878, or the logic -- what do you call

7   it, logic-based script?

8   A.  Logic-based script, yes.

9   Q.  That would enable the telemarketing company to determine

10  who was prequalified to move to the next step, correct?

11  A.  Well, the script did it for itself.  So if it promulgated

12  yes for this, no for this, yes for that, it balanced off.  As I

13  stated earlier in my testimony, certain questions promulgated

14  ICDs, which populated to the physician side.

15  Q.  Right.  But maybe my terminology isn't as good as it should

16  be.

17       If somebody, having gone through this questioning by

18  script, answered the questions indicating they might be a

19  candidate, or could be a candidate, potentially for CGx, or

20  PGx, or both; my terminology is that made them qualified to

21  move onto the next step to deal in the telemedicine realm,

22  correct?

23  A.  Based on the script, yes.

24  Q.  Based on the script.

25       So the extensiveness of the script, regardless of who

 1   actually asked the questions, it was the script itself that

 2   would elicit the responses that might show whether somebody was

 3   or was not eligible for the next step, correct?

 4   A.   Correct.

 5   Q.   So you were asked whether any of the people, the

 6   telemarketers, had medical training, right?

 7   A.   Correct.

 8   Q.   Respectfully, you don't need medical training to ask all of

 9   the questions that are on the script, do you?

10   A.   I don't know that I agree with you.

11   Q.   Well, let's go -- this is page 1 of --

12   A.   I'm not trying to be confrontational.  I'm just saying that

13   I don't know that I agree with you.

14   Q.   Well, did you think when you were using this script that

15   you were breaking the law?  The answer is no, did you?

16   A.   Correct.  I was told that everything was compliant.

17   Q.   And who told you that?

18   A.   Mr. Slagle, and he said he had vetted it with LabSolutions

19   before we started.

20   Q.   And Mr. Slagle had a lawyer, right?

21   A.   Yes.

22   Q.   And you had a lawyer, correct?

23   A.   I didn't have a healthcare attorney at the time.

24   Q.   But Mr. Slagle did, right?

25   A.   Yes.

1  Q.  And Mr. Slagle vetted his information with his lawyer,

2  right?

3  A.  Yes, that's what he told me anyway, so...

4  Q.  And LabSolutions, you were told, vetted their processes

5  with their lawyer, right?

6  A.  That's what I was told.

7  Q.  Did at any point in time someone say to you, be it

8  Mr. Slagle or anyone at LabSolutions, say you had to have

9  medical training in order to use the qualifications or -- use

10  the questionnaire?

11  A.  No.

12  Q.  No.  And that's why it was used, right?

13  A.  That's why it was used.

14  Q.  Right.  So let's go through it.  I don't want to go

15  question by question, but I want to go page by page.

16      This is the objections and rebuttals.  This is the starting

17  part, correct?

18  A.  Correct.

19  Q.  All right.  Let's go to the next page.

20      Now, questions are asked about many different things,

21  including polyps, active cancer, right?

22  A.  Yeah.

23  Q.  And the different -- the reason you're asking about active

24  cancer is active cancer might be a situation where PGx could be

25  used, correct?

1    A.   Potentially.

2    Q.   And also at some point when it became the MACs issue that

3    you mentioned, active cancer, personal history cancer, became

4    required by one MAC where it wasn't required by another MAC,

5    right?

6    A.   Yes, to my knowledge.

7    Q.   Excuse me?

8    A.   To my knowledge, I agree with you.

9    Q.   And that was when you were talking about Palmetto and

10   Novitas during that time period, correct?

11   A.   Correct.

12   Q.   So this covered whether or not someone had cancer, at least

13   this questionnaire did, right?

14   A.   Correct.

15   Q.   Now, then you were asked whether or not, obviously, what

16   cancer it might be, correct?

17   A.   Correct.

18        MR. SADOW:  Next page, please.

19   BY MR. SADOW:

20   Q.   Then you get into the issue of age, additional history,

21   right?

22   A.   Yes.

23   Q.   All of which seeks to elicit information about that

24   particular person and his medical background vis-á-vis

25   potentially having cancer, either in the family or personal,

1    right?

2    A.   Correct.

3         MR. SADOW:   Next page.

4    BY MR. SADOW:

5    Q.   And it goes through familial history, that is, uncles,

6    aunts, parents, right?  Children, correct?

7    A.   Correct.

8         MR. SADOW:   Next.  Next page.  Is that it?

9    BY MR. SADOW:

10   Q.   Now, if someone answered those questions and indicated that

11   they had personal history of cancer or familial or family

12   history of cancer, what was the next step by the telemarketer?

13   A.   He would continue with the script, go through the script

14   and submit it as an order.

15   Q.   Okay.  When you say, "go through the script," tell us --

16   A.   Well, there might have been -- button-up information

17   reconfirming their Medicare number, reconfirming their address,

18   reading a disclosure statement, confirming an appointment for a

19   specimen collection, things of that nature.  So they had to

20   button up their work.

21   Q.   Now, when did they sign that card, the signature card?

22   A.   Who's "they"?

23   Q.   I'm sorry.  The patient.

24   A.   The patient signed the card when they received the

25   specimens in the mail.

1    Q.   Okay.  So that wasn't part of telemarketing process?

2    A.   No.

3    Q.   That's part of the telemedicine process, right?

4    A.   Correct.

5    Q.   Okay.  So the telemarketing process --

6    A.   Well, let me stop you there.

7    Q.   Please.

8    A.   So the specimen, the cards, and the instructions, were sent

9    out -- sent out as LabCorp Services, so -- which was the d/b/a

10   of the marketing company, not the telehealth company.

11   Q.   Okay.  But did the patients or the beneficiaries, whichever

12   terminology one uses, were they told what lab services -- how

13   they were connected or how that company was connected to the

14   telemarketers?

15   A.   I have to look at the script.  I can't just blindly answer

16   you.

17   Q.   So we'll take Lab Services as being potentially part of

18   telemedicine.  That's fine.  Even though --

19   A.   What I said was Lab Services was a d/b/a of the marketing

20   company, not of the telehealth company.

21   Q.   Did you ever -- did you ever notify LabSolutions that Lab

22   Services was part of the telemarketing?

23   A.   I believe they were aware of it because they saw our -- saw

24   our d/b/a's and approved our script.  It says right on the

25   script:  I'm calling you from Lab Services.

1    Q.   Okay.  So that's part of the telemarketing aspect that

2    LabSolutions, at least as far as you remember, was on notice,

3    right?

4    A.   Yes.

5    Q.   Okay.  So then after someone decides, having gone through

6    the questionnaire, that they want to go forward, that is, they

7    want to receive the kit, right?

8    A.   Yes.

9    Q.   Then we move, do we not, to the telemedicine phase?

10   A.   No.  It doesn't move to the telemedicine, as I stated

11   before.  So what happens is, the specimens get shipped out --

12   Q.   Who ships them out?

13   A.   CPL doing business as Lab Services.

14   Q.   Okay.  So --

15   A.   So the envelope said Lab Services.

16   Q.   All right.  I want to make sure I understand.

17        So that's still telemarketing, not telemedicine.

18   A.   Correct.

19   Q.   All right.  So that's what Mr. Goldberg and MedTech is

20   being paid for, that is, the telemarketing?

21   A.   Correct.

22   Q.   So the lab samples or specimens or the lab material goes

23   out, and that's telemarketing still.  And when it goes out, it

24   goes out to the patient beneficiary, right?

25   A.   Correct.

1    Q.  Let's stop right there.  I know that you indicated through

2    your testimony about the fear, the fear of God and all of that

3    stuff.  But so far -- so far --

4    A.  Sir, I didn't understand what you were saying.  I know the

5    fear and what?

6    Q.  You talked about that this whole questionnaire was some --

7    to put the fear of God into people, to put fear into people,

8    right?

9    A.  That is correct.

10   Q.  Right.  But what it was was just a typical telemarketing

11   that is used in many different areas, right?

12   A.  No.  This was specific for this campaign.

13   Q.  Well, DME didn't have anything to do with the fear of God

14   or fear, did it?

15   A.  No.  But it didn't have the same -- we were soliciting

16   cancer medications.

17   Q.  You weren't soliciting cancer here either.  All you were

18   doing was finding out about personal and family history and

19   whether or not an individual was interested in taking a test,

20   CGx, PGx, or both, right?

21   A.  We --

22   Q.  Right?

23   A.  We solicited the people for a free cancer screening test

24   that their Medicare benefits would qualify them for.

25   Q.  Right.

1  A.   That's how the script opened up.

2  Q.   And as far as you knew, on both sides of the equation; that

3  is, on your side, legal said it was okay; LabSolutions' side,

4  legal said it was okay, right?

5  A.   I was told legal said it was okay.

6  Q.   Right.  Now, the specimen goes out or the package -- the

7  test kit goes out, and the individual that receives it is then

8  instructed to, what, call back in, or he receives a phone call?

9  A.   No.  As I said in my testimony before, an appointment is

10  made with the patient by -- it's part of the sales script.  So

11  they actually make an appointment with the patient on the phone

12  for approximately seven days from the day of hitting that

13  submission.

14       And the client is told to take a paper and pen out, write

15  down your time, date, and appointment.  We'll be calling you a

16  day or two in advance to remind.  And they were also told don't

17  eat anything, don't drink anything, don't smoosh -- excuse

18  me -- don't smooch, meaning kiss -- because you don't want to

19  contaminate the sample -- 30 minutes prior to the test.

20  Q.   So they're given instructions on what to do before they

21  actually take the --

22  A.   Yes.

23  Q.   -- put the saliva, right?

24  A.   Yes.

25  Q.   So let me see.  At some point -- I'm kind of moving just to

1    the side a little bit -- I heard you say that nurses were

2    involved.

3         When were the nurses involved?

4    A.   So nurses were involved in the coding process and

5    coordinating, speaking with the providers.

6    Q.   Okay.  So the nurses spoke to the doctors?

7    A.   Yes, to get orders back.  So they would call the doc -- so

8    there's two parts --

9    Q.   Wait.  Hold on that.  I'm going to come back to that.

10   Okay?  Hold on that.  I just wanted to make sure I understood

11   that nurses were involved in this.

12        So now the patient beneficiary has the kit.  He's given the

13   instructions on what to do in order to take the saliva, put it

14   in a kit, and then they send it back, correct?

15   A.   There's a -- they get a phone call from a customer service

16   agent walking them through how to take the test.

17        So sometimes it was some of our agents here in the states,

18   but I subcontracted with a call center based out of

19   Nicaragua --

20   Q.   Hold on a second.

21   A.   -- to walk the people through to take the test.

22   Q.   Okay.  But -- so the call center that you have testified

23   that Mr. Patel visited --

24   A.   Yes.

25   Q.   -- obviously is not one that was in Nicaragua?

1    A.   No, no.  Not at all.

2    Q.   So the one that Mr. Patel, according to you, visited, that

3    was in Florida, South Florida, right?

4    A.   Boca Raton, Florida.

5    Q.   Right.  Now, what did the folks in Nicaragua do?

6    A.   So they handled overflow of appointment reminders, calling

7    the people to remind them that they had an appointment

8    scheduled a day, two days in advance.  And then if we couldn't

9    get the people, they would chase them to get them on the phone

10   to take the test.  Sometimes they would walk them through it or

11   pass it back to one of our agents --

12   Q.   Now, obviously, Mr. Patel couldn't have heard that, because

13   he wasn't in Nicaragua, correct?

14   A.   No, of course not.

15   Q.   All right.  And when the telemarketers, according to you,

16   when Mr. Patel was present, they were doing -- they were going

17   over the questionnaire that we've just talked about, right?

18   A.   Correct.

19   Q.   And that would take up to 30 minutes, correct?

20   A.   Yes.

21   Q.   So it's an extensive questionnaire, taking the time to get

22   the information, correct?

23   A.   That is correct.

24   Q.   And Mr. Patel would hear them asking the questions, right?

25   A.   I don't know if he listened to one person for 30 solid

1    minutes, but he witnessed sales calls.

2    Q.  Asking questions about the family history, personal

3    history, cancer, all those things that were on the

4    questionnaire that we went over, right?

5    A.  Yes.

6    Q.  And then you took him up to the third floor --

7    A.  Correct.

8    Q.  -- right?

9    A.  That is correct.

10   Q.  Now, CPL was on the second floor, right?

11   A.  Correct.

12   Q.  What's the name of it on the third floor?

13   A.  Medtech and RealTime Physicians.

14   Q.  Okay.  Well, but Medtech is CPL, right?

15   A.  No.

16   Q.  That's another company?

17   A.  Correct.

18   Q.  Okay.  On the third floor, according to that, what would

19   Mr. Patel hear anyone saying?

20   A.  So he would see -- he would --

21   Q.  Hearing.  Hearing.

22   A.  So on the third floor, there's a customer service area

23   where they would be doing a chase, the appointment chases, and

24   also walking the people through the specimens on the third

25   floor.

1   Q.   Okay.  So assuming that Mr. Patel, as you testified to, was

2   on the third floor, he didn't -- you didn't tell him that you

3   owned the second floor or the third floor as far as the

4   companies are concerned, right?

5   A.   I didn't own any floor.  I leased space in the building.

6   Q.   No.  But I'm talking about the companies, CPL on the second

7   floor, the other companies on the third floor.

8        You didn't tell Mr. Patel those were yours, correct?

9   A.   So when I first met Mr. Patel, I was introduced as the

10  telehealth part by a telehealth person on the third floor.  I

11  came down to the second floor.  That was my first meeting.  I

12  was introduced to him by Mr. Hirsch and Mr. Youngswick.

13  Q.   As a telehealth person?

14  A.   Yes.

15  Q.   The person who had the connection to the providers?  Would

16  that be fair?  Isn't that telehealth?

17  A.   I was introduced as the person from the third floor who

18  handled the telehealth company.  That's how I was introduced.

19  Q.   And listening on the third floor, if he heard it, he would

20  have heard people -- customer service representative and he

21  would have seen the collection of the samples or the potential

22  mailing of the samples -- of the test kits, right?

23  A.   So as I said before, the third floor was divided into two

24  offices.  One side handled the shipping and receiving of the

25  specimens, which Mr. Patel did see.  And on the other side of

1    the third floor, there were nurses, and there were customer

2    service people.

3         Nurses primarily handled checking to make sure the ICD

4    codes were promulgated properly on orders and checking the

5    codes, and doing any chase that may be necessary in conjunction

6    with the customer service people.

7    Q.   So Mr. Patel would have seen nurses or healthcare

8    individuals on the third floor, correct?

9    A.   Well, I don't know that he knew that they were nurses, not

10   nurses.  They were people in --

11   Q.   But they were nurses.

12   A.   Well, there was three nurses, yes.

13   Q.   Okay.

14   A.   And about ten people that were not nurses.

15   Q.   Okay.  So where in writing do we get to the point where the

16   doctors are being paid?  Where is that in writing on anything

17   that's provided to Mr. Patel about the doctors that actually

18   sign the requisition form being paid to do something to sign

19   the form?  Where is that?

20        I mean, we've seen hundreds of documents; we've been

21   through scripts.  Where is the one in which you say Mr. Patel

22   knew that the doctors were being paid?

23   A.   There is nothing in writing on that.

24   Q.   There is nothing at all, right, that shows Mr. Patel or any

25   part of LabSolutions knew how payments would take place with

1  doctors, right?

2  A.  There's not in writing that --

3  Q.  I'm sorry.  It's not in writing?

4  A.  There's nothing in writing.  However -- however, in

5  conjunction with Mr. Youngswick and Mr. Hirsch's business,

6  Mr. Patel was, in fact -- was aware that the telehealth

7  company --

8  Q.  Did you tell him?

9  A.  No.  There was invoices.

10  Q.  Did you tell him?

11  A.  In fact, Mr. Patel paid one of the invoices on his behalf.

12  Q.  Paid whose invoice?

13  A.  Keith Youngswick and Brett Hirsch.

14  Q.  Have you seen one of those?

15  A.  What do you mean?

16  Q.  Have you seen one in evidence, an invoice paid by Mr. Patel

17  to those people for doctors?

18  A.  Well, I don't know why he would wire $50,000 directly in

19  because Keith and Brett couldn't pay.

20  Q.  Did you see that happen?

21  A.  Yes, I did see the 50,000 happen.

22  Q.  All right.  So wasn't Mr. Hirsch also involved in

23  marketing?

24  A.  Well, they had their own thing.

25  Q.  Didn't they have their own thing in marketing?

1   A.   Which I didn't know what they did.  All I know is what they

2   did with my company.

3   Q.   I'm not talking about your company now.  I am talking about

4   their company.

5        They were involved in marketing too, right?

6   A.   They claimed they were, yes.

7   Q.   Okay.  So how did you pay the doctors?  How did you pay the

8   doctors?

9   A.   So when a client paid an invoice, we would weekly settle up

10  with the doctors --

11  Q.   When a client?  You mean like LabSolutions?

12  A.   No, any client.  It's just not -- you're talking the whole

13  gross.  You just -- in one second we're talking about Keith and

14  Brett.  Now you're talking about something else.  Be specific.

15  Q.   I want to ask you how you paid the doctors.  Tell me,

16  please.

17  A.   So we paid them from Medtech, Medtech Worldwide.

18  Q.   And who paid Medtech Worldwide?

19  A.   Various marketing groups.

20  Q.   But not LabSolutions, correct?

21  A.   No, LabSolutions did not pay Medtech.

22  Q.   So LabSolutions didn't pay the doctors, right?

23  A.   They didn't pay Medtech, that's correct.

24  Q.   Okay.  So the doctors are paid by another entity.

25  LabSolutions is paying the marketing, right?

1   A.   They pay the marketer.

2   Q.   Okay.   So when it comes to the idea of the telemarketing,

3   we've already been through this, at least at the time you were

4   under the impression, I believe, that had been blessed by

5   lawyers on both sides, right?

6   A.   I did.

7   Q.   Right?

8   A.   Yes, sir.

9   Q.   And we've already talked now about paying of the doctors,

10  right?

11  A.   Yes.

12  Q.   Okay.   Who made the decisions at LabSolutions?

13  A.   To my knowledge, Minal Patel.

14  Q.   Okay.   On May 26th, when you were interviewed by Special

15  Agent Lutz and people from the Department of Health and Human

16  Services, Bryan Frank, also present with Mr. Tim Loper of the

17  Justice Department and a Ms. Markman, as well as your defense

18  attorney, David Garvin, didn't you tell them, point blank, that

19  Patel owns LabSolutions, but Saliba made the decisions?

20  A.   No.   What I told them, again, I don't know how they

21  transposed --

22  Q.   I'm asking you, did you say that?

23  A.   I said Patel owned LabSolutions and Saliba reported to

24  Patel.

25          MR. SADOW:   May I approach, Your Honor?

1          THE COURT:  You may.

2     BY MR. SADOW:

3     Q.  Didn't you tell them Patel owned LabSolutions, but Saliba

4     made the decisions?

5     A.  I don't know how somebody transposed it, but I'm telling

6     you that I said Mr. Patel owned LabSolutions and Nick Saliba,

7     who was his president, reported to Mr. Patel.

8     Q.  So that's the second time that the agents apparently got it

9     wrong when they wrote their report?

10    A.  I can't control what an agent or anybody writes down.  All

11    I can control is what I know.

12    Q.  I didn't ask you if you can control it.  I just said this

13    is the second time that the agents wrote it down wrong, they

14    didn't write down what you said, correct?

15    A.  There was a lot of information going back and forth, so I

16    don't -- you know, again, I can't speak for the agent.

17    Q.  Did you show the government your emails with Mr. Slagle?

18    A.  I think the government -- the government had a search

19    warrant on my facility, so they obtained numerous emails, and I

20    also provided the government additional emails.

21    Q.  Didn't you tell the government, on May the 26th, 2021, that

22    you didn't have emails directly between you and Mr. Slagle?

23    A.  I don't recall.

24    Q.  Didn't a person by the name of Neals Maxilin work for you?

25    A.  Yes.

1    Q.   Didn't you destroy the emails between you and Mr. Slagle

2    when you found out that the investigation was going on?

3    A.   I don't believe so.  I produced 25 million records to the

4    government which include the emails, every email that I have.

5    Q.   How about emails directly between you and Mr. Slagle that

6    nobody else had, just the two of you.

7    A.   I have produced every document to the government that I

8    had, that I physically had access to.  Now, there was an email

9    account that Mr. Slagle controlled that I could not gain access

10   to at some point.  So I don't know if you're referring to that,

11   sir.

12   Q.   No, I'm --

13            MR. SADOW:  If I may approach, Your Honor?

14            THE COURT:  You may.

15   BY MR. SADOW:

16   Q.   Didn't you tell the agents --

17            MR. SADOW:  I'm on page 8 of the report.

18   BY MR. SADOW:

19   Q.   Didn't you tell the agents Slagle dealt with --

20   A.   I can't see it, so --

21   Q.   -- Slagle dealt with LabSolutions on a daily basis; you do

22   not have your correspondence with Slagle?

23   A.   Yes.  But I think, again, you're referring to something how

24   it's transposed.  Of course, I have emails with Slagle.  I've

25   produced emails for Slagle.  Like I said, Slagle had a

1   dedicated email that he used for specific correspondence that I

2   had no access to.

3   Q.   Do you -- so this is another time that the agents may have

4   gotten it wrong?

5   A.   No, not necessarily.  I think they got it right, but maybe

6   there's some pieces that may have been missing.

7   Q.   You had a patient authorization card for every single

8   patient that got a kit, right?

9   A.   Yeah.

10  Q.   And those cards still exist, correct?

11  A.   I don't have them.  If they exist, I don't --

12  Q.   Isn't there a warehouse full of material that came from

13  yours -- cards after cards, patient cards?

14  A.   I don't have any materials.

15  Q.   Let's go back to the first part of that question.

16       There was a patient -- there was a card, a signature card,

17  an authorization card from every patient, right?

18  A.   Yes.

19  Q.   You would not have done it without an authorization card,

20  right?

21  A.   That is correct.

22  Q.   So I want to make sure that I understand.  Once they send

23  the kit back, the patient, okay, the kit is back, they've done

24  the questionnaire, which is why they have the kit in the first

25  place, correct?

1   A.   Correct.

2   Q.   Then it goes to the doctor, right, the provider, the

3   information, correct?

4   A.   After everything is checked, to make sure all the ICD-10

5   codes are on there and all the documents are in order, then it

6   goes to the doctor.

7   Q.   And then you told us about percentages.  Do you remember

8   that?

9   A.   Yes.

10  Q.   You didn't tell Mr. Patel about percentages, did you?

11  A.   What are you talking about?  I'm not understanding your

12  question.

13  Q.   You didn't tell Mr. Patel about percentages, that is, the

14  percentages of what was or was not rejected by doctors,

15  correct?

16  A.   That's -- that's not entirely correct.  At some point in

17  time, you know, I told them the approval rate was extremely

18  high, as a matter of fact.

19  Q.   Do you have a single piece of paper that verifies that?

20  A.   Just my conversations with him in my meetings.

21  Q.   I'm going to move to a different subject.

22       Pursuant to your plea agreement, you were to disclose all

23  your assets, correct?

24  A.   Correct.

25  Q.   And I assume you've done that.

```
1   A.   I have.

2   Q.   And why did you refuse to tell probation about your income

3   and assets?

4   A.   What are you referring to?  I have no idea what you're

5   referring to.

6   Q.   I'm sorry?

7   A.   I don't know what you're referring to.

8   Q.   Didn't you tell probation, at the advice of your attorney,

9   you declined to answer any questions regarding your employment

10  and income prior to the arrest?

11  A.   I may have.

12  Q.   Well, why would you do that when your plea agreement said

13  that you were to disclose all that information?

14  A.   So there was a full financial disclosure after we entered

15  into a plea agreement.

16  Q.   Okay.  You met with probation after you pled guilty, right?

17  A.   I pled guilty, and then I met with probation.

18  Q.   Right.  So why did you decline to provide them with your

19  employment and income?

20  A.   I don't know.  Because I still don't know what you're

21  referring to.  You have to show me what you're --

22  Q.   I'm referring to a document that was provided to us by the

23  government.  And I'll show it to you.

24  A.   Yeah.  It says:  Income prior to his arrest in the instant

25  of the offense.
```

1  Q.   The instant offense, I suggest to you, means prior to your
2  arrest for the offense to which you had entered a guilty plea.
3      Why did you refuse to provide your income and employment
4  prior to that?
5  A.   I don't know why.
6  Q.   Okay.  Well, let's go to the next page.
7      Why did you refuse to give probation the information about
8  your assets and liabilities?
9  A.   Is this before or after?  I mean, you're confusing me.
10  Q.   This is after you -- this is after you have entered your
11  plea.
12  A.   So after I entered my plea, I gave a comprehensive -- well,
13  actually, before my plea, I believe, or during my plea, I gave
14  a comprehensive financial statement and listed all my assets
15  which were given to the government.  So I don't understand this
16  document and why it would even say that, but --
17  Q.   So when probation says that you declined to answer
18  questions regarding your assets and liability at the advice of
19  your lawyers, probation has it wrong then, right?
20  A.   No, no.  Time-out.  So my attorney wanted to make sure that
21  when I disclosed everything, that I disclosed everything
22  properly, so that I wouldn't have any issues.  So that's what
23  that probably means.
24      So, in other words, they've been -- disclosed everything.
25  They've always been disclosed everything on a continuous basis.

1    Q.   So that's your explanation for saying I refused to provide

2    the information to probation?

3    A.   So it said my attorney.  Didn't it say --

4    Q.   It said you relied on the advice of your attorney.

5    A.   Correct, because my attorney wanted to make sure that I

6    didn't omit anything off of my financial statements that could

7    cause me any problem which would cause damage to my plea

8    agreement.

9    Q.   All right.

10   A.   That was why.

11   Q.   To do anything to cause damage to your plea agreement.

12   A.   In other words, to make the plea invalid or have a problem

13   with the plea or inadvertently leave something off.  As a

14   matter of fact, I spent one full day with my attorney going

15   over financial statements to make sure everything was

16   1,000 percent correct and disclosed.

17   Q.   So your position is that you have no assets that have not

18   been disclosed.

19   A.   That is correct.

20   Q.   Does anyone have assets that you gave to them during this

21   period, your family, your fiancée?

22   A.   No.  In fact, everything, I've sold assets, I've turned

23   in -- sold my car, turned in jewelry to the government,

24   whatever assets I have.

25   Q.   And they've come back for substitute assets twice from you,

1    right, because you haven't paid all your assets?

2    A.   Yes.  I have not paid all the -- I don't have the money to

3    pay all the assets.

4    Q.   Let's talk about your sentencing because you raised

5    something on direct examination in which the government asked

6    you about your plea agreement and a Rule 35, and it would be up

7    to the judge, right?

8    A.   That is correct.

9    Q.   And that's the way you remember it having been said when

10   you were in court?

11   A.   No, that's what my attorney told me.

12   Q.   That's what your attorney -- do you remember being in

13   court --

14   A.   Yes.

15   Q.   -- when you were sentenced?

16   A.   Yes.

17   Q.   Do you remember what the judge told you about a Rule 35 and

18   cooperation?

19   A.   You would have to explicitly -- there's a lot of things --

20   Q.   Didn't the judge say as long as the government and your

21   attorneys agree, that the judge would sign off on it?

22   A.   I don't recall that he said that.

23   Q.   Didn't the judge say:  And if you all are able to agree, I

24   would, as I said, I would enter an order based on that

25   agreement.

1      Isn't that what the judge said?

2  A.  If it's in the document and it's recorded, then he probably

3  said it.  But I don't recall that.

4  Q.  So it's not just going to be it's not up to the government.

5  It's up -- if the government and your attorneys agree on how

6  much your sentence should be reduced, the judge has already

7  told you he'll go along with it, right?

8  A.  If that's what the document says, but I don't recall that

9  happening.  And I could tell you my attorneys have told me that

10 whatever the government says, the judge still has to approve

11 it.  That's what my attorneys have told me.

12      MR. SADOW:  If I may, Your Honor?

13      THE COURT:  You may.

14 BY MR. SADOW:

15 Q.  If you'll read the paragraph to yourself that I just

16 mentioned and see if what I just told you is correct.

17 A.  So this one right here?

18 Q.  Mmm-hmm.

19      Is what I referenced correct?

20 A.  I'm not 100 percent interpreting it that way, sir.  You

21 want me to read it?

22 Q.  Sure, you can read it.

23 A.  Okay.  For example, it sounds like there's been substantial

24 and will be substantial cooperation.  And if you all are able

25 to agree, I would -- as I said, I would enter an order based on

1   that agreement.  If you can't agree, we will have a hearing.

2   But I don't require either side to provide specifics of the

3   cooperation to me assuming that you agree.  If you can't agree,

4   then you may need to get into some of those issues.  But if you

5   agree, you don't need to, in my view, because I place a lot of

6   confidence in counsel on both sides.

7       That's what it says.

8   Q.  And the gist of that, what I was suggesting to you is, as

9   long as the government and your lawyers agree, the judge would

10  sign off on it, right?

11  A.  It would appear so.

12  Q.  Okay.  You mentioned your family, and I don't want to spend

13  a whole lot of time on this.

14      But your son has not been charged, correct?

15  A.  Correct.

16  Q.  Now, I think on direct examination, you indicated that at

17  some point your son confronted you about your cancer

18  telemarketing and the CGx, right?

19  A.  Correct.

20  Q.  And basically told you to stop.

21  A.  That is correct.

22  Q.  And you didn't stop.

23  A.  I did not.

24  Q.  And after you -- your son confronted you with that, he no

25  longer worked for you, right?

1   A.   He didn't -- well, he -- technically, he never worked for

2   me.   He would help me out with the IP, the logic-based scripts,

3   because that's not my area of expertise.   And he would work

4   with Mr. Slagle taking the spreadsheet that had all these ICD

5   codes and get them into the computer system so the programers

6   could program it.

7   Q.   So even after he confronted you, he continued to interact

8   with you in your business and with Mr. Slagle in the business,

9   correct?

10   A.   For a short period of time, very -- I had to beg him to do

11   so.

12   Q.   And when did you -- when did he -- if you can remember,

13   when did he confront you?

14   A.   Sometime in 2018.

15   Q.   Okay.   So you continued your business until April of 2021,

16   right?

17   A.   I don't remember when the government came with a search

18   warrant.   When they came with a search warrant, that's when

19   everything shut down.

20   Q.   But wasn't --

21   A.   But I don't think it was 2021.

22   Q.   Wasn't the factual predicate that you signed off on in the

23   information -- that is, what you pled to -- didn't it end your

24   conspiracy in April of 2021?

25   A.   If that's what it said.   But I don't know the dates.

1      So my operations, whatever I had going on pertaining to any

2  of this type of business, ceased the day that the government

3  came and served a search warrant on our facility.

4  Q.  Okay.  Do I need to show you the April of 2021, or are you

5  willing to take my word for it?

6  A.  I'm going to take your word for it.

7  Q.  In fact, they were still conducting surveillance of your

8  business in April of 2021, correct?

9  A.  Like I said, I don't remember the date that the government

10  came in.  So if that's the date, that's the date.

11  Q.  Well, let me show you and see if this refreshes your

12  recollection just on dates and on your son.

13      The business location in April of 2021 was at

14  1080 Holland Drive?

15  A.  Correct.

16  Q.  Suite 1?

17  A.  Yes.

18  Q.  Boca Raton?

19  A.  Yes.

20  Q.  Does this refresh your recollection that on April the 14th

21  of 2021, these were the cars that were present, and your son

22  was seen coming out of the building with his laptop?

23  A.  Yes.  He was -- had his own software company that he was

24  building called Future M.D.

25  Q.  In the same location?

1  A.   No.  He was just there visiting.  He didn't come into the

2  office and work.  He was just randomly there and would come by

3  and say hello to his father.

4  Q.   He left Suite 1.  Isn't that where the work was?

5  A.   Yes, but he didn't work out of the office.  He was there.

6  Q.   With his laptop.

7  A.   Yes.

8  Q.   Prior to testifying today, were you given any instructions

9  or directions by the government on how to testify?

10  A.   We went over documents and things of that nature, but --

11  Q.   Didn't you have a meeting in which you were told how to

12  testify, not to ramble, how to answer questions?  Didn't the

13  government tell you that?

14  A.   No.  The government didn't tell me -- they -- they

15  presented documents to me, a lot of which refreshed my memory

16  on things, and basically went over the important facts.  The

17  government never told me to -- how to answer a question or, for

18  that matter, to make up something and/or lie about something.

19  Q.   I didn't ask you that.  I asked you whether the government

20  told you how to testify.  That is --

21  A.   We had -- we had many prep sessions, but I don't know if

22  that's -- how could somebody put words in my mouth?  I mean --

23  Q.   How can they put words in your mouth?  That's not --

24  A.   Yeah.  That's what you're saying.  That's how I'm

25  interpreting you.

1  Q.  I don't want you to interpret anything that's not accurate,

2  okay?  That's not what I'm telling you to do.

3      What I'm telling you to do is -- I asked you whether or

4  not -- whether the government told you how to testify in the

5  sense of how to answer questions; not what to say, but how to

6  answer questions, how to appear before the jury, how to present

7  yourself before the jury.

8      That's correct, isn't it?

9  A.  That is correct.

10 Q.  And they told you that on October the 20th of 2022, right?

11 A.  I don't remember the date, but if you say so --

12 Q.  The gentleman -- the gentleman in the -- the

13 African-American gentleman, he's the one that was giving you

14 the advice, correct?

15 A.  I wasn't prepped by -- by him.

16 Q.  I'm sorry?

17 A.  I was not prepped -- in conjunction to this case?

18 Q.  Yeah.

19 A.  I was not -- I was prepped by the counsel over there,

20 Jamie.

21 Q.  Okay.  Again, maybe they got it wrong when they wrote it

22 down.

23      Right here, who does that say?  Do you know who this

24 gentlemen is, Mr. Cuyler?

25 A.  Yes, I do.

```
 1   Q.   Who is it?

 2   A.   That's the gentleman sitting over there.

 3   Q.   When I said that he's the one who gave you information on

 4   how to testify, was I correct or incorrect?

 5   A.   I guess you're correct, but this was done on the phone.  I

 6   was referring to a couple of prep sessions that I was with the

 7   government and saw documents.  This was a telephonic visit

 8   on -- you know, a while back ago.

 9   Q.   It was done on October the 20th, right?

10   A.   Correct.  And that's the first time I met the prosecutors

11   prosecuting this case.

12   Q.   I want to go back to your fake name.  Okay?

13        You said the purpose of the fake name that you went by with

14   Mr. Patel was what?  Tell me again.

15   A.   I believe Mr. Hirsch and Youngswick introduced me as Mark

16   Stein.

17   Q.   And you just went with it?

18   A.   Yes, I did.

19   Q.   You never thought, in all of the time that you were dealing

20   with Mr. Patel, you should tell him who you really are?

21   A.   Eventually, I did.

22   Q.   You did?

23   A.   Yes.

24   Q.   When?

25   A.   When we went to La Nouvelle Maison, we walked in because
```

1   the reservation was under my last name, and Mr. Patel was next

2   to me.  And I explained to him what had happened and what my

3   name was.

4   Q.  All right.  So when did you tell the government that you

5   actually gave Mr. Patel your real name?

6   A.  I believe at the time that we had that dinner meeting.

7   Q.  I'm sorry?

8   A.  What date did I tell the government or --

9   Q.  Well, did you tell them at all?

10  A.  I believe I did, yeah.

11  Q.  Didn't you tell the government on December the 10th of

12  2021, Patel knew Sporn as Mark Stein?

13  A.  Correct.

14  Q.  When did you tell him that it wasn't Mark Stein?

15  A.  I don't remember, but I remember speaking about it, that

16  over that dinner that we had at -- well, drinks at La Nouvelle

17  Maison, and then we moved to the restaurant -- Italian

18  restaurant next door because both reservations were under my

19  name.  And I had told him my last name.

20  Q.  Isn't the reason why you never told Mr. Patel your name is

21  because you had a criminal past, and you didn't want him to

22  know that you had a criminal past?

23  A.  Yes.

24  Q.  Right?

25  A.  Yes.

1    Q.   Okay.  So is it -- and I'm asking you:  Tell me when you

2    told the government that you ever told Mr. Patel your real

3    name.

4         You never told the government that, not once in all your

5    interviews, correct?

6    A.   I think that in one of my interviews, one of the last prep

7    sessions, I may have stated it to the government that I did

8    tell Mr. Patel my last name.

9    Q.   You may have?

10   A.   Yes.  I believe it came up.  Because, just like I'm telling

11   you, we had dinner at La Nouvelle Maison and then moved to the

12   next restaurant --

13   Q.   So there should be a part -- there should be something in a

14   report -- because we've gone through all this -- in which you

15   said that you told Mr. Patel your name?

16   A.   Yes, I did.

17   Q.   No.  It should be documented because you told the

18   government, right?

19   A.   I would assume so.

20   Q.   The fact is, you never did.  You misrepresented to him your

21   name the entire time, right?

22   A.   Until the time we had dinner, yes.

23   Q.   Just like you misrepresented who owned the companies,

24   right?

25   A.   Like I said, it never came up.

1    Q.   Your testimony is nothing ever came up regarding who owned

2    what, even though you know full well that the checks were

3    written to somebody else and not you, right?

4    A.   Actually, your statement is incorrect, sir.

5    Q.   I'm sorry.  My --

6    A.   If you look at your own statement, it says Steven Goldberg,

7    but it also says the recipient of the funds is Medipak, LLC,

8    which is owned by Marc Sporn, listed by the Secretary of State.

9    Go look it up.  It's always been the same way.

10   Q.   So there's no question that you would have told Mr. Patel

11   that, right?

12   A.   At some point, when we had that dinner that night.

13   Q.   Is there anything in writing that suggests that

14   LabSolutions knew that doctors were being paid illegally?

15   A.   There's nothing in writing that -- about that with

16   LabSolutions, no.

17   Q.   And everything that had to do with the telemarketing that

18   we've been over, and you went over with the government, while

19   it was going on, you understood it was blessed by lawyers,

20   right?

21   A.   I was told it was blessed by lawyers.

22   Q.   And it was a percentage-based, right?  That is, the payment

23   to Goldberg was percentage-based, right?

24   A.   Correct.

25   Q.   Until it changed, correct?

1   A.   Correct.

2   Q.   And it changed to a flat fee, correct?

3   A.   Correct.

4   Q.   It changed to a flat fee when lawyers advised that it could

5   no longer be by commission, correct?

6   A.   Correct.

7   Q.   And the document that you have in front of you -- what's

8   the exhibit number?

9   A.   155.

10  Q.   It reflects when that change occurred, doesn't it?   It

11  started with the first payment in February of 2019, which would

12  have been for the month of January, correct?

13  A.   1/22/19 -- 2/19, I'm sorry.  2/19 of 2019.

14  Q.   And it went from a commission base to a flat fee base,

15  correct?

16  A.   That's correct.

17  Q.   And the flat fee base went to $200,000 a month, correct?

18  A.   That's correct.

19  Q.   And that $200,000 was what was negotiated between whatever

20  entity was receiving it and LabSolutions, correct?

21  A.   Correct.

22  Q.   And that was done because the lawyers said it needed to

23  change from a percentage to a flat fee, correct?

24  A.   That's what I was told.

25  Q.   And that's exactly what was done, right?  If you look at

1    that exhibit --

2    A.   I agree with you.

3    Q.   Right?

4    A.   I said yes.

5    Q.   And then you later learned, at some point in time, on

6    August the 19th of 2019, you came into possession of a document

7    that -- pursuant to an email you sent yourself, called the

8    EKRA.  EKRA?

9    A.   No.

10   Q.   Right?

11   A.   Yes.

12   Q.   And you received that EKRA in a memorandum form from

13   Mr. Patel, correct?

14   A.   I was -- actually, I don't recall the document, but I do

15   know about EKRA.

16   Q.   Right.  And you sent yourself, did you not, a copy of the

17   memorandum on August 20th -- excuse me -- August the 19th of

18   2019, correct?

19   A.   I could have.

20   Q.   Well, you've seen an email to that effect, have you not?

21   A.   Can you show me the email?

22   Q.   I don't want to show it because it's not admitted into

23   evidence yet.

24          MR. SADOW:  Can we -- do we have the ability to show

25   him an exhibit without the jury yet seeing it?

 1        THE COURT:  You're going to have to approach.  Do you

 2  have a physical copy of it?

 3        MS. DE BOER:  I have a copy.

 4        MR. SADOW:  I don't have a physical copy.  I have a

 5  digital.

 6        MS. DE BOER:  I have one.

 7        THE COURT:  If you have a physical copy, that would be

 8  the easiest thing.

 9  BY MR. SADOW:

10  Q.  I'm showing you what the government has marked as 1848.

11  A.  Okay.

12  Q.  I'll ask you whether or not that's an email that you sent

13  yourself on August the 19th, 2019?

14  A.  Yes, I forwarded it from my iPhone.

15  Q.  Okay.

16  A.  So --

17  Q.  And the attachment is referenced in the email as something,

18  correct?

19  A.  Correct.

20  Q.  Okay.

21        MR. SADOW:  I would move 1848 into evidence, Your

22  Honor.

23        THE COURT:  Any objection to 1848?

24        MS. DE BOER:  May we approach, Your Honor?

25        THE COURT:  Sure.

1        (The following proceedings were held sidebar:)

2            MS. DE BOER:  So this is the document we were talking

3    about at lunch.

4            THE COURT:  Correct.

5            MS. DE BOER:  Just want to confirm that we are not

6    publishing this memo at this point.

7            MR. SADOW:  Oh, absolutely.  I said I was not

8    publishing it.

9            THE COURT:  That's my understanding from the pretrial

10    ruling.

11            MS. DE BOER:  Assuming this is all admitted with this

12    witness, what instructions are going to be given to the jury

13    when they eventually get this piece in evidence?

14            MR. SADOW:  By that point in time, I expect there will

15    be an attorney who testified about it.

16            THE COURT:  There will be a predicate laid as well?

17            MR. SADOW:  Yes.

18            THE COURT:  But for now, let's not publish.

19            MR. SADOW:  But we'll identify what it is.

20            THE COURT:  Yes.  That's fine.

21        (Proceedings returned to open court.)

22            THE COURT:  So at this time, based on previous

23    discussions, any concerns by the government on 1848?

24            MS. DE BOER:  Nothing else, Your Honor.

25            THE COURT:  All right.  That will be admitted.

1          MR. SADOW:  I would also seek to admit 1848-A, which is

2    the attachment referenced in 1848.

3          THE COURT:  Correct.  Subject to discussions we've had,

4    any other issues?

5          MS. DE BOER:  No other issues.

6          THE COURT:  All right.  So given that from the

7    government, that'll also be admitted at this time.

8          (Government Exhibit 1848 and 1848-A was received in

9          evidence.)

10   BY MR. SADOW:

11   Q.  And without giving any of the details, this is memorandum

12   that was written to Mr. Patel, correct?

13   A.  Yes.

14   Q.  And it was written on July 12th of 2019.

15   A.  That is correct.

16         MR. SADOW:  Your Honor, if I can just have a second?

17         THE COURT:  Sure.

18   BY MR. SADOW:

19   Q.  What was Genesis Diagnostics?

20   A.  I don't recall.

21         MR. SADOW:  Could we publish -- is 1908-A in?

22         MS. DE BOER:  I know what document you're referring to.

23   I believe it's in, and no objection to admitting it.

24         MR. SADOW:  Okay.  I would seek to introduce -- if it's

25   in, I'm just making sure, 1908, we have A and B, if there's a

1   B.  I think it's just A.

2        THE COURT:  Okay.  Assuming not admitted or ready,

3   that'll be admitted at this time.

4        (Government Exhibits 1908 and 1908-A were received in

5        evidence.)

6        MR. SADOW:  Would you put up 1908 and then 1908-A.

7   BY MR. SADOW:

8   Q.  This is 1908.

9        MR. SADOW:  Can you show the sticker just to make sure?

10  There we go.  Thank you.

11  BY MR. SADOW:

12  Q.  This is an email from you to Nick Saliba on November 27th

13  of 2018, correct?

14  A.  That is correct.

15  Q.  And it makes reference to CGx, LCD, ICD-10 guideline, as

16  well as Medicare, PGx, CPT, ICD-10 cheat sheet, right?

17  A.  Correct.

18  Q.  Now, you were providing this to Mr. Saliba for what

19  purpose?

20  A.  To help them do -- as I said before, I was doing

21  reconnaissance with some other labs.

22  Q.  Is Genesis the other lab?

23  A.  Well, it was one of many other labs that I was doing

24  reconnaissance with.

25  Q.  Let's start with that.  Was one of many other labs.  Many

1  other labs that you were doing business with?

2  A.  No.  I actually didn't do business with Genesis.  I just

3  managed to gather information to see what ICD codes and what

4  was being accepted and reimbursed by Medicare, and I was

5  sharing it with Mr. Saliba.

6  Q.  Mr. Saliba.  Not Mr. Patel, Mr. Saliba, correct?

7  A.  That is correct in this email.

8  Q.  Let's go to 1908-A.  And those are the codes.  I know it's

9  very difficult to see, but those are the codes that you shared?

10  A.  If it's the attachment, it would have been what's shared.

11  Q.  It's admitted as the attachment.

12  A.  Okay.  Yes.

13  Q.  And where did you get the codes from?  You didn't author or

14  create this document, correct?

15  A.  No, I did not.

16  Q.  Somebody else gave it to you.

17  A.  Yes.

18  Q.  Do you happen to remember who gave it to you?

19  A.  I think I may have gotten it direct from Genesis Labs

20  because they wanted to do business with my company, but I never

21  did business with them.

22  Q.  So Genesis Labs was providing you, for the reasons you

23  indicate, these codes, and you were kind enough to share it

24  with Nick Saliba of LabSolutions, right?

25  A.  That is correct.

1   Q.   When you did so, you didn't think there was anything

2   illegal in doing so, did you?

3   A.   In sharing the codes?  No.

4   Q.   Do you know who Eileen Stein is?

5   A.   Who?

6   Q.   Eileen Stein.

7   A.   No.

8   Q.   Okay.  Prior to going to a -- what I would call a fixed

9   amount, that is, the payment that we went over a little

10  earlier, when it became 200,000 a month?

11  A.   Yes.

12  Q.   And you've told the government the attorneys for

13  LabSolutions had spoken, that it was compliant to pay a

14  percentage, correct?

15  A.   I believe so.

16  Q.   Right, that's what you told the government on November

17  the 21st, 2022.  Does that sound right?

18  A.   That could sound right, yes.

19  Q.   Again, lawyers for LabSolutions and paying a commission

20  percentage, correct?

21  A.   Correct.  I was told it was compliant.

22  Q.   Did you ever have interaction with a lawyer by the name of

23  Mark Thomas?

24  A.   Yes.

25  Q.   Was that your lawyer?

```
1    A.   He was Will Slagle's attorney, and I had hired him or paid
2    him for certain advice on different matters.
3    Q.   Okay.  Including matters related to CGx and PGx?
4    A.   Potentially.  I don't recall exactly what the matters were.
5    Q.   But you were seeking the advice of counsel, correct?
6    A.   Correct.
7    Q.   As you've said, Mr. Slagle was as well --
8    A.   Well, I mean --
9    Q.   -- correct?
10   A.   -- I relied on what Slagle and his counsel had told us
11   because I believed Thomas to be a credible attorney.
12   Q.   And that's during the time period, of course, you're
13   dealing with LabSolutions.
14   A.   Yes.  That was at the beginning stages in 2017.  So I
15   started CGx and PGx business at the end of October, beginning
16   of November of 2017.
17   Q.   Okay.  And you told Mr. Patel, did you not, that you had
18   healthcare lawyers, one of which was Mr. Thomas?
19   A.   I may have.
20   Q.   That's what you told the government on November 28, 2022,
21   correct?
22   A.   I'm agreeing with you.  I said I may have.
23   Q.   Was there a period that, for whatever the reason might be,
24   that you were not in the office, that is, not working in your
25   office?
```

1    A.   Yes.

2    Q.   Was that period from April 12th of 2018 to February

3    of 2019?

4    A.   It could have been.  I don't remember the exact dates, but

5    it was in '18.

6    Q.   And that's what you told the government when you were first

7    interviewed in May, May 26th of 2021, correct?

8    A.   Correct.

9    Q.   And I had asked you before about discussing with Mr. Patel

10   approvals versus denials, remember?

11   A.   Yes.

12   Q.   Didn't you tell the government no more than a month and a

13   half ago, October 20th of 2022, that you could not recall any

14   conversations with Mr. Patel on that subject?

15   A.   I don't -- I don't recall.

16   Q.   You don't recall whether you told the government that, or

17   you don't recall whether you had any conversations?

18   A.   I don't recall that conversation with the government.

19   Q.   Okay.  The problem is, there are so many reports of yours,

20   it's tough to keep them straight.  But I'm going to find that

21   one so I can show you.

22        MR. SADOW:  May I approach?

23        THE COURT:  You may.

24   BY MR. SADOW:

25   Q.   If you look at the bottom of page 6 into page 7, did you

1    tell the government that Sporn doesn't recall any conversations

2    with Patel about the approval versus denials issue?

3    A.  Yes, according to that document.

4         MS. DE BOER:  I'm sorry.  I couldn't hear the question

5    or the response.

6         THE COURT:  Go ahead and restate it, if you could.

7    BY MR. SADOW:

8    Q.  The question was, on October the 20th, 2022, did you tell

9    the government that you could not recall any conversations with

10   Patel about the approvals versus denials issue?

11   A.  And I said -- I said, I -- if it's written, I did say that.

12   Q.  Okay.  And did you tell the government that you were

13   responsible for sending results to the patient?

14   A.  Yes.  The lab made us responsible for sending results to

15   the patients.

16   Q.  Okay.

17        MR. SADOW:  I think that's all I have, Your Honor.

18        THE COURT:  All right.  Folks, can you hang in there

19   and see if we can finish this witness for me?  All right.

20   Let's do that.

21        Redirect, please.

22        MR. SADOW:  Oh, I'm sorry.  There was one more exhibit.

23        THE COURT:  Ask -- go ahead.

24        MR. SADOW:  Very quickly.

25        THE COURT:  Please.

1          MR. SADOW:  I'd move in 135, Government Exhibit 135.

2          THE COURT:  135, any objection?

3          MS. DE BOER:  No objection.

4          THE COURT:  All right.  That'll be admitted at this

5    time.  Thank you.

6          (Government Exhibit 135 was received in evidence.)

7          MR. SADOW:  135 -- I'll just publish it, if I may,

8    Judge, and go through it.

9          THE COURT:  Sure.

10   BY MR. SADOW:

11   Q.  The telephone numbers that you had during the period we are

12   talking about, are they listed on 135?

13   A.  Yes.

14   Q.  And does this reflect the phone calls -- this is a summary

15   exhibit -- that you had 38 phone calls between the period of

16   September of '18 to 6/26 of '19?

17   A.  Yes.

18         But by the way, this number I didn't have during that time

19   period.  This is the recent --

20   Q.  The last number, the 4244.

21   A.  Yes.

22   Q.  But it says you had a total of 38 calls, 32 of which were

23   more than basically just no contact, right?  That is 38 total,

24   32 with some conversation.

25   A.  Yes.

1   Q.   In a period of what appears to be about nine months?

2   A.   Correct.

3   Q.   And you ended your business with Mr. Patel when Mr. Patel's

4   company was raided and he was charged, correct?

5   A.   Yeah.  I didn't know that he was charged, but the business

6   terminated when his facility was raided.

7   Q.   Which would have been the middle of August 2019.  Does that

8   sound about right?

9   A.   Sounds about right.

10   Q.   But you didn't get out of the business?

11   A.   No.

12          MR. SADOW:  That's all.

13          THE COURT:  Thank you.

14          Redirect, please.

15          MS. DE BOER:  Thank you, Your Honor.

16                    REDIRECT EXAMINATION

17   BY MS. DE BOER:

18   Q.   Okay.  Mr. Sporn, you were asked a lot of questions about

19   the involvement of attorneys, including attorneys that

20   represented LabSolutions; is that correct?

21   A.   Correct.

22   Q.   Did you ever meet with any of the attorneys from

23   LabSolutions?

24   A.   Never.

25   Q.   Did you ever speak with them on the phone?

1   A.   No.

2   Q.   So do you have any personal knowledge of what was

3   represented to those attorneys in terms of how the business

4   actually worked?

5   A.   No.

6   Q.   Okay.  Did you take Mr. Patel's word for it?

7   A.   Yes.

8   Q.   All right.  Now, despite the fact that there were attorneys

9   involved at various points in this, you nonetheless pled guilty

10  to healthcare fraud; is that correct?

11  A.   I did.

12  Q.   Are you guilty of healthcare fraud?

13  A.   I am.

14  Q.   So can you explain to the jury how -- and let's take a step

15  back.

16       Healthcare fraud is lies for money; is that correct?

17  A.   That is correct.

18  Q.   And in your case, did you lie to Medicare or participate in

19  lies to Medicare in order to make money?

20  A.   I participated in an overall scheme to make money.

21  Q.   Okay.

22  A.   That's correct.

23  Q.   Now, despite the involvement of attorneys at various stages

24  of this, please explain to the jury how it is that you

25  participated in lies to Medicare that wound you up in the chair

1    you're in now.

2  A.  Well, exactly the whole process flow, from start to finish.

3      So I'll start with the telemarketing; the script itself was

4  very misleading and misrepresenting to induce all these people

5  to take these tests.

6      The generation of the actual requisitions, which were

7  prechecked, the letters of medical necessity, if family history

8  was involved, the creation of the clinical summary, and the

9  doctors signing off on it without a client-patient relationship

10  all contributed into me pleading guilty and accepting

11  responsibility.

12  Q.  And, Mr. Sporn, all of the patients that you got to say

13  yes, all of the doctors that you got to say yes, is any of that

14  worth anything if you don't have a lab that will pay you for

15  that?

16  A.  If you don't have a lab, you're not getting any money.

17  Q.  Okay.  Now, Mr. Sporn, you were asked some questions

18  about -- to the effect of you concealed or deceived your

19  involvement in CPL, the telemarketing arm.

20      Do you recall that?

21  A.  I do.

22  Q.  All right.  So I'm going to show you what has been

23  previously admitted at Government's Exhibit 650.

24      And do you see that this is an email from you to Jon at

25  LabSolutions?

1   A.   I do.

2   Q.   Who's Jon?

3   A.   Jon is Jon Berarducci.   I believe he was the vice president

4   of LabSolutions.

5   Q.   All right.   And you've also got on here, Will Slagle as

6   well.

7   A.   That is correct.

8   Q.   And what you're saying to Jon and Will is:   Hi, Jon.

9   Please see the attached agreement?

10  A.   Attached signed agreement.

11  Q.   Okay.   And were you concealing your involvement in CPL when

12  you sent LabSolutions an agreement between LabSolutions and

13  CPL?

14  A.   No.   It's signed on February 28th, right from me directly

15  to him.

16  Q.   Okay.

17  A.   Not bcc, just directly to him.

18  Q.   All right.   And going to the attachment, which is

19  previously admitted Government's Exhibit 650-A, we looked at

20  this on your direct, correct?

21  A.   Correct.

22  Q.   And you were asked some questions about whether or not you

23  concealed from LabSolutions your d/b/a of Lab Services.

24       Do you recall those questions?

25  A.   Yes.

1   Q.   Is it referenced in the very contract between your company

2   and LabSolutions?

3   A.   Yes.

4   Q.   Lab Services d/b/a, right there in black and white,

5   correct?

6   A.   Correct, as well as Medipak and other names.

7   Q.   Okay.  And then this paragraph here that we looked at on

8   your direct examination which says that LabSolutions is paying

9   CPL to market to providers' offices, to healthcare providers,

10  to doctors, correct?

11  A.   Correct.

12  Q.   Is that what you did?

13  A.   No.

14  Q.   So if this document is what the lawyers saw, would the

15  lawyers have had a full picture of what it was that you were

16  doing?

17  A.   Probably not.

18  Q.   And you were asked questions about how it was Steve

19  Goldberg who signed some of these documents as president of CPL

20  Media.

21       Do you recall that?

22  A.   Yes, I do.

23  Q.   And Jon Berarducci is the one that's on this document from

24  LabSolutions; is that correct?

25  A.   That is correct.

1    Q.   So you had a Steven Goldberg, and Minal Patel had a Jon

2    Berarducci?

3    A.   That's correct.

4    Q.   Okay.  You were asked questions about patients opting in to

5    receive these advertisements.

6         Do you recall that?

7    A.   I do.

8    Q.   And do you recall reviewing the online ads together?  We

9    did it on Friday.  It was a little while ago.

10   A.   Yes, I do.

11   Q.   Actually, here, we have one here.  It's Government

12   Exhibit 1916-C.

13        This is an example of one of the online ads, correct?

14   A.   It is.

15   Q.   And it says if you have Medicare Part B, you can sign up

16   and consent to have a representative from CPL Media contact

17   you, correct?

18   A.   It does.

19   Q.   So they did give their consent in some circumstances,

20   correct?

21   A.   Yes, they did.

22   Q.   All right.  Was the point of this to get consent, or was

23   the point of this to filter down to Medicare patients?

24   A.   It was to filter -- well, it was two parts.  So it was to

25   filter down to Medicare patients.  But if somebody didn't opt

1    in, you're not compliant under the FTC rules.

2         So when we say opt in -- and that's a very good point you

3    bring in -- a lead has to be opt in; otherwise, somebody can

4    find a DNC complaint against you, and the fines are excessive.

5         And that's what the terms of opting in -- what I call

6    opting in.

7    Q.   Okay.  And you understand that it's one thing to comply

8    with the telemarketing laws, and it's another thing entirely to

9    comply with the healthcare laws, correct?

10   A.   That is correct.

11   Q.   And so did you plead to a telemarketing violation or a

12   healthcare violation?

13   A.   A healthcare violation.

14   Q.   Because was this, at bottom, a telemarketing fraud, or was

15   this a healthcare fraud?

16   A.   It was a healthcare fraud.

17   Q.   Now, Mr. Sporn, you were asked a lot of questions about

18   interviews that you participated in with the government, and

19   you have met with the government numerous times over the course

20   of your cooperation in this case as well as in other matters;

21   is that correct?

22   A.   That is correct.

23   Q.   And why did it take so many meetings for you to explain to

24   the government everything -- your entire business model and to

25   go through all of these documents together?

1    A.   Well, I believe there's about 25 million documents, all

2    told.   Somewhere -- I mean, it's a ginormous sum of

3    information.

4         And quite candidly, unless you're looking at documents and

5    being reminded, it would be humanly impossible to remember

6    every aspect of every little detail, especially when you're

7    dealing with such a broad spectrum and so many different

8    companies.

9    Q.   And you were also asked about what the government told you

10   in terms of what it was going to be like to testify.

11        Do you recall those questions?

12   A.   Yes.

13   Q.   And is it correct that the government explained to you the

14   various steps of testimony, such as direct testimony and then

15   cross-examination and then redirect, what it's like to testify?

16   A.   Yes.

17   Q.   And what is the one thing that we told you to do every

18   single time that we met with you?

19   A.   To tell it -- tell as I know it, tell the truth.   And if I

20   don't recall something, I don't recall.

21   Q.   And what is your expectation in terms of the prospect for a

22   sentence reduction if you exaggerate, minimize, or fabricate on

23   the stand?

24   A.   Slim to none.

25   Q.   Now, you were also asked some questions regarding money

1   that you made throughout this and other schemes.

2        Do you recall those questions?

3   A.   I do.

4   Q.   And you were asked questions about jewelry and cars and

5   lots of different assets.

6        Do you recall those questions?

7   A.   I do.

8   Q.   And you were asked about hiding and concealing money.

9        Do you recall that?

10  A.   I do.

11  Q.   Mr. Sporn, what was the purpose of all of these lies to

12  Medicare?  What were you hoping to gain?

13  A.   I was -- I don't know what I was looking to gain.  I was

14  financially -- you know, the money was good, and, you know,

15  bottom line is, I kept it going.  I knew it was wrong and I

16  should have stopped.  That's the bottom line.

17  Q.   Thank you, Mr. Sporn.

18        MS. DE BOER:  No further questions.

19        MR. SADOW:  Your Honor, I have two questions on

20  recross, only two.

21        THE COURT:  Go ahead.

22                          RECROSS-EXAMINATION

23  BY MR. SADOW:

24  Q.   Did you tell the government, on May 26, 2021, Patel did not

25  know that Sporn had the call center CPL Media as well as the

1    telemedicine company; Patel thought Goldberg owned and ran CPL?

2    A.  I could have.

3         MR. SADOW:  I'm just going to show him.

4         THE COURT:  I think he answered he could have.  We've

5    shown him enough.

6         Next question.

7         MR. SADOW:  That's it.  That was all I was going to do.

8         THE COURT:  All right.  Any redirect?

9         MS. DE BOER:  No, Your Honor.

10        THE COURT:  Thank you very much, Mr. Sporn.  You are

11   excused.

12        Ladies and gentlemen of the jury, we are going to go

13   ahead and take our 15-minute break as it is 4:00 o'clock at

14   this time.  Go ahead and leave your notepads on your chairs.

15   We'll break for 15 minutes and resume at 4:15.  You are

16   excused.

17        THE COURT SECURITY OFFICER:  All rise.

18   (Jury exits at 4:03 p.m.)

19        THE COURT:  Please be seated.  So I get a sense of how

20   I'm going to use the remaining time today, who do I have on

21   deck from the government?

22        MS. DE BOER:  Well, Your Honor, I think I have some

23   good news for you on that front.  So it's 4:00 o'clock.  We

24   are -- the next -- we had two witnesses on deck, who are both

25   here.  They were Mr. Hayes and Mr. Vartanian.  However --

    1          THE WITNESS:  Hayes and Vartanian?  Okay.

    2          MS. DE BOER:  Yes.  There's no way we finish either of

    3   those today, so the government's proposal is we cut both of

    4   those two witnesses, we stop for the day, and we pick up

    5   tomorrow so we are back on track tomorrow morning with Mr. I.

    6   and Mr. Griner.

    7          THE COURT:  So let me make sure I have in my notes --

    8   so when you say cut, you are not planning on calling Hayes and

    9   Vartanian any longer?

   10          MS. DE BOER:  That's correct, Your Honor.  If you're

   11   asking us to put up a witness today, it would be one of those,

   12   but they would bleed into tomorrow, we'd be a little bit

   13   behind.  My proposal is, yes, we may lose 40 minutes today of

   14   testimony, but we actually make that up by getting back on

   15   track for tomorrow.

   16          THE COURT:  Okay.  I can live with that if they're not

   17   going to be called and that gets us ahead of schedule -- or

   18   back on schedule.  Not ahead.

   19          Who is on deck for tomorrow then?  You mentioned the

   20   names and I missed it.

   21          MS. DE BOER:  Yes, Your Honor.  So we have Mr. I., who

   22   is a patient.

   23          THE COURT:  Okay.

   24          MS. DE BOER:  And Mr. Griner, who is a cooperating

   25   witness.

1          THE COURT:  Okay.

2          MS. DE BOER:  And then we have sort of as a floating

3     witness the next few days --

4          THE COURT:  The analyst.

5          MS. DE BOER:  -- the analyst.  So we'll stick him in

6     tomorrow or Wednesday, whenever we need somebody.

7          THE COURT:  Okay.  And I don't know why -- maybe

8     because I'm not looking at the correct initials -- I don't see

9     Mr. I. on this.

10         MS. DE BOER:  W.I.

11         THE COURT:  W.I.  Thank you.

12         So we have W.I. for tomorrow for the morning, followed

13    by Griner, and then depending on where we're at, we have our

14    analyst kind of standing by.  All right.  Very good.

15         Let's go ahead then and take our break.  I don't have

16    an issue with that schedule, on letting our jurors go.

17    Certainly if we're not going to be calling those two other

18    witnesses, I think putting us back on track with W.I. and

19    Griner tomorrow gets us where we need to go.

20         All right.  Let's take a brief break.  Everyone can use

21    the restroom.  We'll be back in about ten minutes.

22         MS. DE BOER:  Thank you, Your Honor.

23         (Court recessed at 4:06 p.m.)

24         (Back on the record at 4:29 p.m.)

25         THE COURT:  Okay.  The Court's plan will be to bring in

1    our jurors and let them know they are going to be excused.

2    They will be back tomorrow at 9:00 again tomorrow.  I will make

3    sure they understand that we have all met and worked on our

4    lineup, and we are still on schedule, so they don't get too

5    concerned given that we've only covered one witness today.

6         So let's go ahead, if there's no other issues, and we

7    can bring them in so we can get them out of here.  All right?

8    Thank you.

9         (Jury enters at 4:29 p.m.)

10        THE COURT:  Please be seated, everyone.

11        Ladies and gentlemen of the jury, I have a little bit

12   of good news for you, before you settle in.  That's going to be

13   the end of the testimony for today.  Okay?  We're going to get

14   you out of here a little bit early today.

15        I know it's been a long day and we've covered a lot

16   with one witness, but a lot of detail.

17        So one thing I did want to advise you of is I don't

18   want anyone to be concerned on scheduling.  Part of why we're

19   letting you go today a little early is we're going to be just

20   right on schedule tomorrow.  So we've moved a couple of things

21   around on the presentation of evidence so we are able to finish

22   today early and not fall behind.  So I wanted everyone to know

23   we're letting you go but it's not gonna come at a cost with our

24   schedule.  All right.

25        So tomorrow we'll begin again at 9:00 because it is

1   allowing us to keep that momentum going.  If I can make an

2   accommodation and we don't need to start early that day, I'll

3   let you know.  But for now, it puts us right back on schedule

4   with tomorrow's lineup.

5           We anticipate hearing from a few witnesses tomorrow.

6   We'll have them ready to go.  Certainly I need not remind you

7   again of all the rules because you've done such a good job of

8   following them, but it's incumbent upon me to put them in your

9   minds as you leave.

10          Remember, again, when you get home do not discuss what

11  you've heard and what you've seen with family or friends.  They

12  may ask.  You must instruct them that you cannot speak with

13  them about the case until the end of your service when you've

14  been discharged from the trial.

15          Similarly, please continue to avoid discussing any

16  impressions about the evidence with your fellow jurors.  The

17  time will come for you to do that.  Continue to stay off of the

18  internet.  Do no independent research.  Certainly do not visit

19  any people, places, or things on the internet that you've heard

20  about during this trial, and please stay off social media

21  regarding anything about your jury service.

22          And avoid the lawyers if you can, if you bump into them

23  and they steer clear of you, please take no offense.

24          So let's leave all the notepads in the jury room when

25  you go to leave for tomorrow and if you can all be here by

1    9:00, that'll be great.  We'll get started and we'll pickup

2    with our next government witness.

3            So everyone get home safe.  We will see you tomorrow at

4    9:00.  You are excused.

5            (Jury exits at 4:32 p.m.)

6            THE COURT:  All right.  Everyone please be seated.  So

7    just briefly, so I can let everyone also wrap up for the day.

8    We have W.I., and that is going to probably be what we're going

9    to lead off with tomorrow.  And then we have Shawn Griner, and

10   we'll see where that leaves us, if indeed we have anyone else

11   we can cover.

12           Is that right, Ms. De Boer?

13           MS. DE BOER:  That's correct, Your Honor.

14           THE COURT:  All right.  Any other housekeeping issues

15   that I can address before we break for today, starting on

16   behalf of the government?

17           MS. DE BOER:  No, Your Honor.  Thank you.

18           THE COURT:  All right.  Anything on behalf of the

19   defense?

20           MR. SADOW:  Quickly.

21           THE COURT:  Yes.

22           MR. SADOW:  Any idea how long Griner might be on

23   direct?

24           THE COURT:  Good question.  I do not know.  Do you have

25   at least a ballpark, just so I can plan ahead, maybe?

1        MS. GURSKIS:  Similar to Sporn, maybe a little bit

2   shorter.

3        THE COURT:  Okay.  And I would imagine, if it's

4   anything like our past beneficiaries, W.I. will be quite short?

5        MS. DE BOER:  Yes, Your Honor.

6        THE COURT:  Okay.  All right.  So if we knock out W.I.

7   within the first hour, then hopefully I think it's worth

8   planning, Mr. Sadow, that we may be turning Griner over to you

9   in -- hopefully in the midafternoon.  So let's try to target

10  that.  That would be ideal.

11       But I would plan on starting certainly your cross

12  tomorrow and hopefully finishing it tomorrow.

13       All right.  Were there any other questions on behalf of

14  the defense?

15       MR. SAMUEL:  I just was wondering if we could get a

16  heads up about Wednesday a little bit, maybe.

17       THE COURT:  You know, that's not a bad idea.  Let's

18  talk about that.  I don't know necessarily if at that point

19  Dr. Yogel and Roebuck are back in here, but to Mr. Samuel's

20  point, what's our thinking about Wednesday?

21       MS. DE BOER:  Roebuck already testified.

22       THE COURT:  I'm sorry.  I didn't mean Roebuck.  I meant

23  Dr. Yogel only.

24       MS. DE BOER:  So I think Wednesday will be Brett Hirsch

25  and Craig Holden.  The order, I'm not sure.  Mr. Holden is

1    traveling, so we'll work that out.  But I think those are our

2    two witnesses lined up for Wednesday.  My guess is they don't

3    both finish and someone bleeds into Thursday.

4         THE COURT:  Okay.  What was the other name aside from

5    Hirsch?  I'm sorry I missed that.

6         MS. DE BOER:  Craig Holden.

7         THE COURT:  Holden.  All right.  So we'll have to

8    see -- right.  If we're -- depending on how things go tomorrow

9    and how long it takes with Mr. Griner, it's possible that maybe

10   Griner spills in -- hopefully not, but if he does, he might

11   spill in a little bit into Wednesday morning.  And then the

12   next call is whether it's Holden or Hirsch after that, right?

13        MS. DE BOER:  Correct.

14        THE COURT:  So I guess for purposes of preparing, we

15   should have -- we should be prepared to have a cross of Griner

16   tomorrow, and we should be prepared to have a cross of Hirsch

17   on Wednesday.  I mean, I think that's realistic for the defense

18   side just so we can be -- that'll be best case, but let's be

19   ready for that.

20        MS. DE BOER:  And I would suggest also prepare the

21   cross of Holden because it may be that with his scheduling

22   issues, he's traveling down from Baltimore, that we may have to

23   get him on because who knows how long Hirsch is gonna take.  Or

24   it may be that we feel like we're starting Hirsch -- you know,

25   maybe we finish Griner and so Hirsch is 9:00 a.m., we feel okay

1    that Holden is gonna get done earlier Wednesday or earlier

2    Thursday so we can accommodate his issues.

3        We'll just sort of see where we are, Your Honor.  I

4    would say be prepared for either and we're going to call our

5    witnesses to try and fit the time and use the time most

6    efficiently.

7        THE COURT:  I think based upon what Mr. Sadow said on

8    Friday, if we have ourselves wrapping up with Griner, I mean,

9    in a perfect world we finish Griner tomorrow, and I think it's

10   possible, truthfully.  If the pace is a little faster than it

11   was with Mr. Sporn on direct and W.I. is fairly quick, I think

12   the perfect scenario would be to have W.I. and Griner done

13   tomorrow.

14       If we do that, depending on travel, Hirsch sounds like

15   a full-day operation on Wednesday.  That's how Mr. Sadow framed

16   it.  That would work just fine.  Maybe we can let Holden know

17   he needs to be prepared for Thursday instead.

18       But will you let me know, I guess, tomorrow,

19   Ms. de Boer, in the afternoon, who you think is going to lead

20   off, if it's going to be Hirsch or Holden just so I can kind of

21   bank on that?

22       MS. DE BOER:  Definitely.

23       THE COURT:  I don't know who's going to be longer, but

24   I get the sense that Hirsch is going to be a longer witness

25   than Holden, right?

1    MS. DE BOER:  Yeah, Hirsch will be longer.  And just so

2  Your Honor has the full picture, Holden is one of the

3  attorneys, so he won't be a short witness but I don't think

4  he'll be the length of a cooperator.

5    THE COURT:  Okay.  That's good to know.

6    All right.  That's a good lineup.  It could be that

7  those four witnesses, really the three core witnesses right

8  now, which will be Griner, Hirsch, and Holden, could lead us

9  into bleeding into a little bit of Thursday.  Certainly that's

10  realistic.

11    Do we still have Dr. Yogel in our lineup?  That might

12  be something down the road.  I'm just curious.  For some reason

13  I had not stricken Roebuck.  That's why I read her name again.

14  But I know Dr. Yogel was being thrown around for next week --

15  or this week, I guess, now.

16    MS. DE BOER:  Yes.  I think if he testifies, it'll be

17  on Friday, Your Honor.  He's a doctor and that's his day off.

18  That's why we had said last Friday, but it just didn't work out

19  with scheduling.  So that's why we said this Friday.

20    THE COURT:  Got it.

21    Okay.  Does that help, Mr. Samuel?  I think that gives

22  us a good sense, really, of the next 48 and change.

23    MR. SAMUEL:  That's perfect, Your Honor.  Both those

24  witnesses are not Steve's.  One is and one's mine.

25    THE COURT:  Okay.  Thank you.

1          MR. SAMUEL:  It really doesn't make a difference.

2     We'll both be prepared for Wednesday.

3          THE COURT:  That keeps us on pace.  We'll shoot for,

4     again, a 9:00 to 5:00 tomorrow as per usual, and with this

5     lineup, I think we know what we're getting in the next couple

6     of days.  So I'm just gonna make my notes here and we'll be on

7     our way.

8          Anything else on the defense side before we conclude?

9          MR. RAFFERTY:  No, Your Honor.

10         THE COURT:  The only thing I will mention -- I know we

11    talked about it, Mr. Rafferty -- I'm trying to plan ahead.  I

12    think your response will probably hit in a couple of days on

13    the quash -- the motion to quash.

14         MR. RAFFERTY:  We should have that filed by tomorrow

15    morning.

16         THE COURT:  Okay.  And that's okay.  You still have

17    time.  I'm just trying to build in -- you had mentioned to me

18    that there may be a need for some oral argument on that and

19    that you had been in touch I think with some of the lawyers on

20    the other side.  If so, I may require them to file an expedited

21    reply.

22         I'm trying to plan this out.  I don't know -- and I

23    won't be able to make a judgment call on it until probably at

24    least Wednesday, but I'm trying to figure out if there's an

25    organic place where the government stops that we can just carve

1    out that time and argue it here.

2         And presumably -- I mean, as soon as I can set it --

3    because I have to let them know -- but I could have them on

4    Zoom.  So I could do it at a shorter window; I just want to

5    call over there and maybe let those lawyers know.  As soon as

6    your response hits, I may order the reply to be docketed by

7    Thursday, and then I can figure it out.

8         One thing I was thinking of is arguing it, you know,

9    maybe like Monday morning.  I thought about that too.  I just

10   need to figure out -- and maybe you can help me briefly on this

11   point -- the ruling on that and where it needs to be done.

12   Because presumably I would rule from the bench, I think, just

13   so -- because we don't have the luxury of rendering some sort

14   of a lengthy order.  I would have to make a ruling, lay a

15   record.

16        But how it impacts your case is what I'm worried about,

17   right?  So can you give me a sense of when you would want it so

18   it wouldn't jam up your presentation?

19        MR. RAFFERTY:  Your Honor, if it's possible to have

20   that done by the end of the week, I think it would be very

21   helpful for everyone with scheduling.

22        THE COURT:  Okay.  That's all I needed to know.  Okay.

23        So one thing to think about in that regard,

24   Ms. de Boer, is I may have to carve out some time for that.

25   You know, it may be something that I carve out in the middle of

1   the day, or I can end early on one day to try to do it or even

2   presumably carve out, like, a morning.  You know, I could start

3   a little later and try to do about an hour of OA on that.  That

4   may be an option.

5        So just to plan ahead.  Like, for example, if I did it

6   that way, I could hear the argument 9:00 a.m. on Friday, set

7   aside about an hour, and start Friday at 10:00.  That's what I

8   was thinking, just to try to knock that out, make a ruling,

9   they have it, and then we can continue with our trial.

10       Does that work a little bit with the government's

11  schedule?

12       MS. DE BOER:  Yes.  I was going to suggest Friday just

13  because, with Mr. Holden traveling, I know he does have

14  scheduling issues on Friday.  So I would like to get him done

15  Wednesday or Thursday, if possible.  I think we may have one

16  other traveling witness this week before Friday, on Thursday.

17  So that would be great if we -- you know, if we can protect the

18  time that we do have for people whose schedules are at play

19  here a little bit --

20       THE COURT:  Sure.

21       MS. DE BOER:  -- and then do the hearing on Friday,

22  that makes sense.

23       THE COURT:  Okay.  So what I may do then, Mr. Rafferty,

24  maybe the easiest thing to do is set a hearing already so these

25  guys know.  I'll have to do it today.  And I'll set a hearing

1   for 9:00 a.m. for one hour, 9:00 to 10:00 on Friday.  They can

2   fly in if they want, but they can do it by Zoom.  I'll have my

3   CRD take care of that today, and they'll get enough notice.

4         And then I'll just make a note that if they're going to

5   file a reply, a reply would have to be filed no later than noon

6   on Thursday so we can read it.

7         Okay?  Does that make sense?

8         MR. RAFFERTY:  Yes.

9         THE COURT:  Okay.  So I'm going to set that up then

10  now.

11        So now just plan ahead with that, Ms. de Boer, because

12  now you know kind of the scheduling on Friday, we're going to

13  start a little bit later on the last day of the week.

14        MS. DE BOER:  Thank you, Your Honor.

15        MR. SADOW:  Could I make mention on the same issue for

16  just a moment?

17        THE COURT:  Yeah.

18        MR. SADOW:  It's Hegde, right?

19        MR. RAFFERTY:  Yeah.

20        MR. SADOW:  I see it as two issues on Hegde.  One is

21  her testifying as a witness.  Separate and apart is the

22  document production.

23        I sense the Court will be making a ruling on the

24  document production.  It would be unusual for the Court to rule

25  in advance if somebody couldn't be called as a witness.

1          But in conjunction with that, my thought -- what we

2     really need to know is:  Assuming she was called as a defense

3     witness, is she going to testify?

4          I mean, if she's going to -- I'm not saying she will,

5     but if she decides -- and threw this on somebody else -- if she

6     decides to take the Fifth, that kind of obviates at least part

7     of where we are.  So --

8          THE COURT:  We'll get an answer when we talk to the

9     lawyers, I would assume.  I'm going to ask them.  Because, I

10    mean, why are we going to litigate over that, right?  We've

11    talked about this before.

12         MR. SADOW:  That's why I'm bringing it up.

13         THE COURT:  Right.  I think that's a fair point.  I'll

14    ask them.  I mean, that's probably the first thing we have to

15    figure out, because that impacts everything.  And then once we

16    get that done and we get a representation from counsel, we can

17    deal with the documents, if that makes sense.

18         MR. SADOW:  Okay.

19         THE COURT:  All right.  Perfect.  I'll do that.

20         MR. SADOW:  Thank you.

21         THE COURT:  You got it.

22         Okay.  Okay.  Everyone, thank you.  We'll see everyone

23    tomorrow at 9:00 a.m.  We're in recess.

24         MS. DE BOER:  Thank you, Your Honor.

25         (Court recessed at 4:43 p.m.)

```
 1                    C E R T I F I C A T E

 2

 3

 4          I hereby certify that the foregoing is an

 5    accurate transcription of the proceedings in the

 6    above-entitled matter.

 7

 8
     DATE:   December 5, 2022   /s/Ilona Lupowitz
 9                              ILONA LUPOWITZ, CRR, RPR, RMR
                                Official Court Reporter
10                              United States District Court
                                299 East Broward Boulevard
11                              Fort Lauderdale, Florida 33301
                                (954) 769-5568
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## $

**$1,000** [2] - 32:21, 67:13
**$10,000** [1] - 58:1
**$100** [1] - 67:8
**$2,000** [1] - 67:5
**$2,199,003** [1] - 149:24
**$200,000** [3] - 70:14, 192:17, 192:19
**$26,750** [1] - 144:18
**$4,000** [1] - 57:24
**$400** [7] - 147:2, 147:4, 147:5, 147:19, 147:21, 148:12, 148:13
**$450** [1] - 67:12
**$49,500** [1] - 144:17
**$50,000** [1] - 171:18

## '

**'14** [1] - 145:2
**'17** [1] - 62:19
**'18** [2] - 62:19, 201:5, 203:16
**'19** [1] - 203:16
**'65** [1] - 145:2

## /

**/s/Ilona** [1] - 228:8

## 0

**0** [1] - 44:23

## 1

**1** [14] - 1:7, 25:5, 35:4, 44:22, 46:6, 65:2, 65:22, 69:13, 92:7, 92:14, 124:12, 158:11, 185:16, 186:4
**1,000** [1] - 180:16
**1.37** [1] - 146:5
**1/22/19** [1] - 192:13
**10** [1] - 34:5
**10,000** [1] - 120:11
**100** [4] - 20:20, 58:16, 62:22, 182:20
**100-some** [1] - 92:4
**102** [1] - 3:20
**105** [1] - 3:22
**107** [1] - 3:25
**1080** [1] - 185:14
**1099** [1] - 93:6
**10:00** [2] - 225:7, 226:1
**10th** [1] - 189:11
**11** [1] - 73:24
**1116** [4] - 3:12, 18:23, 19:4, 19:7
**112** [1] - 4:1

**117** [1] - 4:3
**1170** [1] - 2:6
**119** [1] - 4:4
**11:02** [2] - 74:1, 74:6
**11:15** [1] - 73:24
**11:26** [2] - 74:7, 74:10
**12** [1] - 111:5
**1223** [3] - 4:4, 119:14, 119:19
**1224** [4] - 4:4, 119:14, 119:19, 119:23
**1225** [4] - 3:25, 107:3, 107:7, 107:9
**123** [2] - 4:5, 4:5
**129** [1] - 3:5
**12:00** [2] - 97:9, 97:10
**12:30** [1] - 121:11
**12:31** [1] - 121:24
**12:32** [1] - 122:18
**12th** [2] - 196:14, 201:2
**13** [1] - 103:2
**134** [1] - 4:6
**135** [7] - 4:7, 203:1, 203:2, 203:6, 203:7, 203:12
**14** [1] - 104:24, 123:17, 141:5
**1400** [1] - 1:16
**14317** [1] - 47:5
**14318** [1] - 47:25
**14319** [1] - 48:13
**14320** [1] - 49:6
**14322** [1] - 49:23
**14323** [1] - 51:21
**14324** [1] - 52:10
**1494** [5] - 4:5, 110:25, 123:5, 123:11, 123:12
**1494-A** [5] - 4:5, 111:15, 123:6, 123:11, 123:12
**1499** [4] - 3:19, 86:24, 87:5, 87:9
**14th** [1] - 185:20
**15** [7] - 34:8, 108:25, 115:2, 119:6, 121:13, 122:6, 213:15
**15-minute** [4] - 34:6, 73:21, 74:3, 213:13
**155** [4] - 4:6, 134:21, 134:24, 192:9
**16,000** [1] - 144:19
**17** [3] - 81:17, 81:18, 103:13
**1746** [4] - 3:14, 23:7, 23:11, 24:19
**1746-A** [4] - 3:14, 23:7, 23:11, 27:21
**1746-B** [2] - 28:6, 28:7
**1746-C** [1] - 29:19
**1767** [3] - 3:20, 102:2, 102:8, 102:16
**1767-A** [3] - 3:20, 102:2,

102:8
**1767-F** [1] - 103:7
**1778** [3] - 3:22, 105:16, 105:23
**1778-A** [3] - 3:22, 105:16, 105:23
**1779** [4] - 3:19, 86:25, 87:5, 89:10
**1779-A** [4] - 3:19, 86:25, 87:5, 90:3
**1783** [3] - 4:1, 112:9, 112:15
**1783-A** [3] - 4:1, 112:9, 112:15
**1785** [3] - 4:1, 112:10, 112:15
**1785-A** [3] - 4:1, 112:10, 112:16
**1786** [6] - 3:16, 3:21, 46:18, 46:22, 102:3, 102:9
**1786-A** [3] - 3:21, 46:18, 46:22, 47:4, 47:24, 102:3, 102:9
**1789** [4] - 3:17, 56:16, 56:20, 60:13
**1792** [3] - 3:22, 105:17, 105:23
**1792-A** [3] - 3:23, 105:17, 105:23
**1795** [3] - 3:23, 105:17, 105:24
**1795-A** [3] - 3:23, 105:17, 105:24
**18-karat** [2] - 144:17, 144:24
**1800** [3] - 3:21, 102:3, 102:8
**1800-A** [3] - 3:21, 102:3, 102:9
**1801** [3] - 4:3, 116:25, 117:6
**1801-A** [3] - 4:3, 116:25, 117:6
**1802** [4] - 3:21, 102:3, 102:9, 104:20
**1802-A** [3] - 3:22, 102:3, 102:9
**1806** [3] - 3:23, 105:17, 105:24
**1806-A** [3] - 3:24, 105:17, 105:24
**1808** [4] - 3:17, 56:16, 56:20, 58:21
**1813** [3] - 4:3, 117:1, 117:6
**1813-A** [3] - 4:4, 117:1, 117:7
**1817** [3] - 3:24, 105:17, 105:24
**1817-A** [3] - 3:24, 105:18, 105:24

**1818** [3] - 4:3, 116:25, 117:6
**1818-A** [3] - 4:3, 117:1, 117:6
**182** [1] - 39:6
**1821** [3] - 3:24, 105:18, 105:24
**1821-A** [3] - 3:25, 105:18, 105:24
**1848** [14] - 4:6, 124:4, 124:10, 125:16, 126:9, 126:10, 127:17, 194:10, 194:21, 194:23, 195:23, 196:2, 196:8
**1848-A** [6] - 4:6, 124:4, 125:16, 126:13, 196:1, 196:8
**1877** [3] - 3:11, 7:7, 7:13
**1878** [10] - 3:11, 7:7, 7:13, 7:16, 12:10, 14:15, 15:14, 17:25, 156:5, 157:6
**1879** [3] - 3:12, 18:23, 19:4
**1880** [4] - 3:13, 21:7, 21:11, 21:14
**1881** [3] - 3:13, 23:6, 23:11
**1882** [3] - 3:13, 23:6, 23:11
**1883** [3] - 3:13, 23:6, 23:11
**1884** [3] - 3:12, 18:24, 19:4
**1885** [3] - 3:12, 18:23, 19:4
**19** [3] - 3:12, 126:12, 152:2
**19-80181** [1] - 5:6
**19-CR-80181-RAR-1** [1] - 1:2
**1906** [3] - 4:2, 112:10, 112:16
**1908** [8] - 4:2, 4:7, 112:10, 112:16, 196:25, 197:4, 197:6, 197:8
**1908-A** [8] - 4:2, 4:7, 112:10, 112:16, 196:21, 197:4, 197:6, 198:8
**1909** [5] - 3:15, 36:21, 36:25, 37:3, 39:11
**1909-A** [3] - 3:15, 38:11, 38:16
**1910** [5] - 3:15, 36:21, 36:25, 41:24, 44:14
**1910-A** [4] - 3:16, 43:21, 44:1, 44:4
**1911** [6] - 3:20, 90:16, 90:21, 90:25, 130:11, 152:2
**1911-A** [6] - 3:20, 90:16, 90:21, 91:22, 152:3, 152:5
**1912** [6] - 3:18, 80:15, 80:20, 80:24, 82:8, 82:16
**1916-C** [1] - 209:12
**195,000** [1] - 145:3
**196** [1] - 4:6
**197** [1] - 4:7
**1971** [1] - 145:2
**1989** [1] - 136:19

**1991** [1] - 136:23
**19th** [4] - 126:15, 193:6, 193:17, 194:13
**1:00** [4] - 34:6, 34:17, 97:9, 97:10
**1:45** [4] - 121:13, 121:23, 122:7, 122:15

## 2

**2** [3] - 40:15, 94:3, 97:16
**2-V** [1] - 155:13
**2.1** [1] - 39:10
**2.7** [1] - 146:2
**2/19** [2] - 192:13
**20** [12] - 34:8, 34:17, 45:2, 45:5, 45:6, 45:9, 45:11, 46:3, 46:9, 108:25, 118:11, 119:7
**20,000** [1] - 144:20
**20-carat** [1] - 144:19
**200,000** [2] - 70:21, 199:10
**200-seat** [1] - 75:23
**2000** [3] - 141:17, 148:15, 149:24
**20005** [1] - 1:16
**2000s** [1] - 142:2
**2002** [3] - 141:19, 148:15, 149:24
**2005** [2] - 148:16, 149:24
**2006** [1] - 141:19
**2007** [4] - 141:21, 148:17, 149:16, 149:18
**2008** [3] - 61:11, 62:10, 148:24
**2011** [1] - 141:21
**2013** [1] - 61:13
**2014** [5] - 142:16, 145:10, 146:4, 146:9, 150:8
**2015** [5] - 142:16, 145:10, 146:1, 146:10, 150:8
**2017** [4] - 65:2, 115:13, 200:14, 200:16
**2018** [23] - 25:5, 27:14, 27:17, 36:8, 58:24, 59:20, 60:15, 62:25, 64:18, 87:11, 89:12, 91:5, 103:2, 103:13, 104:24, 108:1, 111:5, 123:17, 145:16, 145:18, 184:14, 197:13, 201:2
**2019** [17] - 62:25, 69:13, 70:8, 118:9, 124:5, 124:11, 126:12, 145:15, 145:17, 192:11, 192:13, 193:6, 193:18, 194:13, 196:14, 201:3, 204:7
**2020** [1] - 118:9
**2021** [11] - 174:21, 184:15, 184:21, 184:24, 185:4, 185:8, 185:13, 185:21, 189:12, 201:7, 212:24

**2022** [10] - 1:4, 147:1, 147:18, 147:25, 187:10, 199:17, 200:20, 201:13, 202:8, 228:8
**203** [1] - 4:7
**204** [1] - 3:6
**2052** [1] - 1:19
**20th** [5] - 187:10, 188:9, 193:17, 201:13, 202:8
**21** [4] - 3:13, 91:5, 147:18, 147:25
**212** [1] - 3:6
**21st** [2] - 147:1, 199:17
**23** [1] - 3:13
**24** [3] - 41:17, 89:12, 139:25
**240** [1] - 51:14
**2400** [1] - 2:6
**24th** [1] - 87:10
**25** [2] - 175:3, 211:1
**25,000** [1] - 144:25
**26** [1] - 212:24
**260** [1] - 1:18
**26th** [3] - 173:14, 174:21, 201:7
**27** [2] - 81:18, 139:24
**27th** [1] - 197:12
**28** [2] - 115:15, 200:20
**28th** [1] - 207:14
**29** [1] - 115:15
**299** [2] - 1:23, 228:10
**29th** [1] - 127:22
**2:00** [4] - 34:7, 34:18, 97:9, 97:11
**2:02** [1] - 122:19
**2:12** [1] - 129:11

## 3

**3** [3] - 14:15, 94:22, 94:24
**3,696** [1] - 46:3
**30** [8] - 34:17, 114:19, 137:14, 137:18, 137:19, 165:19, 167:19, 167:25
**30303** [1] - 1:19
**30305** [1] - 2:4
**30309** [1] - 2:7
**30th** [2] - 108:1, 108:5
**3131** [1] - 2:3
**32** [2] - 203:22, 203:24
**33** [1] - 115:2
**33,000** [1] - 144:20
**33.75-carat** [1] - 144:23
**3301** [1] - 1:24
**33301** [1] - 228:11
**34** [3] - 46:3, 115:2, 115:11
**35** [3] - 115:11, 181:6, 181:17
**35,000** [1] - 144:25

**36** [1] - 3:15
**36,000** [1] - 144:23
**38** [4] - 3:15, 203:15, 203:22, 203:23

## 4

**4** [1] - 95:22
**40** [4] - 34:17, 41:6, 97:9, 214:13
**40,000** [1] - 144:24
**401** [2] - 126:1, 128:21
**403** [1] - 128:21
**419** [1] - 45:13
**42** [1] - 52:6
**42,000** [1] - 145:1
**42188** [2] - 92:7, 92:9
**42189** [1] - 96:16
**422** [3] - 3:17, 56:16, 56:20
**42311** [1] - 98:14
**42321** [1] - 100:4
**4244** [1] - 203:20
**43230** [1] - 99:13
**44** [1] - 3:16
**442** [3] - 3:18, 80:15, 80:20
**45** [5] - 45:13, 67:1, 67:15, 67:17, 67:20
**45,000** [1] - 144:22
**46** [1] - 3:16
**48** [2] - 41:17, 222:22
**48-carat** [2] - 144:20, 144:21
**4:00** [3] - 40:6, 213:13, 213:23
**4:03** [1] - 213:18
**4:06** [1] - 215:23
**4:15** [1] - 213:15
**4:29** [2] - 215:24, 216:9
**4:32** [1] - 218:5
**4:43** [1] - 1:5, 227:25

## 5

**5** [7] - 1:4, 58:24, 59:20, 67:9, 67:13, 96:17, 228:8
**50** [3] - 33:5, 34:4, 34:17
**50,000** [1] - 171:21
**555-1212** [1] - 55:20
**56** [1] - 3:17
**5:00** [2] - 40:6, 223:4

## 6

**6** [4] - 1:6, 3:5, 66:24, 201:25
**6/26** [1] - 203:16
**60** [5] - 17:7, 20:19, 20:20, 53:22, 76:25
**64** [1] - 3:17
**65** [3] - 20:19, 20:20, 23:16

**65,000** [1] - 145:2
**650** [5] - 3:17, 63:23, 64:5, 64:9, 206:23
**650-A** [5] - 3:17, 63:23, 64:5, 64:21, 207:19
**651** [4] - 3:17, 63:24, 64:5, 68:5
**652** [4] - 3:18, 63:24, 64:5, 69:9
**654-A** [4] - 3:18, 63:24, 64:5, 71:11
**6:00** [1] - 40:7

## 7

**7** [4] - 3:11, 142:8, 142:13, 201:25
**70** [2] - 17:23, 76:25
**74** [1] - 15:14
**769-5568** [2] - 1:24, 228:11

## 8

**8** [2] - 99:14, 175:17
**8,443** [1] - 39:6
**80** [3] - 3:18, 33:7, 34:5
**800** [2] - 32:21, 55:20
**81** [1] - 17:25
**85** [1] - 45:12
**87** [1] - 3:19
**8:00** [1] - 40:5
**8th** [2] - 1:16, 64:18

## 9

**9** [1] - 100:3
**90** [2] - 3:20, 94:20
**92,000** [1] - 144:21
**954** [2] - 1:24, 228:11
**98** [4] - 39:13, 97:16, 97:23, 119:9
**9:00** [10] - 216:2, 216:25, 218:1, 218:4, 220:25, 223:4, 225:6, 226:1, 227:23
**9:25** [1] - 1:5
**9:27** [1] - 5:20
**9th** [1] - 60:14

## A

**a.m** [11] - 1:5, 5:20, 40:5, 74:1, 74:6, 74:7, 74:10, 220:25, 225:6, 226:1, 227:23
**abdominal** [1] - 111:21
**ability** [2] - 149:12, 193:24
**able** [7] - 22:20, 42:14, 50:10, 181:23, 182:24, 216:21, 223:23
**above-entitled** [1] - 228:6
**absolutely** [5] - 67:18, 89:7,

105:13, 113:7, 195:7

**accept** [3] - 83:6, 83:7, 97:13

**accepted** [2] - 141:7, 198:4

**accepting** [1] - 206:10

**access** [3] - 175:8, 175:9, 176:2

**accessed** [1] - 46:8

**accommodate** [1] - 221:2

**accommodation** [1] - 217:2

**according** [6] - 149:23, 156:18, 167:2, 167:15, 168:18, 202:3

**accordingly** [1] - 30:25

**account** [1] - 175:9

**accountability** [1] - 42:9

**accounted** [2] - 5:4, 142:12

**accounts** [8] - 144:7, 144:8, 144:10, 144:12, 144:14, 145:5, 145:21, 148:21

**accurate** [2] - 187:1, 228:5

**accused** [1] - 140:17

**ACHs** [1] - 134:19

**acknowledge** [2] - 22:1, 99:20

**acquired** [2] - 94:11, 145:22

**action** [1] - 61:3

**actions** [1] - 124:21

**active** [9] - 14:7, 14:8, 14:11, 14:13, 14:18, 159:21, 159:23, 159:24, 160:3

**activities** [1] - 75:23

**activity** [2] - 142:1, 142:2

**acts** [4] - 138:21, 151:9, 151:11, 151:22

**actual** [7] - 7:23, 20:17, 25:16, 55:13, 97:7, 206:6

**add** [1] - 121:4

**added** [2] - 11:9, 144:11

**adding** [1] - 35:21

**addition** [3] - 10:15, 96:7, 144:14

**additional** [10] - 14:17, 15:12, 25:14, 30:6, 103:20, 106:17, 111:12, 111:16, 160:20, 174:20

**address** [6] - 60:21, 91:12, 95:9, 127:3, 161:17, 218:15

**adjudications** [1] - 147:4

**adjust** [1] - 97:14

**adjusted** [1] - 70:17

**administration** [1] - 132:9

**admissible** [2] - 126:17, 126:20

**admission** [16] - 18:23, 21:7, 23:6, 36:21, 38:11, 43:22, 46:18, 63:23, 86:24, 90:16, 102:2, 105:16, 107:3, 112:9, 119:14, 125:13

**admit** [6] - 38:14, 56:19, 80:18, 123:10, 128:1, 196:1

**admitted** [43] - 7:12, 21:10, 23:10, 24:18, 29:18, 36:24, 41:24, 46:21, 58:20, 60:12, 64:2, 64:8, 68:5, 69:8, 71:10, 80:23, 87:3, 87:8, 89:9, 90:3, 90:19, 90:24, 102:6, 102:15, 104:19, 105:21, 107:6, 110:24, 112:13, 119:17, 119:22, 124:4, 130:10, 193:22, 195:11, 195:25, 196:7, 197:2, 197:3, 198:11, 203:4, 206:23, 207:19

**admitting** [1] - 196:23

**adopted** [1] - 72:21

**ads** [4] - 19:17, 155:3, 209:8, 209:13

**advance** [3] - 165:16, 167:8, 226:25

**adverse** [5] - 10:16, 10:17, 11:12, 11:16, 17:2

**advertisements** [2] - 6:25, 209:5

**advice** [10] - 124:14, 124:20, 125:5, 125:23, 178:8, 179:18, 180:4, 187:14, 200:2, 200:5

**advice-of-counsel** [2] - 124:14, 125:5

**advise** [1] - 216:17

**advised** [1] - 192:4

**affect** [1] - 106:15

**affiliate's** [1] - 94:5

**affiliated** [1] - 143:11

**African** [1] - 187:13

**African-American** [1] - 187:13

**afternoon** [4] - 87:20, 129:24, 129:25, 221:19

**age** [1] - 160:20

**agent** [9] - 24:13, 76:12, 76:13, 76:14, 147:20, 147:23, 166:16, 174:10, 174:16

**Agent** [3] - 148:1, 148:3, 173:15

**agents** [9] - 75:4, 76:10, 166:17, 167:11, 174:8, 174:13, 175:16, 175:19, 176:3

**ago** [8] - 114:19, 137:14, 137:18, 137:19, 138:20, 188:8, 201:13, 209:9

**agree** [17] - 108:6, 130:1, 133:18, 151:14, 158:10, 158:13, 160:8, 181:21, 181:23, 182:5, 182:25, 183:1, 183:3, 183:5, 183:9, 193:2

**agreed** [6] - 21:2, 73:5, 133:21, 144:3, 147:9, 149:23

**agreed-upon** [1] - 144:3

**agreeing** [1] - 200:22

**agreement** [31] - 63:16, 63:18, 63:20, 64:16, 64:22, 64:25, 65:22, 66:5, 66:10, 66:13, 66:22, 66:23, 68:6, 69:3, 69:11, 70:5, 71:3, 71:5, 71:14, 177:22, 178:12, 178:15, 180:8, 180:11, 181:6, 181:25, 183:1, 207:9, 207:10, 207:12

**agreements** [7] - 63:12, 63:14, 66:13, 69:2, 70:1, 73:7, 73:8

**agrees** [1] - 71:22

**ahead** [34] - 5:5, 5:25, 9:25, 10:6, 14:1, 18:9, 33:17, 34:3, 34:14, 34:15, 45:3, 56:14, 73:19, 73:20, 73:23, 121:12, 122:22, 122:23, 125:8, 129:6, 147:14, 202:6, 202:23, 212:21, 213:13, 213:14, 214:17, 214:18, 215:15, 216:6, 218:25, 223:11, 225:5, 226:11

**akin** [1] - 140:6

**AI** [3] - 61:1, 153:7, 153:9

**Alex** [18] - 25:8, 26:11, 26:12, 26:13, 26:18, 26:20, 26:21, 26:22, 26:25, 27:1, 27:5, 27:7, 89:16, 89:18, 89:21, 90:7, 90:11

**Alexi** [2] - 58:24, 59:1

**Alexi's** [1] - 59:18

**algorithms** [1] - 25:12

**aliases** [1] - 116:4

**Alite** [1] - 117:16

**alleged** [1] - 126:16

**allow** [5] - 14:1, 20:2, 109:8, 109:9, 127:1

**allowing** [1] - 217:1

**almost** [2] - 46:25, 79:11

**alone** [3] - 95:11, 106:17

**AMERICA** [1] - 1:3

**America** [1] - 5:7

**American** [1] - 187:13

**amount** [8] - 36:16, 57:24, 58:2, 69:4, 120:23, 146:24, 149:22, 199:9

**analogy** [2] - 109:7, 119:5

**analysis** [1] - 128:6

**analyst** [3] - 215:4, 215:5, 215:14

**animal** [1] - 124:17

**answer** [14] - 31:17, 84:8, 100:2, 120:21, 153:22, 158:15, 162:15, 178:9, 179:17, 186:12, 186:17,

187:5, 187:6, 227:8

**answered** [7] - 13:2, 30:22, 50:18, 132:8, 157:18, 161:10, 213:4

**answers** [3] - 24:9, 28:12, 29:16

**Anti** [2] - 124:17, 125:19

**Anti-Kickback** [2] - 124:17, 125:19

**anticipate** [1] - 217:5

**anyway** [2] - 127:16, 159:3

**apart** [1] - 226:21

**apologize** [1] - 117:22

**appear** [3] - 59:16, 183:11, 187:6

**appearance** [1] - 60:10

**APPEARANCES** [1] - 1:11

**Appearances** [1] - 2:1

**appointment** [8] - 98:8, 161:18, 165:9, 165:11, 165:15, 167:6, 167:7, 168:23

**approach** [9] - 37:25, 43:8, 147:6, 147:16, 173:25, 175:13, 194:1, 194:24, 201:22

**appropriate** [5] - 24:14, 96:21, 123:23, 124:7, 125:7

**approval** [4] - 41:19, 89:8, 177:17, 202:2

**approvals** [2] - 201:10, 202:10

**approve** [6] - 27:5, 87:18, 88:14, 113:11, 113:13, 182:10

**approved** [8] - 26:18, 42:22, 72:23, 88:23, 97:17, 97:23, 162:24

**approximated** [1] - 23:16

**April** [7] - 184:15, 184:24, 185:4, 185:8, 185:13, 185:20, 201:2

**arc** [1] - 126:4

**area** [3] - 77:23, 168:22, 184:3

**areas** [1] - 164:11

**argue** [1] - 224:1

**arguing** [1] - 224:8

**argument** [3] - 125:18, 223:18, 225:6

**arm** [1] - 206:19

**arrangement** [2] - 68:20, 69:20

**arrest** [3] - 178:10, 178:24, 179:2

**art** [2] - 63:6, 63:7

**artist** [2] - 26:16, 89:20

**aside** [4] - 85:7, 114:14, 220:4, 225:7

**aspect** [4] - 33:25, 82:9, 163:1, 211:6

**aspects** [1] - 85:10
**assessment** [5] - 27:18, 28:9, 28:23, 81:18, 145:24
**assessments** [3] - 81:17, 81:18, 81:21
**assets** [31] - 139:8, 139:12, 139:19, 145:22, 145:23, 148:20, 148:25, 149:2, 149:5, 149:12, 149:14, 149:16, 150:5, 150:6, 150:15, 150:18, 151:10, 153:11, 177:23, 178:3, 179:8, 179:14, 179:18, 180:17, 180:20, 180:22, 180:24, 180:25, 181:1, 181:3, 212:5
**assist** [1] - 55:21
**assisted** [2] - 90:8, 106:16
**associate** [1] - 63:20
**associated** [2] - 51:18, 59:15
**assume** [7] - 19:18, 31:9, 32:25, 54:21, 177:25, 190:19, 227:9
**assuming** [6] - 111:12, 127:25, 169:1, 183:3, 195:11, 227:2
**Assuming** [1] - 197:2
**assured** [1] - 57:13
**at-home** [2] - 8:3, 8:20
**Atlanta** [3] - 1:19, 2:4, 2:7
**Attached** [1] - 103:15
**attached** [7] - 27:11, 64:16, 91:18, 111:10, 126:21, 207:9, 207:10
**Attachment** [1] - 100:3
**attachment** [17] - 89:24, 89:25, 90:2, 91:17, 91:23, 92:6, 98:14, 99:14, 105:1, 111:7, 111:15, 126:12, 194:17, 196:2, 198:10, 198:11, 207:18
**attachments** [2] - 27:22, 103:4
**attempted** [1] - 76:2
**attempting** [1] - 128:5
**attended** [1] - 75:9
**attestation** [1] - 71:12
**attestations** [2] - 71:8, 73:5
**attorney** [16] - 66:12, 69:24, 113:18, 158:23, 173:18, 178:8, 179:20, 180:3, 180:4, 180:5, 180:14, 181:11, 181:12, 195:15, 200:1, 200:11
**attorneys** [13] - 113:19, 181:21, 182:5, 182:9, 182:11, 199:12, 204:19, 204:22, 205:3, 205:8, 205:23, 222:3

**atypical** [1] - 48:19
**Audemars** [1] - 144:18
**audit** [3] - 34:22, 39:19
**audits** [3] - 35:24, 39:20, 45:18
**August** [10] - 60:14, 124:11, 126:12, 126:15, 126:16, 193:6, 193:17, 194:13, 204:7
**aunts** [1] - 161:6
**author** [1] - 198:13
**authorization** [6] - 53:19, 57:16, 99:15, 176:7, 176:17, 176:19
**authorized** [1] - 144:12
**authorizing** [1] - 20:2
**automobiles** [1] - 145:1
**availability** [1] - 22:9
**available** [3] - 18:11, 24:5, 99:8
**Avenue** [1] - 1:16
**average** [1] - 71:2
**avoid** [4] - 121:20, 145:23, 217:15, 217:22
**aware** [6] - 5:15, 34:15, 117:23, 122:9, 132:12, 134:12, 162:23, 171:6

# B

**BAA** [1] - 63:19
**back-door** [1] - 125:4
**backed** [1] - 69:4
**background** [7] - 8:17, 8:18, 13:23, 14:1, 62:7, 74:25, 160:24
**bad** [5] - 17:10, 51:4, 116:14, 150:2, 219:17
**BAKER** [1] - 2:5
**balance** [1] - 121:2
**balanced** [2] - 120:24, 157:12
**ballpark** [1] - 218:25
**balls** [1] - 62:17
**Baltimore** [1] - 220:22
**Bank** [1] - 138:4
**bank** [6] - 144:7, 144:8, 144:10, 145:21, 148:20, 221:21
**bar** [1] - 85:23
**base** [3] - 192:14, 192:17
**based** [48] - 24:7, 24:9, 25:13, 29:15, 30:7, 32:11, 41:3, 47:22, 49:13, 56:5, 67:23, 68:3, 68:20, 69:1, 69:4, 70:17, 70:24, 72:14, 76:16, 76:17, 80:6, 81:20, 83:18, 84:7, 84:22, 93:7, 100:23, 110:14, 124:7, 156:21, 156:24, 157:7, 157:8, 157:23, 157:24,

166:18, 181:24, 182:25, 184:2, 191:22, 191:23, 195:22, 221:7
**basis** [7] - 39:23, 69:6, 69:7, 71:2, 126:5, 175:21, 179:25
**Bates** [11] - 15:14, 17:25, 47:5, 47:25, 49:6, 49:23, 51:21, 52:10, 92:7, 96:16, 100:4
**bcc** [7] - 131:17, 131:18, 132:17, 132:18, 132:25, 155:16, 207:17
**bcc'd** [2] - 91:9, 131:2
**Beach** [1] - 108:23
**BEACH** [1] - 1:2
**beach** [1] - 108:23
**bear** [1] - 37:10
**became** [4] - 34:15, 160:2, 160:3, 199:10
**become** [2] - 117:23, 125:6
**BEFORE** [1] - 1:10
**beg** [1] - 184:10
**began** [2] - 145:15, 145:18
**begin** [2] - 129:18, 216:25
**beginning** [4] - 36:5, 40:10, 200:14, 200:15
**behalf** [9] - 18:12, 113:18, 113:19, 122:9, 122:12, 171:11, 218:16, 218:18, 219:13
**behind** [2] - 214:13, 216:22
**belabor** [1] - 99:18
**belief** [1] - 54:23
**below** [1] - 99:2
**bench** [1] - 224:12
**beneficiaries** [3] - 154:23, 162:11, 219:4
**beneficiary** [2] - 163:24, 166:12
**benefit** [3] - 16:2, 62:13, 99:3
**benefits** [8] - 8:4, 8:21, 9:2, 22:3, 53:12, 57:4, 57:9, 164:24
**Bentley** [1] - 145:3
**Berarducci** [8] - 68:11, 68:18, 88:18, 131:15, 155:15, 207:3, 208:23, 209:2
**best** [2] - 10:1, 220:18
**Bethel** [2] - 58:24, 59:5
**Bethel's** [1] - 59:8
**better** [7] - 48:8, 94:20, 100:17, 111:14, 127:12, 156:23, 156:24
**between** [22] - 12:5, 65:4, 65:9, 69:11, 96:21, 97:3, 100:15, 108:3, 110:4, 110:19, 111:3, 120:4, 120:24, 144:14, 154:13,

174:22, 175:1, 175:5, 192:19, 203:15, 207:12, 208:1
**big** [2] - 39:25, 59:25
**bigger** [1] - 124:3
**bill** [1] - 67:10
**billed** [6] - 13:1, 51:2, 57:17, 57:20, 58:1, 143:14
**billing** [19] - 29:19, 57:4, 57:9, 57:23, 57:25, 67:9, 67:10, 88:22, 88:24, 96:7, 97:17, 97:18, 104:21, 106:12, 106:17, 106:19, 109:23, 110:15, 111:11
**bills** [2] - 53:4, 144:16
**bin** [3] - 77:9
**bins** [2] - 77:8
**Biotech** [7] - 142:17, 143:6, 143:20, 143:25, 144:7, 144:15, 150:9
**Biotech's** [1] - 143:22
**birth** [1] - 47:9
**bit** [16] - 21:18, 22:23, 31:5, 81:12, 130:13, 166:1, 214:12, 216:11, 216:14, 219:1, 219:16, 220:11, 222:9, 225:10, 225:19, 226:13
**black** [1] - 208:4
**blank** [2] - 28:10, 173:18
**bleed** [1] - 214:12
**bleeding** [1] - 222:9
**bleeds** [1] - 220:3
**blessed** [3] - 173:4, 191:19, 191:21
**blind** [1] - 132:21
**blindly** [1] - 162:15
**blood** [1] - 17:8
**blow** [2] - 87:16, 130:12
**boards** [1] - 46:15
**Boca** [13] - 61:4, 74:18, 74:22, 85:18, 86:3, 86:4, 93:21, 108:21, 108:23, 108:24, 167:4, 185:18
**body** [2] - 64:15, 105:4
**BOER** [142] - 1:13, 3:5, 3:6, 5:13, 6:8, 6:15, 6:17, 7:6, 7:15, 14:2, 18:22, 19:6, 19:8, 21:6, 21:12, 23:5, 23:13, 33:18, 33:19, 35:2, 36:9, 36:20, 37:2, 37:4, 37:8, 37:12, 37:18, 37:22, 37:25, 38:2, 38:10, 38:17, 38:20, 41:23, 42:1, 42:8, 42:10, 42:13, 42:16, 42:24, 43:1, 43:8, 43:10, 43:13, 43:15, 43:20, 44:2, 44:12, 44:17, 44:25, 45:4, 46:17, 46:24, 56:11, 56:15, 56:22, 63:22, 64:4, 64:7, 73:13, 74:4,

74:15, 74:16, 80:14, 80:22, 86:23, 87:4, 87:7, 90:15, 90:20, 90:23, 102:1, 102:7, 102:11, 105:15, 105:22, 106:1, 107:2, 107:8, 107:16, 107:20, 112:8, 112:14, 112:18, 116:24, 117:5, 117:8, 119:13, 119:18, 119:21, 122:11, 122:16, 122:20, 122:24, 123:4, 123:16, 123:21, 127:6, 128:23, 129:2, 134:7, 134:22, 147:8, 194:3, 194:6, 194:24, 195:2, 195:5, 195:11, 195:24, 196:5, 196:22, 202:4, 203:3, 204:15, 204:17, 212:18, 213:9, 213:22, 214:2, 214:10, 214:21, 214:24, 215:2, 215:5, 215:10, 215:22, 218:13, 218:17, 219:5, 219:21, 219:24, 220:6, 220:13, 220:20, 221:22, 222:1, 222:16, 225:12, 225:21, 226:14, 227:24

**Boer** [9] - 6:4, 74:14, 126:25, 128:16, 148:6, 218:12, 221:19, 224:24, 226:11

**bold** [1] - 9:9

**bonus** [1] - 93:7

**bottom** [15] - 39:5, 42:6, 46:2, 48:3, 49:19, 52:10, 52:12, 58:22, 61:10, 92:12, 97:12, 201:25, 210:14, 212:15, 212:16

**Boulevard** [2] - 1:23, 228:10

**box** [3] - 27:15, 27:17, 63:8

**boxes** [1] - 29:12

**brace** [3] - 82:14, 82:24, 82:25

**bracelet** [1] - 144:17

**braces** [2] - 61:18

**break** [15] - 56:13, 73:17, 73:19, 73:20, 73:21, 74:3, 110:4, 121:10, 121:15, 122:9, 213:13, 213:15, 215:15, 215:20, 218:15

**Breakers** [2] - 85:11, 85:12

**breaking** [1] - 158:15

**breast** [6] - 27:16, 28:2, 28:3, 28:23, 29:25, 30:5

**Brett** [6] - 74:23, 117:17, 171:13, 171:19, 172:14, 219:24

**BRIAN** [1] - 2:5

**brief** [2] - 73:16, 215:20

**briefly** [6] - 58:10, 58:11,

60:7, 61:16, 218:7, 224:10

**bring** [7] - 41:24, 74:8, 129:4, 134:25, 210:3, 215:25, 216:7

**bringing** [1] - 227:12

**broad** [1] - 211:7

**broader** [1] - 47:11

**Broward** [2] - 1:23, 228:10

**Bryan** [1] - 173:16

**bubbles** [1] - 83:13

**build** [1] - 223:17

**building** [6] - 75:20, 75:21, 94:2, 169:5, 185:22, 185:24

**bulk** [2] - 54:6, 63:1

**bullet** [3] - 71:21, 71:25, 72:6

**bump** [1] - 217:22

**bunch** [3] - 24:1, 103:4, 157:2

**bundled** [1] - 17:21

**Buono** [1] - 148:3

**business** [52] - 62:11, 63:20, 66:1, 67:22, 68:3, 72:24, 73:4, 85:10, 86:10, 93:4, 94:11, 101:3, 101:4, 101:6, 101:7, 115:4, 115:5, 115:6, 115:8, 115:9, 116:4, 117:10, 118:10, 120:11, 120:22, 135:4, 146:18, 146:25, 147:3, 150:16, 151:8, 154:18, 156:15, 163:13, 171:5, 184:8, 184:15, 185:2, 185:8, 185:13, 198:1, 198:2, 198:20, 198:21, 200:15, 204:3, 204:5, 204:10, 205:3, 210:24

**business-like** [1] - 66:1

**businesses** [1] - 116:12

**bust** [1] - 120:11

**busting** [1] - 139:2

**but..** [1] - 149:16

**button** [4] - 83:8, 83:11, 161:16, 161:20

**button-up** [1] - 161:16

**buttons** [1] - 83:5

**BY** [65] - 1:20, 3:5, 3:5, 3:6, 3:6, 6:17, 7:15, 14:2, 19:8, 21:12, 23:13, 33:19, 35:2, 36:9, 37:4, 37:12, 37:22, 38:2, 38:20, 42:1, 42:10, 42:16, 43:1, 43:10, 43:15, 44:2, 44:17, 45:4, 46:24, 56:22, 64:7, 74:16, 80:22, 87:7, 90:23, 102:11, 106:1, 107:8, 107:20, 112:18, 117:8, 119:21, 129:23, 130:14, 134:7, 135:2, 147:17, 152:4, 160:19, 161:4, 161:9, 174:2, 175:15,

175:18, 182:14, 194:9, 196:10, 196:18, 197:7, 197:11, 201:24, 202:7, 203:10, 204:17, 212:23

**C**

**calculated** [4] - 69:4, 70:21, 71:3, 114:8

**caller** [2] - 12:13, 15:25

**camera** [1] - 38:18

**campaign** [1] - 164:12

**canceled** [1] - 71:5

**cancer** [66] - 7:1, 10:13, 10:24, 11:8, 11:10, 13:20, 14:5, 14:7, 14:10, 14:12, 14:17, 14:21, 15:4, 15:13, 16:13, 16:14, 17:1, 17:20, 18:20, 27:16, 27:18, 28:2, 28:3, 28:8, 28:23, 29:19, 31:22, 48:7, 48:19, 50:18, 50:21, 51:3, 51:8, 51:11, 51:14, 51:18, 51:22, 52:14, 52:16, 55:18, 57:25, 85:5, 90:4, 99:5, 106:5, 109:8, 109:9, 111:18, 157:4, 159:21, 159:24, 160:3, 160:12, 160:16, 160:25, 161:11, 161:12, 164:16, 164:17, 164:23, 168:3, 183:17

**cancers** [2] - 14:7, 36:17

**candidate** [2] - 157:19

**candidly** [1] - 211:4

**cannot** [2] - 68:24, 217:12

**car** [1] - 180:23

**card** [17] - 20:1, 21:14, 21:21, 22:16, 22:17, 23:18, 40:22, 144:16, 161:21, 161:24, 176:7, 176:16, 176:17, 176:19

**cards** [5] - 162:8, 176:10, 176:13

**care** [6] - 31:21, 32:16, 118:19, 119:8, 125:15, 226:3

**cars** [2] - 185:21, 212:4

**carve** [4] - 223:25, 224:24, 224:25, 225:2

**CASE** [1] - 1:2

**case** [14] - 28:22, 54:16, 75:25, 82:14, 94:16, 113:12, 124:15, 187:17, 188:11, 205:18, 210:20, 217:13, 220:18, 224:16

**Case** [1] - 5:6

**cases** [2] - 57:16, 139:21

**caused** [2] - 144:10, 148:21

**causes** [1] - 51:8

**cc** [2] - 132:17, 132:25

**cc'd** [1] - 89:11

**ceased** [1] - 185:2

**cell** [1] - 107:11

**center** [10] - 7:20, 7:21, 15:5, 72:17, 75:24, 93:21, 166:18, 166:22, 212:25

**centers** [2] - 62:24, 115:3

**certain** [10] - 13:9, 13:10, 17:8, 26:17, 133:14, 133:15, 133:16, 143:9, 157:13, 200:2

**certainly** [7] - 107:15, 127:2, 215:17, 217:6, 217:18, 219:11, 222:9

**certainty** [1] - 22:6

**certified** [2] - 13:4, 54:14

**certify** [1] - 228:4

**cetera** [1] - 14:14

**CGx** [15] - 27:11, 76:1, 87:16, 95:11, 103:15, 120:11, 151:24, 156:15, 157:19, 164:20, 183:18, 197:15, 200:3, 200:15

**chain** [4] - 24:20, 25:1, 27:1, 58:22

**chair** [1] - 205:25

**chairs** [2] - 73:23, 213:14

**chance** [1] - 154:7

**change** [13] - 68:21, 68:23, 69:21, 69:23, 81:20, 89:2, 89:5, 89:6, 144:23, 144:25, 192:10, 192:23, 222:22

**changed** [5] - 35:23, 69:19, 191:25, 192:2, 192:4

**changes** [7] - 25:12, 35:14, 72:22, 86:20, 89:2, 89:4, 106:5

**charge** [4] - 60:23, 141:1, 141:2, 142:15

**charged** [4] - 117:24, 183:14, 204:4, 204:5

**charges** [1] - 124:16

**chart** [11] - 23:24, 31:1, 31:19, 47:19, 47:21, 48:1, 48:13, 49:6, 49:18, 83:17, 96:10

**chase** [11] - 40:2, 40:7, 118:11, 118:16, 118:22, 118:23, 119:4, 119:10, 167:9, 168:23, 170:5

**chases** [1] - 168:23

**cheat** [2] - 83:17, 197:16

**check** [4] - 5:5, 9:9, 30:5, 88:11

**checkbox** [1] - 27:12

**checked** [14] - 28:1, 28:10, 28:13, 29:1, 29:12, 29:13, 52:8, 87:25, 88:2, 88:4, 88:7, 88:10, 88:15, 177:4

**checking** [3] - 24:14, 170:3, 170:4

**checkmarks** [1] - 90:5

**checks** [2] - 134:13, 191:2
**chief** [1] - 48:3
**children** [2] - 99:4, 161:6
**cholesterol** [2] - 17:8, 17:10
**chooses** [1] - 126:19
**chose** [1] - 39:3
**circumstance** [1] - 127:10
**circumstances** [2] - 41:13, 209:19
**city** [1] - 86:2
**City** [1] - 73:2
**claim** [2] - 57:14, 84:9
**claimed** [1] - 172:6
**clarify** [4] - 20:22, 21:20, 33:16, 136:25
**clear** [5] - 13:19, 50:3, 75:22, 86:16, 217:23
**clearly** [1] - 128:21
**click** [4] - 27:15, 27:17, 82:5, 83:7
**clicks** [1] - 155:6
**client** [10] - 30:7, 61:8, 111:10, 120:20, 121:6, 165:14, 172:9, 172:11, 172:12, 206:9
**client-patient** [1] - 206:9
**clients** [4] - 59:25, 61:8, 62:23
**clinical** [7] - 47:8, 47:11, 50:16, 85:4, 92:8, 92:14, 206:8
**clinics** [1] - 65:19
**close** [3] - 13:25, 62:22, 118:2
**closing** [1] - 148:22
**club** [1] - 108:23
**CMS** [1] - 103:16
**Co** [1] - 59:6
**code** [3] - 29:17, 31:3, 59:11
**coded** [4] - 105:5, 108:18, 108:20, 110:21
**codes** [39] - 24:8, 25:14, 29:9, 29:11, 29:13, 29:17, 29:19, 30:6, 30:8, 30:25, 31:2, 41:3, 49:4, 83:15, 84:8, 88:24, 96:8, 97:17, 97:18, 101:23, 101:24, 103:20, 104:6, 104:16, 106:17, 110:16, 112:3, 112:6, 170:4, 170:5, 177:5, 184:5, 198:3, 198:8, 198:9, 198:13, 198:23, 199:3
**coding** [2] - 51:7, 166:4
**coffee** [2] - 45:21, 129:14
**coincidentally** [1] - 85:23
**cold** [1] - 155:21
**collect** [2] - 143:23, 148:16
**collected** [3] - 12:20,
143:20, 143:25
**Collection** [1] - 148:24
**collection** [8] - 28:21, 88:2, 95:8, 95:10, 95:23, 148:23, 161:19, 169:21
**colon** [1] - 14:14
**colonoscopy** [2] - 13:17, 32:1
**color** [1] - 84:16
**Column** [7] - 37:19, 38:23, 42:17, 44:5, 44:15, 46:3
**column** [4] - 37:19, 42:21, 42:25, 44:18
**columns** [2] - 42:11, 45:12
**combination** [2] - 11:5, 81:24
**coming** [6] - 26:23, 40:11, 81:21, 86:18, 124:19, 185:22
**commission** [4] - 67:1, 192:5, 192:14, 199:19
**committed** [2] - 66:17, 138:2
**common** [2] - 16:7, 111:18
**communicated** [2] - 78:3, 84:19
**communication** [2] - 35:18, 57:6
**community** [1] - 51:7
**companies** [21] - 54:7, 55:9, 58:4, 58:6, 58:17, 58:19, 60:4, 63:11, 106:12, 106:19, 109:23, 142:17, 143:15, 144:11, 151:5, 151:13, 169:4, 169:6, 169:7, 190:23, 211:8
**company** [88] - 8:1, 9:11, 31:11, 53:19, 54:4, 55:10, 56:24, 58:15, 58:17, 59:8, 60:3, 60:9, 60:23, 61:17, 62:11, 65:7, 65:9, 65:15, 66:7, 67:10, 68:12, 68:15, 68:17, 69:11, 71:17, 71:22, 75:5, 83:24, 85:16, 93:13, 100:15, 105:11, 110:5, 116:12, 117:17, 131:12, 133:2, 133:6, 133:8, 134:9, 138:17, 139:8, 139:13, 140:15, 143:6, 143:7, 143:9, 143:11, 143:19, 144:9, 151:7, 151:12, 151:13, 152:19, 152:21, 152:24, 153:3, 153:14, 153:16, 154:1, 154:8, 154:11, 154:19, 154:21, 155:20, 157:9, 162:10, 162:13, 162:20, 168:16, 169:18, 171:7, 172:2, 172:3, 172:4, 185:23, 198:20, 204:4, 208:1, 213:1
**competitor** [1] - 100:24
**complaint** [3] - 48:4, 48:6, 210:4
**complete** [2] - 95:8, 104:10
**completed** [6] - 9:25, 31:17, 47:2, 81:17, 81:18, 118:21
**completely** [1] - 62:16
**completion** [1] - 95:23
**compliance** [7] - 71:7, 71:12, 71:14, 73:5, 91:15, 91:18, 128:10
**compliant** [4] - 158:16, 199:13, 199:21, 210:1
**comply** [2] - 210:7, 210:9
**compound** [2] - 143:8, 146:24
**compounded** [2] - 143:10, 143:15
**compounding** [9] - 61:21, 61:23, 61:24, 62:3, 62:16, 63:3, 146:11, 146:12, 146:18
**compounds** [1] - 146:23
**comprehensive** [2] - 179:12, 179:14
**computer** [5] - 32:8, 37:3, 45:25, 46:8, 184:5
**conceal** [6] - 136:1, 142:25, 145:23, 150:15, 150:18, 151:10
**concealed** [6] - 133:10, 133:24, 135:24, 153:3, 206:18, 207:23
**concealing** [3] - 151:20, 207:11, 212:8
**concerned** [4] - 116:14, 169:4, 216:5, 216:18
**concerning** [1] - 113:21
**concerns** [7] - 5:6, 16:3, 55:20, 55:25, 56:1, 59:5, 68:25, 86:13, 195:23
**conclude** [1] - 223:8
**condition** [3] - 22:7, 22:8, 104:17
**conditions** [2] - 143:10, 157:3
**conduct** [6] - 8:22, 114:20, 114:21, 118:10, 121:17, 141:12
**conducting** [2] - 6:3, 185:7
**confidence** [1] - 183:6
**confirm** [4] - 12:1, 38:6, 43:16, 195:5
**confirming** [2] - 16:21, 161:18
**confront** [1] - 184:13
**confrontational** [1] - 158:12
**confronted** [4] - 115:16, 183:17, 183:24, 184:7
**confusing** [1] - 179:9
**conjunction** [4] - 170:5, 171:5, 187:17, 227:1
**conjunctively** [1] - 109:25
**connected** [2] - 162:13
**connection** [3] - 84:25, 117:24, 169:15
**consent** [4] - 22:10, 209:16, 209:19, 209:22
**consequences** [2] - 11:13, 11:15
**consisted** [1] - 74:20
**consistent** [6] - 39:16, 46:13, 46:15, 95:21, 96:9, 96:12
**conspiracy** [7] - 124:13, 124:19, 124:21, 126:3, 126:5, 126:16, 184:24
**consultant** [1] - 134:23
**consultation** [2] - 96:24, 97:3
**consulted** [1] - 106:18
**consults** [1] - 33:1
**consumers** [1] - 93:13
**contact** [10] - 16:22, 31:20, 35:17, 35:22, 86:17, 86:21, 118:25, 203:23, 209:16
**contacted** [3] - 154:25, 155:24, 155:25
**contacting** [3] - 33:22, 118:14, 118:16
**contaminate** [1] - 165:19
**contemporaneous** [1] - 39:17
**contents** [1] - 77:6
**continuation** [2] - 47:25, 48:13
**continue** [16] - 5:10, 6:4, 9:6, 11:19, 13:11, 13:12, 51:22, 56:4, 101:7, 118:9, 121:18, 148:14, 161:13, 217:15, 217:17, 225:9
**continued** [2] - 2:1, 184:7, 184:15
**CONTINUED** [2] - 3:5, 6:16
**continues** [2] - 6:10, 51:21
**continuing** [1] - 32:25
**continuous** [1] - 179:25
**contract** [5] - 59:6, 66:17, 110:4, 110:7, 153:10, 154:13, 208:1
**contracted** [2] - 59:9, 75:3
**contracting** [1] - 62:10
**contracts** [1] - 135:14
**contributed** [1] - 206:10
**control** [4] - 149:12, 174:10, 174:11, 174:12
**controlled** [2] - 148:23, 175:9
**conversation** [7] - 59:24, 96:21, 97:7, 100:24, 101:8,

201:18, 203:24

**conversations** [9] - 57:6, 106:9, 106:10, 136:4, 177:20, 201:14, 201:17, 202:1, 202:9

**conversion** [1] - 90:9

**conviction** [2] - 139:1, 142:15

**convictions** [2] - 114:17, 136:22

**cool** [2] - 108:14, 108:21

**Cool** [1] - 108:23

**cooperating** [2] - 113:3, 214:24

**cooperation** [4] - 181:18, 182:24, 183:3, 210:20

**cooperator** [1] - 222:4

**coordinates** [1] - 34:25

**coordinating** [1] - 166:5

**copayments** [2] - 143:20, 143:25

**copays** [1] - 143:23

**copied** [1] - 91:7

**copy** [17] - 7:20, 7:22, 64:22, 88:18, 107:12, 107:17, 120:1, 124:5, 124:9, 132:21, 132:23, 193:16, 194:2, 194:3, 194:4, 194:7

**copying** [2] - 104:22, 127:18

**core** [1] - 222:7

**corner** [1] - 83:4

**corporate** [1] - 145:23

**Corporation** [1] - 138:5

**corporation** [2] - 138:13, 144:6

**corporations** [2] - 139:2, 148:22

**Correa** [1] - 89:15

**correct** [337] - 7:10, 11:14, 12:18, 13:15, 13:18, 14:6, 14:19, 14:21, 14:22, 15:2, 15:20, 17:3, 18:6, 21:4, 22:23, 22:24, 24:3, 25:6, 25:9, 25:10, 25:20, 25:21, 26:15, 27:3, 27:6, 27:8, 27:20, 28:5, 29:21, 30:10, 30:24, 38:25, 39:8, 39:9, 39:12, 39:15, 39:21, 44:8, 44:9, 44:10, 45:15, 46:5, 46:10, 48:15, 48:20, 49:11, 49:25, 50:5, 50:23, 50:24, 51:5, 51:9, 51:24, 58:25, 59:21, 60:6, 60:20, 61:9, 61:19, 64:17, 64:18, 64:19, 65:1, 65:3, 65:6, 65:10, 65:11, 66:3, 67:2, 69:14, 69:18, 70:14, 70:15, 71:9, 72:3, 79:19, 88:5, 88:8, 89:13, 89:14, 89:16, 89:17,

91:16, 91:19, 91:21, 96:2, 96:8, 96:14, 96:17, 96:18, 96:25, 97:1, 97:3, 98:10, 98:25, 99:1, 99:12, 99:22, 99:23, 103:5, 103:12, 103:14, 104:16, 108:1, 108:8, 108:12, 110:23, 111:3, 111:6, 111:7, 111:16, 111:19, 111:22, 112:21, 113:5, 114:9, 114:12, 114:13, 117:11, 119:2, 123:8, 123:9, 128:12, 130:4, 130:16, 130:18, 131:11, 131:12, 131:13, 131:15, 131:21, 131:22, 132:7, 132:23, 132:24, 133:25, 134:17, 136:13, 136:16, 139:5, 139:22, 139:23, 140:1, 140:2, 140:5, 141:6, 141:10, 141:25, 142:18, 142:19, 142:22, 143:18, 144:1, 144:2, 144:5, 144:9, 144:12, 144:13, 145:8, 145:9, 145:19, 145:20, 145:24, 145:25, 146:2, 146:3, 146:5, 146:6, 146:7, 148:6, 148:13, 148:17, 148:18, 149:1, 149:6, 149:7, 149:10, 149:11, 150:2, 150:12, 150:14, 150:15, 150:23, 150:24, 151:10, 151:22, 153:5, 153:20, 153:24, 154:19, 154:20, 154:23, 154:24, 155:16, 155:17, 155:19, 155:22, 155:23, 155:25, 156:1, 157:10, 157:22, 158:3, 158:4, 158:7, 158:16, 158:22, 159:17, 159:18, 159:25, 160:10, 160:11, 160:14, 160:16, 160:17, 161:2, 161:6, 161:7, 162:4, 163:18, 163:21, 163:25, 164:9, 166:14, 167:13, 167:18, 167:19, 167:22, 167:23, 168:7, 168:9, 168:11, 168:17, 169:8, 170:8, 172:20, 172:23, 174:14, 176:10, 176:21, 176:25, 177:1, 177:3, 177:15, 177:16, 177:23, 177:24, 180:5, 180:16, 180:19, 181:8, 182:16, 182:19, 183:14, 183:15, 183:19, 183:21, 184:9, 185:8, 185:15, 187:8, 187:9, 187:14, 188:4, 188:5, 188:10, 189:13, 190:5, 191:24, 191:25, 192:1, 192:2, 192:3, 192:5, 192:6, 192:12, 192:15, 192:16,

192:17, 192:18, 192:20, 192:21, 192:23, 193:13, 193:18, 194:18, 194:19, 195:4, 196:3, 196:12, 196:15, 197:13, 197:14, 197:17, 198:6, 198:7, 198:14, 198:25, 199:14, 199:20, 199:21, 200:5, 200:6, 200:9, 200:21, 201:7, 201:8, 204:2, 204:4, 204:20, 204:21, 205:10, 205:16, 205:17, 205:22, 207:7, 207:20, 207:21, 208:5, 208:6, 208:10, 208:11, 208:24, 208:25, 209:3, 209:13, 209:17, 209:20, 210:9, 210:10, 210:21, 210:22, 211:13, 214:10, 215:8, 218:13, 220:13

**correctly** [6] - 10:9, 10:21, 18:13, 22:12, 52:18, 89:17

**correspondence** [2] - 175:22, 176:1

**corrupted** [1] - 91:12

**cost** [8] - 20:12, 32:17, 32:19, 67:6, 67:14, 68:1, 216:23

**costs** [1] - 10:3

**counsel** [9] - 124:14, 125:5, 125:23, 129:20, 183:6, 187:19, 200:5, 200:10, 227:16

**counseling** [3] - 22:9, 98:8, 100:8

**counselor** [1] - 100:11

**count** [1] - 81:19

**country** [1] - 140:23

**couple** [18] - 29:22, 40:1, 42:11, 47:2, 49:23, 61:7, 102:13, 102:17, 104:5, 106:12, 109:17, 116:4, 121:14, 122:20, 188:6, 216:20, 223:5, 223:12

**course** [10] - 9:21, 113:15, 114:20, 121:14, 121:19, 141:23, 167:14, 175:24, 200:12, 210:19

**court** [8] - 122:7, 122:15, 134:5, 136:22, 139:22, 181:10, 181:13, 195:21

**COURT** [163] - 1:1, 5:2, 5:14, 5:17, 5:19, 5:21, 6:9, 7:8, 7:11, 13:24, 18:25, 19:2, 21:8, 21:10, 23:8, 23:10, 33:16, 34:2, 34:12, 36:1, 36:6, 36:22, 36:24, 38:1, 38:12, 38:14, 43:9, 43:23, 43:25, 46:19, 46:21, 56:14, 56:17, 56:19, 63:25, 64:2, 73:15, 73:18, 74:2, 74:5,

74:8, 74:9, 74:11, 80:16, 80:18, 87:1, 87:3, 90:17, 90:19, 102:4, 102:6, 105:19, 105:21, 107:4, 107:6, 107:18, 112:11, 112:13, 117:2, 117:4, 119:15, 119:17, 121:9, 121:25, 122:6, 122:12, 122:14, 122:17, 122:22, 123:1, 123:8, 123:10, 123:14, 125:8, 125:15, 126:22, 127:14, 127:21, 128:4, 128:8, 128:15, 128:24, 129:3, 129:6, 129:10, 129:12, 134:5, 135:1, 147:7, 147:11, 147:14, 147:16, 174:1, 175:14, 182:13, 194:1, 194:7, 194:23, 194:25, 195:4, 195:9, 195:16, 195:18, 195:20, 195:22, 195:25, 196:3, 196:6, 196:17, 197:2, 201:23, 202:6, 202:18, 202:23, 202:25, 203:2, 203:4, 203:9, 204:13, 212:21, 213:4, 213:8, 213:10, 213:17, 213:19, 214:7, 214:16, 214:23, 215:1, 215:4, 215:7, 215:11, 215:25, 216:10, 218:6, 218:14, 218:18, 218:21, 218:24, 219:3, 219:6, 219:17, 219:22, 220:4, 220:7, 220:14, 221:7, 221:23, 222:5, 222:20, 222:25, 223:3, 223:10, 223:16, 224:22, 225:20, 225:23, 226:9, 226:17, 227:8, 227:13, 227:19, 227:21

**Court** [12] - 1:22, 1:23, 5:1, 74:6, 122:8, 122:18, 215:23, 226:23, 226:24, 227:25, 228:9, 228:10

**Court's** [1] - 215:25

**cover** [3] - 55:14, 55:16, 218:11

**coverage** [1] - 106:5

**covered** [8] - 8:3, 8:21, 9:2, 10:2, 16:1, 160:12, 216:5, 216:15

**CPL** [39] - 65:4, 68:12, 69:11, 131:9, 131:10, 131:12, 133:1, 133:3, 133:5, 133:7, 133:8, 133:10, 133:25, 134:2, 134:8, 134:13, 134:16, 134:18, 135:5, 135:15, 135:19, 135:23, 136:7, 153:10, 153:17, 153:18, 153:20,

163:13, 168:10, 168:14, 169:6, 206:19, 207:11, 207:13, 208:9, 208:19, 209:16, 212:25, 213:1
**CPT** [1] - 197:16
**Craig** [2] - 219:25, 220:6
**cramps** [1] - 17:10
**CRD** [1] - 226:3
**cream** [1] - 146:18
**creams** [9] - 61:25, 62:1, 143:10, 143:15, 143:21, 144:1, 146:11, 146:12
**create** [3] - 72:16, 96:10, 198:14
**created** [4] - 62:24, 72:18, 72:19, 96:5
**creation** [2] - 96:5, 206:8
**credentialed** [1] - 54:15
**credible** [1] - 200:11
**credit** [1] - 144:16
**creditors** [3] - 139:9, 139:11, 139:12
**crime** [5] - 113:24, 138:2, 139:6, 141:24
**crimes** [1] - 139:4
**criminal** [5] - 141:11, 142:1, 142:2, 189:21, 189:22
**CRIMINAL** [1] - 1:15
**CROSS** [2] - 3:5, 129:22
**cross** [8] - 122:4, 123:15, 129:19, 211:15, 219:11, 220:15, 220:16, 220:21
**CROSS-EXAMINATION** [2] - 3:5, 129:22
**cross-examination** [3] - 122:4, 129:19, 211:15
**CRR** [2] - 1:21, 228:9
**cup** [1] - 45:21
**curious** [1] - 222:12
**current** [1] - 94:5
**custom** [1] - 144:21
**customer** [6] - 55:21, 166:15, 168:22, 169:20, 170:1, 170:6
**customers** [2] - 143:9, 144:1
**customers'** [1] - 143:14
**customized** [1] - 144:20
**cut** [3] - 144:21, 214:3, 214:8
**CUYLER** [1] - 1:14
**Cuyler** [1] - 187:24
**CVS** [1] - 77:9

# D

**D.C** [1] - 1:16
**d/b/a** [11] - 58:5, 65:4, 65:5, 134:16, 134:18, 135:6, 162:9, 162:19, 207:23, 208:4

**d/b/a's** [1] - 162:24
**daily** [4] - 39:23, 40:4, 81:20, 175:21
**damage** [2] - 180:7, 180:11
**dashboard** [2] - 81:6, 81:19
**database** [2] - 94:11, 95:7
**date** [13] - 34:23, 35:7, 45:19, 47:9, 79:1, 89:12, 147:25, 165:15, 185:9, 185:10, 187:11, 189:8
**DATE** [1] - 228:8
**dated** [6] - 25:5, 65:2, 87:10, 103:13, 111:5, 126:11
**dates** [4] - 118:6, 184:25, 185:12, 201:4
**daughter** [1] - 16:10
**daughter's** [1] - 151:4
**David** [1] - 173:18
**Davis** [1] - 104:21
**days** [7] - 42:9, 53:22, 165:12, 167:8, 215:3, 223:6, 223:12
**DDS** [1] - 137:20
**DE** [142] - 1:13, 3:5, 3:6, 5:13, 6:8, 6:15, 6:17, 7:6, 7:15, 14:2, 18:22, 19:6, 19:8, 21:6, 21:12, 23:5, 23:13, 33:18, 33:19, 35:2, 36:9, 36:20, 37:2, 37:4, 37:8, 37:12, 37:18, 37:22, 37:25, 38:2, 38:10, 38:17, 38:20, 41:23, 42:1, 42:8, 42:10, 42:13, 42:16, 42:24, 43:1, 43:8, 43:10, 43:13, 43:15, 43:20, 44:2, 44:12, 44:17, 44:25, 45:4, 46:17, 46:24, 56:11, 56:15, 56:22, 63:22, 64:4, 64:7, 73:13, 74:4, 74:15, 74:16, 80:14, 80:22, 86:23, 87:4, 87:7, 90:15, 90:20, 90:23, 102:1, 102:7, 102:11, 105:15, 105:22, 106:1, 107:2, 107:8, 107:16, 107:20, 112:8, 112:14, 112:18, 116:24, 117:5, 117:8, 119:13, 119:18, 119:21, 122:11, 122:16, 122:20, 122:24, 123:4, 123:16, 123:21, 127:6, 128:23, 129:2, 134:7, 134:22, 147:8, 194:3, 194:6, 194:24, 195:2, 195:5, 195:11, 195:24, 196:5, 196:22, 202:4, 203:3, 204:15, 204:17, 212:18, 213:9, 213:22, 214:2, 214:10, 214:21, 214:24, 215:2, 215:5, 215:10, 215:22, 218:13, 218:17, 219:5, 219:21, 219:24,

220:6, 220:13, 220:20, 221:22, 222:1, 222:16, 225:12, 225:21, 226:14, 227:24
**de** [9] - 6:4, 74:14, 126:25, 128:16, 148:6, 218:12, 221:19, 224:24, 226:11
**deal** [7] - 122:21, 124:18, 132:6, 140:22, 141:15, 157:21, 227:17
**dealing** [6] - 135:23, 138:13, 147:11, 188:19, 200:13, 211:7
**dealings** [1] - 152:14
**deals** [2] - 17:2, 124:6
**dealt** [2] - 175:19, 175:21
**dear** [3] - 35:16, 35:21, 55:16
**death** [3] - 10:18, 11:16, 50:22
**deceived** [1] - 206:18
**December** [4] - 1:4, 65:2, 189:11, 228:8
**deception** [11] - 130:3, 130:6, 136:17, 136:18, 138:21, 142:23, 142:25, 143:4, 151:9, 151:11, 151:22
**decided** [1] - 115:8
**decides** [3] - 163:5, 227:5, 227:6
**decision** [1] - 155:24
**decisions** [3] - 173:12, 173:19, 174:4
**deck** [3] - 213:21, 213:24, 214:19
**declare** [1] - 145:8
**decline** [1] - 178:18
**declined** [2] - 178:9, 179:17
**dedicated** [2] - 81:10, 176:1
**deduct** [1] - 67:8
**deemed** [1] - 69:2
**DEFENDANT** [2] - 1:17, 2:2
**Defendant** [1] - 1:7
**defendant's** [1] - 127:11
**defense** [12] - 5:14, 122:12, 123:18, 124:14, 125:5, 129:3, 173:17, 218:19, 219:14, 220:17, 223:8, 227:2
**Defense** [1] - 125:9
**defense's** [2] - 125:11, 125:17
**defines** [2] - 66:24, 67:3
**definitely** [2] - 107:14, 221:22
**defrauded** [1] - 139:12
**delineated** [1] - 28:22
**delivering** [1] - 51:2
**demographic** [1] - 96:6
**demographics** [1] - 47:8
**denial** [2] - 40:15, 41:19

**denials** [4] - 97:16, 201:10, 202:2, 202:10
**denied** [14] - 37:21, 38:24, 39:1, 39:6, 39:11, 41:9, 41:20, 42:19, 42:22, 44:5, 53:19, 67:19, 81:23, 133:23
**dental** [2] - 138:13, 138:16
**deny** [7] - 39:14, 83:6, 83:8, 97:13, 97:15, 112:5
**DEPARTMENT** [1] - 1:15
**Department** [3] - 148:1, 173:15, 173:17
**dependent** [1] - 109:10
**describe** [5] - 74:20, 75:9, 80:2, 81:4, 106:8
**described** [4] - 77:23, 85:7, 96:10, 105:12
**describing** [2] - 78:6, 86:1
**description** [3] - 69:20, 77:20, 95:15
**desire** [1] - 69:16
**desires** [1] - 65:17
**despite** [2] - 205:8, 205:23
**destroy** [1] - 175:1
**detail** [2] - 211:6, 216:16
**detailed** [1] - 11:13
**details** [2] - 137:15, 196:11
**detect** [1] - 52:14
**detection** [1] - 10:14
**determination** [2] - 97:13, 152:20
**determine** [3] - 8:23, 12:20, 157:9
**determined** [1] - 51:17
**develop** [1] - 52:16
**developed** [2] - 88:20, 88:25
**DHH** [1] - 148:1
**diagnoses** [2] - 29:9, 29:13
**diagnosis** [1] - 104:6
**diagnostic** [1] - 83:15
**Diagnostics** [1] - 196:19
**diamond** [6] - 144:17, 144:19, 144:20, 144:21, 144:23
**die** [1] - 52:16
**differed** [1] - 119:3
**difference** [2] - 27:12, 223:1
**different** [27] - 27:11, 41:6, 52:6, 58:4, 58:6, 80:8, 82:5, 82:21, 93:17, 97:5, 101:17, 110:2, 110:17, 110:19, 114:1, 114:3, 115:25, 139:4, 147:11, 147:24, 159:20, 159:23, 164:11, 177:21, 200:2, 211:7, 212:5
**differentiating** [1] - 12:5
**differently** [2] - 35:8, 105:5
**difficult** [1] - 198:9

**digital** [1] - 194:5
**digitally** [2] - 20:2, 85:1
**diligent** [1] - 66:1
**dinner** [8] - 85:17, 85:24, 86:6, 189:6, 189:16, 190:11, 190:22, 191:12
**direct** [15] - 5:10, 6:3, 66:5, 130:15, 131:24, 148:8, 152:12, 181:5, 183:16, 198:19, 207:20, 208:8, 211:14, 218:23, 221:11
**DIRECT** [2] - 3:5, 6:16
**directing** [2] - 48:3, 98:6
**directions** [1] - 186:9
**directly** [16] - 36:11, 49:10, 52:17, 52:21, 66:10, 70:10, 85:22, 93:12, 98:9, 118:15, 118:17, 171:18, 174:22, 175:5, 207:14, 207:17
**disagreeing** [1] - 143:3
**discharged** [1] - 217:14
**disclose** [2] - 177:22, 178:13
**disclosed** [6] - 179:21, 179:24, 179:25, 180:16, 180:18
**disclosure** [2] - 161:18, 178:14
**discretion** [1] - 49:16
**discuss** [7] - 22:2, 66:5, 86:8, 99:21, 99:25, 121:15, 217:10
**discussed** [7] - 22:4, 62:4, 85:10, 86:11, 100:16, 106:25, 127:8
**discussing** [3] - 95:25, 201:9, 217:15
**discussion** [4] - 32:25, 95:5, 109:3, 128:10
**discussions** [2] - 195:23, 196:3
**disease** [2] - 22:7, 22:8
**diseases** [2] - 10:13, 99:4
**disguised** [1] - 142:20
**disparities** [1] - 110:19
**disputing** [1] - 114:5
**disrupted** [1] - 109:15
**disruptions** [1] - 109:12
**distant** [1] - 11:8
**distinct** [1] - 93:20
**distinctly** [1] - 93:17
**distribution** [2] - 64:25, 69:10
**distributor** [3] - 71:14, 71:16, 71:22
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [4] - 1:23, 136:23, 139:1, 228:10
**diverted** [2] - 146:1, 146:4

**divided** [3] - 77:22, 109:4, 169:23
**DIVISION** [2] - 1:2, 1:15
**divorce** [1] - 150:2
**dizzy** [1] - 22:13
**DME** [19] - 61:7, 61:13, 61:16, 62:3, 62:16, 62:21, 63:2, 82:2, 82:14, 82:22, 82:24, 94:5, 94:12, 94:18, 146:16, 146:21, 146:23, 156:11, 164:13
**DNC** [1] - 210:4
**doc** [3] - 91:15, 91:18, 166:7
**docketed** [1] - 224:6
**Doctor** [1] - 42:19
**doctor** [58] - 13:6, 20:9, 20:15, 21:21, 22:15, 23:22, 23:25, 24:12, 26:3, 28:20, 29:2, 29:7, 31:12, 31:21, 32:22, 37:16, 37:21, 38:24, 39:1, 39:3, 39:6, 39:11, 39:14, 39:25, 41:8, 41:15, 42:22, 43:5, 44:5, 44:20, 45:10, 45:22, 49:9, 49:15, 61:1, 67:19, 82:1, 82:17, 82:23, 83:17, 84:3, 85:3, 90:13, 93:14, 95:17, 96:11, 97:19, 97:23, 118:11, 118:16, 118:23, 118:25, 119:4, 119:10, 177:2, 177:6, 222:17
**doctor's** [12] - 23:21, 24:17, 33:5, 45:20, 46:8, 49:16, 79:3, 81:22, 82:9, 85:3, 86:20, 93:25
**doctors** [49] - 20:16, 24:2, 24:5, 33:12, 33:22, 35:16, 39:17, 40:2, 40:7, 40:12, 40:13, 45:16, 52:23, 54:3, 54:12, 54:14, 56:4, 68:2, 72:4, 78:2, 78:3, 80:10, 86:15, 86:17, 93:14, 96:24, 97:23, 97:24, 118:15, 118:17, 166:6, 170:16, 170:17, 170:22, 171:1, 171:17, 172:7, 172:8, 172:10, 172:15, 172:22, 172:24, 173:9, 177:14, 191:14, 206:9, 206:13, 208:10
**doctors'** [4] - 25:16, 58:17, 80:9, 93:11
**document** [30] - 38:17, 47:5, 47:7, 47:12, 69:25, 91:23, 95:21, 98:12, 104:4, 107:10, 123:24, 124:24, 126:14, 154:5, 175:7, 178:22, 179:16, 182:2, 182:8, 192:7, 193:6, 193:14,

195:2, 196:22, 198:14, 202:3, 208:14, 208:23, 226:22, 226:24
**documentation** [2] - 32:4, 50:14
**documented** [1] - 190:17
**documents** [14] - 70:1, 103:21, 106:3, 138:4, 170:20, 177:5, 186:10, 186:15, 188:7, 208:19, 210:25, 211:1, 211:4, 227:17
**dog** [1] - 79:12
**dog-and-pony** [1] - 79:12
**dollar** [1] - 69:4
**dollars** [2] - 32:23, 67:12
**domiciled** [1] - 60:22
**DONALD** [1] - 2:2
**done** [29] - 8:10, 8:11, 8:12, 9:10, 9:14, 24:14, 35:1, 43:11, 46:25, 79:3, 84:22, 93:25, 96:5, 110:13, 155:18, 176:19, 176:23, 177:25, 188:5, 188:9, 192:22, 192:25, 217:7, 221:1, 221:12, 224:11, 224:20, 225:14, 227:16
**door** [4] - 77:17, 85:22, 125:4, 189:18
**doors** [1] - 93:11
**double** [1] - 5:5
**Double** [1] - 18:2
**double-check** [1] - 5:5
**down** [38] - 9:8, 9:24, 11:7, 11:25, 14:12, 24:25, 28:25, 34:13, 39:5, 39:24, 40:2, 45:5, 48:3, 49:19, 52:10, 52:25, 65:22, 76:6, 76:7, 87:22, 95:22, 104:13, 111:20, 118:2, 122:2, 123:2, 157:3, 165:15, 169:11, 174:10, 174:13, 174:14, 184:19, 187:22, 209:23, 209:25, 220:22, 222:12
**Dr** [15] - 33:5, 33:6, 34:4, 34:8, 34:17, 61:1, 97:8, 137:20, 138:15, 138:18, 153:7, 219:19, 219:23, 222:11, 222:14
**draw** [1] - 53:21
**drill** [2] - 14:12, 104:13
**drilling** [1] - 11:6, 11:7, 157:3
**drink** [1] - 165:17
**drinks** [5] - 85:19, 86:2, 86:5, 86:7, 189:16
**Drive** [2] - 2:3, 185:14
**drug** [3] - 10:16, 11:12, 11:16
**dry** [1] - 13:13
**due** [5] - 53:14, 72:25,

103:16, 145:12, 148:23
**Durable** [3] - 61:17, 146:15, 146:19
**during** [12] - 78:23, 86:9, 113:15, 115:12, 124:25, 160:10, 179:13, 180:20, 200:12, 203:11, 203:18, 217:20

### E

**e-mailing** [1] - 127:21
**early** [9] - 10:14, 52:14, 62:19, 142:2, 216:14, 216:19, 216:22, 217:2, 225:1
**earned** [2] - 143:16, 148:25
**easiest** [1] - 194:8, 225:24
**East** [2] - 1:23, 228:10
**easy** [1] - 106:21
**eat** [2] - 136:4, 165:17
**education** [1] - 94:21
**effect** [3] - 127:9, 193:20, 206:18
**efficiently** [1] - 221:6
**efforts** [5] - 63:1, 63:4, 66:1, 92:19, 92:22
**Eggen** [2] - 75:17, 76:8
**Eileen** [2] - 199:4, 199:6
**either** [10] - 28:22, 36:11, 45:10, 77:14, 149:15, 160:25, 164:17, 183:2, 214:2, 221:4
**EKRA** [13] - 69:1, 124:6, 124:7, 124:13, 124:16, 125:18, 126:13, 193:8, 193:12, 193:15
**electronic** [3] - 80:11, 80:12, 110:13
**electronically** [1] - 26:7
**elicit** [3] - 93:3, 158:2, 160:23
**eligible** [2] - 8:23, 158:3
**eliminate** [1] - 151:15
**email** [51] - 24:20, 25:1, 25:3, 25:7, 26:10, 26:19, 26:20, 27:4, 27:7, 28:4, 33:7, 58:22, 58:24, 59:18, 60:14, 64:9, 64:15, 87:10, 89:11, 89:12, 89:15, 91:2, 91:11, 102:17, 102:20, 104:21, 105:4, 111:3, 123:17, 123:22, 126:10, 126:11, 126:17, 126:21, 130:22, 131:2, 132:9, 132:22, 175:4, 175:8, 176:1, 193:7, 193:20, 193:21, 194:12, 194:17, 197:12, 198:7, 206:24
**emails** [12] - 26:24, 35:15, 57:5, 174:17, 174:19, 174:20, 174:22, 175:1,

175:4, 175:5, 175:24, 175:25
**emerald** [1] - 144:21
**emerald-cut** [1] - 144:21
**emergency** [1] - 45:23
**EMILY** [1] - 1:13
**employed** [1] - 54:13
**employee** [4] - 26:25, 93:6, 140:20
**employment** [3] - 178:9, 178:19, 179:3
**enable** [1] - 157:9
**encompassed** [2] - 81:24, 81:25
**end** [27] - 16:16, 18:15, 19:19, 22:18, 32:11, 36:4, 40:6, 40:10, 44:15, 45:7, 45:8, 87:14, 98:11, 100:2, 124:13, 124:19, 126:2, 126:16, 128:25, 148:4, 184:23, 200:15, 216:13, 217:13, 224:20, 225:1
**ended** [2] - 92:9, 204:3
**ending** [3] - 15:14, 17:25, 99:13
**endorse** [1] - 65:18
**ends** [10] - 47:5, 47:25, 48:13, 49:23, 51:21, 52:9, 92:6, 96:16, 98:13, 100:3
**engage** [1] - 141:11
**engaging** [1] - 114:20
**enhancement** [3] - 113:21, 113:24, 114:3
**enhancements** [1] - 114:1
**enjoyed** [1] - 120:22
**enter** [4] - 63:11, 66:16, 181:24, 182:25
**entered** [4] - 178:14, 179:2, 179:10, 179:12
**enters** [4] - 5:20, 74:10, 129:11, 216:9
**enticed** [1] - 143:9
**entire** [4] - 99:6, 135:23, 190:21, 210:24
**entirely** [2] - 177:16, 210:8
**entities** [1] - 142:20
**entitled** [1] - 228:6
**entity** [3] - 59:16, 172:24, 192:20
**entries** [2] - 39:10, 45:6
**envelope** [4] - 19:14, 20:6, 40:23, 163:15
**environment** [1] - 93:25
**episode** [1] - 141:13
**equal** [3] - 45:2, 45:6, 45:9
**equation** [1] - 165:2
**Equipment** [3] - 61:17, 146:16, 146:19
**especially** [2] - 86:18, 211:6
**essentially** [7] - 11:2,

11:18, 20:18, 57:13, 66:13, 84:18, 156:13
**establish** [2] - 65:19, 94:7
**estimate** [1] - 52:15
**et** [1] - 14:14
**evade** [1] - 145:23
**evaded** [1] - 148:19
**evening** [1] - 87:19
**eventually** [4] - 28:17, 144:11, 188:21, 195:13
**evidence** [40] - 7:7, 7:14, 19:5, 21:11, 23:12, 37:1, 38:16, 44:1, 46:23, 56:16, 56:21, 64:6, 80:15, 80:21, 87:6, 90:22, 102:10, 105:25, 107:7, 112:17, 116:25, 117:7, 119:20, 123:13, 123:23, 128:9, 128:14, 130:11, 134:20, 134:24, 154:6, 171:16, 193:23, 194:21, 195:13, 196:9, 197:5, 203:6, 216:21, 217:16
**exact** [5] - 32:17, 36:16, 118:6, 146:24, 201:4
**exactly** [11] - 55:11, 57:11, 59:8, 84:18, 92:22, 95:18, 96:13, 136:11, 192:25, 200:4, 206:2
**exaggerate** [1] - 211:22
**EXAMINATION** [8] - 3:5, 3:5, 3:6, 3:6, 6:16, 129:22, 204:16, 212:22
**examination** [14] - 5:10, 6:3, 6:4, 122:4, 129:19, 130:7, 130:16, 131:24, 148:9, 152:12, 181:5, 183:16, 208:8, 211:15
**examine** [2] - 40:16, 41:4
**example** [26] - 13:13, 17:10, 30:17, 31:20, 31:21, 32:1, 34:4, 39:22, 41:20, 47:2, 61:7, 61:8, 84:15, 86:12, 88:18, 89:1, 97:9, 101:22, 101:23, 103:6, 109:5, 128:11, 155:7, 182:23, 209:13, 225:5
**examples** [3] - 29:22, 47:2, 102:13
**Excel** [1] - 38:21
**excess** [3] - 57:23, 58:1, 76:25
**excessive** [1] - 210:4
**exchange** [5] - 72:1, 113:3, 113:4, 120:4, 132:9
**exclusive** [2] - 100:15, 100:17
**excuse** [8] - 57:18, 86:22, 92:9, 155:12, 155:21, 160:7, 165:17, 193:17
**Excuse** [1] - 125:12

**excused** [8] - 73:25, 121:23, 122:2, 122:24, 213:11, 213:16, 216:1, 218:4
**executed** [2] - 64:22, 68:7
**executive** [1] - 77:25
**Exhibit** [68] - 3:10, 7:7, 7:16, 14:15, 15:14, 17:25, 18:23, 19:7, 21:7, 21:11, 21:14, 24:19, 27:21, 29:19, 36:21, 38:16, 39:11, 41:24, 43:21, 44:1, 44:4, 44:14, 46:18, 47:4, 47:24, 56:16, 58:21, 60:13, 63:23, 64:9, 64:21, 68:5, 69:9, 71:11, 80:15, 80:24, 82:8, 82:16, 86:24, 87:9, 89:10, 90:16, 90:25, 91:22, 102:2, 102:16, 104:20, 105:16, 107:3, 107:7, 110:25, 112:9, 116:25, 119:14, 119:23, 123:5, 124:4, 124:10, 125:9, 130:11, 134:21, 134:24, 196:8, 203:1, 203:6, 206:23, 207:19, 209:12
**exhibit** [18] - 48:12, 49:22, 50:17, 63:5, 92:4, 107:21, 123:18, 127:7, 134:22, 135:3, 135:9, 147:11, 156:3, 192:8, 193:1, 193:25, 202:22, 203:15
**exhibits** [1] - 127:5
**Exhibits** [18] - 7:13, 19:4, 23:6, 23:11, 36:25, 46:22, 56:20, 64:5, 80:20, 87:5, 90:21, 102:8, 105:23, 112:15, 117:6, 119:19, 123:12, 197:4
**EXHIBITS** [1] - 3:8
**exist** [2] - 176:10, 176:11
**existing** [1] - 32:5
**exited** [1] - 123:14
**exiting** [1] - 122:1
**exits** [4] - 74:1, 121:24, 213:18, 218:5
**expand** [1] - 100:17
**expanded** [1] - 61:13
**expect** [1] - 195:14
**expectation** [3] - 52:20, 56:3, 211:21
**expedite** [1] - 84:3
**expedited** [1] - 223:20
**expenses** [2] - 144:15, 145:22
**expensive** [2] - 20:15, 32:13
**experience** [3] - 13:24, 17:21, 46:13
**experienced** [2] - 14:5, 109:11
**expertise** [1] - 184:3

**explain** [29] - 20:13, 24:10, 33:1, 34:3, 34:14, 35:6, 36:10, 37:13, 39:1, 41:12, 44:18, 45:8, 60:4, 67:3, 68:23, 80:3, 82:20, 92:24, 94:9, 100:21, 101:14, 109:14, 113:8, 119:3, 155:2, 156:23, 205:14, 205:24, 210:23
**explained** [6] - 58:3, 58:5, 58:6, 156:15, 189:2, 211:13
**explaining** [2] - 34:10, 58:8
**explanation** [3] - 141:4, 141:7, 180:1
**explanations** [1] - 101:18
**explicitly** [1] - 181:19
**export** [2] - 140:19, 140:22
**extensive** [4] - 110:14, 120:25, 157:2, 167:21
**extensiveness** [1] - 157:25
**extent** [1] - 125:6
**extremely** [2] - 57:13, 177:17
**eyes** [1] - 23:1

## F

**fabricate** [1] - 211:22
**face** [3] - 60:23, 96:24
**face-to-face** [1] - 96:24
**facility** [5] - 54:22, 76:6, 93:8, 110:1, 174:19, 185:3, 204:6
**fact** [24] - 8:23, 14:13, 33:12, 33:22, 34:21, 52:3, 53:14, 53:23, 72:11, 73:1, 76:12, 93:1, 104:14, 126:19, 135:24, 152:13, 171:6, 171:11, 177:18, 180:14, 180:22, 185:7, 190:20, 205:8
**facts** [2] - 33:20, 186:16
**factual** [2] - 144:3, 184:22
**faint** [1] - 91:1
**fair** [18] - 16:23, 16:24, 40:17, 40:18, 51:23, 54:23, 54:24, 54:25, 84:13, 84:14, 86:8, 109:18, 111:23, 113:2, 118:8, 169:16, 227:13
**fairly** [2] - 111:23, 221:11
**fake** [2] - 188:12, 188:13
**fall** [1] - 216:22
**false** [6] - 136:21, 137:1, 137:4, 138:4, 138:9, 138:21
**familial** [2] - 161:5, 161:11
**Family** [3] - 15:7, 25:2, 72:20
**family** [36] - 10:13, 10:15, 10:25, 11:2, 11:8, 11:10, 14:21, 15:3, 15:12, 16:2, 16:12, 16:13, 23:23, 30:23,

31:17, 48:19, 50:18, 50:19, 62:12, 85:5, 99:3, 99:6, 109:8, 109:9, 111:14, 121:16, 157:4, 160:25, 161:11, 164:18, 168:2, 180:21, 183:12, 206:7, 217:11
**far** [11] - 35:7, 51:25, 54:19, 66:4, 97:17, 121:18, 163:2, 164:3, 165:2, 169:3
**fast** [2] - 15:11, 98:11
**fast-forward** [2] - 15:11, 98:11
**faster** [1] - 221:10
**fasting** [1] - 88:4
**father** [1] - 186:3
**favorite** [1] - 120:22
**FBI** [1] - 148:1
**fear** [12] - 6:25, 11:4, 11:18, 16:15, 16:17, 164:2, 164:5, 164:7, 164:13, 164:14
**February** [9] - 25:5, 27:14, 27:16, 36:8, 64:18, 91:5, 192:11, 201:2, 207:14
**federal** [2] - 136:22, 139:21
**fee** [16] - 67:6, 67:7, 67:9, 69:3, 69:6, 70:13, 70:14, 70:16, 71:3, 124:8, 192:2, 192:4, 192:14, 192:17, 192:23
**fellow** [1] - 217:16
**female** [1] - 30:13
**few** [3] - 10:9, 215:3, 217:5
**fiancee** [1] - 59:14
**fiancée** [2] - 150:13, 180:21
**Fifth** [1] - 227:6
**figure** [5] - 69:6, 223:24, 224:7, 224:10, 227:15
**file** [11] - 47:2, 49:1, 50:4, 95:8, 95:9, 113:16, 141:17, 141:19, 141:21, 223:20, 226:5
**filed** [4] - 113:18, 113:20, 223:14, 226:5
**filing** [2] - 141:23, 148:24
**filled** [2] - 28:19, 97:19
**filling** [1] - 24:11
**filter** [9] - 37:19, 42:24, 43:14, 44:7, 44:25, 45:3, 209:23, 209:24, 209:25
**filtered** [4] - 37:20, 38:22, 38:24, 46:2
**filtering** [1] - 45:5
**filters** [1] - 45:1
**finally** [1] - 100:3
**financial** [4] - 178:14, 179:14, 180:6, 180:15
**financially** [1] - 212:14
**fine** [5] - 22:25, 144:16, 162:18, 195:20, 221:16

**fines** [1] - 210:4
**finish** [8] - 34:14, 202:19, 206:2, 214:2, 216:21, 220:3, 220:25, 221:9
**finishing** [1] - 219:12
**firm** [1] - 124:5
**firms** [1] - 15:8
**first** [35] - 5:9, 7:24, 12:1, 17:14, 20:15, 24:25, 36:7, 40:5, 47:9, 51:3, 55:2, 58:22, 59:10, 65:12, 71:25, 73:20, 74:22, 79:3, 79:6, 79:10, 108:3, 116:8, 125:9, 125:18, 132:17, 152:22, 169:9, 169:11, 176:15, 176:24, 188:10, 192:11, 201:6, 219:7, 227:14
**fit** [4] - 26:7, 90:10, 152:17, 221:5
**fits** [2] - 125:19, 126:4
**five** [1] - 115:14
**fix** [2] - 37:9, 42:14
**fixed** [1] - 199:8
**fixes** [1] - 105:2
**flat** [10] - 32:20, 69:3, 69:6, 70:13, 192:2, 192:4, 192:14, 192:17, 192:23
**flipped** [1] - 101:4
**flipping** [1] - 14:25
**floating** [1] - 215:2
**floor** [33] - 74:14, 75:20, 75:21, 75:22, 75:24, 76:10, 76:21, 77:2, 77:22, 78:4, 78:6, 129:20, 168:6, 168:10, 168:12, 168:18, 168:22, 168:25, 169:2, 169:3, 169:5, 169:7, 169:10, 169:11, 169:17, 169:19, 169:23, 170:1, 170:8
**Floor** [1] - 1:16
**floors** [1] - 75:20
**FLORIDA** [1] - 1:1
**Florida** [10] - 1:3, 1:24, 61:5, 61:6, 136:23, 139:1, 167:3, 167:4, 228:11
**flow** [7] - 19:21, 40:11, 57:15, 62:24, 84:19, 92:1, 206:2
**flowed** [1] - 118:18
**flows** [1] - 152:10
**fly** [1] - 226:2
**Flying** [1] - 145:2
**focus** [3] - 42:12, 53:14, 65:12
**focused** [3] - 63:2, 63:3
**focusing** [2] - 53:13, 61:10
**folks** [4] - 21:24, 73:24, 167:5, 202:18
**follow** [2] - 98:7
**follow-up** [1] - 98:7

**followed** [3] - 15:9, 152:17, 215:12
**following** [3] - 95:23, 195:1, 217:8
**follows** [1] - 105:8
**font** [1] - 81:12
**FOR** [3] - 1:13, 1:17, 2:2
**foreclosure** [1] - 150:6
**foregoing** [1] - 228:4
**forget** [1] - 151:13
**form** [21] - 25:22, 26:1, 26:2, 28:20, 80:11, 80:12, 80:13, 82:22, 82:23, 89:1, 98:16, 99:15, 100:7, 104:11, 143:3, 149:19, 149:20, 170:18, 170:19, 193:12
**format** [1] - 26:17
**formatted** [2] - 26:7, 27:10
**forms** [4] - 26:14, 89:2, 89:3, 101:15
**Fort** [2] - 1:24, 228:11
**forth** [9] - 22:11, 47:10, 68:2, 77:10, 78:2, 89:8, 101:6, 152:11, 174:15
**forward** [5] - 15:11, 59:18, 59:22, 98:11, 163:6
**forwarded** [1] - 194:14
**forwarder** [1] - 140:22
**four** [4] - 18:21, 53:16, 54:2, 222:7
**four-week** [1] - 54:2
**fourth** [2] - 79:15, 82:15
**frame** [6] - 34:22, 45:11, 62:25, 85:14, 86:18, 126:15
**framed** [1] - 221:15
**Frank** [1] - 173:16
**frankly** [1] - 125:5
**fraud** [14] - 114:11, 146:10, 146:11, 146:13, 146:16, 146:19, 151:18, 205:10, 205:12, 205:16, 210:14, 210:15, 210:16
**FRAUD** [1] - 1:15
**free** [3] - 155:5, 155:6, 164:23
**freight** [1] - 140:21
**Friday** [21] - 6:24, 26:6, 58:3, 75:22, 112:19, 112:20, 114:10, 114:22, 209:9, 221:8, 222:17, 222:18, 222:19, 225:6, 225:7, 225:12, 225:14, 225:16, 225:21, 226:1, 226:12
**friends** [3] - 121:16, 136:3, 217:11
**front** [6] - 63:16, 67:7, 123:24, 124:24, 192:7, 213:23
**FTC** [1] - 210:1
**full** [8] - 102:21, 176:12,

178:14, 180:14, 191:2, 208:15, 221:15, 222:2
**full-day** [1] - 221:15
**fully** [4] - 10:1, 16:1, 68:6, 104:10
**funds** [1] - 191:7
**Future** [1] - 185:24
**future** [1] - 71:6

## G

**gain** [3] - 175:9, 212:12, 212:13
**game** [1] - 67:23
**GARLAND** [1] - 2:3
**Garvin** [1] - 173:18
**gather** [4] - 31:22, 32:4, 32:14, 198:3
**gathering** [1] - 31:12
**gears** [3] - 56:11, 73:11, 112:19
**General** [1] - 148:2
**general** [2] - 31:19, 46:13, 47:15, 79:8, 84:9, 86:10, 93:9, 155:8, 155:21
**generate** [2] - 58:17, 59:3, 75:4
**generated** [7] - 24:6, 47:18, 47:21, 47:22, 48:14, 70:18, 147:4
**generates** [1] - 24:4
**generating** [1] - 75:5
**generation** [1] - 206:6
**generic** [2] - 111:23, 112:2
**genes** [15] - 10:14, 16:14, 51:14, 51:17, 52:6, 52:11, 52:13, 57:22, 88:7, 88:11, 88:12, 88:15, 99:5
**Genes** [3] - 15:7, 25:2, 72:20
**Genesis** [5] - 196:19, 197:22, 198:2, 198:19, 198:22
**genetic** [31] - 8:8, 10:24, 17:1, 17:20, 18:20, 22:9, 51:7, 51:11, 51:22, 52:15, 53:11, 55:18, 62:2, 62:16, 62:19, 63:2, 63:4, 81:24, 83:2, 84:12, 94:7, 94:14, 94:16, 96:8, 97:22, 98:8, 100:7, 100:11, 106:5, 115:17, 155:6
**geneticists** [1] - 54:10
**genetics** [4] - 17:5, 48:24, 55:18, 84:25
**genital** [1] - 30:13
**gentleman** [9] - 13:23, 15:6, 89:19, 100:25, 115:6, 187:12, 187:13, 188:2
**gentlemen** [11] - 5:22, 37:8,

42:13, 74:12, 121:10, 129:13, 130:12, 131:7, 187:24, 213:12, 216:11
**Georgia** [6] - 1:19, 2:4, 2:7, 109:16, 109:19, 120:8
**ginormous** [1] - 211:2
**gist** [1] - 183:8
**given** [13] - 13:25, 15:6, 22:7, 30:3, 113:24, 127:1, 165:20, 166:12, 179:15, 186:8, 195:12, 196:6, 216:5
**glasses** [1] - 23:2
**glitch** [1] - 41:2
**goals** [3] - 48:16, 48:23, 49:2
**God** [4] - 11:4, 164:2, 164:7, 164:13
**gold** [2] - 144:18, 144:24
**Goldberg** [14] - 68:13, 68:14, 131:9, 133:3, 134:17, 135:13, 135:14, 135:16, 163:19, 191:6, 191:23, 208:19, 209:1, 213:1
**Goldberg's** [2] - 133:2, 133:6
**gonna** [4] - 216:23, 220:23, 221:1, 223:6
**goods** [2] - 140:21, 140:23
**Google** [1] - 116:13
**gotcha** [1] - 92:13
**GOVERNMENT** [1] - 1:13
**Government** [45] - 7:7, 7:16, 12:10, 14:15, 15:14, 17:25, 18:23, 19:6, 21:7, 21:13, 24:19, 27:21, 29:19, 36:21, 39:11, 41:24, 43:21, 44:4, 44:13, 47:4, 47:24, 56:16, 58:21, 60:12, 64:9, 64:20, 68:5, 69:9, 71:11, 80:24, 82:7, 87:9, 90:16, 102:15, 104:20, 105:16, 107:3, 110:25, 119:23, 124:4, 124:10, 130:11, 134:21, 203:1, 209:11
**government** [115] - 5:9, 5:12, 6:2, 7:6, 7:13, 12:2, 12:4, 12:6, 12:9, 18:22, 19:4, 21:6, 21:11, 23:5, 23:11, 36:20, 36:25, 38:10, 38:16, 44:1, 46:17, 46:22, 56:15, 56:20, 63:22, 64:5, 80:14, 80:20, 86:24, 87:5, 90:15, 90:21, 102:1, 102:8, 105:23, 107:7, 112:8, 112:15, 113:4, 113:10, 113:16, 113:23, 114:4, 116:24, 117:6, 119:13, 119:19, 122:10, 123:12, 134:24, 147:1, 147:18, 147:23, 148:16, 154:6, 174:17, 174:18,

174:20, 174:21, 175:4, 175:7, 178:23, 179:15, 180:23, 181:5, 181:20, 182:4, 182:5, 182:10, 183:9, 184:17, 185:2, 185:9, 186:9, 186:13, 186:14, 186:17, 186:19, 187:4, 188:7, 189:4, 189:8, 189:11, 190:2, 190:4, 190:7, 190:18, 191:18, 194:10, 195:23, 196:7, 196:8, 197:4, 199:12, 199:16, 200:20, 201:6, 201:12, 201:16, 201:18, 202:1, 202:9, 202:12, 203:6, 210:18, 210:19, 210:24, 211:9, 211:13, 212:24, 213:21, 218:2, 218:16, 223:25
**GOVERNMENT'S** [1] - 3:8
**government's** [3] - 128:25, 214:3, 225:10
**Government's** [16] - 23:6, 46:18, 63:23, 80:15, 82:16, 86:24, 89:10, 90:25, 91:22, 102:2, 112:9, 116:25, 119:14, 123:5, 206:23, 207:19
**government-sponsored** [1] - 12:6
**grab** [2] - 42:2, 111:2
**grandchildren** [1] - 99:4
**grandfather** [2] - 137:8, 137:9
**grandfather-in-law** [1] - 137:8
**grandfather-in-law's** [1] - 137:9
**graphic** [2] - 26:16, 89:20
**great** [6] - 54:2, 78:14, 99:5, 120:10, 218:1, 225:17
**greater** [4] - 45:2, 45:6, 45:9, 57:15
**greet** [2] - 76:5, 79:11
**Griner** [15] - 214:6, 214:24, 215:13, 215:19, 218:9, 218:22, 219:8, 220:9, 220:10, 220:15, 220:25, 221:8, 221:9, 221:12, 222:8
**gross** [1] - 172:13
**grossed** [2] - 147:4
**grounds** [1] - 124:12
**Group** [4] - 65:4, 134:16, 150:25, 151:3
**group** [4] - 50:9, 75:19, 82:13, 132:9
**groups** [6] - 58:18, 59:3, 73:1, 94:4, 117:19, 172:19
**guess** [17] - 13:5, 13:6, 17:7, 28:15, 37:13, 50:25, 91:9, 92:24, 100:24, 127:10,

127:17, 127:19, 188:5, 220:2, 220:14, 221:18, 222:15
**guideline** [2] - 114:8, 197:15
**guidelines** [1] - 103:17
**guilt** [1] - 114:5
**guilty** [9] - 112:21, 114:14, 136:22, 178:16, 178:17, 179:2, 205:9, 205:12, 206:10
**GURSKIS** [2] - 1:13, 219:1
**guys** [3] - 5:15, 73:9, 225:25
**GX-1878** [1] - 156:2

## H

**half** [2] - 136:6, 201:13
**hall** [1] - 77:24
**hand** [4] - 46:2, 76:14, 82:3, 107:13
**handed** [1] - 38:5
**handled** [8] - 102:22, 102:23, 102:25, 103:1, 167:6, 169:18, 169:24, 170:3
**hands** [1] - 32:24
**hang** [1] - 202:18
**happy** [3] - 56:12, 107:12, 128:19
**hard** [4] - 23:3, 107:13, 108:6, 120:10
**harmful** [1] - 17:12
**Harper** [11] - 37:2, 37:11, 37:18, 37:20, 41:23, 42:8, 42:24, 43:13, 44:12, 44:15, 44:25
**Hayes** [3] - 213:25, 214:1, 214:8
**head** [3] - 78:13, 87:19, 89:22
**headline** [1] - 26:10
**heads** [1] - 219:16
**Health** [2] - 148:2, 173:15
**health** [4] - 17:12, 61:12, 143:9, 157:3
**healthcare** [29] - 8:4, 8:21, 9:2, 10:2, 22:3, 22:4, 65:20, 66:2, 66:8, 69:17, 70:9, 99:21, 99:25, 110:7, 110:10, 114:11, 141:14, 158:23, 170:7, 200:18, 205:10, 205:12, 205:16, 208:9, 210:9, 210:12, 210:13, 210:15, 210:16
**hear** [5] - 106:4, 167:24, 168:19, 202:4, 225:6
**heard** [10] - 34:12, 78:7, 121:16, 121:18, 166:1, 167:12, 169:19, 169:20, 217:11, 217:19

**hearing** [7] - 168:21, 183:1, 217:5, 225:21, 225:24, 225:25
**hearsay** [1] - 127:7
**Hegde** [2] - 226:18, 226:20
**held** [1] - 195:1
**hello** [1] - 186:3
**help** [6] - 52:15, 120:1, 184:2, 197:20, 222:21, 224:10
**helped** [1] - 106:18
**helpful** [1] - 224:21
**helping** [1] - 88:22
**helps** [1] - 99:6
**hereby** [1] - 228:4
**hereditary** [8] - 10:12, 27:17, 27:18, 28:8, 28:23, 30:13, 30:20, 51:8
**hereunder** [1] - 66:2
**hi** [5] - 27:7, 91:17, 98:16, 111:10, 207:8
**Hi** [4] - 7:25, 26:20, 26:21, 87:16
**hid** [1] - 149:2
**hiding** [1] - 212:8
**high** [4] - 19:20, 37:13, 50:25, 177:18
**higher** [1] - 112:4
**highlighted** [6] - 12:22, 29:22, 53:1, 92:18, 96:3, 99:2
**himself** [5] - 126:15, 126:18, 127:19, 127:22, 128:3
**hire** [1] - 54:5
**hired** [3] - 8:22, 54:6, 200:1
**Hirsch** [24] - 74:23, 75:1, 75:13, 76:8, 79:9, 85:23, 116:9, 121:5, 169:12, 171:13, 171:22, 188:15, 219:24, 220:5, 220:12, 220:16, 220:23, 220:24, 220:25, 221:14, 221:20, 221:24, 222:1, 222:8
**Hirsch's** [2] - 117:17, 171:5
**historically** [2] - 70:22, 93:6
**history** [30] - 11:8, 12:14, 14:17, 14:21, 15:3, 15:13, 23:23, 29:24, 30:23, 31:17, 48:7, 48:19, 50:16, 50:18, 50:19, 85:5, 95:6, 96:4, 111:14, 157:4, 160:3, 160:20, 161:5, 161:11, 161:12, 164:18, 168:2, 168:3, 206:7
**hit** [4] - 83:8, 83:10, 84:23, 223:12
**hits** [1] - 224:6
**hitting** [1] - 165:12

hmm [1] - 182:18
Hoeveler [1] - 141:3
hold [7] - 57:23, 103:16, 109:18, 115:2, 166:9, 166:10, 166:20
Holden [13] - 219:25, 220:6, 220:7, 220:12, 220:21, 221:1, 221:16, 221:20, 221:25, 222:2, 222:8, 225:13
holding [1] - 144:9
Holdings [2] - 142:18, 150:20
holds [1] - 103:11
Holland [1] - 185:14
home [8] - 8:3, 8:20, 9:10, 15:17, 15:18, 98:9, 217:10, 218:3
homepage [2] - 81:8, 81:10
Honor [87] - 5:13, 5:16, 6:15, 7:10, 13:22, 18:22, 21:6, 23:5, 33:15, 34:9, 36:20, 37:25, 38:10, 38:13, 43:8, 43:20, 46:17, 56:11, 63:22, 64:1, 64:4, 73:13, 73:16, 74:4, 74:15, 80:14, 80:17, 86:23, 87:4, 90:15, 90:20, 102:1, 102:5, 102:7, 105:15, 105:22, 107:2, 107:5, 107:16, 112:8, 112:12, 112:14, 116:24, 117:5, 119:13, 119:18, 122:11, 122:13, 122:16, 122:20, 123:5, 123:16, 125:12, 126:10, 127:6, 127:7, 128:23, 129:2, 129:5, 129:21, 147:8, 173:25, 175:13, 182:12, 194:22, 194:24, 195:24, 196:16, 202:17, 204:15, 212:19, 213:9, 213:22, 214:10, 214:21, 215:22, 218:13, 218:17, 219:5, 221:3, 222:2, 222:17, 222:23, 223:9, 224:19, 226:14, 227:24
HONORABLE [1] - 1:10
Honorable [1] - 1:22
hope [3] - 5:22, 20:19, 129:13
hopefully [5] - 129:15, 219:7, 219:9, 219:12, 220:10
hopes [1] - 21:24
hoping [2] - 113:2, 212:12
horrific [1] - 11:12
hospitalization [1] - 11:16
hospitalizations [1] - 10:17
host [2] - 40:23, 41:5
HOSTETLER [1] - 2:5
Hotel [2] - 85:11, 85:12
hour [8] - 73:20, 121:13, 122:5, 122:6, 219:7, 225:3,

225:7, 226:1
hours [1] - 41:17
house [4] - 28:18, 31:9, 32:9, 150:6
housekeeping [3] - 5:6, 122:8, 218:14
hover [1] - 43:13
Human [2] - 148:2, 173:15
humanly [1] - 211:5
hundred [6] - 20:14, 20:18, 36:17, 119:6, 119:7
hundreds [4] - 36:17, 77:16, 77:18, 170:20
hung [1] - 67:17

I

I. [1] - 54:22
ICD [8] - 24:8, 29:11, 30:6, 104:16, 106:17, 170:3, 184:4, 198:3
ICD-10 [18] - 25:14, 29:17, 29:19, 30:6, 30:8, 30:25, 31:2, 31:3, 41:3, 49:4, 101:23, 101:24, 110:15, 112:3, 112:6, 177:4, 197:15, 197:16
ICDs [1] - 157:14
idea [5] - 69:24, 173:2, 178:4, 218:22, 219:17
ideal [1] - 219:10
identified [1] - 95:6
identify [4] - 52:11, 52:13, 111:11, 195:19
identity [4] - 137:4, 137:9, 137:16, 137:24
II [2] - 1:10, 1:22
illegal [2] - 69:2, 199:2
illegally [1] - 191:14
illustration [1] - 157:1
ILONA [2] - 1:21, 228:9
imagine [2] - 125:20, 219:3
impact [2] - 52:17, 52:21
impacts [2] - 224:16, 227:15
import [1] - 140:19
important [2] - 40:9, 186:16
impose [1] - 20:2
imposed [1] - 85:2
impossibility [1] - 86:14
impossible [5] - 33:24, 34:7, 34:16, 86:16, 97:7, 97:8, 107:14, 211:5
impression [3] - 13:7, 116:14, 173:4
impressions [1] - 217:16
in-home [2] - 9:10, 15:17
in-person [2] - 85:8, 85:9
inadvertently [1] - 180:13
inbound [2] - 94:22, 152:20

incident [1] - 86:1
inclined [1] - 9:5
include [2] - 95:10, 175:4
included [2] - 29:10, 62:13
includes [1] - 96:6
including [10] - 54:19, 99:2, 102:18, 113:4, 142:22, 142:17, 145:1, 159:21, 200:3, 204:19
income [10] - 145:8, 145:24, 146:2, 146:5, 149:6, 178:2, 178:10, 178:19, 178:24, 179:3
incorporate [1] - 150:25
incorporated [1] - 150:9
incorrect [2] - 188:4, 191:4
incumbent [1] - 217:8
indeed [1] - 218:10
independent [4] - 71:13, 71:16, 121:17, 217:18
indicate [2] - 12:12, 63:14, 154:7, 198:23
indicated [8] - 41:14, 62:22, 104:15, 109:22, 112:20, 161:10, 164:1, 183:16
indicates [1] - 99:19
indicating [2] - 96:23, 157:18
individual [16] - 10:18, 11:19, 16:16, 18:19, 19:12, 28:13, 32:11, 47:23, 93:12, 104:9, 104:12, 132:22, 157:2, 164:19, 165:7
individuals [9] - 8:8, 19:13, 20:14, 20:25, 86:17, 94:11, 143:1, 155:24, 170:8
induce [3] - 8:8, 11:23, 206:4
industry [1] - 118:23
influence [1] - 72:6
influencing [1] - 72:11
info [2] - 130:20, 130:25
info-info@
exchangeadministrationgroup
[1] - 130:25
info@
exchangeadministrationgroup
[1] - 130:25
information [51] - 12:19, 16:22, 16:23, 24:1, 24:4, 24:11, 24:16, 28:17, 28:21, 29:9, 31:8, 31:11, 31:13, 31:23, 32:10, 32:14, 35:13, 40:9, 40:20, 47:15, 48:21, 49:13, 55:15, 57:3, 80:7, 83:21, 84:23, 87:17, 88:9, 90:13, 96:4, 96:6, 97:5, 101:11, 101:16, 104:13, 111:13, 130:20, 159:1, 160:23, 161:16, 167:22,

174:15, 177:3, 178:13, 179:7, 180:2, 184:23, 188:3, 198:3, 211:3
Information [1] - 148:24
informed [3] - 22:8, 22:10, 48:8
infrastructure [1] - 121:1
initial [2] - 75:8, 94:21
initials [3] - 132:11, 150:11, 215:8
input [3] - 96:6, 152:7, 152:9
INS [5] - 58:8, 58:13, 59:6, 59:11, 59:15
INS's [1] - 58:11
inside [4] - 35:19, 40:1, 68:1, 77:3
insight [2] - 10:15, 10:25
Inspector [1] - 148:2
instance [1] - 104:4
instant [2] - 178:24, 179:1
instead [4] - 18:19, 70:9, 141:3, 221:17
instill [1] - 11:4, 11:18
instilling [2] - 16:15, 16:17
instruct [2] - 55:23, 217:12
instructed [2] - 52:24, 165:8
instruction [4] - 15:21, 30:3, 30:16, 128:19
instructions [8] - 20:3, 31:4, 57:2, 162:8, 165:20, 166:13, 186:8, 195:12
insurance [21] - 9:11, 12:2, 12:4, 12:6, 12:9, 53:13, 53:18, 53:19, 53:22, 57:4, 57:10, 57:14, 62:11, 115:4, 116:12, 138:13, 138:16, 138:18, 143:15, 143:17
Insurance [2] - 150:25, 151:3
insurance-related [1] - 116:12
insurances [1] - 57:16
intake [2] - 23:25, 96:5
intend [1] - 128:12
intent [4] - 124:22, 124:23, 126:6, 127:11
interact [1] - 17:9, 100:11, 184:7
interaction [5] - 21:21, 34:24, 34:25, 154:22, 199:22
interactions [1] - 17:11
interchange [1] - 130:7
interest [2] - 94:7, 135:18
interested [2] - 155:6, 164:19
interject [1] - 26:15
internal [4] - 34:22, 41:1, 62:18, 63:4

**internet** [4] - 6:25, 19:17, 217:18, 217:19
**interpret** [1] - 187:1
**interpreting** [2] - 182:20, 186:25
**interrupt** [1] - 93:18
**interrupted** [1] - 77:19
**interview** [1] - 147:9
**interviewed** [3] - 148:1, 173:14, 201:7
**interviews** [4] - 124:25, 190:5, 190:6, 210:18
**intestine** [1] - 14:14
**introduce** [1] - 196:24
**introduced** [9] - 74:22, 116:6, 116:8, 116:9, 169:9, 169:12, 169:17, 169:18, 188:15
**introduction** [1] - 116:16
**introductory** [1] - 71:19
**invalid** [1] - 180:12
**investigation** [3] - 145:15, 145:18, 175:2
**invoice** [3] - 171:12, 171:16, 172:9
**invoices** [2] - 171:9, 171:11
**involve** [2] - 114:22, 114:25
**involved** [24] - 26:13, 53:11, 59:17, 62:9, 115:4, 115:8, 115:9, 133:19, 133:20, 146:9, 146:10, 146:13, 146:15, 151:18, 151:20, 156:14, 166:2, 166:3, 166:4, 166:11, 171:22, 172:5, 205:9, 206:8
**involvement** [6] - 95:17, 116:11, 204:19, 205:23, 206:19, 207:11
**involving** [1] - 151:22
**IP** [2] - 34:23, 184:2
**iPhone** [1] - 194:14
**irregular** [1] - 13:16
**irrelevant** [1] - 125:5
**IRS** [4] - 145:15, 145:18, 149:19, 150:4
**isolated** [1] - 51:7
**issue** [13] - 50:22, 113:21, 114:7, 123:15, 124:3, 124:15, 126:23, 160:2, 160:20, 202:2, 202:10, 215:16, 226:15
**issues** [16] - 88:22, 122:8, 123:16, 125:9, 126:9, 127:13, 179:22, 183:4, 196:4, 196:5, 216:6, 218:14, 220:22, 221:2, 225:14, 226:20
**IT** [2] - 77:24, 84:1
**it'll** [1] - 222:16
**Italian** [1] - 189:17

**itchy** [1] - 13:14
**itself** [4] - 82:12, 157:11, 158:1, 206:3

## J

**jail** [2] - 141:5, 141:9
**jam** [1] - 224:18
**JAMIE** [1] - 1:13
**Jamie** [1] - 187:20
**January** [3] - 69:13, 70:8, 192:12
**jewelry** [3] - 144:16, 180:23, 212:4
**Jill** [1] - 104:21
**job** [1] - 217:7
**John** [4] - 64:12, 64:13, 91:2, 91:17
**John's** [1] - 93:4
**John@LabSolutions.com** [1] - 64:10
**joined** [1] - 85:24
**Jon** [12] - 68:11, 68:17, 88:18, 131:15, 206:24, 207:2, 207:3, 207:8, 208:23, 209:1
**Jon@LabSolutions** [1] - 131:14
**Jones** [3] - 16:11, 33:6, 55:17
**judge** [10] - 141:8, 181:7, 181:17, 181:20, 181:21, 181:23, 182:1, 182:6, 182:10, 183:9
**Judge** [4] - 113:11, 113:13, 141:3, 203:8
**JUDGE** [1] - 1:10
**judgment** [1] - 223:23
**juggling** [1] - 62:17
**July** [6] - 87:10, 89:12, 111:5, 124:5, 127:22, 196:14
**June** [1] - 103:2
**juror** [1] - 5:3
**jurors** [5] - 5:18, 129:9, 215:16, 216:1, 217:16
**JURY** [1] - 1:9
**Jury** [8] - 5:20, 74:1, 74:10, 121:24, 129:11, 213:18, 216:9, 218:5
**jury** [64] - 5:22, 17:4, 20:13, 24:10, 33:1, 35:6, 36:10, 37:9, 38:4, 38:18, 39:1, 41:12, 44:3, 44:18, 45:8, 55:11, 58:4, 58:6, 58:11, 60:5, 60:8, 67:4, 68:23, 74:12, 74:20, 76:3, 76:20, 80:3, 81:3, 81:4, 82:20, 84:16, 87:15, 92:24, 94:9, 100:21, 101:14, 106:8, 109:14, 111:9, 113:8, 119:3,

121:10, 121:12, 121:22, 122:1, 127:2, 129:4, 129:10, 129:13, 130:13, 131:7, 137:3, 141:4, 187:6, 187:7, 193:25, 195:12, 205:14, 205:24, 213:12, 216:11, 217:21, 217:24
**jury's** [1] - 126:4
**Justice** [1] - 173:17
**JUSTICE** [1] - 1:15
**justify** [2] - 53:4, 124:21
**justifying** [2] - 51:1

## K

**Kaplus** [2] - 137:20, 138:15
**KAPLUS** [1] - 137:20
**Kaplus'** [1] - 138:18
**Katary** [2] - 101:1, 101:6
**KATHERINE** [1] - 1:14
**KBC** [1] - 59:6
**keep** [22] - 6:20, 9:7, 9:8, 9:22, 14:4, 14:20, 14:24, 23:14, 40:11, 56:12, 56:14, 63:5, 71:4, 73:14, 73:15, 77:19, 126:5, 136:15, 149:12, 201:20, 217:1
**keeping** [1] - 128:17
**keeps** [1] - 223:3
**Keith** [5] - 74:23, 117:17, 171:13, 171:19, 172:13
**kept** [4] - 16:20, 92:19, 92:22, 212:15
**Khalid** [1] - 100:25
**Kickback** [2] - 124:17, 125:19
**kickbacks** [3] - 66:21, 69:1, 143:16
**kidney** [1] - 14:14
**kids** [1] - 16:12
**kind** [4] - 8:17, 11:12, 55:14, 61:18, 96:24, 128:10, 143:6, 149:4, 165:25, 198:23, 215:14, 221:20, 226:12, 227:6
**kinds** [2] - 30:22, 30:25
**king** [1] - 94:12
**kiss** [1] - 165:18
**kit** [23] - 10:1, 16:4, 18:17, 19:24, 19:25, 20:8, 20:17, 21:3, 23:16, 23:17, 24:15, 31:8, 95:9, 95:25, 163:7, 165:7, 166:12, 166:14, 176:8, 176:23, 176:24
**kits** [8] - 8:3, 8:21, 18:9, 20:18, 20:23, 61:22, 77:14, 169:22
**knee** [4] - 61:18, 82:14, 82:24, 83:16
**knock** [2] - 219:6, 225:8

**knocked** [1] - 93:11
**knowing** [1] - 81:25
**knowingly** [1] - 139:15
**knowledge** [9] - 64:13, 140:15, 140:25, 144:2, 144:5, 160:6, 160:8, 173:13, 205:2
**known** [3] - 10:13, 51:14, 115:25
**knows** [2] - 45:22, 220:23

## L

**lab** [50] - 8:2, 8:7, 9:17, 9:19, 19:15, 22:20, 25:24, 26:18, 27:13, 34:20, 50:9, 50:12, 50:15, 52:4, 52:24, 53:16, 55:3, 57:20, 61:8, 61:13, 63:12, 63:15, 63:20, 66:14, 66:22, 67:5, 68:24, 70:2, 70:4, 70:22, 71:1, 72:23, 77:18, 85:15, 93:4, 101:2, 105:2, 111:10, 117:10, 162:12, 163:22, 197:22, 202:14, 206:14, 206:16, 208:4
**Lab** [11] - 8:6, 65:5, 98:16, 98:17, 162:17, 162:19, 162:21, 162:25, 163:13, 163:15, 207:23
**lab's** [1] - 25:22
**LabCorp** [1] - 162:9
**labels** [1] - 140:23
**laboratories** [5] - 65:18, 143:11, 143:14, 143:19, 143:24
**laboratory** [2] - 64:24, 69:10
**labs** [17] - 25:19, 54:19, 62:20, 62:21, 77:18, 88:23, 100:19, 106:12, 106:21, 106:22, 106:23, 109:23, 120:25, 197:21, 197:23, 197:25, 198:1
**Labs** [2] - 198:19, 198:22
**LabSolutions** [93] - 15:9, 25:25, 26:1, 27:24, 35:10, 36:11, 36:13, 36:15, 52:5, 54:20, 56:25, 58:14, 59:9, 59:12, 59:23, 64:14, 65:9, 65:17, 66:25, 68:10, 68:18, 69:11, 69:16, 72:25, 75:9, 75:11, 79:20, 87:24, 91:3, 91:25, 93:4, 95:18, 96:13, 98:25, 99:11, 100:7, 100:12, 100:16, 100:19, 100:23, 101:5, 101:10, 103:11, 104:2, 106:13, 110:4, 117:9, 120:20, 121:5, 124:6, 127:23, 128:1, 128:2,

135:15, 135:23, 152:14, 154:13, 154:18, 155:15, 158:18, 159:4, 159:8, 162:21, 163:2, 170:25, 172:11, 172:20, 172:21, 172:22, 172:25, 173:12, 173:19, 173:23, 174:3, 174:6, 175:21, 191:14, 191:16, 192:20, 198:24, 199:13, 199:19, 200:13, 204:20, 204:23, 206:25, 207:4, 207:12, 207:23, 208:2, 208:8, 208:24

**LabSolutions'** [3] - 69:17, 90:10, 165:3

**LabSolutions.com** [1] - 104:22

**ladies** [10] - 5:22, 37:8, 42:13, 74:12, 121:10, 129:13, 130:12, 131:7, 213:12, 216:11

**lady's** [1] - 144:16

**laid** [2] - 57:11, 195:16

**language** [3] - 71:19, 72:22, 92:18

**laptop** [2] - 185:22, 186:6

**large** [1] - 94:11

**Larkin** [6] - 59:6, 59:13, 150:10, 150:22, 151:3, 151:5

**larkin's** [1] - 151:7

**Larkin's** [1] - 151:12

**Las** [2] - 60:21, 60:24

**last** [22] - 5:3, 6:1, 11:25, 17:24, 32:1, 47:9, 52:12, 53:20, 60:3, 71:20, 75:22, 77:8, 98:4, 129:1, 153:11, 189:1, 189:19, 190:6, 190:8, 203:20, 222:18, 226:13

**late** [1] - 87:20

**Lauderdale** [2] - 1:24, 228:11

**law** [5] - 69:1, 114:15, 124:5, 137:8, 158:15

**LAW** [1] - 1:18

**law's** [1] - 137:9

**laws** [2] - 210:8, 210:9

**lawyer** [7] - 128:2, 158:20, 158:22, 159:1, 159:5, 199:22, 199:25

**lawyers** [16] - 121:20, 173:5, 179:19, 183:9, 191:19, 191:21, 192:4, 192:22, 199:19, 200:18, 208:14, 208:15, 217:22, 223:19, 224:5, 227:9

**lay** [3] - 13:25, 128:18, 224:14

**LC** [1] - 103:11

**LCD** [1] - 197:15

**lead** [7] - 10:17, 11:12,

72:7, 210:3, 218:9, 221:19, 222:8

**leading** [2] - 50:22, 131:18

**leads** [2] - 68:1, 94:15

**learn** [5] - 33:11, 33:15, 33:20, 35:9, 53:12

**learned** [5] - 33:21, 34:21, 35:4, 35:12, 193:5

**leased** [1] - 169:5

**Leasing** [1] - 138:4

**least** [11] - 17:23, 41:16, 125:22, 151:5, 156:19, 160:12, 163:2, 173:3, 218:25, 223:24, 227:6

**leave** [9] - 73:23, 93:3, 116:14, 121:22, 180:13, 213:14, 217:9, 217:24, 217:25

**leaves** [1] - 218:10

**leaving** [2] - 45:24, 45:25

**led** [2] - 33:21, 151:24

**left** [8] - 5:25, 6:24, 46:2, 74:13, 82:3, 83:4, 122:4, 186:4

**left-hand** [1] - 82:3

**leg** [1] - 17:10

**legal** [10] - 113:20, 113:21, 114:7, 124:5, 124:20, 127:22, 128:5, 165:3, 165:4, 165:5

**length** [1] - 222:4

**lengthy** [2] - 112:25, 224:14

**less** [3] - 46:6, 67:13, 67:14

**letter** [21] - 23:24, 31:16, 47:16, 49:24, 50:6, 50:8, 50:21, 50:25, 51:20, 51:25, 52:3, 52:9, 55:14, 55:16, 55:22, 85:4, 87:17, 88:12, 88:15, 98:5, 98:6

**letters** [4] - 50:11, 53:4, 55:23, 206:7

**letting** [3] - 215:16, 216:19, 216:23

**level** [5] - 19:20, 22:6, 37:13, 50:25, 118:10

**liabilities** [1] - 179:8

**liability** [2] - 149:23, 179:18

**licensed** [2] - 49:9, 96:20

**lie** [7] - 130:3, 130:7, 149:8, 149:10, 150:4, 186:18, 205:18

**lied** [4] - 116:17, 133:1, 133:5, 149:19

**lies** [4] - 205:16, 205:19, 205:25, 212:11

**light** [1] - 81:12

**limitations** [1] - 22:3

**limited** [3] - 61:12, 62:12

**line** [6] - 25:7, 26:10, 27:4, 87:14, 212:15, 212:16

**lined** [1] - 220:2

**lineup** [5] - 216:4, 217:4, 222:6, 222:11, 223:5

**list** [10] - 71:21, 103:15, 103:20, 103:24, 105:8, 105:11, 111:18, 111:20, 153:11

**listed** [4] - 30:8, 179:14, 191:8, 203:12

**listen** [2] - 76:14, 150:5

**listened** [1] - 167:25

**listening** [2] - 76:10, 169:19

**listing** [1] - 135:3

**lists** [1] - 52:6

**litigate** [1] - 227:10

**live** [2] - 76:12, 214:16

**lived** [1] - 60:24

**liver** [1] - 14:14

**LLC** [3] - 59:6, 191:7

**LLP** [1] - 2:5

**load** [2] - 120:24, 121:2

**lobby** [1] - 109:1

**located** [3] - 61:2, 94:1, 110:2

**location** [2] - 185:13, 185:25

**locum** [1] - 54:6

**lodged** [1] - 77:10

**LOEB** [1] - 2:3

**logic** [16] - 24:7, 25:13, 29:15, 41:3, 72:14, 76:17, 80:6, 84:7, 84:22, 110:14, 156:21, 156:24, 157:6, 157:7, 157:8, 184:2

**logic-based** [15] - 24:7, 25:13, 29:15, 41:3, 72:14, 76:17, 80:6, 84:7, 84:22, 110:14, 156:21, 156:24, 157:7, 157:8, 184:2

**long-term** [1] - 72:25

**look** [19] - 46:1, 49:2, 49:19, 51:6, 70:12, 83:10, 84:3, 102:12, 103:6, 106:2, 106:22, 107:21, 108:22, 156:2, 162:15, 191:6, 191:9, 192:25, 201:25

**looked** [11] - 41:19, 66:4, 72:17, 82:25, 89:13, 98:15, 98:21, 99:15, 127:24, 207:19, 208:7

**looking** [17] - 27:23, 28:6, 28:8, 38:22, 44:3, 47:6, 49:18, 54:8, 54:10, 73:13, 81:5, 81:9, 82:20, 83:1, 211:4, 212:13, 215:8

**looks** [1] - 107:11

**looped** [1] - 7:4

**Loper** [1] - 173:16

**lose** [2] - 87:21, 214:13

**lost** [1] - 150:6

**Louisiana** [1] - 73:3

**loved** [5] - 11:3, 11:9, 16:13, 48:9, 114:22

**luck** [1] - 53:21

**lucky** [1] - 119:7

**lunch** [6] - 121:11, 121:14, 121:21, 122:9, 129:14, 195:3

**Lupowitz** [1] - 228:8

**LUPOWITZ** [2] - 1:21, 228:9

**Lutz** [1] - 173:15

**luxury** [3] - 145:1, 145:3, 224:13

## M

**M.D** [1] - 185:24

**M.L** [1] - 150:11

**M.S** [7] - 91:11, 91:12, 132:1, 132:3, 132:6, 132:11, 132:13

**ma'am** [7] - 7:2, 8:5, 14:9, 18:8, 18:14, 46:7, 76:19

**MAC** [11] - 109:5, 109:6, 109:10, 109:12, 109:14, 109:16, 109:18, 110:2, 160:4

**MACs** [2] - 109:4, 160:2

**mail** [7] - 9:25, 15:17, 16:22, 55:7, 55:9, 99:24, 161:25

**mailed** [3] - 20:8, 55:12, 55:15

**mailing** [2] - 127:21, 169:22

**main** [1] - 48:6

**maintain** [1] - 71:4

**Maison** [4] - 85:19, 188:25, 189:17, 190:11

**managed** [1] - 198:3

**management** [2] - 52:17, 52:22

**manner** [1] - 90:12

**manual** [1] - 80:12

**Maple** [1] - 2:3

**Marc** [2] - 116:1, 191:8

**March** [1] - 36:8

**mark** [2] - 38:11, 43:20

**Mark** [8] - 25:7, 116:4, 116:9, 188:15, 189:12, 189:14, 199:23

**marked** [5] - 24:16, 27:4, 123:18, 124:3, 194:10

**markers** [1] - 28:1

**market** [2] - 66:1, 208:9

**marketed** [4] - 93:12, 94:12, 143:8, 146:12

**marketer** [6] - 83:19, 83:20, 93:2, 152:19, 152:21, 173:1

**marketers** [8] - 58:14, 62:20, 62:23, 79:23, 79:25, 80:6, 106:21, 106:22

**marketing** [39] - 8:7, 15:8,

36:15, 58:16, 58:17, 58:18, 59:3, 59:10, 62:18, 63:1, 63:18, 66:5, 66:8, 66:10, 70:9, 72:16, 73:1, 75:19, 79:2, 92:18, 92:22, 92:25, 93:2, 93:5, 94:4, 110:7, 110:10, 116:13, 117:18, 117:19, 143:7, 162:10, 162:19, 171:23, 171:25, 172:5, 172:19, 172:25

**Markman** [1] - 173:17

**married** [3] - 18:5, 18:6, 18:16

**Martin** [2] - 116:5

**Master** [1] - 144:24

**Masterpiece** [1] - 144:22

**match** [1] - 38:6

**matched** [2] - 88:12, 88:15

**matches** [1] - 43:17

**material** [2] - 163:22, 176:12

**materials** [2] - 72:16, 176:14

**math** [4] - 39:9, 46:6, 67:11, 119:5

**mathematically** [1] - 20:21

**Matt** [3] - 75:17, 75:18, 75:19

**matter** [9] - 34:21, 76:12, 114:11, 114:12, 117:25, 177:18, 180:14, 186:18, 228:6

**matters** [5] - 114:15, 200:2, 200:3, 200:4, 210:20

**Maxilin** [1] - 174:24

**mean** [47] - 20:13, 22:22, 26:23, 32:19, 40:23, 41:6, 42:21, 43:4, 44:9, 46:11, 51:3, 66:20, 77:16, 79:8, 81:21, 86:10, 92:21, 93:18, 93:24, 106:10, 113:18, 118:17, 125:19, 125:21, 126:3, 126:25, 127:6, 127:15, 127:17, 128:15, 132:20, 153:11, 156:21, 170:20, 171:15, 172:11, 179:9, 186:22, 200:8, 211:2, 219:22, 220:17, 221:8, 224:2, 227:4, 227:10, 227:14

**meaning** [9] - 11:2, 11:6, 55:9, 71:22, 83:23, 83:25, 85:3, 101:19, 165:18

**meanings** [1] - 40:25

**means** [21] - 28:21, 35:17, 39:1, 39:10, 39:13, 42:20, 42:22, 43:5, 44:19, 45:8, 51:1, 53:17, 54:14, 81:17, 94:9, 101:21, 132:18, 132:22, 155:2, 179:1, 179:23

**meant** [2] - 67:4, 219:22

**mechanically** [1] - 24:10

**Medi** [7] - 142:17, 143:6, 143:20, 143:22, 144:7, 144:15, 150:9

**MEDI** [1] - 142:17

**Media** [11] - 65:4, 131:9, 131:10, 131:12, 133:1, 133:5, 133:7, 134:16, 208:20, 209:16, 212:25

**media** [2] - 121:19, 217:20

**Medicaid** [2] - 12:3, 12:8

**Medicaid/Tricare** [1] - 12:2

**medical** [46] - 8:15, 8:18, 12:14, 12:20, 13:3, 13:23, 23:24, 29:14, 31:16, 32:5, 47:16, 49:7, 49:24, 50:6, 50:8, 50:11, 50:16, 50:22, 51:7, 51:25, 52:3, 52:17, 52:22, 56:1, 61:12, 62:13, 65:19, 82:22, 85:4, 87:18, 88:13, 88:16, 94:1, 95:6, 96:4, 98:7, 103:10, 103:17, 104:2, 140:19, 158:6, 158:8, 159:9, 160:24, 206:7

**Medical** [9] - 61:17, 65:4, 117:16, 146:15, 146:19, 151:1, 151:2, 151:7, 151:12

**medically** [2] - 12:25, 72:7

**Medicare** [43] - 9:17, 9:19, 10:19, 11:21, 12:9, 13:1, 13:4, 13:8, 16:1, 50:8, 51:2, 53:5, 53:8, 53:13, 53:14, 53:15, 53:25, 54:1, 54:15, 54:16, 57:4, 57:9, 57:11, 57:12, 57:20, 69:2, 87:25, 94:14, 106:14, 109:4, 109:7, 125:24, 161:17, 164:24, 197:16, 198:4, 205:18, 205:19, 205:25, 209:15, 209:23, 209:25, 212:12

**Medicare's** [1] - 106:5

**medication** [2] - 17:2, 83:16

**medications** [6] - 10:18, 10:20, 17:6, 17:7, 143:8, 164:16

**Medipak** [8] - 65:5, 134:16, 134:18, 135:4, 135:6, 135:8, 191:7, 208:6

**Medtech** [9] - 104:21, 163:19, 168:13, 168:14, 172:17, 172:18, 172:21, 172:23

**meet** [9] - 13:9, 13:10, 76:5, 79:11, 86:5, 104:2, 108:21, 108:23, 204:22

**meet-and-greet** [2] - 76:5, 79:11

**meeting** [32] - 74:20, 74:22, 75:8, 75:9, 76:2, 76:4, 77:1,

77:2, 78:23, 78:25, 79:3, 79:4, 79:6, 79:13, 79:15, 79:16, 79:17, 79:20, 79:24, 80:1, 85:11, 85:13, 85:17, 86:9, 100:23, 100:25, 103:16, 108:22, 108:25, 169:11, 186:11, 189:6

**meetings** [7] - 78:25, 79:14, 85:7, 85:9, 177:20, 210:23

**members** [3] - 16:13, 72:1, 157:4

**memo** [6] - 124:5, 124:12, 124:17, 127:6, 127:22, 195:6

**memorandum** [4] - 126:13, 126:21, 128:6, 128:13, 193:12, 193:17, 196:11

**memory** [2] - 137:21, 186:15

**men's** [2] - 144:17, 144:22

**mention** [2] - 223:10, 226:15

**mentioned** [13] - 21:14, 36:4, 39:19, 49:23, 70:12, 89:19, 114:10, 117:9, 160:3, 182:16, 183:12, 214:19, 223:17

**menu** [1] - 85:20

**Mercedes** [2] - 145:2

**Meridian** [1] - 109:8

**message** [2] - 57:5, 110:11

**met** [13] - 75:7, 79:10, 85:12, 86:1, 108:24, 146:7, 169:9, 178:16, 178:17, 188:10, 210:19, 211:18, 216:3

**Miami** [1] - 1:3

**mic** [1] - 6:20

**Michelle** [5] - 59:6, 59:13, 150:10, 150:22, 151:2

**microphone** [1] - 36:6

**midafternoon** [1] - 219:9

**middle** [2] - 204:7, 224:25

**might** [16] - 47:3, 58:16, 73:3, 82:17, 94:19, 130:11, 156:19, 157:18, 158:2, 159:24, 160:16, 161:16, 200:23, 218:22, 220:10, 222:11

**million** [13] - 10:16, 142:8, 142:13, 146:2, 146:5, 147:2, 147:4, 147:19, 147:21, 148:12, 148:13, 175:3, 211:1

**MINAL** [1] - 1:6

**Minal** [10] - 5:7, 59:19, 59:22, 60:17, 75:10, 87:16, 111:10, 146:7, 173:13, 209:1

**mind** [5] - 16:3, 37:20, 95:19, 123:1, 125:22

**minds** [1] - 217:9

**mine** [1] - 222:24

**minimize** [1] - 211:22

**minute** [2] - 35:1, 44:22

**minutes** [20] - 44:16, 45:7, 45:9, 45:11, 45:12, 45:13, 45:14, 45:17, 46:3, 46:9, 73:24, 108:25, 121:13, 165:19, 167:19, 168:1, 213:15, 214:13, 215:21

**misleading** [1] - 206:4

**mispronouncing** [1] - 148:3

**misrepresented** [2] - 190:20, 190:23

**misrepresenting** [1] - 206:4

**missed** [3] - 155:14, 214:20, 220:5

**missing** [5] - 40:20, 101:23, 104:13, 104:14, 176:6

**mmm-hmm** [1] - 182:18

**model** [3] - 118:12, 118:24, 210:24

**modifications** [1] - 72:22

**moment** [2] - 123:3, 226:16

**momentum** [1] - 217:1

**Monday** [1] - 224:9

**money** [30] - 9:17, 9:20, 67:22, 115:24, 135:10, 135:12, 138:9, 139:17, 142:4, 144:7, 144:14, 146:20, 146:21, 148:16, 148:25, 149:21, 149:22, 149:25, 150:1, 150:3, 150:5, 181:2, 205:16, 205:19, 205:20, 206:16, 211:25, 212:8, 212:14

**Monica** [1] - 103:11

**monies** [2] - 135:4, 146:24

**monitor** [1] - 40:12

**month** [7] - 36:17, 70:14, 120:11, 192:12, 192:17, 199:10, 201:12

**monthly** [6] - 67:1, 69:6, 69:7, 70:16, 71:2, 71:3

**months** [5] - 55:4, 139:24, 139:25, 141:5, 204:1

**morbidity** [1] - 52:14

**morning** [23] - 5:2, 5:21, 6:13, 6:18, 6:19, 34:7, 34:18, 40:5, 40:8, 73:21, 76:18, 95:16, 96:10, 97:10, 97:11, 98:22, 103:15, 214:5, 215:12, 220:11, 223:15, 224:9, 225:2

**mortality** [1] - 52:15

**most** [8] - 17:6, 34:25, 57:15, 57:16, 91:13, 110:18, 142:10, 221:5

**motion** [1] - 223:13

**mouth** [2] - 186:22, 186:23

**move** [22] - 7:4, 19:2, 22:11, 38:11, 43:21, 43:25, 56:16, 59:5, 63:23, 87:14, 123:6, 123:7, 125:13, 130:13, 134:20, 157:10, 157:21, 163:9, 163:10, 177:21, 194:21, 203:1

**moved** [8] - 59:11, 60:2, 117:4, 118:14, 118:24, 189:17, 190:11, 216:20

**moves** [16] - 7:6, 18:23, 21:7, 23:6, 36:21, 46:18, 80:15, 83:7, 86:24, 90:16, 102:2, 105:16, 107:3, 112:9, 116:25, 119:14

**moving** [7] - 41:9, 67:25, 91:22, 94:3, 127:16, 139:12, 165:25

**MR** [112] - 3:5, 3:6, 5:16, 7:10, 13:22, 19:1, 21:9, 23:9, 33:14, 33:25, 34:9, 36:23, 38:13, 43:24, 46:20, 56:18, 64:1, 73:16, 80:17, 87:2, 90:18, 102:5, 105:20, 107:5, 112:12, 117:3, 119:16, 122:13, 123:9, 123:20, 125:12, 126:10, 127:20, 127:25, 128:7, 128:12, 129:5, 129:21, 129:23, 130:10, 130:14, 134:20, 134:25, 135:2, 147:6, 147:13, 147:15, 147:17, 152:2, 152:4, 160:18, 160:19, 161:3, 161:4, 161:8, 161:9, 173:25, 174:2, 175:13, 175:15, 175:17, 175:18, 182:12, 182:14, 193:24, 194:4, 194:9, 194:21, 195:7, 195:14, 195:17, 195:19, 196:1, 196:10, 196:16, 196:18, 196:21, 196:24, 197:6, 197:7, 197:9, 197:11, 201:22, 201:24, 202:7, 202:17, 202:22, 202:24, 203:1, 203:7, 203:10, 204:12, 212:19, 212:23, 213:3, 213:7, 218:20, 218:22, 219:15, 222:23, 223:1, 223:9, 223:14, 224:19, 226:8, 226:15, 226:18, 226:19, 226:20, 227:12, 227:18, 227:20

**MS** [142] - 3:5, 3:6, 5:13, 6:8, 6:15, 6:17, 7:6, 7:15, 14:2, 18:22, 19:6, 19:8, 21:6, 21:12, 23:5, 23:13, 33:18, 33:19, 35:2, 36:9, 36:20, 37:2, 37:4, 37:8, 37:12, 37:18, 37:22, 37:25, 38:2, 38:10, 38:17, 38:20, 41:23, 42:1, 42:8, 42:10, 42:13, 42:16, 42:24, 43:1, 43:8, 43:10, 43:13, 43:15, 43:20, 44:2, 44:12, 44:17, 44:25, 45:4, 46:17, 46:24, 56:11, 56:15, 56:22, 63:22, 64:4, 64:7, 73:13, 74:4, 74:15, 74:16, 80:14, 80:22, 86:23, 87:4, 87:7, 90:15, 90:20, 90:23, 102:1, 102:7, 102:11, 105:15, 105:22, 106:1, 107:2, 107:8, 107:16, 107:20, 112:8, 112:14, 112:18, 116:24, 117:5, 117:8, 119:13, 119:18, 119:21, 122:11, 122:16, 122:20, 122:24, 123:4, 123:16, 123:21, 127:6, 128:23, 129:2, 134:7, 134:22, 147:8, 194:3, 194:6, 194:24, 195:2, 195:5, 195:11, 195:24, 196:5, 196:22, 202:4, 203:3, 204:15, 204:17, 212:18, 213:9, 213:22, 214:2, 214:10, 214:21, 214:24, 215:2, 215:5, 215:10, 215:22, 218:13, 218:17, 219:1, 219:5, 219:21, 219:24, 220:6, 220:13, 220:20, 221:22, 222:1, 222:16, 225:12, 225:21, 226:14, 227:24

**MS@Medtechww.com** [1] - 24:21

**multiple** [6] - 10:20, 25:19, 42:5, 79:14, 120:24, 148:22

**must** [2] - 121:19, 217:12

**mutations** [1] - 51:7

## N

**name** [46] - 7:25, 8:1, 8:7, 15:6, 37:15, 47:9, 49:3, 59:15, 68:9, 68:12, 77:8, 100:25, 115:25, 116:3, 118:20, 135:7, 135:9, 135:12, 138:7, 138:18, 150:9, 151:4, 152:23, 153:1, 153:6, 154:10, 168:12, 174:24, 188:12, 188:13, 189:1, 189:3, 189:5, 189:19, 189:20, 190:3, 190:8, 190:15, 190:21, 199:22, 220:4, 222:13

**named** [1] - 89:15

**names** [8] - 58:5, 144:11, 145:21, 145:23, 148:20, 148:21, 208:6, 214:20

**national** [1] - 60:11

**naturally** [1] - 106:20

**nature** [5] - 86:22, 88:21, 101:24, 161:19, 186:10

**nausea** [1] - 111:21

**navigating** [1] - 125:23

**NDC** [1] - 61:22

**NE** [1] - 2:3

**Neals** [1] - 174:24

**necessarily** [4] - 13:19, 125:20, 176:5, 219:18

**necessary** [4] - 13:1, 53:6, 170:5

**necessity** [19] - 12:21, 23:24, 31:17, 47:16, 49:24, 50:7, 50:8, 50:11, 52:1, 52:4, 82:23, 85:4, 87:18, 88:13, 88:16, 103:10, 103:17, 104:3, 206:7

**necklace** [4] - 144:19, 144:20, 144:21, 144:23

**need** [22] - 5:15, 18:10, 25:14, 41:25, 53:18, 73:18, 105:5, 107:12, 111:1, 128:18, 130:13, 158:8, 183:4, 183:5, 185:4, 215:6, 215:19, 217:2, 217:6, 223:18, 224:10, 227:2

**needed** [7] - 16:8, 27:10, 87:17, 111:13, 121:2, 192:22, 224:22

**Needleman** [3] - 61:1, 153:7, 153:9

**needs** [4] - 52:2, 122:8, 221:17, 224:11

**negative** [1] - 22:6

**negotiated** [1] - 192:19

**net** [3] - 67:1, 67:3, 67:4

**network** [1] - 59:25

**never** [29] - 54:21, 100:13, 101:6, 133:12, 133:13, 134:1, 134:2, 134:11, 136:1, 136:2, 136:5, 139:9, 139:11, 140:23, 147:3, 147:5, 147:21, 153:21, 153:22, 154:16, 184:1, 186:17, 188:19, 189:20, 190:4, 190:20, 190:25, 198:20, 204:24

**New** [1] - 1:16

**new** [2] - 104:15, 150:16

**news** [3] - 106:2, 213:23, 216:12

**next** [43] - 7:5, 9:8, 19:20, 23:19, 23:20, 31:3, 40:8, 47:24, 48:12, 49:5, 49:22, 51:6, 51:13, 52:9, 82:15, 83:15, 85:22, 88:6, 96:15, 108:13, 132:1, 139:6, 157:10, 157:21, 158:3, 159:19, 160:18, 161:3,

161:8, 161:12, 179:6, 189:1, 189:18, 190:12, 213:6, 213:24, 215:3, 218:2, 220:12, 222:14, 222:22, 223:5

**Nicaragua** [4] - 166:19, 166:25, 167:5, 167:13

**nice** [2] - 5:23, 129:14

**Nick** [5] - 85:15, 88:18, 174:6, 197:12, 198:24

**nickel** [1] - 145:7

**night** [4] - 85:18, 119:5, 119:11, 191:12

**nighttime** [1] - 40:7

**nine** [1] - 204:1

**NO** [1] - 1:2

**nobody** [1] - 175:6

**nominee** [7] - 142:21, 143:1, 143:2, 145:5, 145:21, 148:20, 150:20

**nominees** [1] - 146:10

**none** [5] - 52:23, 56:6, 154:15, 211:24

**nonetheless** [1] - 205:9

**noninvasive** [1] - 12:13

**noon** [1] - 226:5

**normally** [1] - 73:21

**note** [5] - 27:1, 35:21, 49:18, 63:5, 226:4

**noted** [1] - 104:13

**notepads** [4] - 73:23, 121:22, 213:14, 217:24

**notes** [9] - 6:1, 23:25, 31:19, 47:15, 49:7, 214:7, 223:6

**nothing** [12] - 31:15, 35:24, 78:13, 89:23, 96:23, 104:17, 170:23, 170:24, 171:4, 191:1, 191:15, 195:24

**notice** [2] - 163:2, 226:3

**notify** [1] - 162:21

**Nouvelle** [4] - 85:18, 188:25, 189:16, 190:11

**November** [10] - 36:5, 58:24, 59:20, 147:1, 147:18, 147:25, 197:12, 199:16, 200:16, 200:20

**Novitas** [7] - 108:9, 108:14, 109:3, 109:16, 110:15, 111:11, 160:10

**NPI** [1] - 60:11

**number** [22] - 33:6, 37:15, 45:1, 46:11, 49:3, 57:23, 60:11, 76:23, 82:13, 88:6, 92:12, 93:7, 94:24, 118:20, 121:15, 123:19, 138:12, 161:17, 192:8, 203:18, 203:20

**numbers** [5] - 20:21, 67:5, 67:14, 81:15, 203:11

**numerous** [7] - 31:2, 101:1, 101:13, 106:10, 144:10, 174:19, 210:19

**nurses** [14] - 77:25, 166:1, 166:3, 166:4, 166:6, 166:11, 170:1, 170:3, 170:7, 170:9, 170:10, 170:11, 170:12, 170:14

**nursing** [1] - 49:8

**NW** [1] - 1:18

# O

**o'clock** [9] - 34:7, 34:18, 40:6, 97:9, 97:11, 213:13, 213:23

**OA** [1] - 225:3

**Oak** [1] - 144:18

**oath** [5] - 6:10, 122:3, 149:4, 149:25

**object** [7] - 13:22, 33:14, 33:25, 34:10, 124:2, 124:12, 147:8

**objection** [38] - 7:8, 7:23, 18:25, 19:1, 21:8, 21:9, 23:8, 23:9, 36:22, 36:23, 38:12, 43:23, 43:24, 46:19, 46:20, 56:17, 56:18, 63:25, 80:16, 87:1, 87:2, 90:17, 90:18, 102:4, 105:19, 105:20, 107:4, 107:5, 112:11, 117:2, 119:15, 119:16, 123:7, 134:22, 194:23, 196:23, 203:2, 203:3

**objections** [7] - 15:22, 16:7, 16:8, 16:10, 16:15, 122:21, 159:16

**obligation** [1] - 143:22

**obtain** [1] - 138:9

**obtained** [1] - 174:19

**obviates** [1] - 227:6

**obvious** [1] - 93:24

**obviously** [22] - 5:9, 9:4, 14:13, 17:19, 18:18, 19:14, 39:25, 40:15, 45:10, 45:12, 50:9, 66:14, 67:24, 81:20, 83:6, 83:15, 84:12, 93:10, 122:3, 160:15, 166:25, 167:12

**occurred** [3] - 76:3, 85:8, 192:10

**occurs** [2] - 96:22, 97:3

**October** [8] - 36:4, 108:1, 108:5, 187:10, 188:9, 200:15, 201:13, 202:8

**odds** [1] - 94:19

**OF** [5] - 1:1, 1:3, 1:9, 1:15, 1:18

**offense** [5] - 121:19, 178:25, 179:1, 179:2, 217:23

**offenses** [1] - 114:17

**offer** [1] - 128:5

**offered** [2] - 22:2, 99:20

**Office** [1] - 148:2

**OFFICE** [1] - 1:18

**office** [14] - 74:18, 76:3, 76:8, 79:22, 85:8, 93:3, 93:25, 94:1, 94:2, 186:2, 186:5, 200:24, 200:25

**OFFICER** [4] - 5:19, 74:9, 129:10, 213:17

**offices** [5] - 77:25, 79:16, 101:1, 169:24, 208:9

**Official** [2] - 1:22, 228:9

**Offshore** [1] - 144:19

**often** [4] - 13:13, 17:13, 17:21, 97:15

**old** [1] - 115:11

**omit** [2] - 136:14, 180:6

**onboard** [1] - 58:14

**once** [7] - 24:14, 26:18, 53:25, 62:17, 95:25, 98:4, 126:23, 155:3, 176:22, 190:4, 227:15

**oncologist** [2] - 31:22, 32:15

**oncologists** [1] - 54:8

**one** [118] - 6:25, 8:24, 9:15, 9:16, 11:9, 13:8, 16:10, 18:19, 23:15, 27:22, 27:25, 28:13, 30:21, 35:1, 35:14, 35:19, 38:14, 39:19, 39:25, 40:20, 44:13, 45:12, 45:13, 46:12, 49:14, 52:4, 52:7, 55:20, 58:8, 59:2, 59:10, 62:4, 66:13, 71:25, 73:1, 73:2, 73:18, 77:11, 80:5, 81:2, 83:6, 83:15, 85:18, 86:17, 87:16, 89:1, 93:24, 101:3, 101:18, 101:22, 103:6, 104:7, 106:3, 106:10, 106:13, 107:13, 107:14, 109:5, 112:5, 116:15, 121:15, 123:16, 124:14, 125:9, 130:1, 132:1, 134:5, 139:6, 139:8, 139:12, 139:24, 145:1, 151:6, 154:4, 156:17, 156:19, 160:4, 162:12, 166:25, 167:2, 167:11, 167:25, 169:24, 170:21, 171:11, 171:14, 171:16, 172:13, 180:14, 182:17, 187:13, 188:3, 190:6, 194:6, 197:23, 197:25, 200:18, 201:21, 202:22, 208:23, 209:11, 209:13, 210:7, 211:17, 214:11, 216:5, 216:16, 216:17, 222:2, 222:24, 224:8, 224:23, 225:1,

225:15, 226:1, 226:20

**one's** [2] - 90:25, 222:24

**ones** [5] - 11:3, 16:13, 48:9, 114:22

**online** [2] - 209:8, 209:13

**open** [2] - 146:6, 195:21

**opened** [3] - 144:10, 148:21, 165:1

**opening** [1] - 148:22

**operated** [6] - 75:19, 75:25, 142:16, 142:20, 151:3, 151:8

**operation** [8] - 75:2, 79:11, 93:10, 93:11, 93:12, 118:2, 221:15

**operations** [9] - 61:2, 86:9, 92:19, 92:23, 92:25, 95:7, 95:22, 98:14, 185:1

**opportunity** [5] - 22:2, 22:15, 99:20, 99:25, 115:6

**opposed** [2] - 119:8, 132:17

**opposite** [1] - 72:14

**opt** [7] - 155:11, 155:16, 155:18, 155:25, 209:25, 210:2, 210:3

**opt-in** [1] - 155:11

**opted** [3] - 154:25, 155:2, 155:3

**opting** [4] - 155:9, 209:4, 210:5, 210:6

**option** [3] - 44:7, 225:4

**options** [4] - 12:3, 28:24, 28:25, 42:25

**oral** [1] - 223:18

**order** [53] - 13:1, 18:10, 23:20, 27:15, 27:17, 29:25, 30:7, 30:13, 31:4, 31:25, 32:2, 39:4, 39:7, 39:11, 39:14, 40:21, 41:4, 41:16, 42:9, 42:22, 42:23, 43:5, 44:21, 44:23, 49:15, 67:19, 82:12, 82:13, 82:14, 82:22, 84:4, 85:1, 108:10, 110:12, 110:16, 110:17, 112:4, 118:20, 118:22, 138:9, 145:23, 151:10, 157:5, 159:9, 161:14, 166:13, 177:5, 181:24, 182:25, 205:19, 219:25, 224:6, 224:14

**Order** [1] - 5:1

**ordered** [2] - 52:5, 97:18

**ordering** [4] - 22:5, 72:7, 72:12, 97:22

**orders** [64] - 20:16, 25:17, 27:12, 33:4, 33:6, 33:7, 33:8, 34:5, 35:1, 35:9, 36:11, 36:13, 37:15, 39:25, 40:2, 40:8, 40:11, 40:12, 40:14, 41:10, 41:21, 52:23, 58:18,

59:3, 67:24, 68:2, 69:5, 75:4, 78:1, 78:4, 78:17, 78:20, 78:21, 80:8, 80:9, 81:19, 81:20, 81:22, 81:23, 81:24, 82:1, 82:2, 86:18, 93:8, 93:15, 97:9, 97:17, 97:25, 101:5, 117:12, 117:16, 117:20, 119:6, 119:7, 119:9, 121:2, 121:4, 166:7, 170:4

**organ** [1] - 30:13

**organic** [1] - 223:25

**organization** [2] - 40:1, 68:1

**original** [1] - 103:21

**originally** [2] - 15:5, 72:19

**otherwise** [1] - 210:3

**ourfamilygenes** [1] - 131:21

**ourselves** [1] - 221:8

**out-of-pocket** [1] - 10:2

**outbound** [2] - 94:23, 152:18

**outside** [1] - 123:2

**ovarian** [4] - 27:16, 28:2, 28:3, 28:24

**overall** [2] - 48:25, 205:20

**overcome** [2] - 15:22, 16:9

**overflow** [1] - 167:6

**overhead** [1] - 120:25

**overruled** [4] - 13:24, 33:17, 34:3, 34:12

**overview** [10] - 84:9, 86:10, 92:1, 93:9, 95:22, 96:15, 98:14, 99:14, 152:18, 155:8

**overwrite** [2] - 60:1, 93:7

**owe** [1] - 142:4

**owed** [1] - 148:25

**owing** [1] - 148:23

**own** [13] - 25:23, 25:24, 41:1, 62:18, 63:4, 72:16, 124:17, 134:18, 169:5, 171:24, 171:25, 185:23, 191:6

**owned** [1] - 101:2, 133:8, 134:2, 134:8, 140:15, 142:16, 142:20, 151:2, 169:3, 173:23, 174:3, 174:6, 190:23, 191:1, 191:8, 213:1

**owner** [7] - 133:9, 133:25, 135:25, 136:6, 153:20, 153:25, 154:7

**owners** [2] - 142:21, 143:2

**ownership** [6] - 133:10, 134:10, 135:18, 142:21, 142:25, 153:3

**owns** [1] - 173:19

# P

**p.m** [11] - 1:5, 121:24,

122:18, 122:19, 129:11, 213:18, 215:23, 215:24, 216:9, 218:5, 227:25
**P.S** [2] - 49:19
**pace** [3] - 41:9, 221:10, 223:3
**package** [2] - 101:21, 165:6
**packages** [1] - 77:5
**packet** [1] - 98:24
**PAGE** [1] - 3:3
**page** [41] - 6:1, 12:1, 12:10, 13:12, 14:15, 14:24, 15:13, 17:24, 47:24, 48:12, 49:5, 49:22, 51:20, 52:9, 66:23, 68:9, 71:20, 81:9, 82:7, 82:15, 82:16, 87:16, 88:6, 92:5, 92:6, 92:12, 96:15, 98:13, 99:13, 108:13, 158:11, 159:15, 159:19, 160:18, 161:3, 161:8, 175:17, 179:6, 201:25
**Pages** [1] - 1:7
**pages** [6] - 14:23, 14:25, 51:25, 55:7, 92:4, 155:10
**paid** [58] - 9:10, 13:8, 17:20, 20:16, 22:21, 50:10, 53:15, 53:17, 53:20, 53:21, 53:24, 54:2, 57:13, 57:17, 66:18, 66:19, 66:20, 66:21, 66:22, 68:20, 69:20, 70:7, 73:6, 73:7, 73:8, 93:6, 93:14, 106:16, 121:3, 138:23, 138:24, 139:9, 139:11, 142:8, 142:12, 143:16, 144:15, 145:14, 153:10, 153:14, 153:16, 163:20, 170:16, 170:18, 170:22, 171:11, 171:12, 171:16, 172:9, 172:15, 172:17, 172:18, 172:24, 181:1, 181:2, 191:14, 200:1
**pain** [4] - 61:25, 62:1, 83:16, 111:21
**paint** [2] - 55:11, 76:20
**PALM** [1] - 1:2
**Palmetto** [5] - 108:9, 109:3, 109:8, 110:16, 160:9
**Panama** [1] - 73:1
**pancreas** [1] - 14:14
**paper** [7] - 26:5, 87:24, 107:12, 107:17, 120:1, 165:14, 177:19
**paperwork** [7] - 53:7, 80:10, 83:7, 101:11, 113:16, 113:20, 118:21
**paragraph** [28] - 7:24, 9:24, 10:7, 10:8, 15:15, 48:16, 48:21, 48:22, 51:3, 51:6, 51:10, 51:13, 51:21, 52:10, 52:12, 53:2, 61:10, 65:13,

65:22, 66:24, 69:15, 95:5, 96:23, 97:12, 98:4, 99:2, 182:15, 208:7
**parameters** [1] - 26:17
**parents** [1] - 161:6
**part** [32] - 10:1, 11:11, 11:23, 15:5, 19:25, 31:18, 36:8, 47:11, 47:14, 47:15, 47:16, 53:6, 53:20, 77:11, 82:11, 99:5, 125:5, 126:17, 159:17, 162:1, 162:3, 162:17, 162:22, 163:1, 165:10, 169:10, 170:25, 176:15, 190:13, 216:18, 227:6
**Part** [4] - 54:1, 57:12, 94:14, 209:15
**partially** [1] - 64:22
**participant** [1] - 127:8
**participate** [1] - 205:18
**participated** [3] - 205:20, 205:25, 210:18
**particular** [11] - 41:20, 43:6, 52:1, 57:20, 81:25, 82:12, 85:25, 109:12, 109:18, 125:11, 160:24
**parts** [5] - 67:25, 82:5, 126:2, 166:8, 209:24
**party** [3] - 123:17, 123:21, 155:11
**pass** [1] - 167:11
**passed** [3] - 10:13, 90:11, 99:5
**past** [5] - 114:15, 114:18, 189:21, 189:22, 219:4
**Patek** [2] - 144:22, 144:25
**Patel** [137] - 5:7, 56:25, 57:3, 57:6, 57:7, 57:9, 58:13, 59:19, 60:14, 62:6, 74:18, 75:6, 75:10, 75:11, 76:2, 76:5, 76:6, 76:21, 77:13, 78:6, 79:2, 79:10, 79:16, 79:21, 79:22, 80:3, 80:4, 84:11, 84:17, 85:10, 85:12, 85:14, 85:17, 86:1, 86:9, 86:13, 87:10, 87:15, 87:23, 88:10, 88:14, 88:17, 88:20, 88:22, 93:20, 97:5, 100:24, 101:4, 101:8, 106:9, 108:3, 108:5, 108:14, 108:21, 109:21, 109:25, 110:11, 111:3, 111:9, 115:12, 116:6, 116:7, 116:9, 116:14, 116:18, 117:12, 117:22, 117:23, 120:5, 120:7, 120:14, 120:23, 120:24, 127:8, 133:1, 133:5, 133:10, 133:18, 133:21, 133:23, 133:24, 133:25, 134:1, 134:8, 135:18, 136:3,

136:18, 146:7, 153:19, 166:23, 167:2, 167:12, 167:16, 167:24, 168:19, 169:1, 169:8, 169:9, 169:25, 170:7, 170:17, 170:21, 170:24, 171:6, 171:11, 171:16, 173:13, 173:19, 173:23, 173:24, 174:3, 174:6, 174:7, 177:10, 177:13, 188:14, 188:20, 189:1, 189:5, 189:12, 189:20, 190:2, 190:8, 190:15, 191:10, 193:13, 196:12, 198:6, 200:17, 201:9, 201:14, 202:2, 202:10, 204:3, 209:1, 212:24, 213:1
**PATEL** [1] - 1:6
**Patel's** [6] - 57:20, 63:12, 124:22, 126:6, 204:3, 205:6
**paths** [1] - 155:4
**patient** [87] - 7:3, 8:10, 8:13, 8:14, 8:23, 10:4, 12:13, 14:5, 14:10, 15:16, 15:21, 15:25, 16:7, 18:4, 19:18, 19:23, 20:1, 20:8, 21:14, 21:20, 22:1, 22:14, 23:15, 28:15, 28:16, 30:21, 31:8, 31:13, 31:23, 31:25, 32:24, 35:17, 35:18, 35:22, 40:21, 47:2, 47:9, 47:19, 47:21, 48:18, 48:23, 49:5, 49:12, 49:13, 49:17, 49:19, 52:1, 52:2, 54:17, 55:12, 67:16, 70:17, 70:25, 94:17, 94:21, 95:6, 95:16, 96:7, 96:10, 96:22, 97:3, 98:7, 99:15, 99:19, 99:24, 100:7, 104:12, 111:13, 118:18, 119:1, 161:23, 161:24, 163:24, 165:10, 165:11, 166:12, 176:7, 176:8, 176:13, 176:16, 176:17, 176:23, 202:13, 206:9, 214:22
**patient's** [15] - 14:21, 15:12, 31:20, 32:4, 37:15, 48:1, 48:6, 49:1, 50:4, 52:15, 52:17, 52:22, 84:9, 94:5, 98:9
**patients** [51] - 9:1, 10:19, 11:21, 11:22, 12:25, 16:18, 17:14, 17:17, 21:1, 21:3, 32:16, 33:12, 33:13, 33:23, 34:17, 36:13, 45:17, 52:25, 55:8, 55:24, 56:5, 56:8, 66:6, 66:11, 70:10, 72:13, 77:6, 78:8, 86:15, 86:22, 94:4, 94:14, 95:3, 96:25, 97:22, 101:12, 103:16, 103:24, 104:2, 105:5, 105:8, 112:1,

154:23, 154:25, 155:11, 162:11, 202:15, 206:12, 209:4, 209:23, 209:25
**patients'** [1] - 90:12
**patterns** [2] - 72:7, 72:12
**pay** [23] - 9:4, 10:5, 60:1, 66:25, 68:25, 69:7, 71:25, 112:6, 142:7, 142:11, 145:7, 145:13, 145:21, 171:19, 172:7, 172:21, 172:22, 172:23, 173:1, 181:3, 199:13, 206:14
**paying** [15] - 32:20, 56:7, 58:17, 67:10, 69:1, 70:23, 71:2, 72:4, 75:5, 97:24, 120:8, 172:25, 173:9, 199:19, 208:8
**payment** [7] - 66:24, 69:19, 70:12, 148:19, 191:22, 192:11, 199:9
**payments** [5] - 109:12, 109:19, 143:17, 153:12, 170:25
**PC** [2] - 1:18, 2:3
**PDF** [2] - 27:14, 27:16
**Peachtree** [1] - 1:18
**Peactree** [1] - 2:6
**PECOS** [1] - 54:14
**PECOS-certified** [1] - 54:14
**pen** [1] - 165:14
**penalties** [2] - 142:5, 142:6
**penalty** [1] - 148:24
**pending** [4] - 39:25, 81:21, 81:22
**Pennsylvania** [1] - 110:1
**people** [30] - 8:22, 40:1, 59:11, 59:23, 76:25, 78:1, 78:2, 94:12, 97:10, 102:17, 117:24, 155:22, 158:5, 164:7, 164:23, 166:21, 167:7, 167:9, 168:24, 169:20, 170:2, 170:6, 170:10, 170:14, 171:17, 173:15, 206:4, 217:19, 225:18
**per** [2] - 32:23, 223:4
**perceived** [1] - 106:5
**percent** [23] - 17:23, 20:19, 20:20, 23:16, 39:10, 39:13, 40:15, 46:6, 67:1, 67:9, 67:13, 67:15, 67:17, 67:20, 94:20, 97:16, 97:23, 119:7, 119:9, 180:16, 182:20
**percentage** [8] - 68:20, 69:1, 124:7, 191:22, 191:23, 192:23, 199:14, 199:20
**percentage-based** [5] - 68:20, 69:1, 124:7, 191:22, 191:23
**percentages** [4] - 177:7,

177:10, 177:13, 177:14
**perfect** [6] - 92:11, 122:22, 221:9, 221:12, 222:23, 227:19
**perfectly** [2] - 37:9, 42:14
**perform** [1] - 56:7
**performed** [3] - 22:1, 22:4, 99:20
**period** [17] - 33:15, 34:6, 54:2, 62:9, 136:6, 138:25, 150:8, 160:10, 180:21, 184:10, 200:12, 200:23, 201:2, 203:11, 203:15, 203:19, 204:1
**perjury** [1] - 148:25
**permitted** [1] - 124:16
**person** [18] - 8:9, 8:13, 13:2, 60:22, 76:12, 85:8, 85:9, 85:15, 89:20, 101:22, 104:15, 160:24, 167:25, 169:10, 169:13, 169:15, 169:17, 174:24
**person's** [1] - 148:21
**personal** [18] - 15:3, 15:12, 27:15, 27:16, 28:3, 28:23, 29:24, 29:25, 30:5, 30:23, 48:19, 144:15, 160:3, 160:25, 161:11, 164:18, 168:2, 205:2
**personal/family** [1] - 48:7
**personally** [1] - 100:13
**persons'** [1] - 145:22
**perspective** [2] - 125:18, 125:22
**pertain** [1] - 127:10
**pertaining** [3] - 73:7, 124:16, 185:1
**pertains** [1] - 126:6
**PGx** [16] - 17:5, 57:22, 57:24, 67:7, 76:1, 95:11, 95:12, 105:2, 151:24, 156:15, 157:20, 159:24, 164:20, 197:16, 200:3, 200:15
**PGxs** [1] - 36:17
**Ph.D** [1] - 61:1
**pharma** [4] - 17:5, 17:20, 18:20, 55:18
**pharmaceuticals** [1] - 61:24
**pharmacies** [5] - 143:11, 143:13, 143:14, 143:19, 143:24
**pharmacy** [9] - 62:21, 82:2, 94:5, 94:13, 94:18, 115:4, 143:23, 146:18
**phase** [1] - 163:9
**Philippe** [2] - 144:22, 144:25
**phone** [29] - 8:10, 8:12,

16:16, 18:19, 32:11, 45:21, 47:23, 49:3, 49:14, 67:17, 73:9, 76:11, 76:13, 76:25, 93:25, 104:8, 104:9, 107:11, 118:19, 118:20, 136:5, 165:8, 165:11, 166:15, 167:9, 188:5, 203:14, 203:15, 204:25
**phones** [1] - 84:21
**phonetic** [3] - 25:14, 29:16, 101:1
**phrased** [1] - 86:14
**physical** [5] - 26:14, 86:14, 194:2, 194:4, 194:7
**physically** [7] - 33:24, 34:7, 34:16, 41:4, 61:2, 97:6, 175:8
**physician** [14] - 12:20, 26:5, 31:21, 81:6, 81:11, 96:22, 97:3, 97:13, 97:21, 98:5, 98:6, 99:8, 119:8, 157:14
**physician's** [2] - 93:3, 118:20
**physicians** [5] - 65:19, 71:25, 81:8, 96:20, 152:20
**Physicians** [7] - 60:5, 60:8, 60:18, 81:13, 152:25, 154:12, 168:13
**physicians'** [1] - 23:22
**pick** [3] - 74:12, 122:3, 214:4
**pickup** [1] - 218:1
**picture** [4] - 55:11, 76:20, 208:15, 222:2
**piece** [3] - 13:6, 177:19, 195:13
**pieces** [2] - 50:14, 176:6
**Piguet** [1] - 144:18
**pills** [3] - 17:8, 17:10
**pinpoint** [1] - 76:22
**pitch** [1] - 76:13
**place** [5] - 79:13, 170:25, 176:25, 183:5, 223:25
**placed** [1] - 127:12
**places** [1] - 217:19
**placing** [1] - 78:7
**plan** [15] - 9:3, 10:2, 12:6, 12:7, 12:9, 48:16, 48:22, 49:2, 215:25, 218:25, 219:11, 223:11, 223:22, 225:5, 226:11
**planning** [2] - 214:8, 219:8
**plans** [3] - 61:12, 62:13, 62:14
**platform** [3] - 58:15, 63:6, 63:7
**play** [1] - 225:18
**plays** [1] - 128:16
**plea** [15] - 112:21, 114:14,

177:22, 178:12, 178:15, 179:2, 179:11, 179:12, 179:13, 180:7, 180:11, 180:12, 180:13, 181:6
**plead** [2] - 114:11, 210:11
**pleading** [1] - 206:10
**pleas** [1] - 136:22
**pled** [6] - 113:24, 114:11, 178:16, 178:17, 184:23, 205:9
**plowing** [1] - 9:22
**plus** [1] - 142:13
**PM** [2] - 61:12
**pocket** [1] - 10:2
**point** [49] - 22:17, 35:3, 35:11, 36:2, 52:24, 53:25, 62:18, 68:6, 68:19, 68:24, 70:8, 71:21, 72:6, 76:9, 99:18, 101:3, 106:4, 106:13, 112:1, 112:8, 115:8, 115:25, 117:23, 118:3, 125:25, 127:4, 127:7, 127:11, 128:18, 147:12, 159:7, 160:2, 165:25, 170:15, 173:18, 175:10, 177:16, 183:17, 191:12, 193:5, 195:6, 195:14, 209:22, 209:23, 210:2, 219:18, 219:20, 224:11, 227:13
**points** [2] - 71:8, 205:9
**polyps** [3] - 13:16, 13:19, 159:21
**pony** [1] - 79:12
**populate** [1] - 104:6
**populated** [9] - 25:17, 29:8, 31:13, 80:6, 84:5, 84:6, 97:19, 104:16, 157:14
**populating** [1] - 41:3
**population** [1] - 155:21
**Porsche** [1] - 145:2
**portal** [41] - 23:21, 23:22, 24:1, 24:17, 25:17, 26:3, 26:4, 26:5, 26:14, 26:17, 33:5, 33:9, 34:19, 34:23, 34:24, 35:20, 45:20, 45:25, 46:8, 52:24, 55:5, 59:3, 59:10, 62:20, 79:2, 79:3, 81:6, 82:5, 82:9, 82:11, 82:18, 83:1, 84:12, 84:16, 84:24, 86:20, 89:6, 89:21, 90:8, 90:10, 93:22
**portals** [4] - 79:18, 80:2, 80:4, 80:5
**portion** [2] - 47:5, 50:18
**portions** [1] - 125:23
**posed** [1] - 85:2
**position** [8] - 128:17, 128:20, 136:7, 136:8, 138:20, 149:25, 152:19, 180:17

**positive** [3] - 22:5, 22:6, 48:24
**possession** [2] - 124:10, 193:6
**possibilities** [1] - 132:6
**possibility** [2] - 18:21, 100:15
**possible** [8] - 33:10, 78:21, 87:18, 104:5, 220:9, 221:10, 224:19, 225:15
**possibly** [1] - 93:7
**posts** [1] - 84:23
**potential** [3] - 78:8, 157:5, 169:21
**potentially** [9] - 18:20, 32:22, 52:16, 112:6, 157:19, 160:1, 160:25, 162:17, 200:4
**powerful** [1] - 23:2
**practice** [2] - 60:10, 63:8
**practices** [1] - 65:20
**pre** [6] - 28:1, 52:8, 84:5, 84:6, 97:19
**pre-checked** [2] - 28:1, 52:8
**pre-filled** [1] - 97:19
**pre-populated** [3] - 84:5, 84:6, 97:19
**prechecked** [1] - 206:7
**precisely** [1] - 130:24
**predicate** [3] - 128:18, 184:22, 195:16
**predict** [3] - 27:15, 27:18, 28:8
**predictor** [1] - 22:8
**preferences** [1] - 25:23
**prep** [3] - 186:21, 188:6, 190:6
**prepare** [1] - 220:20
**prepared** [8] - 66:12, 108:10, 134:23, 220:15, 220:16, 221:4, 221:17, 223:2
**preparing** [1] - 220:14
**prepopulated** [1] - 29:11
**prepped** [3] - 187:15, 187:17, 187:19
**prequalified** [1] - 157:10
**prescription** [6] - 54:16, 143:10, 143:15, 143:21, 144:1, 146:19
**prescriptions** [2] - 58:18, 72:5
**present** [9] - 5:4, 79:23, 79:24, 135:17, 148:6, 167:16, 173:16, 185:21, 187:6
**presentation** [4] - 76:15, 76:16, 216:21, 224:18
**presentations** [1] - 76:10
**presented** [6] - 15:9, 50:19, 72:19, 115:5, 156:16, 186:15

**presents** [1] - 48:18
**president** [10] - 64:13, 68:15, 68:17, 85:16, 131:9, 133:3, 133:7, 174:7, 207:3, 208:19
**pressure** [1] - 17:8
**presumably** [5] - 127:24, 128:8, 224:2, 224:12, 225:2
**pretenses** [1] - 138:10
**pretrial** [1] - 195:9
**pretty** [4] - 121:7, 132:13, 133:15, 133:16
**preventative** [1] - 11:1
**previous** [4] - 48:7, 50:17, 94:5, 195:22
**previously** [5] - 69:5, 94:17, 99:16, 206:23, 207:19
**price** [2] - 138:23, 138:24
**primarily** [1] - 170:3
**primary** [5] - 31:21, 32:15, 53:14, 118:19, 119:8
**print** [1] - 22:25
**printed** [3] - 34:19, 55:6
**prison** [1] - 140:2
**private** [5] - 12:6, 53:22, 57:4, 57:14, 99:7
**probability** [3] - 54:1, 112:4, 132:6
**probation** [9] - 140:7, 178:2, 178:8, 178:16, 178:17, 179:7, 179:17, 179:19, 180:2
**probative** [1] - 128:9
**problegate** [7] - 29:16, 83:18, 84:8, 89:21, 90:12, 110:16, 110:17
**problegated** [4] - 25:14, 30:7, 44:10, 112:3
**problem** [7] - 77:21, 93:19, 124:1, 128:22, 180:7, 180:12, 201:19
**proceed** [1] - 6:13
**Proceedings** [1] - 195:21
**proceedings** [3] - 113:15, 195:1, 228:5
**process** [39] - 7:3, 7:5, 19:17, 19:21, 23:15, 23:19, 23:20, 31:6, 33:1, 40:24, 47:1, 47:3, 48:14, 53:7, 53:10, 56:24, 57:15, 62:3, 62:24, 84:18, 92:1, 95:15, 95:24, 96:9, 96:15, 104:1, 104:18, 116:20, 118:18, 152:10, 152:13, 152:15, 152:17, 155:8, 162:1, 162:3, 162:5, 166:4, 206:2
**processes** [2] - 105:12, 159:4
**processing** [2] - 106:20, 106:23

**procuring** [1] - 106:16
**produced** [3] - 175:3, 175:7, 175:25
**product** [7] - 82:13, 84:9, 92:7, 92:14, 94:15, 94:18, 94:19
**production** [2] - 226:22, 226:24
**products** [2] - 94:13
**professionally** [1] - 49:7
**professionals** [2] - 8:15, 29:14
**proffer** [1] - 144:4
**profitable** [3] - 119:10, 146:23
**profits** [1] - 143:16
**program** [2] - 90:11, 184:6
**programers** [1] - 184:5
**programmed** [1] - 87:19
**programmer** [2] - 26:12, 89:22
**programmer's** [1] - 87:20
**prohibitive** [3] - 20:12, 32:18, 32:19
**promised** [1] - 113:6
**promote** [2] - 65:17, 69:16
**promulgate** [2] - 83:18, 157:5
**promulgated** [3] - 157:11, 157:13, 170:4
**proper** [1] - 88:14
**properly** [2] - 170:4, 179:22
**proposal** [2] - 214:3, 214:13
**proposition** [1] - 130:1
**prosecuting** [1] - 188:11
**prosecutor** [1] - 148:8
**prosecutors** [2] - 113:12, 188:10
**prospect** [1] - 211:21
**prospective** [2] - 94:3, 95:6
**protect** [2] - 149:10, 225:17
**protocol** [1] - 26:24
**provide** [9] - 56:4, 61:7, 97:5, 101:16, 103:20, 178:18, 179:3, 180:1, 183:2
**provided** [13] - 32:12, 43:16, 49:14, 50:11, 50:14, 96:4, 98:5, 98:24, 99:25, 128:1, 170:17, 174:20, 178:22
**Provider** [2] - 35:16, 35:21
**provider** [18] - 13:3, 22:3, 22:5, 22:19, 31:15, 32:16, 33:3, 34:24, 41:18, 41:20, 43:6, 56:2, 60:11, 61:12, 82:4, 99:21, 100:1, 177:2
**provider's** [1] - 84:11
**providers** [13] - 33:4, 35:15, 40:14, 65:20, 66:2, 66:8,

69:17, 70:9, 110:8, 110:11, 166:5, 169:15, 208:9
**providers'** [1] - 208:9
**provides** [1] - 111:18
**providing** [3] - 8:3, 197:18, 198:22
**publish** [4] - 128:12, 195:18, 196:21, 203:7
**published** [1] - 123:5
**publishing** [3] - 19:6, 195:6, 195:8
**pull** [4] - 37:3, 39:24, 49:1, 52:24
**purchase** [1] - 144:16
**purpose** [19] - 9:1, 9:4, 9:14, 10:23, 10:25, 11:15, 12:5, 16:17, 17:17, 18:15, 22:16, 40:3, 50:3, 50:6, 89:7, 116:10, 188:13, 197:19, 212:11
**purposes** [2] - 79:8, 220:14
**pursuant** [4] - 112:21, 153:10, 177:22, 193:7
**pushed** [5] - 23:21, 24:1, 24:8, 24:16, 26:18, 31:8, 78:2, 80:8, 85:2
**pushing** [1] - 44:24
**put** [27] - 19:14, 20:6, 26:13, 33:5, 40:21, 40:22, 55:16, 66:10, 77:7, 123:24, 124:24, 127:21, 128:13, 144:3, 145:21, 152:5, 152:6, 156:7, 164:7, 165:23, 166:13, 186:22, 186:23, 197:6, 214:11, 217:8
**puts** [1] - 217:3
**putting** [1] - 215:18

## Q

**qualifications** [4] - 13:9, 13:10, 54:12, 159:9
**qualified** [3] - 8:23, 13:23, 157:20
**qualify** [4] - 34:2, 36:1, 111:14, 164:24
**qualifying** [1] - 72:13
**quash** [2] - 223:13
**questioning** [1] - 157:17
**questionnaire** [12] - 31:18, 50:19, 156:11, 156:19, 159:10, 160:13, 163:6, 164:6, 167:17, 167:21, 168:4, 176:24
**questions** [60] - 10:9, 11:7, 12:14, 13:3, 13:13, 14:4, 14:16, 14:20, 14:23, 15:1, 15:3, 15:4, 15:12, 16:21, 18:10, 24:9, 25:13, 28:12, 28:17, 29:16, 30:23, 47:22,

49:10, 49:16, 55:19, 104:10, 111:16, 121:8, 131:18, 148:8, 157:3, 157:4, 157:13, 157:18, 158:1, 158:9, 159:20, 161:10, 167:24, 168:2, 178:9, 179:18, 186:12, 187:5, 187:6, 204:18, 206:17, 207:22, 207:24, 208:18, 209:4, 210:17, 211:11, 211:25, 212:2, 212:4, 212:6, 212:18, 212:19, 219:13
**quick** [3] - 57:13, 83:16, 221:11
**quickly** [4] - 122:21, 122:23, 202:24, 218:20
**quit** [1] - 115:20
**quite** [8] - 21:18, 22:23, 39:18, 52:12, 93:24, 118:6, 211:4, 219:4

## R

**radar** [1] - 5:11
**RAFFERTY** [7] - 2:5, 73:16, 223:9, 223:14, 224:19, 226:8, 226:19
**Rafferty** [2] - 223:11, 225:23
**raided** [2] - 204:4, 204:6
**raise** [1] - 76:13
**raised** [1] - 181:4
**raising** [1] - 16:8
**ramble** [1] - 186:12
**ran** [9] - 40:3, 40:4, 41:16, 72:21, 133:8, 150:3, 151:8, 155:3, 213:1
**randomly** [1] - 186:2
**range** [1] - 36:8
**rate** [3] - 40:15, 41:19, 177:17
**rather** [1] - 100:19
**Raton** [6] - 61:4, 85:18, 86:3, 86:4, 167:4, 185:18
**reach** [4] - 49:17, 94:4, 154:21, 155:20
**reactions** [5] - 10:16, 10:17, 11:12, 11:17, 17:2
**read** [26] - 10:8, 10:21, 12:16, 18:13, 21:19, 21:25, 22:9, 22:11, 22:23, 23:3, 24:6, 28:4, 37:20, 50:20, 52:18, 87:15, 107:14, 107:19, 108:6, 111:9, 182:15, 182:21, 182:22, 222:13, 226:6
**reader** [1] - 127:10
**reading** [5] - 8:25, 23:2, 24:13, 103:1, 161:18
**ready** [9] - 6:6, 6:14, 34:19,

77:14, 77:17, 107:24, 197:2, 217:6, 220:19

**Real** [4] - 60:5, 60:8, 60:17, 81:13

**real** [5] - 23:22, 60:10, 61:1, 189:5, 190:2

**real-time** [1] - 23:22

**realistic** [2] - 220:17, 222:10

**reality** [2] - 70:21, 97:15

**realize** [3] - 58:5, 138:20, 141:23

**really** [19] - 11:5, 40:3, 66:18, 67:11, 97:24, 110:10, 124:13, 124:21, 125:3, 125:4, 126:3, 130:21, 140:17, 146:21, 188:20, 222:7, 222:22, 223:1, 227:2

**realm** [1] - 157:21

**RealTime** [5] - 152:25, 154:10, 154:12, 154:14, 168:13

**reason** [12] - 39:3, 83:9, 101:15, 104:6, 128:3, 132:8, 132:17, 132:25, 159:23, 189:20, 200:23, 222:12

**reasons** [2] - 41:5, 198:22

**rebuttal** [1] - 7:23

**rebuttals** [1] - 159:16

**recalling** [1] - 5:10

**receive** [11] - 17:14, 57:2, 57:3, 104:1, 112:25, 113:2, 140:25, 141:2, 143:10, 163:7, 209:5

**Received** [1] - 3:10

**received** [44] - 7:13, 19:5, 21:11, 23:12, 23:21, 24:16, 33:5, 33:7, 36:25, 38:16, 44:1, 46:22, 56:20, 57:24, 58:2, 64:6, 67:5, 75:25, 77:7, 77:15, 80:20, 85:1, 87:5, 90:21, 102:9, 105:25, 107:7, 112:16, 117:7, 119:19, 123:12, 125:1, 134:13, 134:24, 135:12, 139:22, 139:24, 144:7, 161:24, 193:12, 196:8, 197:4, 203:6

**receives** [4] - 21:20, 99:24, 165:7, 165:8

**receiving** [16] - 16:4, 30:16, 67:11, 67:12, 67:13, 77:3, 77:4, 77:5, 77:12, 77:23, 78:16, 132:22, 135:10, 155:6, 169:24, 192:20

**recent** [4] - 31:25, 114:14, 142:10, 203:19

**recently** [1] - 102:22

**recess** [2] - 122:15, 227:23

**recessed** [4] - 74:6, 122:18, 215:23, 227:25

**recipient** [2] - 54:1, 191:7

**recognizance** [2] - 106:11, 109:22

**recognize** [10] - 7:18, 19:9, 37:5, 42:3, 81:1, 107:9, 123:25, 125:10, 125:13, 132:9

**recognizes** [2] - 123:22, 125:12

**recollect** [1] - 101:19, 101:21

**recollection** [3] - 147:10, 185:12, 185:20

**recollections** [1] - 102:21

**recommend** [4] - 65:18, 113:10, 113:23, 114:1

**recommended** [4] - 10:19, 11:20, 114:3, 114:4

**recommends** [1] - 15:25

**reconfirm** [1] - 104:12

**reconfirming** [1] - 161:17

**reconnaissance** [3] - 88:23, 197:21, 197:24

**record** [6] - 32:5, 74:7, 92:10, 122:19, 215:24, 224:15

**recorded** [2] - 95:7, 182:2

**records** [3] - 39:6, 46:4, 175:3

**recross** [1] - 212:20

**RECROSS** [2] - 3:6, 212:22

**RECROSS-EXAMINATION** [2] - 3:6, 212:22

**redirect** [3] - 127:3, 202:21, 204:14, 211:15, 213:8

**REDIRECT** [2] - 3:6, 204:16

**reduce** [1] - 52:14

**reduced** [2] - 87:16, 182:6

**reduction** [6] - 113:3, 113:6, 113:9, 113:11, 113:13, 211:22

**reference** [3] - 59:2, 94:22, 197:15

**referenced** [5] - 89:25, 182:19, 194:17, 196:2, 208:1

**references** [2] - 17:1, 126:12

**referencing** [1] - 26:9

**referral** [1] - 48:24

**referrals** [3] - 70:17, 70:25, 119:3

**referring** [13] - 71:16, 149:14, 150:7, 156:22, 175:10, 175:23, 178:4, 178:5, 178:7, 178:21, 178:22, 188:6, 196:22

**reflect** [3] - 66:18, 89:6, 203:14

**reflects** [1] - 192:10

**reformatted** [2] - 26:4, 27:24

**refresh** [7] - 58:11, 60:8, 83:6, 83:11, 137:21, 147:10, 185:20

**refreshed** [2] - 126:23, 186:15

**refreshes** [1] - 185:11

**refuse** [3] - 178:2, 179:3, 179:7

**refused** [2] - 133:24, 180:1

**regard** [2] - 138:12, 224:23

**regarding** [8] - 14:21, 57:3, 121:17, 178:9, 179:18, 191:1, 211:25, 217:21

**regardless** [2] - 124:16, 157:25

**REGINALD** [1] - 1:14

**region** [1] - 109:10

**regions** [1] - 110:19

**regular** [3] - 8:19, 53:18, 94:2

**regulations** [1] - 128:10

**reimburse** [3] - 9:17, 9:19, 50:9

**reimbursed** [5] - 22:21, 53:7, 106:13, 109:6, 198:4

**reimbursement** [2] - 97:21, 112:5

**reiterate** [1] - 10:5

**rejected** [1] - 177:14

**related** [2] - 116:12, 200:3

**relationship** [7] - 72:25, 75:6, 88:20, 88:25, 100:15, 119:1, 206:9

**relationships** [1] - 65:19

**relative** [2] - 11:8, 11:9

**relatives** [1] - 72:1

**release** [5] - 140:4, 140:10, 140:13, 141:3, 141:8

**released** [1] - 108:14

**relevance** [1] - 125:18

**relevant** [3] - 124:14, 125:6, 126:1

**reliability** [1] - 22:5

**relied** [4] - 124:20, 127:24, 180:4, 200:10

**rely** [1] - 32:7

**relying** [1] - 32:10

**remain** [1] - 122:3

**remaining** [1] - 213:20

**remember** [32] - 6:9, 45:19, 58:3, 58:8, 73:2, 75:12, 77:13, 85:14, 121:15, 126:19, 130:15, 136:3, 137:13, 137:14, 137:16, 156:3, 163:2, 177:7, 181:9, 181:12, 181:17, 184:12, 184:17, 185:9, 187:11, 189:15, 198:18, 201:4,

**reformatted** reformatted

201:10, 211:5, 217:10

**remind** [4] - 17:4, 165:16, 167:7, 217:6

**reminded** [1] - 211:5

**reminders** [2] - 121:14, 167:6

**removed** [1] - 140:22

**rendering** [1] - 224:13

**rep** [9] - 65:14, 65:17, 65:23, 66:25, 69:16, 86:20, 93:5, 104:8

**repeat** [3] - 25:18, 58:10, 92:3

**repeated** [1] - 10:4

**repetitive** [1] - 60:7

**reply** [4] - 223:21, 224:6, 226:5

**repopulate** [1] - 41:5

**report** [6] - 39:23, 98:8, 147:9, 174:9, 175:17, 190:14

**REPORTED** [1] - 1:20

**reported** [2] - 173:23, 174:7

**reporter** [1] - 134:5

**Reporter** [2] - 1:22, 228:9

**reports** [5] - 39:24, 40:3, 40:4, 41:16, 201:19

**represent** [1] - 135:3

**representation** [1] - 227:16

**representative** [3] - 58:13, 169:20, 209:16

**represented** [7] - 67:9, 80:5, 116:21, 117:19, 121:1, 204:20, 205:3

**reproducing** [1] - 90:9

**reps** [3] - 55:21, 75:4, 86:21

**req** [3] - 26:5, 89:1, 89:2

**reqs** [1] - 93:3

**request** [3] - 100:8, 101:18, 113:12

**requested** [3] - 91:18, 100:22, 102:22

**require** [2] - 183:2, 223:20

**required** [5] - 57:15, 92:7, 92:14, 160:4

**requirements** [2] - 104:3, 109:5

**requisite** [1] - 26:5

**requisition** [24] - 20:3, 22:18, 22:19, 25:22, 25:24, 25:25, 26:14, 27:24, 28:11, 28:19, 29:1, 31:16, 47:17, 50:17, 54:16, 85:4, 90:4, 96:6, 96:11, 96:19, 104:7, 104:15, 118:21, 170:18

**requisitions** [7] - 25:16, 27:10, 27:12, 90:10, 96:5, 96:20, 206:6

**rerouted** [1] - 40:14

**research** [2] - 121:17, 217:18

**reservation** [1] - 189:1
**reservations** [2] - 16:3, 189:18
**resort** [2] - 108:24
**respect** [2] - 75:2, 136:20
**respectfully** [2] - 34:9, 158:8
**respond** [4] - 10:18, 108:9, 120:10, 120:17
**responds** [2] - 108:14, 120:14
**response** [5] - 109:21, 125:11, 202:5, 223:12, 224:6
**response)** [1] - 137:10
**responses** [2] - 24:14, 158:2
**responsibility** [1] - 206:11
**responsible** [3] - 156:18, 202:13, 202:14
**rest** [1] - 151:18
**restate** [1] - 202:6
**restaurant** [7] - 85:12, 85:18, 85:21, 86:6, 189:17, 189:18, 190:12
**restful** [1] - 5:23
**restroom** [2] - 73:16, 215:21
**result** [3] - 22:7, 32:2, 139:19
**resulted** [1] - 138:25
**results** [19] - 22:6, 31:25, 32:15, 52:25, 54:18, 55:1, 55:2, 55:4, 55:5, 55:13, 55:15, 55:17, 55:24, 56:5, 98:1, 98:5, 99:7, 202:13, 202:14
**resume** [3] - 5:12, 5:25, 213:15
**reswab** [1] - 101:22
**reswearing** [1] - 6:11
**retro** [1] - 108:15
**return** [3] - 20:6, 38:24, 97:8
**returned** [5] - 37:16, 37:21, 101:10, 101:15, 195:21
**returns** [5] - 141:17, 141:19, 141:21, 141:23, 148:15
**reused** [1] - 94:15
**revenue** [4] - 67:1, 67:3, 67:4, 70:18
**reverify** [1] - 104:11
**review** [14] - 23:25, 27:5, 33:9, 44:20, 45:10, 68:2, 81:22, 83:8, 83:17, 88:14, 90:13, 96:4, 97:25, 103:20
**review/approve** [1] - 25:8
**reviewed** [6] - 12:20, 49:7, 76:18, 78:1, 98:5, 154:6
**reviewing** [2] - 49:15, 209:8

**reviews** [1] - 95:7
**revoked** [1] - 141:3
**reworked** [1] - 87:24
**Ricardo** [5] - 89:15, 89:18, 89:19, 90:7, 90:9
**rider** [1] - 87:24
**rise** [5] - 5:19, 74:9, 129:10, 142:14, 213:17
**risk** [5] - 10:12, 27:18, 28:8, 28:23, 52:16
**risks** [3] - 22:3, 48:8, 52:13
**RMR** [2] - 1:21, 228:9
**road** [1] - 222:12
**Rodolfo** [1] - 1:22
**RODOLFO** [1] - 1:10
**Rodriguez** [1] - 148:1
**Roebuck** [4] - 219:19, 219:21, 219:22, 222:13
**role** [6] - 58:12, 113:21, 113:24, 114:1, 114:3
**roles** [1] - 75:2
**Rolex** [3] - 144:18, 144:22, 144:24
**Romana** [1] - 85:22
**ROOKARD** [1] - 1:14
**room** [11] - 77:3, 77:4, 77:7, 77:12, 77:13, 77:14, 78:16, 88:4, 121:12, 121:22, 217:24
**roughly** [2] - 36:12, 40:4
**round** [3] - 5:18, 67:5, 129:8
**rounding** [1] - 67:13
**routed** [1] - 80:9
**routing** [2] - 108:10, 110:12
**Royal** [1] - 144:18
**RPR** [2] - 1:21, 228:9
**RUIZ** [1] - 1:10
**Ruiz** [1] - 1:22
**rule** [2] - 224:12, 226:24
**Rule** [2] - 181:6, 181:17
**rules** [2] - 210:1, 217:7
**ruling** [5] - 195:10, 224:11, 224:14, 225:8, 226:23
**run** [8] - 32:22, 54:20, 54:21, 54:24, 67:6, 101:19, 114:15, 121:20
**running** [2] - 67:14, 110:1
**RX** [3] - 61:13, 61:20, 61:21

**S**

**S-1** [5] - 123:20, 123:21, 125:9, 127:15, 127:16
**SADOW** [105] - 1:17, 1:18, 3:5, 3:6, 5:16, 7:10, 13:22, 19:1, 21:9, 23:9, 33:14, 33:25, 34:9, 36:23, 38:13, 43:24, 46:20, 56:18, 64:1, 80:17, 87:2, 90:18, 102:5, 105:20, 107:5, 112:12,

117:3, 119:16, 122:13, 123:9, 123:20, 125:12, 126:10, 127:20, 127:25, 128:7, 128:12, 129:5, 129:21, 129:23, 130:10, 130:14, 134:20, 134:25, 135:2, 147:6, 147:13, 147:15, 147:17, 152:2, 152:4, 160:18, 160:19, 161:3, 161:4, 161:8, 161:9, 173:25, 174:2, 175:13, 175:15, 175:17, 175:18, 182:12, 182:14, 193:24, 194:4, 194:9, 194:21, 195:7, 195:14, 195:17, 195:19, 196:1, 196:10, 196:16, 196:18, 196:21, 196:24, 197:6, 197:7, 197:9, 197:11, 201:22, 201:24, 202:7, 202:17, 202:22, 202:24, 203:1, 203:7, 203:10, 204:12, 212:19, 212:23, 213:3, 213:7, 218:20, 218:22, 226:15, 226:18, 226:20, 227:12, 227:18, 227:20
**Sadow** [8] - 126:9, 127:18, 128:4, 129:4, 129:18, 219:8, 221:7, 221:15
**Sadow's** [1] - 35:3
**safe** [2] - 132:13, 218:3
**sale** [1] - 156:10
**sales** [17] - 7:23, 65:14, 65:17, 65:23, 66:25, 69:15, 69:16, 76:10, 76:21, 84:24, 98:16, 152:11, 156:6, 156:7, 156:10, 165:10, 168:1
**salespeople** [2] - 8:19, 84:21
**Saliba** [12] - 85:15, 88:18, 173:19, 173:23, 174:3, 174:6, 197:12, 197:18, 198:5, 198:6, 198:24
**saliva** [7] - 8:3, 8:20, 9:10, 15:17, 88:2, 165:23, 166:13
**sample** [2] - 57:20, 165:19
**samples** [8] - 72:2, 76:1, 100:18, 100:22, 101:11, 163:22, 169:21, 169:22
**Samuel** [1] - 222:21
**SAMUEL** [5] - 2:2, 2:3, 219:15, 222:23, 223:1
**Samuel's** [1] - 219:19
**Santa** [2] - 89:16, 89:22
**satisfy** [1] - 128:21
**saw** [6] - 73:13, 155:3, 162:23, 188:7, 208:14
**scar** [1] - 62:1
**scenario** [2] - 104:8, 221:12
**schedule** [10] - 67:7, 98:7,

214:17, 214:18, 215:16, 216:4, 216:20, 216:24, 217:3, 225:11
**scheduled** [1] - 167:8
**schedules** [1] - 225:18
**scheduling** [6] - 216:18, 220:21, 222:19, 224:21, 225:14, 226:12
**scheme** [3] - 150:15, 150:18, 205:20
**schemed** [1] - 150:17
**schemes** [1] - 212:1
**screen** [5] - 38:5, 38:7, 43:17, 46:2, 130:18
**screening** [2] - 90:4, 164:23
**screenshot** [8] - 38:4, 38:21, 43:12, 43:16, 43:21, 82:17, 107:11, 108:5
**screenshots** [2] - 80:25, 84:15
**script** [57] - 7:20, 7:22, 7:23, 8:14, 8:25, 9:8, 11:7, 11:23, 12:1, 12:12, 13:12, 14:25, 15:7, 16:21, 16:25, 18:15, 19:18, 19:19, 24:7, 24:9, 24:13, 29:15, 32:11, 41:3, 72:17, 76:17, 76:18, 78:10, 98:21, 98:24, 156:6, 156:7, 156:21, 156:25, 157:2, 157:7, 157:8, 157:11, 157:18, 157:23, 157:24, 157:25, 158:1, 158:9, 158:14, 161:13, 161:15, 162:15, 162:24, 162:25, 165:1, 165:10, 206:3
**scripts** [8] - 24:6, 72:14, 72:17, 80:6, 84:22, 156:15, 170:21, 184:2
**scroll** [1] - 87:22
**search** [4] - 174:18, 184:17, 184:18, 185:3
**seated** [9] - 5:2, 5:21, 74:2, 74:11, 121:25, 129:12, 213:19, 216:10, 218:6
**second** [45] - 5:7, 11:11, 12:10, 12:16, 18:11, 31:6, 31:10, 32:25, 37:10, 38:18, 42:2, 42:9, 42:15, 44:13, 51:20, 52:12, 53:10, 54:18, 66:23, 74:24, 75:18, 75:20, 75:21, 75:24, 78:5, 79:4, 79:5, 79:13, 79:15, 81:2, 81:4, 92:6, 107:21, 112:20, 123:2, 166:20, 168:10, 169:3, 169:6, 169:11, 172:13, 174:8, 174:13, 196:16
**secret** [3] - 95:2, 95:4, 136:15

**Secretary** [1] - 191:8
**section** [4] - 9:9, 49:2, 98:1, 152:18
**SECTION** [1] - 1:15
**Section** [6] - 92:7, 92:14, 94:3, 94:22, 95:22, 96:17
**SECURITY** [4] - 5:19, 74:9, 129:10, 213:17
**See** [1] - 111:10
**see** [141] - 5:5, 5:22, 7:17, 8:2, 9:12, 11:7, 12:15, 12:22, 13:12, 13:14, 13:17, 14:4, 14:16, 14:25, 15:19, 15:23, 16:5, 16:20, 16:21, 18:2, 18:7, 21:24, 24:20, 25:2, 27:19, 27:25, 29:20, 30:1, 30:11, 30:14, 37:9, 37:23, 38:4, 38:6, 38:23, 39:5, 39:24, 42:5, 42:14, 42:17, 42:25, 43:14, 43:17, 44:3, 44:15, 46:3, 48:3, 48:10, 48:16, 49:6, 51:15, 59:4, 60:19, 61:14, 63:9, 63:16, 64:16, 65:14, 65:23, 69:10, 69:15, 70:19, 71:13, 71:21, 72:9, 79:11, 82:1, 82:18, 84:18, 85:3, 87:16, 87:25, 88:6, 89:25, 91:2, 91:11, 91:14, 92:16, 92:18, 94:4, 94:22, 95:13, 98:2, 98:19, 99:9, 100:5, 100:9, 102:24, 103:2, 103:8, 103:18, 103:22, 103:24, 105:6, 107:13, 108:7, 108:11, 108:16, 108:19, 109:23, 111:21, 119:24, 120:2, 120:3, 120:7, 120:12, 120:15, 120:18, 121:23, 122:14, 126:25, 127:9, 128:16, 130:1, 130:13, 130:18, 145:3, 152:22, 154:7, 155:12, 157:3, 165:25, 168:20, 169:25, 171:20, 171:21, 175:20, 182:16, 185:11, 198:3, 198:9, 202:19, 206:24, 207:9, 215:8, 218:3, 218:10, 220:8, 221:3, 226:20, 227:22
**seeing** [2] - 110:3, 193:25
**seek** [3] - 125:22, 196:1, 196:24
**seeking** [1] - 200:5
**seeks** [1] - 160:23
**select** [2] - 30:18, 38:24
**selection** [1] - 96:8
**sell** [1] - 65:17
**selling** [1] - 62:12
**send** [21] - 19:15, 19:19, 20:7, 21:3, 25:8, 26:11, 27:5, 52:25, 73:10, 87:17, 88:17,

100:18, 100:22, 101:5, 101:21, 110:11, 118:20, 118:21, 166:14, 176:22
**sending** [17] - 27:9, 27:10, 35:9, 36:11, 36:13, 41:15, 49:15, 55:3, 87:23, 88:13, 89:7, 89:15, 117:20, 120:24, 121:4, 202:13, 202:14
**sends** [5] - 23:16, 25:2, 31:8, 108:5, 126:14
**senior** [1] - 17:7
**seniors** [2] - 17:6, 99:3
**sense** [17] - 11:18, 25:8, 27:5, 36:2, 58:19, 106:23, 109:9, 128:2, 187:5, 213:19, 221:24, 222:22, 224:17, 225:22, 226:7, 226:23, 227:17
**sent** [39] - 19:13, 20:18, 20:23, 22:15, 22:20, 23:17, 26:24, 28:17, 28:20, 29:1, 32:8, 33:7, 34:19, 35:15, 40:1, 41:21, 49:8, 88:10, 91:2, 91:25, 95:16, 96:11, 98:8, 98:24, 99:11, 106:23, 126:17, 128:3, 130:23, 131:14, 135:4, 141:5, 162:8, 162:9, 193:7, 193:16, 194:12, 207:12
**sentence** [7] - 112:25, 113:3, 113:6, 113:9, 113:10, 182:6, 211:22
**sentenced** [3] - 112:23, 113:14, 181:15
**sentences** [1] - 139:22
**sentencing** [2] - 114:7, 181:4
**separate** [5] - 59:16, 92:19, 92:23, 93:1, 226:21
**separately** [1] - 87:18
**September** [2] - 104:24, 203:16
**sequence** [1] - 110:17
**series** [8] - 14:14, 18:18, 33:4, 54:6, 80:24, 112:6, 131:18, 155:3
**serious** [1] - 50:22
**served** [2] - 139:25, 185:3
**serves** [1] - 22:7
**service** [10] - 16:2, 55:21, 75:6, 166:15, 168:22, 169:20, 170:2, 170:6, 217:13, 217:21
**Services** [19] - 8:2, 8:6, 8:7, 65:4, 65:5, 98:16, 98:18, 103:11, 148:2, 162:9, 162:17, 162:19, 162:22, 162:25, 163:13, 163:15, 173:16, 207:23, 208:4
**services** [6] - 62:13, 65:18,

66:2, 67:10, 69:17, 162:12
**session** [1] - 100:8
**sessions** [3] - 186:21, 188:6, 190:7
**set** [8] - 18:11, 58:13, 102:21, 224:2, 225:6, 225:24, 225:25, 226:9
**settle** [2] - 172:9, 216:12
**seven** [1] - 165:12
**several** [7] - 14:23, 14:25, 36:16, 36:17, 101:17, 124:12, 142:16
**share** [2] - 86:12, 198:23
**shared** [4] - 96:20, 99:7, 198:9, 198:10
**sharing** [3] - 16:3, 198:5, 199:3
**Shawn** [1] - 218:9
**sheet** [4] - 14:13, 30:9, 83:17, 197:16
**shell** [1] - 144:6
**shift** [1] - 112:19
**shifted** [1] - 139:8
**ship** [2] - 18:9, 18:10
**shipments** [1] - 95:10
**shipped** [6] - 19:24, 24:15, 76:1, 85:1, 140:23, 163:11
**shipping** [9] - 77:3, 77:4, 77:5, 77:12, 77:14, 77:23, 78:15, 169:24
**ships** [2] - 95:8, 163:12
**shook** [1] - 78:13
**shoot** [1] - 223:3
**shop** [1] - 118:2
**short** [5] - 108:25, 140:21, 184:10, 219:4, 222:3
**short-stopped** [1] - 140:21
**shorter** [2] - 219:2, 224:4
**shortly** [1] - 13:6
**shorts** [1] - 140:20
**show** [36] - 21:13, 24:18, 29:18, 37:14, 38:3, 38:18, 47:1, 58:20, 60:12, 68:4, 69:8, 71:10, 78:23, 79:12, 87:8, 89:9, 93:22, 102:13, 104:19, 110:24, 134:20, 147:14, 147:16, 158:2, 174:17, 178:21, 178:23, 185:4, 185:11, 193:21, 193:22, 193:24, 197:9, 201:21, 206:22, 213:3
**showed** [10] - 43:12, 79:1, 79:17, 80:2, 80:3, 80:7, 80:8, 80:12, 123:5, 153:11
**showing** [9] - 64:8, 68:9, 80:23, 90:24, 102:15, 104:5, 107:9, 119:22, 194:10
**shown** [5] - 76:5, 84:17, 116:21, 123:25, 213:5
**shows** [5] - 37:15, 125:21,

170:24
**shut** [2] - 118:2, 184:19
**sic** [1] - 17:5
**sic]** [1] - 147:5
**side** [25] - 28:18, 31:6, 31:9, 32:9, 46:14, 75:3, 75:4, 78:4, 78:5, 78:22, 82:4, 85:3, 106:24, 119:8, 129:3, 157:14, 165:3, 166:1, 169:24, 169:25, 183:2, 220:18, 223:8, 223:20
**sidebar** [1] - 195:1
**sides** [3] - 165:2, 173:5, 183:6
**sideways** [1] - 103:1
**sign** [24] - 20:2, 20:16, 22:16, 22:17, 33:9, 39:3, 44:20, 66:16, 66:21, 68:16, 70:5, 73:8, 73:10, 83:8, 90:13, 93:14, 97:25, 143:10, 161:21, 170:18, 181:21, 183:10, 209:15
**signatory** [1] - 144:12
**signature** [12] - 13:6, 20:1, 20:3, 21:14, 22:18, 40:21, 40:22, 68:9, 81:22, 96:7, 161:21, 176:16
**signed** [20] - 13:3, 20:20, 23:18, 26:3, 35:16, 43:5, 43:6, 52:23, 64:16, 68:18, 71:8, 81:17, 98:5, 98:6, 135:14, 161:24, 184:22, 207:10, 207:14, 208:19
**significant** [2] - 18:5, 18:6
**signing** [3] - 44:23, 82:23, 206:9
**similar** [12] - 14:16, 14:25, 49:2, 62:3, 83:1, 83:3, 98:21, 105:10, 110:18, 127:15, 156:10, 219:1
**similarly** [1] - 217:15
**simple** [5] - 12:13, 67:11, 99:3, 119:5, 130:1
**simple-to-use** [1] - 99:3
**simply** [2] - 41:20, 114:7
**single** [7] - 14:3, 61:22, 106:3, 154:5, 176:7, 177:19, 211:18
**sit** [1] - 34:12
**sitting** [4] - 33:8, 34:19, 148:4, 188:2
**situation** [1] - 159:24
**six** [1] - 136:21
**skin** [1] - 13:14
**Slagle** [48] - 15:7, 25:2, 25:11, 26:9, 26:20, 27:2, 30:4, 30:16, 36:12, 61:8, 64:10, 72:20, 72:24, 91:7, 102:17, 106:17, 115:6, 115:13, 121:5, 131:23,

132:10, 133:18, 133:22,
152:6, 156:8, 156:16,
156:17, 158:18, 158:20,
158:24, 159:1, 159:8,
174:17, 174:22, 175:1,
175:5, 175:9, 175:19,
175:21, 175:22, 175:24,
175:25, 184:4, 184:8, 200:7,
200:10, 207:5
**Slagle's** [4] - 26:25, 27:7,
36:4, 200:1
**slightly** [1] - 73:11
**slim** [2] - 56:6, 211:24
**slip** [1] - 156:10
**slowly** [2] - 21:19, 21:25
**Smith** [5] - 33:5, 34:4, 34:8,
34:17, 97:8
**smooch** [1] - 165:18
**smoosh** [1] - 165:17
**snapshot** [1] - 46:12
**So's** [1] - 7:25
**so..** [1] - 159:3
**SOAP** [3] - 23:25, 31:19,
47:15
**social** [2] - 121:19, 217:20
**software** [1] - 185:23
**sold** [3] - 11:1, 180:22,
180:23
**sole** [2] - 97:13, 152:19
**solely** [1] - 124:6
**solicit** [1] - 8:7
**solicitation** [1] - 66:6
**solicited** [4] - 20:25, 94:14,
94:18, 164:23
**soliciting** [4] - 12:8, 12:24,
164:15, 164:17
**solid** [1] - 167:25
**solve** [1] - 124:1
**someone** [9] - 26:13, 89:15,
128:1, 129:7, 159:7, 160:12,
161:10, 163:5, 220:3
**sometime** [5] - 36:4, 36:7,
62:18, 71:5, 184:14
**sometimes** [6] - 34:6, 40:6,
53:22, 73:8, 166:17, 167:10
**somewhere** [2] - 36:8,
211:2
**son** [8] - 115:1, 115:11,
183:14, 183:17, 183:24,
185:12, 185:21
**sons** [1] - 16:10
**soon** [4] - 33:10, 35:15,
224:2, 224:5
**sooner** [1] - 53:17
**sorry** [25] - 22:11, 25:18,
39:19, 52:11, 55:10, 77:19,
79:4, 92:9, 93:18, 94:25,
146:22, 147:15, 147:24,
155:14, 161:23, 171:3,
178:6, 187:16, 189:7, 191:5,

192:13, 202:4, 202:22,
219:22, 220:5
**sort** [14] - 7:3, 11:18, 16:22,
17:7, 24:2, 35:17, 41:14,
62:17, 81:8, 121:2, 128:19,
215:2, 221:3, 224:13
**sorts** [1] - 157:4
**sound** [3] - 199:17, 199:18,
204:8
**sounds** [4] - 126:23,
182:23, 204:9, 221:14
**South** [1] - 167:3
**Southern** [2] - 136:22,
139:1
**SOUTHERN** [1] - 1:1
**space** [4] - 61:11, 61:13,
62:2, 169:5
**speaking** [7] - 30:21, 33:12,
33:13, 36:12, 118:18, 166:5,
189:15
**Special** [2] - 148:3, 173:14
**specialist** [1] - 48:25
**specializes** [1] - 8:2
**specific** [18] - 14:12, 27:13,
28:1, 28:22, 35:7, 48:23,
52:1, 52:2, 52:4, 52:7, 81:10,
84:8, 88:11, 125:21, 164:12,
172:14, 176:1
**specifically** [7] - 31:12,
54:8, 54:10, 83:25, 84:17,
131:17, 141:16
**specifics** [1] - 183:2
**specify** [1] - 33:21
**specimen** [18] - 20:1, 20:6,
20:17, 22:19, 40:23, 67:6,
70:17, 76:1, 77:5, 95:8,
95:10, 95:23, 101:19,
101:20, 101:21, 161:19,
162:8, 165:6
**specimens** [7] - 77:10,
77:24, 161:25, 163:11,
163:22, 168:24, 169:25
**spectrum** [1] - 211:7
**spend** [1] - 183:12
**spent** [3] - 45:16, 150:2,
180:14
**spill** [1] - 220:11
**spills** [1] - 220:10
**spoken** [2] - 34:17, 199:13
**sponsored** [1] - 12:6
**Sporn** [101] - 5:10, 6:2, 6:7,
6:8, 6:10, 6:18, 7:17, 10:9,
12:12, 15:15, 17:13, 19:9,
20:22, 21:13, 22:14, 23:14,
24:19, 27:23, 33:20, 34:3,
35:3, 37:5, 37:13, 37:23,
38:3, 38:23, 39:9, 42:3,
42:11, 43:2, 43:11, 43:14,
43:16, 44:4, 44:18, 45:5,
45:14, 46:1, 46:25, 47:6,

53:9, 54:3, 56:23, 63:11,
64:8, 65:13, 66:16, 67:16,
68:6, 68:19, 71:7, 73:11,
74:17, 80:23, 85:25, 87:8,
89:11, 90:24, 92:3, 93:18,
94:17, 95:20, 98:13, 100:14,
102:12, 104:20, 106:2,
107:9, 107:21, 109:2,
112:19, 114:10, 115:10,
116:1, 117:9, 119:22, 121:8,
121:9, 122:2, 122:24, 123:1,
123:14, 123:17, 124:25,
125:7, 125:10, 129:7,
129:19, 189:12, 191:8,
202:1, 204:18, 206:12,
206:17, 210:17, 212:11,
212:17, 212:25, 213:10,
219:1, 221:11
**Sporn's** [1] - 124:9
**Spouse** [1] - 18:2
**spreadsheet** [6] - 37:5,
37:14, 39:10, 42:3, 43:6,
184:4
**spreadsheets** [3] - 39:20,
110:14, 110:15
**Spur** [1] - 145:3
**squeezed** [1] - 129:14
**staff** [6] - 49:8, 49:14, 68:2,
72:1, 77:25, 93:14
**stages** [2] - 200:14, 205:23
**stagnant** [1] - 45:20
**stamp** [10] - 17:25, 47:5,
47:25, 49:6, 49:23, 51:21,
52:10, 92:7, 96:16, 100:4
**stamped** [6] - 15:14, 34:23,
45:19
**stand** [7] - 6:2, 6:11, 9:20,
61:16, 61:20, 129:8, 211:23
**standing** [2] - 76:7, 215:14
**Star** [6] - 150:25, 151:3,
151:7, 151:12, 151:15
**star** [1] - 151:2
**stars** [1] - 151:15
**start** [22] - 10:24, 15:16,
24:25, 44:15, 45:6, 45:8,
47:4, 58:21, 70:9, 123:15,
130:2, 130:10, 136:18,
142:1, 155:21, 197:25,
206:2, 206:3, 217:2, 225:2,
225:7, 226:13
**started** [20] - 6:12, 15:5,
17:9, 35:14, 36:3, 36:14,
55:3, 62:10, 72:24, 92:2,
115:5, 115:7, 115:13,
129:15, 142:2, 148:16,
158:19, 192:11, 200:15,
218:1
**starting** [7] - 7:16, 7:24,
61:11, 159:16, 218:15,
219:11, 220:24

**starts** [4] - 27:7, 48:18,
50:21, 51:13
**State** [1] - 191:8
**state** [9] - 33:3, 33:4, 40:14,
41:18, 49:9, 63:6, 63:7,
96:21, 125:22
**state-of-the-art** [2] - 63:6,
63:7
**statement** [6] - 53:1,
136:21, 161:18, 179:14,
191:4, 191:6
**Statement** [1] - 148:24
**statements** [5] - 137:1,
137:4, 138:21, 180:6, 180:15
**States** [6] - 1:23, 5:7, 6:8,
105:16, 107:3, 228:10
**STATES** [4] - 1:1, 1:3, 1:10,
1:15
**states** [7] - 8:20, 15:16,
15:22, 27:14, 27:17, 42:9,
166:17
**stating** [1] - 55:16
**status** [3] - 37:19, 37:20,
40:25
**statuses** [7] - 39:24, 40:16,
40:19, 40:24, 41:1, 41:6,
80:9
**statute** [1] - 124:15
**Statute** [2] - 124:17, 125:19
**stay** [4] - 99:7, 121:18,
217:17, 217:20
**stayed** [1] - 140:24
**staying** [1] - 108:24
**steady** [1] - 40:11
**steal** [3] - 137:4, 137:8,
137:24
**steer** [1] - 217:23
**Stein** [9] - 116:5, 116:7,
116:9, 188:16, 189:12,
189:14, 199:4, 199:6
**Steinberg** [1] - 116:5
**STENOGRAPHICALLY** [1]
- 1:20
**step** [13] - 7:5, 19:20,
23:19, 23:20, 53:9, 122:2,
123:2, 157:10, 157:21,
158:3, 161:12, 205:14
**stepping** [1] - 123:4
**steps** [4] - 82:25, 84:24,
211:14
**Steve** [1] - 208:18
**Steve's** [1] - 222:24
**Steven** [15] - 68:13, 68:14,
91:20, 131:5, 131:8, 131:9,
132:11, 133:1, 133:3, 133:6,
135:13, 135:14, 135:16,
191:6, 209:1
**STEVEN** [2] - 1:17, 1:18
**stick** [2] - 78:5, 215:5
**sticker** [1] - 197:9

**sticking** [1] - 19:16
**still** [12] - 50:3, 107:19, 142:4, 163:17, 163:23, 176:10, 178:20, 182:10, 185:7, 216:4, 222:11, 223:16
**stole** [1] - 137:16
**stop** [10] - 10:21, 74:24, 75:18, 78:8, 85:25, 162:6, 164:1, 183:20, 183:22, 214:4
**stopped** [3] - 109:20, 140:21, 212:16
**stops** [1] - 223:25
**stored** [1] - 77:24
**story** [1] - 126:20
**straight** [2] - 127:7, 201:20
**strange** [1] - 95:2
**Street** [2] - 1:18, 2:6
**stricken** [1] - 222:13
**strictly** [2] - 62:19, 63:4
**strong** [1] - 23:1
**struck** [1] - 7:1
**struggling** [1] - 126:25
**stuck** [1] - 83:10
**stuff** [5] - 141:14, 142:10, 142:11, 155:5, 164:3
**subcontracted** [1] - 166:18
**subject** [10] - 25:7, 26:10, 27:4, 91:14, 102:20, 105:2, 105:4, 177:21, 196:3, 201:14
**submission** [3] - 98:16, 103:21, 165:13
**submit** [3] - 84:23, 138:4, 161:14
**submitted** [7] - 53:5, 57:14, 67:24, 83:18, 83:20, 93:8, 113:12
**submitting** [2] - 69:5, 70:22
**subsequent** [1] - 78:25
**substantial** [6] - 73:4, 120:20, 121:6, 121:7, 182:23, 182:24
**substantive** [2] - 125:3, 128:5
**substitute** [1] - 180:25
**successful** [1] - 95:23
**successfully** [1] - 148:22
**sudden** [1] - 70:9
**sufficiently** [1] - 13:25
**suggest** [4] - 135:17, 179:1, 220:20, 225:12
**suggested** [1] - 96:7
**suggesting** [1] - 183:8
**suggests** [1] - 191:13
**Suite** [4] - 1:19, 2:6, 185:16, 186:4
**suite** [1] - 77:22
**suites** [1] - 77:22
**sum** [3] - 57:8, 71:2, 211:2
**summary** [9] - 47:8, 47:11,

50:16, 85:4, 134:22, 135:3, 135:9, 203:14, 206:8
**supervise** [1] - 140:14
**supervised** [5] - 140:4, 140:9, 140:13, 141:3, 141:8
**Supplies** [2] - 151:1, 151:2
**supplies** [2] - 95:10, 140:20
**supply** [2] - 138:13, 138:16
**supporting** [1] - 103:21
**supposed** [1] - 143:23
**surveillance** [1] - 185:7
**survey** [1] - 155:5
**swab** [4] - 19:12, 19:13, 20:4
**swabbed** [1] - 23:17
**switch** [4] - 37:2, 56:11, 62:16, 73:11
**switched** [1] - 70:13
**symptoms** [3] - 111:18, 111:23, 112:2
**system** [17] - 7:4, 25:15, 26:8, 27:24, 29:5, 35:14, 41:7, 47:22, 83:9, 85:2, 106:20, 108:18, 108:20, 110:13, 110:22, 152:11, 184:5
**systems** [2] - 62:24, 84:19

## T

**tab** [1] - 42:9
**table** [1] - 148:4
**tabs** [2] - 42:5, 82:4
**target** [1] - 219:9
**targeted** [1] - 61:21
**targeting** [3] - 12:9, 53:13, 53:17
**tax** [15] - 114:12, 141:17, 141:19, 141:21, 141:23, 142:4, 142:7, 142:15, 145:24, 146:1, 146:4, 146:10, 148:15, 149:17, 149:23
**taxes** [14] - 141:14, 141:15, 141:16, 142:8, 142:11, 144:4, 145:7, 145:11, 145:12, 145:13, 145:14, 148:19, 148:23
**team** [5] - 5:14, 84:1, 88:22, 95:7, 111:11
**teams** [1] - 98:6
**technically** [1] - 184:1
**techs** [1] - 104:7
**teledoc** [1] - 32:24
**teledocs** [3] - 52:21, 56:7, 118:25
**telehealth** [21] - 58:15, 60:9, 62:14, 63:6, 63:7, 75:4, 75:25, 93:13, 106:24, 116:12, 118:14, 119:8,

162:10, 162:20, 169:10, 169:13, 169:16, 169:18, 171:6
**telemarketer** [4] - 28:16, 31:14, 32:20, 161:12
**telemarketers** [11] - 30:22, 32:8, 68:1, 76:23, 78:7, 84:21, 155:25, 156:20, 158:6, 162:14, 167:15
**telemarketing** [37] - 19:18, 24:13, 58:18, 66:5, 67:16, 75:3, 75:23, 78:5, 93:12, 94:10, 114:21, 131:12, 133:17, 133:19, 134:8, 135:24, 143:7, 154:18, 154:21, 155:20, 157:9, 162:1, 162:5, 162:22, 163:1, 163:17, 163:20, 163:23, 164:10, 173:2, 183:18, 191:17, 206:3, 206:19, 210:8, 210:11, 210:14
**telemed** [5] - 54:4, 56:4, 93:22, 119:4, 119:10
**telemedicine** [45] - 28:18, 31:6, 31:9, 31:11, 31:12, 32:9, 33:1, 46:13, 49:8, 61:11, 63:1, 78:22, 78:24, 92:19, 92:23, 92:25, 95:17, 96:17, 96:19, 114:21, 133:17, 133:20, 152:17, 152:18, 152:19, 152:20, 152:21, 152:23, 153:3, 153:14, 153:15, 153:16, 153:25, 154:8, 154:11, 157:21, 162:3, 162:18, 163:9, 163:10, 163:17, 213:1
**telephone** [3] - 96:21, 97:2, 203:11
**telephonic** [1] - 188:7
**telephony** [2] - 94:23, 95:2
**temperature** [1] - 88:4
**ten** [2] - 170:14, 215:21
**tenens** [1] - 54:7
**tennis** [2] - 144:17, 144:23
**term** [1] - 72:25
**terminated** [1] - 204:6
**terminology** [3] - 157:15, 157:20, 162:12
**terms** [10] - 66:24, 69:19, 70:12, 86:13, 125:19, 126:2, 205:3, 210:5, 211:10, 211:21
**test** [94] - 8:3, 8:20, 9:5, 9:6, 9:10, 9:20, 9:25, 10:1, 10:6, 10:14, 10:19, 10:24, 11:1, 11:3, 11:4, 11:9, 11:19, 11:20, 11:24, 15:18, 16:1, 16:11, 16:19, 16:22, 17:1, 17:4, 17:5, 17:20, 18:20, 19:19, 21:2, 22:1, 22:4, 22:5, 22:6, 22:7, 22:15, 27:13,

27:15, 27:17, 28:1, 28:3, 28:9, 28:22, 28:25, 29:1, 29:25, 30:5, 30:13, 30:18, 31:4, 32:2, 32:15, 32:23, 37:16, 51:2, 51:11, 52:2, 54:18, 55:1, 55:2, 55:4, 55:13, 55:17, 55:18, 55:19, 58:1, 64:24, 67:14, 72:6, 72:11, 95:16, 96:8, 97:14, 97:15, 97:18, 99:3, 99:6, 99:7, 101:20, 155:7, 164:19, 164:23, 165:7, 165:19, 166:16, 166:21, 167:10, 169:22
**testified** [4] - 166:22, 169:1, 195:15, 219:21
**testifies** [1] - 222:16
**testify** [8] - 186:9, 186:12, 186:20, 187:4, 188:4, 211:10, 211:15, 227:3
**testifying** [4] - 112:20, 113:4, 186:8, 226:21
**testimony** [14] - 13:25, 58:11, 92:2, 125:3, 148:11, 156:18, 157:13, 164:2, 165:9, 191:1, 211:14, 214:14, 216:13
**testing** [22] - 52:15, 53:11, 62:2, 62:17, 62:19, 63:2, 63:4, 65:18, 66:2, 69:17, 83:2, 84:12, 94:7, 94:15, 94:16, 95:11, 95:12, 97:22, 99:19, 106:6, 115:17
**tests** [27] - 8:8, 8:24, 9:2, 10:1, 10:12, 12:25, 13:8, 17:5, 17:13, 17:18, 17:19, 17:21, 18:18, 18:21, 27:25, 31:25, 51:23, 52:5, 52:7, 52:11, 52:13, 52:20, 54:20, 54:24, 72:8, 106:14, 206:5
**text** [5] - 33:7, 57:5, 108:13, 110:11, 120:4
**that'll** [7] - 21:10, 119:17, 196:7, 197:3, 203:4, 218:1, 220:18
**THE** [174] - 1:10, 1:13, 1:17, 2:2, 5:2, 5:14, 5:17, 5:19, 5:21, 6:9, 7:8, 7:11, 13:24, 18:25, 19:2, 21:8, 21:10, 23:8, 23:10, 33:16, 34:2, 34:4, 34:12, 34:16, 36:1, 36:3, 36:6, 36:7, 36:22, 36:24, 38:1, 38:12, 38:14, 41:25, 43:9, 43:23, 43:25, 46:19, 46:21, 56:14, 56:17, 56:19, 63:25, 64:2, 73:15, 73:18, 74:2, 74:5, 74:8, 74:9, 74:11, 80:16, 80:18, 87:1, 87:3, 90:17, 90:19, 102:4, 102:6, 105:19, 105:21,

107:4, 107:6, 107:18,
107:19, 112:11, 112:13,
117:2, 117:4, 119:15,
119:17, 121:9, 121:25,
122:5, 122:6, 122:12,
122:14, 122:17, 122:22,
123:1, 123:8, 123:10,
123:14, 125:8, 125:15,
126:22, 127:14, 127:21,
128:4, 128:8, 128:15,
128:24, 129:3, 129:6,
129:10, 129:12, 134:5,
135:1, 147:7, 147:11,
147:14, 147:16, 174:1,
175:14, 182:13, 194:1,
194:7, 194:23, 194:25,
195:4, 195:9, 195:16,
195:18, 195:20, 195:22,
195:25, 196:3, 196:6,
196:17, 197:2, 201:23,
202:6, 202:18, 202:23,
202:25, 203:2, 203:4, 203:9,
204:13, 212:21, 213:4,
213:8, 213:10, 213:17,
213:19, 214:1, 214:7,
214:16, 214:23, 215:1,
215:4, 215:7, 215:11,
215:25, 216:10, 218:6,
218:14, 218:18, 218:21,
218:24, 219:3, 219:6,
219:17, 219:22, 220:4,
220:7, 220:14, 221:7,
221:23, 222:5, 222:20,
222:25, 223:3, 223:10,
223:16, 224:22, 225:20,
225:23, 226:9, 226:17,
227:8, 227:13, 227:19,
227:21

**themselves** [3] - 19:13,
25:16, 101:22

**therefore** [1] - 136:14

**they've** [6] - 23:17, 176:23,
179:24, 179:25, 180:25

**thinking** [9] - 54:3, 62:25,
78:22, 95:15, 127:17,
127:23, 219:20, 224:8, 225:8

**third** [23] - 72:6, 75:21,
75:24, 77:2, 77:21, 79:15,
82:7, 124:24, 155:11, 168:6,
168:12, 168:18, 168:22,
168:24, 169:2, 169:3, 169:7,
169:10, 169:17, 169:19,
169:23, 170:1, 170:8

**third-party** [1] - 155:11

**Thomas** [3] - 199:23,
200:11, 200:18

**thousand** [2] - 45:14,
45:17, 67:12

**thousands** [1] - 32:23

**three** [12] - 53:16, 54:2,

58:4, 58:6, 60:4, 62:17,
81:23, 112:5, 140:11,
140:12, 170:12, 222:7

**threw** [1] - 227:5

**throughout** [4] - 124:20,
130:6, 152:13, 212:1

**thrown** [1] - 222:14

**Thursday** [8] - 220:3,
221:2, 221:17, 222:9, 224:7,
225:15, 225:16, 226:6

**thwart** [1] - 148:23

**Tim** [1] - 173:16

**time-out** [1] - 179:20

**timed** [1] - 83:9

**timely** [4] - 40:12, 40:13,
41:15

**title** [2] - 71:13, 105:2

**titled** [1] - 18:2

**titles** [1] - 26:20

**Toby** [1] - 124:5

**today** [19] - 8:1, 98:18,
112:20, 114:22, 149:5,
150:1, 186:8, 213:20, 214:3,
214:11, 214:13, 216:5,
216:13, 216:14, 216:19,
216:22, 218:15, 225:25,
226:3

**together** [7] - 21:19, 93:23,
152:5, 152:6, 156:7, 209:8,
210:25

**tomorrow** [26] - 214:5,
214:12, 214:15, 214:19,
215:6, 215:12, 215:19,
216:2, 216:20, 216:25,
217:5, 217:25, 218:3, 218:9,
219:12, 220:8, 220:16,
221:9, 221:13, 221:18,
223:4, 223:14, 227:23

**tomorrow's** [1] - 217:4

**took** [9] - 11:3, 17:19,
44:20, 71:1, 73:20, 78:15,
84:11, 110:4, 168:6

**top** [8] - 7:24, 18:2, 24:20,
29:20, 29:24, 83:4, 102:21,
103:10

**total** [5] - 42:9, 81:18,
149:23, 203:22, 203:23

**touch** [2] - 9:8, 223:19

**touching** [1] - 45:25

**tough** [3] - 21:25, 87:13,
201:20

**tour** [7] - 76:5, 76:9, 77:11,
77:21, 79:1, 79:11, 93:21

**towards** [4] - 61:21, 81:10,
98:11, 128:8

**track** [3] - 214:5, 214:15,
215:18

**tracking** [2] - 19:16, 81:16

**traditional** [3] - 93:2, 93:5

**traditionally** [1] - 26:6

**training** [6] - 8:17, 92:8,
92:15, 158:6, 158:8, 159:9

**TRANSCRIPT** [1] - 1:9

**transcription** [1] - 228:5

**transfer** [1] - 96:7

**transferring** [2] - 144:14,
148:19

**transfers** [2] - 134:18,
144:7

**translate** [1] - 26:2

**translating** [2] - 26:13, 90:8

**transposed** [7] - 24:16,
31:15, 147:20, 147:21,
173:21, 174:5, 175:24

**Trattoria** [1] - 85:22

**travel** [1] - 221:14

**traveling** [4] - 220:1,
220:22, 225:13, 225:16

**treating** [1] - 31:21

**treatment** [4] - 48:16, 49:2,
56:4, 56:8

**triage** [1] - 111:13

**trial** [5] - 5:8, 121:18,
217:14, 217:20, 225:9

**TRIAL** [1] - 1:9

**Triangle** [1] - 138:4

**Tricare** [2] - 12:3, 12:8

**trickier** [1] - 125:23

**trouble** [1] - 114:15

**true** [6] - 13:20, 13:21, 53:2,
133:25, 136:6, 153:19

**trusts** [1] - 148:20

**truth** [3] - 6:10, 136:14,
211:19

**truthfully** [1] - 221:10

**try** [6] - 42:14, 219:9, 221:5,
225:1, 225:3, 225:8

**trying** [10] - 14:12, 17:17,
101:19, 118:25, 148:16,
158:12, 223:11, 223:17,
223:22, 223:24

**turn** [8] - 6:3, 15:13, 27:14,
41:17, 56:24, 125:9, 126:9,
129:18

**turnaround** [2] - 53:15,
57:12

**turned** [2] - 180:22, 180:23

**turning** [3] - 5:9, 40:12,
219:8

**twice** [2] - 41:16, 180:25

**two** [37] - 10:16, 15:8,
17:13, 17:19, 18:9, 27:11,
51:25, 73:1, 73:20, 75:20,
77:22, 80:5, 81:22, 85:13,
89:22, 93:17, 93:22, 112:5,
123:10, 123:16, 124:19,
127:5, 129:1, 145:3, 165:16,
166:8, 167:8, 169:23, 175:6,
209:24, 212:19, 212:20,
213:24, 214:4, 215:17,

220:2, 226:20

**two-hour** [1] - 73:20

**type** [11] - 16:7, 16:8, 16:15,
45:2, 55:21, 76:24, 93:10,
101:15, 105:10, 113:23,
185:2

**typed** [2] - 32:8, 45:5

**types** [5] - 15:1, 53:13,
57:10, 101:14, 101:17

**typical** [1] - 164:10

**typically** [4] - 16:8, 40:5,
45:24, 53:15

**U**

**ultimately** [2] - 69:19,
113:11

**umbrella** [1] - 59:11

**unable** [1] - 40:24

**uncles** [1] - 161:5

**uncover** [1] - 15:22

**under** [21] - 6:10, 13:7,
26:17, 35:1, 54:23, 59:6,
69:6, 94:3, 122:3, 124:6,
126:1, 138:18, 148:24,
149:4, 149:5, 149:25, 151:4,
173:4, 189:1, 189:18, 210:1

**undergo** [1] - 105:12

**underneath** [1] - 108:22

**understood** [2] - 166:10,
191:19

**unique** [1] - 51:14

**uniquely** [1] - 10:18

**UNITED** [4] - 1:1, 1:3, 1:10,
1:15

**United** [6] - 1:23, 5:6, 6:8,
105:15, 107:2, 228:10

**unless** [5] - 13:22, 23:1,
123:22, 147:9, 211:4

**unnecessary** [1] - 72:7

**unrelated** [1] - 97:22

**unusual** [1] - 226:24

**up** [77] - 5:18, 6:9, 6:20,
6:21, 15:4, 15:17, 18:21,
22:18, 25:19, 37:3, 41:24,
44:7, 44:22, 52:6, 58:13,
59:18, 67:17, 70:1, 70:2,
71:4, 74:12, 77:2, 83:4, 83:5,
83:21, 85:19, 86:6, 98:7,
102:20, 107:13, 109:25,
113:11, 118:2, 122:3, 127:2,
129:8, 130:12, 133:12,
133:13, 134:1, 134:10,
134:11, 136:1, 136:2, 136:5,
143:10, 149:18, 153:21,
153:22, 161:16, 161:20,
165:1, 167:19, 168:6, 172:9,
181:6, 182:4, 182:5, 186:18,
190:10, 190:25, 191:1,
191:9, 197:6, 205:25,

209:15, 214:4, 214:11,
214:14, 218:7, 219:16,
220:2, 221:8, 224:18, 226:9,
227:12
**update** [1] - 101:23
**updated** [1] - 104:7
**updates** [1] - 89:6
**uploaded** [1] - 96:19
**urgent** [1] - 123:18
**uses** [1] - 162:12
**usual** [1] - 223:4
**utilizing** [1] - 148:20

## V

**vacation** [1] - 87:20
**value** [1] - 70:24
**various** [11] - 39:24, 40:25,
57:6, 61:12, 71:8, 81:15,
152:10, 172:19, 205:9,
205:23, 211:14
**Vartanian** [3] - 213:25,
214:1, 214:9
**Vegas** [2] - 60:21, 60:24
**verified** [1] - 53:25
**verifies** [1] - 177:19
**version** [1] - 87:24
**versus** [10] - 5:7, 41:19,
53:13, 57:4, 57:10, 119:4,
119:10, 201:10, 202:2,
202:10
**vetted** [4] - 72:23, 158:18,
159:1, 159:4
**vice** [2] - 64:13, 207:3
**Victoria** [1] - 148:3
**video** [2] - 8:10, 96:24
**view** [3] - 41:10, 83:1, 183:5
**violate** [1] - 140:13
**violated** [2] - 140:9, 141:8
**violation** [3] - 210:11,
210:12, 210:13
**virtual** [1] - 93:24
**virtually** [1] - 49:4
**vis-à-vis** [1] - 160:24
**visit** [3] - 79:16, 188:7,
217:18
**visited** [6] - 74:18, 76:21,
77:13, 93:20, 166:23, 167:2
**visiting** [1] - 186:1
**voice** [1] - 6:21
**volume** [10] - 36:12, 67:23,
68:3, 70:17, 70:24, 71:4,
78:19, 119:3, 120:23
**Volume** [1] - 1:6
**volume-based** [2] - 67:23,
68:3
**voluntarily** [1] - 139:15
**vomiting** [1] - 111:21
**vs** [1] - 1:5

## W

**W.I** [9] - 215:10, 215:11,
215:12, 215:18, 218:8,
219:4, 219:6, 221:11, 221:12
**wage** [1] - 32:20
**wait** [1] - 166:9
**waiting** [1] - 37:16
**Walgreens** [1] - 77:9
**walk** [4] - 76:3, 76:14,
166:21, 167:10
**walked** [3] - 85:20, 85:21,
188:25
**walking** [2] - 166:16,
168:24
**Walmol** [4] - 142:17, 144:6,
144:15, 150:20
**WALMOL** [1] - 142:18
**wants** [1] - 26:22
**warehouse** [1] - 176:12
**warrant** [4] - 174:19,
184:18, 185:3
**warranted** [2] - 52:11,
52:13
**Washington** [1] - 1:16
**waste** [1] - 9:16
**watch** [5] - 144:18, 144:19,
144:22, 144:24, 144:25
**Watt** [1] - 127:22
**Watt's** [1] - 124:5
**Wednesday** [13] - 87:20,
215:6, 219:16, 219:20,
219:24, 220:2, 220:11,
220:17, 221:1, 221:15,
223:2, 223:24, 225:15
**week** [13] - 5:8, 32:1, 32:21,
54:2, 60:4, 73:9, 81:20,
85:13, 222:14, 222:15,
224:20, 225:16, 226:13
**weekend** [1] - 5:23
**weekly** [1] - 172:9
**weeks** [2] - 53:16, 85:14
**weight** [1] - 127:1
**welcome** [5] - 5:23, 74:5,
122:17, 128:24, 129:13
**WEST** [1] - 1:2
**whereas** [2] - 32:21, 57:14
**whichever** [1] - 162:11
**white** [1] - 208:4
**whole** [14] - 10:15, 10:25,
11:2, 40:23, 41:5, 53:25,
92:1, 111:20, 126:20,
131:18, 164:6, 172:12,
183:13, 206:2
**willing** [2] - 32:7, 185:5
**willingness** [1] - 125:22
**window** [1] - 224:4
**wire** [2] - 134:18, 171:18
**wish** [2] - 147:5, 147:22
**witness** [29] - 13:25, 37:25,

43:8, 107:16, 123:4, 124:22,
125:7, 126:11, 126:14,
127:12, 127:16, 128:13,
129:8, 147:9, 195:12,
202:19, 214:11, 214:25,
215:3, 216:5, 216:16, 218:2,
221:24, 222:3, 225:16,
226:21, 226:25, 227:3
**WITNESS** [5] - 3:3, 34:4,
34:16, 36:3, 36:7, 41:25,
107:19, 122:5, 214:1
**witnessed** [2] - 78:6, 168:1
**witnesses** [9] - 213:24,
214:4, 215:18, 217:5, 220:2,
221:5, 222:7, 222:24
**woman** [1] - 148:4
**wondering** [1] - 219:15
**word** [6] - 95:2, 130:6,
130:7, 185:5, 185:6, 205:6
**words** [9] - 8:9, 40:20,
45:20, 49:1, 142:24, 179:24,
180:12, 186:22, 186:23
**works** [2] - 129:17, 152:11
**world** [1] - 221:9
**worlds** [3] - 93:17, 93:20,
93:23
**Worldwide** [2] - 172:17,
172:18
**worried** [1] - 224:16
**worth** [5] - 144:17, 144:18,
144:19, 206:14, 219:7
**wound** [3] - 85:19, 86:6,
205:25
**wrap** [1] - 218:7
**wrapping** [1] - 221:8
**write** [4] - 54:15, 72:5,
165:14, 174:14
**writes** [1] - 174:10
**writing** [8] - 170:15, 170:16,
170:23, 171:2, 171:3, 171:4,
191:13, 191:15
**written** [6] - 63:11, 63:14,
191:3, 196:12, 196:14,
202:11
**wrote** [4] - 69:24, 174:9,
174:13, 187:21
**WSlagle** [1] - 131:18

## Y

**Yacht** [1] - 144:24
**yachts** [1] - 145:4
**Yahoo** [1] - 155:5
**year** [7] - 10:16, 53:23,
115:3, 136:6, 141:17, 146:1,
146:4
**year-and-a-half** [1] - 136:6
**years** [19] - 94:10, 109:17,
114:19, 115:14, 137:14,
137:18, 137:19, 140:11,

140:12, 141:19, 142:4,
142:7, 142:9, 142:11,
148:15, 149:17, 149:18,
149:24
**YN** [1] - 42:19
**Yogel** [4] - 219:19, 219:23,
222:11, 222:14
**York** [1] - 1:16
**younger** [1] - 115:14
**Youngswick** [12] - 74:23,
75:1, 75:13, 76:8, 79:9,
85:23, 116:8, 117:17,
169:12, 171:5, 171:13,
188:15

**yourself** [7] - 102:18,
144:11, 182:15, 187:7,
193:7, 193:16, 194:13

## Z

**Z85.3** [2] - 29:25, 30:6
**Z85.40** [1] - 30:11
**zoom** [13] - 7:17, 9:7,
21:18, 21:23, 22:23, 29:23,
38:23, 44:5, 59:4, 81:3, 81:7,
82:8, 83:12
**Zoom** [2] - 224:4, 226:2
**zooming** [2] - 22:22, 28:25