```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                     WEST PALM BEACH DIVISION
                     CASE NO. 19-CR-80181-RAR-1
 3
      UNITED STATES OF AMERICA,            Miami, Florida
 4
                                           December 6, 2022
 5             vs.
                                           9:31 a.m. - 5:22 p.m.
 6
      MINAL PATEL,                          Volume 7
 7
                     Defendant.            Pages 1 to 224
 8    _____

 9
                         TRANSCRIPT OF JURY TRIAL
10           BEFORE THE HONORABLE RODOLFO A. RUIZ, II
                     UNITED STATES DISTRICT JUDGE
11
      APPEARANCES:
12

13    FOR THE GOVERNMENT:        JAMIE DE BOER
                                 EMILY GURSKIS
14                               REGINALD CUYLER
                                 KATHERINE ROOKARD
15                               UNITED STATES DEPARTMENT OF JUSTICE
                                 CRIMINAL DIVISION, FRAUD SECTION
16                               1400 New York Avenue, 8th Floor
                                 Washington, D.C. 20005
17
      FOR THE DEFENDANT:         STEVEN H. SADOW
18                               LAW OFFICE OF STEVEN H. SADOW, PC
                                 260 Peachtree Street NW
19                               Suite 2052
                                 Atlanta, Georgia 30303
20
      STENOGRAPHICALLY REPORTED BY:
21
                                 ILONA LUPOWITZ, CRR, RPR, RMR
22                               Official Court Reporter to:
                                 The Honorable Rodolfo A. Ruiz, II
23                               United States District Court
                                 299 East Broward Boulevard
24                               Fort Lauderdale, Florida 3301
                                 (954) 769-5568
25
      (Appearances continued)
```

```
 1

 2   FOR THE DEFENDANT:              DONALD F. SAMUEL
                                     GARLAND, SAMUEL & LOEB, PC
 3                                   3131 Maple Drive NE
                                     Atlanta Georgia 30305
 4
                                     BRIAN T. RAFFERTY
 5                                   BAKER & HOSTETLER, LLP
                                     1170 Peactree Street, Suite
 6                                   2400
                                     Atlanta, Georgia 30309
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                (Call to the Order of the Court.)

2          THE COURT:  All right.  We just had our last juror

3    arrive, so we have everyone present and accounted for.  Any

4    housekeeping before we bring them out on behalf of the

5    government?

6          MS. DE BOER:  Just briefly, Your Honor.  At some point

7    today, and I recognize the Court probably wants to get started

8    this morning, at some point today before we break it would be

9    great to revisit the issue that we talked about with respect to

10   Mr. Hirsch at motions in limine hearing, specifically the fact

11   that there are a number of recordings that Mr. Hirsch conducted

12   of Mr. Patel while he was cooperating.

13         The government's position is that many of those

14   recordings, if offered by the defense, are straight hearsay,

15   and would be an effort to introduce Mr. Patel's potentially

16   exculpatory statements without him being subject to

17   cross-examination.

18         I understand that, you know, the defense has said,

19   well, there may be some real completeness questions.  I frankly

20   don't see that, and I'm working right now on Mr. Hirsch's

21   direct.  And so by lunch or so, I should have a sense of if we

22   are even going to using any recordings, which they will be, but

23   I can tell you it will be one or two or three at most, and

24   there's dozens.

25         Some of them are, you know, went to voicemail or that

1   kind of thing, but some are more substantive.  I really don't

2   think there's really a lot of potential impeachment of

3   Mr. Hirsch to be done through those recordings either, because

4   he's not really talking in much substance.  There's a lot of

5   sort of complaining about other business matters, talking about

6   personal health issues and that kind of stuff that really is

7   not going to lend itself to impeachment.

8         So I just wanted to put this on the Court's radar.  To

9   the extent we can deal with these issues before Mr. Hirsch

10  takes the stand, I think will be the most efficient use of our

11  time.

12        THE COURT:  All right.  We'll, let's do this.  Let's go

13  ahead and plan after we finish your first witness.  I'm

14  assuming you're going to be calling first W.I.?

15        MS. DE BOER:  Yes, Your Honor.

16        THE COURT:  So let's go ahead and have W.I. first.  And

17  then after that is the next witness Mr. Hirsch?

18        MS. DE BOER:  No, it's Mr. Griner, Your Honor.

19  Mr. Hirsch is tomorrow.

20        THE COURT:  So this is a little premature.  We can deal

21  with this later today.  So let's go ahead and focus.  Because

22  my recollection was you were just going to focus on Griner

23  today.

24        Certainly I can try to give you a ruling by the end of

25  the day on this, but the focus today will be, again, on W.I.

1    and Griner, since Hirsch will not be called until tomorrow at

2    best.

3         So let's go ahead and put a pin on that.  The Court

4    will go back and take a look at the issue, and I don't want to

5    belabor it.  I'll hear from the defense on this point when we

6    have a better sense of the recordings as well that the

7    government plans on using in its direct.  Okay?

8         MS. DE BOER:  Thank you, Your Honor.

9         MR. SADOW:  May I have one second?

10        THE COURT:  Sure.

11        MR. SADOW:  My only request would be if there's going

12   to be an edited transcript that they want to put in, maybe the

13   Court could have the full transcript and the edited version, so

14   that when we're talking about completeness as to ones that

15   they're actually going to use, you have an idea of what's

16   remaining as opposed to just what the government's given you.

17        THE COURT:  Well, I'll ask you, Ms. de Boer, if indeed

18   you guys are putting something like that together, and I know

19   sometimes you do hand out the transcripts with the audio.  If

20   it's difficult to hear, I don't know.

21        If I can get a sense of what that looks like in toto

22   without any edits, that may help to the extent I'm being asked

23   to make rules of completeness decisions on it.  Okay.

24        MS. DE BOER:  Understood.

25        THE COURT:  Very good.  All right.  Let's get started

1  on our goals for today.

2          Anything on the defense side before I bring everybody

3  out?

4          MR. RAFFERTY:  Just briefly, Your Honor.  I did file a

5  motion to response --

6          THE COURT:  I did hear your response.  Yes, thank you.

7  I reached out to the lawyers yesterday evening as well to try

8  to clear our plan for Friday for 9:00 a.m.  I'm waiting for

9  confirmation.  Apparently one of the attorneys had some sort of

10  a conflict, so we're supposed to hear about that today.  The

11  minute I can lock up that schedule, I'll let you guys know.

12          MR. RAFFERTY:  Thank you, Your Honor.

13          THE COURT:  You got it.  All right.

14          Okay.  With that being said, let's go ahead and round

15  up our jurors.  Thank you.

16          THE COURT SECURITY OFFICER:  All rise for the jury.

17          (Jury enters at 9:36 a.m.)

18          THE COURT:  Good morning.  Please be seated, everyone.

19  Good to see you all, ladies and gentlemen of the jury.  Hope

20  everyone had a nice evening yesterday.

21          All right.  So we are going to resume with the

22  government's case-in-chief.  I trust you all have your

23  notepads.  We're going to go ahead and turn it back over and

24  get our next witness on the stand.

25          Government's next witness.

```
 1          MS. ROOKARD:  Thank you, Your Honor.  The government
 2   calls W.I.
 3          THE COURT:  All right.  Hi, Mr. I.  Come on up here and
 4   we'll swear you in.  Thank you, sir.
 5          THE COURTROOM DEPUTY:  Please raise your right hand.
 6          (Government witness, W.I., duly sworn.)
 7          THE COURTROOM DEPUTY:  Please be seated.  Speak into
 8   the microphone.  Say and spell your name for the record.
 9          THE WITNESS:  W.I.  I-x-x-x-x.
10          MS. ROOKARD:  May I proceed?
11          THE COURT:  You may.
12                        DIRECT EXAMINATION
13   BY MS. ROOKARD:
14   Q.  Good morning, Mr. I.
15   A.  Good morning.
16   Q.  Where do you live?
17   A.  In Sarasota, Florida.
18   Q.  And about how long have you lived there?
19   A.  Since 1983.
20   Q.  And what do you do for work?
21   A.  I am retired.
22   Q.  And about how many years have you been retired?
23   A.  I have been retired about ten years.
24   Q.  And what did you do for work before you were retired?
25   A.  I have been in the men's and women's clothing business, the
```

1   retail side of it.

2   Q.   And how old are you?

3   A.   Are you sure you want me to repeat that?  I'm 72.

4   Q.   And what type of insurance do you have, Mr. I.?

5   A.   I have Medicare, and I also have a supplement through AARP.

6   Q.   And that's a Medicare supplement?

7   A.   Yes.

8   Q.   And did you have Medicare in 2018?

9   A.   Yes.

10  Q.   And shifting your attention, do you recall at some point

11  hearing about cancer genetic testing?

12  A.   Yes.

13  Q.   And what do you remember about that?

14  A.   I remember getting a phone call in reference to a program

15  that was tied to a deal with getting gifts or presents, and

16  they tied it into genetic testing.  And in that conversation,

17  there was a lot of talk about my family, et cetera, and our

18  history with cancer and everything else in the family, and how

19  I would really be interested in getting involved with the

20  genetic testing aspect of it.

21       MS. ROOKARD:  At this time, the government would move

22  to introduce what's already been admitted as Government's

23  Exhibit 415-A and B.

24       THE COURT:  All right.

25       MR. SADOW:  No objection, Your Honor.

```
 1          THE COURT:  All right.  I believe it's already been
 2   admitted, but we can go ahead and publish that if necessary.
 3          MS. ROOKARD:  And, Your Honor, I have copies of the
 4   transcript.
 5          May I pass these out?
 6          THE COURT:  Yes, you may.
 7          MS. ROOKARD:  May I approach?
 8          THE COURT:  You may.
 9          MS. ROOKARD:  Ms. Puntillo, could we play Government's
10   Exhibit 415-A?
11   BY MS. ROOKARD:
12   Q.  Mr. I., are you aware if this call was recorded?
13   A.  No, not at the time, no.
14   Q.  Have you become aware that this call was recorded?
15   A.  Yes, I have.
16   Q.  And have you heard this recording before?
17   A.  Yes.
18       (Audio was published.)
19       (Audio was paused.)
20   Q.  Mr. I., is that you on the recording?
21   A.  It is.
22   Q.  And is that the call that you were just describing?
23   A.  Yes, ma'am.
24   Q.  Did you know who that person was that called you?
25   A.  No, I had no idea.
```

1   Q.   And did you remember signing up for betterhealthcare.com?

2   A.   I did not.

3        (Audio was published.)

4        (Audio was paused.)

5   Q.   And, Mr. I., again, this is mentioning Better Healthcare.

6   Have you become -- are you a member of that organization?

7   A.   Not that I'm aware of.

8   Q.   And is this when you first heard about the cancer genetic

9   test?

10  A.   Yes.

11  Q.   And what was your understanding about what that test was

12  going to do?

13  A.   What that test was going to do was inform me of all the

14  better options and make me aware of the different types of

15  cancer that might be coming my way or with the history of my

16  family.  That's how I interpreted it anyway.

17       (Audio was published.)

18       (Audio was paused.)

19  BY MS. ROOKARD:

20  Q.   So Mr. I., is it fair to say that you have a personal

21  history and family history of cancer?

22  A.   Yes.

23  Q.   And in this section they mentioned eligible to be -- for it

24  to be covered by your insurance.

25       What was your understanding of what this test was going to

1   cost to you?

2   A.   Well, I assumed that it wasn't going to be any

3   out-of-pocket expense, but I didn't know, you know, what they

4   were talking about as far as the insurance goes, how that was

5   going to work.

6   Q.   Okay.

7        (Audio was published.)

8        (Audio was paused.)

9   BY MS. ROOKARD:

10  Q.   Mr. I., is Ross Morrison -- was your doctor?

11  A.   Yes.

12  Q.   Is he still your doctor?

13  A.   Yes.

14  Q.   Was he involved in this process at all?

15  A.   No.

16  Q.   Did you ever talk to him about a cancer genetic test?

17  A.   No.

18  Q.   Okay.

19       (Audio was published.)

20       (Audio was paused.)

21  BY MS. ROOKARD:

22  Q.   Mr. I., do you recall getting a follow-up call, like was

23  mentioned?

24  A.   Vaguely, yes, okay, that's -- I'm going to say yes.

25  Q.   And was that, like, an appointment, a normal medical

1    appointment, or was that more of a phone call?

2    A.   It was more of a phone call.

3    Q.   And what kind of -- what was the point of that phone call?

4    A.   As I recall, it was about sending a kit to get filled out

5    and get tested for the genetics that I had and to get mailed

6    back to them to get the results, as I recall it, you know, as I

7    remember it.

8    Q.   And did you receive a kit?

9    A.   I did.

10   Q.   How did you receive that?

11   A.   It came in the mail.

12   Q.   And what was in the package?

13   A.   Again, as I remember -- it's been a while -- it was more of

14   a swab-like product that was in the kit, that you swab the

15   internal part of your mouth and put it back in a container and

16   returned it by U.S. mail back to Miami.

17   Q.   And did you do that?

18   A.   Yes, I did it immediately and sent it back the next day.

19   Q.   You mailed it back?

20   A.   Yes.

21   Q.   Okay.  What happened after that?

22   A.   Well, as I recall, again, I waited and waited and waited,

23   you know, for some sort of results.  And I don't know how much

24   time passed, but I finally called the company back to find out

25   where the results were from the kit, and I had someone pick up

1    the phone who claimed to be a doctor.  And I can't remember the

2    name, but I do remember him replying to my question about, you

3    know, what happened to the kit and where was my response to the

4    swabs and everything that I had sent in.

5         And his reply was that the test had been so successful,

6    that they had been overwhelmed.  And they had so many to

7    process that they were running behind, but they had been

8    catching up, and I could expect to have my kit returned to me

9    within the next 30 days.

10   Q.  And did you follow up again after that?

11   A.  I did.  I never received my kit in the next 30 days.  And I

12   had it marked on the calendar so I would remember to make a

13   phone call.  And that's how I always do with something that I

14   need to follow up on, or I forget all about it.  And I do

15   remember seeing the notation on my calendar.

16        I didn't call back that same date, but within the next

17   week, I did call back.  And I had a number in Miami to call

18   back to.

19        And I called and a gentleman answered the phone, and he

20   gave me his name.  And I don't remember what his name was, but

21   he -- no, that's wrong.  I'm telling you wrong.  That was the

22   first time.  This was the second time.  I'm telling you all

23   wrong.

24        What happened that time was there was no answer on the

25   telephone.

1   Q.  So you called again -- you had the first call where you

2   spoke to a gentleman, and then you had a second call?

3   A.  Then the second call that I made at the end of the 30 days,

4   the phone was disconnected.  There was no one there.  I had no

5   response at all.

6   Q.  Were you ever able to get in contact with someone about

7   getting your results?

8   A.  No.  From that point forward, I never talked to anyone.

9   Q.  Did you ever receive your results?

10  A.  No.

11  Q.  Mr. I., on that first call that we listened to, did you

12  think that that person was a doctor?

13  A.  No.

14  Q.  And did a doctor ever call and explain to you the benefits

15  of this test, the risks of this test?

16  A.  No.

17  Q.  Did a doctor or a genetic counselor explain anything to you

18  at all?

19  A.  No.

20          MS. ROOKARD:  Nothing further.

21          THE COURT:  Thank you.

22          Cross-examination, Mr. Rafferty.

23                      CROSS-EXAMINATION

24  BY MR. RAFFERTY:

25  Q.  Good morning, Mr. I.

1    A.    Good morning.

2    Q.    My name is Brian Rafferty, and I'm one of the attorneys

3    that represents Minal Patel.   I just have a couple of questions

4    for you.   Okay?

5    A.    Fine.   Sure.

6    Q.    Thank you for being here today.   I'm sorry about your

7    history.   It sounds like you have a personal history of cancer.

8    A.    Yes, sir.

9    Q.    And you have a pretty significant family history of cancer.

10    A.    Yes, sir.

11    Q.    During the call we listened to, I noticed that you provided

12    an email address.

13          Is that your email address that -- I don't want to replay

14    the call, but --

15    A.    Yes.

16    Q.    -- there was an email address --

17    A.    That's still my correct email address.

18    Q.    You don't have any other email addresses, do you?

19    A.    Yes, I still do have one other email address.

20    Q.    Do you remember what that one is?

21    A.    Yes, sir.

22    Q.    What's that one?

23    A.    It is 1@Comcast.net.

24    Q.    Okay.   Thank you.

25    A.    Yes, sir.

```
 1   Q.  With respect to the swab that ultimately got sent to you,
 2   was there some paperwork included with that, if you remember?
 3   A.  I can't remember.  I vaguely can remember the box even.
 4   You know, I just have a real hard time remembering that.
 5   Q.  I understand.
 6        The calls that you made, I think you said you called a
 7   couple of times to an address in Miami.
 8   A.  That's correct.
 9   Q.  And you spoke to somebody the first time?
10   A.  Right.
11   Q.  But then the second time, you couldn't get through on that
12   Miami phone number.
13   A.  Yeah.  That phone number had been disconnected.
14   Q.  I think that's all I have, sir.  Thank you very much.  I
15   appreciate your time.
16             THE COURT:  Any redirect?
17             MS. ROOKARD:  No, Your Honor.
18             THE COURT:  Thank you very much, sir.  You are excused.
19             MS. DE BOER:  Your Honor, may I collect the transcripts
20   while we're waiting?
21             THE COURT:  Yes, you may.
22             Government's next witness.
23             MS. GURSKIS:  Thank you, Your Honor.  The United States
24   calls Shawn Griner.
25             THE COURT:  All right.  Do you want to get Mr. Griner?
```

1           Come on up, Mr. Griner, and we'll swear you in.

2           THE COURTROOM DEPUTY:  Please raise your right hand.

3           (Government witness, SHAWN GRINER, duly sworn.)

4           THE COURTROOM DEPUTY:  Please be seated.  Speak into

5   the microphone.  Say and spell your name for the record.

6           THE WITNESS:  Shawn Griner.  S-h-a-w-n, G-r-i-n-e-r.

7                         DIRECT EXAMINATION

8   BY MS. GURSKIS:

9   Q.   Good morning, Mr. Griner.

10          Where do you live, sir?

11  A.   Boynton Beach, Florida.

12  Q.   How long have you lived in Florida?

13  A.   Since 1994.

14  Q.   What's your educational background?

15  A.   I went to Palm Beach Community College for two years.

16  Q.   Did you finish community college?

17  A.   I did not.

18  Q.   Can you briefly describe for the jury your professional

19  background.

20  A.   My background has mainly been focused on marketing and

21  specifically lead generation.

22  Q.   When you say "lead generation," what is a lead?

23  A.   A lead is information of a -- of an individual specific to

24  a certain product or service.

25  Q.   And what products or services have you worked on generating

1   leads for?

2   A.   I started generating leads in the financial space related

3   to debt and then also did mortgages and other financial-related

4   products.  And then I also started in healthcare --

5   healthcare-related leads.

6   Q.   When did you make that shift from the financial space to

7   the healthcare space?

8   A.   Around 2015, '16.

9   Q.   What does it mean to generate a lead?

10  A.   Well, there's two types of leads.  There's an online lead,

11  where somebody goes online and fills out a form.  And then

12  there's a telemarketed lead, where you use raw data and have

13  someone contact them on the phone and qualify them.  And that

14  would be a different type of a lead.

15  Q.   Which type of leads were you dealing with?

16  A.   Telemarketing -- telemarketing leads.

17  Q.   Mr. Griner, have you pled guilty to a felony?

18  A.   Yes.

19  Q.   What crime did you plead guilty to?

20  A.   Healthcare fraud.

21  Q.   Can you tell us, in a few sentences, what you did to

22  violate the law?

23  A.   I was instrumental in building the sales end of a call

24  center designed to generate patients for an unnecessary cancer

25  genetic test.

1   Q.   What type of patients?

2   A.   Medicare patients.

3   Q.   How were you paid?

4   A.   I was paid a percentage of the revenue generated and paid

5   out by Medicare.

6   Q.   Do you see anyone in the courtroom today that participated

7   in that scheme with you?

8   A.   I do.

9   Q.   Can you identify that person based on an article of

10  clothing he or she is wearing?

11  A.   Yes.  It's a little hard for me to see.  I'm sorry.

12  Q.   You can stand up if you need to.

13  A.   Yes.  In the back, in the blue jacket with white shirt.

14        MS. GURSKIS:  Your Honor, may the record reflect that

15  the witness had identified the defendant.

16        THE COURT:  The record will reflect it.

17  BY MS. GURSKIS:

18  Q.   And what is that individual's name, Mr. Griner?

19  A.   Minal Patel.

20  Q.   Can you give us a couple-of-sentence description of what

21  Minal Patel did to further the scheme?

22  A.   Minal offered the laboratory, the laboratory that was

23  processing the cancer tests, and then the billing of those

24  patients for the reimbursements.

25  Q.   What was his personal involvement aside from owning the

1    laboratory?

2    A.   He was involved in -- in the entire process and approve --

3    and approving all of the pieces to that process.

4    Q.   When you say that he approved all of the pieces to that

5    process, can you be a little bit more specific about what you

6    mean?

7    A.   So there were multiple steps that were involved in getting

8    a patient to take the test and then have that test run and

9    processed by his lab, and then they would bill Medicare.  And

10   he oversaw and approved all of the steps of the process.

11   Q.   Are you testifying today pursuant to a plea agreement?

12   A.   Yes.

13   Q.   Have you been sentenced?

14   A.   No.

15   Q.   Is it fair to say that you're hoping to receive a reduction

16   in your sentence in exchange for your testimony today?

17   A.   Yes.

18   Q.   Has anyone from the government promised you anything in

19   exchange for your testimony today?

20   A.   No.

21   Q.   Who will ultimately decide whether your sentence is

22   reduced?

23   A.   The judge.

24   Q.   What was the name of the company that you used to commit

25   healthcare fraud?

1   A.   IDGAF Marketing.

2   Q.   Why did you name the company IDGAF?

3   A.   Myself and my accountant thought it was a funny name, I

4   guess, at the time.

5   Q.   What does that stand for?

6   A.   I Don't Give a F- Marketing.

7   Q.   How did you come to get involved with Minal Patel?

8   A.   I was introduced by Brett Hirsch.

9   Q.   Who is Brett Hirsch?

10   A.   I knew -- I was introduced to Brett a couple of years prior

11   to that, and he made the introduction to Minal.

12   Q.   What was your understanding of why you were being

13   introduced to Minal Patel?

14   A.   Brett knew my experience with call centers, and Minal was

15   launching a new CGx cancer test that he wanted a call center to

16   generate the leads -- patients for.

17   Q.   Where did you ultimately meet Mr. Patel for the first time?

18   A.   At the Boca Raton Hotel.

19   Q.   Can you tell the jury a little bit about that first meeting

20   with Minal Patel at the Boca Raton Hotel?

21   A.   So we met -- we met at the hotel a couple hours.  Minal

22   explained the test and how profitable it could be.  I explained

23   my background and my experience and that I thought I would have

24   the ability to put together a process to generate a substantial

25   amount of patients for that test.

1   Q.   You said Minal Patel told you the tests would be

2   profitable.

3        Do you remember anything more specific beyond that comment?

4   A.   That the reimbursements for each approved, billed test were

5   substantial.

6   Q.   What does that mean?

7   A.   I believe they were in the 5- to $10,000 range per paid

8   test.

9   Q.   And who would be reimbursing that 5,000 to $10,000 per

10  test?

11  A.   Medicare.

12  Q.   Did -- was there any conversation specifically about

13  Medicare, or was it more generally about helping Mr. Patel by

14  generating leads?

15  A.   Both.  It was specific.  The type of patient that he wanted

16  was specifically a Medicare patient.

17  Q.   Did he say why he wanted specifically Medicare patients?

18  A.   Yes.  There was a much wider, easier approval.  The

19  reimbursements were higher.  And the approval -- approval

20  process was much -- at a much higher percentage compared to

21  private insurance.

22  Q.   Did you talk at all about the possibility of obtaining

23  leads for private insurance beneficiaries?

24  A.   Briefly.

25  Q.   What do you recall about that?

1    A.   He said that they wouldn't work in this model, and they

2    were too hard to get approved, and that he would recommend just

3    focusing on Medicare.

4    Q.   And you mentioned that you -- you relayed your background

5    in having a call center or working with call centers to Minal

6    Patel?

7    A.   Correct.

8    Q.   Can you tell us a little bit more about that?

9    A.   I had a large debt settlement call center years prior.   I

10   had experience in generating different types of leads, and that

11   was the reason that Brett Hirsch made the introduction to

12   Minal.

13   Q.   And you shared that call center experience with Minal Patel

14   during that first meeting?

15   A.   Yes.

16   Q.   What was the name of Minal Patel's company?

17   A.   LabSolutions.

18   Q.   Did Minal Patel say anything to you specifically about

19   LabSolutions during that first meeting, if you can recall?

20   A.   Yes, he gave me some background on the lab and the size and

21   the amount of employees and the type of business that he was

22   doing and what his expectation was related to the CGx test.

23   Q.   And what was that expectation?

24   A.   He expected the CGx test to be the most profitable test

25   that he had run up to that point.

1   Q.   What was Minal Patel's demeanor during that conversation?

2   A.   Jovial, calm, very interested.  He seemed happy at my

3   ability to generate -- generate leads or patients for the test.

4   Q.   Did you have any discussions in that first meeting about

5   how exactly the call center would fit into the structure with

6   LabSolutions, the structure of the business?

7   A.   Not granular; more of a general overview.

8   Q.   What was that general overview?

9   A.   We kind of talked through what we thought would be the best

10   process to take a lead and walk through the different steps to

11   have that turn into a qualified patient that would eventually

12   take the CGx test.

13   Q.   What kind of steps did you discuss?

14   A.   We were really brainstorming.  It was my first meeting with

15   him.  But, you know, we went through the basic points of, you

16   know, the initial data, Medicare data, being contacted and

17   qualified, and then having that patient take the test, which

18   then would be delivered and -- delivered to LabSolutions to

19   have them run and process and bill for that test.

20   Q.   And would this be involving opt-in leads?

21   A.   No.

22   Q.   What exactly is an opt-in lead?

23   A.   Opt-in lead is a lead where a person expresses interest in

24   receiving information for that particular product or service.

25   Q.   So the plan was not for you and Mr. Patel to obtain opt-in

1   leads?

2   A.   The plan was to use specific raw Medicare data.

3   Q.   And what were you to do with that raw Medicare data?

4   A.   We were to have a telemarketer contact them, explain the

5   benefits of the test, verify if they had certain -- met certain

6   criteria that would make them approved for that test, approved

7   for reimbursement.

8   Q.   So did you discuss with Mr. Patel that these leads would

9   not be opt-in leads?

10   A.   I don't know if that was at the original meeting, but it

11   was discussed multiple times how we were generating the actual

12   patient.

13   Q.   And did you ultimately end up going into business with

14   Minal Patel and LabSolutions?

15   A.   Yes.

16          MS. GURSKIS:  Your Honor, at this time the government

17   would move to admit Exhibits 1963, 1963-A, and 1964.

18          THE COURT:  Any objection?

19          MR. SADOW:  No, Your Honor.  And again, to make it more

20   efficient, we've been through the exhibits together, and I do

21   not have objections to the government's exhibits.

22          THE COURT:  Very good.  Thank you for that.  Those

23   exhibits will be admitted at this time.

24          MS. GURSKIS:  Thank you, Your Honor.

25          (Government Exhibits 1963, 1963-A, and 1964 were received

```
 1          in evidence.)

 2               MS. GURSKIS:  Do I have permission to publish?

 3               THE COURT:  You do.

 4     BY MS. GURSKIS:

 5     Q.   Can you see that document okay, Mr. Griner?

 6     A.   Yes.

 7     Q.   Okay.  I have on the screen Government's Exhibit 1964.

 8          What is this document?

 9     A.   A marketing lab distribution agreement.

10     Q.   Who is the agreement between?

11     A.   My company, IDGAF, and Minal's company, LabSolutions.

12     Q.   Okay.  And then turning down to this section here, what

13     does that section say about how IDGAF was going to be working

14     with LabSolutions on the marketing side?

15     A.   We would be using different physicians, clinics, medical

16     practices, and healthcare providers.

17     Q.   Is that what you ended up doing with Mr. Patel?

18     A.   No.

19     Q.   And turning to the last page, it looks like this agreement

20     was not signed; is that right?

21     A.   I don't believe it was.

22     Q.   Do you recall if you did sign an agreement with Mr. Patel

23     and LabSolutions?

24     A.   I think I did.  I don't remember that specifically.

25     Q.   Now showing you Government's Exhibit 1963.
```

1        Who is on this email, Mr. Griner?

2    A.   Christian McKeon, Minal Patel, and myself.

3    Q.   And who is Christian McKeon?

4    A.   I was partners with him in the call center.

5    Q.   And what's the phone number that's listed there for

6    Christian McKeon?

7    A.   561-305-6223.

8    Q.   Is that the number that you used to call Mr. McKeon during

9    this time period?

10   A.   Yes.

11   Q.   And do you see down here where Mr. McKeon is referring this

12   to a -- as a "monster account" for cancer tests?

13   A.   Yes, I do.

14   Q.   And turning your attention to 1963-A, is this document

15   familiar to you?

16   A.   I have seen it before, yes.

17   Q.   Do you know whose markings these are?

18   A.   I believe those are Christian's.

19   Q.   And do you see here the addition where it says "patients"

20   in that section that we were just reviewing together from the

21   other version?

22   A.   Yes, I do.

23   Q.   Were you marketing directly to patients, Mr. Griner?

24   A.   Yes, we were.

25   Q.   And turning to the last page here, it looks like this is

1   also not the executed agreement, right?

2   A.   Correct.

3   Q.   Okay.  So you walked us through that first meeting with

4   Minal Patel at the Boca hotel.

5        Was Mr. Hirsch also at that meeting?

6   A.   Yes.

7   Q.   Okay.  What ended up happening after that first meeting?

8   A.   I flew up to the lab.

9   Q.   And did you end up going into business with Mr. Patel?

10  A.   Yes.

11  Q.   And did you end up obtaining data for LabSolutions?

12  A.   I obtained it for the call center with the purpose of

13  generating patients from it.

14  Q.   How do you obtain that data?

15  A.   Purchase it from multiple lead sources, data sources.

16  Q.   And what is in the data, what information?

17  A.   The patient's or person's personal information, name, phone

18  number, address, age, date of birth, Medicare ID number.  Those

19  would be the main fields of data.

20  Q.   Was there a specific criteria in the data that you were

21  looking for?

22  A.   Well, the data had to be specific that the patient -- that

23  the lead had -- was a Medicare beneficiary.  That was the

24  criteria.

25  Q.   Any other criteria?

1    A.    No.

2    Q.    And who gave that criteria to you?

3    A.    Minal.

4    Q.    And did you end up setting up that call center that you

5    discussed with Minal Patel during that first meeting?

6    A.    I actually partnered with Christian McKeon, who had an

7    existing call center.

8    Q.    And who is Christian McKeon?

9    A.    He was the owner of XGEN and multiple other companies that

10   had an existing call center and employees, and I brought him

11   the process and explained the model, and we did it -- did it as

12   a partnership.

13   Q.    And you explained kind of the preliminary discussion that

14   you had with Mr. Patel, but can you explain, once the business

15   kicked off, how the process actually worked between IDGAF and

16   LabSolutions?

17   A.    The entire process?

18   Q.    Yes.

19   A.    So we would purchase raw data that was Medicare specific.

20   We would have a telemarketer contact that person over the phone

21   via cold call.  We would explain the benefits of the test,

22   explain the potential dangers of not taking the test, confirm

23   that the patient would like to take the test.

24        We would then set the appointment with a telemedicine

25   doctor.  The telemedicine doctor would do a consult of that

1    patient via telephone.  Once that consult was done, the doctor

2    would sign the requisition paperwork.  That signed requisition

3    paperwork, along with a sample -- sample kit to take the actual

4    mouth swab, was then sent directly to the patient.

5         We had a team of people that would call the patient once

6    they received the package, walk them through the steps on how

7    to take the test, where to sign the requisition form, and then

8    we would schedule a pickup for that package, and it would be

9    sent directly to LabSolutions to process.

10        Once they processed it and the results were generated, then

11   they would bill Medicare for that sample.  And once they

12   received funds, they would then disburse our percentage

13   according to our agreement.

14   Q.   And you mentioned -- just to walk back through some of

15   those steps and ask you a few follow-up questions.  After the

16   cold call of the patient, I believe you said "we" in the call

17   explain the benefits of the test and the dangers of the test.

18        Who is the "we" in that particular situation?

19   A.   I'm referring to the actual telemarketers in the call

20   center that we employed.

21   Q.   Okay.  And when you said:  We explain the benefits and

22   dangers, what would be the benefits and dangers that would be

23   provided to the beneficiaries on that call?

24   A.   The benefits would be that they would know that they had a

25   specific marker for one of the cancers that the test ran.  A

1    danger of not doing the test would be that you wouldn't have

2    that necessary information.

3    Q.   Okay.  And the telemarketers who were making that call to

4    explain the benefits and explain the dangers, did they have any

5    kind of medical training?

6    A.   No.

7    Q.   And then the next call, I believe you said, is from

8    somebody who explains what to do with the kit?

9    A.   After the -- well, that came after the telemedicine consult

10   was completed.

11   Q.   Okay.  So referring specifically to the call with the

12   person explaining how to use the kit, does that person have any

13   kind of medical background or training?

14   A.   No.

15   Q.   And when you were kicking off this business with Minal

16   Patel, do you recall him giving you any kind of training

17   materials or information to get you started on training your

18   sales reps?

19   A.   He did provide documents and information about the test.

20        MS. GURSKIS:  Your Honor, at this time the government

21   would move in Government's Exhibit 1683 as well as 1683-A

22   through E.

23        THE COURT:  Those are admitted without objection.

24        (Government Exhibits 1683 and 1683-A through E were

25        received in evidence.)

```
 1          MS. GURSKIS:  Do I have permission to publish, Your

 2   Honor?

 3          THE COURT:  You do.

 4   BY MS. GURSKIS:

 5   Q.   I'm showing you Government's Exhibit 1683, Mr. Griner.

 6        Is that large enough for you to read, sir?

 7   A.   Yes.

 8   Q.   Who is the email from?

 9   A.   Minal Patel.

10   Q.   And who is thereallead@yahoo.com?

11   A.   That's my personal Yahoo email address.

12   Q.   Okay.  And down here it says this is forwarded from

13   somebody named Nicholas Vartanian.

14        Do you know who that person is?

15   A.   Yes, I do.

16   Q.   Who is that?

17   A.   He was in charge of sales when I first met Minal.

18   Q.   And about how long did you overlap with Mr. Vartanian?

19   A.   Maybe a couple of months.  Not very long.

20   Q.   I'm now showing you Government's Exhibit 1683-A.

21        Do you recognize this cancer quiz, Mr. Griner?

22   A.   Yes, I do.

23   Q.   What, if anything, did you do with this particular document

24   that you received from Minal Patel?

25   A.   We incorporated it into our telemarketing script to qualify
```

1    the patient for the test.

2    Q.   I'm now showing you 1683-E.

3         Do you recognize this document, Mr. Griner?

4    A.   Yes, I do.

5    Q.   What is it?

6    A.   It's the requisition form that the doctor would complete

7    and the patient would sign.

8    Q.   And do you see the section that's highlighted here?

9    A.   Yes, I do.

10   Q.   What is that?

11   A.   That was the specific CGx test that we were generating the

12   patients for.

13   Q.   Is there any kind of choice here in the cancer test that

14   can be given?

15   A.   No.

16   Q.   And this is the second page of Government's Exhibit 1683.

17        So this is still in the set of materials that were provided

18   to you by Mr. Patel, right, Mr. Griner?

19   A.   Yes.

20   Q.   Did you do any kind of prenatal testing?

21   A.   No.

22   Q.   And you mentioned a moment ago that the sales reps who were

23   handling these calls didn't have any medical background or

24   training; is that right?

25   A.   That's correct.

1   Q.   Did you ever discuss with Minal Patel that the sales reps

2   had no medical background or training?

3   A.   I don't remember if it was discussed specifically, but it

4   was never questioned.

5   Q.   Okay.

6        MS. GURSKIS:   Your Honor, at this time, the government

7   would move in Government's Exhibit 1938 and 1938-A.

8        THE COURT:   Those will be admitted without objection.

9        (Government Exhibits 1938 and 1938-A were received in

10       evidence.)

11       MS. GURSKIS:   Do I have permission to publish, Your

12   Honor?

13       THE COURT:   You do.

14       MS. GURSKIS:   I'm showing the witness Government's

15   Exhibit 1938.

16   BY MS. GURSKIS:

17   Q.   Mr. Griner, do you know what R2R Here to Help is?

18   A.   It was a -- it was an affiliate, another sales group that

19   wanted to generate patients for the test.

20   Q.   Okay.  And do I see your name on this email?

21   A.   Yes.

22   Q.   And is Minal Patel also copied on this email?

23   A.   Yes.

24   Q.   And then in the body of the email:  Six new agents

25   tomorrow, and many more will follow if we can be paid.

1      Do you see that?

2  A.  Yes, I do.

3  Q.  And this is now Government's Exhibit 1938-A.

4      Do you see here, Mr. Griner, that there's a list of names?

5  A.  Yes.

6  Q.  And then on the HIPAA certificate section, there's a list

7  of job titles here?

8  A.  Yes.

9  Q.  Or certifications, perhaps.

10      Do any of these list any kind of medical training or

11  medical background?

12  A.  No.

13  Q.  So you mentioned that some of the information that Minal

14  Patel sent you that we just looked at was used to create a

15  script or a pitch for the call center reps.

16      What kind of pitch did you expect the call center reps to

17  be making when they were calling leads?

18  A.  I'm not sure I understand what you mean.

19  Q.  What did you expect the sales reps to say to the Medicare

20  beneficiaries who they called?

21  A.  Explain the benefits of the test and the reasons why they

22  should take it and that there was no out-of-pocket cost to them

23  for taking the test.

24  Q.  How did the fact that this was a test relating to cancer

25  play into that script, if at all?

1    A.   The whole script was based on it being a cancer test and

2    possibly being able to save lives.

3    Q.   Okay.  You've mentioned a few other names so far this

4    morning, so I just want to follow up and make sure we

5    understand who those people are.

6         So you were talking about Christian McKeon.  What was the

7    name of his company?

8    A.   He had a couple of them.  XGEN Marketing, Lopes Holdings,

9    The Cancer Testing Center.

10         MS. GURSKIS:  Your Honor, at this time, the government

11    would move in Government's Exhibit 1122.

12         THE COURT:  That will be moved in and admitted without

13    objection.

14         (Government Exhibit 1122 was received in evidence.)

15    BY MS. GURSKIS:

16    Q.   Do you recognize that person, Mr. Griner?

17    A.   Yes, I do.

18    Q.   Who is that?

19    A.   That is Christian McKeon.

20    Q.   And what was Christian McKeon's role in this process with

21    Mr. Patel?

22    A.   Christian ran -- ran everything.  His company was the

23    company that had a contract with LabSolutions and received the

24    payments, and he then disbursed the funds to myself and Gregory

25    Orr and Thanasi after expenses were paid.

```
 1          MS. GURSKIS:  Your Honor, at this time, the government
 2    would move in Government's Exhibit 610 and 610-A.
 3          THE COURT:  Those will be admitted without objection.
 4          (Government Exhibits 610 and 610-A were received in
 5       evidence.)
 6          MS. GURSKIS:  Do I have permission to publish, Your
 7    Honor?
 8          THE COURT:  Yes, granted.
 9    BY MS. GURSKIS:
10    Q.  I'm showing you Government's Exhibit 610, Mr. Griner.
11        Who is on this email?
12    A.  Minal Patel and myself.
13    Q.  And Mr. McKeon?
14    A.  Yes.
15    Q.  I'm showing you 610-A.
16        Is this a contract between XGEN Marketing and LabSolutions?
17    A.  Yes.
18    Q.  And I believe you said it was XGEN that had the direct
19    contractual relationship with LabSolutions; is that right?
20    A.  Correct.
21    Q.  You mentioned that Brett Hirsch introduced you to
22    Mr. Patel?
23    A.  Yes.
24    Q.  Did he stay involved in this process at all?
25    A.  He didn't stay involved in the process, but he was in
```

1    observance of the process because he was making an override on

2    any business that I had -- myself or Christian had generated.

3    Q.   What's an override?

4    A.   Override is a percentage of the sales.

5    Q.   So a percentage of the sales -- I guess, to walk that

6    back...

7    A.   So for every dollar that was generated and paid out to

8    myself or XGEN, Brett would receive a percentage of that

9    directly from LabSolutions for the introduction.

10   Q.   And shifting your attention back to Government's 1122, do

11   you recognize this person, Mr. Griner?

12   A.   Yes, I do.

13   Q.   Who is that?

14   A.   That's Brett Hirsch.

15   Q.   And you mentioned someone named Thanasi.

16        Who is Thanasi?

17   A.   Thanasi was Christian's IT guy when I had originally met

18   him, and his role was basically running all of the IT software.

19   Anything related to computers, phones, anything like that was

20   Thanasi's role.

21   Q.   Do you remember what his company was called that was

22   involved in this?

23   A.   I believe it was BBAR Marketing.

24   Q.   Do you know how BBAR got paid?

25   A.   BBAR got paid from XGEN.

```
1   Q.   And XGEN got paid from LabSolutions?

2   A.   Correct.

3   Q.   Did you ever meet somebody named Senthil Ramamurthy?

4   A.   Yes.

5   Q.   This is another photograph from Government's 1122.

6        Do you recognize that person, Mr. Griner?

7   A.   Yes.

8   Q.   Who is that?

9   A.   I know him as "Dr. Rama," but...

10  Q.   Mr. Ramamurthy?

11  A.   Yes.

12  Q.   And what role -- or how was -- did you end up working at

13  all with Mr. Ramamurthy?

14  A.   Yes, I did.

15  Q.   How did that come about?

16  A.   I was introduced to Rama by Minal.  Rama had his own

17  existing lead source of potential patients and wanted to use

18  our existing process that we had in place to generate cancer

19  tests from those -- from his particular leads or data that he

20  had.

21  Q.   So he had -- do you know where the patients or leads that

22  you had were coming from?

23  A.   I do not.

24  Q.   And then you would fit in -- after he got those leads, how

25  would you fit into that process?
```

1   A.  We would use -- we would use those leads in place of the

2   raw data that we were using to generate our own patients.

3   Q.  Did you get paid anything additional for this work with

4   Mr. Ramamurthy?

5   A.  So we billed Rama a certain amount.  I believe Rama was

6   paid directly from LabSolutions and had his own contract, and

7   we billed Rama an amount for using our -- for using our process

8   and infrastructure.

9        MS. GURSKIS:  Your Honor, at this time the government

10  would move to admit Exhibits 1344 and 1344-A.

11       THE COURT:  Those will be admitted without objection.

12       (Government Exhibits 1344 and 1344-A were received in

13       evidence.)

14       MS. GURSKIS:  May I publish, Your Honor?

15       THE COURT:  You may.

16  BY MS. GURSKIS:

17  Q.  Is this an email from Nicholas Vartanian to you,

18  Mr. Griner?

19  A.  Yes, it is.

20  Q.  And the subject is Rama List?

21  A.  Correct.

22  Q.  And was "Rama" a name that you knew Mr. Ramamurthy by?

23  A.  Yes.

24  Q.  I'm showing you 1334-A.

25       Do you know what this document is, Mr. Griner?

1   A.   Can you zoom out a little?  It's --

2   Q.   Sure.

3   A.   Thank you.

4        These were -- these were leads or patients that Rama had

5   submitted.

6   Q.   For LabSolutions?

7   A.   Correct.

8   Q.   Did you ever discuss the work that you were doing with

9   Mr. Ramamurthy with Minal Patel?

10  A.   Yes.

11  Q.   What did you discuss about that?

12  A.   We discussed everything related -- related to Rama and

13  helping him generate as many patients as possible.

14  Q.   Did you discuss any strategies for helping him generate

15  business?

16  A.   Just in general, that he wanted us to help Rama in any way

17  that we could to help him produce volume.

18  Q.   How did you find doctors for the scheme?

19  A.   I had relationships with two different telemedicine

20  companies that employed the doctors.

21  Q.   What were the names of those companies?

22  A.   MyOnCallDoc and LifeMD.

23       MS. GURSKIS:  Your Honor, at this time the government

24  would move to admit 620, 620-A, 621, 621-A, 622, 622-A, 623,

25  623-A, 675, 675-A, and 676 and 676-A.

```
 1              THE COURT:  Admitted at this time without objection.
 2          (Government Exhibits 620, 620-A, 621, 621-A, 522, 622-A,
 3          623, 623-A, 675, 675-A, 676, 676-A were received in
 4          evidence.)
 5              MS. GURSKIS:  May I publish, Your Honor?
 6              THE COURT:  You may.
 7    BY MS. GURSKIS:
 8    Q.  Mr. Griner, I'm showing you Government's Exhibit 620.
 9          Do you recall who Rachel Eisner is?
10    A.  She was an employee at MyOnCallDoc.
11    Q.  And drawing your attention to 620-A, what is this document?
12    A.  That was a credit card authorization form for them to
13    charge for the consults.
14    Q.  And what about this second page here?
15    A.  That is a service agreement.
16    Q.  And Government's Exhibit 621, Mr. Griner.  Again, this is
17    an email from Rachel Eisner a little bit later.
18          And you said she's from MyOnCallDoc?
19    A.  Correct.
20    Q.  And this is another service agreement or draft service
21    agreement between IDGAF and MyOnCallDoc?
22    A.  Yes.
23    Q.  And showing you Government's Exhibit 622.  It looks like
24    here you're forwarding the agreement to Christian McKeon?
25    A.  Yes.
```

1   Q.   Why would you forward it to Mr. McKeon?

2   A.   He was in charge of the entire process and pieces and

3   wanted to see the agreement.

4   Q.   Showing you now Government's Exhibit 623.   Who is this an

5   email to, Mr. Griner?

6   A.   Minal Patel.

7   Q.   And what are you sending him?

8   A.   A copy of the MyOnCallDoc service agreement.

9   Q.   Why were you sending Minal Patel a copy of the MyOnCallDoc

10   service agreement?

11   A.   Minal requested it for approval.

12   Q.   Did he always request those type of contracts for approval?

13   A.   Anything related to telemedicine, yes.

14   Q.   I'm showing you Government's Exhibit 675.   This is from --

15   somebody from LifeMD.

16       Is that the other telemedicine company that you were

17   discussing?

18   A.   Yes.

19   Q.   And did they also help you with leads for LabSolutions?

20   A.   Not with leads.

21   Q.   With the patients?

22   A.   Correct.   They performed the telemedicine consults.

23   Q.   Can you explain what we're looking at here at

24   Government's 675-B, Mr. Griner?

25   A.   That is an invoice from LifeMD for consults.

1    Q.   So it was -- it looks like it's $140 per consult?

2    A.   Correct.

3    Q.   So we just looked at a bunch of these contracts.

4         What was your expectation of what the doctors would do?

5    A.   They would contact the potential patient, verify their

6    information, verify the familial or personal history of cancer,

7    and then execute the requisition form so a test could be

8    performed.

9    Q.   Do you know if any of these doctors actually called any of

10   the patients?

11   A.   I do not know that.

12   Q.   You don't know that?

13   A.   I don't know that.

14   Q.   Do you know what the approval rate was for genetic testing

15   orders by these doctors?

16   A.   I don't know an exact percentage, but it was very high.

17   Q.   Was it above 90?

18   A.   I would say that would be accurate.

19   Q.   What would have happened if you weren't getting an above 90

20   percent approval rate from LifeMD or MyOnCallDoc?

21   A.   We would have found another telemedicine company.

22        MS. GURSKIS:  Your Honor, at this time the government

23   would move in Exhibits 710, 710-A, B, and C, 717, and 717-A.

24        THE COURT:  Those will be admitted at this time without

25   objection.

```
1          (Government Exhibits 710, 710-A through C, 717, and 717-A
2      were received in evidence.)
3          MS. GURSKIS:  May I publish, Your Honor?
4          THE COURT:  You may.
5  BY MS. GURSKIS:
6  Q.  I'm showing you now Government's Exhibit 710, Mr. Griner.
7      Can you explain what this document is?
8  A.  That is an invoice for performed consults.
9  Q.  And what are the Excel spreadsheets that are attached to it
10 or referenced?
11 A.  Those would be reports.  It would be a list of the consults
12 that we were being billed for.
13 Q.  This is 710-A, Mr. Griner.  You see there are some names
14 here, provider names, and then there's some words in the RX
15 column.
16     Do you see that?
17 A.  Yes.
18 Q.  What does "RX yes" mean?
19 A.  RX yes was the initial consult where the doctor would do
20 the consult and then sign the requisition form.
21 Q.  And do you know if any of those consults actually happened?
22 A.  No, I do not.
23 Q.  And then, in the RX column under results, what does that
24 mean?
25 A.  The results would be the second consult that were to be --
```

1   would have been performed after the test had been run and the

2   results were generated.  We were responsible to have the doctor

3   share the results of any negative -- any tests that were

4   negative for any markers.

5   Q.   Sorry.  Did you say you were responsible for sharing the

6   tests of negative markers?

7   A.   That is correct.

8   Q.   So what was the plan for positive markers?

9   A.   LabSolutions had genetic counselors that would share those

10   results and explain exactly what they meant with the patients

11   in the event that they were positive for any markers.

12   Q.   Do you know if LabSolutions actually had any genetic

13   counselors?

14   A.   No, I do not.

15   Q.   Did you ever meet a genetic counselor at LabSolutions?

16   A.   No, I did not.

17   Q.   In terms of the negative results and providing the negative

18   results to patients, whose responsibility was it to provide the

19   negative results to patients?

20   A.   It was our responsibility to have the original doctor that

21   performed the initial consult to also provide those results.

22   Q.   Now showing you Government's Exhibit 717.

23        Before I move on from that, I've showed you just one of

24   these spreadsheets.

25        How often would you receive spreadsheets like this in the

1    course of your business with Mr. Patel?

2    A.   They were attached with every invoice.

3    Q.   So is that once a month, a couple of times a month?

4    A.   I don't remember.  I believe it was twice a month or when

5    we hit a certain amount of consults.  I believe MyOnCallDoc did

6    it based on dates, and I believe LifeMD did it based on a

7    certain amount of volume.

8    Q.   I'm showing you now Government's Exhibit 717.

9         What is this document, Mr. Griner?

10   A.   That's another invoice.

11   Q.   Okay.  I'm showing you 717-A.

12        What are we looking at here, Mr. Griner?

13   A.   That is a -- that is a breakdown from MyOnCallDoc of the

14   specific doctor and the number of consults they completed.

15   Q.   So it looks like a no-show costs $25, and then a completed

16   consult was $67.50; is that right?

17   A.   That is correct.

18   Q.   Do you know if the doctors who were with MyOnCallDoc or

19   LifeMD had to have any particular type of certification or

20   training?

21   A.   There were required to have a PECOS certification.

22   Q.   What is a PECOS certification?

23   A.   PECOS certification is a certification that the doctor

24   would get that would allow them to write prescriptions for

25   Medicare patients and have those tests then reimbursed and

1    billed and paid by Medicare.

2    Q.   Okay.  So it's something unique to Medicare?

3    A.   I believe so.

4    Q.   And did anybody give you a particular instruction about

5    making sure that these doctors have that PECOS certification?

6    A.   Yes.

7    Q.   Who was that person?

8    A.   Minal.

9    Q.   Do you know if any of the telemedicine doctors had any

10   prior relationship with the beneficiaries who they were

11   calling?

12   A.   Yes, I do know, and, no, they did not have any prior

13   relationship.

14   Q.   Did you ever share that with Minal Patel or discuss that

15   with him?

16   A.   I don't know if in that specific.  He was aware and

17   approved the process of using the raw data and then using a

18   telemedicine doctor to perform the consult.

19   Q.   Do you know if the telemedicine doctors were expected to

20   have any future relationship with the beneficiaries after

21   ordering the test?

22   A.   Only to give the results, if they were negative, but beyond

23   that, no.

24        MS. GURSKIS:  Your Honor, at this time I'd like to show

25   the witness a document that has been admitted with a prior

1    witness, which is Government's Exhibit 417, and specifically

2    417-A and B.

3              THE COURT:  You may.

4    BY MS. GURSKIS:

5    Q.  I'm showing you Government's Exhibit 417, Mr. Griner.

6        Do you recognize this type of email?

7    A.  Yes, I do.

8    Q.  Okay.  Do you know what fax2@LabSolutions.com is?

9    A.  I believe it was an email set up to receive -- receive

10   these as well.

11   Q.  Okay.  And is that your name here on the copy line?

12   A.  Yes, it is.

13   Q.  Showing you now 417-A, Mr. Griner.

14       Do you recognize this type of document?

15   A.  Yes, I do.

16   Q.  What is it?

17   A.  That would be the in-house information that was collected

18   from the telemarketer on the call.

19   Q.  When you say "in-house," who creates or generates this

20   form?

21   A.  Well, Thanasi created the form and had a web form where

22   this information was entered by the rep while they were on the

23   phone with the -- with the patient.

24   Q.  And these references to IDGAF, is that showing the

25   connection to your company?

1   A.   Correct.

2   Q.   Do you know why the Social Security number is listed as

3   11111111?

4   A.   I do not.

5   Q.   Do you know why the email domain is listed as @nothing.com?

6   A.   No, I do not.

7   Q.   Showing you now 417-B.  And before I do that, do you see

8   the patient's name here, E.G., Mr. Griner?

9   A.   Yes, I do.

10   Q.   This is also for patient E.G.

11       What is this document here, Mr. Griner?

12   A.   That would be a requisition form that would have to be

13   completed by the doctor and then signed by the patient.

14   Q.   What relationship did that form that we just looked at have

15   to this requisition form?

16   A.   So the data that was in that form would be then

17   prepopulated into the requisition form that we're looking at.

18   Q.   Do you know what this 234 means in the corner?

19   A.   I believe that had to do with our -- with our company so

20   that they knew where it came from, who generated it.

21   Q.   When you say "they," who do you mean?

22   A.   LabSolutions.

23   Q.   And also turning here to -- or drawing your attention to

24   Mr. G., do you see that it says:  It's a male?

25   A.   Yes.

1    Q.   And do you see that it says:  Born in 1950?

2    A.   Yes.

3    Q.   And this also includes a prenatal form?

4    A.   Yes.

5    Q.   Does this match the prenatal form that was sent to you by

6    Minal Patel that we looked at a little bit earlier today?

7    A.   Yes.

8    Q.   And here again, one more thing on this document,

9    Mr. Griner.  I see a couple of checked boxes here under

10   molecular diagnostic testing options.

11        Was there any option on this form for providers to just

12   select a couple of genes or a smaller subset of genes from that

13   list of genes?

14   A.   No, it was either the full panel or the one specific to

15   breast or ovarian cancer.

16        THE COURT:  Let's go ahead at that point and stop right

17   here, if we could.

18        Folks, let's go ahead and give you all a 15-minute

19   break.  Okay?  We've gone about an hour and a half.  Let's

20   leave your notepads on your chairs, please.  Feel free to use

21   the restroom, stretch out.  When you return, we'll pick up

22   where we left off.  You're excused.

23        THE COURT SECURITY OFFICER:  All rise for the jury.

24        (Jury exits at 11:02 a.m.)

25        THE COURT:  Please be seated, everyone.  Restroom

1    break, 15-minute break.

2         (Court recessed at 11:02 a.m.)

3         (Back on the record at 11:25 a.m.)

4         THE COURT:  Please be seated, everyone.  Let's see if

5    our jurors are ready.

6         THE COURT SECURITY OFFICER:  All rise.

7         (Jury enters at 11:26 a.m.)

8         THE COURT:  Please be seated, everyone.  All right,

9    folks.  We'll continue now with the examination of Mr. Griner.

10        Counsel, go ahead.

11        MS. GURSKIS:  Thank you, Your Honor.

12   BY MS. GURSKIS:

13   Q.  Mr. Griner, when we left off for the break we were talking

14   about Government's Exhibit 417-B, which is still up on the

15   screen.

16        Do you remember that?

17   A.  Yes.

18   Q.  And we had talked about it in connection with 417-A, which

19   you explained was generated through the sales rep calls.

20        Do you recall that?

21   A.  Yes.

22   Q.  Do you know if those two documents, which both have

23   Mr. G.'s name on them, are the full patient file, or were there

24   ever other records that were collected relating to the

25   patients?

1   A.   I believe that those were the full patient information that

2   was collected.

3   Q.   Did Minal Patel ever give you feedback on the information

4   being collected for the patients?

5   A.   Not that I remember.

6   Q.   Can you explain how IDGAF, or I-D-G-A-F, earned money in

7   this scheme with Minal Patel?

8   A.   So initially, when I started the process, I was paid

9   directly from LabSolutions.   I was paid a percentage of the

10  reimbursement for each test.   And then, once I worked with

11  Christian, I was paid a percentage of the profits that were

12  left over after the expenses were paid to run the -- to run the

13  call center.

14  Q.   And when you were working with Mr. McKeon, was that still a

15  percentage of what was being reimbursed?

16  A.   So -- so, yes.   XGEN was paid a percentage of the

17  reimbursements.   And then after the expenses that were paid,

18  then IDGAF would receive a portion of that money.

19  Q.   Was there a name for that type of payment?

20  A.   Kickback.

21  Q.   So do I have it right that either the kickbacks were coming

22  at the beginning, directly from LabSolutions, and then once you

23  looped in XGEN, they were coming through XGEN to I-D-G-A-F, or

24  IDGAF?

25  A.   That is correct.

1   Q.   Was it expensive to run the call center?

2   A.   Yes, very.

3   Q.   Can you explain that in more detail?

4   A.   The cost -- the data cost, the sales reps' salaries and

5   bonuses, the telemedicine consults generated a very large

6   monthly -- weekly/monthly expense.

7   Q.   Did you ever address those weekly and monthly expenses that

8   you had to incur with Mr. Patel?

9   A.   I don't know if I did specifically, but he was aware of the

10  expense load and that it was a large expense.

11  Q.   Did you ever discuss with Minal Patel any possible

12  resolution or a way to move money along or front money in that

13  process?

14  A.   Yes.  Greg and Christian had a -- had a relationship with a

15  company that factored money, and we brought -- we brought his

16  company in to -- to advance us the funds so we wouldn't have to

17  wait until the tests were actually reimbursed.

18  Q.   Okay.  You say "factored money."  Can you explain what that

19  means?

20  A.   So we would get paid a percentage of what was coming in,

21  and the factor company would then take a portion as a finance

22  fee for advancing us the money and not having to wait.

23  Q.   Okay.  And you mentioned somebody named Greg who was

24  involved in that.

25       What is Greg's full name, if you can recall?

1    A.   Gregory Orr.

2    Q.   And the Christian you were talking about in that situation

3    is Christian McKeon?

4    A.   Yes.

5    Q.   Did you ever discuss this factoring opportunity with Minal

6    Patel?

7    A.   Yes.

8    Q.   Tell us about that.

9    A.   We explained what the opportunity was, and the owner of the

10   factoring company wanted to meet and see the lab prior to

11   agreeing to -- to factor us the money.

12   Q.   Do you know if the -- that owner of the factoring company

13   actually did go to the lab?

14   A.   Yes, he did.

15   Q.   And do you know the person's name?

16   A.   Mike Dinnen.

17   Q.   Mike Dinnen?

18   A.   Yes.

19   Q.   And did anybody provide Mr. Dinnen with a tour?

20   A.   I was not there, but I believe that's one of the reasons

21   that he went there, was to get a tour of the lab.

22   Q.   Okay.  And I think you gave us a high-level description of

23   factoring, but if you could just explain in maybe a little more

24   detail, piece by piece, so we can follow along exactly what

25   that means.

1   A.   So we would provide a copy of -- like, a weekly report of

2   tests that were generated for that week.  Mike Dinnen's

3   factoring company would then advance us a percentage of the

4   total amount that was -- was billed and would -- his company

5   would wait until LabSolutions actually got reimbursed.  And he

6   would make the difference between what he gave us and what the

7   actual reimbursement was.

8   Q.   Okay.  So it's sort of like a financing system or almost

9   like a payday loan advance or something like that?

10  A.   Something similar, yes.

11  Q.   Okay.  Have you met with the government several times in

12  this case?

13  A.   Yes.

14  Q.   Do you recall a time when law enforcement agents first

15  approached you?

16  A.   Yes, I do.

17  Q.   Was that in approximately August of 2020?

18  A.   Yes.

19  Q.   Were you truthful?

20  A.   No.

21  Q.   Why did you lie to the agents?

22  A.   I was scared; didn't want to get in trouble.

23  Q.   Did you begin with -- cooperating with the government

24  shortly after that first encounter with the law enforcement

25  agents?

```
 1   A.   Yes, I did.
 2   Q.   And did you ultimately sign a plea agreement about a year
 3   later?
 4   A.   Yes.
 5   Q.   What changed between that first encounter with law
 6   enforcement and now that you're here testifying?
 7   A.   I've accepted my role and responsibility in -- in helping
 8   build this fraud.
 9   Q.   During the time period that you were working with Minal,
10   did you consult with any lawyers?
11   A.   I had an indirect feedback from -- from an outside attorney
12   regarding the process that we were doing.
13   Q.   What was that feedback?
14   A.   That it was completely illegal.
15   Q.   What was your reaction when you heard from that attorney
16   that it was completely illegal?
17   A.   Very concerned.
18   Q.   Did you share that information with anybody else?
19   A.   I shared it with Minal Patel.
20   Q.   What happened after you shared that information with Minal
21   Patel?
22   A.   Minal and his healthcare attorney explained -- explained
23   why it was compliant and that the attorney that had given me
24   that information was not a healthcare-specific attorney and
25   basically didn't know what he was talking about.
```

1   Q.   Do you know if that first lawyer was or was not a

2   healthcare-specific attorney?

3   A.   I do not.

4   Q.   Did you ever talk to a third lawyer?

5   A.   Myself, Christian McKeon, and Gregory Orr met with -- met

6   with an attorney to get the attorney's -- call it "stamp of

7   approval" on the process.  I was at one meeting; it was two to

8   three hours long.

9   Q.   Okay.  And did you get that stamp of approval from that

10  attorney?

11  A.   No, we did not.

12  Q.   So knowing that you received this information from Minal

13  Patel and his lawyer about the activities that you were engaged

14  in, why did you lie to the agents when you were first

15  approached?

16  A.   I was scared.

17  Q.   Can you explain?

18  A.   I initially believed the information that I was given from

19  Minal's attorney and -- from Minal and his attorney.  And then,

20  over time, I didn't have much confidence in that information.

21  And I was very surprised when the agent showed up, and I was

22  not -- I was not fully truthful.

23  Q.   You said that over time you became less confident about the

24  information you got from Minal and his lawyer.

25       Did anything in particular happen?  Were there things that

1   you observed, or what made that happen for you?

2   A.   There were a couple of things.  We had patients that were

3   complaining that they'd never ordered the test.  We had

4   patients complaining that they never had a doctor consult.

5        There was an issue with a very large number of samples that

6   were not able to be billed, and Minal had us have those -- have

7   those particular consults -- they weren't redone, but we had to

8   edit the original paperwork so those samples could be billed

9   because there was an issue with the original paperwork that was

10  submitted.

11       And I continued to do my own research on being paid a

12  percentage from Medicare payments.

13  Q.   And what did you learn from that research?

14  A.   Completely illegal.

15  Q.   And when you said that -- you said something about forms

16  that Minal wanted to be redone.

17       Can you explain that in a little more detail?  I'm not sure

18  that I quite followed what you were talking about.

19  A.   I don't remember the specifics that needed to be changed,

20  but there was a large number of samples that had made it to the

21  lab to be billed.  And there was an issue with a large number

22  of them with the paperwork that prevented them from being

23  billed and then, obviously, reimbursed and paid.

24  Q.   And what was the issue that you saw there, if any?

25  A.   Don't think a lab or -- or anyone should be instructing a

1    doctor on paperwork that they're completing.

2              MS. GURSKIS:  Your Honor, at this time the government

3    would move to admit Exhibits 16, 16-A, and 1629-L.

4              THE COURT:  Those will be admitted without objection.

5         (Government Exhibits 16, 16-A, and 1629-L were received

6         in evidence.)

7              MS. GURSKIS:  Do I have permission to publish, Your

8    Honor?

9              THE COURT:  You do.

10   BY MS. GURSKIS:

11   Q.   Do you recognize this, Mr. Griner?

12   A.   Yes, I do.

13   Q.   What is it?

14   A.   It is a flowchart.

15   Q.   And do you know what the purpose of the flowchart was?

16   A.   Christian put together multiple flowcharts to show

17   exactly -- to show, you know, how we were taking a patient

18   from -- I'm sorry -- from the beginning -- the beginning step

19   all the way to the end of the test being billed and paid.

20   Q.   Do you know why Christian was creating the flowchart?

21   A.   Minal had asked for it.

22   Q.   Do you know why Minal and Christian wanted the flowchart?

23   A.   I don't know if Christian wanted it, but Minal wanted it, I

24   believe, for compliance.

25   Q.   Okay.  So looking at the flowchart here, the first step

1   says:  Patient is enrolled in cancer testing by having familial

2   history.

3       Is that really the first step here in this process?

4   A.  No.

5   Q.  What's the first step?

6   A.  The first step would be purchasing the Medicare data and

7   then having a telemarketer contact and qualify that that

8   patient was qualified to -- to do the test.

9   Q.  Okay.  And then moving down here, it says:  Insurance

10  information is sent to lab for verification.

11      Is that accurate?

12  A.  I believe it was -- the Medicare information was sent just

13  to make sure it was valid -- valid Medicare ID.

14  Q.  Okay.  And then moving on here:  Patient is called to

15  schedule a doctor's appointment.  Doctor qualified the patient.

16      Are these steps accurate here that we're seeing?

17  A.  Yes.  Once the doctor qualified the patient, which was a

18  large majority, then -- then -- well, they're missing a step

19  where the doctor would complete the requisition form.

20  Q.  Okay.

21  A.  But once the patient was qualified and the requisition form

22  was completed, then, yes, the next step would be to have that

23  requisition form and empty sample kit sent directly to the

24  patient.

25  Q.  I'm looking at these steps here:  Test kit is sent to UPS.

1    Package tracked to patient's home.  Call is made to walk

2    patient through the test.

3        Is that all following the lines of the steps that you were

4    discussing today?

5    A.   Yes.

6    Q.   Call tag is issued, and UPS picks up kit.  Package is

7    tracked.  Package at lab.  And then the last step is lab runs

8    test and provides results.

9    A.   Correct.

10   Q.   Okay.  So is it fair to say that if someone were relying on

11   this as the steps of the process, that it would be missing

12   information?

13   A.   Yes.

14   Q.   Does it include any information about how the leads are

15   generated in the first place?

16   A.   No.

17   Q.   Does it include any information about how the doctors are

18   compensated?

19   A.   No.

20   Q.   Showing you now 1629-L.  Is this another version of that

21   chart that we were just looking at?

22   A.   It is, but I can't read --

23   Q.   Okay.  I'll zoom in, Mr. Griner.

24       Does this say that the patient is enrolled in cancer

25   genetic testing by opting in?

1   A.   Yes, it does.

2   Q.   Is that true or false?

3   A.   That is false.

4   Q.   And then here, we have the same insurance qualified step.

5   And here we're seeing a couple of additional steps that are

6   added.

7        Patient is asked if they would like to go through their own

8   physician or a qualified PECOS certified and licensed in the

9   patient's state telemedicine provider.

10       Are you aware of any patients getting that option?

11  A.   No.

12  Q.   Patient's information is populated on the requisition form

13  and faxed to the patient's doctor.

14       Are you aware of that option happening?

15  A.   No.

16  Q.   And here, this is talking about what the provider detailed

17  in the consult.

18       Were you aware of any consults ever happening with the

19  providers?

20  A.   Can you ask that --

21  Q.   Sure.  So this step says that -- did the provider qualify

22  the patient from the cancer history mentioned, and did the

23  patient want to proceed with the test from what the provider

24  detailed in the consult?

25  A.   Is that referring to the telemedicine doctor?  Is that what

1   provider -- is that --

2   Q.   It's the step following patient's information is entered

3   into the portal and provider is selected for the patient.

4   A.   Okay.

5   Q.   So are you aware of patients receiving consults?

6   A.   I'm aware that they were supposed to receive consults.  I

7   do not know if they actually happened.

8   Q.   Okay.  And here it says the provider, at their discretion,

9   fills out the requisition form.

10      Do you know who filled out those requisition forms?

11  A.   I believe they were prepopulated from the original -- from

12  the original information sheet that was generated by Thanasi.

13  Q.   And that's Mr. Ziros?

14  A.   Yes.

15  Q.   And then it says:  A preshipment call is made to the

16  patient to confirm the address.  Patient confirms address.  The

17  test kit is sent to the patient.  Package tracked to patient's

18  home.  And then it's followed through whether the test is

19  completed, the package tracking that we saw on the other chart

20  is here.

21      And then it says:  Lab runs test and provides results for

22  the provider.

23      Do you see that?

24  A.   Yes, I do.

25  Q.   Is it fair to say that this chart is not accurate?

 1  A.  Yes.

 2  Q.  So if somebody were relying on this for information about

 3  the process, would they have the full picture?

 4  A.  No.

 5  Q.  Do you recall any type of training that you had to do with

 6  LabSolutions?

 7  A.  They had webinars, but no -- I don't remember specific

 8  training.

 9  Q.  What were the webinars about?

10  A.  I don't remember the specifics.  They were -- they were --

11  I don't remember the specifics.

12  Q.  Was there any training or information provided to you

13  relating to compliance?

14  A.  Not that I recall.

15  Q.  About how long do you think you worked with Mr. Patel on

16  this scheme?

17  A.  Between two to two and a half years.

18  Q.  And in that time period, how often were you talking to him?

19  A.  On a regular basis.

20  Q.  Was that usually over the phone, in person, over text?

21  A.  I did meet with him multiple times over the course, but the

22  majority of the communication was via telephone or text.

23  Q.  Okay.  And do you know what phone number you would use when

24  you were speaking to him during that time period?

25  A.  Do you mean my phone number?

1    Q.   Yes.  Can you provide that for us, please?

2    A.   561-703-8474.

3    Q.   And when you were having these regular conversations with

4    Mr. Patel, what would you typically discuss?

5    A.   We would discuss anything that was going on with the

6    business that needed attention.

7    Q.   Can you give more specific examples?

8    A.   We would discuss anything -- you know, anything that was

9    going on on that particular day or week, whether it was telemed

10   consults, requisition forms, billing changes, reimbursement

11   changes.

12   Q.   When you said -- say billing changes and reimbursement

13   changes, can you elaborate on that a little bit more?

14   A.   Over the course of time, Medicare changed certain criteria

15   as to who was -- as to what cancers would be approved or

16   preexisting, and if they had to have family or multiple family

17   members.  And then there were -- the reimbursement amounts

18   changed as well.

19   Q.   Focusing on what you were talking about in terms of the

20   guideline changes, what do you remember about that?

21   A.   That over time the criteria for the patient to be approved

22   and reimbursed got more difficult.  It was -- it was easier

23   when we started.  It was just a family history that was needed

24   to be approved and billed.

25   Q.   And was that something that you discussed with Minal Patel

1  specifically?

2  A.  Yes.

3  Q.  Do you remember any specific conversations with him about

4  those changes?

5  A.  Well, he let us know when there were changes so that we

6  would target those specific type of leads or data.  We didn't

7  want to, obviously, run the tests for anyone who wasn't going

8  to be paid.

9  Q.  Do you know if Medicare actually was changing the criteria?

10  A.  I do not know that.

11  Q.  Who is your source of information about the Medicare

12  billing criteria?

13  A.  Minal Patel.

14  Q.  You mentioned also that you would sometimes meet with Minal

15  Patel in person?

16  A.  Correct.

17  Q.  Where would that be?

18  A.  I met with him up in Atlanta, at the lab.

19  Q.  How often would you go to the lab?

20  A.  I'd say I was there roughly ten times, give or take, over

21  the -- over the time period.

22  Q.  What would be the reason for you going to the lab?

23  A.  Just to discuss business and -- and pleasure as well, go

24  out for drinks and dinner.

25  Q.  Who would you be at the lab with?

1   A.   Minal and the other employees.

2   Q.   Who was your primary contact at LabSolutions?

3   A.   I had multiple contacts.   On a day-to-day basis, I would be

4   in contact with John Berarducci.   I also spoke to -- also dealt

5   with Nick Saliba on a regular basis, and also Minal.

6   Q.   How would you decide when to reach out to Minal Patel

7   versus Nick Saliba versus John Berarducci?

8   A.   I would call Minal if there was any type of issue that one

9   of those could not handle or I wasn't satisfied with their

10   handling of any issue.

11   Q.   Do you recall any specific examples?

12   A.   I don't, off -- I don't.

13   Q.   Do you recall ever raising concerns or questions with Minal

14   Patel?

15   A.   Do you mean in general?

16   Q.   Yes.

17   A.   Yes.

18   Q.   And then do you recall any specific conversations about

19   questions or concerns that you raised with Minal Patel?

20   A.   I specifically remember the outside attorney informing me

21   that -- the process that we were doing and the fact that we

22   were getting paid a reimbursement billed to Medicare, that one

23   stands out in my mind the most.

24   Q.   Do any others stand out in your mind?

25   A.   When there was -- when the billing issue happened, there

1  was a substantial amount of samples that had been processed and

2  ran, and it was a very, very high priority for us to get

3  whatever paperwork needed to be corrected so that those could

4  be billed.

5  Q.  How did you -- what made you think it was a high priority?

6  A.  Minal said it's a high priority.

7  Q.  Do you recall any patients ever -- I believe you said

8  earlier that you recall patients complaining to LabSolutions.

9  A.  Yes, I do.

10        MS. GURSKIS:  Your Honor, at this time the government

11  would move to admit 1701, 1702, 1703, 1704, and 1438.

12        THE COURT:  Those will be admitted at this time without

13  objection.

14     (Government Exhibits 1438, 1701, 1702, 1703, 1704 were

15       received in evidence.)

16        MS. GURSKIS:  Do I have permission to publish, Your

17  Honor?

18        THE COURT:  You do.

19  BY MS. GURSKIS:

20  Q.  Turning your attention to Government's Exhibit 1701,

21  Mr. Griner.

22        Do you see the subject line?

23  A.  Yes, I do.

24  Q.  What does it say?

25  A.  Missed call from telemed patient.

1    Q.   All right.  And then person's name and date of birth and

2    phone number are given?

3    A.   Yes.

4    Q.   Do you know who Shelbi Davis is?

5    A.   Shelbi worked at the lab.

6    Q.   Did you have much interaction with Ms. Davis?

7    A.   I did.

8    Q.   Do you know what role she had at the lab?

9    A.   I would say, an administrative assistant role.

10   Q.   Okay.  And then Shelbi sends an email:  Sales rep, please.

11   Matt O'Meara responds:  Rochelle Coughlin is XGEN, so

12   Shawn/Thanasi.  Thank you.

13        Do you know who Matt O'Meara is?

14   A.   I don't recall Matt.

15   Q.   And then you got an email from Shelbi, copying Minal Patel:

16   The patient has called the lab two days in a row.  See below.

17   Patient called her doctor and states her doctor didn't order

18   it.  Her information is below.

19        And then you respond:  The test was on order by her primary

20   doctor, that you'll call her again, and she did not answer.

21        Do you remember talking about this particular situation

22   with Minal Patel or anybody at LabSolutions?

23   A.   I don't remember an exact conversation regarding this

24   particular patient.

25   Q.   How often did complaints like this come up?

1    A.   Often.

2    Q.   Now, turning your attention to Government's 1702.  So this

3    is an email from Puja Sheth, April 3, 2017, e-mailing Shelbi

4    Davis, subject:  Missed call from Rudy Smith, telemed patient,

5    provides her date of birth and phone number.  Wants to know why

6    she got the kit.

7         Do you see that?

8    A.   Yes, I do.

9    Q.   And then Ms. Davis responds:  Sales rep, please, Matthew

10   O'Meara, Rudy Smith is Infinity too, so Shawn, Thanasi,

11   Christian.  Thanks.

12        Shelbi emails you, again, copying Minal Patel:  See below

13   and contact the patient.  You say you contacted the patient and

14   answered questions.

15        Do you have any memory of this call with this patient?

16   A.   No, I do not.

17   Q.   How often would you have calls like this with a patient?

18   A.   On a regular basis.

19   Q.   What kinds of things would they want to talk about?

20   A.   They were confused as to who ordered the test, why they

21   took the test.  Those would be the main -- main reasons.

22   Q.   Did you ever discuss that confusion and those questions

23   with Minal Patel?

24   A.   Yes.

25   Q.   What was his response?

1   A.   That the patient should obviously know why they're -- why

2   they took the test, and to make sure that -- to reduce these

3   types of calls.

4   Q.   This is 1703, which is -- includes part of the chain that

5   we were looking at before about Rochelle Coughlin.

6        Do you remember that just a moment ago when we were talking

7   about that patient?

8   A.   Yes.

9   Q.   Okay.  So we just looked at the fact the patient called the

10  doctor, states her doctor didn't order it.

11       Christian responds:  I wasn't told about the first call.

12  It will be handled today, and I'll send you the resolution.

13  Please put me on all accounts.

14       And then Ms. Davis responds to you -- to McKeon, copying

15  you and Minal Patel:  Sure, I will include him going forward.

16  Please be sure to educate all patients on this procedure as we

17  are receiving daily patient calls.

18       Do you recall discussing anything about daily patient calls

19  or complaints with Minal Patel?

20  A.   Yes.

21  Q.   What do you remember about that?

22  A.   That it was an issue and that he -- you know, he did not

23  want those calls going to the lab.

24  Q.   Did he express any kind of concern about it?

25  A.   Yes.

1    Q.   Can you elaborate?

2    A.   He was concerned that patients were taking the test and

3    then, after taking the test, having questions about how -- why

4    they took it or -- if their doctor didn't order it.

5    Q.   Okay.  Now turning your attention to 1438.  This is an

6    email from Kristen Sorenson to fax2@LabSolutions, copying

7    Thanasi, you, Rachel Eisner, and RX@BBAR.us.

8         Do you see that?

9    A.   Yes, I do.

10   Q.   And this says:  Per Dr. Cohen's SOAP note, patient has a

11   family history of cancer but does not want a cancer screening

12   test at this time.

13        Do you see that?

14   A.   Yes, I do.

15   Q.   And the date on that is November 10th.

16        And then Thanasi says:  Dr. Wendt already did the consult

17   and completed it on the 10th of October.

18        Why is Dr. Cohen calling this patient?

19        And then Ms. Eisner replies:  Unsure why the doctor called

20   her now.  Looks like she was scheduled with both Dr. Wendt and

21   Dr. Cohen on October 9th.

22        Do you have any memory of this particular situation?

23   A.   No, not specifically.

24   Q.   Okay.  But generally, can you explain what's going on based

25   on the email that we just looked at?

1    A.   So it -- it appears that one doctor had contacted the

2    patient, and the patient did not want to do the test.  And that

3    was done after they supposedly spoke to another doctor that

4    completed the consult, meaning the patient wanted to do the

5    test.

6    Q.   So I think you said you ended up working with Mr. Patel for

7    two or two and a half years?

8    A.   In that -- in that time frame.

9    Q.   How much of the business at IDGAF, or I-D-G-A-F, came from

10   LabSolutions during that time period?

11   A.   How much of the business went to LabSolutions?

12   Q.   Or came from -- your -- so I believe you said you were

13   reimbursed based on what LabSolutions was receiving from

14   Medicare.

15   A.   Okay.

16   Q.   How much of your pay -- how much of IDGAF's money came from

17   LabSolutions or LabSolutions-generated business versus other

18   companies?

19   A.   Between 90 and 95 percent.

20        MS. GURSKIS:  Your Honor, at this time the government

21   would move to admit 1684, 1386 and 1386-A, 1387, 1388, 1939,

22   and 1939-A.

23        (Government Exhibits 1386, 1386-A, 1387, 1388, 1684,

24        1939, 1939-A were received in evidence.)

25        MS. GURSKIS:  May I publish, Your Honor?

```
 1            THE COURT:  You may.

 2            MS. GURSKIS:  Showing the witness Government's

 3   Exhibit 1684.

 4   BY MS. GURSKIS:

 5   Q.  Do you see that this email chain starts with an email from

 6   you, Mr. Griner?

 7   A.  Yes.

 8   Q.  And it's a little bit earlier than some of the emails we

 9   were just looking at, but September 20, 2016?

10   A.  Correct.

11   Q.  Okay.  And you say:  Good morning, guys.  I hope all is

12   well.  I see that the specimens are making it back to the lab.

13   Big grin.  Can you please put a rush on the results of these

14   samples as we discussed a couple of weeks ago, Omar.  I greatly

15   appreciate your help with all of this and see the light at the

16   end of the tunnel.

17            And then Minal responds -- Minal Patel responds -- can you

18   read his response, Mr. Griner?

19   A.  Shawn, I have my lab coat on and am eagerly waiting for the

20   mailman.  I will process and translate these samples

21   personally, with a smiley face.

22   Q.  Do you know if he was really going to process and treat the

23   samples personally?

24   A.  I do not know that.

25   Q.  Okay.  And then you asked about a portal to track
```

1   everything once the specimens are received at the lab.  Minal

2   tells you to call Shelbi.

3        Do you know if a portal like that existed?

4   A.  Yes, it did.

5   Q.  Was that something that you used in your business with

6   Minal Patel?

7   A.  Yes.

8   Q.  How did you use it?

9   A.  Used it on a daily basis to track the samples, status of

10  the samples.

11  Q.  Okay.  And then Omar responds:  I'll tell you this much,

12  Griner, we are turning things around in under -- he states

13  three weeks on average.  I promise you this is considerably

14  better than most of the competition.  We will continue to get

15  faster.  And did Nicholas not set you up a portal?

16       What did you understand Mr. Aleem to be doing in this

17  email?

18  A.  Basically explaining that they're to focus on certain

19  states that they're able to get results quicker in.

20  Q.  Earlier you mentioned that Minal Patel wanted to approve

21  the telemedicine contracts?

22  A.  Correct.

23  Q.  Were there other aspects of the business that Minal Patel

24  needed to approve before you got started on them?

25  A.  Yes.

1    Q.   Do you recall anything specifically?

2    A.   He wanted copies of the scripts that we were going to be

3    using to pitch to patients.  He did want to -- he approved the

4    telemedicine companies.  We had to send the contracts and the

5    company information for him to review and approve.  I believe

6    there were other things; I just don't remember.

7    Q.   Okay.  I'm going to show you Government's Exhibit 1386.

8         Who is Sonal Jariwala?

9    A.   I believe that's Minal's sister.

10   Q.   Do you know what role she had at LabSolutions?

11   A.   I believe she was the CFO.

12   Q.   Do you know who this Tammy person is on the email?

13   A.   I do not.

14   Q.   Okay.  And to Ziros is who?

15   A.   Thanasi.

16   Q.   And then you.  And do you know who was under the

17   LSmanagement@LabSolutions.com email?

18   A.   No, I do not.

19   Q.   And then we have Shelbi@Labsolutions and Lesline Julien?

20   A.   Yes.

21   Q.   Do you know who Lesline Julien is?

22        (Court reporter clarification.)

23   A.   She was an employee at LabSolutions.

24   Q.   Do you know what her role was there?

25   A.   Administrative.

1    Q.   And here, Ms. Jariwala is saying:  You cannot create your

2    own forms and have LabSolutions' information on.   Anything

3    being sent out on the lab's behalf has to be approved.   Please

4    do not send anything out that has LabSolutions information.

5         And this was one of the attachments to the email, 1386-A.

6         Do you know what this is?

7    A.   No, I do not.

8    Q.   Okay.  But this request from Ms. Jariwala to have that

9    approval on all the forms being sent out, was that typical or

10   not typical to have that level of approval required from

11   LabSolutions?

12   A.   No, that was required.

13   Q.   And here, at 1387, you reply:  Sonal, this is why we sent

14   it to you for your approval or denial.  We have not sent

15   anything out or used anything other than the originals.

16        Do you see that, Mr. Griner?

17   A.   Yes, I do.

18   Q.   Now showing you Government's Exhibit 1939 --

19        MS. GURSKIS:  Actually, did I -- yes, I did.  Sorry

20   about that.

21   BY MS. GURSKIS:

22   Q.   Government's Exhibit 1939.  So there's an email from Rachel

23   Eisner to you:  Here you go.  You can sign this.  I'll have to

24   show you how to use Practice Fusion, but it's simple.

25        Do you see that?

1  A.  Yes, I do.

2  Q.  And can you read your response?

3  A.  Please sign this so that you can access all of the

4  patients' SOAP notes from their doctor consults as per

5  requested by Minal.

6  Q.  Okay.  And so you're sending this to Ms. Jariwala, and

7  Ms. Julien and Mr. Patel are copied.

8      Do you see that?

9  A.  Yes.

10  Q.  Do you have any memory of this particular situation

11  regarding this email?

12  A.  Minal wanted -- Minal wanted access to the patient files

13  from the telemedicine company.

14  Q.  And here, 1939-A, is the attachment, the business associate

15  agreement.

16      Do you see that, Mr. Griner?

17  A.  Yes, I do.

18  Q.  And then there's a signature there.

19      Can you tell what initials it might look like that is under

20  covered entity?

21  A.  To me, it looks like an S and a J.

22  Q.  You mentioned earlier this morning that you also worked

23  with someone named Senthil Ramamurthy?

24  A.  Yes.

25  Q.  Do you recall how long that business relation --

1   relationship lasted with Mr. Ramamurthy?

2   A.   I would estimate around six months, maybe.

3   Q.   Did you have any business relationship with him aside from

4   the scheme with Mr. Patel?

5   A.   No.

6        MS. GURSKIS:   Your Honor, at this time the government

7   would move in Government's 1941.

8        THE COURT:   That will be admitted at this time without

9   objection.

10       (Government Exhibit 1941 was received in evidence.)

11  BY MS. GURSKIS:

12  Q.   Okay.  So looking towards the end, there's an email here:

13  Let me know if you need anything.  Best, Lesline.

14       Is that the Ms. Julien you were just speaking about?

15  A.   Correct.

16  Q.   And there's a colorful chart here, which I'll come back to

17  in a moment.

18       So Lesline says:  Hi, Nicholas.  Please find below an

19  attached status update on the file you sent.  The genetic team

20  sends emails to Shelbi on a regular basis of missing telemed

21  information in order to contact the reps.  Samples are not

22  taken off hold until we have the required information.

23       Do you see that?

24  A.   Yes, I do.

25  Q.   Do you know what this chart is in reference to below here?

1    A.   I believe those are -- those are patients that were

2    generated for Mr. Rama.

3    Q.   Okay.  And then just showing who all is on the chain here,

4    it's you, Mr. Ramamurthy, Frank Ngo, Latoria Cooke.

5         Do you know who Latoria Cooke is?

6    A.   I do not remember, no.

7    Q.   Do you know who Michael Lockett is?

8    A.   No, I do not.

9    Q.   Nicholas Vartanian, is that the LabSolutions employee we

10   talked about earlier?

11   A.   Correct.

12   Q.   Do you know who Amina Rama is?

13   A.   I think it was Dr. Rama's mother.  I don't remember,

14   though.

15   Q.   Okay.  And then we have Mr. Patel.

16   A.   Correct.

17   Q.   Rama is sending this email on December 3, 2016.  There's

18   some things that are in capital letters, in all caps; I want to

19   draw your attention to that.

20        All these leads have problems, missing info.  I need all of

21   the missing info ASAP.  All the claims are on hold.

22        Do you know what the urgency was in terms of getting that

23   missing information?

24   A.   Well, if the claims were on hold, that would prevent a

25   reimbursement.

1   Q.   And what else would that prevent?

2   A.   Us getting paid.

3   Q.   And then later on in the email, Mr. Ramamurthy says:   None

4   of our claims are getting paid because of the missing info

5   below.

6        Then at the bottom:   Worst of all, this is an unnecessary

7   interruption in quality patient care.

8        Were you -- what type of quality patient care were you

9   aware of that was happening at LabSolutions?

10  A.   None.

11  Q.   Can you explain what your response is here?

12  A.   Do you want me to read it or just explain?

13  Q.   If you can just explain it.   Thank you, Mr. Griner.

14  A.   So my response was just basically to get all the names off

15  of the spreadsheet so that I could get whatever missing -- you

16  know, whatever was missing so that the samples could then be

17  reimbursed and then paid.

18            MS. GURSKIS:   Thank you.

19            Your Honor, may I have one moment?

20            THE COURT:   You may.

21  BY MS. GURSKIS:

22  Q.   Just a few more questions, Mr. Griner.

23        So we've spoken a little bit today about criteria changing

24  and Mr. Patel informing you of the criteria potentially

25  changing.

1       Do you remember that?

2   A.   Yes.

3   Q.   Regardless of what the criteria was, was a doctor's

4   approval or doctor's signature always required?

5   A.   You mean for the test to be reimbursed and paid?

6   Q.   Correct.

7   A.   Yes.

8   Q.   And did you ever use a patient's treating physician at any

9   point?

10  A.   Never.

11  Q.   Did you ever use a doctor who had any kind of existing or

12  in-person real relationship with the patient?

13  A.   No.

14  Q.   How financially successful was this scheme?

15  A.   Extremely.

16  Q.   How easy was it to make money?

17  A.   Very.  I'm sorry.  Very easy.

18  Q.   What was wrongful or harmful about this scheme?

19  A.   It generated -- well, there were a couple of things.

20  Patients were getting tests that were not medically necessary.

21  The government was being billed for these tests that should

22  have never been performed in the first place.

23       MS. GURSKIS:  Nothing further.  Thank you, Your Honor.

24       THE COURT:  Thank you.

25       Ladies and gentlemen of the jury, this is a good time

1    to break, since we finished the direct examination.  We will

2    return from lunch and begin the cross-examination of

3    Mr. Griner.

4         A few words before we break.  Please make sure that you

5    take your notepads and leave them in the jury room.  We're

6    going to return, as we've done in the past, at 1:45.  I would

7    ask, of course, that when you are out during the lunch hour, if

8    the lawyers bump into you and steer clear of you, take no

9    offense from that.  Certainly do not discuss the case with one

10   another, with family or friends on any social media, or conduct

11   any research whatsoever.

12        We will pick up where we left off when you return.

13   Have a wonderful lunch break.  Be back in the jury room at

14   1:45.

15        We are in recess.

16      (Jury exits at 12:23 p.m.)

17        THE COURT:  Please be seated, everyone.  Mr. Griner,

18   you're free to take a break as well.  We'll see you back at

19   1:45.

20        THE WITNESS:  Okay.

21        THE COURT:  Thank you.

22        All right.  Before we break, any housekeeping matters?

23   I think the defense will note, we have confirmed and set the

24   hearing at 9:00 a.m. on Friday.  You should have gotten a NEF

25   on that.  The lawyers, who I believe are based in

1    Massachusetts, will appear via Zoom, but we'll do it in court

2    with you guys live.  So we'll work on that tech setup for you

3    all on Friday.  All right?

4           I will ask, if they have a desire for a reply, that it

5    be expedited, and I'll get it in so we can all review it before

6    Friday.  All right.  So that was taken care of.

7           Anything on the government's end, housekeeping-wise,

8    before we return?

9           MS. DE BOER:  No, Your Honor.  Thank you.

10          THE COURT:  Okay.  Anything, gentlemen, before we come

11   back?

12          MR. SADOW:  No, Your Honor.

13          THE COURT:  All right.  Very good.  So we'll see each

14   other around 1:45.  We are in recess.

15          MS. DE BOER:  Thank you, Your Honor.

16          THE COURT:  You got it.

17       (Court recessed at 12:25 p.m.)

18       (Back on the record at 2:09 p.m.)

19          THE COURT:  Please be seated, everyone.  All of our

20   jurors are back and accounted for.  Any issues before we get

21   started from the government?

22          MS. DE BOER:  Just brief housekeeping, Your Honor.

23          THE COURT:  Yes.

24          MS. DE BOER:  And we've identified the defense of this

25   over the lunch hour.  We indicated yesterday that there is a

1    cell phone analyst who would be sort of our floater witness for

2    today or tomorrow if we needed somebody.  We're cutting him.  I

3    expect that this witness will finish around the same time as

4    the witness did yesterday, and given that we have potentially

5    some evidentiary legal issues to take up, you know, if we

6    finish the same time as yesterday then that will close out our

7    day and we'll be right on track for tomorrow.

8              THE COURT:  Very well.  Let's focus on Mr. Griner this

9    afternoon and we'll talk when we're done about our steps for

10   tomorrow and any other rulings that the Court may have to make

11   for future witnesses.  That works.

12             On the defense side, guys, any issues before I go ahead

13   and bring our jurors in?

14             MR. SADOW:  No, Your Honor.

15             THE COURT:  Okay.  Very good.  Let's bring them in,

16   please.

17             THE COURT SECURITY OFFICER:  All rise for the jury.

18        (Jury enters at 2:10 p.m.)

19             THE COURT:  Please be seated, everyone.  Welcome back,

20   ladies and gentlemen.  I hope you all had a good lunch.

21             We will now begin with the cross-examination of

22   Mr. Griner.  All right?

23             Mr. Sadow, the floor is yours.

24             MR. SADOW:  Thank you, sir.

25                               CROSS-EXAMINATION

 1   BY MR. SADOW:

 2   Q.   Good afternoon, Mr. Griner.

 3   A.   Good afternoon.

 4   Q.   My name is Steve Sadow.  We have not spoken previously,

 5   correct?

 6   A.   Correct.

 7   Q.   I'm going to start off, if I might, by doing what I would

 8   call a chronological evolution of your statements to the

 9   government.  Okay?

10   A.   Okay.

11   Q.   And you know that when you speak to the government,

12   typically somebody takes notes, and then a report may be

13   prepared from the notes, correct?

14   A.   Yes.

15   Q.   Okay.  So for the benefit of the jury, the first time that

16   you spoke to anyone from the government was on August the 13th

17   of 2020, correct?

18   A.   Yes.

19   Q.   Okay.  The second time you spoke to the government was

20   November 23, 2020, correct?

21   A.   I don't remember the exact date.

22   Q.   We can do it one of two ways.  I can either bring you a

23   document to refresh your recollection, or at least for

24   the purposes at this stage, you might be able to take my word

25   for it.  Whatever is best for you.

```
 1   A.   Okay, that's fine.

 2   Q.   Which one?

 3   A.   I'll take your word for it.

 4   Q.   Okay.  So that was November 23, 2020.  Okay?

 5   A.   Yes.

 6   Q.   The next time was March 11, 2021.

 7   A.   Okay.

 8   Q.   The next one was October 12, 2022.

 9   A.   Okay.

10   Q.   And then you have November 16, 2022.

11   A.   Okay.

12   Q.   December 4, 2022, just a couple of days ago.

13   A.   Correct.

14   Q.   And then November -- excuse me -- December 5th of 2022,

15   correct?

16   A.   Yes.

17   Q.   All right.  So at least as far as I know, we've got one,

18   two, three, four, five, six, seven times that you've spoken

19   with the government and reports were prepared.  Okay?

20   A.   Yes.

21   Q.   All right.  Now, I have a couple of questions to ask,

22   again, as fundamentals.  Okay?

23   A.   Yes.

24   Q.   All right.  Who is Mike, last name spelled M-o-r-n-a-z?

25   A.   Mike -- I'm sorry -- Mike Mornaz, he's a data lead seller.
```

1   Q.   Okay.  Could you give us just a little bit more of an

2   explanation?

3   A.   Yes.  I purchased data from Mike and his company.

4   Q.   And then you would use that data or data in connection with

5   your telemarketing activities?

6   A.   Correct.

7   Q.   And when did you start receiving information from

8   Mr. Mornaz?

9   A.   I don't remember the exact.

10  Q.   Give me an approximate.  Has it been a number of years?

11  Has it been -- you tell us.

12  A.   I started receiving data somewhere around the time that I

13  started -- started this campaign.

14  Q.   And this campaign, to be as precise as we can be, we'll

15  call this the CGx campaign.  Okay?

16  A.   Yes.

17  Q.   And you began the CGx campaign, to the best of your

18  recollection, when?

19  A.   Near the end of 2016, I believe.

20  Q.   Okay.  Now, you had a company -- let's see -- IDGAF, right?

21  A.   Yes.

22  Q.   And we've already gone through what those -- what that

23  stands for, correct?

24  A.   Yes.

25  Q.   But the only two people that knew what it stood for was you

 1   and your accountant, correct?

 2   A.   It's a very common acronym, so I would assume -- I would

 3   assume that other people knew what it meant.  But me and my

 4   accountant are the ones who came up with the name.

 5   Q.   Didn't you tell the government that the only two people

 6   that knew what those initials stood for were you and the

 7   accountant?

 8   A.   I don't recall.

 9   Q.   Okay.  And the reason we went into the timeliness, the

10   dates of the report, so that when I pull out a report, we'll

11   know where this fits.

12         I'm going to take you to October the 12th of 2022, page 6.

13         MR. SADOW:  Your Honor, this is going to require me to

14   approach.

15         THE COURT:  That's all right.

16         MR. SADOW:  What is the Court's preference, to ask each

17   time or just --

18         THE COURT:  I know you'll be coming back and forth, so

19   I'll give you standing permission.

20         MR. SADOW:  Thank you, sir.

21         THE COURT:  Yeah.

22   BY MR. SADOW:

23   Q.   Now, this is not your report.  This is what someone else

24   wrote and claiming that you said.  Okay?

25   A.   Okay.

```
 1    Q.  So I'm showing you this just to refresh your recollection
 2    as to what you told the government.
 3         Did you tell the government, with regard to IDGAF, only you
 4    and your accountant knew the acronym for his company; is that
 5    correct?
 6    A.  Yes, that's what it says.
 7    Q.  Okay.  Is that what you told the government?
 8    A.  Again, I don't recall.  I'm not disputing what that says.
 9    Q.  When you say you don't recall, does that mean that this
10    doesn't refresh your recollection as to what you told them?
11    A.  No.  It means I don't recall saying that or not saying
12    that.
13    Q.  Okay.  That puts us in a position of me asking you, are you
14    denying that you said it?
15    A.  No.
16    Q.  Okay.  When you first met with the government, which we've
17    talked about already as being on August the 13th of 2020, you
18    did not have a lawyer, correct?
19    A.  That's correct.
20    Q.  And if I understood correctly, you were surprised by
21    government agents making direct personal contact with you,
22    correct?
23    A.  I was surprised that they showed up at my house, yes.
24    Q.  Okay.  And they did show up at your house, right?
25    A.  Correct.
```

1   Q.   And when they showed up at your house, did they make it

2   clear to you that you had the opportunity to talk to them or

3   not to talk to them?

4   A.   Yes, they did.

5   Q.   Okay.  And you chose to talk to them.

6   A.   Yes, I did.

7   Q.   And on that occasion, if I understand what your testimony

8   is today, you lied, correct?

9   A.   Yes, I did.

10  Q.   Okay.  And when you lied to them, okay, you lied to them

11  about many different subjects, right?

12  A.   Correct.

13  Q.   You lied to them, according to you, on who introduced

14  Mr. Patel to you, right?

15  A.   That, I do not --

16  Q.   Did you not tell them that Mr. Ramamurthy introduced

17  Mr. Patel to you?

18  A.   That's -- I -- I don't -- definitely don't remember saying

19  that Mr. Patel introduced me to Dr. Rama.

20  Q.   No, I'm not asking you what you testified to.  I'm asking

21  you what you said on that occasion.

22  A.   That is incorrect.  I'm not denying that I said that, but

23  that is --

24  Q.   Okay.  That's all I'm asking at this point, is whether or

25  not that's something you would have said.

1    A.    Okay.

2    Q.    All right?

3          And did you talk about that you did not deal with the part

4    of the business regarding calling the beneficiaries?

5    A.    Yes.

6    Q.    Was that a lie?

7    A.    Yes.

8    Q.    Okay.  Did you tell them that your understanding of

9    kickbacks is that you cannot pay a doctor for a prescription?

10   A.    Yes.

11   Q.    Is it your position that that was a lie?

12   A.    That was my understanding at the time.

13   Q.    That was your understanding at the time.

14         When you say that was your understanding at the time, now

15   let's get real specific:  What's the time?

16   A.    When they asked me that question.

17   Q.    Okay.  So in October of 2020, your knowledge of what a

18   kickback was had to do with paying -- not paying a doctor for a

19   prescription, right?

20   A.    Can you ask that a different way?

21   Q.    I sure can.

22         Your understanding of what a kickback was or what was

23   prohibited by the law is that you cannot pay a doctor for a

24   prescription, correct?

25   A.    I'm sorry.  Are you asking me that --

1   Q.   I'm asking you -- you told me "at the time," and we

2   narrowed the time down to October of 2020.  And I'm asking you

3   now whether that was your understanding, what I just asked

4   you --

5   A.   Yes.

6   Q.   -- as of that date.

7   A.   Yes.

8   Q.   Okay.  You did not believe, as of October of 2020, that

9   paying a commission or a referral fee was a crime, correct?

10  A.   I don't remember.

11  Q.   You don't remember?

12  A.   If that's what I said and that is there, then I'm not

13  disputing it.

14  Q.   I can't -- I can't tell you something you said or didn't

15  say.  All I can ask you is, as of that time, you didn't believe

16  that paying a commission or a referral unless it went to a

17  doctor was a crime, correct?

18  A.   Correct.

19  Q.   So now we said that was as of October of 2020.  All right.

20  Now, let's go a little further.

21       You told them as well, the agents, that you did not think

22  that Ziros -- and Ziros is -- I can't pronounce his first name.

23  What's --

24  A.   Thanasi.

25  Q.   Thanasi is Ziros.  It's Thanasi Ziros.

1   A.   Correct.

2   Q.   Z-i-r-o-s, right?

3   A.   Yes.

4   Q.   You did not think that Ziros or McKeon did anything

5   illegal; that's what you told the agents, right?

6   A.   Correct.

7   Q.   And that's what you believed at the time, correct?

8   A.   That was a lie.

9   Q.   That was a lie.

10   A.   Correct.

11   Q.   Okay.  We'll come back to that.

12        And you didn't know if BBAR bought doctors' orders, is that

13   a lie, or was that something you believed at the time?

14   A.   That was a lie.  I knew they purchased doctor orders.

15   Q.   Okay.  So that was a lie.

16   A.   Correct.

17   Q.   So there's, like, a little mixture of lies and a little

18   mixture of truth in this, right?

19   A.   Correct.

20   Q.   Okay.  Now, let's move forward in time chronologically.

21        At some point, you reached out to a gentleman by the name

22   of Weinstein, an attorney, to represent you; is that correct?

23   A.   That is correct.

24   Q.   In relation to this October time period of 2020, can you

25   tell us when that might have been?

 1   A.   I do not recall.

 2   Q.   Would it at least have been -- would it at least have been

 3   by January of 2021?

 4   A.   I don't recall.  It was after my initial meeting with them,

 5   and I believe it was prior to my next meeting.  But I don't

 6   know the exact date.

 7   Q.   All right.  Let's see if I can refresh your recollection.

 8        Do you remember that on November the 23rd of 2020, you

 9   signed what was called a proffer agreement?

10   A.   Yes.

11   Q.   And the proffer agreement was an opportunity for you to sit

12   down with the government -- this time, with a prosecutor and

13   agents, having a lawyer present -- to talk to them about what

14   you knew concerning CGx, right?

15   A.   Yes.

16   Q.   And that -- Mr. Weinstein was present for that, correct?

17   A.   Yes.

18   Q.   So we know that at least by November 23, 2020,

19   Mr. Weinstein was your lawyer, right?

20   A.   That is correct.

21   Q.   But you didn't have any plea agreement; this was just a

22   time to sit down and tell the government what you knew, right?

23   A.   Correct.

24   Q.   No promises made.

25   A.   Correct.

1  Q.  And the only thing that you were supposed to do is tell the

2  truth.

3  A.  Correct.

4  Q.  And the only way it could be used to hurt you is if you

5  didn't tell the truth, right?

6  A.  Correct.

7  Q.  And you sat down and did that, correct?

8  A.  Yes.

9  Q.  Okay.  Now, you told the government that the payments you

10 received from McKeon were not based on any percentage; is that

11 correct?

12 A.  That is correct.

13 Q.  You received what from Mr. McKeon?  A flat fee?

14 A.  Correct.

15 Q.  What was your flat fee?

16 A.  That was not accurate.  I was paid -- it was based on a

17 percentage.

18 Q.  Wait.  So you sat down at your proffer agreement with the

19 government.  You were told the only thing you could do is tell

20 the truth; and if you told the truth, it couldn't hurt you, and

21 you lied?

22 A.  That is correct.

23 Q.  And this is with the attorney -- your attorney there?

24 A.  My first attorney, correct.

25 Q.  Your first attorney.

1        And the individual that was the attorney for the

2    government -- there were two people, a Mr. Timothy Loper,

3    correct?

4    A.   Yes.

5    Q.   And a Mr. Patrick Queenan, Q-u-e-e-n-a-n, correct?

6    A.   Yes.

7    Q.   And you told the government that Mr. Patel said that the

8    patients had to have a prior history of cancer, correct?

9    A.   I don't remember.  Again, if that's what it says, then I

10   don't dispute it.

11   Q.   Okay.  Was that true?

12   A.   No.

13   Q.   So you lied about that too, according to your testimony

14   now, right?

15   A.   Correct.

16   Q.   Okay.  You told the government that Rama, who you've

17   referred to as "Dr. Rama," had a business model that received

18   the approval from an attorney.

19        Is that true or is that false?

20   A.   That's what I was told by Rama.

21   Q.   So when you told the agents and the two prosecutors that,

22   on that date, you understood that to be true based on what Rama

23   told you?

24   A.   Correct.

25   Q.   And Rama, I assume, told you this during the time period

1    that you were dealing with him, correct?

2    A.   Correct.

3    Q.   Which was approximately, what, six months?  Is that what

4    you said?

5    A.   Between six and nine months.

6    Q.   And this would have been, what, sometime -- would this have

7    been in 2016, or are we talking into 2017?

8    A.   I believe into 2017.

9    Q.   Okay.  So this is what Mr. -- what Rama, Dr. Rama, would

10   have told you in the six- to nine-month period from, say,

11   beginning of 2017 to whatever six to nine months might be?

12   A.   It might have started prior to 2017.  I don't remember the

13   exact dates, but it was into 2017.

14   Q.   Okay.  Now, you also said that McKeon showed you an email

15   from an attorney, and the attorney stated that a list of things

16   were okay regarding McKeon's CGx business.

17        Was that true or was that false?

18   A.   I believe that's true.

19   Q.   All right.  So Mr. McKeon showed you something from an

20   attorney indicating that McKeon's operation that you've

21   testified to was legal, correct?

22   A.   I believe so, yes.

23   Q.   Okay.  So that would be your testimony today, and that

24   would be your testimony -- what you told the agents and the

25   prosecutors back in November of 2020, correct?

1   A.   Yes.

2   Q.   Okay.  And that Dinnen also had an attorney.

3        Remember Dinnen?  You talked about him and the factoring.

4   A.   Yes.

5   Q.   Did you tell them that Dinnen also had an attorney?

6   A.   Yes.

7   Q.   And did you tell them that Dinnen's attorney vetted --

8        Do you know what I mean by the word "vetted"?

9   A.   Yes, I do.

10  Q.   -- vetted the process prior to factoring it to you.

11       And Dinnen's attorney had also had conversations with

12  Patel's attorney about it, correct?

13  A.   Yes.

14  Q.   And that was true as well, right?

15  A.   Correct.

16  Q.   So now we've got an attorney from McKeon, an attorney from

17  Dinnen, an attorney from Patel, and an attorney from

18  Ramamurthy.

19       Four -- as far as you know, during the time period we're

20  talking about, four lawyers involved, right?

21  A.   Correct.

22  Q.   Now, you also mentioned somebody named Craig Long.

23       (Court reporter clarification.)

24       MR. SADOW:  Long.  I'm sorry.  L-o-n-g.  Craig Long.

25  BY MR. SADOW:

1    Q.   Tell us who Craig Long is.

2    A.   Craig Long -- Craig Long ran the day-to-day operations at

3    MyOnCallDoc.

4    Q.   Okay.  So was he your contact, at least in part, at

5    MyOnCallDoc?

6    A.   Yes.

7    Q.   Okay.  Sometimes that's referred to as M-O, right, C-D,

8    MyOnCallDoc, or did you always just refer to it as just

9    MyOnCallDoc?

10   A.   I just referred to it as MyOnCallDoc.

11   Q.   Now, if I understood correctly, MyOnCallDoc was the company

12   that had the relationship with the doctors, the telemedicine

13   doctors, right?

14   A.   Correct.

15   Q.   MyOnCallDoc would make whatever the necessary arrangements

16   were with the doctors because MyOnCallDoc charged McKeon and --

17   who else? -- charged McKeon and --

18   A.   And IDGAF.

19   Q.   And who?

20   A.   IDGAF, my company.

21   Q.   Okay.  They charged them for a consulting fee, right?

22   A.   I don't know what it was termed.  But, yes, they charged

23   us.

24   Q.   And they charged us, again, referring to the individuals

25   you just said.

1      A fee had to be paid regardless of whether the doctor

2   signed the requisition form or not, correct?

3   A.   Correct.

4   Q.   And if the doctor -- if there was -- if somebody called,

5   that is, if the doctor called and there was no answer, the fee

6   was $25, right?

7   A.   Correct.

8   Q.   If somebody answered and there was any kind of

9   conversation, regardless of whether the requisition form

10  ultimately was signed off on or not, it was $67.50, right?

11  A.   That is correct.

12  Q.   So the doctor didn't get paid to sign a requisition form;

13  he got paid to make the phone call to the would-be patient,

14  right?

15  A.   He got --

16  Q.   Because he got 67.50 regardless, right?

17  A.   Well, no.  He got 67.50 if he spoke to them.

18  Q.   Right.  But that's whether or not he actually signs a

19  requisition form or whether he doesn't sign the requisition

20  form.

21  A.   You're -- that's correct.

22  Q.   Right?

23  A.   Yes.

24  Q.   Okay.  Now, are you aware that Craig Long has never been

25  charged for criminal activity by the feds?

1    A.   I have no idea.

2         MS. GURSKIS:  Objection.

3         THE COURT:  You may proceed.

4         MR. SADOW:  Oh, I'm sorry.

5    BY MR. SADOW:

6    Q.   Are you aware that MyOnCallDoc has not been charged by the

7    feds?

8    A.   I had no idea.

9    Q.   But that's who dealt with the doctors, right?

10   A.   That is correct.

11   Q.   Okay.

12        MS. GURSKIS:  Your Honor, could we approach briefly?

13        THE COURT:  Sure.

14    (The following proceedings were held sidebar:)

15        THE COURT:  Yes.

16        MS. GURSKIS:  This is squarely within the motion in

17   limine regarding the charging decisions of the government,

18   so --

19        MR. SADOW:  Never made an issue out of MyOnCallDoc and

20   the doctors.

21        THE COURT:  Yeah, I disagree.  You're not going to

22   belabor this anyway, right?

23        MR. SADOW:  No.

24        THE COURT:  That's overruled.  We can move on.

25        MR. SADOW:  Thank you.

1           (Proceedings returned to open court.)

2               THE COURT:  You may proceed when ready.

3               MR. SADOW:  Thank you.

4    BY MR. SADOW:

5    Q.  All right.  So let's -- now we can move forward.

6        When you finished with the proffer on November 23rd of

7    2020, the government did not tell you, one way or the other,

8    whether you were going to be charged with a crime, correct?

9    A.  Correct.

10   Q.  So now you are waiting to see if the government's going to

11   make that decision but you're still interacting with your

12   attorney, Mr. Weinstein, right?

13   A.  Correct.

14   Q.  Now, I'm going to ask you a series of questions regarding

15   statements that you made in writing, in emails, to

16   Mr. Weinstein, which have been turned over to us.  Okay?

17   A.  Yes.

18   Q.  First, you were asked in some form or fashion -- I don't

19   know whether it was by a subpoena or just a request -- you were

20   asked to turn over emails from the time period that we've been

21   talking about, right?

22   A.  Correct.

23   Q.  And on or about January 28, 2021 -- and I can be very

24   specific, if you would like to see it -- at 9:36 and 47 seconds

25   you told Mr. Weinstein that you were going to make a specific

1   folder of the emails referencing legal opinions that you had.

2       Do you remember that?

3   A.   Yes.

4   Q.   Did you do that?

5   A.   I don't remember.

6   Q.   You don't remember whether you did it or not, even though

7   you told Mr. Weinstein you were going to do it?

8   A.   That's correct.  I don't remember if I did it.

9   Q.   Did you have legal opinions in your emails?

10  A.   Yes, I did.

11  Q.   And where are those today?

12  A.   They're in evidence already.  It was from -- Nick

13  Oberheiden was what I was referring to.

14  Q.   One -- only one set of emails?

15  A.   That's correct.

16  Q.   So when I'm asking you about those:  I'll make up a

17  specific folder of the emails referencing legal opinions, you

18  were talking about basically a folder with one series of

19  emails.

20  A.   That is correct.

21  Q.   All right.  We're going to get to those in just a second.

22  In fact, we can deal with it now.

23      On November the 5th, 2020 -- and I have to take you a back

24  a little bit -- you received from Mr. Weinstein basically a

25  list of questions that he had for you that appear to have been

1   put to Mr. Weinstein by prosecutors.

2        Do you remember that?

3   A.  I do not recall.

4   Q.  Let me show you to help you remember the way it was

5   formatted.  Okay?

6   A.  Yes.

7   Q.  Please feel free to take a look at it because I'm going to

8   be asking you about the answers that you gave to Mr. Weinstein.

9        And I promise you what I'm going to ask you is the question

10  and the answer.  Okay?

11  A.  Yes.

12  Q.  And this is before your proffer.  This is a document that

13  was sent November 5, 2020, at 14:26, which I think is, what,

14  2:26 in the afternoon.  Okay?

15  A.  Yes.

16  Q.  You were asked about Ramamurthy and Q Health, which was

17  Ramamurthy's company, right?

18  A.  Yes, I believe so.

19  Q.  And you said:  He -- referring to Ramamurthy -- sent

20  business to LabSolutions and did business with Christian

21  McKeon.  Correct?

22  A.  Correct.

23  Q.  And is that a true statement?

24  A.  No.

25  Q.  No.  So your lawyer is asking you questions because he

1    wants to interact with the government, and the very first

2    question that he asked you on this, you lie to him.

3    A.   Correct.

4    Q.   Okay.  Next question:  Christian McKeon ran the whole

5    operation, had all contracts and bank accounts in his companies

6    and -- I'm sorry.  The question was:  Christian McKeon, above

7    Griner in hierarchy of things, wants to know his role.

8         Your answer was:  Christian McKeon ran the whole operation,

9    had all contracts and bank accounts in his companies.

10        Was that true?

11   A.   Yes.

12   Q.   So one false, one true so far, right?

13   A.   Correct.

14   Q.   XGEN wants to know about marketing company, McKeon's

15   marketing company.  This was ran and controlled by McKeon.

16   True?

17   A.   Yes.

18   Q.   BBAR call center, owned by Ziros, wants to know about this.

19   And you write -- you don't say Ziros.  You say Thanasi, so I'll

20   just say Ziros -- ran all tech support for Christian and

21   managed the call center.  True?

22   A.   Correct.

23   Q.   Craig Long, MyOnCallDoc.  Craig Long did business with

24   Christian and his company for telemed services.  True?

25   A.   That is true.

1    Q.   Mike Moranz, Mojo Media, which I guess is Mr. Moranz'

2    company?

3    A.   Correct.

4    Q.   And then, in parenthesis, it says Moranz is cooperating,

5    which is suggestive to me that the government had told your

6    lawyer that Moranz was cooperating.

7         Is that your understanding?

8    A.   Yes.

9    Q.   I introduced Moranz to Christian and Moranz supplied leads

10   to Christian.

11        Is that true?

12   A.   Yes.

13   Q.   I didn't hear his name on direct examination.  Who -- I

14   thought you were the one that gave leads to Christian?

15   A.   Well, they were purchased from Mike Moranz' company.

16   Q.   Okay.  Well, then they didn't come from you.

17   A.   No, I did not supply the raw data, correct.

18   Q.   Okay.  Then what did -- if Moranz supplied the raw data,

19   what did you supply?

20   A.   I had the relationships with both telemed companies.  I had

21   a relationship with Mike Moranz from business done many, many

22   years prior.

23   Q.   I thought you said you'd only known him since 2016, since

24   this.  Maybe I misunderstood.

25        Didn't you tell us just not long ago that your relationship

1   with Moranz started about the same time as CGx?

2   A.   My business relationship did.  I had worked in a call

3   center years before, but not done any business with Moranz.

4   Q.   Okay.  So were you being paid as kind of a broker, that is,

5   putting Mr. Moranz and McKeon together?

6   A.   No.  I was getting a piece of the entire business that was

7   generated.

8   Q.   So you were getting your piece of McKeon's business?

9   A.   Correct.

10   Q.   Were you a partner of McKeon?

11   A.   I was supposed to be.

12   Q.   Well, in your eyes, were you a partner of McKeon's?

13   A.   In my eyes, yes.

14   Q.   Okay.  But you weren't supplying the leads.

15   A.   Correct.

16   Q.   Okay.  Introduced Moranz to Christian and Moranz supplied

17   leads.  Next question was:  IDGAF referred almost 17 million to

18   LabSolutions, and LabSolutions got paid 9 million.  Shawn to

19   disgorge 400 K.

20       And your answer was:  IDGAF referred no one to

21   LabSolutions.  All business was done directly between

22   Christian's company and LabSolutions.  IDGAF never had any

23   contract with LabSolutions or got paid anything from

24   LabSolutions.

25       That's what you wrote back to your lawyer, right?

1    A.   Correct.

2    Q.   Now, is it going to be your testimony that that was a lie?

3    A.   Yes.

4    Q.   Okay.  So -- but that's pretty specific, right?

5    A.   Correct.

6    Q.   Okay.  Next question:  Griner's company, who is the

7    minority owner, Steven Palmer, minority partner, IDGAF, owners,

8    IDGAF, marketing received funds from XGEN, $435,000, forfeiture

9    amount.  Okay?

10        And your answer was:  Palmer is my accountant that was on

11   as registered agent.  I was majority partner in the company.

12        Is that true?

13   A.   Correct.

14   Q.   Okay.  Next question:  No final conclusion that you

15   committed a crime, but feel that you were part of a conspiracy

16   to refer CGx samples to LabSolutions in exchange for illegal

17   kickbacks.

18        Conspiracy to accept kickbacks from telemed companies for

19   signed doctors' orders, feel that you knew accepting Medicare

20   payments were illegal for CGx.

21        And your response was:  I never received any payments from

22   LabSolutions and had no agreement with them either.  I did make

23   introductions, and that was it.  I was not involved in the

24   running of the call center, the back office, marketing, or

25   anything else.  That was all handled by Mike McKeon, and then

1   you have Thanasi, but you meant Ziros.   Right?

2   A.   Correct.

3   Q.   Now let me guess, you're going to tell us that that was a

4   lie too.

5   A.   Correct.

6   Q.   Because all of that runs totally inconsistent with what

7   you've testified to in court, right?

8   A.   Correct.

9   Q.   Okay.   Want to know your relationship with Minal Patel.

10      Met Minal -- I met Minal several times, introduced him to

11  Christian, at which point they dealt directly with each other

12  on the "CHX" testing.

13      You really meant CGx, right?

14  A.   Correct.

15  Q.   And let me guess, that's a lie too?

16  A.   Correct.

17  Q.   Okay.   And then:   Send me back an email with your comments

18  on these topics, then you and I going to schedule a call to

19  discuss.   Signed off on by Mr. Weinstein.   Okay?

20      And that was all done before your proffer agreement,

21  correct?

22  A.   Correct.

23  Q.   Then you give your proffer agreement.   But your

24  communications with Mr. Weinstein don't end, do they?   You

25  wrote an email to Mr. Weinstein on November 24, 2020, at

1   8:8- -- excuse me -- 8:18 a.m.   The subject of the email was

2   model flowchart and sample contract.

3       Sound familiar?

4   A.   Yes.

5   Q.   Would you like to see it before I ask you about it?

6   A.   Yes.

7   Q.   Okay.

8   A.   Yes.

9   Q.   And you responded:   The email chain shows I was under the

10  advice of an attorney approving the process that Christian laid

11  out.   Right?

12  A.   Yes.

13  Q.   I was also present at the initial meeting with Christian

14  and Greg at the lady attorney name he mentioned yesterday.

15  Right?

16  A.   Correct.

17  Q.   And Christian, of course, is McKeon.

18  A.   Yes.

19  Q.   And Greg is a Greg Orr, O-r-r, correct?

20  A.   Yes.

21  Q.   And the lady attorney name "he" mentioned yesterday, who is

22  he, McKeon?

23  A.   I don't know who that's referring to.   I'm sorry.

24  Q.   Okay.   We were there discussing the process.   Right?

25  A.   Yes.

1   Q.   Christian dealt directly with her after the meeting and

2   told me she approved the process and referred him to another

3   attorney which is the one he retained.   Right?

4   A.   Yes.

5   Q.   Remember on direct examination, they asked you whether or

6   not the female, the lady attorney, had told you or Christian

7   anything?   Do you remember that?

8   A.   I do.

9   Q.   Well, this kind of suggests that Christian was told that

10  his process was okay.

11       Is that a lie?

12  A.   I was never told that.   That's what Christian had told me.

13  Q.   Okay.   So when you answered on direct examination that you

14  didn't know if there was a response from the attorney, that

15  wasn't so; that wasn't true, was it?

16  A.   It was true.   I didn't know it for a fact.   I was relying

17  on McKeon.

18  Q.   But you didn't say, I didn't know for a fact; I'm relying

19  on McKeon.   You said it didn't happen.

20       But McKeon told you, in fact, it did, right?

21  A.   That's what he told me, correct.

22  Q.   And that's what you wrote to your lawyer on November 24,

23  2020, correct?

24  A.   Correct.

25  Q.   Okay.   So we have another attorney -- same attorney, but

1    this time, the attorney, according to McKeon during the time

2    period, said his process was okay, right?

3    A.    Correct.

4    Q.    Okay.  Now, let's go post -- postproffer.  Now we're on

5    January 26, 2021.  Okay?

6         And we have a series of emails that you addressed to

7    Mr. Weinstein, who was still your attorney, right?

8    A.    Yes.

9    Q.    Okay.  And you were sending him documents, correct?

10   A.    Yes.

11   Q.    You were sending him documents to show that you had

12   reasonably relied on legal advice to justify your conduct

13   during the time you were dealing with CGx, correct?

14   A.    Yes.

15   Q.    All right.  So let's talk about -- here's one:  There

16   was -- there was a lawyer that gave us his opinion, which was

17   sent to Tobin Watt.

18        Tobin Watt, that's the attorney for Minal Patel, correct?

19   A.    Yes.

20   Q.    Minal's attorney.

21        I was extremely nervous about his response.  However,

22   Tobin, who was a healthcare specialty attorney, said this

23   attorney, Nick, was incorrect, and it was completely legal to

24   pay commissions.

25        And then you say:  Is this something you should send

1  Patrick?  Right?

2  A.  Correct.

3  Q.  Now, that's what you were referring to on direct

4  examination when you were talking about Nick, right?

5  A.  Well, there's two Nicks.  So I was referring to -- when I

6  was referring to Nick, the attorney, yes.

7  Q.  Oberheiden?

8  A.  Yes.

9  Q.  O-b-e-r-h-e-i-d-e-n, right?

10  A.  Yes.

11  Q.  And he represented who?

12  A.  He didn't represent -- he did not represent anybody.

13  Q.  No?  He didn't call on behalf of Infinity?

14  A.  I don't believe he was -- he's legal counsel, but --

15  Q.  Who is Infinity?

16  A.  A company owned by another party.

17  Q.  A company owned by another party.

18      Who, by chance, is this other party?

19  A.  Steve Kefalas.

20  Q.  Okay.  You had nothing to do with Infinity?

21  A.  No.  I was -- the samples I was sending in initially to

22  LabSolutions I was doing with Steve and Infinity, and Steve

23  reached out to Nick to get his opinion on the process.

24      MR. SADOW:  Your Honor, I would move into evidence

25  Exhibit G-2.

1          THE COURT:  Any objection?

2          MS. GURSKIS:  No, Your Honor.  Thank you.

3          THE COURT:  All right.  We'll admit G-2 at this time.

4          MR. SADOW:  Thank you.

5      (Defense Exhibit G-2 was received in evidence.)

6  BY MR. SADOW:

7  Q.  I'm going to show you G-2 to make it comfortable for you,

8  and then I'm going to put it on the screen.  Okay?

9  A.  Okay.

10  Q.  Okay.

11          MR. SADOW:  We appear to be having some technical

12  problems.  Do you know how to make it bigger?

13          THE WITNESS:  I can read it.

14  BY MR. SADOW:

15  Q.  You can read it, but I want to make sure that these folks

16  can read it too.

17  A.  Sorry.

18  Q.  That's okay.

19          Now, this is an email, is it not, that you received from

20  Steve@Infinitymarketing -- something -- NYC.com, correct?

21  A.  Yes.

22  Q.  And you received this email from him on Wednesday,

23  April 12, 2017, correct?

24  A.  Yes.

25  Q.  All right.  But what I'm interested in is down below.

1    Let's see if I can make this bigger.

2        Do you see that part that says:  Nick, I appreciate

3    what...?

4    A.  Yes.

5    Q.  Would you read that to the jury?  Because that's coming

6    from Mr. Watt, who is Mr. Patel's lawyer.  And this is

7    April 12th of 2017, right?

8        So you're right in the middle of the CGx.

9    A.  More at the beginning, but yes.

10   Q.  Okay.  We'll say at the beginning.

11       And this has to do with commissions, correct?

12   A.  Yes.

13   Q.  And Mr. Watt is responding to something that Nick wrote to

14   him about commissions, right?

15   A.  Yes.

16   Q.  Okay.  And now you can read what it says.

17   A.  Nick, I appreciate what you're saying, and I did read the

18   article.  But a question I have relates to the prevalence of

19   commission arrangements in the healthcare world.  For example,

20   distributors of orthopedic implants are paid on a commission

21   basis.  It's the national standard.  These distributors are not

22   employees of the manufacturers.  Why is that permissible?

23   Toby.

24   Q.  Because what was being told to you, as you understood it,

25   was that Mr. Watt was saying it was fine to pay commissions,

1    correct?

2    A.   Yes.

3    Q.   Indeed, just as an aside, you actually spoke to Mr. Watt,

4    didn't you?

5    A.   Yes.

6    Q.   On more than one occasion, correct?

7    A.   Yes.

8    Q.   And when you spoke to Mr. Watt, I assume it had to do with

9    his opinion on legal matters, correct?

10   A.   Yes.

11   Q.   And tell us, what did you talk about with Mr. Watt?

12   A.   It was related to this email here.

13   Q.   It was related to the question of paying commissions?

14   A.   Specifically, paying commissions from Medicare

15   reimbursements.

16   Q.   And Mr. Watt told you that it was permissible, correct?

17   A.   Correct.

18   Q.   Now, let me see if I understand.

19        When you spoke to Mr. Watt, did you say, "I'm being paid

20   kickbacks" or "I'm being paid commissions"?  Which word did you

21   use?

22   A.   Commission.

23   Q.   When did it become kickback as opposed to commission?

24   A.   Well, it was a kickback from day one.

25   Q.   Oh.  That's what you say now.  But clearly, that's not what

 1   you were saying back then, right?

 2   A.   That's correct.

 3   Q.   In fact, you didn't start using the word "kickback" until

 4   you started cooperating with the government, correct?

 5   A.   I don't know if that's accurate.

 6   Q.   Well, I'm sure if there's an email in which you reference

 7   kickback or a text message or anything in writing, the

 8   government will bring it out on redirect.  So let's go back to

 9   this.

10        Oh.  What else did you talk to Mr. Watt about, before I

11   come back to this?

12   A.   I didn't have that many conversations with him.

13   Q.   But you had at least two or three, right?

14   A.   I believe -- I believe they were all related to this.

15   Q.   Okay.  And what did you tell him you did?

16   A.   I don't remember.

17   Q.   Wait a second.  You're talking to an attorney, and you're

18   asking him about commissions and the legality of that with

19   regard to Medicare, right?

20   A.   Correct.

21   Q.   But what did you tell him your job was?  That you were the

22   telemarketer?

23   A.   I don't recall exactly what I told him.

24   Q.   You don't remember, in talking to the lawyer, whether you

25   told him that your role in this was the telemarketing role?

1   A.  I don't know if I did or not.  It's been six or seven

2   years.  I --

3   Q.  But you remember everything else about that time period.

4   That's why I'm asking you.

5       Why would you talk to him about anything else other than

6   your telemarketing role?

7               MS. GURSKIS:  Asked and answered, Your Honor.

8               THE COURT:  Overruled.  You may answer.

9               THE WITNESS:  I'm -- I'm not -- I don't remember if I

10  did or not.  I'm not saying I didn't -- I'm not saying I

11  didn't.  I don't remember if I did or not.

12  BY MR. SADOW:

13  Q.  Well, that was your role, though, right?

14  A.  It's correct.

15  Q.  It was your only role, from what it sounded like with

16  regard to your direct testimony, correct?

17  A.  No.  I was also responsible for managing the telemedicine

18  relationships and, yes, involved in the telemarketing aspect.

19  Q.  So it would only make sense that you would have brought up

20  telemarketing to Mr. Watt, correct?

21  A.  Again, I don't remember if I did or not.

22  Q.  Well, you met him in person, didn't you?

23  A.  I don't think I ever met him in person.

24  Q.  Okay.  Well, let's explore that for a minute.

25      Let's go back to October the 10th of 2022 -- I'm sorry --

1    October the 12th of 2022.  And I'm referring -- I'll show you

2    page 4, if you need to see it.

3        Griner met with Patel's attorney, an older guy who lived in

4    Atlanta and worked for a big healthcare firm.

5        Isn't that what you told them, the government, on

6    October 12, 2022, which is, what, six weeks ago, give or take?

7    A.  I don't remember ever physically meeting him.

8    Q.  But isn't that what you told the government?

9    A.  That, I don't recall.

10   Q.  Let's see if it helps you, because it's under the section

11   called Legal Advice.

12       Does that help you remember whether on that date you told

13   the government you met Mr. Patel?

14   A.  I don't recall saying that.  I don't recall physically

15   meeting him in person.

16   Q.  And then it goes on to say:  Griner talked to Patel's

17   attorney over the phone about two or three times.  Patel's

18   attorney said it was compliant and legal.  Right?

19   A.  Correct.

20   Q.  Okay.  So you knew, when you spoke to Mr. Watt -- let me

21   dispense with whether it was in person or over the phone --

22   that Mr. Watt had advised you as well as, of course, Mr. Patel,

23   his client, that paying commissions from Medicare -- through

24   Medicare was legal, correct?

25   A.  Yes.

1    Q.   But another lawyer disagreed, right?

2    A.   Yes.

3    Q.   So one lawyer disagrees, and one lawyer says it's okay,

4    right?

5    A.   Yes.

6    Q.   But you went with the lawyer who was the healthcare expert,

7    right?

8    A.   Yes.

9    Q.   You actually looked him up, Mr. Watt, online to determine

10   his qualifications, correct?

11   A.   Yes.

12   Q.   And his qualifications were just that.  He was a healthcare

13   law specialist, correct?

14   A.   Yes.

15   Q.   And he was representing Mr. Patel, correct?

16   A.   Yes.

17   Q.   And you were a telemarketer.

18   A.   Yes.

19   Q.   And you had connections with telemedicine, right?

20   A.   Yes.

21   Q.   And you were being paid commissions as a telemarketer,

22   right?

23   A.   Yes.

24   Q.   All right.  Let's go back to your communications with

25   Mr. Weinstein.  Okay?

1       What you were trying to do with Mr. Weinstein is to

2  convince Mr. Weinstein that you were relying on

3  attorney-client -- excuse me -- on legal advice, right?

4  A.   Yes.

5  Q.   All right.  So let's go to another one.

6       Then on the same date you send him a telemed and marketing

7  contract that were reviewed by Minal's attorney, right?

8  A.   Correct.

9  Q.   And you wrote down:  He reviewed and approved!!!  Right?

10 A.   Correct.

11 Q.   Again, legal advice.  Right?

12 A.   Correct.

13 Q.   Telling your attorney, Mr. Weinstein.  Right?  Right?

14 A.   I was telling my attorney that.

15 Q.   Yeah, that's what I said.  You were telling him that,

16 right?

17 A.   Yes, correct.

18 Q.   And then, same day, you wrote -- well, your told your

19 attorney, did you not, that you felt that your involvement was

20 counsel approved, right?

21 A.   Correct.

22 Q.   Okay.  So you've met with the government pursuant to a

23 proffer.  You're waiting on the government to tell you what's

24 going on.  And you're repeatedly telling your lawyer,

25 Mr. Weinstein, that you shouldn't be prosecuted because you

1   relied on legal advice, correct?

2   A.   Yes.

3   Q.   From Mr. Watt, right?

4   A.   Yes.

5   Q.   McKeon's lawyer, correct?

6   A.   Yes.

7   Q.   Dinnen's lawyer.

8   A.   Yes.

9   Q.   All the lawyers.  The only one who disagreed with anyone

10  was Nick Oberheiden, right?

11  A.   Yes.

12  Q.   But you didn't follow his advice, right?

13  A.   No, I did not.

14  Q.   And then you also -- you even wanted your lawyer,

15  Mr. Weinstein, to say that you had numerous contacts in the

16  healthcare industry and feel that you would be a valuable

17  source as an informant, correct?

18  A.   Correct.

19  Q.   You were looking to make it clear that you didn't think you

20  had done anything wrong, you had relied on legal advice coming

21  from all corners, and that you could help the government a

22  different way, right?

23  A.   Correct.

24  Q.   But that didn't work, did it?

25  A.   No.

1  Q.  The government still decided to come after you, right?

2  A.  Correct.

3  Q.  Now, I'm going to change focus for just a minute.

4      When did you stop working -- according to your current

5  testimony, when did you stop working with LabSolutions?

6  A.  I don't remember the -- I don't remember the dates.  I

7  don't recall.

8  Q.  Well, let me suggest to you that the last document of the

9  25 million says that you last communicated on any email with

10 Mr. Patel in July of 2017.

11     Does that give you a point to talk about when your

12 relationship with LabSolutions came to an end?

13 A.  I would think it was after that, but I'm not disputing.

14 Q.  But your relationship with LabSolutions would have started

15 no earlier than the summer of '16?

16 A.  I don't recall the -- I don't recall the exact dates.  I'm

17 sorry.

18 Q.  But your contract, or at least emails that you had with

19 Mr. Nick Vartanian and Omar Aleem, are in September of 2017.

20     Does that sound about right?

21 A.  I -- I don't recall the dates, but I'm not disputing.  I'm

22 not disputing that.

23 Q.  Okay.  Well, how about we make it even as clear as it can

24 be.  Your relationship with LabSolutions lasted no longer than

25 12 months, a year, right?

1   A.   I don't think that's accurate.

2   Q.   Well, I'm sure if the government has anything to show

3   that's after July of 2017, they'll bring it forward.  But there

4   was a point in time right after the email that we're talking

5   about on April the 12th, in which Nick Oberheiden said that the

6   relationship with Infinity and LabSolutions was over.  And that

7   was April the 13th of 2017.

8        Do you know what I'm talking about?

9   A.   I do.

10  Q.   And when the relationship between Infinity and LabSolutions

11  ended, that meant essentially your relationship ended, right?

12  A.   No.

13  Q.   No.  Because you weren't Infinity?

14  A.   Correct.

15       MR. SADOW:  All right.  Can we put up Government

16  Exhibit 1683?  And then we're going to go through some of those

17  exhibits.

18  BY MR. SADOW:

19  Q.   Now, this is an email from Mr. Patel to you, right?

20  Because you're -- you're the all lead, right?

21  A.   Yes.

22  Q.   In which Mr. Patel is sending you attachments, documents,

23  that I assume that he is suggesting that you can use on the

24  telemarketing side, correct?

25  A.   Yes.

1    Q.   Let's go, forward, questionnaire.  So that would be the

2    subject, correct?  The subject matter of this is --

3    A.   Oh, yes.  I'm sorry.

4    Q.   Let's go to -- the next would be A.

5         And this is the cancer quiz, as characterized here, that

6    Mr. Patel is suggesting you can use, correct?

7    A.   Yes.

8    Q.   All right.  And the questions are all related to cancer,

9    correct?

10   A.   Yes.

11   Q.   And if I heard you correctly, you used them, right?

12   A.   Yes.

13   Q.   Going to the next one, B, 1683-B.  And it gave you the --

14   basically, what is the risk assessment from LabSolutions,

15   correct?

16   A.   Yes.

17   Q.   And did you use that too?

18   A.   Yes.

19   Q.   Okay.

20        MR. SADOW:  Go to C.  C, if you can make it a little

21   bigger, please.

22   BY MR. SADOW:

23   Q.   All right.  Did you use this?

24   A.   I don't remember this form.

25   Q.   But you got it, right?

1   A.   I did get it.

2   Q.   And it was by Mr. Patel, right?

3   A.   Yes.

4   Q.   So Mr. Patel gave you a form to use and you don't remember

5   whether you used it.

6   A.   No, I do not.

7   Q.   Well, if he sent it to you, why didn't you use what

8   Mr. Patel sent you?

9   A.   I didn't say I didn't.  I said I didn't remember.

10   Q.   Well, I haven't seen it in anything used in the

11   telemarketing end.  So you just don't remember whether you used

12   it?

13   A.   I don't believe I did.

14   Q.   Okay.  So did you tell Mr. Patel, hey, thank you for

15   sending me the cancer qualifications, but I'm going to use

16   something else?

17   A.   No.

18   Q.   No.  Okay.

19        MR. SADOW:  Next, D.

20   BY MR. SADOW:

21   Q.   And here's another document talking about obviously PGx,

22   right?

23   A.   Correct.

24        MR. SADOW:  And then is there an E?

25   BY MR. SADOW:

1   Q.   And here's the form, right?  That is the LabSolutions

2   requisition form, right?

3   A.   One of them, yes.

4   Q.   One of them.

5        All right.  And this is what you received pursuant to this

6   email, correct?

7   A.   Yes.

8   Q.   Now, is this the process that is -- that Mr. Patel

9   continually and repeatedly told you was blessed by Mr. Watt?

10  A.   I'm not sure I understand what you're --

11  Q.   Well, you've told the government on multiple occasions --

12  and I really don't want to have to go through every single one

13  of them -- but you told the government on multiple occasions

14  that Minal Patel would tell you that everything he was doing,

15  he ran by his attorney, and it was approved, correct?

16  A.   Correct.

17  Q.   And that would -- and that's come up before you entered

18  your plea, it's come up after you've entered your plea.  That's

19  what Mr. Patel always told you, right?

20  A.   Correct.

21  Q.   Okay.  And you, of course, know he had the attorney because

22  you spoke to him, right?

23  A.   Correct.

24  Q.   Okay.  Now, didn't you tell the government on March 11,

25  2021, that you'd never heard of a doctor selling prescriptions?

 1   A.   I don't remember saying that, no.

 2   Q.   I'm looking at page 3.  See if this refreshes your

 3   recollection.  Does that refresh your recollection as to

 4   whether or not, on this date, March 11th of 2021, you made the

 5   statement that I just attributed to you?

 6   A.   Where is that statement?

 7   Q.   Right here.  (Indicating).

 8   A.   I'm sorry.  Yes, that's there.

 9   Q.   Did you make the statement?

10   A.   Yes.

11   Q.   Now, in this same interview, didn't you say that Mr. Watt

12   was involved in the compliance training?

13   A.   He did compliance -- he did compliance webinars.

14   Q.   Okay.  Didn't you tell them that LabSolutions sent out

15   emails, and Watt, referring to the attorney, was on some of the

16   emails regarding compliance?

17   A.   Yes, I believe so.

18   Q.   Didn't you tell the government that some trainings were

19   specific to Medicare and telemedicine?

20   A.   Yes, I did.

21   Q.   Didn't you tell the government that you were on a

22   conference call with Watt regarding payments resulting from

23   percentages of Medicare reimbursements of CGx?

24   A.   Yes.

25   Q.   Didn't you tell them that Watt was a trainer in a number of

1   LabSolutions, CGx, and telemedicine compliance meetings?

2   A.  Yes.

3   Q.  Didn't you tell them that Watt gave advice during the

4   trainings and answered questions about getting paid a

5   percentage of the Medicare reimbursements?

6   A.  Yes.

7   Q.  Didn't you tell them that Watt cited laws and statutes and

8   sounded like an expert?

9   A.  Yes.

10  Q.  And this is when you told them that Watt -- you searched

11  Watt's law firm and was confident that Watt was knowledgeable?

12  A.  Yes.

13  Q.  And you told them that Watt told you that he was Patel's

14  attorney for CGx, and that he had experience with telemedicine?

15  A.  Yes.

16  Q.  And this is all on March 11th of '21, right?

17  A.  Yes.

18  Q.  Okay.  Now, I'm going to talk about the flowcharts that

19  were discussed.

20        MR. SADOW:  And let's see.  So many exhibits.  If you

21  happen to know which of the flowcharts?

22        MS. GURSKIS:  Yes.  It's 16, 16-A, and 1629-L.

23        MR. SADOW:  All right.  Let's go to 16 and 16-A to

24  start with.

25  BY MR. SADOW:

1    Q.   Now, when you were going through 16 and 16-A, the

2    government had you point out that this left out information,

3    correct?

4    A.   Yes.

5    Q.   Okay.  Now, what is the name of this flowchart?

6    A.   Genetic Cancer Testing Process.

7    Q.   Does everything in there have to do with testing?

8    A.   No.

9    Q.   It doesn't?  What's the very first thing that it says?

10   A.   Patient is enrolled in cancer testing by having familial

11   history.

12   Q.   So let's talk about how this telemarketing works.

13        A telemarketer is in contact with a would-be patient or

14   would-be beneficiary, right?

15   A.   Yes.

16   Q.   And there is a questionnaire of some type that is used to

17   determine whether or not that beneficiary, or patient, is

18   qualified to go to the next step, right?

19   A.   Correct.

20   Q.   So the very first step is to determine whether or not that

21   person is qualified, right?

22   A.   Yes.

23   Q.   Because if they're not qualified, they don't move along, do

24   they?

25   A.   No, they don't.

1   Q.   So if someone answers the phone -- the questions of a

2   telemarketer and says, Thank God, I haven't had any cancer in

3   my family, and I don't have any -- and I don't have cancer,

4   they don't move to the next step, do they?

5   A.   No.

6   Q.   Now, you were involved with the telemarketing, right?

7   A.   Yes.

8   Q.   What's the percentage of individuals that didn't move to

9   the next step?

10  A.   It would be a small percentage.

11  Q.   Small percentage?  You mean that when you were doing the

12  telemarketing, out of 100 people, 90 people, 80 people,

13  70 people -- how many people would move to the next step?

14  A.   I don't have a -- I don't know a percentage, but I would

15  say the majority.

16  Q.   Well, that's -- a majority is a lot different than

17  90 percent.

18       A majority is 51 percent, right?

19  A.   I did not say 90 percent.

20  Q.   No, but we're going to get to the 90 percent.

21       But it's a lot less than 90 percent to move to the next

22  step, right?

23  A.   Can you ask it a different way?

24  Q.   I hope so.

25       It's a lot -- it's a lot less than 90 percent that made it

```
 1   through step one, correct?

 2   A.  You mean that had a family history of cancer?

 3   Q.  Right.

 4   A.  I don't know the percentages.  I don't -- don't know a

 5   percentage.

 6   Q.  You don't know that percentage.

 7   A.  No, I do not.

 8   Q.  But you were the one who was doing the telemarketing.  No,

 9   no.  Wait.  You weren't doing the telemarketing.

10   A.  No.

11   Q.  Who was doing it?

12   A.  I'm sorry?

13   Q.  Who was doing the telemarketing?

14   A.  We had sales agents on the phone.

15   Q.  Was it your call center?

16   A.  No.

17   Q.  Whose call center was it?

18   A.  It was Christian's.

19   Q.  Christian's call center.

20       So were you present when they were on the phone?

21   A.  Yes, I was.

22   Q.  And was that a daily thing?

23   A.  For the most part, yes.

24   Q.  So you were there, right?

25   A.  Yes.
```

1   Q.   So they must have been coming in right and left if they

2   were qualified.

3   A.   Yes.

4   Q.   Right.  Okay.  So the first step is you got to be

5   qualified, right?

6   A.   Yes.

7   Q.   And that's what this says, doesn't it?

8   A.   Yes.

9   Q.   And who put the chart together?

10  A.   Christian.

11  Q.   Christian.

12       And who worked on the chart with him?

13  A.   Myself, Thanasi, and Greg.

14  Q.   Right.  I don't hear of Minal Patel having anything to do

15  with this chart.

16       He didn't, did he?

17  A.   With making the chart?

18  Q.   Yes.

19  A.   No, he did not.

20  Q.   That's right.

21       So this chart, when you went over and talked about how it's

22  wrong or it has errors, Mr. Patel had nothing to do with making

23  the chart, did he?

24  A.   No, he did not.

25  Q.   And then you go through the information that's in here.

1      So this is a chart put together by the people you just told

2   us, right?

3   A.   Correct.

4   Q.   You thought it was incorrect when they did it?

5   A.   I thought it was missing information.

6   Q.   You did.  But you did it anyhow; is that -- is that your

7   testimony?

8   A.   Yes.

9   Q.   That you went ahead with the chart anyway?

10  A.   Yes.

11  Q.   And why did you -- why did you leave out information?

12  A.   I don't know that specific reason.

13  Q.   Let's be honest with one another.  You didn't think there

14  was anything wrong with this chart at all, did you, until the

15  government pointed out there was, right?

16  A.   No.  I knew that it was missing the initial --

17  Q.   The initial.  But we only talked about -- this is the

18  testing process.  This doesn't say how do we get the patient

19  process.

20       This talks about after they're qualified, right?

21  A.   Correct.

22  Q.   Now, let's go a little further than that.  Because once

23  they're qualified -- right?  Once they're qualified, you know

24  they either have a family history, right?  Or a personal

25  history, right?

1    A.   Yes.

2    Q.   Or potentially both, right?

3    A.   Yes.

4    Q.   So as far as that's concerned, they're prequalified to move

5    on to the next phases, right?

6    A.   Well, that was the qualification.

7    Q.   Right.  So if they're qualified, wouldn't you expect the

8    next percentage to be high, 90 percent?

9         Why not expect it to be 98 percent?  They're all qualified,

10   right?

11   A.   What percentage are you referring to?  I'm sorry.

12   Q.   The one you said that 90 percent of the time, you were

13   able -- that is, the telemarketers were able to get to the next

14   step after this, which is potentially to have someone

15   communicating with the patient about a kit or telemedicine or

16   something of that nature, right?

17   A.   No.  The 90 percent was in reference to the percentage of

18   telemedicine consults that got completed with a script.  That's

19   what I was -- that's what --

20   Q.   So that -- okay.  So telemedicine, that means we're all the

21   way down to MyOnCallDoc, right?

22   A.   Well, that's what the 90 percent number was referring to.

23   Q.   To -- to MyOnCallDoc people, right?

24   A.   Correct.

25   Q.   So people that were called by MyOnCallDoc that had all this

1    qualification to begin with, 90 percent of them, your

2    estimation, agreed to take the test, right?

3    A.   Correct.

4    Q.   Now, let's talk about, at that point, what happens.

5         MyOnCallDoc gets the agreement of a potential beneficiary

6    or patient to take a step after that, right?

7    A.   When you say "agreement," you mean --

8    Q.   They're willing, at that point, to move forward.  They

9    haven't said, no, thank you.

10   A.   Correct.

11   Q.   So then the information is determined by the telehealth

12   doc, or the telemedicine doc, whether or not they meet the

13   requirements, right?

14   A.   Correct.

15   Q.   The kit isn't even sent to the patient until after the

16   doctor has decided that qualifications have been met, correct?

17   A.   Correct.

18   Q.   So this is not kits sent out and then come back.  This is

19   MyOnCallDoc, who doesn't even send a kit out --

20   A.   Correct.

21   Q.   -- until the doctor says it's okay.

22   A.   Well, they never sent the kit out.  We sent the kit out

23   after the consult was completed.

24   Q.   After the consult was completed.

25        And that's after the doctor would have received his $67.50,

1    one way or the other, whether the person agreed or disagreed,

2    right?

3    A.   Correct.

4    Q.   So the doctor is being paid for the consult, not -- not the

5    result, correct?

6    A.   Correct.

7    Q.   And it's only when all of that process is done, right, that

8    the kit is returned to who?

9    A.   When you say "the process is done"...

10   Q.   No.  After you've -- after the doctor, the telemedicine

11   aspect is done -- right? -- the kit is sent out.

12       The kit is sent back by the patient, the beneficiary, to

13   whom?

14   A.   We would schedule -- meaning the call center would schedule

15   a pickup of that kit and signed requisition form that would be

16   picked up from the patient's house and sent directly to

17   LabSolutions.

18   Q.   Did I hear "signed requisition form"?

19   A.   Yes.

20   Q.   You mean the patient actually signed off on the requisition

21   form that the patient wanted to go forward with the test?

22   A.   Correct.

23   Q.   And nobody took any action until they got that signed

24   requisition form?

25   A.   What do you mean, "action"?

 1  Q.  Action as in picking up -- sending it off to the lab.

 2  A.  Correct.  We scheduled the pickup after the sample was

 3  complete and they executed the requisition form.

 4  Q.  So you got the executed requisition form by the patient,

 5  and you now have the kit picked up at the same time.

 6      And who sends that to the lab?

 7  A.  We did.  We --

 8  Q.  Who's "we"?

 9  A.  The call center.

10  Q.  The call center.

11  A.  Correct.

12  Q.  All right.

13      MR. SADOW:  What was the other one, 1649-L?

14  BY MR. SADOW:

15  Q.  1629-L, can you see that one?

16  A.  Yes.

17  Q.  Okay.  Who put this chart together?

18  A.  Christian.

19  Q.  Christian.

20      Anyone else?

21  A.  I don't remember specifically working on this chart.

22  Q.  But you know it was not Mr. Patel, correct?

23  A.  Correct.

24  Q.  And what does this say?  Genetic Cancer Testing Workflow

25  Process, right?

1   A.   Yes.

2   Q.   Once again, it has to do with the workflow process for the

3   testing, right?

4   A.   Yes.

5   Q.   This is not the how-do-we-get-a-patient chart; this is the

6   testing chart, right?

7   A.   I believe it encompassed everything, but that's what it

8   says.

9   Q.   Did you use it?

10   A.   I'm sorry?

11   Q.   Did you use this chart?

12   A.   No.

13   Q.   Well, who did?

14   A.   We used -- I apologize.  We did use the chart, but there

15   were piece -- there were -- there were steps that were missing.

16   Q.   Wait.  You did use the chart, but there were steps that

17   were missing.

18        Who used the chart?

19   A.   The call center.

20   Q.   The call center.

21        McKeon?

22   A.   Correct.

23   Q.   Right?

24   A.   Yes.

25   Q.   And was the same process essentially that we went through

1   with how it gets to the patient used?

2   A.   Yes.

3   Q.   So this is just another version of the same process?

4   A.   Yes.

5   Q.   And your understanding is that the two charts that we just

6   saw that were created by someone other than Minal Patel were

7   sent along to Minal Patel, right?

8   A.   Yes.

9   Q.   And Minal Patel got the approval of his attorney to follow

10   this process, right?

11   A.   Yes.

12   Q.   Okay.   The telemarketing aspect, all of the calls were

13   recorded, correct?

14   A.   Yes.

15   Q.   All the calls were recorded, correct?

16   A.   Yes.

17   Q.   Which would include the initial call, right?

18   A.   Yes.

19   Q.   Did it include more than the initial call?

20   A.   Every call that was made from the call center on their

21   computers was recorded.

22   Q.   So there should be a call throughout the whole process for

23   each and every patient, right?

24   A.   Correct.

25   Q.   Where are they?

 1   A.   You'd have to ask Christian and Thanasi.

 2   Q.   You told the government what Christian and Mr. Ziros did

 3   with them, didn't you?

 4   A.   I believe they deleted them.

 5   Q.   They deleted them, right?

 6   A.   I don't know for a fact.  That's what I believe happened.

 7   Q.   Well, only people that had access to it were you, right?

 8   A.   No, I had no access to them.

 9   Q.   Okay.  McKeon, correct?

10   A.   Yes.

11   Q.   Ziros, correct?

12   A.   Yes.

13   Q.   Who else?

14   A.   I believe that would be it.

15   Q.   That would be it.

16        So if they don't exist, it's only because McKeon and/or

17   Ziros might have had something to do with their destruction,

18   correct?

19   A.   Correct.

20   Q.   But that would tell us what every single call was

21   throughout the entire process, right?

22   A.   Yes.

23   Q.   Okay.  There was a period of time in which family history

24   was no longer covered, right?

25   A.   I believe towards the end.

1          MR. SADOW:  I'm going to seek to introduce now, G-4 and

2    G-5.  These are the text messages.

3          MS. GURSKIS:  No objection, Your Honor.

4          THE COURT:  Those will be admitted.

5          (Government Exhibit G-4 and G-5 were received in

6          evidence.)

7          MR. SADOW:  And these are really hard to see, so if I

8    could --

9          THE COURT:  Yes, you may approach.

10   BY MR. SADOW:

11   Q.  You can see?

12   A.  Just up close.

13   Q.  Okay.  You're doing better than me.

14        See if you can give me an approximate date.

15   A.  It says 3/13 -- wow.

16   Q.  2018, right?

17   A.  Is that an eight or a six?  Okay.  3/13/18.

18   Q.  Look over here and see if you can see it better.

19   A.  Oh, yes.  3/13 and 3/14 of 2018.

20   Q.  Okay.  So we're talking about March of 2018.  And these are

21   text messages.

22        This is a text message that's between you and who?

23   A.  (No verbal response.)

24   Q.  Michael, right?  Michael -- what's his name?  What's the

25   last name?

1    A.  I don't see any.

2    Q.  You can tell from the context.

3    A.  I'm not going to dispute that it was with Mike Moranz.  I

4    just don't --

5    Q.  Okay.  So -- and what is being said right here about family

6    history?

7    A.  Do you want me to read it?

8    Q.  Sure.

9    A.  Please pause all family history leads immediately.  Just

10   got call from that lab about only being able to process

11   personal history.  I will call you shortly.  Please get on the

12   new leads for personal only.  It is imperative.

13   Q.  Okay.  And now we move to G-5.  See if you can give us a

14   new date.

15   A.  September 13, '18.

16   Q.  Okay.  And same individual, you and that -- Moranz.

17   A.  Moranz.

18   Q.  Moranz.

19       And now what do you tell him?

20   A.  These?

21   Q.  Yeah.

22   A.  Please send me leads.  Can you do that?  Family history

23   starts next week.  This will turn into a very profitable deal

24   for both of us.

25   Q.  And "both of us" being you and Moranz; is that his name?

1    A.   Yes, Mike Moranz.

2    Q.   Because he's the one who was giving you the leads.

3    A.   Correct.

4    Q.   And you understood that when family history -- when family

5    history was not permitted around March or so of 2018, only

6    personal history was permissible, correct?

7    A.   Depending on where the lab was, yes.

8    Q.   All right.  Well, let's talk about that a little bit.

9    Because the lab, that is -- the lab was getting so-called

10   directions from something called a MAC, right?

11   A.   Correct.

12   Q.   And the MAC was making the determination of whether family

13   history and/or personal history was required, correct?

14   A.   Yes.

15   Q.   And at some point, maybe around March of 2018, some MAC

16   somewhere said no more family history alone, correct?

17   A.   Yes.

18   Q.   But that wasn't what all MACs did, right?

19   A.   To my understanding, correct.

20   Q.   There were other locations in which family history was

21   still permissible, correct?

22   A.   Yes.

23   Q.   Do you remember any of the locations?  I don't want to push

24   it too far.

25   A.   I don't.  I just remember that it -- it was determined by

1    the MAC if it was -- if family history was acceptable or not.

2    Q.   Okay.  Now, that kind of gives me --

3         MR. SADOW:  I need to find G-1.

4         I move G-1 into evidence.

5         THE COURT:  Any objection?

6         MS. GURSKIS:  No objection.

7         THE COURT:  We'll admit G-1 at this time.

8         (Government Exhibit G-1 was received in evidence.)

9         MR. SADOW:  This one would be actually put up on the

10   screen.

11   BY MR. SADOW:

12   Q.   All right.  This is G-1, and this is an email from you on

13   September 28, 2016, to Christian McKeon, subject:  CGx lab

14   info.  Right?

15   A.   Yes.

16   Q.   And it has two attachments, Molecular Requisition Form 2

17   and CGx Test-Specific ICD Codes, right?

18   A.   Yes.

19   Q.   And what you are telling Mr. McKeon is clear, the only

20   medical necessity for a Medicare patient is family or personal

21   history, right?

22   A.   Yes.

23   Q.   Now, where did that information come from?

24   A.   I was given that information from the lab.

25   Q.   Which lab?

1   A.   I believe, LabSolutions.

2   Q.   So someone at LabSolutions told you what you wrote to

3   Mr. McKeon, right?

4   A.   Correct.

5   Q.   And it's very clear that the lab believed that the only

6   medical necessity that was necessary was that the Medicare

7   patient had family or personal history, right?

8   A.   And Part B coverage, yes.

9   Q.   And Part B coverage.  But that was it.  That was all that

10   was understood was required, right?

11   A.   Yes.

12   Q.   And you didn't know any better.  That's exactly what you

13   told McKeon, right?

14   A.   Yes.

15   Q.   And this is what you were operating under for an extended

16   period of time, right?

17   A.   Yes.

18   Q.   When did you find out this was inaccurate?

19   A.   Not that it was inaccurate, that the MAC had changed their

20   qualifications.

21   Q.   But the key here is medical necessity.

22        When did you determine or find out that medical necessity

23   was not simply Medicare patient, his family or personal

24   history?

25   A.   I believe on the text that you just showed me, in March

1    of 2018.

2    Q.   I'm asking the questions very poorly, so let me try again.

3    A.   Sorry.

4    Q.   I realize that the texts we went over talked in terms of

5    family history, right?  The ones that we just went over.

6    A.   Yes.

7    Q.   I'm asking you about the only medical necessity, that is,

8    if you have family history, or you have personal history, you

9    have medical necessity.

10       That's what this says, right?

11   A.   Yes.

12   Q.   When did you find out that that wasn't all you needed for

13   medical necessity?

14   A.   When they -- you mean, when they change it to being

15   personal history only?

16   Q.   No, no.

17   A.   I don't know what you're asking.  I'm sorry.

18   Q.   You told me that the tests here weren't for medical

19   necessity.  That's what you told the government on direct

20   examination, right?

21   A.   Can you say that a different way?

22   Q.   I can try.

23       On direct examination you testified that the tests were

24   wrong because they didn't have medical necessity, correct?

25   A.   Yes.

1   Q.   Okay.  But this says the only thing -- this exhibit, in

2   which you wrote, it says:  The only thing that's required for

3   medical necessity is either family or personal history, right?

4   A.   Yes.

5   Q.   When did you find out that more was required?

6   A.   More was not required.

7   Q.   More was not required.

8        You always believed that all you had to do was have a

9   patient with family or personal history, right?

10  A.   Correct.

11  Q.   And the people -- the people that ultimately spoke to

12  MyOnCallDoc, doctors, were all prescreened to have either

13  family or personal history, right?

14  A.   Correct.

15           MR. SADOW:  Could I have just a minute?

16           THE COURT:  You may, Mr. Sadow.

17       (Discussion was held off the record.)

18           MR. SADOW:  I'm going to go through my notes, and then

19  I may be finished, Your Honor.

20           THE COURT:  Sure.

21           MR. SADOW:  Now, actually -- that's what happens.  I

22  move in C-6 -- I mean, G-6 into evidence.

23           THE COURT:  G-6.  Any objection to G-6?

24           MS. GURSKIS:  No, Your Honor.

25           THE COURT:  Very good.  That'll be admitted at this

1    time.

2         (Defense Exhibit G-6 was received in evidence.)

3    BY MR. SADOW:

4    Q.   This is an email written by Ziros to Ms. Eisner in which

5    you are cc'd on, March 6th of 2017, right?

6    A.   Yes.

7    Q.   Do you remember on direct examination you said that when

8    the document showed results, it meant negative?

9    A.   Yes.

10   Q.   Do you see anything on this that indicates that the -- that

11   MyOnCallDoc actually said that?

12   A.   No, that was our instruction to MyOnCallDoc.

13   Q.   You see?  But you asked the question.  Theirs are the

14   appointments where the doctor received the results and went

15   over them with the patient as a follow-up to their original

16   appointment.

17        Do you see anything that says anything about positive or

18   negative?

19   A.   No.

20   Q.   And this is a question asked -- here's the question from

21   Ziros to Ms. Eisner, with you cc'd:  What does it mean when the

22   RX says results and the notes show follow up?

23        And the answer is what is written at the top, correct?

24   A.   Correct.

25   Q.   Nothing about positive.  Nothing about negative.  Just

1    about results, right?

2    A.  Correct.

3    Q.  Do you have a single document -- and here's a document.  Do

4    you have a single document that says results did not include

5    positive?

6    A.  I do not have that document, no.

7    Q.  Because it doesn't exist, does it?

8    A.  I don't know if it does or not.

9    Q.  This is the only document that talks about results and it

10   comes directly from MyOnCallDoc, right?

11   A.  That's -- yes.

12        MR. SADOW:  Can you put up 1684?  Could you blowup the

13   top?

14   BY MR. SADOW:

15   Q.  You see where Mr. Patel wrote you on September 28, 2016,

16   about the lab coat?

17   A.  Yes.

18   Q.  Now, let's just be candid, honest with one another.  You

19   knew this was joking, didn't you?

20   A.  (No verbal response.)

21   Q.  Come on.  Come on, you can tell us.  You knew this was just

22   kidding around.  You knew he wasn't putting on a lab coat.  He

23   was just telling you he was going to work hard to try and get

24   these things finished.  Right?

25   A.  I don't know if it was a joke or not.

1    Q.   But this -- what are these things?  I'm sorry.  I'm a

2    little out of my age here.

3         These dots with the lines on it, what does that mean?

4    A.   It's a smiley face.

5    Q.   And when you do a smiley face, what does that mean?

6    A.   There's multiple --

7    Q.   Doesn't it -- doesn't it indicate that you're just kidding?

8    A.   Not --

9    Q.   That you're smiling and saying that this isn't what I

10   really am doing?

11   A.   No, I wouldn't say that.

12   Q.   Oh.  So you -- I want to make sure I understand you.  Okay?

13        You thought, when you got this on September 28th of 2016,

14   that Mr. Minal Patel, the owner of LabSolutions -- which was a

15   big company, right?

16   A.   Yes.

17   Q.   Right?

18   A.   Yes.

19   Q.   Lots of employees, right?

20   A.   Yes.

21   Q.   You were there, right?

22   A.   Yes.

23   Q.   Expensive equipment, right?

24   A.   Yes.

25   Q.   People working in the lab, right?

1    A.   Yes.

2    Q.   People working in other locations with billing, right?

3    A.   Correct.

4    Q.   A total operating, functional business, correct?

5    A.   Correct.

6    Q.   You're telling us that you said or thought at the time, oh,

7    boy, Patel's putting on the lab coat and going into the lab to

8    do this?  Are you really going to tell us that?

9    A.   I didn't think about it one way or the other.  You asked if

10   I thought it was a joke or if it was -- or if that's what he

11   meant.

12   Q.   You didn't think about it.

13   A.   I didn't --

14   Q.   Did you ever see him in a lab coat?

15   A.   (No verbal response.)

16   Q.   Come on, you can answer that.

17   A.   I don't remember, no.

18   Q.   You don't remember.

19        You tried to convince the government that you shouldn't be

20   prosecuted because of the legal advice that you've all

21   discussed already, right?

22   A.   Correct.

23   Q.   That didn't work, though, did it?

24   A.   No.

25   Q.   The government indicated they were going to prosecute you

1  anyhow, right?

2  A.  Correct.

3  Q.  So you had two choices.  You could either fight it, right?

4  Take a chance, right?

5  A.  Correct.

6  Q.  Or you could work out a plea and cooperate, right?

7  A.  Correct.

8  Q.  And hoped that, by benefitting -- or cooperating with the

9  government, you'd get a lesser sentence, right?

10  A.  Correct.

11  Q.  And that's what you chose to do, correct?

12  A.  Yes.

13  Q.  And when did you enter your plea?  How long ago?  A year

14  ago?

15  A.  I don't remember the exact date, but I would say in that

16  time frame, yes.

17  Q.  And you haven't even been sentenced yet, right?

18  A.  No.

19  Q.  Because you're still cooperating, right?

20  A.  Correct.

21  Q.  And that's why you're here, right?

22  A.  Correct.

23       MR. SADOW:  Thank you.

24       THE COURT:  Folks, let's do this.  Because we're just

25  around 3:50.  Let's take a break at this time, about

1    15 minutes.  So when we come back, we can complete this witness

2    and do the redirect.  Okay?

3           If you want, you can leave your notepads on your

4    chairs, and go ahead and take your break at this time.  We'll

5    see you in just a little bit.  You're excused.

6           (Jury exits at 3:49 p.m.)

7           THE COURT:  Please be seated, everyone.

8           If you need to use the restroom, Mr. Griner, feel free.

9    You can step down, absolutely.

10          All right.  We'll go ahead and take about a 10- or

11   15-minute break, and we'll continue on with the redirect.

12   Okay?

13          (Court recessed at 3:50 p.m.)

14          (Back on the record at 4:22 p.m.)

15          THE COURT:  Are we ready to go with our redirect?

16          MS. GURSKIS:  Yes, Your Honor.

17          THE COURT:  All right.  Let's go line up our jurors.

18          THE COURT SECURITY OFFICER:  All rise.

19          (Jury enters at 4:22 p.m.)

20          THE COURT:  Please be seated, everyone.

21          All right, ladies and gentlemen.  So our last to-do for

22   the afternoon will be to complete this witness.  Okay?  We're

23   going to turn it back to the government for the redirect

24   examination.

25          You may go ahead, Counsel.

```
 1              MS. GURSKIS:  Thank you, Your Honor.
 2                      REDIRECT EXAMINATION
 3  BY MS. GURSKIS:
 4  Q.  Mr. Griner, before we took the afternoon break, Mr. Sadow
 5  was asking you about MACs and medical necessity.
 6         Do you remember that?
 7  A.  Yes.
 8  Q.  Do you know what a MAC is, what that stands for?
 9  A.  I do not.
10  Q.  Do you know what it is connected to or affiliated with?
11  A.  It's connected to Medicare and their billing, I believe.
12  Q.  Okay.  Who taught you that it was connected to Medicare and
13  Medicare billing?
14  A.  I don't remember who specifically.
15  Q.  Okay.  Who spoke to you about MACs with regard to cancer
16  genetic testing?
17  A.  Minal and, I believe, Nick Saliba.
18  Q.  And did Minal and Nick Saliba also give you information
19  about reimbursement for cancer genetic testing?
20  A.  Yes.
21  Q.  At some point, you started focusing on patients who had a
22  personal history of cancer.
23         Do you recall Mr. Sadow asking you about that?
24  A.  Yes.
25  Q.  Were you taking advantage of these cancer survivors to make
```

1  money?

2  A.  Yes.

3  Q.  And who taught you that personal history was needed for a

4  test to be medically necessary or billed to Medicare?

5  A.  I was given that information from the lab.

6  Q.  From the lab.

7      And who from the lab?

8  A.  Minal and, again, Nick Saliba.

9  Q.  And speaking about medical necessity, that first step of

10  the assessment of whether somebody had medical -- had that

11  medical necessity, were the telemarketers the ones making that

12  initial step -- taking that initial step?

13  A.  The telemarketers were making the initial contact to the

14  patient, yes.

15  Q.  And the telemarketers were the one assessing whether they

16  had the required cancer criteria?

17  A.  Correct.

18  Q.  So the screening in this case was done by the telemarketers

19  in the first instance, right?

20  A.  Yes.

21  Q.  But the requisition forms, some of which we've looked at

22  today, those needed a doctor's signature to bill Medicare?

23  A.  Yes.

24  Q.  And that suggested -- involved some -- would involve some

25  sort of decision by a doctor, not by a telemarketer, right?

1   A.   Yes.

2   Q.   Did any of those doctors have a prior relationship with a

3   patient they were writing a test for?

4   A.   No.

5   Q.   Were any of these patients receiving legitimate treatment?

6   A.   No.

7   Q.   You talked also with Mr. Sadow about doctors and doctors'

8   signatures.

9        What was the approval rate of the doctors on the

10  requisition forms that were signed for LabSolutions?

11  A.   In reference to the number of consults that were sent over?

12  Q.   The number of consults that were -- or the number of forms

13  that were signed off on by the telemed docs.

14  A.   I would say in the 90 percent range.

15  Q.   And what would have happened if doctors were not signing

16  off on those orders?

17  A.   We would have found another telemedicine company.

18  Q.   Did you have any way to tell whether the doctors had

19  actually placed the calls to the beneficiaries?

20  A.   No.

21  Q.   So what were you really paying for?

22  A.   Paying for a completed requisition form.

23  Q.   Mr. Sadow also asked you some questions about timing and

24  the length of time with which you worked with Mr. Patel.

25       Do you recall that?

 1    A.   Yes.

 2         MS. GURSKIS:   Your Honor, may I use the ELMO to show a

 3    couple of documents to the witness?

 4         THE COURT:   You may.

 5         MS. GURSKIS:   This is Government's Exhibit 1683.

 6    BY MS. GURSKIS:

 7    Q.   Do you see the date on that, Mr. Griner?

 8    A.   I do.

 9    Q.   And that's 2016?

10    A.   Yes.

11    Q.   And do you recall this morning when we looked at some

12    requisition forms and MyOnCallDoc forms?

13    A.   Yes.

14         MS. GURSKIS:   This is 417-C.

15    BY MS. GURSKIS:

16    Q.   Do you see the date on that?

17    A.   I do.

18    Q.   What's the date?

19    A.   5/25/2018.

20    Q.   So that's, what, about two years after August 2016, would

21    you say?

22    A.   Roughly.

23    Q.   And what's the coding here, Mr. Griner?  Does that say

24    IDGAF?

25    A.   Yes.

1   Q.   Okay.  So this would have been one of your telemed

2   consultations; is that right?

3   A.   Yes.

4   Q.   And who was paying you for the consults -- or what entity?

5   A.   Who was paying me for the consults or for the patients?

6   Q.   The patients.

7   A.   I was paid by XGEN.

8   Q.   Okay.  And where did the money from XGEN come from?

9   A.   LabSolutions.

10  Q.   When you go to a doctor, does Christian McKeon or Minal

11  Patel pay for that visit?

12  A.   No.

13  Q.   Do they make money based on things that your doctor orders

14  for you?

15  A.   No.

16  Q.   Mr. Sadow also asked you some questions about lies in this

17  case.

18       Do you recall that?

19  A.   Yes.

20  Q.   And do you recall stating a few times today that when law

21  enforcement first approached you, you lied?

22  A.   Yes.

23  Q.   Do you remember if one of the things that you lied about

24  was whether you were paid based on a per-lead or per-sample

25  reimbursement from Medicare?

1   A.   Yes.

2   Q.   Is that illegal?

3   A.   Is it illegal to be paid on a per-lead basis?

4   Q.   Yes.

5   A.   No.

6   Q.   Is it illegal to be paid based on the percentage of

7   Medicare reimbursement?

8   A.   Yes.

9   Q.   Did you lie to agents about being paid on a percentage of

10  Medicare reimbursement for those leads?

11  A.   Yes.

12  Q.   Did you lie because you believed that was illegal?

13  A.   Yes.

14  Q.   And you met with the government a couple of times before

15  you were charged; is that right?

16  A.   Yes.

17  Q.   Were you hoping to not be charged?

18  A.   Yes.

19  Q.   And in some of the communications with your attorney, were

20  you trying to convince the government not to charge you?

21  A.   Yes.

22  Q.   Is that why you didn't give the full picture to your

23  lawyer?

24  A.   Yes.

25  Q.   So is it fair to say you were using some of the legal

1   advice that was talked about in those emails as a

2   get-out-of-jail-free card?

3   A.   Yes.

4   Q.   And you pled guilty?

5   A.   Yes.

6   Q.   Is that because you're guilty?

7   A.   Yes.

8   Q.   Is it fair to say that healthcare fraud is lies for money?

9   A.   Yes.

10   Q.   What were some of the lies involved in this particular

11   scheme?

12   A.   The patients actually needing the tests, the benefit of

13   what the tests provided to the patient, the actual value of the

14   test.

15   Q.   And the value of the test, meaning what?

16   A.   That there was actually some inherent value to the patient,

17   when in reality, I don't know what that -- what that is.

18        MS. GURSKIS:   Your Honor, may I show the witness

19   another document on the ELMO?

20        THE COURT:   You may.

21   BY MS. GURSKIS:

22   Q.   We spent some time today discussing this chart.

23        Do you recall that?

24   A.   Yes.

25   Q.   And this chart doesn't portray the full picture; is that

1   true?

2   A.   That's correct.

3   Q.   And Mr. Sadow asked you about attorneys for Mr. Dinnen and

4   Mr. Ramamurthy on your cross-examination.

5        Do you have recall that?

6   A.   Yes.

7   Q.   Did you ever interact with those lawyers?

8   A.   No.

9   Q.   Do you know if they actually had lawyers?

10  A.   No.

11  Q.   Whether it was lawyers for Mr. Dinnen or Mr. Ramamurthy, or

12  another person, if any lawyer was relying on this document,

13  would he be relying on the truth or on falsehoods?

14  A.   Falsehood.

15  Q.   Who made this chart?

16  A.   Christian and myself.

17  Q.   Why did you and Christian make the chart?

18  A.   To show the process that we were using to generate a new

19  patient.

20  Q.   Did someone request that you make this chart?

21  A.   Yes, Minal.

22  Q.   Do you know if Minal Patel knew that this chart wasn't the

23  full picture?

24  A.   I do not know that.

25  Q.   Did Minal Patel know how you got patients?

1   A.   Yes.

2   Q.   Did Minal Patel know that you were cold-calling patients?

3   A.   Yes.

4   Q.   Does this chart show that patients are being cold called?

5   A.   No.

6   Q.   Do you know whether Minal Patel used this chart with his

7   lawyers?

8   A.   I do not know that.

9   Q.   You were asked some questions about somebody named Toby

10   Watt or Tobin Watt on cross-examination.

11        Do you recall that?

12   A.   Yes.

13   Q.   Do you know the name of Mr. Watt's law firm?

14   A.   I do not remember, no.

15   Q.   Did you help lie to Medicare to get them to approve cancer

16   genetic tests in this case?

17   A.   Yes.

18   Q.   Do you need a lawyer to understand that lying to Medicare

19   is wrong?

20   A.   No.

21   Q.   Do you need a lawyer to understand that misleading cancer

22   patients is wrong?

23   A.   No.

24   Q.   Do you need a lawyer to understand that having doctors

25   robo-signing forms is wrong?

1    A.   No.

2    Q.   Are you aware that Mr. Patel's lawyers believed that the

3    marketing consisted of marketing to doctors and

4    brick-and-mortar facilities?

5    A.   I'm sorry.  Could you ask that a different way?

6    Q.   Sure.

7         Do you know whether Minal Patel shared with his lawyers

8    that there was marketing done outside of marketing directly to

9    doctors?

10   A.   I do not know that.

11   Q.   So we've spoken a lot about lawyers today.  Despite all the

12   legal advice that has been discussed today, are you still

13   guilty of fraud?

14   A.   Yes.

15   Q.   What did you do that was wrong?

16   A.   Helped generate patients for unnecessary testing and was

17   compensated directly from Medicare reimbursements.

18   Q.   Do you remember being asked about your meetings with

19   prosecutors in this case?

20   A.   Yes.

21   Q.   What instruction did you receive over and over and over

22   during your meeting with prosecutors?

23   A.   Just tell the truth.

24   Q.   Did anyone from the government ever try to put words in

25   your mouth or tell you how to answer a question?

1    A.   No.

2             MS. GURSKIS:  Nothing further.  Thank you.

3             THE COURT:  Thank you very much, Mr. Griner.  You are

4    excused.

5             THE WITNESS:  Thank you.

6             THE COURT:  Brief sidebar, please.

7         (The following proceedings were held sidebar:)

8             THE COURT:  So are we good then calling it for today

9    based on --

10            MS. DE BOER:  Yes, Your Honor.

11            THE COURT:  You guys are ready to go?

12            MS. DE BOER:  Yes, Your Honor.

13            THE COURT:  So I'm going to call it for 9:00 o'clock

14   tomorrow.

15        (Proceedings returned to open court.)

16            THE COURT:  All right, ladies and gentlemen.  We are

17   not going to be calling any more witnesses for today.  That

18   finishes our testimony, so we're going to get you out of here

19   again a little earlier than we anticipated when we started this

20   morning, similar to what we did yesterday.  I want everyone to

21   feel confident that we would be making the most of the

22   remaining 20 or 30 minutes if we needed them.  But the reason

23   we're letting you go is because we planned ahead.

24            So even though we're ending a couple of minutes early

25   again today, we are still on schedule.  So I wanted everyone to

1    feel confident in that.  We're working very hard with our

2    scheduling issues.  In fact, when you leave today we will be

3    meeting to do some more homework to get ready for tomorrow so

4    that we can keep things moving.

5          So couple of reminders, of course.  As we break for the

6    evening, remember again to continue to follow all of the

7    Court's instructions.  Do not discuss what you have heard with

8    one another, with family or friends.

9          When you get home this evening, please continue to stay

10   off social media, as I know you have done.  And the lawyers

11   will avoid you tomorrow on your way in, should you see them,

12   take no offense from that.  And again, no independent research,

13   please.  Do not go on the internet, look up any people, places,

14   or things.

15         You've heard a lot of testimony regarding genetic

16   testing, telemedicine, and all of the concepts we've reviewed

17   in this trial should only be discussed and analyzed within the

18   four walls of this courtroom.  If you go outside of that and

19   look up other resources, we cannot test the veracity of what

20   you may stumble into and it may not be accurate.  So we want

21   everything to be reviewed by the lawyers before it can be

22   considered.  So please continue to follow those instructions.

23         Let's leave your notepads in the jury room as we do

24   every evening, and we'll see you all tomorrow at 9:00 a.m.  You

25   are excused.  Have a great evening.

 1          (Jury exits at 4:40 p.m.)

 2          THE COURT:  All right, everyone.  Please be seated.

 3          So let's, in preparation for tomorrow, go over a few

 4     things.

 5          So my understanding is tomorrow we will lead off, I

 6     believe, with Brett Hirsch; is that right?

 7          MS. DE BOER:  That's correct, Your Honor.

 8          THE COURT:  Okay.  And then if we are able to complete

 9     Mr. Hirsch tomorrow, do we have a plan -- is it going to be

10     Mr. Holden after that?

11          MS. DE BOER:  That's correct.

12          THE COURT:  Okay.  So our goal tomorrow is Hirsch, and

13     to the extent possible, get started on Mr. Holden, right?

14          MS. DE BOER:  Yes.

15          THE COURT:  All right.  Very good.

16          Okay.  So in light of that, I just want to pivot back

17     to a discussion we had when we started this morning, and I

18     believe, Ms. de Boer, you had mentioned some recordings, the

19     Hirsch recordings of Mr. Patel, and you had pointed out some

20     concerns.

21          And Mr. Sadow had noted that to the extent there is a

22     rule of completeness issue, that it would assist if we had a

23     full transcript, not just any edited transcripts.

24          Do I have a sense, now that we're winding up the day,

25     how much, if any, of the recordings you're going to be using on

1    the government's end?

2         MS. DE BOER:  Yes, Your Honor.  And I think we may be

3    on the same page as the defense at this point.  So we've

4    identified for the defense a small portion of one of the

5    recordings.  It's less than 30 seconds.  And it's -- it

6    basically shows Mr. Hirsch -- Mr. Patel acknowledging

7    Mr. Sporn's full name, Marc Sporn.  That was an issue that had

8    been brought up on Mr. Sporn's cross.  So that's it.

9         And I think that very narrow slice likely doesn't open

10   up a rule of completeness issue, nor potential impeachment

11   issue, and I think the defense is largely on the same page as

12   that.  We are not using a transcript for that call, so --

13        THE COURT:  It's so brief, right, so there's no need

14   for that.  Okay.

15        So on the defense side, guys, I think maybe any sort of

16   impeachment material that could have been gleaned from the

17   recordings doesn't appear to be in play, nor is there a

18   completeness problem if indeed we're just playing one clip.  So

19   do we have less of a concern now, based upon where we were this

20   morning?

21        MR. SADOW:  I guess the simple answer to that is, if

22   they're playing 30 seconds for that purpose, I don't think the

23   rule of 106 completeness is going to kick in.  I told the

24   government that I will not be seeking to introduce the contents

25   of the conversations.  I do intend, of course, to make

1   reference that there were other conversations.

2          THE COURT:  I think that's fine.  Right, Ms. de Boer?

3          MS. DE BOER:  Absolutely.  I mean, it goes to his

4   cooperation and his incentive in testifying.  One thing I will

5   note and I don't know how it will come on cross so it may be a

6   bit premature to fully address it, but there was a suggestion

7   in opening statements that the way the government directed

8   those recordings was improper in directing Mr. Hirsch not to

9   elicit Mr. Patel's legal advice.

10         THE COURT:  I remember that, yeah.

11         MS. DE BOER:  So obviously the Court understands why

12  that direction was given.  And to the extent that's elicited

13  and there's any implication left with the jury that that's

14  somehow improper, I think an instruction might be appropriate,

15  but, frankly, I think that should stayed away from.

16         I don't think that that's a proper suggestion to leave

17  with the jury.  And as the Court knows, the government has

18  filed motions to compel information about legal advice now that

19  it's been put at issue.

20         So I would, I guess, move that that not be a part of

21  the cross-examination of Mr. Hirsch.  But to the extent that

22  that somehow comes up, that an instruction be given.

23         THE COURT:  So let me ask first on the defense side,

24  just to take a step back.  I don't believe we have concerns

25  about any recordings or their use for Mr. Hirsch, so we mooted

1   to a large extent this morning's concern given the government's

2   use of only a 30-second clip.

3          And I would agree, Mr. Sadow, that I don't have a

4   problem with discussions or references that they were in

5   discussions.  I think that's fine.  I think not going into the

6   substance of recordings is one thing.  We're not going to have

7   to deal with that anymore.

8          But certainly their relationship and conversations had

9   between Hirsch and Patel are going to be referenced in the

10  cross and to a certain extent certainly in the direct.  I don't

11  have a problem with that.

12         This follow-up concern regarding direction from the

13  government to Mr. Hirsch and the fact that he needed to not

14  reference legal advice and may have been, in the defense's

15  view, given a bit of a playbook, or at least some guidelines in

16  how to engage Mr. Patel, can you respond to that concern?

17         I don't necessarily know that any of the

18  cross-examination should go there.  Certainly I can give an

19  instruction, but hopefully we don't need to get into that.

20         What's your sense on that, Mr. Sadow?

21         MR. SADOW:  With all due respect, I think the fact that

22  he received that text, if he wants to put into context how he

23  received it, why he received it and so forth, that's fine.

24         But I think it's fair game because they weren't worried

25  about -- it doesn't say stay away from lawyers for legal

1    advice.  It says, no lawyers.  And it's as much of an inference

2    can be drawn that they didn't want there to be anything on tape

3    about lawyers, let alone get into lawyers's advice.

4         So they have two things they can do, respectfully.

5    They can bring it out through Mr. Hirsch, and he can explain

6    when he got the text and under what circumstances, and/or they

7    can call the agent, and the agent can testify that that's what

8    he did.

9         But just drawing that inference alone, I -- if they

10   were that concerned about lawyers, why were they talking to

11   Mr. Patel in the first place?  They know he was represented by

12   counsel.  They had been dealing with counsel in the Southern

13   District of Florida as well as in South Carolina.

14        So it's -- I don't believe that you can simply draw the

15   inference that the government was telling Hirsch to stay away

16   from it and protect the legal rights or the advice of rights --

17   legal rights of -- advice of counsel for Mr. Patel.

18        So I think a predicate needs to be laid.  And if it's

19   laid and the Court then deems it appropriate to either stop me

20   from going into it or instructing the jury otherwise, I

21   certainly can understand it.

22        THE COURT:  So, Ms. de Boer, I think it might be better

23   to come up -- I don't know how much you can deal with it in an

24   anticipatory way when you ask him questions.

25        I think the instruction that I can give -- I'm just

1   trying to think of one that would be tailored to this.  Because

2   I can understand Mr. Sadow's view that, if he's raising it, the

3   jury is going to essentially be able to look at that as one

4   piece of evidence, and what they draw from that is going to be

5   their call.

6        But what I don't want them to draw from it is the

7   assumption that the government is somehow engaged in foul play

8   through that instruction, that they are somehow trying to do

9   something nefarious.

10        So I'm wondering if something to the extent of

11   instructing them that -- you know, to the extent you are

12   concerned or you believe that this is, you know, bad practice

13   or impermissible or some sort of tampering by the government in

14   how they go through the question process from Hirsch, you are

15   instructed that the government, certainly throughout their

16   practice and their protocols, does not want to or is avoiding

17   trying to trigger or at least involve any legal advice or touch

18   on any legal advice granted by Mr. Patel.

19        I mean, something to that effect.  It's not doing it

20   artfully right now, but I'm trying to think of a way to not

21   completely eliminate its evidentiary value but also make it

22   clear that if they're going to consider it at all, they should

23   not draw an inference from it that something improper was done.

24        So what would you say as to how to go about doing this?

25   It may be better if it's just handled in your direct, frankly.

1    I don't know.

2           MS. DE BOER:  Well, Your Honor, I think the only reason

3    to elicit that particular instruction is to leave the jury with

4    the impression that the government was trying to somehow

5    avoid -- for a nefarious purpose, avoid the discussion of legal

6    advice.

7           We are ethically required to give that instruction.

8    That instruction is given to anyone who's making recorded

9    calls.  So -- and Your Honor knows why we have to do that.  And

10   I think that that's the only reason -- it would only be for a

11   nefarious purpose that that would even be elicited.

12          I understand the cross of the government gave you

13   directions.

14          THE COURT:  Right.

15          MS. DE BOER:  They talked to you about what they wanted

16   to get from these calls.  That's one thing.

17          But this particular instruction and to focus on it I

18   think is improper, and there is no instruction that's going to

19   cure it.  Jurors are still going to draw a nefarious inference

20   from that.

21          THE COURT:  And you don't plan, obviously, in your

22   direct -- this text is not a feature at all in your direct,

23   right?

24          MS. DE BOER:  I suppose it depends on the Court's

25   ruling on this.

1          THE COURT:  Certainly.  But what I'm trying to say is,

2    in a perfect world, the government would suggest that just take

3    the text out -- I mean, the text itself that says no lawyers --

4    I mean, that that should essentially be -- because I just don't

5    know how to let that in without giving a curative which then,

6    in a way, eliminates any inference from it either way, right?

7          I mean, there's no probative value anymore if all I'm

8    doing is airing out a text, and then, right along with it,

9    making sure everyone understands that that text is done because

10   of the ethical obligations of the government regarding concerns

11   as to attorney-client privilege.  I mean, something like that.

12         MS. DE BOER:  Exactly.

13         THE COURT:  At that point, why am I even showing the

14   text, I guess, is my -- I can't -- because, to Mr. Sadow's

15   point, he's saying there can be inferences drawn.  I would be

16   explicitly telling them not to do so.

17         So it just -- other than them ignoring my instruction,

18   it just begs for the jury to draw something nefarious from that

19   text when that text is motivated by ethical considerations of

20   the government.

21         MS. DE BOER:  I agree 100 percent, Your Honor.  I think

22   that the text and the -- if there was an oral instruction that

23   came along with it to not seek legal advice or to change the

24   subject if legal advice is discussed -- which would be a

25   typical instruction -- I agree; I think that that would be --

1    it's all risk at that point that the jury misinterprets that,

2    you know, and doesn't follow the Court's instruction.

3           THE COURT:  So tell me, Mr. Sadow -- look, I understand

4    that there could be, in your view, a certain level of probative

5    value.  I mean, certainly the concern here is you are asking

6    the Court not to put a gloss on that text so that it would be

7    explained away by ethical obligation.

8           The challenge I'm having with that is, it can be quite

9    misleading.  And I don't know -- aside from me being able to

10   ask -- and this is why I'm wondering how useful it really would

11   be and how problematic it could be under 403.  If I'm allowing

12   you to get into, at cross, how the government gave Mr. Hirsch

13   instructions, how they directed you to cover certain areas of

14   inquiry, I mean, that, to me, is valuable so that people can

15   understand the involvement of the government in the calls.

16          But beyond that, the text with the lawyers -- the only

17   reason I can think you would do it is essentially to give the

18   impression that the only reason the government doesn't want

19   there to be a question about lawyers is because it's going to

20   elicit testimony favorable to the defense that lawyers are

21   involved and blessing the conduct.

22          I mean, that's what my concern is.  Right?  I mean,

23   that's really what it seems to insinuate; that, well, they're

24   saying no lawyers, because if they were to ask about lawyers,

25   Mr. Patel is gonna explain how all of this has been blessed by

1    his lawyers.

2         I mean, that's what I'm worried about.  Look, you're

3    saying let the jury make the judgment call on that.  But it's

4    tough, because I think that there is an obligation for me to

5    instruct them that this is pursuant to ethical obligations.

6         And I think what you're asking me to do is let a jury

7    decide whether or not this was motivated by ethics or motivated

8    by nefarious reason.  That's a little tricky for me on this

9    one.

10        MR. SADOW:  It is tricky.  The problem, though, is

11   we're all guessing about the instructions.

12        THE COURT:  Sure.

13        MR. SADOW:  Let Mr. Mahmood get on the witness stand

14   before Mr. Hirsch tomorrow and say, during the recording or

15   before the recording, I instructed him so-and-so because of my

16   concern.  Let him -- because I have nothing to that effect.

17   There's no memorandum.  There's nothing that shows what

18   instructions were given.

19        He's never been asked -- Mr. Hirsch has never been

20   asked what the instructions are.  We simply have that text.

21   Okay?

22        So if they want to call him and lay that predicate, it

23   may have less value, I may choose not to use it.  But they

24   can't just say this is what we did without any evidence that

25   that's the reason for it.

1          I mean, Mr. Hirsch has been dealing with Mr. Patel, as

2    you now know, for years.  He knew all about the lawyers.

3    You've heard that from different sources.

4          So whether it was Mr. Hirsch's idea, whether they were

5    concerned what Mr. Patel was going to say, I think you need a

6    factual predicate before you can say it doesn't have value.

7          I know the government thinks that they're protecting

8    his ethical responsibilities.  But why would you send a text

9    then?  Why wouldn't you have already told him that?

10          See, that's like it comes up in the conversation, and

11    then he's being told.  Now, maybe I'm wrong.  All I have is the

12    message.

13          But -- so Mr. Mahmood is here.  He's a potential

14    witness.  Call him.  Have him get on the stand and say, I gave

15    these instructions to Mr. Hirsch before his telephone calls or

16    his face-to-face meetings.  I wanted to make sure we didn't do

17    this.  And I sent the text whenever I sent it, and the reason I

18    sent it is because it was getting close to that.

19          That's fine.  Get that predicate, then we don't have to

20    worry about what the jury is going to think.  On the other

21    hand, just to say, no, you can't touch it, because that's -- we

22    would never do that, you know, sometimes things get lost in the

23    translation.  And I shouldn't be precluded from an inference

24    until that inference is unreasonable.

25          THE COURT:  That's fair.

1          I mean, I guess -- I guess, Ms. de Boer, I understand

2    Mr. Sadow's point.  I don't know if this is something that can

3    be elicited from Mr. Hirsch himself.

4          I mean, assuming Mr. Hirsch has talked to anyone and

5    has some context of why he's getting this reminder, perhaps it

6    would be a little easier to bring it in that way.  But it would

7    be easier -- I mean, I know you're proffering it to me.  I have

8    no reason to doubt that that's the basis for the text.  But

9    certainly, it puts me in an odd spot that I would prohibit it

10   without first getting at least some explanation about the basis

11   for it.

12         What would you suggest in order to try to put this

13   issue to bed?

14         MS. DE BOER:  Well, Your Honor, I mean, we are

15   obligated to give that instruction.  So, of course, that is why

16   it was given.

17         And I don't think Mr. Hirsch -- frankly, he's not an

18   attorney; he's not an agent.  He doesn't understand, you know,

19   the ethical obligations in the same way that people that, you

20   know, do this all the time understand them.

21         The other thing I would add is the government is not on

22   trial in this case, and they are going to be able to put on

23   their advice-of-counsel defense.  They're going to call the

24   lawyers to testify.

25         So the jury is -- what the jury needs to decide is:

1    Did Mr. Patel receive legal advice; were the lawyers properly

2    informed; and did he properly rely on and actually implement

3    that advice?  That's the only thing that is at issue when it

4    comes to the legal advice.

5         Whether or not Brett Hirsch elicited that information

6    on a phone call and whether or not that was -- you know, there

7    were directions from the government about that particular issue

8    and the motivations for those directions, now we're getting

9    into a territory that is so far afield from the factual issues

10   that the jury has to decide and has so much potential for

11   prejudice here, really, that's the only way that the jury could

12   interpret it.

13        I really think that this is getting into extremely

14   dangerous territory that, frankly, doesn't aid in the

15   resolution of this case because the jury is going to hear from

16   the lawyers.  They've said they're calling Toby Watt.  That's

17   all the jury needs to hear to decide do they believe it or not.

18        MR. SADOW:  But that takes it totally out of context.

19   Because this is during the investigative stage, and this is an

20   issue -- the issue at this point is Mr. Hirsch is trying to get

21   Mr. Patel to say something or do something to -- that's either

22   illegal or, in some form or.

23        Fashion, to acknowledge or admit that he's done

24   something illegal.  That's -- that's separate and apart from

25   the advice-of-counsel defense.

1          And with all due respect to the government, this

2     ethical thing, if that's true, Mahmood will get on the stand,

3     and it'll take him five minutes to say, this is what I told him

4     he should do each time.

5          But at the same time, I think the Court needs to take

6     into account they knew he had a lawyer, but that didn't stop

7     them from doing all of this.

8          And I don't know whether Mr. Mahmood gave him those

9     instructions.  If he did, maybe he reduced them to writing.

10    Maybe there's something that says that.  But I don't have

11    anything from Mr. Mahmood because they don't want to call him

12    as a witness.

13         This is -- this is the government saying, with all due

14    respect, please protect us because we wouldn't do this, but we

15    don't want to give you any evidence, in fact, that we didn't do

16    it.

17         So let's have the facts.  This jury gets to decide the

18    facts.  One of the things we're going to say is that starting

19    on June -- in June of 2019, the government did a series of

20    telephone conversations with Mr. Patel, and there were numerous

21    pertaining -- and it wasn't just Mr. Hirsch.  It was Mr. Miano.

22    They set up a meeting at a restaurant.  This is an extended

23    thing all the way into the first two weeks of August.

24         And they're not playing a single call, not one single

25    call about -- except on Mr. Sporn.

1          Now, with all due respect, from my perspective, don't

2     you think that that's a little unusual?

3          I know you've done a lot of trials when you were on the

4     state court bench as well.  How many times have you been in a

5     situation where there are multiple tape-recordings of a suspect

6     and the government doesn't put any of it in except for

7     30 seconds?

8          So, again, the Court, upon hearing testimony, might

9     say, you know what?  I'm of the belief that if you want to go

10    into it, I'm gonna tell the jury that it was done for this

11    reason.  On the other hand, I don't think you can make that

12    determination on a government proffer under these

13    circumstances.

14         And I'm asking you, at the very least, to have

15    Mr. Hirsch testify about it or have -- Mr. Mahmood can be

16    called about it.  If he's called, he's got the paperwork, it'll

17    all be there.  I don't see how the government is harmed by

18    that.

19         Or we can do it a different way.  Call Mr. Mahmood

20    outside the presence of the jury, turn over all the paperwork

21    that deals with this and you can make a call based on what he

22    testifies outside the presence of the jury.

23         THE COURT:  Well, that last suggestion was one that I

24    had thought of not necessarily from a turning over paperwork,

25    but it would be -- perhaps it would at least give the Court a

1    little more of a record if I find it to be material that I

2    should leave out.

3         And I speak specifically about the text message at this

4    point under 403, if I had an agent proffer to the Court the

5    basis for his text message.  I mean, it would just at least

6    give the Court some more of a foundation to make that judgment

7    call.

8         I don't necessarily need to belabor this with him

9    taking the stand, but it would give me some peace of mind with

10   a brief proffer from the agent that this is pursuant to

11   department protocol, this is why it was offered, and then the

12   Court, probably, in that case would find this to be a 403

13   issue.

14        The probative value would be far outweighed -- excuse

15   me.  Yeah.  It would be far outweighed by the prejudice, mostly

16   because the prejudice would be generated by this coming out,

17   and then me giving an instruction along with it that

18   essentially says disregard it for the purpose for which it's

19   being elicited by the defense.

20        So it kind of negates it coming out.  It's going to

21   invite jurors to disregard court instructions with very little

22   probative value because I am allowing the defense to probe into

23   the fact that Hirsch was directed by the government repeatedly.

24   He was told what to do, where to meet, and a lot of that can be

25   fleshed out without needing to put forth a text message that

1   deals with lawyer advice or legal advice or stay away from

2   lawyers.

3         Is that a possibility, Ms. de Boer, that I could do

4   that in the morning?

5         MS. DE BOER:  I'd have to confirm that Agent Mahmood is

6   not one of the current case agents who's been here every day,

7   so we'd have to make sure that he can be here.  Assuming he's

8   in the state, I'm sure he can.  We will make every effort to do

9   that.

10        I will say I agree, the defense can probe into

11  generally that these calls were done at the direction of the

12  government, that there were X number of calls, and then in

13  their closing or in cross, the government played 30 seconds.  I

14  think that's all fair.

15        Obviously the Court understands there are lots of

16  reasons why those calls might not be played in a trial,

17  including that many of them are pretty incomprehensible.  So

18  there's lots of reason for that.  Obviously the defense can

19  argue whatever they want from that.

20        I think -- the last thing that I would add is, getting

21  into this instruction also leaves the jury with the impression

22  that there is exculpatory information on those calls, that

23  Mr. Patel made statements on those calls, which is exactly the

24  type of hearsay that we are attempting to keep out and that the

25  rules of evidence would keep out.

1          And Mr. Patel, obviously, can take the stand and talk

2     about legal advice that he received and things he told

3     Mr. Hirsch and others in this matter.  And that's fine, but it

4     would be subject to cross-examination.

5          I think this text message and what Mr. Sadow is

6     suggesting would leave the jury with an impression that there's

7     exculpatory information on those calls that is not now going to

8     be subject to cross-examination.

9          THE COURT:  No, I agree with you on that.  And we

10    talked a little bit about this.  We talked about self-serving

11    hearsay in the calls in some of that discussion, which we did

12    pretrial.  Look, I will tell you, I am very much inclined to

13    keep that text message completely out under 403.

14         I find that with the leeway I'm giving the defense on

15    the relationship between the government and Mr. Hirsch and the

16    direction they gave him to engage Mr. Patel, that really is

17    what's important here for the jury to consider.

18         Certainly, that text, which is very much out of

19    context, and the fact that I would feel compelled to give a

20    cautionary or limiting instruction that would essentially

21    negate any probative value it has, all the more makes me

22    concerned that it's just purely a prejudicial piece of

23    evidence, that the jury could take back in the jury room and

24    misinterpret, misunderstand, or give undue weight to, and that,

25    to me, is problematic given the underpinnings of the reason for

1    that admonition from the agent to Mr. Hirsch.

2         I think, though, for me to feel a little more comfort

3    in my ruling -- and, look, I could very well reach the ruling

4    without it, but it would be beneficial, I think, to have a very

5    brief, if possible, proffer from the agent as to why he would

6    have sent that text.

7         We can do it first thing tomorrow.  Jurors are getting

8    here, quite frankly, a little bit later than 9:00 each day, so

9    there's probably enough time.  If he can be here tomorrow, I

10   can go ahead and have him proffer the nature of that

11   communication and why it was made.

12        And if the Court is satisfied that the intentions, as I

13   expect they will be, were to adhere to ethical obligations and

14   not something else entirely, then the Court is all but

15   certainly going to keep the text message out under 403, because

16   I don't see any way that a jury, even with some sort of

17   instruction, could not misinterpret the value of that evidence,

18   which would be rightfully negated if indeed the government,

19   through their agent, can proffer to the Court that the basis

20   for that was departmental policy or policy of the agent not to

21   run afoul of someone who's represented by counsel.

22        So I think, Ms. de Boer, just to give us that kind of

23   cover -- and frankly, even if he's not here in the morning, if

24   he's here before the cross, that's probably gonna do it anyway

25   because this really needs to be done before cross.

1        I don't anticipate you're going to touch that message

2   at all in your direct anyway, right?

3        MS. DE BOER:  That's correct, Your Honor.  We'll call

4   the agent as soon as we get out of court and do what we can to

5   arrange that.

6        THE COURT:  Yeah.  Look, I just think, as Mr. Sadow

7   pointed out, it would be helpful for the Court to feel like the

8   ruling is based on more than just the argument that I'm hearing

9   today, but a proffer before the Court of the agent and why the

10  agent would have said that for protocol purposes.  I can live

11  with that.  I know that the defense would still prefer to be

12  able to air this out and let the jury come to its own

13  conclusion.

14       But I think if I get a sense of why it was transmitted

15  and the fact I would feel compelled to give the curative, it

16  pretty much eliminates what the defense would seek the jury to

17  draw from an inference when they see that text.

18       Is that, Mr. Sadow, your take on this?  I think the

19  proffer is at least what I need to get before I --

20       MR. SADOW:  I appreciate that and I'll take, obviously,

21  what the Court is willing to give me.  But I'd like to send you

22  the text message.  I don't think you've seen it.

23       THE COURT:  I think I've only heard it.  You tell me

24  what it looks like.  But isn't it very direct?  It's more than

25  that?

1          MR. SADOW:  That's why -- I can email it --

2          THE COURT:  Yeah, email it to me.  It would be good to

3     have it.

4          MR. SADOW:  And what is yours again?

5          THE COURT:  Just do it to Ruiz, Ruiz@flsd.uscourts.gov.

6          MR. SADOW:  It's on its way.

7          THE COURT:  Okay.  But it would be good to have it

8     because I need the context when I get the proffer anyway.  So

9     that helps.  I'll take a look at it.

10         MR. SADOW:  I've sent it to you.  It's in color.  And

11    you at least have it when you hear what you have to hear.

12         THE COURT:  Okay.  I appreciate that.  And like I said,

13    nothing here is going to stop the defenses' cross from getting

14    into the amount of guidance offered to Mr. Hirsch by the

15    government.  We can draw those inferences.

16         MR. SADOW:  We're going to have to figure out because

17    there's other things in the same text.

18         THE COURT:  In the text?  Okay.

19         MR. SADOW:  That's why the context is important.  It's

20    not like, you know, nothing else.  It's do this, stop talking

21    about that.

22         THE COURT:  Gotcha.  Okay.  I'll take a look at it, and

23    I can -- I can say that I think -- you know, and the government

24    acknowledges that certainly we're going to be able to have the

25    jury hear a little bit about, on cross, how this whole thing

1   played out and the amount of direction given and what he was

2   told to do and how he was told to engage.  I mean, I think a

3   lot of that will give the jurors a good sense of the

4   government's involvement in these communications and the

5   recordings.

6           MR. SADOW:  Can we at least have -- if there was a

7   report done about that conversation or there were notes --

8           THE COURT:  A report?

9           MR. SADOW:  If a report or notes were done by the agent

10  regarding the instructions and so forth, could you at least --

11  I don't even have to look at it.  At least the Court can have

12  it and look at it and see whether or not it fits what you hear

13  tomorrow.

14          THE COURT:  Sure.

15          And I would just ask, Ms. de Boer, I know you're going

16  to call the agent, but if he does have anything that I can take

17  a look at, if he can bring it with him, that would be great.

18          MS. DE BOER:  Of course, Your Honor.

19          THE COURT:  All right.  Thank you.

20          And I see what you're saying.

21          MR. SADOW:  It's not just don't talk.

22          THE COURT:  Yeah.

23          MR. SADOW:  It's as if -- again, what I'm suggesting

24  is, if Mr. Hirsch was instructed about not talking and lawyers,

25  he obviously has disregarded the instruction because they are

1    telling him, as they're listening, stop talking about lawyers.

2         So that's why I'm interested in what he was told

3    previously, how this came up.  I think this is -- it's not just

4    a, you know, I told you before, don't talk about lawyers.  It's

5    they're following the conversation pretty closely.  Talk about

6    this, don't say this.

7         THE COURT:  Look, I think certainly -- I think this

8    text message, because we have the issue of lawyers kind of

9    intertwined in it, it makes it still a concern for me, provided

10   that what I hear from the agent checks out.

11        But this goes to the earlier point, that I think it's

12   fair game.  I mean, we're not throwing this up on the ELMO,

13   but, you know, we definitely should hear, I would imagine at

14   cross, just how much involvement in the discussion the agents

15   had.

16        I mean, this is not -- this is not like, hey,

17   Mr. Hirsch, go talk to him and do your business with him and

18   we'll just stand by.  I mean, I think -- I think questions can

19   be posed to Mr. Hirsch about just how involved the government

20   was in requesting information and dictating, for lack of a

21   better word, what are the areas of inquiry that should be

22   asked.  That, to me, is fair game.

23        The jurors will draw that conclusion, and what they

24   believe was or was not being elicited by Mr. Hirsch or by the

25   government from that cross.  So I'm fine with those kinds of

1    questions.

2         This particular screenshot, though, because it's got

3    the lawyers in addition to some other lines in it, it's a bit

4    difficult not to make a blanket ruling.  I mean, it's not very

5    long, obviously.  It's, like, three or four text messages here.

6    But I think if I can get a bit of an explanation from the

7    agent, that will give me some sense of the basis for this

8    specific referencing of lawyers, or lack thereof, then I will

9    feel more comfortable making a ruling on this piece of

10   evidence.

11        But I certainly do expect -- and I don't think that the

12   government should be surprised that the cross will engage into

13   how much, for lack of a better word, coaching was done by the

14   government to Mr. Hirsch to get him to get out of Mr. Patel

15   what they wanted.  I mean, that's going to be the theme for

16   most of that cross.  I don't think anyone's surprised by that.

17   And we'll see what the jury does with it.

18        All right.  So that'll help me tomorrow.  When we get

19   in tomorrow, Ms. de Boer, let me know, or if you want to copy

20   me on the email and copy Mr. Sadow and Mr. Rafferty and the

21   team if you get some information later, go ahead and do that so

22   I know when he's coming.  As long as I can touch base on that,

23   that'll help tomorrow, and I'll make a final ruling on this

24   under 403 when I hear that.

25        MS. DE BOER:  Will do, Your Honor.

1          THE COURT:  Great.

2          Are there any more concerns about Mr. Hirsch, or for

3   that matter, Mr. Holden?  Although, Mr. Holden's cross tomorrow

4   seems highly unlikely.  Any concerns on Mr. Hirsch from the

5   government that I need to address?

6          MS. DE BOER:  Not at this time, Your Honor.

7          THE COURT:  How about on the defense?

8          MR. RAFFERTY:  Your Honor, I have a question.  The

9   government has indicated it's desire to try and rest on Friday.

10  It feels like every witness that gets called results in two

11  witnesses getting eliminated.

12         THE COURT:  I feel like each witness being called

13  covers so much, that I would hope you bring in one, you

14  eliminate two, because it covers so much information.

15         MR. RAFFERTY:  Yes.  And so, for our purposes, we have

16  witnesses we would like to call.  You know, can we get a sense

17  from the government if, in fact, we are on schedule to rest on

18  Friday, if we need to have our witnesses on Monday.

19         THE COURT:  Yeah.  I was going to ask that too.  And I

20  want to get to that.

21         Can I get a clearance on Hirsch?  So we're good on the

22  Hirsch cross?

23         MR. RAFFERTY:  Yes, Your Honor.

24         THE COURT:  Okay.  And any concerns from you guys on

25  Holden?  I mean, I think it's only the direct, so you should be

1    fine.

2         MR. RAFFERTY:  Yes, Your Honor.

3         THE COURT:  Okay.  All right.  So Mr. Rafferty is a

4    step ahead of me.  I do want to talk about scheduling.

5         So after we get through Holden, which I presume will

6    take us into Thursday morning, I do know that we still have

7    that one main witness that's going to deal with the financial

8    issues, right?

9         You mentioned that to me, Ms. de Boer.  That witness, I

10   assume, is still one that's going to be called?

11        MS. DE BOER:  Yes.  That's Michael Petron, and he will

12   summarize the financials and the claims data.

13        THE COURT:  Okay.  So aside from Petron, do we still

14   have on deck later this week -- is it Dr. Yogel?

15        MS. DE BOER:  For Friday, yes, Your Honor.

16        THE COURT:  Okay.  So right now, I'm looking at Michael

17   Petron and Dr. Yogel.

18        Now, I don't want to assume this, but is it possible

19   that that would be the remainder of the witnesses, meaning

20   Hirsch, Holden, Petron, and Yogel might be it?

21        MS. DE BOER:  No, Your Honor.  So on Thursday, after

22   Holden concludes, we will call a beneficiary, our last

23   beneficiary witness, H.K.

24        THE COURT:  Okay.  H.K.  I see that here, No. 14 on the

25   witness list.  Okay.  And those are relatively short, so I'm

1    not too worried about that.

2           MS. DE BOER:  Yes.

3           THE COURT:  Anybody else you think we're going to need?

4           MS. DE BOER:  We will be calling on Thursday

5    Ms. Rinsky, a former employee.

6           THE COURT:  All right.  Let me see here.  That's

7    No. 16.

8           And do we have a sense of the length of the testimony

9    from Ms. Rinsky?  Just to kind of -- I can't imagine she'll be

10   that lengthy, but we have had prior folks that have worked

11   there that were longer than expected.

12          MS. GURSKIS:  I think she'll be similar to Ms. Roebuck,

13   Your Honor.

14          THE COURT:  That's what I assumed.  Okay.

15          MR. SADOW:  With all due respect, it may be a little

16   longer.

17          THE COURT:  Okay.  But it's more along the lines of

18   somewhere of between Roebuck and a cooperator.  So that gives

19   me a sense of time.

20          Okay.  And who else -- because we've got about a couple

21   more days left, and I'm just trying to plan out, really, the

22   remainder of the week.

23          Is that -- do you think that might be it, or do you

24   have anybody else?

25          MS. DE BOER:  That might be it.  I would say until we

1    see the cross, of course, there's one more potential cooperator

2    who will be a shorter cooperator, and that's Greg Orr.  And I

3    think it's very likely we cut him, but I don't want to make

4    that call until I can see Hirsch's cross.  Even with him, the

5    latest we rest would be Monday.

6          THE COURT:  And did we no longer feel the need to have

7    Christian McKeon?  I know we talked about that witness, but

8    that doesn't seem to be in the lineup now.

9          MS. DE BOER:  We do not intend to call him in our

10   case-in-chief.

11         THE COURT:  All right.  Okay.

12         MR. SADOW:  I just want to make sure.  I appreciate

13   that, but please don't tell me on Wednesday night while I'm in

14   bed that you've decided to call McKeon as a witness.  Because

15   that's a long one.  And maybe the Court sees it a little bit; I

16   tend to do a little preparation for those witnesses.  So...

17         THE COURT:  I will say this.  I think that if we had

18   McKeon somehow resurface, certainly I would not want it to be

19   on the eve of his examination.  I would have to know in time.

20   Right now, though, it looks like if I focus on Hirsch leading

21   off tomorrow and Holden, that gets me through Wednesday.

22         Heading into Thursday, I'm finishing Holden.  And at

23   that point, I'm looking at some combination, it looks like -- I

24   don't know if -- probably -- maybe Rinsky or H.K. is someone

25   that could be on deck for Thursday, I guess, right?

1          MS. DE BOER:  Yeah.  They're both on deck for Thursday,

2    Your Honor.

3          THE COURT:  Okay.  And then what happens is -- and this

4    is just my estimation, although I really would, in a perfect

5    world, like the government to wrap on Friday.  Thinking out

6    loud here, we know that Friday we have to start at 10:00.  So

7    we are losing a little bit of time there because we have that

8    argument we need to hear on the motion to quash.  But based

9    upon this lineup, I find it hard to believe we would rest on

10   Friday.

11         Now, I don't know if Rinsky and H.K. -- if Rinsky's

12   like Roebuck, then I think, realistically, we're looking at

13   that taking up our Thursday, because that means that Hirsch

14   gets done tomorrow, Holden begins, Holden finishes Thursday,

15   and the remainder of Thursday is split between H.K. and Rinsky.

16   I think that's best case.

17         That means we head into Friday with a combination of

18   Petron and Dr. Yogel.

19         So I guess, look, on -- at an outside range, yeah, it's

20   possible.  But from what I understood, Dr. Yogel wasn't very

21   short, and Mr. Petron seemed to be lengthy because he's going

22   to be going through, as a financial analyst, the tracing of the

23   Medicare proceeds and the economics and financial records.  And

24   I cannot imagine that that may not take a chunk of Friday.

25         So I think that it would be difficult, but correct me

1   if I'm wrong on the government's side, Ms. de Boer.  I mean, it

2   sounds to me like there should be no universe where we're not

3   wrapping up on Monday, meaning that, at the outside range, if

4   you can't finish off Petron and Yogel and it spills into

5   Monday, assuming you're not calling Orr or McKeon -- if

6   something changes, which I should know that by Thursday -- you

7   would -- I think on the outside range, you would be resting on

8   Monday.

9         That sounds like -- that sounds certainly -- let's put

10  it this way.  That's what I think has to happen.  Worst case,

11  we have to be finishing the government's case on Monday.  I

12  think that best case, depending on what happens, if you guys

13  drop a witness or maybe you don't need everybody or it's

14  shorter than you expect, you could be wrapping up on Friday.

15        But I would suspect, to help Mr. Rafferty and the

16  defense team out, they shouldn't necessarily have anybody

17  standing by on Monday.  I think we can make that judgment call

18  by the end of Thursday, so we really know.  But I think,

19  realistically, I just can imagine that between Petron and

20  Yogel, that's got to be -- that's got to be a day and a little

21  bit of a morning, I think.  I mean, that's what I'm thinking.

22        I mean, I guess one thing to think about would be, we

23  could -- on Monday, the government could be resting by lunch in

24  a perfect world; I mean, maybe that, if we're lucky.  And then

25  maybe there can be someone on standby, but I find that hard to

1  believe.

2        What do you guys think on the government's side?

3        MS. DE BOER:  I think everything you said is correct,

4  Your Honor.  One thing I will note is Yogel is actually a short

5  witness.

6        THE COURT:  Oh, okay.  Good.

7        MS. DE BOER:  He's a doctor for a beneficiary.  So it's

8  more like Dr. Slomovitz.

9        THE COURT:  Oh, thank you.  I thought it was more like

10  another one of our doctors.  Okay.  All right.  Good.

11        Well, if that's the case, then, look, there's a chance.

12  I think the only way I see that happening, though, is we have

13  to be heading into Friday with Mr. Petron.  I mean, that's got

14  to be it.  I mean, if we're heading into Friday with Mr. Petron

15  and Yogel's quick, then there is a possibility.

16        So I guess let's do this, Mr. Rafferty, to help you

17  guys out.  Let's try to make a judgment call on Thursday.  Does

18  that help out?  I think by the end of Thursday.

19        MR. RAFFERTY:  Yes, Your Honor.

20        THE COURT:  Yeah.  Just so I can have it -- and by the

21  way, it's just so you have someone ready to call on Monday.  It

22  may be someone shorter, but just have someone on deck so we

23  don't lose the day, maybe two.  But we just need to make sure

24  we focus on that.

25        So let's make a judgment call and see where we're at at

1    the end of Friday.  But, to your point, it is possible.

2    Because if we do Hirsch and we get Hirsch done tomorrow, and

3    Holden is done -- spills into the next day, if we get through

4    H.K. and Rinsky, we're looking at putting Petron on on Friday

5    morning after our hearing.

6          And if Yogel is quick, I think that you could even

7    have -- and I know Yogel had to be called Friday, right?

8          MS. DE BOER:  That's correct.

9          THE COURT:  So we could have a scenario where Yogel

10   gets knocked out early; we start with Petron.  Worst case, it

11   could be that Petron spills in or maybe even has his cross on

12   Monday.  But again, I see the government resting Monday at the

13   latest with a chance of calling a defense witness on Monday.

14         All right.  Well, that puts us in a good position,

15   because then it gives us the majority, if not all, of the third

16   week of trial for the defense, which is what we wanted to do,

17   because I did not want the defense putting on their case on the

18   19th, at the eleventh hour, with only a few days to go.

19         And I'll worry about any issues with the forfeiture

20   proceedings later.  Let's just get -- let's just get this to

21   the jury on this point, and we can deal with that after the

22   fact, and I can figure that out later.  But that puts us on a

23   decent schedule.

24         All right.  So I think we know what our plan is

25   tentatively for the rest of the week, for the next three days.

1    We'll kick off tomorrow at 9:00 a.m. with Hirsch, see how that

2    goes.  And hopefully we'll get a chunk of Holden done as well,

3    and then that'll be it.

4          All right.  Any other scheduling -- anything at all,

5    quite frankly?  Scheduling or any other issues, evidentiary

6    issues you need me to handle before we break for this evening,

7    starting with the government?

8          MS. DE BOER:  No, Your Honor.  Thank you.

9          THE COURT:  Thank you.

10         Anything else, guys on the defense side?

11         MR. RAFFERTY:  No, Your Honor.  Thank you.

12         THE COURT:  All right.  You got it.  All right,

13   everybody.  We'll see everybody, then, at 9:00 a.m. tomorrow,

14   and we'll start off with Mr. Hirsch.

15         We are in recess.  Thank you, guys.

16      (Court recessed at 5:22 p.m.)

17

                      C E R T I F I C A T E
18
          I hereby certify that the foregoing is an
19
     accurate transcription of the proceedings in the
20
     above-entitled matter.
21

22   DATE:  December 6, 2022   /s/Ilona Lupowitz
                                ILONA LUPOWITZ, CRR, RPR, RMR
23                              Official Court Reporter
                                United States District Court
24                              299 East Broward Boulevard
                                Fort Lauderdale, Florida 33301
25                              (954) 769-5568

**$**

**$10,000** [2] - 22:7, 22:9
**$140** [1] - 44:1
**$25** [2] - 47:15, 102:6
**$435,000** [1] - 110:8
**$67.50** [3] - 47:16, 102:10, 138:25

**'**

**'16** [2] - 18:8, 125:15
**'18** [1] - 145:15
**'21** [1] - 131:16

**/**

**/s/Ilona** [1] - 201:22

**1**

**1** [1] - 1:7
**10** [1] - 156:10
**100** [2] - 133:12, 176:21
**106** [1] - 170:23
**10:00** [1] - 197:6
**10th** [3] - 73:15, 73:17, 120:25
**11** [2] - 88:6, 129:24
**11111111** [1] - 50:3
**1122** [4] - 36:11, 36:14, 38:10, 39:5
**1170** [1] - 2:5
**11:02** [2] - 51:24, 52:2
**11:25** [1] - 52:3
**11:26** [1] - 52:7
**11th** [2] - 130:4, 131:16
**12** [4] - 88:8, 116:23, 121:6, 125:25
**12:23** [1] - 84:16
**12:25** [1] - 85:17
**12th** [4] - 90:12, 117:7, 121:1, 126:5
**13** [1] - 145:15
**1334-A** [1] - 40:24
**1344** [2] - 40:10, 40:12
**1344-A** [2] - 40:10, 40:12
**1386** [3] - 74:21, 74:23, 77:7
**1386-A** [3] - 74:21, 74:23, 78:5
**1387** [3] - 74:21, 74:23, 78:13
**1388** [2] - 74:21, 74:23
**13th** [3] - 87:16, 91:17, 126:7
**14** [1] - 194:24
**1400** [1] - 1:16
**1438** [3] - 69:11, 69:14, 73:5

**14:26** [1] - 106:13
**15** [1] - 156:1
**15-minute** [3] - 51:18, 52:1, 156:11
**16** [7] - 60:3, 60:5, 88:10, 131:22, 131:23, 132:1, 156:7
**16-A** [5] - 60:3, 60:5, 131:22, 131:23, 132:1
**1629-L** [5] - 60:3, 60:5, 62:20, 131:22, 140:15
**1649-L** [1] - 140:13
**1683** [6] - 31:21, 31:24, 32:5, 33:16, 126:16, 160:5
**1683-A** [3] - 31:21, 31:24, 32:20
**1683-B** [1] - 127:13
**1683-E** [1] - 33:2
**1684** [4] - 74:21, 74:23, 75:3, 152:12
**17** [1] - 109:17
**1701** [3] - 69:11, 69:14, 69:20
**1702** [3] - 69:11, 69:14, 71:2
**1703** [3] - 69:11, 69:14, 72:4
**1704** [2] - 69:11, 69:14
**19-CR-80181-RAR-1** [1] - 1:2
**1938** [3] - 34:7, 34:9, 34:15
**1938-A** [3] - 34:7, 34:9, 35:3
**1939** [4] - 74:21, 74:24, 78:18, 78:22
**1939-A** [3] - 74:22, 74:24, 79:14
**1941** [2] - 80:7, 80:10
**1950** [1] - 51:1
**1963** [3] - 25:17, 25:25, 26:25
**1963-A** [3] - 25:17, 25:25, 27:14
**1964** [3] - 25:17, 25:25, 26:7
**1983** [1] - 7:19
**1994** [1] - 17:13
**19th** [1] - 200:18
**1:45** [4] - 84:6, 84:14, 84:19, 85:14
**1@Comcast.net** [1] - 15:23

**2**

**2** [1] - 147:16
**20** [2] - 75:9, 167:22
**20005** [1] - 1:16
**2015** [1] - 18:8
**2016** [10] - 75:9, 81:17, 89:19, 99:7, 108:23, 147:13, 152:15, 153:13, 160:9, 160:20

**2017** [13] - 71:3, 99:7, 99:8, 99:11, 99:12, 99:13, 116:23, 117:7, 125:10, 125:19, 126:3, 126:7, 151:5
**2018** [7] - 8:8, 144:16, 144:19, 144:20, 146:5, 146:15, 149:1
**2019** [1] - 182:19
**2020** [18] - 56:17, 87:17, 87:20, 88:4, 91:17, 93:17, 94:2, 94:8, 94:19, 95:24, 96:8, 96:18, 99:25, 104:7, 105:23, 106:13, 111:25, 113:23
**2021** [6] - 88:6, 96:3, 104:23, 114:5, 129:25, 130:4
**2022** [10] - 1:4, 88:8, 88:10, 88:12, 88:14, 90:12, 120:25, 121:1, 121:6, 201:22
**2052** [1] - 1:19
**23** [3] - 87:20, 88:4, 96:18
**234** [1] - 50:18
**23rd** [2] - 96:8, 104:6
**24** [2] - 111:25, 113:22
**2400** [1] - 2:6
**25** [1] - 125:9
**26** [1] - 114:5
**260** [1] - 1:18
**28** [3] - 104:23, 147:13, 152:15
**28th** [1] - 153:13
**299** [2] - 1:23, 201:24
**2:09** [1] - 85:18
**2:10** [1] - 86:18
**2:26** [1] - 106:14

**3**

**3** [4] - 71:3, 81:17, 130:2
**3/13** [2] - 144:15, 144:19
**3/13/18** [1] - 144:17
**3/14** [1] - 144:19
**30** [8] - 13:9, 13:11, 14:3, 167:22, 170:5, 170:22, 183:7, 185:13
**30-second** [1] - 172:2
**30303** [1] - 1:19
**30305** [1] - 2:3
**30309** [1] - 2:6
**3131** [1] - 2:3
**3301** [1] - 1:24
**33301** [1] - 201:24
**3:49** [1] - 156:6
**3:50** [2] - 155:25, 156:13

**4**

**4** [2] - 88:12, 121:2
**400** [1] - 109:19
**403** [6] - 177:11, 184:4,

184:12, 186:13, 187:15, 192:24
**415-A** [2] - 8:23, 9:10
**417** [2] - 49:1, 49:5
**417-A** [3] - 49:2, 49:13, 52:18
**417-B** [2] - 50:7, 52:14
**417-C** [1] - 160:14
**47** [1] - 104:24
**4:22** [2] - 156:14, 156:19
**4:40** [1] - 169:1

**5**

**5** [2] - 22:7, 106:13
**5,000** [1] - 22:9
**5/25/2018** [1] - 160:19
**51** [1] - 133:18
**522** [1] - 42:2
**561-305-6223** [1] - 27:7
**561-703-8474** [1] - 66:2
**5:22** [2] - 1:5, 201:16
**5th** [2] - 88:14, 105:23

**6**

**6** [3] - 1:4, 90:12, 201:22
**610** [3] - 37:2, 37:4, 37:10
**610-A** [3] - 37:2, 37:4, 37:15
**620** [3] - 41:24, 42:2, 42:8
**620-A** [3] - 41:24, 42:2, 42:11
**621** [3] - 41:24, 42:2, 42:16
**621-A** [2] - 41:24, 42:2
**622** [2] - 41:24, 42:23
**622-A** [2] - 41:24, 42:2
**623** [3] - 41:24, 42:3, 43:4
**623-A** [2] - 41:25, 42:3
**67.50** [2] - 102:16, 102:17
**675** [3] - 41:25, 42:3, 43:14
**675-A** [2] - 41:25, 42:3
**675-B** [1] - 43:24
**676** [2] - 41:25, 42:3
**676-A** [2] - 41:25, 42:3
**6th** [1] - 151:5

**7**

**7** [1] - 1:6
**70** [1] - 133:13
**710** [3] - 44:23, 45:1, 45:6
**710-A** [3] - 44:23, 45:1, 45:13
**717** [4] - 44:23, 45:1, 46:22, 47:8
**717-A** [3] - 44:23, 45:1, 47:11
**72** [1] - 8:3
**769-5568** [2] - 1:24, 201:25

## 8

**80** [1] - 133:12
**8:18** [1] - 112:1
**8:8** [1] - 112:1
**8th** [1] - 1:16

## 9

**9** [1] - 109:18
**90** [15] - 44:17, 44:19, 74:19, 133:12, 133:17, 133:19, 133:20, 133:21, 133:25, 137:8, 137:12, 137:17, 137:22, 138:1, 159:14
**95** [1] - 74:19
**954** [2] - 1:24, 201:25
**98** [1] - 137:9
**9:00** [7] - 6:8, 84:24, 167:13, 168:24, 187:8, 201:1, 201:13
**9:31** [1] - 1:5
**9:36** [2] - 6:17, 104:24
**9th** [1] - 73:21

## A

**a.m** [12] - 1:5, 6:8, 6:17, 51:24, 52:2, 52:3, 52:7, 84:24, 112:1, 168:24, 201:1, 201:13
**AARP** [1] - 8:5
**ability** [2] - 21:24, 24:3
**able** [14] - 14:6, 36:2, 59:6, 76:19, 87:24, 137:13, 145:10, 169:8, 174:3, 177:9, 180:22, 188:12, 189:24
**above-entitled** [1] - 201:20
**absolutely** [2] - 156:9, 171:3
**accept** [1] - 110:18
**acceptable** [1] - 147:1
**accepted** [1] - 57:7
**accepting** [1] - 110:19
**access** [4] - 79:3, 79:12, 143:7, 143:8
**according** [5] - 30:13, 92:13, 98:13, 114:1, 125:4
**account** [2] - 27:12, 182:6
**accountant** [6] - 21:3, 90:1, 90:4, 90:7, 91:4, 110:10
**accounted** [2] - 3:3, 85:20
**accounts** [3] - 72:13, 107:5, 107:9
**accurate** [9] - 44:18, 61:11, 61:16, 64:25, 97:16, 119:5, 126:1, 168:20, 201:19
**acknowledge** [1] - 181:23
**acknowledges** [1] - 189:24

**acknowledging** [1] - 170:6
**acronym** [2] - 90:2, 91:4
**action** [3] - 139:23, 139:25, 140:1
**activities** [2] - 58:13, 89:5
**activity** [1] - 102:25
**actual** [5] - 25:11, 30:3, 30:19, 56:7, 163:13
**add** [2] - 180:21, 185:20
**added** [1] - 63:6
**addition** [2] - 27:19, 192:3
**additional** [2] - 40:3, 63:5
**address** [13] - 15:12, 15:13, 15:16, 15:17, 15:19, 16:7, 28:18, 32:11, 54:7, 64:16, 171:6, 193:5
**addressed** [1] - 114:6
**addresses** [1] - 15:18
**adhere** [1] - 187:13
**administrative** [2] - 70:9, 77:25
**admit** [9] - 25:17, 40:10, 41:24, 60:3, 69:11, 74:21, 116:3, 147:7, 181:23
**admitted** [16] - 8:22, 9:2, 25:23, 31:23, 34:8, 36:12, 37:3, 40:11, 42:1, 44:24, 48:25, 60:4, 69:12, 80:8, 144:4, 150:25
**admonition** [1] - 187:1
**advance** [3] - 54:16, 56:3, 56:9
**advancing** [1] - 54:22
**advantage** [1] - 157:25
**advice** [31] - 112:10, 114:12, 123:3, 123:11, 124:1, 124:12, 124:20, 131:3, 154:20, 163:1, 166:12, 171:9, 171:18, 172:14, 173:1, 173:3, 173:16, 173:17, 174:17, 174:18, 175:6, 176:23, 176:24, 180:23, 181:1, 181:3, 181:4, 181:25, 185:1, 186:2
**Advice** [1] - 121:11
**advice-of-counsel** [2] - 180:23, 181:25
**advised** [1] - 121:22
**affiliate** [1] - 34:18
**affiliated** [1] - 157:10
**afield** [1] - 181:9
**afoul** [1] - 187:21
**afternoon** [6] - 86:9, 87:2, 87:3, 106:14, 156:22, 157:4
**age** [2] - 28:18, 153:2
**Agent** [1] - 185:5
**agent** [18] - 58:21, 110:11, 173:7, 180:18, 184:4, 184:10, 187:1, 187:5,

187:19, 187:20, 188:4, 188:9, 188:10, 190:9, 190:16, 191:10, 192:7
**agents** [15] - 34:24, 56:14, 56:21, 56:25, 58:14, 91:21, 94:21, 95:5, 96:13, 98:21, 99:24, 134:14, 162:9, 185:6, 191:14
**ago** [8] - 33:22, 72:6, 75:14, 88:12, 108:25, 121:6, 155:13, 155:14
**agree** [4] - 172:3, 176:21, 176:25, 185:10, 186:9
**agreed** [2] - 138:2, 139:1
**agreeing** [1] - 55:11
**agreement** [25] - 20:11, 26:9, 26:10, 26:19, 26:22, 28:1, 30:13, 42:15, 42:20, 42:21, 42:24, 43:3, 43:8, 43:10, 57:2, 79:15, 96:9, 96:11, 96:21, 97:18, 110:22, 111:20, 111:23, 138:5, 138:7
**ahead** [19] - 4:13, 4:16, 4:21, 5:3, 6:14, 6:23, 9:2, 51:16, 51:18, 52:10, 86:12, 136:9, 156:4, 156:10, 156:25, 167:23, 187:10, 192:21, 194:4
**aid** [1] - 181:14
**air** [1] - 188:12
**airing** [1] - 176:8
**Aleem** [2] - 76:16, 125:19
**allow** [1] - 47:24
**allowing** [2] - 177:11, 184:22
**almost** [2] - 56:8, 109:17
**alone** [3] - 146:16, 173:3, 173:9
**AMERICA** [1] - 1:3
**Amina** [1] - 81:12
**amount** [11] - 21:25, 23:21, 40:5, 40:7, 47:5, 47:7, 56:4, 69:1, 110:9, 189:14, 190:1
**amounts** [1] - 66:17
**analyst** [2] - 86:1, 197:22
**analyzed** [1] - 168:17
**answer** [12] - 13:24, 70:20, 102:5, 106:10, 107:8, 109:20, 110:10, 120:8, 151:23, 154:16, 166:25, 170:21
**answered** [6] - 13:19, 71:14, 102:8, 113:13, 120:7, 131:4
**answers** [2] - 106:8, 133:1
**anticipate** [1] - 188:1
**anticipated** [1] - 167:19
**anticipatory** [1] - 173:24
**anyhow** [2] - 136:6, 155:1
**anyway** [6] - 10:16, 103:22,

136:9, 187:24, 188:2, 189:8
**apart** [1] - 181:24
**apologize** [1] - 141:14
**appear** [4] - 85:1, 105:25, 116:11, 170:17
**APPEARANCES** [1] - 1:11
**Appearances** [1] - 1:25
**appointment** [5] - 11:25, 12:1, 29:24, 61:15, 151:16
**appointments** [1] - 151:14
**appreciate** [7] - 16:15, 75:15, 117:2, 117:17, 188:20, 189:12, 196:12
**approach** [4] - 9:7, 90:14, 103:12, 144:9
**approached** [3] - 56:15, 58:15, 161:21
**appropriate** [2] - 171:14, 173:19
**approval** [16] - 22:18, 22:19, 43:11, 43:12, 44:14, 44:20, 58:7, 58:9, 78:9, 78:10, 78:14, 83:4, 98:18, 142:9, 159:9
**approve** [5] - 20:2, 76:20, 76:24, 77:5, 165:15
**approved** [16] - 20:4, 20:10, 22:4, 23:2, 25:6, 48:17, 66:15, 66:21, 66:24, 77:3, 78:3, 113:2, 123:9, 123:20, 129:15
**approving** [2] - 20:3, 112:10
**approximate** [2] - 89:10, 144:14
**April** [5] - 71:3, 116:23, 117:7, 126:5, 126:7
**areas** [2] - 177:13, 191:21
**argue** [1] - 185:19
**argument** [2] - 188:8, 197:8
**arrange** [1] - 188:5
**arrangements** [2] - 101:15, 117:19
**arrive** [1] - 3:3
**artfully** [1] - 174:20
**article** [2] - 19:9, 117:18
**ASAP** [1] - 81:21
**aside** [5] - 19:25, 80:3, 118:3, 177:9, 194:13
**aspect** [4] - 8:20, 120:18, 139:11, 142:12
**aspects** [1] - 76:23
**assessing** [1] - 158:15
**assessment** [2] - 127:14, 158:10
**assist** [1] - 169:22
**assistant** [1] - 70:9
**associate** [1] - 79:14
**assume** [5] - 90:2, 90:3, 98:25, 118:8, 126:23,

194:10, 194:18
**assumed** [2] - 11:2, 195:14
**assuming** [4] - 4:14, 180:4, 185:7, 198:5
**assumption** [1] - 174:7
**Atlanta** [5] - 1:19, 2:3, 2:6, 67:18, 121:4
**attached** [3] - 45:9, 47:2, 80:19
**attachment** [1] - 79:14
**attachments** [3] - 78:5, 126:22, 147:16
**attempting** [1] - 185:24
**attention** [10] - 8:10, 27:14, 38:10, 42:11, 50:23, 66:6, 69:20, 71:2, 73:5, 81:19
**attorney** [63] - 57:11, 57:15, 57:22, 57:23, 57:24, 58:2, 58:6, 58:10, 58:19, 68:20, 95:22, 97:23, 97:24, 97:25, 98:1, 98:18, 99:15, 99:20, 100:2, 100:5, 100:7, 100:11, 100:12, 100:16, 100:17, 104:12, 112:10, 112:14, 112:21, 113:3, 113:6, 113:14, 113:25, 114:1, 114:7, 114:18, 114:20, 114:22, 114:23, 115:6, 119:17, 121:3, 121:17, 121:18, 123:3, 123:7, 123:13, 123:14, 123:19, 129:15, 129:21, 130:15, 131:14, 142:9, 162:19, 176:11, 180:18
**attorney's** [1] - 58:6
**attorney-client** [2] - 123:3, 176:11
**attorneys** [3] - 6:9, 15:2, 164:3
**attributed** [1] - 130:5
**Audio** [1] - 9:19
**audio** [10] - 5:19, 9:18, 10:3, 10:4, 10:17, 10:18, 11:7, 11:8, 11:19, 11:20
**August** [5] - 56:17, 87:16, 91:17, 160:20, 182:23
**authorization** [1] - 42:12
**Avenue** [1] - 1:16
**average** [1] - 76:13
**avoid** [3] - 168:11, 175:5
**avoiding** [1] - 174:16
**aware** [15] - 9:12, 9:14, 10:7, 10:14, 48:16, 54:9, 63:10, 63:14, 63:18, 64:5, 64:6, 82:9, 102:24, 103:6, 166:2

**B**

**back..** [1] - 38:6

**background** [10] - 17:14, 17:19, 17:20, 21:23, 23:4, 23:20, 31:13, 33:23, 34:2, 35:11
**bad** [1] - 174:12
**BAKER** [1] - 2:5
**bank** [2] - 107:5, 107:9
**base** [1] - 192:22
**based** [18] - 19:9, 36:1, 47:6, 73:24, 74:13, 84:25, 97:10, 97:16, 98:22, 161:13, 161:24, 162:6, 167:9, 170:19, 183:21, 188:8, 197:8
**basic** [1] - 24:15
**basis** [13] - 65:19, 68:3, 68:5, 71:18, 76:9, 80:20, 117:21, 162:3, 180:8, 180:10, 184:5, 187:19, 192:7
**BBAR** [5] - 38:23, 38:24, 38:25, 95:12, 107:18
**BEACH** [1] - 1:2
**Beach** [2] - 17:11, 17:15
**became** [1] - 58:23
**become** [3] - 9:14, 10:6, 118:23
**bed** [2] - 180:13, 196:14
**BEFORE** [1] - 1:10
**began** [1] - 89:17
**begin** [4] - 56:23, 84:2, 86:21, 138:1
**beginning** [6] - 53:22, 60:18, 99:11, 117:9, 117:10
**begins** [1] - 197:14
**begs** [1] - 176:18
**behalf** [3] - 3:4, 78:3, 115:13
**behind** [1] - 13:7
**belabor** [3] - 5:5, 103:22, 184:8
**belief** [1] - 183:9
**below** [7] - 70:16, 70:18, 71:12, 80:18, 80:25, 82:5, 116:25
**bench** [1] - 183:4
**beneficial** [1] - 187:4
**beneficiaries** [7] - 22:23, 30:23, 35:20, 48:10, 48:20, 93:4, 159:19
**beneficiary** [8] - 28:23, 132:14, 132:17, 138:5, 139:12, 194:22, 194:23, 199:7
**benefit** [2] - 87:15, 163:12
**benefits** [9] - 14:14, 25:5, 29:21, 30:17, 30:21, 30:22, 30:24, 31:4, 35:21
**benefitting** [1] - 155:8
**Berarducci** [2] - 68:4, 68:7
**best** [7] - 5:2, 24:9, 80:13, 87:25, 89:17, 197:16, 198:12

**Better** [1] - 10:5
**better** [10] - 5:6, 10:14, 76:14, 144:13, 144:18, 148:12, 173:22, 174:25, 191:21, 192:13
**betterhealthcare.com** [1] - 10:1
**between** [17] - 26:10, 29:15, 37:16, 42:21, 56:6, 57:5, 65:17, 74:19, 99:5, 109:21, 126:10, 144:22, 172:9, 186:15, 195:18, 197:15, 198:19
**beyond** [3] - 22:3, 48:22, 177:16
**big** [3] - 75:13, 121:4, 153:15
**bigger** [3] - 116:12, 117:1, 127:21
**bill** [4] - 20:9, 24:19, 30:11, 158:22
**billed** [16] - 22:4, 40:5, 40:7, 45:12, 48:1, 56:4, 59:6, 59:8, 59:21, 59:23, 60:19, 66:24, 68:22, 69:4, 83:21, 158:4
**billing** [8] - 19:23, 66:10, 66:12, 67:12, 68:25, 154:2, 157:11, 157:13
**birth** [3] - 28:18, 70:1, 71:5
**bit** [22] - 20:5, 21:19, 23:8, 42:17, 51:6, 66:13, 75:8, 82:23, 89:1, 105:24, 146:8, 156:5, 171:6, 172:15, 186:10, 187:8, 189:25, 192:3, 192:6, 196:15, 197:7, 198:21
**blanket** [1] - 192:4
**blessed** [2] - 129:9, 177:25
**blessing** [1] - 177:21
**blowup** [1] - 152:12
**blue** [1] - 19:13
**Boca** [3] - 21:18, 21:20, 28:4
**body** [1] - 34:24
**Boer** [11] - 5:17, 169:18, 171:2, 173:22, 180:1, 185:3, 187:22, 190:15, 192:19, 194:9, 198:1
**BOER** [42] - 1:13, 3:6, 4:15, 4:18, 5:8, 5:24, 16:19, 85:9, 85:15, 85:22, 85:24, 167:10, 167:12, 169:7, 169:11, 169:14, 170:2, 171:3, 171:11, 175:2, 175:15, 175:24, 176:12, 176:21, 180:14, 185:5, 188:3, 190:18, 192:25, 193:6, 194:11, 194:15, 194:21, 195:2, 195:4, 195:25, 196:9,

197:1, 199:3, 199:7, 200:8, 201:8
**bonuses** [1] - 54:5
**born** [1] - 51:1
**bottom** [1] - 82:6
**bought** [1] - 95:12
**Boulevard** [2] - 1:23, 201:24
**box** [1] - 16:3
**boxes** [1] - 51:9
**boy** [1] - 154:7
**Boynton** [1] - 17:11
**brainstorming** [1] - 24:14
**break** [16] - 3:8, 51:19, 52:1, 52:13, 84:1, 84:4, 84:13, 84:18, 84:22, 155:25, 156:4, 156:11, 157:4, 168:5, 201:6
**breakdown** [1] - 47:13
**breast** [1] - 51:15
**Brett** [10] - 21:8, 21:9, 21:10, 21:14, 23:11, 37:21, 38:8, 38:14, 169:6, 181:5
**BRIAN** [1] - 2:4
**Brian** [1] - 15:2
**brick** [1] - 166:4
**brick-and-mortar** [1] - 166:4
**brief** [5] - 85:22, 167:6, 170:13, 184:10, 187:5
**briefly** [5] - 3:6, 6:4, 17:18, 22:24, 103:12
**bring** [11] - 3:4, 6:2, 86:13, 86:15, 87:22, 119:8, 126:3, 173:5, 180:6, 190:17, 193:13
**broker** [1] - 109:4
**brought** [5] - 29:10, 54:15, 120:19, 170:8
**Broward** [2] - 1:23, 201:24
**build** [1] - 57:8
**building** [1] - 18:23
**bump** [1] - 84:8
**bunch** [1] - 44:3
**business** [35] - 4:5, 7:25, 23:21, 24:6, 25:13, 28:9, 29:14, 31:15, 38:2, 41:15, 47:1, 66:6, 67:23, 74:9, 74:11, 74:17, 76:5, 76:23, 79:14, 79:25, 80:3, 93:4, 98:17, 99:16, 106:20, 107:23, 108:21, 109:2, 109:3, 109:6, 109:8, 109:21, 154:4, 191:17
**but..** [1] - 39:9
**BY** [47] - 1:20, 7:13, 9:11, 10:19, 11:9, 11:21, 14:24, 17:8, 19:17, 26:4, 32:4, 34:16, 36:15, 37:9, 40:16, 42:7, 45:5, 49:4, 52:12, 60:10, 69:19, 75:4, 78:21,

80:11, 82:21, 87:1, 90:22, 100:25, 103:5, 104:4, 116:6, 116:14, 120:12, 126:18, 127:22, 128:20, 128:25, 131:25, 140:14, 144:10, 147:11, 151:3, 152:14, 157:3, 160:6, 160:15, 163:21

140:10, 141:19, 141:20, 142:20
**centers** [2] - 21:14, 23:5
**certain** [11] - 17:24, 25:5, 40:5, 47:5, 47:7, 66:14, 76:18, 172:10, 177:4, 177:13
**certainly** [17] - 4:24, 84:9, 172:8, 172:10, 172:18, 173:21, 174:15, 176:1, 177:5, 180:9, 186:18, 187:15, 189:24, 191:7, 192:11, 196:18, 198:9
**certificate** [1] - 35:6
**certification** [6] - 47:19, 47:21, 47:22, 47:23, 48:5
**certifications** [1] - 35:9
**certified** [1] - 63:8
**certify** [1] - 201:18
**cetera** [1] - 8:17
**CFO** [1] - 77:11
**CGx** [20] - 21:15, 23:22, 23:24, 24:12, 33:11, 89:15, 89:17, 96:14, 99:16, 109:1, 110:16, 110:20, 111:13, 114:13, 117:8, 130:23, 131:1, 131:14, 147:13, 147:17
**chain** [4] - 72:4, 75:5, 81:3, 112:9
**chairs** [2] - 51:20, 156:4
**challenge** [1] - 177:8
**chance** [4] - 115:18, 154:4, 199:11, 200:13
**change** [3] - 125:3, 149:14, 176:23
**changed** [5] - 57:5, 59:19, 66:14, 66:18, 148:19
**changes** [8] - 66:10, 66:11, 66:12, 66:13, 66:20, 67:4, 67:5, 198:6
**changing** [3] - 67:9, 82:23, 82:25
**characterized** [1] - 127:5
**charge** [4] - 32:17, 42:13, 43:2, 162:20
**charged** [10] - 101:16, 101:17, 101:21, 101:22, 101:24, 102:25, 103:6, 104:8, 162:15, 162:17
**charging** [1] - 103:17
**chart** [30] - 62:21, 64:19, 64:25, 80:16, 80:25, 135:9, 135:12, 135:15, 135:17, 135:21, 135:23, 136:1, 136:9, 136:14, 140:17, 140:21, 141:5, 141:6, 141:11, 141:14, 141:16, 141:18, 163:22, 163:25, 164:15, 164:17, 164:20, 164:22, 165:4, 165:6

**charts** [1] - 142:5
**checked** [1] - 51:9
**checks** [1] - 191:10
**chief** [2] - 6:22, 196:10
**choice** [1] - 33:13
**choices** [1] - 155:3
**choose** [1] - 178:23
**chose** [1] - 92:5, 155:11
**Christian** [51] - 27:2, 27:3, 27:6, 29:6, 29:8, 36:6, 36:19, 36:20, 36:22, 38:2, 42:24, 53:11, 54:14, 55:2, 55:3, 58:5, 60:16, 60:20, 60:22, 60:23, 71:11, 72:11, 106:20, 107:4, 107:6, 107:8, 107:20, 107:24, 108:9, 108:10, 108:14, 109:16, 111:11, 112:10, 112:13, 112:17, 113:1, 113:6, 113:9, 113:12, 135:10, 135:11, 140:18, 140:19, 143:1, 143:2, 147:13, 161:10, 164:16, 164:17, 196:7
**Christian's** [5] - 27:18, 38:17, 109:22, 134:18, 134:19
**chronological** [1] - 87:8
**chronologically** [1] - 95:20
**chunk** [2] - 197:24, 201:2
**CHX** [1] - 111:12
**circumstances** [2] - 173:6, 183:13
**cited** [1] - 131:7
**claimed** [1] - 13:1
**claiming** [1] - 90:24
**claims** [4] - 81:21, 81:24, 82:4, 194:12
**clarification** [2] - 77:22, 100:23
**clear** [8] - 6:8, 84:8, 92:2, 124:19, 125:23, 147:19, 148:5, 174:22
**clearance** [1] - 193:21
**clearly** [1] - 118:25
**client** [3] - 121:23, 123:3, 176:11
**clinics** [1] - 26:15
**clip** [2] - 170:18, 172:2
**close** [3] - 86:6, 144:12, 179:18
**closely** [1] - 191:5
**closing** [1] - 185:13
**clothing** [2] - 7:25, 19:10
**coaching** [1] - 192:13
**coat** [5] - 75:19, 152:16, 152:22, 154:7, 154:14
**Codes** [1] - 147:17
**coding** [1] - 160:23
**Cohen** [2] - 73:18, 73:21
**Cohen's** [1] - 73:10

**cold** [4] - 29:21, 30:16, 165:2, 165:4
**cold-calling** [1] - 165:2
**collect** [1] - 16:19
**collected** [4] - 49:17, 52:24, 53:2, 53:4
**College** [1] - 17:15
**college** [1] - 17:16
**color** [1] - 189:10
**colorful** [1] - 80:16
**column** [2] - 45:15, 45:23
**combination** [2] - 196:23, 197:17
**comfort** [1] - 187:2
**comfortable** [2] - 116:7, 192:9
**coming** [10] - 10:15, 39:22, 53:21, 53:23, 54:20, 90:18, 117:5, 124:20, 135:1, 184:16, 184:20, 192:22
**comment** [1] - 22:3
**comments** [1] - 111:17
**commission** [6] - 94:9, 94:16, 117:19, 117:20, 118:22, 118:23
**commissions** [10] - 114:24, 117:11, 117:14, 117:25, 118:13, 118:14, 118:20, 119:18, 121:23, 122:21
**commit** [1] - 20:24
**committed** [1] - 110:15
**common** [1] - 90:2
**communicated** [1] - 125:9
**communicating** [1] - 137:15
**communication** [2] - 65:22, 187:11
**communications** [4] - 111:24, 122:24, 162:19, 190:4
**Community** [1] - 17:15
**community** [1] - 17:16
**companies** [9] - 29:9, 41:20, 41:21, 74:18, 77:4, 107:5, 107:9, 108:20, 110:18
**company** [41] - 12:24, 20:24, 21:2, 23:16, 26:11, 36:7, 36:22, 36:23, 38:21, 43:16, 44:21, 49:25, 50:19, 54:15, 54:16, 54:21, 55:10, 55:12, 56:3, 56:4, 77:5, 79:13, 89:3, 89:20, 91:4, 101:11, 101:20, 106:17, 107:14, 107:15, 107:24, 108:2, 108:15, 109:22, 110:6, 110:11, 115:16, 115:17, 153:15, 159:17
**compared** [1] - 22:20
**compel** [1] - 171:18
**compelled** [2] - 186:19,

**C**

**C-6** [1] - 150:22
**calendar** [2] - 13:12, 13:15
**calm** [1] - 24:2
**campaign** [4] - 89:13, 89:14, 89:15, 89:17
**cancer** [39] - 8:11, 8:18, 10:8, 10:15, 10:21, 11:16, 15:7, 15:9, 18:24, 19:23, 21:15, 27:12, 32:21, 33:13, 35:24, 36:1, 39:18, 44:6, 51:15, 61:1, 62:24, 63:22, 73:11, 98:8, 127:5, 127:8, 128:15, 132:10, 133:2, 133:3, 134:2, 157:15, 157:19, 157:22, 157:25, 158:16, 165:15, 165:21
**Cancer** [3] - 36:9, 132:6, 140:24
**cancers** [2] - 30:25, 66:15
**candid** [1] - 152:18
**cannot** [5] - 78:1, 93:9, 93:23, 168:19, 197:24
**capital** [1] - 81:18
**caps** [1] - 81:18
**card** [2] - 42:12, 163:2
**care** [3] - 82:7, 82:8, 85:6
**Carolina** [1] - 173:13
**CASE** [1] - 1:2
**case** [19] - 6:22, 56:12, 84:9, 158:18, 161:17, 165:16, 166:19, 180:22, 181:15, 184:12, 185:6, 196:10, 197:16, 198:10, 198:11, 198:12, 199:11, 200:10, 200:17
**case-in-chief** [2] - 6:22, 196:10
**catching** [1] - 13:8
**cautionary** [1] - 186:20
**cc'd** [2] - 151:5, 151:21
**CD** [1] - 101:7
**cell** [1] - 86:1
**Center** [1] - 36:9
**center** [29] - 18:24, 21:15, 23:5, 23:9, 23:13, 24:5, 27:4, 28:12, 29:4, 29:7, 29:10, 30:20, 35:15, 35:16, 53:13, 54:1, 107:18, 107:21, 109:3, 110:24, 134:15, 134:17, 134:19, 139:14, 140:9,

188:15
**compensated** [2] - 62:18, 166:17
**competition** [1] - 76:14
**complaining** [4] - 4:5, 59:3, 59:4, 69:8
**complaints** [2] - 70:25, 72:19
**complete** [6] - 33:6, 61:19, 140:3, 156:1, 156:22, 169:8
**completed** [12] - 31:10, 47:14, 47:15, 50:13, 61:22, 64:19, 73:17, 74:4, 137:18, 138:23, 138:24, 159:22
**completely** [6] - 57:14, 57:16, 59:14, 114:23, 174:21, 186:13
**completeness** [7] - 3:19, 5:14, 5:23, 169:22, 170:10, 170:18, 170:23
**completing** [1] - 60:1
**compliance** [7] - 60:24, 65:13, 130:12, 130:13, 130:16, 131:1
**compliant** [2] - 57:23, 121:18
**computers** [2] - 38:19, 142:21
**concepts** [1] - 168:16
**concern** [9] - 72:24, 170:19, 172:1, 172:12, 172:16, 177:5, 177:22, 178:16, 191:9
**concerned** [7] - 57:17, 73:2, 137:4, 173:10, 174:12, 179:5, 186:22
**concerning** [1] - 96:14
**concerns** [8] - 68:13, 68:19, 169:20, 171:24, 176:10, 193:2, 193:4, 193:24
**concludes** [1] - 194:22
**conclusion** [3] - 110:14, 188:13, 191:23
**conduct** [3] - 84:10, 114:12, 177:21
**conducted** [1] - 3:11
**conference** [1] - 130:22
**confidence** [1] - 58:20
**confident** [4] - 58:23, 131:11, 167:21, 168:1
**confirm** [3] - 29:22, 64:16, 185:5
**confirmation** [1] - 6:9
**confirmed** [1] - 84:23
**confirms** [1] - 64:16
**conflict** [1] - 6:10
**confused** [1] - 71:20
**confusion** [1] - 71:22
**connected** [3] - 157:10, 157:11, 157:12

**connection** [3] - 49:25, 52:18, 89:4
**connections** [1] - 122:19
**consider** [2] - 174:22, 186:17
**considerably** [1] - 76:13
**considerations** [1] - 176:19
**considered** [1] - 168:22
**consisted** [1] - 166:3
**conspiracy** [2] - 110:15, 110:18
**consult** [19] - 29:25, 30:1, 31:9, 44:1, 45:19, 45:20, 45:25, 46:21, 47:16, 48:18, 57:10, 59:4, 63:17, 63:24, 73:16, 74:4, 138:23, 138:24, 139:4
**consultations** [1] - 161:2
**consulting** [1] - 101:21
**consults** [20] - 42:13, 43:22, 43:25, 45:8, 45:11, 45:21, 47:5, 47:14, 54:5, 59:7, 63:18, 64:5, 64:6, 66:10, 79:4, 137:18, 159:11, 159:12, 161:4, 161:5
**contact** [14] - 14:6, 18:13, 25:4, 29:20, 44:5, 61:7, 68:2, 68:4, 71:13, 80:21, 91:21, 101:4, 132:13, 158:13
**contacted** [3] - 24:16, 71:13, 74:1
**contacts** [2] - 68:3, 124:15
**container** [1] - 12:15
**contents** [1] - 170:24
**context** [7] - 145:2, 172:22, 180:5, 181:18, 186:19, 189:8, 189:19
**continually** [1] - 129:9
**continue** [6] - 52:9, 76:14, 156:11, 168:6, 168:9, 168:22
**continued** [2] - 1:25, 59:11
**contract** [7] - 36:23, 37:16, 40:6, 109:23, 112:2, 123:7, 125:18
**contracts** [6] - 43:12, 44:3, 76:21, 77:4, 107:5, 107:9
**contractual** [1] - 37:19
**controlled** [1] - 107:15
**conversation** [8] - 8:16, 22:12, 24:1, 70:23, 102:9, 179:10, 190:7, 191:5
**conversations** [9] - 66:3, 67:3, 68:18, 100:11, 119:12, 170:25, 171:1, 172:8, 182:20
**convince** [3] - 123:2, 154:19, 162:20
**Cooke** [2] - 81:4, 81:5
**cooperate** [1] - 155:6
**cooperating** [7] - 3:12, 56:23, 108:4, 108:6, 119:4,

155:8, 155:19
**cooperation** [1] - 171:4
**cooperator** [3] - 195:18, 196:1, 196:2
**copied** [2] - 34:22, 79:7
**copies** [2] - 9:3, 77:2
**copy** [6] - 43:8, 43:9, 49:11, 56:1, 192:19, 192:20
**copying** [4] - 70:15, 71:12, 72:14, 73:6
**corner** [1] - 50:18
**corners** [1] - 124:21
**correct** [223] - 15:17, 16:8, 23:7, 28:2, 33:25, 37:20, 39:2, 40:21, 41:7, 42:19, 43:22, 44:2, 46:7, 47:17, 50:1, 53:25, 62:9, 67:16, 75:10, 76:22, 80:15, 81:11, 81:16, 83:6, 87:5, 87:6, 87:13, 87:17, 87:20, 88:13, 88:15, 89:6, 89:23, 90:1, 91:5, 91:18, 91:19, 91:22, 91:25, 92:8, 92:12, 93:24, 94:9, 94:17, 94:18, 95:1, 95:6, 95:7, 95:10, 95:16, 95:19, 95:22, 95:23, 96:16, 96:20, 96:23, 96:25, 97:3, 97:6, 97:7, 97:11, 97:12, 97:14, 97:22, 97:24, 98:3, 98:5, 98:8, 98:15, 98:24, 99:1, 99:2, 99:21, 99:25, 100:12, 100:15, 100:21, 101:14, 102:2, 102:3, 102:7, 102:11, 102:21, 103:10, 104:8, 104:9, 104:13, 104:22, 105:8, 105:15, 105:20, 106:21, 106:22, 107:3, 107:13, 107:22, 108:3, 108:17, 109:9, 109:15, 110:1, 110:5, 110:13, 111:2, 111:5, 111:8, 111:14, 111:16, 111:21, 111:22, 112:16, 112:19, 113:21, 113:23, 113:24, 114:3, 114:9, 114:13, 114:18, 115:2, 116:20, 116:23, 117:11, 118:1, 118:6, 118:9, 118:16, 118:17, 119:2, 119:4, 119:20, 120:14, 120:16, 120:20, 121:19, 121:24, 122:10, 122:13, 122:15, 123:8, 123:10, 123:12, 123:17, 123:21, 124:1, 124:5, 124:17, 124:18, 124:23, 125:2, 126:14, 126:24, 127:2, 127:6, 127:9, 127:15, 128:23, 129:6, 129:15, 129:16, 129:20, 129:23, 132:3, 132:19,

134:1, 136:3, 136:21, 137:24, 138:3, 138:10, 138:14, 138:16, 138:17, 138:20, 139:3, 139:5, 139:6, 139:22, 140:2, 140:11, 140:22, 140:23, 141:22, 142:13, 142:15, 142:24, 143:9, 143:11, 143:18, 143:19, 146:3, 146:6, 146:11, 146:13, 146:16, 146:19, 146:21, 148:4, 149:24, 150:10, 150:14, 151:23, 151:24, 152:2, 154:3, 154:4, 154:5, 154:22, 155:2, 155:5, 155:7, 155:10, 155:11, 155:20, 155:22, 158:17, 164:2, 169:7, 169:11, 188:3, 197:25, 199:3, 200:8
**corrected** [1] - 69:3
**correctly** [3] - 91:20, 101:11, 127:11
**cost** [4] - 11:1, 35:22, 54:4
**costs** [1] - 47:15
**Coughlin** [2] - 70:11, 72:5
**Counsel** [1] - 156:25
**counsel** [9] - 52:10, 115:14, 123:20, 173:12, 173:17, 180:23, 181:25, 187:21
**counselor** [2] - 14:17, 46:15
**counselors** [2] - 46:9, 46:13
**couple** [21] - 15:3, 16:7, 19:20, 21:10, 21:21, 32:19, 36:8, 47:3, 51:9, 51:12, 59:2, 63:5, 75:14, 83:19, 88:12, 88:21, 160:3, 162:14, 167:24, 168:5, 195:20
**couple-of-sentence** [1] - 19:20
**course** [12] - 47:1, 65:21, 66:14, 84:7, 112:17, 121:22, 129:21, 168:5, 170:25, 180:15, 190:18, 196:1
**Court** [34] - 1:22, 1:23, 3:1, 3:7, 5:3, 5:13, 52:2, 77:22, 85:17, 86:10, 100:23, 156:13, 171:11, 171:17, 173:19, 177:6, 182:5, 183:8, 183:25, 184:4, 184:6, 184:12, 185:15, 187:12, 187:14, 187:19, 188:7, 188:9, 188:21, 190:11, 196:15, 201:16, 201:23, 201:23
**COURT** [154] - 1:1, 3:2, 4:12, 4:16, 4:20, 5:10, 5:17, 5:25, 6:6, 6:13, 6:16, 6:18, 7:3, 7:11, 8:24, 9:1, 9:6, 9:8,

14:21, 16:16, 16:18, 16:21, 16:25, 19:16, 25:18, 25:22, 26:3, 31:23, 32:3, 34:8, 34:13, 36:12, 37:3, 37:8, 40:11, 40:15, 42:1, 42:6, 44:24, 45:4, 49:3, 51:16, 51:23, 51:25, 52:4, 52:6, 52:8, 60:4, 60:9, 69:12, 69:18, 75:1, 80:8, 82:20, 83:24, 84:17, 84:21, 85:10, 85:13, 85:16, 85:19, 85:23, 86:8, 86:15, 86:17, 86:19, 90:15, 90:18, 90:21, 103:3, 103:13, 103:15, 103:21, 103:24, 104:2, 116:1, 116:3, 120:8, 144:4, 144:9, 147:5, 147:7, 150:16, 150:20, 150:23, 150:25, 155:24, 156:7, 156:15, 156:17, 156:18, 156:20, 160:4, 163:20, 167:3, 167:6, 167:8, 167:11, 167:13, 167:16, 169:2, 169:8, 169:12, 169:15, 170:13, 171:2, 171:10, 171:23, 173:22, 175:14, 175:21, 176:1, 176:13, 177:3, 178:12, 179:25, 183:23, 186:9, 188:6, 188:23, 189:2, 189:5, 189:7, 189:12, 189:18, 189:22, 190:8, 190:14, 190:19, 190:22, 191:7, 193:1, 193:7, 193:12, 193:19, 193:24, 194:3, 194:13, 194:16, 194:24, 195:3, 195:6, 195:14, 195:17, 196:6, 196:11, 196:17, 197:3, 199:6, 199:9, 199:20, 200:9, 201:9, 201:12

**court** [7] - 85:1, 104:1, 111:7, 167:15, 183:4, 184:21, 188:4

**Court's** [5] - 4:8, 90:16, 168:7, 175:24, 177:2

**COURTROOM** [4] - 7:5, 7:7, 17:2, 17:4

**courtroom** [2] - 19:6, 168:18

**cover** [2] - 177:13, 187:23

**coverage** [2] - 148:8, 148:9

**covered** [3] - 10:24, 79:20, 143:24

**covers** [2] - 193:13, 193:14

**Craig** [8] - 100:22, 100:24, 101:1, 101:2, 102:24, 107:23

**create** [2] - 35:14, 78:1

**created** [2] - 49:21, 142:6

**creates** [1] - 49:19

**creating** [1] - 60:20

**credit** [1] - 42:12

**crime** [5] - 18:19, 94:9, 94:17, 104:8, 110:15

**criminal** [1] - 102:25

**CRIMINAL** [1] - 1:15

**criteria** [13] - 25:6, 28:20, 28:24, 28:25, 29:2, 66:14, 66:21, 67:9, 67:12, 82:23, 82:24, 83:3, 158:16

**cross** [29] - 3:17, 14:22, 84:2, 86:21, 164:4, 165:10, 170:8, 171:5, 171:21, 172:10, 172:18, 175:12, 177:12, 185:13, 186:4, 186:8, 187:24, 187:25, 189:13, 189:25, 191:14, 191:25, 192:12, 192:16, 193:3, 193:22, 196:1, 196:4, 200:11

**CROSS** [2] - 14:23, 86:25

**cross-examination** [10] - 3:17, 14:22, 84:2, 86:21, 164:4, 165:10, 171:21, 172:18, 186:4, 186:8

**CROSS-EXAMINATION** [2] - 14:23, 86:25

**CRR** [2] - 1:21, 201:22

**curative** [2] - 176:5, 188:15

**cure** [1] - 175:19

**current** [2] - 125:4, 185:6

**cut** [1] - 196:3

**cutting** [1] - 86:2

**CUYLER** [1] - 1:14

## D

**D.C** [1] - 1:16

**daily** [4] - 72:17, 72:18, 76:9, 134:22

**danger** [1] - 31:1

**dangerous** [1] - 181:14

**dangers** [5] - 29:22, 30:17, 30:22, 31:4

**data** [28] - 18:12, 24:16, 25:2, 25:3, 28:11, 28:14, 28:15, 28:16, 28:19, 28:20, 28:22, 29:19, 39:19, 40:2, 48:17, 50:16, 54:4, 61:6, 67:6, 88:25, 89:3, 89:4, 89:12, 108:17, 108:18, 194:12

**DATE** [1] - 201:22

**date** [18] - 13:16, 28:18, 70:1, 71:5, 73:15, 87:21, 94:6, 96:6, 98:22, 121:12, 123:6, 130:4, 144:14, 145:14, 155:15, 160:7, 160:16, 160:18

**dates** [6] - 47:6, 90:10, 99:13, 125:6, 125:16, 125:21

**Davis** [5] - 70:4, 70:6, 71:4,

71:9, 72:14

**day-to-day** [2] - 68:3, 101:2

**days** [8] - 13:9, 13:11, 14:3, 70:16, 88:12, 195:21, 200:18, 200:25

**DE** [42] - 1:13, 3:6, 4:15, 4:18, 5:8, 5:24, 16:19, 85:9, 85:15, 85:22, 85:24, 167:10, 167:12, 169:7, 169:11, 169:14, 170:2, 171:3, 171:11, 175:2, 175:15, 175:24, 176:12, 176:21, 180:14, 185:5, 188:3, 190:18, 192:25, 193:6, 194:11, 194:15, 194:21, 195:2, 195:4, 195:25, 196:9, 197:1, 199:3, 199:7, 200:8, 201:8

**de** [11] - 5:17, 169:18, 171:2, 173:22, 180:1, 185:3, 187:22, 190:15, 192:19, 194:9, 198:1

**deal** [10] - 4:9, 4:20, 8:15, 93:3, 105:22, 145:23, 172:7, 173:23, 194:7, 200:21

**dealing** [5] - 18:15, 99:1, 114:13, 173:12, 179:1

**deals** [2] - 183:21, 185:1

**dealt** [4] - 68:4, 103:9, 111:11, 113:1

**debt** [2] - 18:3, 23:9

**December** [5] - 1:4, 81:17, 88:12, 88:14, 201:22

**decent** [1] - 200:23

**decide** [7] - 20:21, 68:6, 178:7, 180:25, 181:10, 181:17, 182:17

**decided** [3] - 125:1, 138:16, 196:14

**decision** [2] - 104:11, 158:25

**decisions** [2] - 5:23, 103:17

**deck** [4] - 194:14, 196:25, 197:1, 199:22

**deems** [1] - 173:19

**defendant** [1] - 19:15

**Defendant** [1] - 1:7

**DEFENDANT** [2] - 1:17, 2:2

**defense** [28] - 3:14, 3:18, 5:5, 6:2, 84:23, 85:24, 86:12, 170:3, 170:4, 170:11, 170:15, 171:23, 177:20, 180:23, 181:25, 184:19, 184:22, 185:10, 185:18, 186:14, 188:11, 188:16, 193:7, 198:16, 200:13, 200:16, 200:17, 201:10

**Defense** [2] - 116:5, 151:2

**defense's** [1] - 172:14

**defenses'** [1] - 189:13

**definitely** [2] - 92:18, 191:13

**deleted** [2] - 143:4, 143:5

**delivered** [2] - 24:18

**demeanor** [1] - 24:1

**denial** [1] - 78:14

**denying** [2] - 91:14, 92:22

**DEPARTMENT** [1] - 1:15

**department** [1] - 184:11

**departmental** [1] - 187:20

**DEPUTY** [4] - 7:5, 7:7, 17:2, 17:4

**describe** [1] - 17:18

**describing** [1] - 9:22

**description** [2] - 19:20, 55:22

**designed** [1] - 18:24

**desire** [2] - 85:4, 193:9

**despite** [1] - 166:11

**destruction** [1] - 143:17

**detail** [3] - 54:3, 55:24, 59:17

**detailed** [2] - 63:16, 63:24

**determination** [2] - 146:12, 183:12

**determine** [4] - 122:9, 132:17, 132:20, 148:22

**determined** [2] - 138:11, 146:25

**diagnostic** [1] - 51:10

**dictating** [1] - 191:20

**difference** [1] - 56:6

**different** [15] - 10:14, 18:14, 23:10, 24:10, 26:15, 41:19, 92:11, 93:20, 124:22, 133:16, 133:23, 149:21, 166:5, 179:3, 183:19

**difficult** [4] - 5:20, 66:22, 192:4, 197:25

**Dinnen** [5] - 55:16, 55:17, 55:19, 100:2, 100:3, 100:5, 100:17, 164:3, 164:11

**Dinnen's** [4] - 56:2, 100:7, 100:11, 124:7

**dinner** [1] - 67:24

**DIRECT** [2] - 7:12, 17:7

**direct** [20] - 3:21, 5:7, 37:18, 84:1, 91:21, 108:13, 113:5, 113:13, 115:3, 120:16, 149:19, 149:23, 151:7, 172:10, 174:25, 175:22, 188:2, 188:24, 193:25

**directed** [3] - 171:7, 177:13, 184:23

**directing** [1] - 171:8

**direction** [5] - 171:12, 172:12, 185:11, 186:16, 190:1

**directions** [4] - 146:10,

175:13, 181:7, 181:8
**directly** [15] - 27:23, 30:4, 30:9, 38:9, 40:6, 53:9, 53:22, 61:23, 109:21, 111:11, 113:1, 139:16, 152:10, 166:8, 166:17
**disagree** [1] - 103:21
**disagreed** [3] - 122:1, 124:9, 139:1
**disagrees** - 122:3
**disburse** [1] - 30:12
**disbursed** [1] - 36:24
**disconnected** [2] - 14:4, 16:13
**discretion** [1] - 64:8
**discuss** [17] - 24:13, 25:8, 34:1, 41:8, 41:11, 41:14, 48:14, 54:11, 55:5, 66:4, 66:5, 66:8, 67:23, 71:22, 84:9, 111:19, 168:7
**discussed** [11] - 25:11, 29:5, 34:3, 41:12, 66:25, 75:14, 131:19, 154:21, 166:12, 168:17, 176:24
**discussing** [5] - 43:17, 62:4, 72:18, 112:24, 163:22
**discussion** [5] - 29:13, 169:17, 175:5, 186:11, 191:14
**Discussion** [1] - 150:17
**discussions** [3] - 24:4, 172:4, 172:5
**disgorge** [1] - 109:19
**dispense** [1] - 121:21
**dispute** [2] - 98:10, 145:3
**disputing** [5] - 91:8, 94:13, 125:13, 125:21, 125:22
**disregard** [1] - 184:18, 184:21
**disregarded** [1] - 190:25
**distribution** [1] - 26:9
**distributors** [2] - 117:20, 117:21
**District** [3] - 1:23, 173:13, 201:23
**DISTRICT** [3] - 1:1, 1:1, 1:10
**DIVISION** [2] - 1:2, 1:15
**doc** [2] - 138:12
**docs** [1] - 159:13
**doctor** [55] - 11:10, 11:12, 13:1, 14:12, 14:14, 14:17, 29:25, 30:1, 33:6, 45:19, 46:2, 46:20, 47:14, 47:23, 48:18, 50:13, 59:4, 60:1, 61:15, 61:17, 61:19, 63:13, 63:25, 70:17, 70:20, 72:10, 73:4, 73:19, 74:1, 74:3, 79:4, 83:11, 93:9, 93:18, 93:23, 94:17, 95:14, 102:1, 102:4,

102:5, 102:12, 129:25, 138:16, 138:21, 138:25, 139:4, 139:10, 151:14, 158:25, 161:10, 161:13, 199:7
**doctor's** [4] - 61:15, 83:3, 83:4, 158:22
**doctors** [25] - 41:18, 41:20, 44:4, 44:9, 44:15, 47:18, 48:5, 48:9, 48:19, 62:17, 101:12, 101:13, 101:16, 103:9, 103:20, 150:12, 159:2, 159:7, 159:9, 159:15, 159:18, 165:24, 166:3, 166:9, 199:10
**doctors'** [3] - 95:12, 110:19, 159:7
**document** [25] - 26:5, 26:8, 27:14, 32:23, 33:3, 40:25, 42:11, 45:7, 47:9, 48:25, 49:14, 50:11, 51:8, 87:23, 106:12, 125:8, 128:21, 151:8, 152:3, 152:4, 152:6, 152:9, 163:19, 164:12
**documents** [6] - 31:19, 52:22, 114:9, 114:11, 126:22, 160:3
**dollar** [1] - 38:7
**domain** [1] - 50:5
**DONALD** [1] - 2:2
**done** [29] - 4:3, 30:1, 74:3, 84:6, 86:9, 108:21, 109:3, 109:21, 111:20, 124:20, 139:7, 139:11, 158:18, 166:8, 168:10, 174:23, 176:9, 181:23, 183:3, 183:10, 185:11, 187:25, 190:7, 190:9, 192:13, 197:14, 200:2, 200:3, 201:2
**done".** [1] - 139:9
**dots** [1] - 153:3
**doubt** [1] - 180:8
**down** [13] - 26:12, 27:11, 32:12, 61:9, 94:2, 96:12, 96:22, 97:7, 97:18, 116:25, 123:9, 137:21, 156:9
**dozens** [1] - 3:24
**Dr** [15] - 39:9, 73:10, 73:16, 73:18, 73:20, 73:21, 81:13, 92:19, 98:17, 99:9, 194:14, 194:17, 197:18, 197:20, 199:8
**draft** [1] - 42:20
**draw** [10] - 81:19, 173:14, 174:4, 174:6, 174:23, 175:19, 176:18, 188:17, 189:15, 191:23
**drawing** [3] - 42:11, 50:23, 173:9
**drawn** [2] - 173:2, 176:15

**drinks** [1] - 67:24
**Drive** [1] - 2:3
**drop** [1] - 198:13
**due** [5] - 172:21, 182:1, 182:13, 183:1, 195:15
**duly** [2] - 7:6, 17:3
**during** [18] - 15:11, 23:14, 23:19, 24:1, 27:8, 29:5, 57:9, 65:24, 74:10, 84:7, 98:25, 100:19, 114:1, 114:13, 131:3, 166:22, 178:14, 181:19

# E

**e-mailing** [1] - 71:3
**E.G** [2] - 50:8, 50:10
**eagerly** [1] - 75:19
**early** [2] - 167:24, 200:10
**earned** [1] - 53:6
**easier** [4] - 22:18, 66:22, 180:6, 180:7
**East** [2] - 1:23, 201:24
**easy** [2] - 83:16, 83:17
**economics** [1] - 197:23
**edit** [1] - 59:8
**edited** [3] - 5:12, 5:13, 169:23
**edits** [1] - 5:22
**educate** [1] - 72:16
**educational** [1] - 17:14
**effect** [2] - 174:19, 178:16
**efficient** [2] - 4:10, 25:20
**effort** [2] - 3:15, 185:8
**eight** [1] - 144:17
**Eisner** [7] - 42:9, 42:17, 73:7, 73:19, 78:23, 151:4, 151:21
**either** [12] - 4:3, 51:14, 53:21, 87:22, 110:22, 136:24, 150:3, 150:12, 155:3, 173:19, 176:6, 181:21
**elaborate** [2] - 66:13, 73:1
**eleventh** [1] - 200:18
**elicit** [3] - 171:9, 175:3, 177:20
**elicited** [6] - 171:12, 175:11, 180:3, 181:5, 184:19, 191:24
**eligible** [1] - 10:23
**eliminate** [2] - 174:21, 193:14
**eliminated** [1] - 193:11
**eliminates** [2] - 176:6, 188:16
**ELMO** [3] - 160:2, 163:19, 191:12
**email** [53] - 15:12, 15:13, 15:16, 15:17, 15:18, 15:19, 27:1, 32:8, 32:11, 34:20,

34:22, 34:24, 37:11, 40:17, 42:17, 43:5, 49:6, 49:9, 50:5, 70:10, 70:15, 71:3, 73:6, 73:25, 75:5, 76:17, 77:12, 77:17, 78:5, 78:22, 79:11, 80:12, 81:17, 82:3, 99:14, 111:17, 111:25, 112:1, 112:9, 116:19, 116:22, 118:12, 119:6, 125:9, 126:4, 126:19, 129:6, 147:12, 151:4, 189:1, 189:2, 192:20
**emails** [15] - 71:12, 75:8, 80:20, 104:15, 104:20, 105:1, 105:9, 105:14, 105:17, 105:19, 114:6, 125:18, 130:15, 130:16, 163:1
**EMILY** [1] - 1:13
**employed** [2] - 30:20, 41:20
**employee** [4] - 42:10, 77:23, 81:9, 195:5
**employees** [5] - 23:21, 29:10, 68:1, 117:22, 153:19
**empty** [1] - 61:23
**encompassed** [1] - 141:7
**encounter** [2] - 56:24, 57:5
**end** [21] - 4:24, 14:3, 18:23, 25:13, 28:9, 28:11, 29:4, 39:12, 60:19, 75:16, 80:12, 85:7, 89:19, 111:24, 125:12, 128:11, 143:25, 170:1, 198:18, 199:18, 200:1
**ended** [5] - 26:17, 28:7, 74:6, 126:11
**ending** [1] - 167:24
**enforcement** [4] - 56:14, 56:24, 57:6, 161:21
**engage** [4] - 172:16, 186:16, 190:2, 192:12
**engaged** [2] - 58:13, 174:7
**enrolled** [3] - 61:1, 62:24, 132:10
**enter** [1] - 155:13
**entered** [4] - 49:22, 64:2, 129:17, 129:18
**enters** [4] - 6:17, 52:7, 86:18, 156:19
**entire** [5] - 20:2, 29:17, 43:2, 109:6, 143:21
**entirely** [1] - 187:14
**entitled** [1] - 201:20
**entity** [2] - 79:20, 161:4
**equipment** [1] - 153:23
**errors** [1] - 135:22
**essentially** [7] - 126:11, 141:25, 174:3, 176:4, 177:17, 184:18, 186:20
**estimate** [1] - 80:2
**estimation** [2] - 138:2, 197:4

et [1] - 8:17
ethical [8] - 176:10, 176:19, 177:7, 178:5, 179:8, 180:19, 182:2, 187:13
ethically [1] - 175:7
ethics [1] - 178:7
eve [1] - 196:19
evening [7] - 6:7, 6:20, 168:6, 168:9, 168:24, 168:25, 201:6
event [1] - 46:11
eventually [1] - 24:11
evidence [27] - 26:1, 31:25, 34:10, 36:14, 37:5, 40:13, 42:4, 45:2, 60:6, 69:15, 74:24, 80:10, 105:12, 115:24, 116:5, 144:6, 147:4, 147:8, 150:22, 151:2, 174:4, 178:24, 182:15, 185:25, 186:23, 187:17, 192:10
evidentiary [3] - 86:5, 174:21, 201:5
evolution [1] - 87:8
exact [8] - 44:16, 70:23, 87:21, 89:9, 96:6, 99:13, 125:16, 155:15
exactly [9] - 24:5, 24:22, 46:10, 55:24, 60:17, 119:23, 148:12, 176:12, 185:23
EXAMINATION [5] - 7:12, 14:23, 17:7, 86:25, 157:2
examination [21] - 3:17, 14:22, 52:9, 84:1, 84:2, 86:21, 108:13, 113:5, 113:13, 115:4, 149:20, 149:23, 151:7, 156:24, 164:4, 165:10, 171:21, 172:18, 186:4, 186:8, 196:19
example [1] - 117:19
examples [2] - 66:7, 68:11
Excel [1] - 45:9
except [2] - 182:25, 183:6
exchange [2] - 20:16, 20:19, 110:16
exculpatory [3] - 3:16, 185:22, 186:7
excuse [4] - 88:14, 112:1, 123:3, 184:14
excused [5] - 16:18, 51:22, 156:5, 167:4, 168:25
execute [1] - 44:7
executed [3] - 28:1, 140:3, 140:4
exhibit [1] - 150:1
Exhibit [39] - 8:23, 9:10, 26:7, 26:25, 31:21, 32:5, 32:20, 33:16, 34:7, 34:15, 35:3, 36:11, 36:14, 37:2, 37:10, 42:8, 42:16, 42:23, 43:4, 43:14, 45:6, 46:22,

47:8, 49:1, 49:5, 52:14, 69:20, 75:3, 77:7, 78:18, 78:22, 80:10, 115:25, 116:5, 126:16, 144:5, 147:8, 151:2, 160:5
Exhibits [14] - 25:17, 25:25, 31:24, 34:9, 37:4, 40:10, 40:12, 42:2, 44:23, 45:1, 60:3, 60:5, 69:14, 74:23
exhibits [5] - 25:20, 25:21, 25:23, 126:17, 131:20
exist [2] - 143:16, 152:7
existed [1] - 76:3
existing [5] - 29:7, 29:10, 39:17, 39:18, 83:11
exits [4] - 51:24, 84:16, 156:6, 169:1
expect [9] - 13:8, 35:16, 35:19, 86:3, 137:7, 137:9, 187:13, 192:11, 198:14
expectation [3] - 23:22, 23:23, 44:4
expected [3] - 23:24, 48:19, 195:11
expedited [1] - 85:5
expense [4] - 11:3, 54:6, 54:10
expenses [4] - 36:25, 53:12, 53:17, 54:7
expensive [2] - 54:1, 153:23
experience [5] - 21:14, 21:23, 23:10, 23:13, 131:14
expert [2] - 122:6, 131:8
explain [26] - 14:14, 14:17, 25:4, 29:14, 29:21, 29:22, 30:17, 30:21, 31:4, 35:21, 43:23, 45:7, 46:10, 53:6, 54:3, 54:18, 55:23, 58:17, 59:17, 73:24, 82:11, 82:12, 82:13, 173:5, 177:25
explained [9] - 21:22, 29:11, 29:13, 52:19, 55:9, 57:22, 177:7
explaining [2] - 31:12, 76:18
explains [1] - 31:8
explanation [3] - 89:2, 180:10, 192:6
explicitly [1] - 176:16
explore [1] - 120:24
express [1] - 72:24
expresses [1] - 24:23
extended [2] - 148:15, 182:22
extent [10] - 4:9, 5:22, 169:13, 169:21, 171:12, 171:21, 172:1, 172:10, 174:10, 174:11
extremely [3] - 83:15,

114:21, 181:13
eyes [2] - 109:12, 109:13

F

face [5] - 75:21, 153:4, 153:5, 179:16
face-to-face [1] - 179:16
facilities [1] - 166:4
fact [19] - 3:10, 35:24, 68:21, 72:9, 105:22, 113:16, 113:18, 113:20, 119:3, 143:6, 168:2, 172:13, 172:21, 182:15, 184:23, 186:19, 188:15, 193:17, 200:22
factor [1] - 54:21, 55:11
factored [2] - 54:15, 54:18
factoring [7] - 55:5, 55:10, 55:12, 55:23, 56:3, 100:3, 100:10
facts [2] - 182:17, 182:18
factual [2] - 179:6, 181:9
fair [11] - 10:20, 20:15, 62:10, 64:25, 162:25, 163:8, 172:24, 179:25, 185:14, 191:12, 191:22
false [5] - 63:2, 63:3, 98:19, 99:17, 107:12
falsehood [1] - 164:14
falsehoods [1] - 164:13
familial [3] - 44:6, 61:1, 132:10
familiar [2] - 27:15, 112:3
family [32] - 8:17, 8:18, 10:16, 10:21, 15:9, 66:16, 66:23, 73:11, 84:10, 133:3, 134:2, 136:24, 143:23, 145:5, 145:9, 145:22, 146:4, 146:12, 146:16, 146:20, 147:1, 147:20, 148:7, 148:23, 149:5, 149:8, 150:3, 150:9, 150:13, 168:8
far [10] - 11:4, 36:3, 88:17, 100:19, 107:12, 137:4, 146:24, 181:9, 184:14, 184:15
fashion [2] - 104:18, 181:23
faster [1] - 76:15
favorable [1] - 177:20
fax2@LabSolutions [1] - 73:6
fax2@LabSolutions.com [1] - 49:8
faxed [1] - 63:13
feature [1] - 175:22
feds [2] - 102:25, 103:7
fee [7] - 54:22, 94:9, 97:13, 97:15, 101:21, 102:1, 102:5
feedback [3] - 53:3, 57:11,

57:13
felony [1] - 18:17
felt [1] - 123:19
female [1] - 113:6
few [8] - 18:21, 30:15, 36:3, 82:22, 84:4, 161:20, 169:3, 200:18
fields [1] - 28:19
fight [1] - 155:3
figure [2] - 189:16, 200:22
file [3] - 6:4, 52:23, 80:19
filed [1] - 171:18
files [1] - 79:12
filled [2] - 12:4, 64:10
fills [2] - 18:11, 64:9
final [2] - 110:14, 192:23
finally [1] - 12:24
finance [1] - 54:21
financial [6] - 18:2, 18:3, 18:6, 194:7, 197:22, 197:23
financial-related [1] - 18:3
financially [1] - 83:14
financials [1] - 194:12
financing [1] - 56:8
fine [10] - 15:5, 88:1, 117:25, 171:2, 172:5, 172:23, 179:19, 186:3, 191:25, 194:1
finish [5] - 4:13, 17:16, 86:3, 86:6, 198:4
finished [4] - 84:1, 104:6, 150:19, 152:24
finishes [2] - 167:18, 197:14
finishing [2] - 196:22, 198:11
firm [3] - 121:4, 131:11, 165:13
first [48] - 4:13, 4:14, 4:16, 10:8, 13:22, 14:1, 14:11, 16:9, 21:17, 21:19, 23:14, 23:19, 24:4, 24:14, 28:3, 28:7, 29:5, 32:17, 56:14, 56:24, 57:5, 58:1, 58:14, 60:25, 61:3, 61:5, 61:6, 62:15, 72:11, 83:22, 87:15, 91:16, 94:22, 97:24, 97:25, 104:18, 107:1, 132:9, 132:20, 135:4, 158:9, 158:19, 161:21, 171:23, 173:11, 180:10, 182:23, 187:7
fit [3] - 24:5, 39:24, 39:25
fits [2] - 90:11, 190:12
five [2] - 88:18, 182:3
flat [2] - 97:13, 97:15
fleshed [1] - 184:25
flew [1] - 28:8
floater [1] - 86:1
Floor [1] - 1:16

**floor** [1] - 86:23
**FLORIDA** [1] - 1:1
**Florida** [7] - 1:3, 1:24, 7:17, 17:11, 17:12, 173:13, 201:24
**flowchart** [7] - 60:14, 60:15, 60:20, 60:22, 60:25, 112:2, 132:5
**flowcharts** [3] - 60:16, 131:18, 131:21
**focus** [9] - 4:21, 4:22, 4:25, 76:18, 86:8, 125:3, 175:17, 196:20, 199:24
**focused** [1] - 17:20
**focusing** [3] - 23:3, 66:19, 157:21
**folder** [3] - 105:1, 105:17, 105:18
**folks** [5] - 51:18, 52:9, 116:15, 155:24, 195:10
**follow** [15] - 11:22, 13:10, 13:14, 30:15, 34:25, 36:4, 55:24, 124:12, 142:9, 151:15, 151:22, 168:6, 168:22, 172:12, 177:2
**follow-up** [4] - 11:22, 30:15, 151:15, 172:12
**followed** [2] - 59:18, 64:18
**following** [5] - 62:3, 64:2, 103:14, 167:7, 191:5
**FOR** [3] - 1:13, 1:17, 2:2
**foregoing** [1] - 201:18
**forfeiture** [2] - 110:8, 200:19
**forget** [1] - 13:14
**form** [40] - 18:11, 30:7, 33:6, 42:12, 44:7, 45:20, 49:20, 49:21, 50:12, 50:14, 50:15, 50:16, 50:17, 51:3, 51:5, 51:11, 61:19, 61:21, 61:23, 63:12, 64:9, 102:2, 102:9, 102:12, 102:19, 102:20, 104:18, 127:24, 128:4, 129:1, 129:2, 139:15, 139:18, 139:21, 139:24, 140:3, 140:4, 159:22, 181:22
**Form** [1] - 147:16
**formatted** [1] - 106:5
**former** [1] - 195:5
**forms** [11] - 59:15, 64:10, 66:10, 78:2, 78:9, 158:21, 159:10, 159:12, 160:12, 165:25
**Fort** [2] - 1:24, 201:24
**forth** [4] - 90:18, 172:23, 184:25, 190:10
**forward** [9] - 14:8, 43:1, 72:15, 95:20, 104:5, 126:3, 127:1, 138:8, 139:21
**forwarded** [1] - 32:12
**forwarding** [1] - 42:24

**foul** [1] - 174:7
**foundation** [1] - 184:6
**four** [5] - 88:18, 100:19, 100:20, 168:18, 192:5
**frame** [2] - 74:8, 155:16
**Frank** [1] - 81:4
**frankly** [8] - 3:19, 171:15, 174:25, 180:17, 181:14, 187:8, 187:23, 201:5
**fraud** [5] - 18:20, 20:25, 57:8, 163:8, 166:13
**FRAUD** [1] - 1:15
**free** [5] - 51:20, 84:18, 106:7, 156:8, 163:2
**Friday** [18] - 6:8, 84:24, 85:3, 85:6, 193:9, 193:18, 194:15, 197:5, 197:6, 197:10, 197:17, 197:24, 198:14, 199:13, 199:14, 200:1, 200:4, 200:7
**friends** [2] - 84:10, 168:8
**front** [1] - 54:12
**full** [11] - 5:13, 51:14, 52:23, 53:1, 54:25, 65:3, 162:22, 163:25, 164:23, 169:23, 170:7
**fully** [2] - 58:22, 171:6
**functional** [1] - 154:4
**fundamentals** [1] - 88:22
**funds** [4] - 30:12, 36:24, 54:16, 110:8
**funny** [1] - 21:3
**Fusion** [1] - 78:24
**future** [2] - 48:20, 86:11

# G

**G-1** [5] - 147:3, 147:4, 147:7, 147:8, 147:12
**G-2** [4] - 115:25, 116:3, 116:5, 116:7
**G-4** [2] - 144:1, 144:5
**G-5** [3] - 144:2, 144:5, 145:13
**G-6** [4] - 150:22, 150:23, 151:2
**G-r-i-n-e-r** [1] - 17:6
**G.'s** [1] - 52:23
**game** [3] - 172:24, 191:12, 191:22
**GARLAND** [1] - 2:2
**general** [4] - 24:7, 24:8, 41:16, 68:15
**generally** [2] - 22:13, 73:24, 185:11
**generate** [13] - 18:9, 18:24, 21:16, 21:24, 24:3, 34:19, 39:18, 40:2, 41:13, 41:14, 164:18, 166:16
**generated** [16] - 19:4,

30:10, 38:2, 38:7, 46:2, 50:20, 52:19, 54:5, 56:2, 62:15, 64:12, 74:17, 81:2, 83:19, 109:7, 184:16
**generates** [1] - 49:19
**generating** [7] - 17:25, 18:2, 22:14, 23:10, 25:11, 28:13, 33:11
**generation** [2] - 17:21, 17:22
**genes** [3] - 51:12, 51:13
**genetic** [19] - 8:11, 8:16, 8:20, 10:8, 11:16, 14:17, 18:25, 44:14, 46:9, 46:12, 46:15, 62:25, 80:19, 132:6, 140:24, 157:16, 157:19, 165:16, 168:15
**genetics** [1] - 12:5
**gentleman** [3] - 13:19, 14:2, 95:21
**gentlemen** [6] - 6:19, 83:25, 85:10, 86:20, 156:21, 167:16
**Georgia** [3] - 1:19, 2:3, 2:6
**get-out-of-jail-free** [1] - 163:2
**gifts** [1] - 8:15
**given** [17] - 5:16, 33:14, 57:23, 58:18, 70:2, 86:4, 147:24, 158:5, 171:12, 171:22, 172:1, 172:15, 175:8, 178:18, 180:16, 186:25, 190:1
**gleaned** [1] - 170:16
**gloss** [1] - 177:6
**goal** [1] - 169:12
**goals** [1] - 6:1
**God** [1] - 133:2
**gonna** [3] - 177:25, 183:10, 187:24
**gotcha** [1] - 189:22
**GOVERNMENT** [1] - 1:13
**government** [126] - 3:5, 5:7, 7:1, 8:21, 20:18, 25:16, 25:25, 31:20, 31:24, 34:6, 34:9, 36:10, 36:14, 37:1, 37:4, 40:9, 40:12, 41:23, 42:2, 44:22, 45:1, 56:11, 56:23, 60:2, 60:5, 69:10, 69:14, 74:20, 74:23, 80:6, 80:10, 83:21, 85:21, 87:9, 87:11, 87:16, 87:19, 88:19, 90:5, 91:2, 91:3, 91:7, 91:16, 91:21, 96:12, 96:22, 97:9, 97:19, 98:2, 98:7, 98:16, 103:17, 104:7, 107:1, 108:5, 119:4, 119:8, 121:5, 121:8, 121:13, 123:22, 123:23, 124:21, 125:1, 126:2, 129:11, 129:13, 129:24,

130:18, 130:21, 132:2, 136:15, 143:2, 144:5, 147:8, 149:19, 154:19, 154:25, 155:9, 156:23, 162:14, 162:20, 166:24, 170:24, 171:7, 171:17, 172:13, 173:15, 174:7, 174:13, 174:15, 175:4, 175:12, 176:2, 176:10, 176:20, 177:12, 177:15, 177:18, 179:7, 180:21, 181:7, 182:1, 182:13, 182:19, 183:6, 183:12, 183:17, 184:23, 185:12, 185:13, 186:15, 187:18, 189:15, 189:23, 191:19, 191:25, 192:12, 192:14, 193:5, 193:9, 193:17, 197:5, 198:23, 200:12, 201:7
**Government** [3] - 7:6, 17:3, 126:15
**government's** [14] - 3:13, 5:16, 6:22, 6:25, 16:22, 25:21, 85:7, 104:10, 170:1, 172:1, 190:4, 198:1, 198:11, 199:2
**Government's** [36] - 8:22, 9:9, 26:7, 26:25, 31:21, 32:5, 32:20, 33:16, 34:7, 34:14, 35:3, 36:11, 37:2, 37:10, 38:10, 39:5, 42:8, 42:16, 42:23, 43:4, 43:14, 43:24, 45:6, 46:22, 47:8, 49:1, 49:5, 52:14, 69:20, 71:2, 75:2, 77:7, 78:18, 78:22, 80:7, 160:5
**granted** [2] - 37:8, 174:18
**granular** [1] - 24:7
**great** [4] - 3:9, 168:25, 190:17, 193:1
**greatly** [1] - 75:14
**Greg** [7] - 54:14, 54:23, 112:14, 112:19, 135:13, 196:2
**Greg's** [1] - 54:25
**Gregory** [3] - 36:24, 55:1, 58:5
**grin** [1] - 75:13
**GRINER** [1] - 17:3
**Griner** [63] - 4:18, 4:22, 5:1, 16:24, 16:25, 17:1, 17:6, 17:9, 18:17, 19:18, 26:5, 27:1, 27:23, 32:5, 32:21, 33:3, 33:18, 34:17, 35:4, 36:16, 37:10, 38:11, 39:6, 40:18, 40:25, 42:8, 42:16, 43:5, 43:24, 45:6, 45:13, 47:9, 47:12, 49:5, 49:13, 50:8, 50:11, 51:9, 52:9, 52:13, 60:11, 62:23, 69:21,

75:6, 75:18, 76:12, 78:16, 79:16, 82:13, 82:22, 84:3, 84:17, 86:8, 86:22, 87:2, 107:7, 121:3, 121:16, 156:8, 157:4, 160:7, 160:23, 167:3
**Griner's** [1] - 110:6
**group** [1] - 34:18
**guess** [14] - 21:4, 38:5, 108:1, 111:3, 111:15, 170:21, 171:20, 176:14, 180:1, 196:25, 197:19, 198:22, 199:16
**guessing** [1] - 178:11
**guidance** [1] - 189:14
**guideline** [1] - 66:20
**guidelines** [1] - 172:15
**guilty** [5] - 18:17, 18:19, 163:4, 163:6, 166:13
**GURSKIS** [72] - 1:13, 16:23, 17:8, 19:14, 19:17, 25:16, 25:24, 26:2, 26:4, 31:20, 32:1, 32:4, 34:6, 34:11, 34:14, 34:16, 36:10, 36:15, 37:1, 37:6, 37:9, 40:9, 40:14, 40:16, 41:23, 42:5, 42:7, 44:22, 45:3, 45:5, 48:24, 49:4, 52:11, 52:12, 60:2, 60:7, 60:10, 69:10, 69:16, 69:19, 74:20, 74:25, 75:2, 75:4, 78:19, 78:21, 80:6, 80:11, 82:18, 82:21, 83:23, 103:2, 103:12, 103:16, 116:2, 120:7, 131:22, 144:3, 147:6, 150:24, 156:16, 157:1, 157:3, 160:2, 160:5, 160:6, 160:14, 160:15, 163:18, 163:21, 167:2, 195:12
**guy** [2] - 38:17, 121:3
**guys** [13] - 5:18, 6:11, 75:11, 85:2, 86:12, 167:11, 170:15, 193:24, 198:12, 199:2, 199:17, 201:10, 201:15

## H

**H.K** [6] - 194:23, 194:24, 196:24, 197:11, 197:15, 200:4
**half** [3] - 51:19, 65:17, 74:7
**hand** [5] - 5:19, 7:5, 17:2, 179:21, 183:11
**handle** [2] - 68:9, 201:6
**handled** [3] - 72:12, 110:25, 174:25
**handling** [2] - 33:23, 68:10
**happy** [1] - 24:2
**hard** [8] - 16:4, 19:11, 23:2, 144:7, 152:23, 168:1, 197:9,

198:25
**harmed** [1] - 183:17
**harmful** [1] - 83:18
**head** [1] - 197:17
**heading** [3] - 196:22, 199:13, 199:14
**health** [1] - 4:6
**Health** [1] - 106:16
**healthcare** [16] - 18:4, 18:5, 18:7, 18:20, 20:25, 26:16, 57:22, 57:24, 58:2, 114:22, 117:19, 121:4, 122:6, 122:12, 124:16, 163:8
**Healthcare** [1] - 10:5
**healthcare-related** [1] - 18:5
**healthcare-specific** [2] - 57:24, 58:2
**hear** [17] - 5:5, 5:20, 6:6, 6:10, 108:13, 135:14, 139:18, 181:15, 181:17, 189:11, 189:25, 190:12, 191:10, 191:13, 192:24, 197:8
**heard** [9] - 9:16, 10:8, 57:15, 127:11, 129:25, 168:7, 168:15, 179:3, 188:23
**hearing** [6] - 3:10, 8:11, 84:24, 183:8, 188:8, 200:5
**hearsay** [3] - 3:14, 185:24, 186:11
**held** [3] - 103:14, 150:17, 167:7
**Help** [1] - 34:17
**help** [14] - 5:22, 41:16, 41:17, 43:19, 75:15, 106:4, 121:12, 124:21, 165:15, 192:18, 192:23, 198:15, 199:16, 199:18
**helped** [1] - 166:16
**helpful** [1] - 188:7
**helping** [4] - 22:13, 41:13, 41:14, 57:7
**helps** [2] - 121:10, 189:9
**hereby** [1] - 201:18
**hi** [1] - 80:18
**Hi** [1] - 7:3
**hierarchy** [1] - 107:7
**high** [6] - 44:16, 55:22, 69:2, 69:5, 69:6, 137:8
**high-level** [1] - 55:22
**higher** [2] - 22:19, 22:20
**highlighted** [1] - 33:8
**highly** [1] - 193:4
**himself** [1] - 180:3
**HIPAA** [1] - 35:6
**Hirsch** [59] - 3:10, 3:11, 4:3, 4:9, 4:17, 4:19, 5:1, 21:8, 21:9, 23:11, 28:5, 37:21, 38:14, 169:6, 169:9, 169:12,

169:19, 170:6, 171:8, 171:21, 171:25, 172:9, 172:13, 173:5, 173:15, 174:14, 177:12, 178:14, 178:19, 179:1, 179:15, 180:3, 180:4, 180:17, 181:5, 181:20, 182:21, 183:15, 184:23, 186:3, 186:15, 187:1, 189:14, 190:24, 191:17, 191:19, 191:24, 192:14, 193:2, 193:4, 193:21, 193:22, 194:20, 196:20, 197:13, 200:2, 201:1, 201:14
**Hirsch's** [3] - 3:20, 179:4, 196:4
**history** [42] - 8:18, 10:15, 10:21, 15:7, 15:9, 44:6, 61:2, 63:22, 66:23, 73:11, 98:8, 132:11, 134:2, 136:24, 136:25, 143:23, 145:6, 145:9, 145:11, 145:22, 146:4, 146:5, 146:6, 146:13, 146:16, 146:20, 147:1, 147:21, 148:7, 148:24, 149:5, 149:8, 149:15, 150:3, 150:9, 150:13, 157:22, 158:3
**hit** [1] - 47:5
**hold** [3] - 80:22, 81:21, 81:24
**Holden** [13] - 169:10, 169:13, 193:3, 193:25, 194:5, 194:20, 194:22, 196:21, 196:22, 197:14, 200:3, 201:2
**Holden's** [1] - 193:3
**Holdings** [1] - 36:8
**home** [3] - 62:1, 64:18, 168:9
**homework** [1] - 168:3
**honest** [2] - 136:13, 152:18
**Honor** [80] - 3:6, 4:15, 4:18, 5:8, 6:4, 6:12, 7:1, 8:25, 9:3, 16:17, 16:19, 16:23, 19:14, 25:16, 25:19, 25:24, 31:20, 32:2, 34:6, 34:12, 36:10, 37:1, 37:7, 40:9, 40:14, 41:23, 42:5, 44:22, 45:3, 48:24, 52:11, 60:2, 60:8, 69:10, 69:17, 74:20, 74:25, 80:6, 82:19, 83:23, 85:9, 85:12, 85:15, 85:22, 86:14, 90:13, 103:12, 115:24, 116:2, 120:7, 144:3, 150:19, 150:24, 156:16, 157:1, 160:2, 163:18, 167:10, 167:9, 170:2, 175:2, 175:9, 176:21, 180:14, 188:3, 190:18, 192:25, 193:6, 193:8, 193:23, 194:2,

194:15, 194:21, 195:13, 197:2, 199:4, 199:19, 201:8, 201:11
**HONORABLE** [1] - 1:10
**Honorable** [1] - 1:22
**hope** [5] - 6:19, 75:11, 86:20, 133:24, 193:13
**hoped** [1] - 155:8
**hopefully** [2] - 172:19, 201:2
**hoping** [2] - 20:15, 162:17
**HOSTETLER** [1] - 2:5
**Hotel** [2] - 21:18, 21:20
**hotel** [2] - 21:21, 28:4
**hour** [4] - 51:19, 84:7, 85:25, 200:18
**hours** [2] - 21:21, 58:8
**house** [6] - 49:17, 49:19, 91:23, 91:24, 92:1, 139:16
**housekeeping** [4] - 3:4, 84:22, 85:7, 85:22
**housekeeping-wise** [1] - 85:7
**how-do-we-get-a-patient** [1] - 141:5
**hurt** [2] - 97:4, 97:20

## I

**I-x-x-x-x** [1] - 7:9
**ICD** [1] - 147:17
**ID** [2] - 28:18, 61:13
**idea** [5] - 5:15, 9:25, 103:1, 103:8, 179:4
**identified** [3] - 19:15, 85:24, 170:4
**identify** [1] - 19:9
**IDGAF** [21] - 21:1, 21:2, 26:11, 26:13, 29:15, 42:21, 49:24, 53:6, 53:18, 53:23, 53:24, 74:9, 89:20, 91:3, 101:18, 101:20, 109:17, 109:20, 109:22, 110:7, 110:8, 160:24
**IDGAF's** [1] - 74:16
**ignoring** [1] - 176:17
**II** [2] - 1:10, 1:22
**illegal** [12] - 57:14, 57:16, 59:14, 95:5, 110:16, 110:20, 162:2, 162:3, 162:6, 162:12, 162:22, 181:24
**ILONA** [1] - 1:21, 201:22
**imagine** [4] - 191:13, 195:9, 197:24, 198:19
**immediately** [2] - 12:18, 145:9
**impeachment** [4] - 4:2, 4:7, 170:10, 170:16
**imperative** [1] - 145:12
**impermissible** [1] - 174:13

**implants** [1] - 117:20
**implement** [1] - 181:2
**implication** [1] - 171:13
**important** [2] - 186:17, 189:19
**impression** [4] - 175:4, 177:18, 185:21, 186:6
**improper** [4] - 171:8, 171:14, 174:23, 175:18
**in-house** [2] - 49:17, 49:19
**in-person** [1] - 83:12
**inaccurate** [2] - 148:18, 148:19
**incentive** [1] - 171:4
**inclined** [1] - 186:12
**include** [6] - 62:14, 62:17, 72:15, 142:17, 142:19, 152:4
**included** [1] - 16:2
**includes** [2] - 51:3, 72:4
**including** [1] - 185:17
**incomprehensible** [1] - 185:17
**inconsistent** [1] - 111:6
**incorporated** [1] - 32:25
**incorrect** [3] - 92:22, 114:23, 136:4
**incur** [1] - 54:8
**indeed** [4] - 5:17, 118:3, 170:18, 187:18
**independent** [1] - 168:12
**indicate** [1] - 153:7
**indicated** [3] - 85:25, 154:25, 193:9
**indicates** [1] - 151:10
**indicating** [1] - 99:20
**indicating)** [1] - 130:7
**indirect** [1] - 57:11
**individual** [3] - 17:23, 98:1, 145:16
**individual's** [1] - 19:18
**individuals** [2] - 101:24, 133:8
**industry** [1] - 124:16
**inference** [9] - 173:1, 173:9, 173:15, 174:23, 175:19, 176:6, 179:23, 179:24, 188:17
**inferences** [2] - 176:15, 189:15
**Infinity** [8] - 71:10, 115:13, 115:15, 115:20, 115:22, 126:6, 126:10, 126:13
**info** [4] - 81:20, 81:21, 82:4, 147:14
**inform** [1] - 10:13
**informant** [1] - 124:17
**information** [55] - 17:23, 24:24, 28:16, 28:17, 31:2, 31:17, 31:19, 35:13, 44:6, 49:17, 49:22, 53:1, 53:3,

57:18, 57:20, 57:24, 58:12, 58:18, 58:20, 58:24, 61:10, 61:12, 62:12, 62:14, 62:17, 63:12, 64:2, 64:12, 65:2, 65:12, 67:11, 70:18, 77:5, 78:2, 78:4, 80:21, 80:22, 81:23, 89:7, 132:2, 135:25, 136:5, 136:11, 138:11, 147:23, 147:24, 157:18, 158:5, 171:18, 181:5, 185:22, 186:7, 191:20, 192:21, 193:14
**informed** [1] - 181:2
**informing** [2] - 68:20, 82:24
**infrastructure** [1] - 40:8
**inherent** [1] - 163:16
**initial** [12] - 24:16, 45:19, 46:21, 96:4, 112:13, 136:16, 136:17, 142:17, 142:19, 158:12, 158:13
**initials** [2] - 79:19, 90:6
**inquiry** [2] - 177:14, 191:21
**insinuate** [1] - 177:23
**instance** [1] - 158:19
**instruct** [1] - 178:5
**instructed** [2] - 174:15, 178:15, 190:24
**instructing** [1] - 59:25, 173:20, 174:11
**instruction** [23] - 48:4, 151:12, 166:21, 171:14, 171:22, 172:19, 173:25, 174:8, 175:3, 175:7, 175:8, 175:17, 175:18, 176:17, 176:22, 176:25, 177:2, 180:15, 184:17, 185:21, 186:20, 187:17, 190:25
**instructions** [10] - 168:7, 168:22, 177:13, 178:11, 178:18, 178:20, 179:15, 182:9, 184:21, 190:10
**instrumental** [1] - 18:23
**insurance** [7] - 8:4, 10:24, 11:4, 22:21, 22:23, 61:9, 63:4
**intend** [2] - 170:25, 196:9
**intentions** [1] - 187:12
**interact** [2] - 107:1, 164:7
**interacting** [1] - 104:11
**interaction** [1] - 70:6
**interest** [1] - 24:23
**interested** [4] - 8:19, 24:2, 116:25, 191:2
**internal** [1] - 12:15
**internet** [1] - 168:13
**interpret** [1] - 181:12
**interpreted** [1] - 10:16
**interruption** [1] - 82:7
**intertwined** [1] - 191:9
**interview** [1] - 130:11

**introduce** [4] - 3:15, 8:22, 144:1, 170:24
**introduced** [10] - 21:8, 21:10, 21:13, 37:21, 39:16, 92:13, 92:16, 92:19, 108:9, 111:10
**Introduced** [1] - 109:16
**introduction** [3] - 21:11, 23:11, 38:9
**introductions** [1] - 110:23
**investigative** [1] - 181:19
**invite** [1] - 184:21
**invoice** [4] - 43:25, 45:8, 47:2, 47:10
**involve** [2] - 158:24, 174:17
**involved** [18] - 8:19, 11:14, 20:2, 20:7, 21:7, 37:24, 37:25, 38:22, 54:24, 100:20, 110:23, 120:18, 130:12, 133:6, 158:24, 163:10, 177:21, 191:19
**involvement** [5] - 19:25, 123:19, 177:15, 190:4, 191:14
**involving** [1] - 24:20
**issue** [23] - 3:9, 5:4, 59:5, 59:9, 59:21, 59:24, 68:8, 68:10, 68:25, 72:22, 103:19, 169:22, 170:7, 170:10, 170:11, 171:19, 180:13, 181:3, 181:7, 181:20, 184:13, 191:8
**issued** [1] - 62:6
**issues** [11] - 4:6, 4:9, 85:20, 86:5, 86:12, 168:2, 181:9, 194:8, 200:19, 201:5, 201:6
**IT** [2] - 38:17, 38:18
**it'll** [2] - 182:3, 183:16
**itself** [2] - 4:7, 176:3

**J**

**jacket** [1] - 19:13
**jail** [1] - 163:2
**JAMIE** [1] - 1:13
**January** [3] - 96:3, 104:23, 114:5
**Jariwala** [4] - 77:8, 78:1, 78:8, 79:6
**job** [2] - 35:7, 119:21
**John** [2] - 68:4, 68:7
**joke** [2] - 152:25, 154:10
**joking** [1] - 152:19
**jovial** [1] - 24:2
**JUDGE** [1] - 1:10
**judge** [1] - 20:23
**judgment** [5] - 178:3, 184:6, 198:17, 199:17, 199:25
**Julien** [4] - 77:19, 77:21,

79:7, 80:14
**July** [2] - 125:10, 126:3
**June** [1] - 182:19
**juror** [1] - 3:2
**jurors** [10] - 6:15, 52:5, 85:20, 86:13, 156:17, 175:19, 184:21, 187:7, 190:3, 191:23
**JURY** [1] - 1:9
**jury** [43] - 6:16, 6:19, 17:18, 21:19, 51:23, 83:25, 84:5, 84:13, 86:17, 87:15, 117:5, 168:23, 171:13, 171:17, 173:20, 174:3, 175:3, 176:18, 177:1, 178:3, 178:6, 179:20, 180:25, 181:10, 181:11, 181:15, 181:17, 182:17, 183:10, 183:20, 183:22, 185:21, 186:6, 186:17, 186:23, 187:16, 188:12, 188:16, 189:25, 192:17, 200:21
**Jury** [8] - 6:17, 51:24, 52:7, 84:16, 86:18, 156:6, 156:19, 169:1
**JUSTICE** [1] - 1:15
**justify** [1] - 114:12

**K**

**KATHERINE** [1] - 1:14
**keep** [5] - 168:4, 185:24, 185:25, 186:13, 187:15
**Kefalas** [1] - 115:19
**key** [1] - 148:21
**kick** [2] - 170:23, 201:1
**kickback** [7] - 53:20, 93:18, 93:22, 118:23, 118:24, 119:3, 119:7
**kickbacks** [5] - 53:21, 93:9, 110:17, 110:18, 118:20
**kicked** [1] - 29:15
**kicking** [1] - 31:15
**kidding** [2] - 152:22, 153:7
**kind** [23] - 4:1, 4:6, 12:3, 24:9, 24:13, 29:13, 31:5, 31:13, 31:16, 33:13, 33:20, 35:10, 35:16, 72:24, 83:11, 102:8, 109:4, 113:9, 147:2, 184:20, 187:22, 191:8, 195:9
**kinds** [2] - 71:19, 191:25
**kit** [25] - 12:4, 12:8, 12:14, 12:25, 13:3, 13:8, 13:11, 30:3, 31:8, 31:12, 61:23, 61:25, 62:6, 64:17, 71:6, 137:15, 138:15, 138:19, 138:22, 139:8, 139:11, 139:12, 139:15, 140:5
**kits** [1] - 138:18
**knocked** [1] - 200:10

**knowing** [1] - 58:12
**knowledge** [1] - 93:17
**knowledgeable** [1] - 131:11
**known** [1] - 108:23
**knows** [2] - 171:17, 175:9
**Kristen** [1] - 73:6

## L

**L-o-n-g** [1] - 100:24
**lab** [43] - 20:9, 23:20, 26:9, 28:8, 55:10, 55:13, 55:21, 59:21, 59:25, 61:10, 62:7, 64:21, 67:18, 67:19, 67:22, 67:25, 70:5, 70:8, 70:16, 72:23, 75:12, 75:19, 76:1, 140:1, 140:6, 145:10, 146:7, 146:9, 147:13, 147:24, 147:25, 148:5, 152:16, 152:22, 153:25, 154:7, 154:14, 158:5, 158:6, 158:7
**lab's** [1] - 78:3
**laboratory** [3] - 19:22, 20:1
**LabSolutions** [67] - 23:17, 23:19, 24:6, 24:18, 25:14, 26:11, 26:14, 26:23, 28:11, 29:16, 30:9, 36:23, 37:16, 37:19, 38:9, 39:1, 40:6, 41:6, 43:19, 46:9, 46:12, 46:15, 50:22, 53:9, 53:22, 56:5, 65:6, 68:2, 69:8, 70:22, 74:10, 74:11, 74:13, 74:17, 77:10, 77:23, 78:4, 78:11, 81:9, 82:9, 106:20, 109:18, 109:21, 109:22, 109:23, 109:24, 110:16, 110:22, 115:22, 125:5, 125:12, 125:14, 125:24, 126:6, 126:10, 127:14, 129:1, 130:14, 131:1, 139:17, 148:1, 148:2, 153:14, 159:10, 161:9
**LabSolutions'** [1] - 78:2
**LabSolutions-generated**
[1] - 74:17
**lack** [3] - 191:20, 192:8, 192:13
**ladies** [5] - 6:19, 83:25, 86:20, 156:21, 167:16
**lady** [3] - 112:14, 112:21, 113:6
**laid** [3] - 112:10, 173:18, 173:19
**large** [9] - 23:9, 32:6, 54:5, 54:10, 59:5, 59:20, 59:21, 61:18, 172:1
**largely** [1] - 170:11
**last** [12] - 3:2, 26:19, 27:25, 62:7, 88:24, 125:8, 125:9, 144:25, 156:21, 183:23,

185:20, 194:22
**lasted** [2] - 80:1, 125:24
**latest** [2] - 196:5, 200:13
**Latoria** [2] - 81:4, 81:5
**Lauderdale** [1] - 1:24, 201:24
**launching** [1] - 21:15
**law** [9] - 18:22, 56:14, 56:24, 57:5, 93:23, 122:13, 131:11, 161:20, 165:13
**LAW** [1] - 1:18
**laws** [1] - 131:7
**lawyer** [29] - 58:1, 58:4, 58:13, 58:24, 91:18, 96:13, 96:19, 106:25, 108:6, 109:25, 113:22, 114:16, 117:6, 119:24, 122:1, 122:3, 122:6, 123:24, 124:5, 124:7, 124:14, 162:23, 164:12, 165:18, 165:21, 165:24, 182:6, 185:1
**lawyers** [37] - 6:7, 57:10, 84:8, 84:25, 100:20, 124:9, 164:7, 164:9, 164:11, 165:7, 166:2, 166:7, 166:11, 168:10, 168:21, 172:25, 173:1, 173:3, 173:10, 176:3, 177:16, 177:19, 177:20, 177:24, 178:1, 179:2, 180:24, 181:1, 181:16, 185:2, 190:24, 191:1, 191:4, 191:8, 192:3, 192:8
**lawyers's** [1] - 173:3
**lay** [1] - 178:22
**lead** [20] - 17:21, 17:22, 17:23, 18:9, 18:10, 18:12, 18:14, 24:10, 24:22, 24:23, 28:15, 28:23, 39:17, 88:25, 126:20, 161:24, 162:3, 169:5
**leading** [1] - 196:20
**leads** [35] - 18:1, 18:2, 18:5, 18:10, 18:15, 18:16, 21:16, 22:14, 22:23, 23:10, 24:3, 24:20, 25:1, 25:8, 25:9, 35:17, 39:19, 39:21, 39:24, 40:1, 41:4, 43:19, 43:20, 62:14, 67:6, 81:20, 108:9, 108:14, 109:14, 109:17, 145:9, 145:12, 145:22, 146:2, 162:10
**learn** [1] - 59:13
**least** [19] - 87:23, 88:17, 96:2, 96:18, 101:4, 119:13, 125:18, 172:15, 174:17, 180:10, 183:14, 183:25, 184:5, 188:19, 189:11, 190:6, 190:10, 190:11
**leave** [10] - 51:20, 84:5, 136:11, 156:3, 168:2, 168:23, 171:16, 175:3,

184:2, 186:6
**leaves** [1] - 185:21
**leeway** [1] - 186:14
**left** [8] - 51:22, 52:13, 53:12, 84:12, 132:2, 135:1, 171:13, 195:21
**Legal** [1] - 121:11
**legal** [33] - 86:5, 99:21, 105:1, 105:9, 105:17, 114:12, 114:23, 115:14, 118:9, 121:18, 121:24, 123:3, 123:11, 124:1, 124:20, 154:20, 162:25, 166:12, 171:9, 171:18, 172:14, 172:25, 173:16, 173:17, 174:17, 174:18, 175:5, 176:23, 176:24, 181:1, 181:4, 185:1, 186:2
**legality** [1] - 119:18
**legitimate** [1] - 159:5
**lend** [1] - 4:7
**length** [2] - 159:24, 195:8
**lengthy** [2] - 195:10, 197:21
**Lesline** [4] - 77:19, 77:21, 80:13, 80:18
**less** [6] - 58:23, 133:21, 133:25, 170:5, 170:19, 178:23
**lesser** [1] - 155:9
**letters** [1] - 81:18
**letting** [1] - 167:23
**level** [3] - 55:22, 78:10, 177:4
**licensed** [1] - 63:8
**lie** [17] - 56:21, 58:14, 93:6, 93:11, 95:8, 95:9, 95:13, 95:14, 95:15, 107:2, 110:2, 111:4, 111:15, 113:11, 162:9, 162:12, 165:15
**lied** [8] - 92:8, 92:10, 92:13, 97:21, 98:13, 161:21, 161:23
**lies** [4] - 95:17, 161:16, 163:8, 163:10
**LifeMD** [6] - 41:22, 43:15, 43:25, 44:20, 47:6, 47:19
**light** [2] - 75:15, 169:16
**likely** [2] - 170:9, 196:3
**limine** [2] - 3:10, 103:17
**limiting** [1] - 186:20
**line** [3] - 49:11, 69:22, 156:17
**lines** [4] - 62:3, 153:3, 192:3, 195:17
**lineup** [2] - 196:8, 197:9
**list** [8] - 35:4, 35:6, 35:10, 45:11, 51:13, 99:15, 105:25, 194:25
**List** [1] - 40:20
**listed** [3] - 27:5, 50:2, 50:5
**listened** [2] - 14:11, 15:11

**listening** [1] - 191:1
**live** [4] - 7:16, 17:10, 85:2, 188:10
**lived** [3] - 7:18, 17:12, 121:3
**lives** [1] - 36:2
**LLP** [1] - 2:5
**load** [1] - 54:10
**loan** [1] - 56:9
**locations** [3] - 146:20, 146:23, 154:2
**lock** [1] - 6:11
**Lockett** [1] - 81:7
**LOEB** [1] - 2:2
**look** [20] - 5:4, 79:19, 106:7, 144:18, 168:13, 168:19, 174:3, 177:3, 178:2, 186:12, 187:3, 188:6, 189:9, 189:22, 190:11, 190:12, 190:17, 191:7, 197:19, 199:11
**looked** [9] - 35:14, 44:3, 50:14, 51:6, 72:9, 73:25, 122:9, 158:21, 160:11
**looking** [16] - 28:21, 43:23, 47:12, 50:17, 60:25, 61:25, 62:21, 72:5, 75:9, 80:12, 124:19, 130:2, 194:16, 196:23, 197:12, 200:4
**looks** [11] - 5:21, 26:19, 27:25, 42:23, 44:1, 47:15, 73:20, 79:21, 188:24, 196:20, 196:23
**looped** [1] - 53:23
**Loper** [1] - 98:2
**Lopes** [1] - 36:8
**lose** [1] - 199:23
**losing** [1] - 197:7
**lost** [1] - 179:22
**loud** [1] - 197:6
**LSmanagement@
LabSolutions.com** [1] -
77:17
**lucky** [1] - 198:24
**lunch** [7] - 3:21, 84:2, 84:7, 84:13, 85:25, 86:20, 198:23
**LUPOWITZ** [2] - 1:21, 201:22
**Lupowitz** [1] - 201:22
**lying** [1] - 165:18

## M

**ma'am** [1] - 9:23
**MAC** [6] - 146:10, 146:12, 146:15, 147:1, 148:19, 157:8
**MACs** [3] - 146:18, 157:5, 157:15
**Mahmood** [8] - 178:13, 179:13, 182:2, 182:8,

182:11, 183:15, 183:19, 185:5
**mail** [2] - 12:11, 12:16
**mailed** [2] - 12:5, 12:19
**mailing** [1] - 71:3
**mailman** [1] - 75:20
**main** [4] - 28:19, 71:21, 194:7
**majority** [7] - 61:18, 65:22, 110:11, 133:15, 133:16, 133:18, 200:15
**male** [1] - 50:24
**managed** [1] - 107:21
**managing** [1] - 120:17
**manufacturers** [1] - 117:22
**Maple** [1] - 2:3
**Marc** [1] - 170:7
**March** [9] - 88:6, 129:24, 130:4, 131:16, 144:20, 146:5, 146:15, 148:25, 151:5
**marked** [1] - 13:12
**marker** [1] - 30:25
**markers** [4] - 46:4, 46:6, 46:8, 46:11
**marketing** [13] - 17:20, 26:9, 26:14, 27:23, 107:14, 107:15, 110:8, 110:24, 123:6, 166:3, 166:8
**Marketing** [5] - 21:1, 21:6, 36:8, 37:16, 38:23
**markings** [1] - 27:17
**Massachusetts** [1] - 85:1
**match** [1] - 51:5
**material** [2] - 170:16, 184:1
**materials** [2] - 31:17, 33:17
**Matt** [3] - 70:11, 70:13, 70:14
**matter** [4] - 127:2, 186:3, 193:3, 201:20
**matters** [3] - 4:5, 84:22, 118:9
**Matthew** [1] - 71:9
**McKeon** [50] - 27:2, 27:3, 27:6, 27:8, 27:11, 29:6, 29:8, 36:6, 36:19, 37:13, 42:24, 43:1, 53:14, 55:3, 58:5, 72:14, 95:4, 97:10, 97:13, 99:14, 99:19, 100:16, 101:16, 101:17, 106:21, 107:4, 107:6, 107:8, 107:15, 109:5, 109:10, 110:25, 112:17, 112:22, 113:17, 113:19, 113:20, 114:1, 141:21, 143:9, 143:16, 147:13, 147:19, 148:3, 148:13, 161:10, 196:7, 196:14, 196:18, 198:5
**McKeon's** [7] - 36:20, 99:16, 99:20, 107:14, 109:8, 109:12, 124:5

**mean** [52] - 18:9, 20:6, 22:6, 35:18, 45:18, 45:24, 50:21, 65:25, 68:15, 83:5, 91:9, 100:8, 133:11, 134:2, 138:7, 139:20, 139:25, 149:14, 150:22, 151:21, 153:3, 153:5, 171:3, 174:19, 176:3, 176:4, 176:7, 176:11, 177:5, 177:14, 177:22, 178:2, 179:1, 180:1, 180:4, 180:7, 180:14, 184:5, 190:2, 191:12, 191:16, 191:18, 192:4, 192:15, 193:25, 198:1, 198:21, 198:22, 198:24, 199:13, 199:14
**meaning** [5] - 74:4, 139:14, 163:15, 194:19, 198:3
**means** [7] - 50:18, 54:19, 55:25, 91:11, 137:20, 197:13, 197:17
**meant** [7] - 46:10, 90:3, 111:1, 111:13, 126:11, 151:8, 154:11
**Media** [1] - 108:1
**media** [2] - 84:10, 168:10
**medical** [22] - 11:25, 26:15, 31:5, 31:13, 33:23, 34:2, 35:10, 35:11, 147:20, 148:6, 148:21, 148:22, 149:7, 149:9, 149:13, 149:18, 149:24, 150:3, 157:5, 158:9, 158:10, 158:11
**medically** [2] - 83:20, 158:4
**Medicare** [54] - 8:5, 8:6, 8:8, 19:2, 19:5, 20:9, 22:11, 22:13, 22:16, 22:17, 23:3, 24:16, 25:2, 25:3, 28:18, 28:23, 29:19, 30:11, 35:19, 47:25, 48:1, 48:2, 59:12, 61:6, 61:12, 61:13, 66:14, 67:9, 67:11, 68:22, 74:14, 110:19, 118:14, 119:19, 121:23, 121:24, 130:19, 130:23, 131:5, 147:20, 148:6, 148:23, 157:11, 157:12, 157:13, 158:4, 158:22, 161:25, 162:7, 162:10, 165:15, 165:18, 166:17, 197:23
**meet** [8] - 21:17, 39:3, 46:15, 55:10, 65:21, 67:14, 138:12, 184:24
**meeting** [20] - 21:19, 23:14, 23:19, 24:4, 24:14, 25:10, 28:3, 28:5, 28:7, 29:5, 58:7, 96:4, 96:5, 112:13, 113:1, 121:7, 121:15, 166:22, 168:3, 182:22
**meetings** [3] - 131:1, 166:18, 179:16

**member** [1] - 10:6
**members** [1] - 66:17
**memorandum** [1] - 178:17
**memory** [3] - 71:15, 73:22, 79:10
**men's** [1] - 7:25
**mentioned** [19] - 10:23, 11:23, 23:4, 30:14, 33:22, 35:13, 36:3, 37:21, 38:15, 54:23, 63:22, 67:14, 76:20, 79:22, 100:22, 112:14, 112:21, 169:18, 194:9
**mentioning** [1] - 10:5
**message** [12] - 119:7, 144:22, 179:12, 184:3, 184:5, 184:25, 186:5, 186:13, 187:15, 188:1, 188:22, 191:8
**messages** [3] - 144:2, 144:21, 192:5
**met** [19] - 21:21, 25:5, 32:17, 38:17, 56:11, 58:5, 67:18, 91:16, 111:10, 120:22, 120:23, 121:3, 121:13, 123:22, 138:16, 162:14
**Miami** [5] - 1:3, 12:16, 13:17, 16:7, 16:12
**Miano** [1] - 182:21
**Michael** [5] - 81:7, 144:24, 194:11, 194:16
**microphone** [2] - 7:8, 17:5
**middle** [1] - 117:8
**might** [15] - 10:15, 79:19, 87:7, 87:24, 95:25, 99:11, 99:12, 143:17, 171:14, 173:22, 183:8, 185:16, 194:20, 195:23, 195:25
**Mike** [3] - 55:16, 55:17, 56:2, 88:24, 88:25, 89:3, 108:1, 108:15, 108:21, 110:25, 145:3, 146:1
**million** [3] - 109:17, 109:18, 125:9
**Minal** [99] - 15:3, 19:19, 19:21, 19:22, 21:7, 21:11, 21:13, 21:14, 21:20, 21:21, 22:1, 23:5, 23:12, 23:13, 23:16, 23:18, 24:1, 25:14, 27:2, 28:4, 29:3, 29:5, 31:15, 32:9, 32:17, 32:24, 34:1, 34:22, 35:13, 37:12, 39:16, 41:9, 43:6, 43:9, 43:11, 48:8, 48:14, 51:6, 53:3, 53:7, 54:11, 55:5, 57:9, 57:19, 57:20, 57:22, 58:12, 58:19, 58:24, 59:6, 59:16, 60:21, 60:22, 60:23, 66:25, 67:13, 67:14, 68:1, 68:5, 68:6, 68:8, 68:13, 68:19, 69:6, 70:15,

70:22, 71:12, 71:23, 72:15, 72:19, 75:17, 76:1, 76:6, 76:20, 76:23, 79:5, 79:12, 111:9, 111:10, 114:18, 129:14, 135:14, 142:6, 142:7, 142:9, 153:14, 157:17, 157:18, 158:8, 161:10, 164:21, 164:22, 164:25, 165:2, 165:6, 166:7
**MINAL** [1] - 1:6
**Minal's** [5] - 26:11, 58:19, 77:9, 114:20, 123:7
**mind** [3] - 68:23, 68:24, 184:9
**minority** [2] - 110:7
**minute** [4] - 6:11, 120:24, 125:3, 150:15
**minutes** [4] - 156:1, 167:22, 167:24, 182:3
**misinterpret** [2] - 186:24, 187:17
**misinterprets** [1] - 177:1
**misleading** [2] - 165:21, 177:9
**Missed** [1] - 71:4
**missed** [1] - 69:25
**missing** [13] - 61:18, 62:11, 80:20, 81:20, 81:21, 81:23, 82:4, 82:15, 82:16, 136:5, 136:16, 141:15, 141:17
**misunderstand** [1] - 186:24
**misunderstood** [1] - 108:24
**mixture** [2] - 95:17, 95:18
**MO** [1] - 101:7
**model** [4] - 23:1, 29:11, 98:17, 112:2
**Mojo** [1] - 108:1
**molecular** [1] - 51:10
**Molecular** [1] - 147:16
**moment** [4] - 33:22, 72:6, 80:17, 82:19
**Monday** [12] - 193:18, 196:5, 198:3, 198:5, 198:8, 198:11, 198:17, 198:23, 199:21, 200:12, 200:13
**money** [14] - 53:6, 53:18, 54:12, 54:15, 54:18, 54:22, 55:11, 74:16, 83:16, 158:1, 161:8, 161:13, 163:8
**monster** [1] - 27:12
**month** [4] - 47:3, 47:4, 99:10
**monthly** [2] - 54:6, 54:7
**months** [6] - 32:19, 80:2, 99:3, 99:5, 99:11, 125:25
**mooted** [1] - 171:25
**Moranz** [18] - 108:1, 108:4, 108:6, 108:9, 108:18, 108:21, 109:1, 109:3, 109:5,

109:16, 145:3, 145:16, 145:17, 145:18, 145:25, 146:1

**Moranz'** [2] - 108:1, 108:15
**MORNAZ** [1] - 88:24
**Mornaz** [2] - 88:25, 89:8
**morning** [19] - 3:8, 6:18, 7:14, 7:15, 14:25, 15:1, 17:9, 36:4, 75:11, 79:22, 160:11, 167:20, 169:17, 170:20, 185:4, 187:23, 194:6, 198:21, 200:5
**morning's** [1] - 172:1
**Morrison** [1] - 11:10
**mortar** [1] - 166:4
**mortgages** [1] - 18:3
**most** [8] - 3:23, 4:10, 23:24, 68:23, 76:14, 134:23, 167:21, 192:16
**mostly** [1] - 184:15
**mother** [1] - 81:13
**motion** [3] - 6:5, 103:16, 197:8
**motions** [2] - 3:10, 171:18
**motivated** [3] - 176:19, 178:7
**motivations** [1] - 181:8
**mouth** [3] - 12:15, 30:4, 166:25
**move** [30] - 8:21, 25:17, 31:21, 34:7, 36:11, 37:2, 40:10, 41:24, 44:23, 46:23, 54:12, 60:3, 69:11, 74:21, 80:7, 95:20, 103:24, 104:5, 115:24, 132:23, 133:4, 133:8, 133:13, 133:21, 137:4, 138:8, 145:13, 147:4, 150:22, 171:20
**moved** [1] - 36:12
**moving** [3] - 61:9, 61:14, 168:4
**MR** [80] - 5:9, 5:11, 6:4, 6:12, 8:25, 14:24, 25:19, 85:12, 86:14, 86:24, 87:1, 90:13, 90:16, 90:20, 90:22, 100:24, 100:25, 103:4, 103:5, 103:19, 103:23, 103:25, 104:3, 104:4, 115:24, 116:4, 116:6, 116:11, 116:14, 120:12, 126:15, 126:18, 127:20, 127:22, 128:19, 128:20, 128:24, 128:25, 131:20, 131:23, 131:25, 140:13, 140:14, 144:1, 144:7, 144:10, 147:3, 147:9, 147:11, 150:15, 150:18, 150:21, 151:3, 152:12, 152:14, 155:23, 170:21, 172:21, 178:10, 178:13,

181:18, 188:20, 189:1, 189:4, 189:6, 189:10, 189:16, 189:19, 190:6, 190:9, 190:21, 190:23, 193:8, 193:15, 193:23, 194:2, 195:15, 196:12, 199:19, 201:11
**MS** [125] - 3:6, 4:15, 4:18, 5:8, 5:24, 7:1, 7:10, 7:13, 8:21, 9:3, 9:7, 9:9, 9:11, 10:19, 11:9, 11:21, 14:20, 16:17, 16:19, 16:23, 17:8, 19:14, 19:17, 25:16, 25:24, 26:2, 26:4, 31:20, 32:1, 32:4, 34:6, 34:11, 34:14, 34:16, 36:10, 36:15, 37:1, 37:6, 37:9, 40:9, 40:14, 40:16, 41:23, 42:5, 42:7, 44:22, 45:3, 45:5, 48:24, 49:4, 52:11, 52:12, 60:2, 60:7, 60:10, 69:10, 69:16, 69:19, 74:20, 74:25, 75:2, 75:4, 78:19, 78:21, 80:6, 80:11, 82:18, 82:21, 83:23, 85:9, 85:15, 85:22, 85:24, 103:2, 103:12, 103:16, 116:2, 120:7, 131:22, 144:3, 147:6, 150:24, 156:16, 157:1, 157:3, 160:2, 160:5, 160:6, 160:14, 160:15, 163:18, 163:21, 167:2, 167:10, 167:12, 169:7, 169:11, 169:14, 170:2, 171:3, 171:11, 175:2, 175:15, 175:24, 176:12, 176:21, 180:14, 185:5, 188:3, 190:18, 192:25, 193:6, 194:11, 194:15, 194:21, 195:2, 195:4, 195:12, 195:25, 196:9, 197:1, 199:3, 199:7, 200:8, 201:8
**multiple** [12] - 20:7, 25:11, 28:15, 29:9, 60:16, 65:21, 66:16, 68:3, 129:11, 129:13, 153:6, 183:5
**must** [1] - 135:1
**MyOnCallDoc** [31] - 41:22, 42:10, 42:18, 42:21, 43:8, 43:9, 44:20, 47:5, 47:13, 47:18, 101:3, 101:5, 101:8, 101:9, 101:10, 101:11, 101:15, 101:16, 103:6, 103:19, 107:23, 137:21, 137:23, 137:25, 138:5, 138:19, 150:12, 151:11, 151:12, 152:10, 160:12

---

# N

**name** [36] - 7:8, 13:2, 13:20, 15:2, 17:5, 19:18,

20:24, 21:2, 21:3, 23:16, 28:17, 34:20, 36:7, 40:22, 49:11, 50:8, 52:23, 53:19, 54:25, 55:15, 70:1, 87:4, 88:24, 90:4, 94:22, 95:21, 108:13, 112:14, 112:21, 132:5, 144:24, 144:25, 145:25, 165:13, 170:7
**named** [7] - 32:13, 38:15, 39:3, 54:23, 79:23, 100:22, 165:9
**names** [6] - 35:4, 36:3, 41:21, 45:13, 45:14, 82:14
**narrow** [1] - 170:9
**narrowed** [1] - 94:2
**national** [1] - 117:21
**nature** [2] - 137:16, 187:10
**NE** [1] - 2:3
**near** [1] - 89:19
**necessarily** [4] - 172:17, 183:24, 184:8, 198:16
**necessary** [6] - 9:2, 31:2, 83:20, 101:15, 148:6, 158:4
**necessity** [13] - 147:20, 148:6, 148:21, 148:22, 149:7, 149:9, 149:13, 149:19, 149:24, 150:3, 157:5, 158:9, 158:11
**need** [24] - 13:14, 19:12, 80:13, 81:20, 121:2, 147:3, 156:8, 165:18, 165:21, 165:24, 170:13, 172:19, 179:5, 184:8, 188:19, 189:8, 193:5, 193:18, 195:3, 196:6, 197:8, 198:13, 199:23, 201:6
**needed** [11] - 59:19, 66:6, 66:23, 69:3, 76:24, 86:2, 149:12, 158:3, 158:22, 167:22, 172:13
**needing** [2] - 163:12, 184:25
**needs** [5] - 173:18, 180:25, 181:17, 182:5, 187:25
**NEF** [1] - 84:24
**nefarious** [6] - 174:9, 175:5, 175:11, 175:19, 176:18, 178:8
**negate** [1] - 186:21
**negated** [1] - 187:18
**negates** [1] - 184:20
**negative** [10] - 46:3, 46:4, 46:6, 46:17, 46:19, 48:22, 151:8, 151:18, 151:25
**nervous** [1] - 114:21
**never** [17] - 13:11, 14:8, 34:4, 59:3, 59:4, 83:10, 83:22, 102:24, 103:19, 109:22, 110:21, 113:12, 129:25, 138:22, 178:19, 179:22

**new** [5] - 21:15, 34:24, 145:12, 145:14, 164:18
**New** [1] - 1:16
**next** [31] - 4:17, 6:24, 6:25, 12:18, 13:9, 13:11, 13:16, 16:22, 31:7, 61:22, 88:6, 88:8, 96:5, 107:4, 109:17, 110:6, 110:14, 127:4, 127:13, 128:19, 132:18, 133:4, 133:9, 133:13, 133:21, 137:5, 137:8, 137:13, 145:23, 200:3, 200:25
**Ngo** [1] - 81:4
**nice** [1] - 6:20
**Nicholas** [5] - 32:13, 40:17, 76:15, 80:18, 81:9
**Nick** [16] - 68:5, 68:7, 105:12, 114:23, 115:4, 115:6, 115:23, 117:2, 117:13, 117:17, 124:10, 125:19, 126:5, 157:17, 157:18, 158:8
**Nicks** [1] - 115:5
**night** [1] - 196:13
**nine** [3] - 99:5, 99:10, 99:11
**nine-month** [1] - 99:10
**NO** [1] - 1:2
**no-show** [1] - 47:15
**nobody** [1] - 139:23
**none** [2] - 82:3, 82:10
**normal** [1] - 11:25
**notation** [1] - 13:15
**note** [4] - 73:10, 84:23, 171:5, 199:4
**noted** [1] - 169:21
**notepads** [5] - 6:23, 51:20, 84:5, 156:3, 168:23
**notes** [7] - 79:4, 87:12, 87:13, 150:18, 151:22, 190:7, 190:9
**nothing** [11] - 14:20, 83:23, 115:20, 135:22, 151:25, 167:2, 178:16, 178:17, 189:13, 189:20
**nothing.com** [1] - 50:5
**noticed** [1] - 15:11
**November** [13] - 73:15, 87:20, 88:4, 88:10, 88:14, 96:8, 96:18, 99:25, 104:6, 105:23, 106:13, 111:25, 113:22
**number** [24] - 3:11, 13:17, 16:12, 16:13, 27:5, 27:8, 28:18, 47:14, 50:2, 59:5, 59:20, 59:21, 65:23, 65:25, 70:2, 71:5, 89:10, 130:25, 137:22, 159:11, 159:12, 185:12
**numerous** [2] - 124:15,

182:20
**NW** [1] - 1:18
**NYC.com** [1] - 116:20

# O

**o'clock** [1] - 167:13
**O'Meara** [3] - 70:11, 70:13, 71:10
**OBERHEIDEN** [1] - 115:9
**Oberheiden** [4] - 105:13, 115:7, 124:10, 126:5
**objection** [18] - 8:25, 25:18, 31:23, 34:8, 36:13, 37:3, 40:11, 42:1, 44:25, 60:4, 69:13, 80:9, 103:2, 116:1, 144:3, 147:5, 147:6, 150:23
**objections** [1] - 25:21
**obligated** [1] - 180:15
**obligation** [2] - 177:7, 178:4
**obligations** [4] - 176:10, 178:5, 180:19, 187:13
**observance** [1] - 38:1
**observed** [1] - 59:1
**obtain** [2] - 24:25, 28:14
**obtained** [1] - 28:12
**obtaining** [2] - 22:22, 28:11
**obviously** [12] - 59:23, 67:7, 72:1, 128:21, 171:11, 175:21, 185:15, 185:18, 186:1, 188:20, 190:25, 192:5
**occasion** [3] - 92:7, 92:21, 118:6
**occasions** [2] - 129:11, 129:13
**October** [12] - 73:17, 73:21, 88:8, 90:12, 93:17, 94:2, 94:8, 94:19, 95:24, 120:25, 121:1, 121:6
**odd** [1] - 180:9
**OF** [5] - 1:1, 1:3, 1:9, 1:15, 1:18
**offense** [2] - 84:9, 168:12
**offered** [4] - 3:14, 19:22, 184:11, 189:14
**OFFICE** [1] - 1:18
**office** [1] - 110:24
**OFFICER** [5] - 6:16, 51:23, 52:6, 86:17, 156:18
**Official** [2] - 1:22, 201:23
**often** [6] - 46:25, 65:18, 67:19, 70:25, 71:1, 71:17
**old** [1] - 8:2
**older** [1] - 121:3
**Omar** [3] - 75:14, 76:11, 125:19
**once** [14] - 29:14, 30:1, 30:5, 30:10, 30:11, 47:3, 53:10, 53:22, 61:17, 61:21,

76:1, 136:22, 136:23, 141:2
**one** [79] - 3:23, 5:9, 6:9, 14:4, 15:2, 15:19, 15:20, 15:22, 30:25, 46:23, 51:8, 51:14, 55:20, 58:7, 68:8, 68:22, 74:1, 78:5, 82:19, 84:9, 87:22, 88:2, 88:8, 88:17, 104:7, 105:14, 105:18, 107:12, 108:14, 109:20, 113:3, 114:15, 118:6, 118:24, 122:3, 123:5, 124:9, 127:13, 129:3, 129:4, 129:12, 134:1, 134:8, 136:13, 137:12, 139:1, 140:13, 140:15, 146:2, 147:9, 152:18, 154:9, 158:15, 161:1, 161:23, 168:8, 170:4, 170:18, 171:4, 172:6, 174:1, 174:3, 175:16, 178:9, 182:18, 182:24, 183:23, 185:6, 193:13, 194:7, 194:10, 196:1, 196:15, 198:22, 199:4, 199:10
**ones** [4] - 5:14, 90:4, 149:5, 158:11
**online** [3] - 18:10, 18:11, 122:9
**open** [1] - 104:1, 167:15, 170:9
**opening** [1] - 171:7
**operating** [2] - 148:15, 154:4
**operation** [3] - 99:20, 107:5, 107:8
**operations** [1] - 101:2
**opinion** [3] - 114:16, 115:23, 118:9
**opinions** [1] - 105:1, 105:9, 105:17
**opportunity** [4] - 55:5, 55:9, 92:2, 96:11
**opposed** [2] - 5:16, 118:23
**opt** [4] - 24:20, 24:22, 24:25, 25:9
**Opt** [1] - 24:23
**opt-in** [4] - 24:20, 24:22, 24:25, 25:9
**Opt-in** [1] - 24:23
**opting** [1] - 62:25
**option** [3] - 51:11, 63:10, 63:14
**options** [2] - 10:14, 51:10
**oral** [1] - 176:22
**order** [6] - 70:17, 70:19, 72:10, 73:4, 80:21, 180:12
**Order** [1] - 3:1
**ordered** [2] - 59:3, 71:20
**ordering** [1] - 48:21
**orders** [6] - 44:15, 95:12,

95:14, 110:19, 159:16, 161:13
**organization** [1] - 10:6
**original** [7] - 25:10, 46:20, 59:8, 59:9, 64:11, 64:12, 151:15
**originally** [1] - 38:17
**originals** [1] - 78:15
**Orr** [6] - 36:25, 55:1, 58:5, 112:19, 196:2, 198:5
**ORR** [1] - 112:19
**orthopedic** [1] - 117:20
**otherwise** [1] - 173:20
**out-of-pocket** [2] - 11:3, 35:22
**outside** [10] - 57:11, 68:20, 166:8, 168:18, 183:20, 183:22, 197:19, 198:3, 198:7
**outweighed** [2] - 184:14, 184:15
**ovarian** [1] - 51:15
**overlap** [1] - 32:18
**override** [3] - 38:1, 38:3, 38:4
**overruled** [2] - 103:24, 120:8
**oversaw** [1] - 20:10
**overview** [2] - 24:7, 24:8
**overwhelmed** [1] - 13:6
**own** [7] - 39:16, 40:2, 40:6, 59:11, 63:7, 78:2, 188:12
**owned** [3] - 107:18, 115:16, 115:17
**owner** [5] - 29:9, 55:9, 55:12, 110:7, 153:14
**owners** [1] - 110:7
**owning** [1] - 19:25

# P

**p.m** [11] - 1:5, 84:16, 85:17, 85:18, 86:18, 156:6, 156:13, 156:14, 156:19, 169:1, 201:16
**package** [8] - 12:12, 30:6, 30:8, 62:1, 62:6, 62:7, 64:17, 64:19
**page** [9] - 26:19, 27:25, 33:16, 42:14, 90:12, 121:2, 130:2, 170:3, 170:11
**Pages** [1] - 1:7
**paid** [47] - 19:3, 19:4, 22:7, 34:25, 36:25, 38:7, 38:24, 38:25, 39:1, 40:3, 40:6, 48:1, 53:8, 53:9, 53:11, 53:12, 53:16, 53:17, 54:20, 59:11, 59:23, 60:19, 67:8, 68:22, 82:2, 82:4, 82:17, 83:5, 97:16, 102:1, 102:12, 102:13, 109:4, 109:18,

109:23, 117:20, 118:19, 118:20, 122:21, 131:4, 139:4, 161:7, 161:24, 162:3, 162:6, 162:9
**Palm** [1] - 17:15
**PALM** [1] - 1:2
**Palmer** [2] - 110:7, 110:10
**panel** [1] - 51:14
**paperwork** [11] - 16:2, 30:2, 30:3, 59:8, 59:9, 59:22, 60:1, 69:3, 183:16, 183:20, 183:24
**parenthesis** [1] - 108:4
**Part** [2] - 148:8, 148:9
**part** [8] - 12:15, 72:4, 93:3, 101:4, 110:15, 117:2, 134:23, 171:20
**participated** [1] - 19:6
**particular** [18] - 24:24, 30:18, 32:23, 39:19, 47:19, 48:4, 58:25, 59:7, 66:9, 70:21, 70:24, 73:22, 79:10, 163:10, 175:3, 175:17, 181:7, 192:2
**partner** [4] - 109:10, 109:12, 110:7, 110:11
**partnered** [1] - 29:6
**partners** [1] - 27:4
**partnership** [1] - 29:12
**party** [3] - 115:16, 115:17, 115:18
**pass** [1] - 9:5
**passed** [1] - 12:24
**past** [1] - 84:6
**Patel** [123] - 3:12, 15:3, 19:19, 19:21, 21:7, 21:13, 21:17, 21:20, 22:1, 22:13, 23:6, 23:13, 23:18, 24:25, 25:8, 25:14, 26:17, 26:22, 27:2, 28:4, 28:9, 29:5, 29:14, 31:16, 32:9, 32:24, 33:18, 34:1, 34:22, 35:14, 36:21, 37:12, 37:22, 41:9, 43:6, 43:9, 47:1, 48:14, 51:6, 53:3, 53:7, 54:8, 54:11, 55:6, 57:19, 57:21, 58:13, 65:15, 66:4, 66:25, 67:13, 67:15, 68:6, 68:14, 68:19, 70:15, 70:22, 71:12, 71:23, 72:15, 72:19, 74:6, 75:17, 76:6, 76:20, 76:23, 79:7, 80:4, 81:15, 82:24, 92:14, 92:17, 92:19, 98:7, 100:17, 111:9, 114:18, 121:13, 121:22, 122:15, 125:10, 126:19, 126:22, 127:6, 128:2, 128:4, 128:8, 128:14, 129:8, 129:14, 129:19, 135:14, 135:22, 140:22, 142:6, 142:7, 142:9, 152:15, 153:14, 159:24, 161:11,

164:22, 164:25, 165:2,
165:6, 166:7, 169:19, 170:6,
172:9, 172:16, 173:11,
173:17, 174:18, 177:25,
179:1, 179:5, 181:1, 181:21,
182:20, 185:23, 186:1,
186:16, 192:14

**PATEL** [1] - 1:6

**Patel's** [12] - 3:15, 23:16,
24:1, 100:12, 117:6, 121:3,
121:16, 121:17, 131:13,
154:7, 166:2, 171:9

**patient** [86] - 20:8, 22:15,
22:16, 24:11, 24:17, 25:12,
28:22, 29:23, 30:1, 30:4,
30:5, 30:16, 33:1, 33:7, 44:5,
49:23, 50:10, 50:13, 52:23,
53:1, 60:17, 61:1, 61:8,
61:14, 61:15, 61:17, 61:21,
61:24, 62:2, 62:24, 63:7,
63:22, 63:23, 64:3, 64:16,
64:17, 66:21, 69:25, 70:16,
70:17, 70:24, 71:4, 71:13,
71:15, 71:17, 72:1, 72:7,
72:9, 72:17, 72:18, 73:10,
73:18, 74:2, 74:4, 79:12,
82:7, 82:8, 83:12, 102:13,
132:10, 132:13, 132:17,
136:18, 137:15, 138:6,
138:15, 139:12, 139:20,
139:21, 140:4, 141:5, 142:1,
142:23, 147:20, 148:7,
148:23, 150:9, 151:15,
158:14, 159:3, 163:13,
163:16, 164:19

**patient's** [10] - 28:17, 50:8,
62:1, 63:9, 63:12, 63:13,
64:2, 64:17, 83:8, 139:16

**patients** [48] - 18:24, 19:1,
19:2, 19:24, 21:16, 21:25,
22:17, 24:3, 27:19, 27:23,
28:13, 33:12, 34:19, 39:17,
39:21, 40:2, 41:4, 41:13,
43:21, 44:10, 46:10, 46:18,
46:19, 47:25, 52:25, 53:4,
59:2, 59:4, 63:10, 64:5, 69:7,
69:8, 72:16, 73:2, 77:3, 81:1,
83:20, 98:8, 157:21, 159:5,
161:5, 161:6, 163:12,
164:25, 165:2, 165:4,
165:22, 166:16

**patients'** [1] - 79:4

**Patrick** [2] - 98:5, 115:1

**pause** [1] - 145:9

**paused** [5] - 9:19, 10:4,
10:18, 11:8, 11:20

**pay** [6] - 74:16, 93:9, 93:23,
114:24, 117:25, 161:11

**payday** [1] - 56:9

**paying** [11] - 93:18, 94:9,

94:16, 118:13, 118:14,
121:23, 159:21, 159:22,
161:4, 161:5

**payment** [1] - 53:19

**payments** [6] - 36:24,
59:12, 92:9, 97:9, 110:20, 110:21,
130:22

**PC** [2] - 1:18, 2:2

**peace** [1] - 184:9

**Peachtree** [1] - 1:18

**Peactree** [1] - 2:5

**PECOS** [5] - 47:21, 47:22,
47:23, 48:5, 63:8

**people** [22] - 30:5, 36:5,
89:25, 90:3, 90:5, 98:2,
133:12, 133:13, 136:1,
137:23, 137:25, 143:7,
150:11, 153:25, 154:2,
168:13, 177:14, 180:19

**per** [8] - 22:7, 22:9, 44:1,
73:10, 79:4, 161:24, 162:3

**per-lead** [2] - 161:24, 162:3

**per-sample** [1] - 161:24

**percent** [16] - 44:20, 74:19,
133:17, 133:18, 133:19,
133:20, 133:21, 133:25,
137:8, 137:9, 137:12,
137:17, 137:22, 138:1,
159:14, 176:21

**percentage** [28] - 19:4,
22:20, 30:12, 38:4, 38:5,
38:8, 44:16, 53:9, 53:11,
53:15, 53:16, 54:20, 56:3,
59:12, 97:10, 97:17, 131:5,
133:8, 133:10, 133:11,
133:14, 134:5, 134:6, 137:8,
137:11, 137:17, 162:6, 162:9

**percentages** [2] - 130:23,
134:4

**perfect** [3] - 176:2, 197:4,
198:24

**perform** [1] - 48:18

**performed** [6] - 43:22, 44:8,
45:8, 46:1, 46:21, 83:22

**perhaps** [3] - 35:9, 180:5,
183:25

**period** [15] - 27:9, 57:9,
65:18, 65:24, 67:21, 74:10,
95:24, 98:25, 99:10, 100:19,
104:20, 114:2, 120:3,
143:23, 148:16

**permissible** [4] - 117:22,
118:16, 146:6, 146:21

**permission** [7] - 26:2, 32:1,
34:11, 37:6, 60:7, 69:16,
90:19

**permitted** [1] - 146:5

**person** [23] - 9:24, 14:12,
19:9, 24:23, 29:20, 31:12,
32:14, 36:16, 38:11, 39:6,

48:7, 65:20, 67:15, 77:12,
83:12, 120:22, 120:23,
121:15, 121:21, 132:21,
139:1, 164:12

**person's** [3] - 28:17, 55:15,
70:1

**personal** [23] - 4:6, 10:20,
15:7, 19:25, 28:17, 32:11,
44:6, 91:21, 136:24, 145:11,
145:12, 146:6, 146:13,
147:20, 148:7, 148:23,
149:8, 149:15, 150:3, 150:9,
150:13, 157:22, 158:3

**personally** [2] - 75:21,
75:23

**perspective** [1] - 183:1

**pertaining** [1] - 182:21

**Petron** [3] - 194:11,
194:13, 194:17, 194:20,
197:18, 197:21, 198:4,
198:19, 199:13, 199:14,
200:4, 200:10, 200:11

**PGx** [1] - 128:21

**phases** [1] - 137:5

**phone** [28] - 8:14, 12:1,
12:2, 12:3, 13:1, 13:13,
13:19, 14:4, 16:12, 16:13,
18:13, 27:5, 28:17, 29:20,
49:23, 65:20, 65:23, 65:25,
70:2, 71:5, 86:1, 102:13,
121:17, 121:21, 133:1,
134:14, 134:20, 181:6

**phones** [1] - 38:19

**photograph** [1] - 39:5

**physically** [2] - 121:7,
121:14

**physician** [2] - 63:8, 83:8

**physicians** [1] - 26:15

**pick** [3] - 12:25, 51:21,
84:12

**picked** [2] - 139:16, 140:5

**picking** [1] - 140:1

**picks** [1] - 62:6

**pickup** [3] - 30:8, 139:15,
140:2

**picture** [4] - 65:3, 162:22,
163:25, 164:23

**piece** [8] - 55:24, 109:6,
109:8, 141:15, 174:4,
186:22, 192:9

**pieces** [3] - 20:3, 20:4, 43:2

**pin** [1] - 5:3

**pitch** [3] - 35:15, 35:16,
77:3

**pivot** [1] - 169:16

**place** [5] - 39:18, 40:1,
62:15, 83:22, 173:11

**placed** [1] - 159:19

**places** [1] - 168:13

**plan** [9] - 4:13, 6:8, 24:25,

25:2, 46:8, 169:9, 175:21,
195:21, 200:24

**planned** [1] - 167:23

**plans** [1] - 5:7

**play** [4] - 9:9, 35:25,
170:17, 174:7

**playbook** [1] - 172:15

**played** [3] - 185:13, 185:16,
190:1

**playing** [3] - 170:18,
170:22, 182:24

**plea** [7] - 20:11, 57:2,
96:21, 129:18, 155:6, 155:13

**plead** [1] - 18:19

**pleasure** [1] - 67:23

**pled** [2] - 18:17, 163:4

**pocket** [2] - 11:3, 35:22

**point** [30] - 3:6, 3:8, 5:5,
8:10, 12:3, 14:8, 23:25,
51:16, 83:9, 92:24, 95:21,
111:11, 125:11, 126:4,
132:2, 138:4, 138:8, 146:15,
157:21, 170:3, 176:13,
176:15, 177:1, 180:2,
181:20, 184:4, 191:11,
196:23, 200:1, 200:21

**pointed** [3] - 136:15,
169:19, 188:7

**points** [1] - 24:15

**policy** [2] - 187:20

**poorly** [1] - 149:2

**populated** [1] - 63:12

**portal** [4] - 64:3, 75:25,
76:3, 76:15

**portion** [3] - 53:18, 54:21,
170:4

**portray** [1] - 163:25

**posed** [1] - 191:19

**position** [4] - 3:13, 91:13,
93:11, 200:14

**positive** [5] - 46:8, 46:11,
151:17, 151:25, 152:5

**possibility** [3] - 22:22,
185:3, 199:15

**possible** [7] - 41:13, 54:11,
169:13, 187:5, 194:18,
197:20, 200:1

**possibly** [1] - 36:2

**post** [1] - 114:4

**postproffer** [1] - 114:4

**potential** [9] - 4:2, 29:22,
39:17, 44:5, 138:5, 170:10,
179:13, 181:10, 196:1

**potentially** [5] - 3:15,
82:24, 86:4, 137:2, 137:14

**Practice** [1] - 78:24

**practice** [2] - 174:12,
174:16

**practices** [1] - 26:16

**precise** [1] - 89:14

precluded [1] - 179:23
predicate [4] - 173:18, 178:22, 179:6, 179:19
preexisting [1] - 66:16
prefer [1] - 188:11
preference [1] - 90:16
prejudice [3] - 181:11, 184:15, 184:16
prejudicial [1] - 186:22
preliminary [1] - 29:13
premature [2] - 4:20, 171:6
prenatal [3] - 33:20, 51:3, 51:5
preparation [2] - 169:3, 196:16
prepared [2] - 87:13, 88:19
prepopulated [2] - 50:17, 64:11
prequalified [1] - 137:4
prescreened [1] - 150:12
prescription [3] - 93:9, 93:19, 93:24
prescriptions [2] - 47:24, 129:25
presence [2] - 183:20, 183:22
present [5] - 3:3, 96:13, 96:16, 112:13, 134:20
presents [1] - 8:15
preshipment [1] - 64:15
presume [1] - 194:5
pretrial [1] - 186:12
pretty [5] - 15:9, 110:4, 185:17, 188:16, 191:5
prevalence [1] - 117:18
prevent [2] - 81:24, 82:1
prevented [1] - 59:22
previously [2] - 87:4, 191:3
primary [2] - 68:2, 70:19
priority [3] - 69:2, 69:5, 69:6
private [2] - 22:21, 22:23
privilege [1] - 176:11
probative [5] - 176:7, 177:4, 184:14, 184:22, 186:21
probe [2] - 184:22, 185:10
problem [4] - 170:18, 172:4, 172:11, 178:10
problematic [2] - 177:11, 186:25
problems [2] - 81:20, 116:12
procedure [1] - 72:16
proceed [4] - 7:10, 63:23, 103:3, 104:2
proceedings [4] - 103:14, 167:7, 200:20, 201:19
Proceedings - 104:1,

167:15
proceeds [1] - 197:23
Process [2] - 132:6, 140:25
process [54] - 11:14, 13:7, 20:2, 20:3, 20:5, 20:10, 21:24, 22:20, 24:10, 24:19, 29:11, 29:15, 29:17, 30:9, 36:20, 37:24, 37:25, 38:1, 39:18, 39:25, 40:7, 43:2, 48:17, 53:8, 54:13, 57:12, 58:7, 61:3, 62:11, 65:3, 68:21, 75:20, 75:22, 100:10, 112:10, 112:24, 113:2, 113:10, 114:2, 115:23, 129:8, 136:18, 136:19, 139:7, 139:9, 141:2, 141:25, 142:3, 142:10, 142:22, 143:21, 145:10, 164:18, 174:14
processed [3] - 20:9, 30:10, 69:1
processing [1] - 19:23
produce [1] - 41:17
product [3] - 12:14, 17:24, 24:24
products [2] - 17:25, 18:4
professional [1] - 17:18
proffer [17] - 96:9, 96:11, 97:18, 104:6, 106:12, 111:20, 111:23, 123:23, 183:12, 184:4, 184:10, 187:5, 187:10, 187:19, 188:9, 188:19, 189:8
proffering [1] - 180:7
profitable [4] - 21:22, 22:2, 23:24, 145:23
profits [1] - 53:11
program [1] - 8:14
prohibit [1] - 180:9
prohibited [1] - 93:23
promise [2] - 76:13, 106:9
promised [1] - 20:18
promises [1] - 96:24
pronounce [1] - 94:22
proper [1] - 171:16
properly [2] - 181:1, 181:2
prosecute [1] - 154:25
prosecuted [2] - 123:25, 154:20
prosecutor [1] - 96:12
prosecutors [5] - 98:21, 99:25, 106:1, 166:19, 166:22
protect [2] - 173:16, 182:14
protecting [1] - 179:7
protocol [2] - 184:11, 188:10
protocols [1] - 174:16
provide [6] - 31:19, 46:18, 46:21, 55:19, 56:1, 66:1
provided [6] - 15:11, 30:23,

33:17, 65:12, 163:13, 191:9
provider [9] - 45:14, 63:9, 63:16, 63:21, 63:23, 64:1, 64:3, 64:8, 64:22
providers [3] - 26:16, 51:11, 63:19
provides [3] - 62:8, 64:21, 71:5
providing [1] - 46:17
publish [11] - 9:2, 26:2, 32:1, 34:11, 37:6, 40:14, 42:5, 45:3, 60:7, 69:16, 74:25
published [5] - 9:18, 10:3, 10:17, 11:7, 11:19
Puja [1] - 71:3
pull [1] - 90:10
Puntillo [1] - 9:9
Purchase [1] - 28:15
purchase [1] - 29:19
purchased [3] - 89:3, 95:14, 108:15
purchasing [1] - 61:6
purely [1] - 186:22
purpose [6] - 28:12, 60:15, 170:22, 175:5, 175:11, 184:18
purposes [3] - 87:24, 188:10, 193:15
pursuant [5] - 20:11, 123:22, 129:5, 178:5, 184:10
push [1] - 146:23
put [25] - 4:8, 5:3, 5:12, 12:15, 21:24, 60:16, 72:13, 75:13, 106:1, 116:8, 126:15, 135:9, 136:1, 140:17, 147:9, 152:12, 166:24, 171:19, 172:22, 177:6, 180:12, 180:22, 183:6, 184:25, 198:9
puts [4] - 91:13, 180:9, 200:14, 200:22
putting [6] - 5:18, 109:5, 152:22, 154:7, 200:4, 200:17

Q

qualification [2] - 137:6, 138:1
qualifications [5] - 122:10, 122:12, 128:15, 138:16, 148:20
qualified [18] - 24:11, 24:17, 61:8, 61:15, 61:17, 61:21, 63:4, 63:8, 132:18, 132:21, 132:23, 135:2, 135:5, 136:20, 136:23, 137:7, 137:9
qualify [4] - 18:13, 32:25, 61:7, 63:21
quality [2] - 82:7, 82:8

quash [1] - 197:8
Queenan [1] - 98:5
QUEENAN [1] - 98:5
questioned [1] - 34:4
questionnaire [2] - 127:1, 132:16
questions [23] - 3:19, 15:3, 30:15, 68:13, 68:19, 71:14, 71:22, 73:3, 82:22, 88:21, 104:14, 105:25, 106:25, 127:8, 131:4, 133:1, 149:2, 159:23, 161:16, 165:9, 173:24, 191:18, 192:1
quick [2] - 199:15, 200:6
quicker [1] - 76:19
quite [4] - 59:18, 177:8, 187:8, 201:5
quiz [2] - 32:21, 127:5

R

R2R [1] - 34:17
Rachel [4] - 42:9, 42:17, 73:7, 78:22
radar [1] - 4:8
RAFFERTY [10] - 2:4, 6:4, 6:12, 14:24, 193:8, 193:15, 193:23, 194:2, 199:19, 201:11
Rafferty [6] - 14:22, 15:2, 192:20, 194:3, 198:15, 199:16
raise [2] - 7:5, 17:2
raised [1] - 68:19
raising [2] - 68:13, 174:2
Rama [22] - 39:9, 39:16, 40:5, 40:7, 40:20, 40:22, 41:4, 41:12, 41:16, 81:2, 81:12, 81:17, 92:19, 98:16, 98:17, 98:20, 98:22, 98:25, 99:9
Rama's [1] - 81:13
Ramamurthy [16] - 39:3, 39:10, 39:13, 40:4, 40:22, 41:9, 79:23, 80:1, 81:4, 82:3, 92:16, 100:18, 106:16, 106:19, 164:4, 164:11
Ramamurthy's [1] - 106:17
ran [10] - 30:25, 36:22, 69:2, 101:2, 107:4, 107:8, 107:15, 107:20, 129:15
range [5] - 22:7, 159:14, 197:19, 198:3, 198:7
rate [3] - 44:14, 44:20, 159:9
Raton [2] - 21:18, 21:20
raw [8] - 18:12, 25:2, 25:3, 29:19, 40:2, 48:17, 108:17, 108:18
reach [2] - 68:6, 187:3

**reached** [3] - 6:7, 95:21, 115:23
**reaction** [1] - 57:15
**read** [12] - 32:6, 62:22, 75:18, 79:2, 82:12, 116:13, 116:15, 116:16, 117:5, 117:16, 117:17, 145:7
**ready** [6] - 52:5, 104:2, 156:15, 167:11, 168:3, 199:21
**real** [4] - 3:19, 16:4, 83:12, 93:15
**realistically** [2] - 197:12, 198:19
**reality** [1] - 163:17
**realize** [1] - 149:4
**really** [23] - 4:1, 4:2, 4:4, 4:6, 8:19, 24:14, 61:3, 75:22, 111:13, 129:12, 144:7, 153:10, 154:8, 159:21, 177:10, 177:23, 181:11, 181:13, 186:16, 187:25, 195:21, 197:4, 198:18
**reason** [16] - 23:11, 67:22, 90:9, 136:12, 167:22, 175:2, 175:10, 177:17, 177:18, 178:8, 178:25, 179:17, 180:8, 183:11, 185:18, 186:25
**reasonably** [1] - 114:12
**reasons** [4] - 35:21, 55:20, 71:21, 185:16
**receive** [12] - 12:8, 12:10, 14:9, 20:15, 38:8, 46:25, 49:9, 53:18, 64:6, 166:21, 181:1
**received** [38] - 13:11, 25:25, 30:6, 30:12, 31:25, 32:24, 34:9, 36:14, 36:23, 37:4, 40:12, 42:3, 45:2, 58:12, 60:5, 69:15, 74:24, 76:1, 80:10, 97:10, 97:13, 98:17, 105:24, 110:8, 110:21, 116:5, 116:19, 116:22, 129:5, 138:25, 144:5, 147:8, 151:2, 151:14, 172:22, 172:23, 186:2
**receiving** [7] - 24:24, 64:5, 72:17, 74:13, 89:7, 89:12, 159:5
**recess** [3] - 84:15, 85:14, 201:15
**recessed** [4] - 52:2, 85:17, 156:13, 201:16
**recognize** [9] - 3:7, 32:21, 33:3, 36:16, 38:11, 39:6, 49:6, 49:14, 60:11
**recollection** [8] - 4:22, 87:23, 89:18, 91:1, 91:10, 96:7, 130:3

**recommend** [1] - 23:2
**record** [9] - 7:8, 17:5, 19:14, 19:16, 52:3, 85:18, 150:17, 156:14, 184:1
**recorded** [6] - 9:12, 9:14, 142:13, 142:15, 142:21, 175:8
**recording** [4] - 9:16, 9:20, 178:14, 178:15
**recordings** [15] - 3:11, 3:14, 3:22, 4:3, 5:6, 169:18, 169:19, 169:25, 170:5, 170:17, 171:8, 171:25, 172:6, 183:5, 190:5
**records** [2] - 52:24, 197:23
**REDIRECT** [1] - 157:2
**redirect** [6] - 16:16, 119:8, 156:2, 156:11, 156:15, 156:23
**redone** [2] - 59:7, 59:16
**reduce** [1] - 72:2
**reduced** [2] - 20:22, 182:9
**reduction** [1] - 20:15
**refer** [2] - 101:8, 110:16
**reference** [7] - 8:14, 80:25, 119:6, 137:17, 159:11, 171:1, 172:14
**referenced** [2] - 45:10, 172:9
**references** [2] - 49:24, 172:4
**referencing** [3] - 105:1, 105:17, 192:8
**referral** [2] - 94:9, 94:16
**referred** [6] - 98:17, 101:7, 101:10, 109:17, 109:20, 113:2
**referring** [15] - 27:11, 30:19, 31:11, 63:25, 101:24, 105:13, 106:19, 112:23, 115:3, 115:5, 115:6, 121:1, 130:15, 137:11, 137:22
**reflect** [2] - 19:14, 19:16
**refresh** [3] - 87:23, 91:1, 91:10, 96:7, 130:3
**refreshes** [1] - 130:2
**regard** [4] - 91:3, 119:19, 120:16, 157:15
**regarding** [13] - 57:12, 70:23, 79:11, 93:4, 99:16, 103:17, 104:14, 130:16, 130:22, 168:15, 172:12, 176:10, 190:10
**regardless** [4] - 83:3, 102:1, 102:9, 102:16
**REGINALD** [1] - 1:14
**registered** [1] - 110:11
**regular** [5] - 65:19, 66:3, 68:5, 71:18, 80:20
**reimbursed** [9] - 47:25,

53:15, 54:17, 56:5, 59:23, 66:22, 74:13, 82:17, 83:5
**reimbursement** [12] - 25:7, 53:10, 56:7, 66:10, 66:12, 66:17, 68:22, 81:25, 157:19, 161:25, 162:7, 162:10
**reimbursements** [8] - 19:24, 22:4, 22:19, 53:17, 118:15, 130:23, 131:5, 166:17
**reimbursing** [1] - 22:9
**related** [12] - 18:2, 18:3, 18:5, 23:22, 38:19, 41:12, 43:13, 118:12, 118:13, 119:14, 127:8
**relates** [1] - 117:18
**relating** [3] - 35:24, 52:24, 65:13
**relation** [2] - 79:25, 95:24
**relationship** [23] - 37:19, 48:10, 48:13, 48:20, 50:14, 54:14, 80:1, 80:3, 83:12, 101:12, 108:21, 108:25, 109:2, 111:9, 125:12, 125:14, 125:24, 126:6, 126:10, 126:11, 159:2, 172:8, 186:15
**relationships** [3] - 41:19, 108:20, 120:18
**relatively** [1] - 194:25
**relayed** [1] - 23:4
**relied** [3] - 114:12, 124:1, 124:20
**rely** [1] - 181:2
**relying** [7] - 62:10, 65:2, 113:16, 113:18, 123:2, 164:12, 164:13
**remainder** [1] - 194:19, 195:22, 197:15
**remaining** [2] - 5:16, 167:22
**remember** [82] - 8:13, 8:14, 10:1, 12:7, 12:13, 13:1, 13:2, 13:12, 13:15, 13:20, 15:20, 16:2, 16:3, 22:3, 26:24, 34:3, 38:21, 47:4, 52:16, 53:5, 59:19, 65:7, 65:10, 65:11, 66:20, 67:3, 68:20, 70:21, 70:23, 72:6, 72:21, 77:6, 81:6, 81:13, 83:1, 87:21, 89:9, 92:18, 94:10, 94:11, 96:8, 98:9, 99:12, 100:3, 105:2, 105:5, 105:6, 105:8, 106:2, 106:4, 113:5, 113:7, 119:16, 119:24, 120:3, 120:9, 120:11, 120:21, 121:7, 121:12, 125:6, 127:24, 128:4, 128:9, 128:11, 130:1, 140:21, 146:23, 146:25, 151:7,

154:17, 154:18, 155:15, 157:6, 157:14, 161:23, 165:14, 166:18, 168:6, 171:10
**remembering** [1] - 16:4
**reminder** [1] - 180:5
**reminders** [1] - 168:5
**rep** [4] - 49:22, 52:19, 70:10, 71:9
**repeat** [1] - 8:3
**repeatedly** [3] - 123:24, 129:9, 184:23
**replay** [1] - 15:13
**replies** [1] - 73:19
**reply** [3] - 13:5, 78:13, 85:4
**replying** [1] - 13:2
**report** [8] - 56:1, 87:12, 90:10, 90:23, 190:7, 190:8, 190:9
**REPORTED** [1] - 1:20
**reporter** [2] - 77:22, 100:23
**Reporter** [2] - 1:22, 201:23
**reports** [2] - 45:11, 88:19
**represent** [3] - 95:22, 115:12
**represented** [3] - 115:11, 173:11, 187:21
**representing** [1] - 122:15
**represents** [1] - 15:3
**reps** [7] - 31:18, 33:22, 34:1, 35:15, 35:16, 35:19, 80:21
**reps'** [1] - 54:4
**request** [5] - 5:11, 43:12, 78:8, 104:19, 164:20
**requested** [2] - 43:11, 79:5
**requesting** [1] - 191:20
**require** [1] - 90:13
**required** [13] - 47:21, 78:10, 78:12, 80:22, 83:4, 146:13, 148:10, 150:2, 150:5, 150:6, 150:7, 158:16, 175:7
**requirements** [1] - 138:13
**Requisition** [1] - 147:16
**requisition** [32] - 30:2, 30:7, 33:6, 44:7, 45:20, 50:12, 50:15, 50:17, 61:19, 61:21, 61:23, 63:12, 64:9, 64:10, 66:10, 102:2, 102:9, 102:12, 102:19, 129:2, 139:15, 139:18, 139:20, 139:24, 140:3, 140:4, 158:21, 159:10, 159:22, 160:12
**research** [4] - 59:11, 59:13, 84:11, 168:12
**resolution** [3] - 54:12, 72:12, 181:15
**resources** [1] - 168:19

**respect** [7] - 3:9, 16:1, 172:21, 182:1, 182:14, 183:1, 195:15

**respectfully** [1] - 173:4

**respond** [2] - 70:19, 172:16

**responded** [1] - 112:9

**responding** [1] - 117:13

**responds** [7] - 70:11, 71:9, 72:11, 72:14, 75:17, 76:11

**response** [15] - 6:5, 6:6, 13:3, 14:5, 71:25, 75:18, 79:2, 82:11, 82:14, 110:21, 113:14, 114:21, 144:23, 152:20, 154:15

**responsibilities** [1] - 179:8

**responsibility** [3] - 46:18, 46:20, 57:7

**responsible** [3] - 46:2, 46:5, 120:17

**rest** [5] - 193:9, 193:17, 196:5, 197:9, 200:25

**restaurant** [1] - 182:22

**resting** [2] - 198:7, 198:23, 200:12

**restroom** [3] - 51:21, 51:25, 156:8

**result** [1] - 139:5

**resulting** [1] - 130:22

**results** [27] - 12:6, 12:23, 12:25, 14:7, 14:9, 30:10, 45:23, 45:25, 46:2, 46:3, 46:10, 46:17, 46:18, 46:19, 46:21, 48:22, 62:8, 64:21, 75:13, 76:19, 151:8, 151:14, 151:22, 152:1, 152:4, 152:9, 193:10

**resume** [1] - 6:21

**resurface** [1] - 196:18

**retail** [1] - 8:1

**retained** [1] - 113:3

**retired** [4] - 7:21, 7:22, 7:23, 7:24

**return** [5] - 51:21, 84:2, 84:6, 84:12, 85:8

**returned** [5] - 12:16, 13:8, 104:1, 139:8, 167:15

**revenue** [1] - 19:4

**review** [2] - 77:5, 85:5

**reviewed** [4] - 123:7, 123:9, 168:16, 168:21

**reviewing** [1] - 27:20

**revisit** [1] - 3:9

**rightfully** [1] - 187:18

**rights** [3] - 173:16, 173:17

**Rinsky** [6] - 195:5, 195:9, 196:24, 197:11, 197:15, 200:4

**Rinsky's** [1] - 197:11

**rise** [5] - 6:16, 51:23, 52:6, 86:17, 156:18

**risk** [2] - 127:14, 177:1

**risks** [1] - 14:15

**RMR** [2] - 1:21, 201:22

**robo** [1] - 165:25

**robo-signing** [1] - 165:25

**Rochelle** [2] - 70:11, 72:5

**RODOLFO** [1] - 1:10

**Rodolfo** [1] - 1:22

**Roebuck** [3] - 195:12, 195:18, 197:12

**role** [15] - 36:20, 38:18, 38:20, 39:12, 57:7, 70:8, 70:9, 77:10, 77:24, 107:7, 119:25, 120:6, 120:13, 120:15

**ROOKARD** [14] - 1:14, 7:1, 7:10, 7:13, 8:21, 9:3, 9:7, 9:9, 9:11, 10:19, 11:9, 11:21, 14:20, 16:17

**room** [4] - 84:5, 84:13, 168:23, 186:23

**Ross** [1] - 11:10

**roughly** [2] - 67:20, 160:22

**round** [1] - 6:14

**row** [1] - 70:16

**RPR** [2] - 1:21, 201:22

**Rudy** [2] - 71:4, 71:10

**RUIZ** [1] - 1:10

**Ruiz** [1] - 1:22, 189:5

**Ruiz@flsd.uscourts.gov** [1] - 189:5

**rule** [3] - 169:22, 170:10, 170:23

**rules** [2] - 5:23, 185:25

**ruling** [8] - 4:24, 175:25, 187:3, 188:8, 192:4, 192:9, 192:23

**rulings** [1] - 86:10

**run** [10] - 20:8, 23:25, 24:19, 46:1, 53:12, 54:1, 67:7, 187:21

**running** [3] - 13:7, 38:18, 110:24

**runs** [3] - 62:7, 64:21, 111:6

**rush** [1] - 75:13

**RX** [5] - 45:14, 45:18, 45:19, 45:23, 151:22

**RX@BBAR.us** [1] - 73:7

---

## S

**SADOW** [73] - 1:17, 1:18, 5:9, 5:11, 8:25, 25:19, 85:12, 86:14, 86:24, 87:1, 90:13, 90:16, 90:20, 90:22, 100:24, 100:25, 103:4, 103:5, 103:19, 103:23, 103:25, 104:3, 104:4, 115:24, 116:4, 116:6, 116:11, 116:14, 120:12, 126:15, 126:18,

127:20, 127:22, 128:19, 128:20, 128:24, 128:25, 131:20, 131:23, 131:25, 140:13, 140:14, 144:1, 144:7, 144:10, 147:3, 147:9, 147:11, 150:15, 150:18, 150:21, 151:3, 152:12, 152:14, 155:23, 170:21, 172:21, 178:10, 178:13, 181:18, 188:20, 189:1, 189:4, 189:6, 189:10, 189:16, 189:19, 190:6, 190:9, 190:21, 190:23, 195:15, 196:12

**Sadow** [17] - 86:23, 87:4, 150:16, 157:4, 157:23, 159:7, 159:23, 161:16, 164:3, 169:21, 172:3, 172:20, 177:3, 186:5, 188:6, 188:18, 192:20

**Sadow's** [3] - 174:2, 176:14, 180:2

**salaries** [1] - 54:4

**Sales** [1] - 70:10

**sales** [13] - 18:23, 31:18, 32:17, 33:22, 34:1, 34:18, 35:19, 38:4, 38:5, 52:19, 54:4, 71:9, 134:14

**Saliba** [5] - 68:5, 68:7, 157:17, 157:18, 158:8

**sample** [5] - 30:3, 30:11, 61:23, 112:2, 140:2, 161:24

**samples** [13] - 59:5, 59:8, 59:20, 69:1, 75:14, 75:20, 75:23, 76:9, 76:10, 80:21, 82:16, 110:16, 115:21

**SAMUEL** [2] - 2:2, 2:2

**Sarasota** [1] - 7:17

**sat** [2] - 97:7, 97:18

**satisfied** [2] - 68:9, 187:12

**save** [1] - 36:2

**saw** [3] - 59:24, 64:19, 142:6

**scared** [2] - 56:22, 58:16

**scenario** [1] - 200:9

**schedule** [9] - 6:11, 30:8, 61:15, 111:18, 139:14, 167:25, 193:17, 200:23

**scheduled** [2] - 73:20, 140:2

**scheduling** [4] - 168:2, 194:4, 201:4, 201:5

**scheme** [9] - 19:7, 19:21, 41:18, 53:7, 65:16, 80:4, 83:14, 83:18, 163:11

**screen** [4] - 26:7, 52:15, 116:8, 147:10

**screening** [2] - 73:11, 158:18

**screenshot** [1] - 192:2

**script** [5] - 32:25, 35:15, 35:25, 36:1, 137:18

**scripts** [1] - 77:2

**searched** [1] - 131:10

**seated** [12] - 6:18, 7:7, 17:4, 51:25, 52:4, 52:8, 84:17, 85:19, 86:19, 156:7, 156:20, 169:2

**second** [11] - 5:9, 13:22, 14:2, 14:3, 16:11, 33:16, 42:14, 45:25, 87:19, 105:21, 119:17

**seconds** [5] - 104:24, 170:5, 170:22, 183:7, 185:13

**section** [7] - 10:23, 26:12, 26:13, 27:20, 33:8, 35:6, 121:10

**SECTION** [1] - 1:15

**Security** [1] - 50:2

**SECURITY** [5] - 6:16, 51:23, 52:6, 86:17, 156:18

**see** [83] - 3:20, 6:19, 19:6, 19:11, 26:5, 27:11, 27:19, 33:8, 34:20, 35:1, 35:4, 43:3, 45:13, 45:16, 50:7, 50:24, 51:1, 51:9, 52:4, 55:10, 64:23, 69:22, 70:16, 71:7, 71:12, 73:8, 73:13, 75:5, 75:12, 75:15, 78:16, 78:25, 79:8, 79:16, 80:23, 84:18, 85:13, 89:20, 96:7, 104:10, 104:24, 112:5, 117:1, 117:2, 118:18, 121:2, 121:10, 130:2, 131:20, 140:15, 144:7, 144:11, 144:14, 144:18, 145:1, 145:13, 151:10, 151:13, 151:17, 152:15, 154:14, 156:5, 160:7, 160:16, 168:11, 168:24, 179:10, 183:17, 187:16, 188:17, 190:12, 190:20, 192:17, 194:24, 195:6, 196:1, 196:4, 199:12, 199:25, 200:12, 201:1, 201:13

**seeing** [3] - 13:15, 61:16, 63:5

**seek** [3] - 144:1, 176:23, 188:16

**seeking** [1] - 170:24

**seem** [1] - 196:8

**sees** [1] - 196:15

**select** [1] - 51:12

**selected** [1] - 64:3

**self** [1] - 186:10

**self-serving** [1] - 186:10

**seller** [1] - 88:25

**selling** [1] - 129:25

**send** [10] - 72:12, 77:4, 78:4, 111:17, 114:25, 123:6,

**sending** [11] - 12:4, 43:7, 43:9, 79:6, 81:17, 114:9, 114:11, 115:21, 126:22, 128:15, 140:1
**sends** [3] - 70:10, 80:20, 140:6
**sense** [12] - 3:21, 5:6, 5:21, 120:19, 169:24, 172:20, 188:14, 190:3, 192:7, 193:16, 195:8, 195:19
**sent** [37] - 12:18, 13:4, 16:1, 30:4, 30:9, 35:14, 51:5, 61:10, 61:12, 61:23, 61:25, 64:17, 78:3, 78:9, 78:13, 78:14, 80:19, 106:13, 106:19, 114:17, 128:7, 128:8, 130:14, 138:15, 138:18, 138:22, 139:11, 139:12, 139:16, 142:7, 159:11, 179:17, 179:18, 187:6, 189:10
**sentence** [4] - 19:20, 20:16, 20:21, 155:9
**sentenced** [2] - 20:13, 155:17
**sentences** [1] - 18:21
**Senthil** [2] - 39:3, 79:23
**separate** [1] - 181:24
**September** [6] - 75:9, 125:19, 145:15, 147:13, 152:15, 153:13
**series** [4] - 104:14, 105:18, 114:6, 182:19
**service** [7] - 17:24, 24:24, 42:15, 42:20, 43:8, 43:10
**services** [2] - 17:25, 107:24
**serving** [1] - 186:10
**set** [7] - 29:24, 33:17, 49:9, 76:15, 84:23, 105:14, 182:22
**setting** [1] - 29:4
**settlement** [1] - 23:9
**setup** [1] - 85:2
**seven** [2] - 88:18, 120:1
**several** [2] - 56:11, 111:10
**share** [4] - 46:3, 46:9, 48:14, 57:18
**shared** [4] - 23:13, 57:19, 57:20, 166:7
**sharing** [1] - 46:5
**Shawn** [5] - 16:24, 17:6, 71:10, 75:19, 109:18
**SHAWN** [2] - 17:3, 17:6
**Shawn/Thanasi** [1] - 70:12
**sheet** [1] - 64:12
**Shelbi** [8] - 70:4, 70:5, 70:10, 70:15, 71:3, 71:12, 76:2, 80:20
**Shelbi@Labsolutions** [1] -

77:19
**Sheth** [1] - 71:3
**shift** [1] - 18:6
**shifting** [2] - 8:10, 38:10
**shirt** [1] - 19:13
**short** [3] - 194:25, 197:21, 199:4
**shorter** [3] - 196:2, 198:14, 199:22
**shortly** [2] - 56:24, 145:11
**show** [17] - 47:15, 48:24, 60:16, 60:17, 77:7, 78:24, 91:24, 106:4, 114:11, 116:7, 121:1, 126:2, 151:22, 160:2, 163:18, 164:18, 165:4
**showed** [8] - 46:23, 58:21, 91:23, 92:1, 99:14, 99:19, 148:25, 151:8
**showing** [26] - 26:25, 32:5, 32:20, 33:2, 34:14, 37:10, 37:15, 40:24, 42:8, 42:23, 43:4, 43:14, 45:6, 46:22, 47:8, 47:11, 49:5, 49:13, 49:24, 50:7, 62:20, 75:2, 78:18, 81:3, 91:1, 176:13
**shows** [3] - 112:9, 170:6, 178:17
**side** [10] - 6:2, 8:1, 26:14, 86:12, 126:24, 170:15, 171:23, 198:1, 199:2, 201:10
**sidebar** [3] - 103:14, 167:6, 167:7
**sign** [10] - 26:22, 30:2, 30:7, 33:7, 45:20, 57:2, 78:23, 79:3, 102:12, 102:19
**signature** [3] - 79:18, 83:4, 158:22
**signatures** [1] - 159:8
**signed** [14] - 26:20, 30:2, 50:13, 96:9, 102:2, 102:10, 110:19, 111:19, 139:15, 139:18, 139:20, 139:23, 159:10, 159:13
**significant** [1] - 15:9
**signing** [3] - 10:1, 159:15, 165:25
**signs** [1] - 102:18
**similar** [3] - 56:10, 167:20, 195:12
**simple** [2] - 78:24, 170:21
**simply** [3] - 148:23, 173:14, 178:20
**single** [6] - 129:12, 143:20, 152:3, 152:4, 182:24
**sister** [1] - 77:9
**sit** [2] - 96:11, 96:22
**situation** [6] - 30:18, 55:2, 70:21, 73:22, 79:10, 183:5
**six** [10] - 34:24, 80:2, 88:18, 99:3, 99:5, 99:10, 99:11,

120:1, 121:6, 144:17
**size** [1] - 23:20
**slice** [1] - 170:9
**Slomovitz** [1] - 199:8
**small** [3] - 133:10, 133:11, 170:4
**smaller** [1] - 51:12
**smiley** [3] - 75:21, 153:4, 153:5
**smiling** [1] - 153:9
**Smith** [2] - 71:4, 71:10
**so-and-so** [1] - 178:15
**so-called** [1] - 146:9
**so..** [1] - 196:16
**SOAP** [2] - 73:10, 79:4
**Social** [1] - 50:2
**social** [2] - 84:10, 168:10
**software** [1] - 38:18
**someone** [18] - 12:25, 14:6, 18:13, 38:15, 62:10, 79:23, 90:23, 133:1, 137:14, 142:6, 148:2, 164:20, 187:21, 196:24, 198:25, 199:21, 199:22
**sometime** [1] - 99:6
**sometimes** [4] - 5:19, 67:14, 101:7, 179:22
**somewhere** [3] - 89:12, 146:16, 195:18
**Sonal** [2] - 77:8, 78:13
**soon** [1] - 188:4
**Sorenson** [1] - 73:6
**sorry** [24] - 15:6, 19:11, 46:5, 60:18, 78:19, 83:17, 88:25, 93:25, 100:24, 103:4, 107:6, 112:23, 116:17, 120:25, 125:17, 127:3, 130:8, 134:12, 137:11, 141:10, 149:3, 149:17, 153:1, 166:5
**sort** [9] - 4:5, 6:9, 12:23, 56:8, 86:1, 158:25, 170:15, 174:13, 187:16
**sound** [2] - 112:3, 125:20
**sounded** [2] - 120:15, 131:8
**sounds** [4] - 15:7, 198:2, 198:9
**source** [3] - 39:17, 67:11, 124:17
**sources** [3] - 28:15, 179:3
**South** [1] - 173:13
**SOUTHERN** [1] - 1:1
**Southern** [1] - 173:12
**space** [3] - 18:2, 18:6, 18:7
**speaking** [3] - 65:24, 80:14, 158:9
**specialist** [1] - 122:13
**specialty** [1] - 114:22
**Specific** [1] - 147:17

**specific** [29] - 17:23, 20:5, 22:3, 22:15, 25:2, 28:20, 28:22, 29:19, 30:25, 33:11, 47:14, 48:16, 51:14, 57:24, 58:2, 65:7, 66:7, 67:3, 67:6, 68:11, 68:18, 93:15, 104:24, 104:25, 105:17, 110:4, 130:19, 136:12, 192:8
**specifically** [19] - 3:10, 17:21, 22:12, 22:16, 22:17, 23:18, 26:24, 31:11, 34:3, 49:1, 54:9, 67:1, 68:20, 73:23, 77:1, 118:14, 140:21, 157:14, 184:3
**specifics** [3] - 59:19, 65:10, 65:11
**specimens** [2] - 75:12, 76:1
**spell** [2] - 7:8, 17:5
**spelled** [1] - 88:24
**spent** [1] - 163:22
**spills** [3] - 198:4, 200:3, 200:11
**split** [1] - 197:15
**spoken** [4] - 82:23, 87:4, 88:18, 166:11
**Sporn** [2] - 170:7, 182:25
**Sporn's** [2] - 170:7, 170:8
**spot** [1] - 180:9
**spreadsheet** [1] - 82:15
**spreadsheets** [3] - 45:9, 46:24, 46:25
**squarely** [1] - 103:16
**stage** [2] - 87:24, 181:19
**stamp** [2] - 58:6, 58:9
**stand** [11] - 4:10, 6:24, 19:12, 21:5, 68:24, 178:13, 179:14, 182:2, 184:9, 186:1, 191:18
**standard** [1] - 117:21
**standby** [1] - 198:25
**standing** [2] - 90:19, 198:17
**stands** [3] - 68:23, 89:23, 157:8
**start** [7] - 87:7, 89:7, 119:3, 131:24, 197:6, 200:10, 201:14
**started** [20] - 3:7, 5:25, 18:2, 18:4, 31:17, 53:8, 66:23, 76:24, 85:21, 89:12, 89:13, 99:12, 109:1, 119:4, 125:14, 157:21, 167:19, 169:13, 169:17
**starting** [2] - 182:18, 201:7
**starts** [2] - 75:5, 145:23
**state** [3] - 63:9, 183:4, 185:8
**statement** [4] - 106:23, 130:5, 130:6, 130:9
**statements** [5] - 3:16, 87:8,

104:15, 171:7, 185:23

**States** [3] - 1:23, 16:23, 201:23

**STATES** [4] - 1:1, 1:3, 1:10, 1:15

**states** [4] - 70:17, 72:10, 76:12, 76:19

**stating** [1] - 161:20

**status** [2] - 76:9, 80:19

**statutes** [1] - 131:7

**stay** [6] - 37:24, 37:25, 168:9, 172:25, 173:15, 185:1

**stayed** [1] - 171:15

**steer** [1] - 84:8

**STENOGRAPHICALLY** [1] - 1:20

**step** [27] - 60:18, 60:25, 61:3, 61:5, 61:6, 61:18, 61:22, 62:7, 63:4, 63:21, 64:2, 132:18, 132:20, 133:4, 133:9, 133:13, 133:22, 134:1, 135:4, 137:14, 138:6, 156:9, 158:9, 158:12, 171:24, 194:4

**steps** [14] - 20:7, 20:10, 24:10, 24:13, 30:6, 30:15, 61:16, 61:25, 62:3, 62:11, 63:5, 86:9, 141:15, 141:16

**Steve** [4] - 87:4, 115:19, 115:22

**Steve@Infinitymarketing** [1] - 116:20

**Steven** [1] - 110:7

**STEVEN** [2] - 1:17, 1:18

**still** [19] - 11:12, 15:17, 15:19, 33:17, 52:14, 53:14, 104:11, 114:7, 125:1, 146:21, 155:19, 166:12, 167:25, 175:19, 188:11, 191:9, 194:6, 194:10, 194:13

**stood** [2] - 89:25, 90:6

**stop** [8] - 51:16, 125:4, 125:5, 173:19, 182:6, 189:13, 189:20, 191:1

**straight** [1] - 3:14

**strategies** [1] - 41:14

**Street** [2] - 1:18, 2:5

**stretch** [1] - 51:21

**structure** [2] - 24:5, 24:6

**stuff** [1] - 4:6

**stumble** [1] - 168:20

**subject** [11] - 3:16, 40:20, 69:22, 71:4, 112:1, 127:2, 147:13, 176:24, 186:4, 186:8

**subjects** [1] - 92:11

**submitted** [2] - 41:5, 59:10

**subpoena** [1] - 104:19

**subset** [1] - 51:12

**substance** [2] - 4:4, 172:6

**substantial** [3] - 21:24,

22:5, 69:1

**substantive** [1] - 4:1

**successful** [2] - 13:5, 83:14

**suggest** [3] - 125:8, 176:2, 180:12

**suggested** [1] - 158:24

**suggesting** [4] - 126:23, 127:6, 186:6, 190:23

**suggestion** [3] - 171:6, 171:16, 183:23

**suggestive** [1] - 108:5

**suggests** [1] - 113:9

**Suite** [2] - 1:19, 2:5

**summarize** [1] - 194:12

**summer** [1] - 125:15

**supplement** [2] - 8:5, 8:6

**supplied** [3] - 108:9, 108:18, 109:16

**supply** [2] - 108:17, 108:19

**supplying** [1] - 109:14

**support** [1] - 107:20

**suppose** [1] - 175:24

**supposed** [4] - 6:10, 64:6, 97:1, 109:11

**supposedly** [1] - 74:3

**surprised** [5] - 58:21, 91:20, 91:23, 192:12, 192:16

**survivors** [1] - 157:25

**suspect** [2] - 183:5, 198:15

**swab** [4] - 12:14, 16:1, 30:4

**swab-like** [1] - 12:14

**swabs** [1] - 13:4

**swear** [2] - 7:4, 17:1

**sworn** [2] - 7:6, 17:3

**system** [1] - 56:8

## T

**tag** [1] - 62:6

**tailored** [1] - 174:1

**talks** [2] - 136:20, 152:9

**Tammy** [1] - 77:12

**tampering** [1] - 174:13

**tape** [2] - 173:2, 183:5

**tape-recordings** [1] - 183:5

**target** [1] - 67:6

**taught** [2] - 157:12, 158:3

**team** [4] - 30:5, 80:19, 192:21, 198:16

**tech** [2] - 85:2, 107:20

**technical** [1] - 116:11

**telehealth** [1] - 138:11

**telemarketed** [1] - 18:12

**telemarketer** [10] - 25:4, 29:20, 49:18, 61:7, 119:22, 122:17, 122:21, 132:13, 133:2, 158:25

**telemarketers** [7] - 30:19, 31:3, 137:13, 158:11,

158:13, 158:15, 158:18

**telemarketing** [17] - 18:16, 32:25, 89:5, 119:25, 120:6, 120:18, 120:20, 126:24, 128:11, 132:12, 133:6, 133:12, 134:8, 134:9, 134:13, 142:12

**telemed** [10] - 66:9, 69:25, 71:4, 80:20, 107:24, 108:20, 110:18, 123:6, 159:13, 161:1

**telemedicine** [30] - 29:24, 29:25, 31:9, 41:19, 43:13, 43:16, 43:22, 44:21, 48:9, 48:18, 48:19, 54:5, 63:9, 63:25, 76:21, 77:4, 79:13, 101:12, 120:17, 122:19, 130:19, 131:1, 131:14, 137:15, 137:18, 137:20, 138:12, 139:10, 159:17, 168:16

**telephone** [5] - 13:25, 30:1, 65:22, 179:15, 182:20

**ten** [2] - 7:23, 67:20

**tend** [1] - 196:16

**tentatively** [1] - 200:25

**termed** [1] - 101:22

**terms** [4] - 46:17, 66:19, 81:22, 149:4

**territory** [2] - 181:9, 181:14

**test** [74] - 10:9, 10:11, 10:13, 10:25, 11:16, 13:5, 14:15, 18:25, 20:8, 21:15, 21:22, 21:25, 22:4, 22:8, 22:10, 23:22, 23:24, 24:3, 24:12, 24:17, 24:19, 25:5, 25:6, 29:21, 29:22, 29:23, 30:7, 30:17, 30:25, 31:1, 31:19, 33:1, 33:11, 33:13, 34:19, 35:21, 35:23, 35:24, 36:1, 44:7, 46:1, 48:21, 53:10, 59:3, 60:19, 61:8, 61:25, 62:2, 62:8, 63:23, 64:17, 64:18, 64:21, 70:19, 71:20, 71:21, 72:2, 73:2, 73:3, 73:12, 74:2, 74:5, 83:5, 138:2, 139:21, 158:4, 159:3, 163:14, 163:15, 168:19

**Test** [1] - 147:17

**Test-Specific** [1] - 147:17

**tested** [1] - 12:5

**testified** [4] - 92:20, 99:21, 111:7, 149:23

**testifies** [1] - 183:22

**testify** [3] - 173:7, 180:24, 183:15

**testifying** [3] - 20:11, 57:6, 171:4

**testimony** [15] - 20:16, 20:19, 92:7, 98:13, 99:23, 99:24, 110:2, 120:16, 125:5,

136:7, 167:18, 168:15, 177:20, 183:8, 195:8

**Testing** [3] - 36:9, 132:6, 140:24

**testing** [18] - 8:11, 8:16, 8:20, 33:20, 44:14, 51:10, 61:1, 62:25, 111:12, 132:7, 132:10, 136:18, 141:3, 141:6, 157:16, 157:19, 166:16, 168:16

**tests** [17] - 19:23, 22:1, 27:12, 39:19, 46:3, 46:6, 47:25, 54:17, 56:2, 67:7, 83:20, 83:21, 149:18, 149:23, 163:12, 163:13, 165:16

**text** [38] - 65:20, 65:22, 119:7, 144:2, 144:21, 144:22, 148:25, 172:22, 173:6, 175:22, 176:3, 176:8, 176:9, 176:14, 176:19, 176:22, 177:6, 177:16, 178:20, 179:8, 179:17, 180:8, 184:3, 184:5, 184:25, 186:5, 186:13, 186:18, 187:6, 187:15, 188:17, 188:22, 189:17, 189:18, 191:8, 192:5

**texts** [1] - 149:4

**Thanasi** [17] - 36:25, 38:15, 38:16, 38:17, 49:21, 64:12, 71:10, 73:7, 73:16, 77:15, 94:24, 94:25, 107:19, 111:1, 135:13, 143:1

**Thanasi's** [1] - 38:20

**that'll** [4] - 150:25, 192:18, 192:23, 201:3

**THE** [167] - 1:10, 1:13, 1:17, 2:2, 3:2, 4:12, 4:16, 4:20, 5:10, 5:17, 5:25, 6:6, 6:13, 6:16, 6:18, 7:3, 7:5, 7:7, 7:9, 7:11, 8:24, 9:1, 9:6, 9:8, 14:21, 16:16, 16:18, 16:21, 16:25, 17:2, 17:4, 17:6, 19:16, 25:18, 25:22, 26:3, 31:23, 32:3, 34:8, 34:13, 36:12, 37:3, 37:8, 40:11, 40:15, 42:1, 42:6, 44:24, 45:4, 49:3, 51:16, 51:23, 51:25, 52:4, 52:6, 52:8, 60:4, 60:9, 69:12, 69:18, 75:1, 80:8, 82:20, 83:24, 84:17, 84:20, 84:21, 85:10, 85:13, 85:16, 85:19, 85:23, 86:8, 86:15, 86:17, 86:19, 90:15, 90:18, 90:21, 103:3, 103:13, 103:15, 103:21, 103:24, 104:2, 116:1, 116:3, 116:13, 120:8, 120:9, 144:4, 144:9, 147:5, 147:7, 150:16,

150:20, 150:23, 150:25,
155:24, 156:7, 156:15,
156:17, 156:18, 156:20,
160:4, 163:20, 167:3, 167:5,
167:6, 167:8, 167:11,
167:13, 167:16, 169:2,
169:8, 169:12, 169:15,
170:13, 171:2, 171:10,
171:23, 173:22, 175:14,
175:21, 176:1, 176:13,
177:3, 178:12, 179:25,
183:23, 186:9, 188:6,
188:23, 189:2, 189:5, 189:7,
189:12, 189:18, 189:22,
190:8, 190:14, 190:19,
190:22, 191:7, 193:1, 193:7,
193:12, 193:19, 193:24,
194:3, 194:13, 194:16,
194:24, 195:3, 195:6,
195:14, 195:17, 196:6,
196:11, 196:17, 197:3,
199:6, 199:9, 199:20, 200:9,
201:9, 201:12

**theirs** [1] - 151:13
**theme** [1] - 192:15
**thereallead@yahoo.com**
[1] - 32:10
**thereof** [1] - 192:8
**they've** [1] - 181:16
**thinking** [2] - 197:5, 198:21
**thinks** [1] - 179:7
**third** [2] - 58:4, 200:15
**three** [8] - 3:23, 58:8, 76:13,
88:18, 119:13, 121:17,
192:5, 200:25
**throughout** [3] - 142:22,
143:21, 174:15
**throwing** [1] - 191:12
**Thursday** [13] - 194:6,
194:21, 195:4, 196:22,
196:25, 197:1, 197:13,
197:14, 197:15, 198:6,
198:18, 199:17, 199:18
**tied** [2] - 8:15, 8:16
**timeliness** [1] - 90:9
**timing** [1] - 159:23
**Timothy** [1] - 98:2
**titles** [1] - 35:7
**to-do** [1] - 156:21
**Tobin** [4] - 114:17, 114:18,
114:22, 165:10
**Toby** [3] - 117:23, 165:9,
181:16
**today** [30] - 3:7, 3:8, 4:21,
4:23, 4:25, 6:1, 6:10, 15:6,
19:6, 20:11, 20:16, 20:19,
51:6, 62:4, 72:12, 82:23,
86:2, 92:8, 99:23, 105:11,
158:22, 161:20, 163:22,
166:11, 166:12, 167:8,

167:17, 167:25, 168:2, 188:9
**together** [9] - 5:18, 21:24,
25:20, 27:20, 60:16, 109:5,
135:9, 136:1, 140:17
**tomorrow** [27] - 4:19, 5:1,
34:25, 86:2, 86:7, 86:10,
167:14, 168:3, 168:11,
168:24, 169:3, 169:5, 169:9,
169:12, 178:14, 187:7,
187:9, 190:13, 192:18,
192:19, 192:23, 193:3,
196:21, 197:14, 200:2,
201:1, 201:13
**took** [5] - 71:21, 72:2, 73:4,
139:23, 157:4
**top** [2] - 151:23, 152:13
**topics** [1] - 111:18
**total** [2] - 56:4, 154:4
**totally** [2] - 111:6, 181:18
**toto** [1] - 5:21
**touch** [4] - 174:17, 179:21,
188:1, 192:22
**tough** [1] - 178:4
**tour** [2] - 55:19, 55:21
**towards** [2] - 80:12, 143:25
**tracing** [1] - 197:22
**track** [3] - 75:25, 76:9, 86:7
**tracked** [3] - 62:1, 62:7,
64:17
**tracking** [1] - 64:19
**trainer** [1] - 130:25
**training** [12] - 31:5, 31:13,
31:16, 31:17, 33:24, 34:2,
35:10, 47:20, 65:5, 65:8,
65:12, 130:12
**trainings** [2] - 130:18,
131:4
**transcript** [5] - 5:12, 5:13,
9:4, 169:23, 170:12
**TRANSCRIPT** [1] - 1:9
**transcription** [1] - 201:19
**transcripts** [3] - 5:19,
16:19, 169:23
**translate** [1] - 75:20
**translation** [1] - 179:23
**transmitted** [1] - 188:14
**treat** [1] - 75:22
**treating** [1] - 83:8
**treatment** [1] - 159:5
**TRIAL** [1] - 1:9
**trial** [4] - 168:17, 180:22,
185:16, 200:16
**trials** [1] - 183:3
**tricky** [2] - 178:8, 178:10
**tried** [1] - 154:19
**trigger** [1] - 174:17
**trouble** [1] - 56:22
**true** [20] - 63:2, 98:11,
98:19, 98:22, 99:17, 99:18,
100:14, 106:23, 107:10,

107:12, 107:16, 107:21,
107:24, 107:25, 108:11,
110:12, 113:15, 113:16,
164:1, 182:2
**trust** [1] - 6:22
**truth** [7] - 95:18, 97:2, 97:5,
97:20, 164:13, 166:23
**truthful** [2] - 56:19, 58:22
**try** [9] - 4:24, 6:7, 149:2,
149:22, 152:23, 166:24,
180:12, 193:9, 199:17
**trying** [10] - 123:1, 162:20,
174:1, 174:8, 174:17,
174:20, 175:4, 176:1,
181:20, 195:21
**tunnel** [1] - 75:16
**turn** [6] - 6:23, 24:11,
104:20, 145:23, 156:23,
183:20
**turned** [1] - 104:16
**turning** [10] - 26:12, 26:19,
27:14, 27:25, 50:23, 69:20,
71:2, 73:5, 76:12, 183:24
**twice** [1] - 47:4
**two** [29] - 3:23, 17:15,
18:10, 41:19, 52:22, 58:7,
65:17, 70:16, 74:7, 87:22,
88:18, 89:25, 90:5, 98:2,
98:21, 115:5, 119:13,
121:17, 142:5, 147:16,
155:3, 160:20, 173:4,
182:23, 193:10, 193:14,
199:23
**type** [17] - 8:4, 18:14, 18:15,
19:1, 22:15, 23:21, 43:12,
47:19, 49:6, 49:14, 53:19,
65:5, 67:6, 68:8, 82:8,
132:16, 185:24
**types** [6] - 10:14, 18:10,
23:10, 72:3
**typical** [3] - 78:9, 78:10,
176:25
**typically** [2] - 66:4, 87:12

# U

**U.S** [1] - 12:16
**ultimately** [7] - 16:1, 20:21,
21:17, 25:13, 57:2, 102:10,
150:11
**under** [15] - 45:23, 51:9,
76:12, 77:16, 79:19, 112:9,
121:10, 148:15, 173:6,
177:11, 183:12, 184:4,
186:13, 187:15, 192:24
**underpinnings** [1] - 186:25
**understood** [8] - 5:24,
91:20, 98:22, 101:11,
117:24, 146:4, 148:10,
197:20

**undue** [1] - 186:24
**unique** [1] - 48:2
**United** [3] - 1:23, 16:23,
201:23
**UNITED** [4] - 1:1, 1:3, 1:10,
1:15
**universe** [1] - 198:2
**unless** [1] - 94:16
**unlikely** [1] - 193:4
**unnecessary** [3] - 18:24,
82:6, 166:16
**unreasonable** [1] - 179:24
**unsure** [1] - 73:19
**unusual** [1] - 183:2
**up** [68] - 6:11, 6:15, 7:3,
10:1, 11:22, 12:25, 13:8,
13:10, 13:14, 17:1, 19:12,
23:25, 25:13, 26:17, 28:7,
28:8, 28:9, 28:11, 29:4,
30:15, 36:4, 39:12, 49:9,
51:21, 52:14, 58:21, 62:6,
67:18, 70:25, 74:6, 76:15,
84:12, 86:5, 90:4, 91:23,
91:24, 92:1, 105:16, 120:19,
122:9, 126:15, 129:17,
129:18, 139:16, 140:1,
140:5, 144:12, 147:9,
151:15, 151:22, 152:12,
156:17, 168:13, 168:19,
169:24, 170:8, 170:10,
171:22, 172:12, 173:23,
179:10, 182:22, 191:3,
191:12, 197:13, 198:3,
198:14
**update** [1] - 80:19
**UPS** [2] - 61:25, 62:6
**urgency** [1] - 81:22
**useful** [1] - 177:10

# V

**vaguely** [2] - 11:24, 16:3
**valid** [2] - 61:13
**valuable** [2] - 124:16,
177:14
**value** [12] - 163:13, 163:15,
163:16, 174:21, 176:7,
177:5, 178:23, 179:6,
184:14, 184:22, 186:21,
187:17
**Vartanian** [5] - 32:13,
32:18, 40:17, 81:9, 125:19
**veracity** [1] - 168:19
**verbal** [3] - 144:23, 152:20,
154:15
**verification** [1] - 61:10
**verify** [3] - 25:5, 44:5, 44:6
**version** [4] - 5:13, 27:21,
62:20, 142:3
**versus** [3] - 68:7, 74:17

**vetted** [3] - 100:7, 100:8, 100:10
**via** [4] - 29:21, 30:1, 65:22, 85:1
**view** [3] - 172:15, 174:2, 177:4
**violate** [1] - 18:22
**visit** [1] - 161:11
**voicemail** [1] - 3:25
**Volume** [1] - 1:6
**volume** [2] - 41:17, 47:7
**vs** [1] - 1:5

## W

**W.I** [6] - 4:14, 4:16, 4:25, 7:2, 7:6, 7:9
**wait** [7] - 54:17, 54:22, 56:5, 97:18, 119:17, 134:9, 141:16
**waited** [3] - 12:22
**waiting** [5] - 6:8, 16:20, 75:19, 104:10, 123:23
**walk** [5] - 24:10, 30:6, 30:14, 38:5, 62:1
**walked** [1] - 28:3
**walls** [1] - 168:18
**wants** [7] - 3:7, 71:5, 107:1, 107:7, 107:14, 107:18, 172:22
**Washington** [1] - 1:16
**Watt** [29] - 114:17, 114:18, 117:6, 117:13, 117:25, 118:3, 118:8, 118:11, 118:16, 118:19, 119:10, 120:20, 121:20, 121:22, 122:9, 124:3, 129:9, 130:11, 130:15, 130:22, 130:25, 131:3, 131:7, 131:10, 131:11, 131:13, 165:10, 181:16
**Watt's** [2] - 131:11, 165:13
**ways** [1] - 87:22
**wearing** [1] - 19:10
**web** [1] - 49:21
**webinars** [3] - 65:7, 65:9, 130:13
**Wednesday** [3] - 116:22, 196:13, 196:21
**week** [8] - 13:17, 56:2, 66:9, 145:23, 194:14, 195:22, 200:16, 200:25
**weekly** [2] - 54:7, 56:1
**weekly/monthly** [1] - 54:6
**weeks** [4] - 75:14, 76:13, 121:6, 182:23
**weight** [1] - 186:24
**Weinstein** [20] - 95:22, 96:16, 96:19, 104:12, 104:16, 104:25, 105:7,

105:24, 106:1, 106:8, 111:19, 111:24, 111:25, 114:7, 122:25, 123:1, 123:2, 123:13, 123:25, 124:15
**welcome** [1] - 86:19
**Wendt** [2] - 73:16, 73:20
**WEST** [1] - 1:2
**what..** [1] - 117:3
**whatsoever** [1] - 84:11
**white** [1] - 19:13
**whole** [5] - 36:1, 107:4, 107:8, 142:22, 189:25
**wider** [1] - 22:18
**willing** [2] - 138:8, 188:21
**winding** [1] - 169:24
**wise** [1] - 85:7
**WITNESS** [6] - 7:9, 17:6, 84:20, 116:13, 120:9, 167:5
**witness** [33] - 4:13, 4:17, 6:24, 6:25, 7:6, 16:22, 17:3, 19:15, 34:14, 48:25, 49:1, 75:2, 86:1, 86:3, 86:4, 156:1, 156:22, 160:3, 163:18, 178:13, 179:14, 182:12, 193:10, 193:12, 194:7, 194:9, 194:23, 194:25, 196:7, 196:14, 198:13, 199:5, 200:13
**witnesses** [7] - 86:11, 167:17, 193:11, 193:16, 193:18, 194:19, 196:16
**women's** [1] - 7:25
**wonderful** [1] - 84:13
**wondering** [2] - 174:10, 177:10
**word** [7] - 87:24, 88:3, 100:8, 118:20, 119:3, 191:21, 192:13
**words** [3] - 45:14, 84:4, 166:24
**Workflow** [1] - 140:24
**workflow** [1] - 141:2
**works** [2] - 86:11, 132:12
**world** [4] - 117:19, 176:2, 197:5, 198:24
**worried** [3] - 172:24, 178:2, 195:1
**worry** [2] - 179:20, 200:19
**worst** [3] - 82:6, 198:10, 200:10
**would-be** [3] - 102:13, 132:13, 132:14
**wow** [1] - 144:15
**wrap** [1] - 197:5
**wrapping** [2] - 198:3, 198:14
**write** [2] - 47:24, 107:19
**writing** [4] - 104:15, 119:7, 159:3, 182:9
**written** [2] - 151:4, 151:23

**wrongful** [1] - 83:18
**wrote** [10] - 90:24, 109:25, 111:25, 113:22, 117:13, 123:9, 123:18, 148:2, 150:2, 152:15

## X

**XGEN** [15] - 29:9, 36:8, 37:16, 37:18, 38:8, 38:25, 39:1, 53:16, 53:23, 70:11, 107:14, 110:8, 161:7, 161:8

## Y

**Yahoo** [1] - 32:11
**year** [3] - 57:2, 125:25, 155:13
**years** [13] - 7:22, 7:23, 17:15, 21:10, 23:9, 65:17, 74:7, 89:10, 108:22, 109:3, 120:2, 160:20, 179:2
**yesterday** [8] - 6:7, 6:20, 85:25, 86:4, 86:6, 112:14, 112:21, 167:20
**Yogel** [11] - 194:14, 194:17, 194:20, 197:18, 197:20, 198:4, 198:20, 199:4, 200:6, 200:7, 200:9
**Yogel's** [1] - 199:15
**York** [1] - 1:16

## Z

**Ziros** [16] - 64:13, 77:14, 94:22, 94:25, 95:4, 107:18, 107:19, 107:20, 111:1, 143:2, 143:11, 143:17, 151:4, 151:21
**ZIROS** [1] - 95:2
**zoom** [2] - 41:1, 62:23
**Zoom** [1] - 85:1