```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                    WEST PALM BEACH DIVISION
                     CASE NO. 19-CR-80181-RAR-1
 3
      UNITED STATES OF AMERICA,           Miami, Florida
 4
                                          December 7, 2022
 5           vs.
                                          9:05 a.m. - 5:29 p.m.
 6
      MINAL PATEL,                        Volume 8
 7
                    Defendant.            Pages 1 to 227
 8    _____

 9
                         TRANSCRIPT OF JURY TRIAL
10          BEFORE THE HONORABLE RODOLFO A. RUIZ, II
                     UNITED STATES DISTRICT JUDGE
11
      APPEARANCES:
12

13    FOR THE GOVERNMENT:        JAMIE DE BOER
                                 EMILY GURSKIS
14                               REGINALD CUYLER
                                 KATHERINE ROOKARD
15                               UNITED STATES DEPARTMENT OF JUSTICE
                                 CRIMINAL DIVISION, FRAUD SECTION
16                               1400 New York Avenue, 8th Floor
                                 Washington, D.C. 20005
17
      FOR THE DEFENDANT:         STEVEN H. SADOW
18                               LAW OFFICE OF STEVEN H. SADOW, PC
                                 260 Peachtree Street NW
19                               Suite 2052
                                 Atlanta, Georgia 30303
20
      STENOGRAPHICALLY REPORTED BY:
21
                                 ILONA LUPOWITZ, CRR, RPR, RMR
22                               Official Court Reporter to:
                                 The Honorable Rodolfo A. Ruiz, II
23                               United States District Court
                                 299 East Broward Boulevard
24                               Fort Lauderdale, Florida 3301
                                 (954) 769-5568
25
```

```
 1   (Appearances continued)

 2
     FOR THE DEFENDANT:          DONALD F. SAMUEL
 3                               GARLAND, SAMUEL & LOEB, PC
                                 3131 Maple Drive NE
 4                               Atlanta Georgia 30305

 5                               BRIAN T. RAFFERTY
                                 BAKER & HOSTETLER, LLP
 6                               1170 Peactree Street, Suite
                                 2400
 7                               Atlanta, Georgia 30309

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2   WITNESS                                           PAGE

 3   BRETT HIRSCH

 4   DIRECT EXAMINATION BY MS. DE BOER:                  25
     CROSS-EXAMINATION BY MR. SADOW:                    140
 5

 6                 GOVERNMENT'S EXHIBITS

 7

 8   Exhibit                                      Received

 9   1124                                         27
     1241-V                                       32
10   1241-JJ                                      35
     1744,                                        42
11   1744-A, 1241-L, and                          42
     1241-LL
12   1241-L, and 1241-LL                          42
     1241-LL                                      42
13   1888 and 1888-A                              50
     1001-H                                       60
14   1241-MM, 1515,                               61
     1515-A, 1758, 1759,
15   1814, 1814-A
     601, 602, 602-A,                             72
16   603, 603-A, 607-A,
     and 607-D
17   1241-HH and 1241-N                           86
     1241-Q, 1241-S,                              91
18   1748, 1748-A, 1807,
     1241-G, 1757, 1814,
19   1814-A, 1762, 1775,
     1775-A, 1813,
20   1813-A, 1818,
     1818-A, 1889,
21   1889-A, 1890,
     1890-A, 1891,
22   1891-A, 1894,
     1894-A, 1898,
23   1898-A, and 1900-A
     1241-X, 1241-FF,                             93
24   1241-GG, 1241-O
     1241-P                                       96
25   1241-T                                       97
     1899                                         105
```

```
 1   1241-J                                              105
     2000                                               106
 2   1241-U                                              107
     1243 and 1247                                       111
 3   1247-A                                              112

 4

 5                       DEFENDANT'S EXHIBITS

 6

 7
     Exhibit                              Marked    Received
 8
     BH-6                                            153
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    (Call to the Order of the Court.)

2               THE COURT:  Good morning, everyone.  Please be seated.

3      All right.  Let's go ahead and get started.

4               We're here in case number 19-80181, United States

5      versus Patel.  Picking up where we left off in our trial.

6               Couple of housekeeping things I need to address.  One,

7      right now we have about 12 jurors who have arrived, so we're

8      still a few short.  We're going to take advantage of the time

9      we have to talk to our agent, Mr. Mahmood.  And I did receive

10     the email yesterday from Ms. De Boer on that update.

11              Before I get into that, we had one of our jurors who

12     reached out to us early this morning, Juror No. 4, Cabrera.  I

13     believe he's been sitting a little close to the government's

14     table, maybe second chair.  Mr. Cabrera was the juror who also

15     had an issue with his car on the first day that led to a bit of

16     a late start.  He called because he has, in his words, food

17     poisoning, and is now awaiting to go to a doctor with his

18     mother.

19              And so I obviously could not divine, when my CRD called

20     him back, whether or not this was something that was passing,

21     that he would be able to rejoin us.  He seemed to indicate it

22     was not, and it was serious enough that it could knock him out

23     a day, maybe more.  So I wanted to let the parties know that we

24     are prepared -- that's why we have four alternates -- to move

25     forward without Juror No. 4, Julian Cabrera.

1             I'll check with the parties just to make sure there's

2     nothing else I'm missing, or you want to raise any issues with

3     the government on that?

4             MS. DE BOER:  No, Your Honor.  Thank you.

5             THE COURT:  All right.  And with the defense, any

6     issues you guys want to raise on that?

7             MR. SADOW:  If the Court's asking us whether or not we

8     are in agreement that he ought to be excused?

9             THE COURT:  Yes, I am, in large part because I think we

10    can all agree we can't afford to lose -- this isn't an hour,

11    this is possibly a day or more.

12            MR. SADOW:  And this is the gentleman that essentially

13    sits on the last seat?

14            THE COURT:  That's my suspicion.  Am I right, Gracie?

15    I'm asking my courtroom deputy.

16            THE COURTROOM DEPUTY:  He has a beard.

17            THE COURT:  Does he have a bit of a beard, I think, as

18    well, or does he have glasses?  Because I had one --

19            THE COURTROOM DEPUTY:  He's young.

20            THE COURT:  He's the younger one.  Okay, I'm sorry.

21    I'm confusing him with the other gentleman who has glasses.

22            THE COURTROOM DEPUTY:  No, it's not him.

23            THE COURT:  No, that's not him.  Okay.  So he is the

24    one that has a bit of a beard, I'm being told, and a little bit

25    younger.  So in any event, the reality is -- we are not in a

1    position -- and this is why we have alternates -- to wait for

2    him.  It does not seem like it was the first day with an hour

3    delay for a flat tire, and so we are at a crucial juncture, I

4    think, in terms of keeping ourselves on pace.  So I'm ready to

5    call up another alternate to stand in.

6            So that means, just so that we're all on the same page,

7    I believe the next alternate we had would have been Santana

8    Martinez, if my memory serves me right.  Or actually, Enrique

9    Chavez may be the other one.  That was No. 14.

10           So we're still in a good place.  We have two remaining

11   alternates, should something happen.  It's not uncommon.  This

12   is what happens when trials go long.  We lose people.  So in

13   any event, I'm prepared to go forward with who we have.  I

14   don't see any reason why we need to wait for Mr. Cabrera.

15           So anything else from the defense on that point before

16   I call and let him know to go to the doctor and not worry about

17   trying to make it here?

18           MR. SADOW:  The Court certainly has the discretion to

19   do exactly what it intends to do so there's no reason to raise

20   an issue.  We'll just allow it to -- we agree.

21           THE COURT:  All right.  Very good.

22           Gracie, I'll give you this sheet back.  So if you can

23   call Mr. Cabrera and let him know to just go to the doctor and

24   not worry about his health.  We're going to excuse him.  Okay?

25           All right.  So now we've done that, let's do a little

1   homework here as our remaining jurors straggle in.  I received

2   a message, I believe yesterday evening I did.  Ms. de Boer,

3   thank you for getting in touch with our agent.  And my

4   understanding is that HHS OIG Assistant Special Agent in

5   Charge, Steven Mahmood, is present here today to proffer some

6   of the instructions he gave to Mr. Hirsch in connection with

7   the recordings of Mr. Patel.  Specifically, we're talking about

8   the messages conveying to Mr. Patel not to ask about lawyers,

9   quote/unquote, no lawyers.

10          And I know that there was a request -- it was made

11   before we broke yesterday, but reiterated by Mr. Sadow in his

12   emails that he would bring any reports or notes or other

13   documents that might relate to his instructions to Mr. Hirsch.

14          I don't know if there's anything like that.

15   Ms. de Boer, I was going to ask you.  I know you didn't know

16   either.  Do we have a sense if Special Agent Mahmood has

17   anything aside from just his testimony today?

18          MS. DE BOER:  Your Honor, the short answer is yes, but

19   there is a little bit of a longer answer involved, if I could

20   have the Court's indulgence for just one moment on that.

21          THE COURT:  Sure, go ahead.

22          MS. DE BOER:  So I spent some time last night listening

23   to the recording that was on the day in question, which was

24   July 16, 2019.  There are two recordings from that day.  One is

25   a 1-minute-and-16-second recording of a telephone call with

1   Mr. Patel that's very brief, not much is discussed, just a

2   couple of references to samples.

3          More importantly, on that day there was a significant

4   undercover operation at Clio Lab, which is a lab unaffiliated

5   with Mr. Patel, in Lawrenceville, Georgia.  So the text

6   messages that are at issue that Mr. Sadow has been discussing

7   actually relate to the ops plan that was conducted in

8   Lawrenceville, Georgia.

9          So the reports that I have with me are the ops plan,

10  the post debrief of the cooperating witness after he went into

11  Clio Lab, and in listening to the recording last night, there

12  are exact moments on the recording that actually track with

13  what is being said in those text messages in terms of the

14  recommended topics.

15          There is a lot of meandering conversation with the

16  cooperator.  And so you can hear -- you can see where the --

17  one of the people he's recording against mentions attorney

18  advice and legal advice, and moments later is discussing

19  telemed, is discussing patient pay, is discussing the things

20  that are exactly being referenced in the Mahmood text message.

21          And then finally at the very end of the recording with

22  about ten minutes left, Mr. Hirsch says, Chevy Tahoe, nine

23  minutes.  And that correlates with one of the final texts

24  that's on that sheet that was given to you by Mr. Sadow, which

25  is the request for the Uber, because as documented or as at

1    least articulated to me by Mr. Mahmood, the plan was that the

2    ops would end or the operation would end with Mr. Hirsch taking

3    an Uber to an undisclosed location where he would meet with the

4    agents, remove the wire, do the debrief and do all of that.  So

5    it actually relates to a totally different investigation.

6              THE COURT:  So am I --

7              MS. DE BOER:  It's also genetic testing investigation,

8    but not Mr. Patel's.

9              THE COURT:  So am I correct that the text messages that

10   I'm seeing here between Agent Mahmood and Mr. Hirsch are

11   actually related to the Clio investigations as opposed to the

12   current lab investigation of LabSolutions and Mr. Patel?

13             MS. DE BOER:  That's correct, Your Honor.

14             THE COURT:  Okay.  And so is the reports or any plans

15   he's brought with him, they would indicate or refer to the

16   Lawrenceville, Georgia, operation; they're not going to mention

17   anything in LabSolutions?

18             MS. DE BOER:  That's correct.  And I have them here, if

19   Your Honor would like.

20             THE COURT:  What I think we should do and what might be

21   the easiest thing to do -- obviously given the familiarity,

22   ordinarily I would, myself, put him under oath and have him

23   just proffer.  I would ask him questions.

24             I think that because you obviously understand these two

25   operations, it might be easier to simply have the agent take

1    the stand under oath and allow you to do some brief questioning

2    and allow the defense to do some brief cross outside the

3    presence of the jury to figure out exactly what's going on.

4    And while you do that, you can approach with the report, and I

5    can review it in camera just to assure myself that there's

6    nothing in there relevant to this case.

7           Does that make sense to the government?

8           MS. DE BOER:  It does, Your Honor.

9           THE COURT:  Mr. Sadow, yes, I mean, I think you should

10   be able to ask some questions.  There may be other nuance that

11   I wouldn't capture, given the familiarity of the parties with

12   the case.  But certainly we need to get a sense of what this is

13   related to, if only because, aside from the protocol of getting

14   into attorney-client privilege or avoiding getting into

15   attorney-client privileged communications and the ethical

16   obligations, there could now be more of a 401 relevancy if this

17   is really a discussion about a separate operation, not one that

18   was connected to LabSolutions.

19          But what did you want to add to that?

20          MR. SADOW:  Well, I probably should take this down and

21   type it up right away, because in light of what has just been

22   represented, I'm not sure that we need to do anything else.

23          THE COURT:  Okay.

24          MR. SADOW:  What concerns me -- and I'll state it on

25   the record.  There was a wholesale disclosure of discovery

1    information.  We did not get a report from July 16th of

2    Mr. Hirsch, although we have reports involving Clio and

3    Mr. Satary in almost every other debriefing interview.

4         There is no way for us to know that this July 16th text

5    message pertained to Mr. Satary and not to Mr. Hirsch.

6         THE COURT:  I agree with that.  There's no way to know.

7         MR. SADOW:  So to place us in a position that we

8    receive a text message that we believe is in connection with

9    this case, and to put us in a position to use a text message

10   that we believe is connected to this case has now put us at a

11   disadvantage, because if I had a July 16th report, as I

12   understand it exists, and if I had known that this had to do

13   with Satary and not with Mr. Patel, the Court might assume that

14   I probably would not have brought it up at all in front of the

15   jury.

16        So what I've done now is, I've put something before the

17   jury that I'm not going to be able to prove because I had no

18   way to know it didn't pertain to my client.

19        The Court probably can handle that by simply

20   instructing the government not to make reference to it and

21   repeating, as you would normally do, that opening statements

22   aren't evidence, and, of course, I'm going to ask that.

23        But it just seems, when you turn over 25 million pages

24   of documents, including text messages between a cooperating

25   individual and an agent, that the government, at the very

1  least, should have said this doesn't pertain to your client.

2  There is absolutely no way for me to have known that.  There is

3  a July 16th recording of Mr. Patel.

4          I don't know -- there's no way for me to know that this

5  didn't have something to do with that, even as short as it is.

6  So I don't need the agent under oath.  I'm accepting the

7  government's representation.

8          But if there are other reports that we don't have on

9  Mr. Hirsch, the question becomes is it the government's

10  position somehow that we're not entitled to have those because

11  they don't relate to the subject matter?  I'm not sure that I

12  understand why that wouldn't be *Jencks* for us, that we don't

13  have it.

14          So again, the Court can look at it in camera and

15  determine whether or not there's anything there.  But all of

16  that has to do with his cooperation with the government and the

17  benefit that he may derive ultimately.

18          So I guess what I'm asking is, do I get that one and

19  are there more?

20          THE COURT:  All right.  First, we'll certainly address

21  the in-camera review.  If you want to approach, Ms. Gurskis, I

22  can at least start taking a look at that and confirm it.

23          What I'm hearing from the defense -- and look, I will

24  be frank.  I also agree, Mr. Sadow, with your assessment.  I

25  think we will certainly not mention or draw any attention to

1    this exchange going forward, I think just because it put the

2    defense in a bit of an odd spot.

3         It's difficult, without context, I can agree with that.

4    When you look at this text message, one would absolutely

5    believe it was related to this case.  It's impossible to tell.

6    So I don't want there to be any prejudice to the defense that

7    they have not proven if something that they have indicated at

8    the outset of the case was going to be a feature or part of

9    their defense theory.

10         So we won't have any more mention about this July 16,

11   2019, exchange.  I'm hearing from Mr. Sadow that given the

12   representation, which I can confirm by the in-camera review

13   now, we're not going to need to call the special agent because

14   the proffer is going to be sufficient.

15         Now, the final question that he's raised -- and it's

16   just worth mentioning -- is whether or not this particular

17   report that I'm about to look at is one that should be

18   produced.  And, furthermore, are there other reports that would

19   be probative of Hirsch's cooperation with the government that

20   may fall into requirements for production even if they aren't

21   necessarily related to this particular investigation?  And I

22   don't know what the answer to that is.

23         MS. GURSKIS:  Yes, Your Honor.  So one point of

24   clarification.  The report that I was referencing from July 16,

25   2019, is a report of investigative activity documenting that

1   this event took place, that it was conducted using covert

2   audio-recording devices, identifies who the filter and tech

3   agent were, and that sort of thing.

4            So it's not actually a traditional OI3 or 302 --

5            THE COURT:  It's not a 302.  All right.

6            MS. GURSKIS:  Correct.

7            And then in terms of the recording issue and the date

8   in question, the recordings of Mr. Hirsch have been disclosed

9   to the defense.  These included recordings from July 16, 2019.

10  And I note that, as I mentioned earlier, there is that one

11  July 16, 2019, recording that's just over one minute that's

12  with Mr. Patel.

13           The other July 16, 2019, recordings as it pertained to

14  the Satary investigation -- of which there are many because

15  traditionally when an ops plan is undertaken, there are backups

16  and things of that nature -- those have all been disclosed.

17           And it took me listening through those last night to

18  track this conversation with the undercover -- undercover

19  operation at Clio.  But I think it's pretty apparent, even from

20  that really brief recording, that at least the topics that were

21  referenced in the text message between Mr. Mahmood and

22  Mr. Hirsch were not topics that were discussed in that one

23  small July 16, 2019, conversation between Mr. Hirsch and

24  Mr. Patel.

25           THE COURT:  And I guess, to put a finer point on it,

1    the government is indicating, then, number one, what I'm going

2    to review right now is not a 302 but almost a summary report of

3    the operation taking place and its parameters, and that there

4    are no other reports in the way we would expect them to be

5    presented in a 302 format or otherwise regarding communications

6    the government had with Mr. Hirsch or undercover operations

7    that the government had with Mr. Hirsch; is that right?

8             MS. GURSKIS:  Yes, Your Honor.

9             THE COURT:  Okay.

10            MR. SADOW:  But that can't be entirely correct because

11   there was a meeting that Mr. Patel attended with Mr. Hirsch and

12   Mr. Miano that was recorded.  And we don't have any

13   documentation -- we have the audio.  I'm sure there's video,

14   but there's audio.  We don't have a report of that either.

15            THE COURT:  Well, I guess my question on that point --

16   I mean, again, I am not intimately familiar with all the

17   protocol.  But certainly, I would imagine that there may be

18   some of these calls that didn't generate a formal 302 report,

19   certainly not one that would be produced.

20            I mean, this is a perfect example.  This didn't

21   generate a report.  I mean, I wouldn't call what you're telling

22   me a report.  It seems like a summary of the parameters of what

23   was done, what operation it was related to, but not a report in

24   the true sense; is that right?

25            MS. GURSKIS:  Yes, Your Honor.

1          THE COURT:  Okay.  So, again, I don't --

2          MR. SADOW:  And I understand the distinction.  The only

3   question is, does it relate statements of Mr. Hirsch in the

4   document.  If it doesn't, if it just talks about we got

5   together and we did all of this, but it doesn't have anything

6   to do with what Hirsch says, then I understand it.

7          But if it has something to do with what Hirsch tells

8   the agents about what took place that may not be picked up on

9   the audio -- movements, that type of thing -- then it could

10   have value.  I'm just saying I don't have it.

11          THE COURT:  I don't -- I don't disagree with you, and

12   I'm going to go ahead and take the government at face value

13   that you don't have it because they don't exist.

14          I have to expect that the government -- they've

15   produced all the audio, so certainly we know the audio is

16   there.  But to the extent there is a report that has discussion

17   or indicates statements made in that undercover or that

18   recorded conversation, then, in that situation, certainly we

19   would have some value to the report.

20          But, similar to what I'm being or will be shown now on

21   the July 16, 2019, call, those are not relating any sort of

22   statements, but they're simply talking about the nature of the

23   operation.

24          And so the fact that no other reports with related

25   statements of Hirsch have been produced would lead me to

1   believe that there were no reports that discuss his statements

2   made; and therefore, the discovery obligations of the

3   government would be satisfied and have been satisfied by the

4   production of all the audio.  There's no other gloss on the

5   audio by way of a report.

6          Is that a fair statement?

7          MS. GURSKIS:  Yes, Your Honor.

8          THE COURT:  All right.  Do me a favor, Ms. Gurskis.

9   Come on forward.  Let me take a look at this one, this

10  July 16th summary, just so I can put this issue to bed.

11         And I appreciate the special agent coming early to

12  assist us, but it looks like we'll be able to move on after I

13  look at this.  Thank you.

14         Okay.  The Court can make clear, at this point, I have

15  reviewed both the operational plan and the report of

16  investigative activity.  I'm addressing Mr. Sadow's concern.

17  There are no related statements summarized in either of these

18  documents.  They are simply outlining the nature of the

19  activity, who participated, what the subject matter was

20  generally.

21         I can also confirm that this relates to the same date

22  of 7/16/2019 and that the focus, as indicated by both the

23  operational plan and report of investigative activity, is that

24  these communications were done in the investigation of Clio,

25  the facilities in Lawrenceville, Georgia.

1          So from a relevancy standpoint, these aren't going to

2  apply really to the LabSolutions investigation, and I don't see

3  anything in any of these documents reviewed in camera that

4  would indicate any statements or related statements made by

5  Mr. Hirsch.

6          So that would, to me at least, eliminate any concerns

7  regarding the July 16, 2019, text exchange.  And I think, by

8  agreement of all parties, that the way we should handle this is

9  to make no further mention of that particular text exchange

10 either on direct or raising it on cross.

11         And, of course, at the end, I will give my usual

12 instruction that opening statements are not evidence to

13 minimize the fact that that was shared at opening.  Although I

14 think it was done, quite frankly, in passing.  I don't know

15 that jurors are going to pick up on that not coming up again in

16 the case.

17         But in any event, I'm satisfied we don't have to call

18 Special Agent Mahmood at this time and continue on with a

19 proffer.

20         So with that being said, Mr. Sadow and the defense

21 team, are you all in agreement with me that we can move on from

22 this issue?

23         MR. SADOW:  Yes, Your Honor.

24         THE COURT:  Very good.  Let me go ahead and return that

25 to you, Ms. Gurskis -- thank you for that -- having completed

1   the in-camera review.

2         All right.  So I think we've taken care of all the

3   housekeeping we had to do this morning.  Our plan, I believe,

4   continues to be to have Mr. Hirsch begin this morning with his

5   direct examination.  Hopefully we can complete his examination

6   today and start off with Mr. Holden.

7         Does that continue to be the plan from the government's

8   end?

9         MS. DE BOER:  Yes, Your Honor.  And could I just

10   clarify one matter?

11         THE COURT:  Of course.

12         MS. DE BOER:  So I understand we've dealt with the text

13   message.

14         THE COURT:  Yes.

15         MS. DE BOER:  But just so that the Court and the

16   defense is clear, Mr. Hirsch was orally instructed with respect

17   to the Patel recordings do not ask about attorneys, do not

18   elicit legal advice.  If attorneys are brought up, change the

19   subject.

20         And I've spoken with the agent about this, and we've

21   also spoken with Mr. Loper, who was the attorney on this matter

22   at the time, and that I can represent to the Court -- and we

23   can say more about this ex parte if the Court would like to

24   hear about it -- that was done based on instructions from DOJ's

25   ethics attorneys, and it was not done for the nefarious reasons

1    discussed yesterday.  It was done to protect the defendant's

2    privilege and to maintain the integrity of the investigation,

3    as these recordings were conducted at a point where the

4    defendant had not waived his privilege.

5         And so, obviously, we've dealt with the text message.

6    But the government would request that even though some

7    instructions, you know, may be fair game for the cross, the

8    instruction of did the government ever tell you don't ask about

9    lawyers, we don't think that that's fair game for the same

10   reason that the text message is not fair game.

11        THE COURT:  Yeah.  We talked about this a little bit

12   yesterday.  And obviously, I think it's important, as you've

13   just done, Ms. de Boer, to put on the record a further proffer,

14   after speaking to Mr. Loper and Mr. Mahmood, that the basis --

15   without having to call him to the stand and get into the

16   protocol -- that the basis was an ethical concern from DOJ as

17   to staying away from the lawyers.

18        So turning to the defense on this point, can I get some

19   assurances or at least some understanding of how, if anything,

20   this is going to come up?  Because I don't necessarily know --

21   if this text message is now no longer a feature, I don't know

22   how much we're even going to touch on the issue of the agent

23   telling Mr. Hirsch not to discuss lawyers.

24        Is that even going to be a concern for the defense?

25   Because if it is, I still may have to give that instruction.

1           But my understanding -- correct me if I'm wrong -- was

2    that if today's proffer indicated that that was the basis for

3    the instruction, it would not be asked at all.  That was what I

4    understood.

5           Is that still the defense's position, Mr. Sadow, that

6    we're not going to touch on the lawyer instruction anymore?

7           MR. SADOW:  Correct.

8           THE COURT:  Okay.  So we shouldn't even have to worry

9    about it anymore.  Obviously, if something happens --

10          MR. SADOW:  There's no purpose for me to go into

11   something that I can't use.

12          THE COURT:  I agree.  No reason to cover it.  It's no

13   longer going to be probative of anything.  And if anything, all

14   it's going to do is generate a strong instruction from the

15   Court, which we all want to avoid because we don't want to draw

16   attention to something that has no probative value and, if

17   anything, kickback prejudicial.

18          So let's stay away from that.  Obviously, Mr. Hirsch

19   will not be asked any questions about that.  If I suspect he's

20   going there, I will stop him myself if not prompted by an

21   objection first.  But I think there will be no discussion of

22   any undercover calls or any recorded calls being done with

23   instructions about staying away from legal advice or the

24   representation afforded by lawyers.

25          So does that take care of your concerns; it's not going

1   to be covered now, Ms. de Boer?

2           MS. DE BOER:  It does, Your Honor.  And may I briefly

3   step out to advise the witness of the Court's ruling, just so

4   that that's taken care of?

5           THE COURT:  Yes.  Please do that.  Please do that.

6   Because I think it's important he knows he shouldn't be asked;

7   but in the event he's asked, he should hold back from answering

8   any questions regarding instructions given to him by anyone on

9   the government's team regarding inquiring or touching on legal

10  advice from lawyers.

11          MS. DE BOER:  Thank you, Your Honor.  I will be right

12  back.

13          THE COURT:  Okay.  Very good.

14          Okay.  Great.  And as we are allowing that to be done,

15  I am being told that all of the lawyers -- excuse me; all the

16  lawyers are definitely here -- all the jurors are now here.

17          Do I have anything on the defense side, while I wait

18  for the instructions for Mr. Hirsch, that I need to be aware of

19  before we get started?  Guys, anything else?  We're good?

20          MR. SADOW:  No, Your Honor.

21          THE COURT:  Excellent.

22          And anything else -- I know, Ms. Gurskis, we'll wait

23  for Ms. de Boer, but anything else -- aside from what we've

24  done on Special Agent Mahmood, any other housekeeping that

25  you're aware of?

1           MS. GURSKIS:  No, Your Honor.

2           THE COURT:  Okay.  All right.  So as soon as

3    Ms. de Boer rejoins us, we will go ahead and bring in our jury,

4    and we will get started with Mr. Hirsch.  Okay?

5           All right.  Ms. de Boer, are we ready to go?

6           MS. DE BOER:  Yes, Your Honor.

7           THE COURT:  All right.  Very good.  Let's go ahead and

8    bring in our jurors, please.

9           THE COURT SECURITY OFFICER:  All rise for the jury.

10          (Jury enters at 9:34 a.m.)

11          THE COURT:  Please be seated, everyone.

12          Good morning, ladies and gentlemen of the jury.  Great

13   to see you all.  I trust you all have your notepads, and we're

14   ready to go.  So we're going to continue on with the

15   government's case-in-chief by having them call their next

16   witness.  All right?

17          Government's next witness.

18          MS. DE BOER:  Thank you, Your Honor.  The United States

19   calls Brett Hirsch.

20          THE COURT:  All right.  And we'll get Mr. Hirsch on up

21   here.

22          Good morning, Mr. Hirsch.  Let's go ahead and stand up

23   for me, Mr. Hirsch, and we're going to swear you in.

24          (Government witness, BRETT HIRSCH, duly sworn.)

25          THE COURTROOM DEPUTY:  Please be seated.  Speak into

1    the microphone.  Say and spell your name for the record.

2         THE WITNESS:  My name is Brett -- my name is Brett

3    Hirsch, B-r-e-t-t, H-i-r-s-c-h.

4                        DIRECT EXAMINATION

5    BY MS. DE BOER:

6    Q.  All right.  Good morning, Mr. Hirsch.

7    A.  Good morning.

8    Q.  And I'm just going to ask you -- you're doing a good job of

9    this already, but just make sure you're speaking into the

10   microphone and that you keep your voice up so that everyone can

11   hear you.  Okay?

12   A.  Yep.

13   Q.  Mr. Hirsch, have you pled guilty to a federal crime?

14   A.  Yes.

15   Q.  What did you plead to?

16   A.  One count for getting a kickback from the lab.

17   Q.  And who did you accept kickbacks from?

18   A.  LabSolutions, Minal Patel.

19   Q.  All right.  Did you accept kickbacks from any other labs?

20   A.  Yes.

21   Q.  Which labs?

22   A.  Clio.

23   Q.  And who owns Clio?

24   A.  Khalid Satary.

25   Q.  Okay.  What did you provide to LabSolutions and Mr. Patel

1    in exchange for kickbacks?

2    A.   I -- two different things.  I brought in a handful of reps

3    that -- that were submitting tests, and I also submitted tests

4    as well, CGx and PGx.

5    Q.   Okay.  Do you see Mr. Patel in the courtroom today?

6    A.   Yes.

7    Q.   Could you please identify him by where he is sitting and an

8    article of clothing?

9    A.   Grey suit jacket, third -- third one in, third to the back.

10   Q.   Okay.

11        MS. DE BOER:  Your Honor, may the record reflect that

12   the witness has identified the defendant.

13        THE COURT:  The record will reflect it.

14   BY MS. DE BOER:

15   Q.   So, Mr. Hirsch, you weren't here for all of this, but we've

16   already got a lot of background on what genetic testing is and

17   what LabSolutions was, so I'm going to jump straight into, how

18   did you get into the genetic testing business?

19   A.   I actually met Minal -- Khalid introduced us.  We were at

20   the Hard Rock one night.  Khalid said don't talk business.  We

21   were having dinner.  We gambled a little bit.  And then

22   coincidentally, the next day I saw Minal at the Boca Beach

23   Club.

24        MS. DE BOER:  And, Your Honor, at this time the

25   government moves into evidence Government Exhibit 1124.

1              THE COURT:  Any objection?

2              MR. SADOW:  No.  And as I have done with all the other

3    witnesses, we will not be objecting to any of the government

4    exhibits.

5              THE COURT:  Thank you, Mr. Sadow.  That'll be admitted

6    at this time.

7              MS. DE BOER:  Thank you, Your Honor.

8         (Government Exhibit 1124 was received in evidence.)

9    BY MS. DE BOER:

10   Q.  And, Mr. Hirsch, I'll show you what's Bates stamped 4764.

11   It's a page from Government Exhibit 1124.

12        Do you recognize this?

13   A.  Yes.

14   Q.  And what is it?

15   A.  It's the pool at the Boca Beach Club.

16   Q.  You mentioned that you had bumped into Mr. Patel at the

17   Boca Beach Club by coincidence the day after you had dinner

18   with him.

19        Is this where you bumped into him?

20   A.  Yes.

21   Q.  Where were you when you bumped into him?

22   A.  I was in the back, on the back side of the pool, in the

23   chairs to the right.

24   Q.  Okay.  And where was Mr. Patel?

25   A.  He was to the left side of the pool, in the -- it's cut

1    off, but there was, like, these beds there on the left side.

2    Q.   Were you at the beach club with anybody else on that day?

3    A.   Yes.

4    Q.   Who else was with you?

5    A.   I was with Keith Youngswick.

6    Q.   Who's Keith?

7    A.   He was my partner.

8    Q.   Your business partner?

9    A.   Yes.

10   Q.   All right.  And was Mr. Patel with anyone?

11   A.   He was with a young lady.

12   Q.   Okay.  Did you speak to Mr. Patel that day at the Boca

13   Beach Club?

14   A.   Yes.

15   Q.   What did you talk about?

16   A.   We asked each other what we do, you know, what we do for a

17   living because we couldn't talk that night.  I told him I was

18   involved in a rehab.  And he mentioned something about

19   genetics, which at that time I knew nothing -- nothing about.

20   Never heard of it.  Didn't know anything about it.

21   Q.   And -- so you weren't in the genetic testing business by

22   this point.  What business were you in?

23   A.   I was in the rehab business, and I -- in the lab business

24   as far as toxicology.

25   Q.   Okay.  And what was your relation to Khalid Satary at that

1   point?

2   A.   He was -- the lab that we were submitting the tests,

3   the toxicology tests.

4   Q.   And just for the jury's benefit, what is a toxicology test?

5   A.   It's a test that they give people when they're in drug and

6   alcohol treatment centers to test to see if they have drugs --

7   if they're positive for drugs and alcohol.  Not alcohol, drugs.

8   Sorry.

9   Q.   Okay.  So after you met Mr. Patel, after you bumped into

10  him at the Boca Beach Club, did you set up another meeting, or

11  did you ever have another meeting with him?

12  A.   Yes.  But at that meeting -- I actually called Khalid and

13  said, you know, we were there.  He went crazy, threatening that

14  he'll not pay me anymore, you know, I set the meeting up, that

15  we set it up, you know, and go screw me, go screw Minal.

16       But, yeah, we did -- we did set up to meet again.

17  Q.   And when did you next meet with Mr. Patel?

18  A.   (No verbal response.)

19  Q.   Just to be clear, it's not a memory test.  I'm not asking

20  you for a specific date.  But you bumped into him at the Boca

21  Beach Club.

22       How soon after did you meet with him again?

23  A.   I can't -- I don't know the time when it was, but we did

24  meet relatively quick after that.  I don't remember.

25  Q.   Okay.  And where was this next meeting?

```
 1    A.   Boca Beach Club.

 2    Q.   Okay.  Who was there?

 3    A.   Shawn Griner.

 4    Q.   Shawn Griner and who else?

 5    A.   And Minal Patel.

 6    Q.   Minal Patel.  You.  Anybody else?

 7    A.   No.

 8    Q.   Was anybody else at the LabSolutions meeting besides

 9   Mr. Patel?

10    A.   No.

11    Q.   Did Mr. Patel bring any attorneys to the meeting?

12    A.   No.

13    Q.   Did you bring an attorney to the meeting?

14    A.   No.

15    Q.   Okay.  So when you, Mr. Griner, and Mr. Patel -- well, let

16   me back up.

17         Why did you bring Mr. Griner to the meeting?

18    A.   Shawn was known in the industry of having call centers.  He

19   was in the DME business.  He was in the compound business.  I

20   figured he'd be a perfect match.

21    Q.   All right.  Can you explain to the jury what was discussed

22   at this meeting about telemarketing?

23    A.   That Shawn had a call room and he could, you know, blow

24   this out, he could bring a lot of business to the table.

25    Q.   And you mentioned earlier that, you know, previously you
```

1   were not involved in genetic testing, so what did Mr. Patel

2   tell you about genetic testing that piqued your interest?

3   A.   That there was going to be higher reimbursements paid to --

4   like, mentioned Medicare, that Medicare was, like, a more --

5   how can I explain it?  That Medicare was an easier way to get

6   reimbursements than the private insurances that I was dealing

7   with at the rehabs.

8   Q.   Explain that to the jury.  Why is Medicare easier to get

9   paid from?

10   A.   Well, from my understanding, it was easier -- you submit

11   it.  And there was a timetable of when they had to pay.

12   Whereas private insurance, it could take five months, six

13   months, you know, to collect the money.

14   Q.   Did you discuss anything about this meeting, about how you

15   or Shawn would get paid by the lab?

16   A.   Yes.

17   Q.   What was discussed?

18   A.   That I would get -- after whatever the cost of the test

19   was, I would get 50 percent.  And then, if I brought Shawn in,

20   I would get an override on whatever Shawn would bring in.

21   Q.   Okay.  At the conclusion of this meetings, what were your

22   takeaways?

23   A.   Takeaway was that Shawn was interested and he was gonna

24   move forward.  And I connected them two, and they took it from

25   there.

1   Q.   When you first started doing business with LabSolutions,

2   how were you finding patients?

3   A.   When I first started, I actually went to -- myself and

4   Keith Youngswick, my partner, we went to family and friends.

5          MS. DE BOER:   At this time, Your Honor, the government

6   moves Government Exhibit 1241-V, as in Victor.

7          THE COURT:   That will be admitted now without

8   objection.

9       (Government Exhibit 1241-V was received in evidence.)

10  BY MS. DE BOER:

11  Q.   Mr. Hirsch, in the -- did the government seize your cell

12  phone at some point?

13  A.   Yes.

14  Q.   And in the course of preparing to testify today, have you

15  looked and reviewed various text messages that were taken from

16  your phone?

17  A.   Yes.

18  Q.   Okay.  So I'm going to show you Government Exhibit 1241-V,

19  which is in evidence.  And do you see there's a cover sheet to

20  this?

21      Do you see the cover sheet here?

22  A.   Yes.

23  Q.   Okay.  And in this particular chat, it's you and Jon

24  LabSolutions.

25      Do you see that?

1   A.   Yes.

2   Q.   Who was Jon LabSolutions?

3   A.   Jon Berarducci was, I guess, head of operations, I want to

4   say, his position of LabSolutions.

5   Q.   Okay.  And so -- just to be clear, Minal Patel is not on

6   this particular chain; is that correct?

7   A.   No.

8   Q.   So we're going to show you -- I'm going to direct your

9   attention to this chain here, Mr. Hirsch.  And just to be

10   clear -- so if we see up here, Jon is the grey text and you are

11   the blue text; is that right?

12   A.   Yes.

13   Q.   And so it says, local user -- in other words, because it

14   was taken off of your cell phone.

15   A.   Yes.

16   Q.   Okay.  Directing your attention to this text message here,

17   this was from January 11th of 2017.

18        Do you see that?

19   A.   Yes.

20   Q.   Is this relatively early into your work with LabSolutions?

21   A.   Yes.

22   Q.   And can you read here what you said to Jon?

23   A.   Thanks.  Diane Hirsch canceled test, Dr. Mahmood, Coconut

24   Creek, Florida.

25   Q.   Who is Diane Hirsch?

1   A.   My mom.

2   Q.   And what did your mom have to do with LabSolutions?

3   A.   I had her -- she submitted a test.  I had her go to her

4   local physician to get tested.

5   Q.   Did you submit tests for any other family members?

6   A.   Yes.

7   Q.   Who?

8   A.   My dad.

9   Q.   Did your mom have cancer?

10  A.   Yes.

11  Q.   How, if at all, was the test that LabSolutions ran -- how

12  was that used to help her?

13  A.   It didn't.  Unfortunately, my mom passed away a couple of

14  months ago.  But no, it didn't do anything.

15  Q.   I'm sorry to hear that.

16       Okay, Mr. Hirsch.  So you start with family and friends.

17  How did you, over time, ramp this thing up?

18  A.   I ramped it up by recruiting a lot of reps via underneath

19  me as, like, a sub rep or introducing them to the lab, to

20  submit tests, you know, to submit tests, and I would get an

21  override on them.

22  Q.   Can you explain to the jury, who were some of the other

23  people that you brought into this business?

24  A.   Shawn Griner, as we just spoke, Sean Deegan, Dr. Rama.

25  Q.   And we're going to talk about some of those people.

1            MS. DE BOER:  But first, at this time, Your Honor,

2    the government moves Government Exhibit 1241-JJ into evidence.

3            THE COURT:  That'll be admitted without objection.

4            (Government Exhibit 1241-JJ was received in evidence.)

5    BY MS. DE BOER:

6    Q.  So, Mr. Hirsch, I'm going to show you some excerpts from

7    1241-JJ.

8            And to be clear, this is more text messages from your cell

9    phone?

10   A.  Yes.

11   Q.  And we'll start with the cover page here, 1241-JJ.  So this

12   is a chain between yourself, the local user, Minal Patel, and a

13   404 number.

14           Do you see that?

15   A.  Yes.

16   Q.  So going to the second page of Government Exhibit 1241-JJ,

17   I'm going to direct you to start here, on this text message.

18           Can you read it okay, Mr. Hirsch?

19   A.  Yes.

20   Q.  All right.  And do you see that the date of the text

21   message that you sent to Mr. Patel and the 404 number is

22   August 6th of 2016?

23   A.  Yes.

24   Q.  All right.  So 2016, is this around the time when you began

25   dealing with Mr. Patel?

1   A.   Yes.

2   Q.   All right.  This is the beginning, more or less.

3   A.   Yes.

4   Q.   Okay.  So you say here:  Hi, I'm in the city with Dr. Rama,

5   a lot of business.  Can you be available for a call?  Money, no

6   sleep.

7        Do you see that?

8   A.   Yes.

9   Q.   What were you trying to tell Mr. Patel?

10  A.   That I was with Dr. Rama, and he's -- he was very

11  interested in coming on board to submit tests.

12  Q.   And how did you meet Rama?

13  A.   I met him down in Brickell through an old friend of mine

14  from Wall Street.  He said he knew this doctor that might be

15  interested.

16       I actually did a little compounding with him.  I had him do

17  some compounding.  So that's how I -- that's how we started

18  doing a little business.  But he made some money with someone I

19  referred to him to do compounding, so I had -- he was

20  interested in what else I was doing.

21  Q.   Okay.  Now, then you say to Mr. Patel:  Need EOB on

22  Medicare.  Can you send right away?

23       What were you asking for?

24  A.   Just something to show that -- how much the reimbursement

25  was on a cancer genomics or a pharmacogenetics.  It would show,

1   like, the reimbursement from --

2   Q.   Okay.  And Mr. Patel says:  Send me email address.

3        Do you see that?

4   A.   Yes.

5   Q.   And then going to -- continuing on to the next page of

6   Government Exhibit 1241-JJ, then do you see here at the top,

7   you send your email address?

8   A.   Yes.

9   Q.   And then you say:  For me to give to Dr. Rama.

10       Do you see that?

11  A.   Yes.

12  Q.   What were you going to do with the EOB that you got from

13  Mr. Patel?

14  A.   I was going to show it to Rama to get him interested.

15  Q.   Okay.  And Mr. Patel responds:  Look at email.  Sent you a

16  few.

17       And you say:  Oh, okay.

18       Do you see that?

19  A.   Yes.

20  Q.   And you had mentioned Shawn Griner.  So going down on this

21  chain, do you see, two days later -- sorry; there is a little

22  bit of feedback here -- two days later, you say:  Has Shawn

23  been set up yet?

24       Do you see that?

25  A.   Yes.

 1   Q.   Okay.  And the 404 number responds:  I have no idea.

 2        And continuing to the next page of Government

 3   Exhibit 1241-JJ, you say:  Okay.  I will call him.

 4   A.   Yes.

 5   Q.   Then Minal says:  No.  I have reached out a few times.

 6        And then Mr. Patel sends you a screenshot of an exchange he

 7   had with Mr. Griner --

 8   A.   Yes.

 9   Q.   -- where he asked Mr. Griner to send information?

10   A.   Yes.

11   Q.   All right.  Now, back to Rama.

12        Did Rama end up working with you to refer patients to

13   LabSolutions?

14   A.   Yes.

15   Q.   Can you explain to the jury, what are the type -- some of

16   the ways in which Rama got patient referrals?

17   A.   It was my understanding that his family owned a medical

18   practice, so he -- that's how he started.  Most of the business

19   came from that.

20   Q.   And his family -- so who was signing off on some of those

21   tests?

22   A.   I don't know who actually signed off on it, but it was --

23   it was just known that it was his family's practice.  I don't

24   know who actually signed the forms.

25   Q.   Fair enough.

1    You are seeing -- witnessing someone sign --

2  A.  Right.

3  Q.  -- putting pen to paper?

4  A.  Yeah.

5  Q.  Okay.  Fair enough.  Let me ask it differently.

6    What did Mr. Patel ever tell you about Dr. Rama's family?

7  A.  That -- that he was getting tests from his family, from his

8  mom.

9  Q.  Besides getting tests from his mom, what are some of the

10  other ways in which Rama got tests?

11  A.  He was getting tests in the train station.  I didn't

12  physically see it myself, but train station, Walmart -- stands

13  out in front of Walmart.

14  Q.  Over time, once you brought Rama into the picture, how

15  close did Rama and Mr. Patel become?

16  A.  They were, like, inseparable at some point.  Very close.

17  Q.  What do you mean?

18  A.  Both single, just -- they were together all the time.

19  Q.  Would they travel together?

20  A.  They would travel together, yes.

21  Q.  Okay.  Did there ever come a time where you learned that

22  Rama had gotten in trouble?

23  A.  Yes.

24  Q.  How did you learn that?

25  A.  Minal told me he got in trouble.

1    Q.  Did Mr. Patel tell you what he got in trouble for?

2    A.  My understanding, it was for compounds.  It wasn't anything

3    to do with CGx or PGx, genetic testing; it was for compounding.

4    Q.  Okay.  And did Mr. Rama approach you again about being back

5    involved with Mr. Patel?

6    A.  Yes.  Minal --

7    Q.  What did --

8    A.  Minal didn't want to take him back.  He said, Brett, we

9    can't do business with this guy.  We gotta stay away from him.

10         And then I recall them going back to him -- I don't know if

11   it's before or after he got in trouble.  They wanted to cut his

12   payout down, and he didn't want to get his pay cut down, so he

13   wanted to go through me.

14   Q.  And did that happen?

15   A.  No.

16   Q.  Why not?

17   A.  It just -- it just didn't happen.  It never -- it never

18   came to fruition.

19   Q.  Okay.

20   A.  I don't remember.

21   Q.  Did Rama ever say anything about having lawyers?

22   A.  Lawyers?

23   Q.  Yeah.

24   A.  After he got in trouble or before?

25   Q.  Either.

1   A.   Well, he came to my restaurant, apparently while he was in

2   trouble, with all his court documents to show me that this

3   is -- his lawyer -- he said his lawyer said he's not getting in

4   trouble; this is all -- he's just going to get a slap on the

5   wrist, and is there any way we could, you know, continue under

6   you to submit to Minal.

7        So, yes, he talked about his lawyer, that everything is

8   fine.

9   Q.   And did you ever speak to his lawyer?

10  A.   No.

11  Q.   Did you ever see anything in writing from his lawyer saying

12  he could come back and do business with you?

13  A.   No.

14  Q.   The word lawyer -- you know, my lawyer said it was okay, is

15  that something that got thrown around in this industry a lot?

16  A.   Yes.

17  Q.   What do you mean?

18  A.   Everyone said they spoke to their lawyer; it's all legit,

19  nothing to worry about.  Opinion letters.  I never saw any of

20  them, but it was just always talked about.

21  Q.   Okay.

22        MS. DE BOER:  At this time, Your Honor, the government

23  would move into evidence Government's Exhibit 1744 and 1744-A,

24  1241-L and 1241-LL.

25        THE COURT:  That'll all be admitted without objection.

1            MS. DE BOER:  Thank you, Your Honor.

2            (Government Exhibits 1744, 1744-A, 1241-L, and 1241-LL

3        were received in evidence.)

4    BY MS. DE BOER:

5    Q.  So, Mr. Hirsch, I'm now going to show you what has now been

6    admitted as Government Exhibit 1744.

7            And starting here at the top, do you see that this is an

8    email chain that includes yourself, here, Tushar Narottam,

9    Keith Youngswick, and Minal Patel?

10   A.  Yes.

11   Q.  And this is from May of 2017?

12   A.  Yes.

13   Q.  And do you see that there is an attachment here -- two

14   attachments?

15   A.  Yes.

16   Q.  And then starting with the email down here, in the middle

17   of the chain, Keith sends an email saying that:  This is a

18   follow-up to mine and Minal's conversation yesterday.  Minal,

19   please approve the authorization for Tushar to request

20   accounting to send out the funds for April this morning.  The

21   amount is $203,381.91, which is the amount Tushar put together

22   from the commission run.

23           Do you see that?

24   A.  Yes.

25   Q.  So what was Keith asking for?

1    A.   He was asking for commissions for the month previous on the

2    tests that we -- the CGx/PGx that we got paid.

3    Q.   All right.  And this is referencing Tushar.  We saw

4    somebody named Tushar that was copied on the email.

5         Who is Tushar?

6    A.   Tushar was the one that actually sent the wires.  I

7    understand he was some sort of relative of Minal.  I don't

8    really know.

9    Q.   Okay.  And why did Keith need to go to Minal to get that

10   approval?

11   A.   It was Minal's -- Minal was the one that cut -- you know,

12   it's his company.  He had to approve it.

13   Q.   Okay.  I'm going to take you to 1744-AA -- 1744-A.

14        And is this, Mr. Hirsch, a copy of one of the spreadsheets

15   that's attached?

16   A.   Yes.

17   Q.   Okay.  And we're going to start on this side of the

18   spreadsheet for a second.

19        And do you see here, there's a column with your name?

20   A.   Yes.

21   Q.   And then there's a bunch of other names underneath that?

22   A.   Mmm-hmm.

23   Q.   Q Health, Mike Newman, Wilcox, and then it goes on?

24   A.   Yes.

25   Q.   What is -- what are those names?

1  A.   Those are the subcontractors, I would say, that worked

2  underneath me that didn't actually have their own agreement

3  with LabSolutions.   They had an agreement with me.

4  Q.   Okay.  And then when it says, in the next column,

5  adjudicated commission, what does adjudicated mean?

6  A.   That LabSolutions collected.  Money collected, money paid.

7  Q.   And where did LabSolutions get that money from?

8  A.   Medicare, Medicaid, some private insurance.

9  Q.   Okay.  And then continuing over, you see commissions paid.

10      Is that reflecting what had already been paid to you?

11  A.   That's how much we were owed from the previous month.

12  Q.   Okay.  These types of tracking spreadsheets, did you

13  commonly send or receive things like this with LabSolutions?

14  A.   Every month.

15  Q.   Okay.  So I'm going to show you now what has been admitted

16  as 1241-L.

17      Mr. Hirsch, is this another excerpt from your cell phone?

18  A.   Yes.

19  Q.   And this is an excerpt of a chat between you and Mr. Patel?

20  A.   Yes.

21  Q.   Okay.  So -- and this is from January of 2019.

22      Do you see that?

23  A.   Yes.

24  Q.   And starting at the top here, you say:  He has a thousand

25  PGx a week.

1    Do you see that?

2    A.   Yes.

3    Q.   Now, can you tell from this who, in particular -- what rep

4    you're referring to?

5    A.   No.

6    Q.   Okay.  And then you say:  Let's get it.  Him and I going to

7    split the -- you say commotion.

8        Did you mean commission?

9    A.   Yes.

10   Q.   All right.  And then you correct yourself, and then

11   Mr. Patel says:  Yes.

12       Do you see that?

13   A.   Yes.

14   Q.   Okay.  How common was it for you to discuss new reps and

15   how commission structures would work with Mr. Patel?

16   A.   He's the only one I would -- he's the only one that I dealt

17   with when it came to that.

18   Q.   And why is that?

19   A.   That was the relationship we had.  I went directly with

20   him.

21   Q.   Okay.  So now I'm going to show you 1241-LL.

22       And is this another -- another chat from your phone?

23   A.   Yes.

24   Q.   And this is you, Jon Berarducci, and Mr. Patel?

25   A.   Yep.

```
 1  Q.   Okay.  And this is from October of 2018.

 2       Do you see that?

 3  A.   Yes.

 4  Q.   And Jon says:  Minal and Brett, are we good to go on

 5  Eileen's contract?

 6       Do you see that?

 7  A.   Yes.

 8  Q.   Do you remember who Eileen was?

 9  A.   Eileen Stein was a rep that worked underneath me and that

10  actually ended up working straight for the lab.

11  Q.   And then you say:  No.

12       And Jon says:  You guys just let me know.

13       And then you say:  I'm looking for 10 percent.  I put a lot

14  of work into her.  You guys should give her 35, minus 5

15  billing.

16       Do you see that?

17  A.   Yes.

18  Q.   Can you explain to the jury what you were saying in this

19  text?

20  A.   So at that point, she wanted to not work underneath me, she

21  wanted to work directly with the lab and have her own contract.

22  So we were just fighting over how much money I should get

23  because I did bring her in on an override basis.

24  Q.   And what -- I'm sorry.  Go ahead.

25  A.   If it should be 5 percent, 10 percent.
```

1    Q.   And what is an override?

2    A.   So she brought in, let's just say, a hundred samples, and

3    they generated a thousand dollars, I would get whatever -- I

4    would get 10 percent of the thousand dollars or 5 percent on

5    the thousand dollars, depend -- I don't remember what we worked

6    out on this, but --

7    Q.   Okay.

8    A.   I would get a percentage of what she brought in.

9    Q.   All right.  And then here you said:  I'm looking for

10   10 percent.

11       And then the next text you say:  And hit me with the ten.

12       So what were you asking for from LabSolutions with respect

13   to --

14   A.   10 percent, 10 percent payout.

15   Q.   Okay.  And then you say:  And charge her 650 minimum on the

16   CGx.

17       Do you see that?

18   A.   Yes.

19   Q.   What does that mean?

20   A.   It was the cost of doing business.  LabSolutions had a cost

21   of goods for the test kit, to run the test, and that money was

22   taken out before anyone made commissions.  That was, like, a

23   cost to do business.

24   Q.   Okay.  And then we go to the next page.

25       And you say:  Minal, on you, little buddy.

```
 1         Do you see that?

 2   A.    Yes.

 3   Q.    What were you asking from Minal?

 4   A.    To approve what I wanted, the 10 percent.

 5   Q.    Jon says:  Minal said he could do 9.5 percent override.

 6   A.    Yes.

 7   Q.    And you say:  Done.  LOL.

 8   A.    Meaning I gave in, just not 10, 9 1/2.

 9   Q.    9 1/2, 10; pretty close.

10   A.    Yes.

11   Q.    And Jon sends some smiley faces.

12         You say:  LOL.

13         And then you say:  Eileen is texting you asking.

14         Right?

15   A.    Yes.

16   Q.    Then Minal pipes up and says:  You gotta take 5.

17         Meaning what?

18   A.    He didn't want to give me the 10 or 9 1/2.  He wanted to

19   give me 5.

20   Q.    Okay.  And then --

21   A.    5 percent.

22   Q.    5 percent.  Okay.

23         Then continuing to the next page, you say:  Unreal, duck

24   that.

25         Minal Patel says:  LOL, JK?
```

1          There's a little bit of banter here.

2          And then Jon says:  But she wants 40 minus 5.

3          And you say:  Enough already.

4          Do you see that?

5     A.   Yes.

6     Q.   Okay.  All right.

7          And then on the next page you say:  She will take 35.  It's

8     done.  Minal gave in.

9     A.   Yes.

10    Q.   Did I read that correctly?

11    A.   Yes.

12    Q.   Okay.  So even though Jon is on this text chain, who did,

13    in your experience, made the final decisions on what reps would

14    be paid?

15    A.   Minal.

16    Q.   Okay.  So, Mr. Hirsch, I want to move to the topic of

17    telemedicine for a little bit.

18         At some point, did you start using telemedicine companies

19    to sign off on patients that you were finding?

20    A.   Yes.

21    Q.   And can you explain to the jury, what were some of the

22    telemedicine companies that you worked with?

23    A.   I worked with a company called Blue Mosaic, a company --

24    Marc Sporn and Matt -- I don't remember the name of that

25    company, and there was one other one.  I can't remember the

1   name.

2   Q.  That's okay.  When you were working with telemedicine

3   companies, how did you generate patients?

4   A.  Well, I didn't generate them personally.  It was, like,

5   sort of, like, a package deal.  They would generate -- they

6   would generate the patients.  They would do teledoc, and they

7   would send, like, a full package of the client to the lab.

8   Q.  Okay.

9        MS. DE BOER:  At this time, Your Honor, the United

10  States moves admission of Government Exhibit 1888 and 1888-A.

11       THE COURT:  Those will be admitted without objection.

12       (Government Exhibits 1888 and 1888-A were received in

13       evidence.)

14  BY MS. DE BOER:

15  Q.  So, Mr. Hirsch, I'm showing you Government Exhibit 1888.

16       Do you see that?

17  A.  Yes.

18  Q.  And this is an email from someone named Jeff Morin to you?

19  A.  Yes.

20  Q.  On July 25th of 2018?

21  A.  Yes.

22  Q.  Who's Jeff?

23  A.  Jeff was one of -- he was -- he was, like, a call center

24  that would generate the patients for me.

25  Q.  Okay.  And do you see there's an attachment here called

1    genetic testing script?

2    A.  Yes.

3    Q.  All right.  So we're going to move to that attachment,

4    which is Government Exhibit 1888-A.

5        Is this an example of one of the scripts that Jeff sent

6    you?

7    A.  Yes.

8    Q.  So we'll go through these together.  Is this something that

9    would be used by telemarketers to contact patients?

10   A.  Yes.

11   Q.  Okay.  So it starts with:  Hi, (blank), this is (blank)

12   with Alite Medical Services.

13       Do you see that?

14   A.  Yes.

15   Q.  What was Alite Medical Services?

16   A.  That was my and Keith's company that we worked under.

17   Q.  Okay.  And was it a doctor's office?

18   A.  No.

19   Q.  Did you provide any treatment to patients?

20   A.  No.

21   Q.  Why did you call it medical services?

22   A.  It just sounded good.

23   Q.  Okay.  And then the script continues:  The reason for my

24   call today is that we are reaching out to Medicare and Medicaid

25   patients to offer a free hereditary cancer screening.

1       Did I read that correctly?

2   A.   Yes, yes.

3   Q.   How -- what was the point of describing the test as free?

4   A.   Repeat that.

5   Q.   So do you see here that it's described as a free test?

6   A.   Yes.

7   Q.   Why talk about it as a free test?

8   A.   Makes the patient or the person more interested.  When they

9   hear free, they open their ears a little bit more.

10  Q.   Okay.  And then going to this paragraph here, it says:

11  While, as I'm sure you are aware, the earlier that you are able

12  to detect and treat cancer, the better chance you and your

13  family have at beating it.  That's why we're helping families

14  like yours to better monitor and detect potential cancer

15  mutations before they become a huge problem.

16      Do you see that?

17  A.   Yes, yes.

18  Q.   And then underneath, it repeats that it's a free cancer

19  test?

20  A.   Yes.

21  Q.   So let me ask you:  Were you actually helping families

22  monitor and detect and beat cancer?

23  A.   No.

24  Q.   And if we keep going, there's another reference to a free

25  screening kit, and down here, how the screening is totally

1  free?

2  A.  Yes.

3  Q.  Was that misleading?

4  A.  Yes.

5  Q.  How so?

6  A.  They weren't free.  They were just no money out of pocket.

7  They were -- the government was paying for the test, so it

8  wasn't free.

9  Q.  Okay.  Mr. Hirsch, I want to talk to you about -- you

10  mentioned Marc Sporn.  So I want to talk to you about Marc

11  Sporn.

12      How did you come to meet Mr. Sporn?

13  A.  I met Marc Sporn -- I owned a restaurant in Delray, in the

14  actual -- my chef knew Marc.  Marc used to be a customer that

15  used to come into the restaurant.  And he was -- he was a big

16  wheeler, talker.  My chef said, you gotta go meet this guy, and

17  I did.  My chef introduced us.

18  Q.  And did you start doing business with Mr. Sporn?

19  A.  Yes.

20  Q.  Did you learn whether LabSolutions had any relationship

21  with Mr. Sporn?

22  A.  Well, I wanted the thumbs-up from LabSolutions to sort of

23  vet it out or to give me the thumbs-up that they're legit.  I

24  did ask Minal what was his opinion.  He did pass me on to Jon.

25  He said, Jon's been dealing with them or vetting them out.

1    Jon, the manager.  And Jon gave us the thumbs-up, so we started

2    doing business with him.

3    Q.   And by the time you started doing business with Mr. Sporn,

4    was LabSolutions already working with Mr. Sporn in its own

5    capacity?

6    A.   They were.  I found that out because I went into the

7    mailroom, and half the room was filled with LabSolutions'

8    tests.  I asked Marc about it, and he said Minal doesn't know

9    it's me, I'm working under a nominee name and yes, we're doing

10   business with them.

11   Q.   So explain that.  Did you go to Mr. Sporn's operation?

12   A.   Yes.

13   Q.   Did you see it for yourself?

14   A.   Yes.

15   Q.   So you mentioned a mailroom.  So describe to the jury what

16   you saw in the mailroom.

17   A.   I saw a whole room full of test kits with LabSolutions'

18   name on the boxes.

19   Q.   And, you know, paint a picture for us.  How big was this

20   room, and how much of it was LabSolutions versus other lab

21   stuff?

22   A.   It was three-quarters LabSolutions'.  I want to say it's

23   from this wall -- like this, to the window (indicating).

24   Q.   Okay.  And how much of it was LabSolutions'?

25   A.   Most of it.

 1   Q.  All right.  And you mentioned that at that point Mr. Sporn

 2   said that they were going through somebody else, and that

 3   LabSolutions didn't know about the use of Mr. Sporn's

 4   operation.

 5   A.  Yes.

 6   Q.  Can you explain what you meant?

 7   A.  Apparently, Marc was going through a different -- another

 8   rep that was getting paid, that would pay Marc.  So Marc's name

 9   was not on the actual contract with LabSolutions.

10   Q.  Okay.

11   A.  Do you follow?

12   Q.  Okay.  Go ahead.  I'm sorry.

13   A.  Do you follow?

14   Q.  I understand.

15   A.  Okay.

16   Q.  So at some point, did you learn that Mr. Patel did, in

17   fact, know about Marc Sporn's involvement?

18   A.  Yes.

19   Q.  And explain that to the jury.

20   A.  I had Minal come up to the office one day to introduce

21   them.  We met in Matt Egan -- Vegan -- I forget his last name.

22   We met in Matt's office.  We all sat in the office -- myself,

23   Keith, Minal, Sporn, Matt.

24   Q.  Okay.  And if LabSolutions already had some kind of

25   relationship with Marc Sporn's business, even if it was through

1   another rep, how did you sort of wedge your way into that?

2   A.   I worked out a deal with Matt that one section of his

3   office, we would have five or ten callers calling patients,

4   qualifying the patients, calling the patients, getting test

5   kits in.  It was all -- all wrapped up all in one.  They would

6   do the teledoc, and they would just send the complete sample to

7   LabSolutions.

8        So I didn't get an override on what Marc was doing

9   previous.  I set up my own little organization in his company,

10  in Matt and Marc's company.

11  Q.   And did you ever see a call center at Marc Sporn's company?

12  A.   Yes.

13  Q.   And how many -- roughly speaking, how many telemarketers

14  did they have in that room?

15  A.   Minimum 20, up to 40.

16  Q.   And how many of them at any given time were trying to get

17  patients for your stream of business?

18  A.   Come back -- I'm sorry?

19  Q.   Do you know if any of them were dedicated to your business?

20  A.   Yes.

21  Q.   Okay.  What do you know about that?

22  A.   He would -- Marc and Matt would charge us per patient.  I

23  don't remember what the number was, but we had at least ten

24  reps out of that group that were mine.

25  Q.   Okay.  And can you explain your understanding of the

1   process to the jury, you know, what would happen if Marc's

2   reps -- if they -- Marc's telemarketers, if they got a patient,

3   then what happened with the patient?

4   A.   They got a patient.   They got a patient, someone who was

5   interested.   They would -- I don't remember if, right there and

6   then, they connected them to the teledoc or if they sent out

7   the test kit, if they're interested, FedEx.   Then they would

8   call back.

9        I'm not really sure of the process.   I don't...

10   Q.   That's fine.   And let me ask you a different way.

11        How did Marc obtain prescriptions for those patients?

12   A.   He had teledocs signing off on them.

13   Q.   Okay.   Did they ever come a time where you brought a bagful

14   of patient information to Mr. Sporn?

15   A.   Yes.

16   Q.   What happened?

17   A.   I said, you got to get signatures for these.

18        He's like, ah, you know, we've got so much going on.   Just

19   leave them here.

20        Five days later, I went back and we had the -- they were

21   signed.

22   Q.   And how many patients was it, roughly?

23   A.   It was a plastic bag.   I don't know.   It could be 10, up to

24   40, 50.

25   Q.   Okay.

```
 1   A.   I don't remember.
 2   Q.   Did you ever learn -- you know, with any of the telemeds
 3   that you were working with, did you ever learn any information
 4   that concerned you about their operations?
 5   A.   Come back on that.  I'm sorry.
 6   Q.   Sorry.  Let me ask the question a little bit differently.
 7        Did you ever suspect that doctors were not calling
 8   patients?
 9   A.   Did I suspect it?  I guess, yes.  Yes.  Yes.
10   Q.   And what did you learn that led to that suspicion?
11   A.   A lot of the people, they weren't getting -- there was no
12   follow-up.  Patients were calling without -- they were signing
13   up.  They weren't getting results.  They didn't know what was
14   going on.  The phones were getting blown up with that.
15   Q.   And what do you mean, your phones were getting blown up
16   with that?
17   A.   The patients weren't getting -- they weren't getting the
18   results.  They were doing the tests, and they were concerned
19   about the results, and they never got the results.
20   Q.   Okay.  Sticking with Marc Sporn for a second, did you ever
21   know Mr. Sporn by a different name?
22   A.   No.
23   Q.   You always knew him by "Marc Sporn"?
24   A.   Yes.
25   Q.   Did you ever tell Minal Patel that Marc Sporn had a
```

1   different name?

2   A.   No.

3   Q.   Did you have any understanding of whether Mr. Patel knew

4   that Marc's last name was Sporn?

5   A.   Excuse me?  Did I --

6   Q.   Did you ever use Marc Sporn's last name in front of

7   Mr. Patel?

8   A.   Of course.

9   Q.   Okay.  Let me ask you, Mr. Hirsch:  Did there come a time,

10  before you were formally charged, that you began cooperating

11  with the government?

12  A.   Could you repeat that?  I'm sorry.

13  Q.   That's okay.  Just take your time.

14  A.   Yeah.

15  Q.   You have been cooperating with the government for a number

16  of years.

17  A.   Yes.

18  Q.   And did you start cooperating with the government before

19  you were -- before you had to come to court and before there

20  was a charge against you?

21  A.   Yes.

22  Q.   Okay.  And when you began cooperating with the government,

23  did the government direct you to conduct recordings?

24  A.   Yes.

25  Q.   Against Mr. Patel?

```
 1   A.   Yes.

 2   Q.   And against other people involved in this industry, some

 3   unconnected to Mr. Patel?

 4   A.   Yes.

 5   Q.   Other people that you were working with?

 6   A.   Yes.

 7   Q.   Even Mr. Satary's organization?

 8   A.   Yes.

 9   Q.   Okay.  And did you conduct quite a few recordings against

10   Mr. Patel and lots of other people?

11   A.   Yes.

12   Q.   Okay.

13        MS. DE BOER:  At this time, Your Honor, the government

14   moves into evidence and will play an excerpt of one of these

15   recordings, which is going to be marked as Government

16   Exhibit 1001-H.

17        THE COURT:  That'll be admitted, and we can go ahead

18   and play that, again, without objection.

19        (Government Exhibit 1001-H was received in evidence.)

20        (Audio was published.)

21        (Audio was paused.)

22   BY MS. DE BOER:

23   Q.   Okay.  I know that was brief and a little bit hard to hear.

24        Did you hear you used the words "Marc Sporn"?

25   A.   Yes.
```

1    Q.  All right.  Is that an excerpt of one of the recordings

2    that you did with Mr. Patel?

3    A.  Yes.

4    Q.  Why did you use the name Marc Sporn?

5    A.  I guess I was directed to bring his name up.

6    Q.  And did Mr. Patel -- did you hear Mr. Patel acknowledge

7    Marc Sporn?

8    A.  Yes.

9    Q.  Okay.

10          MS. DE BOER:  At this time, Your Honor, the government

11   moves admission of Government's Exhibits 1758, 1759, 1241-MM as

12   in Mary, 1515, and 1515-A and 1814 and 1814-A.

13          THE COURT:  Those will be admitted at this time without

14   objection.

15          MS. DE BOER:  Thank you, Your Honor.

16       (Government Exhibits 1241-MM, 1515, 1515-A, 1758, 1759,

17         1814, 1814-A were received in evidence.)

18   BY MS. DE BOER:

19   Q.  So, Mr. Hirsch, I'm showing you what has been admitted as

20   Government Exhibit 1758.

21          And looking at the top of this chain, do you see it's an

22   email chain between Minal Patel, someone named Shelbi Davis,

23   Jon Berarducci, yourself, and someone named Matt O'Hera?

24   A.  Yes.

25   Q.  And it's -- the subject is Alite Telemed, and it's dated

1  April 26 of 2018?

2  A.  Yes.

3  Q.  Okay.  I'll zoom in and direct your attention to at this

4  portion of the email chain, where Jon says:  Brett and Minal,

5  moving forward, please send all samples in to LabSolutions with

6  the following listed as the clinic information:  Alite 455.

7  The clinic portal for all results and accessioning is as

8  follows:  Telemed Alite Medical.  And then there's a user name

9  and password.

10     Do you see that?

11  A.  Yes.

12  Q.  Okay.  And then going up on the chain, Mr. Patel sent an

13  email clarifying:  This is so we -- it says "do confuse," but

14  perhaps that's a typo and it meant "don't confuse" -- Alite 100

15  to Alite Telemed 455.

16     Do you see that?

17  A.  Yes.

18  Q.  What was the -- what was going on here?

19  A.  I'm not -- I don't remember what group that was.  They were

20  separate.  I don't know if it was Marc Sporn's that had to be

21  separated because they were getting an override on it.

22     I -- when was this?  This was -- I don't remember.

23  Q.  And I'm not asking you what group had what number.

24  A.  Yeah.

25  Q.  All I'm asking is, was there a way and was the lab tracking

 1   referrals from different sources?

 2   A.   Of course.

 3   Q.   Why was that important to track in that manner?

 4   A.   Because there were certain people getting certain pieces of

 5   that, of the deal.

 6   Q.   And judging from this email, no secret that you were using

 7   telemed; is that fair?

 8   A.   Yes.

 9   Q.   Okay.  Showing you now Government Exhibit 1759.

10       Do you see that this is an email exchange that involves you

11   and Mr. Patel from April of 2018?

12   A.   Yes.

13   Q.   And you say:  Hello.  Need Minal to approve, like, 500 of

14   each, need kits.

15       And then you reference PGx and CGx.

16       Do you see that?

17   A.   Yes.

18   Q.   All right.  Why did you -- well, first of all, 500 of each.

19       500 what?

20   A.   500 bio -- test kits.

21   Q.   Test kits?

22   A.   Yes.

23   Q.   Why did you need Minal's approval on something as simple as

24   getting test kits sent out?

25   A.   Because they were -- it was an expense, and it was a big

1   number.  If I needed 10, 20, 50, I didn't need approval.  But a

2   number like 500, which was a big number, needed his approval on

3   that.

4   Q.   I'm now directing you, Mr. Hirsch, to Government

5   Exhibit 1515.

6        Is this another email chain involving you, Minal Patel, and

7   somebody named Cecilia at LabSolutions.com?

8   A.   Yes.

9   Q.   And this is from September 17th of 2018?

10  A.   Yes.

11  Q.   Who was Cecilia?

12  A.   Cecilia, she would be the lady I would go to -- she was,

13  like -- for supplies, for -- I actually -- yeah, supplies.  I

14  actually -- now that I'm thinking about it, I actually had a

15  banner for maybe one of the -- one of the seminars we were

16  doing.  It was a LabSolutions banner that I actually had to

17  take on the plane, we had to carry back.

18       So I did -- so, like, banners, brochures, tests, test kits.

19  And then when -- when I would get a new rep in, she would

20  register their doctors into the system.

21  Q.   Okay.  And you mentioned seminars.  And we've been talking

22  a lot about telemed, but let's just take a break from telemed

23  for a second.

24       Can you explain to the jury what you mean by seminars?

25  A.   Like a health fair, people doing EKG machines.  We would

1   do -- have a little stand there to do -- you know, to offer the

2   testing at the seminar.  She did supply, like, stuff for the

3   seminar.

4   Q.  And you mentioned a banner.

5       Can you describe the banner?

6   A.  It would -- I can't really remember what it was.  I

7   remember it was big and heavy, and we had to carry it, but I

8   don't -- I don't remember what it said.  Something with

9   LabSolutions.  I don't know.

10  Q.  Okay.  Why did you need a LabSolutions banner for one of

11  the seminars?

12  A.  Just to have some advertising.

13  Q.  Okay.  Can you explain to the jury, you know -- you

14  mentioned at the beginning, you were doing sort of this

15  mom-and-pop -- referrals at mom-and-pop doctors' offices; you

16  mentioned seminars.

17      How did the volume of referrals compare, mom-and-pop and

18  seminars versus telemedicine?

19  A.  It's very small compared to, like, humongous, unlimited

20  amount of opportunity with the telemedicine.

21  Q.  Okay.

22  A.  Compared to just every day doctor, 5 to 10, compared to

23  getting 100 a day, 50 a day.

24  Q.  All right.  Now, turning back to Government's Exhibit 1515,

25  and this email that you sent to Cecilia and Mr. Patel, do you

1    see there's an attachment here called Alite sent to lab

2    summary.xlsx?

3    A.   Yes.

4    Q.   And going now to the attachment, which is 1515-A, do you

5    see a summary of packages and unique patients sent to

6    LabSolutions?

7    A.   Yes.

8    Q.   And it says, highlighted is 722 unique patients?

9    A.   Yes.

10   Q.   What was this tracking?

11   A.   It's tracking all the patients -- all the tests that I've

12   submitted for testing.

13   Q.   Okay.  And if we were to, you know, flip the page on this

14   spreadsheet, you see lots of patient names?

15   A.   Yes.

16   Q.   And then, a column showing what tests they got?

17   A.   Yes.

18   Q.   And some have CGx, and some have PGx?

19   A.   Yes.

20   Q.   Were you marketing both types of tests for LabSolutions?

21   A.   Yes, yes.  Sometimes we do a combination.  When we test one

22   patient for one CGx and one PGx.

23   Q.   Was there ever any issue with testing patients for both?

24   A.   Not that I recall.

25   Q.   Okay.  This is just one example of a spreadsheet from --

 1   and this date was September 17th of 2018.

 2        Did you send or receive similar types of spreadsheets on

 3   other dates?

 4   A.  Yes.

 5   Q.  Why was it important to track these specific patients?

 6   A.  To know how much I was owed every month.

 7   Q.  Okay.  We've been talking about Mr. Sporn's operation.  So

 8   I'm going to show you what has been admitted as Government

 9   Exhibit 1814.

10        And, Mr. Hirsch, do you see that this is an email from

11   someone named Harry Karachopan?

12   A.  Yes.

13   Q.  To you, Keith Youngswick, Matt Egan, and someone named M.S.

14   -- is that Marc?

15   A.  Marc Sporn, yes.

16   Q.  Okay.  It's dated December 19th of 2018.

17        Do you see that?

18   A.  Yes.

19   Q.  Before we go any further, who is Harry and who is Matt?

20   A.  Harry ran the call center, and Matt -- Harry ran the call

21   center.  Matt Egan and Marc Sporn were partners.

22   Q.  Okay.  And there's an attachment here that says M.S.

23   invoice.

24        Do you see that?

25   A.  Yes.

1   Q.   I'm going to Government Exhibit 1814-A, which is the

2   attachment.

3         Do you see that this is an invoice from what is called CPL

4   Media?

5   A.   Yes.

6   Q.   Do you remember what company was CPL?

7   A.   That's Marc's company.

8   Q.   All right.  And looking at this invoice -- I'll zoom in a

9   little more for you.  All right.

10        And do you see here there's a quantity column and a

11  description column?

12  A.   Yes.

13  Q.   And then, if we move all the way to the right, there's a

14  unit price and total for each item that's listed?

15  A.   Yes.

16  Q.   Can you explain to the jury what it is that you were being

17  invoiced for?

18  A.   So I would get this every week or every two weeks or every

19  month.  I don't remember how often they billed us.  But the

20  deal we worked out is every test that they submitted, that got

21  paid, we would pay $300 to Marc and Matt.  PGx, we paid $40.

22        And the tele -- so they billed us for the actual collection

23  of the tests kits that we would pay them, and then they would

24  also bill us for the signatures that they got from the teledoc.

25  Q.   In your experience and observations, once a patient got

1    sent to the teledoc, in other words, the patient's already said

2    yes to the test and now they're being sent to the teledoc, what

3    percentage of the time did that result in a signed order?

4    A.   90 percent.

5    Q.   All right.  Now moving to Government Exhibit 1899.  Do you

6    see this is an email, Mr. Hirsch, from Jeff Morin to you and

7    Keith?

8    A.   Yes, yes.

9    Q.   And it's from April 9th of 2019; is that correct?

10   A.   Yes.

11   Q.   All right.  And so Jeff is sending you an email -- and I

12   want to direct you to these highlighted paragraphs.

13        And Jeff, just to reorient the jury, was one of the call

14   centers that you used?

15   A.   Yes.

16   Q.   All right.  So Jeff says:  In addition, there is one doctor

17   in particular that is declining all patients with no reason

18   listed.  Listening to these audio files, there does not seem to

19   be a good reason for him to be denying.  This doctor is located

20   in S.C.  South Carolina?

21   A.   Yes.

22   Q.   They can blacklist him so no more of our patients goes to

23   him.  However, he is the only doctor domiciled in South

24   Carolina.  My question is if we should consider sending these

25   patients over to your other teledoc.

1    Do you see that?

2    A.  Yes.

3    Q.  Can you explain to the jury, what is the issue that Jeff is

4    flagging for you?

5    A.  That in that jurisdiction, the -- the patients weren't

6    getting signed off -- the doctor in that jurisdiction was not

7    signing off on the -- on the -- on the requisition forms.

8    Q.  Okay.  And one of the solutions Jeff is proposing is that

9    we blacklist that doctor because he's denying patients.

10   A.  Yes.

11   Q.  Okay.  Showing you what has been admitted as Government

12   Exhibit 1241-J.

13       Is this a text exchange between you and Mr. Youngswick?

14   A.  Yes.

15   Q.  Okay.  And I'm directing you to this text message here

16   which is from May 17th of 2019.

17       Do you see that?

18   A.  Yes.

19   Q.  And you say to Keith, First issue is Khalid paying us

20   legal.  Second is if they get called back because teledoc never

21   called the patients.

22       Do you see that?

23   A.  Yes.

24   Q.  And then I'm going to go to the next page of this exhibit.

25   And to be clear, you're talking about someone named Khalid.

1          Who is that again?

2   A.   Khalid Satary.  He owned Clio Labs.

3   Q.   Okay.  And then you say:  The teledoc never coded and never

4   had a call.

5          He said:  That's true.  WTF.

6          And you said:  Yes.

7          And then you said:  We didn't know until after?

8   A.   Yes.

9   Q.   Okay.  Did you continue to use telemedicine even after

10  learning this information?

11  A.   When was that date?

12  Q.   This was in May of 2019.

13  A.   Yes.

14  Q.   Okay.  I want to shift gears, Mr. Hirsch, and talk about --

15  did your companies ever sign contracts with Mr. Patel's

16  companies?

17  A.   Contracts?  What, employment contract?  What do you mean?

18  Q.   Yeah, written agreements talking about what it is that you

19  were being hired to do for Mr. Patel.

20  A.   Yes.

21  Q.   Okay.

22          MS. DE BOER:  At this time, Your Honor, the government

23  would move admission of Government's Exhibit 602 and 602-A, 603

24  and 603-A, 601, 607-A and 607-D.

25          THE COURT:  Those will be all be admitted at this time

1   without objection.

2        MS. DE BOER:  Thank you, Your Honor.

3        (Government Exhibits 601, 602, 602-A, 603, 603-A, 607-A,

4        and 607-D were received in evidence.)

5   BY MS. DE BOER:

6   Q.  Mr. Hirsch, I'm showing you Government Exhibit 602.

7   A.  Yes.

8   Q.  Do you see this is an email from Jon Berarducci to

9   yourself?

10  A.  Yes.

11  Q.  From May 23rd, 2017?

12  A.  Yes.

13  Q.  And there's an attachment here, Alite Medical Solutions,

14  Brett Hirsch agreement?

15  A.  Yes.

16  Q.  And then Mr. Berarducci is asking you to please review, if

17  all looks good, initial every page, sign, and email back to me.

18       Do you see that?

19  A.  Yes.

20  Q.  Okay.  So the time frame here, late May of 2017, had you

21  already been doing business with Mr. Patel and LabSolutions?

22  A.  Yes.

23  Q.  Did you have a written agreement when you first started

24  doing business?

25  A.  No.

1    Q.   Was Mr. Berarducci around when you first struck a deal with
2    Mr. Patel?
3    A.   No.
4    Q.   When did Mr. Berarducci come into the picture?
5    A.   I don't know the time frame.  Maybe six months after.
6    Q.   Let me ask you to try and speak into the mic, if you can.
7    A.   Sorry.
8    Q.   All right.  And why, all of a sudden, if you've been doing
9    business, why all of a sudden do you need a contract?
10   A.   I don't know.
11   Q.   Okay.  Going to 602-A, do you see that the contract then is
12   dated May 1, 2016?
13   A.   Yes, so what was it, a year?
14   Q.   Right.  The email is May 2017.
15   A.   One year, yeah.
16   Q.   Okay.  Why did the contract have to be backdated?
17   A.   I don't know.
18   Q.   Okay.  And we're not going to belabor this contract, but do
19   you see here that this is between LabSolutions and it says here
20   Alite Medical Solutions?
21   A.   Yes.
22   Q.   That's your company?
23   A.   Yes.
24   Q.   Okay.  And moving to Government's Exhibit 603, do you see
25   that then, two months later, in August of 2017, that you sent

1   an email to Mr. Patel?

2   A.  Yes.

3   Q.  And it follows an email that Keith sent to you?

4   A.  Yes.

5   Q.  And then you have an attachment here as well?

6   A.  Yes.

7   Q.  And then moving to the attachment, which is 603-A, do you

8   see that it's the same agreement?

9   A.  Yes.

10  Q.  And then do you see an initial on the bottom?

11  A.  Yes.

12  Q.  And then turning to page 10 of the agreement, do you see

13  that you've now signed it?

14  A.  Not really, but, yes.

15  Q.  And explain.  What do you mean, not really?

16  A.  It's not my signature.

17  Q.  Okay.  You sent it to Mr. Patel?

18  A.  Yes.

19  Q.  But who signed it?

20  A.  Keith.

21  Q.  And why did Keith sign it for you?

22  A.  I'm not really good with emails and signatures, so Keith

23  just signed it and --

24  Q.  Okay.  And the date here, do you see that -- it's a little

25  hard to read, but is that year -- is that 2016 or is that 2017?

```
 1   A.  It looks like '16.
 2   Q.  Okay.  Why didn't you sign -- you know, the agreement is
 3   sent to you in May of 2017.
 4       Why did it then take until August for you or Keith to sign
 5   it?
 6   A.  I was being stubborn.
 7   Q.  What do you mean?
 8   A.  Minal called me every week, every two weeks.  Brett, you
 9   gotta sign this, you gotta sign this.  And I just didn't sign
10   it.
11       Finally, he said, if you don't sign it, you're not gonna
12   get paid.
13       So I said, Keith, send it in.
14   Q.  All right.  And now moving to Government's 601.
15       Is it the same agreement, Mr. Hirsch?
16   A.  Yes.
17   Q.  Okay.  And then to page 10, you see the signature by Keith
18   on behalf of your company.
19   A.  Yes.
20   Q.  And then do you see a signature for LabSolutions now?
21   A.  Yes.
22   Q.  And whose name appears there?
23   A.  Minal Patel.
24   Q.  Okay.  Did there ever come a time when you had to start
25   signing compliance attestations?
```

1   A.  Yes.

2   Q.  Did you have to do that from day one, or was that -- did

3   that come along the way?

4   A.  That came along the way.

5   Q.  All right.  So I'm going to show you Government

6   Exhibit 607-A.

7       Do you see that the subject of this is:  Please review and

8   sign the October LabSolutions commission attestation?

9   A.  Yes.

10  Q.  And it's an email that Jon sent to you, copying Nick Saliba

11  and Minal Patel?

12  A.  Yes.

13  Q.  And who is Nick?

14  A.  Nick was CEO.

15  Q.  And was he there from day one or --

16  A.  No.

17  Q.  No?

18  A.  No.

19  Q.  Okay.  And this is November 11 of 2017?

20  A.  Yes.

21  Q.  Okay.  So starting with an email that you sent earlier on

22  the chain from November 10th of 2017, you say:  What is this?

23  I asked Minal.  He says he don't know.

24      Do you see that?

25  A.  Yes.

 1   Q.   What was your confusion?

 2   A.   I never had this -- I never had to sign anything to get

 3   paid before.

 4   Q.   Okay.

 5   A.   This was something new.

 6   Q.   Okay.  And then going up to the top of the chain, do you

 7   see where Jon says:  You signed it last time we sent it out?

 8   A.   Right.

 9   Q.   Why did you sign these client attestations?

10   A.   To get paid.

11   Q.   Okay.

12   A.   No sign, no pay.

13   Q.   And who told you you wouldn't get paid if you didn't sign

14   it?

15   A.   Minal.  We had to sign it.

16   Q.   And showing you 607-D and going to the third page of 607-D,

17   is this an example of one of those compliance agreements?

18   A.   Yes.

19   Q.   Going to the last page of 607-D, do you see that you --

20   that there are a number of things here that it says that the

21   distributor will not and has not done?

22   A.   Excuse me?

23   Q.   Mr. Hirsch, do you see here, this paragraph?

24   A.   Yes.

25   Q.   It says:  The following compliance rules are to be agreed

1   upon and adhered to by the distributor.  Each business

2   associate/distributor acting as an independent contractor

3   agrees that they will not and have not paid physicians, their

4   staff members, or relatives in exchange for samples?

5   A.  Yes.

6   Q.  And influence test-ordering patterns that would lead to

7   medically unnecessary tests?

8   A.  Yes.

9   Q.  Were you referring medically unnecessary tests?

10  A.  Yes.

11  Q.  And did there ever come a time where you paid doctors or

12  doctors' offices?

13  A.  I paid doctors a few times.

14  Q.  Okay.  And did you pay telemedicine companies?

15  A.  Yes.

16  Q.  And what were you paying them to do?

17  A.  Paying them to do a consultation or to -- basically, just

18  to sign the form to get -- the requisition form.

19  Q.  Okay.  So, Mr. Hirsch, did you ultimately plead guilty?

20  You mentioned at the beginning that you pled guilty.

21  A.  Yes.

22  Q.  And did -- is that -- did you sign a plea agreement with

23  the government?

24  A.  Yes.

25  Q.  Have you been sentenced yet?

 1   A.   Yes.

 2   Q.   And have you had to report to prison yet?

 3   A.   No.

 4   Q.   Have you been, with the government's agreement, allowed to

 5   stay out while you continue to cooperate?

 6   A.   Yes.

 7   Q.   Are you cooperating in a number of different cases besides

 8   this one?

 9   A.   Yes.

10   Q.   And you mentioned -- we talked a little while ago that,

11   among the other things that you've done as part of your

12   cooperation, you've conducted recordings involving a number of

13   different persons under investigation.

14   A.   Yes.

15   Q.   Okay.  At some point, did -- was there a recording --

16   before you started cooperating, did you ever learn that the

17   government had recorded against you?

18   A.   Yes.

19   Q.   And who was it that the government used to record against

20   you?

21   A.   Michael Lohan.

22   Q.   Who's Michael Lohan?

23   A.   He -- I've worked with him for a number of years.  Everyone

24   knows he's Lindsay Lohan's dad.

25        Yes, I worked with him in the treatment side of business.

1   Q.   And what, if anything, did Michael Lohan have to do with

2   LabSolutions?

3   A.   He -- he actually submitted -- he actually gave me some

4   tests to submit into LabSolutions.

5   Q.   And did -- did you end up sending those tests to

6   LabSolutions?

7   A.   Yes.

8   Q.   And in these recordings that Mr. Lohan conducted of you,

9   have you had an opportunity to listen to those?

10  A.   Yes.

11  Q.   What kinds of things did you say in those recordings

12  regarding your business with Mr. Patel?

13  A.   That everything was on the up-and-up, legitimate, that I

14  was -- I knew I was being taped.

15  Q.   You knew you were being taped?

16  A.   Yes.

17  Q.   How did you learn that?

18  A.   Because Michael Lohan's wife called me.

19  Q.   The jig was up.

20  A.   The jig was up.

21  Q.   Okay.  So you knew you were being taped.

22       Why did you say that things were on the up-and-up?

23  A.   I was being taped.  I just went with -- just wasn't gonna

24  give him any info.

25  Q.   Were you lying when you said that things were on the

1   up-and-up?

2   A.  Yes.

3   Q.  Why did you lie?

4   A.  I didn't want to get in trouble.

5   Q.  Okay.  I'm going to ask you a little bit about your past.

6   Okay, Mr. Hirsch?

7   A.  Yeah.

8   Q.  This case, this is not the first time you have been in

9   trouble with the law; is that true?

10  A.  Yes.

11  Q.  Have you been -- do you have a prior conviction?

12  A.  Yes.

13  Q.  Can you explain to the jury what it is that you were

14  convicted for before?

15  A.  Stock fraud.  I worked on Wall Street when I was in my 20s.

16  Q.  And what type of conduct were you part of?

17  A.  It was a criminal enterprise.

18  Q.  Okay.  And just in layman's terms, you know, the company

19  that you worked for, what was it doing?

20  A.  We were a stock brokerage firm, and they had -- basically,

21  it was stock manipulation.  It came down to manipulating

22  stocks.

23  Q.  Did you plead guilty in that case too?

24  A.  Yes.

25  Q.  Okay.  And how old were you when that happened?

1    A.   I was in my 20s.

2    Q.   All right.  And during the time that you were working with

3    Mr. Patel, did you have a drug habit?

4    A.   Yes.

5    Q.   And I'm not -- you know, I know I'm asking you personal

6    information.  But can you explain a little bit to the jury,

7    what was your drug of choice?

8    A.   Cocaine.

9    Q.   And at various points, how frequently were you using?

10   A.   Two times a week, three times a week.

11   Q.   Okay.  Did you take any steps to address your drug use?

12   A.   Yes.

13   Q.   Like what?

14   A.   Went to outpatient treatment as well as on the phone --

15   counselor on the phone.  Been going to Gamblers Anonymous for

16   the last two years, which I continue to go to.

17   Q.   Did there ever come a time -- after you had been charged in

18   this case and after you had appeared before the Court, were you

19   on something called a bond?

20   A.   Yes.

21   Q.   And was it one of your conditions of bond that you

22   shouldn't use drugs?

23   A.   Yes.

24   Q.   Did there come a time where you relapsed?

25   A.   Yes.  Once, yes.

1   Q.   Can you explain that to the jury?

2   A.   So in January of last year, I caught COVID.  I was in ICU

3   for a couple months.  They pronounced me dead.  Thank God I'm

4   here today.

5        I went home.  So after three months, I was -- I was still

6   bedridden until December.  Couldn't get out of bed, pain.  Not

7   using this as an excuse, but I was -- my mom was sick.  I was

8   grabbing everything she had as far as drugs to ease the pain.

9        Super Bowl came, neighbor had a party.  I drank.  I was on

10  all these medications, pills.  And I did cocaine that night.

11  That was Super Bowl last year.

12  Q.   Was that incident brought to the Court's attention?

13  A.   Yes.

14  Q.   Were you, nonetheless, allowed to remain out on your bond?

15  A.   Yes, under certain -- strict -- strict circumstances.

16  Q.   Okay.  So some additional restrictions were added?

17  A.   Yes, yes.

18  Q.   All right.  And have you continued to seek treatment --

19  A.   Yes.

20  Q.   -- in connection with your drug use?

21  A.   Yes.

22  Q.   Okay.  Now, in the course of working with Mr. Patel, did

23  you ever involve any family members in what you were doing?

24  A.   Yes.

25  Q.   Who did you involve?

1   A.   My son, my dad.

2   Q.   Let's talk about your son for a second.

3        What's his name?

4   A.   Max Hirsch.

5   Q.   And how old is he today?

6   A.   27 today.

7   Q.   So when you were working with Mr. Patel, how old was he?

8   A.   23, 24.

9   Q.   Okay.  And what did you ask your son to do in connection

10  with this?

11  A.   He -- he worked at the restaurant I had.  And there was

12  another group of guys that came in and did seminars in my

13  restaurant.  He's like, Dad, why can't I do these seminars as

14  well with Grandpa?

15       And he did two seminars -- two or three seminars in the

16  restaurant.

17  Q.   And did your son ever meet Mr. Patel?

18  A.   Yes.

19  Q.   Did they ever develop a relationship?

20  A.   Yes.

21  Q.   Did they ever hang out without you there?

22  A.   Yes.

23  Q.   And what, if anything -- what did Mr. Patel ever ask you to

24  do with your son?

25  A.   He wanted him to come to Atlanta and train with him.

1   Q.   Did that end up happening?

2   A.   No.

3   Q.   All right.  Now, you've mentioned a couple of times that

4   you -- before you got involved in the genetic testing, you were

5   involved with treatment centers.

6   A.   Yes.

7   Q.   Can you explain that a little bit more to the jury?

8   A.   Michael Lohan, he -- I knew him from -- I owned a

9   restaurant in New York.  I met him.  He told me how lucrative

10  the treatment center business was.  I introduced Michael Lohan

11  to Keith.  Keith went and raised some money to buy into a

12  treatment center.

13       And that's how I learned of the treatment center.  I saw

14  that there was a lot of money in treatment, but there was a lot

15  of money in the testing of the kids for the urinalysis.

16  Q.   Were you engaged in -- were you doing some of the same

17  types of things in the treatment world that you ended up doing

18  in the genetic testing world?

19  A.   It's basically the same thing.  It's giving a test --

20  probably -- I mean, medically unnecessary to test kids two or

21  three times a week, you know, when they were inpatient anyway,

22  where they couldn't get drugs anyway.  So, yes, it's sort of,

23  like, similar thing of medically unnecessary testing.

24  Q.   Okay.  And in the treatment industry, were you testing

25  urine specimens for huge panels of drugs?

1   A.   We would test them for huge panels, yes.  And like I said,

2   they didn't have drugs because they were basically locked down,

3   inpatient treatment.  But yes, we'd still test a full panel of

4   drugs.

5   Q.   Why would you do that?

6   A.   Higher reimbursement.

7   Q.   And translating that into the genetic testing space, what,

8   if anything -- were there panels as well with the genetic

9   testing?

10   A.   The more boxes you checked off with the genetic testing,

11   the higher the reimbursement.

12   Q.   Where did you learn that?

13   A.   Well, I learned it from the lab.  You know, I don't know

14   anything about coding and stuff like that, so -- they would

15   pass down codes to Keith, which Keith did most of that stuff.

16   I didn't really deal with the coding.  But they had a list of

17   coding that they would give or make sure it's -- you know, tell

18   us that it was family history or, you know, stuff like that.

19   Q.   Okay.

20        MS. DE BOER:  At this time, Your Honor, the United

21   States would move into evidence Government's Exhibit 1241-HH

22   and 1241-N, as in Nancy.

23        THE COURT:  Those will be admitted without objection at

24   this time.

25        (Government Exhibits 1241-HH and 1241-N were received in

1      evidence.)

2   BY MS. DE BOER:

3   Q.   So, Mr. Hirsch, a little while ago we were talking about

4   the contract that you had with LabSolutions.

5   A.   Yes.

6   Q.   At the beginning, you had said that you negotiated a

7   percentage-based commission.

8   A.   Yes, yes.

9   Q.   Did that -- did the payment structure to that ever change?

10  A.   Yes.

11  Q.   Can you explain that change to the jury?

12  A.   At some point in 2019, LabSolutions switched from not

13  paying per test that I submitted, but coming up with a

14  calculation based upon what I did the following year, or two

15  years, as a salary instead of per-test payment.

16  Q.   Okay.  And was there a negotiation over what that --

17  A.   Yes.

18  Q.   -- that salary would be?

19  A.   Yes.

20  Q.   Could you explain that to the jury?

21  A.   Minal came up with a $100,000 a month number.  I wasn't

22  happy with that, because I did have subcontractors underneath

23  me.  And I said I wouldn't -- I couldn't -- I wouldn't make

24  money if we stuck at that number.

25       I said, please go back to the two years, because I made

1    more money the year before.  I said I need 150,000 in order to

2    pay them, or they're gonna leave and go somewhere else.  And we

3    settled on the 150,000.

4    Q.  Okay.  And were there ever any discussions about -- over

5    time about whether the 150 was still the right number?

6    A.  Yes.

7    Q.  Can you explain that to the jury?

8    A.  A few months in, I wasn't putting in the amount of samples

9    like I was from the previous year, and he wanted to have a

10   meeting about cutting that money back.  But I think we were --

11   came to an agreement, we'll just check it out for one or two

12   more months, to see how it goes.

13   Q.  Okay.  And what, if anything, did Mr. Patel ever tell you

14   about firing reps who weren't putting in enough samples?

15   A.  He said he was gonna cut a few reps, either get rid of them

16   or just cut their salaries.

17   Q.  Okay.  Mr. Hirsch, did you ever visit the lab?

18   A.  Yes.

19   Q.  And what -- how many times would you say you went to the

20   lab?

21   A.  Maybe once a month, once every two months.

22   Q.  And what were the purposes of those visits?

23   A.  At the beginning, it was, like, to go over -- at the

24   beginning, I was in there a lot more, to just come in, go over

25   numbers, you know, just talk to people, just to come in.  And

1    it sort of, like -- it's sort of less and less, as the time

2    went on, that I would go there.

3    Q.   When you first started going up to the lab, did you ever

4    meet someone named Nick Vartanian?

5    A.   Yes.

6    Q.   And who was Mr. Vartanian?

7    A.   He was the original guy -- he was in an office.  And this

8    is way at the beginning.  I would sit in the office.  He was,

9    like, trying to get the proper codes in order to optimize the

10   payment for Medicare.

11   Q.   And what do you mean, he was trying to get the proper

12   codes?  What was he doing?

13   A.   Mixing and matching codes to submit them to the government,

14   to see which ones were getting paid and how they were getting

15   paid.  You know, I'm not a code guy, so -- but that was the

16   gist of it.

17   Q.   Okay.

18   A.   I would sit with him at his desk, and he would put together

19   different codes.

20   Q.   Okay.  Did there ever come a time where anybody from the

21   lab ever told you that there was a problem getting paid by

22   Medicare?

23   A.   There was a problem for a few -- for months.  I don't

24   remember what the problem was, but there was a problem, yes.

25   Q.   Okay.  And can you explain to the jury how you learned of

1   the problem?  Who told you?

2   A.   Minal.

3   Q.   And what did Minal tell you was the issue?

4   A.   I can't remember.

5   Q.   That's okay.

6        What was the solution?

7   A.   The solution was to open up another lab in a different

8   state.  It was something to do with the states and the

9   jurisdictions.  So the best way was to open up in Pennsylvania.

10  Q.   And then -- I mean, did that solution work?  Did payments

11  start coming back in?

12  A.   Yes.

13  Q.   Okay.  Were you ever asked to change anything about the

14  type of patients that you were referring?

15  A.   Yes, to people that had family history.

16  Q.   And say a little bit more about what you mean.

17  A.   If the patient had an aunt, an uncle, a dad, a mother, if

18  they had cancer, they would qualify for the test.

19  Q.   Okay.  And if there was -- was there ever a change in --

20  communicated to you by the lab of what they wanted in terms of

21  the qualifications of the patients?

22  A.   Yes, but I don't remember what that was.

23  Q.   Fair enough.  Was a doctor's order always required to

24  submit one of these tests to Medicare?

25  A.   Yes, yes.

1   Q.   Okay.  So that wasn't one of the changes.

2   A.   No.

3   Q.   Okay.  And these doctors, you know, speaking to the telemed

4   side of this, the doctors that you were using on the telemed

5   side, did they have any prior relationship with the patients?

6   A.   Zero.

7   Q.   And were they actually rendering treatment to any of these

8   patients?

9   A.   No.

10   Q.   What was their sole function?

11   A.   Sign the requisition form.

12   Q.   Okay.

13        MS. DE BOER:  At this time, Your Honor, I have another

14   list of exhibits to offer into evidence, which is Government's

15   Exhibit 1241-Q, 1241-S, as in Sam, 1748 and 1748-A, 1807,

16   1241-G, 1757, 1814 and 1814-A, 1762, 1775 and 1775-A, 1813 and

17   1813-A, 1818 and 1818-A, 1889 and 1889-A, 1890 and 1890-A, 1891

18   and 1891-A, 1894 and 1894-A, 1898 and 1898-A, and 1900-A.

19        THE COURT:  Those will be admitted at this time bout

20   objection.

21        (Government Exhibits 1241-Q, 1241-S, 1748, 1748-A, 1807,

22        1241-G, 1757, 1814, 1814-A, 1762, 1775, 1775-A, 1813,

23        1813-A, 1818, 1818-A, 1889, 1889-A, 1890, 1890-A, 1891,

24        1891-A, 1894, 1894-A, 1898, 1898-A, and 1900-A were

25        received in evidence.)

1   BY MS. DE BOER:

2   Q.  Mr. Hirsch, I have good news.  We're not going to go

3   through all of those.  But what I do want to do is show you a

4   few other exhibits here in a second, but before I do that--

5        MS. DE BOER:  And, Your Honor, I'm switching topics

6   now.  I don't know if you --

7        THE COURT:  No, you may proceed.  Go ahead.

8        MS. DE BOER:  Okay.

9   BY MS. DE BOER:

10  Q.  At some point, did Mr. Patel ever tell you that he had

11  lawyers involved?

12  A.  Yes.

13  Q.  And what did he tell you about those lawyers?

14  A.  High-powered lawyers, nothing -- you know, I never saw

15  them, met them.  Never saw any letters.

16  Q.  Did you ever speak with any of them?

17  A.  Just Omar at the beginning, his brother.

18  Q.  Okay.  And explain that to the jury.

19  A.  When I first met Minal, he had a partner named Omar.  I

20  don't know his last name.  His brother was a lawyer, and I

21  guess he was -- they were involved at the beginning, and they

22  just disappeared.

23  Q.  Okay.

24  A.  So that was the only lawyer I met throughout.

25  Q.  And you met Omar's brother, who's a lawyer.  Do you happen

1    to remember his name?

2    A.   I don't.

3    Q.   Did you ever hear him render any legal advice, or did you

4    just happen to meet him?

5    A.   Just met him.

6    Q.   Okay.  Did Mr. Patel ever tell you that he had had lawyers

7    look at aspects of this?

8    A.   I don't know.  I mean, he mentioned the lawyer.  Like I

9    said, I don't -- I don't know.  I can't answer that.  I don't

10   know.

11   Q.   That's fair enough.

12        Yeah, and to be clear, I'm only asking you things that you

13   know.  If you don't know, you don't know.

14   A.   Yeah.

15   Q.   All right.

16        MS. DE BOER:  At this time, Your Honor, the United

17   States would move into evidence Government's Exhibit 1241-X,

18   1241-FF, as in Frank, 1241-GG, and 1241-O.

19        THE COURT:  Those will be admitted at this time without

20   objection.

21        (Government Exhibits 1241-X, 1241-FF, 1241-GG, 1241-O

22        were received in evidence.)

23   BY MS. DE BOER:

24   Q.   Mr. Hirsch, at this time I'm showing you what has been

25   admitted as Government Exhibit 1241-X.

1       Do you see that?

2   A.  Yes.

3   Q.  And this is another text between you and Jon Berarducci?

4   A.  Yes.

5   Q.  All right.  And going to -- I'm going to direct your

6   attention here to this text message, which is from April 28th

7   of 2017.

8       Do you see that?

9   A.  Yes.

10  Q.  So you say:  183K Rama said he's getting.  Anything for me?

11      And Jon said:  You are paid off for this whole month.  He

12  had 346K come in so far.

13      Do you see that?

14  A.  Yes.

15  Q.  All right.  And then going to -- continuing with the chain,

16  you say:  Yes.  Is there anything else hitting?  Minal, I

17  thought, said more hitting.

18      Jon said:  Not sure.  I will see it when you guys do.

19      And you say:  Okay, thanks, that's what I thought.

20      Then the next -- couple of days later, May 2, 2017, you

21  follow up and say:  Hey, good morning, everyone.  Getting me

22  crazy the last couple of days.  We haven't had a payment from

23  Medicare in, like, ten days.  Is something going to post soon?

24      Do you see that?

25  A.  Yes.

1   Q.   How often were you chasing Jon or Minal or anybody at

2   LabSolutions to get paid?

3   A.   What do you mean by "chasing"?  Because they've always

4   paid.  Like, they always paid.

5   Q.   All I'm asking is, these types of conversations, how common

6   were they?

7   A.   Every month.

8   Q.   Okay.  But did you ever ultimately have a problem getting

9   paid the money that you thought you were due?

10  A.   There was months of no payments, yes.

11  Q.   Okay.  Explain that to the jury.

12  A.   Apparently, there was something held up -- I don't know the

13  details, but the payments weren't coming in.  Something was

14  being held up with Medicare.  I don't remember what the issue

15  was.

16       But none of the labs were getting paid.  It wasn't just

17  this one.

18  Q.   Okay.

19  A.   It was an industry norm that none of them were getting paid

20  in that MAC or in that -- in that state.  Sorry.

21  Q.   Okay.

22       MS. DE BOER:  At this time, Your Honor, the United

23  States would proffer 1241-P, as in Peter, into evidence.

24       THE COURT:  That'll be admitted at this time without

25  objection.

```
 1           (Government Exhibit 1241-P was received in evidence.)
 2    BY MS. DE BOER:
 3    Q.   All right.  So, Mr. Hirsch, I'm showing you 1241-P.
 4         Is this a text exchange between you and Mr. Patel?
 5    A.   Yes.
 6    Q.   Okay.  So this is from April 9th of 2019.
 7         Do you see that?
 8    A.   Yes.
 9    Q.   And do you see that you send Mr. Patel a link to an AP news
10    article?
11    A.   Yes.
12    Q.   And then continuing down and flipping the page, is this an
13    image from the article that you sent?
14    A.   It is, yes.
15    Q.   Did there come a time where you started to learn about
16    enforcement related to telemedicine and genetic testing?
17    A.   Yes.
18    Q.   Had you previously ever discussed with Minal, you know,
19    what would be the worst thing that would happen if you got in
20    trouble?
21    A.   Yes.
22    Q.   What did he tell you?
23    A.   It would just be a monetary --
24    Q.   What do you mean?
25    A.   That we would have to give the money back or -- if there
```

1   was an issue.

2   Q.   Okay.  And then did you, at some point, start to hear about

3   criminal enforcement in this arena?

4   A.   Yes.

5   Q.   Did that give you any concern?

6   A.   A little bit, but I kept going.

7   Q.   Why did you keep going?

8   A.   The money.

9   Q.   Okay.  So this is one article that you sent to Mr. Patel in

10  April of 2019.

11       Did you ever exchange other articles with Mr. Patel?

12  A.   I don't remember.

13       MS. DE BOER:  Your Honor, the government would offer

14  into evidence Government's Exhibit 1241-T, as in Thomas.

15       THE COURT:  That'll be admitted at this time without

16  objection.

17       (Government Exhibit 1241-T was received in evidence.)

18  BY MS. DE BOER:

19  Q.   So, Mr. Hirsch, I'm showing you 1241-T.

20       Is this an exchange between you and Mr. Patel?

21  A.   Yes.

22  Q.   Okay.  And I'm going to direct you to this text that you

23  sent on June 4th of 2019.

24       Do you see you're sending a link to a Philadelphia Inquirer

25  article?

    1   A.   Yes.

    2   Q.   And the link states -- I know it's a little hard to see

    3   because it's in blue, but it states:  Medicare Fraud Scams,

    4   Genetic Tests.

    5        Do you see that?

    6   A.   Yes.

    7   Q.   And then there's another image associated with the article

    8   that you sent?

    9   A.   Yes.

   10   Q.   And then continuing with the chain, do you see Mr. Patel

   11   responds to that text?

   12   A.   Yes.

   13   Q.   And he sends a link to an oighhs.gov alert?

   14   A.   Yes.

   15   Q.   And it also is about genetic scams, isn't that?

   16   A.   Yes.

   17   Q.   Okay.  And when you were preparing to testify, did you meet

   18   with the government and look up those links to refresh yourself

   19   on what those articles were?

   20   A.   Yes.

   21   Q.   Okay.  So I'm going to show you -- just to remind you, this

   22   is the one that you had -- the link you sent to Mr. Patel; is

   23   that correct?

   24   A.   Yes.

   25   Q.   So now I'm going to show you this.  This is a copy of the

1   article that you sent to Mr. Patel.

2   A.   Yes.

3   Q.   And it's titled:  Medicare Fraud Alert.  Scammers are

4   offering unneeded genetic tests to get your personal

5   information.

6        Do you see that?

7   A.   Yes.

8   Q.   And then, as we saw, Mr. Patel had responded with a link to

9   HHS OIG's fraud alert?

10  A.   Yes.

11  Q.   And did you look at that one with the government as well?

12  A.   Yes.

13  Q.   Is this a copy of the United States Department of Health

14  and Human Services Office of Inspector General fraud alert that

15  Mr. Patel linked you to?

16  A.   Yes.

17  Q.   All right.  And it's called:  Fraud Alert, Genetic Testing

18  Scam?

19  A.   Yes.

20  Q.   And we're not going to read this entire thing but do you

21  see here, it says:  Scammers are offering Medicare

22  beneficiaries, quote/unquote, free screenings or cheek swabs

23  for genetic testing to obtain their Medicare information for

24  identity theft or fraudulent billing purposes.  Fraudsters are

25  targeting beneficiaries through telemarketing calls, booths at

1    public events, health fairs, and door-to-door visits.

2         Do you see that?

3    A.   Yes.

4    Q.   Of the things discussed here in this fraud alert, what were

5    you doing?

6    A.   All of them.

7    Q.   And who was paying you for the patients you obtained

8    through these means?

9    A.   LabSolutions, Minal.

10        THE COURT:  Let's put a pause there, then, and let's do

11   our break at this time.  All right?

12        MS. DE BOER:  Thank you, Your Honor.

13        THE COURT:  So, ladies and gentlemen of the jury, we're

14   going to take a 15-minute break at this point.  Everyone be

15   back in the jury room at 11:30.  You are all excused.

16        THE COURT SECURITY OFFICER:  All rise for the jury.

17        (Jury exits at 11:15 a.m.)

18        THE COURT:  Please be seated, everyone.

19        You're free to also take a restroom break if you need

20   it at this time.  Okay?

21        MS. DE BOER:  Thank you, Your Honor.

22        THE COURT:  You got it.

23        (Court recessed at 11:15 a.m.)

24        (Back on the record at 11:39 a.m.)

25        THE COURT:  Please be seated, everyone.

1          MR. SADOW:  Your Honor, can we bring something to the

2    Court's attention?

3          THE COURT:  Sure.  Is it okay if the witness is

4    present, or should he be excused?

5          MR. SADOW:  The witness should be excused.

6          THE COURT:  Okay.  Sorry.  Just give us a moment,

7    Mr. Hirsch.  If you can step out of the courtroom for me.  This

8    should only take a few minutes.  Okay?

9          (Witness exits the courtroom.)

10         THE COURT:  Yes.  Go ahead, Mr. Sadow.

11         MR. SADOW:  The government has been kind enough to tell

12   me that they may be done in 15 or 20 minutes.

13         THE COURT:  Okay.  Very good.

14         MR. SADOW:  Which I would then make a request that we

15   break for lunch then.

16         THE COURT:  Absolutely.

17         MR. SADOW:  But there's an additional request.  The

18   defense was not put on notice that Mr. Hirsch was going to

19   claim that he knew that Mr. Lohan was wired until today, which

20   I'm not suggesting any misconduct by the government.  I'm just

21   saying we didn't know that until today.

22         We are trying to locate text messages between

23   Mr. Hirsch and Mr. Lohan that postdate April 26, 2019.

24         THE COURT:  Got it.

25         MR. SADOW:  So it would be that date all the way up to

1      June the 13th of 2019, when Mr. Hirsch begins his cooperation.

2          We're going through 25 million documents, and I'm not

3      sure that we ever received those text messages, never knowing

4      or having reason to believe that they would be any value.

5          So I may be asking the government to assist us on that

6      during the lunch hour.  And I don't know whether -- because

7      they may be able to get access to what would be called Hirsch's

8      Cellebrite even faster than we can.

9          So I'm not saying that that will take us longer than a

10     lunch break, but I'm putting the Court on notice that that

11     could be -- it's not a discovery issue, but I'd like to be able

12     to see if I can find it.

13         THE COURT:  Okay.  And I think we'll have some time.  I

14     mean, if we finish in the next 20 minutes, just past 12:00,

15     I'll break.  That probably gives us almost two hours, closer

16     to -- between 12:15 and 2:00 o'clock.  I can do that to buy us

17     a little more time.

18         MR. SADOW:  That would be great.

19         THE COURT:  Let's do that.  I have a 1:30 sentencing

20     anyway.  It will not take more than 20 minutes.  So we have the

21     time.

22         So we can go ahead and -- I may have the jurors come

23     back at 1:45, because they tend to sometimes come in a little

24     slower; they don't all arrive at that time.  I'll give them

25     some coffee, have them ready to go.  But we'll probably bank on

1  starting at, like, 2:00 o'clock once we're done with the

2  direct.  That buys us a little more time.

3           MR. SADOW:  I appreciate that.  Thank you.

4           THE COURT:  Yeah.  All right.  Okay.

5           MS. DE BOER:  Thank you, Your Honor.

6           And just to let the Court know, after our discussion

7  this morning, we had the agents double-check if there were any

8  investigative reports that were not interview reports but that

9  happened to document statements from Mr. Hirsch.  They've gone

10  through, and there's nothing like that with respect to

11  LabSolutions.

12           We did locate an investigative entry where

13  Agent Mahmood directed Mr. Hirsch to have no further contact

14  with Mr. Patel.  It doesn't reflect statements by Mr. Hirsch,

15  but we've given that to Mr. Sadow.

16           THE COURT:  All right.  And then the only thing I would

17  add is, I don't know how easy it is to search for this last

18  request.  But I'll leave it up to you all.  At lunch, if you

19  speak with Mr. Sadow's team, perhaps there's somewhere that the

20  government -- or some way the government could direct or assist

21  in maybe narrowing some of the scope, if it even exists, in

22  some of these postdate text messages or communications.

23           MR. SADOW:  Your Honor, I have been able to locate --

24  apparently, the filter team sent us, in August of 2020, from

25  Mr. Hirsch's cell phone, 254,000 entries.

1          THE COURT:  Okay.

2          MR. SADOW:  So if we can even -- if we can even locate

3    what that -- where that is, or maybe the government could help

4    us locate it, maybe we can do a search and go from there.

5          THE COURT:  Okay.  All right.  We'll try to do that

6    over the lunch break.

7          MS. DE BOER:  Understood, Your Honor.

8          THE COURT:  Very good.  Okay.  Let's go ahead and bring

9    our jurors in, please.

10          THE COURT SECURITY OFFICER:  Please rise for the jury.

11          (Jury enters at 11:44 a.m.)

12          THE COURT:  Please be seated, everyone.

13          MR. SADOW:  We're missing one person.

14          THE COURT:  We are.  Our witness.  We can go ahead and

15    recall Mr. Hirsch.

16          MS. DE BOER:  Yes.  The United States recalls Mr. Brett

17    Hirsch.

18          THE COURT:  Very good.

19          All right.  Mr. Hirsch, we're going to continue and

20    pick up where we left off.

21          All right, folks.  We'll turn it back over to the

22    government.

23          You may proceed.

24          MS. DE BOER:  Thank you, Your Honor.

25    BY MS. DE BOER:

1    Q.   And good morning again, Mr. Hirsch.

2    A.   Hi.

3         MS. DE BOER:   At this time, Your Honor, the United

4    States moves into evidence Government's Exhibit 1899 and

5    1241-J.

6         THE COURT:   Those will be admitted without objection.

7         (Government Exhibits 1899 and 1241-J were received in

8         evidence.)

9    BY MS. DE BOER:

10   Q.   Now, Mr. Hirsch, we talked a little bit about your guilty

11   plea in this case, correct?

12   A.   Yes.

13   Q.   And you are testifying today pursuant to that plea?

14   A.   Yes.

15   Q.   You mentioned that you've been sentenced already.

16        Are you hoping to receive a reduction in that sentence in

17   exchange for cooperating?

18   A.   Yes.

19   Q.   Has anybody promised you that you will, in fact, receive a

20   reduction, or does it depend on certain things?

21   A.   No.

22   Q.   Okay.  Meaning, no promises?

23   A.   No promises.

24   Q.   But it is your hope that you will receive a reduction.

25   A.   Yes.

1    Q.   Okay.  And is it your hope that that reduction would

2    reflect any cooperation that you provided in this case as well

3    as the other matters in which you're cooperating?

4    A.   Yes.

5    Q.   Okay.  You mentioned that you've been to LabSolutions on

6    multiple occasions?

7    A.   Yes.

8         MS. DE BOER:  At this time, Your Honor, United States

9    would move into evidence Government's Exhibit 2000.

10        THE COURT:  That'll be admitted without objection.

11        (Government Exhibit 2000 was received in evidence.)

12   BY MS. DE BOER:

13   Q.   All right, Mr. Hirsch.  What are we looking at?

14   A.   Me in front of one of the machines.

15   Q.   Where?

16   A.   At LabSolutions.

17   Q.   Okay.  And what were you doing at the lab?

18   A.   At that particular -- I don't remember.  Maybe a meeting.

19   I don't remember what that specific date was.

20   Q.   Okay.  And we go to the second page of Government's Exhibit

21   2000.  What are we looking at here?

22   A.   Yeah, Keith just took a picture.  We were playing around in

23   the lab.

24   Q.   Okay.  So Keith, your business partner, took these photos?

25   A.   Yes.

1   Q.   So was he with you on this particular trip?

2   A.   Yes.

3   Q.   How often did Keith come with you to the lab?

4   A.   Every time, except at the end, he wasn't allowed to come

5   back.  He had an issue.

6   Q.   And what was his issue?

7   A.   Apparently, he was sending emails to LabSolutions -- I

8   don't know if it was to anyone specific -- asking questions,

9   and they didn't really want him to send emails about that

10  particular topic or subject.

11          MS. DE BOER:  At this time, Your Honor, the United

12  States moves admission of Government's Exhibit 1241-U.

13          THE COURT:  That'll be admitted at this time without

14  objection.

15          MS. DE BOER:  Thank you.

16      (Government Exhibit 1241-U was received in evidence.)

17  BY MS. DE BOER:

18  Q.   Mr. Hirsch, I'm showing you 1241-U.  Is this another text

19  exchange between you and Mr. Patel?

20  A.   Yes.

21  Q.   And I'm going to direct you to the text message that you

22  sent to Mr. Patel on June 10th of 2019.

23          Do you see that?

24  A.   Yes.

25  Q.   And you say:  I have a thousand tests in teledoc.

1      Do you see that?

2    A.  Yes.

3    Q.  And then you say that:  We sent close to 60 good

4    brick-and-mortar last week.

5      Do you see that?

6    A.  Yes.

7    Q.  So of the 1,000 tests in teledoc, what -- if you've got

8    1,000 tests that are with the teledoc, how many of those are

9    you expecting are going to get approved?

10   A.  900.

11   Q.  Okay.  Why are you telling this information to Mr. Patel?

12   A.  Because my numbers had gone down for the -- for that -- for

13   the monthly salary.

14   Q.  So why was it important to you to communicate these --

15   this -- these pieces of information?

16   A.  So I don't get -- so the money doesn't get cut down, my

17   monthly payment.

18   Q.  Okay.  And then you say:  WTF.

19      Do you know why you sent that at that particular time?

20   A.  Maybe he wasn't responding.

21   Q.  Okay.  And then he does respond and says:  In front of

22   people.

23      Do you see that?

24   A.  Yes.

25   Q.  Okay.  Going to the next page of Government Exhibit 1241-U,

1    Mr. Patel says, again on the same date, June 10th:  We will get

2    through it.

3         And you say:  Call me.

4         And then the next day, you send a link to another news

5    article.

6         Do you see that?

7    A.   Yes.

8    Q.   And it's a little hard to read because the hyperlink is

9    also in blue, but it's a link to an article about:  13

10   investigates fraud alert, DNA, and cancer testing kits linked

11   to Medicare scams.

12        Do you see that?

13   A.   Yes.

14   Q.   And did you also have an opportunity to review the article

15   at this hyperlink before you testified?

16   A.   I'm not sure if I looked at that one.

17   Q.   Okay.  Let's see if you remember.

18        Do you see in this image here?

19   A.   Yes.

20   Q.   That was part of the link?

21   A.   Yes, I remember that.

22   Q.   And is that the same --

23   A.   Yeah.

24   Q.   -- image there?

25   A.   Yes.

1    Q.   The same title?

2    A.   Yes.

3    Q.   Okay.  So is this the article that you sent to Mr. Patel?

4    A.   Yes.

5    Q.   Now, I'm going to focus in on a portion of this.  And the

6    article states:  Marlene usually ignores the constant barrage

7    of phone calls she receives from telemarketers, but a recent

8    call caught her attention:  I just thought it sounded like a

9    good thing.  It was very convincing.  They said that Medicare

10   and my primary insurance would pay for me to get this cancer

11   test, and all you had to do was swab the inside of your mouth

12   and mail it in, said the 71-year-old from Terre Haute.

13        Do you see that?

14   A.   Yes.

15   Q.   What is referenced in this article, is this exactly what

16   you were doing?

17   A.   Yes.

18   Q.   Is this exactly what you were doing for Mr. Patel?

19   A.   Yes.

20   Q.   Is this exactly what he paid you to do?

21   A.   Yes.

22   Q.   And this telemarketing here, is this exactly the kind of

23   thing that was discussed way back in the beginning, in 2016, at

24   that Boca Raton resort meeting with Shawn Griner?

25   A.   Yes.

1          MS. DE BOER:  At this time, Your Honor, the United

2     States moves admission of Government Exhibit 1243 and 1247.

3          THE COURT:  Those will be admitted without objection.

4          (Government Exhibits 1243 and 1247 were received in

5          evidence.)

6     BY MS. DE BOER:

7     Q.   So, Mr. Hirsch, we talked a little bit about both Rama and

8     Michael Lohan, correct?

9     A.   Yes.

10    Q.   So I'm going to show you a text exchange here.  And this is

11    Government Exhibit 1247.  And this is, index says Item 125.

12         All right.  Do you see that Dr. Rama, on December 15, 2016,

13    sends a text message?

14    A.   Yes.

15    Q.   And who else is on this chain?

16    A.   Dr. Rama, Minal, Michael Lohan, and myself.

17    Q.   Okay.  And in December of 2016, Rama says:  I've got 26

18    reps ready, compliance plan with healthcare attorneys.  We can

19    do this.  We can do anything.

20         Did you ever meet any of Rama's healthcare attorneys?

21    A.   No.

22    Q.   Do you think an attorney said it's okay to swab a bunch of

23    people in a train station?

24    A.   No.

25    Q.   And then further down, this is item number 127 from this

1   exhibit.  Do you see that Minal Patel sends a text message?

2   A.   Yes.

3   Q.   To you, Rama, and Mr. Lohan?

4   A.   Yes.

5   Q.   On the same date?

6   A.   Yes.

7   Q.   And it's a link to a YouTube video; is that correct?

8   A.   Yes.

9   Q.   Did you have an opportunity to review that link and refresh

10  your memory on what it was?

11  A.   Yes.

12          MS. DE BOER:  United States moves admission of

13  Government Exhibit 1247-A, Your Honor.

14          THE COURT:  That'll be admitted at this time without

15  objection.

16          (Government Exhibit 1247-A was received in evidence.)

17  BY MS. DE BOER:

18  Q.   And is this a screenshot, Mr. Hirsch, from the link, the

19  YouTube link that Mr. Patel sent you?

20  A.   Yes.

21  Q.   And was it a link to a Wu-Tang Clan music video for the

22  song "Cash Rules Everything Around Me"?

23  A.   Yes.

24  Q.   How did cash rule everything around you and Mr. Patel while

25  you were working together?

1   A.   What do you mean?

2   Q.   How important was money?

3   A.   Very important.

4   Q.   And Mr. Hirsch, did Mr. Patel ever credit you with any of

5   his success?

6   A.   What do you -- what do you mean, credit?

7   Q.   What, if anything, did he ever tell you about how important

8   you were --

9   A.   Oh, yeah.

10   Q.   -- to his success?

11   A.   Yes.  He used to tell everyone that when he met me, he had

12   $2 in the bank.  That was, like, a saying that we always told

13   everyone that we met.

14   Q.   And by the end of this, did you both have a lot more than

15   $2 in the bank?

16   A.   Yes.

17          MS. DE BOER:  One moment, Your Honor.

18          THE COURT:  Yes.

19   BY MS. DE BOER:

20   Q.   Thank you, Mr. Hirsch.

21          MS. DE BOER:  No further questions.

22          THE COURT:  Thank you very much.

23          Ladies and gentlemen of the jury, the best thing we can

24   do at this point is take our break before beginning the

25   cross-examination.  So we're going to have a little more time

1    for lunch.  I will bring in some coffee to you all around 1:45,

2    if you would all be in just around then.

3           We expect to have you retake your seats at

4    approximately 2:00 o'clock.  We have a little bit of homework

5    we're going to do to get things lined up for you over the lunch

6    break, but when we get back we'll go ahead and begin with

7    Mr. Sadow's cross-examination of Mr. Hirsch.

8           So I hope everyone has a nice lunch.  Make sure you

9    leave your notepads in the room.  We'll see you back in the

10   jury room at 1:45.  You are all excused.

11          THE COURT SECURITY OFFICER:  All rise for the jury.

12          (Jury exits at 11:56 a.m.)

13          THE COURT:  Thank you very much.  You're excused,

14   Mr. Hirsch.

15          THE WITNESS:  Thank you.

16          THE COURT:  You got it.  Absolutely.  We'll see you

17   back at just before 2:00 o'clock, if you could be available,

18   1:45.

19          (Witness exits the courtroom.)

20          THE COURT:  All right.  Everyone, please be seated.

21   Unless there's some housekeeping -- I obviously want to give

22   everybody plenty of time to prepare and go through any of the

23   other discovery and any the emails.

24          Any issues from the government before we break?

25          MS. DE BOER:  No, Your Honor.  And just to keep Your

1   Honor up to date, I do think we might get to Holden.

2          THE COURT:  Certainly.  I think we can definitely get

3   to Holden.  I just think there's -- I know that there's cross

4   to come, but the scope of the material compared to other

5   cooperators, I mean, I think we may be able to get our hands

6   around it this afternoon.

7          So as long as we do have Holden standing by, I don't

8   know when we'll get to him, but I think we can definitely make

9   some inroads on his direct this afternoon.  So that sounds

10  good.

11         MS. DE BOER:  Great.  Thank you, Your Honor.

12         THE COURT:  All right.

13         Yes?

14         MR. SADOW:  So the Court knows, I have two audios I'm

15  going to be playing.  The total amount, skipping things that

16  are just conversation, may be in the neighborhood of 20 to

17  25 minutes.

18         THE COURT:  Okay.

19         MR. SADOW:  Although I must tell you, now that he is

20  saying that the whole thing -- that he knew he was -- according

21  to him, he knew he was being wired, it may be required to play

22  it from start to finish, which is much longer.

23         THE COURT:  Okay.  All right.  Take a look and let me

24  know, just so that we're ready when we play those and I know

25  that it's coming.  All right?

1          MS. DE BOER:  And, Your Honor, just on that note, these

2    are the recordings that Mr. Lohan conducted of Mr. Hirsch.

3          THE COURT:  I believe so, yeah.

4          MS. DE BOER:  That's my understanding at least.

5          And my view is that those are not admissible unless

6    there's some impeachment purpose, and I have not heard anything

7    that can be impeached.  I mean, he said on the stand what he

8    said in the -- in the recordings, which is he said everything

9    was on the up-and-up, everything was legit.  And that is what

10   he says in the recordings.

11         THE COURT:  Yeah.  I haven't heard the recordings.  I

12   presume you-all believe there's some impeachment material in

13   that?

14         MR. SADOW:  Well, him saying everything I said was a

15   lie really doesn't put in context what he said, how he said it.

16   He talked about many different things that he hasn't mentioned

17   at all in here.

18         THE COURT:  Okay.  But just for purposes of it not

19   being improper impeachment, can I understand how we're going to

20   be playing that?  I mean, I'm just trying to understand --

21         MR. SADOW:  What I could -- here's the way I would

22   normally do it:  I would ask him, did you say on April 26th...

23   da, da, da, da, da.  If he says yes, then I don't play

24   anything.

25         THE COURT:  Sure.

1           MR. SADOW:  If he says no, then I do.

2           THE COURT:  Okay.  So you're going to reframe it.

3    That's fine.  I just -- I thought we were going straight off

4    his statements and maybe playing it.  But if you set the

5    predicate like that, I don't have a problem.

6           I think, to Ms. de Boer's point, he may confirm that he

7    said those things; but certainly, if not, then we should be

8    able to play it.

9           But let's go ahead and present him with it, and then we

10   can have a much cleaner way to impeachment.  If that's how

11   we're going to do it, I'm fine.  Yeah.

12          MR. SADOW:  Yeah.  I'm not going to play the recordings

13   unless we put into issue whether he -- I mean, if he says, "I

14   don't remember," "I don't know if I said that," then I'm going

15   to have no choice but to play it.

16          THE COURT:  Right.

17          MR. SADOW:  But if he says yes -- I just can't get into

18   a situation if he starts with, "I might have said that."

19   That's -- the only way to get beyond the "might have said that"

20   is to play the recording.

21          THE COURT:  Okay.

22          MS. DE BOER:  And, Your Honor, if he doesn't remember,

23   then it shouldn't be played in front of the jury in the first

24   instance.

25          THE COURT:  Right.  It would be refreshing.  Yeah.

1          And we don't have a transcript of this, do we?

2          MR. SADOW:  I do have a transcript of those portions

3    that I'm going to use.

4          THE COURT:  Okay.  So let's -- if he doesn't remember,

5    though, I'll give you permission to approach and show him the

6    transcript.

7          I anticipate what may happen, based upon some of the

8    cooperators that you've crossed, Mr. Sadow, is he may not have

9    any reason to dispute your characterization, right?

10         We've had a couple that have said, I'm going to go with

11   your reading of it, and I have no reason to doubt that that's

12   what I said, and that way, maybe moot it.

13         But if we could approach, if he needs a refresher,

14   before you play it, that would be great.

15         MR. SADOW:  Right.  I'm not going to -- I'm not going

16   to attempt -- the only reason I would introduce it and play it

17   is because I've been unable to get to that point where he's

18   taking a position.

19         THE COURT:  Very good.  I get it.  I just think, before

20   we get to that point, to help him take a position, if we can go

21   ahead and -- I have no problem with approaching him with a

22   transcript if he has a memory issue.  Because he does have a

23   few moments where you've all seen he just can't remember.  So

24   just approach him with that.

25         MR. SADOW:  Now, there is -- there is a one-minute

1   introduction on the tape recording, and then there -- at the

2   end, there's 35 seconds which the agent says, we're done with

3   the recording.

4          So if I can put that in, I will.  But I'll see if --

5   I'm trying to do it without playing any of it.  Although, I

6   have to tell you, in light of the fact that he claims that he

7   knew he was wired, the way he speaks is as valuable as just the

8   words themselves.

9          THE COURT:  Yeah.  But again, that's not going to be a

10   basis to get it in just based on his tone changing.  I mean, I

11   have no problem with you using it for impeachment if we lay a

12   predicate, but I can't see a reason why we would replay that.

13          You can press him on it in your cross; I know you will.

14   But I don't know that that's a gateway, if he confirms he said

15   what was said, to be able to play it.  I mean, that's the

16   challenge I'm having.

17          MR. SADOW:  We'll go that route, and we'll see where we

18   are.

19          THE COURT:  I gotcha.  All right.  That works.

20          Okay.  So I want to give you guys a chance to finish

21   going through some of those emails.  So with that being said,

22   we'll all be back here at about a quarter before 2:00 o'clock,

23   1:45 or thereabouts.

24          MS. DE BOER:  Thank you, Your Honor.

25          THE COURT:  You got it, guys.  We're in recess.

```
 1              THE COURT SECURITY OFFICER:  All rise.

 2         (Court recessed at 12:02 p.m.)

 3         (Back on the record at 2:10 p.m.)

 4         THE COURT:  Please be seated, everyone.

 5         Before we bring our jurors back in for the

 6  cross-examination of Mr. Hirsch, I understand that there may be

 7  a few issues for the Court to address.  So I'll turn it over

 8  to -- if the government want to go first, or does the defense,

 9  whoever wants to take the lead.

10         MR. SADOW:  I'd like to go first.

11         MS. DE BOER:  Either one.

12         THE COURT:  Okay.  Go ahead, Ms. de Boer.  Maybe you

13  can streamline this, and then I'll hear from the defense.

14         What's going on.

15         MS. DE BOER:  Thank you, Your Honor.  So over the lunch

16  break, in an effort to confirm that everything with respect to

17  the witness who is on the stand has been produced, we

18  identified eight additional reports, five of which pertain to

19  Mr. Hirsch that we cannot confirm were previously produced.

20  They've now been produced.

21         THE COURT:  Okay.

22         MS. DE BOER:  We also identified two reports that

23  pertained to Mr. Deegan, and one --

24         MR. SADOW:  Griner.

25         MS. DE BOER:  I'm sorry.
```

1         -- Mr. Griner, and one report that pertains to

2    Mr. Ramamurthy.  Those have now all been produced.

3         THE COURT:  So let's focus on what we have right in

4    front of us, the Hirsch ones, right?  Because that's what is

5    right in front of me for cross.

6         So you found five reports that you're not certain if

7    they had been previously produced that pertained to Mr. Hirsch?

8         MS. DE BOER:  That's correct.

9         THE COURT:  Okay.  When we talk about reports, given

10   our experience earlier this morning, are we talking about the

11   investigative-type report that does not discuss his statements,

12   or are we talking about reports along the line of 302s?

13        MS. DE BOER:  We're talking about 302s, Your Honor.

14        THE COURT:  Okay.  And these 302s, I would presume, are

15   detailing communications, or at least meaning some of them are

16   detailing communications between Mr. Hirsch and Mr. Patel?

17        MS. DE BOER:  Yes, Your Honor, and other, you know,

18   marketers or what Mr. Hirsch would call downlines involved in

19   this as well as people involved in -- with Satary or other

20   matters.

21        THE COURT:  Okay.  All right.  So let's -- let me hear

22   from the defense on what --

23        You've had chance to look at them.  Obviously, I'm not

24   sure how detailed they are and how lengthy they are.  But what

25   does the defense's initial review indicate on these five

1    reports?

2            MR. SADOW:  Candidly, that we need more time to digest

3    them.

4            THE COURT:  Okay.  All right.  And let me ask in terms

5    of -- how much more time do we need?  Again, I know it's

6    difficult because you've just been made aware of them, and I

7    would presume that they will shape or, at a minimum, influence

8    your cross-examination.

9            Do I have a sense of time?  Is this a situation where I

10   could let my jurors know, look, we're going to give you an

11   extended break and we're going to be back and get started, or

12   is this more significant?

13           I haven't seen the report, so I'm not sure how

14   voluminous or complex they are.

15           MR. SADOW:  Well, they're not voluminous, but they're

16   going to take some time.  But that's only part of the issues

17   for the Court.

18           THE COURT:  All right.  Well, let me take it in turn.

19           So obviously, they're going to take some time.  Let

20   me -- let me move on to whatever the next issue is.  So walk me

21   through your next concern.

22           MR. SADOW:  Okay.  Starting with Mr. Hirsch -- and he's

23   not in here, right?

24           THE COURT:  No, he's not in here.

25           MR. SADOW:  As I told the Court earlier, we learned for

1    the first time today that Mr. Hirsch made a claim that he knew

2    that Mr. Lohan was wired.  We had already received probably

3    16 or 17 reports; now we can add to that.  So now we're at

4    least at 20 reports never mentioned previously.

5           I have serious doubts about his credibility on that

6    issue.  So we got lucky at lunchtime and actually spoke to

7    Ms. Lohan.

8           So the Court understands, point-blank, never happened.

9           THE COURT:  Meaning his testimony that he was made

10   aware that Mr. Lohan was recording him by speaking to

11   Ms. Lohan, she denies that?

12          MR. SADOW:  She denied it.  Everyone on the defense

13   team has heard it.

14          So I called it to the Court's attention because we're

15   now in a position where, going forward, we're going to be

16   bringing -- unfortunately, we're going to have to bring

17   Ms. Lohan in, and it's going to extend the trial.

18          But what really concerns me is I don't think the

19   government has anything to do with that.  I think the witness

20   has -- has committed perjury.  And the question becomes whether

21   we want to take any movement on that now.  Are we going to wait

22   and just bring Ms. Lohan in and leave the credibility with the

23   jury?

24          But I wanted the Court to know.  And it's surprising.

25   I wish -- I wish that I could have tape-recorded the

1  conversation, because I think it would have made it very clear.

2  But that's -- that's --

3      THE COURT:  Listen, if there's one thing I've learned

4  in this trial, let's all stop tape-recording people's

5  conversations, please.  I don't need any more tape recording of

6  anything.

7      MR. SADOW:  Right.

8      THE COURT:  But I will say this, to your concern:  I

9  mean, look, Mr. Hirsch -- I might not be the only judge he is

10 going to have to appear before at sentencing -- well, not

11 sentencing -- at surrender.  He's actually just gotten an

12 extension of time from me for a surrender date to be with us.

13     So any Rule 35 issues -- right? -- which he is here

14 attempting to procure, I'm in a very good vantage point to

15 determine whether or not his cooperation in this trial has not

16 been forthright.

17     So I don't think there's anything for me to do in a --

18 from a perjury standpoint.  I think it's your opportunity,

19 certainly, if we're going to call Ms. Lohan, to have Ms. Lohan

20 come in and directly rebut his credibility regarding this

21 point.

22     I don't think it'll be, hopefully, too belabored in

23 adding her, because it's a focused issue.  But certainly, I

24 would not be surprised at your desire to bring her in and let

25 the jury make that call.

1          MR. SADOW:  That part, I understand.  But I'd also

2    note -- I wanted to put the Court on notice, this is going to

3    come up on the cross.  Now, I can't, obviously, put what she

4    said to me out, because that's hearsay.

5          THE COURT:  Right.  Right.

6          MR. SADOW:  But I can certainly put out that there was

7    a conversation.  And I just want you to know that that's

8    coming.

9          THE COURT:  Yeah.

10         MR. SADOW:  But I don't want him to know, obviously.

11         THE COURT:  No, obviously.  And he's going to have to

12   answer that question, and I'll be listening carefully.  That's

13   for sure.

14         Did you want to add something on this point,

15   Ms. de Boer?

16         MS. DE BOER:  I just wanted to ask quick a question.

17   Which Mrs. Lohan did they speak with?

18         MR. SADOW:  Kate.

19         THE COURT:  It's got to be the wife, the ex-wife.  I'm

20   sorry.  I don't know my gossip columns that well either, so I

21   don't know -- I only know of the daughter who's an actress, and

22   I thought there was an ex-wife but I guess there's a current

23   wife.

24         Is that who we're talking about?

25         MR. SADOW:  It's a still legally married, but may be

1   separated.

2            THE COURT:  Okay.  All right.

3            MR. SADOW:  So you're in there.

4            THE COURT:  I'm somewhere in the right place.  Okay.

5   All right.  So obviously I want you to be able -- and I know

6   you're going to do it artfully -- raise some of this without

7   getting into what she said.  And I fully expect you to do so.

8            And again, Mr. Hirsch knows, he's on the stand, he

9   needs to be coming clean with all of this testimony.  And if

10  this raises an issue as to credibility, the defense should have

11  every opportunity to explore it and we'll see what he answers

12  on cross.

13           Now, one thing I'll add, obviously, and your point may

14  makes it even more pressing, Mr. Sadow, because we may now be

15  adding now some more testimony on the defense case.  I don't

16  want to lose momentum either.  I know you don't.

17           I mean, I can spot you an hour.  I hate to put a time

18  limit on it, but I really don't want to lose, you know, chunks

19  of time with these new 302s.

20           You guys have been prejudiced in the sense that it's

21  not fair to force you to jump right into it without looking at

22  them, but you have a very good team here, and I'm willing to

23  buy you maybe until 3:00 o'clock, give you another 45 minutes,

24  tell my jurors to hang in there and then see if maybe by then

25  you feel comfortable.

1          Can we try that?

2          MR. SADOW:  We can, but now we have to move onto a

3    non-Hirsch issue.

4          THE COURT:  Okay.  So let me take it in pieces.

5          No. 1, no issues with you avoiding any hearsay

6    concerns, but going into the Lohan issue.

7          No. 2, we're gonna give it a shot, and have you start

8    at 3:00, and I'm going to tell the jurors to hang in there so

9    that you can get up to speed on some of these 302s.

10         Tell me what the non-Hirsch issue is.

11         MR. SADOW:  The government also supplied three new

12   reports on witnesses that have already testified.

13         THE COURT:  Which ones?  Remind me again.  Because

14   there was a lot of new stuff that was shared.

15         What were the three witnesses again, for my notes?

16         MR. SADOW:  Two witnesses, three reports.

17         THE COURT:  Okay.

18         MR. SADOW:  Two reports on Griner.

19         THE COURT:  Okay.

20         MR. SADOW:  One on Ramamurthy.

21         THE COURT:  Okay.

22         MR. SADOW:  And we've -- I quickly perused them, and I

23   can tell you, I would have used those in cross-examination --

24         THE COURT:  Okay.

25         MR. SADOW:  Which affects your timeline because --

1          THE COURT:  Of course.

2          MR. SADOW:  -- now to the extent that we're going to

3     move forward on that, I have to recall them.

4          THE COURT:  Yeah.  I have to recall them for the

5     limited purpose of exploring those reports.

6          Now, the only somewhat good news about that is,

7     Ramamurthy's only got one, so my hope is recalling him and

8     recalling Griner with the two.  It sounds like that may be

9     something that wouldn't take too long.

10          I mean, I know you haven't looked at them as thoroughly

11     yet, but do you feel like -- that sounds like a morning, to

12     recall both and get those questions.  I mean, I don't know that

13     it would be that lengthy.

14          What do you guys think?  So that we don't cover the

15     same ground.  Again, I haven't seen the 302s so I'm only

16     speculating.

17          MR. SADOW:  I haven't studied them the way they would

18     need to be studied, but my assumption would be that it wouldn't

19     take any more than a morning.

20          THE COURT:  Okay.  And listen, we'll do what we can to

21     make it happen.  But I think we all need to understand that it

22     makes total sense and it's only fair that we would have Griner

23     and Ramamurthy recalled.

24          But certainly, adding them to a morning and adding the

25     possibility of Ms. Lohan, who also I don't think will be

1   lengthy, will take time, I mean, that's three witnesses we

2   didn't expect the defense to call.

3          I will remain optimistic that we will still be able,

4   next week, to get these witnesses in as part of the defense's

5   case-in-chief, but certainly we have to see how much progress

6   we make as soon as we finish the government's case, hopefully

7   Friday; if not, early Monday.

8          Look, I can only work with what I have and right now I

9   see no issue with you recalling those witnesses and calling

10  Ms. Lohan.  And my plan is to just give you that opportunity,

11  and let's see how far we can get when we're done with those

12  additional new witnesses.  All right?

13         Okay.  Well, that's the only way I can think of curing

14  these late disclosures.

15         So is there anything else from the defense camp before

16  I tell my jurors to hang in there?  I'll stop by, give them a

17  couple more cups of coffee and tell them to hang in there for

18  another 45 minutes or so.

19         What do you think, Mr. Sadow?

20         MR. SADOW:  No, I think we're done with that aspect.

21  But I have one other request.

22         THE COURT:  Tell me.

23         MR. SADOW:  Of course, I cannot control what the

24  government chooses to do, but I would be very, very upset if

25  two agents show up on Ms. Lohan's doorstop to interview her in

1    reference to this.

2          In that sense, what's the language that's been brought

3    out -- fear of God in her to -- in whatever way cause her not

4    to come forward as a witness.  So if this is going to take

5    place, I would like to -- she would be able to have notice that

6    it's happening, and we don't just have someone show up.

7          THE COURT:  Understood.  I don't know if the government

8    has made a decision in this regard, but certainly I would

9    expect to facilitate her ability to come into court and make

10   sure that we make the most of our time, that if indeed the

11   government feels compelled to take that course of action, that

12   out of courtesy to the ongoing proceedings, we avoid that type

13   of situation from transpiring.

14         Again, I can only do so much as well in how the

15   executive wants to manage their case.  But I'm sure the

16   government understands Mr. Sadow's concern, right?

17         MS. DE BOER:  Certainly, Your Honor.

18         MR. SADOW:  Maybe we can have a conversation between

19   now and 2:45 --

20         THE COURT:  Sure.

21         MR. SADOW:  -- if I digest?  I'm sure that we can put

22   the government on the phone with her and they can go talk to

23   her just now.

24         THE COURT:  Whatever works to take care of this issue,

25   I'm game.  I certainly just need to manage juror expectations.

1   And going back to my earlier concern, getting this witness

2   completed today is of paramount importance to the Court,

3   certainly because we're now adding back two witnesses and the

4   potential of a third, and that means all the more reason to

5   hopefully get this witness completed today and see if we can

6   get anything done with Mr. Holden today so that I don't really

7   fall behind here.

8          So let me do this.  I think that's all of the pressing

9   issues that have emerged.  I will step off the bench and return

10  around 3:00 o'clock with the hopes that you've all had a

11  conversation and that you'd at least be able to digest the 302s

12  that pertain to Mr. Hirsch, and we'll see where we're at at

13  that point.

14         Does that work?

15         MR. SADOW:  Thank you.

16         THE COURT:  All right.  We'll be back at 3:00 o'clock.

17  Do your best.  I'll go check in with my jurors.

18         MS. DE BOER:  Thank you, Your Honor.

19         THE COURT:  You got it.

20      (Court recessed at 2:24 p.m.)

21      (Back on the record at 3:15 p.m.)

22         THE COURT:  Checking with my defense team, it's been a

23  little over an hour here.  I know that you could certainly take

24  longer and digest it even better, and I appreciate you all

25  trying to get your hands around these 302s in a short amount of

1    time so that we can begin the cross.

2         How are we feeling at this point, Mr. Sadow, with

3    having Mr. Hirsch on the stand?

4         MR. SADOW:  Let's do it.

5         THE COURT:  All right.  I love it.  That works for me.

6         MS. DE BOER:  Your Honor, I'm really sorry to interrupt

7    but there's one more report.  It's on the way up to the

8    courtroom right now.  I just got the text message.

9         THE COURT:  It's not with Hirsch, is it?

10        MS. DE BOER:  It's with Hirsch.

11        THE COURT:  Oh, man.

12        MS. DE BOER:  I'm really sorry, Your Honor.

13        THE COURT:  All right.  Well, I can't really do much

14   until I see that one.  It's on its way up here now?

15        MS. DE BOER:  Yes, Your Honor.

16        THE COURT:  Okay.  Are you sure there's nothing else?

17   Because the one thing we don't want is for Mr. Sadow to be put

18   in a position where he has to recall Mr. Hirsch in his

19   case-in-chief, like we already have to do with Ramamurthy and

20   others.

21        So let's make sure that's the last one, if you could

22   let them know.  Because obviously I do want to get started, and

23   that makes it a little more difficult.

24        Mr. Sadow, I don't want to do this without you seeing

25   it because it's just fundamentally unfair.  I don't know if

1   it's going to disrupt anything.

2          Do we have an ETA on that?  Is that coming up?

3          MS. DE BOER:  It's being printed right now as of

4   3:15 p.m., so it should be on its way up now, if not

5   momentarily, and Ms. Gurskis is going to go down and confirm,

6   as I just texted, to confirm that this is absolutely the last

7   one.

8          THE COURT:  Yeah, as least for this witness.

9          MS. DE BOER:  Right.

10         THE COURT:  But while we're talking about this, I might

11  as well reiterate the need for us to go back and confirm, for

12  example, that we don't have any other 302s for any other

13  witnesses that have already been called.

14         Certainly if we end up finding that we have extra 302s

15  for Ramamurthy, who's going to get recalled, or Griner, we need

16  to make sure that those are uncovered and produced promptly,

17  and certainly as it pertains to Holden and any other witnesses

18  we still plan on dealing with, that needs to be triple-checked

19  as well.  So we have to do that.

20         MS. DE BOER:  Understood, Your Honor.  And we have two

21  paralegals, an agent, and an attorney working on it, and they

22  will not be rejoining us at the table.  They will be working on

23  that while we're up here today.

24         THE COURT:  That was my suggestion, we have a deep

25  enough bench that we should have some of those folks repurposed

1    to make sure this doesn't happen anymore.

2         The other thing I would just point out, I mean, I don't

3    know how this happens other than search terms are different,

4    but can I just get an education as to how this would have

5    happened on the government's end?  I'm just trying to figure

6    out.  You guys found a bunch of them, the 302s, and produced

7    them, so I know this isn't selected production.  Is it a matter

8    of the terminology?  I just want to know how this happened.

9         I can't understand it with such a large team and the

10   database searches you can run, how these would have not

11   flagged.

12        Do you know?

13        MS. DE BOER:  Not at this time, Your Honor.  I

14   completely understand the Court's frustration.

15        THE COURT:  Yeah.

16        MS. DE BOER:  I assure you, Your Honor, I take full

17   responsibility for this.  It is my responsibility.  No one else

18   at this table is at fault.  I just want to make that very clear

19   to the Court.

20        THE COURT:  Okay.

21        MS. DE BOER:  We are endeavoring to cross-check,

22   triple-check, and make sure we have everything that these

23   agencies have and that it is being produced to the defense.

24        Just to assure the Court, we have not been selecting

25   interview reports based -- you know, if there's an interview

1    report for Hirsch, we've been producing it if it's in our

2    possession, regardless of the topic.

3         THE COURT:  Right.  If it's Hirsch-related, turn it

4    over.  Right.  Yeah.

5         MS. DE BOER:  Right.

6         THE COURT:  That's what I thought you were doing and

7    that's why I mentioned it, because I would have thought typing

8    in Hirsch, anything that hits, turn it over.  That's what I

9    thought we were doing.  That's why I don't know how these

10   didn't make the cut.  It's just odd to me.  I don't know how

11   that happens.  Because I know that's what you've told me you've

12   been doing, so I presumed that we searched broad, we produced

13   broad, and it's better that way, and then if we have to call

14   things out later, better to do that with court intervention

15   than self-selecting.  I can't figure that out.

16        But let's just -- hopefully that will be the last one.

17   I've just checked in with the jurors because they were

18   understandably wondering and I didn't want this to appear to be

19   a delay on behalf of the defense.  So I told them that it was

20   on me and that we were working through some issues to get

21   things ready.  So they are none the wiser.

22        But I certainly don't want them to delay, because

23   they're going to start forgetting a little bit about the direct

24   and I want to try and get this witness done.  So hopefully it

25   gets up here.

1          If you would do me the favor, I guess, as soon as it's

2    here just let me know and then I'll retake the bench and bring

3    them out.  I'll give you a bit of time as well, Mr. Sadow,

4    before we bring them out so you can take a look at that last

5    report.

6          (Court recessed at 3:20 p.m.)

7          (Back on the record at 4:01 p.m.)

8          THE COURT:  All right.  We're back on the record now.

9    Let's get an update, if we could, from the government.  My

10   understanding is we found a few more 302s that related to

11   Hirsch; is that correct?

12         MS. GURSKIS:  They were -- they're reports.  They're

13   contact reports, Your Honor.  So I think, semantically, they're

14   his statements, but they're confirmation on a -- that a call

15   occurred on a particular day relaying a message to Mr. Hirsch.

16   And they've been turned over to Mr. Sadow.

17         THE COURT:  Okay.  And at this point, do we have a

18   sense of whether there's anything else, at least as it pertains

19   to Mr. Hirsch, that needs to be turned over?  Anything else we

20   found?  Have we run an exhaustive search?

21         MS. GURSKIS:  We have been running an exhaustive

22   search, Your Honor.  HHS OIG has confirmed that everything has

23   been produced.  The FBI search is a little bit slower.  That's

24   where Ms. de Boer is right now.  That's why I'm up here without

25   her.

1          THE COURT:  Okay.  So the FBI search, what's our status

2     there?  Do we have a sense that she's going to be giving us an

3     update momentarily, or where are we on that?  She's looking now

4     on that front?

5          MS. GURSKIS:  Yes.  She said that it's taking some

6     time.  I just asked her for another update.  I don't have a

7     precise timestamp on that, so I --

8          THE COURT:  This is to confirm that there's nothing

9     else outstanding; is that right?

10          MS. GURSKIS:  That's right, Your Honor.

11          THE COURT:  Okay.  And whatever else was found when I

12     came back out here, and there was one more found --

13          MS. GURSKIS:  Oh.  She just said nothing else.

14          THE COURT:  Nothing else.  Okay.

15          But I know there was -- in addition to the one that was

16     found right before we were about to begin, another one was

17     found about an hour ago.  And then did I understand that, in

18     addition to that, was the only other thing found the contact

19     reports?

20          MS. GURSKIS:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MS. GURSKIS:  Yeah, the reports of conversation.

23          THE COURT:  All right.  Okay.  So what I'd like to do,

24     Mr. Sadow, turning back to you, I hope you have had a chance at

25     least to review the initial one that they found and anything

1    else that's been found in the last hour.

2         I'd like -- we have to make some progress today.  I

3    don't expect you to finish your close -- excuse me -- your

4    cross today, but I have at least an hour and 15 I can give you

5    here, and I'd like to take advantage of it.

6         So are we able to at least get started on your cross?

7         MR. SADOW:  I will do whatever the Court directs.

8    Obviously, having had the jury sit for a couple of hours, I'm

9    concerned that maybe they're not going to be quite as attentive

10   as maybe they'd typically be.  But I will do whatever the

11   Court --

12        THE COURT:  Let's make some progress.  I will tell you,

13   they are ready to hear what we have to put on for them.  They

14   are -- I mean, they're ready to go.  I checked up on them.

15   They are wondering.  They're engaged.

16        So I'm not worried that we're going to get them

17   distracted.  And they certainly, I think, are expressing a

18   concern that we may not have any more material covered today,

19   knowing the schedule.

20        So they are unaware of the reason for the delay, but I

21   think we need to get them back in here and get started and at

22   least get ourselves underway on the cross and see how much of

23   it we can complete.  So I'm going to bring them back in here.

24        I have the rest of the government team joining me now.

25        Ms. de Boer, if you would jump on the microphone here

1    and confirm Ms. Gurskis's representation that, after checking

2    with the FBI folks, there are no more 302s or any other reports

3    outside of what has been found in the last hour and the

4    additional contact reports.

5            MS. DE BOER:  That's correct, Your Honor.

6            THE COURT:  All right.  Okay.

7            So, with that being said, can we go ahead and get

8    Mr. Hirsch back in here and get him on the stand, if he's out

9    there?  Let's go ahead and have him take the stand again, and

10   then let's get a head count.

11           As I was saying to Mr. Sadow, Ms. de Boer, we're going

12   to do as much as we can in his cross, starting now, try to go

13   to about 5:15 and make some progress and see if we can get

14   close to --

15           THE COURT SECURITY OFFICER:  They're ready.

16           THE COURT:  They're ready?  Okay.  So we just got to

17   get Mr. Hirsch, wherever he may be.  And as soon as he comes

18   in, I'll bring them in.

19           Let's go ahead and -- we can start bringing in the jury

20   so we can get them seated, please.

21           THE COURT SECURITY OFFICER:  Please remain standing for

22   the jury.

23       (Jury enters at 4:06 p.m.)

24           THE COURT:  Please be seated, everyone.

25           Thank you, Mr. Hirsch.  You're free to rejoin us on the

1   stand.

2           Ladies and gentlemen of the jury, I want to thank you

3   all for your patience.  As I indicated to you earlier, there

4   was some housekeeping that we had to do to prepare for the

5   remainder of Mr. Hirsch's testimony.  I am now going to turn it

6   to Mr. Sadow.  We are going to do as much of the

7   cross-examination as we can do with the time we have left

8   today.  As we've done every day, we will break just after

9   5:00 o'clock, or thereabouts, at a good point for the

10  questioning.

11          So we're going to pick up where we left off and turn it

12  back over now to the defense.  Okay?  All right.

13          So, with that being said, Mr. Sadow, the floor is

14  yours.

15          MR. SADOW:  Thank you, Your Honor.

16                      CROSS-EXAMINATION

17  BY MR. SADOW:

18  Q.  Good afternoon, Mr. Hirsch.

19  A.  Good afternoon.

20  Q.  I'm sorry?

21  A.  Good afternoon.

22  Q.  You and I have never spoke, correct?

23  A.  No, sir.

24  Q.  If you would, please, just try to keep your voice up so

25  everybody can hear what you have to say.  Okay?

1    A.   Yep.

2    Q.   Thank you.

3         Could you provide me, please, the name of the wife of

4    Mr. Lohan.

5    A.   Kate Lohan.

6    Q.   Am I correct in stating that it is your claim, under oath,

7    that Kate Lohan tipped you off to the fact that her husband,

8    Michael Lohan, was wired when he met with you on or about

9    April 26th of 2019?

10   A.   She tipped me off to be careful that he would be taping me.

11   Not that particular date, but just in general.

12   Q.   Okay.  So tell us when it was that you believe -- you're

13   testifying under oath that Ms. Lohan -- and I'll just say

14   "Kate" -- told you or tipped you off, according to your

15   testimony?

16   A.   I can't say the date, but it was consistently telling me

17   for months.

18   Q.   For months.  So that would mean, if I understood it

19   correctly, that you would have been aware for months that

20   Mr. Lohan could be cooperating with some law enforcement

21   agency, correct?

22   A.   No.

23   Q.   Okay.  Let's try again.

24        That would mean that you were aware that Mr. Lohan, for

25   some purpose, was taping you, correct?

1    A.   Yes.

2    Q.   And that purpose, you would understand at the time,

3    according to your testimony under oath, would be what purpose?

4    A.   Don't know what the purpose was.  She just said to be

5    careful; that he's setting me up, be very careful of him and a

6    guy named Joe Lobella (phonetic).  Both of them, be careful.

7    Q.   Okay.  I spoke to Ms. Lohan today.

8    A.   Yes.

9    Q.   I had a conversation with her at 1:06 p.m.  I'm not going

10   to tell you what she said.

11        But do you want to take back what you've now said about

12   Ms. Lohan?

13   A.   No.

14   Q.   No.

15        You know Ms. Lohan doesn't care for you at all, right?

16   A.   If you could get all the records of her texting me over the

17   last few years, I would say that's not true.

18   Q.   Yeah?  So you have those records?

19   A.   I erased them, but --

20   Q.   You erased them.

21   A.   Only because she was sending me sexual pictures and I

22   didn't want my wife to see them.

23   Q.   She was sending you sexual pictures?

24   A.   Yes.

25   Q.   So I'm sure, since she was having contact with you, these

1   sexual pictures, you would have told agents of the government

2   that the wife of someone who had cooperated against you was

3   texting you.

4   A.   I only found out yesterday that it was an actual fact that

5   it was -- that he was taping me.  So I just found that out

6   yesterday.

7   Q.   Are you telling us that you, for the last -- let's see.

8   You started cooperating on June the 13th of 2019, correct?

9   A.   Yes.

10  Q.   Are you trying to tell us that from that period until now,

11  with all these, as you claim to be, sexually-related

12  pictures --

13  A.   Yes.

14  Q.   -- that you never one time told the government that the

15  wife of the individual, Mr. Lohan, had sent you or been in

16  contact with you?

17  A.   I did not, because I did not know until yesterday that it

18  was a fact that he was taping me.  Until yesterday, I did not

19  know.

20  Q.   But you knew -- you, of course, would have told them in

21  this time period?

22  A.   Did not -- did not know that it had anything to do with

23  this.

24  Q.   Okay.  Let's -- let me ask my question.  Okay?

25       You spoke to them about Michael Lohan on a number of

1    occasions between June 13th of 2019 and today, correct?

2    A.   No.

3    Q.   You never spoke about Michael Lohan?

4    A.   No.

5    Q.   Okay.  If you'll give me just a moment.  We'll start with

6    April the 14th of 2021.

7         You see, when you talk to the agents, they tend to write

8    what's called a report.

9    A.   Okay.

10   Q.   And I'd like to show you -- since you never spoke about

11   Michael Lohan the entire time, you can explain to us how it is

12   that the first page of this report says Michael Lohan.

13   A.   I spoke about Michael Lohan because I got called in as a

14   witness against him.

15   Q.   I just asked you whether you had spoken to them about

16   Michael Lohan --

17   A.   Not the agents here.  It was not the federal agents here.

18   It was the state.  Sorry.

19   Q.   I'm sorry.  You --

20   A.   I did not -- I did not speak to the -- it was the state

21   agency.

22   Q.   Okay.

23   A.   They called me -- they called me as a witness against

24   Michael.

25   Q.   Who -- who interviewed you?  Look at this.  Who interviewed

1    you on April the 14th, 2021?

2    A.   I don't know.

3    Q.   I'm sorry.  Say that out loud.

4    A.   Inspector General.

5    Q.   Inspector General?  That's a federal agency, right?

6    A.   They must have been there with the state.  They must have

7    been there at that interview with the state.

8    Q.   They must have been.

9         The other people that were there were a detective from the

10   Boca Raton Police Department.  Also present was Assistant Chief

11   Timothy Loper of the United States Department of Justice.

12        I'd say Department of Justice is a federal prosecutor,

13   right?

14   A.   Yes.  I -- now I do remember that.  Yes.

15   Q.   Now you remember.

16   A.   Yes.

17   Q.   Okay.  So when you testified under oath just a matter of a

18   couple minutes ago that you've never spoken about Michael

19   Lohan, that wasn't true, was it?

20   A.   They did -- they called me down there to tell me that the

21   state was gonna use me to testify against Michael, yes.

22   Q.   Okay.

23   A.   I totally forgot about that -- that interview.

24   Q.   All right.  So now let's talk about that.

25        So now that your memory is better about April the 14th,

1    2021, and being interviewed, this appears to be the same time

2    period that you're getting these pictures from Michael Lohan's

3    wife, right?

4    A.   Yes, I guess.  Yes.

5    Q.   So explain to me how that can't -- that doesn't come up

6    when you're talking about Michael Lohan.  You've been called in

7    specifically to talk about Michael Lohan, and you don't mention

8    to anyone that you were receiving pictures from his wife?

9    A.   I didn't -- I didn't bring it up.

10   Q.   You didn't bring it up because -- why?  Just didn't, huh?

11   A.   I didn't bring it up.

12   Q.   Did it start before that?

13   A.   Before what?

14   Q.   Did the pictures start before this interview on April

15   the 14th?

16   A.   Yes.

17   Q.   And they continued after April the 14th?

18   A.   I don't know.  I can't remember.  I don't know.  But

19   they -- they were -- it was for a long time.

20   Q.   A long time.

21        And do I understand -- so that I may move on to something

22   else, do I understand that you don't have a single picture --

23   A.   I don't.

24   Q.   -- available to show --

25   A.   I don't.

1    Q.   -- anyone?

2    A.   I don't.

3    Q.   How about -- forget the pictures.  How about just a text

4    message from Kate Lohan during this time period?

5    A.   I erased everything because she was writing how she loves

6    me, she wants to leave him, up -- last week or two weeks ago,

7    she actually -- or maybe a month ago, she sent pictures, how

8    they were fighting in the house.

9    Q.   And all of those have been deleted?

10   A.   Deleted.

11   Q.   When did you delete them?

12   A.   As soon as I'd get them, I was deleting them.

13   Q.   Did you ever respond to her?  Did you ever say to her,

14   don't send me any pictures?

15   A.   No.

16   Q.   All right.  So the whole time period she's sending you

17   pictures that you don't want, right?

18   A.   Yes.

19   Q.   I mean, that's true.  You don't want them.

20   A.   She sent me a lot of stuff.

21   Q.   Whatever she sent you, you didn't want it, right?

22   A.   No.  Out of the blue she started sending pictures three

23   weeks ago, a month ago, about her and him in the house

24   fighting.

25   Q.   Right.  But she -- during this time period -- do you have

1   an iPhone?  Yeah?

2   A.   She was --

3   Q.   Yes?

4   A.   Yeah, she was texting on Messenger.

5   Q.   On Messenger.  What Messenger, Facebook?

6   A.   I guess it's Facebook.

7   Q.   Well, it came to you.  How did it come to you?

8   A.   A method like Messenger.  I guess that's Facebook, yes.

9   Q.   And you didn't block her on Facebook.  You know how to do

10  that, right?

11  A.   I didn't block her.

12  Q.   You didn't block her.  For all these messages that you were

13  getting, you never blocked her.

14  A.   No.

15  Q.   And you never responded, leave me alone, or anything to

16  that effect, right?

17  A.   No.

18  Q.   Right?

19  A.   Right.

20  Q.   So you have -- based on what you're telling us, you have no

21  evidence to back up your Facebook Messenger claims --

22  A.   I don't.

23  Q.   -- right?  Right?

24  A.   Right.

25  Q.   Okay.  So --

1   A.   If you want -- and I hate to bring my woman that I live

2   with.   I showed her a lot of the pictures.

3   Q.   Well, I'm sure that when we're done with this, there will

4   be an opportunity for the federal government to follow up on

5   that.

6   A.   Okay.

7   Q.   Okay?   Just keep that in mind.

8        So during this time period that you, according to what

9   you're saying -- and I want to make sure that I understand.

10  Because, you see, we got a report yesterday.

11       Didn't you tell the interviewing people yesterday, which

12  includes prosecutors and agents, you remember this meeting with

13  Lohan at the bagel spot, and he was wired, right?   Isn't that

14  what you said to them yesterday?

15  A.   My thought was he was wired, yes.

16  Q.   But yesterday you said he was wired, right?

17  A.   Yeah.   Yes, okay.

18  Q.   Right?

19  A.   Yes, yes.

20  Q.   So you're meeting -- you're meeting with this gentleman,

21  right, Mr. Lohan.   You, according to your testimony, have been

22  on notice for months and months that he might be taping you,

23  right?

24       So could you explain to us, with all due respect, why the

25  heck would you meet with him?

1   A.   He pushed himself that day.   He came -- showed up at my

2   restaurant and I met with him.   I just met with him.   I can't

3   say why, but I did.

4   Q.   He pushed himself?

5   A.   He actually was having a fight with one of my workers, and

6   then he -- I was across the street, and he came across the

7   street.   You know what?   It was --

8   Q.   Do you want to try that one more time?   Because you see,

9   the FBI or one of the law enforcement agencies wired him up in

10  advance, and they would have made plans for him to do this,

11  because that's not something that happens like that.   They have

12  to set all that up.

13  A.   She didn't specifically tell me that day that he was coming

14  to wire -- to tape me that day.   She warned me months in

15  advance to be careful, and he was gonna set me up.   And I

16  just --

17  Q.   Yeah, I understand that.

18  A.   It wasn't that particular -- she didn't say he's coming

19  right now to tape you and wire you.   It wasn't -- I wasn't

20  tipped off that particular day.

21  Q.   Yeah, I know.   That's what you told us.

22       My question is, when you know, based on what you're telling

23  us under oath, when you know that that is a distinct

24  possibility, why the heck would you meet with the man?

25  A.   I can't answer that.

1    Q.   You can't answer it, right?

2    A.   Right.

3    Q.   That's the -- I think I'm going to be set up.  I've known

4    about it for months, but I think I'll sit down at a restaurant

5    with the man, and I will talk to him for an hour, for a solid

6    hour, when I think that he may be taping me, correct?

7    A.   Correct.

8    Q.   Does that make sense to you?

9    A.   (No verbal response.)

10   Q.   Well, does it?

11   A.   I don't know.

12   Q.   But that wasn't the only -- when you had a phone call with

13   him on April the 5th of 2019 -- so I'll ask you the same thing.

14        Why would you be talking to the man on the phone, huh?

15   A.   I can't answer.  Don't know.

16   Q.   And you were sending him text messages during this whole

17   time period; were you not?

18   A.   I guess I really didn't want to believe that he was doing

19   this to me, but he was doing it.  I mean, I didn't pat him

20   down.  I didn't know for a fact, so...

21   Q.   But I'm talking about, now that you've extended this time

22   period away from just April 26th of 2019, I'm trying to

23   understand why -- and I asked you just specifically -- why

24   would you continue to text the man about business matters?

25   A.   I can't answer that.

1   Q.   Does that make sense to you?

2   A.   (No verbal response.)

3   Q.   What makes more sense, maybe I would suggest, is you didn't

4   know anything that you're testifying to, and you sat down with

5   the man, and you had a conversation just like you've done how

6   many times before.

7        How long had you been doing business with Mr. Lohan?

8   A.   Since -- it was years.  I don't know how many exactly.

9   Q.   It was years.

10        Tell us approximately when it would have started.

11   A.   2012, maybe.

12   Q.   So you had an ongoing relationship, business-wise, with the

13   man from let's say approximately 2012 -- not trying to hold you

14   specifically -- to at least -- to at least May of 2019,

15   correct?

16   A.   Correct.

17   Q.   Because even after this conversation on April 26, 2019 --

18   and we're going to get into it in just a few minutes -- you

19   continued to text with him, didn't you?

20   A.   I don't recall.

21        MR. SADOW:  I would move into evidence -- mark it as

22   BH-6.

23        THE COURT:  Any objection?

24        MS. DE BOER:  No objection, Your Honor.

25        THE COURT:  That'll be admitted at this time.

1          (Defense Exhibit BH-6 was received in evidence.)

2     BY MR. SADOW:

3     Q.   Here's a text, April 29, 9:45 in the morning, from Michael

4     Lohan to an unknown party, and I suggest that's you.  Okay?

5     All right?

6     A.   Okay.

7     Q.   Okay.  See the text?  Want to read it?

8     A.   Hey, good morning, hope you had a good weekend.  Have you

9     heard of a company named Mars?  A guy named Mark owns it.  He

10    does CGx and PGx too.

11    Q.   Next text.  How much longer was that afterwards, matter of

12    a few seconds?  You write back:  No.

13         Right?

14    A.   Okay.

15    Q.   Again, I ask you:  You just had a meeting for an hour on

16    April 26th, in which you sat in a restaurant and talked to

17    Michael Lohan about a number of things, but you, according to

18    you, believe that he is taping you or in some form or fashion

19    out to get you.  What are you doing?  Why are you texting the

20    man?  Why don't you just ignore it?  Why don't you just say I

21    don't want to have any dealings with you?  I'm done.

22         No explanation?  How about the best explanation is because

23    the way you characterized April 26, 2019, is not true.

24    A.   It is true.

25    Q.   It is true.

1     Next text.  Mr. Lohan responding back to you shortly

2     thereafter:  The MAT program I'm working with wants to know

3     about it.

4        Right?

5  A.  Yes.

6  Q.  What's the -- do you know what the MAT program was?

7  A.  No.

8  Q.  Hadn't you spoken to him during April 26th about his new

9     venture?

10  A.  Yes, but I don't recall what that is.

11  Q.  At this moment, you don't recall.  But you would have

12     known, right?

13  A.  Back then?  Yes.  I don't recall what it is.

14  Q.  Next text:  I don't know what?

15     I don't know them.

16     Next text.  Still on April 29th.

17     Next text.  This is you telling him that you're going to

18     Mexico on business, right?

19  A.  Yes.

20  Q.  Why would you tell the man that you didn't trust that you

21     were leaving the United States on business?

22  A.  I can't answer that.

23  Q.  Were you leaving the United States on business?

24  A.  I did go to Mexico.  I don't know if it's then.  I'm not

25     sure.

  1   Q.   Did you go to Mexico to see a man named Max?

  2   A.   Yes.

  3   Q.   Why don't you tell us, what was the venture that caused you

  4   to go to Mexico to meet Max?

  5   A.   It was Dr. Rama -- family friend, as I recall.

  6   Q.   As you recall?

  7   A.   Yes.

  8   Q.   How about it had to do with labs and business and CGx and

  9   PGx and making money, right?

 10   A.   Yes, from -- Dr. Rama referred him, to go see him.

 11   Q.   And did you go see him to pay him money?

 12   A.   No, to get his business.

 13   Q.   You didn't pay him $9,500?

 14   A.   Oh, yes, yes.

 15   Q.   Yes.  And did you go alone?

 16   A.   I went with Keith Youngswick.

 17   Q.   Who is your business partner?

 18   A.   Yes.

 19   Q.   So I again ask you, why would you tell the man that you

 20   don't trust, according to you -- and you've been on the lookout

 21   now for months -- that you're going to Mexico?

 22   A.   I don't know.

 23   Q.   You don't know.

 24        Next text.  Mr. Lohan talking about -- talking about three

 25   days later, wants to know if you're back.  Right?

1    A.   (No verbal response.)

2    Q.   Next text.  You tell him you're back, right?

3    A.   Yes.

4    Q.   Continuing to communicate with him.  Now you're letting him

5    know that you came back from Mexico, right?

6    A.   Yes.

7    Q.   I think at this point maybe we should talk a little bit

8    about -- first let's talk April the 5th.

9         Did you, on April the 5th, 2019, in conversations with

10   Mr. Lohan, talk about Minal Patel?

11   A.   I don't remember.

12   Q.   Didn't you listen to the tape yesterday?

13   A.   That's the tape from yesterday?

14   Q.   How many tapes did you listen to yesterday?

15   A.   About Michael?  One.

16   Q.   Just one.

17   A.   Yes.

18   Q.   Well, I'm asking you now about a telephone conversation

19   between you and Michael Lohan on April 5, 2019.

20   A.   Okay.

21   Q.   And I'll ask you again:  Do you recollect talking about

22   Mr. Patel on that date?

23   A.   I don't -- I don't know.  I'm a little lost here.

24   Q.   Okay.  Why, if you didn't trust Mr. Lohan --

25   A.   I didn't trust him for all the years that I knew him.  I

1    really never trusted him.

2    Q.   Okay.

3    A.   But I still --

4    Q.   But you still continued doing business with him --

5    A.   It's like working with the devil, yes.

6    Q.   Yeah, working with the devil.  Okay.

7         Why, when you were working with the devil, would you talk

8    about Minal Patel?  What would be the purpose of that?

9    A.   What was the context of it?  I'm not really sure.

10   Q.   About how you were being paid.

11   A.   Why did I tell him how I was being paid?

12   Q.   Yeah.  Why would you tell him that Minal Patel was now

13   paying you a salary?

14   A.   I don't know why I told him.

15   Q.   Do you doubt that's what you said?

16   A.   I did say it.

17   Q.   I thought you said you didn't remember.

18   A.   I just remembered.

19   Q.   You just remembered it.

20   A.   Yes.

21   Q.   Okay.  And did you emphasize that it's a salary because, at

22   some point before that, you'd been paid a commission, correct?

23   A.   Yes.

24   Q.   So what you were telling Mr. Lohan on April the 5th of 2019

25   was that you were getting a salary because Mr. Patel's lawyers

1    had changed the compensation because the law had changed,

2    right?

3    A.   Correct.

4    Q.   So on direct examination, when you said you didn't remember

5    anything that Mr. Patel said about his lawyers, it was, in

6    fact, the reason, the very reason, why it went from commission

7    to a salary, right?

8    A.   That, I don't know.

9    Q.   Isn't that what you just said?

10   A.   I didn't -- about lawyers?  I didn't -- I don't know

11   what --

12   Q.   Mr. Patel told you, did he not, that the reason that you

13   had to go to a salary in January of 2019 is the law had

14   changed, and his lawyers had said it could no longer be

15   commission; it had to be a salary, right?

16   A.   I don't recall the exact words like that.

17   Q.   You were not happy about getting a salary, correct?

18   A.   I don't recall.  I was happy with the outcome, yes.

19   Q.   Didn't you tell the government that you were unhappy

20   because you had -- it was no longer connected to the number of

21   samples you sent; it was set, a flat rate that would only

22   change every three to six months?

23   A.   Correct.

24   Q.   Okay.  And didn't that potentially cut down on the amount

25   of money that you might make?

1    A.   No.

2    Q.   No.

3         You didn't have to let anybody go as a result of getting a

4    salary; is that your testimony?

5    A.   The numbers that I got as far as the salary, I didn't

6    have -- there was one girl that wanted to go on her own.

7    Everything else stayed the same.

8    Q.   Everything else stayed the same.

9         So you didn't negotiate with Mr. Patel.  He wanted to pay

10   you a 100-, and you wanted 150-?

11   A.   Correct.

12   Q.   You did that.

13   A.   Yes.

14   Q.   And that's because you wanted more money on the flat rate

15   as opposed -- to make up for the fact that you weren't getting

16   the commissions, right?

17   A.   Could you repeat that?

18   Q.   When Mr. Patel came to you and said it had to be flat rate,

19   are you trying to tell us that you didn't say to him, why?

20   A.   I don't remember.

21   Q.   The man has been paying you on commission, according to

22   your testimony --

23   A.   Yes.

24   Q.   -- since sometime in 2016, correct?

25   A.   Yes.

1    Q.   Which is, of course, '16; and then we're talking about all

2    of '17; and we're talking about all of '18.  And then at the

3    beginning of '19, the man, Mr. Patel, says to you, no more

4    commission; it needs to be flat rate.

5         And you're telling us you don't remember asking him why it

6    had to change?

7    A.   Well, it was -- it was just, like, known that it had to be

8    switched.  You know --

9    Q.   When you say it was known --

10   A.   I don't know if he said the lawyer said.  That, I don't

11   know.  I don't remember that.

12   Q.   Well, let's go with what you just said.

13        What do you mean, it was known it had to be changed?

14   A.   Because I dealt with other labs, and they were going

15   through the same process that --

16   Q.   They were going through the same process?

17   A.   Yes.

18   Q.   Because on April 26th -- and we're about to get to that --

19   you told Mr. Lohan that Mr. Patel was the only one that had

20   made that change?

21   A.   He's the only one that did.  The other -- the other places

22   were in the process of switching; they did not.  LabSolutions

23   was the only one that did actually do it.

24   Q.   So that's a true statement.

25   A.   True statement.

 1   Q.   Right.

 2        So when you were talking on April 26th, I thought you said

 3   that everything you talked about with Minal Patel was not true.

 4   A.   What do you mean, not true?

 5   Q.   Well, you -- you told the government on direct examination

 6   that what you told Mr. Lohan on April 26, 2019, that none of it

 7   was true about Mr. Patel.

 8   A.   I didn't say that, not -- not all of it wasn't true.  I

 9   don't know what you mean.

10   Q.   Okay.  And Mr. Lohan, on April the 5th, 2019, on more than

11   one occasion, kept trying to get you to say it was something

12   other than a salary, right?

13   A.   Could you repeat that?

14   Q.   On April the 5th, 2019, Mr. Lohan was trying to get you to

15   say that it really wasn't a salary; it was something else,

16   right?

17   A.   Yes.

18   Q.   But it, in fact, was a salary, right?

19   A.   Was it a salary?  It's -- it was based upon my previous two

20   years' numbers.

21   Q.   But it was a salary.  You got paid the same amount every

22   month, right?

23   A.   Paid the same amount every month, yes.

24   Q.   And it could be reconsidered every so often, right?

25   A.   That's what I was told, yes.

```
 1   Q.   And how often was it to be reconsidered?  Every three
 2   months?  Every six months?
 3   A.   I don't remember.  It wasn't -- it didn't -- didn't switch.
 4   Q.   Didn't switch.
 5   A.   No.
 6   Q.   It stayed the same?
 7   A.   Yeah.
 8   Q.   150,000.
 9   A.   Yes.
10   Q.   Right?
11   A.   Yes.
12   Q.   Okay.  But this is in the conversation on the telephone
13   with Mr. Lohan, right?
14   A.   Yes.
15   Q.   Instead of saying, I'm just not taking the call, you
16   engaged in a conversation with Mr. Lohan, right?
17   A.   Yes.
18   Q.   Okay.  Now let's move to April 26.  And I'm going to go
19   through conversations.  Okay?
20        Are you aware -- now I want to make sure I actually
21   understand.
22        You actually listened to this recording yesterday, correct?
23   A.   Correct.
24   Q.   And you listened to the entire recording, correct?
25   A.   Correct.
```

1  Q.  And the entire recording is about 118 minutes and

2  29 seconds, to be exact, right?  It's a long recording, right?

3  A.  Yes.

4  Q.  And you had a meeting set up with Mr. Lohan to meet him,

5  correct?

6  A.  I don't remember.

7  Q.  You don't remember.

8      When you went through the recording, you heard that

9  Mr. Lohan had an argument with a gentleman named Kevin, right?

10 A.  Yes.

11 Q.  Because that's on the recording, right?

12 A.  Yes.

13 Q.  It doesn't sound like Kevin and Mr. Lohan got along real

14 well.

15 A.  Kevin actually lived with Michael's wife.

16 Q.  Well, that might explain it.

17 A.  Ex-wife.  Ex-wife.

18 Q.  Well, they're still married legally, aren't they?

19 A.  I thought they -- she told me they got divorced.  So...

20 Q.  When did she tell you this?

21 A.  Throughout the years.  I don't know.

22 Q.  Throughout the years.  Okay.

23     When you spoke to the government yesterday, did you say to

24 them Lohan's wife called you to tell you that Lohan was wired?

25 A.  I told them she called me and said be careful with him and

1    Joe Lobella, that they -- that they're setting me up.  She did

2    not say that specific day that he was coming wired.

3    Q.   That's not what you told the agents yesterday, was it?

4    A.   As soon as I listened to the tape, I knew he was wired.  I

5    remember that day.  I didn't pat him down, but I had a gut

6    feeling he was wired.

7    Q.   That's not what I asked you.

8         What I asked you was, that's not what you told the agents.

9    You told them that she called and told you he was wired that

10   day, didn't you?

11   A.   I don't think I said that.

12   Q.   Did you tell them that Kevin knew that Lohan was wired too?

13   A.   Kevin mentioned that afterwards.  He said that, I think he

14   was wired when he came out.

15   Q.   Okay.  But that's after the fact, right?  I mean, that's

16   after you had an hour conversation.  So Kevin could not have

17   put you on notice that he was wired --

18   A.   He didn't -- he didn't put me on notice.  We talked about

19   it afterwards.  He didn't put me on notice.

20   Q.   Okay.  So the on notice, according to your testimony, is

21   the wife, right?

22   A.   She -- she said be careful, that he'd be setting me up,

23   yes.

24   Q.   So --

25   A.   But she told me a lot of stuff.  Obviously, she said she

1   was divorced, and she wasn't.  So who knew what was true and

2   not true?

3   Q.  Mr. Lohan --

4        MR. SADOW:  Do you want me to tell you where I am on

5   the transcript?

6        MS. DE BOER:  Sure.  Thank you.

7   BY MR. SADOW:

8   Q.  On page 8, Mr. Lohan brings up Rama and says:  You still

9   deal with him.  Right?

10  A.  Yes.

11  Q.  And your answer is:  No, no, no.  He got arrested.

12       Right?

13  A.  Yes.

14  Q.  He did get arrested, right?

15  A.  From what I was told.

16  Q.  By who?

17  A.  (No verbal response.)

18  Q.  By him, right?

19  A.  By who?  Rama?

20  Q.  Yeah.

21  A.  He came and told me, yes.

22  Q.  He came and told you he got arrested, right?

23  A.  Yes.

24  Q.  And you still dealt with him, right?

25  A.  No.

1   Q.   Wait a second.  He told you in April of 2019, right, that

2   he had been arrested, correct?

3   A.   I don't know.  He came into my restaurant with papers.  I

4   don't remember what instance you're talking about.  I do

5   remember that he came in and showed me that he was arrested and

6   said don't worry about it.

7   Q.   But you went to Mexico to pay Max after that.  That's what

8   we just went through on the text.

9   A.   Right.

10   Q.   Well, you paid Max because of your dealings with Rama.

11        It was Rama's deal, right?

12   A.   It was Rama's deal?

13   Q.   I can tell you that this jury has already heard about this.

14   A.   Yeah.  I --

15   Q.   Would you like to now -- do you remember you were still

16   dealing with Rama?

17   A.   After he was arrested?  I'm not sure.

18   Q.   Okay.

19   A.   I found -- like, he came into my restaurant with papers.

20   As far as before that, I -- I don't know if he was -- I can't

21   remember.  I don't know.

22   Q.   Okay.  You said -- after that, Mr. Lohan says:  He did?

23        And you say:  Got arrested.

24        Mr. Lohan says:  For what?

25        You say:  For the compounds.  So don't talk to him.

1          Right?

2     A.   Yes.

3     Q.   So now, this is the person that you think might be wired,

4     might be setting you up.

5     A.   Yes.

6     Q.   And you're telling him not to talk to Rama.  Why would you

7     do that?

8     A.   No idea.

9     Q.   Well, wouldn't it make more sense that you were just having

10    a conversation with someone you had been doing business with

11    for at least seven years?

12    A.   Come back with that?

13    Q.   I'll move on.

14         So then you say:  Yeah.  So he came here, like, a couple of

15    days ago --

16         Remember, this is April 26th.

17         -- a couple of days ago to the restaurant.  He and Minal

18    told me, because Minal got the indictment to LabSolutions, and

19    I'm, like, dude, did you get indicted?  He goes, no, no, no,

20    no, no.  I'm, like, dude, you got indicted.  He goes, yeah, he

21    did.  I said, so what are you coming to me for?  Like, I have

22    nothing for you.  You know, I wasn't in that shit.

23         Right?  That's what you said.

24    A.   (No verbal response.)

25    Q.   But you were still dealing with him?

 1   A.   I said -- who did I say that to?

 2   Q.   To Mr. Lohan.

 3   A.   Oh.

 4   Q.   I'm reading from the transcript of the recording that

 5   you -- that you heard yesterday, right?

 6   A.   Okay, yes.

 7   Q.   Okay.  And that's what you said, right?

 8   A.   Yes.

 9   Q.   Okay.  And Mr. Lohan says:  So did he turn on you guys or

10   what?  And you say:  No, he didn't.  He took compounds.

11        Right?  Was that true?

12   A.   I don't know if it's true.

13   Q.   Why are you telling Mr. Lohan?

14   A.   Just conversation.

15   Q.   Just conversation with a guy that you don't trust.

16   A.   Don't trust him.

17   Q.   And then you say:  No, no, no, we're not doing anything

18   wrong.  They requested certain documents for that, for

19   LabSolutions, that they gave.

20        And you're still talking about Rama, right?

21   A.   Yes.

22   Q.   So LabSolutions didn't get in trouble then?  That's Lohan.

23   And you say:  No, no, no, no, there's nothing.

24        Right?  That was true, correct?

25   A.   To my knowledge.

1    Q.  Well, that's all I'm asking you.  You're on the tape,

2    right?

3    A.  Yes, yes.

4    Q.  LabSolutions wasn't in trouble then, right?

5    A.  To my knowledge, no.

6    Q.  Okay.  Again, I'm only asking you what you knew at the

7    time.  Remember, April 26, 2019.

8        And then you say:  They just hired a guy -- referring to

9    LabSolutions.  He was the number two guy at the CIA.

10        Remember that?

11   A.  Do I remember saying it or do I -- yes, I remember saying

12   it.

13   Q.  I'll take anything you want to give me, whether you

14   remember saying it or whether -- huh?

15   A.  Yes, I remember saying that.

16   Q.  And that obviously must have come from somebody at

17   LabSolutions, right?

18   A.  Yes.

19   Q.  And who did it come from?

20   A.  I don't remember.

21   Q.  Don't remember.  I thought your dealings were with

22   Mr. Patel.

23   A.  Yes.

24   Q.  Okay.  Did this come from Mr. Patel?

25   A.  That particular statement?  Not sure.

1    Q.  Well, who else would you be talking about?

2    A.  I speak to Jon, Nick.

3    Q.  Jon Berarducci?

4    A.  Yes.

5    Q.  Nick Saliba?

6    A.  Yes.  I don't know who told me that.

7    Q.  Nick Saliba was CEO?

8    A.  Yes.

9    Q.  And Jon Berarducci was, what, vice president in charge of

10   sales?

11   A.  Yes.

12   Q.  And then you say:  He worked for LabSolutions.  He's

13   actually going in front of -- he's going in front of Congress

14   to get clarity on how we can get paid because, see, January,

15   they switched that.  Can't get paid for samples or a percentage

16   anymore.  It has to be, like, a salary.

17        That's what you said, right?

18   A.  Yes.

19   Q.  That was exactly the truth, wasn't it?

20   A.  Yes.

21   Q.  Okay.  And again, you're telling this to Mr. Lohan, right?

22   A.  (No verbal response.)

23   Q.  And then you say:  Yeah, until January.  So Minal's the

24   only one that switched, and all these other labs, they're not

25   really, you know, going -- going towards those guidelines.

1    Right?

2    A.   I said that, yes.

3    Q.   And that was true too, right?

4    A.   Yes.  At that point, yes.

5    Q.   Again, this is with Mr. Lohan.

6    A.   Yes.

7    Q.   This is after you testified on direct examination that what

8    you said to Mr. Lohan wasn't true, right?

9    A.   Yes.

10   Q.   So then you say:  It's -- LabSolutions isn't under

11   investigation.  They were subpoenaed records for Rama's shit.

12   Sorry, I have to use the language, but that's what you said,

13   right?

14   A.   Yes.

15   Q.   Who told you that the records had been subpoenaed?

16   A.   I can't recall.

17   Q.   Had to come from LabSolutions, though, right?

18   A.   Yes, but I'm not sure who.

19   Q.   Not sure who.  Okay.

20        So Lohan begins to ask you --

21        MR. SADOW:  I'm on page 20.

22   BY MR. SADOW:

23   Q.   So anyway, so listen now.  I have this program, it's called

24   Clean Slate.  It's a MAC program.  They started in

25   Massachusetts.

1       Do you remember any of that?

2   A.   Just from recalling.  Yes, I don't remember.

3   Q.   Mr. Lohan was pitching a business venture, wasn't he?

4   A.   Yes.

5   Q.   But you knew, because you didn't trust him, that you didn't

6   want to have anything to do with it, right?  So you would have

7   said right then and there, I'm not interested, right?

8   A.   I just listened.

9   Q.   You just listened.  Okay.  We'll see if that's true.

10       MR. SADOW:  Now I'm on 23.

11  BY MR. SADOW:

12  Q.   Mr. Lohan:  They're in Texas.  They're in Massachusetts.

13  They're in Ohio.  They're in Connecticut.  They're in New

14  Hampshire.  They're in New York.  They're all over the place.

15       You then say:  So the way to structure it, just so I'm just

16  thinking out loud.  So let's just say LabSolutions, they'll

17  collect all the insurance ones, and the ones who have no

18  insurance, they still have to do the test anyway.  That'll be

19  part of the deal.

20       That's what you said, right?

21  A.   That's what I said.

22  Q.   Doesn't sound like you were just listening.  Sounds to me

23  like you were actually giving him some ideas on how to do

24  business.  Because that's what you were doing, right?

25  A.   At the end of the day, Minal told me all along he wants

1    nothing to do with him, stop taking his calls, and I just

2    entertained it.

3    Q.   Didn't I just read --

4    A.   Yeah, it's just conversation.

5    Q.   Just conversation?

6    A.   Yeah.

7    Q.   And then Mr. Lohan says:  Yeah.

8        And you say:  So if someone's indigent and they can't pay

9    for the test, you know, they bite the bullet on that.

10       Again, just conversation?

11   A.   Conversation.

12   Q.   You're not really interested at all, right?

13   A.   (No verbal response.)

14   Q.   Is that correct?

15   A.   I don't know.

16   Q.   You don't know.  Okay.

17       And then later --

18           MR. SADOW:  I'm on page 24.

19   BY MR. SADOW:

20   Q.   -- Mr. Lohan says:  I get paid for the facilities, for

21   setting it up.

22       And you say:  No.  But remember, you said something about a

23   hospital.  You couldn't get paid, but you're not the owner of

24   the place.  You could get paid.

25       Mr. Lohan says:  No, see, here's how it works.  So the MAC

1  clinic, just like I was working, I get my monthly fee.  They

2  all -- I get -- but from the pharmaceutical company, I get paid

3  for every pill that they give to their people, so I make plenty

4  of money on it.

5      So you say:  So you get paid for the pharma.  You can get

6  paid for the PGF?

7      Sounds to me like you're discussing how he's going to go

8  about doing the business.  Was that just conversation?

9  A.  Conversation.

10  Q.  Just conversation.

11      Mr. Lohan:  --

12          MR. SADOW:  Page 25.

13  BY MR. SADOW:

14  Q.  -- I've got these two little boys.  I don't want to get in

15  trouble.  I'm doing too well.  Too well with this.

16      Mr. Hirsch:  Let me tell you, I've cut out all the shit in

17  my life.  Like I'm making, like, real money now.  Like we are

18  so -- we have a healthcare attorney, like, giving us opinions,

19  like, on everything.  Like with this, we're not -- again,

20  excuse my language -- we're not fucking around, you know, like,

21  we're clean.  So there's a lot of bad people that got into this

22  business, but they're going to wash them out too.

23      That's what you told him, right?

24  A.  Yes.

25  Q.  Was that conversation?

1    A.   Conversation.

2    Q.   Just conversation.

3         Mr. Lohan:  Like, what scares me is like nothing ever

4    happened with Rama or with David Carroll (phonetic) or anything

5    like that.  But I need to know -- and then you say what you

6    can't make out.  It's called indiscernible.

7         And Mr. Lohan says:  Probably can if it's all legit.

8         And you say:  We're getting the VAs.

9         What's the VAs?

10   A.   Veterans Hospital.

11   Q.   All these VAs.  I was out with the head of the VA from,

12   like, three times.  Like, my good friend is his best friend,

13   the head medical director of the VA.  So we're actually putting

14   that work with Tricare.

15        That's the military, right?

16   A.   Yes.

17   Q.   And they're gonna give all the vets the test.

18        That's what you said, right?

19   A.   Yes.

20   Q.   Was that true?

21   A.   I was working on it.  It is.

22   Q.   So why are you discussing it with the man that you don't

23   trust?  Why are you discussing what business you're gonna do?

24   A.   For years this went on with me and him.

25   Q.   Okay.  And then --

1          MR. SADOW:  I'm now on page 29.

2     BY MR. SADOW:

3     Q.  And what you're now telling Mr. Lohan:  It'll be a -- you

4     can't -- you can't get paid for samples.  You would get paid

5     just a salary.  That's a lot of money.  And it's all legit.

6     You're not doing anything wrong.  You're not paying the doctors

7     and you're getting paid a salary.  That is it.  There's

8     nothing.

9          Why are you giving him advice?

10    A.  Like I said, for years this has been going on between me

11    and him.

12    Q.  But according to you, you're concerned about conversing

13    with him, with talking with the man because you think he has

14    been wired or he's recording your conversation, right?

15    A.  Yes.

16    Q.  According to what you've testified to.

17    A.  Yes.

18    Q.  And then you say at the bottom, Mr. Lohan, same page:  I

19    would just watch out for Rama.  I tell you that much.

20         And you say:  Rama's cut off.

21         And Mr. Lohan says:  Doesn't matter, Brett.

22         And you say:  Nothing was ever done wrong.  There's nothing

23    there.

24         Right?

25    A.  Yes.

1   Q.   Mr. Lohan:  He was bragging about how he bought the

2   Lamborghini.

3        Speaking of the Lamborghini, this is part of the text

4   messages that you were doing with Mr. Ramamurthy.

5        Do you remember that?

6   A.   I don't --

7   Q.   Remember he sent you a text message and said that he had

8   the first SUV Lamborghini in Miami?

9   A.   Who said that, Rama?

10  Q.   Yeah.

11  A.   I don't remember that.

12  Q.   You don't remember that.

13       That's when you were still conducting business about Max,

14  right?

15  A.   I can't put the time frame on when it was with Max.

16  Q.   Well, I can give you the time frame because it's in

17  evidence.  It's the end of March 2019, before this

18  conversation.

19  A.   Okay.

20  Q.   Okay?  Does that sound right?

21  A.   (No verbal response.)

22  Q.   And by the way, why would you be going to Mexico to pay Max

23  $9500?

24  A.   Why?

25  Q.   Yeah, why.

1    A.   He put samples in at LabSolutions.

2    Q.   He did?

3    A.   Yes.

4    Q.   Oh, okay.

5         And you did that with Max?

6    A.   Did what with Max?

7    Q.   You took his samples?

8    A.   Did I take his samples?

9    Q.   Yeah.

10   A.   What do you mean, take them?

11   Q.   Well, I don't know.  You said he put samples up.  Max is in

12   Mexico.

13        Where did the samples come from?

14   A.   United States.

15   Q.   United -- where in the United States?

16   A.   I wouldn't know.

17   Q.   How did they get to you?

18   A.   They didn't get to me.  They went to the lab.

19   Q.   How did that arrangement take place?

20   A.   I don't remember.

21   Q.   What money were you being paid on that?

22   A.   What do you mean, what money?

23   Q.   Well --

24   A.   I'd get an -- I'd get an override.

25   Q.   How much money did you make on Max?

 1   A.   I don't remember.

 2   Q.   No idea?

 3   A.   (No verbal response.)

 4   Q.   How much money did you tell the government you made on Max?

 5   A.   Max never came up.

 6   Q.   Max never came up?

 7   A.   I don't recall speaking about Max.

 8        MR. SADOW:  Oh, I'm sorry, Your Honor.  I didn't ask.

 9        THE COURT:  You may approach.

10   BY MR. SADOW:

11   Q.   Showing you what's called a Report of Conversation dated

12   September 27, 2019.

13   A.   20 what?

14   Q.   2019.

15        Tell me, did you talk about Max?

16   A.   Yes.  I -- I didn't recall any of this.  Yes.

17   Q.   On September 27, 2019, you spoke to a special agent with

18   the last name Frank who wanted to ask you to confirm your

19   dealings with Mr. Ramamurthy.

20        Does that sound right?

21   A.   I don't recall.

22   Q.   Specifically about paying Max, correct?

23   A.   That's what that says.

24   Q.   Well, it would only make sense, if he was asking you about

25   paying Max, that Max must have come up before that, right?

```
 1   A.   Come up where?

 2   Q.   In your conversations with the government.

 3   A.   Okay.  I don't know if you know, sir -- now it's like

 4   you're attacking me here -- last year, I got very sick, and I

 5   lost -- from COVID, I lost a lot of my memory.  So there's a

 6   lot of things that I don't recall clearly.

 7        So I don't recall speaking about Max at all.

 8   Q.   Okay.  Well, I think it's fair to say I'm sorry that you

 9   have lost some of your memory.

10        Can I ask you, when did you tell the government that?

11   A.   The government, that I lost my memory?

12   Q.   Yeah.

13   A.   It happened in July of last year.  I was in ICU for a

14   couple months and bedridden.

15   Q.   And I'm sorry, again, that that happens to anyone.

16        But my question is:  When did you tell the government that

17   you were having problems with your memory?

18   A.   I don't -- I don't know what you mean.  When did I tell

19   them?  They knew I was in the hospital.

20   Q.   Well, I understand that.  And again, I'm sorry that that

21   happened to you.  But just being in the hospital alone doesn't

22   mean someone necessarily loses their memory.

23        So I'm asking you politely, when did you tell the

24   government that you had a problem with your memory?

25   A.   I don't know when I told them.
```

1   Q.   I'm sorry?

2   A.   I don't -- I don't know.

3   Q.   You actually never told them at all, right?  Correct?

4   A.   Did I ever tell them --

5   Q.   That you were having problems with your memory.

6   A.   I'm not sure.  I know -- I know I told them over the last

7   week that I -- you know, that I had memory loss.

8   Q.   You told the government over the last week that you had

9   memory loss?

10   A.   I think I mentioned it to them that I had, like -- I lost

11   smell, taste, memory, caught a double pneumonia, pulmonary --

12   pulmonary embolism.  Yeah.  I had -- I was -- I was very sick

13   for six months.

14   Q.   Did you -- to the extent that you can, could you tell me

15   which of the government people here you told that you had

16   memory loss?

17   A.   I said it -- I think Emily, I think I -- I'm not sure who I

18   told.  I don't know.  I thought I mentioned it yesterday or the

19   day before.

20        MR. SADOW:  Your Honor, it's 5:00.  Do you want me to

21   keep --

22        THE COURT:  If we can, let's try to get a few more

23   minutes, if we could, please.

24        MR. SADOW:  Certainly, sir.

25   BY MR. SADOW:

1  Q.  So are you telling me, then, that asking you questions

2  about Max and your dealings with Max and what you may have told

3  the government, it's kind of a waste because you're just not

4  going to be able to remember?

5  A.  No.  Now that you're -- now that you're bringing it up, I'm

6  remembering it a little bit as you're bringing up.  If you

7  didn't bring it up, I -- I knew I went to Mexico.  And then

8  when you said I paid Max, now I remember I did pay Max.  I do

9  remember that.

10  Q.  Okay.  Do you remember how you paid him?

11  A.  Keith Youngswick wrote a check to him.  I do remember that

12  now.

13  Q.  And did you still owe him money, Max, as of September 27,

14  2019?

15  A.  There was still a balance; I do remember that.  I don't

16  know how much.

17  Q.  And that's what you told the government, right?

18  A.  If that's what it says, yes.

19  Q.  All right.  So what you're telling me is, when I asked you

20  about Max to start with, you didn't remember; but as I kind of

21  go a little further, that comes back.

22  A.  Yes.

23  Q.  Okay.  I left off about the April 26, 2019, conversation in

24  which you say, talking about Rama:  As long as he didn't do

25  anything wrong with the lab work, he was okay.

1         Right?  Does that sound right?

2    A.   Yes, yes.

3    Q.   You didn't say that Mr. Rama did or didn't do anything

4    wrong with the lab work; you just said as long as he didn't do

5    anything wrong, right?

6    A.   That's what I said, yes.

7    Q.   As long as he wasn't paying those doctors when he was doing

8    the tests -- this is you -- he's fine.  And that's all in

9    there.  If it comes up that one of the doctors, that they seen

10   money wired to a doctor for doing the test, then he's in

11   trouble.  The lab's not in trouble, though.  He signs a thing

12   every month.  You're signing.  I have a thing -- you didn't pay

13   doctors, you know.  You're fully compliant.

14   A.   Who -- this is between me and Michael?

15   Q.   Yeah.

16        Isn't that what you told Michael, Mr. Lohan?

17   A.   Yeah.  I don't -- I don't -- yeah, I guess I did if you

18   have it.  I don't remember it.  But, yeah, that's the

19   conversation.

20   Q.   Okay.

21        MR. SADOW:  On page 32.

22   BY MR. SADOW:

23   Q.   Do you remember you were trying to think of an individual's

24   name?  And you said:  Can't remember.  And then you said:

25   Shawn Griner.

1       Remember talking about Shawn Griner on April 26, 2019?

2   A.  Do I remember now?  No, I don't remember.  But if that's

3   what I said on the tape, then, yes.

4   Q.  Do you remember saying Shawn Griner, talking about

5   LabSolutions, they fired him?

6   A.  So just -- could we just backtrack?  Is this all on the

7   same tape?  I didn't -- I didn't hear this tape yesterday.  I

8   didn't hear all this tape.

9   Q.  Okay.  Now you've got me a little confused.

10      So I thought you listened to the whole tape yesterday.

11  A.  What you're reading to me, I did not hear.

12  Q.  Who played the tape for you?

13  A.  I forgot.  Fritz.

14  Q.  Fritz?  Is Fritz here?

15  A.  Yes.

16  Q.  Do you see him?

17  A.  (No verbal response.)

18  Q.  Yes?

19  A.  Yes.

20  Q.  Okay.  And you're --

21  A.  I think it was, like, for 40 minutes.  You're telling me it

22  was an hour.  A lot of this stuff, I don't remember.

23  Q.  Well --

24          MR. SADOW:  Your Honor, may I approach?

25          THE COURT:  You may.

 1              THE WITNESS:  Yes.

 2   BY MR. SADOW:

 3   Q.   Yes?  Does that help you remember?

 4   A.   I remember that.

 5   Q.   You remember that.

 6        Did you hear that on the tape yesterday?

 7   A.   I did hear this before.  I guess -- yeah, I guess -- I

 8   guess I heard it yesterday.  Yes.

 9   Q.   On April 26, 2019, you said, as to Shawn Griner:  They

10   fired him.

11        Correct?

12   A.   Yes.

13   Q.   Speaking in terms of LabSolutions, correct?

14   A.   Yes.

15   Q.   And then you said:  He did bad shit.

16        Correct?

17   A.   Yes.

18   Q.   And then you said:  They fired him a long time ago.

19        Correct?

20   A.   Yes.

21   Q.   And then you said:  Yeah, fired him.

22        And then you said:  Remember the time at

23   Charamoki's (phonetic)?

24   A.   I think it was Tramonti's.

25   Q.   That you remember?

1   A.   I do.

2   Q.   What is that?

3   A.   It's a restaurant.

4   Q.   -- when it was me, you, Shawn Griner, the white guy from

5   the Bronx?

6        And Lohan says:  Yes.

7        So LabSolutions did fire Mr. Griner, right?

8   A.   Yes.

9   Q.   That's true, correct?

10  A.   True.

11  Q.   Do you remember talking to Mr. Lohan about the fact that he

12  needs to trust the guy that's gonna be getting the money in his

13  new venture?

14  A.   Yes.

15  Q.   Why would you be telling him he needs to trust the guy?

16  A.   I don't know.

17  Q.   You don't know?  Okay.

18       And then Mr. Hirsch -- Lohan says:  I trust him.  Just see

19  how many tests there are.  Now it's only PGx.  Are you gonna

20  try to get CGx too or just PGx?

21       And you say:  Of course, we'll try to do that.

22       Remember that?

23  A.   Yes.

24  Q.   So when you said, of course, we'll try to do that, you were

25  thinking about getting involved in his new venture, right?

1    A.   No.  It wouldn't have happened.

2    Q.   No.  It wouldn't have happened?

3    A.   No.

4    Q.   So you were just saying, we'll try to do that?

5    A.   Yes.

6    Q.   Okay.  And Mr. Lohan says:  Is it -- it's gotta be

7    medically warranted.

8         And you say:  Of course.

9         Right?

10   A.   Yes.

11   Q.   Because those tests have to be medically necessary, right?

12   A.   Yes.

13   Q.   Okay.  And then you say -- Mr. Lohan says:  Like that whole

14   process was -- again, I apologize -- fucked up.

15        And you say:  Because you thought it was a bad time.  But

16   now the family's good again.

17   A.   Yes.

18   Q.   Family means family history, right?

19   A.   Correct.

20   Q.   Because by April of 2019, family history was being paid

21   again in Pennsylvania, correct?

22   A.   I -- I guess.

23   Q.   Well --

24   A.   I don't remember the dates --

25   Q.   I'm sorry.  I cut you off.  I'm sorry.

1   A.   I don't remember the dates, but I remember something

2   mentioned about family history.

3   Q.   Because LabSolutions had opened up another lab in

4   Pennsylvania, right?

5   A.   Yes.

6   Q.   Because Pennsylvania, that MAC, was paying for family

7   history, correct?

8   A.   Correct.

9   Q.   So when you said that about family history is good again,

10  that was true, right?

11  A.   Correct.

12  Q.   And then you say that MAC, when he was in Atlanta, they're

13  not taking anymore.

14       That is, the MAC in Atlanta wasn't taking family history

15  anymore, right?

16  A.   From what I was told, correct.

17  Q.   Well, okay.  You were told that by whom?

18  A.   By LabSolutions.  Once again, I don't know if it was Minal,

19  Nick, or Jon.  I'm not sure.

20  Q.   Okay.  So Minal opened up a lab in Pennsylvania, and they

21  do it in Pennsylvania, because now they're -- yeah, the lab --

22  yeah, LabSolutions out of Pennsylvania.

23       Right?

24  A.   Correct.

25  Q.   Because that's where family history was being paid, right?

1    A.  Correct.

2    Q.  And Mr. Lohan says:  Just to be honest -- Mr. Lohan says:

3    He must be killing it.

4        And then you say:  Killing it.  And then you say:  $400,000

5    Ferrari?

6        Right?

7    A.  Correct.

8    Q.  Because that's true.  Mr. Patel had bought himself a

9    Ferrari, right?

10   A.  Yes.

11   Q.  So if you're concerned about Mr. Lohan, why are you talking

12   about Mr. Patel and his assets?

13   A.  Conversation.

14   Q.  Conversation.  Okay.

15       And Mr. Hirsch says:  Not paying doctors.  That's -- you

16   say:  Not paying doctors.  Getting paid a salary.  The person,

17   it's all legit.  There's no questions on any part.

18       Right?  Talking about your dealings with LabSolutions,

19   correct?

20   A.  Yes.

21   Q.  And then on page 41, you talk about they'll have to go

22   through a training.  They do, like, a whole training now, all

23   the people.

24       Again, you're talking about LabSolutions, right?

25   A.  Correct.

1   Q.   Now, do you remember who told you about the training?

2   A.   Once again, it could have been any one of three.

3   Q.   And then you say, now -- now it's like you have to take a

4   three -- two- to three-day thing now.  You have to.

5        Talking about the training, right?

6   A.   Correct.

7   Q.   Because that's what LabSolutions had put into effect,

8   correct?

9   A.   Correct.

10        MR. SADOW:  Your Honor, I'm trying to work my way

11   through it so that --

12        THE COURT:  Yes.

13        MR. SADOW:  Now, page 62, getting towards the end.

14   BY MR. SADOW:

15   Q.   You tell Mr. Lohan your salary is $150,000 a month, right?

16   A.   Yes.

17   Q.   Could you please explain why you would tell a man that you

18   were concerned about potentially taping you, according to your

19   testimony, why would you tell that man that you were making

20   $150,000 a month?

21   A.   Conversation, like I said.  Known him seven years.  Known

22   him seven years.  Conversation.

23   Q.   And that was true, right?

24   A.   It was true.

25   Q.   And then you say that -- it's based, of course, and I

1    have -- they went on my track record for the last two years,

2    which is, like, really legit.  You know?  It's not like they

3    came up with just, like, a number.

4         Again you're talking about LabSolutions, right?

5    A.   Correct.

6    Q.   They didn't just make up a number, they were paying you a

7    salary based on what you had been supplying for the last two

8    years before that, correct?

9    A.   Correct.

10   Q.   It wasn't just some sham make-up number, was it?

11   A.   No.

12   Q.   It was a real number based on production, correct?

13   A.   Correct.

14   Q.   Which is kind of what a salary -- if you're going from

15   commission to a salary, that's what you would expect to happen,

16   right?

17   A.   Yes, it was not a made-up number.

18   Q.   Right.

19        MR. SADOW:  Your Honor, I'm done going through that

20   transcript.

21        THE COURT:  Okay.  Then let's go ahead and we'll break

22   at this point if that's the end of that.

23        MR. SADOW:  All right.

24        THE COURT:  Ladies and gentlemen of the jury, that's

25   going to be it for today.  I want to thank you again for your

1   unbelievable patience and I apologize for the delay this

2   afternoon.

3          We will do everything in our power to get back on track

4   tomorrow.  So I don't want anyone to fear that our schedule has

5   been disrupted.  I will continue to work with lawyers, who are

6   also very much aware of time constraints.

7          So we're going to see what we can do, and I'm going to

8   huddle up with them and we'll pick up where we left off

9   tomorrow at 9:00, as we've done the last few days.  So I would

10  ask everyone to please return back to the jury room at

11  9:00 o'clock.  We will have the witness, Mr. Hirsch, retake the

12  stand.

13         Our plan tomorrow morning is to complete his

14  examination and have the government call their next witness.

15  We'll see how much of that we can get done before the lunch

16  hour.

17         Please remember, of course, the rules that I have been

18  repeating throughout the trial.  Do not discuss people, places,

19  or things in this case with each other, with family or friends.

20         Anybody asking questions at home, you must tell them

21  you cannot discuss the case, but you, of course, can continue

22  to keep them apprised of scheduling issues.  Same thing goes

23  with employers or anyone else who may ask how the progress of

24  the trial is unfolding.

25         Remember, do not go to the internet to research

1   anything.  Remember certainly not to engage in any social

2   media.  If the lawyers see you tomorrow and they avoid you,

3   take no offense from that.

4        With that being said, I hope you all have a wonderful

5   evening.  Leave your notepads in the jury room.  We'll see you

6   all tomorrow at 9:00 a.m.  You are excused.

7        THE COURT SECURITY OFFICER:  All rise for the jury.

8        (Jury exits at 5:17 p.m.)

9        THE COURT:  Mr. Hirsch, you are excused.  I would

10  remind you, of course, you continue to be under oath.  You

11  should not have any communications with anyone, certainly not

12  anyone from the government.  And we will see you tomorrow at

13  9:00 a.m.  You are excused.

14       (Witness exits the courtroom.)

15       THE COURT:  All right.  Everyone please be seated.  Let

16  us take the last few minutes here, before we break for the

17  evening, to do a bit of housekeeping.

18       If you could, and I know it may be hard to put a number

19  on it, but for planning, Mr. Sadow, do you have a sense of how

20  much you have left in your cross-examination, ballpark?

21       MR. SADOW:  I'd say, give or take, an hour.

22       THE COURT:  Give or take, an hour?  Okay.  All right.

23  So if that's the case, then I certainly think that with the

24  redirect, we can finish tomorrow with this witness before

25  lunch, which puts us in place to, I believe, still call

 1    Mr. Holden presumably after the lunch hour, depending on how

 2    things go, maybe at least do a little bit before we break.

 3         It really depends on how quick the redirect is.  But he

 4    would have to be available at some point in the mid-morning.

 5         Does the government still intend on calling him as the

 6    next witness?

 7         MS. DE BOER:  So we also have two other witnesses

 8    flying in for tomorrow, Your Honor.  One of them is a

 9    beneficiary, Ms. K., H.K --

10         THE COURT:  Right.

11         MS. DE BOER:  -- who will be quite quick.  I do want to

12    get her on and off the stand tomorrow.  So perhaps we get her

13    on after Mr. Hirsch finishes.

14         THE COURT:  Hirsch.

15         MS. DE BOER:  Mr. Holden is here.  He'll be available

16    tomorrow.  I would like to go as far as possible with him, if

17    not finish him tomorrow.  Then we have Ms. Rinsky, who has

18    flown in tonight or is flying in tonight.  So she'll be after

19    Holden concludes.

20         THE COURT:  Okay.  So the plan tomorrow would be to

21    then finish in the morning on or about 11:00.  Maybe just

22    before that we would call H.K., then we would break.  Then we

23    would start after lunch, presumably, with Mr. Holden; is that

24    right?

25         MS. DE BOER:  Yeah.  And if we can start Mr. Holden

1    before lunch, I would say we do it.

2         THE COURT:  Absolutely.  I need to make the most of it.

3    I'd like to go until about 12:15 or thereabouts.  That's fine.

4    We can play it by ear if we're in a natural breaking point, but

5    I think that will work well to try to get us ahead of where we

6    are now.

7         And in the afternoon we'll see how fast we can move on

8    from Holden.  I guess Ms. Rinsky would be -- I don't know if

9    we'll get to her, but would she be the witness that would come

10   in after Mr. Holden is complete?

11        MS. DE BOER:  Yes, Your Honor.

12        THE COURT:  All right.  So Friday we're looking at

13   Rinsky.  And then are we still thinking Michael Petron on

14   Friday?

15        MS. DE BOER:  Yogel, and then Petron.

16        THE COURT:  Yogel then Petron, with the possibility

17   that Petron spills into Monday.  Okay.  So if we're able to put

18   that schedule together, we continue to be somewhere close to

19   the original plan to turn this over to the defense on Monday.

20        Of course, I do recognize that the defense has the

21   added issue of potentially recalling Ramamurthy and Griner,

22   although I'm confident it won't be a very lengthy examination

23   on either one.  I don't know.

24        Certainly it's up to the defense to figure out whether

25   it even makes sense to call Lohan as a witness next week.  I'll

1    leave it up to you guys.  I suspect not, after what I heard,

2    and I would suspect -- and I would just add, you know, by way

3    of my observations, I don't know that there's a lot left to

4    cover with Mr. Hirsch in terms of what he can and cannot

5    remember anyway, and how --

6                MR. SADOW:  I intend to tailor my examination with that

7    in mind.

8                THE COURT:  Okay.  Yeah.  I just --

9                MR. SADOW:  I understand completely, Your Honor.

10               THE COURT:  Yeah.  It just -- truthfully, I mean, I

11   guess if you -- we talked about this in the beginning when we

12   had a number of cooperators.  We were going to pick and choose

13   our cooperators.  He might not have been the cooperator to

14   pick, right?  He might not be the best one that the government

15   could have advanced.  They had already three.  Maybe you should

16   have skipped this one.

17               But, you know, you make your bed, you lie in it.  So

18   when he gets up here tomorrow, do your best because he's not

19   exactly forthcoming.  Whether that's COVID repercussions or

20   just bad memory, he's a little bit forgetful in that regard.

21   So I don't think it should take us too long to wrap up his

22   testimony and it's value, I think, is --

23               MR. SADOW:  It will not.

24               THE COURT:  His value -- let's put it this way:  The

25   value of his testimony, I think, has been sufficiently

1    questioned by the cross over the last hour, I would say, so...

2           MR. SADOW:  I do have one thing I wanted to raise on

3    that.

4           THE COURT:  Sure.

5           MR. SADOW:  Again, I'm not suggesting that my

6    adversaries have done anything inappropriate.  But according to

7    his testimony, he told the government that he had problems with

8    his memory.  If that's true, respectfully, I think that was

9    *Brady* material that should have been turned over.  If it's not

10   true, then I think they now have an obligation to tell us it's

11   not true.

12          THE COURT:  I'm going to guess -- and again, I'm not

13   putting words in the government's mouth -- that he probably

14   never explained his medical condition to that extent to the

15   government.  But again, I do not know.

16          I can't really trust a lot of what he's saying because

17   it's very convoluted and he seems to be all over the place.  I

18   don't know if the government wants to chime in on that.

19          MS. DE BOER:  He did notify us of his medical condition

20   and the fact that he was basically pronounced dead at one point

21   when he had COVID and then he came back, and it's been apparent

22   to us in interviews that there are things he doesn't remember,

23   and then when you show him a document, it starts to come back,

24   the same thing that's happening here.

25          And I had intended and I thought I had drawn that out

1   on direct when I asked about his medical condition, but perhaps

2   it didn't come out that clearly.

3           MR. SADOW:  It's only -- medical condition?  Fine.

4   Memory, different.

5           THE COURT:  Right.  I tend to agree with the defense.

6   I mean, look, I mean, I'm not saying he doesn't have certainly

7   an impact on his memory from his medical episode and what

8   happened to him with COVID, but I certainly didn't get the

9   sense that he had a prolonged brain fog from COVID that would

10  lead him to forget chunks of his testimony or prior phone

11  calls.

12          I mean, he definitely had medical issues, but I tend to

13  agree.  I didn't appreciate just how much that impacted his

14  memory, and it's touch and go.  But in any event, I'm sure we

15  can continue to clean that up here when we finish his

16  examination.

17          All right.  Well, I'll say this:  I think the most

18  important thing for the Court now is, looking at this lineup,

19  if it hasn't already been done -- and I think looking at the

20  lineup, really, I would believe that it would only be relevant

21  to Holden, because I think everything else here -- between

22  H.K., Rinsky, Yogel, and Petron, it's not an issue.

23          But certainly, I would imagine that we have gone

24  through all our communications at this point and assured

25  ourselves that we don't have anything else outstanding as to

1    any of these witnesses, past and present.  I don't know if we

2    finished that or we're still doing that.

3          Can I get an update from the government on that?

4          MS. DE BOER:  We are doing that, and it will conclude

5    tonight, and we will make absolutely sure, Your Honor.  And I

6    want to say it again:  This is 100 percent on me, not anybody

7    else sitting at this table.  And we will make sure it gets done

8    tonight.

9          THE COURT:  I appreciate that.  I know the defense does

10   too.

11         I mean, we're on a very tight schedule, so we cannot

12   afford to have an episode like the two hours lost today with

13   302s on 2019 case that should have been produced months ago.

14   It's inexcusable.

15         So let's make sure that we correct that.  We can't have

16   that happen going forward.  It's just not only prejudicial, but

17   it delays the presentation of evidence.

18         And hopefully, we can rebound tomorrow.  So my -- my

19   feeling is, looking at this lineup and what we have left with

20   Hirsch, we can get to where we want to go.  It just really

21   depends on how long we take with Holden once we get through

22   H.K., which I believe will be brief.  But it keeps us on a

23   schedule for Monday at the latest.

24         Of course, the fallout will be how long it takes us

25   with Ramamurthy and Griner.

1          One thing I will tell the defense, just to be aware:

2     If, indeed, we're going to recall them and we've made that

3     decision, just sometimes it benefits us to let the marshals

4     know.

5          Because, for example, Ramamurthy might be on his way

6     out of the state; I don't know.  But I know that my CRD has

7     been in contact with the marshals about witness availability.

8     So it's just something to think about if you want to alert my

9     CRD or make sure that we know.

10          I just wouldn't want Mr. Ramamurthy to be recalled and

11     then not be available when the defense needs him in their

12     case-in-chief because he's been transported.  So I just wanted

13     to flag that, just in case.

14          MR. SADOW:  I have an alternative, just to save time.

15          THE COURT:  Sure.  What would that be?

16          MR. SADOW:  I will go through those statements.  And to

17     those that I would ask about, I would wonder if the government

18     will agree to allow those simply to go into evidence.  I can

19     have somebody agree to it, or I can call the agent as opposed

20     to calling the witnesses back.

21          As far as I can tell, maybe four or five things.

22          THE COURT:  Okay.  That's not too bad.  All right.

23          MR. SADOW:  That would be pretty quick.

24          THE COURT:  If we can -- once you get a chance, because

25     I know you haven't even had a chance to really look at it in

1    detail.  But once you get a chance, present it to the

2    government, and let's see if maybe we can streamline that

3    presentation and save us some valuable time.  So just keep me

4    posted on that for next week.

5          MR. SADOW:  I will do so.

6          THE COURT:  All right.  Remember, of course, that

7    Friday also is not a full day in the sense that we start at

8    10:00 because we have an hour set aside for our motion to quash

9    at 9:00.  So I just want everyone to remember that we're

10   managing that too because the Court has to address the motion

11   to quash.

12         I will keep it tight.  So I will try to rule and do

13   everything within that hour so we have everyone seated and

14   ready to go by 10:00 o'clock.  But I just want, for planning

15   purposes, for the government to remember that detail as they

16   sort things out with the remaining witnesses.

17         It probably would impact -- it sounds like maybe it

18   would be Rinsky that would be impacted.  It depends on how

19   things go tomorrow.  Okay.

20         MS. DE BOER:  Thank you, Your Honor.

21         THE COURT:  All right.  Anything else on behalf of the

22   government before we conclude?

23         MS. DE BOER:  No, Your Honor.  Thank you.

24         THE COURT:  All right.  Anything else on the defense

25   side?

1          Yes, Mr. Samuel.

2          MR. SAMUEL:  There may be some issues with Holden.  We

3     talked about it.  We got sidetracked by other things at

4     lunchtime.  I think we're close to being able to work it out.

5     I told her what my -- my objection was to, like, 20 exhibits,

6     but I understood they gave me the universe.  So I just want you

7     to know there may be a couple of straggling issues, but there

8     won't be much.

9          THE COURT:  Very good.  Let's see if we have maybe a

10    natural break tomorrow.  Once we finish with Hirsch and H.K.,

11    we probably will be right around the 11:00 o'clock break.  And

12    so we can use that window to try and clear up any rulings on

13    moving in exhibits.

14         Of course, I would prefer to do what we've done in the

15    past, whereas Mr. Sadow is not really needed to lodge

16    objections and we've moved them in wholesale because it

17    expedites.  So maybe we can do that with the majority; and if

18    there's a couple left, I can make a ruling before Holden

19    starts.  So just let me know where we're at tomorrow.

20         MR. SAMUEL:  I don't think it'll be a problem.  I just

21    wanted you to know that we have a little work to do.

22         THE COURT:  Yeah.

23         MS. DE BOER:  And Mr. Samuel's points that he conveyed

24    to me earlier are well-founded, and I think we will resolve

25    most, if not all, of the issues.

```
1              THE COURT:  Very good.  Okay.  So that's it.  Then I'll
2    let you guys get to work.  I know you have some prep to do for
3    tomorrow.  We'll see each other at 9:00 a.m. tomorrow morning.
4    We're in recess.
5              MS. DE BOER:  Thank you, Your Honor.
6              THE COURT SECURITY OFFICER:  All rise.
7         (Court recessed at 5:29 p.m.)
8
                    C E R T I F I C A T E
9

10

11         I hereby certify that the foregoing is an
12   accurate transcription of the proceedings in the
13   above-entitled matter.
14

15
     DATE:   December 7, 2022   /s/Ilona Lupowitz
16                              ILONA LUPOWITZ, CRR, RPR, RMR
                                Official Court Reporter
17                              United States District Court
                                299 East Broward Boulevard
18                              Fort Lauderdale, Florida 33301
                                (954) 769-5568
19

20

21

22

23

24

25
```

**$**

**$100,000** [1] - 87:21
**$150,000** [2] - 190:15, 190:20
**$203,381.91** [1] - 42:21
**$300** [1] - 68:21
**$40** [1] - 68:21
**$400,000** [1] - 189:4
**$9,500** [1] - 155:13
**$9500** [1] - 177:23

**'**
**-**

**'16** [2] - 75:1, 160:1
**'17** [1] - 160:2
**'18** [1] - 160:2
**'19** [1] - 160:3

**/**

**/s/Ilona** [1] - 203:15

**1**

**1** [3] - 1:7, 73:12, 127:5
**1,000** [2] - 108:7, 108:8
**1-minute-and-16-second**
[1] - 8:25
**1/2** [3] - 48:8, 48:9, 48:18
**10** [15] - 46:13, 46:25, 47:4, 47:10, 47:14, 48:4, 48:8, 48:9, 48:18, 57:23, 64:1, 65:22, 74:12, 75:17
**100** [4] - 62:14, 65:23, 159:10, 199:6
**1001-H** [3] - 3:13, 60:16, 60:19
**105** [2] - 3:25, 4:1
**106** [1] - 4:1
**107** [1] - 4:2
**10:00** [2] - 201:8, 201:14
**10th** [3] - 76:22, 107:22, 109:1
**11** [1] - 76:19
**111** [1] - 4:2
**112** [1] - 4:3
**1124** [4] - 3:9, 26:25, 27:8, 27:11
**1170** [1] - 2:6
**118** [1] - 163:1
**11:00** [2] - 194:21, 202:11
**11:15** [2] - 100:17, 100:23
**11:30** [1] - 100:15
**11:39** [1] - 100:24
**11:44** [1] - 104:11
**11:56** [1] - 114:12
**11th** [1] - 33:17
**12** [1] - 5:7
**1241-FF** [3] - 3:23, 93:18,

93:21
**1241-G** [3] - 3:18, 91:16, 91:22
**1241-GG** [3] - 3:24, 93:18, 93:21
**1241-HH** [3] - 3:17, 86:21, 86:25
**1241-J** [4] - 4:1, 70:12, 105:5, 105:7
**1241-JJ** [8] - 3:10, 35:2, 35:4, 35:7, 35:11, 35:16, 37:6, 38:3
**1241-L** [5] - 3:11, 3:12, 41:24, 42:2, 44:16
**1241-LL** [6] - 3:11, 3:12, 3:12, 41:24, 42:2, 45:21
**1241-MM** [3] - 3:14, 61:11, 61:16
**1241-N** [3] - 3:17, 86:22, 86:25
**1241-O** [3] - 3:24, 93:18, 93:21
**1241-P** [4] - 3:24, 95:23, 96:1, 96:3
**1241-Q** [3] - 3:17, 91:15, 91:21
**1241-S** [3] - 3:17, 91:15, 91:21
**1241-T** [4] - 3:25, 97:14, 97:17, 97:19
**1241-U** [5] - 4:2, 107:12, 107:16, 107:18, 108:25
**1241-V** [4] - 3:9, 32:6, 32:9, 32:18
**1241-X** [3] - 3:23, 93:17, 93:21, 93:25
**1243** [3] - 4:2, 111:2, 111:4
**1247** [4] - 4:2, 111:2, 111:4, 111:11
**1247-A** [3] - 4:3, 112:13, 112:16
**125** [1] - 111:11
**127** [1] - 111:25
**12:00** [1] - 102:14
**12:02** [1] - 120:2
**12:15** [2] - 102:16, 195:3
**13** [1] - 109:9
**13th** [3] - 102:1, 143:8, 144:1
**14** [1] - 7:9
**140** [1] - 3:4
**1400** [1] - 1:16
**14th** [5] - 144:6, 145:1, 145:25, 146:15, 146:17
**15** [3] - 101:12, 111:12, 138:4
**15-minute** [1] - 100:14
**150** [2] - 88:5, 159:10
**150,000** [1] - 88:1, 88:3, 162:8

**1515** [5] - 3:14, 61:12, 61:16, 64:5, 65:24
**1515-A** [4] - 3:14, 61:12, 61:16, 66:4
**153** [1] - 4:8
**16** [10] - 8:24, 14:10, 14:24, 15:9, 15:11, 15:13, 15:23, 17:21, 19:7, 123:3
**16th** [5] - 12:1, 12:4, 12:11, 13:3, 18:10
**17** [1] - 123:3
**1744** [4] - 3:10, 41:23, 42:2, 42:6
**1744-A** [4] - 3:11, 41:23, 42:2, 43:13
**1744-AA** [1] - 43:13
**1748** [3] - 3:18, 91:15, 91:21
**1748-A** [3] - 3:18, 91:15, 91:21
**1757** [3] - 3:18, 91:16, 91:22
**1758** [4] - 3:14, 61:11, 61:16, 61:20
**1759** [4] - 3:14, 61:11, 61:16, 63:9
**1762** [3] - 3:19, 91:16, 91:22
**1775** [3] - 3:19, 91:16, 91:22
**1775-A** [3] - 3:19, 91:16, 91:22
**17th** [3] - 64:9, 67:1, 70:16
**1807** [3] - 3:18, 91:15, 91:21
**1813** [3] - 3:19, 91:16, 91:22
**1813-A** [3] - 3:20, 91:17, 91:23
**1814** [7] - 3:15, 3:18, 61:12, 61:17, 67:9, 91:16, 91:22
**1814-A** [7] - 3:15, 3:19, 61:12, 61:17, 68:1, 91:16, 91:22
**1818** [3] - 3:20, 91:17, 91:23
**1818-A** [3] - 3:20, 91:17, 91:23
**183K** [1] - 94:10
**1888** [4] - 3:13, 50:10, 50:12, 50:15
**1888-A** [4] - 3:13, 50:10, 50:12, 51:4
**1889** [3] - 3:20, 91:17, 91:23
**1889-A** [3] - 3:21, 91:17, 91:23
**1890** [3] - 3:21, 91:17, 91:23
**1890-A** [3] - 3:21, 91:17,

91:23
**1891** [3] - 3:21, 91:17, 91:23
**1891-A** [3] - 3:22, 91:18, 91:24
**1894** [3] - 3:22, 91:18, 91:24
**1894-A** [3] - 3:22, 91:18, 91:24
**1898** [3] - 3:22, 91:18, 91:24
**1898-A** [3] - 3:23, 91:18, 91:24
**1899** [4] - 3:25, 69:5, 105:4, 105:7
**19-80181** [1] - 5:4
**19-CR-80181-RAR-1** [1] - 1:2
**1900-A** [3] - 3:23, 91:18, 91:24
**19th** [1] - 67:16
**1:06** [1] - 142:9
**1:30** [1] - 102:19
**1:45** [5] - 102:23, 114:1, 114:10, 114:18, 119:23

**2**

**2** [4] - 94:20, 113:12, 113:15, 127:7
**20** [10] - 56:15, 64:1, 101:12, 102:14, 102:20, 115:16, 123:4, 171:21, 179:13, 202:5
**2000** [4] - 4:1, 106:9, 106:11, 106:21
**20005** [1] - 1:16
**2012** [2] - 152:11, 152:13
**2016** [8] - 35:22, 35:24, 73:12, 74:25, 110:23, 111:12, 111:17, 159:24
**2017** [12] - 33:17, 42:11, 72:11, 72:20, 73:14, 73:25, 74:25, 75:3, 76:19, 76:22, 94:7, 94:20
**2018** [7] - 46:1, 50:20, 62:1, 63:11, 64:9, 67:1, 67:16
**2019** [47] - 8:24, 14:11, 14:25, 15:9, 15:11, 15:13, 15:23, 17:21, 19:7, 44:21, 69:9, 70:16, 71:12, 87:12, 96:6, 97:10, 97:23, 101:23, 102:1, 107:22, 141:9, 143:8, 144:1, 151:13, 151:22, 152:14, 152:17, 153:23, 156:9, 156:19, 157:24, 158:13, 161:6, 161:10, 161:14, 166:1, 169:7, 177:17, 179:12, 179:14, 179:17, 182:14, 182:23,

205

184:1, 185:9, 187:20, 199:13
**2020** [1] - 103:24
**2021** [3] - 144:6, 145:1, 146:1
**2022** [2] - 1:4, 203:15
**2052** [1] - 1:19
**20s** [2] - 81:15, 82:1
**23** [2] - 84:8, 172:10
**23rd** [1] - 72:11
**24** [2] - 84:8, 173:18
**2400** [1] - 2:6
**25** [5] - 3:4, 12:23, 102:2, 115:17, 174:12
**254,000** [1] - 103:25
**25th** [1] - 50:20
**26** [11] - 62:1, 101:23, 111:17, 152:17, 153:23, 161:6, 162:18, 169:7, 182:23, 184:1, 185:9
**260** [1] - 1:18
**26th** [7] - 141:9, 151:22, 153:16, 154:8, 160:18, 161:2, 167:16
**26th..** [1] - 116:22
**27** [5] - 3:9, 84:6, 179:12, 179:17, 182:13
**28th** [1] - 94:6
**29** [3] - 153:3, 163:2, 176:1
**299** [2] - 1:23, 203:17
**29th** [1] - 154:16
**2:00** [5] - 102:16, 103:1, 114:4, 114:17, 119:22
**2:10** [1] - 120:3
**2:24** [1] - 131:20
**2:45** [1] - 130:19

**3**

**302** [5] - 15:4, 15:5, 16:2, 16:5, 16:18
**302s** [14] - 121:12, 121:13, 121:14, 126:19, 127:9, 128:15, 131:11, 131:25, 133:12, 133:14, 134:6, 136:10, 139:2, 199:13
**30303** [1] - 1:19
**30305** [1] - 2:4
**30309** [1] - 2:7
**3131** [1] - 2:3
**32** [2] - 3:9, 183:21
**3301** [1] - 1:24
**33301** [1] - 203:18
**346K** [1] - 94:12
**35** [5] - 3:10, 46:14, 49:7, 119:2, 124:13
**3:00** [4] - 126:23, 127:8, 131:10, 131:16
**3:15** [2] - 131:21, 133:4
**3:20** [1] - 136:6

**4**

**4** [2] - 5:12, 5:25
**40** [4] - 49:2, 56:15, 57:24, 184:21
**401** [1] - 11:16
**404** [3] - 35:13, 35:21, 38:1
**41** [1] - 189:21
**42** [4] - 3:10, 3:11, 3:12, 3:12
**45** [2] - 126:23, 129:18
**455** [2] - 62:6, 62:15
**4764** [1] - 27:10
**4:01** [1] - 136:7
**4:06** [1] - 139:23
**4th** [1] - 97:23

**5**

**5** [10] - 46:14, 46:25, 47:4, 48:16, 48:19, 48:21, 48:22, 49:2, 65:22, 156:19
**50** [6] - 3:13, 31:19, 57:24, 64:1, 65:23
**500** [5] - 63:13, 63:18, 63:19, 63:20, 64:2
**5:00** [2] - 140:9, 181:20
**5:15** [1] - 139:13
**5:17** [1] - 193:8
**5:29** [2] - 1:5, 203:7
**5th** [6] - 151:13, 156:8, 156:9, 157:24, 161:10, 161:14

**6**

**60** [2] - 3:13, 108:3
**601** [4] - 3:15, 71:24, 72:3, 75:14
**602** [4] - 3:15, 71:23, 72:3, 72:6
**602-A** [4] - 3:15, 71:23, 72:3, 73:11
**603** [4] - 3:16, 71:23, 72:3, 73:24
**603-A** [4] - 3:16, 71:24, 72:3, 74:7
**607-A** [4] - 3:16, 71:24, 72:3, 76:6
**607-D** [6] - 3:16, 71:24, 72:4, 77:16, 77:19
**61** [1] - 3:14
**62** [1] - 190:13
**650** [1] - 47:15
**6th** [1] - 35:22

**7**

**7** [2] - 1:4, 203:15
**7/16/2019** [1] - 18:22

**71-year-old** [1] - 110:12
**72** [1] - 3:15
**722** [1] - 66:8
**769-5568** [2] - 1:24, 203:18

**8**

**8** [2] - 1:6, 165:8
**86** [1] - 3:17
**8th** [1] - 1:16

**9**

**9** [3] - 48:8, 48:9, 48:18
**9.5** [1] - 48:5
**90** [1] - 69:4
**900** [1] - 108:10
**91** [1] - 3:17
**93** [1] - 3:23
**954** [2] - 1:24, 203:18
**96** [1] - 3:24
**97** [1] - 3:25
**9:00** [6] - 192:9, 192:11, 193:6, 193:13, 201:9, 203:3
**9:05** [1] - 1:5
**9:34** [1] - 24:10
**9:45** [1] - 153:3
**9th** [2] - 69:9, 96:6

**A**

**a.m** [10] - 1:5, 24:10, 100:17, 100:23, 100:24, 104:11, 114:12, 193:6, 193:13, 203:3
**ability** [1] - 130:9
**able** [19] - 5:21, 11:10, 12:17, 18:12, 52:11, 102:7, 102:11, 103:23, 115:5, 117:8, 119:15, 126:5, 129:3, 130:5, 131:11, 138:6, 182:4, 195:17, 202:4
**above-entitled** [1] - 203:13
**absolutely** [7] - 13:2, 14:4, 101:16, 114:16, 133:6, 195:2, 199:5
**accept** [2] - 25:17, 25:19
**accepting** [1] - 13:6
**access** [1] - 102:7
**accessioning** [1] - 62:7
**according** [13] - 115:20, 141:14, 142:3, 149:8, 149:21, 153:17, 155:20, 159:21, 164:20, 176:12, 176:16, 190:18, 197:6
**accounting** [1] - 42:20
**accurate** [1] - 203:12
**acknowledge** [1] - 61:6
**acting** [1] - 78:2
**action** [1] - 130:11

**activity** [4] - 14:25, 18:16, 18:19, 18:23
**actress** [1] - 125:21
**actual** [4] - 53:14, 55:9, 68:22, 143:4
**add** [6] - 11:19, 103:17, 123:3, 125:14, 126:13, 196:2
**added** [2] - 83:16, 195:21
**adding** [5] - 124:23, 126:15, 128:24, 131:3
**addition** [3] - 69:16, 137:15, 137:18
**additional** [5] - 83:16, 101:17, 120:18, 129:12, 139:4
**address** [7] - 5:6, 13:20, 37:2, 37:7, 82:11, 120:7, 201:10
**addressing** [1] - 18:16
**adhered** [1] - 78:1
**adjudicated** [2] - 44:5
**admissible** [1] - 116:5
**admission** [6] - 50:10, 61:11, 71:23, 107:12, 111:2, 112:12
**admitted** [25] - 27:5, 32:7, 35:3, 41:25, 42:6, 44:15, 50:11, 60:17, 61:13, 61:19, 67:8, 70:11, 71:25, 86:23, 91:19, 93:19, 93:25, 95:24, 97:15, 105:6, 106:10, 107:13, 111:3, 112:14, 152:25
**advance** [2] - 150:10, 150:15
**advanced** [1] - 196:15
**advantage** [2] - 5:8, 138:5
**adversaries** [1] - 197:6
**advertising** [1] - 65:12
**advice** [7] - 9:18, 20:18, 22:23, 23:10, 93:3, 176:9
**advise** [1] - 23:3
**affects** [1] - 127:25
**afford** [2] - 6:10, 199:12
**afforded** [1] - 22:24
**afternoon** [7] - 115:6, 115:9, 140:18, 140:19, 140:21, 192:2, 195:7
**afterwards** [3] - 153:11, 164:13, 164:19
**agencies** [2] - 134:23, 150:9
**agency** [3] - 141:21, 144:21, 145:5
**Agent** [6] - 8:4, 8:16, 10:10, 19:18, 23:24, 103:13
**agent** [14] - 5:9, 8:3, 10:25, 12:25, 13:6, 14:13, 15:3, 18:11, 20:20, 21:22, 119:2, 133:21, 179:17, 200:19

**agents** [11] - 10:4, 17:8, 103:7, 129:25, 143:1, 144:7, 144:17, 149:12, 164:3, 164:8
**ago** [13] - 34:14, 79:10, 87:3, 137:17, 145:18, 147:6, 147:7, 147:23, 167:15, 167:17, 185:18, 199:13
**agree** [10] - 6:10, 7:20, 12:6, 13:24, 14:3, 22:12, 198:5, 198:13, 200:18, 200:19
**agreed** [1] - 77:25
**agreement** [14] - 6:8, 19:8, 19:21, 44:2, 44:3, 72:14, 72:23, 74:8, 74:12, 75:2, 75:15, 78:22, 79:4, 88:11
**agreements** [2] - 71:18, 77:17
**agrees** [1] - 78:3
**ahead** [24] - 5:3, 8:21, 17:12, 19:24, 24:3, 24:7, 24:22, 46:24, 55:12, 60:17, 92:7, 101:10, 102:22, 104:8, 104:14, 114:6, 117:9, 118:21, 120:12, 139:7, 139:9, 139:19, 191:21, 195:5
**alcohol** [3] - 29:6, 29:7
**alert** [6] - 98:13, 99:9, 99:14, 100:4, 109:10, 200:8
**Alert** [2] - 99:3, 99:17
**Alite** [10] - 51:12, 51:15, 61:25, 62:6, 62:8, 62:14, 62:15, 66:1, 72:13, 73:20
**allow** [4] - 7:20, 11:1, 11:2, 200:18
**allowed** [3] - 79:4, 83:14, 107:4
**allowing** [1] - 23:14
**almost** [3] - 12:3, 16:2, 102:15
**alone** [3] - 148:15, 155:15, 180:21
**alternate** [2] - 7:5, 7:7
**alternates** [3] - 5:24, 7:1, 7:11
**alternative** [1] - 200:14
**AMERICA** [1] - 1:3
**amount** [9] - 42:21, 65:20, 88:8, 115:15, 131:25, 158:24, 161:21, 161:23
**Anonymous** [1] - 82:15
**answer** [11] - 8:18, 8:19, 14:22, 93:9, 125:12, 150:25, 151:1, 151:15, 151:25, 154:22, 165:11
**answering** [1] - 23:7
**answers** [1] - 126:11
**anticipate** [1] - 118:7
**anyway** [6] - 85:21, 85:22, 102:20, 171:23, 172:18,

196:5
**AP** [1] - 96:9
**apologize** [2] - 187:14, 192:1
**apparent** [2] - 15:19, 197:21
**appear** [2] - 124:10, 135:18
**APPEARANCES** [1] - 1:11
**Appearances** [1] - 2:1
**appeared** [1] - 82:18
**apply** [1] - 19:2
**appreciate** [5] - 18:11, 103:3, 131:24, 198:13, 199:9
**apprised** [1] - 192:22
**approach** [8] - 11:4, 13:21, 40:4, 118:5, 118:13, 118:24, 179:9, 184:24
**approaching** [1] - 118:21
**approval** [4] - 43:10, 63:23, 64:1, 64:2
**approve** [4] - 42:19, 43:12, 48:4, 63:13
**approved** [1] - 108:9
**April** [40] - 42:20, 62:1, 63:11, 69:9, 94:6, 96:6, 97:10, 101:23, 116:22, 141:9, 144:6, 145:1, 145:25, 146:14, 146:17, 151:13, 151:22, 152:17, 153:3, 153:16, 153:23, 154:8, 154:16, 156:8, 156:9, 156:19, 157:24, 160:18, 161:2, 161:6, 161:10, 161:14, 162:18, 166:1, 167:16, 169:7, 182:23, 184:1, 185:9, 187:20
**arena** [1] - 97:3
**argument** [1] - 163:9
**arrangement** [1] - 178:19
**arrested** [7] - 165:11, 165:14, 165:22, 166:2, 166:5, 166:17, 166:23
**arrive** [1] - 102:24
**arrived** [1] - 5:7
**artfully** [1] - 126:6
**article** [13] - 26:8, 96:10, 96:13, 97:9, 97:25, 98:7, 99:1, 109:5, 109:9, 109:14, 110:3, 110:6, 110:15
**articles** [2] - 97:11, 98:19
**articulated** [1] - 10:1
**aside** [4] - 8:17, 11:13, 23:23, 201:8
**aspect** [1] - 129:20
**aspects** [1] - 93:7
**assessment** [1] - 13:24
**assets** [1] - 189:12
**assist** [3] - 18:12, 102:5, 103:20
**Assistant** [2] - 8:4, 145:10

**associate/distributor** [1] - 78:2
**associated** [1] - 98:7
**assume** [1] - 12:13
**assumption** [1] - 128:18
**assurances** [1] - 21:19
**assure** [3] - 11:5, 134:16, 134:24
**assured** [1] - 198:24
**Atlanta** [6] - 1:19, 2:4, 2:7, 84:25, 188:12, 188:14
**attached** [1] - 43:15
**attachment** [10] - 42:13, 50:25, 51:3, 66:1, 66:4, 67:22, 68:2, 72:13, 74:5, 74:7
**attachments** [1] - 42:14
**attacking** [1] - 180:4
**attempt** [1] - 118:16
**attempting** [1] - 124:14
**attended** [1] - 16:11
**attention** [10] - 13:25, 22:16, 33:9, 33:16, 62:3, 83:12, 94:6, 101:2, 110:8, 123:14
**attentive** [1] - 138:9
**attestation** [1] - 76:8
**attestations** [2] - 75:25, 77:9
**attorney** [8] - 9:17, 11:14, 11:15, 20:21, 30:13, 111:22, 133:21, 174:18
**attorney-client** [2] - 11:14, 11:15
**attorneys** [6] - 20:17, 20:18, 20:25, 30:11, 111:18, 111:20
**audio** [11] - 15:2, 16:13, 16:14, 17:9, 17:15, 18:4, 18:5, 60:20, 60:21, 69:18
**audio-recording** [1] - 15:2
**audios** [1] - 115:14
**August** [4] - 35:22, 73:25, 75:4, 103:24
**aunt** [1] - 90:17
**authorization** [1] - 42:19
**availability** [1] - 200:7
**available** [6] - 36:5, 114:17, 146:24, 194:4, 194:15, 200:11
**Avenue** [1] - 1:16
**avoid** [3] - 22:15, 130:12, 193:2
**avoiding** [2] - 11:14, 127:5
**awaiting** [1] - 5:17
**aware** [10] - 23:18, 23:25, 52:11, 122:6, 123:10, 141:19, 141:24, 162:20, 192:6, 200:1

**B**

**backdated** [1] - 73:16
**background** [1] - 26:16
**backtrack** [1] - 184:6
**backups** [1] - 15:15
**bad** [5] - 174:21, 185:15, 187:15, 196:20, 200:22
**bag** [1] - 57:23
**bagel** [1] - 149:13
**bagful** [1] - 57:13
**BAKER** [1] - 2:5
**balance** [1] - 182:15
**ballpark** [1] - 193:20
**bank** [3] - 102:25, 113:12, 113:15
**banner** [5] - 64:15, 64:16, 65:4, 65:5, 65:10
**banners** [1] - 64:18
**banter** [1] - 49:1
**barrage** [1] - 110:6
**based** [12] - 20:24, 87:7, 87:14, 118:7, 119:10, 134:25, 148:20, 150:22, 161:19, 190:25, 191:7, 191:12
**basis** [5] - 21:14, 21:16, 22:2, 46:23, 119:10
**Bates** [1] - 27:10
**BEACH** [1] - 1:2
**Beach** [7] - 26:22, 27:15, 27:17, 28:13, 29:10, 29:21, 30:1
**beach** [1] - 28:2
**beard** [3] - 6:16, 6:17, 6:24
**beat** [1] - 52:22
**beating** [1] - 52:13
**become** [2] - 39:15, 52:15
**becomes** [2] - 13:9, 123:20
**bed** [3] - 18:10, 83:6, 196:17
**bedridden** [2] - 83:6, 180:14
**beds** [1] - 28:1
**BEFORE** [1] - 1:10
**began** [3] - 35:24, 59:10, 59:22
**begin** [4] - 20:4, 114:6, 132:1, 137:16
**beginning** [13] - 36:2, 65:14, 78:20, 87:6, 88:23, 88:24, 89:8, 92:17, 92:21, 110:23, 113:24, 160:3, 196:11
**begins** [2] - 102:1, 171:20
**behalf** [3] - 75:18, 135:19, 201:21
**behind** [1] - 131:7
**belabor** [1] - 73:18

belabored [1] - 124:22
bench [3] - 131:9, 133:25, 136:2
beneficiaries [2] - 99:22, 99:25
beneficiary [1] - 194:9
benefit [2] - 13:17, 29:4
benefits [1] - 200:3
Berarducci [10] - 33:3, 45:24, 61:23, 72:8, 72:16, 73:1, 73:4, 94:3, 170:3, 170:9
best [7] - 90:9, 113:23, 131:17, 153:22, 175:12, 196:14, 196:18
better [6] - 52:12, 52:14, 131:24, 135:13, 135:14, 145:25
between [22] - 10:10, 12:24, 15:21, 15:23, 35:12, 44:19, 61:22, 70:13, 73:19, 94:3, 96:4, 97:20, 101:22, 102:16, 107:19, 121:16, 130:18, 144:1, 156:19, 176:10, 183:14, 198:21
beyond [1] - 117:19
BH-6 [3] - 4:8, 152:22, 153:1
big [5] - 53:15, 54:19, 63:25, 64:2, 65:7
bill [1] - 68:24
billed [2] - 68:19, 68:22
billing [2] - 46:15, 99:24
bio [1] - 63:20
bit [30] - 5:15, 6:17, 6:24, 8:19, 14:2, 21:11, 26:21, 37:22, 49:1, 49:17, 52:9, 58:6, 60:23, 81:5, 82:6, 85:7, 90:16, 97:6, 105:10, 111:7, 114:4, 135:23, 136:3, 136:23, 156:7, 182:6, 193:17, 194:2, 196:20
bite [1] - 173:9
blacklist [2] - 69:22, 70:9
blank [3] - 51:11, 123:8
block [3] - 148:9, 148:11, 148:12
blocked [1] - 148:13
blow [1] - 30:23
blown [2] - 58:14, 58:15
blue [4] - 33:11, 98:3, 109:9, 147:22
Blue [1] - 49:23
board [1] - 36:11
Boca [9] - 26:22, 27:15, 27:17, 28:12, 29:10, 29:20, 30:1, 110:24, 145:10
Boer [13] - 5:10, 8:2, 8:15, 21:13, 23:1, 23:23, 24:3, 24:5, 120:12, 125:15,

136:24, 138:25, 139:11
BOER [115] - 1:13, 3:4, 6:4, 8:18, 8:22, 10:7, 10:13, 10:18, 11:8, 20:9, 20:12, 20:15, 23:2, 23:11, 24:6, 24:18, 25:5, 26:11, 26:14, 26:24, 27:7, 27:9, 32:5, 32:10, 35:1, 35:5, 41:22, 42:1, 42:4, 50:9, 50:14, 60:13, 60:22, 61:10, 61:15, 61:18, 71:22, 72:2, 72:5, 86:20, 87:2, 91:13, 92:1, 92:5, 92:8, 92:9, 93:16, 93:23, 95:22, 96:2, 97:13, 97:18, 100:12, 100:21, 103:5, 104:7, 104:16, 104:24, 104:25, 105:3, 105:9, 106:8, 106:12, 107:11, 107:15, 107:17, 111:1, 111:6, 112:12, 112:17, 113:17, 113:19, 113:21, 114:25, 115:11, 116:1, 116:4, 117:22, 119:24, 120:11, 120:15, 120:22, 120:25, 121:8, 121:13, 121:17, 125:16, 130:17, 131:18, 132:6, 132:10, 132:12, 132:15, 133:3, 133:9, 133:20, 134:13, 134:16, 134:21, 135:5, 139:5, 152:24, 165:6, 194:7, 194:11, 194:15, 194:25, 195:11, 195:15, 197:19, 199:4, 201:20, 201:23, 202:23, 203:5
Boer's [1] - 117:6
bond [3] - 82:19, 82:21, 83:14
booths [1] - 99:25
bottom [2] - 74:10, 176:18
bought [2] - 177:1, 189:8
Boulevard [2] - 1:23, 203:17
bout [1] - 91:19
Bowl [2] - 83:9, 83:11
boxes [2] - 54:18, 86:10
boys [1] - 174:14
Brady [1] - 197:9
bragging [1] - 177:1
brain [1] - 198:9
break [20] - 64:22, 100:11, 100:14, 100:19, 101:15, 102:10, 102:15, 104:6, 113:24, 114:6, 114:24, 120:16, 122:11, 140:8, 191:21, 193:16, 194:2, 194:22, 202:10, 202:11
breaking [1] - 195:4
BRETT [3] - 3:3, 24:24, 25:3

Brett [10] - 24:19, 25:2, 40:8, 46:4, 62:4, 72:14, 75:8, 104:16, 176:21
BRIAN [1] - 2:5
brick [1] - 108:4
brick-and-mortar [1] - 108:4
Brickell [3] - 36:13
brief [8] - 9:1, 11:1, 11:2, 15:20, 60:23, 199:22
briefly [1] - 23:2
bring [26] - 8:12, 24:3, 24:8, 30:11, 30:13, 30:17, 30:24, 31:20, 46:23, 61:5, 101:1, 104:8, 114:1, 120:5, 123:16, 123:22, 124:24, 136:2, 136:4, 138:23, 139:18, 146:9, 146:10, 146:11, 149:1, 182:7
bringing [4] - 123:16, 139:19, 182:5, 182:6
brings [1] - 165:8
broad [2] - 135:12, 135:13
brochures [1] - 64:18
broke [1] - 8:11
brokerage [1] - 81:20
Bronx [1] - 186:5
brother [3] - 92:17, 92:20, 92:25
brought [12] - 10:15, 12:14, 20:18, 26:2, 31:19, 34:23, 39:14, 47:2, 47:8, 57:13, 83:12, 130:2
Broward [2] - 1:23, 203:17
buddy [1] - 47:25
bullet [1] - 173:9
bumped [5] - 27:16, 27:19, 27:21, 29:9, 29:20
bunch [3] - 43:21, 111:22, 134:6
business [51] - 26:18, 26:20, 28:8, 28:21, 28:22, 28:23, 30:19, 30:24, 32:1, 34:23, 36:5, 36:18, 38:18, 40:9, 41:12, 47:20, 47:23, 53:18, 54:2, 54:3, 54:10, 55:25, 56:17, 56:19, 72:21, 72:24, 73:9, 78:1, 79:25, 80:12, 85:10, 106:24, 151:24, 152:7, 152:12, 154:18, 154:21, 154:23, 155:8, 155:12, 155:17, 157:4, 167:10, 172:3, 172:24, 174:8, 174:22, 175:23, 177:13
business-wise [1] - 152:12
buy [3] - 85:11, 102:16, 126:23
buys [1] - 103:2
BY [39] - 1:20, 3:4, 3:4,

25:5, 26:14, 27:9, 32:10, 35:5, 42:4, 50:14, 60:22, 61:18, 72:5, 87:2, 92:1, 92:9, 93:23, 96:2, 97:18, 104:25, 105:9, 106:12, 107:17, 111:6, 112:17, 113:19, 140:17, 153:2, 165:7, 171:22, 172:11, 173:19, 174:13, 176:2, 179:10, 181:25, 183:22, 185:2, 190:14

## C

Cabrera [5] - 5:12, 5:14, 5:25, 7:14, 7:23
calculation [1] - 87:14
callers [1] - 56:3
camera [6] - 11:5, 13:14, 13:21, 14:12, 19:3, 20:1
camp [1] - 129:15
canceled [1] - 33:23
cancer [10] - 34:9, 36:25, 51:25, 52:12, 52:14, 52:18, 52:22, 90:18, 109:10, 110:10
candidly [1] - 122:2
cannot [5] - 120:19, 129:23, 192:21, 196:4, 199:11
capacity [1] - 54:5
capture [1] - 11:11
car [1] - 5:15
care [5] - 20:2, 22:25, 23:4, 130:24, 142:15
careful [7] - 141:10, 142:5, 142:6, 150:15, 163:25, 164:22
carefully [1] - 125:12
Carolina [2] - 69:20, 69:24
Carroll [1] - 175:4
carry [2] - 64:17, 65:7
case [25] - 5:4, 11:6, 11:12, 12:9, 12:10, 14:5, 14:8, 19:16, 24:15, 81:8, 81:23, 82:18, 105:11, 106:2, 126:15, 129:5, 129:6, 130:15, 132:19, 192:19, 192:21, 193:23, 199:13, 200:12, 200:13
CASE [1] - 1:2
case-in-chief [4] - 24:15, 129:5, 132:19, 200:12
cases [1] - 79:7
Cash [1] - 112:22
cash [1] - 112:24
caught [3] - 83:2, 110:8, 181:11
caused [1] - 155:3
Cecilia [4] - 64:7, 64:11, 64:12, 65:25
cell [5] - 32:11, 33:14, 35:8,

44:17, 103:25
  Cellebrite [1] - 102:8
  center [7] - 50:23, 56:11, 67:20, 67:21, 85:10, 85:12, 85:13
  centers [4] - 29:6, 30:18, 69:14, 85:5
  CEO [2] - 76:14, 170:7
  certain [6] - 63:4, 83:15, 105:20, 121:6, 168:18
  certainly [32] - 7:18, 11:12, 13:20, 13:25, 16:17, 16:19, 17:15, 17:18, 115:2, 117:7, 124:19, 124:23, 125:6, 128:24, 129:5, 130:8, 130:17, 130:25, 131:3, 131:23, 133:14, 133:17, 135:22, 138:17, 181:24, 193:1, 193:11, 193:23, 195:24, 198:6, 198:8, 198:23
  certify [1] - 203:11
  CGx [9] - 26:4, 40:3, 47:16, 63:15, 66:18, 66:22, 153:10, 155:8, 186:20
  CGx/PGx [1] - 43:2
  chain [17] - 33:6, 33:9, 35:12, 37:21, 42:8, 42:17, 49:12, 61:21, 61:22, 62:4, 62:12, 64:6, 76:22, 77:6, 94:15, 98:10, 111:15
  chair [1] - 5:14
  chairs [1] - 27:23
  challenge [1] - 119:16
  chance [7] - 52:12, 119:20, 121:23, 137:24, 200:24, 200:25, 201:1
  change [8] - 20:18, 87:9, 87:11, 90:13, 90:19, 158:22, 160:6, 160:20
  changed [4] - 158:1, 158:14, 160:13
  changes [1] - 91:1
  changing [1] - 119:10
  characterization [1] - 118:9
  characterized [1] - 153:23
  Charamoki's [1] - 185:23
  charge [4] - 47:15, 56:22, 59:20, 170:9
  Charge [1] - 8:5
  charged [2] - 59:10, 82:17
  chasing [2] - 95:1, 95:3
  chat [3] - 32:23, 44:19, 45:22
  Chavez [1] - 7:9
  check [7] - 6:1, 88:11, 103:7, 131:17, 134:21, 134:22, 182:11
  checked [4] - 86:10, 133:18, 135:17, 138:14
  checking [2] - 131:22,

139:1
  cheek [1] - 99:22
  chef [3] - 53:14, 53:16, 53:17
  Chevy [1] - 9:22
  Chief [1] - 145:10
  chief [4] - 24:15, 129:5, 132:19, 200:12
  chime [1] - 197:18
  choice [2] - 82:7, 117:15
  choose [1] - 196:12
  chooses [1] - 129:24
  chunks [2] - 126:18, 198:10
  CIA [1] - 169:9
  circumstances [1] - 83:15
  city [1] - 36:4
  claim [4] - 101:19, 123:1, 141:6, 143:11
  claims [2] - 119:6, 148:21
  Clan [1] - 112:21
  clarification [1] - 14:24
  clarify [1] - 20:10
  clarifying [1] - 62:13
  clarity [1] - 170:14
  clean [3] - 126:9, 174:21, 198:15
  Clean [1] - 171:24
  cleaner [1] - 117:10
  clear [11] - 18:14, 20:16, 29:19, 33:5, 33:10, 35:8, 70:25, 93:12, 124:1, 134:18, 202:12
  clearly [2] - 180:6, 198:2
  client [6] - 11:14, 11:15, 12:18, 13:1, 50:7, 77:9
  clinic [3] - 62:6, 62:7, 174:1
  Clio [9] - 9:4, 9:11, 10:11, 12:2, 15:19, 18:24, 25:22, 25:23, 71:2
  close [5] - 5:13, 39:15, 39:16, 48:9, 108:3, 138:3, 139:14, 195:18, 202:4
  closer [1] - 102:15
  clothing [1] - 26:8
  Club [7] - 26:23, 27:15, 27:17, 28:13, 29:10, 29:21, 30:1
  club [1] - 28:2
  cocaine [2] - 82:8, 83:10
  Coconut [1] - 33:23
  code [1] - 89:15
  coded [1] - 71:3
  codes [5] - 86:15, 89:9, 89:12, 89:13, 89:19
  coding [3] - 86:14, 86:16, 86:17
  coffee [3] - 102:25, 114:1, 129:17
  coincidence [1] - 27:17

coincidentally [1] - 26:22
  collect [2] - 31:13, 172:17
  collected [1] - 44:6
  collection [1] - 68:22
  column [5] - 43:19, 44:4, 66:16, 68:10, 68:11
  columns [1] - 125:20
  combination [1] - 66:21
  comfortable [1] - 126:25
  coming [14] - 18:11, 19:15, 36:11, 87:13, 90:11, 95:13, 115:25, 125:8, 126:9, 133:2, 150:13, 150:18, 164:2, 167:21
  commission [12] - 42:22, 44:5, 45:8, 45:15, 76:8, 87:7, 157:22, 158:6, 158:15, 159:21, 160:4, 191:15
  commissions [4] - 43:1, 44:9, 47:22, 159:16
  committed [1] - 123:20
  common [2] - 45:14, 95:5
  commonly [1] - 44:13
  commotion [1] - 45:7
  communicate [2] - 108:14, 156:4
  communicated [1] - 90:20
  communications [8] - 11:15, 16:5, 18:24, 103:22, 121:15, 121:16, 193:11, 198:24
  companies [6] - 49:18, 49:22, 50:3, 71:15, 71:16, 78:14
  company [15] - 43:12, 49:23, 49:25, 51:16, 56:9, 56:10, 56:11, 68:6, 68:7, 73:22, 75:18, 81:18, 153:9, 174:2
  compare [1] - 65:17
  compared [2] - 65:19, 65:22, 115:4
  compelled [1] - 130:11
  compensation [1] - 158:1
  complete [5] - 20:5, 56:6, 138:23, 192:13, 195:10
  completed [1] - 19:25, 131:2, 131:5
  completely [2] - 134:14, 196:9
  complex [1] - 122:14
  compliance [4] - 75:25, 77:17, 77:25, 111:18
  compliant [1] - 183:13
  compound [1] - 30:19
  compounding [4] - 36:16, 36:17, 36:19, 40:3
  compounds [3] - 40:2, 166:25, 168:10
  concern [9] - 18:16, 21:16,

21:24, 97:5, 122:21, 124:8, 130:16, 131:1, 138:18
  concerned [6] - 58:4, 58:18, 138:9, 176:12, 189:11, 190:18
  concerns [5] - 11:24, 19:6, 22:25, 123:18, 127:6
  conclude [2] - 199:4, 201:22
  concludes [1] - 194:19
  conclusion [1] - 31:21
  condition [4] - 197:14, 197:19, 198:1, 198:3
  conditions [1] - 82:21
  conduct [3] - 59:23, 60:9, 81:16
  conducted [6] - 9:7, 15:1, 21:3, 79:12, 80:8, 116:2
  conducting [1] - 177:13
  confident [1] - 195:22
  confirm [12] - 13:22, 14:12, 18:21, 117:6, 120:16, 120:19, 133:5, 133:6, 133:11, 137:8, 139:1, 179:18
  confirmation [1] - 136:14
  confirmed [1] - 136:22
  confirms [1] - 119:14
  confuse [2] - 62:13, 62:14
  confused [1] - 184:9
  confusing [1] - 6:21
  confusion [1] - 77:1
  Congress [1] - 170:13
  connected [5] - 11:18, 12:10, 31:24, 57:6, 158:20
  Connecticut [1] - 172:13
  connection [2] - 8:6, 12:8, 83:20, 84:9
  consider [1] - 69:24
  consistently [1] - 141:16
  constant [1] - 110:6
  constraints [1] - 192:6
  consultation [1] - 78:17
  contact [8] - 51:9, 103:13, 136:13, 137:18, 139:4, 142:25, 143:16, 200:7
  context [3] - 14:3, 116:15, 157:9
  continue [14] - 19:18, 20:7, 24:14, 41:5, 71:9, 79:5, 82:16, 104:19, 151:24, 192:5, 192:21, 193:10, 195:18, 198:15
  continued [5] - 2:1, 83:18, 146:17, 152:19, 157:4
  continues [2] - 20:4, 51:23
  continuing [8] - 37:5, 38:2, 44:9, 48:23, 94:15, 96:12, 98:10, 156:4
  contract [9] - 46:5, 46:21, 55:9, 71:17, 73:9, 73:11,

73:16, 73:18, 87:4
**contractor** [1] - 78:2
**contracts** [2] - 71:15, 71:17
**control** [1] - 129:23
**Conversation** [1] - 179:11
**conversation** [39] - 9:15, 15:18, 15:23, 17:18, 42:18, 115:16, 124:1, 125:7, 130:18, 131:11, 137:22, 142:9, 152:5, 152:17, 156:18, 162:12, 162:16, 164:16, 167:10, 168:14, 168:15, 173:4, 173:5, 173:10, 173:11, 174:8, 174:9, 174:10, 174:25, 175:1, 175:2, 176:14, 177:18, 182:23, 183:19, 189:13, 189:14, 190:21, 190:22
**conversations** [5] - 95:5, 124:5, 156:9, 162:19, 180:2
**conversing** [1] - 176:12
**conveyed** [1] - 202:23
**conveying** [1] - 8:8
**convicted** [1] - 81:14
**conviction** [1] - 81:11
**convincing** [1] - 110:9
**convoluted** [1] - 197:17
**cooperate** [1] - 79:5
**cooperated** [1] - 143:2
**cooperating** [12] - 9:10, 12:24, 59:10, 59:15, 59:18, 59:22, 79:7, 79:16, 105:17, 106:3, 141:20, 143:8
**cooperation** [6] - 13:16, 14:19, 79:12, 102:1, 106:2, 124:15
**cooperator** [2] - 9:16, 196:13
**cooperators** [4] - 115:5, 118:8, 196:12, 196:13
**copied** [1] - 43:4
**copy** [3] - 43:14, 98:25, 99:13
**copying** [1] - 76:10
**correct** [68] - 10:9, 10:13, 10:18, 15:6, 16:10, 22:1, 22:7, 33:6, 45:10, 69:9, 98:23, 105:11, 111:8, 112:7, 121:8, 136:11, 139:5, 140:22, 141:6, 141:21, 141:25, 143:8, 144:1, 151:6, 151:7, 152:15, 152:16, 157:22, 158:3, 158:17, 158:23, 159:11, 159:24, 162:22, 162:23, 162:24, 162:25, 163:5, 166:2, 168:24, 173:14, 179:22, 181:3, 185:11, 185:13, 185:16, 185:19, 186:9,

187:19, 187:21, 188:7, 188:8, 188:11, 188:16, 188:24, 189:1, 189:7, 189:19, 189:25, 190:6, 190:8, 190:9, 191:5, 191:8, 191:9, 191:12, 191:13, 199:15
**correctly** [3] - 49:10, 52:1, 141:19
**correlates** [1] - 9:23
**cost** [4] - 31:18, 47:20, 47:23
**counselor** [1] - 82:15
**count** [2] - 25:16, 139:10
**couple** [16] - 5:6, 9:2, 34:13, 83:3, 85:3, 94:20, 94:22, 118:10, 129:17, 138:8, 145:18, 167:14, 167:17, 180:14, 202:7, 202:18
**course** [23] - 12:22, 19:11, 20:11, 32:14, 59:8, 63:2, 83:22, 128:1, 129:23, 130:11, 143:20, 160:1, 186:21, 186:24, 187:8, 190:25, 192:17, 192:21, 193:10, 195:20, 199:24, 201:6, 202:14
**court** [4] - 41:2, 59:19, 130:9, 135:14
**Court** [36] - 1:22, 1:23, 5:1, 7:18, 12:13, 12:19, 13:14, 18:14, 20:15, 20:22, 20:23, 22:15, 82:18, 100:23, 102:10, 103:6, 115:14, 120:2, 120:7, 122:17, 122:25, 123:8, 123:24, 125:2, 131:2, 131:20, 134:19, 134:24, 136:6, 138:7, 138:11, 198:18, 201:10, 203:7, 203:16, 203:17
**COURT** [203] - 1:1, 5:2, 6:5, 6:9, 6:14, 6:17, 6:20, 6:23, 7:21, 8:21, 10:6, 10:9, 10:14, 10:20, 11:9, 11:23, 12:6, 13:20, 15:5, 15:25, 16:9, 16:15, 17:1, 17:11, 18:8, 19:24, 20:11, 20:14, 21:11, 22:8, 22:12, 23:5, 23:13, 23:21, 24:2, 24:7, 24:9, 24:11, 24:20, 26:13, 27:1, 27:5, 32:7, 35:3, 41:25, 50:11, 60:17, 61:13, 71:25, 86:23, 91:19, 92:7, 93:19, 95:24, 97:15, 100:10, 100:13, 100:16, 100:18, 100:22, 100:25, 101:3, 101:6, 101:10, 101:13, 101:16, 101:24, 102:13,

102:19, 103:4, 103:16, 104:1, 104:5, 104:8, 104:10, 104:12, 104:14, 104:18, 105:6, 106:10, 107:13, 111:3, 112:14, 113:18, 113:22, 114:11, 114:13, 114:16, 114:20, 115:2, 115:12, 115:18, 115:23, 116:3, 116:11, 116:18, 116:25, 117:2, 117:16, 117:21, 117:25, 118:4, 118:19, 119:9, 119:19, 119:25, 120:1, 120:4, 120:12, 120:21, 121:3, 121:9, 121:14, 121:21, 122:4, 122:18, 122:24, 123:9, 124:3, 124:8, 125:5, 125:9, 125:11, 125:19, 126:2, 126:4, 127:4, 127:13, 127:17, 127:19, 127:21, 127:24, 128:1, 128:4, 128:20, 129:22, 130:7, 130:20, 130:24, 131:16, 131:19, 131:22, 132:5, 132:9, 132:11, 132:13, 132:16, 133:8, 133:10, 133:24, 134:15, 134:20, 135:3, 135:6, 136:8, 136:17, 137:1, 137:8, 137:11, 137:14, 137:21, 137:23, 138:12, 139:6, 139:15, 139:16, 139:21, 139:24, 152:23, 152:25, 179:9, 181:22, 184:25, 190:12, 191:21, 191:24, 193:7, 193:9, 193:15, 193:22, 194:10, 194:14, 194:20, 195:2, 195:12, 195:16, 196:8, 196:10, 196:24, 197:4, 197:12, 198:5, 199:9, 200:15, 200:22, 200:24, 201:6, 201:21, 201:24, 202:9, 202:22, 203:1, 203:6
**Court's** [7] - 6:7, 8:20, 23:3, 83:12, 101:2, 123:14, 134:14
**courtesy** [1] - 130:12
**courtroom** [7] - 6:15, 26:5, 101:7, 101:9, 114:19, 132:8, 193:14
**COURTROOM** [4] - 6:16, 6:19, 6:22, 24:25
**cover** [6] - 22:12, 32:19, 32:21, 35:11, 128:14, 196:4
**covered** [2] - 23:1, 138:18
**covert** [1] - 15:1
**COVID** [6] - 83:2, 180:5, 196:19, 197:21, 198:8, 198:9
**CPL** [2] - 68:3, 68:6
**crazy** [2] - 29:13, 94:22
**CRD** [3] - 5:19, 200:6, 200:9

**credibility** [4] - 123:5, 123:22, 124:20, 126:10
**credit** [2] - 113:4, 113:6
**Creek** [1] - 33:24
**crime** [1] - 25:13
**criminal** [2] - 81:17, 97:3
**CRIMINAL** [1] - 1:15
**cross** [22] - 11:2, 19:10, 21:7, 113:25, 114:7, 115:3, 119:13, 120:6, 121:5, 122:8, 125:3, 126:12, 127:23, 132:1, 134:21, 138:4, 138:6, 138:22, 139:12, 140:7, 193:20, 197:1
**CROSS** [3] - 3:4, 140:16
**cross-check** [1] - 134:21
**cross-examination** [7] - 113:25, 114:7, 120:6, 122:8, 127:23, 140:7, 193:20
**CROSS-EXAMINATION** [2] - 3:4, 140:16
**crossed** [1] - 118:8
**CRR** [2] - 1:21, 203:16
**crucial** [1] - 7:3
**cups** [1] - 129:17
**curing** [1] - 129:13
**current** [2] - 10:12, 125:22
**customer** [1] - 53:14
**cut** [12] - 27:25, 40:11, 40:12, 43:11, 88:15, 88:16, 108:16, 135:10, 158:24, 174:16, 176:20, 187:25
**cutting** [1] - 88:10
**CUYLER** [1] - 1:14

## D

**D.C** [1] - 1:16
**dad** [4] - 34:8, 79:24, 84:1, 90:17
**Dad** [1] - 84:13
**database** [1] - 134:10
**DATE** [1] - 203:15
**date** [16] - 15:7, 18:21, 29:20, 35:20, 67:1, 71:11, 74:24, 101:25, 106:19, 109:1, 112:5, 115:1, 124:12, 141:11, 141:16, 156:22
**dated** [4] - 61:25, 67:16, 73:12, 179:11
**dates** [3] - 67:3, 187:24, 188:1
**daughter** [1] - 125:21
**David** [1] - 175:4
**Davis** [1] - 61:22
**days** [10] - 37:21, 37:22, 57:20, 94:20, 94:22, 94:23, 155:25, 167:15, 167:17, 192:9
**de** [14] - 5:10, 8:2, 8:15,

21:13, 23:1, 23:23, 24:3,
24:5, 117:6, 120:12, 125:15,
136:24, 138:25, 139:11
**DE** [115] - 1:13, 3:4, 6:4,
8:18, 8:22, 10:7, 10:13,
10:18, 11:8, 20:9, 20:12,
20:15, 23:2, 23:11, 24:6,
24:18, 25:5, 26:11, 26:14,
26:24, 27:7, 27:9, 32:5,
32:10, 35:1, 35:5, 41:22,
42:1, 42:4, 50:9, 50:14,
60:13, 60:22, 61:10, 61:15,
61:18, 71:22, 72:2, 72:5,
86:20, 87:2, 91:13, 92:1,
92:5, 92:8, 92:9, 93:16,
93:23, 95:22, 96:2, 97:13,
97:18, 100:12, 100:21,
103:5, 104:7, 104:16,
104:24, 104:25, 105:3,
105:9, 106:8, 106:12,
107:11, 107:15, 107:17,
111:1, 111:6, 112:12,
112:17, 113:17, 113:19,
113:21, 114:25, 115:11,
116:1, 116:4, 117:22,
119:24, 120:11, 120:15,
120:22, 120:25, 121:8,
121:13, 121:17, 125:16,
130:17, 131:18, 132:6,
132:10, 132:12, 132:15,
133:3, 133:9, 133:20,
134:13, 134:16, 134:21,
135:5, 139:5, 152:24, 165:6,
194:7, 194:11, 194:15,
194:25, 195:11, 195:15,
197:19, 199:4, 201:20,
201:23, 202:23, 203:5
**dead** [2] - 83:3, 197:20
**deal** [10] - 50:5, 56:2, 63:5,
68:20, 73:1, 86:16, 165:9,
166:11, 166:12, 172:19
**dealing** [6] - 31:6, 35:25,
53:25, 133:18, 166:16,
167:25
**dealings** [6] - 153:21,
166:10, 169:21, 179:19,
182:2, 189:18
**dealt** [5] - 20:12, 21:5,
45:16, 160:14, 165:24
**debrief** [2] - 9:10, 10:4
**debriefing** [1] - 12:3
**December** [6] - 1:4, 67:16,
83:6, 111:12, 111:17, 203:15
**decision** [2] - 130:8, 200:3
**decisions** [1] - 49:13
**declining** [1] - 69:17
**dedicated** [1] - 56:19
**Deegan** [2] - 34:24, 120:23
**deep** [1] - 133:24
**DEFENDANT** [2] - 1:17, 2:2

**defendant** [2] - 21:4, 26:12
**Defendant** [1] - 1:7
**DEFENDANT'S** [1] - 4:5
**defendant's** [1] - 21:1
**Defense** [1] - 153:1
**defense** [34] - 6:5, 7:15,
11:2, 13:23, 14:2, 14:6, 14:9,
15:9, 19:20, 20:16, 21:18,
21:24, 23:17, 101:18, 120:8,
120:13, 121:22, 123:12,
126:10, 126:15, 129:2,
129:15, 131:22, 134:23,
135:19, 140:12, 195:19,
195:20, 195:24, 198:5,
199:9, 200:1, 200:11, 201:24
**defense's** [3] - 22:5,
121:25, 129:4
**definitely** [4] - 23:16, 115:2,
115:8, 198:12
**delay** [5] - 7:3, 135:19,
135:22, 138:20, 192:1
**delays** [1] - 199:17
**delete** [1] - 147:11
**deleted** [2] - 147:9, 147:10
**deleting** [1] - 147:12
**Delray** [1] - 53:13
**denied** [1] - 123:12
**denies** [1] - 123:11
**denying** [2] - 69:19, 70:9
**DEPARTMENT** [1] - 1:15
**Department** [4] - 99:13,
145:10, 145:11, 145:12
**deputy** [1] - 6:15
**DEPUTY** [4] - 6:16, 6:19,
6:22, 24:25
**derive** [1] - 13:17
**describe** [2] - 54:15, 65:5
**described** [1] - 52:5
**describing** [1] - 52:3
**description** [1] - 68:11
**desire** [1] - 124:24
**desk** [1] - 89:18
**detail** [2] - 201:1, 201:15
**detailed** [1] - 121:24
**detailing** [2] - 121:15,
121:16
**details** [1] - 95:13
**detect** [3] - 52:12, 52:14,
52:22
**detective** [1] - 145:9
**determine** [2] - 13:15,
124:15
**develop** [1] - 84:19
**devices** [1] - 15:2
**devil** [3] - 157:5, 157:6,
157:7
**Diane** [1] - 33:23, 33:25
**different** [14] - 10:5, 26:2,
55:7, 57:10, 58:21, 59:1,
63:1, 79:7, 79:13, 89:19,

90:7, 116:16, 134:3, 198:4
**differently** [2] - 39:5, 58:6
**difficult** [3] - 14:3, 122:6,
132:23
**digest** [4] - 122:2, 130:21,
131:11, 131:24
**dinner** [2] - 26:21, 27:17
**direct** [18] - 19:10, 20:5,
33:8, 35:17, 59:23, 62:3,
69:12, 94:5, 97:22, 103:2,
103:20, 107:21, 115:9,
135:23, 158:4, 161:5, 171:7,
198:1
**DIRECT** [2] - 3:4, 25:4
**directed** [2] - 61:5, 103:13
**directing** [3] - 33:16, 64:4,
70:15
**directly** [3] - 45:19, 46:21,
124:20
**director** [1] - 175:13
**directs** [1] - 138:7
**disadvantage** [1] - 12:11
**disagree** [1] - 17:11
**disappeared** [1] - 92:22
**disclosed** [2] - 15:8, 15:16
**disclosure** [1] - 11:25
**disclosures** [1] - 129:14
**discovery** [4] - 11:25, 18:2,
102:11, 114:23
**discretion** [1] - 7:18
**discuss** [8] - 1:8, 21:23,
31:14, 45:14, 121:11,
192:18, 192:21
**discussed** [8] - 9:1, 15:22,
21:1, 30:21, 31:17, 96:18,
100:4, 110:23
**discussing** [7] - 9:6, 9:18,
9:19, 174:7, 175:22, 175:23
**discussion** [4] - 11:17,
17:16, 22:21, 103:6
**discussions** [1] - 88:4
**dispute** [1] - 118:9
**disrupt** [1] - 133:1
**disrupted** [1] - 192:5
**distinct** [1] - 150:23
**distinction** [1] - 17:2
**distracted** [1] - 138:17
**distributor** [2] - 77:21, 78:1
**District** [2] - 1:23, 203:17
**DISTRICT** [3] - 1:1, 1:1,
1:10
**divine** [1] - 5:19
**DIVISION** [2] - 1:2, 1:15
**divorced** [2] - 163:19,
165:1
**DME** [1] - 30:19
**DNA** [1] - 109:10
**doctor** [11] - 5:17, 7:16,
7:23, 36:14, 65:22, 69:16,
69:19, 69:23, 70:6, 70:9,

183:10
**doctor's** [2] - 51:17, 90:23
**doctors** [12] - 58:7, 64:20,
78:11, 78:13, 91:3, 91:4,
176:6, 183:7, 183:9, 183:13,
189:15, 189:16
**doctors'** [2] - 65:15, 78:12
**document** [3] - 17:4, 103:9,
197:23
**documentation** [1] - 16:13
**documented** [1] - 9:25
**documenting** [1] - 14:25
**documents** [7] - 8:13,
12:24, 18:18, 19:3, 41:2,
102:2, 168:18
**DOJ** [1] - 21:16
**DOJ's** [1] - 20:24
**dollars** [3] - 47:3, 47:4, 47:5
**domiciled** [1] - 69:23
**don't..** [1] - 57:9
**DONALD** [1] - 2:2
**done** [36] - 7:25, 12:16,
16:23, 18:24, 19:14, 20:24,
20:25, 21:1, 21:13, 22:22,
23:14, 23:24, 27:2, 48:7,
49:8, 77:21, 79:11, 101:12,
103:1, 119:2, 129:11,
129:20, 131:6, 135:24,
140:8, 149:3, 152:5, 153:21,
176:22, 191:19, 192:9,
192:15, 197:6, 198:19,
199:7, 202:14
**door** [2] - 100:1
**door-to-door** [1] - 100:1
**doorstop** [1] - 129:25
**double** [2] - 103:7, 181:11
**double-check** [1] - 103:7
**doubt** [2] - 118:11, 157:15
**doubts** [1] - 123:5
**down** [21] - 11:20, 36:13,
37:20, 40:12, 42:16, 52:25,
81:21, 86:2, 86:15, 96:12,
108:12, 108:16, 111:25,
133:5, 145:20, 151:4,
151:20, 152:4, 158:24, 164:5
**downlines** [1] - 121:18
**Dr** [10] - 33:23, 34:24, 36:4,
36:10, 37:9, 39:6, 111:12,
111:16, 155:5, 155:10
**drank** [1] - 83:9
**draw** [2] - 13:25, 22:15
**drawn** [1] - 197:25
**Drive** [1] - 2:3
**drug** [5] - 29:5, 82:3, 82:7,
82:11, 83:20
**drugs** [9] - 29:6, 29:7,
82:22, 83:8, 85:22, 85:25,
86:2, 86:4
**duck** [1] - 48:23
**dude** [2] - 167:19, 167:20

due [2] - 95:9, 149:24
duly [1] - 24:24
during [7] - 82:2, 102:6, 147:4, 147:25, 149:8, 151:16, 154:8

## E

ear [1] - 195:4
early [4] - 5:12, 18:11, 33:20, 129:7
ears [1] - 52:9
ease [1] - 83:8
easier [4] - 10:25, 31:5, 31:8, 31:10
easiest [1] - 10:21
East [2] - 1:23, 203:17
easy [1] - 103:17
education [1] - 134:4
effect [2] - 148:16, 190:7
effort [1] - 120:16
Egan [2] - 55:21, 67:13, 67:21
eight [1] - 120:18
Eileen [3] - 46:8, 46:9, 48:13
Eileen's [1] - 46:5
either [10] - 8:16, 16:14, 18:17, 19:10, 40:25, 88:15, 120:11, 125:20, 126:16, 195:23
EKG [1] - 64:25
elicit [1] - 20:18
eliminate [1] - 19:6
email [26] - 5:10, 37:2, 37:7, 37:15, 42:8, 42:16, 42:17, 43:4, 50:18, 61:22, 62:4, 62:13, 63:6, 63:10, 64:6, 65:25, 67:10, 69:6, 69:11, 72:8, 72:17, 73:14, 74:1, 74:3, 76:10, 76:21
emails [6] - 8:12, 74:22, 107:7, 107:9, 114:23, 119:21
embolism [1] - 181:12
emerged [1] - 131:9
EMILY [1] - 1:13
Emily [1] - 181:17
emphasize [1] - 157:21
employers [1] - 192:23
employment [1] - 71:17
end [17] - 9:21, 10:2, 19:11, 20:8, 38:12, 80:5, 85:1, 107:4, 113:14, 119:2, 133:14, 134:5, 172:25, 177:17, 190:13, 191:22
endeavoring [1] - 134:21
ended [2] - 46:10, 85:17
enforcement [4] - 96:16, 97:3, 141:20, 150:9
engage [1] - 193:1

engaged [3] - 85:16, 138:15, 162:16
Enrique [1] - 7:8
enterprise [1] - 81:17
enters [3] - 24:10, 104:11, 139:23
entertained [1] - 173:2
entire [4] - 99:20, 144:11, 162:24, 163:1
entirely [1] - 16:10
entitled [2] - 13:10, 203:13
entries [1] - 103:25
entry [1] - 103:12
EOB [2] - 36:21, 37:12
episode [2] - 198:7, 199:12
erased [3] - 142:19, 142:20, 147:5
essentially [1] - 6:12
ETA [1] - 133:2
ethical [2] - 11:15, 21:16
ethics [1] - 20:25
evening [3] - 8:2, 193:5, 193:17
event [6] - 6:25, 7:13, 15:1, 19:17, 23:7, 198:14
events [1] - 100:1
evidence [38] - 12:22, 19:12, 26:25, 27:8, 32:9, 32:19, 35:2, 35:4, 41:23, 42:3, 50:13, 60:14, 60:19, 61:17, 72:4, 86:21, 87:1, 91:14, 91:25, 93:17, 93:22, 95:23, 96:1, 97:14, 97:17, 105:4, 105:8, 106:9, 106:11, 107:16, 111:5, 112:16, 148:21, 152:21, 153:1, 177:17, 199:17, 200:18
ex [5] - 20:23, 125:19, 125:22, 163:17
ex-wife [4] - 125:19, 125:22, 163:17
exact [3] - 9:12, 158:16, 163:2
exactly [10] - 7:19, 9:20, 11:3, 110:15, 110:18, 110:20, 110:22, 152:8, 170:19, 196:19
EXAMINATION [4] - 3:4, 3:4, 25:4, 140:16
examination [16] - 20:5, 113:25, 114:7, 120:6, 122:8, 127:23, 140:7, 158:4, 161:5, 171:7, 192:14, 193:20, 195:22, 196:6, 198:16
example [6] - 16:20, 51:5, 66:25, 77:17, 133:12, 200:5
excellent [1] - 23:21
except [1] - 107:4
excerpt [4] - 44:17, 44:19, 60:14, 61:1

excerpts [1] - 35:6
exchange [15] - 14:1, 14:11, 19:7, 19:9, 26:1, 38:6, 63:10, 70:13, 78:4, 96:4, 97:11, 97:20, 105:17, 107:19, 111:10
excuse [7] - 7:24, 23:15, 59:5, 77:22, 83:7, 138:3, 174:20
excused [9] - 6:8, 100:15, 101:4, 101:5, 114:10, 114:13, 193:6, 193:9, 193:13
executive [1] - 130:15
exhaustive [2] - 136:20, 136:21
exhibit [2] - 70:24, 112:1
Exhibit [51] - 3:8, 4:7, 26:25, 27:8, 27:11, 32:6, 32:9, 32:18, 35:2, 35:4, 35:16, 37:6, 38:3, 41:23, 42:6, 50:10, 50:15, 51:4, 60:16, 60:19, 61:20, 63:9, 64:5, 65:24, 67:9, 68:1, 69:5, 70:12, 71:23, 72:6, 73:24, 76:6, 86:21, 91:15, 93:17, 93:25, 96:1, 97:14, 97:17, 105:4, 106:9, 106:11, 106:20, 107:12, 107:16, 108:25, 111:2, 111:11, 112:13, 112:16, 153:1
exhibits [5] - 27:4, 91:14, 92:4, 202:5, 202:13
Exhibits [10] - 42:2, 50:12, 61:11, 61:16, 72:3, 86:25, 91:21, 93:21, 105:7, 111:4
EXHIBITS [2] - 3:6, 4:5
exist [1] - 17:13
exists [2] - 12:12, 103:21
exits [6] - 100:17, 101:9, 114:12, 114:19, 193:8, 193:14
expect [8] - 16:4, 17:14, 114:3, 126:7, 129:2, 130:9, 138:3, 191:15
expectations [1] - 130:25
expecting [1] - 108:9
expedites [1] - 202:17
expense [1] - 63:25
experience [3] - 49:13, 68:25, 121:10
explain [31] - 30:21, 31:5, 31:8, 34:22, 38:15, 46:18, 49:21, 54:11, 55:6, 55:19, 56:25, 64:24, 65:13, 68:16, 70:3, 74:15, 81:13, 82:6, 83:1, 85:7, 87:11, 87:20, 88:7, 89:25, 92:18, 95:11, 144:11, 146:5, 149:24, 163:16, 190:17
explained [1] - 197:14

explanation [2] - 153:22
explore [1] - 126:11
exploring [1] - 128:5
expressing [1] - 138:17
extend [1] - 123:17
extended [2] - 122:11, 151:21
extension [1] - 124:12
extent [4] - 17:16, 128:2, 181:14, 197:14
extra [1] - 133:14

## F

face [1] - 17:12
Facebook [5] - 148:5, 148:6, 148:8, 148:9, 148:21
faces [1] - 48:11
facilitate [1] - 130:9
facilities [2] - 18:25, 173:20
fact [15] - 17:24, 19:13, 55:17, 105:19, 119:6, 141:7, 143:4, 143:18, 151:20, 158:6, 159:15, 161:18, 164:15, 186:11, 197:20
fair [13] - 18:6, 21:7, 21:9, 21:10, 38:25, 39:5, 63:7, 64:25, 90:23, 93:11, 126:21, 128:22, 180:8
fairs [1] - 100:1
fall [2] - 14:20, 131:7
fallout [1] - 199:24
familiar [1] - 16:16
familiarity [2] - 10:21, 11:11
families [2] - 52:13, 52:21
family [21] - 32:4, 34:5, 34:16, 38:17, 38:20, 39:6, 39:7, 52:13, 83:23, 86:18, 90:15, 155:5, 187:18, 187:20, 188:2, 188:6, 188:9, 188:14, 188:25, 192:19
family's [2] - 38:23, 187:16
far [8] - 28:24, 83:8, 94:12, 129:11, 159:5, 166:20, 194:16, 200:21
fashion [1] - 153:18
fast [1] - 195:7
faster [1] - 102:8
fault [1] - 134:18
favor [2] - 18:8, 136:1
FBI [4] - 136:23, 137:1, 139:2, 150:9
fear [2] - 130:3, 192:4
feature [2] - 14:8, 21:21
federal [5] - 25:13, 144:17, 145:5, 145:12, 149:4
FedEx [1] - 57:7
fee [1] - 174:1
feedback [1] - 37:22

**Ferrari** [2] - 189:5, 189:9

**few** [19] - 5:8, 37:16, 38:5, 60:9, 78:13, 88:8, 88:15, 89:23, 92:4, 101:8, 118:23, 120:7, 136:10, 142:17, 152:18, 153:12, 181:22, 192:9, 193:16

**fight** [1] - 150:5

**fighting** [3] - 46:22, 147:8, 147:24

**figure** [4] - 11:3, 134:5, 135:15, 195:24

**figured** [1] - 30:20

**files** [1] - 69:18

**filled** [1] - 54:7

**filter** [2] - 15:2, 103:24

**final** [3] - 9:23, 14:15, 49:13

**finally** [2] - 9:21, 75:11

**fine** [7] - 41:8, 57:10, 117:3, 117:11, 183:8, 195:3, 198:3

**finer** [1] - 15:25

**finish** [10] - 102:14, 115:22, 119:20, 129:6, 138:3, 193:24, 194:17, 194:21, 198:15, 202:10

**finished** [1] - 199:2

**finishes** [1] - 194:13

**fire** [1] - 186:7

**fired** [4] - 184:5, 185:10, 185:18, 185:21

**firing** [1] - 88:14

**firm** [1] - 81:20

**first** [20] - 5:15, 7:2, 13:20, 22:21, 32:1, 32:3, 35:1, 63:18, 72:23, 73:1, 81:8, 89:3, 92:19, 117:23, 120:8, 120:10, 123:1, 144:12, 156:8, 177:8

**First** [1] - 70:19

**five** [7] - 31:12, 56:3, 57:20, 120:18, 121:6, 121:25, 200:21

**flag** [1] - 200:13

**flagged** [1] - 134:11

**flagging** [1] - 70:4

**flat** [5] - 7:3, 158:21, 159:14, 159:18, 160:4

**flip** [1] - 66:13

**flipping** [1] - 96:12

**Floor** [1] - 1:16

**floor** [1] - 140:13

**FLORIDA** [1] - 1:1

**Florida** [4] - 1:3, 1:24, 33:24, 203:18

**flown** [1] - 194:18

**flying** [2] - 194:8, 194:18

**focus** [3] - 18:22, 110:5, 121:3

**focused** [1] - 124:23

**fog** [1] - 198:9

**folks** [3] - 104:21, 133:25, 139:2

**follow** [6] - 42:18, 55:11, 55:13, 58:12, 94:21, 149:4

**follow-up** [2] - 42:18, 58:12

**following** [3] - 62:6, 77:25, 87:14

**follows** [2] - 62:8, 74:3

**food** [1] - 5:16

**FOR** [3] - 1:13, 1:17, 2:2

**force** [1] - 126:21

**foregoing** [1] - 203:11

**forget** [3] - 55:21, 147:3, 198:10

**forgetful** [1] - 196:20

**forgetting** [1] - 135:23

**forgot** [2] - 145:23, 184:13

**form** [4] - 78:18, 91:11, 153:18

**formal** [1] - 16:18

**formally** [1] - 59:10

**format** [1] - 16:5

**forms** [2] - 38:24, 70:7

**Fort** [2] - 1:24, 203:18

**forthcoming** [1] - 196:19

**forthright** [1] - 124:16

**forward** [10] - 5:25, 7:13, 14:1, 18:9, 31:24, 62:5, 123:15, 128:3, 130:4, 199:16

**founded** [1] - 202:24

**four** [2] - 5:24, 200:21

**frame** [4] - 72:20, 73:5, 177:15, 177:16

**frank** [1] - 13:24

**Frank** [2] - 93:18, 179:18

**frankly** [1] - 19:14

**FRAUD** [1] - 1:15

**fraud** [6] - 81:15, 99:9, 99:14, 99:17, 100:4, 109:10

**Fraud** [2] - 98:3, 99:3

**fraudsters** [1] - 99:24

**fraudulent** [1] - 99:24

**free** [13] - 51:25, 52:3, 52:5, 52:7, 52:9, 52:18, 52:24, 53:1, 53:6, 53:8, 99:22, 100:19, 139:25

**frequently** [1] - 82:9

**Friday** [4] - 129:7, 195:12, 195:14, 201:7

**friend** [4] - 36:13, 155:5, 175:12

**friends** [3] - 32:4, 34:16, 192:19

**Fritz** [3] - 184:13, 184:14

**front** [11] - 12:14, 39:13, 59:6, 106:14, 108:21, 117:23, 121:4, 121:5, 137:4, 170:13

**fruition** [1] - 40:18

**frustration** [1] - 134:14

**fucked** [1] - 187:14

**fucking** [1] - 174:20

**full** [5] - 50:7, 54:17, 86:3, 134:16, 201:7

**fully** [2] - 126:7, 183:13

**function** [1] - 91:10

**fundamentally** [1] - 132:25

**funds** [1] - 42:20

**furthermore** [1] - 14:18

# G

**gambled** [1] - 26:21

**Gamblers** [1] - 82:15

**game** [3] - 21:7, 21:9, 21:10, 130:25

**GARLAND** [1] - 2:3

**gateway** [1] - 119:14

**gears** [1] - 71:14

**general** [1] - 141:11

**General** [3] - 99:14, 145:4, 145:5

**generally** [1] - 18:20

**generate** [8] - 16:18, 16:21, 22:14, 50:3, 50:4, 50:5, 50:6, 50:24

**generated** [1] - 47:3

**genetic** [17] - 10:7, 26:16, 26:18, 28:21, 31:1, 31:2, 40:3, 51:1, 85:4, 85:18, 86:7, 86:8, 86:10, 96:16, 98:15, 99:4, 99:23

**Genetic** [2] - 98:4, 99:17

**genetics** [1] - 28:19

**genomics** [1] - 36:25

**gentleman** [4] - 6:12, 6:21, 149:20, 163:9

**gentlemen** [5] - 24:12, 100:13, 113:23, 140:2, 191:24

**Georgia** [7] - 1:19, 2:4, 2:7, 9:5, 9:8, 10:16, 18:25

**girl** [1] - 159:6

**gist** [1] - 89:16

**given** [8] - 9:24, 10:21, 11:11, 14:11, 23:8, 56:16, 103:15, 121:9

**glasses** [2] - 6:18, 6:21

**gloss** [1] - 18:4

**God** [2] - 83:3, 130:3

**gonna** [12] - 31:23, 75:11, 80:23, 88:2, 88:15, 127:7, 145:21, 150:15, 175:17, 175:23, 186:12, 186:19

**goods** [1] - 47:21

**gossip** [1] - 125:20

**gotcha** [1] - 119:19

**gotta** [6] - 40:9, 48:16, 53:16, 75:9, 187:6

**GOVERNMENT** [1] - 1:13

**government** [91] - 6:3, 11:7, 12:20, 12:25, 13:16, 14:19, 16:1, 16:6, 16:7, 17:12, 17:14, 18:3, 21:6, 21:8, 26:25, 27:3, 32:5, 32:11, 35:2, 41:22, 42:2, 50:12, 53:7, 59:11, 59:15, 59:18, 59:22, 59:23, 60:13, 61:10, 61:16, 71:22, 72:3, 78:23, 79:17, 79:19, 86:25, 89:13, 91:21, 93:21, 97:13, 98:18, 99:11, 101:11, 101:20, 102:5, 103:20, 104:3, 104:22, 105:7, 111:4, 114:24, 120:8, 123:19, 127:11, 129:24, 130:7, 130:11, 130:16, 130:22, 136:9, 138:24, 143:1, 143:14, 149:4, 158:19, 161:5, 163:23, 179:4, 180:2, 180:10, 180:11, 180:16, 180:24, 181:8, 181:15, 182:3, 182:17, 192:14, 193:12, 194:5, 196:14, 197:7, 197:15, 197:18, 199:3, 200:17, 201:2, 201:15, 201:22

**Government** [37] - 24:24, 26:25, 27:8, 27:11, 32:6, 32:9, 32:18, 35:2, 35:4, 35:16, 37:6, 38:2, 42:6, 50:10, 50:15, 51:4, 60:15, 60:19, 61:20, 63:9, 64:4, 67:8, 68:1, 69:5, 70:11, 72:6, 76:5, 93:25, 96:1, 97:17, 106:11, 107:16, 108:25, 111:2, 111:11, 112:13, 112:16

**GOVERNMENT'S** [1] - 3:6

**Government's** [14] - 41:23, 61:11, 65:24, 71:23, 73:24, 75:14, 86:21, 91:14, 93:17, 97:14, 105:4, 106:9, 106:20, 107:12

**government's** [11] - 5:13, 13:7, 13:9, 20:7, 23:9, 24:15, 24:17, 79:4, 129:6, 134:5, 197:13

**grabbing** [1] - 83:8

**Gracie** [2] - 6:14, 7:22

**Grandpa** [1] - 84:14

**great** [5] - 23:14, 24:12, 102:18, 115:11, 118:14

**grey** [2] - 26:9, 33:10

**Griner** [23] - 30:3, 30:4, 30:15, 30:17, 34:24, 37:20, 38:7, 38:9, 110:24, 120:24, 121:1, 127:18, 128:8, 128:22, 133:15, 183:25,

184:1, 184:4, 185:9, 186:4, 186:7, 195:21, 199:25
**ground** [1] - 128:15
**group** [4] - 56:24, 62:19, 62:23, 84:12
**guess** [21] - 13:18, 15:25, 16:15, 33:3, 58:9, 61:5, 92:21, 125:22, 136:1, 146:4, 148:6, 148:8, 151:18, 183:17, 185:7, 185:8, 187:22, 195:8, 196:11, 197:12
**guidelines** [1] - 170:25
**guilty** [5] - 25:13, 78:19, 78:20, 81:23, 105:10
**GURSKIS** [14] - 1:13, 14:23, 15:6, 16:8, 16:25, 18:7, 24:1, 136:12, 136:21, 137:5, 137:10, 137:13, 137:20, 137:22
**Gurskis** [5] - 13:21, 18:8, 19:25, 23:22, 133:5
**Gurskis's** [1] - 139:1
**gut** [1] - 164:5
**guy** [12] - 40:9, 53:16, 89:7, 89:15, 142:6, 153:9, 168:15, 169:8, 169:9, 186:4, 186:12, 186:15
**guys** [14] - 6:6, 23:19, 46:12, 46:14, 84:12, 94:18, 119:20, 119:25, 126:20, 128:14, 134:6, 168:9, 196:1, 203:2

# H

**H-i-r-s-c-h** [1] - 25:3
**H.K** [5] - 194:9, 194:22, 198:22, 199:22, 202:10
**habit** [1] - 82:3
**half** [1] - 54:7
**Hampshire** [1] - 172:14
**handful** [1] - 26:2
**handle** [2] - 12:19, 19:8
**hands** [2] - 115:5, 131:25
**hang** [5] - 84:21, 126:24, 127:8, 129:16, 129:17
**happy** [3] - 87:22, 158:17, 158:18
**Hard** [1] - 26:20
**hard** [5] - 60:23, 74:25, 98:2, 109:8, 193:18
**Harry** [4] - 67:11, 67:19, 67:20
**hate** [2] - 126:17, 149:1
**Haute** [1] - 110:12
**head** [4] - 33:3, 139:10, 175:11, 175:13
**Health** [2] - 43:23, 99:13
**health** [3] - 7:24, 64:25,

100:1
**healthcare** [3] - 111:18, 111:20, 174:18
**hear** [19] - 9:16, 20:24, 25:11, 34:15, 52:9, 60:23, 60:24, 61:6, 93:3, 97:2, 120:13, 121:21, 138:13, 140:25, 184:7, 184:8, 184:11, 185:6, 185:7
**heard** [10] - 28:20, 116:6, 116:11, 123:13, 153:9, 163:8, 166:13, 168:5, 185:8, 196:1
**hearing** [2] - 13:23, 14:11
**hearsay** [2] - 125:4, 127:5
**heavy** [1] - 65:7
**heck** [2] - 149:25, 150:24
**held** [2] - 95:12, 95:14
**hello** [1] - 63:13
**help** [4] - 34:12, 104:3, 118:20, 185:3
**helping** [2] - 52:13, 52:21
**hereby** [1] - 203:11
**hereditary** [1] - 51:25
**HHS** [3] - 8:4, 99:9, 136:22
**hi** [3] - 36:4, 51:11, 105:2
**high** [1] - 92:14
**high-powered** [1] - 92:14
**higher** [3] - 31:3, 86:6, 86:11
**highlighted** [2] - 66:8, 69:12
**himself** [3] - 150:1, 150:4, 189:8
**hired** [2] - 71:19, 169:8
**HIRSCH** [2] - 3:3, 24:24
**Hirsch** [124] - 8:6, 8:13, 9:22, 10:2, 10:10, 12:2, 12:5, 13:9, 15:8, 15:22, 15:23, 16:6, 16:7, 16:11, 17:3, 17:6, 17:7, 17:25, 19:5, 20:4, 20:16, 21:23, 22:18, 23:18, 24:4, 24:19, 24:20, 24:22, 24:23, 25:3, 25:6, 25:13, 26:15, 27:10, 32:11, 33:9, 33:23, 33:25, 34:16, 35:6, 35:18, 42:5, 43:14, 44:17, 49:16, 50:15, 53:9, 59:9, 61:19, 64:4, 67:10, 69:6, 71:14, 72:6, 72:14, 75:15, 77:23, 78:19, 81:6, 84:4, 87:3, 88:17, 92:2, 93:24, 96:3, 97:19, 101:7, 101:18, 101:23, 102:1, 103:9, 103:13, 103:14, 104:15, 104:17, 104:19, 105:1, 105:10, 106:13, 107:18, 111:7, 112:18, 113:4, 113:20, 114:7, 114:14, 116:2, 120:6, 120:19, 121:4,

121:7, 121:16, 121:18, 122:22, 123:1, 124:9, 126:8, 127:3, 127:10, 131:12, 132:3, 132:9, 132:10, 132:18, 135:1, 135:3, 135:8, 136:11, 136:15, 136:19, 139:8, 139:17, 139:25, 140:18, 174:16, 186:18, 189:15, 192:11, 193:9, 194:13, 194:14, 196:4, 199:20, 202:10
**Hirsch's** [4] - 14:19, 102:7, 103:25, 140:5
**Hirsch-related** [1] - 135:3
**history** [9] - 86:18, 90:15, 187:18, 187:20, 188:2, 188:7, 188:9, 188:14, 188:25
**hit** [1] - 47:11
**hits** [1] - 135:8
**hitting** [2] - 94:16, 94:17
**hmm** [1] - 43:22
**hold** [2] - 23:7, 152:13
**holden** [1] - 195:10
**Holden** [16] - 20:6, 115:1, 115:3, 115:7, 131:6, 133:17, 194:1, 194:15, 194:19, 194:23, 194:25, 195:8, 198:21, 199:21, 202:2, 202:18
**home** [2] - 83:5, 192:20
**homework** [2] - 8:1, 114:4
**honest** [1] - 189:2
**Honor** [85] - 6:4, 8:18, 10:13, 10:19, 11:8, 14:23, 16:8, 16:25, 18:7, 19:23, 20:9, 23:2, 23:11, 23:20, 24:1, 24:6, 24:18, 26:11, 26:24, 27:7, 32:5, 35:1, 41:22, 42:1, 50:9, 60:13, 61:10, 61:15, 71:22, 72:2, 86:20, 91:13, 92:5, 93:16, 95:22, 97:13, 100:12, 100:21, 101:1, 103:5, 103:23, 104:7, 104:24, 105:3, 106:8, 107:11, 111:1, 112:13, 113:17, 114:25, 115:1, 115:11, 116:1, 117:22, 119:24, 120:15, 121:13, 121:17, 130:17, 131:18, 132:6, 132:12, 132:15, 133:20, 134:13, 134:16, 136:13, 136:22, 137:10, 137:20, 139:5, 140:15, 152:24, 179:8, 181:20, 184:24, 190:10, 191:19, 194:8, 195:11, 196:9, 199:5, 201:20, 201:23, 203:5
**HONORABLE** [1] - 1:10
**Honorable** [1] - 1:22

**hope** [7] - 105:24, 106:1, 114:8, 128:7, 137:24, 153:8, 193:4
**hopefully** [7] - 20:5, 124:22, 129:6, 131:5, 135:16, 135:24, 199:18
**hopes** [1] - 131:10
**hoping** [1] - 105:16
**Hospital** [1] - 175:10
**hospital** [3] - 173:23, 180:19, 180:21
**HOSTETLER** [1] - 2:5
**hour** [21] - 6:10, 7:2, 102:6, 126:17, 131:23, 137:17, 138:1, 138:4, 139:3, 151:5, 151:6, 153:15, 164:16, 184:22, 192:16, 193:21, 193:22, 194:1, 197:1, 201:8, 201:13
**hours** [3] - 102:15, 138:8, 199:12
**house** [2] - 147:8, 147:23
**housekeeping** [6] - 5:6, 20:3, 23:24, 114:21, 140:4, 193:17
**huddle** [1] - 192:8
**huge** [3] - 52:15, 85:25, 86:1
**Human** [1] - 99:14
**humongous** [1] - 65:19
**hundred** [1] - 47:2
**husband** [1] - 141:7
**hyperlink** [2] - 109:8, 109:15

# I

**ICU** [2] - 83:2, 180:13
**idea** [3] - 38:1, 167:8, 179:2
**ideas** [1] - 172:23
**identified** [3] - 26:12, 120:18, 120:22
**identifies** [1] - 15:2
**identify** [1] - 26:7
**identity** [1] - 99:24
**ignore** [1] - 153:20
**ignores** [1] - 110:6
**II** [2] - 1:10, 1:22
**ILONA** [1] - 1:21, 203:16
**image** [4] - 96:13, 98:7, 109:18, 109:24
**imagine** [2] - 16:17, 198:23
**impact** [2] - 198:7, 201:17
**impacted** [2] - 198:13, 201:18
**impeached** [1] - 116:7
**impeachment** [5] - 116:6, 116:12, 116:19, 117:10, 119:11
**importance** [1] - 131:2

**important** [9] - 21:12, 23:6, 63:3, 67:5, 108:14, 113:2, 113:3, 113:7, 198:18
**importantly** [1] - 9:3
**impossible** [1] - 14:5
**improper** [1] - 116:19
**in-camera** [3] - 13:21, 14:12, 20:1
**inappropriate** [1] - 197:6
**incident** [1] - 83:12
**included** [1] - 15:9
**includes** [2] - 42:8, 149:12
**including** [1] - 12:24
**indeed** [2] - 130:10, 200:2
**independent** [1] - 78:2
**index** [1] - 111:11
**indicate** [4] - 5:21, 10:15, 19:4, 121:25
**indicated** [4] - 14:7, 18:22, 22:2, 140:3
**indicates** [1] - 17:17
**indicating** [1] - 16:1
**indicating)** [1] - 54:23
**indicted** [2] - 167:19, 167:20
**indictment** [1] - 167:18
**indigent** [1] - 173:8
**indiscernible** [1] - 175:6
**individual** [2] - 12:25, 143:15
**individual's** [1] - 183:23
**indulgence** [1] - 8:20
**industry** [5] - 30:18, 41:15, 60:2, 85:24, 95:19
**inexcusable** [1] - 199:14
**influence** [2] - 78:6, 122:7
**info** [1] - 80:24
**information** [11] - 12:1, 38:9, 57:14, 58:3, 62:6, 71:10, 82:6, 99:5, 99:23, 108:11, 108:15
**initial** [4] - 72:17, 74:10, 121:25, 137:25
**inpatient** [2] - 85:21, 86:3
**Inquirer** [1] - 97:24
**inquiring** [1] - 23:9
**inroads** [1] - 115:9
**inseparable** [1] - 39:16
**inside** [1] - 110:11
**Inspector** [3] - 99:14, 145:4, 145:5
**instance** [2] - 117:24, 164:4
**instead** [2] - 87:15, 162:15
**instructed** [1] - 20:16
**instructing** [1] - 12:20
**instruction** [6] - 19:12, 21:8, 21:25, 22:3, 22:6, 22:14
**instructions** [7] - 8:6, 8:13,

20:24, 21:7, 22:23, 23:8, 23:18
**insurance** [5] - 31:12, 44:8, 110:10, 172:17, 172:18
**insurances** [1] - 31:6
**integrity** [1] - 21:2
**intend** [2] - 194:5, 196:6
**intended** [1] - 197:25
**intends** [1] - 7:19
**interest** [1] - 31:2
**interested** [10] - 31:23, 36:11, 36:15, 36:20, 37:14, 52:8, 57:5, 57:7, 172:7, 173:12
**internet** [1] - 192:25
**interrupt** [1] - 132:6
**intervention** [1] - 135:14
**interview** [3] - 12:3, 103:8, 129:25, 134:25, 145:7, 145:23, 146:14
**interviewed** [3] - 144:25, 146:1
**interviewing** [1] - 149:11
**interviews** [1] - 197:22
**intimately** [1] - 16:16
**introduce** [2] - 55:20, 118:16
**introduced** [3] - 26:19, 53:17, 85:10
**introducing** [1] - 34:19
**introduction** [1] - 119:1
**investigates** [1] - 109:10
**investigation** [10] - 10:5, 10:7, 10:12, 14:21, 15:14, 18:24, 19:2, 21:2, 79:13, 171:11
**investigations** [1] - 10:11
**investigative** [6] - 14:25, 18:16, 18:23, 103:8, 103:12, 121:11
**investigative-type** [1] - 121:11
**invoice** [3] - 67:23, 68:3, 68:8
**invoiced** [1] - 68:17
**involve** [2] - 83:23, 83:25
**involved** [12] - 8:19, 28:18, 31:1, 40:5, 60:2, 85:4, 85:5, 92:11, 92:21, 121:18, 121:19, 186:25
**involvement** [1] - 55:17
**involves** [1] - 63:10
**involving** [3] - 12:2, 64:6, 79:12
**iPhone** [1] - 148:1
**issue** [29] - 5:15, 7:20, 9:6, 15:7, 18:10, 19:22, 21:22, 66:23, 70:3, 70:19, 90:3, 95:14, 97:1, 102:11, 107:5, 107:6, 117:13, 118:22,

122:20, 123:6, 124:23, 126:10, 127:3, 127:6, 127:10, 129:9, 130:24, 195:21, 198:22
**issues** [14] - 6:2, 6:6, 114:24, 120:7, 122:16, 124:13, 127:5, 131:9, 135:20, 192:22, 198:12, 202:2, 202:7, 202:25
**it'll** [3] - 124:22, 176:3, 202:20
**item** [2] - 68:14, 111:25
**Item** [1] - 111:11

**J**

**jacket** [1] - 26:9
**JAMIE** [1] - 1:13
**January** [6] - 33:17, 44:21, 83:2, 158:13, 170:14, 170:23
**Jeff** [10] - 50:18, 50:22, 50:23, 51:5, 69:6, 69:11, 69:13, 69:16, 70:3, 70:8
**Jencks** [1] - 13:12
**jig** [2] - 80:19, 80:20
**JK** [1] - 48:25
**job** [1] - 25:8
**Joe** [2] - 142:6, 164:1
**joining** [1] - 138:24
**Jon** [28] - 32:23, 33:2, 33:3, 33:10, 33:22, 45:24, 46:4, 46:12, 48:5, 48:11, 49:2, 49:12, 53:24, 54:1, 61:23, 62:4, 72:8, 76:10, 77:7, 94:3, 94:11, 94:18, 95:1, 170:2, 170:3, 170:9, 188:19
**Jon's** [1] - 53:25
**judge** [1] - 124:9
**JUDGE** [1] - 1:10
**judging** [1] - 63:6
**Julian** [1] - 5:25
**July** [16] - 8:24, 12:1, 12:4, 12:11, 13:3, 14:10, 14:24, 15:9, 15:11, 15:13, 15:23, 17:21, 18:10, 19:7, 50:20, 180:13
**jump** [3] - 26:17, 126:21, 138:25
**juncture** [1] - 7:3
**June** [6] - 97:23, 102:1, 107:22, 109:1, 143:8, 144:1
**jurisdiction** [2] - 70:5, 70:6
**jurisdictions** [1] - 90:9
**Juror** [2] - 5:12, 5:25
**juror** [2] - 5:14, 130:25
**jurors** [15] - 5:7, 5:11, 8:1, 19:15, 23:16, 24:8, 102:22, 104:9, 120:5, 122:10, 126:24, 127:8, 129:16, 131:17, 135:17

**JURY** [1] - 1:9
**jury** [49] - 11:3, 12:15, 12:17, 24:3, 24:9, 24:12, 30:21, 31:8, 34:22, 38:15, 46:18, 49:21, 54:15, 55:19, 57:1, 64:24, 65:13, 68:16, 69:13, 70:3, 81:13, 82:6, 83:1, 85:7, 87:11, 87:20, 88:7, 89:25, 92:18, 95:11, 100:13, 100:15, 100:16, 104:10, 113:23, 114:10, 114:11, 117:23, 123:23, 124:25, 138:8, 139:19, 139:22, 140:2, 166:13, 191:24, 192:10, 193:5, 193:7
**Jury** [6] - 24:10, 100:17, 104:11, 114:12, 139:23, 193:8
**jury's** [1] - 29:4
**JUSTICE** [1] - 1:15
**Justice** [2] - 145:11, 145:12

**K**

**Karachopan** [1] - 67:11
**Kate** [5] - 125:18, 141:5, 141:7, 141:14, 147:4
**KATHERINE** [1] - 1:14
**keep** [10] - 25:10, 52:24, 97:7, 114:25, 140:24, 149:7, 181:21, 192:22, 201:3, 201:12
**keeping** [1] - 7:4
**keeps** [1] - 199:22
**Keith** [27] - 28:5, 28:6, 32:4, 42:9, 42:17, 42:25, 43:9, 55:23, 67:13, 69:7, 70:19, 74:3, 74:20, 74:21, 74:22, 75:4, 75:13, 75:17, 85:11, 86:15, 106:22, 106:24, 107:3, 155:16, 182:11
**Keith's** [1] - 51:16
**kept** [2] - 97:6, 161:11
**Kevin** [6] - 163:9, 163:13, 163:15, 164:12, 164:13, 164:16
**Khalid** [8] - 25:24, 26:19, 26:20, 28:25, 29:12, 70:19, 70:25, 71:2
**kickback** [2] - 22:17, 25:16
**kickbacks** [3] - 25:17, 25:19, 26:1
**kids** [2] - 85:15, 85:20
**killing** [2] - 189:3, 189:4
**kind** [6] - 55:24, 101:11, 110:22, 182:3, 182:20, 191:14
**kinds** [1] - 80:11
**kit** [3] - 47:21, 52:25, 57:7
**kits** [9] - 54:17, 56:5, 63:14,

63:20, 63:21, 63:24, 64:18, 68:23, 109:10

**knock** [1] - 5:22

**knowing** [2] - 102:3, 138:19

**knowledge** [2] - 168:25, 169:5

**known** [11] - 12:12, 13:2, 30:18, 38:23, 151:3, 154:12, 160:7, 160:9, 160:13, 190:21

**knows** [4] - 23:6, 79:24, 115:14, 126:8

## L

**Lab** [2] - 9:4, 9:11

**lab** [29] - 9:4, 10:12, 25:16, 28:23, 29:2, 31:15, 34:19, 46:10, 46:21, 50:7, 54:20, 62:25, 66:1, 86:13, 88:17, 88:20, 89:3, 89:21, 90:7, 90:20, 106:17, 106:23, 107:3, 178:18, 182:25, 183:4, 188:3, 188:20, 188:21

**lab's** [1] - 183:11

**Labs** [1] - 71:2

**labs** [6] - 25:19, 25:21, 95:16, 155:8, 160:14, 170:24

**LabSolutions** [73] - 10:12, 10:17, 11:18, 19:2, 25:18, 25:25, 26:17, 30:8, 32:1, 32:24, 33:2, 33:4, 33:20, 34:2, 34:11, 38:13, 44:3, 44:6, 44:7, 44:13, 47:12, 47:20, 53:20, 53:22, 54:4, 54:20, 55:3, 55:9, 55:24, 56:7, 62:5, 64:16, 65:9, 65:10, 66:6, 66:20, 72:21, 73:19, 75:20, 76:8, 80:2, 80:4, 80:6, 87:4, 87:12, 95:2, 100:9, 103:11, 106:5, 106:16, 107:7, 160:22, 167:18, 168:19, 168:22, 169:4, 169:9, 169:17, 170:12, 171:10, 171:17, 172:16, 178:1, 184:5, 185:13, 186:7, 188:3, 188:18, 188:22, 189:18, 189:24, 190:7, 191:4

**LabSolutions'** [4] - 54:7, 54:17, 54:22, 54:24

**LabSolutions.com** [1] - 64:7

**ladies** [5] - 24:12, 100:13, 113:23, 140:2, 191:24

**lady** [2] - 28:11, 64:12

**Lamborghini** [3] - 177:2, 177:3, 177:8

**language** [3] - 130:2, 171:12, 174:20

**large** [2] - 6:9, 134:9

**last** [35] - 6:13, 8:22, 9:11, 15:17, 55:21, 59:4, 59:6, 77:7, 77:19, 82:16, 83:2, 83:11, 92:20, 94:22, 103:17, 108:4, 132:21, 133:6, 135:16, 136:4, 138:1, 139:3, 142:17, 143:7, 147:6, 179:18, 180:4, 180:13, 181:6, 181:8, 191:1, 191:7, 192:9, 193:16, 197:1

**late** [3] - 5:16, 72:20, 129:14

**latest** [1] - 199:23

**Lauderdale** [2] - 1:24, 203:18

**law** [5] - 81:9, 141:20, 150:9, 158:1, 158:13

**LAW** [1] - 1:18

**Lawrenceville** [4] - 9:5, 9:8, 10:16, 18:25

**lawyer** [14] - 22:6, 41:3, 41:7, 41:9, 41:11, 41:14, 41:18, 92:20, 92:24, 92:25, 93:8, 160:10

**lawyers** [21] - 8:8, 8:9, 21:9, 21:17, 21:23, 22:24, 23:10, 23:15, 23:16, 40:21, 40:22, 92:11, 92:13, 92:14, 93:6, 157:25, 158:5, 158:10, 158:14, 192:5, 193:2

**lay** [1] - 119:11

**layman's** [1] - 81:18

**lead** [4] - 17:25, 78:6, 120:9, 198:10

**learn** [10] - 39:24, 53:20, 55:16, 58:2, 58:3, 58:10, 79:16, 80:17, 86:12, 96:15

**learned** [6] - 39:21, 85:13, 86:13, 89:25, 122:25, 124:3

**learning** [1] - 71:10

**least** [12] - 10:1, 13:1, 13:22, 15:20, 19:6, 21:19, 56:23, 116:4, 121:15, 123:4, 131:11, 133:8, 136:18, 137:25, 138:4, 138:6, 138:22, 152:14, 167:11, 194:2

**leave** [9] - 57:19, 88:2, 103:18, 114:9, 123:22, 147:6, 148:15, 193:5, 196:1

**leaving** [2] - 154:21, 154:23

**led** [2] - 5:15, 58:10

**left** [13] - 5:5, 9:22, 27:25, 28:1, 104:20, 140:7, 140:11, 182:23, 192:8, 193:20, 196:3, 199:19, 202:18

**legal** [6] - 9:18, 20:18, 22:23, 23:9, 70:20, 93:3

**legally** [2] - 125:25, 163:18

**legit** [7] - 41:18, 53:23,

116:9, 175:7, 176:5, 189:17, 191:2

**legitimate** [1] - 80:13

**lengthy** [4] - 121:24, 128:13, 129:1, 195:22

**less** [3] - 36:2, 89:1

**letters** [2] - 41:19, 92:15

**letting** [1] - 156:4

**lie** [3] - 81:3, 116:15, 196:17

**life** [1] - 174:17

**light** [2] - 11:21, 119:6

**limit** [1] - 126:18

**limited** [1] - 128:5

**Lindsay** [1] - 79:24

**line** [1] - 121:12

**lined** [1] - 114:5

**lineup** [3] - 198:18, 198:20, 199:19

**link** [14] - 96:9, 97:24, 98:2, 98:13, 98:22, 99:8, 109:4, 109:9, 109:20, 112:7, 112:9, 112:18, 112:19, 112:21

**linked** [2] - 99:15, 109:10

**links** [1] - 98:18

**list** [2] - 86:16, 91:14

**listed** [3] - 62:6, 68:14, 69:18

**listen** [6] - 80:9, 124:3, 128:20, 156:12, 156:14, 171:23

**listened** [6] - 162:22, 162:24, 164:4, 172:8, 172:9, 184:10

**listening** [6] - 8:22, 9:11, 15:17, 69:18, 125:12, 172:22

**live** [1] - 149:1

**lived** [1] - 163:15

**living** [1] - 28:17

**LLP** [1] - 2:5

**Lobella** [2] - 142:6, 164:1

**local** [3] - 33:13, 34:4, 35:12

**locate** [5] - 101:22, 103:12, 103:23, 104:2, 104:4

**located** [1] - 69:19

**location** [1] - 10:3

**locked** [1] - 86:2

**lodge** [1] - 202:15

**LOEB** [1] - 2:3

**Lohan** [102] - 79:21, 79:22, 80:1, 80:8, 85:8, 85:10, 101:19, 101:23, 111:8, 111:16, 112:3, 116:2, 123:2, 123:7, 123:10, 123:11, 123:17, 123:22, 124:19, 125:17, 127:6, 128:25, 129:10, 141:4, 141:5, 141:7, 141:8, 141:13, 141:20, 141:24, 142:7, 142:12,

142:15, 143:15, 143:25, 144:3, 144:11, 144:12, 144:13, 144:16, 145:19, 146:6, 146:7, 147:4, 149:13, 149:21, 152:7, 153:4, 153:17, 154:1, 155:24, 156:10, 156:19, 156:24, 157:24, 160:19, 161:6, 161:10, 161:14, 162:13, 162:16, 163:4, 163:9, 163:13, 163:24, 164:12, 165:3, 165:8, 166:22, 166:24, 168:2, 168:9, 168:13, 168:22, 170:21, 171:5, 171:8, 171:20, 172:3, 172:12, 173:7, 173:20, 173:25, 174:11, 175:3, 175:7, 176:3, 176:18, 176:21, 177:1, 183:16, 186:6, 186:11, 186:18, 187:6, 187:13, 189:2, 189:11, 190:15, 195:25

**Lohan's** [5] - 79:24, 80:18, 129:25, 146:2, 163:24

**LOL** [3] - 48:7, 48:12, 48:25

**look** [20] - 13:14, 13:22, 13:23, 14:4, 14:17, 18:9, 18:13, 37:15, 93:7, 98:18, 99:11, 115:23, 121:23, 122:10, 124:9, 129:8, 136:4, 144:25, 198:6, 200:25

**looked** [3] - 32:15, 109:16, 128:10

**looking** [12] - 46:13, 47:9, 61:21, 68:8, 106:13, 106:21, 126:21, 137:3, 195:12, 198:18, 198:19, 199:19

**lookout** [1] - 155:20

**looks** [3] - 18:12, 72:17, 75:1

**Loper** [3] - 20:21, 21:14, 145:11

**lose** [4] - 6:10, 7:12, 126:16, 126:18

**loses** [1] - 180:22

**loss** [3] - 181:7, 181:9, 181:16

**lost** [7] - 156:23, 180:5, 180:9, 180:11, 181:10, 199:12

**loud** [2] - 145:3, 172:16

**love** [1] - 132:5

**loves** [1] - 147:5

**lucky** [1] - 123:6

**lucrative** [1] - 85:9

**lunch** [14] - 101:15, 102:6, 102:10, 103:18, 104:6, 114:1, 114:5, 114:8, 120:15, 192:15, 193:25, 194:1, 194:23, 195:1

**lunchtime** [2] - 123:6, 202:4
**Lupowitz** [1] - 203:15
**LUPOWITZ** [1] - 1:21, 203:16
**lying** [1] - 80:25

# M

**M.S** [2] - 67:13, 67:22
**MAC** [6] - 95:20, 171:24, 173:25, 188:6, 188:12, 188:14
**machines** [2] - 64:25, 106:14
**made-up** [1] - 191:17
**Mahmood** [12] - 5:9, 8:5, 8:16, 9:20, 10:1, 10:10, 15:21, 19:18, 21:14, 23:24, 33:23, 103:13
**mail** [1] - 110:12
**mailroom** [3] - 54:7, 54:15, 54:16
**maintain** [1] - 21:2
**majority** [1] - 202:17
**make-up** [1] - 191:10
**man** [17] - 132:11, 150:24, 151:5, 151:14, 151:24, 152:5, 152:13, 153:20, 154:20, 155:1, 155:19, 159:21, 160:3, 175:22, 176:13, 190:17, 190:19
**manage** [2] - 130:15, 130:25
**manager** [1] - 54:1
**managing** [1] - 201:10
**manipulating** [1] - 81:21
**manipulation** [1] - 81:21
**manner** [1] - 63:3
**Maple** [1] - 2:3
**marc** [1] - 53:14
**Marc** [26] - 49:24, 53:10, 53:13, 53:14, 54:8, 55:7, 55:8, 55:17, 55:25, 56:8, 56:11, 56:22, 57:11, 58:20, 58:23, 58:25, 59:6, 60:24, 61:4, 61:7, 62:20, 67:14, 67:15, 67:21, 68:21
**Marc's** [6] - 55:8, 56:10, 57:1, 57:2, 59:4, 68:7
**March** [1] - 177:17
**mark** [1] - 152:21
**Mark** [1] - 153:9
**Marked** [1] - 4:7
**marked** [1] - 60:15
**marketers** [1] - 121:18
**marketing** [1] - 66:20
**Marlene** [1] - 110:6
**married** [2] - 125:25, 163:18

**Mars** [1] - 153:9
**marshals** [2] - 200:3, 200:7
**Martinez** [1] - 7:8
**Mary** [1] - 61:12
**Massachusetts** [2] - 171:25, 172:12
**MAT** [2] - 154:2, 154:6
**match** [1] - 30:20
**matching** [1] - 89:13
**material** [4] - 115:4, 116:12, 138:18, 197:9
**Matt** [12] - 49:24, 55:21, 55:23, 56:2, 56:10, 56:22, 61:23, 67:13, 67:19, 67:20, 67:21, 68:21
**Matt's** [1] - 55:22
**matter** [9] - 13:11, 18:19, 20:10, 20:21, 134:7, 145:17, 153:11, 176:21, 203:13
**matters** [3] - 106:3, 121:20, 151:24
**Max** [27] - 84:4, 155:1, 155:4, 166:7, 166:10, 177:13, 177:15, 177:22, 178:5, 178:6, 178:11, 178:25, 179:4, 179:5, 179:6, 179:7, 179:15, 179:22, 179:25, 180:7, 182:2, 182:8, 182:13, 182:20
**mean** [54] - 11:9, 16:16, 16:20, 16:21, 39:17, 41:17, 44:5, 45:8, 47:19, 58:15, 64:24, 71:17, 74:15, 75:7, 85:20, 89:11, 90:10, 90:16, 93:8, 95:3, 96:24, 102:14, 113:1, 113:6, 115:5, 116:7, 116:20, 117:13, 119:10, 119:15, 124:9, 126:17, 128:10, 128:12, 129:1, 134:2, 138:14, 141:18, 141:24, 147:19, 151:19, 160:13, 161:4, 161:9, 164:15, 178:10, 178:22, 180:18, 180:22, 196:10, 198:6, 198:12, 199:11
**meandering** [1] - 9:15
**meaning** [5] - 48:8, 48:17, 105:22, 121:15, 123:9
**means** [4] - 7:6, 100:8, 131:4, 187:18
**meant** [2] - 55:6, 62:14
**media** [1] - 193:2
**Media** [1] - 68:4
**Medicaid** [2] - 44:8, 51:24
**medical** [9] - 38:17, 51:21, 175:13, 197:14, 197:19, 198:1, 198:3, 198:7, 198:12
**Medical** [5] - 51:12, 51:15, 62:8, 72:13, 73:20
**medically** [6] - 78:7, 78:9,

85:20, 85:23, 187:7, 187:11
**Medicare** [18] - 31:4, 31:5, 31:8, 36:22, 44:8, 51:24, 89:10, 89:22, 90:24, 94:23, 95:14, 98:3, 99:3, 99:21, 99:23, 109:11, 110:9
**medications** [1] - 83:10
**meet** [17] - 10:3, 29:16, 29:17, 29:22, 29:24, 36:12, 53:12, 53:16, 84:17, 89:4, 93:4, 98:17, 111:20, 149:25, 150:24, 155:4, 163:4
**meeting** [20] - 16:11, 29:10, 29:11, 29:12, 29:14, 29:25, 30:8, 30:11, 30:13, 30:17, 30:22, 31:14, 88:10, 106:18, 110:24, 149:12, 149:20, 153:15, 163:4
**meetings** [1] - 31:21
**members** [3] - 34:5, 78:4, 83:23
**memory** [21] - 7:8, 29:19, 112:10, 118:22, 145:25, 180:5, 180:9, 180:11, 180:17, 180:22, 180:24, 181:5, 181:7, 181:9, 181:11, 181:16, 196:20, 197:8, 198:4, 198:7, 198:14
**mention** [5] - 10:16, 13:25, 14:10, 19:9, 146:7
**mentioned** [26] - 15:10, 27:16, 28:18, 30:25, 31:4, 37:20, 53:10, 54:15, 55:1, 64:21, 65:4, 65:14, 65:16, 78:20, 79:10, 85:3, 93:8, 105:15, 106:5, 116:16, 123:4, 135:7, 164:13, 181:10, 181:18, 188:2
**mentioning** [1] - 14:16
**mentions** [1] - 9:17
**message** [23] - 8:2, 9:20, 12:5, 12:8, 12:9, 14:4, 15:21, 20:13, 21:5, 21:10, 21:21, 33:16, 35:17, 35:21, 70:15, 94:6, 107:21, 111:13, 112:1, 132:8, 136:15, 147:4, 177:7
**messages** [13] - 8:8, 9:6, 9:13, 10:9, 12:24, 32:15, 35:8, 101:22, 102:3, 103:22, 148:12, 151:16, 177:4
**Messenger** [5] - 148:4, 148:5, 148:8, 148:21
**met** [17] - 26:19, 29:9, 36:13, 53:13, 55:21, 55:22, 85:9, 92:15, 92:19, 92:24, 92:25, 93:5, 113:11, 113:13, 141:8, 150:2
**method** [1] - 148:8
**Mexico** [10] - 154:18, 154:24, 155:1, 155:4,

155:21, 156:5, 166:7, 177:22, 178:12, 182:7
**Miami** [2] - 1:3, 177:8
**Miano** [1] - 16:12
**mic** [1] - 73:6
**Michael** [28] - 79:21, 79:22, 80:1, 80:18, 85:8, 85:10, 111:8, 111:16, 141:8, 143:25, 144:3, 144:11, 144:12, 144:13, 144:16, 144:24, 145:18, 145:21, 146:2, 146:6, 146:7, 153:3, 153:17, 156:15, 156:19, 183:14, 183:16, 195:13
**Michael's** [1] - 163:15
**microphone** [3] - 25:1, 25:10, 138:25
**mid** [1] - 194:4
**mid-morning** [1] - 194:4
**middle** [1] - 42:16
**might** [18] - 8:13, 10:20, 10:25, 12:13, 36:14, 115:1, 117:18, 117:19, 124:9, 133:10, 149:22, 158:25, 163:16, 167:3, 167:4, 196:13, 196:14, 200:5
**Mike** [1] - 43:23
**military** [1] - 175:15
**million** [2] - 12:23, 102:2
**MINAL** [1] - 1:6
**Minal** [59] - 25:18, 26:19, 26:22, 29:15, 30:5, 30:6, 33:5, 35:12, 38:5, 39:25, 40:6, 40:8, 41:6, 42:9, 42:18, 43:7, 43:9, 43:11, 46:4, 47:25, 48:3, 48:5, 48:16, 48:25, 49:8, 49:15, 53:24, 54:8, 55:20, 55:23, 58:25, 61:22, 62:4, 63:13, 64:6, 75:8, 75:23, 76:11, 76:23, 77:15, 87:21, 90:2, 90:3, 92:19, 94:16, 95:1, 96:18, 100:9, 111:16, 112:1, 156:10, 157:8, 157:12, 161:3, 167:17, 167:18, 172:25, 188:18, 188:20
**Minal's** [4] - 42:18, 43:11, 63:23, 170:23
**mind** [2] - 149:7, 196:7
**mine** [3] - 36:13, 42:18, 56:24
**minimize** [1] - 19:13
**minimum** [3] - 47:15, 56:15, 122:7
**minus** [2] - 46:14, 49:2
**minute** [2] - 15:11, 118:25
**minutes** [15] - 9:22, 9:23, 101:8, 101:12, 102:14, 102:20, 115:17, 126:23, 129:18, 145:18, 152:18,

163:1, 181:23, 184:21,
193:16
**misconduct** [1] - 101:20
**misleading** [1] - 53:3
**missing** [2] - 6:2, 104:13
**mixing** [1] - 89:13
**mmm-hmm** [1] - 43:22
**mom** [10] - 34:1, 34:2, 34:9,
34:13, 39:8, 39:9, 65:15,
65:17, 83:7
**mom-and-pop** [3] - 65:15,
65:17
**moment** [5] - 8:20, 101:6,
113:17, 144:5, 154:11
**momentarily** [2] - 133:5,
137:3
**moments** [3] - 9:12, 9:18,
118:23
**momentum** [1] - 126:16
**Monday** [4] - 129:7, 195:17,
195:19, 199:23
**monetary** [1] - 96:23
**money** [34] - 31:13, 36:5,
36:18, 44:6, 44:7, 46:22,
47:21, 53:6, 85:11, 85:14,
85:15, 87:24, 88:1, 88:10,
95:9, 96:25, 97:8, 108:16,
113:2, 155:9, 155:11,
158:25, 159:14, 174:4,
174:17, 176:5, 178:21,
178:22, 178:25, 179:4,
182:13, 183:10, 186:12
**monitor** [2] - 52:14, 52:22
**month** [16] - 43:1, 44:11,
44:14, 67:6, 68:19, 87:21,
88:21, 94:11, 95:7, 147:7,
147:23, 161:22, 161:23,
183:12, 190:15, 190:20
**monthly** [3] - 108:13,
108:17, 174:1
**months** [26] - 31:12, 31:13,
34:14, 73:5, 73:25, 83:3,
83:5, 88:8, 88:12, 88:21,
89:23, 95:10, 141:17,
141:18, 141:19, 149:22,
150:14, 151:4, 155:21,
158:22, 162:2, 180:14,
181:13, 199:13
**moot** [1] - 118:12
**Morin** [2] - 50:18, 69:6
**morning** [22] - 5:2, 5:12,
20:3, 20:4, 24:12, 24:22,
25:6, 25:7, 42:20, 94:21,
103:7, 105:1, 121:10,
128:11, 128:19, 128:24,
153:3, 153:8, 192:13, 194:4,
194:21, 203:3
**mortar** [1] - 108:4
**Mosaic** [1] - 49:23
**most** [7] - 38:18, 54:25,

86:15, 130:10, 195:2,
198:17, 202:25
**mother** [2] - 5:18, 90:17
**motion** [2] - 201:8, 201:10
**mouth** [2] - 110:11, 197:13
**move** [20] - 5:24, 18:12,
19:21, 31:24, 41:23, 49:16,
51:3, 68:13, 71:23, 86:21,
93:17, 106:9, 122:20, 127:2,
128:3, 146:21, 152:21,
162:18, 167:13, 195:7
**moved** [1] - 202:16
**movement** [1] - 123:21
**movements** [1] - 17:9
**moves** [10] - 26:25, 32:6,
35:2, 50:10, 60:14, 61:11,
105:4, 107:12, 111:2, 112:12
**moving** [6] - 62:5, 69:5,
73:24, 74:7, 75:14, 202:13
**MR** [109] - 3:4, 6:7, 6:12,
7:18, 11:20, 11:24, 12:7,
16:10, 17:2, 19:23, 22:7,
22:10, 23:20, 27:2, 101:1,
101:5, 101:11, 101:14,
101:17, 101:25, 102:18,
103:3, 103:23, 104:2,
104:13, 115:14, 115:19,
116:14, 116:21, 117:1,
117:12, 117:17, 118:2,
118:15, 118:25, 119:17,
120:10, 120:24, 122:2,
122:15, 122:22, 122:25,
123:12, 124:7, 125:1, 125:6,
125:10, 125:18, 125:25,
126:3, 127:2, 127:11,
127:16, 127:18, 127:20,
127:22, 127:25, 128:2,
128:17, 129:20, 129:23,
130:18, 130:21, 131:15,
132:4, 138:7, 140:15,
140:17, 152:21, 153:2,
165:4, 165:7, 171:21,
171:22, 172:10, 172:11,
173:18, 173:19, 174:12,
174:13, 176:1, 176:2, 179:8,
179:10, 181:20, 181:24,
181:25, 183:21, 183:22,
184:24, 185:2, 190:10,
190:13, 190:14, 191:19,
191:23, 193:21, 196:6,
196:9, 196:23, 197:2, 197:5,
198:3, 200:14, 200:16,
200:23, 201:5, 202:2, 202:20
**MS** [127] - 3:4, 6:4, 8:18,
8:22, 10:7, 10:13, 10:18,
11:8, 14:23, 15:6, 16:8,
16:25, 18:7, 20:9, 20:12,
20:15, 23:2, 23:11, 24:1,
24:6, 24:18, 25:5, 26:11,
26:14, 26:24, 27:7, 27:9,

32:5, 32:10, 35:1, 35:5,
41:22, 42:1, 42:4, 50:9,
50:14, 60:13, 60:22, 61:10,
61:15, 61:18, 71:22, 72:2,
72:5, 86:20, 87:2, 91:13,
92:1, 92:5, 92:8, 92:9, 93:16,
93:23, 95:22, 96:2, 97:13,
97:18, 100:12, 100:21,
103:5, 104:7, 104:16,
104:24, 104:25, 105:3,
105:9, 106:8, 106:12,
107:11, 107:15, 107:17,
111:1, 111:6, 112:12,
112:17, 113:17, 113:19,
113:21, 114:25, 115:11,
116:1, 116:4, 117:22,
119:24, 120:11, 120:15,
120:22, 120:25, 121:8,
121:13, 121:17, 125:16,
130:17, 131:18, 132:6,
132:10, 132:12, 132:15,
133:3, 133:9, 133:20,
134:13, 134:16, 134:21,
135:5, 136:12, 136:21,
137:5, 137:10, 137:13,
137:20, 137:22, 139:5,
152:24, 165:6, 194:7,
194:11, 194:15, 194:25,
195:11, 195:15, 197:19,
199:4, 201:20, 201:23,
202:23, 203:5
**multiple** [1] - 106:6
**music** [1] - 112:21
**must** [8] - 115:19, 145:6,
145:8, 169:16, 179:25,
189:3, 192:20
**mutations** [1] - 52:15

# N

**name** [24] - 25:1, 25:2,
43:19, 49:24, 50:1, 54:9,
54:18, 55:8, 55:21, 58:21,
59:1, 59:4, 59:6, 61:4, 61:5,
62:8, 75:22, 84:3, 92:20,
93:1, 141:3, 179:18, 183:24
**named** [15] - 43:4, 50:18,
61:22, 61:23, 64:7, 67:11,
67:13, 70:25, 89:4, 92:19,
142:6, 153:9, 155:1, 163:9
**names** [3] - 43:21, 43:25,
66:14
**Nancy** [1] - 86:22
**Narottam** [1] - 42:8
**narrowing** [1] - 103:21
**natural** [2] - 195:4, 202:10
**nature** [3] - 15:16, 17:22,
18:18
**NE** [1] - 2:3
**necessarily** [3] - 14:21,

21:20, 180:22
**necessary** [1] - 187:11
**need** [28] - 5:6, 7:14, 11:12,
11:22, 13:6, 14:13, 23:18,
36:21, 43:9, 63:13, 63:14,
63:23, 64:1, 65:10, 73:9,
88:1, 100:19, 122:2, 122:5,
124:5, 128:18, 128:21,
130:25, 133:11, 133:15,
138:21, 175:5, 195:2
**needed** [3] - 64:1, 64:2,
202:15
**needs** [8] - 118:13, 126:9,
133:18, 136:19, 160:4,
186:12, 186:15, 200:11
**nefarious** [1] - 20:25
**negotiate** [1] - 159:9
**negotiated** [1] - 87:6
**negotiation** [1] - 87:16
**neighbor** [1] - 83:9
**neighborhood** [1] - 115:16
**never** [27] - 28:20, 40:17,
41:19, 58:19, 70:20, 71:3,
77:2, 92:14, 92:15, 102:3,
123:4, 123:8, 140:22,
143:14, 144:3, 144:10,
145:18, 148:13, 148:15,
157:1, 179:5, 179:6, 181:3,
197:14
**New** [4] - 1:16, 85:9,
172:13, 172:14
**new** [10] - 45:14, 64:19,
77:5, 126:19, 127:11,
127:14, 129:12, 154:8,
186:13, 186:25
**Newman** [1] - 43:23
**news** [4] - 92:2, 96:9,
109:4, 128:6
**next** [32] - 7:7, 24:15,
24:17, 26:22, 29:17, 29:25,
37:5, 38:2, 44:4, 47:11,
47:24, 48:23, 49:7, 70:24,
94:20, 102:14, 108:25,
109:4, 122:20, 122:21,
129:4, 153:11, 154:1,
154:14, 154:16, 154:17,
155:24, 156:2, 192:14,
194:6, 195:25, 201:4
**nice** [1] - 114:8
**Nick** [8] - 76:10, 76:13,
76:14, 89:4, 170:2, 170:5,
170:7, 188:19
**night** [6] - 8:22, 9:11,
15:17, 26:20, 28:17, 83:10
**nine** [1] - 9:22
**NO** [1] - 1:2
**nominee** [1] - 54:9
**non** [2] - 127:3, 127:10
**non-Hirsch** [2] - 127:3,
127:10

none [4] - 95:16, 95:19, 135:21, 161:6
nonetheless [1] - 83:14
norm [1] - 95:19
normally [2] - 12:21, 116:22
note [3] - 15:10, 116:1, 125:2
notepads [3] - 24:13, 114:9, 193:5
notes [2] - 8:12, 127:15
nothing [18] - 6:2, 11:6, 28:19, 41:19, 92:14, 103:10, 132:16, 137:8, 137:13, 137:14, 167:22, 168:23, 173:1, 175:3, 176:8, 176:22
notice [9] - 101:18, 102:10, 125:2, 130:5, 149:22, 164:17, 164:18, 164:19, 164:20
notify [1] - 197:19
November [2] - 76:19, 76:22
nuance [1] - 11:10
number [30] - 5:4, 16:1, 35:13, 35:21, 38:1, 56:23, 59:15, 62:23, 64:1, 64:2, 77:20, 79:7, 79:12, 79:23, 87:21, 87:24, 88:5, 111:25, 143:25, 153:17, 158:20, 169:9, 191:3, 191:6, 191:10, 191:12, 191:17, 193:18, 196:12
numbers [4] - 88:25, 108:12, 159:5, 161:20
NW [1] - 1:18

**O**

o'clock [12] - 102:16, 103:1, 114:4, 114:17, 119:22, 126:23, 131:10, 131:16, 140:9, 192:11, 201:14, 202:11
O'Hera [1] - 61:23
oath [9] - 10:22, 11:1, 13:6, 141:6, 141:13, 142:3, 145:17, 150:23, 193:10
objecting [1] - 27:3
objection [22] - 22:21, 27:1, 32:8, 35:3, 41:25, 50:11, 60:18, 61:14, 72:1, 86:23, 91:20, 93:20, 95:25, 97:16, 105:6, 106:10, 107:14, 111:3, 112:15, 152:23, 152:24, 202:5
objections [1] - 202:16
obligation [1] - 197:10
obligations [2] - 11:16, 18:2

observations [2] - 68:25, 196:3
obtain [2] - 57:11, 99:23
obtained [1] - 100:7
obviously [19] - 5:19, 10:21, 10:24, 21:5, 21:12, 22:9, 22:18, 114:21, 121:23, 122:19, 125:3, 125:10, 125:11, 126:5, 126:13, 132:22, 138:8, 164:25, 169:16
occasion [1] - 161:11
occasions [2] - 106:6, 144:1
occurred [1] - 136:15
October [2] - 46:1, 76:8
odd [2] - 14:2, 135:10
OF [5] - 1:1, 1:3, 1:9, 1:15, 1:18
offense [1] - 193:3
offer [4] - 51:25, 65:1, 91:14, 97:13
offering [2] - 99:4, 99:21
OFFICE [1] - 1:18
office [7] - 51:17, 55:20, 55:22, 56:3, 89:7, 89:8
Office [1] - 99:14
OFFICER [3] - 24:9, 100:16, 104:10, 114:11, 120:1, 139:15, 139:21, 193:7, 203:6
offices [2] - 65:15, 78:12
Official [2] - 1:22, 203:16
often [5] - 68:19, 95:1, 107:3, 161:24, 162:1
Ohio [1] - 172:13
OI3 [1] - 15:4
OIG [2] - 8:4, 136:22
OIG's [1] - 99:9
oighhs.gov [1] - 98:13
old [4] - 36:13, 81:25, 84:5, 84:7
Omar [2] - 92:17, 92:19
Omar's [1] - 92:25
once [12] - 39:14, 68:25, 82:25, 88:21, 103:1, 188:18, 190:2, 199:21, 200:24, 201:1, 202:10
one [18] - 5:6, 5:11, 6:18, 6:20, 6:24, 7:9, 8:20, 8:24, 9:17, 9:23, 11:17, 13:18, 14:4, 14:17, 14:23, 15:10, 15:11, 15:22, 16:1, 16:19, 18:9, 20:10, 25:16, 26:9, 26:20, 43:6, 43:11, 43:14, 45:16, 49:25, 50:23, 51:5, 55:20, 56:2, 56:5, 60:14, 61:1, 64:15, 65:10, 66:21, 66:22, 66:25, 69:13, 69:16, 70:8, 73:15, 76:2, 76:15, 77:17, 79:8, 82:21, 88:11,

90:24, 91:1, 95:17, 97:9, 98:22, 99:11, 104:13, 106:14, 109:16, 113:17, 118:25, 120:11, 120:23, 121:1, 124:3, 126:13, 127:20, 128:7, 129:21, 132:7, 132:14, 132:17, 132:21, 133:7, 134:17, 135:16, 137:12, 137:15, 137:16, 137:25, 143:14, 150:5, 150:8, 150:9, 156:15, 156:16, 159:6, 160:19, 160:21, 160:23, 161:11, 170:24, 183:9, 190:2, 194:8, 195:23, 196:14, 196:16, 197:2, 197:20, 200:1
one-minute [1] - 118:25
ones [5] - 89:14, 121:4, 127:13, 172:17
ongoing [2] - 130:12, 152:12
open [3] - 52:9, 90:7, 90:9
opened [2] - 188:3, 188:20
opening [3] - 12:21, 19:12, 19:13
operation [11] - 9:4, 10:2, 10:16, 11:17, 15:19, 16:3, 16:23, 17:23, 54:11, 55:4, 67:7
operational [2] - 18:15, 18:23
operations [4] - 10:25, 16:6, 33:3, 58:4
opinion [2] - 41:19, 53:24
opinions [1] - 174:18
opportunity [8] - 65:20, 80:9, 109:14, 112:9, 124:18, 126:11, 129:10, 149:4
opposed [3] - 10:11, 159:15, 200:19
ops [4] - 9:7, 9:9, 10:2, 15:15
optimistic [1] - 129:3
optimize [1] - 89:9
orally [1] - 20:16
Order [1] - 5:1
order [4] - 69:3, 88:1, 89:9, 90:23
ordering [1] - 78:6
ordinarily [1] - 10:22
organization [2] - 56:9, 60:7
original [2] - 89:7, 195:19
otherwise [1] - 16:5
ought [1] - 6:8
ourselves [3] - 7:4, 138:22, 198:25
outcome [1] - 158:18
outlining [1] - 18:18
outpatient [1] - 82:14

outset [1] - 14:8
outside [2] - 11:2, 139:3
outstanding [2] - 137:9, 198:25
override [8] - 31:20, 34:21, 46:23, 47:1, 48:5, 56:8, 62:21, 178:24
owe [1] - 182:13
owed [2] - 44:11, 67:6
own [5] - 44:2, 46:21, 54:4, 56:9, 159:6
owned [4] - 38:17, 53:13, 71:2, 85:8
owner [1] - 173:23
owns [2] - 25:23, 153:9

**P**

p.m [12] - 1:5, 120:2, 120:3, 131:20, 131:21, 133:4, 136:6, 136:7, 139:23, 142:9, 193:8, 203:7
pace [1] - 7:4
package [2] - 50:5, 50:7
packages [1] - 66:5
PAGE [1] - 3:2
page [29] - 7:6, 27:11, 35:11, 35:16, 37:5, 38:2, 47:24, 48:23, 49:7, 66:13, 70:24, 72:17, 74:12, 75:17, 77:16, 77:19, 96:12, 106:20, 108:25, 144:12, 165:8, 171:21, 173:18, 174:12, 176:1, 176:18, 183:21, 189:21, 190:13
Pages [1] - 1:7
pages [1] - 12:23
paid [52] - 31:3, 31:9, 31:15, 43:2, 44:6, 44:9, 44:10, 49:14, 55:8, 68:21, 75:12, 77:3, 77:10, 77:13, 78:3, 78:11, 78:13, 89:14, 89:15, 89:21, 94:11, 95:2, 95:4, 95:9, 95:16, 95:19, 110:20, 157:10, 157:11, 157:22, 161:21, 161:23, 166:10, 170:14, 170:15, 173:20, 173:23, 173:24, 174:2, 174:5, 174:6, 176:4, 176:7, 178:21, 182:8, 182:10, 187:20, 188:25, 189:16
pain [2] - 83:6, 83:8
paint [1] - 54:19
PALM [1] - 1:2
panel [1] - 86:3
panels [3] - 85:25, 86:1, 86:8
paper [1] - 39:3
papers [2] - 166:3, 166:19

**paragraph** [2] - 52:10, 77:23
**paragraphs** [1] - 69:12
**paralegals** [1] - 133:21
**parameters** [2] - 16:3, 16:22
**paramount** [1] - 131:2
**part** [11] - 6:9, 14:8, 79:11, 81:16, 109:20, 122:16, 125:1, 129:4, 172:19, 177:3, 189:17
**parte** [1] - 20:23
**participated** [1] - 18:19
**particular** [16] - 14:16, 14:21, 19:9, 32:23, 33:6, 45:3, 69:17, 106:18, 107:1, 107:10, 108:19, 136:15, 141:11, 150:18, 150:20, 169:25
**parties** [4] - 5:23, 6:1, 11:11, 19:8
**partner** [6] - 28:7, 28:8, 32:4, 92:19, 106:24, 155:17
**partners** [1] - 67:21
**party** [2] - 83:9, 153:4
**pass** [2] - 53:24, 86:15
**passed** [1] - 34:13
**passing** [2] - 5:20, 19:14
**password** [1] - 62:9
**past** [4] - 81:5, 102:14, 199:1, 202:15
**pat** [2] - 151:19, 164:5
**Patel** [116] - 5:5, 8:7, 8:8, 9:1, 9:5, 10:12, 12:13, 13:3, 15:12, 15:24, 16:11, 20:17, 25:18, 25:25, 26:5, 27:16, 27:24, 28:10, 28:12, 29:9, 29:17, 30:5, 30:6, 30:9, 30:11, 30:15, 31:1, 33:5, 35:12, 35:21, 35:25, 36:9, 36:21, 37:2, 37:13, 37:15, 38:6, 39:6, 39:15, 40:1, 40:5, 42:9, 44:19, 45:11, 45:15, 45:24, 48:25, 55:16, 58:25, 59:3, 59:7, 59:25, 60:3, 60:10, 61:2, 61:6, 61:22, 62:12, 63:11, 64:6, 65:25, 71:19, 72:21, 73:2, 74:1, 74:17, 75:23, 76:11, 80:12, 82:3, 83:22, 84:7, 84:17, 84:23, 88:13, 92:10, 93:6, 96:4, 96:9, 97:9, 97:11, 97:20, 98:10, 98:22, 99:1, 99:8, 99:15, 103:14, 107:19, 107:22, 108:11, 109:1, 110:3, 110:18, 112:1, 112:19, 112:24, 113:4, 121:16, 156:10, 156:22, 157:8, 157:12, 158:5, 158:12, 159:9, 159:18,

160:3, 160:19, 161:3, 161:7, 169:22, 169:24, 189:8, 189:12
**PATEL** [1] - 1:6
**Patel's** [3] - 10:8, 71:15, 157:25
**patience** [2] - 140:3, 192:1
**patient** [13] - 9:19, 38:16, 52:8, 56:22, 57:2, 57:3, 57:4, 57:14, 66:14, 66:22, 68:25, 90:17
**patient's** [1] - 69:1
**patients** [34] - 32:2, 38:12, 49:19, 50:3, 50:6, 50:24, 51:9, 51:19, 51:25, 56:3, 56:4, 56:17, 57:11, 57:22, 58:8, 58:12, 58:17, 66:5, 66:8, 66:11, 66:23, 67:5, 69:17, 69:22, 69:25, 70:5, 70:9, 70:21, 90:14, 90:21, 91:5, 91:8, 100:7
**patterns** [1] - 78:6
**pause** [1] - 100:10
**paused** [1] - 60:21
**pay** [19] - 9:19, 29:14, 31:11, 40:12, 55:8, 68:21, 68:23, 77:12, 78:14, 88:2, 110:10, 155:11, 155:13, 159:9, 166:7, 173:8, 177:22, 182:8, 183:12
**paying** [16] - 53:7, 70:19, 78:16, 78:17, 87:13, 100:7, 157:13, 159:21, 176:6, 179:22, 179:25, 183:7, 188:6, 189:15, 189:16, 191:6
**payment** [5] - 87:9, 87:15, 89:10, 94:22, 108:17
**payments** [3] - 90:10, 95:10, 95:13
**payout** [2] - 40:12, 47:14
**PC** [2] - 1:18, 2:3
**Peachtree** [1] - 1:18
**Peactree** [1] - 2:6
**pen** [1] - 39:3
**Pennsylvania** [7] - 90:9, 187:21, 188:4, 188:6, 188:20, 188:21, 188:22
**people** [23] - 7:12, 9:17, 29:5, 34:23, 34:25, 58:11, 60:2, 60:5, 60:10, 63:4, 64:25, 88:25, 90:15, 108:22, 111:23, 121:19, 145:9, 149:11, 174:3, 174:21, 181:15, 189:23, 192:18
**people's** [1] - 124:4
**per** [3] - 56:22, 87:13, 87:15
**per-test** [1] - 87:15
**percent** [5] - 39:14, 46:13, 46:25, 47:4, 47:10, 47:14, 48:4, 48:5, 48:21, 48:22,

69:4, 199:6
**percentage** [4] - 47:8, 69:3, 87:7, 170:15
**percentage-based** [1] - 87:7
**perfect** [2] - 16:20, 30:20
**perhaps** [4] - 62:14, 103:19, 194:12, 198:1
**period** [9] - 143:10, 143:21, 146:2, 147:4, 147:16, 147:25, 149:8, 151:17, 151:22
**perjury** [2] - 123:20, 124:18
**permission** [1] - 118:5
**person** [4] - 52:8, 104:13, 167:3, 189:16
**personal** [2] - 82:5, 99:4
**personally** [1] - 50:4
**persons** [1] - 79:13
**pertain** [4] - 12:18, 13:1, 120:18, 131:12
**pertained** [4] - 12:5, 15:13, 120:23, 121:7
**pertains** [3] - 121:1, 133:17, 136:18
**perused** [1] - 127:22
**Peter** [1] - 95:23
**Petron** [5] - 195:13, 195:15, 195:16, 195:17, 198:22
**PGF** [1] - 174:6
**PGx** [11] - 26:4, 40:3, 44:25, 63:15, 66:18, 66:22, 68:21, 153:10, 155:9, 186:19, 186:20
**pharma** [1] - 174:5
**pharmaceutical** [1] - 174:2
**pharmacogenetics** [1] - 36:25
**Philadelphia** [1] - 97:24
**phone** [14] - 32:12, 32:16, 33:14, 35:9, 44:17, 45:22, 82:14, 82:15, 103:25, 110:7, 130:22, 151:12, 151:14, 198:10
**phones** [2] - 58:14, 58:15
**phonetic** [2] - 175:4, 185:23
**phonetic)** [1] - 142:6
**photos** [1] - 106:24
**physically** [1] - 39:12
**physician** [1] - 34:4
**physicians** [1] - 78:3
**pick** [6] - 19:15, 104:20, 140:11, 192:8, 196:12, 196:14
**picked** [1] - 17:8
**picking** [1] - 5:5
**picture** [5] - 39:14, 54:19, 73:4, 106:22, 146:22
**pictures** [13] - 142:21,

142:23, 143:1, 143:12, 146:2, 146:8, 146:14, 147:3, 147:7, 147:14, 147:17, 147:22, 149:2
**pieces** [3] - 63:4, 108:15, 127:4
**pill** [1] - 174:3
**pills** [1] - 83:10
**pipes** [1] - 48:16
**piqued** [1] - 31:2
**pitching** [1] - 172:3
**place** [12] - 7:10, 12:7, 15:1, 16:3, 17:8, 126:4, 130:5, 172:14, 173:24, 178:19, 193:25, 197:17
**places** [2] - 160:21, 192:18
**plan** [14] - 9:7, 9:9, 10:1, 15:15, 18:15, 18:23, 20:3, 20:7, 111:18, 129:10, 133:18, 192:13, 194:20, 195:19
**plane** [1] - 64:17
**planning** [2] - 193:19, 201:14
**plans** [2] - 10:14, 150:10
**plastic** [1] - 57:23
**play** [13] - 60:14, 60:18, 115:21, 115:24, 116:23, 117:8, 117:12, 117:15, 117:20, 118:14, 118:16, 119:15, 195:4
**played** [2] - 117:23, 184:12
**playing** [1] - 106:22, 115:15, 116:20, 117:4, 119:5
**plea** [3] - 78:22, 105:11, 105:13
**plead** [3] - 25:15, 78:19, 81:23
**pled** [2] - 25:13, 78:20
**plenty** [2] - 114:22, 174:3
**pneumonia** [1] - 181:11
**pocket** [1] - 53:6
**point** [43] - 7:15, 14:23, 15:25, 16:15, 18:14, 21:3, 21:18, 28:22, 29:1, 32:12, 39:16, 46:20, 49:18, 52:3, 55:1, 55:16, 79:15, 87:12, 92:10, 97:2, 100:14, 113:24, 117:6, 118:17, 118:20, 123:8, 124:14, 124:21, 125:14, 126:13, 131:13, 132:2, 134:2, 136:17, 140:9, 156:7, 157:22, 171:4, 191:22, 194:4, 195:4, 197:20, 198:24
**point-blank** [1] - 123:8
**points** [2] - 82:9, 202:23
**poisoning** [1] - 5:17
**Police** [1] - 145:10
**politely** [1] - 180:23

**pool** [3] - 27:15, 27:22, 27:25
**pop** [3] - 65:15, 65:17
**portal** [1] - 62:7
**portion** [2] - 62:4, 110:5
**portions** [1] - 118:2
**position** [10] - 7:1, 12:7, 12:9, 13:10, 22:5, 33:4, 118:18, 118:20, 123:15, 132:18
**positive** [1] - 29:7
**possession** [1] - 135:2
**possibility** [3] - 128:25, 150:24, 195:16
**possible** [1] - 194:16
**possibly** [1] - 6:11
**post** [2] - 9:10, 94:23
**postdate** [2] - 101:23, 103:22
**posted** [1] - 201:4
**potential** [2] - 52:14, 131:4
**potentially** [3] - 158:24, 190:18, 195:21
**power** [1] - 192:3
**powered** [1] - 92:14
**practice** [2] - 38:18, 38:23
**precise** [1] - 137:7
**predicate** [2] - 117:5, 119:12
**prefer** [1] - 202:14
**prejudice** [1] - 14:6
**prejudiced** [1] - 126:20
**prejudicial** [2] - 22:17, 199:16
**prep** [1] - 203:2
**prepare** [2] - 114:22, 140:4
**prepared** [2] - 5:24, 7:13
**preparing** [2] - 32:14, 98:17
**prescriptions** [1] - 57:11
**presence** [1] - 11:3
**present** [6] - 8:5, 101:4, 117:9, 145:10, 199:1, 201:1
**presentation** [2] - 199:17, 201:3
**presented** [1] - 16:5
**president** [1] - 170:9
**press** [1] - 119:13
**pressing** [2] - 126:14, 131:8
**presumably** [2] - 194:1, 194:23
**presume** [3] - 116:12, 121:14, 122:7
**presumed** [1] - 135:12
**pretty** [3] - 15:19, 48:9, 200:23
**previous** [5] - 43:1, 44:11, 56:9, 88:9, 161:19
**previously** [5] - 30:25,

**price** [1] - 68:14
**primary** [1] - 110:10
**printed** [1] - 133:3
**prison** [1] - 79:2
**private** [3] - 31:6, 31:12, 44:8
**privilege** [3] - 11:14, 21:2, 21:4
**privileged** [1] - 11:15
**probative** [3] - 14:19, 22:13, 22:16
**problem** [12] - 52:15, 89:21, 89:23, 89:24, 90:1, 95:8, 117:5, 118:21, 119:11, 180:24, 202:20
**problems** [3] - 180:17, 181:5, 197:7
**proceed** [2] - 92:7, 104:23
**proceedings** [2] - 130:12, 203:12
**process** [6] - 57:1, 57:9, 160:15, 160:16, 160:22, 187:14
**procure** [1] - 124:14
**produced** [15] - 14:18, 16:19, 17:15, 17:25, 120:17, 120:19, 120:20, 121:2, 121:7, 133:16, 134:6, 134:23, 135:12, 136:23, 199:13
**producing** [1] - 135:1
**production** [4] - 14:20, 18:4, 134:7, 191:12
**proffer** [7] - 8:5, 10:23, 14:14, 19:19, 21:13, 22:2, 95:23
**program** [4] - 154:2, 154:6, 171:23, 171:24
**progress** [5] - 129:5, 138:2, 138:12, 139:13, 192:23
**prolonged** [1] - 198:9
**promised** [1] - 105:19
**promises** [2] - 105:22, 105:23
**prompted** [1] - 22:20
**promptly** [1] - 133:16
**pronounced** [2] - 83:3, 197:20
**proper** [2] - 89:9, 89:11
**proposing** [1] - 70:8
**prosecutor** [1] - 145:12
**prosecutors** [1] - 149:12
**protect** [1] - 21:1
**protocol** [3] - 11:13, 16:17, 21:16
**prove** [1] - 12:17
**proven** [1] - 14:7
**provide** [3] - 25:25, 51:19, 141:3

**provided** [1] - 106:2
**public** [1] - 100:1
**published** [1] - 60:20
**pulmonary** [2] - 181:11, 181:12
**purpose** [8] - 22:10, 116:6, 128:5, 141:25, 142:2, 142:3, 142:4, 157:8
**purposes** [4] - 88:22, 99:24, 116:18, 201:15
**pursuant** [1] - 105:13
**pushed** [2] - 150:1, 150:4
**put** [33] - 10:22, 12:9, 12:10, 12:16, 14:1, 15:25, 18:10, 21:13, 42:21, 46:13, 89:18, 100:10, 101:18, 116:15, 117:13, 119:4, 125:2, 125:3, 125:6, 126:17, 130:21, 132:17, 138:13, 164:17, 164:18, 164:19, 177:15, 178:1, 178:11, 190:7, 193:18, 195:17, 196:24
**puts** [1] - 193:25
**putting** [6] - 39:3, 88:8, 88:14, 102:10, 175:13, 197:13

---

# Q

**qualifications** [1] - 90:21
**qualify** [1] - 90:18
**qualifying** [1] - 56:4
**quantity** [1] - 68:10
**quarter** [1] - 119:22
**quarters** [1] - 54:22
**quash** [2] - 201:8, 201:11
**questioned** [1] - 197:1
**questioning** [2] - 11:1, 140:10
**questions** [10] - 10:23, 11:10, 22:19, 23:8, 107:8, 113:21, 128:12, 182:1, 189:17, 192:20
**quick** [5] - 29:24, 125:16, 194:3, 194:11, 200:23
**quickly** [1] - 127:22
**quite** [4] - 19:14, 60:9, 138:9, 194:11
**quote/unquote** [2] - 8:9, 99:22

---

# R

**RAFFERTY** [1] - 2:5
**raise** [5] - 6:2, 6:6, 7:19, 126:6, 197:2
**raised** [2] - 14:15, 85:11
**raises** [1] - 126:10
**raising** [1] - 19:10

**Rama** [34] - 34:24, 36:4, 36:10, 36:12, 37:9, 37:14, 38:11, 38:12, 38:16, 39:10, 39:14, 39:15, 39:22, 40:4, 40:21, 94:10, 111:7, 111:12, 111:16, 111:17, 112:3, 155:5, 155:10, 165:8, 165:19, 166:10, 166:16, 167:6, 168:20, 175:4, 176:19, 177:9, 182:24, 183:3
**Rama's** [6] - 39:6, 111:20, 166:11, 166:12, 171:11, 176:20
**Ramamurthy** [11] - 121:2, 127:20, 128:23, 132:19, 133:15, 177:4, 179:19, 195:21, 199:25, 200:5, 200:10
**Ramamurthy's** [1] - 128:7
**ramp** [1] - 34:17
**ramped** [1] - 34:18
**ran** [1] - 34:11, 67:20
**rate** [4] - 158:21, 159:14, 159:18, 160:4
**Raton** [2] - 110:24, 145:10
**reached** [2] - 5:12, 38:5
**reaching** [1] - 51:24
**read** [9] - 33:22, 35:18, 49:10, 52:1, 74:25, 99:20, 109:8, 153:7, 173:3
**reading** [3] - 118:11, 168:4, 184:11
**ready** [12] - 7:4, 24:5, 24:14, 102:25, 111:18, 115:24, 135:21, 138:13, 138:14, 139:15, 139:16, 201:14
**real** [3] - 163:13, 174:17, 191:12
**reality** [1] - 6:25
**really** [31] - 11:17, 15:20, 19:2, 43:8, 57:9, 65:6, 74:14, 74:15, 74:22, 86:16, 107:9, 116:15, 123:18, 126:18, 131:6, 132:6, 132:12, 132:13, 151:18, 157:1, 157:9, 161:15, 170:25, 173:12, 191:2, 194:3, 197:16, 198:20, 199:20, 200:25, 202:15
**reason** [17] - 7:14, 7:19, 21:10, 22:12, 51:23, 69:17, 69:19, 102:4, 118:9, 118:11, 118:16, 119:12, 131:4, 138:20, 158:6, 158:12
**reasons** [1] - 20:25
**rebound** [1] - 199:18
**rebut** [1] - 124:20
**recalled** [3] - 128:23, 133:15, 200:10

**recalling** [5] - 128:7, 128:8, 129:9, 172:2, 195:21
**receive** [7] - 5:9, 12:8, 44:13, 67:2, 105:16, 105:19, 105:24
**received** [22] - 8:1, 27:8, 32:9, 35:4, 42:3, 50:12, 60:19, 61:17, 72:4, 86:25, 91:25, 93:22, 96:1, 97:17, 102:3, 105:7, 106:11, 107:16, 111:4, 112:16, 123:2, 153:1
**Received** [2] - 3:8, 4:7
**receives** [1] - 110:7
**receiving** [1] - 146:8
**recent** [1] - 110:7
**recess** [2] - 119:25, 203:4
**recessed** [5] - 100:23, 120:2, 131:20, 136:6, 203:7
**recognize** [2] - 27:12, 195:20
**recollect** [1] - 156:21
**recommended** [1] - 9:14
**reconsidered** [2] - 161:24, 162:1
**record** [12] - 11:25, 21:13, 25:1, 26:11, 26:13, 79:19, 100:24, 120:3, 131:21, 136:7, 136:8, 191:1
**recorded** [5] - 16:12, 17:18, 22:22, 79:17, 123:25
**recording** [26] - 8:23, 8:25, 9:11, 9:12, 9:17, 9:21, 13:3, 15:2, 15:7, 15:11, 15:20, 79:15, 117:20, 119:1, 119:3, 123:10, 124:4, 124:5, 162:22, 162:24, 163:1, 163:2, 163:8, 163:11, 168:4, 176:14
**recordings** [19] - 8:7, 8:24, 15:8, 15:9, 15:13, 20:17, 21:3, 59:23, 60:9, 60:15, 61:1, 79:12, 80:8, 80:11, 116:2, 116:8, 116:10, 116:11, 117:12
**records** [4] - 142:16, 142:18, 171:11, 171:15
**recruiting** [1] - 34:18
**redirect** [2] - 193:24, 194:3
**reduction** [4] - 105:16, 105:20, 105:24, 106:1
**refer** [2] - 10:15, 38:12
**reference** [4] - 12:20, 52:24, 63:15, 130:1
**referenced** [3] - 9:20, 15:21, 110:15
**references** [1] - 9:2
**referencing** [2] - 14:24, 43:3
**referrals** [4] - 38:16, 63:1,

65:15, 65:17
**referred** [2] - 36:19, 155:10
**referring** [4] - 45:4, 78:9, 90:14, 169:8
**reflect** [4] - 26:11, 26:13, 103:14, 106:2
**reflecting** [1] - 44:10
**reframe** [1] - 117:2
**refresh** [2] - 98:18, 112:9
**refresher** [1] - 118:13
**refreshing** [1] - 117:25
**regard** [2] - 130:8, 196:20
**regarding** [6] - 16:5, 19:7, 23:8, 23:9, 80:12, 124:20
**regardless** [1] - 135:2
**REGINALD** [1] - 1:14
**register** [1] - 64:20
**rehab** [2] - 28:18, 28:23
**rehabs** [1] - 31:7
**reimbursement** [4] - 36:24, 37:1, 86:6, 86:11
**reimbursements** [2] - 31:3, 31:6
**reiterate** [1] - 133:11
**reiterated** [1] - 8:11
**rejoin** [2] - 5:21, 139:25
**rejoining** [1] - 133:22
**rejoins** [1] - 24:3
**relapsed** [1] - 82:24
**relate** [4] - 8:13, 9:7, 13:11, 17:3
**related** [2] - 10:11, 11:13, 14:5, 14:21, 16:23, 17:24, 18:17, 19:4, 96:16, 135:3, 136:10, 143:11
**relates** [2] - 10:5, 18:21
**relating** [1] - 17:21
**relation** [1] - 28:25
**relationship** [6] - 45:19, 53:20, 55:25, 84:19, 91:5, 152:12
**relative** [1] - 43:7
**relatively** [2] - 29:24, 33:20
**relatives** [1] - 78:4
**relaying** [1] - 136:15
**relevancy** [2] - 11:16, 19:1
**relevant** [2] - 11:6, 198:20
**remain** [3] - 83:14, 129:3, 139:21
**remainder** [1] - 140:5
**remaining** [3] - 7:10, 8:1, 201:16
**remember** [100] - 29:24, 40:20, 46:8, 47:5, 49:24, 49:25, 56:23, 57:5, 58:1, 62:19, 62:22, 65:6, 65:7, 65:8, 68:6, 68:19, 89:24, 90:4, 90:22, 93:1, 95:14, 97:12, 106:18, 106:19, 109:17, 109:21, 117:14,

117:22, 118:4, 118:23, 145:14, 145:15, 146:18, 149:12, 156:11, 157:17, 158:4, 159:20, 160:5, 160:11, 162:3, 163:6, 163:7, 164:5, 166:4, 166:5, 166:15, 166:21, 167:16, 169:7, 169:10, 169:11, 169:14, 169:15, 169:20, 169:21, 172:1, 172:2, 173:22, 177:5, 177:7, 177:11, 177:12, 178:20, 179:1, 182:4, 182:8, 182:9, 182:10, 182:11, 182:15, 182:20, 183:18, 183:23, 183:24, 184:1, 184:2, 184:4, 184:22, 185:3, 185:4, 185:5, 185:22, 185:25, 186:11, 186:22, 187:24, 188:1, 190:1, 192:17, 192:25, 193:1, 196:5, 197:22, 201:6, 201:9, 201:15
**remembered** [2] - 157:18, 157:19
**remembering** [1] - 182:6
**remind** [3] - 98:21, 127:13, 193:10
**remove** [1] - 10:4
**render** [1] - 93:3
**rendering** [1] - 91:7
**reorient** [1] - 69:13
**rep** [6] - 34:19, 45:3, 46:9, 55:8, 56:1, 64:19
**repeat** [4] - 52:4, 59:12, 159:17, 161:13
**repeating** [2] - 12:21, 192:18
**repeats** [1] - 52:18
**repercussions** [1] - 196:19
**replay** [1] - 119:12
**report** [27] - 11:4, 12:1, 12:11, 14:17, 14:24, 14:25, 16:2, 16:14, 16:18, 16:21, 16:22, 16:23, 17:16, 17:19, 18:5, 18:15, 18:23, 79:2, 121:1, 121:11, 122:13, 132:7, 135:1, 136:5, 144:8, 144:12, 149:10
**Report** [1] - 179:11
**REPORTED** [1] - 1:20
**Reporter** [2] - 1:22, 203:16
**reports** [30] - 8:12, 9:9, 10:14, 12:2, 13:8, 14:18, 16:4, 17:24, 18:1, 103:8, 120:18, 120:22, 121:6, 121:9, 121:12, 122:1, 123:3, 123:4, 127:12, 127:16, 127:18, 128:5, 134:25, 136:12, 136:13, 137:19, 137:22, 139:2, 139:4

**represent** [1] - 20:22
**representation** [4] - 13:7, 14:12, 22:24, 139:1
**represented** [1] - 11:22
**reps** [9] - 26:2, 34:18, 45:14, 49:13, 56:24, 57:2, 88:14, 88:15, 111:18
**repurposed** [1] - 133:25
**request** [8] - 8:10, 9:25, 21:6, 42:19, 101:14, 101:17, 103:18, 129:21
**requested** [1] - 168:18
**required** [2] - 90:23, 115:21
**requirements** [1] - 14:20
**requisition** [3] - 70:7, 78:18, 91:11
**research** [1] - 192:25
**resolve** [1] - 202:24
**resort** [1] - 110:24
**respect** [5] - 20:16, 47:12, 103:10, 120:16, 149:24
**respectfully** [1] - 197:8
**respond** [2] - 108:21, 147:13
**responded** [2] - 99:8, 148:15
**responding** [2] - 108:20, 154:1
**responds** [3] - 37:15, 38:1, 98:11
**response** [11] - 29:18, 151:9, 152:2, 156:1, 165:17, 167:24, 170:22, 173:13, 177:21, 179:3, 184:17
**responsibility** [2] - 134:17
**rest** [1] - 138:24
**restaurant** [14] - 41:1, 53:13, 53:15, 84:11, 84:13, 84:16, 85:9, 150:2, 151:4, 153:16, 166:3, 166:19, 167:17, 186:3
**restrictions** [1] - 83:16
**restroom** [1] - 100:19
**result** [2] - 69:3, 159:3
**results** [5] - 58:13, 58:18, 58:19, 62:7
**retake** [3] - 114:3, 136:2, 192:11
**return** [3] - 19:24, 131:9, 192:10
**review** [11] - 11:5, 13:21, 14:12, 16:2, 20:1, 72:16, 76:7, 109:14, 112:9, 121:25, 137:25
**reviewed** [3] - 18:15, 19:3, 32:15
**rid** [1] - 88:15
**Rinsky** [5] - 194:17, 195:8, 195:13, 198:22, 201:18
**rise** [7] - 24:9, 100:16,

104:10, 114:11, 120:1,
193:7, 203:6
**RMR** [2] - 1:21, 203:16
**Rock** [1] - 26:20
**RODOLFO** [1] - 1:10
**Rodolfo** [1] - 1:22
**ROOKARD** [1] - 1:14
**room** [10] - 30:23, 54:7,
54:17, 54:20, 56:14, 100:15,
114:9, 114:10, 192:10, 193:5
**roughly** [2] - 56:13, 57:22
**route** [1] - 119:17
**RPR** [2] - 1:21, 203:16
**RUIZ** [1] - 1:10
**Ruiz** [1] - 1:22
**rule** [2] - 112:24, 201:12
**Rule** [1] - 124:13
**rules** [2] - 77:25, 192:17
**Rules** [1] - 112:22
**ruling** [2] - 23:3, 202:18
**rulings** [1] - 202:12
**run** [4] - 42:22, 47:21,
134:10, 136:20
**running** [1] - 136:21

**S**

**S.C** [1] - 69:20
**SADOW** [109] - 1:17, 1:18,
3:4, 6:7, 6:12, 7:18, 11:20,
11:24, 12:7, 16:10, 17:2,
19:23, 22:7, 22:10, 23:20,
27:2, 101:1, 101:5, 101:11,
101:14, 101:17, 101:25,
102:18, 103:3, 103:23,
104:2, 104:13, 115:14,
115:19, 116:14, 116:21,
117:1, 117:12, 117:17,
118:2, 118:15, 118:25,
119:17, 120:10, 120:24,
122:2, 122:15, 122:22,
122:25, 123:12, 124:7,
125:1, 125:6, 125:10,
125:18, 125:25, 126:3,
127:2, 127:11, 127:16,
127:18, 127:20, 127:22,
127:25, 128:2, 128:17,
129:20, 129:23, 130:18,
130:21, 131:15, 132:4,
138:7, 140:15, 140:17,
152:21, 153:2, 165:4, 165:7,
171:21, 171:22, 172:10,
172:11, 173:18, 173:19,
174:12, 174:13, 176:1,
176:2, 179:8, 179:10,
181:20, 181:24, 181:25,
183:21, 183:22, 184:24,
185:2, 190:10, 190:13,
190:14, 191:19, 191:23,
193:21, 196:6, 196:9,

196:23, 197:2, 197:5, 198:3,
200:14, 200:16, 200:23,
201:5
**Sadow** [25] - 8:11, 9:6,
9:24, 11:9, 13:24, 14:11,
19:20, 22:5, 27:5, 101:10,
103:15, 118:8, 126:14,
129:19, 132:2, 132:17,
132:24, 136:3, 136:16,
137:24, 139:11, 140:6,
140:13, 193:19, 202:15
**Sadow's** [4] - 18:16,
103:19, 114:7, 130:16
**salaries** [1] - 88:16
**salary** [25] - 87:15, 87:18,
108:13, 157:13, 157:21,
157:25, 158:7, 158:13,
158:15, 158:17, 159:4,
159:5, 161:12, 161:15,
161:18, 161:19, 161:21,
170:16, 176:5, 176:7,
189:16, 190:15, 191:7,
191:14, 191:15
**sales** [1] - 170:10
**Saliba** [3] - 76:10, 170:5,
170:7
**Sam** [1] - 91:15
**sample** [1] - 56:6
**samples** [14] - 9:2, 47:2,
62:5, 78:4, 88:8, 88:14,
158:21, 170:15, 176:4,
178:1, 178:7, 178:8, 178:11,
178:13
**Samuel** [1] - 202:1
**SAMUEL** [4] - 2:2, 2:3,
202:2, 202:20
**Samuel's** [1] - 202:23
**Santana** [1] - 7:7
**sat** [3] - 55:22, 152:4,
153:16
**Satary** [8] - 12:3, 12:5,
12:13, 15:14, 25:24, 28:25,
71:2, 121:19
**Satary's** [1] - 60:7
**satisfied** [3] - 18:3, 19:17
**save** [2] - 200:14, 201:3
**saw** [9] - 26:22, 41:19, 43:3,
54:16, 54:17, 85:13, 92:14,
92:15, 99:8
**Scam** [1] - 99:18
**scammers** [2] - 99:3, 99:21
**Scams** [1] - 98:3
**scams** [2] - 98:15, 109:11
**scares** [1] - 175:3
**schedule** [5] - 138:19,
192:4, 195:18, 199:11,
199:23
**scheduling** [1] - 192:22
**scope** [2] - 103:21, 115:4
**screening** [3] - 51:25,

52:25
**screenings** [1] - 99:22
**screenshot** [2] - 38:6,
112:18
**screw** [2] - 29:15
**script** [2] - 51:1, 51:23
**scripts** [1] - 51:5
**Sean** [1] - 34:24
**search** [7] - 103:17, 104:4,
134:3, 136:20, 136:22,
136:23, 137:1
**searched** [1] - 135:12
**searches** [1] - 134:10
**seat** [1] - 6:13
**seated** [12] - 5:2, 24:11,
24:25, 100:18, 100:25,
104:12, 114:20, 120:4,
139:20, 139:24, 193:15,
201:13
**seats** [1] - 114:3
**second** [10] - 5:14, 35:16,
43:18, 58:20, 64:23, 70:20,
84:2, 92:4, 106:20, 166:1
**seconds** [3] - 119:2,
153:12, 163:2
**secret** [1] - 63:6
**SECTION** [1] - 1:15
**section** [1] - 56:2
**SECURITY** [9] - 24:9,
100:16, 104:10, 114:11,
120:1, 139:15, 139:21,
193:7, 203:6
**see** [142] - 7:14, 9:16, 19:2,
24:13, 26:5, 29:6, 32:19,
32:21, 32:25, 33:10, 33:18,
35:14, 35:20, 36:7, 37:3,
37:6, 37:10, 37:18, 37:21,
37:24, 39:12, 41:11, 42:7,
42:13, 42:23, 43:19, 44:9,
44:22, 45:1, 45:12, 46:2,
46:6, 46:16, 47:17, 48:1,
49:4, 50:16, 50:25, 51:13,
52:5, 52:16, 54:13, 56:11,
61:21, 62:10, 62:16, 63:10,
63:16, 66:1, 66:5, 66:14,
67:10, 67:17, 67:24, 68:3,
68:10, 69:6, 70:1, 70:17,
70:22, 72:8, 72:18, 73:11,
73:19, 73:24, 74:8, 74:10,
74:12, 74:24, 75:17, 75:20,
76:7, 76:24, 77:7, 77:19,
77:23, 88:12, 89:14, 94:1,
94:8, 94:13, 94:18, 94:24,
96:7, 96:9, 97:24, 98:2, 98:5,
98:10, 99:6, 99:21, 100:2,
102:12, 107:23, 108:1,
108:5, 108:23, 109:6,
109:12, 109:17, 109:18,
110:13, 111:12, 112:1,
114:9, 114:16, 119:4,

119:12, 119:17, 126:11,
126:24, 129:5, 129:9,
129:11, 131:5, 131:12,
132:14, 138:22, 139:13,
142:22, 143:7, 144:7,
149:10, 150:8, 153:7, 155:1,
155:10, 155:11, 170:14,
172:9, 173:25, 184:16,
186:18, 192:7, 192:15,
193:2, 193:5, 193:12, 195:7,
201:2, 202:9, 203:3
**seeing** [3] - 10:10, 39:1,
132:24
**seek** [1] - 83:18
**seem** [2] - 7:2, 69:18
**seize** [1] - 32:11
**selected** [1] - 134:7
**selecting** [2] - 134:24,
135:15
**self** [1] - 135:15
**self-selecting** [1] - 135:15
**semantically** [1] - 136:13
**seminar** [2] - 65:2, 65:3
**seminars** [10] - 64:15,
64:21, 64:24, 65:11, 65:16,
65:18, 84:12, 84:13, 84:15
**send** [15] - 36:22, 37:2,
37:7, 38:9, 42:20, 44:13,
50:7, 56:6, 62:5, 67:2, 75:13,
96:9, 107:9, 109:4, 147:14
**sending** [10] - 69:11, 69:24,
80:5, 97:24, 107:7, 142:21,
142:23, 147:16, 147:22,
151:16
**sends** [6] - 38:6, 42:17,
48:11, 98:13, 111:13, 112:1
**sense** [19] - 8:16, 11:7,
11:12, 16:24, 122:9, 126:20,
128:22, 130:2, 136:18,
137:2, 151:8, 152:1, 152:3,
167:9, 179:24, 193:19,
195:25, 198:9, 201:7
**sent** [37] - 35:21, 37:15,
43:6, 51:5, 57:6, 62:12,
63:24, 65:25, 66:1, 66:5,
69:1, 69:2, 73:25, 74:3,
74:17, 75:3, 76:10, 76:21,
77:7, 96:13, 97:9, 97:23,
98:8, 98:22, 99:1, 103:24,
107:22, 108:3, 108:19,
110:3, 112:19, 143:15,
147:7, 147:20, 147:21,
158:21, 177:7
**sentence** [1] - 105:16
**sentenced** [2] - 78:25,
105:15
**sentencing** [3] - 102:19,
124:10, 124:11
**separate** [2] - 11:17, 62:20
**separated** [2] - 62:21,

126:1

**September** [5] - 64:9, 67:1, 179:12, 179:17, 182:13

**serious** [2] - 5:22, 123:5

**serves** [1] - 7:8

**Services** [3] - 51:12, 51:15, 99:14

**services** [1] - 51:21

**set** [13] - 29:10, 29:14, 29:15, 29:16, 37:23, 56:9, 117:4, 150:12, 150:15, 151:3, 158:21, 163:4, 201:8

**setting** [5] - 142:5, 164:1, 164:22, 167:4, 173:21

**settled** [1] - 88:3

**seven** [3] - 167:11, 190:21, 190:22

**sexual** [3] - 142:21, 142:23, 143:1

**sexually** [1] - 143:11

**sexually-related** [1] - 143:11

**sham** [1] - 191:10

**shape** [1] - 122:7

**shared** [2] - 19:13, 127:14

**Shawn** [17] - 30:3, 30:4, 30:18, 30:23, 31:15, 31:19, 31:20, 31:23, 34:24, 37:20, 37:22, 110:24, 183:25, 184:1, 184:4, 185:9, 186:4

**sheet** [4] - 7:22, 9:24, 32:19, 32:21

**Shelbi** [1] - 61:22

**shift** [1] - 71:14

**shit** [4] - 167:22, 171:11, 174:16, 185:15

**short** [4] - 5:8, 8:18, 13:5, 131:25

**shortly** [1] - 154:1

**shot** [1] - 127:7

**show** [23] - 27:10, 32:18, 33:8, 35:6, 36:24, 36:25, 37:14, 41:2, 42:5, 44:15, 45:21, 67:8, 76:5, 92:3, 98:21, 98:25, 111:10, 118:5, 129:25, 130:6, 144:10, 146:24, 197:23

**showed** [3] - 149:2, 150:1, 166:5

**showing** [12] - 50:15, 61:19, 63:9, 66:16, 70:11, 72:6, 77:16, 93:24, 96:3, 97:19, 107:18, 179:11

**shown** [1] - 17:20

**sick** [3] - 83:7, 180:4, 181:12

**side** [9] - 23:17, 27:22, 27:25, 28:1, 43:17, 79:25, 91:4, 91:5, 201:25

**sidetracked** [1] - 202:3

**sign** [20] - 39:1, 49:19, 71:15, 72:17, 74:21, 75:2, 75:4, 75:9, 75:11, 76:8, 77:2, 77:9, 77:12, 77:13, 77:15, 78:18, 78:22, 91:11

**signature** [3] - 74:16, 75:17, 75:20

**signatures** [3] - 57:17, 68:24, 74:22

**signed** [9] - 38:22, 38:24, 57:21, 69:3, 70:6, 74:13, 74:19, 74:23, 77:7

**significant** [2] - 9:3, 122:12

**signing** [6] - 38:20, 57:12, 58:12, 70:7, 75:25, 183:12

**signs** [1] - 183:11

**similar** [3] - 17:20, 67:2, 85:23

**simple** [1] - 63:23

**simply** [5] - 10:25, 12:19, 17:22, 18:18, 200:18

**single** [2] - 39:18, 146:22

**sit** [4] - 89:8, 89:18, 138:8, 151:4

**sits** [1] - 6:13

**sitting** [3] - 5:13, 26:7, 199:7

**situation** [4] - 17:18, 117:18, 122:9, 130:13

**six** [3] - 31:12, 73:5, 158:22, 162:2, 181:13

**skipped** [1] - 196:16

**skipping** [1] - 115:15

**slap** [1] - 41:4

**Slate** [1] - 171:24

**sleep** [1] - 36:6

**slower** [2] - 102:24, 136:23

**small** [2] - 15:23, 65:19

**smell** [1] - 181:11

**smiley** [1] - 48:11

**so..** [3] - 151:20, 163:19, 197:1

**social** [1] - 193:1

**sole** [1] - 91:10

**solid** [1] - 151:5

**solution** [3] - 90:6, 90:7, 90:10

**solutions** [1] - 70:8

**Solutions** [2] - 72:13, 73:20

**someone** [14] - 36:18, 39:1, 50:18, 57:4, 61:22, 61:23, 67:11, 67:13, 70:25, 89:4, 130:6, 143:2, 167:10, 180:22

**sometime** [1] - 159:24

**sometimes** [3] - 66:21, 102:23, 200:3

**somewhat** [1] - 128:6

**somewhere** [4] - 88:2, 103:19, 126:4, 195:18

**son** [5] - 84:1, 84:2, 84:9,

84:17, 84:24

**song** [1] - 112:22

**soon** [8] - 24:2, 29:22, 94:23, 129:6, 136:1, 139:17, 147:12, 164:4

**sorry** [29] - 6:20, 29:8, 34:15, 37:21, 46:24, 55:12, 56:18, 58:5, 58:6, 59:12, 73:7, 95:20, 101:6, 120:25, 125:20, 132:6, 132:12, 140:20, 144:18, 144:19, 145:3, 171:12, 179:8, 180:8, 180:15, 180:20, 181:1, 187:25

**sort** [11] - 15:3, 17:21, 43:7, 50:5, 53:22, 56:1, 65:14, 85:22, 89:1, 201:16

**sound** [5] - 163:13, 172:22, 177:20, 179:20, 183:1

**sounded** [2] - 51:22, 110:8

**sounds** [6] - 115:9, 128:8, 128:11, 172:22, 174:7, 201:17

**sources** [1] - 63:1

**South** [2] - 69:20, 69:23

**SOUTHERN** [1] - 1:1

**space** [1] - 86:7

**speaking** [9] - 21:14, 25:9, 56:13, 91:3, 123:10, 177:3, 179:7, 180:7, 185:13

**speaks** [1] - 119:7

**Special** [4] - 8:4, 8:16, 19:18, 23:24

**special** [3] - 14:13, 18:11, 179:17

**specific** [5] - 29:20, 67:5, 106:19, 107:8, 164:2

**specifically** [6] - 8:7, 146:7, 150:13, 151:23, 152:14, 179:22

**specimens** [1] - 85:25

**speculating** [1] - 128:16

**speed** [1] - 127:9

**spell** [1] - 25:1

**spent** [1] - 8:22

**spills** [1] - 195:17

**split** [1] - 45:7

**spoken** [5] - 20:20, 20:21, 144:15, 145:18, 154:8

**Sporn** [22] - 49:24, 53:10, 53:11, 53:12, 53:13, 53:18, 53:21, 54:3, 54:4, 55:1, 55:23, 57:14, 58:20, 58:21, 58:23, 58:25, 59:4, 60:24, 61:4, 61:7, 67:15, 67:21

**Sporn's** [8] - 54:11, 55:3, 55:17, 55:25, 56:11, 59:6, 62:20, 67:7

**spot** [3] - 14:2, 126:17, 149:13

**spreadsheet** [3] - 43:18, 66:14, 66:25

**spreadsheets** [3] - 43:14, 44:12, 67:2

**staff** [1] - 78:4

**stamped** [1] - 27:10

**stand** [14] - 7:5, 11:1, 21:15, 24:22, 65:1, 116:7, 120:17, 126:8, 132:3, 139:8, 139:9, 140:1, 192:12, 194:12

**standing** [2] - 115:7, 139:21

**standpoint** [2] - 19:1, 124:18

**stands** [1] - 39:12

**start** [24] - 5:16, 13:22, 20:6, 34:16, 35:11, 35:17, 43:17, 49:18, 53:18, 59:18, 75:24, 90:11, 97:2, 115:22, 127:7, 135:23, 139:19, 144:5, 146:12, 146:14, 182:20, 194:23, 194:25, 201:7

**started** [21] - 5:3, 23:19, 24:4, 32:1, 32:3, 36:17, 38:18, 54:1, 54:3, 72:23, 79:16, 89:3, 96:15, 122:11, 132:22, 138:6, 138:21, 143:8, 147:22, 152:10, 171:24

**starting** [7] - 42:7, 42:16, 44:24, 76:21, 103:1, 122:22, 139:12

**starts** [4] - 51:11, 117:18, 197:23, 202:19

**state** [9] - 11:24, 90:8, 95:20, 144:18, 144:20, 145:6, 145:7, 145:21, 200:6

**statement** [4] - 18:6, 160:24, 160:25, 169:25

**statements** [16] - 12:21, 17:3, 17:17, 17:22, 17:25, 18:1, 18:17, 19:4, 19:12, 103:9, 103:14, 117:4, 121:11, 136:14, 200:16

**states** [4] - 90:8, 98:2, 98:3, 110:6

**States** [10] - 1:23, 5:4, 24:18, 50:10, 86:21, 93:17, 95:23, 99:13, 104:16, 105:4, 106:8, 107:12, 111:2, 112:12, 145:11, 154:21, 154:23, 178:14, 178:15, 203:17

**STATES** [4] - 1:1, 1:3, 1:10, 1:15

**stating** [1] - 141:6

**station** [3] - 39:11, 39:12, 111:23

**status** [1] - 137:1

**stay** [3] - 22:18, 40:9, 79:5
**stayed** [3] - 159:7, 159:8, 162:6
**staying** [2] - 21:17, 22:23
**Stein** [1] - 46:9
**STENOGRAPHICALLY** [1] - 1:20
**step** [3] - 23:3, 101:7, 131:9
**steps** [1] - 82:11
**STEVEN** [2] - 1:17, 1:18
**Steven** [1] - 8:5
**sticking** [1] - 58:20
**still** [27] - 5:8, 7:10, 21:25, 22:5, 83:5, 86:3, 88:5, 125:25, 129:3, 133:18, 154:16, 157:3, 157:4, 163:18, 165:8, 165:24, 166:15, 167:25, 168:20, 172:18, 177:13, 182:13, 182:15, 193:25, 194:5, 195:13, 199:2
**stock** [3] - 81:15, 81:20, 81:21
**stocks** [1] - 81:22
**stop** [4] - 22:20, 124:4, 129:16, 173:1
**straggle** [1] - 8:1
**straggling** [1] - 202:7
**straight** [3] - 26:17, 46:10, 117:3
**stream** [1] - 56:17
**streamline** [2] - 120:13, 201:2
**Street** [4] - 1:18, 2:6, 36:14, 81:15
**street** [2] - 150:6, 150:7
**strict** [2] - 83:15
**strong** [1] - 22:14
**struck** [1] - 73:1
**structure** [2] - 87:9, 172:15
**structures** [1] - 45:15
**stubborn** [1] - 75:6
**stuck** [1] - 87:24
**studied** [2] - 128:17, 128:18
**stuff** [9] - 54:21, 65:2, 86:14, 86:15, 86:18, 127:14, 147:20, 164:25, 184:22
**sub** [1] - 34:19
**subcontractors** [2] - 44:1, 87:22
**subject** [6] - 13:11, 18:19, 20:19, 61:25, 76:7, 107:10
**submit** [9] - 31:10, 34:5, 34:20, 36:11, 41:6, 80:4, 89:13, 90:24
**submitted** [6] - 26:3, 34:3, 66:12, 68:20, 80:3, 87:13
**submitting** [2] - 26:3, 29:2
**subpoenaed** [2] - 171:11, 171:15

**success** [2] - 113:5, 113:10
**sudden** [2] - 73:8, 73:9
**sufficient** [1] - 14:14
**sufficiently** [1] - 196:25
**suggest** [2] - 152:3, 153:4
**suggesting** [2] - 101:20, 197:5
**suggestion** [1] - 133:24
**suit** [1] - 26:9
**Suite** [2] - 1:19, 2:6
**summarized** [1] - 18:17
**summary** [4] - 16:2, 16:22, 18:10, 66:5
**summary.xlsx** [1] - 66:2
**super** [1] - 83:9
**Super** [1] - 83:11
**supplied** [1] - 127:11
**supplies** [1] - 64:13
**supply** [1] - 65:2
**supplying** [1] - 191:7
**surprised** [1] - 124:24
**surprising** [1] - 123:24
**surrender** [2] - 124:11, 124:12
**suspect** [5] - 22:19, 58:7, 58:9, 196:1, 196:2
**suspicion** [2] - 6:14, 58:10
**SUV** [1] - 177:8
**swab** [2] - 110:11, 111:22
**swabs** [1] - 99:22
**swear** [1] - 24:23
**switch** [2] - 162:3, 162:4
**switched** [4] - 87:12, 160:8, 170:15, 170:24
**switching** [2] - 92:5, 160:22
**sworn** [1] - 24:24
**system** [1] - 64:20

---

# T

**table** [5] - 5:14, 30:24, 133:22, 134:18, 199:7
**Tahoe** [1] - 9:22
**tailor** [1] - 196:6
**takeaway** [1] - 31:23
**takeaways** [1] - 31:22
**talker** [1] - 53:16
**talks** [1] - 17:4
**Tang** [1] - 112:21
**tape** [17] - 119:1, 123:25, 124:4, 124:5, 150:14, 150:19, 156:12, 156:13, 164:4, 169:1, 184:3, 184:7, 184:8, 184:10, 184:12, 185:6
**tape-recorded** [1] - 123:25
**tape-recording** [1] - 124:4
**taped** [4] - 80:14, 80:15, 80:21, 80:23
**tapes** [1] - 156:14

**taping** [8] - 141:10, 141:25, 143:5, 143:18, 149:22, 151:6, 153:18, 190:18
**targeting** [1] - 99:25
**taste** [1] - 181:11
**team** [9] - 19:21, 23:9, 103:19, 103:24, 123:13, 126:22, 131:22, 134:9, 138:24
**tech** [1] - 15:2
**tele** [1] - 68:22
**teledoc** [12] - 50:6, 56:6, 57:6, 68:24, 69:1, 69:2, 69:25, 70:20, 71:3, 107:25, 108:7, 108:8
**teledocs** [1] - 57:12
**telemarketers** [4] - 51:9, 56:13, 57:2, 110:7
**telemarketing** [3] - 30:22, 99:25, 110:22
**telemed** [7] - 9:19, 62:8, 63:7, 64:22, 91:3, 91:4
**Telemed** [2] - 61:25, 62:15
**telemedicine** [9] - 49:17, 49:18, 49:22, 50:2, 65:18, 65:20, 71:9, 78:14, 96:16
**telemeds** [1] - 58:2
**telephone** [3] - 8:25, 156:18, 162:12
**ten** [5] - 9:22, 47:11, 56:3, 56:23, 94:23
**tend** [4] - 102:23, 144:7, 198:5, 198:12
**terminology** [1] - 134:8
**terms** [9] - 7:4, 9:13, 15:7, 81:18, 90:20, 122:4, 134:3, 185:13, 196:4
**Terre** [1] - 110:12
**test** [38] - 29:4, 29:5, 29:6, 29:19, 31:18, 33:23, 34:3, 34:11, 47:21, 52:3, 52:5, 52:7, 52:19, 53:7, 54:17, 56:4, 57:7, 63:20, 63:21, 63:24, 64:18, 66:21, 68:20, 69:2, 78:6, 85:19, 85:20, 86:1, 86:3, 87:13, 87:15, 90:18, 110:11, 172:18, 173:9, 175:17, 183:10
**test-ordering** [1] - 78:6
**tested** [1] - 34:4
**testified** [5] - 109:15, 127:12, 145:17, 171:7, 176:16
**testify** [3] - 32:14, 98:17, 145:21
**testifying** [3] - 105:13, 141:13, 152:4
**testimony** [16] - 8:17, 123:9, 126:9, 126:15, 140:5, 141:15, 142:3, 149:21,

**159:4**, 159:22, 164:20, 190:19, 196:22, 196:25, 197:7, 198:10
**Testing** [1] - 99:17
**testing** [22] - 10:7, 26:16, 26:18, 28:21, 31:1, 31:2, 40:3, 51:1, 65:2, 66:12, 66:23, 85:4, 85:15, 85:18, 85:23, 85:24, 86:7, 86:9, 86:10, 96:16, 99:23, 109:10
**tests** [33] - 26:3, 29:2, 29:3, 34:5, 34:20, 36:11, 38:21, 39:7, 39:9, 39:10, 39:11, 43:2, 54:8, 58:18, 64:18, 66:11, 66:16, 66:20, 68:23, 78:7, 78:9, 80:4, 80:5, 90:24, 99:4, 107:25, 108:7, 108:8, 183:8, 186:19, 187:11
**Tests** [1] - 98:4
**Texas** [1] - 172:12
**text** [58] - 9:5, 9:13, 9:20, 10:9, 12:4, 12:8, 12:9, 12:24, 14:4, 15:21, 19:7, 19:9, 20:12, 21:5, 21:10, 21:21, 32:15, 33:10, 33:11, 33:16, 35:8, 35:17, 35:20, 46:19, 47:11, 49:12, 70:13, 70:15, 94:3, 94:6, 96:4, 97:22, 98:11, 101:22, 102:3, 103:22, 107:18, 107:21, 111:10, 111:13, 112:1, 132:8, 147:3, 151:16, 151:24, 152:19, 153:3, 153:7, 153:11, 154:1, 154:14, 154:16, 154:17, 155:24, 156:2, 166:8, 177:3, 177:7
**texted** [1] - 133:6
**texting** [5] - 48:13, 142:16, 143:3, 148:4, 153:19
**texts** [1] - 9:23
**that'll** [11] - 27:5, 35:3, 41:25, 60:17, 95:24, 97:15, 106:10, 107:13, 112:14, 152:25, 172:18
**THE** [213] - 1:10, 1:13, 1:17, 2:2, 5:2, 6:5, 6:9, 6:14, 6:16, 6:17, 6:19, 6:20, 6:22, 6:23, 7:21, 8:21, 10:6, 10:9, 10:14, 10:20, 11:9, 11:23, 12:6, 13:20, 15:5, 15:25, 16:9, 16:15, 17:1, 17:11, 18:8, 19:24, 20:11, 20:14, 21:11, 22:8, 22:12, 23:5, 23:13, 23:21, 24:2, 24:7, 24:9, 24:11, 24:20, 24:25, 25:2, 26:13, 27:1, 27:5, 32:7, 35:3, 41:25, 50:11, 60:17, 61:13, 71:25, 86:23, 91:19, 92:7, 93:19, 95:24, 97:15, 100:10,

100:13, 100:16, 100:18, 100:22, 100:25, 101:3, 101:6, 101:10, 101:13, 101:16, 101:24, 102:13, 102:19, 103:4, 103:16, 104:1, 104:5, 104:8, 104:10, 104:12, 104:14, 104:18, 105:6, 106:10, 107:13, 111:3, 112:14, 113:18, 113:22, 114:11, 114:13, 114:15, 114:16, 114:20, 115:2, 115:12, 115:18, 115:23, 116:3, 116:11, 116:18, 116:25, 117:2, 117:16, 117:21, 117:25, 118:4, 118:19, 119:9, 119:19, 119:25, 120:1, 120:4, 120:12, 120:21, 121:3, 121:9, 121:14, 121:21, 122:4, 122:18, 122:24, 123:9, 124:3, 124:8, 125:5, 125:9, 125:11, 125:19, 126:2, 126:4, 127:4, 127:13, 127:17, 127:19, 127:21, 127:24, 128:1, 128:4, 128:20, 129:22, 130:7, 130:20, 130:24, 131:16, 131:19, 131:22, 132:5, 132:9, 132:11, 132:13, 132:16, 133:8, 133:10, 133:24, 134:15, 134:20, 135:3, 135:6, 136:8, 136:17, 137:1, 137:8, 137:11, 137:14, 137:21, 137:23, 138:12, 139:6, 139:15, 139:16, 139:21, 139:24, 152:23, 152:25, 179:9, 181:22, 184:25, 185:1, 190:12, 191:21, 191:24, 193:7, 193:9, 193:15, 193:22, 194:10, 194:14, 194:20, 195:2, 195:12, 195:16, 196:8, 196:10, 196:24, 197:4, 197:12, 198:5, 199:9, 200:15, 200:22, 200:24, 201:6, 201:21, 201:24, 202:9, 202:22, 203:1, 203:6

**theft** [1] - 99:24

**themselves** [1] - 119:8

**theory** [1] - 14:9

**thereabouts** [3] - 119:23, 140:9, 195:3

**thereafter** [1] - 154:2

**therefore** [1] - 18:2

**they've** [5] - 17:14, 95:3, 103:9, 120:20, 136:16

**thinking** [4] - 64:14, 172:16, 186:25, 195:13

**third** [5] - 26:9, 77:16,

131:4

**Thomas** [1] - 97:14

**thoroughly** [1] - 128:10

**thousand** [5] - 44:24, 47:3, 47:4, 47:5, 107:25

**threatening** [1] - 29:13

**three** [18] - 54:22, 82:10, 83:5, 84:15, 85:21, 127:11, 127:15, 127:16, 129:1, 147:22, 155:24, 158:22, 162:1, 175:12, 190:2, 190:4, 196:15

**three-day** [1] - 190:4

**three-quarters** [1] - 54:22

**throughout** [4] - 92:24, 163:21, 163:22, 192:18

**thrown** [1] - 41:15

**thumbs** [3] - 53:22, 53:23, 54:1

**thumbs-up** [3] - 53:22, 53:23, 54:1

**tight** [2] - 199:11, 201:12

**timeline** [1] - 127:25

**timestamp** [1] - 137:7

**timetable** [1] - 31:11

**Timothy** [1] - 145:11

**tipped** [4] - 141:7, 141:10, 141:14, 150:20

**tire** [1] - 7:3

**title** [1] - 110:1

**titled** [1] - 99:3

**today** [25] - 8:5, 8:17, 20:6, 26:5, 32:14, 51:24, 83:4, 84:5, 84:6, 101:19, 101:21, 105:13, 123:1, 131:2, 131:5, 131:6, 133:23, 138:2, 138:4, 138:18, 140:8, 142:7, 144:1, 191:25, 199:12

**today's** [1] - 22:2

**together** [9] - 17:5, 39:18, 39:19, 39:20, 42:21, 51:8, 89:18, 112:25, 195:18

**tomorrow** [19] - 192:4, 192:9, 192:13, 193:2, 193:6, 193:12, 193:24, 194:8, 194:12, 194:16, 194:17, 194:20, 196:18, 199:18, 201:19, 202:10, 202:19, 203:3

**tone** [1] - 119:10

**tonight** [4] - 194:18, 199:5, 199:8

**took** [8] - 15:1, 15:17, 17:8, 31:24, 106:22, 106:24, 168:10, 178:7

**top** [5] - 37:6, 42:7, 44:24, 61:21, 77:6

**topic** [3] - 49:16, 107:10, 135:2

**topics** [4] - 9:14, 15:20,

15:22, 92:5

**total** [3] - 68:14, 115:15, 128:22

**totally** [3] - 10:5, 52:25, 145:23

**touch** [4] - 8:3, 21:22, 22:6, 198:14

**touching** [1] - 23:9

**towards** [2] - 170:25, 190:13

**toxicology** [3] - 28:24, 29:3, 29:4

**track** [6] - 9:12, 15:18, 63:3, 67:5, 191:1, 192:3

**tracking** [4] - 44:12, 62:25, 66:10, 66:11

**traditional** [1] - 15:4

**traditionally** [1] - 15:15

**train** [4] - 39:11, 39:12, 84:25, 111:23

**training** [4] - 189:22, 190:1, 190:5

**Tramonti's** [1] - 185:24

**TRANSCRIPT** [1] - 1:9

**transcript** [7] - 118:1, 118:2, 118:6, 118:22, 165:5, 168:4, 191:20

**transcription** [1] - 203:12

**translating** [1] - 86:7

**transpiring** [1] - 130:13

**transported** [1] - 200:12

**travel** [2] - 39:19, 39:20

**treat** [1] - 52:12

**treatment** [14] - 29:6, 51:19, 79:25, 82:14, 83:18, 85:5, 85:10, 85:12, 85:13, 85:14, 85:17, 85:24, 86:3, 91:7

**TRIAL** [1] - 1:9

**trial** [6] - 5:5, 123:17, 124:4, 124:15, 192:18, 192:24

**trials** [1] - 7:12

**Tricare** [1] - 175:14

**trip** [1] - 107:1

**triple** [2] - 133:18, 134:22

**triple-check** [1] - 134:22

**triple-checked** [1] - 133:18

**trouble** [15] - 39:22, 39:25, 40:1, 40:11, 40:24, 41:2, 41:4, 81:4, 81:9, 96:20, 168:22, 169:4, 174:15, 183:11

**true** [33] - 16:24, 71:5, 81:9, 142:17, 145:19, 147:19, 153:23, 153:24, 153:25, 160:24, 160:25, 161:3, 161:4, 161:7, 161:8, 165:1, 165:2, 168:11, 168:12, 168:24, 171:3, 171:8, 172:9, 175:20, 186:9, 186:10, 188:10, 189:8, 190:23,

190:24, 197:8, 197:10, 197:11

**trust** [13] - 24:13, 154:20, 155:20, 156:24, 156:25, 168:15, 168:16, 172:5, 175:23, 186:12, 186:15, 186:18, 197:16

**trusted** [1] - 157:1

**truth** [1] - 170:19

**truthfully** [1] - 196:10

**try** [16] - 73:6, 104:5, 127:1, 135:24, 139:12, 140:24, 141:23, 150:8, 181:22, 186:20, 186:21, 186:24, 187:4, 195:5, 201:12, 202:12

**trying** [18] - 7:17, 36:9, 56:16, 89:9, 89:11, 101:22, 116:20, 119:5, 131:25, 134:5, 143:10, 151:22, 152:13, 159:19, 161:11, 161:14, 183:23, 190:10

**turn** [10] - 12:23, 104:21, 120:7, 122:18, 135:3, 135:8, 140:5, 140:11, 168:9, 195:19

**turned** [3] - 136:16, 136:19, 197:9

**turning** [4] - 21:18, 65:24, 74:12, 137:24

**Tushar** [7] - 42:8, 42:19, 42:21, 43:3, 43:4, 43:5, 43:6

**two** [38] - 7:10, 8:24, 10:24, 26:2, 31:24, 37:21, 37:22, 42:13, 68:18, 73:25, 75:8, 82:10, 82:16, 84:15, 85:20, 87:14, 87:25, 88:11, 88:21, 102:15, 115:14, 120:22, 127:16, 127:18, 128:8, 129:25, 131:3, 133:20, 147:6, 161:19, 169:9, 174:14, 190:4, 191:1, 191:7, 194:7, 199:12

**type** [7] - 11:21, 17:9, 38:15, 81:16, 90:14, 121:11, 130:12

**types** [5] - 44:12, 66:20, 67:2, 85:17, 95:5

**typically** [1] - 138:10

**typing** [1] - 135:7

**typo** [1] - 62:14

## U

**Uber** [2] - 9:25, 10:3

**ultimately** [3] - 13:17, 78:19, 95:8

**unable** [1] - 118:17

**unaffiliated** [1] - 9:4

**unaware** [1] - 138:20

**unbelievable** [1] - 192:1

**uncle** [1] - 90:17

**uncommon** [1] - 7:11
**unconnected** [1] - 60:3
**uncovered** [1] - 133:16
**under** [15] - 10:22, 11:1, 13:6, 41:5, 51:16, 54:9, 79:13, 83:15, 141:6, 141:13, 142:3, 145:17, 150:23, 171:10, 193:10
**undercover** [6] - 9:4, 15:18, 16:6, 17:17, 22:22
**underneath** [7] - 34:18, 43:21, 44:2, 46:9, 46:20, 52:18, 87:22
**understandably** [1] - 135:18
**understood** [6] - 22:4, 104:7, 130:7, 133:20, 141:18, 202:6
**undertaken** [1] - 15:15
**underway** [1] - 138:22
**undisclosed** [1] - 10:3
**unfair** [1] - 132:25
**unfolding** [1] - 192:24
**unfortunately** [2] - 34:13, 123:16
**unhappy** [1] - 158:19
**unique** [2] - 66:5, 66:8
**unit** [1] - 68:14
**United** [21] - 1:23, 5:4, 24:18, 50:9, 86:20, 93:16, 95:22, 99:13, 104:16, 105:3, 106:8, 107:11, 111:1, 112:12, 145:11, 154:21, 154:23, 178:14, 178:15, 203:17
**UNITED** [4] - 1:1, 1:3, 1:10, 1:15
**universe** [1] - 202:6
**unknown** [1] - 153:4
**unless** [3] - 114:21, 116:5, 117:13
**unlimited** [1] - 65:19
**unnecessary** [4] - 78:7, 78:9, 85:20, 85:23
**unneeded** [1] - 99:4
**unreal** [1] - 48:23
**up** [126] - 5:5, 7:5, 11:21, 12:14, 17:8, 19:15, 20:18, 21:20, 24:20, 24:22, 25:10, 30:16, 33:10, 34:17, 34:18, 37:23, 38:12, 42:18, 46:10, 48:16, 53:22, 53:23, 54:1, 55:20, 56:5, 56:9, 56:15, 57:23, 58:12, 58:13, 58:14, 58:15, 61:5, 62:12, 77:6, 80:5, 80:13, 80:19, 80:20, 80:22, 81:1, 85:1, 85:17, 87:13, 87:21, 89:3, 90:7, 90:9, 94:21, 95:12, 95:14,

98:18, 101:25, 103:18, 104:20, 114:5, 115:1, 116:9, 125:3, 127:9, 129:25, 130:6, 132:7, 132:14, 133:2, 133:4, 133:14, 133:23, 135:25, 136:24, 138:14, 140:11, 140:24, 142:5, 146:5, 146:9, 146:10, 146:11, 147:6, 148:21, 149:4, 150:1, 150:9, 150:12, 150:15, 151:3, 159:15, 163:4, 164:1, 164:22, 165:8, 167:4, 173:21, 178:11, 179:5, 179:6, 179:25, 180:1, 182:5, 182:6, 182:7, 183:9, 187:14, 188:3, 188:20, 191:3, 191:6, 191:10, 191:17, 192:8, 195:24, 196:1, 196:18, 196:21, 198:15, 202:12
**up-and-up** [4] - 80:13, 80:22, 81:1, 116:9
**update** [5] - 5:10, 136:9, 137:3, 137:6, 199:3
**upset** [1] - 129:24
**urinalysis** [1] - 85:15
**urine** [1] - 85:25
**user** [3] - 33:13, 35:12, 62:8
**usual** [1] - 19:11

**V**

**VA** [2] - 175:11, 175:13
**valuable** [2] - 119:7, 201:3
**value** [8] - 17:10, 17:12, 17:19, 22:16, 102:4, 196:22, 196:24, 196:25
**vantage** [1] - 124:14
**various** [2] - 32:15, 82:9
**Vartanian** [2] - 89:4, 89:6
**VAs** [3] - 175:8, 175:9, 175:11
**Vegan** [1] - 55:21
**venture** [5] - 149:9, 155:3, 172:3, 186:13, 186:25
**verbal** [11] - 29:18, 151:9, 152:2, 156:1, 165:17, 167:24, 170:22, 173:13, 177:21, 179:3, 184:17
**versus** [3] - 5:5, 54:20, 65:18
**vet** [1] - 53:23
**Veterans** [1] - 175:10
**vets** [1] - 175:17
**vetting** [1] - 53:25
**via** [1] - 34:18
**vice** [1] - 170:9
**Victor** [1] - 32:6
**video** [3] - 16:13, 112:7, 112:21
**view** [1] - 116:5

**visit** [1] - 88:17
**visits** [2] - 88:22, 100:1
**voice** [2] - 25:10, 140:24
**Volume** [1] - 1:6
**volume** [1] - 65:17
**voluminous** [2] - 122:14, 122:15
**vs** [1] - 1:5

**W**

**wait** [6] - 7:1, 7:14, 23:17, 23:22, 123:21, 166:1
**waived** [1] - 21:4
**walk** [1] - 122:20
**wall** [1] - 54:23
**Wall** [2] - 36:14, 81:15
**Walmart** [2] - 39:12, 39:13
**wants** [8] - 49:2, 120:9, 130:15, 147:6, 154:2, 155:25, 172:25, 197:18
**warned** [1] - 150:14
**warranted** [1] - 187:7
**wash** [1] - 174:22
**Washington** [1] - 1:16
**waste** [1] - 182:3
**watch** [1] - 176:19
**ways** [2] - 38:16, 39:10
**wedge** [1] - 56:1
**week** [13] - 44:25, 68:18, 75:8, 82:10, 85:21, 108:4, 129:4, 147:6, 181:7, 181:8, 195:25, 201:4
**weekend** [1] - 153:8
**weeks** [4] - 68:18, 75:8, 147:6, 147:23
**well-founded** [1] - 202:24
**WEST** [1] - 1:2
**wheeler** [1] - 53:16
**whereas** [2] - 31:12, 202:15
**white** [1] - 186:4
**whole** [8] - 54:17, 94:11, 115:20, 147:16, 151:16, 184:10, 187:13, 189:22
**wholesale** [2] - 11:25, 202:16
**wife** [16] - 80:18, 125:19, 125:22, 125:23, 141:3, 142:22, 143:2, 143:15, 146:3, 146:8, 163:15, 163:17, 163:24, 164:21
**Wilcox** [1] - 43:23
**willing** [1] - 126:22
**window** [2] - 54:23, 202:12
**wire** [3] - 10:4, 150:14, 150:19
**wired** [20] - 101:19, 115:21, 119:7, 123:2, 141:8, 149:13, 149:15, 149:16, 150:9, 163:24, 164:2, 164:4, 164:6,

164:9, 164:12, 164:14, 164:17, 167:3, 176:14, 183:10
**wires** [1] - 43:6
**wise** [1] - 152:12
**wiser** [1] - 135:21
**wish** [2] - 123:25
**witness** [28] - 9:10, 23:3, 24:16, 24:17, 24:24, 26:12, 101:3, 101:5, 101:9, 104:14, 114:19, 120:17, 123:19, 130:4, 131:1, 131:5, 133:8, 135:24, 144:14, 144:23, 192:11, 192:14, 193:14, 193:24, 194:6, 195:9, 195:25, 200:7
**WITNESS** [4] - 3:2, 25:2, 114:15, 185:1
**witnesses** [15] - 27:3, 127:12, 127:15, 127:16, 129:1, 129:4, 129:9, 129:12, 131:3, 133:13, 133:17, 194:7, 199:1, 200:20, 201:16
**witnessing** [1] - 39:1
**woman** [1] - 149:1
**wonder** [1] - 200:17
**wonderful** [1] - 193:4
**wondering** [2] - 135:18, 138:15
**word** [1] - 41:14
**words** [7] - 5:16, 33:13, 60:24, 69:1, 119:8, 158:16, 197:13
**workers** [1] - 150:5
**works** [4] - 119:19, 130:24, 132:5, 173:25
**world** [2] - 85:17, 85:18
**worried** [1] - 138:16
**worry** [5] - 7:16, 7:24, 22:8, 41:19, 166:6
**worst** [1] - 96:19
**worth** [1] - 14:16
**wrap** [1] - 196:21
**wrapped** [1] - 56:5
**wrist** [1] - 41:5
**write** [2] - 144:7, 153:12
**writing** [2] - 41:11, 147:5
**written** [2] - 71:18, 72:23
**wrote** [1] - 182:11
**WTF** [2] - 71:5, 108:18
**Wu** [1] - 112:21
**Wu-Tang** [1] - 112:21

**Y**

**year** [10] - 73:13, 73:15, 74:25, 83:2, 83:11, 87:14, 88:1, 88:9, 180:4, 180:13
**years** [18] - 59:16, 79:23, 82:16, 87:15, 87:25, 142:17,

152:8, 152:9, 156:25,
163:21, 163:22, 167:11,
175:24, 176:10, 190:21,
190:22, 191:1, 191:8
   **years'** [1] - 161:20
   **yesterday** [26] - 5:10, 8:2,
8:11, 21:1, 21:12, 42:18,
143:4, 143:6, 143:17,
143:18, 149:10, 149:11,
149:14, 149:16, 156:12,
156:13, 156:14, 162:22,
163:23, 164:3, 168:5,
181:18, 184:7, 184:10,
185:6, 185:8
   **Yogel** [3] - 195:15, 195:16,
198:22
   **York** [3] - 1:16, 85:9,
172:14
   **you-all** [1] - 116:12
   **young** [2] - 6:19, 28:11
   **younger** [2] - 6:20, 6:25
   **Youngswick** [7] - 28:5,
32:4, 42:9, 67:13, 70:13,
155:16, 182:11
   **yourself** [7] - 35:12, 42:8,
45:10, 54:13, 61:23, 72:9,
98:18
   **YouTube** [2] - 112:7,
112:19

## Z

   **zero** [1] - 91:6
   **zoom** [2] - 62:3, 68:8