```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                     WEST PALM BEACH DIVISION
                     CASE NO. 19-CR-80181-RAR-1
 3
      UNITED STATES OF AMERICA,           Miami, Florida
 4
                                          December 8, 2022
 5            vs.
                                          9:18 a.m. - 4:48 p.m.
 6
      MINAL PATEL,                         Volume 9
 7
                   Defendant.             Pages 1 to 224
 8    _____

 9
                        TRANSCRIPT OF JURY TRIAL
10          BEFORE THE HONORABLE RODOLFO A. RUIZ, II
                     UNITED STATES DISTRICT JUDGE
11
      APPEARANCES:
12

13    FOR THE GOVERNMENT:       JAMIE DE BOER
                                EMILY GURSKIS
14                              REGINALD CUYLER
                                KATHERINE ROOKARD
15                              UNITED STATES DEPARTMENT OF JUSTICE
                                CRIMINAL DIVISION, FRAUD SECTION
16                              1400 New York Avenue, 8th Floor
                                Washington, D.C. 20005
17
      FOR THE DEFENDANT:        STEVEN H. SADOW
18                              LAW OFFICE OF STEVEN H. SADOW, PC
                                260 Peachtree Street NW
19                              Suite 2052
                                Atlanta, Georgia 30303
20
      STENOGRAPHICALLY REPORTED BY:
21
                                ILONA LUPOWITZ, CRR, RPR, RMR
22                              Official Court Reporter to:
                                The Honorable Rodolfo A. Ruiz, II
23                              United States District Court
                                299 East Broward Boulevard
24                              Fort Lauderdale, Florida 3301
                                (954) 769-5568
25
```

```
 1   (Appearances continued)

 2
     FOR THE DEFENDANT:          DONALD F. SAMUEL
 3                               GARLAND, SAMUEL & LOEB, PC
                                 3131 Maple Drive NE
 4                               Atlanta Georgia 30305

 5                               BRIAN T. RAFFERTY
                                 BAKER & HOSTETLER, LLP
 6                               1170 Peactree Street, Suite
                                 2400
 7                               Atlanta, Georgia 30309

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                              I N D E X

WITNESS                                                    PAGE

BRETT HIRSCH
CONTINUED CROSS-EXAMINATION BY MR. SADOW:                    14
REDIRECT EXAMINATION BY MS. DE BOER:                        31

H.K.

DIRECT EXAMINATION BY MR. CUYLER:                          42
CROSS-EXAMINATION BY MR. RAFFERTY:                         48
REDIRECT EXAMINATION BY MR. CUYLER:                        50

MICHAEL PETRON

DIRECT EXAMINATION BY MS. DE BOER                          55
CROSS-EXAMINATION BY MR. SADOW:                           116
REDIRECT EXAMINATION BY MS. DE BOER:                      163
RECROSS-EXAMINATION BY MR. SADOW                          168
FURTHER REDIRECT EXAMINATION BY MS. DE BOER               171


                        GOVERNMENT'S EXHIBITS


Exhibit                                              Received

1241-O                                                    15
1610                                                      16
301, 302, 303, 304,                                      58
305, 306, 307, 308,
309, 310, 311, 312,
313, 314, 315, 316,
317, 318, 319, 320,
321, 322, 323, 324,
328, 329, 330, 331,
1121, and 1125
112                                                      62
113                                                      64
114                                                      64
116, 108, and 106                                        70
166, 2, 3, and 4                                         72
122-A                                                    78
123                                                      78
124                                                      82
125                                                      83
165                                                      83
6, 7, 8, and 9                                           85

```
 1   151, 152, 153, 154,                          88
     155, 156, 157, 158
 2   132, 133, 134, and                           91
     135
 3   126, 127, 128, 129,                          102
     137, 138, 139
 4   140                                          126
     103                                          133
 5   115                                          158
     108                                          163
 6

 7                    DEFENDANT'S EXHIBITS

 8

 9

10   Exhibit                                 Received

11   BH-1 and BH-2                                14

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    (Call to the Order of the Court.)

2            THE COURT:  All right.  Let's go ahead and get started

3    this morning in case number 19-80181, United States of America

4    versus Minal Patel.  We left off yesterday during the

5    cross-examination of Mr. Hirsch.  I understand we have, give or

6    take, about an hour remaining in that cross-examination.

7            Now, before we recall Mr. Hirsch, I obviously want to

8    check in to make sure that we had no other surprises overnight

9    on behalf of the government regarding any 302s or any other

10   concerns of the nature of discovery.

11           So starting with that question, any updates on behalf

12   of the government?

13           MS. DE BOER:  Yes, Your Honor.  We have confirmed that

14   all of the 302s for witnesses, past and present, have been

15   produced at this time.

16           THE COURT:  Okay.  And I don't know if we had an

17   occasion to discuss it.  It may be premature.  But we had left

18   off with at least a suggestion from Mr. Sadow that to the

19   extent some of those 302s may be utilized in the defense's

20   case-in-chief as they pertain to Griner, Ramamurthy, that there

21   may be a method of doing that that would not require them to be

22   recalled.

23           I don't know if you had a chance to discuss that.

24           MS. DE BOER:  We haven't discussed it yet, but of

25   course we're open to reviewing Mr. Sadow's proposal.  We think

1    that would be an efficient approach, and so we're happy to hear

2    what -- you know, at lunch or overnight or the weekend, what

3    his proposal is on that.

4         THE COURT:  Very good.  Okay.  All right.  Any other

5    housekeeping concerns on the government's end before I turn to

6    the defense?

7         MS. DE BOER:  Yes, Your Honor.

8         THE COURT:  Sure.

9         MS. DE BOER:  I think some good news.

10        THE COURT:  Okay.

11        MS. DE BOER:  Which is we are cutting two witnesses,

12   which would be Holden and Rinsky.

13        THE COURT:  Holden and -- okay.  And Rinsky.

14        MS. DE BOER:  And Rinsky.  So after Mr. Hirsch

15   finishes, it will be Ms. K, a beneficiary, and then we will

16   move to Mr. Petron.

17        THE COURT:  Okay.

18        MS. DE BOER:  I would ask, if Your Honor is open to

19   this, if we could at a minimum take our morning break, if not

20   take an early lunch, just because this was a major shift and I

21   want to just -- we have some exhibits to plot of our boxes, and

22   just make sure we're not fumbling through and making the direct

23   longer than it has to be.

24        But, you know, he will be finished with his direct

25   today, if not into cross today, if the defense is prepared to

1   cross him today.

2          THE COURT:  Very good.  So let's plan on that.  And I

3   believe H.K., or K, the beneficiary, we can do when we're done

4   with Mr. Hirsch before the lunch break probably, right?

5          MS. DE BOER:  I would imagine, Your Honor.

6          THE COURT:  Yeah.  So I think that that should take us

7   to just about noon, if you figure probably between getting the

8   remainder of the cross done, having the redirect, and having

9   H.K., at the end of that, I don't see a reason why we would

10  start Mr. Petron.

11         It makes sense to me that we would go ahead and take a

12  break at that point and then resume after lunch with Petron,

13  right?

14         MS. DE BOER:  Thank you, Your Honor.  I would

15  appreciate the time to just square it up and make sure we're

16  efficient once we do get to him.

17         And then one last matter.  Mr. -- I instructed agents

18  to make sure Mr. Hirsch was going to be here on time and that

19  was the only contact.

20         THE COURT:  Okay.

21         MS. DE BOER:  He is here.  However, when the agent

22  called him to make sure that he was not hitting traffic, that

23  he was going to be here, Mr. Hirsch started to tell the agent

24  that he received calls overnight that he wants to talk to his

25  lawyer about.

 1          The agent did the right thing and said, I can't talk to

 2     you about this, sit tight, get to court, we'll bring it up with

 3     the judge.  So I don't know what these calls are.  I don't know

 4     if they have anything to do with this.  I don't know.

 5          So I don't know if perhaps Your Honor wants to ask him,

 6     is there anything he needs to speak to a lawyer about before he

 7     continues, or if he can continue and then talk to his lawyer

 8     after.

 9          THE COURT:  Very good.  I have no problem asking him

10     that.  Let me proffer just so that we don't have any odd

11     situations arise where he makes any mention of that in front of

12     the jury.

13          So I appreciate your advising the Court, and I will

14     check in with him.

15          MS. DE BOER:  And, Your Honor, just to the extent --

16     since I don't know what it is, I don't know that -- I don't

17     know if it's something that gives him any exposure or if it's

18     something totally harmless.

19          THE COURT:  Sure.

20          MS. DE BOER:  And so perhaps before he says too much,

21     maybe we shouldn't even be in here for this, and Your Honor

22     should decide if he needs to speak to a lawyer.  I defer to the

23     Court, but just given that I have no clue what it is.

24          THE COURT:  Sure.  Let me -- look, I think you guys can

25     stay.  Let me just have him -- and I'm going to be very

1    cautious, obviously, so he doesn't volunteer anything he

2    shouldn't.  If he feels compelled to discuss maybe something

3    more pressing and I'm concerned, then certainly I'll have you

4    guys step out.  But let me get a sense first, because I'm with

5    you.  It could be anything.

6         All right.  So that sounds like a good plan to me.  And

7    certainly I think that even if we take a little bit of a longer

8    lunch break, it should facilitate you showing any additional

9    exhibits from Mr. Petron to the defense, and perhaps we can

10   have the same success we've had where Mr. Sadow's felt

11   comfortable essentially stipulating to exhibits being moved in

12   at the beginning, or at least without objection, as they start

13   coming in, and that'll streamline the presentation for him

14   since I expect him to have a number of financial documents he's

15   going to be analyzing.

16        All right?  Okay.  Very good.

17        So turning to the defense team.  So, gentlemen,

18   obviously we have streamlined this a little bit.  We don't have

19   to concern ourselves with Holden and Rinsky anymore.  You guys,

20   I know, are ready, and Mr. Sadow, you're ready to complete the

21   cross-examination of Mr. Hirsch.

22        And certainly I don't think H.K. is going to be too

23   much of a heavy lift.  And then I'll give you guys an

24   opportunity as well by starting after lunch to kind of get your

25   notes and everything together to begin Mr. Petron's testimony.

 1          And one thing I will let you guys know, I'm going to

 2   enter a paperless order requiring that to the extent the

 3   non-party motion to quash wants to file a reply, that it be

 4   done by the end of today so that all of us can read it tonight,

 5   and we'll be ready for tomorrow's hearing at 9:00 a.m. on Zoom

 6   for those lawyers.

 7          So, Mr. Sadow, anything you want to raise?  Any

 8   housekeeping concerns for me?  Certainly I will bring in

 9   Mr. Hirsch in just a moment and see if we can get to the bottom

10   of that.

11          But anything else you need to make me aware of at this

12   point?

13          MR. SADOW:  Only that my examination should be much

14   shorter than an hour.

15          THE COURT:  Okay.  Not a problem.  I planned for it.

16   If we're able to do it in less, that's not an issue at all.

17          All right.  Very good.

18          So with that being said, if we could, Ms. de Boer,

19   maybe go and bring in Mr. Hirsch first, and let's see what

20   we're going to -- we need to figure out what's going on.

21          I'll have him take the stand already, and we'll talk to

22   him.

23          MS. DE BOER:  And, Your Honor, if Mr. Sadow's

24   examination is that short, are we still intending to break

25   early for lunch to handle --

1          THE COURT:  It's hard to say.  I may -- I have no

2    problem breaking right at noon and giving us from, like, noon

3    to 2:00 and give you extra time.

4          I'm wondering if there's anything you can do to lay

5    foundation for Mr. Petron, or is it like we can't even do that?

6          Come on up, Mr. Hirsch.  I can have you take the stand.

7          MS. DE BOER:  I suppose if all I've done is, you know,

8    his background and the types of things --

9          THE COURT:  That's all.

10         MS. DE BOER:  Would it be okay if then we continue to

11   speak to him over lunch about what's coming?

12         THE COURT:  I don't have an issue if the defense is

13   comfortable with it, simply only -- and I can give an

14   instruction.  If you want to meet with him and go over

15   documents, but I think we can just do his background and then

16   break at that point, and I don't have a fear with that.

17         Is the defense okay with that, if it's purely

18   background?  I'll give an instruction to the witness.

19         MR. SADOW:  Well, my only concern is, I don't know how

20   I'm going to receive whatever he has to say about exhibits if

21   he's doing it during his direct examination.

22         If all they're going to do is say I'm going over these

23   exhibits, that is, I'm going to show you this one and this one

24   and this one; I'm okay.  If it's, I'm going to show you this

25   one, and what is your explanation; not okay.

1          THE COURT:  Okay.  Let's do this.  We can probably find

2     time to take that morning break after we're done with Hirsch

3     and after we're done with H.K., and we'll see if we can figure

4     out when that will be and I can make more of a judgment call.

5          MS. DE BOER:  Thank you, Your Honor.

6          THE COURT:  So, Mr. Hirsch, good morning.

7          Listen, before we get started -- the jury's all here.

8     I want you to listen to me carefully because I don't want you

9     to say anything that may put you in any sort of awkward

10    position or give you any sort of legal exposure.

11         The government has indicated to me that you shared with

12    some agents this morning that you had had a number of phone

13    calls or communications last night and that you felt like you

14    would need to speak to a lawyer before going forward or at

15    least raise some concerns to the government.

16         Am I correct in that?  Is that something --

17         THE WITNESS:  Yes.

18         THE COURT:  Okay.  Now, I don't know what any of this

19    is about, and I don't want you to say anything on this record

20    with the lawyers present.  I can excuse the lawyers, if it

21    makes you more comfortable.

22         I can excuse the lawyers if it makes you more

23    comfortable, but I'm hopeful that whatever it is that

24    transpired will not have any impact on the remainder of your

25    testimony today.

1          I don't believe there's going to be a lot left in terms

2    of the questioning on your cross-examination.  And, you know,

3    you have a sense of where they're going to go and what they're

4    going to talk about on the redirect from the government.

5          So is this a situation where whatever you experienced

6    last night is going to impact your ability to testify today?

7          THE WITNESS:  I don't think so.

8          THE COURT:  You don't think so?  Okay.  So do you feel

9    comfortable with us going forward?

10          THE WITNESS:  Yes.

11          THE COURT:  Okay.  All right.  So I think we're okay,

12    folks.  If at any point it does impinge on that, turn to me and

13    let me know so I can break.  Okay?

14          THE WITNESS:  Okay.

15          THE COURT:  All right.  Very good.

16          MS. DE BOER:  Thank you, Your Honor.

17          THE COURT:  Thank you, guys.

18          So I think we're okay.  All right.  So with that being

19    said, we're going to go ahead and get our jurors in here.

20    Thank you, guys.

21          THE COURT SECURITY OFFICER:  All rise for the jury.

22          (Jury enters at 9:29 a.m.)

23          THE COURT:  Please be seated, everyone.  Good morning,

24    ladies and gentlemen of the jury.  Good to see you all.  Hope

25    everyone had a nice evening.

1          So you may recall before we broke yesterday that

2    Mr. Sadow was in the midst of his cross-examination of

3    Mr. Hirsch.  So we're going to turn it back to Mr. Sadow so he

4    can complete his cross-examination.  All right?

5          So with that being said, Mr. Sadow, the floor is yours.

6          MR. SADOW:  Thank you.

7                    CONTINUED CROSS-EXAMINATION

8    BY MR. SADOW:

9    Q.  Good morning.

10   A.  Good morning.

11   Q.  I'm going to go over a couple of exhibits with you, and I'm

12   going to ask you about the recordings you made while you were

13   cooperating with the government.  Okay?

14   A.  Yes.

15         MR. SADOW:  First, Your Honor, I would move into

16   evidence exhibits BH-1 and BH-2.

17         MS. DE BOER:  No objection, Your Honor.

18         THE COURT:  Thank you.  Those will be admitted at this

19   time with no objection.

20          (Defense Exhibit BH-1 and BH-2 were received in

21          evidence.)

22   BY MR. SADOW:

23   Q.  Let's start out by going over some of the exhibits and then

24   we'll go to the recordings.  Okay?

25   A.  Yes, sir.

1    Q.  Let's start first with Government Exhibit 1241-O.  I

2    believe that's it.

3              MR. SADOW:  I'll move Government's Exhibit 1241-O into

4    evidence.

5              MS. DE BOER:  No objection.

6              THE COURT:  That'll be admitted at this time.

7         (Government Exhibit 1241-O was received in evidence.)

8    BY MR. SADOW:

9    Q.  We'll go right to the text.  This is a text message between

10   you and Mr. Patel, looks like it's around March 8th and 9 of

11   2019, correct?

12   A.  Yes.

13             MR. SADOW:  Go to the next page.  If you go to the

14   bottom text and blow up the bottom text.

15   BY MR. SADOW:

16   Q.  Do you see that on March the 7th of 2019, at approximately

17   1:25 p.m., you sent a text message to Mr. Patel that says:

18   I've spent a lot of money to get my call center and teledoc

19   fully compliant.  We are --

20             MR. SADOW:  Go to the next page.

21   BY MR. SADOW.

22   Q.  -- getting, as of Monday, 50 to 100 a week.

23        Do you see that?

24   A.  Yes.

25   Q.  So on March the 7th, 2019, you sent a text message to

1   Mr. Patel essentially saying that your call center is fully

2   compliant, correct?

3   A.  I see that, yes.

4   Q.  And compliant, respectfully, suggests legit, right?

5   A.  Yes.

6          MR. SADOW:  All right.  If we'll go to Government

7   Exhibit 1610.  And again, I'm not sure if that's in evidence.

8   If it's not, I'll move it in.

9          MS. DE BOER:  No objection.

10         THE COURT:  To the extent it's not admitted, that'll be

11  admitted at this time.

12         (Government Exhibit 1610 was received in evidence.)

13         MR. SADOW:  Please publish 1610.

14  BY MR. SADOW:

15  Q.  All right.  This is an email from you to Jon, which would

16  be Jon Berarducci, correct?

17  A.  Yes.

18  Q.  And also to Minal Patel, correct?

19  A.  Correct.

20  Q.  Dated April 11, 2019, correct?

21  A.  Correct.

22  Q.  So this is -- just as a time frame, this is after the

23  April 5, 2019, call that you had with Mr. Lohan that we went

24  over yesterday, correct?

25  A.  Yes.

```
 1   Q.   The top -- that is, what you tell Mr. Patel and
 2   Mr. Berarducci is:  This is from my guy who runs my call
 3   center.
 4        Correct?
 5   A.   Correct.
 6   Q.   And that's the same call center you had just referenced in
 7   a text message approximately a month or so earlier, correct?
 8   A.   I had a few different ones.  I'm not sure if it's for this
 9   one.
10   Q.   All right.  Well, let's go down.  Jeffrey Morin --
11   M-o-r-i-n -- that's the call center you were using March and
12   April of 2019?
13   A.   Yes.
14   Q.   So it would be appear to be -- would this be the same
15   Jeffrey Morin who, in your earlier text message to Mr. Patel,
16   said -- talked in terms of fully compliant, correct?
17        And if you're not sure, that's fine; just say you're not
18   sure.
19   A.   I'm not sure.
20   Q.   Okay.  This is from Mr. Morin to you and your partner,
21   Mr. Youngswick, right?
22   A.   Yes.
23   Q.   And I'll read it and we'll go forward.  Okay?
24        Hey, guys.  After yesterday's news, I am sure you have many
25   concerns regarding the DME bus.
```

1       "DME" means what?

2   A.  Something medical equipment.

3   Q.  Durable?

4   A.  Durable.

5   Q.  I simply wanted to ensure you that you should not have any

6   worries from our end.

7       Correct?

8   A.  Correct.

9   Q.  In reviewing the actual government documents, it appeared

10  that the DME, call centers, and teledocs involved in this raid

11  were committing fraud in a variety of different ways, including

12  kickbacks, multiselling products from one -- just one phone

13  call, no doctor consultations, paying doctors to sign off,

14  selling patient data, et cetera.

15      Correct?

16  A.  Correct.

17  Q.  I would like to ensure you that the records we are

18  providing you...

19      That is, the records being provided by Mr. Morin to you and

20  your partner, correct?

21  A.  Yes.

22  Q.  ...are opt-in only...

23      Correct?

24  A.  Correct.

25  Q.  ...exclusive to only you...

1       Correct?

2   A.   Correct.

3   Q.   ...HIPAA compliant...

4   A.   Correct.

5   Q.   HIPAA just has to do with what can be disclosed or not

6   disclosed medically, correct?

7   A.   Correct.

8   Q.   ...TCPA compliant...

9        And now I gotta ask you, do you know what TCPA is?

10  A.   No.

11  Q.   ...and double verified.

12       Which sounds like making sure the information is accurate,

13  correct?

14  A.   Correct.

15  Q.   In addition, due to yesterday's news, we are adding several

16  additional layers of checks and balances to our process that

17  are not required but that we feel more comfortable with to

18  ensure full verification and understanding on behalf of the

19  patient.

20       Correct?

21  A.   Correct.

22  Q.   Now, just to make it as clear as I can, this call center is

23  providing information to you; and you, in turn, are providing

24  that information, be it by requisition order or otherwise, to

25  LabSolutions, correct?

1   A.   Correct.

2   Q.   And then Mr. Morin continues:   I have also hired three

3   people that will be assigned exclusively to your account.   They

4   will be listening to every single audio file and confirming

5   that all the data is, in fact, correct before attaching the

6   audio file to the record, which would be uploaded via APL.

7        Do you know what APL is?

8   A.   I don't.

9   Q.   It certainly sounds as if -- that Mr. Morin and his call

10  center is recording every single audio transaction with the

11  patient, correct?

12  A.   Can you say that --

13  Q.   I'm sorry, sir.

14  A.   Can you repeat that?

15  Q.   Sure.   I'll repeat it.

16       It sounds like Mr. Morin is saying that these people --

17  he's hired three people that will be listening to every single

18  audio file, right?

19  A.   Yes.

20  Q.   Which means that the recordings are being made between the

21  call center and the patients, correct?

22  A.   Correct.

23  Q.   Now, have you had the opportunity to listen to any of these

24  audio files?

25  A.   No.

1   Q.   Has the government -- in its many times of preparing you,

2   have they produced any of these audio files for you to listen

3   to?

4   A.   No.

5   Q.   Do you even know whether the government sought to obtain

6   from Mr. Morin any of the audio files?

7   A.   I don't know.

8   Q.   But this clearly indicates, does it not, that there are

9   audio files, right?

10  A.   Correct.

11  Q.   And the government did, on occasion -- and we won't get

12  into all the details -- but they did, on occasion, ask you

13  about Mr. Morin, correct?

14  A.   Correct.

15  Q.   So it's not as if they didn't know he existed, right?

16  A.   Correct.

17  Q.   And then:  Our IT group is currently finalizing the API

18  with Blue Mosaic, and we hope to have that completed shortly.

19       I'm not sure I know what API is.

20       Do you know what Blue Mosaic was?

21  A.   Yes.

22  Q.   What is that?

23  A.   Blue Mosaic was the buffer, I guess you can call it,

24  between Jeff's company and the teledoc.

25  Q.   Okay.  So this is indicating something to do with whatever

1    the API is with Blue Mosaic, right?

2    A.   They were like an intake, sort of, for the patients to give

3    it to teledoc.

4    Q.   Do you know whether the government has shown you any

5    documents or anything at all from Blue Mosaic?

6    A.   I don't recall.

7    Q.   At this point, we are simply waiting on Blue Mosaic's IT to

8    get back to us with any changes they may require.

9         Correct?

10   A.   Yes.

11   Q.   And obviously, it concludes:  If you have questions or

12   concerns...

13        And talks about:  I'd like to schedule a call to discuss

14   further?

15        And it's signed off on by Mr. Morin, correct?

16   A.   Correct.

17   Q.   Thank you.

18        MR. SADOW:  Now, sir, could you publish B-2 -- I'm

19   sorry -- BH-2.

20   BY MR. SADOW:

21   Q.   All right.  This is in evidence, and this is part of a text

22   message or a string of text messages between you and Jon at

23   LabSolutions, right?

24   A.   Yes.

25   Q.   And Jon, we're talking about Jon Berarducci, correct?

 1   A.   Correct.

 2   Q.   And the date that I'm most interested in would be -- let's

 3   do it this way.

 4        Mr. Berarducci is in the light grey, correct?

 5   A.   Correct.

 6   Q.   You are in the blue, correct?

 7   A.   Correct.

 8   Q.   And on or about -- it looks like May the 31st of 2017, you

 9   send Mr. Berarducci a text, correct?

10   A.   Correct.

11   Q.   And the text is that which makes reference to Myriad,

12   right?

13   A.   Yes.

14   Q.   And that text says -- or it's entitled:  Myriad Genetics

15   says cancer test identifies new patients outside testing

16   guidelines.

17        Right?

18   A.   Yes.

19   Q.   And it's talking about the news wire.

20        And it says:  Myriad Genetics, a diagnostics company, said

21   data from a 2000 patient perspective study of its My Risk

22   hereditary cancer test showed 50 percent of the mutations

23   identified were in patients who would not -- who would not meet

24   current testing guidelines, and 34 percent of mutations were

25   identified in unexpected genes.

1        Right?

2    A.   Correct.

3    Q.   The company said results confirm the utility of multigene

4    panel testing to improve hereditary cancer risk assessment.

5        Correct?

6    A.   Correct.

7    Q.   Now, I don't want to get into a whole lot of definitions,

8    but utility means the usefulness, right?

9    A.   Correct.

10   Q.   The data will be featured in three poster presentations at

11   the annual meeting of the American Society of Clinical Oncology

12   on June 5.

13       Correct?

14   A.   Correct.

15   Q.   And this was -- as I said, this was at the end of May of

16   2017, correct?

17   A.   Correct.

18   Q.   Talking about the utility of multigene panels, correct?

19   A.   Correct.

20   Q.   I'm not going to go back and forth with you on this.

21       Do you know what a multigene panel is?

22   A.   No.

23   Q.   Okay.  Thank you.

24       MR. SADOW:  Now, if we can go to -- we're going to deal

25   now with the recordings aspect.  Okay?  If you will put up

1   BH-1.

2          Now, with the Court's permission, I'm going to

3   approach.

4          THE COURT:  You may.

5   BY MR. SADOW:

6   Q.  I want to show you a hard copy.

7   A.  Okay.

8   Q.  Of BH-1.  Okay?

9   A.  Yes.

10  Q.  Page 1 goes all the way to page 18, right?

11  A.  Okay.

12  Q.  Okay?

13  A.  Yes.

14  Q.  Would you like to hold onto this?

15  A.  Sure.

16  Q.  Let me see if it is reflected --

17         MR. SADOW:  I may need -- in order for him to work with

18  this, may I stay up here for a minute?

19         THE COURT:  You may.

20         MR. SADOW:  Thank you.

21  BY MR. SADOW:

22  Q.  BH-1, I'm representing to you, is a listing of the

23  recordings that you made when you were cooperating with the

24  government in July and August of 2019.  Okay?

25  A.  Yes.

1   Q.   And just as a chronology timetable, you first were

2   interviewed by the government on or about June 13th of 2019,

3   correct?

4   A.   Correct.

5   Q.   In fact, they had seized your phone just the day before,

6   right?

7   A.   Correct.

8   Q.   Okay.  And I don't need to get into all the interaction,

9   but there was -- at some point in time, you agreed to do

10  recordings, correct?

11  A.   Correct.

12  Q.   Now, I'm going to go back for a minute.  At the time you

13  were doing the recordings, prior to actually starting with

14  them, had you had any actual contact with a government

15  prosecutor?

16  A.   I don't know what you mean.

17  Q.   You were dealing -- let me do it a little different.

18       In working with the recordings, you were working with

19  government agents, right?

20  A.   Correct.

21  Q.   And can you tell me -- do you remember the names of the

22  agents?

23  A.   Steven Mahmood.

24  Q.   Anyone else?

25  A.   I think Tony Pagent (phonetic).

 1   Q.   Tony Pagent?

 2   A.   Yeah, I think.  I don't remember the other one.

 3   Q.   Now, when you were doing the recordings, I'm suggesting at

 4   least on this, that the first one would have been on or about

 5   July 5 of 2019.  Okay?

 6        What equipment were you given to do your recordings?

 7   A.   What equipment?  I remember, like, a lighter.

 8   Q.   A lighter?

 9   A.   Yeah.

10   Q.   You mean like a lighter that one would use to light a

11   cigarette?

12   A.   Yes, I remember that, some sort of lighter.

13   Q.   Okay.  And that would be the recording device?

14   A.   Or the camera?  I don't remember.

15   Q.   It wasn't a phone; it was something other than a phone.  Is

16   that a fair statement?  Or was it a phone too?

17        If you don't remember -- I know, we talked yesterday.  If

18   you don't remember, that's fine.  You can just say you don't

19   remember.

20   A.   I don't remember.

21   Q.   Do you remember whether the recording device or devices,

22   whatever was being used, would allow the agents to hear your

23   conversations?

24   A.   Yes.

25   Q.   Okay.  So were you given instructions on when you should

1  attempt to record someone?

2  A.  A specific time?

3  Q.  Or a day, or any of that type of thing.

4  A.  I'm sure, yes, yes.

5  Q.  Do you remember what those instructions were?

6  A.  To -- to get him on tape.

7  Q.  To get him on tape.

8  A.  Yes.

9  Q.  Were there any directions or instructions given to you as

10 to topics or subject matter that you should ask about?

11 A.  Yes.

12 Q.  And could you tell us, what is it -- and I'm in reference

13 specifically now as to Minal Patel.

14     What is it that you were asked as topics or subject matter

15 to try to get on tape?

16 A.  One was about Marc Sporn.

17 Q.  Okay.  And we heard that little clip yesterday for

18 30 seconds.

19     Anything else?

20 A.  I recall there was one other scenario.  There was two other

21 gentlemen.  I guess they were cooperating.  And to get them

22 together with Minal on tape.  I don't really remember the

23 details.

24 Q.  Did they tell you they wanted to talk about telemedicine?

25 A.  I don't remember.

1  Q.  Did they tell you they wanted to talk about telemarketing?

2  A.  I don't remember.

3  Q.  Did they tell you they wanted to talk about commissions?

4  A.  I do remember they wanted me to introduce Minal to these

5  two other gentlemen to -- to get them to become reps.

6  Q.  To become reps.

7  A.  Yeah, that, I remember.

8  Q.  Kind of, like, in my language -- you don't have to accept

9  it -- this was kind of to see if they could set up something?

10  A.  Correct.

11  Q.  Right?

12  A.  Yes.

13  Q.  And that went on for approximately a month, correct?

14  A.  Correct.

15  Q.  So what I want you to do now -- because we have 18 pages.

16  And what I have attempted to do, so that it makes it a little

17  easier, sometimes you would try to call Mr. Patel and you

18  wouldn't get him.

19      You'd either leave a message or no message at all, right?

20  A.  Correct.

21  Q.  Well, I've tried to exclude all of those in what I've given

22  you.  What I've tried to do is add -- is to make sure that

23  there are only calls marked in yellow on your exhibit that

24  lasted more than one minute so that it wouldn't just be a quick

25  message.  Okay?

1    A.   Yes.

2    Q.   I believe the total is 20.

3         Would you go through your exhibit and look at how many

4    yellow markings there might be?

5         MR. SADOW:  And at the same time he's doing that, if

6    you could flip, do it page by page -- they're not marked in

7    yellow, but this is just to show you the call pattern.

8         THE WITNESS:  20.

9    BY MR. SADOW:

10   Q.   20.  And the ones that are marked with Patel are Minal

11   Patel, correct?

12   A.   Correct.

13   Q.   And those recordings, when you were done making them, did

14   you keep them for a time, or did you immediately get those to

15   the agents?  If you remember.

16   A.   I don't remember.

17   Q.   Okay.  And out of those 20 that we talked -- that we just

18   referenced, do you believe that the agents were in a position

19   to listen to all of those?

20   A.   I recall, yes.

21   Q.   20 calls.  20 times the agents listened to them.

22        Thank you very much, sir.

23        MR. SADOW:  That's all I have, Your Honor.

24        THE COURT:  All right.  Redirect?

25        MS. DE BOER:  Thank you, Your Honor.

1          THE COURT:  We can go ahead and take that exhibit away

2     from him.  Thank you.

3                         REDIRECT EXAMINATION

4     BY MS. DE BOER:

5     Q.  Good morning, Mr. Hirsch.

6     A.  Good morning.

7     Q.  Mr. Sadow showed you Government's Exhibit 1241, and this

8     was a text message -- I'll zoom in for you here -- between you

9     and Mr. Patel, correct?

10    A.  Yes.

11    Q.  And Mr. Sadow wanted to point out to you this text message

12    that you sent at the bottom of the chain here, that you've

13    spent a lot of money to get your call center and teledoc fully

14    compliant.

15         Do you see that?

16    A.  Yes.

17    Q.  Do you see that in the same exact chain, what is it that

18    you say to Mr. Patel right before the discussion of compliance?

19    A.  That we had no codes to -- we have no codes.

20    Q.  Codes, we have no codes.

21         Right?

22         And what are codes?

23    A.  Those are the codes in order to put on the requisition form

24    in order to get paid.

25    Q.  Okay.  And how did Mr. Patel respond?

1    A.   Codes everywhere.

2    Q.   Okay.  Now, when you did then talk about spending money on

3    getting a call center and teledoc fully compliant, did you have

4    an attorney that you were working with?

5    A.   No.

6    Q.   Did you ever speak with the attorney that Mr. Patel told

7    you that he had look at his process?

8    A.   No.

9    Q.   And do you know -- do you have any personal knowledge of

10   what Mr. Patel told that attorney he was doing?

11   A.   No.

12   Q.   Okay.  Now, you were also asked about Jeff Morin; is that

13   right?

14   A.   Correct.

15   Q.   Okay.  And in particular, you were asked about whether or

16   not the -- you were asked about the calls that Jeff Morin's

17   call center conducted and whether you had listened to any of

18   those in preparation for your testimony.

19        Do you recall those questions?

20   A.   Yes.

21   Q.   Okay.  So I'm going to show you previously admitted

22   Government Exhibit 1888.  Okay?

23        Did we look at this exhibit during your direct testimony

24   yesterday?  Do you remember?

25   A.   I looked at this yesterday?

1  Q.  I'm asking, do you recall looking at the call center script

2  yesterday?

3  A.  Yes.

4  Q.  And this is an email from Jeff Morin, and that's who

5  Mr. Sadow was asking you about?

6  A.  Yes.

7  Q.  And it's an email to you, correct?

8  A.  Yes.

9  Q.  In July of 2018?

10  A.  Yes.

11  Q.  And Mr. Morin is sending you a copy of the call center

12  script, correct?

13  A.  Correct.

14  Q.  Which is what was used on the calls to patients.

15  A.  Correct.

16  Q.  All right.  So showing you Government Exhibit 1888-A, this

17  is the script that we looked at yesterday that talks about free

18  hereditary cancer screening multiple times; is that correct?

19  A.  Correct.

20  Q.  All right.  And who is it -- did you understand that the

21  people who placed these calls, were they doctors?

22  A.  No.

23  Q.  Who were they?

24  A.  They were -- they were -- no, they were just call people.

25  I think they -- I don't even think it was in the United States.

 1    I think they were in another country.

 2    Q.   Okay.  Now, Mr. Sadow also asked you about this exhibit,

 3    Government's Exhibit 1610, and this is with respect to

 4    Mr. Morin.

 5         Do you recall looking at this?

 6    A.   Yes.

 7    Q.   A little while ago?

 8    A.   Yes.

 9    Q.   And you were sending Jon Berarducci and Minal Patel

10    information from the guy who runs your call center, correct?

11    A.   Correct.

12    Q.   And this is the email where Jeff is saying you don't have

13    any worries from us, right?

14    A.   Yes.

15    Q.   And it's talking about -- the subject is DME bust.

16    A.   Yes.

17    Q.   And had there been a DME bust that you guys had been

18    talking about?

19    A.   Yes.

20    Q.   Okay.  And so Jeff is distinguishing here between what

21    happened with the DMEs and what you guys were supposedly doing;

22    is that correct?

23    A.   Yes.

24    Q.   And do you see that he says that the DMEs were committing

25    fraud in a variety of different ways -- and I'm sorry, I'm

1  right here, Mr. Hirsch.

2  A.  Yes.

3  Q.  Committing fraud in a variety of different ways including

4  kickbacks, multiselling products from just one call, no doctor

5  consultations, paying doctors to sign off, selling patient

6  data, etc.

7      Do you see that?

8  A.  Yes.

9  Q.  Which of those things were you doing?

10 A.  Paying doctors off because we would pay them per test that

11 they signed.

12 Q.  Okay.  And how about kickbacks?  Did you receive kickbacks?

13 A.  I received kickbacks from the lab, yes.

14 Q.  Okay.  And how about no doctor consultations?  Did you ever

15 become concerned that doctors were not calling patients?

16 A.  There was situations where no doctors were being -- no

17 patients were being called, correct.

18 Q.  Now, in -- so keep this up for one more second.  Mr. Sadow

19 pointed you to these five bullet points here.

20 A.  Yes.

21 Q.  And Mr. Morin is saying:  I want to assure you that the

22 records we provide, opt-in only, exclusive to you, HIPAA

23 compliant, TCPA compliant, double verified.

24     Do you see that?

25 A.  Yes.

1   Q.   Anywhere in those five bullet points, do you see the

2   word -- the phrase "healthcare fraud"?

3   A.   No.

4   Q.   All right.  Now, the doctors that you were using when it

5   came to telemedicine, did you think that they had any

6   preexisting relationship with the patients?

7   A.   They had none.

8   Q.   And did you think that they were providing any legitimate

9   treatment to the patients at all?

10  A.   Treatment?  No.

11  Q.   Okay.  Now, Mr. Hirsch, you were asked questions yesterday

12  about Michael Lohan and the recording that Michael Lohan did of

13  you.

14  A.   Yes.

15  Q.   Do you recall that?

16  A.   Yes.

17  Q.   And before the government played you that recording a

18  couple days ago, had you ever heard it before?

19  A.   No.

20  Q.   And when you were meeting with Mr. Lohan back in 2019, when

21  it turns out he was recording against you, did you have any

22  concerns that he might be setting you up?

23  A.   Yes.

24  Q.   How did you learn of that?

25  A.   Kate Lohan.

1  Q.  And --

2  A.  Could we stop here a second?

3  Q.  Yes.

4      (Discussion was held off the record.)

5        THE COURT:  You may proceed.

6        MS. DE BOER:  Thank you, Your Honor.

7  BY MS. DE BOER:

8  Q.  And, Mr. Hirsch, at that time when you were meeting with

9  Mr. Lohan, no agents had approached you; is that correct?

10  A.  Correct.

11  Q.  You were not cooperating with the government; is that

12  correct?

13  A.  Correct.

14  Q.  Did you hope that you would stay out of trouble?

15  A.  Of course.

16  Q.  Did you hope that you wouldn't be in the seat that you're

17  in today?

18  A.  Yes.

19  Q.  And so you made some statements to Mr. Lohan, correct?

20  A.  Correct.

21  Q.  Did you lie at all to Mr. Lohan?

22  A.  Correct.

23  Q.  Why did you lie?

24  A.  I didn't want to get in trouble.  I just -- you know, I

25  had -- I was -- she didn't tell me he was coming that day, but

1    I had -- I just -- just went with the flow with him.

2    Q.   Okay.  And as Mr. Sadow told you yesterday, those calls

3    were in April of 2019.

4        Do you recall Mr. Sadow telling you that?

5    A.   Correct.

6    Q.   All right.  So I'm going to show you previously admitted

7    Government Exhibit 1241-U, which we looked at yesterday.

8        And this is between -- a text chain between you and

9    Mr. Patel, correct?

10   A.   Correct.

11   Q.   So the calls with Mr. Lohan were in April of 2019.

12       And then do you recall, in June of 2019, sending to

13   Mr. Patel an article titled "Fraud Alert:  DNA and Cancer

14   Genetic Testing Kits Linked to Medicare Scams"?

15   A.   Yes.

16   Q.   And so this is now a month and a half after this

17   conversation with Mr. Lohan, correct?

18   A.   Yes.

19   Q.   And this is just one example, but yesterday we looked at a

20   couple of other examples where you and Mr. Patel exchanged news

21   articles or alerts about genetic testing fraud scams.

22       Do you recall that?

23   A.   Yes.

24   Q.   Okay.  And I'm going to show you the article that he sent

25   to Mr. Patel here.

1    Do you recall that we looked at this --

2    A.   Yes.

3    Q.   -- yesterday?

4    A.   Yes.

5    Q.   Okay.  Now, this article starts out by quoting from a

6    Medicare beneficiary who got a constant barrage of phone calls

7    from telemarketers.

8        Do you see that?

9    A.   Yes.

10   Q.   And this person states:  I thought it -- I just thought it

11   sounded like a good thing.  It was very convincing.

12       Do you see that?

13   A.   Yes.

14   Q.   They said that Medicare and my primary insurance would pay

15   for me to get this cancer test, and all you had to do was swab

16   the inside of your mouth and mail it in.

17       Do you see that?

18   A.   Yes.

19   Q.   And that this article goes on to discuss what happened to

20   this particular beneficiary; is that correct?

21   A.   Correct.

22   Q.   Okay.  So when you saw this article, were you concerned

23   that this was exactly what you were doing?

24   A.   Yes.

25   Q.   So between April of 2019, when Mr. Lohan began recording

1   against you, and June of 2019 -- this is June 11th of 2019 --

2   did you have real concerns that you were going to get busted?

3   A.   Yes.

4   Q.   And shortly thereafter, in mid June of 2019, did agents

5   show up and interview you?

6   A.   Yes.

7   Q.   And at that time, did you begin cooperating with the United

8   States?

9   A.   Yes.

10  Q.   And ultimately, did you enter into a plea agreement --

11  A.   Yes.

12  Q.   -- with the United States?

13  A.   Yes.

14  Q.   And what did you plead to?

15  A.   One count to kickback from the lab.

16  Q.   And did you plead guilty because you are, in fact, guilty

17  of that charge?

18  A.   Yes.

19  Q.   Who -- as relevant to this case, who is it that paid you

20  kickbacks?

21  A.   Excuse me.  Who what?

22  Q.   As relevant to this particular case, who is it that paid

23  you kickbacks?

24  A.   LabSolutions, Minal Patel.

25  Q.   Okay.

1          MS. DE BOER:  Thank you, Your Honor.  One moment?

2          THE COURT:  Sure.

3          MS. DE BOER:  Mr. Hirsch, thank you.  No further

4    questions.

5          THE COURT:  Thank you.  Thank you, Mr. Hirsch.  You're

6    excused.

7          THE WITNESS:  I'm done?

8          THE COURT:  Yes, you're all done.

9       (Discussion was held off the record.)

10         MR. SADOW:  Your Honor, before the next witness, can we

11   have a brief sidebar?

12         THE COURT:  Yeah, sure.  Come on up.

13       (The following proceedings were held sidebar:)

14         THE COURT:  Yes.

15         MR. SADOW:  Maybe you want to fill us in?

16         THE COURT:  He's been getting contacted by Lohan again,

17   and he ignored the messages.  That's all he's worried about.

18   He was getting in contact with him last night.  He said, I keep

19   getting messages.  I said, don't worry about it.

20         That was really his concern.  There was nothing to add.

21   I think it was more the same from yesterday.

22         MR. SADOW:  Thank you.

23         THE COURT:  You're welcome.

24       (Proceedings returned to open court.)

25         THE COURT:  All right.  Government's next witness.

```
 1              MR. CUYLER:  The United States calls H.K.

 2              THE COURTROOM DEPUTY:  Please raise your right hand.

 3              (Government witness, H.K., duly sworn.)

 4              THE COURTROOM DEPUTY:  Please be seated.  Speak into

 5    the microphone.  Say and spell your full name for the record.

 6              THE WITNESS:  H.K., H-x-x-x-x, K-x-x-x-x-x-x.

 7              MR. CUYLER:  Thank you.

 8         And good morning, everyone.  Again, I'm Reginald

 9    Cuyler, and I'm with the United States.

10                        DIRECT EXAMINATION

11    BY MR. CUYLER:

12    Q.  Ms. K., where do you currently live?

13    A.  Valrico, Florida.

14    Q.  And how long have you lived there?

15    A.  About 30 years now.

16    Q.  And what do you currently do for work?

17    A.  I am retired, disabled.

18    Q.  And how long have you been retired?

19    A.  Over 20 years.

20    Q.  And who do you have for health insurance?

21    A.  Humana Medicare.

22    Q.  And how long have you had Medicare?

23    A.  About the same time as I've been retired, so about

24    20 years.

25    Q.  Now, I want to direct your attention to -- back to May
```

1    2018.

2         Do you recall taking a cancer genetic test?

3    A.  Yes, I do.

4    Q.  Can you explain to the jury how you learned about that

5    test?

6    A.  Sure.  I received a telephone call, and it was a gentleman

7    on the phone.  And he was talking to me.  It started with that

8    I had won some gift cards.  I thought, wow, that's great.  I

9    never win anything.

10        So he said, oh, I see you -- I see you have had cancer.

11        And I said, yes.

12        He says, you know there's a way to test to make sure

13   whether you're going to get another cancer back?

14        And I said, really?

15        He's like, yeah.  What's your insurance?

16        I said, Medicare.

17        He said, oh.  He says, I believe Medicare covers it.  Let

18   me just check and see.

19        So he checked.  And he said, yes, and I will get a kit off

20   to you.

21   Q.  Now, Ms. K., at the time, did you realize that call was

22   recorded?

23   A.  No.

24   Q.  Now, have you since learned that that call was recorded?

25   A.  Yes, sir.

1  Q.  And have you heard it?

2  A.  Yes, sir.

3  Q.  And now, I'm not going to play the recording -- because at

4  this juncture, the jury gets the gist of it -- but I will note

5  that Ms. K.'s call is already in evidence and has been marked

6  as Government's Exhibit 413-A, and the accompanying transcript

7  is 413-B.

8      Now, Ms. K., having listened to that call, do you recall

9  any discussions regarding screening for prenatal chromosomes?

10  A.  No, sir.  I've had a hysterectomy.  I don't have any idea

11  why they would do that.

12  Q.  So did you want any testing for -- or any screening for

13  prenatal chromosomes?

14  A.  No.

15  Q.  Now, at the time, did you have a cancer diagnosis?

16  A.  Yes, I did.

17  Q.  And can you explain briefly to the jury what that diagnosis

18  was?

19  A.  It's blood differentiated papillary transitional cell

20  cancer, which means it's a kind of cancer that lines the

21  bladder -- the lining from the bladder, the lining from the

22  lungs, the lining from the mouth and the throat -- wherever you

23  have those transitional cells, the cancer can come back at.

24      In my case, it was reoccurring quite frequently, like, two

25  or three times a year.  And at one point, it had gone into my

 1   left kidney, and I had to have that removed.

 2        So I was getting desperate, I really was.  Chemo didn't

 3   work, and I did not want to lose my bladder.

 4   Q.   And, Ms. K., did you have a physician that was treating you

 5   for that cancer at the time?

 6   A.   Yes, sir.

 7   Q.   And who was that physician?

 8   A.   Dr. Mahesh Patel.

 9   Q.   Now, Patel is a common name.  Did you have any reason to

10   believe that your doctor, Mahesh Patel, had any relation to the

11   defendant here?

12   A.   No.

13   Q.   Okay.  Now, going back to the call, prior to receiving it,

14   had you ever heard of betterhealthcare.com?

15   A.   No, sir.

16   Q.   And at any point, did you ever give betterhealthcare.com

17   permission to contact you?

18   A.   No.

19   Q.   And you mentioned the free gifts or gift cards.  Did you

20   ever receive them?

21   A.   No, I did not.

22   Q.   And after the phone call, had you heard from Better

23   Healthcare ever again?

24   A.   Unless that's the one that sent me the test kit and it went

25   back to them, or if they had something to do with the diagnosis

1  that they gave me.  But, no.

2  Q.  Okay.  And had you ever heard of a company called IDGAF?

3  A.  No.

4  Q.  And did you ever give that company permission to contact

5  you?

6  A.  No.

7  Q.  Okay.  So after the phone call, can you explain to the jury

8  what happened next?

9  A.  I got the kit into the mail, and I was to spit into this

10  little tube about this big (indicating) and put on the line and

11  put the top back on and put it inside the envelope, and then

12  put that inside the prepaid mailer, and so I did.

13  Q.  And were there any medical professionals there to observe

14  whether or not you did it right?

15  A.  No, sir.

16  Q.  So after you send off the kit, then tell the jury what

17  happened.

18  A.  Well, I waited and I waited to the point where I kind of

19  forgot about it.  And then I received another phone call.  It

20  was a man identifying himself as a doctor.  He said I wanted to

21  call you myself.  I have great news.  You don't have to worry

22  about the cancer.

23  Q.  Now, was that person that called you Dr. Mahesh?

24  A.  No.

25  Q.  Was that person a genetic counselor?

 1   A.   Not as far as I knew.

 2   Q.   Did you have any idea who that individual was?

 3   A.   No.

 4   Q.   Now, regarding the test itself, were you aware that a

 5   negative result simply tells you whether or not you have a high

 6   risk for the genes that were tested?

 7   A.   No.

 8   Q.   And did you know that a negative result didn't necessarily

 9   mean that any cancers would not recur?

10   A.   No, I did not.  I thought that was the whole purpose of the

11   test.

12   Q.   So let me ask you this, Ms. K.  So after receiving the

13   test, did any cancer, in fact, reoccur for you?

14   A.   Yes, the bladder cancer.  Since then, it's come back about

15   five times.

16   Q.   And following up on the call from the individual that

17   purportedly gave you results, did you receive anything in

18   writing?

19   A.   No, sir.

20   Q.   Now, Ms. K, did you have any idea how much Medicare was

21   billed for the test that you took?

22   A.   No.

23   Q.   Now, if you had known that this test -- Medicare was billed

24   thousands of dollars for that test, would you have still taken

25   it?

1    A.   No.

2    Q.   And, Ms. K, have you ever heard of a doctor by the name of

3    Huan Tsai?

4    A.   No, sir.

5    Q.   And did you speak to any doctors after -- prior to sending

6    the kit off?

7    A.   No.

8            MR. CUYLER:   Okay.   I pass the witness and reserve for

9    any redirect.

10           THE COURT:   Thank you, Counsel.

11           Cross-examination.

12           MR. RAFFERTY:   Thank you, Your Honor.

13                         CROSS-EXAMINATION

14   BY MR. RAFFERTY:

15   Q.   Good morning, ma'am.

16   A.   Good morning.

17   Q.   My name is Brian Rafferty, and I'm one of the attorneys

18   that represents Minal Patel.   I just have a few follow-up

19   questions.   Okay?

20   A.   Okay.

21   Q.   I know we haven't played the recording, but my

22   understanding is that you have a personal history of cancer

23   that you've already described for this jury; is that right?

24   A.   Yes, sir.

25   Q.   Do you also have a family history of cancer?

1   A.   Yes, sir.

2   Q.   Can you describe that for the jury?

3   A.   My father died at the age of 56 with lung cancer.

4   Q.   I'm sorry.  Say that again, ma'am.

5   A.   My father died at the age of 56 with lung cancer, and my

6   younger sister died at the age of -- I think it was 58 with

7   breast cancer.

8   Q.   So you have both a personal history of cancer and a family

9   history of cancer.

10  A.   Yes, sir.

11  Q.   Okay.  With respect to the kit that you received in the

12  mail, was there also some paperwork with the kit?

13  A.   Yes, sir.

14  Q.   Did you fill out that paperwork and send it back in with

15  the swab or spit cup, or whatever it is that you sent in?

16  A.   I don't remember throwing anything out, but I'm sure -- I

17  remember instructions in it.

18  Q.   Okay.  And at some point, I think you indicated, after you

19  sent in the kit you received a call from somebody?

20  A.   Yes.

21  Q.   And that person represented themselves to be a doctor?

22  A.   Yes, sir.

23  Q.   And they indicated that the test results were in some form

24  negative?

25  A.   Yes, sir, great news.

 1            MR. RAFFERTY:  That's all I have, Your Honor.  Thank

 2  you.

 3            THE COURT:  Thank you.

 4            Redirect.

 5                      REDIRECT EXAMINATION

 6  BY MR. CUYLER:

 7  Q.  Now, Ms. K, would you consider taking a cancer genetic test

 8  as a healthcare decision?

 9  A.  Yes, I would.

10  Q.  And is a healthcare decision an important life decision to

11  you?

12  A.  Absolutely.

13  Q.  Now, when making important life decisions, would you rather

14  take someone's word for it, or would you rather see it in

15  writing?

16  A.  I'd rather see it in writing, especially since it's this.

17  Q.  And did you receive anything in writing regarding the

18  results of your test?

19  A.  No, sir.

20            MR. CUYLER:  Nothing further.

21            THE COURT:  Thank you.

22            Thank you so much, ma'am.  You're excused.  Take your

23  time stepping down.

24            All right.  Ladies and gentlemen, what we're going to

25  go ahead and do is take our morning break a little earlier so I

```
1    can get some things in place for you.

2         Go ahead and leave your notepads on your chairs, and

3    I'll bring you in at about 10:30.  Brief recess.  Thank you.

4         THE COURT SECURITY OFFICER:  All rise for the jury.

5         (Jury exits at 10:15 a.m.)

6         THE COURT:  Please be seated, everyone.

7         Okay.  So my understanding is then the next witness

8    would be Mr. Petron; is that right?

9         MS. DE BOER:  That's correct, Your Honor.

10        THE COURT:  Okay.  Look, I have to take advantage of

11   the time I have.  It is what it is.  We move witnesses around,

12   but it's only 10:15.  So I'm willing to break at noon.  We

13   don't have to go deeper than that.

14        If you have want to take a little bit of time now, it's

15   10:15, you've got 15 minutes to get some things organized.  I

16   don't know if his background is going to take all that time.  I

17   doubt it.  I think you may begin to get into some of the

18   documents.

19        So certainly I don't know if within the next 15 minutes

20   it gives you enough time to try to give some last-minute

21   guidance to allow the witness to understand where you're going

22   to go.  Certainly I understand the defense's concern that once

23   he takes the stand, further communication with him should

24   ordinarily be prohibited.

25        So I don't know if you can make the most -- I can tell
```

1   you this.  I'm even willing to maybe go a little past 10:30, if

2   you need it, and then we can go straight to noon.  So if you

3   want to take the next 15, maybe 20 minutes, to go through with

4   him and perhaps even use some of the time to check with defense

5   and see if they can agree to some exhibits, we can do that.

6          Does that make sense?

7          MS. DE BOER:  That's perfect, Your Honor.  Especially

8   if it's a little bit of a longer 15 minutes, but I don't think

9   we'll have a need to talk with them over the lunch break.

10          What I will say is I don't know how long Mr. Sadow's

11   cross of this witness is going to be.  Dr. Yogel can't come

12   today; he's tomorrow.  But we will be resting tomorrow.  I

13   don't even think it will take to the end of the day.  So we are

14   ahead of schedule at this point.

15          THE COURT:  Correct.  For me, and I don't have any

16   reason to think if we can finish a little earlier today, too,

17   because of Dr. Yogel's availability, which is not until

18   tomorrow, I'm completely fine with that.

19          One name we had thrown out was Orr.  Is that not going

20   to be a witness called?  Because we had talked about that.

21          MS. DE BOER:  Not in our case-in-chief, Your Honor.

22          THE COURT:  Okay.  All right.  Very good.  So really

23   what we have left is Petron and Dr. Yogel then.  Okay.  And

24   that works because tomorrow we lose that hour anyway because we

25   have to do our arguments.

```
 1              So that's fine by me.  So let's do this.  I think I can
 2     spot you closer to 20, maybe a little more minutes.  And then,
 3     when I come back just after 10:30, we can touch base and see if
 4     there's any rulings I need to make.  And then let's get
 5     started, and we'll go till about noon and break by noon,
 6     wherever we are at with Petron.
 7              So you can plan ahead over your break now.  Okay.
 8              MS. DE BOER:  That's great.  Thank you, Your Honor.
 9              THE COURT:  All right.  Thank you, guys.  We'll be in a
10     brief recess.  I'll be back just after 10:30.
11              THE COURT SECURITY OFFICER:  All rise.
12         (Court recessed at 10:18 a.m.)
13         (Back on the record at 10:50 a.m.)
14              THE COURT:  Please be seated, everyone.  Before we
15     bring out our jury, turning to the government, hopefully we've
16     had a little bit of time to get things organized before we call
17     Mr. Petron.
18              Are we ready to go?
19              MS. DE BOER:  Yes, Your Honor.  Thank you.
20              THE COURT:  All right.  Very good.  Okay.  So let's go
21     ahead and round up our jurors, please.  Thank you.
22              MR. SADOW:  Your Honor, so the Court knows, because of
23     the scheduling changes, I don't actually have the same kind of
24     list of exhibits.  So while I'm not going to object to any of
25     them, it's going to be necessary -- they don't have to say --
```

1  they say next exhibit is so and so --

2          THE COURT:  Right.  Just go through the sequence.  I

3  got you.

4          MR. SADOW:  I don't have any problems.

5          THE COURT:  Okay.  Very good.

6          MS. DE BOER:  And I'll take it slow so he has time to

7  take a peek.

8          THE COURT:  Exactly.  Very good.

9          MS. DE BOER:  And I intend to introduce some business

10  records up front that the witness will be relying on.  I'll do

11  that at the beginning.

12          THE COURT:  Perfect.  I don't think there's going to be

13  much of an objection to that, so we should be good.

14          THE COURT SECURITY OFFICER:  All rise for the jury.

15          (Jury enters at 10:52 a.m.)

16          THE COURT:  Please be seated, everyone.  All right.

17  Welcome back, ladies and gentlemen.

18          So our plan is for the government to call their next

19  witness, and we're going to have this witness take us up to the

20  lunch hour.  All right?

21          So we took our mid-morning break a little earlier so we

22  could get everything lined up for you all.  Okay?

23          So with that being said, we'll turn it over to the

24  government.

25              Next witness.

1        MS. DE BOER:  Thank you, Your Honor.  The United States

2   calls Michael Petron.

3        THE COURT:  All right.  Come on up, Mr. Petron, and

4   we'll swear you in.

5        THE COURTROOM DEPUTY:  Please raise your right hand.

6        (Government witness, MICHAEL PETRON, duly sworn.)

7        THE COURTROOM DEPUTY:  Please be seated.  Speak into

8   the microphone.  Say and spell your name for the record.

9        THE WITNESS:  My name is Michael Petron, P-e-t-r-o-n.

10                     DIRECT EXAMINATION

11   BY MS. DE BOER:

12   Q.  Good morning, Mr. Petron.

13   A.  Good morning.

14   Q.  Could you explain to the ladies and gentlemen of the jury,

15   where do you work?

16   A.  I work at a firm named Stout, S-t-o-u-t.

17   Q.  And what is Stout?

18   A.  Stout is a global investment bank and advisory firm.

19   Q.  What kind of work does Stout do?

20   A.  We do the buying and selling of businesses; we do

21   valuations; and we do dispute consulting.

22   Q.  And does your firm do consulting for the government?

23   A.  We do.

24   Q.  Can you give the jury a little bit of a background of your

25   education and certifications?

1    A.   I can.  I have an undergraduate degree with a double major

2    in economics and statistics.  I have one master's degree in

3    statistics and a second master's degree in accounting.  I'm a

4    certified public accountant and a certified fraud examiner.

5    Q.   And what is your title at Stout?

6    A.   I am a managing director and copresident.

7    Q.   And as managing director and copresident, what is it that

8    you do?

9    A.   I would say my function as a managing director is doing

10   what I'm doing here today, which is assisting clients -- in

11   this case, the government -- in some aspect of litigation.

12   Q.   Okay.  And how long have you been working for Stout?

13   A.   About eight and a half years.

14   Q.   And before you joined Stout, what did you do?

15   A.   The same exact thing at a firm that Stout acquired.

16   Q.   Okay.  And do you work with -- is it just you doing all of

17   the consulting work, or do you work with a large team?

18   A.   I have a very large team that helps.

19   Q.   And the folks that work on your team, what type of

20   qualifications do they have?

21   A.   I would say they are largely accountants or finance

22   professionals.  And we also have a few data scientists, so

23   folks that are more technologically savvy, given my statistics

24   background, that understand computers and data and coding.

25   Q.   And was your firm, Stout, hired by the United States to

1  provide consulting and assistance on this matter?

2  A.  It was.

3  Q.  And can you give an overview of the nature of the requests

4  and your engagement with the government?

5  A.  Sure.  We were asked to do a variety of things.  I will put

6  them into two broad categories.

7      The first is, we were asked to analyze financial records.

8  So these would be bank statements, supporting documents to bank

9  statements, checks, deposit slips, other miscellaneous

10  financial records, and really summarize those records -- I

11  would say standardize and summarize them.

12      I believe we've looked at 19 or 20 different bank accounts

13  for a variety of individuals and companies.  So that would be

14  Category 1.

15      And then Category 2, we were asked to look at voluminous

16  amounts of healthcare claims data.  So this would be data that

17  was billed to either insurance -- which I call Part C for

18  Medicare -- or fee-for-service Medicare, Part B.

19  Q.  Okay.  And the financial records and the claims data that

20  you mentioned, is that material incredibly voluminous?

21  A.  It is extremely voluminous.  I believe we have built a

22  financial database of over 49,000 transactions.  There are well

23  over a million claims in the Medicare claims database that we

24  have.  It's -- it's not something I could print out and show

25  you.

1   Q.  So if we attempted to sort of go through every claim or go

2   through every transaction, we would be here for quite some

3   time; is that fair?

4   A.  You could attempt to do that.  You would not only be here

5   for months upon months, but you would never remember what

6   you're looking at.

7   Q.  Fair enough.  And so in the course of your work, were you

8   asked to create various charts and graphs summarizing what you

9   saw in the financial records and in the claims data?

10  A.  Absolutely.

11  Q.  Okay.  And we're going to go through some of those during

12  your testimony today and break all of that down; is that fair?

13  A.  That's my understanding.

14  Q.  Okay.

15      MS. DE BOER:  At this time, Your Honor, the United

16  States has several exhibits to move into evidence.  Those are

17  301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312,

18  313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324,

19  328, 329, 330, 331, 1121, and 1125.

20      THE COURT:  Any objection?

21      MR. SADOW:  None whatsoever, Your Honor.

22      THE COURT:  Thank you, Mr. Sadow.

23      Those will all be admitted at this time without

24  objection.

25      (Government Exhibits 301, 302, 303, 304, 305, 306, 307,

1          308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318,

2          319, 320, 321, 322, 323, 324, 328, 329, 330, 331, 1121,

3          and 1125 were received in evidence.)

4     BY MS. DE BOER:

5     Q.   And the good news, Mr. Petron, those are the records that

6     you have summarized, so we don't have to go through each one of

7     those.

8          Okay.  So I want to start by talking about the Medicare

9     claims data.

10          Were you provided by the government a list of billing codes

11     and which codes are cancer genetic billing codes and which

12     codes are pharmacogenetic billing codes?

13     A.   I was.

14     Q.   And I'm showing what has been previously admitted as

15     Government Exhibit 109.

16          So, Mr. Petron, this slide is titled "CGx Tests."

17          And do you see here, on the left-hand side, there's a list

18     of different procedure codes?

19     A.   I do.

20     Q.   And a description of what those codes are?

21     A.   I see that, yes.

22     Q.   Okay.  And this continues for two -- two pages.

23          And is it fair to say that these are all codes that are

24     found in the LabSolutions claims data of claims that were

25     submitted to Medicare?

1    A.    Absolutely.

2    Q.    Okay.  And you didn't decide what is a CGx code and what is

3    a PGx code; that information was provided to you by a Medicare

4    expert, Laurie McMillan?

5    A.    That is correct.

6    Q.    Okay.  And I'm going to show you what has been admitted as

7    Government Exhibit 110.

8          And you were also provided by Ms. McMillan a list of what

9    are called Tier 2 cancer genetic testing billing codes; is that

10   correct?

11   A.    It is correct.

12   Q.    And these are ones that have a specific diagnosis code

13   associated with them; is that right?

14   A.    That is correct.  If this diagnosis code exists in

15   combination of this procedure code being billed, then that

16   procedure was considered a CGx, from my analysis.

17   Q.    Okay.  And the Tier 2 codes, they are -- there's a lot here

18   that start with 814, 01, 03, 04, 05.

19         Do you see that?

20   A.    I do.

21   Q.    Okay.  And then, finally, Government Exhibit 111, which was

22   previously admitted.

23         Is this simply a list of the procedure codes for pharmaco,

24   or PGx testing?

25   A.    Precisely.

1    Q.   Okay.  Now, once you had this information of what code

2    corresponds to what type of testing, how did you use that in

3    your analysis?

4    A.   So what we did was create an algorithm from the Medicare

5    claims data to classify all of the billing data into those

6    particular categories, that being the CGx, the Tier 2 CGx, or

7    the PGx.

8    Q.   And using that algorithm, were you then able to identify

9    the total amount that LabSolutions billed to Medicare and

10   received from Medicare and then, among that amount, what was

11   cancer genetic testing and what was pharmacogenetic testing?

12   A.   That is precisely what we did, yes.

13   Q.   And did you create -- did your team create a chart that

14   summarizes the total amounts that were billed and paid to

15   Medicare?

16   A.   We did.  So we took all of those million-plus records.  We

17   used the list -- those three lists that we just went over, and

18   we've created summaries which will show you -- that sum up both

19   the billed amounts and the paid amounts associated with each of

20   the categories of billings.

21        MS. DE BOER:  At this time, Your Honor, the United

22   States offers into evidence Government Exhibit 112.

23        THE COURT:  Any objection to 112?

24        MR. SADOW:  No.  And as previously stated, while it's

25   being done a little differently, all she needs to say is what

1    the exhibit is, and Your Honor can let it in.

2         THE COURT:  Very good.  Thank you for that.  That'll be

3    admitted at this time.

4         MS. DE BOER:  Thank you, Your Honor.

5         Thank you, Mr. Sadow.

6         (Government Exhibit 112 was received in evidence.)

7    BY MS. DE BOER:

8    Q.  So, Mr. Petron, I'm showing you Government Exhibit 112.

9    Let's see.  Starting with the left-hand bar here, can you walk

10   the jury through what it is that is depicted.

11   A.  So what we have on the left-hand side are the total

12   billings for LabSolutions to Medicare from January of 2017

13   through September 2019.  The total amount billed was over

14   $463 million.  That's the number at the top left.

15        That number is then categorized into three buckets.  First,

16   we have the blue bar, which is 269 million of CGx tests and --

17   Q.  Let me stop you right there.

18        That's this blue bucket?

19   A.  That's this blue box, right.

20        And that includes the Tier 2 and the Tier 1.

21        Then we have the green spot in the middle, 73 million of

22   PGx tests.  And then finally, at the top, the whitish part is

23   all other tests.

24   Q.  Okay.  And this bar, the first bar here, this is how much

25   was billed to Medicare; is that correct?

1   A.   Correct.   These are the billed amounts.

2   Q.   Okay.   And then if we move over to the second bar, the

3   slightly shorter bar, what is reflected here?

4   A.   Here, we have a similar analysis; but instead of the billed

5   amount, we have the amounts actually paid to LabSolutions.

6        So LabSolutions was paid over $128 million associated with

7   CGx tests; that's the blue.   So the blue corresponds to the

8   blue in both bars.

9        Likewise, the green, which represents the PGx tests, the

10  PGx were paid just over $25 million.

11       And all other tests billed by LabSolutions were paid just

12  over $34 million.

13  Q.   Okay.   And what is the bottom line here in terms of what

14  type of testing that was being billed by LabSolutions to

15  Medicare?   What type of testing is driving the reimbursements

16  or driving the payments here?

17  A.   So, as you can see, the vast majority of the $187 million

18  in total paid was derived from the CGx tests and the PGx tests.

19  Q.   Okay.   Did you also analyze the testing not just by the

20  amount billed, but also by what beneficiaries were receiving?

21  A.   Correct.   So we analyzed not just amounts billed and paid,

22  but we would analyze the beneficiaries, the individuals who

23  were receiving the tests; we would analyze doctors referring

24  the tests; locations.

25       We analyzed a great deal of information.

1          MS. DE BOER:  Okay.  At this time, Your Honor, the

2     United States offers into evidence Government's Exhibit 113 and

3     114.

4          THE COURT:  Those will be admitted at this time without

5     objection.

6          MS. DE BOER:  Thank you.

7      (Government Exhibits 113 and 114 were received in

8      evidence.)

9     BY MS. DE BOER:

10    Q.   Okay.  So we're going to show 114 to start here,

11    Mr. Petron.  And I want to make sure we're zoomed in

12    sufficiently for the jury to see it.  So there is another

13    column over here that we'll get to.

14         But focusing just on the first two columns, can you walk

15    the jury through what this chart shows?

16    A.   Sure.

17         So what we've done here is we've isolated only individuals

18    that received at least one CGx test.  So we're starting with

19    the baseline of someone has gotten a CGx test, and then we're

20    summarizing everything that that person also was tested for.

21         So what this translates to are -- is:  Over the course of

22    the relevant time period -- that being January 2017 to

23    August 2019 -- there are 27,365 beneficiaries that received CGx

24    tests.

25         And I should clarify here.  An important distinction on

1    this chart is also, this is just one part of the Medicare data,

2    the Part B.  This does not include the Part C or the Medicare

3    Advantage plans run by private insurance.

4    Q.  And let me stop you there to clarify that.

5        The total billing paid that we had looked at, did that

6    include both Part B and Part C Medicare claims data?

7    A.  It did.

8    Q.  Okay.  And if you recall, what -- was it Part B or Part C

9    that made up the bulk of that billing?

10   A.  It was Part B.

11   Q.  Okay.  And so here, you're looking just within the Part B

12   data to determine -- to analyze these beneficiaries?

13   A.  Correct.

14   Q.  Okay.  And I cut you off.  You had just been talking about

15   27,000 patients in the data that got a CGx test.

16   A.  That is correct.

17   Q.  Okay.

18   A.  And so when looking at those 27,365 patients, we examined

19   how many different dates of service, or how many different days

20   did these individuals receive a test.

21       So as everyone knows, you may go to the doctor once a year.

22   Right?  So over the course of three years, you may have three

23   visits.  So we wanted to understand that information.

24       When we did that, we arrived at the second row, and that

25   second row shows the total number of dates of service for those

1    beneficiaries.  And you can see, they're very similar numbers,

2    27,844.

3        And what that means is, by and large, one person had one

4    date with tests.

5    Q.  Okay.  So one person had one date with tests.  But of the

6    27,000 patient that were billed -- whose Medicare was billed

7    for a CGx test, did some of them also receive other tests, or

8    was their Medicare billed for other tests?

9    A.  Absolutely.  Medicare was billed, on those same dates, for

10   other tests as well as the CGx.

11       So the next column represents the PGx tests.  And you can

12   see, of the 27,365 individuals, 8,206 of them also received the

13   PGx test in addition to the CGx test.

14   Q.  Okay.  So in other words, that's about 30 percent of the

15   patients who got a CGx test also got a PGx test billed to

16   Medicare.

17   A.  That is correct.

18   Q.  Okay.  And then continuing over to the other column, what

19   does that mean?

20   A.  So here, this is all other tests.  So these would be any

21   other tests billed that were not classified as CGx or PGx.  And

22   you can see that, again, of the 27,000 CGx beneficiaries, 9,151

23   of them also received other tests as well.

24   Q.  Okay.  And looking down to the average number of tests per

25   beneficiary, can you explain to the jury what that reflects?

1   A.   So what we did is, on each of -- for each beneficiary, we

2   counted how many tests they received.  We looked at the

3   lists -- the first things we looked at were all those lists of

4   tests.

5        Each row is a test, one procedure code.  So we counted,

6   and then we averaged overall the beneficiaries, that on

7   average, an individual received 12 of these tests.

8   Q.   And that's 12 CGx tests.  So on average, the members of the

9   27,000 received on average -- there were 12 procedure codes

10  billed for them just for CGx.

11  A.   Correct.

12  Q.   And could they also have had additional codes billed for

13  PGx?

14  A.   Exactly.  And the column reads the same way.  So that for

15  PGx, of the 8,206 beneficiaries that had PGx tests, on average

16  they received just over six PGx tests.

17  Q.   Okay.  And then the total billed and paid amounts here on

18  the bottom?

19  A.   So on the CGx side, over $223 million billed, with a

20  corresponding amount of $119 million paid.

21       On the PGx grouping, $11 million billed, with $5.8 million

22  paid.

23  Q.   Okay.  Now, did you also analyze the frequency of specific

24  CGx codes in the data?

25  A.   Yes.

1    Q.   And did you create a chart that summarized that?

2    A.   We did.

3    Q.   I'm going to show you what has now been admitted as

4    Government Exhibit 113, and I'm going to start with page 2 of

5    113.

6         And, Mr. Petron, I may have to zoom in on parts of this as

7    we go, but why don't you just start by walking us through, at a

8    high level, what it is that's reflected.

9    A.   Okay.  So this is -- one, I'm a visual person.  I hate

10   boxes of numbers.  I like to see charts like this.

11        So what we've done is, we've created a chart where along

12   the bottom, the X axis, the bottom of the chart, you see all of

13   the five-digit procedure codes.

14   Q.   And I'm going to zoom in here so that the jury can see what

15   you're talking about.  I'll just give it a second to adjust.

16   A.   So while that's happening there, these are the codes that

17   were on the list that we just looked at.  Right?  So this is

18   Tier 1 and Tier 2 CGx codes.

19        And so for every one of these codes, we are counting the

20   number of people that got that test.

21   Q.   And we are only looking, in this slide, at CGx testing; is

22   that correct?

23   A.   That is correct.  The colors, the yellow is the Tier 2

24   ones, and the blue are the Tier 1 CGx codes.

25   Q.   Go ahead.

1    A.   And so just the way you read this chart is, okay, I want to

2    know how many of a particular code was billed.  So I would look

3    at the first one, 81405, and if we go up on the vertical axis,

4    we're counting the number of beneficiaries that got that test,

5    and you can see -- well, you can't see it.  I know the number

6    is a little bit over 26,000 beneficiaries.

7         And that roughly corresponds, if you recall from the last

8    chart that we looked at, of people getting CGx tests.

9    Q.   Right.  So we've just seen that there were approximately

10   27,000 patients that had a CGx test billed to Medicare.

11        Of those 27,000, this chart is showing that over 26,000 of

12   them -- so the vast, vast majority of them -- had this

13   particular code, which is a Tier 2 code bill; is that correct?

14   A.   That is correct.

15   Q.   Okay.  And then the first four, the highest bars on this

16   chart, are all about equal, and they're all Tier 2 codes.

17   A.   That is correct.  Each of those four Tier 2 codes roughly

18   have about 26,500, give or take, beneficiaries.  By and large,

19   these codes were always billed together.

20   Q.   Okay.  And then going further down this chart, you would

21   see every other code that was billed and the number of patients

22   that received that code; is that fair?

23   A.   That's fair.  So let's take the very next one which is a

24   Tier 1 code, 81201.  That's the first blue bar.

25        So what that means is just over, barely over 20,000

1    beneficiaries, received that particular test, 81201.

2    Q.  Okay.

3         MS. DE BOER:  At this time, Your Honor, the government

4    would move admission of Government's Exhibit 116, 108, and 106.

5         THE COURT:  Those will be admitted without objection.

6         (Government Exhibits 116, 108, and 106 were received in

7         evidence.)

8    BY MS. DE BOER:

9    Q.  And, Mr. Petron, did you analyze -- in the data that you

10   were provided, could you determine that there were bills from

11   two different geographical locations?

12   A.  I was, yes.

13   Q.  And did you analyze the billing from each location?

14   A.  We did.

15   Q.  All right.  I'm showing you what has been admitted as

16   Government Exhibit 106.

17        Is this the chart that analyzes the billing by location?

18   A.  It does, yes.

19   Q.  Okay.  And I'll try to zoom in as you -- if you could walk

20   us through this chart, I'll zoom in on the parts you're talking

21   about so the jury can see what you're seeing.

22   A.  So here, we are purely looking at the Medicare Part B CGx

23   billing.  Okay?  The CGx only billing.  And this is a different

24   way to look at it, which is, we're looking at it by month.

25        So we have months going across the bottom on the X axis to

1   see how time factored into the billing.  We start in January

2   of 2017, and we proceed along the blue bars, all the way into

3   2018.

4       The blue bars represent the amount that was billed using

5   the Georgia provider location.  And then, as you can see, the

6   red bars start to pick up in November of 2018, and that is the

7   Pennsylvania billing provider.

8   Q.  Okay.  And the blue bars -- you know, up until November

9   of 2018, there are no red bars, and the blue bars are quite

10  high compared to the red bars that then appear; is that fair?

11  A.  That is fair.

12  Q.  But once the orange or red bars come into play, then what

13  is the trend after that point?

14  A.  You can see that there is a falloff of the blue bars, and I

15  would say the blue bars and the red bars then -- you know, you

16  can see for yourself how to characterize that, but the blue

17  looks to be slightly less than the red going forward.

18  Q.  Okay.  Were you also asked to analyze billing for specific

19  patients?

20  A.  I was.

21  Q.  And did you create summary charts that correspond to that?

22  A.  We did.

23          MS. DE BOER:  At this time, Your Honor, the United

24  States offers into evidence Government's Exhibit 166, 2, 3, and

25  4.

```
 1              THE COURT:  Those will be admitted without objection.
 2              MR. SADOW:  Could you repeat that one more time?  I'm
 3    sorry.
 4              MS. DE BOER:  Yes.  It's four different exhibits; 166,
 5    then it's Government Exhibit 2, then Government Exhibit 3, and
 6    Government Exhibit 4.
 7              MR. SADOW:  Thank you.
 8              (Government Exhibits 166, 2, 3, and 4 were received in
 9              evidence.)
10    BY MS. DE BOER:
11    Q.  So showing you -- starting with Government Exhibit 2,
12    Mr. Petron -- and we're not going to be able to fit the whole
13    thing on the screen, so we'll go sort of bit by bit.
14        So walk us through what is reflected here on Government's
15    Exhibit 2.
16    A.  Government Exhibit 2 is a summary we created, detailing
17    various pieces of information surrounding V.H., which had
18    billings from LabSolutions on 9/24/2018.
19        So what we're looking at is, just starting on the top
20    left-hand side, the claim number.  So that is the unique
21    identification in the Medicare data for the particular claim
22    that was submitted by LabSolutions.
23        We have that claim submission date, 9/24/2018, and finally,
24    the referring provider that referred the test to LabSolutions.
25    Q.  And there's a notation here for no prior relationship.
```

1        Can you explain to the jury what that means?

2   A.   Sure.  We looked at all of the billing data for Ms. H.,

3   going back in time, and we looked for any other claim that had

4   any association whatsoever with Dr. Tsai, and we found no

5   relationship whatsoever, at least from a billing perspective,

6   between that doctor and this patient.

7   Q.   Okay.  And then I'll zoom out so you can continue to take

8   us through this chart.

9   A.   Okay.  So let's go to the top right-hand side.  This is a

10  diagnosis summary from the claim.

11       So these would be the diagnosis codes associated with this

12  particular claim, and they're detailing both personal and

13  family histories of cancer.

14  Q.   And then I'll zoom back out so you can take us through the

15  remainder.

16  A.   And then the bottom part of this is what I would call the

17  procedure code or the line item detail.  So this is what the

18  lab billed for Ms. H. on this day.

19       So as we look at this, we can see 81201.  And if you

20  recall, that was the first blue line of that bar chart that we

21  looked at.  And then there are codes 81404 through 406.  Those

22  are those first yellow lines that we looked at.

23       And the way this chart works is, we detail out every single

24  procedure code, the description of that procedure code, the

25  amount that was billed in the next-to-last column, and finally,

1   the amount paid for that particular procedure.

2   Q.   Okay.  And when we had looked at the chart summarizing the

3   27,000 thousand patients that -- whose Medicare was billed for

4   CGx tests, the average number of tests for CGx was around 12;

5   is that right?

6   A.   Correct.

7   Q.   So if we look at Ms. H.; 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

8   12.  Right on the money.  Fair enough?

9   A.   That's correct.  That's what the average indicates.

10   Q.   All right.  And what is reflected down on the bottom?

11   A.   So here -- I'm sorry, am I causing feedback?

12   Q.   I think it's actually on this mic.  It's not you.  It's

13   been happening with everybody.

14   A.   All right.  So what we have is the total billed amount for

15   Ms. H. on this date, $6,470, and the total amount paid

16   associated with that, $4,149.

17   Q.   Okay.  And did you create similar charts for each of the

18   patients?

19   A.   We did one for each of the accounts.

20   Q.   So moving to Government's Exhibit 3.

21   A.   This is the same exact setup that we just went through, in

22   detail, for Beneficiary G.  we've got the claim number, the

23   claim submission, and the referring provider, Dr. Tsai, with no

24   prior relationship.  So nowhere in the billing history was

25   there another billing with that doctor and this beneficiary.

1      We have the diagnosis in the top right of a personal

2  history of cancer.

3      And then we have the procedure code detail again at the

4  bottom, listing line by line the individual procedures billed

5  for this beneficiary.

6  Q.  And just to give the jury a sense of these procedures.  So

7  the first one reads -- it's 81201, gene analysis, something

8  about polyposis coli, whole gene sequence.

9      Do you see that?

10  A.  I do.

11  Q.  And then molecular pathology, molecular pathology, more

12  gene analysis.  And then one that is highlighted:  Gene

13  analysis breast cancer 1.

14      Do you see that?

15  A.  I do.

16  Q.  And how much was that code billed for?

17  A.  That was the largest individual code billed for $1,310.

18  And ultimately, it was paid at $1,275.

19  Q.  And the total billed -- and paid for -- by LabSolutions for

20  Mr. G.'s care?

21  A.  $5,820 billed and $2,975 paid.

22  Q.  I'm showing you now Government Exhibit 4.

23      Is this a similar chart for Ms. H.K.?

24  A.  It is.  Again, a chart is set up in the same way.  We have

25  the unique claim number followed by the submission date

1    followed by the referring provider, again, Dr. Tsai.

2         And when we examined that claims history, we found no prior

3    relationship with this doctor.

4         The diagnoses related to this particular claim are both a

5    percentage and a family history of various cancers.  And then,

6    similarly, we have all the procedure codes listed that were

7    billed, with their description, their amounts billed and paid,

8    just like before.

9    Q.   And zooming in at the bottom, the total bill then paid for

10   Ms. K.'s test?

11   A.   Here we have $5,820 billed and $1,699 paid.

12   Q.   Okay.  And then were there a few other patients that the

13   government asked you to analyze, perhaps not in quite as much

14   detail as the counts that you just looked at, but a few other

15   billed and paid amounts for certain other patients?

16   A.   There was.

17   Q.   I'm showing you what has been admitted as Government

18   Exhibit 166.

19        All right.  So starting with page 1 of 166, this is for a

20   patient named W.H.; is that correct?

21   A.   It is.

22   Q.   And what did you find for Ms. H?

23   A.   Here, we found one claim on November 17, 2017, the start

24   date and the end date being the same.  That's one.  We found

25   total billings related to all tests of $7,750.

1      In this situation, the only tests billed were all CGx

2  tests.  So that's why the next number is the same, 7,750.  That

3  means there were no other billings outside of CGx testing for

4  Ms. H.

5      And then the associated paid amounts, again, $6,715 were

6  paid.  And those -- again, those two numbers are the same

7  because CGx tests were the only tests billed.

8  Q.  Okay.  And turning to page 2 of Government's 166, is this a

9  similar analysis for W.I.?

10  A.  It is the same exact setup, very similar fact pattern.  On

11  May 31, 2018, a claim for CGx tests only.  That's why the all

12  tests and the CGx are the same.  $6,470 billed with a

13  corresponding paid amount of $5,425.

14  Q.  And A.K.?

15  A.  Again, similar pattern here with Ms. K.  June 7, 2018,

16  billing for CGx tests in the amount of $6,470.  Those were paid

17  in the amount of $5,425.

18  Q.  How about D.N.?

19  A.  Mr. N. had a slightly different pattern.  There were

20  multiple dates of service starting on September 20, 2018,

21  ending on January 4, 2019.

22      All tests combined were billed for $9,595.  Of that $9,595,

23  7,115 of it related to CGx tests.  So unlike the last few that

24  we've looked at where all of the billings were CGx, here we

25  have a subset of it.

1    On the paid side, we have $6,524 for the total paid amount

2    related to Mr. N.  And of that 6,524, 5,938 related to the CGx

3    tests.

4    Q.   Okay.  And last page, Ms. P.W.

5    A.   So here, we have the same fact pattern as the beginning.

6    One claim on May 12, 2018.  All CGx tests billed for $7,120 and

7    a paid amount of $4,149.

8    Q.   Okay.  And now, Mr. Petron, I want to move into the

9    financial analysis for a moment.

10   Can you, just sort of at a high level, explain to the jury

11   what is it that you were asked to do with respect to the

12   financial records you have provided.

13   A.   I would say, at a high level, our job was to take in

14   voluminous amounts of banking records and create a database of

15   those records so that we could have a comprehensive picture of

16   the flows of money both into and out of LabSolutions.

17   Q.   Okay.

18        MS. DE BOER:  At this time, Your Honor, the United

19   States moves admission of Government Exhibit 122-A and 123.

20        THE COURT:  Those will be admitted at this time without

21   objection.

22     (Government Exhibits 122-A and 123 were received in

23     evidence.)

24   BY MS. DE BOER:

25   Q.   And before we move into those, Mr. Petron, I'm going to

1    remind you of -- we had looked at 112 before, and we looked at

2    the total paid amount of 187 million?

3    A.   Correct.

4    Q.   And was it your job to go through and see where that money

5    went?

6    A.   Essentially, it was my job to see where that money went.

7    Q.   Okay.

8    A.   The Medicare billing data, the date gives us that

9    $187 million, is one way to view it, but you have to look in

10   the banking records to find out where the Medicare money is

11   going.

12   Q.   Okay.  And showing you Government Exhibit 122-A.  So kick

13   us off on -- on your financial analysis at a high level.

14        What were the sources of income that LabSolutions had?

15   A.   So here, we list two primary sources.

16        So for the time period listed at the top there, January 3,

17   2017, through August 21, 2019, we looked at all incoming money

18   and categorized it into these three buckets, per se.

19        The first and the biggest, the blue bucket -- and if we can

20   scroll up there -- 75 percent of all of the incoming money came

21   from Medicare, over $168 million.

22        23 percent of the money, or just over $50 million, came

23   from other insurance companies.  So these would be companies

24   that were both associated with Medicare Part C and potentially

25   others.

1       And finally, that small sliver of 2 percent is everything

2   else.  So if we could either classify it as Medicare or

3   classify it as insurance -- if we couldn't do that, then we

4   would put it in the other bucket.

5   Q.   Okay.  And just to be clear, this blue bucket of

6   168 million, is that only Medicare Part B?

7   A.   Correct.

8   Q.   And the slide that we had looked at with the bar chart

9   showed 187 million being paid.

10      Is that because that also included Part C?

11  A.   It also included Part C.

12      And I will say, for years of doing this job, it's nearly

13  impossible to line up billing data/claims data with banking

14  data.

15      So these numbers will never precisely match, but they're

16  relatively in the same ballpark as what we'd expect.  There are

17  delays in billing; there are delays in payment.  There's a lot

18  of different timing aspects to this where we can't ever get

19  them to precisely match, but we got pretty close.

20  Q.   And if we were to chop up the red into what was payments on

21  private insurance plans versus payments on Medicare Part C

22  insurance plans that flow through private insurers, we would

23  find a chunk of this would be Part C and would be the 187; is

24  that fair?

25  A.   Again, it -- it will definitely be the Part C.  Would it

1    add up precisely to 187?  Maybe; maybe not.  Probably not.

2         But that is exactly the way I viewed this, is we would get

3    roughly into that ballpark of 187 if we sliced up the red into

4    Part C.

5    Q.   Okay.  Now showing you Government Exhibit 123.

6         Did you then trace that flow of funds to different

7    entities?

8    A.   We did.

9         So, as a first order of business, this is just a flowchart

10   showing Medicare paying LabSolutions $168 million.  We then add

11   to this chart -- as we will going forward -- different amounts

12   and different payees of where LabSolutions spent their money.

13        In this particular case, we classified $51 million as being

14   paid to marketers.

15   Q.   And is that based on information provided to you by the

16   government on how to classify certain companies?

17   A.   Correct.  The government told me what was -- what to

18   consider for a marketer, and I have a list of those.  And so I

19   would classify them in the banking database that we have.

20   Q.   Okay.  And then did you, at the request of the government,

21   look at specific marketing companies in greater detail?

22   A.   We did.

23             MR. SADOW:  Did you say that's 123?

24             MS. DE BOER:  Yes.

25             MR. SADOW:  Respectfully, can I see your 123?

1          It's just that there was some updated -- we're not

2     questioning; we're just trying to make sure we have the same --

3          THE COURT:  That's all right.  Take a moment.  It's

4     okay.

5          MR. SADOW:  It just looks like we have maybe one -- the

6     earlier version.  It's not a problem; we'll work it out.

7          THE COURT:  Thank you.  Can we go forward, then?

8          MR. SADOW:  Yes, of course.

9          THE COURT:  All right.  You may proceed.

10    BY MS. DE BOER:

11    Q.   And so were there several marketers in particular that the

12    government asked you to focus on?

13    A.   There were.

14         MS. DE BOER:  At this time, Your Honor, the government

15    would move into evidence Exhibit 124.

16         THE COURT:  That'll be admitted without objection.

17         MS. DE BOER:  Thank you.

18      (Government Exhibit 124 was received in evidence.)

19    BY MS. DE BOER:

20    Q.   All right.  So is this just a sort of high-level summary of

21    payments to several marketing companies?

22    A.   It is.

23    Q.   And can you walk the jury through these entities, what was

24    paid to each of them.

25    A.   Sure.  So the last chart had $50 million, roughly, going to

1    marketers.  This is a subset of that.  So we're looking at, in

2    particular, four marketers that received, in total,

3    $23.8 million.

4          Starting on the left, XGEN Marketing received 9.7 million;

5    ePay Funding, 5 million; Mr. Hirsch, 4.5 million; and MediPak

6    received 4.6 million.

7    Q.   Okay.  And particularly with respect to XGEN and ePay, did

8    you do an even deeper dive?

9    A.   Correct.  We were asked to also look into those companies

10   and how those companies moved or used money in the next layer

11   down.

12         MS. DE BOER:  And I'm going to ask, Ms. Puntillo, could

13   we switch to -- well, before we do that, I'm going to show

14   you -- I'll move in Government Exhibit 165.

15         And then, Ms. Puntillo, I'm going to switch to the

16   monitor in a second and ask you to pull up 125, which I'll also

17   move into evidence at this time.

18         Your Honor, may I admit 125 and 165?

19         THE COURT:  Yes.  Both will be admitted without

20   objection.

21         (Government Exhibits 125 and 165 were received in

22         evidence.)

23   BY MS. DE BOER:

24   Q.   And before we get to XGEN, Mr. Petron, I'm showing you

25   what's been admitted as Government Exhibit 165.

 1       Did the government also ask you to summarize payments to a

 2  company called Q Health?

 3  A.   It did.

 4       In this -- in this chart, we're showing just over

 5  $1.3 million going from LabSolutions to Q Health between

 6  January 5, 2017, and November 14, 2018.

 7  Q.   Okay.

 8            MS. DE BOER:   All right.   So, Ms. Puntillo, I'm going

 9  to switch you over.

10            Could you please bring up Government Exhibit 125.

11  BY MS. DE BOER:

12  Q.   Okay.   So, Mr. Petron, this one, there's a little more

13  going on here.   So can you just sort of take us through it?

14  A.   Sure.   Let's start with LabSolutions there at the top.   The

15  first chart we looked at was $50 million going to marketers.

16  Then we looked at a chart of 23 million; of that 23, here we're

17  just examining 2.   So we're just narrowing the funnel of what

18  we're looking at.

19       We're focused in on two marketers:   XGEN and ePay.   XGEN

20  receives 9.7 million, and ePay Funding receives 5 million.

21  EPay, when looking at their accounts, sent $4.4 million to the

22  left, to XGEN.

23       XGEN then sent money to four places.   So I'm just going to

24  walk through each of them, starting on the right:   $7 million

25  was sent from XGEN to BBAR Marketing; $436,000 was sent to

1   IDGAF; 124,000 was sent to Tampa Bay Telehealth, also what's

2   called my MyOnCallDoc; and then, finally, 748,000 was sent from

3   XGEN to KP Network.

4        Moving down into that next layer, we saw that BBAR

5   Marketing also sent money to some of the places that XGEN

6   did -- mainly the MyOnCallDoc and the KP Network -- in the

7   amount of 1.1 million and 2.5 million, respectively.  And BBAR

8   also sent 608,000 to LifeMD and $240,000 to Mojo Media.

9   Q.   And this is a flow.

10       Did the government ask you to analyze specific transactions

11  of interest in this case?

12  A.   We did.

13  Q.   And are those Government Exhibits 6, 7, 8, and 9?

14  A.   Correct.

15       MS. DE BOER:  United States would move into evidence

16  Government Exhibits 6, 7, 8, and 9 at this time.

17       THE COURT:  Those will be admitted without objection.

18       (Government Exhibits 6, 7, 8, and 9 were received in

19       evidence.)

20  BY MS. DE BOER:

21  Q.   So we'll start here, Mr. Petron, with Government Exhibit 6.

22  Take us through what you have reflected here.

23  A.   Here, we have one very specific transaction.  This

24  transaction is a transfer, on February 14, 2017, in the amount

25  of $35,738.99.

1        It is sent from LabSolutions account at BB&T bank, with the

2     account number ending in 5953.  That money is sent to

3     Mr. Hirsch at a Wells Fargo account that ends in 6893.

4        So the arrow is going from left to right.  And on the

5     bottom, I've put here for reference some of the financial

6     records that we examined to show the details of this

7     transaction.

8        So this is an example of what we would see and we have

9     summarized.

10    Q.  Now moving to Government Exhibit 7, is this another

11    specific transaction that you analyzed?

12    A.  Here is another specific transaction.  Same accounts,

13    different date and amount.  So now we have, related to Count 7,

14    a November 14, 2018, transfer in the amount of $150,251.76.

15       And again, the corresponding banking detail at the bottom.

16    Q.  And moving to Government Exhibit 8.

17    A.  Government Exhibit 8, slightly different receiver.  Same

18    sender, but different receiver here.

19       LabSolutions is sending to XGEN Marketing.  Again, a Wells

20    Fargo account, but obviously a different account number, ending

21    in 3990.  On December the 13th of 2018 the transfer was for

22    $728,972.18.

23       And then again, at the bottom we have the detail from the

24    banking records showing all of the same information.

25    Q.  And then, Mr. Petron, Government Exhibit 9.

1   A.   So Count 9 relates to a payment, again, from the same

2   LabSolutions account to an XGEN Marketing account at Wells

3   Fargo, ending in 3990.

4        This happened on April 30, 2019, for $600,000 even, and you

5   can see the excerpt from the financial records that we used.

6   Q.   Now, did Stout, your firm -- did your firm pull together

7   composites of banking materials that contain the underlying

8   transactions for all the payments from LabSolutions to XGEN,

9   for example?

10  A.   We did.

11       So we went through our database of records.  I think there

12  are almost 50,000 records.  And we took out, every time we saw

13  a payment from LabSolutions, any of their accounts to any of

14  the XGEN accounts, and we basically just smashed them together.

15  Q.   And we're not -- and not just for XGEN, but you did it for

16  Brett Hirsch too, for example.

17  A.   We did.

18  Q.   We're not going to go through it, but if the jury was

19  interested in seeing each individual transaction, they can

20  find, for example, the Brett Hirsch transactions at Government

21  Exhibit 157; is that correct?

22  A.   Correct.  And do you physically have it there?

23  Q.   I do.

24  A.   So turn it -- so you can see the paper.  Right?  So that's

25  the underlying record, not just from our database.  That's

1    the -- how we made our database.  We took records like that and

2    digitized them.

3            MS. DE BOER:  At this time, Your Honor, the government

4    moves into evidence Government Exhibit 157, 151, 153, 154, 155,

5    156, 158, and 159.

6            THE COURT:  Those will be admitted at this time without

7    objection.

8            MR. SADOW:  She's speeding up, Your Honor.

9            THE COURT:  I know.  It's all right.

10           MS. DE BOER:  Too much coffee this morning, Your Honor.

11            (Government Exhibits 151, 152, 153, 154, 155, 156, 157,

12             158 were received in evidence.)

13   BY MS. DE BOER:

14   Q.  Okay.  We're not going to go through the stack for

15   everyone, but safe to say for the marketers that we asked you

16   to take a specific look at, you also compiled, for the jury's

17   ease of reference, if they wanted to review it, these specific

18   transactions in a single place?

19   A.  Exactly.  So if we had filled up this corner of the room

20   with paper, we took out all the pieces related to each of those

21   and put them in one spot so you can all look at it in an easily

22   digestible fashion.

23   Q.  And in addition to that, I'm showing you what's been

24   admitted as Government's Exhibit 154.

25           Did you also sort of summarize then all in a chart -- this

1    is, for example, payments to Brett Hirsch.

2        But is there an Excel chart like this summarizing all the

3    transactions that would be in this larger stack?

4    A.   Correct.

5    Q.   So if the jury wanted to review that, they could review it

6    at Government Exhibit 154, for example, for Mr. Hirsch.

7    A.   Exactly.  So each of these transactions are on a piece of

8    banking document somewhere, so here they all are on a

9    spreadsheet that add up for you, and that you can go to the

10   other exhibit, and that's the thick one and every page would

11   have one of these transactions.

12   Q.   And for Mr. Hirsch, for example, adding it up, it would

13   total $4.5 million?

14   A.   Correct.

15   Q.   And you can see, taking Mr. Hirsch as an example, over time

16   there's a variation in the payments until we get towards the

17   very end where they all become 150,000?

18   A.   That's correct.  I believe this is sorted by date, but can

19   you --

20   Q.   We can see.

21   A.   Yes.

22   Q.   And so you see the dates in the middle there.

23   A.   Right.  So this is sorted, you know, oldest to newest, so

24   you can see a timeline of those transactions.

25   Q.   Okay.  And we've done an example of the Brett Hirsch stack

1  of records and summary, but there would be one for XGEN as

2  well?

3  A.   Correct, it will be in a very similar format to that.

4  Q.   Now, were you also asked to examine a different type of

5  records, which is phone records, toll records?

6  A.   We did, yes.

7  Q.   And what are toll records, Mr. Petron?

8  A.   So toll records are a form of data that -- we all have cell

9  phones.  So every time we call someone, there is a record of

10  the outgoing call, the number, and who that number -- the

11  number that was -- you're calling.  So every time there's a

12  call, there's a record.  The toll records show us the date when

13  calls were made, the sending and the receiving phone number,

14  and also the duration of how long a call lasted.  So these

15  records are voluminous and have lots and lots of numbers on

16  them, and so we receive this from the government, and again, we

17  could digitize this and create summaries that can summarize

18  lots of years, lots and lots of numbers, so that you all don't

19  have to go through and count, you know, massive amounts of

20  paper.

21  Q.   Okay.

22       MS. DE BOER:  At this time, Your Honor, the United

23  States offers Government's Exhibit 132, 133, 134, and 135 into

24  evidence.

25       THE COURT:  Those will be admitted without objection.

1          (Government Exhibits 132, 133, 134, and 135 were received

2          in evidence.)

3    BY MS. DE BOER:

4    Q.   And, Mr. Petron, specifically did the government provide

5    you with Minal Patel's toll records?

6    A.   Correct.

7    Q.   And did the government ask that you prepare summaries of --

8    times when Mr. Patel's phone number connected with phone

9    numbers belonging to several other individuals?

10   A.   Correct.

11   Q.   Okay.  I'm going to show you Government's Exhibit 132.

12   I'll zoom out, and then I can zoom in as you walk us through

13   this, Mr. Petron.

14        So go ahead and explain to the jury what you analyzed here.

15   A.   So let's start obviously at the top.  Here, we have

16   Mr. Patel's toll records, from October of 2016 through

17   April 2019.

18        We were provided four phone numbers associated with Rama --

19   I'm sorry.  I'm not going to say this correct.

20   Q.   Mr. Ramamurthy?

21   A.   Ramamurthy.  And those four phone numbers appeared in the

22   toll records 1,160 times.  So there were 1,160 calls placed

23   between Mr. Patel and these four phone numbers, but not all

24   calls had, I would say, a connection.

25        So if the duration of the call was zero, that means no

1  one -- there was no answer, right?  There was no connection.

2      So I thought it was important to put the columns on the

3  right, which show how many of those calls had a duration that

4  was larger than zero.

5      And you can see that there are 914 calls out of the 1,160

6  calls where some connection was made.

7  Q.  And just to be clear, Mr. Petron, you have no idea if, in

8  fact, these two individuals spoke on these 914 times, who it

9  was on either end of the call, if somebody was using somebody

10 else's phone, or what they spoke about.

11 A.  I know none of that.  I have a dataset that has phone

12 numbers, dates, and how long a call lasted.  That's the extent

13 of the knowledge.

14 Q.  Okay.  And at the bottom here, what did you represent?

15 A.  So here I was asked to look at a more specific time period,

16 namely, July 26, 2017, through April 20, 2019, and then I'm

17 presenting the same two pieces of information.  186 total

18 calls, 144 of them having some duration that's greater than

19 zero.

20 Q.  And moving to Government Exhibit 133, what do we have here?

21 A.  Here we have the toll records summarization for

22 Mr. Griner -- his phone number is listed -- for the entire time

23 period, 660 calls, where 629 of them had some connection

24 greater than zero.

25 Q.  And the date range on those calls?

1   A.   October 4, 2016, through November 13, 2017.

2   Q.   Okay.  Looking at Government Exhibit 134.

3   A.   These are the records for Mr. Hirsch.  There were two phone

4   numbers associated with Mr. Hirsch.  We have a slightly

5   narrower time frame here, October 2016 through August of 2019.

6   146 total calls, 138 of them with some greater than zero

7   connection.

8   Q.   And finally, Government Exhibit 135.

9   A.   So here it's Marc Sporn, three numbers, from September

10   of 2018 through June 26, 2019, 38 total calls, 32 of them with

11   a duration greater than zero.

12          MS. DE BOER:  Your Honor, may we approach briefly?

13          THE COURT:  You may.

14      (The following proceedings were held sidebar:)

15          THE COURT:  Yes, is this a good time to stop?

16          MS. DE BOER:  Yeah, I'm about to switch into the money

17   laundering.

18          THE COURT:  Okay.  So we'll stop here.

19          MR. SADOW:  Okay.

20          MS. DE BOER:  Thank you.  You got it.

21      (Proceedings returned to open court.)

22          THE COURT:  All right.  Ladies and gentlemen, it's just

23   at about noon, and we're at a good stopping point in the

24   testimony.  And I want to go ahead and take this moment to

25   break for lunch and remind you all, of course, again, of a

1    number of ground rules you've been following diligently since

2    the beginning of your service.

3         Please remember not to discuss anything that you have

4    heard or seen in this trial with one another until you begin

5    your deliberations at the end of the case.  Certainly we still

6    have evidence left to go, and it's important that no one form

7    an opinion of that evidence until they've heard all of the

8    evidence.

9         So I remind you again to continue to please keep an

10   open mind.  Further, if family or friends reach out to you and

11   ask you about your service and what you've heard, please

12   continue to remember that you cannot discuss this case with

13   anyone.

14        And, of course, when you are out at lunch, if the

15   lawyers see you and they avoid you, take no offense from that.

16        Please continue as well to stay off any social media

17   channels regarding your service, and not to conduct any

18   research online regarding any people, places, or things that

19   you've heard about during this trial.

20        So what I'd like to do is -- we're going to have a

21   little bit of homework and other things we're going to do over

22   the lunch break, but we are very much on pace.  I will give you

23   guys a good sense at the end of today where we're at, but I can

24   guarantee you we're right where we need to be.

25        So I'm going to give you all, as I've done in the past,

1    until about 1:45.  Okay?  We're going to give you a little more

2    time than usual, about an hour and 45 to take a break.

3         If you need to make any calls, check in with work,

4    family, et cetera, of course not to talk about the case but to

5    make sure things are going as they should back home and at

6    work, take advantage of that time.  We'll see you all back in

7    the jury room at 1:45.  You are excused.

8         (Jury exits at 11:58 a.m.)

9         THE COURT:  Mr. Petron, you're also free to step down.

10   Please remember, of course, you're currently under oath and on

11   the stand, so there should be no communication with any of the

12   lawyers.  And we'll see you back here just before 2:00.  Thank

13   you.

14        All right.  Everyone, please be seated.  Just a few

15   brief moments for housekeeping before we break as well.

16        I think we're doing just fine in getting through

17   Mr. Petron at this point.  And we know that our goal is just to

18   complete his testimony today.  I don't see any reason why we

19   won't be able to accomplish that at the pace we're at.

20        I don't want to put you at a number, Ms. de Boer, but I

21   think you've made some good progress.  So I assume in the mid

22   afternoon, you'll be able to turn it over for cross.

23        Is that fair?

24        MS. DE BOER:  Yeah.  I mean, I have maybe an hour or

25   probably less than that left.

1          THE COURT:  Okay.  Perfect.  So that gives Mr. Sadow or

2     Mr. Rafferty, whoever is taking the lead -- all right -- to

3     turn it over for the cross-examination and then the redirect,

4     and we'll complete that witness today.

5          Just to get a little bit ahead of it, I'm looking

6     ahead.  Knowing that Dr. Yogel is tomorrow, is it possible that

7     Dr. Yogel then will be able to join us at the conclusion of our

8     argument, so around 10:00 o'clock?  Is that what we're thinking

9     tomorrow from the government?

10         MS. DE BOER:  Yes, Your Honor.

11         THE COURT:  Okay.  Very good.  And that, again,

12    continues to be the government's last witness, as far as we

13    know right now, right?

14         MS. DE BOER:  Correct.

15         THE COURT:  Okay.  So I wanted to just raise it just to

16    get a sense, and I don't want to force the issue just yet.  But

17    I wanted to turn to the defense team.

18         Certainly, we originally thought we were going to be

19    resting the government's case on Monday, so this is a welcome

20    development that it will be done on Friday.  I don't know if

21    you guys have even had a discussion, so I don't mean to put you

22    on a position now.  But I'd ask that, by the end of today, you

23    guys let me know if there's even a possibility that there's a

24    shorter witness that could be called in your case.

25         I say that because my recollection, Ms. de Boer, was

1   that Dr. Yogel is not an especially lengthy witness because it

2   deals with a beneficiary.

3        MS. DE BOER:  That's correct.  He's a short witness,

4   Your Honor.

5        MR. SADOW:  We can answer that question.  We,

6   unfortunately, are just not in a position to call anyone.  We

7   will be prepared to move forward first thing Monday morning --

8        THE COURT:  Monday morning.  Okay.

9        MR. SADOW:  -- but not Friday.

10        THE COURT:  And that's fair.  I mean, again, we were

11   planning on, best case, you putting someone on Monday.  So it's

12   all right.  It's not the end of the world.

13        I think that we're probably still ahead of schedule

14   based on what we expected originally.  And I feel very

15   confident that your ability to put on witnesses starting Monday

16   will avoid the concerns we had even two or three days ago that

17   we'd be up against the holidays.

18        I mean, we have our third week essentially dedicated to

19   you guys putting on who you need.  And look, I don't know how

20   many witnesses the defense team is contemplating putting on,

21   but I certainly think that finishing this case at least -- you

22   know, I know we still have the forfeiture element of it -- but

23   finishing this primary portion of the case is very doable by

24   the end of next week.

25        I mean, again, I don't want to get ahead of myself in

 1   how many folks defendant plans on calling.  And certainly,

 2   decisions will have to be made as to Mr. Patel; and that would

 3   be lengthy if he testifies, I would imagine.

 4        But, having said that, I think it is realistic that we

 5   are targeting something towards the end of next week.  It's

 6   very possible.  So I want everyone to keep that in mind.  It

 7   just puts us in a very good position with these jurors, given

 8   the schedule.

 9        So I just wanted to kind of let you know my thoughts on

10   that, but I appreciate the defense giving me that intel.

11   Certainly, you guys can make the most, I'm certain, of the time

12   on Friday if, indeed, we end a little early.

13        And I'm certain the jurors who have been coming in

14   every day at 9:00 won't mind getting a little break going into

15   the weekend, knowing that the government will have rested, and

16   they can lock in for the defense's case-in-chief next week.  So

17   then that should work.

18        All right.  Okay.  So let's go ahead and take our

19   break.  Everyone will be coming back at around 1:45, and we

20   will put our witness, Mr. Petron, back on the stand and go from

21   there.

22        Anything else on the government's end before we break?

23        MS. DE BOER:  No, Your Honor.  Thank you.

24        THE COURT:  Sure.

25        Anything else on the defense team's end?

1           MR. SADOW:  No, sir.

2           THE COURT:  All right.  Very good, everyone.  With

3    that, have a good lunch.  We'll see you all at a quarter before

4    2:00.  Thank you.  We're in recess.

5           (Court recessed at 12:03 p.m.)

6           (Back on the record at 2:20 p.m.)

7           THE COURT:  All of our jurors are present and accounted

8    for.

9           Do I have any housekeeping concerns from the government

10   before we resume with Mr. Petron?

11          MS. DE BOER:  No, Your Honor.  Thank you.

12          THE COURT:  Anything from the defense?

13          MR. SADOW:  No, Your Honor.

14          THE COURT:  All right.  Let's go round up our jurors.

15          THE COURT SECURITY OFFICER:  All rise.

16          (Jury enters at 2:21 p.m.)

17          THE COURT:  All right.  Please be seated, everyone.

18          Welcome back, folks.  Hope you had a nice lunch break.

19   We are going to pick up where we left off with the direct

20   examination of Mr. Petron.

21          Everyone ready to go?  Yes?  All right.  Very good.

22   Thank you, guys.

23          Turn it back over to the government.  Go ahead.

24          MS. DE BOER:  Thank you, Your Honor.

25   BY MS. DE BOER:

1    Q.   Good afternoon, Mr. Petron.

2    A.   Good afternoon.

3    Q.   We had started your testimony by discussing the -- the fact

4    that the government has engaged your firm to perform the work

5    that you're testifying to today.

6         Do you recall that?

7    A.   I do.

8    Q.   And I want to talk a little bit about the contracts that

9    your firm has with the Fraud Section of the Department of

10   Justice.  Okay?

11   A.   Okay.

12   Q.   So in connection with this case, has your company, the

13   company you work for, Stout, been awarded multiple contracts

14   for work that you have been doing in this case?

15   A.   We have; two contracts.

16   Q.   Okay.  And in total, with respect to those contracts, do

17   you know approximately how much Stout has billed to the Fraud

18   Section?

19   A.   It would be just about $320,000.

20   Q.   Okay.  And that is the time that you have spent on this

21   case as well as the time that the team that you described

22   earlier has spent working on this case; is that fair?

23   A.   Correct.  I would say it's me and approximately ten other

24   people.

25   Q.   Okay.  And before you were engaged specifically to do work

1    on this case, was Stout engaged by the Department of Justice

2    Fraud Section to perform work on a number of different genetic

3    testing matters?

4    A.   We were, yes.

5    Q.   And did some of that work ultimately tie up into this case?

6    A.   I believe some did, yes.

7    Q.   Okay.  And so even before you began -- you received the

8    contract specific to this case, your company had also billed

9    the government for additional expenses and time spent working

10   on some of the same things that ended up winding into this

11   case?

12   A.   That is correct.

13   Q.   Okay.  Now, putting aside this case, Stout -- is it fair to

14   say that the Fraud Section has engaged Stout on a number of

15   different matters for a number of years?

16   A.   That's fair.

17   Q.   And do you know, since 2020, approximately how much has

18   the -- has your company, Stout, billed to the Fraud Section?

19   A.   The company has billed just over $11 million.

20   Q.   And on how many different contracts?

21   A.   85, 90, something in that order.

22   Q.   Okay.  And any given contract, might it encompass a number

23   of different criminal investigations or cases pending in court?

24   A.   Absolutely.

25   Q.   Okay.  So I'm not asking for a specific number.  But

1    ballpark, in the last roughly two, two and a half years, how

2    many different cases has Stout worked on for the Fraud Section?

3    A.   Ballpark, 150.

4    Q.   Okay.  Now, have you testified -- have you been called to

5    testify as a witness on behalf of the United States in other

6    criminal fraud matters?

7    A.   I have.

8    Q.   Multiple other criminal fraud matters?

9    A.   Many.

10   Q.   Okay.  Testifying to the same nature of things, not the

11   exact same subjects, but claims data and transactions and

12   financial data like you're testifying about today?

13   A.   Very similar to the testimony today, yes.

14   Q.   Okay.  Now, I want to turn to the financial tracing that

15   you conducted in this case.

16        MS. DE BOER:  And at this time, Your Honor, the United

17   States would offer into evidence Government Exhibit 126, 127,

18   128, 129, 137, 138, and 139.

19        THE COURT:  Those will be admitted without objection.

20        MS. DE BOER:  Thank you, Your Honor.

21   (Government Exhibits 126, 127, 128, 129, 137, 138, 139

22        were received in evidence.)

23   BY MS. DE BOER:

24   Q.   Okay.  So, Mr. Petron, we're going to start with Government

25   Exhibit 126, and we're going to walk through the flow of money

1    in this case.  And I'll zoom in here a bit for you.

2         And I should note, Mr. Petron, if at any point you would

3    like me to give you a paper copy of any of these, just let me

4    know, and I'm happy to do that.

5         So -- all right.  Before we get too far into this, can you

6    explain to the jury, at a high level, what is tracing, and what

7    is the methodology that you used in this case?

8    A.   Sure.

9         So tracing, as a general matter, is a process that we go

10   through in order to determine how you track money through

11   financial accounts.

12        So money -- if you think about your own wallet, right, you

13   put money into your wallet or into a bank account, and it's

14   fungible.  And so tracing is a way in which we try to determine

15   the source of funds that are used for certain transactions.

16        So that methodology -- there's a few different

17   methodologies, but the one that we generally employ is

18   called -- something called the lowest intermediate balance

19   rule.

20        And I won't bore you with all the details, but the rule is

21   developed so that we're tracking to ensure that the lowest

22   balance in the account over the time period in which we're

23   doing the tracing never goes too low so that we can't trace, in

24   this case, Medicare proceeds.

25        So we are always ensuring that there is enough Medicare

1   proceeds in the account at all points in time to fund the

2   transactions that we're ultimately tracing to.

3   Q.   Okay.  And you mentioned Medicare proceeds.

4        So what is it that you were tracing through all of these

5   different accounts?

6   A.   We were tracing Medicare money and specifically Part B

7   Medicare proceeds.

8   Q.   And you distinguish Part B.  So how is that distinction --

9   how is that significant in your tracing analysis?

10  A.   So recall this morning, we spoke a little bit about Part B

11  Medicare funds versus Part C Medicare funds.  And in the

12  banking information, we could identify -- I can identify

13  Medicare Part B money coming in.

14       I can also identify, for example, UnitedHealthcare money

15  coming in.  But I don't necessarily know on the

16  UnitedHealthcare side which is a Medicare dollar versus truly a

17  private insurance, a nonfederal beneficiary dollar.

18       So for the purposes of tracing, we just focused on the

19  known Medicare proceeds.

20  Q.   And so in that regard, how, if at all, was your analysis --

21  your tracing analysis conservative?

22  A.   It would be conservative because we're leaving out -- I

23  forget the exact amount -- but we're leaving out tens of

24  millions of dollars.  We're not considering those tens of

25  millions of Part C Medicare money for the purposes of the

1    tracing analysis.

2    Q.   Okay.  So with that background in mind, we're going to turn

3    now to Government Exhibit 126.

4         And can you walk us through what this shows?  And I can

5    zoom in as you go so that the jury can follow along.

6    A.   Sure.

7         So this chart is showing, at this point, flows of funds.

8    So starting in the upper left, we have Medicare sending

9    $168 million to LabSolutions between January 3, 2017, and

10   August 8, 2019.

11        From there, we are tracking the amount of money that

12   LabSolutions sends to Mr. Patel.  There are two primary

13   mechanisms -- we can zoom out a little bit -- that Mr. Patel

14   received funds.

15        The first, the top line, are direct transfers from

16   LabSolutions accounts to Mr. Patel's personal accounts.

17   Q.   And that's this line here that we're talking about?

18   A.   That is the $18.6 million.  And then the second way is

19   Mr. Patel was also an employee of LabSolutions, or I should

20   specify, really, he received regular compensation from

21   LabSolutions through the form of payroll.

22        So as LabSolutions was paying all of its employees through

23   a normal payroll process, Mr. Patel also received $2.9 million

24   through that process.  So not directly, but through a payroll

25   processing.

1  Q.   Okay.  And is that reflected in this set of arrows here?

2  A.   Correct.

3  Q.   Okay.  So in total, over the period that you analyzed, how

4  much in Medicare proceeds did you trace from LabSolutions to

5  Mr. Patel?

6  A.   It's not exactly on this slide, but it's just over

7  $21 million.  It's not quite that exact number that's on there,

8  21.5.  I think the next slide has it.  It's about 21.2 million,

9  if my memory --

10 Q.   And that's a fair point.  I asked you how much you had

11 traced.  So explain the difference between what was traced and

12 what Mr. Patel ultimately received.

13 A.   So what you're looking at here is the total actually

14 received.  Right?  And what we'll show you next is, using

15 tracing and using the methodology I was describing, that lowest

16 intermediate balance rule, how much of that 21.5 million was I

17 able to tie to Medicare money, and the answer is nearly all of

18 it, but it's not 100 percent.

19 Q.   So with that in mind, we're going to move to Government

20 Exhibit 127.

21      So, Mr. Petron, walk us through -- and I suppose let's

22 start up here, since that's the point you were just making.

23 And I'll zoom in a bit so the jury can see it, and then we can

24 walk through how you got there.

25 A.    Right.  So this is exactly what I was just saying,

1    21.5 million in total transfers to Mr. Patel.  Of that

2    21.3 million, the red number is how much I was able to trace to

3    Medicare.

4        And then this chart shows you the derivation of that

5    tracing at every step.  Under the key of the black numbers are

6    the numbers -- the full amount of the transfer, and the red

7    numbers are the amount that I can trace to Medicare.

8    Q.   Okay.  So, Mr. Petron, explain to the jury what you saw in

9    terms of the accounts and how the money went from Medicare to

10   LabSolutions to Mr. Patel?

11   A.   So Medicare sent LabSolutions funds to the tune of

12   $168 million into a BB&T account, 5945.  That's on the

13   left-hand side.

14       Once LabSolutions, in that first BB&T account, got the

15   funds, it largely transferred money to the second LabSolutions

16   account at BB&T, 5953.  Counsel has her finger on it.  And from

17   there, we have that same flow we just saw in the last slide,

18   which are payments going from left to right directly to

19   Mr. Patel's personal accounts at JP Morgan Chase and BB&T.

20       That's the four lines referencing transfers of four

21   accounts, and if you go to the right, that's the payroll.  So

22   that's the same flow we saw before, but now, as you can see,

23   I'm distinguishing between black and red in what is Medicare

24   proceeds versus the total funds flow.

25   Q.   Okay.  And do you know -- I mean, you're showing there are

 1    transfers to multiple different accounts.

 2         Are all of these just a single transaction, or is this a

 3    sum of multiple transactions?

 4    A.   These would be sums of many transactions during the time

 5    period that I have listed there.

 6    Q.   Okay.  And just to give an example, you know, here, for

 7    example, there's 100 -- 1,742,000 transferred over the course

 8    of -- of July of 2017 to October of 2017; is that correct?

 9    A.   Correct.

10    Q.   Okay.  And that would be multiple transactions totalling

11    the 1.7 million.

12    A.   That's correct.

13         And if you look at the first line of those four lines, that

14    is one transaction.  The single date of 10/10/2017 with the

15    $25,000, that's a singular transaction.

16         But the rest of these, any time there's a date range, that

17    means multiple transactions over that date range.

18    Q.   Okay.  And did the government ask you to focus on any

19    particular transactions?

20    A.   They did.

21    Q.   Okay.  So we're going to move to Government Exhibit 128.

22         Mr. Petron, what did you reflect in this exhibit?

23    A.   So this exhibit -- let's call it the top half of this

24    exhibit -- is just a more narrow funds flow to the funds flow

25    we just looked at.  It's just for a smaller time period.

1        So we have Medicare sending money to LabSolutions in the

2    top left in 2018, to the tune of $45 million.

3        LabSolutions then moves that money to its second account at

4    BB&T, 5953.  $58 million gets moved.  Of that 58 million,

5    43 million I can trace to Medicare funds.

6        LabSolutions then sends $6 million to its payroll processor

7    in 2018, or at least the first eight months of 2018, and then

8    the payroll processor, through payroll, is paying Mr. Patel

9    $774,000, all of which I can trace to Medicare proceeds in

10   2018.

11       And then, finally, I was asked to focus on this particular

12   transaction on August 10, 2018, which is a $393,000 purchase of

13   a Ferrari.

14   Q.   Okay.  And so the bottom line, Mr. Petron, where did the

15   money that was used to purchase the Ferrari, where can that be

16   traced back to?

17   A.   Back to the Medicare proceeds.

18   Q.   And did you -- I'm going to go to the next page of this

19   exhibit.

20       Did you determine information about what the car was, what

21   particular Ferrari it was?

22   A.   I did.  This information, again, you have the date

23   purchased, August 10th of 2018, for a Ferrari 488 Spider

24   purchased in or at the Ferrari dealership in Atlanta.

25   Q.   Okay.  And I know this title application is a little bit

 1   difficult to read, but do you see up top here it specifies the

 2   make and model of the car?

 3   A.   Correct.

 4   Q.   And then here it specifies the full name of the owner?

 5   A.   Correct.

 6   Q.   And I'm not sure if you can read it, but do you see that it

 7   says Minal Kumar Patel?

 8   A.   I do see that.

 9   Q.   All right.  And is this a photo of a stock Ferrari 488

10   Spider?

11   A.   It is.

12   Q.   Okay.  So this would be the type of car that was purchased

13   with the Medicare proceeds.

14   A.   Correct.

15   Q.   Now, moving, Mr. Petron, to another something you analyzed,

16   and this is Government Exhibit 129.

17        What did you reflect here?

18   A.   So here, again, for a much more limited timeframe here, in

19   March to May of 2019.  Starting in the top left we have the

20   same flow of funds, Medicare to LabSolutions.  LabSolutions

21   moves the money to its second account at BB&T.

22        And then instead of payroll, Mr. Patel has a direct

23   transfer from LabSolutions into his JP Morgan account, 0736, in

24   the amount of 1.995 million.  100 percent of that transfer, I

25   was able to tie to Medicare proceeds.

1    Q.   Okay.  And --

2    A.   Please --

3    Q.   I'm sorry.  I didn't mean to --

4    A.   I was just going to add.  From Mr. Patel's JP Morgan

5    account, 0736, down, there was a transaction on May 23, 2019, a

6    $215,000 cashier's check made payable to Hennessy Jaguar Land

7    Rover North, and the entirety of that cashier's check I can

8    trace to Medicare proceeds.

9    Q.   Okay.  And then to clarify, up here the date range was --

10   the payments from Medicare that you're analyzing are from

11   March 28, 2019, to April 19, 2019?

12   A.   That is correct.

13   Q.   Okay.  And then going to the next page of this exhibit,

14   were you able to locate, in the banking, the transaction

15   itself?

16   A.   I was.  The transaction was obviously represented in a bank

17   statement, but there was also supporting documentation.  This

18   is one example of a withdrawal slip, and you can see the date

19   on the top left, May 23, 2019, Mr. Patel's name, the Hennessy

20   Jaguar Land Rover North Atlanta.

21        There's a customer's signature, and then finally the amount

22   in the bottom right, $215,000.

23   Q.   Okay.  And then going to the next page of Government

24   Exhibit 129.

25   A.   So this is a copy of the cashier's check that was then

1    generated as a result of that withdrawal slip.

2    Q.   Okay.  Did you also look at charges on an American Express

3    card?

4    A.   I did.

5    Q.   All right.  So I'm showing you Government Exhibit 137.

6         Mr. Petron, go ahead and explain what you analyzed here.

7    A.   So we -- in addition to the bank accounts, we also had

8    American Express credit card statements.

9         Those statements showed that the LabSolutions accounts paid

10   just over $2 million to American Express from January 2017

11   through August of 2019.

12   Q.   Okay.  And did you identify certain transactions in those

13   accounts on the second page of the exhibit?

14   A.   I did.

15        There were certain transactions identified -- I believe

16   these were in 2018, in October.  The first, the Fontainebleau

17   hotel in Miami Beach here, two bottles of alcohol, Dom Pérignon

18    and Don Julio, 1942, in the amount of $4,373.82.

19        The second transaction, The Setai Miami Beach Hotel, for a

20   stay on October 26, 2018, through October 30, 2018, for

21   $15,113.68.

22   Q.   Okay.  And did you also look for transactions at the Boca

23   Raton Resort?

24   A.   I did.  We have summarized all of the transactions on the

25   American Express cards in this exhibit by month.

1      So the Boca Raton Resort was charged just over 19- -- it's

2  not charged -- the Boca Raton Resort was paid just over

3  19 point -- $19,000 from April of 2018 through August of 2019.

4  Q.  Okay.  Did you also -- separate from your tracing analysis,

5  did you also look at how money moved between accounts over

6  which Mr. Patel was a signatory?

7  A.  I did.

8  Q.  And then moving to Government Exhibit 138, starting with

9  the first page, can you walk the jury through the movement of

10  funds?

11  A.  Sure.  So let me start on this explanation in the middle.

12      So the middle box here, it says JP Morgan Chase, JPMCX0736.

13  That was the account that received the most money from

14  LabSolutions.  So most of the LabSolutions money was moving

15  into that account.

16      So then, focusing our attention on that account and

17  moving right, we see $8.1 million transferred out of JPMC to

18  Mr. Patel's 8788 account at BB&T.

19      That $8 million then went up and down in almost equal

20  amounts to two other accounts at BB&T.

21      But coming back in the middle in the JP Morgan account,

22  there were also funds sent to other accounts at JP Morgan in

23  Mr. Patel's name; 1.5 million going up to the account 0957, and

24  then $9.7 million going down to account 9308.

25      And then from there, you can see arrows sort of everywhere.

1   Money was going back and forth between those three accounts

2   throughout this time period.

3   Q.   All right.  And then going to the second page of Government

4   Exhibit 138, did you focus and identify larger transactions in

5   this -- that come from the summary that you just showed us?

6   A.   Correct.

7        I, for this chart, merely put every transaction between

8   Mr. Patel's accounts, anything over $50,000, and just listed

9   the date, the sending account, the receiving account, and the

10  transaction amount.

11  Q.   Okay.  And there were a number of transactions of that

12  size, including a $1.9 million transaction, an $8 million

13  transaction, and several other sizeable transactions?

14  A.   Correct.

15  Q.   Okay.  Now, the LabSolutions account that received funds

16  from Medicare, I'm going to show you Government Exhibit 139.

17       What are we looking at?

18  A.   So this is what is referred to as a signature card for

19  LabSolutions' BB&T account 5945.  The signature card is the

20  record on file of who has authority over that account.

21       You all may have done this when you opened a checking or

22  savings account.  You fill out information that says I'm the

23  owner, I have power to move money in and out.

24       This card, for this LabSolutions account, you can see

25  LabSolutions in the top left, the account number ending in 5945

1    on the left, the account opening date, April 28, 2015.

2         And then finally in the box that's sort of on the right

3    side and called out, you can see LabSolutions under the first

4    line, and then Mr. Patel in the second line, with signatures

5    that follow.

6    Q.   And there are, it appears, three individual signatories on

7    this account; is that correct?

8    A.   Correct.

9    Q.   Minal Patel, Tushar Narottam, and Hemangini Jariwala?

10   A.   Correct.

11   Q.   And what is the significance of this particular

12   LabSolutions account?

13   A.   This is the account that received Medicare funds.

14   Q.   And so these three individuals that had signatory

15   authority, what authority did they have over those Medicare

16   funds?

17   A.   They had custody and control, as it's known, so they had

18   the power to move those funds.

19   Q.   Okay.

20        MS. DE BOER:  One moment, Your Honor?

21        THE COURT:  You may.

22      (Discussion was held off the record.)

23        MS. DE BOER:  Thank you, Mr. Petron.

24        Nothing further.

25        THE COURT:  Thank you, Ms. de Boer.

```
 1               Counsel, cross-examination.

 2               MR. SADOW:  Thank you, Your Honor.

 3                         CROSS-EXAMINATION

 4   BY MR. SADOW:

 5   Q.  Good afternoon, sir.

 6   A.  Good afternoon.

 7   Q.  We met in the courtroom for the first time, correct?

 8   A.  Correct.

 9   Q.  So let me just start with a couple of preface questions.

10       As I understand it, you work for a company called Stout.

11   A.  That is correct.

12   Q.  And you have worked there for a number of years?

13   A.  Since February the 1st, 2014.

14   Q.  Okay.  And Stout has a number of contracts with the

15   Department of Justice Fraud Section.

16   A.  We do.

17   Q.  And if I understood correctly, since January 21st of 2020,

18   Stout has billed the government in excess of $11 million,

19   correct?

20   A.  Just over $11 million, correct.

21   Q.  Which obviously is a tiny sum, correct?

22   A.  I don't consider it a tiny sum, no.

23   Q.  You consider it a significant sum?

24   A.  I do.

25   Q.  Okay.  And your work in this case so far is at least
```

1   $321,000, correct?

2   A.   Correct.

3   Q.   And that includes your work and, did you say, like, ten

4   other people?

5   A.   I believe there were ten other people, yes, working on this

6   case.

7   Q.   Okay.  So let's talk about how that work is determined.

8        When you are employed -- and you've done a number of cases,

9   correct?

10  A.   For the Department of Justice?

11  Q.   Yes.  Everything I'm talking about now, rather than repeat

12  "Department of Justice" or "DOJ," I'm only talking about that.

13  A.   Fair enough.

14  Q.   Okay?

15  A.   Fair enough.

16  Q.   When you are preparing to go to work on a case such as this

17  one, what do you first do?

18  A.   At first, there is a conversation with counsel about the

19  case.

20  Q.   Counsel, as in counsel for the government.

21  A.   Counsel for the government.

22  Q.   And then counsel for the government gives you an overview,

23  I assume.

24  A.   That's correct.

25  Q.   Let's get past the overview.  Then are you given specific

1  assignments or tasks?

2  A.  Eventually that would happen, yes.

3  Q.  Well, when you say "eventually," once there's been the

4  overview, prior to the task or assignments, what do you do?

5  What are you doing?

6  A.  You have to go through the Fraud Section's administrative

7  protocols.

8  Q.  You mean, in order to set up a contract -- forget that

9  part.  Move that part out of the way.

10  A.  Okay.  That's a big part.

11  Q.  I'm not boring the jury with going through the contracts.

12  A.  Thank you.  It's not fun.

13  Q.  I understand.  Let's deal with actually the casework.

14  Okay?

15  A.  Okay.

16  Q.  So you've got the administrative out of the way.

17     What takes place as far as the casework is concerned?  Who

18  tells you what to do or requests you to do?

19  A.  Usually the request is coming from counsel for the

20  government.

21  Q.  So your assignment, or the scope of your task, is

22  determined by government counsel, correct?

23  A.  It is.

24  Q.  All right.  And it winds up ultimately in the preparation

25  of such things as the summary charts that we've seen, right?

1   A.   I believe always there is a potential that summary charts

2   will be needed, yes.

3   Q.   Do you actually write reports separate and apart from the

4   charts that are ultimately prepared?

5   A.   We do not.

6   Q.   Where does the data come from that you use for the charts?

7   A.   Well, the data is -- it could come from a lot of different

8   places.  So --

9   Q.   Let's talk about in this case specifically.

10  A.   So in this case, I'll break into two broad categories.  One

11  is the Medicare claims data, and then the other I will call is,

12  say, banking or financial records.

13  Q.   And the banking and financial records here would have been

14  of LabSolutions?

15  A.   It was of a variety of things:  LabSolutions, Mr. Patel's

16  personal accounts, American Express; I believe we had accounts

17  for some of the marketers.

18       So a lot of different owners of accounts, but financial

19  information.

20  Q.   Okay.  But including, obviously, LabSolutions, clearly,

21  right?

22  A.   Absolutely.

23  Q.   And Mr. Patel, correct?

24  A.   Correct.

25  Q.   Okay.  And then the Medicare data, I'm sure, is voluminous.

1   A.   It is.

2   Q.   And who tells you what Medicare data you should utilize?

3   A.   I'm not so -- I don't remember, in this particular case, if

4   someone is telling me or not as much as I have the experience

5   to know if this is -- you know, if these are the issues, I need

6   the Medicare data for LabSolutions for the relevant time

7   period.

8   Q.   And do you obtain that directly from government counsel,

9   Department of Justice, or is there another way to do that?

10  A.   I would, generally speaking.  And I believe in this case,

11  we obtained it from counsel, who has obtained it from, in most

12  cases, Medicare.

13  Q.   And that would include such things as the procedure codes,

14  correct?

15  A.   It does.

16  Q.   The Z Codes?

17  A.   Diagnosis codes?

18  Q.   Yes.

19  A.   Yes.

20  Q.   All that information comes from -- at least according to

21  your recollection -- from government counsel, DOJ, in this

22  case, right?

23  A.   Correct.  I look to the government counsel to handle the

24  discovery process.

25  Q.   Okay.  So --

1   A.   I don't -- I don't go off on myself and --

2   Q.   I'm sorry.  I cut you off.  That was impolite.

3        Did you have something else to say?

4   A.   No.  I was just saying that I rely upon government --

5   government counsel, through the discovery process, to provide

6   me information.  I don't conduct my own fact-finding, you know,

7   outside of discovery.

8   Q.   Okay.  Do you ever ask government counsel for data or

9   information?

10  A.   Absolutely.

11  Q.   Did you do so in this case?

12  A.   I have -- yes, absolutely.

13  Q.   Okay.  Could you tell us what it is you asked of government

14  counsel.

15  A.   I have specific recollections of asking for copies of

16  checks, of particular checks.  For instance, we saw the Land

17  Rover -- the Land Rover thing and the cashier's check.  I

18  remember specifically trying to get those.

19       I believe we had discussions around missing time periods in

20  some bank accounts and got that information.  That's my

21  recollection.

22  Q.   Anything you can remember significant beyond that?

23  A.   Nothing that comes to my mind.  It doesn't mean that we --

24  my staff or I didn't ask for other things.

25  Q.   And when you -- as you just put it, you're not the one

1    necessarily asking for all this.  You may direct or instruct

2    your staff, who I assume you rely on.

3    A.   Correct.  And my staff may make requests that I -- that

4    they know that something is missing and it never even comes to

5    my attention.

6    Q.   So in the midst of you putting this together, what

7    interaction do you have with the defense?

8    A.   None that I can recall.

9    Q.   Do you ever say to the government, should I interact with

10   the defense to see if they have anything to add?

11   A.   If the government instructs me to interact with the

12   defense, I would.  I don't recall that happening here.

13   Q.   So if I heard what you just said, if the government

14   instructs you to do something, you will do it, correct?

15   A.   If I'm capable, if that's within the scope of my

16   responsibilities, yes.

17   Q.   But if you're not instructed by the government to do it, it

18   doesn't sound like you do it.

19   A.   I am not operating independently of the government.

20   Q.   Okay.  So whatever it is that the government wants you to

21   do, you're doing.  And if they don't ask you to do it, it

22   apparently isn't going to get done, at least by you, right?

23   A.   I am-- I'm confined by the scope of the agreement I have

24   with the government, correct.

25   Q.   You don't have the authority to say, you know, I'd like to

1    know how much LabSolutions spent on a given item, for example,

2    equipment, those type of things.  You don't have the ability to

3    say to the government, I want that information.

4    A.   I wouldn't -- I wouldn't necessarily agree with that.  I

5    absolutely could say that to the government.

6    Q.   Did you?

7    A.   I don't recall that particular thing, but I --

8    Q.   Okay.  So if I ask you during the time period of

9    January 1st of 2017 to -- and sometimes it's into August, and

10   sometimes it stops in September of 2019 -- how much money

11   LabSolutions spent on equipment, your answer would be?

12   A.   I could find that information out.  It's, generally

13   speaking, in the database that we have.

14   Q.   But you don't have the database with you, right?

15   A.   I have nothing with me.

16   Q.   So you don't have the ability to just tell the jurors how

17   much money LabSolutions spent on equipment because that wasn't

18   something that the government asked you to do, correct?

19   A.   I was not instructed to create a summary of that

20   information.

21   Q.   All right.  Well, let's go one step further.

22        Now, can you tell us how much money LabSolutions spent on

23   lawyers between January of 2017 and September of 2019?

24   A.   So I was asked to obtain that information.

25   Q.   You got it?

1   A.   And specifically, if I recall, I was asked to look up three

2   law firms.

3   Q.   Okay.  You have that -- those numbers?

4   A.   It's $263,000, approximately, for the time period that you

5   outlined.

6   Q.   Okay.  And that's for three law firms.

7   A.   Three law firms.

8   Q.   Right.  But when you were going through the banking

9   records, you noted that there was a number of other law firms

10  that were paid as well, correct?

11  A.   That is not correct.  I did not --

12  Q.   No?

13  A.   I did not look one way or the other.  I was asked to look

14  at those three law firms.

15  Q.   Okay.  So -- and I didn't mean to make it sound like I

16  misdirected you.

17       You were told to look for three specific law firms, which

18  you've already said you did.

19  A.   Correct.

20  Q.   You have the data from the banking records of LabSolutions

21  to look for more law firms, correct?

22  A.   I believe I have a complete record for that time period.

23  Q.   But as far as the government didn't instruct you to look

24  for it, you can't give us that information, correct?

25  A.   I can't sitting here.  If someone asks me to look for it,

1    I -- I could go obtain the information.

2    Q.   Right.   But you don't have it today as you're sitting here

3    as a witness?

4    A.   I don't have it sitting here.

5    Q.   Okay.   How many employees did LabSolutions have during this

6    time period?

7    A.   I don't recall.   I remember looking at the payroll records.

8    It was a large number.   I don't recall precisely the number.

9    Q.   Well, and I appreciate you saying a large number, but let's

10   see if we can -- what's the appropriate terminology? --

11   quantify.

12        Any -- if you had been instructed or directed to determine

13   the number of employees by salaries or payments made, you'd

14   have been able to do that, right?

15   A.   Yes, absolutely, sir.

16   Q.   But the government didn't ask you to do it.

17   A.   I was never asked to determine exactly how many employees

18   they had, what their salaries were.

19        We had that information, but I was not asked to do that.

20   Q.   But you did make the determination as to some employees,

21   correct?

22        Didn't you put together a chart for some employees as to

23   how much they made?

24   A.   We did pull certain records from some employees, yes, and

25   created some summary charts.   I don't believe we went over them

1   today, but I do recall --

2   Q.  No, I don't think you did go over that today, but maybe --

3   it may take me a second, but I think we're going to try to do

4   that.  There we go.

5        MR. SADOW:  Government Exhibit 140, has that been moved

6   into evidence?

7             MS. DE BOER:  No, but no objection, Your Honor.

8             THE COURT:  We can admit that at this time.

9        (Government Exhibit 140 was received in evidence.)

10             MR. SADOW:  Okay.  Can you put 140 up for us?  Thank

11   you.

12   BY MR. SADOW:

13   Q.  This was a chart that was prepared, I assume, based on

14   everything you've told us so far, at the direction of the

15   government, correct?

16   A.  Correct.

17   Q.  And the individual -- the first individual is Bernadette

18   Wildemore, correct?

19   A.  Correct.

20   Q.  Can you tell me what Ms. Wildemore did for LabSolutions?

21   A.  I cannot.

22   Q.  That translates into all the government did was tell you,

23   put together the information about Ms. Wildemore as to how much

24   money she was paid during the relevant time period, right?

25   A.  Correct.  I believe I was given the list of names and asked

1   to put a chart together, and that's what I did.

2   Q.   And that's what you did.  But you left out 2019.

3   A.   I don't know if I left it out.

4   Q.   My terminology.  2019 is not on the chart.

5   A.   2019 is not on the chart...

6   Q.   Can you tell me why 2019 is not on the chart?

7   A.   That's what I've been trying to think of.  I cannot --

8   sitting here, I cannot tell you why 2019 is not in the chart.

9   Q.   Well, based on what you've told us so far, if the

10  government told you to include 2019, you would have included

11  2019, correct?

12  A.   If there was information for 2019, I would have for sure.

13  Q.   Again -- and this is not directed at anything other than

14  trying to get to the bottom of this.

15       When did you put this summary chart together?

16  A.   It was relatively recently, if my memory serves.

17  Q.   As in 2022?

18  A.   Oh, absolutely.

19  Q.   Okay.  So clearly the records would be available for 2019,

20  for the period of January 1st, into August or September of

21  2019, like the other summary charts you put together, correct?

22  A.   If records exist for these people, I assume that they are

23  available.

24  Q.   Well, when you say if you assume that the records exist,

25  what you're saying is, since the government didn't direct you

1    or instruct you for 2019, you don't know one way or the other.

2         Would that be a fair statement?

3    A.   I don't think it's a fair statement.  I don't recall if I

4    got a specific instruction around 2019, or if I did not have

5    information for 2019, or if I have information for 2019, and

6    these people aren't there.

7         So there's a number of explanations for why 2019 may not be

8    there.  I just don't recall the precise explanation.

9    Q.   But you had the banking records, correct?

10   A.   I had banking records, but this is payroll information.

11   Q.   Well, this would have come -- didn't you include -- I

12   thought I saw payroll information in some of the charts.

13   A.   I did, yes.

14   Q.   Particularly, I believe it dealt with Mr. Patel, correct?

15   A.   I definitely had payroll information for Mr. Patel.

16   Q.   So you would have had payroll information up to August or

17   maybe September of 2019 because you included it, correct?

18   A.   I don't recall exactly when we had the payroll records

19   through.

20   Q.   Well, when you did the payroll chart or the chart we just

21   looked at for Mr. Patel, didn't it include the payroll time

22   period up to August or September of 2019?

23   A.   Honestly, I don't remember exactly the time period of the

24   payroll records.  We could pull the chart up and find out.

25   Q.   We'll look back and see.  So you've already said you don't

1    know what Ms. Wildemore did, right?

2    A.   I do not.

3    Q.   What about Ms. Rinsky?

4    A.   I do not know what her role is.

5    Q.   What about Mr. Hayes?

6    A.   Same answer.

7    Q.   Ms. Adair?

8    A.   Same.

9    Q.   And we're talking about here -- these are the only people

10   that the government had requested or directed you to get the

11   salary information on, correct?

12   A.   Correct.

13   Q.   All right.  Let's move off of that.

14        One of the things that the government asked you to do is

15   determine the number of doctors involved with the beneficiaries

16   for Medicare Part B, correct?

17   A.   I believe we did that, yes.

18        MR. SADOW:  And if we'll put up Government Exhibit -- I

19   think -- are Government Exhibits 201-A, B, and C in evidence?

20        MS. DE BOER:  201-A, B, and C are in, yes.

21        MR. SADOW:  Let's publish 201-A first.  And once you

22   get it up, if you'll go to Column 2.

23        A JUROR:  I have to use the bathroom.

24        THE COURT:  Okay, ma'am, don't worry about it.

25        Go ahead and leave your notepads where you are, folks.

```
 1   Let's take a brief five-minute restroom break.  If anyone else

 2   needs to use it, let's go ahead and use it at this time.  All

 3   right?

 4           THE COURT SECURITY OFFICER:  All rise.

 5       (Jury exits at 3:06 p.m.)

 6           THE COURT:  Please be seated, everyone.  If anyone

 7   needs a restroom break, please feel free.

 8       (Court recessed at 3:07 p.m.)

 9       (Back on the record at 3:19 p.m.)

10           THE COURT:  Please be seated, everyone.

11       (Jury enters at 3:20 p.m.)

12           THE COURT:  All right.  Please be seated, everyone.

13   Welcome back, ladies and gentlemen.  We'll turn it back to

14   Mr. Sadow to continue his cross.

15           Go ahead, Mr. Sadow.

16           MR. SADOW:  Thank you, Your Honor.

17   BY MR. SADOW:

18   Q.  To take you back for a moment, I had asked you about

19   Mr. Patel and payroll.  I just want to finish that area so I

20   can move onto the next one.

21   A.  Sure.

22           MR. SADOW:  If I can ask you to put up 126.

23   BY MR. SADOW:

24   Q.  This was a chart that the government had asked you about

25   regarding Mr. Patel and payments, correct?
```

1  A.  Correct.

2  Q.  And you can tell by looking through the bottom of the chart

3  where it starts with payroll, that payroll was from 9/22/17 to

4  8/9/19, correct?

5  A.  Correct.

6  Q.  So that means payroll information was apparently available

7  at least to 8/9/19, correct?

8  A.  For Mr. Patel, correct.

9  Q.  Well, when you say "for Mr. Patel," you were only looking

10  for the payroll information for Mr. Patel?

11  A.  No.  This is one of the things that I think we're getting

12  tripped up on.  I don't recall if those individuals listed had

13  payroll in 2019 or did not have payroll in 2019.  I just don't

14  recall.

15  Q.  Okay.  And we could find out, but we can't do it right this

16  minute, right?

17  A.  I definitely can find out, but not sitting here during the

18  middle of the examination.

19  Q.  Okay.

20      MR. SADOW:  Let's go back now to 201-A, please.  And if

21  you can go to -- I believe it's Column Q.

22  BY MR. SADOW:

23  Q.  Boy, that's tough to see.  Can you see that, sir?

24  A.  Yes.  RFX-, referring; provider, PROV; NPICS, name, single.

25  Q.  I guess that translates into who the doctor was, right?

1   A.   The referring doctor for the test.

2   Q.   Right.  Can you tell me, how many referring doctors were

3   there for 201-A, which would be what year, 2017?

4   A.   Can we scroll to the left?

5   Q.   Sure.

6        MR. SADOW:  Please, scroll to the left.

7   BY MR. SADOW:

8   Q.   Does that help you any?

9   A.   All right.  Let's scroll slowly to the right.  Keep going.

10  Okay.  Can we stop there?

11  Q.   Sure.

12  A.   And then can you just -- on Column Alpha Delta, AD, can you

13  just click that drop-down arrow for me, and then scroll down in

14  the filter?

15       So that looks like 2017 to me.

16  Q.   Okay.  So now that we've established it's 2017, how many

17  providers/doctors were involved in 2017?

18  A.   I don't recall specifically in 2017.  I remember the

19  overall numbers are -- if my memory serves, are just north of a

20  thousand.

21  Q.   How about 722 for 2017; does that sound right?

22  A.   I frankly don't know.

23  Q.   Well, again, did the government direct you to determine the

24  number of doctors/providers for LabSolutions during the

25  relevant time periods?

1   A.   I believe they did, yes.

2   Q.   Okay.  And is it totaled somewhere so that the jury can

3   have that number?

4   A.   I believe it is in a government exhibit somewhere, yes.

5   Q.   The number of doctors, providers?

6   A.   Yes, I believe so.

7        MS. DE BOER:  It's Exhibit 103, if you'd a like to move

8   it in.

9        MR. SADOW:  Sure.  1492, if you'll go to Government

10  Exhibit 103.

11       THE COURT:  Is 103 in evidence?

12       MS. DE BOER:  It is not, but we have no objection.

13       MR. SADOW:  Sorry.

14       THE COURT:  It'll be admitted at this time.

15       (Government Exhibit 103 was received in evidence.)

16  BY MR. SADOW:

17  Q.   So we have 1492, and that's different providers, correct?

18  A.   That is 1,492 unique referring doctors.

19  Q.   Which translates into -- they're all different, right?

20  That is, you don't have duplicate doctors.  Unique referring

21  providers means there's actually that many different doctors,

22  right?

23  A.   I'll say this.  I've looked at data a lot.  I don't want to

24  agree with you, with the small caveat that I have seen the same

25  doctor have multiple IDs.  This is unique IDs.

1       So do I think it's unique doctors?  Probably, it's pretty

2   close to that.  But it's possible that there is somebody

3   counted more than once.

4   Q.  Okay.  But let's just use this number.  Okay?

5   A.  Absolutely.

6   Q.  I'm assuming that you weren't directed to make contact with

7   any of the doctors?

8   A.  I was not instructed to contact the doctors.

9   Q.  You were asked to determine what compensation, if any, the

10  1492 doctors received from either LabSolutions -- assuming that

11  even existed -- or any of the marketers?

12  A.  I did not -- I was not asked to provide an analysis on what

13  the doctors made.

14  Q.  So all we know is there's 1492, as you indicated, unique --

15  A.  Providers.

16  Q.  All right.  Now, the number of beneficiaries, I think, from

17  Government Exhibit 114 was --

18       MR. SADOW:  If you'll put up Government Exhibit 114.

19  BY MR. SADOW:

20  Q.  If I understood you correctly -- and please tell me if I'm

21  wrong, you would add across -- it would be the 27,365 plus the

22  8206, plus the 9,151, correct?

23  A.  That's not correct.

24  Q.  That's not correct.

25       Okay.  Then -- I thought that's the way you said it, but

1   please tell me what it is.

2   A.  First, this chart only depicts Part B, not Part C.  So

3   there are more beneficiaries that LabSolutions billed than

4   this.

5       But for Part B, there is 27,365 people that received a CGx

6   test.  Of those 27,365, 8206 also received the PGx.  So

7   Columns 3 and 4, PGx and other, are subsets of column 2.

8   Q.  Okay.  So for purposes, then, of what I was asking,

9   Part B -- these are beneficiaries -- the total would be 27,365,

10  correct?

11  A.  The total for Part B CGx beneficiaries, correct.

12  Q.  Right.  And then, obviously, the subsets, as you've just

13  indicated, right?

14  A.  Correct.

15  Q.  You were asked, I think, to provide information on eight

16  beneficiaries.

17      Does that sound right?  Three -- Counts 2, 3, and 4, and

18  then five additional?

19  A.  That sounds approximately correct.

20  Q.  So we're talking about eight out of 27,365, correct?

21  A.  Those eight that additional information was provided, yes.

22  Q.  You don't have the information, I assume -- once we

23  subtract the eight from the 27,365, you don't have that

24  information about the procedure codes, right, or the ICD codes?

25  You don't have any of that?

1   A.   I have all of that.

2   Q.   But you just don't have it in a chart for us to see?

3   A.   I didn't think it was practical to have 27,000 charts.  We

4   would be here for weeks with me talking to you about 27,000 --

5   Q.   I'm not -- I'm not suggesting -- I'm not suggesting it

6   would be practical.

7        I'm just saying, we don't have it, right?

8   A.   And I guess maybe your definition of "have" is different

9   than mine.  I have it.  I have every single one of these

10  beneficiaries, every single procedure code.

11  Q.   So I know this sounds strange, and based on what you're

12  telling me, it would probably be impractical -- impractical, if

13  not impossible, but we would be able to see which procedure

14  codes were paid out.

15       For example, if you took a hundred of them, you would be

16  able to see which were paid on and which were not paid on?

17  A.   Absolutely.

18  Q.   Which were billed, obviously, and which weren't billed, on

19  an individual basis, right?

20  A.   Well, I wouldn't be able to tell which ones were not

21  billed.

22  Q.   No.  No.  We'd be able to see what were billed and what was

23  paid, correct?

24  A.   Correct.

25  Q.   All right.  So let's go through -- just so I can kind of

 1   run through this, let's go to Exhibit 2.

 2        Can you see that well enough?

 3   A.   Absolutely.

 4   Q.   Okay.  All right.  As you can see, this individual,

 5   according to the information that was available from you for

 6   data, had personal history of cancer, correct?

 7   A.   Correct.

 8   Q.   Also, family history of cancer.

 9   A.   Correct.

10   Q.   Actually, what appears to be at least two people in the

11   family history of cancer, correct?

12   A.   Not necessarily.  It could --

13   Q.   Could be the same person.

14   A.   Could be the same person.

15   Q.   All right.  We'll just leave it as personal and family.

16   Okay?

17   A.   Agreed.

18   Q.   All right.  Now, 81214 is the largest procedure code that

19   was billed for this particular beneficiary, correct?

20   A.   81214 has the largest amount billed for all of these

21   procedure codes.

22   Q.   Right.  How -- why wasn't this one paid?  Do you have any

23   idea?

24   A.   I do not.

25        MR. SADOW:  Okay.  Let's go to number 3.

1   BY MR. SADOW:

2   Q.   Here's, 821 -- 81214 with a personal history of cancer,

3   right?

4   A.   Correct.

5   Q.   And this time, 81214 was paid, correct?

6   A.   Correct.

7   Q.   I'm assuming you don't know why it was paid.

8   A.   I do not.

9   Q.   Do you have --

10          MR. SADOW:   Now let's go to number 4.

11  BY MR. SADOW:

12  Q.   81214 here is personal history of cancer and family history

13  of cancer.

14          And again, we don't know whether it's one person or more in

15  the family, correct?

16  A.   Correct.

17  Q.   Why was 81214 not paid on this one?

18  A.   I do not know.

19  Q.   So simply billing a procedure code, obviously, just looking

20  at these three, doesn't mean you're going to be paid, right?

21  A.   I do not know.  I assume you want paid.  I don't know what

22  the adjudication process ultimately --

23  Q.   No, no.  I understand.  But my question has to do with the

24  billing.

25          Just because it was billed -- we have three different

1    individuals, all of which at least had personal history of

2    cancer and two of which had family history, correct?

3    A.   Correct.

4    Q.   The two that had family history, 81214, along with the

5    personal history, it wasn't paid, right?

6    A.   That's correct.

7    Q.   The one that has only personal history, it was paid, right?

8    A.   In that one particular example, yes.

9    Q.   As you said, it's not within your realm of expertise.  You

10   don't know why that happened, right?

11   A.   I do not.

12   Q.   But what it does show is simply a -- billing a code doesn't

13   mean it's going to be paid, right?

14   A.   Correct.  The procedure codes -- all of the billing needs

15   to go through the adjudication process, and that process is not

16   something I've looked into for this.

17   Q.   And at least as far as you know, we don't have any idea why

18   on these three it's not paid or it was paid, right?

19   A.   I don't know.  I don't know if, collectively, you know,

20   that that answer --

21   Q.   "We" is just --

22   A.   -- is somewhere.

23   Q.   At this point, "we" is just you.

24   A.   Well, "we" being me, I don't have that information.  But I

25   understand that the way that the Medicare contractors work,

 1  that they -- they could get to that answer.  There's a reason.

 2  Q.  But the main point is the fact that a procedure code is

 3  billed in any given individual case does not assure that you

 4  are going to be paid for it, right?

 5  A.  I can't speak in total generalities.  All I know is that

 6  there are numerous instances of claims billed that are not

 7  paid.

 8  Q.  Do we have any other charts like this on individual

 9  patients?

10  A.  What do you mean by "charts like this"?  Like...

11  Q.  A summary done like 2, 3, and 4?

12  A.  I've only prepared them for Counts 2, 3, and 4.

13  Q.  But you did prepare five other ones, which is 166.

14      MR. SADOW:  So let's go to that.

15      THE WITNESS:  Yeah.  A little bit different.

16  BY MR. SADOW:

17  Q.  Why different?

18  A.  I believe they're -- yeah.

19  Q.  Why --

20  A.  I just remembered them being different.

21  Q.  Who told you not to do the same thing on these?

22  A.  I don't recall the specific instruction, who gave the

23  specific instruction.

24  Q.  Well, it had -- specific, it had to be the government,

25  right?

 1    A.   It would have been someone from the government.

 2    Q.   Right.   You -- because you've already indicated that

 3    wouldn't be a determination you would make.

 4    A.   I would not just randomly decide to show W.H. to you all

 5    for no --

 6    Q.   So we don't know -- we don't -- on Ms. H., as far as from

 7    your chart, summary chart, we don't know which procedure codes

 8    were billed and which procedure codes were paid, correct?

 9    A.   From this chart, that information is not shown.   But I

10    obviously know the information.

11    Q.   Right.   You just were not instructed to put the information

12    on this, right?

13    A.   I don't recall the government telling me to put it on or to

14    not put it on, if it was my decision or not.   I just don't

15    recall the instruction.

16    Q.   Well, wait, wait.   It wouldn't be your decision.   You've

17    already told us that you didn't make those decisions.   You said

18    the government directed you in what to do.

19         You wouldn't have made the decision not to include it,

20    would you?

21    A.   It's distinctly possible, in a chart like this, that I was

22    asked to put together a chart for W.H., I put this together,

23    and that was sufficient.   It is distinctly possible.

24    Q.   Okay.   Your terminology, it was sufficient, whose decision

25    was it that it was sufficient?

1    A.   Ultimately, the government would decide if this chart was

2    sufficient for the government's purposes.

3    Q.   Okay.  And I'm assuming that once you prepared the chart,

4    you would have shared it with the government, correct?

5    A.   Correct.

6    Q.   And the government didn't say, please put down the

7    procedure codes that were billed and how much was paid on the

8    procedure codes, correct?

9    A.   I don't recall any specific instruction after the time that

10   I produced this chart where they said, can you go back and add

11   the procedure codes.

12        MR. SADOW:  Okay.  Let's go to the next -- go to the

13   next.  The same would hold true -- actually, go back one more

14   time.

15   BY MR. SADOW:

16   Q.   Ms. H., did she have personal history of cancer, family

17   history of cancer, or both?

18   A.   I don't know, not sitting here.

19   Q.   I'm sorry?

20   A.   I don't know sitting here.  I obviously -- again, I have

21   all of that information; it's just not on this chart.

22        MR. SADOW:  Let's go to the next one.

23   BY MR. SADOW:

24   Q.   Same.  Everything that I asked you about on the chart we

25   just went over is the same for this, correct?

1   A.   Correct.

2   Q.   We don't know why it was paid at 6,470.   Total bill in the

3   CGx was paid 5,425, right?

4   A.   Billed 6,470 and paid 5,425.

5   Q.   Right.   We don't know why.   We don't know what the -- what

6   the particular procedure codes were, right?

7   A.   Those procedure codes are not listed on this chart, but I

8   obviously have the information.

9   Q.   Okay.   Well, I'm only talking about the information that is

10   in the courtroom for the ladies and gentlemen of the jury to

11   get.   Okay?

12   A.   Well, but the ladies and gentlemen of the jury could get

13   that information if they so desire.

14   Q.   You mean they could get that information if the government

15   had told you to put that information on the chart.

16   A.   No.   They can go to the source exhibit, the Medicare data,

17   look for Mr. I., look at May 31, 2018, and very readily find

18   the procedure codes.

19   Q.   And the source data is in evidence?

20   A.   I believe it is.

21   Q.   And which exhibit was that, so they can look at it if they

22   choose to?

23   A.   2- -- I think this is maybe 202.

24        MR. SADOW:   Okay.   Let's go to the next one.

25   BY MR. SADOW:

1    Q.   Same situation.  We don't know personal history, family

2    history, right?

3    A.   It's not listed --

4    Q.   The chart.  I'm only talking about the chart.  Okay?

5    A.   It's not on the chart.

6    Q.   And then the next one, not on the chart, right?

7    A.   Not on the chart.

8    Q.   And on the next one, not on the chart, right?

9    A.   The diagnoses are not on the chart.

10   Q.   So my question with all of those is, who chose those

11   individuals to be put on a chart?

12   A.   The government gave me those names.

13   Q.   They gave you those names.

14   A.   Correct.

15   Q.   Those five out of, obviously, the thousands and thousands

16   that the information exists, correct?

17   A.   The government selected these five for additional charts.

18   Q.   Okay.  All right.  Let's go to some phone records.  Okay?

19   A.   Okay.

20   Q.   Starting with 132.

21        Now, this deals with Mr. Ramamurthy at two distinct time

22   periods, correct?

23   A.   Correct.

24   Q.   And if I understood correctly, the 1160 -- I'm talking

25   about the top part of the exhibit, the first part -- 1160 total

1    calls, and you had a total of 914, through that date range,

2    with a duration of more than zero, right?

3    A.   Correct.

4    Q.   And the government said -- pointed out that that doesn't

5    mean that there were 914 conversations; it just means that

6    there were 914 calls with duration more than zero, right?

7    A.   It means there are 914 calls with duration more than zero.

8    Q.   If there is any connection between phones, any connection

9    at all, it's going to be more than zero, right?

10   A.   I believe that's the way the toll record works.

11   Q.   So if it was one second or two seconds or five seconds or

12   eight seconds; if it was back and forth ten times before

13   someone made contact, that would be included in your 914,

14   right?

15   A.   I'm sorry.  I didn't follow.  You were saying two seconds,

16   eight seconds, ten times...

17   Q.   I'll break it down.  The 914 could include, for example,

18   50 calls that didn't last any more than ten seconds, right?

19   A.   It could.

20   Q.   But you had the information to be able to tell us -- for

21   example, if you wanted to make it duration of more than one

22   minute, you could have done that.

23   A.   I believe I have that information, yes.

24   Q.   Right.  Who asked you to make it duration more than zero?

25   A.   I don't recall.

1    Q.   Well, I don't mean individually.  It had to be the

2    government, right?

3    A.   Again, it's possible that was something that we did at the

4    firm.  I haven't worked with these records before.  But

5    the government obviously didn't object to this presentation.

6    Q.   Okay.  See, you've confused me a little bit and I

7    apologize.

8         I thought, when we started off, that directions were given

9    by the government, and you just did what the government asked

10   you to do.  I didn't realize that you had the discretion to

11   make determinations on what would be on the chart.

12        But you apparently do, correct?

13   A.   Not exactly.  I think you're trying to make it seem a very

14   cut-and-dry thing that -- we have a very complicated analysis.

15        For instance, the government doesn't instruct me how to

16   drive to work in the morning the morning I create the chart.

17   Right?  So there are certain things that I know from years of

18   doing this, that this presentation or this information might be

19   important, so I put it on the chart.

20        The government doesn't give me extreme amounts of detail on

21   how the charts are made.  They leave that, to a degree, to my

22   discretion.  They may say to me, Mr. Petron, please put

23   together a charge of the toll records between Mr. Patel and

24   Mr. Ramamurthy.

25        And then I would put something together and they would

1   either accept or reject it.

2   Q.   Accepting what you just said, when this is provided to the

3   government in this case, on Mr. Ramamurthy, there was no

4   objection that you used greater than zero, correct?

5   A.   Correct.

6        MR. SADOW:   Let's go to the next one, 133.

7   BY MR. SADOW:

8   Q.   Here's Mr. Griner.   Time period, date range,

9   October 14th -- I'm sorry -- October 4 of 2016 to

10  November 13 of 2017, correct?

11  A.   Correct.

12  Q.   And I'll allow you, please, to tell me who chose the date

13  range.

14  A.   I don't recall if anyone chose that date range or if that

15  is the date range of the data that is available.

16  Q.   So that would be -- based on what data you have, those

17  would be when phone calls or contact by phone was made with

18  Mr. Griner, correct?

19  A.   That is correct.

20  Q.   And again, not belaboring the point, that 629 number is

21  simply greater than zero, right?

22  A.   That is what it references, yes.

23  Q.   Which means we don't know how many of those were actually

24  not conversations, they were just back and forth, correct?

25  A.   All I know is that the duration of the call was greater

1    than zero.

2    Q.  But that information was available or is available,

3    correct?

4    A.  The information on duration is available.  What that

5    information necessarily means, I don't know.

6    Q.  But the duration is available?

7    A.  It is available.

8    Q.  Now, these calls, does that include text messages?

9    A.  I believe these are calls.

10         MR. SADOW:  Let's go to the next one.

11   BY MR. SADOW:

12   Q.  Same situation, this time with Mr. Hirsch.  And you have a

13   time period of 10/31/16 to August 15th of 2019, correct?

14   A.  Correct.

15   Q.  And we have the same thing with the 138, correct?

16   A.  Correct.  It is all the same information.

17   Q.  Next one, which I think is the last one --

18         MR. SADOW:  No, I think there's 135.

19   BY MR. SADOW:

20   Q.  Okay.  Now, this one is between Mr. Patel and Marc Sporn,

21   right?

22   A.  Correct.

23   Q.  And you see that the time period is September of 2018 to

24   June 26th of 2019, right?

25   A.  I see that.

1   Q.   And we have a total of 32 calls, right?

2   A.   Where duration is greater than zero.

3   Q.   Right.  So, again, we don't know, out of that 32, how many

4   actual conversations took place, correct?

5   A.   I do not know.

6   Q.   But we have a starting date of September of 2018, right?

7   A.   Correct.

8   Q.   Not 2017, right?

9   A.   That is correct.

10  Q.   Not into 2016, correct?

11  A.   It starts in 2018.

12  Q.   Right.  And it ends June 26th of 2019, correct?

13  A.   Correct.

14  Q.   All right.  Did the information on the last four that

15  we've gone over, 131, 132, 133, 134 and 135, did that come

16  from Mr. Patel's phone records?

17  A.   I don't recall.  I believe so, but I don't recall

18  specifically.

19  Q.   Did you have the phone records for Mr. Ramamurthy?

20  A.   I don't recall.

21  Q.   Did you have the phone records for Mr. Griner?

22  A.   I don't recall.

23  Q.   How about Mr. Hirsch?

24  A.   I don't recall.

25  Q.   And the same with Mr. Sporn?

1   A.   I do not recall.

2   Q.   So you don't know whether you would have been able, if

3   asked, to make the analysis of how many times Rama talked to

4   any of these people, or Griner talked to any of these people,

5   other than Mr. Patel, correct?

6   A.   I don't recall if I had that information or not.

7   Q.   Okay.  Now, I may have missed this, and if I did, I'm sure

8   the government will help me point this out.

9        Do you have a chart that shows what the billing amount is,

10  and then in turn the payment amount for the procedure codes?

11  A.   As a general matter, across the entire LabSolutions time

12  period?

13  Q.   Yes.

14  A.   I believe that information was in a chart.

15  Q.   Okay.  What I'm saying is, if I were to say to you, for

16  example -- we can go to chart, just to give you an example of

17  what I'm trying to go to --

18        MR. SADOW:  Let's go to 113.

19  BY MR. SADOW:

20  Q.   113 was the number of CGx tests billed and you did it by

21  procedure codes, right?

22  A.   Correct.  This is CGx tests by procedure code, correct.

23  Q.   Right.  What I'm asking you is -- I'm having a little

24  trouble seeing it, but I think the highest one was 81404; isn't

25  that correct?

1   A.   This is Part B only.

2   Q.   I -- I'm not trying to go any more than Part B.  I'm doing

3   what's on the chart.

4   A.   The largest one was 81404.

5   Q.   And how much was billed -- not by dollars, but how much per

6   procedure code?

7        How much 81404, how much did it bring for billing purposes,

8   and how much was it paid for billing purposes?

9        That is, if one was using 81404, did it have a set billing

10  amount?

11  A.   A lot of questions there.  So let me try to take the last

12  one first and I'll work backwards.

13       I don't know if there was a set billing amount.  I did not

14  analyze LabSolutions' practices and how they billed what they

15  billed.

16  Q.   And don't -- I have made it unclear and I apologize.

17       I'm not talking just about LabSolutions.  I'm talking

18  about 81404 and Medicare Part B.

19       How much did Medicare pay for 81404?  How much was allowed

20  to bill, and how much were they paying for it?

21  A.   And I'm sorry.  Just some clarification questions:  To

22  LabSolutions, or are you talking about --

23  Q.   In general.  Because the idea -- what I'm trying to ask

24  you -- and I'm not doing a very good job of it -- I'm trying to

25  understand that if someone is billing 81404, there must be

1   something that Medicare says, you can bill this amount, and the

2   typical payment amount.

3       And I'm just asking you whether or not you have that

4   information?

5           MS. DE BOER:  Your Honor, he's not the Medicare expert,

6   and I would suggest maybe Exhibit 108 is what Mr. Sadow might

7   be looking for.

8           THE COURT:  Yeah.  I don't know that you can answer the

9   question.  If you can --

10          THE WITNESS:  I think I could get to an answer with

11   that exhibit that Counsel just pointed out.

12          MR. SADOW:  Okay.  Let's do that then.  Let's go to

13   108.

14          THE COURT:  Let's put up 108.

15          THE WITNESS:  So this is a summary that I created.  The

16   fourth row down is 81404.  And you can see that the total

17   billed is $16.8 million, and the total paid is $9.7 million.

18          And are we getting closer to -- I'm not sure what

19   information you want, but this is more granular than the bar

20   chart, so --

21   BY MR. SADOW:

22   Q.   But this does help.  And I appreciate it.  And thank you.

23       The one that brings in the most amount of money is 81408,

24   correct?

25   A.   The highest paid that LabSolutions billed to Medicare for

1   Part B was 81408 for just over $27 and a half million.

2   Q.   Can we go back to the chart that we were looking at before,

3   the 113?

4   A.   Okay.

5   Q.   Where is 81408 on that chart?

6   A.   It is the yellow bar -- yeah, thank you, whoever has the

7   red arrow.  It's the yellow bar that's -- it's the fifth yellow

8   bar.

9   Q.   So 81408 we just went through brings in the most amount of

10  money from billing -- when billed, correct?

11  A.   I'd say it a little bit differently.

12  Q.   Okay.

13  A.   I would say, in the claims data that we have here,

14  LabSolutions was paid the most, in totality, on its 81408

15  billing.

16  Q.   But as in the amount of the codes used, it was not in the

17  top four, correct?

18  A.   The amount of codes billed, it was not in the top four,

19  that is correct.

20  Q.   In fact, it tends to be near the middle, correct?

21  A.   Sure, yes, towards the middle.

22  Q.   So if someone wanted to bill that to make the most amount

23  of money, 81408 might have been at the top, right?  I mean, if

24  that was the only thing you were looking to do is to make

25  money, if you billed 81408, that would make you the most amount

1   of money, correct?

2   A.  I cannot answer that.  I'm sorry.

3   Q.  Well, we know from the chart we looked at before, that

4   that's the most money that got paid to LabSolutions, right?

5   A.  That is for this given dataset, yes.

6   Q.  So that means that 81408 would have brought in the most

7   amount of money.  If you're in it just to make the money, you

8   bill the one that brings in the most amount of money, correct?

9   A.  I can't answer that.  I don't know if that's correct or

10  it's not correct.

11  Q.  Okay.  How many representatives, sales reps, did

12  LabSolutions have?

13  A.  I do not know.

14  Q.  Is that data in the information that you have?

15  A.  I don't believe we had information on the number of sales

16  reps.

17  Q.  Well, wouldn't there be payments made either by 1099 or

18  W-2s to those individuals?

19  A.  From whom?

20  Q.  LabSolutions.

21  A.  I don't know.

22  Q.  Well, I mean, if it's a sales rep, if LabSolutions is

23  paying sales reps, that's what your information shows, right?

24  A.  I don't remember looking at sales reps from LabSolutions.

25  Q.  Well, sales reps/marketers.  Same thing, isn't it?

1   A.   I don't know if that's the same thing.

2   Q.   You weren't asked to look to determine how many different

3   people acted as sales reps/marketers.

4        Is that a fair statement?

5   A.   I was not asked to look at that, no.

6   Q.   I'm assuming you don't disagree with the proposition that

7   if someone makes money from a legitimate business, how they

8   choose to spend the money is their choice, correct?

9   A.   How someone chooses to spend their money?

10  Q.   Yes.

11  A.   Yes, that's their choice.

12  Q.   So if Mr. Patel obviously chose to purchase two vehicles,

13  that was his choice, correct?

14  A.   I assume that was his choice.

15  Q.   And I'm assuming that you don't have personal or firsthand

16  information about the underlying facts.  You only have what

17  information was given to you by the government, correct?

18  A.   Underlying facts?

19  Q.   Of the case.

20  A.   Of the case.  The only -- I read the indictment and the

21  superseding indictment --

22  Q.   And that's it?

23  A.   -- and I have no personal knowledge.

24       Correct.

25  Q.   Okay.  So if money is paid to Mr. Patel, assuming it to be

1    a legitimate business, again, it's his decision how he chooses

2    to spend it, correct?

3    A.   I assume, if he is the owner of that money, then it is his

4    decision.

5    Q.   And you do know, from at least looking at the records, he

6    was the owner of LabSolutions, correct?

7    A.   Correct, that's my understanding.

8    Q.   And therefore would be the individual who could make

9    decisions about money, correct?

10   A.   I assume that he is.

11   Q.   Who asked you to point out that he bought two bottles of

12   Dom Pérignon in some place in Florida?

13   A.   The government asked me to look for transactions in

14   Florida.

15   Q.   And was there a purpose for finding two bottles of

16   champagne?

17   A.   The only purpose I recall was location.

18   Q.   Was location.

19        So they wanted you to find the fact that he had purchased

20   champagne in Florida?

21   A.   I don't believe that was the instruction.  It was not,

22   Mr. Petron, go find champagne in Florida; it was, go find

23   transactions in Florida.

24   Q.   So are the only transactions in Florida the ones that are

25   on the charts that have been displayed to us?

1    A.   I don't recall.

2    Q.   My last question simply has to do with Z Codes.

3    A.   Diagnosis codes?

4    Q.   Correct.

5    A.   Okay.

6    Q.   Did you make a determination at any time -- and these are

7    diagnosis codes.

8         And maybe I should preface this by asking you, what is your

9    understanding of what a diagnosis code is?

10   A.   A diagnosis code is a code that a healthcare practitioner

11   would put on a medical claim that would represent the ailment,

12   the underlying root cause of why the particular procedure was

13   needed.

14   Q.   All right.  And did you, through your analysis, determine

15   when certain Z Codes, or diagnosis codes, were used?

16   A.   We did.

17   Q.   Okay.  And a chart was made of that, correct?

18   A.   Correct.

19   Q.   And that had to do with the breakdown between what I would

20   call family history and personal history, right?

21   A.   Correct.

22   Q.   And do you remember which exhibit that was?

23   A.   I don't remember the numbers.  I know -- I can picture the

24   exhibit, but I don't remember what the government's sticker

25   number is.

1          MR. SADOW:  Is that in evidence?  I'm asking the

2     government.

3          MS. DE BOER:  It's not, but we do have it.  I'll get

4     you the number in a second, Mr. Sadow.  It is 115.

5          MR. SADOW:  I would move Government Exhibit 115 into

6     evidence, please.

7          MS. DE BOER:  No objection.

8          THE COURT:  That'll be admitted at this time.

9          (Government Exhibit 115 was received in evidence.)

10    BY MR. SADOW:

11    Q.   This particular chart was done, I assume, in part on the

12    basis of diagnostic codes?

13    A.   It absolutely uses diagnosis codes, yes.

14    Q.   So what this is able to tell us is that during the time

15    period January 2017 to August 2019, it appears that family

16    history of cancer was billed more than -- by 52 percent to

17    43 percent over personal history of cancer, correct?

18    A.   Not necessarily.  If I can -- can I explain the chart?

19    Q.   Please.  Please.

20    A.   So this chart is a chart for all CGx tests.  So when

21    looking at all CGx tests, there was 20,000 people that got CGx

22    tests.

23         We went through and looked at the diagnosis codes.  And in

24    some of them, there's a single diagnosis code.  That makes this

25    chart easy.  They get put into a box, whether it be current,

1    personal, family, and other.

2        But oftentimes, as we saw with the counts, there are

3    multiple, right?  Some people have personal and family.

4        So I remember making the decision to create this chart with

5    the following protocol:  First, if there was a current

6    diagnosis of cancer, regardless if there was also a personal

7    history or family history, it got put into that slice that says

8    5 percent, the top right slice.

9    Q.  Again, let me make sure that I understand.

10       That is if it's a current cancer?

11   A.  Correct.

12   Q.  What might be called sometimes "active cancer"?

13   A.  I'm not sure.  All I know --

14   Q.  Okay.

15   A.  -- is what is the diagnosis code.

16   Q.  That's fine.

17   A.  So if the diagnosis code -- if any diagnosis code

18   indicating current cancer was present, the entire claim gets

19   put into that $10 million, or 5 percent.

20   Q.  Regardless of whether there was also family history or

21   other personal history?

22   A.  Yes, sir.  Correct.

23   Q.  Gotcha.  Okay.

24   A.  So then we move to the next stage, the next step.  If

25   that's no current diagnosis, we look for personal history.  So

1   if someone had personal history, regardless if they also had

2   family history or nothing else, it got put into that light blue

3   personal history.

4   Q.  So, again, if you had personal history but it wasn't

5   current cancer, then, no matter whether you had family history

6   or not, you're in the light blue?

7   A.  Correct.

8   Q.  Okay.  And then one would assume that if you don't have

9   personal history and you don't have current cancer, you're in

10  the dark blue.

11  A.  If -- if you have family history.

12  Q.  If you -- no.  Obviously, if you have family --

13  A.  If you have family history and it's diagnosed, right.

14      And then, finally, 1 percent didn't have any either

15  current, personal, or family history.

16  Q.  Okay.  So when we look at the 52 percent in the 116 million

17  that was billed -- not paid, but billed --

18  A.  Billed.

19  Q.  -- you have $116 million worth of family history alone,

20  nothing else?

21  A.  I would say family history with no indication of personal

22  or a current.

23  Q.  That's what I meant by "alone."  I think that's fine.

24      Okay.  So now tell me, did you take another step and

25  determine at what time periods family history -- according to

1    the definitions that you've used -- that family history was

2    billed?

3    A.   I'm not sure I follow.  I'm sorry.

4    Q.   If you have the family history, as you've described it, did

5    you make a determination by, let's say, a monthly period when

6    family history was billed versus personal history?

7    A.   I'm not sure I follow.

8    Q.   For example --

9    A.   Yeah.

10   Q.   I'm not trying to make this complicated.

11        Let's assume it's January of 2018.  Okay?

12   A.   Mmm-hmm.

13   Q.   And I wanted to know, in January of 2018, was LabSolutions

14   billing more family history than personal history, using your

15   definition.

16        Was that done?

17   A.   I don't recall doing that analysis.

18   Q.   Okay.  So is there any way to determine, based on the

19   analysis that you've done, when, if ever, family history

20   dwindled and personal history became more important for a

21   particular MAC?

22   A.   I theoretically could find that out, yes.

23   Q.   You could have done that.  Could have.

24   A.   I believe I have the information that I could have done

25   that.

1   Q.   Did that ever come up in conversation with the government?

2   A.   Not that I recall.

3   Q.   So if I would have -- of course, and you're not interacting

4   with the defense; we've already gotten that far, right?

5   A.   I have had no interaction with the defense.

6   Q.   If someone had said, I want to know, starting in January

7   of 2019, whether most of the billing for the MAC in Georgia --

8   that covered Georgia was personal history and not family

9   history, you could have made that determination?

10  A.   I believe I could have looked into that, yes.

11  Q.   Okay.  And if I had -- because you've also had the other

12  charts, if I wanted to know when family history was being

13  billed in Pennsylvania but not in Georgia with the MACs, you

14  could have done that as well, correct?

15  A.   I mean, assuming your underlying premise is correct and

16  that was occurring, I have the information available to me to

17  determine the timing of all of these claims and what was billed

18  and what was not billed.

19  Q.   And did that ever come up in conversation with the

20  government, as to whether that question of family history

21  versus personal history versus geographical location, as well

22  as dates -- did that ever come up as something that should be

23  plotted as a chart, a summary chart?

24  A.   I don't recall having a conversation about that.

25  Q.   Okay.  Thank you.

1           THE COURT:  Anything else, Mr. Sadow?

2           MR. SADOW:  Oh, I'm sorry.  No.  I said thank you.

3           THE COURT:  All right.  Very good.

4           Redirect.

5           MS. DE BOER:  Thank you, Your Honor.

6           And, Your Honor, I would move Government Exhibit 108

7    into evidence, which was shown by Mr. Sadow, but I'm not sure

8    if it's in.

9           THE COURT:  Sure.  We'll admit that now without

10   objection.

11          MR. SADOW:  Absolutely.

12        (Government Exhibit 108 was received in evidence.)

13                       REDIRECT EXAMINATION

14   BY MS. DE BOER:

15   Q.  All right.  So, Mr. Petron, you were asked some questions

16   about the 27,000, roughly, patients for who LabSolutions billed

17   CGx tests to Medicare.

18        Do you recall that?

19   A.  I do.

20   Q.  And Mr. Sadow asked you some questions about you had

21   represented in summary charts details for a handful of

22   patients, but you haven't done that for all 27,000; is that

23   correct?

24   A.  I did not create a separate chart for all 27,000 patients.

25   Q.  Okay.  But you pointed out to the jury that -- and, in

1    fact, Mr. Sadow showed you one of the spreadsheets that

2    contains all of that information for anybody billed in 2017,

3    for example.

4    A.   Correct.  So I think it was Government Exhibit 201.  I'm

5    sure you know it better than I.

6         But all of the billing data we used is evidence, I believe,

7    and you can look into it.  They're big spreadsheets, and you

8    can find any beneficiary you want.

9    Q.   Okay.  And when Mr. Sadow said that you did not analyze any

10   further information for the 27,000 or summarize any further

11   information for the 27,000, that's not exactly correct, because

12   you do have Government Exhibit 113.

13        And I'm going to direct you to the second page of 113.  And

14   is this information for all of the -- does it pertain to the

15   27,000 beneficiaries for which CGx tests were billed?

16   A.   Correct.  This is the 27,000 beneficiaries, and this is the

17   distribution of each procedure code for those 27,000.

18   Q.   And so when Mr. Sadow says that you don't have a summary

19   showing the procedure codes for all 27,000 beneficiaries, what

20   does this exhibit show?

21   A.   It shows which procedure codes were billed and by what

22   amounts for all of those 27,000.

23   Q.   And focusing on the first four columns here in the bar

24   chart, approximately what percentage of the 27,000 patients

25   that CGx was billed for -- approximately what percentage

1    received these four Tier 2 CGx codes?

2    A.   Nearly all of them.  I mean, it's 99 percent or something.

3    Q.   Okay.  And Mr. Sadow showed you Government Exhibit 108,

4    which is the top CGx procedure codes and the Part B billing

5    data, correct?

6    A.   Correct, we looked at this.

7    Q.   And what type of procedure codes drove the CGx billing?

8    Was it Tier 1 or Tier 2?

9    A.   Tier 2 codes were the higher billing codes.

10   Q.   And, for example, this 81408, 81406, 81405, 81404, are

11   those all Tier 2 CGx codes?

12   A.   They are.

13   Q.   And the total billed and paid for those particular codes --

14   for example, 81408 was the highest single billing code.

15   A.   Correct.

16   Q.   And we looked at a summary chart earlier, which I'm not

17   going to repeat, but where you showed for the 27,000 patients

18   the average number of tests billed for each of those -- average

19   number of CGx tests billed for each of those patients.

20       Do you recall what that average number was?

21   A.   It was a dozen, about 12.

22   Q.   Okay.  So Mr. Sadow pointed out that one way to make money

23   doing this is just hit the highest paying code, right?

24   A.   That was what he was saying, yes.

25   Q.   Okay.  Could another way to make money be throw a bunch of

1   codes and see what sticks?

2   A.   That's distinctly possible, too.

3   Q.   Mr. Sadow showed you Government Exhibit 2, which pertains

4   to patient V.H.

5        Do you recall looking at this?

6   A.   I do.

7   Q.   And are there 12 tests billed for Ms. H on the claims

8   submission date of September 24 of 2018?

9   A.   There are.

10  Q.   And not all of them paid, right?  I mean, if we look over

11  here, some were zero, correct?

12  A.   Correct.

13  Q.   But some, for example, these Tier 2 codes over here, they

14  did pay.

15       Do you see that?

16  A.   I do.   Those Tier 2 codes, row 2, 3, 4; those are all

17  Tier 2.   Those did pay.

18  Q.   Okay.   And regardless of the beneficiaries for which we do

19  have specific summary slides like the ones we just looked at,

20  did you determine the total amount billed and paid by

21  LabSolutions to Medicare?

22  A.   I did.

23  Q.   And is that reflected in Government Exhibit 112?

24  A.   It is.   This is a summary that includes both Part B and

25  Part C, total billed, 463 million.   Total paid, 187 million.

1    Q.   Okay.  And the 187 million -- and this is Part B and

2    Part C, correct?

3    A.   Correct.

4    Q.   So the paid amount for just Part B is a little bit lower

5    than 187 million.

6    A.   It is.

7    Q.   And did you also determine, of the amount that Medicare

8    paid to LabSolutions, how much of that in those Medicare

9    proceeds is traceable to Minal Patel?

10   A.   I did.  At least from the Part B proceeds, over

11   $21 million.

12   Q.   Okay.  And that's reflected in Government Exhibit 127?

13   A.   Correct.

14   Q.   The $21 million?

15   A.   Correct, top right.

16   Q.   Okay.

17          MS. DE BOER:  One moment, Your Honor.

18          THE COURT:  Sure.

19       (Discussion was held off the record.)

20          MS. DE BOER:  Thank you, Mr. Petron.  I have nothing

21   further.

22          MR. SADOW:  Your Honor, I have one exhibit I'd like to

23   put in in light of the --

24          THE COURT:  Sure, go ahead.

25          MR. SADOW:  Is 116 in evidence?

1          MS. GURSKIS:  Yes, it is.

2          MR. SADOW:  Can I publish 116, Your Honor?

3          THE COURT:  I don't believe there's any objection,

4     right?

5          MS. DE BOER:  No objection.

6          THE COURT:  We'll admit 116 at this time.

7          Are you asking for recross on that?

8          MR. SADOW:  Yes, just on -- it deals with those four

9     codes.

10          THE COURT:  Okay.  Go ahead.

11                     RECROSS-EXAMINATION

12     BY MR. SADOW:

13     Q.  Sir, this is Exhibit 116 and these are the four codes, that

14     is, the procedure codes that you were making reference to on

15     what we call redirect examination, correct?  The ones that were

16     billed more than any other, right?

17     A.  Correct.

18     Q.  And this shows you how much the average billing was by

19     LabSolutions and the average paid, correct?

20     A.  Correct.

21     Q.  And I'm assuming the total on the bottom is the average

22     that was paid per code; is that correct?

23     A.  No.  The average paid per code would be in the right-hand

24     column, the $96, the 241, the 280, and the 440.

25     Q.  So what is the 264?

1   A.   Oh, the 246 is a weighted average over the four of them.

2   Q.   Okay.  And what I'm saying is, if you bill all four codes,

3   you would have four codes, average being 264 per code, correct?

4   A.   Well, I don't like averaging averages.  That's why I'm

5   struggling.  The averages for each of the codes are listed

6   there.  That bottom is just a weighted average for the four

7   codes combined.

8   Q.   What I'm trying to get at -- I was trying to do it in an

9   easy way.

10       If you bill all four codes and you get the average paid per

11  code, if you bill that for every person, it would be a little

12  over $1,000, right?  That's all.  It would be a thousand

13  dollars, right?

14  A.   On average, for these four codes and only these four codes.

15  Q.   That's all I'm asking you, these four codes.

16  A.   So for these four codes, on average, it would be my

17  expectation that it would be about a thousand dollars.

18  Q.   Right.  About a thousand, right?  Just a little over

19  thousand?

20  A.   A little over a thousand dollars.

21  Q.   So if someone is talking about bills coming in or payments

22  being made in the thousands and thousands of dollars per

23  beneficiary, it's not from these four codes, is it?

24  A.   Sure it is.

25  Q.   A thousand dollars -- if someone is paying -- remember the

1    four that we did or five that we did in which the amounts were

2    6,000, 7,000, the four that you didn't break down that we

3    talked about?

4    A.   I don't recall exactly what you're talking about.

5    Q.   You did three counts --

6    A.   Three counts --

7    Q.   And then you did five other individuals.

8    A.   Okay.

9    Q.   The amounts in there, I'm suggesting to you, were in the

10   6- and $7,000 range, right?

11   A.   Correct.

12   Q.   Of that, using these as averages, it would be slightly over

13   a thousand dollars if all four of these codes were billed,

14   correct?

15   A.   I would agree that my expectation would be that it would be

16   a little over a thousand dollars for those four, out of, say,

17   the dozen codes that were billed, of those amounts.

18   Q.   And if you went through, if you wanted to determine it, how

19   much the average payment was on others above and beyond these

20   four, we could do that if we wanted to do it, correct?

21   A.   Absolutely.

22   Q.   Thank you.

23            MR. SADOW:  That's all.

24            THE COURT:  Any --

25            MS. DE BOER:  Just briefly.

 1          THE COURT:  Yes, any follow-up questions?  Go ahead.

 2          MS. DE BOER:  I would ask that the defense put that

 3   back up, please.

 4          THE COURT:  If we could put that back up, please,

 5   publish it again.

 6                    FURTHER REDIRECT EXAMINATION

 7   BY MS. DE BOER:

 8   Q.  Mr. Petron, why this code grouping?  Did the government

 9   tell you, represent these four codes, or did you identify these

10   four codes using some methodology?

11   A.  I identified these four codes in the data.  These four

12   codes, to me, if you recall the bar chart, these are the first

13   four that had the highest yellow bars that were all equal.

14          It was incredibly noticeable to me.  So I said, there's

15   something -- these four codes are always being billed, and then

16   there are lots of other codes being billed.  There was a

17   mismatch of other stuff being billed, but these four were

18   always being billed.

19          So I thought -- I created this chart because of that

20   reason.

21   Q.  And the defense showed you page 1, but they didn't show you

22   page 2.

23          MS. DE BOER:  Would you mind putting up page 2?

24   BY MS. DE BOER:

25   Q.  Could you explain to the jury what is reflected in this pie

1    chart?

2    A.   So this pie chart is all CGx codes and Part B only, but all

3    CGx codes, so the same thing we have been looking at.

4         The first page contains the dark blue top-right corner,

5    22 percent.  So 82.1 million are associated with those four

6    codes.  Right?  Those four.

7    Q.   Just those four?

8    A.   Just those four codes.

9    Q.   Okay.

10   A.   The rest of the light blue is what I would call every CGx

11   code, that is not those four codes, billed with the four codes.

12        Does that make sense?

13        It's all of the other CGx codes which make up 138 million

14   or 76 percent of the billings.

15   Q.   Okay.  So let me see if I'm understanding you correctly.

16        This dark blue, that portion got just those four codes.

17   A.   Correct.

18   Q.   From the dark blue all the way around to the end of the

19   light blue, they got either just those four codes, or those

20   four codes plus other codes.

21        Is that fair?

22   A.   I have would say it's not the four codes.  It's every other

23   code, not the four codes.

24   Q.   Okay.  Understood.

25        And right here when it says:  Additional CGx codes billed

1    with the Tier 2 CGx grouping, what does that mean?

2    A.   That's what I'm saying.  So in the situations where we have

3    the Tier 2 code grouping, i.e. the four codes.  So the top blue

4    is the four codes.

5         The rest of the circle, the light blue part of the circle

6    is all --

7         (Court reporter clarification.)

8              THE WITNESS:  Sure, I'm sorry.  I'm away from the mic.

9              The dark blue top corner are the four codes.  The light

10   blue, the rest of the circle, is any other CGx code that is not

11   the four codes.

12   BY MS. DE BOER:

13   Q.   And it's billed with the Tier 2 code grouping?

14   A.   They are billed at the same time.  So these four codes.

15        And then if the average is 12, I would expect, on average,

16   eight other codes being billed with this hand over here.  They

17   might be a different eight, right?  They could be all types of

18   different codes.

19        But I would expect eight of them with these four.

20   Q.   Okay.  Thank you, Mr. Petron.

21             MS. DE BOER:  Nothing further.

22             THE COURT:  Okay.  At this time, Mr. Petron, you're

23   excused.  Thank you very much.

24             THE WITNESS:  Thank you.

25             THE COURT:  Let me get a brief sidebar for scheduling,

1   please.

2        (The following proceedings were held sidebar:)

3        THE COURT:  All right.  Just to confirm that we are

4   left with the doctor tomorrow, correct?

5        MS. DE BOER:  Correct.

6        THE COURT:  That's it?

7        MS. DE BOER:  Yes.

8        THE COURT:  We're good to go?

9        MS. DE BOER:  Yes.

10        THE COURT:  Okay.

11   (Proceedings returned to open court.)

12        THE COURT:  Ladies and gentlemen of the jury, that

13   concludes our testimony for today.  I'm going to give you some

14   instructions, but most importantly, give you a little bit of a

15   preview for what tomorrow, Friday, looks like.

16        Tomorrow morning, we're going to start at 10:00.  We're

17   not going to start at 9:00.  I have to handle a couple of

18   things in this trial to get things ready for you all.

19        But there is a bit of a silver lining with our pace

20   right now.  We expect to have only one witness tomorrow called

21   by the government, and the government's case will conclude.

22        That means that after tomorrow, we are, at least by my

23   estimation, ahead of pace.  If you recall, we had pretty much

24   structured that you could all be with us until about the 20th

25   or thereabouts, right?  This means that on Monday of next week

1      the defense will begin their case.  Okay?

2           So we are at a very critical point in the case that we

3      have allowed the government, over of the past two weeks, to

4      present their case.  They just have one more witness tomorrow.

5      So that means we will start at 10:00, but I anticipate we will

6      probably end even a little earlier than perhaps we're ending

7      today, tomorrow.  Which I think you all deserve.

8           Quite frankly, it warms my heart to get you out of here

9      on a Friday in the early afternoon so you can have a nice

10     weekend and get some rest before we resume with the defense

11     case on Monday.

12          So tomorrow I don't want you to fear that because we're

13     starting late, we are somehow behind.  We are actually, I would

14     say, a little bit ahead of schedule right now.

15          So I think a lot of praise should go to both sides

16     because the lawyers have worked very hard to keep the case

17     moving and get through a lot of witnesses.

18          I think, if my count is correct, after tomorrow it'll

19     be 16 -- 15 or 16 witnesses total that we've heard from over

20     the course of two weeks.

21          So that, of course, brings me to my next point, that we

22     have to continue, despite hearing from so many people, and

23     despite the fact that we have one more to go, to keep an open

24     mind because you've only heard the government's case.

25          And the defense, although they don't have to, does plan

1   on putting some witnesses forward next week.  I also, of

2   course, need to make sure that not only do you keep an open

3   mind, but when you get home and family is going to ask how

4   things are going, you are free to tell them it appears we are

5   at a critical point in the case, that the case is on pace.  You

6   can talk scheduling with them.

7          But besides that, I can't have you discuss anything

8   about what you've heard and what you've seen.  Certainly, today

9   you've heard a lot of additional new testimony, some financial

10  analysis.

11         Similar to the same warnings I've given you from the

12  beginning, as it pertains to genetic testing, telemedicine, and

13  telemarketing, I would ask that you all don't do any of your

14  own research.  You are confined to the evidence admitted in

15  these four corners and these four walls of the courtroom.  So

16  please continue to abide by that rule.

17         Of course, stay off social media, as I know you all

18  have, and make sure that you don't speak to each other.  I know

19  the temptation sometimes is to wonder what your fellow jurors

20  are thinking, but you must wait until the end, when you all can

21  deliberate together to have that first full conversation.

22         So again, we're going to break here in just a moment.

23  I would ask you to leave your notepads in your room.

24         I need everyone here -- let's all try to get here, if

25  we could, please, by 10:00 o'clock, just so we can get started

1    at 10:00.  I suspect that the work I need to do tomorrow will

2    be done by then, and I can get us started just a few minutes

3    thereafter.

4         And that way, we can get a chunk of that testimony done

5    and hopefully let you out in the middle of the afternoon

6    tomorrow for the weekend.  All right?

7         So I want you all to feel comfortable that we've done

8    our job, and we've kept our promise to you.  We're going to

9    keep this train running.  All right?

10        So I appreciate you guys, your patience, your

11   dedication, and your concentration.  I think both lawyers --

12   all lawyers and I would agree it's a lot of information.  It's

13   a lot of information; it's a lot of exhibits.  Some of it is

14   technical, and I know that you are all paying attention.

15        As I've stated from the beginning, all of this has been

16   admitted.  All of these many exhibits, they go back.  They go

17   back to the jury room.  It's very hard, I know, sometimes to

18   remember what you saw yesterday or last week.  And you're

19   seeing them and sometimes not for very long.

20        So you've heard how both lawyers have pointed out

21   certain exhibits.  You can go back, when guys are deliberating,

22   look at them, study them, look at those numbers, look at that

23   data.  You're going to get a chance to do that.  So I don't

24   want anyone to worry if they haven't gotten a full picture or

25   want to follow up on their notes.  You're going to get a chance

1   to do that.

2       So I hope you all have a wonderful rest of your day.

3   We're going to get you out a little early, like I said.  And

4   I'll see you all in the jury room tomorrow at 10:00 a.m.  Have

5   a great evening, folks.

6       (Jury exits at 4:24 p.m.)

7       THE COURT:  All right.  Everyone please be seated.

8       I'll also give you all a chance to work on your notes

9   for tomorrow and get everything ready.  Again, we expect to

10  hear from Dr. Yogel tomorrow.

11      I think, Mr. Rafferty, we'll see what we get in the

12  next 30 minutes, if we get a reply to the quash motion from the

13  nonparties.  Certainly, I don't think the government needs to

14  be in here right at 9:00.  We're going to be working on this

15  motion to quash, and we will make a ruling -- my hope is to

16  make a ruling on that afterwards in the morning.

17      So that's going to take us -- I think we can probably

18  do it inside an hour, but in an abundance of caution, I've set

19  aside 9:00 to 10:00.  So the goal would be to pick up with

20  Dr. Yogel tomorrow at 10:00.

21      I trust, Ms. de Boer, that that's okay with Dr. Yogel's

22  schedule.  I think you had told me she had to fly in -- or he

23  had to fly in, right?

24      MS. DE BOER:  I believe he's local, but Friday is his

25  day off.

1        THE COURT:  I'm sorry.  Friday is his day off.  So you

2   can let the doctor know, if he wants to be here a few minutes

3   prior, that we'll start at 10:00 o'clock.

4        Okay.  Housekeeping issues that I need to be aware of,

5   any concerns?

6        MS. GURSKIS:  Your Honor, I wanted to briefly address

7   the stipulation issue regarding the 302s that had been raised

8   yesterday by Mr. Sadow.

9        THE COURT:  Yes.  That was the request that Mr. Sadow

10  had about the possibility as it pertained to Griner and

11  Ramamurthy, reading them, I think is -- I don't know if it was

12  necessarily reading them verbatim but at least addressing them

13  without having to recall them.  Right?

14       MS. GURSKIS:  Yes.  So I think, as a general matter,

15  the government doesn't oppose having some sort of stipulation.

16  I think the issue is that these are the agents' records of what

17  Mr. Griner and Mr. Ramamurthy said.

18       These -- so we actually -- Ms. de Boer and I were not

19  present for either one of these meetings.  The witnesses

20  haven't seen them.  So we would request leave of the Court to

21  conduct two very brief interviews with these witnesses just for

22  the limited purpose to see if they agree with the statement, if

23  there's anything they don't agree with, if there's any context

24  that's required for the statement; and then, based on that, to

25  draft a stipulation that we could say the witness would

1    therefore adopt based on what is in the report.

2         THE COURT:  And I wanted to see if I caught that right.

3    You were saying to have the Court speak to the two witnesses?

4    Did I understand that right?

5         MS. GURSKIS:  No.  We would just request the Court's

6    permission to contact them --

7         THE COURT:  Oh.  Oh, yes.  The Court's permission.

8         MS. GURSKIS:  -- since we are sort of in a precarious

9    situation where they are obviously no longer testifying, but

10   with the anticipated testimony that could potentially happen.

11        THE COURT:  So the plan would just be to see if

12   there's -- and again, I don't know if -- we can probably do

13   that over teleconferencing equipment, to make it easy.

14        But the idea would be to present the 302s -- I think

15   there was maybe four in total, I recall -- the 302s would be

16   presented to confirm that those are accurate summaries by the

17   agents of their statements.  And then, if so, we can go ahead

18   and stipulate to reading them in or presenting them to the

19   jury.

20        Is that the idea?

21        MS. GURSKIS:  I think it would be a little bit narrower

22   than that.  So Mr. Sadow extended the courtesy of actually

23   highlighting the particular portion that he was most interested

24   in to me.

25        THE COURT:  Ah.  Perfect.  Okay.

 1          MS. GURSKIS:  So I have the information at the ready,

 2  so that would be the information that we would want to see

 3  whether the witness could adopt.  And if the witness can't

 4  adopt that statement, then probably the more appropriate course

 5  of action would be to recall the witness, and Mr. Sadow would

 6  have the opportunity to cross the witness on that particular

 7  point.

 8          MR. SADOW:  That's an incredibly complicated thing to

 9  do.

10          THE COURT:  Well, arguably, I don't know if it's more

11  complicated than trying to get them back here.

12          MR. SADOW:  No.  But I'm talking -- we're talking two

13  sentences out of three reports.

14          THE COURT:  No, no.  But let's clarify.

15          What I'm being told is those two sentences will be

16  presented to the witness to confirm -- because they aren't

17  302s, and they're not direct and verbatim summaries, as my

18  motion in limine ruled on weeks ago -- that they would be able

19  to confirm it, and then we could get them in that way.  They're

20  just concerned about treating those as verbatim statements of

21  the witnesses.  That's my understanding.  So --

22          MR. SADOW:  But there's a much easier way to do that.

23          THE COURT:  What would you suggest, Mr. Sadow?

24          MR. SADOW:  Have the two individuals that wrote the

25  reports look at the two sentences and say, did they say this to

1   you?  If the answer to that is yes, then we don't have a

2   problem.

3            THE COURT:  You would say the individual memorializing

4   the statement is --

5            MR. SADOW:  Yeah.  You simply say to the agent, is this

6   what the witness said?  And if the answer is yes, then you're

7   done.

8            THE COURT:  Well, I would beg to differ.  I think it's

9   the exact opposite.  It's the same way that you -- not through

10  an improper impeachment mechanism, but refreshing recollection,

11  you do the exact opposite to witnesses who -- I could think of

12  several witnesses who stated that the statements provided to

13  the agent in the 302s were not the way they characterized them

14  or at least not exactly the way they described them.

15           I think the problem is the effect on the listener who's

16  writing them down.  If you're not writing them or transcribing

17  them, the fear is that it would not accurately capture the

18  statements of the witnesses.

19           And what you're asking us to do by stipulation is have

20  those statements read in as statements of those witnesses.  And

21  unless those witnesses confirm that that's what was stated, it

22  would be a little problematic to have the individual -- the

23  agent writing them down say, that's my recollection of what he

24  told me.

25           That's my concern.  It wouldn't necessarily capture the

1    accuracy.  It would have to be the person who stated those

2    things to the agent.  And I think that kind of flips it on its

3    head unless I'm missing something from the government.

4            MS. GURSKIS:  Yes.  That's precisely --

5            THE COURT:  Yeah.  I don't think I can go that route.

6            Now, certainly, if they disavow them or change the

7    story, which has happened in some of the questions you've

8    posed, then we would have to, I think, almost certainly recall

9    them so they could be confronted with that 302, like you had

10   done before; and then they would have to explain that away.

11           But if they confirm them -- my only question to you is,

12   if you feel comfortable, if they were to confirm those

13   statements, you get to the same place you want to get to

14   through the agent, but it would just be through the person who

15   actually stated it.  It would be more accurate, so I'm fine

16   with that.

17           MR. SADOW:  I'm following the Court's reasoning

18   completely.  So set aside what I had suggested.  It still

19   sounds as if all that the government needs to do -- and this

20   needs to be done with both parties and probably a court

21   reporter -- is to simply put the individual on the phone and

22   say this:  Did you say, on or about this interview date, the

23   following?  That's it.

24           THE COURT:  That's all I thought.

25           MR. SADOW:  Nothing more than that.

1          THE COURT:  I'm with you 100 percent.  I'm with you

2     100 percent.  That's it.

3          MR. SADOW:  One minute.

4          THE COURT:  One minute, get them on a teleconference,

5     get both parties to read the statement.  And if it checks out,

6     we can turn it into a stip, and we can read it in.

7          MR. SADOW:  And if the witness says, no, I didn't, then

8     we'll go from there.

9          THE COURT:  Exactly.  If it happens from there, you

10    bring it to me, and then we decide how we're going to do

11    recalls and what we're going to do.

12          I would assume that's a procedure that the government

13    is in agreement with.

14          MS. GURSKIS:  Yeah, but I think with just a couple of

15    caveats there.

16          So the sentences are -- on their own, would be a little

17    bit out of context.  So I think that it would -- a little more

18    information is required.

19          And I think also -- not to get super granular, but I

20    will -- with the Ramamurthy report, half of the statement that

21    Mr. Sadow had proposed including is actually -- has already

22    been elicited from Mr. Ramamurthy on both direct and cross and

23    was documented in prior reports.

24          So I don't think we need to hear Mr. Ramamurthy say

25    again that he believed that family history was a qualifier for

1    Medicare.  I think that was very clear during his -- I can pull

2    the transcript cites, but Ms. Rookard and I were looking at the

3    transcript earlier from his testimony, and he did say that on

4    the record.  And it was documented in a different report that

5    had previously been provided to Counsel.

6           But I think the other kind of larger issue is, if it's

7    just the one sentence, I think there needs to be a little bit

8    more context than just, oh, on this day three and a half years

9    ago or three years ago, did you say this one thing?

10          I think a little bit more might be needed to refresh

11   the witness's recollection, to get the narrative or the

12   document that the statement would involve in, as opposed to a

13   30-second call with a court reporter.

14          And to that end, if that's what Mr. Sadow is asking,

15   that's essentially the witness testifying.  So we could just

16   plop Mr. Griner on the stand and do that.

17          MR. SADOW:  But remember, the only reason we're doing

18   this, respectfully, is because we didn't get the statements

19   timely.

20          THE COURT:  Yeah.

21          MR. SADOW:  So to give the government the opportunity

22   to have the witness come back and testify, and then to

23   articulate or to bring out matters again, helps the government.

24   It basically rewards them for the failure to turn it over.

25          What I would ask the Court to do, before you make a

1    decision -- I marked them in red.

2         You can look at the two statements and you can decide,

3    based on that, how much context -- the first one, it says

4    nothing more than this:  Even though it was Ramamurthy's

5    company, he claimed he did not do much for the company.  He

6    spent much of the time in Austin conducting photo shoots and

7    writing movie scripts.

8         The billing for genetic testing averaged 300- to

9    400,000 a month, and Ramamurthy received $40,000 per month.

10   Genetic testing was such a great test because it had no real

11   guidelines, and every person has a family history of cancer.

12        That's Ramamurthy.

13        MS. GURSKIS:  Sorry, I just want to interject one

14   thing, Your Honor.  Regarding Ramamurthy, that's precisely the

15   kind of contextual issues that government is concerned about,

16   because Ramamurthy had many different companies.

17        In that particular paragraph, he's being asked about

18   one company called Rose Shore.  As he testified, the two

19   primary companies at issue, and as was shown through

20   Mr. Petron, Q Health was his primary company that was at issue.

21   That was what he used for the genetic testing.  SKR

22   Enterprises, which I believe he also mentioned, those are the

23   two primary companies.

24        So for him saying that this one company wasn't the one

25   he was using a lot, there's a risk there that the jury is

1    somehow thinking that he's shirking responsibility or hiding

2    from that company, and effectively blaming Mr. Ramamurthy for a

3    mistake on the government, when really it was -- that's the

4    concern about the contextual framework there.

5        MR. SADOW:  And the one for Mr. Griner is, once Patel

6    was made aware that Griner used MyOnCallDoc, Patel wanted the

7    company's information.  Patel needed to perform due diligence

8    on MyOnCallDoc.

9        Patel needed to give the information to his attorney.

10   You don't need context.  As far as I'm concerned, I'll let

11   Ramamurthy go by the wayside.  But the one I just said on

12   Griner is -- clearly never came up in either his direct or his

13   cross-examination.  And you don't need anymore context from

14   that.  That's simply MyOnCallDoc.

15       THE COURT:  Any concern with the Griner one?

16       MS. GURSKIS:  Respectfully, I do disagree a little bit

17   with that characterization of Mr. Griner's testimony.  I

18   believe he did say that Mr. Patel had lawyers that, as a

19   general matter, when he was creating documents for Patel and

20   giving documents to Mr. Patel, it was for the purpose of him

21   sharing that information with his lawyers for compliance

22   purpose.

23       The focus on my direct was on one of the charts.  He

24   did speak about MyOnCallDoc.  The specific question about

25   MyOnCallDoc was not asked, but there was a lot of testimony

1    from Mr. Griner about Mr. Patel's lawyers, about Mr. Patel

2    speaking to his lawyers, about being on the phone with Mr. Watt

3    and Mr. Patel.

4            So it's highlighting something that is consistent with

5    his testimony, Your Honor.

6            MR. RAFFERTY:  Your Honor, what I would say -- if I can

7    just be heard briefly.  First of all, we saw Mr. Sadow

8    cross-examine all of these witnesses for many hours, and we saw

9    the method that he followed in cross-examining those witnesses.

10           I think we all know what would have happened if

11   Mr. Sadow had a copy of that report in front of him.  He would

12   have followed the procedures the Court said was appropriate,

13   and all of that information would have been elicited.

14           And as it relates to the quote from Mr. Griner, that is

15   particularly important because it didn't come out during his

16   testimony, and the government has made much about telemedicine

17   and telehealth.

18           MyOnCallDoc is a telemedicine company, and the

19   statements that Mr. Griner made to the agents that's reflected

20   in that report makes clear that Mr. Patel wanted the name of

21   the company and wanted to vet it with his lawyers.  That

22   testimony did not come out during that testimony.

23           THE COURT:  I would think that -- and I would suggest

24   we recall Mr. Griner.  I don't really see anything that would

25   be productive from attempting to somehow get this context out

1    sufficient so that we can get it in by stipulation.

2         I mean, it's a fairly focused question.  If the

3    government wants to do some rehabilitation, let them do so.

4    But I think you call Griner.  You recall Griner and you go

5    right to the heart of --

6         MR. SADOW:  And that gives the government an

7    opportunity to do something that they should not have an

8    opportunity to do.  I understand that may be the Court's

9    ruling.  I object to that procedure.

10        And if the government's going to get another shot at

11   Griner because they didn't give me the *Jencks* material and I'm

12   forced to use the *Jencks* material now, and they get a second

13   shot at him, I'm not going to use it.

14        Because that simply allows them to do what they wanted

15   to do, which is to bring him back in and attempt to

16   rehabilitate him.  Instead, he should come back in, if he's

17   going to do that, I should ask him whether he said this.

18        If he says yes, I said it, that should be the end of

19   it.  The government should not get an opportunity to ask any

20   more questions, with all due respect, because they failed

21   to live up to their responsibilities under 26.2 and 18,

22   U.S.C., 3500.

23        THE COURT:  Let me ask you this, Mr. Sadow.  Are you

24   comfortable -- if we do it that way, it just sounds like it

25   would be easier with Griner not in a vacuum, meaning, I'm with

1   you, but wouldn't it be easier for you to just have him present

2   and frame the question?

3           I wonder how easy it is to read it off the 302 without

4   being able to have some interaction with the witness.  It just

5   seems --

6           MR. SADOW:  All I would -- and this is what I think

7   Mr. Rafferty was saying.  What I would have said is, didn't you

8   say on such and such a date, to the agent... da, da, da, da,

9   da.

10          THE COURT:  That's it.

11          MR. SADOW:  And he would say, I don't remember.  I

12   don't know.  And I would walk up to him and say, would you

13   refresh your recollection on this?  And he would look at it and

14   I would say, isn't it a fact you said that?  And I think about

15   95 percent of the time he said yes.  That should end it.

16          THE COURT:  Right.  You're right.

17          MR. SADOW:  The government should not get the

18   opportunity at that point in time to say, okay, let's talk

19   about the whole statement and go into -- and it was lies for

20   money and the whole thing again.

21          THE COURT:  No, no.  You just want to be able to bring

22   up that one limited issue in the 302.

23          But you agree with me that it would be easier,

24   mechanically, to just do that by recalling him, though?

25          MR. SADOW:  Actually, mechanically it would be easier

1   to just put it in or have the agent say that's what he said.

2          But I would consider doing, obviously, what the Court

3   has suggested, but the government cannot then get the

4   opportunity to ask him anything.  They're done.

5          THE COURT:  Right.  No, I understand.  I don't have an

6   issue with your proposal that you would go forward and ask him

7   that limited question and that would be the end of it, that

8   we're not going to reopen a full examination of the witness.

9   I'm with you.

10         I'm just trying to get a sense of how -- how much more

11  organic it would be to explain it and have him be live to

12  explain it or qualify it, as opposed to trying to do this

13  procedure where we're going to ask him about it on some sort of

14  teleconference, he's going to then confirm it, and then you're

15  going to essentially present it.

16         I don't know if that's more efficient.

17         Now, I will say this:  Certainly, the ability to get

18  that out of the way and perhaps even do it tomorrow, because we

19  could, I would think.  I don't know necessarily how hard it

20  would be to get Mr. Griner back with us in the afternoon, but

21  it would be a very limited issue and we could take care of it

22  tomorrow.

23         And if Ramamurthy is not a concern, then I could put

24  this behind us and just take care of Griner in the afternoon

25  with just that limited examination.

1          MR. SADOW:  We can certainly do that.  We can say that

2    for purposes of whatever --

3          THE COURT:  Yeah, exactly.  I can script it.  I can

4    just say there was an issue we didn't get a chance to allow the

5    defense to cover in their cross.  We're going to bring him back

6    for that limited question.

7          And you just do it and we're done.

8          MR. SADOW:  I have no problem with that at all.

9          THE COURT:  And you're okay with Ramamurthy not being

10   brought back?

11         MR. SADOW:  I'm sorry.  Forget Ramamurthy.  Leave

12   Ramamurthy wherever it is.

13         THE COURT:  Okay.  So if I only have to deal with

14   Griner and it's only this one limited issue and I can bring him

15   back hopefully tomorrow afternoon, what concern do we have on

16   the government's end?  I mean, it's pretty limited.  It's a

17   quick snapshot.

18         If you have a problem with the way it's being

19   structured, certainly it's something that can be revisited in

20   your closing.  But I don't see anything wrong with allowing

21   that limited question.

22         What would be the issue there?

23         MS. GURSKIS:  I think just the issue would be the

24   implication that Mr. Sadow is impeaching the witness and then

25   it's sort of left dangling, because Mr. Griner did say -- he

1    did talk about MyOnCallDoc.

2         He did talk about sending the copy to Minal Patel.  He

3    did talk about Minal Patel talking about compliance and sending

4    things to his attorney.

5         So I would like the opportunity to redirect him briefly

6    on the general matter that he did testify to, to show the

7    consistency with the other things that he's talked about, as

8    opposed to suggesting that somehow he was lying or concealing

9    information, and then, you know, impeaching the witness without

10   any opportunity to rehabilitate him.

11        THE COURT:  Understood.  I don't know -- remember, I

12   don't necessarily think it's a full-blown impeachment as much

13   as it's just a line of questioning that would have been asked

14   had he been granted the cross.

15        I have to say, we're here because you guys didn't

16   produce the 302s.  I mean, so now you're going to live with it.

17   So you're not going to get any chance.  You blew it the first

18   time.

19        You should have turned them over and we wouldn't have

20   had this issue.

21        So I'm going to only allow Mr. Sadow to get up there,

22   ask this one limited question, and sit back down.  You want to

23   qualify that that is dangling out there, you're going to have

24   to do it at closing.

25        I'm not going to sit here and reopen this now to

1   rehabilitate.  This is, to me, quite frankly, one way of curing

2   what is a full-out discovery violation.  I think this is a

3   reasonable accommodation for the defense.

4        It screwed up part of his cross-examination on a key

5   302 that did not really get addressed in his chance to question

6   the witness.

7        And I think it would just be fundamentally unfair that

8   the government would fail to produce something and then be able

9   to get around it by reframing the testimony of the witness,

10  when the defense is the one that was prejudiced by its failure

11  to produce that report.

12       So I do not think this is a situation where we're going

13  to let there be an extended examination.

14       I think if we simply frame it, as I suggested, that

15  this was a question that we were unable to allow the defense to

16  address, and we're gonna recall him for this limited purpose,

17  jurors are none the wiser.

18       You can go ahead and ask this question.  We won't make

19  it a feature, and it'll allow you guys to wrap up this issue

20  tomorrow.  I mean, this will take 30 minutes, I mean, if that.

21       MR. SADOW:  30?  Might just take five minutes.

22       THE COURT:  Not even.  Five minutes.  I don't think

23  this is some sort of a major misleading thing that the jury is

24  going to get confused, because it's so isolated and it's very

25  similar to other things you've heard.

1        Maybe not exactly the same, but it's not like we

2   haven't covered some of this ground in the government's direct

3   and redirect.

4        So I think this is going to be the way we're going to

5   clear this up.  So I think what we should do then, and I don't

6   know the accessibility or who needs to get on the horn here,

7   but I need someone to make sure that Mr. Griner return to court

8   and be ready to go at some point in the midafternoon.

9        Can that be accommodated by the government?

10       MS. GURSKIS:  I believe so, Your Honor.  Mr. Griner, I

11   believe, lives in Palm Beach County.  So I believe that he can

12   do that.  But, again, I haven't communicated with his lawyer or

13   anything.

14       THE COURT:  Do me a favor, today when we finish, try to

15   reach out to his lawyer.  Tell him the good news is he has

16   enough time to drive down.

17       MS. GURSKIS:  Okay.

18       THE COURT:  Because I'm not going to have him in the

19   morning, and I don't think I'm going to have him, quite

20   frankly, before 2:00, 2:30.  I mean, he could even get in until

21   3:00 o'clock.

22       But I think if you bring him, I can moot this late

23   production, I can cure this issue, and I can let the defense

24   start fresh on Monday, and the government gets to close

25   tomorrow after we finish with Dr. Yogel.  All right?

1           MS. GURSKIS:  Yes, Your Honor.  Thank you.

2           THE COURT:  Let's do that.

3           MR. SADOW:  I appreciate that.  I think the Court is

4    going to wind up in a situation, though, timewise.

5           How long do you expect your direct of this other

6    witness to be?

7           THE COURT:  It didn't sound too long.

8           MS. DE BOER:  It's Mr. Cuyler's direct, but it will be

9    quite short, I think.

10          MR. SADOW:  So we're talking --

11          MR. RAFFERTY:  My cross will be similar to the rest.

12          MR. SADOW:  What I'm saying is we will be done with

13   this witness by 11:00, and then we've got nothing.  We're just

14   going to wait.  I think we should just tell the gentleman --

15          THE COURT:  If he can be down here a little earlier?

16          MR. SADOW:  Yeah, that he needs to come down as quickly

17   as he can be here tomorrow after 10:00 o'clock.

18          THE COURT:  All right.  I say this.  At least we give

19   him the benefit of, if he hits a little bit of traffic, it's

20   not the end of the world because we're still tied up until

21   10:00.

22          So I would ask, if you could, Ms. Gurskis, find out

23   from his lawyer and advise me perhaps tomorrow morning or by

24   email, if you want to email us, let me know when you confirm

25   that he can be here.  Ideally, he can be here by 10:00, no

1    later than 11:00, so that he's standing by and ready to go.

2            I could have a scenario, if Yogel is quick, where we're

3    done tomorrow in the early afternoon.  It sounds like we may be

4    done pretty quick.

5            MS. GURSKIS:  Yes, Your Honor.

6            THE COURT:  Okay.  So just keep me posted on that.

7            All right.  So that'll take care of this one

8    outstanding issue regarding the 302s.

9            So anything else I need to be concerned about on the

10   government's end, just housekeeping before tomorrow?  Anything

11   with Dr. Yogel, for example, or any other exhibit issue?

12           MS. DE BOER:  I don't think so, Your Honor.  We're

13   going to take stock of what exhibits we admitted and if we

14   forgot to move one in and all that.  So there may be some minor

15   housekeeping in that regard tomorrow.  But other than that, I

16   don't think so.

17           THE COURT:  Okay.  Good.  We can take advantage of some

18   of our downtime to do that.

19           Anything else on the defense side, just so I can get a

20   sense of -- any other housekeeping issues?  I think this will

21   take care of your concern on the 302s, but is there anything

22   else that I may have missed?

23           MR. RAFFERTY:  No, Your Honor.  Thank you.

24           THE COURT:  All right.  And I just -- tomorrow

25   afternoon, if I can get a sense -- you don't need to tell me

1    now, but when we break tomorrow, just so I can plan ahead,

2    similar to what we've made the government do where we've given

3    a lineup.  I don't need it all the way out for the week, but

4    maybe give me, like, a Monday and Tuesday lineup.  You guys can

5    decide tomorrow.  Just so I can plan ahead for the jurors and

6    for my own scheduling.  Okay?

7         MR. RAFFERTY:  Yes, Your Honor.

8         THE COURT:  Okay.  If there's nothing else, I'll let

9    everyone get back to work, and we'll circle back on this issue

10   of Mr. Griner.  And we'll be in recess, then.

11        I'll see the defense team tomorrow at 9:00.  If you

12   want to be here a few minutes before, because we're going to

13   dry-run and make sure that the Zoom is working because these

14   guys appearing for the nonparties are coming via Zoom.  So just

15   maybe come in about 8:45 so we can dry-run the tech.  Okay?

16        MR. SADOW:  Yes, Your Honor.

17        THE COURT:  All right.  We're in recess.

18        MS. DE BOER:  Thank you, Your Honor.

19        THE COURT:  You got it.

20        (Court recessed at 4:48 p.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

          I hereby certify that the foregoing is an
4
accurate transcription of the proceedings in the
5
above-entitled matter.
6

7

8   DATE:  12-8-2022            /s/Ilona Lupowitz
                               ILONA LUPOWITZ, CRR, RPR, RMR
9                              Official Court Reporter
                               United States District Court
10                             299 East Broward Boulevard
                               Fort Lauderdale, Florida 33301
11                             (954) 769-5568

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1,000** [1] - 169:12
**$1,275** [1] - 75:18
**$1,310** [1] - 75:17
**$1,699** [1] - 76:11
**$10** [1] - 159:19
**$11** [4] - 67:21, 101:19, 116:18, 116:20
**$116** [1] - 160:19
**$119** [1] - 67:20
**$128** [1] - 63:6
**$15,113.68** [1] - 112:21
**$150,251.76** [1] - 86:14
**$168** [4] - 79:21, 81:10, 105:9, 107:12
**$187** [2] - 63:17, 79:9
**$19,000** [1] - 113:3
**$2,975** [1] - 75:21
**$21** [3] - 106:7, 167:11, 167:14
**$215,000** [2] - 111:6, 111:22
**$223** [1] - 67:19
**$240,000** [1] - 85:8
**$25** [1] - 63:10
**$25,000** [1] - 108:15
**$263,000** [1] - 124:4
**$27** [1] - 153:1
**$320,000** [1] - 100:19
**$321,000** [1] - 117:1
**$34** [1] - 63:12
**$35,738.99** [1] - 85:25
**$393,000** [1] - 109:12
**$4,149** [2] - 74:16, 78:7
**$4,373.82** [1] - 112:18
**$40,000** [1] - 186:9
**$436,000** [1] - 84:25
**$45** [1] - 109:2
**$463** [1] - 62:14
**$5,425** [2] - 77:13, 77:17
**$5,820** [2] - 75:21, 76:11
**$50** [3] - 79:22, 82:25, 84:15
**$50,000** [1] - 114:8
**$51** [1] - 81:13
**$58** [1] - 109:4
**$6,470** [3] - 74:15, 77:12, 77:16
**$6,524** [1] - 78:1
**$6,715** [1] - 77:5
**$600,000** [1] - 87:4
**$7,000** [1] - 170:10
**$7,120** [1] - 78:6
**$7,750** [1] - 76:25
**$728,972.18** [1] - 86:22
**$774,000** [1] - 109:9
**$9,595** [2] - 77:22
**$96** [1] - 168:24

## /

**/s/Ilona** [1] - 199:8

## 0

**01** [1] - 60:18
**03** [1] - 60:18
**04** [1] - 60:18
**05** [1] - 60:18
**0736** [2] - 110:23, 111:5
**0957** [1] - 113:23

## 1

**1** [13] - 1:7, 25:10, 57:14, 62:20, 68:18, 68:24, 69:24, 74:7, 75:13, 76:19, 160:14, 165:8, 171:21
**1,160** [3] - 91:22, 92:5
**1,492** [1] - 133:18
**1,742,000** [1] - 108:7
**1.1** [1] - 85:7
**1.3** [1] - 84:5
**1.5** [1] - 113:23
**1.7** [1] - 108:11
**1.9** [1] - 114:12
**1.995** [1] - 110:24
**10** [2] - 74:7, 109:12
**10/10/2017** [1] - 108:14
**10/31/16** [1] - 148:13
**100** [6] - 15:22, 106:18, 108:7, 110:24, 184:1, 184:2
**102** [1] - 4:3
**103** [5] - 4:4, 133:7, 133:10, 133:11, 133:15
**106** [1] - 3:22, 70:4, 70:6, 70:16
**108** [10] - 3:22, 4:5, 70:4, 70:6, 152:6, 152:13, 152:14, 163:6, 163:12, 165:3
**109** [1] - 59:15
**1099** [1] - 154:17
**10:00** [12] - 96:8, 174:16, 175:5, 176:25, 177:1, 178:4, 178:19, 178:20, 179:3, 196:17, 196:21, 196:25
**10:15** [3] - 51:5, 51:12, 51:15
**10:18** [1] - 53:12
**10:30** [4] - 51:3, 52:1, 53:3, 53:10
**10:50** [1] - 53:13
**10:52** [1] - 54:15
**10th** [1] - 109:23
**11** [2] - 16:20, 74:7
**110** [1] - 60:7
**111** [1] - 60:21
**112** [7] - 3:20, 61:22, 61:23, 62:6, 62:8, 79:1, 166:23

**1121** [3] - 3:20, 58:19, 59:2
**1125** [3] - 3:20, 58:19, 59:3
**113** [10] - 3:21, 64:2, 64:7, 68:4, 68:5, 150:18, 150:20, 153:3, 164:12, 164:13
**114** [6] - 3:21, 64:3, 64:7, 64:10, 134:17, 134:18
**115** [4] - 4:5, 158:4, 158:5, 158:9
**116** [9] - 3:9, 3:22, 70:4, 70:6, 160:16, 167:25, 168:2, 168:6, 168:13
**1160** [2] - 144:24, 144:25
**1170** [1] - 2:6
**11:00** [2] - 196:13, 197:1
**11:58** [1] - 95:8
**11th** [1] - 40:1
**12** [9] - 67:7, 67:8, 67:9, 74:4, 74:8, 78:6, 165:21, 166:7, 173:15
**12-8-2022** [1] - 199:8
**122-A** [4] - 3:23, 78:19, 78:22, 79:12
**123** [6] - 3:23, 78:19, 78:22, 81:5, 81:23, 81:25
**124** [3] - 3:24, 82:15, 82:18
**124,000** [1] - 85:1
**1241** [1] - 31:7
**1241-O** [4] - 3:15, 15:1, 15:3, 15:7
**1241-U** [1] - 38:7
**125** [3] - 3:24, 83:16, 83:18, 83:21, 84:10
**126** [7] - 4:3, 4:4, 102:17, 102:21, 102:25, 105:3, 130:22
**127** [5] - 4:3, 102:17, 102:21, 106:20, 167:12
**128** [4] - 4:3, 102:18, 102:21, 108:21
**129** [5] - 4:3, 102:18, 102:21, 110:16, 111:24
**12:03** [1] - 99:5
**13** [2] - 93:1, 147:10
**131** [1] - 149:15
**132** [6] - 4:2, 90:23, 91:1, 91:11, 144:20, 149:15
**133** [7] - 4:2, 4:4, 90:23, 91:1, 92:20, 147:6, 149:15
**134** [5] - 4:2, 90:23, 91:1, 93:2, 149:15
**135** [6] - 4:2, 90:23, 91:1, 93:8, 148:18, 149:15
**137** [4] - 4:3, 102:18, 102:21, 112:5
**138** [8] - 4:3, 93:6, 102:18, 102:21, 113:8, 114:4, 148:15, 172:13
**139** [4] - 4:3, 102:18, 102:21, 114:16

**13th** [2] - 26:2, 86:21
**14** [5] - 3:3, 4:11, 84:6, 85:24, 86:14
**140** [4] - 4:4, 126:5, 126:9, 126:10
**1400** [1] - 1:16
**144** [1] - 92:18
**146** [1] - 93:6
**1492** [4] - 133:9, 133:17, 134:10, 134:14
**14th** [1] - 147:9
**15** [6] - 3:15, 51:15, 51:19, 52:3, 52:8, 175:19
**150** [1] - 102:3
**150,000** [1] - 89:17
**151** [3] - 4:1, 88:4, 88:11
**152** [2] - 4:1, 88:11
**153** [3] - 4:1, 88:4, 88:11
**154** [5] - 4:1, 88:4, 88:11, 88:24, 89:6
**155** [3] - 4:1, 88:4, 88:11
**156** [3] - 4:1, 88:5, 88:11
**157** [4] - 4:1, 87:21, 88:4, 88:11
**158** [4] - 4:1, 4:5, 88:5, 88:12
**159** [1] - 88:5
**15th** [1] - 148:13
**16** [3] - 3:16, 175:19
**16.8** [1] - 152:17
**1610** [5] - 3:16, 16:7, 16:12, 16:13, 34:3
**163** [2] - 3:10, 4:5
**165** [5] - 3:25, 83:14, 83:18, 83:21, 83:25
**166** [8] - 3:22, 71:24, 72:4, 72:8, 76:18, 76:19, 77:8, 140:13
**168** [2] - 3:10, 80:6
**17** [1] - 76:23
**171** [1] - 3:11
**18** [3] - 25:10, 29:15, 189:21
**18.6** [1] - 105:18
**186** [1] - 92:17
**187** [8] - 79:2, 80:9, 80:23, 81:1, 81:3, 166:25, 167:1, 167:5
**1888** [1] - 32:22
**1888-A** [1] - 33:16
**19** [4] - 57:12, 111:11, 113:1, 113:3
**19-80181** [1] - 5:3
**19-CR-80181-RAR-1** [1] - 1:2
**1942** [1] - 112:18
**1:25** [1] - 15:17
**1:45** [3] - 95:1, 95:7, 98:19
**1st** [3] - 116:13, 123:9,

127:20

## 2

**2** [44] - 3:22, 57:15, 60:9, 60:17, 61:6, 62:20, 68:4, 68:18, 68:23, 69:13, 69:16, 69:17, 71:24, 72:5, 72:8, 72:11, 72:15, 72:16, 74:7, 77:8, 80:1, 84:17, 112:10, 129:22, 135:7, 135:17, 137:1, 140:11, 140:12, 143:23, 165:1, 165:8, 165:9, 165:11, 166:3, 166:13, 166:16, 166:17, 171:22, 171:23, 173:1, 173:3, 173:13
**2.5** [1] - 85:7
**2.9** [1] - 105:23
**20** [13] - 30:2, 30:8, 30:10, 30:17, 30:21, 42:19, 42:24, 52:3, 53:2, 57:12, 77:20, 92:16
**20,000** [2] - 69:25, 158:21
**2000** [1] - 23:21
**20005** [1] - 1:16
**201** [1] - 164:4
**201-A** [5] - 129:19, 129:20, 129:21, 131:20, 132:3
**2014** [1] - 116:13
**2015** [1] - 115:1
**2016** [5] - 91:16, 93:1, 93:5, 147:9, 149:10
**2017** [27] - 23:8, 24:16, 62:12, 64:22, 71:2, 76:23, 79:17, 84:6, 85:24, 92:16, 93:1, 105:9, 108:8, 112:10, 123:9, 123:23, 132:3, 132:15, 132:16, 132:17, 132:18, 132:21, 147:10, 149:8, 158:15, 164:2
**2018** [30] - 33:9, 43:1, 71:3, 71:6, 71:9, 77:11, 77:15, 77:20, 78:6, 84:6, 86:14, 86:21, 93:10, 109:2, 109:7, 109:10, 109:12, 109:23, 112:16, 112:20, 113:3, 143:17, 148:23, 149:6, 149:11, 161:11, 161:13, 166:8
**2019** [60] - 15:11, 15:16, 15:25, 16:20, 16:23, 17:12, 25:24, 26:2, 27:5, 36:20, 38:3, 38:11, 38:12, 39:25, 40:1, 40:4, 62:13, 64:23, 77:21, 79:17, 87:4, 91:17, 92:16, 93:5, 93:10, 105:10, 110:19, 111:5, 111:11, 111:19, 112:11, 113:3, 123:10, 123:23, 127:2, 127:4, 127:5, 127:6, 127:8,

127:10, 127:11, 127:12, 127:19, 127:21, 128:1, 128:4, 128:5, 128:7, 128:17, 128:22, 131:13, 148:13, 148:24, 149:12, 158:15, 162:7
**202** [1] - 143:23
**2020** [2] - 101:17, 116:17
**2022** [2] - 1:4, 127:17
**2052** [1] - 1:19
**20th** [1] - 174:24
**21** [1] - 79:17
**21.2** [1] - 106:8
**21.3** [1] - 107:2
**21.5** [3] - 106:8, 106:16, 107:1
**21st** [1] - 116:17
**22** [1] - 172:5
**23** [5] - 79:22, 84:16, 111:5, 111:19
**23.8** [1] - 83:3
**24** [1] - 166:8
**2400** [1] - 2:6
**241** [1] - 168:24
**246** [1] - 169:1
**26** [3] - 92:16, 93:10, 112:20
**26,000** [2] - 69:6, 69:11
**26,500** [1] - 69:18
**26.2** [1] - 189:21
**260** [1] - 1:18
**264** [2] - 168:25, 169:3
**269** [1] - 62:16
**26th** [2] - 148:24, 149:12
**27,000** [21] - 65:15, 66:6, 66:22, 67:9, 69:10, 69:11, 74:3, 136:3, 136:4, 163:16, 163:22, 163:24, 164:10, 164:11, 164:15, 164:16, 164:17, 164:19, 164:22, 164:24, 165:17
**27,365** [9] - 64:23, 65:18, 66:12, 134:21, 135:5, 135:6, 135:9, 135:20, 135:23
**27,844** [1] - 66:2
**28** [2] - 111:11, 115:1
**280** [1] - 168:24
**299** [2] - 1:23, 199:10
**2:00** [4] - 11:3, 95:12, 99:4, 195:20
**2:20** [1] - 99:6
**2:21** [1] - 99:16
**2:30** [1] - 195:20

## 3

**3** [14] - 3:22, 71:24, 72:5, 72:8, 74:7, 74:20, 79:16, 105:9, 135:7, 135:17, 137:25, 140:11, 140:12,

166:16
**30** [8] - 28:18, 42:15, 66:14, 87:4, 112:20, 178:12, 194:20, 194:21
**30-second** [1] - 185:13
**300** [1] - 186:8
**301** [3] - 3:16, 58:17, 58:25
**302** [7] - 3:16, 58:17, 58:25, 183:9, 190:3, 190:22, 194:5
**302s** [1] - 5:9, 5:14, 5:19, 179:7, 180:14, 180:15, 181:17, 182:13, 193:16, 197:8, 197:21
**303** [3] - 3:16, 58:17, 58:25
**30303** [1] - 1:19
**30305** [1] - 2:4
**30309** [1] - 2:7
**304** [3] - 3:16, 58:17, 58:25
**305** [3] - 3:17, 58:17, 58:25
**306** [3] - 3:17, 58:17, 58:25
**307** [3] - 3:17, 58:17, 58:25
**308** [3] - 3:17, 58:17, 59:1
**309** [3] - 3:17, 58:17, 59:1
**31** [3] - 3:4, 77:11, 143:17
**310** [3] - 3:17, 58:17, 59:1
**311** [3] - 3:17, 58:17, 59:1
**312** [3] - 3:17, 58:17, 59:1
**313** [3] - 3:18, 58:18, 59:1
**3131** [1] - 2:3
**314** [3] - 3:18, 58:18, 59:1
**315** [3] - 3:18, 58:18, 59:1
**316** [3] - 3:18, 58:18, 59:1
**317** [3] - 3:18, 58:18, 59:1
**318** [3] - 3:18, 58:18, 59:1
**319** [3] - 3:18, 58:18, 59:2
**31st** [1] - 23:8
**32** [3] - 93:10, 149:1, 149:3
**320** [3] - 3:18, 58:18, 59:2
**321** [3] - 3:19, 58:18, 59:2
**322** [3] - 3:19, 58:18, 59:2
**323** [3] - 3:19, 58:18, 59:2
**324** [3] - 3:19, 58:18, 59:2
**328** [3] - 3:19, 58:19, 59:2
**329** [3] - 3:19, 58:19, 59:2
**330** [3] - 3:19, 58:19, 59:2
**3301** [1] - 1:24
**331** [3] - 3:19, 58:19, 59:2
**33301** [1] - 199:10
**34** [1] - 23:24
**3500** [1] - 189:22
**38** [1] - 93:10
**3990** [2] - 86:21, 87:3
**3:00** [1] - 195:21
**3:06** [1] - 130:5
**3:07** [1] - 130:8
**3:19** [1] - 130:9
**3:20** [1] - 130:11

## 4

**4** [15] - 3:22, 71:25, 72:6, 72:8, 74:7, 75:22, 77:21, 93:1, 135:7, 135:17, 138:10, 140:11, 140:12, 147:9, 166:16
**4.4** [1] - 84:21
**4.5** [2] - 83:5, 89:13
**4.6** [1] - 83:6
**400,000** [1] - 186:9
**406** [1] - 73:21
**413-A** [1] - 44:6
**413-B** [1] - 44:7
**42** [1] - 3:6
**43** [2] - 109:5, 158:17
**440** [1] - 168:24
**45** [1] - 95:2
**463** [1] - 166:25
**48** [1] - 3:6
**488** [2] - 109:23, 110:9
**49,000** [1] - 57:22
**4:24** [1] - 178:6
**4:48** [2] - 1:5, 198:20

## 5

**5** [9] - 16:23, 24:12, 27:5, 74:7, 83:5, 84:6, 84:20, 159:8, 159:19
**5,425** [2] - 143:3, 143:4
**5,938** [1] - 78:2
**5.8** [1] - 67:21
**50** [4] - 3:7, 15:22, 23:22, 145:18
**50,000** [1] - 87:12
**52** [2] - 158:16, 160:16
**55** [1] - 3:9
**56** [2] - 49:3, 49:5
**58** [3] - 3:16, 49:6, 109:4
**5945** [3] - 107:12, 114:19, 114:25
**5953** [3] - 86:2, 107:16, 109:4

## 6

**6** [8] - 3:25, 74:7, 85:13, 85:16, 85:18, 85:21, 109:6, 170:10
**6,000** [1] - 170:2
**6,470** [2] - 143:2, 143:4
**6,524** [1] - 78:2
**608,000** [1] - 85:8
**62** [1] - 3:20
**629** [2] - 92:23, 147:20
**64** [2] - 3:21, 3:21
**660** [1] - 92:23
**6893** [1] - 86:3

**7**

**7** [9] - 3:25, 74:7, 77:15, 84:24, 85:13, 85:16, 85:18, 86:10, 86:13
**7,000** [1] - 170:2
**7,115** [1] - 77:23
**7,750** [1] - 77:2
**70** [1] - 3:22
**72** [1] - 3:22
**722** [1] - 132:21
**73** [1] - 62:21
**748,000** [1] - 85:2
**75** [1] - 79:20
**76** [1] - 172:14
**769-5568** [2] - 1:24, 199:11
**78** [2] - 3:23, 3:23
**7th** [2] - 15:16, 15:25

**8**

**8** [11] - 1:4, 3:25, 74:7, 85:13, 85:16, 85:18, 86:16, 86:17, 105:10, 113:19, 114:12
**8,206** [2] - 66:12, 67:15
**8.1** [1] - 113:17
**8/9/19** [2] - 131:4, 131:7
**81201** [4] - 69:24, 70:1, 73:19, 75:7
**81214** [7] - 137:18, 137:20, 138:2, 138:5, 138:12, 138:17, 139:4
**814** [1] - 60:18
**81404** [10] - 73:21, 150:24, 151:4, 151:7, 151:9, 151:18, 151:19, 151:25, 152:16, 165:10
**81405** [2] - 69:3, 165:10
**81406** [1] - 165:10
**81408** [10] - 152:23, 153:1, 153:5, 153:9, 153:14, 153:23, 153:25, 154:6, 165:10, 165:14
**82** [1] - 3:24
**82.1** [1] - 172:5
**8206** [2] - 134:22, 135:6
**821** [1] - 138:2
**83** [2] - 3:24, 3:25
**85** [2] - 3:25, 101:21
**8788** [1] - 113:18
**88** [1] - 4:1
**8:45** [1] - 198:15
**8th** [2] - 1:16, 15:10

**9**

**9** [9] - 1:6, 3:25, 15:10, 74:7, 85:13, 85:16, 85:18, 86:25, 87:1

**9,151** [2] - 66:22, 134:22
**9.7** [4] - 83:4, 84:20, 113:24, 152:17
**9/22/17** [1] - 131:3
**9/24/2018** [2] - 72:18, 72:23
**90** [1] - 101:21
**91** [1] - 4:2
**914** [8] - 92:5, 92:8, 145:1, 145:5, 145:6, 145:7, 145:13, 145:17
**9308** [1] - 113:24
**95** [1] - 190:15
**954** [2] - 1:24, 199:11
**99** [1] - 165:2
**9:00** [6] - 10:5, 98:14, 174:17, 178:14, 178:19, 198:11
**9:18** [1] - 1:5
**9:29** [1] - 13:22

**A**

**A.K** [1] - 77:14
**a.m** [9] - 1:5, 10:5, 13:22, 51:5, 53:12, 53:13, 54:15, 95:8, 178:4
**abide** [1] - 176:16
**ability** [5] - 13:6, 97:15, 123:2, 123:16, 191:17
**able** [22] - 10:16, 61:8, 72:12, 95:19, 95:22, 96:7, 106:17, 107:2, 110:25, 111:14, 125:14, 136:13, 136:16, 136:20, 136:22, 145:20, 150:2, 158:14, 181:18, 190:4, 190:21, 194:8
**above-entitled** [1] - 199:5
**absolutely** [7] - 50:12, 58:10, 60:1, 66:9, 101:24, 119:22, 121:10, 121:12, 123:5, 125:15, 127:18, 134:5, 136:17, 137:3, 158:13, 163:11, 170:21
**abundance** [1] - 178:18
**accept** [2] - 29:8, 147:1
**accepting** [1] - 147:2
**accessibility** [1] - 195:6
**accommodated** [1] - 195:9
**accommodation** [1] - 194:3
**accompanying** [1] - 44:6
**accomplish** [1] - 95:19
**according** [3] - 120:20, 137:5, 160:25
**account** [37] - 20:3, 86:1, 86:2, 86:3, 86:20, 87:2, 103:13, 103:22, 104:1, 107:12, 107:14, 107:16, 109:3, 110:21, 110:23, 111:5, 113:13, 113:15, 113:16, 113:18, 113:21,

**113:23, 113:24, 114:9, 114:15, 114:19, 114:20, 114:22, 114:24, 114:25, 115:1, 115:7, 115:12, 115:13
**accountant** [1] - 56:4
**accountants** [1] - 56:21
**accounted** [1] - 99:7
**accounting** [1] - 56:3
**accounts** [26] - 57:12, 74:19, 84:21, 86:12, 87:13, 87:14, 103:11, 104:5, 105:16, 107:9, 107:19, 107:21, 108:1, 112:7, 112:9, 112:13, 113:5, 113:20, 113:22, 114:1, 114:8, 119:16, 119:18, 121:20
**accuracy** [1] - 183:1
**accurate** [4] - 19:12, 180:16, 183:15, 199:4
**accurately** [1] - 182:17
**acquired** [1] - 56:15
**acted** [1] - 155:3
**action** [1] - 181:5
**active** [1] - 159:12
**actual** [3] - 18:9, 26:14, 149:4
**AD** [1] - 132:12
**Adair** [1] - 129:7
**add** [9] - 29:22, 41:20, 81:1, 81:10, 89:9, 111:4, 122:10, 134:21, 142:10
**adding** [2] - 19:15, 89:12
**addition** [4] - 19:15, 66:13, 88:23, 112:7
**additional** [9] - 9:8, 19:16, 67:10, 10:9, 135:18, 135:21, 144:17, 172:25, 176:9
**address** [2] - 179:6, 194:16
**addressed** [1] - 194:5
**addressing** [1] - 179:12
**adjudication** [2] - 138:22, 139:15
**adjust** [1] - 68:15
**administrative** [2] - 118:6, 118:16
**admission** [2] - 70:4, 78:19
**admit** [4] - 83:18, 126:8, 163:9, 168:6
**admitted** [31] - 14:18, 15:6, 16:10, 16:11, 32:21, 38:6, 58:23, 59:14, 60:6, 60:22, 62:3, 64:4, 68:3, 70:5, 70:15, 72:1, 76:17, 78:20, 82:16, 83:19, 83:25, 85:17, 88:6, 88:24, 90:25, 102:19, 133:14, 158:8, 176:14, 177:16, 197:13
**adopt** [3] - 180:1, 181:3, 181:4

**advantage** [3] - 51:10, 95:6, 197:17
**Advantage** [1] - 65:3
**advise** [1] - 196:23
**advising** [1] - 8:13
**advisory** [1] - 55:18
**afternoon** [12] - 95:22, 100:1, 100:2, 116:5, 116:6, 175:9, 177:5, 191:20, 191:24, 192:15, 197:3, 197:25
**afterwards** [1] - 178:16
**age** [3] - 49:3, 49:5, 49:6
**agent** [9] - 7:21, 7:23, 8:1, 182:5, 182:13, 182:23, 183:2, 183:14, 191:1
**agent..** [1] - 190:8
**agents** [12] - 7:17, 12:12, 26:19, 26:22, 27:22, 30:15, 30:18, 30:21, 37:9, 40:4, 180:17, 188:19
**agents'** [1] - 179:16
**ago** [6] - 34:7, 36:18, 97:16, 181:18, 185:9
**agree** [8] - 52:5, 123:4, 133:24, 170:15, 177:12, 179:22, 179:23, 190:23
**agreed** [2] - 26:9, 137:17
**agreement** [3] - 40:10, 122:23, 184:13
**ahead** [31] - 5:2, 7:11, 13:19, 31:1, 50:25, 51:2, 52:14, 53:7, 53:21, 68:25, 91:14, 93:24, 96:5, 96:6, 97:13, 97:25, 98:18, 99:23, 112:6, 129:25, 130:2, 130:15, 167:24, 168:10, 171:1, 174:23, 175:14, 180:17, 194:18, 198:1, 198:5
**ailment** [1] - 157:11
**alcohol** [1] - 157:11
**Alert** [1] - 38:13
**alerts** [1] - 38:21
**algorithm** [2] - 61:4, 61:8
**allow** [7] - 27:22, 51:21, 147:12, 192:4, 193:21, 194:15, 194:19
**allowed** [2] - 151:19, 175:3
**allowing** [1] - 192:20
**allows** [1] - 189:14
**almost** [2] - 87:12, 113:19, 183:8
**alone** [2] - 160:19, 160:23
**Alpha** [1] - 132:12
**America** [1] - 5:3
**AMERICA** [1] - 1:3
**American** [6] - 24:11, 112:2, 112:8, 112:10, 112:25, 119:16
**amount** [47] - 61:9, 61:10,

**62**:13, 63:5, 63:20, 67:20, 71:4, 73:25, 74:1, 74:14, 74:15, 77:13, 77:16, 77:17, 78:1, 78:7, 79:2, 85:7, 85:24, 86:13, 86:14, 104:23, 105:11, 107:6, 107:7, 110:24, 111:21, 112:18, 114:10, 137:20, 150:9, 150:10, 151:10, 151:13, 152:1, 152:2, 152:23, 153:9, 153:16, 153:18, 153:22, 153:25, 154:7, 154:8, 166:20, 167:4, 167:7

**amounts** [20] - 57:16, 61:14, 61:19, 63:1, 63:5, 63:21, 67:17, 76:7, 76:15, 77:5, 78:14, 81:11, 90:19, 113:20, 146:20, 164:22, 170:1, 170:9, 170:17

**analysis** [21] - 60:16, 61:3, 63:4, 75:7, 75:12, 75:13, 77:9, 78:9, 79:13, 104:9, 104:20, 104:21, 105:1, 113:4, 134:12, 146:14, 150:3, 157:14, 161:17, 161:19, 176:10

**analyze** [13] - 57:7, 63:19, 63:22, 63:23, 65:12, 67:23, 70:9, 70:13, 71:18, 76:13, 85:10, 151:14, 164:9

**analyzed** [7] - 63:21, 63:25, 86:11, 91:14, 106:3, 110:15, 112:6

**analyzes** [1] - 70:17

**analyzing** [2] - 9:15, 111:10

**annual** [1] - 24:11

**answer** [13] - 92:1, 97:5, 106:17, 123:11, 129:6, 139:20, 140:1, 152:8, 152:10, 154:2, 154:9, 182:1, 182:6

**anticipate** [1] - 175:5

**anticipated** [1] - 180:10

**anyway** [1] - 52:24

**apart** [1] - 119:3

**API** [3] - 21:17, 21:19, 22:1

**APL** [2] - 20:6, 20:7

**apologize** [2] - 146:7, 151:16

**appear** [2] - 17:14, 71:10

**APPEARANCES** [1] - 1:11

**Appearances** [1] - 2:1

**appeared** [2] - 18:9, 91:21

**appearing** [1] - 198:14

**application** [1] - 109:25

**appreciate** [7] - 7:15, 8:13, 98:10, 125:9, 152:22, 177:10, 196:3

**approach** [3] - 6:1, 25:3, 93:12

**approached** [1] - 37:9

**appropriate** [3] - 125:10, 181:4, 188:12

**April** [12] - 16:20, 16:23, 17:12, 38:3, 38:11, 39:25, 87:4, 91:17, 92:16, 111:11, 113:3, 115:1

**area** [1] - 130:19

**arguably** [1] - 181:10

**argument** [1] - 96:8

**arguments** [1] - 52:25

**arise** [1] - 8:11

**arrived** [1] - 65:24

**arrow** [3] - 86:4, 132:13, 153:7

**arrows** [2] - 106:1, 113:25

**article** [5] - 38:13, 38:24, 39:5, 39:19, 39:22

**articles** [1] - 38:21

**articulate** [1] - 185:23

**aside** [3] - 101:13, 178:19, 183:18

**aspect** [2] - 24:25, 56:11

**aspects** [1] - 80:18

**assessment** [1] - 24:4

**assigned** [1] - 20:3

**assignment** [1] - 118:21

**assignments** [2] - 118:1, 118:4

**assistance** [1] - 57:1

**assisting** [1] - 56:10

**associated** [10] - 60:13, 61:19, 63:6, 73:11, 74:16, 77:5, 79:24, 91:18, 93:4, 172:5

**association** [1] - 73:4

**assume** [15] - 95:21, 117:23, 122:2, 126:13, 127:22, 127:24, 135:22, 138:21, 155:14, 156:3, 156:10, 158:11, 160:8, 161:11, 184:12

**assuming** [3] - 134:6, 134:10, 138:7, 142:3, 155:6, 155:15, 155:25, 162:15, 168:21

**assure** [2] - 35:21, 140:3

**Atlanta** [5] - 1:19, 2:4, 2:7, 109:24, 111:20

**attaching** [1] - 20:5

**attempt** [3] - 28:1, 58:4, 189:15

**attempted** [2] - 29:16, 58:1

**attempting** [1] - 188:25

**attention** [4] - 42:25, 113:16, 122:5, 177:14

**attorney** [5] - 32:4, 32:6, 32:10, 187:9, 193:4

**attorneys** [1] - 48:17

**audio** [8] - 20:4, 20:6,

20:10, 20:18, 20:24, 21:2, 21:6, 21:9

**August** [15] - 25:24, 64:23, 79:17, 93:5, 105:10, 109:12, 109:23, 112:11, 113:3, 123:9, 127:20, 128:16, 128:22, 148:13, 158:15

**Austin** [1] - 186:6

**authority** [4] - 114:20, 115:15, 122:25

**availability** [1] - 52:17

**available** [1] - 127:19, 127:23, 131:6, 137:5, 147:15, 148:2, 148:4, 148:6, 148:7, 162:16

**Avenue** [1] - 1:16

**average** [23] - 66:24, 67:7, 67:8, 67:9, 67:15, 74:4, 74:9, 165:18, 165:20, 168:18, 168:19, 168:21, 168:23, 169:1, 169:3, 169:6, 169:10, 169:14, 169:16, 170:19, 173:15

**averaged** [2] - 67:6, 186:8

**averages** [3] - 169:4, 169:5, 170:12

**averaging** [1] - 169:4

**avoid** [2] - 94:15, 97:16

**awarded** [1] - 100:13

**aware** [4] - 10:11, 47:4, 179:4, 187:6

**awkward** [1] - 12:9

**axis** [3] - 68:12, 69:3, 70:25

## B

**B-2** [1] - 22:18

**background** [7] - 11:8, 11:15, 11:18, 51:16, 55:24, 56:24, 105:2

**backwards** [1] - 151:12

**BAKER** [1] - 2:5

**balance** [3] - 103:18, 103:22, 106:16

**balances** [1] - 19:16

**ballpark** [4] - 80:16, 81:3, 102:1, 102:3

**bank** [9] - 55:18, 57:8, 57:12, 86:1, 103:13, 111:16, 112:7, 121:20

**banking** [6] - 78:14, 79:10, 80:13, 81:19, 86:15, 86:24, 87:7, 89:8, 104:12, 111:14, 119:12, 119:13, 124:8, 124:20, 128:9, 128:10

**bar** [15] - 62:9, 62:16, 62:24, 63:2, 63:3, 69:24, 73:20, 80:8, 152:19, 153:6, 153:7, 153:8, 164:23, 171:12

**barely** [1] - 69:25

**barrage** [1] - 39:6

**bars** [14] - 63:8, 69:15, 71:2, 71:4, 71:6, 71:8, 71:9, 71:10, 71:12, 71:14, 71:15, 171:13

**base** [1] - 53:3

**based** [10] - 81:15, 97:14, 126:13, 127:9, 136:11, 147:16, 161:18, 179:24, 180:1, 186:3

**baseline** [1] - 64:19

**basis** [2] - 136:19, 158:12

**bathroom** [1] - 129:23

**Bay** [1] - 85:1

**BB&T** [10] - 86:1, 107:12, 107:14, 107:16, 107:19, 109:4, 110:21, 113:18, 113:20, 114:19

**BBAR** [3] - 84:25, 85:4, 85:7

**Beach** [3] - 112:17, 112:19, 195:11

**BEACH** [1] - 1:2

**became** [1] - 161:20

**become** [4] - 29:5, 29:6, 35:15, 89:17

**BEFORE** [1] - 1:10

**beg** [1] - 182:8

**began** [2] - 39:25, 101:7

**begin** [5] - 9:25, 40:7, 51:17, 94:4, 175:1

**beginning** [6] - 9:12, 54:11, 78:5, 94:2, 176:12, 177:15

**behalf** [5] - 5:9, 5:11, 19:18, 102:5

**behind** [2] - 175:13, 191:24

**belaboring** [1] - 147:20

**belonging** [1] - 91:9

**beneficiaries** [23] - 63:20, 63:22, 64:23, 65:12, 66:1, 66:22, 67:6, 67:15, 69:4, 69:6, 69:18, 70:1, 129:15, 134:16, 135:3, 135:9, 135:11, 135:16, 136:10, 164:15, 164:16, 164:19, 166:18

**beneficiary** [13] - 6:15, 7:3, 39:6, 39:20, 66:25, 67:1, 74:25, 75:5, 97:2, 104:17, 137:19, 164:8, 169:23

**Beneficiary** [1] - 74:22

**benefit** [1] - 196:19

**Berarducci** [6] - 16:16, 17:2, 22:25, 23:4, 23:9, 34:9

**Bernadette** [1] - 126:17

**best** [1] - 97:11

**better** [1] - 164:5

**Better** [1] - 45:22

**betterhealthcare.com** [1] - 45:14, 45:16

**between** [24] - 7:7, 15:9, 20:1, 21:24, 22:22, 31:8, 34:20, 38:8, 39:25, 73:6, 84:5, 91:23, 105:9, 106:11, 107:23, 113:5, 114:1, 114:7, 123:23, 145:8, 146:23, 148:20, 157:19

**beyond** [2] - 121:22, 170:19

**BH-1** [6] - 4:11, 14:16, 14:20, 25:1, 25:8, 25:22

**BH-2** [4] - 4:11, 14:16, 14:20, 22:19

**big** [3] - 46:10, 118:10, 164:7

**biggest** [1] - 79:19

**bill** [10] - 69:13, 76:9, 143:2, 151:20, 152:1, 153:22, 154:8, 169:2, 169:10, 169:11

**billed** [108] - 47:21, 47:23, 57:17, 60:15, 61:9, 61:14, 61:19, 62:13, 62:25, 63:1, 63:4, 63:11, 63:14, 63:20, 63:21, 66:6, 66:8, 66:9, 66:15, 66:21, 67:10, 67:12, 67:17, 67:19, 67:21, 69:2, 69:10, 69:19, 69:21, 71:4, 73:18, 73:25, 74:3, 74:14, 75:4, 75:16, 75:17, 75:19, 75:21, 76:7, 76:11, 76:15, 77:1, 77:7, 77:12, 77:22, 78:6, 100:17, 101:8, 101:18, 101:19, 116:18, 135:3, 136:18, 136:21, 136:22, 137:19, 137:20, 138:25, 140:3, 140:6, 141:8, 142:7, 143:4, 150:20, 151:5, 151:14, 151:15, 152:17, 152:25, 153:10, 153:18, 153:25, 158:16, 160:17, 160:18, 161:2, 161:6, 162:13, 162:17, 162:18, 163:16, 164:2, 164:15, 164:21, 164:25, 165:13, 165:18, 165:19, 166:7, 166:20, 166:25, 168:16, 170:13, 170:17, 171:15, 171:16, 171:17, 171:18, 172:11, 172:25, 173:13, 173:14, 173:16

**billing** [43] - 59:10, 59:11, 59:12, 60:9, 61:5, 65:5, 65:9, 70:13, 70:17, 70:23, 71:1, 71:7, 71:18, 73:2, 73:5, 74:24, 74:25, 77:16, 79:8, 80:13, 80:17, 138:19, 138:24, 139:12, 139:14, 150:9, 151:7, 151:8, 151:9, 151:13, 151:25, 153:10, 153:15, 161:14, 162:7, 164:6, 165:4, 165:7, 165:9,

165:14, 168:18, 186:8

**billings** [7] - 61:20, 62:12, 72:18, 76:25, 77:3, 77:24, 172:14

**bills** [2] - 70:10, 169:21

**bit** [30] - 9:7, 9:18, 51:14, 52:8, 53:16, 55:24, 69:6, 72:13, 94:21, 96:5, 100:8, 103:1, 104:10, 105:13, 106:23, 109:25, 140:15, 146:6, 153:11, 167:4, 174:14, 174:19, 175:14, 180:21, 184:17, 185:7, 185:10, 187:16, 196:19

**black** [2] - 107:5, 107:23

**bladder** [4] - 44:21, 45:3, 47:14

**blaming** [1] - 187:2

**blew** [1] - 193:17

**blood** [1] - 44:19

**blow** [1] - 15:14

**blown** [1] - 193:12

**blue** [32] - 21:23, 23:6, 62:16, 62:18, 62:19, 63:7, 63:8, 68:24, 69:24, 71:2, 71:4, 71:8, 71:9, 71:14, 71:15, 71:16, 73:20, 79:19, 80:5, 160:2, 160:6, 160:10, 172:4, 172:10, 172:16, 172:18, 172:19, 173:3, 173:5, 173:9, 173:10

**Blue** [5] - 21:18, 21:20, 22:1, 22:5, 22:7

**Boca** [3] - 112:22, 113:1, 113:2

**Boer** [6] - 10:18, 95:20, 96:25, 115:25, 178:21, 179:18

**BOER** [113] - 1:13, 3:4, 3:9, 3:10, 3:11, 5:13, 5:24, 6:7, 6:9, 6:11, 6:14, 6:18, 7:5, 7:14, 7:21, 8:15, 8:20, 10:23, 11:7, 11:10, 12:5, 13:16, 14:17, 15:5, 16:9, 30:25, 31:4, 37:6, 37:7, 41:1, 41:3, 51:9, 52:7, 52:21, 53:8, 53:19, 54:6, 54:9, 55:1, 55:11, 58:15, 59:4, 61:21, 62:4, 62:7, 64:1, 64:6, 64:9, 70:3, 70:8, 71:23, 72:4, 72:10, 78:18, 78:24, 81:24, 82:10, 82:14, 82:17, 82:19, 83:12, 83:23, 84:8, 84:11, 85:15, 85:20, 88:3, 88:10, 88:13, 90:22, 91:3, 93:12, 93:16, 93:20, 95:24, 96:10, 96:14, 97:3, 98:23, 99:11, 99:24, 99:25, 102:16, 102:20, 102:23, 115:20, 115:23, 126:7, 129:20,

133:7, 133:12, 152:5, 158:3, 158:7, 163:5, 163:14, 167:17, 167:20, 168:5, 170:25, 171:2, 171:7, 171:23, 171:24, 173:12, 173:21, 174:5, 174:7, 174:9, 178:24, 196:8, 197:12, 198:18

**bore** [1] - 103:20

**boring** [1] - 118:11

**bottles** [3] - 112:17, 156:11, 156:15

**bottom** [23] - 10:9, 15:14, 31:12, 63:13, 67:18, 68:12, 70:25, 73:16, 74:10, 75:4, 76:9, 86:5, 86:15, 86:23, 92:14, 109:14, 111:22, 127:14, 131:2, 168:21, 169:6

**bought** [1] - 156:11

**Boulevard** [2] - 1:23, 199:10

**box** [4] - 62:19, 113:12, 115:2, 158:25

**boxes** [2] - 6:21, 68:10

**boy** [1] - 131:23

**break** [30] - 6:19, 7:4, 7:12, 9:8, 10:24, 11:16, 12:2, 13:13, 50:25, 51:12, 52:9, 53:5, 53:7, 54:21, 58:12, 93:25, 94:22, 95:2, 95:15, 98:14, 98:19, 98:22, 99:18, 119:10, 130:1, 130:7, 145:17, 170:2, 176:22, 198:1

**breakdown** [1] - 157:19

**breaking** [1] - 11:2

**breast** [2] - 49:7, 75:13

**BRETT** [1] - 3:3

**Brett** [4] - 87:16, 87:20, 89:1, 89:25

**Brian** [1] - 48:17

**BRIAN** [1] - 2:5

**brief** [7] - 41:11, 51:3, 53:10, 95:15, 130:1, 173:25, 179:21

**briefly** [6] - 44:17, 93:12, 170:25, 179:6, 188:7, 193:5

**bring** [14] - 8:2, 10:8, 10:19, 51:3, 53:15, 84:10, 151:7, 184:10, 185:23, 189:15, 190:21, 192:5, 192:14, 195:22

**brings** [4] - 152:23, 153:9, 154:8, 175:21

**broad** [2] - 57:6, 119:10

**broke** [1] - 14:1

**brought** [2] - 154:6, 192:10

**Broward** [2] - 1:23, 199:10

**bucket** [2] - 62:18, 79:19, 80:4, 80:5

**buckets** [2] - 62:15, 79:18

**buffer** [1] - 21:23

**built** [1] - 57:21

**bulk** [1] - 65:9

**bullet** [2] - 35:19, 36:1

**bunch** [1] - 165:25

**bus** [1] - 17:25

**business** [4] - 54:9, 81:9, 155:7, 156:1

**businesses** [1] - 55:20

**bust** [2] - 34:15, 34:17

**busted** [1] - 40:2

**buying** [1] - 55:20

**BY** [67] - 1:20, 3:3, 3:4, 3:6, 3:6, 3:7, 3:9, 3:9, 3:10, 3:10, 3:11, 14:8, 14:22, 15:8, 15:15, 15:21, 16:14, 22:20, 25:5, 25:21, 30:9, 31:4, 37:7, 42:11, 48:14, 50:6, 55:11, 59:4, 62:7, 64:9, 70:8, 72:10, 78:24, 82:10, 82:19, 83:23, 84:11, 85:20, 88:13, 91:3, 99:25, 102:23, 116:4, 126:12, 130:17, 130:23, 131:22, 132:7, 133:16, 134:19, 138:1, 138:11, 140:16, 142:15, 142:23, 143:25, 147:7, 148:11, 148:19, 150:19, 152:21, 158:10, 163:14, 168:12, 171:7, 171:24, 173:12

---

**C**

**camera** [1] - 27:14

**Cancer** [1] - 38:13

**cancer** [48] - 23:15, 23:22, 24:4, 33:18, 39:15, 43:2, 43:10, 43:13, 44:15, 44:20, 44:23, 45:5, 46:22, 47:13, 47:14, 48:22, 48:25, 49:3, 49:5, 49:7, 49:8, 49:9, 50:7, 59:11, 60:9, 61:11, 73:13, 75:2, 75:13, 137:6, 137:8, 137:11, 138:2, 138:12, 138:13, 139:2, 142:16, 142:17, 158:16, 158:17, 159:6, 159:10, 159:12, 159:18, 160:5, 160:9, 186:11

**cancers** [2] - 47:9, 76:5

**cannot** [6] - 94:12, 126:21, 127:7, 127:8, 154:2, 191:3

**capable** [1] - 122:15

**capture** [2] - 182:17, 182:25

**car** [3] - 109:20, 110:2, 110:12

**card** [5] - 112:3, 112:8, 114:18, 114:19, 114:24

**cards** [3] - 43:8, 45:19, 112:25

**care** [5] - 75:20, 191:21, 191:24, 197:7, 197:21
**carefully** [1] - 12:8
**CASE** [1] - 1:2
**case** [54] - 5:3, 5:20, 40:19, 40:22, 44:24, 52:21, 56:11, 81:13, 85:11, 94:5, 94:12, 95:4, 96:19, 96:24, 97:11, 97:21, 97:23, 98:16, 100:12, 100:14, 100:21, 100:22, 101:1, 101:5, 101:8, 101:11, 101:13, 102:15, 103:1, 103:7, 103:24, 116:25, 117:6, 117:16, 117:19, 119:9, 119:10, 120:3, 120:10, 120:22, 121:11, 140:3, 147:3, 155:19, 155:20, 174:21, 175:1, 175:2, 175:4, 175:11, 175:16, 175:24, 176:5
**case-in-chief** [3] - 5:20, 52:21, 98:16
**cases** [4] - 101:23, 102:2, 117:8, 120:12
**casework** [2] - 118:13, 118:17
**cashier's** [4] - 111:6, 111:7, 111:25, 121:17
**categories** [4] - 57:6, 61:6, 61:20, 119:10
**categorized** [2] - 62:15, 79:18
**Category** [2] - 57:14, 57:15
**caught** [1] - 180:2
**causing** [1] - 74:11
**caution** [1] - 178:18
**cautious** [1] - 9:1
**caveat** [1] - 133:24
**caveats** [1] - 184:15
**cell** [2] - 44:19, 90:8
**cells** [1] - 44:23
**center** [14] - 15:18, 16:1, 17:3, 17:6, 17:11, 19:22, 20:10, 20:21, 31:13, 32:3, 32:17, 33:1, 33:11, 34:10
**centers** [1] - 18:10
**certain** [11] - 76:15, 81:16, 98:11, 98:13, 103:15, 112:12, 112:15, 125:24, 146:17, 157:15, 177:21
**certainly** [19] - 9:3, 9:7, 9:22, 10:8, 20:9, 51:19, 51:22, 94:5, 96:18, 97:21, 98:1, 98:11, 176:8, 178:13, 183:6, 183:8, 191:17, 192:1, 192:19
**certifications** [1] - 55:25
**certified** [2] - 56:4
**certify** [1] - 199:3
**cetera** [2] - 18:14, 95:4

**CGx** [64] - 59:16, 60:2, 60:16, 61:6, 62:16, 63:7, 63:18, 64:18, 64:19, 64:23, 65:15, 66:7, 66:10, 66:13, 66:15, 66:21, 66:22, 67:8, 67:10, 67:19, 67:24, 68:18, 68:21, 68:24, 69:8, 69:10, 70:22, 70:23, 74:4, 77:1, 77:3, 77:7, 77:11, 77:12, 77:16, 77:23, 77:24, 78:2, 78:6, 135:5, 135:11, 143:3, 150:20, 150:22, 158:20, 158:21, 163:17, 164:15, 164:25, 165:1, 165:4, 165:7, 165:11, 165:19, 172:2, 172:3, 172:10, 172:13, 172:25, 173:1, 173:10
**chain** [3] - 31:12, 31:17, 38:8
**chairs** [1] - 51:2
**champagne** [2] - 156:16, 156:20, 156:22
**chance** [7] - 5:23, 177:23, 177:25, 178:8, 192:4, 193:17, 194:5
**change** [1] - 183:6
**changes** [2] - 22:8, 53:23
**channels** [1] - 94:17
**characterization** [1] - 187:17
**characterize** [1] - 71:16
**characterized** [1] - 182:13
**charge** [2] - 40:17, 146:23
**charged** [2] - 113:1, 113:2
**charges** [1] - 112:2
**chart** [91] - 61:13, 64:15, 65:1, 68:1, 68:11, 68:12, 69:1, 69:8, 69:11, 69:16, 69:20, 70:17, 70:20, 73:8, 73:20, 73:23, 74:2, 75:23, 75:24, 80:8, 81:11, 82:25, 84:4, 84:15, 84:16, 88:25, 89:2, 105:7, 107:4, 114:7, 125:22, 126:13, 127:1, 127:4, 127:6, 127:8, 127:15, 128:20, 128:24, 130:24, 131:2, 135:2, 136:2, 141:7, 141:9, 141:21, 141:22, 142:1, 142:3, 142:10, 142:21, 142:24, 143:7, 143:15, 144:4, 144:5, 144:6, 144:7, 144:8, 144:9, 144:11, 146:11, 146:16, 146:19, 150:9, 150:14, 150:16, 151:3, 152:20, 153:2, 153:5, 154:3, 157:17, 158:11, 158:18, 158:20, 158:25, 159:4, 162:23, 163:24, 164:24, 165:16, 171:12, 171:19, 172:1, 172:2

**chart..** [1] - 127:5
**charts** [20] - 58:8, 68:10, 71:21, 74:17, 118:25, 119:1, 119:4, 119:6, 125:25, 127:21, 128:12, 136:3, 140:8, 140:10, 144:17, 146:21, 156:25, 162:12, 163:21, 187:23
**Chase** [2] - 107:19, 113:12
**check** [9] - 5:8, 8:14, 43:18, 52:4, 95:3, 111:6, 111:7, 111:25, 121:17
**checked** [1] - 43:19
**checking** [1] - 114:21
**checks** [5] - 19:16, 57:9, 121:16, 184:5
**chemo** [1] - 45:2
**chief** [5] - 5:20, 52:21, 98:16
**choice** [4] - 155:8, 155:11, 155:13, 155:14
**choose** [2] - 143:22, 155:8
**chooses** [2] - 155:9, 156:1
**chop** [1] - 80:20
**chose** [4] - 144:10, 147:12, 147:14, 155:12
**chromosomes** [2] - 44:9, 44:13
**chronology** [1] - 26:1
**chunk** [2] - 80:23, 177:4
**cigarette** [1] - 27:11
**circle** [4] - 173:5, 173:10, 198:9
**cites** [1] - 185:2
**claim** [16] - 58:1, 72:20, 72:21, 72:23, 73:3, 73:10, 73:12, 74:22, 74:23, 75:25, 76:4, 76:23, 77:11, 78:6, 157:11, 159:18
**claimed** [1] - 186:5
**claims** [17] - 57:16, 57:19, 57:23, 58:9, 59:9, 59:24, 61:5, 65:6, 76:2, 102:11, 119:11, 140:6, 153:13, 162:17, 166:7
**clarification** [2] - 151:21, 173:7
**clarify** [4] - 64:25, 65:4, 111:9, 181:14
**classified** [2] - 66:21, 81:13
**classify** [5] - 61:5, 80:2, 80:3, 81:16, 81:19
**clear** [6] - 19:22, 80:5, 92:7, 185:1, 188:20, 195:5
**clearly** [4] - 21:8, 119:20, 127:19, 187:12
**click** [1] - 132:13
**clients** [1] - 56:10
**Clinical** [1] - 24:11
**clip** [1] - 28:17

**close** [3] - 80:19, 134:2, 195:24
**closer** [2] - 53:2, 152:18
**closing** [2] - 192:20, 193:24
**clue** [1] - 8:23
**code** [46] - 60:2, 60:3, 60:12, 60:14, 60:15, 61:1, 67:5, 69:2, 69:13, 69:21, 69:22, 69:24, 73:17, 73:24, 75:3, 75:16, 75:17, 136:10, 137:18, 138:19, 139:12, 140:2, 150:22, 151:6, 157:9, 157:10, 158:24, 159:15, 159:17, 164:17, 165:14, 165:23, 168:22, 168:23, 169:3, 169:11, 171:8, 172:11, 172:23, 173:3, 173:10, 173:13
**codes** [111] - 31:19, 31:20, 31:22, 31:23, 32:1, 59:10, 59:11, 59:12, 59:18, 59:20, 59:23, 60:9, 60:17, 60:23, 67:9, 67:12, 67:24, 68:13, 68:16, 68:18, 68:19, 68:24, 69:16, 69:17, 69:19, 73:11, 73:21, 76:6, 120:13, 120:17, 135:24, 136:14, 137:21, 139:14, 141:7, 141:8, 142:7, 142:8, 142:11, 143:6, 143:7, 143:18, 150:10, 150:21, 153:16, 153:18, 157:3, 157:7, 157:15, 158:12, 158:13, 158:23, 164:19, 164:21, 165:1, 165:4, 165:7, 165:9, 165:11, 165:13, 166:1, 166:13, 166:16, 168:9, 168:13, 168:14, 169:2, 169:3, 169:5, 169:7, 169:10, 169:14, 169:15, 169:16, 169:23, 170:13, 170:17, 171:9, 171:10, 171:11, 171:12, 171:15, 171:16, 172:2, 172:3, 172:6, 172:8, 172:11, 172:13, 172:16, 172:19, 172:20, 172:22, 172:23, 172:25, 173:3, 173:4, 173:9, 173:11, 173:14, 173:16, 173:18
**Codes** [3] - 120:16, 157:2, 157:15
**coding** [1] - 56:24
**coffee** [1] - 88:10
**coli** [1] - 75:8
**collectively** [1] - 139:19
**colors** [1] - 68:23
**column** [7] - 64:13, 66:11, 66:18, 67:14, 73:25, 135:7, 168:24
**Column** [3] - 129:22, 131:21, 132:12

**Columns** [1] - 135:7

**columns** [3] - 64:14, 92:2, 164:23

**combination** [1] - 60:15

**combined** [2] - 77:22, 169:7

**comfortable** [9] - 9:11, 11:13, 12:21, 12:23, 13:9, 19:17, 177:7, 183:12, 189:24

**coming** [11] - 9:13, 11:11, 37:25, 98:13, 98:19, 104:13, 104:15, 113:21, 118:19, 169:21, 198:14

**commissions** [1] - 29:3

**committing** [3] - 18:11, 34:24, 35:3

**common** [1] - 45:9

**communicated** [1] - 195:12

**communication** [2] - 51:23, 95:11

**communications** [1] - 12:13

**companies** [11] - 57:13, 79:23, 81:16, 81:21, 82:21, 83:9, 83:10, 186:16, 186:19, 186:23

**company** [20] - 21:24, 23:20, 24:3, 46:2, 46:4, 84:2, 100:12, 100:13, 101:8, 101:18, 101:19, 116:10, 186:5, 186:18, 186:20, 186:24, 187:2, 188:18, 188:21

**company's** [1] - 187:7

**compared** [1] - 71:10

**compelled** [1] - 9:2

**compensation** [2] - 105:20, 134:9

**compiled** [1] - 88:16

**complete** [5] - 9:20, 14:4, 95:18, 96:4, 124:22

**completed** [1] - 21:18

**completely** [2] - 52:18, 183:18

**compliance** [3] - 31:18, 187:21, 193:3

**compliant** [8] - 15:19, 16:2, 16:4, 17:16, 31:14, 32:3, 35:23

**compliant..** [2] - 19:3, 19:8

**complicated** [4] - 146:14, 161:10, 181:8, 181:11

**composites** [1] - 87:7

**comprehensive** [1] - 78:15

**computers** [1] - 56:24

**concealing** [1] - 193:8

**concentration** [1] - 177:11

**concern** [10] - 9:19, 11:19, 41:20, 51:22, 182:25, 187:4, 187:15, 191:23, 192:15,
197:21

**concerned** [8] - 9:3, 35:15, 39:22, 118:17, 181:20, 186:15, 187:10, 197:9

**concerns** [10] - 5:10, 6:5, 10:8, 12:15, 17:25, 36:22, 40:2, 97:16, 99:9, 179:5

**concerns..** [1] - 22:12

**conclude** [1] - 174:21

**concludes** [2] - 22:11, 174:13

**conclusion** [1] - 96:7

**conduct** [3] - 94:17, 121:6, 179:21

**conducted** [2] - 32:17, 102:15

**conducting** [1] - 186:6

**confident** [1] - 97:15

**confined** [2] - 122:23, 176:14

**confirm** [10] - 24:3, 174:3, 180:16, 181:16, 181:19, 182:21, 183:11, 183:12, 191:14, 196:24

**confirmed** [1] - 5:13

**confirming** [1] - 20:4

**confronted** [1] - 183:9

**confused** [2] - 146:6, 194:24

**connected** [1] - 91:8

**connection** [8] - 91:24, 92:1, 92:6, 92:23, 93:7, 100:12, 145:8

**conservative** [2] - 104:21, 104:22

**consider** [5] - 50:7, 81:18, 116:22, 116:23, 191:2

**considered** [1] - 60:16

**considering** [1] - 104:24

**consistency** [1] - 193:7

**consistent** [1] - 188:4

**constant** [1] - 39:6

**consultations** [3] - 18:13, 35:5, 35:14

**consulting** [4] - 55:21, 55:22, 56:17, 57:1

**contact** [10] - 7:19, 26:14, 41:18, 45:17, 46:4, 134:6, 134:8, 145:13, 147:17, 180:6

**contacted** [1] - 41:16

**contain** [1] - 87:7

**contains** [2] - 164:2, 172:4

**contemplating** [1] - 97:20

**context** [7] - 179:23, 184:17, 185:8, 186:3, 187:10, 187:13, 188:25

**contextual** [2] - 186:15, 187:4

**continue** [9] - 8:7, 11:10, 73:7, 94:9, 94:12, 94:16,
130:14, 175:22, 176:16

**continued** [1] - 2:1

**CONTINUED** [2] - 3:3, 14:7

**continues** [4] - 8:7, 20:2, 59:22, 96:12

**continuing** [1] - 66:18

**contract** [3] - 101:8, 101:22, 118:8

**contractors** [1] - 139:25

**contracts** [7] - 100:8, 100:13, 100:15, 100:16, 101:20, 116:14, 118:11

**control** [1] - 115:17

**conversation** [6] - 38:17, 117:18, 162:1, 162:19, 162:24, 176:21

**conversations** [4] - 27:23, 145:5, 147:24, 149:4

**convincing** [1] - 39:11

**cooperating** [5] - 14:13, 25:23, 28:21, 37:11, 40:7

**copies** [1] - 121:15

**copresident** [2] - 56:6, 56:7

**copy** [6] - 25:6, 33:11, 103:3, 111:25, 188:11, 193:2

**corner** [3] - 88:19, 172:4, 173:9

**corners** [1] - 176:15

**correct** [306] - 12:16, 15:11, 16:2, 16:16, 16:18, 16:19, 16:20, 16:21, 16:24, 17:4, 17:5, 17:7, 17:16, 18:7, 18:8, 18:15, 18:16, 18:20, 18:23, 18:24, 19:1, 19:2, 19:4, 19:6, 19:7, 19:13, 19:14, 19:20, 19:21, 19:25, 20:1, 20:5, 20:11, 20:21, 20:22, 21:10, 21:13, 21:14, 21:16, 22:9, 22:15, 22:16, 22:25, 23:1, 23:4, 23:5, 23:6, 23:7, 23:9, 23:10, 24:2, 24:5, 24:6, 24:9, 24:13, 24:14, 24:16, 24:17, 24:18, 24:19, 26:3, 26:4, 26:7, 26:10, 26:11, 26:20, 29:10, 29:13, 29:14, 29:20, 30:11, 30:12, 31:9, 32:14, 33:7, 33:12, 33:13, 33:15, 33:18, 33:19, 34:10, 34:11, 34:22, 35:17, 37:9, 37:10, 37:12, 37:13, 37:19, 37:20, 37:22, 38:5, 38:9, 38:10, 38:17, 39:20, 39:21, 51:9, 52:15, 60:5, 60:10, 60:11, 60:14, 62:25, 63:1, 63:21, 65:13, 65:16, 66:17, 67:11, 68:22, 68:23, 69:13, 69:14, 69:17, 74:6, 74:9, 76:20, 79:3, 80:7, 81:17, 83:9, 85:14, 87:21, 87:22, 89:4, 89:14, 89:18, 90:3, 91:6,
91:10, 91:19, 96:14, 97:3, 100:23, 101:12, 106:2, 108:8, 108:9, 108:12, 110:3, 110:5, 110:14, 111:12, 114:6, 114:14, 115:7, 115:8, 115:10, 116:7, 116:8, 116:11, 116:19, 116:20, 116:21, 117:1, 117:2, 117:9, 117:24, 118:22, 119:23, 119:24, 120:14, 120:23, 122:3, 122:14, 122:24, 123:18, 124:10, 124:11, 124:19, 124:21, 124:24, 125:21, 126:15, 126:16, 126:18, 126:19, 126:25, 127:11, 127:21, 128:9, 128:14, 128:17, 129:11, 129:12, 129:16, 130:25, 131:1, 131:4, 131:5, 131:7, 131:8, 133:17, 134:22, 134:23, 134:24, 135:10, 135:11, 135:14, 135:19, 135:20, 136:23, 136:24, 137:6, 137:7, 137:9, 137:11, 137:19, 138:4, 138:5, 138:6, 138:15, 138:16, 139:2, 139:3, 139:6, 139:14, 141:8, 142:4, 142:5, 142:8, 142:25, 143:1, 144:14, 144:16, 144:22, 144:23, 145:3, 146:12, 147:4, 147:5, 147:10, 147:11, 147:18, 147:19, 147:24, 148:3, 148:13, 148:14, 148:15, 148:16, 148:22, 149:4, 149:7, 149:9, 149:10, 149:12, 149:13, 150:5, 150:22, 150:25, 152:24, 153:10, 153:17, 153:19, 153:20, 154:1, 154:8, 154:9, 154:10, 155:8, 155:13, 155:17, 155:24, 156:2, 156:6, 156:7, 156:9, 157:4, 157:17, 157:18, 157:21, 158:17, 159:11, 159:22, 160:7, 162:14, 162:15, 163:23, 164:4, 164:11, 164:16, 165:5, 165:6, 165:15, 166:11, 166:12, 167:2, 167:3, 167:13, 167:15, 168:15, 168:17, 168:19, 168:20, 168:22, 169:3, 170:11, 170:14, 170:20, 172:17, 174:4, 174:5, 175:18

**correctly** [4] - 116:17, 134:20, 144:24, 172:15

**correspond** [1] - 71:21

**corresponding** [3] - 67:20, 77:13, 86:15

**corresponds** [3] - 61:2,

63:7, 69:7
**Counsel** [3] - 48:10,
152:11, 185:5
**counsel** [16] - 107:16,
116:1, 117:18, 117:20,
117:21, 117:22, 118:19,
118:22, 120:8, 120:11,
120:21, 120:23, 121:5,
121:8, 121:14
**counselor** [1] - 46:25
**count** [3] - 40:15, 90:19,
175:18
**Count** [2] - 86:13, 87:1
**counted** [3] - 67:2, 67:5,
134:3
**counting** [2] - 68:19, 69:4
**country** [1] - 34:1
**counts** [4] - 76:14, 159:2,
170:5, 170:6
**Counts** [2] - 135:17, 140:12
**County** [1] - 195:11
**couple** [6] - 14:11, 36:18,
38:20, 116:9, 174:17, 184:14
**course** [17] - 5:25, 37:15,
58:7, 64:21, 65:22, 82:8,
93:25, 94:14, 95:4, 95:10,
108:7, 162:3, 175:20,
175:21, 176:2, 176:17, 181:4
**court** [8] - 8:2, 41:24,
93:21, 101:23, 174:11,
183:20, 185:13, 195:7
**COURT** [170] - 1:1, 5:2,
5:16, 6:4, 6:8, 6:10, 6:13,
6:17, 7:2, 7:6, 7:20, 8:9,
8:19, 8:24, 10:15, 11:1, 11:9,
11:12, 12:1, 12:6, 12:18,
13:8, 13:11, 13:15, 13:17,
13:21, 13:23, 14:18, 15:6,
16:10, 25:4, 25:19, 30:24,
31:1, 37:5, 41:2, 41:5, 41:8,
41:12, 41:14, 41:16, 41:23,
41:25, 48:10, 50:3, 50:21,
51:4, 51:6, 51:10, 52:15,
52:22, 53:9, 53:11, 53:14,
53:20, 54:2, 54:5, 54:8,
54:12, 54:14, 54:16, 55:3,
58:20, 58:22, 61:23, 62:2,
64:4, 70:5, 72:1, 78:20, 82:3,
82:7, 82:9, 82:16, 83:19,
85:17, 88:6, 88:9, 90:25,
93:13, 93:15, 93:18, 93:22,
95:9, 96:1, 96:11, 96:15,
97:8, 97:10, 98:24, 99:2,
99:7, 99:12, 99:14, 99:15,
99:17, 102:19, 115:21,
115:25, 126:8, 129:24,
130:4, 130:6, 130:10,
130:12, 133:11, 133:14,
152:8, 152:14, 158:8, 163:1,
163:3, 163:9, 167:18,

167:24, 168:3, 168:6,
168:10, 170:24, 171:1,
171:4, 173:22, 173:25,
174:3, 174:6, 174:8, 174:10,
174:12, 178:7, 179:1, 179:9,
180:2, 180:7, 180:11,
180:25, 181:10, 181:14,
181:23, 182:3, 182:8, 183:5,
183:24, 184:1, 184:4, 184:9,
185:20, 187:15, 188:23,
189:23, 190:10, 190:16,
190:21, 191:5, 192:3, 192:9,
192:13, 193:11, 194:22,
195:14, 195:18, 196:2,
196:7, 196:15, 196:18,
197:6, 197:17, 197:24,
198:8, 198:17, 198:19
**Court** [19] - 1:22, 1:23, 5:1,
8:13, 8:23, 53:12, 53:22,
99:5, 130:8, 173:7, 179:20,
180:3, 185:25, 188:12,
191:2, 196:3, 198:20, 199:9,
199:9
**Court's** [5] - 25:2, 180:5,
180:7, 183:17, 189:8
**courtesy** [1] - 180:22
**COURTROOM** [4] - 42:2,
42:4, 55:5, 55:7
**courtroom** [3] - 116:7,
143:10, 176:15
**cover** [1] - 192:5
**covered** [2] - 162:8, 195:2
**covers** [1] - 43:17
**create** [13] - 58:8, 61:4,
61:13, 68:1, 71:21, 74:17,
78:14, 90:17, 123:19,
146:16, 159:4, 163:24
**created** [6] - 61:18, 68:11,
72:16, 125:25, 152:15,
171:19
**creating** [1] - 187:19
**credit** [1] - 112:8
**criminal** [3] - 101:23, 102:6,
102:8
**CRIMINAL** [1] - 1:15
**critical** [2] - 175:2, 176:5
**CROSS** [6] - 3:3, 3:6, 3:9,
14:7, 48:13, 116:3
**cross** [24] - 5:5, 5:6, 6:25,
7:1, 7:8, 9:21, 13:2, 14:2,
14:4, 48:11, 52:11, 95:22,
96:3, 116:1, 130:14, 181:6,
184:22, 187:13, 188:8,
188:9, 192:5, 193:14, 194:4,
196:11
**CROSS-EXAMINATION** [6]
- 3:3, 3:6, 3:9, 14:7, 48:13,
116:3
**cross-examination** [11] -
5:5, 5:6, 9:21, 13:2, 14:2,

14:4, 48:11, 96:3, 116:1,
187:13, 194:4
**cross-examine** [1] - 188:8
**cross-examining** [1] -
188:9
**CRR** [2] - 1:21, 199:8
**cup** [1] - 49:15
**cure** [1] - 195:23
**curing** [1] - 194:1
**current** [10] - 23:24, 158:25,
159:5, 159:10, 159:18,
159:25, 160:5, 160:9,
160:15, 160:22
**custody** [1] - 115:17
**customer's** [1] - 111:21
**cut** [3] - 65:14, 121:2,
146:14
**cut-and-dry** [1] - 146:14
**cutting** [1] - 6:11
**Cuyler** [1] - 42:9
**CUYLER** [9] - 1:14, 3:6, 3:7,
42:1, 42:7, 42:11, 48:8, 50:6,
50:20
**Cuyler's** [1] - 196:8

---

**D**

**D.C** [1] - 1:16
**D.N** [1] - 77:18
**dangling** [2] - 192:25,
193:23
**dark** [5] - 160:10, 172:4,
172:16, 172:18, 173:9
**data** [49] - 18:14, 20:5,
23:21, 24:10, 35:6, 56:22,
56:24, 57:16, 57:19, 58:9,
59:9, 59:24, 61:5, 65:1, 65:6,
65:12, 65:15, 67:24, 70:9,
72:21, 73:2, 79:8, 80:13,
80:14, 90:8, 102:11, 102:12,
119:6, 119:7, 119:11,
119:25, 120:2, 120:6, 121:8,
122:20, 133:23, 137:6,
143:16, 143:19, 147:15,
147:16, 153:13, 154:14,
164:6, 165:5, 171:11, 177:23
**data/claims** [1] - 80:13
**database** [9] - 57:22, 57:23,
78:14, 81:19, 87:11, 87:25,
88:1, 123:13, 123:14
**dataset** [2] - 92:11, 154:5
**date** [30] - 23:2, 66:4, 66:5,
72:23, 74:15, 75:25, 76:24,
79:8, 86:13, 89:18, 90:12,
92:25, 108:14, 108:16,
108:17, 109:22, 111:9,
111:18, 114:9, 115:1, 145:1,
147:8, 147:12, 147:14,
147:15, 149:6, 166:8,
183:22, 190:8

14:4, 48:11, 96:3, 116:1,
187:13, 194:4
**cross-examine** [1] - 188:8
**cross-examining** [1] -
188:9
**CRR** [2] - 1:21, 199:8
**cup** [1] - 49:15
**cure** [1] - 195:23
**curing** [1] - 194:1
**current** [10] - 23:24, 158:25,
159:5, 159:10, 159:18,
159:25, 160:5, 160:9,
160:15, 160:22
**custody** [1] - 115:17
**customer's** [1] - 111:21
**cut** [3] - 65:14, 121:2,
146:14
**cut-and-dry** [1] - 146:14
**cutting** [1] - 6:11
**Cuyler** [1] - 42:9
**CUYLER** [9] - 1:14, 3:6, 3:7,
42:1, 42:7, 42:11, 48:8, 50:6,
50:20
**Cuyler's** [1] - 196:8

**DATE** [1] - 199:8
**dated** [1] - 16:20
**dates** [7] - 65:19, 65:25,
66:9, 77:20, 89:22, 92:12,
162:22
**days** [3] - 36:18, 65:19,
97:16
**DE** [113] - 1:13, 3:4, 3:9,
3:10, 3:11, 5:13, 5:24, 6:7,
6:9, 6:11, 6:14, 6:18, 7:5,
7:14, 7:21, 8:15, 8:20, 10:23,
11:7, 11:10, 12:5, 13:16,
14:17, 15:5, 16:9, 30:25,
31:4, 37:6, 37:7, 41:1, 41:3,
51:9, 52:7, 52:21, 53:8,
53:19, 54:6, 54:9, 55:1,
55:11, 58:15, 59:4, 61:21,
62:4, 62:7, 64:1, 64:6, 64:9,
70:3, 70:8, 71:23, 72:4,
72:10, 78:18, 78:24, 81:24,
82:10, 82:14, 82:17, 82:19,
83:12, 83:23, 84:8, 84:11,
85:15, 85:20, 88:3, 88:10,
88:13, 90:22, 91:3, 93:12,
93:16, 93:20, 95:24, 96:10,
96:14, 97:3, 98:23, 99:11,
99:24, 99:25, 102:16,
102:20, 102:23, 115:20,
115:23, 126:7, 129:20,
133:7, 133:12, 152:5, 158:3,
158:7, 163:5, 163:14,
167:17, 167:20, 168:5,
170:25, 171:2, 171:7,
171:23, 171:24, 173:12,
173:21, 174:5, 174:7, 174:9,
178:24, 196:8, 197:12,
198:18
**de** [6] - 10:18, 95:20, 96:25,
115:25, 178:21, 179:18
**deal** [4] - 24:24, 63:25,
118:13, 192:13
**dealership** [1] - 109:24
**dealing** [1] - 26:17
**deals** [3] - 97:2, 144:21,
168:8
**dealt** [1] - 128:14
**December** [2] - 1:4, 86:21
**decide** [7] - 8:22, 60:2,
141:4, 142:1, 184:10, 186:2,
198:5
**decision** [11] - 50:8, 50:10,
141:14, 141:16, 141:19,
141:24, 156:1, 156:4, 159:4,
186:1
**decisions** [4] - 50:13, 98:2,
141:17, 156:9
**dedicated** [1] - 97:18
**dedication** [1] - 177:11
**deeper** [2] - 51:13, 83:8
**defendant** [2] - 45:11, 98:1

**DEFENDANT** [2] - 1:17, 2:2
**Defendant** [1] - 1:7
**DEFENDANT'S** [1] - 4:7
**Defense** [1] - 14:20
**defense** [29] - 6:6, 6:25, 9:9, 9:17, 11:12, 11:17, 52:4, 96:17, 97:20, 98:10, 98:25, 99:12, 122:7, 122:10, 122:12, 162:4, 162:5, 171:2, 171:21, 175:1, 175:10, 175:25, 192:5, 194:3, 194:10, 194:15, 195:23, 197:19, 198:11
**defense's** [3] - 5:19, 51:22, 98:16
**defer** [1] - 8:22
**definitely** [3] - 80:25, 128:15, 131:17
**definition** [2] - 136:8, 161:15
**definitions** [2] - 24:7, 161:1
**degree** [4] - 56:1, 56:2, 56:3, 146:21
**delays** [2] - 80:17
**deliberate** [1] - 176:21
**deliberating** [1] - 177:21
**deliberations** [1] - 94:5
**Delta** [1] - 132:12
**Department** [6] - 100:9, 101:1, 116:15, 117:10, 117:12, 120:9
**DEPARTMENT** [1] - 1:15
**depicted** [1] - 62:10
**depicts** [1] - 135:2
**deposit** [1] - 57:9
**DEPUTY** [4] - 42:2, 42:4, 55:5, 55:7
**derivation** [1] - 107:4
**derived** [1] - 63:18
**describe** [1] - 49:2
**described** [4] - 48:23, 100:21, 161:4, 182:14
**describing** [1] - 106:15
**description** [3] - 59:20, 73:24, 76:7
**deserve** [1] - 175:7
**desire** [1] - 143:13
**desperate** [1] - 45:2
**despite** [2] - 175:22, 175:23
**detail** [9] - 73:17, 73:23, 74:22, 75:3, 76:14, 81:21, 86:15, 86:23, 146:20
**detailing** [2] - 72:16, 73:12
**details** [5] - 21:12, 28:23, 86:6, 103:20, 163:21
**determination** [5] - 125:20, 141:3, 157:6, 161:5, 162:9
**determinations** [1] - 146:11
**determine** [18] - 65:12, 70:10, 103:10, 103:14,

109:20, 125:12, 125:17, 129:15, 132:23, 134:9, 155:2, 157:14, 160:25, 161:18, 162:17, 166:20, 167:7, 170:18
**determined** [2] - 117:7, 118:22
**developed** [1] - 103:21
**development** [1] - 96:20
**device** [2] - 27:13, 27:21
**devices** [1] - 27:21
**diagnosed** [1] - 160:13
**diagnoses** [2] - 76:4, 144:9
**diagnosis** [22] - 44:15, 44:17, 45:25, 60:12, 60:14, 73:10, 73:11, 75:1, 120:17, 157:3, 157:7, 157:9, 157:10, 157:15, 158:13, 158:23, 158:24, 159:6, 159:15, 159:17, 159:25
**diagnostic** [1] - 158:12
**diagnostics** [1] - 23:20
**died** [3] - 49:3, 49:5, 49:6
**differ** [1] - 182:8
**difference** [1] - 106:11
**different** [45] - 17:8, 18:11, 26:17, 34:25, 35:3, 57:12, 59:18, 65:19, 70:11, 70:23, 72:4, 77:19, 80:18, 81:6, 81:11, 81:12, 86:13, 86:17, 86:18, 86:20, 90:4, 101:2, 101:15, 101:20, 101:23, 102:2, 103:16, 104:5, 108:1, 119:7, 119:18, 133:17, 133:19, 133:21, 136:8, 138:25, 140:15, 140:17, 140:20, 155:2, 173:17, 173:18, 185:4, 186:16
**differentiated** [1] - 44:19
**differently** [2] - 61:25, 153:11
**difficult** [1] - 110:1
**digestible** [1] - 88:22
**digit** [1] - 68:13
**digitize** [1] - 90:17
**digitized** [1] - 88:2
**diligence** [1] - 187:7
**diligently** [1] - 94:1
**direct** [19] - 6:22, 6:24, 11:21, 32:23, 42:25, 99:19, 105:15, 110:22, 122:1, 127:25, 132:23, 164:13, 181:17, 184:22, 187:12, 187:23, 195:2, 196:5, 196:8
**DIRECT** [4] - 3:6, 3:9, 42:10, 55:10
**directed** [5] - 125:12, 127:13, 129:10, 134:6, 141:18
**direction** [1] - 126:14

**directions** [2] - 28:9, 146:8
**directly** [3] - 105:24, 107:18, 120:8
**director** [3] - 56:6, 56:7, 56:9
**disabled** [1] - 42:17
**disagree** [2] - 155:6, 187:16
**disavow** [1] - 183:6
**disclosed** [2] - 19:5, 19:6
**discovery** [5] - 5:10, 120:24, 121:5, 121:7, 194:2
**discretion** [2] - 146:10, 146:22
**discuss** [8] - 5:17, 5:23, 9:2, 22:13, 39:19, 94:3, 94:12, 176:7
**discussed** [1] - 5:24
**discussing** [1] - 100:3
**discussion** [2] - 31:18, 96:21
**Discussion** [4] - 37:4, 41:9, 115:22, 167:19
**discussions** [2] - 44:9, 121:19
**displayed** [1] - 156:25
**dispute** [1] - 155:21
**distinct** [1] - 144:21
**distinction** [2] - 64:25, 104:8
**distinctly** [3] - 141:21, 141:23, 166:2
**distinguish** [1] - 104:8
**distinguishing** [2] - 34:20, 107:23
**distribution** [1] - 164:17
**DISTRICT** [3] - 1:1, 1:1, 1:10
**District** [2] - 1:23, 199:9
**dive** [1] - 83:8
**DIVISION** [2] - 1:2, 1:15
**DME** [5] - 17:25, 18:1, 18:10, 34:15, 34:17
**DMEs** [2] - 34:21, 34:24
**DNA** [1] - 38:13
**doable** [1] - 97:23
**doctor** [16] - 18:13, 35:4, 35:14, 45:10, 46:20, 48:2, 49:21, 65:21, 73:6, 74:25, 76:3, 131:25, 132:1, 133:25, 174:4, 179:2
**doctors** [20] - 18:13, 33:21, 35:5, 35:10, 35:15, 35:16, 36:4, 48:5, 63:23, 129:15, 132:2, 133:5, 133:18, 133:20, 133:21, 134:1, 134:7, 134:8, 134:10, 134:13
**doctors/providers** [1] - 132:24
**document** [2] - 89:8, 185:12

**documentation** [1] - 111:17
**documented** [2] - 184:23, 185:4
**documents** [8] - 9:14, 11:15, 18:9, 22:5, 51:18, 57:8, 187:19, 187:20
**DOJ** [2] - 117:12, 120:21
**dollar** [2] - 104:16, 104:17
**dollars** [10] - 47:24, 104:24, 151:5, 169:13, 169:17, 169:20, 169:22, 169:25, 170:13, 170:16
**Dom** [2] - 112:17, 156:12
**Don** [1] - 112:18
**DONALD** [1] - 2:2
**done** [38] - 7:3, 7:8, 10:4, 11:7, 12:2, 12:3, 30:13, 41:7, 41:8, 61:25, 64:17, 68:11, 89:25, 94:25, 96:20, 114:21, 117:8, 122:22, 140:11, 145:22, 158:11, 161:16, 161:19, 161:23, 161:24, 162:14, 163:22, 177:2, 177:4, 177:7, 182:7, 183:10, 183:20, 191:4, 192:7, 196:12, 197:3, 197:4
**double** [3] - 19:11, 35:23, 56:1
**doubt** [1] - 51:17
**down** [24] - 17:10, 50:23, 58:12, 66:24, 69:20, 74:10, 83:11, 85:4, 95:9, 111:5, 113:19, 113:24, 132:13, 142:6, 145:17, 152:16, 170:2, 182:16, 182:23, 193:22, 195:16, 196:15, 196:16
**downtime** [1] - 197:18
**dozen** [2] - 165:21, 170:17
**Dr** [16] - 45:8, 46:23, 52:11, 52:17, 52:23, 73:4, 74:23, 76:1, 96:6, 96:7, 97:1, 178:10, 178:20, 178:21, 195:25, 197:11
**draft** [1] - 179:25
**drive** [2] - 146:16, 195:16
**Drive** [1] - 2:3
**driving** [2] - 63:15, 63:16
**drop** [1] - 132:13
**drop-down** [1] - 132:13
**drove** [1] - 165:7
**dry** [3] - 146:14, 198:13, 198:15
**dry-run** [2] - 198:13, 198:15
**due** [3] - 19:15, 187:7, 189:20
**duly** [2] - 42:3, 55:6
**duplicate** [1] - 133:20
**durable** [2] - 18:3, 18:4
**duration** [14] - 90:14,

91:25, 92:3, 92:18, 93:11, 145:2, 145:6, 145:7, 145:21, 145:24, 147:25, 148:4, 148:6, 149:2
**during** [15] - 5:4, 11:21, 32:23, 58:11, 94:19, 108:4, 123:8, 125:5, 126:24, 131:17, 132:24, 158:14, 185:1, 188:15, 188:22
**dwindled** [1] - 161:20

# E

**early** [6] - 6:20, 10:25, 98:12, 175:9, 178:3, 197:3
**ease** [1] - 88:17
**easier** [6] - 29:17, 181:22, 189:25, 190:1, 190:23, 190:25
**easily** [1] - 88:21
**East** [2] - 1:23, 199:10
**easy** [4] - 158:25, 169:9, 180:13, 190:3
**economics** [1] - 56:2
**education** [1] - 55:25
**effect** [1] - 182:15
**effectively** [1] - 187:2
**efficient** [3] - 6:1, 7:16, 191:16
**eight** [11] - 56:13, 109:7, 135:15, 135:20, 135:21, 135:23, 145:12, 145:16, 173:16, 173:17, 173:19
**either** [11] - 29:19, 57:17, 80:2, 92:9, 134:10, 147:1, 154:17, 160:14, 172:19, 179:19, 187:12
**element** [1] - 97:22
**elicited** [2] - 184:22, 188:13
**email** [6] - 16:15, 33:4, 33:7, 34:12, 196:24
**EMILY** [1] - 1:13
**employ** [1] - 103:17
**employed** [1] - 117:8
**employee** [1] - 105:19
**employees** [7] - 105:22, 125:5, 125:13, 125:17, 125:20, 125:22, 125:24
**encompass** [1] - 101:22
**end** [28] - 6:5, 7:9, 10:4, 18:6, 24:15, 52:13, 76:24, 89:17, 92:9, 94:5, 94:23, 96:22, 97:12, 97:24, 98:5, 98:12, 98:22, 98:25, 172:18, 175:6, 176:20, 185:14, 189:18, 190:15, 191:7, 192:16, 196:20, 197:10
**ended** [1] - 101:10
**ending** [6] - 77:21, 86:2, 86:20, 87:3, 114:25, 175:6

**ends** [2] - 86:3, 149:12
**engaged** [4] - 100:4, 100:25, 101:1, 101:14
**engagement** [1] - 57:4
**ensure** [4] - 18:5, 18:17, 19:18, 103:21
**ensuring** [1] - 103:25
**enter** [2] - 10:2, 40:10
**Enterprises** [1] - 186:22
**enters** [4] - 13:22, 54:15, 99:16, 130:11
**entire** [3] - 92:22, 150:11, 159:18
**entirety** [1] - 111:7
**entities** [2] - 81:7, 82:23
**entitled** [2] - 23:14, 199:5
**envelope** [1] - 46:11
**ePay** [5] - 83:5, 83:7, 84:19, 84:20, 84:21
**equal** [3] - 69:16, 113:19, 171:13
**equipment** [7] - 18:2, 27:6, 27:7, 123:2, 123:11, 123:17, 180:13
**especially** [3] - 50:16, 52:7, 97:1
**essentially** [6] - 9:11, 16:1, 79:6, 97:18, 185:15, 191:15
**established** [1] - 132:16
**estimation** [1] - 174:23
**et** [2] - 18:14, 95:4
**etc** [1] - 35:6
**evening** [2] - 13:25, 178:5
**eventually** [2] - 118:2, 118:3
**everywhere** [2] - 32:1, 113:25
**evidence** [47] - 14:16, 14:21, 15:4, 15:7, 16:7, 16:12, 22:21, 44:5, 58:16, 59:3, 61:22, 62:6, 64:2, 64:8, 70:7, 71:24, 72:9, 78:23, 82:15, 82:18, 83:17, 83:22, 85:15, 85:19, 88:4, 88:12, 90:24, 91:2, 94:6, 94:7, 94:8, 102:17, 102:22, 126:6, 126:9, 129:19, 133:11, 133:15, 143:19, 158:1, 158:6, 158:9, 163:7, 163:12, 164:6, 167:25, 176:14
**exact** [9] - 31:17, 56:15, 74:21, 77:10, 102:11, 104:23, 106:7, 182:9, 182:11
**exactly** [17] - 39:23, 67:14, 81:2, 88:19, 89:7, 106:6, 106:25, 125:17, 128:18, 128:23, 146:13, 164:11, 170:4, 182:14, 184:9, 192:3, 195:1
**Exactly** [1] - 54:8

**examination** [20] - 5:5, 5:6, 9:21, 10:13, 10:24, 11:21, 13:2, 14:2, 14:4, 48:11, 96:3, 99:20, 116:1, 131:18, 168:15, 187:13, 191:8, 191:25, 194:4, 194:13
**EXAMINATION** [20] - 3:3, 3:4, 3:6, 3:6, 3:7, 3:9, 3:9, 3:10, 3:10, 3:11, 14:7, 31:3, 42:10, 48:13, 50:5, 55:10, 116:3, 163:13, 168:11, 171:6
**examine** [2] - 90:4, 188:8
**examined** [3] - 65:18, 76:2, 86:6
**examiner** [1] - 56:4
**examining** [2] - 84:17, 188:9
**example** [27] - 38:19, 86:8, 87:9, 87:16, 87:20, 89:1, 89:6, 89:12, 89:15, 89:25, 104:14, 108:6, 108:7, 111:18, 123:1, 136:15, 139:8, 145:17, 145:21, 150:16, 161:8, 164:3, 165:10, 165:14, 166:13, 197:11
**examples** [1] - 38:20
**Excel** [1] - 89:2
**excerpt** [1] - 87:5
**excess** [1] - 116:18
**exchanged** [1] - 38:20
**exclude** [1] - 29:21
**exclusive** [2] - 18:25, 35:22
**exclusively** [1] - 20:3
**excuse** [3] - 12:20, 12:22, 40:21
**excused** [4] - 41:6, 50:22, 95:7, 173:23
**Exhibit** [88] - 3:14, 4:10, 14:20, 15:1, 15:3, 15:7, 16:7, 16:12, 31:7, 32:22, 33:16, 34:3, 38:7, 44:6, 59:15, 60:7, 60:21, 61:22, 62:6, 62:8, 64:2, 68:4, 70:4, 70:16, 71:24, 72:5, 72:6, 72:11, 72:15, 72:16, 74:20, 75:22, 76:18, 78:19, 79:12, 81:5, 82:15, 82:18, 83:14, 83:25, 84:10, 85:21, 86:10, 86:16, 86:17, 86:25, 87:21, 88:4, 88:24, 89:6, 90:23, 91:11, 92:20, 93:2, 93:8, 102:17, 102:25, 105:3, 106:20, 108:21, 110:16, 111:24, 112:5, 113:8, 114:4, 114:16, 126:5, 126:9, 129:18, 133:7, 133:10, 133:15, 134:17, 134:18, 137:1, 152:6, 158:5, 158:9, 163:6, 163:12, 164:4, 164:12, 165:3, 166:3,

**examination** [20] - 5:5, 5:6,

**examination**
**examination**

166:23, 167:12, 168:13
**exhibit** [25] - 29:23, 30:3, 31:1, 32:23, 34:2, 54:1, 62:1, 89:10, 108:22, 108:23, 108:24, 109:19, 111:13, 112:13, 112:25, 133:4, 143:16, 143:21, 144:25, 152:11, 157:22, 157:24, 164:20, 167:22, 197:11
**exhibits** [16] - 6:21, 9:9, 9:11, 11:20, 11:23, 14:11, 14:16, 14:23, 52:5, 53:24, 58:16, 72:4, 177:13, 177:16, 177:21, 197:13
**Exhibits** [13] - 58:25, 64:7, 70:6, 72:8, 78:22, 83:21, 85:13, 85:16, 85:18, 88:11, 91:1, 102:21, 129:19
**EXHIBITS** [2] - 3:12, 4:7
**exist** [2] - 127:22, 127:24
**existed** [2] - 21:15, 134:11
**exists** [2] - 60:14, 144:16
**exits** [4] - 51:5, 95:8, 130:5, 178:6
**expect** [7] - 9:14, 80:16, 173:15, 173:19, 174:20, 178:9, 196:5
**expectation** [2] - 169:17, 170:15
**expected** [1] - 97:14
**expenses** [1] - 107:9
**experience** [1] - 120:4
**experienced** [1] - 13:5
**expert** [2] - 60:4, 152:5
**expertise** [1] - 139:9
**explain** [17] - 43:4, 44:17, 46:7, 55:14, 66:25, 73:1, 78:10, 91:14, 103:6, 106:11, 107:8, 112:6, 158:18, 171:25, 183:10, 191:11, 191:12
**explanation** [3] - 11:25, 113:11, 128:8
**explanations** [1] - 128:7
**exposure** [2] - 8:17, 12:10
**Express** [5] - 112:2, 112:8, 112:10, 112:25, 119:16
**extended** [2] - 180:22, 194:13
**extent** [5] - 5:19, 8:15, 10:2, 16:10, 92:12
**extra** [1] - 11:3
**extreme** [1] - 146:20
**extremely** [1] - 57:21

# F

**facilitate** [1] - 9:8
**fact** [15] - 20:5, 26:5, 40:16, 47:13, 77:10, 78:5, 92:8,

210

100:3, 121:6, 140:2, 153:20, 156:19, 164:1, 175:23, 190:14

**fact-finding** [1] - 121:6
**factored** [1] - 71:1
**facts** [2] - 155:16, 155:18
**fail** [1] - 194:8
**failed** [1] - 189:20
**failure** [2] - 185:24, 194:10
**fair** [23] - 27:16, 58:3, 58:7, 58:12, 59:23, 69:22, 69:23, 71:10, 71:11, 74:8, 80:24, 95:23, 97:10, 100:22, 101:13, 101:16, 106:10, 117:13, 117:15, 128:2, 128:3, 155:4, 172:21
**fairly** [1] - 189:2
**falloff** [1] - 71:14
**family** [41] - 48:25, 49:8, 73:13, 76:5, 94:10, 95:4, 137:8, 137:11, 137:15, 138:12, 138:15, 139:2, 139:4, 142:16, 144:1, 157:20, 158:15, 159:1, 159:3, 159:7, 159:20, 160:2, 160:5, 160:11, 160:12, 160:13, 160:15, 160:19, 160:21, 160:25, 161:1, 161:4, 161:6, 161:14, 161:19, 162:8, 162:12, 162:20, 176:3, 184:25, 186:11
**far** [12] - 47:1, 96:12, 103:5, 116:25, 118:17, 124:23, 126:14, 127:9, 139:17, 141:6, 162:4, 187:10
**Fargo** [3] - 86:3, 86:20, 87:3
**fashion** [1] - 88:22
**father** [2] - 49:3, 49:5
**favor** [1] - 195:14
**fear** [3] - 11:16, 175:12, 182:17
**feature** [1] - 194:19
**featured** [1] - 24:10
**February** [2] - 85:24, 116:13
**fee** [1] - 57:18
**fee-for-service** [1] - 57:18
**feedback** [1] - 74:11
**fellow** [1] - 176:19
**felt** [2] - 9:10, 12:13
**Ferrari** [6] - 109:13, 109:15, 109:21, 109:23, 109:24, 110:9
**few** [11] - 17:8, 48:18, 56:22, 76:12, 76:14, 77:23, 95:14, 103:16, 177:2, 179:2, 198:12
**fifth** [1] - 153:7

**figure** [3] - 7:7, 10:20, 12:3
**file** [5] - 10:3, 20:4, 20:6, 20:18, 114:20
**files** [4] - 20:24, 21:2, 21:6, 21:9
**fill** [3] - 41:15, 49:14, 114:22
**filled** [1] - 88:19
**filter** [1] - 132:14
**finalizing** [1] - 21:17
**finally** [11] - 60:21, 62:22, 72:23, 73:25, 80:1, 85:2, 93:8, 109:11, 111:21, 115:2, 160:14
**finance** [1] - 56:21
**financial** [18] - 9:14, 57:7, 57:10, 57:19, 57:22, 58:9, 78:9, 78:12, 79:13, 86:5, 87:5, 102:12, 102:14, 103:11, 119:12, 119:13, 119:18, 176:9
**fine** [8] - 17:17, 27:18, 52:18, 53:1, 95:16, 159:16, 160:23, 183:15
**finger** [1] - 107:16
**finish** [4] - 52:16, 130:19, 195:14, 195:25
**finished** [1] - 6:24
**finishes** [1] - 6:15
**finishing** [2] - 97:21, 97:23
**firm** [10] - 55:16, 55:18, 55:22, 56:15, 56:25, 87:6, 100:4, 100:9, 146:4
**firms** [2] - 124:2, 124:6, 124:7, 124:9, 124:14, 124:17, 124:21
**first** [44] - 9:4, 10:19, 14:15, 15:1, 26:1, 27:4, 57:7, 62:15, 62:24, 64:14, 67:3, 69:3, 69:15, 69:24, 73:20, 73:22, 75:7, 79:19, 81:9, 84:15, 97:7, 105:15, 107:14, 108:13, 109:7, 112:16, 113:9, 115:3, 116:7, 117:17, 117:18, 126:17, 129:21, 135:2, 144:25, 151:12, 159:5, 164:23, 171:12, 172:4, 176:21, 186:3, 188:7, 193:17
**firsthand** [1] - 155:15
**fit** [1] - 72:12
**five** [14] - 35:19, 36:1, 47:15, 68:13, 130:1, 135:18, 140:13, 144:15, 144:17, 145:11, 170:1, 170:7, 194:21, 194:22
**five-digit** [1] - 68:13
**five-minute** [1] - 130:1
**flip** [1] - 30:6
**flips** [1] - 183:2

**Floor** [1] - 1:16
**floor** [1] - 14:5
**FLORIDA** [1] - 1:1
**Florida** [10] - 1:3, 1:24, 42:13, 156:12, 156:14, 156:20, 156:22, 156:23, 156:24, 199:10
**flow** [11] - 38:1, 80:22, 81:6, 85:9, 102:25, 107:17, 107:22, 107:24, 108:24, 110:20
**flowchart** [1] - 81:9
**flows** [2] - 78:16, 105:7
**fly** [2] - 178:22, 178:23
**focus** [5] - 82:12, 108:18, 109:11, 114:4, 187:23
**focused** [3] - 84:19, 104:18, 189:2
**focusing** [3] - 64:14, 113:16, 164:23
**folks** [7] - 13:12, 56:19, 56:23, 98:1, 99:18, 129:25, 178:5
**follow** [8] - 48:18, 105:5, 115:5, 145:15, 161:3, 161:7, 171:1, 177:25
**follow-up** [2] - 48:18, 171:1
**followed** [4] - 75:25, 76:1, 188:9, 188:12
**following** [8] - 41:13, 47:16, 93:14, 94:1, 159:5, 174:2, 183:17, 183:23
**Fontainebleau** [1] - 112:16
**FOR** [3] - 1:13, 1:17, 2:2
**force** [1] - 96:16
**forced** [1] - 189:12
**foregoing** [1] - 199:3
**forfeiture** [1] - 97:22
**forget** [2] - 104:23, 118:8, 192:11
**forgot** [2] - 46:19, 197:14
**form** [5] - 31:23, 49:23, 90:8, 94:6, 105:21
**format** [1] - 90:3
**Fort** [2] - 1:24, 199:10
**forth** [4] - 24:20, 114:1, 145:12, 147:24
**forward** [9] - 12:14, 13:9, 17:23, 71:17, 81:11, 82:7, 97:7, 176:1, 191:6
**foundation** [1] - 11:5
**four** [60] - 69:15, 69:17, 72:4, 83:2, 84:23, 91:18, 91:21, 91:23, 107:20, 108:13, 149:14, 153:17, 153:18, 164:23, 165:1, 168:8, 168:13, 169:1, 169:2, 169:3, 169:6, 169:10, 169:14, 169:15, 169:16, 169:23, 170:1, 170:2,

170:13, 170:16, 170:20, 171:9, 171:10, 171:11, 171:13, 171:15, 171:17, 172:5, 172:6, 172:7, 172:8, 172:11, 172:16, 172:19, 172:20, 172:22, 172:23, 173:3, 173:4, 173:9, 173:11, 173:14, 173:19, 176:15, 180:15
**fourth** [1] - 152:16
**frame** [4] - 16:22, 93:5, 190:2, 194:14
**framework** [1] - 187:4
**frankly** [4] - 132:22, 175:8, 194:1, 195:20
**FRAUD** [1] - 1:15
**Fraud** [9] - 38:13, 100:9, 100:17, 101:2, 101:14, 101:18, 102:2, 116:15, 118:6, 118:10, 102:2, 116:15, 118:6, 35:3, 36:2, 38:21, 56:4, 102:6, 102:8
**fraud** [8] - 18:11, 34:25, 35:3, 36:2, 38:21, 56:4, 102:6, 102:8
**free** [5] - 33:17, 45:19, 95:9, 130:7, 176:4
**frequency** [1] - 67:23
**frequently** [1] - 44:24
**fresh** [1] - 195:24
**Friday** [7] - 96:20, 97:9, 98:12, 174:15, 175:9, 178:24, 179:1
**friends** [1] - 94:10
**front** [3] - 8:11, 54:10, 188:11
**full** [9] - 19:18, 42:5, 107:6, 110:4, 176:21, 177:24, 191:8, 193:12, 194:2
**full-blown** [1] - 193:12
**full-out** [1] - 194:2
**fully** [5] - 15:19, 16:1, 17:16, 31:13, 32:3
**fumbling** [1] - 6:22
**fun** [1] - 118:12
**function** [1] - 56:9
**fund** [1] - 104:1
**fundamentally** [1] - 194:7
**Funding** [2] - 83:5, 84:20
**funds** [19] - 81:6, 103:15, 104:11, 105:7, 105:14, 107:11, 107:15, 107:24, 108:24, 109:5, 110:20, 113:10, 113:22, 114:15, 115:13, 115:16, 115:18
**fungible** [1] - 103:14
**funnel** [1] - 84:17
**FURTHER** [2] - 3:11, 171:6

## G

**G.'s** [1] - 75:20
**GARLAND** [1] - 2:3

**gene** [4] - 75:7, 75:8, 75:12
**general** [6] - 103:9, 150:11, 151:23, 179:14, 187:19, 193:6
**generalities** [1] - 140:5
**generally** [3] - 103:17, 120:10, 123:12
**generated** [1] - 112:1
**genes** [2] - 23:25, 47:6
**Genetic** [1] - 38:14
**genetic** [12] - 38:21, 43:2, 46:25, 50:7, 59:11, 60:9, 61:11, 101:2, 176:12, 186:8, 186:10, 186:21
**Genetics** [2] - 23:14, 23:20
**gentleman** [2] - 43:6, 196:14
**gentlemen** [12] - 9:17, 13:24, 28:21, 29:5, 50:24, 54:17, 55:14, 93:22, 130:13, 143:10, 143:12, 174:12
**geographical** [2] - 70:11, 162:21
**Georgia** [7] - 1:19, 2:4, 2:7, 71:5, 162:7, 162:8, 162:13
**gift** [2] - 43:8, 45:19
**gifts** [1] - 45:19
**gist** [1] - 44:4
**given** [17] - 8:23, 27:6, 27:25, 28:9, 29:21, 56:23, 98:7, 101:22, 117:25, 123:11, 126:25, 140:3, 146:8, 154:5, 155:17, 176:11, 198:2
**global** [1] - 55:18
**goal** [2] - 95:17, 178:19
**gonna** [1] - 194:16
**gotcha** [1] - 159:23
**gotta** [1] - 19:9
**government** [145] - 5:9, 5:12, 12:11, 12:15, 13:4, 14:13, 15:7, 16:12, 18:9, 21:1, 21:5, 21:11, 22:4, 25:24, 26:2, 26:14, 26:19, 36:17, 37:11, 53:15, 54:18, 54:24, 55:22, 56:11, 57:4, 58:25, 59:10, 62:6, 64:7, 70:3, 70:6, 72:8, 72:16, 76:13, 78:22, 81:16, 81:17, 81:20, 82:12, 82:14, 82:18, 83:21, 84:1, 85:10, 85:18, 86:17, 88:3, 88:11, 90:16, 91:1, 91:4, 91:7, 96:9, 98:15, 99:9, 99:23, 100:4, 101:9, 102:21, 108:18, 116:18, 117:20, 117:21, 117:22, 118:20, 118:22, 120:8, 120:21, 120:23, 121:4, 121:5, 121:8, 121:13, 122:9, 122:11, 122:13, 122:17, 122:19, 122:20, 122:24,

123:3, 123:5, 123:18, 124:23, 125:16, 126:5, 126:9, 126:15, 126:22, 127:10, 127:25, 129:10, 129:14, 130:24, 132:23, 133:4, 133:15, 140:24, 141:1, 141:13, 141:18, 142:1, 142:4, 142:6, 143:14, 144:12, 144:17, 145:4, 146:2, 146:5, 146:9, 146:15, 146:20, 147:3, 150:8, 155:17, 156:13, 158:2, 158:9, 162:1, 162:20, 163:12, 171:8, 174:21, 175:3, 178:13, 179:15, 183:3, 183:19, 184:12, 185:21, 185:23, 186:15, 187:3, 188:16, 189:3, 189:6, 189:19, 190:17, 191:3, 194:8, 195:9, 195:24, 198:2
**GOVERNMENT** [1] - 1:13
**Government** [62] - 15:1, 16:6, 32:22, 33:16, 38:7, 42:3, 55:6, 59:15, 60:7, 60:21, 61:22, 62:8, 68:4, 70:16, 72:5, 72:6, 72:11, 75:22, 76:17, 78:19, 79:12, 81:5, 83:14, 83:25, 84:10, 85:13, 85:16, 85:21, 86:10, 86:16, 86:25, 87:20, 88:4, 89:6, 92:20, 93:2, 93:8, 102:17, 102:24, 105:3, 106:19, 108:21, 110:16, 111:23, 112:5, 113:8, 114:3, 114:16, 129:18, 129:19, 133:9, 134:17, 134:18, 158:5, 163:6, 164:4, 164:12, 165:3, 166:3, 166:23, 167:12
**government's** [13] - 6:5, 41:25, 96:12, 96:19, 98:22, 142:2, 157:24, 174:21, 175:24, 189:10, 192:16, 195:2, 197:10
**Government's** [13] - 15:3, 31:7, 34:3, 44:6, 64:2, 70:4, 71:24, 72:14, 74:20, 77:8, 88:24, 90:23, 91:11
**GOVERNMENT'S** [1] - 3:12
**granted** [1] - 193:14
**granular** [2] - 152:19, 184:19
**graphs** [1] - 58:8
**great** [7] - 43:8, 46:21, 49:25, 53:8, 63:25, 178:5, 186:10
**greater** [9] - 81:21, 92:18, 92:24, 93:6, 93:11, 147:4, 147:21, 147:25, 149:2
**green** [2] - 62:21, 63:9
**grey** [1] - 23:4

**Griner** [28] - 5:20, 92:22, 147:8, 147:18, 149:21, 150:4, 179:10, 179:17, 185:16, 187:5, 187:6, 187:12, 187:15, 188:1, 188:14, 188:19, 188:24, 189:4, 189:11, 189:25, 191:20, 191:24, 192:14, 192:25, 195:7, 195:10, 198:10
**Griner's** [1] - 187:17
**ground** [2] - 94:1, 195:2
**group** [1] - 21:17
**grouping** [5] - 67:21, 171:8, 173:1, 173:3, 173:13
**guarantee** [1] - 94:24
**guess** [4] - 21:23, 28:21, 131:25, 136:8
**guidance** [1] - 51:21
**guidelines** [3] - 23:16, 23:24, 186:11
**guilty** [2] - 40:16
**Gurskis** [1] - 196:22
**GURSKIS** [17] - 1:13, 168:1, 179:6, 179:14, 180:5, 180:8, 180:21, 181:1, 183:4, 184:14, 186:13, 187:16, 192:23, 195:10, 195:17, 196:1, 197:5
**guy** [2] - 17:2, 34:10
**guys** [23] - 8:24, 9:4, 9:19, 9:23, 10:1, 13:17, 13:20, 17:24, 34:17, 34:21, 53:9, 94:23, 96:21, 96:23, 97:19, 98:11, 99:22, 177:10, 177:21, 193:15, 194:19, 198:4, 198:14

# H

**H.K** [2] - 3:5, 7:3, 7:9, 9:22, 12:3, 42:1, 42:3, 42:6, 75:23
**half** [7] - 38:16, 56:13, 102:1, 108:23, 153:1, 184:20, 185:8
**hand** [10] - 42:2, 55:5, 59:17, 62:9, 62:11, 72:20, 73:9, 107:13, 168:23, 173:16
**handful** [1] - 163:21
**handle** [3] - 10:25, 120:23, 174:17
**happy** [2] - 6:1, 103:4
**hard** [5] - 11:1, 25:6, 175:16, 177:17, 191:19
**harmless** [1] - 8:18
**hate** [1] - 68:9
**Hayes** [1] - 129:5
**head** [1] - 183:3
**health** [1] - 42:20
**Health** [3] - 84:2, 84:5,

186:20
**healthcare** [5] - 36:2, 50:8, 50:10, 57:16, 157:10
**Healthcare** [1] - 45:23
**hear** [4] - 6:1, 27:22, 178:10, 184:24
**heard** [19] - 28:17, 36:18, 44:1, 45:14, 45:22, 46:2, 48:2, 94:4, 94:7, 94:11, 94:19, 122:13, 175:19, 175:24, 176:8, 176:9, 177:20, 188:7, 194:25
**hearing** [2] - 10:5, 175:22
**heart** [2] - 175:8, 189:5
**heavy** [1] - 9:23
**held** [7] - 37:4, 41:9, 41:13, 93:14, 115:22, 167:19, 174:2
**help** [3] - 132:8, 150:8, 152:22
**helps** [2] - 56:18, 185:23
**Hemangini** [1] - 115:9
**Hennessy** [2] - 111:6, 111:19
**hereby** [1] - 199:3
**hereditary** [3] - 23:22, 24:4, 33:18
**hiding** [1] - 187:1
**high** [8] - 47:5, 68:8, 71:10, 78:10, 78:13, 79:13, 82:20, 103:6
**high-level** [1] - 82:20
**higher** [1] - 165:9
**highest** [6] - 69:15, 150:24, 152:25, 165:14, 165:23, 171:13
**highlighted** [1] - 75:12
**highlighting** [2] - 180:23, 188:4
**himself** [1] - 46:20
**HIPAA** [3] - 19:3, 19:5, 35:22
**hired** [3] - 20:2, 20:17, 56:25
**HIRSCH** [1] - 3:3
**Hirsch** [32] - 5:5, 5:7, 6:14, 7:4, 7:18, 7:23, 9:21, 10:9, 10:19, 11:6, 12:2, 12:6, 14:3, 31:5, 35:1, 36:11, 37:8, 41:3, 41:5, 83:5, 86:3, 87:16, 87:20, 89:1, 89:6, 89:12, 89:15, 89:25, 93:3, 93:4, 148:12, 149:23
**histories** [1] - 73:13
**history** [59] - 48:22, 48:25, 49:8, 49:9, 74:24, 75:2, 76:2, 76:5, 137:6, 137:8, 137:11, 138:2, 138:12, 139:1, 139:2, 139:4, 139:5, 139:7, 142:16, 142:17, 144:1, 144:2, 157:20, 158:16, 158:17,

159:7, 159:20, 159:21,
159:25, 160:1, 160:2, 160:3,
160:4, 160:5, 160:9, 160:11,
160:13, 160:15, 160:19,
160:21, 160:25, 161:1,
161:4, 161:6, 161:14,
161:19, 161:20, 162:8,
162:9, 162:12, 162:20,
162:21, 184:25, 186:11
**hit** [1] - 165:23
**hits** [1] - 196:19
**hitting** [1] - 7:22
**hmm** [1] - 161:12
**hold** [2] - 25:14, 142:13
**Holden** [3] - 6:12, 6:13,
9:19
**holidays** [1] - 97:17
**home** [2] - 95:5, 176:3
**homework** [1] - 94:21
**honestly** [1] - 128:23
**Honor** [73] - 5:13, 6:7, 6:18,
7:5, 7:14, 8:5, 8:15, 8:21,
10:23, 12:5, 13:16, 14:15,
14:17, 30:23, 30:25, 37:6,
41:1, 41:10, 48:12, 50:1,
51:9, 52:7, 52:21, 53:8,
53:19, 53:22, 55:1, 58:15,
58:21, 61:21, 62:1, 62:4,
64:1, 70:3, 71:23, 78:18,
82:14, 83:18, 88:3, 88:8,
88:10, 90:22, 93:12, 96:10,
97:4, 98:23, 99:11, 99:13,
99:24, 102:16, 102:20,
115:20, 116:2, 126:7,
130:16, 152:5, 163:5, 163:6,
167:17, 167:22, 168:2,
179:6, 186:14, 188:5, 188:6,
195:10, 196:1, 197:5,
197:12, 197:23, 198:7,
198:16, 198:18
**HONORABLE** [1] - 1:10
**Honorable** [1] - 1:22
**hope** [7] - 13:24, 21:18,
37:14, 37:16, 99:18, 178:2,
178:15
**hopeful** [1] - 12:23
**hopefully** [3] - 53:15,
177:5, 192:15
**horn** [1] - 195:6
**HOSTETLER** [1] - 2:5
**hotel** [1] - 112:17
**Hotel** [1] - 112:19
**hour** [7] - 5:6, 10:14, 52:24,
54:20, 95:2, 95:24, 178:18
**hours** [1] - 188:8
**housekeeping** [8] - 6:5,
10:8, 95:15, 99:9, 179:4,
197:10, 197:15, 197:20
**Huan** [1] - 48:3
**Humana** [1] - 42:21

**hundred** [1] - 136:15
**HXXXX** [1] - 42:6
**hysterectomy** [1] - 44:10

---

## I

**i.e** [1] - 173:3
**ICD** [1] - 135:24
**idea** [9] - 44:10, 47:2,
47:20, 92:7, 137:23, 139:17,
151:23, 180:14, 180:20
**ideally** [1] - 196:25
**identification** [1] - 72:21
**identified** [4] - 23:23,
23:25, 112:15, 171:11
**identifies** [1] - 23:15
**identify** [7] - 61:8, 104:12,
104:14, 112:12, 114:4, 171:9
**identifying** [1] - 46:20
**IDGAF** [2] - 46:2, 85:1
**IDs** [2] - 133:25
**ignored** [1] - 41:17
**II** [2] - 1:10, 1:22
**ILONA** [2] - 1:21, 199:8
**imagine** [2] - 7:5, 98:3
**immediately** [1] - 30:14
**impact** [2] - 12:24, 13:6
**impeaching** [2] - 192:24,
193:9
**impeachment** [2] - 182:10,
193:12
**impinge** [1] - 13:12
**implication** [1] - 192:24
**impolite** [1] - 121:2
**important** [8] - 50:10,
50:13, 64:25, 92:2, 94:6,
146:19, 161:20, 188:15
**importantly** [1] - 174:14
**impossible** [2] - 80:13,
136:13
**impractical** [2] - 136:12
**improper** [1] - 182:10
**improve** [1] - 24:4
**include** [9] - 65:2, 65:6,
120:13, 127:10, 128:11,
128:21, 141:19, 145:17,
148:8
**included** [5] - 80:10, 80:11,
127:10, 128:17, 145:13
**includes** [3] - 62:20, 117:3,
166:24
**including** [5] - 18:11, 35:3,
114:12, 119:20, 184:21
**income** [1] - 79:14
**incoming** [2] - 79:17, 79:20
**incredibly** [3] - 57:20,
171:14, 181:8
**indeed** [1] - 98:12
**independently** [1] - 122:19
**indicated** [6] - 12:11, 49:18,

49:23, 134:14, 135:13, 141:2
**indicates** [2] - 21:8, 74:9
**indicating** [3] - 21:25,
46:10, 159:18
**indication** [1] - 160:21
**indictment** [2] - 155:20,
155:21
**individual** [17] - 47:2,
47:16, 67:7, 75:4, 75:17,
87:19, 115:6, 126:17,
136:19, 137:4, 140:3, 140:8,
156:8, 182:3, 182:22, 183:21
**individually** [1] - 146:1
**individuals** [14] - 57:13,
63:22, 64:17, 65:20, 66:12,
91:9, 92:8, 115:14, 131:12,
139:1, 144:11, 154:18,
170:7, 181:24
**information** [88] - 19:12,
19:23, 19:24, 34:10, 60:3,
61:1, 63:25, 65:23, 72:17,
81:15, 86:24, 92:17, 104:12,
109:20, 109:22, 114:22,
119:19, 120:20, 121:6,
121:9, 121:20, 123:3,
123:12, 123:20, 123:24,
124:24, 125:1, 125:19,
126:23, 127:12, 128:5,
128:10, 128:12, 128:15,
128:16, 129:11, 131:6,
131:10, 135:15, 135:21,
135:22, 135:24, 137:5,
139:24, 141:9, 141:10,
141:11, 142:21, 143:8,
143:9, 143:13, 143:14,
143:15, 144:16, 145:20,
145:23, 146:18, 148:2,
148:4, 148:5, 148:16,
149:14, 150:6, 150:14,
152:4, 152:19, 154:14,
154:15, 154:23, 155:16,
155:17, 161:24, 162:16,
164:2, 164:10, 164:11,
164:14, 177:12, 177:13,
181:1, 181:2, 184:18, 187:7,
187:9, 187:21, 188:13, 193:9
**inside** [4] - 39:16, 46:11,
46:12, 178:18
**instance** [2] - 121:16,
146:15
**instances** [1] - 140:6
**instead** [3] - 63:4, 110:22,
189:16
**instruct** [4] - 122:1, 124:23,
128:1, 146:15
**instructed** [6] - 7:17,
122:17, 123:19, 125:12,
134:8, 141:11
**instruction** [8] - 11:14,
11:18, 128:4, 140:22,

140:23, 141:15, 142:9,
156:21
**instructions** [5] - 27:25,
28:5, 28:9, 49:17, 174:14
**instructs** [2] - 122:11,
122:14
**insurance** [10] - 39:14,
42:20, 43:15, 57:17, 65:3,
79:23, 80:3, 80:21, 80:22,
104:17
**insurers** [1] - 80:22
**intake** [1] - 22:2
**intel** [1] - 98:10
**intend** [1] - 54:9
**intending** [1] - 10:24
**interact** [2] - 122:9, 122:11
**interacting** [1] - 162:3
**interaction** [4] - 26:8,
122:7, 162:5, 190:4
**interest** [1] - 85:11
**interested** [3] - 23:2, 87:19,
180:23
**interject** [1] - 186:13
**intermediate** [2] - 103:18,
106:16
**interview** [2] - 40:5, 183:22
**interviewed** [1] - 26:2
**interviews** [1] - 179:21
**introduce** [2] - 29:4, 54:9
**investigations** [1] - 101:23
**investment** [1] - 55:18
**involve** [1] - 185:12
**involved** [3] - 18:10,
129:15, 132:17
**isolated** [2] - 64:17, 194:24
**issue** [21] - 10:16, 11:12,
96:16, 179:7, 179:16, 185:6,
186:19, 186:20, 190:22,
191:6, 191:21, 192:4,
192:14, 192:22, 192:23,
193:20, 194:19, 195:23,
197:8, 197:11, 198:9
**issues** [4] - 120:5, 179:4,
186:15, 197:20
**IT** [2] - 21:17, 22:7
**it'll** [3] - 133:14, 175:18,
194:19
**item** [2] - 73:17, 123:1
**itself** [2] - 47:4, 111:15

---

## J

**Jaguar** [2] - 111:6, 111:20
**JAMIE** [1] - 1:13
**January** [16] - 62:12, 64:22,
71:1, 77:21, 79:16, 84:6,
105:9, 112:10, 116:17,
123:9, 123:23, 127:20,
158:15, 161:11, 161:13,
162:6

**Jariwala** [1] - 115:9
**Jeff** [5] - 32:12, 32:16, 33:4, 34:12, 34:20
**Jeff's** [1] - 21:24
**Jeffrey** [2] - 17:10, 17:15
**Jencks** [2] - 189:11, 189:12
**job** [6] - 78:13, 79:4, 79:6, 80:12, 151:24, 177:8
**join** [1] - 96:7
**joined** [2] - 56:14
**Jon** [6] - 16:15, 16:16, 22:22, 22:25, 34:9
**JP** [6] - 107:19, 110:23, 111:4, 113:12, 113:21, 113:22
**JPMC** [1] - 113:17
**JPMCX0736** [1] - 113:12
**judge** [1] - 8:3
**JUDGE** [1] - 1:10
**judgment** [1] - 12:4
**Julio** [1] - 112:18
**July** [5] - 25:24, 27:5, 33:9, 92:16, 108:8
**juncture** [1] - 44:4
**June** [10] - 24:12, 26:2, 38:12, 40:1, 40:4, 77:15, 93:10, 148:24, 149:12
**JUROR** [1] - 129:23
**jurors** [10] - 13:19, 53:21, 98:7, 98:13, 99:7, 99:14, 123:16, 176:19, 194:17, 198:5
**JURY** [1] - 1:9
**Jury** [8] - 13:22, 51:5, 54:15, 95:8, 99:16, 130:5, 130:11, 178:6
**jury** [46] - 8:12, 13:21, 13:24, 43:4, 44:4, 44:17, 46:7, 46:16, 48:23, 49:2, 51:4, 53:15, 54:14, 55:14, 55:24, 62:10, 64:12, 64:15, 66:25, 68:14, 70:21, 73:1, 75:6, 78:10, 82:23, 87:18, 89:5, 91:14, 95:7, 103:6, 105:5, 106:23, 107:8, 113:9, 118:11, 133:2, 143:10, 143:12, 163:25, 171:25, 174:12, 177:17, 178:4, 180:19, 186:25, 194:23
**jury's** [2] - 12:7, 88:16
**Justice** [6] - 100:10, 101:1, 116:15, 117:10, 117:12, 120:9
**JUSTICE** [1] - 1:15

### K

**K-x-x-x-x-x-x** [1] - 42:6
**K.'s** [2] - 44:5, 76:10
**Kate** [1] - 36:25

**KATHERINE** [1] - 1:14
**keep** [11] - 30:14, 35:18, 41:18, 94:9, 98:6, 132:9, 175:16, 175:23, 176:2, 177:9, 197:6
**kept** [1] - 177:8
**key** [1] - 107:5, 194:4
**kick** [1] - 79:12
**kickback** [1] - 40:15
**kickbacks** [7] - 18:12, 35:4, 35:12, 35:13, 40:20, 40:23
**kidney** [1] - 45:1
**kind** [12] - 9:24, 29:8, 29:9, 44:20, 46:18, 53:23, 55:19, 98:9, 136:25, 183:2, 185:6, 186:15
**kit** [8] - 43:19, 45:24, 46:9, 46:16, 48:6, 49:11, 49:12, 49:19
**Kits** [1] - 38:14
**knowing** [2] - 96:6, 98:15
**knowledge** [3] - 32:9, 92:13, 155:23
**known** [3] - 47:23, 104:19, 115:17
**knows** [2] - 53:22, 65:21
**KP** [2] - 85:3, 85:6
**Kumar** [1] - 110:7

### L

**lab** [3] - 35:13, 40:15, 73:18
**LabSolutions** [80] - 19:25, 22:23, 40:24, 59:24, 61:9, 62:12, 63:5, 63:6, 63:11, 63:14, 72:18, 72:22, 72:24, 75:19, 78:16, 79:14, 81:10, 81:12, 84:5, 84:14, 86:1, 86:19, 87:2, 87:8, 87:13, 105:9, 105:12, 105:16, 105:19, 105:21, 105:22, 106:4, 107:10, 107:11, 107:14, 107:15, 109:1, 109:3, 109:6, 110:20, 110:23, 112:9, 113:14, 114:15, 114:24, 114:25, 115:3, 115:12, 119:14, 119:15, 119:20, 120:6, 123:1, 123:11, 123:17, 123:22, 124:20, 125:5, 126:20, 132:24, 134:10, 135:3, 150:11, 151:17, 151:22, 152:25, 153:14, 154:4, 154:12, 154:20, 154:22, 154:24, 156:6, 161:13, 163:16, 166:21, 167:8, 168:19
**LabSolutions'** [2] - 114:19, 151:14
**ladies** [9] - 13:24, 50:24,

54:17, 55:14, 93:22, 130:13, 143:10, 143:12, 174:12
**Land** [4] - 111:6, 111:20, 121:16, 121:17
**language** [1] - 29:8
**large** [2] - 56:17, 56:18, 66:3, 69:18, 125:8, 125:9
**largely** [2] - 56:21, 107:15
**larger** [4] - 89:3, 92:4, 114:4, 185:6
**largest** [4] - 75:17, 137:18, 137:20, 151:4
**last** [19] - 7:17, 12:13, 13:6, 41:18, 51:20, 69:7, 73:25, 77:23, 78:4, 82:25, 96:12, 102:1, 107:17, 145:18, 148:17, 149:14, 151:11, 157:2, 177:18
**last-minute** [1] - 51:20
**lasted** [3] - 29:24, 90:14, 92:12
**late** [2] - 175:13, 195:22
**Lauderdale** [2] - 1:24, 199:10
**laundering** [1] - 93:17
**Laurie** [1] - 60:4
**law** [7] - 124:2, 124:6, 124:7, 124:9, 124:14, 124:17, 124:21
**LAW** [1] - 1:18
**lawyer** [8] - 7:25, 8:6, 8:7, 8:22, 12:14, 195:12, 195:15, 196:23
**lawyers** [16] - 10:6, 12:20, 12:22, 94:15, 95:12, 123:23, 175:16, 177:11, 177:12, 177:20, 187:18, 187:21, 188:1, 188:2, 188:21
**lay** [1] - 11:4
**layer** [2] - 83:10, 85:4
**layers** [1] - 19:16
**lead** [1] - 96:2
**learn** [1] - 36:24
**learned** [2] - 43:4, 43:24
**least** [21] - 5:18, 9:12, 12:15, 27:4, 64:18, 73:5, 97:21, 109:7, 116:25, 120:20, 122:22, 131:7, 137:10, 139:1, 139:17, 156:5, 167:10, 174:22, 179:12, 182:14, 196:18
**leave** [8] - 29:19, 51:2, 129:25, 137:15, 146:21, 176:23, 179:20, 192:11
**leaving** [2] - 104:22, 104:23
**left** [30] - 5:4, 5:17, 13:1, 45:1, 52:23, 59:17, 62:9, 62:11, 62:14, 72:20, 83:4, 84:22, 86:4, 94:6, 95:25, 99:19, 105:8, 107:13,

107:18, 109:2, 110:19, 111:19, 114:25, 115:1, 127:2, 127:3, 132:4, 132:6, 174:4, 192:25
**left-hand** [5] - 59:17, 62:9, 62:11, 72:20, 107:13
**legal** [1] - 12:10
**legit** [1] - 16:4
**legitimate** [3] - 36:8, 155:7, 156:1
**lengthy** [2] - 97:1, 98:3
**less** [3] - 10:16, 71:17, 95:25
**level** [6] - 68:8, 78:10, 78:13, 79:13, 82:20, 103:6
**lie** [2] - 37:21, 37:23
**lies** [1] - 190:19
**life** [2] - 50:10, 50:13
**LifeMD** [1] - 85:8
**lift** [1] - 9:23
**light** [9] - 23:4, 27:10, 160:2, 160:6, 167:23, 172:10, 172:19, 173:5, 173:9
**lighter** [4] - 27:7, 27:8, 27:10, 27:12
**like..** [1] - 140:10
**likewise** [1] - 63:9
**limine** [1] - 181:18
**limited** [12] - 110:18, 179:22, 190:22, 191:7, 191:21, 191:25, 192:6, 192:14, 192:16, 192:21, 193:22, 194:16
**line** [14] - 46:10, 63:13, 73:17, 73:20, 75:4, 80:13, 105:15, 105:17, 108:13, 109:14, 115:4, 193:13
**lined** [1] - 54:22
**lines** [4] - 44:20, 73:22, 107:20, 108:13
**lineup** [2] - 198:3, 198:4
**lining** [4] - 44:21, 44:22, 174:19
**Linked** [1] - 38:14
**list** [10] - 53:24, 59:10, 59:17, 60:8, 60:23, 61:17, 68:17, 79:15, 81:18, 126:25
**listed** [9] - 76:6, 79:16, 92:22, 108:5, 114:8, 131:12, 143:7, 144:3, 169:5
**listen** [5] - 12:7, 12:8, 20:23, 21:2, 30:19
**listened** [3] - 30:21, 32:17, 44:8
**listener** [1] - 182:15
**listening** [2] - 20:4, 20:17
**listing** [2] - 25:22, 75:4
**lists** [1] - 61:17, 67:3
**litigation** [1] - 56:11
**live** [4] - 42:12, 189:21,

191:11, 193:16
**lived** [1] - 42:14
**lives** [1] - 195:11
**LLP** [1] - 2:5
**local** [1] - 178:24
**locate** [1] - 111:14
**location** [6] - 70:13, 70:17, 71:5, 156:17, 156:18, 162:21
**locations** [2] - 63:24, 70:11
**lock** [1] - 98:16
**LOEB** [1] - 2:3
**Lohan** [12] - 16:23, 36:12, 36:20, 36:25, 37:9, 37:19, 37:21, 38:11, 38:17, 39:25, 41:16
**look** [46] - 8:24, 30:3, 32:7, 32:23, 51:10, 57:15, 69:2, 70:24, 73:19, 74:7, 79:9, 81:21, 83:9, 88:16, 88:21, 92:15, 97:19, 108:13, 112:2, 112:22, 113:5, 120:23, 124:1, 124:13, 124:17, 124:21, 124:23, 124:25, 128:25, 143:17, 143:21, 155:2, 155:5, 156:13, 159:25, 160:16, 164:7, 166:10, 177:22, 181:25, 186:2, 190:13
**looked** [34] - 32:25, 33:17, 38:7, 38:19, 39:1, 57:12, 65:5, 67:2, 67:3, 68:17, 69:8, 73:2, 73:3, 73:21, 73:22, 74:2, 76:14, 77:24, 79:1, 79:17, 80:8, 84:15, 84:16, 108:25, 128:21, 133:23, 139:16, 154:3, 158:23, 162:10, 165:6, 165:16, 166:19
**looking** [30] - 33:1, 34:5, 58:6, 65:11, 65:18, 66:24, 68:21, 70:22, 70:24, 72:19, 83:1, 84:18, 84:21, 93:2, 96:5, 106:13, 114:17, 125:7, 131:2, 131:9, 138:19, 152:7, 153:2, 153:24, 154:24, 156:5, 158:21, 166:5, 172:3, 185:2
**looks** [6] - 15:10, 23:8, 71:17, 82:5, 132:15, 174:15
**lose** [2] - 45:3, 52:24
**low** [1] - 103:23
**lower** [1] - 167:4
**lowest** [3] - 103:18, 103:21, 106:15
**lunch** [15] - 6:2, 6:20, 7:4, 7:12, 9:8, 9:24, 10:25, 11:11, 52:9, 54:20, 93:25, 94:14, 94:22, 99:3, 99:18
**lung** [2] - 49:3, 49:5
**lungs** [1] - 44:22

**Lupowitz** [1] - 199:8
**LUPOWITZ** [2] - 1:21, 199:8
**lying** [1] - 193:8

## M

**ma'am** [4] - 48:15, 49:4, 50:22, 129:24
**MAC** [2] - 161:21, 162:7
**MACs** [1] - 162:13
**Mahesh** [3] - 45:8, 45:10, 46:23
**Mahmood** [1] - 26:23
**mail** [3] - 39:16, 46:9, 49:12
**mailer** [1] - 46:12
**main** [1] - 140:2
**major** [3] - 6:20, 56:1, 194:23
**majority** [2] - 63:17, 69:12
**man** [1] - 46:20
**managing** [3] - 56:6, 56:7, 56:9
**Maple** [1] - 2:3
**Marc** [3] - 28:16, 93:9, 148:20
**March** [6] - 15:10, 15:16, 15:25, 17:11, 110:19, 111:11
**marked** [5] - 29:23, 30:6, 30:10, 44:5, 186:1
**marketer** [1] - 81:18
**marketers** [8] - 81:14, 82:11, 83:1, 83:2, 84:15, 84:19, 88:15, 119:17, 134:11
**marketing** [2] - 81:21, 82:21
**Marketing** [5] - 83:4, 84:25, 85:5, 86:19, 87:2
**markings** [1] - 30:4
**massive** [1] - 90:19
**master's** [2] - 56:2, 56:3
**match** [2] - 80:15, 80:19
**material** [3] - 57:20, 189:11, 189:12
**materials** [1] - 87:7
**matter** [11] - 7:17, 28:10, 28:14, 57:1, 103:9, 150:11, 160:5, 179:14, 187:19, 193:6, 199:5
**matters** [5] - 101:3, 101:15, 102:6, 102:8, 185:23
**McMillan** [2] - 60:4, 60:8
**mean** [32] - 26:16, 27:10, 47:9, 66:19, 95:24, 96:21, 97:10, 97:18, 97:25, 107:25, 111:3, 118:8, 121:23, 124:15, 138:20, 139:13, 140:10, 143:14, 145:5, 146:1, 153:23, 154:22, 162:15, 165:2, 166:10, 173:1, 189:2, 192:16,

193:16, 194:20, 195:20
**meaning** [1] - 189:25
**means** [20] - 18:1, 20:20, 24:8, 44:20, 66:3, 69:25, 73:1, 77:3, 91:25, 108:17, 131:6, 133:21, 145:5, 145:7, 147:23, 148:5, 154:6, 174:22, 174:25, 175:5
**meant** [1] - 160:23
**mechanically** [2] - 190:24, 190:25
**mechanism** [1] - 182:10
**mechanisms** [1] - 105:13
**media** [1] - 94:16, 176:17
**Media** [1] - 85:8
**medical** [3] - 18:2, 46:13, 157:11
**medically** [1] - 19:6
**Medicare** [90] - 38:14, 39:6, 39:14, 42:21, 42:22, 43:16, 43:17, 47:20, 47:23, 57:18, 57:23, 59:8, 59:25, 60:3, 61:4, 61:9, 61:10, 61:15, 62:12, 62:25, 63:15, 65:1, 65:2, 65:6, 66:6, 66:8, 66:9, 66:16, 69:10, 70:22, 72:21, 74:3, 79:8, 79:10, 79:21, 79:24, 80:2, 80:6, 80:21, 81:10, 103:24, 103:25, 104:3, 104:6, 104:7, 104:11, 104:13, 104:16, 104:19, 104:25, 105:8, 106:4, 106:17, 107:3, 107:7, 107:9, 107:11, 107:23, 109:1, 109:5, 109:9, 109:17, 110:13, 110:20, 110:25, 111:8, 111:10, 114:16, 115:13, 115:15, 119:11, 119:25, 120:2, 120:6, 120:12, 129:16, 139:25, 143:16, 151:18, 151:19, 152:1, 152:5, 152:25, 163:17, 166:21, 167:7, 167:8, 185:1
**MediPak** [1] - 83:5
**meet** [2] - 11:14, 23:23
**meeting** [3] - 24:11, 36:20, 37:8
**meetings** [1] - 179:19
**members** [1] - 67:8
**memorializing** [1] - 182:3
**memory** [3] - 106:9, 127:16, 132:19
**mention** [1] - 8:11
**mentioned** [4] - 45:19, 57:20, 104:3, 186:22
**merely** [1] - 114:7
**message** [11] - 15:9, 15:17, 15:25, 17:7, 17:15, 22:22, 29:19, 29:25, 31:8, 31:11

**messages** [4] - 22:22, 41:17, 41:19, 148:8
**met** [1] - 116:7
**method** [2] - 5:21, 188:9
**methodologies** [1] - 103:17
**methodology** [4] - 103:7, 103:16, 106:15, 171:10
**Miami** [3] - 1:3, 112:17, 112:19
**mic** [2] - 74:12, 173:8
**Michael** [4] - 36:12, 55:2, 55:9
**MICHAEL** [2] - 3:8, 55:6
**microphone** [2] - 42:5, 55:8
**mid** [3] - 40:4, 54:21, 95:21
**mid-morning** [1] - 54:21
**midafternoon** [1] - 195:8
**middle** [9] - 62:21, 89:22, 113:11, 113:12, 113:21, 131:18, 153:20, 153:21, 177:5
**midst** [2] - 14:2, 122:6
**might** [10] - 30:4, 36:22, 101:22, 146:18, 152:6, 153:23, 159:12, 173:17, 185:10, 194:21
**million** [77] - 57:23, 61:16, 62:14, 62:16, 62:21, 63:6, 63:10, 63:12, 63:17, 67:19, 67:20, 67:21, 79:2, 79:9, 79:21, 79:22, 80:6, 80:9, 81:10, 81:13, 82:25, 83:3, 83:4, 83:5, 83:6, 84:5, 84:15, 84:16, 84:20, 84:21, 84:24, 85:7, 89:13, 101:19, 105:9, 105:18, 105:23, 106:7, 106:8, 106:16, 107:1, 107:2, 107:12, 108:11, 109:2, 109:4, 109:5, 109:6, 110:24, 112:10, 113:17, 113:19, 113:23, 113:24, 114:12, 116:18, 116:20, 152:17, 153:1, 159:19, 160:16, 160:19, 166:25, 167:1, 167:5, 167:11, 167:14, 172:5, 172:13
**million-plus** [1] - 61:16
**millions** [2] - 104:24, 104:25
**Minal** [15] - 5:4, 16:18, 28:13, 28:22, 29:4, 30:10, 34:9, 40:24, 48:18, 91:5, 110:7, 115:9, 167:9, 193:2, 193:3
**MINAL** [1] - 1:6
**mind** [9] - 94:10, 98:6, 98:14, 105:2, 106:19, 121:23, 171:23, 175:24, 176:3
**mine** [1] - 136:9

**minimum** [1] - 6:19
**minor** [1] - 197:14
**minute** [9] - 25:18, 26:12, 29:24, 51:20, 130:1, 131:16, 145:22, 184:3, 184:4
**minutes** [12] - 51:15, 51:19, 52:3, 52:8, 53:2, 177:2, 178:12, 179:2, 194:20, 194:21, 194:22, 198:12
**miscellaneous** [1] - 57:9
**misdirected** [1] - 124:16
**misleading** [1] - 194:23
**mismatch** [1] - 171:17
**missed** [2] - 150:7, 197:22
**missing** [3] - 121:19, 122:4, 183:3
**mistake** [1] - 187:3
**mmm-hmm** [1] - 161:12
**model** [1] - 110:2
**Mojo** [1] - 85:8
**molecular** [2] - 75:11
**moment** [9] - 10:9, 41:1, 78:9, 82:3, 93:24, 115:20, 130:18, 167:17, 176:22
**moments** [1] - 95:15
**Monday** [10] - 15:22, 96:19, 97:7, 97:8, 97:11, 97:15, 174:25, 175:11, 195:24, 198:4
**money** [60] - 15:18, 31:13, 32:2, 74:8, 78:16, 79:4, 79:6, 79:10, 79:17, 79:20, 79:22, 81:12, 83:10, 84:23, 85:5, 86:2, 93:16, 102:25, 103:10, 103:12, 103:13, 104:6, 104:13, 104:14, 104:24, 105:11, 106:17, 107:9, 107:15, 109:1, 109:3, 109:15, 110:21, 113:5, 113:13, 113:14, 114:1, 114:23, 123:10, 123:17, 123:22, 126:24, 152:23, 153:10, 153:23, 153:25, 154:1, 154:4, 154:7, 154:8, 155:7, 155:8, 155:9, 155:25, 156:3, 156:9, 165:22, 165:25, 190:20
**monitor** [1] - 83:16
**month** [7] - 17:7, 29:13, 38:16, 70:24, 112:25, 186:9
**monthly** [1] - 161:5
**months** [4] - 58:5, 70:25, 109:7
**moot** [1] - 195:22
**Morgan** [6] - 107:19, 110:23, 111:4, 113:12, 113:21, 113:22
**Morin** [15] - 17:10, 17:15, 17:20, 18:19, 20:2, 20:9, 20:16, 21:6, 21:13, 22:15,

32:12, 33:4, 33:11, 34:4, 35:21
**MORIN** [1] - 17:11
**Morin's** [1] - 32:16
**morning** [27] - 5:3, 6:19, 12:2, 12:6, 12:12, 13:23, 14:9, 14:10, 31:5, 31:6, 42:8, 48:15, 48:16, 50:25, 54:21, 55:12, 55:13, 88:10, 97:7, 97:8, 104:10, 146:16, 174:16, 178:16, 195:19, 196:23
**Mosaic** [5] - 21:18, 21:20, 21:23, 22:1, 22:5
**Mosaic's** [1] - 22:7
**most** [17] - 23:2, 51:25, 98:11, 113:13, 113:14, 120:11, 152:23, 153:9, 153:14, 153:22, 153:25, 154:4, 154:6, 154:8, 162:7, 174:14, 180:23
**motion** [4] - 10:3, 178:12, 178:15, 181:18
**mouth** [2] - 39:16, 44:22
**move** [27] - 6:16, 14:15, 15:3, 16:8, 51:11, 58:16, 63:2, 70:4, 78:8, 78:25, 82:15, 83:14, 83:17, 85:15, 97:7, 106:19, 108:21, 114:23, 115:18, 118:9, 129:13, 130:20, 133:7, 158:5, 159:24, 163:6, 197:14
**moved** [5] - 9:11, 83:10, 109:4, 113:5, 126:5
**movement** [1] - 113:9
**moves** [4] - 78:19, 88:4, 109:3, 110:21
**movie** [1] - 186:7
**moving** [10] - 74:20, 85:4, 86:10, 86:16, 92:20, 110:15, 113:8, 113:14, 113:17, 175:17
**MR** [142] - 3:3, 3:6, 3:6, 3:7, 3:9, 3:10, 10:13, 11:19, 14:6, 14:8, 14:15, 14:22, 15:3, 15:8, 15:13, 15:15, 15:20, 15:21, 16:6, 16:13, 16:14, 22:18, 22:20, 24:24, 25:5, 25:17, 25:20, 25:21, 30:5, 30:9, 30:23, 41:10, 41:15, 41:22, 42:1, 42:7, 42:11, 48:8, 48:12, 48:14, 50:1, 50:6, 50:20, 53:22, 54:4, 58:21, 61:24, 72:2, 72:7, 81:23, 81:25, 82:5, 82:8, 88:8, 93:19, 97:5, 97:9, 99:1, 99:13, 116:2, 116:4, 126:5, 126:10, 126:12, 129:18, 129:21, 130:16, 130:17, 130:22, 130:23, 131:20,

131:22, 132:6, 132:7, 133:9, 133:13, 133:16, 134:18, 134:19, 137:25, 138:1, 138:10, 138:11, 140:14, 140:16, 142:12, 142:15, 142:22, 142:23, 143:24, 143:25, 147:6, 147:7, 148:10, 148:11, 148:18, 148:19, 150:18, 150:19, 152:12, 152:21, 158:1, 158:5, 158:10, 163:2, 163:11, 167:22, 167:25, 168:2, 168:8, 168:12, 170:23, 181:8, 181:12, 181:22, 181:24, 182:5, 183:17, 183:25, 184:3, 184:7, 185:17, 185:21, 187:5, 188:6, 189:6, 190:6, 190:11, 190:17, 190:25, 192:1, 192:8, 192:11, 194:21, 196:3, 196:10, 196:11, 196:12, 196:16, 197:23, 198:7, 198:16
**MS** [128] - 3:4, 3:9, 3:10, 3:11, 5:13, 5:24, 6:7, 6:9, 6:11, 6:14, 6:18, 7:5, 7:14, 7:21, 8:15, 8:20, 10:23, 11:7, 11:10, 12:5, 13:16, 14:17, 15:5, 16:9, 30:25, 31:4, 37:6, 37:7, 41:1, 41:3, 51:9, 52:7, 52:21, 53:8, 53:19, 54:6, 54:9, 55:1, 55:11, 58:15, 59:4, 61:21, 62:4, 62:7, 64:1, 64:6, 64:9, 70:3, 70:8, 71:23, 72:4, 72:10, 78:18, 78:24, 81:24, 82:10, 82:14, 82:17, 82:19, 83:12, 83:23, 84:8, 84:11, 85:15, 85:20, 88:3, 88:10, 88:13, 90:22, 91:3, 93:12, 93:16, 93:20, 95:24, 96:10, 96:14, 97:3, 98:23, 99:11, 99:24, 99:25, 102:16, 102:20, 102:23, 115:20, 115:23, 126:7, 129:20, 133:7, 133:12, 152:5, 158:3, 158:7, 163:5, 163:14, 167:17, 167:20, 168:1, 168:5, 170:25, 171:2, 171:7, 171:23, 171:24, 173:12, 173:21, 174:5, 174:7, 174:9, 178:24, 179:6, 179:14, 180:5, 180:8, 180:21, 181:1, 183:4, 184:14, 186:13, 187:16, 192:23, 195:10, 195:17, 196:1, 196:8, 197:5, 197:12, 198:18
**multigene** [3] - 24:3, 24:18, 24:21
**multiple** [10] - 33:18, 77:20, 100:13, 102:8, 108:1, 108:3, 108:10, 108:17, 133:25,

159:3
**multiselling** [2] - 18:12, 35:4
**must** [2] - 151:25, 176:20
**mutations** [2] - 23:22, 23:24
**MyOnCallDoc** [9] - 85:2, 85:6, 187:6, 187:8, 187:14, 187:24, 187:25, 188:18, 193:1
**Myriad** [3] - 23:11, 23:14, 23:20

# N

**name** [12] - 42:5, 45:9, 48:2, 48:17, 52:19, 55:8, 55:9, 110:4, 111:19, 113:23, 131:24, 188:20
**named** [2] - 55:16, 76:20
**namely** [1] - 92:16
**names** [4] - 26:21, 126:25, 144:12, 144:13
**Narottam** [1] - 115:9
**narrative** [1] - 185:11
**narrow** [1] - 108:24
**narrower** [2] - 93:5, 180:21
**narrowing** [1] - 84:17
**nature** [3] - 5:10, 57:3, 102:10
**NE** [1] - 2:3
**near** [1] - 153:20
**nearly** [3] - 80:12, 106:17, 165:2
**necessarily** [11] - 47:8, 104:15, 122:1, 123:4, 137:12, 148:5, 158:18, 179:12, 182:25, 191:19, 193:12
**necessary** [1] - 53:25
**need** [23] - 10:11, 10:20, 12:14, 25:17, 26:8, 52:2, 52:9, 53:4, 94:24, 95:3, 97:19, 120:5, 176:2, 176:24, 177:1, 179:4, 184:24, 187:10, 187:13, 195:7, 197:9, 197:25, 198:3
**needed** [5] - 119:2, 157:13, 185:10, 187:7, 187:9
**needs** [12] - 8:6, 8:22, 61:25, 130:2, 130:7, 139:14, 178:13, 183:19, 183:20, 185:7, 195:6, 196:16
**negative** [3] - 47:5, 47:8, 49:24
**Network** [2] - 85:3, 85:6
**never** [7] - 43:9, 58:5, 80:15, 103:23, 122:4, 125:17, 187:12
**new** [2] - 23:15, 176:9

**New** [1] - 1:16
**newest** [1] - 89:23
**news** [9] - 6:9, 17:24, 19:15, 23:19, 38:20, 46:21, 49:25, 59:5, 195:15
**next** [41] - 15:13, 15:20, 41:10, 41:25, 46:8, 51:7, 51:19, 52:3, 54:1, 54:18, 54:25, 66:11, 69:23, 73:25, 77:2, 83:10, 85:4, 97:24, 98:5, 98:16, 106:8, 106:14, 109:18, 111:13, 111:23, 130:20, 142:12, 142:13, 142:22, 143:24, 144:6, 144:8, 147:6, 148:10, 148:17, 159:24, 174:25, 175:21, 176:1, 178:12
**next-to-last** [1] - 73:25
**nice** [3] - 12:13, 13:6, 175:9
**night** [3] - 12:13, 13:6, 41:18
**NO** [1] - 1:2
**non** [1] - 10:3
**non-party** [1] - 10:3
**none** [5] - 36:7, 58:21, 92:11, 122:8, 194:17
**nonfederal** [1] - 104:17
**nonparties** [2] - 178:13, 198:14
**noon** [8] - 7:7, 11:2, 51:12, 52:2, 53:5, 93:23
**normal** [1] - 105:23
**North** [2] - 111:7, 111:20
**north** [1] - 132:19
**notation** [1] - 72:25
**note** [2] - 44:4, 103:2
**noted** [1] - 124:9
**notepads** [1] - 51:2, 129:25, 176:23
**notes** [3] - 9:25, 177:25, 178:8
**nothing** [13] - 41:20, 50:20, 115:24, 121:23, 123:15, 160:2, 160:20, 167:20, 173:21, 183:25, 186:4, 196:13, 198:8
**noticeable** [1] - 171:14
**November** [7] - 71:6, 71:8, 76:23, 84:6, 86:14, 93:1, 147:10
**nowhere** [1] - 74:24
**NPICS** [1] - 131:24
**number** [60] - 5:3, 9:14, 12:12, 62:14, 62:15, 65:25, 66:24, 68:20, 69:4, 69:5, 69:21, 72:20, 74:4, 74:22, 75:25, 77:2, 86:2, 86:20, 90:10, 90:11, 90:13, 91:8, 92:22, 94:1, 95:20, 101:2,

101:14, 101:15, 101:22, 101:25, 106:7, 107:2, 114:11, 114:25, 116:12, 116:14, 117:8, 124:9, 125:8, 125:9, 125:13, 128:7, 129:15, 132:24, 133:3, 133:5, 134:4, 134:16, 137:25, 138:10, 147:20, 150:20, 154:15, 157:25, 158:4, 165:18, 165:19, 165:20
**numbers** [20] - 66:1, 68:10, 77:6, 80:15, 90:15, 90:18, 91:9, 91:18, 91:21, 91:23, 92:12, 93:4, 93:9, 107:5, 107:6, 107:7, 124:3, 132:19, 157:23, 177:22
**numerous** [1] - 140:6
**NW** [1] - 1:18

**O**

**o'clock** [5] - 96:8, 176:25, 179:3, 195:21, 196:17
**oath** [1] - 95:10
**object** [3] - 53:24, 146:5, 189:9
**objection** [26] - 9:12, 14:17, 14:19, 15:5, 16:9, 54:13, 58:20, 58:24, 61:23, 64:5, 70:5, 72:1, 78:21, 82:16, 83:20, 85:17, 88:7, 90:25, 102:19, 126:7, 133:12, 147:4, 158:7, 163:10, 168:3, 168:5
**observe** [1] - 46:13
**obtain** [4] - 21:5, 120:8, 123:24, 125:1
**obtained** [2] - 120:11
**obviously** [21] - 5:7, 9:1, 9:18, 22:11, 86:20, 91:15, 111:16, 116:21, 119:20, 135:12, 136:18, 138:19, 141:10, 142:20, 143:8, 144:15, 146:5, 155:12, 160:12, 180:9, 191:2
**occasion** [3] - 5:17, 21:11, 21:12
**occurring** [1] - 162:16
**October** [9] - 91:16, 93:1, 93:5, 108:8, 112:16, 112:20, 147:9
**odd** [1] - 8:10
**OF** [5] - 1:1, 1:3, 1:9, 1:15, 1:18
**offense** [1] - 94:15
**offer** [1] - 102:17
**offers** [4] - 61:22, 64:2, 71:24, 90:23
**OFFICE** [1] - 1:18

**OFFICER** [6] - 13:21, 51:4, 53:11, 54:14, 99:15, 130:4
**Official** [2] - 1:22, 199:9
**oftentimes** [1] - 159:2
**oldest** [1] - 89:23
**once** [12] - 7:16, 51:22, 61:1, 65:21, 71:12, 107:14, 118:3, 129:21, 134:3, 135:22, 142:3, 187:5
**Oncology** [1] - 24:11
**one** [121] - 7:17, 10:1, 11:23, 11:24, 11:25, 17:9, 18:12, 27:2, 27:4, 27:10, 28:16, 28:20, 29:24, 35:4, 35:18, 38:19, 40:15, 41:1, 44:25, 45:24, 48:17, 52:19, 56:2, 59:6, 64:18, 65:1, 66:3, 66:5, 67:5, 68:9, 68:19, 69:3, 69:23, 72:2, 74:19, 75:7, 75:12, 76:23, 76:24, 78:6, 79:9, 82:5, 84:12, 85:23, 88:21, 89:10, 89:11, 90:1, 92:1, 94:4, 94:6, 103:17, 108:14, 111:18, 115:20, 117:17, 119:10, 121:25, 123:21, 124:13, 128:1, 129:14, 130:20, 131:11, 136:9, 137:22, 138:14, 138:17, 139:7, 139:8, 142:13, 142:22, 143:24, 144:6, 144:8, 145:11, 145:21, 147:6, 148:10, 148:17, 148:20, 150:24, 151:4, 151:9, 151:12, 152:23, 154:8, 160:8, 164:1, 165:22, 167:17, 167:22, 174:20, 175:4, 175:23, 179:19, 184:3, 184:4, 185:7, 185:9, 186:3, 186:13, 186:18, 186:24, 187:5, 187:11, 187:15, 187:23, 190:22, 192:14, 193:22, 194:1, 194:10, 197:7, 197:14
**ones** [9] - 17:8, 30:10, 60:12, 68:24, 136:20, 140:13, 156:24, 166:19, 168:15
**online** [1] - 94:18
**only..** [1] - 18:22
**open** [8] - 5:25, 6:18, 41:24, 93:21, 94:10, 174:11, 175:23, 176:2
**opened** [1] - 114:21
**opening** [1] - 115:1
**operating** [1] - 122:19
**opinion** [1] - 94:7
**opportunity** [11] - 9:24, 20:23, 181:6, 185:21, 189:7, 189:8, 189:19, 190:18, 191:4, 193:5, 193:10

**oppose** [1] - 179:15
**opposed** [3] - 185:12, 191:12, 193:8
**opposite** [2] - 182:9, 182:11
**opt** [2] - 18:22, 35:22
**opt-in** [2] - 18:22, 35:22
**orange** [1] - 71:12
**order** [9] - 10:2, 19:24, 25:17, 31:23, 31:24, 81:9, 101:21, 103:10, 118:8
**Order** [1] - 5:1
**ordinarily** [1] - 51:24
**organic** [1] - 191:11
**organized** [2] - 51:15, 53:16
**originally** [2] - 96:18, 97:14
**Orr** [1] - 52:19
**otherwise** [1] - 19:24
**ourselves** [1] - 9:19
**outgoing** [1] - 90:10
**outlined** [1] - 124:5
**outside** [3] - 23:15, 77:3, 121:7
**outstanding** [1] - 197:8
**overall** [2] - 67:6, 132:19
**overnight** [1] - 5:8, 6:2, 7:24
**overview** [4] - 57:3, 117:22, 117:25, 118:4
**own** [5] - 103:12, 121:6, 176:14, 184:16, 198:6
**owner** [4] - 110:4, 114:23, 156:3, 156:6
**owners** [1] - 119:18

**P**

**P-e-t-r-o-n** [1] - 55:9
**p.m** [11] - 1:5, 15:17, 99:5, 99:6, 99:16, 130:5, 130:8, 130:9, 130:11, 178:6, 198:20
**P.W** [1] - 78:4
**pace** [5] - 94:22, 95:19, 174:19, 174:23, 176:5
**PAGE** [1] - 3:2
**page** [22] - 15:13, 15:20, 25:10, 30:6, 68:4, 76:19, 77:8, 78:4, 89:10, 109:18, 111:13, 111:23, 112:13, 113:9, 114:3, 164:13, 171:21, 171:22, 171:23, 172:4
**Pagent** [2] - 26:25, 27:1
**pages** [2] - 29:15, 59:22
**Pages** [1] - 1:7
**paid** [78] - 31:24, 40:19, 40:22, 61:14, 61:19, 63:5, 63:6, 63:10, 63:11, 63:18, 63:21, 65:5, 67:17, 67:20,

67:22, 74:1, 74:15, 75:18, 75:19, 75:21, 76:7, 76:9, 76:11, 76:15, 77:5, 77:6, 77:13, 77:16, 78:1, 78:7, 79:2, 80:9, 81:14, 82:24, 112:9, 113:2, 124:10, 126:24, 136:14, 136:16, 136:23, 137:22, 138:5, 138:7, 138:17, 138:20, 138:21, 139:5, 139:7, 139:13, 139:18, 140:4, 140:7, 141:8, 142:7, 143:2, 143:3, 143:4, 151:8, 152:17, 152:25, 153:14, 154:4, 155:25, 160:17, 165:13, 166:10, 166:20, 166:25, 167:4, 167:8, 168:19, 168:22, 168:23, 169:10

**Palm** [1] - 195:11
**PALM** [1] - 1:2
**panel** [2] - 24:4, 24:21
**panels** [1] - 24:18
**paper** [4] - 87:24, 88:20, 90:20, 103:3
**paperless** [1] - 10:2
**paperwork** [2] - 49:12, 49:14
**papillary** [1] - 44:19
**paragraph** [1] - 186:17
**Part** [43] - 57:17, 57:18, 65:2, 65:6, 65:8, 65:10, 65:11, 70:22, 79:24, 80:6, 80:10, 80:11, 80:21, 80:23, 80:25, 81:4, 104:6, 104:8, 104:10, 104:11, 104:13, 104:25, 129:16, 135:2, 135:5, 135:9, 135:11, 151:1, 151:2, 151:18, 153:1, 165:4, 166:24, 166:25, 167:1, 167:2, 167:4, 167:10, 172:2
**part** [12] - 22:21, 62:22, 65:1, 73:16, 118:9, 118:10, 144:25, 158:11, 173:5, 194:4
**particular** [31] - 32:15, 39:20, 40:22, 61:6, 69:2, 69:13, 70:1, 72:21, 73:12, 74:1, 76:4, 81:13, 82:11, 83:2, 108:19, 109:11, 109:21, 115:11, 120:3, 121:16, 123:7, 137:19, 139:8, 143:6, 157:12, 158:11, 161:21, 165:13, 180:23, 181:6, 186:17
**particularly** [3] - 83:7, 128:14, 188:15
**parties** [2] - 183:20, 184:5
**partner** [2] - 17:20, 18:20
**parts** [2] - 68:6, 70:20
**party** [1] - 10:3
**pass** [1] - 48:8

**past** [5] - 5:14, 52:1, 94:25, 117:25, 175:3
**PATEL** [1] - 1:6
**Patel** [69] - 5:4, 15:10, 15:17, 16:1, 16:18, 17:1, 17:15, 28:13, 29:17, 30:10, 30:11, 31:9, 31:18, 31:25, 32:6, 32:10, 34:9, 38:9, 38:13, 38:20, 38:25, 40:24, 45:8, 45:9, 45:10, 48:18, 91:23, 98:2, 105:12, 105:13, 105:19, 105:23, 106:5, 106:12, 107:1, 107:10, 109:8, 110:7, 110:22, 113:6, 115:4, 115:9, 119:23, 128:14, 128:15, 128:21, 130:19, 130:25, 131:8, 131:9, 131:10, 146:23, 148:20, 150:5, 155:12, 155:25, 167:9, 187:5, 187:6, 187:7, 187:9, 187:18, 187:19, 187:20, 188:1, 188:3, 188:20, 193:2, 193:3
**Patel's** [13] - 91:5, 91:8, 91:16, 105:16, 107:19, 111:4, 111:19, 113:18, 113:23, 114:8, 119:15, 149:16, 188:1
**pathology** [2] - 75:11
**patience** [1] - 177:10
**patient** [9] - 18:14, 19:19, 20:11, 23:21, 35:5, 66:6, 73:6, 76:20, 166:4
**patients** [26] - 20:21, 22:2, 23:15, 23:23, 33:14, 35:15, 35:17, 36:6, 36:9, 65:15, 65:18, 66:15, 69:10, 69:21, 71:19, 74:3, 74:18, 76:12, 76:15, 140:9, 163:16, 163:22, 163:24, 164:24, 165:17, 165:19
**pattern** [5] - 30:7, 77:10, 77:15, 77:19, 78:5
**pay** [5] - 35:10, 39:14, 151:19, 166:14, 166:17
**payable** [1] - 111:6
**payees** [1] - 81:12
**paying** [1] - 18:13, 35:5, 35:10, 81:10, 105:22, 109:8, 151:20, 154:23, 165:23, 169:25, 177:14
**payment** [6] - 80:17, 87:1, 87:13, 150:10, 152:2, 170:19
**payments** [14] - 63:16, 80:20, 80:21, 82:21, 84:1, 87:8, 89:1, 89:16, 107:18, 111:10, 125:13, 130:25, 154:17, 169:21
**payroll** [24] - 105:21, 105:23, 105:24, 107:21,

109:6, 109:8, 110:22, 125:7, 128:10, 128:12, 128:15, 128:16, 128:18, 128:20, 128:21, 128:24, 130:19, 131:3, 131:6, 131:10, 131:13
**PC** [2] - 1:18, 2:3
**Peachtree** [1] - 1:18
**Peactree** [1] - 2:6
**peek** [1] - 54:7
**pending** [1] - 101:23
**Pennsylvania** [2] - 71:7, 162:13
**people** [22] - 20:3, 20:16, 20:17, 33:21, 33:24, 68:20, 69:8, 94:18, 100:24, 117:4, 117:5, 127:22, 128:6, 129:9, 135:5, 137:10, 150:4, 155:3, 158:21, 159:3, 175:22
**per** [10] - 35:10, 66:24, 79:18, 151:5, 168:22, 168:23, 169:3, 169:10, 169:22, 186:9
**percent** [20] - 23:22, 23:24, 66:14, 79:20, 79:22, 80:1, 106:18, 110:24, 158:16, 158:17, 159:8, 159:19, 160:14, 160:16, 165:2, 172:5, 172:14, 184:1, 184:2, 190:15
**percentage** [3] - 76:5, 164:24, 164:25
**perfect** [4] - 52:7, 54:12, 96:1, 180:25
**perform** [3] - 100:4, 101:2, 187:7
**perhaps** [8] - 8:5, 8:20, 9:9, 52:4, 76:13, 175:6, 191:18, 196:23
**period** [24] - 64:22, 79:16, 92:15, 92:23, 103:22, 106:3, 108:5, 108:25, 114:2, 120:7, 123:8, 124:4, 124:22, 125:6, 126:24, 127:20, 128:22, 128:23, 147:8, 148:13, 148:23, 150:12, 158:15, 161:5
**periods** [4] - 121:19, 132:25, 144:22, 160:25
**permission** [5] - 25:2, 45:17, 46:4, 180:6, 180:7
**person** [15] - 39:10, 46:23, 46:25, 49:21, 64:20, 66:3, 66:5, 68:9, 137:13, 137:14, 138:14, 169:11, 183:1, 183:14, 186:11
**personal** [37] - 32:9, 48:22, 49:8, 73:12, 75:1, 105:16, 107:19, 119:16, 137:6, 137:15, 138:2, 138:12, 139:1, 139:5, 139:7, 142:16,

144:1, 155:15, 155:23, 157:20, 158:17, 159:1, 159:3, 159:6, 159:21, 159:25, 160:1, 160:3, 160:4, 160:9, 160:15, 160:21, 161:6, 161:14, 161:20, 162:8, 162:21
**perspective** [2] - 23:21, 73:5
**pertain** [2] - 5:20, 164:14
**pertained** [1] - 179:10
**pertains** [2] - 166:3, 176:12
**Petron** [53] - 6:16, 7:10, 7:12, 9:9, 11:5, 51:8, 52:23, 53:6, 53:17, 55:2, 55:3, 55:9, 55:12, 59:5, 59:16, 62:8, 64:11, 68:6, 70:9, 72:12, 78:8, 78:25, 83:24, 84:12, 85:21, 86:25, 90:7, 91:4, 91:13, 92:7, 95:9, 95:17, 98:20, 99:10, 99:20, 100:1, 102:24, 103:2, 106:21, 107:8, 108:22, 109:14, 110:15, 112:6, 115:23, 146:22, 156:22, 163:15, 167:20, 171:8, 173:20, 173:22, 186:20
**PETRON** [2] - 3:8, 55:6
**Petron's** [1] - 9:25
**PGx** [18] - 60:3, 60:24, 61:7, 62:22, 63:9, 63:10, 63:18, 66:11, 66:13, 66:15, 66:21, 67:13, 67:15, 67:16, 67:21, 135:6, 135:7
**pharmaco** [1] - 60:23
**pharmacogenetic** [2] - 59:12, 61:11
**phone** [30] - 12:12, 18:12, 26:5, 27:15, 27:16, 39:6, 43:7, 45:22, 46:7, 46:19, 90:5, 90:13, 91:8, 91:18, 91:21, 91:23, 92:10, 92:11, 92:22, 93:3, 144:18, 147:17, 149:16, 149:19, 149:21, 183:21, 188:2
**phones** [2] - 90:9, 145:8
**phonetic)** [1] - 26:25
**photo** [2] - 110:9, 186:6
**phrase** [1] - 36:2
**physically** [1] - 87:22
**physician** [2] - 45:4, 45:7
**pick** [3] - 71:6, 99:19, 178:19
**picture** [3] - 78:15, 157:23, 177:24
**pie** [2] - 171:25, 172:2
**piece** [1] - 89:7
**pieces** [3] - 72:17, 88:20, 92:17
**place** [6] - 51:1, 88:18,

118:17, 149:4, 156:12, 183:13

**placed** [2] - 33:21, 91:22
**places** [4] - 84:23, 85:5, 94:18, 119:8
**plan** [8] - 7:2, 9:6, 53:7, 54:18, 175:25, 180:11, 198:1, 198:5
**planned** [1] - 10:15
**planning** [1] - 97:11
**plans** [4] - 65:3, 80:21, 80:22, 98:1
**play** [2] - 44:3, 71:12
**played** [2] - 36:17, 48:21
**plea** [1] - 40:10
**plead** [2] - 40:14, 40:16
**plop** [1] - 185:16
**plot** [1] - 6:21
**plotted** [1] - 162:23
**plus** [4] - 61:16, 134:21, 134:22, 172:20
**point** [31] - 7:12, 10:12, 11:16, 13:12, 22:7, 26:9, 31:11, 44:25, 45:16, 46:18, 49:18, 52:14, 71:13, 93:23, 95:17, 103:2, 105:7, 106:10, 106:22, 113:3, 139:23, 140:2, 147:20, 150:8, 156:11, 175:2, 175:21, 176:5, 181:7, 190:18, 195:8
**pointed** [6] - 35:19, 145:4, 152:11, 163:25, 165:22, 177:20
**points** [3] - 35:19, 36:1, 104:1
**polyposis** [1] - 75:8
**portion** [3] - 97:23, 172:16, 180:23
**posed** [1] - 183:8
**position** [5] - 12:10, 30:18, 96:22, 97:6, 98:7
**possibility** [2] - 96:23, 179:10
**possible** [7] - 96:6, 98:6, 134:2, 141:21, 141:23, 146:3, 166:2
**posted** [1] - 197:6
**poster** [1] - 24:10
**potential** [1] - 119:1
**potentially** [2] - 79:24, 180:10
**power** [2] - 114:23, 115:18
**practical** [2] - 136:3, 136:6
**practices** [1] - 151:14
**practitioner** [1] - 157:10
**praise** [1] - 175:15
**precarious** [1] - 180:8
**precise** [1] - 128:8
**precisely** [8] - 60:25, 61:12, 80:15, 80:19, 81:1, 125:8,

183:4, 186:14
**preexisting** [1] - 36:6
**preface** [2] - 116:9, 157:8
**prejudiced** [1] - 194:10
**premature** [1] - 5:17
**premise** [1] - 162:15
**prenatal** [2] - 44:9, 44:13
**prepaid** [1] - 46:12
**preparation** [2] - 32:18, 118:24
**prepare** [2] - 91:7, 140:13
**prepared** [6] - 6:25, 97:7, 119:4, 126:13, 140:12, 142:3
**preparing** [2] - 21:1, 117:16
**present** [9] - 5:14, 12:20, 99:7, 159:18, 175:4, 179:19, 180:14, 190:1, 191:15
**presentation** [3] - 9:13, 146:5, 146:18
**presentations** [1] - 24:10
**presented** [2] - 180:16, 181:16
**presenting** [2] - 92:17, 180:18
**pressing** [1] - 9:3
**pretty** [5] - 80:19, 134:1, 174:23, 192:16, 197:4
**preview** [1] - 174:15
**previously** [6] - 32:21, 38:6, 59:14, 60:22, 61:24, 185:5
**primary** [7] - 39:14, 79:15, 97:23, 105:12, 186:19, 186:20, 186:23
**print** [1] - 57:24
**private** [4] - 65:3, 80:21, 80:22, 104:17
**problem** [8] - 8:9, 10:15, 11:2, 82:6, 182:2, 182:15, 192:8, 192:18
**problematic** [1] - 182:22
**problems** [1] - 54:4
**procedure** [44] - 59:18, 60:15, 60:16, 60:23, 67:5, 67:9, 68:13, 73:17, 73:24, 74:1, 75:3, 76:6, 120:13, 135:24, 136:10, 136:13, 137:18, 137:21, 138:19, 139:14, 140:2, 141:7, 141:8, 142:7, 142:8, 142:11, 143:6, 143:7, 143:18, 150:10, 150:21, 150:22, 151:6, 157:12, 164:17, 164:19, 164:21, 165:4, 165:7, 168:14, 184:12, 189:9, 191:13
**procedures** [3] - 75:4, 75:6, 188:12
**proceed** [3] - 37:5, 71:2, 82:9

**proceedings** [4] - 41:13, 93:14, 174:2, 199:4
**Proceedings** [3] - 41:24, 93:21, 174:11
**proceeds** [14] - 103:24, 104:1, 104:3, 104:7, 104:19, 106:4, 107:24, 109:9, 109:17, 110:13, 110:25, 111:8, 167:9, 167:10
**process** [10] - 19:16, 32:7, 103:9, 105:23, 105:24, 120:24, 121:5, 138:22, 139:15
**processing** [1] - 105:25
**processor** [2] - 109:6, 109:8
**produce** [3] - 193:16, 194:8, 194:11
**produced** [3] - 5:15, 21:2, 142:10
**production** [1] - 195:23
**productive** [1] - 188:25
**products** [2] - 18:12, 35:4
**professionals** [2] - 46:13, 56:22
**proffer** [1] - 8:10
**progress** [1] - 95:21
**prohibited** [1] - 51:24
**promise** [1] - 177:8
**proposal** [3] - 5:25, 6:3, 191:6
**proposed** [1] - 184:21
**proposition** [1] - 155:6
**prosecutor** [1] - 26:15
**protocol** [1] - 159:5
**protocols** [1] - 118:7
**PROV** [1] - 131:24
**provide** [6] - 35:22, 57:1, 91:4, 121:5, 134:12, 135:15
**provided** [12] - 18:19, 59:10, 60:3, 60:8, 70:10, 78:12, 81:15, 91:18, 135:21, 147:2, 182:12, 185:5
**provider** [6] - 71:5, 71:7, 72:24, 74:23, 76:1, 131:24
**providers** [4] - 133:5, 133:17, 133:21, 134:15
**providers/doctors** [1] - 132:17
**providing** [4] - 18:18, 19:23, 36:8
**public** [1] - 56:4
**publish** [5] - 16:13, 22:18, 129:21, 168:2, 171:5
**pull** [5] - 83:16, 87:6, 125:24, 128:24, 185:1
**Puntillo** [3] - 83:12, 83:15, 84:8
**purchase** [3] - 109:12, 109:15, 155:12

**purchased** [4] - 109:23, 109:24, 110:12, 156:19
**purely** [2] - 11:17, 70:22
**purportedly** [1] - 47:17
**purpose** [7] - 47:10, 156:15, 156:17, 179:22, 187:20, 187:22, 194:16
**purposes** [7] - 104:18, 104:25, 135:8, 142:2, 151:7, 151:8, 192:2
**put** [51] - 12:9, 24:25, 31:23, 46:10, 46:11, 46:12, 57:5, 80:4, 86:5, 88:21, 92:2, 95:20, 96:21, 97:15, 98:20, 103:13, 114:7, 121:25, 125:22, 126:10, 126:23, 127:1, 127:15, 127:21, 129:18, 130:22, 134:18, 141:11, 141:13, 141:14, 141:22, 142:6, 143:15, 144:11, 146:19, 146:22, 146:25, 152:14, 157:11, 158:25, 159:7, 159:19, 160:2, 167:23, 171:2, 171:4, 183:21, 191:1, 191:23
**puts** [1] - 98:7
**putting** [7] - 97:11, 97:19, 97:20, 101:13, 122:6, 171:23, 176:1
**Pérignon** [2] - 112:17, 156:12

## Q

**qualifications** [1] - 56:20
**qualifier** [1] - 184:25
**qualify** [2] - 191:12, 193:23
**quantify** [1] - 125:11
**quarter** [1] - 99:3
**quash** [3] - 10:3, 178:12, 178:15
**questioning** [3] - 13:2, 82:2, 193:13
**questions** [13] - 22:11, 32:19, 36:11, 41:4, 48:19, 116:9, 151:11, 151:21, 163:15, 163:20, 171:1, 183:7, 189:20
**quick** [4] - 29:24, 192:17, 197:2, 197:4
**quickly** [1] - 196:16
**quite** [9] - 44:24, 58:2, 71:9, 76:13, 106:7, 175:8, 194:1, 195:19, 196:9
**quote** [1] - 188:14
**quoting** [1] - 39:5

## R

**RAFFERTY** [9] - 2:5, 3:6,

48:12, 48:14, 50:1, 188:6, 196:11, 197:23, 198:7
**Rafferty** [4] - 48:17, 96:2, 178:11, 190:7
**raid** [1] - 18:10
**raise** [5] - 10:7, 12:15, 42:2, 55:5, 96:15
**raised** [1] - 179:7
**Rama** [2] - 91:18, 150:3
**Ramamurthy** [22] - 5:20, 91:20, 91:21, 144:21, 146:24, 147:3, 149:19, 179:11, 179:17, 184:20, 184:22, 184:24, 186:9, 186:12, 186:14, 186:16, 187:2, 187:11, 191:23, 192:9, 192:11, 192:12
**Ramamurthy's** [1] - 186:4
**randomly** [1] - 141:4
**range** [10] - 92:25, 108:16, 108:17, 111:9, 145:1, 147:8, 147:13, 147:14, 147:15, 170:10
**rather** [4] - 50:13, 50:14, 50:16, 117:11
**Raton** [3] - 112:23, 113:1, 113:2
**reach** [10] - 94:10, 195:15
**read** [10] - 10:4, 17:23, 69:1, 110:1, 110:6, 155:20, 182:20, 184:5, 184:6, 190:3
**readily** [1] - 143:17
**reading** [3] - 179:11, 179:12, 180:18
**reads** [2] - 67:14, 75:7
**ready** [10] - 9:20, 10:5, 53:18, 99:21, 174:18, 178:9, 181:1, 195:8, 197:1
**real** [2] - 40:2, 186:10
**realistic** [1] - 98:4
**realize** [2] - 43:21, 146:10
**really** [10] - 28:22, 41:20, 43:14, 45:2, 52:22, 57:10, 105:20, 187:3, 188:24, 194:5
**realm** [1] - 139:9
**reason** [7] - 7:9, 45:9, 52:16, 95:18, 140:1, 171:20, 185:17
**reasonable** [1] - 194:3
**reasoning** [1] - 183:17
**recalled** [1] - 5:22
**recalling** [1] - 190:24
**receive** [8] - 11:20, 35:12, 45:20, 47:17, 50:17, 65:20, 66:7, 90:16
**Received** [2] - 3:14, 4:10
**received** [53] - 7:24, 14:20, 15:7, 16:12, 35:13, 43:6, 46:19, 49:11, 49:19, 59:3, 61:10, 62:6, 64:7, 64:18,

64:23, 66:12, 66:23, 67:2, 67:7, 67:9, 67:16, 69:22, 70:1, 70:6, 72:8, 78:22, 82:18, 83:2, 83:4, 83:6, 83:21, 85:18, 88:12, 91:1, 101:7, 102:22, 105:14, 105:20, 105:23, 106:12, 106:14, 113:13, 114:15, 115:13, 126:9, 133:15, 134:10, 135:5, 135:6, 158:9, 163:12, 165:1, 186:9
**receiver** [2] - 86:17, 86:18
**receives** [2] - 84:20
**receiving** [6] - 45:13, 47:12, 63:20, 63:23, 90:13, 114:9
**recently** [1] - 127:16
**recess** [5] - 51:3, 53:10, 99:4, 198:10, 198:17
**recessed** [4] - 53:12, 99:5, 130:8, 198:20
**recollection** [7] - 96:25, 120:21, 121:21, 182:10, 182:23, 185:11, 190:13
**recollections** [1] - 121:15
**record** [19] - 12:19, 20:6, 28:1, 37:4, 41:9, 42:5, 53:13, 55:8, 87:25, 90:9, 90:12, 99:6, 114:20, 115:22, 124:22, 130:9, 145:10, 167:19, 185:4
**recorded** [2] - 43:22, 43:24
**recording** [9] - 20:10, 27:13, 27:21, 36:12, 36:17, 36:21, 39:25, 44:3, 48:21
**recordings** [11] - 14:12, 14:24, 20:20, 24:25, 25:23, 26:10, 26:13, 26:18, 27:3, 27:6, 30:13
**records** [55] - 18:17, 18:19, 35:22, 54:10, 57:7, 57:10, 57:19, 58:9, 59:5, 61:16, 78:12, 78:14, 78:15, 79:10, 86:6, 86:24, 87:5, 87:11, 87:12, 88:1, 90:1, 90:5, 90:7, 90:8, 90:12, 90:15, 91:5, 91:16, 91:22, 92:21, 93:3, 119:12, 119:13, 124:9, 124:20, 125:7, 125:24, 127:19, 127:22, 127:24, 128:9, 128:10, 128:18, 128:24, 144:18, 146:4, 146:23, 149:16, 149:19, 149:21, 156:5, 179:16
**recross** [1] - 168:7
**RECROSS** [2] - 3:10, 168:11
**RECROSS-EXAMINATION** [2] - 3:10, 168:11
**recur** [1] - 47:9

**red** [13] - 71:6, 71:9, 71:10, 71:12, 71:15, 71:17, 80:20, 81:3, 107:2, 107:6, 107:23, 153:7, 186:1
**REDIRECT** [8] - 3:4, 3:7, 3:10, 3:11, 31:3, 50:5, 163:13, 171:6
**redirect** [10] - 7:8, 13:4, 30:24, 48:9, 50:4, 96:3, 163:4, 168:15, 193:5, 195:3
**reference** [5] - 23:11, 28:12, 86:5, 88:17, 168:14
**referenced** [2] - 17:6, 30:18
**references** [1] - 147:22
**referencing** [1] - 107:20
**referred** [2] - 72:24, 114:18
**referring** [9] - 63:23, 72:24, 74:23, 76:1, 131:24, 132:1, 132:2, 133:18, 133:20
**reflect** [2] - 108:22, 110:17
**reflected** [11] - 25:16, 63:3, 68:8, 72:14, 74:10, 85:22, 106:1, 166:23, 167:12, 171:25, 188:19
**reflects** [1] - 66:25
**reframing** [1] - 194:9
**refresh** [2] - 185:10, 190:13
**refreshing** [1] - 182:10
**regard** [2] - 104:20, 197:15
**regarding** [11] - 5:9, 17:25, 44:9, 47:4, 50:17, 94:17, 94:18, 130:25, 179:7, 186:14, 197:8
**regardless** [4] - 159:6, 159:20, 160:1, 166:18
**REGINALD** [1] - 1:14
**Reginald** [1] - 42:8
**regular** [1] - 105:20
**rehabilitate** [3] - 189:16, 193:10, 194:1
**rehabilitation** [1] - 189:3
**reimbursements** [1] - 63:15
**reject** [1] - 147:1
**related** [7] - 76:4, 76:25, 77:23, 78:2, 86:13, 88:20
**relates** [2] - 87:1, 188:14
**relation** [1] - 45:10
**relationship** [5] - 36:6, 72:25, 73:5, 74:24, 76:3
**relatively** [2] - 80:16, 127:16
**relevant** [6] - 40:19, 40:22, 64:22, 120:6, 126:24, 132:25
**rely** [2] - 121:4, 122:2
**relying** [1] - 54:10
**remainder** [2] - 7:8, 12:24, 73:15
**remaining** [1] - 5:6
**remember** [41] - 26:21,

27:2, 27:7, 27:12, 27:14, 27:17, 27:18, 27:19, 27:20, 27:21, 28:5, 28:22, 28:25, 29:2, 29:4, 29:7, 30:15, 30:16, 32:24, 49:16, 49:17, 58:5, 94:3, 94:12, 95:10, 120:3, 121:18, 121:22, 125:7, 128:23, 132:18, 154:24, 157:22, 157:23, 157:24, 159:4, 169:25, 177:18, 185:17, 190:11, 193:11
**remembered** [1] - 140:20
**remind** [3] - 79:1, 93:25, 94:9
**removed** [1] - 45:1
**reoccur** [1] - 47:13
**reoccurring** [1] - 44:24
**reopen** [2] - 191:8, 193:25
**rep** [1] - 154:22
**repeat** [5] - 20:14, 20:15, 72:2, 117:11, 165:17
**reply** [2] - 10:3, 178:12
**report** [6] - 180:1, 184:20, 185:4, 188:11, 188:20, 194:11
**REPORTED** [1] - 1:20
**reporter** [3] - 173:7, 183:21, 185:13
**Reporter** [2] - 1:22, 199:9
**reports** [4] - 119:3, 181:13, 181:25, 184:23
**represent** [4] - 71:4, 92:14, 157:11, 171:9
**representatives** [1] - 154:11
**represented** [3] - 49:21, 111:16, 163:21
**representing** [1] - 25:22
**represents** [3] - 48:18, 63:9, 66:11
**reps** [6] - 29:5, 29:6, 154:11, 154:16, 154:23, 154:24
**reps/marketers** [2] - 154:25, 155:3
**request** [5] - 81:20, 118:19, 179:9, 179:20, 180:5
**requested** [1] - 129:10
**requests** [3] - 57:3, 118:18, 122:3
**require** [2] - 5:21, 22:8
**required** [3] - 19:17, 179:24, 184:18
**requiring** [1] - 10:2
**requisition** [2] - 19:24, 31:23
**research** [2] - 94:18, 176:14
**reserve** [1] - 48:8

**Resort** [3] - 112:23, 113:1, 113:2
**respect** [6] - 34:3, 49:11, 78:11, 83:7, 100:16, 189:20
**respectfully** [4] - 16:4, 81:25, 185:18, 187:16
**respectively** [1] - 85:7
**respond** [1] - 31:25
**responsibilities** [2] - 122:16, 189:21
**responsibility** [1] - 187:1
**rest** [7] - 108:16, 172:10, 173:5, 173:10, 175:10, 178:2, 196:11
**rested** [1] - 98:15
**resting** [2] - 52:12, 96:19
**restroom** [2] - 130:1, 130:7
**result** [3] - 47:5, 47:8, 112:1
**results** [4] - 24:3, 47:17, 49:23, 50:18
**resume** [3] - 7:12, 99:10, 175:10
**retired** [3] - 42:17, 42:18, 42:23
**return** [1] - 195:7
**returned** [3] - 41:24, 93:21, 174:11
**review** [3] - 88:17, 89:5
**reviewing** [2] - 5:25, 18:9
**revisited** [1] - 192:19
**rewards** [1] - 185:24
**RFX** [1] - 131:24
**right-hand** [2] - 73:9, 168:23
**Rinsky** [5] - 6:12, 6:13, 6:14, 9:19, 129:3
**rise** [6] - 13:21, 51:4, 53:11, 54:14, 99:15, 130:4
**Risk** [1] - 23:21
**risk** [3] - 24:4, 47:6, 186:25
**RMR** [2] - 1:21, 199:8
**RODOLFO** [1] - 1:10
**Rodolfo** [1] - 1:22
**role** [1] - 129:4
**ROOKARD** [1] - 1:14
**Rookard** [1] - 185:2
**room** [5] - 88:19, 95:7, 176:23, 177:17, 178:4
**root** [1] - 157:12
**Rose** [1] - 186:18
**roughly** [6] - 69:7, 69:17, 81:3, 82:25, 102:1, 163:16
**round** [2] - 53:21, 99:14
**route** [1] - 183:5
**Rover** [4] - 111:7, 111:20, 121:17
**row** [5] - 65:24, 65:25, 67:5, 152:16, 166:16
**RPR** [2] - 1:21, 199:8

**RUIZ** [1] - 1:10
**Ruiz** [1] - 1:22
**rule** [4] - 103:19, 103:20, 106:16, 176:16
**ruled** [1] - 181:18
**rules** [1] - 94:1
**ruling** [3] - 178:15, 178:16, 189:9
**rulings** [1] - 53:4
**run** [4] - 65:3, 137:1, 198:13, 198:15
**running** [1] - 177:9
**runs** [2] - 17:2, 34:10

---

# S

**S-t-o-u-t** [1] - 55:16
**SADOW** [128] - 1:17, 1:18, 3:3, 3:9, 3:10, 10:13, 11:19, 14:6, 14:8, 14:15, 14:22, 15:3, 15:8, 15:13, 15:15, 15:20, 15:21, 16:6, 16:13, 16:14, 22:18, 22:20, 24:24, 25:5, 25:17, 25:20, 25:21, 30:5, 30:9, 30:23, 41:10, 41:15, 41:22, 53:22, 54:4, 58:21, 61:24, 72:2, 72:7, 81:23, 81:25, 82:5, 82:8, 88:8, 93:19, 97:5, 97:9, 99:1, 99:13, 116:2, 116:4, 126:5, 126:10, 126:12, 129:18, 129:21, 130:16, 130:17, 130:22, 130:23, 131:20, 131:22, 132:6, 132:7, 133:9, 133:13, 133:16, 134:18, 134:19, 137:25, 138:1, 138:10, 138:11, 140:14, 140:16, 142:12, 142:15, 142:22, 142:23, 143:24, 143:25, 147:6, 147:7, 148:10, 148:11, 148:18, 148:19, 150:18, 150:19, 152:12, 152:21, 158:1, 158:5, 158:10, 163:2, 163:11, 167:22, 167:25, 168:2, 168:8, 168:12, 170:23, 181:8, 181:12, 181:22, 181:24, 182:5, 183:17, 183:25, 184:3, 184:7, 185:17, 185:21, 187:5, 189:6, 190:6, 190:11, 190:17, 190:25, 192:1, 192:8, 192:11, 194:21, 196:3, 196:10, 196:12, 196:16, 198:16
**Sadow** [41] - 5:18, 9:20, 10:7, 14:2, 14:3, 14:5, 31:7, 31:11, 33:5, 34:2, 35:18, 38:2, 38:4, 58:22, 62:5, 96:1, 130:14, 130:15, 152:6,

158:4, 163:1, 163:7, 163:20, 164:1, 164:9, 164:18, 165:3, 165:22, 166:3, 179:8, 179:9, 180:22, 181:5, 181:23, 184:21, 185:14, 188:7, 188:11, 189:23, 192:24, 193:21
**Sadow's** [4] - 5:25, 9:10, 10:23, 52:10
**safe** [1] - 88:15
**salaries** [2] - 125:13, 125:18
**salary** [1] - 129:11
**sales** [7] - 154:11, 154:15, 154:22, 154:23, 154:24, 154:25, 155:3
**SAMUEL** [2] - 2:2, 2:3
**savings** [1] - 114:22
**savvy** [1] - 56:23
**saw** [13] - 39:22, 58:9, 85:4, 87:12, 107:8, 107:17, 107:22, 121:16, 128:12, 159:2, 177:18, 188:7, 188:8
**Scams** [1] - 38:14
**scams** [1] - 38:21
**scenario** [2] - 28:20, 197:2
**schedule** [6] - 22:13, 52:14, 97:13, 98:8, 175:14, 178:22
**scheduling** [4] - 53:23, 173:25, 176:6, 198:6
**scientists** [1] - 56:22
**scope** [3] - 18:21, 122:15, 122:23
**screen** [1] - 72:13
**screening** [3] - 33:18, 44:9, 44:12
**screwed** [1] - 194:4
**script** [4] - 33:1, 33:12, 33:17, 192:3
**scripts** [1] - 186:7
**scroll** [5] - 79:20, 132:4, 132:6, 132:9, 132:13
**se** [1] - 79:18
**seat** [1] - 37:16
**seated** [12] - 13:23, 42:4, 51:6, 53:14, 54:16, 55:7, 95:14, 99:17, 130:6, 130:10, 130:12, 178:7
**second** [21] - 35:18, 37:2, 56:3, 63:2, 65:24, 65:25, 68:15, 83:16, 105:18, 107:15, 109:3, 110:21, 112:13, 112:19, 114:3, 115:4, 126:3, 145:11, 158:4, 164:13, 189:12
**seconds** [7] - 28:18, 145:11, 145:12, 145:15, 145:16, 145:18
**SECTION** [1] - 1:15
**Section** [7] - 100:9, 100:18,

101:2, 101:14, 101:18, 102:2, 116:15
**Section's** [1] - 118:6
**SECURITY** [6] - 13:21, 51:4, 53:11, 54:14, 99:15, 130:4
**see** [102] - 7:9, 10:9, 10:19, 12:3, 13:24, 15:16, 15:23, 16:3, 25:16, 29:9, 31:15, 31:17, 34:24, 35:7, 35:24, 36:1, 39:8, 39:12, 39:17, 43:10, 43:18, 50:14, 50:16, 52:5, 53:3, 59:17, 59:21, 60:19, 62:9, 63:17, 64:12, 66:1, 66:12, 66:22, 68:10, 68:12, 68:14, 69:5, 69:21, 70:21, 71:1, 71:5, 71:14, 71:16, 73:19, 75:9, 75:14, 79:4, 79:6, 81:25, 86:8, 87:5, 87:24, 89:15, 89:20, 89:22, 89:24, 92:5, 94:15, 95:6, 95:12, 95:18, 99:3, 106:23, 107:22, 110:1, 110:6, 110:8, 111:18, 113:17, 113:25, 114:24, 115:3, 122:10, 125:10, 128:25, 131:23, 136:2, 136:13, 136:16, 136:22, 137:2, 137:4, 146:6, 148:23, 148:25, 152:16, 166:1, 166:15, 172:15, 178:4, 178:11, 179:22, 180:2, 180:11, 181:2, 188:24, 192:20, 198:11
**seeing** [4] - 70:21, 87:19, 150:24, 177:19
**seem** [1] - 146:13
**seized** [1] - 26:5
**selected** [1] - 144:17
**selling** [3] - 18:14, 35:5, 55:20
**send** [3] - 23:9, 46:16, 49:14
**sender** [1] - 86:18
**sending** [11] - 33:11, 34:9, 38:12, 48:5, 86:19, 90:13, 105:8, 109:1, 114:9, 193:2, 193:3
**sends** [2] - 105:12, 109:6
**sense** [11] - 7:11, 9:4, 13:3, 52:6, 75:6, 94:23, 96:16, 172:12, 191:10, 197:20, 197:25
**sent** [19] - 15:17, 15:25, 31:12, 38:24, 45:24, 49:15, 49:19, 84:21, 84:23, 84:25, 85:1, 85:2, 85:5, 85:8, 86:1, 86:2, 107:11, 113:22
**sentence** [1] - 185:7
**sentences** [4] - 181:13, 181:15, 181:25, 184:16

**separate** [3] - 113:4, 119:3, 163:24

**September** [11] - 62:13, 77:20, 93:9, 123:10, 123:23, 127:20, 128:17, 128:22, 148:23, 149:6, 166:8

**sequence** [2] - 54:2, 75:8

**serves** [2] - 127:16, 132:19

**service** [7] - 57:18, 65:19, 65:25, 77:20, 94:2, 94:11, 94:17

**set** [8] - 29:9, 75:24, 106:1, 118:8, 151:9, 151:13, 178:18, 183:18

**Setai** [1] - 112:19

**setting** [1] - 36:22

**setup** [2] - 74:21, 77:10

**several** [7] - 19:15, 58:16, 82:11, 82:21, 91:9, 114:13, 182:12

**shared** [2] - 12:11, 142:4

**sharing** [1] - 187:21

**shift** [1] - 6:20

**shirking** [1] - 187:1

**shoots** [1] - 186:6

**Shore** [1] - 186:18

**short** [3] - 10:24, 97:3, 196:9

**shorter** [3] - 10:14, 63:3, 96:24

**shortly** [2] - 21:18, 40:4

**shot** [2] - 189:10, 189:13

**show** [25] - 11:23, 11:24, 25:6, 30:7, 32:21, 38:6, 38:24, 40:5, 57:24, 60:6, 61:18, 64:10, 68:3, 83:13, 86:6, 90:12, 91:11, 92:3, 106:14, 114:16, 139:12, 141:4, 164:20, 171:21, 193:6

**showed** [10] - 23:22, 31:7, 80:9, 112:9, 114:5, 164:1, 165:3, 165:17, 166:3, 171:21

**showing** [20] - 9:8, 33:16, 59:14, 62:8, 69:11, 70:15, 72:11, 75:22, 76:17, 79:12, 81:5, 81:10, 83:24, 84:4, 86:24, 88:23, 105:7, 107:25, 112:5, 164:19

**shown** [4] - 22:4, 141:9, 163:7, 186:19

**shows** [8] - 64:15, 65:25, 105:4, 107:4, 150:9, 154:23, 164:21, 168:18

**side** [10] - 59:17, 62:11, 67:19, 72:20, 73:9, 78:1, 104:16, 107:13, 115:3, 197:19

**sidebar** [5] - 41:11, 41:13, 93:14, 173:25, 174:2

**sides** [1] - 175:15

**sign** [2] - 18:13, 35:5

**signatories** [1] - 115:6

**signatory** [2] - 113:6, 115:14

**signature** [3] - 111:21, 114:18, 114:19

**signatures** [1] - 115:4

**signed** [2] - 22:15, 35:11

**significance** [1] - 115:11

**significant** [3] - 104:9, 116:23, 121:22

**silver** [1] - 174:19

**similar** [13] - 63:4, 66:1, 74:17, 75:23, 77:9, 77:10, 77:15, 90:3, 102:13, 176:11, 194:25, 196:11, 198:2

**similarly** [1] - 76:6

**simply** [14] - 11:13, 18:5, 22:7, 47:5, 60:23, 138:19, 139:12, 147:21, 157:2, 182:5, 183:21, 187:14, 189:14, 194:14

**single** [12] - 20:4, 20:10, 20:17, 73:23, 88:18, 108:2, 108:14, 131:24, 136:9, 136:10, 158:24, 165:14

**singular** [1] - 108:15

**sister** [1] - 49:6

**sit** [3] - 8:2, 193:22, 193:25

**sitting** [7] - 124:25, 125:2, 125:4, 127:8, 131:17, 142:18, 142:20

**situation** [7] - 13:5, 77:1, 144:1, 148:12, 180:9, 194:12, 196:4

**situations** [3] - 8:11, 35:16, 173:2

**six** [1] - 67:16

**size** [1] - 114:12

**sizeable** [1] - 114:13

**SKR** [1] - 186:21

**slice** [2] - 159:7, 159:8

**sliced** [1] - 81:3

**slide** [6] - 59:16, 68:21, 80:8, 106:6, 106:8, 107:17

**slides** [1] - 166:19

**slightly** [6] - 63:3, 71:17, 77:19, 86:17, 93:4, 170:12

**slip** [2] - 111:18, 112:1

**slips** [1] - 57:9

**sliver** [1] - 80:1

**slow** [1] - 54:6

**slowly** [1] - 132:9

**small** [2] - 80:1, 133:24

**smaller** [1] - 108:25

**smashed** [1] - 87:14

**snapshot** [1] - 192:17

**social** [2] - 94:16, 176:17

**Society** [1] - 24:11

**someone** [17] - 28:1, 64:19,

90:9, 97:11, 120:4, 124:25, 141:1, 145:13, 151:25, 153:22, 155:7, 155:9, 160:1, 162:6, 169:21, 169:25, 195:7

**sometimes** [7] - 29:17, 123:9, 123:10, 159:12, 176:19, 177:17, 177:19

**somewhere** [4] - 89:8, 133:2, 133:4, 139:22

**sorry** [21] - 20:13, 22:19, 34:25, 49:4, 72:3, 74:11, 91:19, 111:3, 121:2, 133:13, 142:19, 145:15, 147:9, 151:21, 154:2, 161:3, 163:2, 173:8, 179:1, 186:13, 192:11

**sort** [17] - 12:9, 12:10, 22:2, 27:12, 58:1, 72:13, 78:10, 82:20, 84:13, 88:25, 113:25, 115:2, 179:15, 180:8, 191:13, 192:25, 194:23

**sorted** [2] - 89:18, 89:23

**sought** [1] - 21:5

**sound** [5] - 122:18, 124:15, 132:21, 135:17, 196:7

**sounded** [1] - 39:11

**sounds** [9] - 9:6, 19:12, 20:9, 20:16, 135:19, 136:11, 183:19, 189:24, 197:3

**source** [3] - 103:15, 143:16, 143:19

**sources** [2] - 79:14, 79:15

**SOUTHERN** [1] - 1:1

**speaking** [3] - 120:10, 123:13, 188:2

**specific** [24] - 28:2, 60:12, 67:23, 71:18, 81:21, 85:10, 85:23, 86:11, 86:12, 88:16, 88:17, 92:15, 101:8, 101:25, 117:25, 121:15, 124:17, 128:4, 140:22, 140:23, 140:24, 142:9, 166:19, 187:24

**specifically** [9] - 28:13, 91:4, 100:25, 104:6, 119:9, 121:18, 124:1, 132:18, 149:18

**specifies** [2] - 110:1, 110:4

**specify** [1] - 105:20

**speeding** [1] - 88:8

**spell** [2] - 42:5, 55:8

**spend** [3] - 155:8, 155:9, 156:2

**spending** [1] - 32:2

**spent** [11] - 15:18, 31:13, 81:12, 100:20, 100:22, 101:9, 123:1, 123:11, 123:17, 123:22, 186:6

**Spider** [2] - 109:23, 110:10

**spit** [2] - 46:9, 49:15

**Sporn** [2] - 28:16, 93:9,

148:20, 149:25

**spot** [3] - 53:2, 62:21, 88:21

**spreadsheet** [1] - 89:9

**spreadsheets** [2] - 164:1, 164:7

**square** [1] - 7:15

**stack** [3] - 88:14, 89:3, 89:25

**staff** [3] - 121:24, 122:2, 122:3

**stage** [1] - 159:24

**stand** [6] - 10:21, 11:6, 51:23, 95:11, 98:20, 185:16

**standardize** [1] - 57:11

**standing** [1] - 197:1

**start** [24] - 7:10, 9:12, 14:23, 15:1, 59:8, 60:18, 64:10, 68:4, 68:7, 71:1, 71:6, 76:23, 84:14, 85:21, 91:15, 102:24, 106:22, 113:11, 116:9, 174:16, 174:17, 175:5, 179:3, 195:24

**started** [9] - 5:2, 7:23, 12:7, 43:7, 53:5, 100:3, 146:8, 176:25, 177:2

**starting** [19] - 5:11, 9:24, 26:13, 62:9, 64:18, 72:11, 72:19, 76:19, 77:20, 83:4, 84:24, 97:15, 105:8, 110:19, 113:8, 144:20, 149:6, 162:6, 175:13

**starts** [3] - 39:5, 131:3, 149:11

**statement** [13] - 27:16, 111:17, 128:2, 128:3, 155:4, 179:22, 179:24, 181:4, 182:4, 184:5, 184:20, 185:12, 190:19

**statements** [15] - 37:19, 57:8, 57:9, 112:8, 112:9, 180:17, 181:20, 182:12, 182:18, 182:20, 183:13, 185:18, 186:2, 188:19

**states** [1] - 39:10

**States** [19] - 1:23, 5:3, 33:25, 40:8, 40:12, 42:1, 42:9, 55:1, 56:25, 58:16, 61:22, 64:2, 71:24, 78:19, 85:15, 90:23, 102:5, 102:17, 199:9

**STATES** [4] - 1:1, 1:3, 1:10, 1:15

**statistics** [3] - 56:2, 56:3, 56:23

**stay** [6] - 8:25, 25:18, 37:14, 94:16, 112:20, 176:17

**STENOGRAPHICALLY** [1] - 1:20

**step** [6] - 9:4, 95:9, 107:5, 123:21, 159:24, 160:24

**stepping** [1] - 50:23
**Steven** [1] - 26:23
**STEVEN** [2] - 1:17, 1:18
**sticker** [1] - 157:24
**sticks** [1] - 166:1
**still** [7] - 10:24, 47:24, 94:5, 97:13, 97:22, 183:18, 196:20
**stip** [1] - 184:6
**stipulate** [1] - 180:18
**stipulating** [1] - 9:11
**stipulation** [5] - 179:7, 179:15, 179:25, 182:19, 189:1
**stock** [2] - 110:9, 197:13
**stop** [6] - 37:2, 62:17, 65:4, 93:15, 93:18, 132:10
**stopping** [1] - 93:23
**stops** [1] - 123:10
**story** [1] - 183:7
**Stout** [20] - 55:16, 55:17, 55:18, 55:19, 56:5, 56:12, 56:14, 56:15, 56:25, 87:6, 100:13, 100:17, 101:1, 101:13, 101:14, 101:18, 102:2, 116:10, 116:14, 116:18
**straight** [1] - 52:2
**strange** [1] - 136:11
**streamline** [1] - 9:13
**streamlined** [1] - 9:18
**Street** [2] - 1:18, 2:6
**string** [1] - 22:22
**structured** [2] - 174:24, 192:19
**struggling** [1] - 169:5
**study** [2] - 23:21, 177:22
**stuff** [1] - 171:17
**subject** [3] - 28:10, 28:14, 34:15
**subjects** [1] - 102:11
**submission** [4] - 72:23, 74:23, 75:25, 166:8
**submitted** [2] - 59:25, 72:22
**subset** [2] - 77:25, 83:1
**subsets** [2] - 135:7, 135:12
**subtract** [1] - 135:23
**success** [1] - 9:10
**sufficient** [5] - 141:23, 141:24, 141:25, 142:2, 189:1
**sufficiently** [1] - 64:12
**suggest** [3] - 152:6, 181:23, 188:23
**suggested** [3] - 183:18, 191:3, 194:14
**suggesting** [5] - 27:3, 136:5, 170:9, 193:8
**suggestion** [1] - 5:18
**suggests** [1] - 16:4

**Suite** [2] - 1:19, 2:6
**sum** [5] - 61:18, 108:3, 116:21, 116:22, 116:23
**summaries** [5] - 61:18, 90:17, 91:7, 180:16, 181:17
**summarization** [1] - 92:21
**summarize** [6] - 57:10, 57:11, 84:1, 88:25, 90:17, 164:10
**summarized** [4] - 59:6, 68:1, 86:9, 112:24
**summarizes** [1] - 61:14
**summarizing** [4] - 58:8, 64:20, 74:2, 89:2
**summary** [21] - 71:21, 72:16, 73:10, 82:20, 90:1, 114:5, 118:25, 119:1, 123:19, 125:25, 127:15, 127:21, 140:11, 141:7, 152:15, 162:23, 163:21, 164:18, 165:16, 166:19, 166:24
**sums** [1] - 108:4
**super** [1] - 184:19
**superseding** [1] - 155:21
**supporting** [2] - 57:8, 111:17
**suppose** [1] - 11:7, 106:21
**supposedly** [1] - 34:21
**surprises** [1] - 5:8
**surrounding** [1] - 72:17
**suspect** [1] - 177:1
**swab** [2] - 39:15, 49:15
**swear** [1] - 55:4
**switch** [4] - 83:13, 83:15, 84:9, 93:16
**sworn** [2] - 42:3, 55:6

---

# T

**talks** [2] - 22:13, 33:17
**Tampa** [1] - 85:1
**tape** [4] - 28:6, 28:7, 28:15, 28:22
**targeting** [1] - 98:5
**task** [2] - 118:4, 118:21
**tasks** [1] - 118:1
**TCPA** [3] - 19:8, 19:9, 35:23
**team** [9] - 9:17, 56:17, 56:18, 56:19, 61:13, 96:17, 97:20, 100:21, 198:11
**team's** [1] - 98:25
**tech** [1] - 198:15
**technical** [1] - 177:14
**technologically** [1] - 56:23
**teleconference** [2] - 184:4, 191:14
**teleconferencing** [1] - 180:13
**teledoc** [5] - 15:18, 21:24,

22:3, 31:13, 32:3
**teledocs** [1] - 18:10
**Telehealth** [1] - 85:1
**telehealth** [1] - 188:17
**telemarketers** [1] - 39:7
**telemarketing** [2] - 29:1, 176:13
**telemedicine** [5] - 28:24, 36:5, 176:12, 188:16, 188:18
**telephone** [1] - 43:6
**temptation** [1] - 176:19
**ten** [6] - 100:23, 117:3, 117:5, 145:12, 145:16, 145:18
**tends** [1] - 153:20
**tens** [2] - 104:23, 104:24
**terminology** [3] - 125:10, 127:4, 141:24
**terms** [4] - 13:1, 17:16, 63:13, 107:9
**test** [36] - 23:15, 23:22, 35:10, 39:15, 43:2, 43:5, 43:12, 45:24, 47:4, 47:11, 47:13, 47:21, 47:23, 47:24, 49:23, 50:7, 50:18, 64:18, 64:19, 65:15, 65:20, 66:7, 66:13, 66:15, 67:5, 68:20, 69:4, 69:10, 70:1, 72:24, 76:10, 132:1, 135:6, 186:10
**tested** [2] - 47:6, 64:20
**testified** [2] - 102:4, 186:18
**testifies** [1] - 98:3
**testify** [4] - 13:6, 102:5, 185:22, 193:6
**testifying** [5] - 100:5, 102:10, 102:12, 180:9, 185:15
**testimony** [1] - 9:25, 12:25, 32:18, 32:23, 58:12, 93:24, 95:18, 100:3, 102:13, 174:13, 176:9, 177:4, 180:10, 185:3, 187:17, 187:25, 188:5, 188:16, 188:22, 194:9
**testing** [20] - 23:15, 23:24, 24:4, 38:21, 44:12, 60:9, 60:24, 61:2, 61:11, 63:14, 63:15, 63:19, 68:21, 77:3, 101:3, 176:12, 186:8, 186:10, 186:21
**Testing** [1] - 38:14
**tests** [52] - 62:16, 62:22, 62:23, 63:7, 63:9, 63:11, 63:18, 63:23, 63:24, 64:24, 66:4, 66:5, 66:7, 66:8, 66:10, 66:11, 66:20, 66:21, 66:23, 66:24, 67:2, 67:4, 67:7, 67:8, 67:15, 67:16, 69:8, 74:4, 76:25, 77:1, 77:2, 77:7, 77:11, 77:12, 77:16, 77:22,

77:23, 78:3, 78:6, 150:20, 150:22, 158:20, 158:21, 158:22, 163:17, 164:15, 165:18, 165:19, 166:7
**Tests** [1] - 59:16
**text** [17] - 15:9, 15:14, 15:17, 15:25, 17:7, 17:15, 22:21, 22:22, 23:9, 23:11, 23:14, 31:8, 31:11, 38:8, 148:8
**that'll** [7] - 9:13, 15:6, 16:10, 62:2, 82:16, 158:8, 197:7
**THE** [190] - 1:10, 1:13, 1:17, 2:2, 5:2, 5:16, 6:4, 6:8, 6:10, 6:13, 6:17, 7:2, 7:6, 7:20, 8:9, 8:19, 8:24, 10:15, 11:1, 11:9, 11:12, 12:1, 12:6, 12:17, 12:18, 13:7, 13:8, 13:10, 13:11, 13:14, 13:15, 13:17, 13:21, 13:23, 14:18, 15:6, 16:10, 25:4, 25:19, 30:8, 30:24, 31:1, 37:5, 41:2, 41:5, 41:7, 41:8, 41:12, 41:14, 41:16, 41:23, 41:25, 42:2, 42:4, 42:6, 48:10, 50:3, 50:21, 51:4, 51:6, 51:10, 52:15, 52:22, 53:9, 53:11, 53:14, 53:20, 54:2, 54:5, 54:8, 54:12, 54:14, 54:16, 55:3, 55:5, 55:7, 55:9, 58:20, 58:22, 61:23, 62:2, 64:4, 70:5, 72:1, 78:20, 82:3, 82:7, 82:9, 82:16, 83:19, 85:17, 88:6, 88:9, 90:25, 93:13, 93:15, 93:18, 93:22, 95:9, 96:1, 96:11, 96:15, 97:8, 97:10, 98:24, 99:2, 99:7, 99:12, 99:14, 99:15, 99:17, 102:19, 115:21, 115:25, 126:8, 129:24, 130:4, 130:6, 130:10, 130:12, 133:11, 133:14, 140:15, 152:8, 152:10, 152:14, 152:15, 158:8, 163:1, 163:3, 163:9, 167:18, 167:24, 168:3, 168:6, 168:10, 170:24, 171:1, 171:4, 173:8, 173:22, 173:24, 173:25, 174:3, 174:6, 174:8, 174:10, 174:12, 178:7, 179:1, 179:9, 180:2, 180:7, 180:11, 180:25, 181:10, 181:14, 181:23, 182:3, 182:8, 183:5, 183:24, 184:1, 184:4, 184:9, 185:20, 187:15, 188:23, 189:23, 190:10, 190:16, 190:21, 191:5, 192:3, 192:9, 192:13, 193:11, 194:22, 195:14, 195:18, 196:2, 196:7, 196:15, 196:18,

197:6, 197:17, 197:24, 198:8, 198:17, 198:19
**themselves** [1] - 49:21
**theoretically** [1] - 161:22
**thereabouts** [1] - 174:25
**thereafter** [2] - 40:4, 177:3
**therefore** [2] - 156:8, 180:1
**they've** [1] - 94:7
**thick** [1] - 89:10
**thinking** [3] - 96:8, 176:20, 187:1
**third** [1] - 97:18
**thoughts** [1] - 98:9
**thousand** [10] - 74:3, 132:20, 169:12, 169:17, 169:18, 169:19, 169:20, 169:25, 170:13, 170:16
**thousands** [5] - 47:24, 144:15, 169:22
**three** [28] - 20:2, 20:17, 24:10, 44:25, 61:17, 62:15, 65:22, 79:18, 93:9, 97:16, 114:1, 115:6, 115:14, 124:1, 124:6, 124:7, 124:14, 124:17, 135:17, 138:20, 138:25, 139:18, 170:5, 170:6, 181:13, 185:8, 185:9
**throat** [1] - 44:22
**throughout** [1] - 114:2
**throw** [1] - 165:25
**throwing** [1] - 49:16
**thrown** [1] - 52:19
**tie** [3] - 101:5, 106:17, 110:25
**tied** [1] - 196:20
**Tier** [24] - 60:9, 60:17, 61:6, 62:20, 68:18, 68:23, 68:24, 69:13, 69:16, 69:17, 69:24, 165:1, 165:8, 165:9, 165:11, 166:13, 166:16, 166:17, 173:1, 173:3, 173:13
**tight** [1] - 8:2
**timeframe** [1] - 110:18
**timeline** [1] - 89:24
**timely** [1] - 185:19
**times..** [1] - 145:16
**timetable** [1] - 26:1
**timewise** [1] - 196:4
**timing** [2] - 80:18, 162:17
**tiny** [2] - 116:21, 116:22
**title** [2] - 56:5, 109:25
**titled** [2] - 38:13, 59:16
**today** [25] - 6:25, 7:1, 10:4, 12:25, 13:6, 37:17, 52:12, 52:16, 56:10, 58:12, 94:23, 95:18, 96:4, 96:22, 100:5, 102:12, 102:13, 125:2, 126:1, 126:2, 174:13, 175:7, 176:8, 195:14
**together** [16] - 9:25, 28:22,

69:19, 87:6, 87:14, 122:6, 125:22, 126:23, 127:1, 127:15, 127:21, 141:22, 146:23, 146:25, 176:21
**toll** [10] - 90:5, 90:7, 90:8, 90:12, 91:5, 91:16, 91:22, 92:21, 145:10, 146:23
**tomorrow** [35] - 52:12, 52:18, 52:24, 96:6, 96:9, 174:4, 174:15, 174:16, 174:20, 174:22, 175:4, 175:7, 175:12, 175:18, 177:1, 177:6, 178:4, 178:9, 178:10, 178:20, 191:18, 191:22, 192:15, 194:20, 195:25, 196:17, 196:23, 197:3, 197:10, 197:15, 197:24, 198:1, 198:5, 198:11
**tomorrow's** [1] - 10:5
**tonight** [1] - 10:4
**Tony** [2] - 26:25, 27:1
**took** [8] - 47:21, 54:21, 61:16, 87:12, 88:1, 88:20, 136:15, 149:4
**top** [27] - 17:1, 46:11, 62:14, 62:22, 72:19, 73:9, 75:1, 79:16, 84:14, 91:15, 105:15, 108:23, 109:2, 110:1, 110:19, 111:19, 114:25, 144:25, 153:17, 153:18, 153:23, 159:8, 165:4, 167:15, 172:4, 173:3, 173:9
**top-right** [1] - 172:4
**topics** [2] - 28:10, 28:14
**total** [42] - 30:2, 61:9, 61:14, 62:11, 62:13, 63:18, 65:5, 65:25, 67:17, 74:14, 74:15, 75:19, 76:9, 76:25, 78:1, 79:2, 83:2, 89:13, 92:17, 93:6, 93:10, 100:16, 106:3, 106:13, 107:1, 107:24, 135:9, 135:11, 140:5, 143:2, 144:25, 145:1, 149:1, 152:16, 152:17, 165:13, 166:20, 166:25, 168:21, 175:19, 180:15
**totaled** [1] - 133:2
**totality** [1] - 153:14
**totalling** [1] - 108:10
**totally** [1] - 8:18
**touch** [1] - 53:3
**tough** [1] - 131:23
**towards** [3] - 89:16, 98:5, 153:21
**trace** [8] - 81:6, 103:23, 106:4, 107:2, 107:7, 109:5, 109:9, 111:8
**traceable** [1] - 167:9
**traced** [3] - 106:11, 109:16

**tracing** [15] - 102:14, 103:6, 103:9, 103:14, 103:23, 104:2, 104:4, 104:6, 104:9, 104:18, 104:21, 105:1, 106:15, 107:5, 113:4
**track** [1] - 103:10
**tracking** [2] - 103:21, 105:11
**traffic** [2] - 7:22, 196:19
**train** [1] - 177:9
**transaction** [20] - 20:10, 58:2, 85:23, 85:24, 86:7, 86:11, 86:12, 87:19, 108:2, 108:14, 108:15, 109:12, 111:5, 111:14, 111:16, 112:19, 114:7, 114:10, 114:12, 114:13
**transactions** [27] - 57:22, 85:10, 87:8, 87:20, 88:18, 89:3, 89:7, 89:11, 89:24, 102:11, 103:15, 104:2, 108:3, 108:4, 108:10, 108:17, 108:19, 112:12, 112:15, 112:22, 112:24, 114:4, 114:11, 114:13, 156:13, 156:23, 156:24
**transcribing** [1] - 182:16
**TRANSCRIPT** [1] - 1:9
**transcript** [3] - 44:6, 185:2, 185:3
**transcription** [1] - 199:4
**transfer** [6] - 85:24, 86:14, 86:21, 107:6, 110:23, 110:24
**transferred** [3] - 107:15, 108:7, 113:17
**transfers** [4] - 105:15, 107:1, 107:20, 108:1
**transitional** [2] - 44:19, 44:23
**translates** [4] - 64:21, 126:22, 131:25, 133:19
**transpired** [1] - 12:24
**treating** [2] - 45:4, 181:20
**treatment** [2] - 36:9, 36:10
**trend** [1] - 71:13
**trial** [3] - 94:4, 94:19, 174:18
**TRIAL** [1] - 1:9
**tried** [2] - 29:21, 29:22
**tripped** [1] - 131:12
**trouble** [3] - 37:14, 37:24, 150:24
**true** [1] - 142:13
**truly** [1] - 104:16
**trust** [1] - 178:21
**try** [9] - 28:15, 29:17, 51:20, 70:19, 103:14, 126:3, 151:11, 176:24, 195:14
**trying** [15] - 82:2, 121:18, 127:7, 127:14, 146:13,

150:17, 151:2, 151:23, 151:24, 161:10, 169:8, 181:11, 191:10, 191:12
**Tsai** [4] - 48:3, 73:4, 74:23, 76:1
**tube** [1] - 46:10
**Tuesday** [1] - 198:4
**tune** [2] - 107:11, 109:2
**turn** [16] - 6:5, 13:12, 14:3, 19:23, 54:23, 87:24, 95:22, 96:3, 96:17, 99:23, 102:14, 105:2, 130:13, 150:10, 184:6, 185:24
**turned** [1] - 193:19
**turning** [3] - 9:17, 53:15, 77:8
**turns** [1] - 36:21
**Tushar** [1] - 115:9
**two** [43] - 6:11, 28:20, 29:5, 44:24, 57:6, 59:22, 64:14, 70:11, 77:6, 79:15, 84:19, 92:8, 92:17, 93:3, 97:16, 100:15, 102:1, 105:12, 112:17, 113:20, 119:10, 137:10, 139:2, 139:4, 144:21, 145:11, 145:15, 155:12, 156:11, 156:15, 175:3, 175:20, 179:21, 180:3, 181:12, 181:15, 181:24, 181:25, 186:2, 186:18, 186:23
**type** [9] - 28:3, 56:19, 61:2, 63:14, 63:15, 90:4, 110:12, 123:2, 165:7
**types** [2] - 11:8, 173:17
**typical** [1] - 152:2

## U

**U.S.C** [1] - 189:22
**ultimately** [9] - 40:10, 75:18, 101:5, 104:2, 106:12, 118:24, 119:4, 138:22, 142:1
**unable** [1] - 194:15
**unclear** [1] - 151:16
**under** [4] - 95:10, 107:5, 115:3, 189:21
**undergraduate** [1] - 56:1
**underlying** [6] - 87:7, 87:25, 155:16, 155:18, 157:12, 162:15
**understood** [5] - 116:17, 134:20, 144:24, 172:24, 193:11
**unexpected** [1] - 23:25
**unfair** [1] - 194:7
**unfortunately** [1] - 97:6
**unique** [7] - 72:20, 75:25, 133:18, 133:20, 133:25, 134:1, 134:14

**United** [19] - 1:23, 5:3, 33:25, 40:7, 40:12, 42:1, 42:9, 55:1, 56:25, 58:15, 61:21, 64:2, 71:23, 78:18, 85:15, 90:22, 102:5, 102:16, 199:9

**UNITED** [4] - 1:1, 1:3, 1:10, 1:15

**UnitedHealthcare** [2] - 104:14, 104:16

**unless** [3] - 45:24, 182:21, 183:3

**unlike** [1] - 77:23

**up** [78] - 7:15, 8:2, 11:6, 15:14, 24:25, 25:18, 29:9, 35:18, 36:22, 40:5, 41:12, 47:16, 48:18, 53:21, 54:10, 54:19, 54:22, 55:3, 61:18, 65:9, 69:3, 71:6, 71:8, 75:24, 79:20, 80:13, 80:20, 81:1, 81:3, 83:16, 84:10, 88:8, 88:19, 89:9, 89:12, 97:17, 99:14, 99:19, 101:5, 101:10, 106:22, 110:1, 111:9, 113:19, 113:23, 118:8, 118:24, 124:1, 126:10, 128:16, 128:22, 128:24, 129:18, 129:22, 130:22, 131:12, 134:18, 152:14, 162:1, 162:19, 162:22, 171:1, 171:3, 171:4, 171:23, 172:13, 177:25, 178:19, 187:12, 189:21, 190:12, 190:22, 193:21, 194:4, 194:19, 195:5, 196:4, 196:20

**updated** [1] - 82:1

**updates** [1] - 5:11

**uploaded** [1] - 20:6

**upper** [1] - 105:8

**usefulness** [1] - 24:8

**uses** [1] - 158:13

**usual** [1] - 95:2

**utility** [3] - 24:3, 24:8, 24:18

**utilize** [1] - 120:2

**utilized** [1] - 5:19

**V**

**V.H** [2] - 72:17, 166:4

**vacuum** [1] - 189:25

**Valrico** [1] - 42:13

**valuations** [1] - 55:21

**variation** [1] - 89:16

**variety** [6] - 18:11, 34:25, 35:3, 57:5, 57:13, 119:15

**various** [3] - 58:8, 72:17, 76:5

**vast** [3] - 63:17, 69:12

**vehicles** [1] - 155:12

**verbatim** [3] - 179:12,

181:17, 181:20

**verification** [1] - 19:18

**verified** [2] - 19:11, 35:23

**version** [1] - 82:6

**versus** [8] - 5:4, 80:21, 104:11, 104:16, 107:24, 161:6, 162:21

**vertical** [1] - 69:3

**vet** [1] - 188:21

**via** [2] - 20:6, 198:14

**view** [1] - 79:9

**viewed** [1] - 81:2

**violation** [1] - 194:2

**visits** [1] - 65:23

**visual** [1] - 68:9

**Volume** [1] - 1:6

**voluminous** [6] - 57:15, 57:20, 57:21, 78:14, 90:15, 119:25

**volunteer** [1] - 9:1

**vs** [1] - 1:5

**W**

**W-2s** [1] - 154:18

**W.H** [3] - 76:20, 141:4, 141:22

**W.I** [1] - 77:9

**wait** [4] - 141:16, 176:20, 196:14

**waited** [2] - 46:18

**waiting** [1] - 22:7

**walk** [3] - 62:9, 64:14, 70:19, 72:14, 82:23, 84:24, 91:12, 102:25, 105:4, 106:21, 106:24, 113:9, 190:12

**walking** [1] - 68:7

**wallet** [2] - 103:12, 103:13

**walls** [1] - 176:15

**wants** [6] - 7:24, 8:5, 10:3, 122:20, 179:2, 189:3

**warms** [1] - 175:8

**warnings** [1] - 176:11

**Washington** [1] - 1:16

**Watt** [1] - 188:2

**ways** [3] - 18:11, 34:25, 35:3

**wayside** [1] - 187:11

**week** [9] - 15:22, 97:18, 97:24, 98:5, 98:16, 174:25, 176:1, 177:18, 198:3

**weekend** [4] - 6:2, 98:15, 175:10, 177:6

**weeks** [4] - 136:4, 175:3, 175:20, 181:18

**weighted** [2] - 169:1, 169:6

**welcome** [4] - 41:23, 54:17, 96:19, 99:18

**Welcome** [1] - 130:13

**Wells** [3] - 86:3, 86:19, 87:2

**WEST** [1] - 1:2

**whatsoever** [3] - 58:21, 73:4, 73:5

**whitish** [1] - 62:22

**whole** [6] - 24:7, 47:10, 72:12, 75:8, 190:19, 190:20

**Wildemore** [4] - 126:18, 126:20, 126:23, 129:1

**willing** [2] - 51:12, 52:1

**win** [1] - 43:9

**wind** [1] - 196:4

**winding** [1] - 101:10

**winds** [1] - 118:24

**wire** [1] - 23:19

**wiser** [1] - 194:17

**withdrawal** [2] - 111:18, 112:1

**witness** [42] - 11:18, 41:10, 41:25, 42:3, 48:8, 51:7, 51:21, 52:11, 52:20, 54:10, 54:19, 54:25, 55:6, 96:4, 96:12, 96:24, 97:1, 97:3, 98:20, 102:5, 125:3, 174:20, 175:4, 179:25, 181:3, 181:5, 181:6, 181:16, 182:6, 184:7, 185:15, 185:22, 190:4, 191:8, 192:24, 193:9, 194:6, 194:9, 196:6, 196:13

**WITNESS** [14] - 3:2, 12:17, 13:7, 13:10, 13:14, 30:8, 41:7, 42:6, 55:9, 140:15, 152:10, 152:15, 173:8, 173:24

**witness's** [1] - 185:11

**witnesses** [19] - 5:14, 6:11, 51:11, 97:15, 97:20, 175:17, 175:19, 176:1, 179:19, 179:21, 180:3, 181:21, 182:11, 182:12, 182:18, 182:20, 182:21, 188:8, 188:9

**won** [1] - 43:8

**wonder** [2] - 176:19, 190:3

**wonderful** [1] - 178:2

**wondering** [1] - 11:4

**word** [2] - 36:2, 50:14

**words** [1] - 66:14

**works** [3] - 52:24, 73:23, 145:10

**world** [2] - 97:12, 196:20

**worried** [1] - 41:17

**worries** [2] - 18:6, 34:13

**worry** [4] - 41:19, 46:21, 129:24, 177:24

**worth** [1] - 160:19

**wow** [1] - 43:8

**wrap** [1] - 194:19

**write** [1] - 119:3

**writing** [4] - 47:18, 50:15, 50:16, 50:17, 182:16,

182:23, 186:7

**wrote** [1] - 181:24

**X**

**XGEN** [16] - 83:4, 83:7, 83:24, 84:19, 84:22, 84:23, 84:25, 85:3, 85:5, 86:19, 87:2, 87:8, 87:14, 87:15, 90:1

**Y**

**year** [3] - 44:25, 65:21, 132:3

**years** [13] - 42:15, 42:19, 42:24, 56:13, 65:22, 80:12, 90:18, 101:15, 102:1, 116:12, 146:17, 185:8, 185:9

**yellow** [9] - 29:23, 30:4, 30:7, 68:23, 73:22, 153:6, 153:7, 171:13

**yesterday** [17] - 5:4, 14:1, 16:24, 27:17, 28:17, 32:24, 32:25, 33:2, 33:17, 36:11, 38:2, 38:7, 38:19, 39:3, 41:21, 177:18, 179:8

**yesterday's** [2] - 17:24, 19:15

**Yogel** [10] - 52:11, 52:23, 96:6, 96:7, 97:1, 178:10, 178:20, 195:25, 197:2, 197:11

**Yogel's** [2] - 52:17, 178:21

**York** [1] - 1:16

**you..** [2] - 18:18, 18:25

**younger** [1] - 49:6

**Youngswick** [1] - 17:21

**yourself** [1] - 71:16

**Z**

**zero** [16] - 91:25, 92:4, 92:19, 92:24, 93:6, 93:11, 145:2, 145:6, 145:7, 145:9, 145:24, 147:4, 147:21, 148:1, 149:2, 166:11

**zoom** [13] - 31:8, 68:6, 68:14, 70:19, 70:20, 73:7, 73:14, 91:12, 103:1, 105:5, 105:13, 106:23

**Zoom** [3] - 10:5, 198:13, 198:14

**zoomed** [1] - 64:11

**zooming** [1] - 76:9