```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2                    WEST PALM BEACH DIVISION
                     CASE NO. 19-CR-80181-RAR-1
 3
     UNITED STATES OF AMERICA,           Miami, Florida
 4
                                         December 12, 2022
 5          vs.
                                         9:05 a.m. - 6:08 p.m.
 6
     MINAL PATEL,                        Volume 11
 7
                   Defendant.            Pages 1 to 242
 8   _____

 9
                      TRANSCRIPT OF JURY TRIAL
10          BEFORE THE HONORABLE RODOLFO A. RUIZ, II
                     UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12

13   FOR THE GOVERNMENT:        JAMIE DE BOER
                                EMILY GURSKIS
14                              REGINALD CUYLER
                                KATHERINE ROOKARD
15                              UNITED STATES DEPARTMENT OF JUSTICE
                                CRIMINAL DIVISION, FRAUD SECTION
16                              1400 New York Avenue, 8th Floor
                                Washington, D.C. 20005
17
     FOR THE DEFENDANT:         STEVEN H. SADOW
18                              LAW OFFICE OF STEVEN H. SADOW, PC
                                260 Peachtree Street NW
19                              Suite 2052
                                Atlanta, Georgia 30303
20
     STENOGRAPHICALLY REPORTED BY:
21
                                ILONA LUPOWITZ, CRR, RPR, RMR
22                              Official Court Reporter to:
                                The Honorable Rodolfo A. Ruiz, II
23                              United States District Court
                                299 East Broward Boulevard
24                              Fort Lauderdale, Florida 3301
                                (954) 769-5568
25
```

1    (Appearances continued)

2
     FOR THE DEFENDANT:            DONALD F. SAMUEL
3                                  GARLAND, SAMUEL & LOEB, PC
                                   3131 Maple Drive NE
4                                  Atlanta Georgia 30305

5                                  BRIAN T. RAFFERTY
                                   BAKER & HOSTETLER, LLP
6                                  1170 Peactree Street, Suite
                                   2400
7                                  Atlanta, Georgia 30309

8

9                            I N D E X

10

11   CLOSING ARGUMENTS                                PAGE

12   BY MS. GURSKIS                                    104
     BY MR. RAFFERTY                                   135
13   BY MR. SADOW                                      155
     BY MS. DE BOER                                    189
14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Call to the Order of the Court.)

 2              THE COURT:  Good morning, everyone.  Please be seated.

 3              We are back in case number 19-80181.  We currently

 4     have -- all but two jurors have checked in, and there's some

 5     housekeeping for us to do.

 6              My understanding, from the email I received earlier

 7     this morning, is that the defense intends on resting this

 8     morning in the presence of the jury; is that correct?

 9              MR. SADOW:  That is correct, Your Honor.

10              THE COURT:  All right.  So I've also received a request

11     from the government as to scheduling.  Certainly, we have some

12     work left to do.  Not a lot, but we need to go ahead and get

13     our jury instructions in good working order, which I don't

14     foresee taking too long.

15              And then I understand the government also needs to do

16     some exhibit cleanup and move some exhibits in.

17              What was the plan on that?

18              MS. DE BOER:  We don't have any more exhibits to move

19     in, Your Honor, but just in terms of the physical set of

20     exhibits that will go back to the jury, you know, we're still

21     in the process of QC'ing that.

22              I want to make sure we're aligned with the defense in

23     terms of the list of what's going back with the jury.  We'd

24     also like the opportunity to QC what they're sending back and

25     make sure that's all square, and I think we need to use the
```

1    afternoon to do that.

2           THE COURT:  All right.  Well, I'll tell you this.  I

3    understand that we would like to have a lot of time to go

4    through that, but I have all my jurors who have made their way

5    downtown.  So what I propose is that we let them go this

6    morning after the defense rests, and tell them to come back at

7    1:00 o'clock and give them the rest of the morning off.

8           And then we sit down, do our charge conference, you

9    guys go through the QC; we have hours to go.  For me to go

10   ahead and lose a whole day seems to be foolish.  In fact, I

11   suggested when we thought the defense had presented their case

12   that if they finished their case on Tuesday, we would be

13   closing Tuesday afternoon.

14          So I don't see a reason why we can't get everyone ready

15   to go for an afternoon closing.  An hour and a half a side, if

16   we start at 1:00, puts us in their hands at around

17   4:00 o'clock.  They could begin deliberating with the goal to

18   return tomorrow.

19          But then tomorrow we just have them here deliberating

20   throughout the day.  And I'd prefer to do that than lose a

21   whole afternoon.

22          Does the government understand where I'm coming from on

23   that?

24          MS. DE BOER:  Certainly understand, Your Honor, but

25   they're going to be waiting around.  They can go work for an

1  entire day and get their lives and affairs in order for an

2  entire day if we dismiss them, you know, in the next ten

3  minutes after the defense rests.

4        And frankly, as of last night, we were told there were

5  going to be three defense witnesses, including the attorney.

6  And we were sent a zip file full of exhibits.  So that's how

7  we've been spending our time this weekend.  And, you know --

8  and I understand, look, they want to cut their case.  Obviously

9  that's their prerogative, and we did the same thing.

10        But they also weren't required to put up witnesses on

11  Friday, and we effectively lost that day, and the rationale was

12  because we were ahead of schedule.  And closing tomorrow

13  morning, we are still well ahead of schedule because we had

14  contemplated, at the earliest, closing Tuesday afternoon, if

15  not Wednesday or Thursday, based on the witness lineup that was

16  contemplated even as of last night.

17        THE COURT:  Understood.  How does the defense feel?  Is

18  the defense ready to close this afternoon if we go ahead and

19  wrap up this morning, or do you share now in the government's

20  concern?

21        I truthfully may disagree with both sides even if you

22  want to go ahead and close tomorrow.  I'm just curious what

23  your opinion is in this matter.  I cannot imagine a universe at

24  9:00 o'clock in the morning where I can't get my charge

25  conference and everything else done by 10:30, worst case 11:00.

1   I mean, I can't even think it's going to take that long,

2   truthfully.  I looked at the draft that was submitted.  It's

3   not going to be that difficult for us to clean this up and then

4   let you guys do your QC and still give you a few hours to

5   prepare your remarks.

6           I mean, I cannot imagine it's going to put anyone at a

7   disadvantage and give us plenty of time to put this in their

8   hands.  We still have -- if indeed they return a guilty

9   verdict, we still have a forfeiture proceeding left to go as

10  well, and the longer we wait and the more time we lose -- I

11  suspect the jurors would prefer to hear this thing and not

12  postpone another day and get to closings.

13          But let me hear from the defense camp.  What do you

14  guys think?

15          MR. SADOW:  Well, let's go in reverse order.

16  The defense, depending, obviously, on the verdict.  If there is

17  need for forfeiture, we haven't made it final, but it's highly

18  unlikely that we're going to put it in the hands of the Court

19  as opposed to the jury.

20          THE COURT:  Okay.  That does change things a little bit

21  scheduling-wise.

22          MR. SADOW:  Just want to be candid with the Court.  The

23  defense is ready, subject to whatever the Court chooses to do.

24          THE COURT:  All right.  So let me do this.  Let me get

25  a sense real quick, opening up the jury instructions.  I don't

1   know if the government had suggested to me there was another

2   draft you might be sending, or maybe I already got that.

3            MS. DE BOER:  I thought I sent it.

4            THE COURT:  You might have.  Let me just open up.  I

5   got a couple of emails.

6            MS. DE BOER:  855, Your Honor.

7            THE COURT:  Yeah, give me one second.  Let me just open

8   it up.  I just want to take a quick look.

9            MS. DE BOER:  It hasn't changed since the original

10  charge analysis.

11           THE COURT:  Okay.  That's what I was more curious

12  about, because I pulled up the other one over the weekend.

13           And by the way, the other point that was being made,

14  the Court can reserve on the Rule 29 to give the government a

15  chance to file.  I know it just got filed, I think, late last

16  night.  So that's not a major concern for the Court.

17           I'll give you guys a chance to file a written response,

18  and I can reserve on that and we can hear argument on that.

19  Quite frankly, we can hear argument on that while they're

20  deliberating tomorrow or at some point in the middle of the day

21  tomorrow.

22           So it's not a major concern for me.  Certainly, I could

23  make that work.  So let me just take a quick look here at the

24  instructions and see where we're at.

25           MR. RAFFERTY:  Your Honor?

1          THE COURT:  Yes, Mr. Rafferty.  Go ahead.

2          MR. RAFFERTY:  Mr. Patel would like to, if he can, use

3     the restroom, if that's okay.

4          THE COURT:  Of course.

5          Go ahead, Mr. Patel, use the restroom.  Because I'm not

6     doing anything of substance.  I just want to take a look and

7     see what the instructions look like.

8          Yes, these are in great shape.  It's the same thing I

9     saw over the weekend.  We only have to debate two instructions.

10    Everything else is ready to go.  We can probably deal with this

11    inside an hour, and I can turn over everything to you all to

12    use the remainder of the day to prep.  So it's not like we're

13    putting you guys in a tough spot.

14         I mean, I know there's a lot to cover in closings, but

15    I can get this done quickly, and you guys can go through your

16    QC.  You have enough of a team that some folks can look at the

17    QC while those in charge of closing statements can finish

18    preparing and going through the remarks.

19         I don't see a reason why we're not going to close

20    today.  So we're going to close today.  We're going to try to

21    do it at 1:00 o'clock.  I'll go ahead and get the jurors in

22    here, and as soon as Mr. Patel returns, I'll allow the defense

23    to rest in the presence of the jury, walk them through the fact

24    that they're going to get a break and that they should all

25    return promptly a few minutes before 1:00 o'clock for closing

1    arguments.  And once I let them go, we will sit down and work

2    through these few concerns in the jury instructions.  There's

3    not much.  So this should be pretty streamlined.

4          All right.  So as soon as Mr. Patel comes back, we'll

5    go ahead and bring in the jury.  Okay, guys?

6          MR. RAFFERTY:  Thank you, Your Honor.

7          MR. SADOW:  The Court will be charging before, right?

8          THE WITNESS:  100 percent.  I'll charge them at 1:00,

9    yes, absolutely.  That's the plan.

10          MS. DE BOER:  Your Honor, in terms of the Rule 29, I

11    think what we would appreciate knowing before closing is, is

12    there a whole group of charges that are out?  Because that

13    would affect what we say in closing.

14          I understand the defense is -- you know, I saw what the

15    defense filed, and it was sort of writ large; this isn't

16    sufficient.  We obviously disagree.  They weren't focused on a

17    specific count, which I had wondered Friday if perhaps they

18    were going to be focused on knocking out a certain type of

19    count, and that's not the focus of it.

20          So I guess if, you know, the Court can issue a ruling

21    or at least let us know which way the wind is blowing so we

22    know how to tailor our closing arguments.

23          THE COURT:  Sure.  I mean, look, I'm happy if you

24    want -- don't have a problem with having you -- your concern

25    was, I think, from the beginning you wanted to try to brief it.

1           I can hear argument on this, and you can make argument

2    on this, and we can rule on this today.  I don't need to have a

3    lengthy -- I didn't mean to have it done in writing.  Quite

4    frankly, I can go ahead and deal with it on its face.  So if

5    you want, the Court has no problem.  Why don't we get the jury

6    instructions wrapped up first.

7           I can take a little bit of a break, and if we want to

8    do any OA on the Rule 29, we can do that.  I mean, certainly I

9    think we should have the government's position on the record,

10   and then I can make either a ruling from the bench so that you

11   get the framing on your closing, or at least hear some oral

12   argument from you all.

13          I mean, I'm not one to preview a ruling until I've

14   heard from everyone, but I can certainly address the Rule 29.

15   I don't have to reserve.  I just didn't know if the government

16   felt strongly about the need to respond in writing.  That was

17   why I had held off.

18          MS. DE BOER:  No, we don't need to respond in writing,

19   Your Honor.

20          THE COURT:  Okay.  So why don't we do this, then.

21   Let's go ahead and get the jury on their break, as soon as

22   Mr. Patel comes back.  And what we can do is, I'd rather just

23   take care of the jury instructions first, just get that done,

24   and then as soon as the jury instructions are done, we can take

25   a brief recess and then hear some argument on the Rule 29.  The

1    Court can address that and then we're done.

2         Then you guys can deal with whatever QC issues you want

3    while you prepare for closings, and then that's it, we'll be in

4    recess until 1:00 o'clock.  All right?  Let's do that.

5         MS. DE BOER:  Terrific.  Thank you.

6         THE COURT:  All right.  You got it.  Okay.  So I'm just

7    getting the jury instructions ready here so we don't waste time

8    while we wait for Mr. Patel.

9         MS. DE BOER:  And I guess, Your Honor, there was an

10   exhibit admitted with Mr. Sporn which was Government Exhibit

11   1848 and 1848-A, which was the legal memo from July of 2019

12   that we had had a sidebar about, okay.  This can come through

13   Sporn.  If he doesn't remember it, then the substance of the

14   memo itself cannot come through him.

15        The attorney who wrote the memo is now not testifying,

16   so we would move to strike that exhibit.

17        THE COURT:  Okay.  Defense's perspective on that one,

18   and your position on that one memo?

19        MR. SADOW:  I think that's the memo that was attached

20   to an August 19th email that was not published at the Court's

21   direction.

22        THE COURT:  Yeah.  So I don't think it would be

23   admitted at this time.  I don't think there was any foundation.

24   It wasn't published.  I think it was shown to him, but it would

25   not be a conduit to admit it as an exhibit.

1          MR. SADOW:  I don't actually think it was even shown to

2     him.  I think it just came in as an email plus an attachment

3     that referenced, I think, EKRA.

4          But it's not a problem because it -- I don't think it's

5     an issue.  So our position is, whatever the Court's ruling is,

6     it's okay with us.

7          MS. DE BOER:  So it's not going back with the jury.

8          THE COURT:  It's not going back with the jury, I agree,

9     Ms. de Boer, so we can make that clear.  Thank you.

10          I'm just clearing up the formatting on the jury

11     instructions, so we're saving ourselves some time here.  Soon

12     as we let our jury go, before the break, we will be able to get

13     started on this.

14          All right.  So now that Mr. Patel is back, we will go

15     ahead and bring our jury in to go ahead and allow the defense

16     to rest in their presence.  Then, we will let them go and go to

17     work.

18          Let's go ahead and round them up, please.

19          THE COURT SECURITY OFFICER:  All rise.

20          (Jury enters at 9:19 a.m.)

21          THE COURT:  Please be seated, everyone.

22          Good morning, ladies and gentlemen of the jury.  Good

23     to see you all.

24          THE JURORS:  Good morning.

25          THE COURT:  I hope you all had a nice weekend.  As we

1  start off on week three of our trial, thank you again for being

2  here on time.  I have truly appreciated it.

3        You may recall, before we broke on Friday, that the

4  government had rested their case.  So now, if the defendant

5  chooses to do so, they may put on a case.

6        Remember that they need not put on a case.  It is the

7  government's burden of proof beyond a reasonable doubt, and

8  that burden stays with the government throughout the trial.

9        But I will now check in with the defense and see if the

10  defense wishes to proceed with their case.

11        Mr. Sadow, defense's election to proceed with any

12  witnesses?

13        MR. SADOW:  Your Honor, the defense has decided it is

14  unnecessary to present a case-in-chief, and we therefore rest.

15        THE COURT:  Thank you very much.

16        Ladies and gentlemen, that means both sides have

17  rested.  What does that mean for us?  That means that I'm going

18  to let you guys go, and we're going to close this case today.

19  We're going to have closing arguments this afternoon.  All

20  right?

21        There is work to be done that doesn't involve wasting

22  your time.  I have to sit down with the lawyers this morning

23  and get everything ready.  In particular, we have to get all

24  the legal instructions ready to go for you, which are the ones

25  I'm going to read you.

1          That means that I'm going to let you guys go until

2     1:00 o'clock.  You guys have the morning off.  You are free to

3     do whatever you want to do, check in with work.  If you decide

4     to leave -- if you want to go home and come back, that's fine,

5     but I need everyone in the jury room no later than 12:45

6     because I do want to try to start at 1:00.

7          What is going to happen at 1:00 o'clock?  You're going

8     to come out here, and you're going to find a packet of

9     instructions on each one of your chairs.  Okay?  We're going to

10    read that together.  As soon as we're done reading that

11    together, each side is going to present their closing arguments

12    to all of you, and our goal is to allow you to begin

13    deliberating this afternoon.

14         You're going to be able to come back tomorrow.  You can

15    take as much time as you need.  But I want to try to put this

16    in your hands and let you guys start talking by the end of

17    today.  It'll give you a chance to start thinking things

18    through.  And then tomorrow we can figure how much time we

19    need, and we'll go on from there.

20         Everyone with me?  All right.

21         I know you all appreciate it because we've been able to

22    streamline things.  Thanks to hard work on both sides.  So with

23    that being said, I want everyone in my jury room at 12:45.

24         If you want to go out for a big breakfast, go to

25    Bayside, do whatever you want, it is up to you.  Just please,

1    everyone, be in there.  Make sure you have a nice big lunch or

2    brunch.  Our plan is to motor on this afternoon.  Each side, so

3    you can be prepared, is going to get 90 minutes to talk to you.

4    Okay?

5         We will take a break in between what is known as the

6    first and second close.  What I mean by that is, the government

7    gets to put on a closing argument.  Then they get a rebuttal

8    after the defense goes.  Because they have to use the same

9    90 minutes that I'm going to give the defense.

10        So what I'll expect to happen is they'll use a chunk of

11   their time.  We'll give you a restroom break.  The government

12   will go.  We'll give you a restroom break.  Then the -- excuse

13   me.  The defense will go, and the government will finish.  Then

14   after that, final instructions, and you go on and begin

15   deliberating.

16        So I will build in some bathroom breaks and some coffee

17   breaks in there, but certainly we're going to do some hard work

18   this afternoon.  So, everyone, make sure you have a nice lunch

19   before we get back.  Okay?

20        So with that being said, you guys are free.  12:45, be

21   ready in the jury room, and I'll try to get you in at 1:00.

22        Have a great morning.  We'll see you in a few hours.

23        THE COURT SECURITY OFFICER:  All rise.

24   (Jury exits at 9:23 a.m.)

25        THE COURT:  Everyone, please be seated.  I think you

1   were watching.  A few of our jurors were fist pumping when they

2   heard that the case would close today.  All the more reason why

3   the Court is very much wedded to putting this into their hands

4   and let them start talking because they clearly want to start

5   exploring the issues in this case with one another instead of

6   wasting another full day.

7       So I'm wrapping up this formatting on the jury

8   instructions, and we're going to start talking about them.

9       If both sides want to pull up the most recent draft or,

10  really, the original draft submitted, and we're going to go

11  through this together.  I don't believe we have much to discuss

12  other than a few specific instructions.

13      The first one looks like it's going to be deliberate

14  ignorance as proof of knowledge.  The pagination is probably

15  off.  It's probably now page 15 for me, but I stripped out all

16  of the introductory instructions that I read on my own to the

17  jury earlier.  I think it was two weeks ago.

18      So we don't need to worry about that now.  But I would

19  have you guys go to that and be ready to discuss that

20  particular instruction first in just a moment.

21      We're going to finish cleaning up everything else here.

22      What I'll do is, once we agree on a draft, I'll print

23  it out, and I'll bring it to everyone in a little bit, and we

24  can all go through it together and make sure we don't have any

25  typos or anything else that needs to be eliminated from the

1    instructions now that we have a good sense of the evidence in

2    this case.

3             MR. SAMUEL:  Your Honor?

4             THE COURT:  Yes.

5             MR. SAMUEL:  There are two changes that we want to make

6    from the final.

7             THE COURT:  Okay.

8             MR. SAMUEL:  One, Mr. Sadow is typing up right now.  It

9    adds to the good-faith defense.  It's language you used

10   actually in your other charge, in the *Young* case.

11            THE COURT:  Okay.

12            MR. SAMUEL:  So I don't think it's controversial.  It

13   deals with having good faith attached to willfulness, and the

14   intent to defraud as opposed to just the intent to defraud.

15            THE COURT:  Okay.

16            MR. SAMUEL:  So that's coming.  I don't know if the

17   government -- I haven't even mentioned that to them, but I

18   assume they don't care.

19            THE COURT:  Can you just copy them on the email to me,

20   and we can send it to my inbox?  If you can -- I don't know if

21   you want to highlight or just put the language you're adding in

22   a highlight or something -- that we mark it.  That would be

23   great so I know exactly where to go.

24            MR. SAMUEL:  It'll be in the good-faith instruction.

25            THE COURT:  Got it.

1          MR. SAMUEL:  The other one deals with the more

2     substantive issue dealing with the kickback and the motivation

3     for the kickback.  And there's kind of controversy in the

4     circuits as to whether the motivation has to be a purpose or

5     the purpose.

6          And the Eleventh Circuit has not definitively decided

7     that, and we are asking that you track the language of the

8     indictment as opposed to embellishing it by saying, if it's

9     just at least a purpose of the payment is to induce a referral,

10    we think that is a constructive amendment of the indictment and

11    adds to it or actually subtracts from the government's burden

12    of proof, and we think it should just track that it has to be

13    "the purpose."

14         THE COURT:  Okay.  So you want it as "the purpose," not

15    just "a purpose"?

16         MR. SAMUEL:  That's right.

17         And if you look at -- let me get the page up here where

18    that instruction is.  I have it -- whatever version this is,

19    it's on page 38 -- the top paragraph on page 38.

20         THE COURT:  Page 38.  Can you read what it -- where you

21    are?

22         MR. SAMUEL:  The government -- this is what it says:

23    The government need not prove that the only or primary purpose

24    of the remuneration that was paid was to induce the referral --

25    if the government proves beyond a reasonable doubt that one of

1    the defendant's purposes is offering or paying the remuneration

2    was in return for referring.

3         THE COURT:  I see.  And it's your proposal, I presume,

4    it says something along the --

5         MR. SAMUEL:  The purpose.

6         THE COURT:  -- if the government proves beyond a

7    reasonable doubt that "the purpose"?

8         MR. SAMUEL:  That's correct.

9         THE COURT:  Okay.  Well, I don't know -- let's -- I

10   don't want to jump around, but -- let's address that, but I'm

11   not necessarily sold on that qualifier.  It doesn't appear to

12   need to be so limited.  There could be a multipurpose behind

13   the kickback.

14        So I don't know that it has to be squared up that

15   directly for the instruction to be modified as suggested.  But

16   let's start off, if we could -- I've cleaned it all up, so it's

17   in good shape.

18        The first one we need to discuss that's somewhat in

19   dispute is deliberate ignorance, proof of knowledge.  And this

20   is, I believe, the government's suggested instruction.

21        Am I right on that?

22        MS. DE BOER:  That's correct, Your Honor.

23        THE COURT:  On the defense side -- this is an

24   instruction I've given multiple times.

25        Is there a particular concern with its text or its

1    inclusion wholesale?

2         MR. SAMUEL:  Its inclusion wholesale.

3         There's been no evidence in this case, none, of

4    deliberate ignorance.  The instruction requires actual proof

5    that the defendant took an affirmative step to remain ignorant

6    of the fact -- the knowledge element of the offense.

7         The typical example is, you know, you're flying from,

8    you know, Bogota to Miami, and someone hands you a suitcase and

9    says, whatever you do, don't look in the suitcase, but here's

10   $5,000.  Bring it into the Miami Airport.

11        That is the kind of proof that's actually required to

12   justify the jury not finding actual knowledge but instead

13   deliberate ignorance.  That's why the word "deliberate" is in

14   the instruction.  And I would certainly agree that more often

15   than not, if it's erroneously given, what the Eleventh Circuit

16   says is it's harmless error because if there's no

17   deliberateness, then the jury presumably wouldn't find it.

18        But in this case, it's important because the evidence

19   of actual knowledge is so sparse that Mr. Patel actually knew

20   what some of the down-the-line marketers were doing, that the

21   jury thinking that, well, he should have known, that's what

22   happens.  That's what a whole series of cases in the Seventh

23   Circuit have discussed.  That's the risk of the deliberate

24   ignorance instruction.

25        It's not that it is inaccurate.  It's just

1   inapplicable.  But it leads a jury to believe that the

2   defendant should have known.  He's the boss.  He's the one

3   making all the money.  So the jury mistakenly thinks that the

4   failure to learn is sufficient to satisfy the knowledge

5   requirement of the statute.

6           I can cite cases, you know, all morning talking about

7   the impropriety of giving that instruction in the absence of

8   proof that the defendant took steps to remove himself from

9   having knowledge, to remain deliberately ignorant.

10          So we ask you not to instruct the jury on deliberate

11  ignorance in this case absent any evidence that he

12  intentionally closed his eyes to what the marketers were doing.

13          THE COURT:  Okay.  The government's response for the

14  suggestion of the inclusion on deliberate ignorance?

15          MS. DE BOER:  Yes, Your Honor.  As the Court noted,

16  this is a common instruction given in these types of cases.  In

17  fact, in another very recent healthcare fraud case, the *Agresti*

18  case, Your Honor gave this very instruction, and I would add

19  that the defense kicked the door wide open on this starting

20  with the government's very first witness, which was Laurie

21  McMillan.

22          And they put up 855 with those little Xs or stars next

23  to them, trying to imply to the jury that because the defendant

24  hired a consulting company to assist him with the 855

25  applications, trying to imply that he couldn't have known what

1   was in there because somebody said, you know, read on the

2   dotted line.  Well, that's deliberate ignorance right there,

3   just with the Form 855s.

4        Then we turn to the patient files with Dr. Magliocco.

5   The argument was, well, he hired a lab director who went to a

6   top medical school and had a lot of the same qualifications as

7   the government's expert.  The lab director is the one who

8   should have caught the problems.

9        The defendant had access to these patient files as

10  well.  He set up the system.  He wound the clock.  He created

11  the model that led to these faulty and false patient files, and

12  he had access to them.  That's deliberate ignorance.

13       There's lots of evidence like that peppered through

14  that has been drawn out -- this instruction has become even

15  more relevant in the types of cross-examinations that we've

16  seen.

17       Take the contract, for example, that we showed -- the

18  marketing contract that said marketers market to healthcare

19  providers.  That's not who they marketed to.  They marketed to

20  patients -- direct solicitation of patients.  That's deliberate

21  ignorance.  That's a very deliberate step.

22       So that is more than a fair instruction in a case like

23  this.  Plus if they're getting good faith, I mean, this is the

24  other side of the coin.

25       THE COURT:  Right.  That tends to happen sometimes.

1        Well, here's what the Court is going to do.  Court is

2   going to include deliberate ignorance as proof of knowledge

3   instruction just by way of having a case on the record.

4        I'll cite to *United States v. Geri*, G-e-r-i.  That's

5   869 F.3d 1247.  Just because it gives good guidance to district

6   courts on the inclusion of the instruction.

7        And to me, we need to remember that the instruction for

8   deliberate ignorance is based on the alternative to the actual

9   knowledge requirement at common law, that if a party has his

10  suspicion aroused, but then deliberately omits to make further

11  inquiries because he wishes to remain in ignorance, he's deemed

12  to have knowledge.

13       Including this instruction to the jury is proper when

14  the facts support the inference that the defendant was aware of

15  a high probability of the existence of the fact in question and

16  purposely contrived to avoid learning all of the facts in order

17  to have a defense in the event of a subsequent prosecution.

18       That, to me, is exactly what some of the facts pointed

19  to by the government just now by Ms. de Boer indicate there can

20  be a theory here that he purposely contrived to avoid learning

21  relevant facts.

22       So I think there's sufficient evidence in the record to

23  grant that instruction -- or include it, rather.  So the Court

24  will overrule the defense's objection to its inclusion.

25       We will keep deliberate ignorance as proof of knowledge

1   in the jury instructions.

2           MR. SADOW:  Your Honor.

3           THE COURT:  Yeah.  Anything else you want to add to the

4   record, go ahead.

5           MR. SADOW:  Very briefly.  The one that has been

6   submitted is a deliberate ignorance instruction in a drug case.

7           THE COURT:  It's the pattern one, I believe.  That's

8   why.  I don't know if there's -- I've seen some custom ones,

9   but that's the reason why.  I mean, I think they use the

10  example of the drug case with the controlled substance because

11  it's the most common sense one.

12          As Mr. Samuel pointed out, it's the most common one of

13  avoiding what's in the package or learning what's in the

14  package.  I don't know that there's one you want to modify.

15          Is there something in particular you want to change?

16          MR. SADOW:  Well, I can understand the second

17  paragraph, which is the example.

18          THE COURT:  Yeah.

19          MR. SADOW:  But then the third paragraph is you may

20  find the defendant knew about the possession of a controlled

21  substance.

22          THE COURT:  That's fair.  Yeah.  That's confusing.

23          MR. SADOW:  It's really confusing because this is not

24  that case.

25          THE COURT:  That's a good point.  So let's modify that.

1    You know, so the way it reads now is if the defendant's

2    knowledge of a fact is an essential part of a crime, it's

3    enough that the defendant was aware of a high probability that

4    the fact existed, unless the defendant actually believed the

5    fact didn't exist.

6          Deliberate avoidance of positive knowledge, which is

7    the equivalent of knowledge, occurs, for example, if a

8    defendant possesses a package and believes it contains a

9    controlled substance but deliberately avoids learning that it

10   contains a controlled substance, so he or she can deny

11   knowledge of the package's contents.

12         So let's modify this next line.  It says:  So you may

13   find that the defendant knew -- and we have to obviously take

14   out about the possession of a controlled substance -- if you

15   determine beyond a reasonable doubt that the defendant actually

16   knew about the controlled substance or had every reason to know

17   but closed his eyes.

18         So I want to be careful here.  I might need to go back

19   and see what I have done in prior cases.  I probably have

20   modified it, depending on the alleged fraud.  I don't know if

21   there's anything in particular.

22         Let me start with the defense.  Do you all have a

23   suggestion on how you want to word that particular line, or

24   reword it?

25         MR. SADOW:  Could I remain seated so I can look at my

1   computer?  Is that okay?

2          THE COURT:  Yeah.  Of course, of course.  Remain

3   seated, please.

4          MR. SADOW:  Did the Court give that instruction in

5   *Young*?

6          THE COURT:  I'm almost certain I did.  That's what I'm

7   thinking about going back and looking, because my notes here, I

8   probably have all my forms.  I'm going to go back.  I'm going

9   to look at *Young*.  I know I gave it in the *Agresti* trial, and I

10  am certain that I --

11         MR. SADOW:  I don't see it in *Young*.

12         MS. DE BOER:  I didn't see it in Young, but it was in

13  *Agresti*.

14         THE COURT:  It was in *Agresti*.  I'm trying to think

15  back.  Young's been a little while, so that's why I'm trying to

16  remember if it was raised.  I know I gave it in *Agresti*, so let

17  me see if I can pull it up on here.  Hold on.

18         MS. DE BOER:  And you might even just be able to say:

19  You may find that the defendant knew about a fact.

20         THE COURT:  That's what I was going to say.  Might need

21  to be more broad.  I don't think we need to be so specific.  It

22  might be easier to just put it like that.  Let me see here.

23  For a fact at issue.  Let's see.

24         MR. SADOW:  We're trying to work through it while the

25  Court is looking at it.

1          THE COURT:  Yeah.  I'm working through it.  I'm

2    actually pulling up what I did in the *Agresti* trial because I'm

3    almost certain that I did do it a little broader, and it might

4    work just well with this one.  I'm just pulling it up.

5          So we did a lot more specific than I recall.  So here's

6    how it was worded in the *Agresti* trial.  It's a lot more

7    thorough in talking about the knowledge.

8          So it reads as follows:  If a defendant's knowledge of

9    a fact is an essential part of a crime, it is enough that the

10   defendant was aware of a high probability that the fact

11   existed, unless the defendant actually believed the fact did

12   not exist.

13         The next paragraph is the same one we've all agreed,

14   the controlled substance.

15         Now the next paragraph after that read:  So with

16   respect to the issue of the defendant's knowledge in this case,

17   if you find from all the evidence beyond a reasonable doubt

18   that the defendant was aware of a high probability of a scheme

19   or artifice to defraud the insurance plans, in that case,

20   Aetna, BC/BS, Optum, and others, and deliberately and

21   consciously tried to avoid learning that there was a scheme or

22   artifice to defraud the insurance plans in order to be able to

23   say, if apprehended, that he was unaware of the scheme to

24   defraud the insurance plans, you may treat such deliberate

25   avoidance of positive knowledge as equivalent of knowledge.

1          In other words, requiring the healthcare fraud and wire

2     fraud offenses, you may find that the defendant acted knowingly

3     if you find beyond a reasonable doubt either that the defendant

4     actually participated in the scheme or artifice to defraud a

5     healthcare benefit program or that he had every reason to know

6     but deliberately closed his eyes.

7          But I must -- and I remember giving this instruction --

8     because I'm sure the defense will want it -- but I must

9     emphasize that negligence, carelessness, or foolishness is not

10    enough to prove the defendant's knowledge.

11         I remember adding that because I thought that was fair

12    to add that.

13         MR. SAMUEL:  I think it's too long and complicated.

14    But the last sentence is part of the pattern.

15         THE COURT:  I would take out the middle part, that

16    whole "so with respect."  Let's cut that whole thing.  I agree.

17         MR. SAMUEL:  Just the sentence before that is so -- I

18    couldn't write as fast as you.

19         THE COURT:  No, I'll reread it.

20         MR. SAMUEL:  Just the sentence before, "but I must

21    emphasize" should be all that's needed to replace the paragraph

22    here about drug -- controlled substances.

23         THE COURT:  Let's see here.  Let me put in -- so here's

24    what I think we can do.

25         MR. SAMUEL:  "But you may find," I think you began.

1          THE COURT:  Right.  So here we go.  So here's what I

2     think.  Going back to our current one.  We're all in agreement

3     on the first two paragraphs.  The second one, doing the

4     controlled substance example.

5          But then the next paragraph:  So you may find that a

6     defendant, and then here's what I would say.  I mean, I think

7     it's -- "so you may find" makes it a little bit odd.  I think

8     we can just say -- if we could do the one that I proposed from

9     *Agresti*.  In other words, regarding the healthcare fraud and

10    wire offenses, you may find that the defendant acted knowingly

11    if you find beyond a reasonable doubt, either, one, that the

12    defendant actually participated in a scheme or artifice to

13    defraud a healthcare benefit program, or two, that he had every

14    reason to know but deliberately closed his eyes.

15         That's what it would look like here.  Now you're saying

16    that, in particular, you believe is too wordy, that one?

17         MR. SADOW:  And I think first of all, we've got to make

18    sure that it is clear:  Deliberate ignorance deals with

19    knowledge.

20         MR. SAMUEL:  Facts.

21         MR. SADOW:  It does -- facts.  It does not deal with

22    intent to defraud, and it does not deal with willfulness.

23    That's separate and apart from the knowledge requirement.

24         When you start talking in terms of scheme to defraud or

25    the healthcare and fraud, it becomes confusing.  I suggest

1   there is a very simple way to do it, since we're talking about

2   facts.

3          Again, this is just a suggestion.

4          So you may find beyond a reasonable doubt that the

5   defendant deliberately contrived to avoid learning a material

6   fact, that if you find beyond a reasonable doubt that the

7   defendant deliberately contrived to avoid learning a material

8   fact, you may find the defendant actually knew that material

9   fact.

10          THE COURT:  Do that one more time but just a little

11   slower for me.  Because I think that might work.

12          So if I say -- let's just say -- "so you may find" is

13   how you started --

14          MR. SADOW:  So you may find beyond a reasonable -- you

15   can just say:  If you find beyond a reasonable doubt that the

16   defendant deliberately contrived to avoid learning a material

17   fact, you may find the defendant actually knew that material

18   fact.

19          THE COURT:  I prefer to have it generic instead of

20   being so specific as well.  And since it goes to factual

21   disputes, it would make it a little cleaner.

22          MR. SADOW:  And then my comrade here says the next

23   sentence should be -- go ahead.

24          MR. SAMUEL:  I think it needs to emphasize the

25   government still had to prove the fact existed.

```
1          THE COURT:  Sure, sure.  We don't skip that step.  I
2   mean -- let me see.
3          MR. SADOW:  You can just say after that of course the
4   government must still prove the fact existed.  That's it.
5          THE COURT:  All right.  Let me read you what I have,
6   Ms. de Boer, and you tell me here if there's any major concern.
7          So first two paragraphs continue to be the same.  The
8   third paragraph then would read:  So, if you find beyond a
9   reasonable doubt that defendant deliberately contrived to avoid
10  learning a material fact, you may find that the defendant
11  actually knew that material fact.  Of course, the government
12  must still prove the material fact existed beyond a reasonable
13  doubt.
14         MR. SADOW:  That's perfect.  To the extent we have
15  already objected, that's preserved.  But that version, we
16  accept.
17         THE COURT:  Okay.  What do you think about that,
18  Ms. de Boer?  I think that helps.
19         MS. DE BOER:  I think it's a step in the right
20  direction, Your Honor, but the problem is the statement that
21  was just -- the statement you just read, the defense's edition
22  is simply a restatement of the first paragraph, and it's a more
23  confusing restatement of the first paragraph.
24         And like the word "contrived" isn't anywhere in here,
25  and that's a confusing word.  The third paragraph, which is the
```

1    paragraph that we're attempting to make work for this case, is

2    getting at how do you prove knowledge, and what does knowledge

3    mean under this instruction?

4        And the defense's edition doesn't give the jury any

5    insight into how do you do that.  It just says if the

6    government proves you deliberately ignored, then they've proved

7    knowledge, but that's what the first paragraph says.

8        So I think there's actually a very simple fix here,

9    which is keep the third paragraph and just say, so you may find

10   that the defendant knew about a fact if you determined, beyond

11   a reasonable doubt, that the defendant actually knew the fact

12   or had every reason to know, but closed his eyes.

13       And that's 100 percent consistent with the pattern

14   instruction.  It doesn't introduce the confusing language, and

15   it still educates the jury on how do you prove knowledge, how

16   do you put this instruction into effect.

17       THE COURT:  Read it again one more time.  So you may

18   find that the defendant knew about a fact that determined -- go

19   ahead.

20       MS. DE BOER:  Beyond a reasonable doubt that the

21   defendant, one, actually knew about the fact.  Or, two --

22       THE COURT:  Give me a second.  Go a little slower.

23   Beyond a reasonable doubt that, one, the defendant knew --

24   actually knew.

25       MS. DE BOER:  Actually knew about the fact.

```
 1              THE COURT:  Right.

 2              MS. DE BOER:  Or, two, had every reason to know but

 3    closed his eyes.

 4              And that's exactly the pattern language.  I'm just

 5    changing "controlled substance" to "a fact."

 6              THE COURT:  Okay.  So the way we have it worded is:  So

 7    you may find the defendant knew -- you may find defendant knew

 8    about a fact -- I think we should say material fact -- knew

 9    about a material fact if you determine, beyond a reasonable

10    doubt, that defendant actually knew about the material fact or

11    had every reason to know but closed his eyes.

12              MS. DE BOER:  Correct.

13              THE COURT:  What does defense think?

14              MR. SADOW:  That's not bad.

15              THE COURT:  Yeah.

16              MR. SADOW:  I would say closed his eyes to the material

17    fact.

18              THE COURT:  Yeah, we can qualify it again.  That's

19    fine.  That looks to me like it does the same thing.

20              And then I was going to talk about trying to reword the

21    contrive part, but it might be better to do it that way.  So

22    here's how it reads right now.

23              I mean, again, I'll print this out for you at the end.

24              Deliberate ignorance as proof of knowledge.  If a

25    defendant's knowledge of a fact is an essential part of a
```

 1  crime, it's enough that the defendant was aware of a high

 2  probability that the fact existed unless the defendant actually

 3  believed the fact didn't exist.

 4       Deliberate avoidance of positive knowledge, which is

 5  the equivalent of knowledge, occurs, for example, if a

 6  defendant possesses a package and believes it contains a

 7  controlled substance but deliberately avoids learning that it

 8  contains a controlled substance so he or she can deny knowledge

 9  of the package's contents.

10       So you may find a defendant knew about a material fact

11  and you determine beyond a reasonable doubt that, one, the

12  defendant actually knew about the material fact or, two, had

13  every reason to know, but closed his eyes to the material fact.

14       But I must emphasize that negligence, carelessness, or

15  foolishness isn't enough to prove that the defendant knew about

16  the material fact, I guess, would be the final part.  Right?

17       Yeah.  Okay.  I think that sounds pretty good, and it

18  makes it a lot less confusing.

19       All right.  So that one's ready to go.  We'll give it

20  to you guys in a little bit here so you can do a final read.

21       Scroll all the way through.  I think the next thing I

22  have to discuss is our good-faith instruction.  I did receive

23  the email, so I have this other modification.  I

24  believe it's -- good faith is the next one.

25       So this good-faith instruction is the one that has been

1    proposed by the defense.  I have -- let me see.  I'm copying

2    the other one that you guys emailed me.  Let's see what the

3    difference is.

4         So far the same is here.  Oh, the willfulness.  I see

5    what you did.  You guys want to go with the one you emailed me

6    instead, right?

7         MR. SADOW:  You gave the one in *Young* about

8    willfulness.  The pattern is attempt to defraud, so I have

9    attempted to combine the two together.

10        THE COURT:  Got it.

11        So I don't know if you have the one in the email,

12   Ms. de Boer.  I don't know if you saw that one.  I'm reading

13   off that one.

14        MS. DE BOER:  Okay.  I have it.

15        THE COURT:  Instead of the one in the pattern, it says:

16   Good faith is a complete defense to the charges in the

17   indictment since good faith on the part of the defendant is

18   inconsistent with intent to defraud and willfulness.

19        An intent to defraud is an essential element of the

20   fraud charges, and willfulness is an essential part of the

21   conspiracy and anti-kickback charges in the indictment.

22        A defendant isn't required to prove good faith.  The

23   government must prove the defendant acted with intent to

24   defraud and willfully beyond a reasonable doubt.

25        An honestly held opinion or honestly formed belief by

1    Mr. Patel cannot be fraudulent intent or willfulness even if

2    the opinion or belief is mistaken.  Similarly, evidence of a

3    mistaken judgment, an error in management, or carelessness, can

4    establish fraudulent intent or willfulness.

5            So, yeah, it's just a modifier of the standard except

6    we're adding in the willfulness part of it because that's the

7    second part of the indictment.

8            Okay.  So let me hear from the government on this one.

9            MS. DE BOER:  We're fine adding in willfulness, but I

10   think the change is a lot simpler than what the defense

11   proposed.  It cuts the entire third paragraph of the pattern

12   instruction.

13           THE COURT:  The honest belief one?

14           I thought it was the same.  You mean the one that says

15   honest belief of a venture -- that one doesn't work.  That one

16   I've cut before because it doesn't -- it's not the business

17   venture one.  I have had this happen before, and I always

18   eliminate that.  It's confusing.  So I don't know that we need

19   the last one.

20           That paragraph isn't the only thing that is applicable.

21           MR. SADOW:  That's the reason I cut it because you

22   didn't have it --

23           THE COURT:  Because it didn't work.  It's just

24   confusing.  Yeah.

25           So I think it is -- it's only two paragraphs.  The big

1    difference is we're adding in the willfulness part.  So it

2    looks almost exactly the same except for the fact that we're

3    building in the willfulness, not just intent to defraud.

4         MR. SADOW:  I tried to be specific as to the charges.

5         THE COURT:  Yeah, because it's got to match.  Intent to

6    defraud is an essential element of the fraud charges, and

7    willfulness is an essential part of the conspiracy and

8    anti-kickback charges in the indictment.

9         The defendant is not required to prove good faith.  The

10   government is proving that the defendant acted with intent to

11   defraud and willfully beyond a reasonable doubt.

12        It looks okay.  I don't know how to make it a lot

13   cleaner.  I agree that the last part can make it a little

14   clunky because of the way we are working in willfulness, but it

15   is trying to track the indictment.

16        MS. DE BOER:  Yeah.  I guess what's tripping me up is

17   the beginning is a bit confusing.  It's a bit clunky.  The

18   first sentence is six lines, for example.

19        I think it could be accomplished just by modifying the

20   pattern to say good faith is a complete defense to a charge

21   that requires intent to defraud or willfulness.

22        THE COURT:  Okay.  We will go that way.  Why don't we

23   do, then, the next line:  Intent to defraud is an essential

24   element, like that.  That may work.

25        MS. DE BOER:  I think that's a little duplicative of

1    the intent instruction that the Court is going to give.  This

2    is to explain what does good faith mean.

3          So good faith is a complete defense to a charge that

4    requires intent to defraud and willfulness.  The defendant

5    isn't required to prove good faith.  The government must prove

6    intent to defraud and willfulness beyond a reasonable doubt.

7          And then we can add for the charges of healthcare

8    fraud, wire fraud, and kickbacks.

9          THE COURT:  Give me one second.

10         MR. SADOW:  This clarifies how it applies to specific

11   charges.  It doesn't harm or prejudice the government, and it

12   makes it clear to the jury in what context they'd consider it.

13         THE COURT:  I gotcha.  I think it might not be a bad

14   idea to just -- I know it's a restatement of a prior

15   instruction, and I think it wouldn't be bad to have some

16   context.

17         So I just -- give me one second.  I'm building it in.

18   But I just think if we break it up into two sentences, it'll be

19   a little cleaner.

20         MR. SADOW:  You put a period after willfulness on the

21   first line.

22         THE COURT:  So here's how I have it.

23         Good faith is a complete defense to a charge that

24   requires intent to defraud or willfulness.  Intent to defraud

25   is an essential element of the fraud charges, while willfulness

 1   is an essential part of the conspiracy and anti-kickback

 2   charges in the indictment.

 3          A defendant isn't required to prove good faith.  The

 4   government must prove intent to defraud and willfulness beyond

 5   a reasonable doubt.

 6          An honestly held opinion or an honestly informed belief

 7   cannot be fraudulent intent or -- I guess -- I think we should

 8   say cannot be fraudulent intent or willfulness even if the

 9   opinion or belief is mistaken.

10          Similarly, evidence of a mistake in judgment, an error

11   in management, or carelessness can establish fraudulent intent

12   or willfulness.  I think that's fine.

13          So the only thing we're doing besides building in

14   willfulness, Ms. de Boer, is I'm adding in that second line so

15   we remember what goes with what.  It's been a while.  It's a

16   way earlier instruction, so I don't think anything hurts by

17   just restating what applies to what.

18          MS. DE BOER:  Yeah.  Your Honor, I just -- the one

19   thing that's sort of confusing to me is on the money

20   laundering.  That's knowingly and voluntarily conspired.  So I

21   mean, it's not much different but --

22          MR. SAMUEL:  But it has conspiracy.  Money laundering,

23   conspiracy.

24          THE COURT:  Yeah.  Isn't it just the conspiracy count?

25          MR. SADOW:  Money laundering we're not putting in there

 1   because money laundering is unfortunately different.  But you

 2   still have to have the specified unlawful activity.  So

 3   essentially, if you don't find any of the other charges, you're

 4   not going to get to that anyhow.

 5        THE COURT:  Right.  You shouldn't.  So that's why we

 6   only mentioned the conspiracy and anti-kickback.  We don't go

 7   beyond that.

 8        MR. SADOW:  Which is why I put it that way.

 9        THE COURT:  I think that's right.

10        I'm going to let you guys read it again, but I think

11   that works.  It's a little cleaner, and it makes more sense to

12   me now because we've just streamlined it with the second

13   sentence.

14        All right.  So that was the other main issue.

15        Now I'm going back.  Unless I'm missing something, the

16   only other thing I think we have left is the S-18, good-faith

17   reliance upon advice of counsel.

18        Now, where are we at on this one?

19        And this is also a defense proposed.  Let's touch on

20   this one:  Particular concerns on the government's end with

21   good-faith reliance upon advice of counsel.

22        MS. DE BOER:  Absolutely, Your Honor, because all the

23   defense has shown is that Mr. Patel had attorneys.  There is no

24   evidence of what those attorneys advised.  At best, there's

25   evidence that the attorneys were given information, but no

1    witness has testified to what the advice was, how that advice

2    was implemented.

3          I don't think this instruction is proper.

4          THE COURT:  Okay.  Let's hear argument on the

5    good-faith instruction.

6          MR. SADOW:  Can I just jump up and down and say we have

7    to have it?

8          THE COURT:  No.  I need a little more than that.  Give

9    me a little more than that.

10         MR. SADOW:  I mean, the record is replete with

11   witnesses testifying to information provided to the attorneys.

12   As to exact information, I can't say that that's in the record.

13   The best we've got is compliance, sending documents to the

14   attorney from other witnesses.

15         THE COURT:  Yeah.  I mean, my concern here is I don't

16   know that there is a -- I'm looking here just at some case law

17   just to confirm.

18         But I don't know that there is a certain level of

19   requirement here to give that instruction beyond what has been

20   introduced in this case.  Certainly, I know that we haven't put

21   on an attorney to directly explain what was told to that

22   attorney and how to formulate the advice.

23         But we do have plenty of evidence that regulatory

24   attorneys were consulted, that he had folks he was meeting with

25   to guide them through Medicare and its protocols.

1          I don't know that I can sit here and say he wouldn't --

2     essentially, you're saying that they have not shown or made a

3     prima facie case of an instruction to support advice of

4     counsel.

5          And I'm concerned that we have enough in the record.  I

6     know that the case law -- I'm citing to the case of *Condon*,

7     that's 132 F.3d 653, and it states:  To be entitled to a

8     good-faith reliance instruction, an attorney -- excuse me -- a

9     defendant must show that he fully disclosed all the material

10    facts to his attorney and that he relied on good faith on

11    advice given by his attorney.

12         MR. SADOW:  Your Honor, could we have one minute before

13    we --

14         THE COURT:  Yeah, go ahead and meet on that.

15         (Discussion was held off the record.)

16         MR. SADOW:  We withdraw the instruction.

17         THE COURT:  So that's going to be mooted.  Let's go

18    ahead and take that out.

19         And at this point, I think, looking at the remainder of

20    the instructions -- and I don't think, by the way, that we had

21    any dispute as to the verdict form either.  I think we did the

22    right thing by making sure the objects of the conspiracies are

23    broken out.  So I believe that we have a working form.

24         So what I think we should do is, why don't we go ahead

25    and just print out one copy -- maybe two or three copies for

1    each side, and we all just take one clean read, and everybody

2    can take a moment and tell me if they see anything.

3           I'll have it brought out to you all, and you can make

4    sure there's nothing else in there.

5           MR. SAMUEL:  There's the issue about the purpose.

6           THE COURT:  Walk me through what that is.

7           MR. SAMUEL:  I hope I'm looking at the right one.  It's

8    a page 38 at the top.

9           THE COURT:  I've changed the pagination a lot.  Just

10   read to me, again, the line.

11          MR. SAMUEL:  It's in the kickback instruction on the

12   second page of it.

13          THE COURT:  Okay.  Under the payment of kickbacks

14   instruction?  That's where we're at, right?

15          MR. SAMUEL:  Yes, page 2.

16          THE COURT:  Okay.  Tell me where --

17          MR. SAMUEL:  Top paragraph.

18          THE COURT:  Okay.  You can go ahead and start reading

19   that.

20          MR. SAMUEL:  The government need not prove that the

21   only or primary purpose of the remuneration that was paid was

22   to induce the referral.

23          THE COURT:  Okay.  That's right.  And so you're

24   requesting that it read something to the effect of, the

25   government need not prove -- well, I guess you would say need

1   prove that the only or primary purpose was that it was to

2   induce?

3       MR. SAMUEL:  That's the purpose.  It's already in the

4   instruction.  If you look at subparagraph 2 on the page before,

5   you're elaborating on that for no reason.

6       It just says -- that tracks the language:  The payment

7   or offer of the remuneration was made to induce the person to

8   refer an individual.

9       And you're limiting that by saying it just has to be

10  one of many purposes.  It could be a --

11      THE COURT:  What support do we have for -- and I know

12  that there's been a footnote here that this instruction --

13  because we talked about this, I think early on in the trial

14  when we were going back on my instruction in *Young*, Judge

15  Scola's instruction in his *Esformes*, because this is not one

16  that we have in a pattern.  So we all kind of customized this

17  one over time.

18      Government, I don't know if you want to chime in on

19  this.  That qualifier, I guess I'm not certain where there

20  would be a requirement that it be a primary or only purpose.

21  I'm not sure where that's being derived from.

22      MS. DE BOER:  This is the law, Your Honor, and this is

23  the instruction that you gave in *Young*.  This is the

24  instruction that is routinely given in the Eleventh Circuit.

25  And every single circuit that has considered this issue has

1    adopted this rule.

2         In other words, that if one purpose of the payment is

3    to induce referrals and the payment is a kickback, I would cite

4    the Court to *United States v. Greber*, 760 F.2d 68.  That page

5    is 71 to 72 from the Third Circuit, 1985; the *United States v.*

6    *Mallory*, 988 F.3d 730 on page 741 from the Fourth Circuit.

7         It's a 2021 decision.  *United States v. Davis*, 130 F.

8    3d 1092, at page 1094, Fifth Circuit case from 1998.

9         *United States v. Borrasi*, 639 F.3d 774, pages 781 to

10   82, Seventh Circuit case from 2011.

11        *United States v. Katz*, 871 F.2d 105, at page 108, Ninth

12   Circuit case from 1989.

13        *United States v. McClatchey*, 217 F. 3d 823, at 835,

14   Tenth Circuit case from 2000.

15        The Eleventh Circuit hasn't issued a ruling on this,

16   but this is consistent with the law across the country, and

17   it's consistent with how district courts, including Your Honor,

18   and including the only other double helix to go to trial in

19   this circuit that's consistent with the instructions issued in

20   that case as well.

21        THE COURT:  Yeah, I have to say, I'm just looking at it

22   here.  I understand the defense's argument, but I don't believe

23   that it would necessarily track the law.  I don't think there's

24   a qualifier that it has to be the only purpose or that you

25   can't have a multipurpose.  I know this sounds inartful, but a

1   multipurpose kickback.  Certainly, to me, I think that would be

2   inserting something the statute does not contemplate.

3          I understand the argument, it's preserved, but the

4   Court's going to decline to modify that instruction further.

5   It is the one that I've thought through in the past, and

6   thinking through it with the suggestion again now, I'm

7   persuaded that it should remain as currently worded.

8          So I will decline to take that or add that modifier.

9          MR. SAMUEL:  I'm sorry.  I just want to make sure the

10   Court knows -- first of all, I haven't looked at the

11   indictments in all the cases that the Government cites.

12          You know, part of our argument is not only that the law

13   doesn't require it, but the indictment doesn't specify it here.

14   So we're looking at it as a constructive amendment.

15          THE COURT:  Okay.

16          MR. SADOW:  Eleventh Circuit often gets things much

17   better than the other circuits do.

18          THE COURT:  I would agree there.  And they haven't

19   really opined on this instruction yet, which I think most of us

20   are hoping they will in some of our recent cases that are up on

21   appeal.  I don't know, Ms. de Boer, if you want to address just

22   the constructive amendment argument which they have raised.

23          MS. DE BOER:  This is not a constructive amendment of

24   the indictment, Your Honor.  It's entirely consistent with the

25   charges alleged, and the whole purpose of jury instructions is

1    to give the jury -- not to change the indictment but to give

2    the jury a better sense of how to apply the law.

3            The indictment tracks the statutory language.  The fact

4    that this instruction isn't necessarily, you know, within the

5    elements of the statute doesn't mean that it's not part of the

6    law.  It is part of the law.

7            It is consistent with how courts instruct on the law in

8    this circuit and in every other circuit that's addressed the

9    question.

10           THE COURT:  Thank you.  Again, I'm looking also at the

11   indictment.  I don't believe there's a constructive problem

12   here.  I'm going to go ahead and allow this to remain as

13   worded.

14           All right.  So with that, have I addressed all the

15   concerns on the instructions at this point, other than just

16   cleaning up a few formatting issues?  There's a couple of weird

17   little things here that I need to clean up.  I think I'm in

18   good shape.

19           I should be able to print this off for you all so

20   everyone can give it a once-over.  That way you'll have the

21   instruction.  As you're viewing your closing arguments you can

22   make reference to it, since it'll be read to the jurors first,

23   and they'll be charged.

24           Anything else on the government's end?  I know you need

25   to take a look at it.  But before I go and print it?

1          MS. DE BOER:  Nothing, Your Honor.

2          THE COURT:  Anything on the defense side, guys, before

3    I go ahead and print it?

4          MR. SADOW:  No, Your Honor.

5          THE COURT:  All right.  I'm going to make sure I print

6    this because I want you guys to have an opportunity.  Why don't

7    we do this, Ms. de Boer.  While I'm printing this and cleaning

8    this, go ahead and take the opportunity to maybe go through

9    some of the exhibits with your team.  You guys were doing some

10   QC on that.  If you want to start going through that while I

11   print this, and I'm going to have my CRD bring copies to

12   everybody in just a moment.

13         I'd ask us all to read through it carefully.  Let's

14   make sure -- no one hates reading these instructions to a jury

15   and finding a typo midstream more than me.  So let's go ahead

16   and try to read it altogether.

17         I'm going to step off now and do a final read in

18   chambers, print it, bring it out you.  You guys use this time

19   to keep going through your exhibits.  All right?

20         MS. DE BOER:  Thank you, Your Honor.

21         THE COURT SECURITY OFFICER:  All rise.

22         (Court recessed at 10:07 a.m.)

23         (Back on the record at 11:19 a.m.)

24         THE COURT:  I just want to finalize any last-minute

25   changes to our instructions or anything I might have missed.

1          Ms. De Boer, I'll turn it over to you.  I think you

2     caught a few things.

3          Can you direct me to where we need to go?

4          MS. DE BOER:  Yeah.  Actually, just one thing, Your

5     Honor.  It's extraordinarily minor.

6          THE COURT:  Please, I'd rather have them all fixed.  So

7     I appreciate it.  Where should I go?

8          MS. DE BOER:  On page 20.

9          THE COURT:  Okay.  Let me scroll there.  Yes, I'm

10    there.  Okay.

11         MS. DE BOER:  In number one, I think you can just

12    delete the brackets so the jury isn't confused as to --

13         THE COURT:  Yes, thank you for that.  Yes, yes, I'm

14    glad we caught that.  Okay, good.  Since that's not going to

15    apply.  Okay, good.

16         MS. DE BOER:  I think you can leave the language --

17         THE COURT:  No, no, I mean the bracketing part is what

18    I mean.  You just want to take the brackets themselves out?

19         MS. DE BOER:  Correct.  Yes.  Just the punctuation,

20    yes.

21         THE COURT:  Defense, see where I'm at?  I'm on page 20.

22    I left brackets in, or obtained money or property by a health

23    care benefit program.  I just didn't take out the brackets.

24    That was the edit.  Not a substantive change.

25         Let me make sure I don't have any other brackets

```
 1   anywhere else.  I don't.  Okay.
 2          Was there anything else you spotted, Ms. de Boer, or
 3   was that it?
 4          MS. DE BOER:  That was it, Your Honor.
 5          THE COURT:  All right.  I think I cleaned up everything
 6   else, so we're good.  All right.
 7          On the defense team, gentlemen, did you catch anything
 8   else that needed to be edited?
 9          MR. SADOW:  No, we caught the same mistake, but the
10   government beat us to it.
11          THE COURT:  All right.  So we've gone ahead and
12   replaced -- deleted that unnecessary bracket.  Everything else,
13   to me, looks good.  Of course, if anybody finds something at
14   the eleventh hour as you're preparing your closings, let me
15   know, but I think we have a good form ready to go for our
16   jurors.
17          So what I'd like to do -- because obviously I want to
18   let you, Ms. de Boer, finish preparing and let the defense
19   finish preparing, is perhaps we can just briefly hear your
20   response.  It's quite short.  It's not an overly lengthy
21   memorandum in support, Docket Entry 386 on the Rule 29.
22          I'll turn it over to you, and let's make argument on
23   that.  Go ahead.
24          MS. DE BOER:  Sure.  And I will make this
25   extraordinarily short as well.  Your Honor, the defense's
```

1    motion challenges the overall sufficiency of the indictment.

2    They are not focused -- it doesn't appear they're focused on

3    any particular count.

4         So what I will say is the evidence is sufficient to go

5    to the jury on each and every count.  The defendant signed the

6    855s; he was aware of his obligations to Medicare.  He signed

7    them on multiple occasions.

8         The defendant owned and controlled LabSolutions.  It

9    was the defendant's idea to change LabSolutions from a

10   toxicology lab to a genetic testing lab.  That was done by

11   profit motivation.

12        It all started in 2016 when the defendant met with

13   Shawn Griner and Brett Hirsch at the Boca Beach Club, and they

14   talked there without lawyers, without anyone else from

15   LabSolutions, about the profitability of genetic testing, about

16   using a call center, about using telemed, and that spawned the

17   entire scheme.

18        The defendant knew that he was paying marketers, he

19   knew that his contracts were a lie about what the marketers

20   were doing.  That was done to make it look like commission

21   payments were proper and that they were not a kickback to

22   directly solicit patients and exert undue influence over

23   patients and to drive up the volume of patient referrals.

24        The defendant, in fact, paid kickbacks.  He, in fact,

25   received patient referrals in return for those payments, and

1   those referrals were utterly junk.  The patients were lied to

2   and tricked into getting these tests.  The doctors often did

3   not speak with the patients at all.  The patient files that

4   were generated were generated by telemarketers and

5   rubber-stamped by doctors who were paid to do so.

6        The patient files themselves offer no justification for

7   any of the testing that was done, including on the three count

8   patients, Counts 2 to 4, which Dr. Magliocco discussed and

9   presented to the jury, as there was no basis in the files for

10  the medical necessity of the tests or a legitimate

11  doctor-physician relationship.

12       Many patients did not get results.  If they did get

13  results, they were confused, and in fact, in one instance the

14  results utterly misdiagnosed the patient and that sent the

15  patient down a confusing and traumatizing rabbit hole, as

16  Ms. Foss testified to.

17       With respect to each substantive count of kickbacks,

18  Mike Petron presented the actual transactions themselves, which

19  the government has tied up with the faulty and misleading

20  contracts.

21       And with respect to the money laundering, the

22  government has presented not only just a conspiracy but actual

23  money laundering in terms of transactions of over $10,000

24  and the use of multiple distinct accounts and large transfers

25  to create a rabbit hole money trail here.

1          So very high level, equal to the defense motion, but

2     that's the high-level view of the evidence, and this is

3     sufficient to go to the jury.

4          THE COURT:  Thank you, Ms. de Boer.

5          And I would agree, yes, reading it, when it came in

6     last night -- I read it this morning -- I think it is focusing

7     more on a high level than any particular count, so I wanted to

8     address that.

9          Again, I don't want to belabor it, but any brief reply?

10    Mr. Samuel, I'll turn it over to you.

11         MR. SAMUEL:  We rely on the motion we filed and

12    citations of the authority.  We believe the evidence is

13    insufficient on each and every count.  I specified the

14    substantive count dealing with the individual patients and with

15    regard to the marketers in the money laundering counts.

16         THE COURT:  Thank you, Mr. Samuel.

17         The Court notes that Rule 29 and the responsibility, if

18    you will, of the Court on Rule 29 and what it requires is that

19    a Court on the defendant's motion must enter a judgment of

20    acquittal of any offense for which the evidence is insufficient

21    to sustain a conviction.

22         We know that the applicable standard as elucidated by

23    the Eleventh Circuit for ruling of a motion on a judgment of

24    acquittal under Rule 29 is whether viewing the evidence

25    presented most favorable to the government, a reasonable-minded

1   jury could accept the relevant and admissible evidence as

2   adequate and sufficient to support the conclusion of the

3   defendant's guilt beyond a reasonable doubt.

4          I would cite to an older case, *United States v. Brown*,

5   for that proposition from the Fifth Circuit in '79.  That's 587

6   F.2d 187, pincited at 190.

7          It is not the function, however, of the Court,

8   important for purposes of today, as it is with all Rule 29s, to

9   assess the credibility of witnesses, weigh the evidence,

10  resolve evidentiary conflicts, or substitute my own judgement

11  as to the guilt or innocence of that or for that of the jury.

12         And with that guidance, the Court looks at the motion

13  of the ore tenus response from the government at this point,

14  and I am persuaded that this case will go back to the jury.

15         I think that there is more than sufficient evidence on

16  which the jury can find guilt beyond a reasonable doubt as to

17  each of the individual counts, and especially when I view the

18  evidence in a light most favored to the government, I'm

19  concluding that this is a fact pattern, and the evidence that

20  I've heard is sufficient for a jury to review all the evidence

21  and determine whether or not the government has proven their

22  case beyond a reasonable doubt.

23         I think when you view the evidence in conjunction with

24  each other, meaning every independent witness, every piece of

25  evidence working together, and don't look at it in isolation,

1    that it is clear to me that we do have sufficient evidence in

2    this regard, and I think it would be inappropriate for me to

3    get involved and usurp the jury function because that would

4    truly, I think, eliminate reasonable inferences to be drawn by

5    the jury from my own determination of whether it be credibility

6    or the weighing of the evidence, which isn't appropriate.

7         So I think enough testimony has been provided as to

8    each point over the past two weeks.  I think between the

9    testimony of the financial expert, from the cooperators, and

10   certainly from the beneficiaries, that we do have sufficient

11   evidence to go back to the jury.

12        So the Court will deny the Motion for Judgment of

13   Acquittal, Docket Entry 386, for the reasons stated on the

14   record.  And that, again, will also, I think, provide guidance,

15   as requested by the government earlier this morning, as to

16   whether or not there needed to be a focus on any particular

17   count in the closing argument, as it is a high-level-type

18   argument.

19        So I don't want to take any more time.  It's 11:30.

20   You still have two hours before we will begin our closings.

21   Again, I still have set aside 90 minutes.  Truthfully, I don't

22   know that each side is going to need the full 90 minutes, but

23   you have them, if you need them.

24        And as we discussed before we broke, I have no issue

25   with the defense splitting their 90 minutes between two

1   counsels, and I'll instruct the jury so they're not surprised

2   by that or think anything of that.

3          And I know that the government, I believe, intends to

4   have their split between first and second close.

5          Right, Ms. de Boer?

6          MS. DE BOER:  That's correct.  Ms. Gurskis will be

7   doing the main closing, and I'll rebut.

8          THE COURT:  Very good.

9          The only thing I wanted to add just before we break,

10  just to make sure we have a streamline closing, I suspect, in

11  light of the fact that we are not really pursuing the

12  advice-of-counsel defense, that the defense's closing will be

13  focused primarily on more of the good-faith belief than an

14  advice-of-counsel theory, which we know then the government

15  will be addressing through deliberate ignorance.

16         But I want to make sure that that's really the

17  narrative.  I just don't want to have an issue where the

18  government breaks up or objects mid-close because we start

19  fleshing out an advice-of-counsel defense that was not

20  ultimately pursued.

21         Is that a safe assumption, Mr. Sadow, or Mr. Rafferty,

22  whoever is taking the lead on that?

23         MR. SADOW:  Well, I think I'll be taking the lead on

24  it.  But I want to make sure that I understand what the Court

25  means.

1          We're certainly going to point out that various

2    witnesses spoke in terms of LabSolutions and counsel and

3    compliance and matters being submitted to counsel.  I'm not

4    going to say that you should find good faith because advice of

5    counsel applies.

6          I mean, we're just going to talk the generality of good

7    faith and interaction with lawyers --

8          THE COURT:  Right.

9          MR. SADOW:  -- payment of fees, the whole thing.

10         THE COURT:  That's what I expected.  And I'm okay with

11   that.  I think, Ms. de Boer, my concern is generally explaining

12   someone's good-faith belief, there's probative evidence of that

13   if indeed you are seeking advice, you were seeking legal

14   opinions as to regulations, that kind of generic or general

15   testimony, which we've heard throughout, that he wasn't just

16   going alone at this.

17         He was seeking advice of different people, experts,

18   whether it be medical, regulatory, all of that.  I think that's

19   fine in the general sense because it would indicate or be

20   probative of a good-faith belief that this is not someone that

21   has the willfulness, right, that would be necessary.

22         So I think there's a way to do that, Ms. de Boer,

23   without getting into what was actually said or not said.  It is

24   a very fine line, though, and I suspected that was going to

25   make its way into closing.

1    We don't have an advice-of-counsel defense being

2    pursued.  There's no jury instruction in that regard.  But I

3    think there could be mention of the work done in getting

4    LabSolutions up and running and generally seeking the advice of

5    others as indicating a mens rea concern.

6         I mean, what's the defense's or the government's view

7    on that?  I understand you might be concerned.  So I wanted to

8    air this out now.

9         MS. DE BOER:  Sure.  I mean, two things:  One, we did

10   file a motion in limine to exclude what is now happening.  I

11   understand that's largely been denied by the Court, or it was

12   sort of a wait and see, and I am hearing the Court's ruling

13   right now.

14        THE COURT:  And we had to wait and see.  Right.  The

15   wait and see was what was going to happen.  I mean, really,

16   they withdrew the instructions when they recognized there

17   wasn't enough to give that instruction.

18        MS. DE BOER:  Fair enough.

19        And I understand what the Court is saying that this

20   goes to straight good faith.  I think there is a difference

21   between saying I hired lawyers, and there's certainly evidence

22   that he hired lawyers.  That's in.

23        What isn't in is that the lawyer said it was okay.

24   That is not in.

25        THE COURT:  I agree.

1           MS. DE BOER:  So no implication that the lawyer said it

2    was okay, and no argument that the lawyer said it was okay.

3           There is evidence that Mr. Patel told cooperators he

4    was taking things to his lawyers.

5           THE COURT:  Right.

6           MS. DE BOER:  That's fine.  That's different than

7    lawyer said it was okay.

8           THE COURT:  And that's exactly what I wanted to get to.

9    And I think we understand that evidence.

10          MR. SADOW:  But that's not exactly what the evidence

11   was.  I mean, we have -- and I have transcript references.  So

12   it's not an issue.  But there was testimony from various

13   cooperators that Mr. Patel said the lawyer said it was okay.

14   And that's in the evidence.

15          THE COURT:  I would need to see exactly where that is.

16   I want to make exactly clear.  Because my -- I tend to agree

17   with Ms. de Boer on this, that I have no issue with the

18   testimony that he has lawyers that have assisted, right, or

19   that he went to lawyers.

20          Generally speaking, I think that's fine.  You know, we

21   got a lot of testimony on that, telling him I'm running this by

22   lawyers or I'm showing this to lawyers.  The substance of what

23   those communications were, were never aired out.  That's not

24   happened now.  That's number one.

25          Number two, a lawyer tactically blessing something -- I

1   don't know that I got to that level of specificity.  Certainly,

2   if I -- I mean, there's been a lot of evidence.  Maybe I'm

3   forgetting something.

4        But I want to be very clear on that.  I don't want to

5   have this emerge now that we have moved away from advice of

6   counsel at closing.

7        So where would you point me to?

8        MR. SADOW:  Well, I have them all.  Griner:

9   December 6, 2022, page 117.

10       Because what was told to you, as you understood it, was

11   that Mr. Watt was saying it was fine to pay commissions;

12   correct?

13       Yes, indeed.

14       Just as an aside, you actually spoke to Mr. Watt,

15   didn't you?

16       Yes.

17       On more than one occasion?

18       Correct.

19       And when you spoke to Mr. Watt, I assume it had to do

20   with opinion on legal matters?

21       Correct.

22       And tell us, what did you talk about with Mr. Watt?

23       Remember, it was related to a question of paying for

24   commissions -- specifically paying for commissions for Medicare

25   reimbursements.

```
 1              And Mr. Watt told you it was permissible; correct?
 2              Correct.
 3              I mean that's in evidence.  And then -- I mean, I have
 4    all of those.
 5              THE COURT:  Okay.  Let me get the government's view on
 6    that.
 7              Again, this is from the 6th.  I'm trying to remember
 8    exactly how that played out.
 9              Go ahead.
10              MS. DE BOER:  Yeah.  I mean, I'm not looking at the
11    transcript right now.  If it's directly stated in a transcript,
12    that's one thing.  But if it's -- you know, anything beyond
13    that, I -- you know, there has been -- and Griner is the only
14    one that there was any evidence actually spoke to Mr. Watt.
15    Right?
16              So everything else is just Mr. Patel's statement to
17    another cooperator or another witness or just the witness
18    happened to know, yes, there were lawyers around.
19              THE COURT:  Right.  Lawyers are being involved -- are
20    involved in some generic sense.
21              MS. DE BOER:  Right.
22              THE COURT:  Yeah.  Well, I guess, what we're saying is,
23    if you have it in that -- again, if you have specific
24    references like that, I can live with that.
25              The government understands that.  It's anything that is
```

1    taking it one step further about the lawyers being consulted

2    and blessing conduct that is not found either verbatim in the

3    transcript or at least some explanation in the transcript.

4              Did you want to reference another part of that?

5              MR. SADOW:  Yes, here's Sporn on page -- December 5,

6    2022, page 158.  It's a whole litany of questions.

7              Well, you think when you were using the script that you

8    were breaking the law?  The answer is no, did you?

9              Correct.  I was told that everything was compliant.

10             And who told you that?

11             Mr. Slagle.  And he said he vetted it with LabSolutions

12    before we started.

13             And Mr. Slagle had a lawyer, right?

14             Yes.

15             And you had a lawyer, correct?

16             I didn't have a healthcare attorney at the time.

17             But Mr. Slagle did, right?

18             Yes.

19             And Mr. Slagle vetted the information with his lawyer;

20    right?

21             Yes.  That's what he told me.

22             And LabSolutions, you were told, vetted their processes

23    with their lawyer, right?

24             That's what I was told.

25             I mean --

```
 1              THE COURT:  All right.  Like I said, I don't think
 2    Ms. de Boer and I are taking an issue with that.  I think the
 3    government agrees that we just want to make sure we don't draw
 4    any illusions or connections that aren't supported by record
 5    evidence and testimony.
 6              I just want to make sure that we kind of aired it out
 7    so that we don't have any interruptions in closings at this
 8    point.  Certainly, if you have a line and page, Mr. Sadow, I'm
 9    not going to take issue with it.  I think we just don't want to
10    draw a conclusion, I think, is Ms. de Boer's concern, that we
11    actually fleshed out an advice-of-counsel defense beyond what
12    is supported by the record.
13              That's the key.  It's got to be confined to that.  So
14    long as you stick to that, I don't think there will be a
15    problem.
16              MR. SADOW:  But what I'll do is I'll speak in terms of
17    good faith, and I will talk to you about the evidence in this
18    case that deals with interaction between Mr. Patel, other
19    people, and lawyers.  And then I'll -- right?
20              THE COURT:  Okay.
21              MR. SADOW:  Then I've got records all the way through.
22              THE COURT:  I hear you.  Okay.
23              I think it was important just to air it out so we're
24    all on the same page.  I'm fine with that.
25              MR. SADOW:  But that leaves a question:  Am I
```

1    allowed -- we have transcripts.

2              THE COURT:  Sure.

3              MR. SADOW:  What can you do with the transcript?

4              THE COURT:  Well, look, if you want to put it up on an

5    overhead, I mean, I'm fine.  I would just show -- if you're

6    going to point to something in the record that's in there

7    supported, I don't have a major problem with that.

8              I mean, I tend -- the only concern I always have is, I

9    tend to want jurors to rely on their best recollection of the

10   evidence and their own memory.  I don't want them to then start

11   asking and sometimes they do.  And they say, can we have a

12   whole transcript sent back here?  And I'd like to avoid that a

13   little bit.

14             But if it's selected use for demonstratives, I don't

15   necessarily have a major problem.  I'd rather it come from

16   the witness than your interpretation of the language.

17             Were you thinking of reading it or maybe showing it?

18             MR. SADOW:  I didn't know yet what the Court --

19             THE COURT:  Right.

20             MR. SADOW:  My concern was the same thing.  The Court's

21   concern is if you start showing transcripts, inevitably you're

22   going to wind up --

23             THE COURT:  You're going to wind up -- they want the

24   whole record.

25             I mean, I don't have a problem, and I don't know how

1    the government feels about this.  If we want to have them and

2    refer them, instead of showing them, just because I do think

3    that it begs -- then they will want the whole thing.  This

4    always happens.

5           I mean, again, we can do that, and then I have to tell

6    them, listen, we don't have the whole thing, and you'd be here

7    for a long time until we run through a full transcript.

8           Does the government have any strong feelings on how

9    it's going to be used?

10          MS. DE BOER:  I think it's okay to use limited

11   portions.  And I actually think it's a little -- typically I

12   would say no, but in this case a little safer, given where we

13   are versus where we thought we might be.

14          On the advice of counsel, it might be a little safer to

15   do it that way.

16          You could even, Your Honor, add into the instructions

17   that you're going to hear the closing arguments from the

18   lawyers.  Arguments are not evidence.  The lawyers may refer to

19   transcripts.  That is not evidence.  The evidence is your

20   recollection of what the witness said.  This is only to help

21   you --

22          THE COURT:  Demonstrative.  Yeah.  Because they're not

23   being admitted.  I mean, it's demonstratives.  But, I mean,

24   again, we're going to show you -- same thing as their notes.

25          I don't have a problem, you using it in excerpts like

 1   that, Mr. Sadow, and putting it up.  If you want to do it that

 2   way, that's fine by me.  I think both sides can do that.  I may

 3   just make sure they understand that they're not going to get

 4   copies going back with them.  I just don't want them to think

 5   that.

 6         MR. SADOW:  Yeah, what I -- I'm not sure on that one.

 7   The problem becomes how long it's going to take to keep putting

 8   it up and down.

 9         THE COURT:  Right.

10         MR. SADOW:  What I may wind up doing is saying I'm

11   looking at the testimony of so and so and refer to the

12   government on this date, on page so and so, these questions and

13   answers with this witness, and then go into the questions and

14   answers.

15         THE COURT:  Okay.  I can live with that.  I can live

16   with that as long as we point to the page and line and the

17   government knows so we're all following along, I think that's

18   fine.  And I agree.  I think it can be clunky if we start

19   throwing them up every five minutes anyway.

20         MS. DE BOER:  I mean, we may -- in response, we may

21   want to orient -- I don't know if Ms. Gurskis may in her --

22         THE COURT:  You may.

23         MS. DE BOER:  -- in her opening close want put up a few

24   snippets.  It's not going to be a closing of the transcript.

25         THE COURT:  I can live with putting up a few snippets

1    or reading.  As long as we're going off the text of the

2    transcript, that's fine.  I think it's good, and I agree with

3    you, Ms. de Boer, that it would avoid us trying to summarize,

4    because the wording matters.  Especially on some of the issues

5    with advice of counsel, I'd rather it be read.

6              So whether you read it or you show it, I'm good with

7    that.  And I may just -- again, as I do with all the major

8    instructions, just remind them again that although they will be

9    referring to testimony throughout the trial and they may use it

10   in a demonstrative way, all jurors are always reminded to use

11   their best recollection of the evidence.  Something like that.

12             MS. DE BOER:  Yeah.  I think that will be perfect.

13             THE COURT:  Very good.

14             MR. SADOW:  I did find a typo.

15             THE COURT:  I'm glad you told me.  Where is it?

16             MR. SADOW:  Page 25, second line.

17             THE COURT:  Let me get it out.

18             MR. SADOW:  On the good-faith defense.

19             THE COURT:  Thank you.  I'd rather find it now than

20   when I'm reading it.  Let me pull it up.

21             MR. SADOW:  First word you have is -- I think you mean

22   "intent" as opposed to "intend."

23             THE COURT:  Probably.  It might have autocorrected.

24   Cannot be fraudulent -- it's on page 25, you said?

25             MR. SADOW:  Yes, second line, first word.

```
 1              THE COURT:  Oh, intent.  Yes, thank you.  Intent to
 2    defraud, not intend to defraud.  Thank you.  Got it.
 3              Anything else you guys saw?  Is that it?  If you spot
 4    something else at some point, just shoot me an email and I'll
 5    make the change before I print out a bunch because I'm going to
 6    hold off from printing them all yet.
 7              MR. SADOW:  We are going to have to -- we're going to
 8    have to switch over the machine at some point.
 9              THE COURT:  Yes.  If you need to do anything for tech,
10    let me know how you want to --
11              MR. SADOW:  It'll be after -- are you planning on using
12    --
13              MR. RAFFERTY:  I'm going to use that.
14              MR. SADOW:  You're going to use the overhead?
15              THE COURT:  We'll take a break, Mr. Sadow.  We'll take
16    a break.  So after the government's opening, we'll take a
17    little break -- excuse me -- closing -- we'll take a little
18    break so that you guys can reconfigure if you need to.  Okay?
19              MR. SADOW:  Okay.
20              THE COURT:  Yeah, we'll do that.  Is it fine the way
21    it's set up now, Ms. de Boer, for what you guys need?  You have
22    some time.  I can move stuff around.  If you need me to bring
23    someone from IT or anything, let me know.
24              MS. DE BOER:  Oh, I think the technology is fine.  We
25    may just move this --
```

```
 1            THE COURT:  That's fine.  Be aware of whatever wires of

 2   anything that's connected.  Feel free to reposition, for both

 3   sides.  I'm not confining you to that.  If you want to walk up,

 4   I wouldn't get too far past where Ilona is.  You have a bright

 5   line there, but if you want to work in the well a little bit,

 6   I'm fine with it.

 7            MS. DE BOER:  Okay.  Thank you.

 8            THE COURT:  All right, guys.  I think we're good to go.

 9   So I want to give you guys a chance to eat something, go

10   through your notes.

11            We'll see everybody just before 1:00 o'clock.  All

12   right?

13            MS. DE BOER:  Thank you, Your Honor.

14            THE COURT:  Thank you, guys.  We're in recess.

15            THE COURT SECURITY OFFICER:  All rise.

16       (Court recessed at 11:43 a.m.)

17       (Back on the record at 1:20 p.m.)

18            THE COURT:  All jurors are now present and accounted

19   for.  Does everyone have a revised copy of the jury

20   instructions?  Yes?

21            MS. DE BOER:  Yes, Your Honor.

22            THE COURT:  Okay.  Very good.  We handed out some fresh

23   copies.  And aside from that edit that I made, any other

24   concerns spotted with the instructions before we bring in our

25   jurors?
```

1          Anything from the government?

2          MS. DE BOER:  No, Your Honor.  Thank you.

3          THE COURT:  Anything from the defense?

4          MR. SADOW:  No, Your Honor.

5          THE COURT:  Very good.  Okay.  So as we've discussed,

6    the Court will bring out the jury.  I will instruct them on the

7    law that they must follow.  I will give them some brief

8    instruction on the closing arguments and how they're going to

9    be subdivided.  You have 90 minutes a side.

10          I will keep the time myself, and I will take a break

11   after the government's first close so that everybody can

12   stretch out and use the restroom.  It'll be a five-minute

13   break.

14          And we'll do the same before the rebuttal so that

15   everyone has a moment to collect themselves before the next

16   phase of closing.

17          Anything else on either side, tech related or other

18   concerns, before I charge the jury?

19          Anything on the government's end?

20          MS. DE BOER:  No, Your Honor.  Thank you.

21          THE COURT:  All right.  You're welcome.

22          Anything on the defense end?

23          MR. SADOW:  No, Your Honor.

24          THE COURT:  Very good.  Thank you, everyone.

25          Let's go ahead and bring in our jurors, please.

1          THE COURT SECURITY OFFICER:  All rise for the jury.

2       (Jury enters at 1:22 p.m.)

3          THE COURT:  Please be seated, everyone.  Ladies and

4    gentlemen of the jury, welcome back from your extended

5    breakfast/lunch break.

6          You will find in your chairs a copy of the jury

7    instructions, which I am about to read to all of you.  You are

8    free to follow along or simply listen.  I made copies for each

9    of you so that when you go back into the jury room, you each

10   have your own set, and you can refer to it when you begin to

11   deliberate with one another.

12         So with that being said, we're going to start off now

13   by giving you all the instructions you need to follow in

14   reaching a verdict.

15         Members of the jury, it's my duty to instruct you on

16   the rules of law that you must use in deciding this case.

17   After I've completed these instructions, you will go into the

18   jury room and begin your discussions, what we call your

19   deliberations.

20         You must decide whether the government has proved the

21   specific facts necessary to find the defendant guilty beyond a

22   reasonable doubt.

23         Your decision must be based only on the evidence

24   presented here.  You must not be influenced in any way by

25   either sympathy for or prejudice against the defendant or the

1  government.  You must follow the law as I explain it, even if

2  you do not agree with the law, and you must follow all of my

3  instructions as a whole.  You must not single-out or disregard

4  any of the Court's instructions on the law.

5       The indictment or formal charge against the defendant

6  isn't evidence of guilt.  The law presumes every defendant is

7  innocent.  The defendant does not have to prove his innocence

8  or produce any evidence at all.

9       A defendant does not have to testify, and if the

10  defendant chose not to testify, you cannot consider that in any

11  way while making your decision.

12       The government must prove guilt beyond a reasonable

13  doubt.  If it fails to do so, you must find the defendant not

14  guilty.

15       The government's burden of proof is heavy but it

16  doesn't have to prove a defendant's guilt beyond all possible

17  doubt.  The government's proof only has to exclude any

18  reasonable doubt concerning the defendant's guilt.

19       A reasonable doubt is a real doubt based on your reason

20  and common sense after you've carefully and impartially

21  considered all the evidence in the case.  Proof beyond a

22  reasonable doubt is proof so convincing that you would be

23  willing to rely and act on it, without hesitation, in the most

24  important of your own affairs.

25       If you are convinced that the defendant has been proved

1   guilty beyond a reasonable doubt, say so.  If you are not

2   convinced, say so.

3        As I said before, you must consider only the evidence

4   that I have admitted in the case.  Evidence includes the

5   testimony of witnesses and the exhibits admitted.  But anything

6   the lawyers say is not evidence and isn't binding on you.

7        You shouldn't assume from anything I've said that I

8   have any opinion about any factual issue in this case.  Except

9   for my instructions to you on the law, you should disregard

10  anything I may have said during the trial in arriving at your

11  own decision about the facts.

12       Your only recollection and interpretation of the

13  evidence is what matters.

14       In considering the evidence, you may use reasoning and

15  common sense to make deductions and reach conclusions.  You

16  shouldn't be concerned about whether the evidence is direct or

17  circumstantial.

18       Direct evidence is the testimony of a person who

19  asserts that he or she has actual knowledge of a fact such as

20  an eyewitness.

21       Circumstantial evidence is proof of a chain of facts

22  and circumstances that tend to prove or disprove a fact.

23  There's no legal difference in the weight you may give to

24  either direct or circumstantial evidence.

25       When I say you must consider all the evidence, I don't

1    mean that you must accept all the evidence as true or accurate.

2    You should decide whether you believe what each witness had to

3    say and how important that testimony was.

4         In making that decision, you may believe or disbelieve

5    any witness, in whole or in part.  The number of witnesses

6    testifying concerning a particular point doesn't necessarily

7    matter.

8         To decide whether you believe any witness, I suggest

9    that you ask yourself a few questions.  Did the witness impress

10   you as one who was telling the truth?  Did the witness have any

11   particular reason not to tell the truth?  Did the witness have

12   a personal interest in the outcome of the case?  Did the

13   witness seem to have a good memory?  Did the witness have the

14   opportunity and ability to accurately observe the things he or

15   she testified about?  Did the witness appear to understand the

16   questions clearly and answer them directly?  Did the witness's

17   testimony differ from other testimony or other evidence?

18        You should also ask yourself whether there was evidence

19   that a witness testified falsely about an important fact, and

20   ask whether there was evidence that at some other time, a

21   witness said or did something or didn't say or do something

22   that was different from the testimony the witness gave during

23   this trial.

24        To decide whether you believe a witness, you may

25   consider the fact that the witness has been convicted of a

1    felony or a crime involving dishonesty or a false statement.

2    But keep in mind that a simple mistake doesn't mean a witness

3    wasn't the telling the truth as he or she remembers it.

4         People naturally tend to forget some things or remember

5    them inaccurately.  So if a witness misstated something, you

6    must decide whether it was because of an innocent lapse in

7    memory or intentional deception.

8         The significance of your decision may depend on whether

9    the misstatement is about an important fact or about an

10   unimportant detail.

11        I have permitted the government to introduce statements

12   from some individuals who did not testify in court.  The rules

13   regarding impeachment apply to these individuals as well.

14        Now, when scientific, technical, or other specialized

15   knowledge might be helpful, a person who has special training

16   or experience in that field is allowed to state an opinion

17   about the matter, but that doesn't mean you must accept the

18   witness's opinion.

19        As with any other witness's testimony, you must decide

20   for yourself whether to rely upon the opinion.

21        Now, the indictment charges ten separate crimes called

22   "counts" against the defendant.  Each count has a number.

23   You'll be given a copy of the indictment to refer to during

24   your deliberations.

25        Count 1 charges the defendant knowingly and willfully

1    conspired with Brett Hirsch, Christopher McKeon, and others to

2    commit healthcare fraud and wire fraud.

3             Counts 2 to 3 charge that Defendant committed or aided

4    and abetted in committing what are called substantive offenses,

5    specifically healthcare fraud.

6             I will explain the law governing those substantive

7    offenses in a moment, but first note that the defendant is not

8    charged in Count 1 with committing a substantive offense.  He

9    is charged with conspiring to commit that offense.

10            I will also give you specific instructions on

11   conspiracy.

12            Count 5 charges that the defendant knowingly and

13   willfully conspired with Brett Hirsch, Christopher McKeon, and

14   others to defraud the United States and to pay and receive

15   healthcare kickbacks.

16            Counts 6 to 9 charge that the defendant committed or

17   aided and abetted in committing substantive offenses of payment

18   of kickbacks in connection with a federal healthcare program.

19            I will explain the law governing those substantive

20   offenses in a moment.  But first note that the defendant is not

21   charged in Count 5 with committing a substantive offense.  He

22   is charged with conspiring to commit that offense.

23            Count 10 charges that the defendant knowingly and

24   willfully conspired to commit money laundering.  Again, note

25   that in Count 10, the defendant is only charged with conspiring

1    to commit money laundering.

2           I will now give you more specific instructions on

3    conspiracy and the charged offenses.

4           Each count of the indictment charges a separate crime.

5    You must consider each crime and the evidence relating to it

6    separately.  If you find the defendant guilty or not guilty of

7    one crime, that must not affect your verdict for any other

8    crime.

9           I caution you that the defendant is on trial only for

10   the specific crimes charged in the indictment.  You're here to

11   determine, from the evidence in this case, whether the

12   defendant is guilty or not guilty of those specific crimes.

13   You must never consider punishment in any way to decide whether

14   the defendant is guilty.

15          If you find the defendant guilty, the punishment is for

16   the Judge alone to decide later.

17          Now, your verdict, whether guilty or not guilty, must

18   be unanimous.  In other words, you must all agree.  Your

19   deliberations are secret, and you'll never have to explain your

20   verdict to anyone.

21          Each of you must decide the case for yourself but only

22   after fully considering the evidence with the other jurors.  So

23   you must discuss the case with one another and try to reach an

24   agreement.

25          While you're discussing the case, don't hesitate to

1   reexamine your own opinion and change your mind if you become

2   convinced that you were wrong.  But don't give up your honest

3   beliefs just because others think differently or because you

4   simply want to get the case over with.

5          Remember that in a very real way, you're judges, judges

6   of the facts.  Your only interest is to seek the truth from the

7   evidence in the case.

8          Now, you must consider some witness's testimony with

9   more caution than others.  In this case, the government has

10  made a plea agreement with accomplices and/or co-conspirators

11  in exchange for their testimony.  Such plea bargaining, as it's

12  called, provides for the possibility of a lesser sentence than

13  the accomplice or co-conspirator would normally face.

14         Plea bargaining is lawful and proper, and the rules of

15  this court expressly provide for it.  But a witness who hopes

16  to gain more favorable treatment may have a reason to make a

17  false statement in order to strike a good bargain with the

18  government.

19         So while the witness of that kind may be entirely

20  truthful when testifying, you should consider that testimony

21  with more caution than the testimony of other witnesses.  And

22  the fact that a witness has pleaded guilty to an offense isn't

23  evidence of the guilt of any other person.

24         Now, you've been permitted to take notes during the

25  trial.  Most of you, perhaps all of you, have taken advantage

1    of that opportunity.  You must use your notes only as a memory

2    aid during deliberations.  You must not give your notes

3    priority over your independent recollection of the evidence.

4    And you must not allow yourself to be unduly influenced by the

5    notes of other jurors.

6          I emphasize that notes are not entitled to any greater

7    weight than your memories or impressions about the testimony.

8          Where a statute specifies multiple alternative ways in

9    which an offense may be committed, the indictment may alleged

10   the multiple ways in the conjunctive, that is, by using the

11   word "and."

12         If only one of the alternatives is proved beyond a

13   reasonable doubt, that is sufficient for conviction so long as

14   you agree unanimously as to that alternative.

15         You'll see that the indictment charges that a crime was

16   committed on or about a certain date.  The government doesn't

17   have to prove that the crime occurred on an exact date.  The

18   government only has to prove beyond a reasonable doubt that the

19   crime was committed on a date reasonably close to the date

20   alleged.

21         The word "knowingly" means that an act was done

22   voluntarily and intentionally and not because of a mistake or

23   by accident.

24         The word "willfully" means that the act was committed

25   voluntarily and purposely with the intent to do something the

1    law forbids, that is, with a bad purpose to disobey or

2    disregard the law.

3          While a person must have acted with the intent to do

4    something the law forbids, before you can find that the person

5    acted willfully, the person may not be aware of the specific

6    law or rule that his or her conduct may be violating.

7          If a defendant's knowledge of a fact is an essential

8    part of a crime, it's enough that the defendant was aware of

9    the high probability that the fact existed unless the defendant

10   actually believed the fact didn't exist.

11         Deliberate avoidance of positive knowledge, which is

12   the equivalent of knowledge, occurs, for example, if a

13   defendant possesses a package and believes it contains a

14   controlled substance but deliberately avoids learning that it

15   contains a controlled substance so he or she can deny knowledge

16   of the package's contents.

17         So you may find the defendant knew about a material

18   fact if you determine, beyond a reasonable doubt, that

19   Defendant actually knew about the material fact or had every

20   reason to know, but closed his eyes to the material fact.

21         But I must emphasize that negligence, carelessness, or

22   foolishness isn't enough to prove that the defendant knew about

23   the material fact.

24         It is possible to prove the defendant guilty of a crime

25   even without evidence that the defendant personally performed

1  every act charged.  Ordinarily, any act a person can do may be

2  done by directing another person or agent, or it may be done by

3  acting with or under the direction of others.

4        A defendant aids and abets a person if a defendant

5  intentionally joins with the person to commit a crime.  A

6  defendant's criminally responsible for the acts of another

7  person if the defendant aids and abets the other person.

8        A defendant is also responsible if the defendant

9  willfully directs or authorizes the acts of an agent, employee,

10  or other associate.  But finding that a defendant is criminally

11  responsible for the acts of others requires proof that the

12  defendant intentionally associated with or participated in the

13  crime, not just proof that the defendant was simply present at

14  the scene of a crime or knew about it.

15        In other words, you must find beyond a reasonable doubt

16  that the defendant was a willful participant and not merely a

17  knowing spectator.

18        In this case, regarding the alleged conspiracies

19  charged in Counts 1, 5, and 10, the indictment charges that the

20  defendant conspired to commit healthcare fraud and wire fraud.

21  In other words, the defendant is charged with conspiring to

22  commit two separate substantive crimes.

23        The government does not have to prove that the

24  defendant willfully conspired to commit both crimes.  It is

25  sufficient if the government proves beyond a reasonable doubt

1    that the defendant willfully conspired to commit one of those

2    crimes.  But to return a verdict of guilty, you must all agree

3    on which of the two crimes the defendant conspired to commit.

4         It's a federal crime to knowingly and willfully

5    conspire or agree with someone to do something that, if

6    actually carried out, would result in the crime of healthcare

7    fraud or wire fraud.

8         A conspiracy is an agreement by two or more persons to

9    commit an unlawful act.  In other words, it is a kind of

10   partnership for criminal purposes.  Every member of the

11   conspiracy becomes the agent or partner of every other member.

12        The government does not have to prove that all the

13   people named in the indictment were members of the plan, or

14   that those who were members made any kind of formal agreement.

15        The heart of a conspiracy is the making of the unlawful

16   plan itself.  So the government does not have to prove that the

17   conspirator succeeded in carrying out the plan.  The defendant

18   can be found guilty of this conspiracy offense only if all the

19   following facts are proved beyond a reasonable doubt.

20        One, two or more persons in some way or manner agreed

21   to try to accomplish a common and unlawful plan to commit

22   healthcare fraud and wire fraud as charged in the indictment.

23        And two, the defendant knew the unlawful purpose of the

24   plan and willfully joined in it.

25        A person may be a conspirator even without knowing all

1    the details of the unlawful plan or the names and identities of

2    all the other alleged conspirators.

3           If the defendant played only a minor part in the plan,

4    but had a general understanding of the unlawful purpose of the

5    plan and willfully joined in the plan on at least one occasion,

6    that's sufficient for you to find the defendant guilty.

7           But simply being present at the scene of an event or

8    merely associating with certain people and discussing common

9    goals and interests doesn't establish proof of a conspiracy.

10          Also, a person who doesn't know about a conspiracy but

11   happens to act in a way that advances some purpose of one

12   doesn't automatically become a conspirator.

13          Now, it's a federal crime to knowingly and willfully

14   execute or attempt to execute a scheme or artifice to defraud a

15   healthcare benefit program or to get any of the money or

16   property owned by, or under the custody or control of, a

17   healthcare benefit program by means of false or fraudulent

18   pretenses, representations, or promises.

19          The defendant can be found guilty of this offense only

20   if all the following facts are proved beyond a reasonable

21   doubt:  The defendant knowingly executed or attempted to

22   execute a scheme or artifice to defraud a healthcare benefit

23   program or to obtain money or property owned by, or under the

24   custody or control of, a healthcare benefit program by using

25   false or fraudulent pretenses, representations, or promises.

1    The healthcare benefit program affected interstate commerce,

2    the false or fraudulent pretenses, representations or promises

3    related to a material fact.

4        The defendant acted willfully and intended to defraud.

5    And the defendant did so in connection with the delivery of, or

6    payment, for healthcare benefits, items, or services.

7        Healthcare benefit program means any public or private

8    plan or contract affecting commerce under which any medical

9    benefit, item, or service is provided to any individual, and

10   includes any individual or entity that is providing a medical

11   benefit, item, or service, for which payment may be made under

12   the plan or contract.

13       A healthcare program affects interstate commerce if the

14   healthcare program had any impact on the movement of any money,

15   goods, services, or persons, from one state to another.

16       The government need only prove that the healthcare

17   program itself either engaged in interstate commerce or that

18   its activity affected interstate commerce to any degree.

19       The government need not prove that the defendant

20   engaged in interstate commerce or that the acts of the

21   defendant affected interstate commerce.

22       A scheme to defraud includes any plan or course of

23   action intended to deceive or cheat someone out of money or

24   property by using false or fraudulent pretenses,

25   representations, or promises, relating to a material fact.

1          A statement representation is false or fraudulent if it

2     is about a material fact that the speaker knows is untrue, or

3     makes a reckless indifference as to the truth and makes with

4     intent to defraud.

5          A statement of representation may be false or

6     fraudulent when it's a half truth or effectively conceals a

7     material fact and is made with the intent to defraud.

8          A material fact is an important fact that a reasonable

9     person would use to decide whether to do or not do something.

10    A fact is material if it has the capacity or natural tendency

11    to influence a person's decision.

12         It doesn't matter whether the decision-maker actually

13    relied on the statement or knew or should have known that the

14    statement was false.

15         To act with intent to defraud means to do something

16    with the specific intent to use false or fraudulent pretenses,

17    representations, or promises to cause loss or injury.  Proving

18    intent to deceive alone, without the intent to cause loss or

19    injury, is not sufficient to prove intent to defraud.

20         Government doesn't have to prove all the details

21    alleged in the indictment about the precise nature and purpose

22    of the scheme.  The government also doesn't have to prove that

23    the alleged scheme actually succeeded in defrauding anyone.

24         What must be proved beyond a reasonable doubt is that

25    the defendant knowingly attempted or carried out a scheme

1    substantially similar to the one alleged in the indictment.

2           During a conspiracy, if a conspirator commits a crime

3    to advance a conspiracy towards its goals, then in some cases,

4    a co-conspirator may be guilty of the crime even though the

5    co-conspirator did not participate directly in the crime.

6           So regarding Counts 2 through 4, if you have first

7    found the defendant guilty of the crime of conspiracy to commit

8    healthcare fraud as charged in Count 1, you may also find the

9    defendant guilty of healthcare fraud as charged in Counts 2

10   through 4, even though the defendant did not personally

11   participate in the crime.

12          To do so, you must find beyond a reasonable doubt that

13   during the conspiracy a conspirator committed the additional

14   crime charged to further the conspiracy's purpose, the

15   defendant was a knowing and willful member of the conspiracy

16   when the crime was committed, and it was reasonably foreseeable

17   that a co-conspirator would commit the crime as a consequence

18   of the conspiracy.

19          Now, it's a federal crime to use interstate wire,

20   radio, or television communications, to carry out a scheme to

21   defraud someone else.  The defendant can be found guilty of

22   this crime only if all of the following facts are proved beyond

23   a reasonable doubt:  The defendant knowingly devised or

24   participated in a scheme to defraud someone by using false or

25   fraudulent pretenses, representations, or promises.

1          The false pretenses, representations, or promises, were

2     about a material fact.  The defendant acted with the intent to

3     defraud, and that the defendant transmitted or caused to be

4     transmitted, by wire, some communication in interstate commerce

5     to help carry out the scheme to defraud.

6          A scheme to defraud means any plan or course of action

7     intended to deceive or cheat someone out of money or property

8     by using false or fraudulent pretenses, representations, or

9     promises.

10          A statement or representation is false or fraudulent if

11     it is about a material fact the speaker knows is untrue, or

12     makes with reckless indifference to the truth, and makes with

13     the intent to defraud.

14          A statement or misrepresentation may be false or

15     fraudulent when it is a half truth or effectively conceals a

16     material fact, and is made with the intent to defraud.

17          A material fact is an important fact that a reasonable

18     person would use to decide whether to do or not do something.

19     A fact is material if it has the capacity or natural tendency

20     to influence a person's decision.

21          It doesn't matter whether the decision-maker actually

22     relied on the statement or knew or should have known that the

23     statement was false.

24          To act with intent to defraud means to act knowingly

25     and with the specific intent to use false or fraudulent

 1   pretenses, representations, or promises to cause loss or

 2   injury.  Proving intent to deceive alone, without the intent to

 3   cause loss or injury, is not sufficient to prove intent to

 4   defraud.

 5        The government does not have to prove all the details

 6   alleged in the indictment about the precise nature and purpose

 7   of the scheme.  It also doesn't have to prove that the material

 8   transmitted by interstate wire was itself false or fraudulent,

 9   or that using the wire was intended as a specific or exclusive

10   means of carrying out the alleged fraud, or that the defendant

11   personally made the transmission over the wire.

12        And it doesn't have to prove that the alleged scheme

13   actually succeeded in defrauding anyone.  To use interstate

14   wire communications is to act so that something would normally

15   be sent through wire communications in the normal course of

16   business.

17        Each separate use of the interstate wire communications

18   as part of the scheme to defraud is a separate crime.

19        Now, good faith is a complete defense to charge that

20   requires intent to defraud or willfulness.

21        Intent to defraud is an essential element of the fraud

22   charges, while willfulness is an essential part of the

23   conspiracy and anti-kickback charges in the indictment.

24        A defendant is not required to prove good faith.  The

25   government must prove intent to defraud and willfulness beyond

1   a reasonable doubt.

2          An honestly held opinion or an honestly formed belief

3   cannot be fraudulent intent or willfulness, even if the opinion

4   or belief is mistaken.

5          Similarly, evidence of a mistake in judgment, an err in

6   management, or carelessness, can't establish fraudulent intent

7   or willfulness.

8          It's a separate and federal crime for anyone to

9   conspire or agree with someone else to do something that would

10  be another federal crime if it was actually carried out.

11         A conspiracy is an agreement by two or more people to

12  commit an unlawful act.  In other words, it is a kind of

13  partnership for criminal purposes.  Every member of a

14  conspiracy becomes the agent or partner of every other member.

15         The government does not have to prove that all the

16  named people in the indictment were members of the plan or that

17  those who were members made any kind of formal agreement.

18         The government does not have to prove that the members

19  planned together all the details of the plan, or the overt acts

20  of the indictment charges would be carried out in an effort to

21  commit the intended crime.

22         The heart of a conspiracy is the making of the unlawful

23  plan itself, followed by the commission of any overt act.  The

24  government does not have to prove that the conspirators

25  succeeded in carrying out the plan.

1           The defendant can be found guilty of this crime only if

2     all the following facts are proved beyond a reasonable doubt:

3     Two or more persons in some way agreed to try to accomplish a

4     shared and unlawful plan.  The defendant knew the unlawful

5     purpose of the plan and willfully joined in it.

6           During the conspiracy, one of the conspirators

7     knowingly engaged in at least one overt act as described in the

8     indictment, and the over act was committed at or about the time

9     alleged and with the purpose of carrying out or accomplishing

10    some objects of the conspiracy.

11          An overt act is any transaction or event, even one that

12    may be entirely innocent, when viewed alone, that a conspirator

13    commits to accomplish some object of the conspiracy.

14          A person may be a conspirator without knowing all the

15    details of the unlawful plan or the names and identities of all

16    the other alleged conspirators.

17          If the defendant played only a minor part in the plan,

18    but had a general understanding of the unlawful purpose of the

19    plan, and willfully joined in the plan on at least one

20    occasion, that's sufficient for you to find the defendant

21    guilty.

22          But simply being present at the scene of an event, or

23    merely associating with certain people and discussing common

24    goals and interests, doesn't establish proof of a conspiracy.

25    A person who doesn't know about a conspiracy, but happens to

1    act in a way that advances some purpose of one, doesn't

2    automatically become a conspirator.

3            As I said, Count 5 charges the defendant with

4    conspiracy to offer and pay kickbacks to induce the referral of

5    Medicare and Medicare Advantage patients.

6            Defendant is charged separately in Counts 6 through 9

7    with the substantive crimes of offering and paying kickbacks

8    and bribes for the referral of Medicare and Medicare Advantage

9    patients.

10            Title 42, United States Code, Section 1320a-7b makes it

11    a federal crime for anyone to offer or pay any remuneration,

12    including a kickback or bribe, to a person, to induce such

13    person to refer an individual to a person for the furnishing or

14    arranging for the furnishing of the item and service for which

15    payment may be made, in whole or in part, by a federal

16    healthcare program.

17            A defendant can be found guilty of that offense only if

18    all of the following facts are proved beyond a reasonable doubt

19    as to the defendant:  The defendant offered or paid any

20    remuneration, including a kickback or bribe, directly or

21    indirectly, openly or secretly to a person.

22            The payment or offer of the remuneration was made to

23    induce the person, to refer an individual to a person for the

24    furnishing or arranging for the furnishing of any item or

25    service paid for, in whole or in part, by a federal healthcare

1    program, which, in this case is Medicare and Medicare

2    Advantage.  And the defendant acted knowingly and willfully.

3         The government not need prove that the only or primary

4    purpose of the remuneration that was paid was to induce a

5    referral of Medicare or Medicare Advantage patients.

6         If the government proves beyond a reasonable doubt that

7    one of the defendant's purposes in offering or paying

8    the remuneration was in return for referring Medicare or

9    Medicare Advantage patients, that is sufficient.

10        The term "remuneration" means the transfer of anything

11   of value from one person or entity to another person or entity.

12   Remuneration can be paid directly or indirectly, overtly or

13   covertly.

14        The term "bribe" means abrupt transfer of anything of

15   value from one person or entity to another person or entity,

16   usually to accomplish some lawful result or to accomplish some

17   lawful result by some unlawful means.

18        The term "kickback" means a return of a portion of the

19   original payment.

20        The term "federal healthcare program" means any plan or

21   program that provides health benefits, whether directly,

22   through insurance, or otherwise, which is funded directly, in

23   whole or in part, by the United States Government.

24        Again, let me remind you, in Count 5 the defendant is

25   not charged with offering or paying this type of kickback or

1    bribe.  He's charged in conspiring to do so.

2         In Counts 6 through 9, the defendant is charged with

3    paying this type of kickback.  It's a federal crime to conspire

4    to engage in money laundering or transactions involving the

5    proceeds of a specified unlawful activity.  That violates

6    Title 18, United States Code, Sections 1956(a)(1)(i) or 1975.

7         A conspiracy is an agreement by two or more persons to

8    commit an unlawful act.  In other words, it is a kind of

9    partnership for criminal purposes.  Every member of the

10   conspiracy becomes the agent or partner of every other member.

11        The government doesn't have to prove that all the

12   people named in the indictment were members of the plan, or

13   that those who were members made any kind of formal agreement.

14   The heart of a conspiracy is the making of the unlawful plan

15   itself.  So that the government doesn't have to prove that the

16   conspirators succeeded in carrying out the plan.

17        The defendant can be found guilty of this money

18   laundering conspiracy only if all of the following facts are

19   proved beyond a reasonable doubt:  Two or more people agreed to

20   try to accomplish a common and unlawful plan to violate

21   18 U.S.C. Section 1956(a)(1)(b)(i) or 1957, and the defendant

22   knew about the plan's unlawful purpose and voluntarily joined

23   in it.

24        A person may be a conspirator even without knowing all

25   the details of the unlawful plan or the names and entities of

1    all the other alleged conspirators.  If the defendant played

2    only a minor part in the plan but had a general understanding

3    of the unlawful purpose of the plan and voluntarily joined in

4    the plan on as least one location, that is sufficient for you

5    to find the defendant guilty.

6            But simply being present at the scene of an event or

7    merely associating with certain people and discussing common

8    goals and interests does not establish proof of a conspiracy.

9            Also a person who does not know about a conspiracy but

10   happens to act in a way that advances some purpose of one does

11   not automatically become a conspirator.

12           It's a federal crime to knowingly engage in certain

13   kinds of financial transactions, commonly known as money

14   laundering.

15           The defendant can be found guilty of this crime only if

16   all of the following facts are proved beyond a reasonable

17   doubt:  The defendant knowingly conducted or tried to conduct

18   financial transactions.  The defendant knew that the money or

19   property involved in the transaction were the proceeds from

20   some kind of unlawful activity.  The money or property did come

21   from an unlawful activity, specifically wire fraud, healthcare

22   fraud, or healthcare kickbacks, and the defendant knew the

23   transaction was designed, in whole or in part, to conceal or

24   disguise the nature, location, source, ownership, or the

25   control of the proceeds.

1                To conduct a transaction means to start or finish a

2       transaction or to participate in a transaction at any point.  A

3       transaction means a purchase, sale, loan, promise, gift,

4       transfer, delivery, or any other disposition of money or

5       property.

6                A transaction with a financial institution also

7       includes a deposit, withdrawal, transfer between accounts,

8       exchange of currency, loan, extension of credit, use of a safe

9       deposit box, or purchase or sale of any stock, bond,

10      certificate of deposit or other monetary instrument.

11               A financial transaction means a transaction in any way

12      or to any degree affects interstate or foreign commerce by

13      sending your moving money by wire or other means, or a

14      transaction that in any way or in any degree affects interstate

15      or foreign commerce by involving one or more monetary

16      instruments.

17               The phrase "monetary instruments" includes coins or

18      currency of any country, travelers or personal checks, bank

19      checks, or money orders, or investment securities, negotiable

20      instruments in a form that allows ownership to transfer on

21      delivery or a transaction involving the use of a financial

22      institution that is involved in interstate or foreign commerce,

23      whose activities affect interstate or former commerce in any

24      way or degree.

25               The phrase "financial institution" includes an insured

1   bank under the Federal Deposit Insurance Act or a commercial

2   bank.

3           Interstate or foreign commerce means trade and other

4   business activity between people or businesses in at least two

5   states or even people or businesses in the United States and

6   people or businesses outside the United States.

7           To know that the money or property involved in the

8   transaction came from some kind of unlawful activity is to know

9   that the money or property came from an activity that is a

10  felony under a state, federal, or foreign law.

11          The term "proceeds" means any property derived from or

12  obtained or retained directly or indirectly through some form

13  of unlawful activity including the gross receipts of the

14  activity.

15          The phrase "specified unlawful activity" means

16  conspiracy to commit healthcare fraud, healthcare fraud and

17  wire fraud.

18          It's a federal crime for anyone to engage in certain

19  kinds of financial transactions commonly known as "money

20  laundering."  The defendant can be found guilty of this offense

21  only if all of the following are proved beyond a reasonable

22  doubt:

23          The defendant knowingly engaged or attempted to engage

24  in a monetary transaction.  The defendant knew the transaction

25  involved property or funds that were the proceeds of some

1    criminal activity.  The property had a value of more than

2    $10,000.  The property was, in fact, proceeds of conspiracy to

3    commit healthcare fraud, healthcare fraud or wire fraud.  And

4    the transaction took place in the United States.

5        The term "monitoring transaction" means the deposit,

6    withdrawal, transfer, exchange of funds, or a monetary

7    instrument by, through, or to a financial institution in a way

8    that it affects interstate commerce.

9        A financial institution means an insured or a

10   commercial bank.

11       The term "proceeds" means any property derived from or

12   retained or obtained directly or indirectly through some form

13   of unlawful activity including the gross receipts of the

14   activity.

15       It doesn't matter whether the defendant knew the

16   precise nature of the crime or that the property came from

17   committing conspiracy to commit healthcare fraud, healthcare

18   fraud and wire fraud.  But the government must prove that the

19   defendant knew that the property involved in the monetary

20   transaction was obtained or derived from committing some crime.

21       Also it doesn't matter whether all the property

22   involved was derived from a crime.  The government only has to

23   prove that $10,000 worth of property was obtained or derived

24   from committing a crime.

25       Now, when you get to the jury room, choose one of your

1    members to act as your foreperson.  The foreperson will direct

2    your deliberations and will speak for you in court.

3         A verdict form has been prepared for your convenience,

4    and I will explain it to you now.  I'm going to walk over there

5    so you guys can see it a little bit better.

6         I'm going to give you guys this verdict form that's

7    going to go back to the jury room.  It's kind of hard to see it

8    from there.  Basically it breaks down all the 10 counts, and

9    there are some subparts, and you guys have to check the boxes.

10   Okay?

11        So the first question is:  We the jury unanimously find

12   as follows as to the charges against the defendant,

13   Minal Patel, and then it charts the same way you read the

14   indictment.

15        We'll give you a copy of the indictment so you can mark

16   it and look at it.  It's going to say, Count 1, the conspiracy

17   to commit healthcare fraud and wire fraud.  You have to decide

18   if it's guilty or not guilty.

19        If you find a verdict of guilty, then you have to

20   figure out what the objects of the conspiracy were.  Okay?  And

21   it gives you choices.  You can put both healthcare fraud and

22   wire fraud or only healthcare fraud or only wire fraud.

23        All right?  Obviously, if you find him not guilty, you

24   skip that.

25        Then it goes to the substantive counts, not the

1    conspiracy counts.  So the next one is Count 2, healthcare

2    fraud; Count 3, healthcare fraud; Count 4, healthcare fraud.

3    All of those are simply indicating whether you put guilty or

4    not guilty.

5         Then you get to Count 5, and you go back to conspiracy.

6    Remember, 1, 5, and 10 are conspiracy.  So that one says again,

7    as to Count 5, conspiracy to defraud the United States and pay

8    healthcare kickbacks.

9         If you were to find that guilty, then you go to the

10   objects again.  You have to decide, what are the objects of

11   that conspiracy:  Both to defraud the United States and pay

12   healthcare kickbacks, only to defraud the United States, or

13   only to pay healthcare kickbacks.  You have to select one of

14   those if, and only if, you find it is guilty.

15        Then we go back to the substantive accounts.  That's

16   6, 7, 8, and 9, all of which are asking for payment of

17   healthcare kickbacks.  You must decide whether it is guilty or

18   not guilty.

19        And then the last count is the conspiracy to commit

20   money laundering count.  And there, depending on what you

21   answer -- if you were to answer guilty, then once again, you

22   must pick the object of conspiracy.  Is it both consuming of

23   money laundering and laundering proceeds over $10,000, or only

24   consuming of money laundering, or only laundering proceeds over

25   $10,000.  Okay?

 1          So you have to make sure you've check through each box,

 2    and then at the end, you'll see a space for a foreperson, which

 3    I'm going to talk to you about now, to sign and date.

 4          And a copy will go back with you all to the jury room.

 5          Now, as I just stated, take the verdict -- you will

 6    take the verdict with you.  I will hand it to you to the jury

 7    room.  Now, when you've all agreed on the verdict, your

 8    foreperson must fill out the form, sign it, date it, and carry

 9    it.  Then you return it to the courtroom.

10          If you wish to communicate with me at any time, please

11    write down your message or question and give it to the marshal.

12    The marshal will bring it to me, and I'll respond as promptly

13    as possible either in writing or by talking to you here in the

14    courtroom, but I caution you not to tell me how many jurors

15    have voted one way or another at that time.

16          So if you would all do me a favor and put down our

17    instructions at this time.

18          A brief word before I turn it over to my lawyers here.

19          So you all heard the instructions.  These are the

20    instructions you must follow.

21          The way we're going to do this is, as I stated before

22    the break this morning, the government gets to go first.  They

23    get to divide their time between their closing argument and a

24    rebuttal.  It's a bit of a sandwich.

25          The government gets to go.  Then you're going to have

1    the defense go.  And then the government gets to go again.

2         Because it has taken a bit of time to review this, and

3    I'm going to give them time -- once the government is done with

4    their opening part of their closing argument -- when they get

5    to the first part, we will take a break.  Leave everything as

6    it.  We'll take a five-minute restroom break.  We'll come back.

7         Then the defense will go.  We'll break again, and then

8    the government will wrap up with a rebuttal.  I'll give you

9    final instructions, and you'll begin deliberating.

10        Now, I've given an equal amount of time, approximately

11   90 minutes.  I will keep the time myself.  So you may see -- if

12   I let them know how much time they have, that's why I'm doing

13   that.

14        They may show you on the screens -- you see they're

15   ready to go -- some exhibits, demonstratives, and, for example,

16   you may see some snippets of trial testimony.  We've heard a

17   lot of trial testimony over the last two weeks, and there may

18   be little pieces of transcripts shown up on these screens to

19   help you as they each go through their arguments.

20        Some cases, the lawyer may decide to read some

21   transcript material from earlier in the trial.  What I want you

22   all to remember is what the lawyers say is not evidence.

23        You must always use your best recollection of the

24   evidence in deciding the facts in this case.

25        Do you all understand?

1        THE JURORS:  Yes.

2        THE COURT:  Having said that, it is vital that you

3    listen carefully to each side's argument.  Remember to continue

4    to keep an open mind.

5        Their job now is to summarize, tell you and bring

6    forward everything you've seen, and you've seen a lot, over the

7    last two weeks.  So I urge you to give their arguments close

8    attention.

9        All right.  So with that being said, we will begin with

10   the government.

11       Counsel, the floor is yours.

12       MS. DE BOER:  Your Honor, may we approach briefly?

13       THE COURT:  Yes, come approach.

14   (The following proceedings were held sidebar:)

15       MS. DE BOER:  It occurred to me that before you read

16   the instructions, the defendant wasn't asked whether he wants

17   to to testify.  Does the Court intend do that or --

18       THE COURT:  Yeah, I can do that.  I mean --

19       MR. SADOW:  You don't have to do it now.

20       THE COURT:  I don't have to do it now.  I'm not worried

21   about it now.

22       We can do it on the first break.  Let's do that.

23   (Proceedings returned to open court.)

24       THE COURT:  All right.  Whenever you are ready,

25   Counsel, you may begin.

1          MS. GURSKIS:  Thank you, Your Honor.

2          Could I reserve 30 minutes for the rebuttal at this

3     time?

4          THE COURT:  Absolutely.  I'll let you know when you're

5     close.

6          MS. GURSKIS:  Thank you.

7          THE COURT:  You got it.

8          MS. GURSKIS:  Good afternoon, ladies and gentlemen.

9          Minal Patel preyed on cancer survivors.  Minal Patel

10    preyed on cancer survivors like W.I., H.K., and W.H., to steal

11    hundreds of millions of dollars from Medicare.  He preyed on

12    their fears, and the fears of thousands of other vulnerable

13    people worried about their own health and worried about the

14    health of their family members.

15         For two weeks, you have heard about the fraud and

16    kickbacks and money laundering scheme, and you have heard about

17    Minal Patel, who committed those crimes.  You have heard about

18    the hub of those crimes, Mr. Patel's brainchild, LabSolutions.

19         Minal Patel exploited people's fear of cancer not

20    because these people needed the tests, not because Minal Patel

21    thought he was actually making people healthier, not because

22    Minal Patel cared about whether people stayed cancer-free, but

23    because he wanted to make money.

24         For Minal Patel, genetic tests were ATM cards, and he

25    used billing codes and diagnosis codes along with these genetic

1   tests to cash in on Medicare money, $187.3 million of Medicare

2   money.

3          Minal Patel was the architect of the fraud.  He was the

4   architect of the assembly line that made this scheme possible

5   and that made this scheme profitable.

6          The assembly line that started with telemarketers

7   hawking genetic tests to Medicare patients, often with promises

8   of dining gift cards and assurances that the test was free, and

9   pushing the test as lifesaving for these patients and members

10  of their family.

11         Next, rather than involve these patients' actual

12  doctors, doctors like oncologist Dr. Bryan Slomovitz, Minal

13  Patel cut them out.  Instead, through people like Brett Hirsch,

14  Marc Sporn, Senthil Ramamurthy, and Shawn Griner, and others,

15  Minal Patel found doctors who would rubber-stamp test orders,

16  often without ever speaking to a patient.

17         The forms that the doctors had to sign, Minal Patel did

18  not give the doctors a choice.  The forms were designed so that

19  only the most expensive tests could be chosen.

20         Then, test after test, Minal Patel billed Medicare.

21  Patients like W.H., P.W., and others, either didn't get the

22  results at all, or if they did, they got confusing paperwork in

23  the mail or a worthless call from a doctor who had no

24  background in genetic tests.

25         This assembly line gave Minal Patel the bare minimum to

1    make it look like the test was medically necessary, but it

2    wasn't.

3          As you heard from genetic expert, Dr. Magliocco, and

4    genetic counselor, Kimberly Foss, genetic tests are useful.

5    Genetic tests are helpful.  Genetic tests can save lives, but

6    only when genetic tests are used properly.  And that certainly

7    did not happen here.

8          Minal Patel did not help anyone but himself and his

9    troop of co-conspirators.  Minal Patel bought and paid for

10   every person in his assembly line, every aspect of this scheme,

11   a scheme that he created, that he designed, and that he built

12   from the ground up.

13         Minal Patel and his lab created this opportunity for

14   fraud, and through kickbacks, Minal Patel greased the wheels of

15   the fraud.

16         Minal Patel bought and paid for Medicare beneficiaries

17   with gift cards and empty promises.

18         Minal Patel bought and paid for forms that gave doctors

19   the so-called option of only the most expensive tests.  And

20   Minal bought and paid for the doctors who signed nearly every

21   form that came into their hands.

22         Minal Patel bought and paid for marketers, like Brett

23   Hirsch and Shawn Griner, and Senthil Ramamurthy, who ensured

24   that there would be Medicare beneficiaries whose information

25   Minal Patel could use to bill, bill, bill.

1          In addition to the kickbacks, what else did Minal Patel

2     buy and pay for?  Minal Patel bought and paid for so-called

3     legal advice to hide his fraud behind a veil of legitimacy.

4     Minal Patel bought and paid for people to blame.  Blame the

5     marketers.  Blame the doctors.  Blame the credentialing service

6     in Saco, Maine.  Blame the laboratory director.  Blame the

7     billing company.  Blame the compliance director.  Blame the

8     lawyer.

9          Minal Patel bought and paid for other people to hide

10    behind when he was the only person who knew every single aspect

11    of this scheme from the inside out, because he invented it,

12    and he created it.  He was the puppet master.  And Minal

13    Patel's crimes generated so much money.

14         He stole over $187 million, about 22 million of which

15    he used to pay himself.  And then to hide where the money came

16    from, Mr. Patel moved the money around through his bank

17    accounts.  He laundered it.

18         I'm going to talk in one moment about the counts or

19    charges in the indictment.  Before I do, let me say a word

20    about the evidence in this case.  Because what you have seen in

21    the last two weeks is that the government has proved its case

22    in several ways.

23         You've heard from a variety of witnesses.  You've seen

24    documents.  You even saw a Univision commercial and listened to

25    several audio recordings of telemarketers and patients.

1    Witnesses came in many forms; patients, Medicare beneficiary's

2    treating oncologist, a Medicare beneficiary's genetic

3    counselor.  You heard from people who pleaded guilty and you

4    heard from former LabSolutions employees.  People who were

5    there on the inside.  And you heard from a medical Medicare

6    expert and a genetic testing expert.

7         As you evaluate the testimony you have heard, don't

8    leave your common sense at the door.  Think about the

9    witnesses.  Think about the documentary evidence that supported

10   what they said.

11        The patient files that all look the same.  The emails,

12   the banking, tracking the flow of money from Medicare to

13   LabSolutions to the marketers.  The text messages, the

14   photographs, the recordings.

15        That evidence all confirmed what the witnesses told

16   you, that this was a massive fraud, and a massive fraud

17   masterminded by Minal Patel.

18        As the Judge instructed you, what the lawyers said and

19   what the lawyers have argued is not evidence.  So think about

20   what the witness has said.  Think about what the documents

21   show.  Just like Ms. de Boer explained to you in opening

22   statements, Minal Patel used these genetic testing swabs as

23   magic wands to make money appear, and he did so while taking

24   advantage of vulnerable people.

25        The evidence showed it was lie after lie from Minal

1    Patel to steal money from Medicare with no care or concern to

2    the risk or harm it posed to patients.  And that's the heart of

3    the scheme, and that's exactly what the evidence showed.  And

4    that's what I would like to talk about now, how the evidence

5    proves that Minal Patel committed each element of each of the

6    crimes that is charged in this case.

7         There are basically three buckets of charges at issue

8    in this case, healthcare fraud charges, kickback charges, and

9    the money laundering charge.

10        Let's start with the first bucket of charges, the

11   healthcare fraud charges.

12        Count 1, as you'll see, charges Minal Patel with the

13   conspiracy to commit healthcare fraud and wire fraud.  What is

14   healthcare fraud?  Well, you can see some of the key language

15   on your screen.  This language is from a set of instructions

16   about the law from what the Court gave you.

17        Healthcare fraud is lies for money.  Someone told a lie

18   in order to get money.  In this case, the lies were told to

19   Medicare.  In this case, that someone who told the lies was

20   Minal Patel.

21        But Minal Patel didn't do this alone.  No one could

22   pull off a massive fraud scheme involving thousands of patients

23   in two separate laboratories all by himself.  In this case,

24   Minal Patel had Brett Hirsch, Shawn Griner, Senthil Ramamurthy,

25   Marc Sporn, and other people to help him.

1          And that's why this is a conspiracy.  Here are some of

2    the instructions that you received about a conspiracy.  A

3    conspiracy is just an agreement between at least two people to

4    break the law.

5          For purposes of Count 1, it's an agreement between

6    Brett Hirsch, Shawn Griner, Senthil Ramamurthy, Marc Sporn, and

7    others, to cause the submission of false and fraudulent claims

8    to Medicare for genetic tests.  In other words, an agreement to

9    lie to Medicare to get money.

10          What does wire fraud have to do with it?  Wire fraud

11    has to do with the money that is moving across interstate

12    wires, simple as that.

13          So now let's go through the evidence that proves beyond

14    a reasonable doubt that Minal Patel is guilty of Count 1.

15          You heard evidence about the unlawful plan, defrauding

16    Medicare through expensive and unnecessary genetic tests.  From

17    medical expert Laurie McMillan, you heard the basic rules,

18    Medicare is a trust-based system.  Because so many patients

19    rely on Medicare, claims are paid automatically.

20          Otherwise, the Medicare system would grind to a halt.

21    So Medicare relies on providers like LabSolutions to only

22    submit truthful claims.  The Medicare claims are submitted

23    through interstate wires.  They are submitted through a

24    computer, as Ms. McMillan told you.

25          She also explained to you that Medicare does not cover

1  genetic testing if the doctor is not actually treating the

2  patient.  Medicare does not cover genetic testing if the tests

3  are not used in the care and treatment of a patient.  If

4  someone is taking a test, a genetic testing out of curiosity,

5  Medicare does not cover it.

6        And you've heard that genetic tests have absolutely,

7  absolutely have place in medicine, but they need to be based on

8  individual medical needs.  The rules are clear.  The fact that

9  Minal Patel, as the owner of LabSolutions, had to abide by

10  Medicare's rules and federal law was also clear, but Minal

11  Patel and LabSolutions broke every single one of those rules.

12        Minal Patel sought out marketers and telemedicine

13  companies who would get as many orders as they could, as

14  quickly as possible, with complete disregard to what any of

15  these patients might actually need.

16        Because to Minal Patel, they were not patients.  Their

17  value was the Medicare ID card and the benefits that went along

18  with it.  None of these patient's actual doctors were involved.

19  These tests were not based on individual needs.  You saw that

20  from the cookie-cutter forms and cookie-cutter medical

21  necessity level provided to marketers, like Shawn Griner

22  received from Minal Patel himself.

23        And you heard patients who believe the test to be a

24  screening test, a test that would tell them whether or not they

25  had cancer.

1          You also learned that Minal Patel promised to play by

2     the rules.  With each claim LabSolutions submitted to Medicare,

3     the lab and Minal Patel were promising that the claims were

4     truthful, that the claims were accurate, and that the claims

5     were complete.

6          When Minal Patel enrolled in Medicare and signed all

7     those enrollment forms, he was promising again and again and

8     again that he would be aware of the Medicare rules and he would

9     follow those rules.  He promised Medicare that the buck stopped

10    with him.

11         And Minal Patel, on the screen right now you can see

12    the examples of some of the signatures that we went over with

13    Ms. McMillan.

14         Go to the next slide, Ms. de Boer.

15         This also shows some of the promises that Minal Patel

16    made to Medicare, promises that he read the contents of that

17    application form, that he promised to abide by the rules, that

18    he agreed that he would only be submitting truthful and

19    accurate claims.

20         Ms. McMillan made all this crystal clear for us, but

21    you don't need an expert to tell you that Medicare won't pay

22    for useless, wasteful tests.  Use your common sense.

23         You also heard from Medicare beneficiaries who

24    explained how the scam worked.  You heard from W.I., who told

25    you he was offered gifts and presents.  You heard from H.K.,

1    who also told you about being offered gift cards.  And you

2    heard recordings from the telemarketers, promising gift cards

3    and congratulating Medicare beneficiaries for being able to get

4    a testing kit.

5          It is obvious that the tests ordered for V.H., E.G.,

6    and H.K., did not meet Medicare's requirements.  It is obvious

7    that Dr. Bryan Slomovitz never used the test for Ms. H., and

8    through his years and years of treating her, he knew a genetic

9    test was not an appropriate test for her.

10         It was obvious that Ms. H.K. did not understand the

11   results and that the results were not used in her care.  She

12   told you that she had a doctor who had been treating her for

13   years, and that she had cancer more than five times after

14   getting the call about the genetic test.

15         E.G., like V.H. and H.K., had the same teledoctor who

16   robosigned the same form.  All of these patients, like you

17   heard from Dr. Magliocco, had insufficient documentation to

18   support any actual need for this test.  They were just claims

19   lines and dollar signs to Minal Patel.

20         And they're just three examples of the thousands of

21   patients that Minal Patel and LabSolutions recruited through

22   people like Marc Sporn, and Shawn Griner, and Senthil

23   Ramamurthy, for which fraudulent bills were submitted to

24   Medicare.

25         And here, you can see the payments that went from

1   Medicare, to LabSolutions, to those marketers.

2         What else is obvious here?  The money.  The bank

3   records don't lie.  Medicare made over $187.3 million from this

4   scam, and LabSolutions paid millions for doctors' orders.

5   LabSolutions also transferred over $21 million to Minal Patel.

6         LabSolutions paid XGEN, IDGAF and Q Health Services

7   over $10 million in exchange for referring patients for genetic

8   testing.  It was also no secret that these doctors had no

9   legitimate relationship with the patients.  They were just

10  rubbing-stamping CGx orders.  That's plain as day, from looking

11  at the patient charts, which were nearly identical for these

12  patients.  And it's plain as day with the patient complaints

13  received by LabSolutions and Minal Patel.

14        We're going to talk about the fact that Minal Patel

15  knew what he was doing was wrong, but he didn't care.  IDGAF.

16  He didn't care about the patients, like K.A., who he harmed,

17  but he did it anyway.  DNA for dollars; lying for money.

18        How do we know that Minal Patel knew this was all a

19  lie?  Because he was a puppet master, and because he planned

20  all the lies.

21        The marketers told you how it all worked, and the

22  evidence has shown that it was Minal Patel who created the

23  scheme and Minal Patel who gave the instructions.

24        You heard from Brett Hirsch who told you how it all

25  began with a meeting at the Boca Beach Club.  He told you about

1    the process of getting the kits out to the Medicare

2    beneficiaries, of prioritizing money, of prioritizing getting

3    as many orders as possible in the shortest period of time.

4          He told you he knew it was illegal.  He also showed you

5    text messages between himself and Minal Patel, the text

6    messages that showed that money was the priority, not patient

7    care.

8          You also heard from Senthil Ramamurthy.

9          Mr. Ramamurthy told you about how he got involved in

10   this scheme, through Brett Hirsch, after Brett Hirsch showed

11   him an EOB documenting the high return on Medicare for genetic

12   tests.

13         If you can go back on the slide, Ms. de Boer.  Back one

14   more.  Thank you.

15         Brett Hirsch pulled him into this scheme with the

16   promises of money and the promises of genetic tests.  He them

17   entered this scheme, and he told you about when he flew down to

18   Atlanta to first meet Minal Patel, and he learned about this

19   brain child, about LabSolutions.

20         He learned that Minal Patel had not previously worked

21   in the lab industry, but after getting injured and seeing how

22   lucrative lab testing could be, he wanted in.

23         Mr. Ramamurthy told you about the structure of

24   targeting Medicare beneficiaries, of optimizing codes, of

25   Mr. Vartanian and Mr. Patel finding the best codes to use that

1    would bill at the highest rate for genetic testing.

2              Go to the next slide.

3              And Mr. Patel knew that Mr. Ramamurthy was using

4    Medicare reimbursement to pay reps and to pay for telemed

5    consults.

6              You also heard from Shawn Griner.  Minal Patel

7    encouraged Shawn Griner to create a call center for the purpose

8    of referring lab tests to LabSolutions.  He was cold-calling

9    Medicare patients.  He was using sales reps that had no medical

10   training.  And as he told you, they were preying on people's

11   fear of cancer.

12             He also showed you the panel, again, showing you that

13   the doctors had no choice but to either select the test or not

14   the test.  Select the most expensive panel or select nothing.

15   And he also told you that if the doctors were not at that

16   approval rate of 90 percent or more, he would have found other

17   doctors.

18             Go to the next slide, please.

19             This is an example -- I'm sorry, two slides back.

20             Mr. Griner also told you that everything required

21   Minal Patel's stamp of approval, whether it was the teledoc

22   forms, whether it was forms for soliciting patients, everything

23   required Minal Patel's stamp of approval.

24             You also heard from Marc Sporn.  Mr. Sporn told you

25   about the prefilled out test orders.  He told you about the

1   call center that essentially acted as a farm for getting saliva

2   to Minal Patel as quickly as possible.

3        He told you that it was physically impossible for

4   doctors to actually be reviewing the tests at the rate they

5   were approving the doctors' orders.  He told you it was

6   actually impossible for the doctors to even be contacting all

7   these patients and to continue approving at that rate, that

8   rate of 90 percent.

9        Marc Sporn made clear to you that Minal Patel's

10  priority was money.  It was not patient care.

11       Go to the next slide.  And the next slide, please.

12  Thanks.

13       You also heard about how compliance was not a focus at

14  LabSolutions.  As Senthil Ramamurthy told you, for him it felt

15  like Minal Patel created a compliance program as a window

16  dressing.  He told you about getting a cease and desist letter

17  from Minal Patel and LabSolutions, and then days later going

18  about business as usual.

19       He told you about the compliance agreements that he and

20  other marketers were signing every month, but also were

21  meaningless and were truthless.

22       You also heard from two former employees:  Stacey Adair

23  and Amy Roebuck.

24       Stacey Adair was the sales director, but was left in

25  the dark on key components of the market strategy.  She did not

1    know how many samples are being referred, and she did not know

2    how marketing -- or that marketing was being done to patients.

3           You also heard from Amy Roebuck, the compliance

4    director.  They first hired a compliance director towards the

5    very end of the scheme.  She was only there for four weeks.

6    She told you about how she didn't even have access to the

7    building.  She had to sit on the floor and wait for somebody

8    else to let her in.

9           She was not allowed in the lab area.  She was not

10   allowed to put compliance advice in writing.

11          Minal Patel was the leader of this scheme, and

12   Minal Patel's lies drove the fraud.  He lied to Medicare with

13   each claim submission and on every enrollment form when he made

14   those promises that he did not abide by.  He also lied in the

15   contracts that he executed with all the marketers he heard

16   from.

17          I want to talk about this part of the scheme because it

18   was covered up.  The contracts claimed that patient brokers and

19   marketers were advertising to doctors' offices.  The contract

20   said nothing about telemarketing, internet ads, and tactics

21   that they used to directly solicit patients.

22          Here's one example on the screen of a contract between

23   LabSolutions and CPL Media, which you heard Marc Sporn discuss.

24          Here's another example of a contract between Q Health,

25   Mr. Ramamurthy's company, and LabSolutions.

1          And another example between Brett Hirsch's company and

2     LabSolutions.

3          And there are the signatures from the contract.

4          Go to the next slide, please.

5          There were also lies, as I mentioned a moment ago, in

6     the compliance agreement -- the so-called compliance agreement

7     that completely misrepresented what was going on.  Smoke and

8     mirrors, as Senthil Ramamurthy said.

9          They were targeting patients.  They were focused on

10    volume, not what the compliance agreement said.

11         Go to the next slide.

12         Charts were also created that contained misleading

13    information.  Totally absent from this, that patients were

14    cold-called, that patients were marketed to.  So if a lawyer

15    would ever rely on this, a lawyer would be relying on lies,

16    just like Shawn Griner told you.

17         Minal Patel also lied to patients.  He took advantage

18    of people's fear of cancer.  As Mr. Ramamurthy said, they

19    called the patients low-hanging fruit.  Think about that for a

20    second.  Vulnerable people.  Afraid of cancer.  Many of them

21    living in underprivileged communities.  They would go to bingo

22    halls.  They would go to adult day cares.  They would call

23    these people, and as Mr. Ramamurthy said, use complicated

24    jargon, make them feel that this test is important and lure

25    them in.

1          And who were some examples of this low-hanging fruit.

2          You've heard from C.N.  C.N.'s husband with dementia.

3     That was low-hanging fruit for Senthil Ramamurthy and

4     Minal Patel.

5          W.I. who talked to you about his own cancer and the

6     cancer that ran in his family and that that was a weight that

7     he has carried.  That's another low-hanging fruit for

8     Minal Patel.

9          The telemarketing was misleading.  Again, preying upon

10     their fears of cancer.

11          And this, a pitch from one of the in-person sales reps

12     hired by Senthil Ramamurthy at the direction of Minal Patel.

13     He told you -- Mr. Ramamurthy told you this wasn't accurate.

14     This isn't a screening test.  This test doesn't save lives in

15     the ways that it's represented in this advertisement, in this

16     pitch, but it worked to get the low-hanging fruit for

17     Mr. Patel.

18          Mr. Sporn also told you about the click-bait

19     advertisements.  Patients would be at a completely unrelated

20     website and would see information about whether cancer kept

21     them up at night, about whether they were worried about their

22     family members and were lured in that way.

23          The patient files were also thread bare.  They are

24     another form of the lies of Minal Patel.

25          Here are some examples on the screen of V.H., E.G., and

1    H.K.  You'll see that they all have the same referring

2    teledoctor, either no Social Security number or 11111.  Email

3    address is listed as @nothing.com.  Nothing really listed about

4    their patient care.  For E.G., his patient concern was listed

5    as just prostate.

6           As Dr. Magliocco told you, this is very concerning to

7    him.  These are completely inadequate records, and they're

8    confusing.  They're not real medical charts.

9           Think about this compared to what Dr. Slomovitz told

10   you about the years and years and pages of files he had on V.H.

11   that helped him conclude that that test wasn't appropriate.

12   And here, these patients are worth only a couple of pages.

13          These forms were designed to make the scheme look

14   legitimate.  Another form of the lies of Minal Patel.

15          And members of the jury, this is the heart of the

16   scheme.  If Minal Patel marketed these tests to actually help

17   people rather than to make money off of people, wouldn't he

18   have contacted the primary care physicians to make sure that

19   they knew about the results?

20          Wouldn't he have geared tests or marketing towards

21   people actually treating the patients?

22          If Minal Patel actually cared about the health of these

23   patients, would he have been paying telemarketers like

24   Brett Hirsch and Shawn Griner and Marc Sporn and

25   Senthil Ramamurthy?

1   Would he have been paying for cold-calls for random

2   Medicare beneficiaries.  If Minal Patel cared about the health

3   of these patients, would he have been paying telemarketers like

4   Marc Sporn who preyed off of people's fear of cancer?

5   If Minal Patel actually cared about the health of these

6   patients, wouldn't he have created a system where the primary

7   care doctor signed off on the test as opposed to a doctor who's

8   never even seen the patient and in most instances never talked

9   to the patient?

10   These tests were not legitimate.  They were not covered

11   by Medicare in the way that they were used in this case, but

12   Minal Patel billed Medicare anyway.  That's a lie for money,

13   and that's fraud.

14   Minal Patel was not led astray in this scheme because

15   he created the lies, and he created this system built on lying

16   for money.  He brought in Brett Hirsch.  He brought in

17   Senthil Ramamurthy.  He brought in Shawn Griner.  He brought in

18   Marc Sporn.

19   Every single one of the cooperators that you heard

20   from, he selected.  Minal Patel, multimillion-dollar

21   businessman.  He chose those people.  He chose Brett Hirsch.

22   He chose Senthil Ramamurthy.

23   Now, the elements of healthcare fraud are before you on

24   the screen, and there are five.  The Judge went over them with

25   you a moment ago.

1          First, knowingly executing or trying to execute a

2     scheme to defraud.  That's the crime we have been discussing.

3     Genetic tests that people didn't need.

4          Effecting interstate commerce.  We heard from

5     Ms. McMillan about how claims are processed in Alabama,

6     South Carolina, and Pennsylvania, that the claims cross

7     interstate wires.

8          False representations about the medical need for

9     genetic tests.  The diagnosis codes.  The lack of any real

10    patient/doctor encounter.

11         Willful intent to defraud.  Because this was no

12    accident.  Minal Patel knew the rules.  Minal Patel was

13    reminded of the rules, and Minal Patel chose to break the rules

14    in connection with the delivery of and payment for healthcare

15    services.  These genetic tests -- these genetic tests that were

16    all billed to Medicare.

17         Before I move on, I want to mention two instructions

18    that you heard from the Judge today, and they do matter.  The

19    first is aiding and abetting.

20         What you heard from the Judge is that the government

21    doesn't have to prove that Minal Patel personally performed

22    every act that is charged in the indictment.  He can be held

23    criminally responsible for the acts of other people if he's

24    aiding and abetting the other person or directing or

25    authorizing the acts of an agent, employee, or associate

1    willfully.

2            And the second, guilt for co-conspirator crimes.

3            A defendant can be guilty for a co-conspirator's

4    substantive crimes even when the defendant is not personally

5    participating, if during the conspiracy, the conspirator

6    committed the additional crime to further the conspiracy's

7    purpose, and the defendant was a knowing member of that

8    conspiracy.

9            And it was reasonably foreseeable that action would be

10   taken as a consequence of the conspiracy.

11           The healthcare fraud counts, 1 to 4, as we just went

12   through, you can find Minal Patel guilty of if he aided and

13   abetted.  You can find Minal Patel guilty if his

14   co-conspirators committed the crimes to further the conspiracy

15   that they were all in together.  And if these crimes were a

16   reasonably foreseeable result.  And they were here.

17           The genetic testing process, the assembly line created

18   by Minal Patel and maintained by Minal Patel that you have

19   heard about throughout this trial, that generated thousands and

20   thousands of genetic tests, just like for V.H., the beneficiary

21   in Count 2; E.G., the beneficiary in Count 3; and H.K., the

22   beneficiary in Count 4.

23           Count 2 through 4, as I just mentioned, charged Minal

24   Patel with healthcare fraud in connection with specific

25   patients.  These are just examples of some of the fraudulent

1    bills that were submitted to Medicare based on tests that Minal

2    Patel referred -- submitted.  Claims that Minal Patel

3    submitted.

4          The first slide that's up on the screen, Count 2.

5    Count 2 is based on testing done for V.H.  You can find all of

6    the dates and details regarding Ms. H's testing in Government's

7    Exhibit 2.  As you can see, over $5,000 was billed to Medicare

8    for that testing for Ms. H.

9          Count 3 is E.G.'s testing.  Again, over $5,000 billed

10   to Medicare by LabSolutions.

11         And Count 4 is H.K.'s testing.  Again, over $5,000

12   billed to Medicare by LabSolutions for medically unnecessary

13   genetic tests.

14         These three individuals are all Medicare beneficiaries,

15   that means they have Medicare as their insurance.  And we know

16   they were billed by LabSolutions because their names all appear

17   in the LabSolutions claims data.

18         And all three of these individuals all had the same

19   prenatal consent letter accompany each of their forms.

20         We've talked about the healthcare fraud and wire fraud

21   conspiracy.  There was a kickback conspiracy too.  The next

22   bucket of charges involve the kickbacks paid by Minal Patel to

23   make sure the fraud happened.

24         Count 5 charges the kickback conspiracy.  So we know

25   that a conspiracy is an agreement to break the law.  For

1    Count 5, it's an agreement between Minal Patel, Brett Hirsch,

2    Christian McKeon, and others, to either defraud the United

3    States or pay kickbacks.

4           If Minal Patel conspired to do either one of those

5    things, he's guilty on this count.  If Minal Patel conspired to

6    do both of those things, he is guilty on this count.

7           What is defrauding the United States?  It's basically

8    cheating.  It's cheating the United States out of property or

9    money, and Minal Patel cheated the United States out of money

10   when he referred people for genetic tests that they didn't

11   need, and he caused those tests to be billed to Medicare.

12          What's a kickback?

13          Well, in this case, it's a payment in exchange for

14   referring a Medicare beneficiary for genetic testing.  And if

15   one purpose of the payment is to induce Medicare referrals,

16   it's a kickback.

17          And Minal Patel paid kickbacks.  He paid kickbacks when

18   he paid marketing companies belonging to Brett Hirsch,

19   Christian McKeon, Senthil Ramamurthy, Marc Sporn, and others,

20   for doctors' orders authorizing cancer genetic tests.

21          Count 5 is the conspiracy, the unlawful plan.

22   Payments, payments to induce these marketers to get those

23   signed doctors' orders for genetic tests.

24          You saw examples of order forms for these genetic tests

25   throughout trial.  You saw Minal Patel's signature all over

1    Medicare enrollment paperwork, promising that he understood his

2    responsibility to follow the law, and specifically that he

3    understood he had to follow the Anti-Kickback Statute.

4          And you saw contracts that said they were marketing to

5    physicians.  But that was a lie.  Because if the contracts told

6    the truth, they would be outlining the crimes in black and

7    white.

8          Paying salesmen to push doctors to sign for

9    prescriptions and to push patients to agree for the tests,

10   those are kickbacks.  You don't need to own a lab to know that.

11   You don't need to have finished college to know that.  Shawn

12   Griner knew it.  Shawn Griner told you he went to a community

13   college for a couple of years, and he knew what he was doing

14   was wrong.

15         What does the evidence show?  That commissions are

16   kickbacks.  You heard from Senthil Ramamurthy, Shawn Griner,

17   Brett Hirsch, Marc Sporn; they all said they were paid per

18   sample, per completed order, on volume.

19         You also saw emails showing that when the test

20   reimbursements go up, the money goes up too.  And you heard the

21   Medicare expert tell you that Medicare reimbursements cannot be

22   based on volume.

23         She also told you that Medicare expects every person to

24   abide by the rules, to abide by the Anti-Kickback Statute, be

25   it the lab, be it the officer who's signing those enrollment

1    forms, and everyone else involved in the transaction from the

2    lab at the very end whose submitting the claims to Medicare, to

3    even the patients who are taking the test.

4            Counts 6, 7, 8, and 9 charge specific kickback events,

5    specific payments.

6            You see the elements of the kickback charge on the

7    screen.  Did the defendant make the payment?  Was the payment

8    made in return for ordering or arranging for something to be

9    paid by Medicare?  Did the defendant act knowingly and

10   willfully?

11           Count 6 shows a payment to Brett Hirsch.  As Mr. Hirsch

12   told you, these payments were made for him to bring in

13   marketers, for him to bring in patients, for him to bring in

14   doctors' orders.

15           Count 7, another payment to Brett Hirsch for the same

16   thing.

17           Count 8, payment to XGEN Marketing, which as you

18   learned from Shawn Griner was a marketing company owned by

19   Christian McKeon, that Shawn Griner also had heavy involvement

20   in.  He worked a lot with XGEN Marketing and XGEN Marketing

21   paid IDGAF based on reimbursements it got from Medicare.  These

22   transactions marked the start of the flow of that money.

23           Count 8 and Count 9.  Again, all of these payments are

24   made to induce patients into agreeing to the tests and to

25   induce doctors into signing prescriptions and to induce

1    marketers into giving LabSolutions as many signed doctors'

2    orders as possible to generate the maximum amount of

3    reimbursement for Medicare.

4         The last evidence -- or bucket of information we'll

5    talk about is money laundering.  As you heard the Judge tell

6    you, conspiracy to commit money laundering also involved that

7    same agreement to commit a crime that we have talked about

8    today in regards to the other conspiracy counts.

9         Here, we have a conspiracy with marketers; Brett

10   Hirsch, Shawn Griner, Senthil Ramamurthy, Marc Sporn, and Sonal

11   Jariwala.  You saw Ms. Jariwala's name all over Medicare

12   enrollment forms.  You saw her requesting information to be

13   able to share with Minal Patel, which has the SOAP notes and an

14   email from Shawn Griner.

15        You also heard a lot of testimony about how the point

16   of this scheme was to make money.  Testimony from Senthil

17   Ramamurthy about how they would go -- Mr. Patel and

18   Mr. Ramamurthy would go to Las Vegas or to clubs in Miami and

19   spend lavishly.

20        When Ms. Jariwala and Mr. Patel signed the 855s, they

21   were telling Medicare that they were in control.  They also

22   controlled the bank account, the account to which the Medicare

23   money was deposited into.

24        And as Mr. Petron told you, there were lots of

25   transactions.  There were lots of transactions over $10,000.

1    There were lots of transactions going back and forth and back

2    and forth between many different accounts of Mr. Patel, all to

3    hide where the money was coming from, all to hide that the

4    origin of this money was Medicare money, was money from fraud.

5         And this was all concealed through all the contracts,

6    those sham contracts that were designed to make things look

7    legitimate.

8         And here is an example of some of those transactions

9    showing the money moving back and forth.  These are all

10   exhibits that you'll have back with you in the jury room.

11        At this point I want to draw your attention to one

12   other instruction that you received from the Judge today.

13   Because you know and have learned today that a defendant's

14   knowledge is an essential part of determining whether a crime

15   was committed.

16        And here you can see -- and have heard from the

17   Judge -- that deliberate avoidance of something can be proof of

18   knowledge.  You can find if the defendant knew a fact, whether

19   he actually knew the fact or if he had every reason to know but

20   deliberately closed his eyes.  And those are the charges.

21   Fraud, kickbacks, money laundering.

22        Members of the jury, there's one puzzle piece that I

23   would like to return to, and that's the amount of money.  The

24   money stolen from the Medicare trust fund as a result of this

25   scheme.  In total, LabSolutions billed about $463.8 million to

1    Medicare for fraudulent genetic tests.  Medicare paid over

2    $187 million on those claims.  That's $187.3 million that could

3    have gone to medically necessary healthcare.

4         That's $187.3 million that instead went to line the

5    pockets of Minal Patel and others.  That's $187.3 million from

6    the taxpayer-funded trust that Minal Patel and his

7    co-conspirators treated as their own personal slush fund.

8         Members of the jury, this scheme started with phone

9    calls to people like W.H., H.K., and W.I. and thousands of

10   Medicare patients, and it ended with a multimillion dollar

11   heist.

12        Minal Patel and his co-conspirators thought that the

13   sham contracts would make his whole scheme seem legitimate.

14   Minal Patel thought hiding behind a lawyer would make this

15   whole scheme seem legitimate.  Minal Patel thought he could

16   hide behind doctors, a lab director, a compliance director,

17   that would make this whole scheme seem legitimate.

18        Minal Patel did all this to avoid being found

19   responsible for all of the crimes that he committed.  The

20   crimes that he committed with no care and no regard for the

21   real individuals, many of them cancer survivors, behind the

22   27,000-plus genetic tests that he and LabSolutions submitted

23   claims for.

24        But you can find him responsible.  And in light of all

25   the evidence in this case, it is your duty to do so.

1           During the last two weeks, we, the government, have

2    taken you through evidence, evidence that proves that, in fact,

3    nothing about this operation was legitimate.  And we, and I'm

4    sure the defense is as well, are deeply grateful for the time

5    and attention that you have given to this case.

6           Members of the jury, we've covered a lot during this

7    trial, and now it's time to finish the case.  We leave this

8    case in your hands, with your common sense, with your wisdom,

9    and with your sense of justice.

10          And ladies and gentlemen, the only just verdict, the

11   only right verdict, and the only verdict consistent with all of

12   the evidence in this case is a verdict of guilty on all counts.

13          Thank you.

14          THE COURT:  Thank you very much, Ms. Gurskis.

15          At this time, folks, as promised, let's go ahead and

16   put our notepads down.  Everyone take a five-minute break to

17   stretch out, use the restroom, and we'll bring you back to turn

18   it over to the defense team.  Thank you.

19          THE COURT SECURITY OFFICER:  All rise.

20          (Jury exits at 2:51 p.m.)

21          THE COURT:  Everyone, please be seated.

22          Briefly, if I could, Mr. Patel, I'm going to have you

23   remain standing.

24          Gracie, could you do me a favor and swear Mr. Patel in

25   for me?

1          (Defense witness, MINAL PATEL, duly sworn.)

2          THE COURT:  Thank you, Mr. Patel.  Please have a seat.

3    If you can find a microphone so I can hear you.  I know you're

4    all the way in the corner.  You can speak in any one of them.

5    I just want to make sure.

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  Very good.

8          So, Mr. Patel, I did not get an opportunity, as we were

9    getting everything ready to go, to inquire directly with you

10   about your decision not to testify.

11         So I want to ask you a few questions because, of

12   course, our trial is not over and certainly if you elected to

13   do so, I would reopen the case to permit you to take the stand.

14         My first question to you is, have you had sufficient

15   time to discuss your decision not to testify with your lawyers?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Okay.  And am I correct that you do not

18   wish to testify?

19         THE DEFENDANT:  Yes.

20         THE COURT:  Now, while your lawyers are excellent, you

21   do understand that it is your decision whether or not to

22   testify, correct?

23         THE DEFENDANT:  Yes.

24         THE COURT:  All right.  Are you making a decision not

25   to be a witness on your own behalf freely and voluntarily?

1             THE DEFENDANT:  Yes.

2             THE COURT:  Is there anyone, whether it be your

3    attorneys, family, friends, or anyone else forcing you or

4    threatening you so that you do not testify?

5             THE DEFENDANT:  No.

6             THE COURT:  Do you understand that I will let you

7    testify even if your lawyers tell you not to do so?

8             THE DEFENDANT:  Yes.

9             THE COURT:  Okay.  So who, Mr. Patel, is making the

10   decision that you will not testify?

11            THE DEFENDANT:  I am.

12            THE COURT:  Very good.

13            The Court finds that the defendant, Minal Patel, is

14   alert and intelligent and does understand his right to testify.

15   The defendant is fully informed and has freely and voluntarily

16   chosen not to testify in this matter.

17            I would also confirm with you, Mr. Patel, have your

18   lawyers called all the witnesses that you wished to call?

19            THE DEFENDANT:  Yes.

20            THE COURT:  All right.  And did you get an opportunity

21   to participate with your lawyers in the jury instructions that

22   I gave earlier to the jurors?

23            THE DEFENDANT:  Yes.

24            THE COURT:  All right.  And do you agree with those

25   instructions that were given?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Very good.  Thank you for that.

3          All right.  With that being said, let me let everyone

4     take a restroom break, and we'll be back in just a few moments.

5          You have more than enough time, Ms. de Boer.  I clocked

6     Ms. Gurskis at 45 minutes.  So I don't even think you're even

7     going to need it all, but you'll have your 30.

8          We'll be back in five, guys, and we'll turn it over to

9     the defense.

10          THE COURT SECURITY OFFICER:  All rise.

11         (Court recessed at 2:54 p.m.)

12         (Back on the record at 3:06 p.m.)

13          THE COURT:  Everybody ready?  Let's go round up our

14     jurors.

15         (Jury enters at 3:06 p.m.)

16          THE COURT:  Please be seated, everyone.  All right.

17          Ladies and gentlemen of the jury, I'm going to turn it

18     over in just a moment to the defense team.  Again, one thing I

19     will note is that the defense lawyers have elected to split

20     their time between multiple counsel.

21          So you'll see Mr. Rafferty lead and then at some point,

22     Mr. Sadow will also be contributing to the closing.  Okay.

23          With that being said, Counsel, the floor is yours.

24          MR. RAFFERTY:  Thank you, Your Honor.

25          For timing purposes, if I can have about 30 to

1    35 minutes?

2         THE COURT:  You got it.

3         MR. RAFFERTY:  May it please the Court, Counsel, ladies

4    and gentlemen of the jury, good afternoon.

5         As you know, my name is Brian Rafferty, and I'm one of

6    the three lawyers who has had the honor of representing

7    Minal Patel throughout this trial.  We are deeply appreciative

8    of all your service.

9         We know how difficult this has been for you, an

10   inconvenience, but we know you have been paying close attention

11   to the evidence, what it was and what it wasn't.

12        And where I want to begin is sort of where the

13   government ended because I thought it was a rather interesting

14   dichotomy.  They spent about 30 to 35 minutes talking about all

15   the different things they said Minal Patel did.

16        They said he lied about this.  He lied about that.  He

17   lied to this person.  He lied to that person, and they

18   conveniently, in the end, they start talking to you about

19   deliberate ignorance of proof of knowledge, one of the jury

20   instructions you heard something about.

21        And I think there's -- it's telling that they talked to

22   you about deliberate ignorance because there is no evidence in

23   the record that Minal Patel lied to anyone.  He never lied to a

24   patient.  He never lied to a doctor.  He never lied to

25   Medicare.  He didn't lie to anyone.  He never cheated anyone.

1    He never stole from anyone.

2          There is no evidence of that in the record, and it is

3    their burden to prove otherwise, and they have not.

4          Ladies and gentlemen, all of the CGx and PGx tests that

5    we've been talking about throughout this case, in fact, were

6    performed.  They were all done.  The tests were done.  And

7    there is no dispute, and there's no contrary evidence to the

8    fact that Minal Patel, even the cooperators will say hired

9    lawyers, hired experts, hired consultants to make sure that the

10   operations of LabSolutions was run compliantly.

11         The government has done nothing to rebut that.  Zero.

12   There has been zero evidence.

13         And why is that important?  You heard an instruction

14   during the course of Judge Ruiz's instructions called "good

15   faith."

16         We don't have to prove anything in this case.  We did

17   not have to put on any evidence, and we didn't because the

18   government didn't prove its case.

19         It is the government's job to prove willfulness.  It is

20   the government's job to prove that Minal Patel did something

21   wrong.  They haven't proved anything.  In fact, they failed to

22   prove that his hiring of lawyers, his hiring of consultants,

23   his hiring of experts was not all part of a good-faith effort

24   to run a compliant lab.

25         Folks who are involved in some scheme or some

1    conspiracy don't do that, ladies and gentlemen.  The government

2    talked to you about common sense.  I ask you to think about

3    common sense.

4           Common sense tells you, you don't hire lawyers, you

5    don't hire consultants, you don't hire experts to do the things

6    that Mr. Patel did here.  You don't spend the kind of money he

7    did if you're actually going to be part of some plan.

8           The government asks you to use your common sense but

9    asks you to ignore that very important fact.

10          You know, jury trials, ladies and gentlemen, are the

11   hallmark of our justice system, right?  A lot of us come to

12   this country.  I'm a child of immigrants myself.  They come to

13   this country for the land of opportunity but because of what

14   the system here provides.

15          So many other countries don't give you the right to

16   have a jury, the last line of defense for folks like Minal

17   Patel to stand against tyranny from the government being able

18   to say whatever they want regardless of what the evidence may

19   be and to hold you accountable for it.

20          And we're going to -- we're asking you to stand by your

21   oath.  You said at the beginning of this case, if you had to

22   vote, Mr. Patel was not guilty, every single one of you.

23          Well, I submit to you, based on all the evidence that

24   we've heard so far, he's still not guilty.  They haven't proven

25   anything.  And just because Ms. Gurskis or Ms. de Boer or

1    Mr. Cuyler or Ms. Rookard says something, doesn't make it so.

2    It's the evidence that you have to rely on, and there has been

3    no evidence about Mr. Patel.

4        If you step back for a second and think about what

5    you've heard, what did Mr. Patel do every day?  Do you know?

6    Do you have any idea?  I submit to you, you don't because they

7    didn't prove it.

8        How were these bills submitted?  Do you know?  You

9    don't because they haven't proven it.  It is their job.  And if

10   they haven't done that, ladies and gentlemen, you must find him

11   not guilty.

12       The other charge that you heard so much about from the

13   very beginning of this case is reasonable doubt; is what our

14   system is based upon.  It is what we all rely on, ladies and

15   gentlemen.  It's what we need.  It's what the system is based

16   on.

17       The government has to prove beyond a reasonable doubt.

18   If they don't do it, you must find him not guilty.  And in

19   thinking about that, look at the instruction, ladies and

20   gentlemen.

21       Proof beyond a reasonable doubt is proof so convincing

22   that you would be willing to rely and act on it, without

23   hesitation, in the most important of your own affairs.  And

24   think about what you heard in this case.

25       Can you honestly say, in this world, that you would

1    rely on the testimony of some of these cooperators for any of

2    the important things in your lives?  Have you heard any

3    evidence in this case that you would say is proof beyond a

4    reasonable doubt of anything about Minal Patel?  The answer is,

5    there isn't any.  There hasn't been any.

6            No, ladies and gentlemen.  Minal Patel stands accused

7    of these crimes.  I submit to you, as Mr. Sadow said at the

8    beginning, because of money.  Okay?  There's a reason why the

9    government returned to money at the end of their initial

10   closing argument there.  Because they want you to focus on

11   money, money, money.  Because if you focus on the evidence and

12   not the money, your path is clear.  It's easy.  He's not

13   guilty.  Because they haven't proven it.

14           So what do you do if you're the government?  You flash

15   up signs and charts and summaries talking about $460 million

16   and $100 million paid.  Why?  Because they're trying to

17   demonize Minal Patel.  They're trying to make him out to be

18   something he's not because they know they haven't proven their

19   case, and that's why they went back to that deliberate

20   ignorance instruction, ladies and gentlemen, is because they

21   haven't proven it.  And if they haven't proven it, he's not

22   guilty.

23           You are duty-bound, and we are asking you to find him

24   not guilty because they have not proven it.

25           Ladies and gentlemen, I have a brother who's a teacher.

1    My parents taught us from a young age:  Ask questions.

2    Whenever you hear anything, there's no such thing as a stupid

3    question.  That's what my parents told me.  I'm sure for those

4    of you who have children, you say that to your same kids --

5    your kids, too.

6         I ask a lot of questions, and I ask a lot of questions

7    as the evidence comes in, and I ask you to think about some of

8    the questions that I am going to go through with you, and I ask

9    you to think about it on the healthcare side of the case.

10        Mr. Sadow is going to get into some of the other

11   aspects of the case.  I was here to talk to you about

12   healthcare, and I'm going to talk to you about healthcare.

13        The government talked to you about the patients.  They

14   talked to you about patients, and what did the patients

15   actually say?  They all said they had a personal history of

16   cancer.  They all said they had a family history of cancer.

17   They all took a test.

18        No one ever spoke with anyone from LabSolutions.  They

19   never said anything about Minal Patel, not a word.  And every

20   single one of them signed those requisition forms with doctor's

21   signatures on them, with patient notes attached.

22        They took these tests.  They have nothing to say and

23   nothing to offer about Minal Patel because they never dealt

24   with him.  And the reason why is because you heard from the

25   government's own experts.

1          Whose job is it to deal with the patient?  How many

2     times did I ask that patient?

3          The job of dealing with the patient, lies with the

4     doctors.  The job of determining if the tests need to be

5     ordered, lies with the doctors.  The job of using the test to

6     treat the patients, that lies with the doctors.  It is not

7     Minal Patel's job.  It is not anyone at LabSolutions' job.

8          The evidence is absolutely clear on that.  That is a

9     red herring when the government talks about that because

10    they're trying to hold Mr. Patel accountable for something he

11    had absolutely nothing to do with.

12         What do the experts say, folks?

13         You heard the experts:  Magliocco and McMillan.  They

14    all agreed on some of the same things I just said.  It's the

15    doctor's job to determine medical necessity.  It's the doctor's

16    job to examine the patient.  It's the doctor's job to use the

17    test results to treat the patient.

18         It is not the lab's job.  They all said that,

19    unequivocally, every single one of them, every expert.  The

20    reason for that is because it is the doctor who is the

21    gatekeeper here.  It is the doctor whose job it is to make sure

22    that whatever tests are ordered are reasonable and medically

23    necessary.

24         It is not the lab's.  The labs can't second guess the

25    judgment of a doctor.  And every one of these tests, a doctor

1    ordered.  And Mr. Patel or anyone else at LabSolutions cannot

2    overrule the decisions of a doctor.  And the government hasn't

3    proved otherwise.

4            What else did the experts say?

5            Well, you heard Dr. Magliocco.  What did he talk about?

6    Well, what he talked about primarily, on cross-examination in

7    particular, he was very critical of who?  Once again, the

8    doctors.  He said, those notes are not good enough.  They had

9    to do a better job.  They didn't do a good job of documenting

10   why they're ordering these tests.

11           But he also said, it is not Minal Patel or

12   LabSolutions' job to second guess the judgment of the doctor or

13   the quality of their notes.  That's not his job.  That's the

14   doctor's job.

15           He also said that notwithstanding the lack of quality

16   of the doctor's notes, he said that a large percentage of all

17   these folks who took these tests -- he looked at a bunch of

18   files, he said.  They benefited from the test.  This is

19   something that they would benefit from.

20           This isn't my expert.  This is their expert.  They put

21   that person up there, and he said, yes, you're right.  They

22   would have benefited.  And it wasn't like I was pulling teeth

23   from the guy.  It was pretty obvious.  These were folks that

24   had serious personal and family histories of cancer.  In fact,

25   I think there was one patient up there who says this person has

1    a really bad history of cancer and benefited from that test.

2         So what are we talking about as far as medical

3    necessity, ladies and gentlemen?  That's not the defense's

4    expert.  We have no burden.  That's their expert.  That's what

5    he said.  That alone, ladies and gentlemen, is reasonable

6    doubt.

7         You can't even -- the expert could not say that a

8    single test was not medically necessary.  He didn't identify

9    one.  This case is about medically unnecessary tests.  Their

10   expert says, I can't even say they weren't medically necessary.

11   That's reasonable doubt, ladies and gentlemen.  Not guilty.

12        What did Ms. McMillan talk about?  Well, first of all,

13   she talked about these enrollment forms.  And perhaps my point

14   was not understood by the government or by you, ladies and

15   gentlemen.

16        My point is this:  Yes, Mr. Patel signed these forms.

17   Of course he did.  The point is, just like when you close on a

18   house or a mortgage or anything else, just because he signs the

19   bottom of the form, which no one ever proved that he -- was

20   explained to him or anything else, that's 50 pages long and has

21   references to all sorts of websites and Medicare rules and

22   Medicare regulations, you can't conclude that Mr. Patel knows

23   every aspect of every LCD/NCD, HHS-OIG guideline.

24        Of course he's bound by it, ladies and gentlemen, but

25   you can't find him guilty because his signature appears on the

1   bottom of some form.  That's not how justice works.  That's not

2   proof beyond a reasonable doubt.  And they don't bring it out.

3   I bring it out.  I mean, there's a star next to his name.

4        Use your common sense and experience when you closed on

5   a house, where you closed on an apartment, where you signed any

6   document.  The lawyer just tells you to sign right here.  Does

7   he sit there and explain every last part of whatever it is

8   that you're signing?  What does your common sense and

9   experience tell you?  Of course it doesn't.  Does that not mean

10  that you're responsible?

11       Sure, it does.  But that doesn't mean you're guilty of

12  a crime if something that happens that violates some term

13  within some contract you signed.  That's not how justice works.

14  Don't be fooled by that, ladies and gentlemen.

15       What else did Magliocco tell you about?  Well, he

16  talked about his credentials, right?  He talked about all the

17  different things he's done in his background.  He's an

18  impressive guy.

19       But he also talked about the credentials of the person

20  that was the lab director of LabSolutions, Dr. Wildemore.  Her

21  name appears on every requisition form.  On virtually every

22  document that comes from the lab, her name is somewhere on it.

23  And he commented that she has the same exact background as he

24  does, same training, same Ph.D., same big brain, that she knows

25  all about genetics.  He agreed with all of that, and that's who

1    Mr. Patel hired to put in place to run this lab.

2              And what else did you hear about lab directors?  They

3    have the job to make sure.  It's the lab director's job,

4    Dr. Wildemore.  It's her job to make sure these tests are all

5    right, that these panels are all right.

6              Minal Patel had nothing to do with the preparations of

7    the requisition form.  There is no evidence of that.  He had

8    nothing to do with any of these tests or genes or anything.

9    They didn't prove any of that.  He hired somebody who's as

10   qualified as the government's own expert to do that.

11             What else did you hear from Ms. McMillan that I thought

12   was worth just pointing out for you and reminding you of?  She

13   talked a lot about the claims and that Medicare doesn't cover

14   screenings, and Ms. Gurskis told you Medicare doesn't cover

15   screens.  And then I put up on the screen, 201-A, 201-B, 201-C,

16   the billing data for LabSolutions.

17             If you look at some of the codes, specific codes, look

18   it up yourselves if you want to when you go back in your

19   deliberations, look up diagnosis code Z1379.  Look it up.  And

20   look at how it is defined.  And remember what Ms. McMillan said

21   about that code.  That's a screen.

22             So Ms. Gurskis and Ms. McMillan tell you that Medicare

23   doesn't cover screens, but LabSolutions bills for 20,000 of

24   these, 20,000 times.  They're telling Medicare, guess what

25   we're doing?  We're doing screens.

1          And what does Medicare do?  Notwithstanding what

2    Ms. Gurskis says, notwithstanding what Ms. McMillan says, they

3    paid it.  They paid it over and over again.

4          And what does McMillan say?  Well, they probably

5    shouldn't have done that.  That was probably a mistake.  Well,

6    how is Mr. Patel supposed to know that?  How is anyone from

7    LabSolutions supposed to know that?  If you're not supposed to

8    pay screens, then don't pay screens.  The reason why that

9    happened?  I have no idea.

10         But ladies and gentlemen, part of this case is what was

11   billed.  This is all about false claims, right?  What was

12   submitted that was false?  LabSolutions told Medicare 20,000

13   times, we're doing screens, and they paid them.

14         There's no false claims there at all, zero.  Don't

15   forget that, ladies and gentlemen, look back at 201-A, 201-B,

16   201-C.

17         The other and most important thing that I think came

18   out during Ms. McMillan's testimony was the LCDs.  She stood up

19   there -- you'll remember this.  She stood up there and said

20   these LCDs, they're as clear as day, clear as crystal.  It's

21   obvious this stuff is not covered.

22         And then I put this in front of her, which the

23   government never showed her, which is prepared by who?

24   HHS-OIG.  And what does it say?  LCDs are not clear as crystal.

25   And when was this prepared?  Right in the middle of all of

1    this, in 2014.  The government points out that the study was

2    for 2011.  But why are they issuing it in 2014 if they didn't

3    realize that there is a problem?

4         And if we can go to page 9 of this document.  This will

5    be -- this is in evidence as Defense Exhibit 200.  Look at it

6    for yourself.  Go to page 9.

7         Remember how Ms. McMillan said the reason why we have

8    LCDs is because we don't want to have overuse.  Right?

9    Utilization.  What does HHS conclude on its own?  The presence

10   of LCDs was unrelated to utilization.

11        What else does it say at the bottom of the page?  And

12   this is what's really important here.  Because remember, you

13   heard from experts about how this is a new technology.  This is

14   important:  Genetic testing is important.  It is constantly

15   evolving.  All these experts said that.  Not just Magliocco,

16   not just McMillan.

17        All the doctors who testified said the same thing.

18   What does Medicare itself conclude about problems that they

19   have with new technology?  They can't keep up.  They can't.  I

20   don't blame them.  It's not easy.

21        But because they can't keep up, because of the

22   ambiguity in the documents that they create, you can't hold

23   people like Minal Patel responsible, particularly when there's

24   no evidence that he had anything to do with any of this.

25        This is reasonable doubt right here, Exhibit 200.  Your

1    job is done.

2          Now, Mr. Sadow only gave me about 30 minutes, so I've

3    gotta get through some more questions and I'm going to run

4    through these quick.  I hope you guys will listen to my

5    questions and you'll write them down and you'll think about

6    them.

7          The first question that I want you to think about is

8    this... this case is about telemed.  You heard a lot about it,

9    right?  Telemed has become an important part of our lives,

10   right?  Telemedicine doctors, we all see that and we all know

11   what it is, right?  That's what this case is about.  Right?

12         How many telemedicine doctors were called to testify in

13   this case?  Show of hands.  My brother's a teacher, I said.

14   I'll use a chalkboard.  How about zero?  Zero.  Not one

15   telemedicine doctor came in here to testify to you about

16   anything.

17         The government has the temerity to say that every one

18   of these tests were not necessary, that doctors were bribed and

19   paid all this money, all of this was a giant fraud, and yet not

20   one telemedicine doctor came in here to say anything.  Not one

21   telemedicine doctor testified that he or she ordered a

22   medically unnecessary test.

23         And it's not like it's a mystery, ladies and gentlemen.

24   Because remember, the government has a fancy chart -- can we

25   just blow this out a bit?

1         1,492, that's how many doctors ordered tests from

2    LabSolutions, 1,492.  And how many got called to testify at

3    this trial, where Mr. Patel's liberty is at stake?  How many

4    did you hear from?  Zero.  Why is that?

5         Because they're not going to say that they ordered

6    medically unnecessary tests, I submit, ladies and gentlemen.

7    That's why.  Because they know, those doctors know, it is not

8    Minal Patel, it is not a lab owner's job to determine medical

9    necessity.  That job lays with those doctors.  That is

10   reasonable doubt, ladies and gentlemen.

11        If I can bring this back.

12        How many telemedicine doctors were called to testify

13   that they never used the test to treat the patients?  Same

14   answer, zero.

15        How many telemedicine doctors were called to testify

16   that they never spoke with the patients at all?  Zero.

17        How many testified -- we heard from these so-called

18   cooperators, which I'll let Mr. Sadow talk about, but they talk

19   about paying kickbacks.  How many telemedicine doctors came in

20   to say they were paid kickbacks?  Zero.  Not one.

21        And I've already asked this question, but I'll ask it

22   again:  Of the more than 1,000 telemedicine doctors that

23   ordered tests from LabSolutions, that these government

24   prosecutors identified, how many did they call?  Zero, not one.

25   That's reasonable doubt, ladies and gentlemen.

1          The government talked a little bit about V.H.  What did

2     you hear from her?  Same answer, nothing.  She is a patient in

3     the indictment.  She's one of the patients in those substantive

4     healthcare fraud counts.  Didn't hear a word from her.

5     Government didn't call her either.

6          How about E.G.?  He's another substantive healthcare

7     fraud count.  I believe it's Count 3 or 4.  Did you hear from

8     him?  No, nothing.

9          Now, you heard something about billing during McMillan,

10    that they used billing companies.  I asked them questions about

11    billing companies, because again, this is all about billing,

12    what was billed, right?  That's what this case is supposedly

13    about.

14         What evidence did you hear about the billing company

15    from the government?  Same answer, zero.

16         What evidence did you hear about Mr. Patel's role in

17    the billing in this case?  Did he punch a button?  Did he do

18    anything?  What did you hear?  Zero, nothing.

19         You heard about the companies that help fill these

20    forms out.  I'm not going to go through that again.  But the

21    point is, if you really believe that Minal Patel was adhering

22    to all these rules and regulations contained in a 50-page

23    document where your name, the company that helped him fill it

24    out is right there in it, you think they'd call that company,

25    right?  Bring them on in here.  Let's hear what they have to

1    say.  Right?  Did they do that?  No.  You heard zero from them

2    too.  That's important, ladies and gentlemen.

3         We heard testimony about a guy named Nick Saliba.  Did

4    you hear from him?  What did you hear?  Zero.

5         Jon Berarducci, head of sales, did you hear from him?

6    What did you hear?  Zero, nothing.

7         I talked to you about Dr. B.  Did they bring in Dr. B.

8    to talk about Mr. Patel's role in all this stuff that they say

9    he did?  No.  What did you hear?  Zero.

10        And it's their burden, ladies and gentlemen.  It's not

11   ours.  We have no burden to prove anything.  It is their job to

12   prove it and they have not.  The failure to call these folks is

13   reasonable doubt, ladies and gentlemen.

14        And where is the evidence that we heard from all these

15   cooperators about LabSolutions paying doctors?  Where's the

16   trail of money from LabSolutions to Dr. Tsai or anybody else?

17   Did you see that in any of those fancy charts?  No, you heard

18   zero, because it didn't happen.

19        And this goes to my -- my question that I started with

20   and I've just got a few minutes.  What did the government

21   actually show that Minal Patel did?  What did he do?  His life

22   is on the line here.  This is a trial about Minal Patel.  It's

23   not a trial about LabSolutions or Shawn Griner or anybody else.

24        What did they show you that he did?  They skipped a

25   step here, ladies and gentlemen.  They skipped a big one.  They

1    didn't prove Minal Patel did anything.  They like to say he

2    lied to patients.  He never talked to them.  They like to say

3    he lied to doctors.  He never talked to them.  They like to say

4    he lied to Medicare.  He didn't do that either.

5         They didn't offer any evidence of any of that.  They

6    just said it.  And again, that's tyranny.  They don't get to

7    say things and make it so.  The way it gets proven is from

8    there, on the witness stand, and it didn't happen.

9         And he's not guilty, ladies and gentlemen, plain and

10    simple.  They did not prove it.

11         And think about the experts.  These are just some other

12    questions that I asked during my cross.  Because it would seem

13    to me -- I'm no expert.  I don't have a giant brain, like

14    Dr. Magliocco or Laurie McMillan or probably anybody else in

15    this courtroom.

16         But the reality is, it just occurs to me, again

17    probably because my mom used to ask me to ask questions.  Did

18    you talk -- did you talk to any of the patients, Dr. Magliocco?

19    Did you pick up the phone and ask them?  His answer?  Nope.

20    Didn't talk to one.  Zero.

21         How many of the doctors, these telemedicine doctors who

22    he faults for their poor notes, how many did any of these

23    experts actually talk to?  Do I need to say it again?  Zero,

24    not one.  That's reasonable doubt, ladies and gentlemen.

25         And lastly, we heard from the government's cooperators

1    about their were recordings.  One of these cooperators said

2    there were all these recordings with the doctors.  And my

3    recollection is -- and yours controls.  My recollection is,

4    what happened in those recordings?

5          I'm pretty sure he said he deleted them all.  He got

6    rid of them.  So evidence about what happened between these

7    patients and the doctors, the people that the government are

8    married to and put up on this witness stand deleted that

9    evidence.  So you don't get to see it.  But you're expected to

10   find beyond a reasonable doubt that Minal Patel is guilty of

11   anything?  He's not.

12         And then my last question.  My last question:  How many

13   times did LabSolutions tell Medicare what it did?  You can find

14   this yourself doing the same search I did.  But it's

15   21,876 times.  Laurie McMillan was asked about that.  She had

16   no idea that that actually happened.

17         Reasonable doubt, folks.  Reasonable doubt.

18         That's my time, ladies and gentlemen.  I've spent

19   years, years working on this case, holding my arms around

20   Minal, and we're going to give him to you.  And what I ask you

21   to do is ask these questions.  Ask them.  Because if you do,

22   and you listen to the Judge's instructions, your path is clear.

23         Follow the evidence, ladies and gentlemen.  Ask those

24   questions, and you'll find what I've known all along:

25   Minal Patel is, was, and always will be not guilty.

1          Now I'm going to turn it over to my colleague and

2     friend, Mr. Sadow, to give you his final words.

3          Thank you.

4          THE COURT:  Thank you, Mr. Rafferty.

5          Mr. Sadow, the podium is yours.

6          MR. SADOW:  Good afternoon, everyone.  I hope

7     everyone's all right.  I'm going to talk to you for a while.

8     I'm going to discuss the case that the government has brought

9     against Mr. Patel.

10          I'll remind you, if I might, that this is not a civil

11     case.  Medicare is not suing anyone for the money back.  This

12     is a criminal case.  And when you have a criminal case, the

13     government must prove guilt beyond a reasonable doubt.

14          It's all up to the government.  They prove guilt beyond

15     a reasonable doubt, you convict.  They fail to do so, you

16     acquit.  You find someone not guilty.  It's not a tough

17     decision when it comes to the black-and-white part of that,

18     because it's all up to the government.  And if they do not

19     convince you, then the only verdict that speaks the truth is

20     not guilty.

21          Now, this case is about a lot of things, but what it

22     really is, is did the government prove beyond a reasonable

23     doubt that Minal Patel acted without good faith?  That's what

24     it really is going to boil down to.  And that's what the Judge

25     has told you.

1       Because if you find that the government has failed to

2  prove good -- the absence of good faith, then you would have to

3  find Mr. Patel not guilty.  And the absence of good faith means

4  the government has to prove intent to defraud, and they have to

5  find -- they have to prove willfulness.

6       Intent to defraud is exactly what it sounds like.

7  Willfulness means nothing more than they have to prove bad

8  purpose, bad purpose.

9       So if you find that Mr. Minal Patel acted in good faith

10 and did not have bad purpose, you find him not guilty.

11      Now, what I'm going to try to do is give you some

12 reasons, points that I think create reasonable doubt.  I'm not

13 expecting you to agree with me on all of them.  I'd like you to

14 consider them.  That's why we have juries, because the 12 of

15 you that make this decision are going to do a much better job

16 collectively than any of us can do individually.  And that's

17 why we trust the jury system.

18      One of the instructions you heard to start with has to

19 do with accomplice testimony.

20      Now, accomplice testimony here is Griner, Hirsch,

21 Ramamurthy, and Sporn.  And the Judge has told you that you

22 need to be careful when you consider that testimony because

23 they may have a reason not to testify truthfully.

24      And we all know what that reason is.  It's because

25 freedom is at stake.  And we all know that while the Judge may

1   make the ultimate decision, if the government doesn't come in

2   and say, cut them a break, give them less time, they're going

3   to stay in jail.

4          And as to Mr. Griner, he's probably going to go to

5   jail.  I mean, Mr. Sporn has 14 years in jail.  Mr. Ramamurthy

6   has ten years in jail.  Mr. Hirsch has 57 months in jail.  And

7   Mr. Griner has not been sentenced yet.

8          Now, the only way -- the only way that Sporn,

9   Ramamurthy, and Hirsch get less time is to cooperate with the

10  government, which translates -- when you talk about using

11  common sense -- into pleasing the government.

12         Now, I know the government's going to get up here and

13  they're going to say is, well, the only thing we ask from you

14  is to tell the truth.

15         If Mr. Hirsch got on the witness stand and said, you

16  know, all those things I said on April 26th in the

17  tape-recorded conversation were true, what do you think the

18  chances are that his sentence of 57 months would be reduced by

19  the government?  The chances are zero.  It would not happen.

20         So speaking the truth is a question of who gets to

21  decide the truth.  Fortunately, the government doesn't get to

22  decide whether somebody's guilty or not guilty.  You get to do

23  that.

24         And with Mr. Ramamurthy, well, all I have to do is say,

25  SUV Lamborghini in Miami, which you remember he told Mr. Hirsch

1   in a text message that he had the first one in Miami.  And what

2   did he say about that?  It was a lie.

3         How many times did Mr. Ramamurthy lie in his text

4   messages or his dealings?  Over and over again.

5         So that's what you have to look at when you're talking

6   about an accomplice.

7         Now, let's talk about deliberate ignorance.  Sometimes

8   lawyers call that an ostrich instruction.  And what do I mean

9   by that?  What does an ostrich do when it doesn't want to know

10  what's going around it?  It sticks its head in the sand.

11  That's really what deliberate ignorance is.

12        In order for that to apply, the government has to prove

13  that Mr. Patel basically stuck his hand in the sand so that he

14  wouldn't be knowledgeable about what was going on around him.

15        I suggest strongly that there's been no such evidence

16  here.  In fact, it's been just the opposite, and we're going to

17  go into that in just a minute because I'm going to give you

18  some things.

19        Now, we're talking about good faith.  And here's where

20  it gets interesting.  And I have a lot that I'd like to show

21  you.  As I said, good faith is a complete defense.

22        So why don't we look at the instruction just for a

23  moment so that there's no issue.  And, again, because there are

24  8,000 documents here, every time I have to get something --

25  I'll come back to that.  Thank you.  That's why I have

1   assistance, because those people -- sometimes people can help

2   me with those documents.

3          Everybody can see that okay?

4          This is what it's all about:  A defendant isn't

5   required to prove good faith.  The government must prove intent

6   to defraud and willfulness beyond a reasonable doubt.  An

7   honestly held opinion or an honestly formed belief cannot be

8   fraudulent intent or willfulness, even if the opinion or belief

9   was mistaken.

10          Similarly, evidence of a mistake in judgment, an error

11   in management, or carelessness can't establish fraudulent

12   intent or willfulness.

13          So what is it that we have in this case that suggests

14   that Mr. Patel essentially tried to run his business the right

15   way?  We know from almost the very beginning that Mr. Patel

16   interacted with lawyers, and we know that when he interacted

17   with lawyers, because every cooperating witness, all four of

18   them, talked about that interaction.

19          And we know from Mr. Petron, who made, what, $320,000

20   by testifying for the government, and his firm, Stout, made

21   11 million-plus.  Not a bad job, I guess, if you can get it.

22          But we know that lawyers, three law firms, were paid

23   $263,000 by LabSolutions between January of 2017 and September

24   of 2019.

25          Now, what do we know about -- from the lawyers?  All

1    right.  Well, the best way to talk about that is to actually go

2    to what people said on the witness stand.

3          Now, as the Court indicated, your memories will

4    control, and you'll decide what the facts are, but I'm going to

5    point out what I believe the evidence showed when it came to

6    lawyers.  Okay?

7          So let's talk about Mr. Griner.  And Mr. Griner is

8    probably the best person to deal with starting off.

9          If we can go to G-1, please.  This is Defense

10   Exhibit G-1.

11         Now, this is basically the way this starts off.

12   Mr. Griner is telling Mr. McKeon about CGx lab info, which is

13   referencing essentially LabSolutions.  The only medical

14   necessity for a Medicare patient is family or personal history.

15   They must have Part B coverage.  Give me your new company info

16   so that I can have our agreement put together.

17         Now, what Mr. Griner is telling Mr. McKeon, and what

18   runs through this entire case is, these people believed that if

19   you had family history or personal history on a Medicare

20   patient, that that constituted medical necessity.  And when I

21   talked to Mr. Griner about that, I suggest he said the

22   following:

23         Question:  And what you're telling Mr. McKeon is clear.

24   The only medical necessity for a Medicare patient is family or

25   personal history, right?

1          Answer:  Yes.

2          Now, where did that information come from?

3          I was given that information from the lab.

4          Which lab?

5          I believe LabSolutions.

6          So someone at LabSolutions told you what you wrote to

7   Mr. McKeon, right?

8          Right -- correct.

9          And it's very clear that the lab believed that the only

10  medical necessity that was necessary was that the Medicare

11  patient had family or personal history, right?

12         Answer:  And Part B coverage, yes.

13         And Part B coverage -- question -- but that was it.

14  That was all that was understood was required, right?

15         Yes.

16         And this is what you were operating under for an

17  extended period of time, right?

18         Yes.

19         When did you find out -- question -- that more was

20  required?

21         More was not required.

22         Question:  More was not required?

23         You always believed that all you had to do was have a

24  patient with family or personal history, right?

25         Correct.

1          Question:  And the people -- the people that ultimately

2     spoke to MyOnCallDoc doctors were all pre-screened to either

3     have family or personal history, right?

4          Answer:  Correct.

5          So we start this off, regardless of what theoretically

6     we heard from the government experts, it's clear that

7     LabSolutions, which means Minal Patel, Mr. Griner, and others,

8     believed you didn't have to have anything beyond medical

9     necessity through family or personal history.

10          You put all the other big words aside.  You can take

11     all those definitions aside.  This is the good-faith belief

12     that you only had to have that.

13          Now, where do we know this to come from?  Well, let's

14     go to Mr. Griner again.  And this time, let's go to G-2.

15          Now, you'll remember, I believe, that I asked

16     Mr. Griner about some conversations that he had with a lawyer

17     for LabSolutions by the name of Toby Watt.  And Mr. Griner told

18     us that he had spoke to Mr. Watt a couple of times -- two or

19     three times.  I suggested that he previously said he met

20     Mr. Watt, but Mr. Griner didn't agree to that.

21          But we know Mr. Watt -- from the testimony of others,

22     Ms. Roebuck, Stacey Adair, we know that Mr. Watt was the lead

23     regulatory lawyer for LabSolutions.  When I told you the amount

24     paid, he was one of the lawyers in one of those firms.

25          And what did Mr. Griner want to know?  Well, he already

 1    knows about medical history.  So what did he want to know?  Was

 2    it okay for me to be paid by commission as opposed to some

 3    other way?

 4         And this exhibit is the one in which you have the back

 5    and forth between Toby Watt and another lawyer named Nick.  And

 6    this is in April of 2017.  And what does Mr. Watt say?  Well,

 7    let's go to what Mr. Griner said.

 8         I said, would you read that to the jury?  Talking about

 9    G-2, because that's coming from Mr. Watt, who's Mr. Patel's

10    lawyer.

11         And this is April 12th of 2017, right?  So you're right

12    in the middle of the CGx.

13         More at the beginning, but yes.

14         Okay.  We'll say at the beginning.  And this has to do

15    with commissions; correct?

16         Yes.

17         And Mr. Watt is responding to something that Nick --

18    that's this other lawyer -- wrote to him about commissions.

19         Answer:  Yes.

20         Okay.  And now you can read what it says.

21         And this is what Mr. Toby Watt says in this exhibit:

22    Nick, I appreciate what you're saying, and I did read the

23    article, but a question I have relates to the prevalence of

24    commission arrangements in the healthcare world.  For example,

25    distributors of orthopedic implants are paid on a commission

1    basis.  It's the national standard.  These distributors are not

2    employees of the manufacturers.  Why is that permissible?  It's

3    signed off by Toby.

4          So what Toby is telling Griner -- Toby being what --

5    being Mr. Patel's attorney -- is it's okay to pay commissions.

6    It's okay to pay commissions.  That's not kickbacks.  That's

7    not illegal.  It's okay to pay commissions.

8          Now, was Mr. Watt correct?  It doesn't make any

9    difference if he was correct.  That's what he was saying it was

10   okay to do.  That's what good faith is all about.  That's what

11   good faith is all about.

12         And then I go further and I say:  Because what was

13   being told to you, as you understand it -- again, asking

14   Mr. Griner -- was that Mr. Watt was saying it's fine to pay

15   commissions; correct?

16         Yes.

17         Question:  Indeed, just as an aside, you actually spoke

18   to Mr. Watt, didn't you?

19         Answer:  Yes.

20         Question:  On more than one occasion?

21         Yes.

22         And when you spoke to Mr. Watt, I assume it had to do

23   with his opinion on legal matters; correct?

24         Yes.

25         And tell us what you talked about with Mr. Watt.

1          It was related to this email here.  It was related to

2     the question of paying commissions.

3          "Answer:  Specifically paying commissions for Medicare

4     reimbursements.

5          And Mr. Watt told you it was permissible, correct?

6          Correct."

7          Now, we know what Mr. Griner's role was.  He was a

8     telemarketer.  And he was involved, he told you, with McKeon

9     and Orr as well with some telemedicine.  Now, common sense.

10    You have a conversation going on between the telemarketer and

11    the lawyer for LabSolutions, Minal Patel.  Does it make sense

12    that the telemarketer wouldn't have said, at some point, I'm a

13    telemarketer, is it okay if I get paid by commission?  And

14    obviously the answer is yes.

15         And when you go to the contracts -- and I'm going to

16    give you, so that you can write it down -- when you go to the

17    contracts, which are Government's Exhibit 601, 610-A, 650-A,

18    and 665-A, look and see whether or not every one of them speaks

19    in terms of commissions.

20         There wasn't anything being concealed.  There wasn't

21    anything being hidden.  The contracts speak about commissions

22    to sales reps, exactly what we're talking about with G-2,

23    Griner talking to Toby Watt.

24         And just to be clear, I asked Mr. Griner, speaking

25    about telemarketing:  It was your only role, from what I

1    sounded like, with regard to your direct testimony, correct?

2          No, no.  I was also responsible for managing the

3    telemedicine relationships, and yes, involved in the

4    telemarketing aspect.

5          So there's not a question here.  Interaction with

6    lawyers, good faith, paying commissions, not illegal.

7          Medical necessity, family history, personal history.

8    That's all you needed.

9          Now, what did the government prove here?  Personal

10   history, family history, telemarketing, right?  That's what

11   they proved.  Was it wrong for Mr. Patel to rely on the

12   information he was receiving to establish good faith to

13   believe?  The business was being operated okay?  I suggest it

14   wasn't, but he was authorized to do so.

15         Now, let's talk further about Mr. Griner.  As I said,

16   he's probably the best person to discuss this.

17         When Mr. Griner was approached by government agents, he

18   sat down and talked to them.  You might remember, that was,

19   like, in October of maybe 20- -- I think it was October

20   of 2020.  And he spoke to them.  And what did he do right

21   afterwards?  He went out and hired a lawyer.  He hired a lawyer

22   by the name of Weinstein.

23         And what did he start telling Mr. Weinstein?  I relied

24   on attorney advice to do what I did.  I didn't do anything

25   wrong.  And he told him that over and over and over again.  And

1    he kept saying to him, go to the government, supply

2    the agreements to the government, tell the government about the

3    legal advice, tell them that I relied on it.  They'll

4    understand.

5         But the government didn't want to hear that.  They

6    wanted to hear something else.

7         So Mr. Griner was put in the position -- after he said

8    over and over to his own lawyer that he didn't do anything

9    wrong, he then goes and says to the government, okay, if you're

10   not going to accept that, then what do you need from me?  And

11   then it changes.  The evolution occurs.

12        So we know what was really in Mr. Griner's mind, and we

13   know through the testimony -- we're talking about MyOnCallDoc

14   now.  And that's talking about Government Exhibit 623.  This is

15   an email to you, that is, from Mr. Griner to Mr. Patel.

16        "Question:  And what are you sending him?

17        "A copy of the MyOnCallDoc service agreement.

18        "Why were you sending Minal Patel a copy of the

19   MyOnCallDoc service agreement?

20        "Answer:  Minal requested it for approval."

21        Now, for approval.  We know what that means.  In the

22   scheme of what's going on here, you know exactly what that

23   means.

24        "Did he always request these types of contracts for

25   approval?

1               Anything related to telemedicine, yes."

2               Was it wrong to seek the approval?  Now the

3       government's going to stand up here and say, well, he was just

4       saying that.  But this went on for months and months, over an

5       extended period of time.

6               And we know Griner spoke to Toby Watt, so we know that

7       he's aware of the attorney.

8               And then I asked him about others and lawyers:

9               "All right.  Now, so Mr. McKeon showed you something

10      from an attorney indicating that Mr. McKeon's operation, which

11      is XGEN, that you testified to, was legal, correct?

12              "Answer:  I believe so, yes.

13              "Okay.  So that would be your testimony today and that

14      would be your testimony, what you told the agents and

15      the prosecutors, back in November of 2020, correct?

16              "Answer:  Yes.

17              "Okay.  And Dinnen also had an attorney."

18              Now, Dinnen is ELab.  We're going to get to the diagram

19      in a minute.  But there's another participant.

20              "Remember Dinnen?  You talked about him and the

21      factoring.

22              "Answer:  Yes.

23              "Did you tell them that Dinnen also had an attorney?

24              "Yes.

25              "And did you tell them that Dinnen's attorney vetted --

1   do you know what I mean by the word 'vetted'?

2            "Yes, I do.

3            "Vetted the process prior to factoring it to you?  And

4   Dinnen's attorney had also had conversations with Patel's

5   attorney about it, correct?

6            "Yes.

7            "And that was true as well, right?

8            "Correct.

9            "So now we've got an attorney for McKeon, an attorney

10  from Dinnen, an attorney from Patel, an attorney from

11  Ramamurthy.  Four as you know during the time period you're

12  talking about.  Four lawyers involved, right?

13           "Correct."

14           And then he later goes on to say:

15           "Okay.  So let's go to another exhibit.  Then on the

16  same date you send him a telemed and marketing contract that

17  was reviewed by Minal's attorney, right?

18           "Correct."

19           And you wrote down -- it's talking about his

20  interaction with Mr. Weinstein, his lawyer -- and you wrote

21  down:

22           "He reviewed and approved, right?

23           "Correct.

24           "Telling your attorney, Mr. Weinstein?  Right?  Right?

25           "I was telling my attorney that."

 1                Good faith, attorney.  Good faith, attorney.

 2                All right.  What else do we have?  We have Sporn.

 3                Now, Mr. Sporn -- Mr. Sporn's an interesting man.  I'm

 4       not sure I would want to buy a used car from him, but he's an

 5       interesting man.  He had obviously been involved in criminal

 6       activity in the early '90s.

 7                He told you he was convicted of fraud, committed tax

 8       fraud for seems like countless numbers of years, into the

 9       2000s, used his girlfriend -- her name is Michelle Larkin,

10       M.L., to hide his assets, to conceal his assets.  Pretty smart

11       guy.  Gotta give him credit.  And he was, my word, feisty.  He

12       definitely wanted -- he wanted to go back and forth.  But he

13       was interesting in what he said about lawyers.

14                Now, he's talking about the script the telemarketers

15       used.  Now, you remember, Mr. Sporn, he had a third floor,

16       and a second floor and a one floor of telemarketing.  The other

17       floor was telemedicine.

18                And he admitted that he didn't tell Mr. Patel that he

19       owned both of them.  He did.  He did own both of them, but he

20       didn't necessarily say that.

21                So I ask him:

22                "Well, did you think when you were using this script

23       that you were breaking the law?  The answer is, no, did you?

24                "Correct.  I was told that everything was compliant.

25                "And who told you that?

1           "Mr. Slagle, and he said he had vetted it with

2      LabSolutions -- again, here we go -- before we started."

3           And Mr. Slagle, who he said was his partner --

4           "Mr. Slagle had a lawyer, right?

5           "Yes.

6           "And you had a lawyer, correct?

7           "I didn't have a healthcare attorney at the time.

8           "But Mr. Slagle did, right?

9           "Yes.

10          "And Mr. Slagle vetted his information with his lawyer,

11     right?

12          "Yes, that's what he told me anyway.

13          "And LabSolutions, you were told, vetted their

14     processes with their lawyer, right?

15          "That's what I was told."

16          So even Mr. Sporn, as I was saying, he wasn't willing

17     to say a whole lot, was willing to agree on the lawyers.

18          Okay.

19          "Question:  So when it comes to the idea of the

20     telemarketing, we've already been through this, at least at the

21     time you were under the impression, I believe, that it had been

22     blessed by lawyers on both side, right?

23          "I did.

24          "Right?

25          "Yes, sir."

1          Another question:

2          "Everything that had to do with telemarketing that

3     we've been over and you went over with the government while it

4     was going on, you understood it was blessed by lawyers, right?

5     Just to make sure that there wasn't any misunderstanding.

6          "I was told it was blessed by lawyers.

7          "And it was a percentage-base, that is, a percentage to

8     Goldberg -- which is an individual that was doing CPL, was

9     percentage-based, right?

10         "Correct.

11         "Until it changed, correct?  And it changed to a flat

12    fee, correct?

13         "Correct.

14         "It changed to a flat fee when lawyers advised that it

15    could no longer be commission, correct?

16         "Correct."

17         Then I showed him the bills because it went from the

18    amount that he was receiving to $200,000 every month.  And I

19    asked him on Government Exhibit 155:

20         "It reflects that the change occurred, doesn't it?  It

21    started with the first payment in February of 2019, which would

22    have been for the month of January, correct?  2/19, I'm sorry.

23    2/19 of 2019.  And it went from commission base to a flat fee

24    base, correct?

25         "That's correct.

1             "And the flat-fee base was $200,000 a month, correct?

2             "That's correct.

3             "And that was done because the lawyer said it needed to

4    change from a percentage to a flat fee, correct?

5             "That's what I was told.

6             "Again, lawyers for LabSolutions and paying a

7    commission percentage, correct?

8             "Correct.  I was told that it was compliant.

9             "And did you have an interaction with a lawyer by the

10   name of Mark Thomas?

11            "Yes.

12            "Was that your lawyer?

13            "I had hired him or paid him for certain services.

14            "Okay.  Including matters related to CGx and PGx?

15            "Potentially.  I don't remember."

16            And then he goes on to say that:  He relied on Slagle

17   and he relied on his counsel, who told -- because I believe

18   Thomas to be a credible attorney.

19            So now we have Griner.  We have Sporn.  I'm not going

20   to bore you too much with Rama, Dr. Ramamurthy, but you

21   remember, he also talked about the video and his sister and the

22   script.  And what happened in that?  It was vetted by lawyers

23   on Rama's side and vetted by lawyers on LabSolutions' side.

24   And they said, okay, go with it.  That script was clearly

25   telemarketing.  As clear as it can be.

1              And you know when we talk about telemarketing, I don't

2      like it any more than I know you all don't like it.  I don't

3      like those phone calls.  It always happens in the middle of

4      dinner.  My wife always yells at me, because it's my fault that

5      they've called, somehow I've done it.

6              But I don't like them any more than you do, but they're

7      not illegal.  They're not illegal.  And you have choices.  You

8      can hang up.  You can easily hang up, or you just don't take

9      the call.  And if it's opt in, which is another thing that

10      Mr. Sporn told you, that his call center was opt in, you've

11      already kind of asked for the phone call.

12              I know the government's going to tell you the ads are

13      misleading and so on, but somebody, each one of them -- let me

14      make sure I understand.  61,647 beneficiaries, that's in

15      Government Exhibit 102, that's one of those charts put together

16      by Mr. Petron.  That's how many Part B beneficiaries.

17              So 61,000-plus people reacted to receiving the

18      telemarketing.  And with the opt in, you say I want to be

19      called in.  All you have to do is say I don't want it anymore.

20      I know, I know.  They're going to tell you it was misleading,

21      it was false, the fear of cancer and so forth.

22              Let's see.  Out of 61,000 people, beneficiaries, how

23      many did we hear from?  Eight?  Eight?  I mean, we could have

24      at least gotten into double figures; don't you think?  Maybe

25      15, 20, out of 61,000.

1          Anyway, we know that telemarketing took place with the
2     ad with Dr. Rama, so I'll put him away.
3          Now, what else do we know?  We know from lawyers,
4     Stacey Adair, who was remote -- remember, she wasn't even at
5     LabSolutions.  She said she was involved and that they had
6     compliance training.  And who did the compliance training?
7     Toby Watt.  He put on seminars.
8          They had compliance agreements you had to sign off on.
9     Now, it's easy after the fact for the government to come in and
10    say, you know, that was all B.S.  It wasn't so.  But it was
11    going on, and it went on over and over and over again.
12         And Stacey Adair, she didn't complain to anyone at the
13    time.  She just didn't particularly like that she wasn't given
14    as much responsibility as she wanted.  I think she's the one
15    who said she was waiting for her former boss to come to work at
16    LabSolutions, but he never did.  And then when she found out he
17    wasn't coming, she moved on.
18         And then we moved to -- and those are all what I
19    call -- if you want to look at the exhibits, those are the B
20    exhibits, B-7, B-8, B-9, B-2.  Those all deal with Ms. Adair.
21         All right.  And then we have Amy Roebuck.  Very
22    interesting.  She is a lawyer who was hired to do compliance.
23    She had a lot of complaints.  I guess getting in the building
24    was a big complaint.  She was there for a whole 22 days.  And
25    she was in the middle of the compliance process.

1          Now, I'm going to tie something together that maybe

2     didn't occur to you at the time, but I'm going to explain how

3     this works.

4          She was doing compliance on a guy named Chris.  And

5     when you look at the exhibits, you're going to see a guy named

6     Chris mysteriously appears in July of 2019, and they're doing

7     process audits.

8          Now, who told you that the government was trying to set

9     up Mr. Patel in July of 2019?  Mr. Hirsch.  Do you remember?

10    He was told -- he told you that the government was trying to

11    introduce two new sales reps to Mr. Patel.  And Ms. Roebuck is

12    processing -- she's doing compliance on a guy named Chris.

13         I'm telling you, draw the inference.  That's exactly

14    what was going on.  This was a government setup.  The problem

15    is, it didn't work.

16         We're going to come back to that in just a minute.

17         But Ms. Roebuck told you about Toby Watt, again, about

18    good faith, and she talked about Mr. Watt's qualifications,

19    Harvard grad, healthcare specialist, the whole thing.

20         Again, good faith, good faith.

21         Now, let's move to Mr. Hirsch.

22         Oh, by the way, I don't know if you noticed it.  Maybe

23    you did.  Maybe you didn't.

24         How many times did you hear the four cooperating

25    witnesses say they didn't remember something on direct

1    examination?  Never.  Not once.

2         How many times did they not remember something when I

3    asked them?  Whenever an answer wasn't going to work, it's I

4    don't remember.  Right?  I don't remember.

5         Now, if you think that is coincidental, that's fine.

6    I'm suggesting maybe not so coincidental.  That it's easy when

7    you're the direct examination, but on cross-examination, you

8    don't want to go where I want to take you, you say you don't

9    remember.

10         All right.  So let's go to Mr. Hirsch.  First of all,

11    you didn't have a clue on direct examination that he had a

12    memory problem.  There was nothing that came out.  His health

13    came out.  His health came out.

14         I feel for the man.  Nobody has to go through that.

15    Long COVID.  Sounds like he had a horrible experience.  And I

16    hope he recovers.  But you didn't hear anything about his

17    memory problem on direct.  But on cross-examination, he

18    couldn't remember anything.  No memory.  I don't remember.  I

19    don't know a thing.  I can't -- it's all a fog to me.  It's

20    because of COVID.

21         Maybe it was.  Maybe it is memory from COVID.  Or maybe

22    it's a convenient way not to answer the questions.

23    Particularly, when we -- again, you all are the triers of fact,

24    and I'm only making the suggestions.  I'm not telling you what

25    you have to do.

1            But remember, we went through the whole thing with the

2     woman that supposedly tipped him off about the tape recording

3     and being wired and the pictures, and it's been going on for

4     months.  And I deleted all the pictures.  It was a great story.

5     It was a wonderful story.  Of course, there's nothing at all to

6     back it up, but it's a wonderful story.

7            It's the only explanation he can come up with as to why

8     he said those things on April 5th and April 26th of 2019, all

9     the good things about Minal Patel and LabSolutions.  Otherwise,

10    he looks at the government and says, yeah, you know, I kind

11    of -- I told Lohan all these things were being done right.

12           57 months?  You stay with 57 months.  No reductions for

13    you.  That's what will wind up happening.

14           Okay.  So now we start, which is BH-1.  That's the

15    listing of all the calls.  22 calls of more than one minute.

16    22 of more than one minute from July 5th of 2019 to August 9th

17    of 2019.  78 minutes and 15 seconds' worth of calls.  You can

18    figure it out.  Sometimes my math isn't so good.  But I've got

19    78 minutes and 15 seconds.

20           Did you hear a call -- other than the 30 seconds that

21    we heard about Marc Sporn's name, did you hear one

22    conversation?

23           Now, here's Mr. Hirsch.  He's wired.  The agents are

24    listening.  Remember?  All they want to do is set up Mr. Patel.

25           All they have to do is say, come up with a plan.  What

1    are your directions?  Here's how easy it is.  You know, what

2    are we going to say if they ask us about kickbacks?  What are

3    we going to say if they ask us about paying doctors?

4         All they're looking for is Mr. Patel to say one

5    thing -- one suggestion about what they should say, or

6    admission that it took place, or a concession that it took

7    place.

8         In 22 calls, you don't get a one.

9         Now, what can you infer from that?  That not a darn

10   thing was said that backed up Mr. Hirsch or indicated that

11   Mr. Patel was doing something wrong, because he didn't know

12   that Mr. Hirsch was wired.  He didn't know.

13        And during that is when they're trying to bring this

14   Chris guy in, and that doesn't work either.  So we just ignore

15   the fact that there were all these phone calls.  That is an

16   indication, I suggest, to go back again to good faith.

17        I mean, could you imagine if he had said one thing

18   incriminating?  One thing incriminating.  You would have heard

19   it over and over and over again.  But you didn't.  You didn't

20   because there wasn't.

21        So let's put the memory aside for a minute.  I even

22   asked him what directions he was given.  He couldn't remember

23   what directions he was given.  He couldn't remember anything

24   about the phone calls other than I showed him the list, and he

25   was willing to say that looks like the list.

1          Now what else do we have?  We have an email that

2     Mr. Hirsch sent to Mr. Patel on April 11, 2019, and it's

3     Government Exhibit 1610.  And this was from Mr. Hirsch's call

4     center.  Mr. Morin -- Mr. Morin had talked about the fact that

5     somebody else had been busted, and he was telling Mr. Hirsch --

6     that is, Mr. Morin was telling Mr. Hirsch that you don't have

7     to worry about my call center.  I'm compliant.  I verify.

8          And Mr. Hirsch sent that along to Mr. Patel.  Why?

9     Because he wanted to assure Mr. Patel that it was being done

10    the right way.

11         Take a look at 1610 when you get a chance.  You'll see

12    exactly what I'm talking about.

13         All right.  So now we've talked about corroborators.

14    We've talked about good faith.  We know about compliance.  We

15    know about Mr. Watt.  We know about Griner and medical

16    necessity, commissions, Roebuck.

17         Let's talk about the missing people.

18         Okay.  Here we go.  I actually found these, which is a

19    fete into itself.  Let's go with 124.  This is Government

20    Exhibit 124.

21         Now, you remember seeing this.  XGEN Marketing.  Hmm.

22    Who's XGEN Marketing?  Mr. McKeon, right?  Mr. Orr.  And

23    Mr. Griner had a little bit to do with it.  Where are McKeon?

24    Where's Orr?  Where are they?

25         Remember, this goes back to the burden of proof.  We

1    don't have to present anything.  It's up to the government.  So

2    they give us a chart about money going to XGEN, and they don't

3    call the witnesses from XGEN.

4         Okay.  Let's go to ePay.  Who's ePay Funding?  Dinnen.

5    Did we hear from Mr. Dinnen?  No, we don't hear from him

6    either.  Again, burden of proof.

7         Mr. Hirsch, we heard from him.

8         Mr. Medipak -- Medipak is Mr. Sporn.  So we've heard

9    from those two:  And I've already discussed them.

10        Let's go to Government Exhibit 125.  And now they're

11   tracing all the money, except everybody in there, except

12   Griner, didn't come to trial here.  They're all gone.  They're

13   all missing.  McKeon, XGEN, ePay, Dinnen, BBAR Marketing,

14   Ziros.  No Ziros.  Ziros was a zero.  He didn't come in here.

15        That's my catch phrase for today.

16        Then you have at the bottom -- it's tough to see those.

17   But those are all -- can we clear that up a little bit?

18        Those are all the telemedicine companies.  That's very

19   difficult to read, so let me read it.

20        Tampa Bay Telehealth, doing business as MyOnCallDoc,

21   and you'll look at the MyOnCallDoc, and you'll see that

22   Craig Long is the one from MyOnCallDoc.

23        Did we have anybody from MyOnCallDoc come in and say

24   anything about the illegality of MyOnCallDoc?  Not a soul.  And

25   we know, on MyOnCallDoc -- to go back to Mr. Griner, which is

1    how the government ended its case, because I recalled

2    Mr. Griner.

3         Mr. Griner, on December the 9th, says:

4         "Question:  Do you remember telling agents of the

5    government and prosecutors that once Patel was made aware that

6    Griner used MyOnCallDoc, Patel wanted the company's

7    information.  Patel needed to perform due diligence on

8    MyOnCallDoc.  Patel need the to give the information to his

9    attorney?

10        "Answer:  I don't -- I don't dispute that.  I believe I

11   said something to my effect.  That may be exactly what I said."

12        MyOnCallDoc compliance attorney.  Good faith.

13        KPN Network or KP Network, LLC, a Mr. O'Neil,

14   another -- again, this is a telemed.  Did we hear from

15   Mr. O'Neil?  Not a word.

16        Now, if you're going to prove somebody guilty, and

17   you're going to make allegations that telemedicine and the

18   doctors were doing something wrong, don't you think it might be

19   a good idea if you're trying to prove that beyond a reasonable

20   doubt, that you actually call in someone from the telemedicine

21   company to get on the stand and say, we're so sorry.  We used

22   telemedicine doctors, and they didn't do the right thing.  Not

23   a soul, not a person.

24        LifeMD.  Did we hear from anybody from LifeMD?  No.

25        Mojo Media, LLC.  I'm not even sure what Mojo Media is,

1    but it is on this chart, and there was no one from there

2    either.

3              THE COURT:  You have approximately ten minutes,

4    Mr. Sadow.

5              MR. SADOW:  Thank you, Your Honor.

6              All right.  So we've taken care of Hirsch and the

7    recordings.  We've taken care of all those telemedicine

8    individuals who didn't show up but were called by the

9    government.

10             And let's see.  What else can we discuss?

11             Oh.  And Mr. Rafferty made reference of this, so I

12   think I should probably just touch on it just a little bit.

13   And that would be all the physicians that didn't come to

14   testify, not a one.

15             Government's burden of proof.  Beyond a reasonable

16   doubt.  All you have to do is call a physician and say, boy,

17   I'm really sorry.  I signed off on all of those requisitions,

18   and I shouldn't have done it.  I've made a mistake.  I violated

19   my oath.  I got paid.  And not a one of them showed up.  Not

20   one out of 1,400?  1,400.  Could you get one?  Just one.  Nope.

21             So we don't have any of the telemedicine companies or

22   any of the people that run it.  We don't have any doctors.

23   We're going to rely, according to the government, on Hirsch,

24   Griner, Sporn, and Ramamurthy.  And the beyond a reasonable

25   doubt instruction tells you that beyond a reasonable doubt

 1    means that the evidence or proof is so strong that you would

 2    rely upon it in the most important of your own affairs.

 3         Again, this is all up to you.  We're just talking here,

 4    but would you really make important decisions on the basis of

 5    those four individuals?

 6         If you would, then you should believe what you can from

 7    them.  But if you don't, then you don't take away somebody's

 8    freedom as a result of that.

 9         All right.  Let's talk about the MACs.  You know the

10    MACs.  You know Palmetto, Cahaba, Novitas.  Palmetto is

11    Georgia.  Cahaba is Georgia.  Novitas is Pennsylvania.

12         If you look at Government Exhibit 101, it is going to

13    show you, along with Government Exhibit 115, when things

14    changed.  When the MACs in Georgia moved to the MACs in

15    Pennsylvania.  And you're going to see that most of that took

16    place was in November of 2018, and the reason it starts is

17    because Cahaba, which becomes Palmetto, says what?  You know

18    what.  It says family history is not going to be covered

19    anymore.

20         So what does a businessman do?  He opens a lab in

21    Pennsylvania, which is covered by Novitas.  And Novitas covers

22    family history.  And that's exactly what Mr. Patel did.

23         So when you hear from the experts, the MACs, the LCDs,

24    like Mr. Rafferty said, when you hear from them -- and the MAC,

25    of course, is the Medicare Administrative Contractors -- when

1    you hear from them that family history has never been covered,

2    you say to yourself, when looking at the charts -- this is 115.

3    If it's never been covered, which is the dark blue, how come

4    they paid 116 -- excuse me -- $116 million on family history

5    alone?  This is Medicare, paid $116 million on family history

6    alone.

7              Remember, in the expert -- what's his name?  I forget

8    his name.  But remember, he said these are distinct, they

9    didn't have any combination.  One is personal history, one is

10   family history.  If you're Mr. Patel and you've received

11   from -- some time mid 2016 until August of 2019, approximately

12   $116 million from family history, why wouldn't you believe, in

13   good faith, that family history was covered, a satisfied

14   medical necessity?

15             And did the government show you one document, just one,

16   in which Mr. Patel was written or LabSolutions received a

17   warning that said stop billing for family history.  Okay?  Not

18   one.

19             And then, you know, you remember, and you can look at

20   it.  There's A-4, if you want to look at it.  This was

21   something printed out by LabSolutions to its field agents about

22   this movement from Cahaba to Palmetto.  That was March 27th of

23   '18.  Because Palmetto was only going to cover what?  Personal

24   history.

25             You see the personal history of cancer.  All of which I

1    suggest to you, is very strong indication of good faith.

2          Now, there's other things that I can go over.  I

3    believe, though, I've tried to make my point.  The point is,

4    Minal Patel made a lot of money.  Oh, boy, he made a lot of

5    money.

6          And the government, as they have from the very

7    beginning, are counting on you, as good citizens who -- I hope

8    some of you have made the kind of money like that, but we don't

9    know, but that's a lot of money.  And they're hoping that you

10   say to yourself, you know, there must be something, there must

11   be something illegal, an absence of good faith because he made

12   all this money.

13         And you know he spent the money.  Oh, my goodness.  He

14   made it and he spent it.  He bought a couple of cars.  And he

15   drank champagne once in Miami.  Which I haven't been in Miami

16   in many years, but when I was here, I remember a lot of people

17   drank of champagne.  But I guess that's something the

18   government thinks is really significant, that he drank

19   champagne, and therefore what you've got to find is, he could

20   not have acted in good faith.

21         And I'm suggesting to you that what you have to really

22   go back and say is, you know, some people, fortunately, do make

23   a lot of money, and some people hire lawyers, they pay a lot of

24   money for lawyers because they want to try to do things right.

25         And you want to have a business.  And the business has

1    a lot of employees.  And the employees are working hard,

2    and they get paid well, and we have that in evidence.

3         And there's actually an email in which all the

4    employees back in '17 are listed.  I mean, it was a big

5    operation.  It was a huge operation, and it made a lot of

6    money, and he tried to do it right.  Could it be done better?

7    Things can always be done better.

8         But did he do it without good faith?  Did the

9    government prove beyond a reasonable doubt that this was

10   illegal?  What's their catch line?  The one you're going to

11   hear again is lies for money, lies for money, lies for money.

12        How about this?  How about evidence?  Why don't we do

13   evidence as opposed to nice sayings?  Show us some evidence

14   that Mr. Minal knew.  Not a Ramamurthy, not a Hirsch.  No.  And

15   Griner was good, I gotta tell you, I like Griner.  But not a

16   Sporn.

17        Griner told it to you.  You could tell he was having a

18   hard time.  He really wanted to just stand up and say, wait a

19   second, I followed attorney advice, why am I sitting here?  But

20   he couldn't.  Because he hadn't been sentenced yet.

21        I'm asking you.  I know it's a lot of money, but I've

22   given you a lot of good reasons, I think, to prove beyond a

23   reasonable doubt as to any of those ten charges.

24        Therefore the verdict, only one verdict, is not guilty

25   on all ten charges, and I really appreciate you listening to

1    me.  Thanks.

2            THE COURT:  Thank you, Mr. Sadow.

3            Ladies and gentlemen of the jury, we will now take our

4    final break before I allow you to begin deliberating.  We still

5    have the government's rebuttal to go.  Let us please, once

6    again, leave our notepads in our chairs.

7            This will be a brief break to just use the restroom,

8    five minutes.  We will continue at that time.  You are excused.

9            THE COURT SECURITY OFFICER:  All rise for the jury.

10    (Jury exits at 4:30 p.m.)

11            THE COURT:  All right, everyone.  You may take a quick

12    break, if you need a five-minute break.  We'll start,

13    Ms. de Boer, in about five.  You have just around 30 minutes.

14    Okay?

15            MS. DE BOER:  Thank you.

16            THE COURT:  You got it.

17    (Court recessed at 4:30 p.m.)

18    (Back on the record at 4:42 p.m.)

19            THE COURT:  Ready to go, Ms. de Boer?

20            MS. DE BOER:  Yes, Judge.

21            THE COURT:  Very good.  Let's go ahead and bring our

22    jurors in, please.

23    (Jury enters at 4:42 p.m.)

24            THE COURT:  Ladies and gentlemen, welcome back.  We are

25    going to resume now with the government's rebuttal.  All right?

1          Ms. de Boer, the floor is yours.

2          MS. DE BOER:  Thank you, Your Honor.

3          Ladies and gentlemen, over the last two weeks, you saw

4     a lot of fake documents, fake contracts, fake patient files,

5     but this is not just a fraud case.  You saw a lot of

6     transactions through a web of accounts.

7          This is not just a money laundering case.  You heard a

8     lot of evidence about kickbacks, but not just a kickbacks and

9     bribery case.  All of those things happened.  But the crimes

10    that you have been hearing about for the last two weeks are far

11    from limited to lying, cheating, and stealing.

12         Because this case has been about exploiting people for

13    money.  It has been about exploiting people who have survived

14    cancer, exploiting people who fear cancer, and exploiting

15    senior citizens in order to make money.

16         It's about exploiting people like H.K., who traveled

17    all the way here, to walk up and take that stand and explain to

18    all of you that she never once spoke with any of those 1,400

19    doctors before that test was ordered for her, to explain to you

20    that she felt lucky when she got that call from a telemarketer

21    telling her that she had won dining gift certificates because

22    she never wins anything.

23         And that she thought this test might help her.  But no

24    doctor made that determination.  Because just like so many

25    other patients, including every patient who came in here to

1    testify to you, no doctor was involved.

2         H.K. and every patient who was billed for these genetic

3    tests was all but destined to receive one of these tests the

4    moment that this defendant sat with Shawn Griner and Brett

5    Hirsch at the Boca Beach Resort and hatched this scheme.

6         The moment when the defendant told Shawn Griner to use

7    telemarketing to solicit and target patients.  The moment when

8    the defendant signed contracts that were complete and utter

9    lies, disguising the nature of the marketing so he could

10   convince attorneys to tell other people that this was okay, to

11   get other people involved, like Brett Hirsch, like Shawn

12   Griner, and others.

13        Ladies and gentlemen, the defense has been asking over

14   and over today, for 90 minutes, well, what did Minal Patel

15   actually do?  He signed this contract with Brett Hirsch, one of

16   the contracts that set all of this in motion, ladies and

17   gentlemen.  There's no little X or asterisk here.

18        Minal Patel signed this and he knew what the lies in

19   here were.  So the lies were that Brett Hirsch and others were

20   going to establish relationships with physicians, with doctors'

21   offices, and with other healthcare practices.

22        Ladies and gentlemen, it's fine to pay people to

23   advertise for your lab.  You can pay them based on commission

24   to go to a doctor and say, hey, LabSolutions is a great lab.

25   They're fast.  They're accurate.  You should send your patients

1    to LabSolutions.  That is not what Brett Hirsch and Shawn

2    Griner did.  That is not what Minal Patel asked Brett Hirsch

3    and Shawn Griner to do on that day at the Boca Beach Club.  He

4    didn't ask them to go to doctors' offices and knock on the door

5    and advertise.  He asked them to solicit patients directly.

6         Minal Patel put the model in place.  He put the pieces

7    of the puzzle, like Shawn Griner and Brett Hirsch, in place.

8    He wound the clock, and he doesn't just get to walk away.

9         Because as you know, ladies and gentlemen, the buck

10   stops with him.  He is the one who signed all of these 855

11   forms, time and time again, signature after signature, agreeing

12   he had read them, obligating himself to read them, and agreeing

13   that he would follow the law, that he wouldn't submit false

14   claims, that he wouldn't pay kickbacks.  He knew the rules, and

15   he broke them time and time again.

16        Ladies and gentlemen, just as when you buy a house and

17   you have legal assistance or someone there telling you, here

18   are the places in the contract you need to sign, you still

19   can't lie to the bank to get your mortgage.  Yet Minal Patel

20   lied to Medicare time and time again to get payments.

21        Minal Patel had every opportunity to do the right

22   thing, to run a lab in a legitimate way, to actually advertise

23   his lab's services to physicians' offices in a legitimate way,

24   to use his sales force to do good rather than to take advantage

25   of people.

1          Yet, he still sits here, and through his lawyers,

2     argues that he didn't have a role.  He even goes so far as to

3     argue that this was not fraud at all.  Not only did he know

4     about the telemarketing, about the telemedicine, about the lies

5     to patients, about the absence of involvement of any of these

6     patients' real doctors, he authorized it.

7          He put the model in place.  And he paid people to do

8     these things for him.  And on a daily basis, those individuals

9     whom he paid over $50 million in total took steps to carry out

10    the scheme.  Over the course of over three years, on the backs

11    of thousands and thousands of patients, and through hundreds of

12    millions of dollars in false claims.

13         The contract itself is not the only lie in this case.

14         The defense has been asking, where are the teledoctors?

15    We know what the teledoctors did.  They rubber-stamped these

16    absolutely garbage forms that say nothing about the patient.

17    This is V.H.'s form, and you can find this as Government

18    Exhibit 424-C.  Here's what it said:  That the patient answered

19    call, no questions, no symptoms.  Order lab req. form.

20         H.K.'s form, Government Exhibit 417-C.  Answered call,

21    no symptoms or complaints, order lab req. form.

22         Ladies and gentlemen, I submit to you that there are

23    dozens and dozens and dozens of forms just like this.

24         E.G.'s form, exactly the same, answered call, no

25    particular symptoms or complaints, will order lab req. form.

1          So ladies and gentlemen, you don't need to hear it from

2     the teledocs when you have all of the evidence of what they

3     were doing, which was nothing at all.  And if you want more,

4     you can open up Government Exhibit 446.  That's a hard drive

5     that contains additional patient files just like this one.

6          So folks, when you go back to the jury room, play a

7     game.  It's called pick a file, any file, and you will see the

8     same fake information time and time again, just like for the

9     patients we focused on.

10          So we marched several Medicare beneficiaries up here to

11     testify to you.  If we were to bring in all 62,000, we wouldn't

12     just be here until Hanukkah or Christmas or New Year's, we'd be

13     here for months, ladies and gentlemen.  How many people do you

14     need to hear say the exact same thing, that they received a

15     call, that they were solicited, that they didn't speak to a

16     doctor, and that this test in no way helped them?

17          So ladies and gentlemen, you were asked a little bit

18     about the calls in this case, the telemarketing calls.  One

19     thing the defense didn't focus on is how the patients were

20     induced, how they were offered gift cards to lower their

21     resistance.

22          And this gets back to what Ms. Gurskis talked to you

23     about, about targeting patients who had low resistance,

24     targeting the low-hanging fruit and breaking down the

25     resistance to get them to agree to do something that they

1    didn't need without the input, without the consultation of

2    their own doctor who knows them and can help them make the

3    right healthcare choices for themselves.

4         So ladies and gentlemen, when you hear about concepts

5    like good faith, ask yourselves, was Minal Patel acting in good

6    faith when he signed the lies in that contract or directed

7    others to sign them over and over again?

8         Was he acting in good faith when he hired people like

9    Brett Hirsch, like Shawn Griner, like Marc Sporn, to lie to

10   patients on the phone?

11        Was he acting in good faith when he hired people like

12   Senthil Ramamurthy to go find people in train stations, go use

13   the free cell phone guys to market to patients?  Go swab people

14   outside a Walmart parking lot.  Ladies and gentlemen, that is

15   not good faith.  That is sending tests in search of patients,

16   and that is turning legitimate healthcare completely upside

17   down.

18        So, folks, when you view the evidence in this case, use

19   your common sense.

20        Now, you've heard a little bit about the difference

21   between personal history and family history in the defense's

22   closing.  This case is not about personal versus family

23   history.

24        The entire point is that people with a personal or

25   family history of cancer were taken advantage of, and their

1   prior cancer or their family's prior cancer diagnosis was used

2   in order to justify bills to Medicare.

3        This case is about removing real doctors from the

4   equation and substituting in rubber stamps who are bought and

5   paid for by the defendant and his marketers.

6        There is nothing complicated -- no matter how many LCDs

7   that the defense wants to point to, there is nothing

8   complicated about the fact that Medicare requires a treating

9   physician to be the one to make the decision about whether a

10  patient needs a test, and that Medicare requires that the

11  treating physician intend to use this test in the treatment of

12  a patient.

13       There is nothing complicated about the fact that unless

14  these tests are used to help these patients in some way, they

15  are utterly wasted, and they are fraudulent.

16       The defense brought up some of the former employees:

17  Stacey Adair and Ms. Roebuck, who came to testify.

18       Stacey Adair was in charge of sales and compliance, and

19  she didn't know that the marketers were directly marketing to

20  patients.  She would do trainings for the marketers about these

21  tests and then would hear questions about call centers.  And

22  she did raise those questions to Jon Berarducci, and nothing

23  happened, so she left.  Because she was concerned with the

24  direction of the marketing at LabSolutions.

25       Amy Roebuck, the compliance officer, also didn't know

1   how LabSolutions got its patients.

2          So ladies and gentlemen, was Minal Patel acting in good

3   faith by keeping his best employees in the dark about what was

4   actually happening on the other side of the curtain.

5          So let's talk about the legal advice at issue in this

6   case.  No one disputes that Minal Patel paid attorneys.  No one

7   disputes that attorneys were consulted.  If an attorney

8   reviewed that contract, they would be relying on lies.  They

9   would be relying on a faulty description of what the marketers

10  were doing to say that commissions were okay.

11         The payment itself -- the financial structure becomes

12  an issue when you are paying in exchange for patient referrals.

13  It's not just paying for advertising that's a problem.  It's

14  paying for patients.  That's a problem.  And that's what

15  Minal Patel did, and that's what the contracts disguised.

16         A number of the cooperating witnesses spoke to you

17  about the attorneys that were involved in this matter, and they

18  told you that the defendant said over and over again that he

19  was taking things to his attorneys.

20         Ladies and gentlemen, Shawn Griner, Brett Hirsch,

21  Marc Sporn, Senthil Ramamurthy did not need a lawyer to tell

22  them that lying to Medicare patients is wrong.  They did not

23  need a lawyer to tell them that lying to Medicare is wrong.

24  They did not need a lawyer to tell them that taking a patient's

25  real doctor out of the equation and substituting in a rubber

1    stamp that's paid for is wrong.  That is common sense.

2         All of the cooperating witnesses that you've heard from

3    in this case, Hirsch, Sporn, Ramamurthy, Griner, the government

4    did not take a tour around the world and select individuals

5    that we wanted to put before you.  We are not the ones who

6    picked these witnesses.  The defendant picked these witnesses

7    by partnering with them, by contracting with them, by dealing

8    with them, by giving them instructions on how to get patients,

9    by paying them millions and millions of dollars.

10        The defendant picked who would be the front-row people,

11   the front-row witnesses to this crime, and we brought them to

12   you.  And for several days, each of them took that chair.  They

13   took an oath, and they owned up.

14        Despite everything the defendant tried to mask over

15   under the so-called advice of attorneys, they saw right from

16   wrong, and they came in here and they told you what they did.

17   And they told you what they did with the defendant.

18        So ladies and gentlemen, the defense can call these

19   witnesses any name under the sun, but the defendant is the one

20   who chose to work with these people from day one, all the way

21   from 2016 until the end of the conspiracy.

22        When you're evaluating the charges in this case, as the

23   judge has told you, as Ms. Gurskis told you, and as the defense

24   reminded you, you are to evaluate whether the government has

25   proven its case beyond a reasonable doubt.

1        And we told you on the very first day of the trial that

2   that is a burden that we embrace.  And ladies and gentlemen,

3   you don't leave your common sense at the door when you evaluate

4   these charges.  You know that taking advantage of people the

5   way H.K., the way E.G., W.H., W.I. were taken advantage of was

6   wrong.

7        Don't leave that common sense at the door.  And ask

8   yourself:  Did Minal Patel leave any reasonable doubt in the

9   minds of Brett Hirsch and Shawn Griner when he told them, go

10  use call centers?

11       Did he leave any reasonable doubt in the mind of Rama,

12  when he told Rama, go find the cell phone people that market

13  free phones?

14       Did he leave any reasonable doubt in the minds of the

15  thousands of Medicare beneficiaries who were tricked and duped

16  into taking one of these tests?

17       Ladies and gentlemen, I know you have a lot of charges

18  to decide in this case, and I just want to make one logistical

19  note for you.

20       Counts 2 through 4 are the substantive healthcare fraud

21  counts.  All of the information that you need to decide those

22  counts is contained in Government's Exhibit 2, 3, and 4.  So

23  Counts 2, 3, and 4 line up with Government's Exhibits 2, 3, and

24  4.

25       Same thing for the kickback substantive counts, 6, 7,

1    8, and 9, they line up with Government's Exhibits 6, 7, 8, and

2    9.  So when you're looking for information pertaining to those

3    charges, you can find them easily in those particular exhibits.

4         One of the things that's been discussed is the

5    deliberate ignorance instruction and what it means to know a

6    fact.  And there's two ways to know a fact.  You can have

7    actual knowledge of a fact.

8         So, for example, when Minal Patel went to

9    Brett Hirsch's office, and he overheard and listened to the

10   telemarketers using that bogus script to trick people into

11   taking tests, he had actual knowledge of what was said on those

12   calls.

13        When Minal Patel went into the shipping room at Marc

14   Sporn's office, and he saw containers and boxes stacked up with

15   LabSolutions' kits, he had actual knowledge that Marc Sporn was

16   operating a spit farm.

17        And when Minal Patel was shown the telemedicine portal

18   where he could see prefilled test requisitions with particular

19   tests already checked off, he had actual knowledge that doctors

20   were rubber stamps.

21        And when he sat down at dinner with Marc Sporn, and

22   Marc Sporn told him it was physically impossible for doctors to

23   sign off on the number of tests that they were signing off on,

24   he had actual knowledge that this was a sham.

25        But, ladies and gentlemen, Minal Patel was not the one

1   who personally called thousands and thousands of Medicare

2   beneficiaries.  He did not personally call H.K. and offer her a

3   gift card, or any of the other beneficiaries at issue.

4          But, folks, deliberate ignorance means you can't stick

5   your head in the sand.  You can't cover your ears and go la,

6   la, la, la to everything that's happening around you or

7   everything that you put into motion.

8          So deliberate ignorance means, if he set it up, if he

9   asked for it to happen, he knew.  And that's what the evidence

10  has shown in this case.

11         So he can blame the doctors for checking off on the

12  patient files that he wanted them to sign.  He can blame his

13  lab director for allowing him to bill exactly what he wanted to

14  bill.  He can blame Brett Hirsch.  He can blame Shawn Griner.

15  He can blame anyone around him.

16         But he knew, and he deliberately ignored signs time and

17  time again.

18         So, ladies and gentlemen, what you have seen throughout

19  this case is that Minal Patel was motivated by how lucrative

20  these tests could be.  That's what he told Brett Hirsch at the

21  very beginning.  That's what he sent to Brett Hirsch, to show

22  to Rama, an EOB explaining how much money could be made off of

23  these tests.

24         He wanted the success.  He wanted the fortune.  He

25  wanted to drive the Ferrari.  He wanted to drop thousands of

1    dollars at the Boca Beach Club.  He wanted to drop thousands of

2    dollars at the Setai Hotel.  That's what he wanted.  And this

3    was his way to get that.

4         This crime was a choice.  He did not have to do any of

5    this.  It was nothing but intentional.

6         What happened was beyond one simple criminal act.  It

7    took Minal Patel assembling all of the pieces of the puzzle and

8    all of these other people, like Brett Hirsch, Shawn Griner,

9    Senthil Ramamurthy, Marc Sporn, and many others to participate

10   and go along with it.

11        It takes more than one person to steal hundreds of

12   millions of dollars from Medicare.  It takes all of these

13   people working together, and that is why this was a conspiracy.

14        This is not something that could have been accomplished

15   by accident.  This is not something that could have been

16   accomplished on a mistake.  Every single bill that was

17   submitted that was a lie was a choice, and it didn't have to

18   happen.

19        So, ladies and gentlemen, on behalf of myself and all

20   of the attorneys and agents who have been here on behalf of the

21   United States, it has been our pleasure to present this case to

22   you.

23        Today, we have highlighted just some of the evidence

24   that you have seen over the last two weeks.  We don't have time

25   to take you through every shred of evidence or what every

1    single witness said.

2         So when you go back to the jury room and you begin to

3    deliberate about the charges in this case, don't just think

4    about what we've said today.  Think about what we didn't say.

5    Because proof beyond a reasonable doubt is wherever you find it

6    in this evidence.  You are the jury.

7         Ladies and gentlemen, this scheme ended with

8    $463 million billed to Medicare and $187 million paid out to

9    LabSolutions and $22 million in the pocket of the defendant.

10         But this case does not end until you render your

11    verdicts.  The only verdict that is just, the only verdict that

12    is right, and the only verdict that is consistent with all of

13    the evidence that you have heard in this case is a verdict of

14    guilty on each and every count.

15         Thank you.

16         THE COURT:  Thank you, Ms. de Boer.

17         Ladies and gentlemen of the jury, at this time, here is

18    the plan that the Court envisions.  It is 5:00 o'clock, but it

19    is important for me to give you an opportunity to get settled

20    in and get started.

21         I don't want to keep you much later.  But I would like

22    to give you right up until 6:00 o'clock.  I'm going to give you

23    one hour to go through everything you have in front of you, get

24    your first opportunity to organize your thoughts, obviously

25    select a foreperson, and begin the deliberation process.

1          No matter what, we're going to stop at 6:00.  I'm going

2   to send you all home.  We're going to start tomorrow at

3   10:00 a.m., a little bit later, and you guys are going to

4   continue deliberating as long as you need to.  Okay?

5          But I want to give an opportunity, because things are

6   fresh in your head and you've been building up in your mind all

7   your thoughts, to at least get in the room and set the table,

8   figure out what you want to do, your timelines, start going

9   through the evidence, and I want that to start now.

10          Now, two of you have been serving as alternates.  And I

11   also felt that it would be unfair to keep you here any longer.

12   But I wanted to go ahead and give you guys, both, Ana Madriz

13   and Marline Moncher, the news that your service has, for now,

14   come to an end.

15          But very important words I need to share with you.

16   Although you are the alternates, I am not discharging you at

17   this point.  You are simply not going to continue in the

18   deliberation process.  Your service has ended today as it

19   pertains to going to the jury room.  But you are on call.

20          That means I cannot have the two of you as my

21   alternates discussing anything with anyone about this case

22   until I call you and formally discharge you.  Why would I do

23   that?  There could be a situation where another juror, for

24   example, is unable to continue deliberating for whatever

25   reason:  an emergency, heaven forbid something happens, right?

1        I need to be able to call one of those alternates back

2    in to continue to deliberate.  So until I call and discharge

3    you, you are on standby.  Do not discuss the case with anyone

4    else.  Do not do any research.  Do not engage in discussions

5    with family and friends about the case.

6        Certainly stay off social media.  But both, Ana Madriz

7    and Marline Moncher, when I excuse the remaining jurors, you

8    stay behind because I am going to give you guys some

9    certificates and some further instructions.

10       The rest of you, however, are going to get the chance

11   to begin deliberating now, as I said, for the next hour.  I'm

12   going to send back there both a copy of the verdict form and a

13   copy of the indictment.  Okay?

14       You're also going to hear a knock on the door.  My

15   courtroom deputy will take back all of the exhibits.  I'm going

16   to have the lawyers sit down, make sure we have all the

17   paperwork, everything we need.  We're going to get that back to

18   you as well.  All right?

19       And that way, you guys can start having your

20   discussions and in about an hour or so we'll break and resume

21   tomorrow.

22       Everyone understand?

23       THE JURORS:  Yes.

24       THE COURT:  All right.  Very good.

25       So with that being said, one final thing I will tell

1    you.  And my courtroom deputy will handle this when you go back

2    there.

3           Although I have permitted you throughout deliberations

4    to have your phones on you, one of the procedures that I employ

5    when folks go into the deliberation room is I ask you for your

6    cell phones, and I hold them in my chambers while you're

7    deliberating.

8           You are permitted, if you want to send a text to

9    anyone, family or friends, that you're going to begin

10   deliberating, and that you're not going to have your cell

11   phone.  You can do that.  You can give them my name, and they

12   can call my chambers if there's an emergency.  We have your

13   phone safe.  If one rings off the hook, we'll come and get you.

14          So feel free to send that message.  Of course, don't

15   discuss the case.  But you're free to say to anybody you're

16   going to deliberate, and you're out of pocket.  Plan ahead

17   tomorrow when you return tomorrow at 10:00 to let family and

18   friends know the judge is going to have your phones.

19          I know you guys will follow the rules, and I trust you.

20   But in the abundance of caution, I can't run the risk that

21   someone begins to search on the phone when you're all together

22   in there trying to figure out on Google what something means or

23   look up what something means in the case.

24          You have to focus on the evidence.  I do this for the

25   protection of the proceedings.  I hope you understand that.

1          So when my courtroom deputy takes you back there, after

2     you send a text to families saying you'll be done in about an

3     hour, make sure you give her your phone.

4          When you go to leave, we will give you all your phones

5     back.

6          Do you all understand?

7          THE JURORS:  Yes, sir.

8          THE COURT:  So everyone other than Ms. Madriz and

9     Ms. Moncher, everybody else at this time, you are excuse to

10    begin your deliberations.

11         Thank you very much.

12         THE COURT SECURITY OFFICER:  All rise.

13         (Jury exits at 5:11 p.m.)

14         THE COURT:  All right.  The two of you, I want to thank

15    you again.  Again, remember my rule.  I may need to call on

16    you.  Okay?  But I don't need to keep you any longer.  You're

17    free to go home.  Thank you so much for your service.  We will

18    call you the minute we know what's going on, let you know when

19    you're formally excused.  Okay?  It's been a pleasure having

20    you guys here.

21         I'm going to have my courtroom deputy hand you your

22    certificates as well.  Thank you so much for your service.  If

23    you'd like, give your notepads to Gracie.  We'll hold on to

24    them and secure them.  In the event we don't need them, we'll

25    destroy them.

1          All right, everyone.  Please be seated.  Thank you very

2     much.  At this time we'll go and take a recess.  As I stated,

3     we'll keep them here just a little over 45 minutes and let them

4     get started.  I will ask that you all meet and confer and

5     confirm that the universe of exhibits that we have streamlined

6     is correct so that my courtroom deputy may take it back to the

7     jury room.

8          And of course, if we don't have numbers for you all,

9     before we break today, please make sure you provide some so we

10    can reach you in the event you decide to step away.  As I

11    stated, tomorrow we will resume at 10:00 a.m.  I will just

12    ask -- you don't have to have the full team here.  As long as I

13    think it would be good to have somebody present so the jurors

14    can see you all before they go back in.  So whatever you guys

15    want -- it could just be one of you.  It doesn't matter.

16         MR. SADOW:  There's a question that we have.

17         THE COURT:  Sure.

18         MR. SADOW:  It would appear, not for publication, that

19    we have worked out a disposition on the case that was going to

20    go six to eight months.

21         THE COURT:  Oh, that's the other one, you mean?

22         MR. SADOW:  Yes.  One of us, as in Don or I, need to be

23    back here first thing on Wednesday morning.  Now, assuming

24    there's no verdict, would it be okay, as long as we have the

25    client's permission, for one of us to be here?

1          THE COURT:  Absolutely.  I don't think I need to draw

2     attention to it.  I won't tell the jurors or anything.  They're

3     going to be just fine.  I have no problem with that at all.

4          MR. SADOW:  Thank you.

5          THE COURT:  Absolutely.

6          Like I said, tomorrow I'll leave it up to you guys.  I

7     just think it's good that they see someone from each team

8     before they go back in.  That's all.  It can be whoever it is.

9     Same with the government.

10          MR. SADOW:  We voted.  Mr. Rafferty will be the face of

11     the defense.

12          THE COURT:  He drew the short straw.  He gets to stay

13     behind.  All right.  Very good.

14          What we'll do is we'll have everybody come back at

15     10:00.  Let's just double-check any documents.  Gracie will

16     come out here in a moment and send them back.  We'll see you

17     guys in about 45 minutes.

18          MR. SADOW:  Are you going to give them digital?  How

19     are they going to see digital?

20          THE COURT:  We tend to have a secure laptop which I

21     have always used.  It has no connection to Wi-Fi, it's just to

22     play CDs or play any removable drives.  That'll work.

23          MS. DE BOER:  Exactly.

24          THE COURT:  We have that and I don't have a problem

25     with that.  That typically goes back.  It's a sanitized laptop

1    is what it is.

2         MR. SADOW:  Big screen?

3         THE COURT:  Unfortunately, we don't have a big screen

4    in the jury room.  They can crowd around the laptop.  But they

5    can at least see it.

6         MR. SADOW:  Thank you.

7         THE COURT:  You got it, guys.  I'll step off here.

8    Gracie will be back in just a moment.

9         MS. DE BOER:  Thank you, Your Honor.

10        THE COURT:  You got it, guys.

11        (Court recessed at 5:15 p.m.)

12        (Back on the record at 6:05 p.m.)

13        THE COURT:  Please be seated, everyone.  Let's go ahead

14   and round up our jurors.

15        (Jury enters at 6:05 p.m.)

16        THE COURT:  Please be seated, everyone.  All right,

17   ladies and gentlemen.  As promised, I don't want to take you

18   any later.  It's getting a little dark outside.

19        I want to get everybody home.  So I hope you've been

20   able to at least get started, which is what the purpose of that

21   was, to get you all in the room since you've been together for

22   the last two weeks and haven't had a chance to speak to each

23   other about your thoughts, as you should have waited until now

24   to do so and I know you have, so I'm glad we got started.

25        So the plan tomorrow is very simple.  We'll have you

1   check in by 10:00, so I need everyone here at 10:00.  I'm going

2   to bring you out, make sure I have a head count and I'll send

3   you right back in and let you guys continue to deliberate.

4           Everything is still going to be in the room.  We're

5   going to seal the room tonight.  So you can leave everything as

6   it is, your notes, everything like that.

7           I'll get you guys some coffee in the morning.  One

8   thing that I plan on doing is to the extent that we get into

9   the lunch hour, I will speak with my CRD.  We'll get lunch for

10  you all and we'll bring it to you in the jury room so you can

11  deliberate while you have lunch as well.  Okay?

12          So I hope everyone has a wonderful evening.  Thank you

13  guys for your attention.  We'll see you all in the jury room by

14  10:00 a.m. tomorrow.  You are excused.

15          THE COURT SECURITY OFFICER:  All rise.

16      (Jury exits at 6:07 p.m.)

17          THE COURT:  All right.  Please be seated, everyone.

18  Okay.  I don't believe we have much in the way of housekeeping.

19  As I stated before we broke last, whoever wants to come in on

20  behalf of the government and the defense, as long as we have

21  somebody here, is fine by me.  Just so they can check in.

22          As soon as they get in, we'll send them back to the

23  jury room, make sure we have numbers for you all to the extent

24  you guys stray and want to go ahead and get out of the

25  building, we have a way to reach you in the event we have a

1    juror question or something to that extent.

2            Any other issues from the government before we wrap up?

3            MS. DE BOER:  Just that the laptop hasn't been sent

4    back yet.  There was some kind of password that we have to get

5    from IT.  I doubt they needed it in the last 45 minutes so

6    we'll get it fixed overnight and we'll send it back.

7            THE COURT:  Perfect.  Get it to them tomorrow and we'll

8    have Gracie send it back.  Very good.

9            Anything on the defense side?

10           MR. SADOW:  No, we're good.

11           THE COURT:  Okay, guys.  Thank you very much.  We'll

12   see you all at 10:00 a.m. tomorrow.  We're in recess.

13       (Court recessed at 6:08 p.m.)

14                    C E R T I F I C A T E

15

16

17           I hereby certify that the foregoing is an

18   accurate transcription of the proceedings in the

19   above-entitled matter.

20

DATE:  December 13, 2022 /s/Ilona Lupowitz
21                              ILONA LUPOWITZ, CRR, RPR, RMR
                               Official Court Reporter
22                              United States District Court
                               299 East Broward Boulevard
23                              Fort Lauderdale, Florida 33301
                               (954) 769-5568
24

25

## $

**$10** [1] - 113:7
**$10,000** [6] - 52:23, 97:2, 97:23, 99:23, 99:25, 128:25
**$100** [1] - 139:16
**$116** [3] - 184:4, 184:5, 184:12
**$187** [3] - 106:14, 130:2, 201:8
**$200,000** [2] - 171:18, 172:1
**$21** [1] - 113:5
**$22** [1] - 201:9
**$263,000** [1] - 158:23
**$320,000** [1] - 158:19
**$460** [1] - 139:15
**$463** [1] - 201:8
**$5,000** [4] - 20:10, 124:7, 124:9, 124:11
**$50** [1] - 191:9

## '

**'17** [1] - 186:4
**'18** [1] - 184:23
**'79** [1] - 54:5
**'90s** [1] - 169:6
**'vetted'** [1] - 168:1

## /

**/s/Ilona** [1] - 210:20

## 1

**1** [11] - 1:7, 75:25, 76:8, 81:19, 86:8, 98:16, 99:6, 108:12, 109:5, 109:14, 123:11
**1,000** [1] - 149:22
**1,400** [3] - 182:20, 188:18
**1,492** [2] - 149:1, 149:2
**10** [5] - 76:23, 76:25, 81:19, 98:8, 99:6
**100** [2] - 9:8, 32:13
**101** [1] - 183:12
**102** [1] - 173:15
**104** [1] - 2:12
**105** [1] - 45:11
**108** [1] - 45:11
**1092** [1] - 45:8
**1094** [1] - 45:8
**10:00** [8] - 202:3, 204:17, 206:11, 207:15, 209:1, 209:14, 210:12
**10:07** [1] - 48:22
**10:30** [1] - 5:25
**11** [3] - 1:6, 158:21, 179:2
**11111** [1] - 120:2

**115** [2] - 183:13, 184:2
**116** [1] - 184:4
**117** [1] - 60:9
**1170** [1] - 2:6
**11:00** [1] - 5:25
**11:19** [1] - 48:23
**11:30** [1] - 55:19
**11:43** [1] - 69:16
**12** [2] - 1:4, 155:14
**124** [2] - 179:19, 179:20
**1247** [1] - 23:5
**125** [1] - 180:10
**12:45** [3] - 14:5, 14:23, 15:20
**12th** [1] - 162:11
**13** [1] - 210:20
**130** [1] - 45:7
**132** [1] - 42:7
**1320a-7b** [1] - 91:10
**135** [1] - 2:12
**14** [1] - 156:5
**1400** [1] - 1:16
**15** [4] - 16:15, 173:25, 177:17, 177:19
**155** [2] - 2:13, 171:19
**158** [1] - 62:6
**1610** [2] - 179:3, 179:11
**18** [2] - 93:6, 93:21
**1848** [1] - 11:11
**1848-A** [1] - 11:11
**187** [1] - 54:6
**187.3** [5] - 104:1, 113:3, 130:2, 130:4, 130:5
**189** [1] - 2:13
**19-80181** [1] - 3:3
**19-CR-80181-RAR-1** [1] - 1:2
**190** [1] - 54:6
**1956(a)(1)(b)(i** [1] - 93:21
**1956(a)(1)(i** [1] - 93:6
**1957** [1] - 93:21
**1975** [1] - 93:6
**1985** [1] - 45:5
**1989** [1] - 45:12
**1998** [1] - 45:8
**19th** [1] - 11:20
**1:00** [1] - 4:7, 4:16, 8:21, 8:25, 9:8, 11:4, 14:2, 14:6, 14:7, 15:21, 69:11
**1:20** [1] - 69:17
**1:22** [1] - 71:2

## 2

**2** [16] - 43:15, 44:4, 52:8, 76:3, 86:6, 86:9, 99:1, 123:21, 123:23, 124:4, 124:5, 124:7, 197:20, 197:22, 197:23

**2/19** [2] - 171:22, 171:23
**20** [4] - 49:8, 49:21, 165:19, 173:25
**20,000** [3] - 145:23, 145:24, 146:12
**200** [2] - 147:5, 147:25
**2000** [1] - 45:14
**20005** [1] - 1:16
**2000s** [1] - 169:9
**201-A** [2] - 145:15, 146:15
**201-B** [2] - 145:15, 146:15
**201-C** [2] - 145:15, 146:16
**2011** [2] - 45:10, 147:2
**2014** [2] - 147:1, 147:2
**2016** [3] - 51:12, 184:11, 196:21
**2017** [3] - 158:23, 162:6, 162:11
**2018** [1] - 183:16
**2019** [11] - 11:11, 158:24, 171:21, 171:23, 175:6, 175:9, 177:8, 177:16, 177:17, 179:2, 184:11
**2020** [2] - 165:20, 167:15
**2021** [1] - 45:7
**2022** [4] - 1:4, 60:9, 62:6, 210:20
**2052** [1] - 1:19
**21,876** [1] - 153:15
**217** [1] - 45:13
**22** [5] - 106:14, 174:24, 177:15, 177:16, 178:8
**2400** [1] - 2:6
**25** [2] - 67:16, 67:24
**260** [1] - 1:18
**26th** [2] - 156:16, 177:8
**27,000-plus** [1] - 130:22
**27th** [1] - 184:22
**29** [9] - 7:14, 9:10, 10:8, 10:14, 10:25, 50:21, 53:17, 53:18, 53:24
**299** [2] - 1:23, 210:22
**29s** [1] - 54:8
**2:51** [1] - 131:20
**2:54** [1] - 134:11

## 3

**3** [8] - 76:3, 99:2, 123:21, 124:9, 150:7, 197:22, 197:23
**30** [7] - 103:2, 134:7, 134:25, 135:14, 148:2, 177:20, 187:13
**30303** [1] - 1:19
**30305** [1] - 2:4
**30309** [1] - 2:7
**3131** [1] - 2:3
**3301** [1] - 1:24
**33301** [1] - 210:23
**35** [2] - 135:1, 135:14

**38** [4] - 18:19, 18:20, 43:8
**386** [2] - 50:21, 55:13
**3:06** [2] - 134:12, 134:15
**3d** [2] - 45:8, 45:13

## 4

**4** [13] - 52:8, 86:6, 86:10, 99:2, 123:11, 123:22, 123:23, 124:11, 150:7, 197:20, 197:22, 197:23, 197:24
**417-C** [1] - 191:20
**42** [1] - 91:10
**424-C** [1] - 191:18
**446** [1] - 192:4
**45** [4] - 134:6, 206:3, 207:17, 210:5
**463.8** [1] - 129:25
**4:00** [1] - 4:17
**4:30** [2] - 187:10, 187:17
**4:42** [2] - 187:18, 187:23

## 5

**5** [12] - 62:5, 76:12, 76:21, 81:19, 91:3, 92:24, 99:5, 99:6, 99:7, 124:24, 125:1, 125:21
**50** [1] - 143:20
**50-page** [1] - 150:22
**57** [4] - 156:6, 156:18, 177:12
**587** [1] - 54:5
**5:00** [1] - 201:18
**5:11** [1] - 205:13
**5:15** [1] - 208:11
**5th** [2] - 177:8, 177:16

## 6

**6** [9] - 60:9, 76:16, 91:6, 93:2, 99:16, 127:4, 127:11, 197:25, 198:1
**601** [1] - 164:17
**61,000** [2] - 173:22, 173:25
**61,000-plus** [1] - 173:17
**61,647** [1] - 173:14
**610-A** [1] - 164:17
**62,000** [1] - 192:11
**623** [1] - 166:14
**639** [1] - 45:9
**650-A** [1] - 164:17
**653** [1] - 42:7
**665-A** [1] - 164:18
**68** [1] - 45:4
**6:00** [2] - 201:22, 202:1
**6:05** [2] - 208:12, 208:15
**6:07** [1] - 209:16
**6:08** [2] - 1:5, 210:13

**6th** [1] - 61:7

## 7

**7** [5] - 99:16, 127:4, 127:15, 197:25, 198:1
**71** [1] - 45:5
**72** [1] - 45:5
**730** [1] - 45:6
**741** [1] - 45:6
**760** [1] - 45:4
**769-5568** [2] - 1:24, 210:23
**774** [1] - 45:9
**78** [2] - 177:17, 177:19
**781** [1] - 45:9

## 8

**8** [6] - 99:16, 127:4, 127:17, 127:23, 198:1
**8,000** [1] - 157:24
**82** [1] - 45:10
**823** [1] - 45:13
**835** [1] - 45:13
**855** [4] - 7:6, 21:22, 21:24, 190:10
**855s** [3] - 22:3, 51:6, 128:20
**869** [1] - 23:5
**871** [1] - 45:11
**8th** [1] - 1:16

## 9

**9** [10] - 76:16, 91:6, 93:2, 99:16, 127:4, 127:23, 147:4, 147:6, 198:1, 198:2
**90** [10] - 15:3, 15:9, 55:21, 55:22, 55:25, 70:9, 101:11, 115:16, 116:8, 189:14
**954** [2] - 1:24, 210:23
**988** [1] - 45:6
**9:00** [1] - 5:24
**9:05** [1] - 1:5
**9:19** [1] - 12:20
**9:23** [1] - 15:24
**9th** [2] - 177:16, 181:3

## A

**A-4** [1] - 184:20
**a.m** [10] - 1:5, 12:20, 15:24, 48:22, 48:23, 69:16, 202:3, 206:11, 209:14, 210:12
**abets** [2] - 81:4, 81:7
**abetted** [3] - 76:4, 76:17, 123:13
**abetting** [2] - 122:19, 122:24
**abide** [5] - 110:9, 111:17,

117:14, 126:24
**ability** [1] - 74:14
**able** [11] - 12:12, 14:14, 14:21, 26:18, 27:22, 47:19, 112:3, 128:13, 137:17, 203:1, 208:20
**above-entitled** [1] - 210:19
**abrupt** [1] - 92:14
**absence** [5] - 21:7, 155:2, 155:3, 185:11, 191:5
**absent** [2] - 21:11, 118:13
**absolutely** [10] - 9:9, 40:22, 103:4, 110:6, 110:7, 141:8, 141:11, 191:16, 207:1, 207:5
**abundance** [1] - 204:20
**accept** [5] - 31:16, 54:1, 74:1, 75:17, 166:10
**access** [3] - 22:9, 22:12, 117:6
**accident** [3] - 79:3, 122:12, 200:15
**accompany** [1] - 124:19
**accomplice** [4] - 78:13, 155:19, 155:20, 157:6
**accomplices** [1] - 78:10
**accomplish** [6] - 82:21, 90:3, 90:13, 92:16, 93:20
**accomplished** [3] - 37:19, 200:14, 200:16
**accomplishing** [1] - 90:9
**according** [1] - 182:23
**account** [1] - 128:22
**accountable** [2] - 137:19, 141:10
**accounted** [1] - 69:18
**accounts** [6] - 52:24, 95:7, 99:15, 106:17, 129:2, 188:6
**accurate** [6] - 74:1, 111:4, 111:19, 119:13, 189:25, 210:18
**accurately** [1] - 74:14
**accused** [1] - 139:6
**acquit** [1] - 154:16
**Acquittal** [1] - 55:13
**acquittal** [2] - 53:20, 53:24
**Act** [1] - 96:1
**act** [24] - 72:23, 79:21, 79:24, 81:1, 82:9, 83:11, 85:15, 87:24, 88:14, 89:12, 89:23, 90:7, 90:8, 90:11, 91:1, 93:8, 94:10, 98:1, 122:22, 127:9, 138:22, 200:6
**acted** [13] - 28:2, 29:10, 35:23, 37:10, 80:3, 80:5, 84:4, 87:2, 92:2, 116:1, 154:23, 155:9, 185:20
**acting** [5] - 81:3, 193:5, 193:8, 193:11, 195:2
**action** [3] - 84:23, 87:6, 123:9

**activities** [1] - 95:23
**activity** [15] - 40:2, 84:18, 93:5, 94:20, 94:21, 96:4, 96:8, 96:9, 96:13, 96:14, 96:15, 97:1, 97:13, 97:14, 169:6
**acts** [7] - 81:6, 81:9, 81:11, 84:20, 89:19, 122:23, 122:25
**actual** [15] - 20:4, 20:12, 20:19, 23:8, 52:18, 52:22, 73:19, 104:11, 110:18, 112:18, 198:7, 198:11, 198:15, 198:19, 198:24
**ad** [1] - 174:2
**Adair** [8] - 116:22, 116:24, 161:22, 174:4, 174:12, 174:20, 194:17, 194:18
**add** [7] - 21:18, 24:3, 28:12, 38:7, 46:8, 56:9, 65:16
**adding** [6] - 17:21, 28:11, 36:6, 36:9, 37:1, 39:14
**addition** [1] - 106:1
**additional** [3] - 86:13, 123:6, 192:5
**address** [6] - 10:14, 11:1, 19:10, 46:21, 53:8, 120:3
**addressed** [2] - 47:8, 47:14
**addressing** [1] - 56:15
**adds** [2] - 17:9, 18:11
**adequate** [1] - 54:2
**adhering** [1] - 150:21
**Administrative** [1] - 183:25
**admissible** [1] - 54:1
**admission** [1] - 178:6
**admit** [1] - 11:25
**admitted** [6] - 11:10, 11:23, 65:23, 73:4, 73:5, 169:18
**adopted** [1] - 45:1
**ads** [2] - 117:20, 173:12
**adult** [1] - 118:22
**advance** [1] - 86:3
**advances** [3] - 83:11, 91:1, 94:10
**advantage** [7] - 78:25, 107:24, 118:17, 190:24, 193:25, 197:4, 197:5
**Advantage** [5] - 91:5, 91:8, 92:2, 92:5, 92:9
**advertise** [3] - 189:23, 190:5, 190:22
**advertisement** [1] - 119:15
**advertisements** [1] - 119:19
**advertising** [2] - 117:19, 195:13
**advice** [26] - 40:17, 40:21, 41:1, 41:22, 42:3, 42:11, 56:12, 56:14, 56:19, 57:4, 57:13, 57:17, 58:1, 58:4, 60:5, 63:11, 65:14, 67:5,

106:3, 117:10, 165:24, 166:3, 186:19, 195:5, 196:15
**advice-of-counsel** [2] - 56:12, 56:14, 56:19, 58:1, 63:11
**advised** [2] - 40:24, 171:14
**Aetna** [1] - 27:20
**affairs** [4] - 5:1, 72:24, 138:23, 183:2
**affect** [3] - 9:13, 77:7, 95:23
**affected** [3] - 84:1, 84:18, 84:21
**affecting** [1] - 84:8
**affects** [4] - 84:13, 95:12, 95:14, 97:8
**afraid** [1] - 118:20
**afternoon** [13] - 4:1, 4:13, 4:15, 4:21, 5:14, 5:18, 13:19, 14:13, 15:2, 15:18, 103:8, 135:4, 154:6
**afterwards** [1] - 165:21
**age** [1] - 140:1
**agent** [6] - 81:2, 81:9, 82:11, 89:14, 93:10, 122:25
**agents** [6] - 165:17, 167:14, 177:23, 181:4, 184:21, 200:20
**ago** [3] - 16:17, 118:5, 121:25
**agree** [23] - 12:8, 16:22, 20:14, 28:16, 37:13, 46:18, 53:5, 58:25, 59:16, 66:18, 67:2, 72:2, 77:18, 79:14, 82:2, 82:5, 89:9, 126:9, 133:24, 155:13, 161:20, 170:17, 192:25
**agreed** [8] - 27:13, 82:20, 90:3, 93:19, 100:7, 111:18, 141:14, 144:25
**agreeing** [3] - 127:24, 190:11, 190:12
**agreement** [21] - 29:2, 77:24, 78:10, 82:8, 82:14, 89:11, 89:17, 93:7, 93:13, 109:3, 109:5, 109:8, 118:6, 118:10, 124:25, 125:1, 128:7, 159:16, 166:17, 166:19
**agreements** [3] - 116:19, 166:2, 174:8
**agrees** [1] - 63:3
**Agresti** [8] - 21:17, 26:9, 26:13, 26:14, 26:16, 27:2, 27:6, 29:9
**ahead** [36] - 3:12, 4:10, 5:12, 5:13, 5:18, 5:22, 8:1, 8:5, 8:21, 9:5, 10:4, 10:21, 12:15, 12:18, 24:4, 30:23, 32:19, 42:14, 42:18, 42:24, 43:18, 47:12, 48:3, 48:8,

48:15, 50:11, 50:23, 61:9, 70:25, 131:15, 187:21, 202:12, 204:16, 208:13, 209:24
**aid** [1] - 79:2
**aided** [3] - 76:3, 76:17, 123:12
**aiding** [2] - 122:19, 122:24
**aids** [2] - 81:4, 81:7
**air** [2] - 58:8, 63:23
**aired** [2] - 59:23, 63:6
**Airport** [1] - 20:10
**Alabama** [1] - 122:5
**alert** [1] - 133:14
**aligned** [1] - 3:22
**allegations** [1] - 181:17
**alleged** [15] - 25:20, 46:25, 79:9, 79:20, 81:18, 83:2, 85:21, 85:23, 86:1, 88:6, 88:10, 88:12, 90:9, 90:16, 94:1
**allow** [6] - 8:22, 12:15, 14:12, 47:12, 79:4, 187:4
**allowed** [4] - 64:1, 75:16, 117:9, 117:10
**allowing** [1] - 199:13
**allows** [1] - 95:20
**almost** [4] - 26:6, 27:3, 37:2, 158:15
**alone** [9] - 57:16, 77:16, 85:18, 88:2, 90:12, 108:21, 143:5, 184:5, 184:6
**alternates** [4] - 202:10, 202:16, 202:21, 203:1
**alternative** [3] - 23:8, 79:8, 79:14
**alternatives** [1] - 79:12
**altogether** [1] - 48:16
**ambiguity** [1] - 147:22
**amendment** [4] - 18:10, 46:14, 46:22, 46:23
**AMERICA** [1] - 1:3
**amount** [5] - 101:10, 128:2, 129:23, 161:23, 171:18
**Amy** [4] - 116:23, 117:3, 174:21, 194:25
**Ana** [2] - 202:12, 203:6
**analysis** [1] - 7:10
**Answer** [1] - 167:22
**answer** [23] - 62:8, 74:16, 99:21, 139:4, 149:14, 150:2, 150:15, 152:19, 160:1, 160:12, 161:4, 162:19, 163:19, 164:3, 164:14, 166:20, 167:12, 167:16, 169:23, 176:3, 176:22, 181:10
**answered** [3] - 191:18, 191:20, 191:24
**answers** [2] - 66:13, 66:14

**anti** [5] - 35:21, 37:8, 39:1, 40:6, 88:23
**Anti** [2] - 126:3, 126:24
**anti-kickback** [5] - 35:21, 37:8, 39:1, 40:6, 88:23
**Anti-Kickback** [2] - 126:3, 126:24
**anyhow** [1] - 40:4
**anyway** [5] - 66:19, 113:17, 121:12, 170:12, 174:1
**apart** [1] - 29:23
**apartment** [1] - 144:5
**appeal** [1] - 46:21
**appear** [8] - 9:11, 51:2, 74:15, 107:23, 124:16, 206:18
**Appearances** [1] - 2:1
**APPEARANCES** [1] - 1:11
**applicable** [2] - 36:20, 53:22
**application** [1] - 111:17
**applications** [1] - 21:25
**applies** [3] - 38:10, 39:17, 57:5
**apply** [4] - 47:2, 49:15, 75:13, 157:12
**appreciate** [5] - 9:11, 14:21, 49:7, 162:22, 186:25
**appreciated** [1] - 13:2
**appreciative** [1] - 135:7
**apprehended** [1] - 27:23
**approach** [2] - 102:12, 102:13
**approached** [1] - 165:17
**appropriate** [3] - 55:6, 112:9, 120:11
**approval** [7] - 115:16, 115:21, 115:23, 166:20, 166:21, 166:25, 167:2
**approved** [1] - 168:22
**approving** [2] - 116:5, 116:7
**April** [6] - 156:16, 162:6, 162:11, 177:8, 179:2
**architect** [2] - 104:3, 104:4
**area** [1] - 117:9
**argue** [1] - 191:3
**argued** [1] - 107:19
**argues** [1] - 191:2
**argument** [21] - 7:18, 7:19, 10:1, 10:12, 10:25, 15:7, 22:5, 41:4, 45:22, 46:3, 46:12, 46:22, 50:22, 55:17, 55:18, 59:2, 100:23, 101:4, 102:3, 139:10
**ARGUMENTS** [1] - 2:11
**arguments** [10] - 9:1, 9:22, 13:19, 14:11, 47:21, 65:17, 65:18, 70:8, 101:19, 102:7
**arms** [1] - 153:19

**aroused** [1] - 23:10
**arrangements** [1] - 162:24
**arranging** [3] - 91:14, 91:24, 127:8
**arriving** [1] - 73:10
**article** [1] - 162:23
**artifice** [6] - 27:19, 27:22, 28:4, 29:12, 83:14, 83:22
**aside** [7] - 55:21, 60:14, 69:23, 161:10, 161:11, 163:17, 178:21
**aspect** [4] - 105:10, 106:10, 143:23, 164:4
**aspects** [1] - 140:11
**assembling** [1] - 200:7
**assembly** [5] - 104:4, 104:6, 104:25, 105:10, 123:17
**asserts** [1] - 73:19
**assess** [1] - 54:9
**assets** [2] - 169:10
**assist** [1] - 21:24
**assistance** [2] - 158:1, 190:17
**assisted** [1] - 59:18
**associate** [2] - 81:10, 122:25
**associated** [1] - 81:12
**associating** [3] - 83:8, 90:23, 94:7
**assume** [4] - 17:18, 60:19, 73:7, 163:22
**assuming** [1] - 206:23
**assumption** [1] - 56:21
**assurances** [1] - 104:8
**assure** [1] - 104:8
**asterisk** [1] - 189:17
**astray** [1] - 121:14
**Atlanta** [4] - 1:19, 2:4, 2:7, 114:18
**ATM** [1] - 103:24
**attached** [3] - 11:19, 17:13, 140:21
**attachment** [1] - 12:2
**attempt** [2] - 35:8, 83:14
**attempted** [4] - 35:9, 83:21, 85:25, 96:23
**attempting** [1] - 32:1
**attention** [6] - 102:8, 129:11, 131:5, 135:10, 207:2, 209:13
**attorney** [33] - 5:5, 11:15, 41:14, 41:21, 41:22, 42:8, 42:10, 42:11, 62:16, 163:5, 165:24, 167:7, 167:10, 167:17, 167:23, 167:25, 168:4, 168:5, 168:9, 168:10, 168:17, 168:24, 168:25, 169:1, 170:7, 172:18, 181:9, 181:12, 186:19, 195:7

**attorneys** [13] - 40:23, 40:24, 40:25, 41:11, 41:24, 133:3, 189:10, 195:6, 195:7, 195:17, 195:19, 196:15, 200:20
**audio** [1] - 106:25
**audits** [1] - 175:7
**August** [3] - 11:20, 177:16, 184:11
**authority** [1] - 53:12
**authorized** [2] - 165:14, 191:6
**authorizes** [1] - 81:9
**authorizing** [2] - 122:25, 125:20
**autocorrected** [1] - 67:23
**automatically** [4] - 83:12, 91:2, 94:11, 109:19
**Avenue** [1] - 1:16
**avoid** [10] - 23:16, 23:20, 27:21, 30:5, 30:7, 30:16, 31:9, 64:12, 67:3, 130:18
**avoidance** [5] - 25:6, 27:25, 34:4, 80:11, 129:17
**avoiding** [1] - 24:13
**avoids** [3] - 25:9, 34:7, 80:14
**aware** [12] - 23:14, 25:3, 27:10, 27:18, 34:1, 51:6, 69:1, 80:5, 80:8, 111:8, 167:7, 181:5

## B

**B-2** [1] - 174:20
**B-7** [1] - 174:20
**B-8** [1] - 174:20
**B-9** [1] - 174:20
**B.S** [1] - 174:10
**backed** [1] - 178:10
**background** [3] - 104:24, 144:17, 144:23
**backs** [1] - 191:10
**bad** [9] - 33:14, 38:13, 38:15, 80:1, 143:1, 155:7, 155:8, 155:10, 158:21
**bait** [1] - 119:18
**BAKER** [1] - 2:5
**bank** [8] - 95:18, 96:1, 96:2, 97:10, 106:16, 113:2, 128:22, 190:19
**banking** [1] - 107:12
**bare** [2] - 104:25, 119:23
**bargain** [1] - 78:17
**bargaining** [2] - 78:11, 78:14
**base** [4] - 171:7, 171:23, 171:24, 172:1
**based** [16] - 5:15, 23:8, 71:23, 72:19, 109:18, 110:7,

110:19, 124:1, 124:5, 126:22, 127:21, 137:23, 138:14, 138:15, 171:9, 189:23
**basic** [1] - 109:17
**basis** [4] - 52:9, 163:1, 183:4, 191:8
**bathroom** [1] - 15:16
**Bay** [1] - 180:20
**Bayside** [1] - 14:25
**BBAR** [1] - 180:13
**BC/BS** [1] - 27:20
**Beach** [5] - 51:13, 113:25, 189:5, 190:3, 200:1
**BEACH** [1] - 1:2
**beat** [1] - 50:10
**become** [6] - 22:14, 78:1, 83:12, 91:2, 94:11, 148:9
**becomes** [7] - 29:25, 66:7, 82:11, 89:14, 93:10, 183:17, 195:11
**BEFORE** [1] - 1:10
**began** [2] - 28:21, 113:25
**begin** [16] - 4:17, 14:12, 15:14, 55:20, 71:10, 71:18, 101:9, 102:9, 102:25, 135:12, 187:4, 201:2, 201:25, 203:11, 204:9, 205:10
**beginning** [10] - 9:25, 37:17, 137:21, 138:13, 139:8, 158:15, 162:13, 162:14, 185:7, 199:21
**begins** [1] - 204:21
**begs** [1] - 65:3
**behalf** [4] - 132:25, 200:19, 200:20, 209:20
**behind** [8] - 19:12, 106:3, 106:10, 130:14, 130:16, 130:21, 203:8, 207:13
**belabor** [1] - 53:9
**belief** [14] - 35:25, 36:2, 36:13, 36:15, 39:6, 39:9, 56:13, 57:12, 57:20, 89:2, 89:4, 158:7, 158:8, 161:11
**beliefs** [1] - 78:3
**believes** [3] - 25:8, 34:6, 80:13
**belonging** [1] - 125:18
**bench** [1] - 10:10
**beneficiaries** [16] - 55:10, 105:16, 105:24, 111:23, 112:3, 114:2, 114:24, 121:2, 124:14, 173:14, 173:16, 173:22, 192:10, 197:15, 199:2, 199:3
**beneficiary** [4] - 123:20, 123:21, 123:22, 125:14
**beneficiary's** [2] - 107:1, 107:2

**benefit** [12] - 28:5, 29:13, 49:23, 83:15, 83:17, 83:22, 83:24, 84:1, 84:7, 84:9, 84:11, 142:19
**benefited** [3] - 142:18, 142:22, 143:1
**benefits** [3] - 84:6, 92:21, 110:17
**Berarducci** [2] - 151:5, 194:22
**best** [10] - 40:24, 41:13, 64:9, 67:11, 101:23, 114:25, 159:1, 159:8, 165:16, 195:3
**better** [8] - 33:21, 46:17, 47:2, 98:5, 142:9, 155:15, 186:6, 186:7
**between** [23] - 15:5, 55:8, 55:25, 56:4, 58:21, 63:18, 95:7, 96:4, 100:23, 109:3, 109:5, 114:5, 117:22, 117:24, 118:1, 125:1, 129:2, 134:20, 153:6, 158:23, 162:5, 164:10, 193:21
**beyond** [71] - 13:7, 18:25, 19:6, 25:15, 27:17, 28:3, 29:11, 30:4, 30:6, 30:14, 30:15, 31:8, 31:12, 32:10, 32:20, 32:23, 33:9, 34:11, 35:24, 37:11, 38:6, 39:4, 40:7, 41:19, 54:3, 54:16, 54:22, 61:12, 63:11, 71:21, 72:12, 72:16, 72:21, 73:1, 79:12, 79:18, 80:18, 81:15, 81:25, 82:19, 83:20, 85:24, 86:12, 86:22, 88:25, 90:2, 91:18, 92:6, 93:19, 94:16, 96:21, 109:13, 138:17, 138:21, 139:3, 144:2, 153:10, 154:13, 154:14, 154:22, 158:6, 161:8, 181:19, 182:15, 182:24, 182:25, 186:9, 186:22, 196:25, 200:6, 201:5
**BH-1** [1] - 177:14
**big** [10] - 14:24, 15:1, 36:25, 144:24, 151:25, 161:10, 174:24, 186:4, 208:2, 208:3
**bill** [7] - 105:25, 115:1, 199:13, 199:14, 200:16
**billed** [13] - 104:20, 121:12, 122:16, 124:7, 124:9, 124:12, 124:16, 125:11, 129:25, 146:11, 150:12, 189:2, 201:8
**billing** [10] - 103:25, 106:7, 145:16, 150:9, 150:10, 150:11, 150:14, 150:17, 184:17
**bills** [6] - 112:23, 124:1,

138:8, 145:23, 171:17, 194:2
**binding** [1] - 73:6
**bingo** [1] - 118:21
**bit** [20] - 6:20, 10:7, 16:23, 29:7, 34:20, 37:17, 64:13, 69:5, 98:5, 100:24, 101:2, 148:25, 150:1, 179:23, 180:17, 182:12, 192:17, 193:20, 202:3
**black** [2] - 126:6, 154:17
**black-and-white** [1] - 154:17
**blame** [4] - 106:4, 106:5, 106:6, 106:7, 147:20, 199:11, 199:12, 199:14, 199:15
**blessed** [3] - 170:22, 171:4, 171:6
**blessing** [2] - 59:25, 62:2
**blow** [1] - 148:25
**blowing** [1] - 9:21
**blue** [1] - 184:3
**Boca** [5] - 51:13, 113:25, 189:5, 190:3, 200:1
**Boer** [28] - 12:9, 23:19, 31:6, 31:18, 35:12, 39:14, 46:21, 48:7, 49:1, 50:2, 50:18, 53:4, 56:5, 57:11, 57:22, 59:17, 63:2, 67:3, 68:21, 107:21, 111:14, 114:13, 134:5, 137:25, 187:13, 187:19, 188:1, 201:16
**BOER** [63] - 1:13, 2:13, 3:18, 4:24, 7:3, 7:6, 7:9, 9:10, 10:18, 11:5, 11:9, 12:7, 19:22, 21:15, 26:12, 26:18, 31:19, 32:20, 32:25, 33:2, 33:12, 35:14, 36:9, 37:16, 37:25, 39:18, 40:22, 44:22, 46:23, 48:1, 48:20, 49:4, 49:8, 49:11, 49:16, 49:19, 50:4, 50:24, 56:6, 58:9, 58:18, 59:1, 59:6, 61:10, 61:21, 65:10, 66:20, 66:23, 67:12, 68:24, 69:7, 69:13, 69:21, 70:2, 70:20, 102:12, 102:15, 187:15, 187:20, 188:2, 207:23, 208:9, 210:3
**Boer's** [1] - 63:10
**Bogota** [1] - 20:8
**bogus** [1] - 198:10
**boil** [1] - 154:24
**bond** [1] - 95:9
**bore** [1] - 172:20
**Borrasi** [1] - 45:9
**boss** [2] - 21:2, 174:15
**bottom** [4] - 143:19, 144:1, 147:11, 180:16
**bought** [10] - 105:9, 105:16,

105:18, 105:20, 105:22, 106:2, 106:4, 106:9, 185:14, 194:4
**Boulevard** [2] - 1:23, 210:22
**bound** [2] - 139:23, 143:24
**box** [2] - 95:9, 100:1
**boxes** [2] - 98:9, 198:14
**boy** [2] - 182:16, 185:4
**bracket** [1] - 50:12
**bracketing** [1] - 49:17
**brackets** [5] - 49:12, 49:18, 49:22, 49:23, 49:25
**brain** [3] - 114:19, 144:24, 152:13
**brainchild** [1] - 103:18
**break** [33] - 8:24, 10:7, 10:21, 12:12, 15:5, 15:11, 15:12, 38:18, 56:9, 68:15, 68:16, 68:17, 68:18, 70:10, 70:13, 71:5, 100:22, 101:5, 101:6, 101:7, 102:22, 109:4, 122:13, 124:25, 131:16, 134:4, 156:2, 187:4, 187:7, 187:12, 203:20, 206:9
**breakfast** [1] - 14:24
**breakfast/lunch** [1] - 71:5
**breaking** [3] - 62:8, 169:23, 192:24
**breaks** [4] - 15:16, 15:17, 56:18, 98:8
**Brett** [36] - 51:13, 76:1, 76:13, 104:13, 105:22, 108:24, 109:6, 113:24, 114:10, 114:15, 118:1, 120:24, 121:16, 121:21, 125:1, 125:18, 126:17, 127:11, 127:15, 128:9, 189:4, 189:11, 189:15, 189:19, 190:1, 190:2, 190:7, 193:9, 195:20, 197:9, 198:9, 199:14, 199:20, 199:21, 200:8
**Brian** [1] - 135:5
**BRIAN** [1] - 2:5
**bribe** [4] - 91:12, 91:20, 92:14, 93:1
**bribed** [1] - 148:18
**bribery** [1] - 188:9
**bribes** [1] - 91:8
**brief** [6] - 9:25, 10:25, 53:9, 70:7, 100:18, 187:7
**briefly** [4] - 24:5, 50:19, 102:12, 131:22
**bright** [1] - 69:4
**bring** [26] - 9:5, 12:15, 16:23, 20:10, 48:11, 48:18, 68:22, 69:24, 70:6, 70:25, 100:12, 102:5, 127:12, 127:13, 131:17, 144:2,

144:3, 149:11, 150:25, 151:7, 178:13, 187:21, 192:11, 209:2, 209:10
**broad** [1] - 26:21
**broader** [1] - 27:3
**broke** [5] - 13:3, 55:24, 110:11, 190:15, 209:19
**broken** [1] - 42:23
**brokers** [1] - 117:18
**brother** [1] - 139:25
**brother's** [1] - 148:13
**brought** [8] - 43:3, 121:16, 121:17, 154:8, 194:16, 196:11
Broward [2] - 1:23, 210:22
brown [1] - 54:4
**brunch** [1] - 15:2
Bryan [2] - 104:12, 112:7
**buck** [2] - 111:9, 190:9
**bucket** [3] - 108:10, 124:22, 128:4
**buckets** [1] - 108:7
**build** [1] - 15:16
**building** [7] - 37:3, 38:17, 39:13, 117:7, 174:23, 202:6, 209:25
**built** [2] - 105:11, 121:15
**bunch** [2] - 68:5, 142:17
**burden** [12] - 13:7, 13:8, 18:11, 72:15, 136:3, 143:4, 151:10, 151:11, 179:25, 180:6, 182:15, 197:2
**business** [9] - 36:16, 88:16, 96:4, 116:18, 158:14, 165:13, 180:20, 185:25
**businesses** [3] - 96:4, 96:5, 96:6
**businessman** [2] - 121:21, 183:20
**busted** [1] - 179:5
**button** [1] - 150:17
**buy** [3] - 106:2, 169:4, 190:16
BY [5] - 1:20, 2:12, 2:12, 2:13, 2:13

---

## C

**C.N** [1] - 119:2
**C.N.'s** [1] - 119:2
**Cahaba** [4] - 183:10, 183:11, 183:17, 184:22
**camp** [1] - 6:13
**cancer** [27] - 103:9, 103:10, 103:19, 103:22, 110:25, 112:13, 115:11, 118:18, 118:20, 119:5, 119:6, 119:10, 119:20, 121:4, 125:20, 130:21, 140:16, 142:24, 143:1, 173:21,

184:25, 188:14, 193:25, 194:1
**cancer-free** [1] - 103:22
**candid** [1] - 6:22
**cannot** [13] - 5:23, 6:6, 11:14, 36:1, 39:7, 39:8, 67:24, 72:10, 89:3, 126:21, 142:1, 158:7, 202:20
**capacity** [2] - 85:10, 87:19
**car** [1] - 169:4
**card** [2] - 110:17, 199:3
**cards** [6] - 103:24, 104:8, 105:17, 112:1, 112:2, 192:20
**care** [16] - 10:23, 17:18, 49:23, 108:1, 110:3, 112:11, 113:15, 113:16, 114:7, 116:10, 120:4, 120:18, 121:7, 130:20, 182:6, 182:7
**cared** [4] - 103:22, 120:22, 121:2, 121:5
**careful** [2] - 25:18, 155:22
**carefully** [3] - 48:13, 72:20, 102:3
**carelessness** [7] - 28:9, 34:14, 36:3, 39:11, 80:21, 89:6, 158:11
**cares** [1] - 118:22
**Carolina** [1] - 122:6
**carried** [5] - 82:6, 85:25, 89:10, 89:20, 119:7
**carry** [4] - 86:20, 87:5, 100:8, 191:9
**carrying** [5] - 82:17, 88:10, 89:25, 90:9, 93:16
**cars** [1] - 185:14
**CASE** [1] - 1:2
**case** [125] - 3:3, 4:11, 4:12, 5:8, 5:25, 13:4, 13:5, 13:6, 13:10, 13:14, 13:18, 16:2, 16:5, 17:2, 17:10, 20:3, 20:18, 21:11, 21:17, 21:18, 22:22, 23:3, 24:6, 24:10, 24:24, 27:16, 27:19, 32:1, 41:16, 41:20, 42:3, 42:6, 45:8, 45:10, 45:12, 45:14, 45:20, 54:4, 54:14, 54:22, 63:18, 65:12, 71:16, 72:21, 73:4, 73:8, 74:12, 77:11, 77:21, 77:23, 77:25, 78:4, 78:7, 78:9, 81:18, 92:1, 101:24, 106:20, 106:21, 108:6, 108:8, 108:18, 108:19, 108:23, 121:11, 125:13, 130:25, 131:5, 131:7, 131:8, 131:12, 132:13, 136:5, 136:16, 136:18, 137:21, 138:13, 138:24, 139:3, 139:19, 140:9, 140:11, 143:9, 146:10, 148:8, 148:11,

148:13, 150:12, 150:17, 153:19, 154:8, 154:11, 154:12, 154:21, 158:13, 159:18, 181:1, 188:5, 188:7, 188:9, 188:12, 191:13, 192:18, 193:18, 193:22, 194:3, 195:6, 196:3, 196:22, 196:25, 197:18, 199:10, 199:19, 200:21, 201:3, 201:10, 201:13, 202:21, 203:3, 203:5, 204:15, 204:23, 206:19
**case-in-chief** [1] - 13:14
**cases** [8] - 20:22, 21:6, 21:16, 25:19, 46:11, 46:20, 86:3, 101:20
**cash** [1] - 104:1
**catch** [3] - 50:7, 180:15, 186:10
**caught** [4] - 22:8, 49:2, 49:14, 50:9
**caused** [2] - 87:3, 125:11
**caution** [5] - 77:9, 78:9, 78:21, 100:14, 204:20
**CDs** [1] - 207:22
**cease** [1] - 116:16
**cell** [4] - 193:13, 197:12, 204:6, 204:10
**center** [6] - 51:16, 115:7, 116:1, 173:10, 179:4, 179:7
**centers** [2] - 194:21, 197:10
**certain** [13] - 9:18, 26:6, 26:10, 27:3, 41:18, 44:19, 79:16, 83:8, 90:23, 94:7, 94:12, 96:18, 172:13
**certainly** [17] - 3:11, 4:24, 7:22, 10:8, 10:14, 15:17, 20:14, 41:20, 46:1, 55:10, 57:1, 58:21, 60:1, 63:8, 105:6, 132:12, 203:6
**certificate** [1] - 95:10
**certificates** [3] - 188:21, 203:9, 205:22
**certify** [1] - 210:17
**CGx** [5] - 113:10, 136:4, 159:12, 162:12, 172:14
**chain** [1] - 73:21
**chair** [1] - 196:12
**chairs** [3] - 14:9, 71:6, 187:6
**chalkboard** [1] - 148:14
**challenges** [1] - 51:1
**chambers** [4] - 48:18, 204:6, 204:12
**champagne** [3] - 185:15, 185:17, 185:19
**chance** [7] - 7:15, 7:17, 14:17, 69:9, 179:11, 203:10, 208:22
**chances** [2] - 156:18,

156:19
**change** [10] - 6:20, 24:15, 36:10, 47:1, 49:24, 51:9, 68:5, 78:1, 171:20, 172:4
**changed** [6] - 7:9, 43:9, 171:11, 171:14, 183:14
**changes** [3] - 17:5, 48:25, 166:11
**changing** [1] - 33:5
**charge** [19] - 4:8, 5:24, 7:10, 8:17, 9:8, 17:10, 37:20, 38:3, 38:23, 70:18, 72:5, 76:3, 76:16, 88:19, 108:9, 127:4, 127:6, 138:12, 194:18
**charged** [22] - 47:23, 76:8, 76:9, 76:21, 76:22, 76:25, 77:3, 77:10, 81:1, 81:19, 81:21, 82:22, 86:8, 86:9, 86:14, 91:6, 92:25, 93:1, 93:2, 108:6, 122:22, 123:23
**charges** [42] - 9:12, 35:16, 35:20, 35:21, 37:4, 37:6, 37:8, 38:7, 38:11, 38:25, 39:2, 40:3, 46:25, 75:21, 75:25, 76:12, 76:23, 77:4, 79:15, 81:19, 88:22, 88:23, 89:20, 91:3, 98:12, 106:19, 108:7, 108:8, 108:10, 108:11, 108:12, 124:22, 124:24, 129:20, 186:23, 186:25, 196:22, 197:4, 197:17, 198:3, 201:3
**charging** [1] - 9:7
**chart** [3] - 148:24, 180:2, 182:1
**charts** [8] - 98:13, 113:11, 118:12, 120:8, 139:15, 151:17, 173:15, 184:2
**cheat** [2] - 84:23, 87:7
**cheated** [2] - 125:9, 135:25
**cheating** [3] - 125:8, 188:11
**check** [7] - 13:9, 14:3, 98:9, 100:1, 207:15, 209:1, 209:21
**checked** [2] - 3:4, 198:19
**checking** [1] - 199:11
**checks** [2] - 95:18, 95:19
**chief** [1] - 13:14
**child** [2] - 114:19, 137:12
**children** [1] - 140:4
**chime** [1] - 44:18
**choice** [4] - 104:18, 115:13, 200:4, 200:17
**choices** [3] - 98:21, 173:7, 193:3
**choose** [1] - 97:25
**chooses** [2] - 6:23, 13:5
**chose** [6] - 72:10, 121:21, 121:22, 122:13, 196:20
**chosen** [2] - 104:19, 133:16
**Chris** [4] - 175:4, 175:6,

175:12, 178:14
**Christian** [3] - 125:2, 125:19, 127:19
**Christmas** [1] - 192:12
**Christopher** [2] - 76:1, 76:13
**chunk** [1] - 15:10
**circuit** [4] - 44:25, 45:19, 47:8
**Circuit** [14] - 18:6, 20:15, 20:23, 44:24, 45:5, 45:6, 45:8, 45:10, 45:12, 45:14, 45:15, 46:16, 53:23, 54:5
**circuits** [2] - 18:4, 46:17
**circumstances** [1] - 73:22
**circumstantial** [3] - 73:17, 73:21, 73:24
**citations** [1] - 53:12
**cite** [4] - 21:6, 23:4, 45:3, 54:4
**cites** [1] - 46:11
**citing** [1] - 42:6
**citizens** [2] - 185:7, 188:15
**civil** [1] - 154:10
**claim** [2] - 111:2, 117:13
**claimed** [1] - 117:18
**claims** [21] - 109:7, 109:19, 109:22, 111:3, 111:4, 111:19, 112:18, 122:5, 122:6, 124:2, 124:17, 127:2, 130:2, 130:23, 145:13, 146:11, 146:14, 190:14, 191:12
**clarifies** [1] - 38:10
**clean** [3] - 6:3, 43:1, 47:17
**cleaned** [2] - 19:16, 50:5
**cleaner** [4] - 30:21, 37:13, 38:19, 40:11
**cleaning** [3] - 16:21, 47:16, 48:7
**cleanup** [1] - 3:16
**clear** [22] - 12:9, 29:18, 38:12, 55:1, 59:16, 60:4, 110:8, 110:10, 111:20, 116:9, 139:12, 141:8, 146:20, 146:24, 153:22, 159:23, 160:9, 161:6, 164:24, 172:25, 180:17
**clearing** [1] - 12:10
**clearly** [3] - 16:4, 74:16, 172:24
**click** [1] - 119:18
**click-bait** [1] - 119:18
**client's** [1] - 206:25
**clock** [2] - 22:10, 190:8
**clocked** [1] - 134:5
**close** [16] - 5:18, 5:22, 8:19, 8:20, 13:18, 15:6, 16:2, 56:4, 56:18, 66:23, 70:11, 79:19, 102:7, 103:5, 135:10, 143:17

**closed** [13] - 21:12, 25:17, 28:6, 29:14, 32:12, 33:3, 33:11, 33:16, 34:13, 80:20, 129:20, 144:4, 144:5
**CLOSING** [1] - 2:11
**closing** [30] - 4:13, 4:15, 5:12, 5:14, 8:17, 8:25, 9:11, 9:13, 9:22, 10:11, 13:19, 14:11, 15:7, 47:21, 55:17, 56:7, 56:10, 56:12, 57:25, 60:6, 65:17, 66:24, 68:17, 70:8, 70:16, 100:23, 101:4, 134:22, 139:10, 193:22
**closings** [6] - 6:12, 8:14, 11:3, 50:14, 55:20, 63:7
**Club** [4] - 51:13, 113:25, 190:3, 200:1
**clubs** [1] - 128:18
**clue** [1] - 176:11
**clunky** [3] - 37:14, 37:17, 66:18
**co** [11] - 78:10, 78:13, 86:4, 86:5, 86:17, 105:9, 123:2, 123:3, 123:14, 130:7, 130:12
**co-conspirator** [5] - 78:13, 86:4, 86:5, 86:17, 123:2
**co-conspirator's** [1] - 123:3
**co-conspirators** [5] - 78:10, 105:9, 123:14, 130:7, 130:12
**Code** [2] - 91:10, 93:6
**code** [2] - 145:19, 145:21
**codes** [7] - 103:25, 114:24, 114:25, 122:9, 145:17
**coffee** [2] - 15:16, 209:7
**coin** [1] - 22:24
**coincidental** [2] - 176:5, 176:6
**coins** [1] - 95:17
**cold** [3] - 115:8, 118:14, 121:1
**cold-called** [1] - 118:14
**cold-calling** [1] - 115:8
**cold-calls** [1] - 121:1
**colleague** [1] - 154:1
**collect** [1] - 70:15
**collectively** [1] - 155:16
**college** [2] - 126:11, 126:13
**combination** [1] - 184:9
**combine** [1] - 35:9
**coming** [5] - 4:22, 17:16, 129:3, 162:9, 174:17
**commented** [1] - 144:23
**commerce** [15] - 84:1, 84:8, 84:13, 84:17, 84:18, 84:20, 84:21, 87:4, 95:12, 95:15, 95:22, 95:23, 96:3, 97:8, 122:4
**commercial** [3] - 96:1,

97:10, 106:24
**commission** [10] - 51:20, 89:23, 162:2, 162:24, 162:25, 164:13, 171:15, 171:23, 172:7, 189:23
**commissions** [17] - 60:11, 60:24, 126:15, 162:15, 162:18, 163:5, 163:6, 163:7, 163:15, 164:2, 164:3, 164:19, 164:21, 165:6, 179:16, 195:10
**commit** [26] - 76:2, 76:9, 76:22, 76:24, 77:1, 81:5, 81:20, 81:22, 81:24, 82:1, 82:3, 82:9, 82:21, 86:7, 86:17, 89:12, 89:21, 93:8, 96:16, 97:3, 97:17, 98:17, 99:19, 108:13, 128:6, 128:7
**commits** [2] - 86:2, 90:13
**committed** [17] - 76:3, 76:16, 79:9, 79:16, 79:19, 79:24, 86:13, 86:16, 90:8, 103:17, 108:5, 123:6, 123:14, 129:15, 130:19, 130:20, 169:7
**committing** [7] - 76:4, 76:8, 76:17, 76:21, 97:17, 97:20, 97:24
**common** [26] - 21:16, 23:9, 24:11, 24:12, 72:20, 73:15, 82:21, 83:8, 90:23, 93:20, 94:7, 107:8, 111:22, 131:8, 137:2, 137:3, 137:4, 137:8, 144:4, 144:8, 156:11, 164:9, 193:19, 196:1, 197:3, 197:7
**commonly** [2] - 94:13, 96:19
**communicate** [1] - 100:10
**communication** [1] - 87:4
**communications** [5] - 59:23, 86:20, 88:14, 88:15, 88:17
**communities** [1] - 118:21
**community** [1] - 126:12
**companies** [7] - 110:13, 125:18, 150:10, 150:11, 150:19, 180:18, 182:21
**company** [10] - 21:24, 106:7, 117:25, 118:1, 127:18, 150:14, 150:23, 150:24, 159:15, 181:21
**company's** [1] - 181:6
**compared** [1] - 120:9
**complain** [1] - 174:12
**complaint** [1] - 174:24
**complaints** [4] - 113:12, 174:23, 191:21, 191:25
**complete** [9] - 35:16, 37:20, 38:3, 38:23, 88:19, 110:14, 111:5, 157:21, 189:8

**completed** [2] - 71:17, 126:18
**completely** [4] - 118:7, 119:19, 120:7, 193:16
**compliance** [24] - 41:13, 57:3, 106:7, 116:13, 116:15, 116:19, 117:3, 117:4, 117:10, 118:6, 118:10, 130:16, 174:6, 174:8, 174:22, 174:25, 175:4, 175:12, 179:14, 181:12, 194:18, 194:25
**compliant** [5] - 62:9, 136:24, 169:24, 172:8, 179:7
**compliantly** [1] - 136:10
**complicated** [5] - 28:13, 118:23, 194:6, 194:8, 194:13
**components** [1] - 116:25
**computer** [2] - 26:1, 109:24
**comrade** [1] - 30:22
**conceal** [2] - 94:23, 169:10
**concealed** [2] - 129:5, 164:20
**conceals** [2] - 85:6, 87:15
**concepts** [1] - 193:4
**concern** [15] - 5:20, 7:16, 7:22, 9:24, 19:25, 31:6, 41:15, 57:11, 58:5, 63:10, 64:8, 64:20, 64:21, 108:1, 120:4
**concerned** [4] - 42:5, 58:7, 73:16, 194:23
**concerning** [2] - 72:18, 74:6, 120:6
**concerns** [5] - 9:2, 40:20, 47:15, 69:24, 70:18
**concession** [1] - 178:6
**conclude** [4] - 120:11, 143:22, 147:9, 147:18
**concluding** [1] - 54:19
**conclusion** [2] - 54:2, 63:10
**conclusions** [1] - 73:15
**Condon** [1] - 42:6
**conduct** [4] - 62:2, 80:6, 94:17, 95:1
**conducted** [1] - 94:17
**conduit** [1] - 11:25
**confer** [1] - 206:4
**conference** [2] - 4:8, 5:25
**confined** [1] - 63:13
**confining** [1] - 69:3
**confirm** [3] - 41:17, 133:17, 206:5
**confirmed** [1] - 107:15
**conflicts** [1] - 54:10
**confused** [2] - 49:12, 52:13
**confusing** [14] - 24:22, 24:23, 29:25, 31:23, 31:25, 32:14, 34:18, 36:18, 36:24,

37:17, 39:19, 52:15, 104:22, 120:8

**congratulating** [1] - 112:3

**conjunction** [1] - 54:23

**conjunctive** [1] - 79:10

**connected** [1] - 69:2

**connection** [5] - 76:18, 84:5, 122:14, 123:24, 207:21

**connections** [1] - 63:4

**consciously** [1] - 27:21

**consent** [1] - 124:19

**consequence** [2] - 86:17, 123:10

**consider** [11] - 38:12, 72:10, 73:3, 73:25, 74:25, 77:5, 77:13, 78:8, 78:20, 155:14, 155:22

**considered** [2] - 44:25, 72:21

**considering** [2] - 73:14, 77:22

**consistent** [8] - 32:13, 45:16, 45:17, 45:19, 46:24, 47:7, 131:11, 201:12

**conspiracies** [2] - 42:22, 81:18

**conspiracy** [69] - 35:21, 37:7, 39:1, 39:22, 39:23, 39:24, 40:6, 52:22, 76:11, 77:3, 82:8, 82:11, 82:15, 82:18, 83:9, 83:10, 86:2, 86:3, 86:7, 86:13, 86:15, 86:18, 88:23, 89:11, 89:14, 89:22, 90:6, 90:10, 90:13, 90:24, 90:25, 91:4, 93:7, 93:10, 93:14, 93:18, 94:8, 94:9, 96:16, 97:2, 97:17, 98:16, 98:20, 99:1, 99:5, 99:6, 99:7, 99:11, 99:19, 99:22, 108:13, 109:1, 109:2, 109:3, 123:5, 123:8, 123:10, 123:14, 124:21, 124:24, 124:25, 125:21, 126:8, 128:8, 128:9, 137:1, 196:21, 200:13

**conspiracy's** [2] - 86:14, 123:6

**conspirator** [16] - 78:13, 82:17, 82:25, 83:12, 86:2, 86:4, 86:5, 86:13, 86:17, 90:12, 90:14, 91:2, 93:24, 94:11, 123:2, 123:5

**conspirator's** [1] - 123:3

**conspirators** [11] - 78:10, 83:2, 89:24, 90:6, 90:16, 93:16, 94:1, 105:9, 123:14, 130:7, 130:12

**conspire** [3] - 82:5, 89:9, 93:3

**conspired** [10] - 39:20,

76:1, 76:13, 76:24, 81:20, 81:24, 82:1, 82:3, 125:4, 125:5

**conspiring** [5] - 76:9, 76:22, 76:25, 81:21, 93:1

**constantly** [1] - 147:14

**constituted** [1] - 159:20

**constructive** [5] - 18:10, 46:14, 46:22, 46:23, 47:11

**consultants** [3] - 136:9, 136:22, 137:5

**consultation** [1] - 193:1

**consulted** [3] - 41:24, 62:1, 195:7

**consulting** [1] - 21:24

**consults** [1] - 115:5

**consuming** [2] - 99:22, 99:24

**contacted** [1] - 120:18

**contacting** [1] - 116:6

**contained** [3] - 118:12, 150:22, 197:22

**containers** [1] - 198:14

**contains** [7] - 25:8, 25:10, 34:6, 34:8, 80:13, 80:15, 192:5

**contemplate** [1] - 46:2

**contemplated** [2] - 5:14, 5:16

**contents** [4] - 25:11, 34:9, 80:16, 111:16

**context** [2] - 38:12, 38:16

**continue** [9] - 31:7, 102:3, 116:7, 187:8, 202:4, 202:17, 202:24, 203:2, 209:3

**continued** [1] - 2:1

**contract** [15] - 22:17, 22:18, 84:8, 84:12, 117:19, 117:22, 117:24, 118:3, 144:13, 168:16, 189:15, 190:18, 191:13, 193:6, 195:8

**contracting** [1] - 196:7

**Contractors** [1] - 183:25

**contracts** [17] - 51:19, 52:20, 117:15, 117:18, 126:4, 126:5, 129:5, 129:6, 130:13, 164:15, 164:17, 164:21, 166:24, 188:4, 189:8, 189:16, 195:15

**contrary** [1] - 136:7

**contributing** [1] - 134:22

**contrive** [1] - 33:21

**contrived** [7] - 23:16, 23:20, 30:5, 30:7, 30:16, 31:9, 31:24

**control** [5] - 83:16, 83:24, 94:25, 128:21, 159:4

**controlled** [16] - 24:10, 24:20, 25:9, 25:10, 25:14, 25:16, 27:14, 28:22, 29:4,

33:5, 34:7, 34:8, 51:8, 80:14, 80:15, 128:22

**controls** [1] - 153:3

**controversial** [1] - 17:12

**controversy** [1] - 18:3

**convenience** [1] - 98:3

**convenient** [1] - 176:22

**conveniently** [1] - 135:18

**conversation** [2] - 156:17, 164:10, 177:22

**conversations** [2] - 161:16, 168:4

**convict** [1] - 154:15

**convicted** [2] - 74:25, 169:7

**conviction** [2] - 53:21, 79:13

**convince** [2] - 154:19, 189:10

**convinced** [3] - 72:25, 73:2, 78:2

**convincing** [2] - 72:22, 138:21

**cookie** [2] - 110:20

**cookie-cutter** [2] - 110:20

**cooperate** [1] - 156:9

**cooperating** [4] - 158:17, 175:24, 195:16, 196:2

**cooperator** [1] - 61:17

**cooperators** [10] - 55:9, 59:3, 59:13, 121:19, 136:8, 139:1, 149:18, 151:15, 152:25, 153:1

**copies** [3] - 42:25, 48:11, 66:4, 69:23, 71:8

**copy** [11] - 17:19, 42:25, 69:19, 71:6, 75:23, 98:15, 100:4, 166:17, 166:18, 203:12, 203:19

**copying** [1] - 35:1

**corner** [1] - 132:4

**correct** [51] - 3:8, 3:9, 19:8, 19:22, 33:12, 49:19, 56:6, 60:12, 60:18, 60:21, 61:1, 61:2, 62:9, 62:15, 132:17, 132:22, 160:8, 160:25, 161:4, 162:15, 163:8, 163:9, 163:15, 163:23, 164:5, 164:6, 165:1, 167:11, 167:15, 168:5, 168:8, 168:13, 168:18, 168:23, 169:24, 170:6, 171:10, 171:11, 171:12, 171:13, 171:15, 171:16, 171:22, 171:24, 171:25, 172:1, 172:2, 172:4, 172:7, 172:8, 206:6

**corroborators** [1] - 179:13

**counsel** [17] - 40:17, 40:21, 42:4, 56:12, 56:14, 56:19, 57:2, 57:3, 57:5, 58:1, 60:6,

63:11, 65:14, 67:5, 102:11, 134:20, 172:17

**Counsel** [3] - 102:25, 134:23, 135:3

**counselor** [2] - 105:4, 107:3

**counsels** [1] - 56:1

**count** [21] - 9:17, 9:19, 39:24, 51:3, 51:5, 52:7, 52:17, 53:7, 53:13, 53:14, 55:17, 75:22, 77:4, 99:19, 99:20, 125:5, 125:6, 127:17, 150:7, 201:14, 209:2

**Count** [34] - 75:25, 76:8, 76:12, 76:21, 76:23, 76:25, 86:8, 91:3, 92:24, 98:16, 99:1, 99:2, 99:5, 99:7, 108:12, 109:5, 109:14, 123:21, 123:22, 123:23, 124:4, 124:5, 124:9, 124:11, 124:25, 125:1, 125:21, 127:11, 127:15, 127:23, 150:7

**counting** [1] - 185:7

**countless** [1] - 169:8

**countries** [1] - 137:15

**country** [4] - 45:16, 95:18, 137:12, 137:13

**Counts** [10] - 52:8, 76:16, 81:19, 86:6, 86:9, 91:6, 93:2, 127:4, 197:20, 197:23

**counts** [15] - 53:15, 54:17, 75:22, 76:3, 98:8, 98:25, 99:1, 106:18, 123:11, 128:8, 131:12, 150:4, 197:21, 197:22, 197:25

**couple** [6] - 7:5, 47:16, 120:12, 126:13, 161:18, 185:14

**course** [19] - 8:4, 26:2, 31:3, 31:11, 50:13, 84:22, 87:6, 88:15, 132:12, 136:14, 143:17, 143:24, 144:9, 177:5, 183:25, 191:10, 204:14, 206:8

**COURT** [205] - 1:1, 3:2, 3:10, 4:2, 5:17, 6:20, 6:24, 7:4, 7:7, 7:11, 8:1, 8:4, 9:23, 10:20, 11:6, 11:17, 11:22, 12:8, 12:19, 12:21, 12:25, 13:15, 15:23, 15:25, 17:4, 17:7, 17:11, 17:15, 17:19, 17:25, 18:14, 18:20, 19:3, 19:6, 19:9, 19:23, 21:13, 22:25, 24:3, 24:7, 24:18, 24:22, 24:25, 26:2, 26:6, 26:14, 26:20, 27:1, 28:15, 28:19, 28:23, 29:1, 30:10, 30:19, 31:1, 31:5, 31:17, 32:17, 32:22, 33:1, 33:6,

33:13, 33:15, 33:18, 35:10, 35:15, 36:13, 36:23, 37:5, 37:22, 38:9, 38:13, 38:22, 39:24, 40:5, 40:9, 41:4, 41:8, 41:15, 42:14, 42:17, 43:6, 43:9, 43:13, 43:16, 43:18, 43:23, 44:11, 45:21, 46:15, 46:18, 47:10, 48:2, 48:5, 48:21, 48:24, 49:6, 49:9, 49:13, 49:17, 49:21, 50:5, 50:11, 53:4, 53:16, 56:8, 57:8, 57:10, 58:14, 58:25, 59:5, 59:8, 59:15, 61:5, 61:19, 61:22, 63:1, 63:20, 63:22, 64:2, 64:4, 64:19, 64:23, 65:22, 66:9, 66:15, 66:22, 66:25, 67:13, 67:15, 67:17, 67:19, 67:23, 68:1, 68:9, 68:15, 68:20, 69:1, 69:8, 69:14, 69:15, 69:18, 69:22, 70:3, 70:5, 70:21, 70:24, 71:1, 71:3, 102:2, 102:13, 102:18, 102:20, 102:24, 103:4, 103:7, 131:14, 131:19, 131:21, 132:2, 132:7, 132:17, 132:20, 132:24, 133:2, 133:6, 133:9, 133:12, 133:20, 133:24, 134:2, 134:10, 134:13, 134:16, 135:2, 154:4, 182:3, 187:2, 187:9, 187:11, 187:16, 187:19, 187:21, 187:24, 201:16, 203:24, 205:8, 205:12, 205:14, 206:17, 206:21, 207:1, 207:5, 207:12, 207:20, 207:24, 208:3, 208:7, 208:10, 208:13, 208:16, 209:15, 209:17, 210:7, 210:11

**court** [5] - 23:1, 75:12, 78:15, 98:2, 102:23

**Court** [46] - 1:22, 1:23, 3:1, 6:18, 6:22, 6:23, 7:14, 7:16, 9:7, 9:20, 10:5, 11:1, 16:3, 21:15, 23:1, 23:23, 26:4, 26:25, 38:1, 45:4, 46:10, 48:22, 53:17, 53:18, 53:19, 54:7, 54:12, 55:12, 56:24, 58:11, 58:19, 64:18, 69:16, 70:6, 102:17, 108:16, 133:13, 134:11, 135:3, 159:3, 187:17, 201:18, 208:11, 210:13, 210:21, 210:22

**Court's** [6] - 11:20, 12:5, 46:4, 58:12, 64:20, 72:4

**courtroom** [8] - 100:9, 100:14, 152:15, 203:15, 204:1, 205:1, 205:21, 206:6

**courts** [3] - 23:6, 45:17, 47:7

**cover** [9] - 8:14, 109:25, 110:2, 110:5, 145:13, 145:14, 145:23, 184:23, 199:5

**coverage** [3] - 159:15, 160:12, 160:13

**covered** [9] - 117:18, 121:10, 131:6, 146:21, 183:18, 183:21, 184:1, 184:3, 184:13

**covers** [1] - 183:21

**covertly** [1] - 92:13

**COVID** [3] - 176:15, 176:20, 176:21

**CPL** [2] - 117:23, 171:8

**Craig** [1] - 180:22

**CRD** [2] - 48:11, 209:9

**create** [4] - 52:25, 115:7, 147:22, 155:12

**created** [11] - 22:10, 105:11, 105:13, 106:12, 113:22, 116:15, 118:12, 121:6, 121:15, 123:17

**credentialing** [1] - 106:5

**credentials** [2] - 144:16, 144:19

**credibility** [2] - 54:9, 55:5

**credible** [1] - 172:18

**credit** [2] - 95:8, 169:11

**crime** [50] - 25:2, 27:9, 34:1, 75:1, 77:4, 77:5, 77:7, 77:8, 79:15, 79:17, 79:19, 80:8, 80:24, 81:5, 81:13, 81:14, 82:4, 82:6, 83:13, 86:2, 86:4, 86:5, 86:7, 86:11, 86:14, 86:16, 86:17, 86:19, 86:22, 88:18, 89:8, 89:10, 89:21, 90:1, 91:11, 93:3, 94:12, 94:15, 96:18, 97:16, 97:20, 97:22, 97:24, 122:2, 123:6, 128:7, 129:14, 144:12, 196:11, 200:4

**crimes** [21] - 75:21, 77:10, 77:12, 81:22, 81:24, 82:2, 82:3, 91:7, 103:17, 103:18, 106:13, 108:6, 123:2, 123:4, 123:14, 123:15, 126:6, 130:19, 130:20, 139:7, 188:9

**criminal** [8] - 82:10, 89:13, 93:9, 97:1, 154:12, 169:5, 200:6

**CRIMINAL** [1] - 1:15

**criminally** [3] - 81:6, 81:10, 122:23

**critical** [1] - 142:7

**cross** [6] - 22:15, 122:6, 142:6, 152:12, 176:7, 176:17

**cross-examination** [3] -

142:6, 176:7, 176:17

**cross-examinations** [1] - 22:15

**crowd** [1] - 208:4

**CRR** [2] - 1:21, 210:21

**crystal** [3] - 111:20, 146:20, 146:24

**curiosity** [1] - 110:4

**curious** [2] - 5:22, 7:11

**currency** [2] - 95:8, 95:18

**current** [1] - 29:2

**curtain** [1] - 195:4

**custody** [2] - 83:16, 83:24

**custom** [1] - 24:8

**customized** [1] - 44:16

**cut** [6] - 5:8, 28:16, 36:16, 36:21, 104:13, 156:2

**cuts** [1] - 36:11

**cutter** [2] - 110:20

**Cuyler** [1] - 138:1

**CUYLER** [1] - 1:14

## D

**D.C** [1] - 1:16

**daily** [1] - 191:8

**dark** [4] - 116:25, 184:3, 195:3, 208:18

**darn** [1] - 178:9

**data** [2] - 124:17, 145:16

**DATE** [1] - 210:20

**date** [8] - 66:12, 79:16, 79:17, 79:19, 100:3, 100:8, 168:16

**dates** [1] - 124:6

**Davis** [1] - 45:7

**days** [3] - 116:17, 174:24, 196:12

**de** [29] - 12:9, 23:19, 31:6, 31:18, 35:12, 39:14, 46:21, 48:7, 49:1, 50:2, 50:18, 53:4, 56:5, 57:11, 57:22, 59:17, 63:2, 63:10, 67:3, 68:21, 107:21, 111:14, 114:13, 134:5, 137:25, 187:13, 187:19, 188:1, 201:16

**DE** [63] - 1:13, 2:13, 3:18, 4:24, 7:3, 7:6, 7:9, 9:10, 10:18, 11:5, 11:9, 12:7, 19:22, 21:15, 26:12, 26:18, 31:19, 32:20, 32:25, 33:2, 33:12, 35:14, 36:9, 37:16, 37:25, 39:18, 40:22, 44:22, 46:23, 48:1, 48:20, 49:4, 49:8, 49:11, 49:16, 49:19, 50:4, 50:24, 56:6, 58:9, 58:18, 59:1, 59:6, 61:10, 61:21, 65:10, 66:20, 66:23, 67:12, 68:24, 69:7, 69:13, 69:21, 70:2, 70:20, 102:12,

102:15, 187:15, 187:20, 188:2, 207:23, 208:9, 210:3

**deal** [8] - 8:10, 10:4, 11:2, 29:21, 29:22, 141:1, 159:8, 174:20

**dealing** [4] - 18:2, 53:14, 141:3, 196:7

**dealings** [1] - 157:4

**deals** [4] - 17:13, 18:1, 29:18, 63:18

**dealt** [1] - 140:23

**debate** [1] - 8:9

**deceive** [4] - 84:23, 85:18, 87:7, 88:2

**December** [5] - 1:4, 60:9, 62:5, 181:3, 210:20

**deception** [1] - 75:7

**decide** [22] - 14:3, 71:20, 74:2, 74:8, 74:24, 75:6, 75:19, 77:13, 77:16, 77:21, 85:9, 87:18, 98:17, 99:10, 99:17, 101:20, 156:21, 156:22, 159:4, 197:18, 197:21, 206:10

**decided** [2] - 13:13, 18:6

**deciding** [2] - 71:16, 101:24

**decision** [19] - 45:7, 71:23, 72:11, 73:11, 74:4, 75:8, 85:11, 85:12, 87:20, 87:21, 132:10, 132:15, 132:21, 132:24, 133:10, 154:17, 155:15, 156:1, 194:9

**decision-maker** [2] - 85:12, 87:21

**decisions** [2] - 142:2, 183:4

**decline** [2] - 46:4, 46:8

**deductions** [1] - 73:15

**deemed** [1] - 23:11

**deeply** [2] - 131:4, 135:7

**defendant** [167] - 13:4, 20:5, 21:2, 21:8, 21:23, 22:9, 23:14, 24:20, 25:3, 25:4, 25:8, 25:13, 25:15, 26:19, 27:10, 27:11, 27:18, 28:2, 28:3, 29:6, 29:10, 29:12, 30:5, 30:7, 30:8, 30:16, 30:17, 31:9, 31:10, 32:10, 32:11, 32:18, 32:21, 32:23, 33:7, 33:10, 34:1, 34:2, 34:6, 34:10, 34:12, 34:15, 35:17, 35:22, 35:23, 37:9, 37:10, 38:4, 39:3, 42:9, 51:5, 51:8, 51:12, 51:18, 51:24, 71:21, 71:25, 72:5, 72:6, 72:7, 72:9, 72:10, 72:13, 72:25, 75:22, 75:25, 76:7, 76:12, 76:16, 76:20, 76:23, 76:25, 77:6, 77:9, 77:12, 77:14, 77:15, 80:8, 80:9, 80:13, 80:17, 80:22, 80:24, 80:25, 81:4,

81:7, 81:8, 81:10, 81:12, 81:13, 81:16, 81:20, 81:21, 81:24, 82:1, 82:3, 82:17, 82:23, 83:3, 83:6, 83:19, 83:21, 84:4, 84:5, 84:19, 84:21, 85:25, 86:7, 86:9, 86:10, 86:15, 86:21, 86:23, 87:2, 87:3, 88:10, 88:24, 90:1, 90:4, 90:17, 90:20, 91:3, 91:6, 91:17, 91:19, 92:2, 92:24, 93:2, 93:17, 93:21, 94:1, 94:5, 94:15, 94:17, 94:18, 94:22, 96:20, 96:23, 96:24, 97:15, 97:19, 98:12, 102:16, 123:3, 123:4, 123:7, 127:7, 127:9, 129:18, 133:13, 133:15, 158:4, 189:4, 189:6, 189:8, 194:5, 195:18, 196:6, 196:10, 196:14, 196:17, 196:19, 201:9

**DEFENDANT** [13] - 1:17, 2:2, 132:6, 132:16, 132:19, 132:23, 133:1, 133:5, 133:8, 133:11, 133:19, 133:23, 134:1

**Defendant** [3] - 1:7, 76:3, 80:19

**defendant's** [15] - 19:1, 25:1, 27:8, 27:16, 28:10, 33:25, 51:9, 53:19, 54:3, 72:16, 72:18, 80:7, 81:6, 92:7, 129:13

**defense** [69] - 3:7, 3:22, 4:6, 4:11, 5:3, 5:5, 5:17, 5:18, 6:13, 6:16, 6:23, 8:22, 9:14, 9:15, 12:15, 13:9, 13:10, 13:13, 15:8, 15:9, 15:13, 17:9, 19:23, 21:19, 23:17, 25:22, 28:8, 33:13, 35:1, 35:16, 36:10, 37:20, 38:3, 38:23, 40:19, 40:23, 48:2, 49:21, 50:7, 50:18, 53:1, 55:25, 56:12, 56:19, 58:1, 63:11, 67:18, 70:3, 70:22, 88:19, 101:1, 101:7, 131:4, 131:18, 134:9, 134:18, 134:19, 137:16, 157:21, 189:13, 191:14, 192:19, 194:7, 194:16, 196:18, 196:23, 207:11, 209:20, 210:9

**Defense** [3] - 132:1, 147:5, 159:9

**defense's** [11] - 11:17, 13:11, 23:24, 31:21, 32:4, 45:22, 50:25, 56:12, 58:6, 143:3, 193:21

**defined** [1] - 145:20

**definitely** [1] - 169:12

**definitions** [1] - 161:11

**definitively** [1] - 18:6

**defraud** [56] - 17:14, 27:19, 27:22, 27:24, 28:4, 29:13, 29:22, 29:24, 35:8, 35:18, 35:19, 35:24, 37:3, 37:6, 37:11, 37:21, 37:23, 38:4, 38:6, 38:24, 39:4, 68:2, 76:14, 83:14, 83:22, 84:4, 84:22, 85:4, 85:7, 85:15, 85:19, 86:21, 86:24, 87:3, 87:5, 87:6, 87:13, 87:16, 87:24, 88:4, 88:18, 88:20, 88:21, 88:25, 99:7, 99:11, 99:12, 122:2, 122:11, 125:2, 155:4, 155:6, 158:6

**defrauding** [4] - 85:23, 88:13, 109:15, 125:7

**degree** [4] - 84:18, 95:12, 95:14, 95:24

**delete** [1] - 49:12

**deleted** [4] - 50:12, 153:5, 153:8, 177:4

**deliberate** [38] - 16:13, 19:19, 20:4, 20:13, 20:23, 21:10, 21:14, 22:2, 22:12, 22:20, 22:21, 23:2, 23:8, 23:25, 24:6, 25:6, 27:24, 29:18, 33:24, 34:4, 56:15, 71:11, 80:11, 129:17, 135:19, 135:22, 139:19, 157:7, 157:11, 198:5, 199:4, 199:8, 201:3, 203:2, 204:16, 209:3, 209:11

**deliberately** [15] - 21:9, 23:10, 25:9, 27:20, 28:6, 29:14, 30:5, 30:7, 30:16, 31:9, 32:6, 34:7, 80:14, 129:20, 199:16

**deliberateness** [1] - 20:17

**deliberating** [12] - 4:17, 4:19, 7:20, 14:13, 15:15, 101:9, 187:4, 202:4, 202:24, 203:11, 204:7, 204:10

**deliberation** [3] - 201:25, 202:18, 204:5

**deliberations** [8] - 71:19, 75:24, 77:19, 79:2, 98:2, 145:19, 204:3, 205:10

**delivery** [4] - 84:5, 95:4, 95:21, 122:14

**dementia** [1] - 119:2

**demonize** [1] - 139:17

**demonstrative** [2] - 65:22, 67:10

**demonstratives** [3] - 64:14, 65:23, 101:15

**denied** [1] - 58:11

**deny** [4] - 25:10, 34:8, 55:12, 80:15

**DEPARTMENT** [1] - 1:15

**deposit** [4] - 95:7, 95:9, 95:10, 97:5

**Deposit** [1] - 96:1

**deposited** [1] - 128:23

**deputy** [5] - 203:15, 204:1, 205:1, 205:21, 206:6

**derived** [6] - 44:21, 96:11, 97:11, 97:20, 97:22, 97:23

**described** [1] - 90:7

**description** [1] - 195:9

**designed** [5] - 94:23, 104:18, 105:11, 120:13, 129:6

**desist** [1] - 116:16

**despite** [1] - 196:14

**destined** [1] - 189:3

**destroy** [1] - 205:25

**detail** [1] - 75:10

**details** [7] - 83:1, 85:20, 88:5, 89:19, 90:15, 93:25, 124:6

**determination** [2] - 55:5, 188:24

**determine** [8] - 25:15, 33:9, 34:11, 54:21, 77:11, 80:18, 141:15, 149:8

**determined** [2] - 32:10, 32:18

**determining** [2] - 129:14, 141:4

**devised** [1] - 86:23

**diagnosis** [4] - 103:25, 122:9, 145:19, 194:1

**diagram** [1] - 167:18

**dichotomy** [1] - 135:14

**differ** [1] - 74:17

**difference** [6] - 35:3, 37:1, 58:20, 73:23, 163:9, 193:20

**different** [8] - 39:21, 40:1, 57:17, 59:6, 74:22, 129:2, 135:15, 144:17

**differently** [1] - 78:3

**difficult** [3] - 6:3, 135:9, 180:19

**digital** [2] - 207:18, 207:19

**diligence** [1] - 181:7

**dining** [2] - 104:8, 188:21

**Dinnen** [8] - 167:17, 167:18, 167:20, 167:23, 168:10, 180:4, 180:5, 180:13

**Dinnen's** [2] - 167:25, 168:4

**dinner** [2] - 173:4, 198:21

**direct** [11] - 22:20, 49:3, 73:16, 73:18, 73:24, 98:1, 165:1, 175:25, 176:7, 176:11, 176:17

**directed** [1] - 193:6

**directing** [2] - 81:2, 122:24

**direction** [5] - 11:21, 31:20, 81:3, 119:12, 194:24

**directions** [3] - 178:1, 178:22, 178:23

**directly** [16] - 19:15, 41:21, 51:22, 61:11, 74:16, 86:5, 91:20, 92:12, 92:21, 92:22, 96:12, 97:12, 117:21, 132:9, 190:5, 194:19

**director** [11] - 22:5, 22:7, 106:6, 106:7, 116:24, 117:4, 130:16, 144:20, 199:13

**director's** [1] - 145:3

**directors** [1] - 145:2

**directs** [1] - 81:9

**disadvantage** [1] - 6:7

**disagree** [2] - 5:21, 9:16

**disbelieve** [1] - 74:4

**discharge** [2] - 202:22, 203:2

**discharging** [1] - 202:16

**disclosed** [1] - 42:9

**discuss** [12] - 16:11, 16:19, 19:18, 34:22, 77:23, 117:23, 132:15, 154:8, 165:16, 182:10, 203:3, 204:15

**discussed** [6] - 20:23, 52:8, 55:24, 70:5, 180:9, 198:4

**discussing** [6] - 77:25, 83:8, 90:23, 94:7, 122:2, 202:21

**Discussion** [1] - 42:15

**discussions** [3] - 71:18, 203:4, 203:20

**disguise** [1] - 94:24

**disguised** [1] - 195:15

**disguising** [1] - 189:9

**dishonesty** [1] - 75:1

**dismiss** [1] - 5:2

**disobey** [1] - 80:1

**disposition** [2] - 95:4, 206:19

**disprove** [1] - 73:22

**dispute** [4] - 19:19, 42:21, 136:7, 181:10

**disputes** [3] - 30:21, 195:6, 195:7

**disregard** [4] - 72:3, 73:9, 80:2, 110:14

**distinct** [2] - 52:24, 184:8

**distributors** [2] - 162:25, 163:1

**DISTRICT** [3] - 1:1, 1:1, 1:10

**district** [2] - 23:5, 45:17

**District** [2] - 1:23, 210:22

**divide** [1] - 100:23

**DIVISION** [2] - 1:2, 1:15

**DNA** [1] - 113:17

**Docket** [2] - 50:21, 55:13

**doctor** [22] - 52:11, 104:23, 110:1, 112:12, 121:7, 135:24, 141:20, 141:21, 141:25, 142:2, 142:12, 148:15, 148:20, 148:21, 188:24, 189:1, 189:24, 192:16, 193:2, 195:25

**doctor's** [6] - 140:20, 141:15, 141:16, 142:14, 142:16

**doctor-physician** [1] - 52:11

**doctors** [52] - 52:2, 52:5, 104:12, 104:15, 104:17, 104:18, 105:18, 105:20, 106:5, 110:18, 113:8, 115:13, 115:15, 115:17, 116:4, 116:6, 126:8, 127:25, 130:16, 141:4, 141:5, 141:6, 142:8, 147:17, 148:10, 148:12, 148:18, 149:1, 149:7, 149:9, 149:12, 149:15, 149:19, 149:22, 151:15, 152:3, 152:21, 153:2, 153:7, 161:2, 178:3, 181:18, 181:22, 182:22, 188:19, 191:6, 194:3, 198:19, 198:22, 199:11

**doctors'** [9] - 113:4, 116:5, 117:19, 125:20, 125:23, 127:14, 128:1, 189:20, 190:4

**document** [5] - 146:6, 144:22, 147:4, 150:23, 184:15

**documentary** [1] - 107:9

**documentation** [1] - 112:17

**documenting** [2] - 114:11, 142:9

**documents** [8] - 41:13, 106:24, 107:20, 147:22, 157:24, 158:2, 188:4, 207:15

**dollar** [3] - 112:19, 121:20, 130:10

**dollars** [7] - 103:11, 113:17, 191:12, 196:9, 200:1, 200:2, 200:12

**Don** [1] - 206:22

**DONALD** [1] - 2:2

**done** [34] - 5:25, 8:15, 10:3, 10:23, 10:24, 11:1, 13:21, 14:10, 25:19, 51:10, 51:20, 52:7, 58:3, 79:21, 81:2, 101:3, 117:2, 124:5, 136:6, 136:11, 138:10, 144:17, 146:5, 148:1, 172:3, 173:5, 177:11, 179:9, 182:18, 186:6, 186:7, 205:2

**door** [6] - 21:19, 107:8, 190:4, 197:3, 197:7, 203:14

**dotted** [1] - 22:2

**double** [3] - 45:18, 173:24, 207:15

**double-check** [1] - 207:15

**doubt** [82] - 13:7, 18:25, 19:7, 25:15, 27:17, 28:3, 29:11, 30:4, 30:6, 30:15, 31:9, 31:13, 32:11, 32:20, 32:23, 33:10, 34:11, 35:24, 37:11, 38:6, 39:5, 54:3, 54:16, 54:22, 71:22, 72:13, 72:17, 72:18, 72:19, 72:22, 73:1, 79:13, 79:18, 80:18, 81:15, 81:25, 82:19, 83:21, 85:24, 86:12, 86:23, 89:1, 90:2, 91:18, 92:6, 93:19, 94:17, 96:22, 109:14, 138:13, 138:17, 138:21, 139:4, 143:6, 143:11, 144:2, 147:25, 149:10, 149:25, 151:13, 152:24, 153:10, 153:17, 154:13, 154:15, 154:23, 155:12, 158:6, 181:20, 182:16, 182:25, 186:9, 186:23, 196:25, 197:8, 197:11, 197:14, 201:5, 210:5

**down** [22] - 4:8, 9:1, 13:22, 20:20, 41:6, 52:15, 66:8, 98:8, 100:11, 100:16, 114:17, 131:16, 148:5, 154:24, 164:16, 165:18, 168:19, 168:21, 192:24, 193:17, 198:21, 203:16

**down-the-line** [1] - 20:20

**downtown** [1] - 4:5

**dozens** [3] - 191:23

**Dr** [18] - 22:4, 52:8, 104:12, 105:3, 112:7, 112:17, 120:6, 120:9, 142:5, 144:20, 145:4, 151:7, 151:16, 152:14, 152:18, 172:20, 174:2

**draft** [5] - 6:2, 7:2, 16:9, 16:10, 16:22

**drank** [3] - 185:15, 185:17, 185:18

**draw** [5] - 63:3, 63:10, 129:11, 175:13, 207:1

**drawn** [2] - 22:14, 55:4

**dressing** [1] - 116:16

**drew** [1] - 207:12

**Drive** [1] - 2:3

**drive** [3] - 51:23, 192:4, 199:25

**drives** [1] - 207:22

**drop** [2] - 199:25, 200:1

**drove** [1] - 117:12

**drug** [3] - 24:6, 24:10, 28:22

**due** [1] - 181:7

**duly** [1] - 132:1

**duped** [1] - 197:15

**duplicative** [1] - 37:25

**during** [17] - 73:10, 74:22, 75:23, 78:24, 79:2, 86:2, 86:13, 90:6, 123:5, 131:1, 131:6, 136:14, 146:18, 150:9, 152:12, 168:11, 178:13

**duty** [3] - 71:15, 130:25, 139:23

**duty-bound** [1] - 139:23

# E

**E.G** [7] - 112:5, 112:15, 119:25, 120:4, 123:21, 150:6, 197:5

**E.G.'s** [2] - 124:9, 191:24

**earliest** [1] - 5:14

**early** [2] - 44:13, 169:6

**ears** [1] - 199:5

**easier** [1] - 26:22

**easily** [2] - 173:8, 198:3

**East** [2] - 1:23, 210:22

**easy** [5] - 139:12, 147:20, 174:9, 176:6, 178:1

**eat** [1] - 69:9

**edit** [2] - 49:24, 69:23

**edited** [1] - 50:8

**edition** [2] - 31:21, 32:4

**educates** [1] - 32:15

**effect** [3] - 32:16, 43:24, 181:11

**effecting** [1] - 122:4

**effectively** [3] - 5:11, 85:6, 87:15

**effort** [2] - 89:20, 136:23

**eight** [3] - 173:23, 206:20

**either** [21] - 10:10, 28:3, 29:11, 42:21, 62:2, 70:17, 71:25, 73:24, 84:17, 100:13, 104:21, 115:13, 120:2, 125:2, 125:4, 150:5, 152:4, 161:2, 178:14, 180:6, 182:2

**EKRA** [1] - 12:3

**ELab** [1] - 167:18

**elaborating** [1] - 44:5

**elected** [2] - 132:12, 134:19

**election** [1] - 13:11

**element** [7] - 20:6, 35:19, 37:6, 37:24, 38:25, 88:21, 108:5

**elements** [3] - 47:5, 121:23, 127:6

**eleventh** [1] - 50:14

**Eleventh** [6] - 18:6, 20:15, 44:24, 45:15, 46:16, 53:23

**eliminate** [2] - 36:18, 55:4

**eliminated** [1] - 16:25

**elucidated** [1] - 53:22

**email** [13] - 3:6, 11:20, 12:2, 17:19, 34:23, 35:11, 68:4, 120:2, 128:14, 164:1, 166:15, 179:1, 186:3

**emailed** [2] - 35:2, 35:5

**emails** [3] - 7:5, 107:11, 126:19

**embellishing** [1] - 18:8

**embrace** [1] - 197:2

**emerge** [1] - 60:5

**emergency** [2] - 202:25, 204:12

**EMILY** [1] - 1:13

**emphasize** [6] - 28:9, 28:21, 30:24, 34:14, 79:6, 80:21

**employ** [1] - 204:4

**employee** [2] - 81:9, 122:25

**employees** [8] - 107:4, 116:22, 163:2, 186:1, 186:4, 194:16, 195:3

**empty** [1] - 105:17

**encounter** [1] - 122:10

**encouraged** [1] - 115:7

**end** [14] - 14:16, 33:23, 40:20, 47:24, 70:19, 70:22, 100:2, 117:5, 127:2, 135:18, 139:9, 196:21, 201:10, 202:14

**ended** [5] - 130:10, 135:13, 181:1, 201:7, 202:18

**engage** [2] - 93:4, 94:12, 96:18, 96:23, 203:4

**engaged** [4] - 84:17, 84:20, 90:7, 96:23

**enrolled** [1] - 111:6

**enrollment** [6] - 111:7, 117:13, 126:1, 126:25, 128:12, 143:13

**ensured** [1] - 105:23

**enter** [1] - 53:19

**entered** [1] - 114:17

**enters** [5] - 12:20, 71:2, 134:15, 187:23, 208:15

**entire** [6] - 5:1, 5:2, 36:11, 51:17, 159:18, 193:24

**entirely** [3] - 46:24, 78:19, 90:12

**entities** [1] - 93:25

**entitled** [3] - 42:7, 79:6, 210:19

**entity** [5] - 84:10, 92:11, 92:15

**Entry** [2] - 50:21, 55:13

**envisions** [1] - 201:18

**EOB** [2] - 114:11, 199:22

**ePay** [3] - 180:4, 180:13

**equal** [2] - 53:1, 101:10

**equation** [2] - 194:4, 195:25

equivalent [4] - 25:7, 27:25, 34:5, 80:12
err [1] - 89:5
erroneously [1] - 20:15
error [4] - 20:16, 36:3, 39:10, 158:10
Esformes [1] - 44:15
especially [2] - 54:17, 67:4
essential [14] - 25:2, 27:9, 33:25, 35:19, 35:20, 37:6, 37:7, 37:23, 38:25, 39:1, 80:7, 88:21, 88:22, 129:14
essentially [5] - 40:3, 42:2, 116:1, 158:14, 159:13
establish [9] - 36:4, 39:11, 83:9, 89:6, 90:24, 94:8, 158:11, 165:12, 189:20
evaluate [3] - 107:7, 196:24, 197:3
evaluating [1] - 196:22
evening [1] - 209:12
event [8] - 23:17, 83:7, 90:11, 90:22, 94:6, 205:24, 206:10, 209:25
events [1] - 127:4
evidence [130] - 17:1, 20:3, 20:18, 21:11, 22:13, 23:22, 27:17, 36:2, 39:10, 40:24, 40:25, 41:23, 51:4, 53:2, 53:12, 53:20, 53:24, 54:1, 54:9, 54:15, 54:18, 54:19, 54:20, 54:23, 54:25, 55:1, 55:6, 55:11, 57:12, 58:21, 59:3, 59:9, 59:10, 59:14, 60:2, 61:3, 61:14, 63:5, 63:17, 64:10, 65:18, 65:19, 67:11, 71:23, 72:6, 72:8, 72:21, 73:3, 73:4, 73:6, 73:13, 73:14, 73:16, 73:18, 73:21, 73:24, 73:25, 74:1, 74:17, 74:18, 74:20, 77:5, 77:11, 77:22, 78:7, 78:23, 79:3, 80:25, 89:5, 101:22, 101:24, 106:20, 107:9, 107:15, 107:19, 107:25, 108:3, 108:4, 109:13, 109:15, 113:22, 126:15, 128:4, 130:25, 131:2, 131:12, 135:11, 135:22, 136:2, 136:7, 136:12, 136:17, 137:18, 137:23, 138:2, 138:3, 139:3, 139:11, 140:7, 141:8, 145:7, 147:5, 147:24, 150:14, 150:16, 151:14, 152:5, 153:6, 153:9, 153:23, 157:15, 158:10, 159:5, 183:1, 186:2, 186:12, 186:13, 188:8, 192:2, 193:18, 199:9, 200:23, 200:25, 201:6, 201:13,
202:9, 204:24
evidentiary [1] - 54:10
evolution [1] - 166:11
evolving [1] - 147:15
exact [4] - 41:12, 79:17, 144:23, 192:14
exactly [20] - 17:23, 23:18, 33:4, 37:2, 59:8, 59:10, 59:15, 59:16, 61:8, 108:3, 155:6, 164:22, 166:22, 175:13, 179:12, 181:11, 183:22, 191:24, 199:13, 207:23
examination [6] - 142:6, 176:1, 176:7, 176:11, 176:17
examinations [1] - 22:15
examine [1] - 141:16
example [18] - 20:7, 22:17, 24:10, 24:17, 25:7, 29:4, 34:5, 37:18, 80:12, 101:15, 115:19, 117:22, 117:24, 118:1, 129:8, 162:24, 198:8, 202:24
examples [6] - 111:12, 112:20, 119:1, 119:25, 123:25, 125:24
excellent [1] - 132:20
except [5] - 36:5, 37:2, 73:8, 180:11
excerpts [1] - 65:25
exchange [6] - 78:11, 95:8, 97:6, 113:7, 125:13, 195:12
exclude [2] - 58:10, 72:17
exclusive [1] - 88:9
excuse [6] - 15:12, 42:8, 68:17, 184:4, 203:7, 205:9
excused [3] - 187:8, 205:19, 209:14
execute [2] - 83:14, 83:22, 122:1
executed [2] - 83:21, 117:15
executing [1] - 122:1
exert [1] - 51:22
exhibit [7] - 3:16, 11:10, 11:16, 11:25, 162:4, 162:21, 168:15
Exhibit [18] - 11:10, 124:7, 147:5, 147:25, 159:10, 164:17, 166:14, 171:19, 173:15, 179:3, 179:20, 180:10, 183:12, 183:13, 191:18, 191:20, 192:4, 197:22
Exhibits [2] - 197:23, 198:1
exhibits [15] - 3:16, 3:18, 3:20, 5:6, 48:9, 48:19, 73:5, 101:15, 129:10, 174:19, 174:20, 175:5, 198:3, 203:15, 206:5
exist [4] - 25:5, 27:12, 34:3, 80:10
existed [7] - 25:4, 27:11, 30:25, 31:4, 31:12, 34:2, 80:9
existence [1] - 23:15
exits [5] - 15:24, 131:20, 187:10, 205:13, 209:16
expect [1] - 15:10
expected [2] - 57:10, 153:9
expecting [1] - 155:13
expects [1] - 126:23
expensive [4] - 104:19, 105:19, 109:16, 115:14
experience [4] - 75:16, 144:4, 144:9, 176:15
expert [18] - 22:7, 55:9, 105:3, 107:6, 109:17, 111:21, 126:21, 141:19, 142:20, 143:4, 143:7, 143:10, 145:10, 152:13, 184:7
experts [14] - 57:17, 136:9, 136:23, 137:5, 140:25, 141:12, 141:13, 142:4, 147:13, 147:15, 152:11, 152:23, 161:6, 183:23
explain [11] - 38:2, 41:21, 72:1, 76:6, 76:19, 77:19, 98:4, 144:7, 175:2, 188:17, 188:19
explained [4] - 107:21, 109:25, 111:24, 143:20
explaining [2] - 57:11, 199:22
explanation [2] - 62:3, 177:7
exploited [1] - 103:19
exploiting [5] - 188:12, 188:13, 188:14, 188:16
exploring [1] - 16:5
expressly [1] - 78:15
extended [3] - 71:4, 160:17, 167:5
extension [1] - 95:8
extent [4] - 31:14, 209:8, 209:23, 210:1
extraordinarily [2] - 49:5, 50:25
eyes [11] - 21:12, 25:17, 28:6, 29:14, 32:12, 33:3, 33:11, 33:16, 34:13, 80:20, 129:20
eyewitness [1] - 73:20

**F**

F.2d [3] - 45:4, 45:11, 54:6
F.3d [4] - 23:5, 42:7, 45:6, 45:9
face [3] - 10:4, 78:13, 207:10
facie [1] - 42:3
fact [95] - 4:10, 8:23, 20:6, 21:17, 23:15, 25:2, 25:4, 25:5, 26:19, 26:23, 27:9, 27:10, 27:11, 30:6, 30:8, 30:9, 30:17, 30:18, 30:25, 31:4, 31:10, 31:11, 31:12, 32:10, 32:11, 32:18, 32:21, 32:25, 33:5, 33:8, 33:9, 33:10, 33:17, 33:25, 34:2, 34:3, 34:10, 34:12, 34:13, 34:16, 37:2, 47:3, 51:24, 52:13, 54:19, 56:11, 73:19, 73:22, 74:19, 74:25, 75:9, 78:22, 80:7, 80:9, 80:10, 80:18, 80:19, 80:20, 80:23, 84:3, 84:25, 85:2, 85:7, 85:8, 85:10, 87:2, 87:11, 87:16, 87:17, 87:19, 97:2, 110:8, 113:14, 129:18, 129:19, 131:2, 136:5, 136:8, 136:21, 137:9, 142:24, 157:16, 174:9, 176:23, 178:15, 179:4, 194:8, 194:13, 198:6, 198:7
factoring [2] - 167:21, 168:3
facts [21] - 23:14, 23:16, 23:18, 23:21, 29:20, 29:21, 30:2, 42:10, 71:21, 73:11, 73:21, 78:6, 82:19, 83:20, 86:22, 90:2, 91:18, 93:18, 94:16, 101:24, 159:4
factual [2] - 30:20, 73:8
fail [1] - 154:15
failed [2] - 136:21, 155:1
fails [1] - 72:13
failure [2] - 21:4, 151:12
fair [4] - 22:22, 24:22, 28:11, 58:18
faith [65] - 17:9, 17:13, 17:24, 22:23, 34:22, 34:24, 34:25, 35:16, 35:17, 35:22, 37:9, 37:20, 38:2, 38:3, 38:5, 38:23, 39:3, 40:16, 40:21, 41:5, 42:8, 42:10, 56:13, 57:4, 57:7, 57:12, 57:20, 58:20, 63:17, 67:18, 88:19, 88:24, 136:15, 136:23, 154:23, 155:2, 155:3, 155:9, 157:19, 157:21, 158:5, 161:11, 163:10, 163:11, 165:6, 165:12, 169:1, 175:18, 175:20, 178:16, 179:14, 181:12, 184:13, 185:1, 185:11, 185:20, 186:8, 193:5, 193:6, 193:8, 193:11, 193:15, 195:3

**fake** [4] - 188:4, 192:8
**false** [27] - 22:11, 75:1, 78:17, 83:17, 83:25, 84:2, 84:24, 85:1, 85:5, 85:14, 85:16, 86:24, 87:1, 87:8, 87:10, 87:14, 87:23, 87:25, 88:8, 109:7, 122:8, 146:11, 146:12, 146:14, 173:21, 190:13, 191:12
**falsely** [1] - 74:19
**families** [1] - 205:2
**family** [31] - 103:14, 104:10, 119:6, 119:22, 133:3, 140:16, 142:24, 159:14, 159:19, 159:24, 160:11, 160:24, 161:3, 161:9, 165:7, 165:10, 183:18, 183:22, 184:1, 184:4, 184:5, 184:10, 184:12, 184:13, 184:17, 193:21, 193:22, 193:25, 203:5, 204:9, 204:17
**family's** [1] - 194:1
**fancy** [2] - 148:24, 151:17
**far** [6] - 35:4, 69:4, 137:24, 143:2, 188:10, 191:2
**farm** [2] - 116:1, 198:16
**fast** [2] - 28:18, 189:25
**fault** [1] - 173:4
**faults** [1] - 152:22
**faulty** [3] - 22:11, 52:19, 195:9
**favor** [2] - 100:16, 131:24
**favorable** [2] - 53:25, 78:16
**favored** [1] - 54:18
**fear** [6] - 103:19, 115:11, 118:18, 121:4, 173:21, 188:14
**fears** [3] - 103:12, 119:10
**February** [1] - 171:21
**Federal** [1] - 96:1
**federal** [15] - 76:18, 82:4, 83:13, 86:19, 89:8, 89:10, 91:11, 91:15, 91:25, 92:20, 93:3, 94:12, 96:10, 96:18, 110:10
**fee** [5] - 171:12, 171:14, 171:23, 172:1, 172:4
**feelings** [1] - 65:8
**fees** [1] - 57:9
**feisty** [1] - 169:11
**felony** [2] - 75:1, 96:10
**felt** [4] - 10:16, 116:14, 188:20, 202:11
**Ferrari** [1] - 199:25
**fete** [1] - 179:19
**few** [14] - 6:4, 8:25, 9:2, 15:22, 16:1, 16:12, 47:16, 49:2, 66:23, 66:25, 74:9, 132:11, 134:4, 151:20
**Fi** [1] - 207:21

**field** [2] - 75:16, 184:21
**Fifth** [2] - 45:8, 54:5
**figure** [5] - 14:18, 98:20, 177:18, 202:8, 204:22
**figures** [1] - 173:24
**file** [6] - 5:6, 7:15, 7:17, 58:10, 192:7
**filed** [3] - 7:15, 9:15, 53:11
**files** [13] - 22:4, 22:9, 22:11, 52:3, 52:6, 52:9, 107:11, 119:23, 120:10, 142:18, 188:4, 192:5, 199:12
**fill** [3] - 100:8, 150:19, 150:23
**final** [10] - 6:17, 15:14, 17:6, 34:16, 34:20, 48:17, 101:9, 154:2, 187:4, 203:25
**finalize** [1] - 48:24
**financial** [11] - 55:9, 94:13, 94:18, 95:6, 95:11, 95:21, 95:25, 96:19, 97:7, 97:9, 195:11
**fine** [23] - 14:4, 33:19, 36:9, 39:12, 57:19, 57:24, 59:6, 59:20, 60:11, 63:24, 64:5, 66:2, 66:18, 67:2, 68:20, 68:24, 69:1, 69:6, 163:14, 176:5, 189:22, 207:3, 209:21
**finish** [7] - 8:17, 15:13, 16:21, 50:18, 50:19, 95:1, 131:7
**finished** [2] - 4:12, 126:11
**firm** [1] - 158:20
**firms** [2] - 158:22, 161:24
**first** [43] - 10:6, 10:23, 15:6, 16:13, 16:20, 19:18, 21:20, 29:3, 29:17, 31:7, 31:22, 31:23, 32:7, 37:18, 38:21, 46:10, 47:22, 56:4, 67:21, 67:25, 70:11, 76:7, 76:20, 86:6, 98:11, 100:22, 101:5, 102:22, 108:10, 114:18, 117:4, 122:1, 122:19, 124:4, 132:14, 143:12, 148:7, 157:1, 171:21, 176:10, 197:1, 201:24, 206:23
**fist** [1] - 16:1
**five** [10] - 66:19, 70:12, 101:6, 112:13, 121:24, 131:16, 134:8, 187:8, 187:12, 187:13
**five-minute** [4] - 70:12, 101:6, 131:16, 187:12
**fix** [1] - 32:8
**fixed** [2] - 49:6, 210:6
**flash** [1] - 139:14
**flat** [5] - 171:11, 171:14, 171:23, 172:1, 172:4
**flat-fee** [1] - 172:1
**fleshed** [1] - 63:11

**fleshing** [1] - 56:19
**flew** [1] - 114:17
**floor** [8] - 102:11, 117:7, 134:23, 169:15, 169:16, 169:17, 188:1
**Floor** [1] - 1:16
**FLORIDA** [1] - 1:1
**Florida** [3] - 1:3, 1:24, 210:23
**flow** [2] - 107:12, 127:22
**flying** [1] - 20:7
**focus** [7] - 9:19, 55:16, 116:13, 139:10, 139:11, 192:19, 204:24
**focused** [7] - 9:16, 9:18, 51:2, 56:13, 118:9, 192:9
**focusing** [1] - 53:6
**fog** [1] - 176:19
**folks** [14] - 8:16, 41:24, 131:15, 136:25, 137:16, 141:12, 142:17, 142:23, 151:12, 153:17, 192:6, 193:18, 199:4, 204:5
**follow** [12] - 70:7, 71:8, 71:13, 72:1, 72:2, 100:20, 111:9, 126:2, 126:3, 153:23, 190:13, 204:19
**followed** [2] - 89:23, 186:19
**following** [11] - 66:17, 82:19, 83:20, 86:22, 90:2, 91:18, 93:18, 94:16, 96:21, 102:14, 159:22
**follows** [2] - 27:8, 98:12
**fooled** [1] - 144:14
**foolish** [1] - 4:10
**foolishness** [3] - 28:9, 34:15, 80:22
**footnote** [1] - 44:12
**FOR** [3] - 1:13, 1:17, 2:2
**forbid** [1] - 202:25
**forbids** [2] - 80:1, 80:4
**force** [1] - 190:24
**forcing** [1] - 133:3
**foregoing** [1] - 210:17
**foreign** [5] - 95:12, 95:15, 95:22, 96:3, 96:10
**foreperson** [5] - 98:1, 100:2, 100:8, 201:25
**foresee** [1] - 3:14
**foreseeable** [3] - 86:16, 123:9, 123:16
**forfeiture** [2] - 6:9, 6:17
**forget** [3] - 75:4, 146:15, 184:7
**forgetting** [1] - 60:3
**Form** [1] - 22:3
**form** [26] - 42:21, 42:23, 50:15, 95:20, 96:12, 97:12, 98:3, 98:6, 100:8, 105:21, 111:17, 112:16, 117:13,

119:24, 120:14, 143:19, 144:1, 144:21, 145:7, 191:17, 191:19, 191:20, 191:21, 191:24, 191:25, 203:12
**formal** [4] - 72:5, 82:14, 89:17, 93:13
**formally** [2] - 202:22, 205:19
**formatting** [3] - 12:10, 16:7, 47:16
**formed** [3] - 35:25, 89:2, 158:7
**former** [5] - 95:23, 107:4, 116:22, 174:15, 194:16
**forms** [21] - 26:8, 104:17, 104:18, 105:18, 107:1, 110:20, 111:7, 115:22, 120:13, 124:19, 125:24, 127:1, 128:12, 140:20, 143:13, 143:16, 150:20, 190:11, 191:16, 191:23
**formulate** [1] - 41:22
**Fort** [1] - 1:24, 210:23
**forth** [6] - 129:1, 129:2, 129:9, 162:5, 169:12, 173:21
**fortunately** [2] - 156:21, 185:22
**fortune** [1] - 199:24
**forward** [1] - 102:6
**Foss** [2] - 52:16, 105:4
**foundation** [1] - 11:23
**four** [6] - 117:5, 158:17, 168:11, 168:12, 175:24, 183:5
**Fourth** [1] - 45:6
**framing** [1] - 10:11
**frankly** [3] - 5:4, 7:19, 10:4
**FRAUD** [1] - 1:15
**fraud** [78] - 21:17, 25:20, 28:1, 28:2, 29:9, 29:25, 35:20, 37:6, 38:8, 38:25, 76:2, 76:5, 81:20, 82:7, 82:22, 86:8, 86:9, 88:10, 88:21, 94:21, 94:22, 96:16, 96:17, 97:3, 97:17, 97:18, 98:17, 98:21, 98:22, 99:2, 103:15, 104:3, 105:14, 105:15, 106:3, 107:16, 108:8, 108:11, 108:13, 108:14, 108:17, 108:22, 109:10, 117:12, 121:13, 121:23, 123:11, 123:24, 124:20, 124:23, 129:4, 129:21, 148:19, 150:4, 150:7, 169:7, 169:8, 188:5, 191:3, 197:20
**fraudulent** [28] - 36:1, 36:4, 39:7, 39:8, 39:11, 67:24, 83:17, 83:25, 84:2, 84:24,

85:1, 85:6, 85:16, 86:25, 87:8, 87:10, 87:15, 87:25, 88:8, 89:3, 89:6, 109:7, 112:23, 123:25, 130:1, 158:8, 158:11, 194:15

**free** [11] - 14:2, 15:20, 69:2, 71:8, 103:22, 104:8, 193:13, 197:13, 204:14, 204:15, 205:17

**freedom** [2] - 155:25, 183:8
**freely** [2] - 132:25, 133:15
**fresh** [1] - 69:22, 202:6
**Friday** [3] - 5:11, 9:17, 13:3
**friend** [1] - 154:2
**friends** [4] - 133:3, 203:5, 204:9, 204:18
**front** [4] - 146:22, 196:10, 196:11, 201:23
**front-row** [2] - 196:10, 196:11
**fruit** [6] - 118:19, 119:1, 119:3, 119:7, 119:16, 192:24
**full** [5] - 5:6, 16:6, 55:22, 65:7, 206:12
**fully** [3] - 42:9, 77:22, 133:15
**function** [2] - 54:7, 55:3
**fund** [2] - 129:24, 130:7
**funded** [2] - 92:22, 130:6
**Funding** [1] - 180:4
**funds** [2] - 96:25, 97:6
**furnishing** [4] - 91:13, 91:14, 91:24

## G

**G-1** [2] - 159:9, 159:10
**G-2** [3] - 161:14, 162:9, 164:22
**G-e-r-i** [1] - 23:4
**gain** [1] - 78:16
**game** [1] - 192:7
**garbage** [1] - 191:16
**GARLAND** [1] - 2:3
**gatekeeper** [1] - 141:21
**geared** [1] - 120:20
**general** [5] - 57:14, 57:19, 83:4, 90:18, 94:2
**generality** [1] - 57:6
**generally** [3] - 57:11, 58:4, 59:20
**generate** [1] - 128:2
**generated** [4] - 52:4, 106:13, 123:19
**generic** [3] - 30:19, 57:14, 61:20
**genes** [1] - 145:8
**genetic** [43] - 51:10, 51:15, 103:24, 103:25, 104:7, 104:24, 105:3, 105:4, 105:5,

105:6, 107:2, 107:6, 107:22, 109:8, 109:16, 110:1, 110:2, 110:4, 110:6, 112:8, 112:14, 113:7, 114:11, 114:16, 115:1, 122:3, 122:9, 122:15, 123:17, 123:20, 124:13, 125:10, 125:14, 125:20, 125:23, 125:24, 130:1, 130:22, 147:14, 189:2
**genetics** [1] - 144:25
**gentlemen** [62] - 12:22, 13:16, 50:7, 71:4, 103:8, 131:10, 134:17, 135:4, 136:4, 137:1, 137:10, 138:10, 138:15, 138:20, 139:6, 139:20, 139:25, 143:3, 143:5, 143:11, 143:15, 143:24, 144:14, 146:10, 146:15, 148:23, 149:6, 149:10, 149:25, 151:2, 151:10, 151:13, 151:25, 152:9, 152:24, 153:18, 153:23, 187:3, 187:24, 188:3, 189:13, 189:17, 189:22, 190:9, 190:16, 191:22, 192:1, 192:13, 192:17, 193:4, 193:14, 195:2, 195:20, 196:18, 197:2, 197:17, 198:25, 199:18, 200:19, 201:7, 201:17, 208:17
**Georgia** [6] - 1:19, 2:4, 2:7, 183:11, 183:14
**Geri** [1] - 23:4
**giant** [2] - 148:19, 152:13
**gift** [8] - 95:3, 104:8, 105:17, 112:1, 112:2, 188:21, 192:20, 199:3
**gifts** [1] - 111:25
**girlfriend** [1] - 169:9
**given** [16] - 19:24, 20:15, 21:16, 40:25, 42:11, 44:24, 65:12, 75:23, 101:10, 131:5, 133:25, 160:3, 174:13, 178:22, 178:23, 186:22
**glad** [3] - 49:14, 67:15, 208:24
**goal** [2] - 4:17, 14:12
**goals** [4] - 83:9, 86:3, 90:24, 94:8
**Goldberg** [1] - 171:8
**good-faith** [14] - 17:9, 17:24, 34:22, 34:25, 40:16, 40:21, 41:5, 42:8, 56:13, 57:12, 57:20, 67:18, 136:23, 161:11
**goodness** [1] - 185:13
**goods** [1] - 84:15
**Google** [1] - 204:22
**gotcha** [1] - 38:13

**gotta** [3] - 148:3, 169:11, 186:15
**governing** [2] - 76:6, 76:19
**government** [150] - 3:11, 3:15, 4:22, 7:1, 7:14, 10:15, 13:4, 13:8, 15:6, 15:11, 15:13, 17:17, 18:22, 18:23, 18:25, 19:6, 23:19, 30:25, 31:4, 31:11, 32:6, 35:23, 36:8, 37:10, 38:5, 38:11, 39:4, 43:20, 43:25, 44:18, 50:10, 52:19, 52:22, 53:25, 54:13, 54:18, 54:21, 55:15, 56:3, 56:14, 56:18, 61:25, 63:3, 65:1, 65:8, 66:12, 66:17, 70:1, 71:20, 72:1, 72:12, 75:11, 78:9, 78:18, 79:16, 79:18, 81:23, 81:25, 82:12, 82:16, 84:16, 84:19, 85:20, 85:22, 88:5, 88:25, 89:15, 89:18, 89:24, 92:3, 92:6, 93:11, 93:15, 97:18, 97:22, 100:22, 100:25, 101:1, 101:3, 101:8, 102:10, 106:21, 122:20, 131:1, 135:13, 136:11, 136:18, 137:1, 137:8, 137:17, 138:17, 139:9, 139:14, 140:13, 141:9, 142:2, 143:14, 146:23, 147:1, 148:17, 148:24, 149:23, 150:1, 150:5, 150:15, 151:20, 153:7, 154:8, 154:13, 154:14, 154:18, 154:22, 155:1, 155:4, 156:1, 156:10, 156:11, 156:19, 156:21, 157:12, 158:5, 158:20, 161:6, 165:9, 165:17, 166:1, 166:2, 166:5, 166:9, 171:3, 174:9, 175:8, 175:10, 175:14, 177:10, 180:1, 181:1, 181:5, 182:9, 182:23, 184:15, 185:6, 185:18, 186:9, 196:3, 196:24, 207:9, 209:20, 210:2
**Government** [14] - 11:10, 46:11, 92:23, 166:14, 171:19, 173:15, 179:3, 179:19, 180:10, 183:12, 183:13, 191:17, 191:20, 192:4
**GOVERNMENT** [1] - 1:13
**Government's** [5] - 124:6, 164:17, 197:22, 197:23, 198:1
**government's** [28] - 5:19, 10:9, 13:7, 18:11, 19:20, 21:13, 21:20, 22:7, 40:20, 47:24, 58:6, 61:5, 68:16, 70:11, 70:19, 72:15, 72:17,

136:19, 136:20, 140:25, 145:10, 152:25, 156:12, 167:3, 173:12, 182:15, 187:5, 187:25
**Gracie** [5] - 131:24, 205:23, 207:15, 208:8, 210:8
**grad** [1] - 175:19
**grant** [1] - 23:23
**grateful** [1] - 131:4
**greased** [1] - 105:14
**great** [5] - 8:8, 15:22, 17:23, 177:4, 189:24
**greater** [1] - 79:6
**Greber** [1] - 45:4
**grind** [1] - 109:20
**Griner** [7] - 51:13, 60:8, 61:13, 104:14, 105:23, 108:24, 109:6, 110:21, 112:22, 115:6, 115:7, 115:20, 118:16, 120:24, 121:17, 126:12, 126:16, 127:18, 127:19, 128:10, 128:14, 151:23, 155:20, 156:4, 156:7, 159:7, 159:12, 159:17, 159:21, 161:7, 161:14, 161:16, 161:17, 161:20, 161:25, 162:7, 163:4, 163:14, 164:23, 164:24, 165:15, 165:17, 166:7, 166:15, 167:6, 172:19, 179:15, 179:23, 180:12, 180:25, 181:2, 181:3, 181:6, 182:24, 186:15, 186:17, 189:4, 189:6, 189:12, 190:2, 190:3, 190:7, 193:9, 195:20, 196:3, 197:9, 199:14, 200:8
**Griner's** [2] - 164:7, 166:12
**gross** [2] - 96:13, 97:13
**ground** [1] - 105:12
**group** [1] - 9:12
**guess** [14] - 9:20, 11:9, 34:16, 37:16, 39:7, 43:25, 44:19, 61:22, 141:24, 142:12, 145:24, 158:21, 174:23, 185:17
**guidance** [3] - 23:5, 54:12, 55:14
**guide** [1] - 41:25
**guideline** [1] - 143:23
**guilt** [11] - 54:3, 54:11, 54:16, 72:6, 72:12, 72:16, 72:18, 78:23, 123:2, 154:13, 154:14
**guilty** [70] - 6:8, 71:21, 72:14, 73:1, 77:6, 77:12, 77:14, 77:15, 77:17, 78:22, 80:24, 82:2, 82:18, 83:6, 83:19, 86:4, 86:7, 86:9, 86:21, 90:1, 90:21, 91:17,

93:17, 94:5, 94:15, 96:20, 98:18, 98:19, 98:23, 99:3, 99:4, 99:9, 99:14, 99:17, 99:18, 99:21, 107:3, 109:14, 123:3, 123:12, 123:13, 125:5, 125:6, 131:12, 137:22, 137:24, 138:11, 138:18, 139:13, 139:22, 139:24, 143:11, 143:25, 144:11, 152:9, 153:10, 153:25, 154:16, 154:20, 155:3, 155:10, 156:22, 181:16, 186:24, 201:14

**Gurskis** [10] - 56:6, 66:21, 131:14, 134:6, 137:25, 145:14, 145:22, 146:2, 192:22, 196:23

**GURSKIS** [5] - 1:13, 2:12, 103:1, 103:6, 103:8

**guy** [8] - 142:23, 144:18, 151:3, 169:11, 175:4, 175:5, 175:12, 178:14

**guys** [50] - 4:9, 6:4, 6:14, 7:17, 8:13, 8:15, 9:5, 11:2, 13:18, 14:1, 14:2, 14:16, 15:20, 16:19, 34:20, 35:2, 35:5, 40:10, 48:2, 48:6, 48:9, 48:18, 68:3, 68:18, 68:21, 69:8, 69:9, 69:14, 98:5, 98:6, 98:9, 134:8, 148:4, 193:13, 202:3, 202:12, 203:8, 203:19, 204:19, 205:20, 206:14, 207:6, 207:17, 208:7, 208:10, 209:3, 209:7, 209:13, 209:24, 210:11

# H

**H's** [1] - 124:6

**H.K** [12] - 103:10, 111:25, 112:6, 112:10, 112:15, 120:1, 123:21, 130:9, 188:16, 189:2, 197:5, 199:2

**H.K.'s** [2] - 124:11, 191:20

**half** [3] - 4:15, 85:6, 87:15

**hallmark** [1] - 137:11

**halls** [1] - 118:22

**halt** [1] - 109:20

**hand** [3] - 100:6, 157:13, 205:21

**handed** [1] - 69:22

**handle** [1] - 204:1

**hands** [9] - 4:16, 6:8, 6:18, 14:16, 16:3, 20:8, 105:21, 131:8, 148:13

**hang** [2] - 173:8

**hanging** [6] - 118:19, 119:1, 119:3, 119:7, 119:16, 192:24

**Hanukkah** [1] - 192:12

**happy** [1] - 9:23

**hard** [6] - 14:22, 15:17, 98:7, 186:1, 186:18, 192:4

**harm** [2] - 38:11, 108:2

**harmed** [1] - 113:16

**harmless** [1] - 20:16

**Harvard** [1] - 175:19

**hatched** [1] - 189:5

**hates** [1] - 48:14

**hawking** [1] - 104:7

**head** [5] - 151:5, 157:10, 199:5, 202:6, 209:2

**health** [9] - 49:22, 92:21, 103:13, 103:14, 120:22, 121:2, 121:5, 176:12, 176:13

**Health** [2] - 113:6, 117:24

**healthcare** [72] - 21:17, 22:18, 28:1, 28:5, 29:9, 29:13, 29:25, 38:7, 62:16, 76:2, 76:5, 76:15, 76:18, 81:20, 82:6, 82:22, 83:15, 83:17, 83:22, 83:24, 84:1, 84:6, 84:7, 84:13, 84:14, 84:16, 86:8, 86:9, 91:16, 91:25, 92:20, 94:21, 94:22, 96:16, 97:3, 97:17, 98:17, 98:21, 98:22, 99:1, 99:2, 99:8, 99:12, 99:13, 99:17, 108:8, 108:11, 108:13, 108:14, 108:17, 121:23, 122:14, 123:11, 123:24, 124:20, 130:3, 140:9, 140:12, 150:4, 150:6, 162:24, 170:7, 175:19, 189:21, 193:3, 193:16, 197:20

**healthier** [1] - 103:21

**hear** [49] - 6:11, 6:13, 7:18, 7:19, 10:1, 10:11, 10:25, 36:8, 41:4, 50:19, 63:22, 65:17, 132:3, 140:2, 145:2, 145:11, 149:4, 150:2, 150:4, 150:7, 150:14, 150:16, 150:18, 150:25, 151:4, 151:5, 151:6, 151:9, 166:5, 166:6, 173:23, 175:24, 176:16, 177:20, 177:21, 180:5, 181:14, 181:24, 183:23, 183:24, 184:1, 186:11, 192:1, 192:14, 193:4, 194:21, 203:14

**heard** [74] - 10:14, 16:2, 54:20, 57:15, 100:19, 101:16, 103:15, 103:16, 103:17, 105:3, 106:23, 107:3, 107:4, 107:5, 107:7, 109:15, 109:17, 110:6, 110:23, 111:23, 111:24, 111:25, 112:2, 112:17, 113:24, 114:8, 115:6,

115:24, 116:13, 116:22, 117:3, 117:15, 117:23, 119:2, 121:19, 122:4, 122:18, 122:20, 123:19, 126:16, 126:20, 128:5, 128:15, 129:16, 135:20, 136:13, 137:24, 138:5, 138:12, 138:24, 139:2, 140:24, 141:13, 142:5, 147:13, 148:8, 149:17, 150:9, 150:19, 151:1, 151:3, 151:14, 151:17, 152:25, 155:18, 161:6, 177:21, 178:18, 180:7, 180:8, 188:7, 193:20, 196:2, 201:13

**hearing** [2] - 58:12, 188:10

**heart** [5] - 82:15, 89:22, 93:14, 108:2, 120:15

**heaven** [1] - 202:25

**heavy** [2] - 72:15, 127:19

**heist** [1] - 130:11

**held** [8] - 10:17, 35:25, 39:6, 42:15, 89:2, 102:14, 122:22, 158:7

**helix** [1] - 45:18

**help** [11] - 65:20, 87:5, 101:19, 105:8, 108:25, 120:16, 150:19, 158:1, 188:23, 193:2, 194:14

**helped** [3] - 120:11, 150:23, 192:16

**helpful** [2] - 75:15, 105:5

**helps** [1] - 31:18

**hereby** [1] - 210:17

**herring** [1] - 141:9

**hesitate** [1] - 77:25

**hesitation** [2] - 72:23, 138:23

**HHS** [3] - 143:23, 146:24, 147:9

**HHS-OIG** [2] - 143:23, 146:24

**hidden** [1] - 164:21

**hide** [7] - 106:3, 106:9, 106:15, 129:3, 130:16, 169:10

**hiding** [1] - 130:14

**high** [11] - 23:15, 25:3, 27:10, 27:18, 34:1, 53:1, 53:2, 53:7, 55:17, 80:9, 114:11

**high-level** [1] - 53:2

**high-level-type** [1] - 55:17

**highest** [1] - 115:1

**highlight** [2] - 17:21, 17:22

**highlighted** [1] - 200:23

**highly** [1] - 6:17

**himself** [7] - 21:8, 105:8, 106:15, 108:23, 110:22, 114:5, 190:12

**hire** [4] - 137:4, 137:5, 185:23

**hired** [17] - 21:24, 22:5, 58:21, 58:22, 117:4, 119:12, 136:8, 136:9, 145:1, 145:9, 165:21, 172:13, 174:22, 193:8, 193:11

**hiring** [3] - 136:22, 136:23

**Hirsch** [55] - 51:13, 76:1, 76:13, 104:13, 105:23, 108:24, 109:6, 113:24, 114:10, 114:15, 120:24, 121:16, 121:21, 125:1, 125:18, 126:17, 127:11, 127:15, 128:10, 155:20, 156:6, 156:9, 156:15, 156:25, 175:9, 175:21, 176:10, 177:23, 178:10, 178:12, 179:2, 179:5, 179:6, 179:8, 180:7, 182:6, 182:23, 186:14, 189:5, 189:11, 189:15, 189:19, 190:1, 190:2, 190:7, 193:9, 195:20, 196:3, 197:9, 199:14, 199:20, 199:21, 200:8

**Hirsch's** [3] - 118:1, 179:3, 198:9

**histories** [1] - 142:24

**history** [32] - 140:15, 140:16, 143:1, 159:14, 159:19, 159:25, 160:11, 160:24, 161:3, 161:9, 162:1, 165:7, 165:10, 183:18, 183:22, 184:1, 184:4, 184:5, 184:9, 184:10, 184:12, 184:13, 184:17, 184:24, 184:25, 193:21, 193:23, 193:25

**hmm** [1] - 179:21

**hold** [7] - 26:17, 68:6, 137:19, 141:10, 147:22, 204:6, 205:23

**holding** [1] - 153:19

**hole** [2] - 52:15, 52:25

**home** [4] - 14:4, 202:2, 205:17, 208:19

**honest** [3] - 36:13, 36:15, 78:2

**honestly** [9] - 35:25, 39:6, 89:2, 138:25, 158:7

**honor** [1] - 135:6

**Honor** [41] - 3:9, 3:19, 4:24, 7:6, 7:25, 9:6, 9:10, 10:19, 11:9, 13:13, 17:3, 19:22, 21:15, 21:18, 24:2, 31:20, 39:18, 40:22, 42:12, 44:22, 45:17, 46:24, 48:1, 48:4, 48:20, 49:5, 50:4, 50:25, 65:16, 69:13, 69:21, 70:2, 70:4, 70:20, 70:23, 102:12,

103:1, 134:24, 182:5, 188:2, 208:9

**Honorable** [1] - 1:22
**HONORABLE** [1] - 1:10
**hook** [1] - 204:13
**hope** [9] - 12:25, 43:7, 148:4, 154:6, 176:16, 185:7, 204:25, 208:19, 209:12
**hopes** [1] - 78:15
**hoping** [2] - 46:20, 185:9
**horrible** [1] - 176:15
**HOSTETLER** [1] - 2:5
**Hotel** [1] - 200:2
**hour** [8] - 4:15, 8:11, 50:14, 201:23, 203:11, 203:20, 205:3, 209:9
**hours** [4] - 4:9, 6:4, 15:22, 55:20
**house** [3] - 143:18, 144:5, 190:16
**housekeeping** [2] - 3:5, 209:18
**hub** [1] - 103:18
**huge** [1] - 186:5
**hundreds** [3] - 103:11, 191:11, 200:11
**hurts** [1] - 39:16
**husband** [1] - 119:2

**I**

**ID** [1] - 110:17
**idea** [7] - 38:14, 51:9, 138:6, 146:9, 153:16, 170:19, 181:19
**identical** [1] - 113:11
**identified** [1] - 149:24
**identify** [1] - 143:8
**identities** [2] - 83:1, 90:15
**IDGAF** [3] - 113:6, 113:15, 127:21
**ignorance** [26] - 16:14, 19:19, 20:4, 20:13, 20:24, 21:11, 21:14, 22:2, 22:12, 22:21, 23:2, 23:8, 23:11, 23:25, 24:6, 29:18, 33:24, 56:15, 135:19, 135:22, 139:20, 157:7, 157:11, 198:5, 199:4, 199:8
**ignorant** [2] - 20:5, 21:9
**ignore** [2] - 137:9, 178:14
**ignored** [2] - 32:6, 199:16
**II** [2] - 1:10, 1:22
**illegal** [7] - 114:4, 163:7, 165:6, 173:7, 185:11, 186:10
**illegality** [1] - 180:24
**illusions** [1] - 63:4
**Ilona** [1] - 69:4
**ILONA** [1] - 1:21, 210:21
**imagine** [3] - 5:23, 6:6,

178:17
**immigrants** [1] - 137:12
**impact** [1] - 84:14
**impartially** [1] - 72:20
**impeachment** [1] - 75:13
**implants** [1] - 162:25
**implemented** [1] - 41:2
**implication** [1] - 59:1
**imply** [2] - 21:23, 21:25
**important** [24] - 20:18, 54:8, 63:23, 72:24, 74:3, 74:19, 75:9, 85:8, 87:17, 118:24, 136:13, 137:9, 138:23, 139:2, 146:17, 147:12, 147:14, 148:9, 151:2, 183:2, 183:4, 201:19, 202:15
**impossible** [3] - 116:3, 116:6, 198:22
**impress** [1] - 74:9
**impression** [1] - 170:21
**impressions** [1] - 79:7
**impressive** [1] - 144:18
**impropriety** [1] - 21:7
**in-person** [1] - 119:11
**inaccurate** [1] - 20:25
**inaccurately** [1] - 75:5
**inadequate** [1] - 120:7
**inapplicable** [1] - 21:1
**inappropriate** [1] - 55:2
**inartful** [1] - 45:25
**inbox** [1] - 17:20
**include** [2] - 23:2, 23:23
**includes** [6] - 73:4, 84:10, 84:22, 95:7, 95:17, 95:25
**including** [11] - 5:5, 23:13, 45:17, 45:18, 52:7, 91:12, 91:20, 96:13, 97:13, 172:14, 188:25
**inclusion** [5] - 20:1, 20:2, 21:14, 23:6, 23:24
**inconsistent** [1] - 35:18
**inconvenience** [1] - 135:10
**incriminating** [1] - 178:18
**indeed** [4] - 6:8, 57:13, 60:13, 163:17
**independent** [2] - 54:24, 79:3
**indicate** [2] - 23:19, 57:19
**indicated** [2] - 159:3, 178:10
**indicating** [3] - 58:5, 99:3, 167:10
**indication** [2] - 178:16, 185:1
**indictment** [38] - 18:8, 18:10, 35:17, 35:21, 36:7, 37:8, 37:15, 39:2, 46:13, 46:24, 47:1, 47:3, 47:11, 51:1, 72:5, 75:21, 75:23,

77:4, 77:10, 79:9, 79:15, 81:19, 82:13, 82:22, 85:21, 86:1, 88:6, 88:23, 89:16, 89:20, 90:8, 93:12, 98:14, 98:15, 106:19, 122:22, 150:3, 203:13
**indictments** [1] - 46:11
**indifference** [2] - 85:3, 87:12
**indirectly** [4] - 91:21, 92:12, 96:12, 97:12
**individual** [10] - 44:8, 53:14, 54:17, 84:9, 84:10, 91:13, 91:23, 110:8, 110:19, 171:8
**individually** [1] - 155:16
**individuals** [9] - 75:12, 75:13, 124:14, 124:18, 130:21, 182:8, 183:5, 191:8, 196:4
**induce** [15] - 18:9, 18:24, 43:22, 44:2, 44:7, 45:3, 91:4, 91:12, 91:23, 92:4, 125:15, 125:22, 127:24, 127:25
**induced** [1] - 192:20
**industry** [1] - 114:21
**inevitably** [1] - 64:21
**infer** [1] - 178:9
**inference** [2] - 23:14, 175:13
**inferences** [1] - 55:4
**influence** [3] - 51:22, 85:11, 87:20
**influenced** [2] - 71:24, 79:4
**info** [2] - 159:12, 159:15
**information** [18] - 40:25, 41:11, 41:12, 62:19, 105:24, 118:13, 119:20, 128:4, 128:12, 160:2, 160:3, 165:12, 170:10, 181:7, 181:8, 192:8, 197:21, 198:2
**informed** [2] - 39:6, 133:15
**initial** [1] - 139:9
**injured** [1] - 114:21
**injury** [4] - 85:17, 85:19, 88:2, 88:3
**innocence** [2] - 54:11, 72:7
**innocent** [3] - 72:7, 75:6, 90:12
**input** [1] - 193:1
**inquire** [1] - 132:9
**inquiries** [1] - 23:11
**inserting** [1] - 46:2
**inside** [3] - 8:11, 106:11, 107:5
**insight** [1] - 32:5
**instance** [1] - 52:13
**instances** [1] - 121:8
**instead** [8] - 16:5, 20:12, 30:19, 35:6, 35:15, 65:2,

104:13, 130:4
**institution** [5] - 95:6, 95:22, 95:25, 97:7, 97:9
**instruct** [5] - 21:10, 47:7, 56:1, 70:6, 71:15
**instructed** [1] - 107:18
**instruction** [60] - 16:20, 17:24, 18:18, 19:15, 19:20, 19:24, 20:4, 20:14, 20:24, 21:7, 21:16, 21:18, 22:14, 22:22, 23:3, 23:6, 23:7, 23:13, 23:23, 24:6, 26:4, 28:7, 32:3, 32:14, 32:16, 34:22, 34:25, 36:12, 38:1, 38:15, 39:16, 41:3, 41:5, 41:19, 42:3, 42:8, 42:16, 43:11, 43:14, 44:4, 44:12, 44:14, 44:15, 44:23, 44:24, 46:4, 46:19, 47:4, 47:21, 58:2, 58:17, 70:8, 129:12, 136:13, 138:19, 139:20, 157:8, 157:22, 182:25, 198:5
**instructions** [55] - 3:13, 6:25, 7:24, 8:7, 8:9, 9:2, 10:6, 10:23, 10:24, 11:7, 12:11, 13:24, 14:9, 15:14, 16:8, 16:12, 16:16, 17:1, 24:1, 42:20, 45:19, 46:25, 47:15, 48:14, 48:25, 58:16, 65:16, 67:8, 69:20, 69:24, 71:7, 71:13, 71:17, 72:3, 72:4, 73:9, 76:10, 77:2, 100:17, 100:19, 100:20, 101:9, 102:16, 108:15, 109:2, 113:23, 122:17, 133:21, 133:25, 135:20, 136:14, 153:22, 155:18, 196:8, 203:9
**instrument** [2] - 95:10, 97:7
**instruments** [3] - 95:16, 95:17, 95:20
**insufficient** [3] - 53:13, 53:20, 112:17
**insurance** [5] - 27:19, 27:22, 27:24, 92:22, 124:15
**Insurance** [1] - 96:1
**insured** [2] - 95:25, 97:9
**intelligent** [1] - 133:14
**intend** [4] - 67:22, 68:2, 102:17, 194:11
**intended** [5] - 84:4, 84:23, 87:7, 88:9, 89:21
**intends** [2] - 3:7, 56:3
**intent** [53] - 17:14, 29:22, 35:18, 35:19, 35:23, 36:1, 36:4, 37:3, 37:5, 37:10, 37:21, 37:23, 38:1, 38:4, 38:6, 38:24, 39:4, 39:7, 39:8, 39:11, 67:22, 68:1, 79:25, 80:3, 85:4, 85:7, 85:15,

85:16, 85:18, 85:19, 87:2,
87:13, 87:16, 87:24, 87:25,
88:2, 88:3, 88:20, 88:21,
88:25, 89:3, 89:6, 122:11,
155:4, 155:6, 158:5, 158:8,
158:12
  **intentional** [2] - 75:7, 200:5
  **intentionally** [4] - 21:12,
79:22, 81:5, 81:12
  **interacted** [2] - 158:16
  **interaction** [6] - 57:7,
63:18, 158:18, 165:5,
168:20, 172:9
  **interest** [2] - 74:12, 78:6
  **interesting** [6] - 135:13,
157:20, 169:3, 169:5,
169:13, 174:22
  **interests** [3] - 83:9, 90:24,
94:8
  **internet** [1] - 117:20
  **interpretation** [2] - 64:16,
73:12
  **interruptions** [1] - 63:7
  **interstate** [21] - 84:1, 84:13,
84:17, 84:18, 84:20, 84:21,
86:19, 87:4, 88:8, 88:13,
88:17, 95:12, 95:14, 95:22,
95:23, 96:3, 97:8, 109:11,
109:23, 122:4, 122:7
  **introduce** [3] - 32:14,
75:11, 175:11
  **introduced** [1] - 41:20
  **introductory** [1] - 16:16
  **invented** [1] - 106:11
  **investment** [1] - 95:19
  **involve** [3] - 13:21, 104:11,
124:22
  **involved** [22] - 55:3, 61:19,
61:20, 94:19, 95:22, 96:7,
96:25, 97:19, 97:22, 110:18,
114:9, 127:1, 128:6, 136:25,
164:8, 165:3, 168:12, 169:5,
174:5, 189:1, 189:11, 195:17
  **involvement** [2] - 127:19,
191:5
  **involving** [5] - 75:1, 93:4,
95:15, 95:21, 108:22
  **isolation** [1] - 54:25
  **issue** [20] - 9:20, 12:5, 18:2,
26:23, 27:16, 40:14, 43:5,
44:25, 55:24, 56:17, 59:12,
59:17, 63:2, 63:9, 73:8,
108:7, 157:23, 195:5,
195:12, 199:3
  **issued** [2] - 45:15, 45:19
  **issues** [5] - 11:2, 16:5,
47:16, 67:4, 210:2
  **issuing** [1] - 147:2
  **IT** [2] - 68:23, 210:5
  **it'll** [6] - 14:17, 17:24,
38:18, 47:22, 68:11, 70:12
  **item** [4] - 84:9, 84:11,
91:14, 91:24
  **items** [1] - 84:6
  **itself** [10] - 11:14, 82:16,
84:17, 88:8, 89:23, 93:15,
147:18, 179:19, 191:13,
195:11

## J

  **jail** [5] - 156:3, 156:5, 156:6
  **JAMIE** [1] - 1:13
  **January** [2] - 158:23,
171:22
  **jargon** [1] - 118:24
  **Jariwala** [2] - 128:11,
128:20
  **Jariwala's** [1] - 128:11
  **job** [29] - 102:5, 136:19,
136:20, 138:9, 141:1, 141:3,
141:4, 141:5, 141:7, 141:15,
141:16, 141:18, 141:21,
142:9, 142:12, 142:13,
142:14, 145:3, 145:4, 148:1,
149:8, 149:9, 151:11,
155:15, 158:21
  **joined** [6] - 82:24, 83:5,
90:5, 90:19, 93:22, 94:3
  **joins** [1] - 81:5
  **Jon** [2] - 151:5, 194:22
  **Judge** [14] - 44:14, 77:16,
107:18, 121:24, 122:18,
122:20, 128:5, 129:12,
129:17, 136:14, 134:24,
155:21, 155:25, 187:20
  **judge** [2] - 196:23, 204:18
  **JUDGE** [1] - 1:10
  **Judge's** [1] - 153:22
  **judgement** [1] - 54:10
  **judges** [2] - 78:5
  **judgment** [8] - 36:3, 39:10,
53:19, 53:23, 89:5, 141:25,
142:12, 158:10
  **Judgment** [1] - 55:12
  **July** [4] - 11:11, 175:6,
175:9, 177:16
  **jump** [2] - 119:10, 41:6
  **junk** [1] - 52:1
  **juries** [1] - 155:14
  **juror** [2] - 202:23, 210:1
  **jurors** [22] - 3:4, 4:4, 6:11,
8:21, 16:1, 47:22, 50:16,
64:9, 67:10, 69:18, 69:25,
70:25, 77:22, 79:5, 100:14,
133:22, 134:14, 187:22,
203:7, 206:13, 207:2, 208:14
  **JURORS** [4] - 12:24, 102:1,
203:23, 205:7
  **JURY** [1] - 1:9
  **jury** [94] - 3:8, 3:13, 3:20,
3:23, 6:19, 6:25, 8:23, 9:2,
9:5, 10:5, 10:21, 10:23,
10:24, 11:7, 12:7, 12:8,
12:10, 12:12, 12:15, 12:22,
14:5, 14:23, 15:21, 16:7,
16:17, 20:12, 20:17, 20:21,
21:1, 21:3, 21:10, 21:23,
23:13, 24:1, 32:4, 32:15,
38:12, 46:25, 47:1, 47:2,
48:14, 49:12, 51:5, 52:9,
53:3, 54:1, 54:11, 54:14,
54:16, 54:20, 55:3, 55:5,
55:11, 56:1, 58:2, 69:19,
70:6, 70:18, 71:1, 71:4, 71:6,
71:9, 71:15, 71:18, 97:25,
98:7, 98:11, 100:4, 100:6,
120:15, 129:10, 129:22,
130:8, 131:6, 133:21,
134:17, 135:4, 135:19,
137:10, 137:16, 155:17,
162:8, 187:3, 187:9, 192:6,
201:2, 201:6, 201:17,
202:19, 206:7, 208:4,
209:10, 209:13, 209:23
  **Jury** [10] - 12:20, 15:24,
71:2, 131:20, 134:15,
187:10, 187:23, 205:13,
208:15, 209:16
  **justice** [4] - 131:9, 137:11,
144:1, 144:13
  **JUSTICE** [1] - 1:15
  **justification** [1] - 52:6
  **justify** [2] - 20:12, 194:2

## K

  **K.A** [1] - 113:16
  **KATHERINE** [1] - 1:14
  **Katz** [1] - 45:11
  **keep** [14] - 23:25, 32:9,
48:19, 66:7, 70:10, 75:2,
101:11, 102:4, 147:19,
147:21, 201:21, 202:11,
205:16, 206:3
  **keeping** [1] - 195:3
  **kept** [2] - 119:20, 166:1
  **key** [2] - 63:13, 108:14,
116:25
  **kickback** [25] - 18:2, 18:3,
19:13, 35:21, 37:8, 39:1,
40:6, 43:11, 45:3, 46:1,
51:21, 88:23, 91:12, 91:20,
92:18, 92:25, 93:3, 108:8,
124:21, 124:24, 125:12,
125:16, 127:4, 127:6, 197:25
  **Kickback** [2] - 126:3,
126:24
  **kickbacks** [30] - 38:8,
43:13, 51:24, 52:17, 76:15,
76:18, 91:4, 91:7, 94:22,
99:8, 99:12, 99:13, 99:17,
103:16, 105:14, 106:1,
124:22, 125:3, 125:17,
126:10, 126:16, 129:21,
149:19, 149:20, 163:6,
178:2, 188:8, 190:14
  **kicked** [1] - 21:19
  **kids** [2] - 140:4, 140:5
  **Kimberly** [1] - 105:4
  **kind** [20] - 18:3, 20:11,
44:16, 57:14, 63:6, 78:19,
82:9, 82:14, 89:12, 89:17,
93:8, 93:13, 94:20, 96:8,
98:7, 137:6, 173:11, 177:10,
185:8, 210:4
  **kinds** [2] - 94:13, 96:19
  **kit** [1] - 112:4
  **kits** [2] - 114:1, 198:15
  **knock** [2] - 190:4, 203:14
  **knocking** [1] - 9:18
  **knowing** [7] - 9:11, 81:17,
82:25, 86:15, 90:14, 93:24,
123:7
  **knowingly** [20] - 28:2,
29:10, 39:20, 75:25, 76:12,
76:23, 79:21, 82:4, 83:13,
83:21, 85:25, 86:23, 87:24,
90:7, 92:2, 94:12, 94:17,
96:23, 122:1, 127:9
  **knowledge** [46] - 16:14,
19:19, 20:6, 20:12, 20:19,
21:4, 21:9, 23:2, 23:9, 23:12,
23:25, 25:2, 25:6, 25:7,
25:11, 27:7, 27:8, 27:16,
27:25, 28:10, 29:19, 29:23,
32:2, 32:7, 32:15, 33:24,
33:25, 34:4, 34:5, 34:8,
73:19, 75:15, 80:7, 80:11,
80:12, 80:15, 129:14,
129:18, 135:19, 198:7,
198:11, 198:15, 198:19,
198:24
  **knowledgeable** [1] - 157:14
  **known** [9] - 15:5, 20:21,
21:2, 21:25, 85:13, 87:22,
94:13, 96:19, 153:24
  **knows** [8] - 46:10, 66:17,
85:2, 87:11, 143:22, 144:24,
162:1, 193:2
  **KP** [1] - 181:13
  **KPN** [1] - 181:13

## L

  **lab** [33] - 22:5, 22:7, 51:10,
105:13, 111:3, 114:21,
114:22, 115:8, 117:9,
126:10, 126:25, 127:2,
130:16, 136:24, 144:20,

144:22, 145:1, 145:2, 145:3, 149:8, 159:12, 160:3, 160:4, 160:9, 183:20, 189:23, 189:24, 190:22, 191:19, 191:21, 191:25, 199:13

**lab's** [3] - 141:18, 141:24, 190:23

**laboratories** [1] - 108:23

**laboratory** [1] - 106:6

**labs** [1] - 141:24

**LabSolutions** [69] - 51:8, 51:9, 51:15, 57:2, 58:4, 62:11, 62:22, 103:18, 107:4, 107:13, 109:21, 110:9, 110:11, 111:2, 112:21, 113:1, 113:4, 113:5, 113:6, 113:13, 114:19, 115:8, 116:14, 116:17, 117:23, 117:25, 118:2, 124:10, 124:12, 124:16, 124:17, 128:1, 129:25, 130:22, 136:10, 140:18, 142:1, 144:20, 145:16, 145:23, 146:7, 146:12, 149:2, 149:23, 151:15, 151:16, 151:23, 153:13, 158:23, 159:13, 160:5, 160:6, 161:7, 161:17, 161:23, 164:11, 170:2, 170:13, 172:6, 174:5, 174:16, 177:9, 184:16, 184:21, 189:24, 190:1, 194:24, 195:1, 201:9

**LabSolutions'** [4] - 141:7, 142:12, 172:23, 198:15

**lack** [2] - 122:9, 142:15

**ladies** [61] - 12:22, 13:16, 71:3, 103:8, 131:10, 134:17, 135:3, 136:4, 137:1, 137:10, 138:10, 138:14, 138:19, 139:6, 139:20, 139:25, 143:3, 143:5, 143:11, 143:14, 143:24, 144:14, 146:10, 146:15, 148:23, 149:6, 149:10, 149:25, 151:2, 151:10, 151:13, 151:25, 152:9, 152:24, 153:18, 153:23, 187:3, 187:24, 188:3, 189:13, 189:16, 189:22, 190:9, 190:16, 191:22, 192:1, 192:13, 192:17, 193:4, 193:14, 195:2, 195:20, 196:18, 197:2, 197:17, 198:25, 199:18, 200:19, 201:7, 201:17, 208:17

**Lamborghini** [1] - 156:25

**land** [1] - 137:13

**language** [11] - 17:9, 17:21, 18:7, 32:14, 33:4, 44:6, 47:3, 49:16, 64:16, 108:14, 108:15

**lapse** [1] - 75:6

**laptop** [4] - 207:20, 207:25, 208:4, 210:3

**large** [3] - 9:15, 52:24, 142:16

**largely** [1] - 58:11

**Larkin** [1] - 169:9

**Las** [1] - 128:18

**last** [24] - 5:4, 5:16, 7:15, 28:14, 36:19, 37:13, 48:24, 53:6, 99:19, 101:17, 102:7, 106:21, 128:4, 131:1, 137:16, 144:7, 153:12, 188:3, 188:10, 200:24, 208:22, 209:19, 210:5

**last-minute** [1] - 48:24

**lastly** [1] - 152:25

**late** [1] - 7:15

**Lauderdale** [1] - 1:24, 210:23

**laundered** [1] - 106:17

**laundering** [24] - 39:20, 39:22, 39:25, 40:1, 52:21, 52:23, 53:15, 76:24, 77:1, 93:4, 93:18, 94:14, 96:20, 99:20, 99:23, 99:24, 103:16, 108:9, 128:5, 128:6, 129:21, 188:7

**Laurie** [4] - 21:20, 109:17, 152:14, 153:15

**lavishly** [1] - 128:19

**LAW** [1] - 1:18

**law** [34] - 23:9, 41:16, 42:6, 44:22, 45:16, 45:23, 46:12, 47:2, 47:6, 47:7, 62:8, 70:7, 71:16, 72:1, 72:2, 72:4, 72:6, 73:9, 76:6, 76:19, 80:1, 80:2, 80:4, 80:6, 96:10, 108:16, 109:4, 110:10, 124:25, 126:2, 158:22, 169:23, 190:13

**lawful** [3] - 78:14, 92:16, 92:17

**lawyer** [37] - 58:23, 59:1, 59:2, 59:7, 59:13, 59:25, 62:13, 62:15, 62:19, 62:23, 101:20, 106:8, 118:14, 118:15, 130:14, 144:6, 161:16, 161:23, 162:5, 162:10, 162:18, 164:11, 165:21, 166:8, 168:20, 170:4, 170:6, 170:10, 170:14, 172:3, 172:9, 172:12, 174:22, 195:21, 195:23, 195:24

**lawyers** [55] - 13:22, 51:14, 57:7, 58:21, 58:22, 59:4, 59:18, 59:19, 59:22, 61:18, 61:19, 62:1, 63:19, 65:18, 73:6, 100:18, 101:22,

107:18, 107:19, 132:15, 132:20, 133:7, 133:18, 133:21, 134:19, 135:6, 136:9, 136:22, 137:4, 157:8, 158:16, 158:17, 158:22, 158:25, 159:6, 165:24, 165:6, 167:8, 168:12, 169:13, 170:17, 170:22, 171:4, 171:6, 171:14, 172:6, 172:22, 172:23, 174:3, 185:23, 185:24, 191:1, 203:16

**lays** [1] - 149:9

**LCD/NCD** [1] - 143:23

**LCDs** [7] - 146:18, 146:20, 146:24, 147:8, 147:10, 183:23, 194:6

**lead** [4] - 56:22, 56:23, 134:21, 161:22

**leader** [1] - 117:11

**leads** [1] - 21:1

**learn** [1] - 21:4

**learned** [5] - 111:1, 114:18, 114:20, 127:18, 129:13

**learning** [11] - 23:16, 23:20, 24:13, 25:9, 27:21, 30:5, 30:7, 30:16, 31:10, 34:7, 80:14

**least** [15] - 9:21, 10:11, 18:9, 62:3, 83:5, 90:7, 90:19, 94:4, 96:4, 109:3, 170:20, 173:24, 202:7, 208:5, 208:20

**leave** [14] - 14:4, 49:16, 101:5, 107:8, 131:7, 187:6, 197:3, 197:7, 197:8, 197:11, 197:14, 205:4, 207:6, 209:5

**leaves** [1] - 63:25

**led** [2] - 22:11, 121:14

**left** [6] - 3:12, 6:9, 40:16, 49:22, 116:24, 194:23

**legal** [11] - 11:11, 13:24, 57:13, 60:20, 73:23, 106:3, 163:23, 166:3, 167:11, 190:17, 195:5

**legitimacy** [1] - 106:3

**legitimate** [12] - 52:10, 113:9, 120:14, 121:10, 129:7, 130:13, 130:15, 130:17, 131:3, 190:22, 190:23, 193:16

**lengthy** [1] - 10:3, 50:20

**less** [3] - 34:18, 156:2, 156:9

**lesser** [1] - 78:12

**letter** [2] - 116:16, 124:19

**level** [7] - 41:18, 53:1, 53:2, 53:7, 55:17, 60:1, 110:21

**liberty** [1] - 94:7

**lie** [16] - 51:19, 107:25, 108:17, 109:9, 113:3,

113:19, 121:12, 126:5, 135:25, 157:2, 157:3, 190:19, 191:13, 193:9, 200:17

**lied** [16] - 52:1, 117:12, 117:14, 118:17, 135:16, 135:17, 135:23, 135:24, 152:2, 152:3, 152:4, 190:20

**lies** [22] - 108:17, 108:18, 108:19, 113:20, 117:12, 118:5, 118:15, 119:24, 120:14, 121:15, 141:3, 141:5, 141:6, 186:11, 189:9, 189:18, 189:19, 191:4, 193:6, 195:8

**life** [1] - 151:21

**LifeMD** [2] - 181:24

**lifesaving** [1] - 104:9

**light** [3] - 54:18, 56:11, 130:24

**limine** [1] - 58:10

**limited** [3] - 19:12, 65:10, 188:11

**limiting** [1] - 44:9

**line** [25] - 20:20, 22:2, 25:12, 25:23, 37:23, 38:21, 39:14, 43:10, 57:24, 63:8, 66:16, 67:16, 67:25, 69:5, 104:4, 104:6, 104:25, 105:10, 123:17, 130:4, 137:16, 151:22, 186:10, 197:23, 198:1

**lines** [2] - 37:18, 112:19

**lineup** [1] - 5:15

**list** [3] - 3:23, 178:24, 178:25

**listed** [4] - 120:3, 120:4, 186:4

**listen** [5] - 65:6, 71:8, 102:3, 148:4, 153:22

**listened** [2] - 106:24, 198:9

**listening** [1] - 177:24, 186:25

**listing** [1] - 177:15

**litany** [1] - 62:6

**live** [4] - 61:24, 66:15, 66:25

**lives** [5] - 5:1, 105:5, 119:14, 139:2, 148:9

**living** [1] - 118:21

**LLC** [2] - 181:13, 181:25

**LLP** [1] - 2:5

**loan** [2] - 95:3, 95:8

**location** [2] - 94:4, 94:24

**LOEB** [1] - 2:3

**logistical** [1] - 197:18

**Lohan** [1] - 177:11

**look** [41] - 5:8, 7:8, 7:23, 8:6, 8:7, 8:16, 9:23, 18:17, 20:9, 25:25, 26:9, 29:15,

44:4, 47:25, 51:20, 54:25, 64:4, 98:16, 105:1, 107:11, 120:13, 129:6, 138:19, 145:17, 145:19, 145:20, 146:15, 147:5, 157:5, 157:22, 164:18, 174:19, 175:5, 179:11, 180:21, 183:12, 184:19, 184:20, 204:23

**looked** [3] - 6:2, 46:10, 142:17

**looking** [14] - 26:7, 26:25, 41:16, 42:19, 43:7, 45:21, 46:14, 47:10, 61:10, 66:11, 113:10, 178:4, 184:2, 198:2

**looks** [8] - 16:13, 33:19, 37:2, 37:12, 50:13, 54:12, 177:10, 178:25

**lose** [3] - 4:10, 4:20, 6:10

**loss** [4] - 85:17, 85:18, 88:1, 88:3

**lost** [1] - 5:11

**low** [7] - 118:19, 119:1, 119:3, 119:7, 119:16, 192:23, 192:24

**low-hanging** [6] - 118:19, 119:1, 119:3, 119:7, 119:16, 192:24

**lower** [1] - 192:20

**lucky** [1] - 188:20

**lucrative** [2] - 114:22, 199:19

**lunch** [5] - 15:1, 15:18, 209:9, 209:11

**Lupowitz** [1] - 210:20

**LUPOWITZ** [2] - 1:21, 210:21

**lure** [1] - 118:24

**lured** [1] - 119:22

**lying** [5] - 113:17, 121:15, 188:11, 195:22, 195:23

---

# M

**M.L** [1] - 169:10

**MAC** [1] - 183:24

**machine** [1] - 68:8

**MACs** [5] - 183:9, 183:10, 183:14, 183:23

**Madriz** [3] - 202:12, 203:6, 205:8

**magic** [1] - 107:23

**Magliocco** [11] - 22:4, 52:8, 105:3, 112:17, 120:6, 141:13, 142:5, 144:15, 147:15, 152:14, 152:18

**mail** [1] - 104:23

**main** [2] - 40:14, 56:7

**Maine** [1] - 106:6

**maintained** [1] - 123:18

**major** [6] - 7:16, 7:22, 31:6, 64:7, 64:15, 67:7

**maker** [2] - 85:12, 87:21

**Mallory** [1] - 45:6

**man** [3] - 169:3, 169:5, 176:14

**management** [4] - 36:3, 39:11, 89:6, 158:11

**managing** [1] - 165:2

**manner** [1] - 82:20

**manufacturers** [1] - 163:2

**Maple** [1] - 2:3

**Marc** [21] - 104:14, 108:25, 109:6, 112:22, 115:24, 116:9, 117:23, 120:24, 121:4, 121:18, 125:19, 126:17, 128:10, 177:21, 193:9, 195:21, 198:13, 198:15, 198:21, 198:22, 200:9

**March** [1] - 184:22

**marched** [1] - 192:10

**Mark** [1] - 172:10

**mark** [2] - 17:22, 98:15

**marked** [1] - 127:22

**market** [4] - 22:18, 116:25, 193:13, 197:12

**marketed** [4] - 22:19, 118:14, 120:16

**marketers** [24] - 20:20, 21:12, 22:18, 51:18, 51:19, 53:15, 105:22, 106:5, 107:13, 110:12, 110:21, 113:1, 113:21, 116:20, 117:15, 117:19, 125:22, 127:13, 128:1, 128:9, 194:5, 194:19, 194:20, 195:9

**Marketing** [4] - 127:17, 127:20, 179:21, 179:22, 180:13

**marketing** [11] - 22:18, 117:2, 120:20, 125:18, 126:4, 127:18, 168:16, 189:9, 194:19, 194:24

**Marline** [2] - 202:13, 203:7

**married** [1] - 153:8

**marshal** [2] - 100:11, 100:12

**mask** [1] - 196:14

**massive** [3] - 107:16, 108:22

**master** [2] - 106:12, 113:19

**masterminded** [1] - 107:17

**match** [1] - 37:5

**material** [34] - 30:5, 30:7, 30:8, 30:16, 30:17, 31:10, 31:11, 31:12, 33:8, 33:9, 33:10, 33:16, 34:10, 34:12, 34:13, 34:16, 42:9, 80:17, 80:19, 80:20, 80:23, 84:3,

84:25, 85:2, 85:7, 85:8, 85:10, 87:2, 87:11, 87:16, 87:17, 87:19, 88:7, 101:21

**math** [1] - 177:18

**matter** [14] - 5:23, 74:7, 75:17, 85:12, 87:21, 97:15, 97:21, 122:18, 133:16, 194:6, 195:17, 202:1, 206:15, 210:19

**matters** [6] - 57:3, 60:20, 67:4, 73:13, 163:23, 172:14

**maximum** [1] - 128:2

**McClatchey** [1] - 45:13

**McKeon** [15] - 76:1, 76:13, 125:2, 125:19, 127:19, 159:12, 159:17, 159:23, 160:7, 164:8, 167:9, 168:9, 179:22, 179:23, 180:13

**McKeon's** [1] - 167:10

**McMillan** [18] - 21:21, 109:17, 109:24, 111:13, 111:20, 122:5, 141:13, 143:12, 145:11, 145:20, 145:22, 146:2, 146:4, 147:7, 147:16, 150:9, 152:14, 153:15

**McMillan's** [1] - 146:18

**mean** [55] - 6:1, 6:6, 8:14, 9:23, 10:3, 10:8, 10:13, 13:17, 15:6, 22:23, 24:9, 29:6, 31:2, 32:3, 33:23, 36:14, 38:2, 39:21, 41:10, 41:15, 47:5, 49:17, 49:18, 57:6, 58:6, 58:9, 58:15, 59:11, 60:2, 61:3, 61:10, 62:25, 64:5, 64:8, 64:25, 65:5, 65:23, 66:20, 67:21, 74:1, 75:2, 75:17, 102:18, 144:3, 144:9, 144:11, 156:5, 157:8, 168:1, 173:23, 178:17, 186:4, 206:21

**meaning** [1] - 54:24

**meaningless** [1] - 116:21

**means** [40] - 13:16, 13:17, 14:1, 56:25, 79:21, 79:24, 83:17, 84:7, 85:15, 87:6, 87:24, 88:10, 92:10, 92:14, 92:17, 92:18, 92:20, 95:1, 95:3, 95:11, 95:13, 96:3, 96:11, 96:15, 97:5, 97:9, 97:11, 124:15, 155:3, 155:7, 161:7, 166:21, 166:23, 183:1, 198:5, 199:4, 199:8, 202:20, 204:22, 204:23

**media** [1] - 203:6

**Media** [3] - 117:23, 181:25

**medical** [24] - 22:6, 52:10, 57:18, 84:8, 84:10, 107:5, 109:17, 110:8, 110:20, 115:9, 120:8, 122:8, 141:15,

143:2, 149:8, 159:13, 159:20, 159:24, 160:10, 161:8, 162:1, 165:7, 179:15, 184:14

**medically** [9] - 105:1, 124:12, 130:3, 141:22, 143:8, 143:9, 143:10, 148:22, 149:6

**Medicare** [115] - 41:25, 51:6, 60:24, 91:5, 91:8, 92:1, 92:5, 92:8, 92:9, 103:11, 104:1, 104:7, 104:20, 105:16, 105:24, 107:1, 107:2, 107:5, 107:12, 108:1, 108:19, 109:8, 109:9, 109:16, 109:18, 109:19, 109:20, 109:21, 109:22, 109:25, 110:2, 110:5, 110:17, 111:2, 111:6, 111:8, 111:9, 111:16, 111:21, 111:23, 112:3, 112:24, 113:1, 113:3, 114:1, 114:11, 114:24, 115:4, 115:9, 117:12, 121:2, 121:11, 121:12, 122:16, 124:1, 124:7, 124:10, 124:12, 124:14, 124:15, 125:11, 125:14, 125:15, 126:1, 126:21, 126:23, 127:2, 127:9, 127:21, 128:3, 128:11, 128:21, 128:22, 129:4, 129:24, 130:1, 130:10, 135:25, 143:21, 143:22, 145:13, 145:14, 145:22, 145:24, 146:1, 146:12, 147:18, 152:4, 153:13, 154:11, 159:14, 159:19, 159:24, 160:10, 164:3, 183:25, 184:5, 190:20, 192:10, 194:2, 194:8, 194:10, 195:22, 195:23, 197:15, 199:1, 200:12, 201:8

**Medicare's** [2] - 110:10, 112:6

**medicine** [1] - 110:7

**Medipak** [2] - 180:8

**meet** [4] - 42:14, 112:6, 114:18, 206:4

**meeting** [2] - 41:24, 113:25

**member** [8] - 82:10, 82:11, 86:15, 89:13, 89:14, 93:9, 93:10, 123:7

**members** [16] - 71:15, 82:13, 82:14, 89:16, 89:17, 89:18, 93:12, 93:13, 98:1, 103:14, 104:9, 119:22, 120:15, 129:22, 130:8, 131:6

**memo** [5] - 11:11, 11:14, 11:15, 11:18, 11:19

memorandum [1] - 50:21
memories [2] - 79:7, 159:3
memory [9] - 64:10, 74:13,
75:7, 79:1, 176:12, 176:17,
176:18, 176:21, 178:21
mens [1] - 58:5
mention [2] - 58:3, 122:17
mentioned [4] - 17:17,
40:6, 118:5, 123:23
merely [4] - 81:16, 83:8,
90:23, 94:7
message [3] - 100:11,
157:1, 204:14
messages [4] - 107:13,
114:5, 114:6, 157:4
met [2] - 51:12, 161:19
Miami [8] - 1:3, 20:8, 20:10,
128:18, 156:25, 157:1,
185:15
Michelle [1] - 169:9
microphone [1] - 132:3
mid [2] - 56:18, 184:11
mid-close [1] - 56:18
middle [6] - 7:20, 28:15,
146:25, 162:12, 173:3,
174:25
midstream [1] - 48:15
might [21] - 7:2, 7:4, 25:18,
26:18, 26:20, 26:22, 27:3,
30:11, 33:21, 38:13, 48:25,
58:7, 65:13, 65:14, 67:23,
75:15, 110:15, 154:10,
165:18, 181:18, 188:23
Mike [1] - 52:18
million [21] - 104:1, 106:14,
113:3, 113:5, 113:7, 129:25,
130:2, 130:4, 130:5, 139:15,
139:16, 158:21, 184:4,
184:5, 184:12, 191:9, 201:8,
201:9
million-plus [1] - 158:21
millions [6] - 103:11, 113:4,
191:12, 196:9, 200:12
Minal [155] - 98:13, 103:9,
103:17, 103:19, 103:20,
103:22, 103:24, 104:3,
104:12, 104:15, 104:17,
104:20, 104:25, 105:8,
105:9, 105:13, 105:14,
105:16, 105:18, 105:20,
105:22, 105:25, 106:1,
106:2, 106:4, 106:9, 106:12,
107:17, 107:22, 107:25,
108:5, 108:12, 108:20,
108:21, 108:24, 109:14,
110:9, 110:10, 110:12,
110:16, 110:22, 111:1,
111:3, 111:6, 111:11,
111:15, 112:19, 112:21,
113:5, 113:13, 113:14,

113:18, 113:22, 113:23,
114:5, 114:18, 114:20,
115:6, 115:21, 115:23,
116:2, 116:9, 116:15,
116:17, 117:11, 117:12,
118:17, 119:4, 119:8,
119:12, 119:24, 120:14,
120:16, 120:22, 121:2,
121:5, 121:12, 121:14,
121:20, 122:12, 122:13,
122:21, 123:12, 123:13,
123:18, 123:23, 124:1,
124:2, 124:22, 125:1, 125:4,
125:5, 125:9, 125:17,
125:25, 128:13, 130:5,
130:6, 130:12, 130:14,
130:15, 130:18, 133:13,
135:7, 135:15, 135:23,
136:8, 136:20, 137:16,
139:4, 139:6, 139:17,
140:19, 140:23, 141:7,
142:11, 145:6, 147:23,
149:8, 150:21, 151:21,
151:22, 152:1, 153:10,
153:20, 153:25, 154:23,
155:9, 161:7, 164:11,
166:18, 166:20, 177:9,
185:4, 186:14, 189:14,
189:18, 190:2, 190:6,
190:19, 190:21, 193:5,
195:2, 195:6, 195:15, 197:8,
198:8, 198:13, 198:17,
198:25, 199:19, 200:7
MINAL [2] - 1:6, 132:1
Minal's [1] - 168:17
mind [6] - 75:2, 78:1, 102:4,
166:12, 197:11, 202:6
minded [1] - 53:25
minds [2] - 197:9, 197:14
minimum [1] - 104:25
minor [4] - 49:5, 83:3,
90:17, 94:2
minute [13] - 42:12, 48:24,
70:12, 101:6, 131:16,
157:17, 167:19, 175:16,
177:15, 177:16, 178:21,
187:12, 205:18
minutes [25] - 5:3, 8:25,
15:3, 15:9, 55:21, 55:22,
55:25, 66:19, 70:9, 101:11,
103:2, 134:6, 135:1, 135:14,
148:2, 151:20, 177:17,
177:19, 182:3, 187:8,
187:13, 189:14, 206:3,
207:17, 210:5
mirrors [1] - 118:8
misdiagnosed [1] - 52:14
misleading [5] - 52:19,
118:12, 119:9, 173:13,
173:20

misrepresentation [1] -
87:14
misrepresented [1] - 118:7
missed [1] - 48:25
missing [3] - 40:15, 179:17,
180:13
misstated [1] - 75:5
misstatement [1] - 75:9
mistake [9] - 39:10, 50:9,
75:2, 79:22, 89:5, 146:5,
158:10, 182:18, 200:16
mistaken [5] - 36:2, 36:3,
39:9, 89:4, 158:9
mistakenly [1] - 21:3
misunderstanding [1] -
171:5
model [3] - 22:11, 190:6,
191:7
modification [1] - 34:23
modified [2] - 19:15, 25:20
modifier [2] - 36:5, 46:8
modify [4] - 24:14, 24:25,
25:12, 46:4
modifying [1] - 37:19
Mojo [2] - 181:25
mom [1] - 152:17
moment [16] - 16:20, 43:2,
48:12, 70:15, 76:7, 76:20,
106:18, 118:5, 121:25,
134:18, 157:23, 189:4,
189:6, 189:7, 207:16, 208:8
moments [1] - 134:4
Moncher [3] - 202:13,
203:7, 205:9
monetary [6] - 95:10,
95:15, 95:17, 96:24, 97:6,
97:19
money [100] - 21:3, 39:19,
39:22, 39:25, 40:1, 49:22,
52:21, 52:23, 52:25, 53:15,
76:24, 77:1, 83:15, 83:23,
84:14, 84:23, 87:7, 93:4,
93:17, 94:13, 94:18, 94:20,
95:4, 95:13, 95:19, 96:7,
96:9, 96:19, 99:20, 99:23,
99:24, 103:16, 103:23,
104:1, 104:2, 106:13,
106:15, 106:16, 107:12,
107:23, 108:1, 108:9,
108:17, 108:18, 109:9,
109:11, 113:2, 113:17,
114:2, 114:6, 114:16,
116:10, 120:17, 121:12,
121:16, 125:9, 126:20,
127:22, 128:5, 128:6,
128:16, 128:23, 129:3,
129:4, 129:9, 129:21,
129:23, 129:24, 137:6,
139:8, 139:9, 139:11,
139:12, 148:19, 151:16,

154:11, 180:2, 180:11,
185:4, 185:5, 185:8, 185:9,
185:12, 185:13, 185:23,
185:24, 186:6, 186:11,
186:21, 188:7, 188:13,
188:15, 199:22
monitoring [1] - 97:5
month [4] - 116:20, 171:18,
171:22, 172:1
months [9] - 156:6, 156:18,
167:4, 177:4, 177:12,
192:13, 206:20
mooted [1] - 42:17
Morin [3] - 179:4, 179:6
morning [19] - 3:2, 3:7, 3:8,
4:6, 4:7, 5:13, 5:19, 5:24,
12:22, 12:24, 13:22, 14:2,
15:22, 21:6, 53:6, 55:15,
100:22, 206:23, 209:7
mortgage [2] - 143:18,
190:19
most [16] - 16:9, 24:11,
24:12, 46:19, 53:25, 54:18,
72:23, 78:25, 104:19,
105:19, 115:14, 121:8,
138:23, 146:17, 183:2,
183:15
motion [9] - 51:1, 53:1,
53:11, 53:19, 53:23, 54:12,
58:10, 189:16, 199:7
Motion [1] - 55:12
motivated [1] - 199:19
motivation [3] - 18:2, 18:4,
51:11
motor [1] - 15:2
move [7] - 3:16, 3:18,
11:16, 68:22, 68:25, 122:17,
175:21
moved [5] - 60:5, 106:16,
174:17, 174:18, 183:14
movement [2] - 84:14,
184:22
moving [3] - 95:13, 109:11,
129:9
MR [110] - 2:12, 2:13, 3:9,
6:15, 6:22, 7:25, 8:2, 9:6,
9:7, 11:19, 12:1, 13:13, 17:3,
17:5, 17:8, 17:12, 17:16,
17:24, 18:1, 18:16, 18:22,
19:5, 19:8, 20:2, 24:2, 24:5,
24:16, 24:19, 24:23, 25:25,
26:4, 26:11, 26:24, 28:13,
28:17, 28:20, 28:25, 29:17,
29:20, 29:21, 30:14, 30:22,
30:24, 31:3, 31:14, 33:14,
33:16, 35:7, 36:21, 37:4,
38:10, 38:20, 39:22, 39:25,
40:8, 41:6, 41:10, 42:12,
42:16, 43:5, 43:7, 43:11,
43:15, 43:17, 43:20, 44:3,

46:9, 46:16, 48:4, 50:9,
53:11, 56:23, 57:9, 59:10,
60:8, 62:5, 63:16, 63:21,
63:25, 64:3, 64:18, 64:20,
66:6, 66:10, 67:14, 67:16,
67:18, 67:21, 67:25, 68:7,
68:11, 68:13, 68:14, 68:19,
70:4, 70:23, 102:19, 134:24,
135:3, 154:6, 182:5, 206:16,
206:18, 206:22, 207:4,
207:10, 207:18, 208:2,
208:6, 210:10

**MS** [66] - 2:12, 2:13, 3:18,
4:24, 7:3, 7:6, 7:9, 9:10,
10:18, 11:5, 11:9, 12:7,
19:22, 21:15, 26:12, 26:18,
31:19, 32:20, 32:25, 33:2,
33:12, 35:14, 36:9, 37:16,
37:25, 39:18, 40:22, 44:22,
46:23, 48:1, 48:20, 49:4,
49:8, 49:11, 49:16, 49:19,
50:4, 50:24, 56:6, 58:9,
58:18, 59:1, 59:6, 61:10,
61:21, 65:10, 66:20, 66:23,
67:12, 68:24, 69:7, 69:13,
69:21, 70:2, 70:20, 102:12,
102:15, 103:1, 103:6, 103:8,
187:15, 187:20, 188:2,
207:23, 208:9, 210:3

**multimillion** [2] - 121:20,
130:10

**multimillion-dollar** [1] -
121:20

**multiple** [6] - 19:24, 51:7,
52:24, 79:8, 79:10, 134:20

**multipurpose** [3] - 19:12,
45:25, 46:1

**must** [58] - 28:7, 28:8,
28:20, 31:4, 31:12, 34:14,
35:23, 38:5, 39:4, 42:9,
53:19, 70:7, 71:16, 71:20,
71:23, 71:24, 72:1, 72:2,
72:3, 72:12, 72:13, 73:3,
73:25, 74:1, 75:6, 75:17,
75:19, 77:5, 77:7, 77:13,
77:17, 77:18, 77:21, 77:23,
78:8, 79:1, 79:2, 79:4, 80:3,
80:21, 81:15, 82:2, 85:24,
86:12, 88:25, 97:18, 99:17,
99:22, 100:8, 100:20,
101:23, 138:10, 138:18,
154:13, 158:5, 159:15,
185:10

**MyOnCallDoc** [3] - 161:2,
166:13, 166:17, 166:19,
180:20, 180:21, 180:22,
180:23, 180:24, 180:25,
181:6, 181:8, 181:12

**mysteriously** [1] - 175:6
**mystery** [1] - 148:23

**N**

**name** [15] - 128:11, 135:5,
144:3, 144:21, 144:22,
150:23, 161:17, 165:22,
169:9, 172:10, 177:21,
184:7, 184:8, 196:19, 204:11
**named** [8] - 82:13, 89:16,
93:12, 151:3, 162:5, 175:4,
175:5, 175:12
**names** [4] - 83:1, 90:15,
93:25, 124:16
**narrative** [1] - 56:17
**national** [1] - 163:1
**natural** [2] - 85:10, 87:19
**naturally** [1] - 75:4
**nature** [5] - 85:21, 88:6,
94:24, 97:16, 189:9
**NE** [1] - 2:3
**nearly** [2] - 105:20, 113:11
**necessarily** [6] - 19:11,
45:23, 47:4, 64:15, 74:6,
169:20
**necessary** [9] - 57:21,
71:21, 105:1, 130:3, 141:23,
143:8, 143:10, 148:18,
160:10
**necessity** [13] - 52:10,
110:21, 141:15, 143:3,
149:9, 159:14, 159:20,
159:24, 160:10, 161:9,
165:7, 179:16, 184:14
**need** [72] - 3:12, 3:25, 6:17,
10:2, 10:16, 10:18, 13:6,
14:5, 14:15, 14:19, 16:18,
18:23, 19:12, 19:18, 23:7,
25:18, 26:20, 26:21, 36:18,
41:8, 43:20, 43:25, 47:17,
47:24, 49:3, 55:22, 55:23,
59:15, 68:9, 68:18, 68:21,
68:22, 71:13, 84:16, 84:19,
92:3, 110:7, 110:15, 111:21,
112:18, 122:3, 122:8,
125:11, 126:10, 126:11,
134:7, 138:15, 141:4,
152:23, 155:22, 166:10,
181:8, 187:12, 190:18,
192:1, 192:14, 193:1,
195:21, 195:23, 195:24,
197:21, 202:4, 202:15,
203:1, 203:17, 205:15,
205:16, 205:24, 206:22,
207:1, 209:1
**needed** [8] - 28:21, 50:8,
55:16, 103:20, 165:8, 172:3,
181:7, 210:5
**needs** [6] - 3:15, 16:25,
30:24, 110:8, 110:19, 194:10
**negligence** [3] - 28:9,
34:14, 80:21

**negotiable** [1] - 95:19
**Network** [2] - 181:13
**never** [24] - 59:23, 77:13,
77:19, 112:7, 121:8, 135:23,
135:24, 135:25, 136:1,
140:19, 140:23, 146:23,
149:13, 149:16, 152:2,
152:3, 174:16, 176:1, 184:1,
184:3, 188:18, 188:22
**New** [2] - 1:16, 192:12
**new** [4] - 147:13, 147:19,
159:15, 175:11
**news** [1] - 202:13
**next** [5] - 5:2, 21:22,
25:12, 27:13, 27:15, 29:5,
30:22, 34:21, 34:24, 37:23,
70:15, 99:1, 104:11, 111:14,
115:2, 115:18, 116:11,
118:4, 118:11, 124:21,
144:3, 203:11
**nice** [4] - 12:25, 15:1,
15:18, 186:13
**Nick** [4] - 151:3, 162:5,
162:17, 162:22
**night** [5] - 5:4, 5:16, 7:16,
53:6, 119:21
**Ninth** [1] - 45:11
**NO** [1] - 1:2
**nobody** [1] - 176:14
**none** [2] - 20:3, 110:18
**normal** [1] - 88:15
**normally** [2] - 78:13, 88:14
**note** [5] - 76:7, 76:20,
76:24, 134:19, 197:19
**noted** [1] - 21:15
**notepads** [3] - 131:16,
187:6, 205:23
**notes** [16] - 26:7, 53:17,
65:24, 69:10, 78:24, 79:1,
79:2, 79:5, 79:6, 128:13,
140:21, 142:8, 142:13,
142:16, 152:22, 209:6
**nothing** [26] - 43:4, 48:1,
115:14, 117:20, 120:3,
131:3, 136:11, 140:22,
140:23, 141:11, 145:6,
145:8, 150:2, 150:8, 150:18,
151:6, 155:7, 176:12, 177:5,
191:16, 192:3, 194:6, 194:7,
194:13, 194:22, 200:5
**nothing.com** [1] - 120:3
**noticed** [1] - 175:22
**notwithstanding** [3] -
142:15, 146:1, 146:2
**November** [2] - 167:15,
183:16
**Novitas** [4] - 183:10,
183:11, 183:21
**number** [9] - 3:3, 49:11,
59:24, 59:25, 74:5, 75:22,

120:2, 195:16, 198:23
**numbers** [3] - 169:8, 206:8,
209:23
**NW** [1] - 1:18

**O**

**o'clock** [11] - 4:7, 4:17,
5:24, 8:21, 8:25, 11:4, 14:2,
14:7, 69:11, 201:18, 201:22
**O'Neil** [2] - 181:13, 181:15
**OA** [1] - 10:8
**oath** [3] - 137:21, 182:19,
196:13
**object** [2] - 90:13, 99:22
**objected** [1] - 31:15
**objection** [1] - 23:24
**objects** [6] - 42:22, 56:18,
90:10, 98:20, 99:10
**obligating** [1] - 190:12
**obligations** [1] - 51:6
**observe** [1] - 74:14
**obtain** [1] - 83:23
**obtained** [5] - 49:22, 96:12,
97:12, 97:20, 97:23
**obvious** [6] - 112:5, 112:6,
112:10, 113:2, 142:23,
146:21
**obviously** [9] - 5:8, 6:16,
9:16, 25:13, 50:17, 98:23,
164:14, 169:5, 201:24
**occasion** [4] - 60:17, 83:5,
90:20, 163:20
**occasions** [1] - 51:7
**occur** [1] - 175:2
**occurred** [3] - 79:17,
102:15, 171:20
**occurs** [5] - 25:7, 34:5,
80:12, 152:16, 166:11
**October** [2] - 165:19
**odd** [1] - 29:7
**OF** [5] - 1:1, 1:3, 1:9, 1:15,
1:18
**offense** [12] - 20:6, 53:20,
76:8, 76:9, 76:21, 76:22,
78:22, 79:9, 82:18, 83:19,
91:17, 96:20
**offenses** [7] - 28:2, 29:10,
76:4, 76:7, 76:17, 76:20,
77:3
**offer** [8] - 44:7, 52:6, 91:4,
91:11, 91:22, 140:23, 152:5,
199:2
**offered** [4] - 91:19, 111:25,
112:1, 192:20
**offering** [4] - 19:1, 91:7,
92:7, 92:25
**office** [2] - 198:9, 198:14
**OFFICE** [1] - 1:18
**officer** [2] - 126:25, 194:25

**OFFICER** [10] - 12:19, 15:23, 48:21, 69:15, 71:1, 131:19, 134:10, 187:9, 205:12, 209:15

**offices** [4] - 117:19, 189:21, 190:4, 190:23

**Official** [2] - 1:22, 210:21

**often** [5] - 20:14, 46:16, 52:2, 104:7, 104:16

**OIG** [2] - 143:23, 146:24

**older** [1] - 54:4

**omits** [1] - 23:10

**once** [11] - 9:1, 16:22, 47:20, 99:21, 101:3, 142:7, 176:1, 181:5, 185:15, 187:5, 188:18

**once-over** [1] - 47:20

**oncologist** [2] - 104:12, 107:2

**one** [192] - 7:7, 7:12, 10:13, 11:17, 11:18, 14:9, 16:5, 16:13, 17:8, 18:1, 18:25, 19:18, 21:2, 22:7, 24:5, 24:7, 24:11, 24:12, 24:14, 27:4, 27:13, 29:2, 29:3, 29:8, 29:11, 29:16, 30:10, 32:17, 32:21, 32:23, 34:11, 34:24, 34:25, 35:2, 35:5, 35:7, 35:11, 35:12, 35:13, 35:15, 36:8, 36:13, 36:14, 36:15, 36:17, 36:19, 38:9, 38:17, 39:18, 40:18, 40:20, 42:12, 42:25, 43:1, 43:7, 44:10, 44:15, 44:17, 45:2, 46:5, 48:14, 49:4, 49:11, 52:13, 58:9, 59:24, 60:17, 61:12, 61:14, 62:1, 66:6, 71:11, 74:10, 77:7, 77:23, 79:12, 82:1, 82:20, 83:5, 83:11, 84:15, 86:1, 90:6, 90:7, 90:11, 90:19, 91:1, 92:7, 92:11, 92:15, 94:4, 94:10, 95:15, 97:25, 99:1, 99:6, 99:13, 100:15, 106:18, 108:21, 110:11, 114:13, 117:22, 119:11, 121:19, 125:4, 125:15, 129:11, 129:22, 132:4, 134:18, 135:5, 135:19, 137:22, 140:18, 140:20, 141:19, 141:25, 142:25, 143:9, 143:19, 148:14, 148:17, 148:20, 149:20, 149:24, 150:3, 151:25, 152:20, 152:24, 153:1, 155:18, 157:1, 161:24, 162:4, 163:20, 164:18, 169:16, 173:13, 173:15, 174:14, 177:15, 177:16, 177:21, 178:4, 178:5, 178:8, 178:17,

178:18, 180:22, 182:1, 182:14, 182:19, 182:20, 184:9, 184:15, 184:18, 186:10, 186:24, 189:3, 189:15, 190:10, 192:5, 192:18, 194:9, 195:6, 196:19, 196:20, 197:16, 197:18, 198:4, 198:25, 200:6, 200:11, 201:23, 203:1, 203:25, 204:4, 204:13, 206:15, 206:21, 206:22, 206:25, 209:7

**one's** [1] - 34:19

**ones** [3] - 13:24, 24:8, 196:5

**open** [6] - 7:4, 7:7, 21:19, 102:4, 102:23, 192:4

**opening** [5] - 6:25, 66:23, 68:16, 101:4, 107:21

**openly** [1] - 91:21

**opens** [1] - 183:20

**operated** [1] - 165:13

**operating** [2] - 160:16, 198:16

**operation** [4] - 131:3, 167:10, 186:5

**operations** [1] - 136:10

**opined** [1] - 46:19

**opinion** [16] - 5:23, 35:25, 36:2, 39:6, 39:9, 60:20, 73:8, 75:16, 75:18, 75:20, 78:1, 89:2, 89:3, 158:7, 158:8, 163:23

**opinions** [1] - 57:14

**opportunity** [13] - 3:24, 48:6, 48:8, 74:14, 79:1, 105:13, 132:8, 133:20, 137:13, 190:21, 201:19, 201:24, 202:5

**opposed** [7] - 6:19, 17:14, 18:8, 67:22, 121:7, 162:2, 186:13

**opposite** [1] - 157:16

**opt** [3] - 173:9, 173:10, 173:18

**optimizing** [1] - 114:24

**option** [1] - 105:19

**Optum** [1] - 27:20

**oral** [1] - 10:11

**Order** [1] - 3:1

**order** [15] - 3:13, 5:1, 6:15, 23:16, 27:22, 78:17, 108:18, 125:24, 126:18, 157:12, 188:15, 191:19, 191:21, 191:25, 194:2

**ordered** [9] - 112:5, 141:5, 141:22, 142:1, 148:21, 149:1, 149:5, 149:23, 188:19

**ordering** [2] - 127:8, 142:10

**orders** [12] - 95:19, 104:15,

110:13, 113:4, 113:10, 114:3, 115:25, 116:5, 125:20, 125:23, 127:14, 128:2

**ordinarily** [1] - 81:1

**ore** [1] - 54:13

**organize** [1] - 201:24

**orient** [1] - 66:21

**origin** [1] - 129:4

**original** [3] - 7:9, 16:10, 92:19

**Orr** [3] - 164:9, 179:22, 179:24

**orthopedic** [1] - 162:25

**ostrich** [2] - 157:8, 157:9

**otherwise** [5] - 92:22, 109:20, 136:3, 142:3, 177:9

**ourselves** [1] - 12:11

**outcome** [1] - 74:12

**outlining** [1] - 126:6

**outside** [3] - 96:6, 193:14, 208:18

**overall** [1] - 51:1

**overhead** [2] - 64:5, 68:14

**overheard** [1] - 198:9

**overly** [1] - 50:20

**overnight** [1] - 210:6

**overrule** [2] - 23:24, 142:2

**overt** [4] - 89:19, 89:23, 90:7, 90:11

**overtly** [1] - 92:12

**overuse** [1] - 147:8

**own** [21] - 16:16, 54:10, 55:5, 64:10, 71:10, 72:24, 73:11, 78:1, 103:13, 119:5, 126:10, 130:7, 132:25, 138:23, 140:25, 145:10, 147:9, 166:8, 169:19, 183:2, 193:2

**owned** [6] - 51:8, 83:16, 83:23, 127:18, 169:19, 196:13

**owner** [1] - 110:9

**owner's** [1] - 149:8

**ownership** [2] - 94:24, 95:20

## P

**p.m** [17] - 1:5, 69:17, 71:2, 131:20, 134:11, 134:12, 134:15, 187:10, 187:17, 187:18, 187:23, 205:13, 208:11, 208:12, 208:15, 209:16, 210:13

**P.W** [1] - 104:21

**package** [5] - 24:13, 24:14, 25:8, 34:6, 80:13

**package's** [1] - 25:11, 34:9, 80:16

**packet** [1] - 14:8

**page** [27] - 16:15, 18:17, 18:19, 18:20, 43:8, 43:12, 43:15, 44:4, 45:4, 45:6, 45:8, 45:11, 49:8, 49:21, 60:9, 62:5, 62:6, 63:8, 63:24, 66:12, 66:16, 67:16, 67:24, 147:4, 147:6, 147:11

**PAGE** [1] - 2:11

**pages** [4] - 45:9, 120:10, 120:12, 143:20

**Pages** [1] - 1:7

**pagination** [2] - 16:14, 43:9

**paid** [49] - 18:24, 43:21, 51:24, 52:5, 91:19, 91:25, 92:4, 92:12, 105:9, 105:16, 105:18, 105:20, 105:22, 106:2, 106:4, 106:9, 109:19, 113:4, 113:6, 124:22, 125:17, 125:18, 126:17, 127:9, 127:21, 130:1, 139:16, 146:3, 146:13, 148:19, 149:20, 158:22, 161:24, 162:2, 162:25, 164:13, 172:13, 182:19, 184:4, 184:5, 186:2, 191:7, 191:9, 194:5, 195:6, 196:1, 201:8

**PALM** [1] - 1:2

**Palmetto** [5] - 183:10, 183:17, 184:22, 184:23

**panel** [2] - 115:12, 115:14

**panels** [1] - 145:5

**paperwork** [3] - 104:22, 126:1, 203:17

**paragraph** [17] - 18:19, 24:17, 24:19, 27:13, 27:15, 28:21, 29:5, 31:8, 31:22, 31:23, 31:25, 32:1, 32:7, 32:9, 36:11, 36:20, 43:17

**paragraphs** [3] - 29:3, 31:7, 36:25

**parents** [2] - 140:1, 140:3

**parking** [1] - 193:14

**Part** [4] - 159:15, 160:12, 160:13, 173:16

**part** [41] - 25:2, 27:9, 28:14, 28:15, 33:21, 33:25, 34:16, 35:17, 35:20, 36:6, 36:7, 37:1, 37:7, 37:13, 39:1, 46:12, 47:5, 47:6, 49:17, 62:4, 74:5, 80:8, 83:3, 88:18, 88:22, 90:17, 91:15, 91:25, 92:23, 94:2, 94:23, 101:4, 101:5, 117:17, 129:14, 136:23, 137:7, 144:7, 146:10, 148:9, 154:17

**participant** [2] - 81:16, 167:19

**participate** [5] - 86:5,

86:11, 95:2, 133:21, 200:9
**participated** [4] - 28:4, 29:12, 81:12, 86:24
**participating** [1] - 123:5
**particular** [17] - 13:23, 16:20, 19:25, 24:15, 25:21, 25:23, 29:16, 40:20, 51:3, 53:7, 55:16, 74:6, 74:11, 142:7, 191:25, 198:3, 198:18
**particularly** [3] - 147:23, 174:13, 176:23
**partner** [4] - 82:11, 89:14, 93:10, 170:3
**partnering** [1] - 196:7
**partnership** [3] - 82:10, 89:13, 93:9
**party** [1] - 23:9
**password** [1] - 210:4
**past** [3] - 46:5, 55:8, 69:4
**Patel** [204] - 8:2, 8:5, 8:22, 9:4, 10:22, 11:8, 12:14, 20:19, 36:1, 40:23, 59:3, 59:13, 63:18, 98:13, 103:9, 103:17, 103:19, 103:20, 103:22, 103:24, 104:3, 104:13, 104:15, 104:17, 104:20, 104:25, 105:8, 105:9, 105:13, 105:14, 105:16, 105:18, 105:22, 105:25, 106:1, 106:2, 106:4, 106:9, 106:16, 107:17, 107:22, 108:1, 108:5, 108:12, 108:20, 108:21, 108:24, 109:14, 110:9, 110:11, 110:12, 110:16, 110:22, 111:1, 111:3, 111:6, 111:11, 111:15, 112:19, 112:21, 113:5, 113:13, 113:14, 113:18, 113:22, 113:23, 114:5, 114:18, 114:20, 114:25, 115:3, 115:6, 116:2, 116:15, 116:17, 117:11, 118:17, 119:4, 119:8, 119:12, 119:17, 119:24, 120:14, 120:16, 120:22, 121:2, 121:5, 121:12, 121:14, 121:20, 122:12, 122:13, 122:21, 123:12, 123:13, 123:18, 123:24, 124:2, 124:22, 125:1, 125:4, 125:5, 125:9, 125:17, 128:13, 128:17, 128:20, 129:2, 130:5, 130:6, 130:12, 130:14, 130:15, 130:18, 131:22, 131:24, 132:2, 132:8, 133:9, 133:13, 133:17, 135:7, 135:15, 135:23, 136:8, 136:20, 137:6, 137:17, 137:22,

138:3, 138:5, 139:4, 139:6, 139:17, 140:19, 140:23, 141:10, 142:1, 142:11, 143:16, 143:22, 145:1, 145:6, 146:6, 147:23, 149:8, 150:21, 151:21, 151:22, 152:1, 153:10, 153:25, 154:9, 154:23, 155:3, 155:9, 157:13, 158:14, 158:15, 161:7, 164:11, 165:11, 166:15, 166:18, 168:10, 169:18, 175:9, 175:11, 177:9, 177:24, 178:4, 178:11, 179:2, 179:8, 179:9, 181:5, 181:6, 181:7, 181:8, 183:22, 184:10, 184:16, 185:4, 189:14, 189:18, 190:2, 190:6, 190:19, 190:21, 193:5, 195:2, 195:6, 195:15, 197:8, 198:8, 198:13, 198:17, 198:25, 199:19, 200:7
**PATEL** [2] - 1:6, 132:1
**Patel's** [15] - 61:16, 103:18, 106:13, 115:21, 115:23, 116:9, 117:12, 125:25, 141:7, 149:3, 150:16, 151:8, 162:9, 163:5, 168:4
**path** [2] - 139:12, 153:22
**patient** [47] - 22:4, 22:9, 22:11, 51:23, 51:25, 52:3, 52:6, 52:14, 52:15, 104:16, 107:11, 110:2, 110:3, 113:11, 113:12, 114:6, 116:10, 117:18, 119:23, 120:4, 121:8, 121:9, 135:24, 140:21, 141:1, 141:2, 141:3, 141:16, 141:17, 142:25, 150:2, 159:14, 159:20, 159:24, 160:11, 160:24, 188:4, 188:25, 189:2, 191:16, 191:18, 192:5, 194:10, 194:12, 195:12, 199:12
**patient's** [2] - 110:18, 195:24
**patient/doctor** [1] - 122:10
**patients** [80] - 22:20, 51:22, 51:23, 52:1, 52:3, 52:8, 52:12, 53:14, 91:5, 91:9, 92:5, 92:9, 104:7, 104:9, 104:21, 106:25, 107:1, 108:2, 108:22, 109:18, 110:15, 110:16, 110:23, 112:16, 112:21, 113:7, 113:9, 113:12, 113:16, 115:9, 115:22, 116:7, 117:2, 117:21, 118:9, 118:13, 118:14, 118:17, 118:19, 119:19, 120:12, 120:21,

120:23, 121:3, 121:6, 123:25, 126:9, 127:3, 127:13, 127:24, 130:10, 140:13, 140:14, 141:6, 149:13, 149:16, 150:3, 152:2, 152:18, 153:7, 188:25, 189:7, 189:25, 190:5, 191:5, 191:11, 192:9, 192:19, 192:23, 193:10, 193:13, 193:15, 194:14, 194:20, 195:1, 195:14, 195:22, 196:8
**patients'** [2] - 104:11, 191:6
**pattern** [10] - 24:7, 28:14, 32:13, 33:4, 35:8, 35:15, 36:11, 37:20, 44:16, 54:19
**pay** [23] - 60:11, 76:14, 91:4, 91:11, 99:7, 99:11, 99:13, 106:2, 106:15, 111:21, 115:4, 125:3, 146:8, 163:5, 163:6, 163:7, 163:14, 185:23, 189:22, 189:23, 190:14
**paying** [24] - 19:1, 51:18, 60:23, 60:24, 91:7, 92:7, 92:25, 93:3, 120:23, 121:1, 121:3, 126:8, 135:10, 149:19, 151:15, 164:2, 164:3, 165:6, 172:6, 178:3, 195:12, 195:13, 195:14, 196:9
**payment** [23] - 18:9, 43:13, 44:6, 45:2, 45:3, 57:9, 76:17, 84:6, 84:11, 91:15, 91:22, 92:19, 99:16, 122:14, 125:13, 125:15, 127:7, 127:11, 127:15, 127:17, 171:21, 195:11
**payments** [9] - 51:21, 51:25, 112:25, 125:22, 127:5, 127:12, 127:23, 190:20
**PC** [2] - 1:18, 2:3
**Peachtree** [1] - 1:18
**Peactree** [1] - 2:6
**Pennsylvania** [4] - 122:6, 183:11, 183:15, 183:21
**people** [74] - 57:17, 63:19, 75:4, 82:13, 83:8, 89:11, 89:16, 90:23, 93:12, 93:19, 94:7, 96:4, 96:5, 96:6, 103:13, 103:20, 103:21, 103:22, 104:13, 106:4, 106:9, 107:3, 107:4, 107:24, 108:25, 109:3, 112:22, 118:20, 118:23, 120:17, 120:21, 121:21, 122:3, 122:23, 125:10, 130:9, 147:23, 153:7, 158:1, 159:2, 159:18, 161:1, 173:17,

173:22, 179:17, 182:22, 185:16, 185:22, 185:23, 188:12, 188:13, 188:14, 188:16, 189:10, 189:11, 189:22, 190:25, 191:7, 192:13, 193:8, 193:11, 193:12, 193:13, 193:24, 196:10, 196:20, 197:4, 197:12, 198:10, 200:8, 200:13
**people's** [4] - 103:19, 115:10, 118:18, 121:4
**peppered** [1] - 22:13
**per** [2] - 126:17, 126:18
**percent** [4] - 9:8, 32:13, 115:16, 116:8
**percentage** [6] - 142:16, 171:7, 171:9, 172:4, 172:7
**percentage-base** [1] - 171:7
**percentage-based** [1] - 171:9
**perfect** [3] - 31:14, 67:12, 210:7
**perform** [1] - 181:7
**performed** [3] - 80:25, 122:21, 136:6
**perhaps** [4] - 9:17, 50:19, 78:25, 143:13
**period** [5] - 38:20, 114:3, 160:17, 167:5, 168:11
**permissible** [3] - 61:1, 163:2, 164:5
**permission** [1] - 206:25
**permit** [1] - 132:13
**permitted** [4] - 75:11, 78:24, 204:3, 204:8
**person** [45] - 44:7, 73:18, 75:15, 78:23, 80:3, 80:4, 80:5, 81:1, 81:2, 81:4, 81:5, 81:7, 82:25, 83:10, 85:9, 87:18, 90:14, 90:25, 91:12, 91:13, 91:21, 91:23, 92:11, 92:15, 93:24, 94:9, 105:10, 106:10, 119:11, 122:24, 126:23, 135:17, 142:21, 142:25, 144:19, 159:8, 165:16, 181:23, 200:11
**person's** [2] - 85:11, 87:20
**personal** [20] - 74:12, 95:18, 130:7, 140:15, 142:24, 159:14, 159:19, 159:25, 160:11, 160:24, 161:3, 161:9, 165:7, 165:9, 184:9, 184:23, 184:25, 193:21, 193:22, 193:24
**personally** [7] - 80:25, 86:10, 88:11, 122:21, 123:4, 199:1, 199:2
**persons** [5] - 82:8, 82:20,

84:15, 90:3, 93:7
**perspective** [1] - 11:17
**persuaded** [2] - 46:7, 54:14
**pertaining** [1] - 198:2
**pertains** [1] - 202:19
**Petron** [4] - 52:18, 128:24, 158:19, 173:16
**PGx** [2] - 136:4, 172:14
**Ph.D** [1] - 144:24
**phase** [1] - 70:16
**phone** [13] - 130:8, 152:19, 173:3, 173:11, 178:15, 178:24, 193:10, 193:13, 197:12, 204:11, 204:13, 204:21, 205:3
**phones** [5] - 197:13, 204:4, 204:6, 204:18, 205:4
**photographs** [1] - 107:14
**phrase** [4] - 95:17, 95:25, 96:15, 180:15
**physical** [1] - 3:19
**physically** [2] - 116:3, 198:22
**physician** [4] - 52:11, 182:16, 194:9, 194:11
**physicians** [4] - 120:18, 126:5, 182:13, 189:20
**physicians'** [1] - 190:23
**pick** [3] - 99:22, 152:19, 192:7
**picked** [3] - 196:6, 196:10
**pictures** [2] - 177:3, 177:4
**piece** [2] - 54:24, 129:22
**pieces** [3] - 101:18, 190:6, 200:7
**pincited** [1] - 54:6
**pitch** [2] - 119:11, 119:16
**place** [10] - 97:4, 110:7, 145:1, 174:1, 178:6, 178:7, 183:16, 190:6, 190:7, 191:7
**places** [1] - 190:18
**plain** [3] - 113:10, 113:12, 152:9
**plan** [43] - 3:17, 9:9, 15:2, 82:13, 82:16, 82:17, 82:21, 82:24, 83:1, 83:3, 83:5, 84:8, 84:12, 84:22, 87:6, 89:16, 89:19, 89:23, 89:25, 90:4, 90:5, 90:15, 90:17, 90:19, 92:20, 93:12, 93:14, 93:16, 93:20, 93:25, 94:2, 94:3, 94:4, 109:15, 125:21, 137:7, 177:25, 201:18, 204:16, 208:25, 209:8
**plan's** [1] - 93:22
**planned** [2] - 89:19, 113:19
**planning** [1] - 68:11
**plans** [3] - 27:19, 27:22, 27:24
**play** [4] - 111:1, 192:6,

207:22
**played** [4] - 61:8, 83:3, 90:17, 94:1
**plea** [3] - 78:10, 78:11, 78:14
**pleaded** [2] - 78:22, 107:3
**pleasing** [1] - 156:11
**pleasure** [2] - 200:21, 205:19
**plenty** [2] - 6:7, 41:23
**plus** [3] - 12:2, 22:23, 158:21
**pocket** [2] - 201:9, 204:16
**pockets** [1] - 130:5
**podium** [1] - 154:5
**point** [50] - 7:13, 7:20, 24:25, 42:19, 47:15, 54:13, 55:8, 57:1, 60:7, 63:8, 64:6, 66:16, 68:4, 68:8, 74:6, 95:2, 128:15, 129:11, 134:21, 143:13, 143:16, 143:17, 150:21, 159:5, 164:12, 185:3, 193:24, 194:7, 202:17
**pointed** [2] - 23:18, 24:12
**pointing** [1] - 145:12
**points** [2] - 147:1, 155:12
**poor** [1] - 152:22
**portal** [1] - 198:17
**portion** [1] - 92:18
**portions** [1] - 65:11
**posed** [1] - 108:2
**position** [4] - 10:9, 11:18, 12:5, 166:7
**positive** [4] - 25:6, 27:25, 34:4, 80:11
**possesses** [3] - 25:8, 34:6, 80:13
**possession** [2] - 24:20, 25:14
**possibility** [1] - 78:12
**possible** [8] - 72:16, 80:24, 100:13, 104:4, 110:14, 114:3, 116:2, 128:2
**postpone** [1] - 6:12
**potentially** [1] - 172:15
**practices** [1] - 189:21
**pre** [1] - 161:2
**pre-screened** [1] - 161:2
**precise** [3] - 85:21, 88:6, 97:16
**prefer** [3] - 4:20, 6:11, 30:19
**prefilled** [2] - 115:25, 198:18
**prejudice** [2] - 38:11, 71:25
**prenatal** [1] - 124:19
**prep** [1] - 8:12
**preparations** [1] - 145:6
**prepare** [2] - 6:5, 11:3
**prepared** [4] - 15:3, 98:3,

146:23, 146:25
**preparing** [4] - 8:18, 50:14, 50:18, 50:19
**prerogative** [1] - 5:9
**prescriptions** [2] - 126:9, 127:25
**presence** [4] - 3:8, 8:23, 12:16, 147:9
**present** [10] - 13:14, 14:11, 69:18, 81:13, 83:7, 90:22, 94:6, 180:1, 200:21, 206:13
**presented** [6] - 4:11, 52:9, 52:18, 52:22, 53:25, 71:24
**presents** [1] - 111:25
**preserved** [2] - 31:15, 46:3
**presumably** [1] - 20:17
**presume** [1] - 19:3
**presumes** [1] - 72:6
**pretenses** [9] - 83:18, 83:25, 84:2, 84:24, 85:16, 86:25, 87:1, 87:8, 88:1
**pretty** [5] - 9:3, 34:17, 142:23, 153:5, 169:10
**prevalence** [1] - 162:23
**preview** [1] - 10:13
**previously** [2] - 114:20, 161:19
**preyed** [4] - 103:9, 103:10, 103:11, 121:4
**preying** [2] - 115:10, 119:9
**prima** [1] - 42:3
**primarily** [2] - 56:13, 142:6
**primary** [7] - 18:23, 43:21, 44:1, 44:20, 92:3, 120:18, 121:6
**print** [10] - 16:22, 33:23, 42:25, 47:19, 47:25, 48:3, 48:5, 48:11, 48:18, 68:5
**printed** [1] - 184:21
**printing** [2] - 48:7, 68:6
**prioritizing** [1] - 114:2
**priority** [2] - 79:3, 114:6, 116:10
**private** [1] - 84:7
**probability** [6] - 23:15, 25:3, 27:10, 27:18, 34:2, 80:9
**probative** [2] - 57:12, 57:20
**problem** [19] - 9:24, 10:5, 12:4, 31:20, 47:11, 63:15, 64:7, 64:15, 64:25, 65:25, 66:7, 147:3, 175:14, 176:12, 176:17, 195:13, 195:14, 207:3, 207:24
**problems** [2] - 22:8, 147:18
**procedures** [1] - 204:4
**proceed** [2] - 13:10, 13:11
**proceeding** [1] - 6:9
**proceedings** [3] - 102:14, 204:25, 210:18

**Proceedings** [1] - 102:23
**proceeds** [9] - 93:5, 94:19, 94:25, 96:11, 96:25, 97:2, 97:11, 99:23, 99:24
**process** [8] - 3:21, 114:1, 123:17, 168:3, 174:25, 175:7, 201:25, 202:18
**processed** [1] - 122:5
**processes** [2] - 62:22, 170:14
**processing** [1] - 175:12
**produce** [1] - 72:8
**profit** [1] - 51:11
**profitability** [1] - 51:15
**profitable** [1] - 104:5
**program** [18] - 28:5, 29:13, 49:23, 76:18, 83:15, 83:17, 83:23, 83:24, 84:1, 84:7, 84:13, 84:14, 84:17, 91:16, 92:1, 92:20, 92:21, 116:15
**promise** [1] - 95:3
**promised** [5] - 111:1, 111:9, 111:17, 131:15, 208:17
**promises** [16] - 83:18, 83:25, 84:2, 84:25, 85:17, 86:25, 87:1, 87:9, 88:1, 104:7, 105:17, 111:15, 111:16, 114:16, 117:14
**promising** [4] - 111:3, 111:7, 112:2, 126:1
**promptly** [2] - 8:25, 100:12
**proof** [31] - 13:7, 16:14, 18:12, 19:19, 20:4, 20:11, 21:8, 23:2, 23:25, 33:24, 72:15, 72:17, 72:21, 72:22, 73:21, 81:11, 81:13, 83:9, 90:24, 94:8, 129:17, 135:19, 138:21, 139:3, 144:2, 179:25, 180:6, 182:15, 183:1, 201:5
**proper** [4] - 23:13, 41:3, 51:21, 78:14
**properly** [1] - 105:6
**property** [20] - 49:22, 83:16, 83:23, 84:24, 87:7, 94:19, 94:20, 95:5, 96:7, 96:9, 96:11, 96:25, 97:1, 97:2, 97:11, 97:16, 97:19, 97:21, 97:23, 125:8
**proposal** [1] - 19:3
**propose** [1] - 4:5
**proposed** [4] - 29:8, 35:1, 36:11, 40:19
**proposition** [1] - 54:5
**prosecution** [1] - 23:17
**prosecutors** [2] - 149:24, 167:15, 181:5
**prostate** [1] - 120:5
**protection** [1] - 204:25

**protocols** [1] - 41:25
**prove** [77] - 18:23, 28:10, 30:25, 31:4, 31:12, 32:2, 32:15, 34:15, 35:22, 35:23, 37:9, 38:5, 39:3, 39:4, 43:20, 43:25, 44:1, 72:7, 72:12, 72:16, 73:22, 79:17, 79:18, 80:22, 80:24, 81:23, 82:12, 82:16, 84:16, 84:19, 85:19, 85:20, 85:22, 88:3, 88:5, 88:7, 88:12, 88:24, 88:25, 89:15, 89:18, 89:24, 92:3, 93:11, 93:15, 97:18, 97:23, 122:21, 136:3, 136:16, 136:18, 136:19, 136:20, 136:22, 138:7, 138:17, 145:9, 151:11, 151:12, 152:1, 152:10, 154:13, 154:14, 154:22, 155:2, 155:4, 155:5, 155:7, 157:12, 158:5, 165:9, 181:16, 181:19, 186:9, 186:22
**proved** [18] - 32:6, 71:20, 72:25, 79:12, 82:19, 83:20, 85:24, 86:22, 90:2, 91:18, 93:19, 94:16, 96:21, 106:21, 136:21, 142:3, 143:19, 165:11
**proven** [10] - 54:21, 137:24, 138:9, 139:13, 139:18, 139:21, 139:24, 152:7, 196:25
**proves** [8] - 18:25, 19:6, 32:6, 81:25, 92:6, 108:5, 109:13, 131:2
**provide** [3] - 55:14, 78:15, 206:9
**provided** [4] - 41:11, 55:7, 84:9, 110:21
**providers** [2] - 22:19, 109:21
**provides** [3] - 78:12, 92:21, 137:14
**providing** [1] - 84:10
**proving** [3] - 37:10, 85:17, 88:2
**public** [1] - 84:7
**publication** [1] - 206:18
**published** [2] - 11:20, 11:24
**pull** [4] - 16:9, 26:17, 67:20, 108:22
**pulled** [2] - 7:12, 114:15
**pulling** [3] - 27:2, 27:4, 142:22
**pumping** [1] - 16:1
**punch** [1] - 150:17
**punctuation** [1] - 49:19
**punishment** [2] - 77:13, 77:15

**puppet** [2] - 106:12, 113:19
**purchase** [2] - 95:3, 95:9
**purpose** [39] - 18:4, 18:5, 18:9, 18:13, 18:14, 18:15, 18:23, 19:5, 19:7, 43:5, 43:21, 44:1, 44:3, 44:20, 45:2, 45:24, 46:25, 80:1, 82:23, 83:4, 83:11, 85:21, 86:14, 88:6, 90:5, 90:9, 90:18, 91:1, 92:4, 93:22, 94:3, 94:10, 115:7, 123:7, 125:15, 155:8, 155:10, 208:20
**purposely** [3] - 23:16, 23:20, 79:25
**purposes** [9] - 19:1, 44:10, 54:8, 82:10, 89:13, 92:7, 93:9, 109:5, 134:25
**pursued** [2] - 56:20, 58:2
**pursuing** [1] - 56:11
**push** [2] - 126:8, 126:9
**pushing** [1] - 104:9
**put** [41] - 5:10, 6:6, 6:7, 6:18, 13:5, 13:6, 14:15, 15:7, 17:21, 21:22, 26:22, 28:23, 32:16, 38:20, 40:8, 41:20, 64:4, 66:23, 98:21, 99:3, 100:16, 117:10, 131:16, 136:17, 142:20, 145:1, 145:15, 146:22, 153:8, 159:16, 161:10, 166:7, 173:15, 174:2, 174:7, 178:21, 190:6, 191:7, 196:5, 199:7
**puts** [1] - 4:16
**putting** [6] - 8:13, 16:3, 39:25, 66:1, 66:7, 66:25
**puzzle** [3] - 129:22, 190:7, 200:7

## Q

**QC** [7] - 3:24, 4:9, 6:4, 8:16, 8:17, 11:2, 48:10
**QC'ing** [1] - 3:21
**qualifications** [2] - 22:6, 175:18
**qualified** [1] - 145:10
**qualifier** [3] - 19:11, 44:19, 45:24
**qualify** [1] - 33:18
**quality** [2] - 142:13, 142:15
**questions** [21] - 62:6, 66:12, 66:13, 74:9, 74:16, 132:11, 140:1, 140:6, 140:8, 148:3, 148:5, 150:10, 152:12, 152:17, 153:21, 153:24, 176:22, 191:19, 194:21, 194:22
**quick** [5] - 6:25, 7:8, 7:23,

148:4, 187:11
**quickly** [3] - 8:15, 110:14, 116:2
**quite** [3] - 7:19, 10:3, 50:20

## R

**rabbit** [2] - 52:15, 52:25
**radio** [1] - 86:20
**RAFFERTY** [8] - 2:5, 2:12, 7:25, 8:2, 9:6, 68:13, 134:24, 135:3
**Rafferty** [8] - 8:1, 56:21, 134:21, 135:5, 154:4, 182:11, 183:24, 207:10
**raise** [1] - 194:22
**raised** [2] - 26:16, 46:22
**Rama** [5] - 172:20, 174:2, 197:11, 197:12, 199:22
**Rama's** [1] - 172:23
**Ramamurthy** [37] - 104:14, 105:23, 108:24, 109:6, 112:23, 114:8, 114:9, 114:23, 115:3, 116:14, 118:8, 118:18, 118:23, 119:3, 119:12, 119:13, 120:25, 121:17, 121:22, 125:19, 126:16, 128:10, 128:17, 128:18, 155:21, 156:5, 156:9, 156:24, 157:3, 168:11, 172:20, 182:24, 186:14, 193:12, 195:21, 196:3, 200:9
**Ramamurthy's** [1] - 117:25
**ran** [1] - 119:6
**random** [1] - 121:1
**rate** [5] - 115:1, 115:16, 116:4, 116:7, 116:8
**rather** [10] - 10:22, 23:23, 49:6, 64:15, 67:5, 67:19, 104:11, 120:17, 135:13, 190:24
**rationale** [1] - 5:11
**rea** [1] - 58:5
**reach** [4] - 73:15, 77:23, 206:10, 209:25
**reaching** [1] - 71:14
**reacted** [1] - 173:17
**read** [34] - 13:25, 14:10, 16:16, 18:20, 22:1, 27:15, 31:5, 31:8, 31:21, 32:17, 34:20, 40:10, 43:1, 43:10, 43:24, 47:22, 48:13, 48:16, 48:17, 53:6, 67:5, 67:6, 71:7, 98:13, 101:20, 102:15, 111:16, 162:8, 162:20, 162:22, 180:19, 190:12
**reading** [8] - 14:10, 35:12, 43:18, 48:14, 53:5, 64:17, 67:1, 67:20

**reads** [3] - 25:1, 27:8, 33:22
**ready** [16] - 4:14, 5:18, 6:23, 8:10, 11:7, 13:23, 13:24, 15:21, 16:19, 34:19, 50:15, 101:15, 102:24, 132:9, 134:13, 187:19
**real** [9] - 6:25, 72:19, 78:5, 120:8, 122:9, 130:21, 191:6, 194:3, 195:25
**reality** [1] - 152:16
**realize** [1] - 147:3
**really** [20] - 16:10, 24:23, 46:19, 56:11, 56:16, 58:15, 120:3, 143:1, 147:12, 150:21, 154:22, 154:24, 157:11, 166:12, 182:17, 183:4, 185:18, 185:21, 186:18, 186:25
**reason** [27] - 4:14, 8:19, 16:2, 24:9, 25:16, 28:5, 29:14, 32:12, 33:2, 33:11, 34:13, 36:21, 44:5, 72:19, 74:11, 78:16, 80:20, 129:19, 139:8, 140:24, 141:20, 146:8, 147:7, 155:23, 155:24, 183:16, 202:25
**reasonable** [85] - 13:7, 18:25, 19:7, 25:15, 27:17, 28:3, 29:11, 30:4, 30:6, 30:14, 30:15, 31:9, 31:12, 32:11, 32:20, 32:23, 33:9, 34:11, 35:24, 37:11, 38:6, 39:5, 53:25, 54:3, 54:16, 54:22, 55:4, 71:22, 72:12, 72:18, 72:19, 72:22, 73:1, 79:13, 79:18, 80:18, 81:15, 81:25, 82:19, 83:20, 85:8, 85:24, 86:12, 86:23, 87:17, 89:1, 90:2, 91:18, 92:6, 93:19, 94:16, 96:21, 109:14, 138:13, 138:17, 138:21, 139:4, 141:22, 143:5, 143:11, 144:2, 147:25, 149:10, 149:25, 151:13, 152:24, 153:10, 153:17, 154:13, 154:15, 154:22, 155:12, 158:6, 181:19, 182:15, 182:24, 182:25, 186:9, 186:23, 196:25, 197:8, 197:11, 197:14, 201:5
**reasonable-minded** [1] - 53:25
**reasonably** [4] - 79:19, 86:16, 123:9, 123:16
**reasoning** [1] - 73:14
**reasons** [3] - 55:13, 155:12, 186:22
**rebut** [2] - 56:7, 136:11
**rebuttal** [7] - 15:7, 70:14, 100:24, 101:8, 103:2, 187:5,

187:25

**recalled** [1] - 181:1
**receipts** [2] - 96:13, 97:13
**receive** [3] - 34:22, 76:14, 189:3
**received** [10] - 3:6, 3:10, 51:25, 109:2, 110:22, 113:13, 129:12, 184:10, 184:16, 192:14
**receiving** [3] - 165:12, 171:18, 173:17
**recent** [3] - 16:9, 21:17, 46:20
**recess** [5] - 10:25, 11:4, 69:14, 206:2, 210:12
**recessed** [6] - 48:22, 69:16, 134:11, 187:17, 208:11, 210:13
**reckless** [2] - 85:3, 87:12
**recognized** [1] - 58:16
**recollection** [8] - 64:9, 65:20, 67:11, 73:12, 79:3, 101:23, 153:3
**reconfigure** [1] - 68:18
**record** [20] - 10:9, 23:3, 23:22, 24:4, 41:10, 41:12, 42:5, 42:15, 48:23, 55:14, 63:4, 63:12, 64:6, 64:24, 69:17, 134:12, 135:23, 136:2, 187:18, 208:12
**recorded** [1] - 156:17
**recording** [1] - 177:2
**recordings** [7] - 106:25, 107:14, 112:2, 153:1, 153:2, 153:4, 182:7
**records** [3] - 63:21, 113:3, 120:7
**recovers** [1] - 176:16
**recruited** [1] - 112:21
**red** [1] - 141:9
**reduced** [1] - 156:18
**reductions** [1] - 177:12
**reexamine** [1] - 78:1
**refer** [8] - 44:8, 65:2, 65:18, 66:11, 71:10, 75:23, 91:13, 91:23
**reference** [3] - 47:22, 62:4, 182:11
**referenced** [1] - 12:3
**references** [3] - 59:11, 61:24, 143:21
**referencing** [1] - 159:13
**referral** [6] - 18:9, 18:24, 43:22, 91:4, 91:8, 92:5
**referrals** [6] - 45:3, 51:23, 51:25, 52:1, 125:15, 195:12
**referred** [3] - 117:1, 124:2, 125:10
**referring** [7] - 19:2, 67:9, 92:8, 113:7, 115:8, 120:1,

125:14
**reflects** [1] - 171:20
**regard** [5] - 53:15, 55:2, 58:2, 130:20, 165:1
**regarding** [5] - 29:9, 75:13, 81:18, 86:6, 124:6
**regardless** [2] - 137:18, 161:5
**regards** [1] - 128:8
**REGINALD** [1] - 1:14
**regulations** [3] - 57:14, 143:22, 150:22
**regulatory** [3] - 41:23, 57:18, 161:23
**reimbursement** [2] - 115:4, 128:3
**reimbursements** [5] - 60:25, 126:20, 126:21, 127:21, 164:4
**related** [7] - 60:23, 70:17, 84:3, 164:1, 167:1, 172:14
**relates** [1] - 162:23
**relating** [2] - 77:5, 84:25
**relationship** [2] - 52:11, 113:9
**relationships** [2] - 165:3, 189:20
**relevant** [3] - 22:15, 23:21, 54:1
**reliance** [3] - 40:17, 40:21, 42:8
**relied** [7] - 42:10, 85:13, 87:22, 165:23, 166:3, 172:16, 172:17
**relies** [1] - 109:21
**rely** [13] - 53:11, 64:9, 72:23, 75:20, 109:19, 118:15, 138:2, 138:14, 138:22, 139:1, 165:11, 182:23, 183:2
**relying** [3] - 118:15, 195:8, 195:9
**remain** [8] - 20:5, 21:9, 23:11, 25:25, 26:2, 46:7, 47:12, 131:23
**remainder** [2] - 8:12, 42:19
**remaining** [1] - 203:7
**remarks** [2] - 6:5, 8:18
**remember** [47] - 11:13, 13:6, 23:7, 26:16, 28:7, 28:11, 39:15, 60:23, 61:7, 75:4, 78:5, 99:6, 101:22, 102:3, 145:20, 146:19, 147:7, 147:12, 148:24, 156:25, 161:15, 165:18, 167:20, 169:15, 172:15, 172:21, 174:4, 175:9, 175:25, 176:2, 176:4, 176:9, 176:18, 177:1, 177:24, 178:22, 178:23, 179:21,

179:25, 181:4, 184:7, 184:8, 184:19, 185:16, 205:15
**remembers** [1] - 75:3
**remind** [3] - 67:8, 92:24, 154:10
**reminded** [3] - 67:10, 122:13, 196:24
**reminding** [1] - 145:12
**remote** [1] - 174:4
**removable** [1] - 207:22
**remove** [1] - 21:8
**removing** [1] - 194:3
**remuneration** [10] - 18:24, 19:1, 43:21, 44:7, 91:11, 91:20, 91:22, 92:4, 92:8, 92:10
**Remuneration** [1] - 92:12
**render** [1] - 201:10
**reopen** [1] - 132:13
**replace** [1] - 28:21
**replaced** [1] - 50:12
**replete** [1] - 41:10
**reply** [1] - 53:9
**REPORTED** [1] - 1:20
**Reporter** [2] - 1:22, 210:21
**reposition** [1] - 69:2
**representation** [3] - 85:1, 85:5, 87:10
**representations** [10] - 83:18, 83:25, 84:2, 84:25, 85:17, 86:25, 87:1, 87:8, 88:1, 122:8
**represented** [1] - 119:15
**representing** [1] - 135:6
**reps** [5] - 115:4, 115:9, 119:11, 164:22, 175:11
**req** [3] - 191:19, 191:21, 191:25
**request** [2] - 3:10, 166:24
**requested** [2] - 55:15, 166:20
**requesting** [2] - 43:24, 128:12
**require** [1] - 46:13
**required** [14] - 5:10, 20:11, 35:22, 37:9, 38:5, 39:3, 88:24, 115:20, 115:23, 158:5, 160:14, 160:20, 160:21, 160:22
**requirement** [5] - 21:5, 23:9, 29:23, 41:19, 44:20
**requirements** [1] - 112:6
**requires** [9] - 20:4, 37:21, 38:4, 38:24, 53:18, 81:11, 88:20, 194:8, 194:10
**requiring** [1] - 28:1
**requisition** [3] - 140:20, 144:21, 145:7
**requisitions** [2] - 182:17, 198:18

**reread** [1] - 28:19
**research** [1] - 203:4
**reserve** [4] - 7:14, 7:18, 10:15, 103:2
**resistance** [3] - 192:21, 192:23, 192:25
**resolve** [1] - 54:10
**Resort** [1] - 189:5
**respect** [4] - 27:16, 28:16, 52:17, 52:21
**respond** [3] - 10:16, 10:18, 100:12
**responding** [1] - 162:17
**response** [5] - 7:17, 21:13, 50:20, 54:13, 66:20
**responsibility** [3] - 53:17, 126:2, 174:14
**responsible** [9] - 81:6, 81:8, 81:11, 122:23, 130:19, 130:24, 144:10, 147:23, 165:2
**rest** [5] - 4:7, 8:23, 12:16, 13:14, 203:10
**restatement** [3] - 31:22, 31:23, 38:14
**restating** [1] - 39:17
**rested** [2] - 13:4, 13:17
**resting** [1] - 3:7
**restroom** [9] - 8:3, 8:5, 15:11, 15:12, 70:12, 101:6, 131:17, 134:4, 187:7
**rests** [2] - 4:6, 5:3
**result** [6] - 82:6, 92:16, 92:17, 123:16, 129:24, 183:8
**results** [8] - 52:12, 52:13, 52:14, 104:22, 112:11, 120:19, 141:17
**resume** [3] - 187:25, 203:20, 206:11
**retained** [2] - 96:12, 97:12
**return** [13] - 4:18, 6:8, 8:25, 19:2, 51:25, 82:2, 92:8, 92:18, 100:9, 114:11, 127:8, 129:23, 204:17
**returned** [2] - 102:23, 139:9
**returns** [1] - 8:22
**reverse** [1] - 6:15
**review** [2] - 54:20, 101:2
**reviewed** [3] - 168:17, 168:22, 195:8
**reviewing** [1] - 116:4
**revised** [1] - 69:19
**reword** [2] - 25:24, 33:20
**rid** [1] - 153:6
**rings** [1] - 204:13
**rise** [10] - 12:19, 15:23, 48:21, 69:15, 71:1, 131:19, 134:10, 187:9, 205:12, 209:15
**risk** [3] - 20:23, 108:2,

204:20
**RMR** [2] - 1:21, 210:21
**robosigned** [1] - 112:16
**Rodolfo** [1] - 1:22
**RODOLFO** [1] - 1:10
**Roebuck** [9] - 116:23, 117:3, 161:22, 174:21, 175:11, 175:17, 179:16, 194:17, 194:25
**role** [5] - 150:16, 151:8, 164:7, 164:25, 191:2
**ROOKARD** [1] - 1:14
**Rookard** [1] - 138:1
**room** [24] - 14:5, 14:23, 15:21, 71:9, 71:18, 97:25, 98:7, 100:4, 100:7, 129:10, 192:6, 198:13, 201:2, 202:7, 202:19, 204:5, 206:7, 208:4, 208:21, 209:4, 209:5, 209:10, 209:13, 209:23
**round** [3] - 12:18, 134:13, 208:14
**routinely** [1] - 44:24
**row** [2] - 196:10, 196:11
**RPR** [2] - 1:21, 210:21
**rubber** [6] - 52:5, 104:15, 191:15, 194:4, 195:25, 198:20
**rubber-stamp** [1] - 104:15
**rubber-stamped** [2] - 52:5, 191:15
**rubbing** [1] - 113:10
**rubbing-stamping** [1] - 113:10
**Ruiz** [1] - 1:22
**RUIZ** [1] - 1:10
**Ruiz's** [1] - 136:14
**Rule** [10] - 7:14, 9:10, 10:8, 10:14, 10:25, 50:21, 53:17, 53:18, 53:24, 54:8
**rule** [4] - 10:2, 45:1, 80:6, 205:15
**rules** [19] - 71:16, 75:12, 78:14, 109:17, 110:8, 110:10, 110:11, 111:2, 111:8, 111:9, 111:17, 122:12, 122:13, 126:24, 143:21, 150:22, 190:14, 204:19
**ruling** [7] - 9:20, 10:10, 10:13, 12:5, 45:15, 53:23, 58:12
**run** [2] - 65:7, 136:10, 136:24, 145:1, 148:3, 158:14, 182:22, 190:22, 204:20
**running** [2] - 58:4, 59:21
**runs** [1] - 159:18

## S

**S-18** [1] - 40:16
**Saco** [1] - 106:6
**Sadow** [15] - 13:11, 17:8, 56:21, 63:8, 66:1, 68:15, 134:22, 139:7, 140:10, 148:2, 149:18, 154:2, 154:5, 182:4, 187:2
**SADOW** [77] - 1:17, 1:18, 2:13, 3:9, 6:15, 6:22, 9:7, 11:19, 12:1, 13:13, 24:2, 24:5, 24:16, 24:19, 24:23, 25:25, 26:4, 26:11, 26:24, 29:17, 29:21, 30:14, 30:22, 31:3, 31:14, 33:14, 33:16, 35:7, 36:21, 37:4, 38:10, 38:20, 39:25, 40:8, 41:6, 41:10, 42:12, 42:16, 46:16, 48:4, 50:9, 56:23, 57:9, 59:10, 60:8, 62:5, 63:16, 63:21, 63:25, 64:3, 64:18, 64:20, 66:6, 66:10, 67:14, 67:16, 67:18, 67:21, 67:25, 68:7, 68:11, 68:14, 68:19, 70:4, 70:23, 102:19, 154:6, 182:5, 206:16, 206:18, 206:22, 207:4, 207:10, 207:18, 208:2, 208:6, 210:10
**safe** [3] - 56:21, 95:8, 204:13
**safer** [2] - 65:12, 65:14
**sale** [2] - 95:3, 95:9
**sales** [8] - 115:9, 116:24, 119:11, 151:5, 164:22, 175:11, 190:24, 194:18
**salesmen** [1] - 126:8
**Saliba** [1] - 151:3
**saliva** [1] - 116:1
**sample** [1] - 126:18
**samples** [1] - 117:1
**SAMUEL** [30] - 2:2, 2:3, 17:3, 17:5, 17:8, 17:12, 17:16, 17:24, 18:1, 18:16, 18:22, 19:5, 19:8, 20:2, 28:13, 28:17, 28:20, 28:25, 29:20, 30:24, 39:22, 43:5, 43:7, 43:11, 43:15, 43:17, 43:20, 44:3, 46:9, 53:11
**Samuel** [3] - 24:12, 53:10, 53:16
**sand** [3] - 157:10, 157:13, 199:5
**sandwich** [1] - 100:24
**sanitized** [1] - 207:25
**sat** [3] - 165:18, 189:4, 198:21
**satisfied** [1] - 184:13
**satisfy** [1] - 21:4
**save** [2] - 105:5, 119:14

**saving** [1] - 12:11
**saw** [16] - 8:9, 9:14, 35:12, 68:3, 106:24, 110:19, 125:24, 125:25, 126:4, 126:19, 128:11, 128:12, 188:3, 188:5, 196:15, 198:14
**sayings** [1] - 186:13
**scam** [2] - 111:24, 113:4
**scene** [4] - 81:14, 83:7, 90:22, 94:6
**schedule** [2] - 5:12, 5:13
**scheduling** [2] - 3:11, 6:21
**scheduling-wise** [1] - 6:21
**scheme** [50] - 27:18, 27:21, 27:23, 28:4, 29:12, 29:24, 51:17, 83:14, 83:22, 84:22, 85:22, 85:23, 85:25, 86:20, 86:24, 87:5, 87:6, 88:7, 88:12, 88:18, 103:16, 104:4, 104:5, 105:10, 105:11, 106:11, 108:3, 108:22, 113:23, 114:10, 114:15, 114:17, 117:5, 117:11, 117:17, 120:13, 120:16, 121:14, 122:2, 128:16, 129:25, 130:8, 130:13, 130:15, 130:17, 136:25, 166:22, 189:5, 191:10, 201:7
**school** [1] - 22:6
**scientific** [1] - 75:14
**Scola's** [1] - 44:15
**screen** [11] - 108:15, 111:11, 117:22, 119:25, 121:24, 124:4, 127:7, 145:15, 145:21, 208:2, 208:3
**screened** [1] - 161:2
**screening** [2] - 110:24, 119:14
**screenings** [1] - 145:14
**screens** [8] - 101:14, 101:18, 145:15, 145:23, 145:25, 146:8, 146:13
**script** [6] - 62:7, 169:14, 169:22, 172:22, 172:24, 198:10
**scroll** [2] - 34:21, 49:9
**seal** [1] - 209:5
**search** [3] - 153:14, 193:15, 204:21
**seat** [1] - 132:2
**seated** [12] - 3:2, 12:21, 15:25, 25:25, 26:3, 71:3, 131:21, 134:16, 206:1, 208:13, 208:16, 209:17
**second** [21] - 7:7, 15:6, 24:16, 29:3, 32:22, 36:7, 38:9, 38:17, 39:14, 40:12, 43:12, 56:4, 67:16, 67:25, 118:20, 123:2, 138:4, 141:24, 142:12, 169:16,

186:19
**seconds** [2] - 177:19, 177:20
**seconds'** [1] - 177:17
**secret** [2] - 77:19, 113:8
**secretly** [1] - 91:21
**SECTION** [1] - 1:15
**Section** [2] - 91:10, 93:21
**Sections** [1] - 93:6
**secure** [2] - 205:24, 207:20
**securities** [1] - 95:19
**Security** [1] - 120:2
**SECURITY** [10] - 12:19, 15:23, 48:21, 69:15, 71:1, 131:19, 134:10, 187:9, 205:12, 209:15
**see** [65] - 4:14, 7:24, 8:7, 8:19, 12:23, 13:9, 15:22, 19:3, 25:19, 26:11, 26:12, 26:17, 26:22, 26:23, 28:23, 31:2, 35:1, 35:2, 35:4, 43:2, 49:21, 58:12, 58:14, 58:15, 59:15, 69:11, 79:15, 98:5, 98:7, 100:2, 101:11, 101:14, 101:16, 108:12, 108:14, 111:11, 112:25, 119:20, 120:1, 124:7, 127:6, 129:16, 134:21, 148:10, 151:17, 153:9, 158:3, 164:18, 173:22, 175:5, 179:11, 180:16, 180:21, 182:10, 183:15, 184:25, 192:7, 198:18, 206:14, 207:7, 207:16, 207:19, 208:5, 209:13, 210:12
**seeing** [2] - 114:21, 179:21
**seek** [2] - 78:6, 167:2
**seeking** [4] - 57:13, 57:17, 58:4
**seem** [5] - 74:13, 130:13, 130:15, 130:17, 152:12
**select** [6] - 99:13, 115:13, 115:14, 196:4, 201:25
**selected** [2] - 64:14, 121:20
**seminars** [1] - 174:7
**send** [13] - 17:20, 168:16, 189:25, 202:2, 203:12, 204:8, 204:14, 205:2, 207:16, 209:2, 209:22, 210:6, 210:8
**sending** [7] - 3:24, 7:2, 41:13, 95:13, 166:16, 166:18, 193:15
**senior** [1] - 188:15
**sense** [26] - 6:25, 17:1, 24:11, 40:11, 47:2, 57:19, 61:20, 72:20, 73:15, 107:8, 111:22, 131:8, 131:9, 137:2, 137:3, 137:4, 137:8, 144:4, 144:8, 156:11, 164:9,

164:11, 193:19, 196:1, 197:3, 197:7

**sent** [9] - 5:6, 7:3, 52:14, 64:12, 88:15, 179:2, 179:8, 199:21, 210:3

**sentence** [8] - 28:14, 28:17, 28:20, 30:23, 37:18, 40:13, 78:12, 156:18

**sentenced** [2] - 156:7, 186:20

**sentences** [1] - 38:18

**Senthil** [20] - 104:14, 105:23, 108:24, 109:6, 112:22, 114:8, 116:14, 118:8, 119:3, 119:12, 120:25, 121:17, 121:22, 125:19, 126:16, 128:10, 128:16, 193:12, 195:21, 200:9

**separate** [8] - 29:23, 75:21, 77:4, 81:22, 88:17, 88:18, 89:8, 108:23

**separately** [2] - 77:6, 91:6

**September** [1] - 158:23

**series** [1] - 20:22

**serious** [1] - 142:24

**service** [12] - 84:9, 84:11, 91:14, 91:25, 106:5, 135:8, 166:17, 166:19, 202:13, 202:18, 205:17, 205:22

**services** [5] - 84:6, 84:15, 122:15, 172:13, 190:23

**Services** [1] - 113:6

**serving** [1] - 202:10

**set** [11] - 3:19, 22:10, 55:21, 68:21, 71:10, 108:15, 175:8, 177:24, 189:16, 199:8, 202:7

**Setai** [1] - 200:2

**settled** [1] - 201:19

**setup** [1] - 175:14

**Seventh** [2] - 20:22, 45:10

**several** [4] - 106:22, 106:25, 192:10, 196:12

**sham** [3] - 129:6, 130:13, 198:24

**shape** [3] - 8:8, 19:17, 47:18

**share** [3] - 5:19, 128:13, 202:15

**shared** [1] - 90:4

**Shawn** [31] - 51:13, 104:14, 105:23, 108:24, 109:6, 110:21, 112:22, 115:6, 115:7, 118:16, 120:24, 121:17, 126:11, 126:12, 126:16, 127:18, 127:19, 128:10, 128:14, 151:23, 189:4, 189:6, 189:11, 190:1, 190:3, 190:7, 193:9, 195:20, 197:9, 199:14, 200:8

**shipping** [1] - 198:13

**shoot** [1] - 68:4

**short** [3] - 50:20, 50:25, 207:12

**shortest** [1] - 114:3

**show** [16] - 42:9, 64:5, 65:24, 67:6, 101:14, 107:21, 126:15, 148:13, 151:21, 151:24, 157:20, 182:8, 183:13, 184:15, 186:13, 199:21

**showed** [13] - 22:17, 107:25, 108:3, 114:4, 114:6, 114:10, 115:12, 146:23, 159:5, 167:9, 171:17, 178:24, 182:19

**showing** [7] - 59:22, 64:17, 64:21, 65:2, 115:12, 126:19, 129:9

**shown** [8] - 11:24, 12:1, 40:23, 42:2, 101:18, 113:22, 198:17, 199:10

**shows** [2] - 111:15, 127:11

**shred** [1] - 200:25

**side** [16] - 4:15, 14:11, 15:2, 19:23, 22:24, 43:1, 48:2, 55:22, 70:9, 70:17, 140:9, 170:22, 172:23, 195:4, 210:9

**side's** [1] - 102:3

**sidebar** [2] - 11:12, 102:14

**sides** [6] - 5:21, 13:16, 14:22, 16:9, 66:2, 69:3

**sign** [10] - 100:3, 100:8, 104:17, 126:8, 144:6, 174:8, 190:18, 193:7, 198:23, 199:12

**signature** [4] - 125:25, 143:25, 190:11

**signatures** [3] - 111:12, 118:3, 140:21

**signed** [19] - 51:5, 51:6, 105:20, 111:6, 121:7, 125:23, 128:1, 128:20, 140:20, 143:16, 144:5, 144:13, 163:3, 182:17, 189:8, 189:15, 189:18, 190:10, 193:6

**significance** [1] - 75:8

**significant** [1] - 185:18

**signing** [1] - 116:20, 126:25, 127:25, 144:8, 198:23

**signs** [4] - 112:19, 139:15, 143:18, 199:16

**similar** [1] - 86:1

**similarly** [4] - 36:2, 39:10, 89:5, 158:10

**simple** [7] - 30:1, 32:8, 75:2, 109:12, 152:10, 200:6, 208:25

**simpler** [1] - 36:10

**simply** [9] - 31:22, 71:8, 78:4, 81:13, 83:7, 90:22, 94:6, 99:3, 202:17

**single** [11] - 44:25, 72:3, 106:10, 110:11, 121:19, 137:22, 140:20, 141:19, 143:8, 200:16, 201:1

**single-out** [1] - 72:3

**sister** [1] - 172:21

**sit** [7] - 4:8, 9:1, 13:22, 42:1, 117:7, 144:7, 203:16

**sits** [1] - 191:1

**sitting** [1] - 186:19

**situation** [1] - 202:23

**six** [2] - 37:18, 206:20

**skip** [2] - 31:1, 98:24

**skipped** [2] - 151:24, 151:25

**Slagle** [10] - 62:11, 62:13, 62:17, 62:19, 170:1, 170:3, 170:4, 170:8, 170:10, 172:16

**slide** [9] - 111:14, 114:13, 115:2, 115:18, 116:11, 118:4, 118:11, 124:4

**slides** [1] - 115:19

**Slomovitz** [3] - 104:12, 112:7, 120:9

**slower** [2] - 30:11, 32:22

**slush** [1] - 130:7

**smart** [1] - 169:10

**smoke** [1] - 118:7

**snippets** [3] - 66:24, 66:25, 101:16

**so-called** [5] - 105:19, 106:2, 118:6, 149:17, 196:15

**SOAP** [1] - 128:13

**social** [1] - 203:6

**Social** [1] - 120:2

**sold** [1] - 19:11

**solicit** [4] - 51:22, 117:21, 189:7, 190:5

**solicitation** [1] - 22:20

**solicited** [1] - 192:15

**soliciting** [1] - 115:22

**someone** [18] - 20:8, 57:20, 68:23, 82:5, 84:23, 86:21, 86:24, 87:7, 89:9, 108:17, 108:19, 110:4, 154:16, 160:6, 181:20, 190:17, 204:21, 207:7

**sometimes** [5] - 22:25, 64:11, 157:7, 158:1, 177:18

**somewhat** [1] - 19:18

**somewhere** [1] - 144:22

**Sonal** [1] - 128:10

**soon** [7] - 8:22, 9:4, 10:21, 10:24, 12:11, 14:10, 209:22

**sorry** [5] - 46:9, 115:19, 171:22, 181:21, 182:17

**sort** [4] - 9:15, 39:19, 58:12, 135:12

**sorts** [1] - 143:21

**sought** [1] - 110:12

**soul** [2] - 180:24, 181:23

**sounded** [1] - 165:1

**sounds** [4] - 34:17, 45:25, 155:6, 176:15

**source** [1] - 94:24

**South** [1] - 122:6

**SOUTHERN** [1] - 1:1

**space** [1] - 100:2

**sparse** [1] - 20:19

**spawned** [1] - 51:16

**speaker** [2] - 85:2, 87:11

**speaking** [4] - 59:20, 104:16, 156:20, 164:24

**speaks** [2] - 154:19, 164:18

**special** [1] - 75:15

**specialist** [1] - 175:19

**specialized** [1] - 75:14

**specific** [21] - 9:17, 16:12, 26:21, 27:5, 30:20, 37:4, 38:10, 61:23, 71:21, 76:10, 77:2, 77:10, 77:12, 80:5, 85:16, 87:25, 88:9, 123:24, 127:4, 127:5, 145:17

**specifically** [5] - 60:24, 76:5, 94:21, 126:2, 164:3

**specificity** [1] - 60:1

**specified** [4] - 40:2, 53:13, 93:5, 96:15

**specifies** [1] - 79:8

**specify** [1] - 46:13

**spectator** [1] - 81:17

**spend** [2] - 128:19, 137:6

**spending** [1] - 5:7

**spent** [4] - 135:14, 153:18, 185:13, 185:14

**spit** [1] - 198:16

**split** [2] - 56:4, 134:19

**splitting** [1] - 55:25

**Sporn** [37] - 11:10, 11:13, 62:5, 104:14, 108:25, 109:6, 112:22, 115:24, 116:9, 117:23, 119:18, 120:24, 121:4, 121:18, 125:19, 126:17, 128:10, 155:21, 156:5, 156:8, 169:2, 169:3, 169:15, 170:16, 172:19, 173:10, 180:8, 182:24, 186:16, 193:9, 195:21, 196:3, 198:15, 198:21, 198:22, 200:9

**Sporn's** [3] - 169:3, 177:21, 198:14

**spot** [2] - 8:13, 68:3

**spotted** [1] - 50:2, 69:24

**square** [1] - 3:25

**squared** [1] - 19:14

**Stacey** [7] - 116:22, 116:24, 161:22, 174:4, 174:12, 194:17, 194:18
**stacked** [1] - 198:14
**stake** [2] - 149:3, 155:25
**stamp** [4] - 104:15, 115:21, 115:23, 196:1
**stamped** [2] - 52:5, 191:15
**stamping** [1] - 113:10
**stamps** [2] - 194:4, 198:20
**stand** [11] - 132:13, 137:17, 137:20, 152:8, 153:8, 156:15, 159:2, 167:3, 181:21, 186:18, 188:17
**standard** [3] - 36:5, 53:22, 163:1
**standby** [1] - 203:3
**standing** [1] - 131:23
**stands** [1] - 139:6
**star** [1] - 144:3
**stars** [1] - 21:22
**start** [31] - 4:16, 13:1, 14:6, 14:16, 14:17, 16:4, 16:8, 19:16, 25:22, 29:24, 43:18, 48:10, 56:18, 64:10, 64:21, 66:18, 71:12, 95:1, 108:10, 127:22, 135:18, 155:18, 161:5, 165:23, 177:14, 187:12, 202:2, 202:8, 202:9, 203:19
**started** [13] - 12:13, 30:13, 51:12, 62:12, 104:6, 130:8, 151:19, 170:2, 171:21, 201:20, 206:4, 208:20, 208:24
**starting** [2] - 21:19, 159:8
**starts** [2] - 159:11, 183:16
**state** [3] - 75:16, 84:15, 96:10
**statement** [13] - 31:20, 31:21, 61:16, 75:1, 78:17, 85:1, 85:5, 85:13, 85:14, 87:10, 87:14, 87:22, 87:23
**statements** [3] - 8:17, 75:11, 107:22
**States** [25] - 1:23, 23:4, 45:4, 45:5, 45:7, 45:9, 45:11, 45:13, 54:4, 76:14, 91:10, 92:23, 93:6, 96:5, 96:6, 97:4, 99:7, 99:11, 99:12, 125:3, 125:7, 125:8, 125:9, 200:21, 210:22
**states** [2] - 42:7, 96:5
**STATES** [4] - 1:1, 1:3, 1:10, 1:15
**stations** [1] - 193:12
**Statute** [2] - 126:3, 126:24
**statute** [4] - 21:5, 46:2, 47:5, 79:8
**statutory** [1] - 47:3

**stay** [5] - 156:3, 177:12, 203:6, 203:8, 207:12
**stayed** [1] - 103:22
**stays** [1] - 13:8
**steal** [3] - 103:10, 108:1, 200:11
**stealing** [1] - 188:11
**STENOGRAPHICALLY** [1] - 1:20
**step** [10] - 20:5, 22:21, 31:1, 31:19, 48:17, 62:1, 138:4, 151:25, 206:10, 208:7
**steps** [2] - 21:8, 191:9
**STEVEN** [2] - 1:17, 1:18
**stick** [2] - 63:14, 199:4
**sticks** [1] - 157:10
**still** [17] - 3:20, 5:13, 6:4, 6:8, 6:9, 30:25, 31:4, 31:12, 32:15, 40:2, 55:20, 55:21, 137:24, 187:4, 190:18, 191:1, 209:4
**stock** [1] - 95:9
**stole** [2] - 106:14, 136:1
**stolen** [1] - 129:24
**stood** [2] - 146:18, 146:19
**stop** [2] - 184:17, 202:1
**stopped** [1] - 111:9
**stops** [1] - 190:10
**story** [3] - 177:4, 177:5, 177:6
**Stout** [1] - 158:20
**straight** [1] - 58:20
**strategy** [1] - 116:25
**straw** [1] - 207:12
**stray** [1] - 209:24
**streamline** [2] - 14:22, 56:10
**streamlined** [3] - 9:3, 40:12, 206:5
**Street** [2] - 1:18, 2:6
**stretch** [2] - 70:12, 131:17
**strike** [2] - 11:16, 78:17
**stripped** [1] - 16:15
**strong** [3] - 65:8, 183:1, 185:1
**strongly** [2] - 10:16, 157:15
**structure** [2] - 114:23, 195:11
**stuck** [1] - 157:13
**study** [1] - 147:1
**stuff** [3] - 68:22, 146:21, 151:8
**stupid** [1] - 140:2
**subdivided** [1] - 70:9
**subject** [1] - 6:23
**submission** [2] - 109:7, 117:13
**submit** [7] - 109:22, 137:23, 138:6, 139:7, 149:6, 190:13,

191:22
**submitted** [15] - 6:2, 16:10, 24:6, 57:3, 109:22, 109:23, 111:2, 112:23, 124:1, 124:2, 124:3, 130:22, 138:8, 146:12, 200:17
**submitting** [2] - 111:18, 127:2
**subparagraph** [1] - 44:4
**subparts** [1] - 98:9
**subsequent** [1] - 23:17
**substance** [16] - 8:6, 11:13, 24:10, 24:21, 25:9, 25:10, 25:14, 25:16, 27:14, 29:4, 33:5, 34:7, 34:8, 59:22, 80:14, 80:15
**substances** [1] - 28:22
**substantially** [1] - 86:1
**substantive** [19] - 18:2, 49:24, 52:17, 53:14, 76:4, 76:6, 76:8, 76:17, 76:19, 76:21, 81:22, 91:7, 98:25, 99:15, 123:4, 150:3, 150:6, 197:20, 197:25
**substitute** [1] - 54:10
**substituting** [2] - 194:4, 195:25
**subtracts** [1] - 18:11
**succeeded** [5] - 82:17, 85:23, 88:13, 89:25, 93:16
**success** [1] - 199:24
**sufficiency** [1] - 51:1
**sufficient** [19] - 9:16, 21:4, 23:22, 51:4, 53:3, 54:2, 54:15, 54:20, 55:1, 55:10, 79:13, 81:25, 83:6, 85:19, 88:3, 90:20, 92:9, 94:4, 132:14
**suggest** [7] - 29:25, 74:8, 157:15, 159:21, 165:13, 178:16, 185:1
**suggested** [5] - 4:11, 7:1, 19:15, 19:20, 161:19
**suggesting** [2] - 176:6, 185:21
**suggestion** [5] - 21:14, 25:23, 30:3, 46:6, 178:5
**suggestions** [1] - 176:24
**suggests** [1] - 158:13
**suing** [1] - 154:11
**suitcase** [2] - 20:8, 20:9
**Suite** [2] - 1:19, 2:6
**summaries** [1] - 139:15
**summarize** [2] - 67:3, 102:5
**sun** [1] - 196:19
**supply** [1] - 166:1
**support** [6] - 23:14, 42:3, 44:11, 50:21, 54:2, 112:18
**supported** [2] - 63:4, 63:12, 64:7, 107:9

**supposed** [3] - 146:6, 146:7
**supposedly** [2] - 150:12, 177:2
**surprised** [1] - 56:1
**survived** [1] - 188:13
**survivors** [3] - 103:9, 103:10, 130:21
**suspect** [2] - 6:11, 56:10
**suspected** [1] - 57:24
**suspicion** [2] - 23:10
**sustain** [1] - 53:21
**SUV** [1] - 156:25
**swab** [1] - 193:13
**swabs** [1] - 107:22
**swear** [1] - 131:24
**switch** [1] - 68:8
**sworn** [1] - 132:1
**sympathy** [1] - 71:25
**symptoms** [3] - 191:19, 191:21, 191:25
**system** [10] - 22:10, 109:18, 109:20, 121:6, 121:15, 137:11, 137:14, 138:14, 138:15, 155:17

---

**T**

**table** [1] - 202:7
**tactically** [1] - 59:25
**tactics** [1] - 117:20
**tailor** [1] - 9:22
**talks** [1] - 141:9
**Tampa** [1] - 180:20
**tape** [2] - 156:17, 177:2
**tape-recorded** [1] - 156:17
**target** [1] - 189:7
**targeting** [4] - 114:24, 118:9, 192:23, 192:24
**taught** [1] - 140:1
**tax** [1] - 169:7
**taxpayer** [1] - 130:6
**taxpayer-funded** [1] - 130:6
**teacher** [2] - 139:25, 148:13
**team** [7] - 8:16, 48:9, 50:7, 131:18, 134:18, 206:12, 207:7
**tech** [2] - 68:9, 70:17
**technical** [1] - 75:14
**technology** [3] - 68:24, 147:13, 147:19
**teeth** [1] - 142:22
**teledoc** [1] - 115:21
**teledocs** [1] - 192:2
**teledoctor** [2] - 112:15, 120:2
**teledoctors** [1] - 191:14, 191:15
**Telehealth** [1] - 180:20

**telemarketer** [5] - 164:8, 164:10, 164:12, 164:13, 188:20

**telemarketers** [8] - 52:4, 104:6, 106:25, 112:2, 120:23, 121:3, 169:14, 198:10

**telemarketing** [15] - 117:20, 119:9, 164:25, 165:4, 165:10, 169:16, 170:20, 171:2, 172:25, 173:1, 173:18, 174:1, 189:7, 191:4, 192:18

**telemed** [6] - 51:16, 115:4, 148:8, 148:9, 168:16, 181:14

**telemedicine** [23] - 110:12, 148:10, 148:12, 148:15, 148:20, 148:21, 149:12, 149:15, 149:19, 149:22, 152:21, 164:9, 165:3, 167:1, 169:17, 180:18, 181:17, 181:20, 181:22, 182:7, 182:21, 191:4, 198:17

**television** [1] - 86:20

**temerity** [1] - 148:17

**ten** [6] - 5:2, 75:21, 156:6, 182:3, 186:23, 186:25

**tend** [6] - 59:16, 64:8, 64:9, 73:22, 75:4, 207:20

**tendency** [2] - 85:10, 87:19

**tends** [1] - 22:25

**Tenth** [1] - 45:14

**tenus** [1] - 54:13

**term** [8] - 92:10, 92:14, 92:18, 92:20, 96:11, 97:5, 97:11, 144:12

**terms** [8] - 3:19, 3:23, 9:10, 29:24, 52:23, 57:2, 63:16, 164:19

**terrific** [1] - 11:5

**test** [39] - 104:8, 104:9, 104:15, 104:20, 105:1, 110:4, 110:23, 110:24, 112:7, 112:9, 112:14, 112:18, 115:13, 115:14, 115:25, 118:24, 119:14, 120:11, 121:7, 126:19, 127:3, 140:17, 141:5, 141:17, 142:18, 143:1, 143:8, 148:22, 149:13, 188:19, 188:23, 192:16, 194:10, 194:11, 198:18

**testified** [8] - 41:1, 52:16, 74:15, 74:19, 147:17, 148:21, 149:17, 167:11

**testify** [23] - 72:9, 72:10, 75:12, 102:17, 132:10, 132:15, 132:18, 132:22, 133:4, 133:7, 133:10, 133:14, 133:16, 148:12,

148:15, 149:2, 149:12, 149:15, 155:23, 182:14, 189:1, 192:11, 194:17

**testifying** [5] - 11:15, 41:11, 74:6, 78:20, 158:20

**testimony** [37] - 55:7, 55:9, 57:15, 59:12, 59:18, 59:21, 63:5, 66:11, 67:9, 73:5, 73:18, 74:3, 74:17, 74:22, 75:19, 78:8, 78:11, 78:20, 78:21, 79:7, 101:16, 101:17, 107:7, 128:15, 128:16, 139:1, 146:18, 151:3, 155:19, 155:20, 155:22, 161:21, 165:1, 166:13, 167:13, 167:14

**testing** [20] - 51:10, 51:15, 52:7, 107:6, 107:22, 110:1, 110:2, 110:4, 112:4, 113:8, 114:22, 115:1, 123:17, 124:5, 124:6, 124:8, 124:9, 124:11, 125:14, 147:14

**tests** [69] - 52:2, 52:10, 103:20, 103:24, 104:1, 104:7, 104:19, 104:24, 105:4, 105:5, 105:6, 105:19, 109:8, 109:16, 110:2, 110:6, 110:19, 111:22, 112:5, 114:12, 114:16, 115:8, 116:4, 120:16, 120:20, 121:10, 122:3, 122:9, 122:15, 123:20, 124:1, 124:13, 125:10, 125:11, 125:20, 125:23, 125:24, 126:9, 127:24, 130:1, 130:22, 136:4, 136:6, 140:22, 141:4, 141:22, 141:25, 142:10, 142:17, 143:9, 145:4, 145:8, 148:18, 149:1, 149:6, 149:23, 189:3, 193:15, 194:14, 194:21, 197:16, 198:11, 198:19, 198:23, 199:20, 199:23

**text** [9] - 19:25, 67:1, 107:13, 114:5, 157:1, 157:3, 204:8, 205:2

**that'll** [1] - 207:22

**THE** [224] - 1:10, 1:13, 1:17, 2:2, 3:2, 3:10, 4:2, 5:17, 6:20, 6:24, 7:4, 7:7, 7:11, 8:1, 8:4, 9:8, 9:23, 10:20, 11:6, 11:17, 11:22, 12:8, 12:19, 12:21, 12:24, 12:25, 13:15, 15:23, 15:25, 17:4, 17:7, 17:11, 17:15, 17:19, 17:25, 18:14, 18:20, 19:3, 19:6, 19:9, 19:23, 21:13, 22:25, 24:3, 24:7, 24:18, 24:22, 24:25, 26:2, 26:6, 26:14, 26:20, 27:1, 28:15,

28:19, 28:23, 29:1, 30:10, 30:19, 31:1, 31:5, 31:17, 32:17, 32:22, 33:1, 33:6, 33:13, 33:15, 33:18, 35:10, 35:15, 36:13, 36:23, 37:5, 37:22, 38:9, 38:13, 38:22, 39:24, 40:5, 40:9, 41:4, 41:8, 41:15, 42:14, 42:17, 43:6, 43:9, 43:13, 43:16, 43:18, 43:23, 44:11, 45:21, 46:15, 46:18, 47:10, 48:2, 48:5, 48:21, 48:24, 49:6, 49:9, 49:13, 49:17, 49:21, 50:5, 50:11, 53:4, 53:16, 56:8, 57:8, 57:10, 58:14, 58:25, 59:5, 59:8, 59:15, 61:5, 61:19, 61:22, 63:1, 63:20, 63:22, 64:2, 64:4, 64:19, 64:23, 65:22, 66:9, 66:15, 66:22, 66:25, 67:13, 67:15, 67:17, 67:19, 67:23, 68:1, 68:9, 68:15, 68:20, 69:1, 69:8, 69:14, 69:15, 69:18, 69:22, 70:3, 70:5, 70:21, 70:24, 71:1, 71:3, 102:1, 102:2, 102:13, 102:18, 102:20, 102:24, 103:4, 103:7, 131:14, 131:19, 131:21, 132:2, 132:6, 132:7, 132:16, 132:17, 132:19, 132:20, 132:23, 132:24, 133:1, 133:2, 133:5, 133:6, 133:8, 133:9, 133:11, 133:12, 133:19, 133:20, 133:23, 133:24, 134:1, 134:2, 134:10, 134:13, 134:16, 135:2, 154:4, 182:3, 187:2, 187:9, 187:11, 187:16, 187:19, 187:21, 187:24, 201:16, 203:23, 203:24, 205:7, 205:8, 205:12, 205:14, 206:17, 206:21, 207:1, 207:5, 207:12, 207:20, 207:24, 208:3, 208:7, 208:10, 208:13, 208:16, 209:15, 209:17, 210:7, 210:11

**themselves** [5] - 49:18, 52:6, 52:18, 70:15, 193:3

**theoretically** [1] - 161:5

**theory** [2] - 23:20, 56:14

**Therefore** [1] - 186:24

**therefore** [2] - 13:14, 185:19

**they've** [2] - 32:6, 173:5

**thinking** [6] - 14:17, 20:21, 26:7, 46:6, 64:17, 138:19

**thinks** [2] - 21:3, 185:18

**Third** [1] - 45:5

**third** [6] - 24:19, 31:8,

31:25, 32:9, 36:11, 169:15

**this..** [1] - 148:8

**Thomas** [2] - 172:10, 172:18

**thorough** [1] - 27:7

**thoughts** [3] - 201:24, 202:7, 208:23

**thousands** [13] - 103:12, 108:22, 112:20, 123:19, 123:20, 130:9, 191:11, 197:15, 199:1, 199:25, 200:1

**thread** [1] - 119:23

**threatening** [1] - 133:4

**three** [12] - 5:5, 13:1, 42:25, 52:7, 108:7, 112:20, 124:14, 124:18, 135:6, 158:22, 161:19, 191:10

**throughout** [10] - 4:20, 13:8, 57:15, 67:9, 123:19, 125:25, 135:7, 136:5, 199:18, 204:3

**throwing** [1] - 66:19

**Thursday** [1] - 5:15

**tie** [1] - 175:1

**tied** [1] - 52:19

**timelines** [1] - 202:8

**timing** [1] - 134:25

**tipped** [1] - 177:2

**Title** [2] - 91:10, 93:6

**Toby** [10] - 161:17, 162:5, 162:21, 163:3, 163:4, 164:23, 167:6, 174:7, 175:17

**today** [18] - 8:20, 10:2, 13:18, 14:17, 16:2, 54:8, 122:18, 128:8, 129:12, 129:13, 167:13, 180:15, 189:14, 200:23, 201:4, 202:18, 206:9

**together** [14] - 14:10, 14:11, 16:11, 16:24, 35:9, 54:25, 89:19, 123:15, 159:16, 173:15, 175:1, 200:13, 204:21, 208:21

**tomorrow** [18] - 4:18, 4:19, 5:12, 5:22, 7:20, 7:21, 14:14, 14:18, 202:2, 203:21, 204:17, 206:11, 207:6, 208:25, 209:14, 210:7, 210:12

**tonight** [1] - 209:5

**took** [15] - 20:5, 21:8, 97:4, 118:17, 140:17, 140:22, 142:17, 174:1, 178:6, 183:15, 191:9, 196:12, 196:13, 200:7

**top** [4] - 18:19, 22:6, 43:8, 43:17

**total** [2] - 129:25, 191:9

**totally** [1] - 118:13

**touch** [2] - 40:19, 182:12

**tough** [3] - 8:13, 154:16, 180:16
**tour** [1] - 196:4
**towards** [3] - 86:3, 117:4, 120:20
**toxicology** [1] - 51:10
**tracing** [1] - 180:11
**track** [4] - 18:7, 18:12, 37:15, 45:23
**tracking** [1] - 107:12
**tracks** [2] - 44:6, 47:3
**trade** [1] - 96:3
**trail** [2] - 52:25, 151:16
**train** [1] - 193:12
**training** [5] - 75:15, 115:10, 144:24, 174:6
**trainings** [1] - 194:20
**transaction** [19] - 90:11, 94:19, 94:23, 95:1, 95:2, 95:3, 95:6, 95:11, 95:14, 95:21, 96:8, 96:24, 97:4, 97:5, 97:20, 127:1
**transactions** [12] - 52:18, 52:23, 93:4, 94:13, 94:18, 96:19, 127:22, 128:25, 129:1, 129:8, 188:6
**transcript** [11] - 59:11, 61:11, 62:3, 64:3, 64:12, 65:7, 66:24, 67:2, 101:21
**TRANSCRIPT** [1] - 1:9
**transcription** [1] - 210:18
**transcripts** [4] - 64:1, 64:21, 65:19, 101:18
**transfer** [6] - 92:10, 92:14, 95:4, 95:7, 95:20, 97:6
**transferred** [1] - 113:5
**transfers** [1] - 52:24
**translates** [1] - 156:10
**transmission** [1] - 88:11
**transmitted** [3] - 87:3, 87:4, 88:8
**traumatizing** [1] - 52:15
**traveled** [1] - 188:16
**travelers** [1] - 95:18
**treat** [4] - 27:24, 141:6, 141:17, 149:13
**treated** [1] - 130:7
**treating** [7] - 107:2, 110:1, 112:8, 112:12, 120:21, 194:8, 194:11
**treatment** [3] - 78:16, 110:3, 194:11
**TRIAL** [1] - 1:9
**trial** [25] - 13:1, 13:8, 26:9, 27:2, 27:6, 44:13, 45:18, 67:9, 73:10, 74:23, 77:9, 78:25, 101:16, 101:17, 101:21, 123:19, 125:25, 131:7, 132:12, 135:7, 149:3, 151:22, 151:23, 180:12,

197:1
**trials** [1] - 137:10
**trick** [1] - 198:10
**tricked** [2] - 52:2, 197:15
**tried** [7] - 27:21, 37:4, 94:17, 158:14, 185:3, 186:6, 196:14
**triers** [1] - 176:23
**tripping** [1] - 37:16
**troop** [1] - 105:9
**true** [3] - 74:1, 156:17, 168:7
**truly** [2] - 13:2, 55:4
**trust** [5] - 109:18, 129:24, 130:6, 155:17, 204:19
**trust-based** [1] - 109:18
**truth** [13] - 74:10, 74:11, 75:3, 78:6, 85:3, 85:6, 87:12, 87:15, 126:6, 154:19, 156:14, 156:20, 156:21
**truthful** [4] - 78:20, 109:22, 111:4, 111:18
**truthfully** [4] - 5:21, 6:2, 55:21, 155:23
**truthless** [1] - 116:21
**try** [12] - 8:20, 9:25, 14:6, 14:15, 15:21, 48:16, 77:23, 82:21, 90:3, 93:20, 155:11, 185:24
**trying** [18] - 21:23, 21:25, 26:14, 26:15, 26:24, 33:20, 37:15, 61:7, 67:3, 122:1, 139:16, 139:17, 141:10, 175:8, 175:10, 178:13, 181:19, 204:22
**Tsai** [1] - 151:16
**Tuesday** [3] - 4:12, 4:13, 5:14
**turn** [10] - 8:11, 22:4, 49:1, 50:22, 53:10, 100:18, 131:17, 134:8, 134:17, 154:1
**turning** [1] - 193:16
**two** [50] - 3:4, 8:9, 16:17, 17:5, 29:3, 29:13, 31:7, 32:21, 33:2, 34:12, 35:9, 36:25, 38:18, 42:25, 55:8, 55:20, 55:25, 58:9, 59:25, 81:22, 82:3, 82:8, 82:20, 82:23, 89:11, 90:3, 93:7, 93:19, 96:4, 101:17, 102:7, 103:15, 106:21, 108:23, 109:3, 115:19, 116:22, 122:17, 131:1, 161:18, 175:11, 180:9, 188:3, 188:10, 198:6, 200:24, 202:10, 202:20, 205:14, 208:22
**type** [4] - 9:18, 55:17, 92:25, 93:3
**types** [3] - 21:16, 22:15,

166:24
**typical** [1] - 20:7
**typically** [2] - 65:11, 207:25
**typing** [1] - 17:8
**typo** [2] - 48:15, 67:14
**typos** [1] - 16:25
**tyranny** [2] - 137:17, 152:6

## U

**U.S.C** [1] - 93:21
**ultimate** [1] - 156:1
**ultimately** [2] - 56:20, 161:1
**unable** [1] - 202:24
**unanimous** [1] - 77:18
**unanimously** [2] - 79:14, 98:11
**unaware** [1] - 27:23
**under** [14] - 32:3, 43:13, 53:24, 81:3, 83:16, 83:23, 84:8, 84:11, 96:1, 96:10, 160:16, 170:21, 196:15, 196:19
**underprivileged** [1] - 118:21
**understood** [7] - 5:17, 60:10, 126:1, 126:3, 143:14, 160:14, 171:4
**undue** [1] - 51:22
**unduly** [1] - 79:4
**unequivocally** [1] - 141:19
**unfair** [1] - 202:11
**unfortunately** [2] - 40:1, 208:3
**unimportant** [1] - 75:10
**United** [25] - 1:23, 23:4, 45:4, 45:5, 45:7, 45:9, 45:11, 45:13, 54:4, 76:14, 91:10, 92:23, 93:6, 96:5, 96:6, 97:4, 99:7, 99:11, 99:12, 125:2, 125:7, 125:8, 125:9, 200:21, 210:22
**UNITED** [4] - 1:1, 1:3, 1:10, 1:15
**universe** [2] - 5:23, 206:5
**Univision** [1] - 106:24
**unlawful** [29] - 40:2, 82:9, 82:15, 82:21, 82:23, 83:1, 83:4, 89:12, 89:22, 90:4, 90:15, 90:18, 92:17, 93:5, 93:8, 93:14, 93:20, 93:22, 93:25, 94:3, 94:20, 94:21, 96:8, 96:13, 96:15, 97:13, 109:15, 125:21
**unless** [6] - 25:4, 27:11, 34:2, 40:15, 80:9, 194:13
**unlikely** [1] - 6:18
**unnecessary** [3] - 13:14, 50:12, 109:16, 124:12, 143:9, 148:22, 149:6

**unrelated** [2] - 119:19, 147:10
**untrue** [2] - 85:2, 87:11
**up** [103] - 5:10, 5:19, 6:3, 6:25, 7:4, 7:8, 7:12, 10:6, 12:10, 12:18, 14:25, 16:7, 16:9, 16:21, 17:8, 18:17, 19:14, 19:16, 21:22, 22:10, 26:17, 27:2, 27:4, 37:16, 47:17, 50:5, 51:23, 52:19, 56:18, 58:4, 64:4, 64:22, 64:23, 66:1, 66:8, 66:10, 66:19, 66:23, 66:25, 67:20, 68:21, 69:3, 78:2, 101:8, 101:18, 105:12, 117:18, 119:21, 124:4, 126:20, 134:13, 139:15, 142:21, 142:25, 145:15, 145:18, 145:19, 146:18, 146:19, 147:19, 147:21, 152:19, 153:8, 154:14, 154:18, 156:12, 167:3, 173:8, 175:9, 177:6, 177:7, 177:13, 177:24, 177:25, 178:10, 180:1, 180:17, 182:8, 182:19, 183:3, 186:18, 188:17, 192:4, 192:10, 194:16, 196:13, 197:23, 198:1, 198:14, 199:8, 201:22, 202:6, 204:23, 207:6, 208:14, 210:2
**upside** [1] - 193:16
**urge** [1] - 102:7
**useful** [1] - 105:4
**useless** [1] - 111:22
**usual** [1] - 116:18
**usurp** [1] - 55:3
**utilization** [2] - 147:9, 147:10
**utter** [1] - 189:8
**utterly** [3] - 52:1, 52:14, 194:15

## V

**V.H** [7] - 112:5, 112:15, 119:25, 120:10, 123:20, 124:5, 150:1
**V.H.'s** [1] - 191:17
**value** [4] - 92:11, 92:15, 97:1, 110:17
**variety** [1] - 106:23
**various** [2] - 57:1, 59:12
**Vartanian** [1] - 114:25
**Vegas** [1] - 128:18
**veil** [1] - 106:3
**venture** [2] - 36:15, 36:17
**verbatim** [1] - 62:2
**verdict** [27] - 6:9, 6:16,

42:21, 71:14, 77:7, 77:17, 77:20, 82:2, 98:3, 98:6, 98:19, 100:5, 100:6, 100:7, 131:10, 131:11, 131:12, 154:19, 186:24, 201:11, 201:12, 201:13, 203:12, 206:24

**verdicts** [1] - 201:11
**verify** [1] - 179:7
**version** [2] - 18:18, 31:15
**versus** [2] - 65:13, 193:22
**Vetted** [1] - 168:3
**vetted** [9] - 62:11, 62:19, 62:22, 167:25, 170:1, 170:10, 170:13, 172:22, 172:23
**video** [1] - 172:21
**view** [6] - 53:2, 54:17, 54:23, 58:6, 61:5, 193:18
**viewed** [1] - 90:12
**viewing** [2] - 47:21, 53:24
**violate** [1] - 93:20
**violated** [1] - 182:18
**violates** [2] - 93:5, 144:12
**violating** [1] - 80:6
**virtually** [1] - 144:21
**vital** [1] - 102:2
**Volume** [1] - 1:6
**volume** [4] - 51:23, 118:10, 126:18, 126:22
**voluntarily** [7] - 39:20, 79:22, 79:25, 93:22, 94:3, 132:25, 133:15
**vote** [1] - 137:22
**voted** [2] - 100:15, 207:10
**vs** [1] - 1:5
**vulnerable** [3] - 103:12, 107:24, 118:20

**W**

**W.H** [4] - 103:10, 104:21, 130:9, 197:5
**W.I** [5] - 103:10, 111:24, 119:5, 130:9, 197:5
**wait** [7] - 6:10, 11:8, 58:12, 58:14, 58:15, 117:7, 186:18
**waited** [1] - 208:23
**waiting** [2] - 4:25, 174:15
**walk** [6] - 8:23, 43:6, 69:3, 98:4, 188:17, 190:8
**Walmart** [1] - 193:14
**wands** [1] - 107:23
**wants** [3] - 102:16, 194:7, 209:19
**warning** [1] - 184:17
**Washington** [1] - 1:16
**waste** [1] - 11:7
**wasted** [1] - 194:15
**wasteful** [1] - 111:22

**wasting** [2] - 13:21, 16:6
**watching** [1] - 16:1
**Watt** [27] - 60:11, 60:14, 60:19, 60:22, 61:1, 61:14, 161:17, 161:18, 161:20, 161:21, 161:22, 162:5, 162:6, 162:9, 162:17, 162:21, 163:8, 163:14, 163:18, 163:22, 163:25, 164:5, 164:23, 167:6, 174:7, 175:17, 179:15
**watt's** [1] - 175:18
**ways** [5] - 79:8, 79:10, 106:22, 119:15, 198:6
**web** [1] - 188:6
**website** [1] - 119:20
**websites** [1] - 143:21
**wedded** [1] - 16:3
**Wednesday** [2] - 5:15, 206:23
**week** [1] - 13:1
**weekend** [4] - 5:7, 7:12, 8:9, 12:25
**weeks** [12] - 16:17, 55:8, 101:17, 102:7, 103:15, 106:21, 117:5, 131:1, 188:3, 188:10, 200:24, 208:22
**weigh** [1] - 54:9
**weighing** [1] - 55:6
**weight** [3] - 73:23, 79:7, 119:6
**Weinstein** [4] - 165:22, 165:23, 168:20, 168:24
**weird** [1] - 47:16
**welcome** [3] - 70:21, 71:4, 187:24
**WEST** [1] - 1:2
**wheels** [1] - 105:14
**white** [2] - 126:7, 154:17
**whole** [26] - 4:10, 4:21, 9:12, 20:22, 28:16, 46:25, 57:9, 62:6, 64:12, 64:24, 65:3, 65:6, 72:3, 74:5, 91:15, 91:25, 92:23, 94:23, 130:13, 130:15, 130:17, 170:17, 174:24, 175:19, 177:1
**wholesale** [2] - 20:1, 20:2
**Wi** [1] - 207:21
**Wi-Fi** [1] - 207:21
**wide** [1] - 21:19
**wife** [1] - 173:4
**Wildemore** [2] - 144:20, 145:4
**willful** [3] - 81:16, 86:15, 122:11
**willfully** [20] - 35:24, 37:11, 75:25, 76:13, 76:24, 79:24, 80:5, 81:9, 81:24, 82:1, 82:4, 82:24, 83:5, 83:13, 84:4, 90:5, 90:19, 92:2, 123:1,

127:10
**willfulness** [36] - 17:13, 29:22, 35:4, 35:8, 35:18, 35:20, 36:1, 36:4, 36:6, 36:9, 37:1, 37:3, 37:7, 37:14, 37:21, 38:4, 38:6, 38:20, 38:24, 38:25, 39:4, 39:8, 39:12, 39:14, 57:21, 88:20, 88:22, 88:25, 89:3, 89:7, 136:19, 155:5, 155:7, 158:6, 158:8, 158:12
**willing** [5] - 72:23, 138:22, 170:16, 170:17, 178:25
**wind** [5] - 9:21, 64:22, 64:23, 66:10, 177:13
**window** [1] - 116:15
**wins** [1] - 188:22
**wire** [27] - 28:1, 29:10, 38:8, 76:2, 81:20, 82:7, 82:22, 86:19, 87:4, 88:8, 88:9, 88:11, 88:14, 88:15, 88:17, 94:21, 95:13, 96:17, 97:3, 97:18, 98:17, 98:22, 108:13, 109:10, 124:20
**wired** [3] - 177:3, 177:23, 178:12
**wires** [4] - 69:1, 109:12, 109:23, 122:7
**wisdom** [1] - 131:8
**wise** [1] - 6:21
**wish** [2] - 100:10, 132:18
**wished** [1] - 133:18
**wishes** [2] - 13:10, 23:11
**withdraw** [1] - 42:16
**withdrawal** [2] - 95:7, 97:6
**withdrew** [1] - 58:16
**WITNESS** [1] - 9:8
**witness** [37] - 5:15, 21:20, 41:1, 54:24, 61:17, 64:16, 65:20, 66:13, 74:2, 74:5, 74:8, 74:9, 74:10, 74:11, 74:13, 74:15, 74:19, 74:21, 74:22, 74:24, 74:25, 75:2, 75:5, 78:15, 78:19, 78:22, 107:20, 132:1, 132:25, 152:8, 153:8, 156:15, 158:17, 159:2, 201:1
**witness's** [4] - 74:16, 75:18, 75:19, 78:8
**witnesses** [23] - 5:5, 5:10, 13:12, 41:11, 41:14, 54:9, 57:2, 73:5, 74:5, 78:21, 106:23, 107:1, 107:9, 107:15, 133:18, 175:25, 180:3, 195:16, 196:2, 196:6, 196:11, 196:19
**woman** [1] - 177:2
**won** [1] - 188:21
**wondered** [1] - 9:17
**wonderful** [3] - 177:5,

177:6, 209:12
**word** [16] - 20:13, 25:23, 31:24, 31:25, 67:21, 67:25, 79:11, 79:21, 79:24, 100:18, 106:19, 140:19, 150:4, 168:1, 169:11, 181:15
**worded** [4] - 27:6, 33:6, 46:7, 47:13
**wording** [1] - 67:4
**words** [13] - 28:1, 29:9, 45:2, 77:18, 81:15, 81:21, 82:9, 89:12, 93:8, 109:8, 154:2, 161:10, 202:15
**wordy** [1] - 29:16
**works** [4] - 40:11, 144:1, 144:13, 175:3
**world** [3] - 138:25, 162:24, 196:4
**worried** [4] - 102:20, 103:13, 119:21
**worry** [2] - 16:18, 179:7
**worst** [1] - 5:25
**worth** [4] - 97:23, 120:12, 145:12, 177:17
**worthless** [1] - 104:23
**wound** [2] - 22:10, 190:8
**wrap** [3] - 5:19, 101:8, 210:2
**wrapped** [1] - 10:6
**wrapping** [1] - 16:7
**writ** [1] - 9:15
**write** [4] - 28:18, 100:11, 148:5, 164:16
**writing** [5] - 10:3, 10:16, 10:18, 100:13, 117:10
**written** [2] - 7:17, 184:16
**wrote** [5] - 11:15, 160:6, 162:18, 168:19, 168:20

**X**

**XGEN** [10] - 113:6, 127:17, 127:20, 167:11, 179:21, 179:22, 180:2, 180:3, 180:13
**Xs** [1] - 21:22

**Y**

**Year's** [1] - 192:12
**years** [13] - 112:8, 112:13, 120:10, 126:13, 153:19, 156:5, 156:6, 169:8, 185:16, 191:10
**yells** [1] - 173:4
**York** [1] - 1:16
**young** [1] - 140:1
**Young** [8] - 17:10, 26:5, 26:9, 26:11, 26:12, 35:7, 44:14, 44:23
**Young's** [1] - 26:15

242

**yourself** [10] - 74:9, 74:18, 75:20, 77:21, 79:4, 147:6, 153:14, 184:2, 185:10, 197:8
**yourselves** [2] - 145:18, 193:5

---

## **Z**

---

**Z1379** [1] - 145:19
**zero** [21] - 136:11, 136:12, 146:14, 148:14, 149:4, 149:14, 149:16, 149:20, 149:24, 150:15, 150:18, 151:1, 151:4, 151:6, 151:9, 151:18, 152:20, 152:23, 156:19, 180:14
**zip** [1] - 5:6
**Ziros** [3] - 180:14