**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-CR-80181**

SEALED

FILED BY_____ D.C.

MAY 31 2023

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

UNITED STATES OF AMERICA,

v.

**UNDER SEAL**

MINAL KUMAR PATEL

Defendant,

**MINAL KUMAR PATEL'S MOTION FOR NEW TRIAL**
**PURSUANT TO FED. R. CRIM. P. 33(a)**

Minal Kumar Patel ("Patel"), by and through his undersigned counsel, Pietragallo Gordon

Alfano Bosick & Raspanti, LLP, hereby moves this Court, pursuant to Fed. R. Crim.P 33(a), to

reverse his conviction and grant a new trial, for the bases set forth in the accompanying

Memorandum of Law.

Respectfully submitted,

**PIETRAGALLO GORDON ALFANO**
**BOSICK & RASPANTI, LLP**

By: _____
Tama B. Kudman, Esquire
Kevin E. Raphael, Esquire
7108 Fairway Drive, Suite 130
Palm Beach Gardens, FL 33418
Telephone: (561) 472-0811
Facsimile: (412) 236-4264
tbk@pietragallo.com
ker@pietragallo.com

*Counsel for Minal Kumar Patel*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-CR-80181**

UNITED STATES OF AMERICA,

v.

**UNDER SEAL**

MINAL KUMAR PATEL

      Defendant,

**MINAL KUMAR PATEL'S MEMORANDUM OF LAW IN SUPPORT OF FOR NEW**
**TRIAL PURSUANT TO FED. R. CRIM. P. 33(a)**

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ........................................................................................... 1

II.  STATEMENT OF FACTS ................................................................................................... 3

   A)  Unauthorized Third-Party Recordings ....................................................................... 3

      1)   Chris White Recordings ........................................................................................ 3

      2)   Other Recordings .................................................................................................. 5

      3)   Attorney Robin Sztyndor Claims To Leave The County On The Eve Of Trial ... 5

   B)  Conflicts Of Interest By The Defense Team ............................................................... 6

      1)   Nick Saliba ............................................................................................................ 6

         a.   Don Samuel's Conflict with Nick Saliba ...................................................... 6

         b.   The Government's Knowledge of Samuel's Conflict with Saliba ...................... 7

         c.   Sadow's Involvement with Saliba's Defense .................................................. 8

         d.   Sztyndor's Recording of Saliba ................................................................... 8

         e.   Lack of Crucial Cross-Examination Due to Saliba Conflict ............................. 9

      2)   Sadow and Samuels' Conflict with Satary ............................................................ 10

         a.   Effect Of Satary Conflicts ......................................................................... 11

   C)  The Aleems ................................................................................................................ 11

      1)   Sadow's Conflict With The Aleems ...................................................................... 11

      2)   Sadow Law Firm Conflicted from Representation of the Aleems and Patel ...... 12

   D)  Garcia Hearings ......................................................................................................... 14

   E)  Brady Violation .......................................................................................................... 14

      1)   Vollaro/LifeMD .................................................................................................. 14

   F)  Defendant's Colloquy ................................................................................................. 15

III. RULE 33 PERMITS A NEW TRIAL IF THE INTEREST OF JUSTICE REQUIRES
     16

IV.  PATEL WAS THE VICTIM OF NUMEROUS CONSTITUTIONAL VIOLATIONS
     AND ERRORS WARRANTING A NEW TRIAL IN THE INTEREST OF JUSTICE ...... 16

   A)  Violation of Patel's Sixth Amendment Right to Effective Assistance of Counsel
       Warrants A New Trial in The Interest of Justice ...................................................... 17

      1)   The Standard of Review ...................................................................................... 18

   B)  The Multiple Conflicts and Their Effect ................................................................... 19

      1)   The Saliba Conflict ............................................................................................. 19

      2)   The Samuel-Satary Conflict ............................................................................... 20

      3)   The Sadow-Satary Conflict ................................................................................ 21

4)   The Aleems-Sadow Conflict.........................................................................22

5)   Personal Conflicts ......................................................................................22

6)   The Government Failed to Notify the Court of Conflicts Known To It ..............23

7)   Patel Did Not Enter Valid Waivers of His Right to Conflict-Free Counsel ........23

8)   Patel Did Not Enter Valid Waivers of Conflict Before the Court.......................24

C)   Violation of Patel's Sixth Amendment Right to Autonomy in His Choice of, and Full Participation in, His Defense Warrants A New Trial......................................................26

D)   Patel Suffered A *Brady* Violation...................................................................28

E)   The Aggregate Of Errors Warrant A New Trial In The Interest Of Justice ............29

F)   Even If No Error, The Interest Of Justice And Perceived Unfairness Warrant A New Trial.......................................................................................................................29

G)   The Discovery Of New Evidence Preponderates Heavily Against The Verdict And Warrants A New Trial In The Interest Of Justice.............................................................29

V.   CONCLUSION ...........................................................................................30

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-CR-80181**

UNITED STATES OF AMERICA,

v.

**UNDER SEAL**

MINAL KUMAR PATEL

Defendant,

**MINAL KUMAR PATEL'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION**
**FOR A NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33(a)**

Minal Kumar Patel ("Patel"), by and through his undersigned counsel, Pietragallo Gordon

Alfano Bosick & Raspanti, LLP, hereby submits this Memorandum of Law in Support of Patel's

Motion for a New Trial Pursuant to Fed. R. Crim.P 33(a).

**I.    PRELIMINARY STATEMENT**

Patel's Post-Trial Motion, for which Patel respectfully requests a hearing, raises several

issues which undersigned counsel believe to be meritorious and warrant a new trial in the interests

of justice.  Due diligence and investigation has revealed deep conflicts between other clients of

Patel's trial team and Patel, as well as ethical and potentially illegal misconduct by certain of Mr.

Patel's prior attorneys. *See United States v. Ross*, 33 F.3d. 1507, 1523 (11th Cir. 1994) ("When an

actual conflict of interest exists, the client is denied effective assistance of counsel[.]").  These

conflicts appear to have affected the trial team's decisions at trial, including the cross-examination

of government witnesses and the decision not to put on a defense case. *See Cuyler v. Sullivan*, 446

U.S. 335, 348 (1980) (stating a defendant must only show that an actual conflict of interest

adversely affected his lawyer's performance in order to establish a Sixth Amendment violation).

Patel's trial team consisted of Steven Sadow ("Sadow"), Donald Samuel ("Samuel"), and Brian Rafferty ("Rafferty") (hereinafter collectively referred to as "Trial Counsel"). Patel was also represented by Robyn Sztyndor ("Sztyndor"), who was removed from the defense team prior to trial sometime in August of 2022. Despite Patel's repeated requests and insistence, Trial Counsel failed to put on an affirmative defense and failed to conduct planned and promised cross-examination regarding certain individuals with whom counsel had a conflict, and specific subjects. This severely limited the presentation of a good faith defense and eliminated Mr. Patel's advice of counsel defense, both of which Patel had been assured would be presented at trial.[1] *See McCoy v. Louisiana*, 138 S. Ct. 1500, 1507 (2018) (holding where a defendant's right to make fundamental choices about his defense is usurped by counsel, a new trial is granted without a showing of prejudice).

Additionally, as shall be more fully explained below, the government was aware of the conflict involving Nick Saliba, but did not inform the Court. It is also respectfully submitted that the Government failed to turn over important *Brady/Giglio* information.

Finally, because Mr. Patel was not provided with independent counsel with respect to conflicts litigated before the Court, it is respectfully submitted that Mr. Patel did not receive adequate advice with respect to those conflicts and their impact, such that Patel's waiver of these conflicts was not knowingly and intelligently entered.

A review of these newly discovered facts and information, as summarized below, establish that Patel's Fifth and Sixth Amendment Rights were violated. Accordingly, a new trial should be granted in the interest of justice, pursuant to Fed. R. Crim. P. Rule 33.

---

[1] *See* Affidavit of Jeffrey Danik attached hereto as **Exhibit A**.

2

## II.   STATEMENT OF FACTS

### A) Unauthorized Third-Party Recordings

Review of prior counsels' files revealed numerous surreptitious recordings of telephone calls made by Sztyndor, including calls with represented individuals such as Chris White and Nick Saliba.  The recordings contain numerous statements from witnesses that Patel believed to be beneficial to his defense and that he wanted to elicit during his trial.  While making these recordings, Sztyndor, and Patel's other defense counsel, continually assured Patel that these recordings were beneficial to his defense and were legal and admissible.

### 1)  Chris White Recordings

The original Indictment in the instant matter contained allegations heavily tied to witness and alleged co-conspirator, Chris White ("White"). While cooperating with the government, White was also communicating regularly with Sztyndor, whom he informed about his meetings with the government and to whom he provided exculpatory information helpful to Patel's defense.[2] White's counsel, Jason Mehta ("Mehta"), has stated that he was unaware of and did not approve of these conversations.  Further, Sztyndor recorded these phone calls without White's knowledge and/or consent and without Mehta's knowledge and consent.  These recordings were attached to emails exchanged between Sztyndor and Patel's trial counsel.[3]

Sztyndor was urged not to call the Bar about these recordings by Sadow.[4]  Sztyndor was removed from the defense team by Trial Counsel sometime in or about August of 2022.[5]

---

[2] White provided Sztyndor recordings from his company with the patients listed in the initial indictment, which were exculpatory.  Defense counsel planned to use these recordings in its cross-examination of White and others.

[3] Undersigned counsel is in possession of nine of those recordings, along with numerous emails between Sztyndor and Trial Counsel sharing and discussing the recordings.  *See* **Composite Exhibit B** attached.

[4] See emails between Sadow and Sztyndor.

[5] *See* August, 2022 emails attached as **Exhibit C**.

Trial in the instant matter commenced on November 28, 2022. At a hearing held on November 18, 2022, Trial Counsel disclosed to the Court that White had been recorded.[6] Rafferty has now stated that Trial Counsel's disclosure to the Court occurred because Mehta had called Rafferty prior to November 18, 2022 and told Rafferty that Sztyndor revealed to Mehta that she had recorded White. In this call, Mehta threatened to take action against Trial Counsel. Trial Counsel decided to move to use the recordings under Fed. R. Evid. 806 to get ahead of the issue. At a later sealed hearing regarding the use of the recording at trial, the Court expressed grave concern about the recording and stated on the record that the matter would be referred to the Court's ethics committee for investigation.[7] During the hearing Sadow attempted to distance himself from any involvement in the recording[8] and did not reveal the existence of the other recordings of numerous witnesses and third-parties.[9]

Mehta, realizing that the recordings would undermine White's cooperation, stated, "If the Court is going to allow in the transcript [of the recording], it would be my intention to call the government tonight[.]"[10] White was thus never called by the government to testify at trial, precluding the admission of important defense evidence through White's anticipated cross-examination. It was also later revealed at White's sentencing hearing[11] that White and his attorneys had met with prosecutors over Thanksgiving 2022 to "secure" Patel's conviction.[12] According to Mehta, the government decided to exclude any reference to Chris White as a conspirator, to render

---

[6] *See* November 18, 2022 Hearing Transcript, p. 3 (D.E. 326).

[7] (D.E. 338). November 21, 2022 Hearing Transcript, p. 34.

[8] *Id.*

[9] On April 20, 2023, without solicitation, attorney Sztyndor forwarded investigator Jeff Danik a copy of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In this text, Sztyndor blames Sadow for his instruction and ratification of her recordings of Chris White. *See* text message from Sztyndor to Danik, attached hereto as **Exhibit D.**

[10] *See,* November 21, 2022 Tr., p. 20-21.

[11] *USA v. Edward Christopher White*, FLMD Case No. 20-CR-00165.

[12] *See Transcript of Chris White Sentencing,* p. 21.

4

the exculpatory recordings irrelevant. Id at 33.[13]  Chris White was never called by Patel's trial team as a defense witness.  Thus, a friendly witness who had previously and consistently provided exculpatory information was eliminated  because of Patel's counsels' conduct.

### 2)  Other Recordings

The defense has in its possession additional recordings (and communications referencing those recordings) of witnesses that would have been beneficial to Patel's defense, AUSAs, OIG/HHS attorneys, other members of the defense team, CMS representatives, Medicare agents, defense experts, consultants and others.[14]

Sztyndor threatened people using certain of these recordings.  On July 23, 2022, Sztyndor emailed members of the defense team, claiming to have recorded a call with an attorney for Patel's insurance company, who manages Patel's legal fees, during which she alleged insurance fraud against the Trial Team.  At this time, the defense team was trying to remove her as a member. *Id.*, p.39.

The extent to which these recordings usurped proper investigative techniques, affected the functioning of the trial team, generally, and their ability to conduct effective cross and make strategic decisions cannot be overstated.  Indeed, it is respectfully submitted that the fear of discovery of these additional recordings and the Trial Team's knowledge of, and involvement in, them severely affected the entire trial.

### 3)  Attorney Robin Sztyndor Claims To Leave The County On The Eve Of Trial

Trial counsel had anticipated calling Sztyndor as a healthcare law expert and to authenticate the White and CMS recordings.  Throughout the preparation of Patel's defense, Sztyndor

---

[13] Undersigned counsel spoke with the government on this point.  The government indicted that the decision to supersede was a strategic one, based solely on AUSA DeBoer's review of the case upon her assignment to it several months before trial.

[14] *See* **Exhibit E.**

5

counseled the team that Patel's billing of CGX testing to Medicare was legal. [15] On November 14, 2022, Sadow and Rafferty directed the issuance of a trial subpoena to Sztyndor.[16] Apparently concerned that she would be confronted about her recordings of witnesses, Sztyndor verbally threatened to testify that CGX testing was illegal. She then notified trial counsel that she had left the country and sent a video of herself at a bar laughingly wishing Patel good luck at trial.[17] Her absence created a major gap in the planned good faith/advice of counsel defense. *Id.*[18]

### B) Conflicts Of Interest By The Defense Team

#### 1) Nick Saliba

Nick Saliba ("Saliba") was LabSolutions' CEO and was identified as a target by the government early in the same investigation. Saliba ran LabSolutions. Evidence shows that he contracted with billing and marketing companies, made and oversaw payments to contractors, communicated with compliance attorneys and was in charge of company compliance. He had direct communications with most of the witnesses called by the government and was central to Patel's planned good faith and reliance on advice of counsel defenses.

##### a. Don Samuel's Conflict with Nick Saliba

Don Samuel was brought into Patel's defense by Sadow and was charged with presenting the advice of counsel defense. Samuel also represented Saliba.[19] In a recent interview, Sadow

---

[15] Sztyndor claimed to have recordings of CMS representatives, in which they acknowledged the lawfulness of Lab Solution's billing for the genetic testing.

[16] *See* Composite **Exhibit F** attached.

[17] *See* **Exhibit G.**

[18] Sztyndor offered a different explanation for her absence from Patel's trial in her Motion to Preserve the Defendants' Deprivation of Lead Healthcare Counsel Due to Sexual Harassment, filed under seal on December 19, 2022 (DE 409) ("Motion to Preserve"). The Motion to Preserve alleged that Sztyndor was the victim of sexual harassment by Government witness, Marc Sporn ("Sporn"), and contained allegations that she felt unsafe being in the same courtroom as him. Sztyndor remained as counsel of record for Patel until she was substituted by the undersigned attorneys on January 19, 2023 (DE 465).

[19] Samuel's Fee Agreement, signed by Saliba on August 26, 2019 after LabSolutions was raided by the FBI and the government seized millions of dollars in LabSolutions bank account deposits but prior to Patel's indictment, states "At all times, GSL loyalty is limited to the representation of Nick Saliba.". *See* Garland, Samuel & Loeb, P.C. Fee Agreement, Composite **Exhibit H.**

6

explained that he intended to present the defense through Saliba in Patel's case-in-chief and by cross-examining government witnesses about Saliba's role at Lab Solutions. That was also Patel's understanding. Samuel admitted to undersigned counsel that he never intended to permit Saliba to testify, though this was never conveyed to Patel. Samuel admitted that the obvious conflict was not discussed among the defense team or with Saliba or Patel, nor were waivers of conflict executed. The Court was also never informed about this conflict.

In the months leading up to trial, Patel stated that he did not want to be represented by Samuel because Samuel appeared to not be working diligently on Patel's defense and was, "causing harm."[20] However, Sadow refused to remove Samuel. At trial, reference to Saliba was notably absent from cross examination of government witnesses, and Saliba did not testify. Ultimately, no advice of counsel or good faith defense were presented.

### b. The Government's Knowledge of Samuel's Conflict with Saliba

The government knew that Saliba was represented by Samuel and identified Saliba as a target of the investigation and co-conspirator,[21] but did not raise this conflict with the Court.[22] Immediately following a status conference held on October 26, 2022, AUSA Jamie DeBoer ("DeBoer") approached Samuel to discuss separate counsel for Saliba. Samuel met in private with her. Sadow was not physically present at the status conference. After this meeting with DeBoer, Samuel called Sadow on his speaker phone, in the presence of other Patel defense team members, and told Sadow that he had agreed to locate new counsel for Saliba, to which Sadow replied "why

---

[20] *See* **Exhibit I**.

[21] *See* **Exhibit J**.

[22] As early as December 19, 2019, AUSA Tim Loper sent Sadow an email advising that Saliba was a priority for government scrutiny. AUSA Patrick Queenan also emailed Samuel and identified Saliba as a conspirator. *See* **Exhibit J** attached. Further, Government agents attempted to interview Saliba on January 12, 2022. The 302 of this event notes Saliba's request that the agents allow him to first contact his attorney, Samuel, before he agreed to an interview. Saliba ultimately declined the interview. *See* **Exhibit K** attached.

in the f### would we ever agree to that?" and "we're not doing that." Sadow was then taken off speaker.[23] New counsel was never actually hired.

### c. Sadow's Involvement with Saliba's Defense

Sadow involved himself in Saliba's representation. There exist numerous communications between Sadow and Saliba, and emails between Sadow, Samuel and Saliba, discussing Saliba's case.[24] Patel did not consent to or sign a joint defense agreement with Saliba, nor were the parameters of a proposed joint defense explained to Patel. All the while, Patel was told that the defense would highlight Saliba's control over day-to-day operations of LabSolutions and Patel's lack of involvement. Further, Patel provided multiple witnesses who would have indicated that Saliba was the person who ran LabSolutions and who was responsible for the compliance at LabSolutions.[25] Neither Sadow or Samuel appear to have pursued these witnesses.[26]

### d. Sztyndor's Recording of Saliba

On January 15, 2022, just three days after having been approached by federal agents, Sztyndor called and recorded Saliba without his or Samuel's knowledge or permission.[27] ███████████

████████████████████████████████████████████████████

████████████████████ [28] Sztyndor shared the recording with Sadow, who had the

---

[23] *See* **Exhibit A** at ¶35.
[24] *See* Composite **Exhibit L.**
[25] These witnesses include: ██████████████████████████████████████████████████

[26] Further, Sadow and Samuel did not pursue cross-examination of individuals and cooperators at trial regarding the numerous emails, contracts, business records and conversations where Saliba was directly involved as the decision maker, all of which were exculpatory of Patel. Samuel and Sadow's conflicting loyalty to Saliba inured to the great legal detriment of Patel.
[27] *See* **Exhibit E** at 101.
[28] **Exhibit A** at ¶ 39.

recording transcribed. Sadow then informed Samuel of the recording.[29] Samuel was furious about Sztyndor's recording of his client. *Id.*  As evidenced by a text from Rafferty to Patel, Sztyndor's recording of this call placed Sadow and Samuel in a fatally conflicted position: they possessed a highly beneficial piece of evidence should Saliba decide to cooperate against Patel, but the use of that evidence would violate Samuel's duty to Saliba.  *Id.*

Samuel never withdrew from representing Patel or Saliba. Further, Sadow alerted his friend and co-counsel Samuel that Saliba had been compromised, to Patel's detriment.[30]

### e. Lack of Crucial Cross-Examination Due to Saliba Conflict

For example, Marc Sporn ("Sporn") was one of the Government's most important cooperators against Patel. However, in one of Sporn's first debriefings with the Government, Sporn indicated that Saliba was the decision maker at LabSolutions.[31]  At trial, Sporn contradicted this, but was not confronted on cross-examination with his prior inconsistent statement.  Sadow admitted to undersigned counsel that there was no strategic reason of this lack of cross.

Additionally, Government witness Senthil Ramamurthy ("Ramamurthy") testified that he had engaged in significant fraud while working at LabSolutions and that Patel was the ultimate decision-making authority at LabSolutions.  During cross examination, it was never elicited that Patel had, in fact, fired Ramamurthy in 2017 or that Saliba overruled Patel and unilaterally brought Ramamurthy back as a LabSolutions marketer. Further, Sadow refused to cross-examine Government witness Brett Hirsch ("Hirsch") about Saliba's role in the payment of commissions,

---

[29] *See* **Exhibit M** at 169; *See* also **Exhibit E** at 101.

[30] Sztyndor later bragged that she was responsible for eliminating Saliba as a government witness because Samuel had informed Saliba that he was recorded by Sztyndor and that his recorded conversation would be used against Saliba if Saliba testified against Patel. *Id.*

[31] *See* **Exhibit N** (Sporn FBI Interview 5/26/21).

which the Government labeled as kickbacks.  All of this despite Patel's urging that Sadow conduct these crosses.

### 2) Sadow and Samuels' Conflict with Satary

Khalid Satary ("Satary") was known for operating unscrupulous ghost laboratories. Evidence exists that Patel enforced a strict policy at LabSolutions forbidding marketers under contract to LabSolutions from dealing with Satary.[32]  Hirsch was recorded contrasting LabSolutions with Satary's lab, stating that Patel operates his lab in a compliant manner, and that Hirsch only sent questionable or tainted genetic testing to Satary. There were other witnesses who also made this contrast, and Patel wanted to highlight this as part of his defense.  The defense team had assured Patel that this strategy would be presented at trial. It was not.

Early in 2022, Sadow asked Patel to sign a conflict waiver that would allow Sadow's concurrent representation of Satary in his criminal case, which was nearly contemporaneous with Patel's indictment.  Sadow had formerly represented Satary in other criminal matters and still owed him a duty.[33]  Despite this conflict, Sadow remained as counsel for Patel and never discussed this conflict or its potential impact upon Patel's desired strategy, nor did he inform the Court.

In fact, Patel refused to sign the requested waiver and explicitly forbade members of his defense team from representing Satary because of his desired strategy.  Sadow and Samuel then asked Patel to permit attorney Scott Grubman ("Grubman") (who had previously represented LabSolutions in the related civil matter to Patel's criminal case) to represent Satary. Patel acquiesced because Grubman was not a member of Patel's defense team.

On March 8, 2022, unknown to Patel, and despite Patel's prohibition, Samuel's law partner, Amanda R. Clark-Palmer ("Clark-Palmer"), who had participated in Patel's defense as well,

---

[32] FBI 302 reports reveal that Hirsch and Sporn chose to engage with Satary despite Patel's instruction.
[33] *See* Composite **Exhibit O** attached.

10

entered her appearance as counsel of record for Satary in the matter of *USA. v. Satary*, Eastern District of Louisiana Case No. 19-CR-00197 (Dkt. No. 272). Patel was never informed of this. *Id*. Indeed, Patel only learned of the representation *after* Patel's trial had concluded.[34]

### a.  Effect Of Satary Conflicts

Important cross examination related to Satary was never conducted. Patel instructed his defense team to cross-examine Hirsch about how Hirsch hid business dealings with Satary and about a secretly recorded conversation with a third-party cooperator, where Hirsch stated that Patel followed specific laws regarding billing and payment. Patel also asked Sadow to cross examine Hirsch using other recordings and a text message wherein Hirsch noted that he sends "all the good stuff" to LabSolutions and differentiated LabSolutions with Performance Lab (a Satary lab).[35] This and similar cross-examination was never performed.

### C)  The Aleems

### 1)  Sadow's Conflict With The Aleems

Yussuf and Tarek Aleem are attorneys in Georgia, and Omar is a genetic scientist. All three Aleem brothers assisted Patel in founding LabSolutions and were collectively 25% owners of LabSolutions for all time periods relevant to the indicted conduct. Yussuf and Tarek Aleem were also LabSolutions' outside general counsel. The Aleems prepared all of LabSolutions' initial legal documents, including its Operating Agreement and contracts used with LabSolutions' marketers. Omar Aleem was LabSolutions' Chief Scientific Officer responsible for initially establishing the LabSolutions' operating procedures and overseeing the laboratory operations. Notably, Omar Aleem founded LabSolutions' genetics testing. The Aleems' management and legal representation

---

[34] It should be noted that Amanda Clark-Palmer is also listed on Samuel's Legal Representation Agreement as Samuel's co-counsel for Saliba. She apparently performed legal work on Saliba's case.
[35] *See* **Exhibit P** (11/29/18 Hirsch email).

of LabSolutions ceased in approximately December 2016 over a financial dispute, but they remained owners until August 2019. The Aleems' collective roles in the creation and management of LabSolutions were an important pieces of Patel's advice of counsel and good faith defenses.

### 2)   Sadow Law Firm Conflicted from Representation of the Aleems and Patel

From October, 2007 through the present, Sadow has been Special Counsel to a Georgia law firm, Schulten, Ward, Turner & Weiss, LLP ("SWTW").[36]   On October 24, 2018, a Georgia court ruled that SWTW was conflicted in its representation of LabSolutions/Patel in a lawsuit brought by the Aleems("Aleem-Patel lawsuit"),[37] was disqualified and barred from representing any party adverse to the Aleems and was immediately removed from the litigation.   However, Sadow did not cease.[38]

In August 2019, the Government seized LabSolutions' business bank accounts and Patel's personal accounts. At the time, approximately $8,490,000 in LabSolutions' receipts <u>for genetics payments</u> was held under neutral control in a Mediation account.  The Government had not seized this bank account, though it contained proceeds of the alleged illegal conduct.  After the Indictment herein, Sadow worked to broker a settlement of the Aleem-Patel lawsuit. Sadow informed undersigned counsel that Sadow threatened the Aleems that he would notify the government of the money if the Aleems did not settle the dispute as Sadow proposed.  As part of Sadow's efforts to accomplish this settlement, Sadow facilitated the settlement of a lawsuit between the Aleems and

---

[36] Sadow is inextricably tied to SWTW. Sadow is prominently listed on SWTW's website **(Exhibit Q)** and his LinkedIn page documents his association with SWTW for over fifteen years. In District of New Jersey Case 2:17-cr-00576 (D.E. 154), Sadow signed a plea agreement on behalf of a client addressed to Sadow, Schulten Ward Turner, listing SWTW address.  *See* **Exhibit R** attached.

[37] Because of attorney Kevin Ward's conflict of interest arising from a legal consultation provided to Tarek Aleem in 2014 in violation of Georgia's Rules of Professional Conduct. *See* Composite **Exhibit S** attached.

[38] So significant was the LabSolutions'/Patel/ SWTW conflict, that LabSolutions served notice to SWTW that they were filing a malpractice claim and SWTW filed a tolling agreement to extend the malpractice filing timeframe for LabSolutions from February 2019 until August 5, 2019, while they negotiated to settle the dispute with LabSolutions. *See* Composite **Exhibit T** attached.

a third party, Mr. Moorehead ("Moorehead"). Moorehead informed the undersigned's investigator that Sadow paid Moorehead's legal fees in his suit against the Aleems, in order to accomplish the settlement of the Moorehead-Aleem lawsuit. *See* Exhibit <u>A</u>. Moorehead also stated that Sadow told Moorehead that Sadow needed to resolve both lawsuits so he could get partial payment for his representation of Patel in the instant matter. *Id*.

As a result, LabSolutions' share of the Mediation account, $3,768,062, was transferred to Sadow's IOLTA account on September 26, 2019, **just two days after Patel's indictment was returned**.[39] Sadow informed undersigned counsel that he received a portion of that settlement to pay his legal fees in this matter. The transfer occurred after Sadow entered his appearance herein and was aware of the forfeiture allegations exceeding $144 million.

A portion of Patel's deposition transcript in the Aleem-Patel lawsuit was read into the record at Patel's trial.[40] Sadow never disclosed his involvement in the Aleem-Patel lawsuit to the Court, nor the conflict involving the Aleems. Importantly, Sadow did not explain the conflict to Patel or how it could impact Patel's defense.

Early in his representation of Patel, Sadow instructed the defense team to never speak of or mention the Aleems or their legal advice. [41] Sadow instructed, without explanation, that he would not use the Aleems in Patel's defense at trial. *Id*. Sadow did not: 1) tell Patel that he would not address the Aleems in Patel's defense; 2) obtain a waiver of conflict; or 3) ask Patel to waive raising the Aleems as part of his good faith/advice of counsel defenses. *Id*.

On a March 9, 2020 email, Sztyndor advised Sadow that extensive attorney-client privileged documents had been leaked to the Government, which had produced the privileged

---

[39] *See* Composite **Exhibit U**.
[40] Trial exhibits 1115-F, P and K, **Exhibit V**. (Tr. Vol. 10, p. 21-23)
[41] *See* **Exhibit A** at ¶ 37.

materials to Patel in discovery.[42] Although this discovery contained numerous pieces of evidence regarding the Aleem Law firm that supported the advice of counsel defense, Sadow did not use this evidence at trial. Sadow also filed no motion, or took any other action, regarding the government's possible breach of the attorney-client privilege.

**D) Garcia Hearings**

The Court conducted several *Garcia* hearings. Of note, on November 2, 2022, the Court conducted a hearing regarding Sadow's prior representation of LabSolutions. The Court was not notified about, or aware of, the various conflicts set forth herein. At the Garcia hearings, Trial Counsel provided advice to Patel. As set forth below, it is respectfully submitted that independent counsel should have been appointed to advise Patel.

**E) Brady Violation**

**1) Vollaro/LifeMD [43]**

Government cooperator Shawn Griner provided key testimony against Patel. Critically, Griner testified that the Lab Solution's patients were not receiving legitimate treatment by Vollaro telemed-LifeMD (159:5). ("Vollaro/LifeMD")

A mistrial was declared in the government's prosecution in the Vollaro case [44] on or about December 2, 2022 (during Patel's trial but prior to Griner's testimony). The primary reason for the mistrial was discovery violations by the Government. After the Vollaro jury was empaneled, the government produced approximately 90 gigabytes of data seized by a search warrant from the emails of Mark Vollaro, and others affiliated with Complete Healthcare Concierge (the same company Vollaro had contracted to provide telemedicine services to LabSolutions). Vallaro Co-

---

[42] *See* **Exhibit W** attached.

[43] *See*, Composite **Exhibit X** attached.

[44] *USA v. Vollaro, et al.* SDFL Case 21-CR-60124.

Defendant Joseph Cavallo represented to the court in his Amended Motion to Dismiss Indictment (Case 21-CR-60124, DE 487) that late produced discovery contained 422,954 emails constituting important *Brady* and *Giglio* materials that would have supported Vollaro's and Cavallo's good-faith, lack of intent, and safe-harbor defenses. Additionally, such materials allegedly contained important witness impeachment material ("Vollaro late produced discovery").

Griner testified in Patel's trial that the time frame of the relationship between LabSolutions and Vollaro/LifeMD overlapped the time frame of the discovered *Brady* material (from July to December 2016). The Vollaro late produced discovery appears to have been critical to Patel's theory of defense and the impeachment of Griner in Patel's trial. Patel never received this apparently relevant *Brady/Giglio* material, though Griner admitted on cross in Patel's trial that he lied to the Government on numerous occasions while cooperating.[45] .

### F) Defendant's Colloquy

The Government rested on Friday, December 9, 2022. On the morning of Monday, December 12, 2022, Trial Counsel did not put on a defense and rested. It was only after the Court read the jury instructions and the Government made its closing argument that Patel was colloquized as to his right to put on a defense and his right to testify.[46] The Court acknowledged the failure.[47] Sadow has admitted that Patel was furiously opposed to not putting on a defense and also admitted that he pressured Patel to respond that Patel waived presenting a defense when queried by the Court during the colloquy.[48]

---

[45] (Tr. 92:7-12; 97:19-22; 98:13-15; 161:20-22).

[46] Dec. 12, 2022, Trial Tr. 102:9-25.

[47] *See* Dec. 12, 2022, Trial Tr. 132:8-134-2.

[48] *See* **Exhibit A.**

### III.    RULE 33 PERMITS A NEW TRIAL IF THE INTEREST OF JUSTICE REQUIRES

Fed. Crim. P. Rule 33 permits a new trial where a miscarriage of justice may have occurred at trial. *U.S. v. Robertson*, 110 F.3d 1113, 1117 (5th Cir. 1997); *see also U.S. v. Crittenden*, 46 F. 4th 292, 297 (5th Cir. 2022) ("The [']miscarriage of justice['] requirement reflects the common-law roots of the new trial power as a backstop against unjust verdicts[.]") Though the "interest of justice" standard is undefined, it is broad. *United States v. Baptiste*, 8 F. 4th 30, 40 (1st Cir. 2021); *see also U.S. v. Vicaria*, 12 F. 3d 195, 198 (11th Cir. 1994) (noting the standard is broad). Generally, whether a new trial is accorded in the "interest of justice," is a "judgment call." *Baptise*, 8 F. 4th at 41. Ultimately, Rule 33 affords a trial court broad discretion to grant a new trial where justice requires. *U.S. v. Ferguson*, 246 F. 3d 129, 133 (2d Cir. 2001) ("[Rule 33] by its terms gives the trial court broad discretion…to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."); *see also Baptiste*, 8 F. 4th at 41.

### IV.    PATEL WAS THE VICTIM OF NUMEROUS CONSTITUTIONAL VIOLATIONS AND ERRORS WARRANTING A NEW TRIAL IN THE INTEREST OF JUSTICE

As discussed at length in the Statement of Facts, *infra*, Patel was deprived of his Sixth Amendment right to effective assistance of counsel due to the myriad professional and personal conflicts within his legal team.  Trial Counsel failed to provide Patel the good faith and advice of counsel defenses he was promised, in an apparent effort to mask the attorneys' severe conflicts and improper conduct. The conflicts enumerated above precluded the defense team from properly investigating, preparing, and ultimately presenting a full defense at trial, including full cross-examination of witnesses, all of which served to deprive Patel—who was unaware of most conflicts or their effect on his defense — meaningful participation in his own defense. The repeated and flagrant legal, professional, and Constitutional violations — whether taken separately or in the aggregate— warrant a new trial.

Generally, Rule 33 is applicable in situations (1) where error infects the trial; (2) when the court believes the evidence weighs heavily against the verdict; or (3) where new evidence is discovered. *See Crittenden*, 46 F. 4th at 296; *see also United States v. Sypher*, 684 F. 3d 622, 626 (6th Cir. 2012). There is no bright line test or standard to apply Rule 33 where error infects the trial. Instead, courts have granted a new trial on a case-by-case basis, and in cases with a wide-ranging set of "errors." *See generally Crittenden*, 46 F. 4th at 296-97 (acknowledging "whatever the grounds for the grant of a new trial").[49]

### A) Violation of Patel's Sixth Amendment Right to Effective Assistance of Counsel Warrants A New Trial in The Interest of Justice

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense. U.S. Const. amend. VI.

By deviating from legal, professional, and ethical standards via the conflicts discussed *infra,* prior counsel denied Patel his Sixth Amendment guarantee of effective assistance of counsel, which includes the right to representation free from conflicts of interest.[50] *Wood v. Georgia*, 340 U.S. 261, 271 (1981); *see also Strickland v. Washington,* 466 U.S. 668, 688 (1984). The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment. *Id.* at 685. The simple presence of counsel is not sufficient to satisfy the Constitutional right to counsel. *Id.* Rather, "the right to counsel is the right to the effective assistance of counsel." *McMann v.*

---

[49] In *Crittenden*, the Fifth Circuit noted that some errors warranting a new trial include erroneous admission or exclusion of evidence, inflammatory comments by a lawyer, or faulty jury instructions. *Crittenden*, 46 F. 4th at 296-97.

[50] A lawyer must not represent a client where the representation is directly adverse to another client, there is a substantial risk that the representation of one or more clients will be materially limited by the lawyers responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer. Fla. R. Prof. Conduct 4-1.7 (a).

*Richardson*, 397 U.S. 759, 771, n. 14 (1970); *see also* Fla. R. Prof. Conduct 4-1.1 (stating a lawyer must provide competent representation to a client).[51]

### 1) The Standard of Review

"To establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely ***affected*** his lawyer's performance." *Cuyler*, 446 U.S. at 348 (*emphasis added)*. A showing of prejudice is not required. *Strickland*, 466 U.S. at 692.

Counsel has an ethical obligation to (1) avoid conflicting representations and (2) to advise the court of the conflict. *Cuyler,* 446 U.S. at 346. Indeed, when a conflict exists, the client is denied effective assistance of counsel. *Ross*, 33 F. 3d at 1523 (citing *United States v. Martinez*, 630 F. 2d 361, 362 (5th Cir. 1980)). Even the *potential* for a conflict of interest suffices for disqualifying an attorney from representing a defendant. *Id.*

The onus is on counsel to appraise his client of matters concerning his representation, including, conflicts of interest. *See generally* Fla. R. Prof. Conduct 4-1.7; *see also* Fla. R. Prof. Conduct 4-1.4 (a) (5) (stating a lawyer must disclose limitations of the representation). Where counsel fails to advise the defendant or the court of an actual or potential conflict, courts have recognized the severe prejudicial effect and engaged in remedial measures. *See Mickens v. Taylor*, 535 U.S. 162 (2002) (remanding to further develop the record after counsel did not disclose a conflict to the court, co-counsel, or defendant); *Rubin v. Gee*, 292 F. 3d 396 (4th Cir. 2022) (finding counsel had an undisclosed personal conflict that adversely affected representation); *United States v. Henry*, 50 M.J. 647 (N.M. Ct. Crim. App. 1999) (finding no knowing waiver had adverse effect after counsel failed to disclose conflicts to defendant); *Howerton v. Danenberg*, 621 S.E. 2d 738

---

[51] *See also In re Hood*, 727 F. 3d 1360, 1363 (11th Cir. 2013) (stating attorneys who practice before all courts sitting in Florida are governed by the Florida Rules of Professional Conduct).

(Ga. 2005) (finding undisclosed conflict to be impermissible even though there was no evidence counsel's conduct was influenced by the conflict, because the conflict undermines the adversarial process and calls into question the reliability of the outcome of the proceedings).

Conflicts of interest for attorneys representing criminal defendants may fall into one of three categories: (1) concurrent representation (*i.e.* joint, multiple, or simultaneous representation); (2) successive representation of clients with conflicting interests; and (3) conflicts that pit the attorney's personal interests against those of the defendant. All three conflicts are present here. No matter what type of conflict is at issue, an attorney is expressly prohibited from representing adverse interests and cannot represent a client where there is a substantial risk that representation will materially limit the lawyer's responsibilities to a client. Fla. R. Prof. Conduct 4-1.7.

### B)  The Multiple Conflicts and Their Effect

#### 1)  The Saliba Conflict

As detailed above, Saliba, who was a key piece of the good faith/advice of counsel defenses, was represented by Samuel before, and while, Samuel was a member of the Patel defense team. As CEO of Patel's company, LabSolutions, Saliba's import to both the government and defense was obvious. Patel was never informed that the dual representation posed a conflict, nor was he informed that Samuel's loyalties would be divided between defending Patel and protecting Saliba. Indeed, it was the defense's primary goal to present its defense through Saliba's testimony — testimony Samuel has admitted he would never allow.

To make matters worse, Samuel was the Trial Team member in charge of Patel's advice of counsel defense. All of the evidence tied to Patel's advice of counsel defense, however, placed Saliba in jeopardy because such evidence illustrated that Saliba ran LabSolutions, made the management decisions, conferred with compliance counsel, spoke with the billing people, made hiring decisions, entered into contracts, communicated with marketing people, *etc*. In sum, Samuel

assumed responsibility for a defense he could not present. This is the quandary the rule against conflicted representation is designed to prevent.

Though Patel was aware of Samuel's representation of Saliba, and Sadow's communications with Saliba, Patel was not made aware of, nor did he understand, the extent of the crippling effect that the Saliba representation would have on his defense. This conflict was not discussed with Patel by any of his lawyers, he did not sign any waiver of the conflict (nor did Saliba), and the Court was not alerted of the issue. This conflict precluded the defense promised to Patel, the cross examination of key witnesses in areas central to his defense and led to the complete abandonment of the advice of counsel and good faith defenses that Patel expected.

Significantly, the Government was aware of Samuel's dual representation for several years yet failed to notify the Court. Certainly, from a strategic perspective, the conflict worked in the Government's favor, as they were able to present witnesses without worrying about cross-examination as to Saliba or Patel's good faith/ advice of counsel defenses.

### 2) The Samuel-Satary Conflict

Samuel was aware that Patel had verbally precluded anyone on his defense team from representing Satary for the reasons set forth above. *See infra*. Trial counsel avoided detection of the Satary conflict by having Samuel's partner enter her appearance. As a result, Samuel's firm received those fees for Satary's representation. The Florida Rules of Professional Conduct clearly prohibit fees that are sought or secured through means of intentional misrepresentation or fraud upon the client, nonparty, or court. Fla. R. Prof. Conduct 4-1.5. Additionally, the Florida Rules expressly impute conflict to all attorneys in a law firm. Rule 4-1.10 (a) states:

> Imputed Disqualification of All Lawyers in Firm. While lawyers are associated in a firm, none of them may knowingly represent a client when any 1 of them practicing along would be prohibited from doing so [.]

*See also Ross*, 33 F. 3d at 1523 (imputing the conflict of one attorney onto the whole firm).[52]

Again, Patel had specifically directed his attorneys to develop cross-examination based on the witnesses' prior statements that Patel worked hard to ensure LabSolutions was compliant, unlike Satary and his lab. This comparison was part of the evidence, and trial counsel did not pursue this line of cross. There is no legitimate strategic decision to avoid this cross- examination.

### 3) The Sadow-Satary Conflict

A lawyer who has formerly represented a client must not afterwards:

(a)    Represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent;

(b)    Use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client or when the information has become generally known; or

(c)    Reveal information relating to the representation except as these rules would permit or require with respect to a client.

Fla. R. Prof. Conduct 4-1.9.

The Court was not advised of the conflict regarding Sadow's prior representation of Satary. Patel was not informed that such prior representation would tie Sadow's hands in pursuing Patel's desired strategy. Despite Patel's requests that counsel cross-examine government witnesses regarding Satary, Trial Counsel did not. Patel never understood why.

---

[52] Clark-Palmer also worked on Patel's case, though she did not enter her appearance on the record.

### 4) The Aleems-Sadow Conflict

The only way to explain Trial Counsel's failure to cross-examine witnesses regarding the role of the Aleems in setting up Patel's lab and providing the legal advice underlying much of Patel's alleged conduct, was to avoid: (1) revealing Sadow's conflict with the Aleems to the Court; and (2) revealing that Sadow's legal fees had come from the settlement of the Aleem-Patel lawsuit — money that was subject to forfeiture. Multiple witnesses, including Ramamurthy, were well-versed on the Aleems' involvement, including providing legal advice, in the formation and operation of LabSolutions. Despite this, the subject of the Aleems was avoided at trial.

### 5) Personal Conflicts

"A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs." Fla. R. Prof. Conduct (Preamble). Indeed, a lawyer may not withhold information to serve the lawyer's own interest or convenience or the interests or convenience of another person. Fla. R. Prof. Conduct 4-1.4 (Comment). For example, in *Rubin,* the court found counsel had an actual conflict of interest that adversely affected representation and granted a new trial with conflict-free representation. *Rubin*, 292 F.3d at 406. The court highlighted counsels' evasive action and participation in a crime to secure their retainer fee. The court further noted that, counsel would not testify because of the potential criminal charges. Ultimately, the court found that "at all times, the attorneys' fidelity to their own interests superseded any sense of obligation they may have had to their client." *Id.* at 404. The same appears to be true here with prior counsel.

Had Trial Counsel disclosed all recordings made, many of Patel's prior counsel (including Trial Counsel) would be implicated in procuring the recordings. Indeed, Trial Counsel (and other prior counsel) would have been potentially criminally liable for their participation and complicity in these illegally obtained and shared audio recordings. *See* Fla. Stat. Ch. 934.03. At a minimum,

Trial Counsel knew they might be subject to the same Ethics Committee review for which Sztyndor had been referred.

Finally, had Sadow not participated in a case from which he was precluded, the Aleem-Patel lawsuit, to negotiate a settlement from which he took his fees, he would perhaps not have avoided the good-faith/advice of counsel defenses promised to Patel and presented evidence regarding the Aleem's legal advice and management of LabSolutions.

Ultimately, Trial Counsel's decisions were apparently intended to avoid professional and legal liability, which deprived Patel of his Sixth Amendment Rights and affected Patel's trial.

### 6)  The Government Failed to Notify the Court of Conflicts Known To It

The government attorneys abandoned their duty to ensure fairness by failing to report all known conflicts to the Court. The government was aware of, and addressed, Samuels' conflict in representing Patel and Saliba.  The overlapping investigations and criminal prosecutions involving Satary and Patel were led by the same Department of Justice Attorney who would have been—and was—aware of the dual representations, and the overlapping witnesses and witness testimony.  The government failed to disclose these conflicts and used that knowledge to present evidence without full impeachment. [53]

### 7)  Patel Did Not Enter Valid Waivers of His Right to Conflict-Free Counsel

"A defendant may waive an actual conflict of interest if the waiver is "knowing, intelligent, and voluntary." *U.S. v. Valois*, 915 F.3d 717, 727 (11th Cir. 2019) (citing *Ross*, 33 F.3d at 1524). This Court has stated:

> In order for a waiver of the right to conflict-free counsel to be knowing and intelligent, the State must show that the defendant (1)

---

[53] *U.S. v. Scroggins*, 379 F.3d 233, 239-40; 256-57 (5th Cir. 2004), *vacated on other grounds*, 543 U.S. 1112 (2005) (discussing government interference and the grant of a new trial in the interest of justice); *See also Strickland*, 466 U.S. at 692 (noting that prejudice is presumed where the state interferes with counsel's assistance because prejudice is so likely and not worth the cost of a case-by-case inquiry).

> was aware that a conflict of interest existed; (2) realized the consequences to his defense that continuing with counsel under the onus of a conflict could have; and (3) was aware of his right to obtain other counsel.

*Quinto v. United States,* 2010 WL 5620946 *14 (S.D. Fla. June 7, 2010), report and recommendation adopted, 2011 WL 197423 (S.D. Fla. Jan. 20, 2011).

"The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *U.S. v. Padilla-Martinez*, 762 F.2d 942, 948 (11th Cir. 1985) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Counsel has a duty to advise the defendant of the advantages and risks involved were a waiver to be entered (*e.g.* being unable to call or cross-examine favorable witnesses). *See* Fla. R. Prof. Conduct 4-1.7; *see also* Fla. R. Prof. Conduct, p. 192 (requiring communication of adequate information and explanation of material risks and reasonably available alternatives to the proposed course of conduct). Patel was never informed of the conflicts and, to the extent that he was asked to waive the Satary conflict, he vehemently objected.

### 8) Patel Did Not Enter Valid Waivers of Conflict Before the Court

Several conflicts were addressed by the Court. However, the waivers entered by Patel in those instances were not knowing, as Patel did not receive advice from independent counsel. Rather, the Court relied on the conflicted members of Patel's defense team to provide advice with respect to those conflicts. Respectfully, the Court was unaware of the depth of the conflicts and misconduct inside of the defense team when placing the defense team members in charge of the conflict discussions. However, it is respectfully suggested that it was error for the court to utilize existing members of the defense team to give advice about conflict waivers, particularly as to Sadow's conflict in representing LabSolutions.

24

Notably, the defense team was led by Sadow himself. This placed all counsel in a potentially adverse position to its' team leader, risking discord should anyone provide advice contrary to supporting a waiver of the conflict. Of course, the Court was not aware of the depth of conflict that would preclude members of the trial team from giving candid and full advice to Patel.

Courts are tasked with considering their independent duty to ensure the integrity of the judicial process. "Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. U.S.,* 486 U.S. 153, 160 (1988). It necessarily follows that the authority of federal courts to disqualify attorneys derives from the inherent power to preserve the integrity of the adversary process. *United States v. Prevezon Holdings Ltd.,* 839 F. 3d 227, 241 (2d. Cir. 2016). Further, "the judge must have sufficient information about the surrounding circumstances to be able to inform the defendants of *all possible conflicts.*" *Padilla-Martinez,* 762 F.2d at 949 (emphasis added).

Indeed, to ensure that a defendant's waiver is knowing, intelligent, and voluntary, *Garcia* specified:

> Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections.

*U.S. v. Garcia,* 517 F. 2d 272, 278 (5th Cir. 1975). While mere affirmative responses to questions from the bench may be enough to satisfy the requirements of waiver, Courts should nonetheless "endeavor to have each defendant personally articulate in detail his intent to forego this significant

constitutional protection." *Id.*  It is respectfully submitted that Patel did not make such showing,

nor could he, as he himself was not fully briefed as to the conflicts by his defense counsel.

The Court should not tolerate inadequate representation resulting from a conflict of

interest:

> Accordingly, we hold that when a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant. Such representation not only constitutes a breach of professional ethics and invites disrespect for the integrity of the court, but it is also detrimental to the independent interest of the trial judge to be free from future attacks over the adequacy of the waiver or the fairness of the proceedings in his own court and the subtle problems implicating the defendant's comprehension of the waiver.

*U.S. v. Dolan*, 570 F.2d 1177, 1184 (3d Cir. 1978).

The evidence is clear that the defense team was riddled with conflicts of interests that were

not revealed or explained to the Court or Patel.  Allowing members of Patel's defense team to act

as independent counsel as to conflicts placed the fox in charge of guarding the hen-house.

### C) Violation of Patel's Sixth Amendment Right to Autonomy in His Choice of, and Full Participation in, His Defense Warrants A New Trial

Patel's right to make fundamental choices concerning his defense were usurped by trial

counsel when they failed to put on Patel's good faith and advice of counsel defenses. The

wholesale abandonment of such defenses without his consent denied Patel's right to participate in,

and put on, his defense of choice. The issue here is defendant's autonomy, not counsels'

competence or counsels' freedom to make strategic decisions within the confines of the

defendant's choice of defense. Put differently, where a defendant's right to make a fundamental

choice about his own defense is usurped by counsel, a new trial is granted without a showing of

prejudice. *See generally McCoy*, 138 S. Ct. at 1510-11.

26

The right to defend is personal and belongs to the client as the defendant. *Id.* at 1507. The defendant is the master of his own defense. *Mulligan v. Kemp*, 771 F.2d 1436, 1441 (11th Cir. 1985). "With individual liberty. . . at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense[.]" *Id.* at 1505. That a defendant be allowed to make his own choices about the proper way to protect his own liberty is a fundamental legal principle. *Faretta v. California*, 422 U.S. 806, 834 (1975). Accordingly, "a lawyer shall abide by a client's decisions concerning the objectives of the representation."[54] *Mccoy,* 138 S. Ct. at 1509. Counsel is only an assistant to the defendant.[55] *Mulligan*, 771 F.2d at 1441. Because a defendant has broad power to dictate the manner in which he is tried, great deference is given to choices made under the explicit direction of the client. *Id.* [56, 57]

While many choices concerning strategy do not require the client's consent, counsel must nonetheless develop trial strategy and discuss that strategy with the client.[58] *Id.* at 1509. The Supreme Court was clear that, "although defense counsel is free to develop defense theories based on reasonable assessments of the evidence, as guided by her professional judgment, she cannot

---

[54] "Lawyer to Abide by Client's Decisions. A lawyer must abide by a client's decisions concerning the objectives of representation and must reasonably consult with the client as to the means by which they are to be pursued." Fla. R. Prof. Conduct 4-1.2 (a); *See also* Comment to Fla. R. Prof. Conduct 4-1.2 (stating "A lawyer must act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf); *Gonzalez v. U.S.*, 553 U.S. 242, 254 (2008) (Scalia, J., concurring) (noting that action taken in direct contradiction to the client's wishes "would have the effect of revoking the agency with respect to the action in question.")

[55] The "granting of the accused personally the right to make his defense, speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant." *McCoy*, 138 S. Ct. at 1503 (quoting *Faretta,* 422 U.S. at 819-20 (internal citations omitted)).

[56] *See In re Hood*, 727 F. 3d at 1363 (holding attorneys who practice before federal courts sitting in Florida are governed by the Florida Rules of Professional Conduct).

[57] An attorney has an affirmative duty to explain matters to a client. Fla. R. Prof. Conduct 4-1.4 (b). Indeed, "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. *Id.* This includes ensuring the client has sufficient information to participate intelligently in decisions concerning the objectives of his representation and the means by which they are to be pursued. *See id.* (explaining the Rule in the Comment).

[58] "A lawyer must abide by a client's decisions concerning the objectives of the representation, and…must reasonably consult with the client as to the means by which they are to be pursued." Fla. R. Prof. Conduct 4-1.2 (a). "A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf. *Id.* at Comment.

usurp those fundamental choices given directly to the criminal defendants by the United States []
Constitution[.] *Id.* at 1510.

In choosing to obfuscate their conflicts and misconduct, trial counsel usurped Patel's right
to pursue advice of counsel and good faith defenses. Thus, when the court queried Patel two days
after the defense rested as to whether he agreed with the defense having rested without putting on
a defense, Patel was strong-armed by Sadow to answer the court in the affirmative.[59]  In any event,
it was too late to reopen the evidence even if Patel had objected.  This, too, was error.

### D) Patel Suffered A *Brady* Violation

Society wins when criminal trials are fair. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In
all criminal cases, the prosecution has an affirmative obligation to ensure that justice is carried out.
*See generally Brady*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972); *Jencks v.
United States*, 353 U.S. 657 (1957). The "United States Attorney is the representative not of an
ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as
compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution
is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78,
88 (1935). The good faith or bad faith of the prosecution is irrelevant to whether a due process
violation has occurred. *Brady,* 373 U.S. at 87*; see also Smith v. Cain*, 565 U.S. 73, 75 (2012).

A *Brady* violation exists where (1) the evidence at issue is favorable to the accused, either
because it is exculpatory, or because it is impeaching; (2) this favorable evidence was suppressed
by the State, either willfully or inadvertently; and (3) the defendant was prejudiced as a result.
*Downs v. Secretary, Florida Dept. of Corrections,* 738 F. 3d 240, 258 (11th Cir. 2013). Prejudice

---

[59] During a recent interview with Sadow, he conceded that Patel was not in agreement with the decision to not call
witnesses and that Sadow instructed Patel to answer the Court in the affirmative though he did not want to. *See* affidavit
of Jeff Danik.

lies where there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* This does not mean that the defendant would have received a different verdict, "only that the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Smith*, 565 U.S. at 75 (2012).

In *Kyles*, the court found that the Government's failure to disclose statements made by an informant-witness violated *Brady. Kyles v. Whitley*, 514 U.S. 419, 421 (1995). The court noted the defendant had been prejudiced because he was precluded form exposing the jury to the witness' own words and inconsistences which would have allowed the jury to make exculpating inferences. *Id.* at 445. The violations present in *Kyles* are analogous to the one here. *See infra*.

E) **The Aggregate Of Errors Warrant A New Trial In The Interest Of Justice**

Regardless of whether the claims independently prevail, the confluence of errors suffice to support a new trial in the interest of justice. *See Baptiste*, 8 F.4th at 39 (holding "errors not individually reversible can become so cumulatively").

F) **Even If No Error, The Interest Of Justice And Perceived Unfairness Warrant A New Trial**

Even if this court finds no error, a new trial is nonetheless appropriate. Where error is lacking, the court may nonetheless grant a new trial. *See Vicaria*, 12 F.3d at 198-99; *see also Baptiste*, 8 F. 4th at 40 ("A judge may grant a new trial in the interest of justice based on perceived unfairness of something not amounting to reversible error.") The's perceived unfairness of what occurred during Patel's trial warrant a new trial in the interest of justice.

G) **The Discovery Of New Evidence Preponderates Heavily Against The Verdict And Warrants A New Trial In The Interest Of Justice**

The conflicts that infected Patel's defense constitute new evidence justifying a new trial. Where there is new evidence, the defendant must show that the new evidence (1) was discovered

29

after the trial; (2) could not have been discovered earlier with due diligence; (3) is material and not merely cumulative or impeaching; and (4) would likely produce an acquittal. Fed. R. Crim. P. 33; *see also United States v. Jernigan,* 341 F. 3d 1273, 1287 (11th Cir. 2003). Newly discovered evidence does not have to relate to the issue of guilt to justify a new trial, however, but may be probative of another issue of law. *United States v. Campa*, 459 F. 3d 1121, 1151 (11th Cir. 2006). In this case, the *Brady* violation and misconduct of counsel constitute newly discovered evidence.

## V.   CONCLUSION

Conflicts, potentially criminal conduct, professional misconduct, misrepresentation, ethical violations, whether taken separately—or considered in the aggregate—all establish the gross mishandling of Patel's case and the violation of his Fifth and Sixth Amendment Rights. In sum, the interest of justice necessitates that Patel receive a new trial.

Respectfully submitted,

**PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP**

By:

Tama B. Kudman, Esquire
Kevin E. Raphael, Esquire
7108 Fairway Drive, Suite 130
Palm Beach Gardens, FL 33418
Telephone: (561) 472-0811
Facsimile: (412) 236-4264
tbk@pietragallo.com
ker@pietragallo.com

*Counsel for Minal Kumar Patel*