**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**UNITED STATES OF AMERICA**

**v.**

**MINAL PATEL, a/k/a Minalkumar Patel,**

      **Defendant.**

_____/

### UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR NEW TRIAL PURSUANT TO FED. R. CRIM. P. 33(a)

The United States of America, through undersigned counsel, hereby opposes Defendant Minal Patel's Motion for New Trial Pursuant to Fed. R. Crim. P. 33(a). [D.E. 506 ("Motion")]. Patel received a fair trial during which the United States proved that Patel masterminded a $463 million fraud that targeted elderly cancer survivors and others, convinced them to give over their personal information through deceptive marketing, paid telemedicine companies to rubber-stamp test orders, and billed Medicare for expensive and unnecessary genetic tests that were never used to help patients. The jury convicted Patel of all ten counts against him, including conspiracy to commit health care fraud and wire fraud, health care fraud, conspiracy to pay kickbacks and defraud the United States, payment of kickbacks, and conspiracy to commit money laundering.

Patel does not challenge the sufficiency of the evidence presented at trial, which overwhelmingly proved his guilt.  Nor does he challenge any of the Court's evidentiary rulings or jury instructions. Instead, Patel asks the Court to slog through hundreds of pages of extraneous communications between Ms. Sztyndor and other members of the defense team and information related to defense attorneys' other engagements. Patel attempts to recast this information as conflicts of interest that impeded his defense. But this Court and Judge Reinhart held multiple hearings on potential conflicts of interest, and, at every turn, Patel knowingly elected to proceed

1

with his counsel of choice. Patel identifies no actual conflicts and nothing that warrants a new trial. Likewise, Patel's attempt to shoehorn his ineffective assistance claim into a motion based on "new evidence" fails. Much of the so-called evidence is not evidence at all, but rather rank hearsay, speculation, or other inadmissible, irrelevant, and/or conclusory assertions. Nothing in Patel's Motion warrants disturbing the guilty verdicts, which are supported by overwhelming evidence that Patel led a massive scheme to steal nearly half a billion dollars from one of our country's most important social safety nets.

## FACTUAL BACKGROUND

### A.  The Superseding Indictment.

On September 8, 2022, a grand jury sitting in the Southern District of Florida returned a Superseding Indictment charging Patel with conspiracy to commit health care fraud (Count 1); health care fraud (Counts 2-4); conspiracy to defraud the United States and pay kickbacks (Count 5); payment of kickbacks (Counts 6-9); and conspiracy to commit money laundering (Count 10). [D.E. 275]. Like the original Indictment before it, the Superseding Indictment alleged that Patel owned and operated LabSolutions LLC ("LabSolutions"), a lab located in Georgia that billed Medicare for expensive, medically unnecessary genetic tests. The Superseding Indictment further alleged that Patel recruited a cohort of patient brokers, including patient brokers located in the Southern District of Florida, who used deceptive marketing to target Medicare beneficiaries and convince them to agree to take genetic tests that they did not need. *Id.*, Count 1, ¶¶ 5, 7. At Patel's direction, the marketers then obtained signed prescriptions by paying kickbacks to telemedicine companies. *Id.*, Count 1, ¶ 8. Patel paid kickbacks to the marketers in exchange for the completed patient referrals and concealed these kickbacks through sham documentation that made the kickbacks look like legitimate payments for lawful marketing. *Id.*, Count 1, ¶¶ 5-6. Patel's lab

billed Medicare for excessive, unnecessary genetic testing. *Id.*, Count 1, ¶ 9. The Medicare beneficiaries often did not receive test results, and the results were not used in the beneficiaries' treatment. *Id.*, Count 1, ¶ 8. In total, Patel caused the submission of nearly $464 million in false claims to Medicare and Medicare Advantage, approximately $187 million of which was paid. *Id.*, Count 1, ¶¶ 9-10. Patel then laundered the proceeds of this fraud. *Id.*, Count 10.

Compared to the original Indictment, the Superseding Indictment charged different health care fraud and kickback substantive counts, clarified that the charges pertained to multiple types of genetic testing (not just cancer genetic testing), and eliminated references to one co-conspirator (Chris White). The Superseding Indictment retained references to co-conspirators Brett Hirsch and Christian McKeon, as well as their companies. *Id.*, General Allegations ¶¶ 29-32.

### B.  The Overwhelming Evidence of Guilt.

The jury convicted Patel of every count against him. Voluminous evidence from multiple sources over the course of a two-week trial demonstrated that, for three years, Patel created and led the scheme. Patel, inspired by the great expense of lab tests after his own surgery, built this fraud from the ground up. 11/30/22 Tr. 131:20-25 (S. Ramamurthy Testimony). The jury heard the testimony of 16 witnesses, including four of Patel's co-conspirators, two of Patel's former employees, elderly patients or their caregivers, and experts. [*See* D.E. 396, Witness List]. Over 600 exhibits corroborated the testimony of these witnesses. [*See* D.E. 397, Admitted Exhibits].

The evidence included testimony from Medicare expert Laurie McMillan, who explained that Patel promised to abide by Medicare's rules and federal law. *See also* GX 209A, 210A, 212A, 214A (LabSolutions Medicare Enrollment Forms). Each time the lab submitted a claim, Patel was attesting to its veracity, accuracy, and medical necessity. 11/29/22 Tr. 87:23-88:6, 12-23 (L. McMillan Testimony). The claims data showed that Patel was responsible for over $463 million

in billing to Medicare—in just three years. GX 201A-F. The jury also heard from Medicare beneficiaries, the spouse of a Medicare beneficiary suffering from dementia, and a beneficiary's oncologist, who explained that these tests were not used in the care of these patients. In addition, the jury heard recorded calls of telemarketers pressuring beneficiaries to accept the test. The jury was shown patient files ordering identical, expansive, and unnecessary genetic test panels. Genetic testing expert Dr. Anthony Magliocco described the patient files as "very incomplete and internally contradictory" and insufficient to justify the tests ordered. 12/2/22 Tr. 29:18-19.

Other witnesses described Patel's involvement in every aspect of the criminal enterprise. Co-conspirator Senthil Ramamurthy testified about Patel's process for determining the best codes to use when billing Medicare, to "come up with a list of codes that will always go through" to get reimbursement. 11/30/22 Tr. 133:14-15 (S. Ramamurthy Testimony). The jury saw exhibits showing Patel's involvement with billing code selection for genetic testing. GX 1318, 1318A, 1324, 1324A, 1325A, 1338. Ramamurthy also testified about Patel's desire to target elderly and low-income populations, or "low-hanging fruit" who did not give "a lot of resistance" to marketers. 11/30/22 Tr. 134:7-25, 135:5-11, 145:18-146:3 (S. Ramamurthy Testimony). Patel compensated Ramamurthy with Medicare reimbursements. *See* GX 1375. Ramamurthy testified about Patel's concern about strategically increasing the Medicare billing at certain intervals to "go under the radar," or not be "detected by Medicare or law enforcement." 11/30/22 Tr. 142:18-25.

Co-conspirator Shawn Griner also described the broad scope of Patel's involvement, stating that "there were multiple steps that were involved in getting a patient to take the test and then have that test run and processed by [LabSolutions], and then they would bill Medicare. And [Patel] oversaw and approved all of the steps of the process." 12/6/22 Tr. 20:7-10. Patel enticed Griner into shifting his call center business to target Medicare patients for genetic testing by telling

him about Medicare's high approval rate and high-dollar reimbursement. 12/6/22 Tr. 21:19-22:11. Griner used a call center staffed by telemarketers with no medical training who called beneficiaries to induce them to accept a genetic test. 12/6/22 Tr. 25:2-9. After the beneficiary agreed to provide a swab, Patel, through Griner, paid telemedicine companies to sign orders for the most expensive option available. Patel provided Griner with forms that had already been filled out to select the expansive panel. 12/6/22 Tr. 33:2-19; 44:14-21; 51:9-15; GX 1683E. Co-conspirator Marc Sporn, another marketer, was also instructed by Patel to use the "comprehensive panel" to generate the highest possible reimbursements from Medicare. 12/2/22 Tr. 209:14-210:11. Sporn testified about Patel visiting his call center, where telemarketers with no medical training pushed the tests on Medicare beneficiaries, using sales tactics that preyed on people's fears of cancer. 12/5/22 Tr. 77:12-14; GX 1916B; GX 1916C. Co-conspirator Brett Hirsch describing meeting with Patel and Griner at the Boca Beach Club, where Patel explained that "Medicare was an easier way to get reimbursements" for genetic testing. 12/7/22 Tr. 30:1-31:13. Hirsch, Patel, and Griner also discussed how Patel would pay them—"after whatever the cost of the test was, I (Hirsch) would get 50 percent. And then, if I brought Shawn (Griner) in, I would get an override on whatever Shawn would bring in." *Id.* at 31:18-21. Hirsch testified to his dealings with Ramamurthy, Griner, and Sporn, corroborating what each of these co-conspirators described and authenticating text messages, emails, and contracts with Patel and other co-conspirators. Testimony from any of these cooperating witnesses would have proved Patel's role in the scheme; the evidence provided by all four cooperators consistently proved Patel's knowledge and control of key elements of the scheme.

While Patel oversaw all aspects of the scheme, he prevented employees in critical positions from uncovering the true—and criminal—nature of the lab's operations. Former LabSolutions sales director Stacey Adair did not know how many samples were referred—or that tests were

marketed directly to patients. 12/1/22 Tr. at 176:8-21. Patel hired attorney Amy Roebuck, the lab's first compliance director, in July 2019. During her time at LabSolutions, she found documents where her signature was forged, was told not to put compliance advice in writing, and was not allowed inside the lab. 12/2/22 Tr. at 146:11-147:19; 159:15-24.

Michael Petron, a certified public accountant and certified fraud examiner, testified about the movement of money through approximately 20 bank accounts as well as patterns in the claims data. 12/8/22 Tr. 57:7-14. During the conspiracy, LabSolutions billed approximately $463.9 million to Medicare, of which approximately $269.5 million was for cancer genetic testing. GX 112. Of that, LabSolutions was paid approximately $187.4 million. Much of the fraud proceeds moved from the LabSolutions bank accounts into various other accounts controlled by Patel, sometimes zigzagging between multiple accounts; other times used for luxury purchases like a Ferrari and a Land Rover. GX 128; GX 129; GX 138; GX 305-310.

### C.  The United States' and Court's Efforts to Address Potential Conflicts.

The United States and the Court paid careful attention to potential conflicts of interest throughout this case,[1] but particularly to Mr. Sadow's potential conflicts. On July 1, 2022, Patel delivered a signed waiver of attorney-client privilege to the United States related to a possible advice-of-counsel defense. Mr. Sadow represented Patel and LabSolutions during the final seven

---

[1]     *See, e.g.,* D.E. 35, Joint Motion for Hearing Regarding Discovery, Possible Conflict, and Existence of Common Interest Agreement; D.E. 45, Paperless Order Setting Hearing; D.E. 57, Paperless Order following 6/19/20 *Garcia* hearing finding that Patel's decision to retain Sztyndor as counsel is knowing, voluntary, and fully informed; D.E. 268, Order on Sealed Motion for Hearing Regarding Potential Conflict of Interest (referencing *Garcia* hearings held on 1/24/22, 1/31/22, 2/24/22 and finding Patel's waiver of any conflict by Brian Rafferty's law firm to be knowing, voluntary, and fully informed); D.E. 300, United States' Motion for Release of Documents, Hearing Regarding Potential Conflict, and Pretrial Deadline for Rule 17(c) Subpoena Compliance; D.E. 321, Minute Entry for 11/2/22 Evidentiary Hearing (addressing D.E. 300); D.E. 323, Order Granting in Part and Denying in Part D.E. 300; D.E. 331, Appeal from Magistrate Judge's Order; D.E. 354, Order Denying Appeal.

months of the conspiracy period, as well as during earlier periods. During the alleged conspiracy period, Mr. Sadow met with attorneys and marketers who were potential trial witnesses.

Given Mr. Sadow's history representing LabSolutions, the United States requested a hearing to address any potential conflict of interest involving Mr. Sadow. [D.E. 300]. Mr. Sadow confirmed that he had represented Patel or the lab pre-indictment but was unequivocal that he never provided advice to Patel or the lab about regulatory matters or health care compliance issues. [*See, e.g.,* D.E. 317, Patel's Pre-Hearing Memorandum]. Mr. Sadow further explained, "I've been Mr. Patel's lawyer for a long time" and represented him in "other little matters" over the years (11/2/22 Tr. 33:5-8) and that "[his] job was to look after [Patel's] interests in a potential criminal case" (11/22/22 Tr. 52:6-13).

Both Judge Reinhart and this Court conducted colloquies of Patel, advised Patel that Mr. Sadow's prior representation of Patel and LabSolutions could limit his representation of Patel at trial, and confirmed Patel's knowing waiver of a potential conflict. 11/2/22 Tr. at 49:11-57:8 (Judge Reinhart's colloquy); 11/22/22 Tr. at 69:8-73:7 (Judge Ruiz's colloquy). As the Court noted, "Mr. Patel is put on notice that despite his waiver today, he's going in eyes wide open, that his preferred counsel may be limited if people begin to bring him into the discussions when it comes to legal advice." 11/22/22 Tr. at 73:2-5.[2]

As to Individual 1, after agents approached Individual 1 in January 2022 and Individual 1 indicated he was represented by Mr. Samuel, the United States made no efforts to interview

---

[2]       Likewise, when the United States anticipated calling Jamie Simmons as a witness, Judge Reinhart conducted a *Garcia* hearing because Brian McEvoy represented Simmons. The United States ultimately elected not to call Simmons as a witness, nullifying any potential conflict. Nonetheless, as has been true throughout this case, when a potential conflict was identified, the potential conflict was brought to the Court. At every turn, Patel elected to proceed with counsel of his choice and provided knowing and voluntary waivers. *See* 1/31/22 Tr. at 6:6-13:14 (Judge Reinhart's colloquy of Patel regarding Simmons conflict).

Individual 1 until fall 2022. *See* Patel's Exhibit H. In fall 2022, the undersigned prosecutors contacted Mr. Samuel, explained their interest in meeting with Individual 1 and discussing potential criminal exposure, and explained their view that Mr. Samuel could not represent Individual 1 for purposes of such a meeting. Until the United States expressed an interest in moving forward with an interview, Patel's interests and Individual 1's interests were not adverse. The moment the United States expressed serious interest in this interview, Mr. Samuel informed the United States that he withdrew from representing Individual 1 and a different attorney had assumed the representation. The United States had no contact with this attorney and the interview never occurred.

## **LEGAL STANDARD**

Federal Rule of Criminal Procedure 33 permits a district court to order a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "The defendant bears the burden of justifying a new trial." *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc). While the court has discretion to grant or deny a new trial, the court "may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable." *Butcher v. United States*, 368 F.3d 1290, 1297 (11th Cir. 2004) (quoting *United States v. Martinez*, 763 F.2d 1297, 1312 (11th Cir. 1985)). "The evidence must preponderate heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Martinez*, 763 F.2d at 1313. "Courts are to grant [new trials] sparingly and with caution, doing so only in those really 'exceptional cases.'" *Id.* (citations omitted).

Another ground on which a defendant might move the district court for a new trial is his alleged discovery of new evidence. *See* Fed. R. Crim. P. 33(b)(1). Such evidence has been described as "evidence that could not have been discovered with due diligence at the time of trial."

*United States v. Johnson,* 596 F.2d 147, 148 (5th Cir. 1979) (quotation omitted). The district court may grant a motion for new trial based on such evidence if the interest of justice so requires and if (1) the evidence was in fact discovered after trial, (2) the defendant exercised due care to discover the evidence, (3) the evidence was not merely cumulative or impeaching, (4) the evidence was material, and (5) the evidence was of such a nature that a new trial would probably produce a different result. Fed. R. Crim. P. 33(a); *United States v. Lee,* 68 F.3d 1267, 1273–74 (11th Cir. 1995). Each element of this test must be satisfied or else a new trial is not warranted. *Id.* at 1273–74. Furthermore, motions for new trial are "highly disfavored," and district courts "should use great caution in granting a new trial motion based on newly discovered evidence." *United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003) (quotation omitted).

Here, the thrust of Patel's Motion is alleged conflicts of interest that Patel claims adversely affected his defense. "To establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

## ARGUMENT

I.   **OVERWHELMING EVIDENCE PROVED PATEL GUILTY OF ALL COUNTS, AND PATEL'S MOTION FAILS TO MEET THE EXACTING STANDARD NECESSARY TO WARRANT A NEW TRIAL.**

This is not an "exceptional case" where allowing the guilty verdicts to stand would be a "miscarriage of justice." *Martinez*, 763 F.2d at 1313. To the contrary, the evidence of Patel's criminal involvement in fraud, kickbacks, and money laundering was overwhelming.

For the health care fraud counts, the evidence included, among many other things: (1) the Medicare billing with respect to the particular claim; (2) the sham patient file affiliated with the particular claim; (3) testimony from individual patients for whom the genetic tests were ordered

or from the patient's primary care provider about the lack of medical need for the test for that patient; and (4) expert testimony from Dr. Magliocco establishing that the test was inappropriate. *See United States v. Agresti*, Case No. 18-CR-80124-RUIZ, 2022 U.S. Dist. LEXIS 94982, at *8 (S.D. Fla. May 26, 2022) (rejecting defense argument for new trial based on "defective" fraud theory where evidence included insurance billing, some patient testimony, and the patient files).

As to the overarching health care fraud and wire fraud conspiracy and kickback conspiracy, the jury also heard from Patel's co-conspirators, who described their successful efforts, with Patel, to drum up thousands of claims to Medicare for lucrative genetic testing. They preyed on patients' cancer fears, paid telemedicine companies for signed doctors' orders, and hid behind fake contracts. And Patel compensated all of them based on Medicare's payments to LabSolutions—a textbook violation of the Anti-Kickback Statute. In addition to the bogus contracts and marketing agreements, Patel continued the smoke-and-mirrors effect at LabSolutions. He hired a sales director who could not know about Patel's actual marketing strategies and a compliance director who could not access the lab and who observed her signature forged on company documents. Each of the kickback counts was supported by cooperator testimony regarding the nature of the improper relationship between the lab and the marketer, as well as banking records showing the details of the underlying transaction.

The money laundering evidence included bank records and financial analysis showing millions of dollars from false Medicare claims in the LabSolutions accounts being funneled between a web of bank accounts controlled by Patel. Sometimes, the transactions culminated with purchases for luxury vehicles or property.

Accordingly, the interest of justice does not warrant a new trial. *See* Fed. R. Crim. P. 33(a).

## II.   THE UNITED STATES AND THE COURT ROBUSTLY ADDRESSED POTENTIAL CONFLICTS, AND PATEL KNOWINGLY ELECTED TO PROCEED WITH COUNSEL OF HIS CHOICE.

Patel points to nothing showing an actual conflict of interest, much less one that adversely affected his defense. *See Cuyler*, 446 U.S. at 348. To the contrary, the record shows that possible conflicts of interest were robustly addressed in the lead up to trial and that Patel knowingly elected to proceed with counsel of his choice at every turn. Patel's attempt at a post-conviction U-turn on conflicts that he previously waived (or which never existed) should be rejected.

### A. Conflicts Were Timely and Appropriately Addressed.

The United States brought possible conflicts to the Court's attention on multiple occasions. These issues were addressed thoroughly by the Court and involved lengthy hearings and briefing by both parties. Patel was advised of the potential conflicts and potential implications for his defense. He nevertheless knowingly elected to proceed with counsel of his choice. For example, the Court and Judge Reinhart conducted multiple thorough colloquies as to Mr. Sadow's potential conflicts. On November 2, 2022, after approximately an hour of oral argument on the issue of any possible conflicts by Mr. Sadow, Judge Reinhart presented Patel with various hypotheticals involving Mr. Sadow's prior representation of Patel and LabSolutions, including Patel's inability to call Mr. Sadow as a witness if he proceeded as trial counsel. Patel knowingly elected to retain Mr. Sadow as his lead counsel. On November 22, 2022, this Court conducted an additional colloquy of Patel. Once again, it followed an extensive back-and-forth between his counsel, the Court, and the United States on possible issues that could arise during trial if Mr. Sadow continued to represent Patel and how a potential conflict could limit Mr. Sadow in representing Patel at trial. Patel elected to retain Mr. Sadow as his lead counsel. As the Court put it in the November 22 hearing, "Mr. Patel is put on notice that despite his waiver today, he's going in eyes wide open"

and "that his preferred counsel may be limited." 11/22/22 Tr. at 73:2-5. Accordingly, Patel's arguments about Mr. Sadow's prior representation or the insufficiency of the multiple *Garcia* hearings are not grounds for a new trial.[3] The record belies any suggestion that the Court or counsel for the United States failed to address a conflict.

### B.  Mr. Samuel's Relationship with Individual 1 Does Not Warrant a New Trial.

Both the United States and Mr. Samuel appropriately identified and addressed a potential conflict regarding Individual 1 before it developed. There was no need for a *Garcia* hearing because Mr. Samuel withdrew from representing Individual 1 once there was reason to believe Individual 1's interest may become adverse to Patel's, *i.e.*, once the United States expressed interest in exploring Individual 1's testimony. As it turns out, the United States never interviewed Individual 1 about any substance and did not secure Individual 1's testimony against Patel. Under these facts, Patel can identify no adverse impact from Mr. Samuel's extremely limited representation of Individual 1. Instead, Patel speculates that Individual 1 could have been a defense witness, but there is no indication that Individual 1 would have testified in Patel's defense or that such testimony would have provided credible exculpatory information sufficient to overcome the weight of the inculpatory evidence. Individual 1 was not immunized by the United States. The United States presented tremendous evidence of Individua 1's involvement in the scheme.

Patel next suggests that cooperating witnesses Marc Sporn and Brett Hirsch were not sufficiently cross-examined on prior statements about Individual 1. Mr. Sadow, not Mr. Samuel, cross-examined Sporn and Hirsch and he did so at length. Mr. Sadow questioned these witnesses on many of their prior statements. Mr. Sadow's strategic decision to refrain from extensively

---

[3]     As discussed in the background section above, the Court also addressed Mr. McEvoy's potential conflict and Ms. Sztyndor's potential conflict.

questioning these witnesses about Individual 1's role makes perfect sense. The United States did not dispute Individual 1's role; to the contrary, the United States presented evidence that Patel delegated considerable responsibility to Individual 1, among others. It was entirely consistent with the weight of the evidence that Individual 1 had a significant role, but that Patel was Individual 1's boss. That does not exculpate Patel of his crimes; if anything, that is more evidence of a conspiracy, or at minimum an inner circle of key employees that knew about the fraud, and an outer circle who were kept in the dark. Mr. Sadow's decision not to cross-examine Sporn and Hirsch on this is not evidence of a conflict that adversely affected Patel.

### C.  The Satary and Aleem Issues Do Not Warrant a New Trial.

Patel has identified no actual conflict in either Mr. Sadow's prior representation of Satary or in Mr. Samuel's partner representing Satary; nor has Patel identified any adverse impact from this representation. Patel claims that the supposed conflicts precluded him (Patel) from pursuing a defense that Patel somehow operated a less vile business than Satary, but such a defense clearly would not have been admissible. That would be akin to a defendant charged in a drug distribution case claiming that he is not guilty because the neighboring drug dealer sells more drugs through more notorious means. Here, the United States presented extensive evidence about how Patel's marketers secured patient referrals and doctors' orders, and the United States proved that LabSolutions' billing of these referrals to Medicare was fraudulent; in light of that evidence, proof that the marketers sent even worse patient referrals to Satary (even if true) would have been irrelevant and inadmissible.

Relatedly, Patel has no grounds to pursue a new trial based on a supposed conflict between Mr. Sadow and the Aleem brothers. The conspiracy period spanned July 2016 to August 2019. The Aleems had little to no involvement with LabSolutions and its operations after 2016. In early

13

2017, they sued Patel and LabSolutions for wrongful termination. By 2015, Patel and LabSolutions had retained the services of Tobin Watt for health care compliance matters, who continued his representation of Patel for many years. Yet Patel expresses concern because (1) Mr. Sadow's retainer apparently included a portion of the LabSolutions settlement with the Aleems and (2) Mr. Sadow is Special Counsel for White Collar and High Profile Defense at the law firm disqualified from representing LabSolutions adverse to the Aleems in the wrongful termination lawsuit. This does not establish that Mr. Sadow was conflicted in his representation of Patel at trial; Mr. Sadow was not disqualified from representing LabSolutions in other matters, or from representing Patel in criminal cases. Yet Patel claims that, because of this history, Mr. Sadow did not pursue a tentacle of the advice-of-counsel defense that would have involved the Aleems. Patel can point to nothing that suggests that more information about the Aleems would have changed the jury's verdict. Patel further claims that multiple witnesses were "well-versed" on the Aleems' involvement, but identifies only Senthil Ramamurthy. The trial record shows that Ramamurthy overlapped with Omar Aleem for about a month, and could barely remember Yussuf Aleem, whose name appeared on an email that was forwarded to him. Despite this contact with the Aleems, Ramamurthy pled guilty for his involvement in Patel's scheme and testified to the key elements of the scheme.

## III.   PATEL'S OTHER ARGUMENTS DO NOT WARRANT A NEW TRIAL.

### A.  The Court Properly Inquired of Patel Before the Jury Deliberated.

Before the case went back to the jury, the Court placed Patel under oath and inquired about Patel's decision not to testify and his decision not to call any witnesses. The Court advised Patel that it was his right to testify, and Patel agreed that his decision not to testify was free and voluntary, that no one (not even his lawyers) forced him not to testify, and that he could testify over his lawyer's advice to the contrary. Patel also confirmed that he did not wish to call any

14

additional witnesses and agreed with the Court's jury instructions (which did not include an advice-of-counsel instruction). Tr. 12/12/22 at 132:22-134:4.

Patel now regrets his decision not to call any witnesses and wonders if the outcome might have been different had he called a lawyer to testify. Patel's post-conviction regrets do not warrant a new trial. In any event, Tobin Watt's testimony would not have changed the outcome of the trial; in fact, it would have solidified the guilty verdicts, which defense counsel knew and clearly considered in counseling against calling witnesses. The United States debriefed Tobin Watt for nearly an entire day, in the presence of Mr. Rafferty and Mr. Samuel. The interview report is attached as Exhibit 1 to this Opposition. In sum, Mr. Watt was expected to testify that he was not aware of certain facts about how patients were recruited and how doctors' orders were obtained. Furthermore, had Mr. Watt testified, the United States would have called in rebuttal another attorney hired by Patel, S. Craig Holden, whose testimony would have further confirmed that Patel did not disclose all material facts to his lawyers. *See* Exhibit 2 (Holden interview memo).[4] A legal memo drafted by Holden expressly says that its advice is premised on the notion that Patel's marketers were conducting legitimate, traditional marketing, a lie the United States debunked at trial with nearly every witness. The defense was far better off sticking to evidence the defense elicited through cross-examination about the involvement of a series of lawyers, through which the defense was able to argue that Patel acted in good faith by trying to get legal advice from renowned attorneys. Patel's seasoned defense lawyers made an entirely reasonable strategic judgment in declining to call Watt or other witnesses, and Patel was wise to heed their judgment.

---

[4]     Redactions for public filing have been applied to both reports. Unredacted copies were produced to the defense in discovery and can be provided to the Court upon request.

**B. The Chris White Recordings Were Inadmissible, and Any Conceivable Testimony from Ms. Sztyndor Would Have Been Inadmissible.**

Patel argues that his former counsel took actions that rendered Chris White an irrelevant witness, which prejudiced his defense by making the White recordings inadmissible. The United States chose to remove White from the Superseding Indictment long before the United States ever learned of the recordings. The United States did so because it did not intend to call White as a witness in its case-in-chief and did not want to be bound to presenting evidence about White at trial. Therefore, the United States—not defense counsel—rendered White irrelevant by virtue of its charging and strategy decisions.[5]

The Court properly ruled that the recordings were inadmissible as substantive evidence because they contain hearsay not subject to any exception. The defense's only hope of admitting the recordings was as impeachment of White. But White did not testify. And the United States did not admit co-conspirator statements from White subject to impeachment under Rule 806. Patel suggests that other recordings exist that he would have liked to admit, but Patel fails to establish the content of any of these recordings, that they would have been anything other than inadmissible hearsay, and that they would have moved the needle at his trial.[6] Indeed, the jury was presented with evidence of other conspirators previously making statements the defense considered

---

[5]     The Superseding Indictment was filed on September 8, 2022, and the United States first learned of the White recordings when Mr. Mehta called the undersigned prosecutors the evening of November 21, 2022, following the Court's *ex parte* hearings on the matter. The United States met with White on a handful of occasions to understand all possible evidence in the case and to prepare in the event unforeseen circumstances required the United States to call White as a witness, including in rebuttal.

[6]     The suggestion that former defense counsel made a strategic blunder by disclosing the White recordings to the Court, rather than springing them on everyone in the middle of trial, is mind-boggling. In light of the nature and circumstances of the recordings, former defense counsel necessarily had to raise the issue with the Court in advance of the trial. And the United States had moved to compel the disclosure of Rule 806 impeachment material, so it is possible they would have come to light through litigation on that motion anyway.

helpful—whether through Brett Hirsch's conversation with Michael Lohan, or Shawn Griner's emails about legal advice—and still convicted across the board. In any event, the discovery of "new" impeachment evidence (to the extent this can even be characterized as new) is not grounds for a new trial under Rule 33. *See United States v. Champion*, 813 F.2d 1154, 1171 (11th Cir. 1987) ("Newly discovered impeachment evidence" of this nature "is insufficient to warrant a new trial."); *see also United States v. Brown*, 423 F. App'x 889, 890-91 (11th Cir. 2011) (per curiam) (concluding that "district court did not abuse its discretion to deny Brown's motion for a new trial because the new evidence was cumulative and merely impeaching, and because Brown did not show that the jury would probably have reached a different result").

Because the recordings were properly excluded and would not have changed the outcome of the trial, the question of Ms. Sztyndor's availability to testify during the trial is irrelevant. Ms. Sztyndor could have offered no other admissible testimony. She was not part of Patel's written privilege waiver, so she could not have advanced the advice-of-counsel defense. It would also have been impermissible for Ms. Sztyndor to testify regarding the legality or illegality of genetic testing, as suggested in the Motion.[7]

---

[7]     Indeed, Ms. Sztyndor was noticed as a defense witness in a prior Operation Double Helix case, where she was apparently expected to testify to the same curious legal theories contained in Patel's motion to dismiss the indictment in this case. *See United States v. Ivan Scott*, 19-cr-209-PGB, ECF No. 89, United States' Motion *in Limine* to Preclude Testimony of Robyn Lynn Sztyndor and Exclude Defense Exhibits 35-36 and 39-42 (Jan. 3, 2021). This would have been improper expert testimony and would been excludable under Federal Rule of Evidence 403 as prejudicial and misleading to the jury. Indeed, both this Court and the Eleventh Circuit have largely rejected these legal theories on genetic testing. *See United States v. Scott*, 61 F.4th 855 (11th Cir. 2023) (defendant did not show that Medicare generally covered cancer genetic testing and indictment sufficiently charged fraud related to genetic testing) (citing *United States v. Patel*, 19-cr-80181-RAR, 2021 WL 2550477 (S.D. Fla. June 22, 2021)). The court in the *Scott* trial expressed skepticism over Ms. Sztyndor's proposed testimony and the defense ultimately withdrew her as a witness, mooting the United States' motion to exclude her testimony.

### C.  The United States Did Not Commit a *Brady* Violation.

"To establish a *Brady* violation, the defendant must show that (1) the government possessed favorable evidence to the defendant; (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different." *United States v. Vallejo*, 297 F.3d 1154, 1165 (11th Cir. 2002). Patel does not come close to establishing that a *Brady* violation occurred. Indeed, the record shows that the United States did not commit a *Brady* violation.

In Exhibit X to his Motion, Defendant identifies several documents obtained through a search warrant executed in a case charged by a different prosecutorial office (the U.S. Attorney's Office, not DOJ's Fraud Section, which prosecuted Patel's case). According to the Motion, the search warrant was for Mark Vollaro's emails. Vollaro owned a telemedicine company that Shawn Griner, Christian McKeon, and their co-conspirators paid for doctors' orders, which Griner and McKeon then sold to Patel. The United States satisfied its discovery obligations to Patel as it pertains to Vollaro-related material, and it was not obligated to produce this search warrant.

Vollaro was not a witness in the *Patel* trial and his name appears nowhere in the trial transcripts. Instead, Griner, who purchased doctors' orders from Vollaro's company and sold them to Patel, was a witness. United States produced the following to Patel: Shawn Griner's emails, documents subpoenaed from Griner's company (IDGAF), and Patel's (and other LabSolutions employees') emails, among many other records. To the extent emails or documents in the Vollaro search warrant contained information regarding the relationship between Griner and Vollaro, or communications between Vollaro and Patel, such records would have been included the materials produced to the defense in this case (and Patel would independently have his own emails). The

United States produced to Patel all the information needed to effectively cross-examine Griner on his relationship with Vollaro, but, despite having access to such voluminous materials, Patel chose not to even mention Vollaro. Unsurprisingly, the documents flagged by Patel in Exhibit X generally were produced to him in these other sources.[8] *See* Exhibit 3 (versions of documents produced to Patel).[9]

Moreover, the documents in Exhibit X are highly inculpatory and fall far short of the standard necessary to warrant a new trial. The invoice on p. 274 of Patel's exhibits, which is a draft invoice that Patel received asking for a payment to a telemedicine company, only adds to the United States' proof of Patel's knowledge that the marketers were paying for doctors' orders.[10] This invoice reflects $180 per consultation and interpretation of results. That presumes that a test will be ordered in every instance, otherwise there would be no need to pay for result interpretation. This document proves that from the beginning—in 2016—Patel knew he was paying marketers to secure doctors' orders for genetic testing. This document also confirms that Patel knew the marketers were coordinating with telemedicine companies and they sought his approval in doing

---

[8]    One of those documents (the March 2, 2017, email) was even on a draft of the United States' exhibit list that was produced to the defense on November 22, 2022, and November 27, 2022.

[9]    As to the September 9, 2016, email chain, the United States produced a version of this email chain to Patel, but not the exact one identified in Patel's Exhibit X. The draft invoice and wire instructions appear not to have been included in the version of the email obtained through Griner and LabSolutions' emails, and therefore those attachments were not produced by this prosecution team to Patel. But it appears from the email that Patel received these documents and could have located this within his own files. In any event, similar invoices from Vollaro to Griner were produced to Patel (such as doj_patel_3_0001272668), and Patel chose not to cross-examine Griner on them. His suggestion now that this document is somehow *Brady* is belied by his own strategy at trial, in which the many Vollaro-related documents produced to him were not used in his defense at all.

[10]    Despite the use of the term "doctor consult" instead of "doctor order," the evidence at trial overwhelmingly showed that the purpose of these payments was to obtain doctors' orders authorizing genetic testing.

so. This is not *Brady* material and there is zero likelihood these documents would have changed the outcome. *See United States v. Gilmore*, 833 F. App'x 790, 798 (11th Cir. 2020) (per curiam) ("Claims under *Brady* or *Giglio* can succeed only upon a showing a prejudice. … As we have explained, the government introduced overwhelming evidence of Jones's guilt in the robberies for which he was tried; thus, he cannot show prejudice."); *see also Park*, 517 F. App'x at 772 ("Park's *Brady* challenge fails. The newly-discovered documents do not qualify as 'material' under *Brady v. Maryland*, 373 U.S. 83 (1963), because they do not 'put the whole case in such a different light as to undermine confidence in the verdict.'") (citation omitted); *United States v. Laureti*, 2022 WL 10445908, *1 (11th Cir. Oct. 18, 2022) (per curiam) ("The district court did not abuse its discretion in denying the new-trial motion because, even if we assume the evidence would qualify as newly discovered or as *Brady*/*Giglio* material, Laureti failed to meet even the lowest materiality standard for these doctrines. He has not shown there was a reasonable likelihood that the evidence could have affected the outcome of the trial.").

## CONCLUSION

The United States proved Patel's guilt through overwhelming evidence, including testimony of 16 witnesses and hundreds of documentary exhibits that uniformly told the story of Patel's leading role in an extensive fraud scheme. Patel does not challenge the sufficiency of this evidence or any of the Court's evidentiary rulings or jury instructions. The Court and the United States properly handled potential conflicts of interest and Patel knowingly proceeded with counsel of his choice. Patel received a fair trial in every respect. Nothing in the Motion satisfies the exacting standard required for a new trial under Rule 33(a). Patel has not shown a *Brady* violation. And Patel has identified no "new evidence" warranting a do-over. For the reasons stated above, Patel's Motion should be denied, and this case should proceed to sentencing.

Dated: July 5, 2023        Respectfully submitted,

                        MARKENZY LAPOINTE
                        UNITED STATES ATTORNEY
                        SOUTHERN DISTRICT OF FLORIDA

                        GLENN S. LEON, CHIEF
                        CRIMINAL DIVISION, FRAUD SECTION
                        U.S. DEPARTMENT OF JUSTICE

By:     */s/ Jamie de Boer*
          Jamie de Boer
          Florida Special Bar No. A5502601
          Emily Gurskis
          Florida Special Bar No. A5502499
          Trial Attorneys
          U.S. Department of Justice
          Criminal Division, Fraud Section
          1400 New York Avenue, N.W.
          Washington, D.C. 20005
          Tel: (202) 616-3842 (de Boer)
          Tel: (202) 203-9186 (Gurskis)
          Jamie.deBoer@usdoj.gov
          Emily.Gurskis@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**


I hereby certify that, on July 5, 2023, I served and filed the foregoing document with the Clerk of the Court via ECF.


By:     */s/ Jamie de Boer*