UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CR-80181

UNITED STATES OF AMERICA,

v.

MINAL KUMAR PATEL

    Defendant,

_____/

## DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

Pursuant to Fed. R. Crim. P. Rule 32(f)(2) and Southern District of Florida Local Administrative Order 95-02, and with leave of Court to file objections to the PSIR on August 11, 2023 (DE 524), Defendant Minal Kumar Patel respectfully makes the following objections and requests for clarification to his Presentence Investigation Report, and in support hereof states the following:

**Identifying Data**

    Race: Asian

**The Offense Conduct**

    **General Statement**: Mr. Patel is mindful of the jury's verdict in this case and has a deep respect for the Jury and our Court system. However, Mr. Patel maintains that he was deprived of effective assistance of counsel due to his trial attorneys' multiple personal and professional conflicts, which prevented him from presenting his good faith and advice of counsel defenses to the jury. Accordingly, though Mr. Patel cannot contest many of the averments contained within the PSIR based on the record created at trial, it is respectfully submitted that a failure to object to any particular paragraphs of the PSIR should not be deemed an admission.

**Genetic Tests**

**Paragraphs 17 & 18**: Mr. Patel respectfully requests that these paragraphs be clarified as follows:

Genetic testing can be performed for several reasons; including: 1) as a diagnostic tool, and 2) as a predictive tool for specific disease processes or conditions in those with a familial history.

<u>Diagnostic/Confirmatory Testing in Symptomatic Individuals</u>: This testing is done to rule out, identify, or confirm a suspected genetic disorder in an affected individual. Diagnostic testing may be performed to help determine the course of the disease or indicated treatment.

<u>Predictive Testing in Pre-Symptomatic Individuals</u>: Predictive testing is used to determine whether individuals who have a family history of a disease but no current symptoms have the gene or mutation associated with the disease. Predictive genetic testing includes pre-symptomatic testing and pre-dispositional testing. When a specific mutation is identified through pre-symptomatic testing, the patient will eventually develop symptoms of a disease (e.g., testing for Huntington's disease before symptoms are present). In pre-dispositional testing, eventual development of symptoms is likely but not certain when the gene mutation is present (e.g., breast cancer).

Mr. Patel further requests that the following information be added: At additional expense to LabSolutions, a database of all genetic test results was being created by LabSolutions in collaboration with Medneon such that as new genetic risk markers were identified by doctors and scientists, LabSolutions would notify patients of their additional genetic risk profiles. This database was to be maintained by LabSolutions at no extra cost to patients or insurers, though it cost approximately $200 per patient to run. It was Mr. Patel's hope that his extensive database would help to isolate additional problematic genetic markers and advance patient care and predictive screening.

Additionally, LabSolutions contracted with MolDX at additional cost to ensure that it employed proper lab equipment and processes, had employed qualified laboratory personnel and scientists, ran proper panels and used the appropriate billing codes.

**Paragraphs 22 & 57:** Mr. Patel objects to several allegations contained in these paragraphs.

First, Mr. Patel objects to the allegation that he oversaw LabSolutions or its employees. Evidence establishes that, while Mr. Patel owned LabSolutions, first Omar Aleem and then Nick Saliba oversaw the employees, contractors, and daily operations of Lab Solutions.

Further, Mr. Patel objects to the allegation that he was the "architect of the scheme." Mr. Patel added genetic testing to LabSolutions' other lab services at the suggestion of the Aleem brothers, who sought to partner in those operations. The Aleems set up and managed the testing at issue herein. The two Aleem brothers who were lawyers (Yussuf and Tareek) provided legal advice regarding the set up and operation of these lab services, including: LabSolutions' compliance policies and enforcement. The Aleems drafted and approved the contracts and installed their brother Omar as the manager within LabSolutions to oversee the entire operation. Later, Nick Saliba took over management of LabSolutions and continued to oversee compliance, employees, contractors, and day-to-day operations of the lab.

**Paragraph 25**: Mr. Patel clarifies that **LabSolutions** entered into marketing agreements with marketing companies that employed Sporn and other marketers. Mr. Patel objects to the allegation that Sporn sold beneficiary information, tests, and doctor's orders to **Patel**. By way of clarification, Sporn referred laboratory orders to LabSolutions and he was compensated by Marketing companies with whom LabSolutions contracted for marketing services.

**Paragraph 26:** Mr. Patel clarifies that Shawn Griner worked for a marketing company with whom LabSolutions had contracted. LabSolutions paid the marketing company in accordance with that contract. LabSolutions never paid Mr. Griner.

3

**Manner and Means:**

**Paragraphs 32 – 34**: Mr. Patel objects to the conclusion that he paid kickbacks and bribes to his alleged co-conspirators. Mr. Patel maintains that **LabSolutions** paid contractors per contracts negotiated and reviewed by lawyers, and that he believed that the referred Lab Orders were medically necessary, appropriate and properly signed by physicians.

**Paragraph 37**: Mr. Patel objects to the allegation that he **personally** made the referenced wire transfers. Such transfers were executed by employees of LabSolutions at the direction of Nick Saliba and pursuant to the compensation schedules outlined in the respective parties' contracts.

**Paragraphs 45-47**: Mr. Patel denies that he disregarded the medical necessity of Lab Orders and denies knowledge of the impropriety of the Telemedicine Services that were provided.

**Paragraph 54**: Mr. Patel respectfully requests that the PSIR note that the Government alleged that Mr. Patel received $21 million dollars from the conduct of which he was convicted. See **Exhibit A,** Government Ex. 126. However, in fact, Mr. Patel received far less than this amount from the alleged fraud conduct. The $21 million dollars alleged apparently includes *all* money received by Patel from LabSolutions as wages and profits, including earnings from its other legitimate laboratory services (standard blood tests, toxicology testing, women's health tests, and genetic testing conducted by brick-and-mortar practices outside of the scope of the conspiracy alleged).

**Role Assessment:**

**Paragraph 57**: Mr. Patel reiterates the information provided above regarding his role assessment.

**Offense Level Computation:**

**Paragraph 71:** Mr. Patel objects to the intended loss amount attributed to him of $463,889,078. First, intended loss no longer is a valid measure of loss in this Circuit, only actual loss is, as "loss" is not genuinely ambiguous thereby precluding deference to commentary. *United*

*States v. Dupree*, 57 F.4th 1269, 1274-75 (11th Cir. 2023) (en banc) (citing *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-15, 204 L. Ed. 2d 841 (2019)); *United States v. Alford*, No. 3:21cr052, 2022 U.S. Dist. LEXIS 149494, *10-11, 2022 WL 3577373 (N.D. Fla. Aug. 20, 2022) (declining to utilize intended loss because it "does not 'fall within the bounds of reasonable interpretation' for the term 'loss' in § 2B1.1(b)(1)"). The Third Circuit has similarly concluded that actual loss, and not intended loss, is the only driver of loss under USSG § 2B1.1. *United States v. Banks*, 55 F. 4th 256, 255-258 (3d. Cir. 2022).

Second, as noted in Paragraph 29, "[i]t was the purpose of the conspiracy" to pay bribes and kickbacks "in exchange for the referral of Medicare beneficiaries[] so that LabSolutions could bill Medicare for **genetic tests**" without regard for need or medical necessity. (Emphasis added). This is confirmed by the Government's press release regarding Mr. Patel's conviction: "Patel conspired with patient brokers, telemedicine companies, and call centers to target Medicare beneficiaries with telemarketing calls falsely stating that Medicare covered expensive **cancer genetic tests**." See **Exhibit B.** (Dept. of Justice, Press Release, *Lab Owner Convicted in $463 Million Genetic Testing Scheme to Defraud Medicare*, Dec. 14, 2022 (emphasis added), https://www.justice.gov/opa/pr/lab-owner-convicted-463-million-genetic-testing-scheme-defraud-medicare). The amount Medicare paid for CGx testing referred through patient brokers, call centers and Telemedicine doctors, therefore, is the limit of any loss amount attributable to Mr. Patel as it is the outer-bounds of what he may be held accountable for. See USSG §1B1.3, comment. (n.3(B)) (accountability under jointly undertaken criminal activity limited to "scope of the criminal activity the particular defendant agreed to jointly undertake (i.e., the scope of the *specific* conduct and objectives *embraced* by the defendant's agreement)") (emphasis added). Per Paragraph 57, Medicare and Medicare Advantage Plans paid no more than $128,163,945 for CGx testing. Accordingly, as the actual loss attributable to Mr. Patel is no greater than $150 million, the correct loss enhancement can be no greater than 24.

Finally, Mr. Patel objects to the enhancement for loss amount under 2B1.1 as the government has not met its burden, by a preponderance of the evidence, as to the amount of loss exclusively related to the referring physicians affiliated with the telemedicine companies and kickbacks. There were many physicians who referred to LabSolutions for genetic testing, who had established treatment relationships with patients and for whom there is no evidence that kickbacks were paid. These referrals do not fit with the government's theory of conspiracy, of which Mr. Patel was convicted, and should not be included in the loss calculation.

Mr. Patel also objects to the two-level mass marketing enhancement and the two-level sophisticated means enhancement. First, nowhere does the PSR cite any factual support for these enhancements. Second, simultaneous application of both enhancements necessarily is duplicative of each other, i.e., the enhancements encompass the same conduct and thus constitutes impermissible double-counting. *United States v. Whyte*, 928 F.3d 1317, 1338 (11th Cir. 2019) ("Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines.") (Citation and quotation marks omitted). Second, the significant enhancement for loss necessarily encompasses such conduct, i.e., an offender cannot commit an offense of this magnitude without engaging in mass marketing in a sophisticated manner. See Frank O. Bowman, III, *Damp Squib: The Disappointing Denouement of the Sentencing Commission's Economic Crime Project (and What They Should Do Now)*, 27 Fed. Sent. R. 270, 280 (2015) (arguing that the sophisticated means enhancement "is particularly useless in high loss cases because stealing really big sums inevitably involves methods the courts characterize as sophisticated means"). Finally, there was nothing "especially complex or especially intricate" about Mr. Patel's offense conduct. USSG §2B1.1, comment. (n.9(B)). The sophisticated means enhancement applies only where "the defendant's own intentional conduct" was especially complex or intricate. USSG, App. C., Amend. 792 (eff. Nov. 1, 2015). Mr. Patel's

intentional conduct here was not any more sophisticated than any of his co-conspirators or other defendants in similar cases.

Accordingly, the total base offense level should be no higher than 35.

Further, Mr. Patel also objects to the four-level enhancement for loss to a Government health care program pursuant to § 2B1.1(7)(A),(B)(iii). As noted in Amendment 749[1], this enhancement was the result of a Congressional directive in the Patient Protection Act. Because this Amendment was adopted due to a Congressional directive, and not as a result of the Commission's expertise and deliberation, the Court should disregard it by offsetting its application with a four-level variance. *See, e.g.*, *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) ("The crack cocaine Guidelines . . . present no occasion for elaborative discussion of this matter because **those Guidelines do not exemplify the Commission's exercise of its characteristic institutional role**. In formulating Guidelines ranges for crack cocaine offenses, as we earlier noted, the Commission looked to the mandatory minimum sentences set in the 1986 Act and did not take account of 'empirical data and national experience.'"). As with the crack guidelines, so too with this enhancement. It was the product of a Congressional directive, not of the Commission's exercise of its institutional role, and thus violates the principle of parsimony set forth at 18 USC 3553(a).

Additionally, in the context of a healthcare fraud case, such as this, in which loss exceeds $20,000,000, the four-level enhancement for Governmental loss in excess of $20,000,000 is also duplicative to the harm accounted for in the fraud-loss table. *Whyte*, at 1338.

**Paragraph 74:** The PSR bases the four-level role adjustment on Mr. Patel's healthcare fraud conduct. See PSR at 16, ¶ 57. However, as the primary sentencing guideline is USSG §2S1.1(a)(1), per paragraph 71 of the PSR, the role adjustment does not apply. See USSG §2S1.1, Comment n.2(C) ("in cases in which subsection [2S1.1](a)(1) applies, application of any Chapter

---

[1] See **Exhibit C**.

Three adjustment shall be determined based on the offense covered by this guideline (i.e., the laundering of criminally derived funds) and not on the underlying offense from which the laundered funds were derived").

**Paragraph 79:** Based on the above objections, Mr. Patel's Total Offense Level is no greater than 33. However, Mr. Patel requests that the PSR note that he is eligible for the pending amendment to the Guidelines that creates a new, two-level downward adjustment for zero-point offenders at USSG §4C1.1. See U.S. Sentencing Comm'n, *Amendments to U.S. Sentencing Guidelines* at 87, Apr. 27, 2023, (https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf). District courts may take into consideration pending amendments to the Guidelines. *United States v. Miranda-Garcia*, 417 Fed. Appx. 895, 897 (11th Cir. 2011) (variance based on pending amendments to the U.S. Sentencing Guidelines is discretionary); *United States v. Ruiz-Apolonio*, 657 F.3d 907, 917 (9th Cir. 2011) ("A sentencing court, of course, has the discretion to grant a variance from the Guidelines after promulgation but before adoption of a proposed amendment."); *United States v. McMillan*, 863 F.3d 1053, 1058 (8th Cir. 2017) ("Although district courts are required to apply the guidelines in effect on the date of sentencing, they may consider pending amendments to the guidelines."); *United States v. Lua-Guizar*, 656 F.3d 563, 567 (7th Cir. 2011) (holding that sentencing court could have considered the pending amendment); *United States v. Frierson*, 308 Fed. Appx. 298, 302-3 (10th Cir. 2007) (defendant given downward departure of 15 months in light of pending amendment to Guidelines). While that amendment does not take effect until November 1, 2023, the U.S. Sentencing Commission may vote on August 24, 2023 to make the amendment retroactive. See U.S. Sentencing Comm'n, *Public Meeting – August 24, 2023*, https://www.ussc.gov/policymaking/meetings-hearings/public-meeting-august-24-2023).

**As Mr. Patel is a zero-point offender, PSR at 24, ¶ 88, and otherwise meets all the criteria for the new adjustment, his Total Offense Level ultimately is no greater than 31.**

Should the ultimate Total Offense Level be determined to be 43, this two-point reduction would still apply, making the Total Offense Level a 41.

The tables below summarize and compare the Guidelines calculation as set forth in the current iteration of the PSR, and Mr. Patel's calculation.[2]

| PSR | | | PATEL | | |
|---|---|---|---|---|---|
| Guideline | Description | Off. Level | Guideline | Description | Off. Level |
| 2S1.1(a)(1) | Cross-Reference to Underlying Offense (2B1.1) | | 2S1.1(a)(1) | Cross-Reference to Underlying Offense (2B1.1) | |
| 2B1.1(a)(1) | BOL | 7 | 2B1.1(a)(1) | BOL | 7 |
| 2B1.1(b)(1)(O) | Loss $250-$550 Million | 28 | 2B1.1(b)(1)(O) | Loss $65-$150 Million | 24 |
| 2B1.1(b)(7)(A),(B)(iii) | More than $20 Million Loss to Gov't Healthcare Program | 4 | 2B1.1(b)(7)(A),(B)(iii) | More than $20 Million Loss to Gov't Healthcare Program | 0 |
| 2B1.1(b)(2)(A)(ii) | Mass-marketing | 2 | 2B1.1(b)(2)(A)(ii) | Mass-marketing | 0 |
| 2B1.1(b)(10)(C) | Sophisticated means | 2 | 2B1.1(b)(10)(C) | Sophisticated means | 0 |
| *Subtotal* | | 43 | *Subtotal* | | 31 |
| 2S1.1(b)(2)(B) | 1956(h) violation | 2 | 2S1.1(b)(2)(B) | 1956(h) violation | 2 |
| 3B1.1(a) | Role | 4 | 3B1.1(a) | Role | 0 |
| 4C1.1 | Zero Point Offender | 0 | 4C1.1 | Zero Point Offender | -2 |
| *Adjusted Offense Level* | | 49 | *Adjusted Offense Level* | | 31 |
| Ch. 5, Pt. A (comment. n.2) | Total Offense Level | 43 | | Total Offense Level | 31 |

**Paragraph 122:** Mr. Patel objects to the conclusion that he defrauded CMS in the amount of $463,889,078, for the reasons set forth in ¶71-79 above.

---

[2] As indicated *supra* at Fn 1, Mr. Patel objects to any enhancement under 2B1.1 and reserves the right to challenge the application of this enhancement at sentencing.

## PART C. OFFENDER CHARACTERISTICS

### Physical Condition

**Paragraph 104**: Mr. Patel respectfully requests that this paragraph be amended to include that he continues to experience severe physical pain and has been advised to undergo further surgery. Additionally, Mr. Patel has not received adequate pain relief medications while housed at the FDC, nor has he been given access to needed physical therapy or medical/surgical services. He respectfully requests medical treatment (including surgical intervention as recommended by his treating physicians) and physical therapy to address his spinal condition and horrific chronic pain.

**Paragraph 108**: Mr. Patel seeks to clarify that he is not at present taking any medication because the FDC has not provided his prescribed medication. Prior to being incarcerated he received physical therapy and was prescribed pain medication, as reflected in his medical records.

### Mental and Emotional

**Paragraph 109**: Mr. Patel has suffered from insomnia, anxiety and severe depression necessitating the prescription of Ambien, Xanax and mirtazapine. His severe physical pain continues to affect him psychologically and physiologically, and it is respectfully submitted that a psychological evaluation and mental health treatment is indicated, along with drug treatment.

### Substance Abuse

**Paragraphs 111, 112 and 113:** Mr. Patel clarifies that he ceased using pot and/or any other illegal drugs once he was Indicted herein. Prior to his Indictment herein, Mr. Patel used marijuana, cocaine and MDA to assist him with his chronic pain and the ensuing. Mr. Patel recognizes that he would benefit from drug treatment to teach him better coping mechanisms and respectfully requests a recommendation for RDAP and other treatment programs to assist him.

## PART D: SENTENCING OPTIONS

### Restitution

**Paragraph 144:** Mr. Patel objects to the allegation that he owes $187,369,693 in restitution to the Centers for Medicare and Medicaid Services (CMS). As described more fully, *infra* at Footnote 1, the government has not met its burden of proving the loss amount attributable to the offense of conviction.

**PART E: FACTORS THAT MAY WARRANT DEPARTURE AND/OR VARIANCE**

Mr. Patel requests that the PSR note in this section that "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." USSG §2B1.1, comment. (n.21(C)). This is especially the case here inasmuch as there is only a single, non-natural person victim of the offense conduct: the Centers for Medicare and Medicaid Services. PSR at 18, ¶ 65.

Mr. Patel also requests that the PSR indicate the following output for two sentencing scenarios, attached as **Exhibits C and D**, which are derived from the Judicial Sentencing Information portal (JSIN), available at https://jsin.ussc.gov/. "The Judiciary Sentencing Information (JSIN) platform is an online sentencing data resource specifically developed with the needs of judges in mind. The platform provides quick and easy online access to sentencing data for similarly situated defendants." U.S. Sentencing Comm'n, *Judiciary Sentencing Information*, (https://www.ussc.gov/guidelines/judiciary-sentencing-information).

Currently, the Federal Judicial Center is conducting a two-year study of JSIN in at least 31 districts including several within the Eleventh Circuit. See U.S. Courts, *Judiciary Studies Use of Online Tool in Presentence Reports*, updated Apr. 28, 2023, (https://www.uscourts.gov/news/2023/01/25/judiciary-studies-use-online-tool-presentence-reports).

The scenarios utilize 2B1.1 as the operative Guideline instead of 2S1.1. First, the Guideline calculations are driven by the cross-reference to 2B1.1, so referring to the 2B1.1 sentencing data is far more indicative of the sentences imposed on those similarly situated to Mr.

Patel. Second, the 2S1.1 data often involve wholly distinct cases. For example, many cases sentenced under 2S1.1 were cross-referenced from the drug distribution Guideline at 2D1.1 rather than 2B1.1. Furthermore, a significant proportion of those sentenced under 2S1.1 received mandatory minimums—sometimes as high as life. As Mr. Patel is not facing any mandatory minimum penalty, reference to such cases is extremely misleading.

### *SCENARIO 1: 2B1.1, TOL 43, CHC I with "Include Sentence Length Data" selected.*

During the last five fiscal years (FY2018-2022), there were 29 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 43 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 29 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 195 month(s) and the median length of imprisonment imposed was 156 month(s). Additionally, per JSIN, only 16% of these offenders received a "Within Range" sentence, and 77% received a "Downward Departure or Variance."

The following chart illustrates the distribution of these 29 sentences by select ranges as reported in the pertinent U.S. Sentencing Commission's datafiles. As illustrated, a single individual received a sentence of a year-and-a-day or less (12.03 months). Four individuals received a sentence greater than a year-and-a-day, but not greater than 60 months. A plurality (8) received a sentence greater than 120 months, but not greater than 180 months. See **Exhibit C attached.**

### *SCENARIO 2: 2B1.1, TOL 31, CHC I with "Include Sentence Length Data" selected.*

During the last five fiscal years (FY2018-2022), there were 89 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 31 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 89 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 85 month(s) and the median length of imprisonment imposed was

87 month(s).  Additionally, per JSIN, only 25% of these offenders received a "Within Range" sentence, and 48% received a "Downward Departure or Variance."

The following chart illustrates the distribution of these 89 sentences by select ranges as reported in the pertinent U.S. Sentencing Commission's datafiles. As illustrated, four individuals received a sentence of a year-and-a-day or less (12.03 months).  Twenty-six individuals received a sentence greater than a year-and-a-day, but not greater than 60 months.  A plurality (47) received a sentence greater than 60 months, but not greater than 120 months. See **Exhibit D** attached.

## CONCLUSION

Defendant Patel respectfully requests that the Presentence Investigation Report be adjusted to incorporate the above-referenced objections and averments.

Dated: August 11, 2023

Respectfully submitted,

**PIETRAGALLO GORDON ALFANO BOSICK & RASPANTI, LLP**

**Tama Beth Kudman, Esq.**
**Kevin E. Raphael, Esq.**
7108 Fairway Drive, Suite 130
Palm Beach Gardens, Florida 33418
Tel: (561) 472-0811; Facsimile: (561) 828-0210
tbk@pietragallo.com
ker@pietragallo.com

By: /s/ Tama Kudman
     Florida Bar No. 637432

*Attorneys for Defendant Minal Patel*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the forgoing was filed electronically via CM/ECF and furnished electronically to all counsel of record on August 11, 2023.

By: /s/ Tama Kudman