UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CR-80181-RAR

UNITED STATES OF AMERICA

vs.

MINAL PATEL, a/k/a "Minalkumar Patel,"

    Defendant.
_____/

## ORDER DENYING MOTION FOR NEW TRIAL

**THIS CAUSE** comes before the Court upon Defendant Minal Kumar Patel's Motion for New Trial Pursuant to Fed. R. Crim. P. 33(a) ("Motion"), [ECF No. 506]. The Court having carefully reviewed the Motion, the Government's Response in Opposition ("Response"), [ECF No. 517], Defendant's Reply in Support, [ECF No. 521], the record, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion is **DENIED** as set forth herein.

## BACKGROUND

On September 24, 2019 a grand jury returned an indictment against Defendant Minal Patel. *See* Indictment, [ECF No. 1]. The operative Superseding Indictment, [ECF No. 275], was issued on September 8, 2022. Defendant was charged with one count of conspiracy to commit health care fraud and wire fraud (Count 1); three counts of health care fraud (Counts 2–4); one count of conspiracy to defraud the United States and to pay and receive health care kickbacks (Count 5); three counts of payment of kickbacks in connection with a federal health care program (Count 6–9); and one count of conspiracy to commit money laundering (Count 10). Superseding Indictment, [ECF No. 275]. Following a jury trial, Defendant was found guilty of all counts. *See* Verdict Form, [ECF No. 393]. Defendant, relying on a variety of ethical rules governing lawyers

in Florida, as well as the Sixth Amendment, now moves for a new trial based on alleged conflicts he claims affected the presentation of his defense at trial. He also claims the Government committed a *Brady* violation. The Court discusses each ground below.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 33(a) allows a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). "Motions for a new trial are highly disfavored and should be granted with great caution." *United States v. Muzio*, 663 F. App'x 845, 849 (11th Cir. 2016). The interest of justice standard is "broad" and affords a district court with great discretion to determine whether to grant a new trial. *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994). "An evidentiary hearing on a Rule 33 motion is not required where 'the record contained all the evidence needed to dispose of each of the grounds asserted as a basis for a new trial.'" *Muzio*, 663 F. App'x at 849 (quoting *United States v. Scrushy*, 721 F.3d 1288, 1305 n.30 (11th Cir. 2013)).[1]

## ANALYSIS

Defendant's Motion relies heavily on purported conflicts of interest he argues affected trial counsels' performance. The Sixth Amendment protects the right to have the "Assistance of Counsel." U.S. CONST. amend. VI. "The right to effective assistance of counsel encompasses the right to representation free from actual conflict with defense counsel." *Buenoano v. Singletary*, 74 F.3d 1078, 1086 (11th Cir. 1996). When a defendant does not raise an objection at trial, he "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). A conflict must be "actual, not merely hypothetical or speculative." *McConico v. Alabama*, 919 F.2d 1543, 1546 (11th Cir. 1990). The "mere

---

[1] Because the Court finds the record contains all the evidence necessary to dispose of each ground in the Motion, Defendant's request for a hearing on the Motion is **DENIED**.

possibility of [a] conflict of interest does not rise to the level of a Sixth Amendment violation." *Buenoano*, 74 F.3d at 1086. Defendants in this circuit must "point to specific instances in the record to suggest an actual conflict or impairment of their interests." *Smith v. White*, 815 F.2d 1401, 1404 (11th Cir. 1987) (citation omitted). A defendant must therefore "make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence that favors an interest in competition with that of the defendant." *Ferrell v. Hall*, 640 F.3d 1199, 1244 (11th Cir. 2011) (quoting *Buenoano*, 74 F.3d at 1086 n.6). Where an attorney "did not make such a choice, the conflict remain[s] hypothetical." *Buenoano*, 74 F.3d at 1086 n.6 (quoting *Smith*, 815 F.2d at 1404).

### I. Purported Conflicts of Interest

#### a. Nick Saliba

Defendant first points to a possible conflict of interest relating to one of his trial counsel, Donald Samuel. Samuel appears to have represented Defendant and Nick Saliba, the CEO of Defendant's company, LabSolutions, for much of the period leading up to trial. Mot. at 6–7, 19–20. Defendant argues that while Saliba was "central" to possible good faith and reliance on advice of counsel defenses, Samuel did not pursue any argument highlighting Saliba's involvement in the charged conduct because of Samuel's conflicting loyalties. *Id.* Steven Sadow, the head of Defendant's defense team, allegedly planned to "present th[is] defense through Saliba in Patel's case-in-chief and by cross-examining government witnesses about Saliba's role at Lab Solutions." Mot. at 7. Defendant claims Samuel's conflict was never discussed among defense counsel nor with Saliba and Defendant. *Id.* Citing no evidence, Defendant claims Samuel has now admitted "he never intended to permit Saliba to testify." *Id.* Defendant also alleges any conflict with

Samuel was deepened when Robyn Sztyndor, another one of Defendant's lawyers, recorded Saliba without his permission. Mot. at 8–9.

Defendant has failed to establish his counsel labored under an actual conflict of interest here. He cites little to no evidence for several of his key assertions, including that Saliba would have offered favorable testimony and Samuel prevented him from testifying. *See* Mot. at 6–7. Therefore, the Court is left only to speculate that the failure to utilize Saliba in Defendant's case-in-chief was "because [a conflict] had an adverse effect on counsel's performance." *United States v. Williams*, 902 F.3d 1328, 1333 (11th Cir. 2018). This dearth of evidence is exacerbated by the fact the Government asserts—and Defendant does not appear to dispute—that Samuel withdrew from representing Saliba prior to Defendant's trial.[2] Resp. at 12. On this record, Defendant has not carried his burden of demonstrating his counsel failed to follow a possible course of action because of an alleged conflict. *See McConico*, 919 F.2d at 1546. And, as discussed below, there is more than enough evidence that defense counsel vigorously presented evidence about Saliba's involvement with LabSolutions.[3]

Defendant then attempts to impute a conflict onto Sadow by claiming he "involved himself in Saliba's representation," and "[t]here exist numerous communications between Sadow and Saliba, and emails between Sadow, Samuel[,] and Saliba discussing Saliba's case." Mot. at 8. He also lists multiple witnesses he claims should have been called who would indicate Saliba ran

---

[2] In the Motion, Defendant claims that "Samuel never withdrew from representing Patel or Saliba." Mot. at 9. In response, the Government asserts Samuel did in fact withdraw from representing Saliba. Resp. at 12. In his Reply, Defendant appears to concede this point in a footnote by saying "Samuel's ethical and legal obligations to Saliba never ceased." Reply at 7 n.5.

[3] To salvage his argument relating to Samuel, Defendant states "he did not want to be represented by Samuel because Samuel appeared to not be working diligently on Patel's defense and was[] 'causing harm'" but "Sadow refused to remove Samuel." Mot. at 7. The Court is unmoved by this assertion because it misrepresents the single piece of evidence cited in support of this proposition. The communication merely shows an exchange in which Defendant initially desired to remove Samuel from the defense team but was advised by Sadow to make a final decision at another time. This run of the mill exchange is not improper.

LabSolutions and was responsible for its compliance with the law. *Id.* There is no evidence cited to support these assertions other than a single text message that in no way indicates Sadow was representing Saliba such that a conflict of interest would arise. And, though unclear, Defendant seems to have been a party to this communication, so any implication he was unaware of the conduct reflected in this message appears to be rebutted by his own evidence. Defendant admits this when he concedes he "was aware of Samuel's representation of Saliba, and Sadow's communications with Saliba." Mot. at 20. But in the absence of any evidence Sadow was laboring under any division of interests, the Court cannot conclude this conduct calls the veracity of the verdict into question.

Equally speculative is the prospect Sztyndor's recording of Saliba created a conflict. Defendant maintains this recording placed his counsel in a "fatally conflicted position" wherein "they possessed a highly beneficial piece of evidence should Saliba decide to cooperate against Patel." Mot. at 9. This concern is entirely hypothetical because it is undisputed Saliba did not cooperate with the Government and did not testify at trial. Resp. at 12. So, even assuming there was any potential conflict of interest here, it did not "ripen[] into an 'actual conflict'" that would have the potential to affect trial counsels' performance. *Williams*, 902 F.3d at 1333.

Further, any assertion that Saliba's role at LabSolutions was not discussed by defense counsel at trial is contrary to the record, confirming to the Court that counsels' performance was unaffected by an alleged conflict. Defense counsel, including Samuel, noted Saliba's role at LabSolutions multiple times. When one witness incorrectly identified Saliba's role in the company, Samuel followed up by saying, "Can I give you another choice? . . . . CEO." Trial Tr. vol. 4, [ECF No. 441], at 199:9–11. Samuel reemphasized Saliba's position the next day. Trial Tr. vol. 5, [ECF No. 442], at 161:21–22 ("Mr. Saliba is the CEO of the company, right – was the CEO of the company, right?"). Samuel asked this question just before confirming the witness's

belief that Defendant "ran the day-to-day operations" at LabSolutions was based only on the fact the witness was "informed by [the witness's] direct supervisor that he was the owner." *Id.* at 162:1–163:7.

Relatedly, the Motion erroneously asserts one Government witness, Marc Sporn, was not confronted with a previous inconsistent statement in which he supposedly indicated Saliba made the decisions at LabSolutions. Mot. at 9–10. This is blatantly contradicted by the record. *See* Trial Tr. vol. 6, [ECF No. 443], at 173:18–19 ("[D]idn't you tell [the Government], point blank, that Patel owns LabSolutions, but Saliba made the decisions?"); *id.* at 174:3–4 ("Didn't you tell [the Government] Patel owned LabSolutions, but Saliba made the decisions?"). Sadow proceeded to cross examine Sporn about his claim that this statement was misrepresented in the report in which it appears. *Id.* at 174:5–16. Later, Sadow highlighted the fact Sporn sent information about "what was being accepted and reimbursed by Medicare" to Saliba rather than Defendant. *Id.* at 197:12–198:6. And this questioning aligned with Sadow's assertion in his opening statement, where he stated Sporn initially claimed Defendant "owned LabSolutions, but a gentleman named Nick Saliba . . . made all the decisions." Trial Tr. vol. 2, [ECF No. 439], at 49:17–20.

In the face of these references, Defendant would be hard pressed—and has failed—to demonstrate his trial counsel operated under a conflict of interest in Saliba's favor. And to the extent the Motion evidences a desire that counsel should have pursued specific lines of questioning or called certain witnesses, these are the sorts of strategic decisions counsel are trusted to make. *Cf. Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004) ("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." (quoting *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995))); *Dingle v. Sec'y for Dep't of Corrs.*, 480 F.3d 1092, 1099 (11th Cir. 2007) (describing counsel's choice not to present expert testimony as a "tactical decision").

Finally, even assuming Samuel was operating under a conflict of interest, the Court has already explained why Sadow was not. And Defendant makes no allegation Brian Rafferty, another lawyer who represented him at trial, was operating under a conflict of interest. This is crucial, because "[t]he Sixth Amendment does not 'include the right to receive good advice from every lawyer a criminal defendant consults about his case.'" *Ochoa v. United States*, 45 F.4th 1293, 1299 (11th Cir. 2022) (quoting *Clark v. Chappell*, 936 F.3d 944, 968–69 (9th Cir. 2019)). A defendant cannot merely allege "a particular conflicted attorney failed to pursue a strategy; *the defendant* must have lost the opportunity to pursue it." *Id.* The likelihood that a Sixth Amendment violation has occurred is diminished "if the defendant also receives the assistance of conflict-free counsel." *Id.*

Here, Defendant had the benefit of being represented by multiple conflict-free attorneys even if Samuel was subject to anything more than a speculative conflict. He therefore suffered no Sixth Amendment violation relating to Saliba.[4]

### b. Satary

Next, Defendant relies on a potential conflict involving Sadow's former representation of Khalid Satary. Satary operated laboratories similar to LabSolutions, but Defendant maintains Satary's laboratories were known for being noncompliant with the law. Mot. at 10–11. Because of this, Defendant hoped to contrast LabSolutions with Satary's labs as part of his defense and claims there are several witnesses who favorably compared LabSolutions with Satary's labs. Mot. at 10. Defendant asserts Sadow previously represented Satary in criminal cases and wished to

---

[4] Defendant also takes issue with the fact the Government knew of this potential conflict but never informed the Court about it. Mot. at 7. But the Government raised this issue with Samuel once a potential conflict arose, and Defendant does not dispute Samuel then withdrew from representing Saliba. Resp. at 12. The Court finds no error in the Government not raising this issue with the Court after the potential for a conflict disappeared.

concurrently represent Defendant and Satary. *Id.* As a result, Sadow asked Defendant to execute a conflict waiver in early 2022. *Id.* Defendant refused to do so and, though he prohibited members of his defense team from representing Satary, he later allowed another lawyer, Scott Grubman, to represent Satary. *Id.* Then, seemingly without Defendant's knowledge, one of Samuel's law partners, Amanda R. Clark-Palmer, entered an appearance in Satary's case. *Id.* Clark-Palmer allegedly performed work on this case without entering an appearance. *Id.*

The only effect of these conflicts Defendant identifies is the fact his counsel did not ultimately elicit the comparison against Satary's laboratories. But to establish adverse effect, Defendant "must show: (1) the existence of a plausible alternative defense strategy or tactic that might have been pursued; (2) that the alternative strategy or tactic was reasonable under the facts; and (3) a link between the actual conflict and the decision to forgo the alternative strategy of defense." *Tuomi v. Sec'y, Fla. Dep't of Corrs.*, 980 F.3d 787, 796 (11th Cir. 2020) (quoting *Pegg v. United States*, 253 F.3d 1274, 1278 (11th Cir. 2001)). Defendant's desired comparison was not a tactic that could have been pursued. The fact certain witnesses perceived LabSolutions to be more compliant with the law than Satary's laboratories is wholly irrelevant and would have been inadmissible. *See* FED. R. EVID. 401 (standard for relevancy); FED. R. EVID. 402 ("Irrelevant evidence is not admissible."). And to the extent Defendant maintains witness Brett Hirsch previously "stated that Patel followed specific laws regarding billing and payment," Defendant fails to connect how any alleged conflict would relate to this testimony. Mot. at 11. Ultimately, the Court is skeptical there was any conflict relating to Satary—but assuming there was one, it did not prevent counsel from pursuing a viable defense strategy.[5]

---

[5] The Court also notes that while Defendant claims Sadow "never discussed this conflict or its potential impact" with Defendant, that is contradicted by the assertion he was asked to execute a conflict waiver and appreciated the effect of a potential conflict enough to refuse. Mot. at 10.

Page **8** of **18**

### c. The Aleems

The next alleged conflict relates to Yussuf, Tarek, and Omar Aleem (the "Aleems"), three brothers Defendant claims helped found LabSolutions and were partial owners of the company for a time. Mot. at 11–12. Yussuf and Tarek Aleem are attorneys in Georgia who "prepared all of LabSolutions' initial legal documents, including its Operating Agreement and contracts used with LabSolutions' marketers" and served as outside counsel to LabSolutions until approximately December 2016. *Id.* Omar Aleem is a genetic scientist who allegedly served as "LabSolutions' Chief Scientific Officer responsible for initially establishing [] LabSolutions' operating procedures and overseeing the laboratory operations" and "founded LabSolutions' genetic testing." *Id.* Defendant now says he wished to present information about the Aleems as part of his advice of counsel and good faith defenses. Mot. at 12.

After the Aleems' employment relationship with LabSolutions ended, they sued Defendant and LabSolutions (the "Aleem-Patel lawsuit"). *Id.* In that lawsuit, a Georgia state court ruled that Schulten, Ward, Turner & Weiss, LLP ("SWTW")—a law firm for which Sadow serves as Special Counsel for White Collar and High Profile Defense—was conflicted in its representation of LabSolutions and Patel against the Aleems. *See* Mot. Ex. S. This disqualification arose because a lawyer at SWTW, Kevin Ward, previously engaged in a phone consultation with Tarek Aleem that potentially resulted in him receiving confidential information relevant to the Aleem-Patel lawsuit. *See id.*

Defendant claims the Aleem-Patel lawsuit generated two conflicts relevant here. First, he argues Sadow should have elicited testimony relating to the Aleems but did not do so because of SWTW's disqualification in the Aleem-Patel lawsuit. Mot. at 13. To support this point, an investigator working for Defendant attests Sadow stated he did not want the Aleems mentioned at trial. *See id.* Sadow also allegedly did not obtain a conflict waiver from Defendant nor told

Defendant he would not discuss the Aleems at trial. *Id.* Assuming these assertions are true and SWTW's conflict in the Aleem-Patel lawsuit may be imputed on Sadow, Defendant has failed to demonstrate Sadow operated under an actual conflict. Because Sadow seemingly had no connection with the Aleems when he began representing Defendant in this matter, this case presents—at most—a successive representation. This is a "significant factor," because "generally, it is more difficult to prove that successive representation caused an actual conflict of interest than that simultaneous representation did so." *Smith*, 815 F.2d at 1405.

Such is the case here: Defendant has failed to establish anything more than a speculative conflict of interest. Defendant claims there were "multiple witnesses" who were "well-versed on the Aleems' involvement" with LabSolutions, yet he only names Senthil Ramamurthy. But when the Aleems were mentioned at trial, the relevant witnesses seemed far from well-versed in their involvement. Ramamurthy testified he "believe[d]" Yussuf Aleem was a lawyer and that he "never met" him. Trial Tr. vol. 4 at 66:16–21, 117:11. Hirsch testified only that the Aleem brothers "were involved [with LabSolutions] at the beginning, and they just disappeared" and that he did not know their last name. *See* Trial Tr. vol. 8, [ECF No. 445], at 92:19–22.[6] Defendant has not carried his burden of demonstrating these or other witnesses possessed information his counsel failed to elicit.

As to the second conflict, Defendant claims Sadow brokered settlements in the Aleem-Patel lawsuit and another lawsuit, which resulted in a portion of his legal fees being paid with LabSolutions funds Defendant claims were subject to forfeiture. Mot. at 12–13. Defendant asserts Sadow avoided mentioning the Aleems at trial to prevent this coming to light. But Defendant cites no evidence to support the proposition Sadow was concerned about this, nor has he explained how

---

[6] In fact, Hirsch's knowledge of the Aleems is called even further into question by the fact he stated Omar had a "brother [who] was a lawyer," implying he was completely unaware of the third Aleem brother. Trial Tr. vol. 8 at 92:20.

any of this would have been raised at trial. So, even accepting any of it as true, this is yet another speculative conflict.

Notably, Defendant did not present any advice of counsel defense at trial. But the Superseding Indictment alleges Defendant's illegal conduct began in July 2016, *see* Superseding Indictment at 8, and the Aleems ceased working with Defendant that same year. The charged conduct, however, continued until August 2019. *Id.* Defendant did not call any counsel that represented him for the nearly three years during which his conduct continued following the Aleems' departure from LabSolutions. Given Defendant did not put on this defense at all, it is nothing but rank speculation his counsel did not pursue a mere sliver of this defense because of a speculative conflict. And Defendant was represented by multiple lawyers with no relation to the Aleems. This includes Samuel, who Defendant claims was in charge of his advice of counsel defense. Defendant therefore did not lose the opportunity to pursue any defense related to the Aleems and suffered no Sixth Amendment violation.[7] *Ochoa*, 45 F.4th at 1299.

### d. Other Recordings & Sztyndor Testimony

Defendant next represents that Sztyndor recorded several other people, including Chris White, who was a potential Government witness. Mot. at 3–5. This recording of White was raised with the Court before trial, and the Court ruled any such recording would only be admissible as impeachment evidence. *See* Hr'g Tr., [ECF No. 414], at 36:1–10 *see also* Paperless Order, [ECF No. 347] (holding the recording transcript could be used pursuant to Federal Rule of Evidence 806). Ultimately, White did not testify at trial nor were any co-conspirator statements admitted.

---

[7] Defendant also notes the Government seemingly produced attorney-client privileged material between the Aleems and their counsel. Mot. at 13–14. Without discussing the content of these documents, other than stating they supported his advice of counsel defense, Defendant faults his counsel for not using this material at trial. Just as with his general objection to the failure to bring up the Aleems at trial, there is nothing to indicate Sadow did not use this material because of any alleged conflict.

Nonetheless, Defendant argues his counsel did not use any of the recordings at trial because of a concern their existence would come to light and counsel would face ethical or legal consequences. Mot. at 5.

This argument fails. Defendant has not established any of these recordings were favorable to him and only states they "would have been beneficial to [his] defense." *Id.* More crucially, Defendant has not demonstrated these recordings would be anything other than inadmissible hearsay or impeachment evidence. Of the many recordings Defendant cites, only one appears to involve a witness who testified at trial. *See* Mot. Ex. E. Because Defendant has not established these recordings could be used at trial, he has not shown "the existence of a plausible alternative defense strategy or tactic that might have been pursued" related to these recordings. *Tuomi*, 980 F.3d at 796. And the same counsel Defendant claims shied away from using the recordings made the existence of the White recording known and vehemently argued Defendant should be able to use it at trial, so the claim that counsel fearfully suppressed any favorable evidence is unsupported. *See generally* Hr'g Trs., [ECF Nos. 413–14]. It is thus purely speculative that defense counsel operated under any form of conflict here, and, even accepting the remote possibility a conflict existed, Defendant has not established a viable strategy that defense counsel did not pursue.[8]

Finally, Defendant condemns his counsel for not calling Sztyndor to testify at trial as a healthcare law expert and to authenticate the recordings. Mot. at 6. But Defendant states his counsel attempted to secure Sztyndor's appearance at trial and, to avoid having to appear, Sztyndor allegedly threatened to testify that Defendant's billing of CGX tests was illegal. *See id.* "The decision as to which witnesses to call is an aspect of trial tactics that is normally entrusted to

---

[8] Defendant also appears to argue it was improper for his counsel to preemptively move to secure the admissibility of the White recording rather than ambush White with it at trial. Mot. at 3–4. The idea it was error to preemptively ensure the recording's admissibility has no merit, but it is also clear there is no viable argument this was related to a purported conflict.

counsel." *Blanco v. Singletary*, 943 F.2d 1477, 1495 (11th Cir. 1991). Complaints that trial counsel failed to call a particular witness are usually disfavored because "allegations of what a witness would have testified are largely speculative." *Jones v. McNeil*, No. 07–22367, 2009 WL 1758740, at *6 (S.D. Fla. June 22, 2009). The assertion it was somehow erroneous to refrain from calling a witness that was avoiding appearing entirely, allegedly left the country, and threatened to testify against Defendant strains credulity. And to the extent Sztyndor would have authenticated the recordings, Defendant was not prejudiced because, as explained, they merely related to impeachment evidence and almost none of the recorded individuals testified at Defendant's trial. *Cf. United States v. Brown*, 423 F. App'x 889, 890 (11th Cir. 2011) (noting that when a motion for new trial rests on newly discovered evidence the new evidence cannot be "merely cumulative or impeaching" (citation omitted)).

## II.  *Garcia* Hearings & Other Conflict Waivers

Courts facing a potential conflict of interest "should conduct an inquiry, akin to the plea colloquy under Rule 11, to determine whether the defendant wishes to waive the conflict." *United States v. Saint Surin*, 477 F. App'x 683, 686 (11th Cir. 2012). Waiver of a conflict must be voluntary, as well as a "knowing, intelligent act[] done with sufficient awareness of the relevant circumstances and likely consequences." *United States v. Garcia*, 517 F.2d 272, 276 (5th Cir. 1975), *abrogated on other grounds by Flanagan v. United States*, 465 U.S. 259 (1984) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). Here, Defendant argues he did not validly waive conflicts before the Court. Mot. at 24. He argues the Court should have required him to receive advice from counsel who was not on his trial team before waiving any conflicts. Mot. at 24–25.

Defendant points to no authority requiring the Court direct him to consult with independent counsel prior to waiving a conflict. But as explained above, any conflict identified at this stage is,

Page 13 of 18

at most, speculative and therefore the Court cannot conclude any counsel was laboring under a conflict that would have disqualified them from advising Defendant at these hearings. And a careful review of the transcripts of the relevant hearings establishes that Defendant entered waivers at each hearing knowingly, voluntarily, and intelligently before this Court and Magistrate Judge Reinhart. For example, Magistrate Judge Reinhart extensively demonstrated the risks of proceeding with Sadow's representation of Defendant and confirmed Defendant had an opportunity to confer with his other attorneys about this potential conflict. *See, e.g.*, Hr'g Tr., [ECF No. 327], at 49:14–51:25, 54:22–57:8. In sum, there was no error during any of these proceedings warranting a new trial.

### III. Right to Autonomy

Defendant also argues his Sixth Amendment right to autonomy was violated when his trial counsel decided not to pursue his preferred good faith and advice of counsel defenses. Mot. at 26–28. This argument is without any merit. It is true "the Sixth Amendment, in 'granting to the accused personally the right to make his defense,' 'speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant.'" *McCoy v. Louisiana*, 138 S. Ct. 1500, 1508 (2018) (alteration accepted) (quoting *Faretta v. California*, 422 U.S. 806, 819–20 (1975)). Therefore, a defendant maintains control over "[s]ome decisions," such as "whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." *Id.* But counsel still "mak[e] decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'" *Id.* (quoting *Gonzalez v. United States*, 553 U.S. 242, 248 (2008)). The decision as to what specific defense to pursue at trial is obviously the type of strategic decision within counsel's domain to make. Therefore, Defendant suffered no constitutional violation when his counsel determined not to advance good faith and advice of counsel defenses in light of the evidence presented.

### IV. *Brady* Violation

Defendant attempts to argue he suffered a *Brady* violation when the Government allegedly failed to produce documents relating to Vollarotelemed-LifeMD ("Vollaro"). Mot. at 14. A defendant attempting to establish a *Brady* violation must prove (1) the government possessed favorable evidence; (2) the defendant did not possess the evidence and could not obtain the evidence with reasonable diligence; (3) the government suppressed the evidence; and (4) there is a reasonable probability the outcome of the trial would have been different had the evidence been disclosed. *United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001).

First, Defendant has not established the Government possessed the relevant information. Courts have held the Government in a criminal trial only possesses information within the control of "a district's prosecution team, which includes both investigative and prosecutorial personnel." *Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002) (quoting *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989)). The "prosecution team" includes "the prosecutor or anyone over whom he has authority." *Id.* (quoting *Meros*, 866 F.2d at 1309). Prosecutors do not have a "duty to undertake a fishing expedition in other jurisdictions in an effort to find potentially impeaching evidence every time a criminal defendant makes a *Brady* request for information regarding a government witness." *Meros*, 866 F.2d at 1309. Here, the Government prosecuted Defendant through the Department of Justice's central office, and the *Vollaro* case was prosecuted out of the U.S. Attorney's Office for the Southern District of Florida. Defendant has provided no support for the position that the *Vollaro* prosecution team's possession of any exculpatory material can be imputed to the Government in this case.

Second, Defendant falls far short of establishing there is a reasonable probability the outcome at trial would have been different had Defendant been provided any *Brady* material he did not receive. Defendant only cites one witness related to this material. Mot. at 14–15. Given

the overwhelming evidence of guilt presented over the course of the proceedings, there is no indication the information at issue would have resulted in a different verdict. *See, e.g.*, *United States v. Laureti*, Nos. 18-10508, 20-12102, 2022 WL 10445908, at *1 (11th Cir. Oct. 18, 2022) (finding *Brady* material was not material where "there was [no] reasonable likelihood that the evidence could have affected the outcome of the trial" because it was "cumulative impeachment evidence"); *United States v. Gilmore*, 833 F. App'x 790, 798 (11th Cir. 2020) (holding the defendant could not show prejudice because of the "overwhelming evidence" of guilt).[9]

### V. Defendant's Colloquy

The Court administered a colloquy to Defendant before the case was submitted to the jury during which Defendant, under oath, confirmed he did not wish to testify and his lawyers "called all the witnesses that [Defendant] wished to call." Trial Tr. vol. 11, [ECF No. 448], at 132:2–134:9. Now, with no affidavit of his own to support this assertion, he claims he was "pressured" by his counsel to answer yes. Mot. at 15. And Defendant implies it was error to administer this colloquy after the close of evidence. *Id.* Courts in this circuit, however, need not administer such a colloquy at all where a defendant is represented by counsel, and therefore the Court's use of this colloquy was simply a prophylactic measure to ensure the fairness of the proceedings. *See United States v. Watts*, 896 F.3d 1245, 1252–53 (11th Cir. 2018) (noting district courts do "not normally engage in a colloquy with the defendant to ensure that the decision [not to testify] was made knowingly and intelligently because such a colloquy would improperly disturb the attorney-client relationship" (internal quotation marks and citation omitted)).

Further, while the Court did not conduct the colloquy until the close of evidence, it assured Defendant the "trial [was] not over" and the Court would "reopen the case to permit" Defendant

---

[9] Because Defendant has failed to establish two of the requirements to be entitled to relief under *Brady*, the Court need not determine whether he received or independently possessed some of this material.

to testify if he desired to do so. Trial Tr. vol. 11 at 132:11–13. Conducting this colloquy before the case was submitted to the jury was not erroneous. *See Lisbon v. United States*, 758 F. App'x 780, 782 (11th Cir. 2018) (noting a district court conducted a colloquy "[a]fter the close of evidence"). The Court finds no error, especially none warranting a new trial, based on this prophylactic colloquy the Court administered while Defendant had the benefit of counsel.[10]

### VI. New Evidence Does Not Justify a New Trial

Defendant is inconsistent about whether he also moves for a new trial based on newly discovered evidence. *Compare* Mot. at 29–30 (stating a new trial is justified because of new evidence), *with* Reply at 5 (claiming the Government "erroneously states" the Motion is "premised on the discovery of new evidence"). The Court considers any argument relating to newly discovered evidence abandoned. If Defendant did make this argument, it would fail. "Motions for a new trial based on newly discovered evidence are highly disfavored in the Eleventh Circuit and should be granted only with great caution. Indeed, the defendant bears the burden of justifying a new trial." *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (citation omitted). These motions should only be granted when (1) the evidence was discovered after trial, "(2) the defendant exercised due care to discover the evidence, (3) the evidence was not merely cumulative or impeaching, (4) the evidence was material, and (5) the evidence was of such a nature that a new trial would probably produce a different result." *United States v. Vargas*, 243 F. App'x 456, 458 (11th Cir. 2007). Even assuming any of the material Defendant includes with his Motion could somehow constitute newly discovered evidence, none of this evidence is of such a nature that it

---

[10] The Court also confirmed Defendant willingly abandoned his advice of counsel defense after Sadow withdrew the proposed jury instruction relating to it. *See* Trial Tr. vol. 11 at 42:16 (withdrawing jury instruction on good faith reliance on advice of counsel); *id.* at 133:20–134:1 (confirming Defendant participated in the decision on jury instructions and agreed with them).

would potentially produce a different result at trial given the overwhelming evidence of guilt. A new trial is therefore unwarranted.

### VII. A New Trial is Not Warranted for Any Other Reason

Finally, Defendant argues the "confluence of errors" requires a new trial and that, if there was no error, the Court should grant a new trial because of the perceived unfairness of the proceedings. Mot. at 29–30. As thoroughly discussed, there is no error warranting a new trial. And the Court does not find any perceived unfairness in a proceeding in which Defendant was represented by competent counsel, willingly put on no defense, and there was overwhelming evidence of guilt. The Court therefore declines to exercise its "broad" discretion to order a new trial in these circumstances. *Vicaria*, 12 F.3d at 198. The Motion must be denied.

### CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion for New Trial Pursuant to Fed. R. Crim. P. 33(a), [ECF No. 506], is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 17th day of August, 2023.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**