Isaac Wright, Jr., Esq. (*pro hac vice*)
Gene R. Besen, Esq. (*pro hac vice*)
Carmen Elena Jule, Esq.

**ATTORNEY FOR DEFENDANT**
MINAL PATEL

**On the Letter-Brief:**
Isaac Wright, Jr., Esq.
Gene R. Besen, Esq.

LETTER-BRIEF AND EXHIBITS SUPPORTING
DEFENDANT'S MOTION FOR A NEW TRIAL BASED
UPON NEWLY DISCOVERED EVIDENCE

**<u>Via Electronic Filing</u>**
Hon. Rodolfo A. Ruiz, II
United States District Court Judge
U.S. District Court for the Southern District of Florida
Wilkie D. Ferguson, Jr. U.S. Courthouse
400 N. Miami Avenue,
Miami, FL  33128

**Re:**   **<u>United States of America v. Minal Patel</u>**
Criminal Case No. 19-80181

**<u>Criminal Action:</u>**   **On Motion for a New Trial Based**
**Upon Newly Discovered Evidence**
**Pursuant to Fed. R. Crim. P. 33**

**<u>Presiding:</u>** Hon. Rodolfo A. Ruiz, II, U.S.D.J.

Your Honor:

This letter-brief and supporting Exhibits, including Defendant's Affirmation is submitted

on behalf of Defendant, Minal Patel, in support of his motion for a New Trial based upon Newly

Discovered Evidence.

i

**TABLE OF CONTENTS**

PAGE

Summary of the Argument……………………………………………………………1

BACKGROUND………………………………………………………………………..2

ARGUMENT…………………………………………………………………………...3

   1. Introduction to the Argument and Governing Law………………………..………3
      a. Introduction to Argument………………………………………………..…….3
      b. Rule 33 – Newly Discovered Evidence & Governing Law………………...…….5

## Point I

The Defense Team's Failure To Inform The Court Of Their Own Misconduct
And Conflicts Of Interest, Including Their Knowledge Of And/Or Involvement
In The Impermissible Communications With And Illegal Recordings Of An
Unindicted Coconspirator, As Well As Infighting That Prompted Co-Counsel
To Report Lead Counsel To The DOJ And Florida Bar, Caused The Court's
Failure To Conduct A Garcia Hearing As A Result Of The Court's Unawareness,
Depriving Defendant Of His Sixth Amendment Right To Conflict-Free-Counsel
And To His Right To Counsel Of His Choice………………….………………………6

## Point II

In-Fighting Within The Defense Team, In Particular, Between Integral
Healthcare-Counsel And Lead-Counsel Over Use Of Illegal Recordings Of The
Unindicted-Coconspirator Chris White, Including Healthcare Counsel's Resignation
From The Case And Allegations To The Florida Bar Of Egregious Wrongdoing
By Lead Counsel, Resulted In A Conflict Of Interest Environment So Toxic, Prejudice
is Presumed…………………………………………………………………..;…16

   A. Attorney Conflicts…………………………………………………………18
   B. Adverse Effect…………………………………………………...………20
      1. The Plausible Alternative Defense Strategy………………………………....21
      2. The Alternative Defense Strategy Was
         Reasonable…………………….……..……..21
      3. The Link Between the Conflict of Interest and
         Abandonment of Alternative Defense Strategy…………………………….……..23

**TABLE OF CONTENTS (Cont'd)**

PAGE

## Point III

Defendant's Healthcare-Counsel's "Double Agent" Activities, Including
Having Unauthorized Communication With The Government Related To
Defendant's Case and Providing The Government With Sensitive Defense
Strategies, Coupled With Multiple Members Of The Defense Team
Operating Under Significant Conflicts Of Interests Throughout the Entire
Criminal Proceedings, Rose To The Level Of a Structural Error, Requiring
A New Trial……………………………………………………………………..27

## Point IV

If The Court Believes That The Points Of Errors Sub Judice Do Not
Individually Require Defendant's Conviction Be Vacated, Then In The
Interest Of Justice And Fairness, The Cumulative Effect Of Those
Errors Require Such A Result………………………………………………..…..46

## Point V

Request For Hearing - In Light Of The Magnitude And Complexity Of The
Errors Espoused In The Points Sub Judice, This Court Should Grant An
Evidentiary Hearing Or, In The Alternative, Allow Oral Argument……………………………….49

   A.  Evidentiary Hearing……………………………………………………...………49

**TABLE OF EXHIBITS**

PAGE

1.EMAIL: Robyn Sztyndor to Chris White &  his attorneys (Dated - 2/4/2020)
      Providing White's defense team with legal memo……………………..….…………**De1**

2.EMAIL: Robyn Sztyndor to Chris White & his attorneys (Dated – 2/9/2020)
      Providing White's defense team with legal memo on PGL……………..………...**De2**

3.EMAIL: Robyn Sztyndor to Chris White & attorneys (Dated – 2/10/2020)
      Updating White's defense team on her compliance analysis……………..………..**De3**

4.EMAIL: Robyn Sztyndor to Chris White & his attorneys (Dated - 4/4/2020)
      Providing White's defense team with legal advice on AKS………...…..…….......**De4**

**TABLE OF CONTENTS (Cont'd)**

PAGE

**TABLE OF EXHIBITS**

5. EMAIL: Robyn Sztyndor to Chris White & his attorneys (Dated – 4/5/2020)
   Providing White's defense team opinion on criminal conspiracy,,,,,,,,,,,,,,,,,,,………..**De5**

6. EMAIL: Robyn Sztyndor to Chris White & his attorneys (Dated – 8/14/2020)
   Providing White's defense team with meeting notes…………………………….……….**De6**

7. EMAIL: Robyn Sztyndor to AUSA Prosecution Team (Dated – 12/27/2020)
   Enlightening Government on Defense strategy………..……………………..**De7-131**

8. EMAIL: Robyn Sztyndor to the Defense team (Dated – 12/31/2020)
   Providing defense strategy memo to Government……………..…………….….**De132-135**

9. EMAIL: Robyn Sztyndor to Chris White & his attorneys (Dated – 1/18/2021)
   Informing she will be providing another compliance memo………………….…**De136**

10. Robyn Sztyndor and Don O'Neill - Authors (Dated 3/16/2021)
    Presentation: Operation Double Helix Powerpoint……………….……..…...**De137-146**

11. EMAIL: Robyn Sztyndor to AUSA Prosecution Team (Dated – 7/16/2021)
    Enlightening Gov. about meaning of recordings and illegal biller…………………**De147**

12. EMAIL: Robyn Sztyndor to AUSA Prosecution Team (Dated – 7/16/2021)
    Enlightening Gov. about meaning of recordings and illegal biller……………..**De148-151**

13. EMAIL: Robyn Sztyndor to AUSA Prosecution Team (Dated – 7/16/2021)
    Informing the Gov. they will not understand info requested…………….....…**De152-153**

14. EMAIL: Robyn Sztyndor to Chris White (Dated – 7/27/2021)
    Helping White understand applicable regulations………………………………. **De154**

15. EMAIL: Robyn Sztyndor to DOJ attorneys Hayesand Queenan (Dated – 8/15/2021)
    Providing DOJ transcript of O'Neill call with Healthrecon………………….**De155-173**

16. EMAIL: Robyn Sztyndor to DOJ attorneys Hayes and Queenan (Dated – 8/18/2021)
    Telling Patrick Queenan not to talk to her anymore…………………………….......**De174**

17. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 8/26/2021)
    Accusing Loper of bullying her and referencing recordings ………………..……....**De175**

**TABLE OF CONTENTS (Cont'd)**

PAGE

**TABLE OF EXHIBITS**

18.EMAIL: Robyn Sztyndor to Steve Sadow (Dated – 10/6/2021)
Sadow telling Robyn to pick up "IF IF IF" White calls…………………….......**De176-178**

19.EMAIL: Steve Sadow to Robyn Sztyndor (Dated – 8/19/2022)
Telling her not to contact the Florida bar……………….……….…...……….**De179-183**

20.TEXT: Robyn Sztyndor to Jason Mehta (Dated – 11/1/2022)
Warning Mehta about Steve harming White …………………………………..**De184-246**

21.EMAIL: Brian Rafferty to Robyn Sztyndor (Dated – 11/14/2022)
Informing Robyn she is on the witness list………………………….......……**De247-248**

22.TRANSCRIPT: Robyn Sztyndor disciplinary hearing (Dated – 3/20/2023)
Sadow testified he knew about the recordings …………………………….....**De249-453**

23.TRANSCRIPT: Chris White's sentencing hearing (Dated – 4/3/2023)
Mehta states that White would have testified in Patel …………………………**De454-539**

24. – RESERVE -

25.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 7/9/2023)
Repeated references to warning Chris White………………….………………..….**De540-541**

26.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 11/24/2023)
Sending DOJ screenshot of text warning Mehta about Sadow……………….…..…**De542**

27.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 12/4/2023)
Telling DOJ she was mad about White while representing Minal……………..**De543-544**

28.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 12/17/2023)
Telling Jamie she rescued her in the Patel case ……………………….……....**De545-562**

29.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 12/18/2023)
Explaining how she "bailed out" DOJ in Patel …………………………….…..**De563-600**

30:EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 12/20/2023)
Sending a Chris White recording that "slams" DOJ…………….…….….………**De601**

31.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 1/10/2024)
Explaining that she told White their trial strategy…………………………..….**De602-603**

# TABLE OF CONTENTS (Cont'd)

PAGE

## TABLE OF EXHIBITS

32.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 1/16/2024)
Stating she protected Chris White from Sadow…………….………..………**De604-607**

33.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 1/21/2024)
Detailing abusive messages from Sporn …………….………………….…...**De608-609**

34.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 1/21/2024)
Continuing previous thread about Sporn …………..……….…………….…..**De610**

35.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 2/10/2024)
Robyn was aware that Sadow would lie to the judge ……………….……………**De611**

36.TRANSCRIPT: Witness at second Robyn Sztyndor hearing (Dated – 2/21/2024)
Sadow further discusses his involvement in the recordings…………………... **De612-674**

37.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 3/9/2024)
Asking what would happen if she hadn't warned White…………...….……………**De675**

38.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 3/18/2024)
Sending DOJ a recording with Qlarent …………….……………………..…**De676-680**

39.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 3/24/2024)
Asks what would have happened if White took the stand………………….……..…**De681**

40.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 3/24/2024)
Asks what if she had not warned White on 11/15………………….…………..**De682**

41.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 3/24/2024)
Sending screenshot of Sadow transcript from hearing …………………....... **De683-686**

42.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 4/2/2024)
Said she was forced to chose between Minal and Chris …………………….....**De687**

43.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 4/6/2024)
References warning White ………………………………………………………….**De688**

44.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 4/7/2024)
Discusses her emotional instability …………………………………………**De689-718**

**TABLE OF CONTENTS (Cont'd)**

PAGE

**TABLE OF EXHBITS**

45.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 4/9/2024)
References Steve setting up Judge Ruiz …………………………………….**De719-720**

46.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 4/21/2024)
References Sadow setting up Hayes with recordings………….….…………… **De721**

47.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 4/25/2024)
Discusses Sadow frequently keeping her from leaving Patel case……………. **De722-723**

48.FILING: Robyn Sztyndor's response to show cause order (Dated – 4/30/2024)
Argues Sadow directed and advised Robyn about recordings ……………....**De724-779**

49.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 6/6/2024)
Telling Hayes that Steve's actions caused her disbarment ………..….…………**De780**

50.FILING: Order barring Sztyndor from SDFL practice (Dated – 6/5/2024)
Upholds ad hoc committee's findings ……………….….………………....**De781-783**

51.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 6/19/2024)
References warning White to protect DOJ …………….….………………………**De784**

52.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 7/2/2024)
References falling on her sword by warning DOJ about White……..…………**De785-786**

53.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/12/2024)
Very friendly references to DOJ attorneys …………………………………....…..**De787**

54.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/13/2024)
Calling a DOJ attorney a house husband ………………………………….…...**De788-812**

55.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 9/14/2024)
Discusses Clerkson, Garret, and Ray as DOJ work friends………………..…...**De813-814**

56.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/14/2024)
References Sadow sucking her into criminal cases …………….….………...**De815-840**

57.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/15/2024)
References Steve recordings being bad…………….….………………….…..**De841-845**

## TABLE OF CONTENTS (Cont'd)

PAGE

## TABLE OF EXHIBITS

58. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/16/2024)
    References recordings of Tim Loper ………………………………………….**De846**

59. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/17/2024)
    References wanting committee evidence produced ………………………………...**De847**

60. EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 9/18/2024)
    References confiding in Hayes about "the Brians"……………….…………….**De848**

61. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/19/2024)
    References a Steve Sadow "pirate plan" ………………….……………**De849-851**

62. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/19/2024)
    Accuses Loper of mistreating her since Patel ……………………………...… **De852**

63. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/21/2024)
    Says Tim is why Steve made her record ………….………………………**De853-855**

64. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/21/2024)
    References Steve recording everything ……………….…………………… **De856-858**

65. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/22/2024)
    References Robyn under criminal investigation ……………….…………....**De859-862**

66. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/23/2024)
    References subpoenaing her when she was opposing counsel………………....**De863-866**

67. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/23/2024)
    Sztyndor sent Loper abusive email while repping Patel…………….……...… **De867**

68. EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 9/23/2024)
    Asks by Hayes didn't protect her from Loper ……………….………..…….**De868**

69. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/23/2024)
    References criminal investigation and Steve making her record………….....**De869-871**

70. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/24/2024)
    Says she was under criminal investigation while repping Patel…………….……**De872**

**TABLE OF CONTENTS (Cont'd)**

PAGE

**TABLE OF EXHIBITS**

71. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/25/2024)
    Refers to DOJ attorney as house husband……………………..………………..**De873**

72. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/27/2024)
    Says Loper saw everything ………………………..……………………**De874-875**

73. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 10/8/2024)
    Threatens to publish the worst Sadow recordings …………………………….**De876**

74. EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 10/10/2024)
    Says she waived confidentiality on committee evidence……………..…………...**De877**

75. EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 10/10/2024)
    Says she can release recordings whenever she wants ……………………….…...**De878**

76. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 10/12/2024)
    References Sadow recordings and DOJ slut shaming her …………….....…………...**De879**

77. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 10/16/2024)
    References videos making DOJ attorneys look like criminals………………..…...**De880**

78. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 10/22/2024)
    References warning Chris White…………………………….……………..…….......**De881**

79. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 12/1/2024)
    Forwards 12/27/2020 email and asks if Jamie used incorrect Cdx guidelines to
    wrongfully convict Minal ……………………………………………………...**De882-883**

80. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 4/12/2025)
    References O'Neill qui tam and Tier 2 codes ………………………………….**De884-885**

81. EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/15/2024)
    References that DOJ not appreciating her………………………………….…...**De886-891**

82. TRANSCRIPT: Call between Don O'Neill and Scottie Ward
    Discusses CMS billing mistakes ………………………….……………………**De892-905**

83. SIGNAL INFO: Robyn Sztyndor and Chris White communications
    Documents their extensive conversations …………………………....…...**De906-960**

**TABLE OF CONTENTS (Cont'd)**

PAGE

**TABLE OF EXHIBITS**

84.TEXTS: Text groups including Sztyndor and Sadow
    Multiple discussions involving White calls………………………………….…**De961-993**

85.TEXTS: Robyn Sztyndor and Steve Sadow Texts
    Text messages about Chris White recordings………………………….....**De994-1032**

86.FILING: Entire 407-1 filing with multiple emails……………………….…………**De1033-1134**

87.EMAIL: Robyn Sztyndor to Sadow (Dated – 12/14/2019)
    Forwarding White Convo Memo dated 12/7/2019..………………………**De1135-1145**

88.EMAIL: Robyn Sztyndor to Ryan Schubert (Dated – 10/5/2020)
    Later forwarded to De Boer before Patel involvement.………………….......**De1146-1147**

89.EMAIL: Robyn Sztyndor to White team (Dated – 1/25/2021)
    Sztyndor forwards draft filing to White………………………………...........**De1148-1150**

90.EMAIL: Robyn Sztyndor to Government (Dated – 9/25/2021)
    Sztyndor asks Queenan hypothetical question about recordings……………..……**De1151**

91.EMAIL: Robyn Sztyndor to Sadow and Patel (Dated – 8/22/2022)
    Sztyndor sends questions from ethics hotline……………………….…..........**De1152-1153**

92.EMAIL: Robyn Sztyndor to Government (Dated – 9/25/2023)
    Robyn email is forwarded to De Boer…………………………………………..**De1154**

93.EMAIL: Robyn Sztyndor to Government (Dated – 10/14/2023)
    Robyn says she has been mistreated by De Boer…………………………….…**De1155**

94.EMAIL: Robyn Sztyndor to Government (Dated – 8/22/2022)
    Robyn sends draft referencing Florida Bar ethics issues……………..……..**De1156-1159**

95.EMAIL: Robyn Sztyndor to Government (Dated – 8/15/2021)
    Robyn instructs government on testing modifiers...……………….........……**De1160-1161**

96.EMAIL: Brian Rafferty to Minal Patel (Dated – 12/11/2022)
    Rafferty tell Patel to make sure witnesses are ready...……………….......……**De1162**

97.EMAIL: Email from Paul Gerrard (Dated – 8/14/2018)
    Discussing LabSolutions' approved billing codes.....……………….......……**De1163**

x

**TABLE OF CONTENTS (Cont'd)**

PAGE

**TABLE OF EXHIBITS**

98. Moldx Approvals for LabSolutions
Showing billing codes approved for LabSolutions…………………......……**De1164-1178**

xi

## Summary of the Argument

Newly discovered evidence in this case makes clear a new trial is warranted.  The Court's ultimate endeavor during criminal proceedings is to ensure the fairness of those proceedings for the accused.  When the Defendant's own counsel(s) misleads the Court about their knowledge and/or involvement in conflicted/illegal conduct, the Court is deprived of its fundamental duty to safeguard the integrity of its proceeding.  Mr. Patel had a Sixth Amendment right to conflict-free-counsel and counsel of his choosing.  As will be shown below, Counsels' individual and combined unethical, illegal conduct throughout the entire 3 ½ years of their representation—including the misrepresentations made to this Court—deprived the Court of the opportunity to discern its need and constitutional obligation for further inquiry with both counsels and Defendant.

Newly discovered evidence, unobtainable before trial, now explains the previously inexplicable and supports the five legal points enumerated in this letter-brief:

(1)     Mr. Patel's entire defense team was complicit in the illicit recording of *ex parte* communications with an unindicted co-conspirator and represented Government witness; was conflicted as a result of that conduct; bar complaints and DOJ complaints by co-counsel against lead counsel; as well as by their collective decision to mislead the Court about their overt direction and orchestration of those activities (over a series of years)—depriving this Court of the ability to conduct a Garcia hearing in order to safeguard Defendant's constitutional right to conflict-free-counsel and his right to counsel of his choice, creating a structural error.

(2)     The conflicts of Mr. Patel's defense team caused them to preserve their own interests and loyalties to themselves, each other, and third parties over the interests of and loyalties to Defendant in such a continuous and systematic manner that Mr. Patel's defense team—in the face of being exposed and under a real and lingering threat of prosecution, without warning or

1

consultation with Mr. Patel—abandoned his defenses at the last minute, defenses that were years in the making and honed through mock trials, while witnesses waited in staging areas prepared to testify—all in violation of Mr. Patel's Sixth Amendment right to conflict-free-counsel.

(3)     The long term misconduct and unethical acts of counsels, making themselves witnesses in the case, delivering defense strategies to Mr. Patel's adversaries, infighting over the use and misuse of material evidence, betraying each other with ethical complaints before the Court and the Florida bar, including being accused of unethical and criminal conduct within the case by the attorney representing an unindicted coconspirator as well as this Court's decision to open an investigation into the allegations of misconduct, all occurring over a span of 3 ½ years up to, including and after Mr. Patel's trial, constitute a structural error requiring a new trial.

(4)     Hundreds of individual incidents of unethical, criminal and erroneous conduct by counsels over the course of 3 ½ years cumulatively requires a new trial in the interest of justice in the event Points 1 through 3 are deemed not to require a new trial.

(5)     Because of the long and torrid procedural history, including the 1178-pages of newly discovered evidence comprising both a convoluted and complicated record as well as the novel and complex legal issues before this Court, an evidentiary hearing or, alternatively, oral argument is necessary in order to undertake a comprehensive and clear search for the truth.

## **BACKGROUND**

In an August 17, 2023, opinion on Mr. Patel's 14-day motion for a new trial, the Court discussed the background of this case.  Doc. 535, at p. 1-2.  Mr. Patel incorporates herein and makes a part hereof the Court's Background with reference.

2

## **ARGUMENT**

**1.     Introduction to the Argument and Governing Law**

    a.     Introduction to Argument:

Defendant must belabor this Court by providing a backdrop of significant defense counsel failures upon which his Points of argument should be considered. The reason is two-fold: (1) It is anticipated that the Government's response to this motion is going to depend heavily on the evidence it presented at trial—a chorus deeply rooted in its own beliefs as well as this Court's finding that there was "overwhelming evidence of guilt," see Doc. 535 at p. 17-18—evidence that went uncontroverted by the total absence of a defense case-in-chief.[1] 11T3:6-9;[2] and (2) because, while newly discovered evidence is not evidence that was available to the Mr. Patel during pretrial or trial stages, its discovery usually affects the Court's view on how pretrial investigations were done and/or affects how the facts or absence of facts, as well as counsels conduct and decisions

---

[1] Sadow sent an email to the Court the morning the defense was due to call its first three witnesses. 11T5:4-5. That email informed the Court that the Defense was not going to put on a case-in-chief. 11T3:6-9. Defendant was not copied on the email and was never consulted or given the ability to weigh-in on the decision. Def. Aff. at ¶¶ 30-33; In essence, Sadow ambushed Defendant by taking away Defendant's ability to object or prevent the defense from resting before Sadow was able to inform the Court. Id.

[2] 1T denotes Volume 1 of Defendant's trial transcripts, dated November 28, 2022.
  2T denotes Volume 2 of Defendant's trial transcripts, dated November 29, 2022.
  3T denotes Volume 3 of Defendant's trial transcripts, dated November 30, 2022.
  4T denotes Volume 4 of Defendant's trial transcripts, dated December 1, 2022.
  5T denotes Volume 5 of Defendant's trial transcripts, dated December 2, 2022.
  6T denotes Volume 6 of Defendant's trial transcripts, dated December 5, 2022.
  7T denotes Volume 7 of Defendant's trial transcripts, dated December 6, 2022.
  8T denotes Volume 8 of Defendant's trial transcripts, dated December 7, 2022.
  9T denotes Volume 9 of Defendant's trial transcripts, dated December 8, 2022.
  10T denotes Volume 10 of Defendant's trial transcripts, dated December 9, 2022.
  11T denotes Volume 11 of Defendant's trial transcripts, dated December 12, 2022.
  12T denotes Volume 12 of Defendant's trial transcripts, dated December 13, 2022.
  13T denotes Volume 13 of Defendant's trial transcripts, dated December 14, 2022.

3

during those periods are viewed by the Court.  United States v. Jernigan, 341 F.3d 1273, 1278 (11th Cir. 2003) (Generally, motions for new trial based upon newly discovered evidence require that the evidence be material and that a new trial would "probably produce a different result."); see Freund v. Butterworth, 165 F.3d 839, 860 (11th Cir. 1999) (en banc) (Request for new trial based upon newly discovered evidence require a showing of "adverse effect" in the conflict of interest context).

Against an onslaught of Government evidence presented to the jury over the course of more than two-weeks—against the empirical promise to the jury that "this case is about Mr. Patel's actions, his conduct, to be judged on the basis of whether it was done in good faith or not," see 2T39:14-16—against the unbridled promise that Mr. Patel's "lawyers will come in [court], and they will tell [the jury] the advice they gave," see 2T39:9-10—in the face of a self-created obligation to the jury that Mr. Patel will put on both a "good faith" and an "advice of counsel" defense, see 2T38:25 to 41:25—Mr. Patel's trial counsel failed to put on any defense and to call a single witness.

This failure occurred even though critical witnesses were available, some having already arrived in Florida, ready-to-testify—being only 5 minutes from the Courthouse.  Def. Aff. at ¶¶ 31-33.  Had these witnesses testified, the jury would have not only learned that Mr. Patel's and LabSolutions' actions were performed under the tutelage and advice of counsel but also that the company's administration, operations, testing apparatus and marketing strategies were all performed within a structured system of regulatory compliance, legal oversight, billing integrity, and corrective action—highlighting and significantly supporting both Mr. Patel's "good faith" and "advice of counsel" defenses.  See Def. Aff. at ¶¶ 15-16.

4

b.      Rule 33 - Newly Discovered Evidence & Governing Law

Rule 33 allows a defendant to file a motion for a new trial within 3 years after the verdict if the motion is based on "newly discovered evidence," or 14 days after the verdict if based on "other grounds." Fed.R.Crim.P. 33(b).  The court may grant the motion "if the interest of justice so requires." Fed.R.Crim.P. 33(a).

Defendant is not unmindful that "[m]otions for a new trial based on newly discovered evidence are highly disfavored in the Eleventh Circuit and should be granted only with great caution." United States v. Campa, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc).  Consequently, "[n]ewly discovered impeaching evidence is insufficient to warrant a new trial." United States v. Champion, 813 F.2d 1154, 1171 (11th Cir. 1987).

In deciding whether a new trial is required, the Eleventh Circuit has repeatedly set forth the five-part test courts must apply when evaluating a motion for a new trial based on newly discovered evidence:  **(1)** the evidence must be discovered following the trial; **(2)** the movant must show due diligence to discover the evidence; **(3)** the evidence must not be merely cumulative or impeaching; **(4)** the evidence must be material to issues before the court; and **(5)** the evidence must be of such a nature that a new trial would probably produce a different result. United States v. Hobson, 825 F.2d 364, 366 (11th Cir. 1987) (per curiam); (quoting United States v. Bollinger, 796 F.2d 1394, 1401 (11th Cir. 1986)); Bentley v. United States, 701 F.2d 897, 898 (11th Cir. 1983) (per curiam).

For the reasons herein and below, this Court should find that a new trial is warranted or, at a minimum, a substantial question exists warranting remand from the United States Court of Appeals for the Eleventh Circuit.  FRAP 12.1.

5

I.      **The Defense Team's Failure To Inform The Court Of Their Own Misconduct And Conflicts Of Interest, Including Their Knowledge Of And/Or Involvement In The Impermissible Communications With And Illegal Recordings Of An Unindicted Coconspirator, As Well As Infighting That Prompted Co-counsel To Report Lead Counsel To The DOJ And Florida Bar, Caused The Court's Failure To Conduct A Garcia Hearing As A Result Of The Court's Unawareness, Depriving Defendant Of His Sixth Amendment Right To Conflict-Free-Counsel And To His Right To Counsel Of His Choice.**

The fundamental question under this point heading is whether Mr. Patel had a right to know, as far back as 2019, that his counsels were compromised and conflicted because of their misconduct, divided loyalties, infighting and whether that right included the choice to retain new counsel, after being fully informed of the adverse consequences of counsel's conflicts and misconduct?

There appears to be no published opinion reflecting the same or similar series of attorney misconduct and conflicts in this case.  Yet, while this is not a case where Mr. Patel's direct request for counsel was denied, see Gonzalez-Lopez, 548 U.S. at 147-48, it goes without saying that a "constructive denial of counsel is 'legally presumed to result in prejudice' and thus to constitute a structural error."  United States v. Arbolaez, 450 F.3d 1283, 1294 (11th Cir. 2006) (quoting Strickland, 466 U.S. at 692).

Here, the denial of the Mr. Patel's right to counsel of choice was done constructively.  In other words, the Court's failure to hold a mandatory Garcia hearing happened because of every single defense attorney's decision to keep the Court in the dark about their misconduct and conflicts.  As a result, Mr. Patel was denied his constitutional right to both conflict-free-counsel and his right to counsel of his choice—i.e., the right to choose counsel, free from the taint of misconduct, disqualification and conflict.

To the point, the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right…to have the Assistance of Counsel for his defence."  U.S. Constr.

6

Amend. VI.  The United States Supreme Court has previously held that an element of this right is the right of a defendant who does not require appointed counsel to choose who will represent him.  See Wheat, 486 U.S. at 159.  Cf. Powell v. Alabama, 287 U. S. 45, 53 (1932) ("It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice").  More specifically, "a defendant who does not require appointed counsel" enjoys both the right to effective assistance of counsel and the right "to choose who will represent him."  United States v. Gonzalez–Lopez, 548 U.S. 140, 144, 147 (2006).  "The right to select counsel of one's choice ... has been regarded as the root meaning of the constitutional guarantee."  Id. at 147–48.

When, as here, current counsel is disqualified, conflicted or—for some other reason such as misconduct—compromised, a Defendant has the right to seek new counsel.  Id.  In fact, the right allows a defendant to substitute a retained or appointed counsel with retained counsel "regardless of the quality of the representation he received," see id. at 148, as long as it does not interfere with the "fair, orderly and effective administration of the courts."  United States v. Jimenez-Antunez, 820 F.3d 1267, 1270 (11th Cir. 2016) (quoting United States v. Koblitz, 803 F.2d 1523, 1528 (11th Cir.1986)).  Consequently, "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds."  Caplin Drysdale, Chartered v. United States, 491 U. S. 617, 624-25 (1989).

To be crystal clear, "[t]he right to counsel of choice…commands not that a trial be fair, but that a particular guarantee of fairness be provided — to wit, that the accused be defended by the counsel he believes to be best."  Gonzalez-Lopez, 548 U.S. at 140 (citing Crawford v. Washington, 541 U. S. 36, 61 (2004)).  Further, this Sixth Amendment violation is not subject to harmless-error

7

analysis.  Erroneous deprivation of the right to counsel of choice, "with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.'" Sullivan v. Louisiana, 508 U. S. 275, 282 (1993).  Indeed, deprivation of the right to counsel of one's choice "def[ies] analysis by 'harmless error' standards" because it "affec[ts] the framework within which the trial proceeds" and is not "simply an error in the trial process itself." Arizona v. Fulminante, 499 U. S. 279, 309-310 (1991).

The deprivation is "complete" when the defendant is erroneously prevented from being represented by the lawyer he wants.  See Gonzalez-Lopez, 548 U.S. at 148.

In the case at bar, Steve Sadow, Esq., was Mr. Patel's lead counsel.  He hired Robyn Sztyndor, Esq., as Mr. Patel's healthcare specialist attorney shortly after he was arrested in 2019. EH1T10:15; EH1T22:9-13.[3]  By October 2019, Sztyndor was engaging *ex parte* communications with unindicted coconspirator Chris White for the purpose of calling White as a defense witness or using the information gathered to impeach White in the event he became a Government witness. EH1T85:16-24.  The defense team believed that the information gathered could severely damage the credibility of the Government's case as White was making serious allegations of prosecutorial misconduct, including coercing White to fabricate his involvement with Mr. Patel and to falsely inculpate him.  EH1T436:3 – 437:1; EH1T467:10-23; EH1T493:11 – 494:1.  This Court agreed with the evidence's importance.  CW2T15:22 – 17:5;[4] CW2T25:17 – 26:11; CW2T7:12-19.

---

[3] EH1T denotes Ethics Hearing Transcripts Volume 1, dated March 30, 2023.
  EH2T denotes Ethics Hearing Transcripts Volume 2, dated February 24, 2024.

[4] CW1T denotes *Ex Parte* Hearing Transcripts Volume 1, dated November 18, 2022 (Dkt. 413).
  CW2T denotes *Ex Parte* Hearing Transcripts Volume 2, dated November 21, 2022 (Dkt. 414).

Sztyndor subsequently withdrew from the case a few months before Mr. Patel's trial as a result of infighting and conflicts with both White and lead counsel, Steve Sadow—against Mr. Patel's interests.  EH1T43:25 – 47:16.

However, this withdrawal was of no moment.  Sztyndor was actually subject to disqualification by her actions as Mr. Patel's attorney the moment she had the first *ex parte* discussion with White in October of 2019.  EH1T16:11 – 21:15.  See also R. Regulating Fla. Bar 4-3.7(a)("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness on behalf of the client…"); ABA Model Rules of Prof'l Conduct R. 3.7(a) (2019) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness…").

Further fallout from the White debacle arose in court on two occasions.  Once, on November 18, 2022 when the Court heard arguments on the admissibility of the White recordings and the other on November 21, 2022, when the Court heard further arguments on the matter.  During both of those hearings, the record discloses a Court that was appalled and highly vexed by the actions of Sztyndor, but went no further to determine whether any other member of the defense team was involved or, in any other way, tainted by Sztyndor's misconduct.  CW1T17:14 – 18:19; CW1T76:10-20; CW2T5:13-23; CW2T34:13-24.

Every attorney on the defense team, however, was ethically obligated to bring Sztyndor's conduct to the attention of the Court immediately upon becoming aware of it back in October of 2019 so that a Garcia hearing could be appropriately conducted.  EH1T451:16 – 452:22; R. Regulating Fla. Bar R. 4-3.3 (A lawyer is required to be honest and candid with the Court); see also R. Regulating Fla. Bar R. 4-8.3 (a lawyer must report known misconduct by another lawyer that raises a substantial question regarding honesty, trustworthiness, or fitness to practice).  Not only does the rules of ethics and professional conduct dictate such a result but the court must have

9

the "ability—to make early inquiry in certain situations likely to give rise to conflicts." Stevenson v. Newsome, 774 F.2d 1558, 1562 (11th Cir. 1985).

When this Court presented Sadow with the opportunity to come clean about his involvement, he failed to inform the Court that he not only directed Sztyndor to engage *ex parte* communications with White but he also **directed and orchestrated her to illegally record the conversations with him**.  EH1T486:19 – 487:4.  In fact, Sadow took the opportunity to not just mislead the Court about his involvement and obligations to prevent or stop the misconduct but to boldly lie about it:

> "**We didn't encourage.  We don't have the obligation to tell her to stop.  We do have the obligation to bring it to the Court's attention**, as we did, that there's been a violation in that sense."

CW2T10:14-17 (emphasis added).

Even when being questioned under oath during his testimony at the first ethics hearing, Sadow refused to admit that he had both an ethical and legal obligation to tell the Court that he directed and orchestrated the *ex parte* communications and secret recordings of White.  EH1T521:2 – 529:22.

When considering that Sadow, as lead counsel, directed co-counsel to secretly record her conversation with White, one must come to the conclusion that such a defense team is mortally wounded by poor and corrupt leadership.

The fact that White was removed as a witness against Mr. Patel, that he never testified at trial and that Sztyndor withdrew as counsel before trial is of no moment to the Sixth Amendment violation at issue.  See Garcia, 517 F.2d at 276.  Sadow's and Sztyndor's conduct lasted over three years before their relationship deteriorated over the White recordings.  EH1T247:17-24.  Yet, neither of them should have been representing Mr. Patel a single day beyond the initial October

2019, *ex parte* conversation with White.  See <u>Garcia</u>, 517 F.2d at 276; <u>R. Regulating Fla. Bar</u> 4-3.7(a) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness on behalf of the client…").  The damage that was done during those three years were irreversible.  By the time Sztyndor withdrew, Mr. Patel's right to conflict-free attorneys had been long and continually eviscerated and his fate had already been sealed by the misconduct.

To explain, Mr. Patel must highlight a pivotal moment in the litigation.  Up until November 21, 2022 (the second hearing on the White tapes), this Court was completely unaware of the chaos and attorney misconduct taking place within the defense team.  EH1T521:2 – 526:9.  While the Court was made aware, in a limited fashion, of Sztyndor's actions, it was left in the dark about the depth of the misconduct and the players involved.  <u>Id.</u>  From all appearances, it seemed the rug would never be lifted, until White's attorney asked a monumental question—the Court responded:

> [MR. MEHTA:] …What if anything, can I tell my client about what the Court is inclined to do?
> THE COURT:  I think what you should do is tell your client my procedure – and really, our local rules committee will be in the best position to evaluate the circumstances on any sort of legality issues on the recording.  But my plan is – and I can't promise you I'm going to do it tomorrow, but I do know that once we kind of get this trial underway, I'm going to check in with our local rules committee, and **I'm going to make a referral <u>that it be investigated.  I want it to be investigated</u>.**
> **You can <u>let your client know that the Court is going to start an internal investigation</u> using its local rules committee for attorney discipline**.
> MR. MEHTA: Thank you, Your Honor.

CW2T34:11-25.  (Emphasis added).

This Court was clear that the secret recordings of White was a violation of Florida's criminal statute "Section 934.03, that you cannot record without mutual consent."  CW1T17:21-22.  Therefore, all who were complicit in the White conspiracy had to have understood that they were all subject to criminal investigation and prosecution by State authorities and that both the Government and the Court could, at any time, push for such an investigation.  <u>R. Regulating Fla.</u>

11

Bar R. 4-8.3 (a lawyer must report known misconduct by another lawyer that raises a substantial question regarding honesty, trustworthiness, or fitness to practice). They must have also understood that "they face[d] a credible threat of prosecution in the form of disciplinary investigation and sanction." Rubenstein and Rubenstein Law, P.A. v. The Fla. Bar, 69 F.Supp. 3d 1331, 1339 (S.D. Fla. 2014); see also R. Fla. Bar R. 4-8.4, 4-8.4(c) (Lawyers cannot violate the rules, assist others in doing so, or engage in dishonesty, fraud, or misrepresentation).

Even more significantly concerning for the defense team is the lingering threat of prosecution from the same United States Attorney's Office that was prosecuting their client—the recordings themselves indicating a clear violation of federal law, as the Court colloquy revealed:

> MR. MEHTA: And I have made some suggestion that Mr. Sadow pushed back against about what I understood from listening to the audio about Ms. Sztyndor, I think I used the words "witness tampering" and "obstruction." And I would just real briefly point the Court to pages 8, lines 15 through 19; page 13, 15 through 21. I think, as the Court's considering the substance and what matters, and the context, **I'd ask the Court to not forget that in my view these recordings not only violate state law, but they violate federal law related to obstruction of witnessing.**
> THE COURT: **Yes. I have the portions of the transcript here that you just cited. I'm with you.** And I need to read through these 24 pages carefully, too, to get a better sense of the conduct before I rule. So I will absolutely do that. But thanks for flagging that for me.
> MR. MEHTA: Thank you, Your Honor.

CW1T89:1-17.[5]  (Emphasis added).

The violation of federal law Mehta referred to can be found in 18 U.S.C. § 1512(b):

Whoever knowingly…corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--
> (1) influence…the testimony of any person in an official proceeding;
> (2) cause or induce any person to--
>> (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding…
> shall be fined under this title or imprisoned not more than 20 years, or both.

---

[5] See 18 U.S.C. §§ 1503, 1512.

A week before trial was to begin, the entire defense team was now under a continuing threat of prosecution from both levels of government for misconduct occurring in the very same case in which they represent Mr. Patel.  See Rubenstein, 69 F.Supp. 3d at 1331 (11th Cir. 2014); see also United States v. McLain, 823 F.2d 1457, 1463-64 (11th Cir. 1987) (holding that when trial counsel was under investigation by same United States Attorney's office that was prosecuting counsel's client, under circumstances presented, an actual conflict of interest existed).  Mr. Patel's lawyer must have perceived that they faced the threat of prosecution for obstructing or tampering with White.

There should be "no doubt the threat of prosecution can weigh heavily on the mind of anyone under investigation." Trump v. United States, 54 F.4th 689, 700 (11th Cir. 2022) (citations omitted).  As a result, this Court is compelled to consider the continuing and real threat of prosecution over every member of the defense team who tried this case.

That consideration cannot withstand the cloud of uncertainty related to defense counsel's actions and the questions they pose: Why did counsels' cross-examination fail to highlight Mr. Patel's innocence through the mountain of evidence in the defense's possession showing cooperators were misrepresenting material facts?  (Def. Aff. at ¶ 7; Why did counsel—without consulting Mr. Patel and against the literal begging and pleadings of Mr. Patel not to abandon his defense—decide to call no witnesses that were present at court and ready to explain to the jury that Mr. Patel's company was a fully automated and technologically advanced lab that was operated by approximately 180 employees, headed by a CEO?  Id. at ¶¶ 3-5; Why did counsel fail to present to the jury the abundance of evidence in its possession showing that Mr. Patel was obsessed with compliance, spending hundreds of thousands of dollars on a staff of attorneys that designed and orchestrated the company's marketing apparatus and decisions, drew up contracts and held

13

mandatory training for staff on compliance? Id. at ¶¶ 4-6; Why did counsel fail to present evidence that clearly showed Mr. Patel, whose role did not include the day-to-day operations of the business, but was that of a majority shareholder whose primary concern and demand was to ensure and maintain regulatory and statutory compliance? Id. at ¶¶ 14-15; Why did defense counsel fail to aggressively and forcefully present evidence in its possession that clearly established that any regulatory or statutory mistakes made by staff were grounded in mistake of law and/or advice of the MAC, not the intent of Mr. Patel? Id. at ¶¶ 24-27; and see Godwin Aff @MolDX codes) and Why would defense counsel decide to abandon Mr. Patel's case-in-chief without consulting Mr. Patel, in light of the years long efforts in preparing a "good faith" and "advice of counsel" defense, including the scientific and legal complexities the jury was faced with and the onslaught of Government evidence left uncontroverted? Id. at ¶¶ 16-19, 24-37.

It is settled that "the right to conflict-free counsel, the public's interest in a fair trial, and the government's interest in precluding reversal of a conviction all are adequately protected if defendants are informed both that their representation might be adversely affected in certain ways and that they have the right to counsel unimpaired by any conflict." In re Paradyne Corporation, 803 F.2d 604, 611 (11th Cir. 1986). However, when the conduct of counsel thwarts this Court's ability to protect Mr. Patel's rights and by extension thwarts the proper and lawful administration of justice as it has in this case, it becomes impossible to determine the motivation or reasons behind deficient performances or the questionable decisions made during pretrial investigation or during trial. Weaver v. Massachusetts, 137 S.Ct. 1899 (2017).

Weaver explains that structural errors fall into one of three categories based on the rationale underlying their classification as structural: whether (1) "the right at issue is not designed to protect the defendant from erroneous conviction, instead protects some other interest," (2) "the effects of

14

the error are simply too hard to measure," or (3) "the error always results in fundamental unfairness." Id. at 1905-08.

These categories "are not rigid" and "more than one of these rationales may be part of the explanation for why an error is deemed to be structural." Id. at 1908. However, "one point is critical: **An error can count as structural even if the error <u>does not lead to fundamental unfairness in every case</u>.**" Id. (Emphasis added). The crucial determination for this court is whether the particular structural error at issue here "counts as structural because it always leads to fundamental unfairness or for some other reason." Id.

As evident here, "a classic example of a structural error is denial of the Sixth Amendment right to counsel of one's choice. Because the 'effect of the violation cannot be ascertained' given the manifold ways one lawyer's performance might differ from another's, the error is deemed structural and removed from harmless-error analysis." <u>Taylor v. Mentor Worldwide, LLC</u>, 940 F.3d 582, 612 (11th Cir. 2019) (Tjoflat, J., dissenting) (quoting <u>Gonzalez-Lopez</u>, 548 U.S. at 148).

Mr. Patel would have never proceeded with his defense team at any stage of the proceedings had he understood the extent of their misconduct and known they were compromised. Def. Aff. at ¶¶ 54-58. Likewise, had this Court been given the rudimentary information upon which to protect Mr. Patel's rights, it would have conducted a <u>Garcia</u> hearing on the issue, at a minimum.[6]

---

[6] Here, Defendant is certain the Court would have immediately held a <u>Garcia</u> hearing, supported by at least four <u>Garcia</u> hearings the Court conducted where far less serious conflicts were indicated:
**June 19, 2020 Garcia Hearing:**
A potential conflict of interest existed because Sztyndor previously represented Bucky Houser, a potential government witness.
**January 24, 31, and February 24 2022 Garcia Hearings:**
A potential conflict of interest existed because Baker Hostetler sought to represent Patel while also representing James Simmons, a cooperating witness who might testify about matters relevant to Patel's case. Each hearing focused on a slightly different issue related to the potential conflicts, which Defendant knowingly and voluntarily waived.

15

In the absence of a <u>Garcia</u> hearing, Mr. Patel was deprived of his right to be informed of the misconduct and conflicts of counsel, their adverse consequences and of the opportunity to hire new counsel of his choice. See <u>Weaver</u>, 582 U.S. at 295-96. In other words, the defense team's misconduct and subsequent failure to bring its complicity to the attention of the Court "is significant enough that it amounts to a restraint for purposes of the Sixth Amendment right to hire counsel of one's choice." <u>United States v. Balotin</u>, 3:19-cr-191-MMH-JBT, 2023 WL 2264181 at *15 (M.D. Fla., Feb 28, 2023).

This Court should find that a vacatur of Mr. Patel's conviction is warranted or, at a minimum, that a substantial question exists entitling Mr. Patel to a remand.

**II.     In-Fighting Within The Defense Team, In Particular, Between Integral Healthcare-Counsel And Lead-Counsel Over Use Of Illegal Recordings Of The Unindicted-Coconspirator Chris White, Including Healthcare Counsel's Resignation From The Case And Allegations To The Florida Bar Of Egregious Wrongdoing By Lead Counsel, Resulted In A Conflict Of Interest Environment So Toxic, Prejudice is Presumed.**

The Sixth Amendment guarantees "a correlative right to representation that is free from conflicts of interest." <u>Wood v. Georgia</u>, 450 U.S. 261, 271 (1981). A year before <u>Wood</u>, in <u>Cuyler v. Sullivan</u>, 446 U.S. 335 (1980), the Supreme Court held that an actual conflict of interest by a retained attorney violates the defendant's rights to effective assistance of counsel under the Sixth Amendment. The <u>Cuyler</u> Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. Id. at 345-350.

To establish a violation of the defendant's Sixth Amendment right to counsel based on a conflict of interest, a defendant must demonstrate: "(a) that his defense attorney had an actual conflict of interest, and (b) that this conflict adversely affected his attorney's performance." <u>Reynolds v. Chapman</u>, 253 F.3d 1337, 1342 (11th Cir. 2011) (citing <u>Cuyler</u>, 446 U.S. at 348-49).

16

In demonstrating the "actual conflict" requirement, a defendant "'must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action…' that favors an interest in competition with that of the defendant. 'If [counsel] did not make such a choice, the conflict remained hypothetical.'" Buenoano v. Singletary, 74 F.3d 1078, 1086 n.6 (11th Cir. 1996) (quoting Smith v. White, 815 F.2d 1401, 1404 (11th Cir. 1987)); see also Freund, 165 F.3d at 859 ("An 'actual conflict' of interest occurs when a lawyer has 'inconsistent interests.'" (quoting Smith, 815 F.2d at 1405)).

In order to establish "adverse effect, a…defendant must show: (1) the existence of a plausible alternative defense strategy or tactic that might have been pursued; (2) that the alternative strategy or tactic was reasonable under the facts; and (3) a link between the actual conflict and the decision to forgo the alternative strategy of defense." Pegg v. United States, 253 F.3d 1274, 1278 (11th Cir. 2001).

### A.     Attorney Conflicts

In the case at bar, Sadow's conflict began at the outset of his representation in as much as he was one of LabSolution's compliance attorneys and, as such, a potential witness in the case.[7] Def. Aff. at ¶¶ 5-6. See United States v. Ross, 33 F.3d 1507, n. 29 (11th Cir. 1994) (citing Government of Virgin Islands v. Zepp, 748 F.2d 125, 136 (3d Cir. 1984) ("When defense counsel has independent personal information regarding the facts underlying his client's charges,…he has an actual conflict of interest."); and see R. Regulating Fla. Bar 4-3.7(a)("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness on behalf of the client…").

---

[7] While the Court addressed this potential conflict shortly before trial, Doc. 327 at 54-60, it should be considered in light of the newly discovered evidence as just one part of the many conflicts besetting Sadow.

Newly discovered evidence, however, discloses a spiraling web of additional conflicts among the entire defense team.  For example, as stated in Point I above, Sadow made both himself and Sztyndor witnesses in the case as early as October 2019, when he directed and orchestrated the Chris White communications and recordings.  EH1T486:19 – 487:4; R. Regulating Fla. Bar 4-3.7(a).

Sztyndor further conflicted herself against Mr. Patel's interests by her involvement with and loyalties to White.  **De242 ("You need to protect Chris from whatever [Sadow] has up his sleeve")**; EH1T58:11 to 59:23; EH1T45:10 to 47:16.  The record is unequivocal:

> MS. SZTYNDOR: He had no problem with being recorded. **He was calling me 200 times**, because he trusted me, and I would not do that to somebody. If it wasn't disclosed, I wouldn't use it. That was unfair to Chris and that's why I called the Bar. I separated from Minal, who I am so close with, **less than 90 days before trial and like abandoned Minal in a sense** because I was so upset with what they were doing to Chris. It was really wrong.

EH1T204:3-15.  (Emphasis added).

Sztyndor's conflicted loyalty was not limited to her consultations with White's defense team, it also entailed handing over privileged defense materials to White's attorneys.  **De6**. Sztyndor's loyalty to White created further conflict with Sadow when she sent Sadow's email to the DOJ, wherein he is suggesting that she not contact the Florida Bar regarding their misconduct. **De179-80**.[8]  In September 2021, Sztyndor emailed DOJ attorney Patrick Queenan, mere days after he appeared in Mr. Patel's case, to ask a "hypothetical" about whether to contact the DOJ to present "exculpatory" "recorded calls" and "89 pages of WhatsApp messages." **De1151**.  This was clearly some attempt to tell the DOJ about the recordings without Mr. Patel knowing she was doing so.

---

[8] It appears that Sztyndor was acting as a double agent early during her representation as the record indicates she was providing information on Sadow's conduct to the DOJ since early 2020. **De610**, **874-75**.

Leading up to her withdrawal from the case, in August 2022, she emailed a document to DOJ attorneys that referenced her reason for withdrawing being a matter before the Florida Bar, clearly another attempt to entice the government into looking into the White recordings.  **De1156-59**.

Sztyndor's and Sadow's conflict with each other and against the interests of Mr. Patel, plateaued when she reported him to the Florida Bar and ultimately withdrew from Mr. Patel's case in favor of her loyalty to White, rather than uphold her constitutionally required loyalty to Mr. Patel. [9] EH1T43:25 – 47:16; EH1T97:12-17.

Because the rules of professional conduct prohibited Sadow's and Sztyndor's continued representation of Mr. Patel the moment they engaged in misconduct in October of 2019, their representation of Mr. Patel, in-and-of-itself, became a violation of the rules of professional conduct.  See id.  The result is that each attorneys' immediate withdrawal from the case was mandatory under both Florida and Georgia rules, and the ABA Model Rules.  R. Regulating Fla. Bar 4-1.16(c) ("a lawyer shall not represent a client or, **where representation has commenced, shall withdraw from the representation of a client if**: (1) the representation will result in violation of the Rules of Professional Conduct or law.").  See also State Bar of Georgia, Rules of Professional Conduct, Rule 1.16; see Model Rules of Prof'l Conduct R. 1.16 (A.B.A. 2019).[10]

---

[9] Chris White aside, the depth of Sztyndor's conflict and resulting damage cannot be understated. If taking Sadow's professional opinion of Sztyndor as "know[ing] more about the healthcare area than maybe anyone in the United States," see EH1T480:21-23, it becomes evident that there was no better witness in support of Mr. Patel's healthcare defense than Sztydnor.  Her conflict, however, was stronger than her constitutionally mandated loyalty—as she rejected any notion of her being a witness on Defendant's behalf—a position that further gutted Mr. Patel's healthcare defense.  See Op., Doc. 535 at p. 12 (This Court acknowledged that Sztyndor threatened the defense that if called as a witness, she would inform the jury that Mr. Patel's CGx testing was illegal)—a threat made even though she understood that CGx testing based upon family history alone was legal.  **De198-208**.

[10] It should be noted that the defense team's internal and external conflicts and impermissible representation continued for years—from 2019 to 2022, after Defendant was convicted—only

19

Although Sztyndor's conflict of interest ended before trial with her withdrawal, a new even more damaging conflict arose with Sadow and the remaining defense team. The entire defense team knew that Sztyndor was not a lone or rogue operative in the White misconduct. EH1T486:19 – 487:4; EH1T451:16 – 452:22. The team misled the Court and allowed the Court to direct its disdain solely at Sztyndor, paving the way for the Court's decision to call for an investigation—a decision that placed every member of the defense team under a continuing and real threat of exposure and prosecution, one week before the trial was to begin. CW2T34:11-25.

In essence, going into a trial under a threat of prosecution triggers a primary concern as to whether "[t]he interests of lawyer and client…have diverged with respect to their dealings with [the DOJ]." Armienti, 234 F.3d at 824–25. In other words, the defense team tried this case to a jury while in conflict between the desire to aid Mr. Patel and save themselves. McLain, 823 F.2d at 1464.

### B. <u>**Adverse Effect**</u>

As stated above, in order "[t]o prove adverse effect, a…defendant must show: (1) the existence of a plausible alternative defense strategy or tactic that might have been pursued; (2) that the alternative strategy or tactic was reasonable under the facts; and (3) a link between the actual conflict and the decision to forgo the alternative strategy of defense." Pegg, 253 F.3d at 1278.

#### 1. *The Plausible Alternative Defense Strategy:*

Here, the defense team's strategy was limited to testing the credibility of the Government's evidence through impotent cross-examination of the Government's witnesses and then to rest its case without calling a single witness. Def. Aff. at ¶¶ 24-39. However, there was a plausible alternative strategy wherein the defense gathered evidence and secured witnesses over the course

---

ending with a revelation that withdrawal was necessary after Defendant's conviction. EH1T431:11-18.

of three-years in preparation for the presentation of a "good faith" and "advice of counsel" defense at trial. Def. Aff. at ¶¶ 4-17; **De677**. In fact, a "good faith" and "advice of counsel" defense was defendant's strategy until the very day the defense was supposed to put on its case-in-chief. Def. Aff. ¶¶ 31-37.[11]

### 2. The Alternative Defense Strategy Was Reasonable:

The "good faith" and "advice of counsel" defense strategy was reasonable when considering the defense evidence showed that Mr. Patel operated a full-service lab with 180 employees consisting of experts in the field of genetics and pathology. Def. Aff. at ¶ 4. Further, defense evidence revealed that Mr. Patel left the day-to-day operations of the company to his CEO and took the position of a majority shareholder. Def. Aff. at ¶ 15; Godwin Aff. at ¶ 8. Specific employees would have testified that Mr. Patel's core concern and demand was to ensure that the company maintained compliance and that the company's billing apparatus and decisions were in compliance with both the Moldx and LCD's directions at the time. Def. Aff. at ¶ 4, 25-27; Wildemore Aff. at ¶¶ 5-9; Godwin Aff. at ¶¶ 4-5.[12] Further, testimony would show that Mr. Patel acted immediately to fire anyone who violated compliance requirements and that he made no decisions that would knowingly or with intent to violate compliance requirements. Def. Aff. at ¶

---

[11] Additionally, the impotence of Mr. Patel's defense is palpable. In one instance, the Government argued that a memo addressing EKRA was not related to the kickback statute and should not be shown to the jury. 6T124:13-18. Counsel for Mr. Patel allows this argument to proceed, does not counter the Government's erroneous position, and jury never sees, let alone receives, a memo LabSolutions received from counsel directly related to compliance and avoiding potential kickbacks. The failure to counter the Government is bewildering. EKRA stands for the Eliminating Kickbacks in Recovery Act! Of course, the memo analyzing EKRA is central to LabSolutions kickback compliance efforts.

While there are numerous more examples, including billing guidance from MACs never invoked and presented and the Government's application of the wrong LCDs, we shall not belabor them here. **De1663**.

[12] Moldx approved specific codes for LabSolutions' use. **De1164-1178**.

54-58. Along that line, the defense evidence showed Mr. Patel maintained a staff of compliance attorneys who not only advised LabSolutions but conducted compliance training sessions for its staff.  Def. Aff. at ¶¶ 4-5, 9-10, 15-16; Watt Aff. at ¶ 6-8.

The defense conducted mock trial sessions that revealed a "good faith" and/or "advice of counsel" defense yielded a significantly high chance of acquittal if used at trial.  In fact, the defense made an explicit promise to the jury during their opening statement that the jury would have the opportunity to consider those defenses:

> [SADOW:]  And this wasn't done after the fact, which is why we're here for the government.  This was done from the get-go.  **And yes, <u>you will hear from those lawyers, and no, there were no lies to those lawyers.  Those lawyers will come in here, and they will tell you the advice they gave.</u>**
> Now, if that advice turned out to be incorrect, or wrong, it is. But Mr. Patel and LabSolutions is entitled to rely on the advice as long as they are acting in good faith.  **So really <u>what this case is about is Mr. Patel's actions, his conduct,</u> to be judged on the basis of whether it was done <u>in good faith or not</u>**.

2T39:6-16. (Emphasis added); see the numerous other remarks to the jury promising them a "good faith" and "advice of counsel" defense.  2T39:25 – 40:13; 2T40:21 – 41:1; 2T41:15-25; 2T42:1-21; 2T48:20-25; and see 2T51:13-17.

In light of three and a half years of preparing a "good faith" and "advice of counsel" defense, including successful results with using that defense at a mock trial session, there is no question "good faith" and "advice of counsel" defenses were reasonable alternative defense strategies.  This is especially so when considering that the defenses were introduced to the jury in opening statements at trial.

       *3.*     *The Link Between the Conflict of Interest and Abandonment of Alternative Defense Strategy:*

Here, the Court must not be unmindful that when developing a link between the conflict of interest and the alternative defense strategy, the law "requires only some 'link between the… conflict and the decision to forgo the alternative strategy of defense…[i.e., a showing] that the

alternative defense was inherently in conflict with or not undertaken due to [counsels'] other loyalties or interests.'"   United States v. Williams, 902 F.3d 1328, 1333 n.4 (11th Cir. 2018) (quoting Freund, 165 F.3d at 860).

As shown above, the defense opened by promising the jury that they would be presented with a "good faith" and "advice of counsel" defense.   However, once the presentation of Government's evidence began, Mr. Patel struggled with counsel throughout the entire trial, trying to get them to utilize defense evidence and knowledge to enhance their cross-examination's effectiveness.   Def. Aff. at ¶¶ 24-30.   Further, after the Government rested its case, the defense informed the Court and Government of, at least, three defense witnesses that would be testifying the following day—what was believed to be a full day of testimony.   11T5:4-16.   Yet, when Mr. Patel arrived at court the next morning, he discovered that Sadow had sent an email to the Court earlier that morning, informing the Court that no witnesses would be called.   11T3:6-9.

It is at this point, Mr. Patel implores the Court's razor-sharp attention.   On Friday, December 9, 2022, the Government rested its case and the defense informed the Court and the Government that it would be calling the first set of three witnesses in pursuit of Mr. Patel's "good faith" and "advice of counsel" defenses.   Id.   By Sunday, December 11, 2022, defense witnesses had begun arriving in Miami and at approximately 8:44pm that same night, Brian Rafferty texts Mr. Patel with instructions to make sure his witnesses are available to testify the very next day, on Monday, December 12, 2022.   **De1162**.   At 8:35am Monday morning, Sadow sends an email to the Court, informing the Court that the defense would be calling no witnesses.   11T3:6-9.   When Mr. Patel arrived at court that morning, he discovered what Sadow had done.   Id.

The undersigned has never, during his decades of experience with the criminal justice system, having litigated cases in courtrooms across the country and having read thousands of

23

opinions—come across a scenario where the defense team informs the Court that they would be abandoning all defenses without first consulting with and getting the consent from the Client. Faretta v. California, 422 U.S. 806, 819-20 (1975) (For the Sixth Amendment, in "grant[ing] to the accused personally the right to make his defense," "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant."); and see Gannett Co. v. DePasquale, 443 U. S. 368, 382, n. 10 (1979) (the Sixth Amendment "contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense."). (Emphasis added).

Whether caused by an epiphany or the indulgence of a mood altering substance, it remains a mystery as to what could have motivated such a drastic change between the time Rafferty's text to de on Sunday evening directing Defendant to ensure the appearance of defense witnesses the next morning and Sadow's 8:35am email to the Court abandoning Defendant's defense that same next morning. Here, Sadow made the decision to abandon all defenses, executed that decision by informing the Court and then ambushed Defendant when he arrived in court later that morning— bullying him into agreeing with the decision after it was made. Def. Aff. at ¶ 29-36.

In fact, the defense had previously squandered a critical tactical advantage when they lost the use of the White evidence because of their misconduct and conflict—a result brought on by Sztyndor's choice to protect White's relationship with the Government as a cooperator as opposed to abiding by her constitutionally demanded loyalty to Mr. Patel. **De563**; EH1T49:15 – 51:3; EH1T56:2-17; EH1T212:4-13. Now, at the very moment the defense's case-in-chief was to begin, the team decides to fold—squandering the last chance to put up a significant, compelling defense. 11T3:6-9. It was evident that defense counsels merely went through the motions in order to hold Mr. Patel off so that the plug could be pulled on the defense when there was no opportunity for Mr. Patel to prevent that from happening.

24

Mr. Patel saw the writing on the wall and an aggressive, loud argument ensued between the two (Sadow and Mr. Patel) that could be heard in the courtroom and hallway outside the private room where they were located. Def. Aff. at ¶ 33. After Sadow adamantly refused to put on a defense case and forcefully espoused his opinion that the defense had the case won—Mr. Patel reluctantly gave in when the remaining defense team sided with Sadow. Def. Aff. at ¶ 34-37. A later opinion by this Court, however, describing the Government evidence as "overwhelming," confirmed Mr. Patel's perception that a conviction was certain if the Government's case goes uncontroverted by a "good faith" and "advice of counsel" defense. Doc. 535, p. 18.

Here, multiple attorney conflicts are clearly established in the record and the defense team's abandonment of a plausible, reasonable defense is clearly established in the record. It wasn't until Mr. Patel received and reviewed thousands of pages of newly discovered evidence that the link between the two became readily apparent. That link? **This Court's decision to open and ensure an investigation into the Chris White scandal.** CW2T34:11-25. Again, the moment this Court made it unmistakably clear that an investigation was forthcoming, the entire defense team was subject to exposure and, as a result, fell under continuing and real threat of prosecution. Id. From that moment forward, Mr. Patel's trial became a defense team tool for damage control. McLain, 823 F.2d at 1464 (A defense team trying a case while under a lingering threat of prosecution, inherently finds itself in conflict between the desire to aid the defendant and save themselves.).[13]

---

[13] Where, as here, defense counsels are under a threat of prosecution and subject to criminal investigation by the same prosecuting authority that is prosecuting the defendant, one of the primary concerns is whether "[t]he interests of lawyer and client…have diverged with respect to their dealings with that office." Armienti, 234 F.3d at 824–825. More specifically, this Court must be mindful of the defense teams' conflict between the desire to aid Defendant and save themselves. McLain, 823 F.2d at 1464. A defense counsel who is personally the subject of criminal charges or awaiting a decision as to whether such charges will be brought may believe that he or she has an interest in tempering the defense of the client "in order to curry favor with the prosecution." United States v. Levy, 25 F.3d at 156 (2d Cir. 1994); see also Anne Bowen Poulin, Conflicts of

When moving through the numerous defense conflicts, misconduct, including the cloud of uncertainty members of the Defense must have felt because of the continuing threat of prosecution and whether their participation in the Chris White cover-up would be exposed—it becomes a difficult endeavor to completely disconnect the Court's announcement of its decision to investigate that misconduct as a link between the conflicts caused by the misconduct and the defense team's decision to abandon all defenses.  Newsome, 774 F.2d at 1562 ("[I]t is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests"); and see Thompkins v. Cohen, 965 F.2d at 332 (7th Cir. 1992)(The threat of prosecution or an investigation that can result in criminal charges brought against the attorney "may induce the lawyer to pull his punches in defending his client lest the prosecutor's office be angered by an acquittal and retaliate against the lawyer.").

Indeed, one would have to be blind in one eye and hallucinaut in the other to not recognize the conflicts between counsel's own interests and that of defendants; between counsel's loyalty to Mr. Patel and the interests of Chris White as well as counsels' competing interests between each other that adversely served the interests of Mr. Patel.  These multi-layered, cross-collateralized, competing conflicts reveal a defense team in perpetual, ethical and moral chaos.

This Court should find that Mr. Patel is entitled to a new trial or, at a minimum, that a substantial question exists entitling Mr. Patel to a remand.

---

Interest in Criminal Cases: Should the Prosecution Have a Duty to Disclose?, 47 Am. Crim. L. Rev. 1135, 1165).  The threat of prosecution or an investigation that can result in criminal charges brought against the attorney "may induce the lawyer to pull his punches in defending his client lest the prosecutor's office be angered by an acquittal and retaliate against the lawyer" Thompkins v. Cohen, 965 F.2d at 332 (7th Cir. 1992).  In this regard, it is noted that "an indispensable element of the effective performance of [an attorney's] responsibilities is the ability to act independently of the Government and to oppose it in adversary litigation." Ferri v. Ackerman, 444 U.S. 193, 204 (1979).

26

**III.**   **Defendant's Healthcare-Counsel's "Double Agent" Activities, Including Having Unauthorized Communication With The Government Related To Defendant's Case and Providing The Government With Sensitive Defense Strategies, Coupled With Multiple Members Of The Defense Team Operating Under Significant Conflicts Of Interests Throughout the Entire Criminal Proceedings, Rose To The Level Of a Structural Error, Requiring A New Trial.**

The question to be decided under this Point is whether counsels' unchecked egregious misconduct, multiplicitous conflicts and cover-up spanning over 3 ½ years—culminating into the complete abandonment of Mr. Patel's defenses—rose to the level of structural error?

Because the facts of this case render the question under this point one of first impression, it is important to first define a structural error.

To begin, constitutional errors fall into two categories: trial error and structural error. Fulminante, 499 U.S. at 307-08.  Trial error happens "during the presentation of the case to the jury[ ] and may therefore be quantitatively assessed in the context of other evidence."  Id.  When trial error occurs, the courts evaluate it by determining whether the government has proven that the error was harmless to the outcome, beyond a reasonable doubt.  Id.  "[M]ost constitutional errors" fall into the category of trial error.  Gonzalez-Lopez, 548 U.S. at 148 (internal quotation marks omitted).  Structural error, in contrast, "affect[s] the framework within which the trial proceeds, rather than [being] simply an error in the trial process itself."  Fulminante, 499 U.S. at 310. This type of error "necessarily render[s] a trial fundamentally unfair."  Rose v. Clark, 478 U.S. 570, 577 (1986).

For this reason, when structural error occurs, the court does not give the government a chance to try to demonstrate beyond a reasonable doubt that the defendant was not prejudiced; instead, the court assumes prejudice without actually assessing the record for it.  See generally Gonzalez-Lopez, 548 U.S. at 148.  Failure to provide the "basic protections" at trial, id. —for example, an impartial judge, the correct standard of proof, an impartial jury, and the assistance of

counsel, see Neder v. United States, 527 U.S. 1, 9 (1999) —results in structural error because when any of these safeguards is missing, "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." Rose, 478 U.S. at 577-78, 106 S.Ct. 3101 (citation omitted).

The reality is that the effects of structural error can be difficult or even impossible to quantify. Gonzalez-Lopez, 548 U.S. at 150. And even when they can be assessed, structural error involves "'circumstances ...that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'" See Wright v. Van Patten, 552 U.S. 120, 124 (2008) (quoting Cronic, 466 U.S. at 658.). The Supreme Court has defined a structural error as a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." Fulminante, 499 U.S. 279, 310. The Eleventh Circuit interprets the Supreme Court's definition of "[a] structural error [as] one that so fundamentally affects the structure of judicial proceedings that it requires automatic reversal." United States v. Smith, 433 F. App'x 847, 850 (11th Cir. 2011). Therefore, once a petitioner demonstrates a violation of his Sixth Amendment right to conflict and misconduct-free counsel so egregious that it "affect[ed] the framework within the trial proceeds, rather than simply an error in the trial process itself," see Fulminante, 499 U.S. at 279, he need not show that the violation prejudiced him in any way. Id.

Here, the collective egregious behavior of counsels spanning 3 ½ years, including the multiplicity of competing conflicts, the abandonment of loyalty in favor of a cooperating witness, the double agent style betrayals, including delivering defense strategy to the adversary and implicating lead counsel's misconduct to the DOJ, the cover-up of unethical and illegal conduct in favor of their own self-interests—in particular, the complete abandonment of defenses that took years to develop and the continuing and real threat of prosecution— collectively making it almost

28

impossible for the Government to show that the error was "harmless beyond a reasonable doubt," see Weaver, 137 S.Ct. at 1908 (citing Chapman v. California, 386 U.S. 18, 24 (1967)), because the consequences of counsels collective actions are simply too hard to measure, i.e., where the precise effect of the violation cannot be ascertained.   Gonzalez-Lopez, 548 U.S. at 149 n.4 (quoting Vasquez, 474 U.S. at 263).

A.      Sztyndor's Conduct & Conflicts

The appreciation of Mr. Patel's position begins with a glimpse of the defense team's clandestine state of decomposition—Sztyndor must be addressed first:

**Emails from Sztyndor to the Government Prosecution Team:**

"**I even tried to help you in our aligned cases and you've been nothing but cruel to me.**" [**De175** (August 26, 2021).  (Emphasis added.)]

"If we go over every case I was ever involved in--- **DOJ prevailed (not in spite of me), but BECAUSE of me**.  For example, in Patel DOJ knew about the Chris White recordings before Steve 806ed Chris on the stand because I elected to tell Chris (once I had the confidentiality waiver from B2).  I previously wanted to tell Hayes but the Florida Bar Ethics lady said I needed the waiver--- so I waited until I had it… **The facts are that every DOJ case I was involved in I either stayed out of, or my voluntary participation actually helped DOJ**." [**De802-03** (Jan. 10, 2024).]

"You didn't think being exploited by my boss to the point where I **had to choose between Minal and Chris White was hard for me**?" [**De687** (April 2, 2024).  (Emphasis added.)]

"**Everyone knows I'll release all of the horrible recordings that I never handed in to Steve** to prove what really happened to me... And Minal gets a new trial… Steve will win again. And I deal with all of the fallout of what he orchestrated…" [**De719-20** (April 9, 2024).  (Emphasis added.)]

"**I protected all of you. I warned Chris White** at my own expense (and I'm not sorry because he didn't deserve what Steve was going to do to him)." [**De784** (June 18, 2024).  (Emphasis added.)][14]

---

[14] The list of egregious conduct, conflicted loyalties and threats to the DOJ are too numerous to mention.  See **De174; De179-83** (Informing Sadow she was reporting him to the Florida Bar)**; De540-41; De563** (Threatening DOJ about releasing recordings she made of Chris White that she

**"Jamie—I'm not going to rescue you like I did in Patel.  You're going to have to learn the law and show up**." **De545**.[15]

"fraud isn't the lack of medical necessity— it's the improper modifier use. Read the transcript. The tests wouldn't be paid unless you run the tests with an NCCI override modifiers (59 or one of the subsets like XS). **So that's the fraud—not the lack medical necessity**."  **De1160-61**.[16]

"**You let Tim [Loper] put me under criminal investigation?** For what? He tortured me and he loved every minute of it." **De869**.

"It is very upsetting that DOJ would let someone who clearly had a personal vendetta against me, not only **open a criminal investigation against me (when I was opposing counsel on Patel no less)**, but also initiate indictments against dozens of my clients . . . ." **De872**.

It is difficult to conceive that any attorney in this country could admit, in writing, to serious misconduct and openly threaten prosecutors at the Department of Justice with the release of secret recordings and other evidence that would adversely affect numerous cases they're prosecuting and nothing happens.  It is even more troubling that, in this case, the Government—the moment it learned that Sztyndor might have significant favorable evidence that she never disclosed to the

---

kept secret from the defense team)**; De610** (Claiming she reported everything to DOJ); and see **De675; De682; De688; De722-23; De785-86; De841; De846; De874-75; De876; De878; De886**; **De885**.

[15] Sztyndor provided defense strategy to the Government without Mr. Patel's consent.  **De006; De002; De1148**.

[16] While representing Mr. Patel, Sztyndor and O'Neill were actively investigating and preparing a *qui tam* complaint and provided DOJ with information used against Mr. Patel at trial.  While it is not clear if the *qui tam* was ever filed, it is clear Sztyndor was actively working to enrich herself and advance legal theories to the government that could injure her client, Mr. Patel.

defense team—did not immediately notify the defense and/or move before the Court to compel Sztyndor to disclose that evidence.[17]

The undersigned can only assume that the reason the Government chose to do nothing is because any information it obtained favorable to the defense would constitute Brady information. 373 U.S. at 87. They would then be compelled to turn all of that information over to the defense in this case and to defendants in any other respective cases. Id.

Equally as troubling is the fact that Sztyndor represented Mr. Patel under multiple significant conflicts of interest for over 3 ½ years—building a strong healthcare defense that included evidence that the Government was coercing witnesses to falsely inculpate Mr. Patel— only to be forced to withdraw from the case a few months before trial, causing the entire defense to implode, specifically because of those conflicts. EH1T43:25 – 47:16. Her conflicts, not only included reporting Mr. Patel's lead counsel to the Florida Bar for misconduct in this case but it also included her representing Mr. Patel while consulting the defense of Chris White and secretly giving White Mr. Patel's "privileged" defense strategies. Id.; **De6**; EH1T398:18 – 399:17.

Indeed, Sztyndor's own testimony before the ethics committee reveals her legal nakedness:

> MR. RODRIGUEZ: **Can you tell us <u>when you first found out</u> that Mr. White could be a potential witness in Mr. Patel's case that you were representing him in?**
> MS. SZTYNDOR: I knew he was a vendor. Again, he had a hundred and something down lines. I don't know which ones are going to be witnesses. So I don't -- **I would say that <u>I knew at the start</u>, he could have been a potential witness. That's why I said there was a potential conflict.**
> MR. RODRIGUEZ: **You're telling the committee that <u>at the very beginning you understood that you have a conflict</u>,** because Mr. White could be a potential witness in the case that you were representing Mr. Patel in?

---

[17] Brady v. Maryland requires the Government to disclose evidence known to it that is favorable or material to a defendant's guilt or punishment, whether or not the defendant requests it. 373 U.S. 83, 87 (1963).

31

> MS. SZTYNDOR: **I would say <u>I knew I had a conflict</u> and it could possibly be a potential conflict**.

EH1T39:4-24.  (Emphasis added).

To the point, Sztyndor turned on Mr. Patel's defense team, in favor of her loyalty to White. **De540-41**; **De687.**  She withdrew her representation of Mr. Patel and reported Sadow to the Florida Bar. EH1T97:14-17; EH1T43:25 – 47:16.  She also did something even more damning.  In September 2021, she emailed a DOJ attorney actively working on Mr. Patel's case with a "hypothetical" situation:

> Hey P… Can I ask you a hypothetical question? What if strikeforce indicted 2 people, and 1 of them was really guilty and the other person was innocent. And let's say, hypothetically, this could be proven from lawfully recorded calls in one party consent states and 89 pages of WhatsApp messages.
> Should the innocent person try to meet with the prosecutor and to disclose the exculpatory evidence or just present it at the hypothetical trial? Is that something that DOJ would hypothetically be responsive to? Or just wait until the hypothetical trial and get a jury verdict to acquit the person? This is a hypothetical so I was just wondering if you had an opinion on it. Asking for a friend.

**De1151**.  It is not difficult to see her attempt to prompt the government to inquire into the White recordings.  She further compounded this betrayal when, in August 2022, she sent a draft of a motion notifying the government that a Florida Bar Rules issue was causing her to withdraw from the case.  **De1156-59**.  Of course, then in November 2022 her betrayal was complete when she notified White's team about the recordings.

Sztyndor's betrayal also gave the Government the ability to preemptively neutralize the Chris White evidence gathered by the Defense.  EH1T468:6 – 469:18; EH1T433:25 – 435:12.

By September of 2022, the very next month, a superseding indictment was returned, completely removing Chris White as a coconspirator.  Id.  In retaliation for the defense team secretly recording him, White "immediately informed the Government about the existence of the[] recordings so that they could prevent the Government from being caught off guard…"

32

CWST20:22-24.[18]  In fact, "Mr. White himself on Thanksgiving met with and spoke with the Government prosecutors and did everything [he] could to secure the conviction of Mr. Patel…" CWST21:2-5.  White's retaliation successfully, neutralized any defense threat associated with the secret recordings.

Further, the moment Sztyndor was given an opportunity to help Mr. Patel (now her former client) by testifying on his behalf, she made herself unavailable.  Doc. 535 at 12.  For example, she threatened that if called as a witness, she would inform the jury that Mr. Patel's CGx testing was illegal.  Id.  She made this threat even though she was being called limited to Chris White's revelations that he was being coerced by the Government to falsely inculpate Mr. Patel—not as to CGx testing.[19]

Sztyndor's conduct conflicted and compromised herself, along with every member of the Defense team, ultimately triggering an ethics investigation that placed the entire team in legal jeopardy and under a threat of prosecution—eviscerating any chance the criminal proceedings could fairly run its course and Mr. Patel could be tried before a jury with a defense team free of Sixth Amendment infirmities.  Holloway v. Arkansas, 435 U.S. 475, 482 (1978).

As a last stand at snubbing her nose at every ethics rule governing the attorney/client relationship and every Sixth Amendment edict governing the obligation of counsel to the client, Sztyndor undertook to use Mr. Patel's conviction as a staging platform to her personal issues.  Doc. 454.  Instead of taking the opportunity to actually help Mr. Patel, she used motion practice to

---

[18] CWST denotes Chris White Sentencing Transcript dated April 4, 2023.  **De454.**

[19] Sztyndor made this threat even though she understood that CGx testing based upon family history alone was legal.  **De198-208**.

defend accusations of conflicts of interest and misconduct that were raised against her, commenting:

> "Mr. White entered into a Common Privilege relationship (or Joint Defense Agreement, hereinafter called [']CIP[']) with Mr. Patel… Because Mr. White and Mr. Patel were sharing certain information in furtherance of this privileged relationship, Jason Mehta, Esq. even assigned Attorney Sztyndor legal research projects to assist on Mr. White's efforts to obtain a plea deal with the Department of Justice when he was indicted on an *unrelated* pharmacy case."

Doc. 407 at 2.

A February 1, 2020 email from Sztyndor to Chris White and his attorneys, Jason Mehta and Lee Bentley reveals the truth. The so-called "Common Privilege relationship"/"Joint Defense Agreement" was not just a delusion, it was an outright lie:

> Hi,
> So I talked to Steve Sadow about sharing Lab Solutions information and he said we cannot do that. So the only client I have permission to share info with Chris White's counsel currently is from Chris Lytle… For any Lab Solution stuff you have to go direct to Steve Sadow…

**De1036.**[20]

Aside from her problem with the truth, Sztyndor had no issue reporting conduct on the part of Mr. Patel's defense team she believed to be abhorrent and wrong. In fact, Sztyndor's conduct presents a glaring constitutional crisis. Sztyndor notified everyone about the defense team's

---

[20] It should be noted that Sztyndor claimed to have communicated with White over two hundred times without obtaining any written consent from his attorney for the communications. EH1T129:7-14. Sztyndor then attempted to avoid legal jeopardy by claiming she was in Georgia for each of the 16-known secret records she made of White—a position designed to indicate the Florida criminal statute governing the matter was not violated. EH1T65:21 – 66:14. Once she was informed that the Florida criminal statute governs where the non-recording party is located, she pivoted and then stated that Chris White was not in Florida for any of the recorded calls, see EH1T238:21 – 247:24—a proposition contradicted by Chris White's attorney, see EH1T316:19 – 318:2, and impossible for her to personally know, especially given the fact that she was not with Chris White during any of the 16-conversations she admitted to recording and "hundreds" of other recordings she claims to have in her possession but did not inform the Defense. **De719-20, 879**.

transgressions, except this Court—the very tribunal she was obligated to notify—successfully thwarting "the ability of trial court[] to make early inquiry in certain situations likely to give rise to conflicts." Purvis v. Crosby, 451 F.3d 734, 741 (11th Cir. 2006). Her obligation to protect Mr. Patel and to inform this Court dated back to September of 2019 when she was aware that her actions created a conflict. See EH1T39:4-24; and see Garcia, 517 F.2d at 276.

B.       Sadow's and the Remaining Defense Team's Conduct & Conflict

Steve Sadow's conduct is, by far, the most egregious, the most destructive to the defense and the most disappointing, when considering the fact that he was lead counsel. His decision to hire Sztyndor on the defense team was clearly a catastrophic mistake. However, his conduct as leader of Mr. Patel's defense team and, in particular, his involvement in the Chris White scandal, proved to be a defense-extinction event.

The undersigned will set aside, for the moment, the fact that Sadow did not voluntarily inform the Court that he worked for LabSolutions as one of its compliance attorneys within the offense periods in the indictment, see Def. Aff. at ¶¶ 5-6, a position rendering him a material witness, especially with respects to Mr. Patel's "advice of counsel" defense. See R. Regulating Fla. Bar 4-3.7(a).

Attention is more aptly placed, however, with this Court's finding regarding the Chris White misconduct:

> THE COURT: Let me ask you, Mr. Mehta. She's not with us, so I don't want to jump the gun here. Has there been a Bar complaint filed against this lawyer? **Because I have to tell you, <u>that's quite egregious</u>. The fact that a lawyer would knowingly violate a Florida statute – this is not someone who doesn't know the law.** But as far as I know, most folks know Florida's privacy law.
> If my memory serves me right, it's Section 934.03, that you cannot record without mutual consent. And to have a lawyer do it, on top of **the fact she knows that there's counsel for that individual of record that she should go through to communicate with him <u>is quite egregious</u>.**

35

CW1T17:14-25.  (Emphasis added).

> [THE COURT:] …**And I want to be very clear.  I'm not imputing that conduct right now on the rest of my defense team**.  She's not in the case anymore.  But certainly, I'm very concerned that she even did that in the first place, and then now is no longer involved in this case.  I don't know if that's why.  **But certainly, I'm very troubled** that someone would do that.  This lawyer has been in the game quite a while.  She knows better.

CW1T18:1-7.  (Emphasis added.)

As previously stated, once a petitioner demonstrates a violation of his Sixth Amendment right to conflict and misconduct-free counsel so egregious that it "affect[ed] the framework within the trial proceeds, rather than simply an error in the trial process itself," see Fulminante, 499 U.S. at 279, he need not show that the violation prejudiced him in any way.  Id.  Here, Steve Sadow, Don Samuel and Brian Rafferty—the entire defense team was present at the above hearing.  They all clearly heard the Court, while finding Sztyndor's conduct egregious, refrain from pointing the finger and casting aspersions at or against them.  Id.  The Court then turned its attention directly to Mr. Patel's defense team—giving every member of the defense team an opportunity to exercise each of their obligations to be forthright and candid about their individual involvement in or knowledge of the Chris White communications and recordings, commenting in pertinent part:

> [THE COURT:] …**I guess I would turn, Mr. Sadow or Mr. Rafferty, to you all**. How would you have me -- and, **look, I don't know how much you did or did not know about what was being done by your former co-counsel. I don't want to get that far into it just yet.** But I think you guys understand my concern, that something procured this way -- I mean, look, let's be frank. You guys got a lot of knowledge out of this. Whether or not it's coming in or being used as a recording or a transcript, obviously, you got knowledge that you wouldn't otherwise have, and purportedly, from what I'm hearing, procured by some leading questions on a represented witness, **which is troubling**.
> But as I understand it, you guys talked about using it in your case-in-chief or that you would have Jencks concerns with it. I mean, at this point, I don't know how this entire piece of evidence just doesn't even get used at all. I mean, whether we want to call it as a sanction at how it was obtained, or all the other problems that flow from using this, the legality of it, et cetera, I don't know how I would let this come in given the way in which it was obtained.

36

**So can you guys walk me through? <u>I mean, you have to understand my concern on this.</u>**

CW1T20:9 – 21:5.

This was a defining moment in time for the case and Mr. Patel's fate. Sadow and the defense team already knew that Sztyndor had threatened to report Sadow to the Florida bar several months earlier, in August of 2022. **De179-80**. On August 22, 2022, Sztyndor actually reported Sadow to the bar for his misconduct. EH1T70:22 – 71:9. They were all aware of their individual complicity and vulnerabilities related to the Chris White episode. <u>See</u> EH1T452:17-22. The question was… Would they put Mr. Patel's interest before their own and come clean with the Court? Of course, mankind would learn how to draw blood from a stone before that would happen. Declining the opportunity to come clean, the defense team continued its push for admissibility of the Chris White evidence. CW1T21:6 - 24:1.

At a subsequent hearing on the matter, after reviewing the recordings and obtaining a more in-depth understanding of its content as well as the surrounding circumstances, the Court gave Sadow and the defense team a second chance to come clean:

> THE COURT: …I'm concerned about the behavior and I don't feel comfortable. **It may be that there's more to it, and when someone else looks at it, it raises a level of Bar discipline**. [CW2T7:22-25. (Emphasis added.)]
>
> …I don't want to give anyone incentive. But my view is the best way to do this is through discipline, and the discipline will, hopefully, be what dissuades anybody in a defense camp from doing this type of behavior, not hanging up the phone the minute someone that is a co-defendant or co-conspirator calls, without counsel present, under the no contact rule. [CW2T9:4-10.]
>
> …**I do know that once we kind of get this trial underway, I'm going to check in with our local rules committee, and <u>I'm going to make a referral that it be investigated.</u>  <u>I want it to be investigated.</u>**
> …**You can let your client know that <u>the Court is going to start an internal investigation</u> using its local rules committee for attorney discipline**. [CW2T34:18-24.]

37

If the defense team didn't know it before, they must have realized after hearing the Court's colloquy, that any defense attorney involved in the Chris White fiasco would be in serious trouble if found out and, certainly, did not belong on the defense team. Id. In other words, an investigation meant that their conduct, involvement or knowledge regarding the Chris White communication and recordings were subject to be exposed by an investigation—endangering both their license and career. See Rubenstein, 69 F. Supp. 3d at 1331; McLain, 823 F.2d at 1463-64; see also Thompkins v. Cohen, 965 F.2d 330, 332 (7th Cir. 1992)(The threat of prosecution "may induce the lawyer to pull his punches in defending his client lest the prosecutor's office be angered by an acquittal and retaliate against the lawyer. Such retaliation would be unethical; but still the defense lawyer may fear it, at least to the extent of tempering the zeal of his defense of his client somewhat.").

It was at this precise moment when each individual on the defense team had only two specific options—either inform the Court of their involvement and/or what they knew, see R. Regulating Fla. Bar R. 4-8.3, or withdraw as Mr. Patel's counsel. It is legally and ethically impermissible for any defense attorney to represent a client if he or she is under investigation for misconduct involving that same representation. R. Regulating Fla. Bar 4-1.16(c).

The moment the defense team decided to do neither but, instead, to continue on as Mr. Patel's attorney and to try him to a verdict, every single act or omission made by them in this case became suspect. McLain, 823 F.2d at 1463-64. This reality is highlighted by the ethics committee's aggressive stance on Sadow's responsibility to have informed the Court of his and the defense team's knowledge of and/or involvement in the Chris White scandal. EH1T521:2 – 526:9. It is also exacerbated by Sadow's own admission that the entire defense team was aware of communications and recordings, see EH1T452:17-22, and that it was him who orchestrated and directed the illegality:

38

MR. HEARON: After you read that memo, were you the one who suggested that taping the conversations would be a good idea?

MR. SADOW: I'd have to say that I would have said as long as she was doing it lawfully, then yes. **It probably would have been my suggestion, because I don't think -- at that point, I don't think she would have had the awareness to even do so.**

EH1T486:19 – 487:4.

The blind audacity reflected in that answer…  Here, the communications and recordings were not just unlawful, they represented an ongoing pattern of unethical and criminal conduct that was done in secret, without Chris White's or his attorney's knowledge.  EH1T312:24 – 313:16.

Members of the bar of the Southern District of Florida, including pro hac vice litigants, are governed in their professional conduct by the Rules Regulating the Florida Bar.  See First Impressions Designs and Management, Inc. v. All that Style Interiors, Inc., 122 F.Supp. 2d 1352, 1354 (S.D. Fla. 2000); see also Bayshore Ford Truck Sales, Inc. v. Ford Motor Co., 380 F.3d 1331, 1338 (11th Cir. 2004).  Those rules include but are not limited to:

R. Regulating Fla. Bar 4-1.16(c)( "a lawyer shall not represent a client or, **where representation has commenced, shall withdraw from the representation of a client if**: (1) the representation will result in violation of the Rules of Professional Conduct or law.").

R. Regulating Fla. Bar 4-3.7(a)("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness on behalf of the client…").

R. Regulating Fla. Bar 4-4.1(a)("In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person").  This prohibition includes misrepresentation.  See Comment Misrepresentation.

R. Regulating Fla. Bar 4-4.2(a)("In representing a client, a lawyer must not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer.")

R. Regulating Fla. Bar R. 4-8.3(a)(" A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects shall inform the appropriate professional authority.")

39

R. Regulating Fla. Bar R. 4-8.4 ("A lawyer shall not: (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects; (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.")

Every single one of the above rules of professional conduct were violated by members of Mr. Patel's defense team. Not only did Defense counsel's misconduct mandate their responsibility, pursuant to Rule 4-1.16(c) to withdraw from representing Mr. Patel en masse, counsel's conduct was subject to this Court's sanctioning power. See Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th Cir. 2005) (noting a district court's broad discretion to impose sanctions). One such sanction was removal from further participation as Mr. Patel's lawyer. Woods v. Covington County Bank, 537 F.2d 804, 810 (5th Cir. 1976). The sanction of attorney disqualification is especially relevant when attorneys admitted pro hac vice violate the Court's Local Rules and the Rules of Professional Conduct. Schlumberger Tech., Inc. v. Wiley, 113 F.3d 1553, 1561 (11th Cir. 1997).

For Sadow, Sztyndor and the remaining defense team to be complicit in misconduct for 3 ½ years—conduct that they kept from this Court—conduct that left the entire defense team vulnerable and conflicted, is constitutionally unforgivable. U.S. Const. amend VI; R. Regulating Fla. Bar. R. 4-1.16(c). To brazenly, with pride, admit that he was the catalyst of that conduct—condemning and then abandoning his client to a 27-year prison sentence—displays a level of carelessness rarely seen in the absence of sociopathy.

To date, the Supreme Court has identified a number of classes of errors as structural. Johnson v. United States, 520 U.S. 461, 468-69 (1997). See, e.g., McCoy v. Louisiana, 138 S. Ct. 1500, 584 U.S. 414 (2018) (attorney admission of defendant's guilt over defendant's objection); Sullivan v. Louisiana, 508 U.S. 275 (1993) (erroneous reasonable-doubt instruction); Vasquez, 474 U.S. at 254 (racial discrimination in selection of grand jury); Waller v. Georgia, 467 U.S. 39 (1984)

40

(violation of the right to a public trial); <u>McKaskle v. Wiggins</u>, 465 U.S. 168 (1984) (right to self-representation at trial); <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963) (total deprivation of counsel); <u>Tumey v. Ohio</u>, 273 U.S. 510 (1927) (lack of an impartial trial judge).

However, "[t]he precise reason why a particular error is not amenable to [harmless error] analysis—and thus the precise reason why the Court has deemed it structural—**varies in a significant way from error to error**." <u>Weaver</u>, 137 S. Ct. at 1907-08.  (Emphasis added).  The Supreme Court has adopted at least three broad rationales for identifying errors as structural.  **First**, an error has been deemed structural in instances where "'the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest,' such as 'the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty.'" <u>McCoy</u>, 138 S. Ct. at 1511, 584 U.S. 414, 416 (quoting <u>Weaver</u>, 137 S. Ct. at 1908).[21]

**Second**, an error has been deemed structural if the effects of the error are simply too hard to measure; i.e. where "the precise 'effect of the violation cannot be ascertained.'" <u>United States v. Gonzalez-Lopez</u>, 548 U.S. 140, 149 n.4 (quoting <u>Vasquez</u>, 474 U.S. at 263).  Such is the case where the consequences of a constitutional deprivation "are necessarily unquantifiable and indeterminate," <u>Gonzalez-Lopez</u>, 548 U.S. at 150.  For example, when a defendant is denied the right to select his or her own attorney, the government will, as a result, find it almost impossible

---

[21] This rationale fits hand-in-glove to Defendant's first argument that he was denied the right to counsel of his choice because the Court did not give him the opportunity to either choose to proceed to trial with conflict and misconduct free representation or to waive that right—caused by defense counsels deliberate failure to inform the Court of either their knowledge of and/or complicity in the 3 ½ years long scheme to unethically and illegally communicate and record the conversations of Chris White.

to show that the error was "harmless beyond a reasonable doubt." Weaver, 137 S. Ct. at 1908 (citing Chapman v. California, 386 U.S. 18, 24 (1967)).

**Third**, "an error has been deemed structural if the error always results in fundamental unfairness." Weaver, 137 S. Ct. at 1908. In these circumstances, it "would therefore be futile for the government to try to show harmlessness." Id.

These three categories are not rigid; more than one of these rationales may be part of the explanation for why an error is deemed structural. Weaver, 137 S. Ct. at 1908. Thus, an error can count as structural **even if the error does not lead to fundamental unfairness in every case**. Id., see Gonzalez-Lopez, 548 U.S. at 149, n.4 (rejecting the idea that structural errors "always or necessarily render a trial fundamentally unfair and unreliable").

Although only one rationale need be shown—in the case at bar, all three rationale for structural error are satisfied by the facts of this case.

As for the **First Rationale** for structural error, yes, Mr. Patel was aware that his then healthcare counsel was communicating with Chris White and that she had recorded, at least, some of their conversation—memorializing a wealth of exculpatory information, including damning revelations of Government coercion. Def. Aff. at ¶¶ 13-14. Additionally, Mr. Patel was involved in preparing his defense, participating in mock trial preparations and was present at every critical stage of the criminal proceedings. Id. On the surface, Mr. Patel's participation in protecting his freedom appears pricelessly perfect—as if a Picasso sitting on the wall of an elite art gallery.

However, Mr. Patel was not aware that Sadow had directed Sztyndor to communicate with White under circumstances contrary to the rules of ethics and without ensuring and then confirming consent was received from White's counsel. Def. Aff. at ¶¶ 44-56. Mr. Patel was unaware that the recordings were done secretly and illegally without both White and his counsel's

42

knowledge.  Id.  Mr. Patel was unaware that the acts of his lead counsel and healthcare counsel were not only unethical but criminal in nature, compromising their representation of him and subjecting them to disqualification from acting as his attorneys.  Id.  Mr. Patel was not aware of Sztyndor's double agent styled communications with the Government and that she was leaking information about defense counsel's activities, strategy and defenses.  Id.  Mr. Patel was not aware that before his trial began, Sztyndor had reported Sadow to the Florida bar for disciplinary violations related to Sadow's conduct in his case.  EH1T97:14-17.

Not knowing the extent of Sadow's involvement in directing Sztyndor in the Chris White scandal, Mr. Patel was not aware that Sadow and the remaining attorneys on his defense team, Brian Rafferty and Don Samuel had misrepresented and misled the Court regarding their involvement in and/or knowledge of the Chris White communications and recordings.  Id. Mr. Patel was not aware that, because of their individual acts and/or omissions related to their misconduct, his entire defense team took him to trial under a threat of prosecution—this threat of prosecution existed not just because some of the acts were criminal in nature but also because the Court had made it clear it was going to be seeking disciplinary investigation and action.  Id.  Mr. Patel was unaware that for over 3 ½ years, his attorneys, because of their misconduct, had placed into action a series of events that would implode his defense and ensure his conviction.  Id.

Contrary to what things appeared to be on the surface, the attorney misconduct, conflict of interests and ensuing coverup clearly indicates that Mr. Patel was out-of-the-loop regarding the true nature and posture of his representation which served to prohibit him from being involved in protecting his own freedom—having no idea how endangered that freedom was.  McCoy, 138 S. Ct. at 1511 (quoting Weaver, 137 S. Ct. at 1908)(It is a "'fundamental legal principle that a

43

defendant must be allowed to make his own choices about the proper way to protect his own liberty.'").

In essence that Picasso perched on the wall of an elite art gallery—at further examination—turned out to be the random, dyslexic scribblings of the criminally insane. And, the elite art gallery??? A federal prison in disguise. Counsels' conduct and resulting fallout created a structural error warranting a new trial. Weaver, 137 S. Ct. at 1908.

As for the **Second Rationale**, little comment is necessary. As espoused in arguments above, Defendant was denied the right to counsel of his choice—the right to be informed of counsel's improprieties and to be provided the opportunity to choose qualified counsel, free from misconduct and conflicting interests. Id. As a result and to avoid belaboring the Court, Mr. Patel incorporates herein with reference, those arguments in Point I and II to the extent they are applicable herein.

Finally, as for the **Third Rationale** for structural error, the Court's task here is impossible. Weaver, supra. In light of the horrendous conduct and disingenuousness of members of the defense team, this Court will never truly be able to determine the extent of any damage done to the criminal process generally and to Mr. Patel and his rights specifically. See United States v. Gonzalez-Lopez, 548 U.S. 140, 149, n.4; see also Stevenson, 774 F.2d at 1562. In this case, Mr. Patel proceeded to trial with a defense team who had been engaging in misconduct as a fundamental part of their representation throughout the entire criminal proceeding for over 3 ½ years.

When, as here, that misconduct—accented by multiple overlapping conflicts of interests and cover-up—culminated into the threat of prosecution, the fallout from that threat carries inherent "consequences that are necessarily unquantifiable and indeterminate, unquestionably qualify[ng] as 'structural error.'" Sullivan, 508 U. S. at 282. In essence, the criminal proceedings

44

in this case involved a Mr. Patel surrounded by representation fraught with betrayal, abandonment, conflicting interests, infighting, unethical and criminal conduct—a defense team that engaged a course of conduct which road roughshod over the proper and lawful administration of justice for over 3 ½ years. When factoring in the complete desertion of a "good faith" and "advice of counsel" defense, the totality the errors and its effect on Mr. Patel's case and rights "def[ies] analysis by 'harmless error' standards" because it "affec[ts] the framework within which the trial proceeds" and is not "simply an error in the trial process itself." Fulminante, 499 U. S. at 309-310.[22]

In the case at bar, the defense's conduct has caused Mr. Patel to suffer significant losses. It deprived him of the ability to properly protect his liberty. It deprived him of the opportunity to seek new counsel of his choosing—free of misconduct, conflict and compromise. And it deprived him of the basic fundamental fairness in constitutionally required criminal proceedings—the comfort that the criminal process, including his trial and the result was not corrupted or brought on, even in part, as a result of counsel's misconduct or conflicts. See Vasquez, 474 U.S. at 263. The magnitude and egregiousness of counsels' conduct here has structural implications as the list of deprivation and fallout adversely affecting the criminal proceedings generally and the trial specifically are immeasurable. Gonzalez-Lopez, 548 U.S. 140, 149, n.4.

---

[22] This Court has been unequivocal that the Government presented overwhelming evidence of guilt. Doc. 535 at 18. It is profoundly hard to believe that, upon the Government's decision to rest its case, highly experienced defense attorneys saw a "win" to the extent that they were willing to abandon 3 ½ years of preparing a "good faith" and "advice of counsel" defense—leaving witnesses, who travel far to testify, baffled about the sudden change and waste of their time… How could they see a definitive "win" when the court is seeing overwhelming evidence of guilt, uncontroverted because of the lack of a defense? It is this type of suspicion and struggle to understand counsels' motives when the case is corroded with misconduct, betrayal of loyalties and the lingering threat of prosecution—when the "effects of the error are simply too hard to measure." Weaver, 137 S.Ct. at 1908. Even Custer, seeing all was lost, gave a "last stand" at the Battle of the Little Bighorn.

This Court should give an indicative ruling that Mr. Patel is entitled to a new trial or, at a minimum, find that a substantial question exists warranting a remand.

**IV.     If The Court Believes That The Points Of Errors Sub Judice Do Not Individually Require Defendant's Conviction Be Vacated, Then In The Interest Of Justice And Fairness, The Cumulative Effect Of Those Errors Require Such A Result.**

Mr. Patel must begin this argument with the definition of what constitutes "error." "Error" is simply a deviation from a legal rule. United States v. Olano, 507 U.S. 725, 732-33 (1993) ("If a legal rule was violated during the district court proceedings, and if the defendant did not waive the rule, then there has been an "error" within the meaning of Rule 52(b)....").

Because the denial of "conflict-free" representation is a constitutional error, see Wood, 450 U.S. at 271 (The Sixth Amendment guarantees "a correlative right to representation that is free from conflicts of interest."), getting to this Point of argument usually means that this Court has "declare[d] a belief that [all errors were] harmless beyond a reasonable doubt." United States v. Guzman, 167 F.3d 1350, 1353 (11th Cir. 1999)(quoting Chapman, 386 U.S. at 24). The problem with such a finding, if made, is that the conflicts of interest here are not subject to harmless error analysis because they are structural errors, not trial errors. Cuyler, 447 U.S. at 349-50; McConico v. Alabama, 919 F.2d 1543, 1548 (11th Cir. 1990).

Since it is highly improbable this Court will find that a conflict of interest did not exist under the newly discovered evidence presented and espoused above, Mr. Patel must proceed with this argument based upon a presumption that the Court found that errors occurred but has determined the individual errors found do not entitle Mr. Patel to a new trial. See United States v. Labarbera, 581 F.2d 107, 110 (5th Cir. 1978) (holding that "cumulative effect of [multiple] errors" worked to deprive defendant of fair trial, although some errors, standing alone, would be subject to plain error review and others might be harmless).

Proceeding on this premise, it is important to reiterate that an "error" is defined as the deviation from a legal rule. Olano, 507 U.S. at 732-33. This truth means that the Court must look beyond the three Points of argument and consider every single "error" espoused within those three Points. For example, on October 4, 2019, Sztyndor created a constitutional dilemma when having the first known communication with White who was then unindicted coconspirator. EH1T16:11 – 22:13. That single text was a violation of the "no contact rule," see R. Regulating Fla. Bar. R. 4-4.2. The moment White began to communicate information indicating the Government was coercing him to falsely implicate Mr. Patel in the charged offenses, Sztyndor was simultaneously violating the "no contact" rule and subjecting herself to disqualification as a material witness in the case, see EH1T436:3 – 437:1; EH1T:10-23; EH1T493:11 – 494:1. These early violations called for her immediate withdrawal. R. Regulating Fla. Bar 4-3.7(a)("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness on behalf of the client…"); see R. Regulating Fla. Bar 4-1.16(c)("a lawyer shall not represent a client or, **where representation has commenced, shall withdraw from the representation of a client if**: (1) the representation will result in violation of the Rules of Professional Conduct or law."). The moment, Sztyndor failed or refused to notify the Court of her actions and to call for a Garcia hearing or, alternatively, to effectuate her obligation to withdraw under the rules of professional responsibility, that failure created an "actual conflict of interest" and was error. Id.

What we know today is Sztyndor repeated this error over 200 times—ultimately committing 200 distinct errors over the course of 3 ½ years. EH1T87:13-23; EH1T153:17-25; EH1T185:14-22; EH1T204:3-15; 213:24 – 214:3. We also know that at least 16 of those errors (the secret recording of Chris White) were criminal in nature. CW1T17:21-22. In fact, Sztyndor

47

claims to have secret recordings that she failed to turn over to the defense team—meaning it is difficult to tell how deep the rabbit-hole of individual errors go. **De719-20**.

Mr. Patel is not going to belabor this Court with a recitation of every single error mentioned in the Points above—suffice to say that lead counsel shared in Sztyndor's conflict as the person who both directed and orchestrated her actions. EH1T487:2-3. Sztyndor's additional betrayal of loyalties, double agent style acts, along with the defense team's efforts in covering up the Chris White misconduct and going into a trial conflicted under continuing threat of prosecution, significantly increased the individual acts of error.

In order to reject what is clearly a methodical disembowelment of the constitutional mandate for fundamental fairness, this court must view—as if nothing—hundreds of individual instances of error over the course of 3 ½ years, from the outset of the representation throughout pretrial investigation and the trial, up until post-conviction, when Sztyndor audaciously and impermissibly re-entered the representation of Mr. Patel, knowing that, by that time, she was the "Walking Dead" of conflict.

Here, only the complete absence of humanity—a desire to mock the goals of rationality and consistency required by the modern right to due process of law jurisprudence can result in the total rejection that a 3 ½ year epidemic of errors throughout the entire criminal proceedings requires a new trial in the interest of justice. See United States v. Hesser, 800 F.3d 1310, 1329 (11th Cir. 2015) (citing United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) ("Under the cumulative-error doctrine, [']an aggregation of nonreversible errors ... can yield a denial of the constitutional right to a fair trial, which calls for reversal."); Sanchez, 176 F.3d at 1220, 1225 (not resolving plain error question where cumulative effect of errors compelled reversal); cf. McLain, 823 F.2d 1457, 1462 (holding that although prosecutorial misconduct alone would not have

merited reversal, "the cumulative effect of the errors committed by the judge and the prosecutor…denied the defendants a fair trial"); see also Taylor v. Kentucky, 436 U.S. 478, 487 n.15 (1978) (finding that while cumulative errors are individually harmless, when taken together they can prejudice a defendant as much as a single reversible error and violate a defendant's right to due process of law.); and see United States v. Hands, 184 F.3d 1322, 1334 (11th Cir. 1999).

In the event, this Court does not find that the individual errors espoused in the Points above, warrants a new trial, the Court should, nonetheless, find that cumulatively the errors require such a result. Id.

**V.**      **Request For Hearing - In Light Of The Magnitude And Complexity Of The Errors Espoused In The Points Sub Judice, This Court Should Grant An Evidentiary Hearing Or, In The Alternative, Allow Oral Argument.**

     **A.**      **Evidentiary Hearing:**

A "decision whether to hold an evidentiary hearing on a motion for a new trial based on newly discovered evidence is within the trial court's sound discretion." United States v. Slocum, 708 F.2d 587, 600 (11th Cir. 1983). The sheer volume, extent and magnitude of errors here, especially when it raises issues of conflict of interest, constrains the Court to hold an evidentiary hearing. "To rule other-wise…would do violence to the court's duty to search for the truth…" Sexton v. Poole Truck Lines, Inc., 888 F.Supp. 127, 130 (M.D.Ala 1994).

For these reasons, Mr. Patel's request for an evidentiary hearing should be granted or, at the very least, oral argument should be allowed. See Local Rule 7.1(b)(2).

Dated: May 15, 2026          Respectfully submitted,

         */s/ Isaac Wright, Jr.*

         Isaac Wright, Jr. (*pro hac vice*)
         iwright@hunthamlinridley.com
         HUNT HAMLIN & RIDLEY
         60 Park Place, 16th Floor

49

Military Park Building
Newark, NJ 07102
Telephone (973) 242-4471

Gene R. Besen (*pro hac vice*)
gbesen@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, TX 75021
Telephone (469) 391-7400
Facsimile (469) 391-7401

*/s/ Carmen Elena Jule*
Carmen Elena Jule
Florida Bar No. 1030760
cjule@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
30 Rockefeller Plaza, 39th Floor
New York, NY 10112
Telephone (212) 653-8198
Facsimile (212) 653-8701

Attorneys for Minal Patel

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing was served on the U.S. Attorney's Office on this 15th day of May, 2026, via email.

*/s/ Carmen Elena Jule*
Carmen Elena Jule