**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | **Criminal Action** |
| Plaintiff, | : | |
| | : | Case No. 19-80181 |
| | : | |
| v. | : | VERIFICATION OF MINAL PATEL |
| | : | PURSUANT TO 28 USC § 1746 IN |
| MINAL PATEL, | : | SUPPORT OF HIS MOTION UNDER |
| | : | FED. R. CRIM. P. 33(a) FOR A NEW |
| Defendant. | : | BASED UPON NEWLY DISCOVERED |
| | : | EVIDENCE. |

I, MINAL PATEL, being of full age, and in lieu of oath does say that:

1. I am the Defendant in the above-entitled action and make this Verification of the following facts…

2. During the early part of 2013, I started a company called Labsolutions (hereinafter referred to as "LS"), located downtown Atlanta. LS began as a testing laboratory providing toxicology testing.

3. The company's growth was steady and by 2015-16 Labsolutions evolved into a Full-service laboratory located in a 17000 square feet space in mid-town Atlanta with the technological ability to proved a variety of services, including but not limited to CGx testing, all in-house.

4. By 2017, LS had spent millions of dollars on equipment. Further, LS now

employed over 120 people, including genetic experts, pathologists and a team of regulatory compliance attorneys from very reputable national law firms. The administrative procedures and standard operating procedures of the company was designed to maintain well trained staff, both in handling and testing specimens as well as understanding and maintaining compliance with regulatory, statutory and LCD requirements interpreted and enforced by the regional MAC.

5. In fact, my trial attorney, Steve Sadow, Esq., was also hired to help in certain aspects of the companies compliance requirements. His responsibility also included dealing a U.S., grand jury subpoena issued against me to testify in the United States case against Senthil Ramamurthy regarding a violation of the AKS.

6. Sadow, along with attorney, Tobin Watts negotiated a resolution with the DOJ that would avoid my testimony. Consequently, the DOJ would indictment me on healthcare fraud and AKS offense and then use Ramamurthy as a witness against me in my trial.

7. On pages --- of the letter-brief in support of my motion for a new trial, Defense counsel explains the prospective defense witness testimony related to the "operational procedures" of LS, breaking them down in five administrative and operational categories. I have reviewed that section of the letter-brief and attest that it is an accurate and true description of how LS was ran. As such, I incorporate that section of the letter-brief herein by reference.

8. On or about August of 2019, law enforcement entered LS and effectuated a search of the premises pursuant to a search warrant. Millions of dollars in company revenue was also frozen, essentially shutting the business down.

9. Tobin Watts, Esq., of Fox Rothchild was a part of the team of compliance attorneys representing LS and engaged law enforcement at the scene during their search. At this time, I had not been charged or indicted and, accordingly, Fox Rothchild began communicating with the DOJ in search of a civil resolution. Steve Peterson, Esq., an attorney at Fox Rothchild who specialized in White Collar defense had made significant headway in that respect and coordinated a meeting with the DOJ's office in Washington, D.C. designed to secure a civil resolution.

10. Before that meeting was able to take place, I brought on Steve Sadow who immediately changed course, indicating that the DOJ meeting was a setup to gather intelligence. Steve Sadow, however, never explained to me that because of his employment as a member of LS's compliance team, he was likely a material witness and prohibited by both the Florida and Georgia the rules of professional responsibility from representing me.

11. Without any communication with or approval from me, Steve Sadow sought release of the money seized/frozen in LS's bank account, demanding that I either by charged with an offense or that the money be returned.

12. The DOJ's response was to maintain it's control over LS's money and to

charge me with criminal offenses involving a violation of the healthcare fraud statutes and the AKS. In September 2019, I was arrested and subsequently released on bond. During my arraignment, the Court made a comment about my case being civil in nature and now its criminal. This brought me to question Sadow's decision to insist that the DOJ charge me with a crime or return LS's money.

13. Nevertheless, I pushed those thoughts aside as unsubstantiated paranoia. A month later, Steve Sadow hired Robyn Sztyndor as my healthcare specialist attorney. In early 2020, I became aware that Ms. Sztyndor had been both communicating with and recording conversations with Chris White. At the time, I was unaware of any illegal or ethical issues related to those recordings and none of my attorneys indicated to me that there was any ethical or legal issues with what they were doing.

14. What was told to me and what I believed, based on the content of Chris White's representation is that the Government was coercing White to falsely inculpate me in offenses charged against me. I agreed with my defense team that this was explosive evidence and that it seriously bolstered my defense by showing the jury that the Government's cooperating witnesses were subject to prosecutorial coercion designed to deliver perjured testimony before the jury for the sole purposes of falsely implicating me in the charged offenses.

15. This evidence was in addition to my "good faith" defense, supported by

several employees who would testify that LS was organized and operated with maintaining compliance as its number one concern; that any irregularity or violation of regulations or statute was not something deliberately designed by the company but was motivated exclusively by the executive team and the company's belief that they were following both the direction and approval of the MAC; and that I was not responsible nor involved in the day-to-day operation of the business but was highly sensitive to any act or omission by independent contractors who refused to follow the rules/demanding their immediate termination.

16. There was also a team of attorneys who advised the company in the area of compliance wherein we followed their direction to the letter. In fact, the defense team conducted mock trials related to the success rate of our defense at trial. For example, in 2021, a mock trial was conducted in preparation for my case. After mock government presentation of its case and in the absence of putting up a defense, toll of jury found me to be 80–90 percent guilty.

17. However, after the defense presented its case, submitting evidence of its defenses that included a mock presentation of "advice of counsel," a majority of jurors found me to be innocent. It became evident that a defense case where the jury received evidence of my defenses was not only needed, it was a mandatory requirement for the jury's decision making regarding my guilt or innocence.

18. As a result, throughout the pretrial period, and especially in the five months

leading up to trial, there was extensive defense preparation, including the identification of favorable witnesses, preparation of testimony, and issuance of subpoenas. There was clear strategy and supporting evidence to put on an advice counsel defense and a good faith defense, all supported and substantially strengthened by the Chris White evidence that was not important because of its impeachment quality but because it cast a grave shadow over the credibility of the Government's entire case.

19. Based on these preparations, I had a clear understanding that my defense would include live witness testimony and substantive evidentiary presentations. I also understood government witnesses would be fully-challenged with impeachment and exculpatory evidence.

20. During this time, I repeatedly asked trial team to not take advise and remove Don Oniel as a consultant to the defense team.  Don Oniel owned his own lab and was brought on as an independent and neutral guide on how—among other things—labs operated, how MACs operated and why MAC's, at least in the regions Labsolutions did business, approved the billing of CGx texting based upon family history alone.

21. However, I found out that Oniel had filed or was preparing to file a qui tam

under the whistleblower statue related to operation double helix and my case. I vehemently insisted that he be removed since I did not personally hire him and, at that point, Oniel was both in conflict with my defense and was a liability.

22.Brian Rafferty, Esq., who was a part of my defense team, responded by threatening me with violence. Specifically, he threatened to beat me ass with his phone if I ever brought up Don Oniel's name again in the context of firing him.

23.I immediately informed Sadow who was lead counsel and demanded that Rafferty be fired immediately but he refused, stating, Jusge Ruiz is not going to extend trial and we won't have any help or replacement.

24.During my trial, I became increasingly concerned with what I believed was the defense team's failure to use exculpatory and impeachment techniques during cross-examination to reveal both the unreliability and falsity of the Government's witnesses.

25.For example, during McMillan's testimony, the Government's used BRACA LCD to show that CGx testing based upon family history alone was not an approved test. I reminded my attorneys that the payments made by Medicare to Labsolutions were under an LCD other than the BRACA that was being used by the Government but they failed to bring that up in cross-examination.

26. I further pointed out that the LCD and guidelines the Government used to

explain CGx testing was actually guidelines for somatic testing. Still my lawyers failed to point that out to the jury during cross.

27.I pointed out to my attorneys that, contrary to the evidence, Labsolutions were not unable to bill maximum panels for purposes of overbilling because of automation. Under cross-examination, my attorneys failed to show that lab solutions testing and billing apparatus was fully automated. In other words, it was impossible to pick and bill codes just to manipulate max reimbursements. There was no room for deviant behavior and only what the doctor ordered was ran to get results. After result was created, it was sent to doctor automatically. Only after the doctor received the results was Medicare billed by an independent billing company.

28. This was is a very short list of counsel's failures to utilize cross-examination to properly impeach the Government witnesses and highlight the erroneous use of evidence to prove my guilt.

29. When I began to get upset about the decision to leave unchallenged blatantly false or erroneous testimony, my lead attorney, Steve Sadow assured me that whatever was not brought out or accomplished during cross-examination will be addressed and clearly put before the jury when we put on our case-in-chief.

30.However, on the day the defense was scheduled to begin presenting witnesses in its case-in-chief, I was informed, without prior notice, that no witnesses would be called.

31. I learned that LS's attorney, Tobin Watts, had been instructed by Brian Rafferty to go home, and that the defense team had decided to rest the case without putting on its years-long prepared case-in-chief. Sadow appeared very nervous when he realized that several other employee witnesses had arrived in Florida and were only a few minutes away from the Courthouse, waiting to be called as witness.

32. I insisted that they be called. But Sadow appeared nervous and directed me to a private room where a shouting match ensued. We were screaming so loud, that people in the hallways and courtroom could hear. Ultimately, Sadow shut the conversation down by outright refusing to put on a case-in-chief. Defeated by the fact that I had no other attorney to turn to that saw the need to put on a case as I did and nowhere to turn, I gave-in to Sadow's demands.

33. He instructed me to make sure the other witnesses who were standing-by to testify, Cecilia Godwin (RCS, billing manager, Medicare communication), Dr. Bernadette Wildermore (in-house Pathologist and Medical Director) and Matt O'Meara (sample integrity/rejections) went home and not show up to court.

34. Steve Sadow insisted that this decision was his alone and warned that if I continued to object, I would anger the judge. He aggressively insisted that, during the Court's colloquy, I instruct the Court that I did not wish to testify and did not want to present a defense. When I insisted that, in the absence of putting on a

defense, I was going down—I would certainly be convicted, Sadow insisted that the case was won and that we have the case in the bag. He was joined in that belief by Rafferty and Don Samuels when I looked to them for support.

35. I saw what happened in trial. It was clear to me that, without putting on our case-in-chief that the defense had been prepared for years, I would certainly be convicted. I could not understand how they were seeing something completely different than what I was. This was especially troubling since our mock trial results indicated that we would surely lose if we failed to present our defenses in our case-in-chief.

36. Despite my strong disagreement, I had no other attorney to turn to and ultimately followed the advise of my attorneys, doing everything they instructed me to do with regard to giving up my defense and not testifying.

37. Once that happened and the jury was instructed and then went into deliberations, Mr. Sadow left the trial without informing or warning me of his intensions—reportedly to attend a media-related event involving another client—leaving Don Samuels to monitor deliberations.

38. After the guilty verdict, I was in a State of severe distress and panic. Everything I had perceived had turned out correct and my lawyers were wrong. I struggled with the thought that my defense team did this to me deliberately and

couldn't understand why. In my desperation, I reached out to Ms. Sztyndor for help.

39.She met with me and discussed what she described as serious issues affecting my case. I asked her to rejoin my legal team, and she agreed, stating that prior conflicts, referred to as the "Sporn issue," were no longer present. However, she never told me that her conduct related to Chris White and other serious misconduct issues that I would later find out, actually disqualified her from representing me in any capacity related to my case.

40.She then filed papers on my behalf, purportedly to preserve important issues about the way my trial was conducted for appeal. However, it wasn't until I later had an opportunity to read her papers and to read the transcripts of that hearing that I realized she had no intention of preserving trial errors. She clearly took advantage of my distress and vulnerabilities in order to use my case as a platform to advance her own agenda—to defend what she perceived was her honor—pointing fingers at everyone she believed had done her wrong, including this Court.

41.I was embarrassed and ashamed at the pornographic content of some of her papers. I was horrified by the Court's disdain for her conduct—fearing that I had mad a catastrophic mistaking reaching out to her for help and that the Court would later use that against me.

42. Ultimately, Mr. Sadow and the rest of my defense team abandoned me, indicating that because of Ms. Sztyndor's latest filings and other things coming down the pipeline, they had to withdraw. The truth is, the entire Defense team and, in particular, Steve Sadow should have withdrawn from my case or, at a minimum, inform the Court of serious conflicts triggered by the Chris White communication and recordings so that the appropriate Garcia hearing could take place.

43. In fact, it wasn't until the March 13, 2024 and November 20, 2024, release of newly discovered evidence documents that I truly and fully understood how badly and deeply compromised my entire defense team was.

44. For example, until the release of those documents, I was not aware that Sadow had directed Sztydnor to communicate with White under circumstances contrary to the rules of ethics and without ensuring and then confirming consent was received from White's counsel.

45. I was unaware that the recordings were done secretly and illegally without both White and his counsel's knowledge.

46. I was unaware that the acts of my lead counsel and healthcare counsel were not only unethical but criminal in nature, compromising their representation of me and disqualifying them from acting as my attorneys.

47. I was not aware of Sztydnor's double agent styled communications with the

Government and that she was leaking information about my lead defense counsel's activities, strategy and defenses.

48. I was not aware that before his trial began, Sztydnor had reported Sadow to the Florida bar for disciplinary violations related to Sadow's conduct in his case.

49. Not knowing the extent of Sadow's involvement in directing Sztydnor in the Chris White scandal, I was not aware that Sadow and the remaining attorneys on his defense team, Brian Rafferty and Don Samuel had misrepresented and misled the Court regarding their involvement in and/or knowledge of the Chris White communications and recordings.

50. I was not aware that, because of their individual acts and/or omissions related to their individual and conspiratorial misconduct, my defense team took me to trial under a threat of prosecution—not just because some of the acts were criminal in nature but also because the Court had made it clear it was going to be seeking disciplinary investigation.

51. I was unaware that for over 3 ½ years, my attorneys, because of their misconduct, had placed into action a series of events that would implode his defense and ensure his conviction.

52. Contrary to what things appeared to be on the surface, the attorney misconduct, conflict of interests and ensuing coverup clearly indicates that I was out-of-the-loop regarding the true nature and posture of my legal representation

which served to prohibited me from being involved in protecting my own freedom—having no idea how endangered that freedom was.

53.For example, had I known that Sadow's and Sztyndor's conduct related to Chris White made them witnesses in my case or, in any other way compromise them as my attorneys, I would have absolutely disagreed with those actions, accompanied by the threat of being fired.

54.Had I found out after the fact, both attorneys would have been fired immediately and I would have brought in attorneys free of misconduct and impropriety.

55.Both Brian Rafferty as well as Don Samuels would have also been fired for failing to exercise their obligations to inform me and the Court of Sadow and Sztyndor's actions.

56.Finally, the conduct I discovered from the productions March and November 2024 production that was undertaken by Ms. Sztyndor was horrific. First, it indicates that Ms. Sztyndor had a personal relationship with AUSA Loper during my representation. It also indicates that she was exposing defense information to both Chris White's legal team as well as the Government. It indicates that the scope of illegal recording is significantly higher than anyone knew and involves individuals both members of the Defense team as well as AUSA Loper. And, finally, the newly discovered evidence indicates that Sztyndor threat to expose the

Government with her secret recordings had teeth. The Government literally, did nothing related to these threats and informed no one. The actions of Sztyndor was so unethical, reckless and destructive, that it endangered the entire me and my Defense team.

57. In essence, the moment the first unethical communications and illegal recording took place in September of 2019 and the information shared between the Defense team, every single lawyer should have been fired. Their silence alone required that I protect the integrity of my defense, my rights, the loyalty of my representation and my life. They all would have been fired, had I known the depth what was going on and how it effected me and my case. That reality especially hit home as I watched every single substantial defense plan and strategy we formulated over the years be abandoned at trial and the jury foreman condemn my fate as a result.

58. The sentence I received of over two and a half decades is proof positive that the conduct of my defense team played a significant role in my ultimate condemnation. As disclosed in the mock trial results and in the mountain of defense evidence that was never utilized and failure to conduct a defense case-in-chief, a new defense team, untainted by misconduct utilizing the proper defense evidence would probably achieve a different result in a new trial.

59. My plea to this Court is a constitutional request at a chance to be properly

and legally defended by loyal, competent counsel and to go before a jury with a defense team with the integrity and honor that would obligate them to the truth and candidness before this Court and a jury, uncompromised by misconduct and the threat of prosecution.

60. I declare under penalty of perjury that the foregoing is true and correct. Executed on November 6, 2026.

*/s/Minal Patel*
Register No. 20565-104
FCI Jesup
2600 Highway 301 South
Jesup, GA 31599