IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 9:19-cr-80181-RUIZ/REINHART

UNITED STATES OF AMERICA :
:
Plaintiff, :
:
v. :
:
MINAL PATEL :
:
Defendant. :
:

DEFENDANT MINAL PATEL'S MOTION FOR A NEW TRIAL
BASED UPON NEWLY DISCOVERED EVIDENCE

PLEASE TAKE NOTICE, that on a date and time decided by the Court, in the Wilkie D. Furguson, Jr., United States Courthouse in Miami, Florida, the undersigned counsel, Isaac Wright, Jr., Esq. and Gene Besen, Esq., on behalf of Defendant Minal Patel, will move before the United States District Court for the Southern District of Florida for an Order granting a new trial or, in the alternative, finding that a substantial question exists supporting remand.

## TABLE OF CONTENTS

INTRODUCTION .......... 1

BACKGROUND .......... 1

I. Over Years of Preparation, the Defense Team Builds a Strong Advice-of-Counsel and Good Faith Defense for Defendant's Case-in-Chief .......... 3

II. At Trial, Defendant's Counsel Abandons the Planned Defense Strategy at the Eleventh Hour Without Consulting Defendant, Resulting in His Conviction .......... 6

III. The Defense Team Violates Ethics Rules and Criminal Statutes and Misrepresents the Scope of Their Misconduct to the Court .......... 10

IV. Newly Discovered Evidence Reveals the Defense Team Was Cooperating with the Government Against Him .......... 16

LEGAL STANDARD .......... 20

ARGUMENT .......... 21

I. Newly Discovered Evidence Reveals the Defense Team's Misconduct and Conflicts, Previously Unknown to the Court, Deprived Defendant of a Required Garcia Hearing and Violated His Sixth Amendment Right To Conflict-Free Counsel of His Choice. .......... 21

II. The Defense Team's Misconduct, Including In-Fighting over the Use of Illegal Recordings, Unlawful Instructions from Lead Counsel, and Efforts to Protect Themselves at the Expense of Defendant, Deprived Defendant of His Sixth Amendment Right to Conflict-Free Counsel. .......... 30

III. Sztyndor's Cooperation with the Government by Clandestinely Delivering Sensitive and Privileged Defense Information to the Government and the Attorney for a Cooperator Against Defendant, Violated the Fifth and Sixth Amendments and Warrants a New Trial. .......... 42

IV. Defendant's Healthcare-Counsel's "Double Agent" Activities, Including Having Unauthorized Communication With The Government Related To Defendant's Case And Providing The Government With Sensitive Defense Strategies, Coupled With Multiple Members Of The Defense Team Operating Under Significant Conflicts Of Interests Throughout The Entire Criminal Proceedings, Rose To The Level Of A Structural Error, Requiring A New Trial. .......... 55

V. The Cumulative Effect Of These Errors Requires a New Trial. .......... 58

VI. In the Alternative, the Court Should Grant an Evidentiary Hearing .......... 59

CONCLUSION .......... 60

## Appendix of Newly Discovered Evidence Documents


1.EMAIL: Robyn Sztyndor to Chris White & his attorneys (Dated - 2/4/2020)
Providing White's defense team with legal memo .......................................................**De1**

2.EMAIL: Robyn Sztyndor to Chris White & his attorneys (Dated – 2/9/2020)
Providing White's defense team with legal memo on PGL..........................................**De2**

3.EMAIL: Robyn Sztyndor to Chris White & attorneys (Dated – 2/10/2020)
Updating White's defense team on her compliance analysis........................................**De3**

4.EMAIL: Robyn Sztyndor to Chris White & his attorneys (Dated - 4/4/2020)
Providing White's defense team with legal advice on AKS ..........................................**De4**

5.EMAIL: Robyn Sztyndor to Chris White & his attorneys (Dated – 4/5/2020)
Providing White's defense team opinion on criminal conspiracy..................................**De5**

6.EMAIL: Robyn Sztyndor to Chris White & his attorneys (Dated – 8/14/2020)
Providing White's defense team with meeting notes.....................................................**De6**

7.EMAIL: Robyn Sztyndor to AUSA Prosecution Team (Dated – 12/27/2020)
Enlightening Government on errors found by Defense ..........................................**De7-131**

8.EMAIL: Robyn Sztyndor to the Defense team (Dated – 12/31/2020)
Providing memo Mistake of Law to defense, and same to Gov. .........................**De132-135**

9.EMAIL: Robyn Sztyndor to Chris White & his attorneys (Dated – 1/18/2021)
Informing she will be providing another compliance memo.....................................**De136**

10.Robyn Sztyndor and Don O'Neill - Authors (Dated 3/16/2021)
Presentation: Operation Double Helix Powerpoint.............................................**De137-146**

11.EMAIL: Robyn Sztyndor to AUSA Prosecution Team (Dated – 7/16/2021)
Enlightening Gov. about meaning of recordings and illegal biller .............................**De147**

12.EMAIL: Robyn Sztyndor to AUSA Prosecution Team (Dated – 7/16/2021)
Enlightening Gov. about meaning of recordings and illegal biller ......................**De148-151**

13.EMAIL: Robyn Sztyndor to AUSA Prosecution Team (Dated – 7/16/2021)
Informing the Gov. they will not understand info requested…...……………….**De152-153**

14.EMAIL: Robyn Sztyndor to Chris White (Dated – 7/27/2021)
.................... Helping White understand applicable regulations……………………. **De154**

15.EMAIL: Robyn Sztyndor to DOJ attorneys Hayes and Queenan (Dated – 8/15/2021)
Providing DOJ transcript of O'Neill call with Healthrecon ..............................**De155-173**

16.EMAIL: Robyn Sztyndor to DOJ attorneys Hayes and Queenan (Dated – 8/18/2021)
Telling Patrick Queenan not to talk to her anymore ................................................**De174**

17.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 8/26/2021)
Accusing Loper of bullying her and referencing recordings ...................................**De175**

18.EMAIL: Robyn Sztyndor to Steve Sadow (Dated – 10/6/2021)
Sadow telling Robyn to pick up "IF IF IF" White calls……….........................**De176-178**

19.EMAIL: Steve Sadow to Robyn Sztyndor (Dated – 8/19/2022)
Telling her not to contact the Florida bar………………..……………………..**De179-183**

20.TEXT: Robyn Sztyndor to Jason Mehta (Dated – 8/25/2022)
Warning Mehta about Steve harming White

TEXT: Robyn Sztyndor to Jason Mehta (Dated – 11/1/2022)
Warning Mehta about Steve harming White ......................................................**De184-246**

21.EMAIL: Brian Rafferty to Robyn Sztyndor (Dated – 11/14/2022)
Informing Robyn she is on the witness list ........................................................**De247-248**

22. OMITTED pursuant to ECF 700.

23.TRANSCRIPT: Chris White's sentencing hearing (Dated – 4/3/2023)
Mehta states that White would have testified in Patel .......................................**De454-539**

24. – RESERVE –

25.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 7/9/2023)
Repeated references to warning Chris White…………………….…………….**De540-541**

26.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 11/24/2023)
Sending DOJ screenshot of text warning Mehta about Sadow..................................**De542**

27.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 12/4/2023)
Telling DOJ she was mad about White while representing Minal……………..**De543-544**

28.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 12/17/2023)
Telling Jamie she rescued her in the Patel case ..................................................**De545-562**

29.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 12/18/2023)
Explaining how she “bailed out” DOJ in Patel ..................................................**De563-600**

30:EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 12/20/2023)
Sending a Chris White recording that “slams” DOJ ..................................................**De601**

31.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 1/10/2024)
Explaining that she told White their trial strategy ..............................................**De602-603**

32.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 1/16/2024)
Stating she protected Chris White from Sadow ..................................................**De604-607**

33.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 1/21/2024)
Detailing abusive messages from Sporn ............................................................**De608-609**

34.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 1/21/2024)
Continuing previous thread about Sporn ..................................................................**De610**

35.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 2/10/2024)
Robyn was aware that Sadow would lie to the judge ……………………………….**De611**

36. OMITTED pursuant to ECF 700.

37.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 3/9/2024)
Asking what would happen if she hadn’t warned White ..........................................**De675**

38.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 3/18/2024)
Sending DOJ a recording with Qlarent ............................................................**De676-680**

39.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 3/24/2024)
Asks what would have happened if White took the stand ........................................**De681**

40.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 3/24/2024)
Asks what if she had not warned White on 11/15.....................................................**De682**

41.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 3/24/2024)
Sending screenshot of Sadow transcript from hearing ……............................ **De683-686**

42.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 4/2/2024)
Said she was forced to choose between Minal and Chris ........................................**De687**

43.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 4/6/2024)
References warning White ........................................................................................**De688**

44.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 4/7/2024)
Discusses her emotional instability ....................................................................**De689-718**

45.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 4/9/2024)
References Steve setting up Judge Ruiz ..........................................................**De719-720**

46.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 4/21/2024)
References Sadow setting up Hayes with recordings ..............................................**De721**

47.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 4/25/2024)
Discusses Sadow frequently keeping her from leaving Patel case ......................**De722-723**

48. OMITTED pursuant to ECF 700.

49.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 6/6/2024)
Telling Hayes that Steve's actions caused her disbarment........................................**De780**

50.FILING: Order barring Sztyndor from SDFL practice (Dated – 6/5/2024)
Upholds ad hoc committee's findings ................................................................**De781-783**

51.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 6/19/2024)
References warning White to protect DOJ ............................................................**De784**

52.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 7/2/2024)
References falling on her sword by warning DOJ about White ..........................**De785-786**

53.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/12/2024)
Very friendly references to DOJ attorneys................................................................**De787**

54.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/13/2024)
Calling a DOJ attorney a house husband …………………………... ....................**De788-812**

55.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 9/14/2024)
Discusses Clerkson, Garret, and Ray as DOJ work friends……...........................**De813-814**

56.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/14/2024)
References Sadow sucking her into criminal cases ...........................................**De815-840**

57.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/15/2024)
References Steve recordings being bad .............................................................**De841-845**

58.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/16/2024)
References recordings of Tim Loper.............................................................................**De846**

59.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/17/2024)
References wanting committee evidence produced .................................................**De847**

60.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 9/18/2024)
References confiding in Hayes about "the Brians" ...................................................**De848**

61.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/19/2024)
References a Steve Sadow "pirate plan" ...........................................................**De849-851**

62.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/19/2024)
Accuses Loper of mistreating her since Patel ..........................................................**De852**

63.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/21/2024)
Says Tim is why Steve made her record ...........................................................**De853-855**

64.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/21/2024)
References Steve recording everything ............................................................**De856-858**

65.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/22/2024)
References Robyn under criminal investigation ................................................**De859-862**

66.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/23/2024)
References subpoenaing her when she was opposing counsel ...........................**De863-866**

67.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/23/2024)
Sztyndor sent Loper abusive email while repping Patel ...........................................**De867**

68.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 9/23/2024)
Asks by Hayes didn't protect her from Loper .........................................................**De868**

69.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/23/2024)
References criminal investigation and Steve making her record ........................**De869-871**

70.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/24/2024)
Says she was under criminal investigation while repping Patel ...............................**De872**

71.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/25/2024)
Refers to DOJ attorney as house husband ................................................................**De873**

72.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/27/2024)
Says Loper saw everything ....................................................................................**De874-875**

73.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 10/8/2024)
Threatens to publish the worst Sadow recordings ...................................................**De876**

74.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 10/10/2024)
Says she waived confidentiality on committee evidence ..........................................**De877**

75.EMAIL: Robyn Sztyndor to DOJ attorney Hayes (Dated – 10/10/2024)
Says she can release recordings whenever she wants ..............................................**De878**

76.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 10/12/2024)
References Sadow recordings and DOJ slut shaming her .......................................**De879**

77.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 10/16/2024)
References videos making DOJ attorneys look like criminals .................................**De880**

78.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 10/22/2024)
References warning Chris White ..................................................................**De881**

79.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 12/1/2024)
Forwards 12/27/2020 email and asks if Jamie used incorrect CDX guidelines to wrongfully convict Minal ......................................................................**De882-883**

80.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 4/12/2025)
References O'Neill qui tam and Tier 2 codes ....................................................**De884-885**

81.EMAIL: Robyn Sztyndor to many DOJ attorneys (Dated – 9/15/2024)
References that DOJ not appreciating her ........................................................**De886-891**

82.TRANSCRIPT: Call between Don O'Neill and Scottie Ward
Discusses CMS billing mistakes ..........................................................................**De892-905**

83.SIGNAL INFO: Robyn Sztyndor and Chris White communications
Documents of their extensive conversations ......................................................**De906-960**

84.TEXTS: Text groups including Sztyndor and Sadow
Multiple discussions involving White calls ......................................................**De961-993**

85.TEXTS: Robyn Sztyndor and Steve Sadow Texts
Text messages about Chris White recordings ..................................................**De994-1032**

86.FILING: Entire 407-1 filing with multiple emails ................................................**De1033-1134**

87.EMAIL: Robyn Sztyndor to Sadow (Dated – 12/14/2019)
Forwarding White Convo Memo dated 12/7/2019 ........................................**De1135-1145**

88.EMAIL: Robyn Sztyndor to Ryan Schubert (Dated – 10/5/2020)
Later forwarded to De Boer before Patel involvement ..................................**De1146-1147**

89.EMAIL: Robyn Sztyndor to White team (Dated – 1/25/2021)
Sztyndor forwards draft filing to White ........................................................**De1148-1150**

90.EMAIL: Robyn Sztyndor to Government (Dated – 9/25/2021)
Sztyndor asks Queenan hypothetical question about recordings ............................ **De1151**

91.EMAIL: Robyn Sztyndor to Sadow and Patel (Dated – 8/22/2022)
Sztyndor sends questions from ethics hotline ................................................ **De1152-1153**

92.EMAIL: Robyn Sztyndor to Government (Dated – 9/25/2023)
Robyn email is forwarded to De Boer .................................................................. **De1154**

93.EMAIL: Robyn Sztyndor to Government (Dated – 10/14/2023)
Robyn says she has been mistreated by De Boer .................................................. **De1155**

94.EMAIL: Robyn Sztyndor to Government (Dated – 8/22/2022)
Robyn sends draft referencing Florida Bar ethics issues ............................... **De1156-1159**

95.EMAIL: Robyn Sztyndor to Government (Dated – 8/15/2021)
Robyn instructs government on testing modifiers ........................................ **De1160-1161**

96.EMAIL: Brian Rafferty to Minal Patel (Dated – 12/11/2022)
Rafferty tell Patel to make sure witnesses are ready ............................................... **De1162**

97.EMAIL: Email from Paul Gerrard (Dated – 8/14/2018)
Discussing LabSolutions' approved billing codes ................................................. **De1163**

98.Moldx Approvals for LabSolutions
Showing billing codes approved for LabSolutions ....................................... **De1164-1192**

99.EMAIL: Palmetto to LabSolutions (Dated – 08/14/2018)
Discussing coverage of testing panels ……………………………………………..**De1193**

100.REPORT: PGx and CGx Test Analysis (Dated – December 2017)
Analyzing LabSolutions testing offerings …………………………………...**De1194-1232**

101.EMAIL: Don Samuel to Tobin Watt (Dated – 11/30/2022)
Discussing Watt's expected testimony ……………………….......................**De1233-1234**

102.EMAIL: Robyn Sztyndor to Government (Dated – 10/15/2023)
Robyn says she has cooperated with DOJ……………………………………….**De1235**

103.EMAIL: Internal Defense Team (Dated – 11/14/2022)
Discussing testimony of LabSolutions employees…………………………..**De1236-1240**

104.EMAIL: Tobyn Watt and Minal Patel (Dated – 7/12/2019)
Discussing memo from Watt to LabSolutions re: EKRA……………………**De1241-1243**

105.EMAIL: Jon Beraducci to LabSolutions team (Dated – 11/18/2018)

Sending Baker Donelson memo on Antikickback Compliance……………...**De1244-1251**

106.EMAIL: Don Samuel to Defense Team (Dated – 11/20/2022)
Referencing a memorandum responding to Jason Mehta………….……………….**De1252**

107.WITNESS LIST: Minal Patel's witness list (Dated 11/14/2022)........................**De1253-1256**

108.EMAIL: Internal Defense Team (Dated – 11/14/2022)
Discussing planned defense case…………………………………………….**De1257-1261**

109.EMAIL: Internal Defense Team (Dated – 11/20/2022)
Exchanging memo to the Court regarding CW recordings…………………..**De1262-1265**

110.EMAIL: Robyn Sztyndor to Government (Dated – 6/5/2025)
Referencing Sztyndor and Clarkson filing qui tams……………………………….**De1266**

111.EMAIL: DOJ Queenan to De Boer and Loper (Dated – 9/26/2021)
Forwarding Robyn's hypothetical question email………………………………….**De1267**

112.EMAIL: Robyn Sztyndor to Government (Dated – 7/16/2023)
Forwarding government privileged defense communication………………..**De1268-1269**

113.EMAIL: Robyn Sztyndor to Government (Dated – 8/3/2021)
Sending DOJ info about potential cooperation……………………..………………**De1270**

114.EMAIL: Robyn Sztyndor to Government (Dated – 11/14/2021)
Sending DOJ tip about kickbacks involving lab testing……………......................**De1271**

115.EMAIL: Robyn Sztyndor to Government (Dated – 11/14/2021)
Sending DOJ tip about kickbacks involving lab testing……………......................**De1272**

116.EMAIL: Robyn Sztyndor to Government
Sending DOJ tip about alleged billing fraud scheme…………….........................**De1273**

117.EMAIL: Robyn Sztyndor to Government (Dated – 6/6/2024)
Discussing exculpatory recordings for Patel……………………………………….**De1274**

118.EMAIL: Robyn Sztyndor to Government (Dated – 3/24/2025)
Discussing Don O'Neill's qui tam……………………………….........................**De1275**

119.EMAIL: Robyn Sztyndor to Government (Dated – 6/5/2025)
Discussing filing qui tams with Clarkson…..……………………..........................**De1276**

120.EMAIL: Robyn Sztyndor to Government (Dated – 6/5/2025)
Discussing lab kickback scheme……….…..…………………….........................**De1277**

120.EMAIL: Don Samuel to Defense Team (Dated – 11/20/2022)
Exchanging memorandum responding to Mehta .............................................**De1278-1281**

## INTRODUCTION

Newly discovered evidence demonstrates that for years in the run-up to the Defendant's trial, his defense team engaged in misconduct that is possibly unprecedented in its scope and severity. This Court should grant a new trial for each of five independent reasons. *First*, the defense team's failure to disclose unethical and criminal conduct to the Court created a conflict of interest that violated the Defendant's Sixth Amendment right to counsel of his choice, a structural error that requires a new trial. *Second*, conflicts between members of the defense team and with the Defendant adversely affected the defense case, violating Defendant's Sixth Amendment right to unconflicted counsel and to put on evidence of his choice. *Third*, the defense team's unauthorized and clandestine disclosure of the Defendant's privileged information to the Government, and a Government cooperator, violated the Defendant's Fifth and Sixth Amendment rights. *Fourth*, this egregious conduct, which spanned from the Defendant's indictment through the jury's verdict, and the threat of criminal prosecution by the federal Government, constitutes a structural error. *Fifth*, the cumulative effect of these errors requires a new trial. At minimum, the Court should grant an evidentiary hearing to lay bare the full extent of defense counsel's newly discovered misconduct and the devastating effects it had on the Defendant's defense.

## BACKGROUND

On August 16, 2019, federal agents effectuated a search of Mr. Patel's business, LabSolutions, LLC ("LS"). Counsel's Aff. ¶ 1.[1] One of LS's compliance attorneys, Tobin "Toby" Watt, Esq., rushed to the lab during the search and spoke with federal agents. After the search, Watt's firm, Fox Rothschild, immediately engaged the Government and began negotiating a civil

[1] "Counsel's Aff." denotes the affirmation of attorney Isaac Wright, Jr., Esq., dated November 5, 2026, prepared as a proffer of evidence in support of Defendant's motion for a new trial. "Def. Aff." denotes the affidavit of Defendant Minal Patel filed in support of this motion.

resolution. Id. A meeting set at DOJ's office in Washington, D.C., in furtherance of that discussion was abruptly halted by Steve Sadow, Esq., who had also been involved in advising LS regarding some of its business practices. Id.

Instead of allowing Fox Rothschild to proceed discussing a civil resolution with the DOJ, Sadow demanded, in a letter to the DOJ, for the Government to either release LS's funds that had been frozen incident to the search or to charge Mr. Patel with an offense. Id. In response, the DOJ charged Mr. Patel with a variety of healthcare and related offenses. Id.

From that moment, all other LS attorneys were out and Sadow became lead counsel in Mr. Patel's criminal case. Id. Sadow's strategic blunder in calling the DOJ's bluff paled in comparison to the tragedy that became Mr. Patel's defense team. Id. ¶ 32. By the time Mr. Patel's case came before a jury, the misconduct of Sadow and the other defense attorneys within the team had spanned years and had deteriorated the sanctity of the team and Defendant's defense to such an extent that a fair trial with the competent performance of qualified counsel had long disappeared. Id. at ¶¶ 13, 17, 28.

Themselves under the threat of prosecution, the Defense team limped through Mr. Patel's trial while using the surface performance of cross-examination to camouflage the reality that they were actually sitting on their hands—a revelation that did not become apparent to Mr. Patel until newly discovered evidence surfaced post-conviction. Def. Aff. ¶¶ 43-56. That evidence reveals violations of Mr. Patel's Fifth and Sixth Amendment rights to conflict-free, loyal counsel of his choice. As a result, Mr. Patel implores this Court to grant him a new trial or, in the alternative, find that an evidentiary hearing is warranted.

## I. Over Years of Preparation, the Defense Team Builds a Strong Advice-of-Counsel and Good Faith Defense for Defendant's Case-in-Chief

Defendant Minal Patel founded LabSolutions, LLC ("LS"), a CLIA certified clinical laboratory, in 2013 in Atlanta, Georgia. Def. Aff. ¶ 2. Under Defendant's ownership, LS grew steadily by running a wide variety of clinical tests, including genetic tests. Id. ¶ 3. Defendant reinvested his profits in LS by purchasing millions of dollars of equipment and a large physical facility, hiring doctors and other laboratory professionals, and engaging outside lawyers and consultants to create a structured system of regulatory compliance and legal oversight designed to keep LS within the bounds of the law and to submit claims for its testing in compliance with billing and coding requirements. Id. ¶ 4. LS billed its claims to several third-party payors, including Medicare.

The process for submitting and processing claims under Medicare "is governed by a notoriously complex statute." Advoc. Christ Med. Ctr. v. Kennedy, 605 U.S. 1, 5 (2025); see United States ex rel. Drummond v. BestCare Lab'y Servs., LLC, 950 F.3d 277, 281 (5th Cir. 2020) ("The byzantine laws governing Medicare reimbursement have been aptly described as a 'labyrinth.'"). To the point, the series of statutes, regulations, National Coverage Determinations ("NCDs"), and Local Coverage Determinations ("LCDs") that apply to Medicare reimbursement for genetic testing and the associated rules for payments to marketers is particularly complex, and the Medicare coverage policies for genetic testing underwent substantial changes over the period of 2016 to 2020. And the rules for reimbursement are frequently interpreted in different ways by different Medicare Administrative Contractors ("MACs") in different parts of the country. For example, LS's MAC changed from Cahaba to Palmetto in February 2018, and CMS issued a new NCD applicable to next-generation sequencing genetic tests (NCD 90.2) in March 2018, which applied only to somatic testing (not germline testing), and was only later revised in January 2020,

to address germline (i.e., CGx) testing for the first time. It goes without saying that providers in the genetic testing space like LS necessarily rely on the advice of specialized healthcare attorneys to navigate this web of authority and the often ambiguous or conflicting regulatory language.

In 2019, federal agents effectuated a search of LS's headquarters, and the Government obtained a court order freezing its assets, effectively shutting the company down. Def. Aff. ¶ 8. On September 24, 2019, a grand jury indicted Defendant. ECF 1. The original indictment charged Defendant in 13 counts with conspiracy to commit health care fraud and wire fraud, health care fraud, conspiracy to defraud the United States, payment of kickbacks in connection with a federal health care program, and conspiracy to commit money laundering. Id. The indictment referred to a large number of alleged coconspirators, one of whom was Edward Christopher White. See Sep. 19, 2022 Hr'g Tr. 5:13-17, ECF 630. The Government unveiled Defendant's indictment along with indictments of unrelated genetic testing labs in what the Government branded Operation Double Helix.[2] Steve Sadow served as Defendant's lead defense counsel. Def. Aff. ¶¶ 8, 10. Sadow added to Defendant's defense team Robyn Sztyndor as a healthcare law specialist and local counsel in Florida. Def. Aff. ¶ 13; ECF 8. Remarkably, Defendant's case was Sztyndor's first federal criminal case.

In subsequent years, Defendant's defense team grew to include Don Samuel, ECF 201, and Brian Rafferty, ECF 219. The team also hired investigators Don O'Neill and Jeff Danik. Def. Aff.

[2] See Federal Law Enforcement Action Involving Fraudulent Genetic Testing Results in Charges Against 35 Individuals Responsible for Over $2.1 Billion in Losses in One of the Largest Health Care Fraud Schemes Ever Charged, Dep't of Just. (Sep. 27, 2019), https://www.justice.gov/archives/opa/pr/federal-law-enforcement-action-involving-fraudulent-genetic-testing-results-charges-against.

¶ 20; 1T3:24-25;[3] Danik Aff. ¶ 4, ECF 506-1. Between 2019 and 2022, the defense team investigated and assembled a defense that Defendant, as the owner of LS and not the CEO responsible for day-to-day decisions, reasonably relied upon the advice of several highly qualified outside lawyers and other expert healthcare industry consultants to ensure that every aspect of LS's operations was legally compliant. Def. Aff. ¶¶ 15-18. Specifically, witnesses would testify that LS incurred substantial costs to ensure the accuracy of its test results, Wildemore Aff. ¶ 7, that LS sought advice from Medicare directly and engaged industry-leading consultants to advise on billing and coding, id. ¶¶5-6; Godwin Aff. ¶ 7, that Defendant did not advise on the billing and coding of claims, Godwin Aff. ¶ 8, and that LS relied, after full disclosure of relevant facts, on legal advice from multiple law firms regarding marketer compensation, use of telemedicine, and compliance programs, Watt Aff. ¶¶ 15-18. The legal advice that LS received was memorialized in tens of thousands of pages of emails and legal memoranda from counsel. See, e.g., **De1133**; 3T61:20-22; **De1241-43**; **De1244-45; De1246-51**.

As trial approached, Defendant and his team had reason to believe their significant investment in the development of this defense case would pay off. The mission appeared to be clear and the defense certain. In 2022, the defense team conducted a mock jury trial exercise to test the advice-of-counsel and good-faith defenses. Def. Aff. ¶ 16. Although most jurors voted to convict after hearing only the Government's case and the defense's cross-examination, the exercise found that most of the mock jurors voted to acquit after they heard the defense's case. Id. ¶ 17. The defense team thereafter continued to work to prepare its witnesses to testify. Id. ¶ 18. On November 14, 2022, for example, just two weeks before trial, Rafferty described preparing witness

---

[3] 1T denotes Volume 1 of Defendant's trial transcripts, dated November 28, 2022, ECF 438. The other transcripts are identified similarly, i.e., 2T denotes Volume 2 of Defendant's trial transcripts, dated November 29, 2022, ECF 439, and so on.

Cecilia Godwin, LS's Revenue Cycle Manager, and remarked she would be a "very good defense witness" and that with other planned witnesses they had a "solid" defense case. **De1236;** see also **De1257; De1260-61**. The defense team was similarly preparing for testimony by Dr. Bernadette Wildemore, Matt O'Meara, Tobin Watt, and Madhuri Hegde. Heading to trial, Defendant understood that his defense would include testimony from multiple witnesses and substantive presentation of evidence. Def. Aff. ¶ 19; see **De1253-55**; **De1262**.

## II. At Trial, Defendant's Counsel Abandons the Planned Defense Strategy at the Eleventh Hour Without Consulting Defendant, Resulting in His Conviction

As Defendant's trial began, his counsel continued to signal that they would follow through on this planned defense case. In a motion in limine ruling, the Court observed that Defendant's counsel had "sufficiently proffered the necessary factual predicate to advance an advice-of-counsel defense during opening statements." ECF 351 (Nov. 22, 2022). And counsel promised to advance that defense to the jury at the beginning of the case. In his opening statement, Sadow framed the entire case as turning on whether "the government [can] prove beyond a reasonable doubt that Mr. Patel acted without good faith." 2T39:17-18. Sadow told the jury that Defendant and LS had acted in good faith because they had "in three years, spent $450,000 on lawyers for advice on compliance, on what was allowed and wasn't allowed." Id. at 39:3-5. And Sadow promised the jurors that "yes, you will hear from those lawyers, and no, there were no lies to those lawyers. Those lawyers will come in here, and they will tell you the advice they gave." Id. at 39:8-10. Sadow even spelled out the last name of one of Defendant's lawyers the defense planned to call as a witness, "Mr. Tobin Watt, W-a-t-t," to ensure the jury would remember him. Id. at 40:1-2.

Sadow explained that LS obtained legal advice for every aspect of the business that the Government challenged. As to the relationship between doctors and patients, Sadow said that lawyer Watt "told Mr. Patel, in writing" that LS was not responsible for doctors' relationships with

patients. Id. at 41:1-4. Sadow also told the jury that "telemedicine was approved by the lawyer" and that the jury was "going to hear that telemarketing was approved by the lawyer." Id. at 40:11-12. As to the payment of commissions to marketers allegedly in violation of the Anti-Kickback Statute, too, "the lawyer said, you can pay them commissions." Id. at 40:24. And when there was a change in the law affecting payment to marketers, Sadow assured the jury, "LabSolutions and Mr. Patel . . . go to the lawyer," ask for advice, and follow that advice. Id. at 41:15-25; id. 41:24-25 ("It follows the lawyer's advice because that's why they're paying the lawyers, for advice."). Sadow even promised the jury that the Government's cooperating witnesses were instructed to avoid the topic of Defendant's lawyers who had reviewed and approved LS's practices. Id. at 44:18-45:3.

Beyond legal advice, Sadow also assured the jury that it would hear from witnesses about "compliance requirements, training seminars," and contracts all "prepared by LabSolutions for the reason to try to do it correctly and legally." Id. at 51:20-23. Sadow told the jury to put their trust in him, because "I'm going to show you exactly what I'm telling you." Id. at 47:23-24.

But the defense team failed to keep Sadow's promises. The jury did not see the legal advice that LS received, how LS changed its practices to comply with that advice, or hear from the lawyers themselves. The jury was not shown even one of the many legal memoranda that Defendant and LS had requested and paid for. Twice, defense counsel offered up a legal memorandum prepared by LS's outside counsel. But on the first occasion, Samuel asked about an email with a legal memo attached, without "getting into the content of" the memo, and the Court agreed it was "just paper flow." 5T183:6, 184:4. And on the second occasion, Sadow voluntarily withdrew a legal memorandum that had been introduced into evidence, 6T196:1-15 (introducing GX 1848-A),

outright acknowledging that the exhibit was not "even shown to [the witness]" and it was "not a problem" to remove it from evidence, 11T11:19-12:6.

As the trial unfolded, Defendant was forced to wrestle with his counsel, trying in vain to get them to utilize defense evidence and knowledge to enhance their cross-examination's effectiveness and challenge the Government's repeated misrepresentations. Def. Aff. ¶¶ 24-30.[4] His defense team assured him that "whatever was not brought out or accomplished during cross-examination [would] be addressed" in the defense case, which would also include evidence of his good faith and reliance on the advice of counsel. See id. ¶ 29. The Government and the Court similarly understood that the defense would call LS's attorneys, including Tobin Watt, to present the advice-of-counsel defense. See, e.g., 7T180:22-181:16 (Government arguing that defense cross questions were unnecessary because the defense was "going to call the lawyers to testify"). During the first weekend of trial, defense counsel even had a meeting scheduled to prepare Watt to testify, though that meeting did not take place. See **De1233-34**.

The Government rested its case on Friday, December 9, 2022. 10T24:4-5. Sadow and Rafferty told the Court and the Government that the defense case would start Monday morning with "five or six witnesses": "Cecilia Godwin, Dr. Bernadette Wildemore, [Matt] O'Meara, Madhuri Hegde, and Tobi[n] Watt." 10T30:10-15, 31:11-18. The Sunday night before, December 11, the defense again told the Government to expect "three defense witnesses" and "sent a zip file full of exhibits." 11T5:4-5. Late that same night, Rafferty sent a text to Defendant reminding him

[4] As just one example, the Government argued that a memo addressing EKRA issues was unrelated to the anti-kickback statute and should not be shown to the jury. 6T125-128. Mr. Patel's counsel did not challenge that position, and the jury never saw or received the memo. Yet EKRA stands for the "Eliminating Kickbacks in Recovery Act," and counsel's memo analyzing EKRA for LabSolutions was central to the company's efforts to comply with prohibitions against unlawful kickbacks. It is difficult to explain why competent, unconflicted counsel would not vigorously challenge the Government's erroneous argument.

to make sure that all of his witnesses were ready to appear at the courthouse the next morning. De1162. The morning of Monday, December 12, Dr. Bernadette Wildemore, Cecilia Godwin, attorney Tobin Watt, and Matt O'Meara, were all present in Miami ready to testify on behalf of Defendant. See Wildemore Aff. ¶ 4; Godwin Aff. ¶ 3; Watt Aff. ¶¶ 14-15, 20; Def. Aff. ¶ 33. As Rafferty had instructed the night before, these witnesses were only minutes away from the courthouse. Def. Aff. ¶ 31.

But at 8:35 AM on Monday morning, Sadow sent an email informing the Court that there would be no defense case. 11T3:6-9. Defendant did not receive advance notice of this decision and was not consulted on it. Def. Aff. ¶¶ 30-32. He learned what Sadow had done only when he arrived at the courthouse that morning. Id. ¶¶ 31-32. Defendant vehemently objected to Sadow's decision, and demanded that his counsel put on the defense case they had planned. But in an ensuing shouting match at the courthouse, Sadow outright refused and ordered Defendant to tell his witnesses to go home. Id. ¶¶ 31-34, 36. Sadow further instructed Defendant that he would not testify. Id. ¶ 34. Instead, Sadow told Defendant that the choice was Sadow's alone, that Sadow refused to put Defendant on the stand, and that if Defendant objected, he would only anger Judge Ruiz. Id.

Because defense counsel refused to put on a defense case, the jury was never instructed on Defendant's long-planned advice-of-counsel defense. At the charging conference, the defense team initially proposed an advice-of-counsel instruction, and the Court observed there was "plenty of evidence that regulatory attorneys were consulted" and expressed "concern[]," in response to the Government's objection, "that we have enough in the record" to warrant the instruction. 11T40-42. But then, the defense team inexplicably withdrew its proposed instruction. Id. at 42:16. Later, the Government observed, and the Court agreed, that while the fact that Defendant hired

lawyers was in the record, "what isn't in [the record] is that the lawyers said [LS's actions] w[ere] okay." Id. at 58:23-25. The Court confirmed that "[t]he substance of what those communications [with the lawyers] . . . were never aired out." Id. at 59:22-24. The Court then charged the jury, and the Government and the defense gave their closing arguments. Id. at 71-201. Although Sadow referred to Defendant's and LS's lawyers frequently, because he had abandoned the planned defense case, Sadow could only refer to statements on cross-examination by Government witnesses with secondhand knowledge that lawyers may have been involved at some point. After two days of deliberation, the jury returned a verdict of guilty on all ten counts. 13T11:25-14:17.

Defendant's counsel never explained to him why they refused to put on a defense case, let alone why they did so without consulting him or even providing him advance notice before they informed the Court and presented it as a *fait accompli*. As detailed below, newly discovered evidence demonstrates that the reason for defense counsel's decision lies in a years-long pattern of misconduct and disloyalty that violated counsel's ethical obligations, Florida criminal statutes, and Defendant's constitutional rights.

## III. The Defense Team Violates Ethics Rules and Criminal Statutes and Misrepresents the Scope of Their Misconduct to the Court

Over the entire length of time in which Defendant's counsel were preparing his defense, Sztyndor—ostensibly, the team's healthcare law expert—was in nearly constant communication with White, an unindicted coconspirator who later agreed to cooperate with the Government against Defendant. In October 2019, shortly after Defendant's indictment, White engaged criminal defense attorney Jason Mehta to represent him. On May 27, 2020, White was indicted in the Middle District of Florida for a pharmacy-related fraud offense. See United States v. White, No. 20 Crim. 165 (M.D. Fla. May 27, 2020), ECF 1.

Although White was represented by separate counsel, Sztyndor spoke to him about facts relevant to both his and Defendant's cases, approximately 200 times. See, e.g., De872 ("He called me 201 times."); Counsel's Aff. ¶¶ 13, 17, 28. Sztyndor did so outside the presence of his retained counsel and without his counsel's permission. See CW1T13:14-14:6.[5]

Incredibly, Sztyndor's conduct did not end at unauthorized communications with a represented party. On at least 15 occasions, Sztyndor recorded her calls with White without his knowledge or consent. CW1T13:14-22; CW2T21:1-5. Sztyndor spoke with White, and recorded him, even as he was under indictment in the Middle District of Florida and his travel outside the state was severely restricted by court order. See Order Setting Conditions of Release at 2, United States v. White, No. 20 Crim. 165 (M.D. Fla. May 27, 2020), ECF 4 (restricting White to the Northern and Middle Districts of Florida).

Sztyndor shared what she learned from speaking to White in real time with Sadow and the defense team in the form of texts, formal memoranda, and the nonconsensual recordings. Those communications were frequent as Defendant's counsel prepared his defense. See, e.g., **De1004-06**, **1009**, **1011**, **1016**. According to Sztyndor, she spoke with White "twice a week on average." **De988-90** (July 2020). In her communications with the defense team, Sztyndor expressed her view that White's statements were highly beneficial to Defendant's case because they reflected that LS's operations were lawful, that Defendant was not engaged in any fraudulent conduct, and that the Government was encouraging White to testify against Defendant based on a narrative that White knew to be false. See, e.g., **De964**, **1014**.

---

5 CW1T denotes *Ex Parte* Hearing Transcripts Volume 1, dated November 18, 2022, ECF 413. CW2T denotes *Ex Parte* Hearing Transcripts Volume 2, dated November 21, 2022, ECF 414.

In the summer of 2022, Sztyndor learned that Sadow intended to use White's calls in Defendant's case, including by introducing the recordings (or transcripts of the same) to undermine White's credibility if the Government called him as a witness. **De181**. In response, on August 19, 2022, Sztyndor reported Sadow to the Florida Bar. **De180**; **De182**. Sztyndor then issued an ultimatum to Sadow and Defendant: delete the recordings (that Sztyndor agreed were beneficial to Defendant) or else she would withdraw from the case. **De182-83**. On August 23, after being fired by Defendant's defense team, see Counsel Aff. ¶ 20, Sztyndor filed a motion to withdraw as Defendant's counsel, which the Court granted the same day, ECF 271, 272.

Sztyndor apparently wanted to withdraw as Defendant's counsel so that she could inform White of the recordings' existence. Two days after her withdrawal, Sztyndor informed White's counsel, Mehta, by text that she had withdrawn from the case because Sadow "turned out to be evil," that Mehta shouldn't "trust him," and that "[r]eally bad things are going to happen in Minal's trial." **De236-40** (Aug. 25, 2022). On September 8, 2022, the Government filed a superseding indictment that, in addition to modifying the charges against Defendant, removed any mention of White from the allegations. See ECF 275. As trial drew closer, Sztyndor further told Mehta that "Steve [Sadow] is up to no good directed at Chris White. So you need to protect him." **De242** (Nov. 1, 2022).

On November 14, two weeks from the first day of trial, the defense team informed Sztyndor she had been listed on the defense's draft witness list to testify regarding White. **De247** (Nov. 14, 2022). Mere minutes later, Sztyndor told White's counsel about the recordings and gave Mehta copies of everything he asked for. Counsel Aff. ¶ 20; see CW1T12-14 ("It was not until these defense lawyers subpoenaed another witness and said that that person would be on a witness list

that that witness told us about the existence of these recordings, and that we then raised this issue.").

Because of Sztyndor's unauthorized disclosure of Defendant's confidential defense materials to a known cooperating witness, Defendant's counsel requested an *ex parte* hearing with the Court less than two weeks before trial was scheduled to start to alert the Court to the recordings' existence. At that hearing, Mehta, White's counsel, explained that Sztyndor's communications with White violated the rules of professional conduct and that the recordings violated Florida's criminal prohibition on nonconsensual recordings, Florida Statute § 934.03, and even federal obstruction-of-justice statutes. See CW1T12-14; see id. at 18-19 ("Frankly, I think it merits a criminal report."). The Court agreed with Mehta's assessment, observing that the recordings reflected a "knowing[] violat[ion] [of] a Florida statute" and were "blatantly illegal" and that the communications were a "quite egregious" violation of the rules of professional conduct. Id. at 17-18, 29; id. at 17:21-22 ("[I]t's Section 934.03, that you cannot record without mutual consent."). Throughout the hours-long hearing, the Court repeated these same conclusions and highlighted not only the professional, but also the criminal, consequences at stake. See, e.g., id. at 46-47, 89.

The Court gave every member of the defense team an opportunity to exercise each of their obligations to be forthright and candid about their individual involvement in or knowledge of the Chris White communications and recordings, commenting in pertinent part:

> [THE COURT:] …**I guess I would turn, Mr. Sadow or Mr. Rafferty, to you all**. How would you have me -- and, **look, I don't know how much you did or did not know about what was being done by your former co-counsel. I don't want to get that far into it just yet.** But I think you guys understand my concern, that something procured this way -- I mean, look, let's be frank. You guys got a lot of knowledge out of this. Whether or not it's coming in or being used as a recording or a transcript, obviously, you got knowledge that you wouldn't otherwise have, and purportedly, from what I'm hearing, procured by some leading questions on a represented witness, **which is troubling**.

> But as I understand it, you guys talked about using it in your case-in-chief or that you would have Jencks concerns with it. I mean, at this point, I don't know how this entire piece of evidence just doesn't even get used at all. I mean, whether we want to call it as a sanction at how it was obtained, or all the other problems that flow from using this, the legality of it, et cetera, I don't know how I would let this come in given the way in which it was obtained.
>
> **So can you guys walk me through? I mean, you have to understand my concern on this.**

CWH1T20:9 – 21:5.

The defense team, in turn, placed all blame for the unauthorized communications and nonconsensual recordings on Sztyndor. In recounting the circumstances of the recordings, Sadow referred only to the actions of one "former defense counsel." E.g., id. at 3-4, 21-22. He even represented to the Court that, because of "the violation of [the] Florida statute," if called as a witness, Sztyndor would "take the Fifth." Id. at 35-36. And he took no effort to correct the Court's understanding that the rest of the defense team had not been involved in the recordings. Id. at 18:1-7 ("And I want to be very clear. I'm not imputing that conduct right now on the rest of my defense team. She's not in the case anymore."). Nor did any other member of the defense team. Over the weekend, they drafted and submitted to the Court a memorandum that insisted that "the attorney who participated in these conversations with White . . . is no longer part of the defense team" and that "[c]urrent counsel were not involved in these conversations." **De1278-81**. At another hearing the next day, Sadow continued to place all blame on Sztyndor. He represented to the Court that Sztyndor was the sole defense counsel responsible and that the remainder of Defendant's defense team "didn't encourage" the calls or recordings. CW2T17:12-14. Based on Sadow's representations that the misconduct was isolated to Sztyndor, the Court ruled that the recording most useful to Defendant's case was admissible under Rule 806 on cross-examination of White. Id. at 24:24-25:4.

The Court reiterated that the conduct reflected a "professional violation" and "possibly a criminal one, under Florida law, for the unsolicited recording." Id. at 7. The Court stated it would refer Sztyndor to the local rules committee for attorney discipline. Id. at 34. At the conclusion of that process, Sztyndor was disbarred from the Southern District of Florida.[6]

Newly discovered evidence, which Defendant obtained years after trial, Def. Aff. ¶ 43, demonstrates that Sadow's representations to the Court were false. Far from a passive observer who only later learned of Sztyndor's misconduct, Sadow for years not only "encouraged" but directed Sztyndor's unauthorized communications with White. See Counsel Aff. ¶ 26. As reflected in contemporaneous communications between Sadow and Sztyndor, Sztyndor updated Sadow on the substance of many of her calls with White and shared recordings of those calls with him. See, e.g., **De1004-06** (Feb. 10, 2020); **De1009** (recording on June 10, 2020); **De1011** (recording on June 22, 2020); **De1016** ("I'll record next time my recorder was out of battery"). Sadow instructed Sztyndor on the questions to ask White on these recorded calls. See **De1007** ("Obviously you can continue to talk to [Chris White]"); **De176** ("IF IF IF White calls you, just try to get him to say why he agreed to facts about LabSolutions that are not true?"). In fact, as Sztyndor has even told attorneys for the Government, Sadow ordered Sztyndor to answer White's calls and to record them, sometimes over her objection. See, e.g., **De683** ("I wasn't allowed to reject them or not pickup. Steve [Sadow] made me pick all of the calls up."); **De784** ("Steve admittedly made me video or record."); **De869** ("Steve made me record everything."). Thus, as the trial began in November 2022, Defendant's entire remaining defense team knew—but Defendant, and the Court,[7] did not—

[6] https://www.flsd.uscourts.gov/sites/flsd/files/adminorders/2024-43.pdf.

[7] Because the defense team obscured its role in Sztyndor's misconduct, the Court was not aware of the need for a Garcia hearing to explore this conflict of interest. The Court's November 22, 2022 colloquy with Defendant was limited to the potential conflict stemming from Sadow's

that they all faced the serious risk of not only professional consequences but a potential criminal referral hanging over them if the full extent of their involvement in Sztyndor's illegal actions were to come to light.

## IV. Newly Discovered Evidence Reveals the Defense Team Was Cooperating with the Government Against Him

Remarkably, the defense team's unauthorized communications with, and nonconsensual recordings of, a represented Government witness are not the end of defense counsel's misconduct. Newly discovered evidence reveals that over the entire course of Defendant's trial preparation, Sztyndor was simultaneously supplying confidential and privileged information about Defendant's case strategy to White (who she knew may testify against Defendant) as well as directly to attorneys for the Government as they were prosecuting Defendant.

In emails Defendant obtained after his trial,[8] Def. Aff. ¶ 43, Sztyndor communicated with the Government in a manner fundamentally inconsistent with her duties of loyalty and zeal on behalf of Defendant. In an October 5, 2020 email to the Department of Health and Human Services' Office of Inspector General, for example, Sztyndor described herself as being "on the operation Double Helix cases with Tim Loper and Jim Hayes," two attorneys in DOJ's criminal division prosecuting Defendant. **De1146**. And a couple of months later, she referred to Tom Clarkson, an Assistant U.S. Attorney, as her "only DOJ work friend." **De558-59**. In a 2021 email,

---

representation of Defendant pre-indictment and how that could hamper his advice of counsel defense. See CW2T69:11-73:5, ECF 359.

[8] The newly discovered evidence supporting this motion derived from periods beginning on or around October 15, 2024 to March 9, 2026. This evidence includes over three-thousand pages of filter team productions as well as documents from Steve Sadow and Robyn Sztyndor. But for disclosures that occurred related to disciplinary proceedings, Defendant would not have obtained this new evidence.

Sztyndor went even further, explaining to a group of DOJ attorneys without Defendant's knowledge that she "tried to help you in our aligned cases." **De175**.

As Defendant's case progressed, Sztyndor's unilateral communications with the Government grew only closer. On September 26, 2021—two years after Defendant was indicted and shortly after White pled guilty—she sent an email to Patrick Queenan in DOJ's criminal division titled "Hypothetical Question" in which she asked (using the word "hypothetical" six times) if DOJ's "strikeforce indicted 2 people and 1 of them was really guilty and the other person was innocent," which could be "proven from lawfully recorded calls in one party consent states and 89 pages of WhatsApp messages," whether DOJ would "hypothetically be responsive to" the disclosure of that evidence." **De1151**. Sztyndor capped off the email with "Asking for a friend." **De1151**. Queenan had entered an appearance in Defendant's case only days earlier. <u>See</u> ECF 205. The next day, Sztyndor's tip about a "really guilty" defendant in a healthcare fraud case was forwarded to Jamie De Boer, the lead attorney prosecuting Defendant. **De1267**.

Throughout the period leading up to Defendant's trial, Sztyndor fed information about Defendant's defense strategy to DOJ attorneys and to White. For example, on December 27 and 31, 2020, Sztyndor sent two legal memoranda to attorneys in DOJ's criminal division identifying legal errors (including that NCD 90.2 did not apply to LS's germline testing)[9] that Sztyndor found

[9] During the period at issue, LS was subject to two different coverage regimes. Until February 2018, LS's MAC was Cahaba, which did not participate in the MolDX program and had its own LCDs (e.g., L36741 (BRCA1/BRCA2) and L35553 (Lynch syndrome)). In February 2018, Cahaba's providers moved to Palmetto GBA, which administers MolDX—a program intended to streamline lab testing coverage adjudication—and which applied its own LCDs (e.g., L35025 (Molecular Diagnostic Tests), L36082 (BRCA1/BRCA2), and L35024 (Lynch syndrome)). CMS's NCD 90.2 on next-generation sequencing took effect on March 16, 2018. As originally issued, it addressed somatic (acquired) mutation testing in patients with advanced cancer and did not address germline testing; CMS issued a revised NCD addressing germline testing for hereditary breast and ovarian cancer on January 27, 2020.

while she was retained by Defendant in connection with DOJ's charges brought in Operation Double Helix. See De7-8 (Dec. 27, 2020 email to DOJ); De9-131 (Dec. 27, 2020 memo to DOJ); De134-35 (Dec. 31, 2020 email to DOJ). These memoranda contained the same legal theories on which Defendant intended to rely in his defense.

Sztyndor also fed Government attorneys evidence on individuals and companies connected to her own clients and encouraged the Government to bring prosecutions. For example, on July 16, 2021, Sztyndor on her own initiative disclosed to two attorneys in DOJ's criminal division that a biller named Denver Fernando "did a lot of illegal billing things to [her] clients" and she offered to "teach" DOJ attorneys about this "very complex" and "illegal scheme." De147. Sztyndor represented that she had "recordings to prove it" and offered to produce them to DOJ, De148-50, which she subsequently did, De155-72. In subsequent emails, she even offered the Government advice on how to refine its theories of billing fraud to bring a prosecution, and explained her coordination with Don O'Neill, who she claimed was "probably the best claims analyst in the nation for lab billing." **De1160-61**. Sztyndor's disclosures were also motivated by financial self-interest; she pitched numerous qui tam actions to the Government that implicated healthcare billing fraud analogous to the Governments allegations against the Defendant. See, e.g., **De885** ("[Y]our comments on Tier 2 edits that you probably acquiesced from Clarkson's quintam's [sic] with Don O'Neill that I referred . . ."); **De1266** ("So Clarkson and I did 3 qui tams . . ."); *see also infra* 48 n.23.

Sztyndor also disclosed confidential and privileged information to White, who was an unindicted coconspirator of Defendant and who later pled guilty and agreed to cooperate with the Government to reduce his sentence. She knew from early on that White's interests diverged from Defendant's, which she acknowledged to Sadow. See **De990**; Counsel Aff. ¶ 18. Sadow confirmed

to Sztyndor early in Defendant's case that she "cannot do work for [White] at all" and she "can't share anything or discuss anything with them about [Defendant's] case." **De1003** (Feb. 1, 2020).

But Sztyndor apparently did not feel bound by her duty of loyalty to Defendant. On February 9, 2020, Sztyndor shared a legal memorandum with White and his counsel explaining a defense theory against charges under the Anti-Kickback Statute and telehealth regulations that Defendant was facing in his prosecution. **De2**. And on August 14, 2020, Sztyndor emailed to White and his counsel several documents containing legal advice prepared for Defendant and LS that, on their face, were labeled "Privileged" legal advice, as well as "unredacted" attorney meeting notes. **De6**. These disclosures to White and his defense team were done without Defendant's knowledge and outside the protections of attorney-client privilege, since White was not (and could not be) Sztyndor's client and Defendant did not share any common-interest or joint-defense privilege with White.

Nevertheless, Sztyndor's clandestine disclosures to White continued, and directly implicated Defendant's intended defense at trial. In January 2021, Sztyndor emailed White and his counsel a slide deck prepared by Sztyndor and Don O'Neill (Defendant's retained defense investigator) that outlined, among other information, Defendant's intended defenses against the Anti-Kickback Statute charges and LS's coding for genetic tests. **De136-46**. And in February 2021, Sztyndor provided additional legal work product to White and his counsel, tying it directly to privileged legal advice given by "Tobby Watts [sic] at Fox Rothschild" and by Baker Donelson in "Opinion Letters they wrote for LabSolutions." **De1130-34**. Sztyndor further described to White's counsel the discovery productions that Defendant intended to make to the Government. **De1133**.

These communications demonstrate that even though Sztyndor had a duty of undivided loyalty to Defendant, she repeatedly chose to sell out her own client to the Government (and to

White) to advance the prosecution of Defendant. Sztyndor's conscious decision to put the interests of the Government and its cooperating witness above the interests of her own client is revealed in her emails to the Government. After Defendant's trial, in describing the actions she took leading up to trial, Sztyndor explained that she had "protected Chris White from what Steve [Sadow] was going to do to him (and subsequently you at DOJ)." **De604**. To DOJ, she said: "I protected all of you. I warned Chris White at my own expense[.]" **De784**. And she expressly framed the decision she faced as "ha[ving] to choose between Minal [Patel] and Chris White"—a choice she says was "hard" but which she made against her client's interests. **De687**.

Because Defendant discovered this evidence of systemic and flagrant violations of his constitutional rights only after his trial and conviction, he now brings this motion for a new trial under Federal Rule of Criminal Procedure 33.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Where a motion for a new trial is grounded on newly discovered evidence, the defendant may file the motion within three years of the jury's verdict. Fed. R. Crim. P. 33(b)(1).[10]

In deciding whether a new trial is warranted, the Eleventh Circuit has set forth a five-part test courts must apply when evaluating a motion for a new trial based on newly discovered evidence: **(1)** the evidence must be discovered following the trial; **(2)** the movant must show due diligence to discover the evidence; **(3)** the evidence must not be merely cumulative or impeaching; **(4)** the evidence must be material to issues before the court; and **(5)** the evidence must be of such

[10] This motion is timely because the Court on December 2, 2025, within three years of the December 14, 2022 jury verdict, granted Defendant additional time to file his motion, and has subsequently extended that deadline to November 6, 2026. See ECF 643, 711, 714.

a nature that a new trial would probably produce a different result. United States v. Hobson, 825 F.2d 364, 366 (11th Cir. 1987) (per curiam); see United States v. Bollinger, 796 F.2d 1394, 1401 (11th Cir. 1986); Bentley v. United States, 701 F.2d 897, 898 (11th Cir. 1983) (per curiam).

The Rule 33 "interest of justice" test is a "broad standard" that affords district courts discretion. United States v. Vicaria, 12 F.3d 195, 198 (11th Cir. 1994). Newly discovered evidence "need not relate directly to the issue of guilt or innocence to justify a new trial, 'but may be probative of another issue of law.'" United States v. Campa, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc) (quoting United States v. Beasley, 582 F.2d 337, 339 (5th Cir. 1978) (per curiam)). The evidence need only afford "reasonable grounds to question the fairness of the trial or the integrity of the verdict." United States v. Agresti, 794 F. Supp. 3d 1185, 1196 (S.D. Fla. 2025) (Ruiz, J.) (quoting Campa, 459 F.3d at 1151 n.268); see, e.g., United States v. Bowen, 799 F.3d 336, 349-50 (5th Cir. 2015) (granting new trial for newly discovered evidence of prosecutorial misconduct unrelated to defendant's guilt).

## ARGUMENT

Newly discovered evidence demonstrates that for years in the run-up to trial, the defense team engaged in misconduct that is possibly unprecedented in its scope and severity. Because of this misconduct, including the defense team's obfuscation of their wrongdoing, Defendant was effectively deprived of his right to: (1) counsel of his choice, (2) counsel free from conflicts, and (3) counsel independent of, and without loyalty to, the prosecutors charging him. The result of this misconduct, in isolation and cumulatively, warrants a new trial, or at the very least, an evidentiary hearing into the misconduct that rendered this trial fundamentally unfair.

### I. Newly Discovered Evidence Reveals the Defense Team's Misconduct and Conflicts, Previously Unknown to the Court, Deprived Defendant of a Required Garcia

**Hearing and Violated His Sixth Amendment Right To Conflict-Free Counsel of His Choice.**

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right…to have the Assistance of Counsel for his defence." Id. The United States Supreme Court has previously held that "a defendant who does not require appointed counsel" enjoys both the right to effective assistance of counsel and the right "to choose who will represent him." United States v. Gonzalez–Lopez, 548 U.S. 140, 144, 147 (2006). "The right to select counsel of one's choice ... has been regarded as the root meaning of the constitutional guarantee." Id. at 147-48.

Although this is not a case where Defendant's direct request for counsel was denied, see Gonzalez–Lopez, 548 U.S. at 147-48, a "constructive denial of counsel is 'legally presumed to result in prejudice' and thus to constitute a structural error." United States v. Arbolaez, 450 F.3d 1283, 1294 (11th Cir. 2006) (quoting Strickland v. Washington, 466 U.S. 668, 692 (1984)). Here, the denial of Defendant's right to counsel of choice was constructive. See id. The Court failed to hold a constitutionally mandated Garcia hearing because of every defense attorney's decision to keep the Court in the dark about their misconduct and conflicts. See United States v. Garcia, 517 F.2d 272 (5th Cir. 1975). As a result, Defendant was denied his constitutional right to both conflict-free-counsel and his right to counsel of his choice—i.e., the right to choose counsel, free from the taint of misconduct, disqualification, and conflict.

When, as here, current counsel is disqualified, conflicted or—for some other reason such as misconduct—compromised, a Defendant has the right to seek new counsel. Id. In fact, the right allows a defendant to substitute a retained or appointed counsel with retained counsel "regardless of the quality of the representation he received," see id. at 148, as long as it does not interfere with the "fair, orderly and effective administration of the courts." United States v. Jimenez-Antunez, 820 F.3d 1267, 1270 (11th Cir. 2016) (quoting United States v. Koblitz, 803 F.2d 1523, 1528 (11th

Cir.1986)). Consequently, "the Sixth Amendment guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." Caplin Drysdale, Chartered v. United States, 491 U. S. 617, 624-25 (1989). "The right to counsel of choice…commands not that a trial be fair, but that a particular guarantee of fairness be provided — to wit, that the accused be defended by the counsel he believes to be best." United States v. Gonzalez-Lopez, 548 U.S. 140, 146 (2006) (citing Crawford v. Washington, 541 U. S. 36, 61 (2004)).

Denial of this right constitutes structural error. The Supreme Court has adopted at least three broad rationales for identifying errors as structural. **First**, an error has been deemed structural in instances where "'the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest,' such as 'the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty.'" McCoy v. Louisiana, 584 U.S. 414, 416 (2018) (quoting Weaver v. Massachusetts, 137 S.Ct. 1899, 1908 (2017).[11] **Second**, an error has been deemed structural if the effects of the error are simply too hard to measure; i.e. where "the precise 'effect of the violation cannot be ascertained.'" Gonzalez-Lopez, 548 U.S. at 149 n.4 (quoting Vasquez, 474 U.S. at 263). For example, when a defendant is denied the right to select his or her own attorney, the Government will, as a result, find it almost impossible to show that the error was "harmless beyond a reasonable doubt." Weaver, 137 S. Ct. at 1908 (citing Chapman v. California, 386 U.S. 18, 24 (1967)). **Third**,

[11] This rationale fits hand-in-glove to Defendant's argument that he was denied the right to counsel of his choice because the Court did not give him the opportunity to either choose to proceed to trial with conflict- and misconduct-free representation or to waive that right—caused by defense counsel's deliberate failure to inform the Court of either their knowledge of and/or complicity in the 3-years-long scheme to unethically and illegally communicate and record the conversations of Chris White.

"an error has been deemed structural if the error always results in fundamental unfairness." Id. at 1908. In these circumstances, it "would therefore be futile for the government to try to show harmlessness." Id. "The precise reason why a particular error is not amenable to [harmless error] analysis—and thus the precise reason why the Court has deemed it structural—varies in a significant way from error to error." Id. at 1907-08. These categories "are not rigid" and "more than one of these rationales may be part of the explanation for why an error is deemed to be structural." Id. at 1908.

As evident here, this Sixth Amendment violation is not subject to harmless-error analysis. Erroneous deprivation of the right to counsel of choice, "with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error.'" Sullivan v. Louisiana, 508 U. S. 275, 282 (1993). Indeed, deprivation of the right to counsel of one's choice "def[ies] analysis by 'harmless error' standards" because it "affecf[ts] the framework within which the trial proceeds" and is not "simply an error in the trial process itself." Arizona v. Fulminante, 499 U. S. 279, 309-10 (1991). The deprivation is "complete" when the defendant is erroneously prevented from being represented by the lawyer he wants. See Gonzalez-Lopez, 548 U.S. at 148.

Defendant would have never proceeded with his defense team at any stage of the proceedings had he understood the extent of their misconduct and known they were compromised. Def. Aff. ¶¶ 54-58. Likewise, had this Court been given the rudimentary information upon which to protect Defendant's rights, it would have conducted a Garcia hearing on the issue, at a minimum. But defense counsel's misconduct extended to misleading the Court about its scope.

In the case at bar, Sadow, Defendant's lead counsel, hired Sztyndor as Defendant's healthcare specialist attorney shortly after Defendant was arrested in 2019. Counsel's Aff. ¶ 11. By October 2019, Sztyndor was engaging in communications with unindicted coconspirator White,

without his counsel's consent, for the purpose of calling White as a Defense witness or using the information gathered to impeach White in the event he was a Government witness. Id. ¶ 15. Defense counsel believed that the information gathered could severely damage the credibility of the Government's case as White was making serious allegations of prosecutorial misconduct, including coercing White to fabricate his involvement with Defendant and to falsely inculpate him. Id. ¶ 16. This Court agreed that the evidence was important. CW2T15:22-17:5; CW2T25:17-26:11; CW2T 7:12-19.

Sztyndor withdrew from the case a few months before Defendant's trial. Counsel's Aff. ¶¶ 12-13, 19, 25. However, this withdrawal came far too late. Sztyndor was subject to disqualification by her actions as Defendant's attorney the moment she had the first discussion with Chris White, without his counsel's consent, in October of 2019. Id. ¶¶ 15, 23-24; see also R. Regulating Fla. Bar 4-4.2(a) ("In representing a client, a lawyer must not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer."); R. Regulating Fla. Bar 4-3.7(a) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness on behalf of the client…"); ABA Model Rules of Prof'l Conduct R. 3.7(a) (2019) (similar).

The taint of the Chris White debacle spilled out in court on November 18 and 21, 2022, when the Court heard arguments on the admissibility of the White recordings. During both of those hearings, the record discloses a Court that was appalled and highly vexed by the actions of Sztyndor, but was misled as to the need to go further to determine whether any other member of the defense team was involved or, in any other way, tainted by Sztyndor's misconduct. CW1T17:14-18:19; CW1T76:10-20; CW2T5:13-23; CW2T34:13-24.

Every attorney on the defense team was ethically obligated to bring Sztyndor's conduct to the attention of the Court immediately upon becoming aware of it back in October of 2019 so that a Garcia hearing could be appropriately conducted. R. Regulating Florida Bar R. 4-3.3 (A lawyer is required to be honest and candid with the Court); see also R. Regulating Florida Bar R. 4-8.3 (a lawyer must report known misconduct by another lawyer that raises a substantial question regarding honesty, trustworthiness, or fitness to practice). And not only do the rules of ethics and professional conduct dictate such a result, but so does the Constitution; the court must have the ability "to make early inquiry in certain situations likely to give rise to conflicts." Stevenson v. Newsome, 774 F.2d 1558, 1562 (11th Cir. 1985). Instead of fulfilling their duties, and in response to the Court's reaction to Sztyndor's conduct, the defense team lied to the Court out of self-interest and fear of prosecution by the same government that was simultaneously prosecuting Defendant.

When this Court presented Sadow with the opportunity to come clean about his involvement, he failed to inform the Court that he not only directed Sztyndor to engage in communications with Chris White, without his counsel present, but he also **directed and orchestrated her to illegally record the conversations with him**. Counsel's Aff. ¶ 23-25, 31. In fact, Sadow took the opportunity to not just mislead the Court about his involvement and obligations to prevent or stop the misconduct but to boldly lie about it:

> "**We didn't encourage. We don't have the obligation to tell her to stop. We do have the obligation to bring it to the Court's attention**, as we did, that there's been a violation in that sense."

CW2T10:14-17 (emphasis added).

Once Sadow, as lead counsel, directed co-counsel to secretly record her conversation with White, and later misrepresented his involvement to the Court, the entire defense team was corrupted. The fact that Chris White was removed as a witness against Defendant, that he never

testified at trial, and that Sztyndor withdrew as counsel before trial is of no moment to the Sixth Amendment violation at issue. See Garcia, 517 F.2d at 276. Sadow and Sztyndor's conduct lasted almost three years before their relationship deteriorated over the Chris White recordings. Counsel's Aff. ¶ 12. Yet, neither of them should have been representing Defendant a single day beyond the initial October 2019 conversation with Chris White. See Garcia, supra; R. Regulating Fla. Bar 4-4.2(a), 4-3.7(a). The damage that was done during those three years was irreversible. By the time Sztyndor withdrew, Defendant's right to conflict-free attorneys had been long and continually eviscerated and his fate had already been sealed by the misconduct.

Crucially, up until November 18, 2022, this Court was completely unaware of the chaos and attorney misconduct taking place within the defense team. Counsel's Aff. ¶ 22. While the Court was made aware, in a limited fashion, of Sztyndor's actions, it was left in the dark about the depth of the misconduct and the players involved. Id. From all appearances, it seemed the veil would never be lifted, until Chris White's attorney asked a monumental question:

> [MEHTA:] …What if anything, can I tell my client about what the Court is inclined to do?
>
> THE COURT: I think what you should do is tell your client my procedure – and really, our local rules committee will be in the best position to evaluate the circumstances on any sort of legality issues on the recording. But my plan is – and I can't promise you I'm going to do it tomorrow, but I do know that once we kind of get this trial underway, I'm going to check in with our local rules committee, and **I'm going to make a referral that it be investigated. I want it to be investigated.**
>
> **You can let your client know that the Court is going to start an internal investigation using its local rules committee for attorney discipline**.

CW2T34:11-25 (emphasis added).

This Court was clear that the secret recordings of Chris White was a violation of Florida's criminal statute "Section 934.03, that you cannot record without mutual consent." CW1T17:21-22. Therefore, all who were complicit in the Chris White conspiracy understood that they were subject to criminal investigation and prosecution by State authorities and that both the Government

and the Court could, at any time, push for such an investigation. R. Regulating Florida Bar R. 4-8.3. They must have also understood that "they face[d] a credible threat of prosecution in the form of disciplinary investigation and sanction." Rubenstein and Rubenstein Law, P.A., 69 F.Supp. 3d at 1339; see also R. Florida Bar R. 4-8.4 (Lawyers cannot violate the rules, assist others in doing so, or engage in dishonesty, fraud, or misrepresentation).

Even more concerning for the defense team is the lingering threat of prosecution from the same United State Attorney's Office that was prosecuting their client—the recordings themselves indicating a clear violation of federal law, as the Court colloquy revealed:

> MEHTA: And I have made some suggestion that Mr. Sadow pushed back against about what I understood from listening to the audio about Ms. Sztyndor, I think I used the words "witness tampering" and "obstruction." And I would just real briefly point the Court to pages 8, lines 15 through 19; page 13, 15 through 21. I think, as the Court's considering the substance and what matters, and the context, **I'd ask the Court to not forget that in my view these recordings not only violate state law, but they violate federal law related to obstruction of witnessing.**
>
> THE COURT: **Yes. I have the portions of the transcript here that you just cited. I'm with you.** And I need to read through these 24 pages carefully, too, to get a better sense of the conduct before I rule. So I will absolutely do that. But thanks for flagging that for me.

CW1T89:1-17 (emphasis added); see 18 U.S.C. § 1512 (criminalizing witness tampering).

A week before trial was to begin, the entire defense team was under a continuing threat of prosecution from both levels of Government for misconduct related to their representation of Defendant in this case. See Rubenstein and Rubenstein Law, P.A. v. The Florida Bar, 69 F.Supp. 3d 1331 (11th Cir. 2014); see also United States v. McLain, 823 F.2d 1457, 1463-64 (11th Cir. 1987) (holding that when trial counsel was under investigation by same United States Attorney's office that was prosecuting counsel's client, an actual conflict of interest existed). Sadow has since admitted that the entire defense team was aware of the communications and recordings, and that he had orchestrated and directed the illegal conduct. Counsel's Aff. ¶¶ 23-31. By November 22,

2022, Defendant's lawyers must have perceived that they faced the threat of prosecution from the federal government for obstructing or tampering in relation to their conduct involving White. There should be "no doubt the threat of prosecution can weigh heavily on the mind of anyone under investigation." Trump v. United States, 54 F.4th 689, 700 (11th Cir. 2022) (citations omitted). As a result, this Court is compelled to consider the continuing and real threat of prosecution over every member of the defense team who tried this case.

It is settled that "the right to conflict-free counsel, the public's interest in a fair trial, and the Government's interest in precluding reversal of a conviction all are adequately protected if defendants are informed both that their representation might be adversely affected in certain ways and that they have the right to counsel unimpaired by any conflict." In re Paradyne Corporation, 803 F.2d 604, 611 (11th Cir. 1986). However, when the conduct of counsel thwarts this Court's ability to protect Defendant's rights and by extension thwarts the proper and lawful administration of justice, as it has in this case, it becomes impossible to determine the motivation or reasons behind deficient performances or the questionable decisions made during pretrial investigation or during trial. Weaver v. Massachusetts, 137 S.Ct. 1899 (2017).

Had the Court been aware of the entire defense team's misconduct, it would have held a Garcia hearing.[12] In the absence of a Garcia hearing, Defendant was deprived of his right to be informed of the misconduct and conflicts of counsel, their adverse consequences and of the opportunity to hire new counsel of his choice. See Weaver, 582 U.S. at 295-96. In other words, the defense team's misconduct and subsequent failure to bring its complicity to the attention of the Court "is significant enough that it amounts to a restraint for purposes of the Sixth Amendment

[12] Defendant is certain the Court would have immediately held a Garcia hearing based on its pattern of holding Garcia hearings throughout this case to explore far less serious potential conflicts. See, e.g., ECF 57, 241, 245, 254.

right to hire counsel of one's choice." United States v. Balotin, 3:19-cr-191-MMH-JBT, 2023 WL 2264181 at *15 (M.D. Fla., Feb 28, 2023).

This Court should find that a vacatur of Defendant's conviction is warranted or, at a minimum, that he is entitled to an evidentiary hearing.

## II. The Defense Team's Misconduct, Including In-Fighting over the Use of Illegal Recordings, Unlawful Instructions from Lead Counsel, and Efforts to Protect Themselves at the Expense of Defendant, Deprived Defendant of His Sixth Amendment Right to Conflict-Free Counsel.

The Sixth Amendment guarantees "a correlative right to representation that is free from conflicts of interest." Wood v. Georgia, 450 U.S. 261, 271 (1981). "The duty of unfettered loyalty to one's clients is among the most central of a criminal defense attorney's responsibilities." Reynolds v. Chapman, 253 F.3d 1337, 1342 (11th Cir. 2001). To prevail, the defendant must establish an "actual conflict with adverse effect." Mickens v. Taylor, 535 U.S. 162, 202 (2002).

"An 'actual conflict' of interest occurs when a lawyer has 'inconsistent interests.'" Freund v. Butterworth, 165 F.3d 839, 859 (11th Cir. 1999) (en banc) (citation modified). To establish "adverse effect, a…defendant must show: (1) the existence of a plausible alternative defense strategy or tactic that might have been pursued; (2) that the alternative strategy or tactic was reasonable under the facts; and (3) a link between the actual conflict and the decision to forgo the alternative strategy of defense." Pegg v. United States, 253 F.3d 1274, 1278 (11th Cir. 2001).

### *A. Newly Discovered Evidence Demonstrates that Defense Counsel's Involvement in Sztyndor's Illegal Recording Created an Actual Conflict*

In the case at bar, Sadow's conflict began at the outset of his representation in as much as he was one of LS's compliance attorneys and, as such, a potential witness in the case.[13] Counsel's

[13] While the Court addressed this potential conflict shortly before trial, ECF 327 at 54-60, it should be considered in light of the newly discovered evidence as just one part of the many conflicts besetting Sadow.

Aff. ¶ 1; Def. Aff. ¶¶ 5-6; see also United States v. Ross, 33 F.3d 1507, n.29 (11th Cir. 1994) (quoting Government of Virgin Islands v. Zepp, 748 F.2d 125, 136 (3d Cir. 1984) ("When defense counsel has independent personal information regarding the facts underlying his client's charges,…he has an actual conflict of interest."); R. Regulating Fla. Bar 4-3.7(a). Because the rules of professional conduct prohibited Sadow's and Sztyndor's continued representation of Defendant the moment they engaged in misconduct in October of 2019, their representation of Defendant, in-and-of-itself, became a violation of the rules of professional conduct. The result is that each attorney's immediate withdrawal from the case was mandatory under both Florida and Georgia rules, and the ABA Model Rules. R. Regulating Fla. Bar 4-1.16(c) ("a lawyer shall not represent a client or, **where representation has commenced, shall withdraw from the representation of a client if**: (1) the representation will result in violation of the Rules of Professional Conduct or law."); see also State Bar of Georgia, Rules of Professional Conduct, Rule 1.16; Model Rules of Prof'l Conduct R. 1.16 (A.B.A. 2019).[14]

Newly discovered evidence, discloses a spiraling web of additional conflicts among the entire defense team. For example, as stated above, Sadow made both himself and Sztyndor witnesses in the case as early as October 2019, when he directed and orchestrated the White communications and recordings, in violation of the no-contact rule. Counsel's Aff. ¶¶ 14, 26; R. Regulating Fla. Bar 4-3.7(a); 4-4.2(a).

By the time of trial, the entire defense team operated under an actual conflict of interest in the form of a threat of disciplinary referral, and potential criminal liability, based on their concealed involvement in Sztyndor's misconduct. Sztyndor unlawfully recorded White, an

[14] It should be noted that the defense team's internal and external conflicts and impermissible representation continued for years—from 2019 to 2022—only ending with a revelation that withdrawal was necessary after Defendant's conviction. Counsel's Aff. ¶ 28.

unindicted coconspirator turned cooperator, see CW1T25:16-18 ("everybody knew it was him"), without his lawyer present and without his lawyer's consent, see id. at 13:14-14:6. When this issue was brought to Judge Ruiz's attention at the November 18, 2022 *ex parte* hearing, the rest of Defendant's defense team distanced themselves from that misconduct. Sadow repeatedly argued that only one "former defense counsel," Sztyndor, was responsible. CW1T3-4, 21-22, 27:19-22 (Sadow: "I don't think that we were doing anything improper, us being – I'm trying to use – as far as the former defense counsel."). The team even submitted a memorandum to the Court stating that "[c]urrent counsel were not involved in these conversations and did not participate in the recording of the conversations," despite their extensive involvement. **De1265**.

Newly discovered evidence shows that the entire team, and lead counsel Sadow in particular, not only knew of the legal and ethical implications of the recordings, but knowingly directed Sztyndor to continue in her unlawful conduct for their benefit at trial. **De180**; **De182**; **De1090**; **De1000**; **De1028-29**; **De1014-16**. That newly discovered evidence flatly contradicts Sadow's representation to the Court that the defense team "didn't encourage" Sztyndor's actions. CW2T17:12-14. So, when Judge Ruiz made clear he would "start an internal investigation using [the court's] local rules committees for attorney discipline," CW2T34:22-24, Sadow learned he could face the same professional (or potentially criminal) consequences that Sztyndor faced. That threat hung over the defense team from the November 21 hearing through the final day of jury deliberations, when Judge Ruiz discussed the impending disciplinary referral with them at a sidebar. 13T31:11-13 ("I am going to be referring her to the disciplinary committee as to her taped recordings of the third-party witness."). Unbeknownst to Judge Ruiz or Defendant, the defense team was equally culpable in the misconduct.

The team also knew that the consequences for their participation in the unlawful recordings could be serious. At the November 18 hearing, White's counsel argued that Sztyndor's recordings violated the rules of professional conduct, Florida's criminal two-party consent statute, and even federal obstruction-of-justice laws. CW1T12-14, 18-19. Judge Ruiz agreed that the conduct reflected a "knowing[] violat[ion] [of] a Florida statute" and a "quite egregious" violation of the rules of professional conduct. Id. at 17-18, 29, 46-47.[15] At the November 21 *ex parte* hearing, Judge Ruiz reiterated that the conduct was a "professional violation" and "possibly a criminal one, under Florida law, for the unsolicited recording." CW2T7:12-19. He concluded the hearing by stating that he would refer Sztyndor to the "local rules committee for attorney discipline." Id. at 34:22-24.[16]

It is well established that such a threat of criminal consequences created a conflict of interest between Defendant and his defense counsel. "Many courts have found an actual conflict of interest when a defendant's lawyer faces possible criminal charges or significant disciplinary consequences as a result of questionable behavior related to his representation of the defendant." United States v. Levy, 25 F.3d 146, 156 (2d Cir. 1994) (collecting cases). The Eleventh Circuit has long recognized a conflict where counsel is under investigation by the same United States Attorney's office as the defendant he represents. United States v. McLain, 823 F.2d 1457, 1464 (11th Cir. 1987); see also Armienti v. United States, 234 F.3d 820, 824-25 (2d Cir. 2000) (similar).

---

[15] The recordings violated Florida law regardless of where Sztyndor was located at the time: "[t]he law is clear that an 'interception' occurs 'where the words or the communication is uttered, not where it is recorded or heard.'" Stalley v. ADS All. Data Sys., Inc., 997 F. Supp. 2d 1259, 1265 (M.D. Fla. 2014), aff'd, 602 F. App'x 732 (11th Cir. 2015) (collecting cases). Throughout this time, White was under indictment and confined to Florida with few exceptions. See supra at 9-10.

[16] The communications with White violated the Rules of Professional Conduct whether White called Sztyndor or vice versa. See Fla. R. Prof. Conduct 4-4.2 cmt. ("The rule applies even though the represented person initiates or consents to the communication.").

The threat of future discipline creates an inevitable temptation and incentive for counsel to "pull [their] punches" or "temper[]" their defense "in order to curry favor" with the decisionmaker. See Thompkins v. Cohen, 965 F.2d 330, 332 (7th Cir. 1992) (Posner, J.); Levy, 25 F.3d at 156.

Even aside from criminal consequences, defense counsel faced an actual conflict at trial arising from the threat of professional consequences. See United States v. Greig, 967 F.2d 1018, 1023 (5th Cir. 1992). Defendant's counsel operated under the same threat of disciplinary referral for his involvement in Sztyndor's misconduct, for which Judge Ruiz had already informed the parties he would refer Sztyndor. CW2T34. Courts have recognized that a risk of professional consequences for violating the professional no-contact rule creates a conflict of interest. For example, in Greig, the defendant's lawyer directly contacted a represented codefendant who had signed a plea agreement, without his counsel present, and told the codefendant that he had a valid defense and should seek other counsel. Id. at 1020. The Fifth Circuit had "little doubt that an actual conflict existed," reasoning that at "the very least," the lawyer "faced severe disciplinary measures, including monetary sanctions, and indeed the very loss of the right to appear as counsel in the [district court]." Id. at 1022-23; *see also id.* at 1023 n.12 (quoting the ABA's Model Code of Professional Responsibility regarding communication with a person represented by counsel).

Although Sztyndor's conflict of interest ended before trial with her withdrawal, a new even more damaging conflict arose with Sadow and the remaining defense team. The entire defense team knew that Sztyndor was not a lone or rogue operative in the Chris White misconduct. Counsel's aff. at ¶ 29. The defense team misled the Court and allowed the Court to direct its disdain solely at Sztyndor, paving the way for the Court's decision to call for an investigation—a decision that placed every member of the defense team under a continuing and real threat of

exposure and prosecution by the federal government, one week before the trial was to begin. CW2T34:11-25.

In essence, going into a trial under a threat of prosecution triggers a primary concern as to whether "[t]he interests of lawyer and client…have diverged with respect to their dealings with [the DOJ]." Armienti, 234 F.3d at 824–825. In other words, the defense team tried this case to a jury while in conflict between the desire to aide Defendant and save themselves. McLain, 823 F.2d at 1464.

*B. The Conflict Had Adverse Effects on the Defense*

A defendant may demonstrate an "adverse effect" by (1) identifying a plausible alternative strategy; (2) demonstrating that strategy would have been reasonable; and (3) showing "some link" between the actual conflict and the decision to forgo the alternative strategy. Novaton, 271 F.3d at 1011 (quoting Freund, 165 F.3d at 860). All three requirements are satisfied here.

First, the alternative defense strategy was obvious: to simply put on the defense case-in-chief that defense counsel had planned for years to show Defendant acted in good faith in reliance on advice of counsel and good faith with respect to billing and coding compliance advice from third-party consultants and the governing MAC. This strategy was not merely "plausible," it was *the entire* defense strategy up until the morning of December 12, 2022, when the defense inexplicably decided to rest rather than present its long-prepared case. This is shown by the defense team's communications before the *ex parte* hearing, **De1236** (describing efforts to finalize defense witnesses' testimony and prepare them for cross-examination), opening statements, see 2T39:7-10 ("And yes, you will hear from those lawyers, and no, there were no lies to those lawyers. Those lawyers will come in here, and they will tell you the advice they gave."), and even the eve of the

defense's case, 11T5:4-6 ("And frankly, as of last night, we were told there were going to be three defense witnesses, including the attorney. And we were sent a zip file full of exhibits.").

Second, this long-planned strategy was undoubtedly reasonable. Not only did the defense team have a genuine belief in the strength of their strategy, see **De1236**, but they had conducted mock jury testing to receive objective feedback on their strategy, Def. Aff. ¶¶ 16-17. That feedback demonstrated that a defense case was essential to achieve Defendant's acquittal. Id.

And the team had strong evidence to support both good faith and advice-of-counsel defenses. Specific employees would have testified that Defendant's core concern and demand was to ensure that the company maintained compliance and that the company's billing apparatus and decisions were in compliance with applicable coverage policies at the time. Def. Aff. ¶¶ 4, 25-27; Wildemore. Aff. ¶¶ 5-9. Defense evidence would show that LS sought guidance from consultants as the requirements for claims changed when LS's MAC changed from Cahaba to Palmetto in February 2018, which was significant in that Palmetto required adherence to the MolDX program and thus LS became subject to a new and more complex process for billing its tests. See, e.g., **De1194-1232**; infra n.17. LS and its consultants even sought clarity from Palmetto's medical director directly to ensure compliance, and ultimately was successful in obtaining Palmetto/MolDX coverage status for several of its submitted tests.[17] See **De1193; De1164-92**.

---

[17] Defense counsel knew but refused to point out to the jury, for correction, several significant flaws in the Government's prosecution that could have been clarified had it put on a defense case, including that the Government's evidence indicating that somatic testing procedures and requirements for physicians to issue requisitions for CGx testing was inapplicable to LS's testing (as was CMS's NCD 90.2, effective March 2018, which addressed only somatic testing of tumors in patients with advanced cancer), in that somatic testing of acquired mutations is a distinct test (with different coverage requirements and for which telemedicine was generally prohibited) from germline testing of inherited mutations (for which telemedicine could be permissible), of which LS only conducted the latter (see, e.g., 2T150); and that LS went through the rigorous MolDX (a program intended to streamline lab testing coverage adjudication) approval process, including registering its tests, obtaining unique test identifiers ("Z Codes"), and submitting the required

Further, testimony would show that Defendant acted immediately to fire anyone who violated compliance requirements and that he made no decisions that would knowingly or with intent to violate compliance requirements. Def. Aff. ¶ 54-58. Along that line, the defense evidence showed Defendant maintained a staff of compliance attorneys who not only advised LS but conducted compliance training sessions for its staff, and that at times LS rejected samples that did not meet regulatory requirements. Def. Aff. ¶¶ 4-5, 9-10, 15-16, 33; Watt Aff. ¶¶ 6-8.

The defense conducted mock trial sessions that revealed a "good faith" and/or "advice of counsel" defense yielded a significantly high chance of acquittal if used at trial. In fact, the defense made an explicit promise to the jury during their opening statement that the jury would have the opportunity to consider those defenses:

> [SADOW:] And this wasn't done after the fact, which is why we're here for the government. This was done from the get-go. **And yes, you will hear from those lawyers, and no, there were no lies to those lawyers. Those lawyers will come in here, and they will tell you the advice they gave.**
>
> Now, if that advice turned out to be incorrect, or wrong, it is. But Mr. Patel and LabSolutions is entitled to rely on the advice as long as they are acting in good faith. **So really what this case is about is Mr. Patel's actions, his conduct, to be judged on the basis of whether it was done in good faith or not**.

---

Technical Assessments, and that MolDX designated Z Codes as "covered" for specific LS biomarkers. In addition, Defense counsel refused to correct the Government's reliance only on one MAC's (Palmetto's) BRCA1/BRCA2 coverage requirements, which misled the jury to believe that all LS's genetic testing was subject to that coverage policy when, in fact, (a) LS was not part of the Palmetto MAC (and, thus, the MolDX program), nor subject to the referenced Palmetto BRCA1/BRCA2 coverage requirements, until February 2018 (McMillan testified that the Palmetto BRCA LCD had been in effect since 2016, 2T134 et seq.), and (b) the BRCA1/BRCA2 coverage requirements were not applicable to a substantial portion of LS's testing offerings, which included other biomarkers addressed by separate coverage policies or left to MAC discretion, and LS did not received much, if any, reimbursement for BRCA1/BRCA2 tests under Palmetto's relevant coverage policy that didn't include personal history as a coverage element; in other words, that LS did not get paid under that LCD for claims relying solely on family history (see 2T82, 133, 134, 154-55; 3T73).

2T39:6-16. (Emphasis added); see the numerous other remarks to the jury promising them a "good faith" and "advice of counsel" defense. 2T39:25 – 40:13; 2T40:21 – 41:1; 2T41:15-25; 2T42:1-21; 2T48:20-25; and see 2T51:13-17.

After years preparing a "good faith" and "advice of counsel" defense, including successful results with using that defense at a mock trial session, there was no question going into trial that putting on their defense was a reasonable, and in fact their best, strategy.

Third, under the threat of disciplinary referral, and potential criminal liability, the defense team's interests were "inherently in conflict" with zealous advocacy for Defendant. See Novaton, 271 F.3d at 1011 (quoting Freund, 165 F.3d at 860). It wasn't until he received and reviewed thousands of pages of newly discovered evidence that the link between the two became readily apparent. That link? **This Court's decision to open and ensure an investigation into the Chris White scandal.** CW2T34:11-25. Again, the moment this Court made it unmistakably clear that an investigation was forthcoming, the entire defense team was subject to exposure for their misconduct related to Chris White and, as a result, fell under continuing and real threat of prosecution. Id. Laboring under that threat, Defendant's trial became a defense team tool for damage control. McLain, 823 F.2d at 1464 (A defense team trying a case while under a lingering threat of prosecution, inherently finds itself in conflict between the desire to aid defendant and save themselves.). The Government knew about this conflict and could have, for example, requested a Garcia hearing, but did not.[18]

---

[18] Where, as here, defense counsel are under a threat of prosecution and subject to criminal investigation by the same prosecuting authority that is prosecuting the defendant, one of the primary concerns is whether "[t]he interests of lawyer and client…have diverged with respect to their dealings with that office." Armienti, 234 F.3d at 824–25. In this regard, it is noted that "an indispensable element of the effective performance of [an attorney's] responsibilities is the ability to act independently of the Government and to oppose it in adversary litigation." Ferri v. Ackerman, 444 U.S. 193, 204 (1979); see also Anne Bowen Poulin, Conflicts of Interest in

To minimize the risk that the defense team's involvement in the unlawful recordings would come to light, the defense team chose to pull its punches and dramatically reduce the scope of its defense strategy. In particular, the defense team chose to fully abandon its case-in-chief, including its emphasis on advice of counsel and LS compliance efforts related to billing and marketing, including discussions with Medicare and industry-leading consultants, that had been at the center of its strategy for years.

The decision to abandon the entire defense strategy defied logic. In 2022, Defendant paid for a mock jury trial exercise that demonstrated that presenting a defense case was effective and necessary for an acquittal. Def. Aff. ¶¶ 16-17. The defense team identified a series of credible witnesses who would testify that LS had extensive compliance procedures put in place according to legal advice, that attorneys approved each aspect of the operations that were challenged in the indictment, and that Defendant was not involved in day-to-day business operations. See, e.g., **De1236** (summarizing Godwin's expected testimony and concluding "she will be a very good defense witness"). After the Government rested its case, the defense informed the Court and Government of at least three defense witnesses that would be testifying the following court day—what was believed to be a full day of testimony. 11T5:4-16. By Sunday, December 11, 2022, defense witnesses had begun arriving in Miami and at approximately 8:44pm that same night, Brian Rafferty texted Defendant with instructions to make sure his witnesses were available to testify the very next morning, on Monday, December 12, 2022. **De1162**.

Those witnesses were in Miami on the morning the defense case was to begin and were only minutes away from the courthouse ready to testify. See Wildemore Aff. ¶ 4; Godwin Aff. ¶ 3;

---

Criminal Cases: Should the Prosecution Have a Duty to Disclose?, 47 Am. Crim. L. Rev. 1135, 1165.

Watt Aff. ¶ 14; see also 11T5:4-5 ("And frankly, as of last night, we were told there were going to be three defense witnesses, including [Toby Watt]."). At 8:35am Monday morning, Sadow sent an email to the Court, informing the Court that the defense would be calling no witnesses. 11T3:6-9. When Defendant arrived at court that morning, he discovered what Sadow had done. Id. Defendant vehemently objected, but the deed was done. Def. Aff. ¶¶ 30-37. Sadow's decision was not explained to Defendant. After Sadow adamantly refused to put on a defense case, Defendant reluctantly gave in when the remaining defense team sided with Sadow. Def. Aff. ¶¶ 34-37. A later opinion by this Court, however, describing the Government evidence as "overwhelming," confirmed Defendant's perception that a conviction was certain if the Government's case goes uncontroverted by a "good faith" and "advice of counsel" defense. ECF. No. 535, p. 18.

Deciding to forego a defense case without even the trappings of client input on his own defense is flatly inconsistent with the Sixth Amendment, which "contemplat[es] a norm in which the accused, and not a lawyer, is master of his own defense." Gannett Co. v. DePasquale, 443 U.S. 368, 383 n.10 (1979). The undersigned has never, during his decades of experience with the criminal justice system, having litigated cases in courtrooms across the country and having read thousands of opinions—come across a scenario where the defense team informs the Court that they would be abandoning all defenses without first consulting with and getting the consent from the Client. Faretta v. California, 422 U.S. 806, 819-20 (1975) (For the Sixth Amendment, in "grant[ing] to the accused personally the right to make his defense," "speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant."). It is evident that defense counsel merely went through the motions in order to hold Defendant off so that the plug could be pulled on the defense when there was no opportunity for Defendant to prevent that from happening. See **De1262-65** (Sadow telling Defendant on November 20, 2022—while drafting a misleading

submission to the Court regarding Sadow's involvement in the White recordings in between the *ex parte* hearings and while Sadow was under threat of investigation and prosecution—that pointing out flaws in the Government's case is "done at trial").

Because of counsel's unilateral decision, the defense suffered a waterfall of negative consequences, including that they could not admit any legal memoranda that LS had paid for to ensure its legal compliance, see, e.g., 11T11-12 (Sadow agreeing GX 1848-A cannot be admitted), could not seek an advice-of-counsel instruction, see id. at 40-42, and could only rely on the testimony of cooperators who had interacted, directly or indirectly, with lawyers during their involvement in the underlying conduct, and *still chose to plead guilty*, 11T158:15-18 ("We know from almost the very beginning that Mr. Patel interacted with lawyers . . . because every cooperating witness, all four of them, talked about that interaction.").

When moving through the numerous defense conflicts, misconduct, including the cloud of uncertainty members of the Defense must have felt because of the continuing threat of prosecution by the same prosecuting office and whether their participation in the Chris White cover-up would be exposed—it becomes a difficult endeavor to disconnect the Court's announcement of its decision to investigate that misconduct as a link between the conflicts caused by the misconduct and the defense team's decision to abandon all defenses. Newsome, 774 F.2d at 1562 ("[I]t is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests"); see Thompkins v. Cohen, 965 F.2d at 332 (7th Cir. 1992) (The threat of prosecution or an investigation that can result in criminal charges brought against the attorney "may induce the lawyer to pull his punches in defending his client lest the prosecutor's office be angered by an acquittal and retaliate against the lawyer."). Specifically, counsels' interests in mitigating any legal jeopardy caused by their complicity in the White scandal was in conflict with their constitutionally

demanded interests and duty in utilizing all tools and defenses available to successfully defend Defendant at trial. These multi-layered, cross-collateralized, competing conflicts reveal a defense team in perpetual, ethical, legal and moral chaos.

To think this seasoned defense team truly believed that this strategy could succeed strains credulity.[19] The more probable explanation is the explanation that court after court has accepted in similar cases: the defense team pulled its punches to wrap up an already-lengthy trial and fly under the radar to avoid scrutiny, linking their abandonment of the trial strategy to the actual conflict they faced. See, e.g., Levy, 25 F.3d at 156; McLain, 823 F.2d at 1464; Thompkins, 965 F.2d at 332. Defendant is entitled to a new trial to remedy this violation of his Sixth Amendment rights.

## III. Sztyndor's Cooperation with the Government by Clandestinely Delivering Sensitive and Privileged Defense Information to the Government and the Attorney for a Cooperator Against Defendant, Violated the Fifth and Sixth Amendments and Warrants a New Trial.

The purpose of the attorney-client privilege is to encourage open and complete communication between a client and his attorney by eliminating the possibility of subsequent compelled disclosure of their confidential communications. United States v. Suarez, 820 F.2d 1158, 1160 (11th Cir. 1987). That relationship is further protected by the Sixth Amendment from

[19] This Court has been unequivocal that the Government presented overwhelming evidence of guilt. ECF No. 535 at 18. It is profoundly hard to believe that, upon the Government's decision to rest its case, highly experienced defense attorneys saw a "win" to the extent that they were willing to abandon 3 years of preparing a "good faith" and "advice of counsel" defense—leaving witnesses, who travel far to testify, baffled about the sudden change and waste of their time… How could they see a definitive "win" when the court is seeing overwhelming evidence of guilt, uncontroverted because of the lack of a defense? It is this type of suspicion and struggle to understand counsels' motives when the case is corroded with misconduct, betrayal of loyalties and the lingering threat of prosecution—when the "effects of the error are simply too hard to measure." Weaver, 137 S.Ct. at 1908. Even Custer, seeing all was lost, gave a "last stand" at the Battle of the Little Bighorn.

Government intrusion. Weatherford v. Bursey, 429 U.S. 545, 554 n.4 (1977); United States v. Kilrain, 566 F.2d 979, 983 (5th Cir. 1978); *see* United States v. Levy, 577 F.2d 200, 209 (3d Cir. 1978). When Government intrusion into the confidential or privileged attorney-client relationship occurs, the defendant's right to the effective assistance of counsel has been violated. United States v. Noriega, 917 F.2d 1543, 1551 (11th Cir. 1990).

The standard for determining ineffective assistance of counsel under an intrusion analysis is distinct from the Strickland[20] two-part test as well as the conflict two-prong test enunciated in Cuyler.[21] The test for an "intrusion" analysis is enunciated in Weatherford, supra. Under the Weatherford "Government intrusion" test, the Eleventh Circuit has found that a "Government intrusion" into the attorney-client relationship "can be successful when the defendant shows one of three things: (1) tainted evidence; (2) communication of the defense strategy to the prosecution; or (3) purposeful intrusion by the government on the defendant's Sixth Amendment rights." United States v. Blair, 174 F.4th 1309, 1316 (11th Cir. 2026); see United States v. Roper, 874 F.2d 782, 790 (11th Cir. 1989).

In cases—unlike this case—where a defendant is seeking a dismissal of the indictment because of Government intrusion, he must make an additional showing of prejudice or a substantial threat thereof. United States v. Morrison, 449 U.S. 361, 364-65 (1981); Weatherford, 429 U.S. at 554. However, when as here, the lesser remedy of a new trial is being sought, instead of a dismissal, the required showing is modest and "the prejudice need not be 'outcome determinative.'" United States v. Noriega, 764 F. Supp. 1480, 1490 n.8 (S.D. Fla. 1991) (quoting United States v. Kelly, 790 F.2d 130, 138 n.6 (D.C. Cir. 1986)); 3 Wayne R. LaFave et al., Crim. Proc. § 11.8(b) (4th ed.)

[20] Strickland v. Washington, 466 U.S. 668 (1984).

[21] Cuyler v. Sullivan, 446 U.S. 335 (1980).

(explaining that a "a remedy less severe than the dismissal-with-prejudice" requires a lesser showing); see Morrison, 449 U.S. at 365 (contrasting dismissal with a new trial). In order to establish prejudice, or the substantial threat thereof, it must be shown that the confidential information was used for the benefit of the Government or the detriment of the defendant. See United States v. Bishop, 701 F.2d 1150, 1156-57 (6th Cir. 1983); Mastrian v. McManus, 554 F.2d 813, 821 (8th Cir. 1977).

A. The Intrusion

**1. Tainted evidence**

Given that evidence of the full extent of Sztyndor's disloyalty is peculiarly in her possession, she is unlikely to disclose further evidence of her misconduct absent a court order. Indeed, the record in this case demonstrates that Sztyndor's decision to unilaterally disclose Defendant's defense strategy to a known Government cooperator, White, and directly to the Government was devastating in its prejudicial effect.

After years of Sztyndor sending out Defendant's legal research and summaries of his intended defense, the Government filed a superseding indictment in September 2022 that altered and refined the Government's legal theories and removed White as an unindicted coconspirator. Compare ECF 1, with ECF 275. Those amendments relate directly to the defense strategy materials that Sztyndor had for years been sharing with the Government and White. Counsel's Aff. ¶ 20. Consequently, the intrusion "tainted" the superseding indictment as well as the altered and refined evidence used to prosecute Defendant under the new indictment. In as much as the Government's evidence used at trial in pursuit of a conviction under the superseding indictment was tainted by the intrusion, Defendant is entitled to a new trial.

**2. Communication of the defense strategy to the prosecution**

Over the course of years, even as Sztyndor represented Defendant and purported to prepare his defense case, she repeatedly disclosed Defendant's defense strategy and evidence both directly to the Government prosecuting her client and to a key cooperating witness. Sztyndor's disloyalty also had a material and prejudicial effect on the preparation of Defendant's defense and presentation at trial.

To DOJ's criminal division, Sztyndor explained that "in every case I was ever involved in—DOJ prevailed (not in spite of me), but BECAUSE of me." **De602** (Jan. 10, 2024: "The facts are that every DOJ case I was involved in I either stayed out of, or my voluntary participation actually helped DOJ."). Among the five examples Sztyndor gave was Defendant's case. Sztyndor explained that "DOJ knew about the Chris White recordings before Steve [Sadow] 806ed Chris [White] on the stand because I elected to tell Chris." **De602**; see also **De1155** (explaining that Sztyndor had "been nothing but cooperative with DOJ from the onset through numerous trials"). If Sztyndor had not tipped off White to the defense's evidence, she explained, "[t]he plan was always to let the DOJ witnesses testify, and then use the recordings on cross without disclosure." **De540-41** (July 8, 2023); id. ("Steve [Sadow] lost control of me and I told a DOJ witness. That's what happened."). In short, Sztyndor openly admitted that her actions "rescue[d]" DOJ's prosecution against Defendant by preventing his defense team from effectively being able to use the Chris White evidence. See also **De175** (Aug. 26, 2021: "I even tried to help you in our aligned cases and you've been nothing but cruel to me.").

Sztyndor's words and actions demonstrate that she understood herself to be on the side of the Government prosecution and White (a Government cooperator who she never represented) more than she was on Defendant's team.[22]

Newly discovered evidence makes especially clear that Sztyndor on a regular basis shared Defendant's defense strategy with White, even though she knew that White and Defendant had conflicting interests, **De990;** Counsel's Aff. ¶¶ 18-19, and even though Sadow expressly instructed her not to share anything from Defendant's case with White, **De1003**. As the defense team expected, White ultimately did plead guilty on September 17, 2021, and "agree[d] to cooperate fully with the United States" in its healthcare prosecutions, Plea Agreement at 5-6, United States v. White, 20 Crim. 165 (M.D. Fla. Oct. 5, 2021), ECF No. 128.

That agreement created a legally enforceable obligation on White to share Defendant's defense strategy, which he received from Sztyndor, to the prosecution team. The materials shared by Sztyndor included materials developed by Defendant's defense team to summarize his factual defenses, research on his legal positions, and descriptions of the legal advice that Defendant and LS received. See **De2** (Feb. 9, 2020 memo regarding Anti-Kickback Statute); **De6** (Aug. 14, 2020 documents to White including "Privileged" legal advice to LS and "unredacted" attorney meeting notes).

And in February 2021, Sztyndor provided additional legal work product to White and his counsel, tying it directly to privileged legal advice given by "Tobby Watts [sic] at Fox Rothschild" and by Baker Donelson in "Opinion Letters they wrote for LabSolutions." **De1130-34**. Sztyndor

---

[22] The examples of egregious conduct, conflicted loyalties and threats to the DOJ are numerous. See **De174; De179-83** (Informing Sadow she was reporting him to the Florida Bar)**; De540-41; De563** (Threatening DOJ about releasing recordings she made of Chris White that she kept secret from the defense team)**; De610** (Claiming she reported everything to DOJ); **De675; De682; De 687; De688; De722-23; De785-86; De841; De846; De874-75; De876; De878; De886**; **De885**.

further described to White's counsel the discovery productions that Defendant intended to make to the Government. **De1133**. Sztyndor disclosed all this information despite Steve Sadow's instruction that she "cannot do work for [White] at all" and she "can't share anything or discussed anything with them about [Defendant's] case." **De1003** (Feb. 1, 2020).[23]

Acting on her apparent view that she can pick and choose her loyalties on a whim, Sztyndor over the course of Defendant's prosecution repeatedly disclosed Defendant's defense strategy directly to the Government. Those disclosures include two substantive legal memoranda that summarized legal research that informed Defendant's defense strategy. See **De7-8** (Dec. 27, 2020 email to DOJ); **De9-131** (Dec. 27, 2020 memo to DOJ); **De134-35** (Dec. 31, 2020 email to DOJ). Several months after that, Sztyndor affirmatively presented evidence to two DOJ attorneys that had appeared in Defendant's case regarding a medical biller who worked with Sztyndor's clients and was engaged in an "illegal billing scheme" and offered to "teach" DOJ attorneys about it, **De147-50**, and shared (without prompting) a transcript of a recorded call that she says contained evidence of fraud, **De155-72**. That biller, by Sztyndor's admission, was working with testing lab clients she represented. **De1160-61**. And she explained why the billing for those labs was fraudulent and illegal. Id.; see also **De885**; **De1266**. In short, Sztyndor was intentionally feeding evidence of allegedly fraudulent conduct connected to her lab clients (of which LS was one)

[23] It should be noted that Sztydnor claimed to have communicated with White over two hundred times without obtaining any written consent from his attorney for the communications. Counsel's Aff. ¶ 17. Sztydnor then attempted to avoid legal jeopardy by claiming she was in Georgia for each of the 16-known secret recordings she made of White—a position designed to indicate the Florida criminal statute governing the matter was not violated. Id. Once she was informed that the Florida criminal statute governs where the non-recording party is located, she pivoted and then stated that Chris White was not in Florida for any of the recorded calls, see id.—a proposition contradicted by Chris White's attorney, see id., and impossible for her to personally know, especially given the fact that she was not with Chris White during any of the 16-conversations she admitted to recording and "hundreds" of other recordings she claims to have in her possession but did not inform the Defense. **De719-20, 879**.

directly to Government attorneys prosecuting Defendant for fraud. And she did so without Defendant's knowledge and outside any agreement with the Government that Sztyndor's information be used to benefit him (rather than inculpate him).

Between dissemination of the Chris White evidence and the dissemination of other defenses strategies directly to the Government and indirectly to the Government through cooperator, Chris White, Sztyndor's unauthorized disclosure of privileged and confidential defense information is indisputable.

### 3. Purposeful intrusion by the Government on Defendant's Sixth Amendment rights

In emails spanning years, Sztyndor described herself, variously, as working on Government cases with DOJ attorneys, **De1146**, as having DOJ attorneys as "work friend[s]," **De813; De869**, as "protect[ing]" a cooperating witness for DOJ (and "subsequently [attorneys] at DOJ"), **De604**; **De784**, as "tr[ying] to help [DOJ]," **De175**, as "falling on the sword" for DOJ, **De785**, and even as "choos[ing] between" a cooperating witness and her own client, **De687**.

As shown in the disclosures enumerated above, the history of the Sztyndor/DOJ relationship in this and other cases discloses a pattern of a cooperation that is too obvious to ignore. The Government knew Sztyndor's clandestine dissemination of privileged information was both questionable and problematic. Her invitation to educate DOJ personnel on matters integral to their prosecution and on how to identify and glean illegality from complex facts that was only known to her is contrary to the constitutional demands of a defense attorney. Reynolds v. Chapman, 253 F.3d 1337, 1342 (11th Cir. 2001) (citing Strickland v. Washington, 466 U.S. 668, 692 (1984) ("The duty of unfettered loyalty to one's clients is among the most central of a criminal defense attorney's responsibilities.").

The list of verifiable disclosures of evidence and defense strategy to the Government is almost certainly incomplete. Given the number of communications between Sztyndor and the Government, and her casual disregard of her loyalty to her client, the disclosures of which Defendant is aware are likely just the tip of the iceberg.[24] In fact, even after Sztyndor withdrew and Defendant was convicted, Sztyndor's pattern of dissemination continued.

For example, in July 2023, Sztyndor forwarded to three DOJ attorneys key discussion topics for Defendant that were prepared in the months before Defendant's trial. **De1268**. And in March 2024, in yet another email thread with a group of attorneys at DOJ's criminal division, Sztyndor asked Timothy Coley—a DOJ attorney—if he had sent to other DOJ attorneys Defendant's "$52,000 mock jury trial where he was found innocent." **De677**.

That mock jury trial was a key moment when Defendant's defense team prepared its attack on the Government's case and refined its own case-in-chief centered on Defendant's good-faith and advice-of-counsel defenses. Def. Aff. ¶¶ 16-17. Yet, Sztyndor's email strongly implies that she had shared those confidential materials with Defendant's prosecution team long before.[25] What

---

[24] This email to the DOJ indicates that Sztyndor is involved to some extent in pursuing qui tam prosecutions. **De885**. The email suggests that Sztyndor used her position as counsel to extract damning information from clients' discovery related to violations of federal offenses associated with the Government's double helix investigations. She then would forward that information to lawyers, like Jim Durham, as a referral for qui tam prosecution—thus, insulating herself from conflict of interest claims so that she can get paid for the referral on the backend. Defendant was charged and prosecuted as part of the double helix investigation—meaning Sztyndor was referring qui tam information for prosecution involving the same or similar facts she was defending Defendant against criminally. *See also supra* 16-17. These communications are part of a long pattern of Sztyndor working closely with the Government to report alleged Medicare fraud. See, e.g., **De1270-77**.

[25] Defendant has requested word from the Government regarding each date it received Defendant's mock trial information from Sztyndor, specific identification of the information, who among DOJ personnel received that information, either directly from Sztyndor or otherwise and why the Defense was never informed of the DOJ's receipt of the information since there was inherently no authority for the Government to be sent or to receive such damning, top secret, strategic and privileged defense information.

is more troubling is that, upon receiving this information on multiple occasions wherein multiple prosecutors are copied, the Government remained hush about it—never disclosing to the defense that they received or possessed the information.

This sprawling years-long perpetual pattern implies an understanding between Sztyndor and the Government—a wink and a nod—evidencing a meeting of the minds that as long as Sztyndor continue to provide the sensitive, privileged or confidential information that is helpful to the Government, the Government will accept it without objection or inquiry, regardless of its content. If it wasn't for newly discovered emails from Sztyndor reminding the DOJ of all her help—including threats to destroy DOJ cases by releasing damning evidence she's withholding in order to ensure the DOJ's reciprocal loyalty and appreciation of her—Defendant would have never learned of her transgressions. In essence, the Government's years-long pattern of receiving known privileged information from Sztyndor related to Defendant's case and the cases of other clients without objection from the Government or a direct demand to cease and desist her actions, reveals a purposeful receipt of the information, knowing it was confidential and provided without authorization.

B. Prejudice

As a reminder, the United States Supreme Court in Weatherford requires only that a defendant show "a realistic possibility of injury" to himself or a mere "benefit" to the Government from the disclosure of the defense information. Weatherford, 429 U.S. at 557-58; see also United States v. Noriega, 764 F. Supp. at 1490 n.8. The "realistic possibility of injury" requirement is easily satisfied here, where, after Defendant's counsel fed details of his strategy to the Government and to one of the Government's planned star cooperating witnesses, the Government altered its strategy in at least three key ways. First, the Government filed a superseding indictment that

removed the cooperator and reference to beneficiaries under the Novitas MAC. Second, at trial, the Government shifted its theory of fraud to focus on Tier 2 coding, a theory that expressly came from Sztyndor. **De885**. The Government further altered its trial strategy to omit any reference to the NCD 90.2 (the express basis for the Government's search of LS), see **De9-131**, and to reference only LCDs issued by the Palmetto MAC. And third, the Government chose not to call its former-star cooperator as a witness, depriving the defense team a crucial opportunity to reveal the Government's case against the Defendant was knowingly fraudulent.

In short, Sztyndor openly admitted that her actions "rescue[d]" DOJ's prosecution against Defendant by preventing his defense team from impeaching a key Government cooperating witness using the recordings. **De545**. In Sztyndor's words, those recordings would demonstrate that Defendant's case was premised on "prosecutorial misconduct." **De563**. This Court, having listened to the recordings, agreed they were "significant" and would have gone "straight to [White's] credibility." CW2T6:4-10. Sztyndor alerted White, and saved the Government's case from such impeachment, out of a desire to protect White and boost her own reputation with the Government, rather than out of loyalty to her former client.[26]

In summary, the intrusion prejudiced Defendant's case. He is therefore entitled to a new trial, Bell, 776 F.2d at 972-73, or in the alternative, an evidentiary hearing.

C. Structural Error

[26] In retaliation for the defense team secretly recording him, White "immediately informed the Government about the existence of the[] recordings so that they could prevent the Government from being caught off guard…" **De454** at 20:22-24 (Chris White Sentencing Transcript dated April 4, 2023 ("CWST")). In fact, "Mr. White himself on Thanksgiving met with and spoke with the Government prosecutors and did everything [he] could to secure the conviction of Mr. Patel…" CWST21:2-5. Thus, Sztyndor's misconduct and White's retaliation successfully, neutralized any defense threat associated with the secret recordings.

Typically, Government-intrusion cases involve a confidential informant or a federal agent that acted as the conduit to the Government. Here, the intrusion was far worse, because it was facilitated by Defendant's own defense counsel, who acted as a backchannel for the Government intrusion into his privileged and confidential defense information. In this respect, the prejudice suffered by Defendant is as profound as it is unique, and constitutes structural error.

A structural error "affect[s] the framework within which the trial proceeds, rather than [being] simply an error in the trial process itself." Fulminante, 499 U.S. at 310. This type of error "necessarily render[s] a trial fundamentally unfair." Rose v. Clark, 478 U.S. 570, 577 (1986). For this reason, when structural error occurs, the court does not give the Government a chance to try to demonstrate beyond a reasonable doubt that the defendant was not prejudiced; instead, the court assumes prejudice without actually assessing the record for it. See generally Gonzalez-Lopez, 548 U.S. at 148. Failure to provide the "basic protections" at trial, id. —for example, an impartial judge, the correct standard of proof, an impartial jury, and the assistance of counsel, see Neder v. United States, 527 U.S. 1, 9 (1999)—results in structural error because when any of these safeguards is missing, "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." Rose, 478 U.S. at 577-78 (citation omitted).

The reality is that the effects of structural error can be difficult or even impossible to quantify. Gonzalez-Lopez, 548 U.S. at 150. And even when they can be assessed, structural error involves" 'circumstances ...that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'" See Wright v. Van Patten, 552 U.S. 120, 124 (2008) (quoting Cronic, 466 U.S. at 658.). Once a petitioner demonstrates a violation of his Sixth Amendment right to conflict and misconduct-free counsel so egregious that it "affect[ed] the

framework within which the trial proceeds, rather than simply an error in the trial process itself," see Fulminante, 499 U.S. at 310, he need not show that the violation prejudiced him in any way. Id.

Here, the evidence discovered by Defendant after his conviction reveals that, while he labored for years to develop his defense strategy, his defense counsel was concurrently feeding details of that strategy to the Government and to one of the Government's planned star cooperating witnesses. That conduct "smacks of the basest conflict of interest and disloyalty" and reflects an "utter perversion of the attorney-client relationship." Messelt v. Alabama, 595 F.2d 247, 248, 251 (5th Cir. 1979). Such disloyalty by defense counsel is inherently prejudicial and is itself sufficient basis to grant a new trial "without even considering the actual trial performance of [counsel]." Id. at 251; see, e.g., Gandy v. Alabama, 569 F.2d 1318, 1327 (5th Cir. 1978) (holding that counsel's "blatant breach of the sacred loyalty owed his client was itself such ineffective assistance of counsel as to render this trial fundamentally unfair"); United States v. Phillips, 664 F.2d 971, 1041 (5th Cir. Unit B 1981) (similar); United States v. Marshank, 777 F. Supp. 1507, 1 (N.D. Cal. 1991).

Here, the egregious behavior of counsel spanning 3 years, including the multiplicity of competing conflicts, the abandonment of loyalty in favor of a cooperating witness, the double agent style betrayals, including delivering defense strategy to the adversary and implicating lead counsel's misconduct to the DOJ, collectively make it almost impossible for the Government to show that the error was "harmless beyond a reasonable doubt," see Weaver, 137 S.Ct. at 1908 (citing Chapman v. California, 386 U.S. 18, 24 (1967), because the consequences of counsels'

collective actions are simply too hard to measure; the precise effect of the violation cannot be ascertained.[27] Gonzalez-Lopez, 548 U.S. at 149 n.4 (quoting Vasquez, 474 U.S. at 263).

Sztyndor's deliberate and unauthorized dissemination of confidential defense information, evidence and strategy—either out of loyalty to a Government cooperator or out of her personal and professional interests in "voluntar[ily]…help[ing] DOJ"—constituted a gross conflict of interest. Her involvement in the Government intrusion created a symbiotic constitutional anomaly where both Defendant's right to conflict free counsel under Cuyler and his right to attorney-client privilege under Weatherford were simultaneously violated, compounding both constitutional errors to the point that counsel urges the Court to find a structural one.

Because Defendant's own attorney was the source of the unauthorized Government intrusion, the synthesis of the Sixth Amendment violations under Cuyler and Weatherford has caused a multitude of harm "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." Fulminante, 499 U.S. at 310. Accordingly, in considering counsel's involvement in the intrusion, this Court should go beyond finding a Sixth Amendment violation of the attorney-client privileged based upon the Weatherford standard. This Court should find that counsel's involvement—and related conflict of interest—in effectuating the intrusion renders "the effects of the error…too hard to measure," Weaver, 137 S. Ct. at 1908. Indeed, when factoring in the presumption of prejudice inherent in a Cuyler violation, the precise effect of the violation here cannot be ascertained. Gonzalez-Lopez, 548 U.S. at 149 n.4 (quoting Vasquez, 474

[27] Additionally, Sztyndor faced another fatal conflict of interest because she believed herself to be under criminal investigation by the same office of DOJ responsible for prosecuting Defendant. **De852-67** (explaining that the Government photographed Sztyndor's house, froze her bank account, and placed her in a photo lineup). Because that pending investigation presents an obvious incentive for Sztyndor to act in her own self-interest in dealing with the Government, the undisclosed investigation created a "clear conflict" between Sztyndor and her clients facing federal criminal prosecution. **De867**.

U.S. at 263). In essence, this Court should find that a Sixth Amendment structural error has occurred because a defense attorney's involvement in the unauthorized dissemination of a Defendant's privileged and confidential defense strategy and information, when coupled with an actual conflict of interest, is an error that "always results in fundamental unfairness." Weaver, 137 S. Ct. at 1908.

With a violation so egregious that it satisfies the tests enunciated in multiple constitutional standards required for a new trial, this Court need only pick one. Defense counsel's conduct has caused Defendant to suffer significant losses. It deprived him of the ability to properly protect his liberty. It deprived him of the opportunity to seek new counsel of his choosing—free of misconduct, conflict and compromise. And it deprived him of the basic fundamental fairness in constitutionally required criminal proceedings—the comfort that the criminal process, including his trial and the result was not corrupted or brought on, even in part, as a result of counsel's misconduct or conflicts. See Vasquez, 474 U.S. at 263. The magnitude and egregiousness of counsels' conduct here has structural implications as the list of deprivation and fallout adversely affecting the criminal proceedings generally and the trial specifically are immeasurable. Gonzalez-Lopez, 548 U.S. 140, 149, n.4. A new trial is warranted.

**IV. Defendant's Healthcare-Counsel's "Double Agent" Activities, Including Having Unauthorized Communication With The Government Related To Defendant's Case And Providing The Government With Sensitive Defense Strategies, Coupled With Multiple Members Of The Defense Team Operating Under Significant Conflicts Of Interests Throughout The Entire Criminal Proceedings, Rose To The Level Of A Structural Error, Requiring A New Trial.**

Once a petitioner demonstrates a violation of his Sixth Amendment right to conflict and misconduct-free counsel so egregious that it "affect[ed] the framework within the trial proceeds, rather than simply an error in the trial process itself," see Fulminante, 499 U.S. at 279, he need not show that the violation prejudiced him in any way because the error is structural. Id. Here, the

collective egregious behavior of counsels spanning 3 years, collectively making it almost impossible for the Government to show that the error was "harmless beyond a reasonable doubt," see Weaver, 137 S.Ct. at 1908 (citing Chapman v. California, 386 U.S. 18, 24 (1967), because the consequences of counsels' collective actions are simply too hard to measure, i.e., where the precise effect of the violation cannot be ascertained. Gonzalez-Lopez, 548 U.S. at 149 n.4 (quoting Vasquez, 474 U.S. at 263). All three of the rationales for structural error discussed above are satisfied by the facts of this case, independently justifying a new trial.

As for the **First Rationale** for structural error, that the right protects some other interest than erroneous conviction, not knowing the extent of Sadow's involvement in directing Sztyndor in the Chris White scandal, Defendant was not aware that Sadow and the remaining attorneys on his defense team, Brian Rafferty and Don Samuel had misrepresented and misled the Court regarding their involvement in and/or knowledge of the Chris White communications and recordings. Id. Defendant was not aware that, because of their individual acts and/or omissions related to their misconduct, his entire defense team took him to trial under a threat of prosecution—this threat of prosecution existed not just because some of the acts were criminal in nature but also because the Court had made it clear it was going to be seeking disciplinary investigation and action. Id. Defendant was unaware that for over 3 years, his attorneys, because of their misconduct, had placed into action a series of events that would implode his defense and ensure his conviction. Id.

Contrary to what things appeared to be on the surface, the attorney misconduct, conflict of interests, and ensuing coverup clearly indicate that Defendant was out-of-the-loop regarding the true nature and posture of his representation which served to prohibit him from being involved in

protecting his own freedom—having no idea how endangered that freedom was.[28] McCoy, 138 S. Ct. at 1511 (quoting Weaver, 137 S. Ct. at 1908) (It is a "'fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty.'").

As for the **Second Rationale**, that the error is too hard to measure, little comment is necessary. As espoused in arguments above, Defendant was denied the right to counsel of his choice—the right to be informed of counsel's improprieties and to be provided the opportunity to choose qualified counsel, free from misconduct and conflicting interests. Id. As a result and to avoid belaboring the Court, Defendant incorporates those arguments by reference.

Finally, as for the **Third Rationale** for structural error, the Court's task here is impossible. Weaver, supra. In light of the horrendous conduct and disingenuousness of members of the defense team, this Court will never truly be able to determine the extent of any damage done to the criminal process generally and to Defendant and his rights specifically. See United States v. Gonzalez-Lopez, 548 U.S. 140, 149, n.4; see also Stevenson, 774 F.2d at 1562. In this case, Defendant proceeded to trial with a defense team who had been engaging in misconduct as a fundamental part of their representation throughout the entire criminal proceeding for over 3 years.

When, as here, that misconduct—accented by multiple overlapping conflicts of interests and cover-up—culminated into the threat of prosecution, the fallout from that threat carries inherent "consequences that are necessarily unquantifiable and indeterminate, unquestionably qualify[ng] as 'structural error.'" Sullivan 508 U. S. at 282. In essence, the criminal proceedings

[28] Like in Arbolaez, where the defendant was constructively denied the right to counsel because the defense could not put on a case, 450 F.3d at 1294-95, here the defense team's misconduct worked to deprive Defendant of "the opportunity to present evidence in [his] favor," and so too constitutes structural error, see United States v. Hurn, 368 F.3d 1359, 1362 (11th Cir. 2004).

in this case involved a Defendant surrounded by representation fraught with betrayal, abandonment, conflicting interests, infighting, unethical and criminal conduct—a defense team that engaged a course of conduct which road roughshod over the proper and lawful administration of justice for over 3 years. When factoring in the complete desertion of a "good faith" and "advice of counsel" defense, the totality the errors and its effect on Defendant's case and rights "def[ies] analysis by 'harmless error' standards" because it "affec[ts] the framework within which the trial proceeds" and is not "simply an error in the trial process itself." Fulminante, 499 U. S. at 309-310.

This Court should give an indicative ruling that Defendant is entitled to a new trial or, at a minimum, find that a substantial question exists warranting a remand.

**V. The Cumulative Effect Of These Errors Requires a New Trial.**

"Under the cumulative-error doctrine, an aggregation of nonreversible errors ... can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) (citation modified); Sanchez, 176 F.3d at 1220, 1225 (not resolving plain error question where cumulative effect of errors compelled reversal); see also Taylor v. Kentucky, 436 U.S. 478, 487 n.15 (1978) (finding that while cumulative errors are individually harmless, when taken together they can prejudice a defendant as much as a single reversible error and violate a defendant's right to due process of law.); United States v. Hands, 184 F.3d 1322, 1334 (11th Cir. 1999). Given the extensive errors articulated above, allowing this verdict to stand would work a disservice to our system of criminal justice and fundamental due process principles. "The basis for granting a new trial under Rule 33 is whether it is required 'in the interest of justice.' That is a broad standard." United States v. Vicaria, 12 F.3d 195, 198 (11th Cir. 1994). In the event, this Court does not find that the individual errors espoused in the Points

above warrant a new trial, the Court should, nonetheless, find that cumulatively the errors require such a result. See United States v. Hesser, 800 F.3d 1310, 1329 (11th Cir. 2015).

## VI. In the Alternative, the Court Should Grant an Evidentiary Hearing

At a minimum, the Court should grant Defendant an evidentiary hearing. This Court may hold an evidentiary hearing "pursuant to its jurisdiction to entertain [a] Motion for New Trial, as well as the Eleventh Circuit's stay of proceedings pending resolution of district court proceedings on the Motion." Agresti, 794 F. Supp. 3d at 1189 n.2; see Order, United States v. Patel, No. 23-13292 (11th Cir. June 2, 2026). A defendant is entitled to an evidentiary hearing on a motion for a new trial if he "has made sufficient allegations so that it cannot be *conclusively* stated that he is entitled to no relief." United States v. Yizar, 956 F.2d 230, 234 (11th Cir. 1992) (remanding district court's denial of hearing). The Eleventh Circuit has long recognized that evidentiary hearings can be particularly helpful to "flesh out all of the relevant facts relating to [a] conflict of interest claim." United States v. Williams, 902 F.3d 1328, 1336 (11th Cir. 2018); see Burden v. Zant, 871 F.2d 956, 957 (11th Cir. 1989) (ordering an evidentiary hearing on conflict of interest claim).

A hearing is particularly appropriate because much of the evidence most relevant to Defendant's claims is inherently in the possession of his former defense counsel and the Government, none of whom have an incentive to volunteer evidence of his counsel's misconduct in support of a new trial. Moreover, Defendant learned of some facts crucial to this motion from the disciplinary hearings against Sztyndor. In ruling on Defendant's prior motion regarding the use of transcripts from that hearing, this Court explained that Defendant can "subpoena[] trial counsel (or other witnesses) and elicit[] the same facts that were elicited at the disciplinary hearing" for purposes of this Motion. ECF 709 at 2. If the Court does not find these pleadings and documentary submissions sufficient, Defendant welcomes the opportunity to call these witnesses to establish a

complete evidentiary record of his defense team's misconduct. Each revelation has only affirmed that the defense team's misconduct resulted in a trial that was, as a whole, not "fundamentally fair." See United States v. Lopez, 590 F.3d 1238, 1258 (11th Cir. 2009) (quoting United States v. Calderon, 127 F.3d 1314, 1333 (11th Cir. 1997)).

Finally, given Rule 33's broad "interest of justice" standard and the 27-year sentence Defendant is currently serving, there is no risk to airing out these issues. To counsel's knowledge, the Eleventh Circuit has never found that a district court abused its discretion by holding an evidentiary hearing on a motion for new trial. To the extent the Court finds more evidence is needed to support this Motion, an evidentiary hearing is the appropriate solution.

**CONCLUSION**

For these reasons, Defendant respectfully requests the Court grant his motion.

Dated: November 7, 2026

Respectfully submitted,

*/s/ Isaac Wright, Jr.*
Isaac Wright, Jr. (*pro hac vice*)
iwright@hunthamlinridley.com
HUNT HAMLIN & RIDLEY
60 Park Place, 16th Floor
Military Park Building
Newark, NJ 07102
Telephone (973) 242-4471

Gene R. Besen (*pro hac vice*)
gbesen@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
2200 Ross Avenue, 20th Floor
Dallas, TX 75021
Telephone (469) 391-7400
Facsimile (469) 391-7401

*/s/ Carmen Elena Jule*
Carmen Elena Jule
Florida Bar No. 1030760
cjule@sheppardmullin.com
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
30 Rockefeller Plaza, 39th Floor

New York, NY 10112
Telephone (212) 653-8198
Facsimile (212) 653-8701

Attorneys for Minal Patel

**CERTIFICATE OF SERVICE**

A true and correct copy of the foregoing was served on the U.S. Attorney's Office on this 7th day of November, 2026, via email.

*/s/ Carmen Elena Jule*
Carmen Elena Jule