**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : **Criminal Action** |
| Plaintiff, | : |
| | : Case No. 19-80181 |
| | : |
| v. | : VERIFIIED PROFFER OF ISAAC |
| | : WRIGHT, JR., COUNSEL FOR |
| MINAL PATEL, | : DEFENDANT MINAL PATEL, IN |
| | : SUPPORT OF MOTION FOR A NEW |
| Defendant. | : TRIAL, BASED UPON NEWLY |
| | : DISCOVERED EVIDENCE. |

I, Isaac Wright, Jr., being of full age, and in lieu of oath, pursuant to 28 U.S.C. § 1746 does say that:

1. I am counsel for the Defendant, Minal Patel, in the above-entitled action and make this Verification by first proffering the following pertinent background, based upon information and belief. On or about August 16, 2019, federal agents effectuated a search of Defendant's business, a genetics testing lab, called Lab Solutions, LLC (hereinafter "LS"). One of the LS's compliance attorneys, Toby Watt, Esq., converge at the lab during the search and conversed with federal agents. Upon completion of the search, the lab was not shut down and the employees were allowed to go back to work. Subsequent to the search, Mr. Watt's firm, FoxRothchild, immediately engaged the Government and began negotiating a civil resolution. A meeting set at DOJ's office in Washington, D.C. in furtherance of

that discussion was abruptly halted by Steve Sadow, Esq., who had also been involved in advising LS regarding some of its business practices.[1] Instead of first allowing FoxRothchild to seek a civil resolution, Sadow demanded, in a letter to the DOJ, for the Government to either release LS's funds that had been frozen incident to the search or charge Defendant with an offense. In response, the DOJ charged Defendant with a variety of healthcare and related offense. From that moment, all other attorneys were out and Sadow became lead counsel in Defendant's criminal case.

2. I now turn to the Background related to newly discovered evidence that arose in the ethics investigation of Robyn Sztyndor (hereinafter "Sztyndor") related to her conduct in this case. On March 30, 2023 and February 21, 2024, Sztyndor, Defendant's previous counsel, was the subject of a disciplinary hearing with respects to allegations against her of misconduct in her representation of Defendant, including conduct during her investigation of Defendant's case and her relationship with Steve Sadow, Esq., Defendant's lead counsel at the time.

3. The disciplinary hearing broadly covered three areas: (1) the improper communications with unindicted coconspirator, turned indicted government cooperator, Chris White without the knowledge of his counsel; (2) the secret,

[1] Sadow's relationship to Lab Solutions and Defendant during the pre-arrest period questions whether he was qualified to represent Defendant in the criminal case as his activities with the lab subjected him to be called as a witness in the criminal case.

illegal recordings of some of those communications; and (3) the inappropriate filings without the required redactions, including a failure to file underseal during reentry of the case while under conflict.

4. Sztyndor, Sadow and Chris White's attorney Jason Mehta, testified at the disciplinary hearing. Sztyndor was eventually disbarred by the United States District Court for the Southern District Florida related to her conduct in Defendant's case.

5. On May 22, 2026, Defendant moved for an order permitting him to disclose unredacted quotes and citations from the disciplinary hearing transcripts in his motion for a new trial. ECF No. 682.

6. The Court found that the motion was improper based upon the Court's previous rulings and then struck Defendant's Rule 33 motion and ordered Defendant to refile it without quoting the content of the transcripts or citing to that content. ECF No. 700.

7. On July 17, 2026, Defendant, again, moved for permission to use the disciplinary transcripts on constitutional grounds. The Court denied that motion on July 20, 2026. ECF No. 709. In denying Defendant's motion to use excerpts from the disciplinary transcripts, the Court ruled in pertinent part:

> Mr. Patel can try to prove that he is entitled to a new trial because his trial counsel's "misconduct . . . significantly contributed to Defendant's conviction and 27- year prison sentence." ECF No. 708 at 10. **He can try to prove it <u>by subpoenaing trial counsel (or other witnesses)</u> and eliciting**

> **the same facts that were elicited at the disciplinary hearing**… And, consistent with Fed. R. Civ. P. 11, if he has a good-faith basis to believe that certain underlying facts are true, **<u>he can proffer those facts in his pleadings</u>, but cannot cite or quote from the transcripts**.

<u>Id.</u> (Emphasis added).

8. I, along with Defendant and the remaining defense team, have thoroughly reviewed and discussed the content of the disciplinary hearing transcripts on a number of occasions and have personal knowledge of the content thereof.

9. Therefore, in anticipation of the Court's decision to hold an evidentiary hearing wherein Defendant will be "subpoenaing trial counsel (or other witnesses)," to testify about "the same facts that were elicited at the disciplinary hearing," Defendant proffers the following facts regarding the ethics investigation of Sztyndor and subsequent disciplinary hearings:

10. Before being hired to represent Defendant, Sztyndor had authored a "Compliance Letter" articulating the dos and don'ts related to one's activities in the healthcare industry so as to avoid coming under Government scrutiny and/or violating the anti-kickback and medical fraud statutes. Sztyndor disseminated this letter to her client and others whom she believed were under a common interest privilege protection.

11. Steve Sadow, Esq., was Defendant's lead trial counsel. He subsequently

hired Sztyndor as Defendant's healthcare specialist attorney shortly after Defendant was arrested in 2019 in order to formulate a healthcare defense to the related charges.

12.Sztyndor subsequently withdrew from the case a couple months before Defendant's trial as a result of infighting and egregious conflicts of interests that included compromising Defendant's defense by reporting Sadow's improper conduct to the Florda bar, disseminating privileged defense strategies to adverse third-parties as well as violating other ethical rules and criminal statutes associated with her representation of Defendant.

13.Subsequent to her withdrawal, she refused to testify on Defendant's behalf, imploding both Defendant's healthcare defense and any chances of challenging the integrity of the Government's case through allegations of Government suborned perjury falsely implicating Defendant's complicity in the charged offenses. Although Sztyndor ultimately withdrew from Defendant's case after approximately three-years of representation, the disciplinary hearing record reflects that she should have withdrawn shortly after she was hired in 2019.

14.On September 24, 2019, Defendant was indicted by a federal grand jury for a series of healthcare related offense. The wording of the indictment was almost identical to the wording in Sztyndor's Compliance Letter. Apparently, the Government had come into possession of the letter and used it to formulate an

indictment against Defendant. It is clear from the disciplinary hearing that, at that moment, Sztyndor became a potential witness in the case, she should have immediately withdrawn or been disqualified. Neither happened.

15. Instead, by October 2019—while already compromised by the Compliance Letter and related indictment of her client (the Defendant)—Sztyndor doubles down on her conflict by engaging ex parte communications with unindicted coconspirator Chris White for the purpose of calling White as a Defense witness or using the information gathered to impeach White in the event he became a Government witness.

16. The Defense team believed that the information gathered could severely damage the credibility of the Government's case as White was making serious allegations of prosecutorial misconduct, including coercing White to fabricate his involvement with Defendant and to falsely inculpate him. The problem, however, is that this conduct further subjected Sztyndor to disqualification. See also R. Regulating Fla. Bar 4-3.7(a)("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness on behalf of the client…"); ABA Model Rules of Prof'l Conduct R. 3.7(a) (2019) ("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness…").

17. Sztyndor's inappropriate professional relationship with White involved over

200 phone calls, 15-16 of which were secretly and illegally recorded—meaning on over two hundred distinct occasions, spanning a 3-year period, Sztyndor compromised herself personally and professionally, including as Defendant's attorney. When confronted by the ethics committee about the illegal and, apparently, criminal nature of the recordings under Florida law, Sztyndor claimed she was in Georgia at the time of the calls. Once the committee brought to her attention that Florida law actually governs where the person is located who is being recorded, she pivots and disingenuously states that White was not in Florida during any of the recorded calls, even though White's attorney swore he was in Florida and even though Sztyndor was not with White and had no idea where he was at the time of the recordings.

18.Her conflicts, included representing Defendant while consulting the defense of Chris White and secretly giving White Defendant's "privileged" defense strategies. Sztyndor did these things, admitting that she knew from the very beginning that White could be a witness for the Government and, because of that, she had a conflict.

19.But there was a more compelling conflict, prominently gleaned from the disciplinary hearing transcripts, that further contributed to Sztyndor going off the rails. She knew that use or disclosure of the White recordings would reveal her

questionable ethics and illegality in both secretly recording White as well as her attempts to influence Whites' cooperation with the Government.

20.Seeing the writing on the wall with Sadow's insistence on using the recordings, Sztyndor moved preemptively to save herself at the expense of Defendant by neutralizing the defense's ability to use that evidence. She reported Sadow's conduct to the Florida Bar. She withdrew from representing Defendant and revealed the existence of the tapes to Chris White's attorney as well as the Government, causing a cascade effect that ultimately pulled the plug on White being a witness for the Government as well as the recordings' usefulness to the defense. Sztyndor told White's attorney about the recordings mere minutes after she learned she was on the defense team's draft witness list. In fact, the disciplinary hearing transcripts reflect that Sztyndor explicitly admitted that she made a conscious decision to separate herself from Defendant and to abandon him in favor of her loyalty to White.

21.Further fallout from the Chris White debacle arose in court on two occasions. Once, on November 18, 2022, when the Court heard arguments on the admissibility of the White recordings and the other on November 21, 2022, when the Court heard further arguments on the matter. During both of those hearings, the record discloses a trial judge that was appalled and highly vexed by the actions

of Ms. Sztyndor but went no further to determine whether any other member of the defense team was involved or, in any other way, tainted by Sztyndor's misconduct.

22. Up until November 21, 2022 (the second hearing on the Chris White tapes), this Court was completely unaware of the chaos and attorney misconduct taking place within the defense team. While the Court was made aware, in a limited fashion, of Sztyndor's actions, it was left in the dark about the depth of the misconduct and the involvement of Sadow and the remaining defense team.

23. For example, when the trial judge presented Sadow with the opportunity to come clean about his involvement in the Chris White scandal, he failed to inform the Court that he not only directed Ms. Sztyndor to engage ex parte communications with Chris White but he also directed and orchestrated her to illegally record the conversations with him.

24. Even when being questioned under oath during his testimony at the first ethics hearing, Sadow refused to admit that he had both an ethical and legal obligation to tell the Court that he directed and orchestrated the ex parte communications and secret recordings of Chris White.

25. The damage that was done as result of counsels' conduct was irreversible. By the time Sztyndor withdrew, Defendant's right to conflict-free attorneys had been long and continually eviscerated and his fate had already been sealed by the misconduct.

26. In fact, the disciplinary investigation and resulting hearing uncovered a spiraling web of additional conflicts among the entire defense team. Sadow directed Sztyndor to record White without his knowledge. Sztyndor sent the recordings to Sadow and the rest of the defense team contemporaneously. When she asked if she could stop, Sadow said no. Sadow even instructed Sztyndor on the questions she should ask White. To the point, Sadow made both himself and Sztyndor witnesses in the case as early as October 2019, when he directed and orchestrated the Chris White communications and recordings. R. Regulating Fla. Bar 4-3.7(a)("A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness on behalf of the client…").

27. These acts squandered a critical tactical advantage when the defense lost the use of the Chris White evidence because of Sadow and Sztyndor's misconduct and conflict—a result brought on by Sztyndor's choice to protect herself and White's relationship with the Government as a cooperator as opposed to abiding by her constitutionally demanded loyalty to Defendant.

28. The defense team's internal and external conflicts and impermissible representation continued for years, including throughout the trial—from 2019 to 2022—only ending after Defendant was convicted, with a dilatory revelation that withdrawal was necessary.

29. Although Sztyndor's representation of Defendant ended before trial with her

withdrawal, a new even more damaging conflict arose with Sadow and the remaining defense team. The entire defense team knew that Sztyndor was not a lone or rogue operative in the Chris White misconduct. The disciplinary hearing transcript reveals that Defendant's entire defense team were all aware of their individual complicity and vulnerabilities related to the Chris White episode.

30. The moment the Court informed the defense team that it was going to start an investigation into the Chris White misconduct, none of them chose to withdraw from the case and/or inform the Court of their individual knowledge or complicity. Instead, they each chose to continue representing Defendant and to try his case to a verdict.

31. Once Sadow and the remaining defense team chose not yield to their constitutional and ethical obligation to mitigate the damage their conduct had done by informing the Court of their complicity in the White scandal and/or by withdrawing from the case, every single act or omission made by them during the trial in this case became suspect. This reality is highlighted by the ethics committee's aggressive stance on Sadow's responsibility to have informed the Court of his and the defense team's knowledge of and/or involvement in the Chris White scandal. It is exasperated by Sadow's own admission that the entire defense team was aware of communications and recordings and that it was him who orchestrated and directed the illegality

32.Upon reviewing the transcripts of the trial, the hearings regarding the Chris White scandal as well as the disciplinary hearing, a clear picture emerges of a hodge podge of death-blowing conflicts, misconduct and illegality by Defendant's defense team that evolved into a series of significant and fatal pulled punches at trial—triggered by the threat of prosecution when an incensed trial judge made an open court decision to initiate an investigation into the misconduct regarding defense activities related to Chris White.

33.In considering this Verified Proffer and the accompanying legal arguments of counsel, the totality of the record in this case, including exhibits, Defendant's Certification and any evidentiary hearing that may take place, a finding should be made that Defendant is entitled to a new trial or, at the very least, that he has presented a substantial question on his motion for a new trial.

34.I verify under penalty of perjury that the foregoing is true and correct.

Executed on November 5, 2026.

s/Isaac Wright, Jr.,
NJ Bar. No. 015092008
Hunt, Hamlin & Ridley
60 Park Place, 16th Floor
Newark, NJ 07102
iwright@hunthamlinridley.com
973-242-4471